UNITED STATES DISTRICT COURT
FOR THE
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| TERESA TODERO, as Special | ) | |
| Administrator of the ESTATE OF | ) | |
| CHARLES TODERO , | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | CAUSE NO. 1:17-cv-1698-TWP-MJD |
| CITY OF GREENWOOD, BRIAN | ) | |
| BLACKWELL, RENEE ELLIOT, | ) | |
| ELIZABETH LAUT, and AS-YET | ) | |
| UNIDENTIFIED GREENWOOD POLICE | ) | |
| OFFICERS | ) | |
| | ) | |
| Defendants | ) | |

## DEFENDANT BRIAN BLACKWELL'S
## MEMORANDUM OF LAW IN SUPPORT OF
## MOTION FOR SUMMARY JUDGMENT

Comes now Defendant, Brian Blackwell, by counsel, and hereby submits his

Memorandum of Law in Support of Motion for Summary Judgment.  The Memorandum of Law will

show that there are no genuine issues of fact, and that Defendant is entitled to judgment in his favor

as a matter of law.

## I.  STATEMENT OF MATERIAL FACTS NOT IN DISPUTE

On May 29, 2016 Charles Todero, Plaintiff's decedent, was causing disruption among

traffic on a busy street in Greenwood, Indiana.  (Deposition of Deborah McNaughton, pp. 13-14,

37).  Specifically, Todero was stepping out in front of traffic, causing motorists to slam on their

brakes to avoid hitting him.  (Deposition of Roger Poynter, pp. 12, 14, 42).  Due to the dangerous

situation Todero was creating, two motorists called 911 to report the problem.  (Deposition of Deborah McNaughton, pp. 10, 40-42, 45; Deposition of Roger Poynter, pp. 16, 54-55).

Despite the fact that Todero lived with his mother and brother, they had not seen or spoken to him for two (2) days and did not know where he was.  (Deposition of Teresa Todero, p. 43; Deposition of Aaron Crowe, p. 22).  Todero had been distraught since his father's death a week before, and had been drinking heavily that week.  (Deposition of Teresa Todero, p. 25; Deposition of Aaron Crowe, p. 21).  It appeared as though he might have been on his way towards a mental breakdown.  (Deposition of Teresa Todero, p. 202; Deposition of Aaron Crowe, p. 83).

Lieutenant Brian Blackwell responded to the 911 call, which had been reported as a mental subject trying to commit suicide.  (Deposition of Brian Blackwell, pp. 18, 29, 32). Blackwell has been a police officer with the City of Greenwood Police Department for many years.  (Deposition of Brian Blackwell, p. 7; Amended Complaint ¶ 13, Filing No. 25, at ECF p. 3; Blackwell's Answer to Amended Complaint ¶ 13, Filing No. 28, at ECF p. 2).  In that capacity, Blackwell interacted with Todero many times and became familiar with him. (Deposition of Brian Blackwell, p. 318; Amended Complaint ¶ 18, Filing No. 25, at ECF p. 4; Blackwell's Answer to Amended Complaint ¶ 18, Filing No. 28, at ECF p. 3).  Therefore, when Blackwell arrived at the scene, he recognized Todero as someone with whom he had a friendly relationship.  (Deposition of Brian Blackwell, p. 318; Deposition of Tyler Todero, pp. 28-29).

At first, Todero was sitting on the curb holding a Bible.  (Deposition of Brian Blackwell, p. 40).  Blackwell wanted to get Todero off the roadway and attempted to engage him, but Todero repeatedly claimed to be Jesus Christ and began walking away.  (Deposition of Brian Blackwell, pp. 42-45, 49).  After Todero moved toward traffic, Blackwell put a hand on Todero's

shoulder and told him to stop.  (Deposition of Brian Blackwell, pp. 51-52).   Todero did not stop,

so Blackwell warned Todero, "You're going to get tased."  (Deposition of Brian Blackwell, pp.

53, 55; Deposition of Holly Walters, p. 17).   At this point, Blackwell was concerned for his and

Todero's safety, as well as the obstruction of nearby traffic.  (Deposition of Brian Blackwell, pp.

104-105, 209-210).  When Todero continued to walk away, Blackwell deployed his taser at

Todero's back.  (Deposition of Brian Blackwell, pp. 54, 56).

