1

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

- - -

TERESA TODERO, as Special )
Administrator of the )
ESTATE OF CHARLES TODERO, )
)
          Plaintiff, )
)
    vs. )  Cause No.
)  1:17-cv-1698-TWP-MJD
CITY OF GREENWOOD, BRIAN )
BLACKWELL, RENEE ELLIOT, )
ELIZABETH LAUT, and AS-YET )
UNIDENTIFIED GREENWOOD )
POLICE OFFICERS, )
)
          Defendants. )

- - -

DEPOSITION

of IAN R. GODFREY, called pursuant to notice by
the Plaintiff under the applicable rules of
procedure, taken before me, Lindy L. Meyer, Jr., a
Notary Public in and for the State of Indiana,
County of Shelby, at the Law Resources Center,
170 North Jackson Street, Franklin, Indiana, on
Thursday, June 14, 2018 at 9:00 o'clock a.m.

- - -

FILLENWARTH REPORTING SERVICE
775 Hummingbird Lane
Whiteland, Indiana  46184
(317) 535-1607

**Page 22**

Mobile Data Console. The Mobile Data Console is a computer which runs a program, and in this case, Greenwood uses one called Spillman, and it gives you basic information about the call. It tells you where you're going, what you are going for, if there are any additional notes, like if the police have radioed into the dispatch center and said, "This is what's going on" and the dispatcher feels it's pertinent, they'll put it in the notes. It gives you your time stamps of when you get dispatched, respond, arrive, transport, et cetera.

Q. Do you know if that dispatch system is integrated with the Greenwood Fire Department, or at the time if it was integrated with the Greenwood Fire Department, the Spillman system?

A. Yes, it was.

Q. Okay. And was it also integrated with the Greenwood Police Department?

A. I -- I don't know.

Q. Okay. And just so I'm clear, the answer you just gave describing that, the dual dispatch system, that's based on your general memory of how the dispatch system worked at the time --

A. Yes.

Q. -- is that correct? And you know you

**Page 23**

would have been dispatched that way because that's how you were always dispatched, but you don't have a specific memory of being dispatched on May 29th?

A. Right. I mean the only two instances where that wouldn't be the case is, one, if the firehouse alerting system, or what we call the locution system, which is the overhead paging system in the firehouse, was not working, or if the Spillman system was not working at the time, which did -- I mean it's a computer technology. Occasionally they do updates and things like that, so occasionally it was down. But in terms of that specific day, I don't recall whether either system was running or down. I'm just explaining how we -- we're generally dispatched to calls.

Q. I appreciate that. Based on the description you gave of the dispatch, you would receive certain details about the nature of the call; is that correct?

A. Oh, again, it depended on what was available. Some calls were -- there were more details available, like if there was a police officer on-scene that had been involved in something, there would generally be more notes, because they would relay information to their

**Page 24**

dispatcher, who would relay it to our dispatcher, who would put it into our notes when we were dispatched. But, you know, if we were going to just a 911 call at a house, there would generally be very few notes. It would basically be address, chief complaint, and possibly age, gender, things like that.

Q. Do you have any memory of what details were included in the dispatch that you received on May 29th --

A. No --

Q. -- 2016?

A. -- I do not.

Q. What's the first memory you do have of your role in that incident that day?

A. My -- I mean my overall independent memory, I mean, is very, very vague. I remember responding to the call, I remember the general situation of the call, I remember some -- some things about the call, but again, they're very, very vague. And then I obviously remember the outcome of the call, but again, it's mostly -- it's mostly broad strokes, not finite details from my independent memory.

Q. Okay. What are those broad strokes that

**Page 25**

you have in terms of your independent memory?

A. So, I remember that there was a subject who had been tased and that he was lying on the ground when we arrived, that he was extremely uncooperative and agitated, despite being tased. We lifted him to the stretcher, we put him in the ambulance, he was -- he continued to be extremely agitated, combative, and so we ultimately administered a sedative to him, and then we were transporting him to the hospital, and shortly before our arrival at the hospital, he went into cardiac arrest.

