LOUISVILLE  LEXINGTON  LONDON  FLORENCE  CINCINNATI  INDIANAPOLIS  ORLANDO  JACKSONVILLE  TAMPA



# KENTUCKIANA
## COURT REPORTERS

# CASE NO. 1:17-cv-1698-TWP-MJD

# TERESA TODERO, AS SPECIAL ADMINISTRATOR

# OF THE ESTATE OF CHARLES TODERO

# V.

# CITY OF GREENWOOD, BRIAN BLACKWELL, RENEE ELLIOT,

# ELIZABETH LAUT, AND AS-YET UNIDENTIFIED

# GREENWOOD POLICE OFFICERS

## DEPONENT:

## DR. CHRIS HARTMAN

## DATE:

## APRIL 3, 2018


a courtroom powerhouse

schedule@kentuckianareporters.com
877.808.5856 | 502.589.2273

www.kentuckianareporters.com

Page 14

1   Q   Okay. So when did you join Saint Francis?
2   A   It would have been in 1998.
3   Q   Okay. And so you've been at Saint Francis
4   from 1998 to the present?
5   A   Yes.
6   Q   Okay. Full time?
7   A   Yes.
8   Q   The entire time?
9   A   Yes.
10  Q   Okay. Any additional employment outside of
11  working for Saint Francis during that period of time?
12  A   Yes. I worked at Methodist in the emergency
13  department picking up occasional teaching shifts.
14  Q   When did that start?
15  A   I don't recall.
16  Q   Is it something that continues to be ongoing?
17  A   No.
18  Q   Okay. Do you recall when it -- when was the
19  last time that you did that?
20  A   When my daughter was born. The fourth kid, it
21  was time to quit.
22  Q   And what year was that?
23  A   Oh, that's mean. 1998.
24  Q   Any other full or part-time medical employment
25  during that period of time that you were working for

Page 15

1   Saint Francis?
2   A   Did some moonlight shifts for another
3   hospital. Let's see. I don't even know if it's still
4   in existence here in town, but I only did three or four
5   shifts there.
6   Q   Okay.
7   A   The DO hospital, Westview.
8   Q   Where is that located?
9   A   Here in Indianapolis.
10  Q   Can you describe generally what the residency
11  in emergency medicine consists of, primary areas of --
12  A   Exposures to a vast collection of experience
13  for, which you'd then be able to handle emergencies that
14  are common to those areas including cardiology,
15  intensive care, trauma, trauma intensive care, medicine,
16  pediatrics, OBGYN, toxicology, EMS.
17  Q   And when you joined Saint Francis in 1998, you
18  joined -- what was your position?
19  A   As a staff emergency physician.
20  Q   Okay. What is your position currently?
21  A   The same.
22  Q   Has it been the same throughout that period?
23  A   Yes.
24  Q   I'm not sure if you know this, but are you
25  able to tell me how many admissions the Saint Francis

Page 16

1   emergency gets, either however you want -- whatever
2   period of time, you know --
3   A   70-plus thousand a year.
4   Q   Okay. That's visits to the ER?
5   A   Correct.
6   Q   Not admissions, correct?
7   A   Correct.
8   Q   Okay. Do you know what number would be for
9   admissions?
10  A   I don't.
11  Q   You indicated previously that you reviewed the
12  medical records in relation to the care that was
13  provided to Mr. Todero; is that correct?
14  A   Yes.
15  Q   And when you reviewed those records, what did
16  it -- do you recall what those records indicated in
17  terms of when you provided care to Mr. Todero?
18  A   You mean -- I'm not sure I understand the
19  question.
20  Q   Sure. So he was admitted on May 29, 2016?
21  A   Correct.
22  Q   And he passed away on June 11, 2016?
23  A   Okay.
24  Q   Do you recall from your review of the medical
25  records during that period of time on which days you

Page 17

1   provided him care?
2   A   The very first day only.
3   Q   Okay. The review that you did of the -- of
4   the medical records for this case previous to this
5   deposition, when did you do that?
6   A   Scattered over the past week-and-a-half, I
7   would guess, and I suspect I did when I initially got
8   the -- the subpoena as well.
9   Q   How much time would you say you spent
10  reviewing the -- the record?
11  A   Oh, gosh. Maybe an hour, hour-and-a-half.
12  Q   And previous to receiving the subpoena for
13  your deposition, had you reviewed those medical records
14  before then?
15  A   Yes.
16  Q   Okay. When was that?
17  A   That would have been his time in the hospital
18  to follow his stay to see how things were progressing.
19  Q   Okay. So during the period of time itself,
20  your testimony is you gave him care on the first day
21  that he was admitted, but you followed his care by
22  reviewing the medical records as --
23  A   Correct.
24  Q   -- his care continued for the next couple
25  weeks; is that fair?

