```
 1              IN THE UNITED STATES DISTRICT COURT

 2            FOR THE SOUTHERN DISTRICT OF INDIANA

 3                   INDIANAPOLIS DIVISION

 4              CASE NO. 1:17-cv-1698-TWP-MJD

 5                JUDGE TANYA WALTON PRATT

 6            MAGISTRATE JUDGE MARK J. DINSMORE

 7

 8   TERESA TODERO, as Special Administrator of the ESTATE OF

 9                   CHARLES TODERO,

10                      PLAINTIFF

11

12                         V.

13

14       CITY OF GREENWOOD, BRIAN BLACKWELL, RENEE ELLIOT,

15   ELIZABETH LAUT, and AS-YET UNIDENTIFIED GREENWOOD POLICE

16                      OFFICERS,

17                     DEFENDANTS

18

19

20

21

22

23   DEPONENT:   LIEUTENANT BRIAN BLACKWELL

24   DATE:       APRIL 6, 2018

25   REPORTER:   EMILEE BOLEYN
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

The Deposition of LIEUTENANT BRIAN BLACKWELL, taken on April 06, 2018

26..29

Page 26

1    A    There could've been some more, but I -- I
2  mean, that's all --
3    Q    Take your time.
4    A    -- I can remember --
5    Q    Take your time.
6    A    -- right now.
7    Q    Lieutenant, tell me anything else you may have
8  said.
9    A    I don't know if we got the blood -- they got
10 the blood test back or not, but I remember saying
11 something about, He tested positive for marijuana,
12 because they've got those drug things back, and I think
13 maybe either Renee told me.  I can't remember, but he
14 said something about, That's what I'm talking about.
15 That's why I don't respond to him.
16   Q    Did you tell James that you had tased Charlie?
17   A    Yeah -- I don't know.  I don't know if that
18 time I did or not.
19   Q    Can't remember?
20   A    I cannot remember.
21   Q    Okay.  Did you tell James how many times you
22 tased Charlie?
23   A    No.
24   Q    Anything else you remember about that
25 conversation?

Page 27

1    A    Not unless it would be brought up and I
2  remember, but no, I do not.  I do not.
3    Q    You were in full uniform --
4    A    Yes.
5    Q    -- at that time?
6    A    Yes.
7    Q    And by "at that time" again, I'm referring to
8  your encounter with Charlie on May 29th.
9    A    Yes.  I was.
10
11
12   Q    Now, would you describe that uniform for us?
13   A    Long, dark navy blue pants with a dark black
14 stripe, or dark blue stripe, short-sleeved polyester
15 uniform top with a badge, gold buttons, name tag, patch
16 that says Greenwood Police on each shoulder.
17   Q    Okay.  And what equipment were you carrying?
18   A    At that time, I think we were carrying, as far
19 as firearms go, the Glock.  I think we were at .40
20 calibers, then we switched to 9 sometime around that
21 time.  The X26 Taser, handcuffs -- (clears throat)
22 excuse me -- pepper spray, which is -- other people call
23 it Mace, but that's a name brand, and a magazine pouch
24 that had two extra magazines for my firearm, and I
25 believe that's it.

Page 28

1    Q    Radio?
2    A    Yes.  Radio.
3    Q    What kind of radio was it?  Honestly, I --
4  it's what --
5    A    Like, a 900 megahertz.  It just goes on your
6  side here, probably about three inches by ten, 11
7  inches, and then it has a cord that goes up, and then
8  the mike actually attaches to my collar.
9    Q    Was -- the microphone that you were carrying,
10 is that how you communicated to the officers on your
11 shift?
12   A    Yes.
13   Q    And is that how you communicated to dispatch?
14   A    Yes.
15   Q    Did Greenwood have its own dispatch, or were
16 you entirely relying on Johnson County?
17   A    At that time, I think we were with Johnson
18 County.
19   Q    You think?
20   A    We used to -- we used to have our own.
21   Q    You think or you know?
22   A    I'd say Johnson County, yeah, at that time.  We
23 did have our own, like, maybe a little prior, but yes,
24 it was Johnson County.
25   Q    So the only way that you could receive

Page 29

1  information was through Johnson County; is that correct?
2    A    Yes.
3    Q    Okay.  Did you have any means, when you were
4  out on the road, of monitoring Johnson County
5  dispatches?
6    A    Other than our own?
7    Q    Yes.
8    A    Yeah.  I could -- I could've been on scan, but
9  I -- I don't scan.  I just stay on our channel, because
10 there's enough going on in Greenwood.  I don't need to
11 know what's going on anywhere else.  That would be way
12 too much chatter.
13   Q    You don't recall exactly where you were when
14 you heard the dispatch from Johnson County?
15   A    No.
16   Q    Is that --
17   A    No.
18   Q    -- correct?  What was it that you heard from
19 Johnson County?
20   A    Something to the effect of, you know,
21 Greenwood units, report of a subject on Madison Avenue
22 attempting to commit suicide by traffic, and they
23 described him wearing a white shirt, and that's all I
24 can recall right off my --
25   Q    Well, you take your time and tell me

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

Kentuckiana
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

The Deposition of LIEUTENANT BRIAN BLACKWELL, taken on April 06, 2018

30..33

Page 30

1 everything. We have time. So when you say, "I don't
2 recall," I have to know whether it's permanently you
3 can't recall --
4     A    No.
5     Q    -- or just at the moment. So take all the
6 time you need, and tell me anything that you can
7 remember hearing.
8     A    Again, unless someone refreshed my memory or I
9 heard the radio traffic on record, I -- you know,
10 currently cannot -- it's been almost two years.
11    Q    All right. From the time that you heard the
12 dispatch until the time you arrived at the scene and saw
13 the person that you now know to be Charlie, did you
14 receive any other information from any other source?
15    A    Pertaining to Charlie or anything?
16    Q    Pertaining to anything.
17    A    Yeah. There was an accident or something, and
18 either I had to -- I think either someone answered up
19 and said they'd take the accident, and I said -- or -- I
20 switched runs or something. Either I was -- it was up
21 to me to either take the accident or take the suicide by
22 traffic, and I don't like taking accidents, so I just
23 said, "I'll go ahead and take the incident on Madison
24 Avenue," which was --
25    Q    And who --

Page 31

1     A    -- Mr. Todero.
2     Q    -- did you say that to?
3     A    I'm not 100 percent sure, but I think Officer
4 Elliot.
5     Q    All right. And why would you tell Officer
6 Elliot that, was she the other person who was out on
7 patrol?
8     A    Yes. She was the training officer to
9 Elizabeth Laut. They were a two-person vehicle.
10    Q    Was there anyone else from your department who
11 was on patrol at that time?
12    A    Yes.
13    Q    Who else was on patrol?
14    A    Officer Eck -- Randy Eck. I -- I don't
15 remember except who was involved in this case. I know
16 there was some -- I honestly don't know. I mean -- I
17 mean, I could -- if I say something and it's wrong, then
18 it's going to come back and bite me, so I don't want to
19 say it unless I'm -- I'm sure. So I don't want to
20 guess. So I really don't know.
21    Q    All right. Would it be fair to say that
22 everyone who was on patrol would hear the communications
23 on the radio, including your saying, "I'll take the
24 person that's walking in traffic, someone else will take
25 the accident"?

Page 32

1     A    That -- yes, that's what happened. Correct.
2     Q    And how long did it take you from the time
3 that you said that you would take care of the person --
4 or take care of the incident of the person walking in
5 traffic, until you actually got to the scene?
6     A    Probably no more than just a few minutes. I
7 mean, I don't know. I don't know exact...
8     Q    And during those few minutes -- or it might've
9 been more, might've been less -- did you assess what you
10 were going to do when you got there?
11    A    No. I mean, it's hard to think ahead because
12 I'm not sure what's going on. What -- what the exact
13 scene is until I get there.
14    Q    Well, you had the information that there was
15 someone that was suicidal walking in traffic?
16    A    Right. Make contact with him and try to talk
17 to him and find out what's going on. Can I give him a
18 ride somewhere? You know, do they need to go to the
19 hospital?
20    Q    Anything else that you did by way of
21 assessment, as to what you were going to do when you
22 arrived at the scene?
23    A    No. Because I didn't have any more
24 information than that, so it -- if you try to plan
25 something ahead of time, when you get there, you're

Page 33

1 going to find out it's totally different and that was a
2 waste of thinking.
3     Q    So you --
4     A    Because it's different every time.
5     Q    So you don't do a lot of planning in your
6 mind; is that correct?
7     A    Everything's automated. We know what to do.
8 We arrive and we start questioning. I mean, you go and
9 you approach that person. There is -- I mean, it's --
10 I've been doing it for 29 years, so you just go there
11 and it's fluid, is the best way to say it. There's no
12 way to plan. Yeah, I mean, I know when I get there I'm
13 going to talk to the person, find out what's going on,
14 and try to help them; Do you need to go to the hospital?
15 Do you need a ride somewhere? You know, is there -- you
16 know, what --
17    Q    You had some concern; would I be correct in
18 saying that the person was walking in traffic, based on
19 the call that you received?
20    A    Yes.
21    Q    So you didn't want that person to continue
22 walking in traffic?
23    A    Correct.
24    Q    Is that fair to say?
25    A    Yes.

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

The Deposition of LIEUTENANT BRIAN BLACKWELL, taken on April 06, 2018

34..37

Page 34

1    Q    Okay.  When you got there, where were -- what
2  direction -- well, tell us the way in which you got to
3  the scene, what streets did you go on?
4    A    I just remember US-31 and Fry, and I think I
5  -- I was actually on Fry and crossed over 31.  I'm not
6  100 percent sure.  I could've been coming from North 31.
7  All I remember is that intersection, there was an
8  accident, and I just, like, pointed at him and said,
9  "Are you okay?"  And they said, "Yeah."  So then I went
10  on to Mr. Todero, via Fry Road to Madison, south on
11  Madison.
12    Q    And when you saw him, were you going south or
13  north?
14    A    I was going south.
15    Q    And he was on the other side, he was on the
16  Northbound lanes; is that correct?
17    A    Correct.
18    Q    So what did you do?
19    A    Well, I saw he was over in the northbound
20  lane, so I looked ahead, saw that there was no traffic
21  at least immediately coming my way, so I went ahead and
22  cut over and activated my lights, and then pulled over
23  south of where he was sitting at the time, and then came
24  to a stop and exited my car.
25    Q    Did -- you had no dome lights, so when say

Page 35

1  "activated your lights" --
2    A    Yeah.
3    Q    -- what do you mean?
4    A    Right.  The interior one -- the -- the front
5  and back that are inside my car up in my windshield, and
6  then -- and then I have Wig Wag headlights, and then red
7  and blue flashing lights in the back.
8    Q    Okay.  But you've already testified no dome
9  lights, correct?
10    A    Correct.
11    Q    Did you think you were responding to an
12  emergency?
13    A    Yeah.  What -- yeah.  I mean, he's going --
14  and I may have had them on on the way to there.
15    Q    I'm just asking if --
16    A    I'm just saying when I arrived.
17    Q    My question is: Did you think you were
18  responding to an emergency?
19    A    Yes.
20    Q    Why didn't you put your siren on?
21    A    Because it says either/or, lights or siren,
22  and if -- unless there's someone in front of me, I don't
23  need my siren.
24    Q    Who said "either/or"?
25    A    Our policy.

Page 36

1    Q    Okay. .  Your policy is: Even if you're
2  responding to an emergency, you shouldn't -- don't have
3  to put your siren on, or you shouldn't put your siren
4  on?
5    A    (No verbal response.)
6    Q    What is the policy with respect to siren?
7    A    Well, the siren you don't -- I mean, I don't
8  -- I usually put it on, but if there's really light
9  traffic or there's just no one in front of me, there's
10  no reason to turn it on.  And plus, I also let that
11  person know I'm coming, and if he's got a gun or a knife
12  or he decides to flee, that he's not there, or else he's
13  ready for me, so I try to keep quiet and not arrive with
14  my siren on.  I don't want them to know that I'm coming.
15    Q    Okay.  After you did the U-turn, you stopped
16  your --
17    A    U-turn; what do you mean?
18    Q    Well, did you make a U-turn -- strike that,
19  please.  You went from -- you went from the southbound
20  turn -- lane to the northbound lane, correct?
21    A    Correct.  But I never -- I -- what I did is I
22  just merged over face -- so I'm actually facing south in
23  the northbound lane.
24    Q    Correct.  And thank you.  It was not a U-turn.
25    A    Oh, no problem.

Page 37

1    Q    And how close did you park your vehicle with
2  reference to the person who you saw?
3    A    It would be approximate, but 20 feet.
4    Q    And did you have any particular intention in
5  mind when you parked your vehicle?
6    A    Well, I parked it there so at least I knew I
7  didn't have to walk across the lanes of traffic to get
8  to him, and then also, kind of it was like a little
9  physical barrier, you know, that I knew that, at least
10  for my -- the width of my car, that I would be okay for
11  a -- you know, a certain distance.
12    Q    Did you recognize the person sitting on the
13  curb?
14    A    Yes.
15    Q    And when is the first time you ever told
16  anybody that you immediately recognized the person
17  sitting on the curb?
18    A    I knew him as Todero.  I could not think of
19  his first name because he's got several brothers.  I
20  knew who he was, but it's like one of those things,
21  like, Uncle Bob, but what's his name?  You know, a
22  relative --
23    Q    The question --
24    A    -- you haven't seen?
25    Q    That's not my question.  My question is: When

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

The Deposition of LIEUTENANT BRIAN BLACKWELL, taken on April 06, 2018

38..41

Page 38

1  is the first time you ever told anyone that you
2  recognized the person sitting on the curb?
3      A    On the scene, is the first person that
4  arrived.
5      Q    Oh, and did you tell that to the deputy chief
6  when he interviewed you?
7      A    Interviewed who?
8      Q    You.  Did you tell the deputy chief that you
9  recognized the person sitting on the curb, when you were
10 interviewed by --
11     A    I -- I don't recall if I told him or if he
12 asked me or if I volunteered it.  I don't -- I don't
13 remember.
14     Q    Any reason not to volunteer it?
15     A    Like I said, I may have.  I don't know.
16     Q    Well, you reviewed your police reports.  In
17 any of your police reports, did you say that you
18 recognized the person sitting on the curb?
19     A    Yes, but I don't know if I told that to the
20 chief during the interview.  I mean, yeah, I did some
21 time or another, but he lead with the questions.
22     Q    Okay.  Isn't it true that the first time you
23 said that you recognized the person as being Charlie
24 Todero, was after you learned that Charlie died?
25     A    No.  I knew it was Charlie before that, at the

Page 39

1  scene.
2      Q    Okay.  I'm not asking whether you knew it was
3  him, but the first time you said that you immediately
4  recognized him as Charlie Todero.  The first --
5      A    If I --
6      Q    The first time that you ever told anyone that
7  you recognized him as Charlie Todero, when you first saw
8  someone sitting on the curb, was after Charlie died; is
9  that correct?
10     A    No.
11     Q    Okay.  So immediately, you told everybody
12 there, when I first saw the person sitting on the curb,
13 it was Charlie Todero?
14         MS. POLLACK:  Objection.  As to form.
15     Mischaracterizes his testimony.
16     Q    Go ahead.
17         MS. POLLACK:  Go ahead.  Give him the correct
18 answer.
19     Q    Go ahead.
20         MS. POLLACK:  That's not correct.
21     A    okay.  What, now?  I'm -- I mean, yeah.  I
22 knew it was Charlie, and then as soon as Renee --
23     Q    As soon as you saw him?
24     A    As -- yeah.  As soon as Renee -- I knew it
25 was Charlie, but I didn't know his fir -- I couldn't

Page 40

1  remember his first name, but I knew.  I was, like, "Come
2  on.  What's his name?"  I just couldn't remember.  And
3  as soon as someone -- I forget who it was, or maybe
4  Renee told me.  I said, "I'll get -- that's it,
5  Charlie."  I couldn't remember it, but I knew him.  I
6  mean, I've known him for years.  I just couldn't -- he'd
7  been out of the limelight for a while, and I just had
8  to, you know -- but as soon as Renee and the other
9  officers showed up, I said, "It's Todero."  So yeah.  So
10 she would've been the first one I told.
11     Q    Did you -- when you got out of your vehicle,
12 did you lock the vehicle?  Did you leave the engine
13 running?
14     A    I left the engine running.
15     Q    All right.  And how far away were you from the
16 person sitting on the curb?
17     A    Approximately 20 feet, give or take.
18     Q    Was the person who was sitting on the curb
19 doing anything?
20     A    Yeah.  He had a -- book in his hand.  At
21 that time, I didn't know what it was, and he was just
22 sitting on the curb looking straight ahead with the book
23 down in his lap, and he just had this dead stare.
24     Q    Do you now know that book to be a Bible?
25     A    Yes.

Page 41

1      Q    And when did you learn it was a Bible?
2      A    Sometime while I was there I just noticed it.
3  I mean, I think when he held it up it looked like it was
4  -- I can't remember if the front page was ripped off,
5  but I saw what looked like the index, and I saw "Holy
6  Bible" or something like that on it.
7      Q    Did he have the -- did he hold it up while he
8  was sitting on the curb?
9      A    As soon as I arrived, that's when he just goes
10 like this, and then raises it up in front of him.
11     Q    And can --
12     A    But he raised it up.  My --
13         MR. LOEVY:  Steve, can you do me a favor?  Can
14 you show me -- do we have a --
15         MR. ART:  Yep.
16         MR. LOEVY:  -- Bible here?  I'm going to move
17 your water.
18         THE WITNESS:  Okay.
19         MR. LOEVY:  So we can right --
20 BY MR. LOEVY:
21     Q    Was this approximately the size of the Bible
22 he was holding?
23     A    I think it may have been a little larger, but
24 close to it.  I mean...
25     Q    Okay.  Show us -- demonstrate for us how he

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

The Deposition of LIEUTENANT BRIAN BLACKWELL, taken on April 06, 2018

42..45

Page 42

1  held the Bible in front of him.
2       A    Okay.  When -- when I arrived, he was sitting
3  on the curb and he was just like this.  And then as I
4  got -- parked my car and got out, as soon as I got out,
5  he just goes like this.
6       Q    Was the Bible open when he was holding it --
7       A    No.
8       Q    -- or closed?
9       A    No.  It was closed.  He was -- just had it
10  like this, but kind of glancing over it.  Not at it, but
11  kind of over it, just kind of like this.  And then he
12  put it down and then that's when he got up.
13       Q    Did you talk to him while he was still sitting
14  down?
15       A    Yeah.  I said, "Hey, bud, what's going on?"
16  And at that point I --
17       Q    Did you call him by name?
18       A    I couldn't remember his first name.  I said,
19  "Todero."  I said, "Hey, Todero, what's up?"  And he
20  wouldn't respond.
21       Q    What was your initial reaction?
22       A    Well, as soon as he didn't respond and he --
23  he just had that glare in his face.  I was, like, some
24  -- something's going on.  At that point, I had not made
25  a determination yet, whether he was having a mental

Page 43

1  illness or he was intoxicated, impaired, or what.  I
2  hadn't quite come to that decision yet.
3       Q    What did he say?
4       A    Nothing.  Well, I asked him -- you know, it
5  was a few seconds after that, I said, "What's going on,
6  bud?"  And he's like, "I'm Jesus Christ the Prophet."
7       Q    He was still sitting down when he said that?
8       A    At that point, yeah.  I think he said it,
9  like, maybe once, and then that's when he stood up,
10  because I was, like, walking towards him and that's
11  when he stood up.
12       Q    Okay.  You weren't at him yet?  I mean --
13       A    I was probably ten feet away from him.
14       Q    Okay.  He was saying it pretty loud then?  You
15  were able to --
16       A    Yeah.
17       Q    -- decipher --
18       A    I've got a kind of a voice that carries.
19  That's why I'm trying to keep it down now, because I can
20  -- I'm -- can be a little loud.
21       Q    Got closer to him then?
22       A    Yeah.
23       Q    Still -- how high was the curb, by the way?
24       A    Six inches -- six to -- six inches.
25       Q    When you first saw him --

Page 44

1       A    Maybe eight.
2       Q    -- he was sitting on a six-inch curb?
3       A    Six to eight, something like that.
4       Q    All right.  And there's no side -- is there a
5  sidewalk on that part of the lane?
6       A    No.
7       Q    So as you're walking, you have to be walking
8  on the -- on the street?
9       A    Yes.
10       Q    Okay.  And so, you hear him say that.  What's
11  the next thing that you do or say or hear?
12       A    I just kept saying, "Hey.  Hey, what's going
13  on?  You know, Todero, hey, what's going on?"  And he
14  kept replying, "I'm Jesus Christ the Prophet," and I
15  said, "Okay."  And then at that point --
16       Q    Did you get closer to him?
17       A    Yeah.  I was probably five feet away from him.
18       Q    Okay.  What happened next?
19       A    He -- well, either at that time he had already
20  stood up or that's the time he stood up.  You know, I
21  don't remember exactly, but he stood up, and then again,
22  just held the Bible up like this, and you know, he
23  wasn't reading it.  I mean, it -- it was just --
24       Q    Was it open at that point in time?
25       A    No.  He just looked at the cover.  That's what

Page 45

1  was -- just, had it like this.
2       Q    Okay.  What was he saying?
3       A    He never said anything but "I'm Jesus Christ,"
4  or, "I'm Jesus Christ the Prophet."  He never said
5  anything else.  I'm double-checking here.  No.  I don't
6  remember him saying anything else.
7       Q    And what did you think about that?
8       A    Oh, at that point, I'm, like, okay, he's
9  probably taking some drug or something, because --
10       Q    Just for --
11       A    He wasn't with us mentally.  Let's put it that
12  way.
13       Q    Well, did you think he was -- he might be
14  having some kind of a mental crisis?
15       A    Well, I mean, yeah.  It could've -- could've
16  been anything.  Sorry.  I'm going to grab that back.
17       Q    Well, could it have been a mental crisis?
18       A    Could it have been?  Sure.
19       Q    Yeah.  You didn't know whether he was on drugs
20  or not on drugs, correct?
21       A    No.
22       Q    And so, at that point in time, did you call an
23  ambulance?
24       A    No.  I'm just trying to get him off the
25  roadway as first priority.

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201



KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

**Page 46**

1    Q    Okay.  And -- but he was already on the
2  roadway, correct?
3    A    Yeah.  He was on --
4    Q    So --
5    A    -- the far side.  Right.
6    Q    When you say "the far side," he was off the
7  curb, correct?
8    A    Right.  And it's this time he had stood up.  I
9  remember he stood up, and then he had turned away from
10  me and started walking northbound on Madison about maybe
11  that far from the curb.
12    Q    And that far?  Okay.
13    A    A foot and a half, two foot.
14    Q    All right.
15    A    And I'm, like, "Hey, hey, come back here," you
16  know.
17    Q    Did you ask -- you didn't call an ambulance --
18    A    No.
19    Q    -- at that point in time?  Did you call for
20  help at that point in time?
21    A    I can't remember when I called for assistance.
22    Q    Do you remember calling for help at that point
23  in time?
24    A    Not that point.  That's what I'm saying.  I
25  don't know when I did.  I really don't.  I -- I probably

**Page 47**

1  did, but I don't remember if it was at that particular
2  point or not.  I don't remember.
3    Q    All right.  And what did -- what was your
4  plan, at that point in time?
5    A    Just get him to communicate with me, talk to
6  me, find out what's going on.
7    Q    Okay.  And you had training in dealing with
8  people that have had mental health problems; is that
9  correct?
10    A    Yes.
11    Q    Tell us about that training.
12    A    Just during our yearly training, we deal with
13  mental illness and --
14    Q    How do you deal with mental illness?  Tell me
15  what the training is.
16    A    Again, try not to get them upset.  Establish
17  communication.  It's, number one, how to identify it.
18    Q    Okay.
19    A    And then --
20    Q    You had already identified as him having some
21  kind of --
22    A    Something.
23    Q    -- mental problems?
24    A    Well, no, not mental.  Just -- well, yeah, but
25  how it was either induced by drugs or by, you know,

**Page 48**

1  something else, I have no idea.
2    Q    But irrespective of how it was induced, you
3  knew you were dealing with someone with a mental
4  problem?
5    A    Yes.
6    Q    By the time he said "I'm Jesus Christ," and --
7    A    I knew something was up at that time.
8    Q    -- and the look in his eyes?
9    A    Yes.
10    Q    You didn't know what caused it, but you knew
11  you were dealing with someone with a mental problem,
12  correct?
13    A    Correct.
14    Q    And at that point in time, you didn't ask for
15  help, correct?
16    A    I don't know.  I don't remember.
17    Q    All right.  So what's the next thing that you
18  saw or heard?
19    A    It's mainly just making communication with
20  him, and he started walking away, so --
21    Q    Well, let's --
22    A    -- I'm, like --
23    Q    -- slow up a little bit.
24    A    Okay.
25    Q    Making communication with him how?  What did

**Page 49**

1  you say?  What did he say?
2    A    Verbally --
3    Q    What did he say?
4    A    Hey, come --
5    Q    Tell us what you said.  Tell us what he said.
6       MS. POLLACK:  Well, beyond what he's already
7     said he's said, or do you want him --
8    Q    At that point in time, when he started walking
9  away.
10    A    "Hey, come back here."  I said, "Hey, Todero,
11  come back here, buddy.  It's me, Blackwell.  Come here.
12  Come here.  Talk to me.  What are you doing?  What's up,
13  bud?"  You know, just casual.  Now, in order or what, I
14  don't know, but I mean, that's the type of -- what I was
15  doing.
16    Q    What, if anything, did he say?
17    A    "I'm Jesus Christ the Prophet."
18    Q    How many times did he say that?
19    A    No less than -- no less than two or three.  I
20  mean, it was -- it was about every time I asked.
21    Q    How many steps did the two of you take while
22  that kind of communication was going on?
23    A    He walked probably, again, approximately
24  probably 15 to 20 feet, and then that's...
25    Q    And you walked the same 15 to 20 feet?

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

The Deposition of LIEUTENANT BRIAN BLACKWELL, taken on April 06, 2018

50..53

Page 50

1   A   Yes.

2   Q   Did you catch up with him?

3   A   I stayed the same distance, about five feet in
4   front of him.

5   Q   Five feet or four feet?

6   A   I said about five feet, so plus or minus.

7   Q   And did you catch up with him?

8   A   I -- no, I stayed pace with him at that four
9   or five feet, or six feet or...

10  Q   Why didn't you catch up with him to stop him
11  from walking on the road?

12  A   Well, because to stop him, I would have to
13  physically -- I mean, because he wasn't following my
14  verbal commands at that time, so there was no reason to
15  immediately stop him, and because he was still only
16  along the curb, about a foot, foot and a half, so he
17  wasn't a big danger at that point.  But we were going
18  away from my car, further and further, which means now
19  that car that I'm using as protection is getting further
20  away from me.

21  Q   Why didn't you get in front of him?

22  A   Because then that's kind of a confrontation,
23  and in his mental capacity, that could mean a physical
24  confrontation or like I'm -- you know, it's kind of
25  rushing things.  To get in front and try to stop

Page 51

