Ian R. Godfrey
June 14, 2018

1

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

-   -   -

TERESA TODERO, as Special      )
Administrator of the           )
ESTATE OF CHARLES TODERO,      )
                               )
            Plaintiff,         )
                               )
      vs.                      )        Cause No.
                               )  1:17-cv-1698-TWP-MJD
CITY OF GREENWOOD, BRIAN       )
BLACKWELL, RENEE ELLIOT,       )
ELIZABETH LAUT, and AS-YET     )
UNIDENTIFIED GREENWOOD         )
POLICE OFFICERS,               )
                               )
            Defendants.        )

-   -   -

DEPOSITION

of IAN R. GODFREY, called pursuant to notice by

the Plaintiff under the applicable rules of

procedure, taken before me, Lindy L. Meyer, Jr., a

Notary Public in and for the State of Indiana,

County of Shelby, at the Law Resources Center,

170 North Jackson Street, Franklin, Indiana, on

Thursday, June 14, 2018 at 9:00 o'clock a.m.

-   -   -

FILLENWARTH REPORTING SERVICE
775 Hummingbird Lane
Whiteland, Indiana  46184
(317) 535-1607

Ian R. Godfrey
June 14, 2018

22

```
1    Mobile Data Console.  The Mobile Data Console is a
2    computer which runs a program, and in this case,
3    Greenwood uses one called Spillman, and it gives
4    you basic information about the call.  It tells
5    you where you're going, what you are going for, if
6    there are any additional notes, like if the police
7    have radioed into the dispatch center and said,
8    "This is what's going on" and the dispatcher feels
9    it's pertinent, they'll put it in the notes.  It
10   gives you your time stamps of when you get
11   dispatched, respond, arrive, transport, et cetera.
12        Q.  Do you know if that dispatch system is
13   integrated with the Greenwood Fire Department, or
14   at the time if it was integrated with the
15   Greenwood Fire Department, the Spillman system?
16        A.  Yes, it was.
17        Q.  Okay.  And was it also integrated with the
18   Greenwood Police Department?
19        A.  I -- I don't know.
20        Q.  Okay.  And just so I'm clear, the answer
21   you just gave describing that, the dual dispatch
22   system, that's based on your general memory of how
23   the dispatch system worked at the time --
24        A.  Yes.
25        Q.  -- is that correct?  And you know you
```

Ian R. Godfrey
June 14, 2018

23

1   would have been dispatched that way because that's

2   how you were always dispatched, but you don't have

3   a specific memory of being dispatched on May 29th?

4       A.   Right.   I mean the only two instances

5   where that wouldn't be the case is, one, if the

6   firehouse alerting system, or what we call the

7   locution system, which is the overhead paging

8   system in the firehouse, was not working, or if

9   the Spillman system was not working at the time,

10  which did -- I mean it's a computer technology.

11  Occasionally they do updates and things like that,

12  so occasionally it was down.   But in terms of that

13  specific day, I don't recall whether either system

14  was running or down.   I'm just explaining how

15  we -- we're generally dispatched to calls.

16      Q.   I appreciate that.   Based on the

17  description you gave of the dispatch, you would

18  receive certain details about the nature of the

19  call; is that correct?

20      A.   Oh, again, it depended on what was

21  available.   Some calls were -- there were more

22  details available, like if there was a police

23  officer on-scene that had been involved in

24  something, there would generally be more notes,

25  because they would relay information to their

Ian R. Godfrey
June 14, 2018

24

1    dispatcher, who would relay it to our dispatcher,

2    who would put it into our notes when we were

3    dispatched.  But, you know, if we were going to

4    just a 911 call at a house, there would generally

5    be very few notes.  It would basically be address,

6    chief complaint, and possibly age, gender, things

7    like that.

8         Q.  Do you have any memory of what details

9    were included in the dispatch that you received on

10   May 29th --

11        A.  No --

12        Q.  -- 2016?

13        A.  -- I do not.

14        Q.  What's the first memory you do have of

15   your role in that incident that day?

16        A.  My -- I mean my overall independent

17   memory, I mean, is very, very vague.  I remember

18   responding to the call, I remember the general

19   situation of the call, I remember some -- some

20   things about the call, but again, they're very,

21   very vague.  And then I obviously remember the

22   outcome of the call, but again, it's mostly --

23   it's mostly broad strokes, not finite details from

24   my independent memory.

25        Q.  Okay.  What are those broad strokes that

Ian R. Godfrey
June 14, 2018

25

1   you have in terms of your independent memory?

2       A.   So, I remember that there was a subject

3   who had been tased and that he was lying on the

4   ground when we arrived, that he was extremely

5   uncooperative and agitated, despite being tased.

6   We lifted him to the stretcher, we put him in the

7   ambulance, he was -- he continued to be extremely

8   agitated, combative, and so we ultimately

9   administered a sedative to him, and then we were

10  transporting him to the hospital, and shortly

11  before our arrival at the hospital, he went into

12  cardiac arrest.

13      Q.   You stated that there was a subject who

14  had been tased.  Was that something that you

15  remember learning before you arrived on the scene?

16      A.   I don't recall.

17      Q.   Okay.  You might have learned it while you

18  were on the way or it might have been something

19  you learned after your arrival?

20      A.   It's -- yes, it's possible we learned it

21  on the way, either from dispatch over the radio or

22  through the Mobile Data terminal on the Spillman

23  program.  It's completely possible, but I don't --

24  I don't recall off the top of my head.

25      Q.   And you were not on the scene for any of

Ian R. Godfrey
June 14, 2018

26

1   the tases; is that correct?

2       A.   That is correct.

3       Q.   Okay.  So, you have no first-hand

4   knowledge of why the police officer tased

5   Mr. Todero that day?

6       A.   That's correct.

7       Q.   And no first-hand knowledge of what he was

8   doing at the time that he was tased?

9       A.   No.

10      Q.   Okay.

11           MS. SCHNEEMAN:  He -- to clarify the

12   record, you mean -- who is "he"?

13           MR. HEPPELL:  Mr. Todero.

14      A.   That's correct, I don't have any

15   first-hand knowledge of that, that's correct.

16      Q.   Your -- you described the subject was

17   lying on the ground when you arrived?

18      A.   Yes.

19      Q.   And so we're clear, that subject you're

20   referring to, that's Mr. Todero; is --

21      A.   Yes.

22      Q.   -- that correct?

23      A.   Yes.

24      Q.   Do you recall any -- any more detail in

25   terms of his appearance and position when you

Ian R. Godfrey
June 14, 2018

27

1   arrived beyond that he was lying on the ground?

2       A.   Not off the top of my head.

3       Q.   Okay.

4       A.   I would think -- I know you would think

5   after reviewing the chart as many times as I have

6   recently, I would remember, but I just came off my

7   shift.  I don't remember off the top of my head.

8       Q.   No, that's --

9       A.   I'm sorry.

10      Q.   -- that's -- that's fine.  And again, if I

11  understand your answer, it sounds like you -- you

12  believe that information to be recorded in your

13  report?

14      A.   Yes.

15      Q.   And that's --

16      A.   Yes.

17      Q.   -- that's something we're going to look

18  at.

19      A.   Okay.

20      Q.   But in terms of -- I guess what I'm

21  interested in most right now is not your ability

22  to remember what's in the report in terms of what

23  you've read recently, but actually casting your

24  mind back to that day, so --

25      A.   In that case, I don't -- I don't recall.

Ian R. Godfrey
June 14, 2018

28

1      Q.  Okay.  Are there any details, again, at

2   this time casting your mind independently back to

3   that day, about Mr. Todero's appearance, physical

4   appearance, upon your arrival beyond that you

5   remember he was lying on the ground?

6      A.  I don't recall.

7      Q.  The -- the next thing you describe, sort

8   of going through those broad strokes that you

9   remembered, was Mr. Todero being extremely

10  uncooperative and agitated?

11     A.  Yes.

12     Q.  What do you remember, again, you know,

13  casting your mind back independently to that day,

14  in terms of the specifics of his behavior?

15     A.  Independently, not much that I can recall.

16     Q.  Is there anything independently that you

17  can recall in terms of his behavior that sort of

18  leads you --

19     A.  I'm trying to -- I'm trying to kind of

20  draw -- I'm trying to put -- those why I'm kind of

21  squinting my eyes, is I'm trying to kind of hone

22  myself in to remember that.  Oh, gosh.  No, I

23  don't -- I don't remember.

24     Q.  Okay.  That's no problem.  You described

25  the next step is lifting him up onto the

Ian R. Godfrey
June 14, 2018

29

1  stretcher.  Again, do you have any independent

2  memory of how that process went?

3      A.  No.

4      Q.  Okay.  Just a memory that that's something

5  that happened?

6      A.  Yes.

7      Q.  Okay.  And then in terms of the process

8  of, you know, getting him into the back of the

9  ambulance, any memory of that process?

10     A.  We were concerned about keeping him on the

11 stretcher because of how he was thrashing around.

12     Q.  Do you -- so, you remember being

13 concerned?

14     A.  Yes, I remember that we had at least one

15 person on either side of him to make sure he

16 didn't tip the stretcher or fall off.

17     Q.  Do you -- again, casting your mind back as

18 you're sitting here today, do you have a memory of

19 his behavior in terms of that thrashing around?

20     A.  Can you clarify that question?

21         MS. SCHNEEMAN:  Well, he just said he

22 was thrashing around --

23     Q.  Well --

24         MS. SCHNEEMAN:  -- so he obviously

25 remembers it.

Ian R. Godfrey
June 14, 2018

30

1     Q.  Well, if I understood your answer, you
2  stated that you remembered being concerned about
3  him thrashing around --
4     A.  Right.
5     Q.  -- is that correct?
6     A.  Right.
7     Q.  Do you also remember -- you know, you can
8  cast your mind back and remember him thrashing
9  around?  Is that something you can independently
10 remember?
11    A.  Yes.
12    Q.  Can you describe how Mr. Todero was
13 thrashing around?
14    A.  Not specifically, no.
15    Q.  Okay.  The details of that you just don't
16 remember?
17    A.  I -- yes, that's correct.
18    Q.  Was this -- the thrashing around that you
19 do remember, was that after -- before Mr. Todero
20 was placed on the stretcher, was it after he was
21 placed on the stretcher but before he was put in
22 the back of the ambulance, or was it after he was
23 in the back of the ambulance, or some combination
24 of those?
25    A.  A combination of all of them.  The reason

Ian R. Godfrey
June 14, 2018

31

1  we lifted him from the ground to the stretcher,

2  usually as would be the case is we would stand the

3  patient up, have them get on the stretcher, and

4  that's obviously the preferred way of doing

5  things, but he was so uncooperative and -- that we

6  had to lift him up and get him on the stretcher.

7  We used to use the term "combative," but we don't

8  use that term anymore.  We use the term

9  "uncooperative."  That's the preferred term now.

10     Q.  Okay.  What -- is that -- when you say,

11  "We used to use [that] term" and it being "the

12  preferred term," is that something through your

13  specific employer, or through the paramedic field

14  more broadly?

15     A.  It's something that's being taught

16  nationally, that there's a change in thinking.

17     Q.  Okay.  Do you know the reason for that

18  change?

19     A.  I learned it at the time, but I don't

20  recall what --

21     Q.  Okay.

22     A.  -- the reason is.

23     Q.  So, would it be fair to say that if you

24  were -- if this same incident were to happen today

25  and you were to be writing your reports describing

Ian R. Godfrey
June 14, 2018

32

1   the same incident, you'd use the word

2   "uncooperative" to describe Mr. Todero's behavior?

