**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF INDIANA**
**INDIANAPOLIS DIVISION**

| | |
|---|---|
| TERESA TODERO, as Special Administrator of the ESTATE OF CHARLES TODERO, ) ) ) | |
| | Case No. 1:17-cv-1698-TWP-MJD |
| *Plaintiff*, ) | |
| ) | Judge Tanya Walton Pratt |
| v. ) | |
| ) | Magistrate Judge Mark J. Dinsmore |
| CITY OF GREENWOOD, BRIAN ) BLACKWELL, RENEE ELLIOT, ELIZABETH ) LAUT, and AS-YET UNIDENTIFIED ) GREENWOOD POLICE OFFICERS, ) | |
| | JURY TRIAL DEMANDED |
| ) | |
| *Defendants*. ) ) | |

# <u>EXHIBIT 42</u>

**Jim Ison Deposition & Exhibits**

BY**:**  /s/ Steve Art
*One of Plaintiff's Attorneys*

Arthur Loevy
Jon Loevy
Steve Art
Sam Heppell
Danielle Hamilton
LOEVY & LOEVY
311 North Aberdeen St., Third Floor
Chicago, IL 60607
(312) 243-5900

LOUISVILLE  LEXINGTON  LONDON  FLORENCE  CINCINNATI  INDIANAPOLIS  ORLANDO  JACKSONVILLE  TAMPA



# KENTUCKIANA
## — COURT REPORTERS —

CASE NO. 1:17-cv-1698-TWP-MJD

TERESA TODERO, as Special Administrator of the

ESTATE OF CHARLES TODERO

VS.

CITY OF GREENWOOD, BRIAN BLACKWELL, RENEE ELLIOT,

ELIZABETH LAUT, and AS-YET UNIDENTIFIED

GREENWOOD POLICE OFFICERS

DEPONENT:  JIM ISON

DATE:   APRIL 5, 2018



a courtroom
**powerhouse**

✉ schedule@kentuckianareporters.com

☎ 877.808.5856 | 502.589.2273

www.kentuckianareporters.com

1            IN THE UNITED STATES DISTRICT COURT

2            FOR THE SOUTHERN DISTRICT OF INDIANA

3                  INDIANAPOLIS DIVISION

4            CASE NO. 1:17-cv-1698-TWP-MJD

5              JUDGE TANYA WALTON PRATT

6          MAGISTRATE JUDGE MARK D. DINSMORE

7                JURY TRIAL DEMANDED

8

9   TERESA TODERO, as Special Administrator of the ESTATE OF

10                 CHARLES TODERO,

11                    PLAINTIFF

12

13                       V.

14

15     CITY OF GREENWOOD, BRIAN BLACKWELL, RENEE ELLIOT,

16   ELIZABETH LAUT, and AS-YET UNIDENTIFIED GREENWOOD POLICE

17                    OFFICERS,

18                   DEFENDANTS

19

20

21

22

23   DEPONENT:  JIM ISON

24   DATE:      APRIL 5, 2018

25   REPORTER:  EMILEE BOLEYN



Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1                        APPEARANCES

 2

 3   ON BEHALF OF THE PLAINTIFF, TERESA TODERO, as Special

 4   Administrator of the ESTATE OF CHARLES TODERO:

 5   STEVEN ART

 6   LOEVY & LOEVY

 7   311 NORTH ABERDEEN STREET, THIRD FLOOR

 8   CHICAGO, ILLINOIS 60607

 9   TELEPHONE NO.: (312) 243-5900

10   E-MAIL: STEVEN@LOEVY.COM

11

12   ON BEHALF OF THE DEFENDANT, BRIAN BLACKWELL:

13   CAREN L. POLLACK

14   POLLACK LAW FIRM, P.C.

15   10333 NORTH MERIDIAN STREET, SUITE 111

16   INDIANAPOLIS, INDIANA 46290

17   TELEPHONE NO.: (317) 660-4880

18   E-MAIL: CPOLLACK@POLLACKLAWPC.COM

19

20

21

22

23

24

25
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201



KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1                  APPEARANCES (CONTINUED)

 2

 3   ON BEHALF OF THE DEFENDANTS, CITY OF GREENWOOD, AND

 4   ELIZABETH LAUT AND RENEE ELLIOT:

 5   PAM G. SCHNEEMAN

 6   STEPHENSON MOROW & SEMLER

 7   3077 EAST NINETY-EIGHTH STREET, SUITE 240

 8   INDIANAPOLIS, INDIANA 46280

 9   TELEPHONE NO.: (312) 844-3830

10   E-MAIL:  PSCHNEEMAN@STEPHLAW.COM

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```



Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 1:17-cv-01698-JPH-MJD   Document 125-54   Filed 08/13/18   Page 6 of 639 PageID #:
4685
The Deposition of Joan Watson taken on April 13, 2017                                    4

|    |                                                | INDEX |
|----|------------------------------------------------|-------|
| 1  |                  INDEX                         |       |
| 2  |                                                | Page  |
| 3  | DIRECT EXAMINATION BY MR. ART                  | 7     |
| 4  | CROSS EXAMINATION BY MS. SCHNEEMAN             | 268   |
| 5  | REDIRECT EXAMINATION BY MR. ART                | 268   |
| 6  | RECROSS EXAMINATION BY MS. SCHNEEMAN           | 324   |
| 7  | FURTHER DIRECT EXAMINATION BY MR. ART          | 325   |
| 8  |                                                |       |
| 9  |                EXHIBITS                         |       |
| 10 |                                                | Page  |
| 11 | 1  FULL REPORT                                 | 109   |
| 12 | 2  HANDWRITTEN NOTES                            | 171   |
| 13 | 3  REPORT                                       | 174   |
| 14 | 4  TIME LINE OF EVENTS                          | 253   |
| 15 | 5  E-MAIL                                       | 257   |
| 16 | 6  TIME CALCULATIONS                            | 258   |
| 17 | 7  TASER LOG                                     | 258   |
| 18 | 8  COLOR MAP                                     | 267   |
| 19 | 9  INSTANT MESSAGES                             | 272   |
| 20 | 10 USE OF FORCE REPORT                          | 279   |
| 21 | 11 REPORT OF CONVERSATION WITH DR. HARTMAN     | 293   |
| 22 |                                                |       |
| 23 |                                                |       |
| 24 |                                                |       |
| 25 |                                                |       |

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1                    EXHIBITS (CONTINUED)

 2

 3   12 MR. PITTS REPORT                          294

 4   13 CASE REPORT FOR INCIDENT                  296

 5   14 DISPATCH LOG                              298

 6   15 E-MAILS                                   300

 7   16 COLLECTION OF E-MAILS                     307

 8   17 E-MAIL                                    317

 9   18 E-MAILS                                   318

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```



Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1                        STIPULATION

 2

 3   The deposition of JIM ISON taken at KENTUCKIANA COURT

 4   REPORTERS, 8520 ALLISON POINTE BOULEVARD, SUITE 220,

 5   INDIANAPOLIS, INDIANA 46250 on THURSDAY, the 5th day of

 6   APRIL, 2018 at approximately 10:58 a.m.; said deposition

 7   was taken pursuant to the FEDERAL Rules of Civil

 8   Procedure.

 9

10   It is agreed that EMILEE BOLEYN, being a Notary Public

11   and Court Reporter for the State of INDIANA, may swear

12   the witness.

13

14

15

16

17

18

19

20

21

22

23

24

25
```



Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 1:17-cv-01698-JPH-MJD   Document 125-54   Filed 08/13/18   Page 9 of 639 PageID #:
4688                                                                        7
The Deposition of   John Ison taken   on April 13, 2018

```
 1                        PROCEEDINGS
 2             COURT REPORTER:  Will you raise your right
 3        hand?  Do you solemnly swear or affirm the
 4        testimony you're about to give will be the truth,
 5        the whole truth, and nothing but the truth?
 6             THE WITNESS:  Yes.  I do.
 7             COURT REPORTER:  Thank you.
 8                    DIRECT EXAMINATION
 9   BY MR. ART:
10        Q    Hello, Deputy Chief Ison.  Could you state and
11   spell your name for the record, please?
12        A    It's James Ison, I-S-O-N.  Who's your current
13   employer?
14        Q    The City of Greenwood Police Department.
15        A    What is your current title?
16        Q    Deputy Chief of the Uniform Division.
17        A    I see you have a folder in front of you today.
18   Is that your investigative file relating to the Charles
19   Todero matter?
20        Q    Yes.  It is.
21        A    At a break, what I think we'll do is just
22   inspect it and see how it links up with the production.
23   Was it produced as one thing?
24             MS. SCHNEEMAN:  It's exactly what we produced
25        to you, and I believe we've even produced it to you
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1        in that same format and binder.
 2   BY MR. ART:
 3        Q    Yeah.  I think so, so at some point I'll just
 4   have a look through it --
 5        A    Sure.
 6        Q    -- if it's all right with you.
 7        A    Yeah.  Absolutely.
 8        Q    Based on your investigation, did Lieutenant
 9   Blackwell recognize Charles Todero when he arrived at
10   the scene on May 29, 2016?
11        A    Yes.
12        Q    Was that fact important to your investigation?
13        A    Yes.
14        Q    Why?
15        A    Lieutenant Blackwell had stated that he had
16   multiple prior incidents with the Todero family,
17   including Charles and his brother James and his father,
18   Charles or Chuck.  And he had actually built a
19   relationsh -- somewhat of a relationship with Charles,
20   over the years, from those dealings and to where when he
21   was even working off-duty at a -- at the library,
22   Charles would come in and, just the librarian, have
23   casual conversation with Lieutenant Blackwell.
24        Q    Is there any other way that it was important
25   to your investigation?
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1        A     No.

 2        Q     Did the fact that your investigation revealed

 3   that Lieutenant Blackwell recognized Charles Todero

 4   affect your evaluation of whether his use of force was

 5   reasonable or not?

 6        A     No.

 7        Q     It didn't affect that in any way whatsoever?

 8        A     No.

 9        Q     Okay.  When was the first time that Lieutenant

10   Blackwell informed you that he had this -- strike that,

11   please.  When was the first time after May 29, 2016,

12   that Lieutenant Blackwell informed you about this

13   history that he had with the Todero family?

14        A     I don't recall the exact date that -- I

15   believe it was in his interview.

16        Q     Okay.  Do you recall getting an e-mail from

17   Lieutenant Blackwell shortly after Charles Todero died?

18        A     Yes.

19        Q     Was that -- in that e-mail, I'll represent to

20   you -- and we'll go through it -- but in that e-mail, he

21   discusses that history.  Do you recall having heard

22   about Lieutenant Blackwell's history with Charles Todero

23   prior to receiving that e-mail?

24        A     I don't recall.

25        Q     Did the emergency response crew -- the EMTs
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1   and the fire response crew that came to the scene on May
 2   29, 2016, do anything to cause Charlie's death, based on
 3   your investigation?
 4        A    I wouldn't be qualified to answer that, and I
 5   wasn't there to -- to view it.
 6        Q    Did you view -- strike that, please.  Did you
 7   uncover any evidence at all that the EMTs took any
 8   action that contributed to Charlie's symptoms in the
 9   hospital, or his ultimate death?
10        A    No.
11        Q    In your investigation, were you working to
12   justify the force that was used against Charles Todero?
13        A    No.  I was -- my job is to conduct an
14   objective investigation based on the facts.
15        Q    So you didn't have a view coming into that
16   investigation, one way or the other, whether the force
17   you used was reasonable or not; is that correct?
18        A    Correct.
19        Q    Did you pick and choose what witnesses to
20   interview during your investigation?
21        A    No.
22        Q    Is there a reason that Mr. Godfrey is the only
23   EMT that you interviewed?
24             MS. SCHNEEMAN:  Objection.  Form of question.
25        Q    Go ahead.
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1        A     The reason that I chose Ian Godfrey is, as I
 2   believe, he was the paramedic that treated Mr. Todero in
 3   the back of the ambulance.
 4        Q     Is there any other reason that you interviewed
 5   Ian Godfrey and not other EMTs who were on the scene?
 6        A     No.
 7        Q     Is there a reason that you interviewed Terry
 8   and Jeanne Moore from Vineyard Church and not other
 9   employees of that church who interacted with Charles
10   Todero in the days before his death?
11             MS. SCHNEEMAN:  Objection.  Form of question,
12        and misstates the facts.
13        Q     Go ahead.
14        A     No.
15        Q     I believe there were four people that
16   interacted with Charles Todero at the church.  However,
17   during the course of my investigation, after speaking
18   with Jeanne and her husband, I didn't -- I didn't feel
19   it necessary to -- if -- there were probably multiple
20   people throughout the day, both days that he was at that
21   church, that witnessed Charlie.  However, I -- yeah, I -
22   - I didn't feel it necessary to seek out everyone that
23   came into contact with him.
24        Q     Why didn't you feel it necessary to interview
25   additional people from the church after you talked to
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1   the Moores?
 2       A    (Coughs.)  Excuse me.  Because the Moores
 3   consultant -- the Moores' statements were consistent
 4   with everyone else that I had interviewed up to that
 5   point.
 6       Q    And who else had you interviewed up to that
 7   point?
 8       A    Oh, can I refer to my notes --
 9       Q    Sure.
10       A    -- the order of them?  I'd interviewed
11   Lieutenant Blackwell, Holly Walters, Elizabeth Laut,
12   Robert, Debra MacNaughton, Robert -- Roger Poynter.  I
13   believe they were -- Ian Godfrey.  I believe --
14       Q    Let me -- let me --
15       A    -- Mr. and Mrs. Moore were --
16       Q    Let me --
17       A    -- the last two.
18       Q    I'm just going to apologize for interrupting.
19   Let me -- yeah.  Let me ask you it that way: Were the
20   Moores the last people that you interviewed?
21       A    I believe they were.
22       Q    What information did they provide you that was
23   consistent with what you had learned previously?
24       A    That Mr. Todero was -- his appearance was
25   disheveled.  His clothing was torn.  He was not acting
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1   normal.  He was actually being disruptive at the church,

2   and that they believe that he had possibly spent the

3   night at the church Saturday night, going into Sunday,

4   and was trying to light some of his personal belongings

5   on fire in the church fire pit in the -- oh, it's a

6   patio area of the church.

7        Q    That information was all new to you, at the

8   time you interviewed the Moores, correct?

9             MS. SCHNEEMAN:  Objection.  Form of question.

10       Misstates the facts.

11       A    Some of it was.  The issue -- well, I -- since

12  Charles Moyer -- Reserve Officer Charles Moyer had

13  already given a statement, he had brought a lot of that

14  to my attention prior to -- let me just confirm my dates

15  here, before I give you a -- yes, so I did interview

16  Charles Moyer prior to the Moores, and he had informed

17  me of many of the same things that they did.

18       Q    So what caused you to interview the Moores

19  after interviewing Mr. Moyer?

20       A    Because they had direct contact with -- they

21  were members of the Vineyard Church, employees, that had

22  direct contact with Charles Todero.

23       Q    And then what did the Moores tell you that

24  caused you not to interview anyone after interviewing

25  the Moores?

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Transcript of Deposition of Clinton Naas – Volume 3/3  2 Page 14

```
 1       A    Nothing.
 2       Q    Okay.  Is there any reason that you can think
 3  of that you didn't interview other people who had -- who
 4  you knew had come into contact with Charles Todero in --
 5  on the day of the incident and the day previous?
 6       A    No.
 7       Q    Did the Greenwood Police Department issue a
 8  statement that its officers had acted appropriately,
 9  before you had completed your investigation?
10       A    I believe the chief did hold a press
11  conference.
12       Q    And in that press conference, did he state
13  that the officers involved in the incident, including
14  Lieutenant Blackwell, had acted appropriately?
15       A    I was not present for the press conference,
16  and without viewing it, I would be reluctant to answer
17  that.
18       Q    Do you have any knowledge of what occurred at
19  the press conference, as you sit here today?
20       A    Yes.  I do -- I did watch it on the news
21  afterwards.  That was my daughter's birthday, and we had
22  taken her to Holiday World, so I was at Holiday World
23  that day, but I did watch it on the news.  However, I --
24  I do not recollect everything that was said.
25       Q    Okay.  Do you recall him saying that the
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1    officers' actions were justified, as you sit here today,

 2    during that press conference?

 3         A    I believe he did.

 4         Q    Okay.  Do you know why he did that prior to

 5    the completion of your investigation?

 6         A    I -- that would be a question for him.

 7         Q    Okay.  Do you think that that was appropriate

 8    for him to make a public statement about the

 9    appropriateness of the officers' actions before the

10    investigation was complete?

11         A    It's not my job to question my boss.

12         Q    You don't have a feeling, one way or the

13    other, as you sit here?

14         A    No.

15         Q    Have you ever been a plaintiff for a defendant

16    in a civil lawsuit?

17         A    I don't believe so.

18         Q    Have you ever been a witness in a civil

19    lawsuit?

20         A    I don't believe so.

21         Q    Have you ever been a witness in a criminal

22    case?

23         A    Oh, yes.

24         Q    About how many times just, totally

25    approximately, over 100?
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1        A    No.  50.
 2        Q    Okay.  All in connection with your work at the
 3   Greenwood Police Department?
 4        A    Yes.
 5        Q    Have you given a deposition like this before?
 6        A    Yes.
 7        Q    How many?
 8        A    An estimate?
 9        Q    Yeah.
10        A    20.
11        Q    When was the last deposition you gave?
12        A    I do not recall.  It's been awhile.
13        Q    More than a year?
14        A    Yes.  I believe so.
15        Q    More than five years?
16        A    No.
17        Q    Okay.  Do you recall what the subject matter
18   of the last deposition you gave was?
19        A    I do not.
20        Q    Do you recall the subject matter of any prior
21   deposition you gave?
22        A    Yes.  Many of them are OWI.
23        Q    Okay.  Just briefly explain to me what that
24   means?
25        A    Operating while intoxicated arrests that I
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1    made.
 2         Q    And then in what capacity are you giving an
 3    interv -- a deposition in this civil case for --
 4    concerning an OWI?
 5         A    Not a civil case.  A criminal case.
 6         Q    Okay.  So you sometimes give depositions in
 7    criminal cases?
 8         A    Yes.
 9              MS. SCHNEEMAN:  I think you misunderstood his
10        testimony.
11              MR. ART:  Did I?
12              MS. SCHNEEMAN:  I believe he said he's never
13        given a deposition in a civil case.
14              MR. ART:  In a civil case.
15              MS. SCHNEEMAN:  Only in criminal cases.
16              MR. ART:  Let me go back.
17    BY MR. ART:
18         Q    Have you ever given a deposition in a civil
19    case?
20         A    No.
21         Q    All right.
22         A    I don't believe so.
23         Q    Thank you.  Have you ever been arrested?
24         A    No.
25         Q    So you may be familiar with some of the
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1   deposition rules.  I'm going to talk through just a

 2   couple of the important ones.  It's important that we

 3   continue to speak one at a time.

 4        A    Sure.

 5        Q    You're going to be able to predict the answer

 6   to a lot of my questions, but just wait until there's a

 7   full pending question and your attorney has an

 8   opportunity to object.  Since there's no judge here,

 9   usually you will answer after an objection unless your

10   attorney instructs you otherwise, okay?

11        A    Sure.

12        Q    Please give verbal answers instead of gestures

13   and uh-huh and uh-uh, and that kind of thing, okay?

14        A    Yes.

15        Q    You -- if you don't understand a question that

16   I ask, please ask me to rephrase it, okay?

17        A    Okay.

18        Q    If you answer a question, we're going to

19   assume that you understand it, okay?

20        A    Okay.

21        Q    If you need a break, let us know, but just

22   make sure that you answer the question that's pending

23   before a break, all right?

24        A    Yeah.

25        Q    And I apologize for these questions, but I
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1    have to ask: Do you have any conditions or are you

 2    taking any medications that might affect your memory?

 3         A    No.

 4         Q    Are you taking any medications, or do you have

 5    any conditions, that might affect your ability to

 6    testify truthfully today?

 7         A    No.

 8         Q    Please, tell me everything that you did -- so

 9    with the following preface, that I don't want to know

10    about your conversations with your attorney, please tell

11    me everything that you did to prepare for your

12    deposition today?

13         A    I reviewed the investigative notes before me.

14    I reviewed the videos of all the interviews that I did,

15    and that is pretty much it.

16         Q    So you reviewed the binder of materials that

17    you have in front of you, correct?

18         A    Yes.

19         Q    You reviewed the videos of the interviews that

20    you did of Greenwood personnel and third party

21    witnesses, correct?

22         A    Yes.

23         Q    Did you review body cam videos?

24         A    I did.

25         Q    Did you review any audio recordings?
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1        A    Yes.  I reviewed the 911 calls and partial of
 2   the -- the time-stamped audio.
 3        Q    The radio traffic?
 4        A    Yes.
 5        Q    Other than the 911 calls and the radio
 6   traffic, did you review any other audio, in preparation
 7   for today's deposition?
 8        A    No.
 9        Q    Other than the videos of your interview and
10   the videos from the body cam, did you review any videos
11   in preparation for your deposition today?
12        A    No.
13        Q    Other than the binder that's in front of you
14   right now, did you review any other documents in
15   preparation for your deposition?
16        A    Some of the IM messages and -- yeah, so I
17   think it would just be the IM messages.
18        Q    Did you review any e-mails?
19        A    Just --
20        Q    Have you --
21        A    -- what I have in -- with me.
22        Q    I didn't follow the rules.  Sorry.  Other than
23   e-mails that are in the binder in front of you, did you
24   review any e-mails in preparation for your deposition
25   today?
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1        A     No.  Not that I recall.
 2        Q     Okay.  How many times did you review the
 3   binder that's in front of you, prior to your deposition
 4   today?
 5             MS. SCHNEEMAN:  In order to prepare for the
 6        deposition?
 7             MR. ART:  Correct.
 8        A     Probably five.
 9   BY MR. ART:
10        Q     Okay.  When was the last time you reviewed it
11   in its entirety?
12        A     I don't know that.  I would say I --I've
13   reviewed it in its entirety in one sitting.  I reviewed
14   bits and pieces of it this morning, just to refresh my
15   memory.
16        Q     Have you reviewed the entire thing within the
17   last week?
18        A     Yes.
19        Q     Okay.  When did you last view the body cam
20   videos?
21        A     This week.  I don't remember what day it was.
22        Q     At some point this week?
23        A     Yeah.
24        Q     So you have a pretty good recollection of
25   what's in the binder in front of you as you sit here
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1   right now, correct?

 2        A    Yes.

 3        Q    Do you have a pretty good recollection of the

 4   body cam, as you sit here right now, correct?

 5        A    Yes.

 6        Q    Did you review all four body cam videos that

 7   exist?

 8        A    No.

 9        Q    Which body cam videos did you review?

10        A    I think I just reviewed Renee Elliot's.

11        Q    Okay.  That was produced to us in three

12   segments.

13        A    Uh-huh.  Yes.

14        Q    Do you watch it the same way?

15        A    Yes.

16        Q    Okay.  Did you review all three segments?

17        A    Yes.

18        Q    Did you review any of Officer X's body cam?

19        A    I don't believe I did this week.  I don't

20   believe I did in preparation for this.

21        Q    But you have before?

22        A    Yes.  I have before.

23        Q    And with respect to the audio, did you listen

24   to the audio that you testified about this week as well?

25        A    Parts of it.
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1        Q     Okay.  You listened to the 911 calls in their
 2   entirety, obviously, correct?
 3        A     Yes.
 4        Q     And parts of the radio traffic, correct?
 5        A     Yes.
 6        Q     Apart from the instant messages and the binder
 7   that you have before you today, have you reviewed any
 8   other document in preparation for your deposition?
 9        A     I believe so.
10        Q     Have you reviewed any testimony in preparation
11   for your deposition?
12        A     No.
13        Q     Are the notes that you took during interviews
14   with witnesses in that binder?
15        A     I don't believe they are.
16        Q     Have you reviewed those notes at any time,
17   recently?
18        A     Yes.
19        Q     When was the last time you reviewed them?
20        A     Within the last week.
21        Q     Okay.  Apart from the binder, those notes and
22   the instant messages, any other documents you can think
23   of that you reviewed in preparation for this deposition?
24        A     No.
25        Q     How many times have you met with attorneys to
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

```
 1   prepare for this deposition?

 2       A    Once.

 3       Q    When was that meeting?

 4       A    Tuesday morning.

 5       Q    How long did it last?

 6       A    A few hours.

 7       Q    Was anyone else present?

 8       A    Just the attorneys.

 9       Q    And you?

10       A    Yes.

11       Q    When you say "a few hours" do you mean...?

12       A    Approximately three.

13       Q    Okay.  Great.  Prior to that, have you spoken

14   with your attorneys at any time?

15       A    Over the phone.

16       Q    On how many occasions?

17       A    Twice, I believe.  I've spoken to Pam.

18       Q    Do you recall when those phone calls occurred?

19       A    Well, there would've been more, because I've

20   spoken to Mark Holloway over the course of this, and

21   typically, I do not remember the exact dates, but I can

22   tell you that --

23       Q    Don't tell me the subject matter.

24       A    Okay.  Well, I can, because it's --

25       Q    It's privileged.
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1          MS. SCHNEEMAN:  Yeah.  At this point, all he's

2      asking is just, as I understand the question, how

3      many times have you talked with --

4          THE WITNESS:  Okay.

5          MS. SCHNEEMAN:  -- anybody from my law firm.

6  BY MR. ART:

7      Q    And I appreciate your wanting to move this

8  along, so let me try to do that this way: Have you been

9  involved in the efforts to produce documents in this

10  case?

11      A    Yes.

12      Q    Okay.  Have you spoken to any other attorneys

13  about this case, other than your own?

14      A    No.

15      Q    How did you learn this lawsuit had been filed?

16      A    Through our city legal.

17      Q    Okay.  Did you first learn about it when there

18  was a notice of court claim?

19      A    I believe I did, yes.

20      Q    And then you forwarded that on to certain

21  personnel in the Greenwood Police Department, correct?

22      A    Well, the notice of court claim, I believe,

23  would've went to our legal department.

24      Q    Okay.

25      A    And then they would have forwarded it to the

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1   chief, who would've informed me.
 2        Q    Okay.  Same, when the actual federal civil
 3   rights complaint was filed?
 4        A    I believe so.  I -- I don't remember, but
 5   typically that's the process.
 6        Q    Okay.  Apart from your attorneys, who have you
 7   discussed this lawsuit with since it was filed in May
 8   2017?
 9        A    Our command staff.  I believe that is it.
10        Q    Who is the command staff?
11        A    The chief, John Laut, the assistant chief,
12   Matt Fillenwarth, the deputy chief of investigations,
13   Doug Roller, and myself.
14        Q    And is the command staff the chief and all the
15   deputy chiefs?
16        A    Yes.
17        Q    Okay.  And so the only discussions you've had
18   about this lawsuit is among the command staff, correct?
19        A    Yes.
20        Q    Have you had discussions with the command
21   staff without attorneys present?
22        A    Yes.
23        Q    Tell me what you've discussed with the command
24   staff since this lawsuit was filed, that has to do with
25   this lawsuit.
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1        A    I would -- I wouldn't be able to recall.  We
 2   have command staff meetings every Monday at 2:00 p.m.,
 3   so we typically -- it most certainly has not been an
 4   issue of discussion in every meeting since the lawsuit,
 5   but occasionally, especially during the investigation, I
 6   would give updates on where the investigation was at the
 7   time.
 8        Q    So I'm going to get to the time period during
 9   your investigation up until May 2017 when --
10        A    Right.
11        Q    -- the lawsuit was filed, so let's just focus
12   on the period after May 2017 for now.
13        A    The only thing that I can --
14             MS. SCHNEEMAN:  Okay.  Hold on.  You're losing
15        me.  The date the lawsuit was filed?
16             MR. ART:  To the present.
17             MS. SCHNEEMAN:  Okay.
18             MR. ART:  Yeah.
19             MS. SCHNEEMAN:  So the date the lawsuit was
20        filed to the present, you're wanting to know his
21        communications with command staff?
22             MR. ART:  Correct.
23             MS. SCHNEEMAN:  Do you understand the
24        question?
25             THE WITNESS:  Yeah.  Yeah.
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1              MS. SCHNEEMAN:  You got it.
 2      A    Typically, just -- just discussion on the --
 3  the process that, Hey, I've got a deposition.  I've been
 4  subpoenaed for a deposition.  I've been asked to produce
 5  these documents.  Just updates.
 6  BY MR. ART:
 7      Q    Have you had any discussion with command staff
 8  that doesn't relate to the process?
 9              MS. SCHNEEMAN:    Objection.  Vague.
10      A    I don't understand.
11      Q    Yeah.  Let me rephrase it.  Have you had any
12  discussion with the command staff since this lawsuit was
13  filed about whether the lawsuit has merit?
14      A    Yes.
15      Q    What discussion?
16      A    Opinion.
17      Q    The opinion of the various members of the
18  command staff?
19      A    Yes.
20      Q    Okay.  And describe those discussions to me.
21      A    Well, we obviously believe that our officers
22  acted within the scope of the law and within our
23  policies, so that's pretty much it.
24      Q    So you've had discussions among the command
25  staff about the officers who are named as Defendants
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

The Deposition of Officer Don Eastham, taken on 05/03/18                    29

```
 1   here, acting within the scope of the law, correct?

 2        A    Yes.

 3        Q    On how many occasions?

 4        A    I -- I couldn't give you an accurate estimate

 5   on that.

 6        Q    Is it over ten conversations to that effect?

 7        A    No.

 8        Q    Over five?

 9        A    Probably three or four.

10        Q    Okay.  Describe to me, in those three or four

11   conversations, what you have discussed about the

12   officers acting within the law, with other members of

13   the command staff?

14        A    Oh, this is -- typically, when I'm subpoenaed

15   for additional documents, it's as simple as not seeing

16   the relevancy of those document -- we provide them, but

17   quite honestly, I think a lot of them are irrelevant,

18   but nonetheless, that's pretty much what the

19   conversation consisted of.

20        Q    So are these conversations in passing about

21   your view that the lawsuit doesn't have merit, and --

22        A    No.  Like I said, most of our conversations

23   occur in our command staff meetings, and I'm giving

24   updates.  Say, I've been subpoenaed for every e-mail

25   that has been -- you know?  And, what in the world?  You
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Videotaped Deposition of Officer Coleman Baird 5/16/2018

30

```
 1    know?  They want all the -- you know?  It -- just that
 2    type of thing.
 3         Q     Okay.
 4         A     I -- I -- as far as specifics, the majority of
 5    the time it's been just giving updates on what you or
 6    our attorneys have requested.
 7         Q     Okay.  I appreciate that.  So when you-all are
 8    having these discussions, do you ever talk about the
 9    merits of the lawsuit, in terms of whether the use of
10    force by Lieutenant Blackwell was appropriate or not,
11    with the command staff?
12         A     Well, of course.
13         Q     Okay.  Tell me about those discussions.
14         A     I can't tell you anymore than we all stand by
15    the -- the officers and their actions.
16         Q     So you've had discussions about how you-all
17    stand by the officers and their actions, correct?
18         A     Correct.
19         Q     Can you tell me anything else that you've
20    discussed with the command staff about the substance of
21    the lawsuit, as opposed to the process of responding to
22    a discovery request.
23               MS. SCHNEEMAN:  Again, objection.  Vague.  If
24         you understand, you can answer.
25         A     I -- I don't.  I don't understand.
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1        Q    I mean, do you guys sit around the table and
 2   say, we stand by our officers.  And that's all that you
 3   say, or do you talk about the factual circumstances of
 4   Lieutenant Blackwell's use of force?
 5        A    I'm still -- I mean, you're -- you're asking
 6   me to recall specific conversations and I -- I can't
 7   remember everything that was -- that's been said.
 8        Q    Can you remember anything that has been said
 9   during these conversations with command staff about the
10   subject matter of this lawsuit?
11        A    Just, like I said, the -- the officers acted
12   within the scope of the law and within our policy, and
13   we stand by their actions.
14        Q    Anything else that you can remember about
15   those discussions with command staff since the lawsuit
16   was filed?
17        A    No.
18        Q    Has anybody ever expressed any doubt that the
19   officers acted within the law, since the lawsuit was
20   filed, in these command staff discussions?
21        A    No.
22        Q    Have you had any discussions since this
23   lawsuit was filed with any of your family members about
24   the lawsuit?
25        A    Not -- not specifics, just that I've got a
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1   deposition on this case.

 2        Q    Any discussion with family members about the

 3   substance of the lawsuit?

 4        A    No.

 5        Q    Any discussion with Lieutenant Blackwell about

 6   the substance of the lawsuit since it was filed?

 7        A    No.  I try -- I don't talk to Lieutenant

 8   Blackwell concerning the specifics of this case.

 9        Q    Have you had any discussion with him at all

10   about this lawsuit since it was filed in May 2017?

11        A    I think the only thing that I have told

12   Lieutenant Blackwell is just I have reassured him that

13   the administration stands behind him and to cooperate

14   fully with the investigation, and I have also ordered

15   him and Renee Elliot, because he is her supervisor, not

16   to speak in regards to this lawsuit.

17        Q    When you say "not to speak" what do you mean?

18        A    I don't want them discussing the lawsuit.

19        Q    With anyone?

20        A    Yes.

21        Q    Is that correct?

22        A    Yes.

23        Q    Other than telling Lieutenant Blackwell that

24   the administration stands behind him and that he should

25   cooperate and that he should not speak about the
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Videotaped Deposition of Officer Jonathan Robert Sampson 33

```
 1   lawsuit, have you had any other discussion with
 2   Lieutenant Blackwell, since this lawsuit was filed,
 3   about the subject matter of the lawsuit?
 4        A    No.
 5        Q    What about with Lieutenant Elliot?
 6        A    Officer Elliot.
 7        Q    Sorry.  Officer Elliot.  Thank you.
 8        A    No.
 9        Q    What about with Officer Laut?  Elizabeth,
10   right?
11        A    No.
12        Q    Is Elizabeth her first name?
13        A    Elizabeth Laut, yes.
14        Q    Have you had any discussion about this lawsuit
15   with any member of the Greenwood Police Department,
16   other than command staff and Lieutenant Blackwell, since
17   it was filed?
18        A    No.  Not -- not to my -- I mean, they see me
19   leaving to -- you know, I'm going to a deposition --
20        Q    Right.
21        A    -- for the Todero case, but, no.
22        Q    Other than that sort of logistical discussion,
23   any discussion with any member of the Greenwood Police
24   Department about the substance of this lawsuit, other
25   than the discussions you've already testified about with
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1    command staff and Lieutenant Blackwell?

 2        A     No.

 3        Q     Do you know this company Hirons?

 4        A     Hirons?

 5        Q     Hirons.

 6        A     Yeah.  They're -- yes.

 7        Q     PR company?

 8        A     Yes.

 9        Q     Have you had any discussions with them about

10    this lawsuit at any time?

11        A     No.

12        Q     Have you had any discussion with any of the

13    EMTs who responded to the scene, about this lawsuit,

14    since this lawsuit was filed?

15        A     No.

16        Q     Have you had discussion with Mr. Godfrey since

17    this lawsuit was filed?

18        A     No.

19        Q     Have you had any discussion with any of the

20    other witnesses in your investigation, about this

21    lawsuit, since the lawsuit was filed?

22        A     No.

23        Q     Have you spoken with Holly Walters about this

24    lawsuit since it was filed?

25        A     No.
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1       Q       When's the last time you spoke with her?

2       A       The exact date would've been the date that I

3  interviewed her.

4       Q       On camera?

5       A       Yes.

6       Q       Very good.  What about any employee of the

7  Vineyard Church; when was the last time you spoke with

8  any of those people?

9       A       It would've been when I interviewed Jeanne

10 Moore and her husband.

11      Q       What about the two folks that dialed 911 and

12 had recorded 911 calls?

13      A       When I interviewed them.

14      Q       When was the last time you spoke with any

15 officer of the LMP -- excuse me.  When was the last time

16 you spoke with any officer at the Indiana State Police

17 about the Todero incident?

18      A       it would've been when Trooper Cunningham came

19 to my office and informed me that he had dealt with

20 Charles Todero.

21      Q       So prior to the time that he issued his

22 report?

23      A       Yes.

24      Q       Okay.  You haven't spoken with any member of

25 the Indiana State Police about this case since then --

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Deposition of Jason Gowan, taken on 05/03/18

36

```
 1        A    No.
 2        Q    -- correct?  When was the last time you spoke
 3   with a member of the coroner -- or the Marion County
 4   Coroner's Office about this case?
 5        A    It would've been -- lawsuit or case?
 6        Q    So let me ask you this.  Let me strike the
 7   question and ask you this: Have you spoken with any
 8   employee or contractor at the Marion County Coroner's
 9   Office since this lawsuit was filed?
10        A    No.
11        Q    Prior to the filing of this lawsuit, when was
12   the last time you spoke with any employee or contractor
13   at the Marion County Coroner's Office about the Todero
14   case?
15        A    It would've been -- there was a typo that was
16   in the autopsy report concerning a skull fracture, and I
17   contacted --
18        Q    We'll get to the specifics, so let me --
19        A    Okay.
20        Q    -- focus you on the question.
21        A    So --
22        Q    When was the --
23        A    When --
24        Q    -- date of that conversation, generally?
25        A    It would've been right after the autopsy
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

The Deposition of JASON JOHN, taken 08/23/13, 2018

1    report came back.

2          Q    Okay.  So in 2016, at some point?

3          A    Yes.

4          Q    Okay.  All right.  So now, focusing on the

5    period of time -- well, strike that, please.  When did

6    your investigation of the Todero incident conclude?

7          A    June -- the timeline.  It concluded on June

8    27, 2016.

9          Q    Okay.  Other than your discussion with the

10   Marion County Coroner's Office that you just testified

11   about, have you had a discussion with any witness who's

12   not a Greenwood Police Department employee, since June

13   27, 2016, about the Charles Todero case?

14         A    No.

15         Q    I want to focus on the period of time between

16   June 27, 2016, and May 2017, when this lawsuit was

17   filed, okay?

18         A    Okay.

19              MS. SCHNEEMAN:  Wait.  Say that one more time?

20        You talk a little fast, and my brain --

21              MR. ART:  Sorry.

22              MS. SCHNEEMAN:  -- is having a hard time

23        keeping up.

24              MR. ART:  Yeah.  Yeah.  Yeah.

25              MS. POLLACK:  It's a Chicago thing.

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1              MR. ART:  And I'd --
 2              MS. SCHNEEMAN:  Yeah.
 3              MR. ART:  You know, I got here an hour late,
 4       too.
 5              MS. SCHNEEMAN:  Sorry.  Did you mean --
 6  BY MR. ART:
 7       Q    Between the time that Deputy Chief Ison's
 8  investigation concluded on June 27, 2016, and the time
 9  this lawsuit was filed on May 23, 2017, I'm going to ask
10  you some questions about your conversations with
11  Greenwood Police Department employees about the Todero
12  case, okay?
13       A    Okay.
14       Q    Did you have conversations with command staff
15  during that period of time about the Todero case?
16       A    Oh, I'm sure I did.  I -- I don't remember
17  specifically, but I'm sure that we did discuss updates.
18       Q    Do you recall anything that you discussed with
19  them in that period of time in general?
20       A    I do not.
21       Q    Do you recall any specific thing that any
22  member of the command staff said to you, or you to them,
23  about the Charles Todero case, during that time period?
24       A    I don't.
25       Q    Did you have discussion with Lieutenant
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1    Blackwell about the Charles Todero case during that time

 2    period?

 3         A    Not that I recall.

 4         Q    Did you have any discussion with Officer

 5    Elliot about the Todero case during that time period?

 6         A    Not that I recall.

 7         Q    With Officer Laut during that time period?

 8         A    Not that I recall.

 9         Q    Other than the command staff and -- and having

10    a recollection of conversations in general, do you

11    recall any conversation that you had with any Greenwood

12    Police Department employee, about the Todero case,

13    during that time period?

14         A    No.

15         Q    During that time period, did you have any

16    discussion with the folks from Hirons?

17         A    No.

18         Q    Did you have any discussion with any of the

19    EMTs or hospital staff that treated Charles Todero?

20         A    No.

21         Q    Did you have any discussion with any other

22    witness -- I think I already asked you this -- other

23    than folks at the coroner's office?

24         A    No.

25         Q    Have you had any interactions with Teresa
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1   Todero, or any member of her family, or any relative of
 2   Charles Todero, since completing your investigation on
 3   June 27, 2016?
 4        A    No.
 5        Q    Prior to completing your investigation did you
 6   have any interaction with Teresa Todero or her family
 7   members?
 8        A    I don't believe so, in regards to this case or
 9   previous runs.
10        Q    In regards to this case?
11        A    Okay.  No.
12        Q    Yeah.  So after May 29, 2016, did you have
13   any?
14        A    Since this -- since this incident?
15        Q    Hold on.  Sorry.  Just so we have a clear
16   record: After May 29, 2016, have you had any
17   conversation with Teresa Todero or her family members?
18        A    I -- I can make this easy: I have had no
19   conversation with Teresa Todero or any of her family
20   members during any course of this investigation or
21   process.
22        Q    Are you aware of any interaction between
23   Lieutenant Blackwell and any witness, at any time during
24   your investigation?
25        A    I'm not.
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

```
 1        Q    He writes in his Use of force Report that he
 2   interviewed a 911 caller; do you recall that?
 3        A    Can I refer to that?
 4        Q    Absolutely.  And we're going to go through it
 5   in more detail, but I believe it's in the first
 6   paragraph, so take a look at it, and let us know when
 7   you've had a chance to review it.
 8             MS. SCHNEEMAN:  Are you referring to
 9        Blackwell's Use of force Report?
10             MR. ART:  Correct.
11             MS. SCHNEEMAN:  I'm not sure you're --
12             THE WITNESS:  Oh, the Use of force.
13             MR. ART:  Yeah.  The --
14             MS. SCHNEEMAN:  Yeah.  I think you're looking
15        at a different document than Plaintiff's counsel
16        has referred to.
17   BY MR. ART:
18        Q    It's back here.  You know what?  We're going
19   to get to it, so let me just re-ask the questions.  I
20   don't --
21        A    Okay.
22        Q    Don't worry about that at this point.  As you
23   sit here today, are you aware of any interaction that
24   Lieutenant Blackwell has had with any witness to the
25   Todero tasing or any witness in your investigation?
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1        A     No.
 2              MS. SCHNEEMAN:  Objection.  Vague, as to time.
 3        Q     At any time?
 4              MS. SCHNEEMAN:  Before or after the May 29,
 5        2016, incident?
 6        Q     Right.  So have you had any -- have you had --
 7   strike that, please.  Are you aware of any interaction
 8   between Lieutenant Blackwell and any witness to the
 9   Todero tasing incident that occurred on May 29, 2016 --
10              MS. SCHNEEMAN:  Okay.
11        Q     -- at any time?
12              MS. SCHNEEMAN:  An objection. Vague, as to the
13        term "witness".
14        A     No.  Not -- during the course of the lawsuit?
15        Q     At any time?
16        A     No.  I'm not -- other than what he -- during
17   his interaction with him at the scene, no.
18        Q     So you know about his interactions with people
19   at the scene from the body cam, correct?
20        A     Yes.
21        Q     You know about his interaction --
22        A     And his reports.
23        Q     And his report, correct?
24        A     And their statements, yes.
25        Q     Right.  And you know about his interactions
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1   with you, correct?

 2        A    Yes.

 3        Q    Are you aware of his interactions with any

 4   other witnesses other than what's in the reports and

 5   it's on the body cam?

 6             MS. SCHNEEMAN:  Okay.  Objection.  Same

 7        objection as to time and to the term "witness".

 8        A    No.  I'm not.

 9        Q    All right.  When did you join the Greenwood

10   Police Department?

11        A    June -- January 15, 2001.

12        Q    Did you have to take a test to join?

13        A    Yes.  There's a written exam.

14        Q    How many times did you take a written exam?

15        A    One.

16        Q    You passed it the first time?

17        A    Yes.

18        Q    Prior to that, have you ever worked in law

19   enforcement?

20        A    Yes.

21        Q    What was your -- what were -- let's talk about

22   your law enforcement jobs prior to joining the Greenwood

23   Police Department, okay?

24        A    Yes.

25        Q    All right.  So working backwards in time; were
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1    you a law enforcement officer immediately prior to

2    joining Greenwood Police?

3        A    Yes.

4        Q    With what department?

5        A    The IUPUI.

6        Q    What's that?

7        A    Indiana University-Purdue University

8    Indianapolis.

9        Q    How long were you an officer with that

10   department?

11       A    I was employed with them for about three

12   years.  I was a full-time police officer for one year. I

13   was a cadet going through their criminal justice system,

14   so after I graduated, they hired me full-time.

15       Q    Got it.  So you were going to school and you

16   were serving as a part-time officer at the same time?

17       A    Yes.  Well, full-time.

18       Q    Full-time?

19       A    Yeah.

20       Q    Okay.

21       A    But -- sorry -- they hired -- I was serving,

22   yes, as a part-time, then they hired me as a full-time.

23       Q    Got it.  And they hired you after a two-year

24   program?

25       A    No.  It's not a two-year program.

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1        Q     Just explain it to me.

 2        A     So you get -- you get hired as a cadet.  You

 3   work for a year; dispatch, building patrol, that type of

 4   thing.  They send you to the academy.  When you come out

 5   of the academy, you go through an FTO process.  After

 6   that, then you become a part-time police officer.  I

 7   became a full-time, because I had graduated.

 8        Q     Got it.  And you worked as a full-time police

 9   officer in that department for one year?

10        A     Yes.

11        Q     And then you made application to the Greenwood

12   Police Department?

13        A     Yes.

14        Q     Did you make application at any other police

15   department?

16        A     No.

17        Q     Why did you want to join the Greenwood Police

18   Department?

19        A     I grew up in Greenwood, hometown.

20        Q     Got it.  Did you go to high school there?

21        A     I did.

22        Q     Other than doing the law enforcement program

23   that you did at -- what was the university?  I'm sorry.

24        A     Indiana -- it's IUPUI.

25        Q     IUPY?
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 1:17-cv-01698-JPH-MJD Document 125-54 Filed 08/13/18 Page 48 of 639 PageID #:
4727
The Deposition of Jason Henson, taken 6/28/13,   46

```
 1     A    IUPUI.
 2     Q    IUP --
 3     A    Indiana University --
 4     Q    UI?
 5     A    -- Purdue University of Indianapolis.
 6     Q    Got it.  Other than doing the program at
 7  IUPUI, have you done any other schooling after high
 8  school?
 9     A    Just the law enforcement academy and the
10  Police Executive Leadership Academy.
11     Q    Okay.  What's the law enforcement academy?
12     A    The Indiana Law Enforcement Academy is all
13  officers have to complete.  Back then, it was a 12-week
14  training course to get certified as a law enforcement
15  officer.
16     Q    Okay.  So you took a 12-week course there,
17  correct?
18     A    At IU.
19     Q    At IU?
20     A    Yeah.  IU has their own police academy.
21     Q    Okay.  In Bloomington?
22     A    Yes.
23     Q    Okay.  So you took a 12-week course at IU,
24  correct?
25     A    Yes.
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201
KENTUCKIANA COURT REPORTERS
502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1        Q     You took how many years of classes at IUPUI?

 2        A     About two and a half, associate's degree.

 3        Q     Okay.  And did you graduate with an

 4   associate's degree?

 5        A     Yes.

 6        Q     And then you mentioned one other institution,

 7   correct?

 8        A     Yes.  It's the Police Executive Leadership

 9   Academy, but it's basically a four-week course, and it's

10   a training course for leadership.

11        Q     Do you come out with a certification?

12        A     Yes.

13        Q     What's the certification?

14        A     It's just a training certificate.

15        Q     Got it.

16        A     Accomplished.

17        Q     When you complete the Law Enforcement Academy,

18   do you come out with a particular certification, or is

19   that just the basic requirement to become a law

20   enforcement officer in the State of Indiana?

21        A     You're certified as a police officer, yes.

22        Q     Okay.  Other than the training and schooling

23   you've just described, have you received any other

24   schooling ever?

25        A     I've been to multiple training courses through
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1  law enforcement, but, no.

 2       Q    Okay.  Prior to doing your work at IUPUI, what

 3  was your employment?

 4       A    I delivered pizza in college for Papa John's.

 5       Q    Okay.

 6       A    How far back do you want it to go?

 7       Q    That's fine.

 8       A    Okay.

 9       Q    You can stop right there.  So you joined

10  Greenwood in 2001, correct?

11       A    Yes.

12       Q    What was your rank when you first joined?

13       A    Officer, patrolman.

14       Q    And what were your duties in that position?

15       A    Enforce state law, local ordinance, traffic

16  law.

17       Q    Were you out on the street?

18       A    Yeah.  Patrol.

19       Q    Were you with a partner?

20       A    No.

21       Q    Do officers of the Greenwood Police Department

22  work with partners, or no?

23       A    Only in their field training.

24       Q    Okay.  When you started there, did you have to

25  do field training, or did you start as a full-time
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1    officer?

 2         A    No.  I had to do field training.  Mine was

 3    expedited because I had already had experience.

 4         Q    Who did you train with when you did that field

 5    training?

 6         A    I had multiple training officers.

 7         Q    Okay.  Any of the defendants in this lawsuit;

 8    I guess, that would be Elliot or Blackwell at that time?

 9         A    No.  Randy Eck I did.

10         Q    Not a defendant, but --

11         A    Right.

12         Q    So you did some training with Randy Eck?

13         A    Right.

14         Q    Okay. Did you do any training with Lieutenant

15    Blackwell?

16         A    No.

17         Q    Did you do any training with Officer Elliot at

18    any point?

19         A    No.

20         Q    Did she come after you?

21         A    No.  She was before me.

22         Q    Okay.  What was your next position at the

23    Greenwood Police Department after patrolman?

24         A    In 2007, I was promoted to sergeant.

25         Q    Is that a merit-based promotion, or
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1   something --
 2        A    Merit.
 3        Q    Okay.  Did you have to take a test for it?
 4        A    Yes.
 5        Q    How many times did you take the sergeant test?
 6        A    Twice.
 7        Q    Did you fail it once and pass it the second
 8   time?
 9        A    It's not a fail.  It's a -- multiple
10   applicants test and interview, and they rank you by your
11   scores.
12        Q    And then they go down the list?
13        A    Yeah.
14        Q    Okay.  So the second time, you made the cut?
15        A    Yes.
16        Q    What years did you take the sergeant exam?
17        A    I believe it would've been -- they do it every
18   two years, so it probably would've been 2005.
19        Q    Okay.  And that's --
20        A    And 2007.
21        Q    Okay.  And 2007 is the year you were promoted
22   to sergeant?
23        A    Yes.
24        Q    All right.  And what was the next -- what were
25   your duties as a sergeant?
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1        A    Supervise patrolmen -- road supervisor.
 2        Q    Did you do training in that capacity?
 3        A    Yes.
 4        Q    Did you do any training in use of a taser in
 5   that capacity?
 6             MS. SCHNEEMAN:  You mean, did you receive it?
 7        A    I was --
 8             MS. SCHNEEMAN:  Or did he...?
 9             MR. ART:  Did you provide it.
10             MS. SCHNEEMAN:  You said "do".
11             MR. ART:  Yeah.
12             MS. SCHNEEMAN:  It could be ambiguous.
13   BY MR. ART:
14        Q    So --
15        A    I did not provide taser training.  I'm not a
16   taser instructor.
17        Q    Okay.  Are there particular taser instructors
18   at the Greenwood Police Department?
19        A    Yes.
20        Q    Are they certified by Taser?
21        A    Yes.
22        Q    Have you ever been one of those instructors?
23        A    Never.
24        Q    Have you ever received training from one of
25   those instructors?
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

```
 1        A     Yes.

 2        Q     Who have you received training from in use of

 3   taser at Greenwood Police Department?

 4        A     Joey Rodriguez, who's no longer with us, and

 5   Sergeant Jason Holtzleiter.

 6        Q     Is Sergeant Holtzleiter the current --

 7        A     He is.

 8        Q     -- certified --

 9        A     Yes.

10        Q     -- Taser trainer --

11        A     Yes.

12        Q     -- at the Greenwood Police Department?

13        A     Yes.

14        Q     When did he assume that position?

15        A     I don't know.

16        Q     Do you know when Officer Rodriguez left?

17        A     2015, I believe.

18        Q     Okay.  When was the last time you received

19   taser training?

20        A     February of this year.

21        Q     Okay.  February 2018.  When was the time

22   before that?

23        A     February of last year.

24        Q     And the time before that?

25        A     February.  We have our annual updates in
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1    February, every year.

2        Q    Okay.  So every year, in February, you've

3    received an update on taser training, correct?

4        A    Yes.

5        Q    And you've received those trainings from

6    Sergeant Holtzleiter, correct?

7        A    Yes.

8        Q    And before him, from Sergeant Rodriguez?

9        A    Officer Rodriguez.

10       Q    Officer Rodriguez; is that correct?

11       A    Yes.

12       Q    Have you received any taser training from any

13   other person while at the Greenwood Police Department?

14       A    Yes.  I believe we did -- when we transitioned

15   from the 26 to the 2, the X2 Taser, I believe Sergeant

16   Holtzleiter led the training, but a couple other taser

17   instructors assisted him due to the size of the classes,

18   so it'd have been Brian Falco and I believe, Matt

19   Fillenwarth.

20       Q    Those are officers of the Greenwood Police

21   Department?

22       A    Yes.

23       Q    Are they also certified taser instructors?

24       A    I believe they are, yes.

25       Q    But they just don't -- strike that, please.

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1   Have Officers Falco or Fillenwarth taught any taser
 2   training other than this transition from the X26 to the
 3   X2 that you described?
 4        A    Well, they would have to train.  I don't
 5   remember attending their training sessions.
 6        Q    Okay.
 7        A    Typically, the ones that I attended, I
 8   believe, were Holtzleiter and -- and Rodriquez.
 9        Q    Okay.  But there are currently three officers
10   at Greenwood Police Department who are certified to
11   train in tasers; is that correct?
12        A    I believe so, yes.
13        Q    And is it your understanding that all three of
14   them provide taser training to officers of Greenwood
15   Police Department?
16        A    Yes.
17        Q    Other than the transition from the X26 to the
18   X2 and these taser trainings that you've received each
19   February, going back in time, are there any other taser
20   trainings that you've been part of at the Greenwood
21   Police Department in the last ten years?
22        A    Not that I recall, no.
23        Q    During the updates that happened in February,
24   what training do officers at the Greenwood Police
25            Department receive?  Well, let me strike that
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1   and first ask you: Do all officers of the Greenwood
 2   Police Department receive taser training each February?
 3        A    Yes.
 4        Q    During that training, what are they taught?
 5        A    The PowerPoint that was given to you.  That's
 6   the training material that -- there's a wide variety of
 7   issues that are gone over.
 8        Q    Right.  You said the PowerPoint and you
 9   touched the binder that's --
10        A    Yes.
11        Q    -- in front of you.  Is that PowerPoint in
12   that binder?
13        A    Yes.
14        Q    And is the PowerPoint that's in the binder in
15   front of you today, the PowerPoint that's used in
16   training each February for members of the Greenwood
17   Police Department?
18        A    Yes and no.
19        Q    Please, explain.
20        A    Okay.  So often, Taser will update their
21   training.  Our -- and this is coming from Sergeant
22   Holtzleiter, he advised me that he gets his training
23   materials, the PowerPoints, from the Taser website.
24   January of this year, Taser updated their training
25   PowerPoint.
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1        Q     Right.

 2        A     Which is pretty much similar to the way it is

 3   every year.  I just provided that to our attorneys, but

 4   okay, so yes and no.

 5        Q     So what you've got in your binder that's in

 6   front of you, is the version of Taser's training

 7   materials from prior to January of this year, correct?

 8        A     Yes.

 9        Q     And those are the materials that would've been

10   used at trainings prior to January of this year,

11   correct?

12        A     Yes.

13        Q     Is it correct to say that the officers

14   involved in the Todero tasing incident in May of 2016,

15   had received training on the Taser most recently in

16   February of 2016?

17        A     Yes.

18        Q     The transition from the X26 to the X2 occurred

19   after May 2016, correct?

20        A     Yes.

21        Q     And so the training that you received in that

22   occurred after the -- Charles Todero was tased, correct?

23        A     On the X2?  Yes.

24        Q     How was the training on the X2 different than

25   the training that you receive every February?
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

```
 1        A     Mainly, operational issues on the taser.  The

 2   P26 has one cartridge that contains projectiles.

 3        Q     Right.

 4        A     The X2 can -- has two.

 5        Q     Right.

 6        A     The way you test it is a little bit different,

 7   also.  There's -- there are side buttons on the taser

 8   that you push instead of actually pulling the trigger.

 9        Q     Are the sights different on the X2?

10        A     I believe they're similar.

11        Q     Okay.

12        A     The -- the X2 does have two laser points.

13        Q     Yeah.

14        A     The 26 has one.

15        Q     Right.  Okay.  Let's go back to your career

16   with the Greenwood Police Department.  So you became a

17   sergeant in 2007, correct?

18        A     Yes.

19        Q     You said you supervised patrolmen then,

20   correct?

21        A     Yes.

22        Q     Did you have to do any supervision around uses

23   of force in that capacity?

24        A     Yes.  I would have -- I would've signed off on

25   uses of force.
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Videotaped Deposition of Officer John Laut, Sr., 6-15-18

```
 1        Q    Okay.  When you say you "would've signed off
 2   on uses of force," explain what you mean.
 3        A    At the end of the shift, typically the
 4   sergeant reviews all the cases, and puts it -- their
 5   initials on the CAD screen, stating that the report has
 6   been viewed and approved.
 7        Q    When an officer uses force in the field on a
 8   shift at the Greenwood Police Department, are they
 9   required to complete a Use of force Report that shift?
10        A    No.
11        Q    When are they required to complete that
12   report?
13        A    We -- we teach them, especially in critical
14   incidents, that it's best to take two sleep periods, or
15   48 hours, before --
16        Q    Okay.  We'll get into that in a bit more
17   detail next, but we'll come back to it.  So you would
18   approve Use of force Reports, correct?
19        A    Yes.
20        Q    Would you conduct investigations, as a
21   sergeant, into uses of force?
22        A    No.  Typically, we will read the report, find
23   the -- the only way -- let me rephrase that.  The only
24   way that we would conduct an investigation is if there
25   was a complaint, or the facts did not support the use of
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1    the force.

2         Q    And if an investigation needed to be

3    conducted, it would not be conducted by a sergeant,

4    correct?

5         A    No.

6         Q    Who conducts investigations into uses of force

7    at the Greenwood Police Department?

8         A    At that -- at the time that I was a sergeant,

9    we had a conduct review board that was made up of a

10   lieutenant, a sergeant, and a patrolman.

11        Q    Okay.  When did the conduct review board at

12   the Greenwood Police Department come into existence, if

13   you know?

14        A    I do not know.

15        Q    When's --

16        A    It was there when I became an officer.

17        Q    Is there a conduct review board anymore?

18        A    No.  There's a -- no, there's not.

19        Q    When did the conduct review board cease to

20   exist?

21        A    I'm giving an estimate.  I don't remember the

22   -- I want to say it was sometime around 2014 or '15.

23        Q    Okay.  Do you know why it was disbanded?

24        A    I don't.

25             MS. SCHNEEMAN:  I'm sorry.  What year did you

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1        approximate it was?
 2                THE WITNESS:  2014 or '15.
 3                MS. SCHNEEMAN:  Thank you.
 4        A     Somewhere in there.
 5   BY MR. ART:
 6        Q     That review board was the entity charged with
 7   investigating uses of force prior to when it was
 8   disbanded; is that correct?
 9        A     Yes.  If the chief would have deemed it
10   necessary.  The chief would call the review board to
11   investigate.  He would make that decision.
12        Q     Okay.  So prior to whenever the review board
13   was disbanded, the chief would make a decision about
14   whether an investigation into a use of force was
15   warranted, correct?
16        A     Correct.
17        Q     And if such an investigation was warranted,
18   the review board would conduct that investigation,
19   correct?
20        A     Yes.
21        Q     And who made up the review board?
22        A     A lieutenant, a sergeant, and a patrolman.
23        Q     Is there a reason that there were members of
24   all different ranks on the review board, as far as you
25   know?
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1       A    Just to -- to separate different experiences
 2   and viewpoints.
 3       Q    Okay.
 4       A    To give more diverse structure to the board.
 5       Q    Did that review board have policies governing
 6   its investigation of uses of force?
 7       A    I don't recall an actual policy for the review
 8   board.
 9       Q    Do you know whether they received training in
10   investigating uses of force?
11       A    It would've been the same training that --
12   investigating crimes.
13       Q    Okay.  And you said you don't know why it was
14   disbanded?
15       A    I don't.
16       Q    In 2014 or '15, when it was disbanded, what
17   replaced the conduct review board when it came to
18   investigating uses of force at the Greenwood Police
19   Department?
20       A    It would be the chief's discretion on who he
21   assigned.
22       Q    So the chief will assign someone to
23   investigate from the time the review board was disbanded
24   to the present, correct?
25       A    Correct.
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1        Q    Is the person who investigates always a deputy
 2   chief?
 3        A    Most often it is.
 4        Q    Are there times that you're aware of where use
 5   of force has been investigated by someone other than the
 6   conduct review board or a deputy chief?
 7        A    No.
 8        Q    Whether investigated by the conduct review
 9   board prior to the time it was disbanded, or by a deputy
10   chief, since, the chief of police has always had the
11   discretion to order an investigation into a use of force
12   or not, correct?
13        A    Yes.
14        Q    And is that in the chief's sole discretion?
15        A    Yes.
16        Q    Other than approving Use of force Reports when
17   you were a sergeant, did you have any other duties
18   relating to investigating uses of force as a sergeant?
19        A    No.
20        Q    When did you receive your next promotion at
21   the Greenwood Police Department?
22        A    In 2011.
23        Q    And what position were you promoted to?
24        A    Assistant Chief.
25        Q    Did you have to test for that position?
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1      A    No.  It's an appointed position.

 2      Q    Appointed by who?

 3      A    The mayor.

 4      Q    Does the mayor have any authority in Greenwood

 5  to review use of force investigations by the chief of

 6  police?

 7      A    I can't -- I -- the mayor could review the

 8  report.  I have never known -- I've worked under two

 9  mayors -- I've never seen that happen.

10           MS. SCHNEEMAN:  I just want you to read back

11      that last question, so I have it in my head.

12           COURT REPORTER:  Question and answer?

13           MS. SCHNEEMAN:  Just the question.

14       (REPORTER PLAYS BACK REQUESTED TESTIMONY)

15           MR. ART:  Thank you very much, I appreciate

16      it.

17           MS. SCHNEEMAN:  Thank you, I'm sorry to

18      interrupt.

19  BY MR. ART:

20      Q    All right.  In your experience with the

21  Greenwood Police Department, let's say the last ten

22  years, since you've been the sergeant, or higher rank,

23  have you ever known a mayor to review the chief of

24  police's investigation of uses of force in any way?

25      A    No.
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

```
 1       Q    Have you ever known the mayor to reach a
 2  conclusion about a use of force investigation different
 3  than the one reached by the chief of police?
 4       A    No.
 5       Q    Was it -- would it be fair to say that the
 6  chief of police is the final decision maker on
 7  investigations regarding use of force in the Greenwood
 8  Police Department?
 9       A    Yes.
10            MS. SCHNEEMAN:  I object to the form of the
11       question.  Go ahead.  That's okay.
12       Q    You said that prior to the review board being
13  disbanded, the chief would delegate the responsibility
14  to investigate to the board, correct?
15       A    Yes.
16       Q    And now he delegates it to deputy chiefs to do
17  an investigation for use of force, correct?
18       A    Since I have been the deputy chief, yes.
19       Q    Okay.  What about prior to your becoming the
20  deputy chief?
21       A    I have no knowledge of that.
22       Q    Got it.  Did you first become involved in
23  investigating uses of force when you became a deputy
24  chief?
25       A    Can you repeat that?
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 1:17-cv-01698-JPH-MJD   Document 125-54   Filed 08/13/18   Page 67 of 639 PageID #:
4746
The Deposition of GARRISON BATEMAN, taken on 01/23/18                     65

```
 1        Q      Did you first become involved in investigating
 2   uses of force in the Greenwood Police Department when
 3   you became a deputy chief?
 4            MS. SCHNEEMAN:  Objection.  Form of question.
 5        You mean as a department as opposed --
 6        Q      Let me strike it.  Did you have any personal
 7   experience yourself conducting investigations into use
 8   of force prior to the time that you were promoted to
 9   deputy chief?
10        A      Yes.  I mean, as a Road Supervisor, I would
11   have, like I said, reviewed the reports.  But to do a
12   thorough investigation like what's before me, no.
13        Q      Okay.  Prior to the Todero use of force
14   investigation, had you conducted a use of force
15   investigation?
16        A      No.
17        Q      Prior to the Todero use of force
18   investigation, are you aware of any use of force
19   investigation conducted by the Greenwood Police
20   Department?
21            MS. SCHNEEMAN:  Objection.  Form of question.
22        A      The last real use of force issue that I can
23   recall was around 2000, when we had an officer
24   terminated for excessive use of force.
25        Q      Okay.  Is that the last investigation into a
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1   use of force that you can recall prior to the Todero

 2   incident?

 3        A    That's the last one that I can recall.

 4        Q    Sure.  Okay.  You were appointed by the mayor

 5   in 2011 to be an assistant chief, correct?

 6        A    Yes.

 7        Q    Is that the rank directly below deputy chief?

 8        A    No.

 9        Q    Okay.  Is it a different rank now that doesn't

10   exist?

11        A    No.  It's the rank directly above deputy

12   chief.

13        Q    Okay.  When you were appointed assistant

14   chief, who were you assistant to?

15        A    Chief Rick McQueary.

16        Q    How long was Chief McQueary chief?

17        A    Nine months.

18        Q    Nine months.  Was he a member of the Greenwood

19   Police Department prior to becoming chief?

20        A    Yes.

21        Q    Who appointed him chief?

22        A    Mayor Charles Henderson.

23        Q    Okay.  And why was he only chief nine months?

24        A    Mayoral change.

25        Q    I see.  Were you and he appointed to the
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1   positions of chief and assistant chief by the same

 2   mayor?

 3        A    Yes.

 4        Q    And then that mayor was not re-elected?

 5        A    Correct.

 6        Q    And then the new mayor appointed a new chief

 7   and assistant chief?

 8        A    Yes.  And deputy chiefs.

 9        Q    Okay.  What year did that change occur?

10        A    2012.

11        Q    So is the assistant chief position term-

12   limited at all, or is it --

13        A    No.

14        Q    -- just by appointment?

15        A    Just by appointment.

16        Q    And you serve at the pleasure of the mayor?

17        A    Yes.

18        Q    Okay.  Same with the chief?

19        A    Yes.

20        Q    All right.  And what year did you say the

21   mayoral change was?

22        A    2012.

23        Q    And then what position did you obtain after

24   the change in city leadership?

25        A    I went back to being a sergeant.
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

The Deposition of OMICRON Baden Sept. 13/18 2 Page
68

```
 1        Q     And how long were you a sergeant, then?

 2        A     Until June of 2015.

 3        Q     And what promotion did you receive in June of

 4   2015?

 5        A     Deputy Chief.

 6        Q     Do you have to test for that promotion?

 7        A     No.  It's appointed.

 8        Q     Appointed by who?

 9        A     The mayor.  Which would be the new mayor, at

10   this point.

11        Q     Okay.  So there's another new mayor?

12        A     No.  The -- Mark Meyers.  Okay.  The current -

13   - the mayor that took office in 2012.

14        Q     Okay.  And he is currently the mayor of

15   Greenwood, correct?

16        A     Yes.

17        Q     When you went back to being a sergeant in

18   2012, were your duties just the same as they had been

19   when you were a sergeant prior to being appointed to

20   assistant chief?

21        A     Yes.

22        Q     When you were appointed deputy chief in 2015,

23   what were your responsibilities?

24        A     Uniform Division Commander.

25        Q     What does that mean?
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

THE DEPOSITION OF OFFICER ANTHONY Samm - April 13, 2018

69

```
 1        A    That I'm over all of the road patrol, the road

 2   officers, shift sergeants, lieutenants, K-9, and

 3   motorcycles.

 4        Q    So you are the person responsible for

 5   supervising the entire patrol operation of the Greenwood

 6   Police Department?

 7        A    Yes.

 8        Q    How many folks are below you when you're in

 9   that position in a shift?

10             MS. SCHNEEMAN:  Objection.  Vague.

11        Q    So when you're -- so just, describe to me

12   generally when you're on duty, supervising as a deputy

13   chief, how many people are you supervising?

14        A    Technically, I'm over -- in my division,

15   because the deputy chief is still -- even though I don't

16   give direct orders to detectives, they still --

17        Q    Report to you?

18        A    Well --

19        Q    You're up the chain of command?

20        A    Yeah.  Yeah.  So technically, I'm third in

21   command.

22        Q    Okay.

23        A    So, we have 64 officers.

24        Q    How many deputy chiefs work at the same time?

25        A    Two.
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1        Q     Two.  Okay.

 2        A     And --

 3        Q     Go ahead.

 4        A     -- not necessarily the same time, but we are

 5   lateral positions.

 6        Q     So there are two deputy chiefs; is that right?

 7        A     There are two deputy chiefs, one is over

 8   investigations, one is over the uniform division.

 9        Q     Okay.  The command staff, I thought you said

10   had -- so currently, you are a deputy chief, correct?

11        A     Yes.

12        Q     Is Roller a deputy chief?

13        A     Roller, yes.

14        Q     Roller?  What is his jurisdiction?

15        A     The whole city's his jurisdiction, but he is

16   over the investigators --

17        Q     Okay.

18        A     -- and the civilians.

19        Q     And then was Fillenwarth a deputy chief?

20        A     No.  He's an assistant chief.

21        Q     Got it.

22        A     He's second in command.

23        Q     Got it.  Have you always been the deputy chief

24   in charge of the uniform division?

25        A     Since 2015, yes.
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

```
 1        Q    And in that capacity, you have responsibility

 2   for investigation -- investigating uses of force,

 3   correct?

 4        A    If the chief assigns them to me, yes.

 5        Q    And since then you've only investigated one

 6   use of force, correct?

 7        A    Yes.

 8        Q    And you hold that rank today, correct, deputy

 9   chief?

10        A    Yes.

11        Q    Did you receive any taser training in the

12   Indiana Law Enforcement Academy?

13        A    No.  Can we --

14        Q    Is the -- yeah?

15             THE WITNESS:  Can we take a break?

16             MR. ART:  For sure.  Let's go off the record.

17                   (OFF THE RECORD)

18   BY MR. ART:

19        Q    Okay. I believe we ended with me asking

20   whether you received Taser training at the Indiana Law

21   Enforcement Academy.  Do you recall that question?

22        A    Yes.  And I have not.

23        Q    Okay.  Do you know whether taser training is

24   ever taught at the law enforcement academy?

25        A    I do not believe it is.
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1    Q    What training in use of force did you receive
2  at the Indiana Law Enforcement Academy?
3    A    Physical tactics.
4    Q    Describe that for me?
5    A    Pressure points, kick strikes, verbal de-
6  escalation.
7    Q    Do you learn a use-of-force continuum?
8    A    I did.
9    Q    Yeah.
10   A    I do not believe they teach it anymore.
11   Q    When you do your cadet training there, is that
12 the only training you do as a law enforcement officer at
13 the Indiana Law Enforcement Academy?
14   A    In regards to...
15   Q    Or do you do other trainings there --
16   A    Oh, yeah.
17   Q    -- as well?
18   A    They do several.  You do criminal law, traffic
19 law --
20   Q    Okay.
21   A    -- EVOC.  A --
22   Q    How often do you --
23   A    -- multitude of --
24   Q    Lots of training?
25   A    Yes.

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1        Q    How often do you go back there?

 2        A    You do not.

 3        Q    Right.  So you do one training at the start of

 4   your career there, correct?

 5        A    Right.

 6        Q    And it's multiple subjects, correct?

 7        A    Correct.

 8        Q    And then you don't go back there, correct?

 9        A    You do not go back.

10        Q    So is all other training that an officer goes

11   to the academy and comes to the Greenwood Police

12   Department, training that's provided by the Greenwood

13   Police Department?

14        A    No.  Not all of it.  But the required training

15   by the state is provided every year.  And that's usually

16   what we do in February.  We knock it all out in one day.

17        Q    Got it.  The Greenwood Police Department

18   provides training in February of each year, that's the

19   training required by the state of Indiana, correct?

20        A    Yes.

21        Q    Other than that training each year, and the

22   academy training at the start of their career, do

23   Greenwood police officers receive any other training?

24        A    Yes.  Most of it is elective training, or for

25   specialties.  But anything from SWAT, to interview
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1   techniques, leadership, there -- we could go on and on.
 2       Q    So there's that day of mandatory training each
 3   year, correct?
 4       A    Yes.
 5       Q    And then there's all kinds of elective
 6   training that you can take?
 7       A    Yes.  And we do firearms training once a
 8   month.
 9       Q    Okay.  Is the Taser training that you
10   described earlier part of the mandatory training?
11       A    Yes.
12       Q    So it's mandated by Indiana law, correct?
13       A    No.  But it is involved -- it is done on --
14   what we do -- the mandatory training.
15       Q    Got it.  So that is not mandatory training,
16   but it's done the same day?
17       A    Yes.
18       Q    Other than that training each year, is there
19   any other Taser training that officers at the Greenwood
20   Police Department receive?
21       A    No.
22       Q    And they haven't received any Taser training
23   in the Indiana Law Enforcement Academy, correct?
24       A    No.
25       Q    They received training on use of force tactics
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1   at the law enforcement academy --

2       A    Yes.

3       Q    -- correct?  And then you said that at the

4   time that you were at the law enforcement academy they

5   received training on use of force continuum, correct?

6       A    Yes.  And it's the Plus One theory where the

7   level of resistance, the officer can escalate one level

8   up from the level of resistance being provided.

9       Q    Do they teach that anymore?

10      A    No.  I don't believe they do.  I haven't been

11  back through the academy, but I have asked.  I was a

12  defensive tactics instructor for 13 years.

13      Q    Okay.

14      A    And in one of my trainings, one of the younger

15  guys that had just got out of the academy said, "You

16  know what?  They don't teach us that anymore."

17      Q    Really?  Do you know what they teach these

18  days?

19      A    I do not.

20      Q    Okay.  Other than the law enforcement academy,

21  the mandatory training each year, and electives that an

22  officer might take, is there any other training that's

23  provided to officers at the Greenwood Police Department?

24      A    No.

25      Q    Do you do training in use of body -- strike

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1   that, please.  Have officers at the Greenwood Police
 2   Department ever been trained in the use of body cameras?
 3        A    Yes.  Typically the way -- so our assistant
 4   chief, Matt Fillenwarth, is in charge of the Body-Worn
 5   Camera --
 6        Q    Okay.
 7        A    -- Program.  When he issues officers body-worn
 8   cameras, he --
 9        Q    Shows them how to use it?
10        A    -- shows them how to use it and goes over the
11   policy with them.
12        Q    Okay.  Do you have a written policy on that?
13        A    We do.
14        Q    Are they Axon cameras?
15        A    They are.
16        Q    When did the program get put in place?
17        A    I can give you an estimate, I don't know an
18   exact date.
19        Q    That's fine.
20        A    2014, '15.
21        Q    Okay.  Are there squad cameras in the
22   Greenwood Police Department?
23        A    No.
24        Q    When -- have you ever had squad cameras?
25        A    Yes.
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1        Q     When did you stop having squad cameras?

 2        A     I'm going to estimate it at 2009 or '10.

 3        Q     Okay.  Before the Todero incident?

 4        A     Yeah.  They were the old VHS that recorded in

 5   the trunk.

 6        Q     At any time after 2015 has any police car with

 7   the Greenwood Police Department had a squad car camera?

 8        A     No.

 9        Q     Do you know why that system is not used?

10        A     No.  We went to -- well, we went to the body-

11   worn cameras.  The old VHS, if you got too far away from

12   the car, it wouldn't even record the audio, but you --

13   it also wouldn't record the incident.  These new body-

14   worn cameras record a lot more, and they allow -- the

15   transmitter goes with the officers, so...

16        Q     So fair to say that the body camera program

17   that is currently in place sort of replaces the squad

18   car camera program?

19        A     Yes.

20        Q     All right.  What does the policy on body

21   cameras at the Greenwood Police Department say about

22   when they have to be turned on?

23        A     It gives a list of -- and I've got the policy

24   with me, if you'd like me to quote it.

25        Q     Just give me your general understanding.
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1        A     Anytime there's confrontation with a subject,
 2   traffic stops, arrests, field interviews.  But we also
 3   recognize that they cannot -- we don't expect the
 4   officers to turn them on in rapidly evolving, you know,
 5   we understand that situations may occur where the
 6   officer doesn't have time to turn it on.
 7        Q     Okay.  When an officer is responding to a call
 8   that has to do with a confrontation, would there be an
 9   expectation that they turn on the body camera?
10        A     Yes.
11        Q     Was it a violation of policy for officer
12   Elliot not to turn on her body camera when she responded
13   to the Todero call?
14        A     No.
15        Q     Why not?
16        A     Because at that time, her -- and that was
17   taken into consideration in my investigation -- however,
18   that camera was new to her, so she wasn't used to
19   wearing it, and it was a situation where she had to jump
20   out of the car and go hands-on immediately.  Therefore,
21   it fell into the clause that as soon as possible after
22   the situation was resolved, she -- she turned it on.
23        Q     Would you agree with me that at the time that
24   she was driving to the scene, she knew that she was
25   driving to a confrontation with a subject?
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

 1          A     Yes.

 2          Q     Did the policy call for her to turn on the

 3    camera while she was driving to the scene?

 4          A     No.

 5          Q     Why not?

 6          A     She was FTO-ing, so she had a rookie with her.

 7    I'm just telling you the reasons why I came to my

 8    conclusion.

 9          Q     Sure.

10          A     She had a rookie with her, she's trying to

11    mentor the younger officer, Elizabeth Laut.  While she's

12    driving, in an emergent state, she arrives at the scene

13    and finds a struggle.  So she immediately gets out, and

14    unfamiliar to her at the time, the camera's new to her.

15    I, as an administrator, would always want the officer to

16    err on safety, and officer safety prior to worrying

17    about activating that camera.

18          Q     Is it fair to say that policy about when you

19    turn on your body camera at the Greenwood Police

20    Department allows some room for discretion on the part

21    of the individual officer?

22          A     Yes.

23          Q     And in your view, Officer Elliot exercised

24    that discretion appropriately in this case, correct?

25                MS. SCHNEEMAN:  Objection.  Form of question.

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

                                                        502.589.2273 Phone
                                                        502.584.0119 Fax
                                                        schedule@kentuckianareporters.com
                                                        www.kentuckianareporters.com

```
 1        Q      Go ahead.

 2        A      Yes.

 3        Q      When -- would it have been preferable for

 4   Officer Elliot to turn her camera on while coming to the

 5   scene of the Todero incident?

 6        A      Yes.

 7        Q      Did -- does the Greenwood Police Department,-

 8   separate from the law enforcement academy, provide

 9   training in use of force?

10        A      Yes.

11        Q      What training?

12        A      We're required two hours per year by the

13   state.

14        Q      What's taught in that -- strike that, please.

15   Is that training given on the same day in February that

16   you've described previously?

17        A      Yes.

18             MS. SCHNEEMAN:  Yeah, you know what?  I missed

19        your first question.  You said does the Greenwood

20        Police Department or state of Indiana, sorry?

21             MR. ART:  The Greenwood Police Department --

22             MS. SCHNEEMAN:  Okay.

23             MR. ART:  -- separate from the state of

24        Indiana's --

25             MS. SCHNEEMAN:  Okay.  Got it.
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Transposition of Global Unhappened. Shapped 3/4, 2 Page

81

```
1              MR. ART:  -- Law Enforcement Academy --
2              MS. SCHNEEMAN:  Okay.
3              MR. ART:  -- provide training on use of force?
4         The answer was: there's a two hour --
5              MS. SCHNEEMAN:  Got it.
6              MR. ART:  -- requirement per year.
7  BY MR. ART:
8         Q    What's taught as part of that two-hour
9  requirement?
10        A    It varies.  That's at the discretion of the
11 instructor.  Typically it -- they go over use of force
12 policy, our GPD general order.  They go over
13 handcuffing, kicks, strikes, report writing at times.
14 But obviously there are a lot of areas to cover, and two
15 hours leaves a lot of discretion for what they're going
16 to cover in those two hours.
17        Q    Who designs that training?
18        A    The instructor.
19        Q    And who is the instructor on use of force?
20        A    We have three at this time.
21        Q    Who are they?
22        A    They are Randy Eck, Eric McElhaney, and
23 Brandon Cox.
24        Q    How long have they been the instructors?
25        A    Randy and Eric over 15 years.
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1        Q     Okay.

 2        A     And Brandon less than a year.

 3        Q     Okay.  But that subject has always been taught

 4   by officers Eck and -- is it McElhaney?

 5        A     McElhaney.

 6        Q     McElhaney. So, correct?

 7        A     I was a defensive tactics instructor from 2005

 8   until 2018.

 9        Q     Have you ever provided training to Officer

10   Blackwell about uses of force?

11        A     Probably.

12        Q     Not that you can recall?

13        A     I don't recall if he was in any of my classes

14   or not.

15        Q     Okay.  Is a use-of-force continuum taught

16   during two-hour training?

17        A     Yes.

18        Q     Is that taught every year?

19        A     No.

20        Q     Do you know when the last time it was taught

21   was?

22        A     I do not.

23        Q     Did you teach it every year when you were

24   teaching?

25        A     I would say yes.
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1        Q     Would you teach the same Plus One theory that
 2   you learned?
 3        A     Yes.
 4        Q     Describe that theory, just in general terms.
 5        A     In general terms, it's that the officer can
 6   escalate their use of force one step higher than the
 7   suspect's actions.
 8        Q     Okay.  In the situation where somebody is --
 9        A     Or level of resistance.
10        Q     -- okay.  In the situation where someone's
11   level of resistance is refusing to be handcuffed, what's
12   the permissible use of force based on that training?
13            MS. SCHNEEMAN:  Objection.  Incomplete
14        hypothetical.
15        Q     Go ahead.
16            MS. SCHNEEMAN:  Calls for speculation.
17        A     Refusing to be -- can you repeat it?  I'm
18   sorry.
19            MR. ART:  Yeah.  So according to that training
20        on the Plus One continuum, what's the permissible
21        use of force for someone who's refusing to be
22        handcuffed?
23            MS. SCHNEEMAN:  You mean just verbally
24        refusing?  Objection.  Vague.  Incomplete
25        hypothetical, word "refusing".
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1             MR. ART:  So suppose that the subject is just
 2       refusing to be handcuffed and doing nothing else?
 3             MS. SCHNEEMAN:  You mean orally?  Verbally?
 4             MR. ART:  Physically.
 5             MS. SCHNEEMAN:  Okay.  Physically, that's
 6       different.
 7       A    Physically refusing to be handcuffed, that --
 8  they could use an intermediate weapon if they are
 9  physically resisting.
10  BY MR. ART:
11       Q    When you say "intermediate weapon" what do you
12  mean?
13       A    They could use a ASP, baton, mace, pepper
14  spray, or the taser.
15       Q    Okay.  A taser is an intermediate weapon,
16  correct?
17       A    It was not considered an intermediate weapon
18  at the time.
19       Q    Why not?
20       A    It was one step below on our use of force
21  continuum.
22       Q    It was a step below the intermediate weapons?
23       A    Yeah.
24       Q    Okay.
25       A    But, yes, the taser could be used in the
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1  circumstance that you gave.

2       Q    Is it now considered an intermediate weapon?

3       A    Yes.

4       Q    Why?

5       A    Because that's what Taser has changed their

6  recommendations to.

7       Q    When did they change their recommendation?

8       A    I do not know.

9       Q    Do you know if it was before or after the

10 Todero tasing?

11      A    I believe it was after.  That would be a

12 question for our Taser instructors.

13      Q    Okay.  What's the level below Intermediate

14 Weapon on the use-of-force continuum that Greenwood

15 officers --

16      A    Hard empty hand, punches, kicks, strikes.

17      Q    And what's the level below that?

18      A    Soft empty hand.

19      Q    And what's the level below that?

20      A    Verbal.

21      Q    And is that the lowest level?

22      A    Yeah.  Or officer presence is the lowest

23 level.

24      Q    Okay.  What's the level above intermediate

25 weapon?

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1          A     Deadly force.

 2          Q     At the time of the Todero incident, was use of

 3   taser, to the best of your knowledge, at the

 4   intermediate level, or at the same level as closed-hand

 5   strikes?

 6          A     It would have been authorized at the same

 7   level as hard empty hand.

 8          Q     Hard empty hand?

 9          A     Yeah.  That's what it was classified as.

10   Verbal non-compliance, actually.  Turn around now.  The

11   officers were justified in using the taser.

12          Q     Okay.  Do you know whether in February of 2016

13   officers Laut, Elliot, and Lieutenant Blackwell received

14   training in the use of force continuum?

15          A     I do not.

16          Q     Do you know when the last time prior to the

17   Todero tasing those officers received training in the

18   use of force continuum?

19          A     I do not.

20          Q     Is it your understanding as of the present

21   day, that all Greenwood police have been trained at

22   least once in this use of force continuum?

23          A     No.  That wouldn't be correct.  We've hired

24   multiple officers in the past couple of years, and like

25   I said, the training is changing, because what we're
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1  being told is the academy has gotten away from it.

2  That's one reason why I didn't renew my certification. I

3  sent some of the younger guys that were new and fresh to

4  bring the new training into the department.

5      Q    Is it your understanding as you sit here today

6  that Lieutenant Blackwell has received training in the

7  use of force continuum from the Greenwood Police

8  Department?

9      A    Yes.

10      Q    Is it your understanding that he also would

11  have received that training at the Indiana Law

12  Enforcement Academy?

13      A    Most likely, yes.

14      Q    Given the time period that he was there,

15  correct?

16      A    Yes.

17      Q    Does the Greenwood Police Department provide

18  training on assisting civilians with mental health

19  issues?

20      A    Yes.

21      Q    How often?

22      A    February of every year.

23      Q    What training is provided in February of every

24  year?

25      A    I believe it's one hour's -- or, one-hour

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1  training on police and dealing with people with

2  disabilities.

3       Q    And what is the substance of that training?

4       A    Identifying different types of disabilities,

5  and how to best get cooperation from people with certain

6  types of disabilities, autism, blind, deaf.

7       Q    Does it teach about interactions with people

8  with mental health problems in particular separate from

9  disabilities?

10      A    It touches on -- on that.  But, no, not as --

11  not that I recall a specific --

12      Q    When you say "it touches on that" describe

13  what you mean.

14      A    Just observing the different characteristics

15  that people display with -- the training is actually

16  Police and People with Disabilities, so the mental

17  illness would be a disability.

18      Q    Okay.  Do they receive any particular training

19  about uses of force against individuals with

20  disabilities or mental health issues?

21      A    No.

22      Q    Are you aware of any training that any

23  Greenwood police officer has received on that subject?

24      A    No.

25      Q    Did the Greenwood police officers receive any

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1   training on conducting criminal investigations?
 2        A     Yes.
 3        Q     How often?
 4        A     Well, at the academy.
 5        Q     Okay.
 6        A     And then specialized training.  A lot of our
 7   officers go through interviewing courses, and road-side
 8   interdiction courses for narcotics, OWI interdiction,
 9   stuff like that.
10        Q     Have you gone through interviewing courses?
11        A     Yes.
12        Q     Have you gone through other courses in
13   conducting criminal investigations?
14        A     Just general -- general training.  Most of my
15   training has been in defensive tactics and leadership.
16        Q     Okay.  You said that in the two-hour use of
17   force training, Greenwood officers received training on
18   handcuffing, correct?
19        A     Yes.
20        Q     What does that training consist of?
21        A     Proper maintenance of handcuffs, proper
22   application, checking for a proper fit, double-locking.
23        Q     When you say "proper application", what do you
24   mean?
25        A     How to position the handcuffs to -- obviously,
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

The Deposition of DeWaun Cottongim, taken 06/26/18

```
 1   the most -- people often resist when that first handcuff
 2   is applied.  So getting them on quickly and correctly is
 3   important.  So speed of application, accuracy, different
 4   positions in which their handcuffs -- standing, prone,
 5   on their knees.
 6        Q    How often would you say that a subject resists
 7   handcuffs physically?  In what percentage of cases where
 8   you got to handcuff someone?
 9        A    I'm confused.  In which -- are you asking out
10   of the resisters how often do they resist?
11        Q    Well, the resisters all resist, right?
12        A    Right.
13        Q    So out of people that a police officer has to
14   put handcuffs on in the Greenwood Police Department, how
15   often do you encounter a resister?
16        A    I couldn't give an accurate -- I don't know
17   what that would be.
18        Q    Do officers need to be trained on how to do
19   deal with a person who's resisting handcuffs?
20        A    Oh, absolutely.  Yes.
21        Q    Okay.  Sorry.  Describe for us the training
22   that an officer receives on that subject?
23        A    Like I said, the -- if they're a high-risk of
24   -- for instance, felony stops where someone has
25   committed a felony, and you're getting them out of the
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

The Deposition of Officer John Laake, on 03/13/18

91

```
 1   vehicle, you always want that person laying prone on the
 2   ground, because that gives the officer the tactical
 3   advantage.  You want to approach from what we call the
 4   interview -- or, the number two-and-a-half position.  So
 5   the proper way to bring the wrist up and apply the cuff,
 6   the proper way to kneel on the back to immobilize them
 7   and get the other cuff, and then how to properly search
 8   them while they're cuffed.
 9        Q    Is that the training that officers in the
10   Greenwood Police Department receive for felony stops or
11   for all stops that require handcuffs?
12        A    No.  That would just be for felony-type high
13   risk stop.
14        Q    Okay.  What about for other stops requiring
15   handcuffs, what training do they receive?
16        A    Just general handcuffing?
17        Q    Yep.
18        A    How to approach.  The right, you know, the
19   right angle to approach.  How to apply and to apply
20   quickly, without causing injury to the wrist or them
21   being more uncomfortable than what handcuffs are.  To
22   check for proper fitting, it's a one-finger rule.  You
23   slide the finger in between the handcuff and the wrist.
24   And to double-lock them so that they don't tighten up on
25   the individual after they are cuffed.
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1        Q     Okay.  In the felony stop context, you said

 2   you want the subject to be prone on the ground.  What

 3   does that mean?

 4        A     Laying flat.

 5        Q     Okay.  And then you say you teach them how to

 6   apply the handcuffs?

 7        A     Yes.

 8        Q     How are they to apply the handcuffs in the

 9   felony context?

10        A     You would have the person -- they would be

11   looking away from you.  They would have their arms as

12   high as they could get them, palms facing up.  The

13   officer approaches from the two-and-a-half position,

14   from whichever direction they choose.  They would grab

15   the hand, bring the cuff into the wrist at the same time

16   you're bringing the wrist into the cuff.  Get that first

17   one applied.  You'd rotate the shoulder as to not

18   dislocate the shoulder.  Grab the other hand, apply that

19   cuff to perform your pat-down search.

20        Q     What are they taught to do in that context

21   when someone's refusing to give them their hands?

22        A     So the hands are under the body?

23        Q     Yep.

24        A     Well, then you would have to resort to other

25   options, which could be the taser.  You could tase them
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1  for compliance.  You could apply knee strikes.  You

2  could apply pressure points.

3      Q    Are Greenwood police officers trained that

4  they can use a Taser to get compliance so that they can

5  put handcuffs on a felony subject?

6      A    If the subject is physically resisting, yes.

7      Q    What about in the context of a non-felony

8  case?  Are Greenwood police officers trained that they

9  can use a taser to apply handcuffs in a non-felony case

10 where a person is physically resisting getting

11 handcuffs?

12     A    The type of crime committed is irrelevant to

13 our use of force.  It is the subject's actions that

14 determine what use of force is optional.  And yes, if

15 he's physically resisting and he's committed a

16 misdemeanor, the officer is authorized to use the taser.

17     Q    Okay.  So all Greenwood police officers are

18 authorized to use a Taser in a case where a person is

19 physically resisting handcuffs, correct?

20          MS. SCHNEEMAN:  Objection.  Form of question.

21     Q    Is there any limit to the number of times they

22 can use a Taser under that training?

23     A    No.

24     Q    Have you received any awards for your police

25 work?

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

```
 1        A     Yes.

 2        Q     How many awards?

 3        A     A lot.

 4        Q     Okay.  We'll skip them, but...

 5              MS. SCHNEEMAN:  No, I want to every one of

 6        them.

 7        Q     Okay.  You have experience doing criminal

 8   investigations, correct?

 9        A     Yes.

10        Q     Is it important in a criminal investigation to

11   identify and interview all witnesses?

12        A     Yes.

13        Q     Why?

14        A     To get as many accounts as possible.

15        Q     Do you do that in all of your criminal

16   investigations?

17        A     I try to.

18        Q     Do you expect other Greenwood police officers

19   to do that during criminal investigations?

20        A     Yes.

21        Q     Is it important during your criminal

22   investigation to identify all important documents?

23        A     Yes.

24        Q     Why?

25        A     To be thorough in your investigation.
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1       Q    Do you do that in all of your criminal

2  investigations?

3       A    Yes.

4       Q    And do you have that expectation of all

5  Greenwood police officers?

6       A    Yes.

7       Q    Is it important to keep an open mind and

8  explore all avenues that an investigation reveals during

9  a criminal investigation?

10      A    Yes.  You want to be objective.

11      Q    And why is that important?

12      A    As to come to the accurate and -- well, to do

13  your due diligence as an investigator to hear all the

14  facts and circumstances surrounding a case.  And come to

15  the most accurate conclusion.

16      Q    Do you apply that philosophy in all of your

17  criminal investigations?

18      A    Yes.

19      Q    And do you have the same expectation of other

20  Greenwood police officers conducting criminal

21  investigations?

22      A    Yes.

23      Q    Are you familiar with the concept of tunnel

24  vision?

25      A    Yes.

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

The Deposition of Officer Brian Stephan, 6/25/2013

96

```
1        Q     What does that term mean to you?
2        A     The narrowing of your vision, focusing on a
3   threat, the peripheral vision decreases by of about 70
4   percent, so you can't see what's left and right of you.
5        Q     Not to interrupt, but have you heard of that
6   concept in the context of criminal investigations?
7        A     Peripheral vision?
8        Q     No, no, no.  Tunnel vision.
9        A     Oh.  Tunnel vision. It's typically associated
10  with officers.
11       Q     Right.  So have you heard about it used in the
12  context where someone focuses on a suspect and develops
13  evidence supporting, you know, the arrest of that
14  subject to the exclusion of other potential subjects?
15  Have that term used that way before?
16       A     No.
17       Q     Is it important in a criminal investigation to
18  conduct follow-up interviews?
19             MS. SCHNEEMAN:  Objection.  Form of question.
20       A     If necessary.
21       Q     In what circumstances is that important?
22       A     If additional information comes to light that
23  you need to confirm or deny.
24       Q     Do you do that in your criminal
25  investigations?
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1        A     When necessary.

 2        Q     And do you have that expectation that

 3   Greenwood police officers would do it in their criminal

 4   investigations when necessary?

 5        A     Yes.

 6        Q     When you conduct interviews in a criminal

 7   investigation, is it important not to ask leading

 8   questions of witnesses?

 9        A     Yes.

10        Q     Do you know what I mean by "leading question"?

11        A     I do.

12        Q     Why is it important?

13        A     Because you -- you don't want to influence

14   their response.

15        Q     You would agree with me that it's important

16   not to suggest answers to questions to a witness,

17   correct?

18        A     Correct.

19        Q     You would agree with me that it's important to

20   ask open-ended questions that leads to the objective

21   discovery of evidence, correct?

22        A     I would -- I would say yes.  You need to be

23   objective in your questioning.  I mean, I -- I don't

24   know that I like the way that that was asked.

25        Q     Yeah.  I don't know if I like it, either.
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

98

```
 1              MS.  SCHNEEMAN:  Let's all agree we do not
 2         like it.
 3         Q    But, in any event, do you try to avoid leading
 4    questions when you conduct witness interviews in
 5    criminal investigations?
 6         A    I do.
 7         Q    And do you expect the same of Greenwood Police
 8    Department employees conducting such investigations?
 9         A    Yes.
10         Q    Is it important in criminal investigations to
11    avoid developing evidence that supports a conclusion
12    that you reach at the beginning of the investigation?
13              MS. SCHNEEMAN:  Objection.  Form of question
14         that he reaches conclusions at the beginning of an
15         investigation.
16    BY MR. ART:
17         Q    And I don't mean you in particular.  I mean is
18    it important -- an important concept in criminal
19    investigations that you don't attempt to develop
20    evidence supporting a particular theory?
21         A    I would say that you need to gather all the
22    facts and circumstances, and then come to your
23    conclusion.
24         Q    Okay.  And do you take that approach to
25    criminal investigations?
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1        A    Yes.

 2        Q    And do you have that expectation of all GPD

 3   officers?

 4        A    Yes.

 5        Q    Is there any difference in the techniques and

 6   approach you apply to a criminal investigation and those

 7   which you apply to a investigation of the use of force?

 8        A    Yes.

 9        Q    What are the differences?

10        A    The use of force would involve the officer

11   being questioned that was involved.  So we would have to

12   inform them of their Garrity Rights, which would not be

13   needed in a -- with a civilian.

14        Q    And I appreciate that the investigations are

15   going to have different -- sort of, they're going to

16   have different witnesses, and different procedures, and

17   that kind of thing.  But in terms of the way that you

18   interview witnesses, the way that you gather evidence,

19   the things that we've just discussed, is there any

20   difference between the way you approach a criminal

21   investigation and the way you approach an internal

22   investigation into the use of force?

23        A    No.

24        Q    The same concepts are important in both

25   contexts, correct?
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1        A     Yes.

 2        Q     I want to talk about your investigation of the

 3   Todero tasing, okay?

 4        A     Okay.

 5        Q     When did the investigation begin?

 6        A     June the 7.

 7        Q     Why did the investigation begin on that date?

 8        A     That is the day that Chief Laut came to me and

 9   informed me that he wanted me to do the investigation.

10        Q     Do you know why there was a delay between May

11   29 and June 7 of the start of that investigation?

12             MS. SCHNEEMAN:  Okay.  I'm going to object to

13        the form of the question.  Word "delay".

14        Q     Do you know that -- why there was a period of

15   time between May 29 and June 7 before the investigation

16   began?

17        A     When this incident occurred on the 29th, the

18   last update that I had received was that Mr. Todero had

19   been resuscitated and was stable.  We had not received a

20   complaint, and I had no reason to believe that the

21   officers acted improperly.  So, at that point, there was

22   -- there was nothing to prompt an investigation.

23   Sometime around June 7, it came to the attention of our

24   administration that the Toderos were -- that Charlie as

25   in intensive care, and that the Todero's were making
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1  claims that excessive force was used.  When I say "the
 2  Toderos" I believe it was Teresa.  So when the chief --
 3  when this was brought to his attention, he asked me to
 4  look into the use of force to the entire incident,
 5  actually.
 6      Q    Did the personnel of the Greenwood Police
 7  Department have an understanding that between May 29 and
 8  June 7, Charlie Todero had been taken out of intensive
 9  care at some point?
10          MS. SCHNEEMAN:  Objection.  Form of question.
11      "Personnel" vague.
12      Q    Did you have that understanding?
13      A    I did not.  I don't know that I ever knew that
14  he was in intensive care.  Like I said, the last update
15  that I got was that he had went into cardiac arrest but
16  was resuscitated, and I assumed was recovering fine.
17      Q    Is there something about learning that Charlie
18  Todero was in intensive care that prompted the internal
19  investigation?
20      A    I don't believe so.  I believe it was the
21  accusations that -- and I don't remember where they were
22  coming from --
23      Q    Okay.
24      A    -- but I know that there were some accusations
25  that had come to the attention of the chief.  That
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
1    Teresa Todero was claiming that the use of force was

2    excessive.

3         Q    Okay.  And were any of those accusations made

4    directly to you?

5         A    No.

6         Q    Did you learn them -- about all of them from

7    other people?

8         A    Yes.  I don't remember -- I know that there

9    was some media coverage, but I don't remember the dates.

10        Q    Okay.  Is it your understanding that the

11   investigation began because of those accusations?

12        A    Yes.

13        Q    All right.

14        A    There had not been a formal complaint.  No one

15   came in to fill out -- and I believe that the chief even

16   reached out to Teresa Todero when these accusations came

17   to light.  And my understanding that she would not give

18   a statement.

19        Q    Okay.  So the incident occurred on May 29,

20   2016, correct?

21        A    Yes.

22        Q    Officer Blackwell filed his Use of Force

23   Report the same day, correct?

24        A    I don't believe so.

25        Q    Okay.  Can you tell me what day he filed his
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

The Deposition of Steven Davis, taken April 3, 2018                    103

```
1    Use of Force Report?

2         A    This Use of Force Report was completed on May

3    the 30.

4         Q    Okay.  So he filed his Use of Force Report the

5    next day, correct?

6         A    Yes.

7         Q    That Use of Force Report did not, itself,

8    prompt an internal investigation, correct?

9         A    No.

10        Q    Had there been no complaint from the Todero

11   family, would there have been an internal investigation

12   of this tasing, as far as you know?

13        A    No.

14        Q    So the Use of Force Report alone would not

15   prompt such an investigation in the Greenwood Police

16   Department, correct?

17             MS. SCHNEEMAN:  Objection.  Form of question.

18        A    No, they did not.

19        Q    The complaint coming from the Todero family --

20   and I understand that you don't know how it came in --

21   to the best of your understanding, that is what prompted

22   the investigation, correct?

23        A    Correct.

24        Q    Is there any other factor that prompted the

25   investigation, other than the complaint from the Todero
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1    family?
 2            MS. SCHNEEMAN:  To his knowledge?
 3       Q    To your knowledge?
 4       A    No.
 5       Q    And for all questions, it's to your knowledge.
 6    So who assigned you to this investigation?
 7       A    Chief Laut.
 8       Q    What directions did he give you?
 9       A    I really didn't have any directions.  He asked
10    me to investigate it.
11       Q    Had you -- you said you'd never conducted a
12    use of force investigation before, correct?
13       A    I've conducted several conduct investigations,
14    complaints on officers.  But none that I can remember
15    use of force.
16       Q    Describe to me your recollection of the
17    conversation with Chief Laut where he assigned you to
18    this investigation, use of force.
19       A    I don't remember the conversation.
20       Q    Do you have any recollection of anything that
21    he said to you during that conversation?
22       A    I don't.
23       Q    Do you have any recollection of anything that
24    you said to him during that conversation?
25       A    I don't.
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1         Q    Did you ask him how to conduct a use of force
 2  investigation?
 3         A    No.  I was well aware of how to conduct an
 4  investigation.
 5         Q    And what made you well aware of how to conduct
 6  a use of force investigation at that time?
 7         A    Because it's no different -- as we've
 8  discussed in previous questions -- than conducting
 9  criminal investigations.
10         Q    Okay.  So you applied the same techniques as
11  you apply during a criminal investigation, correct?
12         A    Correct.
13         Q    And what was the purpose of that investigation
14  into the use of force, in your own words?
15         A    Purpose of the investigation into this tasing?
16         Q    Yep.
17         A    To find out if a violation of policy or the
18  law occurred if -- if there was an excessive use of
19  force.
20         Q    You were tasked with determining whether
21  Greenwood Police Department policies had been violated,
22  correct?
23         A    Correct.
24         Q    Or you understood that to be one of the
25  purposes of your investigation, correct?
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1        A     Correct.

 2        Q     And you also understood it to be a purpose of

 3   your investigation to determine whether the use of force

 4   was reasonable; is that fair to say?

 5        A     Yes.

 6        Q     Okay.  Were there any other purpose of your

 7   investigation, other than making those determinations?

 8        A     Well, I -- when I do these types of

 9   investigations, I'm looking for any violations of

10   policy.  It wasn't necessarily just use of force.

11        Q     Okay.  So any violation of GPD policy,

12   correct?

13        A     Right.

14        Q     And whether the use of force was reasonable,

15   correct?

16        A     Right.

17        Q     Other than those purposes, was there any other

18   purpose of your investigation?

19        A     No.

20        Q     What did you do to ensure that your

21   investigation served those purposes?

22        A     I interviewed all officers involved, the

23   witnesses, paramedic.  I spoke to the ER doctor via

24   telephone.

25        Q     You know what?  Let me take you -- let me take
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1   you through it, because my question was impossibly
 2   broad.
 3        A    Okay.
 4        Q    So let me -- we'll go step by step.  And I
 5   don't mean to interrupt.  Did anyone give you any
 6   instruction during your investigation about how to
 7   conduct your investigation?
 8        A    No.
 9        Q    Did anyone else participate in your
10   investigation?
11        A    No.
12        Q    And I mean, did anyone else from the Greenwood
13   Police Department participate as an investigator as part
14   of that investigation?  Did you know -- do you see what
15   I mean?
16        A    Yes.  Yes.
17        Q    Obviously other people were witnesses.
18        A    Sure.  Yes.  Detective -- well, Deputy Chief
19   Doug Roller, and Detective Patti Cummings  attended the
20   autopsy.
21        Q    Right.  So other than those two attending the
22   autopsy, did any other employee of the Greenwood Police
23   Department participate in your investigation as an
24   investigator?
25        A    No.
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

The Deposition of SIMEON CASEY, taken on April 19, 2017      108

```
 1        Q    Okay.  Is it fair to say that you made the
 2   decisions about what interviews to conduct?
 3        A    Yes.
 4        Q    And you made the decisions about what evidence
 5   to collect?
 6        A    Yes.
 7        Q    And you made the decision about what documents
 8   to collect?
 9        A    Yes.
10        Q    And you made the decision about what reports
11   to write?
12        A    Yes.
13        Q    And you made the decision about what findings
14   to reach?
15        A    Yes.
16        Q    Let's talk a little bit about the evidence
17   that you collected.  My first question was: do you have
18   a single file of the evidence that you've collected?
19        A    A single file?
20        Q    Do you have a file that contains all of the
21   documents you collected during your investigation?
22        A    Yes.  It would -- it would be documented in
23   the involvements in the case report.
24        Q    Okay.  Is the file sitting in front of you
25   your file on this investigation?
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 1:17-cv-01698-JPH-MJD   Document 125-54   Filed 08/13/18   Page 111 of 639 PageID #:
4790
The Deposition of Cameron Ison, taken on April 18, 2017
109

 1      A      Yes.

 2      Q      **Okay.**

 3             MS. SCHNEEMAN:  Did you want to take a break?

 4             MR. ART:  Yeah.  Can we take a break?  I got

 5      to think about what to do.

 6                      (OFF THE RECORD)

 7             MR. ART:  So we've marked as Exhibit 1 the

 8      binder that Deputy Chief Ison has brought to the

 9      deposition today, and we've agreed that the court

10      reporter will make a copy of that exhibit, and then

11      that copy will become the marked Exhibit number 1,

12      and the original will be returned to Deputy Chief

13      Ison.  That work for you?

14          (EXHIBIT 1 MARKED FOR IDENTIFICATION)

15             MS. SCHNEEMAN:  That does, yes.  Thank you.

16   BY MR. ART:

17      **Q      Okay.  Does this binder that's been marked as**

18   **Exhibit 1 contain all the documents that you gathered**

19   **during your investigation of the Todero tasing?**

20      A      That I gathered, yes.

21      **Q      Are there documents pertinent to your**

22   **investigation that you're aware of that are not in that**

23   **binder?**

24      A      No.

25      **Q      Obviously there's no physical evidence in the**

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
1   binder, correct?

2       A    Right.

3       Q    And there's no videos in the binder, correct?

4       A    No.

5       Q    And there's no audio recording in the binder,

6   correct?

7       A    No.

8       Q    Other than those pieces of physical evidence,

9   audio, and video, does the binder contain everything

10  that you relied upon in your investigation?

11      A    Yes.

12      Q    Does the binder contain everything that you

13  relied upon in reaching the -- your findings in this

14  case?

15      A    Yes.

16      Q    Did you collect the Taser as evidence in this

17  case?

18      A    I did.

19      Q    What kind of Taser was it?

20      A    It was a P26.

21      Q    X26?

22      A    X26P.

23      Q    X26P?

24      A    Yeah.

25      Q    How long had the Greenwood PD had the X26P in
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1   service prior to the incident?

 2        A    We bought them sporadically.  So I want to say

 3   somewhere in the area of 2010.  '09 or '10.

 4        Q    Was it the first model taser the department

 5   got?

 6        A    No.

 7        Q    What was before that?

 8        A    The X26.

 9        Q    Okay.  So the X26 got replaced by the X26P at

10   Greenwood, correct?

11        A    Yes.

12        Q    And the X26P got replaced by the X2, correct?

13        A    Yes.

14        Q    And you're still on the X2?

15        A    Yes.

16        Q    All right.  Why did you gather the taser as

17   evidence?

18        A    Because it was used in the incident.

19        Q    Who did you gather it from?

20        A    I did not gather it.

21        Q    Who gathered it?

22        A    Believe Lieutenant Blackwell put his own taser

23   into evidence.

24        Q    Why do you believe that?

25        A    I -- I don't have the entry log, but that
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1    would -- yeah.  I would have to have the property log to
 2    be able to tell you for certain, but...
 3         Q    And you don't have that here today, correct?
 4         A    I don't.
 5         Q    Okay.
 6         A    But it was entered on May 29.  I would be
 7    comfortable in saying it was Lieutenant Blackwell.
 8         Q    Fair enough.  So, Lieutenant Blackwell put his
 9    own taser into evidence on the date of the incident,
10    correct?
11         A    Correct.
12         Q    Was it put in an evidence locker like other
13    evidence in an investigation?
14         A    Yes.
15         Q    Were the wires put with the taser into
16    evidence?
17         A    I don't know.
18         Q    Was the cartridge put -- and, you know, I'm --
19    let me just be clear about this.  If you want to look at
20    something, you're totally welcome to, but it's also not
21    a test.
22         A    Okay.
23         Q    You know.
24         A    Yeah.
25         Q    I'm just trying to explore --
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1        A    Yes.  The cartridge was placed into evidence.

 2        Q    Okay.  So the gun was placed into evidence,

 3   the cartridge was --

 4            MS. SCHNEEMAN:  Okay.  Gun -- just taser. Just

 5        so we don't make it sound like --

 6        Q    -- the taser device was placed in evidence,

 7   the cartridge was placed in evidence, correct?

 8        A    Yes.

 9        Q    Do you know whether the wires were with the

10   cartridge?

11        A    I do not.

12        Q    Do you know whether the barbs were with the

13   cartridge?

14        A    The barbs were not.

15        Q    How do you know that the barbs were not with

16   the cartridge?

17        A    In the report, it states that the paramedics

18   removed one barb at the scene, I believe that was thrown

19   away.  And the second barb was removed at the hospital,

20   and I believe they discarded that.

21        Q    Okay.  When you say the barb at the scene was

22   thrown away, what do you mean?

23        A    I'm not certain that it was, but it wasn't

24   collected as evidence.

25        Q    Okay.  Do you know whether Lieutenant
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

The Deposition of CAMERON, taken 05/23/2017   114

```
 1    Blackwell collected it as evidence at the scene?

 2         A    I don't believe he did.

 3              MS. SCHNEEMAN:  You can see in the video

 4         exactly what happened with that.

 5              MR. ART:  I am not --

 6              MS. SCHNEEMAN:  Uh-huh.

 7              MR. ART:  -- here to hear testimony from

 8         counsel --

 9              MS. SCHNEEMAN:  Okay.

10              MR. ART:  -- about what happened on videos.

11              MS. SCHNEEMAN:  Well --

12              MR. ART:  Okay?  So

13              MS. SCHNEEMAN:  -- I just want to make it

14         clear --

15              MR. ART:  I mean, just to be totally clear,

16         don't interject that kind of thing during a

17         deposition. That's not responsive to any question.

18    BY MR. ART:

19         Q    So do you have any knowledge of whether

20    Lieutenant Blackwell collected that barb at the scene or

21    not?

22         A    I don't believe he did.

23         Q    And what gives -- what's the basis for your

24    belief?

25         A    The report.
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

The Deposition of Cameron Paten, taken 07/13/17   Page 115

```
 1        Q     Which report?

 2        A     Just a minute to refer, here.

 3        Q     Yeah.

 4        A     You know, I can't find it.  It may have been -

 5  - I'm certain that they were not collected.

 6        Q     Right.

 7        A     It may have been from the videos that I came

 8  to that conclusion.

 9        Q     Okay.  So let me break it down a little bit.

10  You're certain that the barbs are not in evidence today,

11  correct?

12        A     Correct.

13        Q     And that they were not in evidence during your

14  investigation, correct?

15        A     (NO VERBAL RESPONSE.)

16        Q     And it's your understanding that the barb that

17  was removed at the scene was not collected, correct?

18        A     Correct.

19        Q     And you testified earlier that you thought

20  that that was in a report, but you can't find it as

21  you're sitting here, correct?

22        A     Correct.

23        Q     And then you just testified that you may have

24  that understanding based on videos you reviewed,

25  correct?
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

```
 1       A    I may have.

 2       Q    The other barb, the one that was in Mr.

 3  Todero's back when he left the scene, is it your

 4  understanding that that was disposed of at the hospital?

 5       A    Yes.

 6       Q    What's that understanding based on?

 7       A    I know that it was removed at the hospital.

 8       Q    Okay.  So in -- so relating to the Taser

 9  device, the Taser device itself was put into evidence,

10  correct?

11       A    Yes.

12            MS. SCHNEEMAN:  Well, I'm not sure "evidence"

13       is the right -- put into the evidence room?

14       Q    You collect evidence, correct?

15       A    I submitted -- or, it was submitted to the

16  evidence room.

17       Q    Okay.  As was the cartridge, correct?

18       A    Yes.

19       Q    And did you say whether you knew one way or

20  another about the wires?

21       A    I don't know whether the wires were not.

22       Q    Okay.  Are employees of the Greenwood Police

23  Department who are trained in use of tasers trained to

24  collect the taser barbs and wires as evidence?

25       A    If possible.
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1        Q     And why are those things collected as
 2   evidence?
 3        A     Well, the taser barbs are biohazard, so they
 4   really don't matter.  We're trained to collect the
 5   cartridge, and the cartridge typically contains and
 6   disperses little -- it's, like, confetti that's marked
 7   with the taser information.  So typically what happens
 8   is the officer will roll the wires up around the
 9   cartridge and submit the cartridge.  Occasionally, the
10   wires will go inside the empty taser, if applicable. But
11   the -- I don't -- there are also biohazard risks.
12        Q     Are you familiar with Taser training materials
13   that state that the barbs should be collected and put in
14   the two empty holes in the top of the cartridge?
15        A     Not specifically, no.
16        Q     Okay.  Is that something that Greenwood police
17   officers have ever received training in?  Doing that in
18   particular?
19        A     We must have, because I know I've done it
20   several times.  But I'm not a Taser instructor.
21        Q     Okay.  Did you collect footage from body
22   cameras as part of your investigation?
23        A     Yes.
24        Q     Did you -- were you the person who actually
25   downloaded that video?
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1        A     I don't believe so.  It was probably Assistant

2    Chief Fillenwarth.

3        **Q     Okay.**

4        A     There would be a video log of that.

5        **Q     Were all of the videos that existed**

6    **downloaded?**

7        A     Yes.

8        **Q     Was Lieutenant Blackwell wearing a body camera**

9    **on that day?**

10       A     He was not.  He's not issued on.

11       **Q     Was there a camera in his car on that day?**

12       A     No.

13       **Q     Was there a camera in Officer Eck's car?**

14       A     No.

15       **Q     Was there a camera in Officer Elliot's car?**

16       A     No.

17       **Q     Did you collect any other footage of the**

18   **incident, other than the one file of Eck's body camera**

19   **and the three files of Elliot's body camera?**

20       A     No.

21       **Q     So those four files are all of the video of**

22   **the incident that exists, correct?**

23       A     Correct.

24       **Q     Did you collect 911 calls?**

25       A     I did.

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 1:17-cv-01698-JPH-MJD   Document 125-54   Filed 08/13/18   Page 121 of 639 PageID #:
4800
The Deposition of Cameron Faulkner, taken 04/25/18                                          119

```
1        Q      Did you collect those from the Johnson County

2   dispatch?

3        A      Yes.

4        Q      You collected two 911 calls, correct?

5        A      Yes.

6        Q      Were there any other 911 calls?

7        A      No.

8        Q      Relating to this incident?

9        A      No.

10        Q      Did you collect the radio traffic?

11        A      Yes.

12        Q      You collected radio traffic from the period in

13   time that the call went out regarding Charlie Todero,

14   correct?

15        A      Correct.

16        Q      Was that audio the first mention over the

17   radio of anything relating to the Charles Todero

18   incident?

19        A      Yes.

20        Q      And then did you collect audio from that point

21   until the last mention of anything on the radio relating

22   to the Charlie Todero incident?

23        A      Yes.

24        Q      And that is the audio file you've produced in

25   this case --
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 1:17-cv-01698-JPH-MJD   Document 125-54   Filed 08/13/18   Page 122 of 639 PageID #:
4801
Video Deposition of James Sowders, taken 04-25-2017   Page 120

```
 1        A     Yes.

 2        Q     -- correct?  Okay.  Is there any other radio

 3   traffic concerning the Todero incident that exists?

 4        A     No.

 5        Q     Or that existed at any point in time?

 6        A     No.

 7        Q     Other than what we've discussed, did you

 8   collect any other physical video or audio evidence in

 9   this case?

10        A     No.

11        Q     Did you collect any of Charles Todero's

12   clothing?

13        A     Well, the -- going back to your previous

14   question, the video, including the video recordings of

15   the interviews?

16        Q     Correct.  Sorry.

17        A     Okay.

18        Q     Yes.  You did interviews, correct?

19        A     Correct.

20        Q     You videotaped those interviews, correct?

21        A     Correct.

22        Q     And those videos are also part of your file --

23        A     Yes.

24        Q     -- correct?  Any other physical evidence?

25        A     The personal belongings that were taken by --
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1    or, they weren't taken, they were located -- that

2    Charlie Todero had left at the Vineyard Church.

3        Q    Anything else?

4        A    No.

5        Q    Did you collect any of Charles Todero's

6    clothing?

7        A    No.

8        Q    Why not?

9        A    Because at the time, I had no reason to.  I

10   had not launched an investigation.

11       Q    Did you attempt to collect any clothing when

12   the investigation did launch on June 7, 2016?

13       A    No.

14       Q    Why not?

15       A    I didn't deem it to be a necessary part of the

16   investigation.

17       Q    Why not?

18       A    I don't see that it held any evidentiary

19   value.  We had Charlie and his clothing on video.

20       Q    Okay.  Did you collect any -- strike that,

21   please.  Did you make any attempt to collect any blood

22   from Charlie Todero for testing?

23       A    No.

24       Q    Why not?

25       A    Wouldn't -- I wouldn't have been able to.

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1        Q    Why is that?

 2        A    Because I initiated the investigation on

 3   June 7.

 4        Q    He was still living at that time, correct?

 5        A    Correct.

 6        Q    You could have collected blood from him?

 7        A    There wasn't -- oh.  Well, I see what you're

 8   saying.  There wasn't a need for me to.  The hospital

 9   had already collected the blood.

10        Q    Did you make any attempt to secure that blood

11   that the hospital had already collected?

12        A    It would be records, not blood.

13        Q    Tell me what you mean?

14        A    They wouldn't have kept the blood.  It would

15   be the records of the results that they ran.

16        Q    Okay.  Did you collect hospital records as

17   part of your investigation?

18        A    I collected EMS records and autopsy records.

19        Q    Okay.  And we'll get to the documentary

20   evidence in a second, but going back to the blood, are

21   you aware that at some point in time the hospital

22   disposed of the blood that was taken from Charlie Todero

23   at his intake at the emergency room?

24        A    I have no idea when they disposed of --

25        Q    Okay.
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 1:17-cv-01698-JPH-MJD   Document 125-54   Filed 08/13/18   Page 125 of 639 PageID #:
4804
The Deposition of Cameron, taken on April 6, 2017    123

```
 1      A    -- any blood that was taken.
 2      Q    Did you ever make inquiry into whether that
 3 blood was available for testing?
 4      A    No.
 5      Q    All right.  I want to talk to you about how
 6 you went about identifying the witnesses.
 7      A    Okay.
 8      Q    So the first question is: how did you go
 9 about, you know -- strike that, please.  When you were
10 assigned this first on June 7, how did you go about
11 identifying what witnesses you needed to interview?
12      A    Well, I started with the 911 calls.  And the
13 two people that made the 911 calls: Deborah MacNaughton
14 and Robert Poynter -- or, Roger Poynter.  So I
15 interviewed them.  Ian Godfrey,  because he was the
16 medic with most control, and the ambulance.  I attempted
17 to interview Dr. Hartman, and he would only speak with
18 me over the phone because the hospital does not allow
19 him to give official interviews.
20      Q    So we're going to get into your interactions
21 with these.
22      A    Okay.
23      Q    But in terms of just how did you identify all
24 of the witnesses you need to interview?  Like, what
25 process did you go through to determine who you wanted
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

 1   to interview?

 2      A    Basically, everyone that was involved.  From -

 3   - and some of these individuals came to my knowledge

 4   well after the fact.  Charles Moyer, the reserve

 5   officer, I did not know he had any contact with -- there

 6   was not -- there wasn't a case pulled, it was simply he

 7   was working off-duty for the Vineyard Church and came

 8   into contact with Charlie and asked him to leave.

 9      Q    Right.

10      A    And then, once I became aware of that

11   incident, I wanted to speak with Jeanne Moore and her

12   husband.

13      Q    Okay.  So did you begin by identifying as

14   witnesses everyone who had been at the scene?

15      A    Yes.

16      Q    Okay.  Did you consider the people who --

17      A    Not everyone.  I did not interview all

18   firefighters and paramedics who were at the scene.

19      Q    Did you consider all the people at the scene

20   to be witnesses to this incident?

21      A    Certain parts of the incident, yes, because

22   they arrived at different times.

23      Q    Okay.  What about people at the hospital, did

24   you consider them to be witnesses to the incident who

25   had information pertinent to your investigation?

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1        A    The ER doctor, yes.

 2        Q    Just the ER doctor?

 3        A    Yes.  I started with him, and I was informed

 4   that they would not be allowed to do a -- to speak with

 5   me.

 6        Q    Is the fact that you were informed by him that

 7   they were not allowed to speak with you the reason you

 8   didn't interview anyone else at the hospital as well?

 9        A    Yeah.  That -- my -- my attempts at

10   interviewing hospital staff stopped right there.

11        Q    Did -- have you had a situation like that

12   where a medical personnel has said, "I can't be a

13   witness in your criminal investigation --

14        A    No.

15        Q    -- because of our legal department?"

16             MS. SCHNEEMAN:  Objection.  This wasn't a

17        criminal investigation.

18        Q    Sorry.  Your investigation?

19        A    No.

20        Q    Did you say to Dr. Hartman, "We're the police,

21   come in for an interview?"

22        A    I don't think I can force him to do that.

23        Q    Why not?

24        A    Well, I would probably have to have a court

25   order for him to give an interview against his will.
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1    Q    Why do you think that you would need a court

2  order to interview a doctor about a treatment that they

3  provided?

4    A    Well, I don't -- I can't physically force him.

5  If he's not going to speak to me, I don't --

6    Q    What is the extent of your police power to

7  interview witnesses?  Do you -- can you only interview

8  witnesses who volunteer to interview with you?

9    A    Yes.  Without a court order for them to be

10 ordered to speak.

11   Q    Did you seek any assistance in getting

12 personnel from St. Francis to speak with you in

13 connection with your investigation?

14   A    I'm sorry, what?

15   Q    Did you seek any assistance from a court or

16 anyone else to get -- to compel Dr. Hartman or others

17 from St. Francis --

18   A    No.

19   Q    -- to speak with you?

20   A    No.

21   Q    Why not?

22   A    I -- at the time, I believed that the medical

23 records and autopsy report would be sufficient.

24   Q    Why did you believe those would be sufficient?

25   A    Because I'd already -- regardless of his

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 1:17-cv-01698-JPH-MJD   Document 125-54   Filed 08/13/18   Page 129 of 639 PageID #:
4808
The Deposition of SIMEON ELLINGTON, taken 07/18/17    127

```
 1   willingness to come in for a formal interview, I had
 2   video recording of Dr. Hartman interacting with officers
 3   upon their arrival and stating to the officers his
 4   medical opinion that the tasing had nothing to do with
 5   Todero going into cardiac arrest.  And our phone call on
 6   the 15th, he reassured me that there were so many
 7   medical problems that he had, that he was certain that
 8   the taser had nothing to do with Charlie Todero's death.
 9        Q    Do you have any understanding, as you sit
10   here, of how long Dr. Hartman interacted with Charlie
11   Todero once he was taken to the hospital?
12        A    I don't, other than what the video shows when
13   the officers were in the ER.
14        Q    Did you do any investigation to find out what
15   other doctors and medical personnel interacted with
16   Charlie Todero between the date of the incident and the
17   day that he died?
18        A    No.  That would all be in the medical reports.
19        Q    Okay.  Did you gather those medical reports?
20        A    I -- yeah.  I got the --
21        Q    Let me ask that question a different way so
22   that you don't have to try to describe what you have
23   there.  Are all the medical reports that you gathered
24   from St. Francis Hospital in connection with your
25   investigation in what's been marked as Exhibit 1?
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

 1         A    The only medical reports that I gathered were

 2    the EMS reports.

 3         Q    Okay.  Did you gather any hospital records

 4    from St. Francis during your investigation?

 5         A    No.

 6         Q    Why not?

 7         A    I -- I didn't feel that it was relevant with

 8    the information that I had already received.

 9         Q    Why wasn't it relevant -- Charles Todero's

10    course of treatment, from May 29 to when he died on June

11    11, why wasn't that relevant to your investigation?

12         A    The coroner's -- the coroner would have

13    gathered Charlie's hospital records, and it would have

14    went in the pathology -- would have went in the doctor's

15    notes that conducted the pathology.

16         Q    As you sit here today, do you know what

17    hospital records from St. Francis the coroner gathered

18    as part of the coroner's investigation?

19         A    I don't.  But he does list that "At the time

20    of the investigation, the hospital information

21    management system was not working for routine

22    maintenance.  As a result, a complete set of medical

23    records from date of admission could not be obtained."

24    And that's written by the deputy coroner.

25         Q    Right.

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 1:17-cv-01698-JPH-MJD   Document 125-54   Filed 08/13/18   Page 131 of 639 PageID #:
4810
The Deposition of CAMERON PERMENTER, taken 04/13/18
129

```
 1        A    Hospital staff stated that he was -- had
 2   hepatitis C and marijuana use.  According to hospital
 3   staff, his urinalysis on the date of admission showed
 4   marijuana in his system.  From what they interviewed the
 5   hospital staff.
 6        Q    So back to my question was: did you consider
 7   Charlie Todero's course of treatment between the date of
 8   the incident and the date that he died in the hospital
 9   to be relevant to your investigation?
10        A    The information that I obtained from the
11   doctor, yes.
12        Q    Okay.
13        A    I did not get -- what you're asking is gather
14   the medical report from the hospital, I did not do that.
15        Q    And so, I guess my question is why didn't you
16   do take that step in your investigation?
17        A    I'm not a medical doctor.  I just didn't see
18   it to be relevant.
19        Q    Right.  But what is the reason that you didn't
20   think it was relevant?
21        A    Because I had statement -- video recording of
22   the doctor telling me that he was suffering from
23   acidosis, hepatitis C.  I had a phone conversation with
24   the doctor, and quite honestly, the hospital wasn't
25   playing nice.
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 1:17-cv-01698-JPH-MJD   Document 125-54   Filed 08/13/18   Page 132 of 639 PageID #:
4811
The Deposition of Christon Lafferty, taken on April 13, 2018    130

1      Q    Okay.  So you couldn't get access to the

2    doctors, you thought, correct?

3      A    Correct.

4      Q    And you -- did you also think that you

5    couldn't get access to those medical records?

6      A    Oh, we could subpoena the medical records.

7      Q    Okay.  So you --

8      A    The system -- the system was -- was obviously

9    down, and they weren't available.

10     Q    If there was information in the medical

11   records that contradicted what the doctor had said to

12   your officers at the time that Charles Todero was

13   brought in, would that information be relevant to your

14   investigation?

15     A    Yes.

16     Q    Is there a reason that you didn't go and seek

17   information from the hospital to check what the doctor

18   had told you?

19     A    I felt that I did attempt to seek.  And they -

20   - like I said, they were not allowing the physicians or

21   their staff to give statements.

22     Q    So let me try to wrap up this line of

23   questioning by asking you this: it's true that you

24   didn't collect medical records yourself from the

25   hospital, correct?

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
1        A    Correct.  Yes.

2        Q    It's also true that you didn't speak with any

3   medical personnel who treated Charlie except for Dr.

4   Hartman, correct?

5             MS. SCHNEEMAN:  Misstates the testimony,

6        ambulance got here.

7        Q    Okay.  So let me re-phrase the question.  It's

8   true that you didn't speak with any medical personnel at

9   St. Francis other than Dr. Hartman, correct?

10       A    Correct.

11       Q    And it's true that Dr. Hartman said that he

12  wouldn't be able to talk to you on advice of his

13  lawyers, correct?

14       A    Correct.

15       Q    And he provided you a little bit of additional

16  information during that phone call, correct?

17       A    Correct.

18       Q    But other than that, you didn't speak to any

19  medical personnel at St. Francis about the course of

20  Charlie Todero's treatment in the time between he -- the

21  tasing and his ultimate death, correct?

22       A    Correct.

23       Q    So as you sit here, you have no knowledge of

24  the symptoms he displayed during that time period at the

25  hospital, correct?
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1        A    Correct.

 2        Q    And you have no knowledge of the course of

 3   treatment he was provided at the hospital, correct?

 4        A    Correct.

 5        Q    And those symptoms and course of treatment

 6   during that time period did not inform the findings that

 7   you made in connection with your investigation into the

 8   tasing, correct?

 9        A    Can you repeat that?

10             MR. ART:  Can you read it back?  Very

11        complicated.

12             (REPORTER PLAYS BACK REQUESTED TESTIMONY)

13             MR. ART:  Can you hear it?  I'll read it.

14        Ready?

15             COURT REPORTER:  Yeah.

16   BY MR. ART:

17        Q    Did the symptoms that Charlie Todero was

18   displaying in the hospital in the time period between

19   the tasing and his ultimate death, or his course of

20   treatment at the hospital influence any finding that you

21   made during your investigation into the tasing?

22        A    Not other than the statement that Dr. Hartman

23   made, and that was in the coroner's report.

24        Q    Okay.  So the evidence -- the medical evidence

25   supporting -- strike that, please.  The medical evidence
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 1:17-cv-01698-JPH-MJD   Document 125-54   Filed 08/13/18   Page 135 of 639 PageID #:
4814
The Deposition of CAMERON, taken 06/25/2017   133

```
 1   that influenced your findings were the statements of Dr.
 2   Hartman, the evidence you obtained from the EMTs, and
 3   the evidence you obtained from the coroner, correct?
 4            MS. SCHNEEMAN:  Okay.  I'm going to object to
 5        the form of the question.  But, you can go ahead
 6        and answer to the extent you understand it.
 7        A    Yes.
 8   BY MR. ART:
 9        Q    I want to talk to you about the witnesses that
10   you identified as witnesses to this incident that had
11   interaction with Charlie before Lieutenant Blackwell
12   encountered him, okay?  So you've talked about the two
13   911 callers?
14        A    Uh-huh.
15        Q    And you identified those folks right away,
16   correct?
17        A    (No VERBAL RESPONSE.)
18        Q    And at some point, you became aware of
19   witnesses who had interacted with Charlie in the days
20   before the incident, correct?
21        A    Correct.
22        Q    Or hours and days before the incident?
23        A    Correct.
24        Q    How do you first become aware of such
25   witnesses?
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

The Deposition of Cameron Allen, taken 08/13/18    134

```
 1        A    Which ones, specifically?

 2        Q    Any of them?  What was the first witness you

 3   became aware of who had interacted with Charlie in the

 4   hours and days before Lieutenant Blackwell encountered

 5   him?

 6        A    I believe it was Trooper Cunningham.

 7        Q    Okay.  And how did Trooper Cunningham come to

 8   your attention?

 9        A    He is often at our police department.  And he

10   stopped by my office, and said, "Hey, I heard."  And I

11   don't know how he heard.  It may have been, like I said,

12   there was some media coverage.  But, "I thought you

13   ought to know that I dealt with Mr. Todero on the

14   Saturday before the incident occurred.

15        Q    Was that before or after Todero died?  If you

16   know.

17        A    Look at my timeline.  It would have been

18   after.  It was on June the 17.

19        Q    Okay.  And is that the first time that you

20   engaged with a witness who had interacted with Charlie

21   in the days or hours before Lieutenant Blackwell

22   encountered him?

23             MS. SCHNEEMAN:  You mean is that the first

24        person he interviewed?

25        A    No, I --
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 1:17-cv-01698-JPH-MJD  Document 125-54  Filed 08/13/18  Page 137 of 639 PageID #:
4816
The Deposition of SHANNON PATTON, taken April 3, 2017    135

```
 1              MS. SCHNEEMAN:  Objection.  Form of question,
 2       vague.
 3       Q      Go ahead.
 4       A      I'm sorry.  I interviewed Mr. Poynter.
 5       Q      Right.  Right.  I forgot about him.  Okay.
 6       A      The two 911 --
 7       Q      Yeah.
 8       A      -- Holly Walters, or Waters.
 9       Q      So, to be clear, Holly Walters --
10       A      Walters.
11       Q      -- interacted with Todero at the same time as
12  Blackwell, right?
13       A      Yes.
14       Q      She arrived at the scene after Blackwell,
15  correct?
16       A      Correct.
17       Q      Okay.  So put her to one side, all right?  And
18  then you have already testified you identified the two
19  911 callers and talked to them right away, correct?
20       A      Correct.
21       Q      As soon as the investigation started, correct?
22       A      Correct.
23       Q      All right.  Other than those folks, was
24  Trooper Cunningham the first person you spoke with in
25  connection with your investigation who had interacted
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1 with Charlie prior to his interaction with Lieutenant

2 Blackwell?

3      A    Yes.

4      Q    Okay.  Who was the next witness that came to

5 your attention from the period of time prior to

6 Charlie's encounter with Lieutenant Blackwell?

7      A    Charles Moyer.

8      Q    Okay.  Mr. Moyer is a reserve officer,

9 correct?

10      A    Yes.

11      Q    How did it -- how did you come to know that he

12 had knowledge about Charlie Todero?

13      A    He answered directly to Sergeant Holtzlieter,

14 and he informed Sergeant Holtzlieter of his interaction

15 with Todero around this -- around this date.  It was

16 June 19 that I spoke to Charles Moyer.

17      Q    Okay.

18      A    But I believe the same thing, it was when it

19 became a media issue that he -- it came to his

20 attention, and said, "I need to tell someone that I had

21 contact with him."

22      Q    Got it.  So is what happens, essentially,

23 there's a press conference, and then people learn that

24 this incident has happened, and then they report to you

25 that they had had interaction with Charlie?

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1              MS. SCHNEEMAN:  Objection.  Form of the
 2        question, "press conference."
 3        Q     The chief's press conference.  Is basically
 4   the event that causes these people to come forward who
 5   had interaction with Charlie before the tasing, that the
 6   chief has gone on television and made the public aware
 7   of this incident?
 8        A     I don't -- I don't know.  I truly don't know.
 9        Q     Fair enough.  Once Mr. Moyer came to your
10   attention, is that what brought the other folks at
11   Vineyard Church to your attention?
12        A     Yes.
13        Q     Okay.  Other than speaking with Cunningham and
14   Moyer, did -- was there any other witness you identified
15   who had had interaction with Charlie in the days or
16   hours before encountering Lieutenant Blackwell?
17        A     Just Jeanne Moore and her husband.
18        Q     And they are from Vineyard Church, correct?
19        A     Yes.
20        Q     Yeah.  So other than them, were there any
21   other witnesses that you identified from that period of
22   time?
23        A     Not that I spoke to, no.
24        Q     Okay.  Did you go searching for any other
25   witnesses?
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1        A    No.

 2        Q    All right.  Why not?

 3        A    The only other witnesses that would have been

 4   available to speak to are those people that came into

 5   contact with him at the Vineyard, which were multiple.

 6   So, quite honestly, I felt that Charles Moyer, Jeanne

 7   Moore, and her husband were sufficient, and that their

 8   statements were all pretty much identical.

 9        Q    Did you do any investigation into where

10   Charlie Todero had been before Trooper Cunningham

11   encountered him on the highway?

12        A    I don't know how I would have came to that

13   information.

14        Q    Did you consider the -- where Charlie had been

15   and what he had been doing prior to his encounter with

16   Blackwell to be important evidence in your

17   investigation?

18        A    Yes.

19        Q    Why was it important?

20        A    Because it establishes a pattern of events up

21   to what we could -- we could know from his encounter

22   with Trooper Cunningham being, you know, the trooper

23   stating that he was on 465, acting -- what you could

24   argue is delusional.  The same type of statements made

25   by those at the Vineyard Church and Charles Moyer, the
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1   clothing being disheveled, and ripped, and torn.  It was
 2   all showing a pattern of similar types of behavior that
 3   Lieutenant Blackwell encountered when he attempted to
 4   make contact with Charles Todero.
 5       Q    Was what Charlie Todero had been doing in the
 6   hours and days before his encounter with Lieutenant
 7   Blackwell relevant, in your view, to the question
 8   whether Blackwell's use of force was reasonable?
 9       A    No.  It puts in -- it paints the big picture.
10   It goes to the totality of the circumstances.
11       Q    Is it relevant as -- strike that, please.  Is
12   it fair to say that that information was relevant as
13   context and background from an investigative
14   perspective?
15       A    Yes.
16       Q    But that it didn't influence your evaluation
17   of whether Blackwell's use of force was reasonable?
18       A    It would help to establish the -- the state of
19   mind, so to speak, that the officer used to make his
20   determination to use force.
21       Q    Let me try -- let me get at it a different
22   way.  Would you agree with me that at the time that
23   officer Blackwell encountered Charlie Todero, the
24   information that he knew about Charlie Todero's state
25   was having heard on the radio that there was a white
```



Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

Case 1:17-cv-01698-JPH-MJD   Document 125-54   Filed 08/13/18   Page 142 of 639 PageID #:
4821
The Deposition of CAMERON, taken 08/13/18, Juan   140

```
 1   male trying to commit suicide in traffic?

 2              MS. SCHNEEMAN:  Objection.  Form of question.

 3        A    I --

 4        Q    So I guess my -- so let me ask the question

 5   again.  Would you agree with me that -- that what

 6   Officer Blackwell knew at the time that he encountered

 7   Charlie Todero was what he had heard over the radio

 8   traffic?

 9              MS. SCHNEEMAN:  Same objection.

10        A    That was --

11              MS. SCHNEEMAN:  Misstates the facts and

12        evidence.  You can go ahead.

13        A    Yes.  I mean, at the time, that would -- I

14   don't think he even knew it was Charlie Todero until he

15   arrived and recognized him.

16        Q    Right.

17        A    So that would be all the information that was

18   available to him.

19        Q    Right.  So he had -- strike that, please.

20   Lieutenant Blackwell hadn't heard the 911 calls himself,

21   correct?

22        A    No.

23        Q    Lieutenant Blackwell didn't know where Charlie

24   Todero had been in the hours before his encounter,

25   correct?
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1        A    Correct.

 2        Q    Didn't know he had been at the Vineyard Church

 3   the day before and the day of, correct?

 4        A    Correct.

 5        Q    He didn't know that Trooper Cunningham had

 6   found him on the highway, correct?

 7        A    Correct.

 8        Q    So none of that information was relevant to

 9   your evaluation of whether Blackwell was reasonable in

10   using force on May 29, correct?

11             MS. SCHNEEMAN:  Objection.  Form of question.

12        A    Blackwell's use of force would have been

13   independent upon his contact with Charles Todero at the

14   time of the incident and Charlie Todero's response.

15        Q    Because that's what Blackwell knew about at

16   the time of the incident, correct?

17        A    Correct.

18        Q    And so, when you're interviewing these

19   witnesses who had interacted with Charlie beforehand,

20   that was to understand what Charlie had been doing and

21   build context, correct?

22        A    Correct.

23        Q    And not to evaluate whether or not Blackwell

24   had properly used force, correct?

25        A    Correct.
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 1:17-cv-01698-JPH-MJD   Document 125-54   Filed 08/13/18   Page 144 of 639 PageID #:
4823
The Deposition of Cameron Craten, taken on April 4, 2018           142

```
1        Q     When it comes to the witnesses on the scene --
2   we've talked about this a little bit -- you said that
3   you considered everyone involved to be a witness,
4   correct?
5        A     Yes.
6        Q     And then you interviewed some witnesses but
7   not others, correct?
8        A     Correct.
9        Q     And is there a reason that you didn't
10  interview every single EMT who had interacted with
11  Charlie Todero?
12       A     Yes.
13       Q     What was that reason?
14       A     I didn't feel that there was a need to
15  interview every person on the scene, just as I didn't
16  feel there was a need to interview the 300 people in the
17  Vineyard Church that came into contact with Charlie
18  Todero.  I interviewed those who had the most contact
19  with him.
20       Q     Okay.  There were multiple paramedics
21  interacting with Charlie Todero at the same time as Ian
22  Godfrey, correct?
23       A     Correct.
24       Q     Wasn't it important to get each of their
25  accounts of what had happened?
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1        A    I don't believe so, no.  Because I -- the
 2   paramedics on -- Ian Godfrey was in the ambulance with
 3   him.  The paramedics on the scene, for the most part --
 4   in the video you can see their actions in the video.
 5        Q    Are you aware that Ian Godfrey stated in his
 6   interview with you and at the hospital that Charlie
 7   Todero was being extremely combative?
 8        A    Yes.
 9        Q    And that he was displaying super strength?
10        A    Yes.
11        Q    Did you see any extreme combativeness or super
12   strength on the video of the body cams that you
13   reviewed?
14        A    I saw him kicking his legs, but my
15   understanding in interviewing Ian Godfrey is the
16   majority of the combativeness occurred inside the
17   ambulance on the way to the hospital.
18        Q    Okay.  So you agree with me that in his
19   interview with you, Ian Godfrey said that Charlie Todero
20   was being extremely combative on the scene before he was
21   in the ambulance, correct?
22        A    He stated the he was kicking his legs.
23        Q    Okay.  Do you recall him saying he was being
24   extremely combative?
25        A    Well --
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1        Q    At the scene?

 2        A    I remember him saying he was kicking his legs,

 3   so they decided to tie his legs together with a bed

 4   sheet.

 5        Q    Right.  And you say you saw that on the video?

 6             MS. SCHNEEMAN:  No, that -- objection.

 7   Misstates the testimony.

 8        Q    Let me ask the question: did you -- viewing

 9   the body cam videos, did you see any kicking?

10        A    Yeah.  I saw him kicking his legs.  The other

11   -- and I have to say that the body camera was not always

12   fixed on Mr. Todero for me to see everything that Mr.

13   Godfrey saw at that time.

14        Q    Other than kicking his legs, did you -- and

15   don't worry about looking that up, because we're going

16   to get to it.  Other than kicking his legs, did you see

17   any other combativeness from Charlie Todero on any of

18   the body cam that you saw?

19        A    No.

20        Q    Would you agree with me that viewing the body

21   cam, you cannot see any evidence of extreme

22   combativeness?

23             MS. SCHNEEMAN:  Objection.  Form of question.

24   You can answer.

25        A    I -- I saw him moving and squirming.  I think
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 1:17-cv-01698-JPH-MJD   Document 125-54   Filed 08/13/18   Page 147 of 639 PageID #:
4826
The Deposition of CAMERON GODFREY, taken April 5, 2018                145

```
 1    that would be up to the people that were there to --
 2    you're asking me to --
 3         Q    I'm asking you your opinion, to be clear.
 4         A    Okay.
 5              MS. SCHNEEMAN:  You're asking him what he saw
 6         on the video?
 7         Q    And your opinion of whether that would
 8    constitute extreme combativeness.
 9         A    Okay.  I would -- I would say that it would
10    constitute combativeness.  I think the "extreme" is
11    going to be left up to those who said it.
12         Q    Okay.  If -- if the different EMTs had
13    different accounts of how combative Todero was at the
14    scene, wouldn't that be important to your investigation?
15         A    Yes.
16         Q    Did you ever learn whether the other EMTs had
17    accounts different than Mr. Godfrey's account?
18         A    No.
19         Q    If they -- I just asked you that question, I'm
20    not going to ask it again.  Okay.
21         A    Understand --
22         Q    Yeah.
23         A    -- I feel like I need to say this.  I wasn't
24    investigating what the EMT's did.  What I was
25    investigating was what happened up to the point that Mr.
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 1:17-cv-01698-JPH-MJD   Document 125-54   Filed 08/13/18   Page 148 of 639 PageID #:
4827
The Deposition of Cameron Baker, taken on April 25, 2018

146

1  Todero was taking -- taken in the ambulance.  So, what

2  the EMTs did and saw inside the ambulance, I have no way

3  of -- of knowing.

4       **Q     Let me ask you --**

5       A     Other than their -- other than their

6  statements.

7       **Q     So let me follow-up on that.  If Charlie**

8  **Todero was combative after the tasing ended, are you**

9  **saying that's not relevant to whether the use of force**

10 **was appropriate?**

11      A     The use of force was over at that time.

12      **Q     Right.  And so the question whether Charlie**

13 **Todero was being combative in the ambulance, you're**

14 **saying, is not relevant to whether that use of force in**

15 **the past was appropriate, correct?**

16      A     It's relevant to the investigation, but --

17 yeah.  But it's not relevant as to whether Lieutenant

18 Blackwell used excessive force.

19      **Q     Right.  And so what you're saying is --**

20      A     I think we're getting in a play on words here.

21      **Q     No, no, I'm not trying to get into a play on**

22 **words.  What I'm trying to understand is what's the**

23 **relevance in your investigation of Godfrey saying,**

24 **"Todero was being extremely combative in the ambulance?"**

25      A     Yes.  I think it confirms that he was in a

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 1:17-cv-01698-JPH-MJD   Document 125-54   Filed 08/13/18   Page 149 of 639 PageID #:
4828
The Deposition of CAMERON, taken 04/25/2018   147

```
 1   combative state.
 2       Q    Okay.  So it is relevant to showing that
 3   previously, before the body cams were on, Charlie Todero
 4   had been combative?
 5       A    I don't think Charlie Todero's combativeness
 6   in the ambulance has any effect on his combativeness
 7   with Lieutenant Blackwell.
 8       Q    Okay.
 9       A    Okay?
10       Q    So what the paramedics -- I'm sorry, go ahead.
11   I need to know.
12       A    So, yes.  I mean, those are two separate
13   incidents.
14       Q    Right.  And so what the paramedics observed
15   when they arrived on the scene after the use of force is
16   over isn't relevant to whether Blackwell was justified
17   in using force, correct?
18       A    Correct.
19       Q    Because he was experiencing something
20   different when he was using force, correct?
21            MS. SCHNEEMAN:  Well, objection.  Form of
22       question as to what exactly Blackwell was
23       experiencing.
24       Q    Let me ask it a different way, because I'm not
25   trying to ask unfair questions.  The thing that was
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 1:17-cv-01698-JPH-MJD   Document 125-54   Filed 08/13/18   Page 150 of 639 PageID #:
4829
The Deposition of Cameron Taken oct 03/15/17 Jun    148

1   important to the evaluation of whether Blackwell

2   appropriately used force is what Blackwell experienced,

3   correct?

4        A    Correct.

5        Q    And what the other officers who then arrived

6   experienced, correct?

7        A    Correct.

8        Q    Before the use of force ended, correct?

9        A    Correct.

10        Q    And what the paramedics saw after the use of

11   force ended was not relevant to the question of whether

12   Blackwell had used a force appropriately, correct?

13        A    Correct.  It wouldn't have -- it wouldn't

14   influence the investigation of Blackwell's use of force

15   one way or the other.

16        Q    And that's why you didn't feel the need to

17   interview all of the EMTs, right?

18        A    Like I said, I interviewed the EMT that had

19   the most direct contact with --

20        Q    Right.

21        A    -- and that was with him the entire time.

22        Q    How did you know that that was Godfrey?

23        A    Because I called the fire department and asked

24   the -- who was the EMT that treated him.

25        Q    Are all of the interviews that you did with

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 1:17-cv-01698-JPH-MJD   Document 125-54   Filed 08/13/18   Page 151 of 639 PageID #:
4830
The Deposition of Cameron Baker, taken 04.25.18   149

```
 1   witnesses memorialized in a report?

 2       A    Yes.

 3       Q    Okay.  Are all of the things that they said to

 4   you during the interviews that were pertinent to your

 5   investigation recorded in the reports that you wrote?

 6            MS. SCHNEEMAN:  Objection.  Form of question.

 7       Q    Let me ask it a different way.  Is there

 8   information that you were provided by witnesses during

 9   your investigation that was pertinent to the

10   investigation, but is not recorded in a police report?

11       A    No.  And they were all video recorded from

12   start to finish, so anything that would be left out of

13   the report would be video recorded.

14       Q    Okay.  So --

15       A    And available.

16       Q    -- sorry.  All the pertinent information that

17   you got from witnesses during your investigation is

18   either in a police report on a video recording --

19       A    Yes.

20       Q    -- correct?

21       A    Yes.

22       Q    Right.  You didn't videotape all the

23   interviews that you did, correct?

24       A    I didn't videotape my phone conversation with

25   Dr. Hartman.
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1        Q    Right.  Is that the only witness interview
 2   that you did that's not on videotape?
 3        A    Yes.
 4        Q    Okay.
 5        A    Or -- and the -- the conversations that I had
 6   with the coroner.
 7        Q    Okay.  So the conversations you had with the
 8   coroner, the conversations you had with Dr. Hartman are
 9   not video, correct?
10        A    Correct.
11        Q    Did you write reports about those
12   conversations?
13        A    (NO VERBAL RESPONSE.)
14        Q    Let me break it down:  did you write reports
15   about your conversations with Dr. Hartman?
16        A    Yes.
17        Q    Did that report contain everything pertinent
18   that he had told you during that conversation?
19        A    Yes.
20        Q    Did you write reports about your conversation
21   with the coroner?
22        A    I believe so.  I believe it's in my --
23        Q    Just have a quick look for me.
24        A    Okay.  You know what?  I think that's in e-
25   mail form.
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1      Q     Okay.  We'll get to that later.

2      A     Yeah.  I think that's an e-mail.

3      Q     Is your conversation with the coroner the only

4   conversation that's not either recorded in a police

5   report or on a video?  That you had with a witness who's

6   relevant to your investigation?

7      A     No.  Trooper Cunningham.  When he informed me

8   that he had encountered, and that's when I asked him to

9   produce a report.

10     Q     Okay.  So there's no report on your

11  conversation with Trooper Cunningham, correct?

12     A     Correct.

13     Q     There's no report on conversation --

14     A     Well, there is a report.  It's Trooper

15  Cunningham's --

16     Q     Incident report?

17     A     -- report.  Yeah.

18     Q     Right.  But so you didn't write a report on

19  your interaction with Trooper Cunningham, correct?

20     A     No.  Just -- I just documented that I spoke

21  with him and asked him to write --

22     Q     Okay.

23     A     -- a report.

24     Q     You didn't write a report on your conversation

25  with personnel at the coroner's office, correct?

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1       A    Correct.

 2       Q    Other than those conversations, is there any

 3   other witness interview you did during your

 4   investigation for which there is not a police report?

 5       A    No.

 6       Q    All right.  You recorded video interviews of

 7   Lieutenant Blackwell, correct?

 8       A    Yes.

 9       Q    And was that on June 13?

10       A    Yes.

11       Q    With Officer Eck, correct?  You recorded that

12   interview as well?

13       A    Yes.

14       Q    Is that also on June 13?

15       A    Yes.

16       Q    Is the same true for a videoed interview with

17   Officer Elliot?

18       A    Yes.

19       Q    Did you perform a video interview of Officer

20   Laut?

21       A    Yes.

22       Q    And that was on June 14, correct?

23       A    Yes.

24       Q    Did you perform a video interview with Ian

25   Godfrey?
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 1:17-cv-01698-JPH-MJD Document 125-54 Filed 08/13/18 Page 155 of 639 PageID #:
4834
video deposition of Cameron Taken of A.S. Perry Joan    153

```
 1        A    I did.

 2        Q    And that was June 8, correct?

 3        A    Yes.

 4        Q    Did you perform a video interview with Jeanne

 5   Moore?

 6        A    I did.

 7        Q    And that was on June 24, correct?

 8        A    Yes.

 9        Q    Did you perform a video interview with Terry

10   Moore?

11        A    Yes.

12        Q    And that was on June 24, correct?

13        A    Yes.

14        Q    Did you perform a video interview Deborah

15   MacNaughton?

16        A    I did.

17        Q    And that was on June 8, correct?

18        A    Yes.

19        Q    Same is true for Roger Poynter, correct?

20        A    Yes.

21        Q    Did you perform an interview -- video

22   interview of Holly Walters?

23        A    I did.

24        Q    And that was on June 16, correct?

25        A    Yes.
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 1:17-cv-01698-JPH-MJD   Document 125-54   Filed 08/13/18   Page 156 of 639 PageID #:
4835
The Deposition of Gumersindo Lopez, taken 04/25/17        154

```
 1        Q     Do you know why you waited until June 16 to

 2   interview her?

 3        A     I -- I don't remember.  I believe that she --

 4   I believe that she couldn't come in until June 16 due to

 5   her schedule.

 6        Q     Okay.  Did you perform a video interview with

 7   Charles Moyer?

 8        A     Yes.

 9        Q     And that was on June 22, correct?

10        A     No.  That was June 19.

11        Q     June 19.  Okay.  Have we now discussed all the

12   video interviews that you did?

13        A     Yes.

14              MR. ART:    All right.  Can we take a quick

15        break?

16                    (OFF THE RECORD)

17   BY MR. ART:

18        Q     So we left off and I have just made a list of

19   names -- which we've all forgotten, I'm sure -- of

20   people you did video interviews.  So I'm going to run

21   through the list one more time, okay?

22        A     Okay.

23        Q     And the list is -- for video interviews, is

24   Blackwell, Eck, Elliot, Laut, Godfrey, Jeanne Moore,

25   Terry Moore, Deborah MacNaughton, Roger Poynter, Holly
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1   Walters, and Charles Moyer?

 2       A    Yes.

 3       Q    Is that the complete list of folks that you

 4   did videotaped interviews with?

 5       A    Yes.

 6       Q    And then in addition to those folks, you had

 7   some discussion with Dr. Hartman, correct?

 8       A    Right.

 9       Q    And you had a report about that, correct?

10       A    Yes.

11       Q    You had some discussion with ISP Trooper

12   Cunningham, correct?

13       A    Yes.

14       Q    And he wrote a report about that, correct?

15       A    Yes.

16       Q    And then you had some discussion with

17   personnel at the coroner's office, correct?

18       A    Yes.

19       Q    And are those witnesses all of the witnesses

20   that you interviewed during your investigation?

21       A    Yes.

22       Q    For the ones that you did not video, did you

23   have any discussion with them about the Todero tasing

24   incident, or Charlie Todero prior to beginning the video

25   interviewing?
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1      A    No.
 2      Q    So when we're watching the videos of those
 3  interviews, we are seeing all of the questions and
 4  answers from those interviews --
 5      A    Yes.
 6      Q    -- correct?  And you did not pre-interview any
 7  of those witnesses, correct?
 8      A    No.
 9      Q    And then after the video ended, did you do any
10  follow-up interview with any of those witnesses?
11      A    I did not.
12      Q    Terrific.  All right.  Are there any other
13  witnesses that you've interviewed other than that what
14  you've testified about already during your
15  investigation?
16      A    No.
17      Q    Other than the EMTs that you didn't interview,
18  are there any other witnesses to the tasing itself who
19  were at the scene that you're aware of?
20      A    I think I -- I think I interviewed the only
21  EMT.  You mean the firefighters that were on the scene?
22           MS. SCHNEEMAN:  I think the purpose --
23           MR. ART:  Yeah.
24           MS. SCHNEEMAN:  -- is in clarification.  I
25      think we're getting confused --
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 1:17-cv-01698-JPH-MJD   Document 125-54   Filed 08/13/18   Page 159 of 639 PageID #:
4838
The Deposition of Sarah Simeson, taken August 16, 2016                                    157

```
 1              MR. ART:  Yes.

 2              MS. SCHNEEMAN: -- between EMTs and a

 3       paramedic.

 4   BY MR. ART:

 5       Q    Okay.  Tell me the difference, so I know.

 6       A    Well, I truly don't know.

 7       Q    Okay.

 8       A    But I know that Ian Godfrey was the EMT that I

 9   interviewed.  Most of those individuals there, I

10   believe, were firefighters.

11       Q    They were firefighters?

12       A    Yeah.

13       Q    Okay.  Okay.

14       A    Maybe they have some EMT training.  I don't

15   know.

16       Q    So I'm going to say EMT and fire, right, for

17   all the people at the scene who are not police officers

18   or Holly Walters, okay?

19       A    Okay.

20       Q    So other than the folks that you've testified

21   about already, and the EMT and fire department personnel

22   who you didn't interview, are you aware of any other

23   witnesses to the Todero tasing itself?

24              MS. SCHNEEMAN:  Oh, well, you mean "the

25       incident."
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 1:17-cv-01698-JPH-MJD   Document 125-54   Filed 08/13/18   Page 160 of 639 PageID #:
4839
The Deposition of Cameron Bragg, taken 04/25/18                      158

```
 1        Q     The incident at Madison Avenue on May 29?

 2        A     No.

 3        Q     Okay.  Have you spoken with any experts on the

 4   function of Taser in connection with your investigation?

 5        A     Yes.

 6        Q     Who have you spoken with?

 7        A     Truthfully, I do not know her name.  I was at

 8   the Force Science Institute in Chicago for training last

 9   year.  And we had a -- well, this would have been March

10   of 2017.

11        Q     Okay.

12        A     There was an expert doctor from Vancouver that

13   talked about excited delirium.  And after it was over, I

14   ran this situation by -- this incident by her, and

15   obviously she, just word of mouth, what I'm telling her,

16   she didn't review the report.  But she said that she

17   felt that it sounded like excited delirium.  That's the

18   extent of which I've talked to an expert.

19        Q     Did you make any finding that Charles Todero

20   was suffering from excited delirium?

21        A     No.  No.

22        Q     Okay.

23        A     This was a mutual conversation between one of

24   the instructors and myself.

25        Q     You have any belief today that Charlie Todero
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 1:17-cv-01698-JPH-MJD   Document 125-54   Filed 08/13/18   Page 161 of 639 PageID #:
4840
The Deposition of CAMERON, taken on April 24, 2017    159

```
 1    was suffering from excited delirium on May 29, 2016?

 2         A    I'm not qualified to answer that.

 3         Q    Okay.  Did you collect any evidence that he

 4    was suffering from a condition called excited delirium

 5    during your investigation?

 6         A    No.

 7         Q    Do you have an understanding of what excited

 8    delirium is?

 9         A    I've got an understanding.

10         Q    What's your understanding?

11         A    It's usually a case of psychosis that is

12    brought on by either a metabolic or drug-induced

13    chemical reaction in the body.  And it causes a person

14    to display extreme strength, erratic behavior, and

15    delusions.

16         Q    Is your knowledge of excited delirium based on

17    information that you learned from the doctor from

18    Vancouver?

19         A    Yes.

20         Q    Was she giving a talk on excited delirium at

21    this conference?

22         A    Yes.

23         Q    What was the conference?

24         A    It was the Force Science Institute.  It's --

25         Q    Fourth Science?
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1       A     Force Science Institute.

2       **Q     And it was in March of 2017?**

3       A     Yeah.

4       **Q     Did you ask this doctor from Vancouver to**

5     **review any of the evidence?**

6       A     I did not, no.

7       **Q     Did you ask -- did she review any video in the**

8     **case?**

9       A     No.

10      **Q     So you gave her an account, correct?**

11      A     Yes.

12      **Q     And she gave you an opinion, correct?**

13      A     I don't know that I would even call it an

14    opinion.  It was -- yes, sounds that many elements

15    exist.

16      **Q     Okay.  Other than saying "many elements exist"**

17    **--**

18      A     This had no bearing, by the way.  The report

19    was done way before this.  This was a mutual

20    conversation.

21      **Q     Appreciate that.  Other than saying that**

22    **elements of excited delirium existed, anything else that**

23    **she told you after you explained the Todero incident to**

24    **her?**

25      A     No.

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 1:17-cv-01698-JPH-MJD   Document 125-54   Filed 08/13/18   Page 163 of 639 PageID #:
4842
The Deposition of CAMERON TAKEN, Taken on 06/13/18
161

1      Q     Did you ask her to help you or assist you in

2    the investigation in any way?

3      A     No.

4      Q     Other than speaking with the doctor from

5    Vancouver, any other conversations with experts relating

6    to taser use?

7      A     No.

8      Q     Any conversations with experts relating to the

9    Todero incident?

10     A     No.

11     Q     I want to just talk about the documents you

12   collected.  My understanding is that other than audio,

13   and video, and physical evidence, the documents you

14   collected in your investigation are in Exhibit 1,

15   correct?

16     A     Correct.

17     Q     All right.  So some of these questions are

18   going to be redundant of what's in Exhibit 1, and I

19   apologize for that.  Did you actually collect the

20   instant messages between Lieutenant Blackwell and others

21   from the day of the incident?

22     A     I did not collect them, they were collected by

23   our IT department.

24     Q     Fair enough.

25     A     Yeah.

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1          Q    And so when I say "collect" I mean loosely.

 2          A    Yes.

 3          Q    Did you come to possess them during your

 4   investigation?

 5          A    Yes.  I turned them over to our attorneys.

 6          Q    Did you have them before you issued your

 7   report?

 8          A    No.

 9          Q    Okay.  What about dispatch logs, did you

10   collect all of those?

11          A    The -- what do you mean by "dispatch logs"?

12          Q    We're going to -- we're going to skip that --

13          A    Oh.

14          Q    -- we're going to get --

15          A    Okay.

16          Q    -- to the computer system, because I don't

17   know what they are.

18          A    Okay.

19          Q    Did you collect all police reports written by

20   police officers involved in the incident?

21          A    Yes.

22          Q    Did you assist in the writing of any of those

23   reports?

24          A    No.

25          Q    Did anyone other than the officers writing the
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
1    reports assist in the writing of those reports to the

2    best of your knowledge?

3         A    I do not know.  Often it is recommended that

4    with the use -- any use of force, that they, when

5    writing the Use of Force Report, the person writing it,

6    if they are not a defensive tactics instructor, or Taser

7    instructor, or if it's a firearms related incident that

8    they consult for verbiage, I guess, for proper wording

9    with one of the instructors while writing the report.  I

10   do not know if Lieutenant Blackwell did that or not.

11        Q    Okay.

12        A    But it is not uncommon to --

13        Q    You receive that?

14        A    -- have them -- to receive help with proper

15   wording.

16        Q    You do not know in this case whether --

17        A    I do not know.

18        Q    -- Lieutenant Blackwell got help?

19        A    I do not know.

20        Q    Did you gather all of the EMT or fire

21   department reports in connection with your

22   investigation?

23        A    Yes.

24        Q    And, obviously, they gave you -- we've

25   reviewed this already, I think we might have done it
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1   during a break -- they gave you an incomplete copy of
 2   their run report, correct?
 3       A    Yeah.  At which time, I did not know it was
 4   incomplete.
 5       Q    Right.  Is that the copy of your -- the run
 6   report that you had at the time you issued your
 7   findings?
 8       A    Yes.
 9       Q    Did you gather training records for Lieutenant
10   Blackwell or Officers Elliot and Laut?
11       A    Yes.
12       Q    Did you gather all of their training records?
13       A    I gathered all that were requested.
14       Q    So let me be clear:  the questions I'm asking
15   you about documents that you gathered, I'm just asking
16   about prior to the time that you issued your report, and
17   that you rely upon during your investigation.  I
18   understand that you've been helping to gather
19   documents --
20       A    Right.
21       Q    -- that my clients have been -- my client has
22   been requesting, okay?  So put all that to the side.  To
23   just what you had at the time of your findings, okay?
24       A    Just -- okay.
25       Q    All right.  So at that time, did you gather
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1   training records of Blackwell, Elliot, and Laut?

 2        A    No.

 3        Q    Did you gather their HR files?

 4        A    No.

 5        Q    Did you gather any reports from the Indiana

 6   State Police?

 7        A    No.  Well, I -- Shane Cunningham's.

 8        Q    Other than that report did you gather any

 9   other reports from the state police?

10        A    No.

11        Q    Did you look at any complaint history lodged

12   against Blackwell, Elliot, or Laut?

13        A    No.

14        Q    Did you gather Taser user materials?

15        A    No.

16        Q    Did you gather Taser training materials in

17   connection with your investigation?

18        A    Yes.  And Taser -- what did you ask prior to

19   that?

20        Q    So I -- Taser user manuals or materials?

21        A    I did when you requested them, so, yes.

22        Q    Did you gather those prior to when we

23   requested them in this litigation?

24        A    No.  Just the checklist that you were

25   submitted.
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1        Q    Okay.  So in terms of materials from Taser,

 2   the PowerPoint slides, any manuals were not gathered by

 3   you during your investigation, correct?

 4        A    No.  It would have been after.

 5        Q    Right.  But the Taser Incident Checklist was

 6   something you used during your investigation, correct?

 7        A    Yes.

 8        Q    We're clear with that.  Did you gather the log

 9   of Blackwell's taser use in connection with your

10   investigation?

11        A    Yes.

12        Q    Why was that important?

13        A    To document the times in which the taser was

14   activated, both duration and frequency.

15        Q    Did you review that log before you made your

16   findings in this case?

17        A    Yes.

18        Q    Did you gather photographs of Charlie Todero

19   at any point during your investigation?

20        A    Yes.

21        Q    Did you gather photographs from autopsy?  It's

22   a bit tricky, because they're -- the autopsy photos are

23   taken by the investigator in the hospital.

24        A    Right.  Yeah.

25        Q    And so the question is: did you get those
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1   photographs from the coroner's investigator as part of

 2   your investigation?

 3        A    No.  But I believe our investigators would

 4   have obtained those and entered those into evidence.

 5        Q    But you didn't have those photographs at the

 6   time you issued your findings, correct?

 7        A    No.

 8        Q    Did you have photographs of Charlie Todero and

 9   his brother practicing boxing at the time that you

10   issued your report?

11        A    I had photographs of them near a boxing bag.

12        Q    Like, kind of posing?

13        A    A punching bag.  Yes.

14        Q    Yeah.  When did you gather those photographs?

15        A    Those were provided to me -- I do not know.  It

16   was during the course of the investigation.  I don't --

17   I don't remember the date.

18        Q    In --

19        A    Sorry.

20        Q    And we'll go through this, but in his e-mail

21   to you, Dr. Blackwell -- sorry, strike that.  In this e-

22   mail to you, Lieutenant Blackwell states that he has

23   reviewed Facebook photos --

24        A    Right.

25        Q    -- of Charles Todero and his brother.
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

The deposition of Simeon Karen Seay, 4-20-16    168

```
 1        A    Yes.

 2        Q    Are those those photos?

 3        A    Yes.

 4        Q    Did that e-mail from Blackwell prompt you to

 5   get those photos, or did you provide those photos to

 6   Lieutenant Blackwell?

 7        A    Oh, no.  I believe Lieutenant Blackwell

 8   researched the Facebook, Charlie's Facebook page, and

 9   printed those off for me.

10        Q    Got it.

11        A    But I do not remember at what point he gave

12   them to me.

13        Q    Okay.  The evidence from the Vineyard Church

14   that you collected, that was all collected by Officer

15   Moyer?

16        A    Yes.

17             MS. SCHNEEMAN:  You mean --

18        A    It was --

19             MS. SCHNEEMAN:  -- the tangible items?

20        Q    The tangible items.

21        A    The --

22        Q    The physical evidence.

23        A    -- the driver's license --

24        Q    Yeah.

25        A    -- the burned -- they were, I believe, found
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1    by the maintenance man in the fire pit on the patio of

2    the Vineyard and turned in to Officer Moyer.

3         Q    Got it.  And then you wrote a sup about just

4    the collection of those, right?

5         A    Yes.  I believe he brought those to me when I

6    interviewed him.

7         Q    Okay.  And so, now, other than the police

8    reports you wrote about your witness interviews, are

9    there any other documents that you collected in

10   connection with your investigation that I haven't

11   mentioned?

12        A    No.

13        Q    Okay.  Did you contact any witnesses and ask

14   them to make reports after Charlie's death?

15        A    No.

16        Q    Did you ask Moyer, at any point, to write a

17   report about his actions in the case?

18        A    Yes.  I believe I asked him to do a

19   supplement.

20        Q    Did he do it?

21        A    Let me see.  You know what?  I think I did the

22   -- I did the supplement after interviewing Moyer.

23        Q    Okay.

24        A    I did the -- the supplement.  And I think the

25   reason why I did was because this statement was

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 1:17-cv-01698-JPH-MJD   Document 125-54   Filed 08/13/18   Page 172 of 639 PageID #:
4851
The Deposition of CAMERON, taken 04/23/2018     John     170

```
 1  videotaped.
 2      Q    Okay.  Did you ask Ian -- strike that, please.
 3  Did you ask Mr. Pitts, who I think is a fire department
 4  employee, to write a supplemental report?
 5      A    Not that I remember.
 6      Q    Do you know -- have any knowledge of why Mr.
 7  Pitts wrote such a report on June 13, after Charlie
 8  Todero's death?
 9      A    I have no idea.
10      Q    Okay.  What -- let me go back to when I -- I
11  think you have this report.  Ian Godfrey.
12      A    What date was it?
13           MS. SCHNEEMAN:  Okay.  Are we Pitts or
14      Godfrey?
15           MR. ART:  Pitts.
16           MS. SCHNEEMAN: Okay.
17      A    What date was it?
18  BY MR. ART:
19      Q    I'll show you -- let me show you the report.
20      A    Okay.  Well, what I'm thinking is if it was
21  after I interviewed Godfrey, maybe he went back and
22  asked Pitts to --
23      Q    We'll come back to that.
24      A    Okay.
25      Q    But do you have any -- did you instruct Pitts,
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1   at any time, to write a report?

 2       A    No.

 3       Q    Okay.  Did you instruct Officer Cunningham

 4   from the Indiana State Police to write a report?

 5       A    Yes.

 6       Q    All right.  Tell me about --

 7       A    I requested.

 8       Q    Right.  Tell me about -- strike that, please.

 9   Did you request that of him when he came to you, as you

10   testified earlier?

11       A    Yes.

12       Q    Okay.

13       A    He came to me, and informed me, and I asked

14   him to produce a report.

15       Q    Okay.  We've marked this as Exhibit 2.  So

16   have a quick look through it.

17            (EXHIBIT 2 MARKED FOR IDENTIFICATION)

18       A    Okay.

19       Q    What I'm going to represent to you is that we

20   asked your counsel to produce all investigative notes --

21       A    Yeah.

22       Q    -- that you had, and this got produced in

23   response --

24       A    Sure.

25       Q    -- relatively recently.
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 1:17-cv-01698-JPH-MJD   Document 125-54   Filed 08/13/18   Page 174 of 639 PageID #:
4853
The Deposition of SIMEON TAKEN ALIVE, taken 4/19/17

172

 1        A     Sure.

 2        Q     So have a quick look through it, I'm not going

 3   to test you on what it says in there.  My question is

 4   going to be: are these all of the notes that you took

 5   during your investigation -- handwritten notes?

 6        A     Yes.

 7        Q     Well, look through it and make sure that I --

 8        A     Oh, okay.

 9        Q     -- I didn't take anything out or anything.

10             MS. SCHNEEMAN:  Right.  And just for the

11        record, the Bates stamp on the lower left-hand

12        corner, that's something applied by your office?

13             MR. ART: That's right.  And we produced the

14        whole thing back, and so we can state for the

15        record that the Bates range on what we've marked as

16        Exhibit 2 is stamped D5064 to 5089.

17             MS. SCHNEEMAN:  I think he just wants to make

18        sure that it doesn't look like there's something

19        missing.

20        A     I don't see anything missing.

21   BY MR. ART:

22        Q     Does that look complete to you?

23        A     Yes.  Yes, it does.

24        Q     And does it appear to contain all of the notes

25   that you took during your interviews with witnesses

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1    during your investigation?
 2         A    Yes.
 3         Q    And would you agree with me that the last four
 4    pages are a Taser incident investigation checklist that
 5    we discussed a few minutes ago?
 6         A    Yes.
 7         Q    Okay.  We're going to go through that later.
 8         A    Okay.
 9         Q    Did you fill out that -- one more question
10    about Exhibit 2 -- did you fill out that Taser incident
11    checklist as part of your investigation?
12         A    No.  This was done -- I believe it was done
13    after the investigation.
14         Q    Okay.
15         A    Sergeant Holtzleiter, our Taser instructor,
16    brought this to me.  I don't remember the date.  But he
17    said, "Hey, I found this."  I believe it was on Taser
18    website, "This may be of help to you."
19         Q    Okay.  And so after you'd issued your
20    findings, you filled that in?
21         A    I believe it was after.
22         Q    Okay.  So --
23         A    But I don't remember the date.  I wish -- I
24    wish I did, but I don't.
25         Q    Okay.  All right.  Let me mark as Exhibit 3 --
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1        A     And this was for me to go through and check.  I
 2   mean, I was using it as a guide to what I covered,
 3   basically.
 4        Q     Right.  And that's my understanding of what
 5   that's for, right?
 6        A     Yeah.
 7        Q     Okay.  We may come back to it, you can put it
 8   to the side right now.
 9        A     Okay.
10        Q     All right.  Exhibit 3, have a look at that.
11   Okay.  We're looking at what's been marked as Exhibit 3,
12    for the record it bears the Bates stamps D1094 through
13   1098.  Have you had a chance to review if it's complete?
14             (EXHIBIT 3 MARKED FOR IDENTIFICATION)
15        A     Yes.
16        Q     Does this contain all of the findings that you
17   reached at the conclusion of your investigation?
18        A     Yes.
19        Q     All right.  So it starts with a cover letter,
20   correct?
21        A     Yes.
22        Q     What's the date of that?
23        A     Well, these are two --
24        Q     Separate documents?
25        A     -- two separate documents.
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1      Q     Okay.  So the cover letter was separate from

2   all of the pages that followed, correct?

3      A     Yeah.  They're two separate documents.

4      Q     Were they submitted to the chief of police at

5   the same time or at different times?

6      A     They were submitted at the same time.  I put

7   together a binder just like this one and submitted it to

8   the chief.

9      Q     So to be clear, when you say "just like this

10  one" you're pointing at Exhibit 1?

11     A     Yes.

12     Q     Was the binder that you put together for the

13  chief literally exactly the same as what is in Exhibit

14  1?

15     A     No.

16     Q     Okay.

17     A     Because I have added some of the items that

18  you have requested since.  Training manuals,

19  PowerPoints, and updated policies.

20     Q     Okay.  So those items that you've just

21  mentioned, you've added to your binder since the time

22  that you issued your findings --

23     A     Yes.

24     Q     -- correct?  All right.  And so the binder

25  that you would have provided the chief of police looked

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 1:17-cv-01698-JPH-MJD   Document 125-54   Filed 08/13/18   Page 178 of 639 PageID #:
4857
The Deposition of CAMERON TAYLOR, taken 06/29/2017        176

```
 1   exactly like Exhibit 1, minus those documents --

 2        A    Yes.

 3        Q    -- correct?  So let's just talk about page one

 4   of Exhibit 3 first, then, since it was separate.  What

 5   is the purpose of this letter?

 6        A    This is to inform the chief of my findings.

 7        Q    Okay.  And what were your findings?

 8        A    That the officers on the scene performed their

 9   duties within the scope of the law and accordance to our

10   policies and procedures.

11        Q    And did you submit this to the chief of

12   police?

13        A    I did.

14        Q    When did you submit it to him?

15        A    On the 27th of June 2016.

16        Q    Did you receive any response?

17        A    No.

18        Q    Okay.

19        A    Not that I recall.

20        Q    Did you have discussion with the chief of

21   police about this letter at any point in time?

22        A    Not that I recall.  I -- I may have, I just

23   don't remember.

24        Q    Did you have substantive discussion with him

25   about the findings that you had made, at any point in
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 1:17-cv-01698-JPH-MJD   Document 125-54   Filed 08/13/18   Page 179 of 639 PageID #:
4858
The Deposition of Cameron Taken on Apr 8, 2016          177

 1  time, after you had submitted him this letter?

 2      A   Like I said, I mean, we have staff meetings

 3  every Monday.  I know that we discussed the findings.  I

 4  don't remember the content of the discussions.

 5      Q   Did he review the findings in any way?

 6      A   Oh, yeah.  He would have reviewed it, I'm

 7  sure.

 8      Q   Okay.  So -- so he had access to the binder

 9  you'd put together, correct?

10      A   Yes.

11      Q   Do you know whether or not he reviewed the

12  evidence that you had put in the binder?

13      A   I would be assuming, but I would -- let's say

14  yes, he did.

15      Q   Okay.  But as you sit here, you don't have

16  personal knowledge of him reviewing it?

17      A   No.

18      Q   Did you have --

19      A   I didn't sit there and watch him go through

20  it.

21      Q   Right.  But you did have a discussion with him

22  about his review of it, correct?

23      A   Not that I recall.

24      Q   And did he come back to you, at any point, and

25  say, "Your findings are approved?"

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1      A    No.

2      Q    Did he come back to you, at any point, and

3   say, "I need to you revisit this finding?"

4      A    No.

5      Q    Did he come back to you, at any point, and

6   say, "I need you to pursue another investigative" --

7      A    No.  He accepted the findings and agreed.

8      Q    That's what I'm getting at.  Is there any

9   process for formally approving the findings that you

10  submitted to him within the Greenwood Police Department,

11  or does you submitting the findings represent the

12  conclusion of the investigation?

13     A    It would -- his accepting the findings would

14  be the conclusion of the investigation.

15     Q    Okay.  And he did so when you submitted them

16  to him, correct?

17     A    Yes.

18     Q    And so --

19     A    Well, after -- I'm assuming after reviewing

20  them.

21     Q    So I guess what I'm getting at is June 27,

22  2016 the date that the accepted the findings?

23     A    It's the date that I submitted them to him.

24     Q    Okay.  And you don't know at what point in

25  time after that he accepted them, correct?

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 1:17-cv-01698-JPH-MJD   Document 125-54   Filed 08/13/18   Page 181 of 639 PageID #:
4860
The Deposition of CAMERON Taken on 03/13/17   179

```
 1        A    No.  I don't.

 2        Q    Let's look at the other pages of what's been

 3   marked at Exhibit 3, okay?  And describe for me what

 4   those other pages are.

 5        A    This is just a Summary of Facts.

 6        Q    Okay.  When you call it "a Summary of Facts",

 7   is it a summary of some longer document that exists, or

 8   is it a summary of what was in the binder that's been

 9   marked as Exhibit 1?

10             MS. SCHNEEMAN:  Objection.  Form of question.

11        Q    Yeah.

12             MS. SCHNEEMAN:  Assuming it's only two

13        options.

14        Q    Yeah, yeah, yeah.  So here's the first

15   question:  is there some other document that provides a

16   factual account all in one place, like this, that's a

17   longer version of this?

18        A    No.

19        Q    Okay.  So the Summary of Facts is -- well, let

20   me ask you this way --

21        A    These are the --

22        Q    -- describe what you mean by "the Summary of

23   Facts."

24        A    -- these are the key points that led me to my

25   determination.
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
1        Q    Okay.

2        A    Or my findings.

3        Q    Fair enough.  So the Summary of Facts document

4   that we're looking here in Exhibit 3, summarizes all

5   facts pertinent to your findings, correct?

6        A    Yes.  Not all, but the -- obviously, this is a

7   complex investigation, but yes, the meat and potatoes of

8   it.

9        Q    Were there any facts that supported your

10  finding that you excluded?

11       A    No.

12       Q    Okay.  Were there any -- so these contain all

13  the facts necessary, in your view, to support your

14  finding in your investigation, correct?

15       A    Yes.

16       Q    Were there any facts that contradicted your

17  findings that you excluded from this statement of facts?

18       A    No.

19       Q    Did anyone help you write this statement of

20  facts?

21       A    No.

22       Q    Did you make any conscious choices about what

23  facts to include in this summary and what facts to

24  exclude?  That you recall, as you sit here today?

25       A    I think what you're asking me is did I exclude
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1   any facts.

 2        Q    Yeah, I guess so, right?

 3        A    So no.

 4        Q    All right.  Let's go through some of the

 5   facts, here.  Okay?  Okay.  Bullet point 1, paragraph 1,

 6   okay?  It says that, "Charles Todero's actions posed a

 7   risk of injury and/or death to himself, officers, and

 8   motorists."  You see that?

 9        A    Yes.

10        Q    Are you aware that Lieutenant Blackwell, in

11   this litigation, has admitted that Charlie Todero was

12   not a threat to him?

13             MS. SCHNEEMAN:  Objection.  I don't think

14        that's a correct statement of facts, but you may

15        answer.

16        A    That would be a first for me, if he admitted

17   that he wasn't a threat.  I think the actions were a

18   threat that the officer had to follow him into traffic.

19        Q    Okay.  So when you say that there was a threat

20   to officers in this paragraph, you mean a threat caused

21   by an officer being in traffic, correct?

22        A    I mean, a threat caused by Mr. Todero's

23   actions in resisting in a fairly busy thoroughfare. It's

24   one of the main north/south thoroughfares in our city.

25        Q    So here's what I'm trying to isolate --
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1        A    Okay.

 2        Q    -- okay?  Was the threat that this officer was

 3   going to end up in traffic, or was there some other

 4   threat in addition to that threat from Charles Todero?

 5        A     It was primarily the threat of being out in

 6   traffic.

 7        Q    Okay.  Was there any other threat, in your

 8   mind, based on your investigation, that Charles Todero

 9   presented to the officers other than that one?

10        A    The fact of resisting and -- and not

11   complying, I think, is -- that's a hard question for me

12   to answer.  It's almost impossible, because I don't -- I

13   wasn't on the scene and you're asking me to --

14        Q    So let me confine the question a little more.

15   In this first paragraph, when you said that he presented

16   a threat to officers, did you mean because they --

17        A    Yes, I was talking about the traffic.

18        Q    Let me get the question out.  In this first

19   paragraph in the Summary of Facts in Exhibit 3, where

20   you said that Todero presented an officer -- a threat to

21   officers, were you talking about the threat of them

22   being out in traffic?

23        A    Yes.

24        Q    Were you talking about any other kind of

25   threat other than that one?
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1       A    No.

2       Q    Paragraph 2, it says, "Lieutenant Blackwell

3  was on the scene without backup for three minutes and

4  one second."  You see that?

5       A    Yes.

6       Q    Why -- how did you get three minutes and one

7  second?

8       A    Let's see here.  So he arrived on the scene at

9  11:50:02.

10      Q    What's that based on?

11      A    This is on the CAD, I believe.  But let me --

12  I don't have the --

13      Q    You know what I want to do --

14      A    I don't have the time stamped radio log with

15  me, but...

16      Q    I want to come back to this question of how

17  you calculated the time, so just kind of do it all

18  together rather than just doing it in the context of

19  your findings.  So we'll come back to it --

20      A    Okay.

21      Q    -- so that I can understand how these

22  different times all fit together.

23      A    Sure.

24      Q    Okay.  It's -- the third sentence of the

25  second paragraph says, "Lieutenant Blackwell gave Todero

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

184

```
1    multiple, loud verbal commands to stop walking in the

2    roadway."  Do you see that?

3         A    Yes.

4         Q    Why didn't you mention here where in the

5    roadway Todero was walking?

6         A    It's in the statements given by Lieutenant

7    Blackwell that are in the book.  This is a summary.

8         Q    Okay.  Was it relevant to your findings that

9    Todero was two feet from the curb when he was walking in

10   the roadway?

11        A    I think it was relevant that he was in the --

12   walking in the roadway.

13        Q    But was the distance he was from the curb

14   relevant?

15        A    No.  I don't believe so.

16        Q    Okay.  There's no mention of Blackwell's car

17   providing protection from the traffic, was that relevant

18   to your findings?

19        A    No.

20        Q    Okay.  Why not?

21        A    Because I -- they were far enough away from

22   the car that any car passing them could have still got

23   over in the lane, and as a police officer, I can tell

24   you those lights don't mean a whole lot when it comes to

25   motorists and -- and traffic.
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 1:17-cv-01698-JPH-MJD   Document 125-54   Filed 08/13/18   Page 187 of 639 PageID #:
4866
The Deposition of CAMERON, taken on April 26, 2018                   185

1    Q    How far away were they from Blackwell's car?

2         MS. SCHNEEMAN:  Wait.  "They"?

3         MR. ART:  Charlie and Blackwell.

4         MS. SCHNEEMAN:  Okay.  When they first

5    encountered each other?

6         MR. ART:  At the point when they were at risk.

7    A    I'd have to go back to -- I wasn't there. But

8    from what I saw in the video, where they wound up when

9    he was on the curb, they were several feet.

10   BY MR. ART:

11   Q    How many feet?  Did you ever make a

12   determination of how many feet away they were?

13   A    No.

14   Q    Okay.  Is there a reason you chose not to put

15   the fact that Blackwell's car was providing some

16   protection in paragraph 2 of your Summary of Facts?

17   A    Like I said, this was handed as a one -- as a

18   full document.  So he had not only the written

19   statements which documented the fact that his car -- the

20   direction that his car was parked and where, but also

21   the video recorded statements digitally attached to this

22   binder.  So like I said, this is all one huge report.

23   Q    Would you agree with me that whether or not

24   Blackwell's car was providing protection to Blackwell

25   and to Charlie is relevant to whether Blackwell's use of

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1   force was reasonable?

 2        A    Yes.  Yes.

 3        Q    And why is it relevant?

 4        A    Well, if -- if Charles Todero was allowed to

 5   walk out in front of traffic, which we have multiple

 6   witnesses saying he was doing, he was refusing to comply

 7   with Lieutenant Blackwell's commands to stop. Lieutenant

 8   Blackwell had to follow him into the roadway. He -- in

 9   Lieutenant Blackwell's statement, he was veering out

10   from the cover of the car, which is all, you know,

11   questionable as to how far they were from the car. I

12   wasn't there, but I know from experience, it's within a

13   few feet, a car could pass and not see them in the

14   roadway and hit them.  But Lieutenant Blackwell has a

15   responsibility to protect Charlie's Todero from his own

16   actions, let alone following him out into traffic that

17   puts the officer at risk.

18        Q    So is it fair to say that whether or not

19   Blackwell's car was protecting the two of them from the

20   traffic is relevant to whether the use of force is

21   reasonable, because --

22        A    No.  I don't believe so, because -- I'm sorry,

23   I interrupted you.

24        Q    No, no, no.  It's fine.  Let me ask --

25             MS. SCHNEEMAN:  No.  Stop.
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201



KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1        A    But the whole thing is, they're in the --
 2             MS. SCHNEEMAN:  Oh.  Stop for a minute.
 3             MR. ART:  Let me just get a --
 4             MS. SCHNEEMAN:  Let him ask --
 5             MR. ART:  Let me just get an opening.
 6             MS. SCHNEEMAN:  Let him ask his --
 7   BY MR. ART:
 8        Q    Just so that -- and I appreciate you know
 9   where I'm going --
10        A    Okay.
11        Q    I want to get a good question on the record,
12   so the record's clear.  Is how -- strike that.  Is the
13   question -- strike that.  Let me figure out how to ask
14   it.  Is it relevant to your investigation of whether
15   Blackwell's use of force was reasonable how much cover
16   Blackwell's car was providing from on-coming traffic?
17        A    I think the fact that they were -- according
18   to Lieutenant Blackwell's statement, they were in the
19   roadway at all puts both of them at -- in danger.  As a
20   matter of fact, someone could -- if they were close
21   enough to the car to provide cover, someone could have
22   hit the car and pushed the car into them.  So I don't
23   know that the cover of the car has a whole lot of
24   influence on my findings.
25        Q    And your view is the same with respect to
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 1:17-cv-01698-JPH-MJD   Document 125-54   Filed 08/13/18   Page 190 of 639 PageID #:
4869
The Deposition of Cameron Crane, taken August 29, 2017   188

```
 1   Charlie Todero being two feet from the curb, correct?

 2        A    Yes.

 3        Q    What matters is that he was in the roadway,

 4   correct?

 5        A    Well, that he was in the roadway, and

 6   according to Officer Blackwell's statement, he was

 7   veering out away from the curb.

 8        Q    Okay.  There's no mention in paragraph -- or,

 9   strike that, please.  There's no mention in your Summary

10   of Facts about Charlie Todero being seated at the time

11   that Lieutenant Blackwell first encountered him,

12   correct?

13        A    In the summary?

14        Q    Correct.

15        A    No.  But it is in the full report.

16        Q    And I appreciate that there's a lot of paper

17   here.

18        A    Right.

19        Q    So I'm really just asking you about the

20   summary, here.  Is there a reason that you excluded that

21   fact from the summary?

22        A    It's a summary.

23        Q    Was it an important fact to your investigation

24   that he was seated at the time that Blackwell first

25   encountered him?
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
1          A     No.

2          Q     Why not?

3          A     Because of his actions after.  It was a

4    continuation, and like I said, in the totality of the

5    circumstances and the incident.  And Lieutenant

6    Blackwell didn't use force on him while he was seated on

7    the curb.

8          Q     Okay.  Paragraph 3 --

9          A     Okay.

10         Q     -- says, "Due to Todero's unsafe delusional

11   actions and non-compliance to Lieutenant Blackwell's

12   commands to stop, Lieutenant Blackwell deployed his

13   taser, striking Todero in the upper and lower back."  Do

14   you see that?

15         A     Yes.

16         Q     Why is there no mention in that paragraph of

17   any problem with the taser connection?

18         A     Well, that's the initial statement.  Like I

19   said, it's a summary.

20         Q     Okay.

21         A     This is the entire report, so that's just the

22   statement of facts.  That is a fact.

23         Q     It's a fact that the taser struck Todero in

24   the upper and lower back, correct?

25         A     Yes.
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1    Q    Next paragraph says, "Witness Holly Walters

2   was a motorist, stopped and asked Lieutenant Blackwell

3   if he needed help.  Lieutenant Blackwell requested that

4   Walters stay to be a witness," correct?

5    A    Uh-huh.  Yes.

6    Q    Do you agree with me that if Ms. Walters was

7   present on the scene as a witness, that Todero was not

8   posing much of a danger?

9         MS. SCHNEEMAN:  Objection.  Form of question.

10       Calls for speculation.

11   A    Can you restate that, because I --

12   Q    Yeah.  As a police officer you would not put a

13  civilian in a dangerous situation, correct?

14   A    I don't believe that that put her in a

15  dangerous situation.  She was on the curb.

16   Q    Right.  So she was on the curb, and you saw

17  that -- strike that, please.  You saw the video of her

18  on the curb, correct?

19   A    Yes.

20   Q    And she ends up less than ten feet from

21  Todero, correct?

22   A    This is, I believe, once he's in custody,

23  right?

24   Q    Well, at the start of the first video, she's

25  on the curb with him, correct?

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1        A     Let me -- I don't have the video in front of
 2   me.  So what I will say is -- you're asking my opinion,
 3   as a police officer.  I applaud Lieutenant Blackwell for
 4   -- I applaud Holly Walters for seeing this incident and
 5   turning around to help the officer.  I see nothing wrong
 6   with that.  I see nothing wrong with Lieutenant
 7   Blackwell saying, "Just stay put.  I don't -- don't try
 8   to physically help me but be a witness."  So yes, I
 9   support that, and I agree that that is appropriate.
10        Q     Okay.  But you wouldn't put a civilian witness
11   within ten feet of a subject you considered to be
12   dangerous, correct?
13        A     If you could prevent it, I would say correct.
14        Q     Right.  Okay.  Next paragraph, "According to
15   Lieutenant Blackwell and Holly Walters, Todero was tased
16   multiple times during the one minute and three second
17   timeframe between the first taser deployment, and the
18   arrival of the first back-up units."  Do you see that
19   paragraph?
20        A     Where are we?
21        Q     The last paragraph on the first page of the
22   Summary of Facts.
23        A     Okay.  Yes.
24        Q     It says Todero was tased multiple times during
25   that timeframe.
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 1:17-cv-01698-JPH-MJD   Document 125-54   Filed 08/13/18   Page 194 of 639 PageID #:
4873
The Deposition of CAMERON, taken 06/28/2017   Page 192

```
 1          A     Yes.

 2          Q     Do you know how many times he was tased during

 3   that timeframe?

 4          A     I do not.

 5          Q     Did you do any investigation to find out?

 6          A     Well, the taser log shows the times in which

 7   the taser was activated, and/or the duration in which

 8   the taser was activated.  The -- the problem -- so the

 9   answer to this is no. I do not know how many times in

10   that first minute and three seconds, but that would be

11   in the taser log that was provided with the report.

12          Q     Right.  So -- and let me clear about that. You

13   don't know how many of the taser deployments that appear

14   on the log occur between the start of the tasing and

15   Officers Elliot and Laut arriving, correct?

16          A     Yes, I -- yes, we do, because we have the

17   taser log.  But this, like I said, this is the statement

18   -- I'm saying that Holly Walters and Lieutenant

19   Blackwell stated that he was tased multiple times before

20   his backup arrived.

21          Q     Right.

22          A     And this is just a statement made by them.

23   This was not the conclusion of how, you know.

24          Q     Right.  So my question for you is: did you

25   ever learn how many times Todero had been tased in the
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 1:17-cv-01698-JPH-MJD   Document 125-54   Filed 08/13/18   Page 195 of 639 PageID #:
4874
The Deposition of   Sherron  Taken on   August 13, 2018        193

```
 1   time between the tasing starting and Elliot and Laut
 2   arriving?
 3        A    It would be easy to determine that by going
 4   off of the taser log, but no, off the top of my head, I
 5   do not know.
 6        Q    Okay.  How would you determine that going off
 7   the taser log?
 8        A    Okay.  Well, let's look at the taser log.  So
 9   one of the issues that was determined when -- and I know
10   that you've seen this note that I wrote to the chief --
11   was the taser, Lieutenant Blackwell's taser, was three
12   minutes and 52 seconds faster than our CAD, which is
13   Spillman's timestamp, okay?  Why that is, I do not know.
14   But it's internal clocks, they're not synced.
15        Q    Right.
16             MS. SCHNEEMAN:  Oh, sorry.  I have a risk --
17             THE WITNESS:     No, that's all right.
18             MS. SCHNEEMAN:  -- she wanted to put that on
19        the record.
20        A    So we would have to -- May 29 at 11:56. That's
21   one minute and two seconds.  So it looks like one, two,
22   three, four, five, six.  Looks like six times in the
23   first minute and three seconds.
24   BY MR. ART:
25        Q    So based on your review of the taser log, do
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
1   you think you can say that there were six deployments

2   between the time the tasing started and the time that

3   the back-up arrived, correct?

4        A    Yes.

5        Q    And that was in the time period of what? One

6   minute --

7        A    One minute and three seconds.

8        Q    Thank you.  Is that the -- is this the first

9   time you have done that calculation of how many tases

10  were during that time period?

11       A    Oh, I'm sure it's not.

12       Q    Okay.  Is there any report where you recorded

13  that previously?

14       A    No.  Once again, it's all --

15       Q    Understand.

16       A    -- in here.

17       Q    I understand.

18       A    I'm --

19       Q    And I'm not -- you know, a lot of this is just

20  to establish what is actually written down and documents

21  at what point in time.

22       A    Right.

23       Q    Right.  So --

24       A    Well, and --

25       Q    I understand this --
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1        A    I went to --

 2        Q    -- it's a tough job.

 3        A    -- great lengths to write the -- the struggles

 4   that I had with the different internal clocks.

 5        Q    Yeah.

 6        A    Because you're dealing with three.

 7        Q    We'll get -- we'll get there --

 8        A    Yeah.

 9        Q    -- in just a second, hopefully.  And I'm going

10   to pick up the pace here, since we're running out of

11   time.  Okay.  Do you agree with me -- so next paragraph,

12   please.

13        A    Uh-huh.

14        Q    In your summary, on the page that is marked

15   D1096.  Do you agree with me that at the time that Holly

16   Walters pulled her car up at the scene, Charlie Todero

17   was lying face-down on the ground?

18        A    I'd have to look at her statement.  Yes.

19        Q    Okay.  Do you agree with me that Holly Walters

20   wouldn't have a clue about best law enforcement

21   practices for how long a person must wait until they use

22   a taser in repeated taser deployments?

23             MS. SCHNEEMAN:  Objection.  Form of question.

24        A    I think that -- I don't know that she would

25   know law enforcement practice, but I think as an
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 1:17-cv-01698-JPH-MJD   Document 125-54   Filed 08/13/18   Page 198 of 639 PageID #:
4877
The Deposition of Cameron Parker, taken April 5, 2017     196

1  individual, she could give an opinion.

2      Q      Based on what?

3      A      Based on what she thought was a sufficient

4  length on time to comply to orders.

5      Q      Okay.  Let's go two paragraphs down.  It's the

6  paragraph that starts, "Lieutenant Blackwell," it

7  states, "Lieutenant Blackwell stated that he observed

8  that the Taser prong that struck Todero's lower back was

9  'dangling' from his shirt, creating a clothing

10  disconnect, and resulting in less effective results." Do

11  you see that paragraph?

12      A      Yes.

13      Q      Did you ever ask Lieutenant Blackwell how that

14  taser probe was dangled?

15      A      No.  Because I've, in my experience, had many

16  similar instances.  And it's quite easy to see a loose

17  connect.  If you can imagine a dart sticking through

18  your clothing and making contact with the skin, it's

19  going to push the clothing tight to the skin.  And if

20  it's not, if it's just stuck in the clothing, there is

21  no connection to the skin.  So if it's loose clothing,

22  you would see it.

23      Q      But you don't know if that's what Blackwell

24  meant by "dangling", correct?

25      A      I don't know that I had him elaborate on that.

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 1:17-cv-01698-JPH-MJD   Document 125-54   Filed 08/13/18   Page 199 of 639 PageID #:
4878
The Deposition of   James Sauerberg, taken on April 19, 2018                     197

```
 1        Q    I mean, in fact, you didn't have him elaborate
 2   on that, correct?
 3        A    Not to my recollection.
 4        Q    I couldn't find anywhere in the record that
 5   anyone explained what "dangling" meant.
 6        A    Okay.
 7        Q    Could you -- do you know of any such place in
 8   the record?  That's what I'm getting at.
 9        A    No.
10        Q    Did you review video evidence to verify
11   whether the taser probe was dangling from Todero's
12   shirt?
13        A    No.  At the time -- I believe at the time the
14   video was taken, the probe was no longer in the shirt.
15        Q    Did you see any evidence at any point on the
16   video about -- that supported Blackwell's statement that
17   the taser probe was dangling from Todero's shirt?
18        A    I -- I'd really need to see the video.
19        Q    As you sit here today, do you recall any video
20   of that taser barb being pulled from Charlie Todero's
21   back?
22        A    Being pulled out of his back, the one that was
23   dangling?
24        Q    Well, the one that Lieutenant Blackwell says
25   was dangling, yes.
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 1:17-cv-01698-JPH-MJD   Document 125-54   Filed 08/13/18   Page 200 of 639 PageID #:
4879
The Deposition of CAMERON PACKET, taken Apr. 19, 2018                198

```
 1        A     No.
 2        Q     So you don't recall reviewing any such video
 3   evidence?
 4        A     No.
 5        Q     Okay.  Do you recall reviewing any photos of
 6   Charlie Todero's back?
 7        A     No.
 8        Q     Do you -- in your investigation, did you see
 9   any photos of taser burns on Charlie Todero's back?
10        A     I don't believe so.
11        Q     That --
12        A     Was this autopsy?
13        Q     Yeah.  Would that have been pertinent to your
14   investigation?
15        A     No.
16        Q     Why not?
17        A     Because it -- we know that -- that Charlie was
18   tased in the back.  The clothing disconnect, as a matter
19   of fact, I can tell you from experience, most officers
20   when they get the taser exposure -- we use what's called
21   alligator clips that have the wires attached to them,
22   they clip them.  I volunteer to take the shot in the
23   back.  It did the same thing to me when I was shot in
24   the back.  I had one good connection, the other was
25   stuck in my clothing.  I was still -- I was still
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1  feeling pain, but I had a little burn mark from where

2  that probe was arcing.  So was -- you know, so yes.  I

3  can understand why there would be.  I don't know that I

4  saw any.

5      Q    Okay.  Would the fact that there were taser

6  burns on Charlie's back -- were photographic evidence of

7  taser burns on Charlie's back have been something you

8  would want to consider during your investigation?

9      A    Once again, I -- there was no argument that he

10  was tased in the back, so I -- it wouldn't have

11  influenced my investigation.

12      Q    Are photographs of Charlie Todero's taser

13  burns irrelevant to evaluating whether there was a good

14  Taser connection, in your view?

15      A    No.  Because --

16      Q    What are they --

17      A    -- as I said, I've experienced myself --

18      Q    And let me be clear -- hold on.  Before we go

19  further.  So my question was -- I forgot my question.

20  But let me make sure I state it correctly so that you

21  don't give a no answer to something you did.  My

22  question is: is photographic evidence of a taser burn

23  relevant to evaluating whether there was a good taser

24  connection?

25      A    I don't think evidence of a burn is proof that

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
1   there was a good connection or not.
2        Q    Is it the --
3        A    You can get a burn from either a bad
4   connection or a good connection.
5        Q    Okay.  So it doesn't conclusively tell you one
6   way or the other, correct?
7        A    Correct.
8        Q    If you have a clothing-interrupted connection,
9   you can still get burned, correct?
10       A    Yes.
11       Q    In fact, you're testifying that that has
12  happened to you when you go shot in the back by a taser,
13  correct?
14       A    Yes.
15       Q    And when you get shot in the back and there's
16  this clothing interruption as you have experienced, you
17  still experience pain, correct?
18       A    Yes.
19       Q    And Taser's materials in fact say that --
20       A    I should say you can --
21       Q    Right.
22       A    -- experience pain.
23       Q    And Taser's materials, in fact, state that the
24  taser barb works through light clothing, correct?
25            MS. SCHNEEMAN:  You said "light clothing"?
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1              MR. ART:   Yes.
 2       A    I don't know.
 3       Q    We'll come back to that, too.  In any event,
 4  you didn't review video evidence of that prong being
 5  removed from Charlie Todero's back, correct?
 6       A    That prong --
 7       Q    Meaning that one that Lieutenant Blackwell
 8  said was dangling?
 9       A    No.  I believe that wound up in his left hand.
10       Q    Okay.  You didn't review any video evidence of
11  that prong being removed from Charlie Todero's shirt,
12  correct?
13       A    The dangling?
14       Q    The one that Lieutenant Blackwell said was
15  dangling?
16       A    No.
17       Q    Next paragraph on Exhibit 3.
18       A    Okay.
19       Q    It says, "Approximately one minute and 39
20  seconds after Lieutenant Blackwell requested
21  assistance."  Do you see that?
22       A    Yes.
23       Q    Did Lieutenant Blackwell ever request
24  assistance?
25       A    Yes.
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201



KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1        Q    Do you agree with me that when Elliot first
 2   offered over the radio traffic to respond to the scene,
 3   Lieutenant Blackwell said, "No.  Go pick up Laut first"?
 4        A    Yes.
 5        Q    Okay.  So at the time that Blackwell first
 6   encountered Charlie, he didn't immediately request back-
 7   up, correct?
 8        A    Upon -- no.  I believe it was when Charlie
 9   began not complying with his orders.
10        Q    Okay.  Second to the bottom paragraph on the
11   same page.
12        A    Okay.
13        Q    Second sentence states, "It is noticed at this
14   time that the taser prong that Lieutenant Blackwell
15   observed dangling in Todero's shirt was now lodged in
16   Todero's left hand."  Do you see that?
17        A    Yes.
18        Q    What evidence did you develop that the taser
19   prong was lodged in his left hand?
20        A    The statements from the officers and the
21   paramedics.
22        Q    Any other evidence that it was lodged in his
23   left hand?
24        A    No.
25        Q    Did you observe it lodged in his left hand on
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1   the video?

 2        A    I would need to see the video, I don't

 3   remember.

 4        Q    Do you have a recollection, as you sit here --

 5   well, strike that, please.  When was the last time you

 6   watched the video?

 7        A    I watched bits and pieces of videos this week.

 8        Q    As you sit here today, do you have any

 9   recollection of the taser barb being lodged -- strike

10   that, please.  As you sit here today, do you have any

11   recollection of the video showing a taser barb lodged in

12   Charlie's left hand?

13        A    No.  I'd be happy to -- do we have the video?

14        Q    We do.  And we can go through it.

15             MS. SCHNEEMAN:  Do you need to set up a --

16             MR. ART:  Yeah.  We should do it --

17             MS. SCHNEEMAN:  You need a set-up.

18             MR. ART:  -- we should do it at break.  So let

19        me keep going --

20             MS. SCHNEEMAN:  Okay.

21             THE WITNESS:  Okay.

22             MR. ART:  -- and we'll come back to the video,

23        because I want to watch a couple things on the

24        video, anyway.

25             THE WITNESS:  Okay.
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1   BY MR. ART:

 2        Q    The next paragraph on the next -- the first

 3   paragraph on the next page, please.  So the page marked

 4   D1097.

 5        A    Okay.

 6        Q    It states, "Lieutenant Blackwell, Officer

 7   Renee Elliot, Officer Elizabeth Laut, and Holly Walters

 8   all advised that prior to each tase administered

 9   throughout this incident, Todero was given verbal

10   commands, did not comply, and at times physically

11   resisted."  Do you see that?

12        A    Yes.

13        Q    Why do you say, "at times physically

14   resisted"?

15        A    Because Officer Elliot and Officer Laut, along

16   with Holly Walters, and Lieutenant Blackwell all stated

17   in their video-recorded statements that he had his hands

18   underneath his body and would offer resistance when they

19   tried to pull his hands out.  That he was rolling,

20   struggling.  And at times they would get a hand out, and

21   then he would pull it back, away from them.

22        Q    Okay.  So he was lying on his hands, correct?

23        A    Yes.

24        Q    He was pulling his hands away from them,

25   correct?
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 1:17-cv-01698-JPH-MJD   Document 125-54   Filed 08/13/18   Page 207 of 639 PageID #:
4886
The Deposition of CHARLES TODERO, taken 04/25/18    205

```
 1        A     Yes.

 2        Q     He was rocking back and forth?  Is that a

 3   fair --

 4        A     Yes.

 5        Q     -- way to say?  Other than that, was he

 6   offering any other kind of physical resistance?

 7        A     No.

 8        Q     At any time during the incident, other than

 9   what you've just testified about, was Charlie Todero

10   physically resisting?

11        A     Yes.  When Lieutenant Blackwell placed a hand

12   on his shoulder to try to stop him, and he continued to

13   walk.

14        Q     Okay.  So he physically resisted by walking

15   away, correct?

16        A     Are you -- yes.

17        Q     And then once he was on the ground, he

18   physically resisted by first lying on his hands,

19   correct?

20        A     Correct.

21        Q     Second, pulling his hands away from the

22   officers, correct?

23        A     Correct.

24        Q     And third, rocking his body back and forth,

25   correct?
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1        A     Yes.
 2        Q     Other than doing those things, did Charlie
 3   Todero physically resist, based on evidence you
 4   developed during your investigation, at any time during
 5   the incident?
 6        A     No.
 7        Q     Did he physically resist in any other way
 8   during the incident?
 9        A     Besides the medic's report of him kicking and
10   -- are we --
11        Q     Before --
12        A     -- is this -- okay.
13        Q     -- before the tasing stopped.
14        A     No.
15        Q     So let me ask so that I get it cleanly: other
16   than what you've testified about already, did Charlie
17   Todero physically resist in any other way at any time
18   during the tasing?
19        A     Any other way than was already stated?
20        Q     Yes.
21        A     No.
22        Q     You don't mention Charlie Todero hitting his
23   head on the ground in this Summary of Facts, correct?
24        A     Correct.
25        Q     Why not?
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

207

```
1        A    I didn't think it was relevant.  I'm not sure.

2        Q    Why wasn't it relevant?

3        A    The -- him hitting his head was stated by one

4   of the witnesses, Holly Walters.  And that was in the

5   tape-recorded interview, which is in here.

6        Q    Right.

7        A    So it is documented.  But I didn't feel the

8   need to put it in the Summary of Facts.

9        Q    So the question is: why didn't you feel the

10  need to put it in the Summary of Facts?

11       A    Because at the time that she alleges he hit

12  his head on the curb, the use of force was terminated.

13  He was in custody, sitting upright on the curb, waiting

14  for paramedics to arrive.  So it would not have been a

15  use of force issue.

16       Q    Are you sure that that use of -- that him

17  hitting his head on the curb occurred after the use of

18  force had ended?

19       A    Yes.

20       Q    What's that based on?

21       A    Her statements.

22       Q    The second paragraph on this page states,

23  "Lieutenant Blackwell's taser log indicated that the

24  taser was activated 16 times in a three minute and ten

25  second time span."  Do you see that?
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1        A    Yes.

 2        Q    "The total duration of the time" -- strike

 3   that, please.  And then it continues, "The total

 4   duration of time that the taser was activated during

 5   this time span was one minute and 38 seconds."

 6        A    Yes.

 7        Q    Okay?  Does that accurately describe the Taser

 8   deployment memorialized on the taser log?

 9        A    Yes.

10        Q    Okay.  Did you do anything to reconcile that

11   number of tases, 16, with the six that appear in

12   Lieutenant Blackwell's Use of Force Report?

13             MS. SCHNEEMAN:  Objection.  Form of question.

14        Vague and ambiguous.

15        A    I don't remember.  I don't.

16        Q    Did you question Blackwell at any point in

17   time about why his Use of Force report only memorialized

18   six tases when the taser log recorded 16 deployments?

19        A    Can you re-ask that?  I'm sorry.

20        Q    So in the Use of Force report, Lieutenant

21   Blackwell describes six tases of Charlie Todero, do you

22   agree with that?

23        A    I -- I'll have to look at it.  I -- I don't --

24   that doesn't ring a bell.

25        Q    Okay.  Does it -- did it ever strike you as an
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1   issue in your investigation that Lieutenant Blackwell's
 2   Use of Force Report reported a different number of
 3   tasers than the Taser log?
 4        A    No.
 5        Q    Okay.  And did you ever take any action to
 6   investigate why there was a discrepancy between those
 7   two documents?
 8        A    First, I'd like to see where it states that.
 9        Q    If you're looking at his Use of Force Report,
10   it recounts six activations, or deployment, of the
11   taser.  We have to count -- you have to count the ones
12   that he describes in his report.
13        A    Okay.  Give me a minute to --
14        Q    Please --
15        A    -- review this.
16        Q    -- please do.
17             MR. ART:  Do you want to take a break while he
18        reviews this?
19                       (OFF THE RECORD)
20   BY MR. ART:
21        Q    Have you had a chance, now, to review
22   Lieutenant Blackwell's Use of Force Report which is part
23   of Exhibit 1?
24        A    Yes.
25        Q    Does it memorialize six tases?
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1      A    Yes.

2      Q    **Does it memorialize more than six tases?**

3      A    Yes.  In my opinion it does.

4      Q    **Tell me why.**

5      A    It said, "I told," -- in the -- halfway

6  through the second paragraph -- "I told Charles that he

7  was going to get tased again," -- and I believe this is

8  the fifth -- "if he didn't comply.  He refused, and

9  another application was given.  This continued for about

10 two minutes before the other hand was retrieved."

11     Q    **In your opinion, how many tases are**

12 **memorialized in Officer Blackwell's Use of Force Report?**

13     A    I think that his statement of "it continued" -

14 - because he stated that he applied the taser, and that

15 it continued for about two minutes before the struggle

16 and the tasing, is how I took that.

17     Q    Okay.  So how many tases is that?

18     A    I -- it's not specific.

19     Q    **Do you agree with me that you cannot tell from**

20 **the report?**

21     A    Yes.

22     Q    **So if you adopt your interpretation of the**

23 **report, it is more than six tases, correct?**

24     A    Yes.

25     Q    **But you cannot tell how many, correct?**

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1        A    Correct.

 2        Q    Did you make any effort to determine how many

 3   he -- strike that, please.  Did you make any attempt

 4   during your investigation to clarify with him how many

 5   tases he was reporting in this Use of Force Report?

 6        A    No.  I -- I did not expect him to remember

 7   exactly how many.  He was pretty close.  In his

 8   conversation with me on the phone the day of, he advised

 9   me that he thought he had administered 15.

10        Q    Okay.  So on the day of the incident, he

11   reported to you that he administered 15 tases?

12        A    Yes.

13        Q    Did he --

14        A    Approximately.

15        Q    -- did you report that anywhere?

16        A    Let's see here.  I believe it's in his

17   statement.

18        Q    But did you report that anywhere?

19        A    No.

20        Q    Okay.

21        A    Like I said, this whole document is my report.

22        Q    So when you got the Use of Force Report from

23   him, and it said six -- and it memorialized six tases

24   and then continuing tases --

25        A    Yes.
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1        Q     -- did you --

 2              MS. SCHNEEMAN:  Objection to form of question.

 3        Your characterization of the document.

 4        Q     Do you -- would you characterize that document

 5   as recording six tases and then continuing tasing?

 6        A     Yes.

 7        Q     I thought that that was your interpretation,

 8   correct?

 9        A     Yes.  I don't think -- I don't believe he knew

10   -- could accurately recall exactly the number and -- and

11   sequence of the tases.

12        Q     You agree with me that a Use of Force Report

13   is supposed to identify each use of force that the

14   officer has used, right?

15        A     Yes.

16        Q     Okay.  So a properly filled-out Use of Force

17   Report would memorialize, to the best of the officer's

18   recollection, each time he had used the taser, correct?

19        A     Yes.  And I believe that that's what we have.

20        Q     Okay.  So he said to you on the telephone, the

21   day before he submitted this report, that he had tased

22   Charlie 15 times, correct?

23        A     Approximately.

24        Q     Right.  And so then you got a report from him

25   that memorialized six, and then said the tasing
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 1:17-cv-01698-JPH-MJD   Document 125-54   Filed 08/13/18   Page 215 of 639 PageID #:
4894
The Deposition of Suan Hoskinson, taken August 10th, 2018                    213

 1   continued, correct?

 2      A    Yes.

 3      Q    And did you say to Lieutenant Blackwell, "Hey,

 4   you've got to put down each time you used force here?"

 5      A    I did not, no.

 6      Q    Why not?

 7      A    Because he documented to the best of his

 8   ability.  I can't -- I can't ask him to remember

 9   something that he doesn't remember.

10      Q    But he had just told you it was approximately

11   15?

12      A    Right.

13      Q    So why didn't you say, "Why don't we write

14   down approximately 15 in here?"

15      A    You know, if he -- I guess if he would have

16   taken out the "went on for two minutes" and added a

17   number, we wouldn't be having this discussion.  But I

18   can't advise --

19      Q    But anyway -- at any rate, you didn't go back

20   to him and ask him to clarify, correct?

21      A    In our interview, I believe I did ask him, and

22   he said to the -- that he couldn't remember each

23   specific incident, that it went on for several minutes.

24      Q    Fair enough.  Would you agree with me that

25   each use of force must be justified?

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1        A    It should be, yes.

 2        Q    Okay.  So if I use a taser once, I've got to

 3   justify one use of the taser, correct?

 4        A    Correct.

 5        Q    And if I use it a hundred times, I've got to

 6   justify a hundred uses of the taser?

 7        A    Yes.

 8        Q    Do you agree that the Use of Force report does

 9   not justify each use of the taser?

10        A    I don't agree.

11        Q    Why don't you agree?

12        A    Because he stated that Mr. Todero -- he

13   accounted for each additional -- or each tase up to a

14   point, and then lumped several in to the same resistive

15   action that Mr. Todero was providing that he continued

16   to pull away, was resistive, and he got tased.

17        Q    So in your view, after he gets to six,

18   Blackwell is simply saying, "The same thing kept

19   happening repeatedly?"

20        A    Yes.

21        Q    "And I kept tasing repeatedly?"  That's how

22   you read the Use of Force Report, correct?

23        A    I think he -- what he's saying is, the same

24   resistance was provided by Mr. Todero, and his response

25   was, yes, the same after each -- after each resistive
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1   action.

 2        Q    Did you ever in your investigation go any

 3   further than what's written in Blackwell's Use of Force

 4   Report to justify individually each taser deployment

 5   that Blackwell used?

 6            MS. SCHNEEMAN:  Objection. Form of question.

 7        Did he justify the uses of force?

 8            MR. ART:  Correct.

 9   BY MR. ART:

10        Q    Did you ever go further --

11            MS. SCHNEEMAN:  Objection.  Form of the

12        question.

13        Q    -- in your investigation to justify each use

14   of force or each taser deployment that Lieutenant

15   Blackwell used against Charlie Todero?

16        A    Okay.  So since I wasn't there, and there was

17   no video up until the point in which Officer Elliot

18   activated her camera, which is well into the incident,

19   there would be no way for me to review each taser

20   application other than what I did by comparing the

21   statements with the timestamps on the radio traffic, the

22   CAD log, and the taser -- inner clock of the taser.

23        Q    And that's what I'm getting at.  In your

24   investigation, you didn't go further than what Blackwell

25   wrote in his Use of Force report to justify each
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
1    individual tase that Blackwell used, correct?

2              MS. SCHNEEMAN:  Objection.  Form of question.

3         Misstates the facts and the evidence.

4         A    I reviewed the number of tases in accordance

5    with the time frames.  I don't know how I would have

6    been able to -- other than the statements given to me,

7    it's not video recorded, and I wasn't there.  So I --

8    all I can do is use the evidence that I have to come to

9    the most educated conclusion that can be made.

10        Q    Based on your review of the video, is there

11   any taser deployment in this incident captured on video?

12        A    No.

13        Q    Did you see Blackwell at any point in the

14   video using a drive-stun against Charlie Todero?

15        A    No.

16        Q    If that had appeared on video, would it have

17   been important to your investigation?

18        A    Yes.

19        Q    Why?

20        A    Well, it would have been evidence of the use

21   of force.

22        Q    And you could have linked what you saw in the

23   video up to the taser log, correct?

24        A    No.  I would have still been approximating

25   time.  Like I said, the time differences between the
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 1:17-cv-01698-JPH-MJD Document 125-54 Filed 08/13/18 Page 219 of 639 PageID #:
4898
The Deposition of Cameron Larsen, taken 04/25/18

217

```
1    inner clocks was problematic.
2         Q    Yeah.
3         A    Not really the best answer.
4         Q    We'll get to that.  So one question I have
5    about the clocks is: do you base the time of the first
6    tase off of Blackwell radioing it in?
7         A    Yes.
8         Q    In your investigation, could you figure out
9    any better way to figure out the time of the first tase?
10        A    No.
11        Q    Would you agree with me that it is likely that
12   Blackwell didn't deploy his taser and say that on the
13   radio at the exact same moment?
14        A    I -- that would be speculating.  I don't know.
15        Q    Okay.  In other words, you can't tell whether
16   the first deployment of the taser and him radioing that
17   in happened at the same time, correct?
18        A    Correct.
19        Q    Only Blackwell could tell us that, correct?
20        A    Correct.
21        Q    Did you ever ask him?
22        A    I believe his account was that he administered
23   the tase and immediately advised "taser deployed."
24        Q    And that is in the videoed interview that he
25   did with you?
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1        A     Let's see.

 2        Q     I guess what I'm asking is -- let me strike

 3   that question and ask you a different question.

 4        A     Okay.

 5        Q     You had a phone call with him on the day of

 6   the incident, correct?

 7        A     Yes.

 8        Q     He told you he'd used the taser 15 times

 9   against Charlie --

10        A     Approximately, yes.

11        Q     -- approximately?  Anything else he told you

12   during that phone call that you can recall?

13        A     Just the synopsis of the incident.

14        Q     What did he say to you?

15        A     Verbatim, I couldn't tell you.  But the gist

16   of it, he called me, let me know that they had a

17   suicidal subject.  I knew of Charlie Todero, he used his

18   name.  Said it was Charles Todero, that he was walking

19   in front of cars, that he didn't respond to -- or

20   basically resisted, failed to comply with commands. That

21   he tased him.  It was in the roadway.  That the taser

22   didn't have much effect on Charlie, and that he had to

23   tase him multiple times.  I don't know whether I asked

24   him how many or whether he volunteered, but he did say

25   approximately 15.  He stated that Charlie was fine. They
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1    called for medics according to policy, they transported

2    Charlie with intentions of doing a psychiatric

3    evaluation due to his mental state.  And that he later

4    found out that Charlie had went into cardiac arrest in

5    the ambulance, and that he responded to the hospital,

6    and that he had a conversation with the doctor.  Doctor

7    told him not to -- you know, that this had nothing --

8    that Charlie's condition had nothing to do with the

9    taser.  And that was the gist of it.

10        **Q    Why didn't you write a report recording all of**

11   **that information that Blackwell contemporaneously**

12   **provided to you on the day of the incident?**

13        A    Like I said, all of it -- all of it is in

14   here.  It's in the -- it's all in Lieutenant Blackwell's

15   statement.

16        **Q    Okay.  When did Lieutenant Blackwell give that**

17   **statement?**

18        A    This was -- let's see here.  This was on June

19   the 13.

20        **Q    So you're saying two weeks prior to giving**

21   **that statement, he provided you all of that information**

22   **over the phone, and you did not write a police report,**

23   **correct?**

24        A    No.  I did not.

25        **Q    What is the reason that you did not write a**

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201



KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1    police report two weeks prior to him giving you the

2    statement, memorializing what he had told you on the day

3    of the incident?

4              MS. SCHNEEMAN:  Okay.  Objection. Form of

5         question.  Assumes certain facts.

6         A    I think I see where you're going, now.  I kind

7    of misunderstood you.  The -- our policy with me being

8    the deputy chief is any time there is a major incident,

9    a robbery, a officer-involved shooting, a use of force,

10   anything that can be construed as a media incident --

11   media interest, I should say, the on-duty supervisor is

12   required to contact me by phone, and then I determine if

13   it needs to go to my boss.  It is not uncommon for me to

14   get phone calls daily, in the middle of the night, of

15   incidents that occur.  At that point, I had no reason to

16   believe that there was going to be an investigation, so

17   I did not do -- I did not do any type of report on it.

18        Q    After you learned that there was going to be

19   an investigation on June 7, a week later, why didn't you

20   write a report?

21        A    I -- I didn't -- I don't see that that's

22   relevant.  I still --

23        Q    Why isn't --

24        A    -- don't.

25        Q    -- why isn't the information that Blackwell

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 1:17-cv-01698-JPH-MJD   Document 125-54   Filed 08/13/18   Page 223 of 639 PageID #:
4902
The Deposition of Cameron Parten, taken April 6, 2017                221

```
1    told you on the day of the incident about what had
2    happened during the incident relevant to the
3    investigation of the incident?
4        A    That was a conversation between he and I over
5    the phone before there was any reason -- before I was
6    ordered to do an investigation, and there was no
7    information provided that wasn't provided in the report.
8        Q    Okay.  When the investigation started on June
9    7, before Blackwell had given his interview, what is the
10   reason you did not write a report memorializing the
11   conversation you had had with him on May 29?
12           MS. SCHNEEMAN:  Okay.  Objection. Same
13       objection as before.  Assumes certain facts.
14       Q    Go ahead.
15       A    I don't -- I don't know how to answer it
16   anyway.  I didn't memorialize it, I didn't write a
17   report, I didn't feel that it was necessary.  It's
18   common for shift commanders -- he's a shift commander --
19   to contact me and notify me of incidents.  The
20   investigation was well over a week -- began a week
21   later, and I found no information -- nothing
22   contradicting the information that he told me at the
23   time, and the report.
24       Q    But you didn't have that information when the
25   investigation started.
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1       A     The information that he told me over the
 2  phone?
 3       Q     You didn't have the information from his video
 4  interview, which happened on June 13, when the
 5  investigation started on June 7.
 6       A     Right.
 7       Q     So why didn't you, in the time period between
 8  the investigation starting, and interviewing him make
 9  any record that this phone call had occurred?
10       A     I didn't see a need to.
11       Q     Okay.  Did you rely on that phone call in any
12  way in evaluating whether his use of force was
13  reasonable?
14       A     In the course of my investigation, or at the
15  time?
16       Q     In reaching your findings about the use of
17  force being reasonable and policies being followed, did
18  you rely, in any way, on the conversation that you had
19  had with Lieutenant Blackwell on May 29?
20       A     It was consistent with what I found in my
21  investigation.
22       Q     Okay.  Did you --
23       A     But --
24       Q     -- did you rely on that conversation,
25  though --
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 1:17-cv-01698-JPH-MJD   Document 125-54   Filed 08/13/18   Page 225 of 639 PageID #:
4904
The Deposition of Jon Robeson, taken June 13, 2017          223

```
1        A    No.

2        Q    -- as support for your findings?

3        A    No.

4        Q    Did you report that conversation to Chief Laut

5   at any point in time?

6        A    Yes.  Because I called Chief Fillenwarth, he

7   called -- he contacted Chief Laut.

8        Q    And you-all shared this information that

9   Blackwell had provided to you during those phone calls?

10       A    Yes.

11       Q    And did that occur on May 29?

12       A    Yes.

13       Q    And did any of them write a report about it?

14       A    No.

15       Q    Do you know why not?

16       A    I don't.  I would assume for the same reason

17  that I didn't.

18       Q    You testified earlier that you had not had

19  conversations with witnesses other that the -- what was

20  recorded on the video interviews.  Do you remember that

21  testimony?

22       A    Yes.

23       Q    So this was a conversation with Blackwell that

24  was not on the video interview, correct?

25       A    Correct.
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1              MS. SCHNEEMAN: To be clear, he told you about
 2         this earlier in the deposition.
 3              MR ART:     Is that responsive to something?
 4              MS. SCHNEEMAN:  Yeah.  Because you're
 5         suggesting that this is the first time you've heard
 6         it today but asked and answered.  And you can cover
 7         the topic again, I guess.
 8  BY MR. ART:
 9         Q    Okay.  Did you have any other conversations
10  with Blackwell other than this phone call on the 30 --
11         A    You see --
12         Q    -- and -- hold on, let me get the question out
13  -- and the videotaped interview that you did on June 13?
14         A    I believe the question that was asked earlier
15  was during the course of my investigation did I have any
16  conversations.  This wasn't during the course of my
17  investigation.
18         Q    Okay.
19         A    I wasn't avoiding it, it just wasn't in my
20  mind.
21         Q    Okay.  So did you have any other conversations
22  with Blackwell about this incident other than the one on
23  the phone on May 29, and the videotaped interview on
24  June 13?
25              MS. SCHNEEMAN:  And the other ones he told you
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 1:17-cv-01698-JPH-MJD   Document 125-54   Filed 08/13/18   Page 227 of 639 PageID #:
4906
The Deposition of CAMERON TALLEY, taken 06/13/2017    225

```
 1        about earlier today.

 2        A     Not that I recall.

 3        Q     Earlier he described conversations where he

 4   said, "We support you in that kind of thing," --

 5        A     Yes.

 6        Q     -- but it did not discuss the subject.

 7        A     Right.  Yeah.

 8        Q     So am I correct in understanding that you've

 9   had two occasions on which you've discussed the

10   substance of this incident with Lieutenant Blackwell?

11        A     There was an occasion in which I told him --

12   which I reported to you earlier -- that I did not want

13   him and Officer Elliot conversing concerning this case,

14   this investigation.

15        Q     So other than that conversation, the May 29

16   call, the June 13 interview, have you had any

17   conversation with Lieutenant Blackwell about the

18   substance --

19        A     The substance, no.

20        Q     -- of this incident?

21        A     No.

22        Q     Okay.

23        A     Other than to just reassure him he's going to

24   be okay.

25        Q     What did you tell him during the May 29 call?
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1        A    I just took the information and said, "Okay."

 2        Q    You didn't say anything else other than,

 3   "okay?"

 4        A    I don't remember exactly what I said, but our

 5   conversation was not long.

 6        Q    Okay.  Did he say anything about his history

 7   with Charlie Todero during that call?

 8        A    I don't remember.

 9        Q    Did he say anything during that call that you

10   haven't testified about already today?  And I want you

11   to take as long as you need to think about it, because I

12   don't want new stuff that's not in any report coming up

13   at trial.

14        A    Oh, I get it.  Understand you're asking me to

15   remember something that was --

16        Q    A long time ago?

17        A    Yes.

18        Q    And there's no report memorializing it,

19   correct?

20        A    Correct.

21        Q    So you can't refresh your recollection with

22   anything, correct?

23        A    (NO VERBAL RESPONSE.)

24        Q    So my question is: other than what you've

25   testified about already, do you remember any other fact
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1   that Lieutenant Blackwell told you during that May 29

 2   call?

 3        A    I don't.

 4        Q    Say -- tell me in your own words why you found

 5   Lieutenant Blackwell's use of force to be justified.

 6        A    Other than what I've already stated?  I'm not

 7   -- I feel like we've covered this.  Charlie Todero, not

 8   following Lieutenant Blackwell's orders, and physically

 9   pulling away from him or walking away from him when he

10   tried to physically put his hand on his shoulder, fell

11   within our policy that a Taser application could be

12   used.  Charlie was a danger to himself, he was a danger

13   to Lieutenant Blackwell at that point with a stake in

14   place in the road.  We have multiple people -- witnesses

15   stating that Charlie was walking out in front of cars.

16   They believed that he was either on drugs or trying to

17   commit suicide.  I have to go off of the information

18   that the officer had at the time, and the circumstances

19   surrounding it.  You are right in saying that each

20   individual action is in and of itself.  Each individual

21   tase is in and of itself a use of force.  And each --

22   all of the witnesses involved, and the officers involved

23   stated that Charlie was given ample time after each

24   command to cease resisting, and to comply.  And that he

25   refused.  Oftentimes physically pulling away, rolling,
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1   kicking.  This is all justifiable.  This is -- it falls
 2   in the reasonable force category of our policy.  The
 3   force used was reasonable.
 4        Q    Any -- anything else other than what you just
 5   testified about justifying the use of force?
 6        A    No.
 7        Q    You said you had no role in setting up the
 8   press conference, correct?
 9        A    I had none.
10        Q    Do you agree with me that there is a limit the
11   number of times a taser should be used against a human
12   being?
13        A    No.
14        Q    You think there's no limit to the number of
15   times a taser can be used against a human being?
16             MS. SCHNEEMAN:  Objection.  Form of question.
17        A    No.  I don't.  I think that each incident is
18   unique, and I think it depends on the facts and the
19   circumstances surrounding each individual incident.
20        Q    Are you aware of any upper time limit that
21   Taser sets for use of a taser against a human being?
22        A    I believe Taser -- it's a recommendation that
23   after three tases, or 15 seconds, it's recommended that
24   the officer -- I'm trying to think of how they
25   specifically state it -- consider other options.
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
1        Q    Are there -- strike that, please.  In your
2   view, are there situations that would justify the use of
3   a taser 100 times against a human being?
4             MS. SCHNEEMAN:  Objection.  Calls for
5        speculation. Incomplete hypothetical.  You can go
6        ahead.
7        A    I don't know.  In the situation -- this is
8   hypothetical.
9        Q    My question is: is there a -- in your mind --
10  an upper limit to the number of times it's safe to use a
11  taser on a human being period, or does it depend on the
12  circumstances?
13            MS. SCHNEEMAN:  Same objection.  Calls for
14       speculation.  Incomplete hypothetical.
15       A    I think it would depend on the circumstances.
16       Q    Okay.  What about -- same question but with
17  respect to the duration the taser is used.  Is there an
18  amount of time over which use of a taser becomes
19  dangerous to a human being, or does it depend on the
20  situation?
21            MS. SCHNEEMAN:  Objection.  Form of question.
22       Calls for speculation.  Incomplete hypothetical.
23       Personal knowledge.
24       A    So that answer is going to be two-fold.  The
25  first is: we are trained that after a five-second burst,
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1   that we allow for compliance, and then tase again if we

2   don't get compliance.  Hypothetically, yes, there could

3   be a long duration, longer than five seconds, of

4   electricity administered, and situations that would call

5   for legal force.  Or -- so I'm just saying, if somebody

6   has a gun and they're refusing to drop the gun, yes,

7   it's conceivable that the officer, if he'd begun --

8   began tasing, would not release the trigger.

9   BY MR. ART:

10          Q     Do you agree with me, then, that use of a

11   Taser can constitute the use of deadly force?

12               MS. SCHNEEMAN:  Objection.  Form of question.

13          A     No.  I don't think so.  I think that if --

14   that's why in situations in which -- for instance, when

15   we serve a search warrant, or go into a home, you

16   usually have a less-lethal and a lethal option

17   available.

18          Q     In your view, is use of a taser never deadly

19   force?

20          A     I think that use of a taser is never -- I have

21   never experienced a taser-related death.  I have never

22   investigated, I have never -- to my knowledge -- had one

23   at the Greenwood Police Department.  I know that from

24   training, there are instances in which people have

25   experienced death immediately after being tased, but no,

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 1:17-cv-01698-JPH-MJD   Document 125-54   Filed 08/13/18   Page 233 of 639 PageID #:
4912
The Deposition of Cameron Paxton, taken 08/13/18    Page 231

```
 1    I have no specific knowledge.
 2         Q    So in your experience, you do not consider the
 3    use of a taser to be the use of deadly force?
 4         A    No.  It's a -- it's a less -- it's actually
 5    considered less lethal.
 6         Q    And does -- strike that, please.  Is that your
 7    view no matter how many times the taser is used against
 8    a subject?
 9         A    Yes.  I don't think that the number of times
10    constitutes it as deadly force.
11         Q    And is that your view no matter of the
12    duration of the cumulative time that the taser is used
13    against a single subject?
14         A    Yes.
15         Q    Would you agree --
16         A    No, I'll give you more.
17         Q    Yeah.  Please.  Please, go ahead.  Sorry.
18         A    I remember a training video in -- I believe it
19    was Montana -- but the deputy was by himself and the guy
20    -- the perpetrator was tased for 35 or 40 minutes
21    straight.  Until the deputy had back-up arrive.  And I
22    believe the suspect kept getting up and saying, "I'm
23    going to kill you," coming at the deputy, "I'm going to
24    kill you." So that situation, the deputy's by himself.
25         Q    Was it --
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
1      A    I think --

2      Q    -- a grizzly bear?

3      A    -- that -- no.  I think that --

4           MS. SCHNEEMAN:  I was wondering why you were

5      laughing.

6      Q    35 minutes?

7      A    Like, 35 to 40 minutes, but yeah, I think that

8  in lieu of having to shoot the subject, yes, I think it

9  is reasonable to -- there are situations, is what I'm

10 saying, that it may be necessary to do that.

11     Q    Okay.  In your view, the use of the taser in

12 this case, for a minute 38 within about three minutes

13 was not excessive, correct?

14     A    Correct.

15     Q    And the use of a taser 16 times was not

16 excessive, correct?

17     A    Correct.

18     Q    If Charlie had been lying on the ground and

19 had put his arms behind his back, would there have been

20 any justification for the use of force against him if he

21 had done that?

22          MS. SCHNEEMAN:  I'm going to object to the

23     form of the question, incomplete hypothetical, and

24     calls for speculation.

25     A    Yeah.  I wouldn't want to speculate.
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1    That's --
 2    BY MR. ART:
 3         Q     Go ahead and speculate.
 4              MS. SCHNEEMAN:  I'm not sure what facts you're
 5         asking him to consider.
 6         Q     Everything is the exact same as you'd
 7    uncovered during your investigation, except Charlie was
 8    lying on his face and puts his hands behind his back.
 9         A     So you're saying that Charlie complied with
10    the officer's orders and was handcuffed?
11         Q     Correct.
12         A     Yes.  The tasing should have stopped.
13         Q     If you had -- strike that.  In your view --
14    strike that.  Based on your investigation, did the
15    tasing have anything to do with Charlie's death?
16         A     No.
17         Q     Do you believe that Charlie would have died in
18    the hospital on June 11, 2016 if he hadn't been tased by
19    Lieutenant Blackwell?
20         A     I'm not a medical doctor.  I'm not qualified
21    to answer that.
22         Q     But you are testifying, though, that the taser
23    had nothing to do with the death, correct?
24         A     Correct.
25         Q     So would you agree with me that, logically
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1   then, if you assume the taser had nothing to do with the

2   death, then Charlie would have died on the same day in

3   the hospital --

4        MS. SCHNEEMAN:  Objection.

5   Q     -- whether -- hold on -- whether or not --

6        MS. SCHNEEMAN:  Well, I thought --

7   Q     -- the tasing had

8        MS. SCHNEEMAN:  -- you were done with your

9   question, I'm sorry.

10        MR. ART:  That's fair.

11        MS. SCHNEEMAN:  If I didn't think so, I

12   wouldn't have started there.

13        MR. ART:  Yeah.  Go ahead.

14        MS. SCHNEEMAN:  Okay.  No, go ahead.  Finish

15   your question.

16        MR. ART:  No, I have now finished it.

17        MS. SCHNEEMAN:  Okay.  Why don't we have the

18   court reporter read it back so we're all -- hear

19   the full question.

20    (REPORTER PLAYS BACK REQUESTED TESTIMONY)

21        MS. SCHNEEMAN:  I have the same objection.

22        MR. ART:  Okay.  Go ahead.

23        MS. SCHNEEMAN:  And asked and answered, as

24   well.

25   A     So, no.  Once again, I'm not qualified.  All I

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 1:17-cv-01698-JPH-MJD   Document 125-54   Filed 08/13/18   Page 237 of 639 PageID #:
4916
The Deposition of   Cameron Taken   of April 6,   2018     235

1   can go off of is my -- I went off of the medical

2   expert's opinion that he died of natural causes, and

3   that he had several underlying health issues that

4   contributed to his death.

5   BY MR. ART:

6       Q       So you're not a medical expert, correct?

7       A       Correct.

8       Q       So you can't tell us one way or the other

9   whether the taser caused the symptoms he suffered in the

10  hospital, correct?

11      A       You asked me my opinion of that.

12      Q       Right.

13      A       And so my opinion is no, the taser did not.

14  And the reason for that opinion is because the autopsy

15  report states that it was due to multi-system liver --

16  or multi-system organ failure, and natural causes due to

17  underlying issues that -- severe underlying health

18  issues that he had.

19      Q       So if you can provide that medical opinion why

20  can't --

21      A       I'm not.

22      Q       -- you provide the one that he would've died

23  anyway?

24              MS. SCHNEEMAN:  Okay.  Objection.

25      Argumentative.  He didn't say he was providing a

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 1:17-cv-01698-JPH-MJD   Document 125-54   Filed 08/13/18   Page 238 of 639 PageID #:
4917
The Deposition of   Jim Jackson, taken   08/13/18   236

```
 1         medical opinion, he was telling you what he's read
 2         in his investigation.
 3  BY MR. ART:
 4      Q    Okay.  Is your conclusion about Charlie's
 5  cause of death based entirely on the autopsy report?
 6      A    Yes.
 7      Q    Okay.  Do you --
 8      A    And Dr. Hartman's statement.
 9      Q    Okay.  So other than those two statements, can
10  you reach any conclusion one way or the other about
11  whether the taser caused particular symptoms in Charlie
12  Todero while he was in the hospital.
13         MS. SCHNEEMAN:  Do you need a read of that
14         question back?
15         THE WITNESS:  Yeah, please.
16         MR. ART:  Well, let me just ask it again.
17         MS. SCHNEEMAN:  Okay.
18  BY MR. ART:
19      Q    What I'm wondering about is what you're going
20  to come to trial and provide testimony about, okay?  And
21  so if you're saying, "I've read this autopsy report, I
22  see it says, 'death from natural causes,' I'm basing my
23  conclusion on that.  I know what Dr. Hartman said."
24  That's one thing.  But if you're going to come to trial
25  and testify, "Here's how I think this cause of death
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 1:17-cv-01698-JPH-MJD   Document 125-54   Filed 08/13/18   Page 239 of 639 PageID #:
4918
The Deposition of SIMEON RAKENS, taken 04/13/18                    237

```
 1    happened."
 2         A    Right.
 3         Q    That's another, okay?  So that's what I'm
 4    getting at --
 5         A    No.
 6         Q    -- and what I'm asking you is: do you have any
 7    basis other than what Dr. Hartman told you, and what the
 8    coroner's office told you, to opine one way or the other
 9    about whether the taser caused Charlie's death?
10         A    No.  I went off of those reports.
11              MS. SCHNEEMAN:  Right.  And that was asked and
12         answered.
13         Q    Okay.  Do you agree with me that Charlie
14    Todero didn't have a weapon?
15         A    Yes.
16         Q    Do you agree with me that Blackwell, at no
17    time, thought that he had a weapon?
18         A    Yes.
19         Q    And Blackwell has never reported thinking that
20    --
21         A    I think that --
22         Q    -- he had a weapon?
23         A    -- Blackwell did -- I think there's no way for
24    Blackwell to know whether Charlie had a weapon or not,
25    until he was in custody.
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 1:17-cv-01698-JPH-MJD   Document 125-54   Filed 08/13/18   Page 240 of 639 PageID #:
4919
The Deposition of JEFFERSON BLACKWELL, taken April 13, 2017   238

```
 1        Q     Okay.  Did Blackwell ever express a concern to
 2   you that Charlie had a weapon?
 3        A     No.
 4        Q     Okay.  He didn't do in on the May 30 -- 29
 5   phone call, correct?
 6        A     Correct.
 7        Q     He didn't do it in his interview with you,
 8   correct?
 9        A     Correct.
10        Q     He didn't put it in his Use of Force Report,
11   correct?
12        A     Correct.
13        Q     So he's never expressed that concern
14   previously, that you're aware of, correct?
15        A     Correct.
16        Q     All right.  Do you agree with me that Charlie
17   went to his knees on the first application of the taser
18   that Blackwell used?
19        A     Yes.
20        Q     Okay.  And then do you agree with me that by
21   tase number six, at the latest, Charlie was on his
22   front?
23        A     Yes.
24        Q     Okay.  So do you agree with me then that --
25   strike that, please.  After Charlie was on his front,
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1   Blackwell was using drive-stun, correct?
 2        A    I think he used three or four at some point.
 3   There's no way to know -- the taser doesn't document the
 4   difference between a drive-stun or prong.
 5        Q    Did you ask him?
 6        A    Yes.  I mean, other than what I'm telling you
 7   is other than what he stated, there's no way to prove --
 8   differentiate in the Taser log whether it was a drive-
 9   stun.
10        Q    Do you agree with me that by the time Charlie
11   went down on the ground, on his front, Blackwell had
12   noticed, as he describes it, that barb was dangling and
13   not making a good connection?
14        A    Yes.
15        Q    And did he tell that at that point in time, he
16   used the drive-stun technique because there was not a
17   good connection?
18        A    Yes.
19        Q    And the drive-stun technique is used to
20   complete the circuit, correct?
21        A    Yes.
22        Q    So would you agree with me that after he
23   noticed there was a bad connection, he was using the
24   drive-stun technique when he was using the taser?
25        A    Yes.
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201



KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 1:17-cv-01698-JPH-MJD   Document 125-54   Filed 08/13/18   Page 242 of 639 PageID #:
4921
The Deposition of Steven Yount, taken 6-25-2018    240

```
 1      Q    Okay.  So if he's on his front by tase number
 2  six, that means tases seven through 16 are all drive-
 3  stun, correct?
 4          MS. SCHNEEMAN:  Objection.  Form of question.
 5      Makes assumptions about facts not in evidence.
 6      A    That I do not believe is accurate.
 7      Q    Why not?
 8      A    Yes.  I don't think that there's a -- I don't
 9  think it was specified.
10      Q    Do you agree with me that it wouldn't make
11  much sense for Officer Blackwell to go back to probe-
12  deployment mode after he had noticed there wasn't a
13  connection?
14          MS. SCHNEEMAN:  Objection as to form of
15      question.  Assumes facts not in evidence.
16      Q    Go ahead.
17          MS. SCHNEEMAN:  Speak up if you want.
18          MS. POLLACK:  I'm not sure it's a proper.  I
19      don't know if it's grounds for objection.  I think
20      there's a misunderstanding here of dry-stun versus
21      probes thing, here, but -- sorry.  Answer the
22      question if it makes sense to you, it doesn't make
23      sense to me based on my understanding.
24      A    I think that -- I'm not -- I don't know the
25  circumstance.  I wasn't there, I didn't view it.  So I
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 1:17-cv-01698-JPH-MJD   Document 125-54   Filed 08/13/18   Page 243 of 639 PageID #:
4922
The Deposition of Cameron Blackwell, taken Aug. 16, 2016
241

```
1   don't know how to answer that, because I don't know if

2   it was -- if the final tases were all drive-stuns or

3   not.

4   BY MR. ART:

5       Q    Did you ever ask Blackwell to tell you?

6       A    Yeah.  And he had a -- I mean, he had a hard

7   time remembering each individual --

8       Q    When did you ask him to tell you?

9       A    When I interviewed him, we discussed -- we

10  discussed the number of tases.

11      Q    Do you agree with me that in your interview

12  with him, you never ask him what the total number of

13  tases is?

14      A    He stated it several times, and I already knew

15  what the total number of tases were from the taser log.

16      Q    So in your view, the total number of tases is

17  what's reflected on the paperwork, correct?

18           MS. SCHNEEMAN:  Yeah.  Objection.  Form of

19           question as to the word "tases" and what that means

20      A    I'd need to view the video.

21      Q    Okay.  Review your report of your interview

22  with Blackwell and tell me whether it records a total

23  number of tases.

24      A    No. It doesn't.

25      Q    Is there a reason that you didn't ask him
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1   during that interview what the total number of tases

2   that he imposed on Charlie Todero was?

3        A    No.

4        Q    Is there a reason you didn't ask him during

5   that interview whether the tases the he was using after

6   Charlie was face-down on the ground were drive-stun or

7   another technique?

8        A    No.

9        Q    Is it difficult to determine whether the tases

10  are justified if you haven't even asked him what tases

11  he employed during the incident?

12       A    No.  I think that it -- each -- as we've

13  discussed multiple times, each individual act of

14  resistance, it doesn't matter if it's a drive-stun or a

15  prong tase, it's a tase.  So if the action of Mr. Todero

16  was physically resisting, then it -- each individual

17  taser application would be justified.

18       Q    But how would you know that if you don't know

19  the total number of tases?

20       A    I know the total number of tases?

21       Q    What is the total number of tases?

22       A    16.

23       Q    Does Blackwell dispute that?

24       A    No.  He doesn't dispute it.

25       Q    Did you do any investigation after you issued

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 1:17-cv-01698-JPH-MJD   Document 125-54   Filed 08/13/18   Page 245 of 639 PageID #:
4924
The Deposition of SOMEONE, taken on Apr 13, 2017

243

```
 1  your findings on June 27, 2016?
 2       A    No.  The only thing that I did after that was
 3  gather information that you requested.
 4       Q    Do you agree with me that on the body cam, the
 5  officers spend some time identifying which Todero
 6  brother they are dealing with?
 7       A    I would need to view it.
 8       Q    Do you have any recollection of Officer Eck
 9  looking up Charlie Todero's tattoos on the computer
10  system to identify him?
11       A    I'd need to view the video.
12       Q    So you don't have any recollection without
13  viewing the video --
14       A    Right.
15       Q    -- correct?
16       A    Right.
17       Q    Do you have any recollection, as you sit here,
18  of officer's having discussion about not being able to
19  identify Charlie Todero at the scene?
20       A    No.
21       Q    If they were having such a discussion, would
22  that be relevant at all to your investigation?
23       A    No.
24       Q    Why not?
25       A    Who was resisting is not relevant. The actions
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1   of -- and the actions of the officers are what is
 2   relevant.
 3       Q    So Blackwell's background knowledge of Charlie
 4   Todero would not be relevant to whether he was justified
 5   in using force against a resister, correct?
 6       A    I think it would --
 7            MS. SCHNEEMAN:  Objection.  Form of question.
 8       Yeah.  Go ahead.
 9       A    I think it would establish Lieutenant
10   Blackwell's mindset at the time, but it would not
11   justify using -- it wouldn't be the justification for
12   using force.
13       Q    Okay.  So the officer's inability to identify
14   which Todero brother it was on the body cam would be
15   relevant to Blackwell's mindset; is that correct?
16            MS. SCHNEEMAN:  Hold on.  I think there were
17       too many nots or negatives, I didn't follow that.
18       Could we have her read it back?
19       (REPORTER PLAYS BACK REQUESTED TESTIMONY)
20            MS. SCHNEEMAN:  I'm still not following the
21       question.
22            THE WITNESS:  I still don't understand.
23            MS. SCHNEEMAN:  Can you rephrase it?
24   BY MR. ART:
25       Q    If on the body cam video, the officers are
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 1:17-cv-01698-JPH-MJD   Document 125-54   Filed 08/13/18   Page 247 of 639 PageID #:
4926
The Deposition of CAMERON JON TAYLOR, taken 08/13/18                    245

1    having a discussion about not being able to identify

2    which Todero brother that is, okay, is that, in your

3    view, relevant or irrelevant to Blackwell's mindset?

4              MS. SCHNEEMAN:  Asked and answered.

5        A    I believe -- I don't think the question was

6    ever whether Blackwell recognized him, and I don't

7    recall the discussion about the tattoo.  But Blackwell

8    states that he recognized Charlie Todero as Charlie

9    Todero.

10       Q    In your interview with him, correct?

11       A    Yes.

12       Q    Okay.  But if at the scene, he could not

13   identify which Todero it was, would that be relevant, in

14   any way, to your investigation?

15             MS. SCHNEEMAN:  Okay.  Objection.  I think

16        misstates the facts, but you can go ahead.

17       A    It would not -- like I said, his knowledge of

18   Charles Todero establishes the officer's mindset, but it

19   doesn't justify use of force in and of itself.

20       Q    Did Blackwell report to you at any time during

21   your investigation his communications with the Todero

22   family?

23       A    No.

24       Q    Did he report to you anything about phone

25   calls with James Todero?

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1        A    Yes.  I believe -- and I remember this vaguely
 2   that he had said that, I believe, James Todero called
 3   the police department and was referred to Blackwell.  I
 4   instructed Lieutenant Blackwell that he shouldn't be
 5   having conversations with them.
 6        Q    Okay.  Did you make a report of any
 7   communication between Blackwell and the Todero family?
 8        A    No.
 9        Q    Why not?
10        A    I didn't feel it relevant.
11        Q    Why not?
12        A    My understanding was that Mr. -- that James
13   Todero, which is Charlie's brother, called asking
14   questions concerning the incident.  Wasn't given any
15   pertinent information, and that was -- that was it.
16        Q    Okay.  So Blackwell reported to you that he
17   did not give pertinent information to James Todero?
18        A    I don't remember the exact conversation.
19        Q    Do you remember anything about the
20   conversation?
21        A    Very little.  Just that Todero called.  He was
22   referred to Blackwell.  And I believe that this all
23   happened well before we even began an investigation.
24        Q    Okay.  What about -- what do you recall about
25   the conversation?
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1      A    I don't really recall anything, other than he
 2  was asking the questions.
 3      Q    Questions -- do you recall any of the
 4  questions that James Todero was asking?
 5      A    I don't.
 6      Q    Do you recall anything that Blackwell told you
 7  that he had told to James Todero?
 8      A    No, I don't.
 9      Q    Okay.  So you recall one phone call between
10  Blackwell and James Todero, correct?
11      A    Yes.
12      Q    Do you recall Blackwell telling you about any
13  other phone call between he and James Todero?
14      A    No.
15      Q    All of the reports that you produced during
16  your investigation are in Exhibit 1, correct?
17      A    Yes.
18      Q    You wrote all of them, correct?
19      A    Yes.
20      Q    Did anyone help you write them?
21      A    Oh, I did not write the state police report,
22  the coroner's report --
23      Q    Sorry.
24           MS. SCHNEEMAN:  He figures that.
25      A    The medic report.
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

The Deposition of Cameron Faber, taken 07/13/18

248

```
 1              MS. SCHNEEMAN:  Asked and answered.
 2       Q     Let me back up.  All of the reports that you
 3  wrote on interviews you've conducted are in Exhibit 1,
 4  correct?
 5       A     Yes.
 6       Q     In that subset of reports, did you write all
 7  of them?
 8       A     Yes.
 9       Q     Did anyone help you write them?
10       A     No.
11       Q     Okay.  Are all the copies of them that are in
12  Exhibit 1 true and accurate copies of the reports that
13  you have written?
14       A     Yes.
15       Q     Are there any prior drafts of those reports
16  anywhere that are different than what's in Exhibit 1?
17       A     No.
18       Q     Did you note in the body cam video that Dr.
19  Hartman said at the hospital "that he wanted to make
20  sure that you know that however this shit all goes down
21  in the media, I just want to make sure your guys' asses
22  are completely covered?"
23              MS. SCHNEEMAN:  Objection to form of question,
24          assuming that that's the quote.
25              MS. POLLACK:  Yeah, I think that's inaccurate.
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1        I was part of his deposition two days ago.
 2   BY MR. ART:
 3        Q    Did you ever notice Hartman using words to the
 4   effect on the body camera video?
 5        A    Yeah.  I believe so.
 6        Q    What did you make of him saying words to that
 7   effect?
 8        A    I didn't think a whole lot of it, really.  I
 9   think that he was, once again, trying to assure not only
10   Lieutenant Blackwell, but the paramedics that -- that
11   Todero's condition was not a result of this incident.
12        Q    Is there anything about him saying, "I want to
13   make sure your guys' arses are completely covered," that
14   would cause you to doubt the reliability of this
15   testimony?
16        A    No.
17        Q    If a witness in a criminal investigation said
18   to another witness in the investigation, "I'm going to
19   make sure your ass is covered," okay, -- that's the
20   hypothetical -- would that cause you, in that criminal
21   investigation, to doubt what that witness had to say?
22        A    Not if the statement was factual.  Not if what
23   he as telling the officers and the paramedics was what
24   he truly believed.
25        Q    Okay.  So that statement has absolutely no
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 1:17-cv-01698-JPH-MJD   Document 125-54   Filed 08/13/18   Page 252 of 639 PageID #:
4931
The Deposition of CAMERON, taken 06/13/18     250

```
1  effect on your assessment of the reliability of that
2  witness, correct?
3       A    Right.
4       Q    I may have asked you this, but would you
5  describe anything that you saw on the body cam videos as
6  Charlie being extremely combative?  You?
7       A    Yeah.  We've discussed the extreme part of it,
8  and that the video doesn't show the complete
9  interaction.  So it's quite possible that there was
10 extreme combativeness that wasn't recorded.  But I did
11 see him kicking his legs.
12      Q    Other than kicking his legs, did you --
13      A    No.
14      Q    -- see anything on the video that you would
15 describe as combative?
16      A    No.
17      Q    Did you see anything at all in the video -- on
18 the video that you would describe as extreme
19 combativeness?
20      A    No.
21           MS. SCHNEERMAN:  Again, asked and answered.
22      Q    All right.  This case has a case number in the
23 Greenwood Police Department, correct?
24      A    Yes.
25      Q    Are all documents relating to this case in
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

1    your computer system stored under that one case number?

2         A    No.

3         Q    Please explain.

4         A    The initial report is.

5         Q    Okay.

6         A    My internal investigation is in a separate

7    file.

8         Q    Got it.  So there's a case number for the

9    incident, correct?

10        A    Right.

11        Q    And there's a case number for your

12   investigation?

13        A    Yes.  No, no.  They're under the same case

14   number --

15        Q    Okay.

16        A    -- but the internal's completely different

17   than the original case.

18        Q    Where it's stored in your computer system?

19        A    Where it's stored.  Yeah.

20        Q    Got it.  All right.  Is the Spillman system

21   your centralized computer system?

22        A    It's for the entire county, yes.

23        Q    Okay.  Is that the system that the officers

24   have in their squad vehicles?

25        A    Yes.

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1        Q    And it's the system you have at the police
 2   department?
 3        A    Yes.
 4        Q    Is it what you write reports on?
 5        A    Yes.
 6        Q    Does dispatch use it?
 7        A    Yes.
 8        Q    So the Spillman clock is the clock that we see
 9   on the dispatch reports?
10        A    Yes.
11        Q    And entries on the dispatch report, are those
12   put in by dispatchers and officers manually in
13   computers?
14        A    It would be put in by dispatch.
15        Q    Let me give you an example.  If I dispatch
16   Officer One to the scene --
17        A    Yeah.
18        Q    -- do I have to hit a button that puts that
19   time entry on a log?
20        A    Yes.
21        Q    Okay.  And then can an officer, in their car,
22   hit a button that shows when they arrive at a scene?
23        A    Yes.
24        Q    All right.  Is the Spillman clock that sets
25   those dispatch times different from the clock that we
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

```
1    hear on the radio traffic?

2         A    Yes.

3         Q    Why is that?

4         A    Because when I -- when I noticed the

5    difference, I contacted the dispatch director, and I

6    informed him.  And he informed me it was something they

7    have never thought about but would sync the -- would

8    make sure they get synced.

9         Q    Got it.  So when you were doing this

10   investigation, you noticed that they were not synced,

11   correct?

12        A    Correct.

13        Q    Is the 911 call on a separate system than

14   either of those two systems, or is it on the same one as

15   one of them?

16        A    Yeah.  I don't know whether the 911 -- I would

17   -- I would guess it would be on the time-stamped radio,

18   the same system as that, but I am not sure.

19        Q    Fair enough.  I want to mark this as Exhibit

20   4.  It's a timeline of events.  I can give you guys a

21   copy.  All I want you to read is the thing at the very

22   top.  You got to keep the marked one.  Okay.  It says,

23   "The radio traffic timestamp is four minutes and 50

24   seconds behind the Spillman timestamp."

25             (EXHIBIT 4 MARKED FOR IDENTIFICATION)
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1        A    Uh-huh.

 2        Q    Please explain what that means.

 3        A    Okay.  So the radio traffic -- so when

 4   dispatch keys up and says, you know, "Units respond."

 5        Q    Uh-huh.

 6        A    And you heard in the recording that I gave you

 7   that it did say, you know, "11:52 and 37 seconds."

 8        Q    Right.

 9        A    Or whatever.

10        Q    Right.

11        A    That is the time-stamped radio log.

12        Q    Right.

13        A    The Spillman log is what they enter into the

14   computer.

15        Q    Right.

16        A    So in combining the -- or in comparing the

17   radio log with what they were entering, I found that

18   those two timestamps were four minutes and 57 seconds

19   off.

20        Q    Let me ask you a couple questions about that

21   time difference: first, on the radio traffic, you hear a

22   chime and then a voice saying a time.  My understanding

23   is that the time that's being read by that voice is the

24   time of when that -- you hear the chime.

25        A    I do know -- I don't know.
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1        Q    Okay.  Do you have any reason to doubt that
 2   that's the case?  So in other words -- and let me just
 3   give you an example, and it's not going to translate to
 4   the record at all.  It goes (sound effect) --
 5        A    Yeah.
 6        Q    -- and it says, "May 29, 2016 at --" and it
 7   has a time --
 8        A    I don't -- my -- my understanding of it is --
 9   my opinion is that the bing does not represent any time.
10   I think it is telling you that this -- it is a separate
11   call.  You are getting a separate -- a separate radio
12   traffic --
13        Q    Okay.
14        A    -- than before.  It's just a separation ding.
15        Q    Is it difficult, then, to say exactly what
16   time a thing on the radio traffic is occurring?
17        A    No.  No, it's not.  Because -- hear me out,
18   here -- the -- the timestamp attached to that, even
19   though it's all from the other internal clock, they're
20   two separate systems.  When that radio keys up, that
21   time is stamped internally.  And that's where you're
22   getting -- so it is accurate within that system.
23        Q    Let me -- so let me be clear about that.  When
24   someone presses the button on their radio, it makes a
25   time stamp in the Spillman system that they've called
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 1:17-cv-01698-JPH-MJD   Document 125-54   Filed 08/13/18   Page 258 of 639 PageID #:
4937
The Deposition of CAMERON TAYLOR, taken April 17, 2018

256

1    in?

2         A    Not Spillman, in the radio.  Two totally

3    separate.

4         Q    Got it.  And so that time stamp exists, and

5    you can compare that to when, for example, the dispatch

6    pushes a button saying, "Here's what time --

7         A    Yes.

8         Q    -- I dispatched that person?"  Okay.  And so

9    the next question is: there's an assumption in comparing

10   those two timelines that the time that the dispatch says

11   something is the same time that you press the button

12   that puts the entry in the Spillman system, correct?

13        A    Yes.

14        Q    So there may be some slight variation --

15        A    Correct.

16        Q    -- between those two times, correct?

17        A    Correct.

18        Q    Now, with respect to the taser clock, how can

19   that clock be reconciled with the other two, the one

20   that appears on the taser log?

21        A    So every time that the taser is downloaded, it

22   -- and Sergeant Holtzleiter does the downloads, and

23   typically it's done once a year in our Taser training.

24   He downloads it, it syncs it to the Spillman clock.

25        Q    Okay.  So the taser clock syncs to the

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

```
 1   Spillman clock --
 2        A    Automatically.
 3        Q    -- each time it's downloaded?
 4        A    Automatically.
 5        Q    Okay.
 6        A    It -- go ahead.
 7        Q    I just want to make sure we're marking the
 8   exhibits that we need.  So this is Exhibit 5.  Just have
 9   a look at that e-mail.  Here you go.  Here you go.  Uh-
10   huh.  Okay.  What is Holtzleiter saying to you in this
11   e-mail?
12             (EXHIBIT 5 MARKED FOR IDENTIFICATION)
13        A    So when I noticed that in comparing Lieutenant
14   Blackwell's time-stamped radio traffic when he says that
15   he done the first taser application, that it was off
16   from the taser time.
17        Q    Right.
18        A    So I wanted Sergeant Holtzleiter to confirm
19   that those two clocks were not -- so he went back, and
20   20 -- I believe it was 20 days later -- I guess I should
21   preface by saying when he downloaded Lieutenant
22   Blackwell's taser after the incident, he -- it should
23   have synced it with the Spillman clock.
24        Q    Right.
25        A    When he downloaded it 20 days later to test
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1    this, it had gained 45 seconds and so the internal clock
 2    was going too fast.
 3         Q     So in other words, over time a distance is
 4    created by the Taser log clock and the Spillman clock --
 5         A     Yes.
 6         Q     -- correct?
 7         A     Yes.
 8         Q     And you noticed that that was happening, and
 9    that's what Exhibit 5 is about?
10         A     Yes.
11         Q     And then Exhibit 6 is your calculation of how
12    much faster the taser usage log was from the Spillman
13    timestamp, correct?
14              (EXHIBIT 6 MARKED FOR IDENTIFICATION)
15         A     Give me a minute to read it.
16         Q     Yep.
17         A     Yes.
18         Q     That calculation is based on the assumption
19    that the time that Blackwell calls on the radio to say,
20    "taser deployed" is the same time as the first May 29
21    entry on the taser log, correct?
22         A     Yes.
23         Q     You can put those to the side.  Thank you for
24    going through that.  This is Exhibit 7.  It is the --
25              MS. SCHNEEMAN:  The court reporter will end up
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1        wanting these, so let's just make sure that --
 2             THE WITNESS:  Okay.
 3             MR. ART:  Thank you very much.
 4          (EXHIBIT 7 MARKED FOR IDENTIFICATION)
 5   BY MR. ART:
 6        Q    That's the taser log.  You've reviewed this
 7   taser log before, correct?
 8        A    Yes.
 9        Q    This is the taser log downloaded from Officer
10   Blackwell's taser following the Todero incident,
11   correct?
12        A    Yes.
13        Q    It was downloaded on May 31, 2016, correct?
14        A    Yes.
15        Q    That was the last time this taser was used,
16   correct?
17        A    No.
18        Q    Please explain.
19        A    The last time the taser was used was the 29.
20        Q    Yeah.  Correct.  The taser has not been used
21   again since May 30, 2016, correct?
22        A    I'm pretty sure the taser -- I believe the
23   taser was given back to Lieutenant Blackwell after the
24   download.
25        Q    I thought you said that the taser went into
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1   the evidence locker?

 2        A    It did --

 3        Q    Okay.

 4        A    -- until the download.

 5        Q    All right.  And then what happened?

 6        A    I think it was downloaded and then returned

 7   back to Lieutenant Blackwell.

 8        Q    So it is not in the evidence locker today?

 9        A    I don't believe so.

10        Q    And do you think it was returned to him on May

11   31, 2016?

12        A    I do not know that.

13        Q    Is there a -- (clears throat) excuse me.  Is

14   there a reason that it was not preserved as evidence?

15             MS. SCHNEERMAN:  Assuming that that is a fact.

16        A    Yeah.

17        Q    Yeah.  Assuming that it went out to Blackwell

18   again, is there a reason that it was not kept in the

19   evidence locker?

20        A    We felt that the internal records were the

21   evidence --

22        Q    Okay.

23        A    -- report.

24        Q    All right.  Did you feel that the physical

25   taser itself was evidence relevant to your investigation
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1   in any way?

 2        A    No.

 3        Q    Is this taser log accurate, to the best of

 4   your knowledge?

 5        A    With its internal clock -- besides the

 6   internal clock issue, yes.

 7        Q    And by "internal clock issue" you mean the

 8   internal clock of this taser is shifted from the

 9   Spillman clock, correct?

10        A    Yes.

11        Q    But the internal clock is correctly reporting

12   the time intervals and the time for which the taser was

13   used on May 29, 2016, correct?

14        A    Yes.

15        Q    And this is an accurate recording based on

16   your investigation of a taser that Lieutenant Blackwell

17   was using that day, correct?

18        A    Yes.

19        Q    Did you ever visit the scene during your

20   investigation?

21        A    No.

22        Q    Did you ever take measurements at the scene?

23        A    No.

24        Q    Did you ever do an analysis of the video to

25   determine where the particular cars were at the scene?
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 1:17-cv-01698-JPH-MJD   Document 125-54   Filed 08/13/18   Page 264 of 639 PageID #:
4943
The Deposition of Sherena Patton, taken on April 13, 2018     262

```
 1        A     Yes.  I -- I watched all of the videos.
 2        Q     Okay.  Did you -- did you plot out on a map
 3   where the cars were in the videos?
 4        A     No.
 5        Q     Did you make any determination of how far
 6   Charlie Todero was, in any of the videos, from
 7   Blackwell's car?
 8        A     I would need to review the video.  I do
 9   remember thinking that it was a decent distance.
10        Q     Okay.  When you say "decent distance" what do
11   you mean?
12        A     A distance in which a car could have went
13   around Blackwell's car and still ran them over.
14        Q     Okay.  Did you ever calculate what that
15   distance was?
16        A     No.
17        Q     Is there a reason you didn't do that?
18        A     No.  I just didn't feel that it was relevant.
19   It's shown on the video, and if I'm correct -- like I
20   said, I'd feel more comfortable having the video in
21   front of me.  But I believe by the time the video is
22   taken, Todero is in custody and on the curb.  So where
23   the actual -- I'm assuming that the actual incident took
24   place.
25              MR. ART:  Let's take a quick break.
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

 1          MS. SCHNEEMAN:  Okay.

 2                    (OFF THE RECORD)

 3  BY MR. ART:

 4      Q    So I'm going to play the body cam video of

 5  Officer Eck, and I'm going to start it at, I think, two

 6  minutes and 20 seconds.  I'm going to start it at two

 7  minutes and 38 seconds.  Ready?

 8      A    Yeah.

 9                    (VIDEO PLAYED)

10      Q    So to narrate it a bit, we're seeing Officer

11  Eck travel to the scene now, and he's arriving.

12          MS. SCHNEERMAN:  And -- you want to stop it

13      for a second?  I'm going to just object that the

14      video speaks for itself.

15                    (VIDEO STOPPED)

16          MR. ART:  Sure.

17          MS. SCHNEERMAN:  So --

18          MR. ART:  You know --

19          MS. SCHNEERMAN:  -- asking the officer to

20      opine upon what he sees; the video is the best

21      evidence. And I'll just have that as a continuing

22      objection.

23          MR. ART:  Very good.

24          MS. POLLACK:  And so the picture on the right

25      is completely irrelevant to what he --

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 1:17-cv-01698-JPH-MJD   Document 125-54   Filed 08/13/18   Page 266 of 639 PageID #:
4945
The Deposition of CAMERON, taken on 04/13/18

264

```
 1              MR. ART:  This --
 2              MS. POLLACK:  -- is supposed to be looking at?
 3              MR. ART:  -- is my desktop.
 4              MS. POLLACK:  Yeah.  Okay.
 5              MR. ART:  Sorry.
 6              MS. POLLACK:  Okay.
 7              MR. ART:  That's my wife in --
 8              MS. POLLACK:  Sorry.
 9              MR. ART:  -- a foreign country.  That's, I
10      think, as big as I can get it.  Sorry about that.
11      Okay.
12                   (VIDEO PLAYED)
13 BY MR. ART:
14      Q    So there he is pulling up to the scene.
15      A    Uh-huh.
16                   (VIDEO STOPPED)
17      Q    So pausing it there, at two minutes and 59
18 seconds, would you agree with me that this video shows
19 Officer Eck's arrival on the scene?
20      A    Yes.
21      Q    And would you agree with me that Charles
22 Todero, based on what you've seen, is not yet in
23 custody?
24      A    I can't answer that.
25      Q    Go ahead and hit play, and look at it a little
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

The Deposition of Cameron Blackwell, taken April 10, 2018

265

```
1    bit, and see if you can make that determination.
2                    (VIDEO PLAYED)
3                    (VIDEO STOPPED)
4        Q    Could you tell in that --
5        A    I couldn't whether he was cuffed yet or not.
6        Q    Okay.
7        A    It looks like it's at the -- at the point to
8    where he is either being cuffed or has already been.
9        Q    Okay.  So that was stopped at 3:12.
10       A    Uh-huh.
11       Q    I'm going to take you back again, and just
12   have you look at it one more time, okay?
13       A    Okay.
14                   (VIDEO PLAYED)
15       Q    I'll attempt to pause it, here.  Okay.
16                   (VIDEO STOPPED)
17       Q    Do you agree with me that Blackwell is holding
18   the taser in his right hand?
19       A    Yes.
20       Q    Had you noticed that on the video previously?
21       A    I don't -- I don't -- I'm going to say no, I
22   didn't.
23       Q    Okay.  Would you agree with me that he is
24   holding the taser -- it's not clear from the video
25   whether it's on or off -- but he is holding it to
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 1:17-cv-01698-JPH-MJD   Document 125-54   Filed 08/13/18   Page 268 of 639 PageID #:
4947
The Deposition of CAMERON, taken 04/05/2017
266

```
 1  Charlie Todero's leg?
 2      A    Yes.  But I would say that it is clear that it
 3  is off because it's -- or it's not being activated.  You
 4  would hear that.
 5      Q    Okay.  What would you hear if it was
 6  activated?
 7      A    Pulsing, cracking sound.
 8      Q    Okay.  Is it a repetitive sound that you hear?
 9      A    Yes.
10      Q    Does it sound like -- like, I'm not sure how
11  to do this on the record like this.  Describe for me,
12  the best you can, what the sound is like when the
13  taser's being activated.
14      A    It's a pulsing, cracking.
15      Q    When you say it's a pulsing, cracking sound,
16  is it a repeating cracking sound?
17      A    (Sound effect).  I don't --
18      Q    Yeah.
19      A    -- you know?
20      Q    Yep.  That'll have to do for the record. Okay.
21  Did you do any investigation of what the traffic was
22  like at the scene at the time of the incident?
23      A    Just in speaking with those that were there.
24      Q    Other than that, did you do any investigation
25  of that fact?
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1              MS. SCHNEEMAN:  You mean, like, the volume of
 2        traffic?
 3              MR. ART:  Correct.
 4        A    I don't know how I would have done that other
 5   than speaking to the witnesses.
 6   BY MR. ART:
 7        Q    Fair enough.  All right.  I'm going to take
 8   you to the moment that he pulls up here, and I want you
 9   to observe, if you can, where Officer Blackwell's car
10   is, and the other cars are.
11        A    Okay.
12                  (VIDEO PLAYED)
13              MS. SCHNEEMAN:  And again, you know, the video
14        speaks for itself regardless of what this witness
15        would interpret from the video.
16        A    Okay.
17   BY MR. ART:
18        Q    Okay.  And then continue to watch as he turns
19   around.
20                  (VIDEO STOPPED)
21        A    That's a pretty good distance.
22        Q    Okay.  So I'm going to show you a map.  And
23   I'm going to mark it as Exhibit 8.  And what I want to
24   ask you is whether this map and the three boxes on it
25   accurately reflect the police cars and their positioning
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
1   at the scene.  Oops, I gave you the black and white one.

2   Okay.  We've marked as Exhibit 8 a color map with three

3   boxes representing cars.

4               (EXHIBIT 8 MARKED FOR IDENTIFICATION)

5               MS. SCHNEEMAN:  Let me ask a couple questions.

6               MR. ART:  Please.

7                      CROSS EXAMINATION

8   BY MS. SCHNEEMAN:

9        Q    Have you ever seen this map before?

10       A    I have not.

11       Q    Okay.  This map marked as Exhibit 8?

12       A    (NO VERBAL RESPONSE.)

13       Q    Do have any idea who put the red boxes on

14   there that Plaintiff's counsel has directed you to look

15   at?

16       A    No.

17                     REDIRECT EXAMINATION

18  BY MR. ART:

19       Q    I will represent to you that I did it.  Last

20  night.  And so my question to you is: do these appear to

21  be accurate representations of where Blackwell, Eck's,

22  and Elliot's patrol vehicles were based on the video

23  that you've just seen?

24               MS. SCHNEEMAN:  If you can tell.

25       A    Not to scale.  Yes, similar.
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1        Q     Okay.  Did you ever -- I think I asked you
 2   this, and I apologize if I did -- but did you ever
 3   measure the distances between vehicles, or the distances
 4   between vehicles and where Charlie Todero appears on the
 5   video from Eck's body camera?
 6        A     I did not measure him.
 7                      (VIDEO PLAYED)
 8        Q     Okay.  And now we're reviewing the video again
 9   to check something about Exhibit 8.
10        A     Yes.  So since we've documented that the
11   drawing is not to scale, it's close.
12                      (VIDEO STOPPED)
13        Q     Let's put that to the side.  In the video that
14   you've just viewed, did you see Charlie Todero being --
15   kicking at any time?
16        A     I -- it looks to me like Lieutenant
17   Blackwell's on his legs.
18        Q     Me, too.  Did you see him kicking at any time?
19        A     I didn't then, no.
20        Q     Okay.  Did you see him being combative at any
21   time during that video?
22        A     That is hard to -- for me to answer.  I see
23   the officers struggling, it looks like they're trying to
24   get handcuffs on him.
25        Q     Other than that, any evidence that you would
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1    classify as combative?

 2         A    No.

 3         Q    During your investigation, did you ever

 4    develop any evidence that Charlie Todero was intoxicated

 5    during this incident?

 6         A    Just the autopsy report that he had marijuana

 7    in his system upon arrival at the hospital.

 8         Q    Other than that, any evidence of intoxication?

 9         A    No.

10         Q    Do you know what that autopsy report shows in

11    terms of when Charlie Todero had that marijuana?

12         A    It would have been -- I believe it was when

13    they drew his blood in the ER.

14         Q    Sure.  And so that's -- well, the autopsy

15    report -- I will represent the toxicology -- strike

16    that, please.  The toxicology report in connection with

17    the autopsy is based on blood drawn after his death, so

18    I'll represent that to you.

19         A    Well, just one second.

20         Q    Okay.  Go ahead.

21         A    And these are not that easy to navigate

22    through.

23         Q    Yeah.

24         A    Was it that -- I'm getting tired.

25         Q    Yeah.  That's fine.
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1              MS. SCHNEEMAN:  He wants you to be tired.
 2              MR. ART:  Yeah.
 3              THE WITNESS: Yeah, I know.
 4              MR. ART:  That's what us lawyers do.
 5              MS. SCHNEEMAN:  And without lunch.
 6              THE WITNESS:  Yeah.  That's all right.
 7   BY MR. ART:
 8        Q    So let me withdraw the request --
 9        A    It's on this report.
10        Q    -- pending because we don't need to have a
11   discussion about what blood was from where.  But here's
12   my question: I think I just asked you other than
13   toxicology reports that you saw from the coroner, did
14   you develop any evidence of Charlie Todero being
15   intoxicated during this incident?
16        A    No.
17        Q    And then you said that the toxicology report
18   showed cannabinoids in his system, correct?
19        A    Yes.  This says, "According to hospital staff,
20   the decedent had the following medical history:
21              hepatitis C, and medical -- or marijuana use."
22        Q    Okay.  So --
23        A    And that his urinalysis on the date of
24   admission showed marijuana in his system.
25        Q    Right.  Do you have any knowledge, as you sit
```

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1  here today, of whether the cannabinoids in his system
2  were a metabolized form or an un-metabolized form?
3      A    No.
4      Q    Do you have any knowledge as you sit here --
5  strike that please.  Did you ever develop any evidence
6  of that during your investigation?
7      A    No.
8      Q    Okay.  I want to show you the instant
9  messages.  You've had a chance to review these recently,
10 I take it?
11     A    Yeah.
12     Q    Okay.  So I just have a question about a
13 couple of them.
14          MS. SCHNEEMAN:  And that's going to be 9?
15     Q    9.  So we've marked as Exhibit 9 the instant
16 messages from May 29, 2016 that have been produced in
17 this case.  Did you help produce these?
18          (EXHIBIT 9 MARKED FOR IDENTIFICATION)
19     A    I handed them over to counsel.
20     Q    Okay.  And just so I'm clear, and I know that
21 I asked you, but you did not have these at the time that
22 you issued your findings, correct?
23     A    I did not.
24     Q    Okay.  So if we look at Officer -- or
25 Lieutenant Blackwell's instant messages, which start on

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1   the page marked D000004 and look at the one from

 2   12:11:11, which is on page D0000010, second from the

 3   top.

 4        A    Okay.

 5        Q    Do you see what that instant message says?

 6        A    Yes.

 7        Q    Do you know what it means?

 8        A    That is Lieutenant Blackwell, and what I

 9   believe it means is him joking on "My back, my back."

10   Like, we tease him all the time about the amount of time

11   he takes off from work.

12        Q    Okay.  So you think that he's referring to his

13   own back --

14        A    Yes.

15        Q    -- in that statement?

16        A    Yes, yes, yes.

17        Q    And not to the shooting someone in the back

18   that happened within the hour before that?

19        A    You would have to speak to him.  I have not

20   questioned him about that.

21        Q    Okay.

22        A    But I -- I have heard him multiple times say

23   that, and it's usually after somebody startles him or

24   something like, "Oh, you made me jump.  My back, my

25   back."  That type of thing.
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

```
 1        Q    Okay.  You have not talked to him about this?

 2        A    I have not talked to him about that.

 3        Q    If he's referring to Todero, would you think

 4   that that was an inappropriate instant message to send

 5   to other officers with the department after an incident

 6   like that?

 7        A    Once again, I think -- I think that -- if he

 8   is referring to Todero, in -- in a mocking-type of --

 9   yes.

10        Q    Okay.  Did you notice him mocking or referring

11   to Todero in a derogatory way at any time on the body

12   cam videos?

13        A    No.  I didn't.

14        Q    Okay.  Go to the next one and I think you flip

15   the page.

16        A    Oh, okay.  Yeah.

17        Q    Go back.  The next one is the one above it.  It

18   says, "Extreme acid buildup from resisting."  Do you see

19   that?

20        A    Yeah.

21        Q    Do you know why Blackwell wrote that?

22        A    I'm assuming this is from --

23             MS. SCHNEEMAN:  I'm going to object, calls for

24        speculation, but...

25        Q    Right.  So the first question is --
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

Case 1:17-cv-01698-JPH-MJD   Document 125-54   Filed 08/13/18   Page 277 of 639 PageID #:
4956
The Deposition of CAMERON, taken 08/13/18          275

```
 1        A    -- I can only assume --

 2        Q    -- do you know?

 3        A    No.

 4        Q    Okay.  That's fine, then.  So turn to the

 5   entry which will be -- actually, on the page before, I

 6   think, at 3:20:53.  Do you see that one?

 7        A    So the page before?

 8             MS. POLLACK:  So what page are you on?

 9             MS. SCHNEEMAN: So we're going farther back in

10        the --

11             MR. ART:  Yeah.  It's 9.

12             MS. SCHNEEMAN:  -- 11?

13             THE WITNESS:       Okay.

14             MR. ART:  And this time entry is 13:20:53.

15             MS. SCHNEEMAN:  Hold on, let me get there.

16             A Yes.

17   BY MR. ART:

18        Q    Okay.  You know what Lieutenant Blackwell's

19   referring to in that instant message?

20             MS. SCHNEEMAN:  Which -- tell me again which

21        one it is?  I wasn't there, sorry.

22             MR. ART:  13:20:53.

23        A    Well, that's not Lieutenant Blackwell.

24   BY MR. ART:

25        Q    Oh, it isn't?
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1       A    I believe that's a Johnson County Deputy.

 2       Q    It's to Blackwell?

 3       A    To Blackwell.

 4       Q    Okay.  Do you have any idea what that means?

 5            MS. SCHNEEMAN:  Calls for speculation.

 6       A    Yeah.  I couldn't tell you what that means.

 7  That's not even one of our officers.

 8       Q    Do you know whether they're talking about the

 9  Todero incident?

10       A    Do what?

11       Q    Do you know whether they're talking about the

12  Todero incident or not?

13       A    I do not know.

14            MS. SCHNEEMAN:  Calls for speculation.

15       Q    Did you ever ask Lieutenant Blackwell about

16  that?

17       A    I did not.

18       Q    All right.  Go to the time entry 13:23:10.  Do

19  you see that?

20       A    Yes.

21       Q    What does it say?

22       A    "Jimmy said hold off on supplements."

23       Q    That's from Brian Blackwell, right?

24       A    Yes.

25       Q    Is Jimmy you?
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 1:17-cv-01698-JPH-MJD   Document 125-54   Filed 08/13/18   Page 279 of 639 PageID #:
4958
The Deposition of SIMEON LASKER, taken on 04/13/18   277

```
 1        A     Yes.

 2        Q     What does that mean, if you know?

 3        A     I just told him to hold off on writing his

 4  report.  Typically, we recommend 48 hours after a use of

 5  force.  And I wanted him to consult with a Taser

 6  instructor on proper wording. They use neuromuscular

 7  incapacitation, stuff like that.

 8        Q     Why do you wait 48 hours -- strike that,

 9  please.  Why do you advise waiting 48 hours before an

10  officer fills out a Use of Force Report?

11        A     It gives -- and oftentimes with adrenaline and

12  exhaustion, it's hard for officers to accurately recall

13  -- and there's been a lot of studies done that show that

14  after two sleep periods -- after two sleep periods, it's

15  much easier for an officer to accurately recall the

16  events.

17        Q     Isn't it --

18        A     Go ahead.

19        Q     -- sorry, go ahead.

20        A     This is taught in the academy, and it's taught

21  in defensive tactics instructors.

22        Q     Does that time delay also give the officer

23  time for evidence to be gathered to justify the use of

24  force?

25        A     That's not the purpose of having them wait.
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1        Q     Is that an effect of having them wait?

 2        A     I think there could be a lot of unintended --

 3   I mean, I think you're -- once again, we're speculating

 4   on hypotheticals.

 5        Q     Do you agree with me that waiting 48 hours to

 6   write a report about an incident allows the officer time

 7   to come up with a story about how the incident occurred

 8   that justifies the use of force?

 9              MS. SCHNEEMAN:  Objection.  Form of question.

10        A     I can only tell you that this is something

11   that we are taught as law enforcement officers from day

12   one.

13        Q     Do you agree with me or disagree with me that

14   it has the effect of allowing the officer time to come

15   up a story to justify these reports?

16        A     I disagree, because I think you're insinuating

17   malice.

18        Q     All right.  Did Officer Blackwell wait 48

19   hours to write his Use of Force Report?

20        A     I believe he wrote it the next day.

21        Q     Okay.

22        A     And if he felt up to doing that, I didn't have

23   a problem with it.

24        Q     Okay.  I'm going to mark this as 10.  There's

25   a Use of Force Report.  Thank you.  Is there -- are
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1  there two there?  Thanks.  Sorry.  Okay.  Is this a true

2  and accurate copy of Lieutenant Blackwell's Use of Force

3  Report?

4        (EXHIBIT 10 MARKED FOR IDENTIFICATION)

5  A    Yes, it looks like it is.

6  Q    It was written on May 30, 2016?

7  A    Yes.

8  Q    So when he wrote this on the computer, what

9  you're saying is he would have had -- he would have

10  talked to a -- someone with expertise in use of force?

11  A    Yes.  I don't know that he did, that was my

12  suggestion to him.

13  Q    And why do we do -- why does the GPD do that?

14        MS. SCHNEEMAN:  Asked and answered, but you

15     can answer.

16  Q    Thanks.

17  A    I think it's common practice in law

18  enforcement.  There are certain terms when using --

19  well, the taser for instance, just like I just said.

20  Neuromuscular incapacitation.  That the taser

21  instructors are trained to articulate, so to speak, and

22  I wanted to make sure that he was able to articulate

23  what he did and why.

24  Q    Okay.  Does having that assistance help the

25  officer fill out the Use of Force Report in a way that

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1   justifies their use of force?
 2           MS. SCHNEEMAN:  Objection.  Form of question.
 3       A   I don't think that it's to justify the use of
 4   force, it's to accurately explain their actions.
 5       Q   Okay.  Let's look at Exhibit 10 on the first
 6   page, which is D1183.  Do you see where narcotics has
 7   three Xs next to it?
 8       Q   Three-quarters of the way --
 9       A   Yes.
10       Q   -- down?  Do you know why that's checked?
11       A   I believe that --
12           MS. SCHNEEMAN:  Well, objection.  Calls for
13       speculation.
14       A   Yeah.  I believe that -- and I don't know if
15   they had already been told of the urinalysis or not --
16       Q   Right.
17       A   -- but I believe it was the marijuana.
18       Q   Okay.  If they hadn't been told yet of the
19   toxicology analysis at intake at the hospital, do you
20   know why this is checked?
21       A   I -- I don't know.
22       Q   Okay.  Do you know who approved this Use of
23   Force Report?
24       A   It would have been -- the supervisor on duty
25   signs off on it.
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1        Q    Do you know who that was --

 2        A    That was --

 3        Q    -- at this time?

 4        A    -- he's the shift commander.  And then comes

 5   to me, so I would have approved it.

 6        Q    Okay.  Do you know when you approved it?

 7        A    I do not know the date that it was approved,

 8   no.

 9        Q    When you approved it -- strike that, please.

10   Did you approve it close in time to the time it was

11   written?

12        A    Yes.

13        Q    Would you wait more than a shift to approve a

14   report like this?

15        A    Probably not.

16        Q    When you approve it, do you verify any of the

17   information that's in it independently?

18        A    It depends.

19        Q    Please explain.

20        A    Okay.  So what I look for is -- and I keep

21   spreadsheets of all Use of Force Reports.  But that's

22   been something -- I did not do that at this time.  We

23   started doing that --

24        Q    Right.

25        A    -- but I look at the facts surrounding the use
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 1:17-cv-01698-JPH-MJD   Document 125-54   Filed 08/13/18   Page 284 of 639 PageID #:
4963
The Deposition of Steven Carter, taken 07/23/2017                          282

1    of force and the force that was used to deem that

2    whether it was reasonable force or not.  Once I'm asked,

3    or once I have reason to believe that the force was not

4    or it's in question, then I will open an investigation,

5    which is what I did.

6         Q    Got it.

7         A    I didn't have any inclination at that time

8    that there was going to be a complaint, or that Mr.

9    Todero was going to die.

10        Q    So a few different questions:  first, when you

11   -- when this report gets submitted in the computer

12   system, does it go to a terminal where only the

13   supervisor can review it and no one else can change it?

14   How does the computer system deal with a report like

15   this?

16        A    So it does not.  So technically, anyone on our

17   agency could get in and change it.

18        Q    Yep.

19        A    If that were to happen, there are logs of --

20        Q    That would show the changes?

21        A    -- who -- it would show up -- yes.

22        Q    Okay.  Would logs exist of who made changes to

23   this?  This particular report that's marked as Exhibit

24   10 --

25             MS. SCHNEEMAN:  Okay.  Objection.  Form of the

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

The Deposition of Steve Conrad, taken on 04/18/18

283

```
 1        question.  Assumes that changes were made.
 2        Q    Sure.  Yes.
 3        A    If changes were made, it would show.
 4        Q    So if changes were made to this report at any
 5   point in time, there's a log in the computer system that
 6   shows it?
 7        A    There's a log that shows who accessed the
 8   report.
 9        Q    Okay.  Have you looked at that log?
10        A    Not for this report.
11        Q    At any point in time?
12        A    No.  I had no reason to believe that anyone
13   has tampered with it.
14        Q    Is this the Spillman system?
15        A    Yes.
16        Q    All right.  When you approved this report,
17   whenever it was approved, is that something you enter
18   into the computer system or is it just the act of having
19   reviewed the report?
20        A    So the process is: the shift commander -- or
21   the shift supervisor, it could be a sergeant -- approves
22   all Use of Force Reports.  Every Use of Force Report
23   that is completed is -- a copy of it is put in the four
24   -- we have four chiefs -- in each chief's mailbox for
25   review.
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 1:17-cv-01698-JPH-MJD   Document 125-54   Filed 08/13/18   Page 286 of 639 PageID #:
4965
The Deposition of CAMERON TAYLOR, taken 04/03/18   284

```
 1        Q     Got it.

 2        A     So I keep track, personally, of each use of

 3   force.  I keep a file, and I keep a spreadsheet.  So I

 4   review it.  If I don't see any problems with it and we

 5   haven't received a complaint, it gets filed and it's

 6   done.

 7        Q     Got it.  Did this report go to other chiefs?

 8        A     It would have went to all -- all of us.

 9        Q     So it would have simultaneously gone to Chief

10   Laut, Assistant Chief Fillenwarth, you, and Deputy Chief

11   Roller.

12        A     Roller.

13        Q     Roller.  Yes.  Sorry.  Do you know what any of

14   them did with this report?

15        A     I do not.

16        Q     When you review this report before approving

17   it, are you just looking at the information that the

18   officer writes in the report before you approve it?  Or

19   do you follow-up with other witnesses --

20        A     Typically what -- typically what I do is

21   review -- I'll review the written report, and I'll pull

22   the body-worn camera video and review it.

23        Q     Okay.  And based on that, you make a

24   determination of whether there are facts in the report

25   that justify the use of force, correct?
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1        A    Yes.

 2        Q    And then if there are, you will approve it,

 3   correct?

 4        A    Yes.

 5        Q    And if there are not, you may open an

 6   investigation, correct?

 7        A    Yes, theoretically.

 8        Q    So there are situations where you approve the

 9   Use of Force report, and then a complaint comes in,

10   correct?

11        A    Uh-huh.

12        Q    And then, even though you've approved it, you

13   open an investigation, correct?

14        A    Yes.

15        Q    And that describes what happened in this case,

16   essentially?

17        A    Yes.

18        Q    Okay.  Did -- look at the bottom of the first

19   page, where it says, "Was drive-stun technique used" do

20   you see that?

21        A    Yes.

22        Q    What does it say there?

23        A    It says "no."

24        Q    That is not correct, correct?

25        A    That is not correct.
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

 1       Q     All right.  So did you point out to Officer
 2  Blackwell that that was an incorrect statement on his
 3  Use of Force Report?
 4       A     I did not.
 5       Q     Why not?
 6       A     I have no reason.  I -- I missed it.
 7       Q     Okay.  But you knew he had used drive-stun at
 8  the time you approved this, correct?
 9       A     Yes.
10       Q     Because he had told you that on the May 29
11  call, correct?
12       A     I don't think he told me that on the May 29
13  call, but believe it says in his report that he did.
14  Applied another at this time, connecting the taser --
15       Q     To his thigh.
16       A     -- to his thigh --
17       Q     Okay.
18       A     -- so the circuits would be completed, and
19  that taser was --
20       Q     So in your view that this -- I'm sorry to cut
21  you off.  In your view this on the first page is just an
22  oversight?
23       A     Yes.  And I -- I don't want to speak for
24  Lieutenant Blackwell, but this may be a prime example of
25  why we recommend a taser instructor.  His viewpoint of a

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1   drive-stun may not be the same as others.
 2        Q    Okay.  Do you know who listed the witnesses
 3   who appear on pages 1 and 2 of this report?
 4        A    When the -- on Exhibit 10?
 5        Q    Yeah.
 6        A    The person who wrote it.
 7        Q    Okay.
 8        A    So Lieutenant Blackwell.
 9        Q    Okay.  In the second paragraph -- sorry, the
10   first paragraph of the narrative it says that Blackwell
11   interviewed or advised -- sorry, strike that.  It says,
12   "McNaughton advised me later," do you see that?
13        A    Where are we?  I'm sorry.
14        Q    Like, five lines down from the --
15        A    Okay.
16        Q    -- start of the page.
17        A    Okay.  Yes.
18        Q    Do you know when Blackwell talked to
19   McNaughton?
20        A    I believe it was the same day during his --
21   would have either been the 29th or the 30th.
22        Q    Okay.  So at some point, he followed up with
23   her as well, correct?
24        A    Yes.  As a witness.
25        Q    Do you know whether he followed-up with
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1    Poynter?

 2        A    I don't know whether he made contact with him

 3    or not.

 4        Q    Do you know if he followed-up with Walters?

 5        A    I don't believe he followed-up with Walters

 6    because Elizabeth Laut took a statement from her at the

 7    scene.

 8        Q    Do you know whether he followed-up with Ian

 9    Godfrey?

10        A    I don't believe he did.

11        Q    And just to be clear, I'm reading the

12    witnesses that are -- appear on --

13        A    Yes.  Just because they're witnesses doesn't

14    mean that he had to interview them.

15        Q    Yeah.  Let's see if I have anything else we

16    haven't talked about already.  Okay.  Let's go back to

17    this --

18        A    Okay.

19        Q    All right.  Just one more on these instant

20    messages, okay?

21        A    Okay.

22        Q    Can you go to Blackwell's instant message at -

23    - let me see if this is possible for us to do it.  Okay.

24    At 16:44:50.

25        A    Which -- which page is that?
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1        Q    Yeah.  I'll get it.  It's 5.  Page 5 of
 2   Exhibit 8 -- 9.
 3             COURT REPOTER:  9.
 4             MS. SCHNEEMAN:  What time is it?
 5             MR. ART:  Page 5 of Exhibit 9, and the time is
 6   16:44:50.
 7   BY MR. ART:
 8        Q    Okay.  Do you see what Blackwell writes there?
 9        A    Yes.
10        Q    And what does it say?
11        A    Says, "I had to tase a guy a dozen times today
12   for trying to commit suicide by walking into traffic.
13   And he ended up coding when he arrived at the hospital.
14   So the chief wants a thorough report."
15        Q    Okay.  Who does he write that to?
16        A    I'm not sure who that is.
17        Q    Do you know a person named Ronald Dinsmore?
18        A    Yes.
19        Q    Who's that?
20        A    He is a patrolman.
21        Q    Could that be Ronald Dinsmore?
22        A    Yes.  That is who that is.
23        Q    Okay.  You agree with me that he says he tased
24   a guy a dozen times?
25        A    Yes.
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1        Q    Right?  And that's consistent with what he
 2   told you on the phone about approximately 15 tases,
 3   correct?
 4        A    Yes.
 5        Q    What is Officer Dinsmore's response to
 6   Lieutenant Blackwell?
 7        A    LOL nice.
 8        Q    Do you know what that means?
 9        A    I think it's self-explanatory.
10        Q    What do you think it means?
11        A    I can't speculate what it means, but it's
12   probably inappropriate of Officer Dinsmore to say that.
13        Q    You agree with me that he's saying, "Laugh out
14   loud, nice" in response to Blackwell's report of having
15   tased someone, correct?
16             MS. SCHNEEMAN:  Objection.  Calls for
17        speculation and not necessarily proper
18        interpretation of the document.
19        A    I don't know what he meant by it.  I will say
20   that that LOL is an abbreviation for laugh out loud. And
21   nice, I don't know that he was saying it was nice that
22   the subject got tased, or whether he was, in general
23   making a comment that, you know, that sounds nice.  You
24   know, like --
25   BY MR. ART:
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1        Q    Because you're not him, right?

 2        A    Right.

 3        Q    So you don't know what he was saying?

 4        A    I'm saying that there could be several

 5   different interpretations.

 6        Q    And one of those interpretations would be in

 7   appropriate for an officer --

 8        A    Yes.

 9        Q    -- exchanging text messages about this

10   incident, correct?

11        A    Yes.

12                       (OFF THE RECORD)

13   BY MR. ART:

14        Q    Okay.  The taser checklist -- just to clear --

15   that we looked at that is the last four pages of Exhibit

16   2.

17        A    Okay.

18        Q    You did not fill that out during your

19   investigation, correct?

20        A    No.  I believe this was after.

21        Q    Turn to the last page of it.  Is there a

22   reason that you didn't fill out the chart that's on the

23   last page?

24        A    Yes.  This was simply for my notes, and a

25   checklist.  I knew where the taser prongs were.
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1        Q    Okay.  I'm going to ask you on Exhibit 2 to
 2   draw where the Taser prongs were.
 3        A    And I'm going off of upper-back and lower-
 4   back, right?
 5        Q    Yep.
 6        A    I don't know which side they were.
 7             MS. SCHNEEMAN:  Well, and I'm going to object
 8        to the form of the question to the extent that your
 9        questions is -- you're asking him to do something
10        inconsistent with his prior testimony.
11   BY MR. ART:
12        Q    Please go ahead, to the extent that your
13   investigation led you, as you just said, to know where
14   the Taser prongs were.  Please draw them on that
15   exhibit.
16        A    Yeah.  I don't know which side each were, but
17   there's one on the lower-back and one on the upper-back.
18   And then one that wound up in the -- it would be the
19   left hand somewhere.
20        Q    Okay.  Can you circle the two little dots that
21   you just made on that exhibit?
22        A    I made three.
23        Q    Can you circle the three little dots that you
24   just made on that exhibit?  Thank you.  I'm going to
25   mark this as Exhibit 11.  Just a couple quick questions
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1   about that.  Did you write this report?

2        (EXHIBIT 11 MARKED FOR IDENTIFICATION)

3        A    Yes.

4        Q    Does it memorialize your conversation that you

5   had with Dr. Hartman?

6        A    Yes.

7        Q    Does is record all of the information that Dr.

8   Hartman provided to you about the reasons that he

9   thought that the Taser had not caused Charlie's death?

10       A    It was nearly two years ago, I don't remember

11  everything that was said.  I would say that this is the

12  pertinent summary of it.

13       Q    Did he -- excuse me.  Did he provide you any

14  information during that call that casts doubt on his

15  statement that the taser didn't cause the death?

16       A    No.

17       Q    So you didn't record just some of the

18  information that he gave that supported one theory,

19  correct?

20       A    Correct.

21       Q    If he had provided you information that, in

22  fact, there was evidence that the Taser had caused the

23  death, you would have recorded that in your report as

24  well, correct?

25       A    Yes.

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1        Q    Okay.  Let's mark this as 12. Here's 11. We're
 2   done with the instant messages, so you can get rid of
 3   those.   That's 12.  Have you seen this report before
 4   that's been marked as Exhibit 12?
 5             (EXHIBIT 12 MARKED FOR IDENTIFICATION)
 6        A    I have not.
 7        Q    Did you instruct Mr. Pitts to write this
 8   report?
 9        A    I don't remember instructing him to write this
10   report, but --
11        Q    Do you know why --
12        A    -- if I would have, I would have had a copy of
13   it.
14        Q    -- do you know why Mr. Pitts wrote this report
15   after Charlie's death?
16        A    I do not know.
17        Q    If you can turn in Exhibit 1 to Officer Laut's
18   supplemental report about the tasing, which I think you
19   have in there.  I think I saw it.
20        A    In my book?
21        Q    In your book.
22        A    Okay.
23        Q    Do you know why it -- sorry.  Her supplemental
24   report that she wrote --
25        A    Oh.
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

```
 1        Q     -- if you --

 2        A     Sorry.

 3        Q     -- if you have it.  No, no.  You're fine.

 4              MS. SCHNEEMAN:  I'm sorry, who's supplemental

 5        report?

 6              MR. ART:     Officer Laut's.

 7              MS. SCHNEEMAN:  Okay.

 8        A     Okay.

 9   BY MR. ART:

10        Q     Do you know why it doesn't mention any tases?

11              MS. SCHNEEMAN:  I'm going to object to the

12        form of the question.

13        Q     Oh, does it?  Let me rephrase the question,

14   because it does mention "We got him with the taser."

15              Here's the question: do you know why Officer

16   Laut doesn't record the number of tases that she

17   witnessed in this report?

18              MS. SCHNEEMAN:  And I'm still going to object

19        to the form of the question.

20        A     Yeah.  I think during the majority of the

21   incident where the taser was administered, she was

22   speaking to Holly Walters and getting a statement.

23   Officer Elliot was trying to get -- was assisting

24   Lieutenant Blackwell, trying to get Mr. Todero cuffed,

25   and was unable to do it by herself.  So Officer Laut
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1   came over and was helping her out after speaking with
 2   Holly Walters.
 3        Q    Okay.  Is it your understanding that Officer
 4   Laut didn't witness tasing?
 5        A    I think that she did witness it in the sense
 6   of hearing the taser activated.
 7        Q    Okay.  I'm marking a Law Incident Table as
 8   Exhibit 13.
 9         (EXHIBIT 13 MARKED FOR IDENTIFICATION)
10        A    Okay.
11             MR. ART:    I think I just gave you two of
12        them.
13             MS. SCHNEEMAN:  Oh, okay.  Thanks.
14        Q    What is this?
15        A    This is the case report for the incident.
16        Q    What does it show?
17        A    The front page is the CAD screen.  Shows the
18   officers involved at the time the call was reported. All
19   parties involved at the time.  Evidence collected at the
20   time.  Second page is a main radio log.  Has some codes
21   in it that specify the incident occurred in a business
22   street.  Taser was deployed.  Some photographs were
23   taken.
24        Q    Let me stop you there, just for a minute.
25        A    Yes.
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 1:17-cv-01698-JPH-MJD   Document 125-54   Filed 08/13/18   Page 299 of 639 PageID #:
4978
The Deposition of CAMERON PARKER, taken 04/23/18
297

```
 1        Q     The code for taser deployed, TADED --
 2        A     Uh-huh.
 3        Q     -- do you see that on the page --
 4        A     Yes.
 5        Q     -- 75?  Is that supposed to appear somewhere
 6   else in the timeline?
 7        A     No.
 8        Q     That just --
 9        A     This is a -- this is a circumstance code that
10   we use in-house to be able to easily search the number
11   of taser deployments.
12        Q     Got you.
13              MS. SCHNEEMAN:  Could you just point that code
14        out to me, I'm not sure what I'm -- okay.  Got it,
15        got it.
16        A     We also have one for Taser displayed
17   without --
18   BY MR. ART:
19        Q     Is the time and date that appears on these
20   logs the Spillman clock?
21        A     Yes.
22        Q     Turn to the page 77.  What does that page
23   show?
24              MS. SCHNEEMAN:  I'm going to object to -- the
25        page speaks for itself, but...
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1         A     This is -- this is in the narrative section.
 2    It's a brief synopsis for the reason for the call.  The
 3    reports are always written in supplemental sections.
 4         Q     Who puts in the reason for the call?
 5         A     This would be the officer writing the report.
 6         Q     Okay.  It's not dispatch?
 7         A     No.
 8         Q     Okay.  We'll let you put that to the side, and
 9    hand you what's been marked --
10         A     Are we done with this one?
11         Q     Yeah.
12         A     Pitts?
13         Q     Yep.  Done with all of those.  I'm handing you
14       what's been marked as Exhibit 14.  What is this?
15              (EXHIBIT 14 MARKED FOR IDENTIFICATION)
16         Q     Let me ask you this:  Is this all from
17    dispatch, all three pages with this?
18         A     Yes.  I believe this -- yeah, this is the
19    dispatch log.
20         Q     Okay.
21         A     And to be honest with you, I don't know that
22    I've ever seen -- so yeah, this -- these are the
23    comments -- these are the notes section of what the
24    officers would see on their computers.
25         Q     Okay.  And so you're pointing to the comments
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1   section on page 1173?

 2       A    Yeah.

 3       Q    Okay.  So that -- those would come up on the

 4   computers in the squad cars as dispatch sends those

 5   messages out?

 6       A    Yeah.

 7       Q    All right.  And the rest is a log of what

 8   dispatch is doing; is that fair to say?

 9       A    Yes, and the arrival times and en-route times,

10   call completed times, all listed over here.

11       Q    And that -- by "over here" you mean on page

12   1174, right?

13       A    Yes.

14       Q    Okay.  Put that to the side.  I just want to

15   walk through -- I think I just want to walk -- you know

16   what?  I -- I don't want to mark these as exhibits,

17   because I don't want to waste your time with them.  I

18   have multiple copies of timelines that were attached to

19   various e-mails.

20       A    Uh-huh.

21       Q    Did you do multiple drafts of timelines of the

22   incident --

23       A    No.

24       Q    -- that you recall?

25       A    No.
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1        Q    Did you do a timeline for the press
 2   conference?
 3        A    I don't believe I did.  I wasn't even there
 4   the day of the press conference.
 5        Q    Okay.
 6        A    Did I add -- did I add the press conference in
 7   my timeline?
 8        Q    Nope.  No, I don't care about that.  Do you
 9   have recollection of doing multiple drafts of timelines?
10        A    They only timeline I know that I did was the
11   one that's in this book.
12        Q    Show me that one?  And you will agree that
13   that's the same on that we marked as Exhibit 4?  Yes.
14   Very good.  Thank you.
15        A    Are there multiple timelines?
16        Q    I think so, but I think we're going to ask
17   Roller about it.
18        A    Oh.
19        Q    They come from his e-mails.  Okay.  I want to
20   talk about some of your e-mails.
21        A    Okay.
22        Q    I'm going to mark this one as Exhibit 15.  And
23   it -- and there's -- it's actually multiple e-mails. And
24   so I'll say for the record that it contains three e-
25   mails.  Have a look at them and then I'll ask you some
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 1:17-cv-01698-JPH-MJD   Document 125-54   Filed 08/13/18   Page 303 of 639 PageID #:
4982
The Deposition of CAMERON TAYLOR, taken 05/09/17   Page
301

```
 1    questions about them.

 2         (EXHIBIT 15 MARKED FOR IDENTIFICAION)

 3    A    This is the same e-mail, right?

 4    Q    It may be a copy of it being forwarded or

 5    something like that, or printed from a different

 6    account.  Let me know when you've just had a chance to

 7    look them over.

 8    A    Yeah.  I'm familiar with both of them.

 9    Q    Okay.  The first e-mail is sent from Mr. Prior

10    to you, Roller, Fillenwarth and Laut on June 12, 2016.

11    Do you see that?

12    A    Yes.

13    Q    At 3:00 in the morning, correct?

14    A    Yes.

15    Q    Do you know when you received this?

16    A    It would have been the next morning when I

17    woke up.

18    Q    Who's James Prior?

19    A    He's a night shift Lieutenant.

20    Q    Okay.  It states in the second paragraph that

21    -- well, first of all, it states that Todero has died,

22    correct?

23    A    Yes.

24    Q    And then it states in the second paragraph

25    that his kidneys began to shut down, do you see that?
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 1:17-cv-01698-JPH-MJD Document 125-54 Filed 08/13/18 Page 304 of 639 PageID #: 4983
The Deposition of Cameron Snider, taken of April 5, 2018
302

```
 1        A    Yes.
 2        Q    What do you understand to be Charlie Todero's
 3   immediate cause of death?
 4        A    What do --
 5             MS. SCHNEEMAN:  Objection.  Form of question.
 6        It's determined he is.
 7             MS. POLLACK:  I don't think we asked -- I
 8        think it's been asked and answered a couple of
 9        hours ago.
10             MR. ART:  Yeah.  I think so, too.
11             MS. POLLACK: Yeah.
12   BY MR. ART:
13        Q    And correct me if this is mischaracterizing
14   your testimony, but did you understand him to have died
15   from liver failure?
16        A    Multi-organ failure.
17        Q    Did you understand kidney failure to be a part
18   of that?
19        A    I would consider a kidney an organ, yes.
20        Q    Did you know that he had suffered from kidney
21   failure when you issued your report?
22        A    I believe I did.
23        Q    Okay.  Do you know what caused kidneys to
24   fail?
25        A    I do not.
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201



KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 1:17-cv-01698-JPH-MJD   Document 125-54   Filed 08/13/18   Page 305 of 639 PageID #:
4984
The Deposition of Cameron Taylor, taken 06/19/17   303

```
1        Q    Next paragraph says there is some additional
2   complications.  Will you read that sentence to yourself?
3        A    Yes.
4        Q    Do you know why it was a complication that the
5   blood taken in admission to the hospital on May 29 was
6   no longer available?
7        A    You'll have to ask Lieutenant Prior about
8   that.  That's his determination of complication.  I
9   don't find it to be a complication.
10       Q    Okay.  Turn to the last e-mail in this
11  exhibit.
12       A    Hold on.  Oh, okay.
13       Q    Who sent this e-mail?
14       A    It says Brian Blackwell.
15       Q    Who did he send it to?
16       A    To me.
17       Q    Did he send it the same morning that you
18  received the e-mail that we just reviewed?
19       A    Yes.
20       Q    He had been copied on that first e-mail,
21  correct, that we just reviewed?
22       A    Yes.
23       Q    So you did not have to forward him that e-
24  mail, correct?
25       A    Correct.
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1        Q    Do you know whether you sent him any e-mail
 2   between the first e-mail we looked at and this one that
 3   he sent you?
 4        A    I don't believe so.
 5        Q    Did you speak with him before he sent you this
 6   e-mail on June 12 at 10:44 a.m.?
 7        A    No.  I don't believe so.
 8        Q    Okay.  Do you know why Lieutenant Blackwell
 9   sent this to you?
10        A    I don't.
11        Q    Did you think it was strange that he sent you
12   this e-mail on June 12 at 10:44 a.m.?
13             MS. SCHNEEMAN:  Objection.  Form of question.
14        A    I remember the e-mail.  I don't remember any
15   of the -- I truly do not remember the facts surrounding
16   it.
17        Q    As you look at it now, does it seem strange to
18   you?
19             MS. SCHNEEMAN:  Objection.  Form of question.
20        A    I think that the -- the date being the same,
21   which I didn't realize until right now.  I don't know
22   that it's -- I don't know that it's strange.  It just
23   may have been something that he had on his mind, and
24   then when he got the e-mail from Lieutenant Prior,
25   decided that it was time.  I don't remember much about
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1   this.
 2        Q    The last time you had spoken to him about this
 3   incident was on May 29, correct?
 4        A    Correct.
 5        Q    And so he's sending you an e-mail shortly
 6   after learning that Todero died, providing you
 7   additional information, correct?
 8        A    Yes.
 9        Q    He states in the beginning, "As usual, time
10   elapses, and a person remembers more about details in an
11   incident."  Do you see that?
12        A    Yes.
13        Q    Do you believe that that's an accurate
14   statement about the way witnesses recall incidents?
15        A    Repeat that, I'm sorry.
16        Q    Do you --
17             MS. SCHNEEMAN:  I'm going to --
18        Q    -- that that --
19             MS. SCHNEEMAN:  -- object to the form of the
20        question.  Calls for speculation.
21        Q    In your experience as a investigator, do
22   witnesses remember more details about incidents over
23   time, or forget them?
24        A    Well, I think that his intentions here were --
25   well, let's go back to the timeline.  Initially when
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1    this occurred, there was no internal investigation.  On
 2    June 7, I initiated the internal investigation.  So at
 3    that point he knew that, and was scheduled, I believe,
 4    for an interview on the next day.  So he was aware of
 5    it.  I can't speak -- and this is a question that you'll
 6    have to ask Lieutenant Blackwell -- is the timing and
 7    why.
 8         Q    Okay.
 9         A    I simply document what I receive.
10         Q    So you don't know, as you sit here, why he
11    sent this to you the day before his scheduled interview,
12    correct?
13         A    I do not.
14         Q    All right.  Is this the first time that he
15    told you that he immediately recognized Charles Todero
16    as he arrived at the scene?
17         A    I don't believe, no.  He had made that
18    statement before.
19         Q    When had he made that statement before?
20         A    In his report.
21         Q    Okay.  In the Use of Force Report, that's the
22    report you're referring to?
23         A    His supplemental report.  It's in here.
24         Q    Show that to me so I understand just what
25    you're --
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1        A    It's in the case report.  Right here.  It's
 2   going to be almost identical to the Use of Force
 3   narrative.
 4        Q    Okay.  It's just in a different format?
 5        A    Yes.
 6        Q    Okay.  Yeah.  I thought they were exactly the
 7   same.  Does he actually write that on the day of the
 8   incident?
 9        A    Yeah.  "The moment I pulled -- that I drove up
10   to the man, I knewed to be Charles Todero."
11        Q    Right.  Is that sup report that you're reading
12   written on May 29?
13        A    This one is written on May 29.
14        Q    So if that narrative's the same as the use of
15   force narrative, does that mean he wrote that narrative
16   on May 29?
17        A    I haven't compared them to see if they are
18   exactly the same.  But he wrote this one on -- and then
19   completed the Use of Force.  They are different
20   documents.
21        Q    Okay.  Do you know -- strike that.  Let's move
22   on to the next one.  I'm going to mark this Exhibit 16.
23   It's a whole group of e-mails.  If you'd like to look
24   them all over first, you're welcome.  I'm going to ask
25   you pretty specific questions about them.
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 1:17-cv-01698-JPH-MJD    Document 125-54    Filed 08/13/18    Page 310 of 639 PageID #:
4989
The Deposition of JOHNSON, taken 06-28-2017    308

```
 1            (EXHIBIT 16 MARKED FOR IDENTIFICATION)

 2       A    Okay.  I'll look them over --

 3       Q    And if you need to --

 4       A    -- one at a time.

 5       Q    -- pause, let me know, okay?

 6       A    Okay.

 7       Q    So we've marked as Exhibit 16 a group of e-

 8  mails that have your e-mail address on them in one way

 9  or another, okay?  And we're going to talk about them

10  individually.  So the first page is an e-mail sent from

11  you to a Ms. Willis.  Do you see that e-mail?

12       A    Yes.

13       Q    Do you know who Ms. Willis is?

14       A    An employee of the coroner's office. I

15  believe --

16       Q    What date and time -- I'm sorry.  What date

17  and time was it sent?

18       A    This was sent on August 1, 2016 at 2:41 p.m.

19       Q    You had already issued your findings at this

20  time, correct?

21       A    Yes.

22       Q    Did you have a copy of the autopsy report at

23  the time you sent this e-mail?

24       A    I don't -- I don't believe so.

25       Q    So you issued your findings without an autopsy
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1   report, correct?

 2         A    The -- yes.  But remember that Detective --

 3   well, Deputy Chief Roller and our investigator were

 4   present for the autopsy and the results at that time.

 5         Q    Okay.  So they were present at the autopsy,

 6   correct?

 7         A    They were present at the autopsy.

 8         Q    Did you learn information from them about what

 9   had occurred at the autopsy?

10         A    Yes.

11         Q    What information did you learn?

12         A    That the pathologist had informed them that

13   Todero's death was natural and a result of prior health

14   conditions.

15         Q    Any other things that you learned from the GPD

16   personnel who were present at that autopsy about

17   findings at the autopsy?

18         A    I don't remember the exact -- the exact

19   conversation.

20         Q    Anything else you recall at this time, as you

21   sit here?

22         A    No.

23         Q    Is there any report of them -- strike that,

24   please.  Is there any report memorializing what they

25   learned at the autopsy?
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1      A    No, just my narratives.

2      Q    Do you know what dated you learned that

3  information?

4      A    It would have been the day of the autopsy.

5      Q    Okay.  At that time, you did not have an

6  autopsy report, though, correct?

7      A    I did not.  That takes quite a while.

8      Q    Okay.  So you issued your findings without an

9  autopsy report, correct?

10     A    Right.

11     Q    So the information that you had about Charlie

12  Todero's cause of death at the time that you issued your

13  findings was, one, what Dr. Hartman had told you, and,

14  two, what you had learned by way of your officers who

15  were present at the autopsy, correct?

16     A    Correct.

17     Q    You did not have any other medical

18  information, correct?

19     A    The EMS reports, yes.

20     Q    Thank you.  You had the EMS reports as well,

21  as that time, correct?

22     A    Yes.

23     Q    But other than those three things, then, you

24  didn't have any additional medical information at the

25  time you issued your findings, correct?

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1        A     Correct.

 2        Q     Turn to the next page.  It's an e-mail back to

 3   you from Ms. Willis, do you see that?

 4        A     Yes.

 5        Q     Sent the same day, correct?

 6        A     Yes.

 7        Q     Attaching the autopsy report, correct?

 8        A     Yes.

 9        Q     It says, "Attached you will find the final

10   report as requested."  Do you see that?

11        A     Yes.

12        Q     Had you learned that they had a final autopsy

13   report at the time you sent your e-mail officially

14   requesting it?

15        A     You know, well --

16        Q     Like, is there something about this day where

17   you knew it became available or something like that?

18              MS. SCHNEEMAN:  You mean August 1, 2016?

19              MR. ART:  Yes.  Correct.

20        A     I want to -- I want to look back into what day

21   this autopsy report was completed.  Getting to a point

22   to where I'm getting a little --

23              MS. POLLACK:  Punchy?

24              MR. ART:  Yeah.

25              MS. SCHNEEMAN:  Yeah.  It's been long and you
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1      haven't had any lunch.

 2            MS POLLACK:  Join the club.

 3            THE WITNESS:  Okay.  So --

 4            MS. SCHNEEMAN:    Can we go off the record

 5      for a second?

 6            MR. ART:  Please do.

 7                 (OFF THE RECORD)

 8      A    You know, I need to -- give me a minute to

 9      review this.  Because I am not sure -- this autopsy

10      report was completed on -- it looks like 6-13, which is

11      -- there was question that I had had.  Okay.  Yeah, I

12      mean, I guess to the best of my recollection, we have to

13      go by the e-mails, and we received the autopsy report on

14      the 1.

15      BY MR. ART:

16      Q    Okay.

17      A    So --

18      Q    Very good.   Turn to the next page, please?

19      A    Okay.

20      Q    You forwarded it to the chief, correct?

21      A    Yes.

22      Q    Okay.  Turn to the next e-mail, please?

23      A    Okay.

24      Q    It's from you back to Ms. Willis on the same

25      day, correct?
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1        A    Yes.

 2        Q    But later in the afternoon, correct?

 3        A    Yes.

 4        MS. SCHNEEMAN:  Just so we're with you, what

 5   time, 5:20?

 6        MR. ART:  5:20 p.m., correct.

 7        A    Okay.

 8   BY MR. ART:

 9        Q    Please read what your e-mail says.

10        A    "Ms. Willis, thank you very much for report. I

11   do have a question.  On page 6, it states the dura is

12   stripped, revealing fractures of the vascular skull.  I

13   spoke to our detectives that attended the autopsy, and

14   he was unaware of any head trauma found.  Could you shed

15   some light on this statement, please?  Also, would it be

16   possible to obtain the autopsy photos taken?"

17        Q    Okay.  A few questions:  first, did the report

18   that you had been sent on August 1, in fact, say what is

19   in the quotation in your e-mail?

20        A    Yes, it did.

21        Q    So it said that the dura is stripped,

22   revealing fractures of the vascular skull?

23        A    Yes.

24        Q    Okay.  Did you receive autopsy photos in

25   response to this e-mail?
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

The deposition of Simpson taken June 8, 2017 - Jane                    314

```
 1        A     I don't -- I don't believe I ever did.

 2        Q     Okay.  Do you have autopsy photos in your file

 3   right now?

 4        A     I do not.

 5        Q     I see.  Okay.  Do you have any photos of

 6   Todero post-mortem?

 7        A     I don't believe I do.  I do not.

 8        Q     All right.  Next page.  Actually, two pages.

 9        A     Photos -- I believe that the coroner has the

10   photos.  Sorry.  Go ahead.

11        Q     Fair enough.  Go to the next e-mail.  This one

12   is from Ms. Willis to you on August 2, 2016 at 9:34

13   a.m., correct?

14        A     Yes.

15        Q     So this is the next morning, correct?

16        A     Yes.

17        Q     And it -- copied on it is Alfie Ballew.  Do

18   you see that?

19        A     Yes.

20        Q     Do you know who that is?

21        A     I believe it is Ms. Willis' supervisor.

22        Q     Okay.  And the e-mail states, "Good morning. I

23   will forward these questions to my chief deputy, as she

24   is reviewing the case now."  Do you see that?

25        A     Yes.
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

 1          Q      Did you respond to that e-mail at all that you

 2    know of?

 3          A      I don't remember.

 4          Q      Okay.  Flip two more pages.

 5          A      Okay.

 6          Q      Later that day, August 2, 2016 at 10:15 a.m.,

 7    do you see that e-mail?

 8          A      10:15 a.m.?  Yes.

 9          Q      This is from Alfie Ballew to you, correct?

10          A      Yes.

11          Q      Please read what it says.

12          A      It says, "I'm in receipt of your questions

13    regarding the autopsy report and the findings.  Please

14    keep in mind that while I have sent you the report, it

15    is not public information at this time.  Additionally,

16    it has not been shared with the family because I still

17    had questions about the case.  I will also ask about --

18    I will also ask about this section of the autopsy

19    report.  It could be some other reason for the fractures

20    that are consistent with non-trauma events.  I plan to

21    meet with the pathologist in the next few days for

22    clarification.  Please do not release any information on

23    this death investigation."

24          Q      Thank you.  Do you know what questions she had

25    about the case when she wrote that e-mail?

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1        A    I do not.

 2        Q    Did you inquire at any --

 3        A    I did not.

 4        Q    -- point in time?  Do you know what she meant

 5  by it could be some other reason for the fractures that

 6  is -- that are consistent with non-trauma events?

 7        A    I do not.

 8        Q    Did you ever inquire?

 9        A    I did not.

10        Q    Okay.

11        A    And it's because she later responded that --

12        Q    We're getting there.

13        A    Okay.

14        Q    Next e-mail is from you to her on August 2,

15  2016 at 10:37 a.m.  Do you see that?  Sent from your

16  iPhone?  It simply says --

17             MS. SCHNEEMAN:  What time again?

18             MR. ART:     10:37 a.m.

19        Q    It says, "Thank you.  I will not release this

20  information to the public."

21        A    See, I'm still not finding that.  I believe --

22  yes. What page are we on?

23             MS. SCHNEEMAN:  You know what?  You can just

24        leave that --

25        Q    Very good.
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1      A     With that -- yes.

 2      Q     Okay.  Now I want you to go to the second to

 3  last page of the exhibit.  And ten days later, on August

 4  12, 2016 at 1:15 p.m. you sent another e-mail.

 5            MS. SCHNEEMAN:  August 12, 2016 at what time?

 6      Q     1:15 p.m.  And it says, "Hello, I am following

 7  up on the Charles Todero autopsy report.  Have you had

 8  an opportunity to speak to the pathologist to get an

 9  explanation on the skull fracture?"

10      A     Yes.

11      Q     Did you -- had you had any communication with

12  the coroner between the 2nd when you sent your e-mail

13  saying, "I will not share it with the public," and the

14  12th when you sent the one following-up?

15      A     No.

16      Q     Please put that exhibit to the side.  There

17  are a couple more short ones just to complete the

18  record.

19            MR. ART:  What are we on?

20            COURT REPORTER:  17.

21            MR. ART:  Thank you.  Okay.  Marking Exhibit

22  17.

23  BY MR. ART:

24      Q     Review that e-mail if you would.  Thank you.

25  Okay.  Is this the next e-mail that you sent to them
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1   after the August 12 e-mail that you had sent as a
 2   follow-up?
 3          (EXHIBIT 17 MARKED FOR IDENTIFICATION)
 4    A    Yes.
 5    Q    Do you know whether you had heard from them at
 6   all in the time between the 2nd --
 7    A    I don't believe I did.
 8    Q    -- the 12th, and August 31 when you sent this?
 9    A    Yeah.  I don't believe I did.
10    Q    Finally, Exhibit 18.  Take a moment to review
11   that.  Did I give them all to you?
12          (EXHIBIT 18 MARKED FOR IDENTIFCATION)
13    A    Yeah. Hang on just a minute.
14    Q    Thanks.  Here you go.  Okay.  The first e-mail
15   on this page is from Carrie England to you on November
16   3, 2016.  Do you see that?
17    A    Yes.
18    Q    Do you know who Carrie England is?
19    A    I do not.
20    Q    Okay.  This e-mail is two months after the one
21   that you sent saying, "I'm following up again on the
22   autopsy report," --
23    A    Uh-huh.
24    Q    -- correct?
25    A    Yes.
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1        Q    Do you agree with that?

 2        A    Yes.

 3        Q    Was there any communication between you and

 4   coroner's office at any time between August 31 when you

 5   sent your follow-up e-mail and November 3, 2016?

 6        A    Not to my knowledge.

 7        Q    Okay.  So two months later they just e-mail

 8   you back, correct?

 9        A    Apparently.

10        Q    And they say, "Alfie spoke with Dr. Gellar

11   about the autopsy report of Charles Todero, and there

12   were errors on the report."  Do you see that?

13        A    Yes.

14        Q    Did they identify for you what those errors

15   were, at any point?

16        A    No.

17        Q    It says, "I, the report, has been amended, and

18   a corrected copy is attached to this e-mail." You see

19   that?

20        A    I'm sorry, what?

21        Q    This second sentence says the report has been

22   amended and a corrected copy has been --

23        A    Yes.

24        Q    -- attached to this e-mail?  Was there a

25   corrected copy attached to the e-mail?
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1        A    I believe so.
 2        Q    Did you notice differences between that
 3   corrected copy and the original one that you'd gotten?
 4        A    Yes.
 5        Q    What were the differences?
 6        A    That the skull fracture was no longer on the
 7   report.
 8        Q    Is it the case that before the word "skull
 9   fracture", they had inserted the word "no"?  And that
10   was the difference?
11        A    It may have been.  I don't remember the exact.
12        Q    At the time -- I'm sorry -- at the time they
13   sent that to you on November 3, did they provide an
14   explanation about how that error had occurred?
15        A    They did not.
16        Q    Turn the page.
17        A    Yes.
18        Q    You respond on the same day, "Thank you."  Do
19   you see that?
20        A    Yes.
21        Q    At any point did you ask them to explain what
22   was going on?
23        A    No. I just went off of the new report.
24        Q    Okay.
25        A    I just assumed it was a typo.  I don't know
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
1    how they -- I don't know how they complete their
2    reports.  If it was, you know, auto-fill in the blank,
3    and it was left out, I have no idea.
4         Q    Okay.  Go to the last page.
5         A    Okay.
6         Q    Do you forward it to Krista Taggart?
7         A    Yes.
8         Q    You see that?  Is that one of the attorneys?
9         A    It's the city --
10        Q    Corp counsel?
11        A    Yeah.  Corporate counsel.
12        Q    All right.  It says, "Please see the amended
13   autopsy report.  The original report stated that Todero
14   had a skull fracture, he did not.  The pathologist has
15   amended the report."  Do you see that?
16        A    Yes.
17        Q    Was that statement that you made "The original
18   report stated that he had a skull fracture, he did not",
19   was that just based on the amended report you'd found?
20        A    Yes.
21        Q    So you didn't have any other knowledge other
22   than the fact that the coroner had sent you an amended
23   report, correct?
24        A    (NO VERBAL REPSONSE.)
25        Q    You hadn't asked them about how they had made
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1   such a mistake, correct?

 2       A    No.

 3       Q    You hadn't looked at autopsy photos that

 4   showed whether or not there was skull fractures,

 5   correct?

 6       A    Correct.

 7       Q    That's all -- oh.  One more question.  Dr. --

 8       A    I don't believe they ever sent me the

 9   requested autopsy photos.

10       Q    Very good.  Ian Godfrey says at the hospital

11   on the body cam that Charlie Todero's heart stopped at

12   12:19 p.m.  Do you have any reason to dispute that

13   that's the time when his heart first stopped?

14       A    No.

15            MS. SCHNEEMAN:  Assuming that that was a true

16       fact.

17       A    No. I have no reason.

18       Q    I may have asked you this at the beginning,

19   but in your investigation did you uncover any evidence

20   that Versed given to Charlie Todero in the ambulance

21   contributed to any cardiac arrest?

22       A    No.

23            MR. ART:    That's all I've got.  Thank you

24       so much for your time.

25            THE WITNESS:    You're welcome.
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1        MS. SCHNEEMAN:  Do you want to call out any

 2   questions?

 3        MS. POLLACK:  Uh-uh.

 4        MS. SCHNEEMAN:  Okay.  Can we go off the

 5   record for a second?

 6             (OFF THE RECORD)

 7        MS. SCHNEEMAN:    Okay.  When we went off the

 8   record, I had a brief conversation with the other

 9   counsel about the fact that after one of the

10   questions earlier in today's deposition posed to

11   Detective  Ison by Plaintiff's counsel, he had some

12   additional information that he needed to

13   supplement.  I am going to ask him a question to

14   allow him to supplement his previous answer.  I

15   anticipate it might cause Plaintiff's counsel to

16   ask some follow-up questions. The matter involved a

17   unresolved personnel issue that is pending with the

18   Greenwood Police Department.  And because of the

19   nature of the personnel matter, counsel, all

20   present, have agreed that this portion of the

21   deposition will be under seal, will not be released

22   to any members of the public or filed with the

23   court pending further discussion and a ruling by

24   the court if necessary.

25        MR. ART:  Agreed.
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1              MS. POLLACK:  Yep.

 2              MS. SCHNEEMAN:  Okay.  Detective Ison,

 3          after --

 4              MS. POLLACK:  Deputy Chief.

 5              MS. SCHNEEMAN:  Oh, I'm sorry.

 6              MR. ART:  Yeah.

 7                    RECROSS EXAMINATION

 8  BY MS. SCHNEEMAN:

 9      Q    I messed up my very first question.  It's been

10  a long day.  Yes, Deputy Chief, was there a point at

11  today's deposition that you informed me that you needed

12  to supplement a response to a previous question?

13      A    Yes.

14      Q    Okay.  And was that question something to the

15  effect of: since the time that you investigated the

16  Todero incident, have you had an occasion to investigate

17  any other use of force incidents?

18      A    Yes.

19      Q    Okay.  And you advised me that there was some

20  additional information that you needed to share; is that

21  correct?

22      A    Yes.

23      Q    Okay.  And very briefly, what other use of

24  force incident did you investigate?

25      A    Just -- it's been about three weeks ago.  We
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1   had a complaint of excessive use of force by -- am I to
 2   give names?
 3        Q    Not necessarily.  If Plaintiff's counsel --
 4             MR. ART:  I'm going to ask.
 5        Q    -- can follow up if he wants.  Go ahead, you
 6   can.
 7        A    Officer Elliot.  It is still ongoing as we are
 8   pending merit board hearing.
 9             MS. SCHNEEMAN:    Okay.  I think that answers
10        my question, thank you.
11             MS. POLLACK:  And you don't have any, right?
12        You don't have -- okay.  We're done.  Thanks.
13             MR. ART:  Okay.  Do you have other questions
14        you would like to ask on whatever you want to call
15        it, redirect, cross?
16             MS. SCHNEEMAN: No.
17             MR. ART: Okay.  Do you have any?
18             MS. POLLACK:   No.
19             MR. ART:  Okay.
20                  FURTHER DIRECT EXAMINATION
21   BY MR. ART:
22        Q    This investigation into an alleged use of
23   force by Officer Elliot, are you investigating it?
24        A    Real quick, there's people out there.
25             MS. SCHNEEMAN:  Very good.  Thank you.
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1              MS. POLLACK:  It's the cleaning people.  Sorry.
 2   BY MR. ART:
 3        Q    Are you investigating it?
 4        A    Yes.
 5        Q    When did the use of force occur?
 6        A    I do not know the exact date.  I'd have to
 7   have the report in front of me, and I don't.
 8        Q    So in the month of March?
 9        A    In the month of March.
10        Q    Please describe the use of force to the extent
11   -- you know, please summarize for us what the
12   allegations are in the complaint.
13        A    The allegations: she had made and arrest of a
14   adult who was not of drinking age for being in an
15   accident and registering with alcohol on his breath.  He
16   made the accusation that Officer Elliot, while sitting
17   in the front seat of his car -- or in the front seat of
18   her car, handcuffed, had grabbed his head and pushed it
19   into her laptop computer.
20        Q    Does Officer Elliot deny that that happened?
21        A    She denies that she pushed his head into the
22   computer.  She does not deny grabbing him by the head.
23        Q    Okay.  Other than taking the complainant's
24   story as true for a second, other than having his -- was
25   it a him?  Who's the complainant?
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1        A    I'd have to have the report in front of me.

 2        Q    Is it the person who got their head pushed

 3   into the --

 4        A    Yes.  And he is -- as ironic as it is, he is

 5   refusing to give me a statement.

 6        Q    Okay.  Was that person injured?

 7        A    No.  No injury.

 8        Q    Who is making the complaint?

 9        A    He called in to make the complaint.  And he

10   made it over the phone.  I requested he come in for a

11   recorded interview, and at that point, he advised me

12   that he wasn't going to say anything else.

13        Q    Okay.  What --

14        A    So I took it upon myself to further

15   investigate.

16        Q    And that investigation is on-going?

17        A    The hearing date is -- my investigation is

18   complete, and my findings have gone to the chief.

19        Q    What is your findings?

20        A    That there was an excessive use of force.

21        Q    What's that based on?

22        A    Another officer's body-worn camera video,

23   which is not very good angles.  Off of statements made

24   by Officer Elliot.  And she -- basically, those two

25   things.
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

```
 1        Q     What officers were present other than Elliot?

 2        A     Officer Trumble.

 3        Q     And it's Trumble's body cam that you used as

 4   evidence?

 5        A     Yes.

 6        Q     Was Elliot wearing a body cam?

 7        A     No.

 8        Q     Why not?

 9        A     That was another thing that I found her in

10   violation of.

11        Q     Okay.  So she used excessive force in your

12   opinion, and also did not have a body cam on, correct?

13        A     Yes.  Conduct unbecoming an officer.

14        Q     Okay.  Any other policy violations that you

15   found that she committed?

16        A     There were several. I'd have to have it in

17   front of me.  Rules and regulations, conduct unbecoming,

18   treatment of the public, body-worn camera.

19        Q     Do you have a file of that investigation

20   similar to the one that you have for Charles Todero?

21        A     No.

22        Q     It's obviously not as big, correct?

23        A     No.  Not at all.

24        Q     So there's report -- and you interviewed both

25   officers who were at the scene?
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1        A    Yes.

 2        Q    Was there anyone at the scene other than the

 3   complainant and the two officers?

 4        A    Yes.  There -- and it would have been the

 5   girlfriend of the complainant.  And she also will not

 6   give a statement.

 7        Q    Okay.  So the only two interviews you've done

 8   are of the officers, correct?

 9        A    No. I did one of a witness that was working in

10   a store that was adjacent to the incident.  And he did

11   not see any of the alleged actions.

12        Q    Okay.

13        A    He saw them out in the parking lot, but not

14   any of the alleged actions.

15        Q    What was the complainant doing in the front

16   seat of Elliot's squad car?

17        A    He was under arrest.

18        Q    For what?

19        A    For minor consumption of alcohol.

20        Q    You said that.  Why is it going to a merit

21   board hearing?

22        A    We are requesting her be terminated.

23        Q    Why are you requesting that she be terminated?

24        A    Well, we found her in violation of multiple

25   policies.  We've established a pattern of not wearing a
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1  body-worn camera.  And her statements of the incident.  I

 2  don't -- I don't know how else to answer it.  I mean,

 3  she's in violation of multiple --

 4      Q     Got you.

 5      A     -- policies.

 6      Q     Does it relate -- so it relates to this

 7  incident, correct?

 8      A     I -- no.

 9            MS. POLLACK:  This could be what --

10            MS. SCHNEERMAN:  Objection.  Form of question.

11      We're here for Todero.-

12            MR. ART:  No, no, no.

13  BY MR. ART:

14      Q     The decision to ask for her to be terminated

15  relates to the incident that you've just investigated,

16  correct?  That you've just testified about, correct?

17      A     Yes.

18      Q     And it relates to her having a pattern, as you

19  said, of not wearing a body camera, correct?

20      A     To clarify, she had her body camera on.

21      Q     Physically on?

22      A     The camera was on her.  The transmitter was at

23  her home.

24      Q     What does that mean?

25      A     It means that there is no power to it.  So the
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1   camera is useless without the transmitter.  She had the
 2   forthwith, though, to put that on but forgot to put the
 3   transmitter.
 4        Q    Got it.  Okay.  Has she done that previously?
 5        A    Not to my knowledge, no.
 6        Q    When you say that she has a pattern of not
 7   wearing her body camera, what do you mean?
 8        A    There have just been incidents in the past
 9   where she hasn't turned it on.  But as far as being
10   disciplined for that -- like I said, I didn't bring that
11   file, I didn't anticipate this --
12        Q    Fair enough.
13        A    -- questioning.
14        Q    The -- her failure -- strike that, please. Her
15   failure to turn on her body cam during the Todero
16   incident is part of her pattern of not wearing or
17   utilizing her body camera, is that correct or incorrect?
18        A    Incorrect in that she was not disciplined at
19   the time for the reasons that I previously stated.
20   However, as we progress, enough time has gone by that
21   she should be used to that body-worn camera.
22        Q    A straw that breaks the camel's back.
23        A    And that day, she had it -- she had it with
24   her, she just didn't turn it on.  This incident, she
25   didn't even have the equipment with her.
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1        Q    Other than this incident, which I'll -- the
 2   March 2018 incident, and the Todero incident, have you
 3   had other occasions where you had problems with Officer
 4   Elliot and her body camera?
 5        A    I would have to look at her disciplinary file.
 6   I can't remember off the top of my head.
 7        Q    And you can't say as you sit here today,
 8   correct?
 9        A    Right.  Yes.
10        Q    What is the process for terminating a police
11   officer from Greenwood Police Department?
12        A    She has to be given a merit board hearing, so
13   an official hearing with our elected merit board, and
14   they make a ruling whether there's grounds to terminate
15   employment or not.
16        Q    Okay.  Who sits on that merit board?
17        A    You want names?
18        Q    Is it police officers?
19        A    No.
20        Q    Okay.
21        A    It's a civilian merit board.
22        Q    Okay.  And is it the City of Greenwood's merit
23   board?
24        A    Yes.
25        Q    All right.  When is the hearing before the
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1    merit board?

2         A    I don't know the exact date.  It will probably

3    take place either the third week of -- third week of

4    April, or third week of May.

5         Q    Are these contested hearings?

6         A    Contested?  I'm sorry?

7              MS. SCHNEEMAN:  You mean this particular one?

8              MR. ART:  Yeah.  This -- sorry.

9         Q    So first of all, does she have the opportunity

10   to contest her termination?

11        A    Yes.

12        Q    Before the merit board?

13        A    Yes.

14        Q    And is she, in this case?

15        A    She has not given us indication one way or the

16   other.  She is currently been put on leave of absence

17   without pay.

18        Q    Okay.  Was she put on leave of absence as soon

19   as the incident happened?

20        A    As soon as my investigation was complete.

21        Q    When was your investigation complete?

22        A    I'd have to look at the -- this has been a few

23   weeks ago. I don't know the exact date.

24        Q    That's fair.  Did you issue findings similar

25   to those that you issued in the Todero matter?

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

Case 1:17-cv-01698-JPH-MJD   Document 125-54   Filed 08/13/18   Page 336 of 639 PageID #:
5015
The Deposition of SUMESON, taken 04/23/18     334

```
 1        A    Yes.

 2        Q    Did you provide them to the chief?

 3        A    Yes.

 4        Q    Did the chief review them?

 5        A    Yes.

 6        Q    Did he accept those findings?

 7        A    Yes.

 8        Q    Did anyone work with you during the

 9   investigation of the March 2018 incident?

10        A    No.

11        Q    Did you investigate alone or with other

12   chiefs?

13        A    No, I investigated it.

14        Q    Did you take a statement from her during this

15   incident?

16        A    I did not.

17        Q    Did you read her her Garrity rights?

18        A    I did not.  She -- once again, I don't know

19   what I can release and what I can't --

20             MS. SCHNEEMAN:  Right now, we're all under

21        seal.

22        Q    Yeah, but also be -- you may want to talk to

23   your attorney about what you can reveal about --

24             MS. SCHNEEMAN:  Yeah.

25        Q    I just don't know anything else about it,
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1  so...  So let me ask you this:  Did she give you an
 2  interview?
 3            MS. SCHNEEMAN:  Well...  Yeah.
 4       A    It wasn't an interview.  She showed up at my
 5  office after she had been put on leave and requested to
 6  speak to me.  So I let her come in, and I didn't ask her
 7  a single question --
 8       Q    Got it.
 9       A    -- she just started --
10       Q    All right.
11       A    -- telling me what she did.
12       Q    All right.  So you did not arrange an
13  interview with her, correct?
14       A    I did not.  She showed --
15       Q    And you did not question her, correct?
16       A    I did not ask her a single question.
17       Q    And you did not have the opportunity to read
18  her her rights or anything like that?
19       A    No.
20       Q    And she volunteered information to you --
21       A    Yes.
22       Q    -- correct?  What information did she
23  volunteer to you?
24       A    She informed me that she -- that he wasn't
25  being truthful.  That she did not slam his head into the
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1    computer, but that she grabbed his head and pushed it

2    away from her.  And she stated that the constitution

3    gives her the right to do that because he said the word,

4    "fuck."

5        Q    And did you concur in her evaluation of what

6    the constitution provides?

7        A    I informed her that she was mistaken.  That

8    that is not permissible and that she cannot lay her

9    hands on someone for simply cursing at her.

10       Q    Did you have any further discussion with her

11   other than what you've just testified about, in

12   connection with this March 2018 event?

13       A    No.  Other than -- she did say that the

14   Supreme Court has ruled that "fuck" is not protected

15   speech.  So I --

16           MR. ART:  So with that question, can we go off

17       the record momentarily?

18           COURT REPROTER:  Yeah.

19               (OFF THE RECORD)

20           MR. ART:  So I have no further questions.

21       Thanks for your time.

22               (DEPOSITION CONCLUDED AT 7:15 P.M.)

23

24

25

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1   CERTIFICATE OF REPORTER

 2   STATE OF INDIANA

 3

 4   I do hereby certify that the witness in the foregoing

 5   transcript was taken on the date, and at the time and

 6   place set out on the Title page hereof by me after first

 7   being duly sworn to testify the truth, the whole truth,

 8   and nothing but the truth; and that the said matter was

 9   recorded by me and then reduced to typewritten form

10   under my direction, and constitutes a true record of the

11   transcript as taken, all to the best of my skills and

12   ability. I certify that I am not a relative or employee

13   of either counsel, and that I am in no way interested

14   financially, directly or indirectly, in this action.

15

16

17

18

19

20

21

22   EMILEE BOLEYN,

23   COURT REPORTER / NOTARY

24   COMMISSION EXPIRES ON: 04/17/2025

25   SUBMITTED ON: 06/15/2018
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

**Exhibits**

EX 1 109:7,11, 14,18 127:25 161:14,18 175:10,13,14 176:1 179:9 209:23 247:16 248:3,12,16 294:17

EX 2 171:15,17 172:16 173:10 291:15,16 292:1

EX 3 173:25 174:10,11,14 176:4 179:3 180:4 182:19 201:17

EX 4 253:19, 20,25 300:13

EX 5 257:8,12 258:9

EX 6 258:11,14

EX 7 258:24 259:4

EX 8 267:23 268:2,4,11 269:9 289:2

EX 9 272:15,18 289:5

EX 10 279:4 280:5 282:23, 24 287:4

EX 11 292:25 293:2

EX 12 294:4,5

EX 13 296:8,9

EX 14 298:14, 15

EX 15 300:22 301:2

EX 16 307:22 308:1,7

EX 17 317:21, 22 318:3

EX 18 318:10, 12

---

**-**

--i've 21:12

---

**0**

09 111:3

---

**1**

1 109:7,11,14, 18 127:25 161:14,18 175:10,14 176:1 179:9 181:5 209:23 247:16 248:3, 12,16 287:3 294:17 308:18 311:18 312:14 313:18

10 77:2 111:3 278:24 279:4 280:5 282:24 287:4

100 15:25 229:3

1098 174:13

10:15 315:6,8

10:37 316:15, 18

10:44 304:6,12

11 128:11 233:18 275:12 292:25 293:2 294:1

1173 299:1

1174 299:12

11:50:02 183:9

11:52 254:7

11:56 193:20

12 294:1,3,4,5 301:10 304:6, 12 317:4,5

318:1

12-week 46:13, 16,23

12:11:11 273:2

12:19 322:12

12th 317:14 318:8

13 75:12 152:9, 14 170:7 219:19 222:4 224:13,24 225:16 296:8,9

13:20:53 275:14,22

13:23:10 276:18

14 152:22 298:14,15

15 43:11 59:22 60:2 61:16 76:20 81:25 211:9,11 212:22 213:11, 14 218:8,25 228:23 290:2 300:22 301:2

15th 127:6

16 153:24 154:1,4 207:24 208:11,18 232:15 240:2 242:22 307:22 308:1,7

16:44:50 288:24 289:6

17 134:18 317:20,22 318:3

18 318:10,12

19 136:16 154:10,11

1:15 317:4,6

---

**2**

2 53:15 171:15, 17 172:16

173:10 183:2 185:16 287:3 291:16 292:1 314:12 315:6 316:14

20 16:10 257:20,25 263:6

2000 65:23

2001 43:11 48:10

2005 50:18 82:7

2007 49:24 50:20,21 57:17

2009 77:2

2010 111:3

2011 62:22 66:5

2012 67:10,22 68:13,18

2014 59:22 60:2 61:16 76:20

2015 52:17 68:2,4,22 70:25 77:6

2016 9:11 10:2 37:2,8,13,16 38:8 40:3,12,16 42:5,9 56:14, 16,19 86:12 102:20 121:12 159:1 176:15 178:22 233:18 243:1 255:6 259:13,21 260:11 261:13 272:16 279:6 301:10 308:18 311:18 314:12 315:6 316:15 317:4,5 318:16 319:5

2017 26:8 27:9, 12 32:10 37:16 38:9 158:10 160:2

2018 52:21 82:8 332:2 334:9 336:12

22 154:9

23 38:9

24 153:7,12

26 53:15 57:14

27 37:8,13,16 38:8 40:3 178:21 243:1

27th 176:15

29 9:11 10:2 40:12,16 42:4,9 100:11,15 101:7 102:19 112:6 128:10 141:10 158:1 159:1 193:20 221:11 222:19 223:11 224:23 225:15,25 227:1 238:4 255:6 258:20 259:19 261:13 272:16 286:10, 12 303:5 305:3 307:12,13,16

29th 100:17 287:21

2:00 27:2

2:41 308:18

2nd 317:12 318:6

---

**3**

3 173:25 174:10,11,14 176:4 179:3 180:4 182:19 189:8 201:17 318:16 319:5 320:13

30 103:3 224:10 238:4 259:21 279:6

300 142:16

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

Case 1:17-cv-01698-JPH-MJD   Document 125-54   Filed 08/13/18   Page 341 of 639 PageID #:
5020
The Deposition of    SIMEON, taken on April 13, 2018
339

**30th** 287:21

**31** 259:13
260:11 318:8
319:4

**35** 231:20
232:6,7

**37** 254:7

**38** 208:5 232:12
263:7

**39** 201:19

**3:00** 301:13

**3:12** 265:9

**3:20:53** 275:6

---
**4**
---

**4** 253:20,25
300:13

**40** 231:20 232:7

**45** 258:1

**465** 138:23

**48** 58:15 277:4,
8,9 278:5,18

---
**5**
---

**5** 257:8,12
258:9 289:1,5

**50** 16:1 253:23

**5089** 172:16

**52** 193:12

**57** 254:18

**59** 264:17

**5:20** 313:5,6

---
**6**
---

**6** 258:11,14
313:11

**6-13** 312:10

**64** 69:23

249:25

---
**7**
---

**7** 100:6,11,15,
23 101:8
121:12 122:3
123:10 220:19
221:9 222:5
258:24 259:4
306:2

**70** 96:3

**75** 297:5

**77** 297:22

**7:15** 336:22

---
**8**
---

**8** 153:2,17
267:23 268:2,4,
11 269:9 289:2

---
**9**
---

**9** 272:14,15,18
275:11 289:2,3,
5

**911** 20:1,5 23:1
35:11,12 41:2
118:24 119:4,6
123:12,13
133:13 135:6,
19 140:20
253:13,16

**9:34** 314:12

---
**A**
---

**a.m.** 304:6,12
314:13 315:6,8
316:15,18

**abbreviation**
290:20

**ability** 19:5
213:8

**absence**
333:16,18

**absolutely**
41:4 90:20

**academy** 45:4,
5 46:9,10,11,
12,20 47:9,17
71:12,21,24
72:2,13 73:11,
22 74:23 75:1,
4,11,15,20 80:8
81:1 87:1,12
89:4 277:20

**accept** 334:6

**accepted**
178:7,22,25

**accepting**
178:13

**access** 130:1,5
177:8

**accessed**
283:7

**accident**
326:15

**Accomplished**
47:16

**accordance**
176:9 216:4

**account**
145:17 160:10
179:16 217:22
301:6

**accounted**
214:13

**accounts**
94:14 142:25
145:13,17

**accuracy** 90:3

**accurate** 29:4
90:16 95:12,15
240:6 248:12
255:22 261:3,
15 268:21
279:2 305:13

**accurately**
208:7 212:10
267:25 277:12,
15 280:4

**accusation**
326:16

**accusations**
101:21,24
102:3,11,16

**acid** 274:18

**acidosis**
129:23

**act** 242:13
283:18

**acted** 14:8,14
28:22 31:11,19
100:21

**acting** 12:25
29:1,12 138:23

**action** 10:8
209:5 214:15
215:1 227:20
242:15

**actions** 15:1,9
30:15,17 31:13
83:7 93:13
143:4 169:17
181:6,17,23
186:16 189:3,
11 243:25
244:1 280:4
329:11,14

**activated**
166:14 192:7,8
207:24 208:4
215:18 266:3,6,
13 296:6

**activating**
79:17

**activations**
209:10

**actual** 26:2
61:7 262:23

**add** 300:6

**added** 175:17,
21 213:16

**addition** 155:6
182:4

**additional**
11:25 29:15
96:22 131:15
214:13 303:1
305:7 310:24
323:12 324:20

**Additionally**
315:15

**address** 308:8

**adjacent**
329:10

**administered**
204:8 211:9,11
217:22 230:4
295:21

**administration**
32:13,24
100:24

**administrator**
79:15

**admission**
128:23 129:3
271:24 303:5

**admitted**
181:11,16

**adopt** 210:22

**adrenaline**
277:11

**adult** 326:14

**advantage**
91:3

**advice** 131:12

**advise** 213:18
277:9

**advised** 55:22
204:8 211:8
217:23 287:11,
12 324:19
327:11

**affect** 9:4,7
19:2,5

**afternoon**
313:2

**age** 326:14

**agency** 282:17

**agree** 78:23
97:15,19 98:1
139:22 140:5
143:18 144:20
173:3 185:23
190:6 191:9
195:11,15,19

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

202:1 208:22
210:19 212:12
213:24 214:8,
10,11 217:11
228:10 230:10
231:15 233:25
237:13,16
238:16,20,24
239:10,22
240:10 241:11
243:4 264:18,
21 265:17,23
278:5,13
289:23 290:13
300:12 319:1

**agreed** 109:9
178:7 323:20,
25

**ahead** 10:25
11:13 64:11
70:3 80:1 83:15
133:5 135:3
140:12 147:10
221:14 229:6
231:17 233:3
234:13,14,22
240:16 244:8
245:16 257:6
264:25 270:20
277:18,19
292:12 314:10
325:5

**alcohol** 326:15
329:19

**Alfie** 314:17
315:9 319:10

**allegations**
326:12,13

**alleged** 325:22
329:11,14

**alleges** 207:11

**alligator**
198:21

**allowed** 125:4,
7 186:4

**allowing**
130:20 278:14

**ambiguous**
51:12 208:14

**ambulance**
11:3 123:16
131:6 143:2,17,
21 146:1,2,13,
24 147:6 219:5
322:20

**amended**
319:17,22
321:12,15,19,
22

**amount** 229:18
273:10

**ample** 227:23

**analysis**
261:24 280:19

**and/or** 181:7
192:7

**angle** 91:19

**angles** 327:23

**annual** 52:25

**answers** 18:12
97:16 156:4
325:9

**anticipate**
323:15 331:11

**anymore**
30:14 59:17
72:10 75:9,16

**Anytime** 78:1

**apologize**
12:18 18:25
161:19 269:2

**Apparently**
319:9

**appearance**
12:24

**appeared**
216:16

**appears**
256:20 269:4
297:19

**applaud** 191:3,
4

**applicable**
117:10

**applicants**
50:10

**application**
45:11,14 89:22,
23 90:3 210:9
215:20 227:11
238:17 242:17
257:15

**applied** 90:2
92:17 105:10
172:12 210:14
286:14

**apply** 91:5,19
92:6,8,18 93:1,
2,9 95:16 99:6,
7 105:11

**appointed**
63:1,2 66:4,13,
21,25 67:6
68:7,8,19,22

**appointment**
67:14,15

**approach**
91:3,18,19
98:24 99:6,20,
21

**approaches**
92:13

**appropriately**
14:8,14 79:24
148:2,12

**appropriateness**
15:9

**approve** 58:18
281:10,13,16
284:18 285:2,8

**approved** 58:6
177:25 280:22
281:5,6,7,9
283:16,17
285:12 286:8

**approves**
283:21

**approving**
62:16 178:9
284:16

**approximate**
60:1

**approximately**
15:25 24:12
201:19 211:14
212:23 213:10,
14 218:10,11,
25 290:2

**approximating**
216:24

**April** 333:4

**arcing** 199:2

**area** 13:6 111:3

**areas** 81:14

**argue** 138:24

**argument**
199:9

**Argumentative** 235:25

**arms** 92:11
232:19

**arrange**
335:12

**arrest** 96:13
101:15 127:5
219:4 322:21
326:13 329:17

**arrested** 17:23

**arrests** 16:25
78:2

**arrival** 127:3
191:18 264:19
270:7 299:9

**arrive** 207:14
231:21 252:22

**arrived** 124:22
135:14 140:15
147:15 148:5
183:8 192:20
194:3 289:13
306:16

**arrives** 79:12

**arriving**
192:15 193:2
263:11

**arses** 249:13

**ART** 17:11,14,

16,17 21:7,9
25:6 27:16,18,
22 28:6 37:21,
24 38:1,3,6
41:10,13,17
51:9,11,13 60:5
63:15,19 71:16,
18 80:21,23
81:1,3,6,7
83:19 84:1,4,10
98:16 109:4,7,
16 114:5,7,10,
12,15,18
132:10,13,16
133:8 154:14,
17 156:23
157:1,4 170:15,
18 172:13,21
185:3,6,10
187:3,5,7
193:24 201:1
203:16,18,22
204:1 209:17,
20 215:8,9
224:3,8 230:9
233:2 234:10,
13,16,22 235:5
236:3,16,18
241:4 244:24
249:2 259:3,5
262:25 263:3,
16,18,23 264:1,
3,5,7,9,13
267:3,6,17
268:6,18 271:2,
4,7 275:11,14,
17,22,24 289:5,
7 290:25
291:13 292:11
295:6,9 296:11
297:18 302:10,
12 311:19,24
312:6,15 313:6,
8 316:18
317:19,21,23
322:23 323:25
324:6 325:4,13,
17,19,21 326:2
330:12,13
333:8 336:16,
20

**articulate**
279:21,22

**ASP** 84:13


Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

**ass** 249:19

**asses** 248:21

**assessment** 250:1

**assign** 61:22

**assigned** 61:21 104:6,17 123:10

**assigns** 71:4

**assist** 161:1 162:22 163:1

**assistance** 126:11,15 201:21,24 279:24

**assistant** 26:11 62:24 66:5,13,14 67:1,7,11 68:20 70:20 76:3 118:1 284:10

**assisted** 53:17

**assisting** 87:18 295:23

**associate's** 47:2,4

**assume** 18:19 52:14 223:16 234:1 275:1

**assumed** 101:16 320:25

**Assumes** 220:5 221:13 240:15 283:1

**assuming** 177:13 178:19 179:12 248:24 260:15,17 262:23 274:22 322:15

**assumption** 256:9 258:18

**assumptions** 240:5

**assure** 249:9

**attached** 185:21 198:21 255:18 299:18 311:9 319:18, 24,25

**Attaching** 311:7

**attempt** 98:19 121:11,21 122:10 130:19 211:3 265:15

**attempted** 123:16 139:3

**attempts** 125:9

**attended** 54:7 107:19 313:13

**attending** 54:5 107:21

**attention** 13:14 100:23 101:3,25 134:8 136:5,20 137:10,11

**attorney** 18:7, 10 19:10 334:23

**attorneys** 23:25 24:8,14 25:12 26:6,21 30:6 56:3 162:5 321:8

**audio** 19:25 20:2,6 22:23,24 77:12 110:5,9 119:16,20,24 120:8 161:12

**August** 308:18 311:18 313:18 314:12 315:6 316:14 317:3,5 318:1,8 319:4

**authority** 63:4

**authorized** 86:6 93:16,18

**autism** 88:6

**auto-fill** 321:2

**Automatically**

257:2,4

**autopsy** 36:16, 25 107:20,22 122:18 126:23 166:21,22 198:12 235:14 236:5,21 270:6, 10,14,17 308:22,25 309:4,5,7,9,16, 17,25 310:4,6, 9,15 311:7,12, 21 312:9,13 313:13,16,24 314:2 315:13, 18 317:7 318:22 319:11 321:13 322:3,9

**Avenue** 158:1

**avenues** 95:8

**avoid** 98:3,11

**avoiding** 224:19

**awards** 93:24 94:2

**aware** 40:22 41:23 42:7 43:3 62:4 65:18 88:22 105:3,5 109:22 122:21 124:10 133:18, 24 134:3 137:6 143:5 156:19 157:22 181:10 228:20 238:14 306:4

**awhile** 16:12

**Axon** 76:14

---

**B**

**back** 11:3 17:16 37:1 41:18 46:13 48:6 54:19 57:15 58:17 63:10,14 67:25 68:17 73:1,8,9 75:11 91:6 116:3 120:13

122:20 129:6 132:10,12 170:10,21,23 172:14 174:7 177:24 178:2,5 183:16,19 185:7 189:13, 24 196:8 197:21,22 198:6,9,18,23, 24 199:6,7,10 200:12,15 201:3,5 203:22 204:21 205:2, 24 213:19 232:19 233:8 234:18,20 236:14 240:11 244:18,19 248:2 257:19 259:23 260:7 265:11 273:9, 13,17,24,25 274:17 275:9 288:16 292:4 305:25 311:2, 20 312:24 319:8 331:22

**back-** 202:6

**back-up** 191:18 194:3 231:21

**background** 139:13 244:3

**backup** 183:3 192:20

**backwards** 43:25

**bad** 200:3 239:23

**bag** 167:11,13

**Ballew** 314:17 315:9

**barb** 113:18, 19,21 114:20 115:16 116:2 197:20 200:24 203:9,11 239:12

**barbs** 113:12,

14,15 115:10 116:24 117:3, 13

**base** 217:5

**based** 10:2,14 83:12 115:24 116:6 159:16 182:8 183:10 193:25 196:2,3 206:3 207:20 216:10 233:14 236:5 240:23 258:18 261:15 264:22 268:22 270:17 284:23 321:19 327:21

**basic** 47:19

**basically** 47:9 124:2 137:3 174:3 218:20 327:24

**basing** 236:22

**basis** 114:23 237:7

**Bates** 172:11, 15 174:12

**baton** 84:13

**bear** 232:2

**bearing** 160:18

**bears** 174:12

**bed** 144:3

**began** 100:16 102:11 202:9 221:20 230:8 246:23 301:25

**begin** 100:5,7 124:13

**beginning** 98:12,14 155:24 305:9 322:18

**begun** 230:7

**behavior** 139:2 159:14

**belief** 114:24 158:25

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

**believed** 126:22 227:16 249:24

**bell** 208:24

**belongings** 13:4 120:25

**big** 139:9 264:10 328:22

**binder** 19:16 20:13,23 21:3, 25 23:6,14,21 55:9,12,14 56:5 109:8,17,23 110:1,3,5,9,12 175:7,12,21,24 177:8,12 179:8 185:22

**bing** 255:9

**biohazard** 117:3,11

**birthday** 14:21

**bit** 57:6 58:16 108:16 115:9 131:15 142:2 166:22 263:10 265:1

**bits** 21:14 203:7

**black** 268:1

**Blackwell** 9:3, 10,12,17 12:11 14:14 30:10 32:5,8,12,23 33:2,16 34:1 39:1 40:23 41:24 42:8 49:8,15 82:10 86:13 87:6 102:22 111:22 112:7,8 114:1, 20 118:8 133:11 134:4, 21 135:12,14 136:2,6 137:16 138:16 139:3,7, 23 140:6,20,23 141:9,15,23 146:18 147:7, 16,22 148:1,2, 12 152:7

154:24 161:20 163:10,18 164:10 165:1, 12 167:21,22 168:4,6,7 181:10 183:2, 25 184:7 185:3, 24 186:8,14 188:11,24 189:6,12 190:2, 3 191:3,7,15 192:19 196:6,7, 13,23 197:24 201:7,14,20,23 202:3,5,14 204:6,16 205:11 208:16, 21 213:3 214:18 215:5, 15,24 216:1,13 217:6,12,19 219:11,16 220:25 221:9 222:19 223:9, 23 224:10,22 225:10,17 227:1,13 233:19 237:16, 19,23,24 238:1, 18 239:1,11 240:11 241:5, 22 242:23 245:6,7,20 246:3,4,7,16,22 247:6,10,12 249:10 258:19 259:23 260:7, 17 261:16 265:17 268:21 273:8 274:21 275:23 276:2,3, 15,23 278:18 286:2,24 287:8, 10,18 289:8 290:6 295:24 303:14 304:8 306:6

**Blackwell's** 9:22 31:4 41:9 139:8,17 141:12 148:14 166:9 184:16 185:1,15,24,25 186:7,9,19 187:15,16,18

188:6 189:11 193:11 197:16 207:23 208:12 209:1,22 210:12 215:3 219:14 227:5,8 244:3,10,15 245:3 257:14, 22 259:10 262:7,13 267:9 269:17 272:25 275:18 279:2 288:22 290:14

**blank** 321:2

**blind** 88:6

**blood** 121:21 122:6,9,10,12, 14,20,22 123:1, 3 270:13,17 271:11 303:5

**Bloomington** 46:21

**board** 59:9,11, 17,19 60:6,10, 12,18,21,24 61:4,5,8,17,23 62:6,9 64:12,14 325:8 329:21 332:12,13,16, 21,23 333:1,12

**body** 19:23 20:10 21:19 22:4,6,9,18 42:19 43:5 75:25 76:2 77:16,20 78:9, 12 79:19 92:22 117:21 118:8, 18,19 143:12 144:9,11,18,20 147:3 159:13 204:18 205:24 243:4 244:14, 25 248:18 249:4 250:5 263:4 269:5 274:11 322:11 328:3,6,12 330:19,20 331:7,15,17 332:4

**body-** 77:10,13

**body-worn** 76:4,7 284:22 327:22 328:18 330:1 331:21

**book** 184:7 294:20,21 300:11

**boss** 15:11 220:13

**bottom** 202:10 285:18

**bought** 111:2

**boxes** 267:24 268:3,13

**boxing** 167:9, 11

**brain** 37:20

**Brandon** 81:23 82:2

**break** 18:21,23 71:15 109:3,4 115:9 150:14 154:15 164:1 203:18 209:17 262:25

**breaks** 331:22

**breath** 326:15

**Brian** 53:18 276:23 303:14

**briefly** 16:23 324:23

**bring** 87:4 91:5 92:15 331:10

**bringing** 92:16

**broad** 107:2

**brother** 167:9, 25 243:6 244:14 245:2 246:13

**brought** 13:13 101:3 109:8 130:13 137:10 159:12 169:5 173:16

**build** 141:21

**building** 45:3

**buildup** 274:18

**Bullet** 181:5

**burn** 199:1,22, 25 200:3

**burned** 168:25 200:9

**burns** 198:9 199:6,7,13

**burst** 229:25

**business** 296:21

**busy** 181:23

**button** 252:18, 22 255:24 256:6,11

**buttons** 57:7

----

**C**

**CAD** 58:5 183:11 193:12 215:22 296:17

**cadet** 44:13 45:2 72:11

**calculate** 262:14

**calculated** 183:17

**calculation** 194:9 258:11, 18

**call** 60:10 78:7, 13 79:2 91:3 119:13 127:5 131:16 160:13 179:6 218:5,12 222:9,11 224:10 225:16, 25 226:7,9 227:2 230:4 238:5 247:9,13 253:13 255:11 286:11,13 293:14 296:18 298:2,4 299:10 323:1 325:14

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

called 148:23
159:4 198:20
218:16 219:1
223:6,7 246:2,
13,21 255:25
327:9

caller 41:2

callers 133:13
135:19

calls 20:1,5
23:1 24:18
35:12 83:16
118:24 119:4,6
123:12,13
140:20 190:10
220:14 223:9
229:4,13,22
232:24 245:25
258:19 274:23
276:5,14
280:12 290:16
305:20

cam 19:23
20:10 21:19
22:4,6,9,18
42:19 43:5
144:9,18,21
243:4 244:14,
25 248:18
250:5 263:4
274:12 322:11
328:3,6,12
331:15

camel's
331:22

camera 35:4
76:5 77:7,16,18
78:9,12,18
79:3,17,19 80:4
118:8,11,13,15,
18,19 144:11
215:18 249:4
269:5 284:22
327:22 328:18
330:1,19,20,22
331:1,7,17,21
332:4

camera's
79:14

cameras 76:2,
8,14,21,24
77:1,11,14,21

117:22

cams 143:12
147:3

cannabinoids
271:18 272:1

capacity 17:2
51:2,5 57:23
71:1

captured
216:11

car 77:6,7,12,
18 78:20
118:11,13,15
184:16,22
185:1,15,19,20,
24 186:10,11,
13,19 187:16,
21,22,23
195:16 252:21
262:7,12,13
267:9 326:17,
18 329:16

cardiac 101:15
127:5 219:4
322:21

care 100:25
101:9,14,18
300:8

career 57:15
73:4,22

Carrie 318:15,
18

cars 218:19
227:15 261:25
262:3 267:10,
25 268:3 299:4

cartridge 57:2
112:18 113:1,3,
7,10,13,16
116:17 117:5,9,
14

case 15:22
17:3,5,13,14,19
25:10,13 32:1,8
33:21 35:25
36:4,5,14 37:13
38:12,15,23
39:1,5,12 40:8,
10 79:24 93:8,

9,18 95:14
108:23 110:14,
17 119:25
120:9 124:6
159:11 160:8
163:16 166:16
169:17 225:13
232:12 250:22,
25 251:1,8,11,
13,17 255:2
272:17 285:15
296:15 307:1
314:24 315:17,
25 320:8
333:14

cases 17:7,15
58:4 90:7

casts 293:14

category
228:2

caused 13:18,
24 181:20,22
235:9 236:11
237:9 293:9,22
302:23

causing 91:20

cease 59:19
227:24

centralized
251:21

certificate
47:14

certification
47:11,13,18
87:2

certified 46:14
47:21 51:20
52:8 53:23
54:10

chain 69:19

chance 41:7
174:13 209:21
272:9 301:6

change 66:24
67:9,21,24 85:7
282:13,17

changed 85:5

changing
86:25

characteristic
s 88:14

characterizati
on 212:3

characterize
212:4

charge 70:24
76:4

charged 60:6

Charles 9:3,
17,22 10:12
11:9,16 13:12,
16,22 14:4
35:20 37:13
38:23 39:1,19
40:2 56:22
66:22 119:17
120:11 121:5
124:4 128:9
130:12 136:7,
16 138:6,25
139:4 141:13
154:7 155:1
158:19 167:25
181:6 182:4,8
186:4 210:6
218:18 245:18
264:21 306:15
307:10 317:7
319:11 328:20

Charlie 11:21
100:24 101:8,
17 119:13,22
121:2,19,22
122:22 124:8
127:8,10,16
129:7 131:3,20
132:17 133:11,
19 134:3,20
136:1,12,25
137:5,15
138:10,14
139:5,23,24
140:7,14,23
141:14,19,20
142:11,17,21
143:6,19
144:17 146:7,
12 147:3,5
155:24 158:25

166:18 167:8
170:7 181:11
185:3,25 188:1,
10 195:16
197:20 198:6,9,
17 199:12
201:5,11 202:6,
8 205:9 206:2,
16,22 208:21
212:22 215:15
216:14 218:9,
17,22,25 219:2,
4 226:7 227:7,
12,15,23
232:18 233:7,9,
17 234:2
236:11 237:13,
24 238:2,16,21,
25 239:10
242:2,6 243:9,
19 244:3 245:8
250:6 262:6
266:1 269:4,14
270:4,11
271:14 302:2
310:11 322:11,
20

Charlie's 10:2,
8 128:13 136:6
168:8 169:14
186:15 199:6,7
203:12 219:8
233:15 236:4
237:9 246:13
293:9 294:15

chart 291:22

check 91:22
130:17 174:1
269:9

checked
280:10,20

checking
89:22

checklist
165:24 166:5
173:4,11
291:14,25

chemical
159:13

Chicago 37:25
158:8

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

**chief** 14:10
26:1,11,12,14
38:7 60:9,10,13
61:22 62:2,6,
10,24 63:5,23
64:3,6,13,18,
20,24 65:3,9
66:5,7,12,14,
15,16,19,21,23
67:1,6,7,11,18
68:5,20,22
69:13,15 70:10,
12,19,20,23
71:4,9 76:4
100:8 101:2,25
102:15 104:7,
17 107:18
109:8,12 118:2
137:6 175:4,8,
13,25 176:6,11,
20 193:10
220:8 223:4,6,7
284:9,10
289:14 309:3
312:20 314:23
324:4,10
327:18 334:2,4

**chief's** 61:20
62:14 137:3
283:24

**chiefs** 26:15
64:16 67:8
69:24 70:6,7
283:24 284:7
334:12

**chime** 254:22,
24

**choices**
180:22

**choose** 10:19
92:14

**chose** 11:1
185:14

**church** 11:8,9,
16,21,25 13:1,
3,5,6,21 35:7
121:2 124:7
137:11,18
138:25 141:2
142:17 168:13

**circle** 292:20,
23

**circuit** 239:20

**circuits** 286:18

**circumstance**
85:1 240:25
297:9

**circumstance
s** 31:3 95:14
96:21 98:22
139:10 189:5
227:18 228:19
229:12,15

**city** 25:16
67:24 181:24
321:9 332:22

**city's** 70:15

**civil** 15:16,18
17:3,5,13,14,18
26:2

**civilian** 99:13
190:13 191:10
332:21

**civilians** 70:18
87:18

**claim** 25:18,22

**claiming** 102:1

**claims** 101:1

**clarification**
156:24 315:22

**clarify** 211:4
213:20 330:20

**classes** 47:1
53:17 82:13

**classified** 86:9

**classify** 270:1

**clause** 78:21

**cleaning** 326:1

**cleanly** 206:15

**clear** 40:15
112:19 114:14,
15 135:9 145:3
164:14 166:8
175:9 187:12
192:12 199:18
224:1 255:23
265:24 266:2

272:20 288:11
291:14

**clears** 260:13

**client** 164:21

**clients** 164:21

**clip** 198:22

**clips** 198:21

**clock** 215:22
252:8,24,25
255:19 256:18,
19,24,25 257:1,
23 258:1,4
261:5,6,7,8,9,
11 297:20

**clocks** 193:14
195:4 217:1,5
257:19

**close** 187:20
211:7 269:11
281:10

**closed-hand**
86:4

**clothing** 12:25
120:12 121:6,
11,19 139:1
196:9,18,19,20,
21 198:18,25
200:16,24,25

**clothing-
interrupted**
200:8

**club** 312:2

**clue** 195:20

**code** 297:1,9,
13

**codes** 296:20

**coding** 289:13

**collect** 108:5,8
110:16 116:14,
24 117:4,21
118:17,24
119:1,10,20
120:8,11 121:5,
11,20,21
122:16 130:24
159:3 161:19,
22 162:1,10,19

**collected**
108:17,18,21
113:24 114:1,
20 115:5,17
117:1,13 119:4,
12 122:6,9,11,
18 161:12,14,
22 168:14
169:9 296:19

**collection**
169:4

**college** 48:4

**color** 268:2

**combative**
143:7,20,24
145:13 146:8,
13,24 147:1,4
250:6,15
269:20 270:1

**combativenes
s** 143:11,16
144:17,22
145:8,10 147:5,
6 250:10,19

**combining**
254:16

**comfortable**
112:7 262:20

**command**
26:9,10,14,18,
20,23 27:2,21
28:7,12,18,24
29:13,23 30:11,
20 31:9,15,20
33:16 34:1
38:14,22 39:9
69:19,21 70:9,
22 227:24

**commander**
68:24 221:18
281:4 283:20

**commanders**
221:18

**commands**
184:1 186:7
189:12 204:10
218:20

**comment**
290:23

**comments**
298:23,25

**commit** 140:1
227:17 289:12

**committed**
90:25 93:12,15
328:15

**common**
221:18 279:17

**communicatio
n** 246:7 317:11
319:3

**communicatio
ns** 27:21
245:21

**company** 34:3,
7

**compare**
256:5

**compared**
307:17

**comparing**
215:20 254:16
256:9 257:13

**compel** 126:16

**complainant**
326:25 329:3,5,
15

**complainant's**
326:23

**complaint**
26:3 58:25
100:20 102:14
103:10,19,25
165:11 282:8
284:5 285:9
325:1 326:12
327:8,9

**complaints**
104:14

**complete**
15:10 46:13
47:17 58:9,11
128:22 155:3
172:22 174:13
239:20 250:8
317:17 321:1
327:18 333:20,

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

21

**completed**
14:9 103:2
283:23 286:18
299:10 307:19
311:21 312:10

**completely**
248:22 249:13
251:16 263:25

**completing**
40:2,5

**completion**
15:5

**complex** 180:7

**compliance**
93:1,4 230:1,2

**complicated**
132:11

**complication**
303:4,8,9

**complications**
303:2

**complied**
233:9

**comply** 186:6
196:4 204:10
210:8 218:20
227:24

**complying**
182:11 202:9

**computer**
162:16 243:9
251:1,18,21
254:14 279:8
282:11,14
283:5,18
326:19,22
336:1

**computers**
252:13 298:24
299:4

**conceivable**
230:7

**concept** 95:23
96:6 98:18

**concepts**
99:24

**concern** 238:1,
13

**conclude** 37:6

**concluded**
37:7 38:8
336:22

**conclusion**
64:2 79:8 95:15
98:11,23 115:8
174:17 178:12,
14 192:23
216:9 236:4,10,
23

**conclusions**
98:14

**conclusively**
200:5

**concur** 336:5

**condition**
159:4 219:8
249:11

**conditions**
19:1,5 309:14

**conduct** 10:13
58:20,24 59:9,
11,17,19 60:18
61:17 62:6,8
96:18 97:6 98:4
104:13 105:1,3,
5 107:7 108:2
328:13,17

**conducted**
59:3 65:14,19
104:11,13
128:15 248:3

**conducting**
65:7 89:1,13
95:20 98:8
105:8

**conducts** 59:6

**conference**
14:11,12,15,19
15:2 136:23
137:2,3 159:21,
23 228:8 300:2,
4,6

**confetti** 117:6

**confine** 182:14

**confirm** 13:14
96:23 257:18

**confirms**
146:25

**confrontation**
78:1,8,25

**confused** 90:9
156:25

**connect**
196:17

**connecting**
286:14

**connection**
16:2 126:13
127:24 132:7
135:25 158:4
163:21 165:17
166:9 169:10
189:17 196:21
198:24 199:14,
24 200:1,4,8
239:13,17,23
240:13 270:16
336:12

**conscious**
180:22

**consideration**
78:17

**considered**
84:17 85:2
142:3 191:11
231:5

**consist** 89:20

**consisted**
29:19

**consistent**
12:3,23 222:20
290:1 315:20
316:6

**constitute**
145:8,10
230:11

**constitutes**
231:10

**constitution**
336:2,6

**construed**
220:10

**consult** 163:8
277:5

**consultant**
12:3

**consumption**
329:19

**contact** 11:23
13:20,22 14:4
124:5,8 136:21
138:5 139:4
141:13 142:17,
18 148:19
169:13 196:18
220:12 221:19
288:2

**contacted**
36:17 223:7
253:5

**contemporane
ously** 219:11

**content** 177:4

**contest** 333:10

**contested**
333:5,6

**context** 92:1,9,
20 93:7 96:6,12
139:13 141:21
183:18

**contexts** 99:25

**continuation**
189:4

**continue** 18:3
267:18

**continued**
205:12 210:9,
13,15 213:1
214:15

**continues**
208:3

**continuing**
211:24 212:5
263:21

**continuum**
72:7 75:5 82:15
83:20 84:21

85:14 86:14,18,
22 87:7

**contractor**
36:8,12

**contradicted**
130:11 180:16

**contradicting**
221:22

**contributed**
10:8 235:4
322:21

**control** 123:16

**conversation**
29:19 36:24
39:11 40:17,19
104:17,19,21,
24 129:23
149:24 150:18,
20 151:3,4,11,
13,24 158:23
160:20 211:8
219:6 221:4,11
222:18,24
223:4,23
225:15,17
226:5 246:18,
20,25 293:4
309:19 323:8

**conversations**
19:10 29:6,11,
20,22 31:6,9
38:10,14 39:10
150:5,7,8,12,15
152:2 161:5,8
223:19 224:9,
16,21 225:3
246:5

**conversing**
225:13

**cooperate**
32:13,25

**cooperation**
88:5

**copied** 303:20
314:17

**copies** 248:11,
12 299:18

**copy** 109:10,11
164:1,5 253:21



Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 1:17-cv-01698-JPH-MJD   Document 125-54   Filed 08/13/18   Page 348 of 639 PageID #:
5027
The Deposition of STINSON, taken 04/23/2018   Page
346

279:2 283:23
294:12 301:4
308:22 319:18,
22,25 320:3

**corner** 172:12

**coroner** 36:3
128:12,17,24
133:3 150:6,8,
21 151:3
271:13 314:9
317:12 321:22

**coroner's**
36:4,8,13 37:10
39:23 128:12,
18 132:23
151:25 155:17
167:1 237:8
247:22 308:14
319:4

**Corp** 321:10

**Corporate**
321:11

**correct** 10:17,
18 13:8 19:17,
21 21:7 22:1,4
23:2,4 25:21
26:18 27:22
29:1 30:17,18
32:21 36:2
41:10 42:19,23
43:1 46:17,24
47:7 48:10
53:3,6,10 54:11
56:7,11,13,19,
22 57:17,20
58:18 59:4
60:8,15,16,19
61:24,25 62:12
64:14,17 66:5
67:5 68:15
70:10 71:3,6,8
73:4,6,7,8,19
74:3,12,23
75:3,5 79:24
82:6 84:16
86:23 87:15
89:18 93:19
94:8 97:17,18,
21 99:25
102:20,23
103:5,8,16,22,
23 104:12
105:11,12,22,

23,25 106:1,12,
15 110:1,3,6
111:10,12
112:3,10,11
113:7 115:11,
12,14,17,18,21,
22,25 116:10,
14,17 118:22,
23 119:4,14,15
120:2,16,18,19,
20,21,24 122:4,
5 130:2,3,25
131:1,4,9,10,
13,14,16,17,21,
22,25 132:1,3,
4,8 133:3,16,
20,21,23
135:15,16,19,
20,21,22 136:9
137:18 140:21,
25 141:1,3,4,6,
7,10,16,17,21,
22,24,25 142:4,
7,8,22,23
143:21 146:15
147:17,18,20
148:3,4,6,7,8,9,
12,13 149:20,
23 150:9,10
151:11,12,19,
25 152:1,7,11,
22 153:2,7,12,
17,19,24 154:9
155:7,9,12,14,
17 156:6,7
160:10,12
161:15,16
164:2 166:3,6
167:6 174:20
175:2,24 176:3
177:9,22
178:16,25
180:5,14
181:14,21
188:1,4,12,14
189:24 190:4,
13,18,21,25
191:12,13
192:15 194:3
196:24 197:2
200:6,7,9,13,
17,24 201:5,12
202:7 204:22,
25 205:15,19,
20,22,23,25
206:23,24

210:23,25
211:1 212:8,18,
22 213:1,20
214:3,4,22
215:8 216:1,23
217:17,18,19,
20 218:6
219:23 223:24,
25 225:8
226:19,20,22
228:8 232:13,
14,16,17
233:11,23,24
235:6,7,10
238:5,6,8,9,11,
12,14,15 239:1,
12,14,15 239:1,
20 240:3
241:17 243:15
244:5,15
245:10 247:10,
16,18 248:4
250:2,23 251:9
253:11,12
256:12,15,16,
17 258:6,13,21
259:7,11,13,16,
20,21 261:9,13,
17 262:19
267:3 271:18
272:22 284:25
285:3,6,10,13,
24,25 286:8,11
287:23 290:3,
15 291:10,19
293:19,20,24
301:13,22
302:13 303:21,
24,25 305:3,4,7
306:12 308:20
309:1,6 310:6,
9,15,16,18,21,
25 311:1,5,7,19
312:20,25
313:2,6 314:13,
15 315:9
318:24 319:8
321:23 322:1,5,
6 324:21
328:12,22
329:8 330:7,16,
19 331:17
332:8 335:13,
15,22

**corrected**
319:18,22,25

320:3

**correctly** 90:2
199:20 261:11

**Coughs** 12:2

**counsel** 41:15
114:8 171:20
268:14 272:19
321:10,11
323:9,11,15,19
325:3

**count** 209:11

**country** 264:9

**county** 36:3,8,
13 37:10 119:1
251:22 276:1

**couple** 18:2
53:16 86:24
203:23 254:20
268:5 272:13
292:25 302:8
317:17

**courses** 47:25
89:7,8,10,12

**court** 25:18,22
63:12 109:9
125:24 126:1,9,
15 132:15
234:18 258:25
289:3 317:20
323:23,24
336:14,18

**cover** 81:14,16
174:19 175:1
186:10 187:15,
21,23 224:6

**coverage**
102:9 134:12

**covered** 174:2
227:7 248:22
249:13,19

**Cox** 81:23

**cracking**
266:7,14,15,16

**created** 258:4

**creating** 196:9

**crew** 9:25 10:1

**crime** 93:12

**crimes** 61:12

**criminal** 15:21
17:5,7,15 44:13
72:18 89:1,13
94:7,10,15,19,
21 95:1,9,17,20
96:6,17,24
97:3,6 98:5,10,
18,25 99:6,20
105:9,11
125:13,17
249:17,20

**critical** 58:13

**cross** 268:7
325:15

**cuff** 91:5,7
92:15,16,19

**cuffed** 91:8,25
265:5,8 295:24

**Cummings**
107:19

**cumulative**
231:12

**Cunningham**
35:18 134:6,7
135:24 137:13
138:10,22
141:5 151:7,11,
19 155:12
171:3

**Cunningham's**
151:15 165:7

**curb** 184:9,13
185:9 188:1,7
189:7 190:15,
16,18,25
207:12,13,17
262:22

**current** 52:6
68:12

**cursing** 336:9

**custody**
190:22 207:13
237:25 262:22
264:23

**cut** 50:14
286:20

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

**D**

**D0000010** 273:2

**D000004** 273:1

**D1094** 174:12

**D1096** 195:15

**D1097** 204:4

**D1183** 280:6

**D5064** 172:16

**daily** 220:14

**danger** 187:19 190:8 227:12

**dangerous** 190:13,15 191:12 229:19

**dangled** 196:14

**dangling** 196:9,24 197:5, 11,17,23,25 201:8,13,15 202:15 239:12

**dart** 196:17

**date** 9:14 27:15,19 35:2 36:24 76:18 100:7 112:9 127:16 128:23 129:3,7,8 136:15 167:17 170:12,17 173:16,23 174:22 178:22, 23 271:23 281:7 297:19 304:20 308:16 326:6 327:17 333:2,23

**dated** 310:2

**dates** 13:14 24:21 102:9

**daughter's** 14:21

**day** 11:20 14:5, 23 21:21 73:16

74:2,16 80:15 86:21 100:8 102:23,25 103:5 118:9,11 127:17 141:3 161:21 211:8, 10 212:21 218:5 219:12 220:2 221:1 234:2 261:17 278:11,20 287:20 300:4 306:4,11 307:7 310:4 311:5,16, 20 312:25 315:6 320:18 324:10 331:23

**days** 11:10,20 75:18 133:19, 22 134:4,21 137:15 139:6 249:1 257:20, 25 315:21 317:3

**de-** 72:5

**deadly** 86:1 230:11,18 231:3,10

**deaf** 88:6

**deal** 90:19 282:14

**dealing** 88:1 195:6 243:6

**dealt** 35:19 134:13

**death** 10:2,9 11:10 127:8 131:21 132:19 169:14 170:8 181:7 230:21, 25 233:15,23 234:2 235:4 236:5,22,25 237:9 270:17 293:9,15,23 294:15 302:3 309:13 310:12 315:23

**Deborah** 123:13 153:14 154:25

**Debra** 12:12

**decedent** 271:20

**decent** 262:9, 10

**decided** 144:3 304:25

**decision** 60:11,13 64:6 108:7,10,13 330:14

**decisions** 108:2,4

**decreases** 96:3

**deem** 121:15 282:1

**deemed** 60:9

**defendant** 15:15 49:10

**defendants** 28:25 49:7

**defensive** 75:12 82:7 89:15 163:6 277:21

**degree** 47:2,4

**delay** 100:10, 13 277:22

**delegate** 64:13

**delegates** 64:16

**delirium** 158:13,17,20 159:1,4,8,16,20 160:22

**delivered** 48:4

**delusional** 138:24 189:10

**delusions** 159:15

**denies** 326:21

**deny** 96:23 326:20,22

**department** 14:7 16:3 25:21,23 33:15, 24 37:12 38:11 39:12 43:10,23 44:4,10 45:9, 12,15,18 48:21 49:23 51:18 52:3,12 53:13, 21 54:10,15,21, 25 55:2,17 57:16 58:8 59:7,12 61:19 62:21 63:21 64:8 65:2,5,20 66:19 69:6 73:12,13,17 74:20 75:23 76:2,22 77:7,21 79:20 80:20,21 87:4,8,17 90:14 91:10 98:8 101:7 103:16 105:21 107:13, 23 111:4 116:23 125:15 134:9 148:23 157:21 161:23 163:21 170:3 178:10 230:23 246:3 250:23 252:2 274:5 323:18 332:11

**Department,-** 80:7

**depend** 229:11,15,19

**depends** 228:18 281:18

**deploy** 217:12

**deployed** 189:12 217:23 258:20 296:22 297:1

**deployment** 191:17 208:8 209:10 215:4, 14 216:11 217:16 240:12

**deployments** 192:13 194:1 195:22 208:18

297:11

**deposition** 16:5,11,18,21 17:3,13,18 18:1 19:12 20:7,11, 15,24 21:3,6 23:8,11,23 24:1 28:3,4 32:1 33:19 109:9 114:17 224:2 249:1 323:10, 21 324:11 336:22

**depositions** 17:6

**deputy** 26:12, 15 38:7 62:1,6, 9 64:16,18,20, 23 65:3,9 66:7, 11 67:8 68:5,22 69:12,15,24 70:6,7,10,12, 19,23 71:8 107:18 109:8, 12 128:24 220:8 231:19, 21,23 276:1 284:10 309:3 314:23 324:4, 10

**deputy's** 231:24

**derogatory** 274:11

**describe** 28:20 29:10 69:11 72:4 83:4 88:12 90:21 104:16 127:22 179:3, 22 208:7 250:5, 15,18 266:11 326:10

**describes** 208:21 209:12 239:12 285:15

**designs** 81:17

**desktop** 264:3

**detail** 41:5 58:17

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA COURT REPORTERS

**details** 305:10, 22

**Detective** 107:18,19 309:2 323:11 324:2

**detectives** 69:16 313:13

**determination** 139:20 179:25 185:12 262:5 265:1 284:24 303:8

**determinations** 106:7

**determine** 93:14 106:3 123:25 193:3,6 211:2 220:12 242:9 261:25

**determined** 193:9 302:6

**determining** 105:20

**develop** 98:19 202:18 270:4 271:14 272:5

**developed** 206:4

**developing** 98:11

**develops** 96:12

**device** 113:6 116:9

**dialed** 35:11

**die** 282:9

**died** 9:17 127:17 128:10 129:8 134:15 233:17 234:2 235:2,22 301:21 302:14 305:6

**difference** 99:5,20 157:5 239:4 253:5

254:21 320:10

**differences** 99:9 216:25 320:2,5

**differentiate** 239:8

**difficult** 242:9 255:15

**digitally** 185:21

**diligence** 95:13

**ding** 255:14

**Dinsmore** 289:17,21 290:12

**Dinsmore's** 290:5

**direct** 13:20,22 69:16 148:19 325:20

**directed** 268:14

**direction** 92:14 185:20

**directions** 104:8,9

**directly** 66:7, 11 102:4 136:13

**director** 253:5

**disabilities** 88:2,4,6,9,16, 20

**disability** 88:17

**disagree** 278:13,16

**disbanded** 59:23 60:8,13 61:14,16,23 62:9 64:13

**discarded** 113:20

**disciplinary**

332:5

**disciplined** 331:10,18

**disconnect** 196:10 198:18

**discovery** 30:22 97:21

**discrepancy** 209:6

**discretion** 61:20 62:11,14 79:20,24 81:10, 15

**discuss** 38:17 225:6

**discussed** 26:7,23 29:11 30:20 38:18 99:19 105:8 120:7 154:11 173:5 177:3 225:9 241:9,10 242:13 250:7

**discusses** 9:21

**discussing** 32:18

**discussion** 27:4 28:2,7,12, 15 32:2,5,9 33:1,14,22,23 34:12,16,19 37:9,11 38:25 39:4,16,18,21 155:7,11,16,23 176:20,24 177:21 213:17 243:18,21 245:1,7 271:11 323:23 336:10

**discussions** 26:17,20 28:20, 24 30:8,13,16 31:15,20,22 33:25 34:9 177:4

**disheveled** 12:25 139:1

**dislocate** 92:18

**dispatch** 45:3 119:2 162:9,11 252:6,9,11,14, 15,25 253:5 254:4 256:5,10 298:6,17,19 299:4,8

**dispatched** 256:8

**dispatchers** 252:12

**disperses** 117:6

**display** 88:15 159:14

**displayed** 131:24 297:16

**displaying** 132:18 143:9

**disposed** 116:4 122:22, 24

**dispute** 242:23,24 322:12

**disruptive** 13:1

**distance** 184:13 258:3 262:9,10,12,15 267:21

**distances** 269:3

**diverse** 61:4

**division** 68:24 69:14 70:8,24

**doctor** 106:23 125:1,2 126:2 129:11,17,22, 24 130:11,17 158:12 159:17 160:4 161:4 219:6 233:20

**doctor's** 128:14

**doctors** 127:15 130:2

**document** 23:8 29:16 41:15 166:13 179:7,15 180:3 185:18 211:21 212:3,4 239:3 290:18 306:9

**documentary** 122:19

**documented** 108:22 151:20 185:19 207:7 213:7 269:10

**documents** 20:14 23:22 25:9 28:5 29:15 94:22 108:7,21 109:18,21 161:11,13 164:15,19 169:9 174:24, 25 175:3 176:1 194:20 209:7 250:25 307:20

**dots** 292:20,23

**double-lock** 91:24

**double-locking** 89:22

**doubt** 31:18 249:14,21 255:1 293:14

**Doug** 26:13 107:19

**download** 259:24 260:4

**downloaded** 117:25 118:6 256:21 257:3, 21,25 259:9,13 260:6

**downloads** 256:22,24

**dozen** 289:11, 24

**drafts** 248:15

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

299:21 300:9

**draw** 292:2,14

**drawing** 269:11

**drawn** 270:17

**drew** 270:13

**drinking** 326:14

**drive-** 239:8 240:2

**drive-stun** 216:14 239:1,4, 16,19,24 242:6, 14 285:19 286:7 287:1

**drive-stuns** 241:2

**driver's** 168:23

**driving** 78:24, 25 79:3,12

**drop** 230:6

**drove** 307:9

**drug-induced** 159:12

**drugs** 227:16

**dry-stun** 240:20

**due** 53:17 95:13 154:4 189:10 219:3 235:15,16

**dura** 313:11,21

**duration** 166:14 192:7 208:2,4 229:17 230:3 231:12

**duties** 48:14 50:25 62:17 68:18 176:9

**duty** 69:12 280:24

---

**E**

**e-** 150:24 167:21 300:24 303:23 308:7

**e-mail** 9:16,19, 20,23 29:24 151:2 167:20 168:4 257:9,11 301:3,9 303:10, 13,18,20 304:1, 2,6,12,14,24 305:5 308:8,10, 11,23 311:2,13 312:22 313:9, 19,25 314:11, 22 315:1,7,25 316:14 317:4, 12,24,25 318:1, 14,20 319:5,7, 18,24,25

**e-mails** 20:18, 23,24 299:19 300:19,20,23 307:23 312:13

**earlier** 74:10 115:19 171:10 223:18 224:2, 14 225:1,3,12 323:10

**easier** 277:15

**easily** 297:10

**easy** 40:18 193:3 196:16 270:21

**Eck** 49:9,12 81:22 82:4 152:11 154:24 243:8 263:5,11

**Eck's** 118:13, 18 264:19 268:21 269:5

**educated** 216:9

**effect** 29:6 147:6 218:22 249:4,7 250:1 255:4 266:17 278:1,14

324:15

**effective** 196:10

**effort** 211:2

**efforts** 25:9

**elaborate** 196:25 197:1

**elapses** 305:10

**elected** 332:13

**elective** 73:24 74:5

**electives** 75:21

**electricity** 230:4

**elements** 160:14,16,22

**Elizabeth** 12:11 33:9,12, 13 79:11 204:7 288:6

**Elliot** 32:15 33:5,6,7 39:5 49:8,17 78:12 79:23 80:4 86:13 152:17 154:24 164:10 165:1,12 192:15 193:1 202:1 204:7,15 215:17 225:13 295:23 325:7, 23 326:16,20 327:24 328:1,6 332:4

**Elliot's** 22:10 118:15,19 268:22 329:16

**emergency** 9:25 122:23

**emergent** 79:12

**employed** 44:11 242:11

**employee** 35:6 36:8,12 37:12

39:12 107:22 170:4 308:14

**employees** 11:9 13:21 38:11 98:8 116:22

**employment** 48:3 332:15

**empty** 85:16, 18 86:7,8 117:10,14

**EMS** 122:18 128:2 310:19, 20

**EMT** 10:23 142:10 148:18, 24 156:21 157:8,14,16,21 163:20

**EMT's** 145:24

**EMTS** 9:25 10:7 11:5 34:13 39:19 133:2 145:12,16 146:2 148:17 156:17 157:2

**en-route** 299:9

**encounter** 90:15 136:6 138:15,21 139:6 140:24

**encountered** 133:12 134:4, 22 138:11 139:3,23 140:6 151:8 185:5 188:11,25 202:6

**encountering** 137:16

**end** 58:3 182:3 258:25

**ended** 71:19 146:8 148:8,11 156:9 207:18 289:13

**ends** 190:20

**Enforce** 48:15

**enforcement** 43:19,22 44:1 45:22 46:9,11, 12,14 47:17,20 48:1 71:12,21, 24 72:2,12,13 74:23 75:1,4,20 80:8 81:1 87:12 195:20,25 278:11 279:18

**engaged** 134:20

**England** 318:15,18

**ensure** 106:20

**enter** 254:13 283:17

**entered** 112:6 167:4

**entering** 254:17

**entire** 21:16 69:5 101:4 148:21 189:21 251:22

**entirety** 21:11, 13 23:2

**entity** 60:6

**entries** 252:11

**entry** 111:25 252:19 256:12 258:21 275:5, 14 276:18

**equipment** 331:25

**ER** 106:23 125:1,2 127:13 270:13

**Eric** 81:22,25

**err** 79:16

**erratic** 159:14

**error** 320:14

**errors** 319:12, 14

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

Case 1:17-cv-01698-JPH-MJD   Document 125-54   Filed 08/13/18   Page 352 of 639 PageID #:
5031
The Deposition of SIMEON, taken on 04/13/18   Page 350
350

escalate 75:7
83:6

escalation
72:6

essentially
136:22 285:16

establish
139:18 194:20
244:9

established
329:25

establishes
138:20 245:18

estimate 16:8
29:4 59:21
76:17 77:2

evaluate
141:23

evaluating
199:13,23
222:12

evaluation 9:4
139:16 141:9
148:1 219:3
336:5

event 98:3
137:4 201:3
336:12

events 138:20
253:20 277:16
315:20 316:6

evidence 10:7
96:13 97:21
98:11,20 99:18
108:4,16,18
109:25 110:8,
16 111:17,23
112:9,12,13,16
113:1,2,6,7,24
114:1 115:10,
13 116:9,12,13,
14,16,24 117:2
120:8,24
122:20 132:24,
25 133:2,3
138:16 140:12
144:21 159:3
160:5 161:13
167:4 168:13,

22 177:12
197:10,15
198:3 199:6,22,
25 201:4,10
202:18,22
206:3 216:3,8,
20 240:5,15
260:1,8,14,19,
21,25 263:21
269:25 270:4,8
271:14 272:5
277:23 293:22
296:19 322:19
328:4

evidentiary
121:18

EVOC 72:21

evolving 78:4

exact 9:14
24:21 35:2
76:18 217:13
233:6 246:18
309:18 320:11
326:6 333:2,23

exam 43:13,14
50:16

EXAMINATIO
N 268:7,17
324:7 325:20

excessive
65:24 101:1
102:2 105:18
146:18 232:13,
16 325:1
327:20 328:11

exchanging
291:9

excited
158:13,17,20
159:1,4,7,16,20
160:22

exclude
180:24,25

excluded
180:10,17
188:20

exclusion
96:14

excuse 12:2
35:15 260:13
293:13

Executive
46:10 47:8

exercised
79:23

exhaustion
277:12

exhibit 109:7,
10,11,14,18
127:25 161:14,
18 171:15,17
172:16 173:10,
25 174:10,11,
14 175:10,13
176:1,4 179:3,9
180:4 182:19
201:17 209:23
247:16 248:3,
12,16 253:19,
25 257:8,12
258:9,11,14,24
259:4 267:23
268:2,4,11
269:9 272:15,
18 279:4 280:5
282:23 287:4
289:2,5 291:15
292:1,15,21,24,
25 293:2 294:4,
5,17 296:8,9
298:14,15
300:13,22
301:2 303:11
307:22 308:1,7
317:3,16,21
318:3,10,12

exhibits 257:8
299:16

exist 22:7
59:20 66:10
160:15,16
282:22

existed 118:5
120:5 160:22

existence
59:12

exists 118:22
120:3 179:7
256:4

expect 78:3
94:18 98:7
211:6

expectation
78:9 95:4,19
97:2 99:2

expedited 49:3

experience
49:3 63:20 65:7
94:7 186:12
196:15 198:19
200:17,22
231:2 305:21

experienced
148:2,6 199:17
200:16 230:21,
25

experiences
61:1

experiencing
147:19,23

expert 158:12,
18 235:6

expert's 235:2

expertise
279:10

experts 158:3
161:5,8

explain 16:23
45:1 55:19 58:2
251:3 254:2
259:18 280:4
281:19 320:21

explained
160:23 197:5

explanation
317:9 320:14

explore 95:8
112:25

exposure
198:20

express 238:1

expressed
31:18 238:13

extent 126:6
133:6 158:18

292:8,12
326:10

extreme
143:11 144:21
145:8,10
159:14 250:7,
10,18 274:18

extremely
143:7,20,24
146:24 250:6

___

**F**

face 233:8

face-down
195:17 242:6

Facebook
167:23 168:8

facing 92:12

fact 9:2 124:4
125:6 182:10
185:15,19
187:17,20
188:21,23
189:22,23
197:1 198:19
199:5 200:11,
19,23 226:25
260:15 266:25
293:22 313:18
321:22 322:16
323:9

factor 103:24

facts 10:14
11:12 13:10
58:25 95:14
98:22 140:11
179:5,6,19,23
180:3,5,9,13,
16,17,20,23
181:1,5,14
182:19 185:16
188:10 189:22
191:22 206:23
207:8,10 216:3
220:5 221:13
228:18 233:4
240:5,15
245:16 281:25
284:24 304:15

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

**factual** 31:3
179:16 249:22

**fail** 50:7,9
302:24

**failed** 218:20

**failure** 235:16
302:15,16,17,
21 331:14,15

**fair** 64:5 77:16
79:18 106:4
108:1 112:8
137:9 139:12
161:24 180:3
186:18 205:3
213:24 234:10
253:19 267:7
299:8 314:11
331:12 333:24

**fairly** 181:23

**Falco** 53:18
54:1

**falls** 228:1

**familiar** 17:25
95:23 117:12
301:8

**family** 9:13
31:23 32:2
40:1,6,17,19
103:11,19
104:1 245:22
246:7 315:16

**farther** 275:9

**fast** 37:20
258:2

**faster** 193:12
258:12

**February**
52:20,21,23,25
53:1,2 54:19,23
55:2,16 56:16,
25 73:16,18
80:15 86:12
87:22,23

**federal** 26:2

**feel** 11:18,22,
24 128:7
142:14,16
145:23 148:16

207:7,9 221:17
227:7 246:10
260:24 262:18,
20

**feeling** 15:12
199:1

**feet** 184:9
185:9,11,12
186:13 188:1
190:20 191:11

**fell** 78:21
227:10

**felony** 90:24,
25 91:10 92:1,9
93:5

**felony-type**
91:12

**felt** 130:19
138:6 158:17
260:20 278:22

**field** 48:23,25
49:2,4 58:7
78:2

**figure** 187:13
217:8,9

**figures** 247:24

**file** 108:18,19,
20,24,25
118:18 119:24
120:22 251:7
284:3 314:2
328:19 331:11
332:5

**filed** 25:15
26:3,7,24
27:11,15,20
28:13 31:16,20,
23 32:6,10
33:2,17 34:14,
17,21,24 36:9
37:17 38:9
102:22,25
103:4 284:5
323:22

**files** 118:19,21
165:3

**filing** 36:11

**fill** 102:15

173:9,10
279:25 291:18,
22

**filled** 173:20

**filled-out**
212:16

**Fillenwarth**
26:12 53:19
54:1 70:19 76:4
118:2 223:6
284:10 301:10

**fills** 277:10

**final** 64:6 241:2
311:9,12

**Finally** 318:10

**find** 58:22
105:17 115:4,
20 127:14
192:5 197:4
303:9 311:9

**finding** 132:20
158:19 178:3
180:10,14
316:21

**findings**
108:13 110:13
132:6 133:1
164:7,23
166:16 167:6
173:20 174:16
175:22 176:6,7,
25 177:3,5,25
178:7,9,11,13,
22 180:2,5,17
183:19 184:8,
18 187:24
222:16 223:2
243:1 272:22
308:19,25
309:17 310:8,
13,25 315:13
327:18,19
333:24 334:6

**finds** 79:13

**fine** 48:7 76:19
101:16 186:24
218:25 270:25
275:4 295:3

**finger** 91:23

**finish** 149:12
234:14

**finished**
234:16

**fire** 10:1 13:5
148:23 157:16,
21 163:20
169:1 170:3

**firearms** 74:7
163:7

**firefighters**
124:18 156:21
157:10,11

**firm** 25:5

**fit** 89:22 183:22

**fitting** 91:22

**five-second**
229:25

**fixed** 144:12

**flat** 92:4

**flip** 274:14
315:4

**focus** 27:11
36:20 37:15

**focuses** 96:12

**focusing** 37:4
96:2

**folks** 35:11
39:16,23 69:8
133:15 135:23
137:10 155:3,6
157:20

**follow** 20:22
181:18 186:8
244:17 325:5

**follow-up**
96:18 146:7
156:10 284:19
318:2 319:5
323:16

**followed-up**
287:25 288:4,5,
8

**following-up**
317:14

**footage** 117:21
118:17

**force** 9:4
10:12,16 30:10
31:4 41:1,9,12
57:23,25 58:2,
7,9,18,21 59:1,
6 60:7,14 61:6,
10,18 62:5,11,
16,18 63:5,24
64:2,7,17,23
65:2,8,13,14,
17,18,22,24
66:1 71:2,6
72:1 74:25 75:5
80:9 81:3,11,19
82:10 83:6,12,
21 84:20 86:1,
14,18,22 87:7
88:19 89:17
93:13,14 99:7,
10,22 101:1,4
102:1,22 103:1,
2,4,7,14
104:12,15,18
105:1,6,14,19
106:3,10,14
125:22 126:4
139:8,17,20
141:10,12,24
146:9,11,14,18
147:15,17,20
148:2,8,11,12,
14 158:8
159:24 160:1
163:4,5 186:1,
20 187:15
189:6 207:12,
15,18 208:12,
17,20 209:2,9,
22 210:12
211:5,22
212:12,13,16
213:4,25 214:8,
22 215:3,7,14,
25 216:21
220:9 222:12,
17 227:5,21
228:2,3,5
230:5,11,19
231:3,10
232:20 238:10
244:5,12
245:19 277:5,
10,24 278:8,19,

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

25 279:2,10,25
280:1,4,23
281:21 282:1,2,
3 283:22 284:3,
25 285:9 286:3
306:21 307:2,
15,19 324:17,
24 325:1,23
326:5,10
327:20 328:11

**foreign** 264:9

**forget** 305:23

**forgot** 135:5
199:19 331:2

**forgotten**
154:19

**form** 10:24
11:11 13:9
64:10 65:4,21
79:25 93:20
96:19 98:13
100:13 101:10
103:17 133:5
135:1 137:1
140:2 141:11
144:23 147:21
149:6 150:25
179:10 190:9
195:23 208:13
212:2 215:6,11
216:2 220:4
228:16 229:21
230:12 232:23
240:4,14
241:18 244:7
248:23 272:2
278:9 280:2
282:25 292:8
295:12,19
302:5 304:13,
19 305:19
330:10

**formal** 102:14
127:1

**formally** 178:9

**format** 307:4

**forthwith**
331:2

**forward** 137:4
303:23 314:23

321:6

**forwarded**
25:20,25 301:4
312:20

**found** 141:6
168:25 173:17
219:4 221:21
222:20 227:4
254:17 313:14
321:19 328:9,
15 329:24

**four-week**
47:9

**Fourth** 159:25

**fracture** 36:16
317:9 320:6,9
321:14,18

**fractures**
313:12,22
315:19 316:5
322:4

**frames** 216:5

**Francis**
126:12,17
127:24 128:4,
17 131:9,19

**frequency**
166:14

**fresh** 87:3

**front** 19:17
20:13,23 21:3,
25 55:11,15
56:6 108:24
186:5 191:1
218:19 227:15
238:22,25
239:11 240:1
262:21 296:17
326:7,17 327:1
328:17 329:15

**FTO** 45:5

**FTO-ING** 79:6

**fuck** 336:4,14

**full** 18:7 185:18
188:15 234:19

**full-time** 44:12,
14,17,18,22

45:7,8 48:25

**fully** 32:14

**function** 158:4

---

**G**

**gained** 258:1

**Garrity** 99:12
334:17

**gather** 98:21
99:18 111:16,
19,20 127:19
128:3 129:13
163:20 164:9,
12,18,25 165:3,
5,8,14,16,22
166:8,18,21
167:14 243:3

**gathered**
109:18,20
111:21 127:23
128:1,13,17
164:13,15
166:2 277:23

**gave** 16:11,18,
21 85:1 160:10,
12 163:24
164:1 168:11
183:25 254:6
268:1 293:18
296:11

**Gellar** 319:10

**general** 38:19
39:10 77:25
81:12 83:4,5
89:14 91:16
290:22

**generally**
36:24 69:12

**gestures**
18:12

**girlfriend**
329:5

**gist** 218:15
219:9

**give** 13:15 17:6
18:12 27:6 29:4
61:4 69:16

76:17 77:25
90:16 92:21
102:17 104:8
107:5 123:19
125:25 130:21
196:1 199:21
209:13 219:16
231:16 246:17
252:15 253:20
255:3 258:15
277:22 312:8
318:11 325:2
327:5 329:6
335:1

**giving** 17:2
29:23 30:5
59:21 159:20
219:20 220:1

**Godfrey** 10:22
11:1,5 12:13
34:16 123:15
142:22 143:2,5,
15,19 144:13
146:23 148:22
152:25 154:24
157:8 170:11,
14,21 288:9
322:10

**Godfrey's**
145:17

**good** 21:24
22:3 35:6
187:11 198:24
199:13,23
200:1,4 239:13,
17 263:23
267:21 300:14
312:18 314:22
316:25 322:10
325:25 327:23

**governing**
61:5

**GPD** 81:12
99:2 106:11
279:13 309:15

**grab** 92:14,18

**grabbed**
326:18 336:1

**grabbing**
326:22

**graduate** 47:3

**graduated**
44:14 45:7

**great** 24:13
195:3

**Greenwood**
14:7 16:3 19:20
25:21 33:15,23
37:12 38:11
39:11 43:9,22
44:2 45:11,17,
19 48:10,21
49:23 51:18
52:3,12 53:13,
20 54:10,14,20,
24 55:1,16
57:16 58:8
59:7,12 61:18
62:21 63:4,21
64:7 65:2,19
66:18 68:15
69:5 73:11,12,
17,23 74:19
75:23 76:1,22
77:7,21 79:19
80:7,19,21
85:14 86:21
87:7,17 88:23,
25 89:17 90:14
91:10 93:3,8,17
94:18 95:5,20
97:3 98:7 101:6
103:15 105:21
107:12,22
110:25 111:10
116:22 117:16
178:10 230:23
250:23 323:18
332:11

**Greenwood's**
332:22

**grew** 45:19

**grizzly** 232:2

**ground** 91:2
92:2 195:17
205:17 206:23
232:18 239:11
242:6

**grounds**
240:19 332:14

**group** 307:23

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

308:7

**guess** 49:8
129:15 140:4
163:8 178:21
181:2 213:15
218:2 224:7
253:17 257:20
312:12

**guide** 174:2

**gun** 113:2,4
230:6

**guy** 231:19
289:11,24

**guys** 31:1
75:15 87:3
253:20

**guys'** 248:21
249:13

———————

**H**

**half** 47:2

**halfway** 210:5

**hand** 85:16,18
86:7,8 92:15,18
201:9 202:16,
19,23,25
203:12 204:20
205:11 210:10
227:10 265:18
292:19 298:9

**handcuff** 90:1,
8 91:23

**handcuffed**
83:11,22 84:2,7
233:10 326:18

**handcuffing**
81:13 89:18
91:16

**handcuffs**
89:21,25 90:4,
7,14,19 91:11,
15,21 92:6,8
93:5,9,11,19
269:24

**handed** 185:17
272:19

**handing**
298:13

**hands** 92:21,
22 204:17,19,
22,24 205:18,
21 233:8 336:9

**hands-on**
78:20

**handwritten**
172:5

**Hang** 318:13

**happen** 63:9
282:19

**happened**
54:23 114:4,10
136:24 142:25
145:25 200:12
217:17 221:2
222:4 237:1
246:23 260:5
273:18 285:15
326:20 333:19

**happening**
214:19 258:8

**happy** 203:13

**hard** 37:22
85:16 86:7,8
182:11 241:6
269:22 277:12

**Hartman**
123:17 125:20
126:16 127:2,
10 131:4,9,11
132:22 133:2
149:25 150:8,
15 155:7
236:23 237:7
248:19 249:3
293:5,8 310:13

**Hartman's**
236:8

**head** 63:11
193:4 206:23
207:3,12,17
313:14 326:18,
21,22 327:2
332:6 335:25
336:1

**health** 87:18
88:8,20 235:3,
17 309:13

**hear** 95:13
114:7 132:13
234:18 253:1
254:21,24
255:17 266:4,5,
8

**heard** 9:21
96:5,11 134:10,
11 139:25
140:7,20 224:5
254:6 273:22
318:5

**hearing** 296:6
325:8 327:17
329:21 332:12,
13,25

**hearings**
333:5

**heart** 322:11,
13

**held** 121:18

**helping** 164:18
296:1

**Henderson**
66:22

**hepatitis**
129:2,23
271:21

**Hey** 28:3
134:10 173:17
213:3

**high** 45:20 46:7
91:12 92:12

**high-risk**
90:23

**higher** 63:22
83:6

**highway**
138:11 141:6

**hired** 44:14,21,
22,23 45:2
86:23

**Hirons** 34:3,4,5
39:16

**history** 9:13,
21,22 165:11
226:6 271:20

**hit** 186:14
187:22 207:11
252:18,22
264:25

**hitting** 206:22
207:3,17

**hold** 14:10
27:14 40:15
71:8 199:18
224:12 234:5
244:16 275:15
276:22 277:3
303:12

**holding**
265:17,24,25

**holes** 117:14

**Holiday** 14:22

**Holloway**
24:20

**Holly** 12:11
34:23 135:8,9
153:22 154:25
157:18 190:1
191:4,15
192:18 195:15,
19 204:7,16
207:4 295:22
296:2

**Holtzleiter**
52:5,6 53:6,16
54:8 55:22
173:15 256:22
257:10,18

**Holtzlieter**
136:13,14

**home** 230:15
330:23

**hometown**
45:19

**honest** 298:21

**honestly** 29:17
129:24 138:6

**hospital** 10:9
39:19 113:19
116:4,7 122:8,

11,16,21
123:18 124:23
125:8,10
127:11,24
128:3,13,17,20
129:1,2,5,8,14,
24 130:17,25
131:25 132:3,
18,20 143:6,17
166:23 219:5
233:18 234:3
235:10 236:12
248:19 270:7
271:19 280:19
289:13 303:5
322:10

**hour** 38:3 81:4
273:18

**hour's** 87:25

**hours** 24:6,11
58:15 80:12
81:15,16
133:22 134:4,
21 137:16
139:6 140:24
277:4,8,9
278:5,19 302:9

**HR** 165:3

**huge** 185:22

**human** 228:11,
15,21 229:3,11,
19

**hundred**
214:5,6

**husband** 11:18
35:10 124:12
137:17 138:7

**hypothetical**
83:14,25 229:5,
8,14,22 232:23
249:20

**Hypothetically**
230:2

**hypotheticals**
278:4

———————

**I**

**Ian** 11:1,5

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

12:13 123:15
142:21 143:2,5,
15,19 152:24
157:8 170:2,11
288:8 322:10

**idea** 122:24
170:9 268:13
276:4 321:3

**identical** 138:8
307:2

**IDENTIFCATI
ON** 318:12

**IDENTIFICAIO
N** 301:2

**IDENTIFICATI
ON** 109:14
171:17 174:14
253:25 257:12
258:14 259:4
268:4 272:18
279:4 293:2
294:5 296:9
298:15 308:1
318:3

**identified**
133:10,15
135:18 137:14,
21

**identify** 94:11,
22 123:23
212:13 243:10,
19 244:13
245:1,13
319:14

**identifying**
88:4 123:6,11
124:13 243:5

**illness** 88:17

**IM** 20:16,17

**imagine**
196:17

**immediately**
44:1 78:20
79:13 202:6
217:23 230:25
306:15

**immobilize**
91:6

**important** 18:2
90:3 94:10,21,
22 95:7,11
96:17,21 97:7,
12,15,19 98:10,
18 99:24
138:16,19
142:24 145:14
148:1 166:12
188:23 216:17

**imposed** 242:2

**impossible**
182:12

**impossibly**
107:1

**improperly**
100:21

**in-house**
297:10

**inability**
244:13

**inaccurate**
248:25

**inappropriate**
274:4 290:12

**incapacitation**
277:7 279:20

**incident** 14:5,
13 35:17 37:6
40:14 42:5,9
56:14 66:2
77:3,13 80:5
86:2 100:17
101:4 102:19
111:1,18 112:9
118:18,22
119:8,18,22
120:3 124:11,
20,21,24
127:16 129:8
133:10,20,22
134:14 136:24
137:7 141:14,
16 151:16
155:24 157:25
158:1,14
160:23 161:9,
21 162:20
163:7 166:5
173:4,10 189:5

191:4 204:9
205:8 206:5,8
211:10 213:23
215:18 216:11
218:6,13
219:12 220:3,8,
10 221:1,2,3
224:22 225:10,
20 228:17,19
242:11 246:14
249:11 251:9
257:22 259:10
262:23 266:22
270:5 271:15
274:5 276:9,12
278:6,7 291:10
295:21 296:7,
15,21 299:22
305:3,11 307:8
324:16,24
329:10 330:1,7,
15 331:16,24
332:1,2 333:19
334:9,15

**incidents**
58:14 147:13
220:15 221:19
305:14,22
324:17 331:8

**inclination**
282:7

**include** 180:23

**including**
14:13 120:14

**incomplete**
83:13,24 164:1,
4 229:5,14,22
232:23

**inconsistent**
292:10

**incorrect**
286:2 331:17,
18

**independent**
141:13

**independently**
281:17

**Indiana** 35:16,
25 44:7 45:24
46:3,12 47:20

71:12,20 72:2,
13 73:19 74:12,
23 80:20 87:11
165:5 171:4

**Indiana's**
80:24

**Indianapolis**
44:8 46:5

**indication**
333:15

**individual**
79:21 91:25
196:1 216:1
227:20 228:19
241:7 242:13,
16

**individually**
215:4 308:10

**individuals**
88:19 124:3
157:9

**influence**
97:13 132:20
139:16 148:14
187:24

**influenced**
133:1 199:11

**inform** 99:12
132:6 176:6

**information**
12:22 13:7
96:22 117:7
124:25 128:8,
20 129:10
130:10,13,17
131:16 138:13
139:12,24
140:17 141:8
149:8,16
159:17 219:11,
21 220:25
221:7,21,22,24
222:1,3 223:8
226:1 227:17
243:3 246:15,
17 281:17
284:17 293:7,
14,18,21 305:7
309:8,11 310:3,
11,18,24

315:15,22
316:20 323:12
324:20 335:20,
22

**informed** 9:10,
12 13:16 26:1
35:19 100:9
125:3,6 136:14
151:7 171:13
253:6 309:12
324:11 335:24
336:7

**initial** 189:18
251:4

**Initially** 305:25

**initials** 58:5

**initiated** 122:2
306:2

**injured** 327:6

**injury** 91:20
181:7 327:7

**inquire** 316:2,8

**inquiry** 123:2

**inserted** 320:9

**inside** 117:10
143:16 146:2

**insinuating**
278:16

**instance** 90:24
230:14 279:19

**instances**
196:16 230:24

**instant** 23:6,22
161:20 272:8,
15,25 273:5
274:4 275:19
288:19,22
294:2

**Institute** 158:8
159:24 160:1

**institution**
47:6

**instruct** 170:25
171:3 294:7

**instructed**
246:4



Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

**instructing**
294:9

**instruction**
107:6

**instructor**
51:16 75:12
81:11,18,19
82:7 117:20
163:6,7 173:15
277:6 286:25

**instructors**
51:17,22,25
53:17,23 81:24
85:12 158:24
163:9 277:21
279:21

**instructs**
18:10

**intake** 122:23
280:19

**intensive**
100:25 101:8,
14,18

**intentions**
219:2 305:24

**interacted**
11:9,16 127:10,
15 133:19
134:3,20
135:11,25
141:19 142:10

**interacting**
127:2 142:21

**interaction**
40:6,22 41:23
42:7,17,21
133:11 136:1,
14,25 137:5,15
151:19 250:9

**interactions**
39:25 42:18,25
43:3 88:7
123:20

**interdiction**
89:8

**interest** 220:11

**interject**
114:16

**intermediate**
84:8,11,15,17,
22 85:2,13,24
86:4

**internal** 99:21
101:18 103:8,
11 193:14
195:4 251:6
255:19 258:1
260:20 261:5,6,
7,8,11 306:1,2

**internal's**
251:16

**internally**
255:21

**interpret**
267:15

**interpretation**
210:22 212:7
290:18

**interpretation
s** 291:5,6

**interrupt** 63:18
96:5 107:5

**interrupted**
186:23

**interrupting**
12:18

**interruption**
200:16

**interv** 17:3

**intervals**
261:12

**interview** 9:15
10:20 11:24
13:15,18,24
14:3 20:9 50:10
73:25 91:4
94:11 99:18
123:11,17,24
124:1,17 125:8,
21,25 126:2,7,8
127:1 142:10,
15,16 143:6,19
148:17 150:1
152:3,12,16,19,
24 153:4,9,14,
21,22 154:2,6
156:10,17

157:22 207:5
213:21 217:24
221:9 222:4
223:24 224:13,
23 225:16
238:7 241:11,
21 242:1,5
245:10 288:14
306:4,11
327:11 335:2,4,
13

**interviewed**
10:23 11:4,7
12:4,6,10,20
13:8 35:3,9,13
41:2 106:22
123:15 129:4
134:24 135:4
142:6,18
148:18 155:20
156:13,20
157:9 169:6
170:21 241:9
287:11 328:24

**interviewing**
13:19,24 89:7,
10 125:10
141:18 143:15
155:25 169:22
222:8

**interviews**
19:14,19 23:13
78:2 96:18 97:6
98:4 108:2
120:15,18,20
123:19 148:25
149:4,23 152:6
154:12,20,23
155:4 156:3,4
169:8 172:25
223:20 248:3
329:7

**intoxicated**
16:25 270:4
271:15

**intoxication**
270:8

**investigate**
60:11 61:23
64:14 104:10
209:6 324:16,
24 327:15
334:11

**investigated**
62:5,8 71:5
230:22 324:15
330:15 334:13

**investigates**
62:1

**investigating**
60:7 61:10,12,
18 62:18 64:23
65:1 71:2
145:24,25
325:23 326:3

**investigation**
9:2 10:3,11,14,
16,20 11:17
14:9 15:5,10
27:5,6,9 32:14
34:20 37:6 38:8
40:2,5,20,24
41:25 58:24
59:2 60:14,17,
18 61:6 62:11
63:24 64:2,17
65:12,14,15,18,
19,25 71:2
78:17 94:10,22,
25 95:8,9 96:17
97:7 98:12,15
99:6,7,21,22
100:2,5,7,9,11,
15,22 101:19
102:11 103:8,
11,15,22,25
104:6,12,18
105:2,4,6,11,
13,15,25 106:3,
7,10,14,23
108:21,25
109:19,22
110:10 112:13
115:14 117:22
121:10,12,16
122:2,17
124:25 125:13,
17,18 126:13
127:14,25
128:4,11,18,20
129:9,16
130:14 132:7,
21 135:21,25
138:9,17
145:14 146:16,
23 148:14

149:5,9,10,17
151:6 152:4
155:20 156:15
158:4 159:5
161:2,14 162:4
163:22 164:17
165:17 166:3,6,
10,19 167:2,16
169:10 172:5
173:1,4,11,13
174:17 178:12,
14 180:7,14
182:8 187:14
188:23 192:5
198:8,14 199:8,
11 206:4 209:1
211:4 215:2,13,
24 216:17
217:8 220:16,
19 221:3,6,8,
20,25 222:5,8,
14,21 224:15,
17 225:14
233:7,14 236:2
242:25 243:22
245:14,21
246:23 247:16
249:17,18,21
251:6,12
253:10 260:25
261:16,20
266:21,24
270:3 272:6
282:4 285:6,13
291:19 292:13
306:1,2 315:23
322:19 325:22
327:16,17
328:19 333:20,
21 334:9

**investigations**
26:12 58:20
59:6 63:5 64:7
65:7 70:8 89:1,
13 94:8,16,19
95:2,17,21
96:6,25 97:4
98:5,8,10,19,25
99:14 104:13
105:9 106:9

**investigative**
19:13 139:13
171:20 178:6

**investigator**

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

95:13 107:13, 24 166:23 167:1 305:21 309:3

**investigators** 70:16 167:3

**involve** 99:10

**involved** 14:13 25:9 56:14 64:22 65:1 74:13 99:11 106:22 124:2 142:3 162:20 227:22 296:18, 19 323:16

**involvements** 108:23

**iphone** 316:16

**ironic** 327:4

**irrelevant** 29:17 93:12 199:13 245:3 263:25

**isolate** 181:25

**Ison** 109:8,13 323:11 324:2

**Ison's** 38:7

**ISP** 155:11

**issue** 13:11 14:7 27:4 65:22 136:19 207:15 209:1 261:6,7 323:17 333:24

**issued** 35:21 118:10 162:6 164:6,16 167:6, 10 173:19 175:22 242:25 272:22 302:21 308:19,25 310:8,12,25 333:25

**issues** 55:7 57:1 76:7 87:19 88:20 193:9 235:3,17,18

**items** 168:19, 20 175:17,20

**IU** 46:18,19,20, 23

**IUP** 46:2

**IUPUI** 44:5 45:24 46:1,7 47:1 48:2

**IUPY** 45:25

_____

**J**

**James** 245:25 246:2,12,17 247:4,7,10,13 301:18

**January** 43:11 55:24 56:7,10

**Jason** 52:5

**Jeanne** 11:8, 18 35:9 124:11 137:17 138:6 153:4 154:24

**Jimmy** 276:22, 25

**job** 10:13 15:11 195:2

**jobs** 43:22

**Joey** 52:4

**John** 26:11

**John's** 48:4

**Johnson** 119:1 276:1

**join** 43:9,12 45:17 312:2

**joined** 48:9,12

**joining** 43:22 44:2

**joking** 273:9

**judge** 18:8

**jump** 78:19 273:24

**June** 37:7,12, 16 38:8 40:3 43:11 68:2,3 100:6,11,15,23

101:8 121:12 122:3 123:10 128:10 134:18 136:16 152:9, 14,22 153:2,7, 12,17,24 154:1, 4,9,10,11 170:7 176:15 178:21 219:18 220:19 221:8 222:4,5 224:13,24 225:16 233:18 243:1 301:10 304:6,12 306:2

**jurisdiction** 70:14,15

**justice** 44:13

**justifiable** 228:1

**justification** 232:20 244:11

**justified** 15:1 86:11 147:16 213:25 227:5 242:10,17 244:4

**justifies** 278:8 280:1

**justify** 10:12 214:3,6,9 215:4,7,13,25 229:2 244:11 245:19 277:23 278:15 280:3 284:25

**justifying** 228:5

_____

**K**

**K-9** 69:2

**keeping** 37:23

**key** 179:24

**keys** 254:4 255:20

**kick** 72:5

**kicking** 143:14,22

144:2,9,10,14, 16 206:9 228:1 250:11,12 269:15,18

**kicks** 81:13 85:16

**kidney** 302:17, 19,20

**kidneys** 301:25 302:23

**kill** 231:23,24

**kind** 18:13 99:17 110:19 114:16 167:12 182:24 183:17 205:6 220:6 225:4

**kinds** 74:5

**knee** 93:1

**kneel** 91:6

**knees** 90:5 238:17

**knew** 14:4 78:24 101:13 116:19 139:24 140:6,14 141:15 212:9 218:17 241:14 286:7 291:25 306:3 311:17

**knewed** 307:10

**knock** 73:16

**knowing** 146:3

**knowledge** 14:18 64:21 86:3 104:2,3,5 114:19 124:3 131:23 132:2 136:12 159:16 163:2 170:6 177:16 229:23 230:22 231:1 244:3 245:17 261:4 271:25 272:4 319:6 321:21 331:5

**Krista** 321:6

_____

**L**

**lane** 184:23

**laptop** 326:19

**laser** 57:12

**late** 38:3

**lateral** 70:5

**latest** 238:21

**laugh** 290:13, 20

**laughing** 232:5

**launch** 121:12

**launched** 121:10

**Laut** 12:11 26:11 33:9,13 39:7 79:11 86:13 100:8 104:7,17 152:20 154:24 164:10 165:1, 12 192:15 193:1 202:3 204:7,15 223:4, 7 284:10 288:6 295:16,25 296:4 301:10

**Laut's** 294:17 295:6

**law** 25:5 28:22 29:1,12 31:12, 19 43:18,22 44:1 45:22 46:9,11,12,14 47:17,19 48:1, 15,16 71:12,20, 24 72:2,12,13, 18,19 74:12,23 75:1,4,20 80:8 81:1 87:11 105:18 176:9 195:20,25 278:11 279:17 296:7

**lawsuit** 15:16, 19 25:15 26:7,

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

18,24,25 27:4,
11,15,19 28:12,
13 29:21 30:9,
21 31:10,15,19,
23,24 32:3,6,
10,16,18 33:1,
2,3,14,24
34:10,13,14,17,
21,24 36:5,9,11
37:16 38:9
42:14 49:7

**lawyers**
131:13 271:4

**lay** 336:8

**laying** 91:1
92:4

**leadership**
46:10 47:8,10
67:24 74:1
89:15

**leading** 97:7,
10 98:3

**leads** 97:20

**learn** 25:15,17
72:7 102:6
136:23 145:16
192:25 309:8,
11

**learned** 12:23
83:2 159:17
220:18 309:15,
25 310:2,14
311:12

**learning**
101:17 305:6

**leave** 124:8
316:24 333:16,
18 335:5

**leaves** 81:15

**leaving** 33:19

**led** 53:16
179:24 292:13

**left** 52:16 96:4
116:3 121:2
145:11 149:12
154:18 201:9
202:16,19,23,
25 203:12

292:19 321:3

**left-hand**
172:11

**leg** 266:1

**legal** 25:16,23
125:15 230:5

**legs** 143:14,22
144:2,3,10,14,
16 250:11,12
269:17

**length** 196:4

**lengths** 195:3

**less-lethal**
230:16

**let alone**
186:16

**lethal** 230:16
231:5

**letter** 174:19
175:1 176:5,21
177:1

**level** 75:7,8
83:9,11 85:13,
17,19,21,23,24
86:4,7

**license** 168:23

**lieu** 232:8

**lieutenant** 9:3,
9,12,17,22
12:11 14:14
30:10 31:4
32:5,7,12,23
33:2,5,16 34:1
38:25 40:23
41:24 42:8
49:14 59:10
60:22 86:13
87:6 111:22
112:7,8 113:25
114:20 118:8
133:11 134:4,
21 136:1,6
137:16 139:3,6
140:20,23
146:17 147:7
152:7 161:20
163:10,18
164:9 167:22

168:6,7 181:10
183:2,25 184:6
186:7,9,14
187:18 188:11
189:5,11,12
190:2,3 191:3,
6,15 192:18
193:11 196:6,7,
13 197:24
201:7,14,20,23
202:3,14 204:6,
16 205:11
207:23 208:12,
20 209:1,22
213:3 215:14
219:14,16
222:19 225:10,
17 227:1,5,8,13
233:19 244:9
246:4 249:10
257:13,21
259:23 260:7
261:16 269:16
272:25 273:8
275:18,23
276:15 279:2
286:24 287:8
290:6 295:24
301:19 303:7
304:8,24 306:6

**lieutenants**
69:2

**light** 13:4 96:22
102:17 200:24,
25 313:15

**lights** 184:24

**limit** 93:21
228:10,14,20
229:10

**limited** 67:12

**lines** 287:14

**linked** 216:22

**list** 50:12 77:23
128:19 154:18,
21,23 155:3

**listed** 287:2
299:10

**listen** 22:23

**listened** 23:1

**literally** 175:13

**litigation**
165:23 181:11

**liver** 235:15
302:15

**living** 122:4

**LMP** 35:15

**local** 48:15

**located** 121:1

**locker** 112:12
260:1,8,19

**lodged** 165:11
202:15,19,22,
25 203:9,11

**log** 111:25
112:1 118:4
166:8,15
183:14 192:6,
11,14,17 193:4,
7,8,25 207:23
208:8,18 209:3
215:22 216:23
239:8 241:15
252:19 254:11,
13,17 256:20
258:4,12,21
259:6,7,9 261:3
283:5,7,9
296:20 298:19
299:7

**logically**
233:25

**logistical**
33:22

**logs** 162:9,11
282:19,22
297:20

**LOL** 290:7,20

**long** 24:5 44:9
66:16 68:1
81:24 110:25
127:10 195:21
226:5,11,16
230:3 311:25
324:10

**longer** 52:4
179:7,17
197:14 230:3

303:6 320:6

**looked** 175:25
283:9 291:15
304:2 322:3

**loose** 196:16,
21

**loosely** 162:1

**losing** 27:14

**lot** 13:13 18:6
29:17 77:14
81:14,15 89:6
94:3 184:24
187:23 188:16
194:19 249:8
277:13 278:2
329:13

**Lots** 72:24

**loud** 184:1
290:14,20

**lower** 172:11
189:13,24
196:8

**lower-** 292:3

**lower-back**
292:17

**lowest** 85:21,
22

**lumped** 214:14

**lunch** 271:5
312:1

**lying** 195:17
204:22 205:18
232:18 233:8

— **M** —

**mace** 84:13

**Macnaughton**
12:12 123:13
153:15 154:25

**made** 17:1
45:11 50:14
59:9 60:21
102:3 105:5
108:1,4,7,10,13
123:13 132:7,
21,23 137:6

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

138:24 154:18 166:15 176:25 192:22 216:9 273:24 282:22 283:1,3,4 288:2 292:21,22,24 306:17,19 321:17,25 326:13,16 327:10,23

**Madison** 158:1

**mail** 150:25 167:22 303:24

**mailbox** 283:24

**mails** 300:25 308:8

**main** 181:24 296:20

**maintenance** 89:21 128:22 169:1

**major** 220:8

**majority** 30:4 143:16 295:20

**make** 15:8 18:22 40:18 45:14 60:11,13 109:10 113:5 114:13 121:21 122:10 123:2 139:4,19 158:19 169:14 172:7,17 180:22 185:11 199:20 211:2,3 222:8 240:10, 22 246:6 248:19,21 249:6,13,19 253:8 257:7 259:1 262:5 265:1 279:22 284:23 327:9 332:14

**maker** 64:6

**makes** 240:5, 22 255:24

**making** 100:25

106:7 196:18 239:13 290:23 327:8

**male** 140:1

**malice** 278:17

**man** 169:1 307:10

**management** 128:21

**mandated** 74:12

**mandatory** 74:2,10,14,15 75:21

**manually** 252:12

**manuals** 165:20 166:2 175:18

**map** 262:2 267:22,24 268:2,9,11

**March** 158:9 160:2 326:8,9 332:2 334:9 336:12

**marijuana** 129:2,4 270:6, 11 271:21,24 280:17

**Marion** 36:3,8, 13 37:10

**mark** 24:20 68:12 173:25 199:1 253:19 267:23 278:24 292:25 294:1 299:16 300:22 307:22

**marked** 109:7, 11,14,17 117:6 127:25 171:15, 17 172:15 174:11,14 179:3,9 195:14 204:3 253:22, 25 257:12 258:14 259:4

268:2,4,11 272:15,18 273:1 279:4 282:23 293:2 294:4,5 296:9 298:9,14,15 300:13 301:2 308:1,7 318:3, 12

**marking** 257:7 296:7 317:21

**material** 55:6

**materials** 19:16 55:23 56:7,9 117:12 165:14,16,20 166:1 200:19, 23

**Matt** 26:12 53:18 76:4

**matter** 16:17, 20 24:23 31:10 33:3 117:4 187:20 198:18 231:7,11 242:14 323:16, 19 333:25

**matters** 188:3

**mayor** 63:3,4, 7,23 64:1 66:4, 22 67:2,4,6,16 68:9,11,13,14

**mayoral** 66:24 67:21

**mayors** 63:9

**Mcelhaney** 81:22 82:4,5,6

**Mcnaughton** 287:12,19

**Mcqueary** 66:15,16

**Meaning** 201:7

**means** 16:24 240:2 241:19 254:2 273:7,9 276:4,6 290:8, 10,11 330:25

**meant** 196:24 197:5 290:19 316:4

**measure** 269:3,6

**measurements** 261:22

**meat** 180:7

**media** 102:9 134:12 136:19 220:10,11 248:21

**medic** 123:16 247:25

**medic's** 206:9

**medical** 125:12 126:22 127:4,7,15,18, 19,23 128:1,22 129:14,17 130:5,6,10,24 131:3,8,19 132:24,25 233:20 235:1,6, 19 236:1 271:20,21 310:17,24

**medications** 19:2,4

**medics** 219:1

**meet** 315:21

**meeting** 24:3 27:4

**meetings** 27:2 29:23 177:2

**member** 33:15, 23 35:24 36:3 38:22 40:1 66:18

**members** 13:21 28:17 29:12 31:23 32:2 40:7,17,20 55:16 60:23 323:22

**memorialize** 209:25 210:2 212:17 221:16

293:4

**memorialized** 149:1 208:8,17 210:12 211:23 212:25

**memorializing** 220:2 221:10 226:18 309:24

**memory** 19:2 21:15

**mental** 87:18 88:8,16,20 219:3

**mention** 119:16,21 184:4,16 188:8, 9 189:16 206:22 295:10, 14

**mentioned** 47:6 169:11 175:21

**mentor** 79:11

**merit** 28:13 29:21 50:2 325:8 329:20 332:12,13,16, 21,22 333:1,12

**merit-based** 49:25

**merits** 30:9

**message** 273:5 274:4 275:19 288:22

**messages** 20:16,17 23:6, 22 161:20 272:9,16,25 288:20 291:9 294:2 299:5

**messed** 324:9

**met** 23:25

**metabolic** 159:12

**metabolized** 272:2

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Meyers 68:12

middle 220:14

mind 95:7
139:19 182:8
224:20 229:9
304:23 315:14

mindset
244:10,15
245:3,18

Mine 49:2

minor 329:19

minus 176:1

minute 115:2
187:2 191:16
192:10 193:21,
23 194:6,7
201:19 207:24
208:5 209:13
232:12 258:15
296:24 312:8
318:13

minutes 173:5
183:3,6 193:12
210:10,15
213:16,23
231:20 232:6,7,
12 253:23
254:18 263:6,7
264:17

mischaracteri
zing 302:14

misdemeanor
93:16

missed 80:18
286:6

missing
172:19,20

misstates
11:12 13:10
131:5 140:11
144:7 216:3
245:16

mistake 322:1

mistaken
336:7

misunderstan
ding 240:20

misunderstoo
d 17:9 220:7

mocking
274:10

mocking-type
274:8

mode 240:12

model 111:4

moment
217:13 267:8
307:9 318:10

momentarily
336:17

Monday 27:2
177:3

Montana
231:19

month 74:8
326:8,9

months 66:17,
18,23 318:20
319:7

Moore 11:8
12:15 35:10
124:11 137:17
138:7 153:5,10
154:24,25

Moores 12:1,2,
20 13:8,16,18,
23,25

Moores' 12:3

morning 21:14
24:4 301:13,16
303:17 314:15,
22

motorcycles
69:3

motorist 190:2

motorists
181:8 184:25

mouth 158:15

move 25:7
307:21

moving 144:25

Moyer 13:12,
16,19 124:4
136:7,8,16
137:9,14 138:6,
25 154:7 155:1
168:15 169:2,
16,22

Multi-organ
302:16

multi-system
235:15,16

multiple 11:19
47:25 49:6 50:9
73:6 86:24
138:5 142:20
184:1 186:5
191:16,24
192:19 218:23
227:14 242:13
273:22 299:18,
21 300:9,15,23
329:24 330:3

multitude
72:23

mutual 158:23
160:19

————————

N

named 28:25
289:17

names 154:19
325:2 332:17

narcotics 89:8
280:6

narrate 263:10

narrative
287:10 298:1
307:3,15

narrative's
307:14

narratives
310:1

narrowing
96:2

natural 235:2,
16 236:22
309:13

nature 323:19

navigate
270:21

necessarily
70:4 106:10
290:17 325:3

needed 59:2
99:13 123:11
190:3 323:12
324:11,20

negatives
244:17

neuromuscula
r 277:6 279:20

news 14:20,23

nice 129:25
290:7,14,21,23

night 13:3
220:14 268:20
301:19

non-
compliance
86:10 189:11

non-felony
93:7,9

non-trauma
315:20 316:6

nonetheless
29:18

normal 13:1

north/south
181:24

note 193:10
248:18

notes 12:8
19:13 23:13,16,
21 128:15
171:20 172:4,5,
24 291:24
298:23

notice 25:18,
22 249:3
274:10 320:2

noticed 202:13
239:12,23
240:12 253:4,

10 257:13
258:8 265:20

notify 221:19

nots 244:17

November
318:15 319:5
320:13

number 91:4
93:21 109:11
208:11 209:2
212:10 213:17
216:4 228:11,
14 229:10
231:9 238:21
240:1 241:10,
12,15,16,23
242:1,19,20,21
250:22 251:1,8,
11,14 295:16
297:10

————————

O

object 18:8
64:10 100:12
133:4 232:22
263:13 274:23
292:7 295:11,
18 297:24
305:19

objection
10:24 11:11
13:9 18:9 28:9
30:23 42:2,12
43:6,7 65:4,21
69:10 79:25
83:13,24 93:20
96:19 98:13
101:10 103:17
125:16 135:1
137:1 140:2,9
141:11 144:6,
23 147:21
149:6 179:10
181:13 190:9
195:23 208:13
212:2 215:6,11
216:2 220:4
221:12,13
228:16 229:4,
13,21 230:12
234:4,21

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

235:24 240:4,
14,19 241:18
244:7 245:15
248:23 263:22
278:9 280:2,12
282:25 290:16
302:5 304:13,
19 330:10

**objective**
10:14 95:10
97:20,23

**observe**
202:25 267:9

**observed**
147:14 196:7
202:15

**observing**
88:14

**obtain** 67:23
313:16

**obtained**
128:23 129:10
133:2,3 167:4

**occasion**
225:11 324:16

**occasionally**
27:5 117:9

**occasions**
24:16 29:3
225:9 332:3

**occur** 29:23
67:9 78:5
192:14 220:15
223:11 326:5

**occurred**
14:18 24:18
42:9 56:18,22
100:17 102:19
105:18 134:14
143:16 207:17
222:9 278:7
296:21 306:1
309:9 320:14

**occurring**
255:16

**off-duty** 124:7

**offer** 204:18

**offered** 202:2

**offering** 205:6

**office** 35:19
36:4,9,13 37:10
39:23 68:13
134:10 151:25
155:17 172:12
237:8 308:14
319:4 335:5

**officer** 13:12
22:18 33:6,7,9
35:15,16 39:4,7
44:1,9,12,16
45:6,9 46:15
47:20,21 48:13
49:1,17 52:16
53:9,10 58:7
59:16 65:23
72:12 73:10
75:7,22 78:6,7,
11 79:11,15,16,
21,23 80:4 82:9
83:5 85:22
88:23 90:13,22
91:2 92:13
93:16 99:10
102:22 117:8
118:13,15
124:5 136:8
139:19,23
140:6 152:11,
17,19 168:14
169:2 171:3
181:18,21
182:2,20
184:23 186:17
188:6 190:12
191:3,5 204:6,
7,15 210:12
212:14 215:17
225:13 227:18
228:24 230:7
240:11 243:8
252:16,21
259:9 263:5,10,
19 264:19
267:9 272:24
277:10,15,22
278:6,14,18
279:25 284:18
286:1 290:5,12
291:7 294:17
295:6,15,23,25
296:3 298:5

**offered** 202:2

325:7,23
326:16,20
327:24 328:2,
13 332:3,11

**officer's**
212:17 233:10
243:18 244:13
245:18 327:22

**officer-involved** 220:9

**officers** 14:8,
13 28:21,25
29:12 30:15,17
31:2,11,19
46:13 48:21
49:6 53:20
54:1,9,14,24
55:1 56:13
69:2,23 73:23
74:19 75:23
76:1,7 77:15
78:4 82:4 85:15
86:11,13,17,24
88:25 89:7,17
90:18 91:9
93:3,8,17 94:18
95:5,20 96:10
97:3 99:3
100:21 104:14
106:22 117:17
127:2,3,13
130:12 148:5
157:17 162:20,
25 164:10
176:8 181:7,20
182:9,16,21
192:15 198:19
202:20 205:22
227:22 243:5
244:1,25
249:23 251:23
252:12 269:23
274:5 276:7
277:12 278:11
296:18 298:24
310:14 328:1,
25 329:3,8
332:18

**officers'** 15:1,9

**official** 123:19
332:13

**officially**

311:13

**oftentimes**
227:25 277:11

**on-coming**
187:16

**on-duty** 220:11

**on-going**
327:16

**one-finger**
91:22

**one-hour**
87:25

**ongoing** 325:7

**Oops** 268:1

**open** 95:7
282:4 285:5,13

**open-ended**
97:20

**opening** 187:5

**Operating**
16:25

**operation** 69:5

**operational**
57:1

**opine** 237:8
263:20

**opinion** 28:16,
17 127:4 145:3,
7 160:12,14
191:2 196:1
210:3,11 235:2,
11,13,14,19
236:1 255:9
328:12

**opportunity**
18:8 317:23
333:9 335:17

**opposed** 30:21
65:5

**option** 230:16

**optional** 93:14

**options** 92:25
179:13 228:25

**orally** 84:3

**order** 12:10
21:5 62:11
81:12 125:25
126:2,9

**ordered** 32:14
126:10 221:6

**orders** 69:16
196:4 202:9
227:8 233:10

**ordinance**
48:15

**organ** 235:16
302:19

**original** 109:12
251:17 320:3
321:13,17

**oversight**
286:22

**OWI** 16:22 17:4
89:8

––––––––––

**P**

––––––––––

**p.m.** 27:2
308:18 313:6
317:4,6 322:12
336:22

**P26** 57:2
110:20

**pace** 195:10

**pages** 173:4
175:2 179:2,4
287:3 291:15
298:17 314:6
315:4

**pain** 199:1
200:17,22

**paints** 139:9

**palms** 92:12

**Pam** 24:17

**Papa** 48:4

**paper** 188:16

**paperwork**
241:17

**paragraph**
41:6 181:5,20

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

182:15,19
183:2,25
185:16 188:8
189:8,16 190:1
191:14,19,21
195:11 196:6,
11 201:17
202:10 204:2,3
207:22 210:6
287:9,10
301:20,24
303:1

**paragraphs**
196:5

**paramedic**
11:2 106:23
157:3

**paramedics**
113:17 124:18
142:20 143:2,3
147:10,14
148:10 202:21
207:14 249:10,
23

**parked** 185:20

**parking** 329:13

**part** 54:20
74:10 79:20
81:8 107:13
117:22 120:22
121:15 122:17
128:18 143:3
167:1 173:11
209:22 249:1
250:7 302:17
331:16

**part-time**
44:16,22 45:6

**partial** 20:1

**participate**
107:9,13,23

**parties** 296:19

**partner** 48:19

**partners** 48:22

**parts** 22:25
23:4 124:21

**party** 19:20

**pass** 50:7
186:13

**passed** 43:16

**passing** 29:20
184:22

**past** 86:24
146:15 331:8

**pat-down**
92:19

**pathologist**
309:12 315:21
317:8 321:14

**pathology**
128:14,15

**patio** 13:6
169:1

**patrol** 45:3
48:18 69:1,5
268:22

**patrolman**
48:13 49:23
59:10 60:22
289:20

**patrolmen**
51:1 57:19

**pattern** 138:20
139:2 329:25
330:18 331:6,
16

**Patti** 107:19

**pause** 265:15
308:5

**pausing**
264:17

**pay** 333:17

**PD** 110:25

**pending** 18:7,
22 271:10
323:17,23
325:8

**people** 11:15,
20,25 12:20
14:3 35:8 42:18
69:13 88:1,5,7,
15,16 90:1,13
102:7 107:17

123:13 124:16,
19,23 136:23
137:4 138:4
142:16 145:1
154:20 157:17
227:14 230:24
325:24 326:1

**pepper** 84:13

**percent** 96:4

**percentage**
90:7

**perform** 92:19
152:19,24
153:4,9,14,21
154:6

**performed**
176:8

**period** 27:8,12
37:5,15 38:15,
19,23 39:2,5,7,
13,15 87:14
100:14 119:12
131:24 132:6,
18 136:5
137:21 194:5,
10 222:7
229:11

**periods** 58:14
277:14

**peripheral**
96:3,7

**permissible**
83:12,20 336:8

**perpetrator**
231:20

**person** 53:13
62:1 69:4 90:19
91:1 92:10
93:10,18
117:24 134:24
135:24 142:15
159:13 163:5
195:21 256:8
287:6 289:17
305:10 327:2,6

**personal** 13:4
65:6 120:25
177:16 229:23

**personally**
284:2

**personnel**
19:20 25:21
101:6,11
125:12 126:12
127:15 131:3,8,
19 151:25
155:17 157:21
309:16 323:17,
19

**perspective**
139:14

**pertinent**
109:21 124:25
149:4,9,16
150:17 180:5
198:13 246:15,
17 293:12

**philosophy**
95:16

**phone** 24:15,
18 123:18
127:5 129:23
131:16 149:24
211:8 218:5,12
219:22 220:12,
14 221:5 222:2,
9,11 223:9
224:10,23
238:5 245:24
247:9,13 290:2
327:10

**photographic**
199:6,22

**photographs**
166:18,21
167:1,5,8,11,14
199:12 296:22

**photos** 166:22
167:23 168:2,5
198:5,9 313:16,
24 314:2,5,9,10
322:3,9

**physical** 72:3
109:25 110:8
120:8,24
161:13 168:22
205:6 260:24

**physically**

84:4,5,7,9 90:7
93:6,10,15,19
126:4 191:8
204:10,13
205:10,14,18
206:3,7,17
227:8,10,25
242:16 330:21

**physicians**
130:20

**pick** 10:19
195:10 202:3

**picture** 139:9
263:24

**pieces** 21:14
110:8 203:7

**pit** 13:5 169:1

**Pitts** 170:3,7,
13,15,22,25
294:7,14
298:12

**pizza** 48:4

**place** 76:16
77:17 179:16
197:7 227:14
262:24 333:3

**plaintiff** 15:15

**Plaintiff's**
41:15 268:14
323:11,15
325:3

**plan** 315:20

**play** 146:20,21
263:4 264:25

**PLAYED** 263:9
264:12 265:2,
14 267:12
269:7

**playing** 129:25

**PLAYS** 63:14
132:12 234:20
244:19

**pleasure** 67:16

**plot** 262:2

**point** 12:5,7
21:22 25:1 37:2



Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

41:22 49:18
68:10 100:21
101:9 119:20
120:5 122:21
133:18 145:25
166:19 168:11
169:16 176:21,
25 177:24
178:2,5,24
181:5 185:6
194:21 197:15
208:16 214:14
215:17 216:13
220:15 223:5
227:13 239:2,
15 265:7 283:5,
11 286:1
287:22 297:13
306:3 311:21
316:4 319:15
320:21 324:10
327:11

**pointing**
175:10 298:25

**points** 57:12
72:5 93:2
179:24

**police** 14:7
16:3 25:21
33:15,23 35:16,
25 37:12 38:11
39:12 43:10,23
44:2,12 45:6,8,
12,14,17 46:10,
20 47:8,21
48:21 49:23
51:18 52:3,12
53:13,20 54:10,
15,21,24 55:2,
17 57:16 58:8
59:7,12 61:18
62:10,21 63:6,
21 64:3,6,8
65:2,19 66:19
69:6 73:11,13,
17,23 74:20
75:23 76:1,22
77:6,7,21 79:19
80:7,20,21
86:21 87:7,17
88:1,16,23,25
90:13,14 91:10
93:3,8,17,24
94:18 95:5,20

97:3 98:7 101:6
103:15 105:21
107:13,22
116:22 117:16
125:20 126:6
134:9 149:10,
18 151:4 152:4
157:17 162:19,
20 165:6,9
169:7 171:4
175:4,25
176:12,21
178:10 184:23
190:12 191:3
219:22 220:1
230:23 246:3
247:21 250:23
252:1 267:25
323:18 332:10,
11,18

**police's** 63:24

**policies** 28:23
61:5 105:21
175:19 176:10
222:17 329:25
330:5

**policy** 31:12
61:7 76:11,12
77:20,23 78:11
79:2,18 81:12
105:17 106:10,
11 219:1 220:7
227:11 228:2
328:14

**POLLACK**
37:25 240:18
248:25 263:24
264:2,4,6,8
275:8 302:7,11
311:23 312:2
323:3 324:1,4
325:11,18
326:1 330:9

**portion** 323:20

**posed** 181:6
323:10

**posing** 167:12
190:8

**position** 48:14
49:22 52:14
62:23,25 63:1
67:11,23 69:9

89:25 91:4
92:13

**positioning**
267:25

**positions** 67:1
70:5 90:4

**possess** 162:3

**possibly** 13:2

**post-mortem**
314:6

**potatoes** 180:7

**potential** 96:14

**power** 126:6
330:25

**Powerpoint**
55:5,8,11,14,
15,25 166:2

**Powerpoints**
55:23 175:19

**Poynter** 12:12
123:14 135:4
153:19 154:25
288:1

**PR** 34:7

**practice**
195:25 279:17

**practices**
195:21

**practicing**
167:9

**pre-interview**
156:6

**predict** 18:5

**preface** 19:9
257:21

**preferable**
80:3

**preparation**
20:6,11,15,24
22:20 23:8,10,
23

**prepare** 19:11
21:5 24:1

**presence**

85:22

**present** 14:15
24:7 26:21
27:16,20 61:24
86:20 190:7
309:4,5,7,16
310:15 323:20
328:1

**presented**
182:9,15,20

**preserved**
260:14

**press** 14:10,
12,15,19 15:2
136:23 137:2,3
228:8 256:11
300:1,4,6

**presses**
255:24

**pressure** 72:5
93:2

**pretty** 19:15
21:24 22:3
28:23 29:18
56:2 138:8
211:7 259:22
267:21 307:25

**prevent** 191:13

**previous** 14:5
40:9 105:8
120:13 323:14
324:12

**previously**
12:23 80:16
147:3 194:13
238:14 265:20
331:4,19

**primarily**
182:5

**prime** 286:24

**printed** 168:9
301:5

**prior** 9:23
13:14,16 15:4
16:20 21:3
24:13 35:21
36:11 40:5
43:18,22 44:1

48:2 56:7,10
60:7,12 62:9
64:12,19 65:8,
13,17 66:1,19
68:19 79:16
86:16 111:1
136:1,5 138:15
155:24 164:16
165:18,22
204:8 219:20
220:1 248:15
292:10 301:9,
18 303:7
304:24 309:13

**privileged**
24:25

**probe** 196:14
197:11,14,17
199:2

**probe-** 240:11

**probes** 240:21

**problem**
189:17 192:8
278:23

**problematic**
217:1

**problems** 88:8
127:7 284:4
332:3

**procedures**
99:16 176:10

**process** 26:5
28:3,8 30:21
40:21 45:5
123:25 178:9
283:20 332:10

**produce** 25:9
28:4 151:9
171:14,20
272:17

**produced**
22:11 119:24
171:22 172:13
247:15 272:16

**program**
44:24,25 45:22
46:6 76:7,16
77:16,18

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

**progress** 331:20

**projectiles** 57:2

**promoted** 49:24 50:21 62:23 65:8

**promotion** 49:25 62:20 68:3,6

**prompt** 100:22 103:8,15 168:4

**prompted** 101:18 103:21, 24

**prone** 90:4 91:1 92:2

**prong** 196:8 201:4,6,11 202:14,19 239:4 242:15

**prongs** 291:25 292:2,14

**proof** 199:25

**proper** 89:21, 22,23 91:5,6,22 163:8,14 240:18 277:6 290:17

**properly** 91:7 141:24 212:16

**property** 112:1

**protect** 186:15

**protected** 336:14

**protecting** 186:19

**protection** 184:17 185:16, 24

**prove** 239:7

**provide** 12:22 29:16 51:9,15 54:14 80:8 81:3 87:17 168:5 187:21 235:19,

22 236:20 293:13 320:13 334:2

**provided** 56:3 73:12,15 75:8, 23 82:9 87:23 126:3 131:15 132:3 149:8 167:15 175:25 192:11 214:24 219:12,21 221:7 223:9 293:8,21

**providing** 184:17 185:15, 24 187:16 214:15 235:25 305:6

**psychiatric** 219:2

**psychosis** 159:11

**public** 15:8 137:6 315:15 316:20 317:13 323:22 328:18

**pull** 204:19,21 214:16 284:21

**pulled** 124:6 195:16 197:20, 22 307:9

**pulling** 57:8 204:24 205:21 227:9,25 264:14

**pulls** 267:8

**pulsing** 266:7, 14,15

**punches** 85:16

**punching** 167:13

**Punchy** 311:23

**Purdue** 46:5

**purpose** 105:13,15 106:2,6,18 156:22 176:5 277:25

**purposes** 105:25 106:17, 21

**pursue** 178:6

**push** 57:8 196:19

**pushed** 187:22 326:18,21 327:2 336:1

**pushes** 256:6

**put** 76:16 90:14 93:5 111:22 112:8,12,15,18 116:9,13 117:13 135:17 164:22 174:7 175:6,12 177:9, 12 185:14 190:12,14 191:7,10 193:18 207:8, 10 213:4 227:10 232:19 238:10 252:12, 14 258:23 268:13 269:13 283:23 298:8 299:14 317:16 331:2 333:16, 18 335:5

**puts** 58:4 139:9 186:17 187:19 233:8 252:18 256:12 298:4

**Q**

**qualified** 10:4 159:2 233:20 234:25

**question** 10:24 11:11 13:9 15:6,11 18:7, 15,18,22 25:2 27:24 36:7,20 63:11,12,13 64:11 65:4,21 71:21 79:25 80:19 85:12 93:20 96:19 97:10 98:13

100:13 101:10 103:17 107:1 108:17 114:17 120:14 123:8 127:21 129:6, 15 131:7 133:5 135:1 137:2 139:7 140:2,4 141:11 144:8, 23 145:19 146:12 147:22 148:11 149:6 166:25 172:3 173:9 179:10, 15 182:11,14, 18 183:16 187:11,13 190:9 192:24 195:23 199:19, 22 207:9 208:13,16 212:2 215:6,12 216:2 217:4 218:3 220:5 224:12,14 226:24 228:16 229:9,16,21 230:12 232:23 234:9,15,19 236:14 240:4, 15,22 241:19 244:7,21 245:5 248:23 256:9 268:20 271:12 272:12 274:25 278:9 280:2 282:4 283:1 292:8 295:12, 13,15,19 302:5 304:13,19 305:20 306:5 312:11 313:11 322:7 323:13 324:9,12,14 325:10 330:10 335:7,15,16 336:16

**questionable** 186:11

**questioned** 99:11 273:20

**questioning** 97:23 130:23 331:13

**questions** 18:6,25 38:10 41:19 97:8,16, 20 98:4 104:5 105:8 147:25 156:3 161:17 164:14 246:14 247:2,3,4 254:20 268:5 282:10 292:9, 25 301:1 307:25 313:17 314:23 315:12, 17,24 323:2,10, 16 325:13 336:20

**quick** 150:23 154:14 171:16 172:2 262:25 292:25 325:24

**quickly** 90:2 91:20

**quotation** 313:19

**quote** 77:24 248:24

**R**

**radio** 20:3,5 23:4 119:10,12, 17,21 120:2 139:25 140:7 183:14 202:2 215:21 217:13 253:1,17,23 254:3,11,17,21 255:11,16,20, 24 256:2 257:14 258:19 296:20

**radioing** 217:6,16

**ran** 122:15 158:14 262:13

**Randy** 49:9,12 81:22,25

**range** 172:15

**rank** 48:12 50:10 63:22

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

66:7,9,11 71:8

**ranks** 60:24

**rapidly** 78:4

**rate** 213:19

**re-ask** 41:19
208:19

**re-elected**
67:4

**re-phrase**
131:7

**reach** 64:1
98:12 108:14
236:10

**reached** 64:3
102:16 174:17

**reaches** 98:14

**reaching**
110:13 222:16

**reaction**
159:13

**read** 58:22
63:10 132:10,
13 214:22
234:18 236:1,
13,21 244:18
253:21 254:23
258:15 303:2
313:9 315:11
334:17 335:17

**reading** 288:11
307:11

**Ready** 132:14
263:7

**real** 65:22
325:24

**realize** 304:21

**reason** 10:22
11:1,4,7 14:2
60:23 87:2
100:20 121:9
125:7 129:19
130:16 142:9,
13 169:25
185:14 188:20
219:25 220:15
221:5,10
223:16 235:14

241:25 242:4
255:1 260:14,
18 262:17
282:3 283:12
286:6 291:22
298:2,4 315:19
316:5 322:12,
17

**reasonable**
9:5 10:17
106:4,14 139:8,
17 141:9 186:1,
21 187:15
222:13,17
228:2,3 232:9
282:2

**reasons** 79:7
293:8 331:19

**reassure**
225:23

**reassured**
32:12 127:6

**recall** 9:14,16,
21,24 14:25
16:12,17,20
21:1 24:18 27:1
31:6 38:18,21
39:3,6,8,11
41:2 54:22 61:7
65:23 66:1,3
71:21 82:12,13
88:11 143:23
176:19,22
177:23 180:24
197:19 198:2,5
212:10 218:12
225:2 245:7
246:24 247:1,3,
6,9,12 277:12,
15 299:24
305:14 309:20

**receipt** 315:12

**receive** 51:6
54:25 55:2
56:25 62:20
68:3 71:11 72:1
73:23 74:20
88:18,25 91:10,
15 163:13,14
176:16 306:9
313:24

**received** 47:23
51:24 52:2,18
53:3,5,12 54:18
56:15,21 61:9
71:20 74:22,25
75:5 86:13,17
87:6,11 88:23
89:17 93:24
100:18,19
117:17 128:8
284:5 301:15
303:18 312:13

**receives** 90:22

**receiving** 9:23

**recently** 23:17
56:15 171:25
272:9

**recognize** 78:3

**recognized**
9:3 140:15
245:6,8 306:15

**recollect** 14:24

**recollection**
21:24 22:3
39:10 104:16,
20,23 197:3
203:4,9,11
212:18 226:21
243:8,12,17
300:9 312:12

**recommend**
277:4 286:25

**recommendati
on** 85:7 228:22

**recommendati
ons** 85:6

**recommended**
163:3 228:23

**reconcile**
208:10

**reconciled**
256:19

**record** 40:16
71:16,17 77:12,
13,14 109:6
154:16 172:11,
15 174:12
187:11 193:19

197:4,8 209:19
222:9 255:4
263:2 266:11,
20 291:12
293:7,17
295:16 300:24
312:4,7 317:18
323:5,6,8
336:17,19

**record's**
187:12

**recorded**
35:12 77:4
149:5,10,11,13
151:4 152:6,11
185:21 194:12
208:18 216:7
223:20 250:10
293:23 327:11

**recording**
110:5 127:2
129:21 149:18
212:5 219:10
254:6 261:15

**recordings**
19:25 120:14

**records**
122:12,15,16,
18 126:23
128:3,13,17,23
130:5,6,11,24
164:9,12 165:1
241:22 260:20

**recounts**
209:10

**recovering**
101:16

**RECROSS**
324:7

**red** 268:13

**redirect**
268:17 325:15

**redundant**
161:18

**refer** 12:8 41:3
115:2

**referred** 41:16
246:3,22

**referring** 41:8
273:12 274:3,8,
10 275:19
306:22

**reflect** 267:25

**reflected**
241:17

**refresh** 21:14
226:21

**refused** 210:8
227:25

**refusing**
83:11,17,21,24,
25 84:2,7 92:21
186:6 230:6
327:5

**registering**
326:15

**regulations**
328:17

**relate** 28:8
330:6

**related** 163:7

**relates** 330:6,
15,18

**relating** 62:18
116:8 119:8,17,
21 161:5,8
250:25

**relative** 40:1

**release** 230:8
315:22 316:19
334:19

**released**
323:21

**relevance**
146:23

**relevancy**
29:16

**relevant** 128:7,
9,11 129:9,18,
20 130:13
139:7,11,12
141:8 146:9,14,
16,17 147:2,16
148:11 151:6
184:8,11,14,17

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

185:25 186:3, 20 187:14 199:23 207:1,2 220:22 221:2 243:22,25 244:2,4,15 245:3,13 246:10 260:25 262:18

**reliability** 249:14 250:1

**relied** 110:10, 13

**reluctant** 14:16

**rely** 164:17 222:11,18,24

**remember** 21:21 24:21 26:4 31:7,8,14 38:16 54:5 59:21 101:21 102:8,9 104:14, 19 144:2 154:3 167:17 168:11 170:5 173:16, 23 176:23 177:4 203:3 208:15 211:6 213:8,9,22 223:20 226:4,8, 15,25 231:18 246:1,18,19 262:9 293:10 294:9 304:14, 15,25 305:22 309:2,18 315:3 320:11 332:6

**remembering** 241:7

**remembers** 305:10

**removed** 113:18,19 115:17 116:7 201:5,11

**Renee** 22:10 32:15 204:7

**renew** 87:2

**repeat** 64:25 83:17 132:9 305:15

**repeated** 195:22

**repeatedly** 214:19,21

**repeating** 266:16

**repetitive** 266:8

**rephrase** 18:16 28:11 58:23 244:23 295:13

**replaced** 61:17 111:9,12

**replaces** 77:17

**report** 35:22 36:16 37:1 41:1,9 42:23 58:5,9,12,22 63:8 69:17 81:13 102:23 103:1,2,4,7,14 108:23 113:17 114:25 115:1, 20 126:23 129:14 132:23 136:24 149:1, 10,13,18 150:17 151:5,9, 10,13,14,16,17, 18,23,24 152:4 155:9,14 158:16 160:18 162:7 163:5,9 164:2,6,16 165:8 167:10 169:17 170:4,7, 11,19 171:1,4, 14 185:22 188:15 189:21 192:11 194:12 206:9 208:12, 17,20 209:2,9, 12,22 210:12, 20,23 211:5,15, 18,21,22 212:12,17,21, 24 214:8,22 215:4,25

219:10,22 220:1,17,20 221:7,10,17,23 223:4,13 226:12,18 235:15 236:5, 21 238:10 241:21 245:20, 24 246:6 247:21,22,25 251:4 252:11 260:23 270:6, 10,15,16 271:9, 17 277:4,10 278:6,19,25 279:3,25 280:23 281:14 282:11,14,23 283:4,8,10,16, 19,22 284:7,14, 16,18,21,24 285:9 286:3,13 287:3 289:14 290:14 293:1, 23 294:3,8,10, 14,18,24 295:5, 17 296:15 298:5 302:21 306:20,21,22, 23 307:1,11 308:22 309:1, 23,24 310:6,9 311:7,10,13,21 312:10,13 313:10,17 315:13,14,19 317:7 318:22 319:11,12,17, 21 320:7,23 321:13,15,18, 19,23 326:7 327:1 328:24

**reported** 209:2 211:11 225:12 237:19 246:16 296:18

**reporter** 63:12, 14 109:10 132:12,15 234:18,20 244:19 258:25 317:20

**reporting** 211:5 261:11

**reports** 42:22 43:4 58:18 62:16 65:11 108:10 127:18, 19,23 128:1,2 149:5 150:11, 14,20 162:19, 23 163:1,21 165:5,9 169:8, 14 237:10 247:15 248:2,6, 12,15 252:4,9 271:13 278:15 281:21 283:22 298:3 310:19, 20 321:2

**REPOTER** 289:3

**represent** 9:19 171:19 178:11 255:9 268:19 270:15,18

**representations** 268:21

**representing** 268:3

**REPROTER** 336:18

**REPSONSE** 321:24

**request** 30:22 171:9 201:23 202:6 271:8

**requested** 30:6 63:14 132:12 164:13 165:21,23 171:7 175:18 190:3 201:20 234:20 243:3 244:19 311:10 322:9 327:10 335:5

**requesting** 164:22 311:14 329:22,23

**require** 91:11

**required** 58:9, 11 73:14,19 80:12 220:12

**requirement** 47:19 81:6,9

**requiring** 91:14

**researched** 168:8

**reserve** 13:12 124:4 136:8

**resist** 90:1,10, 11 206:3,7,17

**resistance** 75:7,8 83:9,11 204:18 205:6 214:24 242:14

**resisted** 204:11,14 205:14,18 218:20

**resister** 90:15 244:5

**resisters** 90:10,11

**resisting** 84:9 90:19 93:6,10, 15,19 181:23 182:10 205:10 227:24 242:16 243:25 274:18

**resistive** 214:14,16,25

**resists** 90:6

**resolved** 78:22

**resort** 92:24

**respect** 22:23 187:25 229:17 256:18

**respond** 202:2 218:19 254:4 315:1 320:18

**responded** 34:13 78:12 219:5 316:11

**responding** 30:21 78:7

**response** 10:1 97:14

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

115:15 133:17 141:14 150:13 171:23 176:16 214:24 226:23 268:12 290:5, 14 313:25 324:12

**responsibilitie s** 68:23

**responsibility** 64:13 71:1 186:15

**responsible** 69:4

**responsive** 114:17 224:3

**rest** 299:7

**restate** 190:11

**result** 128:22 249:11 309:13

**resulting** 196:10

**results** 122:15 196:10 309:4

**resuscitated** 100:19 101:16

**retrieved** 210:10

**returned** 109:12 260:6, 10

**reveal** 334:23

**revealed** 9:2

**revealing** 313:12,22

**reveals** 95:8

**review** 19:23, 25 20:6,10,14, 18,24 21:2 22:6,9,16,18 41:7 59:9,11, 17,19 60:6,10, 12,18,21,24 61:5,7,17,23 62:6,8 63:5,7, 23 64:12 158:16 160:5,7

166:15 174:13 177:5,22 193:25 197:10 201:4,10 209:15,21 215:19 216:10 241:21 262:8 272:9 282:13 283:25 284:4, 16,21,22 312:9 317:24 318:10 334:4

**reviewed** 19:13,14,16,19 20:1 21:10,13, 16 22:10 23:7, 10,16,19,23 65:11 115:24 143:13 163:25 167:23 177:6, 11 216:4 259:6 283:19 303:18, 21

**reviewing** 177:16 178:19 198:2,5 269:8 314:24

**reviews** 58:4 209:18

**revisit** 178:3

**Rick** 66:15

**rid** 294:2

**rights** 26:3 99:12 334:17 335:18

**ring** 208:24

**ripped** 139:1

**risk** 91:13 181:7 185:6 186:17 193:16

**risks** 117:11

**road** 51:1 65:10 69:1 227:14

**road-side** 89:7

**roadway** 184:2,5,10,12 186:8,14

187:19 188:3,5 218:21

**robbery** 220:9

**Robert** 12:12 123:14

**rocking** 205:2, 24

**Rodriguez** 52:4,16 53:8,9, 10

**Rodriquez** 54:8

**Roger** 12:12 123:14 153:19 154:25

**role** 228:7

**roll** 117:8

**Roller** 26:13 70:12,13,14 107:19 284:11, 12,13 300:17 301:10 309:3

**rolling** 204:19 227:25

**Ronald** 289:17, 21

**rookie** 79:6,10

**room** 79:20 116:13,16 122:23

**rotate** 92:17

**routine** 128:21

**rule** 91:22

**ruled** 336:14

**rules** 18:1 20:22 328:17

**ruling** 323:23 332:14

**run** 154:20 164:2,5

**running** 195:10

**runs** 40:9

## S

**safe** 229:10

**safety** 79:16

**Saturday** 13:3 134:14

**scale** 268:25 269:11

**scene** 10:1 11:5 34:13 42:17,19 78:24 79:3,12 80:5 113:18,21 114:1,20 115:17 116:3 124:14,18,19 135:14 142:1, 15 143:3,20 144:1 145:14 147:15 156:19, 21 157:17 176:8 182:13 183:3,8 190:7 195:16 202:2 243:19 245:12 252:16,22 261:19,22,25 263:11 264:14, 19 266:22 268:1 288:7 306:16 328:25 329:2

**schedule** 154:5

**scheduled** 306:3,11

**SCHNEEMAN** 10:24 11:11 13:9 17:9,12,15 21:5 25:1,5 27:14,17,19,23 28:1,9 30:23 37:19,22 38:2,5 41:8,11,14 42:2,4,10,12 43:6 51:6,8,10, 12 59:25 60:3 63:10,13,17 64:10 65:4,21 69:10 79:25 80:18,22,25

81:2,5 83:13, 16,23 84:3,5 93:20 94:5 96:19 98:1,13 100:12 101:10 103:17 104:2 109:3,15 113:4 114:3,6,9,11,13 116:12 125:16 131:5 133:4 134:23 135:1 137:1 140:2,9, 11 141:11 144:6,23 145:5 147:21 149:6 156:22,24 157:2,24 168:17,19 170:13,16 172:10,17 179:10,12 181:13 185:2,4 186:25 187:2,4, 6 190:9 193:16, 18 195:23 200:25 203:15, 17,20 208:13 212:2 215:6,11 216:2 220:4 221:12 224:1,4, 25 228:16 229:4,13,21 230:12 232:4, 22 233:4 234:4, 6,8,11,14,17, 21,23 235:24 236:13,17 237:11 240:4, 14,17 241:18 244:7,16,20,23 245:4,15 247:24 248:1, 23 258:25 263:1 267:1,13 268:5,8,24 271:1,5 272:14 274:23 275:9, 12,15,20 276:5, 14 278:9 279:14 280:2, 12 282:25 289:4 290:16 292:7 295:4,7, 11,18 296:13 297:13,24 302:5 304:13,



Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

19 305:17,19
311:18,25
312:4 313:4
316:17,23
317:5 322:15
323:1,4,7
324:2,5,8
325:9,16,25
333:7 334:20,
24 335:3

**SCHNEERMAN** 250:21
260:15 263:12,
17,19 330:10

**school** 44:15
45:20 46:8

**schooling**
46:7 47:22,24

**Science** 158:8
159:24,25
160:1

**scope** 28:22
29:1 31:12
176:9

**scores** 50:11

**screen** 58:5
296:17

**seal** 323:21
334:21

**search** 91:7
92:19 230:15
297:10

**searching**
137:24

**seat** 326:17
329:16

**seated** 188:10,
24 189:6

**seconds**
192:10 193:12,
21,23 194:7
201:20 208:5
228:23 230:3
253:24 254:7,
18 258:1 263:6,
7 264:18

**section** 298:1,
23 299:1

315:18

**sections** 298:3

**secure** 122:10

**seek** 11:22
126:11,15
130:16,19

**sees** 263:20

**segments**
22:12,16

**self-explanatory**
290:9

**send** 45:4
274:4 303:15,
17

**sending** 305:5

**sends** 299:4

**sense** 240:11,
22,23 296:5

**sentence**
183:24 202:13
303:2 319:21

**separate** 61:1
80:8,23 88:8
147:12 174:24,
25 175:1,3
176:4 251:6
253:13 255:10,
11,20 256:3

**separation**
255:14

**sequence**
212:11

**sergeant**
49:24 50:5,16,
22,25 52:5,6
53:6,8,15 55:21
57:17 58:4,21
59:3,8,10 60:22
62:17,18 63:22
67:25 68:1,17,
19 136:13,14
173:15 256:22
257:18 283:21

**sergeants**
69:2

**serve** 67:16
230:15

**served** 106:21

**service** 111:1

**serving** 44:16,
21

**sessions** 54:5

**set** 128:22
203:15

**set-up** 203:17

**sets** 228:21
252:24

**setting** 228:7

**severe** 235:17

**Shane** 165:7

**share** 317:13
324:20

**shared** 223:8
315:16

**shed** 313:14

**sheet** 144:4

**shift** 58:3,8,9
69:2,9 221:18
281:4,13
283:20,21
301:19

**shifted** 261:8

**shirt** 196:9
197:12,14,17
201:11 202:15

**shit** 248:20

**shoot** 232:8

**shooting**
220:9 273:17

**short** 317:17

**shortly** 9:17
305:5

**shot** 198:22,23
200:12,15

**shoulder**
92:17,18
205:12 227:10

**show** 170:19
250:8 267:22
272:8 277:13
282:20,21
283:3 296:16
297:23 300:12
306:24

**showed** 129:3
271:18,24
322:4 335:4,14

**showing** 139:2
147:2 203:11

**shown** 262:19

**shows** 76:9,10
127:12 192:6
252:22 264:18
270:10 283:6,7
296:17

**shut** 301:25

**side** 57:7
135:17 164:22
174:8 258:23
269:13 292:6,
16 298:8
299:14 317:16

**sights** 57:9

**signed** 57:24
58:1

**signs** 280:25

**similar** 56:2
57:10 139:2
196:16 268:25
328:20 333:24

**simple** 29:15

**simply** 124:6
214:18 291:24
306:9 316:16
336:9

**simultaneously** 284:9

**single** 108:18,
19 142:10
231:13 335:7,
16

**sit** 14:19 15:1,
13 21:25 22:4
31:1 41:23 87:5
127:9 128:16

131:23 177:15,
19 180:24
197:19 203:4,8,
10 243:17
271:25 272:4
306:10 309:21
332:7

**sits** 332:16

**sitting** 21:13
108:24 115:21
207:13 326:16

**situation**
78:19,22 83:8,
10 125:11
158:14 190:13,
15 229:7,20
231:24

**situations**
78:5 229:2
230:4,14 232:9
285:8

**size** 53:17

**skin** 196:18,19,
21

**skip** 94:4
162:12

**skull** 36:16
313:12,22
317:9 320:6,8
321:14,18
322:4

**slam** 335:25

**sleep** 58:14
277:14

**slide** 91:23

**slides** 166:2

**slight** 256:14

**Soft** 85:18

**sole** 62:14

**someone's**
83:10 92:21

**sort** 33:22
77:17 99:15

**sound** 113:5
255:4 266:7,8,
10,12,15,16,17

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

sounded 158:17

sounds 160:14 290:23

span 207:25 208:5

speak 18:3 32:16,17,25 123:17 124:11 125:4,7 126:5, 10,12,19 131:2, 8,18 138:4 139:19 240:17 273:19 279:21 286:23 304:5 306:5 317:8 335:6

speaking 11:17 137:13 161:4 266:23 267:5 295:22 296:1

speaks 263:14 267:14 297:25

specialized 89:6

specialties 73:25

specific 31:6 38:21 88:11 210:18 213:23 231:1 307:25

specifically 38:17 117:15 134:1 228:25

specifics 30:4 31:25 32:8 36:18

speculate 232:25 233:3 290:11

speculating 217:14 278:3

speculation 83:16 190:10 229:5,14,22 232:24 274:24 276:5,14 280:13 290:17

305:20

speech 336:15

speed 90:3

spend 243:5

spent 13:2

Spillman 251:20 252:8, 24 253:24 254:13 255:25 256:2,12,24 257:1,23 258:4, 12 261:9 283:14 297:20

Spillman's 193:13

spoke 35:1,7, 14,16 36:2,12 106:23 135:24 136:16 137:23 151:20 313:13 319:10

spoken 24:13, 17,20 25:12 34:23 35:24 36:7 158:3,6 305:2

sporadically 111:2

spray 84:14

spreadsheet 284:3

spreadsheets 281:21

squad 76:21, 24 77:1,7,17 251:24 299:4 329:16

squirming 144:25

St 126:12,17 127:24 128:4, 17 131:9,19

stable 100:19

staff 26:9,10, 14,18,21,24 27:2,21 28:7, 12,18,25 29:13,

23 30:11,20 31:9,15,20 33:16 34:1 38:14,22 39:9, 19 70:9 125:10 129:1,3,5 130:21 177:2 271:19

stake 227:13

stamp 172:11 255:25 256:4

stamped 172:16 183:14 255:21

stamps 174:12

stand 30:14,17 31:2,13

standing 90:4

stands 32:13, 24

start 48:25 73:3,22 100:11 149:12 190:24 192:14 263:5,6 272:25 287:16

started 48:24 123:12 125:3 135:21 194:2 221:8,25 222:5 234:12 281:23 335:9

starting 193:1 222:8

startles 273:23

starts 174:19 196:6

state 14:12 35:16,25 47:20 48:15 73:15,19 79:12 80:13,20, 23 117:13 139:18,24 147:1 165:6,9 171:4 172:14 199:20 200:23 219:3 228:25 247:21

stated 129:1

143:5,22 192:19 196:7 204:16 206:19 207:3 210:14 214:12 218:25 227:6,23 239:7 241:14 321:13, 18 331:19 336:2

statement 13:13 14:8 15:8 102:18 129:21 132:22 169:25 180:17,19 181:14 186:9 187:18 188:6 189:18,22 192:17,22 195:18 197:16 210:13 211:17 219:15,17,21 220:2 236:8 249:22,25 273:15 286:2 288:6 293:15 295:22 305:14 306:18,19 313:15 321:17 327:5 329:6 334:14

statements 12:3 42:24 130:21 133:1 138:8,24 146:6 184:6 185:19, 21 202:20 204:17 207:21 215:21 216:6 236:9 327:23 330:1

states 113:17 167:22 196:7 202:13 204:6 207:22 209:8 235:15 245:8 301:20,21,24 305:9 313:11 314:22

stating 58:5 127:3 138:23 227:15

stay 190:4 191:7

step 83:6 84:20,22 107:4 129:16

sticking 196:17

stop 48:9 77:1 91:13 92:1 184:1 186:7,25 187:2 189:12 205:12 263:12 296:24

stopped 125:10 134:10 190:2 206:13 233:12 263:15 264:16 265:3,9, 16 267:20 269:12 322:11, 13

stops 78:2 90:24 91:10,11, 14

store 329:10

stored 251:1, 18,19

story 278:7,15 326:24

straight 231:21

strange 304:11,17,22

straw 331:22

street 48:17 296:22

strength 143:9,12 159:14

strike 9:10 10:6 36:6 37:5 42:7 53:25 54:25 65:6 75:25 80:14 121:20 123:9 132:25 139:11 140:19 167:21 170:2 171:8 187:12,13 188:9 190:17 203:5,9 208:2, 25 211:3 218:2

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

229:1 231:6
233:13,14
238:25 270:15
272:5 277:8
281:9 287:11
307:21 309:23
331:14

**strikes** 72:5
81:13 85:16
86:5 93:1

**striking** 189:13

**stripped**
313:12,21

**struck** 189:23
196:8

**structure** 61:4

**struggle** 79:13
210:15

**struggles**
195:3

**struggling**
204:20 269:23

**stuck** 196:20
198:25

**studies** 277:13

**stuff** 89:9
226:12 277:7

**stun** 239:9
240:3

**subject** 16:17,
20 24:23 31:10
33:3 78:1,25
82:3 84:1 88:23
90:6,22 92:2
93:5,6 96:14
191:11 218:17
225:6 231:8,13
232:8 290:22

**subject's**
93:13

**subjects** 73:6
96:14

**submit** 117:9
176:11,14

**submitted**
116:15 165:25
175:4,6,7 177:1

178:10,15,23
212:21 282:11

**submitting**
178:11

**subpoena**
130:6

**subpoenaed**
28:4 29:14,24

**subset** 248:6

**substance**
30:20 32:3,6
33:24 88:3
225:10,18,19

**substantive**
176:24

**suffered** 235:9
302:20

**suffering**
129:22 158:20
159:1,4

**sufficient**
126:23,24
138:7 196:3

**suggest** 97:16

**suggesting**
224:5

**suggestion**
279:12

**suicidal**
218:17

**suicide** 140:1
227:17 289:12

**summarize**
326:11

**summarizes**
180:4

**summary**
179:5,6,7,8,19,
22 180:3,23
182:19 184:7
185:16 188:9,
13,20,21,22
189:19 191:22
195:14 206:23
207:8,10
293:12

**Sunday** 13:3

**super** 143:9,11

**Supervise**
51:1

**supervised**
57:19

**supervising**
69:5,12,13

**supervision**
57:22

**supervisor**
32:15 51:1
65:10 220:11
280:24 282:13
283:21 314:21

**supplement**
169:19,22,24
323:13,14
324:12

**supplemental**
170:4 294:18,
23 295:4 298:3
306:23

**supplements**
276:22

**support** 58:25
180:13 191:9
223:2 225:4

**supported**
180:9 197:16
293:18

**supporting**
96:13 98:20
132:25

**supports**
98:11

**suppose** 84:1

**supposed**
212:13 264:2
297:5

**Supreme**
336:14

**surrounding**
95:14 227:19
228:19 281:25
304:15

**suspect** 96:12
231:22

**suspect's** 83:7

**SWAT** 73:25

**symptoms**
10:8 131:24
132:5,17 235:9
236:11

**sync** 253:7

**synced** 193:14
253:8,10
257:23

**syncs** 256:24,
25

**synopsis**
218:13 298:2

**system** 44:13
77:9 128:21
129:4 130:8
162:16 243:10
251:1,18,20,21,
23 252:1
253:13,18
255:22,25
256:12 270:7
271:18,24
272:1 282:12,
14 283:5,14,18

**systems**
253:14 255:20

---

**T**

**table** 31:1
296:7

**tactical** 91:2

**tactics** 72:3
74:25 75:12
82:7 89:15
163:6 277:21

**TADED** 297:1

**Taggart** 321:6

**takes** 273:11
310:7

**taking** 19:2,4
146:1 326:23

**talk** 18:1 30:8
31:3 32:7 37:20
43:21 100:2
108:16 123:5
131:12 133:9
159:20 161:11
176:3 300:20
308:9 334:22

**talked** 11:25
25:3 133:12
135:19 142:2
158:13,18
274:1,2 279:10
287:18 288:16

**talking** 182:17,
21,24 276:8,11

**tampered**
283:13

**tangible**
168:19,20

**tape-recorded**
207:5

**tase** 92:25
204:8 214:13
216:1 217:6,9,
23 218:23
227:21 230:1
238:21 240:1
242:15 289:11

**tased** 56:22
191:15,24
192:2,19,25
198:18 199:10
210:7 212:21
214:16 218:21
230:25 231:20
233:18 289:23
290:15,22

**taser** 51:4,15,
16,17,20 52:3,
10,19 53:3,12,
15,16,23 54:1,
14,18,19 55:2,
20,23,24 56:15
57:1,7 71:11,
20,23 74:9,19,
22 84:14,15,25
85:5,12 86:3,11
92:25 93:4,9,
16,18,22
110:16,19
111:4,16,22



Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

112:9,15 113:4,
6 116:8,9,24
117:3,7,10,12,
20 127:8 158:4
161:6 163:6
165:14,16,18,
20 166:1,5,9,13
173:4,10,15,17
189:13,17,23
191:17 192:6,7,
8,11,13,17
193:4,7,8,11,25
195:22 196:8,
14 197:11,17,
20 198:9,20
199:5,7,12,14,
22,23 200:12,
24 202:14,18
203:9,11
207:23,24
208:4,7,8,18
209:3,11
210:14 212:18
214:2,3,6,9
215:4,14,19,22
216:11,23
217:12,16,23
218:8,21 219:9
227:11 228:11,
15,21,22 229:3,
11,17,18
230:11,18,20
231:3,7,12
232:11,15
233:22 234:1
235:9,13
236:11 237:9
238:17 239:3,8,
24 241:15
242:17 256:18,
20,21,23,25
257:15,16,22
258:4,12,20,21
259:6,7,9,10,
15,19,20,22,23,
25 260:25
261:3,8,12,16
265:18,24
277:5 279:19,
20 286:14,19,
25 291:14,25
292:2,14 293:9,
15,22 295:14,
21 296:6,22
297:1,11,16

**taser's** 56:6
200:19,23
266:13

**taser-related**
230:21

**tasers** 54:11
116:23 209:3

**tases** 194:9
208:11,18,21
209:25 210:2,
11,17,23 211:5,
11,23,24 212:5,
11 216:4
228:23 240:2
241:2,10,13,15,
16,19,23 242:1,
5,9,10,19,20,21
290:2 295:10,
16

**tasing** 41:25
42:9 56:14
85:10 86:17
100:3 103:12
105:15 109:19
127:4 131:21
132:8,19,21
137:5 146:8
155:23 156:18
157:23 192:14
193:1 194:2
206:13,18
210:16 212:5,
25 214:21
230:8 233:12,
15 234:7
294:18 296:4

**tasked** 105:20

**tattoo** 245:7

**tattoos** 243:9

**taught** 54:1
55:4 71:24
80:14 81:8
82:3,15,18,20
92:20 277:20
278:11

**teach** 58:13
72:10 75:9,16,
17 82:23 83:1
88:7 92:5

**teaching** 82:24

**tease** 273:10

**technically**
69:14,20
282:16

**technique**
239:16,19,24
242:7 285:19

**techniques**
74:1 99:5
105:10

**telephone**
106:24 212:20

**television**
137:6

**telling** 32:23
79:7 129:22
158:15 236:1
239:6 247:12
249:23 255:10
335:11

**ten** 29:6 54:21
63:21 190:20
191:11 207:24
317:3

**Teresa** 39:25
40:6,17,19
101:2 102:1,16

**term** 42:13
43:7 96:1,15

**term-** 67:11

**terminal**
282:12

**terminate**
332:14

**terminated**
65:24 207:12
329:22,23
330:14

**terminating**
332:10

**termination**
333:10

**terms** 30:9
83:4,5 99:17
123:23 166:1
270:11 279:18

**Terrific** 156:12

**Terry** 11:7
153:9 154:25

**test** 43:12 50:3,
5,10 57:6 62:25
68:6 112:21
172:3 257:25

**testified** 22:24
33:25 37:10
115:19,23
135:18 156:14
157:20 171:10
205:9 206:16
223:18 226:10,
25 228:5
330:16 336:11

**testify** 19:6
236:25

**testifying**
200:11 233:22

**testimony**
17:10 23:10
63:14 114:7
131:5 132:12
144:7 223:21
234:20 236:20
244:19 249:15
292:10 302:14

**testing** 121:22
123:3

**text** 291:9

**That'll** 266:20

**theoretically**
285:7

**theory** 75:6
83:1,4 98:20
293:18

**thigh** 286:15,
16

**thing** 18:13
21:16 27:13
30:2 32:11
37:25 38:21
45:4 99:17
114:16 136:18
147:25 172:14
187:1 198:23
214:18 225:4
236:24 240:21

243:2 253:21
255:16 273:25
328:9

**things** 13:17
99:19 117:1
149:3 203:23
206:2 309:15
310:23 327:25

**thinking**
170:20 237:19
262:9

**thoroughfare**
181:23

**thoroughfares**
181:24

**thought** 70:9
115:19 130:2
134:12 196:3
211:9 212:7
234:6 237:17
253:7 259:25
293:9 307:6

**threat** 96:3
181:12,17,18,
19,20,22 182:2,
4,5,7,16,20,21,
25

**Three-
quarters** 280:8

**throat** 260:13

**thrown** 113:18,
22

**tie** 144:3

**tight** 196:19

**tighten** 91:24

**time** 9:9,11
13:8 18:3 21:10
23:16,19 24:14
27:7,8 30:5
34:10 35:1,7,
14,15,21 36:2,
12 37:5,15,19,
22 38:7,8,15,
19,23 39:1,5,7,
13,15 40:23
42:2,3,11,15
43:7,16,25
44:16 49:8
50:8,14 52:18,

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

370

21,24 54:19
59:8 61:23 62:9
65:8 69:24 70:4
75:4 77:6 78:6,
16,23 79:14
81:20 82:20
84:18 86:2,16
87:14 92:15
100:15 105:6
119:13 120:5
121:9 122:4,21
126:22 128:19
130:12 131:20,
24 132:6,18
134:19 135:11
136:5 137:22
139:22 140:6,
13 141:14,16
142:21 144:13
146:11 148:21
154:21 164:3,6,
16,23,25 167:6,
9 171:1 175:5,
6,21 176:21
177:1 178:25
183:14,17
188:10,24
193:1 194:2,5,
9,10,21 195:11,
15 196:4
197:13 202:5,
14 203:5 205:8
206:4,17
207:11,25
208:2,4,5,17
212:18 213:4
216:5,25 217:5,
9,17 220:8
221:23 222:7,
15 223:5 224:5
226:16 227:18,
23 228:20
229:18 231:12
237:17 239:10,
15 241:7 243:5
244:10 245:20
252:19 254:21,
22,23,24 255:7,
9,16,21,25
256:4,6,10,11,
21 257:3,16
258:3,19,20
259:15,19
261:12 262:21
265:12 266:22
269:15,18,21

272:21 273:10
274:11 275:14
276:18 277:22,
23 278:6,14
281:3,10,22
282:7 283:5,11
286:8,14 289:4,
5 296:18,19,20
297:19 299:17
304:25 305:2,9,
23 306:14
308:4,16,17,20,
23 309:4,20
310:5,12,21,25
311:13 313:5
315:15 316:4,
17 317:5 318:6
319:4 320:12
322:13,24
324:15 331:19,
20 336:21

**time-stamped**
20:2 253:17
254:11 257:14

**timeframe**
191:17,25
192:3

**timeline** 37:7
134:17 253:20
297:6 300:1,7,
10 305:25

**timelines**
256:10 299:18,
21 300:9,15

**times** 15:24
21:2 23:25 25:3
43:14 50:5 62:4
81:13 93:21
117:20 124:22
166:13 175:5
183:22 191:16,
24 192:2,6,9,
19,25 193:22
204:10,13,20
207:24 212:22
214:5 218:8,23
228:11,15
229:3,10 231:7,
9 232:15
241:14 242:13
252:25 256:16
273:22 289:11,
24 299:9,10

**timestamp**
193:13 253:23,
24 255:18
258:13

**timestamps**
215:21 254:18

**timing** 306:6

**tired** 270:24
271:1

**today** 14:19
15:1 19:6,12
20:11,25 21:4
23:7 41:23
55:15 71:8 87:5
109:9 112:3
115:10 128:16
158:25 180:24
197:19 203:8,
10 224:6 225:1
226:10 260:8
272:1 289:11
332:7

**today's** 20:7
323:10 324:11

**Todero** 9:3,13,
17,22 10:12
11:2,10,16
12:24 13:22
14:4 33:21
35:17,20 36:13
37:6,13 38:11,
15,23 39:1,5,
12,19 40:1,2,6,
17,19 41:25
42:9 56:14,22
65:13,17 66:1
77:3 78:13 80:5
85:10 86:2,17
100:3,18 101:8,
18 102:1,16
103:10,19,25
109:19 119:13,
17,22 120:3
121:2,22
122:22 127:5,
11,16 130:12
132:17 134:13,
15 135:11
136:12,15
138:10 139:4,5,
23 140:7,14,24
141:13 142:11,
18,21 143:7,19

144:12,17
145:13 146:1,8,
13,24 147:3
155:23,24
157:23 158:19,
25 160:23
161:9 166:18
167:8,25
181:11 182:4,8,
20 183:25
184:5,9 186:4,
15 188:1,10
189:13,23
190:7,21
191:15,24
192:25 195:16
204:9 205:9
206:3,17,22
208:21 214:12,
15,24 215:15
216:14 218:17,
18 226:7 227:7
236:12 237:14
242:2,15 243:5,
19 244:4,14
245:2,8,9,13,
18,21,25 246:2,
7,13,17,21
247:4,7,10,13
259:10 262:6,
22 264:22
269:4,14 270:4,
11 271:14
274:3,8,11
276:9,12 282:9
295:24 301:21
305:6 306:15
307:10 314:6
317:7 319:11
321:13 322:20
324:16 328:20
331:15 332:2
333:25

**Todero's**
100:25 116:3
120:11 121:5
127:8 128:9
129:7 131:20
139:24 141:14
147:5 170:8
181:6,22
189:10 196:8
197:11,17,20
198:6,9 199:12
201:5,11

202:15,16
243:9 249:11
266:1 302:2
309:13 310:12
322:11

**Todero.-**
330:11

**Toderos**
100:24 101:2

**told** 32:11 87:1
130:18 150:18
160:23 210:5,6
213:10 218:8,
11 219:7 220:2
221:1,22 222:1
224:1,25
225:11 227:1
237:7,8 247:6,7
277:3 280:15,
18 286:10,12
290:2 306:15
310:13

**top** 117:14
193:4 253:22
273:3 332:6

**topic** 224:7

**torn** 12:25
139:1

**total** 208:2,3
241:12,15,16,
22 242:1,19,20,
21

**totality** 139:10
189:4

**totally** 15:24
112:20 114:15
256:2

**touched** 55:9

**touches** 88:10,
12

**tough** 195:2

**toxicology**
270:15,16
271:13,17
280:19

**track** 284:2

**traffic** 20:3,6
23:4 48:15

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

72:18 78:2
119:10,12
120:3 140:1,8
181:18,21
182:3,6,17,22
184:17,25
186:5,16,20
187:16 202:2
215:21 253:1,
23 254:3,21
255:12,16
257:14 266:21
267:2 289:12

**train** 49:4 54:4,
11

**trained** 76:2
86:21 90:18
93:3,8 116:23
117:4 229:25
279:21

**trainer** 52:10

**training** 46:14
47:10,14,22,25
48:23,25 49:2,
5,6,12,14,17
51:2,4,15,24
52:2,19 53:3,
12,16 54:2,5,
14,24 55:2,4,6,
16,21,22,24
56:6,15,21,24,
25 61:9,11
71:11,20,23
72:1,11,12,24
73:3,10,12,14,
18,19,21,22,23,
24 74:2,6,7,9,
10,14,15,18,19,
22,25 75:5,21,
22,25 80:9,11,
15 81:3,17
82:9,16 83:12,
19 86:14,17,25
87:4,6,11,18,23
88:1,3,15,18,22
89:1,6,14,15,
17,20 90:21
91:9,15 93:22
117:12,17
157:14 158:8
164:9,12 165:1,
16 175:18
230:24 231:18
256:23

**trainings** 53:5
54:18,20 56:10
72:15 75:14

**transition**
54:2,17 56:18

**transitioned**
53:14

**translate**
255:3

**transmitter**
77:15 330:22
331:1,3

**transported**
219:1

**trauma** 313:14

**travel** 263:11

**treated** 11:2
39:19 131:3
148:24

**treatment**
126:2 128:10
129:7 131:20
132:3,5,20
328:18

**trial** 226:13
236:20,24

**tricky** 166:22

**trigger** 57:8
230:8

**trooper** 35:18
134:6,7 135:24
138:10,22
141:5 151:7,11,
14,19 155:11

**true** 130:23
131:2,8,11
152:16 153:19
248:12 279:1
322:15 326:24

**Trumble** 328:2

**Trumble's**
328:3

**trunk** 77:5

**truthful** 335:25

**truthfully** 19:6
158:7

**Tuesday** 24:4

**tunnel** 95:23
96:8,9

**turn** 78:4,6,9,
12 79:2,19 80:4
86:10 275:4
291:21 294:17
297:22 303:10
311:2 312:18,
22 320:16
331:15,24

**turned** 77:22
78:22 162:5
169:2 331:9

**turning** 191:5

**turns** 267:18

**two-and-a-half**
91:4 92:13

**two-fold**
229:24

**two-hour** 81:8
82:16 89:16

**two-year**
44:23,25

**type** 30:2 45:3
93:12 138:24
220:17 273:25

**types** 88:4,6
106:8 139:2

**typically** 24:21
26:5 27:3 28:2
29:14 54:7
58:3,22 76:3
81:11 96:9
117:5,7 256:23
277:4 284:20

**typo** 36:15
320:25

---

**U**

**Uh-** 257:9

**uh-huh** 18:13
22:13 114:6
133:14 190:5
195:13 254:1,5
264:15 265:10
285:11 297:2

299:20 318:23

**uh-uh** 18:13
323:3

**UI** 46:4

**ultimate** 10:9
131:21 132:19

**un-
metabolized**
272:2

**unable** 295:25

**unaware**
313:14

**unbecoming**
328:13,17

**uncomfortable**
91:21

**uncommon**
163:12 220:13

**uncover** 10:7
322:19

**uncovered**
233:7

**underlying**
235:3,17

**underneath**
204:18

**understand**
18:15,19 25:2
27:23 28:10
30:24,25 78:5
103:20 133:6
141:20 145:21
146:22 164:18
183:21 194:15,
17,25 199:3
226:14 244:22
302:2,14,17
306:24

**understanding**
54:13 77:25
86:20 87:5,10
101:7,12
102:10,17
103:21 115:16,
24 116:4,6
127:9 143:15
159:7,9,10
161:12 174:4

225:8 240:23
246:12 254:22
255:8 296:3

**understood**
105:24 106:2

**unfair** 147:25

**unfamiliar**
79:14

**uniform** 68:24
70:8,24

**unintended**
278:2

**unique** 228:18

**units** 191:18
254:4

**university**
44:7 45:23
46:3,5

**University-
purdue** 44:7

**unresolved**
323:17

**unsafe** 189:10

**update** 53:3
55:20 100:18
101:14

**updated** 55:24
175:19

**updates** 27:6
28:5 29:24 30:5
38:17 52:25
54:23

**upper** 189:13,
24 228:20
229:10

**upper-back**
292:3,17

**upright** 207:13

**urinalysis**
129:3 271:23
280:15

**usage** 258:12

**use-of-force**
72:7 82:15
85:14

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

useless 331:1

user 165:14,20

usual 305:9

utilizing 331:17

**V**

vague 28:9 30:23 42:2,12 69:10 83:24 101:11 135:2 208:14

vaguely 246:1

Vancouver 158:12 159:18 160:4 161:5

variation 256:14

varies 81:10

variety 55:6

vascular 313:12,22

veering 186:9 188:7

vehicle 91:1

vehicles 251:24 268:22 269:3,4

verbal 18:12 72:5 85:20 86:10 115:15 133:17 150:13 184:1 204:9 226:23 268:12 321:24

verbally 83:23 84:3

Verbatim 218:15

verbiage 163:8

verify 197:10 281:16

Versed 322:20

version 56:6

179:17

versus 240:20

VHS 77:4,11

video 110:9 114:3 117:25 118:4,21 120:8, 14 121:19 127:2,12 129:21 143:4, 12 144:5 145:6 149:11,13,18 150:9 151:5 152:6,19,24 153:4,9,14,21 154:6,12,20,23 155:22,24 156:9 160:7 161:13 185:8, 21 190:17,24 191:1 197:10, 14,16,18,19 198:2 201:4,10 203:1,2,6,11, 13,22,24 215:17 216:7, 10,11,14,16,23 222:3 223:20, 24 231:18 241:20 243:11, 13 244:25 248:18 249:4 250:8,14,17,18 261:24 262:8, 19,20,21 263:4, 9,14,15,20 264:12,16,18 265:2,3,14,16, 20,24 267:12, 13,15,20 268:22 269:5,7, 8,12,13,21 284:22 327:22

video-recorded 204:17

videoed 152:16 217:24

videos 19:14, 19,23 20:9,10 21:20 22:6,9 110:3 114:10 115:7,24 118:5

120:22 144:9 156:2 203:7 250:5 262:1,3,6 274:12

videotape 149:22,24 150:2

view 10:5,6,15 21:19 29:21 79:23 139:7 180:13 187:25 199:14 214:17 229:2 230:18 231:7,11 232:11 233:13 240:25 241:16, 20 243:7,11 245:3 286:20, 21

viewed 58:6 269:14

viewing 14:16 144:8,20 243:13

viewpoint 286:25

viewpoints 61:2

Vineyard 11:8 13:21 35:7 121:2 124:7 137:11,18 138:5,25 141:2 142:17 168:13 169:2

violated 105:21

violation 78:11 105:17 106:11 328:10 329:24 330:3

violations 106:9 328:14

vision 95:24 96:2,3,7,8,9

visit 261:19

voice 254:22, 23

volume 267:1

volunteer 126:8 198:22 335:23

volunteered 218:24 335:20

**W**

wait 18:6 37:19 185:2 195:21 277:8,25 278:1, 18 281:13

waited 154:1

waiting 207:13 277:9 278:5

walk 186:5 205:13 299:15

walking 184:1, 5,9,12 205:14 218:18 227:9, 15 289:12

Walters 12:11 34:23 135:8,9, 10 153:22 155:1 157:18 190:1,4,6 191:4,15 192:18 195:16, 19 204:7,16 207:4 288:4,5 295:22 296:2

wanted 100:9 123:25 124:11 193:18 248:19 257:18 277:5 279:22

wanting 25:7 27:20 259:1

warrant 230:15

warranted 60:15,17

waste 299:17

watch 14:20,23 22:14 177:19 203:23 267:18

watched 203:6,7 262:1

watching 156:2

Waters 135:8

weapon 84:8, 11,15,17 85:2, 14,25 237:14, 17,22,24 238:2

weapons 84:22

wearing 78:19 118:8 328:6 329:25 330:19 331:7,16

website 55:23 173:18

week 21:17,21, 22 22:19,24 23:20 203:7 220:19 221:20 333:3,4

weeks 219:20 220:1 324:25 333:23

whatsoever 9:7

When's 35:1 59:15

whichever 92:14

white 139:25 268:1

wide 55:6

wife 264:7

willingness 127:1

Willis 308:11, 13 311:3 312:24 313:10 314:12

Willis' 314:21

wires 112:15 113:9 116:20, 21,24 117:8,10 198:21

withdraw 271:8

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

**witnessed** 11:21 295:17

**witnesses** 10:19 19:21 23:14 34:20 43:4 94:11 97:8 99:16,18 106:23 107:17 123:6,11,24 124:14,20,24 126:7,8 133:9, 10,19,25 137:21,25 138:3 141:19 142:1,6 149:1, 8,17 155:19 156:7,10,13,18 157:23 169:13 172:25 186:6 207:4 223:19 227:14,22 267:5 284:19 287:2 288:12, 13 305:14,22

**woke** 301:17

**wondering** 232:4 236:19

**word** 83:25 100:13 158:15 241:19 320:8,9 336:3

**wording** 163:8, 15 277:6

**words** 105:14 146:20,22 217:15 227:4 249:3,6 255:2 258:3

**work** 16:2 45:3 48:2,22 69:24 93:25 109:13 273:11 334:8

**worked** 43:18 45:8 63:8

**working** 10:11 43:25 124:7 128:21 329:9

**works** 200:24

**world** 14:22 29:25

**worn** 77:11,14

**worry** 41:22 144:15

**worrying** 79:16

**would've** 24:19 25:23 26:1 35:2,9,18 36:5,15,25 50:17,18 56:9 57:24 58:1 61:11 235:22

**wound** 185:8 201:9 292:18

**wrap** 130:22

**wrist** 91:5,20, 23 92:15,16

**write** 108:11 150:11,14,20 151:18,21,24 169:16 170:4 171:1,4 180:19 195:3 213:13 219:10,22,25 220:20 221:10, 16 223:13 247:20,21 248:6,9 252:4 278:6,19 289:15 293:1 294:7,9 307:7

**writes** 41:1 284:18 289:8

**writing** 81:13 162:22,25 163:1,5,9 277:3 298:5

**written** 43:13, 14 76:12 128:24 162:19 185:18 194:20 215:3 248:13 279:6 281:11 284:21 298:3 307:12,13

**wrong** 191:5,6

**wrote** 149:5 155:14 169:3,8 170:7 193:10

215:25 247:18 248:3 274:21 278:20 279:8 287:6 294:14, 24 307:15,18 315:25

**X**

**X's** 22:18

**X2** 53:15 54:3, 18 56:18,23,24 57:4,9,12 111:12,14

**X26** 54:2,17 56:18 110:21 111:8,9

**X26p** 110:22, 23,25 111:9,12

**Xs** 280:7

**Y**

**year** 16:13 44:12 45:3,9 50:21 52:20,23 53:1,2 55:24 56:3,7,10 59:25 67:9,20 73:15, 18,21 74:3,18 75:21 80:12 81:6 82:2,18,23 87:22,24 158:9 256:23

**years** 16:15 44:12 47:1 50:16,18 54:21 63:22 75:12 81:25 86:24 293:10

**you-all** 30:7,16 223:8

**younger** 75:14 79:11 87:3





G16L11930  Charles Todero



**Greenwood Police Department**
**Case G16L11930 Internal Revue**

Contents:

A.    GPD Case Report G16L11930
B.    Use of Force Report
C.    Lt. Blackwell's Taser Log
D.    ISP Case Report 16ISPN000286
E.    Time Stamped Radio Traffic List
F.    GFD/Medic Report 16-1602622
G.    Coroner Report MC-16-1209
H.    Autopsy Report
I.    Witness Information Sheet
J.    Ian Godfrey Statement
K.    Roger Poynter Statement
L.    Deborah MacNaughton Statement
M.    Lt. Blackwell Statement
N.    Officer Renee Elliott Statement
O.    Officer Randy Eck Statement
P.    Officer Elizabeth Laut Statement
Q.    Holly Walters Statement
R.    Dr. Chris Hartman Statement
S.    Officer Charles Moyer Statement
T.    Jeannie Moore Statement
U.    Terry Moore Statement.
V.    Timeline of Events
W.    Summary of Facts
X.    Findings
Y.    GPD General Order 86-G-31 (Use of Force/OC Spray/Impact Weapons)
Z.    GPD SOP-40 (Taser Use)
AA.   GPD Taser Training Power Point & Recertification Lesson Plan
BB.   Photos
CC.   Audio/Video Recordings



GPD CASE REPORT

```
/22/16                    Greenwood Police Department                        535
_3:59                       LAW Incident Table:

   Incident
Incident Number  G16L11930   Nature  Mental Subject
     Case Number                          Image  PHO
         Address? N Madison Ave & Camby St
            City Greenwood              State  IN   ZIP  461
            Area LPL23                         Contact  Roger

   Complainant
Numbr  G98N14310
   Last  Poynter                   Fst  Roger           Mid  William
   DOB  ████████   SSN  ████████   Adr? 455 E Broadway St
   Race  W Sx  M Tel  (317)441-7485 Cty  Greenwood      ST  IN ZIP  46143

   Details
   Statute Codes
   Offense Codes  MENT                  Reported  MENT  Observed  MENT
   Circumstances  LT31  TADEP
Rspndg Officers  Elliott R        Blackwell B       Laut E          ?
Rspnsbl Officer  Blackwell B      Agency  GPD        CAD Call ID  160509383
    Received By  Philpott, Ad         Last RadLog  13:31:23 05/29/16    CMPLT
   How Received  9  911 Line          Clearance  CRO  Cleared, Responsible
  When Reported  11:45:38 05/29/16    Disposition  CLO  Disp Date  05/29/16
Occurrd between  11:44:59 05/29/16    Judicial Sts
            and  11:44:59 05/29/16    Misc Entry  BB
             MO

   Narrative
   Narrative  (See below)
   Supplement  1                            E. Laut                        ?

= = = = = = = = = = = = = = = = = = = = = = = = = = = = = = = = = = = = = = =

INVOLVEMENTS:
Type  Record #     Date       Description                    Relationship
 LW   G16L12847   06/09/16    Request Officer                Related Incident
 MM     503316    05/29/16    Godfrey, Ian                   Medic 92 AMR
 NM   G98N5696    05/29/16    Todero, Charles Arthur         involved
 NM   G1N016666   05/29/16    Macnaughton, Deborah           Witness
 NM   G98N14310   05/29/16    Poynter, Roger William         *Complainant
 NM   G98N15366   05/29/16    Walters, Holly L               Witness
 CA   160509383   05/29/16    11:45 05/29/16 Mental Subject  *Initiating Call
 PR   G16P03072   06/22/16    BRO paper bag Vineyard Chur $0 Evidence
 PR   G16P02670   05/29/16    YEL taser taser X26  $800      Evidence
 PR   G16P02671   05/29/16    Cartridge taser x26  $25       Evidence
```

```
Image codes for Incident:
                    Image Codes
Seq Code                      Id Description
  1 PHO  PHOTOGRAPH           Photograph

LAW Incident Offenses Detail:
                    Offense Codes
Seq Code                             Amount
  1 MENT Mental Subject                0.00

LAW Incident Circumstances:
                Contributing Circumstances
Seq Code                             Comments
  1 LT31  Street-Business Area
  2 TADEP Taser Deployed

LAW Incident Responders Detail
    Responding Officers
Seq Name               Unit
  1 Elliott R          G3110
  2 Blackwell B        G3104
  3 Laut E             G3235
  4 Eck R              G3133

Main Radio Log Table:
  me/Date          Typ Unit   Code  Zone  Agnc Description
   :31:23 05/29/16  1  G3133  CMPLT G2    GPD  incid#=G16L11930 Completed cal
   :20:03 05/29/16  f  MD92   CMPLT G912  GFD  (MDC) Completed call incid#=G1
  13:19:51 05/29/16 f  MD92   RETRN G912  GFD  (MDC)  incid#=G16F02622 call=7
  13:10:56 05/29/16 1  G3235  CMPLT G2    GPD  (MDC) Completed call incid#=G1
  12:19:56 05/29/16 1  G3133  ARRVD G2    GPD  incid#=G16L11930 sfs call=781
  12:19:56 05/29/16 1  G3235  ARRVD G2    GPD  incid#=G16L11930 sfs call=781
  12:19:51 05/29/16 f  MD92   HOSP  G912  GFD  (MDC) st francis, call=78f
  12:14:06 05/29/16 f  MD92   ENRTH G912  GFD  (MDC), call=78f
  12:13:47 05/29/16 1  G3133  CMPLT G2    GPD  (MDC) Completed call incid#=G1
  12:11:43 05/29/16 1  G3104  CMPLT G2    GPD  (MDC) Completed call incid#=G1
  12:10:26 05/29/16 1  G3110  CMPLT G2    GPD  incid#=G16L11930 Completed cal
  12:10:16 05/29/16 1  G3110  INSRV G2    GPD  call=781
  12:09:52 05/29/16 1  G3235  ENRT  G2    GPD  St.Francis following medics, c
  12:09:26 05/29/16 1  G3110  BUSY  G2    GPD  FTO G3235, call=781
  12:07:56 05/29/16 1  G3235  ARRVD G2    GPD  (MDC) Arrived on scene incid#=
  12:07:48 05/29/16 f  EG91   ENRTH G912  GFD  (MDC) CHS, call=78f
  12:01:09 05/29/16 f  MD92   ARRVD G912  GFD  (MDC) Arrived on scene incid#=
  12:00:35 05/29/16 f  EG91   ARRVD G912  GFD  (MDC) Arrived on scene incid#=
  11:57:56 05/29/16 1  G3133  DLINQ G1    GPD  MDC: name=TODERO
  11:57:55 05/29/16 1  G3133  NMINQ G1    GPD  MDC: name=TODERO
  11:57:52 05/29/16 f  EG91   ENRT  G912  GFD  (MDC) Enroute to a call incid#
  11:57:33 05/29/16 1  G3133  DLINQ G1    GPD  MDC: name=TEDERO
  11:57:32 05/29/16 1  G3133  NMINQ G1    GPD  MDC: name=TEDERO
```

| ne/Date | Typ | Unit | Code | Zone | Agnc | Description |
|---|---|---|---|---|---|---|
| 11:57:29 05/29/16 | f | MD92 | ENRT | G912 | GFD | (MDC) Enroute to a call incid# |
| 11:57:19 05/29/16 | 1 | G3133 | DLINQ | G1 | GPD | MDC: name=TADERO |
| 11:57:18 05/29/16 | 1 | G3133 | NMINQ | G1 | GPD | MDC: name=TADERO |
| 11:56:19 05/29/16 | f | EG91 | DISP | G912 | GFD | incid#=G16F02622 Unit Has Been |
| 11:56:19 05/29/16 | f | MD92 | DISP | G912 | GFD | incid#=G16F02622 Unit Has Been |
| 11:55:36 05/29/16 | 1 | G3133 | ARRVD | G2 | GPD | incid#=G16L11930 Arrived on sc |
| 11:53:28 05/29/16 | 1 | G3110 | ENRT | G2 | GPD | incid#=G16L11930 Enroute to a |
| 11:52:01 05/29/16 | 1 | G3133 | ENRT | G2 | GPD | incid#=G16L11930 Enroute to a |
| 11:51:45 05/29/16 | 1 | G3110 | CMPLT | G2 | GPD | incid#=G16L11930 Reassigned to |
| 11:50:24 05/29/16 | 1 | G3104 | ARRVD | G2 | GPD | incid#=G16L11930 Arrived on sc |
| 11:50:22 05/29/16 | 1 | G3235 | ENRT | G2 | GPD | incid#=G16L11930 Enroute to a |
| 11:46:14 05/29/16 | 1 | G3104 | ENRT | G2 | GPD | incid#=G16L11930 Enroute to a |
| 11:46:14 05/29/16 | 1 | G3110 | ENRT | G2 | GPD | incid#=G16L11930 Enroute to a |

Narrative:

Subject "attempting suicide" by walking in traffic. Taken to hospital.

```
Law Supplemental Narrative:
                                      Supplemental Narratives
Seq Name                 Date                   Narrative
  1 Blackwell B          16:43:31 05/29/16
1
```

Law Supplemental Narrative:

|  |  |  | Supplemental Narratives |
|---|---|---|---|
| Seq | Name | Date | Narrative |
| 2 | Laut E | 16:44:59 05/29/16 | |

E. Laut

```
Law Supplemental Narrative:
                               Supplemental Narratives
Seq Name              Date                    Narrative
   3 Elliott R        17:06:13 05/29/16
```

Law Supplemental Narrative:

                              Supplemental Narratives
Seq Name                Date                    Narrative
  4 Laut E              16:45:29 05/29/16
Supplemental Reporting Officer: E. Laut     Date: Sun May 29 16:46:17 EDT 2016

At approximately 11:50 am I was north bound on Madison Ave and Officer Blackwell
said he had a resister and that a Taser was deployed. When I arrived on scene I
spoke with a witness, Holly Walters. Holly stated that she had pulled over when
she saw that Officer. Blackwell was talking to Charles Todero. Holly stated that
she got out of her car in order to help Blackwell because she noticed that he
was alone. Holly then said "I heard him [Blackwell] tell him to stop walking in
the road several times. He [Blackwell] said that he was going to taser him and
told him to stop moving. When the guy kept goin he got him with the Taser"

I then assisted Officer Blackwell and Officer Elliott with the apprehension of
Charles. Charles was on the ground and refusing to give his hands to the any of
the officers. Blackwell kept instructing Charles to give him his hands while
Elliott and I tried to pull his hands out from underneath him. Once all three of
us were attempting to handcuff him we were able to get his hands out from
underneath him.

After Charles was handcuffed we had him sit on his back, against the curb and
waited for paramedics to arrive. Once the paramedics were on the scene Charles
..s placed on a stretcher and put in the ambulance.


EOR

Law Supplemental Narrative:
                              Supplemental Narratives
Seq Name                Date                   Narrative
  5 Elliott R           17:06:23 05/29/16
Supplemental Reporting Officer: Elliott R  Date: Sun May 29 17:06:35 EDT 2016

I was riding with Officer E. Laut northbound on Madison Ave.  Lt. Blackwell was
investigating a mental subject walking in front of vehicles on Madison Ave., and
he reported that he deployed his taser and wanted assistance.  We stopped about
30 seconds after his request.

I saw Lt. Blackwell standing in the northbound lane and the male, Todero had the
taser prongs in his back.  He was laying on his stomach and he was not complying
with Lt. Blackwell's commands to get his hands out and place them behind his
back.  I immediately grabbed my handcuffs and I was able to get Todero's right
arm and place a handcuff on the wrist, leaving an area open the width of my
thumb.  Todero was yelling that he was Jesus Christ, and a prophet.  He was
being ordered to place his other hand behind his back, and he kept it under his
body, so Lt. Blackwell tased him a few more times.  I was then able to roll
Tadero with the help of Officer E. Laut, and get the handcuff on his other
wrist, leaving an area the width of my thumb.  Once Todero was handcuffed, he
rolled over on his back, and we waited for paramedics.

The paramedics tried to take the prong from the Taser out, but it was deep, and
was left in until he arrived at the hospital.  He was placed on the gurney,
ing on his left side, and transported to the hospital.  end of report

Law Supplemental Narrative:

Supplemental Narratives

| Seq | Name | Date | Narrative |
|-----|------|------|-----------|
| 6 | Blackwell B | 17:24:58 05/29/16 | |

On May 29, 2016 I responded to the area of Madison Avenue, south of Fry Road, reference a subject wearing a white t-shirt "attempting suicide" by walking into traffic. Two recorded calls were made from Roger Poynter and Deb Macnaughton who both reported the man's strange and dangerous behavior. Macnaughton advised me later that the man crossed the road directly in front of her and she had to swerve to keep from striking him. She also stated that the car behind her had to brake and then honked their horn at the man. When I arrived, I observed the man sitting on the roadside curb just north of Camby Street. The moment I pulled drove up to the man, that I knew to be Charles Todero, he held up a bible in front of him as if
he was reading it. I asked Charles if he was alright and he replied, "I am Jesus Christ." Charles had no emotion and his face was void of any expression. I asked Charles again if it was okay and if he needed assistance.  Charles then replied that he was Jesus Christ the Profit.

He then stood up began walking northbound on Madison Avenue next to the curb. I ordered  Charles to sit down on the curb to avoid an vehicular traffic but he continued walking with the Bible out in front of him. I then extracted my Taser X26 from my holster and order him again to get out of the roadway and sit on the curb or I would tase him.  Charles began stating his name was Jesus Christ and ontinued walking but this time he angled towards his left into the northbound affic. I placed my left hand on his left shoulder and again told him to sit ▒wn or he would be tased. He continued walking and I then deployed my Taser X26. Charles went down to his knees and while struggling with the Taser deployment, held the bible
Up in front of him and stated again that he was Jesus Christ the Profit. I have used the Taser  X26 in the past and thought this to be an unusual reaction due to lack of
compliance and the continued ability to move his arms voluntarily. I gave Charles verbal orders to do to the ground But he refused. I gave another 5 second application and continued with verbal direction with no Compliance. Charles still would not lay face down as directed and attempted to stand up. I told Charles that he was going to get tased again of he didn't lay on the ground with his hands
Behind his back. He stated that he was Jesus Christ again and another application was administered. This failure to comply continued. Moments later, I observed that
one of the prongs was caught up in his shirt and was not actually making contact with his skin and therefore the Taser was not working to its full potential to cause compliance. Charles continued to refused orders and attempted to stand up again. Due to his suicidal and erratically behavior, along with greater than normal strength,  I applied another application, this time Connecting the Taser to his thigh so the circuit could be completed and the Taser was more effective. This time Charles went to the ground but placed his arms underneath his chest. A female motorist, Holly Walters, pulled over and asked if she could assist me in any way. I asked Holly to please stand by and just observe to assist in witnessing Charles' behavior in the event someone questioned our police response to this incident.

▒ficer Renee Elliott and Officer Elizabeth Laut arrived and Officer Elliott ▒tempted to handcuff Charles. Elliott gave Charles verbal instructions to give ▒▒ his hands but he refused and rather stiffened his arms in resistance. I administered another application with the taser but this had little effect on

arles. Elliott was able to get one arm out from under Charles but he would not give her the other arm. Charles continued to resist by stiffening his arm and leaving it under his chest. I told Charles that he was going to get tased again if he didn't comply. He refused and another application was given. This continued for about a minute or 2 before the other hand was retrieved and Charles was secured. Medics arrived and

Ian Godfrey, Medic 92 AMR (513-649-5169) was witness to Charles' behavior. Charles had to be lifted onto the cot and secured with safety belts. He was then transported to St. Francis Hospital where he was under Care of Dr. Chris Hartman, MD.  Godfrey stated that Charles was verbally abusive most of the trip and calling them all fucking pussies and other Profanity.

Law Supplemental Narrative:

Supplemental Narratives
Seq Name              Date              Narrative
  8 Ison J            11:03:44 06/22/16
Supplemental Narrative: Wed Jun 22 11:13:20 EDT 2016

On June 22, 2016 while conducting an internal review of this case, I interviewed Reserve Officer Charles Moyer.  Officer Moyer informed me that on May 29, 2016 while working security at the Vineyard Church, he came into contact with Charles Todero.  Officer Moyer stated that Todero was causing a disturbance, and that employees of the church wanted him to leave.  Officer Moyer stated that after asking Todero to leave, a church employee gave him a paper bag containing some of Todero's personal belongings.  Officer Moyer stated that the church employee informed him that Todero had been trying to light his belongings on fire.

The brown paper bag had a Vineyard Church sticker affixed to it.  Inside the bag were the following items:  1 black bi-fold wallet, 1 burnt Indiana Drivers Licesne (Charles Todero), 1 burn business card (Chris Clay Administrative Pastor at the Vineyard Church), 1 social security card (Charles Todero), 1 Hoosier Works card (Charles Todero), 1 Outback Steakhouse gift card, 2 business cards, 1 paper receipt, and 1 bic lighter.

These items were photographed and placed into GPD evidence.

USE OF FORCE REPORT

USE OF FORCE REPORT

Incident Number:   G16L11930

Date:  May 30, 2016

Location of Incident:     Madison Avenue and Camby Street

Reporting Officer:  Lt. Brian Blackwell     Officer Injured:   NO

Officer Deploying Taser:  Lt. Brian Blackwell

Officer(s) Involved:

1.   R. Elliott

2.   E. Laut

3.   R. Eck

Reason for officer(s)response to the location:

Multiple calls to dispatch of a man attempting to commit suicide by walking into traffic.

Criminal charges against suspect:

None at this time. It is priority that the suspect get medical and mental assistance before evaluating criminal charges.

Suspect's Name:  Charles A. Todero
DOB:
SSN:
Race:   white

Suspect Impaired:  YES   Alcohol: _____   Narcotics: XXX   UNKNOWN: _____

Suspect injured prior to officer's arrival:  YES (minor bruising on knees)

Suspect injured during arrest:  No signs of injuries other than taser prong entries into skin.

Was suspect transported to hospital:  YES

Was Taser used:  YES

Was cartridge deployed: YES

Who removed probes:  Emergency Room Personal

Was drive stun technique used:  NO

Witnesses to incident:

Name:      Holly L. Walters
Address:   1224 N Capital, Indpls, 46227
Telephone: 765-277-0414

Name:      Deborah Macnaughton
Address:   1342 Hamilton Drive, Greenwood, 46143
Telephone: 341-5247

Name:      Roger W. Poynter
Address:   455 E. Broadway, Greenwood, 46143
Telephone: 441-7485

Name:      Ian Godfrey
Address:   Greenwood Fire Station 92 Medic

List specifically all statements or actions by suspect before officer action
was taken.  list specifically what actions were taken by the officer(s) in
response to the suspects actions:

On May 29, 2016 I responded to the area of Madison Avenue, south of Fry Road,
reference a subject wearing a white t-shirt "attempting suicide" by walking
into traffic. Two recorded calls were made from Roger Poynter and Deb
Macnaughton who both reported the man's strange and dangerous behavior.
Macnaughton advised me later that the man crossed the road directly in front of
her and she had to swerve to keep from striking him. She also stated that the
car behind her had to brake and then honked their horn at the man. When I
arrived, I  observed the man sitting on the roadside curb just north of Camby
Street. The moment I pulled  drove up to the man, that I knew to be Charles
Jodero, he held up a bible in front of him as if
he was reading it. I asked Charles if he was alright and he replied, "I am Jesus
Christ." Charles had no emotion and his face was void of any expression. I
asked Charles again if was okay and if he needed assistance.  Charles then
replied that he was Jesus Christ the Profit.

He then stood up began walking northbound on Madison Avenue next to the curb. I
ordered  Charles to sit down on the curb to avoid an vehicular traffic but he
continued walking with the Bible out in front of him. I then extracted my Taser
X26 from my holster and order him again to get out of the roadway and sit on
the curb or I would tase him.  Charles began stating his name was Jesus Christ
and continued walking but this time he angled towards his left into the
northbound traffic. I placed my left hand on his left shoulder and again told
him to sit down or he would be tased. He continued walking and I then deployed
my Taser X26. Charles went down to his knees and while struggling with the
Taser deployment, held the bible
Up in front of him and stated again that he was Jesus Christ the Profit. I have
used the Taser  X26 in the past and thought this to be an unusual reaction due
to lack of
compliance and the continued ability to move his arms voluntarly. I gave
Charles verbal orders to do to the ground But he refused. I gave another 5
second application and continued with verbal direction with no Compliance.
Charles still would not lay face down as directed and attempted to stand up. I
told Charles that he was going to get tased again of he didn't lay on the

ground with his hands
Behind his back. He stated that he was Jesus Christ again and another
application was administered. This failure to comply continued. Moments later,
I observed that
one of the prongs was caught up in his shirt and was not actually making
contact with his skin and therefore the Taser was not working to its full
potential to cause compliance. Charles continued to refused orders and
attempted to stand up again. Due to his suicidal and erratically behavior,
along with greater than normal strength,  I applied another application, this
time Connecting the Taser to his thigh so the circuit could be completed and
the Taser was more effective.  This time Charles went to the ground but placed
his arms underneath his chest. A female motorist, Holly Walters, pulled over
and asked if she could assist me in any way. I asked Holly to please stand by
and just observe to assist in witnessing Charles' behavior in the event someone
questioned our police response to this incident.

Officer Renee Elliott and Officer Elizabeth Laut arrived and Officer Elliott
attempted to handcuff Charles. Elliott gave Charles verbal instructions to give
her his hands but he refused and rather stiffened his arms in resistance. I
administered another application with the taser but this had little effect on
Charles. Elliott was able to get one arm out from under Charles but he would
not give her the other arm. Charles continued to resist by stiffening his arm
and leaving it under his chest. I told Charles that he was going to get tased
again if he didn't comply. He refused and another application was given. This
continued for about a minute or 2 before the other hand was retrieved and
Charles was secured. Medics arrived and
Ian Godfrey, Medic 92 AMR (513-649-5169) was witness to Charles' behavior.
Charles had to be lifted onto the cot and secured with safety belts. He was
then transported to St. Francis Hospital where he was under Care of Dr. Chris
Hartman, MD.  Godfrey stated that Charles was verbally abusive most of the trip
and calling them all fucking pussies and other Profanity.


Shift Supervisor:
Date/Time:

LT. BLACKWELL G
TASER LOG

Chief John Laut,

It should be noted that during the course of my investigation I found Lt. Blackwell's taser usage log to be approximately 3:52 faster than the Spillman time stamp.  This was calculated by subtracting the Spillman time at which Lt. Blackwell advised that his taser had been deployed from the first trigger pull on the taser usage log.  I was informed by Sgt. Jason Holtzleiter that upon each data download the taser will sync with Spillman time.  Sgt. Holtzleiter informed me that when he downloaded the data from Lt. Blackwell's taser on May 31, 2016 he did not verify that the taser time was the same as the Spillman time.  On June 21, 2016 I requested Sgt. Holtzleiter re-sync Lt. Blackwell's taser time with Spillman time. Sgt. Holtzleiter advised that since the last down load and sync on May 31st, the taser had gained 45 seconds on Spillman time.

James Ison

| | |
|---|---|
| :om: | Jason Holtzleiter <holtzlej@greenwood.in.gov> |
| Sent: | Tuesday, June 21, 2016 8:30 AM |
| To: | James Ison |
| Subject: | Emailing - TASER_X26_X00-730387_offline.pdf |
| Attachments: | TASER_X26_X00-730387_offline.pdf |

I pulled the trigger on the Taser when the Spillman clocked turned 8:27am exactly.  The Taser log shows that the trigger was activated at 8:27:45 am, which is about 45 seconds off.

1

 **TASER** P R O T E C T   L I F E

# EVIDENCE①SYNC

| TASER Information | | Offline Report | |
|---|---|---|---|
| Serial | X00-730387 | Local Timezone | Eastern Standard Time (UTC -04:00) |
| Model | TASER X26 | Generated On | 31 May 2016 07:34:20 |
| Firmware Version | Rev. 24 | | |
| Application Version | 3.12.48 | | |

## Device (X26)

| Seq # | Local Time [DD:MM:YYYY hh:mm:ss] | Event [Event Type] | Duration [Seconds] | Temp [Degrees Celcius] | Batt Remaining [%] | |
|---|---|---|---|---|---|---|
| 1 | Invalid Date/Time | Sync | Invalid Date/Time to Invalid Date/Time | | | |
| 2 | 16 Oct 2013 17:56:41 | Sync | 16 Oct 2013 17:56:41 to 16 Oct 2013 17:56:41 | | | |
| 3 | 16 Oct 2013 17:57:29 | Trigger | 5 | 27 | 99 | |
| 4 | 16 Oct 2013 17:57:36 | Trigger | 5 | 27 | 99 | |
| 5 | 16 Oct 2013 17:57:43 | Trigger | 5 | 28 | 99 | |
| 6 | 08 Jan 2014 15:11:41 | Trigger | 1 | 21 | 98 | |
| 7 | 08 Jan 2014 15:13:32 | Trigger | 1 | 22 | 98 | |
| 8 | 13 Jan 2014 17:50:38 | Trigger | 1 | 21 | 98 | |
| 9 | 19 Jan 2014 04:45:27 | Trigger | 1 | 19 | 98 | |
| 10 | 22 Jan 2014 18:01:37 | Trigger | 1 | 20 | 97 | |
| 11 | 23 Jan 2014 05:59:41 | Trigger | 1 | 20 | 97 | |
| 12 | 23 Jan 2014 17:43:35 | Trigger | 1 | 21 | 97 | |
| 13 | 23 Jan 2014 19:09:04 | Trigger | 1 | 14 | 97 | |
| 14 | 27 Jan 2014 17:49:46 | Trigger | 1 | 20 | 97 | |
| 15 | 28 Jan 2014 22:09:20 | Trigger | 1 | 24 | 97 | |
| 16 | 31 Jan 2014 18:07:15 | Trigger | 1 | 20 | 97 | |
| 17 | 01 Feb 2014 05:51:10 | Trigger | 1 | 22 | 97 | |
| 18 | 01 Feb 2014 18:06:01 | Trigger | 1 | 21 | 97 | |
| 19 | 05 Feb 2014 18:06:45 | Trigger | 1 | 19 | 97 | |
| 20 | 06 Feb 2014 20:41:11 | Trigger | 1 | 20 | 97 | |
| 21 | 09 Feb 2014 16:43:19 | Trigger | 1 | 20 | 96 | |
| 22 | 09 Feb 2014 16:43:22 | Trigger | 2 | 20 | 96 | |
| 23 | 10 Feb 2014 15:25:40 | Trigger | 1 | 22 | 96 | |
| 24 | 11 Feb 2014 18:12:48 | Trigger | 1 | 20 | 96 | |
| 25 | 14 Feb 2014 23:49:42 | Trigger | 1 | 23 | 96 | |
| 26 | 15 Feb 2014 18:09:10 | Trigger | 1 | 21 | 96 | |
| 27 | 19 Feb 2014 16:55:11 | Trigger | 1 | 20 | 96 | |
| 28 | 25 Feb 2014 17:50:25 | Trigger | 1 | 21 | 96 | |
| 29 | 01 Mar 2014 17:54:26 | Trigger | 1 | 20 | 96 | |
| 30 | 01 Mar 2014 17:54:37 | Trigger | 3 | 21 | 95 | |
| 31 | 02 Mar 2014 18:05:00 | Trigger | 1 | 21 | 95 | |
| 32 | 02 Mar 2014 20:09:55 | Trigger | 1 | 26 | 95 | Page 1 of 4 |
| 33 | 05 Mar 2014 18:06:58 | Trigger | 1 | 21 | 95 | |
| 34 | 06 Mar 2014 18:13:15 | Trigger | 1 | 22 | 95 | |
| 35 | 10 Mar 2014 17:59:24 | Trigger | 2 | 20 | 95 | |
| 36 | 11 Mar 2014 17:56:01 | Trigger | 2 | 21 | 95 | |
| 37 | 15 Mar 2014 17:19:56 | Trigger | 2 | 21 | 94 | |
| 38 | 16 Mar 2014 18:16:00 | Trigger | 2 | 18 | 94 | |
| 39 | 19 Mar 2014 18:05:01 | Trigger | 2 | 21 | 94 | |
| 40 | 20 Mar 2014 18:06:11 | Trigger | 1 | 21 | 94 | |
| 41 | 25 Mar 2014 18:07:34 | Trigger | 1 | 20 | 94 | |
| 42 | 30 Mar 2014 18:03:54 | Trigger | 2 | 21 | 94 | |
| 43 | 02 Apr 2014 17:57:45 | Trigger | 1 | 21 | 94 | |

| Seq # | Local Time [DD:MM:YYYY hh:mm:ss] | Event [Event Type] | Duration [Seconds] | Temp [Degrees Celcius] | Batt Remaining [%] |
|---|---|---|---|---|---|
| 4 | 03 Apr 2014 18:06:08 | Trigger | 1 | 21 | 93 |
| 45 | 07 Apr 2014 18:03:40 | Trigger | 1 | 19 | 93 |
| 46 | 08 Apr 2014 18:11:01 | Trigger | 1 | 22 | 93 |
| 47 | 11 Apr 2014 22:40:35 | Trigger | 1 | 25 | 93 |
| 48 | 12 Apr 2014 18:05:35 | Trigger | 2 | 24 | 93 |
| 49 | 13 Apr 2014 18:09:05 | Trigger | 1 | 23 | 93 |
| 50 | 17 Apr 2014 18:23:04 | Trigger | 1 | 22 | 93 |
| 51 | 21 Apr 2014 18:03:26 | Trigger | 2 | 21 | 93 |
| 52 | 22 Apr 2014 23:29:01 | Trigger | 1 | 25 | 92 |
| 53 | 26 Apr 2014 18:03:57 | Trigger | 1 | 23 | 92 |
| 54 | 05 May 2014 18:14:55 | Trigger | 2 | 23 | 92 |
| 55 | 06 May 2014 18:11:08 | Trigger | 2 | 23 | 92 |
| 56 | 10 May 2014 17:07:37 | Trigger | 2 | 21 | 92 |
| 57 | 14 May 2014 18:15:05 | Trigger | 1 | 22 | 92 |
| 58 | 15 May 2014 18:13:42 | Trigger | 1 | 21 | 92 |
| 59 | 19 May 2014 20:12:08 | Trigger | 2 | 27 | 92 |
| 60 | 20 May 2014 18:03:15 | Trigger | 1 | 24 | 91 |
| 61 | 02 Jun 2014 18:10:59 | Trigger | 2 | 20 | 91 |
| 62 | 06 Jun 2014 18:07:46 | Trigger | 2 | 20 | 91 |
| 63 | 07 Jun 2014 18:09:07 | Trigger | 2 | 20 | 91 |
| 64 | 08 Jun 2014 18:05:01 | Trigger | 1 | 20 | 91 |
| 65 | 08 Jun 2014 18:05:05 | Trigger | 1 | 20 | 91 |
| 66 | 08 Jun 2014 18:05:11 | Trigger | 1 | 20 | 90 |
| 67 | 12 Jun 2014 04:09:56 | Trigger | 2 | 23 | 90 |
| 68 | 16 Jun 2014 21:53:45 | Trigger | 1 | 27 | 90 |
| 69 | 17 Jun 2014 15:05:59 | Trigger | 1 | 27 | 90 |
| 0 | 21 Jun 2014 17:57:02 | Trigger | 2 | 19 | 90 |
| 71 | 22 Jun 2014 18:04:12 | Trigger | 2 | 19 | 90 |
| 72 | 22 Jun 2014 21:32:43 | Trigger | 1 | 27 | 90 |
| 73 | 23 Jun 2014 00:31:10 | Trigger | 3 | 29 | 90 |
| 74 | 25 Jun 2014 18:02:09 | Trigger | 1 | 20 | 89 |
| 75 | 25 Jun 2014 19:24:35 | Trigger | 1 | 26 | 89 |
| 76 | 25 Jun 2014 19:15:51 | Sync | 25 Jun 2014 19:25:08 to 25 Jun 2014 19:15:51 | | |
| 77 | 04 Jul 2014 17:47:36 | Trigger | 2 | 20 | 89 |
| 78 | 05 Jul 2014 17:52:10 | Trigger | 1 | 23 | 89 |
| 79 | 09 Jul 2014 18:04:46 | Trigger | 1 | 20 | 89 |
| 80 | 10 Jul 2014 17:44:34 | Trigger | 1 | 20 | 89 |
| 81 | 15 Jul 2014 17:57:57 | Trigger | 2 | 21 | 89 |
| 82 | 19 Jul 2014 17:54:17 | Trigger | 1 | 23 | 88 |
| 83 | 28 Jul 2014 17:56:13 | Trigger | 1 | 23 | 88 |
| 84 | 29 Jul 2014 17:58:02 | Trigger | 1 | 22 | 88 |
| 85 | 31 Jul 2014 11:01:45 | Trigger | 1 | 23 | 88 |
| 86 | 02 Aug 2014 18:05:55 | Trigger | 1 | 20 | 88 |
| 87 | 06 Aug 2014 17:28:01 | Trigger | 1 | 20 | 88 |
| 88 | 07 Aug 2014 17:54:18 | Trigger | 1 | 20 | 88 |
| 89 | 11 Aug 2014 20:33:21 | Trigger | 2 | 20 | 88 |
| 90 | 16 Aug 2014 16:30:30 | Trigger | 2 | 23 | 88 |
| 91 | 21 Aug 2014 18:00:53 | Trigger | 1 | 20 | 87 |
| 92 | 22 Aug 2014 00:42:18 | Trigger | 2 | 26 | 87 |
| 93 | 30 Aug 2014 17:52:18 | Trigger | 1 | 21 | 87 |
| 94 | 04 Sep 2014 18:28:45 | Trigger | 1 | 26 | 87 |
| 95 | 04 Sep 2014 18:35:06 | Trigger | 1 | 27 | 87 |
| 96 | 04 Sep 2014 18:35:43 | Trigger | 1 | 27 | 97 |
| 7 | 04 Sep 2014 18:35:45 | Trigger | 1 | 27 | 97 |
| 98 | 26 Jan 2015 17:58:39 | Trigger | 2 | 21 | 86 |
| 99 | 30 Jan 2015 22:30:09 | Trigger | 1 | 22 | 86 |
| 100 | 05 Feb 2015 16:56:58 | Trigger | 2 | 21 | 86 |
| 101 | 05 Feb 2015 17:19:10 | Trigger | 1 | 22 | 86 |

Page 2 of 4

| Seq # | Local Time [DD:MM:YYYY hh:mm:ss] | Event [Event Type] | Duration [Seconds] | Temp [Degrees Celcius] | Batt Remaining [%] |
|---|---|---|---|---|---|
| 102 | 09 Feb 2015 17:49:11 | Trigger | 1 | 21 | 85 |
| 103 | 13 Feb 2015 18:00:42 | Trigger | 2 | 20 | 85 |
| 104 | 14 Feb 2015 18:02:44 | Trigger | 1 | 20 | 85 |
| 105 | 20 Feb 2015 08:01:58 | Trigger | 1 | -7 | 85 |
| 106 | 20 Feb 2015 08:03:34 | Trigger | 1 | -4 | 85 |
| 107 | 20 Feb 2015 07:55:15 | Sync | 20 Feb 2015 08:04:10 to 20 Feb 2015 07:55:15 | | |
| 108 | 20 Feb 2015 07:56:47 | Trigger | 1 | 4 | 85 |
| 109 | 22 Feb 2015 02:10:12 | Trigger | 1 | 20 | 85 |
| 110 | 24 Feb 2015 18:08:52 | Trigger | 1 | 20 | 85 |
| 111 | 09 Mar 2015 17:53:32 | Trigger | 1 | 20 | 84 |
| 112 | 14 Mar 2015 18:07:44 | Trigger | 1 | 21 | 84 |
| 113 | 19 Mar 2015 18:04:40 | Trigger | 1 | 21 | 84 |
| 114 | 23 Mar 2015 22:28:13 | Trigger | 1 | 26 | 84 |
| 115 | 29 Mar 2015 23:29:25 | Trigger | 1 | 26 | 84 |
| 116 | 01 Apr 2015 18:02:07 | Trigger | 1 | 21 | 84 |
| 117 | 07 Apr 2015 17:55:47 | Trigger | 1 | 20 | 84 |
| 118 | 11 Apr 2015 18:01:53 | Trigger | 1 | 22 | 84 |
| 119 | 15 Apr 2015 18:02:05 | Trigger | 1 | 21 | 83 |
| 120 | 16 Apr 2015 18:08:08 | Trigger | 5 | 22 | 83 |
| 121 | 25 Apr 2015 16:29:07 | Trigger | 1 | 21 | 83 |
| 122 | 29 Apr 2015 18:02:24 | Trigger | 5 | 22 | 83 |
| 123 | 05 May 2015 17:55:12 | Trigger | 2 | 25 | 82 |
| 124 | 08 May 2015 19:21:30 | Trigger | 5 | 20 | 82 |
| 125 | 10 May 2015 17:54:21 | Trigger | 5 | 20 | 82 |
| 126 | 10 May 2015 21:45:30 | Trigger | 5 | 28 | 81 |
| 127 | 14 May 2015 17:58:57 | Trigger | 1 | 22 | 81 |
| 128 | 19 May 2015 17:57:56 | Trigger | 3 | 21 | 81 |
| 129 | 01 Jun 2015 17:59:28 | Trigger | 5 | 20 | 80 |
| 130 | 15 Jun 2015 17:47:14 | Trigger | 3 | 20 | 80 |
| 131 | 19 Jun 2015 18:00:08 | Trigger | 2 | 20 | 79 |
| 132 | 19 Jun 2015 22:11:13 | Trigger | 2 | 25 | 79 |
| 133 | 19 Jun 2015 22:11:32 | Trigger | 5 | 26 | 79 |
| 134 | 24 Jun 2015 17:59:56 | Trigger | 2 | 20 | 79 |
| 135 | 25 Jun 2015 17:57:49 | Trigger | 2 | 20 | 78 |
| 136 | 03 Jul 2015 17:57:16 | Trigger | 1 | 20 | 78 |
| 137 | 08 Jul 2015 17:55:01 | Trigger | 1 | 21 | 78 |
| 138 | 09 Jul 2015 18:00:56 | Trigger | 1 | 21 | 78 |
| 139 | 13 Jul 2015 18:04:17 | Trigger | 2 | 20 | 78 |
| 140 | 22 Jul 2015 17:58:37 | Trigger | 2 | 20 | 78 |
| 141 | 31 Jul 2015 17:54:20 | Trigger | 2 | 19 | 77 |
| 142 | 18 Aug 2015 06:54:30 | Trigger | 5 | 21 | 77 |
| 143 | 29 Aug 2015 18:02:06 | Trigger | 2 | 19 | 77 |
| 144 | 02 Sep 2015 17:54:40 | Trigger | 3 | 19 | 76 |
| 145 | 11 Sep 2015 17:55:37 | Trigger | 3 | 22 | 76 |
| 146 | 13 Sep 2015 17:59:31 | Trigger | 2 | 22 | 76 |
| 147 | 21 Sep 2015 18:07:55 | Trigger | 2 | 22 | 76 |
| 148 | 26 Sep 2015 18:03:02 | Trigger | 5 | 21 | 75 |
| 149 | 09 Oct 2015 18:04:53 | Trigger | 2 | 22 | 75 |
| 150 | 10 Oct 2015 18:08:58 | Trigger | 5 | 22 | 75 |
| 151 | 10 Oct 2015 20:20:01 | Trigger | 5 | 27 | 74 |
| 152 | 10 Oct 2015 20:20:11 | Trigger | 5 | 27 | 74 |
| 153 | 19 Oct 2015 17:58:07 | Trigger | 2 | 21 | 73 |
| 154 | 24 Oct 2015 17:53:13 | Trigger | 5 | 23 | 73 |
| 155 | 28 Oct 2015 18:05:13 | Trigger | 3 | 20 | 73 |
| 156 | 29 Oct 2015 19:25:54 | Trigger | 5 | 22 | 73 |
| 157 | 02 Nov 2015 18:14:10 | Trigger | 5 | 22 | 72 |
| 158 | 03 Nov 2015 18:10:48 | Trigger | 5 | 23 | 72 |
| 159 | 06 Nov 2015 16:51:35 | Trigger | 5 | 23 | 71 |

Page 3 of 4

| Seq # | Local Time [DD:MM:YYYY hh:mm:ss] | Event [Event Type] | Duration [Seconds] | Temp [Degrees Celcius] | Batt Remaining [%] |
|---|---|---|---|---|---|
| 160 | 30 Nov 2015 17:45:36 | Trigger | 5 | 21 | 71 |
| 161 | 01 Dec 2015 17:56:47 | Trigger | 5 | 21 | 70 |
| 162 | 04 Dec 2015 18:03:58 | Trigger | 5 | 21 | 70 |
| 163 | 10 Dec 2015 18:05:54 | Trigger | 5 | 21 | 70 |
| 164 | 06 Jan 2016 21:47:46 | Trigger | 5 | 23 | 69 |
| 165 | 12 Jan 2016 18:06:15 | Trigger | 5 | 21 | 68 |
| 166 | 19 Jan 2016 05:58:29 | Trigger | 5 | 20 | 68 |
| 167 | 24 Jan 2016 05:59:56 | Trigger | 5 | 20 | 68 |
| 168 | 27 Jan 2016 17:43:34 | Trigger | 5 | 23 | 67 |
| 169 | 28 Jan 2016 18:53:42 | Trigger | 2 | 24 | 67 |
| 170 | 05 Feb 2016 06:07:36 | Trigger | 5 | 20 | 66 |
| 171 | 06 Feb 2016 12:06:57 | Trigger | 3 | 23 | 66 |
| 172 | 11 Feb 2016 06:13:24 | Trigger | 4 | 20 | 66 |
| 173 | 11 Feb 2016 08:14:31 | Trigger | 2 | 22 | 65 |
| 174 | 11 Feb 2016 08:14:35 | Trigger | 2 | 22 | 65 |
| 175 | 11 Feb 2016 08:14:44 | Trigger | 2 | 22 | 65 |
| 176 | 11 Feb 2016 08:54:48 | Trigger | 5 | 27 | 65 |
| 177 | 11 Feb 2016 08:56:42 | Trigger | 5 | 27 | 65 |
| 178 | 11 Feb 2016 08:57:56 | Trigger | 5 | 28 | 64 |
| 179 | 17 Feb 2016 13:41:26 | Trigger | 5 | 20 | 64 |
| 180 | 17 Feb 2016 13:59:01 | Sync | 17 Feb 2016 14:12:24 to 17 Feb 2016 13:59:01 | | |
| 181 | 24 Feb 2016 05:55:44 | Trigger | 5 | 20 | 63 |
| 182 | 09 Mar 2016 15:25:52 | Trigger | 1 | 27 | 63 |
| 183 | 09 Mar 2016 15:25:58 | Trigger | 1 | 27 | 63 |
| 184 | 18 Mar 2016 06:04:48 | Trigger | 3 | 20 | 63 |
| 185 | 20 Mar 2016 05:58:42 | Trigger | 2 | 21 | 62 |
| 86 | 03 Apr 2016 05:59:26 | Trigger | 5 | 20 | 62 |
| 187 | 26 Apr 2016 05:54:12 | Trigger | 5 | 20 | 62 |
| 188 | 09 May 2016 05:57:33 | Trigger | 5 | 20 | 61 |
| 189 | 24 May 2016 05:53:04 | Trigger | 3 | 20 | 61 |
| 190 | 29 May 2016 11:56:00 | Trigger | 5 | 25 | 60 |
| 191 | 29 May 2016 11:56:15 | Trigger | 12 | 26 | 60 |
| 192 | 29 May 2016 11:56:27 | Trigger | 10 | 27 | 59 |
| 193 | 29 May 2016 11:56:41 | Trigger | 13 | 29 | 58 |
| 194 | 29 May 2016 11:56:55 | Trigger | 5 | 29 | 57 |
| 195 | 29 May 2016 11:57:02 | Trigger | 2 | 30 | 57 |
| 196 | 29 May 2016 11:57:14 | Trigger | 8 | 30 | 57 |
| 197 | 29 May 2016 11:57:21 | Trigger | 5 | 31 | 56 |
| 198 | 29 May 2016 11:57:33 | Trigger | 5 | 32 | 56 |
| 199 | 29 May 2016 11:57:39 | Trigger | 5 | 32 | 55 |
| 200 | 29 May 2016 11:57:47 | Trigger | 5 | 32 | 55 |
| 201 | 29 May 2016 11:57:53 | Trigger | 5 | 33 | 55 |
| 202 | 29 May 2016 11:58:11 | Trigger | 5 | 34 | 54 |
| 203 | 29 May 2016 11:58:20 | Trigger | 5 | 34 | 54 |
| 204 | 29 May 2016 11:58:30 | Trigger | 3 | 34 | 54 |
| 205 | 29 May 2016 11:59:10 | Trigger | 5 | 34 | 53 |
| 206 | 31 May 2016 07:32:37 | Sync | 31 May 2016 07:36:31 to 31 May 2016 07:32:37 | | |

ISP CASE REPORT



## Indiana State Police

Incident Report
8620 East 21st Street  Indianapolis, IN 46219
Phone (317) 899  8577 Fax (317) 899 - 8299

| ORI | County | Venue | Report # |
|---|---|---|---|
| INISP5200 | MARION | INDIANAPOLIS | 16ISPN000286 |

Indianapolis District

| Report Date / Time | Occurrence Date / Time | File Class |
|---|---|---|
| 06/22/2016 12:31 Hrs (US/Eastern) | 05/28/2016 12:18 Hrs - 05/28/2016 13:18 Hrs (US/Eastern) | 910-320 |

**Nature of Incident:**   Incidents Against Law Enforcement/Public Safety    **Supplements:** Initial Report (1)

**Summary:**   Dispatched to traffic hazard of a person on the interstate at the 105.2mm.  Transported subject off the interstate.

### Incident Location

**Address:**   105.2 Mm I65 Nb
**City:**   Indianapolis          **County:**                          **State:**   Indiana
**ZIP:**                          **Country:**  United States of America
**Township of Occurrence:**  PERRY

                          **Latitude:**   39.89161505820463    **Longitude:**   -86.10482316929783

**Sub-Beat:**   P49I

### Incident Offenses

| Supp # | Offense | Status | Status Date |
|---|---|---|---|
| 0 | 910-320 - Traffic Investigation (Non-Criminal Event) | CLOSED- NO ADDITIONAL LEADS TO PURSUE | 05/28/2016 12:18 Hrs |

### Officers Involved

| Role | Name | Agency | Supp # |
|---|---|---|---|
| Assisting | TROOPER (SENIOR) H. KALINA (#ISP6812) | Indianapolis District | 0 |
|  | TROOPER S. RELIFORD (#ISP7712) | Indianapolis District | 0 |
| Reporting | TROOPER S. CUNNINGHAM (#ISP7689) | Indianapolis District | 0 |

### Incident Narratives

**Title: Original Narrative**

**Author:** SHANE CUNNINGHAM              **Data / Time:**  06/22/2016 12:39 Hrs      **Supp #:**  0

On Saturday May 28th at 1222 hours I Trp. S. Cunningham 7689 responded to a call from Indiana State Police dispatch of a traffic hazard, a man walking on the interstate at I65 at the 105mm.  I encountered the subject, a white male wearing a white t-shirt and white pants walking Southbound in the median at the 104mm of I65, at 12:30 PM.  I stopped and began a conversation with the subject, later identified as Charlie Todero, of Greenwood In.  I asked Todero what he was doing and he stated that he was just walking and talking to his Lord and savior Jesus Christ.  Todero was sweating like crazy and holding a bible, and the way he looked, talked and was behaving there was just something off about him, in my opinion.  After running Todero's ID and it came back ok, I then asked what he was doing out there on the Interstate again.  By this time, I had been joined by two other Troopers at the scene. Sgt. Reliford and M/Trp. Kalina  I, along with the other Troopers, determined that Todero did not

Report Run On  WEDNESDAY JUNE 22, 2016 12:50 36 PM                    By: SC

16 SPN000396 - Indianapolis District - ISP ( SP)

pose a threat to himself and did not warrant an immediate detention, or further action. After several minutes of questions and no real answers to a solution to what we were going to do with Todero, I made the decision to give him a ride off the Interstate. He wanted to go to Greenwood area and talk to a Priest or Godly man to discuss the passing of his father a week prior. I told Todero I would give him a ride, but with his behavior and such out on the Interstate I was going to have to put him in handcuffs as I transported him to his destination. Todero agreed apprehensively, and would not let go of his bible. So I walked Todero to my commission with the bible wedged between his legs. Once in the car and buckled in, I tried to once again have a conversation. I ask about what he was doing out on the interstate, same reaction and answer as before… just walking and talking to God. Todero was somewhat calm during the ride to Greenwood, still very agitated but somewhat calm talking to himself and praying out loud. I dropped Todero off at the Vineyard Church at 512 S Madison Ave in Greenwood. As I took the handcuffs off and released him from my control, he was still talking to himself, praying out loud, and just acting a little off. At no time did Todero get combative or resist in any way, or threaten to hurt himself, thus eliminating the need for an Immediate Detention and evaluation. I dropped Todero off and saw him walking toward the front doors of the church, then I left the area and cleared myself from the run at 1318 hours. Later that night I happened to drive by the area of the Church and observed Todero walking from the church. He had his bible in one hand and a visitor's bag from the Church in the other.

It was not until several days later that I learned of his passing and the incident with the Greenwood Police. I thought it best to inform them of Indiana State Police's dealings with Todero. They requested an incident report to document my interaction with Todero.

| Signed: TROOPER S. CUNNINGHAM (#ISP7689) | Reviewed By: |
|---|---|

TIME STAMPED
RADIOED TRAFFIC LIST

Time stamped radio traffic is 4:57 seconds slower than Spillman time.


First 911:        11:39:51

Second 911:     11:40:03

Initial Dispatch:        11:40:16

3104 marks enroute:   11:40:37

Officer marks on scene:  11:45:05

3104 requesting a second unit:  11:46:26

Taser deployed:  11:47:10

3104 had broken traffic:  11:47:36

3110 marks on scene with 3104:  11:48:06

Dispatcher asked 3110 if they wanted the medics, told to standby:  11:48:56

3133 marks on scene 11:50:25

Officer advised to start Medics:  11:50:47

Medics dispatched:  11:51:23

Engine 91 marks arrived on MDC 12:00:35 (Spillman time) they did not mark on the radio

Medic 92 marks arrived on MDC 12:01:09 (Spillman time) they did not mark on the radio

3110 and 3235 are following to the hospital: 12:03:49

3235 marks out at the hospital:  12:14:24

3110 lets 3104 know they are starting CPR in the Ambulance: 12:16:01

Medics never marked on air out at the hospital.



CORONER REPORT

# FIELD DEPUTY REPORT

Owner: Mallory Malczewski                    Charles Todero                    Case Number: MC-16-1209

| Deceased - Name (First, Middle, Last) | | | Sex | Time Pronounced | Date of Death |
|---|---|---|---|---|---|
| Charles Todero | | | Male | 11:48 PM | 06/11/2016 |

| Date Notified | | Time Notified | | Time Arrived | |
|---|---|---|---|---|---|
| 06/12/2016 | | 12:22 AM | | 12:45 AM | |

| Social Security Number | Age | | Date of Birth | Birthplace (City and State or Foreign Country) | |
|---|---|---|---|---|---|
| | 30 years, 10 months, 19 days | | ▮▮▮▮▮ | Indiana | |

| Marital Status | Surviving Spouse (if wife, give maiden name) | | Decedent Usual Occupation | Kind of Business/Industry | |
|---|---|---|---|---|---|
| Never Married | | | unknown | | |

| Address Line 1 | | | | Address Line 2 | |
|---|---|---|---|---|---|
| 8172 S. Peoga Raod | | | | | |

| City | State | Zip Code | County of Residence | Citizen of What Country? | |
|---|---|---|---|---|---|
| Trafalgar | Indiana | 46181 | Johnson | United States | |

| Decedent's Race | | Decedent's Ethnicity | | Decedent's Education | |
|---|---|---|---|---|---|
| White | | No, not Spanish/Hispanic/Latino | | High School | |

| Place of Death? | Place of Death (Addl Info) | | Armed Forces Service Member? | |
|---|---|---|---|---|
| Hospital - Inpatient | | | Inactive | |

| Facility Name | | City, Town, or Location of Death | County of Death |
|---|---|---|---|
| ST. FRANCIS HOSPITAL - INDIANAPOLIS | | Indianapolis | Marion |

| Father's Name (First, Middle, Last) | | Mother's Name (First, Middle, Maiden Surname) | |
|---|---|---|---|
| unknown | | Teresa Todero | |

| Informant's Name | | Informant's Address | |
|---|---|---|---|
| | | | |

| City | State | Zip Code | Informant's Relationship |
|---|---|---|---|
| | | | |

| Next-of-Kin's Name | | Next-of-Kin's Address | |
|---|---|---|---|
| Teresa Todero | | 8172 S. Peoga Raod | |

| City | State | Zip Code | Informant's Relationship |
|---|---|---|---|
| Trafalgar | Indiana | 46181 | Mother |

| Notification Made? | Notified Person's Name | Notified Person's Phone | Notification Time | Notification Date |
|---|---|---|---|---|
| Yes | Teresa Todero | (317) 529-3921 | 11:48 PM | 06/11/2016 |

| Notified Person's Address Line 1 | Notified Person's Address Line 2 | Notification Made By |
|---|---|---|
| 8172 S. Peoga Raod | | Hospital Staff |

| Degree of Rigor | Position Found |
|---|---|
| Full Body | |
| Livor Location | Decedent was found lying face up on a hospital bed. |
| Posterior | |

| Describe How Deceased Was Dressed |
|---|
| Decedent was observed clad in a hospital gown. |

| Identification Method | Vehicle(s) Towed? |
|---|---|
| Family on Scene | No |

06/13/2016

# FIELD DEPUTY REPORT

Owner: Mallory Malczewski                    Charles Todero                    Case Number: MC-16-1209

## Injury Information

| Date & Time of Injury | | | Place of Injury | | |
|---|---|---|---|---|---|
| 5/29/2016 11:44 AM | | | Roadway | | |
| Address | | City | County | State | Zip Code |
| Madison Avenue & Camby Street | | Greenwodd | Johnson | Indiana | 46142 |
| Description of How Injury Occurred | | | | | |
| Decedent went into cardiac arrest in the back of an ambulance after being tasered by police officers. | | | | | |

## On Scene Personnel

| Type | Name | Unit Number | Case Reference # | Phone # |
|---|---|---|---|---|
| Deputy Coroner | Mallory Malczewski | Coroner 15 | G16L11930 | |

## Criteria

| Criteria for Case | Additional Information |
|---|---|
| Undeterminable | |

## Circumstantial

On 6/12/2016 at approximately 12:22 AM, Deputy Coroner Mallory Malczewski was notified via onramp to respond to the ICU at St. Francis Hospital to conduct a death investigation on a W/M/30 who had expired from unknown circumstances after being tasered by police officers.

## Identification and Notification

The decedent was POSITIVELY identified at hospital bedside by his mother, as: Charles Todero, W/M/30, DOB: ▬▬▬▬ residing at: 8172 S. Peoga Road, Trafalgar, IN 46181.

NOTIFICATION

The decedent's NOK, mother Teresa Todero, was notified at time of death pronounced at hospital bedside at approximately 11:48 PM on 6/11/2016.

06/13/2016

# FIELD DEPUTY REPORT

Owner: Mallory Malczewski                    Charles Todero                    Case Number: MC-16-1209

## Past Medical History

\*\*\*At time of on scene investigation, the hospital information management system was not working for routine maintenance. As a result, a complete set of medical records from date of admission could not be obtained. Deputy Malczewski prepared a subpoena for medical records.

According to hospital staff, the decedent had the following medical history:

Hepatitis C
Marijuana Use

According to hospital staff, the decedent's urinalysis on date of admission showed marijuana in his system. Per hospital staff, following the decedent's admission to the hospital on 5/29/2016, the decedent was found to have tricuspid valve vegetation and endocarditis. Per hospital staff, the decedent's family was adamant he did not have a history of heroin use. Per hospital staff, they do not test for spice or other additional substances. Per hospital staff, the decedent's reported no familial history of cardiac problems.

\*\*At time of report, no admission blood remained at the hospital for testing\*\*

## Social History

An extensive social history is not known at time of report. The decedent's mother could not be reached. According to medical staff, the decedent's family had reported he had a history of marijuana abuse and drank approximately ½ gallon of vodka daily. Per hospital staff, the decedent's family had reported the decedent's father died last month and the decedent had been relying heavily on religion to get through his grief. According to the Johnson Co. Sheriff Dept, the decedent had a previous history of run-in's with their law enforcement agency.

## Physical Exam

The decedent was observed to be a white male lying face up on a hospital bed. The decedent was observed to be covered with a white blanket and clad in a hospital gown. Rigor was beginning to present in the extremities and lividity was posterior. The decedent was observed to have tattoos along both of his arms. The decedent was observed to have the following articles of medical intervention present, including: IV's in both the right and left side of the neck, heart monitor pads, defibrillator pads, IV's in right and left side of groin region, blood pressure cuff around right bicep, pressure wrap around right calf and a fecal tube. The decedent was observed to have a bruise along the inside of his left bicep. The decedent was observed to have a scabbed abrasion on his right knee. The decedent was observed to have six small healing abrasion on the right lower side of his back. Hospital staff identified the marks as being from a taser. The decedent was observed to have

06/13/2016

## FIELD DEPUTY REPORT

Owner: Mallory Malczewski          Charles Todero          Case Number: MC-16-1209

a large imprint of an 'x' across his back from a back board on the hospital bed underneath him.

## Terminal Episode

On 6/12/2016 at approximately 12:22 AM, Deputy Coroner Mallory Malczewski was notified via onramp to respond to the ICU at St. Francis Hospital to conduct a death investigation on a W/M/30 who had expired from unknown circumstances after being tased by police officers. According to the Johnson Co. Sheriff Dept., on 5/29/2016 at approximately 11:44 AM, they received a 911 call for a possible suicidal person who was trying to step out in front of traffic. Per the deputy, officers arrived at the intersection to find the decedent with a bible in his hand claiming to be jesus. Per the deputy, the decedent attempted to step into traffic a second time in what appeared to be a suicide attempt. Per the deputy, the responding officer tasered the decedent in the back but full contact was not made. Per the deputy, the decedent dropped to his knees but continue to no comply with the responding deputy's commands. Per the deputy, the responding deputy tasered the decedent again in the leg in order to gain compliance and eventually was able to get the decedent subdued. Per the deputy, the decedent was loaded into an ambulance and transported from the scene for evaluation.

According to hospital staff, the decedent coded in the ambulance shortly after receiving versed administered through the nose. Per hospital staff, the decedent was resuscitated by EMS workers and had to be intubated in the ER. Per hospital staff, the decedent was transferred to the ICU on 5/29/2016. Per hospital staff, shortly after arrival to the ICU the decedent's liver enzyme count was extremely high they were considering transferring the decedent for a possible transplant. The hospital staff reported the decedent also went into kidney failure and was placed on dialysis. Hospital staff reported the decedent continued to deteriorate but then seemed to improve. Per hospital staff, the decedent was never able to be weaned off of the ventilator and could slightly respond to commands. Per hospital staff, on 6/10/2016 the decedent began to code while on the ventilator throughout the day. Per hospital staff, the decedent's family were given his grim prognosis and they decided to wean him off of life support. Per hospital staff, the decedent was pronounced nonviable on 6/11/2016 at approximately 11:48 PM.

## Disposition

Digital photographs were taken; identification tag placed on decedent; decedent was placed in a labeled transport bag and transported to MCCO via DMS.

# FIELD DEPUTY REPORT

Owner: Mallory Malczewski                     Charles Todero                     Case Number: MC-16-1209

## Scene Investigation

The decedent was found in room P306 of the Adult ICU at St. Francis Hospital in
Indianapolis, IN

## Additional Comments

Johnson Co. Sheriff Deputies will be present at autopsy

Case #: G16L11930

06/13/2016



AUTOPSY REPORT



WITNESS INFO SHEET

WITNESS INFORMATION

Ian Godfrey:  (513)649-5169
325 Greenbriar Dr.
Hanover IN, 47243

Roger Poynter 455 E. Broadway St.
Greenwood IN, 46142
(317)441-7485

Deborah MacNaughton
1342 Hamliton Dr.
Greenwood IN, 46143
(317) 341-5247

Holly Walters
1224 N. Capital Ave.
Indianapolis IN,
(765)277-0442

Dr. Chris Hartman
8111 S. Emerson Ave.
Indianapolis IN, 46227
(317)696-0777

Jeanne Moore
547 Ramblin Rd.
Greenwood IN, 46142
(317)748-0726

Terry Moore
547 Ramblin Rd.
Greenwood IN, 46142
(317)748-0726

IAN GODFREY
STATEMENT

Interview Date: June 08, 2016
Witness: Ian Godfrey
Case #: G16L11930

On June 08, 2016 I conducted a video recorded interview with Ian Godfrey. Godfrey is a
paramedic on GFD Engine 92 and he treated Charles Todero on May 29, 2016. Ian advised that
he was dispatched to assist the Police Department with a suicidal person. He stated that when
he arrived on the scene at Madison Ave. and Camby St. he spoke with officers from the
Greenwood Police Department. He advised that officers informed him that Charles Todero had
been walking out in front of cars in an attempt to commit suicide. He stated that he was
further informed that officers had to tase Todero between 12 and 15 times before taking
Todero into custody.

Godfrey stated that upon his arrival he observed Todero handcuffed behind his back and lying
on his stomach. He stated that Todero had a Taser prong stuck in his upper back and a second
Taser prong stuck in his left hand. He advised that Todero was combative; specifically that he
was kicking, thrashing, and screaming profanities at first responders. Godfrey stated that
Todero was very strong and that it took 6 or 7 first responders to restrain him on the gurney.

Godfrey stated that Torero's pants were ripped and urine soaked. He stated that officers
informed him that Todero's pants were in that condition upon making contact with him and not
a result of their interaction with him.

Godfrey stated that Todero's heart rate was 130 to 140; he had a good pulse, and showed no
signs of trauma. He stated that Todero continued to scream profanities, thrash, and bang his
head against the gurney while in the ambulance. He informed me that he administered 5mg of
Midazolam to Todero to calm him down. He stated that after the medication was
administered, Todero stopped being physically combative, but continued being verbally
abusive.

Godfrey stated that he contacted Community South Hospital because it was the closest
hospital. He stated that he was advised that Community South Hospital was on physicatric
diversion. Todero was then transported to St. Francis South Hospital.

Godfrey explained that since Todero was not displaying physical signs of distress he was
considering this a psychiatric event. He advised that upon arrival to St. Francis South, Todero's
heart rate and breathing began to slow. He stated that Todero then went into full cardiac
arrest. He stated that CPR was started and that within a few minutes Todero was resuscitated.
He stated that a few minutes later Todero went back into cardiac arrest. He was once again
resuscitated by hospital staff.

Godfrey informed me that the Emergency Room Doctor (Dr. Chris Hartman) advised him and Lt. Blackwell that Todero's medical condition was not a result of him being tased. He stated that Todero was suffering from Metabolic Acidosis and that his blood PH level was 6.77 and that the normal range is 7.35-7.45.

He further explained that Dr. Hartman stated that the time duration between the last time Todero was tased (11:59am) and when he went into cardiac arrest (12:19pm) was too long. He explained that if the taser were the cause of Todero's cardiac arrest it would have happened much sooner. Godfrey also stated that Dr. Hartman stated that typically in situations where the heart is stopped due to taser usage, ventricular arrhythmia is present, and that it was not in Todero's case. Godfrey ended the interview by stating it was his opinion that all the GPD officers on the scene acted professional and appropriately at all times.



ROGER POYNTER STATEMENT

Interview Date: June 08, 2016
Witness: Roger Poynter
Case #: G16L11930

On June 08, 2016 I conducted a video recorded interview with Roger Poynter.  Mr. Poynter stated that on May 29th, 2016 at approximately 11:45am he was traveling north on Madison Ave. north of Broadway St., but south of Fry Rd.  He stated that he observed a white male who was later identified as Charles Todero walking from west to east across Madison Ave.  He stated that Todero was looking forward and not looking left or right at traffic.  He stated that Todero walked directly in front of his vehicle.  He stated that from his convertible, he yelled, "what are you doing," but that Todero just kept walking and did not respond.  He stated that through his review mirror he observed Todero walk to the east curb, then turn around and walked back into the north bound lanes in front of traffic that was approaching him.  Mr. Poynter stated that then called 911.

Mr. Poynter stated that he did not know if Todero was "high on drugs" or "trying to commit suicide," but that he did not seem right.  He stated that he called 911 because he was concerned for Todero's safety.

DEBORAH mcCONAUGHTON
STATEMENT

Interview Date: June 08, 2016
Witness: Deborah MacNaughton
Case #: G16L11930

On June 08, 2016 I conducted a video recorded interview with Deborah MacNaughton.  Ms. MacNaughton stated that on May 29, 2016 at approximately 11:45am she was traveling north in the left lane of Madison Ave. south of Fry Rd.  She stated that she observed a white male later identified as Charles Todero standing on the curb of the south bound lanes.  She stated that as she traveled north, Todero began crossing Madison Ave, walking from west to east.  She stated that he was not looking at on-coming traffic and was void of any facial expression.  She stated that Todero walked into her lane of travel, and that she had to swerve abruptly into the right lane to avoid hitting him.  She stated that the vehicle behind her also had to slam on its brakes to avoid hitting Todero.  She informed me that she likely would have been involved in a motor vehicle crash if there was a motorist traveling beside her at the time she swerved to avoid hitting Todero.

Ms. MacNaughton stated that she continued north, but observed through her review mirror, Todero walk to the curb and then back into the north bound lanes.  She informed me that at first she thought Todero might be playing games, but then realized that it was an intentional act.  She stated that she called 911, because she was concerned for Todero's safety.

LITIGATION
STATEMENT

## Greenwood Police Department

"Statement of Rights"

I wish to advise you that you are being questioned as part of an official investigation of the police department.  You will be asked questions specifically, directly and narrowly relating to the performance of your official duties as an employee or concerning your fitness for serving as an employee.  You have the Constitutional Right not to incriminate yourself.  I further wish to advise you that if you refuse to testify or to answer questions relating to the performance of your official duties or fitness for duty, you will be subject to departmental charges which could result in your dismissal from this agency.

I have read the above and understand it fully.  I sign this statement having been advised of the above Rights before any questions have been asked of me.

Brian Blackwell

Signed at  3:12 PM  o'clock PM. this date of June 13, 2016.

James Ison

---

'om:                    Brian Blackwell
Sent:                   Sunday, June 12, 2016 10:44 AM
To:                     James Ison
Subject:                Additional information on Charles Todero

Importance:             High

As usual, time elapses and a person remembers more about details in an incident or other thoughts come to mind to justify actions taken during an incident....

*As I arrived on the scene I immediately recognized the "suicidal subject" as Charles Todero. I have known Mr. Todero through my police career for approximately 25 years. I have known Mr. Todero and his brothers to have an interest for fighting and boxing. Days after the incident I researched Mr. Todero's Facebook page and copied 2 photos of him, one with James Todero at a training center for fighting and another photo of Mr. Todero taking a "selfie" of himself without a shirt on.

*When I approached Mr. Todero I observed that his pants were torn from his ankle to just below his groin area. I observe what I believed to be urine stains in the crotch area of his pants. His knees could be seen through the tear in his pants and he had bruises and scratches on both knees prior to any contact with police.

*Due to the fact that Mr. Todero was walking northbound on Madison I was unable to observe any vehicular traffic oming from behind me. I knew that My police car was providing "some" protection but Mr. Todero and myself were till in the roadway with our back to traffic. This expedited my actions.

Interview Date: June 13, 2016
Officer:  Lt. Brian Blackwell
Case#:  G16L11930

On June 13, 2016 I conducted a video recorded interview with Lt. Brian Blackwell.  Lt. Blackwell was advised of his Garity Rights and he signed a waiver.  Lt. Blackwell stated that on May 29, 2016 at approximately 11:45am he was dispatched to a report of a suicidal male who was intentionally walking in front of vehicles on Madison Ave.  He stated that he located the male who he immediately recognized as Charles Todero approximately 100 yards south of Camby St. on Madison Ave.

Lt. Blackwell stated that he knew Charles Todero from previous police incidents involving Charles and his family members over the last 25 years of his career.  Lt. Blackwell specifically stated that he has previously interacted with Charles Todero on juvenile problems, and intoxication calls in which Todero was intoxicated.  Blackwell stated that Charles Todero once worked with him on a drug case involving Todero's Uncle.  Blackwell informed me that he also used to work security at the Greenwood Public Library, and that he would often speak to Charles Todero when he was visiting the library.

Lt. Blackwell stated that Todero has an older brother, James Todero, who used to box.  He stated that he had heard rumors that Charles and James both liked to work out and fight.

Lt. Blackwell stated that upon arriving on the scene, he parked his police vehicle facing south in the right lane of north bound Madison Ave. south of Camby St.  He stated that he strategically parked his vehicle to provide some protection for both him and Todero.  He stated that at this time Todero was standing on the east side of the north bound lanes of Madison Ave.  He reported that Todero was holding a book out in front of him.  He stated that Todero was starring directly at the book with no focus or emotion.  He stated that he observed Todero's pant leg was torn and what appeared to be dried urine stains in the groin area of his pants.  He reported that Todero had abrasions and bruising on his knees.

Lt. Blackwell stated that he approached Todero, identified himself, and attempted to speak to him.  He stated that Todero did not respond to him.  He stated that Todero began walking north in the right lane of north bound Madison Ave holding his bible up in front of him.

Lt. Blackwell stated that he told Todero to stop walking and sit down several times, but that Todero did not comply and began stating that he was Jesus Christ.  Lt. Blackwell stated that he followed behind Todero still pleading with him to stop walking in the road.  Lt. Blackwell stated that as they continued walking north he was becoming concerned for both his safety and Todero's safety due to them moving too far away from the protection of his vehicle.

Lt. Blackwell stated that he then placed his hand on Todero's shoulder still ordering him to stop walking in the roadway. He stated that Todero then "veered left" further into the roadway and toward the left lane of north bound Madison Ave. Lt. Blackwell stated that at this time he ordered Todero to stop and informed him that if he did not stop he would be tased. Lt. Blackwell reported that Todero did not comply and that he deployed his taser, which struck Todero in his back.

Lt. Blackwell stated that Todero went down to his knees, and held the Bible up stating, "I'm Jesus Christ the Profit." Lt. Blackwell stated that he then radioed for backup.

Lt. Blackwell stated that he continued to order Todero to lay flat on the ground, but that Todero remained on his knees, holding the Bible up, and claiming that he was Jesus Christ. Lt. Blackwell reported that each time Todero refused to comply with his orders to lie on the ground, he administered an additional tase. Blackwell stated that this exchange happened a few times, and that Todero had no reaction or expression.

Lt. Blackwell stated that he then observed that one of the taser prongs was dangling from Todero's shirt, resulting in loss of contact, and rendering the tases ineffective. He stated that he continued to order Todero to the ground, without compliance from Todero. Blackwell stated that he then with his taser cartridge still attached, delivered a drive stun to Todero's right calf muscle to complete the circuit.

Lt. Blackwell stated that this attempt was successful and that Todero laid flat on the ground, and placed both of his hands under his torso. He further stated that he gave Todero verbal commands to put his hands behind his back, but that Todero still would not comply. He stated that he then delivered another drive stun to Todero's right calf muscle. He stated that after each tase he gave verbal commands for Todero to remove his hands from under his body and place them behind his back, but that each time was met with non-compliance. Lt. Blackwell stated that each time Todero refused to comply; he delivered an additional drive stun.

Lt. Blackwell stated that a female passerby, later identified as Holly Walters stopped and asked him if he needed help. Lt. Blackwell requested that Holly simply be a witness to this incident.

Lt. Blackwell stated that he continued to give Todero commands to put his hands behind his back and that Todero refused to comply. He stated that Holy even began pleading with Todero to comply.

Lt. Blackwell stated that Officers Renee Elliott and Elizabeth Laut then arrived on the scene. He reported that he asked Officer Laut to get a statement from Holly Walters while Officer Elliott assisted him with Todero.

Lt. Blackwell stated that Officer Elliott physically tried to pull Todero's arms out from under his body while giving verbal commands. He stated that Todero was physically pulling away and refusing to allow Officer Elliott to handcuff him. He stated that he administered a couple of more drive stuns to Todero's calf while he was resisting Officer Elliott. He stated that they eventually were able to get one handcuff on Todero. He stated that he then assisted Officer Elliott in removing Todero's left hand from under his body. He reported that Todero was then successfully restrained. Lt. Blackwell commented that Todero was "strong."

Lt. Blackwell stated that once restrained, Todero was breathing hard and sweating profusely. He stated Todero was rolled onto his back so that he could breathe adequately. He stated that he removed the taser prong that was dangling in Todero's shirt. He also stated that Officer Elliott was concerned that Todero was going to hyperventilate.

Lt. Blackwell stated that when the paramedics arrived, they had to tie a bedsheet around Todero's feet to keep him from kicking. He stated that Todero was then strapped to a gurney.

Lt. Blackwell stated that after Todero was placed on the gurney. He went to his car to get some water. He stated that Officers Elliott and Laut followed the ambulance to St. Francis Hospital.

Lt. Blackwell stated that Officer Elliott contacted him and informed him that Todero had gone into cardiac arrest upon his arrival at the hospital. He stated that he then responded to the hospital.

He stated that upon his arrival he spoke with the Medical Doctor (Dr. Chris Hartman) who was treating Todero. He stated he briefed Dr. Hartman on Todero's erratic behavior, and that he was tased approximately 15 times. He stated that Dr. Hartman informed him that Todero's cardiac arrest was not caused by the taser. He stated that Dr. Hartman also mentioned that Todero had high amounts of acid in his blood.



Interview Date: June 13, 2016
Officer: Renee Elliott
Case#: G16L11930

On June 13, 2016 I conducted a video recorded interview with Officer Renee Elliott. Officer Elliott stated that on May 29, 2016 at approximately 11:45am she was acting as a Field Training Officer for new officer Elizabeth Laut. She stated that she and Laut were enroute to a property damage accident when she heard Lt. Brian Blackwell call for help and announce that he deployed his taser. She stated that she and Officer Laut were close to Lt. Blackwell's location and responded.

Officer Elliott stated that upon arrival, she observed Lt. Blackwell's vehicle facing south in the right lane of north bound Madison Ave. She further advised that Charles Todero was lying in the right lane of Madison Ave with his hands under his body. She stated that Todero was not far from the curb and in the roadway. She also reported that Todero had two Taser prongs stuck in his back.

Officer Elliott advised that she ran to help Lt. Blackwell, and instructed Officer Laut to speak with a female witness. Officer Elliott stated that as she approached Todero Lt. Blackwell had just administered a tase. She stated that when the tase was completed she was able to get Todero's right arm out from under his body and place a handcuff on his right wrist. She stated that both she and Lt. Blackwell then gave Todero loud verbal commands to give them his left hand. She stated that Todero did not comply and kept his left hand tucked under his body.

Officer Elliott stated that she then attempted removed Todero's left arm from under his body, but that he would not give her his left arm. She stated that as she attempted to remove his left arm from under his body, Todero "jerked" and Lt. Blackwell administered another tase. She stated that during the taze Todero pulled her arm down between the two taser prongs causing her to receive a slight shock. She stated that at this time she realized that there was a poor taser connection due to the shock that she received not being the "full amount." She stated that Todero began yelling "I'm Jesus Christ, the profit, Jerusalem." Officer Elliott stated that Todero then placed his left arm back under his torso. She stated that she applied pressure to his mandibular angle pressure point, but that it had no effect. She advised that she struggled with Todero trying to get his left arm out from under his body, but could not. She stated that at this time, Officer Elizabeth Laut came to assist her. She stated that she and Officer Laut were able to push Todero on his side while pulling on his left arm. She reported that she was then able to remove his arm from under is body and place the handcuff on him. Officer Elliott also commented that Todero was very strong.

Officer Elliott advised that once Todero was safely secured in handcuffs, Lt. Blackwell immediately called for an ambulance. She also advised that she noticed a tattoo on Todero's arm that read, "Todero". She stated that it was at this time she realized that he was one of the

Todero brothers.  She stated that she knew of the Todero brothers from police runs she had taken in the past.

Officer Elliott stated that from the time Todero was handcuffed until the time he departed from the scene in the ambulance, he was conscious and alert, but "out of it" as if he were high on "Spice or drugs."

Officer Elliott advised that Officer Randy Eck arrived on the scene after Todero was handcuffed and asked her if she had turned her body worn camera on.  She stated that she realized that she forgot to turn it on when she arrived, and then turned it on immediately.

Officer Elliott stated that when the medics arrived, she observed the taser prong in Todero's lower back fall out of his shirt.  She reported that Todero continued to say that he was Jesus Christ and that he was kicking a thrashing on the gurney. She stated that the paramedics had to use a sheet to tie Todero's legs together to keep him from kicking.

Officer Elliott stated that she and Officer Laut followed the ambulance to St. Francis Hospital. She reported that Todero was in cardiac arrest upon arrival at the hospital.   She stated that security was waiting for the ambulance upon their arrival, due to reports that Todero was being violent inside the ambulance.

Officer Elliott advised that inside the emergency room she was present when Dr. Hartman spoke to Lt. Blackwell.  She stated that Lt. Blackwell told Dr. Hartman that Todero had been tased approximately 15 times.  She stated that Dr. Hartman then told Lt. Blackwell "I want you to know that the tasing had nothing to do with Todero's condition.

OFC HANDY ECK STATEMENT

Interview Date: June 13, 2016
Officer: Randy Eck
Case#G16L11930

On June 13, 2016 I conducted a video recorded interview with Officer Randy Eck.  Officer Eck advised me that on May 29, 2016 at approximately 11:45am he was on a lost child call near Stop 18 Rd.  He stated that he heard Lt. Blackwell frantically request assistance over the radio. He advised that he then drove emergent to Madison Ave. and Camby St. to assist Lt. Blackwell.

Officer Eck stated that upon his arrival he observed Officers Renee Elliott and Elizabeth Laut placing handcuffs on Charles Todero.  He stated that everything appeared to be under control at this time.

Officer Eck stated that Todero was on his back and that medics were talking to Todero.  He stated that he overheard the medics state that one of the taser prongs was embedded too deep to remove on the scene.

Officer Eck stated that Todero was conscious and alert.  He stated that Todero was stating that he was the "Son of God, Jesus Christ" and stating biblical names.  Officer Eck stated that Todero did not appear to be having a medical emergency at that time.

Officer Eck stated that Lt. Blackwell approached him and told him that he had tased Todero and that one of the prongs did not stick.  Eck stated that he then retrieved a spare taser cartridge from his vehicle and gave it to Lt. Blackwell to use in case he needed it later in his shift.

Officer Eck stated that the medics had to use a blanket to wrap around Todero's legs to keep him from kicking.  He stated that did not actually observe Todero kicking at the paramedics.  He stated that he was more concerned about Lt. Blackwell because he appeared to be exhausted.  He also stated that Blackwell informed him that Todero "would not stop fighting."

Officer Eck stated that once the paramedics left the scene he went back in service.



Interview Date: June 14, 2016
Officer: Elizabeth Laut
Case #: G16L11930

On June 14, 2016 I conducted a video recorded interview with Officer Elizabeth Laut. Officer Laut stated that on May 29, 2016 she was in training with Officer Renee Elliott. She advised that at approximately 11:45am she and Officer Elliott were enroute to a property damage accident on Fry Rd. She stated that Lt. Blackwell called for assistance in the area of Madison Ave. and Camby St. She stated that when Lt. Blackwell called for help, she and Officer Elliott were on Madison Ave. near Main St. She stated that she and Officer Elliott responded to Lt. Blackwell's location and arrived in less than two minutes.

Officer Laut stated that upon her arrival she observed Lt. Blackwell standing a couple of yards north of his vehicle with his taser out. She stated that Charles Todero was lying in the right lane of north bound Madison Ave. She stated that Todero was attempting to get up and that Lt. Blackwell was telling Todero "stop resisting, and to "quit trying to get up". She stated that Todero did not comply with Lt. Blackwell's commands.

Officer Laut stated that Officer Elliott went to help Lt. Blackwell while she spoke to a witness (Holly Walters). Officer Laut advised that Holly Walters stated that she observed Todero who she thought was possibly intoxicated, walking back and forth "dodging traffic" on Madison Ave. She stated that Walters advised that Todero caught her eye because his shirt was ripped. Officer Laut stated that Walters advised her that she saw Lt. Blackwell by himself and stopped to help him. Officer Laut stated that Walters told her that she observed Lt. Blackwell tell Todero several times to stop and sit down. She stated that Walters also reported that Lt. Blackwell warned Todero several times that if he did not stop he would be tased.

Officer Laut stated that while she was speaking to Holly Walters, she observed Officer Elliott struggling with Todero. She stated that Officer Elliott was attempting to place handcuffs on Todero, who had his hands under his body. She stated that Lt. Blackwell was warning Todero that he was going to be tased if he did not comply.

Officer Laut stated that she observed that the taser prong that had been in Todero's back had come loose and was stuck in his hand. She stated that she began assisting Officer Elliott with trying to remove Todero's hands from under his body. She stated that Officer Elliott almost had Todero's right hand in a position to cuff when Todero pulled out of her grip while screaming that he was Jesus. She stated that Lt. Blackwell then told Todero "put your hands behind your back or I will tase you." She reported that Todero did not comply and that Lt. Blackwell tased him for 5 seconds via drive stun on his leg. She stated that after the tase Officer Elliott was able to place a hand cuff on his right hand. She stated that she and Officer Elliott then attempted to get control of his left hand. She reported that she and Officer Elliott attempted to roll him over by pushing on his side in an attempt to gain control of his left arm. She stated that Todero

continued to resist and roll back onto his arm. She reported that Lt. Blackwell then delivered another 5 second drive stun. She stated that Officer Elliott was accidentally shocked because she was holding onto the handcuff on Todero's right hand and her other hand resting on his back.

Officer Laut stated that she was pushing on Todero's body trying to roll him off of his left arm while Officer Elliott was trying to pull his left arm from under his body. She stated that Todero was physically rolling back towards her and Officer Elliott. She reported that Todero was saying, "No," "I'm Jesus," and grunting. Officer Laut stated that Todero was really strong. Officer Laut stated that Todero continued to resist her and Officer Elliott's attempts remove his left arm from under his body. She reported that Lt. Blackwell then administered another tase. She reported that she and Officer Elliott were then able to gain control of Todero's left arm and place the handcuff on him.

Officer Laut stated that they then sat Todero upright against the curb.

Officer Laut stated that from the time she arrived on the scene until Todero was safely restrained, she thought he was tased at least four times. She stated that Lt. Blackwell gave verbal commands prior to each tase and that Todero had sufficient time to comply with the commands before being tased.

Officer Laut stated that after Todero was under control, Lt. Blackwell began asking Todero what type of drugs he was on and telling him that he was only trying to help him. She stated that Todero offered no response.

Officer Laut stated that Todero did not display any signs of being in medical distress. She stated that he was breathing heavy and sweating a lot, but that she attributed this to the struggle.

Officer Laut stated she did not observe Todero become combative with the paramedics. She stated that she and Officer Elliott followed the ambulance to St. Francis Hospital. She reported that upon their arrival, Todero was in cardiac arrest.

Officer Laut stated that she was present in the emergency room when Dr. Hartman spoke to Lt. Blackwell. She stated that Dr. Hartman told Lt. Blackwell that Todero's cardiac arrest was not a result of being tased. She stated that he mentioned that Todero had toxins in his blood and that the medication given to him in the ambulance may have caused him to have a reaction.



HOLLY WALTERS STATEMENT

Interview Date: June 16, 2016

Witness: Holly Walters

Case #: G16L11930


On June 16, 2016 I conducted a video recorded interview with Holly Walters.  Holly stated that on May 29, 2016 at approximately 11:45am she was traveling south on Madison Ave. in the area of Camby St.  She stated that she observed a police car parked in the north bound lane of Madison Ave. facing south.  She stated that she also observed a male, later identified as Charlie Todero, walking north in the north bound lane of Madison Ave., and a police officer later identified as, Lt. Blackwell,  walking behind him and holding a taser.  She stated that she had her windows down and heard Lt. Blackwell say, "If you don't stop, I'm going have to tase you."

Holly stated that she continued south on Madison Ave. before making a U-turn to go back and check on the Lt. Blackwell.  She stated that when she returned she found Todero lying in the roadway and assumed that he had been tased.  She stated that she asked the Lt. Blackwell if he needed help.  She stated that at this time the male on the ground was talking about Jesus and Moses.

Holly stated that the Lt. Blackwell was ordering Todero to put his hands behind his back.  She reported that Todero was lying on his stomach with his body weight on his hands.  She reported that Todero refused to comply with Lt. Blackwell's orders.

She reported that Lt. Blackwell warned Todero that if he did not place his hands behind his back, that he would be tased.  She stated that Todero refused to comply and was tased again. She informed me that the officer continued to order Todero to put his hands behind his back and warned him that he would be tased again if he did not comply.  She reported that to the best of her memory, Todero was given this order approximately four times and refused to comply each time.  She stated that each time Todero refused he was tased.

Holly stated that the Taser did not appear to be affecting Todero.  She explained that while the taser was activated, Todero seemed to tense up, but that when the tase ended, Lt. Blackwell would give him orders to place his hands behind his back, and he would not comply.

Holly stated that she and the Lt. Blackwell were both "pleading" with Todero to stop resisting and comply.  She commented that she felt like Lt. Blackwell truly wanted him to comply.

She stated that Todero did not respond to the pleas, but just looked forward with big eyes, like he was "on something." She also stated that Todero seemed "super strong" and "super combative."

Holley stated that within two minutes two female officers arrived on the scene. She stated that the older female officer went to help Lt. Blackwell, and that the younger officer, later identified as Elizabeth Laut, spoke to her.

Holly stated that she was standing a few feet from Lt. Blackwell, Officer Renee Elliott, and Todero. She stated that Officer Elliott bent down on top of Todero and attempted to pull Todero's hand out from under his body. She stated that both Officer Elliott and Lt. Blackwell were giving commands for Todero to give them his hands. She stated that Todero did not comply and that he rolled his body and pulled his arms back under his body as Officer Elliott attempted to gain control of his hands. Holly stated that Todero was "physically resisting" Officer Elliott. She reported that during the struggle to get him handcuffed, he was tased by Blackwell two more times. She also stated that Officer Elliott accidentally got tased during the struggle. She reported that prior to being tased, both Lt. Blackwell and Officer Elliott were both giving Todero commands to stop resisting.

Holly stated that after a couple of minutes, Officer Elliott was eventually able to placed handcuffs on Todero. She stated that Todero was then sat upright against the curb. She reported that as Todero sat against the curb, he fell backwards and struck his head on the curb. She reported that Todero was not saying much after he was handcuffed.

STATEMENT

Interview Date: June 15, 2016
Witness: Dr. Chris Hartman
Case # G16L11930


On June 15, 2016 I spoke to Dr. Chris Hartman via telephone.  Dr. Hartman informed me that he treated Charles Todero upon his arrival at St. Francis South Hospital on May 29, 2016.  He advised me that they could not participate in a video recorded interview at the direction of hospital legal staff.  Dr. Hartman did however inform me that Charles Todero's cardiac arrest and death had nothing to do with the actions of Greenwood Police Officers or him being tased.

Dr. Hartman explained that the fact that Todero's heart stopped several minutes after he was tased ruled out the possibility that the tasing was related.  He explained that in situations where the electricity causes the heart to stop, the effects are immediate.  He stated that the fact that Charles Todero was able to speak, and be combative inside the ambulance is proof that he was not experiencing Atrial Fibrillation, which would have been present at the time of the tasing.

Interview Date:  June 15, 2016
Witness: Dr. Chris Hartman
Case # G16L11930

On June 15, 2016 I spoke to Dr. Chris Hartman via telephone.  Dr. Hartman informed me that he treated Charles Todero upon his arrival at St. Francis South Hospital on May 29, 2016.  He advised me that they could not participate in a video recorded interview at the direction of hospital legal staff.  Dr. Hartman did however inform me that Charles Todero's cardiac arrest and death had nothing to do with the actions of Greenwood Police Officers or him being tased.

Dr. Hartman explained that the fact that Todero's heart stopped several minutes after he was tased ruled out the possibility that the tasing was related.  He explained that in situations where the electricity causes the heart to stop, the effects are immediate.  He stated that the fact that Charles Todero was able to speak, and be combative inside the ambulance is proof that he was not experiencing Atrial Fibrillation, which would have been present at the time of the tasing.

CHARLES MOYER
STATEMENT

Interview Date: June 22, 2016
Reserve Officer: Charles Moyer
Case # G16L11930

On June 19, 2016 I received an email from Sgt. Jason Holtzleiter, informing me that Greenwood Police Reserve Officer Charles Moyer had come into contact with Charles Todero the morning of May 29, 2016.

On June 22, 2016 I conducted a video recorded interview with Reserve Officer Charles Moyer. Moyer advised that he was working off-duty security at the Vineyard Church (512 S. Madison Ave.) on May 29, 2016. Moyer stated that at approximately 9:15am he was approached by church members who informed him that there was a male outside the south entrance to the church preaching. Moyer advised that he located Charles Todero on the patio just outside the south doors of the church. Moyer stated that Todero's hair was a mess, and that one of his pant legs was torn. Moyer advised that Todero was preaching, and appeared to be "high on something." Moyer stated that he escorted Todero off the church property, and that Todero asked him if he was kicking him out of church. Moyer stated that he told Todero that he was not kicking him out of church, and recommended that he go to Walmart and preach to people there. He stated that Todero then left without incident.

Moyer stated that after Todero left, a church member handed him a brown paper bag that Todero had left behind. Moyer stated that the church member informed him that Todero had been attempting to set the items inside the bag on fire. Moyer still had the bag in his possession and turned it over to me.

The bag was made of brown paper, and had a Vineyard Church sticker affixed to it. Inside the bag I located the following items: 1 black bi-fold wallet, 1 burnt Indiana Driver's License (Charles Todero), 1 burnt business card (Chris Clay Administrative Pastor at the Vineyard Church), 1 social security card (Charles Todero), 1 Hoosier Works card (Charles Todero), 1 Outback Steakhouse gift card, 2 business cards, 1 paper receipt, and 1 bic lighter.

The bag was placed into evidence.

JEANNE MOORE
STATEMENT

Interview Date: June 24, 2016
Witness: Jeanne Moore
Case #: G16L11930

On June 24, 2016 I conducted a video recorded interview with Jeanne Moore. Jeanne is an employee of the Vineyard Church (512 S. Madison Ave.) She advised that on May 28, 2016 at approximately 4:00pm she arrived at the church for the Saturday night service and was in the Green Room by herself. She stated that she was startled, when a white male abruptly walked out of the closet in the Green Room. She described the male as disheveled, wearing pants with a ripped pant leg.

Jeanne stated that she asked the male what he was doing. She stated that he identified himself as "Charlie" and told her that he had been praying. She stated that she did not feel comfortable being in the room alone with him, so she walked to the bathroom where she texted other church employee's including her husband, Terry Moore. She stated that she asked them to check on Charlie and then did not think any more about it. She had no further interaction with Charlie.



TERRY MUDRIC
STATEMENT

Interview Date: June 24, 2016
Witness: Terry Moore
Case #: G16l11930

On June 24, 2016 I conducted a video recorded interview with Terry Moore.  Terry is an employee of the Vineyard Church (512 S. Madison Ave.)  He stated that on May 28, 2016 a member of the church band, Clay Orander, encountered Charlie Todero on the church patio. He stated that Clay invited Todero to the Green Room where he prayed with him.  He reported that Clay left, and apparently Todero stayed in the Green Room.  He stated that his wife Jeanne Moore arrived at the church to prepare for the Saturday night service and was startled in the Green Room by Todero.  He further reported that Jeanne sent him a text message asking him to check on Todero.  He stated that Todero then attended the Saturday night service, met with one of the pastors afterwards, and then exited the church.

Terry stated that on May 29, 2016 the church maintenance employee Marcus McQueen encountered Charlie Todero on the church patio by the fire pit.  Terry reported that Marcus collected several pieces of Charlie Todero's belongings (driver's license, social security card, etc.) that had been partially burned from the fire pit.  Terry informed me that he believes that Charlie slept on the church patio Saturday night.

Terry reported that just before the first Sunday morning service, the band was practicing on stage.  He stated that Todero got on stage with the band on three separate occasions and had to be removed.  He stated that Todero then began walking the church hallways, hugging people and preaching loudly.

Terry stated that he then contacted Greenwood Police Reserve Officer Charles Moyer who was working security for the church.  He stated that Officer Moyer escorted Todero outside and asked him to leave.  He reported that Todero gave Officer Moyer a "bear hug", before leaving the property.  He stated that Todero walked one block south and continued preaching on the side of the road.

Terry reported that approximately 45 minutes after leaving the church, Todero came back on church property.  He stated that he confronted Todero and again asked him to leave.  He stated that Todero told him that he wanted to hear the service.  Terry advised Todero that it was the same service that he had heard the night before.

Terry reported that Todero then left the church a second time around 11:15am to 11:30am, and walked north on Madison Ave.

Terry described Todero as a white male, stalky, and in shape.  He stated that his pant leg was ripped from his waist to his ankle.  He stated that he was difficult to talk to.  He described him as being irrational at times.  He stated that he had asked Todero where he lived, and Todero's response was, "I live in heaven."

TIMELINE OF EVENTS

**Timeline of Events**

(The radio traffic timestamp is 4 minutes and 57 seconds behind the Spillman
timestamp.  All times listed below are Spillman times.)

**May 28, 2016,**

- 12:22:00  Indiana State Police are dispatched to I65 mile marker 105 on the
  report of a man walking on the interstate.  Trooper Shane Cunningham
  responded and located Charles Todero.  Todero was walking and talking to
  God.  Trooper Cunningham offered to give Todero a ride.  Todero
  requested to be driven to the Vineyard church so that he could talk to a
  godly man about his father's recent passing.  Trooper Cunningham drove
  Todero the Vineyard Chruch where he dropped him off.  Trooper
  Cunningham described Todero as "a little off."

**May 29, 2016**

- Approximately 09:15:00  Charles Todero was at the Vineyard Church (512 S.
  Madison Ave.) looking disheveled, and preaching to church members
  outside the church.  Todero was causing a disturbance and was asked to
  leave by Greenwood Reserve Officer Charles Moyer.

- 11:44:48  The first 911 call is received by the Johnson County 911 Center
  stating that a white male is trying to get hit by traffic on Madison Ave.

- 11:45:00  The second 911 call is received by the Johnson County 911 Center
  stating that a male is walking in front of cars, back and forth across the
  street.

- 11:45:13  The Johnson County 911 Center dispatches that a male is trying to
  commit suicide by walking in front of vehicular traffic on Madison Ave.

- 11:45:34  Lt. Blackwell marks enroute to the call from Main St. and S.R. 135.

- 11:50:02  Lt. Blackwell arrives on the scene.

- 11:51:23  Lt. Blackwell requested a second unit.

- 11:52:07  Lt. Blackwell advised "Taser Deployed".

- 11:52:33  There was indiscernible radio traffic from Lt. Blackwell.

- 11:53:03  Officer's Renee Elliott and Elizabeth Laut arrive on the scene.

- 11:53:53  Officer Elliott advises "Stand by"when asked by dispatch if they
  wanted medics.

- 11:55:22 Officer Eck arrives on the scene.

- 11:55:44  Officer Eck requested medics.

- 12:00:35  GFD Engine 91 arrives on scene.

- 12:01:09  Medics arrive on the scene.

- 12:08:46  Officers Elliott and Laut follow the ambulance to St. Francis
  Hospital.

- 12:19 Todero goes into cardiac arrest when arriving at St. Francis Hospital.

- 12:19:21  Officers Elliott and Laut arrive at St. Francis Hospital.

- 12:20:58  Officer Elliott notifies Lt. Blackwell that Todero is in cardiac arrest.

**06/07/2016**

- Chief John Laut orders an internal investigation.

**06/11/2016**

- 11:48pm Charles Todero is pronounced deceased at St. Francis Hospital.

**06/12/2016**

- The Greenwood Police Department is notified of Charles Todero's death.

**06/13/2016**

- Preliminary autopsy report indicates that Charles Todero died of natural causes due to liver disease.

**06/15/2016**

- Deputy Chief Ison speaks to Dr. Chris Hartman via telephone.  Dr. Hartman advises Deputy Chief Ison that Todero's condition upon arriving at St. Francis Hospital on May 29, 2016 was not a result of being tased.

**06/17/2016**

- Indiana State Police Trooper Shane Cunningham notifies Deputy Chief Ison that he responded to a similar incident involving Todero on May 28, 2016. Trooper Cunningham agrees to provide the ISP case report concerning this incident.

**06/19/2017**

- Deputy Chief Ison is notified that GPD reserve Officer Charles Moyer while working off-duty for the Vineyard Church on May 29, 2016 came into contact with Charles Todero.

**06/27/2016**

- Internal Review Completed.



SUMMARY OF FACTS

To: Chief John Laut
From: Deputy Chief James Ison
Date: 06/17/2016
Ref. G16L11930 (Summary of Facts)

- Charles Todero's actions on May 29, 2016 posed a risk of injury and/or death to himself, officers, and motorists. Witnesses Roger Poynter and Deborah MacNaughton both stated that they nearly struck Todero with their vehicles, and MacNaughton reported that she would have been involved in a motor vehicle crash if another vehicle would have been in the lane next to her when she swerved to avoid colliding with Todero. The officers involved in this case were also placed at risk of being struck by a vehicle while attempting to take Todero into custody for a psychiatric evaluation.

- Lt. Blackwell was on the seen without backup for 3 minutes and 1 second. He confronted a delusional Todero who was claiming to be Jesus Christ and walking in the roadway. Lt. Blackwell gave Todero multiple, loud verbal commands to stop walking in the roadway and placed his hand on Todero's shoulder in an attempt to stop him. Todero continued walking further into the roadway and ignored Lt. Blackwell's commands. Lt. Blackwell warned Todero that he would deploy his taser if he did not stop his dangerous behavior. Todero again failed to comply with Lt. Blackwell's commands. Lt. Blackwell requested additional units to assist him with Todero.

- Due to Todero's unsafe, delusional actions and non-compliance to Lt. Blackwell's commands to stop, Lt. Blackwell deployed his Taser striking Todero in the upper and lower back.

- Witness Holly Walters a motorist, stopped and asked Lt. Blackwell if he needed help. Lt. Blackwell requests that Walters stay to be a witness.

- According to Lt. Blackwell and Holly Walters, Todero was tased multiple times during the 1 minute and 3 seconds time frame between the first taser deployment and the arrival of the first back-up units.

- Lt. Blackwell and Holly Walters both stated that Todero was given loud verbal commands to lie on the ground and put his hands behind his back, and that he was given adequate time to respond to these commands prior to each taser application. Lt. Blackwell and Holly Walters both stated that Todero refused to comply and that the taser did not seem to have much of an effect on Todero.

- Holly Walters stated that she and Lt. Blackwell were actually "pleading" with Todero to stop resisting and comply with commands to put his hands behind his back."

- Lt. Blackwell stated that he observed that the taser prong that struck Todero's lower back was "dangling" from his shirt, creating a clothing disconnect, and resulting in less effective results.

- Approximately 1 minute and 39 seconds after Lt. Blackwell requested assistance, Officers Renee Elliott and Elizabeth Laut arrived on the scene.

- Lt. Blackwell, Officer Renee Elliott, Officer Elizabeth Laut, and Holly Walters all stated that Todero was lying flat on the ground, in the roadway, with his hands under his body upon the arrival of Officers Elliott and Laut.  They further reported that Todero was given several verbal commands to put his hands behind his back.  They stated that Todero not only refused to comply but physically rolled and pulled away from Officer's Elliott and Laut as they attempted to secure him in handcuffs.  Officer Elliott reported that she attempted to apply digital pressure to Todero's mandibular angle "pressure point", but that it had no effect on him.  During the struggle to gain control of Todero's hands, Lt. Blackwell delivered approximately two to four drive stuns to Todero's leg.

- Officer Elliott advised that immediately following the final tase, she and Officer Laut where able to secure Todero in handcuffs.  It is noticed at this time that the taser prong that Lt. Blackwell observed "dangling" in Todero's shirt was now lodged in Todero's left hand.

- There was no additional use of force after Todero was secured in handcuffs.

- Lt. Blackwell, Officer Renee Elliott, Officer Elizabeth Laut, and Holly Walters all advised that prior to each tase administered throughout this incident, Todero was given verbal commands, did not comply, and at times physically resisted.  They also stated that Todero was given adequate time between tases to comply with the officers commands.

- Lt. Blackwell's taser log indicated that the taser was activated 16 times in a 3 minute and 10 second time span.  The total duration of time that the taser was activated during this time span was 1 minute and 38 seconds (Taser usage report attached).

- After being successfully handcuffed, Todero was sat upright and against the curb of the north bound lanes of Madison Ave.

- Officer Randy Eck arrived on the scene and reminded Officer Elliott to activate her body worn camera.  Officer Eck also called for paramedics as required after any taser usage, by the Greenwood Police Department Taser Use policy.

- Upon the arrival of the paramedics, Todero was still claiming to be Jesus Christ. Paramedics tied Todero's legs together with a blanket to refrain him from kicking.

- Paramedic Ian Godfrey stated that Todero was stable at the scene, and that he observed no signs that Todero was having a medical emergency.  Godfrey stated that due to there being no indication of a medical emergency the ambulance was routed away from the closest hospital (Community South) and to St. Francis Hospital, because Community South Hospital was on psychiatric diversion.  Godfrey reported that while enroute to St. Francis Hospital, Todero became combative inside the ambulance.  Godfrey stated that Todero was kicking, thrashing, and banging his head against the gurney.  Godfrey advised that he gave Todero 5mg of Midazolam to "chemically restrain" him.  Godfrey reported that Todero's heartrate dropped significantly and that he began breathing agonally.  Godfrey further reported that Todero went into Cardiac Arrest at 12:19pm.

- Dr. Chris Hartman advised Lt. Blackwell, Officer Renee Elliott, Officer Elizabeth Laut, and Ian Godfrey that the use of the taser on Todero was not the cause of his cardiac arrest. Dr. Hartman further advised Deputy Chief James Ison via telephone on June 15, 2016 that if the taser would have contributed to Todero's heart stopping, it would have occurred immediately after he was tased and not in the ambulance nearly 25 minutes later.

- Todero died at St. Francis Hospital on June 11, 2016 at 11:48pm.

- Autopsy was preformed on June 13, 2016. Preliminary results indicate Todero died of natural causes stemming from liver disease.

FINDINGS

To:     Chief John Laut
From:  Deputy Chief James Ison
Ref:    Case # G16L11930 (Findings)
Date:  06/27/2016


Chief Laut,

After conducting a thorough internal review of incident G16L11930, I find that Lt. Brian
Blackwell, Officer Renee Elliott, Officer Elizabeth Laut, and Officer Randy Eck all preformed their
duties within the scope of the law, and in accordance with Greenwood Police Department
Policies and Procedures.



GPD GENERAL ORDER
86-G-31



| | GREENWOOD POLICE DEPARTMENT | 86-G-31 |
|---|---|---|
| | **General Order: 86-G-31** | |
| TITLE: | Use of Force/OC Spray/Impact Weapons | |
| First Issued Date: 3/6/1986 Last Revision Date: 03/07/2012 | **EFFECTIVE DATE: May 10, 2012** | |

## I.   PURPOSE

The purpose of this directive is to establish guidelines in the appropriate use of force.

## II.   POLICY

The value of human life is immeasurable in our society. Police Officers have been delegated the awesome responsibility of protecting life, property and the apprehension of criminal offenders. The protection of property and the apprehension of criminal offenders must at all times be subservient to the protection of life, including that of the officer. Officers of this agency will use the **minimum** amount of force necessary to effectively protect the element of human life, to subdue, apprehend or recapture an individual (s).

## III.   DEFINITIONS

A.   ALTERNATIVE FORCE:  Any defensive action except deadly force.

B.   DEADLY FORCE:  Any action that a reasonable and prudent person would consider likely to create a serious degree of risk or is intended to cause death or serious bodily injury.

C.   DEFENSIVE TACTICS:  The technique used in protecting oneself from a threat of force from an individual.

D.   FIREARM:  An instrument used in the propulsion of shot, shell or bullets by the action of gunpowder exploding within it.

E.   FORCE:  Any act of employing physical power of strength whether by hand, weapon, or other means.

F.   IMPACT WEAPON:  Standard issue police baton, of size, material type and configuration as specified by this agency and used for defensive purposes.

G.   REASONABLE FORCE:  The degree of force which is not excessive and is appropriate in protecting oneself or one's property under the circumstances.

## IV.   IMPACT WEAPONS

a.   An impact weapon shall only be used to defend yourself and never used to initiate a confrontation.

b.  An impact weapon carried or used by an officer must be approved by this department and be of the size, configuration and material type specified by the impact instructor.

V.  IMPROVISED WEAPONS

The Greenwood Police Department realizes and acknowledges that in tense uncertain or rapidly evolving confrontations an officer may have to reasonably use techniques, weapons, and/or improvised weapons that are:

1.  Not a part of the agencies formal training program;
2.  That may not be covered in this or other departmental policies;
3.  Not in conformity to training or; or
4.  Has an unintentional, on the part of the officer, impact point or outcome that is not part of the agencies training curriculum, due to the suspect's own actions.

All Officers actions that are deemed reasonable in retrospect will be considered to be covered within policy, even if the specific action and/or operation are not specifically addressed herein.

VI.  CHEMICAL AGENTS

A.  Chemical Agent/Belt Unit

1.  Officers may use the chemical agent, aerosol belt unit, issued by the department as an intermediate defensive weapon.  Officers should only use chemical agents authorized and issued by the department

2.  The issued chemical agent, aerosol belt unit, shall be carried in an authorized holster on the gun belt at a location that is easily accessible to the officer.

B.  Custody of Chemical Agents

1.  Chemical agents assigned to the Special Weapons and Tactics Team (SWAT) shall remain in the custody of the SWAT.

2.  SWAT members shall maintain issued chemical agents with their assigned SWAT equipment and supplies.

3.  All other issued chemical agents shall remain in the possession of the individual officer. The issued chemical agent shall be carried on duty and may be carried off duty.

4.  Additional chemical agent replenishment supplies will be stored and maintained by the Training Coordinator.

C.  Use of Chemical Agents

1.  Chemical agents may be used as an alternate action in lieu of the expandable baton in appropriate circumstances and not intended as an absolute replacement for the baton or firearm.

2.  The use of chemical agents fall into the category of hard intermediate weapons in the force continuum doctrine and may be used when empty hand techniques are inadequate and deadly force is not warranted.

3.  Prior to the application of chemical agents, or any force, officers are directed to use interpersonal communications techniques in an effort to resolve the situation.

4.  Issued chemical agents may be used by officers when circumstances require the use of lawful force, i.e., attempting to subdue an attacker, about to be physically assaulted or a physically resisting offender.

     a.  Chemical agents shall not be used indiscriminately.

5.  Department issued chemical agents shall be applied as necessary to control and/or restrain unlawful or violent behavior.  At no time at shall officers apply more chemical agents than reasonable to effect an arrest.

6.  Officers assigned to the SWAT team and authorized to dispense chemical agents shall do so upon the command of the SWAT commander, his designee, or a ranking supervisor.  Circumstances for dispensing chemical agents shall include, but not be limited to the following.

     a.  Minimize unlawful behavior;

     b.  Control violent behavior;

     c.  To disperse crowds;

     d.  Control crowd movement;

     e.  Barricaded subject(s) and/or;

     f.  Hostage situations.

7.  Chemical agents may be used to effect the removal of offenders who have confined themselves in closed vehicles and refuse to emerge only when authorized to do so by a supervisor using the following guidelines:

     a.  Removal of an offender from a vehicle shall be accomplished as  quickly as possible after introducing the chemical agent to the interior of the vehicle.

     b.  Officers will be aware that offenders may exit a vehicle into the path of on coming traffic.  Officers will take every precaution to protect the offender from that traffic including; blocking and stopping traffic from proceeding past the incident as chemical agents are being introduced into the vehicle.

     c.  Officers applying chemical agents to any offender in a vehicle shall, prior to introduction of the chemical agent, instruct the

subject to exit   the vehicle from the side offering the greatest measure of safety.

    8.   Officers should attempt to refrain from deploying chemical agents in the immediate vicinity of infants, small children, or the obvious elderly person.

    9.   Chemical agents may be used against aggressive animals in lieu of deadly force.

D.   Certification/Re-Certification for use of chemical agents.

    1.   Initial certification for use of chemical agents will occur during in-service training.

E.   Medical aid after exposure to chemical agents.

    1.   Persons to whom a chemical agent has been applied shall be given first aid as soon as the situation allows.

    2.   In cases where first aid treatment fails to provide relief the person shall be checked out by a medic.  If the medic is unable to provide relief and the medic recommends it, the subject shall  be taken to the nearest medical facility for treatment.

F.   Required reports of the use of chemical agents.

    1.   A use of force report will be completed in each case chemical agents are used.  Use of a  chemical agent will also be noted in the officer's case report.  The jailer or booking officer shall be informed any time an offender has been subdued with chemical agents.

Officers assigned to the Uniform Division shall be required to carry at least two less than lethal weapons from the following list:

Taser
OC Spray
Expandable Baton

V.   Force

A.   Alternative Force

    1.   Defense Tactics

        a.   Body language/presence
        b.   Voice commands
        c.   Control holds
        d.   Takedown techniques
        e.   Impact weapon

    2.   Chemical Agents

B.   Deadly Force

Deadly force can only be used when the officer has probable cause to believe that the suspect (s) poses a threat of serious physical harm, either to the officer or to others.

There are three basic elements that must be met before deadly force can be used.

1.   ABILITY
2.   OPPORTUNITY
3.   JEOPARDY

The suspect must have the ability to harm you or another person, must have the opportunity to cause the injury, and the officer or person must be in jeopardy. Once all three of these elements have been met, deadly force may be used under the following conditions:

1.   A law enforcement officer is justified in using reasonable force if necessary to affect a lawful arrest. However, an officer is justified in using deadly force only if he reasonably believes that the force is necessary:

   a.   to prevent serious bodily injury to himself or a third person; or

   b.   to prevent the commission of a forcible felony where the officer has reason to believe that serious bodily injury or death might or has occurred; or

   c.   to effect the arrest of a person who has committed or attempted to commit a forcible felony where the officer has reason to believe that serious bodily injury or death has or might occur.

2.   A law enforcement officer making an arrest under an invalid warrant is justified in using force as if the warrant was valid, unless he knows that the warrant is invalid.

3.   A law enforcement officer who has an arrested person in his custody is justified in using the same force to prevent the escape of the arrested person from his custody that he would be justified in using if he was arresting that person.

4.   A law enforcement officer is justified in using reasonable force, if he reasonably believes that force is necessary to prevent the escape of a person who is detained in the penal facility.  Deadly force may be used if the circumstance comply with section V, subsection B, 1 (a,b)

5.   This directive will apply to juvenile offenders as well as adult offenders in relation to the use of force.

6.   Where an animal is involved, deadly force is authorized in the defense of an individual, including the officer, from serious bodily injury or death.  Deadly force may also be used against animals for humane reasons, if the animal is injured or if the animal poses a threat or nuisance to the community.

7. Officers must use reasonable caution when employing deadly force in situations where innocent bystanders would be injured.

8. Officers will not discharge their firearm with the intent to kill, but to stop and incapacitate an assailant from completing a potentially dangerous act as described in the following section. For maximum effectiveness and minimal danger to innocent bystanders, the officer should aim at center mass.

SPECIAL NOTE: Warning Shots Are Prohibited

VI.   ADMINISTRATIVE ACTION

A.   Whenever a situation where deadly force is involved resulting in the death or serious bodily injury, the officer (s) involved will be placed on administrative leave by the supervisor on duty, as soon as time and circumstances allow. The Chief of Police will ratify the decision of the supervisor as soon as possible. The purpose of the leave is to:

1. Allow the officer time away form the normal agency responsibility so he may address the personal and emotional needs arising from the incident.

2. Require the officer(s) involved to seek counseling in dealing with the moral, ethical and or psychological effect of the incident.

3. Allow for the officer(s) involved to be available for the review board(s).

B.   Because the shooting incident will be handled as any crime scene, the supervisor on duty will remove, from each officer involved, all firearms including the ammunition and/or any other weapon which might be evidence in the case. These items will be considered evidence and will be properly tagged and placed into the property room.

C.   The officer(s) involved will be issued a temporary replacement weapon and new ammunition until the duty weapon is released from the investigation.

D.   The firearms review board will convene and conduct the administrative review of the incident as soon as possible.

E.   Prior to returning to active duty, if a firearm was used, the officer involved will be required to attend a firearms training and qualification.

SPECIAL NOTES:

The spouse and/or family of the officer involved will be afforded counseling along with the officer to assist in dealing with the after effects of the situation.

Officer(s) placed upon administrative leave as a result of this directive will not suffer any loss of pay or benefits. Administrative leave will be under the authority of the Chief of Police and will continue until the review of the incident is complete.

In all cases where any individual has been seriously injured or killed as a result of action taken by an officer, the involved officer(s) and/or his family will be required to seek the

services of a Mental Health Counselor or the department chaplain, to be made available by this agency.

THIS DIRECTIVE IS FOR AGENCY USE ONLY AND DOES NOT APPLY IN ANY CRIMINAL OR CIVIL PROCEEDING.  THIS DIRECTIVE SHOULD NOT BE CONSTRUED AS CREATING A HIGHER LEGAL STANDARD OF SAFETY OR CARE WITH RESPECT TO THIRD PARTY CLAIMS.  VIOLATION OF THIS DIRECTIVE WILL ONLY FORM THE BASIS FOR AGENCY ADMINISTRATIVE SANCTIONS. VIOLATIONS OF LAW WILL FORM THE BASIS FOR CRIMINAL OR CIVIL SANCTIONS IN A RECOGNIZED JUDICIAL SETTING.

By Order of the Chief of Police



| GREENWOOD POLICE DEPARTMENT | 86-G-31 |
|---|---|

**General Order: 86-G-31**

| TITLE: | Use of Force/OC Spray/Impact Weapons |
|---|---|

| First Issued Date: 3/6/1986 | EFFECTIVE DATE: |
|---|---|
| Last Revision Date: 01/15/2017 | March 1, 2017 |

### I. PURPOSE

The purpose of this directive is to establish guidelines in the appropriate use of force.

### II. POLICY

The value of human life is immeasurable in our society. Police Officers have been delegated the awesome responsibility of protecting life, property and the apprehension of criminal offenders. The protection of property and the apprehension of criminal offenders must at all times be subservient to the protection of life, including that of the officer. Officers of this agency will use the **minimum** amount of force necessary to effectively protect the element of human life, to subdue, apprehend or recapture an individual (s).

### III. DEFINITIONS

A. **ALTERNATIVE FORCE:** Any defensive action except deadly force.

B. **DEADLY FORCE:** Any action that a reasonable and prudent person would consider likely to create a serious degree of risk or is intended to cause death or serious bodily injury.

C. **DEFENSIVE TACTICS:** The technique used in protecting oneself from a threat of force from an individual.

D. **FIREARM:** An instrument used in the propulsion of shot, shell or bullets by the action of gunpowder exploding within it.

E. **FORCE:** Any act of employing physical power of strength whether by hand, weapon, or other means.

F. **IMPACT WEAPON:** Standard issue police baton, of size, material type and configuration as specified by this agency and used for defensive purposes.

G. **REASONABLE FORCE:** It is the policy of the Greenwood Police Department that officers use only the force that is reasonably necessary to effectively bring an incident under control and to accomplish lawful objectives. Any use of force must be objectively reasonable. The officer must only use that force which a reasonably prudent officer would use under the same or similar circumstances at the time the incident occurs.

1

H.     PHYSICAL TACTICS:  Are tactics used to bring a subject into compliance.

I.     INTERMEDIATE WEAPON:  Chemical agent spray, Taser or expandable baton that is deployed when lesser tactics are not working.  They are to lessen the officer's chance of injury due to the combative subject actions when physical contact failed and prior to the use of deadly force.  Intermediate weapons are designed to bring combative subjects under control and not to cause serious injury or death.

IV.    INTERMEDIATE WEAPON USE

a.     Intermediate weapons may be used when physical force is failing or a suspect is exhibiting behavior that would lead a prudent officer to believe that physical injury can occur if physical contact occurs and lethal force is not necessary.

b.     An intermediate weapon shall only be used to defend yourself or bring a combative suspect under control and never used to initiate a confrontation.

IV.    IMPACT WEAPONS

a.     An impact weapon shall only be used to defend yourself and never used to initiate a confrontation.

b.     An impact weapon carried or used by an officer must be approved by this department and be of the size (no less than 21 inched expanded), configuration and material type specified by the impact instructor.

V.     SPECIALTY IMPACT MUNITIONS

A.     This policy addresses the use of Specialty Impact Munitions defined as extended range less lethal weapons and projectiles and as extended range batons.  The Greenwood Police Department recognizes that combative, non-compliant, armed and/or violent subjects cause handling and control problems that require special training and equipment.  Thus, the department has adopted the less-lethal force philosophy to assist with the de-escalation of these potentially violent confrontations.

1.    Impact Munitions

c.     The primary "less lethal" projectile used by the Greenwood Police Department is the 40mm flexible baton.
d.     The primary "less lethal" launcher used by the Uniform Division of the Greenwood Police Department is the Defense Technology Model 1440, 40mm Tactical 4-Shot Launcher.

2.    Deployment Recommendations

a.     All officers must give special attention to the deployment of specialty impact munitions.  Many factors should be considered in order to ensure the safety of all those involved.  Specialty impact munitions should be used by the officers trained in there use by a certified instructor and following approved guidelines.

2

VI.   IMPROVISED WEAPONS

The Greenwood Police Department realizes and acknowledges that in a tense uncertain or rapidly evolving confrontations an officer may have to reasonably use techniques, weapons, and/or improvised weapons that are:

1.   Not a part of the agencies formal training program;
2.   That may not be covered in this or other departmental policies;
3.   Not in conformity to training or; or
4.   Has an unintentional, on the part of the officer, impact point or outcome that is not part of the agencies training curriculum, due to the suspect's own actions.

All Officers actions that are deemed reasonable in retrospect will be considered to be covered within policy, even if the specific action and/or operation are not specifically addressed herein.

VII.   CHEMICAL AGENTS

A.   Chemical Agent/Belt Unit

1.   Officers may use the chemical agent, aerosol belt unit, issued by the department as an intermediate defensive weapon.  Officers should only use chemical agents authorized and issued by the department.

2.   The issued chemical agent, aerosol belt unit, shall be carried in an authorized holster on the gun belt at a location that is easily accessible to the officer.

B.   Custody of Chemical Agents

1.   Chemical agents assigned to the Special Weapons and Tactics Team (SWAT) shall remain in the custody of the SWAT.

2.   SWAT members shall maintain issued chemical agents with their assigned SWAT equipment and supplies.

3.   All other issued chemical agents shall remain in the possession of the individual officer. The issued chemical agent shall be carried on duty and may be carried off duty.

4.   Additional chemical agent replenishment supplies will be stored and maintained by the Training Coordinator.

C.   Use of Chemical Agents

1.   Chemical agents may be used as an alternate intermediate weapon in lieu of the expandable baton or Taser in appropriate circumstances and not intended as an absolute replacement for the baton, Taser or firearm.

2.   The use of chemical agents fall into the category of intermediate weapons and may be used when empty hand techniques are inadequate and deadly force is not warranted.

3

3. Prior to the application of chemical agents, or any force, officers are directed to use loud and repetitive interpersonal communications techniques in an effort to resolve the situation.

4. Issued chemical agents may be used by officers when circumstances require the use of lawful force, i.e., attempting to subdue an attacker, about to be physically assaulted or a physically resisting offender.

   a. Chemical agents shall not be used indiscriminately.

5. Department issued chemical agents shall be applied as necessary to control and/or restrain unlawful or violent behavior.  At no time at shall officers apply more chemical agents than reasonable to effect an arrest.

6. Officers assigned to the SWAT team and authorized to dispense chemical agents shall do so upon the command of the SWAT commander, his designee, or a ranking supervisor.  Circumstances for dispensing chemical agents shall include, but not be limited to the following.

   a. Minimize unlawful behavior;

   b. Control violent behavior;

   c. To disperse crowds;

   d. Control crowd movement;

   e. Barricaded subject(s) and/or;

   f. Hostage situations.

7. Chemical agents may be used to effect the removal of offenders who have confined themselves in closed vehicles and refuse to emerge only when authorized to do so by a supervisor using the following guidelines:

   a. Removal of an offender from a vehicle shall be accomplished as  quickly as possible after introducing the chemical agent to the interior of the vehicle.

   b. Officers will be aware that offenders may exit a vehicle into the path of on coming traffic.  Officers will take every precaution to protect the offender from that traffic including; blocking and stopping traffic from proceeding past the incident as chemical agents are being introduced into the vehicle.

   c. Officers applying chemical agents to any offender in a vehicle shall, prior to introduction of the chemical agent, instruct the subject to exit   the vehicle from the side offering the greatest measure of safety.

4

        8.  Officers should attempt to refrain from deploying chemical agents in the immediate vicinity of infants, small children, or the obvious elderly person.

        9.  Chemical agents may be used against aggressive animals in lieu of deadly force.

       10.  A fire extinguisher used in the same manner as irritant spray is considered a chemical agent.

D.    Certification/Re-Certification for use of chemical agents.

        1.  Initial certification for use of chemical agents will occur during in-service training.

E.    Medical aid after exposure to chemical agents.

        1.  Persons to whom a chemical agent has been applied shall be given first aid as soon as the situation allows.

        2.  In cases where first aid treatment fails to provide relief the person shall be checked out by a medic.  If the medic is unable to provide relief and the medic recommends it, the subject shall be taken to the nearest medical facility for treatment.

F.    Required reports of the use of chemical agents.

        1.  A use of force report will be completed in each case chemical agents are used.  Use of a  chemical agent will also be noted in the officer's case report.  The jailer or booking officer shall be informed any time an offender has been subdued with chemical agents.

G.    Officers assigned to the Uniform Division shall be required to carry the department issued Taser and at least one intermediate weapon from the following list:

        OC Spray
        Expandable Baton (at least 21 inches expanded)

VIII.   Deadly Force

Deadly force can only be used when the officer has probable cause to believe that the suspect (s) poses a threat of serious physical harm, either to the officer or to others.
There are three basic elements that must be met before deadly force can be used.

    1.     ABILITY
    2.     OPPORTUNITY
    3.     JEOPARDY TO ANYONE INCLUDING THE SUSPECT

The suspect must have the ability to harm you or another person, must have the opportunity to cause the injury, and the officer or person must be in jeopardy.

5

Once all three of these elements have been met, deadly force may be used under the following conditions:

1. A law enforcement officer is justified in using reasonable force if necessary to affect a lawful arrest. However, an officer is justified in using deadly force only if he reasonably believes that the force is necessary:

    a.     to prevent serious bodily injury to himself or a third person; or

    b.     to prevent the commission of a forcible felony where the officer has reason to believe that serious bodily injury or death might or has occurred; or

    c.     to effect the arrest of a person who has committed or attempted to commit a forcible felony where the officer has reason to believe that serious bodily injury or death has or might occur.

2. A law enforcement officer making an arrest under an invalid warrant is justified in using force as if the warrant was valid, unless he knows that the warrant is invalid.

3. A law enforcement officer who has an arrested person in his custody is justified in using the same force to prevent the escape of the arrested person from his custody that he would be justified in using if he was arresting that person.

4. A law enforcement officer is justified in using reasonable force, if he reasonably believes that force is necessary to prevent the escape of a person who is detained in the penal facility.  Deadly force may be used if the circumstance comply with section V, subsection B, 1 (a,b)

5. This directive will apply to juvenile offenders as well as adult offenders in relation to the use of force.

6. Where an animal is involved, deadly force is authorized in the defense of an individual, including the officer, from serious bodily injury or death.  Deadly force may also be used against animals for humane reasons, if the animal is injured or if the animal poses a threat or nuisance to the community.

7. Officers must use reasonable caution when employing deadly force in situations where innocent bystanders would be injured.

8. Officers will not discharge their firearm with the intent to kill, but to stop and incapacitate an assailant from completing a potentially dangerous act as described in the following section.  For maximum effectiveness and minimal danger to innocent bystanders, the officer should aim at center mass.

SPECIAL NOTE:  Warning Shots Are Prohibited

6

IV.   ADMINISTRATIVE ACTION

A.   Whenever a situation where deadly force is involved resulting in the death or serious bodily injury, the officer (s) involved will be placed on administrative leave by the supervisor on duty, as soon as time and circumstances allow.  The Chief of Police will ratify the decision of the supervisor as soon as possible.  The purpose of the leave is to:

1.   Allow the officer time away form the normal agency responsibility so he may address the personal and emotional needs arising from the incident.

2.   Require the officer(s) involved to seek counseling in dealing with the moral, ethical and or psychological effect of the incident.

3. Allow for the officer(s) involved to be available for the review board(s).

B.   Because the shooting incident will be handled as any crime scene, the supervisor on duty will remove, from each officer involved, all firearms including the ammunition and/or any other weapon which might be evidence in the case.  These items will be considered evidence and will be properly tagged and placed into the property room.

C.   The officer(s) involved will be issued a temporary replacement weapon and new ammunition until the duty weapon is released from the investigation.

D.   The firearms review board will convene and conduct the administrative review of the incident as soon as possible.

E.   Prior to returning to active duty, if a firearm was used, the officer involved will be required to attend a firearms training and qualification.

SPECIAL NOTES:

The spouse and/or family of the officer involved will be afforded counseling along with the officer to assist in dealing with the after effects of the situation.

Officer(s) placed upon administrative leave as a result of this directive will not suffer any loss of pay or benefits.  Administrative leave will be under the authority of the Chief of Police and will continue until the review of the incident is complete.

In all cases where any individual has been seriously injured or killed as a result of action taken by an officer, the involved officer(s) and/or his family will be required to seek the services of a Mental Health Counselor or the department chaplain, to be made available by this agency.

THIS DIRECTIVE IS FOR AGENCY USE ONLY AND DOES NOT APPLY IN ANY CRIMINAL OR CIVIL PROCEEDING.  THIS DIRECTIVE SHOULD NOT BE CONSTRUED AS CREATING A HIGHER LEGAL STANDARD OF SAFETY OR CARE WITH RESPECT TO THIRD PARTY CLAIMS.  VIOLATION OF THIS DIRECTIVE WILL ONLY FORM THE BASIS FOR AGENCY ADMINISTRATIVE SANCTIONS. VIOLATIONS OF LAW WILL FORM THE BASIS FOR CRIMINAL OR CIVIL SANCTIONS IN A RECOGNIZED JUDICIAL SETTING.

By Order of the Chief of Police



GFD SOP-40



| GREENWOOD POLICE DEPARTMENT | SOP-40 |
|---|---|
| Standard Operating Procedure SOP-40 | |
| TITLE: Taser Use | |
| First Issued Date: 5/1/2005<br>Last Revision Date: 6/3/2008 | EFFECTIVE DATE:<br>May 10, 2012 |

This policy is intended to provide general guidelines for the use of the M26, and X26 Advanced Taser, hereinafter Taser (hereinafter, collectively referred to as, the "Taser"). The Taser will be used as a supplementary police tool and is not intended to replace firearms or other self-defense techniques. The Taser may reduce the need for other types of physical force by the officer. This policy will also stress the importance of proper training with the Taser.

I.   POLICY:

The Taser is a less-than-lethal electronic control devise that uses propelled wires to conduct energy to a remote target, thereby controlling and overriding the body's nervous system. It uses neuro-muscular incapacitation (NMI) to stimulate the peripheral nervous system by causing direct stimulation of motor nerves contracting muscles. This causes an uncontrollable contraction of the muscle tissue, allowing the Taser to physically debilitate a target regardless of pain tolerance or mental focus. At a high level, stun systems affect the sensory nervous system whereas the NMI systems affect the motor nervous system and muscles causing direct physical incapacitation.

The Taser fires two (2) probes up to a distance of thirty-five (35) feet from a replaceable cartridge. These probes are connected to the weapon by high voltage insulated wire. When the probe makes contact with the target, the Taser transmits electrical pulses along the wires into the body of the target, through up to two (2) inches of clothing.

The Taser also has contact probes at the front of the unit that allows a back-up drive stun. The Taser has a data port that stores the time and date when it was fired. This data protects the officers from claims of excessive use of force by providing complete and accurate documentation of each firing.

The Taser is a defensive weapon listed in the Use of Force policy after "Verbal and Physical Directions or Commands", and before "Chemical Agents". The decision to use the Taser depends on the actions and the critical distance of the threat.

The use of the Taser gives police officers an alternative to lethal force when involved in cases, including but not limited to:

- Individuals threatening others who are aggressive, uncooperative, and not responding to verbal commands.
- Individuals that pose a threat to themselves or others.
- Disarming individuals armed with weapons i.e. knives, clubs or other items, which are used in a threatening manner.

- Violent subjects.
- Civil disobedience.
- Civil riot situations.
- Correctional facility riot.
- Correctional facility disobedience.
- Aggressive animals.
- Other circumstances, where the officer by virtue of his/her specialized training with Taser, deem it appropriate.

II.   PROCEDURE:

A.   Authority to Carry and Use:

1.  The Taser shall be issued to and worn by sworn personnel who have completed the Taser-training program.

2.  Only properly functioning and charged Taser's shall be used.

3.  Each officer carrying an M26 or X26 Taser should check the device before the beginning of each shift for battery strength and to ensure that the device is functioning properly.  A spark test of the M-26 or X-26 is also recommended prior to starting each shift.

B.   Operation of the Taser:

1.  Keep hands away from the front of the unit at all times unless the safety slide is forward and the Taser is deactivated.  Never place your hands in front of the cartridge at any time after placement on the weapon.

2.  Prior to the use of the Taser, if practical, notify other officers on scene of the imminent deployment of the Taser to prevent officer surprise and sympathetic shootings.  Recommended notification is shouting "TASER".

3.  Use verbal commands and point laser light at subject prior to firing.

4.  Have a second air cartridge present or a second Taser ready to fire in case of a miss or malfunction.

5.  Unless the situation requires the immediate use of force to protect the officer or a third party, always have a backup officer present in any direct confrontation.

6.  Use available distance to ensure officer safety  Optimum range is seven (7) to fifteen (15) feet.

7.  Aim for the lower torso.  Never aim the Taser at the suspect's face or head area, unless a higher level of force is needed

8.  The Taser is programmed to give a 5-second electrical charge.  While the charge is being applied, do not touch the probes; make contact within two inches of the probe, or between the probes in order to avoid receiving the same "electrical current" as the target.  Avoid stepping on or tripping over the wires.

9.  **Do not fire the Taser near flammable liquids or fumes**  The Taser can ignite gasoline or other flammable liquids.  Do not utilize the Taser in a suspected meth lab  Some self-defense sprays are flammable and would be extremely dangerous to use

in conjunction with the Taser.  **NOTE: The current oleoresin capsicum (OC) spray issued by the Greenwood Police Department is non-flammable.**

10. The Taser is very effective on suspects in the water or in wet environments, but use with extreme caution on targets in the water as they may become incapacitated and possibly drown.  Do not deploy the Taser at a suspect in deep water.

11. Watch for thick and/or loose clothing.  If probes hit clothing, the electrical current can only penetrate a maximum of two (2) inches.

12. Once you have used the Taser do not re-fire the weapon unless the suspect continues to resist.  The Taser documents each time the weapon is discharged.  Your engaging the weapon after the suspect has been subdued may be mistaken for mistreatment of the offender.

13. The Taser will automatically introduce five-second energy current with each single pull of the trigger.  The operator can extend the time length by holding down the trigger, or shorten the time by turning off the weapon via the safety lever.

14. The arrest team **can touch** and handcuff the suspect **while the Taser is being fired.** The incapacitation caused by the Taser greatly enhances the officer's ability to control the suspect.

15. The Taser **should not** be used on a suspect being engaged by a K-9 (Police Dog).

16. Following the use of a Taser, the employing officer must complete a Use of Force Report.

C.   **Supervisor Responsibility:**

The immediate supervisor of any officer using the Taser in the line of duty shall, upon notification or observation of use, ensure that:

1. The officer who uses the Taser completes the Use of Force Report.  This report will be submitted to the Training Director, and Assistant Chief.

2. Medical treatment is provided to all subjects and noted on all reports.

3. The spent air cartridge and probes shall be submitted into the property room as evidence.  The probes should be treated as a hazardous material.  The cartridge shall be entered into the Spillman property as follows:

> Item= *cartridge*
> Brand= *Taser*
> Model= *35' (or the length of the cartridge being entered)*
> Serial number= *serial number on back of Taser cartridge*



D.   **Medical Treatment:**

1   Once the target is under control, the officer shall advise communications that a person has been subjected to the Taser.

2.   If the probes penetrate the skin, then removal should be by a trained officer or medical staff.  Officers should wear gloves when removing the probes from the subject and observe universal precautions when dealing with potential blood exposure.  Medics should clean and bandage the wounds if necessary

3.   If the probes are embedded in soft tissue areas such as the neck, face, and groin, removal shall be by medical staff only.  A sample probe will go with the subject to the hospital or emergency room to be shown to the staff treating the subject.

4.   Always seek medical attention for the affected subject after any use of the Taser This can be conducted by an ambulance crew or fire rescue  After examining the affected subject, the medics will make the determination if the subject should or should not be transported to the hospital for evaluation.  This determination should not be made by the officer.

5.   When the Taser is used, secondary injuries can occur and are usually caused by falling to the ground.  These types of impact injuries may require transportation to the nearest hospital for treatment.  Evaluation by a medic is the proper method of determining whether such injuries exist, officers should not attempt to make this determination.

E.   **Care of the Taser:**

The Taser is a sensitive electronic product and costly device that should be stored in its protective case when not in use.  Care should be taken to avoid dropping the unit and to

assure that it is adequately secured at all times.  Defective Taser's and Taser cartridges should be turned into Taser Coordinator.

Spark test recommended prior to start of shift for both M-26 and X-26.

Always replace air cartridges by their expiration date and use expired cartridges for training purposes only.

F.    Training:

All Taser instructors are required to complete re-training every two years to remain eligible to instruct on the Taser.  All officers authorized to use the Taser must successfully complete re-training and receive certification with the device at least once every two (2) years to remain eligible to use the device.

All officers will attend training on the M-26 or X-26 Taser. Each of these employees must take one (1) hit from the device to understand the temporary incapacitation qualities of the weapon.  The Chief of Police may waive this requirement due to medical conditions Once you have complied you will not be required to take any additional hits in future training, unless you so desire.

G.    Tactical Considerations and Limitations:

DO NOT USE THE TASER IN ANY OF THE FOLLOWING SITUATIONS:
a.    Any known or obviously pregnant female. (danger of secondary fetal injury due to fall), unless deadly force is the only other option.
b.    Any subject who is saturated with or in the presence of a highly flammable or combustible atmosphere, material and liquid.
c.    Any subject who may receive a secondary injury resulting from a fall from its use, I.E. standing on a roof ledge, a high elevation, bridge, etc. unless deadly force is the only other option.
d.    As a tool of coercion, punishment or any other unjustified use not necessary for the officer or other's safety or to subdue and restrain the subject.
e.    When a prisoner is handcuffed, unless such use would prevent the prisoner from inflicting serious bodily injuries to another person or escape of the suspect.
f.    Excessive use of the Taser in subduing a subject is forbidden.
g.    To escort or jab individuals
h.    To awaken unconscious or intoxicated individuals

THE TASER SHOULD NOT BE USED IN ANY OF THE FOLLOWING SITUATIONS UNLESS THERE ARE COMPELLING, ARTICULABLE REASONS TO DO SO:

a.    When the subject is operating a moving motor vehicle.
b.    When the subject is holding a firearm.
c.    When the subject is at the extremes of age or physical disability..
d.    In a situation where deadly force is clearly justifiable unless another officer is present and capable of providing deadly force to protect the TASER officers and/or civilians as necessary.

NOTE: This directive shall be considered conclusive on all matters herein discussed, however, the above lists in Section G are not meant to be all inclusive.  With respect to situations not specifically described in Section G, Taser use may be justified, and officers would be authorized to employ such tactics, in situations similar to those described above if where the use of deadly force is justified, and due to the unique circumstances at the time of the situation the officer opts to try the less than lethal Taser alternative.

By order of the Chief of Police



| GREENWOOD POLICE DEPARTMENT | SOP-40 |
|---|---|
| **Standard Operating Procedure SOP-40** | |
| TITLE: Taser Use | |
| First Issued Date: 5/1/2005  Last Revision Date: 8/7/2017 | EFFECTIVE DATE: August 21, 2017 |

This policy is intended to provide general guidelines for the use of the X2, and X26P Advanced Taser, hereinafter Taser (hereinafter, collectively referred to as, the "Taser"). The Taser will be used as a supplementary police tool and is not intended to replace firearms or other self-defense techniques. The Taser may reduce the need for other types of physical force by the officer. This policy will also stress the importance of proper training with the Taser.

I.    POLICY:

The Taser is a less-than-lethal electronic control devise that uses propelled wires to conduct energy to a remote target, thereby controlling and overriding the body's nervous system. It uses neuro-muscular incapacitation (NMI) to stimulate the peripheral nervous system by causing direct stimulation of motor nerves contracting muscles. This causes an uncontrollable contraction of the muscle tissue, allowing the Taser to physically debilitate a target regardless of pain tolerance or mental focus. At a high level, stun systems affect the sensory nervous system whereas the NMI systems affect the motor nervous system and muscles causing direct physical incapacitation.

The Taser fires two (2) probes up to a distance of thirty-five (35) feet from a replaceable cartridge. These probes are connected to the weapon by high voltage insulated wire. When the probe makes contact with the target, the Taser transmits electrical pulses along the wires into the body of the target, through up to two (2) inches of clothing.

The Taser also has contact probes at the front of the unit that allows a back-up drive stun. The Taser has a data port that stores the time and date when it was fired. This data protects the officers from claims of excessive use of force by providing complete and accurate documentation of each firing.

The Taser is a defensive weapon listed in the Use of Force policy after "Verbal and Physical Directions or Commands". The decision to use the Taser depends on the actions and the critical distance of the threat.

The use of the Taser gives police officers an alternative to lethal force when involved in cases, including but not limited to:

•    Individuals threatening others who are aggressive, uncooperative, and not responding to verbal commands.
•    Individuals that pose a threat to themselves or others.
•    Disarming individuals armed with weapons i.e. knives, clubs or other items, which are used in a threatening manner.

1

- Violent subjects.
- Civil disobedience.
- Civil riot situations.
- Correctional facility riot.
- Correctional facility disobedience.
- Aggressive animals.
- Other circumstances, where the officer by virtue of his/her specialized training with Taser, deem it appropriate.

II.   PROCEDURE:

A.   Authority to Carry and Use:

1. The Taser shall be issued to and worn by sworn personnel who have completed the Taser-training program.

2. Only properly functioning and charged Taser's shall be used.

3. Each officer carrying a Taser should check the device before the beginning of each shift for battery strength and to ensure that the device is functioning properly.  A regular spark test of the Taser is mandatory and is also recommended prior to starting each shift.

B.   Operation of the Taser:

1. Keep hands away from the front of the unit at all times unless the safety slide is forward and the Taser is deactivated.  Never place your hands in front of the cartridge at any time after placement on the weapon.

2. Prior to the use of the Taser, if practical, notify other officers on scene of the imminent deployment of the Taser to prevent officer surprise and sympathetic shootings.  Recommended notification is shouting "TASER".

3. Use verbal commands and point laser light at subject prior to firing.

4. Have a second air cartridge present or a second Taser ready to fire in case of a miss or malfunction.

5. Unless the situation requires the immediate use of force to protect the officer or a third party, always have a backup officer present in any direct confrontation.

6. Use available distance to ensure officer safety.  Optimum range is seven (7) to fifteen (15) feet.

7. Aim for the lower torso.  Never aim the Taser at the suspect's face or head area, unless a higher level of force is needed.

8. The Taser is programmed to give a 5-second electrical charge.  While the charge is being applied, do not touch the probes; make contact within two inches of the probe, or between the probes in order to avoid receiving the same "electrical current" as the target.  Avoid stepping on or tripping over the wires.

9. **Do not fire the Taser near flammable liquids or fumes**.  The Taser can ignite gasoline or other flammable liquids.  Do not utilize the Taser in a suspected meth lab.  Some self-defense sprays are flammable and would be extremely dangerous to use

2

in conjunction with the Taser.  **NOTE: The current oleoresin capsicum (OC) spray issued by the Greenwood Police Department is non-flammable.**

10. The Taser is very effective on suspects in the water or in wet environments, but use with extreme caution on targets in the water as they may become incapacitated and possibly drown.  Do not deploy the Taser at a suspect in deep water.

11. Watch for thick and/or loose clothing.  If probes hit clothing, the electrical current can only penetrate a maximum of two (2) inches.

12. Use the shortest duration of Taser exposure objectively reasonable to accomplish lawful objectives, and reassess the subject's behavior, reaction, and resistance before initiating or continuing the exposure.  If a Taser deployment is ineffective in incapacitating a subject or achieving compliance, consider alternative control measures in conjunction with or separate from the Taser.

13. The Taser will automatically introduce five-second energy current with each single pull of the trigger.  The operator can extend the time length by holding down the trigger, or shorten the time by turning off the weapon via the safety lever.

14. The arrest team **can touch** and handcuff the suspect **while the Taser is being fired.** The incapacitation caused by the Taser greatly enhances the officer's ability to control the suspect.

15. The Taser **should not** be used on a suspect being engaged by a K-9 (Police Dog)

16. Each time the probes are deployed or re-energized, Officers shall consider this a separate use of force incident, including the drive stun technique. Following the use of a Taser, the employing officer must complete a Use of Force Report.

C.   **Supervisor Responsibility:**

The immediate supervisor of any officer using the Taser in the line of duty shall, upon notification or observation of use, ensure that:

1.   The officer who uses the Taser completes the Use of Force Report and will add Taser Deployed to the Circumstance Field in Spilman.  This Use of Force Report will include the circumstances surrounding each time the weapon is energized.  This report will be submitted to the Training Director, and Assistant Chief.

2.   Medical treatment is provided to all subjects and noted on all reports.

3.   The spent air cartridge and probes shall be submitted into the property room as evidence.  The probes should be treated as a hazardous material.  The cartridge shall be entered into the Spillman property as follows:

> Item= *cartridge*
> Brand= *Taser*
> Model= *35' (or the length of the cartridge being entered)*
> Serial number= *serial number on back of Taser cartridge*

3



D.   Medical Treatment:

1.   Once the target is under control, the officer shall advise communications that a person has been subjected to the Taser.

2.   If the probes penetrate the skin, then removal should be by a trained officer or medical staff.  Officers should wear gloves when removing the probes from the subject and observe universal precautions when dealing with potential blood exposure.  Medics should clean and bandage the wounds if necessary.

3.   If the probes are embedded in soft tissue areas such as the neck, face, and groin, removal shall be by medical staff only.

4.   Always seek medical attention for the affected subject after any use of the Taser. This can be conducted by an ambulance crew or fire rescue.  After examining the affected subject, the medics will make the determination if the subject should or should not be transported to the hospital for evaluation.  This determination should not be made by the officer.

5.   When the Taser is used, secondary injuries can occur and are usually caused by falling to the ground.  These types of impact injuries may require transportation to the nearest hospital for treatment.  Evaluation by a medic is the proper method of determining whether such injuries exist, officers should not attempt to make this determination.

E.   Care of the Taser:

The Taser is a sensitive electronic product and costly device that should be stored in its protective case when not in use.  Care should be taken to avoid dropping the unit and to

4

assure that it is adequately secured at all times.  Defective Taser's and Taser cartridges should be turned into Taser Coordinator.

Spark test recommended prior to start of shift for both M-26 and X-26.

Always replace air cartridges by their expiration date and use expired cartridges for training purposes only.

F.    Training:

All Taser instructors are required to complete re-training every two years to remain eligible to instruct on the Taser.  All officers authorized to use the Taser must successfully complete re-training and receive certification with the device at least once every two (2) years to remain eligible to use the device.

All officers will attend training on the Taser. Each of these employees must take one (1) exposure from the device to understand the temporary incapacitation qualities of the weapon.  The Chief of Police may waive this requirement due to medical conditions. Once you have complied you will not be required to take any additional hits in future training, unless you so desire.

G.    Tactical Considerations and Limitations:

DO NOT USE THE TASER IN ANY OF THE FOLLOWING SITUATIONS:
a.   Any known or obviously pregnant female. (danger of secondary fetal injury due to fall), unless deadly force is the only other option.
b.   Any subject who is saturated with or in the presence of a highly flammable or combustible atmosphere, material and liquid.
c.   Any subject who may receive a secondary injury resulting from a fall from its use, I.E. standing on a roof ledge, a high elevation, bridge, etc. unless deadly force is the only other option.
d.   As a tool of coercion, punishment or any other unjustified use not necessary for the officer or other's safety or to subdue and restrain the subject.
e.   When a prisoner is handcuffed, unless such use would prevent the prisoner from inflicting serious bodily injuries to another person or escape of the suspect.
f.   Excessive use of the Taser in subduing a subject is forbidden.
g.   To escort or jab individuals
h.   To awaken unconscious or intoxicated individuals

THE TASER SHOULD NOT BE USED IN ANY OF THE FOLLOWING SITUATIONS UNLESS THERE ARE COMPELLING, ARTICULABLE REASONS TO DO SO:

a.   When the subject is operating a moving motor vehicle.
b.   When the subject is holding a firearm.
c.   When the subject is at the extremes of age or physical disability.
d.   In a situation where deadly force is clearly justifiable unless another officer is present and capable of providing deadly force to protect the TASER officers and/or civilians as necessary.

NOTE: This directive shall be considered conclusive on all matters herein discussed, however, the above lists in Section G are not meant to be all inclusive. With respect to situations not specifically described in Section G, Taser use may be justified, and officers would be authorized to employ such tactics, in situations similar to those described above if where the use of deadly force is justified, and due to the unique circumstances at the time of the situation the officer opts to try the less than lethal Taser alternative.

By order of the Chief of Police



V19 Annual CEW User Update

©1999-2013 TASER International, Inc.



# Annual CEW User Update

## Version 19
## April, 2013



V19 Annual CEW User Update

# Annual Certification Requirements

- Each agency must determine the contents of each continuing and update training
- TASER's minimum requirements for annual user recertification include:
  - Review of this entire presentation including notes
  - Review of current law enforcement warnings
  - Firing two cartridges

©1999-2013 TASER International Inc

V19 Annual CEW User Update

# Contents

- ECD Smart Use Guidelines: Legal Update
- Medical and Safety Refresher
- Tactical Consideration Update



**⚠ WARNING**

**Conducted Electrical Weapon**
- Can temporarily incapacitate target.
- Can cause death or serious injury.
- Obey warnings, instructions and all laws.
- Comply with current training materials and requirements.
- See www.TASER.com.

Be sure to read the notes for each slide

©1999-2013 TASER International Inc.

V19 Annual CEW User Update

# CEW Smart Use Considerations

TASER does not provide legal advice.

©1999-2013 TASER International Inc.

# 4th Amendment Risk Benefit Standard

"[I]n judging whether [officer's] actions were reasonable, we must consider the risk of bodily harm that [officer's] actions posed to [suspect] in light of the [suspect's] threat to the public that [officer] was trying to eliminate."

*Scott v. Harris*, 550 U.S. 372, 383 (2007)

©1999-2013 TASER International Inc.

V19 Annual CEW User Update

# 4th Amendment – CEW Probe Mode

CEW in dart mode constitutes an "intermediate, significant level" of force that must be justified by a strong government interest[1]

- Pepper spray and batons are also intermediate force options.

CEW against a non-violent misdemeanant who appeared to pose no immediate threat and who was given no warning was unconstitutional excessive force[2]

©1999-2013 TASER International Inc.

# 4th Amendment

"It is an excessive and unreasonable use of force for a police officer repeatedly to administer electrical shocks with a [CEW] on an individual who no longer is armed, has been brought to the ground, has been restrained physically by several other officers, and no longer is actively resisting arrest."*

©1999-2013 TASER International Inc.

# CEW Probe Mode Guidance

(**Generally**) To use CEW in probe mode officer must reasonably perceive subject to be:

- An immediate threat of harm/injury, or
- Fleeing or flight risk from serious offense crime and the officer is justified in tackling the person.

Consider necessity of a verbal warning before deploying the CEW.

Be aware of foreseeable primary risks and risks of secondary injury, especially falls from heights or on hard surfaces, ignition of flammables, or effects of intermittent clothing disconnects.

©1999-2013 TASER International Inc.

# X26 CEW Drive-Stun Guidance
## (Using Force ONLY to Gain Volitional Compliance)

Using X26 CEW for volitional compliance (when feasible):

- Reasonably perceive person is "actively resisting"
- Have a reasonable belief person is capable of volitional compliance to commands
- Avoid conflicting commands
- Give a warning of the imminent application of force
- Must give adequate time for volitional compliance to warning:
  - Time "to recover from extreme pain" experienced,
  - Opportunity to "gather herself,"
  - Opportunity to "consider her refusal to comply" with officer's commands/directives before next force application
- Always prepare clear, complete, unambiguous reports

©1999-2013 TASER International Inc.

V19 Annual CEW User Update

# X26 CEW Drive-Stun Guidance
## (Using Force ONLY to Gain Volitional Compliance)

Person must be given a reasonable opportunity to comply with officer's directives prior to each X26 CEW drive-stun application.

For example, the 9th Cir.[1] has found that 3 X26 CEW drive-stun applications in rapid succession provided no time for an actively resisting pregnant female to recover from the extreme pain she experienced, gather herself, and reconsider her refusal to comply.

This does **NOT** apply to multi-electrode CEWs including the X2 and X3 CEWs.*

©1999-2013 TASER International Inc.

V19 Annual CEW User Update

# Additional Force Factors

- Court may consider "the availability of [less injurious] alternative methods of capturing or subduing a suspect." [1]

- Court may consider what officers knew about the suspect's health, mental condition, or other relevant frailties.*[2]

- Officer should give a warning before force when appropriate.

©1999-2013 TASER International Inc.

# Considerations to Avoid CEW Excessive Force Liability

Force decision must reasonably consider (as time and circumstances reasonably permit):

- Officer's reasonable perceptions of subject's actions or behaviors the officer is attempting to stop, thwart, or control
- Officer's objective for using force
  - Use CEW only to accomplish lawful objectives
- Quantum of Force:
  - Foreseeable risks of injuries or harm to subject resulting from force to be used
  - Foreseeable secondary risks of injury
- (When necessary) Give warning and reasonably perceive subject capable of complying with demands

©1999-2013 TASER International Inc.

V19 Annual CEW User Update

# Considerations to Avoid CEW Excessive Force Liability

- Follow "targeting guidelines" when feasible and use 5-second "window of opportunity" to restrain and "cuff under power"

- Every CEW trigger pull or 5 seconds of discharge must be justified under the specific circumstances of the incident

- CEW use is within:
  - Law (correctly applied legal standards of care) and
  - Agency Policy and Training

- Do not use CEW for:
  - verbal defiance
  - belligerence
  - punishment
  - horse play

©1999-2013 TASER International Inc.

# Considerations to Avoid CEW Excessive Force Liability

- Fully document
  - Subject's threats, behaviors, and actions
  - Each use or application of force
  - Each CEW trigger pull or 5-second discharge
  - Each mode of CEW use
  - Each injury or allegation of injury
- Avoid multiple, repeated, prolonged, extended, or continuous CEW exposures[1] unless necessary to counter reasonably perceived threat(s) and it is justifiable
  - always document your justifications

©1999-2013 TASER International Inc.

V19 Annual CEW User Update

# Brief Overview of Selected Portions of Medical and Safety

Review TASER's CEW Research Index and  other documents and materials contained on the Training DVD and on TASER's website.

©1999-2013 TASER International Inc.

# CARDIAC

CEW cardiac risks are not zero.

CEW cardiac risks are sufficiently remote that making accurate risk or probability estimates are very difficult.

©1999-2013 TASER International Inc.

V19 Annual CEW User Update

# CARDIAC

Experts have identified the following key factors related to CEW cardiac risks:

– Dart-to-heart ("DTH") distances,

– Amount of delivered electrical charge

The further a CEW dart is away from the heart and the lower the delivered electrical charge the lower the risk of the CEW affecting the heart.

©1999-2013 TASER International Inc.

V19 Annual CEW User Update

# CARDIAC

To reduce cardiac risks (when possible):

- Target the back
- Avoid targeting chest
- Avoid prolonged and repeated exposures

©1999-2013 TASER International Inc.

# Avoid Extended Durations

Several law enforcement groups have set out 15 seconds (multiple applications or continuous) of CEW exposure as a significant safety point:

- Police Executive Research Forum (PERF), Community Oriented Policing Services (COPS), and US Department of Justice (DOJ) (March 2011)
- Int'l Association of Chiefs of Police (IACP) (April 2010)
- American Academy of Emergency Medicine (AAEM) (May 2011)
- National Institute of Justice (NIJ) (May 2011)
- Civil Rights Division, DOJ (December 2012)

©1999-2013 TASER International Inc.

# Physiologically or Metabolically Compromised Persons

- Law enforcement personnel are called upon to deal with individuals in crises that are often physiologically or metabolically compromised and may be susceptible to arrest-related death ("ARD")

- The subject may already be at risk of death or serious injury as a result of pre-existing conditions, individual susceptibilities, or other factors

- **Any physiologic or metabolic change may cause or contribute to death or serious injury**

- Follow your agency's guidance and policies when dealing with physiologically or metabolically compromised persons

©1999-2013 TASER International Inc.

V19 Annual CEW User Update

# Tactical Considerations

©1999-2013 TASER International Inc.

# Know Your CEW Trigger Operation: Continuous Discharge

- Remember, if you hold the trigger back, the X26 CEW will continue to discharge after the 5-second cycle until you release the trigger , as long as the battery charge is sufficient to support discharge
  - Does not apply to X2/X26P CEWs with APPM

- Holding the trigger back may result in continuous, extended, or prolonged CEW discharges and allegations of excessive force or elevated or cumulative subject injury

©1999-2013 TASER International Inc.

# TARGETING

**Avoid intentionally targeting the CEW on sensitive areas of the body such as the head, throat, breast, chest or area of the heart, genitals, or known pre-existing injury areas without legal justification.**

- The preferred target areas are below the neck area for back shots and the lower center mass (below chest or heart area) for front shots
  - Avoid sensitive areas

©1999-2013 TASER International Inc.

V19 Annual CEW User Update

# Preferred Target Zone Rear
## (when possible)

Below neck (blue zone)

— Large muscles

— Avoid head

*The back is always the preferred target area when reasonably practicable under the totality of circumstances of the incident.*



©1999-2013 TASER International Inc.

V19 Annual CEW User Update

# Preferred Target Zone Front
## (when possible)

Lower torso (blue zone below chest)

- More effective
  - Split the belt line
  - Larger muscles
- Reduces risk of hitting sensitive body areas (see current product warnings)
- Increases dart-to-heart (DTH) safety margin distances
- Do not intentionally target genitals



©1999-2013 TASER International Inc.

V19 Annual CEW User Update

# Probe Placement

- Deploy per department SOP
- Greater probe spread generally increases effectiveness
  - "Incapacitation by all measures was found to be a function of spread; generally increasing in effectiveness up to spreads between 9 and 12 in. There were notable differences between front and back exposures, with front exposures not leading to full incapacitation of the upper extremities regardless of probe spread."[1]
  - If practical, minimum four-inch spread to have some effect
  - Narrow probe spreads typically are more effective if one probe is above the belt and the other probe is below the belt

©1999-2013 TASER International Inc.

V19 Annual CEW User Update

# Neuro-Muscular Incapacitation (NMI)

- There are different levels of NMI ranging from limited area effects to significant body lockup

- The greater probe spread, the higher likelihood of NMI

- CEWs may not achieve total NMI incapacitation

- Subject may maintain muscle control, particularly in arms and legs (depending on many factors, including probe locations)

- Be prepared with other force options including a drive-stun follow up to spread NMI over a wider area if necessary and reasonably appropriate

- Drive stun alone usually will not achieve NMI, only localized pain

©1999-2013 TASER International Inc.

# Injuries From Falls

- NMI frequently causes subject to fall

- Falls are often uncontrolled and subject is often unable to protect or catch himself

- Falls, even from ground level, can cause serious injuries or death

- Consider the environment (including the ground surface) and the likelihood of a fall related injury

- Consider intermittent connections/effects, such as intermittent clothing disconnects

©1999-2013 TASER International Inc.

# Controlling/Cuffing Under Power

You can go hands on with the subject during the 5-second cycle without feeling the effects of the NMI

- Electricity generally follows the path of least resistance
- Do not place hands on or between probes

©1999-2013 TASER International Inc.

V19 Annual CEW User Update

# Controlling/Cuffing Under Power

- Use each 5-second CEW cycle as a "window of opportunity" to establish control/cuff while the subject is affected

- Move in, control, and handcuff subject while the CEW is cycling during the 5-second "window of opportunity"

©1999-2013 TASER International Inc.

V19 Annual CEW User Update

# Controlling/Cuffing Under Power

- Be aware that emotionally disturbed persons (EDPs), focused, intoxicated, deaf, and excited delirium individuals may not comply with verbal commands

- The need for multiple 5-second cycles, or extended or prolonged CEW exposures, may be avoided or reduced by "controlling/cuffing under power" during the "window of opportunity" the 5-second CEW cycle provides

©1999-2013 TASER International Inc.

V19 Annual CEW User Update

# Avoid Extended, Repeated, or Prolonged TASER CEW Applications[1] Where Practicable

- Each trigger pull and/or 5-second cycle or discharge must be legally justified
- Avoid extended, repeated, or prolonged CEW applications where practical
- The application of the CEW is a physically stressful event
- Attempt to minimize the physical and psychological stress to the subject

©1999-2013 TASER International Inc.

V19 Annual CEW User Update

# Avoid Extended, Repeated, or Prolonged TASER CEW Applications Where Practicable

- Only apply the number of 5-second cycles reasonably necessary to capture, control or restrain the subject

- Human studies have not shown that CEW applications affect or impair breathing patterns

- If circumstances require extended duration or repeated discharges, the operator should carefully observe the subject and provide breaks in the CEW stimulation when practicable

©1999-2013 TASER International Inc,

# Be Careful of Distractions

- There are incidents/cases where officers have been accused of using excessive CEW exposures caused by distractions (including by nearby family members, bystanders, incident witnesses), stress, etc.

- Be alert to and avoid potential or occurring distractions and stress induced hesitations that result in unnecessary additional 5-second CEW cycles or extended exposures

- Distraction and stress may result in the officer inadvertently holding the trigger down unintentionally which may result in a constant electrical discharge of unintended duration

©1999-2013 TASER International Inc.

V19 Annual CEW User Update

# Clearly Record the Incident

- If available, use on-officer point of view ("POV") incident recording equipment

- When safe, consider using your radio to establish record of significant events with dispatch time logs (call in):

  - Immediately at end of CEW use

  - Immediately upon subject being handcuffed

  - Person's perceived medical status and condition and any changes

©1999-2013 TASER International Inc.

6/14/2016

1 **Annual CEW User Update**
   Version 19
   April, 2013

2 **Annual Certification Requirements**
   - Each agency must determine the contents of each continuing and update training
   - TASER's minimum requirements for annual user recertification include:
     – Review of this entire presentation including notes
     – Review of current law enforcement warnings
     – Firing two cartridges

3 **Contents**
   - ECD Smart Use Guidelines: Legal Update
   - Medical and Safety Refresher
   - Tactical Consideration Update

   .

   Be sure to read the notes for each slide
   .

4 **CEW Smart Use Considerations**
   TASER does not provide legal advice.

5 **4th Amendment Risk Benefit Standard**
   "[I]n judging whether [officer's] actions were reasonable, we must consider the risk of bodily harm that [officer's] actions posed to [suspect] in light of the [suspect's] threat to the public that [officer] was trying to eliminate."
       *Scott v. Harris*, 550 U.S. 372, 383 (2007)

6 **4th Amendment – CEW Probe Mode**
   CEW in dart mode constitutes an "intermediate, significant level" of force that must be justified by a strong government interest
           · Pepper spray and batons are also intermediate force options.
   CEW against a non-violent misdemeanant who appeared to pose no immediate threat and who was given no warning was unconstitutional excessive force

7 **4th Amendment**
   "It is an excessive and unreasonable use of force for a police officer repeatedly to administer electrical shocks with a [CEW] on an individual who no longer is armed, has been brought to the ground, has been restrained physically by several other officers, and no longer is actively resisting arrest."*
   .

8 **CEW Probe Mode Guidance**
   (Generally) To use CEW in probe mode officer must reasonably perceive subject to be:
     – An immediate threat of harm/injury, or
     – Fleeing or flight risk from serious offense crime and the officer is justified in tackling

6/14/2016

the person.

Consider necessity of a verbal warning before deploying the CEW.

Be aware of foreseeable primary risks and risks of secondary injury, especially falls from heights or on hard surfaces, ignition of flammables, or effects of intermittent clothing disconnects.

## X26 CEW Drive-Stun Guidance
### (Using Force ONLY to Gain Volitional Compliance)

Using X26 CEW for volitional compliance (when feasible):

- Reasonably perceive person is "actively resisting"
- Have a reasonable belief person is capable of volitional     compliance to commands
- Avoid conflicting commands
- Give a warning of the imminent application of force
- Must give adequate time for volitional compliance to warning:
  – Time "to recover from extreme pain" experienced,
  – Opportunity to "gather herself,"
  – Opportunity to "consider her refusal to comply" with officer's commands/directives before next force application
- Always prepare clear, complete, unambiguous reports

## X26 CEW Drive-Stun Guidance
### (Using Force ONLY to Gain Volitional Compliance)

Person must be given a reasonable opportunity to comply with officer's directives prior to each X26 CEW drive-stun application.

For example, the 9th Cir.[1] has found that 3 X26 CEW drive-stun applications in rapid succession provided no time for an actively resisting pregnant female to recover from the extreme pain she experienced, gather herself, and reconsider her refusal to comply. This does NOT apply to multi-electrode CEWs including the X2 and X3 CEWs.*

## Additional Force Factors

- Court may consider "the availability of [less injurious] alternative methods of capturing or subduing a suspect." [1]
- Court may consider what officers knew about the suspect's health, mental condition, or other relevant frailties.*[2]
- Officer should give a warning before force when appropriate.

## Considerations to Avoid CEW Excessive Force Liability

Force decision must reasonably consider (as time and circumstances reasonably permit):

- Officer's reasonable perceptions of subject's actions or behaviors the officer is attempting to stop, thwart, or control
- Officer's objective for using force
  – Use CEW only to accomplish lawful objectives
- Quantum of Force:
  – Foreseeable risks of injuries or harm to subject resulting from force to be used
  – Foreseeable secondary risks of injury
- (When necessary) Give warning and reasonably perceive   subject capable of

6/14/2016

complying with demands

13 **Considerations to Avoid CEW Excessive Force Liability**
- Follow "targeting guidelines" when feasible and use 5-second "window of opportunity" to restrain and "cuff under power"
- Every CEW trigger pull or 5 seconds of discharge must be justified under the specific circumstances of the incident
- CEW use is within:
  - Law (correctly applied legal standards of care) and
  - Agency Policy and Training
- Do not use CEW for:
  - verbal defiance
  - belligerence
  - punishment
  - horse play

14 **Considerations to Avoid CEW Excessive Force Liability**
- Fully document
  - Subject's threats, behaviors, and actions
  - Each use or application of force
  - Each CEW trigger pull or 5-second discharge
  - Each mode of CEW use
  - Each injury or allegation of injury
- Avoid multiple, repeated, prolonged, extended, or continuous CEW exposures[1] unless necessary to counter reasonably perceived threat(s) and it is justifiable
  - always document your justifications

15 **Brief Overview of Selected Portions of Medical and Safety**

Review TASER's CEW Research Index and other documents and materials contained on the Training DVD and on TASER's website.

16 **CARDIAC**

CEW cardiac risks are not zero.
CEW cardiac risks are sufficiently remote that making accurate risk or probability estimates are very difficult.

17 **CARDIAC**

Experts have identified the following key factors related to CEW cardiac risks:
  - Dart-to-heart ("DTH") distances,
  - Amount of delivered electrical charge
The further a CEW dart is away from the heart and the lower the delivered electrical charge the lower the risk of the CEW affecting the heart.

6/14/2016

18  CARDIAC

To reduce cardiac risks (when possible):
- Target the back
- Avoid targeting chest
- Avoid prolonged and repeated exposures

19  **Avoid Extended Durations**

Several law enforcement groups have set out 15 seconds (multiple applications or continuous) of CEW exposure as a significant safety point:
- Police Executive Research Forum (PERF), Community Oriented Policing Services (COPS), and US Department of Justice (DOJ) (March 2011)
- Int'l Association of Chiefs of Police (IACP) (April 2010)
- American Academy of Emergency Medicine (AAEM) (May 2011)
- National Institute of Justice (NIJ) (May 2011)
- Civil Rights Division, DOJ (December 2012)

20  **Physiologically or Metabolically Compromised Persons**
- Law enforcement personnel are called upon to deal with individuals in crises that are often physiologically or metabolically compromised and may be susceptible to arrest-related death ("ARD")
- The subject may already be at risk of death or serious injury as a result of pre-existing conditions, individual susceptibilities, or other factors
- Any physiologic or metabolic change may cause or contribute to death or serious injury
- Follow your agency's guidance and policies when dealing with physiologically or metabolically compromised persons

21  **Tactical Considerations**

22  **Know Your CEW Trigger Operation:**
**Continuous Discharge**
- Remember, if you hold the trigger back, the X26 CEW will continue to discharge after the 5-second cycle until you release the trigger , as long as the battery charge is sufficient to support discharge
  - Does not apply to X2/X26P CEWs with APPM
- Holding the trigger back may result in  continuous, extended, or prolonged CEW discharges and allegations of excessive force or elevated or cumulative subject injury

23  TARGETING

Avoid intentionally targeting the CEW on sensitive areas of the body such as the head, throat, breast, chest or area of the heart, genitals, or known pre-existing injury areas without legal justification.

•The preferred target areas are below the neck area for back shots and the lower center mass (below chest or heart area) for front shots
  - Avoid sensitive areas
-

24  Preferred Target Zone Rear

6/14/2016

(when possible)
Below neck (blue zone)
  – Large muscles
  – Avoid head

*The back is always the preferred target area when reasonably practicable under the totality of circumstances of the incident.*

—

25  **Preferred Target Zone Front**
    **(when possible)**
Lower torso (blue zone below chest)
  • More effective
    – Split the belt line
    – Larger muscles
  • Reduces risk of hitting sensitive body areas (see current product warnings)
  • Increases dart-to-heart (DTH) safety margin distances
  • Do not intentionally target genitals

26  **Probe Placement**
  • Deploy per department SOP
  • Greater probe spread generally increases effectiveness
    ‣ "Incapacitation by all measures was found to be a function of spread; generally increasing in effectiveness up to spreads between 9 and 12 in. There were notable differences between front and back exposures, with front exposures not leading to full incapacitation of the upper extremities regardless of probe spread."[1]
    – If practical, minimum four-inch spread to have some effect
    – Narrow probe spreads typically are more effective if one probe is above the belt and the other probe is below the belt

27  **Neuro-Muscular Incapacitation (NMI)**
  • There are different levels of NMI ranging from limited area effects to significant body lockup
  • The greater probe spread, the higher likelihood of NMI
  • CEWs may not achieve total NMI incapacitation
  • Subject may maintain muscle control, particularly in arms and legs (depending on many factors, including probe locations)
  • Be prepared with other force options including a drive-stun follow up to spread NMI over a wider area if necessary and reasonably appropriate
  • Drive stun alone usually will not achieve NMI, only localized pain

28  **Injuries From Falls**
  • NMI frequently causes subject to fall
  • Falls are often uncontrolled and subject is often unable to protect or catch himself
  • Falls, even from ground level, can cause serious injuries or death
  • Consider the environment (including the ground surface) and the likelihood of a fall related injury

6/14/2016

· Consider intermittent connections/effects, such as intermittent clothing disconnects

29   **Controlling/Cuffing Under Power**

You can go hands on with the subject during the 5-second cycle without feeling the effects of the NMI

– Electricity generally follows the path of least resistance
– Do not place hands on or between probes

30   **Controlling/Cuffing Under Power**

· Use each 5-second CEW cycle as a "window of opportunity" to establish control/cuff while the subject is affected
· Move in, control, and handcuff subject while the CEW is cycling during the 5-second "window of opportunity"

31   **Controlling/Cuffing Under Power**

· Be aware that emotionally disturbed persons (EDPs), focused, intoxicated, deaf, and excited delirium individuals may not comply with verbal commands
· The need for multiple 5-second cycles, or extended or prolonged CEW exposures, may be avoided or reduced by "controlling/cuffing under power" during the "window of opportunity" the 5-second CEW cycle provides
·

32   **Avoid Extended, Repeated, or Prolonged TASER CEW Applications[1] Where Practicable**

· Each trigger pull and/or 5-second cycle or discharge must be legally justified
· Avoid extended, repeated, or prolonged CEW applications where practical
· The application of the CEW is a physically stressful event
· Attempt to minimize the physical and psychological stress to the subject

33   **Avoid Extended, Repeated, or Prolonged TASER CEW Applications Where Practicable**

· Only apply the number of 5-second cycles reasonably necessary to capture, control or restrain the subject
· Human studies have not shown that CEW applications affect or impair breathing patterns
· If circumstances require extended duration or repeated discharges, the operator should carefully observe the subject and provide breaks in the CEW stimulation when practicable

34   **Be Careful of Distractions**

· There are incidents/cases where officers have been accused of using excessive CEW exposures caused by distractions (including by nearby family members, bystanders, incident witnesses), stress, etc.
· Be alert to and avoid potential or occurring distractions and stress induced hesitations that result in unnecessary additional 5-second CEW cycles or extended exposures
· Distraction and stress may result in the officer inadvertently holding the trigger down unintentionally which may result in a constant electrical discharge of unintended duration
·

35   **Clearly Record the Incident**

6/14/2016

- If available, use on-officer point of view ("POV") incident recording equipment
- When safe, consider using your radio to establish record of significant events with dispatch time logs (call in):
  - Immediately at end of CEW use
  - Immediately upon subject being handcuffed
  - Person's perceived medical status and condition and any changes



PHOTOS











RECORDINGS

Date 4.5.18
KENTUCKIANA Reporter EB  Exhibit # 2
Case
Deponent  Jim Ison

G16L11930

Ian Godfrey

* Tased 12-15

* Barb upper back + left hand

* Todero was combative at the scene.
  ↳ Kicking + thrashing + screaming Profanities

* Comm. South not accepting psychiatric patients.
  ↳ no reason to believe that Todero was having a
  Medical Emergency.

* Initial heart rate 130-140, Good Pulse, was screaming
  out medics, no signs of significant trauma.

* Todero's pants were ripped + urine soaked. Officers
  stated he was found that way prior to use of
  force.

* Medics chemically restrained him with 5mg
  Midazolam to calm him down. Due to Todero
  trying to h.t his head on the side of the cot.

* Extremely Strong. Took approx. 6 or 7 people to
  restrain him to the cot.

D 005064

* After medication Todero stopped being ~~combat~~ physically combative but continued being verbally abusive.

* Upon arrival at ~~St~~ St. Francis Todero's heart rate + breathing slowed + then stopped.

* Todero went into asystole "Flatline". CPR was administered.

* A few minutes of full arrest before resuscitated then ~~he~~ went back into full arrest.

* Acidosis — Todero's blood PH was 6.77 → Normal is 7.35 - 7.45.

* Dr. Hartman advised that Taser had nothing to do with Todero's Cardiac arrest.

* Amount of time between Todero being tased + onset of Cardiac Arrest.

* Ventricular Arithmia is common when Taser is related to Cardiac Arrest. — This was not present.

* More than 30 min. between last Tase + Cardiac arrest. 12:19 pm — Time of Cardiac Arrest.

D 005065

* Todero had Metabolic Acidosis.

* Officers acted appropriately + professional at all times.

D 005066

Roger Poynter
455 E. Broadway St.
(317) 441-7485

* Going north on Madison Ave in a convertible
Todero was walked from west to east in front
of him w/o looking to see if traffic was
coming.

* Slowed down and asked "what are you doing?"
Todero did not answer. He walked to the east
curb, before walking back into the north
bound lane & stood their as another vehicle was
approaching him.

D 005067

Deborah MacNaughton
1342 Hamilton DE
GREENWOOD IN 46143
(317) 341-5247


\* She was traveling north in the left lane of Madison. Tedero was on the curb on the west side of the road. As she approached he began walking across the street. He walked in front of her not looking and void of facial expression. She had to swerve to the right to avoid hitting him. She stated the vehicle behind him had to slam on it's breaks to avoid hitting him. She stated that Tedero then walked to the east curb, before walking back into the north bound lanes.

\* First thought it might be a game. Then realized it was an intentional act.

\* Called 911 because she was concerned for his safety.

D 005068

Lt. Blackwell

\* Male attempting suicide by walking in traffic.

\* Approx 100 yards S. of Camby ST.

\* Positioned vehicle in roadway. South of Todaro.

\* Recognized the suicidal Male as Charles Todaro.

\* Had recognized Charles from dealing with him for Most of his career.
1. Juvenile problems.
2. Intoxication
3. Worked with Charles as an informant when he turned in his UnclG.
4. Library

5. Older Brother James used to Box. Remembers seeing James & Charles working out.

6. Battery suspect in past.

7. Had heard rumors that Charles liked to fight.

\* Charles was holding a book holding it out in front of him. He was looking straight at the book with no focus or emotion.

\* Pants torn, urine dried, abrasions/bruising on his knees.

\* Held Bible up. Started walking north in right lane. Asked him several times to stop + sit down.

D 005069

* Todor was claiming to be Jesus Christ.

* Blackwell Placed his left hand on Toderos shoulder.

* AT this time Todero veered left into traffic.

* Blackwell ordered him to stop, threatened Taser.

* Todero refused to stop. Toder was tased in back.

* Toder went to his knees and held the Bible up stating "I'm Jesus Christ.

* Todero was ordered again to place his hands behind his back. Stated "I'm Jesus Christ the profit."

* This happened a few more times. w/o expression or reaction from Charles.

* Blackwell noticed that a prong was "dangling" from his shirt.

* Blackwell as trained followed up with drive Stun to the right calf.

* Todero went down and placed hands under his torso.

* Additional Orders were given for Todero to place hands behind his back. Todero refused and additional drive stuns were administered.

* Female motorist pulled over and asked Blackwell if he needed help. Blackwell asked her to be a witness.

* Todero was laying in the road. Still refusing to put his hands behind his back.

* Witness even plead with Todero to comply.

* Officer Elliott + Laut arrived. Blackwell asked Laut to get witness information.

* Officer Elliott physically tried to pull Toderas arms out from underneath him while giving verbal orders. Todero was physically pulling away. A couple more TASES. While they both attempted to pull his hands out from under him.

* Blackwell + Elliott were able to pull his hands out from under him and got him cuffed. — Elliott got one cuff on + Blackwell assisted with the other hand. — STATED Todero was strong.

* Todero was breathing hard, + sweating. He was rolled over on his back to help him breath.

* Medic arrived. Had to tie a blanket around his ankles due to him kicking. He was then strapped to gurney.

* Officer Elliott was concerned that he was hyperventilating.

* As soon as he was on gurney. Blackwell went to car to get water.

D 00507

* DR. Chris Hartman was briefed by Blackwell in ER.
DR. Hartman told Blackwell this isn't caused by
the Taser it's something else. Explained he had
high acid amounts in his blood.

D 005072

OFFicer RENEE Elliott.

* Dispatched to the area on a man walking in front of traffic trying to commit suicide.

* Was FTO - E. Laut.

* Lt. Blackwell disregarded Elliott and offered to take the run, so that She could take a traffic accident.

* Lt. Blackwell called for back-up + stating taser deployed.

* Elliott + Laut turned around "Euclid/Madison" to start for Blackwell

* Lt. Blackwell car was facing south in the right lane. Laut parked in middle of north lanes.

* Todero was in right lane with his arms under his body. She observed two prongs in his back.

* Lt. Blackwell to E. Laut to get witness information. Elliott went to help Blackwell

* Was able to get right arm out + cuffed. Officer Elliott + Lt. Blackwell both gave verbal commands to give hands but Todero would not comply. Stating he was Jesus, profit. Elliott attempted to get left hand as Blackwell tased again. Todero pulled arm away during tase + Elliott's arm fell between prongs + received

D 005073

* A light shock. Then knew it was a bad connection. Tried mandibular angle pressure point, with no effect. E. Lant helped pull Todoros left arm out + get him cuffed.

* Noticed Todoro was very strong + solid.

* Renee saw a tattoo of "Todoro" on his arm and realized it was one of the Todoro brothers.

* Knew Todoros from police runs. When they lived on winter street.

* Todoro was conscious + alert but out of it as if he was high on spice or drugs.

* Randy Eck arrived and asked if Elliott had camera on. - This reminds her to turn it on.

* Saw prong in lower back fall out.

* No sign of medical stress.

* Continued saying he was Jesus Christ.

* Had to tie Todoros legs due to him kicking + thrashing.

* Followed Ambulance to hospital.

* Todoro was in cardiac arrest upon arrival.

* Security met Ambulance because Todoro was being violent in ambulance.

D 005074

* DR. Hartman asked what happened. Once he was informed that Todero was tased several times. (15) Per Dr. Hartman told Blackwell "I want you to know that the tasing had nothing to do with Todero's condition Now".

* Felt that Todero was "not man handled". Use of force was adequate.

D 005075

Officer Randy Eck

* Was on a lost child report on Stop 18 Rd.
Heard Lt. Blackwell request assistance.

* Responded sig 10 to Madison Ave / Camby St.
arrived after Medic, E. Laut, R. Elliott.

* Upon arrival officer E. Laut + R. Elliott were
placing handcuffs on Todero. Todero appeared
to be under control.

* Todero was lying on his back after cuffing.
Over heard medics talking about 1 taser probe
being lodged to deep to remove.

* Todero was conscious + alert. Medics asked
his name and he was stating he was Jesus
Christ.

* Did not appear to be in medical distress

* Blackwell approach Eck and told him that
he tased Todero but did not have a good
connection. Eck gave Blackwell a spare
taser cartridge.

* Thinks Todero was kidding because medic
tied a blanket around his legs.

* Eck wasn't paying much attention to what
the medics were doing. He was with Blackwell
He felt that Blackwell was exhausted + that
Blackwell stated to him that Todero would not
stop resisting.

D 005076

Elizabeth Laut  6-14-16

* 76 to PD accident on Fry RD.

* Less than 2 min. to arrival.

* Blackwell stated quit resisting, stop trying to get up. - Todero was on the ground flat but kept trying to get up or his knees - Claiming he was Jesus.

* Lt. Blackwell was north of his vehicle a couple of yards. Standing up.

* Pulled up in front of Todero + Blackwell

* Reece went to help Lt. Blackwell + told E. Laut to talk to the witness.

* witness was in the grass on east side of head.

* Holy Walters - witness.   She stated that she observed Todero "possibly intoxicated" walking back and forth across Madison AVE. It caught her eyes because his shirt was ripped. She said he was "dodging traffic".

Saw Lt. Blackwell by himself Stopped to help. Observed Blackwell tell Todero to sit down. Head Blackwell tell Todero to Stop several times and warn Todero that he would be Tased.

D 005077

* While talking to Holly she observed Blackwell & Renee struggling with Todero to get him cuffed. Todero had hands under Red his body.

* Prying up Todoros hair + back.

* Lt. Blackwell was kneeling cut this time with taser against Toderos calf.

* Renee nearly got right hand out before Todero pulled away.

* Blackwell TASED Todero Back after giving commands to put his hands behind his back.

* Right cuff is placed.

* E. Laut rolled/push Todero on his side while Elliott tried to pull his left hand from under his body. Todero is saying "No" "I'm Jesus". Actively resisting. Blackwell states that he is going to deliver another tase. Elliott says went as Blackwell pulls trigger. Elliott recieves minor shock.

* Todero was really strong.

* Lt. Blackwell delivered a 3rd Tase. + Todero was successfully cuffed.

* Sat Todero up against curb.

* Tased approx. 4 times after her arrival.

* Felt that ~~blah~~ there was sufficient time to respond to commands between tases.

D 000078

* Lt. Blackwell was talking to Charles trying to find out if he had taken any drug & told him that he was trying to help him.
  ↳ No Response from Todero.

* No signs of Medical condition. Was sweating + breathing heavy -but thought that it was a result of the struggle.

* Did not observe Todero be combative with Medics.

* followed ambulance. Upon arrival Medic were doing CPR.

* Dr. Hartman told officers that it wasn't the tase. Mentioned toxins in Toderos blood could be have had a reaction to the drugs given in ambulance.

D 005079

Holly Walters
1224 N. Capital Ave
Indpls
(765) 277-0442

* South of Madison - observed car.

↳ Observed Male walking in street in the north band
lanes. Officer follow(s) with Taser "STOP or I'm
going to have to tase.

* Passed did U-TURN. Came back Saw the man
down. realized had been tased. Asked Officer if he
needed help.

* Male was talking about Jesus + Moses.

* Officers was telling him to put his hands behind
his back. -

* Subject was on his stomach with his weight on
him.

* Put your hands behind his back or you will be
tased. The subject refused + was tase 3 to 4
times. — Didn't appear that the taser had
much affect.

* Officer + Holly were "Pleading"

* Eye really big looking forward appeared that
he was "ON Something"

D 005080

* Females officers arrived on the scene. older female officer assisted officer. — Got down on Tadero trying to get Tadero under control — Both officers

* trying to get him to comply by giving verbal commands — Did not comply. Tased a couple more times. Female officer was tased.

* Female officer was physically trying to remove arms. The male was rolling and pulling away from officers "Physically resisting.

* Officers were asking his name + are you on Something

* A couple of minutes before it was over after back up arrived.

* After cuffed he was sat against the curb Tadero fell back and hit his head.

* Wasn't saying much after hand cuffed.

D 005081

Charles Moyer

* Working off Duty at Vineyard

* Church members Requested Todero by Renard.

* Todero was on south side of church Preaching

* I was told by God to come here & Preach

* Todero's pants were ripped.

* Todero's appearance was disshavaled.

* Suggested that he preach at walmart

* No signs of intoxication

* At first thought Todero was high.

* Todero asked Are you kicking me out?

* Church members gave Todero's paper bag of belongings to Moyer.

* Total interaction was 6 to 7 min.

* Incident occurred at apprax. 9:15

D 005082

Jeanne Moore
547 Ramblin Rd.
Greenwood IN 46142
317 748-0726

* On 5/28/16 at 4pm was in green room

* White male came out of closet. He was wear jeans that were ripped.   ⟶ abruptly.

* She ask what he was doing

* He identified himself as "Charlie" I'm praying "disheveled"

* She left. + Texted some members asking who Charlie was.

*

D 005083

Terry Moore
547 Ramblin Rd
Greenwood IN 46142
(317) 409-3385

* On 5/28 worship leader "Clay Oxander" invited
Charlie to the greenroom upon encountering him
outside. - Prayed for him

* Wife Jeanne encountered Charlie in the GREEN Room
to sent text to him

* Charlie sat through the worship then went
back out side

* On 5/29 Maitance man Marcus McQueen
first encountered Charlie. Charlie was believed
to have slept on the patio over night. lit belongings
on fire

* As Band was playing on Sunday Charlie got
up on Stage 3 times. Removed 3 times.

* Then began walking the hallways trying to
hug people while preaching. - Being loud.

* Terry Called Officer Meyer + informed him of
Charlie. Officer Meyer talked to Charlie +
ask him to leave                    Bear hug.

* Charlie walk 1 block South. Still Preaching
+ reading from his Bible.

* 1 hr. later came back to church property +
was asked to leave again by Terry.

D 005084

Charlie stated that he just wanted to hear the service. (was informed) that it was the same service as last night.

※ left N. Bound. 11:15 - 11:30 am.

※ Stalky in shape guy. Pants ripped from waste to ankle.

※ Not able to carry on a realist or rational answers. "where do you live?" "I live in heaven".

D 005085

⊘ TASER          CEW Event Analysis and Evidence Collection Checklist

This checklist is intended to be a wide-ranging list of evidentiary items your agency may desire to gather as part
of an investigation involving the use of a TASER® conducted electrical weapon (CEW).  Each agency will
determine its own investigation procedures and practices.

Event date and time: 05-29-16  11:45am
Department Case No.: G16L11930
CEW Operator(s):  LT. Brian Blackwell

**Data Downloads:**  As soon as reasonable, download the CEW data and reset the clock if necessary to account
for any time drift.  Also download all recording devices that may have captured the incident.  For best chain of
custody record, security safeguards, and ease of use, it is recommended that all data and video be uploaded to
EVIDENCE.com services.

☑ Collect each CEW used or present at incident for data download and time drift correction
☑ Record each CEW model and serial number
☑ Record each CEW cartridge model and serial number
☑ Identify which CEWs were used/deployed during incident
☑ Download all audio and video recordings from incident (including on-officer and in-vehicle recordings)
☑ Download each CEW present at the incident[1]
☐ Perform a time synchronization for each CEW present at the incident to correct for any clock time drift
☐ Consider placing each CEW used on subject into evidence during investigation
☐ Consider testing the CEW's electrical output to determine if it was operating within the manufacturer's
  specifications

**Acquire any time stamped logs/information:**
☑ 911 and agency dispatch time logs and recordings
☑ Emergency Medical Services (EMS) dispatch and time logs
☑ Hospital emergency room (ER) dispatch and time logs
☑ Other time stamped/logs

**Create annotated timeline of the incident:**
☑ Create annotated timeline of all reasonably accurate documented times regarding the incident

**Record how each CEW was used during the incident:**
☑ CEW drawn from holster
☑ CEW pointed at subject
☑ CEW LASER activated at subject
☐ CEW warning arc
☐ CEW drive-stun without the cartridge(s)
☐ CEW drive-stun with the cartridge(s) but without any probes attached
☑ CEW probe deployment (one set of probes)
☐ CEW probe deployment (two sets of probes from a single CEW)
☐ CEW probe deployment (two sets of probes from two separate CEWs)
☐ CEW three-point deployment (with single probe connection)
☐ CEW three-point deployment (with both probes from single cartridge connection)
☐ CEW multi-point deployment (with multiple cartridges/probes from single CEW with X-Connect™
  technology)

---

[1] Agency should determine whether or not it will provide a copy of the CEW's data download to the CEW user before the
officer is required to provide a force report.

Revised April 10, 2013

D 005086

⊘ TASER        CEW Event Analysis and Evidence Collection Checklist

**Subject's Information:**
- ☑ Gender
- ☐ Age
- ☐ Height
- ☐ Weight
- ☑ Build: e.g., very thin, skinny, medium build, muscular, large, overweight, obese
- ☑ Dispatched information regarding the subject
- ☑ Officer's observations of subject
- ☑ Subject's information reported to officer (by subject or witnesses on scene)
- ☑ Pre-event behaviors of the subject
- ☑ Type of physical exertion by the subject (running, fighting, pacing, throwing objects, resisting, struggling, etc.)
- ☑ Duration of the subject's physical exertion
- ☑ Under the influence of drugs or alcohol
- ☑ Emotionally disturbed person (EDP), mental illness, or serious psychological distress (SPD)
- ☐ Did the subject experience loss of consciousness
- ☐ If subject experienced loss of consciousness, what is the time gap between conclusion of CEW discharge and loss of consciousness
- ☑ All signs of life (pulse, breathing, moaning, groaning, talking, etc.) after conclusion of CEW discharge
- ☑ Subject's criminal history
- ☑ Subject's drug history
- ☑ Subject's medical history (e.g., diabetic, history of epilepsy or seizure)
- ☑ Subject's psychiatric history
- ☐ Subject's prescription history (including compliance)
- ☐ Subject's rehab history

**Additional evidence identification and collection:**
- ☑ Photos of wounds, probe impacts, and/or drive-stun marks (with scale for reference in the photo)
- ☑ Photos of subject to document where injuries are present and where injuries are not present
- ☑ Keep the original battery in the CEW (certain CEW models require the battery to always remain inserted to keep the integrity of the CEW's internal clock).
- ☑ Keep the cartridge probes and wires. Do not let EMS place probes in sharps containers for disposal. Do not wind the wire up – maintain wire integrity as best as possible.
- ☐ Collect and maintain as evidence the subject's clothing in the event that a probe penetrated or was attached to the clothing or for later analysis of potential probe impact sites.
- ☑ Collect AFID tags from the TASER cartridge(s) and note their locations at the scene.

**Record the TASER CEW Deployment Circumstances:**
- ☑ Officer's objective for each CEW deployment or discharge
- ☐ Any CEW discharge after subject surrendered
- ☐ Any CEW discharge after subject handcuffed or otherwise restrained (and note the type of restraint)
- ☐ Any spark/function tests during the incident
- ☑ Any cartridge removal during the incident
- ☑ Any cartridge reattachment on CEW after removal during the incident
- ☑ Any cartridge discarded after removal from CEW during the incident
- ☑ CEW discharge duration(s), and number of cycle(s), with/without cartridge in place, mode of deployment
- ☑ Distance from the front of the CEW cartridge to the subject at the time of the probe deployment(s)
- ☑ For each probe deployment:
  - o Did probe(s) from a cartridge make contact with the subject or the subject's clothing
  - o Did probe(s) penetrate the skin
  - o Specific location of each probe that made contact with the subject (see diagram below) and distance in inches between the probes
  - o Match up probes and clearly identify if more than one probe deployment
  - o Distance between the probes (probe spread) for each pair of probes

Revised April 10, 2013                                    2

D 005087

⊘ TASER          CEW Event Analysis and Evidence Collection Checklist

- o For multi-shot CEWs, were probes from more than 1 cartridge part of the same deployment cycle
- o Did any probe land or fall on the ground; if so, record the type of surface the probe fell onto and save and mark the probe
- ☑ For each drive-stun discharge, note any drive-stun follow-up to a probe deployment or any combination of the probes and drive-stun used together
- ☑ For each drive-stun discharge, was the drive-stun with or without expended cartridge in place on CEW
- ☑ Effectiveness of the discharge (did subject respond as expected, was there a change in the subject's behavior). If the CEW did not perform as expected, the reason for ineffectiveness (e.g., single probe hit, clothing disconnect, intermittent connection, wire breakage, low muscle-mass deployment, small spread between the probes, low or dead battery pack, CEW dropped, CEW subjected to a high-moisture (wet) environment, etc.).
- ☑ Any other use of force employed on the subject other than a CEW, if so what type(s)
- ☑ Weather/environmental conditions

If an Automated External Defibrillator (AED), defibrillator, or heart monitor was used on the subject:
- ☐ Type of device used, manufacturer, model number, serial number, and who owns the device
- ☐ Recorded cardiac rhythms and times of each monitored or recorded rhythm
- ☐ Did the device indicate a shockable rhythm
- ☐ Did the device operator deliver a "manual" defibrillation shock
- ☐ Did the device shock the subject and, if so, what was the cardiac rhythm after each shock
- ☐ Did the device report "no shock"
- ☐ Obtain a printout of the strips and event records from the device
- ☐ Obtain an electronic download of the event from the device
- ☐ Obtain a maintenance download from the device

*EMS Report* →

If a death occurred temporal to the CEW use:
- ☐ Obtain hair and nail samples for forensic and medical testing
- ☐ Obtain pre-mortem body core temperature
- ☐ Obtain pre-mortem blood samples
- ☐ Obtain post-mortem body core temperature as soon after death as reasonable
- ☐ Obtain post-mortem fluid samples (including where, when, how taken) (drug redistribution concerns)
- ☐ Obtain annotated timeline of events between CEW deployment and time of death:
  - o Whether or not the subject was initially responsive (walking, talking, etc.) after CEW exposure(s) and if so, for how long. List the complete record of signs of life post-CEW use.
  - o Length of time between the CEW exposure and subject's collapse
  - o Approximate time that subject went into distress (or died) after the last CEW deployment
- ☐ Within 24 hours, collect brain tissue samples for the University of Miami Brain Endowment Bank to conduct critical brain chemistry changes and dopamine reviews. Call 1-800-UM-BRAIN (1-800-862-7246) for details and instruction on the collection of the tissue.

*Autopsy* ↑

Revised April 10, 2013

3

D 005088

⊘ **TASER**        CEW Event Analysis and Evidence Collection Checklist

Clearly and accurately mark the paired locations of the probe or drive-stun exposures



When using the diagram, please indicate the distance in inches between the probe locations.  Be sure to clearly identify both the top and bottom probes (consider using "OT" for the top probe and "OB" for the bottom probe; an "X" for a drive-stun; and a "3X" for a 3-point discharge.  For multiple deployments use OT and OB; OT2 and OB2; OT3 and OB3; etc.)

<u>TASER Resources</u>

For TASER CEW safety and medical resources please go to:  http://www.taser.com/research-and-safety/science-and-medical.  For TASER critical event assistance resources please go to:  http://www.taser.com/support/critical-event-assistance-resources.

For any media inquiries related to the TASER, TASER CEWs and how they function or their general safety, please direct the media to www.TASER.com, TASER's Media Hotline at 480.444.4000, or press@TASER.com.

X-Connect and ⊘ are trademarks of TASER International, Inc., and TASER is a registered trademark of TASER International, Inc., registered in the U.S. © 2013 TASER International, Inc. All rights reserved.

Revised April 10, 2013

D 005089

To:     Chief John Laut
From:  Deputy Chief James Ison
Ref:    Case # G16L11930 (Findings)
Date:   06/27/2016

Date 4.5.18
KENTUCKIANA Reporter_____  Exhibit # 3
Case_____
Deponent    Jim Ison

Chief Laut,

After conducting a thorough internal review of Incident G16L11930, I find that Lt. Brian
Blackwell, Officer Renee Elliott, Officer Elizabeth Laut, and Officer Randy Eck all preformed their
duties within the scope of the law, and in accordance with Greenwood Police Department
Policies and Procedures.

To: Chief John Laut
From: Deputy Chief James Ison
Date: 06/17/2016
Ref. G16L11930 (Summary of Facts)

- Charles Todero's actions on May 29, 2016 posed a risk of injury and/or death to himself, officers, and motorists. Witnesses Roger Poynter and Deborah MacNaughton both stated that they nearly struck Todero with their vehicles, and MacNaughton reported that she would have been involved in a motor vehicle crash if another vehicle would have been in the lane next to her when she swerved to avoid colliding with Todero. The officers involved in this case were also placed at risk of being struck by a vehicle while attempting to take Todero into custody for a psychiatric evaluation.

- Lt. Blackwell was on the seen without backup for 3 minutes and 1 second. He confronted a delusional Todero who was claiming to be Jesus Christ and walking in the roadway. Lt. Blackwell gave Todero multiple, loud verbal commands to stop walking in the roadway and placed his hand on Todero's shoulder in an attempt to stop him. Todero continued walking further into the roadway and ignored Lt. Blackwell's commands. Lt. Blackwell warned Todero that he would deploy his taser if he did not stop his dangerous behavior. Todero again failed to comply with Lt. Blackwell's commands. Lt. Blackwell requested additional units to assist him with Todero.

- Due to Todero's unsafe, delusional actions and non-compliance to Lt. Blackwell's commands to stop, Lt. Blackwell deployed his Taser striking Todero in the upper and lower back.

- Witness Holly Walters a motorist, stopped and asked Lt. Blackwell if he needed help. Lt. Blackwell requests that Walters stay to be a witness.

- According to Lt. Blackwell and Holly Walters, Todero was tased multiple times during the 1 minute and 3 seconds time frame between the first taser deployment and the arrival of the first back-up units.

D 001095

- Lt. Blackwell and Holly Walters both stated that Todero was given loud verbal commands to lie on the ground and put his hands behind his back, and that he was given adequate time to respond to these commands prior to each taser application. Lt. Blackwell and Holly Walters both stated that Todero refused to comply and that the taser did not seem to have much of an effect on Todero.

- Holly Walters stated that she and Lt. Blackwell were actually "pleading" with Todero to stop resisting and comply with commands to put his hands behind his back."

- Lt. Blackwell stated that he observed that the taser prong that struck Todero's lower back was "dangling" from his shirt, creating a clothing disconnect, and resulting in less effective results.

- Approximately 1 minute and 39 seconds after Lt. Blackwell requested assistance, Officers Renee Elliott and Elizabeth Laut arrived on the scene.

- Lt. Blackwell, Officer Renee Elliott, Officer Elizabeth Laut, and Holly Walters all stated that Todero was lying flat on the ground, in the roadway, with his hands under his body upon the arrival of Officers Elliott and Laut.  They further reported that Todero was given several verbal commands to put his hands behind his back.  They stated that Todero not only refused to comply but physically rolled and pulled away from Officer's Elliott and Laut as they attempted to secure him in handcuffs.  Officer Elliott reported that she attempted to apply digital pressure to Todero's mandibular angle "pressure point", but that it had no effect on him.  During the struggle to gain control of Todero's hands, Lt. Blackwell delivered approximately two to four drive stuns to Todero's leg.

- Officer Elliott advised that immediately following the final tase, she and Officer Laut where able to secure Todero in handcuffs.  It is noticed at this time that the taser prong that Lt. Blackwell observed "dangling" in Todero's shirt was now lodged in Todero's left hand.

- There was no additional use of force after Todero was secured in handcuffs.

D 001096

- Lt. Blackwell, Officer Renee Elliott, Officer Elizabeth Laut, and Holly Walters all advised that prior to each tase administered throughout this incident, Todero was given verbal commands, did not comply, and at times physically resisted. They also stated that Todero was given adequate time between tases to comply with the officers commands.

- Lt. Blackwell's taser log indicated that the taser was activated 16 times in a 3 minute and 10 second time span. The total duration of time that the taser was activated during this time span was 1 minute and 38 seconds (Taser usage report attached).

- After being successfully handcuffed, Todero was sat upright and against the curb of the north bound lanes of Madison Ave.

- Officer Randy Eck arrived on the scene and reminded Officer Elliott to activate her body worn camera. Officer Eck also called for paramedics as required after any taser usage, by the Greenwood Police Department Taser Use policy.

- Upon the arrival of the paramedics, Todero was still claiming to be Jesus Christ. Paramedics tied Todero's legs together with a blanket to refrain him from kicking.

- Paramedic Ian Godfrey stated that Todero was stable at the scene, and that he observed no signs that Todero was having a medical emergency. Godfrey stated that due to there being no indication of a medical emergency the ambulance was routed away from the closest hospital (Community South) and to St. Francis Hospital, because Community South Hospital was on psychiatric diversion. Godfrey reported that while enroute to St. Francis Hospital, Todero became combative inside the ambulance. Godfrey stated that Todero was kicking, thrashing, and banging his head against the gurney. Godfrey advised that he gave Todero 5mg of Midazolam to "chemically restrain" him. Godfrey reported that Todero's heartrate dropped significantly and that he began breathing agonally. Godfrey further reported that Todero went into Cardiac Arrest at 12:19pm.

- Dr. Chris Hartman advised Lt. Blackwell, Officer Renee Elliott, Officer Elizabeth Laut, and Ian Godfrey that the use of the taser on Todero was not the cause of his cardiac arrest. Dr. Hartman further advised Deputy Chief James Ison via telephone on June 15, 2016 that if the taser would have contributed to Todero's heart stopping, it would have occurred immediately after he was tased and not in the ambulance nearly 25 minutes later.

- Todero died at St. Francis Hospital on June 11, 2016 at 11:48pm.

- Autopsy was preformed on June 13, 2016. Preliminary results indicate Todero died of natural causes stemming from liver disease.

Date 4.5.16
KENTUCKIANA Reporter _____  Exhibit # 4
Case _____
Deponent  Jim Ison

## Timeline of Events

(The radio traffic timestamp is 4 minutes and 57 seconds behind the Spillman timestamp.  All times listed below are Spillman times.)

May 28, 2016,

- 12:22:00  Indiana State Police are dispatched to I65 mile marker 105 on the report of a man walking on the interstate.  Trooper Shane Cunningham responded and located Charles Todero.  Todero was walking and talking to God.  Trooper Cunningham offered to give Todero a ride.  Todero requested to be driven to the Vineyard church so that he could talk to a godly man about his father's recent passing.  Trooper Cunningham drove Todero the Vineyard Chruch where he dropped him off.  Trooper Cunningham described Todero as "a little off."

May 29, 2016

- Approximately 09:15:00  Charles Todero was at the Vineyard Church (512 S. Madison Ave.) looking disheveled, and preaching to church members outside the church.  Todero was causing a disturbance and was asked to leave by Greenwood Reserve Officer Charles Moyer.

- 11:44:48  The first 911 call is received by the Johnson County 911 Center stating that a white male is trying to get hit by traffic on Madison Ave.

- 11:45:00  The second 911 call is received by the Johnson County 911 Center stating that a male is walking in front of cars, back and forth across the street.

- 11:45:13  The Johnson County 911 Center dispatches that a male is trying to commit suicide by walking in front of vehicular traffic on Madison Ave.

- 11:45:34  Lt. Blackwell marks enroute to the call from Main St. and S.R. 135.

- 11:50:02  Lt. Blackwell arrives on the scene.

- 11:51:23  Lt. Blackwell requested a second unit.

- 11:52:07  Lt. Blackwell advised "Taser Deployed".

- 11:52:33  There was indiscernible radio traffic from Lt. Blackwell.

- 11:53:03  Officer's Renee Elliott and Elizabeth Laut arrive on the scene.

- 11:53:53  Officer Elliott advises "Stand by"when asked by dispatch if they wanted medics.

- 11:55:22Officer Eck arrives on the scene.

- 11:55:44 Officer Eck requested medics.

- 12:00:35 GFD Engine 91 arrives on scene.

- 12:01:09  Medics arrive on the scene.

- 12:08:46  Officers Elliott and Laut follow the ambulance to St. Francis Hospital.

- 12:19 Todero goes into cardiac arrest when arriving at St. Francis Hospital.

- 12:19:21  Officers Elliott and Laut arrive at St. Francis Hospital.

- 12:20:58  Officer Elliott notifies Lt. Blackwell that Todero is in cardiac arrest.

D 001226

**06/07/2016**

- Chief John Laut orders an internal investigation.

**06/11/2016**

- 11:48pm Charles Todero is pronounced deceased at St. Francis Hospital.

**06/12/2016**

- The Greenwood Police Department is notified of Charles Todero's death.

**06/13/2016**

- Preliminary autopsy report indicates that Charles Todero died of natural causes due to liver disease.

**06/15/2016**

- Deputy Chief Ison speaks to Dr. Chris Hartman via telephone.  Dr. Hartman advises Deputy Chief Ison that Todero's condition upon arriving at St. Francis Hospital on May 29, 2016 was not a result of being tased.

**06/17/2016**

- Indiana State Police Trooper Shane Cunningham notifies Deputy Chief Ison that he responded to a similar incident involving Todero on May 28, 2016. Trooper Cunningham agrees to provide the ISP case report concerning this incident.

**06/19/2017**

- Deputy Chief Ison is notified that GPD reserve Officer Charles Moyer while working off-duty for the Vineyard Church on May 29, 2016 came into contact with Charles Todero.

06/27/2016

- Internal Review Completed.

D 001228

## James Ison

| | |
|---|---|
| From: | Jason Holtzleiter <holtzlej@greenwood.in.gov> |
| Sent: | Tuesday, June 21, 2016 8:30 AM |
| To: | James Ison |
| Subject: | Emailing - TASER_X26_X00-730387_offline.pdf |
| Attachments: | TASER_X26_X00-730387_offline.pdf |

I pulled the trigger on the Taser when the Spillman clocked turned 8:27am exactly. The Taser log shows that the trigger was activated at 8:27:45 am, which is about 45 seconds off.

Date 4.5.18

KENTUCKIANA  Reporter_____  Exhibit # 5

Case_____

Deponent  Jim Ison

1

Chief John Laut,

It should be noted that during the course of my investigation I found Lt. Blackwell's taser usage log to be approximately 3:52 faster than the Spillman time stamp. This was calculated by subtracting the Spillman time at which Lt. Blackwell advised that his taser had been deployed from the first trigger pull on the taser usage log. I was informed by Sgt. Jason Holtzleiter that upon each data download the taser will sync with Spillman time. Sgt. Holtzleiter informed me that when he downloaded the data from Lt. Blackwell's taser on May 31, 2016 he did not verify that the taser time was the same as the Spillman time. On June 21, 2016 I requested Sgt. Holtzleiter re-sync Lt. Blackwell's taser time with Spillman time. Sgt. Holtzleiter advised that since the last down load and sync on May 31st, the taser had gained 45 seconds on Spillman time.

Date 4.5.18

KENTUCKIANA Reporter_____ Exhibit # 6

Case_____

Deponent_____ Jim Ison

Date 4.5.18
KENTUCKIANA Reporter_____ Exhibit # 7
Case _____
Deponent___ Jim Ison

 **TASER**
P R O T E C T   L I F E

# EVIDENCE ⓞ SYNC™

**TASER Information**
Serial              X00-730387
Model               TASER X26
Firmware Version    Rev. 24
Application Version 3.12.48

**Offline Report**
Local Timezone    Eastern Standard Time (UTC -04:00)
Generated On      31 May 2016 07:34:20

## Device (X26)

| Seq # | Local Time [DD:MM:YYYY hh:mm:ss] | Event [Event Type] | Duration [Seconds] | Temp [Degrees Celcius] | Batt Remaining [%] |
|---|---|---|---|---|---|
| 1 | Invalid Date/Time | Sync | Invalid Date/Time to Invalid Date/Time | | |
| 2 | 16 Oct 2013 17:56:41 | Sync | 16 Oct 2013 17:56:41 to 16 Oct 2013 17:56:41 | | |
| 3 | 16 Oct 2013 17:57:29 | Trigger | 5 | 27 | 99 |
| 4 | 16 Oct 2013 17:57:36 | Trigger | 5 | 27 | 99 |
| 5 | 16 Oct 2013 17:57:43 | Trigger | 5 | 28 | 99 |
| 6 | 08 Jan 2014 15:11:41 | Trigger | 1 | 21 | 98 |
| 7 | 08 Jan 2014 15:13:32 | Trigger | 1 | 22 | 98 |
| 8 | 13 Jan 2014 17:50:38 | Trigger | 1 | 21 | 98 |
| 9 | 19 Jan 2014 04:45:27 | Trigger | 1 | 19 | 98 |
| 10 | 22 Jan 2014 18:01:37 | Trigger | 1 | 20 | 97 |
| 11 | 23 Jan 2014 05:59:41 | Trigger | 1 | 20 | 97 |
| 12 | 23 Jan 2014 17:43:35 | Trigger | 1 | 21 | 97 |
| 13 | 23 Jan 2014 19:09:04 | Trigger | 1 | 14 | 97 |
| 14 | 27 Jan 2014 17:49:46 | Trigger | 1 | 20 | 97 |
| 15 | 28 Jan 2014 22:09:20 | Trigger | 1 | 24 | 97 |
| 16 | 31 Jan 2014 18:07:15 | Trigger | 1 | 20 | 97 |
| 17 | 01 Feb 2014 05:51:10 | Trigger | 1 | 22 | 97 |
| 18 | 01 Feb 2014 18:06:01 | Trigger | 1 | 21 | 97 |
| 19 | 05 Feb 2014 18:06:45 | Trigger | 1 | 19 | 97 |
| 20 | 06 Feb 2014 20:41:11 | Trigger | 1 | 20 | 97 |
| 21 | 09 Feb 2014 16:43:19 | Trigger | 1 | 20 | 96 |
| 22 | 09 Feb 2014 16:43:22 | Trigger | 2 | 20 | 96 |
| 23 | 10 Feb 2014 15:25:40 | Trigger | 1 | 22 | 96 |
| 24 | 11 Feb 2014 18:12:48 | Trigger | 1 | 20 | 96 |
| 25 | 14 Feb 2014 23:49:42 | Trigger | 1 | 23 | 96 |
| 26 | 15 Feb 2014 18:09:10 | Trigger | 1 | 21 | 96 |
| 27 | 19 Feb 2014 16:55:11 | Trigger | 1 | 20 | 96 |
| 28 | 25 Feb 2014 17:50:25 | Trigger | 1 | 21 | 96 |
| 29 | 01 Mar 2014 17:54:26 | Trigger | 1 | 20 | 96 |
| 30 | 01 Mar 2014 17:54:37 | Trigger | 3 | 21 | 95 |
| 31 | 02 Mar 2014 18:05:00 | Trigger | 1 | 21 | 95 |
| 32 | 02 Mar 2014 20:09:55 | Trigger | 1 | 26 | 95 |
| 33 | 05 Mar 2014 18:06:58 | Trigger | 1 | 21 | 95 |
| 34 | 06 Mar 2014 18:13:15 | Trigger | 1 | 22 | 95 |
| 35 | 10 Mar 2014 17:59:24 | Trigger | 2 | 20 | 95 |
| 36 | 11 Mar 2014 17:56:01 | Trigger | 2 | 21 | 95 |
| 37 | 15 Mar 2014 17:19:56 | Trigger | 2 | 21 | 94 |
| 38 | 16 Mar 2014 18:16:00 | Trigger | 2 | 18 | 94 |
| 39 | 19 Mar 2014 18:05:01 | Trigger | 2 | 21 | 94 |
| 40 | 20 Mar 2014 18:06:11 | Trigger | 1 | 21 | 94 |
| 41 | 25 Mar 2014 18:07:34 | Trigger | 1 | 20 | 94 |
| 42 | 30 Mar 2014 18:03:54 | Trigger | 2 | 21 | 94 |
| 43 | 02 Apr 2014 17:57:45 | Trigger | 1 | 21 | 94 |

Page 1 of 4

TODERO 00004

| Seq # | Local Time [DD:MM:YYYY hh:mm:ss] | Event [Event Type] | Duration [Seconds] | Temp [Degrees Celcius] | Batt Remaining [%] |
|---|---|---|---|---|---|
| 44 | 03 Apr 2014 18:06:08 | Trigger | 1 | 21 | 93 |
| 45 | 07 Apr 2014 18:03:40 | Trigger | 1 | 19 | 93 |
| 46 | 08 Apr 2014 18:11:01 | Trigger | 1 | 22 | 93 |
| 47 | 11 Apr 2014 22:40:35 | Trigger | 1 | 25 | 93 |
| 48 | 12 Apr 2014 18:05:35 | Trigger | 2 | 24 | 93 |
| 49 | 13 Apr 2014 18:09:05 | Trigger | 1 | 23 | 93 |
| 50 | 17 Apr 2014 18:23:04 | Trigger | 1 | 22 | 93 |
| 51 | 21 Apr 2014 18:03:26 | Trigger | 2 | 21 | 93 |
| 52 | 22 Apr 2014 23:29:01 | Trigger | 1 | 25 | 92 |
| 53 | 26 Apr 2014 18:03:57 | Trigger | 1 | 23 | 92 |
| 54 | 05 May 2014 18:14:55 | Trigger | 2 | 23 | 92 |
| 55 | 06 May 2014 18:11:08 | Trigger | 2 | 23 | 92 |
| 56 | 10 May 2014 17:07:37 | Trigger | 2 | 21 | 92 |
| 57 | 14 May 2014 18:15:05 | Trigger | 1 | 22 | 92 |
| 58 | 15 May 2014 18:13:42 | Trigger | 1 | 21 | 92 |
| 59 | 19 May 2014 20:12:08 | Trigger | 2 | 27 | 92 |
| 60 | 20 May 2014 18:03:15 | Trigger | 1 | 24 | 91 |
| 61 | 02 Jun 2014 18:10:59 | Trigger | 2 | 20 | 91 |
| 62 | 06 Jun 2014 18:07:46 | Trigger | 2 | 20 | 91 |
| 63 | 07 Jun 2014 18:09:07 | Trigger | 2 | 20 | 91 |
| 64 | 08 Jun 2014 18:05:01 | Trigger | 1 | 20 | 91 |
| 65 | 08 Jun 2014 18:05:05 | Trigger | 1 | 20 | 91 |
| 66 | 08 Jun 2014 18:05:11 | Trigger | 1 | 20 | 90 |
| 67 | 12 Jun 2014 04:09:56 | Trigger | 2 | 23 | 90 |
| 68 | 16 Jun 2014 21:53:45 | Trigger | 1 | 27 | 90 |
| 69 | 17 Jun 2014 15:05:59 | Trigger | 1 | 27 | 90 |
| 70 | 21 Jun 2014 17:57:02 | Trigger | 2 | 19 | 90 |
| 71 | 22 Jun 2014 18:04:12 | Trigger | 2 | 19 | 90 |
| 72 | 22 Jun 2014 21:32:43 | Trigger | 1 | 27 | 90 |
| 73 | 23 Jun 2014 00:31:10 | Trigger | 3 | 29 | 90 |
| 74 | 25 Jun 2014 18:02:09 | Trigger | 1 | 20 | 89 |
| 75 | 25 Jun 2014 19:24:35 | Trigger | 1 | 26 | 89 |
| 76 | 25 Jun 2014 19:15:51 | Sync | 25 Jun 2014 19:25:08 to 25 Jun 2014 19:15:51 | | |
| 77 | 04 Jul 2014 17:47:36 | Trigger | 2 | 20 | 89 |
| 78 | 05 Jul 2014 17:52:10 | Trigger | 1 | 23 | 89 |
| 79 | 09 Jul 2014 18:04:46 | Trigger | 1 | 20 | 89 |
| 80 | 10 Jul 2014 17:44:34 | Trigger | 1 | 20 | 89 |
| 81 | 15 Jul 2014 17:57:57 | Trigger | 2 | 21 | 89 |
| 82 | 19 Jul 2014 17:54:17 | Trigger | 1 | 23 | 88 |
| 83 | 28 Jul 2014 17:56:13 | Trigger | 1 | 23 | 88 |
| 84 | 29 Jul 2014 17:58:02 | Trigger | 1 | 22 | 88 |
| 85 | 31 Jul 2014 11:01:45 | Trigger | 1 | 23 | 88 |
| 86 | 02 Aug 2014 18:05:55 | Trigger | 1 | 20 | 88 |
| 87 | 06 Aug 2014 17:28:01 | Trigger | 1 | 20 | 88 |
| 88 | 07 Aug 2014 17:54:18 | Trigger | 1 | 20 | 88 |
| 89 | 11 Aug 2014 20:33:21 | Trigger | 2 | 20 | 88 |
| 90 | 16 Aug 2014 16:30:30 | Trigger | 2 | 23 | 88 |
| 91 | 21 Aug 2014 18:00:53 | Trigger | 1 | 20 | 87 |
| 92 | 22 Aug 2014 00:42:18 | Trigger | 2 | 26 | 87 |
| 93 | 30 Aug 2014 17:52:18 | Trigger | 1 | 21 | 87 |
| 94 | 04 Sep 2014 18:28:45 | Trigger | 1 | 26 | 87 |
| 95 | 04 Sep 2014 18:35:06 | Trigger | 1 | 27 | 87 |
| 96 | 04 Sep 2014 18:35:43 | Trigger | 1 | 27 | 97 |
| 97 | 04 Sep 2014 18:35:45 | Trigger | 1 | 27 | 97 |
| 98 | 26 Jan 2015 17:58:39 | Trigger | 2 | 21 | 86 |
| 99 | 30 Jan 2015 22:30:09 | Trigger | 1 | 22 | 86 |
| 100 | 05 Feb 2015 16:56:58 | Trigger | 2 | 21 | 86 |
| 101 | 05 Feb 2015 17:19:10 | Trigger | 1 | 22 | 86 |

TODERO 00005

| Seq # | Local Time [DD:MM:YYYY hh:mm:ss] | Event [Event Type] | Duration [Seconds] | Temp [Degrees Celcius] | Batt Remaining [%] |
|---|---|---|---|---|---|
| 102 | 09 Feb 2015 17:49:11 | Trigger | 1 | 21 | 85 |
| 103 | 13 Feb 2015 18:00:42 | Trigger | 2 | 20 | 85 |
| 104 | 14 Feb 2015 18:02:44 | Trigger | 1 | 20 | 85 |
| 105 | 20 Feb 2015 08:01:58 | Trigger | 1 | -7 | 85 |
| 106 | 20 Feb 2015 08:03:34 | Trigger | 1 | -4 | 85 |
| 107 | 20 Feb 2015 07:55:15 | Sync | 20 Feb 2015 08:04:10 to 20 Feb 2015 07:55:15 | | |
| 108 | 20 Feb 2015 07:56:47 | Trigger | 1 | 4 | 85 |
| 109 | 22 Feb 2015 02:10:12 | Trigger | 1 | 20 | 85 |
| 110 | 24 Feb 2015 18:08:52 | Trigger | 1 | 20 | 85 |
| 111 | 09 Mar 2015 17:53:32 | Trigger | 1 | 20 | 84 |
| 112 | 14 Mar 2015 18:07:44 | Trigger | 1 | 21 | 84 |
| 113 | 19 Mar 2015 18:04:40 | Trigger | 1 | 21 | 84 |
| 114 | 23 Mar 2015 22:28:13 | Trigger | 1 | 26 | 84 |
| 115 | 29 Mar 2015 23:29:25 | Trigger | 1 | 26 | 84 |
| 116 | 01 Apr 2015 18:02:07 | Trigger | 1 | 21 | 84 |
| 117 | 07 Apr 2015 17:55:47 | Trigger | 1 | 20 | 84 |
| 118 | 11 Apr 2015 18:01:53 | Trigger | 1 | 22 | 84 |
| 119 | 15 Apr 2015 18:02:05 | Trigger | 1 | 21 | 83 |
| 120 | 16 Apr 2015 18:08:08 | Trigger | 5 | 22 | 83 |
| 121 | 25 Apr 2015 16:29:07 | Trigger | 1 | 21 | 83 |
| 122 | 29 Apr 2015 18:02:24 | Trigger | 5 | 22 | 83 |
| 123 | 05 May 2015 17:55:12 | Trigger | 2 | 25 | 82 |
| 124 | 08 May 2015 19:21:30 | Trigger | 5 | 20 | 82 |
| 125 | 10 May 2015 17:54:21 | Trigger | 5 | 20 | 82 |
| 126 | 10 May 2015 21:45:30 | Trigger | 5 | 28 | 81 |
| 127 | 14 May 2015 17:58:57 | Trigger | 1 | 22 | 81 |
| 128 | 19 May 2015 17:57:56 | Trigger | 3 | 21 | 81 |
| 129 | 01 Jun 2015 17:59:28 | Trigger | 5 | 20 | 80 |
| 130 | 15 Jun 2015 17:47:14 | Trigger | 3 | 20 | 80 |
| 131 | 19 Jun 2015 18:00:08 | Trigger | 2 | 20 | 79 |
| 132 | 19 Jun 2015 22:11:13 | Trigger | 2 | 25 | 79 |
| 133 | 19 Jun 2015 22:11:32 | Trigger | 5 | 26 | 79 |
| 134 | 24 Jun 2015 17:59:56 | Trigger | 2 | 20 | 79 |
| 135 | 25 Jun 2015 17:57:49 | Trigger | 2 | 20 | 78 |
| 136 | 03 Jul 2015 17:57:16 | Trigger | 1 | 20 | 78 |
| 137 | 08 Jul 2015 17:55:01 | Trigger | 1 | 21 | 78 |
| 138 | 09 Jul 2015 18:00:56 | Trigger | 1 | 21 | 78 |
| 139 | 13 Jul 2015 18:04:17 | Trigger | 2 | 20 | 78 |
| 140 | 22 Jul 2015 17:58:37 | Trigger | 2 | 20 | 78 |
| 141 | 31 Jul 2015 17:54:20 | Trigger | 2 | 19 | 77 |
| 142 | 18 Aug 2015 06:54:30 | Trigger | 5 | 21 | 77 |
| 143 | 29 Aug 2015 18:02:06 | Trigger | 2 | 19 | 77 |
| 144 | 02 Sep 2015 17:54:40 | Trigger | 3 | 19 | 76 |
| 145 | 11 Sep 2015 17:55:37 | Trigger | 3 | 22 | 76 |
| 146 | 13 Sep 2015 17:59:31 | Trigger | 2 | 22 | 76 |
| 147 | 21 Sep 2015 18:07:55 | Trigger | 2 | 22 | 76 |
| 148 | 26 Sep 2015 18:03:02 | Trigger | 5 | 21 | 75 |
| 149 | 09 Oct 2015 18:04:53 | Trigger | 2 | 22 | 75 |
| 150 | 10 Oct 2015 18:08:58 | Trigger | 5 | 22 | 75 |
| 151 | 10 Oct 2015 20:20:01 | Trigger | 5 | 27 | 74 |
| 152 | 10 Oct 2015 20:20:11 | Trigger | 5 | 27 | 74 |
| 153 | 19 Oct 2015 17:58:07 | Trigger | 2 | 21 | 73 |
| 154 | 24 Oct 2015 17:53:13 | Trigger | 5 | 23 | 73 |
| 155 | 28 Oct 2015 18:05:13 | Trigger | 3 | 20 | 73 |
| 156 | 29 Oct 2015 19:25:54 | Trigger | 5 | 22 | 73 |
| 157 | 02 Nov 2015 18:14:10 | Trigger | 5 | 22 | 72 |
| 158 | 03 Nov 2015 18:10:48 | Trigger | 5 | 23 | 72 |
| 159 | 06 Nov 2015 16:51:35 | Trigger | 5 | 23 | 71 |

Page 3 of 4

TODERO 00006

| Seq # | Local Time [DD:MM:YYYY hh:mm:ss] | Event [Event Type] | Duration [Seconds] | Temp [Degrees Celsius] | Batt Remaining [%] |
|---|---|---|---|---|---|
| 160 | 30 Nov 2015 17:45:36 | Trigger | 5 | 21 | 71 |
| 161 | 01 Dec 2015 17:56:47 | Trigger | 5 | 21 | 70 |
| 162 | 04 Dec 2015 18:03:58 | Trigger | 5 | 21 | 70 |
| 163 | 10 Dec 2015 18:05:54 | Trigger | 5 | 21 | 70 |
| 164 | 06 Jan 2016 21:47:46 | Trigger | 5 | 23 | 69 |
| 165 | 12 Jan 2016 18:06:15 | Trigger | 5 | 21 | 68 |
| 166 | 19 Jan 2016 05:58:29 | Trigger | 5 | 20 | 68 |
| 167 | 24 Jan 2016 05:59:56 | Trigger | 5 | 20 | 68 |
| 168 | 27 Jan 2016 17:43:34 | Trigger | 5 | 23 | 67 |
| 169 | 28 Jan 2016 18:53:42 | Trigger | 2 | 24 | 67 |
| 170 | 05 Feb 2016 06:07:36 | Trigger | 5 | 20 | 66 |
| 171 | 06 Feb 2016 12:06:57 | Trigger | 3 | 23 | 66 |
| 172 | 11 Feb 2016 06:13:24 | Trigger | 4 | 20 | 66 |
| 173 | 11 Feb 2016 08:14:31 | Trigger | 2 | 22 | 65 |
| 174 | 11 Feb 2016 08:14:35 | Trigger | 2 | 22 | 65 |
| 175 | 11 Feb 2016 08:14:44 | Trigger | 2 | 22 | 65 |
| 176 | 11 Feb 2016 08:54:48 | Trigger | 5 | 27 | 65 |
| 177 | 11 Feb 2016 08:56:42 | Trigger | 5 | 27 | 65 |
| 178 | 11 Feb 2016 08:57:56 | Trigger | 5 | 28 | 64 |
| 179 | 17 Feb 2016 13:41:26 | Trigger | 5 | 20 | 64 |
| 180 | 17 Feb 2016 13:59:01 | Sync | 17 Feb 2016 14:12:24 to 17 Feb 2016 13:59:01 | | |
| 181 | 24 Feb 2016 05:55:44 | Trigger | 5 | 20 | 63 |
| 182 | 09 Mar 2016 15:25:52 | Trigger | 1 | 27 | 63 |
| 183 | 09 Mar 2016 15:25:58 | Trigger | 1 | 27 | 63 |
| 184 | 18 Mar 2016 06:04:48 | Trigger | 3 | 20 | 63 |
| 185 | 20 Mar 2016 05:58:42 | Trigger | 2 | 21 | 62 |
| 186 | 03 Apr 2016 05:59:26 | Trigger | 5 | 20 | 62 |
| 187 | 26 Apr 2016 05:54:12 | Trigger | 5 | 20 | 62 |
| 188 | 09 May 2016 05:57:33 | Trigger | 5 | 20 | 61 |
| 189 | 24 May 2016 05:53:04 | Trigger | 3 | 20 | 61 |
| 190 | 29 May 2016 11:56:00 | Trigger | 5 | 25 | 60 |
| 191 | 29 May 2016 11:56:15 | Trigger | 12 | 26 | 60 |
| 192 | 29 May 2016 11:56:27 | Trigger | 10 | 27 | 59 |
| 193 | 29 May 2016 11:56:41 | Trigger | 13 | 29 | 58 |
| 194 | 29 May 2016 11:56:55 | Trigger | 5 | 29 | 57 |
| 195 | 29 May 2016 11:57:02 | Trigger | 2 | 30 | 57 |
| 196 | 29 May 2016 11:57:14 | Trigger | 8 | 30 | 57 |
| 197 | 29 May 2016 11:57:21 | Trigger | 5 | 31 | 56 |
| 198 | 29 May 2016 11:57:33 | Trigger | 5 | 32 | 56 |
| 199 | 29 May 2016 11:57:39 | Trigger | 5 | 32 | 55 |
| 200 | 29 May 2016 11:57:47 | Trigger | 5 | 32 | 55 |
| 201 | 29 May 2016 11:57:53 | Trigger | 5 | 33 | 55 |
| 202 | 29 May 2016 11:58:11 | Trigger | 5 | 34 | 54 |
| 203 | 29 May 2016 11:58:20 | Trigger | 5 | 34 | 54 |
| 204 | 29 May 2016 11:58:30 | Trigger | 3 | 34 | 54 |
| 205 | 29 May 2016 11:59:10 | Trigger | 5 | 34 | 53 |
| 206 | 31 May 2016 07:32:37 | Sync | 31 May 2016 07:36:31 to 31 May 2016 07:32:37 | | |

Page 4 of 4

TODERO 00007

**Google** Maps



Imagery ©2018 Google, Map data ©2018 Google    20 ft



Date 4.5.18

KENTUCKIANA   Reporter_____   Exhibit # 8

Case_____

Deponent_____ Jim Ison

g0renel
Elliott

Date 4.5.18
KENTUCKIANA Reporter_____ Exhibit # 9
Case_____
Deponent   Jim Ison

# Greenwood Police Department

Electronic Communications
Report by Conversation

**17:28:31 05/29/16 from g0elila; to: g0renel**
HEY JUST WANTED TO REMIND YOU IF YOU WANTED TO DO A DOR TODAY, AND IF I DON'T SEE YA, HAVE A GOOD COUPLE DAYS OFF!

**17:09:15 05/29/16 from j9shase; to: g0aarky , g0braco , g0brasa , g0bribl , g0elila , g0erimc , g0jasyo , g0jefmc , g0ranec , g0renel , g0ronde**
43 we are in site trunking

**15:20:20 05/29/16 from g0bribl; to: g0aarky , g0elila , g0jasho1 , g0jefho , g0jefmc , g0ranec , g0renel**
Densmore is coming in as soon as he can

**14:43:05 05/29/16 from g0bribl; to: g0aarky , g0doumu , g0elila , g0jasho1 , g0jefho , g0jefmc , g0ranec**
k

**14:43:00 05/29/16 from g0jefho; to: g0aarky , g0bribl , g0doumu , g0elila , g0jasho1 , g0jefmc , g0ranec**
they both are gone from here

**14:41:49 05/29/16 from g0bribl; to: g0aarky , g0doumu , g0elila , g0jasho1 , g0jefho , g0jefmc , g0ranec**
she left?

**14:41:33 05/29/16 from g0bribl; to: g0aarky , g0doumu , g0elila , g0jasho1 , g0jefho , g0jefmc , g0ranec**
10-8

**14:41:22 05/29/16 from g0jefho; to: g0aarky , g0bribl , g0doumu , g0elila , g0jasho1 , g0jefmc , g0ranec**
they have alredy left here

**14:39:31 05/29/16 from g0bribl; to: g0aarky , g0doumu , g0elila , g0jasho1 , g0jefho , g0jefmc , g0ranec**
you just met Jesus on madison ave....how closer do u want

**14:38:54 05/29/16 from g0elila; to: g0aarky , g0bribl , g0doumu , g0jasho1 , g0jefho , g0jefmc , g0ranec**
ok, got to potty first. oh, haven't gone to church today yet.

**14:38:30 05/29/16 from g0bribl; to: g0aarky , g0doumu , g0elila , g0jasho1 , g0jefho , g0jefmc , g0ranec**

copyright 2003 Spillman Technologies
All Rights Reserved

01/17/18

D 000001

you ought to run over there and meet satan's wife

**14:38:27 05/29/16 from g0elila; to:** g0aarky , g0bribl , g0doumu , g0jasho1 , g0jefho , g0jefmc , g0ranec
lol

**14:38:07 05/29/16 from g0bribl; to:** g0aarky , g0doumu , g0elila , g0jasho1 , g0jefho , g0jefmc , g0ranec
wait.....you havent met kimberly EB.....

**14:37:43 05/29/16 from g0elila; to:** g0aarky , g0bribl , g0doumu , g0jasho1 , g0jefho , g0jefmc , g0ranec
yea!

**14:37:27 05/29/16 from g0bribl; to:** g0aarky , g0doumu , g0elila , g0jasho1 , g0jefho , g0jefmc , g0ranec
26th run on her this year!!!!

**14:14:16 05/29/16 from g0elila; to:** g0bribl
clr

**14:14:08 05/29/16 from g0bribl; to:** g0elila
just have her come on station in a bit

**14:14:05 05/29/16 from g0elila; to:** g0bribl
haha

**14:13:56 05/29/16 from g0bribl; to:** g0elila
Me too........we'll all go to Disney Land on our disability

**14:13:26 05/29/16 from g0elila; to:** g0bribl
She hurt her back while we were trying to handle that guy.

**14:12:36 05/29/16 from g0bribl; to:** g0elila
what did she do?

**14:12:16 05/29/16 from g0elila; to:** g0bribl
Renee is going to file out an injury report. She's hurt her shoulder and it's not due to my driving.

**14:11:40 05/29/16 from g0bribl; to:** g0elila
lol....ty

**14:11:34 05/29/16 from g0elila; to:** g0bribl
Capitol, my hand writting is bad. It's in Indianapolis

**14:10:51 05/29/16 from g0bribl; to:** g0elila
do you remember the street name fro the witness????? Looks like Cophol or Lophel

D 000002

*Electronic Communications Report by Conversation*                                    *Page 3*

---

**14:10:44 05/29/16 from g0elila; to: g0bribl**
? Sorry closed out the old messages

**14:10:17 05/29/16 from g0bribl; to: g0elila**
there

**13:56:04 05/29/16 from g0elila; to: j9adaph**
k

**13:51:00 05/29/16 from j9adaph; to: g0elila**
INFO: Jim Hughes (the caller) is requesting an update when you're complete with the welfare check.
317-502-7046. I told him I'd pass on the request

**13:30:28 05/29/16 from g0elila; to: g0aarky , g0bribl , g0doumu , g0erimc , g0jasho , g0jasho1 , g0jasyo ,
g0jefho , g0jefmc , g0ranec**
Brian, the doctor said it may be from what ever drug(s) he took also. Not necessary the struggle

**13:28:44 05/29/16 from g0elila; to: g0bribl**
ok

**13:24:02 05/29/16 from g0bribl; to: g0elila**
......we will do them but he wants it blocked so noone can go back in and change or add things that were not
involved

**13:23:10 05/29/16 from g0bribl; to: g0elila**
Jimmy said hold off of on supplements

**13:19:35 05/29/16 from g0bribl; to: g0elila**
there

**13:04:09 05/29/16 from g0jefmc; to: g0brasa , g0bribl , g0doumu , g0elila , g0erimc , g0jasho , g0jasyo ,
g0jefho , g0joste , g0ranec**
was that idiot on something?

**13:03:24 05/29/16 from g0bribl; to: g0brasa , g0doumu , g0elila , g0erimc , g0jasho , g0jasyo , g0jefho ,
g0jefmc , g0joste , g0ranec**
Excteme acid build up from resisting

**12:11:11 05/29/16 from g0bribl; to: g0brasa , g0doumu , g0elila , g0erimc , g0jasyo , g0jefho , g0jefmc , g0joste
, g0ranec , g0renel**
"OH MY BACK, MY BACK!!!!!!"

copyright 2003 Spillman Technologies
All Rights Reserved

01/17/18



gø bribl
Bloclwell

# Greenwood
# Police
# Department

Electronic Communications
Report by Conversation

---

**18:09:56 05/29/16 from g0ruscr; to:** g0aarky , g0braco , g0brasa , g0bribl , g0bruca , g0erimc , g0erisc , g0renel , g0ronde , g0scoco , g0stees , j9adaph
checking on it

**18:06:16 05/29/16 from j9adaph; to:** g0aarky , g0braco , g0brasa , g0bribl , g0bruca , g0erimc , g0erisc , g0renel , g0ronde , g0ruscr , g0scoco , g0stees
INFO: There is a female named Lacy Taylor in the lobby to pick up Marcus Rush who she believes was being questioned at GPD.

**18:05:43 05/29/16 from g0erisc; to:** g0aarky , g0braco , g0brasa , g0bribl , g0bruca , g0erimc , g0renel , g0ronde , g0ruscr , g0scoco , g0stees , j9erito
clr

**18:01:13 05/29/16 from j9erito; to:** g0aarky , g0braco , g0brasa , g0bribl , g0bruca , g0erimc , g0erisc , g0ronde , g0ruscr , g0scoco , g0stees
i'll be more than happy to run anything you guys need just bear with me if we start to get busy.

**18:00:19 05/29/16 from g0ronde; to:** g0aarky , g0braco , g0brasa , g0bribl , g0bruca , g0erimc , g0erisc , g0jasyo , g0ruscr , g0scoco , g0stees , j9erito
outstanding

**18:00:19 05/29/16 from g0bruca; to:** g0aarky , g0braco , g0brasa , g0bribl , g0erimc , g0erisc , g0jasyo , g0ronde , g0ruscr , g0scoco , g0stees , j9erito
k

**18:00:15 05/29/16 from g0scoco; to:** g0aarky , g0braco , g0brasa , g0bribl , g0bruca , g0erimc , g0erisc , g0jasyo , g0ronde , g0ruscr , g0stees , j9erito
K

**18:00:12 05/29/16 from g0stees; to:** g0aarky , g0braco , g0brasa , g0bribl , g0bruca , g0erimc , g0erisc , g0jasyo , g0ronde , g0ruscr , g0scoco , j9erito
K

copyright 2003 Spillman Technologies
All Rights Reserved

01/17/18

**18:00:00 05/29/16 from j9erito; to:** g0aarky , g0braco , g0brasa , g0bribl , g0bruca , g0erimc , g0erisc , g0jasyo , g0ronde , g0ruscr , g0scoco , g0stees
FYI, Dispatch radios are currently in site trunking. Franklin tower is down. HQ is 10-0 until further notice.

**17:09:15 05/29/16 from j9shase; to:** g0aarky , g0braco , g0brasa , g0bribl , g0elila , g0erimc , g0jasyo , g0jefmc , g0ranec , g0renel , g0ronde
43 we are in site trunking

**16:46:10 05/29/16 from g0bribl; to:** g0ronde
I am up here still typing my novel

**16:46:00 05/29/16 from g0bribl; to:** g0ronde
thanks man!

**16:45:56 05/29/16 from g0ronde; to:** g0bribl
happy to help

**16:45:34 05/29/16 from g0bribl; to:** g0ronde
3133, 3152, and 3188 mae 3 arrests on a $30,000 burglary and are still working it.....just been a nightmare

**16:45:20 05/29/16 from g0ronde; to:** g0bribl
lol nice

**16:44:50 05/29/16 from g0bribl; to:** g0ronde
I had to tase a guy a dozen times today for trying to commit suicide by walking into traffic and he ended up coding when he arrived at the hospital...so the chief wants a thorough report

**16:44:09 05/29/16 from g0ronde; to:** g0bribl
ok can do

**16:43:48 05/29/16 from g0bribl; to:** g0ronde
this is our last day on and we were slammed....we just need assistance with pending runs

**16:43:18 05/29/16 from g0ronde; to:** g0bribl
hey sir do yall need help with anything specific?

**15:53:37 05/29/16 from g0jefmc; to:** g0bribl
Dont forget anything said on a felony has to b recorded to b admissable

**15:20:20 05/29/16 from g0bribl; to:** g0aarky , g0elila , g0jasho1 , g0jefho , g0jefmc , g0ranec , g0renel
Densmore is coming in as soon as he can

**15:14:27 05/29/16 from j9patbr; to:** g0bribl
(H)

copyright 2005 Spillman Technologies
All Rights Reserved

*Electronic Communications Report by Conversation*                                                          *Page 3*

---

**15:14:22 05/29/16 from g0bribl; to: j9patbr**
thank you!

**15:14:12 05/29/16 from j9patbr; to: g0bribl**
Natasha Bowman is on station for you

**14:55:20 05/29/16 from j9margal; to: g0bribl**
ok ty

**14:55:14 05/29/16 from g0bribl; to: j9margal**
I'll call.....ty

**14:54:40 05/29/16 from j9margal; to: g0bribl**
np u want me call her back

**14:54:27 05/29/16 from g0bribl; to: j9margal**
ty

**14:53:36 05/29/16 from j9margal; to: g0bribl**
2nd caller was female 317-341-5247..i can call her back and get her information, at that time we had numerous
calls

**14:51:11 05/29/16 from j9shase; to: g0bribl**
ok ill ask the call takers..its all good

**14:51:05 05/29/16 from g0bribl; to: j9shase**
I keep calling it a wlfare....sorry

**14:50:54 05/29/16 from g0bribl; to: j9shase**
yes

**14:50:47 05/29/16 from j9shase; to: g0bribl**
okay the mental subject

**14:50:39 05/29/16 from g0bribl; to: j9shase**
ok

**14:50:33 05/29/16 from g0bribl; to: j9shase**
welfare check on madison'

**14:50:14 05/29/16 from j9shase; to: g0bribl**
i was trying to figure out which call it was to look at it.

**14:49:48 05/29/16 from g0bribl; to: j9shase**

copyright 2005 Spillman Technologies
All Rights Reserved                                                        01/17/18

Just|just wanted to put them down as witness too

**14:49:30 05/29/16 from g0bribl; to: j9shase**
so the second callers phone number or anything isn't known?

**14:43:05 05/29/16 from g0bribl; to: g0aarky , g0doumu , g0elila , g0jasho1 , g0jefho , g0jefmc , g0ranec k**

**14:43:00 05/29/16 from g0jefho; to: g0aarky , g0bribl , g0doumu , g0elila , g0jasho1 , g0jefmc , g0ranec**
they both are gone from here

**14:41:49 05/29/16 from g0bribl; to: g0aarky , g0doumu , g0elila , g0jasho1 , g0jefho , g0jefmc , g0ranec**
she left?

**14:41:33 05/29/16 from g0bribl; to: g0aarky , g0doumu , g0elila , g0jasho1 , g0jefho , g0jefmc , g0ranec**
10-8

**14:41:22 05/29/16 from g0jefho; to: g0aarky , g0bribl , g0doumu , g0elila , g0jasho1 , g0jefmc , g0ranec**
they have alredy left here

**14:39:31 05/29/16 from g0bribl; to: g0aarky , g0doumu , g0elila , g0jasho1 , g0jefho , g0jefmc , g0ranec**
you just met Jesus on madison ave....how closer do u want

**14:38:54 05/29/16 from g0elila; to: g0aarky , g0bribl , g0doumu , g0jasho1 , g0jefho , g0jefmc , g0ranec**
ok, got to potty first. oh, haven't gone to church today yet.

**14:38:30 05/29/16 from g0bribl; to: g0aarky , g0doumu , g0elila , g0jasho1 , g0jefho , g0jefmc , g0ranec**
you ought to run over there and meet satan's wife

**14:38:27 05/29/16 from g0elila; to: g0aarky , g0bribl , g0doumu , g0jasho1 , g0jefho , g0jefmc , g0ranec**
lol

**14:38:07 05/29/16 from g0bribl; to: g0aarky , g0doumu , g0elila , g0jasho1 , g0jefho , g0jefmc , g0ranec**
wait.....you havent met kimberly EB.....

**14:37:43 05/29/16 from g0elila; to: g0aarky , g0bribl , g0doumu , g0jasho1 , g0jefho , g0jefmc , g0ranec**
yea!

**14:37:27 05/29/16 from g0bribl; to: g0aarky , g0doumu , g0elila , g0jasho1 , g0jefho , g0jefmc , g0ranec**
26th run on her this year!!!!

**14:20:08 05/29/16 from j9shase; to: g0bribl**
im having trouble finding it do you know the address or what strret it was on by chance

copyright 2005 Spillman Technologies
All Rights Reserved

01/17/18

*Electronic Communications Report by Conversation*                                                    *Page 5*

**14:14:16 05/29/16 from g0elila; to: g0bribl**
clr

**14:14:08 05/29/16 from g0bribl; to: g0elila**
just have her come on station in a bit

**14:14:05 05/29/16 from g0elila; to: g0bribl**
haha

**14:13:56 05/29/16 from g0bribl; to: g0elila**
Me too........we'll all go to Disney Land on our disability

**14:13:26 05/29/16 from g0elila; to: g0bribl**
She hurt her back while we were trying to handle that guy.

**14:12:36 05/29/16 from g0bribl; to: g0elila**
what did she do?

**14:12:16 05/29/16 from g0elila; to: g0bribl**
Renee is going to file out an injury report. She's hurt her shoulder and it's not due to my driving.

**14:11:40 05/29/16 from g0bribl; to: g0elila**
lol....ty

**14:11:34 05/29/16 from g0elila; to: g0bribl**
Capitol, my hand writting is bad. It's in Indianapolis

**14:10:51 05/29/16 from g0bribl; to: g0elila**
do you remember the street name fro the witness????? Looks like Cophol or Lophel

**14:10:44 05/29/16 from g0elila; to: g0bribl**
? Sorry closed out the old messages

**14:10:17 05/29/16 from g0bribl; to: g0elila**
there

**13:41:24 05/29/16 from j9shase; to: g0bribl**
oh okay

**13:38:58 05/29/16 from g0bribl; to: j9shase**
alot of it depends on type of speakers you have and all that

**13:38:19 05/29/16 from j9shase; to: g0bribl**

D 000008

im gonna get fired working with your' shift, im not sure if im the one who can't hear well or they are talking fast and its muffled. i hate to make them repeat and get angry

**13:30:28 05/29/16 from g0elila; to:** g0aarky , g0bribl , g0doumu , g0erimc , g0jasho , g0jasho1 , g0jasyo , g0jefho , g0jefmc , g0ranec
Brian, the doctor said it may be from what ever drug(s) he took also. Not necessary the struggle

**13:28:44 05/29/16 from g0elila; to:** g0bribl
ok

**13:25:58 05/29/16 from j9shase; to:** g0bribl
ahh gorcha

**13:24:02 05/29/16 from g0bribl; to:** g0elila
......we will do them but he wants it blocked so noone can go back in and change or add things that were not involved

**13:23:10 05/29/16 from g0bribl; to:** g0elila
Jimmy said hold off of on supplements

**13:22:53 05/29/16 from g0bribl; to:** j9shase
he wont remember a thing

**13:20:53 05/29/16 from j9shase; to:** g0bribl
well that should teach him not to resist again..maybe

**13:20:20 05/29/16 from j9shase; to:** g0bribl
good deal

**13:20:18 05/29/16 from g0bribl; to:** j9shase
acid buil-up from physically resisting

**13:19:56 05/29/16 from g0bribl; to:** j9shase
yes, but back w/ us

**13:19:44 05/29/16 from j9shase; to:** g0bribl
did that mental subject go 10-0

**13:19:35 05/29/16 from g0bribl; to:** g0elila
there

**13:04:09 05/29/16 from g0jefmc; to:** g0brasa , g0bribl , g0doumu , g0elila , g0erimc , g0jasho , g0jasyo , g0jefho , g0joste , g0ranec
was that idiot on something?

*Electronic Communications Report by Conversation*                                         *Page 7*

---

13:03:24 05/29/16 from g0bribl; to: g0brasa , g0doumu , g0elila , g0erimc , g0jasho , g0jasyo , g0jefho , g0jefmc , g0joste , g0ranec
Excteme acid build up from resisting

12:11:11 05/29/16 from g0bribl; to: g0brasa , g0doumu , g0elila , g0erimc , g0jasyo , g0jefho , g0jefmc , g0joste , g0ranec , g0renel
"OH MY BACK, MY BACK!!!!!!"

11:01:15 05/29/16 from g0bribl; to: j9patbr
k

11:01:04 05/29/16 from j9patbr; to: g0bribl
nope to callers one male one female

11:00:13 05/29/16 from g0bribl; to: j9patbr
any idea who it was?

10:59:57 05/29/16 from j9patbr; to: g0bribl
please check your voicemail

08:16:19 05/29/16 from g0bribl; to: g0erimc
I heard that

08:16:11 05/29/16 from g0bribl; to: g0erimc
2 syllables max

08:16:08 05/29/16 from g0erimc; to: g0bribl
remember VU wasnt a real collage

08:15:21 05/29/16 from g0bribl; to: g0erimc
remember, I only have an Associate degree so can you keep the words down to no more than 7 letters

08:15:12 05/29/16 from g0erimc; to: g0aarha , g0bribl , g0brisw , g0jasho1 , g0jasyo , g0jefho , g0jefmc , g0ranec , g0renel
ok

08:14:39 05/29/16 from g0erimc; to: g0bribl
killed

08:13:16 05/29/16 from g0bribl; to: g0erimc
I have never eternized a deer.....

08:12:36 05/29/16 from g0bribl; to: g0erimc

copyright 2005 Spillman Technologies
All Rights Reserved

01/17/18

*Electronic Communications Report by Conversation*                                                      *Page 8*

eternized????

**08:10:04 05/29/16 from g0bribl; to: g0douro**
vocally

**08:10:00 05/29/16 from g0bribl; to: g0douro**
None of these people "Vovally" ask for money, they hold signs.....isn't this kind of useless?

**08:09:38 05/29/16 from g0bribl; to: g0douro**
what's your take on this.......However, panhandling shall not include the act of passively standing or sitting nor performing music, singing, or other street performance with a sign or other indication that a donation is being sought, without any vocal request other than in response to an inquiry by another person.

**08:09:24 05/29/16 from g0bribl; to: g0douro**
there?

**08:07:17 05/29/16 from g0bribl; to: g0jefmc**
Roller is showing on the IM.....FYI

**08:07:06 05/29/16 from g0bribl; to: g0jefmc**
I IM'ed him to NOT interview the 10 year old, just ask mom what she knows. If the juvenile is safe and no physical evidence needs to be collected....pass it on to detecives

**08:06:17 05/29/16 from g0jefmc; to: g0bribl**
theres a whole protocall how these have 2 b handled not sure hooch knows it

**08:05:14 05/29/16 from g0bribl; to: g0jefmc**
Det. Kyle is available because I woke him up at 0600 to varify he was offi duty

**08:05:11 05/29/16 from g0jefmc; to: g0bribl**
Ill figure it out

**08:04:48 05/29/16 from g0bribl; to: g0jefmc**
ok....I told him unless there was some type of time crunch just take the initial report and send to Roller. It sounds like the family might be visiting from out of town so that might be an issue to if they leave before Tuesday.

**08:03:39 05/29/16 from g0jefmc; to: g0bribl**
im gonna head to juniper

**08:00:15 05/29/16 from g0ranec; to: g0aarha , g0bribl , g0brisw , g0douro , g0erimc , g0jasho1 , g0jasyo , g0jefho , g0jefmc , g0renel**
clr

**07:59:55 05/29/16 from g0bribl; to: g0aarha , g0brisw , g0douro , g0erimc , g0jasho1 , g0jasyo , g0jefho ,**

copyright 2003 Spillman Technologies
All Rights Reserved

D 000011

g0jefmc , g0ranec , g0renel
unknown the actual dates

**07:59:48 05/29/16 from g0bribl; to:** g0aarha , g0brisw , g0douro , g0erimc , g0jasho1 , g0jasyo , g0jefho , g0jefmc , g0ranec , g0renel
Sounds like something I would try to do for a little extra cash....

**07:59:40 05/29/16 from g0jefmc; to:** g0aarha , g0bribl , g0brisw , g0douro , g0erimc , g0jasho1 , g0jasyo , g0jefho , g0ranec , g0renel
do they have it this weekend?

**07:59:00 05/29/16 from g0bribl; to:** g0aarha , g0brisw , g0douro , g0erimc , g0jasho1 , g0jasyo , g0jefho , g0jefmc , g0ranec , g0renel
FYI, the Burmese citizens have rented the Freedom Park Shelter House for several events this summer. Last year they were charging people to park in the parking lot. Just FYI should we get any calls. They are renting the shelter not the parking lot. They also parked people in the grass and tore up the grounds.

**07:58:18 05/29/16 from g0jefho; to:** g0bribl
okay

**07:58:08 05/29/16 from g0bribl; to:** g0jefho
Please have Houchins get his training certificate showing that he successfully completed the last accident investigator school, to Sgt. Holtzleiter ASAP. Thanks

**07:41:37 05/29/16 from g0erimc; to:** g0bribl
np

**07:41:08 05/29/16 from g0bribl; to:** g0erimc
ok, just making sure

**07:41:02 05/29/16 from g0erimc; to:** g0bribl
yes

**07:40:55 05/29/16 from g0bribl; to:** g0erimc
16 hours of OPO?

**07:32:45 05/29/16 from j9margal; to:** g0bribl
yeah well nwpd had a domestic asked for fire dept and then few min later asked if they had been started lol

**07:32:18 05/29/16 from g0bribl; to:** j9margal
she said non-emergent

**07:31:59 05/29/16 from j9margal; to:** g0bribl
lol

copyright 2005 Spillman Technologies
All Rights Reserved

D 000012

*Electronic Communications Report by Conversation*                    *Page 10*

**07:30:07 05/29/16 from g0bribl; to:** g0jefho
....out of state

**07:30:05 05/29/16 from g0jefho; to:** g0bribl
okay

**07:29:58 05/29/16 from g0bribl; to:** g0jefho
only if the family will be leaving by tuesday

**07:29:29 05/29/16 from g0jefho; to:** g0bribl
yep.,,, do you want detectives notifiedtoday ?

**07:29:15 05/29/16 from g0bribl; to:** g0jefho
roller has fits oer that

**07:29:00 05/29/16 from g0bribl; to:** g0jefho
remember get basic facts and dont interview child

copyright 2005 Spillman Technologies
All Rights Reserved

01/17/18



gOelila
Elizabeth
Laut

# Greenwood
# Police
# Department

Electronic Communications
Report by Conversation

**18:09:56 05/29/16 from g0ruscr; to:** g0aarky , g0braco , g0brasa , g0bribl , g0bruca , g0erimc , g0erisc , g0renel , g0ronde , g0scoco , g0stees , j9adaph
checking on it

**18:06:16 05/29/16 from j9adaph; to:** g0aarky , g0braco , g0brasa , g0bribl , g0bruca , g0erimc , g0erisc , g0renel , g0ronde , g0ruscr , g0scoco , g0stees
INFO: There is a female named Lacy Taylor in the lobby to pick up Marcus Rush who she believes was being questioned at GPD.

**18:05:43 05/29/16 from g0erisc; to:** g0aarky , g0braco , g0brasa , g0bribl , g0bruca , g0erimc , g0renel , g0ronde , g0ruscr , g0scoco , g0stees , j9erito
clr

**17:28:31 05/29/16 from g0elila; to:** g0renel
HEY JUST WANTED TO REMIND YOU IF YOU WANTED TO DO A DOR TODAY, AND IF I DON'T SEE YA, HAVE A GOOD COUPLE DAYS OFF!

**17:09:15 05/29/16 from j9shase; to:** g0aarky , g0braco , g0brasa , g0bribl , g0elila , g0erimc , g0jasyo , g0jefmc , g0ranec , g0renel , g0ronde
43 we are in site trunking

**15:20:20 05/29/16 from g0bribl; to:** g0aarky , g0elila , g0jasho1 , g0jefho , g0jefmc , g0ranec , g0renel
Densmore is coming in as soon as he can

**12:11:11 05/29/16 from g0bribl; to:** g0brasa , g0dournu , g0elila , g0erimc , g0jasyo , g0jefho , g0jefmc , g0joste , g0ranec , g0renel
"OH MY BACK, MY BACK!!!!!!"

**08:15:12 05/29/16 from g0erimc; to:** g0aarha , g0bribl , g0brisw , g0jasho1 , g0jasyo , g0jefho , g0jefmc , g0ranec , g0renel
ok

**08:00:15 05/29/16 from g0ranec; to:** g0aarha , g0bribl , g0brisw , g0douro , g0erimc , g0jasho1 , g0jasyo ,

copyright 2005 Spillman Technologies
All Rights Reserved

01/17/18

D 000014

*Electronic Communications Report by Conversation*                                    *Page 2*

g0jefho , g0jefmc , g0renel
clr

**07:59:55 05/29/16 from g0bribl; to:** g0aarha , g0brisw , g0douro , g0erimc , g0jasho1 , g0jasyo , g0jefho , g0jefmc , g0ranec , g0renel
unknown the actual dates

**07:59:48 05/29/16 from g0bribl; to:** g0aarha , g0brisw , g0douro , g0erimc , g0jasho1 , g0jasyo , g0jefho , g0jefmc , g0ranec , g0renel
Sounds like something I would try to do for a little extra cash....

**07:59:40 05/29/16 from g0jefmc; to:** g0aarha , g0bribl , g0brisw , g0douro , g0erimc , g0jasho1 , g0jasyo , g0jefho , g0ranec , g0renel
do they have it this weekend?

**07:59:00 05/29/16 from g0bribl; to:** g0aarha , g0brisw , g0douro , g0erimc , g0jasho1 , g0jasyo , g0jefho , g0jefmc , g0ranec , g0renel
FYI, the Burmese citizens have rented the Freedom Park Shelter House for several events this summer. Last year they were charging people to park in the parking lot. Just FYI should we get any calls. They are renting the shelter not the parking lot. They also parked people in the grass and tore up the grounds.

D 000015

## Record List - Total:66

| Incident | Nature | Area | Agency | Reported | Disposition |
|----------|--------|------|--------|----------|-------------|
| G16L11911 | Checking Area | LPL4 | GPD | 00:10:04 05/29/16 | CLO |
| G16L11912 | Suspicious-Pers | LPL39 | GPD | 00:20:30 05/29/16 | CLO |
| G16L11913 | Domestic | LPL40 | GPD | 00:45:30 05/29/16 | CLO |
| G16L11914 | Warrant Service | LPL28 | GPD | 01:07:54 05/29/16 | CLO |
| G16L11915 | Threatening | LWR31 | GPD | 02:45:45 05/29/16 | CAA |
| G16L11916 | Traffic Invest | LWR31 | GPD | 03:33:12 05/29/16 | CLO |
| G16L11917 | Lockout | LPL32 | GPD | 05:05:18 05/29/16 | CLO |
| G16L11918 | Citizen Assist | LPL9 | GPD | 05:09:01 05/29/16 | CLO |
| G16L11919 | Check | LWR11 | GPD | 06:17:03 05/29/16 | CLO |
| G16L11920 | Investigation | LPL14 | GPD | 07:17:20 05/29/16 | CAA |
| G16L11921 | Crim Mischief | LPL27 | GPD | 07:22:02 05/29/16 | CLO |
| G16L11922 | Burglary All | LPL40 | GPD | 07:36:36 05/29/16 | CWA |
| G16L11923 | Theft | LPL9 | GPD | 08:44:10 05/29/16 | SPL |
| G16L11924 | Agency Assist | LPL22 | GPD | 10:11:10 05/29/16 | CLO |
| G16L11926 | Theft | LPL39 | GPD | 10:12:16 05/29/16 | SPL |
| G16L11925 | Theft | LPL9 | GPD | 10:13:30 05/29/16 | SPL |
| G16L11927 | Incomplete 911 | LPL38 | GPD | 10:19:24 05/29/16 | CLO |
| G16L11928 | Animal Problem | LWR31 | GPD | 10:35:15 05/29/16 | CLO |
| G16L11929 | Found Child | LPL38 | GPD | 10:55:09 05/29/16 | CLO |
| G16L11930 | Mental Subject | LPL23 | GPD | 11:45:38 05/29/16 | CLO |
| G16L11931 | Accident PD | LPL6 | GPD | 11:50:38 05/29/16 | CLO |
| G16L11932 | Suspicious-Pers | LPL9 | GPD | 12:10:59 05/29/16 | CLO |
| G16L11933 | Animal Problem | LPL32 | GPD | 13:03:07 05/29/16 | CLO |
| G16L11934 | Agency Assist | LPL20 | GPD | 13:30:59 05/29/16 | CLO |
| G16L11935 | Welfare Check | LPL9 | GPD | 13:37:29 05/29/16 | CLO |
| G16L11936 | Accident PD | LPL37 | GPD | 14:11:18 05/29/16 | ACT |
| G16L11937 | Lockout | LPL15 | GPD | 14:16:33 05/29/16 | CLO |
| G16L11938 | Domestic-w/Batt | LPL27 | GPD | 14:30:33 05/29/16 | CLO |
| G16L11939 | Narcotics | LPL3 | GPD | 14:52:51 05/29/16 | CLO |
| G16L11940 | Shoplifting | LPL13 | GPD | 14:56:16 05/29/16 | CLS |
| G16L11943 | Theft | LPL15 | GPD | 15:06:30 05/29/16 | CLO |
| G16L11941 | Traffic Invest | LWR11 | GPD | 15:13:54 05/29/16 | CLO |
| G16L11942 | Alarm-Business | LPL8 | GPD | 15:43:25 05/29/16 | FAL |
| G16L11945 | Abandoned Vehic | LPL35 | GPD | 15:55:27 05/29/16 | CLO |
| G16L11944 | Agency Assist | LPL27 | GPD | 16:15:59 05/29/16 | CLO |
| G16L11946 | Lockout | LWR31 | GPD | 16:38:43 05/29/16 | CLO |
| G16L11947 | Traffic Invest | LPL14 | GPD | 16:44:40 05/29/16 | CLO |
| G16L11948 | Suspicious | LPL27 | GPD | 16:59:55 05/29/16 | CLO |
| G16L11949 | Custodial Int | LPL6 | GPD | 17:44:00 05/29/16 | CLO |
| G16L11950 | Suspicious-Pers | LWR11 | GPD | 17:52:10 05/29/16 | CLO |
| G16L11951 | Trouble With/ | LPL15 | GPD | 18:35:50 05/29/16 | CLO |
| G16L11952 | Investigation | LPL39 | GPD | 19:17:45 05/29/16 | CLO |
| G16L11953 | Citizen Dispute | LPL13 | GPD | 19:21:54 05/29/16 | CLO |
| G16L11954 | Noise | LPL22 | GPD | 19:40:39 05/29/16 | CLO |
| G16L11956 | Trespassing | LPL6 | GPD | 20:01:14 05/29/16 | CLO |
| G16L11955 | Traffic Offense | LWR11 | GPD | 20:01:42 05/29/16 | CAA |
| G16L11957 | Traffic Invest | LPL13 | GPD | 20:07:29 05/29/16 | CLO |
| G16L11958 | Accident PD | LPL20 | GPD | 20:18:06 05/29/16 | CLO |
| G16L11959 | Misdialed 911 | LPL20 | GPD | 20:19:46 05/29/16 | CLO |
| G16L11960 | Burg Atmpt Res | LPL39 | GPD | 20:29:46 05/29/16 | PRO |
| G16L11961 | Disturbance | LPL38 | GPD | 20:43:39 05/29/16 | CLO |
| G16L11962 | Fight | LWR11 | GPD | 21:35:55 05/29/16 | CLO |
| G16L11963 | Property Damage | LPL32 | GPD | 21:53:26 05/29/16 | CLO |
| G16L11964 | Checking Area | LPL32 | GPD | 21:59:21 05/29/16 | CLO |
| G16L11965 | Lockout | LPL15 | GPD | 22:20:01 05/29/16 | CLO |
| G16L11969 | Threatening | LPL15 | GPD | 22:23:04 05/29/16 | CLO |
| G16L11966 | Traffic Offense | LPL13 | GPD | 22:23:22 05/29/16 | CAA |

| G16L11967 | Suspicious-Veh   | LWR5   | GPD | 22:23:56 05/29/16 | CAA |
| G16L11968 | Traffic Invest   | LPL6   | GPD | 22:24:04 05/29/16 | CLO |
| G16L11971 | Animal Problem   | LPL14  | GPD | 22:26:20 05/29/16 | CLO |
| G16L11970 | Traffic Offense  | LPL27  | GPD | 22:28:47 05/29/16 | CAA |
| G16L11972 | Trespassing      | LPL20  | GPD | 22:30:28 05/29/16 | CLO |
| G16L11973 | Disturbance      | LWR11  | GPD | 22:39:53 05/29/16 | CLO |
| G16L11974 | Traffic Invest   | LPL6   | GPD | 23:34:10 05/29/16 | CLO |
| G16L11975 | Traffic Invest   | LPL13  | GPD | 23:39:02 05/29/16 | CLO |
| G16L11976 | Juvenile Prob    | LPL15  | GPD | 23:41:03 05/29/16 | CLO |

Date 4.5.18

KENTUCKIANA Reporter_____ Exhibit # 10

Case _____

Deponent __J.m Ison__

USE OF FORCE REPORT

Incident Number:   G16L11930

Date:  May 30, 2016

Location of Incident:    Madison Avenue and Camby Street

Reporting Officer:  Lt. Brian Blackwell     Officer Injured:   NO

Officer Deploying Taser:  Lt. Brian Blackwell

Officer(s) Involved:

1.   R. Elliott

2.   E. Laut

3.   R. Eck

Reason for officer(s) response to the location:

Multiple calls to dispatch of a man attempting to commit suicide by walking into traffic.

Criminal charges against suspect:

None at this time. It is priority that the suspect get medical and mental assistance before evaluating criminal charges.

Suspect's Name:  Charles A. Todero
DOB:
SSN:
Race:   white

Suspect Impaired:  YES   Alcohol: ____   Narcotics: XXX   UNKNOWN: ____

Suspect injured prior to officer's arrival:  YES (minor bruising on knees)

Suspect injured during arrest:  No signs of injuries other than taser prong entries into skin.

Was suspect transported to hospital:  YES

Was Taser used:  YES

Was cartridge deployed: YES

Who removed probes:  Emergency Room Personal

Was drive stun technique used:  NO

Witnesses to incident:

Name:    Holly L. Walters
Address:   1224 N Capital, Indpls, 46227
Telephone: 765-277-0414

D 001183

Name:      Deborah Macnaughton
Address:   1342 Hamilton Drive, Greenwood, 46143
Telephone: 341-5247

Name:      Roger W. Poynter
Address:   455 E. Broadway, Greenwood, 46143
Telephone: 441-7485

Name:      Ian Godfrey
Address:   Greenwood Fire Station 92 Medic

List specifically all statements or actions by suspect before officer action
was taken.  list specifically what actions were taken by the officer(s) in
response to the suspects actions:

On May 25, 2016 I responded to the area of Madison Avenue, south of Fry Road,
reference a subject wearing a white t-shirt "attempting suicide" by walking
into traffic. Two recorded calls were made from Roger Poynter and Deb
Macnaughton who both reported the man's strange and dangerous behavior.
Macnaughton advised me later that the man crossed the road directly in front of
her and she had to swerve to keep from striking him. She also stated that the
car behind her had to brake and then honked their horn at the man. When I
arrived, I  observed the man sitting on the roadside curb just north of Camby
Street. The moment I pulled  drove up to the man, that I knew to be Charles
Todero, he held up a bible in front of him as if
he was reading it. I asked Charles if he was alright and he replied, "I am Jesus
Christ." Charles had no emotion and his face was void of any expression. I
asked Charles again if was okay and if he needed assistance.  Charles then
replied that he was Jesus Christ the Profit.

He then stood up began walking northbound on Madison Avenue next to the curb. I
ordered  Charles to sit down on the curb to avoid an vehicular traffic but he
continued walking with the Bible out in front of him. I then extracted my Taser
X26 from my holster and order him again to get out of the roadway and sit on
the curb or I would tase him.  Charles began stating his name was Jesus Christ
and continued walking but this time he angled towards his left into the
northbound traffic. I placed my left hand on his left shoulder and again told
him to sit down or he would be tased. He continued walking and I then deployed
my Taser X26. Charles went down to his knees and while struggling with the
Taser deployment, held the bible
Up in front of him and stated again that he was Jesus Christ the Profit. I have
used the Taser  X26 in the past and thought this to be an unusual reaction due
to lack of
compliance and the continued ability to move his arms voluntarily. I gave
Charles verbal orders to do to the ground But he refused. I gave another 5
second application and continued with verbal direction with no Compliance.
Charles still would not lay face down as directed and attempted to stand up. I
told Charles that he was going to get tased again of he didn't lay on the

D 001184

ground with his hands
Behind his back. He stated that he was Jesus Christ again and another
application was administered. This failure to comply continued. Moments later,
I observed that
one of the prongs was caught up in his shirt and was not actually making
contact with his skin and therefore the Taser was not working to its full
potential to cause compliance. Charles continued to refused orders and
attempted to stand up again. Due to his suicidal and erratically behavior,
along with greater than normal strength,  I applied another application, this
time Connecting the Taser to his thigh so the circuit could be completed and
the Taser was more effective.  This time Charles went to the ground but placed
his arms underneath his chest. A female motorist, Holly Walters, pulled over
and asked if she could assist me in any way. I asked Holly to please stand by
and just observe to assist in witnessing Charles' behavior in the event someone
questioned our police response to this incident.

Officer Renee Elliott and Officer Elizabeth Laut arrived and Officer Elliott
attempted to handcuff Charles. Elliott gave Charles verbal instructions to give
her his hands but he refused and rather stiffened his arms in resistance. I
administered another application with the taser but this had little effect on
Charles. Elliott was able to get one arm out from under Charles but he would
not give her the other arm. Charles continued to resist by stiffening his arm
and leaving it under his chest. I told Charles that he was going to get tased
again if he didn't comply. He refused and another application was given. This
continued for about a minute or 2 before the other hand was retrieved and
Charles was secured. Medics arrived and
Ian Godfrey, Medic 92 AMR (513-649-5169) was witness to Charles' behavior.
Charles had to be lifted onto the cot and secured with safety belts. He was
then transported to St. Francis Hospital where he was under Care of Dr. Chris
Hartman, MD.  Godfrey stated that Charles was verbally abusive most of the trip
and calling them all fucking pussies and other Profanity.

Shift Supervisor:
Date/Time:

D 001185

Interview Date: June 15, 2016
Witness: Dr. Chris Hartman
Case # G16L11930


On June 15, 2016 I spoke to Dr. Chris Hartman via telephone. Dr. Hartman informed me that he treated Charles Todero upon his arrival at St. Francis South Hospital on May 29, 2016. He advised me that they could not participate in a video recorded interview at the direction of hospital legal staff. Dr. Hartman did however inform me that Charles Todero's cardiac arrest and death had nothing to do with the actions of Greenwood Police Officers or him being tased.

Dr. Hartman explained that the fact that Todero's heart stopped several minutes after he was tased ruled out the possibility that the tasing was related. He explained that in situations where the electricity causes the heart to stop, the effects are immediate. He stated that the fact that Charles Todero was able to speak, and be combative inside the ambulance is proof that he was not experiencing Atrial Fibrillation, which would have been present at the time of the tasing.


Date 4 5.18
KENTUCKIANA   Reporter_____ Exhibit # 11
Case_____
Deponent____ Jim Ison___

D 001213

Date 4.5.18    Exhibit # 12

KENTUCKIANA Reporter

Case _____

Deponent _____ Jim Ison

### GREENWOOD FIRE DEPARTMENT
### SUPPLEMENTARY INVESTIGATION REPORT

Run No <u>16-1602622</u>

Name of Complainant
<u>Shane Pitts</u>

Date <u>06/13/2016</u>

DETAILS OF OFFENSE OR EVENT, PROGRESS OF INVESTIGATION, ETC:

On May 29, 2016 I was the officer in charge of E91 to assist GPD on a mental emotional run at Madison Ave. and Camby St. U/A E91 found GPD with the PT laying supine in handcuffs on the curb of the Northbound lanes. GPD advised that the PT was walking in front of traffic yelling at cars about biblical testaments. GPD advised that they tried to get him out of the roadway for his and the public's safety without incident but the PT became combative so GPD advised that they had to tease him for all parties' safety. The PT was still mildly combative upon our assessment and also talking about things that were not of a normal nature. Upon the arrival of M92 the PT was loaded for transport to CHS which was changed do the psychiatric diversion to SFS. When the PT was placed on M92's cot he was placed handcuffed on his left side but the PT kept turning himself to his stomach. E91and M92 tried multiple times to keep him on his side but the PT would force himself back to his stomach so we allowed him to stay in his position of comfort.  Myself and E91B road into SFS with M92 to assist with the transport. A few minutes into the transport the PT became mildly combative but was already secured to the cot straps x3 so the PT could not get free. The medic decided to give the PT Versed to calm the PT down. The PT did become much calmer and there were no eventful changes in the PT for most of the transport. The medic and I switch positions in the ambulance so he could start an IV. After the switch I noticed the PT's color was changing and then noticed on the monitor the PT's heart rate was slowing down. We unstrapped the PT and moved him to his back. At that time the PT's heart rate stopped and I started proving rescue breathing by BVM and E91B started chest compressions. M92 had arrived at SFS almost at the same time as the PT's condition changed. The PT was moved into the ER and care was transferred over to ER staff. Just for note as we were leaving the ER the PT regained pulses. E91B and I moved back over to our rig and marked make in-service. EOR.

D 001231

Date 4.5.18

KENTUCKIANA Reporter_____ Exhibit # 13

Case _____

Deponent_____ Jim Ison

```
01/11/18                    Greenwood Police Department                    535
15:14                        LAW Incident Table:                 Page:      1

    Incident
Incident Number  G16L11930   Nature  Mental Subject
    Case Number                          Image   PHO
       Address?  N Madison Ave & Camby St
          City   Greenwood              State   IN   ZIP   461
          Area   LPL23                        Contact   Roger

    Complainant
Numbr  G98N14310
    Last  Poynter                   Fst  Roger          Mid  William
    DOB                    SSN              Adr?  455 E Broadway St
    Race  W Sx  M Tel  (317)441-7485 Cty   Greenwood       ST  IN ZIP  46143

    Details
    Statute Codes
    Offense Codes  MENT                    Reported  MENT  Observed  MENT
    Circumstances  LT31  TADEP
Rspndg Officers  Elliott R        Blackwell B        Laut E          ?
Rspnsbl Officer  Blackwell B      Agency  GPD            CAD Call ID  160509383
    Received By   Philpott, Ad          Last RadLog  13:31:23 05/29/16    CMPLT
   How Received  9  911 Line           Clearance  CRO  Cleared, Responsible
  When Reported  11:45:38 05/29/16     Disposition  CLO  Disp Date  05/29/16
Occurrd between  11:44:59 05/29/16    Judicial Sts
           and   11:44:59 05/29/16     Misc Entry  BB
            MO

    Narrative
 Narrative  (See below)
 Supplement  1                          E. Laut                          ?

= = = = = = = = = = = = = = = = = = = = = = = = = = = = = = = = = = = = = = = = = =

INVOLVEMENTS:
Type  Record #     Date       Description                 Relationship
LW   G16L12847   06/09/16    Request Officer             Related Incident
NM      503316   05/29/16    Godfrey, Ian                Medic 92 AMR
NM    G98N5696   05/29/16    Todero, Charles Arthur      involved
NM   G1N016666   05/29/16    Macnaughton, Deborah        Witness
NM   G98N14310   05/29/16    Poynter, Roger William      *Complainant
NM   G98N15366   05/29/16    Walters, Holly L            Witness
CA   160509383   05/29/16    11:45 05/29/16 Mental Subject  *Initiating Call
PR   G16P03072   06/22/16    BRO paper bag Vineyard Chur $0  Evidence
PR   G16P02670   05/29/16    YEL taser taser X26  $800   Evidence
PR   G16P02671   05/29/16    Cartridge taser x26  $25    Evidence
```

D 000074

Image codes for Incident:
```
                       Image Codes
Seq Code                   Id Description
   1 PHO   PHOTOGRAPH         Photograph
```

LAW Incident Offenses Detail:
```
                    Offense Codes
Seq Code                                    Amount
   1 MENT Mental Subject                      0.00
```

LAW Incident Circumstances:
```
                   Contributing Circumstances
Seq Code                               Comments
   1 LT31   Street-Business Area
   2 TADEP Taser Deployed
```

LAW Incident Responders Detail
```
     Responding Officers
Seq Name                Unit
   1 Elliott R          G3110
   2 Blackwell B        G3104
   3 Laut E             G3235
   4 Eck R              G3133
```

Main Radio Log Table:
```
Time/Date            Typ Unit    Code  Zone   Agnc Description
13:31:23 05/29/16    l   G3133   CMPLT G2     GPD  incid#=G16L11930 Completed cal
13:20:03 05/29/16    f   MD92    CMPLT G912   GFD  (MDC) Completed call incid#=G1
13:19:51 05/29/16    f   MD92    RETRN G912   GFD  (MDC)  incid#=G16F02622 call=7
13:10:56 05/29/16    l   G3235   CMPLT G2     GPD  (MDC) Completed call incid#=G1
12:19:56 05/29/16    l   G3133   ARRVD G2     GPD  incid#=G16L11930 sfs call=781
12:19:56 05/29/16    l   G3235   ARRVD G2     GPD  incid#=G16L11930 sfs call=781
12:19:51 05/29/16    f   MD92    HOSP  G912   GFD  (MDC) st francis, call=78f
12:14:06 05/29/16    f   MD92    ENRTH G912   GFD  (MDC), call=78f
12:13:47 05/29/16    l   G3133   CMPLT G2     GPD  (MDC) Completed call incid#=G1
12:11:43 05/29/16    l   G3104   CMPLT G2     GPD  (MDC) Completed call incid#=G1
12:10:26 05/29/16    l   G3110   CMPLT G2     GPD  incid#=G16L11930 Completed cal
12:10:16 05/29/16    l   G3110   INSRV G2     GPD  call=781
12:09:52 05/29/16    l   G3235   ENRT  G2     GPD  St.Francis following medics, c
12:09:26 05/29/16    l   G3110   BUSY  G2     GPD  FTO G3235, call=781
12:07:56 05/29/16    l   G3235   ARRVD G2     GPD  (MDC) Arrived on scene incid#=
12:07:48 05/29/16    f   EG91    ENRTH G912   GFD  (MDC) CHS, call=78f
12:01:09 05/29/16    f   MD92    ARRVD G912   GFD  (MDC) Arrived on scene incid#=
12:00:33 05/29/16    f   EG91    ARRVD G912   GFD  (MDC) Arrived on scene incid#=
11:57:56 05/29/16    l   G3133   DLINQ G1     GPD  MDC: name=TODERO
11:57:55 05/29/16    l   G3133   NMINQ G1     GPD  MDC: name=TODERO
11:57:52 05/29/16    f   EG91    ENRT  G912   GFD  (MDC) Enroute to a call incid#
11:57:33 05/29/16    l   G3133   DLINQ G1     GPD  MDC: name=TEDERO
11:57:32 05/29/16    l   G3133   NMINQ G1     GPD  MDC: name=TEDERO
```

D 000075

| Time/Date | Typ | Unit | Code | Zone | Agnc | Description |
|---|---|---|---|---|---|---|
| 11:57:29 05/29/16 | f | MD92 | ENRT | G912 | GFD | (MDC) Enroute to a call incid# |
| 11:57:19 05/29/16 | l | G3133 | DLINQ | G1 | GPD | MDC: name=TADERO |
| 11:57:18 05/29/16 | l | G3133 | NMINQ | G1 | GPD | MDC: name=TADERO |
| 11:56:19 05/29/16 | f | EG91 | DISP | G912 | GFD | incid#=G16F02622 Unit Has Been |
| 11:56:19 05/29/16 | f | MD92 | DISP | G912 | GFD | incid#=G16F02622 Unit Has Been |
| 11:55:36 05/29/16 | l | G3133 | ARRVD | G2 | GPD | incid#=G16L11930 Arrived on sc |
| 11:53:28 05/29/16 | l | G3110 | ENRT | G2 | GPD | incid#=G16L11930 Enroute to a |
| 11:52:01 05/29/16 | l | G3133 | ENRT | G2 | GPD | incid#=G16L11930 Enroute to a |
| 11:51:45 05/29/16 | l | G3110 | CMPLT | G2 | GPD | incid#=G16L11930 Reassigned to |
| 11:50:24 05/29/16 | l | G3104 | ARRVD | G2 | GPD | incid#=G16L11930 Arrived on sc |
| 11:50:22 05/29/16 | l | G3235 | ENRT | G2 | GPD | incid#=G16L11930 Enroute to a |
| 11:46:14 05/29/16 | l | G3104 | ENRT | G2 | GPD | incid#=G16L11930 Enroute to a |
| 11:46:14 05/29/16 | l | G3110 | ENRT | G2 | GPD | incid#=G16L11930 Enroute to a |

D 000076

Narrative:

Subject "attempting suicide" by walking in traffic. Taken to hospital.

D 000077

Law Supplemental Narrative:

Supplemental Narratives

Seq Name              Date              Narrative
  7 Blackwell B       13:02:25 06/01/16
USE OF FORCE REPORT

Incident Number:   G16L11930

Date:  May 30, 2016

Location of Incident:    Madison Avenue and Camby Street

Reporting Officer: Lt. Brian Blackwell   Officer Injured:   NO

Officer Deploying Taser: Lt. Brian Blackwell

Officer(s) Involved:

1.   R. Elliott

2.   E. Laut

3.   R. Eck

Reason for officer(s) response to the location:

Multiple calls to dispatch of a man attempting to commit suicide by walking into traffic.

Criminal charges against suspect:

None at this time. It is priority that the suspect get medical and mental assistance before evaluating criminal charges.

Suspect's Name:  Charles A. Todero
DOB:             ███████████
SSN:             ███████████
Race:   white

Suspect Impaired: YES  Alcohol: ____   Narcotics: XXX   UNKNOWN: ____

Suspect injured prior to officer's arrival:  YES (minor bruising on knees)

Suspect injured during arrest:  No signs of injuries other than taser prong entries into skin.

Was suspect transported to hospital:  YES

Was Taser used:  YES

Was cartridge deployed:  YES

Who removed probes:  Emergency Room Personal

Was drive stun technique used:  NO

D 000078

Witnesses to incident:

Name:      Holly L. Walters
Address:   1224 N Capital, Indpls, 46227
Telephone: 765-277-0414

Name:      Deborah Macnaughton
Address:   1342 Hamilton Drive, Greenwood, 46143
Telephone: 341-5247

Name:      Roger W. Poynter
Address:   455 E. Broadway, Greenwood, 46143
Telephone: 441-7485

Name:      Ian Godfrey
Address:   Greenwood Fire Station 92 Medic

List specifically all statements or actions by suspect before officer action
was taken.  list specifically what actions were taken by the officer(s) in
response to the suspects actions:

On May 29, 2016 I responded to the area of Madison Avenue, south of Fry Road,
reference a subject wearing a white t-shirt "attempting suicide" by walking into
traffic. Two recorded calls were made from Roger Poynter and Deb Macnaughton who
both reported the man's strange and dangerous behavior. Macnaughton advised me
later that the man crossed the road directly in front of her and she had to
swerve to keep from striking him. She also stated that the car behind her had to
brake and then honked their horn at the man. When I arrived, I  observed the man
sitting on the roadside curb just north of Camby Street. The moment I pulled
drove up to the man, that I knew to be Charles Todero, he held up a bible in
front of him as if he was reading it. I asked Charles if he was alright and he
replied, "I am Jesus Christ." Charles had no emotion and his face was void of
any expression. I asked Charles again if was okay and if he needed assistance.
Charles then replied that he was Jesus Christ the Profit.

He then stood up began walking northbound on Madison Avenue next to the curb. I
ordered  Charles to sit down on the curb to avoid an vehicular traffic but he
continued walking with the Bible out in front of him. I then extracted my Taser
X26 from my holster and order him again to get out of the roadway and sit on the
curb or I would tase him.  Charles began stating his name was Jesus Christ and
continued walking but this time he angled towards his left into the northbound
traffic. I placed my left hand on his left shoulder and again told him to sit
down or he would be tased. He continued walking and I then deployed my Taser
X26. Charles went down to his knees and while struggling with the Taser
deployment, held the bible up in front of him and stated again that he was Jesus
Christ the Profit. I have used the Taser  X26 in the past and thought this to be
an unusual reaction due to lack of compliance and the continued ability to move
his arms voluntarily. I gave Charles verbal orders to do to the ground But he
refused. I gave another 5 second application and continued with verbal direction
with no Compliance. Charles still would not lay face down as directed and
attempted to stand up. I told Charles that he was going to get tased again of he
didn't lay on the ground with his hands behind his back. He stated that he was
Jesus Christ again and another application was administered. This failure to
comply continued. Moments later, I observed that one of the prongs was caught up
in his shirt and was not actually making contact
with his skin and therefore the Taser was not working to its full potential to

cause compliance. Charles continued to refused orders and attempted to stand up again. Due to his suicidal and erratically behavior, along with greater than normal strength, I applied another application, this time Connecting the Taser to his thigh so the circuit could be completed and the Taser was more effective. This time Charles went to the ground but placed his arms underneath his chest. A female motorist, Holly Walters, pulled over and asked if she could assist me in any way. I asked Holly to please stand by and just observe to assist in witnessing Charles' behavior in the event someone questioned our police response to this incident.

Officer Renee Elliott and Officer Elizabeth Laut arrived and Officer Elliott attempted to handcuff Charles. Elliott gave Charles verbal instructions to give her his hands but he refused and rather stiffened his arms in resistance. I administered another application with the taser but this had little effect on Charles. Elliott was able to get one arm out from under Charles but he would not give her the other arm. Charles continued to resist by stiffening his arm and leaving it under his chest. I told Charles that he was going to get tased again if he didn't comply. He refused and another application was given. This continued for about a minute or 2 before the other hand was retrieved and Charles was secured. Medics arrived and
Ian Godfrey, Medic 92 AMR (513-649-5169) was witness to Charles' behavior. Charles had to be lifted onto the cot and secured with safety belts. He was then transported to St. Francis Hospital where he was under Care of Dr. Chris Hartman, MD. Godfrey stated that Charles was verbally abusive most of the trip and calling them all fucking pussies and other Profanity.

Shift Supervisor:
Date/Time:

D 000080

Date 4.5.18
KENTUCKIANA Reporter_____ Exhibit # 14
Case_____
Deponent_____ J. m Ison

```
06/13/16                       Greenwood Police Department                        630
08:04                            CALL DETAIL REPORT                      Page:      1

Call Number:      160509383

Nature:           Mental Subject
Reported:         11:45:38 05/29/16
Rcvd By:          Philpott, Ad                              How Rcvd: 9
Occ Btwn:         11:44:59 05/29/16     and 11:44:59 05/29/16
Type:             1f
Priority:         3

Address:          N Madison Ave & Camby St
City:             Greenwood

Alarm:

COMPLAINANT/CONTACT
-------------------
Complainant: Poynter, Roger William                          Name#: G98N14310
Race: W    Sex: M    DOB:
Address: 455 E Broadway St, Greenwood
Home Phone: (317)441-7485                    Work Phone: (317)977-5699

Contact: Roger
Address:
Phone: (317)441-7485

RADIO LOG
---------
Dispatcher Time/Date            Unit    Code Zone Agnc Description
---------- ------------------- ------  ---- ---- ---- --------------------------
Philpott,  11:46:14 05/29/16 G3104     ENRT G2   GPD  incid#=G16L11930 Enroute to
                                                      a call call=781
Philpott,  11:46:14 05/29/16 G3110     ENRT G2   GPD  incid#=G16L11930 Enroute to
                                                      a call call=781
Philpott,  11:50:22 05/29/16 G3235     ENRT G2   GPD  incid#=G16L11930 Enroute to
                                                      a call call=781
Philpott,  11:50:24 05/29/16 G3104     ARRV G2   GPD  incid#=G16L11930 Arrived on
                                                      scene time=11:50:24 05/29/16
                                                      call=781
Philpott,  11:51:45 05/29/16 G3110     CMPL G2   GPD  incid#=G16L11930 Reassigned
                                                      to call 791, completed call
                                                      781
Philpott,  11:52:01 05/29/16 G3133     ENRT G2   GPD  incid#=G16L11930 Enroute to
                                                      a call call=781
Philpott,  11:53:28 05/29/16 G3110     ENRT G2   GPD  incid#=G16L11930 Enroute to
                                                      a call call=781
Shawn Sext 11:55:36 05/29/16 G3133     ARRV G2   GPD  incid#=G16L11930 Arrived on
                                                      scene call=781
Butler, Le 11:56:19 05/29/16 EG91      DISP G912 GFD  incid#=G16F02622 Unit Has
                                                      Been Dispatched call=78f
Butler, Le 11:56:19 05/29/16 MD92      DISP G912 GFD  incid#=G16F02622 Unit Has
                                                      Been Dispatched call=78f
Eck R      11:57:18 05/29/16 G3133     NMIN G1   GPD  MDC: name=TADERO
Eck R      11:57:19 05/29/16 G3133     DLIN G1   GPD  MDC: name=TADERO
Medic 92   11:57:29 05/29/16 MD92      ENRT G912 GFD  (MDC) Enroute to a call
                                                      incid#=G16F02622 call=78f
Eck R      11:57:32 05/29/16 G3133     NMIN G1   GPD  MDC: name=TEDERO
```

D 001172

```
06/13/16                      Greenwood Police Department                          630
08:04                           CALL DETAIL REPORT                    Page:         2

Eck R         11:57:33 05/29/16 G3133   DLIN G1   GPD   MDC: name=TEDERO
ENG91         11:57:52 05/29/16 EG91    ENRT G912 GPD   (MDC) Enroute to a call
                                                        incid#=G16F02622 call=78f
Eck R         11:57:55 05/29/16 G3133   NMIN G1   GPD   MDC: name=TODERO
Eck R         11:57:56 05/29/16 G3133   DLIN G1   GPD   MDC: name=TODERO
ENG91         12:00:35 05/29/16 EG91    ARRV G912 GFD   (MDC) Arrived on scene
                                                        incid#=G16F02622 call=78f
Medic 92      12:01:09 05/29/16 MD92    ARRV G912 GFD   (MDC) Arrived on scene
                                                        incid#=G16F02622 call=78f
ENG91         12:07:48 05/29/16 EG91    ENRT G912 GFD   (MDC) CHS, call=78f
Laut E        12:07:56 05/29/16 G3235   ARRV G2   GPD   (MDC) Arrived on scene
                                                        incid#=G16L11930 call=781
Shawn Sext    12:09:26 05/29/16 G3110   BUSY G2   GPD   FTO G3235, call=781
Shawn Sext    12:09:52 05/29/16 G3235   ENRT G2   GPD   St.Francis following medics,
                                                        call=781
Shawn Sext    12:10:16 05/29/16 G3110   INSR G2   GPD   call=781
Shawn Sext    12:10:26 05/29/16 G3110   CMPL G2   GPD   incid#=G16L11930 Completed
                                                        call call=781
Blackwell     12:11:43 05/29/16 G3104   CMPL G2   GPD   (MDC) Completed call
                                                        incid#=G16L11930 call=781
Eck R         12:13:47 05/29/16 G3133   CMPL G2   GPD   (MDC) Completed call
                                                        incid#=G16L11930 call=781
Medic 92      12:14:06 05/29/16 MD92    ENRT G912 GFD   (MDC), call=78f
Medic 92      12:19:51 05/29/16 MD92    HOSP G912 GFD   (MDC) st francis, call=78f
Shawn Sext    12:19:56 05/29/16 G3133   ARRV G2   GPD   incid#=G16L11930 sfs
                                                        call=781
Shawn Sext    12:19:56 05/29/16 G3235   ARRV G2   GPD   incid#=G16L11930 sfs
                                                        call=781
Laut E        13:10:56 05/29/16 G3235   CMPL G2   GPD   (MDC) Completed call
                                                        incid#=G16L11930 call=781
Medic 92      13:19:51 05/29/16 MD92    RETR G912 GFD   (MDC)  incid#=G16F02622
                                                        call=78f
Medic 92      13:20:03 05/29/16 MD92    CMPL G912 GFD   (MDC) Completed call
                                                        incid#=G16F02622 call=78f
Shawn Sext    13:31:23 05/29/16 G3133   CMPL G2   GPD   incid#=G16L11930 Completed
                                                        call call=781
```

COMMENTS
--------
white male in a white shirt, trying to be hit by traffic
11:46:29 05/29/2016 - Little, Ma
2nd 911 caller stated white male in white shirt was walking in front of cars
keeps walking back and forth across the street
11:48:08 05/29/2016 - Philpott, Ad
second caller advised he was near La Trattoria 201 N Madison Ave
11:53:37 05/29/2016 - Philpott, Ad - From: Blackwell B
2nd car to assist; taser deployed
11:56:19 05/29/2016 - Shawn Sexton - From: Eck R
advised start medics
12:21:48 05/29/2016 - Shawn Sexton
q3110 advised they are starting cpr in medic

UNIT HISTORY
------------

Unit  Time/Date           Code
----- ------------------- ----

D 001173

```
06/13/16                    Greenwood Police Department                      630
08:04                          CALL DETAIL REPORT              Page:          3

EG91    11:56:19 05/29/16    DISP
EG91    11:57:52 05/29/16    ENRT
EG91    12:00:35 05/29/16    ARRV
EG91    12:07:48 05/29/16    ENRT
G3104   11:46:14 05/29/16    ENRT
G3104   11:50:24 05/29/16    ARRV
G3104   12:11:43 05/29/16    CMPL
G3110   11:46:14 05/29/16    ENRT
G3110   11:51:45 05/29/16    CMPL
G3110   11:53:28 05/29/16    ENRT
G3110   12:09:26 05/29/16    BUSY
G3110   12:10:16 05/29/16    INSR
G3110   12:10:26 05/29/16    CMPL
G3133   11:52:01 05/29/16    ENRT
G3133   11:55:36 05/29/16    ARRV
G3133   11:57:18 05/29/16    NMIN
G3133   11:57:19 05/29/16    DLIN
G3133   11:57:32 05/29/16    NMIN
G3133   11:57:33 05/29/16    DLIN
G3133   11:57:55 05/29/16    NMIN
G3133   11:57:56 05/29/16    DLIN
G3133   12:13:47 05/29/16    CMPL
G3133   12:19:56 05/29/16    ARRV
G3133   13:31:23 05/29/16    CMPL
G3235   11:50:22 05/29/16    ENRT
G3235   12:07:56 05/29/16    ARRV
G3235   12:09:52 05/29/16    ENRT
G3235   12:19:56 05/29/16    ARRV
G3235   13:10:56 05/29/16    CMPL
MD92    11:56:19 05/29/16    DISP
MD92    11:57:29 05/29/16    ENRT
MD92    12:01:09 05/29/16    ARRV
MD92    12:14:06 05/29/16    ENRT
MD92    12:19:51 05/29/16    HOSP
MD92    13:19:51 05/29/16    RETR
MD92    13:20:03 05/29/16    CMPL

RESPONDING OFFICERS
--------------------
Unit    Officer
------  --------------------
EG91    ENG91
G3104   Blackwell B
G3110   Elliott R
G3133   Eck R
G3235   Laut E
MD92    Medic 92

INVOLVEMENTS
------------
Type  Record#     Date      Description                      Relationship
----  ---------   --------  -----------------------------    ------------------------
NM    G98N14310   05/29/16  Poynter Roger William  455 E     Complainant
FR    G16F02622   05/29/16  FDM-Ment/Emo G16F02622           Initiating Call
LW    G16L11930   05/29/16  Mental Subject G16L11930 N M     Initiating Call
```

D 001174

## Mark Holloway

| | |
|---|---|
| **From:** | James Prior <priorj@greenwood.in.gov> |
| **Sent:** | Sunday, June 12, 2016 3:03 AM |
| **To:** | James Ison; Doug Roller; Matthew Fillenwarth; John Laut |
| **Cc:** | Brian Blackwell |
| **Subject:** | Charles Todero |

**Importance:**          High

G16L11930

At about 0215 6/12/16 I received a notice from dispatch to contact Marion County Deputy Coroner #15 "Mallory" @ 219-771-3033 in reference to G16L11930. She advised Charles Todero died at St. Francis Hospital South on 6/11/16 at 2348hrs after being hospitalized since our interaction with him on May 29. According to Mallory, the family blames GPD for the death as a result of being tased.

Apparently Todero coded in the ambulance and again in the ER immediately after interaction with GPD. He was put on a ventilator and "pressors" (cardiac stimulating drug) through June 4. He began to improve slighty responding somewhat to commands. He was then put on dialysis as his kidneys began to shut down. Todero again began coding throughout the day of June 10 as the family then began the decision to cease life support.

There are some additional complications as the blood taken at admission on May 29 is no longer available for toxicological testing. A limited urinalysis was conducted at that time showing only evidence of prior (metabolized) marijuana. As of this morning, Mallory was unable to obtain the actual hospital records as the system was down.

Lt. Blackwell was advised of Mallory's request to call her around noon on 6/12 to offer additional details of his interaction and obervations with Todero for their investigation.

Todero was transported to the Marion County coroner's office and an autopsy is tentatively scheduled for Monday morning.

Date 4.5.18

KENTUCKIANA Reporter _____ Exhibit # 15

Case _____

Deponent   Jim Ison

1

**Mark Holloway**

| | |
|---|---|
| From: | James Prior <priorj@greenwood.in.gov> |
| Sent: | Sunday, June 12, 2016 6:12 AM |
| To: | Jason Holtzleiter |
| Subject: | Fwd: Charles Todero |

Importance:        High

-------- Original message --------
From: James Prior <priorj@greenwood.in.gov>
Date: 06/12/2016 3:02 AM (GMT-05:00)
To: James Ison <isonj@greenwood.in.gov>, Doug Roller <rollerd@greenwood.in.gov>, Matthew Fillenwarth <fillenwm@greenwood.in.gov>, John Laut <lautj@greenwood.in.gov>
Cc: Brian Blackwell <blackweb@greenwood.in.gov>
Subject: Charles Todero

G16L11930

At about 0215 6/12/16 I received a notice from dispatch to contact Marion County Deputy Coroner #15 "Mallory" @ 219-771-3033 in reference to G16L11930. She advised Charles Todero died at St. Francis Hospital South on 6/11/16 at 2348hrs after being hospitalized since our interaction with him on May 29. According to Mallory, the family blames GPD for the death as a resultof being tased.

Apparently Todero coded in the ambulance and again in the ER immediately after interaction with GPD. He was put on a ventilator and "pressors" (cardiac stimulating drug) through June 4. He began to improve slighty responding somewhat to commands. He was then put on dialysis as his kidneys began to shut down. Todero again began coding throughout the day of June 10 as the family then began the decision to cease life support.

There are some additional complications as the blood taken at admission on May 29 is no longer available for toxicological testing. A limited urinalysis was conducted at that time showing only evidence of prior (metabolized) marijuana. As of this morning, Mallory was unable to obtain the actual hospital records as the system was down.

Lt. Blackwell was advised of Mallory's request to call her around noon on 6/12 to offer additional details of his interaction and obervations with Todero for their investigation.

Todero was transported to the Marion County coronoer's office and an autopsy is tentatively scheduled for Monday morning.

**Mark Holloway**

| | |
|---|---|
| From: | Brian Blackwell <blackweb@greenwood.in.gov> |
| Sent: | Sunday, June 12, 2016 10:44 AM |
| To: | James Ison |
| Subject: | Additional information on Charles Todero |
| | |
| Importance: | High |

As usual, time elapses and a person remembers more about details in an incident or other thoughts come to mind to justify actions taken during an incident....

*As I arrived on the scene I immediately recognized the "suicidal subject" as Charles Todero. I have known Mr. Todero through my police career for approximately 25 years. I have known Mr. Todero and his brothers to have an interest for fighting and boxing. Days after the incident I researched Mr. Todero's Facebook page and copied 2 photos of him, one with James Todero at a training center for fighting and another photo of Mr. Todero taking a "selfie" of himself without a shirt on.

*When I approached Mr. Todero I observed that his pants were torn from his ankle to just below his groin area. I observe what I believed to be urine stains in the crotch area of his pants. His knees could be seen through the tear in his pants and he had bruises and scratches on both knees prior to any contact with police.

*Due to the fact that Mr. Todero was walking northbound on Madison I was unable to observe any vehicular traffic coming from behind me. I knew that My police car was providing "some" protection but Mr. Todero and myself were still in the roadway with our back to traffic. This expedited my actions.

**Mark Holloway**

| | |
|---|---|
| **From:** | James Prior <priorj@greenwood.in.gov> |
| **Sent:** | Sunday, June 12, 2016 3:03 AM |
| **To:** | James Ison; Doug Roller; Matthew Fillenwarth; John Laut |
| **Cc:** | Brian Blackwell |
| **Subject:** | Charles Todero |

**Importance:**          High

G16L11930

At about 0215 6/12/16 I received a notice from dispatch to contact Marion County Deputy Coroner #15 "Mallory" @ 219-771-3033 in reference to G16L11930. She advised Charles Todero died at St. Francis Hospital South on 6/11/16 at 2348hrs after being hospitalized since our interaction with him on May 29. According to Mallory, the family blames GPD for the death as a result of being tased.

Apparently Todero coded in the ambulance and again in the ER immediately after interaction with GPD. He was put on a ventilator and "pressors" (cardiac stimulating drug) through June 4. He began to improve slightly responding somewhat to commands. He was then put on dialysis as his kidneys began to shut down. Todero again began coding throughout the day of June 10 as the family then began the decision to cease life support.

There are some additional complications as the blood taken at admission on May 29 is no longer available for toxicological testing. A limited urinalysis was conducted at that time showing only evidence of prior (metabolized) marijuana. As of this morning, Mallory was unable to obtain the actual hospital records as the system was down.

Lt. Blackwell was advised of Mallory's request to call her around noon on 6/12 to offer additional details of his interaction and obervations with Todero for their investigation.

Todero was transported to the Marion County coroner's office and an autopsy is tentatively scheduled for Monday morning.

Date 4.5.18

KENTUCKIANA Reporter_____ Exhibit # 15

Case_____

Deponent   Jim Ison

1

**Mark Holloway**

| | |
|---|---|
| From: | James Prior <priorj@greenwood.in.gov> |
| Sent: | Sunday, June 12, 2016 6:12 AM |
| To: | Jason Holtzleiter |
| Subject: | Fwd: Charles Todero |

Importance:     High

-------- Original message --------
From: James Prior <priorj@greenwood.in.gov>
Date: 06/12/2016 3:02 AM (GMT-05:00)
To: James Ison <isonj@greenwood.in.gov>, Doug Roller <rollerd@greenwood.in.gov>, Matthew Fillenwarth <fillenwm@greenwood.in.gov>, John Laut <lautj@greenwood.in.gov>
Cc: Brian Blackwell <blackweb@greenwood.in.gov>
Subject: Charles Todero

G16L11930

At about 0215 6/12/16 I received a notice from dispatch to contact Marion County Deputy Coroner #15 "Mallory" @ 219-771-3033 In reference to G16L11930. She advised Charles Todero died at St. Francis Hospital South on 6/11/16 at 2348hrs after being hospitalized since our Interaction with him on May 29. According to Mallory, the family blames GPD for the death as a resultof being tased.

Apparently Todero coded in the ambulance and again in the ER immediately after interaction with GPD. He was put on a ventilator and "pressors" (cardiac stimulating drug) through June 4. He began to improve slighty responding somewhat to commands. He was then put on dialysis as his kidneys began to shut down. Todero again began coding throughout the day of June 10 as the family then began the decision to cease life support.

There are some additional complications as the blood taken at admission on May 29 is no longer available for toxicological testing. A limited urinalysis was conducted at that time showing only evidence of prior (metabolized) marijuana. As of this morning, Mallory was unable to obtain the actual hospital records as the system was down.

Lt. Blackwell was advised of Mallory's request to call her around noon on 6/12 to offer additional details of his interaction and obervations with Todero for their investigation.

Todero was transported to the Marion County coronoer's office and an autopsy is tentatively scheduled for Monday morning.

1

**Mark Holloway**

| | |
|---|---|
| **From:** | Brian Blackwell <blackweb@greenwood.in.gov> |
| **Sent:** | Sunday, June 12, 2016 10:44 AM |
| **To:** | James Ison |
| **Subject:** | Additional information on Charles Todero |
| | |
| **Importance:** | High |

As usual, time elapses and a person remembers more about details in an incident or other thoughts come to mind to justify actions taken during an incident....

*As I arrived on the scene I immediately recognized the "suicidal subject" as Charles Todero. I have known Mr. Todero through my police career for approximately 25 years. I have known Mr. Todero and his brothers to have an interest for fighting and boxing. Days after the incident I researched Mr. Todero's Facebook page and copied 2 photos of him, one with James Todero at a training center for fighting and another photo of Mr. Todero taking a "selfie" of himself without a shirt on.

*When I approached Mr. Todero I observed that his pants were torn from his ankle to just below his groin area. I observe what I believed to be urine stains in the crotch area of his pants. His knees could be seen through the tear in his pants and he had bruises and scratches on both knees prior to any contact with police.

*Due to the fact that Mr. Todero was walking northbound on Madison I was unable to observe any vehicular traffic coming from behind me. I knew that My police car was providing "some" protection but Mr. Todero and myself were still in the roadway with our back to traffic. This expedited my actions.

1

**Mark Holloway**

| | |
|---|---|
| **From:** | James Ison <isonj@greenwood.in.gov> |
| **Sent:** | Monday, August 01, 2016 2:41 PM |
| **To:** | mwillis@indy.gov |
| **Subject:** | Charles Todero |
| **Attachments:** | James Ison.vcf |

Ms. Willis,

Please consider this email a formal request from our agency to receive a copy of the Autopsy report for Charles Todero (DOB: ████████ Thank you in advance for your assistance.


**James Ison**
Greenwood Police Department
Deputy Chief

(317) 882-9191 Work
(317) 887-5865 Fax
isonj@greenwood.in.gov
186 Surina Way
Greenwood IN 46143

KENTUCKIANA   Date 4.5.18   Reporter_____   Exhibit # 16
Case_____
Deponent_____ Jim Ison

**Mark Holloway**

| | |
|---|---|
| From: | Willis, Michelle <Michelle.Willis@indy.gov> |
| Sent: | Monday, August 01, 2016 3:35 PM |
| To: | James Ison |
| Subject: | RE: Charles Todero |
| Attachments: | todero final report.pdf |

Dear sir,

Attached you will find the final report as requested.  If there is anything else you need please let us know.

Thank you,

Michele L Willis, MDI
Senior Deputy Coroner
Marion Co Coroners Office
521 W. McCarty St.
Indianapolis, IN  46225
O (317) 327-4744
F (317) 327-4563

From: James Ison [mailto:isonj@greenwood.in.gov]
Sent: Monday, August 01, 2016 2:41 PM
To: Willis, Michelle <Michelle.Willis@indy.gov>
Subject: Charles Todero

Ms. Willis,

Please consider this email a formal request from our agency to receive a copy of the Autopsy report for Charles Todero (DOB: ████). Thank you in advance for your assistance.



**James Ison**
Greenwood Police Department
Deputy Chief

(317) 882-9191
(317) 887-5365 Fax
isonj@greenwood.in.gov
186 Surina Way
Greenwood IN 46143

1

**Mark Holloway**

| | |
|---|---|
| **From:** | James Ison <isonj@greenwood.in.gov> |
| **Sent:** | Monday, August 01, 2016 4:06 PM |
| **To:** | John Laut |
| **Subject:** | Fwd: Charles Todero |
| **Attachments:** | todero final report.pdf; ATT00001.htm |

Autopsy attached.

Sent from my iPhone

Begin forwarded message:

**From:** "Willis, Michelle" <Michelle.Willis@indy.gov>
**To:** "James Ison" <isonj@greenwood.in.gov>
**Subject: RE: Charles Todero**

Dear sir,
Attached you will find the final report as requested.  If there is anything else you need please let us know.

Thank you,

Michele L Willis, MDI
Senior Deputy Coroner
Marion Co Coroners Office
521 W. McCarty St.
Indianapolis, IN  46225
O (317) 327-4744
F (317) 327-4563

**From:** James Ison [mailto:isonj@greenwood.in.gov]
**Sent:** Monday, August 01, 2016 2:41 PM
**To:** Willis, Michelle <Michelle.Willis@indy.gov>
**Subject:** Charles Todero

Ms. Willis,

Please consider this email a formal request from our agency to receive a copy of the Autopsy report for Charles Todero
(DOB: ████████  Thank you in advance for your assistance.

1

**Mark Holloway**

| | |
|---|---|
| **From:** | James Ison <isonj@greenwood.in.gov> |
| **Sent:** | Monday, August 01, 2016 5:20 PM |
| **To:** | Willis, Michelle |
| **Subject:** | RE: Charles Todero |
| **Attachments:** | James Ison2.vcf |

Ms. Willis,

Thank you very much for the report. I do have a question. On page 6 it states "The dura is stripped revealing fractures of the basilar skull." I spoke to our detective that attended the autopsy and he was unaware of any head trauma found. Could you shed some light on this statement please? Also, would it be possible to obtain the autopsy photos? Thanks again.



**James Ison**
Greenwood Police Department
Deputy Chief

(317) 882-9191 Work
(317) 887-5865 Fax
Isonj@greenwood.in.gov
186 Surina Way
Greenwood IN 46143

**From:** Willis, Michelle [mailto:Michelle.Willis@indy.gov]
**Sent:** Monday, August 01, 2016 3:35 PM
**To:** James Ison
**Subject:** RE: Charles Todero

Dear sir,
Attached you will find the final report as requested. If there is anything else you need please let us know.

Thank you,

Michele L Willis, MDI
Senior Deputy Coroner
Marion Co Coroners Office
521 W. McCarty St.
Indianapolis, IN 46225
O (317) 327-4744
F (317) 327-4563

**From:** James Ison [mailto:isonj@greenwood.in.gov]
**Sent:** Monday, August 01, 2016 2:41 PM
**To:** Willis, Michelle <Michelle.Willis@indy.gov>
**Subject:** Charles Todero

Ms. Willis,

1

Please consider this email a formal request from our agency to receive a copy of the Autopsy report for Charles Todero (DOB: ███████ Thank you in advance for your assistance.



**James Ison**
Greenwood Police Department
Deputy Chief

(317) 882-9191 ...
(317) 887-5865 Fax
isonj@greenwood.in.gov
186 Surina Way
Greenwood IN 46143

## Mark Holloway

**From:** Willis, Michelle <Michelle.Willis@indy.gov>
**Sent:** Tuesday, August 02, 2016 9:34 AM
**To:** James Ison
**Cc:** Ballew, Alfie T
**Subject:** RE: Charles Todero

Good morning,
I will forward these questions to my Chief Deputy as she is reviewing the case now.

Thank you,

Michele L Willis, MDI
Senior Deputy Coroner
Marion Co Coroners Office
521 W. McCarty St.
Indianapolis, IN 46225
O (317) 327-4744
F (317) 327-4563


**From:** James Ison [mailto:IsonJ@greenwood.in.gov]
**Sent:** Monday, August 01, 2016 5:20 PM
**To:** Willis, Michelle <Michelle.Willis@indy.gov>
**Subject:** RE: Charles Todero

Ms. Willis,

Thank you very much for the report. I do have a question. On page 6 it states "The dura is stripped revealing fractures of the basilar skull." I spoke to our detective that attended the autopsy and he was unaware of any head trauma found. Could you shed some light on this statement please? Also, would it be possible to obtain the autopsy photos? Thanks again.



**James Ison**
Greenwood Police Department
Deputy Chief

(317) 882-9191 Work
(317) 887-5365 Fax
isonj@greenwood.in.gov
186 Surina Way
Greenwood IN 46143


**From:** Willis, Michelle [mailto:Michelle.Willis@indy.gov]
**Sent:** Monday, August 01, 2016 3:35 PM
**To:** James Ison
**Subject:** RE: Charles Todero

Dear sir,

1

Attached you will find the final report as requested. If there is anything else you need please let us know.

Thank you,

Michele L. Willis, MDI
Senior Deputy Coroner
Marion Co Coroners Office
521 W. McCarty St.
Indianapolis, IN  46225
O (317) 327-4744
F (317) 327-4563

From: James Ison [mailto:isonj@greenwood.in.gov]
Sent: Monday, August 01, 2016 2:41 PM
To: Willis, Michelle <Michelle.Willis@indy.gov>
Subject: Charles Todero

Ms. Willis,

Please consider this email a formal request from our agency to receive a copy of the Autopsy report for Charles Todero (DOB: ███████. Thank you in advance for your assistance.

**James Ison**
Greenwood Police Department
Deputy Chief

(317) 882-9191
(317) 887-5365 Fax
isonj@greenwood.in.gov
196 Surina Way
Greenwood IN 46143

2

## Mark Holloway

| | |
|---|---|
| **From:** | Ballew, Alfie T <Alfie.Ballew@indy.gov> |
| **Sent:** | Tuesday, August 02, 2016 10:15 AM |
| **To:** | James Ison |
| **Cc:** | Willis, Michelle |
| **Subject:** | RE: Charles Todero |
| **Importance:** | High |

Deputy Chief Ison,

I am in receipt of your questions regarding the autopsy report and the findings.  Please keep in mind that while I have sent you the report, it is NOT public information at this time.  Additionally, it has not been shared with the family because I still had questions about the case.  I will also ask about this section of the autopsy report.  It could be some other reason for the fractures that are consistent with non trauma events.  I plan to meet with the pathologist in the next few days for clarification.

Please do NOT release any information on this death investigation!

Alfie

*Alfarena T. Ballew, MBA*
*Chief Deputy Coroner*
*Marion County Coroner's Office*
*Ph 327-4769  Fax 317-327-4563*


**From: Willis, Michelle**
**Sent: Tuesday, August 02, 2016 9:34 AM**
**To: James Ison <isonj@greenwood.in.gov>**
**Cc: Ballew, Alfie T <Alfie.Ballew@indy.gov>**
**Subject: RE: Charles Todero**

Good morning,
I will forward these questions to my Chief Deputy as she is reviewing the case now.

Thank you,

Michele L Willis, MDI
Senior Deputy Coroner
Marion Co Coroners Office
521 W. McCarty St.
Indianapolis, IN  46225
O (317) 327-4744
F (317) 327-4563

1

**From:** James Ison [mailto:isonj@greenwood.in.gov]
**Sent:** Monday, August 01, 2016 5:20 PM
**To:** Willis, Michelle <Michelle.Willis@indy.gov>
**Subject:** RE: Charles Todero

Ms. Willis,

Thank you very much for the report.  I do have a question.  On page 6 it states "The dura is stripped revealing fractures of the basilar skull."  I spoke to our detective that attended the autopsy and he was unaware of any head trauma found.  Could you shed some light on this statement please?  Also, would it be possible to obtain the autopsy photos?  Thanks again.



**James Ison**
Greenwood Police Department
Deputy Chief

(317) 882-9191
(317) 887-5965 Fax
isonj@greenwood.in.gov
186 Surina Way
Greenwood IN 46143

**From:** Willis, Michelle [mailto:Michelle.Willis@indy.gov]
**Sent:** Monday, August 01, 2016 3:35 PM
**To:** James Ison
**Subject:** RE: Charles Todero

Dear sir,
Attached you will find the final report as requested.  If there is anything else you need please let us know.

Thank you,

Michele L. Willis, MDI
Senior Deputy Coroner
Marion Co Coroners Office
521 W. McCarty St.
Indianapolis, IN  46225
O (317) 327-4744
F (317) 327-4563

**From:** James Ison [mailto:isonj@greenwood.in.gov]
**Sent:** Monday, August 01, 2016 2:41 PM
**To:** Willis, Michelle <Michelle.Willis@indy.gov>
**Subject:** Charles Todero

Ms. Willis,

Please consider this email a formal request from our agency to receive a copy of the Autopsy report for Charles Todero (DOB: ▉▉▉▉ Thank you in advance for your assistance.

2



**James Ison**
Greenwood Police Department
Deputy Chief

(317) 882-9191 Work
(317) 887-5865 Fax
isonj@greenwood.in.gov
186 Surina Way
Greenwood IN 46143

**Mark Holloway**

| | |
|---|---|
| **From:** | James Ison <isonj@greenwood.in.gov> |
| **Sent:** | Tuesday, August 02, 2016 10:37 AM |
| **To:** | Ballew, Alfie T |
| **Subject:** | Re: Charles Todero |
| **Attachments:** | image001.jpg |

Thank you.  I will not release this information to the public.

Sent from my iPhone

On Aug 2, 2016, at 10:15 AM, Ballew, Alfie T <Alfie.Ballew@indy.gov> wrote:

Deputy Chief Ison,

I am in receipt of your questions regarding the autopsy report and the findings.  Please keep in mind that while I have sent you the report, it is NOT public information at this time.  Additionally, it has not been shared with the family because I still had questions about the case.  I will also ask about this section of the autopsy report.  It could be some other reason for the fractures that are consistent with non trauma events.  I plan to meet with the pathologist in the next few days for clarification.

Please do NOT release any information on this death investigation!

Alfie

*Alfarena T. Ballew, MBA*
*Chief Deputy Coroner*
*Marion County Coroner's Office*
*Ph 327-4769  Fax 317-327-4563*

From: Willis, Michelle
Sent: Tuesday, August 02, 2016 9:34 AM
To: James Ison <isonj@greenwood.in.gov>
Cc: Ballew, Alfie T <Alfie.Ballew@indy.gov>
Subject: RE: Charles Todero

Good morning,
I will forward these questions to my Chief Deputy as she is reviewing the case now.

Thank you,

Michele L. Willis, MDI
Senior Deputy Coroner
Marion Co Coroners Office
521 W. McCarty St.
Indianapolis, IN  46225

1

O (317) 327-4744
F (317) 327-4563

**From:** James Ison [mailto:isonj@greenwood.in.gov]
**Sent:** Monday, August 01, 2016 5:20 PM
**To:** Willis, Michelle <Michelle.Willis@indy.gov>
**Subject:** RE: Charles Todero

Ms. Willis,

Thank you very much for the report.  I do have a question.  On page 6 it states "The dura is stripped revealing fractures of the basilar skull."  I spoke to our detective that attended the autopsy and he was unaware of any head trauma found.  Could you shed some light on this statement please?  Also, would it be possible to obtain the autopsy photos?  Thanks again.

<image001.jpg>

---

**From:** Willis, Michelle [mailto:Michelle.Willis@indy.gov]
**Sent:** Monday, August 01, 2016 3:35 PM
**To:** James Ison
**Subject:** RE: Charles Todero

Dear sir,
Attached you will find the final report as requested.  If there is anything else you need please let us know.

Thank you,

Michele L Willis, MDI
Senior Deputy Coroner
Marion Co Coroners Office
521 W. McCarty St.
Indianapolis, IN  46225
O (317) 327-4744
F (317) 327-4563

**From:** James Ison [mailto:isonj@greenwood.in.gov]
**Sent:** Monday, August 01, 2016 2:41 PM
**To:** Willis, Michelle <Michelle.Willis@indy.gov>
**Subject:** Charles Todero

Ms. Willis,

Please consider this email a formal request from our agency to receive a copy of the Autopsy report for Charles Todero (DOB ███████   Thank you in advance for your assistance.

<image001.jpg>

2

**Mark Holloway**

| | |
|---|---|
| **From:** | James Ison <isonj@greenwood.in.gov> |
| **Sent:** | Friday, August 12, 2016 1:15 PM |
| **To:** | Alfie.Ballew@Indy.gov |
| **Subject:** | Charles Todero Autopsy |
| **Attachments:** | James Ison.vcf |

Hello,

I am following up on the Charles Todero Autopsy Report.  Have you had an opportunity to speak to the pathologists to get an explanation on the skull fracture?



**James Ison**
Greenwood Police Department
Deputy Chief

(317) 882-9191
(317) 887-5865 Fax
isonj@greenwood.in.gov
186 Surina Way
Greenwood IN 46143

1

**Mark Holloway**

| | |
|---|---|
| **From:** | Ballew, Alfie T <Alfie.Ballew@indy.gov> |
| **Sent:** | Friday, August 12, 2016 1:15 PM |
| **To:** | James Ison |
| **Subject:** | Automatic reply: Charles Todero Autopsy |

Extended out of office

I will be out of the office Friday August 5th thru August 23rd.

I will have limited access to email during this time.

If you have an immediate concern or issue please contact my assistant Carrie England, cengland@indy.gov.

For media questions please contact Marchele Hall at mhall@indy.gov or 327-4744.

Alfie

Alfarena Ballew, MBA
Chief Deputy Coroner
Marion County Coroner's Office

**Mark Holloway**

| | |
|---|---|
| **From:** | James Ison <isonj@greenwood.in.gov> |
| **Sent:** | Wednesday, August 31, 2016 10:28 AM |
| **To:** | Alfie.Ballew@indy.gov |
| **Subject:** | Charles Todero |
| **Attachments:** | James Ison.vcf |

Good Morning,

I am following up on the Charles Todero Autopsy.  Have you received any additional information from the pathologists concerning the skull fracture listed on the autopsy report?

 **James Ison**
Greenwood Police Department
Deputy Chief

(317) 382-9191 Work
(317) 887-5865 Fax
isonj@greenwood.in.gov
186 Surina Way
Greenwood IN 46143

KENTUCKIANA
COURT REPORTERS

Date 4.5.18
Reporter_____    Exhibit #_17_
Case_____
Deponent   Jim Ison

1

**Mark Holloway**

| | |
|---|---|
| **From:** | England, Carrie <Carrie.England@indy.gov> |
| **Sent:** | Thursday, November 03, 2016 10:51 AM |
| **To:** | isonj@greenwood.in.gov |
| **Subject:** | Amended autopsy report |
| **Attachments:** | AR.pdf |

Good morning,

Alfie spoke with Dr. Geller about the autopsy report of Charles Todero and there were errors on the report. I the report has been amended and a corrected copy is attached to this email. Please let me know if you have any questions or concerns.

Sincerely,

Carrie England AS, MDI
Marion County Coroner's Office

Date 4.5.18
KENTUCKIANA Reporter_____ Exhibit # 18
Case_____
Deponent_____ Jim Ison

1

**Mark Holloway**

| | |
|---|---|
| From: | James Ison <isonj@greenwood.in.gov> |
| Sent: | Thursday, November 03, 2016 12:09 PM |
| To: | England, Carrie |
| Subject: | Re: Amended autopsy report |

Thank you

Sent from my iPhone

On Nov 3, 2016, at 10:50 AM, England, Carrie <Carrie.England@indy.gov> wrote:

Good morning,

Alfie spoke with Dr. Geller about the autopsy report of Charles Todero and there were errors on the report. I the report has been amended and a corrected copy is attached to this email. Please let me know if you have any questions or concerns.

Sincerely,

Carrie England AS, MDI
Marion County Coroner's Office

<AR.pdf>

## Mark Holloway

| | |
|---|---|
| **From:** | James Ison <isonj@greenwood.in.gov> |
| **Sent:** | Thursday, November 03, 2016 12:11 PM |
| **To:** | Krista Taggart |
| **Subject:** | Fwd: Amended autopsy report |
| **Attachments:** | AR.pdf; ATT00001.htm |

Krista,

Please see the amended autopsy report. The original report stated that Todero had a skull fracture. He did not. The pathologist has amended the report.

Sent from my iPhone

Begin forwarded message:

**From:** "England, Carrie" <Carrie.England@indy.gov>
**Date:** November 3, 2016 at 10:50:44 AM EDT
**To:** "isonj@greenwood.in.gov" <isonj@greenwood.in.gov>
**Subject: Amended autopsy report**

Good morning,

Alfie spoke with Dr. Geller about the autopsy report of Charles Todero and there were errors on the report. I the report has been amended and a corrected copy is attached to this email. Please let me know if you have any questions or concerns.

Sincerely,

Carrie England AS, MDI
Marion County Coroner's Office

1