After the taser was fired, Todero dropped to his knees in the street, raised his Bible, and

again declared, "I am Jesus Christ the Prophet."  (Deposition of Brian Blackwell, pp. 57, 62-63).

Blackwell ordered Todero to get on the ground with his hands behind his back.  (Id.).  Todero

again claimed to be Jesus Christ, and Blackwell warned him that he would be tased again.  (Id.).

Blackwell activated his taser a second time.  (Deposition of Brian Blackwell, p. 60-61).

The second activation had no effect.  (Deposition of Brian Blackwell, p. 63).  Todero

remained on his knees holding his Bible and claiming to be Jesus Christ.  (Id.).  Blackwell then

issued another warning and activated his taser a third time.  (Deposition of Brian Blackwell, p.

64-66).  Again, Todero remained on his knees holding his Bible.  (Deposition of Brian

Blackwell, pp. 57-60).

A passing motorist, Holly Walters, observed the situation and came back to see if she

could assist Blackwell, who had no back-up.  (Deposition of Holly Walters, pp. 21, 24).  Walters

arrived on the scene and was amazed at Todero's continued resistance to Blackwell's repeated

verbal commands and use of the taser.  (Deposition of Holly Walters, pp. 26-27, 33).

Blackwell became concerned that the taser was not achieving its desired effect, since it

should have caused neuromuscular incapacitation in Todero but did not.  (Deposition of Brian

Blackwell, pp. 57-60; Deposition of Holly Walter, p. 33).  Furthermore, the loud sound being

emitted from the taser when the trigger was pulled let Blackwell know that a good connection had not been achieved.  (Deposition of Brian Blackwell, p. 75).  When a taser arcs loudly it means the connection is not being completed.  (Deposition of Jason Holtzleiter, pp. 22-24).  The lack of a good connection was also obvious to back-up officers Elizabeth Laut and Renee Elliott once they arrived on-scene.  (Deposition of Elizabeth Laut, pp. 108, 218-219, 241; Deposition of Renee Elliott, p. 128, 130).  In short, given Todero's continued noncompliance, apparent lack of reaction to the intended tasing, and the loud noise being emitted from the taser, it appeared that the taser was not working.  (Deposition of Brian Blackwell, pp. 57-60, 75; Deposition of Renee Elliott, p. 128).

Todero was wearing a baggy t-shirt, and after failing to get a response from the third or fourth application of the taser, Blackwell noticed that one of the prongs from his taser was not making contact with Todero's body.  (Deposition of Brian Blackwell, pp. 69-72, 89).  He then approached Todero – who was still on his knees – and placed the taser just above Todero's calf.  (Deposition of Brian Blackwell, p. 71).  At that point, Todero fell prone on the ground with his hands under his body.  (Deposition of Brian Blackwell, p. 71-72, 93, 109).  With Todero on the ground, Blackwell continued to demand that Todero place his hands behind his back.  (Deposition of Brian Blackwell, pp. 81, 83, 97).  Todero did not comply with this command.  (Deposition of Brian Blackwell, p. 110; Deposition of Holly Walters, pp. 25-26; Deposition of Renee Elliott, p. 134).

When Officers Elizabeth Laut and Renee Elliott arrived on the scene, Elliott ran toward Todero on the ground, and Laut spoke with Walters.  (Deposition of Renee Elliott, pp. 112-114, 117-119; Deposition of Elizabeth Laut, pp. 195-196).  Blackwell continued to order Todero to put his hands behind his back and warning Todero: "Don't make me tase you again."

(Deposition of Renee Elliott, p. 119).  Todero continued to make loud, angry references to Jesus. (Deposition of Renee Elliott, pp. 120-121; Deposition of Elizabeth Laut, pp. 182, 187).  Todero was not yet under the officers' control.  (Deposition of Brian Blackwell, p. 205).

Todero was extremely strong, as he worked out regularly and was athletically gifted. (Deposition of Teresa Todero, p. 139; Deposition of Aaron Crowe, p. 77; Deposition of Tyler Todero, p. 24).  Blackwell knew that Todero liked to box.  (Deposition of Brian Blackwell, pp. 319-320).  The attempt to get him handcuffed was extremely difficult, and there was a concern for officers' safety if they were not able to secure his arms or his hands.  (Deposition of Elizabeth Laut, pp. 210, 241, 261; Deposition of Renee Elliott, p. 129).