Q. You stated that there was a subject who had been tased. Was that something that you remember learning before you arrived on the scene?

A. I don't recall.

Q. Okay. You might have learned it while you were on the way or it might have been something you learned after your arrival?

A. It's -- yes, it's possible we learned it on the way, either from dispatch over the radio or through the Mobile Data terminal on the Spillman program. It's completely possible, but I don't -- I don't recall off the top of my head.

Q. And you were not on the scene for any of

**Page 26**

1  the tases; is that correct?
2     A. That is correct.
3     Q. Okay. So, you have no first-hand
4  knowledge of why the police officer tased
5  Mr. Todero that day?
6     A. That's correct.
7     Q. And no first-hand knowledge of what he was
8  doing at the time that he was tased?
9     A. No.
10    Q. Okay.
11        MS. SCHNEEMAN: He -- to clarify the
12 record, you mean -- who is "he"?
13        MR. HEPPELL: Mr. Todero.
14    A. That's correct, I don't have any
15 first-hand knowledge of that, that's correct.
16    Q. Your -- you described the subject was
17 lying on the ground when you arrived?
18    A. Yes.
19    Q. And so we're clear, that subject you're
20 referring to, that's Mr. Todero; is --
21    A. Yes.
22    Q. -- that correct?
23    A. Yes.
24    Q. Do you recall any -- any more detail in
25 terms of his appearance and position when you

**Page 27**

1  arrived beyond that he was lying on the ground?
2     A. Not off the top of my head.
3     Q. Okay.
4     A. I would think -- I know you would think
5  after reviewing the chart as many times as I have
6  recently, I would remember, but I just came off my
7  shift. I don't remember off the top of my head.
8     Q. No, that's --
9     A. I'm sorry.
10    Q. -- that's -- that's fine. And again, if I
11 understand your answer, it sounds like you -- you
12 believe that information to be recorded in your
13 report?
14    A. Yes.
15    Q. And that's --
16    A. Yes.
17    Q. -- that's something we're going to look
18 at.
19    A. Okay.
20    Q. But in terms of -- I guess what I'm
21 interested in most right now is not your ability
22 to remember what's in the report in terms of what
23 you've read recently, but actually casting your
24 mind back to that day, so --
25    A. In that case, I don't -- I don't recall.

**Page 28**

1     Q. Okay. Are there any details, again, at
2  this time casting your mind independently back to
3  that day, about Mr. Todero's appearance, physical
4  appearance, upon your arrival beyond that you
5  remember he was lying on the ground?
6     A. I don't recall.
7     Q. The -- the next thing you describe, sort
8  of going through those broad strokes that you
9  remembered, was Mr. Todero being extremely
10 uncooperative and agitated?
11    A. Yes.
12    Q. What do you remember, again, you know,
13 casting your mind back independently to that day,
14 in terms of the specifics of his behavior?
15    A. Independently, not much that I can recall.
16    Q. Is there anything independently that you
17 can recall in terms of his behavior that sort of
18 leads you --
19    A. I'm trying to -- I'm trying to kind of
20 draw -- I'm trying to put -- those why I'm kind of
21 squinting my eyes, is I'm trying to kind of hone
22 myself in to remember that. Oh, gosh. No, I
23 don't -- I don't remember.
24    Q. Okay. That's no problem. You described
25 the next step is lifting him up onto the

**Page 29**

1  stretcher. Again, do you have any independent
2  memory of how that process went?
3     A. No.
4     Q. Okay. Just a memory that that's something
5  that happened?
6     A. Yes.
7     Q. Okay. And then in terms of the process
8  of, you know, getting him into the back of the
9  ambulance, any memory of that process?
10    A. We were concerned about keeping him on the
11 stretcher because of how he was thrashing around.
12    Q. Do you -- so, you remember being
13 concerned?
14    A. Yes, I remember that we had at least one
15 person on either side of him to make sure he
16 didn't tip the stretcher or fall off.
17    Q. Do you -- again, casting your mind back as
18 you're sitting here today, do you have a memory of
19 his behavior in terms of that thrashing around?
20    A. Can you clarify that question?
21        MS. SCHNEEMAN: Well, he just said he
22 was thrashing around --
23    Q. Well --
24        MS. SCHNEEMAN: -- so he obviously
25 remembers it.