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 30

1  BY MR. FIELD:
2    Q    So just for the sake of the record, Exhibit 1
3  are certain medical records from Saint Francis Hospital
4  that are Bates stamped Todero 519 through Todero 570.
5  You're familiar with these records, correct, Doctor?
6    A    Yes.  I'm familiar with the record.  This is
7  just in a different format than I'm used to seeing, so
8  yes.
9    Q    Okay.  But then you have no reason to believe
10 that these are not records from Saint Francis Hospital,
11 correct?
12   A    No.
13   Q    Okay.
14   A    Correct, I should say.  I do not believe they
15 are anything but actual records.
16   Q    Okay.  If you could look at that first page,
17 down near the bottom it has a section called "Treatment
18 Team."  Do you see that?
19   A    Yes.
20   Q    Okay.  And that section goes on for a couple
21 of pages listing all of the providers that provided care
22 to Mr. Todero during his stay at Saint Francis; is that
23 correct?
24   A    Yes.
25   Q    Okay.  On that first page, you are listed as

Page 31

1  the attending provider; is that correct?
2    A    Correct.
3    Q    Okay.  And the from to, does that -- does that
4  indicate the period of time in which you provided
5  treatment to Mr. Todero?  So in other words --
6    A    I presume that to be the case.  That makes
7  sense.
8    Q    Okay.  And your testimony earlier was that you
9  had provided care to Mr. Todero just on the first day
10 that he was admitted, correct?
11   A    Correct.
12   Q    Okay.  And the document doesn't indicate that
13 you provided care, at least in terms of this portion of
14 the document doesn't indicate that you provided care at
15 any other time besides on May 29, 2016, correct?
16   A    Correct.
17   Q    Okay.  Are you able to generally tell me what
18 the duties of the -- well, let me ask it this way:  The
19 roles listed here on this first page, there is attending
20 provider, and there's an admitting provider.  I guess
21 I'm wondering what the -- how those two roles differ.
22   A    I was an attending in the emergency
23 department.  As an attending, you are the person who is
24 specifically seeing the patient as a board certified
25 physician.  So it may be a misnomer to call me an

Page 32

1  attending there and call somebody else somebody --
2  something different.  It may be more accurate to say
3  emergency provider, and then the admitting provider
4  there listed is the ICU doctor who came down to admit
5  and coordinate care thereafter.
6    Q    Okay.  And so as the emergency provider, what
7  is your -- just taken outside of this case, I'm just
8  wondering about what your general responsibilities are.
9  Let's assume, so that it's not such an open question,
10 that the individual will get admitted to the ICU, but in
11 between them coming to the hospital and then that
12 admission occurring, what is your role as the emergency
13 provider?
14   A    To assess, diagnose, necessitate, and treat.
15   Q    Are you the -- the physician who will decide
16 whether the patient gets admitted to the hospital?
17   A    Yes.
18   Q    Okay.  And will you decide to where in the
19 hospital the patient will be admitted?
20   A    It's more complex than that.  I will decide
21 that they need to go -- I will call the person who
22 admits to the unit I presume they need to go to.  There
23 are times that they alter that course dependent upon
24 their bed allocations, their bed resources.
25   Q    Okay.  Can we look at -- I know the writing is

Page 33

1  tiny, but it's marked as Todero 524, and the larger page
2  number is page 55.  The Todero number is right down at
3  the bottom --
4    A    Yes.  Got it.
5    Q    -- and the smaller numbers -- this page
6  represents notes that were created by you; is that
7  correct?
8    A    Yes.
9    Q    In your care of Mr. Todero on May 29th,
10 correct?
11   A    Yes.
12        MS. POLLACK:  Did you say 534?  Did you say
13 534?
14        MR. FIELD:  524.
15        MS. POLLACK:  Oh, 24.  I'm like, he's looking
16 at a different page than I am.  Okay.  524.
17        MR. FIELD:  I thought you meant the date, and
18 I somehow had lost days to the --
19        MS. POLLACK:  524.  Okay.  Got you.  All
20 right.
21 BY MR. FIELD:
22   Q    So just to go back one second.  These are
23 notes you created on -- well, in relation to your -- the
24 care that you provided to Mr. Todero on 5-29, correct?
25   A    Yes.