1   somebody?  It's kind of -- that can cause a physical
2   confrontation.

3   Q   As you were walking, did you remove your Taser
4   from its holster?

5   A   Not at that point.

6   Q   Okay.  So you weren't --

7   A   That I recall.

8   Q   -- worried about him going into traffic,
9   right?

10  A   Well, not at that point, no.

11  Q   Okay.  At what point -- was there a point that
12  you did catch up with him?

13  A   No.  I was still about that five feet behind.
14  I never closed that distance because then you're closing
15  a reaction gap.

16  Q   Okay.  You never did catch up with him; is
17  that correct?

18  A   Well, I didn't try catching up to him.

19  Q   I didn't ask --

20  A   I just tried --

21  Q   -- you if you tried.  My question is:  You
22  never did catch up with him; is that correct?

23  A   I -- I guess that would be no.  Well, at that
24  point, but then when he started angling out in traffic,
25  that's when I kind of hopped -- you know, skipped up a

Page 52

1   little quicker, and then, Hey, hey, hey, like that.  And
2   then I put my --

3   Q   Is that when you --

4   A   -- hand on his shoulder.

5   Q   -- jeared into traffic?

6   A   Yes.

7   Q   And then you put your left hand on his left
8   shoulder; is that correct?

9   A   I bel -- yes.

10  Q   Okay.  So at that point in time, you did catch
11  up with him.  You made physical contact with him,
12  correct?

13  A   Yeah.  And then at that point is when I took
14  the Taser out.

15  Q   Okay.  And you took a -- you're right-handed
16  or left-handed?

17  A   I'm right-handed.  You just unclip it like
18  that.  I mean, it's -- you do it with your right hand.

19  Q   To put that Taser on the left hand, you have
20  to un -- excuse me -- the Taser is on your left hip?

21  A   Uh-huh.  Yes.

22  Q   You're right-handed, so you reach across your
23  body to unclip it?

24  A   Yes.

25  Q   You did that as you had your left hand on his

Page 53

1   left shoulder; is that correct?

2   A   Yeah.  Yeah.

3   Q   So that was the point in time that you made a
4   decision to use the Taser; is that correct?

5   A   Yeah.  At the point I touched him on the
6   shoulder and said, "Stop."  Now, at this point, I'm,
7   like, "Hey, stop," and he continued, and then that's
8   when I went ahead and stopped.  He took about two more
9   steps, and then that's when I said, "Taser," or, "You're
10  going to get tased," and he continued, and that's when
11  --

12  Q   Okay.  Did you expect he would understand you
13  would say -- he would understand you when you said,
14  "You're going to be tased," or words to that effect?

15  A   That he would understand?

16  Q   Yeah.

17  A   Well, I would hope that he understood.

18      Sometimes if somebody -- you know, there are
19  those that don't -- let's put it thisaway:  The --
20  they're conscious.  They know what you're saying and
21  doing, but they -- they follow their delirium or
22  delusion up until the time you say Taser.  And then
23  sometimes out of -- like, "Okay.  All right.  I'm -- I'm
24  -- all right.  Let's -- I'll go back to the car, you
25  know."  But whether he did or not, I just have to follow

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

Page 54

1  the rules of the Taser, which is to announce that you're
2  going to get tased.
3      Q    So you remove your Taser at the same time your
4  hand is on his shoulder; is that correct?
5      A    Yeah.  Maybe a second before.  Maybe a second
6  after.  I mean, but yes.  It's kind of like that, and
7  then like that, and then I let go, "Let him take two
8  more steps," and then tased him.
9      Q    How many more steps did he take?
10     A    Two or three.
11     Q    So he was two, three steps away from you when
12 you first tased him; is that correct?
13     A    Yes.  Approximately.
14     Q    Okay.  Can you stand up for just a moment?
15 Tell us the stance -- show us the stance you took when
16 you tased him.
17     A    To the best of my memory, you know, it was
18 like that.
19     Q    Everything is to the best of your memory.
20     A    Well, I know.  I just -- I don't want to get
21 trapped, you know?  So...
22     Q    Why do you think you're being trapped if
23 you're telling the truth, sir?
24          MS. POLLACK:  Oh, come on.  This was two years
25     ago.  He's doing the best he can in remembering.

Page 55

1      A    I think it was -- it was just like this, like,
2  "Taser."  I said, "Taser, Taser, Taser," like that, and
3  then popped him.
4      Q    And every time that you activated your Taser,
5  did you say, "Taser, Taser, Taser"?
6      A    Not "Taser, Taser, Taser" every time.  I would
7  just saying, "You're going to get tased again."
8      Q    How many times did you tase Charlie?
9      A    Well, I discharged the thing, according to the
10 record, 16 times, but --
11     Q    And it was your --
12     A    -- it was not effective.
13     Q    Excuse me, sir.  Each of those 16 times that
14 the record showed that you discharged your Taser, did
15 you say, "Taser, Taser, Taser"?
16     A    No.
17     Q    Why not?
18     A    Because I just said, "You're going to get
19 tased again," or, "You're going to get tased."
20     Q    Each time did you say that?
21     A    Yes.
22     Q    So 16 times, you said to Charlie, You're going
23 to get tased again; is that correct?
24     A    Yes.
25     Q    All right.  The first time you said "Taser,

Page 56

1  Taser, Taser," that was when he took two feet away from
2  you after --
3      A    Two to three feet, yeah.
4      Q    -- directly after you had your left hand on
5  his left shoulder, correct?
6      A    Yes.
7      Q    You've already demonstrated the stance.
8      A    Yeah.
9      Q    What were you aiming at from those two feet
10 away?
11     A    Midsection of his back.
12     Q    Okay.
13     A    There's a red laser dot, and it kind of went
14 right between his shoulder blades, because then the
15 other one will go down lower.
16     Q    And from those two feet away, how did you
17 activate your Taser?
18     A    You turn -- you turn -- well, you have to turn
19 it on.  There's a --
20     Q    Oh, I'm sorry.
21     A    -- little on/off, and then pull the trigger.
22     Q    Did you see the prongs?  Can you see the
23 prongs leaving the Taser?
24     A    You don't -- you don't -- I mean, you -- I
25 suppose if you really concentrated on looking you could.

Page 57

1  I didn't that day.  I just noticed that they hit.  I
2  mean, once they're in there, you, like, just for a brief
3  second, you see the impact of one or two of them.
4      Q    Okay.  And you saw the impact?
5      A    I don't -- I don't remember.  I know I did.  I
6  mean, I know I saw the coils come out, you know, and
7  maybe I didn't see the actual impact, but once it --
8  they were there, then you see it.  But as far as the
9  actual motion of them going out, no.
10     Q    And after the Taser was discharged and the
11 prongs hit Charlie, what's the next thing that happened?
12     A    Well, I notice he didn't co -- he -- I didn't
13 get the response that I have seen before.  He didn't --
14     Q    He went to his knees, didn't he?
15     A    Do what?
16     Q    He went to his knees, did he not?
17     A    Let's see.  Yes.  He did.
18     Q    Okay.  So on the first shot --
19     A    But that's not the response we look --
20     Q    I'm not --
21     A    -- normally get.
22     Q    -- asking -- just try and answer the
23 questions.  He went to his knees, correct?
24     A    Yes.
25     Q    How long did it take him to get to his knees?

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

The Deposition of LIEUTENANT BRIAN BLACKWELL, taken on April 06, 2018

58..61

Page 58

1    A    I think he did it within a second.
2    Q    Okay.  So he's on his knees.  What's the next
3  thing that you hear or say or do after the first shot
4  and Charlie's on his knees?
5    A    Charlie, get off the roadway.  I mean, I --
6  I'm asking him.  At this point, we were more in traffic,
7  so I believe I asked -- told him to get off the roadway,
8  or, Get down and put your hands behind your back.  One
9  of the two.  I can't remember.
10   Q    When you say "roadway" you mean street?
11   A    Yes.
12   Q    Okay.  So he's on his knees?
13   A    Uh-huh.
14   Q    And you tell him to get up?
15   A    No.  I said -- I can't remember.  I know I
16  wanted to get him off the roadway, but I can't remember
17  if I said, "Get your hands behind your back," at that
18  point, or if I was still trying to get him off the
19  roadway.  I can't remember, because I know I've -- I
20  asked for both several times, so I can't remember.
21   Q    What's the next thing you do remember hearing,
22  seeing, or doing after Charlie goes to his knees?
23   A    I want to say I told him to get down on the
24  ground, put his hands behind his back, and he goes, "I'm
25  Jesus Christ the Prophet" again.

Page 59

1    Q    Okay.  This is after you Tasered him, correct?
2    A    Well, and I attempted to, because, like I
3  said, it's not -- it's not the -- that is not the full
4  effect.
5    Q    He's on his knees.  And I'm sorry if I'm
6  repeating, but I'm just trying to get the answer the
7  question.  After he goes to his knees, what is the first
8  thing that you remember either saying or doing?
9    A    That's the point where I think I said, Get on
10  the ground.  Put your hands behind your back.
11   Q    Okay.  While he was still on his knees?
12   A    Yes.
13   Q    Okay.  What, if anything, did Charlie respond?
14   A    "I'm Jesus Christ the Prophet."
15   Q    What is the next thing that you remember
16  saying or doing --
17   A    "You're going to get" --
18   Q    -- seeing?
19   A    -- "tased again if you don't put your -- get
20  down and put your hands behind your back."
21   Q    Okay.  And this is when you're still on the
22  road?
23   A    Yes.
24   Q    How far from the curb?
25   A    Six to eight feet.

Page 60

1    Q    What, if anything, did Charlie respond?
2    A    He didn't.  When I said "you're going to get
3  tased again," I don't believe he said anything.  But if
4  he did, it was "I'm Jesus Christ the Prophet," because
5  there was nothing else he said.
6    Q    I am just asking what you remember, if
7  anything.
8    A    I don't remember at that point.
9    Q    What is the next thing?  After you said to
10  Charlie what you just testified to, what is the next
11  thing that you say, saw, or heard, or did?
12   A    Well, when I noticed the first discharge
13  wasn't effective and I warned him again --
14   Q    It wasn't effective even though he fell to his
15  knees, correct?
16        MR. HOLLOWAY:  Could you let him finish his
17     answer, please?
18   Q    Go ahead.
19   A    When I noticed that, you know, it didn't get
20  the effect that a good tasing would give, which is
21  immediate -- just total fall to the ground, you'd have
22  -- you won't even be able to keep your balance.  So I
23  said, "You're going to get tased again."  I don't
24  remember if he said --
25   Q    Just tell me what you do remember.

Page 61

1    A    At that point, I activated again.
2    Q    You pulled the trigger again?
3    A    Yep.  And then he held the --
4    Q    You're still two feet away?
5    A    I think I was -- well, at that point, about
6  three or four.  I mean, I'm sure I backed up --
7    Q    You backed up --
8    A    -- a little bit.
9    Q    -- a little bit?
10   A    Just a little bit more.  I like the reaction
11  gap.  I don't like being close to somebody.
12   Q    Yeah.  But you already testified you did --
13   A    Yeah.  I did, but --
14   Q    -- back --
15   A    -- what I do between --
16   Q    So you might've --
17   A    -- that time and this time --
18   Q    -- backed up a little bit?
19        MS. POLLACK:  This transcript is going to read
20     like a disaster if you don't let him finish his
21     answers. It's just constantly cutting off each
22     other.
23        MR. LOEVY:  Okay.  And just --
24        MS. POLLACK:  So --
25        MR. LOEVY:  -- try to answer the question I'm

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 62

1    asking.
2        A    Again, it's fluid.
3    BY MR. LOEVY:
4        Q    Did you back up a little bit?
5        A    Yes.  I believe I did.
6        Q    Between the first Taser shot --
7        A    Yes.
8        Q    -- and the second?
9        A    I like to take a couple steps back.
10       Q    I'm not asking you that, sir.
11       A    Yes.
12       Q    Did you then back up a couple of feet?
13       A    Yes.
14       Q    All right.  So now you're about four feet away
15   for the second Taser shot?
16       A    Approximately.  yes.
17       Q    How much time elapsed between the first time
18   you tased Charlie and the second?
19       A    Approximately ten to 15 seconds.
20       Q    Okay.  And did you reassess the situation
21   between the first shot and the second shot?
22       A    Yes.
23       Q    How did you reassess the situation?
24       A    None.  And my verbal -- there was no verbal
25   compliance.  He didn't follow any orders given, and I

Page 63

1    noticed that, you know, he put the Bible back up, and
2    said, "I'm Jesus Christ the Prophet."  And -- and then I
3    said, you know, "You're going to get tased again."  I
4    pulled the trigger.  Again, I did not get the effect.
5        Q    You pulled the trigger.  What happens after
6    you pulled the trigger the second time?
7        A    I didn't get the desired effect.  He just --
8        Q    What happened?
9        A    He stayed on his knees -- didn't move, didn't
10   do anything, and I'm like, "There's something wrong
11   here.  This is -- the Taser's not working or it's not
12   hooked up right, but there's something going on."
13       Q    So what, if anything -- after you determined
14   that the Taser wasn't working, what is the next thing
15   that you did?
16       A    Again, "Charlie, get down on the ground.  Put
17   your hands behind your back.  I'm not kidding," you
18   know, something along those lines.  You know, that's my
19   normal -- what I normally say, and he didn't.  He said,
20   "I'm Jesus Christ the Prophet."
21       Q    Again?
22       A    Right.  So there's, like, there's no pain.  I
23   mean, there's no pain.  There's no anything.  I mean,
24   he's just -- like, this isn't hurting him.  Hey, this is
25   not even working, and he still holds that Bible up.

Page 64

1        Q    So what did you do?
2        A    I said, "You're going to get tased again."  So
3    then there was that third time.
4        Q    So the third time --
5        A    And I pulled the charge -- I pulled the
6    trigger and --
7        Q    Let me ask the questions.  You pulled the
8    trigger a third time even though in your mind it wasn't
9    working, correct?
10       A    Correct.
11       Q    All right.  And you announced the third time
12   that you were going to tase him?
13       A    Yes.
14       Q    And what happened then?
15       A    I pulled the trigger and still got the -- no
16   response.
17       Q    Well, was he still on his knees?
18       A    Still on his knees.
19       Q    Still holding the Bible?
20       A    Yes.
21       Q    Okay.  What's the next thing you did or said?
22       A    At that point, I'm, like, "Okay."  Now, I'm
23   like, reassessing what's going on here.  So I'm -- I'm
24   kind of looking, and then I noticed the bottom Taser
25   prong was in his shirt and dangling.  It dis --

Page 65

1        Q    This is first time you noticed it then?
2        A    At that point, yeah.  The third or fourth.  I
3    don't -- I -- like I said, I didn't count, but about the
4    third or fourth, and it may have been the fourth time.  I
5    don't remember, but it was like, the third or fourth.
6        Q    How much time was there between the second and
7    third tase?
8        A    Approxi -- again, this is approximating
9    because I didn't keep count, but probably, I know, eight
10   seconds.  I mean, I'm just -- enough for a response, but
11   I didn't get one.
12       Q    Okay.  How much between the third and the
13   fourth?
14       A    Again, probably -- probably eight seconds,
15   something like that.  I don't know.  I mean, just enough
16   to -- for me to say, "You're going to get tased again.
17   Get on the ground.  Put your hands behind your back."
18   And then when there was no response, then I'd say,
19   "Okay, you're going to get tased again."  And then I
20   would activate the Taser --
21       Q    Each time --
22       A    So...
23       Q    Each time he remained on his knees?
24       A    Yes.
25       Q    And each time he said, "I'm Jesus Christ the

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 66

1    Prophet," correct?
2         A    Yeah.  I think there was a time or two he
3    didn't say it, but for -- yeah, I know he said it at
4    least twice.
5         Q    And the Taser; in your department, does each
6    police officer have his or her own Taser?
7         A    Yes.
8         Q    So this is a Taser that you were familiar
9    with, correct?
10        A    Yes.
11        Q    Did you ever complain about the Taser not
12   being operative or not working right?
13        A    No.  Not prior to that day that I can
14   remember, no.
15        Q    Okay.  And at the beginning of your shift --
16   strike that, please.  Is the Taser kept in the
17   department?
18        A    No.  It remains with me.
19        Q    So you take it home with you?
20        A    Yes.
21        Q    And what are the requirements, in terms of
22   testing a Taser, to be sure that the electricity is
23   working?
24        A    Well, they recommend that at the beginning of
25   your shift that you test it.

Page 67

1         Q    And do you do that?
2         A    For five seconds?
3         Q    Yeah.
4         A    Not very often.
5         Q    Why not?
6         A    Because it always worked, and I mean, it's
7    always worked in the past.  It has a battery life that
8    was kind of short, and at that time, the department
9    didn't have any spare batteries, and they -- they said,
10   you know, when your battery's out, you're out, because
11   we're getting ready to go to another Taser here, and
12   right now, we're out of batteries.
13        Q    But you knew your battery was working,
14   correct?
15        A    Yes.
16        Q    And there's no question that your battery was
17   not working, is there?
18        A    No.  It -- no, it was working.
19        Q    Okay.  And you never complained about the
20   Taser not being operative?
21        A    No.  It -- no, it always worked in the past.
22        Q    And the first -- if I understood you
23   correctly, the first time when the Taser's prongs
24   actually hit Charlie -- or as you pointed out, his shirt
25   -- you were only two feet away, but you backed up to

Page 68

1    four feet; is that correct?
2         A    It's the -- the distance between when I had
3    the Taser out was two feet.  I -- and then you'd add
4    another, you know, arm-length, and then I took another
5    two steps back, so you know, I'm not sure if you're
6    wanting to know the distance from the Taser to him or
7    from me, but overall, there was about a four to five
8    foot gap from where I was standing to him, and then --
9         Q    After the second and third shots?
10        A    Yeah.  That -- well, that's when I backed up
11   to do the -- after the first shot.
12        Q    Okay.  What was Charlie wearing?
13        A    Had a torn, white T-shirt and then torn blue
14   jeans.
15        Q    Okay.  When you say "torn, white T-shirt," how
16   was it torn?
17        A    It was -- if I remember right, it was like,
18   somewhere around in here (indicating), like someone had
19   either poked a hole and then spread it, or someone took
20   a knife and sliced it.  Just a long tear.
21        Q    It was a long tear.  How long was the T-shirt?
22        A    I don't know.  It went down to just bel -- I
23   mean, down below his beltline.
24        Q    Just below the beltline?
25        A    Yeah.

Page 69

1         Q    And was there any markings on the T-shirt?
2         A    I don't recall any.
3         Q    And was it a tight T-shirt or loose T-shirt?
4         A    It was -- it was loose.  It was baggy.
5         Q    And what kind of pants was he wearing?
6         A    Kind of light-colored blue jeans.  I call them
7    jean -- blue jeans, but they were kind of light in
8    color.
9         Q    Denim?
10        A    I believe so.
11        Q    Or cotton?
12        A    I believe they were denim, but...
13        Q    All right.  And when you were close to
14   Charlie, when you put your hand on him, at any time, did
15   you attempt to do a pat down?
16        A    No.
17        Q    Why?
18        A    Because he's moving.  You don't -- you don't
19   do a pat down when someone's moving.
20        Q    Well, why didn't you stop him so you could do
21   a pat down?
22        A    I was trying to stop him.
23        Q    How did you try to stop him?
24        A    I put my hand on his shoulder and gave him
25   verbal commands to stop.

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

The Deposition of LIEUTENANT BRIAN BLACKWELL, taken on April 06, 2018

70..73

Page 70

1    Q    And did you have any concern that he might've
2    been armed at that time?
3         A    Walking out in traffic?  Yeah.  I mean, I was
4    worried --
5         Q    Okay.  Did you --
6         A    -- about him walking out in traffic.
7         Q    No.  I asked you if you had a concern that he
8    was armed, that he had a weapon.
9         A    Well, that always concerns me, yes.
10        Q    Okay.  So then why didn't you test -- why
11   didn't you stop him, physically stop him, to find out if
12   he had a weapon?
13        MS. POLLACK:  That's been asked and answered.
14   Go ahead, Brian, answer it again.
15        A    Because to physically stop him is kind of
16   jumping, you know, number one, I'd go hands-on with a
17   guy when I can keep my safe distance and then, you know,
18   go to the Taser.  But like I said, once I put my hand on
19   his shoulder, that's about as physical as I'm going to
20   get versus using the Taser.
21        Q    Okay.  How many times did you discharge your
22   Taser while Charlie was on his knees?
23        A    Three or four.  And I -- I mean...
24        Q    Okay.  And then did you approach Charlie?
25        A    Well, at that point, yeah.  I noticed that --

Page 71

1    that the bottom barb didn't make contact.  So I'm, like,
2    "Oh, there's the problem."  So what I did then is what
3    we were trained to do; is leave the -- the cartridge on,
4    and then I went up and he had -- of course, he's on his
5    knees, so his -- whatever this -- from your kneecap down
6    is behind him, and I went up and put it on right above
7    his, like, what is -- calf, I guess you could say, and
8    activated it, and then that's when he went down to the
9    ground.
10        Q    That was a drive-stun?
11        A    Well, you could --
12        Q    Correct?
13        A    -- call it a drive-stun, but since it's
14   incorporated with the barb being in, you're -- you're
15   still doing what is considered a tasing.  A drive-stun
16   is just no prongs in it at all.  You take the cartridge
17   off and put it on them.
18        Q    Is that --
19        A    And it's a pain --
20        Q    And that's what you did?
21        A    No.  I left the cartridge on.  So the one barb
22   that's in there, when I put this -- when I put the Taser
23   up there, the other electrode that's not hooked up is
24   now close to his skin.  It can complete the circuit.  So
25   it's not a drive-stun.  It's an actual tase.  It's an

Page 72

1    actual tase.
2         Q    But if you knew that one barb wasn't in there,
3    why did you not go to a drive-stun totally, as opposed
4    to trying to activate something that you just told us
5    wasn't fully activated?
6         A    Because I noticed why it wasn't working.  The
7    other barb wasn't in.  You have to have both barbs
8    embedded into the skin --
9         Q    Yes.  And --
10        A    -- to complete the --
11        Q    - you noticed that before you went and put the
12   Taser right against him, correct?
13        A    I knew one was good.
14        Q    Right.
15        A    I knew one was bad.  This completes the
16   circuit in place of the one that's not in.
17        Q    All right.  So you put it -- in what portion
18   of his body did you put that in?
19        A    Like, his -- like, his, his calf, back here.
20        Q    Okay.  He was still on his knees, correct?
21        A    Yes.
22        Q    Never left his knees, correct?
23        A    Well, until that happened, and then he went
24   down with his hands on his chest.
25        Q    Okay.  But he never stood up?

Page 73

1         A    No.
2         Q    So he's on his knees, and so that was either
3    the fourth or fifth time that you used the drive-stun,
4    correct?
5         A    Well...
6         Q    You used the drive-stun method?
7         A    To complete the circuit, yes.
8         Q    All right.  And at that point, he goes down
9    flat, correct?
10        A    (No verbal response.)
11        Q    He goes down flat, correct?
12        A    Yes.
13        Q    Okay.  And so, when he's down flat, what's the
14   next thing that you do?  Is anybody with you at this
15   point?
16        A    No.  And at this point --
17        Q    You're all by yourself?
18        A    Yeah.  And I'm -- I'm sure whether -- as soon
19   as I -- and we jumped over this but I'm sure I called
20   for backup once the Taser was deployed.  So at that
21   point, it's where I probably -- .
22        Q    After the first, second, third, fourth, or
23   fifth tase?
24        A    First.  Well, I wasn't asked and I guess I
25   forgot to tell, so it just came to my mind.  At that

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

Page 74

1  point is when I probably asked.  After the first one is
2  what I'm mean --
3      Q   He's flat down?
4      A   No.  When I did the very first one.  Once I
5  activate my Taser, I'm going to ask for a backup.
6      Q   I'm not going to ask what you're going to do.
7  I asked what you did do.
8      A   I asked for backup.
9      Q   All right.
10     A   On one of the first --
11     Q   So just you and Charlie.  He's flat down.  You
12  tased him five times, correct?
13     A   I attempted, yes, but wasn't getting the full
14  reaction.
15     Q   Okay.  And when he went down, did he still
16  have the Bible?
17     A   I don't know what happened to the Bible, to
18  tell you the truth.  I'm assuming he still had it, but I
19  don't know.  I never looked.
20     Q   Okay.  And at the time that he went down flat,
21  was there any further need to keep tasing him?
22     A   Yeah.  I asked him to put his hands behind his
23  back.
24     Q   And this is the first -- did you address him
25  as Jesus Christ?  Did you address him by his name?  How

Page 75

1  did you address him when you asked him to do that?
2      A   Well, by this time, I'm pretty sure he knew I
3  was talking to him, because there's --
4      Q   Why are you --
5      A   -- no one else around.
6      Q   -- pretty sure he was talking to him?
7      A   Because there's nobody else there, so I'm just
8  saying, "Put your hands behind your back."  I mean, I'm
9  giving him, you know, kind of like how I know you're
10  talking to me right now because you're here and we're
11  addressing each other, just like I'm addressing him
12  there.
13     Q   So you kept on tasing him?
14     A   Until I got compliance.
15     Q   11 more times?
16     A   Well...
17     Q   12 more times?  20 more times?  How many
18  times?
19     A   Well, according to the log, it was 16, but
20  none of them were actual, good tases, because I never
21  got the reaction I was looking -- that you're supposed
22  to have, which is compliance.  Plus, you can hear the
23  cracking of the Taser which means there's -- it's not
24  making a good contact.
25     Q   And so, you kept on using the Taser to do --

Page 76

1      A   Until my backup got there, because what --
2      Q   How many times did you tase Charlie before the
3  backup?
4      A   I have no idea.  I mean --
5      Q   You --
6      A   -- I don't know.
7      Q   You're trained.  Am I correct in saying that
8  after each use of a Taser, you're supposed to reassess
9  the situation, correct?
10     A   Yep.  Yes.
11     Q   And did you reassess the Taser usage after
12  each time you used it?
13     A   Yes.
14     Q   What --
15     A   It was ineffective.  He didn't follow --
16         MR. HOLLOWAY:  Brief --
17     A   -- verbal commands.
18         MR. HOLLOWAY:  Brief break?
19         MR. LOEVY:  What?
20         MR. HOLLOWAY:  Can we take a brief break?
21         MR. LOEVY:  Yeah.  Let's mark these first.  I'm
22  going to ask the reporter to mark these.
23         MR. ART:  I got it.  I got it.
24         MR. LOEVY:  Not these.
25         MR. ART:  I got it.

Page 77

1         MR. LOEVY:  Each page.  Ask the reporter to