3       A.   That's correct.

4       Q.   Okay.  Do you, again, independently,

5   remember any of the details in terms of in what

6   ways he was uncooperative?

7       A.   Like I said, I just remember he was

8   thrashing around and we were concerned about that,

9   and I remember he was very vocal.  I don't

10  remember the contents of what he was saying, I

11  just remember he was yelling.

12      Q.   Okay.  And again, not to split hairs, but

13  it sounds like you don't remember the specific

14  words he used; would that --

15      A.   Right.

16      Q.   -- be fair to say?  Setting aside the

17  specific words, do you remember any, you know,

18  general information about what he was saying in

19  terms of the topics or subject matters of what he

20  was saying?

21      A.   No, I don't.

22      Q.   Okay.  So, fair to say the only thing you

23  remember about what Mr. Todero was saying is that

24  he was vocal?

25      A.   Yes.

Ian R. Godfrey
June 14, 2018

33

1    Q.  But in terms of the actual contents, no

2  memory at all of that?

3    A.  That's correct.

4    Q.  Okay.  You -- you stated that you remember

5  administering a sedative; is that correct?

6    A.  Yes.

7    Q.  What do you remember about administering

8  the sedative?

9    A.  In terms of what?

10    Q.  Well, let me break that down, then.  Do

11  you remember why you administered the sedative?

12    A.  Well, the reason for administering a

13  sedative is a concern for -- that the patient is a

14  harm to themself [sic] or others.  That's the

15  reason.  So, I must have believed that that was

16  the case in Mr. Todero's case.

17    Q.  Do you specifically remember what

18  Mr. Todero was doing or why you believed he was

19  potentially a harm to himself or others?

20    A.  As I stated, he was thrashing around on

21  the stretcher.  That causes a number of concerns.

22  In the ambulance, obviously somebody has to be

23  secured in an ambulance.  There are state

24  requirements that require five-point harnessing of

25  all patients in the ambulance, three -- one on the

Ian R. Godfrey
June 14, 2018

34

1  legs, one on the mid-section, one on the torso,

2  and then two shoulder harness straps.  And

3  obviously we want to keep the patient on the

4  stretcher.

5       And then also there are concerns that they

6  could hit thems -- hit their head on other things

7  in the ambulance.  There are sharp metal edges

8  along the bench seats and things like that.  They

9  can cause -- they can cause musculoskeletal

10 injuries.  People have fractured their wrists

11 before.  There are -- the number of reasons --

12 ways that they could be harmful to themselves in

13 thrashing around are just numerous.  It just --

14 it's a safety issue for the patient.

15      Q.  Was there anything that Mr. Todero was

16 doing that caused you concern that he would cause

17 harm to others?

18      A.  I don't believe so.  I don't -- I don't

19 believe so.

20      Q.  Okay.  So, was -- the concern for

21 potential harm to himself was what caused you to

22 administrative the sedative?

23      A.  That's correct.

24      Q.  Do you remember the dose of the sedative

25 that you administered?

Fillenwarth Reporting Service
317.535.1607

Ian R. Godfrey
June 14, 2018

35

1    A.   Five milligrams.

2    Q.   Okay.   And what the specific sedative that

3  you used?

4    A.   I used midazolam, or known by its brand

5  name, Versed.

6    Q.   And do you remember physically the process

7  of administering that sedative to Mr. Todero?

8    A.   No, I do not.

9    Q.   Is -- in term -- strike that.   Are there

10  different doses of sedative or types of sedative

11  that you can administer?

12    A.   As a Paramedic, we follow medical

13  direction protocols that are established through

14  the county that we work in.   The standard sedative

15  dose of Versed is five milligrams, and that's what

16  we use.   Now, with the emergence of some of these

17  drugs which cause people to be more violent and

18  agitated and things like that, we've actually

19  switched to ketamine, but that was not on the

20  ambulance at the time of Mr. Todero's incident.

21    Q.   So, would it be fair to say both the type

22  of sedative and the dose of sedative that you

23  administered to Mr. Todero was standard at the

24  time?

25    A.   Yes.

Ian R. Godfrey
June 14, 2018

36

1    Q.  Okay.  How -- how often during your career

2    as a Paramedic have you -- would you estimate that

3    you've administered a five-milligram dose of

4    Versed to a patient?

5    A.  Oh, gosh.  I don't know.  I mean hundreds,

6    maybe upwards of a thousand.  I don't know.  It's

7    a fairly -- it's a fairly common thing, because

8    you don't only use it for situations where the

9    patients are agitated and uncooperative, you use

10   it for seizures, you use it for sedation following

11   advanced airway procedures, following cardiac

12   procedures.  I mean there is -- there are a slew

13   of situations which you use it for other than just

14   this particular situation, so I mean I couldn't

15   even venture a guess at how many times.

16   Q.  Your best estimate would be hundreds, if

17   not over a thousand --

18   A.  Yes.

19   Q.  -- during your career?

20   A.  Yes.

21   Q.  Okay.  So, would it be fair to say that

22   while it's not something you would do on a

23   majority of runs, it's certainly not an

24   uncommon -- not an uncommon part of your job?

25   A.  That's correct.

Ian R. Godfrey
June 14, 2018

37

1    Q.  Okay.  Do you remember independently any
2  of the details of Mr. Todero's medical condition
3  prior to administering the Versed?
4    A.  In terms of?
5    Q.  Well -- and I guess in terms of either
6  specific vital signs or even observations of his
7  physical appearance that, to you, seemed medically
8  relevant.
9    A.  Okay.  So, we were unable to obtain a
10  blood pressure due to the level of agitation that
11  he was in, and beyond that, I -- I don't recall
12  his medical condition.
13    Q.  So, you recall that you were not able to
14  get a blood pressure level?
15    A.  That's correct.
16    Q.  Do you recall specifically what he was
17  doing that prevented you from obtaining that
18  reading?
19    A.  No, I do not.
20    Q.  Okay.  And again, independently, do you
21  recall any other vitals prior to administering the
22  Versed?
23    A.  No, I do not.
24    Q.  What about any sort of qualitative rather
25  than quantitative characteristics that might have

Ian R. Godfrey
June 14, 2018

38

1   been relevant to his medical condition in terms of

2   his appearance?

3        A.   I don't recall independently.

4        Q.   Okay.   What about after you administered

5   the sedative; do you recall any change in

6   Mr. Todero's behavior or demeanor after you

7   administered the sedative?

8        A.   Yes.   So, as expected, he became sedated.

9        Q.   And when you say "sedated," can you

10  clarify a little bit what you mean by that?

11       A.   So, he was still speaking, but he was no

12  longer thrashing around.   He -- I remember that at

13  that point I had moved over to -- I had moved from

14  the position on the bench seat on the passenger's

15  side over to the bench seat on the driver's side

16  because of the way he was positioned.   As he was

17  handcuffed, his arms were on the -- facing the

18  passenger -- or the driver's side, excuse me --

19  and so, I had switched over there, because at that

20  point I was going to start an I.V. on him.

21       Q.   Do you remember why you were going to

22  start an I.V. on him?

23       A.   It's just standard procedure.   You know,

24  any -- any advanced life support call, especially

25  when you administer a medication, you know, it's

Ian R. Godfrey
June 14, 2018

39

1   just -- it's just standard practice to start I.V.

2   access.

3       Q.  What's the -- what's the purpose of the --

4   of establishing the I.V. access?

5       A.  So, I.V.'s are established in case you

6   need to give fluids, so I.V. fluids, in case their

7   blood pressure's low or something like that, or in

8   case you have to administer medications.

9       Q.  So, there's a -- I guess would it be fair

10  to say there's a variety of steps you might want

11  to take in terms of providing medical care in the

12  back of the ambulance, and the I.V. access is kind

13  of the -- provides access to taking several

14  different steps that might arise during the course

15  of a call?

16      A.  Yes.

17      Q.  Okay.  Do you recall if you had initially

18  attempted to establish the I.V. access prior to

19  sedating him, or only after you'd administered the

20  Versed?

21      A.  I don't independently recall.

22      Q.  Okay.  Do you recall the period of time --

23  well, strike that.  Do you recall how much time

24  passed between administering the Versed and

25  observing the change in Mr. Todero's behavior,

Ian R. Godfrey
June 14, 2018

40

1    that he was still speaking but no longer thrashing

2    around, as you described it.

3        A.  No, I don't recall.

4        Q.  Okay.  Do you recall how long after

5    getting in the back of the ambulance with

6    Mr. Todero it was before you administered the

7    Versed?

8        A.  I do not recall.

9        Q.  Other than the change in his condition

10   that you just testified to in terms of a change in

11   his physical behavior, if not his vocalizations,

12   are there other changes in Mr. Todero's condition

13   that occurred prior to your arrival at the

14   hospital that you independently recall?

15       A.  Yes.  So, when I -- when I'm in the back

16   of the ambulance, the cardiac monitor is generally

17   on the far side of the patient so I can keep

18   direct line of sight with it, to monitor the

19   patient's condition.  Just every time I look up, I

20   can take a quick look and say, "Okay.  Things are

21   going well."

22           And then, so as I said, I shifted over to

23   the other side to attempt I.V. access, and I

24   noticed that his heart rate had dropped

25   dramatically, and then I -- I don't independently

Ian R. Godfrey
June 14, 2018

41

1    recall any kind of -- everything that hap -- the

2    order in which everything happened, but he went

3    into -- he eventually went into cardiac arrest.

4        Q.  And when you say "cardiac arrest," can you

5    be -- are you able to be a little more precise in

6    terms of what you mean in this case?

7        A.  His heart stopped.

8        Q.  Okay.  And if I understood your answer,

9    you don't -- would it be fair to say you don't

10   independently recall the specific details around

11   the order of events leading to that heart

12   stoppage?

13       A.  That's correct.

14       Q.  Okay.  You stated at the beginning part of

15   your answer that you recall noticing on the heart

16   monitor that his heart rate had dropped?

17       A.  Yes.

18       Q.  Do you have any memory of an approximate

19   quantification of that in terms of what his heart

20   rate had been previously and what you observed it

21   to be?

22       A.  So, I know it was high initially.  I

23   believe it was in the 130's, but I don't

24   completely recall, I just remember that it was

25   high, and then I remember it went extremely low,

Ian R. Godfrey
June 14, 2018

59

1      Q.  Do you have any recollection of any of the

2  details of those conversations?

3      A.  No, I do not.

4      Q.  Do you have any recollection, even if you

5  don't remember the details, of the topics or

6  subject matters of what you talked about?

7      A.  You know, it was an emergency medical

8  situation, so it would not be a social situation,

9  it would be a situation where we were talking

10 about what transpired prior to our arrival, how we

11 got from them getting dispatched or finding him.

12 I don't remember whether Lt. Blackwell drove up on

13 him or if he was dispatched to him.  I don't

14 remember that.

15      And then, you know, we would -- we would

16 find out what transpired before we got there, how

17 they got the call, what they observed when they

18 got there, and, you know, how -- how and why they

19 called us, and that would be kind of the scope of

20 the conversation that we would have.

21      Q.  Got it.  And again, just so I'm clear, is

22 that your testimony because that's the practice

23 you would follow in every situation in terms of

24 providing medical response?