At some point, Blackwell activated the taser again, and Todero lifted up enough for Elliott to grab his Bible and to place a handcuff on his right hand.  (Deposition of Renee Elliott, p. 129).  Before she could place a cuff on his left hand, Todero went back down on the ground with his arm tucked under his body, and the struggle continued.  (Deposition of Renee Elliott, pp. 151-152, 163-165).   It was not until Blackwell placed the taser against Todero's leg that they were able to secure both of Todero's hands.  (Deposition of Renee Elliott, p. 167).

Todero was continuing to struggle when emergency responders arrived on the scene, and the decision was made in the ambulance en route to the hospital to "chemically restrain" him. (Deposition of Ian Godfrey, pp. 25, 28-29, 31-35, 147-149).   Godfrey administered 5 milligrams of Versed, a sedative.  (Deposition of Ian Godfrey, p. 35).  Shortly after the Versed was administered, Todero went into cardiac arrest.  (Deposition of Ian Godfrey, pp. 40-41, 141).

Todero was resuscitated by the paramedic and emergency medical technicians in the ambulance, and was brought into the emergency room at St. Francis Hospital.  (Deposition of Ian Godfrey, p. 52).  Dr. Chris Hartman, the emergency room physician, treated Todero that day.

(Deposition of Chris Hartman, pp. 16-17, 31).  Hartman made clear to the emergency responders and Lieutenant Blackwell that the tasing had no causal connection to Todero's condition. (Deposition of Chris Hartman, pp. 41, 54-55).  In fact, Todero's medical condition was such that Hartman was confident Todero would have ended up in the emergency room within 24 hours, whether or not he had been tased.  (Deposition of Chris Hartman, p. 111).  Further, Hartman opines that given the type of cardiac event experienced by Todero and the duration of time between the tasing and the event, the tasing had no relationship to Todero's cardiac arrest. (Deposition of Chris Hartman, pp. 81-85, 95-96).  Ultimately, Todero died from multi-system organ failure caused by sepsis and associated with various other issues.  (Deposition of Chris Hartman, p. 103).

## II. LEGAL STANDARD

Summary judgment is an integral and important practice under the Federal Rules.  *See Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986) ("Summary judgment procedure is properly regarded as an integral part of the Federal Rules as a whole which are designed 'to secure the just, speedy and inexpensive determination of every action.'").  In fact, a motion for summary judgment must be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  Fed.R.Civ.P. 56(c); *Celotex*, 477 U.S. at 322.

When determining whether factual issues exist, a "court must view all the evidence in the light most favorable to the non-moving party."  *Black v. Henry Pratt Company*, 778 F.2d 1278, 1281 (7th Cir. 1985).  However, the mere existence of some factual dispute does not defeat a summary judgment motion; "the requirement is that there is a genuine issue of material fact."

6

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  For the fact to be material, it must relate to a disputed matter that "might affect the outcome of the suit."  *Id*.  For a dispute to be genuine, the evidence must be such that a "reasonable jury could return a verdict for the nonmoving party."  *Id*.

Thus, to successfully oppose a motion for summary judgment, the non-moving party must do more than raise a "metaphysical doubt as to the material facts."  *Matsushita Electric Industrial Company v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).  Rather, he "must come forward with 'specific facts showing that there is a genuine issue for trial.'"  *Id*. at 587 (quoting Fed. R. Civ. P. 56(e)).  "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial."  *Id*. (quotation omitted).  When undertaking this analysis, the court is "not required to draw every conceivable inference from the record.  [It] need draw only reasonable ones."  *Tyler v. Runyon*, 70 F.3d 458, 467 (7th Cir. 1995) (quotation omitted).