**Page 30**

1  Q. Well, if I understood your answer, you
2  stated that you remembered being concerned about
3  him thrashing around --
4  A. Right.
5  Q. -- is that correct?
6  A. Right.
7  Q. Do you also remember -- you know, you can
8  cast your mind back and remember him thrashing
9  around? Is that something you can independently
10 remember?
11 A. Yes.
12 Q. Can you describe how Mr. Todero was
13 thrashing around?
14 A. Not specifically, no.
15 Q. Okay. The details of that you just don't
16 remember?
17 A. I -- yes, that's correct.
18 Q. Was this -- the thrashing around that you
19 do remember, was that after -- before Mr. Todero
20 was placed on the stretcher, was it after he was
21 placed on the stretcher but before he was put in
22 the back of the ambulance, or was it after he was
23 in the back of the ambulance, or some combination
24 of those?
25 A. A combination of all of them. The reason

**Page 31**

1  we lifted him from the ground to the stretcher,
2  usually as would be the case is we would stand the
3  patient up, have them get on the stretcher, and
4  that's obviously the preferred way of doing
5  things, but he was so uncooperative and -- that we
6  had to lift him up and get him on the stretcher.
7  We used to use the term "combative," but we don't
8  use that term anymore. We use the term
9  "uncooperative." That's the preferred term now.
10 Q. Okay. What -- is that -- when you say,
11 "We used to use [that] term" and it being "the
12 preferred term," is that something through your
13 specific employer, or through the paramedic field
14 more broadly?
15 A. It's something that's being taught
16 nationally, that there's a change in thinking.
17 Q. Okay. Do you know the reason for that
18 change?
19 A. I learned it at the time, but I don't
20 recall what --
21 Q. Okay.
22 A. -- the reason is.
23 Q. So, would it be fair to say that if you
24 were -- if this same incident were to happen today
25 and you were to be writing your reports describing

**Page 32**

1  the same incident, you'd use the word
2  "uncooperative" to describe Mr. Todero's behavior?
3  A. That's correct.
4  Q. Okay. Do you, again, independently,
5  remember any of the details in terms of in what
6  ways he was uncooperative?
7  A. Like I said, I just remember he was
8  thrashing around and we were concerned about that,
9  and I remember he was very vocal. I don't
10 remember the contents of what he was saying, I
11 just remember he was yelling.
12 Q. Okay. And again, not to split hairs, but
13 it sounds like you don't remember the specific
14 words he used; would that --
15 A. Right.
16 Q. -- be fair to say? Setting aside the
17 specific words, do you remember any, you know,
18 general information about what he was saying in
19 terms of the topics or subject matters of what he
20 was saying?
21 A. No, I don't.
22 Q. Okay. So, fair to say the only thing you
23 remember about what Mr. Todero was saying is that
24 he was vocal?
25 A. Yes.

**Page 33**

1  Q. But in terms of the actual contents, no
2  memory at all of that?
3  A. That's correct.
4  Q. Okay. You -- you stated that you remember
5  administering a sedative; is that correct?
6  A. Yes.
7  Q. What do you remember about administering
8  the sedative?
9  A. In terms of what?
10 Q. Well, let me break that down, then. Do
11 you remember why you administered the sedative?
12 A. Well, the reason for administering a
13 sedative is a concern for -- that the patient is a
14 harm to themself [sic] or others. That's the
15 reason. So, I must have believed that that was
16 the case in Mr. Todero's case.
17 Q. Do you specifically remember what
18 Mr. Todero was doing or why you believed he was
19 potentially a harm to himself or others?
20 A. As I stated, he was thrashing around on
21 the stretcher. That causes a number of concerns.
22 In the ambulance, obviously somebody has to be
23 secured in an ambulance. There are state
24 requirements that require five-point harnessing of
25 all patients in the ambulance, three -- one on the

**Page 34**

legs, one on the mid-section, one on the torso, and then two shoulder harness straps. And obviously we want to keep the patient on the stretcher.