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 38

1 statement to the Greenwood Police Department in relation
2 to Mr. Todero's condition at the hospital?
3    A    No.  I wouldn't have done that.  You're
4 talking about, like, on a separate phone conversation or
5 while they're in the emergency department?
6    Q    No.  Outside the hospital in terms of either
7 on the phone or, you know, an actual face-to-face
8 interview with someone from the Greenwood Police
9 Department.
10   A    No.  I can't recall.
11   Q    Okay.
12   A    Can't recall any conversation.
13   Q    Outside of -- you think you may have received
14 a phone call, correct?
15   A    Yeah.  Honestly, I can't recall, is probably
16 the best answer I can give you, but it wouldn't have
17 been -- it wouldn't surprise me if somebody said, "Hey,
18 you talked to so and so."  I wouldn't have been
19 surprised.
20   Q    Okay.  If you would, turn to the next page,
21 page 526 or 57, depending on what the number in front of
22 you is.  These are some lab results, correct, related to
23 Mr. Todero?
24   A    Yes.
25   Q    Okay.  And it indicates that the basic

Page 39

1 metabolic panel was abnormal; is that correct?
2    A    Correct.
3    Q    Okay.  And then his lactic acid, was that
4 normal as well?
5    A    Yes.
6    Q    Okay.  And then if you could go to the page
7 after that.  This is, again, a continuation of your
8 notes from the care that you provided on 5-29, correct?
9    A    Yes.
10   Q    Okay.  And the section about two-thirds or
11 three-quarters of the way down the page on impression?
12   A    Yes.
13   Q    These are, is it fair to say, a summary of
14 your diagnoses at that time?
15   A    Yes.
16   Q    Okay.  And so you had diagnosed Mr. Todero
17 with cardiac arrest?
18   A    Uh-huh.
19   Q    And the rhabdomyolysis, correct?
20   A    Yes.
21   Q    As well as the other two that are listed
22 there, hyperthermia?
23   A    Yes.
24   Q    And then acute psychosis by report?
25   A    Correct.

Page 40

1    Q    By report, does that indicate that the
2 information came from an outside source?
3    A    Yes.
4    Q    Okay.  That wasn't the diagnosis that you made
5 independently of the outside source, correct?
6    A    Correct.
7    Q    I may have a couple of additional questions
8 about that, so I'd ask you to keep it in front of you.  I
9 will introduce Exhibit 2, which I will represent are
10 some notes taken by Deputy Chief Ison from the Greenwood
11 Police Department.
12          (EXHIBIT 2 MARKED FOR IDENTIFICATION)
13   Q    Could you -- I believe that those pages may --
14 they're not -- the page numbers are not marked, so I
15 apologize for that.  But these are Defendant's 5064
16 through 5089.  I apologize, Doctor, for not having page
17 numbers on those, but if you could turn to the fifth
18 page.  Is that -- are we looking at the same page?  That
19 short, just one paragraph on the page?
20   A    Yeah.
21   Q    It indicates that, "Dr. Chris Hartman was
22 briefed by Blackwell in ER.  Dr. Hartman told Blackwell,
23 'This isn't caused by the Taser.  It's something else,'
24 explained that he had high acid amounts in his blood."
25 Do you see that?

Page 41

1    A    Yes.
2    Q    Okay.  Do you have a recollection, as you sit
3 here today, of making those statements to Officer
4 Blackwell?
5    A    I do not recall making statements about high
6 acid.  Do I recall talking to him, yes.
7    Q    Okay.  Do you recall indicating to him that
8 you determined that what had happened to Mr. Todero
9 wasn't caused by the Taser?
10   A    Yes.
11   Q    Okay.  And can you describe for me what your
12 basis for that statement was at the time?
13   A    It was based on the history, his exam, and the
14 labs predominantly.  By history, I mean he was tased,
15 slumped to the ground where he may have sustained those
16 knee abrasions, but there was no other significant
17 external signs of trauma that should have led to a
18 cardiac arrest.  His physical exam, beyond the abrasions
19 and the barb, was and is -- was really pretty not
20 exciting when you consider any signs of trauma.  His
21 temperature, part of the physical exam, was elevated,
22 which isn't consistent with tasing, and his laboratory
23 evaluation, which if I did mention acids, would have
24 come from that, are not consistent with somebody who is
25 tased.  I should say is consistent more with what I



Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 1:17-cv-01698-JPH-MJD   Document 112-12   Filed 07/13/18   Page 5 of 10 PageID #: 1630
The Deposition of DR. CHRIS HARTMAN, taken on April 03, 2018
54..57

Page 54

1  A    I don't recall, but it doesn't surprise me
2  because as I mentioned earlier --
3  Q    Right.  You think there may have been a phone
4  call --
5  A    Yeah.
6  Q    -- and you don't really remember?
7  A    Yeah.
8  Q    Okay.  Understood.  It says here, the second
9  sentence indicates, "Dr. Hartman informed me that he
10 treated Charles Todero.  Upon his arrival at Saint
11 Francis Health Hospital on May 29, 2016, he advised me
12 that they could not participate in a video recorded
13 interview at the direction of hospital legal staff."  Do
14 you recall being directed by anyone from the hospital to
15 not give a video recorded --
16 A    I don't remember that, but it seems logical.
17 If somebody called me to do a video recording, I would
18 ask hospital legal if that was an okay thing to do.
19 Q    And as you sit here today, you don't recall
20 whether that occurred or not?
21 A    I don't.
22 Q    Okay.  The last sentence of that paragraph
23 indicates, "Dr. Hartman did however inform me that
24 Charles Todero's cardiac arrest and death had nothing to
25 do with the actions of Greenwood police officers or him