2  mark the exhibits.
3         MR. ART:  I got it.  She gave me the stickers.
4         MR. LOEVY:  Let's circle that, six seconds.
5         (EXHIBIT 1 MARKED FOR IDENTIFICATION)
6  BY MR. LOEVY:
7      Q   Turn to Defendant 001289, please.  It's the
8  last page.  Have you ever seen this before, this log?
9      A   No.
10     Q   You've never seen the Taser log for what
11  happened on May 29, 2016?
12     A   No.
13     Q   At 11:56 a.m.?
14     A   No.  I have not seen it.
15     Q   All right.  Do you have any reason to believe
16  that the intervals between shots on the Taser log are
17  inaccurate?
18     A   I don't know.  Where's the intervals?  The --
19  the -- you know --
20     Q   I'll explain it.
21     A   -- the duration?
22     Q   I'll explain it to you, okay?  See where it
23  says, "Event" --
24     A   Yes.
25     Q   -- "Local Time"?  See the column?  It says



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

The Deposition of LIEUTENANT BRIAN BLACKWELL, taken on April 06, 2018

82..85

Page 82

1    A    -- you're going to get tased again.
2    Q    Demonstr -- and tell us how you tased him
3  during those 12 seconds.
4    A    I don't know when I went from the calf up to
5  the thigh, because there was -- there was one point
6  where I went from the -- calf to the thigh, trying
7  to get more -- like, a muscle group here, a larger
8  muscle group, and still, it wasn't -- I don't know if
9  the blue jeans were getting in the way or whatever, but
10 I was not getting that effect that the Taser typically
11 gives.  I've never --
12   Q    Why didn't you stop?
13   A    Well, because I'm still wanting to get out of
14 the roadway and I'm wanting him to comply with my verbal
15 commands.
16   Q    Did you ever take him off the roadway?
17   A    Did I take him off the roadway?
18   Q    Yeah.
19   A    I could drag him, I suppose.  That wasn't --
20 there --
21   Q    Did you -- was he ever taken off the roadway?
22   A    Only after the event.  I mean, after the -- my
23 backup got there.
24   Q    You continued tasing him --
25   A    Until my backup --

Page 83

1    Q    Continued tasing him after your backup got
2  there, didn't you?
3    A    Yep.  Because he -- well, because he -- he
4  resisted.  Would not put -- he kept his hands under him,
5  and they're sitting there pulling, and we're giving
6  verbal directions the entire time, and he would not put
7  -- get out from under his hands -- his arms, from out
8  them -- from out from underneath his chest.  And you
9  know, Officer Elliot's sitting here pulling and giving
10 him verbal instructions to give her his arm, and he
11 refused to do so.  So again, you know, you do it, and --
12 and you know, the -- that's the whole thing, is the
13 Taser is -- I've never had anyone go beyond two tasings
14 and not comply.  So I knew there was something wrong
15 with the -- it was not making a good connection, either
16 through his blue jeans or what but it wasn't making a
17 good connection.  But I'm still trying to get that
18 compliance, you know.  And at that time, just wasn't
19 working.  I mean, just was not working.
20   Q    So you kept on doing it?
21   A    Yep.  Until I -- I kept going like this,
22 trying to figure out --
23   Q    Did you put it on his flesh then to --
24   A    Well, no.  He had blue jeans on, and so I
25 didn't --

Page 84

1    Q    Oh, blue jeans were torn though, weren't they?
2    A    Yeah.  But they were on the front, not the
3  back.
4    Q    No?
5    A    Not that I remember, so you know, I'm sitting
6  here moving it, like, around, a couple times until I
7  was, like, surely there's going to be a spot here that
8  it's going to make it through the blue jeans or get a
9  better connection.
10   Q    Why didn't you --
11   A    But it never did.
12   Q    -- do it on his arms?
13   A    Well, because Officer Elliot was on top of him
14 and his arms were underneath him.
15   Q    On his back.  Same place where you tased him?
16   A    Officer Elliot was on top.
17   Q    You couldn't find a place?
18   A    Well, yeah.  I was.  I was moving all around
19 his legs.
20   Q    Oh.  Did you ask her to move so you could find
21 a place?
22   A    No.  It was a little chaotic.  I mean, she's
23 on top of him trying -- or trying to get him -- or not
24 on top of him, but she's to the side of him to where,
25 you know...

Page 85

1    Q    Was everything you did, in terms of tasing,
2  consistent with your understanding of the practice of
3  your department?
4    A    Prior to that date, yes.
5    Q    Was everything that you did then consistent
6  with your understanding of the policies of your
7  department?
8    A    Prior to that incident, yes.
9    Q    And what happened after the incident?  Did the
10 practice or policy change?
11   A    Yeah.  It changes almost every year.  Not the
12 policies, but Taser manual changes and --
13   Q    Well, tell us what changes occurred after.
14   A    They limited -- like, after, like the third
15 exposure, if it doesn't --isn't compliant, move on to
16 another use of force, or you know, go to an alternative
17 means.
18   Q    After the first four tases, was every Taser
19 that you applied, consistent with the law, to Charlie's
20 leg?
21   A    Calf.  I mean -- yes.
22   Q    Okay.  What portions of his leg were you
23 applying the Taser to?
24   A    From his calf --
25   Q    How many to the calf?

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

The Deposition of LIEUTENANT BRIAN BLACKWELL, taken on April 06, 2018

86..89

Page 86

1    A    I -- it was until Officer Elliot arrived, so I
2  don't know.  I don't know how many I did after she
3  arrived -- maybe three.
4    Q    So 13.  Elliot, was the first officer to
5  arrive?
6    A    Yes.
7    Q    So you did 13 of these before she arrived, and
8  then three after?
9    A    Yeah.  Well, three or four after.  I mean, I'm
10 not -- don't want to pinpoint myself to three, but yes.
11 The majority was all before her arrival, literally
12 trying to either get him to put his hands behind his
13 back and then he could be removed, and -- and/or just --
14 to keep him at bay until my backup got there, you know,
15 but the whole thing is, I wanted him off the road, you
16 know?  So I wanted to get him handcuffed, and I wanted
17 to get him off the road.
18   Q    And so, the effort to get him off the road was
19 why you Tasered him 16 times?
20        MS. POLLACK:  Objection.  Mischaracterizes the
21 testimony.
22   Q    Go ahead.
23   A    I'm sorry?
24   Q    Go ahead.  You can --
25        MS. POLLACK:  You can answer.

Page 87

1    A    Oh, okay.  Okay.  Yes.  I was try -- well, I
2  was trying to get him handcuffed and secured, then I
3  could assist him up and move him off the roadway.
4    Q    Okay.
5    A    But I don't want to go hands on with somebody
6  acting like the way he was, because I don't know what
7  his intentions are.
8    Q    Well, how had he acted?  After he was down on
9  the ground, never rose, went to his knees, then was
10 flat.  He never got up.  How was he acting in such a way
11 that you continued to Taser him, other than he was on
12 his arms?
13   A    Still refusing verbal commands and still in
14 the street --
15   Q    Did he say --
16   A    -- in traffic.
17   Q    I'm sorry.  Did he ever say a word to you
18 after he was down on the ground?
19   A    I can't remember if he continued with the
20 "Jesus Christ.  I'm the Prophet."  I don't remember.
21   Q    Did he --
22   A    It would be in my report.  I'd have to --
23   Q    Do you remember him saying anything other than
24 he was Jesus Christ?
25   A    No.

Page 88

1    Q    At any time?
2    A    He was saying something when the medics were
3  there and he was on the ground, but I mean, I don't
4  know.
5    Q    Before the medics arrived.
6    A    Oh, before the medics arrived?  I do not
7  recall.  I don't think so.
8    Q    Okay.  And what was it that made you think
9  that he would be responsive to anything that you said
10 after you had tased him?
11   A    Well, there just comes a point where hope --
12 you're hoping they submit and comply, but he never did.
13        MR. LOEVY:  Let's take a break for just a
14 minute.  I have some exhibits I want to look at.
15        VIDEOGRAPHER:  We are now off of the record.
16 The time is 11:36.
17        (OFF THE RECORD)
18        VIDEOGRAPHER:  We are now back on the record.
19 The time is 11:41.
20 BY MR. LOEVY:
21   Q    Just to clarify, first time you tased Charlie,
22 he went down on his knees, correct?
23   A    Yes.
24   Q    The second time you tased Charlie, was he
25 still -- did he remain on his knees or did he go flat?

Page 89

1    A    Knees.
2    Q    Still on his knees?
3    A    Still on his knees.
4    Q    Third time you tased Charlie, was he on his
5  knees or did he go flat?
6    A    Still on his knees.
7    Q    Fourth time you tased Charlie, still on his
8  knees or did he go flat?
9    A    And this is where it starts.  Either the third
10 or fourth, is when he went down, so I don't know if it
11 was the third or if it was the fourth.
12   Q    And let me just ask you a question about
13 Tasering, okay?  When you're not doing the Taser
14 directly against the party's flesh, and you keep your
15 finger on the Taser, do you just keep it on?  With one
16 pull, how long is it, your understanding, that the Taser
17 lasts?
18   A    Five seconds.
19   Q    And so, in order to make it go longer than
20 five seconds, what do you have to do?
21   A    Depress the trigger, but then --
22   Q    Keep it depressed?
23   A    Yeah.  Then sometimes you -- you let go,
24 thinking it's -- automatically it's going to stop and
25 you keep forgetting, like, oh, yeah, that's right.  It

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201



KENTUCKIANA
COURT REPORTERS

502 589 2273 Phone
502 584 0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 90

1  keeps going. You know?
2      Q   So just looking at this again, just for
3  clarification, when it shows 12, that means you had your
4  finger on the trigger pulling it for 12 seconds,
5  correct?
6      A   No.
7      Q   That's not your understanding? Okay.
8      A   It would be seven seconds.
9      Q   Okay. Then I'm just asking your understanding
10 based on your training.
11     A   Okay.
12     Q   And when it says ten seconds and 13 seconds,
13 it's not your understanding that you actually kept your
14 finger on the trigger for that length of time; is that
15 correct?
16     A   Yes.
17     Q   Okay. And let's take a look at this, at 194.
18 Do you see that one?
19     A   Yes.
20     Q   Okay. That's a five-seconds, correct?
21     A   Correct.
22     Q   And where did you apply that five-second tase,
23 to what part of his body?
24     A   I -- like I said, it was either the third or
25 the fourth time that I went from the -- like, the calf

Page 91

1  to the -- the bigger thigh, so it's --
2      Q   Well, was it the --
3      A   -- going to be on or the other.
4      Q   -- calf or the thigh; do you remember?
5      A   Well, now, the first one was --
6      Q   You just --
7      A   -- here. I guess, the calf?
8      Q   You pointed to the calf.
9      A   And then -- and then eventually, I don't know
10 if it was that fourth or fifth, or third or fourth, I
11 went --
12     Q   Let's -- we'll take it one at a time.
13     A   Okay.
14     Q   So at 194, that's the five seconds, correct?
15     A   Yes.
16     Q   Did you keep your -- that was directly against
17 the calf, right?
18     A   That would be the calf or the thigh. I don't
19 know. I -- like I said, this is that adjustment period.
20 I don't know which.
21     Q   And he was down on the ground at that point in
22 time --
23     A   Yes.
24     Q   -- correct?
25     A   Yes.

Page 92

1      Q   And he wasn't saying anything at that point,
2  at the time, correct?
3      A   Well, again, I -- I don't --
4      Q   You don't remember --
5      A   -- remember when he --
6      Q   -- him saying anything?
7      A   -- stopped. Yeah. I know he contin -- it was
8  abruptly, but I -- I mean, I don't know. Throughout
9  this whole thing, he kept doing it off and on, but I
10 don't know when, on which, you know, trigger -- when I
11 administered the trigger -- or the Taser, that it -- he
12 said it.
13     Q   Okay.
14     A   I just don't remember each specific time.
15     Q   And after each time, you reassessed, correct?
16     A   Yes.
17     Q   All right. Now, 195. Let's look at 195,
18 which is the -- excuse me -- yeah. That's the two-
19 second. 194 was the five seconds. 195 was the two. Do
20 you see that?
21     A   Uh-huh.
22     Q   Okay. What portion of his body did you apply
23 the Taser to there?
24     A   At that point, I think, we're -- we're on the
25 thigh now.

Page 93

1      Q   Okay. And what were you saying while you were
2  applying the -- if anything, the Taser to his thigh?
3      A   I know each time I said, you know, "Hands
4  behind your back or you'll, you know, get tased again."
5      Q   And your only purpose was to get him to put
6  his hand behind his back?
7      A   Yes. That way, I can go hands-on with him.
8      Q   Okay. And is it your memory that at that
9  point in time your backup had already arrived?
10     A   I don't -- no, it was -- like I said, I only
11 remember tasing him, like, maybe three times while they
12 were there.
13     Q   Okay. The next one is 196. That's eight
14 seconds, correct?
15     A   Yes.
16     Q   Okay. What portion of his body were you
17 applying the Taser to?
18     A   This is the point I'm going from place to
19 place, but it was mainly on the -- the meaty part of the
20 thigh.
21     Q   Okay.
22     A   But I was moving it around, trying to find a
23 better -- you know, maybe a -- hit a better muscle group
24 or something, or -- I don't know. I was just trying to
25 get a good contact and I still wasn't getting that

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

The Deposition of LIEUTENANT BRIAN BLACKWELL, taken on April 06, 2018

Page 94

1  desired effect.  It -- that we're always trained to
2  have, and known to have in the past.
3        Q     And that was the drive-stun that you were
4  applying, correct?
5        A     To complete the circuit for the tase, yes.
6        Q     Well, either case, it was a Taser that you
7  pulled the trigger on.  How do you -- well, strike that,
8  please.  How do you distinguish between the fact that
9  you were just completing the circuit, or doing the
10  drive-stun?
11        A     Because as long as one prong is in and you
12  still have the cartridge on your Taser, which is
13  removable, when you put the cartridge up next to that
14  person's body and pull the trigger, the arcing effect
15  will go through and complete the circuit to that.  So to
16  me, that is an attempted Tasering versus drive-stun,
17  which is no prongs in him and just -- that's more of a
18  pain compliance.
19        Q     And is it your testimony that your training
20  was that you cannot drive-stun someone when prongs are
21  in the body?
22        A     Not if the cartridge is still on.
23        Q     That's your understanding?
24        A     That's my understanding.  Yeah.  Yeah.
25        Q     Okay.

Page 95

1        A     If the prongs are still on, you're just
2  completing the circuit as if both prongs are in.  All
3  you're doing is artificially disregarding the one that's
4  not in, and this, now, is acting as that second prong.
5        Q     All right.  Let us go to 190 -- I forgot what
6  number I'm on, but --
7        A     I think you're on 5 or 4.  I think --
8        Q     I think --
9        A     -- we're on 6.
10        Q     -- 195.
11        A     Okay.
12        Q     Let's look at 195.  What were you saying and
13  doing?
14        MS. POLLACK:  If you remember.
15        A     No.  I --
16        MS. POLLACK:  This --
17        A     No.  I don't really.  I don't remember an --
18  any of the individuals other than, you know, just
19  telling him to get his hands behind his back, but I
20  don't -- there is nothing individual that I remember
21  specific about each individual...
22        Q     What portion of his body were you applying it
23  to?
24        A     I was --
25        MS. POLLACK:  Same.

Page 96

1        A     -- on his thigh.  Yeah, on his -- on his thigh
2  again until my backup arrived, and then I kind of was
3  helped.
4        Q     So 195 was before your backup?
5        A     Yeah.  I -- like I said, I know the last three
6  to four.  Again, not exactly, were there, is when my
7  backup arrived.  Everything prior to the third or
8  fourth, the last third or fourth, is going to be me by
9  myself.  So approximately the last three or four was
10  with my backup.  Everything prior was before my backup.
11        Q     196; what were you -- what part of his body
12  were you applying it to?
13        A     Thigh.
14        Q     Also --
15        A     Moving it around again.  I mean, again, I'm
16  trying to --
17        Q     Demonstrate to us how you were applying the
18  drive-stun.  What do you do?
19        A     You press the actual -- the Taser itself just
20  up next to here, and if you don't get any, you move it
21  here, and then here.  I mean, you just try to --
22        Q     Each time --
23        A     -- you know --
24        Q     with your --
25        A     -- find a spot.

Page 97

1        Q     -- with your -- when you take your finger off
2  the trigger, though, between, correct?
3        A     Yes.
4        Q     So you apply it to the thigh with the idea of
5  inducing pain, correct?
6        A     No.  That's the drive-stun.
7        Q     Well, at this point in time -- at the point in
8  time when he's flat, what is your purpose in Tasering
9  him?
10        A     To get his hands behind his back so I can go
11  hands-on.  Get him...
12        Q     And your training was, you were trained you
13  can tase someone with a drive-stun method by putting the
14  drive -- by putting the Taser against his flesh in order
15  to get him to move his hands, correct?  Is that --
16        A     Now, are you talking about the drive-stun?
17        A     Oh, yeah.
18        A     Without the cartridge?
19        Q     Either way.
20        A     Well --
21        MS. POLLACK:  That mischaracterizes the
22  testimony.  There's not an either way for a drive-
23  stun.
24        A     Right.  It's --
25        Q     Let's look at 196.

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

The Deposition of LIEUTENANT BRIAN BLACKWELL, taken on April 06, 2018

106..109

**Page 106**

1    Q    Okay.  So you waited 12 seconds.  What did you
2    do in those 12 seconds, reassess everything?
3        A    Continued giving warnings, and somewhere in
4    there is when the -- actually, before, is when one of
5    the witnesses came up and she's telling him to just, "Do
6    what the officer says.  Do what the officer says."  So
7    to me, he's just ignoring both of us.
8        Q    And so, you tased him again?
9        A    Yep.
10       Q    And that's 198.  How did you tase him at 198?
11       A    Somewhere in the leg area.
12       Q    What portion of his leg?
13       A    Thigh or calf.
14       Q    Okay.  And what -- if anything, what reaction
15   did he have to that tase?
16       A    Non-compliance.  Nothing.
17       Q    Besides not putting his hands behind his back,
18   what reaction, if any, did he have?
19       A    None.
20       Q    Was he comatose at that point?
21       A    No.  I mean, he's breathing and he's got his
22   head -- chin like that, like, looking ahead, but he's
23   just not saying anything.
24       Q    Outside of breathing, did you recognize
25   anything else about his --

**Page 107**

1        A    Nope.
2        Q    -- physical and --
3        A    No.
4        Q    -- being at that point?
5        A    No.
6        Q    And then what was the time between 198 and
7    199?  What did you do during that period of time?
8        A    Six -- about six seconds.
9        Q    What did you do during those six seconds after
10   having tased him?
11       A    I know a couple times we were -- I just said,
12   "You're -- you're going to get it again," you know,
13   meaning, tasing.
14       Q    Were you angry at that time?
15       A    No.  I'm just, like, "Come on.  Put your hands
16   behind your back."  That's the only thing.  I wanted
17   that from him.
18       Q    Okay.  And this is before backup came,
19   correct, so --
20       A    Yes.  this is getting to the approximate time
21   that backup arrives.
22       Q    Okay.  At any of the time, starting at the
23   beginning up through 198, what efforts, if any, did you
24   make to get his hands behind his back?
25       A    Verbal commands.

**Page 108**

1        Q    Other than a verbal command?
2        A    None.  Because then I'd have to close my
3    distance on him and I'm within his arms.
4        Q    Your distance was close.  You were right on
5    top of him, weren't you?
6        A    Yeah, but the -- the hands are what hurts you.
7    They can hurt you.
8        Q    I understand.
9        A    Not -- so I don't want to put myself on the
10   side of him where he can just "wham".  I mean --
11       Q    Well, you were on the side of him, weren't
12   you?
13       A    No.  I was --
14       Q    And where were you when you were --
15       A    I was next to his legs.  I was -- I was down
16   by his feet, because I didn't want to get kicked.
17       Q    Okay.
18       A    So I had -- literally was reaching over like
19   that.
20       Q    Okay.  Am I correct in saying you made no
21   physical effort to put his hands behind his back while
22   you were tasing him all these times?
23       A    No.  Because I've got my Taser in hand.  I
24   can't.
25       Q    You didn't put your Taser to the side --

**Page 109**

1        A    I'm --
2        Q    -- and try to get --
3        A    -- not letting go of it.
4        Q    -- his arms behind his back?
5        A    I'm not letting go of the -- my Taser.
6        Q    Okay.
7        A    No.  That's a weapon.
8        Q    All right.  Just asking.  And am I correct in
9    saying that he -- all these times that you had tased
10   him, from the first tase to the last until your backup
11   arrived, he, at no time, actually resisted putting his
12   arms behind his back?
13       A    No.  He just placed them underneath him.
14       Q    All right.  He fell down, correct, and when he
15   fell, his hands were beneath him, correct?
16       A    Right.  But once that Taser's -- the -- is is --
17   well, mine wasn't working to begin with, but in between
18   tases, he's got 100 percent control over his muscles.  So
19   he could do it at any time.
20       Q    But when he went down, he went down with his
21   hands underneath him?
22       A    Yes.
23       Q    Correct?
24       A    Yes.
25       Q    He didn't make any effort or gestures when his

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

The Deposition of LIEUTENANT BRIAN BLACKWELL, taken on April 06, 2018

110..113

Page 110

1  hands were out and put them underneath him, correct?
2      A   True.
3      Q   And isn't it also true, during this entire
4  incident until your backup arrived, you made no effort
5  to get him to get his arms from underneath?
6      A   True.
7      Q   And isn't it also true that while you were
8  Tasering him, he was not resisting in any way.  He was
9  only not, as you put it, complying with your order, is
10 that true?
11     A   That's true.  That's why I didn't escalate the
12 force anymore.
13     Q   Okay.  What happened in the six seconds
14 between 198 and 199?
15     A   Either, again, Place your hands behind your
16 back or you're going to get tased again.
17     Q   And he was non-responsive?
18     A   Exactly.  And your training was that if
19 someone doesn't put their hands behind their back, you
20 just tase them.  You don't try to get them to put their
21 hands behind their back, correct?
22     A   Yeah.  That would be a step above.  You know,
23 once you start going physical then, you know, it's
24 hands-on versus, at that time, the Taser was actually
25 just above verbal compliance, and then it would be

Page 111

1  hands-on.
2      Q   Okay.  And that was at 11:57:33.  That was
3  198.
4          MR. LOEVY:  Is that where I was Steven?
5          MR. ART:  Yep.
6          MR. LOEVY:  Thank you.
7  BY MR. LOEVY:
8      Q   And then how much time before 199?
9      A   Six seconds.  I think we did a thorough -- is
10 this the one we did earlier?
11         MR. ART:  We did 198 to 199.
12     A   Yeah.  I was thinking we already did this,
13 yeah.
14     Q   Okay.  Thank you.
15         MR. HOLLOWAY:  Thank you.
16     Q   And how much time between 199?  That's
17 11:37:39 --
18         MR. HOLLOWAY:  57.
19     Q   -- and 11:37:42?
20         MR. HOLLOWAY:  57.
21     Q   57.
22         MS. POLLACK:  10:47.
23         MR. LOEVY:       Thank you.  Thank you.
24     Q   That's why it's easier without them.  What did
25 you do during that time?

Page 112

1      A   Again, told him, you're -- You're going to get
2  it again, or, you're -- or Taser.  But I always said,
3  "You're going to get -- you know, you're going to get
4  another tase if you don't do it."  At this point, I'm
5  just feeling he's just not wanting to do anything and
6  the Taser's still not working properly.
7      Q   Okay.  And again, during that period of time,
8  you didn't make any effort to roll him over, correct?
9      A   Correct.
10     Q   You didn't make any effort to -- why didn't
11 you make -- excuse me -- strike that, please.  Why
12 didn't make an effort just to roll him over?
13     A   Because then I would have to up to the side of
14 his body to do that and I stay -- I'm staying away from
15 his arms and hands and his feet.
16     Q   You're staying away from his hands.  And why
17 are you staying away from him if you wanted to get him
18 off the road?
19         MS. POLLACK:  I think this has been asked and
20         answered.  Go ahead.
21     Q   Go ahead.
22     A   Because once I get within his arms -- I mean
23 -- you know, I mean, I'm not going to say -- if there's
24 a person here and I'm like this, within a tenth of a
25 second, I could punch that person.  I mean, I could go

Page 113

1  from, "Man, you know, blah, blah," and they just (sound
2  effect), you know?  And it's happened, and I'm not going
3  to go there again.  You know, I'm not going to put
4  myself in danger or -- and I've seen enough videos where
5  it's happened, and I've had other officers that have
6  gotten pun -- someone was just as complacent as can be,
7  and then boom, within a tenth of second, they're hit or
8  they're hurt.  And I'm not going to get within arm's
9  reach of him at that time.
10     Q   So your policy then -- strike that, please.
11 Your understanding of the practice is, if a civilian is
12 possible to hit you, you should tase him to avoid being
13 hit, in all circumstances?
14     A   No.  We're -- while I'm attempting to tase him
15 to have him put his arms behind his back where --
16     Q   And your understanding through all of this, is
17 that -- well, strike that, please.  That's okay.  What
18 happens between --
19     A   200 and --
20         MR. HOLLOWAY:  200 and 201.
21         MR. LOEVY:  200 and 201.  Thank you.
22     Q   That's 11:57:47 and 11:57:53.  That's a
23 six-second period.
24     A   Okay.  At this point in time, this is about
25 where my backups arrive in either this one or the one

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 126

1    A    I don't know.  Officer Elliot was on the side,
2    didn't -- you know...
3    Q    But you're the boss.  Why didn't you just tell
4    him [sic], Let's roll this guy over?
5    A    I have no idea, other than -- than his hands
6    would be -- you know, he's back -- you know -- I don't
7    know.  You know, when -- it's a little chaotic.  You
8    don't -- you know, it's not, Everything works out the
9    way you expected.
10   Q    Yeah.  I understand.  And was there ever an
11   effort to roll him over?
12   A    I don't know.  I really don't.
13   Q    Well, you were --
14   A    I didn't.
15   Q    -- there.
16   A    You know, now, if she was, she may have been.
17   I don't remember.  I didn't -- it - -
18   Q    You never told her?
19   A    You know, at this time, we didn't know this
20   was going to be such an event that we needed to
21   remember.  It just -- it was something that happens.  You
22   know, like, every day, we take runs after runs after
23   runs, and I don't commit them to memory.  I couldn't
24   tell you what I did yesterday at work, tell you the
25   truth.

Page 127

1    Q    All right.  How many times have you been
2    involved in an incident where the person died within a
3    couple of weeks?
4    A    Probably -- I mean, that would be speculation,
5    but ten -- tens and ten -- I mean --
6         MS. POLLACK:  Don't speculate.
7    A    -- I'll say I did.
8    Q    Well, do you remember?
9    A    Several.
10   Q    Several times.  And they -- any of them
11   involve tasing?
12   A    No.
13   Q    Okay.  Let's go -- where did we finish up