25      A.  Yes, when dealing with, you know --

Ian R. Godfrey
June 14, 2018

60

1   whether it be a police agency or a fire agency,

2   whoever it -- first responder, bystander that

3   arrives on-scene before we do, you know, that

4   is -- that's how we practice.  You know, there's

5   plenty of time to decompress and talk about things

6   afterward, but when we're on-scene, it's business.

7       Q.  So, would it be fair to say that you know

8   those are the topics you would have talked about

9   because that would have been your practice, but

10  you don't have a specific memory of talking about

11  those topics when you --

12      A.  That's correct.

13      Q.  What about in the back of the ambulance;

14  do you have any memory of conversations either

15  with Mr. Todero or with the other first responders

16  in the back of the ambulance?

17      A.  No, I don't recall anything.

18      Q.  Do you remember anything about the

19  conversation -- well, strike that.  You testified

20  earlier, I believe, again, without knowing exactly

21  who was in the back of the ambulance with you,

22  there were -- you remember at least there being a

23  number of firefighters in the back of the

24  ambulance; correct?

25      A.  That's correct.

Ian R. Godfrey
June 14, 2018

61

1      Q.   Would it be fair to say that firefighters

2   accompanying you in the back of the ambulance is

3   something that sometimes happens, but doesn't

4   always happen, when both firefighters and

5   paramedics are dispatched to a call for service?

6      A.   That's correct.

7      Q.   Do you have any recollection of how it

8   came to be that on this occasion there were

9   firefighters who traveled with you in the back of

10  the ambulance?

11     A.   Absolutely.  So, it was his behavior,

12  which was concerning for injury, that caused me to

13  take the firefighters with me so I would have

14  extra hands to help me, you know, in the time that

15  it took for the Versed to set in, and in the event

16  that the Versed didn't work, to help me, you know,

17  intervene at that point.  You know, at that point

18  it had nothing to do with any -- I don't want to

19  call it medical signs, because obviously mental

20  emergencies are medical emergencies as well.  I'm

21  trying to figure out exactly how to word this.

22          There was nothing about his -- his

23  condition in terms of his vital signs and things

24  like that, I guess we'll just use that since I

25  can't think of the word I'm looking for.  There

Ian R. Godfrey
June 14, 2018

62

 1  wasn't anything to indicate that he was in any

 2  kind of distress in terms of his cardiac function,

 3  his respiratory function, or anything like that.

 4  It was strictly just hands that were needed to

 5  help control him and make sure he was safe.

 6      Q.  Do you recall having a conversation with

 7  the firefighters about them joining you in the

 8  back of the ambulance, or is it just that you

 9  recall that that's why they were there?

10      A.  That's why they were there.  I don't

11  recall having a conversation with them.

12      Q.  Do you recall any -- anything about the

13  decision to have -- strike that.  Do you recall

14  anything about the conversation or decision around

15  how many firefighters would join you in the back

16  of the ambulance?

17      A.  I don't recall specifically, but, you

18  know, generally on a scene like that, we judge it

19  by, you know, the size and strength of the patient

20  and exactly how agitative -- agitated they are.

21      Q.  Did -- did you personally take any vitals

22  or any sort of quantitative medical measurements

23  or evaluation of Mr. Todero prior to putting him

24  in the back of the ambulance?

25      A.  The first thing that I did when I got on

Ian R. Godfrey
June 14, 2018

63

1    scene was I checked his radial -- the pulse in his

2    wrist.  That tells us a number of different

3    things.  If they have a good pulse in their wrist,

4    it tells us that they have what we call profusing

5    blood pressure, so blood pressure that's getting

6    oxygenated blood to their brain.  You know, the

7    rate, rhythm and quality of it, whether it's weak,

8    whether it's strong, whether it's fast, whether

9    it's slow, things like that.

10        Q.  Do you recall on this -- in this incident,

11   on checking Mr. Todero's pulse?

12            MS. SCHNEEMAN:  Asked and answered.

13        You can go ahead.

14        A.  Yes, I do.

15        Q.  Do you recall what your observations were?

16        A.  My observation was that it was bounding

17   and strong.

18        Q.  Can you explain what that means?

19        A.  And rapid; I'm sorry.

20            MS. POLLACK:  Did you say bounding?

21            THE WITNESS:  Bounding, yes.

22            MS. POLLACK:  Bounding and strong;

23   okay.

24            THE WITNESS:  Bounding, strong and

25   rapid, yes.

Ian R. Godfrey
June 14, 2018

64

1      A.  So, there's weak, which obviously means

2  you feel a very faint pulse; there's normal, which

3  is what you and I would feel; and then there's

4  bounding, and bounding is kind of a very -- what

5  is the word I'm looking for? -- very -- very

6  forceful beating.

7      Q.  Is that bounding or forceful beating

8  something that's unusual or noteworthy?

9      A.  Well, it is -- it is noteworthy; however,

10  in someone who has just -- who is at that level of

11  agitation and who has just been through a physical

12  stressor, it's not uncommon.

13      Q.  When you say someone who's "just been

14  through a physical stressor," what are you

15  referring to?

16      A.  So, we know that he endured a Taser strike

17  for some duration of time, we know that somehow he

18  was on the ground and he was handcuffed, and he

19  was being very resistive to treatment, so there

20  was a high level of physical exertion, as well as

21  the stressor of being tased.

22      Q.  There -- there wasn't any quantification

23  of the pulse that you took on the side of the

24  road; is that correct?

25      A.  No.

Ian R. Godfrey
June 14, 2018

65

1      Q.  It was a qualitative --

2      A.  Yes.

3      Q.  -- evaluation?

4      A.  Yes.

5      Q.  Do you know -- do you recall if you made

6  any record of that qualitative evaluation?

7      A.  I don't recall.

8      Q.  Okay.  It might be something that was in

9  your ambulance report?

10     A.  That's correct.

11     Q.  Okay.  Other than taking his pulse, were

12  there any other steps that you took prior to

13  Mr. Todero being in the back of the ambulance in

14  terms of evaluating his medical condition?

15     A.  Well, so, you know, generally, the three

16  things that we evaluate in a -- in kind of rapid

17  succession with one another are airway breathing

18  and circulation.  So, circulation is obviously the

19  pulse:  Rate, rhythm, quality, things of that

20  nature.

21          And as we check that, we also check the

22  skin color, condition and temperature.  That tells

23  us a number of things.  That tells us, you know,

24  the level of stress their body is under, it tells

25  us the level of blood flow that they're getting to

Ian R. Godfrey
June 14, 2018

66

1    the capillary beds and everything like that, which
2    is important, because if they're not getting blood
3    flow to the capillary bed, then you know that
4    they're, you know, bringing the blood to save
5    their organs, and so, indicative of potential
6    problems.
7            And then -- so, obviously in terms of
8    airway and breathing, we had established that he
9    had a patent airway and that he was breathing by
10   the fact that he was yelling.  So, we knew that
11   his breathing was adequate and that his airway was
12   adequate.
13       Q.  When you were -- I'm sorry.  When you were
14   describing something related to his skin color --
15       A.  Uh-huh.
16       Q.  -- do you recall what you observed in
17   terms of his skin color on the scene?
18       A.  No, I don't independently recall that.
19       Q.  Okay.  Any other steps in terms of medical
20   evaluation that you personally engaged in while --
21   while on the scene prior to him going into the
22   back of the ambulance?
23       A.  Not that I recall.
24       Q.  Okay.  Do you recall anyone else
25   conducting any medical evaluation while you --

Ian R. Godfrey
June 14, 2018

67

1   after your arrival and prior to him going into the

2   back of the ambulance?

3       A.  Not that I recall.

4       Q.  Okay.  Are you familiar with the record --

5   the -- strike that.  Are you familiar with the

6   note-taking system that the Greenwood Fire

7   Department used during calls for service at that

8   time?

9       A.  Yes.

10      Q.  Okay.  What's your understanding of that

11  note-taking system at the time for the Fire

12  Department?

13      A.  So, on the fire side, basically it was a

14  very framework report, and I don't -- I don't

15  remember, in-depth, anything.  I just remember

16  that it was very kind of framework, and then there

17  was a narrative where they put in some

18  information.

19      Q.  And are you referring to like a report

20  that they would generate after the fact and upon

21  return to the --

22      A.  Uh-huh.

23      Q.  -- firehouse, for example?

24      A.  Yes.

25      Q.  Do you recall if it was the practice of

Ian R. Godfrey
June 14, 2018

68

1    the Greenwood Fire Department to have their
2    firefighters take handwritten notes while on the
3    scene of a call for service?
4        A.   There was a standard kind of -- I don't
5    know.  It was probably -- maybe an
6    eight-and-a-half-by -- it was probably a half
7    sheet of paper, so eight-and-a-half-by-five --
8    by-five carbon copy paper.  They would write down
9    basic information.  They would keep one copy.
10   They would hand us the other copy.  It would have
11   name, date of birth, if they did any vitals prior
12   to arrival, things like that.  They would keep a
13   copy, we would keep a copy, and --
14       Q.   Do you have an independent recollection of
15   receiving a copy of those handwritten notes with
16   reference to Mr. Todero?
17       A.   Not in this specific case.
18       Q.   What was your practice in relation to what
19   you did with those -- that carbon copy of those
20   handwritten notes after you received it?
21       A.   Shredded them.
22       Q.   Okay.  Would you do anything with the
23   information on that copy?
24       A.   So, that information, if there was any
25   pertinent information -- if they had done vital

Fillenwarth Reporting Service
317.535.1607

Ian R. Godfrey
June 14, 2018

103

1    lots of -- whether it be in-hospital or doctor's

2    offices, there are lots of different types of

3    Patient Care Reports, but yes, in this situation,

4    they are referring to the same thing.

5        Q.   Okay.   And recognizing that you haven't

6    read every word on every page of both of those

7    documents, but taking -- but taking as much time

8    as you need --

9        A.   Yeah.

10       Q.   -- to sort of see what -- what categories

11   of information and the substance of the

12   information that's in both of Exhibit 1 and

13   Exhibit 2, are you able to identify anything

14   that's contained in one of those two exhibits that

15   is not contained in the other?

16              MS. SCHNEEMAN:   Well, I will note that

17   the documents are not identical, and they do speak

18   for themselves, but --

19       A.   Yeah.   I mean they're not -- they're not

20   identical, but the same information does appear to

21   be contained within -- like I said, we've got the

22   signature page, we've got the page where I signed,

23   we've got clinical notes, EKG strip, so yeah, I

24   mean --

25       Q.   Well, I'm happy for you to go off of

Ian R. Godfrey
June 14, 2018

104

 1    whichever one you prefer to go off of in terms of

 2    going through it.  So --

 3         A.  Okay.

 4         Q.  -- do you have a preference?

 5         A.  Why don't we go with 2, since that's got

 6    all of the -- all of the pages.

 7              MS. POLLACK:  So, which is 2?

 8              THE WITNESS:  It's this one that you

 9    guys had.

10              MS. POLLACK:  The Pre-Hospital?

11              THE WITNESS:  Yeah.

12              MS. POLLACK:  So, the Pre-Hospital

13    is 2.

14              MS. SCHNEEMAN:  Yes.

15              THE WITNESS:  The Pre-Hospital Care

16    Report.

17              MS. POLLACK:  And then -- so, the

18    other one is 1; okay.