## III. ARGUMENT

A. **BLACKWELL IS ENTITLED TO QUALIFIED IMMUNITY FROM TODERO'S CLAIM OF UNCONSTITUTIONALLY EXCESSIVE FORCE BECAUSE IT WOULD NOT HAVE BEEN CLEAR TO A REASONABLE POLICE OFFICER IN SIMILARLY EVOLVING AND CONFUSED CIRCUMSTANCES THAT THE REPEATED USE OF HIS TASER WAS EXCESSIVE.**

When a police officer is accused of violating the constitutional rights of a suspect, he or she may raise the defense of qualified immunity, which "works to cut off what often would otherwise be legitimate calls for redress."  *Triad Assocs. v. Robinson*, 10 F.3d 492, 499 (7th Cir. 1993).  The goal is to facilitate "decisions made in the moment," *Gruenberg v. Gempeler*, 697 F.3d 573, 579 (7th Cir. 2012), by giving the police officer "breathing room to make reasonable but mistaken judgments about open legal questions."  *Ashcroft v. al-Kidd*, 563 U.S. 731, 743, 131 S. Ct. 2074, 2085 (2011).  Thus, a police officer is generally entitled to the defense "unless the plaintiff can show (1) that the official violated a statutory or constitutional right, and (2) that the right was clearly established at the time of the challenged conduct."  *Meadows v. Rockford*

*Hous. Auth.*, 861 F.3d 672, 675 (7th Cir. 2017) (internal quotation omitted).  Put most succinctly, the concept shields "all but the plainly incompetent or those who knowingly violate the law." *Malley v. Briggs*, 475 U.S. 335, 341 (1986).

Blackwell was not plainly incompetent because existing law did not give him a reason to believe that the manner in which he used his taser was unlawful under the uniquely confused and dangerous circumstances he confronted.  A brief observation about Plaintiff's characterization of the taser use is important here.  Plaintiff's position is that each of the 16 trigger pulls constituted excessive force.  (Filing No. 25, at ECF p. 6).  However, the evidence does not establish which of the 16 pulls actually made contact with Todero, and there is no way that the available evidence could establish such a fact.  (Deposition of Jason Holtzleiter, p. 100).  To the contrary, the evidence will show that Blackwell reasonably believed that he did not tase Todero 16 times.  This reasonable belief is part and parcel of the analysis, and it will add to the conclusion that it was not clearly established that Blackwell's specific use of force in the particular circumstances he faced was constitutionally excessive.  As a result, he is entitled to summary judgment as a matter of law.

1. **Summary judgment is the appropriate juncture at which to determine the qualified immunity defense.**

This case turns on whether or not Blackwell violated a clearly established right, and what is or is not "clearly established" is primarily a legal question appropriately decided in a summary judgment proceeding.  "The dispositive question is whether the violative nature of particular conduct is clearly established."  *Mullenix v. Luna*, ___ U.S. ___, 136 S. Ct. 305, 308 (2015) (internal quotation and emphasis omitted).  For a plaintiff to show that the conduct was clearly violative, she does not need a case analyzing the precise circumstances of this case, but she must be able to show that existing precedent has placed the constitutional question beyond debate.

*White v. Pauly*, ___ U.S. ___, 137 S. Ct. 548, 551 (2017).  In either case, the question is clearly a legal one: whether the law in the relevant jurisdiction has placed police officers on notice that they should not be engaged in the particular course of conduct at issue.  As discussed more fully below, the law in this jurisdiction was not so clear that Blackwell should have been notice that his conduct was constitutionally problematic.

Because the law had not clearly established the unlawfulness of Blackwell's conduct, summary judgment must be granted.  "One of the purposes of immunity, absolute or qualified, is to spare a defendant not only unwarranted liability, but unwarranted demands customarily imposed upon those defending a long drawn out lawsuit."  *Siegert v. Gilley*, 500 U.S. 226, 232, 111 S. Ct. 1789, 1793 (1991).  As the Supreme Court recently reminded lower courts, the goals of the qualified immunity defense are "effectively lost if a case is erroneously permitted to go to trial."  *White*, 137 S. Ct. at 551-52 (citing *Pearson v. Callahan*, 555 U.S. 223, 231 (2009)).

### 2. Existing precedent did not clearly direct Blackwell not to use his taser in the circumstances he confronted but instead would have led a reasonable officer to believe that the force used was not unconstitutional.

The relevant circumstances faced by Blackwell were kaleidoscopic, and there was no precedent that should have caused him to second guess the use of his Taser in this disorienting scene.  To be clear, Blackwell is aware that a taser can, under certain circumstances, constitute an excessive use of force.  It is certainly more than *de minimis* force, but it is also less than the force applied by an impact weapon.  *See Abbott v. Sangamon Cty.*, 705 F.3d 706, 726 (7th Cir. 2013) ("The use of a taser, therefore, falls somewhere in the middle of the nonlethal-force spectrum.").  It has also been clearly established for some time that excessive force may not be used to make an arrest, and it is well-known that significant levels of force against a non-resisting or a passively resisting suspect is excessive.  *See Alicea v. Thomas*, 815 F.3d 283, 291-

92 (7th Cir. 2016).  However, this high level of generality is not particularly helpful here.  *See White*, 137 S. Ct. at 552 ("Today, it is again necessary to reiterate the longstanding principle that clearly established law should not be defined at a high level of generality.") (internal quotation omitted).