And then also there are concerns that they could hit thems -- hit their head on other things in the ambulance. There are sharp metal edges along the bench seats and things like that. They can cause -- they can cause musculoskeletal injuries. People have fractured their wrists before. There are -- the number of reasons -- ways that they could be harmful to themselves in thrashing around are just numerous. It just -- it's a safety issue for the patient.

Q. Was there anything that Mr. Todero was doing that caused you concern that he would cause harm to others?

A. I don't believe so. I don't -- I don't believe so.

Q. Okay. So, was -- the concern for potential harm to himself was what caused you to administrative the sedative?

A. That's correct.

Q. Do you remember the dose of the sedative that you administered?

**Page 35**

A. Five milligrams.

Q. Okay. And what the specific sedative that you used?

A. I used midazolam, or known by its brand name, Versed.

Q. And do you remember physically the process of administering that sedative to Mr. Todero?

A. No, I do not.

Q. Is -- in term -- strike that. Are there different doses of sedative or types of sedative that you can administer?

A. As a Paramedic, we follow medical direction protocols that are established through the county that we work in. The standard sedative dose of Versed is five milligrams, and that's what we use. Now, with the emergence of some of these drugs which cause people to be more violent and agitated and things like that, we've actually switched to ketamine, but that was not on the ambulance at the time of Mr. Todero's incident.

Q. So, would it be fair to say both the type of sedative and the dose of sedative that you administered to Mr. Todero was standard at the time?

A. Yes.

**Page 36**

Q. Okay. How -- how often during your career as a Paramedic have you -- would you estimate that you've administered a five-milligram dose of Versed to a patient?

A. Oh, gosh. I don't know. I mean hundreds, maybe upwards of a thousand. I don't know. It's a fairly -- it's a fairly common thing, because you don't only use it for situations where the patients are agitated and uncooperative, you use it for seizures, you use it for sedation following advanced airway procedures, following cardiac procedures. I mean there is -- there are a slew of situations which you use it for other than just this particular situation, so I mean I couldn't even venture a guess at how many times.

Q. Your best estimate would be hundreds, if not over a thousand --

A. Yes.

Q. -- during your career?

A. Yes.

Q. Okay. So, would it be fair to say that while it's not something you would do on a majority of runs, it's certainly not an uncommon -- not an uncommon part of your job?

A. That's correct.

**Page 37**

Q. Okay. Do you remember independently any of the details of Mr. Todero's medical condition prior to administering the Versed?

A. In terms of?

Q. Well -- and I guess in terms of either specific vital signs or even observations of his physical appearance that, to you, seemed medically relevant.

A. Okay. So, we were unable to obtain a blood pressure due to the level of agitation that he was in, and beyond that, I -- I don't recall his medical condition.