Page 55

1  being tased."  Do you recall providing that statement in
2  June of 2016?
3  A    I don't, but it fits with my thoughts when I
4  told them in the emergency department.  So it wouldn't
5  surprise me that I would say this in conversation.
6  Q    Sure.  But just to be clear, as you sit here
7  today, you don't recall making that statement in June
8  2016?
9  A    I don't.
10 Q    Okay.  The second paragraph, if you could just
11 review that and then let me know if you recall making
12 any of those statements to a member of the Greenwood
13 Police Department in June of 2016.
14 A    The one you just read to me?
15 Q    No.  The second paragraph, same page, second
16 paragraph, starting, "Dr. Hartman explained."
17 A    Okay.
18 Q    Do you recall making any of those statements
19 in June 2016?
20 A    No.
21 Q    Okay.  You mentioned atrial fibrillation here?
22 A    That would have been an incorrect notation of
23 what I would have said.
24 Q    What would you have said?
25 A    Ventricular fibrillation or ventricular

Page 56

1  tachycardia.
2  Q    Okay.  Can you explain why atrial fibrillation
3  is incorrect?
4  A    That wouldn't have caused sudden cardiac
5  death, where ventricular fibrillation or ventricular
6  tachycardia would.
7  Q    So I just want to be clear on what part of
8  that sentence you believe is incorrect.  So it says that
9  you stated that the fact that Charles Todero was able to
10 speak and be combative inside the ambulance is proof
11 that he was not experiencing atrial fibrillation, which
12 would have been present at the time of the tasing.  So
13 is it just the condition itself that's incorrect, or is
14 there something about this -- the meaning of the
15 sentence that isn't incorrect?
16 A    No.  It is an accurate representation of what
17 I would have said, minus the atrial.  It should be
18 ventricular fibrillation.
19 Q    Okay.  And so your -- just so I'm clear on
20 what your position is, you -- sorry.  So you said it
21 should have been ventricular fibrillation; is that
22 correct?
23 A    Correct.
24 Q    And then ventricular fibrillation would have
25 been present at the time of tasing.  Is that your

Page 57

1  position?
2  A    A malignant arrhythmia traditionally is
3  ventricular fibrillation or ventricular tachycardia, but
4  not atrial fibrillation.  So I either misspoke and said
5  atrial fibrillation, because it's another arrhythmia, or
6  he put down the wrong thing.
7  Q    Sure.  But you're --
8  A    I guess it makes more sense that I would have
9  misspoke as opposed to him pulling atrial out of the
10 air.
11 Q    Probably.
12 A    Probably.  In fairness.
13      MR. HOLLOWAY:  A-fib is more common.
14      MS. POLLACK:  Yeah.  People know a-fib.
15      THE WITNESS:  That's only because the drug
16 companies are getting --
17      MR. HOLLOWAY:  It's all the commercials.
18 BY MR. FIELD:
19 Q    I just want to -- so you've indicated that
20 ventricular fibrillation is the condition that could
21 lead to sudden cardiac arrest, correct?
22 A    Ventricular tachycardia, ventricular
23 fibrillation are the malignant pre-death rhythms that
24 one would expect from an electrical discharge.
25 Q    Such as a Taser?

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 78

1  yourself as the ER physician to protect the police
2  officers from being blamed or being disciplined for what
3  had occurred to the patient that was were treating?
4      A    As I mentioned previously, there's been --
5  there had been a lot of police community interaction,
6  stories of late that seemed to grab lots of interest.
7      Q    Sure. But as you -- your testimony was as you
8  sit here today, you can't recall what stories like that
9  you're referring to, correct?
10     A    I could probably Google a whole list of them,
11 honestly.
12     Q    Okay. But none of them are coming to mind as
13 you sit here right now?
14     A    There was one in Florida.
15     Q    Is that recently or at the time?
16     A    I can't even recall.
17     Q    Okay.
18     A    There was a Missouri one.
19     Q    Okay.
20     A    There's been a whole host of them.
21     Q    Sure. So I understand -- I understand that
22 there's sort of underlying factors or the thing that you
23 had in mind was these stories about police interactions
24 with the public, correct, when you said it made this
25 statement?