14   here?
15        MR. HOLLOWAY:  So we just did --
16        MR. ART:  Are we on 203, 204?
17        MR. HOLLOWAY:  Yes.  That is the one we should
18   do now, 203 to 204.
19   BY MR. LOEVY:
20   Q    Okay.  203 to 204.  How much time lapsed?
21   A    Ten seconds.
22   Q    And what did you do in those seconds?
23   A    Again, either myself or Officer Elliott,
24   giving him commands to get -- give her his arm.
25   Q    Right.

Page 128

1    A    While she's pulling on it, and --
2    Q    And you made the decision to pull the trigger
3    again?
4    A    Yep.  Still trying to find another spot.
5    Q    And --
6    A    A Clear spot.
7    Q    And by that point, you knew that there was
8    some arcing, as you put it, going on?  There was some
9    connections?
10   A    Right.  But I don't know how -- I can't
11   distinguish this one from any of the others, you know,
12   accurately.
13        MR. HOLLOWAY:  You need to -- because it's very
14        confusing how you've used the term arcing, because
15        he used it, I think, to mean the opposite of what
16        you have, because he's explained arcing is no
17        connection, and you -- it seems like you're saying
18        it is connecting.
19   BY MR. LOEVY:
20   Q    Fair enough.  Before you -- you tell us.  What
21   do you mean by arcing?
22   A    I forgot even how I used it in a sentence just
23   then.
24   Q    How did --
25   A    I'm sorry.

Page 129

1    Q    That's okay.  Tell us now.  What do you mean
2    by arcing?
3    A    That it is not making a good inter-muscular
4    connection with the probe that is still in him.
5    Q    Does it mean they're making some connection?
6    A    Either it is or isn't.  I mean, like I said --
7    and there's also that in-between, like I said.  So I
8    can't distinguish if that one was a loud one or a quiet
9    one.  I don't remember which it was.
10   Q    Okay.  I understand.  What is the -- I'll go
11   back again, then.
12   A    It's a loud clicking sound.
13   Q    And when does the loud clicking sound occur?
14   A    It means that it's not making a good
15   connection in the probes said, "This is the nearest
16   circuit that I can complete is between these two."
17   Q    Correct.
18   A    So it does that.
19   Q    And what is the sound, if any, that a good
20   connection makes?
21   A    Usually, all but silence.  You know, it's
22   silent.
23   Q    Okay.
24   A    Pretty quiet.
25   Q    Some of the time there was clicking, correct,

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 130

1    if I understand you correctly?
2        A    Yes.
3        Q    And some of the time there was not?
4        A    Anywhere in between.  There's that -- like I
5    said, there --
6        Q    Am I correct --
7        A    -- was some --
8        Q    -- in saying that; some of the time there was
9    clicking, some of the time there was none?
10       A    I can't remember if there was any silent --
11       Q    Am I correct --
12       A    -- or not.
13       Q    -- in saying you can't remember the number of
14   times that there was no clicking?
15       A    I -- I cannot remember if there was no
16   clicking.
17       Q    Can't remember one way or the other?
18       A    Well, I know there was some, but I don't know.
19   Like I said, I don't think it was ever abso --
20   absolutely quiet.
21       Q    How many times was there clicking?
22       A    I don't know.  It was off and on.  I don't
23   know.
24       Q    It was more than once?
25            MS. POLLACK:  He said he doesn't know.

Page 131

1        A    I was going to say, it's --
2        Q    Am I correct in saying you can't tell the
3    number of times you heard a clicking sound after
4    applying the Taser?
5        A    True.  Absolutely.
6        Q    Am I correct in saying you can't recall any
7    specific instance in which you tased and there was a
8    clicking sound, indicating a bad connection?
9        A    Not -- I do not know the number of times, no.
10       Q    Okay.  Well, can you identify any of these 16
11   times that you tased Mr. Todero, where there was a
12   clicking sound?
13       A    The first four, because it was -- but I mean,
14   that was -- I mean, I don't know the others were making
15   that connection.  The first four were totally bad -- no
16   connection, clicking -- loud clicking, because they
17   weren't -- it was not connected.  The others, it was off
18   and on.
19       Q    And that was the -- let's go back to those
20   four then.  Your testimony is, on the first one, and
21   that's the time -- that's 190.  Under 190, you tased
22   Todero.  He went to his knees, correct?
23       A    Yeah.
24            MS. POLLACK:  This has all been completely
25       asked and answered and covered.  I can't believe

Page 132

1    we're starting this over.  Are -- I don't understand
2    where we're going with this.
3        Q    Go ahead.  190 --
4            MS. POLLACK:  He's asked and answered it.
5        Q    -- you tased him and he went to his knees,
6    correct?
7        A    Correct.
8        Q    And as your --
9        A    And that's when it was a good connection.
10       Q    -- testimony, now you heard a clicking sound,
11   even though you tased him from two feet away, he went
12   directly to his knees?
13       A    Yeah.  That's not a conne -- that is not a
14   tasing.
15       Q    Okay.
16       A    He's maybe -- like I said, remember that area
17   in between?  He's getting probably something, but he
18   ain't getting -- he's not getting the full effect.
19       Q    What do you think caused him to go to his
20   knees?
21            MS. POLLACK:  Objection.
22       Q    If not the --
23            MS. POLLACK:  It calls for speculation.
24       A    Don't know.
25       Q    Do you have any explanation, as he went -- I

Page 133

1    asked him why he went to his knees, other than the fact
2    he was tased?
3        A    Don't know.  It would be -- it -- it would be
4    speculation.  I would have to be guessing.  I don't --
5        Q    I'm asking --
6        A    -- I don't know why.
7        Q    -- if you know any reason, other than the fact
8    that he was tased, why he went to his knees?
9        A    I mean, I could give a list.  I mean, it
10   could've been the sound of the Taser itself.  He may be
11   in -- you know, he thought it was a gun going off
12   because it makes a loud pop sound.  Maybe it was the,
13   you know, the touching of the -- the -- the one dart
14   going in and, you know, like, "Ow," or something.  I
15   don't know.  It just -- it would be multiple things.  I
16   don't know.
17       Q    Okay.  You testified earlier that after the
18   first tase, and that's number 190 --
19       A    Uh-huh.
20       Q    -- that you stepped back a couple of feet; do
21   you recall testifying to that?
22       A    Yes.
23       Q    Okay.  And the second tase was 191, correct?
24       A    Yes.
25       Q    Okay.  And on 191, tell us what you remember,

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201



KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 134

1    if anything, about that tase.
2          MS. POLLACK:  Asked and answered.
3       Q   Go ahead.
4       A   The second one, that's when he -- he went to
5    his knees.  I wasn't getting the full effect.  Gave him
6    verbal commands to put his hands behind his back, and he
7    didn't.
8       Q   Still had the Bible in his hands?
9       A   Yes.  And then -- yeah.  And then the -- there
10   was the clicking.
11      Q   And let's look at 192.  That's -- that
12   indicates the duration of ten seconds; do you see that?
13      A   Yes.
14      Q   Okay.  What happened between 191 and 192?
15          MS. POLLACK:  Same objection.  We have been
16   over this.  It has been fully explored.  He has
17   asked -- been asked it.  He has answered it.
18   BY MR. LOEVY:
19      Q   Go ahead.
20      A   He remained on his knees.  There was no
21   reaction, and either on that one or a couple other ones,
22   he's replied that he was "Jesus Christ the Prophet," and
23   had his Bible out in front of him.
24      Q   Still in his hands?
25      A   Yes.

Page 135

1       Q   What you testified to?
2          MR. LOEVY:  Hey, can I see the Bible again
3    for a moment, Steven?
4          MR. ART:  Uh-huh.
5          MR. LOEVY::  Is that around?
6    BY MR. LOEVY:
7       Q   Show us, while he's on his knees, is the --
8       A   He had it in front of him, looking kind of a
9    little over it.
10      Q   Okay.  Thank you.
11      A   Closed.
12          MR. LOEVY:  And that was -- what number was
13   that, Steve?
14      A   192.
15          MR. HOLLOWAY:  You just did 192.
16      A   192.
17      Q   Okay.  And then 192 was at 11:56:27, and then
18   at 11:56:41, there's a 13-second duration, correct?
19      A   (No verbal response.)
20      Q   What happened between 192 and 193?
21          MS. POLLACK:  Same objection.  Asked and
22   answered.
23      Q   Go ahead.
24      A   I gave him verbal instructions to place his
25   hands behind his back or he was going to get tased

Page 136

1    again.
2       Q   Okay.  Then what happened between 193 and 194?
3          MS. POLLACK:  Same objection.  Asked and
4    answered.
5       A   193 and 94?
6       Q   Uh-huh.
7       A   Yeah.  That -- that's -- let's see, one nine
8    -- oh, between?  Okay.  I'm sorry.  Between.  Again,
9    told him to place his hands behind his back or he was
10   going to get tased.
11      Q   Now, I know we've gone through some of the --
12   which interval did he go flat on his face?
13      A   After the -- well, that's the problem with --
14   although these are a little longer, because I'm not
15   getting any connection.  So it'd probably be between --
16   like I said, it was either three or four.  So it'd
17   probably be between 93 and 94 -- 194 -- 193 and 194, but
18   I'm -- that's what I'd be speculating, which I shouldn't
19   do.  But it was either the -- after the third or after
20   the fourth, so I'll -- I'll do it that way.
21      Q   And after the third or the fourth, did he go
22   down face down?  Describe for us how --
23      A   Yes.
24      Q   -- he went down.
25      A   He -- at that point, he had the Bible and --

Page 137

1    and just went -- went down like that.
2       Q   Okay.
3       A   And then he laid on the ground.
4       Q   Okay.  Did you think that was the effect of
5    the tasing?
6       A   I felt that there -- that at that point there
7    was some type of connection, like I said, in-between a
8    real good one and a none.  It was somewhere in there,
9    because, you know, there's just no way that anybody
10   could, you know, do what he did, you know, and -- and
11   not comply, so And then, like I said, you don't get that
12   yelling, there was no moaning, there was no groaning,
13   there was no grunting, and that's always happened.  I
14   mean, I've seen 100 people get tased.  I've never known
15   one of them be quiet.
16      Q   Were you ever tased yourself?
17      A   Yes.
18      Q   Did you moan and groan?
19      A   Yeah, I said some things.
20      Q   What did you say?
21      A   I think it was like, "Son of a bitch."  I
22   mean, it was -- I mean
23      Q   It hurts, doesn't it?
24      A   Well, yeah.  When you get the full effect it
25   does.



Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

The Deposition of LIEUTENANT BRIAN BLACKWELL, taken on April 06, 2018

158..161

Page 158

1  kicking before that?

2      A   I don't believe so, no.

3      Q   Anytime?  Can't remember?

4      A   No.  Just -- when I went back, that's when I

5  had to hold him down.

6      Q   That's the first time you saw his legs --

7      A   Right.

8      Q   -- kicking?  Okay.

9      A   And then the one medic said, "We're going to"

10  -- he goes, "Do we" -- something about -- I go, "Do you

11  have anything to tie the -- you know, his legs

12  together?"  He goes, "Man, we're going to have to get a

13  blanket or something."  So he goes, "We'll get a

14  blanket."  So he gets a blanket and wraps around and

15  ties him so he would stop kicking.

16      Q   What's the next thing you said or did?  Did

17  you have further conversations with the medics at that

18  point in time?

19      A   I -- you know, I probably did, but I don't

20  remember any of it.  I mean, and then they lifted him

21  up, put him on the cot, and took him to the hospital.

22      Q   Okay.  What did you do after Charlie was put

23  in the ambulance?

24      A   I think I went back to the police department,

25  and I was going to start on my report, and then that's

Page 159

1  when I heard Officer Elliot say that they were starting

2  CPR on him, and that he was --

3      Q   She was back at the station or...?

4      A   She followed the ambulance, because he still

5  had her handcuffs on him and since he started to be a --

6  like I said, kicking and stuff, he -- she followed him

7  there, so she could get her handcuffs, and kind of find

8  out what's going on, and then tell the doctor what was

9  going on.

10      Q   So what did Elliot tell you?

11      A   It was just over the radio.  They're starting

12  CPR on him.  And I'm, like, "What?"  So I think that's -

13  - she called me or I called her.  I do not remember.  And

14  she said, "Yeah, they're just getting off the ambulance

15  and they were doing CPR on him, chest compressions."

16  And I'm, like, "Well, I've got to find out, you know,

17  off -- I need to call his brother or something.  I need

18  to find out what's going on here."

19      Q   That's when you called James?

20      A   Yeah.  So I looked James up on our computer,

21  and James and I had a really decent rapport in the past.

22      Q   And I remember asking you questions earlier

23  today what you said to James and what he said to you.

24      A   Right.

25      MS. POLLACK:  Yeah.

Page 160

1      A   So that's all the same, so that's when --

2      Q   So after --

3      A   -- that took place.

4      Q   -- you talked to James, what's the next thing

5  you did?

6      A   Went to the hospital, I believe.

7      Q   Why'd you go to the hospital?

8      A   Why did I?

9      Q   Uh-huh.

10      A   Oh, I wanted to check on Charlie, find out

11  what was -- what's going on with him.

12      Q   All right.  What did you learn at the

13  hospital?

14      A   Well, a lot of it was just -- you know, for

15  the first several minutes was just watching them work on

16  him, you know, they had just nurses everywhere and a

17  doctor.  And -- and Officer Elliot kind of just filled

18  me in, briefly, on what was going on.

19      Q   Did the doctors ask you what happened -- or

20  nurses?

21      A   Yeah.  After they got him under control and

22  everything, I had went over and talked to the doctor and

23  told him that, you know, he had -- that I tased him

24  several times, but acted -- I didn't say how many.

25  Didn't say how many, just said "several".

Page 161

1      Q   Did you say "several"?

2      A   I want to say -- yeah, I think I did.

3      Q   Did you tell them 16?

4      A   No.

5      Q   Okay.

6      A   I said, "He's been" -- at this point, we're

7  still thinking it's the drugs or whatever we, you know,

8  believed he was on at the time was causing this.

9      Q   Well, that's what you believed.  It's -- you

10  didn't tell that you had tased Charlie 16 times?

11      A   No.  Because at that point, in our training,

12  the Taser never had any side effects to anybody, so

13  there was no medical studies.  And if there were, they

14  always said they had pre-existing conditions.  But it

15  was supposed to be or --

16      Q   Your training was, there could be no side

17  effects from multiple tasings; is that correct?

18      A   Yes.  Because we were even told -- wait a

19  minute.  We were even told that Taser hired people to

20  take a 30-second straight without any breaks, and there

21  were no side effects.

22      MR. LOEVY:  Can I see the Taser stuff?  You

23  know, the highlights?

24      MR. ART:  Yeah.

25      MR. LOEVY:  Okay.

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 162

1      MS. POLLACK:  You need a break or you're good?
2      THE WITNESS:  No.  I'm...
3      MS. POLLACK:  All right.
4      THE WITNESS:  That first water bottle's getting
5   through me, but we're fine though.
6   BY MR. LOEVY:
7      Q    Okay.  How long did you spend at the hospital?
8      A    Plus or minus, 15, 20 minutes.  Maybe 25.  I
9   --
10     Q    What's the next thing you did?
11     A    Called Chief Ison, told him what was going on.
12     MR. ART:  Are you ready for a break?
13     MR. LOEVY:  We're going to be a couple of
14   minutes.
15     MR. HOLLOWAY:  Let's -- can we take a brief
16   break?
17     MR. LOEVY:  Yeah.  Just for a second.
18     VIDEOGRAPHER:  We are off the record.  The time
19   is 12:38.
20     (OFF THE RECORD)
21     VIDEOGRAPHER:  We are now back on the record.
22   The time is 1:10.
23     MR. LOEVY:  And I should have done it off the
24   record, but just really quickly, Counsel, what's
25   your feeling on taking a break for lunch if not, you

Page 163

1   know --
2      MS. POLLACK:  Oh, I'd like to get out of here
3   at a decent --
4      MR. ART:  I just ate a sandwich.
5      MS. POLLACK:  -- hour.  Yeah, we kind of
6   brought -- we've done this drill a few times, so we
7   were planning on getting out of here at a decent
8   hour, so I'd rather not.
9      MR. LOEVY:  So you want to skip lunch?
10     MS. POLLACK:  That's fine.
11     MR. LOEVY:  Okay.
12     MS. POLLACK:  That's what we've done every day
13   so far, yeah.
14     MR. LOEVY:  Okay.  Let us -- then let's go on
15   then.  See where we go.
16   BY MR. LOEVY:
17     Q    Your training on the use of the Taser
18   consisted of what, Lieutenant?
19     A    Several hours of PowerPoint and video, you
20   know, the dos, don'ts.
21     Q    Let me ask you more specifically.
22     A    I was going to say this can go on for awhile.
23     Q    Let's go back to the -- your time in the
24   academy some years ago.  Did you have Taser training at
25   that time, when you first went into the academy?

Page 164

1      A    No.
2      Q    Did you ever go back to the academy for Taser
3   training?
4      A    No.
5      Q    Did you ever go to the county for Taser
6   training?
7      A    Prior to this incident or --
8      Q    Yes.
9      A    -- at any time?
10     Q    Prior to.
11     A    No.
12     Q    Okay.  Prior to -- and thank you for pointing
13   that out, Lieutenant.  Prior to this incident, was the
14   entire amount of your training, that which you received,
15   at your department?
16     A    Yes.
17     Q    And you have training records.  Have you
18   looked at your training records prior to this dep?
19     A    No.
20     Q    Okay.  When you attend a training session,
21   including one which would include Tasers, do you have to
22   sign up for it in some fashion or...?
23     A    Sign up to take the training or sign in when
24   you go?
25     Q    Just -- and thank you again.  First, signing

Page 165

1   up for it?
2      A    No.  It's mandatory that we go.
3      Q    And what -- and the training is mandatory over
4   what period of time?  How frequently are you mandated to
5   take Taser training?
6      A    Off the top of my head, I believe it's two
7   years.  I just, whenever they tell me to go, I go.
8      Q    And then you have to sign in?
9      A    Yes.
10     Q    Correct?
11     A    Yes.
12     Q    And did you have Taser training within a two-
13   year period prior to May of 2016?
14     A    Yes.
15     Q    Okay.  Sometime in 2015?
16     A    I don't know.
17     Q    Fair.  But roughly that period of time?
18     A    I guess, yeah.
19     Q    Who taught that training program?
20     A    I think then, it was Joey Rodri -- Officer
21   Joey Rodriguez.
22     Q    Okay.
23     A    But --
24     Q    He is a member of your department?
25     A    He was.  He moved on to Virginia and does AR-



Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 166

1   15 training with --

2       Q   Do you know, one way or the other, whether he

3   was certified to give Taser training?

4       A   Yeah.  He was -- yeah, he was a training

5   officer and a Taser trainer.

6       Q   You know that he was certified to give both?

7       A   Well, he says he was, you know?  And -- and I

8   -- I don't have any reason to dispute it, because, you

9   know, they allowed him to do it.

10      Q   And during the Taser training that you

11  received, first training -- or strike that, please.  The

12  Taser training you received immediately prior to May

13  2016, not immediately prior to, but the last one before

14  2016, how long did that take?  Was it a full day?

15      A   I don't believe it was a full day.  Once you

16  do your official one, then it's just kind of a -- you

17  know, a brief --

18      Q   Refresher?

19      A   Yeah.  You know...

20      Q   Okay.  How long --

21      A   I -- I --

22      Q   -- were those?

23      A   I really don't remember.

24      Q   Hours?  Half-day?

25      A   It was over an hour.  I know, over an hour,

Page 167

1   but I do not know how long, because literally, we get --

2   we do a full 12-hour day of nothing, then stuff that's

3   mandated.  We go over EVOC, firearms, domestic, mental

4   illness, every -- you know, so I don't remember.

5       Q   They throw everything into that?

6       A   Well, all the state mandates, yeah.

7       Q   Okay.  And did you receive, in your training,

8   written material concerning use of a Taser?

9       A   I think they actually give us a copy of the

10  PowerPoint, but I'm not positive.  But I think there was

11  some kind of paper that came with it.

12      Q   And tell us -- and I helped you with the word

13  a little bit earlier, but what does that mean, "the

14  PowerPoints"?

15      A   What would normally be shown on a video screen

16  so the whole class can see it.  Sometimes they'll print

17  those out and give them to us, so we can also keep them,

18  have them, or look through it, and make mark -- you

19  know, like, highlight things if we find it interesting

20  or something.

21      Q   Were you given -- after that training, were

22  you given copies of the PowerPoints?

23      A   I don't -- I'm just saying I remember having

24  some kind of literature in front of me, but I don't

25  know.

Page 168

1       Q   Did you ever keep any copies of the

2   PowerPoints?

3       A   No.

4       Q   You didn't keep possession of them?

5       A   No.

6       Q   Any place where they were at the station?

7       A   We just go to our training officer if we have

8   a question about anything or need a copy.  We just go

9   back to him and say, Hey, can I have a copy of that

10  PowerPoint, or, Can I have the -- another copy of the

11  literature you gave us?

12      Q   When did Rodriguez leave the department?

13      A   You know, I --

14      MR. LOEVY:  Can I interrupt the attorneys?

15      A   He left --

16      MR. LOEVY:  -- and -

17      A   I don't -- five years ago?

18  BY MR. LOEVY:

19      Q   How many years ago?

20      A   Four or five.  I -- I --

21      Q   Well, then that -- he left before the 2015

22  then?

23      A   Then again, see, they switch back.  They

24  switch back.  I know Joey did the first one, and I know

25  he did some in-between.  I don't know when he -- when he

Page 169

1   quit.

2       MR. LOEVY:  Can you mark these as Exhibit 2?

3       (EXHIBIT 2 MARKED FOR IDENTIFICATION)

4       A   It's either him or Jason Holtzleiter, but I

5   know Joey's done it.  I was thinking he was the one that

6   did it before, but I don't -- like I said, they trade

7   off and on, so -- but I thought it was Officer

8   Rodriguez.

9       MS. POLLACK:  So is this 1 and this is 2?

10      MR. ART:  Correct.

11      MS. POLLACK:  Yeah?  Okay.

12      MR. ART:  So for the record, Exhibit 1 is the

13  Taser log.  Exhibit 2, we've just marked as

14  Defendant Blackwell's Answer to Plaintiff's First

15  Set of Interrogatories.

16      MR. LOEVY:  Okay.  Is there -- were these

17  admitted as well?

18      MR. ART:  You've got them -- everything, right

19  there.

20      MR. LOEVY:  Okay.

21  BY MR. LOEVY:

22      Q   Okay.  I'm showing you Exhibit 2 is -- look at

23  the last page; is that your signature?

24      A   Yes.

25      Q   And the date, I assume, is accurate as well?



Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 190

1  Charles went to the ground." Is that the first time
2  Charles went to the ground after you tased him in his
3  thigh?
4       A    I'd have to -- let's see.  How many times did
5  I say I did before then?
6       Q    Okay.  Let me ask you another way.
7       A    I mean, I'm try -- "Struggling," okay.
8       MS. POLLACK:  Brian, he's going to ask you
9  another question so just wait for that.
10      Q    I'm going to ask you another question, okay?
11  Why didn't you initial the time that you pulled -- the
12  fact that you deployed the Taser, in other words pulled
13  the trigger, 16 times?
14      A    Because it -- I didn't have an accurate -- I
15  don't know.  I don't know how many times I pulled the --
16  the trigger that day.  I never got the resp -- like I
17  said, I don't know.
18      Q    You could've checked the Taser log, couldn't
19  you?
20      A    I -- no, not on a weekend.  I couldn't -- or a
21  holiday weekend.  This is Memorial Day.
22      Q    Okay.
23      A    And I don't have access to that.
24      Q    But if you read -- would you agree that if you
25  read this report, there's no way you could prove that

Page 191

1  you had deployed your Taser 16 times in a four-minute
2  period?
3       A    Correct.  It just -- it -- well, I -- all I
4  did is instead of being -- this is supposed to be kind
5  of shortened, like a CliffsNotes version; what I did is
6  put down this contin -- oh, where is it?  I know in one
7  of my reports, I just said, "This continued on" -- oh,
8  here it is.  "He refused, and another application" --
9  "this continued for about a minute or two minutes."  In
10  other words, I am putting in there, this continued and
11  continued, the same action of him being told, refusing,
12  and then attempting to tase, and then told, refusing,
13  attempting to tase.
14      MR. LOEVY:  Let's make that an Exhibit.
15      A    I mean, it'd be kind of redundant to continue
16  doing that over and over again, so that's why I just
17  said, you know, "This continued for a minute or two
18  before the other hand was retrieved."
19      Q    Okay.
20      A    So I didn't leave it out.  I just didn't have
21  an accurate count, but I tell -- if you -- it went on
22  for a few minutes.
23      MR. ART:  Just for a second?
24      MR. LOEVY:  This is the amended response.
25      MR. ART:  Okay.  Can I have -- see it for a

Page 192

1  second, please?
2  BY MR. LOEVY:
3       Q    Okay.  Who did you submit the report to?
4       A    They go to the chief, assistant chief, both
5  deputy chiefs, and the training officer.
6       Q    And upon the receipt of it, did anyone ask any
7  questions about it?
8       A    No.  Not that I -- I don't think anybody asked
9  me any questions about it.
10      Q    Okay.
11      A    I mean, at this point, he's, you know, he went
12  to the hospital, and we didn't know anything -- anything
13  more about him.
14      Q    Well, you --
15      A    We just figured --
16      Q    You knew that his heart had stopped at one
17  point?
18      A    Well, yeah.  I mean, but didn't know --
19      MR. LOEVY:  This is the amended response of the
20  first one.  It doesn't matter.  You can reverse the
21  orders.  Put that over there.  Thank you.
22  BY MR. LOEVY:
23      Q    I'm showing you what has been marked as
24  Exhibit 4.  This is a Response to a request for
25  admission, and tell me if your signature appears on this

Page 193

1  document.
2       (EXHIBIT 4 MARKED FOR IDENTIFICATION)
3       A    No.
4       MS. POLLACK:  Well, it wouldn't --
5       MR. HOLLOWAY:  There's no request --
6       MS. POLLACK:  -- be, because they're not
7  required to sign.
8       MR. HOLLOWAY:  Yeah.
9  BY MR. LOEVY:
10      Q    Okay.  All right.  And let me show you number
11  5.
12       (EXHIBIT 5 MARKED FOR IDENTIFICATION)
13      MR. ART:  Do you want the other one, too?
14      MR. LOEVY:  Yeah.  Thank you.
15      Q    Here is number 5.  This is an amended --
16      A    So which one do you want me to look at?
17      Q    I'm going to ask you some questions.  Give me
18  a second.  Let's look at number 5.  Nope.  Take that
19  back.  Number 6.
20       (EXHIBIT 6 MARKED FOR IDENTIFICATION)
21      MS. POLLACK:  Exhibit 5 or 4?
22      MR. LOEVY:  6.  6.
23      MS. POLLACK:  Which exhibit?
24      MR. HOLLOWAY:  Which exhibit?
25      MR. LOEVY:  They should be the same.



Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

The Deposition of LIEUTENANT BRIAN BLACKWELL, taken on April 06, 2018

194..197

Page 194