19         Q.  So, turning to the times section of

20    Exhibit 2, it's got various different categories

21    of timings listed there, "Call Received,

22    Dispatched, Enroute, At Scene," et cetera.

23         A.  Correct.

24         Q.  Do you know how those times were generated

25    in terms of them appearing on this report?

Ian R. Godfrey
June 14, 2018

105

1      A.  So, the way those are generated is that we

2  get those to our Mobile Data Console, to the

3  Spillman program, and then we would put those in

4  at the end of -- at the end of the call.

5      Q.  Okay.  So, is that -- just so I understand

6  the process, is that something that you had to

7  manually enter into the report, but from something

8  that was --

9      A.  Yes.

10      Q.  -- generated on a different system you

11  were able to look at?

12      A.  Right.  So, when -- you know, when we went

13  en route to the call, we would have pressed one

14  button, when we arrived on-scene, we'd press

15  another button on the Mobile Data Console,

16  transporting, et cetera, et cetera.  And then

17  after the call, we would query the call, and all

18  of those times would populate for us, and we would

19  transfer the ones that were on the screen to the

20  ones that are on the page, because the Spillman

21  system does not cross over into the AMR Meds

22  System.

23      Q.  Got it.  So, although they're both

24  independently sophisticated computer systems, you

25  as the human being have to be the bridge to sort

Ian R. Godfrey
June 14, 2018

106

1    of manually enter those times in your report?

2        A.  Absolutely.

3        Q.  Okay.  Do you know what the -- just to go

4    through each of those, "Call Received" and

5    "Dispatched" are both listed as the same time here

6    as 11:56.

7        A.  Yes.

8        Q.  And that refers to you being first made

9    aware of the call for service; is that correct?

10       A.  That's correct.  That's 911 receiving the

11   call -- or our dispatch center receiving the call.

12   So, like I said before, if the police were called

13   to it first and they arrived on-scene and they

14   decided that they needed us, then they would call

15   their dispatch, who would call our dispatch, and

16   then they would send the call out to us.  However

17   it was received, whether it be via radio, phone,

18   however it may be, that's the "Call Received."

19   "Dispatch" is the time that we're notified,

20   "Enroute" is the time that we're sitting in the

21   truck and rolling out the door.

22       Q.  Okay.  And then the time "At Scene" is --

23   refers to your sort of pulling up at the scene; is

24   that --

25       A.  That's correct --

Ian R. Godfrey
June 14, 2018

107

1    Q.  -- correct?

2    A.  -- yes.

3    Q.  And then time "At [Patient] Side," I

4  assume, refers to once you've gotten out of the

5  truck and are actually seeing the patient that

6  you're there for.

7    A.  Yes.

8    Q.  And then there's a "Transport" and

9  "Arrival" time listed.

10    A.  Yes.

11    Q.  Do you know what those refer to?

12    A.  So, "Transport" is the time that we leave

13  the scene, "Arrival" is the time that we arrive at

14  our destination, so the hospital.

15    Q.  And does that five-minute period of time

16  comport with your memory and also your

17  understanding of the distance between the area

18  where the Todero incident took place and

19  St. Francis Hospital?

20    A.  Yes, that sounds like it would be correct.

21    Q.  On the -- in the middle section of that

22  Exhibit 2, under "Dispatch Information," it lists

23  a "Response Mode" and a "Transport Mode."

24    A.  Yes.

25    Q.  "Response Mode" is listed as "Lights and

Ian R. Godfrey
June 14, 2018

108

1    Siren," "Transport Mode" is "No Lights and Siren."

2        A.   Yes.

3        Q.   What does that refer to?

4        A.   So, "Lights and Siren," I mean that means

5    we use our lights and our siren to go where we're

6    going, and "No Lights and Siren" means no lights

7    and siren.  "Response Mode" means going to the

8    scene, "Transport Mode" means going from the scene

9    to the hospital.

10       Q.   So, that -- that reflects that getting to

11   the area of Madison Avenue and Frye Road where

12   Mr. Todero was, you had your lights and siren on;

13   is that correct?

14       A.   Yes.  Every call in Greenwood we responded

15   to with lights and sirens.

16       Q.   And then transporting him from that scene

17   to the hospital was no lights and siren?

18       A.   That's correct.

19       Q.   Is that a standard practice?

20       A.   That is a standard practice this day and

21   age.  Lights and sirens are used to transport

22   patients in a very few -- few and far between

23   circumstances.

24       Q.   And then the "Care [Transferred]" notation

25   at 12:21 p.m., does that refer to sort of the

Ian R. Godfrey
June 14, 2018

109

1   formal process of now he's in the care of the

2   emergency room folks at the hospital?

3       A.   That's when we first encounter the

4   emergency room staff and we begin giving them our

5   verbal report.

6       Q.   Okay.   And then in this context, do you

7   know what the "Available" time refers to?

8       A.   That's when our unit is placed back in

9   service, so when we're leaving the hospital.

10      Q.   And that would be after you completed the

11  report?

12      A.   In this case, yes.

13      Q.   Okay.   Turning over to -- well, the second

14  and third pages of this report are blank; is that

15  correct?

16      A.   That's correct.

17      Q.   Other than the --

18      A.   Yes.

19      Q.   -- repeated header at the top?

20      A.   Right.

21      Q.   And then, I guess, turning to the fourth

22  page --

23      A.   Yes.

24      Q.   -- at the bottom of the fourth page and

25  then leading up to the top half of the fifth page,

Ian R. Godfrey
June 14, 2018

110

1    there is a series of times and descriptions listed

2    under the heading, "Treatments."  Do you see what

3    I'm -- do you see what I'm referring to?

4        A.  Yes.

5        Q.  How are these populated or included in the

6    report?

7            MS. SCHNEEMAN:  I'm sorry; under what,

8    the "Treatments" section?

9            MR. HEPPELL:  Under the "Treatments"

10   heading --

11           MS. SCHNEEMAN:  Okay.

12           MR. HEPPELL:  -- on the bottom of the

13   page, spilling over onto the top half of the next

14   page.

15           MS. SCHNEEMAN:  Okay.

16       A.  So, these are recorded as we go along, and

17   then they're manually entered into the report.

18       Q.  Okay.  How -- how are those recorded as

19   you go along?

20       A.  They're written, handwritten.

21       Q.  Okay.  So, these would be handwritten

22   notes that -- that you or another individual had

23   taken during the course of providing treatment to

24   Mr. Todero?

25       A.  That's correct.

Fillenwarth Reporting Service
317.535.1607

Ian R. Godfrey
June 14, 2018

132

1      A.  Right.

2      Q.  -- on the previous page.  Is that -- is

3    that documenting what you were describing earlier

4    in terms of first perceiving a deterioration of

5    his condition, and you not being sure whether you

6    noticed the heart rate or the breathing first?

7      A.  Yes.

8      Q.  But both of those are reflected in this

9    time entry; is that correct?

10     A.  Yes.

11     Q.  Does that suggest to you that if it's

12   contained in one time entry, that those were

13   approximately -- those occurred approximately the

14   same time?

15     A.  Yes.

16     Q.  I mean unless you had one eye on one and

17   one eye on the other, you would have --

18     A.  Exactly.

19     Q.  -- observed one before the other?

20     A.  Exactly.  Well, I mean probably, if I had

21   to guess, I heard his respirations snoring, looked

22   up at the monitor --

23     Q.  Right.

24     A.  -- and that's where we were.  Because at

25   this time, like I had said before, I was

Ian R. Godfrey
June 14, 2018

133

```
 1    sitting -- I was sitting next to him, so that
 2    would have been the first thing.
 3         Q.  So, like virtually a simultaneous
 4    observation?
 5         A.  Yeah, exactly, exactly.  I would have had
 6    an auditory cue and then a visual cue.
 7         Q.  And then at 12:19 p.m., or one minute
 8    later, that -- is that entry then reflecting the
 9    asystole with the pulse regularity listed as
10    absent?
11         A.  Yes.
12         Q.  Okay.  Turning to the narrative section of
13    your report, I'm not going to go through every
14    word of it, but the --
15         A.  Right.
16         Q.  -- third sentence, "The patient was
17    extremely combative and screaming expletives.  The
18    patient was flailing and kicking."  Do you see
19    what I'm referring to?
20         A.  Yes.
21         Q.  Does reading that refresh your memory at
22    all in terms of any of the details of the
23    specifics of the behaviors that you observed, or
24    calling up in your mind images of how Mr. Todero
25    was behaving?
```

Ian R. Godfrey
June 14, 2018

134

1    A.  Not really anything further beyond what --

2    what I wrote and what I already kind of testified

3    to.

4    Q.  Okay.  Similarly, a few sentences on, the

5    sentence that starts with, "The patient's skin was

6    pink, warm and diaphoretic," the next sentence

7    continues, "and he was uncooperative with a

8    pupillary and lung sound assessment."

9    A.  Uh-huh.

10   Q.  Do you have any memory of what that lack

11   of cooperation -- or how that lack of cooperation

12   manifested itself?

13   A.  No, I don't.

14   Q.  Okay.  A little bit further along, it

15   states, "Due to his kicking the patient's feet

16   were tied with a blanket and he was lifted onto

17   the stretcher..."

18   A.  Okay.

19   Q.  Do you see what I'm referring to?

20   A.  Yes.

21   Q.  Do you have a memory of that event?

22   A.  No, not independently, no.

23   Q.  Do you -- is it -- do you know whether --

24   no, strike that, that question.  And then as the

25   narrative continues, it talks about after he's

Ian R. Godfrey
June 14, 2018

135

1  placed in the back of the ambulance -- or it says,

2  "The patient was loaded into the ambulance where

3  he continued to be combative and attempt to throw

4  himself off of the stretcher and hit his head off

5  of things."

6      A.  Yes.

7      Q.  Do you have an independent memory of that?

8      A.  No, I don't.

9      Q.  Okay.  Do you -- are you able to decipher

10  just from reading the report what that's referring

11  to in terms of Mr. Todero's behavior?

12      A.  I don't -- I don't know what you're

13  asking.  I think it's pretty self-explanatory that

14  he was attempting to throw himself off the

15  stretcher and he was attempting to hit his head

16  off of things.  I mean like I stated before,

17  there's a bench seat that's there, there's all

18  sorts of things in the way.  So, I don't know -- I

19  don't know what kind of further clarification

20  you're looking for.  If you could --

21      Q.  See, I -- maybe let it -- let me ask it

22  this way:  So, I guess one -- one way of reading

23  this would be sort of implying some

24  intentionality, like you made the determination

25  that he is trying to get himself off the

Ian R. Godfrey
June 14, 2018

136

1   stretcher --

2       A.   Oh, no.

3       Q.   -- he is trying to bang his head on

4   things.

5       A.   No, absolutely not.

6       Q.   Okay.

7       A.   It was an involuntary thing.

8       Q.   Okay.  So, whatever physical movements

9   that you observed, there was a concern that you

10  had that that was going to result in him --

11      A.   Being severely injured, yes.

12      Q.   -- injuring himself, either hitting his

13  head or falling off the stretcher or --

14      A.   Right --

15      Q.   -- what have you?

16      A.   -- exactly.

17      Q.   Not that he was intentionally trying to

18  bring his head into contact with something for the

19  purposes of injuring himself?

20      A.   Exactly.

21      Q.   Okay.

22      A.   Exactly.

23      Q.   The next sentence states, "The patient

24  continued to be a danger to himself and others."