In an excessive force case, a plaintiff must be more specific and is required to demonstrate that he had a "right to be free from the particular use of force under the relevant circumstances." *Abbott*, 705 F.3d at 725.  Very recently, the Supreme Court stressed the importance of this rule and reiterated that excessive force claims depend "'very much on the facts of each case,' and thus police officers are entitled to qualified immunity unless existing precedent 'squarely governs' the specific facts at issue." *Kisela v. Hughes*, ___ U.S. ___, 138 S. Ct. 1148, 1153 (2018).  Of course, the relevant precedent here is that which is set by either the Supreme Court or the Seventh Circuit, *see Werner v. Wall*, 836 F.3d 751, 762 (7th Cir. 2016), and neither court has decided a case involving the use of a taser that squarely governs the unique fact pattern presented by this case.

There is certainly authority that tends to support Blackwell's claim to qualified immunity. In *Abbott v. Sangamon Cty.*, *supra*, a police officer arrested and tased a troublesome 20-year-old man and his mother.  The son was handcuffed with his hands behind his back, and placed in the back of a police vehicle.  At some point, the son maneuvered his hands to the front of his body, and a struggle with the deputy ensued in the backseat.  During this struggle, the deputy used his taser on the son multiple times until the son stopped fighting.  The son sued the deputy and argued that multiple applications of the taser was an excessive use of force.  The Court of Appeals did not decide whether the force was excessive but instead concluded that the deputy was entitled to qualified immunity because it was not clearly established that the use of the taser

against the son was excessive under the circumstances. *Abbott*, 705 F.3d at 726.  First, the court endorsed the general rule "that the use of a taser against an actively resisting suspect either does not violate clearly established law or is constitutionally reasonable." *Id*. at 727.  Consequently, it was significant that the son admitted to struggling and even "overpowering" the deputy, *id*., and this led the court to conclude: "Insofar as [the son] continued to resist after the first tasing, [the deputy] did not violate clearly established law by using the taser in drive stun mode several more times until [the son] was subdued." *Id*. at 728.

In *Forrest v. Prine*, 620 F.3d 739 (7th Cir. 2010), a case cited in *Abbott*, the Seventh Circuit reached a similar conclusion after a police officer used a taser against a recently arrested detainee who refused to cooperate with a mandatory jailhouse strip search.  The detainee struck a police officer in the face during his arrest, and immediately before the taser strike, the detainee was yelling obscenities with clenched fists.  Moreover, this particular subject was a large man behaving unpredictably who was warned that the taser would be used if he failed to cooperate. Under these circumstances, the Court concluded that the use of the taser was reasonable.  *Id*. at 745.

Todero was behaving enough like the son in *Abbott* and the detainee in *Forrest* that Blackwell can be excused for not believing the use of his taser was excessive. Like the detainee in *Forrest*, Todero was a physically imposing person, he was acting unpredictably, and he did not respond to verbal cues or commands.  He also appeared to be under the influence of some substance, or at least in a highly agitated state.  In fact, Todero was walking back into the traffic that he had originally disrupted before Blackwell deployed the taser.  (Deposition of Brian Blackwell, pp. 51-52).  Thus, Todero was a danger to himself and posed a threat both to Blackwell, who initially had no backup, and to the motoring public.  Like the officer in *Forrest*,

Blackwell warned Todero that the taser would be used if Todero did not comply with verbal commands.  (Deposition of Blackwell, p. 55).  Just as the detainee in *Forrest* ignored the warning, Todero did not – or could not – heed Blackwell's warning.  Then, when Todero failed to respond to the initial use of the taser, he became more like the son in *Abbott*, which supports the application of qualified immunity to the additional trigger pulls that were designed to terminate Todero's resistance.  In *Abbott*, the son struggled with the deputy, and the deputy used his taser in drive stun mode, *i.e.*, placing the device against the body, multiple times until he ended the son's struggle.  Here, Todero was not fighting, but he continued to resist Blackwell's commands and would not allow Officers Elliott and Laut to apply handcuffs.  Thus, Blackwell, under the authority of *Forrest* and *Abbott*, could reasonably believe that the continued use of the taser was reasonable.