Q. So, you recall that you were not able to get a blood pressure level?

A. That's correct.

Q. Do you recall specifically what he was doing that prevented you from obtaining that reading?

A. No, I do not.

Q. Okay. And again, independently, do you recall any other vitals prior to administering the Versed?

A. No, I do not.

Q. What about any sort of qualitative rather than quantitative characteristics that might have

**Page 38**

1  been relevant to his medical condition in terms of
2  his appearance?
3      A. I don't recall independently.
4      Q. Okay. What about after you administered
5  the sedative; do you recall any change in
6  Mr. Todero's behavior or demeanor after you
7  administered the sedative?
8      A. Yes. So, as expected, he became sedated.
9      Q. And when you say "sedated," can you
10 clarify a little bit what you mean by that?
11     A. So, he was still speaking, but he was no
12 longer thrashing around. He -- I remember that at
13 that point I had moved over to -- I had moved from
14 the position on the bench seat on the passenger's
15 side over to the bench seat on the driver's side
16 because of the way he was positioned. As he was
17 handcuffed, his arms were on the -- facing the
18 passenger -- or the driver's side, excuse me --
19 and so, I had switched over there, because at that
20 point I was going to start an I.V. on him.
21     Q. Do you remember why you were going to
22 start an I.V. on him?
23     A. It's just standard procedure. You know,
24 any -- any advanced life support call, especially
25 when you administer a medication, you know, it's

**Page 39**

1  just -- it's just standard practice to start I.V.
2  access.
3      Q. What's the -- what's the purpose of the --
4  of establishing the I.V. access?
5      A. So, I.V.'s are established in case you
6  need to give fluids, so I.V. fluids, in case their
7  blood pressure's low or something like that, or in
8  case you have to administer medications.
9      Q. So, there's a -- I guess would it be fair
10 to say there's a variety of steps you might want
11 to take in terms of providing medical care in the
12 back of the ambulance, and the I.V. access is kind
13 of the -- provides access to taking several
14 different steps that might arise during the course
15 of a call?
16     A. Yes.
17     Q. Okay. Do you recall if you had initially
18 attempted to establish the I.V. access prior to
19 sedating him, or only after you'd administered the
20 Versed?
21     A. I don't independently recall.
22     Q. Okay. Do you recall the period of time --
23 well, strike that. Do you recall how much time
24 passed between administering the Versed and
25 observing the change in Mr. Todero's behavior,

**Page 40**

1  that he was still speaking but no longer thrashing
2  around, as you described it.
3      A. No, I don't recall.
4      Q. Okay. Do you recall how long after
5  getting in the back of the ambulance with
6  Mr. Todero it was before you administered the
7  Versed?
8      A. I do not recall.
9      Q. Other than the change in his condition
10 that you just testified to in terms of a change in
11 his physical behavior, if not his vocalizations,
12 are there other changes in Mr. Todero's condition
13 that occurred prior to your arrival at the
14 hospital that you independently recall?
15     A. Yes. So, when I -- when I'm in the back
16 of the ambulance, the cardiac monitor is generally
17 on the far side of the patient so I can keep
18 direct line of sight with it, to monitor the
19 patient's condition. Just every time I look up, I
20 can take a quick look and say, "Okay. Things are
21 going well."
22         And then, so as I said, I shifted over to
23 the other side to attempt I.V. access, and I
24 noticed that his heart rate had dropped
25 dramatically, and then I -- I don't independently

**Page 41**

1  recall any kind of -- everything that hap -- the
2  order in which everything happened, but he went
3  into -- he eventually went into cardiac arrest.
4      Q. And when you say "cardiac arrest," can you
5  be -- are you able to be a little more precise in
6  terms of what you mean in this case?
7      A. His heart stopped.
8      Q. Okay. And if I understood your answer,
9  you don't -- would it be fair to say you don't
10 independently recall the specific details around
11 the order of events leading to that heart
12 stoppage?
13     A. That's correct.
14     Q. Okay. You stated at the beginning part of
15 your answer that you recall noticing on the heart
16 monitor that his heart rate had dropped?
17     A. Yes.
18     Q. Do you have any memory of an approximate
19 quantification of that in terms of what his heart
20 rate had been previously and what you observed it
21 to be?
22     A. So, I know it was high initially. I
23 believe it was in the 130's, but I don't
24 completely recall, I just remember that it was
25 high, and then I remember it went extremely low,