Page 79

1      A    I presume so.
2      Q    Okay.
3      A    Yes.
4      Q    My question is, why did you feel it was
5  incumbent upon yourself as an ER doctor to protect these
6  police officers from either media scrutiny or from being
7  disciplined or otherwise, any other type scrutiny?
8           MR. HOLLOWAY:  Object to the question because
9      it mischaracterizes his testimony.
10     A    Same reason why I would attempt to protect a
11 foster parent for a child that injured himself under
12 their care or accurately -- or document in a rape case
13 so that the perpetrator can be apprehended. I think all
14 these things that even eke of litigious nature we are
15 just more careful in documenting.
16     Q    Sure, but would you agree with me that there's
17 a difference between more careful and documenting what
18 you're seeing as a physician and telling police officers
19 directly that you're going to cover their butts for
20 something?
21     A    I don't know if that's what I said, but, yes.
22 I feel it was appropriate that I make sure everything
23 was down because I didn't feel that the tasing caused
24 this.
25     Q    Sure. My question was a slightly different

Page 80

1  one.
2      A    Okay. I'm sorry.
3      Q    That's fine. I'm asking you if you agree with
4  me that there's a difference between accurately
5  documenting what you're seeing in the patient as an ER
6  physician versus indicating to police officers that you
7  want to make sure that they're covered so that they
8  don't get any blame for what occurred.
9           MS. POLLACK:  Well, I think it
10     mischaracterizes his testimony. I'm going to
11     object to that extent.
12          MR. FIELD:  That's fine.
13 BY MR. FIELD:
14     Q    Would you agree that those two things -- I
15 know it's probably confusing you because it's such a
16 basic thing, but would you agree that accurately
17 documenting Mr. Todero's symptoms and the care that was
18 provided is different from directly informing police
19 officers that you want to make sure that they're
20 covered?
21     A    Well, I think it's incumbent upon -- sometimes
22 when we have conversation, we explain why we're asking
23 questions, and I think it was a natural consequence of
24 that, I would presume. I can't recall exactly what led
25 to my saying that, but I would presume that to be the

Page 81

1  case.
2      Q    Okay. Previous to your attorney informing you
3  of these statements in the -- that you made in the ER,
4  did you recall making those statements?
5      A    I recalled not specifically those statements,
6  but I recall telling the police officer that I did not
7  believe the tasing caused this --
8      Q    Okay.
9      A    -- sudden cardiac death.
10     Q    Is it fair to say that you didn't recall
11 telling the officers that you wanted to make sure that
12 their whatever was covered?
13     A    That's fair.
14     Q    Okay. As you sit here today, can you recall
15 any other time that you informed law enforcement that
16 you wanted to make sure that their butts were covered?
17     A    I can't recall that, no.
18     Q    Okay. Is that something that you typically
19 tell law enforcement that bring individuals into the
20 emergency room?
21     A    No.
22     Q    Beyond accurately documenting what occurred
23 and what Mr. Todero's symptoms were --
24     A    Yes.
25     Q    What other steps, if any, were you finding to

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 82

1 take or did you take in order to make sure that the
2 police officers were covered?
3   A    Beyond treating the patient and documenting
4 what I did?
5   Q    Yes.
6   A    That was it.
7   Q    Okay. Have you ever given any statements to
8 the media in relation to this case?
9   A    Not that I'm aware of.
10  Q    Okay. You stated that after the statement
11 about making sure that officers were covered, you said
12 something to the effect of then the tasing was over
13 here. If you recall from the video, you pointed in one
14 direction, and then cardiac arrest is over here, and you
15 pointed in the opposite direction. Can you explain what
16 you meant by that statement?
17  A    Yes. I mean, there are multiple factors that
18 led me to believe the tasing didn't cause it. One of
19 them was the timing in relation to the sudden cardiac
20 death. If he was tased over here, and yet was able to
21 continue to struggle, he did not suffer cardiac arrest
22 over here when he was tased. He suffered it down the
23 road over here. So because most people's opinions, mine
24 included, are that if tasing was to cause sudden cardiac
25 death, it would have to elicit a malignant heart rhythm,

Page 83

1 such as ventricular fibrillation or ventricular
2 tachycardia, but it happens at that point. It doesn't
3 trigger a heart's susceptibility for that rhythm to
4 happen later. It happens at the moment.
5   Q    Okay. So I just want to make sure I
6 understand what you mean by at the moment. Do you mean
7 immediately after being tased?
8   A    Correct, concurrent with being tased.
9   Q    Okay. So is it your testimony that if an
10 individual is going to go into cardiac arrest from being
11 tased, they will do that concurrently with being tased?
12  A    Yes.
13  Q    Okay. So fair to say that your view is that
14 an individual -- any individual who goes into cardiac
15 arrest after being tased, your view is that the tasing
16 would not have caused that cardiac arrest? In other
17 words, only if the cardiac arrest occurs concurrently
18 with the tasing, would you believe that the tasing had -
19 - was a factor in causing the cardiac arrest?
20  A    Yes.
21  Q    Okay.
22  A    Though in medicine, there are no absolutes.
23  Q    If we could go back to the medical records. I
24 ask you to look at what is marked as Todero 529 or page
25 60 in the larger numbering. Do you see that? It's a