```
1         MR. ART:  4 or 5.
2         THE WITNESS:  One's 4, one's 5.
3         MR. HOLLOWAY:  You're looking at Exhibit 4,
4    right now.  Here's Exhibit 5.
5         MR. LOEVY:  Yeah.
6  BY MR. LOEVY:
7    Q    Look at number 6.
8         MR. ART:  Of which exhibit?
9         MR. LOEVY:  Either or.
10        MR. ART:  Okay.
11        MR. LOEVY:  Of the first request --
12        MR. ART:  Exhibit 4...
13        MS. POLLACK:  4?
14        MR. LOEVY:  -- of Exhibit 4.  Yes, sir.
15        MS. POLLACK:  Is he looking at the first
16   request for -- on Exhibit 4?
17        MR. LOEVY:  The first -- no, number 6 on
18   Exhibit 4.
19  BY MR. LOEVY:
20    Q    And the Request to Admit, is "Admit that prior
21  to May 29, 2016, Brian Blackwell has been trained to
22  minimum [sic] repeated, continuous, or simultaneous use
23  of a Taser."  Your response, "Defendant admits that he
24  was trained to use the minimal level of force
25  necessary."  Is that what you were trained to do, to use
```

Page 195

```
1  the minimal level of force necessary?
2    A    Yes.
3    Q    Okay.  And now let us look to Exhibit 5, also
4  number 6.  You amended your response, and the reason is
5  as follows, "Despite having made reasonable inquiry, the
6  information known to Defendant," that's you, "is
7  insufficient for you to either admit or deny our
8  request."  Again, the request was that you were trained
9  to minimize repeated, continuous, or simultaneous use of
10  a Taser.  So my question to you is: Were you or were you
11  not trained to use the minimal amount of force necessary
12  when using a Taser?
13        MS. POLLACK:  Well, I'll object to form of
14   question.  I don't think the amended request
15   contradicts the original response.
16        MR. LOEVY:
17    Q    Either way, were you or were you not trained
18  to use the minimal level of force necessary in use of a
19  Taser?
20        MS. POLLACK:  Well, that was not the request.
21    A    In the use of a Taser?
22        MS. POLLACK:  That was not the request.
23        MR. LOEVY:  Hang on.  I'm just asking him the
24   question, though.  I'm giving him the --
25        MS. POLLACK:  You're not asking him about --
```

Page 196