25  I think the danger to himself is self-explanatory

Ian R. Godfrey
June 14, 2018

137

1    given your previous sentence.  Do you know what --

2    what you were referring to by being a danger to

3    others in that sentence?

4        A.   If he's kicking and things like that and

5    we're attempting to -- we're attempting to treat

6    him, that obviously poses a danger to providers.

7        Q.   And was -- again, just so I'm clear, would

8    that be again like he's not intentionally --

9        A.   Right, yes.

10       Q.   -- kicking you for the purpose of causing

11   you harm, but you were concerned that his

12   movements might --

13       A.   No, there's no --

14       Q.   -- might cause that?

15       A.   -- there's no meaning of intent there.

16       Q.   Okay.  At any point during your

17   interactions with Mr. Todero on May 29th, did you

18   feel threatened by him or perceive any threat

19   towards you?

20       A.   Do you mean intentionally?

21       Q.   Intentionally.

22       A.   No.

23       Q.   And beyond the -- I guess the kicking that

24   you referred to, I guess the potential that he

25   could strike you with his legs, was there any

Ian R. Godfrey
June 14, 2018

138

1    other -- were there any other ways in which you

2    perceived an unintentional threat towards you?

3        A.   Well, I mean someone -- you're in a very

4    small enclosed space when you're in an ambulance.

5    There's a very limited space between the stretcher

6    and the bench seat, so in the process, if the

7    person were to flip themselves off the stretcher

8    and you were in the way, it could injure you.  I

9    mean there are any number of ways that, you know,

10   he could -- he could head butt somebody if he's

11   trying to put his -- you know, bounce his head off

12   thing -- or I shouldn't say "trying" -- if he is

13   bouncing his head around and -- you know, he could

14   head butt somebody.  I mean there are any number

15   of ways that he could be a danger to others in

16   this situation.

17       Q.   I guess let me -- so, let me phrase it

18   this way:  Other -- other than him coming into

19   contact with someone or causing an injury to

20   someone as a result of those body movements --

21   strike that.  Let me ask it a different way.  At

22   any point in time on May 29th, 2016, did you

23   perceive any intentional threat from Mr. Todero

24   towards you?

25       A.   No.

Fillenwarth Reporting Service
317.535.1607

Ian R. Godfrey
June 14, 2018

139

1      Q.   Did you perceive any intentional from

2    Mr. Todero towards anyone else?

3      A.   No.

4      Q.   Did you perceive any intentional threat

5    from Mr. Todero towards himself?

6      A.   No, not intentional, no.

7      Q.   I think I'm going to have you turn to

8    Exhibit 1, only because my recollection is that

9    the EKG --

10     A.   Yes.

11     Q.   -- is more legible, slightly more legible,

12   on that one.

13     A.   Okay.

14     Q.   I guess they're maybe pretty similar.  Can

15   you just -- well, anyway, on Exhibit 1 it's

16   reproduced at Todero 420.

17     A.   Uh-huh.

18     Q.   We're looking at the same page?

19     A.   Yes.

20     Q.   Can you just help me understand what this

21   chart or graph represents?

22     A.   It just represents his EKG strip.  This

23   represents the sinus tachycardia that I was

24   talking about.

25     Q.   Okay.  So, this is an EKG strip reflecting

Ian R. Godfrey
June 14, 2018

140

1   the entry at 12:14?

2       A.   12:08, I think it was.

3       Q.   12:08 p.m. --

4       A.   Yeah.

5       Q.   -- where he had a slightly elevated -- he

6   had an elevated heart rate in addition to sinus

7   tachycardia?

8       A.   Yes.

9       Q.   Was there an EKG strip created for other

10  moments during the -- during the course of the

11  treatment in the ambulance?

12      A.   No, unfortunately, there wasn't.  So, the

13  way that the monitors work, the Life Pack 15 that

14  we used in Greenwood, so the way that it works is

15  when you apply it to the patient, it acquires an

16  initial rhythm and it automatically captures that

17  and saves that as part of the patient record.

18  Anything subsequent to that, you have to manually

19  prompt it to record.  So, by the time I recognized

20  the type of distress he was in, I was more

21  concerned with getting my hands on him to treat

22  him than recording it on the monitor.

23      Q.   Do you -- do you have any recollection of

24  the, I guess, specific wave form that you -- that

25  you observed at any later point subsequent to the

Ian R. Godfrey
June 14, 2018

141

1   EKG strip that's preserved here?

2       A.  No, other than the -- other than the rate

3   that I -- that I noted.

4       Q.  Okay.  Do you recall one way or the other

5   whether there was anything abnormal about the wave

6   forms subsequently, beyond the -- beyond the rate

7   that you observed?

8       A.  No.  I marked here that it was -- that he

9   had a regular pulse, so it wasn't irregular, but I

10  don't make a notation as to whether it was wide or

11  narrow or anything of that nature, so --

12      Q.  And this was happening relatively quickly,

13  and as you just stated, your primary focus at that

14  point was not on observing the monitor, but on

15  working on the patient; fair to say?

16      A.  Yeah, absolutely.  Well, not that I wasn't

17  looking at the monitor, but I wasn't trying to --

18  I wasn't prompting the monitor to record.  I

19  was --

20      Q.  Right.

21      A.  -- you know, I was focused on the fact

22  that he was going -- I mean this happened within a

23  matter of two minutes while we were arriving in

24  the ambulance bay at the hospital, so, you know,

25  we were trying to get equipment out to ventilate

Ian R. Godfrey
June 14, 2018

162

 1    the industry now is uncooperative?

 2        A.  Yes.

 3        Q.  Do you think combative is an -- was an

 4    appropriate word choice at the time to describe

 5    his behavior?

 6        A.  At the time, I did.

 7        Q.  Okay.  And can you describe with any more

 8    particularity what he was doing that was

 9    combative?

10              MR. HEPPELL:  Objection.  Asked and

11    answered.

12          You can go ahead.

13        A.  Again, I mean from -- from what I've said

14    and what I've read out of my report, I mean that's

15    pretty much what I can recall, not any other

16    specifics.

17        Q.  Okay.  Do you recall him twisting with his

18    torso and shoulders?

19        A.  I don't recall.  Certainly from reviewing

20    the video, it appeared that that was the case.

21        Q.  Okay.  Do you -- and I'm asking about

22    anything that you recall, even if your memory's

23    been refreshed by --

24        A.  Okay.

25        Q.  -- the video.

Ian R. Godfrey
June 14, 2018

163

1      A.   Uh-huh.

2      Q.   Do you recall him kicking at any point?

3      A.   I don't independently recall.  Like I

4  said, in the video someone was holding his legs

5  down.  There was a firefighter across his legs,

6  and I marked it in my report, so I -- this was

7  written, you know, within an hour of when we did

8  the call.  This is now two years later, so --

9      Q.   Right.  Well, that brings me to a good

10  point.  Under the -- I know I'm skipping around on

11  your report here --

12      A.   No, no, you're fine.

13      Q.   -- but under the "Narrative" section --

14      A.   Yes.

15      Q.   -- would you have written any of that at

16  the time if it had not been true?

17      A.   Absolutely not.

18      Q.   And at the time you wrote this, this was

19  the same day of the incident; is that correct?

20      A.   Yes, it was within an hour of -- actually,

21  I closed it almost an hour to the second of when

22  we received our call.

23      Q.   Okay.  And at that point, you had no idea

24  if a lawsuit would ever be filed; correct?

25      A.   Absolutely not.

Ian R. Godfrey
June 14, 2018

164

1      Q.   So, there was no reason for you to tailor

2   this negative -- or to tailor your negative to the

3   benefit of any particular person?

4      A.   Absolutely not.

5             MR. HEPPELL:  Object to form.

6             MS. POLLACK:  Do you mean narrative?

7             THE WITNESS:  Oh.

8             MR. HEPPELL:  Argumentative.  Sorry.

9             MS. POLLACK:  Tailor -- tailor his

10  narrative?

11            MS. SCHNEEMAN:  Right.

12     Q.   There was no -- there was no reason for

13  you to tailor your nega -- your -- I'm sorry -- to

14  tailor your narrative because you, at that time,

15  anticipated a lawsuit would be filed?

16            MR. HEPPELL:  Same objection.

17       Go ahead.

18     A.   That's correct.

19     Q.   Okay.  And the words that you chose to

20  describe Mr. Todero's appearance and conduct,

21  those were the words that you thought at the time

22  best described his behavior and appearance;

23  correct?

24     A.   That's correct.

25     Q.   Since we're talking about the narrative,

Ian R. Godfrey
June 14, 2018

165

1   up towards the top, it says that Mr. Todero was

2   "screaming expletives."

3        A.  Yes.

4        Q.  Okay.  It -- to you, is the word

5   "expletives" another word or the same as

6   profanities?

7        A.  Yes.

8        Q.  Okay.  Same as curse words?

9        A.  Yes.

10       Q.  Do you recall any of the particular curse

11  words he was using?

12             MR. HEPPELL:  Objection.  Asked and

13  answered.

14       Go ahead.

15       A.  I don't recall any particulars, no.

16       Q.  Did the -- do you recall if he was using

17  curse words both on the street when you arrived,

18  and continued to use them in the ambulance, or was

19  he only using them at particular points in time?

20       A.  I don't recall.

21       Q.  Okay.  Do you recall whether he used

22  expletives in the ambulance?

23       A.  Well, in my narrative, it says, "He

24  continued to yell expletives but became less

25  physically combative."  So, according to this

Ian R. Godfrey
June 14, 2018

1   narrative, then yes.

2        Q.   Okay.   And the narrative says, "He was

3   flailing and kicking."   Would you have written

4   that if he had not been doing those things?

5        A.   Absolutely not.

6        Q.   The narrative explains that "The police

7   received a call for a check [on the welfare of a

8   patient due to] walking in...traffic claiming he

9   was a prophet and the second coming of Christ."

10  Do you see that there?

11       A.   Yes.

12       Q.   That's information that you received from

13  the police?

14       A.   Yes.

15       Q.   When you were present at the scene, did

16  you hear Mr. Todero make any claims that he was a

17  prophet or the second coming of Christ?

18       A.   I don't recall.

19       Q.   Okay.   Did you ever hear him say anything

20  about the Bible or make -- recite things that

21  might have sounded like Bible passages?

22       A.   I don't recall.

23       Q.   A few lines down further, it says, "The

24  patient's skin was pink, arm and diaphoretic and

25  he was uncooperative with a pupillary and lung

Ian R. Godfrey
June 14, 2018

167

1   sound assessment."

2       A.  Yes.

3       Q.  Do you have a recollection or do you

4   recall how Mr. Todero was being uncooperative with

5   a pupillary and/or lung sound assessment?

6       A.  I don't specifically recall now.

7       Q.  Okay.  What is involved in a lung sound

8   assessment?

9       A.  So, in order to assess lung sounds, we

10  listen in five places on the back, because there

11  are five lobes of the lung, three on the right,

12  two on the left, so we listen to the -- to both

13  uppers, then we listen to the middle right, and

14  then we listen to both lowers.  Then we listen in

15  the what's called midaxillary or below the

16  armpits, then we listen -- and then we listen to

17  the front as well.

18      Q.  And is it docu -- do you have a

19  recollection or is it documented in your report

20  the results of that lung sound assessment?