Of course, there is authority that suggests another conclusion, but this precedent is so tied to a unique set of facts that it is of little use here.  In addition to the suit by the son in *Abbott*, the mother also sued the deputy under § 1983, claiming an excessive use of force.  Her claim began when the deputy was trying to transport the son from the scene.  Obviously distracted by the son, the deputy backed his police vehicle into the mother's vehicle.  She was angered and approached the officer.  The deputy saw the mother approach.  He deployed his taser in response, and the mother fell to the ground.  While she lay on her back, the deputy ordered her to roll over.  When she did not move, the deputy deployed his taser a second time.

The mother argued that the second use of the taser was excessive.  The Court agreed and concluded that qualified immunity would not apply because it was clearly established that the second use of the taser constituted excessive force.  *Abbott*, 705 F.3d at 730-32.  The key to this holding was precedent directing officers not to use force on a subdued or passively resisting

suspect. *Id*. at 732.  Thus, the Court held, "[I]t is unlawful to deploy a taser in dart mode against a nonviolent misdemeanant who had just been tased in dart mode and made no movement when, after the first tasing, the officer instructed her to turn over."  *Id*.  *See Lewis v. Downey*, 581 F.3d 467, 479 (7th Cir. 2009) (finding that it was clearly established that a police officer could not use a taser on a suspect who was prone on his bed, weakened, and docile); *see also Cyrus v. Town of Mukwonago*, 624 F.3d 856, 863 (7th Cir. 2010) ("[O]nce [the suspect] was on the ground, unarmed, and apparently unable to stand up on his own, the risk calculus changed. Or so a jury might reasonably conclude.").  This is a very specific ruling, and it is not applicable to the scenario that Blackwell confronted.

In fact, Todero was nothing like the mother in *Abbott*.  He did not simply fall to the ground in a heap when first struck with the taser.  Todero was physically strong, and Blackwell knew him to be a boxer.  According to Blackwell, the initial taser shot simply prompted Todero to drop to his knees and raise his Bible.  Subsequent trigger pulls did not cause him to drop his Bible or stop talking.  All of this was inconsistent with a successful application of the taser, which would ordinarily render a person completely incapacitated.  Moreover, the taser was making a noise that indicated it was not completing a circuit.  That it was not making effective contact was confirmed when Blackwell eventually noticed that one of the taser probes was dangling from Todero's baggy t-shirt.  In other words, unlike the mother in *Abbott*, Todero had not clearly been tased in dart mode, rendered incapacitated, and then tased again.  It was not clear to what extent Todero was being tased at all, and he certainly was never incapacitated by any of the trigger pulls.  Thus, it cannot be said that *Abbott* clearly established that Blackwell's particular use of the taser was in violation of Todero's rights.

Because it was not clear that Blackwell's taser was having an effect, this case is more like the decision of the Sixth Circuit in *Sheffy v. City of Covington*, 564 Fed.Appx. 783 (6th Cir. 2014).[1]  In *Sheffy*, multiple police officers were confronted with facts analogous to those faced by Blackwell alone.  The officers in that case were confronted with a seemingly disturbed man standing more than 6 feet tall, weighing more than 400 pounds, and wearing heavy clothing. The officers ordered the man to show his hands and to get on the ground.  He did not comply, and began moving in the direction of one of the officers.  That officer deployed his taser, but the man barely registered the hit and actually tried to remove the prongs.  The taser was cycled a second time, and this too was ineffective.  A second officer then fired his taser into the man's neck.  This got the man's attention, but it did not subdue him or drop him to the ground.  It did afford the officers an opportunity to wrestle the man to the ground.  A five-minute battle to place the man in handcuffs ensued.  During this struggle, multiple officers used their tasers a combined eight times over a period of 47 seconds.  After being subdued and placed in handcuffs, the man exhibited signed of physical distress.  An ambulance was called, but the man stopped breathing and was pronounced dead at the hospital.