**Page 50**

1    other --
2         (Cell phone rang.)
3    Q. -- monitors that were giving you any sort
4    of quant -- quantitative readings about
5    Mr. Todero's condition, other than the heart rate
6    monitor?
7    A. I don't recall.
8         MR. HEPPELL: Do you want to take a
9    break now?
10        MS. POLLACK: That was my five-minute
11   reminder, so if you have a couple more --
12        MR. HEPPELL: Yeah, I'll ask just a
13   couple more, and then --
14        MS. POLLACK: Okay.
15        MR. HEPPELL: -- we can go off.
16   Q. Other than the change in his breathing
17   that you recall and the drop in his heart rate
18   that you recall, are there -- were there any other
19   changes in his condition or appearance that you
20   recall that caused you concern beyond those two?
21   A. Not that I can recall.
22   Q. Okay. Do you recall how much -- how much
23   time passed between administering the sedative and
24   first observing a change that you perceived to be
25   concerning, whichever one, you know, came first?

**Page 51**

1    A. I don't recall.
2    Q. Okay. Do you recall -- well, you
3    testified earlier that eventually he went into
4    cardiac arrest, and clarified for me that you
5    meant that his heart rate stopped.
6    A. Yes.
7    Q. Dropped -- it was a zero heart rate; is
8    that correct?
9    A. Yes.
10   Q. Is that referred to as asystole?
11   A. Yes.
12   Q. Okay. Do you recall how much time passed
13   between first noticing the changes in condition
14   that you perceived to be concerning and the
15   cardiac arrest?
16   A. I don't recall.
17        MR. HEPPELL: Why don't we go off the
18   record and take a break?
19        MS. POLLACK: Okay.
20        (Recess taken.)
21   Q. Mr. Godfrey, before we took a break, we
22   were talking about the change in Mr. Todero's
23   condition, which ultimately led to him going into
24   cardiac arrest and asystole. Do you recall what
25   steps you took when Mr. Todero's heart stopped?

**Page 52**

1    A. So, we were ventilating him with a bag
2    valve mask, which is what we use to ventilate
3    people who are either not breathing or not
4    breathing adequately, and we were pulling into the
5    ambulance bay at St. Francis when that all
6    transpired, and so, we immediately began CPR on
7    him, chest compressions.
8    Q. When you say, "we were ventilating him
9    with a bag...mask...[we started] chest
10   compressions," are you referring to yourself and
11   the individuals who you had in the back of the
12   ambulance as well?
13   A. That's correct. I can't -- I believe --
14   actually, no. Strike that. I know for a fact
15   that Tiffany was driving, because it was AMR's
16   company policy that no one except company
17   employees were allowed to drive the ambulances, so
18   Tiffany was driving, and I had at least two
19   firefighters in the back with me. One of the
20   firefighters was ventilating Mr. Todero, and the
21   other one initiated chest compressions.
22   Q. What was -- what was your role and what
23   steps were you taking after Mr. Todero's heart
24   stopped?
25   A. Like I said, we were pulling into the

**Page 53**

1    ambulance bay. I was basically directing the
2    resuscitation attempt. At that point, it did not
3    make sense to continue trying to establish
4    vascular access and things like that. It made
5    more sense to get him into the hospital since we
6    were parked in the ambulance bay. So, Tiffany
7    went in and alerted the staff, who came out and
8    assisted us in getting Mr. Todero into the
9    emergency room.
10   Q. Do you have an independent recollection of
11   transporting Mr. Todero out of the back of the
12   ambulance and into the emergency room?
13   A. No.
14   Q. Okay. Do you have an independent
15   recollection of what happened after -- well,
16   strike that. Did you go with Mr. Todero from the
17   ambulance into the emergency room?
18   A. Yes.
19   Q. Okay. What's the first thing you
20   independently remember after arriving in the
21   emergency room?
22   A. I mean I -- I honestly don't have any
23   independent recollections of exactly what
24   transpired. I know procedurally what transpires
25   after every call when I bring someone into the