Page 84

1 discharge summary.
2   A    Yes.
3   Q    Okay. And the discharge diagnosis, can you
4 explain to me what discharge diagnoses would be, and I
5 don't mean the specific ones here. I just mean
6 generally what would that list?
7   A    A collection of things that this patient was
8 labeled with at the time of their disposition.
9   Q    Okay. And --
10  A    What they're being cared for, treated for.
11  Q    Sure. I asked you some questions earlier
12 about whether certain conditions could result in being
13 tased.
14  A    Yes.
15  Q    You said hyperkalemia was one of those things
16 that could result from being tased, correct?
17  A    Sure, yes. Not even sure, yes.
18  Q    What about acute kidney injury? Is that
19 something that could result from being tased?
20  A    If rhabdomyolysis can be a result of tasing
21 and hyperkalemia result of tasing, both of those
22 conditions are a result of muscle breakdown, and the
23 muscle breakdown, the myoglobin is what deposits in the
24 kidneys and causes acute kidney injury.
25  Q    Okay. And your testimony earlier was that

Page 85

1 rhabdomyolysis and hyperkalemia can result from being
2 tased?
3   A    Yes.
4   Q    Okay. What about septic shock? Is that a
5 condition that can result from being tased?
6   A    No.
7   Q    Even if it's in the same way that you've
8 described?
9   A    No.
10  Q    Okay. I think I asked you this at the
11 beginning but maybe not. I understand what your opinion
12 is in this particular case with this particular patient.
13  A    Okay.
14  Q    Do you have a view one way or the other on
15 whether being tased can cause cardiac arrest?
16  A    Again, in medicine, I think there are no
17 absolutes, and I would say that there is a possibility
18 that that can occur, yes.
19  Q    Okay. Is shock liver something that can
20 result from being tased?
21  A    No.
22  Q    Going back to the investigative file, which is
23 right here, let's look at page 1213.
24       MS. POLLACK: Which -- what are you looking --
25       MR. FIELD: The investigative file with the

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 94

1 walking nonstop beyond what most normal people would do,
2 because they have achy, miserable muscles, yes.
3  Q  Okay.
4  A  But if you're just routinely walking, no.
5  Q  Okay. Were you aware that -- I guess you are
6 from looking at the medical records, that Mr. Todero had
7 Hepatitis C?
8  A  Initially, I don't believe we were aware of
9 that fact, but I think later, yes.
10  Q  Okay. Did he have liver damage?
11  A  He had liver -- he had what was termed shock
12 liver throughout the course of his stay.
13  Q  Okay. And when did he develop shock liver, if
14 you know?
15  A  I don't know.
16  Q  Is it something that could have occurred
17 before he was brought to the ER?
18  A  Yes. But this is easily determined.
19  Q  Okay. And how is it easily determined?
20  A  If his labs were normal as far as liver
21 function, then a process may have existed at the time of
22 his admission, but it wasn't there at that moment if
23 they were normal on admission. If they then became
24 elevated, then it happened from that time onward.
25  Q  Okay.

Page 95

1  A  Presumably.
2  Q  So we don't know whether they were elevated
3 after he came in?
4  A  I don't -- they were not done in the initial
5 labs. And I may be wrong, but I just don't see that
6 they were checked that first day.
7  Q  Okay.
8  A  The second day they were checked, and they
9 were elevated.
10  Q  Okay. What causes shock liver?
11  A  Decreased blood flow to the liver or toxins.
12  Q  Can alcohol abuse cause it?
13  A  It doesn't cause the term shock liver, but it
14 causes the same laboratory test result initially.
15 Meaning, it will not cause -- unless you reach end-stage
16 liver disease from alcohol, it will not cause that level
17 of liver function test elevation.
18  Q  Okay. So if he had elevated results or
19 elevated lab measurements from shock liver, you don't
20 have the -- lab results from the first day, then if his
21 -- if the elevations occurred after he was in the
22 emergency department, what would have caused it?
23  A  Well, again, my -- in this case specifically,
24 my presumption is based on what he presented with,
25 having a fever of 103, having a lactic acid level of 25,

Page 96

1 the potassium, the total CK greater than 8,000
2 initially, already in acute renal failure, these are
3 things you cannot suffer as a result of a four to five-
4 minute cardiac arrest. These are things you suffer
5 before you get there.
6  Q  How long of a time does this develop? Is this
7 hours, or is this days?
8  A  Hours to days.
9  Q  Okay. Was he dehydrated?
10  A  Yes.
11  Q  All right. Mark this.
12     (EXHIBIT 5 MARKED FOR IDENTIFICATION)
13     MR. HOLLOWAY: What did we mark it as?
14     COURT REPORTER: Exhibit 5.
15     MR. HOLLOWAY: 5, okay.
16 BY MR. HOLLOWAY:
17  Q  I've handed you what's been marked as Exhibit
18 5. On that first page it says, "Myonecrosis." What is
19 that?
20  A  That is rhabdomyolysis.
21  Q  Okay.
22  A  That is the only way back then that we could
23 get the new electronic medical record to accurately
24 reflect muscle cell death, because they didn't have a
25 category for rhabdomyolysis.