```
1         MR. LOEVY:
2         I'm giving him the advantage of looking at his
3    Request to Admit and the Amended Request to Admit.
4    Now I'm asking him the question.
5  BY MR. LOEVY:
6    Q    And the question is: "Were you or were you not
7  trained to use the minimal level of force necessary when
8  using a Taser?"
9    A    Okay.  So you're -- okay, so you're adding in
10  the Taser, not in general, correct?
11    Q    Correct.
12    A    The -- I don't know if it -- I mean, you --
13  you use it until it works.  You get compliance, and the
14  -- the subject's arrested, because -- then I would have
15  to elevate it to the next level of force, which I --
16    Q    Actually, Lieutenant, I don't think you're
17  answering my question.  My question is just related to
18  your training: Were you trained in the use of a Taser to
19  use the minimal amount of force necessary?
20    A    It was in our training about -- it's -- force
21  in general. that they didn't say, before that incident,
22  that there was a -- a minimal amount.
23    Q    Okay.  So you were not, correct --
24    A    So I don't --
25    Q    Am I right in saying you were not trained in
```

Page 197

```
1  the use of a Taser to use the minimal amount of force
2  necessary?
3    A    Not that I recall.  I mean, you don't --
4    Q    Did you get --
5    A    You don't use excess.  I mean -- I mean, you
6  use what's needed until it works and you get the
7  compliance that you are requesting.
8    Q    Okay.  And so, there was no limitation, in
9  your training, as to how frequently you could pull the
10  trigger and deploy the Taser?
11        MS. POLLACK:  I'll object.
12    Q    Is that correct?
13        MS. POLLACK:  That mischaracterizes his
14   testimony.
15    Q    It's a different question.  Go ahead.
16    A    Prior to that incident, I do not recall ever
17  having a limit on the amount you could use.  If it was,
18  then I do not recall it.  But I remember specifically
19  asking for those records and they would not -- they were
20  not produced to me.  They said they couldn't find them,
21  that the other officer took them when he retired.
22    Q    Would it be fair to say; you've had a chance
23  to think about this issue?
24    A    Well, yeah.  I don't remember.  I -- I mean,
25  like I said, I don't remember them ever saying that.
```



Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

The Deposition of LIEUTENANT BRIAN BLACKWELL, taken on April 06, 2018

198..201

Page 198

1   That only afterwards, something was said.
2       Q   Am I correct in saying then; you don't
3   remember ever having been told --
4       A   No.
5       Q   -- that there was a minimum amount of times
6   that you should activate your Taser on a --
7       MS. POLLACK:  A minimum amount --
8       Q   -- given --
9       MS. POLLACK:  -- of times?
10      Q   Minimal amount of -- or a maximum amount, or a
11  minimum?  Thank you for the correction.  I'll repeat the
12  question.  I appreciate it, Counsel.  Am I correct in
13  saying that your training, prior to May of 2016 never
14  gave you a maximum number of times that you should
15  deploy your Taser on an individual person?
16      A   None that I can recall.
17      Q   And you've had time to think about it?
18      A   Yes.
19      Q   And you've looked for records to see if anyone
20  had trained you to do that?
21      A   I had to use the restroom at the time, or
22  something, or made a phone call.  I mean, I don't
23  remember that being said.  That's why I was confident
24  that day.
25      Q   Would I be also fair to say that you depended,

Page 199

1   on your training in the use of the Taser, on your
2   employer?
3       A   I'm sorry?
4       Q   Would it be fair to say that you depended, on
5   the use of a Taser -- from instructions on how to use
6   it, you depended on your employer?
7       A   Yes.
8       Q   The Town of Greenwood and its police
9   department?
10      A   Yes.
11      Q   Then let us turn to Exhibit 5, number 7.
12      MR. HOLLOWAY:  I think that's what he just did,
13  wasn't it?
14      Q   Okay.  Do you see it there?
15      A   Yes.
16      Q   And the question is: "Admit to prior to
17  May 29, 2016, Blackwell had not been trained to minimize
18  repeated, continuous, or simultaneous use of a Taser."
19  And your first admission was that "He was trained to use
20  the minimal level of force necessary."  Do you see that
21  answer?
22      MS. POLLACK What are we on, 5?
23      MR. LOEVY:  7.
24      MS. POLLACK:  Number 7?
25      MR. LOEVY:  Exhibit 5.

Page 200

1       MS. POLLACK:  Exhibit 5.
2       MR. LOEVY:  Number 7.
3       MS. POLLACK:  I'm sorry.
4   BY MR. LOEVY:
5       Q   Do you see that answer?
6       A   "Force necessary but not" okay, "of the
7   Taser."
8       Q   Yes.
9       A   Okay.  Now, you're -- okay, this one adds the
10  Taser in, okay.
11      Q   Correct.  Do you see that?
12      A   Yes.  I'm just --
13      Q   And when you answered that question in that
14  way in Exhibit 4, was that a truthful answer?
15      A   As the -- yeah, the training as a whole, yes.
16  I mean, to use it with the minimal force necessary.
17      Q   In the use of a Taser?
18      A   Correct.
19      Q   Okay.  That was an accurate answer; you were
20  trained to use the minimal level of force necessary?
21      A   What, prior to -- well --
22      Q   That's prior to May 29th, yeah.  We're looking
23  at number 7.
24      MR. LOEVY:  Let's mark this 7.
25      (EXHIBIT 7 MARKED FOR IDENTIFICATION)

Page 201

1       MS. POLLACK:  I think that's been asked and
2   answered.
3       MR. LOEVY:  Can you read back the question,
4   please, and his answer, if any?
5       MR. ART:  Just so you know, she can't read it
6   back.
7       MR. LOEVY:  Okay.
8       MR. ART:  But it plays quietly from her
9   computer.
10      MR. LOEVY:  Okay.  What is still on --
11      THE WITNESS:  "Force necessary by Taser." Okay.
12  I -- I don't know why I'd say that.  I mean, I --
13      MS. POLLACK:  Well, first of all, I think the
14  answer speaks for itself, but I think it's also been
15  asked and answered.
16      MR. LOEVY:  Would you like to move on, Officer?
17      THE WITNESS:  Yes, because I'm -- yeah.
18      MR. LOEVY:  And what number?  Okay.
19      MR. ART:  6.
20      MR. LOEVY:  Set it down.
21  BY MR. LOEVY:
22      Q   This is Exhibit 6.  And before you look -- why
23  don't I take a look at it?  This is D, Defendant 004684.
24  These are -- remember you testified a little earlier as
25  to the training you had taken in 2015, before the

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201



KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 202

1   incident with Mr. --
2       A   Yes.
3       Q   -- Todero?  Remember that?  And you testified
4   as to PowerPoints that were used in the presentation?
5       A   Yes.  That I believe that's what they used,
6   yes.
7       Q   Yeah.  And you couldn't remember what the
8   PowerPoints were?  You had a general...?
9       A   Right.
10      Q   These are what had been submitted to us as
11  some of the PowerPoints that were used.
12      A   Okay.
13      Q   See if it refreshes your memory.
14          MR. HOLLOWAY:  While you look through those,
15      I'll state for the record that the Bates range on
16      this is selection from the documents that produced.
17      The Bates numbers are D4684, D4693, D4462, D4463,
18      D4465, D4560, D4562, D4563, D4580, and D4581.  And
19      as we said on the record yesterday, those Bates
20      stamps are applied by Plaintiff's Counsel to
21      Defendant's production.
22          MR. LOEVY:  Okay.
23  BY MR. LOEVY:
24      Q   So the first PowerPoint is contingencies; do
25  you see that?  Very first one.

Page 203

1       A   Yes.
2       Q   And that says that, "If a Taser cartridge is a
3   dud, keep ECD aimed at target while placing the ECD on
4   Safe"; do you see that?
5       A   (No verbal response.)
6       Q   "Reload with a new cartridge and re-engage
7   target.  Do not attempt to reuse a dud"; do you see
8   that?
9       A   Yes.
10      Q   Okay.  And was that how you were trained?  Do
11  you remember seeing that?
12      A   Did this come from our department or from
13  Taser?
14      Q   From your department.
15      A   Okay.  I don't have a second cartridge, so
16  that wasn't an option.
17      Q   You didn't have a second cartridge?
18      A   Nope.
19      Q   Why not?
20      A   Because only certain -- the second cartridge
21  goes -- is an attachment -- a special attachment that's
22  hooked onto the battery, and some of us -- some have
23  them, some don't.  I didn't.
24      Q   So is it your testimony that your Taser did
25  not have the capability of a second cartridge?

Page 204

1       A   Yes.
2       Q   And your -- what was the number of yours,
3   X...?
4       A   26.
5       Q   And an X26 does not -- so I understand --
6       A   Only if you buy that battery attachment that
7   has the attachment for the second cartridge.  Mine
8   didn't.
9       Q   Why didn't it?  And was buying the battery
10  attachment --
11      A   You've got to buy a whole new --
12      Q   -- optional?
13      A   -- battery.  You've got to buy the whole new
14  battery, and that -- we get what the department gives
15  us.
16      Q   So let me just understand; so your department
17  doesn't give you the battery attachment, or...?
18      A   Some officers have them.  They came out later,
19  I think, and that's why the newer officers would get
20  one, because the -- when we first got these, I don't
21  think that was available.  And then as they became
22  available, we started getting new officers.  Well, they
23  would get the updated one.
24      Q   Okay.  Is that --
25      A   But I did not.

Page 205

1       Q   All right.  Is it your testimony that your
2   Taser cartridge -- excuse me -- that your Taser
3   cartridge was a dud?
4       A   No.  It just didn't have a good attach -- I
5   just couldn't get a good placement.
6       Q   Okay.  Let's turn to the second page.  "Avoid
7   extended, repeated, or prolonged Taser applications
8   where practical.  Did you avoid extended Taser
9   applications?  Tases, you deployed your Taser 16 times
10  in four minutes.
11      A   It just said provide breaks in between
12  stimulation when -- when -- when practical.
13      Q   Well, was Mr. Todero captured when he was
14  lying on the ground?
15      A   Nope.  Not until he's in handcuffs.
16      Q   Was he restrained?
17      A   After the fact, yes.
18      Q   Was he under control?
19      A   When he was handcuffed.
20      Q   Not --
21      A   Are you talking about before?  No.
22      Q   No?  Okay.  Did you know that "Human studies
23  have shown that ECD applications do not impair normal
24  breathing patterns?"
25      A   Where's this?  Is this -- is this on here?

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

The Deposition of LIEUTENANT BRIAN BLACKWELL, taken on April 06, 2018

206..209

Page 206

1    Q    The second bullet point.
2    A    "Human studies shown that ECD applications do
3    not impair normal breathing patterns."
4    Q    Oh, I'm sorry.  It's -- it's Bates 004693.  The
5    Bates stamps are in the lower, left-hand corner.
6    A    Okay.  That's what I'm on, but...?
7         MS. POLLACK:  Second one.
8    Q    Okay.
9    A    It says, "It does not impair normal breathing
10   patterns,"
11   Q    Okay.  Now, look at the third one.
12        MS. POLLACK:  Well, I think we just looked at
13   the third one.
14        MR. LOEVY:  Third bullet point.
15        MS. POLLACK:  But we just looked at that.
16        MR. LOEVY:  Sorry?
17        MS. POLLACK:  We just looked at that.  You just
18   asked him about it.
19        MR. LOEVY:  No.  I asked about the second one.
20   Now I'm on the third bullet point.
21        MS. POLLACK:  Well, you asked about the third
22   one before the second one, but okay.
23   BY MR. LOEVY:
24   Q    I know.
25   A    I brought it --

Page 207

1    Q    It says --
2    A    I brought it up, because -- are you talking
3    about this one here, the circuit --
4    Q    Third bullet point.  Are we on the same page?
5         MS. POLLACK:  You just talked about the third
6    one, about giving breaks.
7    A    Yeah.
8         MS. POLLACK:  Yeah.
9    A    That's what I said.  He was provided breaks in
10   between.
11        MS. POLLACK:  Yeah.
12   Q    Were you trained in that in your 2015
13   training?
14   A    Well, if it's all in here, I guess I did.  I
15   don't recall, but he was given the breaks.
16   Q    If you'd have remembered -- well, let's go
17   back to page 1, Contingencies, okay?  If you'd've
18   remembered the training on the first page, would that
19   have affected your behavior, with respect to Mr. Todero,
20   in 2016?
21   A    To use the dud?  Are we on --
22   Q    Anything here.  If you'd remembered the
23   contingencies?
24   A    No.  I didn't.  No.  It -- because I didn't
25   have the second.

Page 208

1    Q    Okay.  If you would've remembered your
2    training on 004693, would that have affected --
3    A    No.
4    Q    -- your interaction with Mr. Todero?
5         MS. POLLACK:  Well, I'm going to object to the
6    form.  I don't like the implication that he forgot
7    his training.
8         MR. LOEVY:  Well...
9         MS. POLLACK:  So...
10   BY MR. LOEVY:
11   Q    We'll ask him.  Did you remember receiving --
12   thank you.  Do you -- I'll go back then.  On 4693, do
13   you remember receiving this training?
14   A    4-6 of '93 or what...?
15        MS. POLLACK:  4693, the page.
16        THE WITNESS:  Oh, I'm sorry.
17        MS. POLLACK:  Yeah.
18   A    I'm thinking the date.  I was, like, Holy
19   mackerel.  I don't remember that.
20   BY MR. LOEVY:
21   Q    Do you remember receiving this training, as
22   it's stated on this page?
23   A    I'm getting this training mixed up with other
24   trainings that I've had since then, but if this is on
25   PowerPoint then yes, it was in my training.  Yes.

Page 209

1    Q    Okay.  So you were trained on all these
2    matters and did you remember your training on 004693
3    when you had your interaction with Mr. Todero?
4    A    Yes.
5    Q    All right.  Let us turn to the next page,
6    004462.  Do you remember receiving this training?
7    A    Yes.
8    Q    Okay.  So you remember the training that said
9    that "Multiple Taser applications cannot be justified
10   solely on the grounds that a suspect fails to comply
11   with a command."  You understood that, correct?
12   A    Yes.
13   Q    But you tased him anyway.  16 times, you
14   deployed your Taser in a four-minute period, knowing
15   that "multiple applications cannot be justified solely
16   on the grounds that a suspect fails to comply with a
17   command"?
18   A    But he also continued walking after I
19   attempted physical contact with him.  So at that point,
20   it's not just a command.  It's also, he's not subject --
21   or giving in to any phys -- or physical contact, and
22   he's obstructing traffic.
23   Q    Sure.
24   A    And --
25   Q    I thought you testified that at least 12 of

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201



KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

The Deposition of LIEUTENANT BRIAN BLACKWELL, taken on April 06, 2018

210..213

Page 210

1  those Tasers were deployed because he failed to comply
2  with your command to put his arms behind his back and be
3  arrested, handcuffed?
4      A    Correct.  But, say -- the comply -- the
5  "comply with a command" followed him walking in the traffic
6  and refusing verbal orders and a physical contact.  So I
7  mean, he's still committing a crime, but that wasn't a
8  priority at that time, I mean, as far as getting him to
9  -- versus getting him medical help for his condition.
10     Q    You tased him 12 times --
11     A    Uh-huh.
12     Q    -- at least, because he failed to comply with
13  your command.  Were you doing it as punishment for his
14  failure to comply with your command to stop walking
15  away?
16     A    No.  He was going out in traffic.
17     Q    Yeah.
18     A    And like I said, I've got to get him out of
19  there for my safety and his.
20     Q    I'm talking about when he's lying on the
21  ground.
22     A    Lying down in a roadway with traffic with me
23  there.  So it's not just verbal commands that he didn't
24  command [sic], it's also putting himself and myself in a
25  dangerous situation just because I was using verbal

Page 211

1  commands, I mean, I -- I mean, I could go hands-on and
2  then prove your theory that...
3      Q    Prove my theory.
4      A    Well, I mean, I don't want to drag him off the
5  roadway by his feet.
6      Q    Okay.  At any rate, you're aware of --
7      A    Yes.
8      Q    -- 004462, and did you take it into account
9  when you did what you did to Mr. Todero?
10     A    Yes.
11     Q    All right.  Let's turn to the next page,
12  004463.  Were you aware of this in your training, "Any
13  decision to apply multiple ECD applications must take
14  into consideration whether a suspect is capable of
15  complying with officer's commands"?
16     A    Yes.
17     Q    All right.  And you took that into account as
18  well, correct?
19     A    Yes.
20     Q    All right.  Let's turn to the next page,
21  004465, "Justify/document every trigger pull five-
22  seconds discharge.  Articulately document threat
23  behavior."  Were you aware of that prior to your
24  interaction with Mr. Todero?
25     A    Yes.

Page 212

1      Q    All right.  Let's look to the next bullet
2  point, "Avoid multiple, repeated, pro-longed, or
3  continuous exposures, unless necessary to counter
4  reasonably perceived threats and it's justifiable.
5  Document your justification.  Avoid intentionally
6  targeting sensitive areas when possible."
7      A    Yes.
8      Q    You were aware of that, correct?
9      A    Yes.
10     Q    And is it -- well, strike that, please.  Let's
11  look at the next one, "Electrical arc can penetrate some
12  soft body armor and may jump off the clothing up to
13  approximately two inches total, or approximately one
14  inch per probe.  Were you aware of this?
15     A    Hang on.  Let me read that.  "Or approximately
16  one inch per probe."  I don't -- let's see here...
17     Q    Were you aware of this training?
18     A    Well, no.  I'm trying to figure out what
19  they're trying to say.  I understand "can jump through
20  clothing approximately two inches."  Then it says
21  "total, or approximately one inch per probe."  I don't
22  know what they mean by "one inch per probe."  "Or
23  approximately one inch per probe."
24     Q    Were you aware of the training, is my
25  question.

Page 213

1      A    Yeah.  I -- I remember the placement.  I don't
2  remember something about two inches of clo --
3      Q    How thick was Charlie's T-shirt?
4      A    It was thin.  I mean, just like a normal T-
5  shirt.
6      Q    Something less than inch thick?
7      A    Right.  But they're -- they're talking about
8  clothing that's like this, up next to you.  But if it's
9  bagging like this, that absorbs the -- the dar -- the
10  dart.
11     Q    Let's turn to 004562, "Causes of limited
12  effectiveness."  Were you trained in this area?
13     A    Yeah.  Loose or thick clothing.  That's what I
14  was -- yeah.
15     Q    Okay.
16     A    "Limited probe...spread," yes.
17          MR. HOLLOWAY:  He said, "Yes."
18          MR. LOEVY:  Oh, I know.
19     A    I'm sorry.
20     Q    Okay.
21     A    Yeah.
22     Q    You were trained.  Okay.  Next page.  Silence
23  is Golden.
24     A    Yes.
25     Q    Were you trained in this?

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201


KENTUCKIANA
COURT REPORTERS

502 589.2273 Phone
502 584 0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 1:17-cv-01698-TWP-MJD   Document 113-16   Filed 07/13/18   Page 33 of 43 PageID #:
1765
The Deposition of LIEUTENANT BRIAN BLACKWELL, taken on April 06, 2018
214..217

Page 214

1    A    Yes.
2    Q    And you were trained on reloading, correct,
3  but --
4    A    I don't have one, yeah.
5    Q    Very good.  Let's go to the next page, 004580.
6  Were you trained in this, including "avoiding extended,
7  repeated, or prolonged ECD applications, where
8  practical"?  Just asking if you were trained in that,
9  sir.
10    A    I believe I did, yes.  I remember that
11  wording.
12    Q    And were you trained, "Attempt to minimize the
13  physical and psychological stress to the subject"?
14    A    Yes.
15    Q    Let's go to the next page, 004581, "Avoid
16  extended, repeated, or prolonged Taser ECD
17  applications".
18        MS. POLLACK:  I think we've already covered
19    this one as a prior page, I think.
20        THE WITNESS:  That's --
21        MS. POLLACK:  These look familiar.
22        THE WITNESS:  -- this was -- this was already
23    in there.
24        MS. POLLACK:  Yeah.
25        MR. LOEVY:  Thank you for that.

Page 215

1        MS. POLLACK:  Yeah.  It's the same as 004693.
2  BY MR. LOEVY:
3    Q    At any rate, there's multiple -- that's what,
4  Exhibit 6?
5        MS. POLLACK:  Yep.
6    Q    -- Multiple PowerPoint's that you remember
7  being trained in, correct?
8    A    Yes.
9        MR. LOEVY:  Can I have his report that's before
10    that, please?  Thank you.
11        MR. ART:  Are you talking about -- which one of
12    these two are you talking about?
13        MR. LOEVY:  Let me see for a moment.  Now, this
14    --
15        MR. ART:  That's Ison's report.  That's his.
16        MR. LOEVY:  This one?
17        MR. ART:  That's it.
18        MR. LOEVY:  Got it.  Thank you.
19        MR. ART:  That's Exhibit 7.
20  BY MR. LOEVY:
21    Q    I'm showing you what has been marked as
22  Exhibit 7.  Is this one of the documents you reviewed
23  prior to the deposition?
24    A    Yes.
25    Q    And you reviewed this document last night; is

Page 216

1  that correct?
2    A    Yeah.  I looked, yes.
3    Q    What is -- it's sometimes called the
4  Supplemental Narrative.  Sometimes it's Supplemental
5  Report?
6    A    Right.
7    Q    Can you tell us what this document is?
8    A    Anytime we go into detail where our report's
9  more than a couple sentences -- it's going to be more
10  than a couple of sentences long and we're going to
11  mention names, we go to a supplement.  That way, if --
12  not everyone has access to it as far as like, media
13  goes, and things like that.  Because since we use names
14  and stuff, we don't want, you know, the media getting
15  ahold of juveniles' names and things like that.  So it's
16  this policy to do a real quick, you know, main
17  narrative, you know.  You know, like in this case, it
18  should probably say "don't" -- you know, "dealing," or
19  "subject attempting suicide by traffic was later taken
20  to the hospital."  It would be real short, real short.
21    Q    Supplemental reports --
22    A    But the supplements are more detailed.
23    Q    Oh, okay.
24    A    Yeah.
25    Q    So this one --

Page 217

1    A    That's so we can -- this is where we put names
2  down, you know, addresses, names, things like that, so
3  it's protected from the public, unless they ask for it.
4    Q    Okay.  So this is to be a detailed report of
5  what transpired?
6    A    Yes.
7    Q    And who does this -- well, who prepared this
8  report?
9    A    I did.
10    Q    What was the date, and it's -- just to be
11  clear, it's 0018 through 20.  Did you prepare the report
12  yourself?
13    A    Yes.
14    Q    Anybody assist you in writing the report?
15    A    No.
16    Q    When did you prepare this report?
17    A    5:24 p.m. on the date.  I'm sorry.  On May
18  29th.
19    Q    Okay.  On -- so this was when everything was
20  fresh in your mind, correct?
21    A    Yes.
22    Q    And you did say that Macnaughton -- who's
23  Macnaughton, Deborah Macnaughton?
24    A    Those are the people that called in and --
25    Q    Right.

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 246

1   Greenwood.
2        MS. POLLACK:  Yeah.
3        MR. HOLLOWAY:   Let me say something.  What is
4   the agreement, as you currently understand it?
5        MS. POLLACK:  That until such time as the
6   qualified immunity issue has been decided on summary
7   judgment, it is not appropriate to ask a defendant
8   about his financial assets for purposes of punitive
9   damages.
10       MR. ART:  Okay.  Are you guys agreeing to re-
11   open discovery on that issue after summary judgment?
12       MS. POLLACK:  On that issue, we will answer
13   questions, if you have surmised summary judgment on
14   that.
15       MR. ART:  Okay.
16       MR. LOEVY:  And that issue being ability to pay
17   --
18       MS. POLLACK:  Correct.
19       MR. LOEVY:  -- punitive damages?
20       MS. POLLACK:  Correct.
21       MR. ART:  And then I have one more
22   qualification that I'd like you to agree to, and
23   here's the problem: Sometimes we get the summary
24   judgment decision, in some cases, very close to
25   trial.  And so, what I would ask is that you would

Page 247

1   agree that we do it within two weeks of the summary
2   judgment position, or starting three weeks before
3   trial, so that we're not doing it the week before
4   trial.
5        MR. HOLLOWAY:  I'm not making any agreement
6   like that right now.
7        MS. POLLACK:  Yeah.  I don't know.  Yeah,
8   without knowing when the ruling's going to come
9   down, I mean, I don't know.  I mean...
10       MR. ART:  I just don't want to get in a
11   situation where we have no court recourse, right?
12   So now's our chance to ask questions.  If you want
13   to delay it, I understand that we could make an, you
14   know, agreement.  I just don't want to --
15       MR. HOLLOWAY:  Again, I think we did.
16       MS. POLLACK:  We did.
17       MR. HOLLOWAY:  And if I have --
18       MS. POLLACK:  We did.
19       MR. HOLLOWAY:  -- to go back and look at our
20   notes, but we did discuss this --
21       MS. POLLACK:  We did discuss it.
22       MR. HOLLOWAY:  -- with Judge Dinsmore in that
23   four-hour conference we had with them, when Sam
24   Heppell was there.
25       MR. ART:  And what did the Court say?

Page 248

1        MR. HOLLOWAY:  That it --
2        MS. POLLACK:  It was agreed.  I -- you guys
3   asked me for case law, to cite the case law, which I
4   did, and it was all agreed.  So until summary
5   judgment is ruled on, there won't be any issues of
6   punitive damages.  There won't be issue of financial
7   assets explored.
8        MR. HOLLOWAY:  Yeah.  Because there were
9   interrogatories.
10       MR. LOEVY:  I would rely on --
11       MR. HOLLOWAY:  And request for production on
12   them, so...
13       MR. LOEVY:  -- their good faith representation
14   that --
15       MR. ART:  Yeah.
16       MR. LOEVY:  -- you know, that we'll do it in a
17   timely fashion.  Fair?
18       MR. HOLLOWAY:  Yeah.  That sounds fair.
19       MS. POLLACK:  Fine.  Yep.
20       MR. LOEVY:  Can I have some of the exhibits,
21   please?
22       MR. ART:  Do you want to do these first?
23       MR. LOEVY:  Yep.
24       MR. ART:  Okay.  Let me give it back to me
25   then, because --

Page 249

1        MR. LOEVY:  Okay.
2        MR. ART:  -- I'm missing all that.  There's
3   that.  So we're going by that incident?
4        MR. LOEVY:  Do we have copies of that?
5        MR. ART:  Yep.
6        MR. LOEVY:  And what exhibit number is this?
7        MR. ART:  This will be 8.  We're going to go in
8   that order, what's on that page?
9        (EXHIBIT 8 MARKED FOR IDENTIFICATION)
10       MR. LOEVY:  Yeah.
11       MR. ART:  This is for you.
12       MR. LOEVY:  This is the summary.  I got you.
13       MR. ART:  All right.  You ready?
14       MR. LOEVY:  Ready.
15       MR. ART:  All right.
16       MR. LOEVY:  Where's 8?
17       MR. ART:  There's 8.
18   BY MR. LOEVY:
19       Q    Okay.  You have deployed your Taser in the
20   course of your employment in the past; is that correct?
21       A    Yes.
22       Q    You have deployed your Taser on multiple
23   occasions; is that correct?
24       MS. POLLACK:  Well, object.
25       Q    Multiple is it more than one?



Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

The Deposition of LIEUTENANT BRIAN BLACKWELL, taken on April 06, 2018

250..253

Page 250

1      MS. POLLACK: Define "multiple". Yeah. He's
2  been a cop for 29 years. Can you define "multiple"?
3      Q   Well, in -- I'm not sure what --
4      A   12.
5      Q   -- relevance of this being a --
6      A   Ten, prob -- I mean, I don't know. What's
7  "multiple"? I mean, more than one --
8      Q   Yeah.
9      A   -- less than --
10      Q   That's all I'm asking.
11      A   -- 100? 12-ish, 15-ish. I don't know.
12      Q   Okay. Have you ever been disciplined for
13  deploying your Taser?
14      A   No.
15      Q   Have you ever been questioned about your use
16  of Taser?
17      A   No.
18      MR. LOEVY: On Exhibit 8 -- did we give him
19  this?
20      MR. ART: Yep.
21  BY MR. LOEVY:
22      Q   Okay. Do you recall -- and this is subsequent
23  to the event -- well, strike that, please. Do you
24  recall the incident on June 27, 2013, when you deployed
25  your Taser?

Page 251

1      A   Yes.
2      Q   And what was it that caused you to deploy your
3  Taser on that date?
4      A   A guy threw a Gatorade bottle at us, a full
5  one.
6      Q   And it landed between you and another officer?
7      A   Yes.
8      Q   And so, what did you do?
9      A   I tased him.
10      Q   What part of his body did you tase him in?
11      A   He got -- I think, it went in, like, his
12  stomach, and then down towards his groin area, but that
13  wasn't on purpose.
14      Q   Tase him in the groin?
15      A   Yes. That was not on purpose.
16      Q   How many times did you tase him in his groin?
17      A   I think, only once.
18      Q   Do you remember?
19      A   Yeah. Because I remember he gave up quite
20  quickly.
21      Q   I would imagine so.
22      A   Yeah.
23      Q   But you don't remember. How old was the
24  person that did this?
25      A   He just got out of prison four hours, six

Page 252

1  hours earlier. He was in his 20s.
2      Q   I'm not asking how long he was --
3      A   20s.
4      Q   20 years old?
5      A   20s. I don't know. I'd have to look at his
6  date of birth.
7      Q   Okay. And was he charged?
8      A   Oh, yeah.
9      Q   Okay.
10      A   He was born in '83.
11      Q   Let's do the next one.
12      MR. ART: Exhibit 9?
13      Q   This would be 9.
14      (EXHIBIT 9 MARKED FOR IDENTIFICATION)
15      MR. ART: And that is --
16      Q   It's not marked. This is an incident of 11-9-
17  2013, correct?
18      A   November 9th, yes, 2013.
19      Q   Okay. And that was someone you had pulled
20  over, correct?
21      A   Yes.
22      Q   And the person questioned why you pulled him
23  over?
24      A   He got out of his car without permission. I
25  told him to go back to his car. He said, something

Page 253

1  like, "This is bullshit. I'm tired of being harassed
2  from the Greenwood Police," and kept walking towards me.
3  I told him to get back in his car, and he said --
4  refused, and then that's when I pulled out my Taser, and
5  I said, "You're going get tased," and he kept coming at
6  me, so I deployed the Taser.
7      Q   How many times did you tase him?
8      A   Well, it didn't go in. He had -- it was
9  wintertime and he had a thick jacket it, and it -- it --
10  he just -- as soon as I shot it, he turned around and
11  tried to run away, and I kept -- I was literally running
12  after him, trying to keep him from pulling the cords
13  out, hoping that it would get ahold of him. And then
14  finally, it -- it -- his jacket either got real close to
15  where it did make an arc, because I remember him -- him
16  going like that, but then he started to get up again.
17  And then I just -- I said, "You're going to get it
18  again. You're going to get it again." He goes, "Okay,
19  I give up. I give up. I give up." And he gave up. So
20  how many times I actually pulled? I do not remember. It
21  wasn't more than two or three.
22      Q   You used the drive-stun technique --
23      A   No.
24      Q   -- on him?
25      A   I don't believe I did.

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

The Deposition of LIEUTENANT BRIAN BLACKWELL, taken on April 06, 2018

254..257

Page 254

1    Q    Okay.

2    A    He gave up.  As soon as he fell on the floor

3  -- or ground, he just goes, "I -- I -- you know, I give

4  up.  I give up."

5    Q    And you didn't drive-stun him --

6    A    No.

7    Q    -- after he --

8    A    He gave up.

9    Q    Okay.  And of course, you completed reports on

10  both those incidents?

11    A    Yes.

12    Q    All right.  Let's do the next one.  That's May

13  10th.

14    A    Is that attached here or...?

15          MR. ART:  This is exhibit 10.

16          (EXHIBIT 10 MARKED FOR IDENTIFICATION)

17    Q    And on May 10th, you tased a woman -- oh, 2 --

18  2015, I'm sorry.  May 10, 2015.  Is that the one you've

19  got?

20    A    Yes.  1-3-18.

21    Q    Okay.  And that was a woman that you tased,

22  correct?

23    A    Let me see.  I --

24          MS. POLLACK:  What'd you just say?  You just

25      said the wrong date.

Page 255

1          THE WITNESS:  It's 1-3 of --

2          MS. POLLACK:  That's not the date of it.

3          THE WITNESS:  Oh.

4          MS. POLLACK:  No.  That's not the date of it.

5          MR. LOEVY:  You should have --

6          THE WITNESS:  Oh, I'm sorry.  It's --

7          MS. POLLACK:  Yeah.

8          THE WITNESS:  It's --

9          MR. LOEVY:  Well...

10          MR. ART:  May 10, 2015.

11          THE WITNESS:  May --

12          MS. POLLACK:  Yeah.  He's looking at the day it

13      was printed on here.

14          THE WITNESS:  Oh.  Here we go.  May 10th.  Okay.

15          MS. POLLACK:  Yeah.

16          MR. HOLLOWAY:  Lieutenant has Exhibit 10

17      though, right?

18          MS. POLLACK:  Yes.

19          MR. LOEVY:  Got it.

20          THE WITNESS:  Okay.

21  BY MR. LOEVY:

22    Q    And that was a woman that you tased, correct?

23    A    Memory here.  What -- I don't -- let me --

24  hang on here.  Oh, this is the -- okay.  Hang on.  Yeah,

25  okay.  I know this one, yes.  Yes.

Page 256

1    Q    Tell us about it.

2    A    Extremely impaired.  She had called for a

3  lockout on "her truck" saying she locked the keys in the

4  truck.  Well, she didn't know that mall security had

5  called us to do it, because they don't do it.  They're

6  not wanting to be liable for a damage to vehicle, so

7  they called us.  Well, when I arrived and she looked at

8  me and -- and immediately turned around and started

9  walking away, and so I look at mall security and I go,

10  "Is this the one that locked her keys in this truck?"

11  She goes, "Yeah."  And I said, "Hey."  I said, "I'm

12  here."  She goes, "Nope, never mind now.  I don't need

13  it."  I'm like, "Wait a minute.  Something's going on

14  here."  I said, "Is that your truck?"  And she goes, "I

15  just want to go home.  Leave me alone."  And I mean, she

16  was really, really impaired.  I mean, really bad, so

17    Q    How many times did you tase her?

18    A    Once.

19    Q    Where?  What part of her body?

20    A    I don't remember.

21    Q    Okay.

22    A    She had, like, five different drugs in her.

23  Anyway, that wasn't even her truck.  She was wanting me

24  to get her into someone else's truck.  Not even a

25  relative.  She just wanted to get into the truck, so

Page 257

1  that's why she was walking away.  It turned out -- you

2  know, I don't know if she was going to steal it or just

3  pass out in it and sleep, but it wasn't even hers.

4    Q    And then there's October 10, 22015.

5          MR. LOEVY:   Do we have that one?

6          MR. ART:  Exhibit 11.

7          (EXHIBIT 11 MARKED FOR IDENTIFICATION)

8    A    Got it.  Yes, I remember this.

9          MS. POLLACK:  There's not a question,

10  Lieutenant.

11          THE WITNESS:  Oh, okay.

12  BY MR. LOEVY:

13    Q    Okay.  This is a -- this occurred in

14  October 10, 2015, correct?  And you tased a woman while

15  K-9 -- a dog was with her?

16    A    Yes.

17    Q    Okay.  And your own policies say you shouldn't

18  use a K-9 -- shouldn't use a Taser when a dog is

19  involved with a person, correct?

20    A    When the dog's actively going after them, yes.

21  Yeah.  In case it accidentally gets tased, then it will

22  never attack again.

23    Q    You tased her anyway?

24    A    You know what?  I -- I thought the K-9 was a

25  step higher up in use of force than the Taser, so I went

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201


Kentuckiana
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

The Deposition of LIEUTENANT BRIAN BLACKWELL, taken on April 06, 2018

258..261

Page 258

1  ahead and deployed it, due to the fact that there were
2  multiple people in the restaurant watching.  I didn't
3  want to have them really watch a dog attack a woman.  So
4  that was --
5      Q    So you tased her?
6      A    Yes.
7      Q    How many times?
8      A    Two.
9      Q    Two.  What parts of her body?
10     A    I do not recall.  She was facing me, so I
11 would assume the chest area, but I do not know.  I do
12 not remember.
13     Q    In each of those instances that I've shown
14 you, did the department have an investigation?
15     A    They just looked through the use of force for
16 any improprieties or anything, but there's not an
17 official investigation, you know, like, question and
18 answer.  They just looked here, said, "Yep, he followed
19 instructions or not."  And the K-9 officer came up after
20 me and -- told me, "Hey, don't forget about the
21 policy with the dog."  And I said, "I just didn't want
22 her to, you know, get bit by a dog in front of people,"
23 and he goes, "I understand.  I understand."  But there
24 was no investigation.
25     Q    But there was no departmental investigation?

Page 259

1      A    No.
2      Q    There was no conclusion that was reached?
3      A    Correct.
4      Q    And you were never reprimanded for your use of
5  Taser?
6      A    No.
7      Q    Never disciplined?
8      A    No.
9      Q    And if I understood you correctly, never
10 investigated for your use of a Taser in these instances?
11     A    There -- yeah, the use of force.  They looked
12 through there, but if there's no problems, no
13 complaints, and no improprieties, they don't need to do
14 a thorough, official investigation.
15     Q    Are you saying there were no citizen
16 complaints in any of these --
17     A    Nope.
18     Q    -- instances?
19     A    No.
20     Q    Is that correct?  That's what you're saying?
21     A    I don't remember.  If they did, they didn't
22 tell me about it.
23     Q    All right.  You know a woman named Angela
24 Marie?
25     A    No.

Page 260

1      Q    Did you have an incident with a woman whose
2  husband had a PTSD episode and she was in the bathtub
3  when you responded to an incident report?  Does that
4  refresh your memory at all?
5      A    I don't remember that.  I mean, if it -- I --
6      Q    Suicide -- perhaps a suicide call and you
7  responded?
8      A    No.  I don't remember that.
9      Q    Okay.
10     A    I do a lot of suicide attempts and PTSD.  I
11 mean, but I don't remember tasing anyone.
12     Q    Okay.  And you're experienced in the area of
13 how to handle someone that's suicidal, correct?
14     A    Yes.
15     Q    And you used that experience in the process of
16 activating your Taser in the Charles Todero encounter,
17 correct?
18     A    Yes.
19         MR. LOEVY:  Okay.  Let's keep going on these,
20 Steve.
21     Q    Have you ever been in the military?
22     A    No.
23     Q    Ever make application to go in the military?
24     A    No.  I knew I wanted law enforcement and went
25 into two years -- two and a half years of college, in

Page 261

1  securities.
2      Q    Well, what college you have for two and a half
3  years.  Is that where you --
4      A    Well, Vincennes, and then IUPUI, but then I
5  got the job at the sheriff's department, so I dropped
6  out of college.
7      Q    Oh, I didn't -- and thank you.  The Vincennes
8  College was before you became a police officer?
9      A    Yes.
10     Q    Okay.  I'm showing you what has been marked as
11 Exhibit number 12.  And first, can you just tell me,
12 Lieutenant, what this document is we received?
13         (EXHIBIT 12 MARKED FOR IDENTIFICATION)
14     A    These appear to be instant messages from our
15 in-car computers that we would use to talk to one or a
16 group of officers.
17     Q    Okay.  And so, you would state that these
18 reflect conversations from one car to another.  Everybody
19 has a code name, though, correct?
20     A    Yes.
21     Q    Does that relate to the car or to the
22 individual?
23     A    The -- well, the individual can log onto, I
24 guess, an -- I don't know if you can log on to another -
25 - yeah, he's on here.  It's the computer itself that has

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

Kentuckiana
COURT REPORTERS

502 589 2273 Phone
502 584 0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

The Deposition of LIEUTENANT BRIAN BLACKWELL, taken on April 06, 2018

314..317

Page 314