21      A.  No.  Under "Chest," it says, "Symmetric

22  with bilateral chest rise," so that would have

23  strictly been an observational thing.  We were not

24  able to listen to his lungs, but we -- that's

25  another way of assessing somebody's respiratory

Ian R. Godfrey
June 14, 2018

168

1   status, and noting that there is no chance of --

2   that a lung has collapsed, or what's called a

3   pneumothorax, or that they have an injury to their

4   chest is that both sides of their chest are

5   equally moving and that they rise and fall with

6   every breath.

7        Q.  Okay.  Now, are you able to tell from your

8   report, or does your report refresh your memory,

9   as to whether the lung sound assessment was normal

10  or concerning in any way?

11       A.  Well, I was unable to perform it because

12  he was uncooperative with it.

13       Q.  Okay.

14       A.  But certainly if he was yelling, like I

15  said before, we knew his airway was patent, we

16  knew his respiratory status was intact, and there

17  was no severe concern for a lack of oxygen at that

18  time.

19       Q.  You said, "no severe concern."  Was there

20  any concern at all about him being able to get

21  oxygen?

22       A.  No.

23       Q.  Further down in the narrative, and this is

24  kind of just below the middle, I guess, it states,

25  "The cardiac monitor was applied to the patient's

Ian R. Godfrey
June 14, 2018

169

shoulder and flank."

A.   Uh-huh.

Q.   "Due to patient's combativeness, multiple attempts at blood pressure and pulse o x failed."

A.   Uh-huh.

Q.   The term "pulse o x," what is that?

A.   So, pulse ox is pulse oximetry.  It's the measurement of oxygen in the blood, and the way that it works is that a little plastic finger probe goes on the finger, and it's spring loaded, so just -- it just clips right onto the finger, and it's got an infrared light which shines through the bed -- the nail bed, basically, and it measures the percent of oxygen bound to the red blood cells, and then it gives you a quantitative number on the monitor.  But the problem is that somebody who is resisting treatment and who's uncooperative, that probe -- like I said, it's just a little spring-loaded probe.  It's very easily flung off and things like that.

Q.   Was -- did Mr. Todero fling off the pulse oximetry?

A.   I didn't specifically state that, but I'm guessing that that's why we were unable to obtain a reading.  It says that multiple attempts failed.

Ian R. Godfrey
June 14, 2018

170

1    Q.  The narrative continues on that the

2    patient was given 5 [milligrams] of midazolam,"

3    and that's the Versed that we were talking about

4    earlier?

5    A.  Yes.

6    Q.  Okay.  And then it goes on to say, "The

7    patient continued to yell expletives..."  So, am I

8    correct to understand that after the Versed was

9    administered, Mr. Todero continued to shout

10   profanities inside the ambulance?

11   A.  Yes.

12   Q.  But you don't remember specifically the

13   curse words he was using?

14   A.  That's correct.

15   Q.  And the narrative here states, a little

16   further down, "While preparing to pull the patient

17   out of the ambulance, the patient went into

18   [astole and the monitor] -- on the monitor and

19   pulse was lost."  Am I correct to understand that

20   Mr. Todero went into cardiac arrest as you were

21   trying to pull him out of the ambulance?

22   A.  Right.  So, basically when we arrive at

23   the hospital, there are a number of things that we

24   do.  We have to secure all of the equipment to the

25   stretcher to make sure that it won't fall off the

Ian R. Godfrey
June 14, 2018

171

1    stretcher as we're transporting somebody in.  You

2    know, in this case we were ventilating Mr. Todero,

3    we were breathing for him, so we have to move the

4    oxygen tubing from the oxygen that's secured in

5    the ambulance to the one that's on the stretcher.

6          There are a number of kind of procedural

7    things that happen when you arrive at the hospital

8    before you actually pull the patient out, and so,

9    this was -- what this says to me is that while

10    kind of the back doors were open, my partner was

11    waiting to pull the patient out, we were getting

12    everything kind of moved over, secured, and that's

13    when it happened.

14    Q.  And that's -- and that's -- you mean when

15    the heart rate on the monitor went to zero?

16    A.  Yes, when he went into asystole and his

17    heart rate -- and his heart stopped.

18    Q.  Okay.  And it's my understanding, and

19    correct me if I'm wrong, that once the ambulance

20    was actually on the hospital property, that's when

21    you all noticed the heart rate dropped

22    dramatically and started taking the steps to get

23    the air bag and the -- do what you needed to do,

24    but it wasn't until actually the ambulance doors

25    opened that the heart rate went to zero?

Ian R. Godfrey
June 14, 2018

172

1      A.   That's correct.

2      Q.   And I take it when it says, "End Report,"

3   and then there looks like some initials, those are

4   your initials?

5      A.   Those are my initials, yes.

6      Q.   Did anyone suggest to you what you ought

7   to write in your narrative?

8      A.   No.

9      Q.   This was all your words?

10     A.   Yes.

11     Q.   And I guess just to be clear, no one from

12   the Greenwood Police Department attempted to tell

13   you what to write in this narrative?

14     A.   No.

15     Q.   Turning your attention back to page one of

16   Exhibit 2 --

17     A.   Okay.

18     Q.   -- I know you had talked a little bit

19   earlier in your deposition today about the

20   "Dispatch Information" and the "Transport Mode."

21     A.   Right.

22     Q.   And under "Transport Mode," where it says,

23   "No Lights and Siren" --

24     A.   Yes.

25     Q.   -- if my understanding of your testimony

Ian R. Godfrey
June 14, 2018

173

1    was correct, that means when you loaded Mr. Todero

2    into the ambulance and set off for St. Francis

3    Hospital, the ambulance was not running with its

4    lights and sirens on; is that correct?

5        A.  Yes.

6        Q.  Okay.  And I think you said also earlier

7    today that it's fairly common not to run lights

8    and sirens to a hospital.

9        A.  That's absolutely correct.

10       Q.  Okay.  What would be -- what would be --

11   well, when would you run lights and sirens?  What

12   would have to be -- what facts would have to be

13   present to run lights and sirens?

14       A.  An obvious heart attack, an obvious

15   stroke, something like a gunshot wound, a

16   stabbing, if we were performing any kind of

17   cardiac interventions and not seeing improvement.

18   In fact, generally, even people who we find to be

19   critically ill when we get to their side, as long

20   as we can provide immediate stabilizing care, we

21   do not transport them with lights and sirens to

22   the hospital.

23           So, people who are having severe difficulty

24   breathing who need to have a special -- a special

25   mask put on, breathing treatments, I.V. steroids,

Ian R. Godfrey
June 14, 2018

174

1    things like that, as long as we see a clinical

2    improvement in them, we do not transport them with

3    lights and sirens to the hospital.  People whose

4    blood pressure is extremely low, as long as we can

5    get I.V. access on them and get their blood

6    pressure up with a limited amount of I.V. fluids,

7    we do not transport them lights and sirens to the

8    hospital.

9            There's a very, very limited scope of what

10   we do transport lights and sirens to the hospital.

11   Someone who's been successfully resuscitated from

12   cardiac arrest, they would be transported with

13   lights and sirens, things like that.

14       Q.  Would -- the list of things that you've

15   just described -- the obvious heart attack,

16   stroke, gunshot wound, stabbing -- would you say

17   that those are life-threatening conditions?

18       A.  Absolutely.

19       Q.  Was there anything about Mr. Todero's

20   condition when he was loaded into the ambulance

21   as -- just as you were --

22       A.  Right.

23       Q.  -- starting to leave that you considered a

24   life-threatening condition?

25       A.  Absolutely not.

Ian R. Godfrey
June 14, 2018

175

1    Q.  Did this appear -- did Mr. Todero's

2    condition, to you, as you were pulling away from

3    the scene, did it appear in any way to you to be a

4    medical emergency?

5    A.  I don't -- I don't really think that --

6    that's a -- that's kind of a tricky question.

7    There was obviously an underlying medical

8    condition and an underlying medical emergency that

9    needed to be treated at an emergency room, but did

10   I consider it an immediate critical life threat?

11   No.  And the fact that, like I -- like it was

12   stated in my narrative, he was -- his level of

13   combativeness decreased after administering the

14   Versed.  That was actually initially a very

15   encouraging thing.  You know, we all took a deep

16   breath and said, "Okay.  Things are going well

17   now."

18   Q.  Okay.  So, if I understand what you just

19   said, are you conveying to us that once Mr. Todero

20   was in the ambulance, his condition actually

21   improved?

22   A.  Well, in terms of --

23        MR. HEPPELL:  Objection.  Incomplete

24   hypothetical.  Misstates prior testimony.

25        You can go ahead.

Ian R. Godfrey
June 14, 2018

176

1           THE WITNESS:  Okay.

2      A.  So --

3      Q.  Well, obviously before -- well, obviously

4  before he went into cardiac arrest.  Initially,

5  was it your impression that his condition was

6  improving en route to the hospital?

7      A.  Yes, after we -- after we gave him the

8  medication, it was the initial impression that he

9  was calming down and things were going very, very

10  well for him.

11      Q.  And then it was only when you got onto the

12  hospital property that things took a turn for the

13  worse?

14      A.  Yes.

15      Q.  The -- switching gears a little bit, the

16  Taser probe that you saw in the upper part of

17  Mr. Todero's back that was unable to be removed.

18      A.  Uh-huh.

19      Q.  Do you have any information about how the

20  Taser probe became so embedded?  And I guess what

21  I mean by that is:  Do you know whether the Taser

22  probe became deeply embedded at the point at which

23  the officer pulled the Taser trigger, or whether

24  it may have become embedded when Mr. Todero was

25  rolling on the ground?

Ian R. Godfrey
June 14, 2018

177

```
1          MR. HEPPELL:  Object to form.
2      Go ahead.
3      A.  I have absolutely no idea.  I mean I --
4  like I said, I've never encountered a Taser barb
5  that wasn't able to be removed, either before or
6  after this incident.  It was probably the most
7  deeply embedded I've seen, but as I stated before,
8  I'm certainly not an expert on Tasers and how deep
9  those probes can penetrate or --
10     Q.  Okay.
11     A.  -- anything of that nature.
12     Q.  Okay.  So, all you're able to say --
13 correct me if I'm wrong in understanding your
14 testimony, but all you're able to say is that when
15 you saw it, it was deeply embedded, but how it
16 became deeply embedded, you can't say; is that
17 fair?
18     A.  That's correct.
19     Q.  Okay.  At any time when you were at the
20 scene -- and this is before you loaded Mr. --
21     A.  Right.
22     Q.  -- Todero in the hos -- into the
23 ambulance -- did you see him fall backwards and
24 hit his head?
25     A.  No.
```

Ian R. Godfrey
June 14, 2018

178

1      Q.  Earlier today you referenced, and I think

2  your words were an official statement you gave to

3  the Police Department.

4      A.  Yes.

5      Q.  Okay.  The official statement you gave to

6  the Police Department, do you have a sense of when

7  you gave that statement to the Police Department?

8      A.  I believe it was within a few days of when

9  the actual incident occurred, but I'm not -- but

10  it may have been after he died.  I don't remember

11  specifically.

12     Q.  Okay.  Would it be fair to say that it was

13  relatively close in time to the incident?

14     A.  Yes.

15     Q.  Okay.  Not several months later?

16     A.  Correct.

17     Q.  At most, a couple of -- maybe a couple of

18  weeks to a month later?

19     A.  That's correct.

20     Q.  Okay.  Now, correct my understanding if

21  I'm wrong, but you asked me for a copy of that

22  statement, and I sent it to you?

23     A.  That's correct.

24     Q.  And have you had an opportunity to review

25  it?