The district concluded that the use of the tasers was objectively reasonable, and the Sixth Circuit agreed.  *Sheffy*, 564 Fed. Appx. at 790-95.  There were many reasons for this conclusion, including the man's ongoing resistance.  *See, e.g., id*. at 792-93.  However, among the circumstances that led to the holding was the officers' reasonable belief that their tasers were not making a good connection with the man's body.  *Id*. at 792.  According to the court, this belief was reasonable both because it failed to induce the neuromuscular paralysis that is typical of a taser fired in probe mode and because of the man's thick clothing.  *Id*. at 791.  This reasonable

---

[1] The opinion in *Sheffy* was not recommended for publication.  However, the case was decided after 2007, so it would be appropriately cited in the circuit court.  *See* Fed. R. App. P. 32.1.

belief, combined with the fact that no taser was used after the man was subdued, led the court to conclude that the repeated use of the tasers did not constitute excessive force.

The similarities between *Sheffy* and the present case should weigh in favor of applying qualified immunity and granting summary judgment for Blackwell.  In *Sheffy*, the suspect was wearing thick clothing that prevented him from being incapacitated by repeated dart strikes from the officers' tasers.  In this case, Todero was wearing baggy clothing and Blackwell actually saw that the dart was not making full contact with his body, which would explain why Todero was similarly undeterred by the taser strike.  Thus, as in *Sheffy*, many of the repeated trigger pulls in this case can be explained by Blackwell's reasonable belief that he was not inflicting any – or at least very little – force each time he activated his taser.  To the extent he was mistaken about this, it was a reasonable mistake of fact.  *See Smith v. Ball State Univ.*, 295 F.3d 763, 771 (7th Cir. 2002) ("Although we accept as true the fact that Smith was not actively resisting, a reasonable officer who happened on the scene could reasonably misconstrue Smith's unresponsiveness as resistance requiring the minimal use of force.").  In any event, as the *Sheffy* court recognized, the repeated pulls under these circumstances could not be considered unreasonable force.  A similar result should obtain here.

In short, the precedent existing at the time of Blackwell's encounter with Todero did not clearly instruct Blackwell that he should not have pursued the course he chose to take in the heat of the moment.  At best, the cases have created a spectrum.  On one end, it is clear that an officer cannot use a taser on a subdued or passively resisting individual.  On the other end, it is equally clear that an officer may use a taser on an actively resisting individual.  This case falls somewhere in between.  Further, the evidence suggests that Blackwell was reasonably uncertain

about the amount of force that was being applied in the first place.  Such uncertainty makes this the paradigmatic case for application of qualified immunity.

**B.  BLACKWELL IS SHIELDED FROM LIABILITY BY THE INDIANA TORT CLAIMS ACT FROM THE CLAIMS ARISING UNDER STATE LAW.**

Blackwell is entitled to immunity from the state law tort claims for at least two reasons. First, the claims arise from a law enforcement function and liability for such claims is precluded by the Indiana Tort Claims Act ("ITCA").  Second, Blackwell was acting in the course and scope of his employment and is therefore personally protected from liability under the Act.  These issues are well suited for summary judgment because they are questions of law that are to be decided the Court.  *See Hershberger v. Kline*, No. 1:09-CV-198-TS, 2011 U.S. Dist. LEXIS 20504, at *31 (N.D. Ind. Mar. 1, 2011).

**1.   <u>Blackwell is entitled to law enforcement immunity.</u>**

Because Blackwell was acting in the scope of his employment and engaged in a law enforcement function, he is immune from Plaintiff's state law tort claims.  The Indiana Tort Claims Act states:  "A governmental entity or an employee acting within the scope of the employee's employment is not liable if a loss results from . . . [t] he adoption and enforcement of or failure to adopt or enforce . . . a law . . . unless the act of enforcement constitutes false arrest or false imprisonment."  Ind. Code § 34-13-3-3(8).  To determine whether this section provides immunity for a police officer, a court must first determine whether the officer was acting within the scope of his employment at the time of the alleged tort, "and, second, whether the officer was engaged in the enforcement of a law at that time."  *Harness v. Schmitt*, 924 N.E.2d 162, 165 (Ind. Ct. App. 2010).  The first question is easy to answer because the parties agree that Blackwell was acting within the scope of his employment.  (Amended Complaint ¶ 13, Filing

No. 25, at ECF p. 3; Blackwell's Answer to Amended Complaint ¶ 13, Filing No. 28, at ECF p.
2).  Therefore, there is no further need to address this prong of the immunity test.