**Page 138**

1  other -- were there any other ways in which you
2  perceived an unintentional threat towards you?
3     A. Well, I mean someone -- you're in a very
4  small enclosed space when you're in an ambulance.
5  There's a very limited space between the stretcher
6  and the bench seat, so in the process, if the
7  person were to flip themselves off the stretcher
8  and you were in the way, it could injure you. I
9  mean there are any number of ways that, you know,
10 he could -- he could head butt somebody if he's
11 trying to put his -- you know, bounce his head off
12 thing -- or I shouldn't say "trying" -- if he is
13 bouncing his head around and -- you know, he could
14 head butt somebody. I mean there are any number
15 of ways that he could be a danger to others in
16 this situation.
17    Q. I guess let me -- so, let me phrase it
18 this way: Other -- other than him coming into
19 contact with someone or causing an injury to
20 someone as a result of those body movements --
21 strike that. Let me ask it a different way. At
22 any point in time on May 29th, 2016, did you
23 perceive any intentional threat from Mr. Todero
24 towards you?
25    A. No.

**Page 139**

1     Q. Did you perceive any intentional from
2  Mr. Todero towards anyone else?
3     A. No.
4     Q. Did you perceive any intentional threat
5  from Mr. Todero towards himself?
6     A. No, not intentional, no.
7     Q. I think I'm going to have you turn to
8  Exhibit 1, only because my recollection is that
9  the EKG --
10    A. Yes.
11    Q. -- is more legible, slightly more legible,
12 on that one.
13    A. Okay.
14    Q. I guess they're maybe pretty similar. Can
15 you just -- well, anyway, on Exhibit 1 it's
16 reproduced at Todero 420.
17    A. Uh-huh.
18    Q. We're looking at the same page?
19    A. Yes.
20    Q. Can you just help me understand what this
21 chart or graph represents?
22    A. It just represents his EKG strip. This
23 represents the sinus tachycardia that I was
24 talking about.
25    Q. Okay. So, this is an EKG strip reflecting

**Page 140**

1  the entry at 12:14?
2     A. 12:08, I think it was.
3     Q. 12:08 p.m. --
4     A. Yeah.
5     Q. -- where he had a slightly elevated -- he
6  had an elevated heart rate in addition to sinus
7  tachycardia?
8     A. Yes.
9     Q. Was there an EKG strip created for other
10 moments during the -- during the course of the
11 treatment in the ambulance?
12    A. No, unfortunately, there wasn't. So, the
13 way that the monitors work, the Life Pack 15 that
14 we used in Greenwood, so the way that it works is
15 when you apply it to the patient, it acquires an
16 initial rhythm and it automatically captures that
17 and saves that as part of the patient record.
18 Anything subsequent to that, you have to manually
19 prompt it to record. So, by the time I recognized
20 the type of distress he was in, I was more
21 concerned with getting my hands on him to treat
22 him than recording it on the monitor.
23    Q. Do you -- do you have any recollection of
24 the, I guess, specific wave form that you -- that
25 you observed at any later point subsequent to the

**Page 141**

1  EKG strip that's preserved here?
2     A. No, other than the -- other than the rate
3  that I -- that I noted.
4     Q. Okay. Do you recall one way or the other
5  whether there was anything abnormal about the wave
6  forms subsequently, beyond the -- beyond the rate
7  that you observed?
8     A. No. I marked here that it was -- that he
9  had a regular pulse, so it wasn't irregular, but I
10 don't make a notation as to whether it was wide or
11 narrow or anything of that nature, so --
12    Q. And this was happening relatively quickly,
13 and as you just stated, your primary focus at that
14 point was not on observing the monitor, but on
15 working on the patient; fair to say?
16    A. Yeah, absolutely. Well, not that I wasn't
17 looking at the monitor, but I wasn't trying to --
18 I wasn't prompting the monitor to record. I
19 was --
20    Q. Right.
21    A. -- you know, I was focused on the fact
22 that he was going -- I mean this happened within a
23 matter of two minutes while we were arriving in
24 the ambulance bay at the hospital, so, you know,
25 we were trying to get equipment out to ventilate