Page 97

1  Q  I see. Okay.
2  A  And that may have been the switch to the ICD-
3 10 coding. I don't know.
4  Q  Okay. And then just take a look at the very
5 next page. And it says, "Patient brought to ER by EMS."
6 And then it goes further down where it says, "Upon EMS
7 arrival, patient remained combative and was given five
8 milligrams of intranasal. Upon arrival of EMS to ER,
9 patients went into," I guess that's SB, "sinus
10 bradycardia."
11  A  Yes.
12  Q  And then asystole and was in full cardiac
13 arrest when they brought him from ambulance, from the
14 ambulance. CPR in progress upon arrival. Then if you
15 look at the very next page of where it says, "HPI," and
16 then it talks more about sinus tachycardia, bradycardia,
17 and asystole. I just want to try to understand the
18 sequence when he was in the ambulance, and as he arrived
19 at the ambulance of what his heart was doing, whether it
20 went into bradycardia first or tachycardia first. I
21 guess tachycardia first and then bradycardia, and then
22 asystole. Can you tell from these records?
23  A  So your question is, what I presume his rhythm
24 was pre-hospital?
25  Q  Yes. Yes.

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA COURT REPORTERS

Case 1:17-cv-01698-JPH-MJD   Document 112-12   Filed 07/13/18   Page 9 of 10 PageID #: 1634
The Deposition of DR. CHRIS HARTMAN, taken on April 03, 2018
102..105

Page 102

```
 1              EXAMINATION
 2   BY MS. POLLACK:
 3      Q    So, Doctor, is metabolic acidosis fatal?
 4      A    Most times not.  It can be.
 5      Q    So what's the treatment for it?
 6      A    Say that again.
 7      Q    What's the treatment for it?
 8      A    Depends what causes it.  Again, all those
 9   different causes of it have to be treated differently,
10   depending upon what caused it in the first place.  Let's
11   take substance, for instance.  To treat lactic acidosis,
12   a form of metabolic acidosis from sepsis, you have to
13   treat the underlying condition which causes the sepsis.
14   So you got to treat the infection.  You got to treat the
15   low pressure associated with it so you adequately
16   perfuse, and you have to make sure you effectively
17   provide nutrients for cells, like oxygen, so that you
18   don't generate more.
19      Q    So from reviewing the medical chart and
20   speaking to the subsequent providers of Mr. Todero, what
21   is your understanding as to why he could not be saved?
22   Do you have one?
23      A    Are we talking initially?  Because we saved
24   him in four minutes.
25      Q    Right.
```

Page 103

```
 1      A    He had a perfusing rhythm.
 2      Q    Right.  But come June 11th when he died.
 3      A    Yes.
 4      Q    What did he die from?
 5      A    He died from multisystem organ failure
 6   associated as a result of sepsis, as a result or
 7   comorbidity of the various issues he had concurrently
 8   going on, rhabdomyolysis causing acute renal failure
 9   made him more susceptible, and his metabolic acidosis
10   and his "shock liver," which is kind of a broad term
11   that means his liver wasn't working well, no matter what
12   reason you want to assign to it.
13      Q    Would that be from Hep C?
14      A    Hep C, alcohol, hypoxy during the cardiac
15   arrestment, hypersympathetic state pre-arrest, all those
16   variables, yes.
17      Q    So was he --
18      A    But ultimately --
19      Q    Go ahead.
20      A    -- I believe he died at that last moment from
21   endocarditis.
22      Q    Which is?
23      A    An infection within the heart of the tricuspid
24   valve.
25      Q    Okay.  And it is possible to know what caused
```

Page 104

```
 1   that?
 2      A    There's a -- you can Google the list of
 3   causes, but top on the list would be IV drug abuse.
 4      Q    Okay.
 5      A    In a huge way.
 6      Q    Okay.  So we've heard from his mother and
 7   brother, you know, laypersons' versions of what killed
 8   him or what he died from, and their understanding is
 9   they couldn't get his heart to stop arresting.  Is that
10   accurate?
11      A    He had multiple cardiac arrests later in his
12   hospitalization.
13      Q    Correct.
14      A    And that was concurrent with the time they
15   were evaluating and treating him for this endocarditis.
16   So at that point, he suffered cardiac arrest. Initially,
17   he had that four-minute span, and readily, I should not
18   -- no.  You can't say readily recover, but he did
19   recover from it to the point where he was following
20   commands later in the hospital.
21      Q    Okay.  So his mother testified -- she was
22   deposed last Friday, and she testified that at one point
23   whoever was treating him at the time took her outside
24   and told her that her son was not going to survive this.
25   Was there one particular condition that was identifiable
```