```
1    in that issue at all.
2         (SEALED PORTION REDACTED)
3    BY MR. LOEVY:
4         Q    Was there a second call that you made?
5         A    I can't remember if I called him or he called
6    me, tell you the truth, on that one.  I don't remember.
7         Q    Fair to say there was a second conversation
8    that --
9         A    Yes.
10        Q    -- you had with him?  You don't remember who
11   initiated it?
12        A    No.  I don't.
13        Q    Is that correct?  That first conversation, by
14   the way, you did initiate.  Did you do that on your cell
15   phone or a landline?
16        A    I did it on my cell phone.
17        Q    Okay.  And the second conversation you had,
18   which brother did you have it with?
19        A    James.
20        Q    Same brother you had the first conversation
21   with?
22        A    Yes.
23        Q    And were you on a landline or a cell phone
24   when you had that conversation, the second one?
25        A    I believe cell phone.
```

Page 315

```
1         Q    Okay.  And in that second conversation, you
2    can't remember who initiated it, correct?
3         A    No.  I don't.  I don't know if he just kept my
4    number and speed dialed and called me or, you know, on
5    memory, and called me or if I called him.  I really
6    don't remember who did.
7         Q    When did the second conversation take place?
8         A    It was like a couple days after the event.  I
9    don't know.
10        Q    Roughly, a couple of days?
11        A    I guess that many.
12        Q    All right.  And how long did the conversation
13   take place?
14        A    It -- I'm -- it -- I mean, it wasn't all that
15   long.  I mean, a couple minutes maybe.
16        Q    Okay.  Do you remember where you were when the
17   conversation took place?
18        A    No.  I don't.
19        Q    Okay.  What did you say to him, and he to you?
20        A    I remember him saying, "Blackwell, don't you
21   real" -- or he said something about the tasing.  He
22   said, "Don't you know people can die from that?  He may
23   not make it out of that hospital," something like that.
24        Q    What if anything did you respond?
25        A    I said, "I don't know anything about that."  I
```

Page 316