Ian R. Godfrey
June 14, 2018

179

1      A.   No, I did not.

2      Q.   Okay.  What I'd like to do is I'd like to

3    play the statement -- the interview for you?

4      A.   Okay.

5      Q.   And -- well, let me ask this preliminary

6    question first.  The statement that you gave to

7    the Police Department, would your statement have

8    encompassed the facts to the best of your

9    recollection at that time --

10              MR. HEPPELL:  Object --

11      Q.   -- at the time it was given?

12              MR. HEPPELL:  Object to form.

13        Go ahead.

14      A.   Yes.

15      Q.   Would you have purposely misrepresented

16    anything to the Police Department when you made

17    your statement?

18      A.   Absolutely not.

19              MR. HEPPELL:  Pam, I also brought

20    copies of the transcript that we had made up of

21    the statement.  Obviously, if you want to show him

22    the video, that's fine, but --

23              MS. SCHNEEMAN:  Oh, sure, yeah.

24              MR. HEPPELL:  -- it's totally up to

25    you.

Fillenwarth Reporting Service
317.535.1607

IAN GODFREY DEPOSITION EXHIBITS



AMR
CENTRAL INDIANA
PRE-HOSPITAL CARE REPORT

Case #: 01602622                    Unit ID: MD92                          Date: 5/29/2016

| SERVICE | DISPATCH INFORMATION | TIMES |
|---|---|---|
| FROM:<br><br>N MADISON AVENUE & CANBY STREET<br>GREENWD, IN 46143<br>(ROADWAY)<br><br>TO:<br><br>ST FRANCIS HOSPITAL INDIANAPOLIS<br>8111 S Emerson Ave<br><br>INDIANAPOLIS, IN 46237<br><br>(HOSPITAL - ED)<br>ROOM/DEPT: 12<br>DESTINATION DECISION: DIVERSION | RESPONSE MODE:   LIGHTS AND SIREN<br>TRANSPORT MODE:  NO LIGHTS AND SIREN<br>ALS ASSESSMENT: AMR PARAMEDIC<br>DISPOSITION: TRANSPORTED - TO HOSPITAL ER/ED<br><br><br><br>RESPONSE PRIORITY: I<br><br><br>RESPONDER(S) ON SCENE:<br>LAW ENFORCEMENT, GREENWOOD FIRE DEPT | CALL RECEIVED: 11:56:00<br>DISPATCHED:   11:56:00<br>ENROUTE:      11:57:00<br>AT SCENE:     12:01:00<br><br>AT PT SIDE:   12:02:00<br>TRANSPORT:    12:14:00<br>ARRIVAL:      12:19:00<br>CARE TRANS'D:  5/29/2016<br>12:21:00 PM<br>AVAILABLE:    13:19:00<br><br>DEST MILES:      3.7<br>TOTAL MILES:     3.7 |

**PATIENT DEMOGRAPHICS**

| | |
|---|---|
| NAME: TODERO, CHARLES<br>ADDRESS: ███████████████ | DOB: ███████████<br>AGE: 30<br>GENDER: MALE |
| CITY, STATE ZIP: GREENWOOD, IN 46142<br>PHONE: ███████████<br>CELL PHONE:<br>SSN: xxx-xx-███<br>INSURANCE          POLICY          GROUP<br>NO INSURANCE AVAILABLE | ETHNICITY: CAUCASIAN |
| RESPONSIBLE PARTY: TODERO, CHARLES<br>PHONE: (317)691-6855<br>HOSPITAL MRN:<br>HOSPITAL FIN: | NAME OF EMPLOYER: ⊏<br>EMPLOYER PHONE:<br>SUPERVISOR:<br>SUPERVISOR PHONE: |

**MEDICAL HISTORY**

HISTORY OBTAINED FROM: NOT OBTAINED
MEDICAL HISTORY: UNKNOWN
ALLERGIES: UNKNOWN
ALLERGY DESCRIPTION:
MEDICATIONS: UNKNOWN

**HISTORY OF PRESENT ILLNESS**

CHIEF COMPLAINTS

CHIEF COMPLAINT CATEGORY: PSYCH/BEHAVIORAL CRISIS, CHIEF COMPLAINT CATEGORY: PSYCH/BEHAVIORAL CRISIS, CHIEF COMPLAINT CATEGORY: PSYCH/BEHAVIORAL CRISIS, CHIEF COMPLAINT CATEGORY: PSYCH/BEHAVIORAL CRISIS

DEPOSITION
EXHIBIT
Godfrey 2
6-14-18  LLM
PENGAD 800-431-0989

Case #: 01602622
PCR: 20160529130822058862
Device: EGRWMEDS04

Date of Service: 05/29/2016
Patient: Charles Todero

Page: 1 of 9
Printed : 6/13/2016 7:02:43 AM

Case #: 0-602622
PCR: 20160529130822058G2
Device: EGRWMEDS04

Date of Service: 05/29/2016
Patient: Charles Todero

Page: 2 of 9
Printed : 6/13/2016 7:02:40 AM

## PHYSICAL FINDINGS

WEIGHT: 170 LBS;  77 KG

PHYSICAL ASSESSMENT

BACK: ☒

    UPPER BACK

    POSITIVE: PUNCTURE/PIERCING

    REMARKS: TASER BARB IMPALED, UNABLE TO BE REMOVED

EXTREMITIES: ☒

    LEFT HAND

    POSITIVE: PUNCTURE/PIERCING

    REMARKS: TASER BARB REMOVED

    RIGHT KNEE

    POSITIVE: ABRASION

    LEFT KNEE

    POSITIVE: ABRASION

HEAD: SYMMETRICAL

NECK: NO JVD

CHEST: SYMMETRIC WITH BILATERAL CHEST RISE

ABDOMEN: SOFT, NON-TENDER

PELVIS: STABLE

## IMPRESSION

PRIMARY IMPRESSION: BEHAVIORAL / PSYCHIATRIC - PSYCHOTIC EPISODE

SECONDARY IMPRESSION: TOXICOLOGICAL - ILLEGAL DRUGS

Other Impression  EXCITED DELIRIUM

## VITAL SIGNS

| TIME | BLOOD PRESSURE | PULSE | RESP | GLASGOW COMA SCALE E | V | M | TOTAL | EKG | SPO2 | BLOOD GLUCOSE | PAIN SCALE |
|------|------|------|------|------|------|------|------|------|------|------|------|
| 12:08 | NT | 142 | 24 | 4 | 3 | 4 | 11 | Sinus Tachycardia | | | |
| 12:16 | | | | | | | | | | 64 | |
| 12:16 | NT | 30 | 6 | 1 | 1 | 1 | 3 | | | | |
| 12:19 | NT | 0 | 12 | 1 | 1 | 1 | 3 | | | | |

## TREATMENTS

| PTA | TIME | CAREGIVER | PROCEDURE |
|------|------|------|------|
| | 12:02 | LAW ENFORCEMENT | PSYCHIATRIC HOLD STATUS  STATUS: INVOLUNTARY; IS PAPERWORK ATTACHED  FALSE; AGENCY/FACILITY NAME: GREENWOOD POLICE DEPARTMENT |
| | 12:02 | HOWARD, TIFFANY, AMR | PUPILS  LEFT PUPIL SIZE (MM): 5 MM; RIGHT PUPIL SIZE (MM)  5 MM  COMMENTS: PATIENT UNCOOPERATIVE WITH ASSESSMENT |
| | 12:02 | GODFREY, IAN, AMR | SKIN ASSESSMENT  NORMAL COLOR; ; DIAPHORETIC MOISTURE; ; WARM TEMPERATURE |
| | 12:08 | GODFREY, IAN, AMR | EKG/ECG  INDICATION: MEDICATION ADMINISTRATION; TYPE: 4 LEAD; CLINICIAN INTERPRETATION: SINUS TACHYCARDIA; ELEVATION: FALSE; DEPRESSION: FALSE  COMMENTS: COMBATIVE, EXCITED DELIRUM PATIENT |
| | 12:08 | GODFREY, IAN, AMR | VITAL SIGNS - COMMENTS: patient handcuffed and combative, blood pressure attempted without sucess |
| | | | GLASGOW COMA SCALE  GCS EYES: 4, GCS VERBAL  3, GCS MOTOR  4; GCS SCORE: 11  COMMENTS: PATIENT HANDCUFFED AND COMBATIVE, BLOOD PRESSURE ATTEMPTED WITHOUT SUCESS |

| | | | |
|---|---|---|---|
| | | | VITALS BLOOD PRESSURE NOT TAKEN; PULSE: 142; PULSE REGULARITY: REGULAR; PULSE STRENGTH: NORMAL; PULSE TAKEN AT: CAROTID; RESPIRATORY RATE: 24; RESPIRATORY DEPTH: NORMAL; RESPIRATORY EFFORT: NORMAL; DIFFICULTY/CHALLENGES: PT HANDCUFFED/COMBATIVE, BP ATTEMPTED UNSUCCESSFUL; DIFFICULTY/CHALLENGES: PT HANDCUFFED/COMBATIVE, BP ATTEMPTED UNSUCCESSFUL; MEAN ARTERIAL PRESSURE: 0  COMMENTS: PATIENT HANDCUFFED AND COMBATIVE, BLOOD PRESSURE ATTEMPTED WITHOUT SUCESS |
| 12:14 | | GODFREY, IAN,AMR | MEDICATION ADMINISTRATION HOSPITAL SUPPLIED MEDICATIONS: FALSE; MIDAZOLAM HCL 5MG/ML 5ML VIAL (2ML); 5; MG; INTRANASAL; DELTOID-RIGHT; RESULT AFTER: DETERIORATED; WASTED DRUG AMOUNT: 5; NAME OF WITNESS TO DRUG WASTING: DEREK TENNELL; WITNESS TITLE: RN |
| 12:14 | | | FACILITY ACTIVATION TIME ACTIVATED: MAY 29 2016 12:14PM; ACTIVATION METHOD: OTHER; COMMENTS: CELL PHONE, ALERTED COMBATIVE PSYCHIATRIC PATIENT |
| 12:16 | | GODFREY, IAN,AMR | BLOOD GLUCOSE BLOOD GLUCOSE READING/LEVEL: 64 |
| 12:18 | | GREENWOOD FIRE DEPT | MEDICATION ADMINISTRATION HOSPITAL SUPPLIED MEDICATIONS: FALSE; OXYGEN; 15; LPM; BVM/MASK; RESULT AFTER: DETERIORATED |
| 12:18 | | GREENWOOD FIRE DEPT | MEDICATION ADMINISTRATION HOSPITAL SUPPLIED MEDICATIONS: FALSE; OXYGEN; 15; LPM; BVM/MASK; RESULT AFTER: DETERIORATED |
| 12:18 | | GODFREY, IAN,AMR | VITAL SIGNS - |
| | | | GLASGOW COMA SCALE GCS EYES: 1; GCS VERBAL: 1; GCS MOTOR: 1; GCS SCORE: 3 |
| | | | VITALS BLOOD PRESSURE NOT TAKEN; PULSE: 30; PULSE REGULARITY: REGULAR; PULSE STRENGTH: WEAK; PULSE TAKEN AT: CAROTID; RESPIRATORY RATE: 6; RESPIRATORY DEPTH: SHALLOW; RESPIRATORY EFFORT: AGONAL; MEAN ARTERIAL PRESSURE: 0 |
| 12:19 | | GODFREY, IAN,AMR | VITAL SIGNS - |
| | | | GLASGOW COMA SCALE GCS EYES: 1; GCS VERBAL: 1; GCS MOTOR: 1; GCS SCORE: 3 |
| | | | VITALS BLOOD PRESSURE NOT TAKEN; PULSE: 0; IS PULSELESS; PULSE REGULARITY: ABSENT; PULSE STRENGTH: ABSENT; PULSE TAKEN AT: CAROTID; RESPIRATORY RATE: 12; RESPIRATORY DEPTH: ABSENT; RESPIRATORY EFFORT: ASSISTED; MEAN ARTERIAL PRESSURE: 0 |