The second prong of the test – whether Blackwell was engaged in enforcement of law at
the time of the incident – can also be answered in the affirmative.  Certainly, there is no dispute
that Blackwell was a law enforcement officer "attempt[ing] to compel the obedience of another
to laws, rules or regulations."  *Harness*, 924 N.E.2d at 167.  Moreover, the fact that Plaintiff
alleges intentionally tortious conduct does not change the analysis.  *See City of Anderson v.
Weatherford*, 714 N.E.2d 181, 186 (Ind. Ct. App. 1999) (concluding that an arrestee's claim of
intentional infliction of emotional distress was barred by the Tort Claims Act).  In short,
Blackwell is entitled to immunity from the state law tort claims pursuant to Indiana Code § 34-
13-3-3(8).

> **2.  Even if the court finds that general law enforcement immunity does not
> apply, Blackwell is individually entitled to immunity because he was acting in
> the course and scope of his employment.**

Blackwell cannot be held individually liable for any torts defined by state law.  "A
lawsuit alleging that an employee acted within the scope of the employee's employment bars an
action by the claimant against the employee personally."  Ind. Code § 34-13-3-5(b).  *See also
Miner v. Southwest School Corp.*, 755 N.E.2d 1110, 1114-15 (Ind. Ct. App. 2001), *trans. denied*.
The Indiana Supreme Court has determined that this section provides "a government employee
defendant … a complete defense: the action occurred within the scope of employment."
*Bushong v. Williamson*, 790 N.E.2d 467, 472 (Ind. 2003).  As another District Court has put it:
"If a plaintiff alleges that an employee was acting within the scope of his employment, . . . the
plaintiff is barred from bringing a state law tort claim against the employee personally unless the
governmental entity answers that the employee was acting outside the scope of his employment."

*Ocasio v. Turner*, 19 F. Supp. 3d 841, 860-61 (N.D. Ind. 2014). Plaintiff has specifically alleged that Blackwell was acting in the course of his employment, and both Blackwell and the City admitted that allegation. (Amended Complaint ¶ 13, Filing No. 25, at ECF p. 3; Blackwell's Answer to Amended Complaint ¶ 13, Filing No. 28, at ECF p. 2; City's Answer to Amended Complaint ¶ 13, Filing No. 31, at ECF p. 2). Therefore, Blackwell is entitled to summary judgment in his individual capacity on the tort claims arising under state law.

## IV.  CONCLUSION

Blackwell is entitled to the qualified immunity defense because it was not clearly established that his conduct violated Todero's rights. Therefore, he is entitled to summary judgment on the § 1983 claims as a matter of law. Moreover, the Indiana Tort Claims Act shields his law enforcement activities from tort claims arising under Indiana law.

WHEREFORE, Defendant, Brian Blackwell, by counsel, prays that this Court enter judgment in his favor and against Plaintiff, and for all other relief proper in the premises.

Respectfully submitted,

POLLACK LAW FIRM, P.C.

s/Caren L. Pollack
Caren L. Pollack Attorney No. 11897-49
*Attorney for Defendant, Brian Blackwell*

## CERTIFICATE OF SERVICE

I certify that a true and exact copy of the foregoing was filed electronically on July 13, 2018.   Notice of this filing will be sent to the following parties by operation of the Court's ECF system:

D. Samuel Heppell                    James S. Stephenson
Steven E. Art                        Mark A. Holloway
Jonathan I. Loevy                    Pamela G. Schneeman
Arthur Loevy                         STEPHENSON MOROW & SEMLER
LOEVY & LOEVY                        3077 East 98th Street, Suite 240
311 N. Aberdeen Street, 3rd Floor    Indianapolis, IN 46280
Chicago, IL 60607                    *Attorneys for Defendants, City of Greenwood,*
*Attorneys for Plaintiff*            *Renee Elliot, and Elizabeth Laut*


                                     s/Caren L. Pollack
                                     Caren L. Pollack


POLLACK LAW FIRM, P.C.
10333 N. Meridian Street, Suite 111
Indianapolis, Indiana  46290
Ph: (317) 660-4880
Fx: (317) 660-4888
cpollack@pollacklawpc.com

19