**146**

1  Q. So, I'll just make that bigger for you,
2  and it's the four minute and 15 -- actually, no,
3  I'm going to go back a little bit farther, because
4  I think that might be -- I'm going to go back
5  to -- let's do three minutes and 30 seconds?
6  A. Uh-huh.
7  Q. And I might stop it and ask you some other
8  questions, but my -- the question I'm asking right
9  now is just for you to let us know when you see
10  him on the video --
11  A. Okay.
12  Q. -- behaving in the way that you identified
13  in your report as extremely combative.
14  A. Uh-huh.
15         (Video played.)
16  A. So, I mean right there he's starting to --
17         (Video stopped.)
18  A. -- he's starting to get agitated, but he
19  has three firefighters holding him down, at least,
20  and that's not showing if there's somebody down on
21  his legs as well.
22  Q. Okay.
23         MS. SCHNEEMAN: And that's at what
24  time?
25         THE WITNESS: 5:28.

**147**

1  Q. Okay. So, this is one of the moments that
2  you're referring to in your report when you're
3  describing him as extremely agitated --
4  A. Yes.
5  Q. -- or extremely combative, I should say?
6  A. Yes.
7  Q. Okay. All right. And you'll let me
8  know --
9  A. Uh-huh.
10  Q. When we get to another one?
11         (Video played.)
12  A. I mean he's continuing to resist. Like I
13  said, he's got at least three people on -- I mean
14  they're putting their full body weight on him.
15  They're putting their full body weight on him.
16    So, right there you can see that -- the
17  firefighter who's laying on him keeping him --
18         (Video stopped.)
19  A. -- down because he's resisting and --
20  Q. Okay.
21  A. -- he's getting combative.
22         MS. POLLACK: Tell us the time, will
23  you?
24         THE WITNESS: Oh, I'm sorry; 6:37.
25         MS. POLLACK: Okay.

**148**

1  Q. So, this is another moment you're
2  identifying him in the video as what you -- as
3  this being what you described in your report as
4  extremely combative?
5  A. Well, again, he's got his hands cuffed,
6  he's got three firefighters on him, and I can't
7  tell if there's a police officer down there, so
8  you wouldn't be able to tell that he's being
9  extremely combative because you're not there
10  trying to hold him down while he's bucking up
11  against you.
12  Q. And at this moment in the video that we're
13  watching, you're not trying to hold him down;
14  correct? It's the firefighters?
15  A. I don't believe I am. I look like I'm
16  standing up.
17  Q. Okay. So, he wasn't bucking up against
18  you personally?
19  A. No, not against me personally, no.
20         (Video played.)
21  A. So, there he's tensing up again --
22         (Video stopped.)
23  Q. All right.
24  A. -- 7:44.
25  Q. And that's another moment that you would

**149**

1  identify as extremely combative?
2  A. Like I said, this video does not capture
3  the fact that there are multiple people on him,
4  that -- multiple strong people on him, holding him
5  down to stop resisting against it. That's the
6  part that's missing out of this video.
7         (Video played.)
8  Q. And I'm going to stop the video --
9         (Video stopped.)
10  Q. -- because at this point it doesn't show
11  anything --
12  A. Okay.
13  Q. -- further of your interactions with
14  Mr. Todero. So, I've stopped playing the video at
15  nine minutes and 17 seconds.
16         MS. POLLACK: Who's the man in the
17  hat; do you know?
18         MS. SCHNEEMAN: If I saw it, I could
19  tell you, but I don't remember.
20         MS. POLLACK: Who was the man in the
21  hat; do you know? Which one's got the hat on?
22         MS. SCHNEEMAN: I can tell you if I
23  saw it.
24         MR. HEPPELL: I think it's Venne.
25         MS. POLLACK: Is it Venne? Because I