Page 105

```
 1   with something that was not survivable, or did it
 2   surprise you that it was known before June 11th that he
 3   was not survive this?
 4      A    It depends when she said this, to be honest
 5   with you.  But there was a period of time in the chart,
 6   and I can't say when it was day wise that I was reading
 7   that they planned to take him to the operating room to
 8   remove these vegetations from the right side of his
 9   heart, vegetations being the collection of junk that
10   invaded his tricuspid valve as a result of the infection
11   on that tricuspid valve.  So you get just a collection
12   of fibrin and bacteria, and when they attempted to do
13   that, and he only got sicker, then that was, I think,
14   kind of -- and he cardiac arrested multiple times.  I
15   think that was kind of writing on the wall that
16   suggested that the possibility of him surviving was
17   pretty grim.
18      Q    So was it the multiple organ failure that
19   caused the -- or I could be saying it completely wrong
20   because I'm a lawyer, and I don't have the vaguest
21   understanding of medicine.  Which came first, the
22   chicken or the egg?  Multiple organ failure caused the
23   cardiac problems or vice versa or neither?
24      A    I -- multi-organ failure caused the --
25      Q    Cardiac problems?
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
— COURT REPORTERS —

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 110

you try to blow it off in essence, and so to do so means maintaining a very rapid respiratory rate, which is what diabetics who have DKA or diabetic ketoacidosis do. They breathe really fast to compensate for the acidotic state. So he may have been compensating for his acidotic state breathing fast. The moment he was given a sedative, he may not have breathed as fast. His acidosis may have transiently gotten worse.

Q  Okay. So is this -- is the fast breathing something he's doing subconsciously?

A  Yes.

Q  Okay. So if there was -- if one of the officers voiced concern at the scene that he was going to hyperventilate, he was breathing so fast, that was actually serving some purpose to his body, that he was breathing that fast?

A  It may have been at that moment with his acidotic state, yes.

Q  Okay. So the Versed slowing down his breathing, so was that counterproductive then, or did that need to happen?

A  I wasn't in the ambulance, but if it's taken, I think I saw six to seven people to hold somebody down, you really have no choice.

Q  Okay.

Page 111

A  Or getting hit by a car in the middle of traffic.

Q  I mean, could leaving -- leaving his breathing at that rapid pace have been a problem as well?

A  He eventually was going to see us in the emergency department. I'm convinced of that. Whether or not the police brought him in, or he collapsed, I'm sure we were going to see him at some point in the next 24 hours. He had some serious, serious underlying physiologic issues no matter what you ascribe to the cause.

Q  So tell me how all this -- what the interplays with all his underlying conditions and existed delirium, is there any relationship?

A  I'm not sure I understand the question exactly.

Q  Well, let me ask you -- give me a definition, if you would, Doctor. What is excited delirium?

A  I don't know if anybody knows.

Q  Okay.

A  I think people use it as a wastebasket term, to be honest with you, for a very hypersympathetic state combined with confusion. It very commonly occurs in patients with psychiatric illnesses, or it occurs in patients who become delusional but sometimes not.

Page 112

Sometimes it's somebody who's delirious because of a drug that they've taken, and it drives their heart rate up, their blood pressure up, their temperature up, and causes as a result of all that hypersympathetic state, these underlying pathophysiologic processes within the body that puts you at risk for illness.

Q  And even death?

A  Even death.

Q  Okay. So is it known how people -- so you get it from -- where do you get it from? How do you get it? From --

A  Well, I'm not an expert on it.

Q  Okay.

A  But we know you get it from drug abuse.

Q  Okay.

A  For one.

Q  Okay.

A  We know you can get it from an acute psychotic break in conjunction with, I would say, co-conditions, whether or not it's somehow you got dehydrated with it or the body became exerted from physical activity and drove your temperature up, and you got even more dehydrated. It seems to be kind of vicious circle, a collection of issues, not just one specific thing.

Q  Okay. So tell me what the significance of the

Page 113

103 degree fever is.

A  It's significant in the sense there's something causing it, and his cardiac arrest did not cause it because we see people come in with cardiac arrest all the time, and they're not fibril.

Q  Okay.

A  So presumably, there's an underlying issue. If you throw all of this together, though, nothing specific because you could say, "Well, the temperature is because he has pneumonia." So or you could say, "The temperature is because he has a urine infection." But if you throw everything together, it looks like a hypermetabolic, hypersympathetic state, the fact that he's got rhabdom, the fact that he's got acute renal failure, the fact that he's incredibly dehydrated, the fact that his potassium is elevated, and that he's got a temperature or a fever, I should say all those things point -- and then you add that in combination of the history of somebody who is outside, is exerting themselves, is by all reports very combative, combative to the point to where I presume -- it sounds bad for me to say this, but I presume it took that number of Tases to subdue somebody, just is almost a barometer of the level of physical activity going on at the moment, in conjunction with the fact that it still didn't work. He

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201


KENTUCKIANA
— COURT REPORTERS —

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com