```
1    kind of just let him do the talking.  He was kind of,
2    you know, the one initiating the conversation, so I
3    don't remember.
4         Q    Sounded worried about his brother?
5         A    Yeah.  Because he said, you know, "Just
6    because I don't hang out with him or have anything to do
7    with him, doesn't mean anything.  He's still my
8    brother," is what he said.
9         Q    Say he loved him?
10        A    No.
11        Q    Okay.  And what did you say to him about the
12   tasing, if anything?
13        A    I kept -- as soon as he told me what he told
14   me, I kept my mouth -- I didn't really go into any
15   detail.  I didn't say anything about the -- I just said,
16   you know, he just wasn't, you know, acting right.  There
17   was something wrong with him.
18        Q    Did you say --
19        A    But I didn't go into detail.
20        Q    I'm sorry.  I didn't mean to cut you off.
21        A    That's okay.
22        Q    But you did say to him, He wasn't acting
23   right?
24        A    Yes.
25        Q    Okay.  What else, if anything, did you say?
```

Page 317

```
1         A    I don't recall.  I -- it wasn't anything.  I
2    mean, I can't think of anything that I said that was
3    significant, whatsoever.  I mean, I think it was him
4    talking most of the time.  I think he was calling to let
5    me know what was going on, in brief.  And you know, I
6    think he was -- I can't even remember if I told him I
7    was the one that tased him.  I -- I don't know.  He just
8    started talking about the tasing in general and that --
9    and that, People die from it or -- could die from it,
10   but I don't know what else.
11        Q    Did you respond with any information about the
12   tasing?
13        A    No.  As soon as he said he wasn't going to
14   make it out of the hospital, I just -- I said, "I see
15   where this is going."
16        Q    Did you hang up on him  or say --
17        A    No.  No.  No.  No.
18        Q    Nothing like that?
19        A    No.  No.  We had a good rapport.  I mean,
20   we've always had a -- I've always got along with James.
21        Q    And you've always got along with James.  Did
22   you get along with all the brothers as well as you did
23   with James?
24        A    Oh, I always -- well, when they were little.  I
25   mean, I always talked to them and said, you know, "You
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

The Deposition of LIEUTENANT BRIAN BLACKWELL, taken on April 06, 2018

318..321

Page 318

1    need to cut this out," or, "You need to stop." I mean,
2    they always did some goofy things. But, you know, their
3    names always got brought up in things. So yeah, I'd
4    have long talk -- you know, talks with, like, Charlie
5    every once in a while. And Tyler, never really talked
6    to him much. But yeah, Charlie -- Charlie and I talked
7    quite a bit, but nothing ever -- I mean, called name --
8    name-calling or, "I hate you," or, "I wish you were
9    dead." Nothing like that, whatsoever. We talked. Had
10   a good rapport.
11        Q    Did you know -- at the time of tasing, did you
12   know anything about Charlie's arrest record or
13   background?
14        A    Oh, yeah. I mean back in the '90s and 2000s,
15   I mean, he was, you know, always into something.
16        Q    Outside of that, what else did -- at the time
17   of the tasing, what else did you know about Charlie?
18        A    That actually he'd been off the radar for a
19   while, but I mean, I worked a case with him where he
20   turned his uncle in for marijuana.
21        Q    Right.
22        A    So I knew --
23        Q    Did Charlie ever do or say anything to you
24   that made you afraid of him?
25        A    No. He's just somebody I would not want --

Page 319

1    you know, he -- he's the type, I could just see, being
2    very revengeful, or you know --
3        Q    Well, how --
4        A    He's just -- it's hard to explain. I mean,
5    it's -- if someone said Charlie was going to, you know,
6    do something, I would be afraid that he would. He would
7    probably do it, because I -- I know how he is with,
8    like, repercussions or revenge.
9        Q    Well, when's the last time you saw Charlie,
10   prior to this incident?
11        A    It'd been -- it'd been a couple years.
12        Q    Okay. You don't know if he changed or was
13   different during those couple of years?
14        A    No.
15        Q    And you're aware Charlie's never been
16   convicted of a felony, correct?
17        A    I don't know.
18        Q    Don't know one way or the other?
19        A    Right.
20        Q    Okay. Anything else about Charlie that was --
21   well, strike that, please. Was there anything that you
22   knew about Charlie that influenced you in your
23   interaction with him on the date in question?
24        A    Well, I -- I'm not sure where you're going. I
25   mean, I knew he liked to box with his brother and things

Page 320

1    like that. And I knew he was physically fit, and that's
2    why, you know, I was kind of like, you know, this is not
3    someone I want to go hands-on by myself. Is that
4    what...? I mean, I'm not sure what else you're wanting
5    to know.
6        Q    No. Just curious.
7        A    Okay. That's -- I don't really know anything.
8        Q    That's it. His brother is a boxer. James is
9    the boxer?
10        A    James -- James started it, and then I think
11   Charlie kind of followed suit, but James started. I
12   mean, he boxed at a young age.
13        Q    And how do you know that Charlie followed?
14        A    We'd go to James's house on like an
15   investigation or something, and this is back when he --
16   I think he lived in the trailer park, and he had a
17   boxing bag out in a shed, or else hanging from a tree. I
18   don't remember. You're talking the nine -- I mean,
19   like, late '90s, and him and James would be out there,
20   and he would be wearing shorts and no shirt, and had
21   their arms either wrapped up -- and I don't remember if
22   Charlie did or not, but I know he was out there with him
23   in -- in a shirt and -- or just pants, like he was out
24   there, too. And I just knew that he liked boxing, and I
25   knew James liked boxing, and he hung -- he kind of

Page 321

1    admired James and hung around him quite a bit.
2        Q    It was the late '90s?
3        A    Late '90s --
4        Q    Anything --
5        A    Late '90s to -- I'm just -- 2000s. I don't
6    know, you know.
7        Q    Whenever. 2000. And did you ever hear about
8    his boxing from 2000 until --
9        A    No.
10        Q    -- 2016? Okay.
11             MR. LOEVY: We have just one other matter that
12   I have to confer with co-counsel on, and let's --
13             MR. ART: So can we go off for a minute?
14             VIDEOGRAPHER: We are now off the record. The
15   time is 4:50.
16             (OFF THE RECORD)
17             VIDEOGRAPHER: We are now back on record. The
18   time is 4:56.
19   BY MR. LOEVY:
20             MR. LOEVY: So will you narrate the exhibit
21   that's in front of us, please?
22             MR. ART: So I guess we're marking as Exhibit
23   14, a still frame from the body camera of Officer
24   Eck, at three minutes and three seconds on that
25   video, okay? I'm going to turn it around.

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

The Deposition of LIEUTENANT BRIAN BLACKWELL, taken on April 06, 2018

322..325

Page 322

BY MR. LOEVY:

2    Q    Do you understand that this is a still of a
3  video that was taken from what you call the Taser camera
4  of Officer Eck?

5    A    Yes.

6    Q    Okay.  Have you ever seen this before?

7    A    Yes.

8    Q    And when have you seen this before?

9    A    I reviewed it, I don't know, a week or so ago.

10   Q    Okay.  I thought I'd asked you earlier --

11   A    About...?

12   Q    -- if you had reviewed any videos, and you
13 said "No"?

14   A    I don't remember.

15   Q    You don't remember that, okay.  But you did --

16   A    No.  I did.  Yeah.  I would've said I did if I
17 did, unless I misunderstood --

18   Q    You have reviewed videos then?

19   A    Yes.

20   Q    What?  Tell us the -- before I ask about this,
21 tell me all the videos that you've seen.

22   A    Of -- of -- just the cams of Officer Eck and
23 Officer Elliott?

24   Q    Okay.  Where were you when you saw the videos?

25   A    Home.

Page 323

1    Q    And how did you get -- who showed them to you?

2    A    No one showed them to me.  They sent them to
3  me.

4    Q    Who sent them to you?

5    A    James Hook.

6    Q    Excuse me?

7    A    James Hook.

8    Q    Who's James Hook?

9    A    He works with the law firm, Pollack.

10   Q    And that's not -- so how many videos were you
11 sent altogether?

12   A    There were just Eck and Elliot's.

13   Q    And what else were you sent, besides the
14 videos?

15   A    That -- that was it.

16   Q    At any time, what else were you sent besides
17 the videos?

18   A    Nothing.

19   Q    How long ago were you sent these videos?

20   A    After my meeting with --

21   Q    I don't know what meeting you're talking
22 about.

23   A    Well, I don't -- a couple weeks ago.

24   Q    And did you get any still photos?

25   A    No.

Page 324

1    Q    So the testimony you've given today is based
2  at least in part on your observation of the videos; is
3  that correct?

4    A    Yeah.  Some of it, yes.

5    Q    Well, which portion --

6    A    But most --

7    Q    -- was it based on?

8    A    It was refreshing my memory of what happened.

9    Q    Okay.  And so -- well, all of your testimony
10 was at least in part based on the fact that you had seen
11 videos of a portion of the events from the Taser cam?

12        MS. POLLACK:  Oh, I think that mischaracterizes
13 --

14        Is that correct?

15        MS. POLLACK:  -- his testimony.

16        Go ahead.

17   A    I did it by memory, and like I said, you know,
18 you -- you asked to do it by memory and that's what I
19 did.

20   Q    Well, I asked you to do that, in part, because
21 you said you hadn't seen any videos.

22   A    No.  I -- if you did, I mean, I would've --

23        MS. POLLACK:  Well, that --

24   A    -- as it was, I just said no.

25        MS. POLLACK:  That's not a question.  That's

Page 325

1  not a question.  That's just an argumentative
2  statement.  Don't -- you don't need to respond.

3  BY MR. LOEVY:

4    Q    Okay.  What are we looking at here, Officer?

5    A    Officer Elliot and Officer Laut and myself.

6    Q    Can you describe for us, who's Elliot, who's
7  Laut?

8    A    Officer Elliot --

9    Q    Pointing is not going to help.  You've got to
10 describe it.

11   A    Officer Elliot is to the left of Officer
12 Todero [sic] --

13        MS. POLLACK:  Officer Todero?

14   A    -- or -- sorry -- Charlie Todero.  That is
15 Elizabeth Laut in the middle, and then that is me to the
16 right.

17   Q    And who is that to the far left of the screen?

18   A    That's the lady that stopped by.  I can't
19 remember -- remember her name.

20   Q    Okay.

21   A    Polly [sic] something or...?

22   Q    And there is a -- looks like a curb there.  Do
23 you see that?

24   A    Yes.

25   Q    And that's the curb to the street?

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502 589 2273 Phone
502 584 0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

The Deposition of LIEUTENANT BRIAN BLACKWELL, taken on April 06, 2018

326..329

Page 326

1    A    Yes.

2    Q    Okay.  And in this picture, this still, are --

3  has Mr. Todero been handcuffed, or are you guys in --

4    A    I'd have to watch it.  I don't -- I don't know

5  if he'd already been handcuffed or not, or if there --

6  that's the moving part.  I don't know.  Could you go

7  back a couple seconds?

8    Q    We sure will.

9         You're on the far right, correct?

10    A    Yes.

11    Q    You see the Taser in your hand?

12    A    Yes.

13    Q    Okay.  Does that help you recall whether or

14  not Todero had been or had not been handcuffed?

15    A    Well, the barbs are still in him, so I have to

16  have the Taser in me until -- or in my hand until we

17  take the -- the barbs out or break the wire.  So that

18  doesn't mean he's being tased at that time.  It just

19  means I've got it in case he starts resisting again, or

20  else starts kicking or something.

21    Q    No.  I understand.  Does that help you reach

22  an opinion as to whether or not he was handcuffed at the

23  time that this still was taken?

24    A    I would --

25    Q    That's what I'm asking.

Page 327

1    A    I don't -- I don't know if that, or if -- if

2  they're -- I don't really know.  I -- I mean, I think he

3  was handcuffed at this time, because -- and he's just

4  either resisting or I -- I don't remember at that point.

5         MR. LOEVY:  Steve, can we identify the -- by

6  frame and give him a little bit before this, so

7  it'll help him to explain to all of us what's going

8  on?

9         MR. ART:  Yes.  Let's go off the record

10  momentarily while I figure out what that timeframe

11  is.

12         MR. LOEVY:  Okay.  Thank you.

13         VIDEOGRAPHER:  We are now off the record.  The

14  time is 5:02.

15         (OFF THE RECORD)

16         VIDEOGRAPHER:  We are now back on record.  The

17  time is 5:03.

18         MR. ART:  We are now going to watch the video

19  from Officer Eck's body cam, from three minutes and

20  45 seconds -- sorry -- two minutes and 45 seconds to

21  three minutes and ten seconds.  We're going to watch

22  it once like this, and then we're going to turn it

23  around and watch it again.

24         (EXHIBIT 16 MARKED FOR IDENTIFICATION)

25         (VIDEO PLAYING)

Page 328

1         MR. LOEVY:  And the context --

2         (VIDEO STOPPED)

3         MR. ART:  It stopped at 3:07.  I'll play the

4  same thing for the officer.

5         MS. POLLACK:  All right.

6  BY MR. LOEVY:

7    Q    But before playing it, I want to suggest to

8  the Lieutenant; the context I want you to watch it in,

9  is whether or not -- in that last still that we just

10  looked at, whether or not Todero was or was not

11  handcuffed.

12    A    Okay.

13    Q    Okay?

14         MR. ART:  Are you ready?

15         THE WITNESS:  Yes.

16         (VIDEO PLAYING)

17    A    I can't tell.

18    Q    Does it -- can you tell me what those police

19  officers, including yourself, were doing if not

20  handcuffing Todero?

21    A    Trying to get him -- it looked like, you know,

22  he was physically moving around, and they're trying to

23  maybe sit him up.  I don't know.  I was just --

24    Q    Well, you were right there.

25    A    -- sitting there watching, but I don't --

Page 329

1  yeah.

2    Q    You were right there.  What were you doing?

3    A    Well, I was waiting for the barbs to be

4  removed so I could take them out -- or take the --

5    Q    Okay.  Then you --

6    A    -- disconnect.  because I have to hold the

7  Taser.  It won't go on my --

8    Q    Yeah.  I understand.  If you were waiting for

9  the barbs to be taken out, he must've been handcuffed

10  already; isn't that fair to say?

11    A    No.  I'm just saying I have to hold the Taser

12  until it -- until it is, but then if the medics are, you

13  know, going to be coming anyway, wait for them to take

14  it out.

15    Q    I'm sorry.  And I'm trying not to be

16  argumentative, but you see, I see all those officers on

17  the video, including yourself with a Taser in your hand,

18  and my question, again is: Doesn't that give you any

19  information as to whether or not, at that point in time,

20  Todero had been or had not been handcuffed?

21    A    I do -- to my best recollection, he had been

22  handcuffed and then moved over to the side of the road,

23  and he was still rolling around.  And to -- that's when

24  we all started to talking to him.  The only thing I can

25  think of is they're sitting there -- they're, like,

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

The Deposition of LIEUTENANT BRIAN BLACKWELL, taken on April 06, 2018

330..333

---

Page 330

1  raising him up like this, or -- or got his arms, to try
2  to communicate with him.  I do not know.
3        Q    After he was handcuffed, you didn't walk away?
4        A    No.
5        Q    Okay.
6             MR. LOEVY:    I think that's it but we will --
7  one last conference, and then I think we're done.
8             VIDEOGRAPHER:  We are off the record.  The time
9  is 5:07.
10            (OFF THE RECORD)
11            VIDEOGRAPHER:  We are now back on the record.
12 The time is 5:13.
13            MR. LOEVY:  No further questions.
14            MR. HOLLOWAY:  I just have one -- a couple of
15 questions.
16            MS. POLLACK:  You said, "One."
17            MR. ART:  Hold on.  Hold on, Mark.  Hold on.
18            MR. ART:  He did say, "One."
19            MS. POLLACK:  He did say, "One."
20            MR. ART:  Did he?
21            MS. POLLACK:  Uh-huh.
22            MR. HOLLOWAY:  Sorry.
23            MR. ART:  Off the record?
24                  CROSS EXAMINATION
25 BY MR. HOLLOWAY:

---

Page 331

1        Q    From my notes, I think you've testified at
2  least three times -- at least several times, that after
3  Renee Elliot and Elizabeth Laut arrived on the scene,
4  you deployed your Taser three or four times; is that
5  your best recollection?
6        A    Yes.
7        Q    Okay.  The other question I had pertains to
8  your report.  It's Exhibit 3.  If you could take a look
9  at that?
10            MR. LOEVY:  Just what is Exhibit 3?  That's his
11 report?
12            MS. POLLACK:  It's before the report.
13            THE WITNESS:  Exhibit 3 or 7?
14            MS. POLLACK:  Did you say, "3"?
15            THE WITNESS:  That's the Use of Force, is the -
16 - Exhibit 3.
17            MS. POLLACK:  I thought you said "3"?
18            THE WITNESS:  Did you want --
19            MR. HOLLOWAY:  I think it's 3, yeah.
20            MR. ART:  Yeah.
21            MS. POLLACK:  Okay.
22            THE WITNESS:  Okay.  So the use of force, then?
23            MS. POLLACK:  Yeah.
24            THE WITNESS:  Okay.
25 BY MR. HOLLOWAY:

---

Page 332

1        Q    Yeah.  It's the Use of Force Report.  It's
2  dated May 30, 2016.  On the last page there, and --
3        A    Well, hang on.  I'm still searching for it.
4        Q    Oh, sorry.
5             MR. LOEVY:  He doesn't know what that --
6        A    Yeah.  There we go.  That'll work.  Okay.
7        Q    On the last page, in that second big paragraph
8  there, where it says, "Officer Renee Elliot and Officer
9  Elizabeth Laut arrived."  Do you see that?
10       A    Yes.
11       Q    Okay.  And then it goes on to say, "And
12 Officer Elliot attempted to handcuff Charles."  Then it
13 says, "Elliot gave Charles verbal instructions to give
14 her his hands, but he refused and rather, stiffened his
15 arms in resistance."  When you wrote this report, was it
16 your understanding that he had stiffened his arms in
17 resistance?
18       A    Yeah.  Well, he wasn't giving it, so, yes.  I
19 mean, he was not -- he had it stiffened, because he
20 couldn't -- she couldn't get it out from under him.
21       Q    Okay.  You still consider your report accurate
22 in that regard?
23       A    Yes.
24            MR. HOLLOWAY:  Okay.  That's all I have.
25                  EXAMINATION

---

Page 333

1  BY MS. POLLACK:
2        Q    Brian, let me just have you clarify.  Earlier
3  you said that Charlie had not resisted you prior to you
4  tasing him; can you clarify what you meant?
5        A    I meant, like -- like, actual, like, you know,
6  hitting or running, fleeing, something, you know, along
7  those lines.  I mean, he still refused verbal commands,
8  and then I went to the attempt of just putting my hands
9  to make -- say, "Hey, I'm here.  I'm giving you an
10 order."  And then him not doing, you know -- so yeah, he
11 wasn't.  He was passively aggressive, I guess, is the
12 word to use.
13       Q    Okay.  All right.  You said he wasn't
14 cooperative, was he?
15       A    No.
16            MS. POLLACK:  All right.  That's all I have.
17            MR. LOEVY:  Okay.
18            VIDEOGRAPHER:  We are now off the record.  The
19 time is 5:16.
20            (DEPOSITION CONCLUDED AT 5:16 P.M.)
21
22
23
24
25

---

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

The Deposition of LIEUTENANT BRIAN BLACKWELL, taken on April 06, 2018

334

```
                                                        Page 334
 1   CERTIFICATE OF REPORTER

 2   STATE OF INDIANA

 3

 4   I do hereby certify that the witness in the foregoing

 5   transcript was taken on the date, and at the time and

 6   place set out on the Title page hereof by me after first

 7   being duly sworn to testify the truth, the whole truth,

 8   and nothing but the truth; and that the said matter was

 9   recorded by me and then reduced to typewritten form

10   under my direction, and constitutes a true record of the

11   transcript as taken, all to the best of my skills and

12   ability. I certify that I am not a relative or employee

13   of either counsel, and that I am in no way interested

14   financially, directly or indirectly, in this action.

15

16

17

18

19

20

21

22   EMILEE BOLEYN,

23   COURT REPORTER / NOTARY

24   COMMISSION EXPIRES ON: 04/17/2025

25   SUBMITTED ON:  04/24/2018
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com