## NARRATIVE

30 YEAR OLD MALE FOUND SUPINE ON THE GROUND WITH HIS HANDS HANDCUFFED BEHIND HIS BACK AND TASER BARBS IN HIS LEFT HAND AND UPPER BACK. THE PATIENT WAS IN CARE OF GREENWOOD POLICE AND FIRE DEPARTMENTS. THE PATIENT WAS EXTREMELY COMBATIVE AND SCREAMING EXPLETIVES. THE PATIENT WAS FLAILING AND KICKING. PER THE POLICE, THE PATIENT HAD RECEIVED 12-15 5 SECOND TASER STRIKES WHILE THEY DETAINED HIM FOR HIS SAFETY. THE POLICE RECEIVED A CALL FOR A CHECK THE WELFARE DUE TO THE PATIENT WALKING INTO TRAFFIC CLAIMING HE WAS A PROPHET AND THE SECOND COMING OF CHRIST. THE TASER BARB WAS REMOVED FROM THE PATIENT'S LEFT HAND BUT THE BARB WAS UNABLE TO BE SAFELY REMOVED FROM HIS UPPER BACK AND WAS TAPED IN PLACE. THE PATIENT'S SKIN WAS PINK, WARM AND DIAPHORETIC AND HE WAS UNCOOPERATIVE WITH A PUPILLARY AND LUNG SOUND ASSESSMENT. THE PATIENT WAS NOTED TO HAVE RIPPED PANTS AND ABRASIONS TO BOTH KNEES, BUT NO OTHER SIGNS OF TRAUMA. DUE TO HIS KICKING THE PATIENT'S FEET WERE TIED WITH A BLANKET AND HE WAS LIFTED ONTO THE STRETCHER WHERE HE WAS PLACED IN THE LEFT LATERAL POSITION AND SECURED. COMMUNITY SOUTH WAS CONTACTED AND REFUSED THE PATIENT DUE TO PSYCHIATRIC DIVERSION STATUS AND ST FRANCIS WAS CONTACTED AND ACCEPTED THE PATIENT. THE PATIENT WAS LOADED INTO THE AMBULANCE WHERE HE CONTINUED TO BE COMBATIVE AND ATTEMPT TO THROW HIMSELF OFF OF THE STRETCHER AND HIT HIS HEAD OFF OF THINGS. THE PATIENT CONTINUED TO BE A DANGER TO HIMSELF AND OTHERS. THE CARDIAC MONITOR WAS APPLIED TO THE PATIENT'S SHOULDER'S AND FLANK. DUE TO PATIENT'S COMBATIVENESS MULTIPLE ATTEMPTS AT BLOOD PRESSURE AND PULSE OX FAILED. THE PATIENT WAS GIVEN 5MG OF MIDAZOLAM IN HIS RIGHT DELTOID MUSCLE. THE PATIENT CONTINUED TO YELL EXPLETIVES BUT BECAME LESS PHYSICALLY COMBATIVE. WHEN THE PATIENT BECAME SEDATED A BLOOD SUGAR WAS OBTAINED AND AN IV WAS BEING LOOKED FOR WHEN THE ETA TO THE HOSPITAL WAS LESS THAN 1 MINUTE. AT THAT TIME, WITH LESS THAN 1 MINUTE ETA TO THE HOSPITAL THE PATIENT'S HEART RATE DROPPED SHARPLY FROM THE 140S TO THE 30S AND THE PATIENT BEGAN BREATHING AGONALLY, CAROTID PULSE WAS INTACT. BAG VALVE MASK VENTILATIONS WERE BEGUN IMMEDIATELY WITH 15 LITERS PER MINUTE OF OXYGEN ATTACHED. WHILE PREPARING TO PULL THE PATIENT OUT OF THE AMBULANCE, THE PATIENT WENT INTO ASYSTOLE ON THE MONITOR AND PULSE WAS LOST. CPR WAS INITIATED. AN IV HAD NOT BEEN ESTABLISHED AND NO ALS INTERVENTIONS WERE PERFORMED. THE PATIENT WAS BROUGHT INTO THE ER WITH CPR BEING PERFORMED WITH BAG VALVE BAG VENTILATIONS. UPON ARRIVAL IN THE ER CARE WAS TRANSFERRED TO RN AND MD WITH VERBAL REPORT GIVEN. END REPORT./RG

## FOLLOW-UP-CARE

| FOLLOW-UP: ☐ | FOLLOW-UP-DATE: | FOLLOW-UP-TIME: |
|---|---|---|
| FOLLOW-UP CARE: ☐ | | |

Case #: 01602622
PCR: 201605291308220596 2
Device: EGRWMEDS04

Date of Service: 05/29/2016
Patient: Charles Todero

Page: 3 of 9
Printed : 6/13/2016 7:02:40 AM

RUN COMPLETION

PRIVACY PRACTICES: THE NOTICE OF PRIVACY PRACTICES WAS UNABLE TO BE PROVIDED

Case #: 01602622
PCR: 2016052913082205862
Device: EGRWMEDS04

Date of Service: 05/29/2016
Patient: Charles Todero

Page: 4 of 9
Printed : 6/13/2016 7:02:40 AM

RURAL METRO/AMR OF KENTUCKY
PRE-HOSPITAL CARE REPORT SIGNATURES
GREENWOOD

Case #: 01602622          Unit ID: MD92          Date: 5/29/2016

**AMR CREW MEMBERS**

CREW 1
NAME: GODFREY, IAN, AMR
NUMBER: 0252-6301
CERTIFICATION: Paramedic

CREW 2
NAME: HOWARD, TIFFANY, AMR
NUMBER: 2694-6754
CERTIFICATION: Paramedic

**DESTINATION**

TURNED OVER TO: CORY THANE

Case #: 01602822
PCR: 20160529130822205862
Device: EGRWMEDS04

Date of Service: 05/29/2016
Patient: Charles Todero

Page: 5 of 9
Printed : 6/13/2016 7:02:40 AM

## American Medical Response

| | | | |
|---|---|---|---|
| Run Number | 01602622 | Date and Time of Transport | 5/29/2016 at 12:14:00 |
| Patient Name | Todero, Charles | | |
| Destination: | St Francis Hospital Indianapolis, 8111 S. Emerson Ave, Indianapolis, IN  46237 | | |

I acknowledge that I am legally responsible for the ambulance services provided to me. I request and assign payment of authorized Medicare benefits and/or other insurance benefits be made on my behalf to AMR directly for any ambulance services and supplies furnished to me by AMR whether in the past, now, or in the future. I authorize any holder of medical information about me or other relevant documentation about me to release to the Centers for Medicare and Medicaid Services and its agents and contractors, any and all appropriate third party payers and their respective agents and contractors, as well as AMR, any information or documentation in their possession needed to determine these benefits and/or the benefits payable for related services whether in the past, now or in the future. I agree to cooperate with AMR or its agent in collecting any such benefits. I acknowledge that I have been provided with a copy of AMR's Notice of Privacy Practices. I expressly authorize AMR or it agents or associates to contact me or any responsible party at any phone number provided, including any cellular phone number provided, for the purpose of resolving any unpaid balances or other pertinent issues. Patient or Guarantor agrees that such contact may be made to any mailing address, telephone number, cellular phone number, e-mail address, or any other electronic address that Patient or Guarantor has provided, or may in the future provide, to AMR. Patient or Guarantor agrees and acknowledges that any e-mail address or any other electronic address that Patient or Guarantor provides to AMR is Patient's or Guarantor's private address and cannot be accessed by unauthorized third parties. Patient or Guarantor agrees that in addition to individual persons' attempting to communicate directly with Patient or Guarantor, any type of contact described above may be made using, among other methods, pre-recorded or artificial voice messages delivered by an automatic telephone dialing system, pre-set e-mail messages delivered by an automatic e-mailing system, or any other pre-set electronic messages delivered by any other automatic electronic messaging system. Patient or Guarantor also authorizes AMR or its agents or associates to obtain a credit report to assist in the collection of any unpaid balances. Nothing herein shall relieve me from the direct financial responsibility for any charges not paid by an insurer. I further agree to send promptly to AMR any payments that an insurer forwards to me.

Signature of Patient: _____ Date _____

## REPRESENTATIVE SIGNATURE

Reason Patient could not Sign:      Cardiac Arrest

By signing below, I certify that I am one of the following individuals and that I am authorized to sign on the patient's behalf (check one)

Signature of Representative _____ Printed Name of Representative _____ Date _____

## FACILITY SIGNATURE

Complete this section only if you are unable to obtain the signature of the patient or authorized representative listed above.

*Reason Patient could not Sign:*      Cardiac Arrest

By signing below, I certify that the above named patient was physically or mentally incapable of signing at the time of transport and that none of the individuals listed in 42 C.F.R. §424.36(b)(1)-(3) was available or willing to sign the claim on behalf of the beneficiary.

Crew Signature _____      5/29/2016
     Crew Date

*This section is to be complete by a representative of the receiving facility, whenever you are unable to obtain the signature of the patient or an authorized representative. Note: The crew must also complete the Crew Signature Section above.*

Name and Location of Facility      St. Francis Indianapolis, IN

The above named patient, as described by AMR, was received by our facility, which provided care or assistance to the patient, on the date and time set forth above.

_____      5/29/2016

Case #: 01602622
PCR: 20160529130822205962
Device: EGRWMEDS04

Date of Service: 05/29/2016
Patient: Charles Todero

| Signature of Receiving Representative | Date |
|---|---|
| Cory Thine | Registered Nurse |
| Printed Name of Receiving Facility Representative | Title |

*AMR is required to obtain this form in order to submit a claim for payment to Medicare or other third party payer. This Signature is not an acceptance of financial responsibility for the patient.*

Case #: 01602622          Pt. Name: Todero, Charles                    Date: 5/29/2016 12:00:00 AM

Supply Descripton                Quantity
OXYGEN                                1      3001

Case #: 01602622
PCR: 201605291308Z205862
Device: EGRWMEDS04

Date of Service: 05/29/2016
Patient: Charles Todero

Page: 7 of 9
Printed : 6/13/2016 7:02:40 AM

Case number: 01602622

Unit: MD92

Document: EKG Strip



Case #: 01602622
PCR: 2016052913082205862
Device: EGRWMEDS04

Date of Service: 05/29/2016
Patient: Charles Todero

Page: 8 of 9
Printed : 6/13/2016 7:02:40 AM

Case number: 01602622

Unit: MD92                          Document: Face Sheet



Case #: 01602622
PCR: 201605291308220S862
Device: EGRWMEDS04

Date of Service: 05/29/2016
Patient: Charles Todero

Page: 9 of 9
Printed : 6/13/2016 7:02:40 AM

| Date | Evaluator | Section Header | Field | Note |
|------|-----------|----------------|-------|------|

No records to display.