**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF INDIANA**
**INDIANAPOLIS DIVISION**

| | | |
|---|---|---|
| TERESA TODERO, as Special Administrator of the ESTATE OF CHARLES TODERO, | ) ) ) | Case No. 1:17-cv-1698-TWP-MJD |
| *Plaintiff*, | ) ) | Judge Tanya Walton Pratt |
| v. | ) ) | Magistrate Judge Mark J. Dinsmore |
| CITY OF GREENWOOD, BRIAN BLACKWELL, RENEE ELLIOT, ELIZABETH LAUT, | ) ) ) ) | JURY TRIAL DEMANDED |
| *Defendants*. | ) ) ) | |

# <u>EXHIBIT 44</u>

**Chief John Laut Deposition**

BY: <u>/s/ Steve Art</u>
*One of Plaintiff's Attorneys*

Arthur Loevy
Jon Loevy
Steve Art
Sam Heppell
Danielle Hamilton
LOEVY & LOEVY
311 North Aberdeen St., Third Floor
Chicago, IL 60607
(312) 243-5900

LOUISVILLE   LEXINGTON   LONDON   FLORENCE   CINCINNATI   INDIANAPOLIS   ORLANDO   JACKSONVILLE   TAMPA



# KENTUCKIANA
## — COURT REPORTERS —

CASE NO. 1:17-cv-1698-TWP-MJD

## TERESA TODERO, as Special Administrator of the ESTATE OF

## CHARLES TODERO

### VS.

## CITY OF GREENWOOD, ET AL.

### DEPONENT:

### CHIEF JOHN LAUT

### DATE:

### APRIL 2, 2018



a courtroom
**powerhouse**

✉ schedule@kentuckianareporters.com
☎ 877.808.5856 | 502.589.2273

www.kentuckianareporters.com

1              IN THE UNITED STATES DISTRICT COURT

2            FOR THE SOUTHERN DISTRICT OF INDIANA

3                  INDIANAPOLIS DIVISION

4            CASE NO. 1:17-cv-1698-TWP-MJD

5               JUDGE TANYA WALTON PRATT

6            MAGISTRATE JUDGE MARK J. DINSMORE

7

8

9  TERESA TODERO, as Special Administrator of the ESTATE OF

10                  CHARLES TODERO,

11                    PLAINTIFF

12

13                       V.

14

15    CITY OF GREENWOOD, BRIAN BLACKWELL, RENEE ELLIOT,

16  ELIZABETH LAUT, and AS-YET UNIDENTIFIED GREENWOOD POLICE

17                    OFFICERS,

18                   DEFENDANTS

19

20

21

22

23  DEPONENT:  CHIEF JOHN LAUT

24  DATE:      APRIL 2, 2018

25  REPORTER:  EMILEE BOLEYN

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201



KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1                         APPEARANCES

 2

 3   ON BEHALF OF THE PLAINTIFF, TERESA TODERO, as Special

 4   Administrator of the ESTATE OF CHARLES TODERO:

 5   VINCE FIELD

 6   LOEVY & LOEVY

 7   311 NORTH ABERDEEN STREET

 8   THIRD FLOOR

 9   CHICAGO, ILLINOIS 60607

10   TELEPHONE NO.: (312) 243-5900

11   E-MAIL: VINCE@LOEVY.COM

12

13   ON BEHALF OF THE DEFENDANT, BRIAN BLACKWELL:

14   CAREN L. POLLACK

15   POLLACK LAW FIRM, P.C.

16   10333 NORTH MERIDIAN STREET

17   SUITE 111

18   INDIANAPOLIS, INDIANA 46290

19   TELEPHONE NO.: (317) 660-4880

20   E-MAIL: CPOLLACK@POLLACKLAWPC.COM

21

22

23

24

25
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1                    APPEARANCES (CONTINUED)

 2

 3   ON BEHALF OF THE DEFENDANTS, CITY OF GREENWOOD,

 4   ELIZANETH LAUT, AND RENNE ELLIOT:

 5   JAMES S. STEPHENSON

 6   STEPHENSON MOROW & SEMLER

 7   3077 EAST 98TH STREET

 8   SUITE 240

 9   TELEPHONE NO.: (312) 844-3830

10   E-MAIL:  JSTEPHENSON@STEPHLAW.COM

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1                         INDEX

 2                                                 Page

 3   DIRECT EXAMINATION BY MR. FIELD                 6

 4   CROSS EXAMINATION BY MS. POLLACK              252

 5   REDIRECT EXAMINATION BY MR. FIELD            253

 6   EXAMINATION BY MR. STEPHENSON                253

 7   RECROSS EXAMINATION BY MS. POLLACK           254

 8

 9                       EXHIBITS

10                                                Page

11   1    STANDARD OPERATING PROCEDURE SOP-40       28

12   2    USE OF FORCE RECORD                       86

13   3    TASER EVIDENCE SYNC RECORD               133

14   4    DEPUTY CHIEF ISON NOTES                  159

15   5    HANDWRITTEN NOTES                        189

16   6    POWERPOINT AND NOTES                     192

17   7    OFFICER ECK BODY WORN CAMERA FOOTAGE     199

18        (RETAINED BY COUNSEL)

19   8    OFFICER ELLIOT BODY WORN CAMERA FOOTAGE  207

20        (RETAINED BY COUNSEL)

21   9    ELECTRONIC COMMUNICATIONS                220

22   10   POLICE VIOLATION LOG                     229

23

24

25
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1                           STIPULATION

 2

 3     The deposition of CHIEF JOHN LAUT taken at KENTUCKIANA

 4     COURT REPORTERS, 8520 ALLISON POINTE BOULEVARD, SUITE

 5     220, INDIANAPOLIS, INDIANA 46250 on MONDAY, the 2nd day

 6     of APRIL, 2018 at approximately 9:55 a.m.; said

 7     deposition was taken pursuant to the FEDERAL Rules of

 8     Civil Procedure.

 9

10     It is agreed that EMILEE BOLEYN, being a Notary Public

11     and Court Reporter for the State of INDIANA, may swear

12     the witness.

13

14

15

16

17

18

19

20

21

22

23

24

25
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1                        PROCEEDINGS
 2            COURT REPORTER:  Sir, will you raise your right
 3      hand?  Do you solemnly swear or affirm the testimony
 4      you are about to give will be the truth, the whole
 5      truth, and nothing but the truth?
 6            THE WITNESS:  I do.
 7            COURT REPORTER:  Thank you.
 8                      DIRECT EXAMINATION
 9  BY MR. FIELD:
10       Q    Chief Laut, could you just state and spell
11  your name for the record?
12       A    John Laut, L-A-U-T, common spelling of John,
13  J-O-H-N.
14       Q    I apologize for mispronouncing the last name,
15  Mr. Laut.
16       A    That's okay.
17       Q    Is calling you chief or Chief Laut okay with
18  you for the rest of the deposition?
19       A    Whichever you prefer.
20       Q    Sure.  Okay.  I'm sure you've been deposed
21  before, but I'll just go through the sort of basic
22  ground rules just so that we get through this as quickly
23  and efficiently as possible.  I'd just ask that you
24  provide verbal oral answers to my questions rather than
25  nodding your head or saying "uh-huh" or something like
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1    that.  That way, the court reporter can get down
 2    everything that you say here today.  In the same vein, I
 3    asked that you let me finish asking the question before
 4    you start answering even if the question is obvious, and
 5    I will likewise do the same thing.  I will let you
 6    finish answering a question and will not ask another
 7    question while you're answering the question.  More
 8    importantly, I'll assume that you understand my question
 9    if you answer it, so please if I ask a bad question or
10    it's not clear what I'm asking, just let me know.  I'm
11    happy to rephrase it or try to explain to you what it is
12    that I'm asking.  And if you need a break at any time
13    for any reason just let me know.  I'm happy to go off
14    the record.  I just ask that you would answer any
15    pending question before we take that break.  Does all
16    that make sense to you?
17        A     Yes.  It does.
18        Q     Okay.  Is there any reason that you wouldn't
19    be able to provide truthful and  fulsome testimony here
20    this morning?
21        A     No.  There is not.
22        Q     Okay.  Chief, how long have you been the Chief
23    of the Greenwood Police Department?
24        A     Since 2012.
25        Q     Okay.  And previous to that, were you employed
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

 1    by the Greenwood Police Department?

 2         A    Yes.  I was.

 3         Q    And in what position were you employed?

 4         A    At which time?

 5         Q    Previous to the 2012.

 6         A    Night shift sergeant.

 7         Q    Night shift sergeant.  That was the position

 8    that you were in before you became the chief?

 9         A    That is correct.

10         Q    Okay.  And how long were you in the night

11    shift sergeant position?

12         A    From 2011 until I came back from the U.S.

13    Marshals Fugitive Task Force and I really don't remember

14    that date.

15         Q    Okay.  So -- but fair to say not for a

16    particularly long time before you became the chief; is

17    that correct?

18         A    At least a year, year-and-a-half.

19         Q    Okay.

20         A    To the best of my recollection.

21         Q    Okay.  Well, why don't we do it this way. Have

22    you had other positions at the Greenwood Police

23    Department besides night shift sergeant and being the

24    chief?

25         A    Yes.  I have.

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1    Q    And so why don't we start from the beginning

2 and then we'll just go through your sort of employment

3 history at the Greenwood Police Department.

4    A    All right.  So I went from patrolman to I

5 became a sergeant.

6    Q    Okay.  And how long were you a patrolman for?

7    A    I became a sergeant in '99.

8    Q    Okay.

9    A    I became a patrolman in 1988, so 11 years.

10    Q    Okay.

11    A    If I'm doing my math correct.

12    Q    And you were a patrolman for those 11 years at

13 the Greenwood Police Department?

14    A    That is correct.

15    Q    Okay.  And were you ever employed at any other

16 police department during that period of time?

17    A    Not before I became a sergeant.

18    Q    Okay.  All right.  So you became a sergeant in

19 1999.

20    A    That is correct.

21    Q    And how long were you in that position?

22    A    Until 2011.

23    Q    Okay.  And then at some point in 2011, you

24 went, you said to the U.S. Marshals Fugitive Task Force?

25    A    That is correct.

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1        Q     Is that a -- like a training academy or...?
 2        A     No, sir.  It's the Fugitive Task Force --
 3        Q     Okay.  So you were actually --
 4        A     -- Southern District.
 5        Q     You were employed by the U.S. Marshals?
 6        A     Fugitive Task Force, yes.
 7        Q     Okay.  And you were there for approximately --
 8        A     Approximately a year.
 9        Q     Okay.
10        A     And I need to interject.  In 2003, I was
11   appointed the commander of the investigation division,
12   2003-2004.
13        Q     Okay.  And who appointed you to that position?
14        A     At that time, it was Chief Albert Hessman.
15        Q     Okay.  What prompted you to move from the
16   Greenwood Police Department to the U.S. Marshals Task
17   Force?
18        A     It was an opportunity afforded by Chief Joe
19   Pitcher.
20        Q     Okay.  He asked you if it was something you
21   were interested in being a part of and you said yes?
22        A     That is correct.
23        Q     Okay.  And the position you said lasted
24   approximately a year.  Is that because that's how long
25   the task force was for?
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1        A     No.
 2        Q     Okay.
 3        A     The task force is still in operation today.  I
 4   was called back to work as a sergeant.
 5        Q     Okay.  And who called you back?
 6        A     Deputy Chief Mike Wright.
 7        Q     You said his name was Mike Wright?
 8        A     Yes, sir.
 9        Q     Okay.  And that was at some point in 2011?
10        A     2010 or 2011.  I don't recall.
11        Q     All right.  To the best of your recollection,
12   sometime in that period?  And you believe you were in
13   the U.S. Marshals for approximately a year?
14        A     Approximately.  Yes.
15        Q     Okay.  And when you came back from the
16   U.S. Marshals Task Force, were you put in that night
17   shift sergeant position or were you in a different
18   sergeant?
19        A     To the best of my recollection, the night
20   shift sergeant.
21        Q     Okay.  Are there different duties between a
22   sergeant and the night shift sergeant or is it just the
23   time that they work?
24        A     Just the time they work.
25        Q     Okay.  And you were in that position from
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1   sometime in 2010 or 2011 to the best of your
 2   recollection.
 3        A    Correct.
 4        Q    Until you were appointed chief in 2012; is
 5   that correct?
 6        A    That is correct.
 7        Q    Okay.  When you became chief in 2012, was that
 8   an interim position to begin with or were you --
 9        A    No.  I was promoted to the position of chief
10   by the mayor.
11        Q    Okay.  And who was the chief previous to you?
12        A    Richard McQueary.
13        Q    And do you know how long he was chief before
14   you became the chief?
15        A    Sometime in April of '11 until the end of '11,
16   I think.
17        Q    Okay.
18        A    I don't remember exactly when everything
19   changed.
20        Q    Okay.  When you say "everything changed," what
21   are you referring to?
22        A    When Chief Pitcher was removed by the previous
23   mayor and then Chief McQueary was appointed.
24        Q    Okay.  Do you know why Chief -- did you say
25   his name was Pitcher?
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1        A      Pitcher.

 2        Q      Did you -- do you know why he was removed?

 3        A      No.  I cannot answer that honestly because I

 4   do not know what took place in the mayor's office.

 5        Q      Okay.

 6        A      And I'm not going to speculate to what was in

 7   the media and everything else.

 8        Q      Sure.  And that was -- but that was a decision

 9   that was made in the mayor's office that you had no part

10   of; is that correct?

11        A      Absolutely correct.

12        Q      Okay.  And would the same thing be true for

13   the appointment of Chief McQueary meaning that it was a

14   decision made in the mayor's office that you had no part

15   of?

16        A      That is correct.

17        Q      Okay.  And then you said that when you were

18   appointed the chief, that was at the behest of the

19   mayor; is that correct?

20        A      That is correct.

21        Q      Okay.  And that was in 2012 to the best of

22   your recollection?

23        A      As of January 1, 2012.

24        Q      Okay.  And who was the mayor who appointed

25   you?
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

```
 1        A    Mark Myers.

 2        Q    Is it unusual for a sergeant to be appointed

 3   to go from -- or is it unusual for an officer to go from

 4   sergeant to chief?

 5        A    I don't suppose.  The -- we've had it happen

 6   before in our administration.

 7        Q    Okay.  And who else has been promoted from

 8   sergeant to chief?

 9        A    Charles Henderson who went from chief to

10   becoming mayor.  Robert Dine who went from sergeant to

11   chief.

12        Q    In terms of the chain of command in between

13   sergeant and chief, there's a lieutenant above sergeant,

14   correct?

15        A    That is correct.

16        Q    And then above lieutenant, what's the next

17   level of the chain of command in the Greenwood Police

18   Department?

19        A    That is as high as we have as a permanent

20   rank --

21        Q    Okay.

22        A    -- is lieutenant.  After that, it goes to the

23   deputy chief, to the assistant chief, to the chief.

24        Q    The -- who is your current assistant chief?

25        A    Matthew Fillenwarth.
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1        Q     And who is your current deputy chief?
 2        A     There are two.  Over the uniform division is
 3   James Ison.  Over the investigation division is
 4   Doug Roller.
 5        Q     Have your assistant chief or deputy chief
 6   changed from the period of time that you were appointed
 7   chief in 2012 to the present?
 8        A     The assistant chiefs has not.  The deputy
 9   chiefs over the uniform division and the investigation
10   division has changed.
11        Q     Okay.  Who was the -- well, who are the other
12   individuals or other individual who is in the -- who is
13   the deputy chief in the uniform division?
14        A     Gary Duvall.
15        Q     Okay.  Anyone else?
16        A     No.
17        Q     Okay.  And what year did Deputy Chief Ison
18   become the deputy chief, to your knowledge?
19        A     To my knowledge, 2014.
20        Q     Okay.
21        A     Or '15.  I'm --
22        Q     Okay.
23        A     I didn't put it in the calendar book.
24        Q     Sure.  In any case, at the time of the
25   incident that's at issue in this case meaning the tasing
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1    of Mr. Todero in May 29, 2016, is it fair to say that

2    your assistant chief was Matthew Fillenwarth and your

3    deputy chief over the uniform division was James Ison?

4        A    That is correct.

5        Q    Okay.  During the period of time that you've

6    been employed at the Greenwood Police Department have

7    you held any other law enforcement positions outside of

8    the department?

9        A    Yes.  I have.

10       Q    When was that and what was the position?

11       A    The exact year is -- well, I don't remember

12   the year I went to work but it was a part time

13   employment at Southport Police Department.

14       Q    Did you say -- sorry, I didn't hear the name

15   of the department.

16       A    Southport.

17       Q    Southport.  Okay.  And what was your position

18   there?

19       A    That was patrol officer.

20       Q    And you said as you sit here today you don't

21   recall the year that that was?

22       A    It was sometime after the terrorist attacks

23   because my wife lost her job.

24       Q    Okay.

25       A    And I don't remember the exact date I started.

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1    And we've stayed there until probably 2007 or '08.

2        Q    Okay.  But during that same period you were

3    also employed by the Greenwood Police Department?

4        A    That is correct.

5        Q    Okay.  And the position at the Southport

6    Police Department was a part time position; is that

7    correct?

8        A    That is correct.

9        Q    And you said you were in the position of

10   patrolman?

11       A    That is correct.

12       Q    And was that the only position that you held

13   there?

14       A    Yes.  It is.

15       Q    Okay.  Any other part time positions as you --

16   in law enforcement as you -- during the period of time

17   that you were employed by the Greenwood Police

18   Department?

19       A    Not in law enforcement, no.

20       Q    Okay.  Any other employment outside of law

21   enforcement during that period?

22       A    Various.  I -- we all work part time jobs here

23   and there.  If you're going to ask me to recall every

24   one since 1988, that's impossible.

25       Q    Okay.  When was the last time that you held a

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1   part time job that was outside law enforcement during
 2   the period of time that you worked at the Greenwood
 3   Police Department?
 4       A    Probably Thanksgiving Day.
 5       Q    Of this past year?
 6       A    No.  Year before.
 7       Q    Okay.
 8       A    So Thanksgiving of '16.
 9       Q    Okay.  And during that period of time you were
10   the chief of the Greenwood Police Department?
11       A    That is correct.
12       Q    Okay.  And what was that part time position?
13       A    It was working for Best Buy.
14       Q    Okay.  In what position?
15       A    Standing at the door, crowd control, loss
16   prevent -- or theft prevention.
17       Q    Sure.
18       A    Reducing their liability, basically.
19       Q    Okay.  Probably like Black Friday sales --
20       A    Exactly.
21       Q    -- and things like that.  Okay.  Got you.  It
22   took me a second.  You have to give me a second to
23   figure these things out because I'm from Canada.  We
24   don't have the Black Friday and our Thanksgiving is in
25   October.  So --
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

 1      A     Okay.

 2      Q     Our big shopping day is after Christmas for

 3  some reason.  It doesn't make any sense, but that's how

 4  it is.  Okay.  How about previous to that position?

 5  Well, let me ask you this: How long did the position at

 6  Best Buy last?

 7      A     Just that one day.

 8      Q     Just that one day.  Anything that you would

 9  qualify as more long-term part time employment, meaning

10  not something that you did just for a day or for a

11  couple of days?

12      A     No.

13      Q     Previous to you becoming a patrolman at the

14  Greenwood Police Department, did you -- had you worked

15  for any other law enforcement agency?

16      A     No.  I did not.

17      Q     Okay.  Can we just go through your education

18  background before you became a patrolman?  And you don't

19  have to go back to high school, just anything after high

20  school, basically.

21      A     I attended Indiana University 1981 to 1985.  I

22  did not obtain my degree.  I obtained that later in

23  2008.

24      Q     Was that either Indiana University or

25  somewhere else?

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1        A    IUPUI which is at Indianapolis.
 2        Q    Can you provide the full name of that.  Sorry,
 3   I didn't catch it?
 4        A    Indiana University, Purdue University,
 5   Indianapolis, IUPUI.
 6        Q    And what was your degree in?
 7        A    Criminal justice.
 8        Q    And what were you studying in the period of
 9   time from '81 to '85 when you were at Indiana
10   University?
11        A    That was at a time it was called The School of
12   Environmental -- School of Public and Environmental
13   Affairs with a concentration in criminal justice.
14        Q    Okay.  And when you --
15        A    The acronym for that is SPEA, S-P-E-A.
16        Q    Okay.  When you left Indiana University in
17   1985, where did you go?
18        A    Back to Indianapolis.
19        Q    Okay.  And were you involved in any education
20   after 1985 but before your 2008 degree?
21        A    Yes.
22        Q    Where were you -- where were you and what were
23   the degrees that you --
24        A    It wasn't a degree.  It was 17 hours of credit
25   from the University of Virginia while I attended the FBI
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1    National Academy.
 2         Q     Okay.
 3         A     To which I came back and applied those 17
 4    credit hours and had IUPUI direct me how many more
 5    credit hours I needed to complete my degree.
 6         Q     Okay.  Do you recall what year you did the --
 7         A     2006.
 8         Q     2006.  Okay.  And were you employed between
 9    the time that you left Indiana University in 1985 and
10    the time that you went to -- well, you started as a
11    patrolman in 1988.  So did you do any training previous
12    to becoming a patrolman, meaning --
13         A     Explain training, please.
14         Q     So is there a training academy that you have
15    to attend before you can apply to be a patrolman or
16    anything like that?
17         A     No.
18         Q     Okay.  So you were able to apply to become a
19    patrolman without attending any kind of training academy
20    or needing any kind of sort of law enforcement --
21         A     That is correct.
22         Q     -- certificate; is that correct?
23         A     That is correct.
24         Q     Okay.  When you became a -- had you applied to
25    the Greenwood Police Department previous to becoming a
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1  patrolman in 1988?

 2       A    Why would I have to?

 3       Q    I mean were there times -- I guess a better

 4  way to put it, sorry, is had you applied previous to the

 5  time that you were accepted or you, for whatever reason,

 6  were turned away?

 7       A    No.  No.

 8       Q    Okay.

 9       A    No.  I was not.

10       Q    Okay.  Once you become a patrolman, is there

11  mandatory training that you have to --

12       A    Within one year you have to attend the

13  Law Enforcement Academy.

14       Q    And where is the academy held?

15       A    Plainfield, Indiana.

16       Q    And how long is the course of study at the

17  Law Enforcement Academy?

18       A    Then or now?

19       Q    Then?

20       A    12 weeks.

21       Q    What is it now?

22       A    16, I believe.

23       Q    Okay.  Or it's 14 to 16.  They've been making

24  some changes.

25       A    Sure.
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1        Q     And I know I mentioned this briefly previous
 2   to now, but have you been deposed before?
 3        A     Yes.  I have.
 4        Q     How many times have you been deposed?
 5        A     I do not recall.
 6        Q     Do you recall when the last time was that you
 7   were deposed?
 8        A     No.
 9        Q     Was it within the last year?
10        A     No.
11        Q     Within the last five years?
12        A     Could be.  I'm not --
13        Q     Okay.  Was that -- when you were -- the last
14   time that you were deposed was it for a case in which
15   you were a defendant?
16        A     No.
17        Q     Okay.  Was it for a case in which -- that
18   involved the Greenwood Police Department?
19        A     I believe it was a DUI case to the best of my
20   recollection, or I had made an arrest.
21        Q     Okay.  So you were -- you were providing
22   testimony as part --
23        A     Correct.
24        Q     -- of a criminal case?
25        A     That is correct.
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1        Q    Have you done -- have you sat for a deposition
 2    before in a case where you were a defendant?
 3        A    No.  I have not.
 4        Q    Okay.
 5        A    I stand corrected.  I may have.  I do not
 6    remember if they got to that level when I was a sergeant
 7    with a lawsuit.  I may have.  I just don't remember.
 8        Q    Okay.  Just so I'm clear on your testimony,
 9    you're saying that there was a time as a sergeant that
10    you were named as a defendant in the lawsuit, but you do
11    not recall as you sit here today whether or not you sat
12    for a deposition in that case; is that --
13        A    That is correct.  I can tell you the
14    individual's name.  I cannot tell you if I remember
15    having being deposed on it.
16        Q    Okay.  I don't need the individual's name, but
17    do you recall what the case was about?
18        A    It was a case of a patrol officer and use of
19    force.
20        Q    Okay.  Were you the individual that was being
21    accused of using excessive force?
22        A    They excused -- no.  It was the patrol officer
23    but because I was a sergeant, I was lumped in.
24        Q    Okay.  You were the patrol officer's
25    supervisor?
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

 1      A    That is correct.

 2      Q    Okay.  And as you sit here today, do you have

 3  any recollection of the outcome of that case?

 4      A    It was settled, but I do not know.

 5      Q    Okay.  And, again, your testimony is that you

 6  don't recall whether or not you sat for a deposition?

 7      A    I don't remember.

 8      Q    Okay.  But fair to say since you're -- the

 9  case was settled so it didn't go to trial, correct?

10      A    That is correct.

11      Q    Okay.  Have you sat for a deposition in a case

12  where you -- during the period of time that you've been

13  chief where you were the defendant?

14      A    No.  I have not.

15      Q    Okay.  And I know you said you couldn't recall

16  the last time you were deposed, but do you know if

17  you've sat for a deposition during a period of time

18  previous to today that you were a chief, whether or not

19  you were a defendant in the case?

20      A    No.  I have not sat in any deposition as

21  chief.

22      Q    Okay.  You became chief in 2012, correct?

23      A    Correct.

24      Q    So no deposition in your position as chief

25  since at least that date?

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1        A     That is correct.
 2        Q     Okay.  Did you review any documents in
 3   preparation for your deposition today?
 4        A     Yes.  I did.
 5        Q     What documents did you review?
 6        A     Those provided by my attorney.
 7        Q     Okay.  But what were the documents that you
 8   reviewed?
 9        A     Various numerous ones.  I don't -- we looked
10   at some use of force and things like this.
11        Q     When you say "use of force," do you mean the
12   policy itself?
13        A     The policies.
14        Q     Okay.  So let me ask it this way: Did you --
15   one of the things you reviewed in preparation for your
16   deposition was the Use of Force Policy; is that correct?
17        A     That's correct.
18        Q     Do you know what year that -- the policy was
19   that you reviewed?
20        A     I reviewed both of them.
21        Q     Okay.  And when you say "both of them," do you
22   mean the one from in effect in 2012 and the one in
23   effect in 2017?
24        A     Yes.  Both of those.
25        Q     Did you review the -- any Greenwood Police
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1  Department policies related to the use of tasers?

2     A    Yes.  We did.

3     Q    Okay.  Which policies did you review?

4     A    Both.

5     Q    The 2012 again and 2017?

6     A    Correct.

7     Q    Okay.  And that was the -- I'm sorry, it's not

8  a general order what the taser policies is considered

9  what again?

10    A    Taser policy.

11    Q    Okay.  Are there any other written policies or

12 procedures related to the use of the taser besides the

13 one that you reviewed?

14    A    Rephrase your question.  I'm trying to --

15    Q    Sure.  Let me ask it this way: So the taser

16 policy is a standard operating procedure, correct?

17    A    Correct.

18    Q    Which is different from a general order,

19 correct?

20    A    Specifically no yes, they're all lumped

21 together in the same.  We have -- the general orders

22 came out from 1978 by the Board of Works.  In 2012, we

23 went in and revised those because they were written in

24 1978 and had not been updated since then.

25    Q    Okay.

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1      A    And then in this administration we grouped

2   everything together in the rules and regulations and

3   policies and procedures, so call it what you may, it's

4   just a rules and regulations, policies and procedures.

5      **Q    Okay.  So one of the rules and regulations or**

6   **policies and procedures is the one in relation to taser**

7   **use, correct?**

8      A    Correct.

9      **Q    Okay.  And we can mark this as Exhibit 1. I'll**

10  **just hand that to you.  That's the policy from -- that**

11  **was in effect in 2012; is that correct?**

12              (EXHIBIT 1 MARKED FOR IDENTIFICATION)

13          THE WITNESS:  Do you want to look at it.

14          MS. POLLACK:  Is that the only copy you've got,

15      Vince?

16          MR. FIELD:  No.  No.  I've got copies for

17      everyone.  Sorry.  I didn't actually have any

18      questions on the policy itself.  I just wanted --

19      but yeah, I've copies of everything.

20          MS. POLLACK:  What'd you call it, number 1?

21          MR. FIELD:  Exhibit 1, yeah.

22          MS. POLLACK:  Okay.

23          MR. FIELD:  Were you guys using a different --

24          MS. POLLACK:  I know we started over on Friday.

25      Sometimes we were going consecutively but I know we

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

1    started over on Todero ones.

2         MR. FIELD:  I'm going to keep a running list

3    here --

4         MS. POLLACK:  All right.

5         MR. FIELD:  -- and then I can provide it to

6    everybody.

7    A    To the best of my knowledge, it is.

8    BY MR. FIELD:

9    Q    Okay.  So I don't have any questions on the

10   actual content of the policy itself just yet.  My

11   question is: Are there, to your knowledge, any other

12   written policies besides this one in the department in

13   relation to taser use?

14   A    Prior to or after 2012? .

15   Q    Well, let's start with prior to.

16   A    No.  There may be.  I don't have --

17   Q    Okay.  And what about after 2012?

18   A    This is after this administration, so this is

19   the one and then the revision we made.

20   Q    Okay.  But outside of those standard operating

21   procedures, what I mean is there -- is there a separate

22   policy, written policy or procedure related to taser use

23   besides that one?

24   A    No.

25   Q    Okay.

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1              MR. STEPHENSON:  Vince?

 2              MR. FIELD:  Yeah.

 3              MR. STEPHENSON:  You have attached to Exhibit 1

 4      what appear to be taser training bulletins.

 5              MR. FIELD:  Oh, yeah.  We can take those off.

 6      We'll just -- Exhibit 1 is the Standard Operating

 7      Procedure, SOP40, which runs to page -- which starts

 8      at Defendant 664 and goes to Defendant 669 which is

 9      page 6 of the document itself.  Sorry.  Thank you

10      for noticing that.

11  BY MR. FIELD:

12      Q    Okay.  In terms of the May 2016 incident

13  involving Mr. Todero, there was a final investigative

14  report that was created; is that correct?

15      A    That is correct.

16      Q    Okay.  Is that the same thing that you

17  reviewed in preparation of your deposition today?

18      A    Yes.

19      Q    And that's the report that was created by

20  Assistant Chief Ison; is that correct?

21      A    Deputy Chief Ison, that is correct.

22      Q    Okay.  Did you review any video in preparation

23  for your deposition today?

24      A    Yes.  I did.

25      Q    Which videos did you review?
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1        A     Officer Eck and Officer Elliott's.

 2        Q     And when you say "Officer Eck's video," are

 3   you referring to Officer Eck's body cam video?

 4        A     That is correct.

 5        Q     Okay.  And same question for Officer Elliott.

 6   When you say "That you reviewed Officer Elliott's video,

 7   you are referring to their --

 8        A     Body camera, yes.

 9        Q     Okay.  Any other videos that you reviewed in

10   preparation for your deposition today?

11        A     That I reviewed?

12        Q     Yes.

13        A     No.

14        Q     Okay.  Any other -- we've talked about three

15   different documents, the use of force document the -- or

16   policy, the taser policy and then the investigative

17   report that was created by Deputy Chief Ison.  Any other

18   documents that you recall that you reviewed?

19        A     Define document for me.

20        Q     Anything that's written down on paper.

21        A     Newspaper article included?

22        A     Yes.

23        Q     Yes, as a matter of fact, I reviewed the 1983

24   slaying of Denver Smith in Bloomington, Indiana just

25   because Mr. Smith was found in 1983 to have swelling of
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1   the brain and I was talking to my daughter over Easter
 2   and I said how remarkable how life has changed because
 3   1983 when I was at Bloomington, it took five police
 4   officers and getting their batons taken away from them
 5   as well as their guns and they ended up having to shoot
 6   Denver Smith and how the world's changed now and how
 7   we're able to have different tools at our hands.  So
 8   that an article I did review.
 9        Q    Okay.  And you said that that was an article
10   from -- I'm sorry, you said it was from 1983 but I'm not
11   sure if you were referring to the article or the
12   actual --
13        A    It was online.
14        Q    Okay.  But the incident that was covered was
15   an incident from 1983; is that correct?
16        A    Correct.
17        Q    Okay.  But Mr. Smith had swelling of the brain
18   just like I was talking to my daughter about my -- not
19   my daughter who's a police officer, but my other
20   daughter who is her twin who lives in Detroit, we were
21   talking about --
22        Q    Okay.
23        A    -- Mr. Smith.
24        Q    So you have a daughter who is a police
25   officer?
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1    A    Yes.  I do.

2    Q    **Okay.  And where she is a police officer?**

3    A    Greenwood.

4    Q    **In the same department in which you are chief?**

5    A    That is correct.

6    Q    **Okay.  And your other daughter who lives in,**

7    **did you say Detroit?**

8    A    That is correct.

9    Q    **What does she do for a living?**

10   A    She works for a division of AmeriCorps called

11   the FoodCorps.

12   Q    **Okay.**

13   A    Where she works with underprivileged intercity

14   youth teaching them education about food nutrition.

15   Q    **Okay.**

16   A    Quite frankly, she's deferring her student

17   loan until this August and then it's going -- you know.

18   Q    **Nothing wrong with deferring those student**

19   **loans.  And when you say "until this August," what is**

20   **she planning on doing in August?**

21   A    Your guess is as good as mine.

22   Q    **Okay.  How long has your daughter who's a**

23   **police officer been a police officer at the Greenwood**

24   **Police Department?**

25   A    She just completed her probation.  She is now

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1   a first-class patrolman, so approximately three years.

2        Q    You were saying that she just completed

3   something, and you -- what has she just completed?

4        A    You go from probationary to second class to

5   first class patrolman.

6        Q    Okay.  And is each of those -- well, how long

7   is the probationary period last?

8        A    It depends on date of hire but you generally a

9   year.

10       Q    Okay.  And what about the --

11       A    Second class, one year.

12       Q    One year.  Okay.  Besides the newspaper

13  article related to Denver Smith, any other documents

14  that you can recall?

15       A    Not that I recall.

16       Q    Okay.  Deputy Chief Ison created some notes as

17  part of his investigation.  Is that -- do you -- is that

18  something that your familiar with?

19       A    His notes?

20       Q    Yes.

21       A    The only thing I know about his notes is that

22  he was looking for them the other day.

23       Q    Okay.

24            MR. STEPHENSON:  He's not seen the notes if

25       that's what you're --

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

 1          MR. FIELD:  Oh.  Okay.

 2  BY MR. FIELD:

 3      Q     So I'll introduce it as an exhibit later and

 4  ask you but that's fine, I'll take your counsel's

 5  representation that he hasn't seen that.

 6      A     That's true.

 7      Q     Yeah.  Okay.  So in any case, as you sit here

 8  today, you can't recall any other documents that you

 9  reviewed in preparation for your dep today; is that

10  correct?

11      A     To the best of my knowledge, no.

12      Q     Okay.  And the only videos that you reviewed

13  were the body-worn camera videos from Officers Eck and

14  Elliott; is that correct?

15      A     That is correct.

16      Q     Okay.  The other officers, or the other

17  officer on the scene from the Greenwood Police

18  Department besides officer Blackwell was your -- is that

19  your daughter?

20      A     Officer -- yes.  Officer Laut and then Officer

21  Elliott.

22      Q     Okay.  So there were four officers on the

23  scene, Blackwell, Eck, Laut, and Elliott; is that

24  correct?

25      A     Correct.

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201



KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1      Q      Okay.  And you reviewed the body-worn camera

2  videos from Officers Elliott and Eck, correct?

3      A      Correct.

4      Q      Okay.  Officer -- was officer -- or sorry,

5  he's the lieutenant, correct?  Officer Blackwell is a

6  lieutenant?

7      A      That's correct.

8      Q      Okay.  And at the time of the incident in

9  May 2016, he was a lieutenant?

10     A      Yes.

11     Q      Okay.  Did officer -- sorry, Lieutenant

12  Blackwell have a body-worn camera on him that day?

13     A      No.  He did not.

14     Q      Okay.  Is there a reason why he didn't have a

15  body-worn camera on that day?

16     A      Yes.  When we implemented the program,

17  lieutenants are supposed to be -- run the shift.  And it

18  was our thought plus budgetary reasons that sergeants

19  down would wear body-worn cameras.  Detectives don't

20  wear body-worn cameras.  I don't wear a body-worn

21  camera.  So a lieutenant hypothetically should be

22  managing the shift, so he should not wear one.

23     Q      As the chief, do you carry a service weapon?

24     A      Define service weapon.

25     Q      Do you carry a revolver or other --

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1        A     Yes.

 2        Q     -- firearm?  Okay.  And as the chief, do you

 3   carry a taser on you?

 4        A     Yes.

 5        Q     Okay.  And is that at all times as long as

 6   you're in uniform?

 7        A     No.

 8        Q     Okay.  When would you carry a taser as the

 9   chief?

10        A     Let me tell you when I would not.  It would be

11   easier to answer it that way.

12        Q     Sure.

13        A     If I am in a dress blouse, I will not carry a

14   taser.  I will not have a gun leather on.

15        Q     Okay.

16        A     If I am in a normal Class A uniform, I will

17   wear a taser.

18        Q     Okay.  In which circumstances would you wear a

19   dress blouse?

20        A     Formal occasions.

21        Q     Okay.  Is that the -- is it fair to say that

22   that would be the same in terms of whether or not they

23   would wear a taser for the assistant and deputy chiefs?

24        A     I would say that's common, but I don't -- we

25   don't wear a taser with a dress blouse.
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1    Q    Okay.  Let me ask it this way: Is there a

2  requirement for the chief to carry a taser?

3    A    Yes.

4    Q    It's something that's required by the

5  department?

6    A    We are required to carry two forms of non or

7  less lethal.

8    Q    Okay.  And the options for the forms of less

9  lethal weapons are taser, baton, and OC spray or pepper

10  spray; is that correct?

11    A    Correct.

12    Q    Okay.  And is it left to the individual

13  officer to decide which of those three, two of the three

14  things to carry?

15    A    Yes.

16    Q    Okay.  So it's possible that an officer in the

17  Greenwood Police Department could opt not to carry a

18  taser; is that correct?

19    A    That is incorrect.  The taser is one you will

20  carry.

21    Q    Okay.  But I thought your testimony was that

22  you needed to carry --

23    A    I was incorrect.

24    Q    Okay.

25    A    It's taser or one of the others as you

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1    described.

 2         Q    Okay.  So I just want to be clear.  Is the

 3    policy to where the officer is required to wear two of

 4    the three less than lethal force weapons, or is it

 5    something else?

 6         A    It's they will carry the taser plus one of the

 7    other two less lethal.

 8         Q    Okay.  Is that -- was that the policy in May

 9    2016 when -- on May 29, 2016?

10         A    Yes.

11         Q    Okay.  So back to the body-worn camera.  So

12    Lieutenant Blackwell was not required as a lieutenant to

13    have a body-worn camera.  You said that was both because

14    of the requirements of a lieutenant's job but also

15    budgetary concerns; is that correct?

16         A    Correct.

17         Q    Okay.  Sergeants and below in terms of the

18    office ranks are required to wear body-worn cameras; is

19    that correct?

20         A    In uniform, yes.

21         Q    Okay.  So Officer Laut at the scene would've

22    been wearing a body-worn camera?

23         A    That is incorrect.

24         Q    Incorrect did you say?

25         A    That is incorrect because she was a
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

 1  probationary status.  She had not been to the Law

 2  Enforcement Academy yet.  We generally do not issue them

 3  until a later date.

 4      Q    Okay.  So I believe you testified earlier that

 5  when you were accepted in the Greenwood Police

 6  Department as a patrolman you have up to one year to

 7  attend the Law Enforcement Academy; is that correct?

 8      A    That is correct.

 9      Q    Okay.  So fair to say that on May 29, 2016

10  Officer Laut had not -- she had been hired as a

11  patrolman, but she had not yet attended the Law

12  Enforcement Academy; is that correct?

13      A    Correct.

14      Q    So she was within that first year of being

15  hired, correct?

16      A    Correct.

17      Q    Okay.  Is there a reason that officers who are

18  on probationary status are not required to wear body-

19  worn cameras?

20      A    Well, A, we don't know how long they'll be

21  with us.  B, they have a lot of more important things to

22  learn other than pushing the button and to remember to

23  turn on a camera.  They're a young sponge so that was

24  our thought process early on in this.

25      Q    When you say "early on in this," what do you

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1  mean?

2      A    When we were coming up with the policy of the

3  body-worn cameras program.

4      Q    Okay.  What year did the -- to the best of

5  your knowledge Greenwood Police Department first adopt

6  tasers?

7      A    Tasers?

8      Q    Yes.

9      A    I do not know.

10      Q    Okay.  Was it previous to the time that --

11      A    Yes.  It was.  I'm sorry.

12      Q    No.  That's fine.

13      A    Previous to the time that you became a

14  patrolman in the department?

15      A    No.  No.  Not till the previous chief.  I -- I

16  just don't remember when we started carrying them.

17      Q    Okay.  What about the body-worn cameras, when

18  did -- when were those adopted by the department?

19      A    We started testing those in '14, I believe,

20  with four units.  We had looked at different models

21  before that before making the decision to go with the

22  Axon taser.

23      Q    Okay.

24      A    And then in '15, I believe, is when we started

25  the whole program with the officers.

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1        Q     Okay.

 2              MR. STEPHENSON:  With what?

 3              THE WITNESS:  '15.

 4              MR. STEPHENSON:  I didn't hear what your

 5       last --

 6              THE WITNESS: Is when we went with the --

 7       equipping the officers.

 8              MR. STEPHENSON:  Oh, okay.

 9  BY MR. FIELD:

10        Q     Just to be clear, when you said you began

11  testing with four units, you mean four different types

12  of devices, correct?

13        A     No.  We had tried different products up until

14  '14 and that's when we made the decision to test taser.

15        Q     Okay.  And when you say "four units," you mean

16  units of actual officers?

17        A     Yes.  Four officers were --

18        Q     Okay.

19        A     -- equipped with the body-worn cameras.

20        Q     And these were the Axon taser camera; is that

21  correct?

22        A     Correct.

23        Q     Okay.  And that was ultimately the camera that

24  the department decided to go with, correct?

25        A     Yes.
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1    Q    Okay.  And you said it was 2015 that the

2  policy was implemented whereby all officers up to the

3  rank of sergeant or up to and including the rank of

4  sergeant would be required to wear body-worn cameras?

5    A    I would ask to review the body-worn policy

6  camera.  I don't know if -- I'm not specifically clear

7  on the dates.  I'm saying '15.

8    Q    Okay.

9    A    I think that's correct.

10    Q    Okay.  And then whenever the exact period of

11  time was where it was adopted for the whole department

12  up to and including sergeants, previous to that there

13  were four officers that were testing; is that correct?

14    A    Yes.

15    Q    Okay.  The decision to adopt body-worn cameras

16  for the department was made while you were the -- during

17  the period of time that you were the chief, correct?

18    A    Correct.

19    Q    Okay.  So what was your role in the decision,

20  though, whether to adopt body-worn cameras?

21    A    That was my final decision to make.

22    Q    Okay.  And why did you decide to adopt body-

23  worn cameras for the department?

24    A    Because over time the in-car camera systems

25  had been done away with.  We knew we wanted something on

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1    the officers.  Quite frankly, the in-car camera systems

2    are very expensive, and they did not follow the officers

3    into a residence or other places as they go.  So we

4    thought that it would be best to put the individual

5    officers in body-worn cameras.

6        **Q   Were the in-car camera systems done away with**

7    **or were they -- did you just continue to use the ones**

8    **that the department had and then also adopted the body-**

9    **worn cameras?**

10       A    No.  the previous administration had  it left

11   to when the cars were changed out, they would not keep

12   putting them back in.

13       **Q   Okay.  So anytime a car was updated to a newer**

14   **patrol vehicle, they would not put the old camera system**

15   **back in; is that correct?**

16       A    That's correct.  And I can't answer for the

17   previous administration when they made a decision to

18   quit recording.  I know there were storage issues and

19   other -- at the time.  So it was a different

20   administration, different policy.  So...

21       **Q   When you say "administration," do you mean**

22   **under a chief previous to you or under a different**

23   **mayor?**

24       A    Under the previous chief.

25       **Q   Okay.**

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

 1        A     And different mayor.

 2        Q     Okay.  So without going to the reasons --

 3    well, let me ask it this way: You were the -- the first

 4    time the body-worn cameras were adopted for the

 5    department was under the period of time that you were

 6    the chief, correct?

 7        A     Correct.

 8        Q     Okay.  So under the previous administration,

 9    if there was a period of time where they were doing away

10    with the in-car cameras, there may have been a period of

11    time where there was no recording devices either in the

12    camera -- either in the car or on the officer; is that

13    correct?

14        A     That is correct.

15        Q     Okay.  When you first became the chief, was

16    there a period of time where the -- both the officers

17    were not equipped with cameras and the patrol cars did

18    not have cameras?

19        A     That is correct.

20        Q     Okay.  And how long of a period of time --

21    well, yeah.  How long of a period of time was that the

22    case?

23        A     Well, 2012 until -- well, I guess you would

24    say 2014, because we had four officers equipped at that

25    time in the trial period, but until 2015.

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1        Q    Okay.  Do you know if any of the car -- any of
 2   the cameras -- or sorry, any of the patrol cars had
 3   cameras in them in 2012 when you became chief?
 4        A    To the best of my recollection, no.
 5        Q    Okay.
 6        A    The reason I hesitate is there was an old pool
 7   canine that may have still had one in it, but I -- it
 8   didn't work.
 9        Q    Okay.  I was asking you some questions before
10   about what you did to prepare for your deposition.  Did
11   you meet with your attorney to prepare for your
12   deposition today?
13        A    Yes.
14        Q    Okay.  And how many times did you meet with
15   your attorney?
16        A    Two, I believe.
17        Q    And do you recall as you sit here today how
18   much time you spent with your attorney preparing for
19   your deposition?
20        A    No.  because I had to leave in the first
21   meeting on a family emergency.
22        Q    Okay.
23        A    And then we met afterwards so I didn't keep
24   track of my hours --
25        Q    Okay.
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1        A    -- on that.

 2        Q    The second time you met your attorney, do you

 3   recall how long you met with him?

 4        A    A couple hours maybe.  I don't know.

 5        Q    Okay.  Besides your attorney, have you talked

 6   to anyone else about your deposition today?

 7        A    The only thing is the assistant chief and I,

 8   we talk about traffic coming up here to anticipate when

 9   to leave.

10        Q    Okay.  Anyone else that you talked to about

11   your deposition?

12        A    Just my spouse that I'm going to have to give

13   it, and --

14        Q    Okay.

15        A    -- make sure she's going to let the dog out at

16   lunchtime.

17        Q    You mentioned that when you were talking about

18   Denver Smith that you were having a conversation with

19   your daughter.  Was -- did that conversation involve a

20   discussion of this case?

21        A    No.

22        Q    Okay.  So when you had this conversation about

23   Denver Smith, it wasn't prompted or didn't result in any

24   way a conversation about Mr. Todero?

25        A    No.  I talked about tasers.
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1    Q    Okay.  And what was the discussion about

2  tasers?

3    A    How they're a useful took in preventing what

4  it had -- had to do back in the '80s with go after

5  somebody who has mental emotions or alcohol, or

6  whatever.  You don't have to go hands on using your

7  hands, a club, or a revolver.

8    Q    Okay.  So the --

9    A    A taser's a wonderful tool.

10    Q    Okay.  So it's fair to say that the gist of

11  the conversation was at least in terms of when you

12  talked about tasers, it was that they were -- they're a

13  useful law enforcement tool; is that correct?

14    A    Yes.

15    Q    Okay.  At any point previous to today have you

16  spoken to anyone from Axon or Taser Corporations about

17  this case?

18    A    No.  Not about this case.

19    Q    Okay.  Have you at any point previous to today

20  in the period of time that you were the chief of the

21  department spoken to anyone at Axon or Taser in relation

22  to one of your officers using a taser against somebody?

23    A    The only thing I could say is that during the

24  chief's conference in Philadelphia in 2000 -- I don't

25  remember what year it was, I greeted Rick Smith, the CEO

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

```
1   of Taser and I thanked him for what he's done for law

2   enforcement and how tasers have changed law enforcement

3   for the better.

4        Q    You don't recall what year that -- sorry, what

5   did you say it was?  Police Chief's Convention?

6        A    International Association of Chiefs of Police.

7        Q    Okay.

8        A    It may have been 2013.

9        Q    Okay.  And you said it was in Philadelphia?

10       A    Correct.

11       Q    Okay.  But outside of that interaction with

12   Mr. Smith, have you at any time previous to today had a

13   conversation with anyone at Axon or Taser in relation to

14   an officer employed by the Greenwood Police Department

15   using or deploying their taser against somebody?

16       A    No.

17       Q    Okay.  And that includes that incident with

18   Mr. Todero, you've never spoken to anyone at Axon or

19   Taser about that incident; is that correct?

20       A    That is correct.

21       Q    Okay.  We went through the chain of command

22   structure earlier.  The chief of police is the highest

23   authority in the department; is that correct?

24       A    That is correct.

25       Q    Okay.  Can we -- well, let me ask this first.
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1    So that -- so both Chief Fillenwarth and Chief Ison

 2    report to you; is that correct?

 3         A    That is correct.

 4         Q    Okay.  And so would the chief of the

 5    investigative division, but I just don't recall that

 6    person.

 7         A    That is correct.

 8         Q    Okay.  Can we go -- can you go -- I know this

 9    is a general question but just generally speaking, what

10    are your duties as the chief of the Greenwood Police

11    Department?

12         A    The oversight of the department, policymaking,

13    chief policymaker.

14         Q    Okay.

15         A    Keep the mayor happy.  Public relations, work

16    with the city council.  Work with the board of works.

17    Ultimate responsibility for the supervision of the

18    officers, discipline of them.

19         Q    You said you're the -- the chief if the chief

20    policymaker; is that correct?

21         A    That is correct.

22         Q    So for any given policy, the chief will be the

23    final authority on that policy; is that correct?

24         A    No.  That is not correct.  I will be the final

25    authority in the police department.  We take all of ours
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

1  before the bubble -- board of public and safety works

2  who is the oversight and once they approve, then we put

3  them into policy.

4      Q    And you said that was the board of public and

5  safety works?

6      A    Well, it's board -- board of works.

7      Q    Board of works, okay.  In any case, if I refer

8  to board of works, you'll know --

9      A    That's correct.

10     Q    -- what I'm talking about?  Okay.  Okay.  So

11  any new policies will be -- would be taken in front of

12  the board of works for a final approval; is that

13  correct?

14     A    That is correct.

15     Q    Okay.  But within the department itself, you

16  are the final authority on the policies; is that

17  correct?

18     A    That is correct.

19     Q    Okay.  So taking, for example, any new policy

20  within the department, you would have the final say

21  about whether or not that -- the policy was acceptable,

22  correct?

23     A    Yes.

24     Q    And then once you've made that ultimate

25  decision then it's taken to the board of works for their

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1    approval or disapproval; is that correct?
 2         A    That is correct.
 3         Q    Okay.  And then your testimony is once the
 4    board of works approves it, then it would be put into --
 5    it would become policy within the department?
 6         A    Correct.
 7         Q    Okay.  What about the revision of existing
 8    policies.  Is the chief the ultimate or final authority
 9    on the revision of existing policies?
10         A    Yes.  I am.
11         Q    Okay.  And when an existing policy is going to
12    be revised, does the revision also have to go in front
13    of the board of works, or is that just for new policies?
14         A    Yes.  We take the revised in front of them.
15         Q    Okay.  Have you ever taken a new policy to the
16    board of works that wasn't approved?
17         A    No.  I have not.
18         Q    Okay.  And have you ever taken a revision of a
19    policy to the board of works that wasn't approved?
20         A    No.  I have not.
21         Q    Okay.  You testified that you were the -- the
22    chief is the ultimate, or is ultimately responsible for
23    supervision and discipline of officers; is that correct?
24         A    That is correct.
25         Q    Can you explain in a bit more detail what you
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1   mean by that?

2       A    Every type of disciplinary action comes up to

3   my desk.  I have the ultimate decision.  I have

4   rescinded some that I did not feel were warranted.  But,

5   however, if I accept those what they -- I can increase,

6   I can decrease whatever the supervisor did.  Does that

7   make sense?  So my suspension authorities are up to five

8   days.

9       Q    Okay.

10      A    A sergeant is one day, lieutenant is two days,

11  and so I can give more or I can give less.  We also have

12  a written reprimand, verbal counseling.

13      **Q    In terms of giving less, can you rescind the**

14  **discipline completely, meaning that the individual --**

15  **the officer wouldn't be disciplined at all?**

16      A    That is correct.

17      **Q    Okay.  And in terms of increased the**

18  **discipline, the maximum discipline that you can impose**

19  **as the chief is a five-day suspension; is that correct?**

20      A    Yes and no.

21      **Q    Okay.  In what way is it not correct.**

22      A    Well, I have to explain our merit commission.

23  So I can give five days and there's no question.

24      **Q    Okay.**

25      A    If I wish to give more than five days, I have

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

 1 │ to take the officer to the merit commission.  However,
 2 │ said officer -- if I have filed charges against an
 3 │ officer, they can be suspended without pay pending the
 4 │ next merit commission hearing at which date the -- and
 5 │ then the merit commission decides if they want to have a
 6 │ hearing and accept the charges.  So in a lengthy answer
 7 │ to your question is five days; however, there are
 8 │ exceptions to the merit law.
 9 │     Q    Okay.  So just so that I'm clear.  You can
10 │ impose a five-day suspension without question or having
11 │ to go to any other authority; is that correct?
12 │     A    That is correct.
13 │     Q    Okay.  You could also bring charges against an
14 │ officer which would result in them being suspended
15 │ without pay, correct?
16 │     A    Until the next meeting, correct.
17 │     Q    Okay.  And so it would technically be possible
18 │ that the next meeting was more than five days away so
19 │ that in effect they would be suspended for longer than
20 │ five?
21 │     A    Correct.
22 │     Q    Okay.  What is the lowest form of discipline?
23 │     A    Verbal counseling.
24 │     Q    Okay.  And does that lowest form of
25 │ discipline, verbal counseling, is that something that

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1    comes to your desk as well?

 2         A    Yes.

 3         Q    Okay.  So in the instance of an officer being

 4    reprimanded with verbal counseling, you could either

 5    increase it or basically just do away with the reprimand

 6    altogether; is that correct?  There would be no lower

 7    form of punishment basically?

 8         A    Correct.

 9         Q    Okay.  But the point is that every form of

10    discipline comes to the chief for approval or

11    disapproval and what you do with it from there is up to

12    you within the confines of what we've just talked about?

13         A    Correct.  And just so you know, is that

14    whenever any disciplinary action comes to me, if I make

15    the decision to accept it, then it goes on to our merit

16    commission and they review it.

17         Q    Okay.  Is that for all forms of discipline

18    including verbal counseling?

19         A    Yes.

20         Q    Okay.  And the merit commission, is that

21    something that's within the department or outside of the

22    department?

23         A    No.  That's a civilian oversight.

24         Q    Okay.  And so all forms of discipline within

25    the department including the lowest form of discipline
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1  in the form of verbal counseling would have to go to the

2  merit commission?

3       A    Correct.  And understand that the verbal

4  counseling is written.

5       Q    Okay.

6       A    Just so you understand, it's documented.

7       Q    Sure.  It's documented, and it would be

8  documented in the officer's discipline file, is that --

9  or their employment file?

10      A    Correct.

11      Q    Okay.  And but the main point is that all

12  forms of discipline once you what you've done whatever

13  you're going to do with it as chief have to go to the

14  merit commission for approval?

15      A    Correct.

16      Q    Okay.  Does that include the times that you

17  decide no punishment or discipline is warranted?  Would

18  that decision have to go to the merit commission?

19      A    No.  Because it's not discipline at that time.

20      Q    Okay.  How common would you say it is that you

21  increase the severity of discipline that is brought to

22  your attention?

23      A    I don't believe I've increased.  I've

24  decreased on one occasion.

25      Q    Okay.  So in the period of time that you've

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

The Deposition of MICHAEL O'NEIL, taken on 04/19/18

57

```
 1    been the chief, as you sit here today your recollection
 2    is that you've never increased the discipline that was
 3    recommended to you by one of the officers under you; is
 4    that correct?
 5         A    To the best of my knowledge.
 6         Q    Okay.
 7         A    Generally, if it's to a point where if I'm
 8    involved and I'm the one issuing the discipline.  Does
 9    that make sense?  So if I see an action, I want to take
10    action as a chief then I go to somebody and say you need
11    to take care of that.
12         Q    Okay.  And then otherwise at least in terms of
13    whether or not you're going to increase it, your -- I
14    know that your recollection isn't perfect, but as you
15    sit here today your memory is that you have accepted the
16    recommendations that have been brought to you and have
17    not increased the level of discipline in the period of
18    time that you've been chief?
19         A    To the best of my recollection, yes.
20         Q    Okay.  And I believe that you said that you
21    may have decreased recommended discipline one time; is
22    that correct?
23         A    That is correct.
24         Q    Okay.  And do you recall what that was in
25    relation to?
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1          A     That's an internal matter.  However, I will

2     just say, and simply say that I think that the

3     discipline was imposed far too late after the occurrence

4     of the violation and it was a minor trivial thing and it

5     was a supervisor, first line supervisor, who was

6     learning.

7          Q     What -- what is a first line supervisor?

8          A     Sergeant.

9          Q     Okay.  What were the actions by the sergeant

10    that were being disciplined?

11         A     The sergeant wasn't being disciplined.  The

12    sergeant was -- I think it was a sergeant lieutenant who

13    was actually issuing the discipline.

14         Q     Okay.

15         A     It's called the hot stove effect.  All right.

16    So if you burn your hand on the stove, you immediately

17    pull back, correct?

18         Q     Correct.

19         A     A week later, you know not to do that.  So

20    three weeks later if you -- someone says to you "Hey, if

21    you put your hand on the stove you're going to burn

22    yourself."  Three weeks later you're being disciplined

23    for something you've already done.  I -- that's what it

24    was.  And it was a trivial matter.

25         Q     Okay.

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1      A    What it was.  So basically put -- you don't --
 2  if you're housebreaking your dog, you don't punish it
 3  later on.
 4      Q    Right.  You punish it -- you're saying the
 5  punishment needs to be meted out at the time where
 6  there's actually a learning opportunity --
 7      A    Correct.
 8      Q    -- to be had.  Okay.  But in terms of what the
 9  action was that was being disciplined, what did the
10  sergeant do that required discipline?
11      A    It was not a sergeant requiring discipline, it
12  was a patrol officer who was being disciplined.  It had
13  -- I don't remember.  It was one of those things that
14  just made me shake my head.
15      Q    Okay.  So something you're saying you don't
16  recall the exact details but your memory of it was that
17  it was something trivial; is that correct?
18      A    It was very trivial.
19      Q    Okay.  So for example, it didn't involve the
20  use of force on a civilian?
21      A    Absolutely not.
22      Q    Okay.
23      A    No.
24      Q    How often as the chief is discipline brought
25  to your desk for you to approve or disapprove?  Is it
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1    something that happens on a daily basis, weekly basis,

2    monthly basis?

3        A    It fluctuates.  It's not daily, not weekly,

4    not monthly, but there can be a time when maybe there

5    are two or three will come across, so it fluctuates.

6        Q    Okay.  But it's not something that occurs on

7    the daily basis?

8        A    Absolutely not.  No.

9        Q    Okay.  How many officers -- well, let me ask

10   it.  When you became chief in 2012, do you recall how

11   many officers were -- there were in the department?

12       A    I think we were at 54.

13       Q    Okay.  And currently, there are how many?

14       A    We are slotted for 64, we're at 62.

15       Q    And that's all -- is that just the -- is that

16   lieutenants, sergeants, and patrolmen?

17       A    That's all sworn?

18       Q    Sworn officers, okay.  As the chief, are you a

19   sworn officer?

20       A    Yes.  I am.

21       Q    Okay.  So the chiefs that are the assistant

22   and deputy chiefs that are under you are also sworn

23   officers, correct?

24       A    Correct.

25       Q    So they would be included in this -- in these

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1  numbers?

2      A    Correct.

3      Q    Okay.  As the chief, do you have any role to

4  play in the training of officers?

5      A    Mentoring, setting an example.  Other than

6  that, I mean, no.  Do I specifically train?  No.  I am

7  not a certified trainer.

8      Q    Okay.

9          MR. STEPHENSON:  Do you want to take a short

10     break?

11         MR. FIELD:  Sure.  Yeah.

12         MR. STEPHENSON:  Do you want to?

13         THE WITNESS:  Yeah.

14                (OFF THE RECORD)

15  BY MR. FIELD:

16     Q    Before we went off the record, we were talking

17  about whether or not you had a role to play in the

18  training of officers as chief and you said that you're

19  not a training officer so outside of setting an example

20  and mentoring, you're not -- you do not provide

21  training; is that correct?

22     A    That is correct.

23     Q    Okay.  And that would include training on the

24  use of tasers; is that correct?

25     A    That is correct.

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

The Deposition of Michael James Yaros, taken on 7/17/18

62

1    Q    Okay.  As the chief of the Greenwood Police

2 Department, do you have a role to play in the

3 investigation of incidents like the one with Mr. Todero

4 in May of 2016?

5    A    The only role I would have is to initiate the

6 investigation.

7    Q    Okay.  And what does initiating the

8 investigation entail?

9    A    It entails having somebody conduct an

10 investigation.

11    Q    Okay.  So you would, as the chief, you would

12 decide whether or not an investigation needs to be done

13 on any particular incident; is that correct?

14    A    That is correct.

15    Q    Okay.  And then you would assign the task of

16 investigating that incident to one of your subordinates;

17 is that correct?

18    A    That is correct.

19    Q    Okay.  Is there a particular individual under

20 you just by position that would be typically assigned

21 investigations such as this or is it just -- it can be

22 any number of people and you just decide who you think

23 is best placed to do the investigation?

24    A    It can go two different ways.  In this

25 instance, it was just I assigned Deputy Chief Ison.

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

 1        Q     Okay.

 2        A     In the event there is a citizen complaint

 3   filed, we can convene, it's called a risk management

 4   board to investigate the complaint.

 5        Q     Did you say it was a risk management board?

 6        A     Correct.

 7        Q     The -- is a risk management board convened

 8   automatically as a result of a citizen complaint or is

 9   that a decision that you as chief would have to make?

10        A     It would be my decision.

11        Q     Okay.  And is the risk management board

12   composed of individuals from the Greenwood Police

13   Department, or is -- does it contain individuals that

14   are not a part of the department?

15        A     No.  It's Greenwood officers.

16        Q     Okay.  And how many officers are assigned to a

17   risk management board or does it depend?

18        A     I believe it's five.  Off the top of my head.

19   I haven't reviewed that policy in a while.

20        Q     Okay.

21        A     I know it is a sergeant and a lieutenant and I

22   can't remember if it's two or three patrol officers.

23        Q     Okay.  So the decision to convene a risk

24   management board is yours as the chief.  Can you also

25   when there is a citizen complaint you decide to initiate

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1   and investigation that doesn't include the convening of
 2   a risk management board?
 3        A    Well, that answer would be that complaints can
 4   come in and generally if -- the number one complaint we
 5   get is speeding vehicles.
 6        Q    Okay.
 7        A    Officers speeding.  I'm not going to convene a
 8   risk management board to investigate if an officer is
 9   speeding.  All right.  So it just depends upon the
10   nature of the complaint if it's convened.
11        Q    Sure.  So you can get citizen complaints where
12   your decision as chief is not to do any investigation at
13   all; is that correct?
14        A    That is correct.
15        Q    Okay.  And there are also citizen complaints
16   that would result in you convening a -- one of these
17   risk management boards, correct?
18        A    Correct.
19        Q    Okay.  I guess my -- I'm sorry if it was a bad
20   question.  My question is: Can you initiate an
21   investigation pursuant to a citizen complaint that
22   doesn't involve the use of a risk management board?
23        A    Yes.
24        Q    The incident is investigated but you don't
25   think a risk management board is necessary?
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
1      A    Correct.

2      Q    Okay.  And that would be in terms of how the

3  investigation gets done would be something more similar

4  to as occurred with the Todero incident where you

5  assigned it to Deputy Chief Ison.

6      A    It was assigned to Deputy Chief Ison.  The

7  Toderos never filed an official complaint with us.

8      Q    Okay.  What I meant was you could have a

9  citizen complaint and you could, rather than convene a

10 risk management board, assuming that you believe an

11 investigation is required, you could assign that

12 investigation to Deputy Chief Ison, for example?

13     A    Yes.

14     Q    Okay.  Are all decisions related to whether or

15 not incidents will be investigated, are all of those

16 decisions made by you?

17     A    That is correct.

18     Q    Okay.  So, obviously with the -- well, I won't

19 say obviously.  With the Todero incident that was

20 something that you were made aware of through the

21 regular channels, correct, however you became aware of

22 it, because it's an incident that involved one of your

23 officers.  It got a lot of press and all of that stuff.

24 So that would've been something you didn't require

25 somebody to tell you directly had occurred; is that
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1  correct?

2      A    I do not understand your question.

3      Q    Okay.  That's -- I didn't phrase it

4  particularly well.  What I'm trying to understand, I

5  guess, is if a citizen complaint is filed, does that

6  complaint automatically come to your desk or does

7  somebody review it before you would see it?

8      A    It will be reviewed.

9      Q    Okay.

10     A    Generally, by Deputy Chief Ison.

11     Q    Okay.  So can Deputy Chief Ison decide whether

12  or not a citizen complaint needs to be investigated?

13     A    Yes and no.  You have an individual who calls

14  up and yells and leaves a voicemail message that he saw

15  a Greenwood police car speeding.

16     Q    Sure.

17     A    Deputy Chief Ison isn't going to come to me

18  and say, "Some unknown individual called and made a

19  complaint."  All right.  We have nothing to investigate.

20  If the individual were to go online and fill out our

21  complaint form and file it, nine times out of ten,

22  Deputy Chief Ison will look into it before he even comes

23  to my desk.  As I said, and I'll repeat.  Our number one

24  complaint is speeding vehicles.

25     Q    Sure.

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201



KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1        A    So every speeding vehicle complaint he will

 2   just look at it.  The complaint and may write down "A

 3   Greenwood police car was speeding in 465 this morning,"

 4   all right.

 5        Q    Sure.

 6        A    An individual took the time to go on the web

 7   site, write this all out and submit it to us.  They

 8   don't have a license plate number.  They don't have a

 9   car number, so what are we going to do with it?

10        Q    Sure.

11        A    So Deputy Chief Ison isn't going to come to me

12   and say "Chief, we've got this complaint on an officer

13   that's been filed," until now if one comes in that's

14   troubling.  You know, say an officer was abusive or

15   things like this, then he may come to me and say "Hey,

16   this complaint came in.  What do you want me to do."

17        Q    Okay.

18        A    All right.

19        Q    Outside of complaints about speeding vehicles,

20   are there other types of complaints that -- well, let me

21   ask this first.  So the complaints with speeding

22   vehicles, those are things that if they were submitted

23   through the website and Deputy Chief Ison saw them, he

24   wouldn't need to take that to you in order to decide not

25   to investigate it; is that correct?
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201



KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1        A    Yes and no.  He may decide not to -- he may
 2   investigate it, but he will come to me and say, "This
 3   complaint came in and there's nothing here."
 4        Q    Okay.
 5        A    All right.
 6        Q    So I guess let me ask it this way: Are all --
 7   even if it's a speeding car complaint, are all the --
 8   any written complaints that are submitted are they
 9   brought to your attention even if it's just to say
10   "there's nothing here.  We're not going to investigate
11   it"?
12        A    Yes.
13        Q    Okay.  So it doesn't matter the nature of the
14   complaint as long as it's submitted in writing it will
15   at least be brought to your attention even if there's
16   nothing to be done?
17        A    Correct.
18        Q    Okay.  Okay.  Are there other types of
19   complaints and I don't mean one offs, things that you
20   get commonly that also fall into the category of a
21   complaint that doesn't get investigated?
22        A    Well, yes.  Police officers are police
23   officers.  Quite often we get a complaint that they're
24   rude.
25        Q    Okay.
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

 1        A     You know, but when you're talking about
 2   serious complaints of misconduct or things like that,
 3   they are seldom and far and few between.
 4        Q     But for the most part, the typical complaint
 5   about an officer speeding or an officer being rude,
 6   those are things that would not be investigated,
 7   correct?  I didn't mean the typical complaint.  I
 8   understand that there could be a one off where someone's
 9   giving you the license plate number, saying they're
10   traveling 200 in a 20 mile per hour.  That might be
11   something you would look at but just typically speaking,
12   your typical run of the mill officer speeding complaint
13   or Officer Joe was mean to me complaint, those are
14   things that wouldn't be investigated?
15        A     That is correct.
16        Q     Okay.  And your testimony is that complaints
17   in relation to what, you I think characterized as
18   troubling behavior are few and far between; is that
19   correct?
20        A     That is correct.
21        Q     Okay.  And for those types of complaints, you
22   as chief would be the individual in the department who
23   decides whether an investigation is done and what type
24   of investigation is done; is that correct?
25        A     That is correct.

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201



KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1        Q    Okay.  You indicated previously that as the
 2   chief you're not involved in the training of officers.
 3   Do you have to -- are there training requirements that
 4   you have to go through as the chief?  So, for example,
 5   is the instate service training, is that something that
 6   the chief has to do or is it only for officers, you
 7   know, like the patrolmen, sergeants and lieutenants?
 8        Q    Are you referencing the annual in-service
 9   training?
10        A    Yes.
11        Q    Yes.  I attend that.
12        Q    Okay.  You indicated previously that as the
13   chief you would -- as long as you're in your uniform
14   rather than in your dress uniform, you would carry a
15   taser; is that correct?
16        A    That's incorrect.  I don't have my taser on
17   today.
18        Q    Okay.  But you're not in uniform either.
19        A    Correct.
20        Q    Okay.  So when you are in your uniform and I
21   don't mean the dress blouse uniform, you would carry
22   your taser, correct?
23        A    Correct.
24        Q    Okay.  So do you have to go through the
25   recertification training on the taser as well as the
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1  chief of police?

2      A    I am the chief of police.

3      Q    Right.  So I'm asking, since you carry a

4  taser, do you have to -- are you also required to go

5  through the recertification process on the taser that

6  other officers would have to go through?

7      A    That is correct.

8      Q    Okay.  The in-service, annual in-service

9  training, does that consist of any training in relation

10  to the use of tasers?

11      A    Yes.  It does.

12      Q    Okay.  How -- well, can you describe what the

13  nature of the training is in terms of tasers in relation

14  to the annual in-service training?

15      A    Generally, it's just a PowerPoint

16  presentation.  Some years we have actual deployed

17  tasers.  One year, it had to do with the adoption of the

18  new tasers.

19      Q    The new tasers.  Do you mean the E2 model?

20      A    If that's what it's called, yes.

21      Q    Okay.  The adoption of the new I12017; is that

22  correct?

23      A    Correct.

24      Q    Okay.  But typically, your testimony is

25  typically the in-service training or the mandatory

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1  annual in-service training as it pertains to taser use,

2  it's typically a PowerPoint presentation; is that

3  correct?

4       A    That is correct.

5       Q    Okay.  And the in-service training is

6  mandatory and annual, correct?

7       A    Yes.

8       Q    Okay.  The recertification training on the

9  taser, when was the last time you had that training, to

10 the best of your knowledge?

11      A    It may have been '16 or '15.  I don't

12 remember.

13      Q    Okay.  On the adoption of the new taser in

14 2017, did you have to go through certification training

15 for that?

16      A    I do believe so.

17      Q    Okay.  And, in any case, if you did it would

18 be reflected in your personnel files, correct?

19      A    Correct.

20      Q    Okay.  I understand that you're not 100

21 percent sure when you last had recertification training

22 on the taser, but does the recertification training on

23 the taser differ from what the training is during your

24 in-service training, or is it essentially the same

25 thing, a PowerPoint presentation?

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1        A    Essentially the same.

 2        Q    Okay.  So have there been -- I know you

 3   indicated that some years with the in-service training,

 4   you may actually deploy a taser.  In terms of the

 5   recertification training, have there been -- have you

 6   been involved in recertification training where there

 7   was no deployment of the taser, meaning it was just the

 8   PowerPoint presentation or some other type of

 9   presentation short of the actual deployment of the

10   taser?

11        A    Yes.  Because you're going back several years,

12   and I don't remember which years we --

13        Q    Sure.

14        A    -- deployed and which years we just watched --

15   viewed the PowerPoint and had discussions, so...

16        Q    Okay.  Is the certification or recertification

17   training on the taser provided by an officer in the

18   department or someone from outside the department?

19        A    It's been inside the department.

20        Q    Okay.  Is it provided by the -- well, is there

21   an officer who is assigned to doing the taser training?

22        A    Generally, it's Sergeant Polslider (phonetic),

23   or Officer Black, not -- Officer Falco who's now a

24   sergeant.

25        Q    Okay.
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1        A    He's done it too.  And I know we have other
 2   instructors, but I don't recall who they've been over
 3   the years.
 4        Q    Okay.  And do -- whichever officer is
 5   providing the certification and recertification
 6   training, do they have to go through special training
 7   themselves to be able to provide training to the rest of
 8   the department?
 9        A    That is correct.
10        Q    Okay.  Was there ever a period of time that
11   you were employed by the Greenwood Police Department
12   where you provided the training on taser use?
13        A    No.
14        Q    Okay.  Does the Greenwood Police Department
15   have a policy in terms of documenting witness
16   interviews?
17        A    No.
18        Q    Okay.  Is there a requirement in the
19   department whether or not it's a written policy or
20   procedure that all witness interviews be documented
21   somehow?
22        A    The only documentation I think that would
23   exist on that is a state law but if it's a felony it has
24   to be recorded audio and video.  For our own policy on
25   that, every?  No.
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1    Q    Okay.  Is there training in the department on

2  how to determine which witness interviews to document

3  which you don't have to document?

4    A    No.

5    Q    Okay.  So that's left to the discretion of the

6  officer; is that fair?

7    A    That is correct.

8    Q    Okay.

9    A    May I interject on that?

10   Q    Sure.

11   A    But you may have instances where a supervisor

12 on a scene may say "Get that person's statement.  Get

13 that person's statement," or to the accident

14 investigator, you may say get that.  So you understand

15 that, I'm saying is that it's individual officer nine

16 times out of ten but sometimes they may be directed to

17 obtain the statement.

18   Q    Sure.  So any supervising officer whether it's

19 a sergeant over a patrolman, or a lieutenant over

20 sergeants or patrolman can direct an officer under them

21 to document a witness interview or statement; is that

22 correct?

23   A    That is correct.

24   Q    Okay.  And as chief, for example, if you were

25 to assign an investigation to Deputy Chief Ison you

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1   could instruct the deputy chief to get certain witness

 2   interviews; is that correct?

 3        A    I could.  I do not, and I would not because I

 4   view myself as I'm the one who reviews this document or

 5   reviews the investigation, so I would prefer to the

 6   investigator investigate without oversight.  Does that

 7   make sense?

 8        Q    Sure.  You have the authority to do it but in

 9   terms of your practice, your practice is to let the

10   investigator do their investigation and then for you to

11   review it once the investigation is complete?

12        A    Correct.

13        Q    Okay.  Without you instructing the

14   investigator what investigative tasks to undertake; is

15   that correct?

16        A    Correct.

17        Q    Okay.  The policies and procedures of the

18   department, the written policies and procedures, are

19   they stored in any particular place in the department?

20   Are they given to the officers individually?  How does

21   that work?

22        A    It's been done both ways.  When we made a lot

23   of the modifications in 2012, we store them online.  We

24   have handed out on occasions, but generally, they are --

25   we'll send it out, a new one.  It's stored online but
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1    we'll attach it to an e-mail --
 2         Q    Okay.
 3         A    -- to show a revision.
 4         Q    So is the primary method for informing
 5    officers that there's either a new policy or a revision
 6    to a policy to send out an e-mail to the officers
 7    indicating that this has occurred and then attaching the
 8    policy, or the revised policy?
 9         A    Generally, yes.
10         Q    Okay.  Is there a requirement for officers to
11    review the policies of the department on a regular
12    basis?
13         A    No.  One would hope they would but they --
14    it's -- they are there for their review anytime they
15    need it.
16         Q    Okay.  So, for example, there's not a
17    requirement that officers review all of the policies on
18    an annual basis?
19         A    No.
20         Q    Okay.  And there's not a requirement -- well,
21    let me ask this.  When, for example, if a new policy is
22    sent out, is there a requirement that officers document
23    in any way that they've reviewed that new policy?
24         A    No.  We have though and had lieutenants
25    document -- it's -- it's happened before in the past.
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1        Q     Okay.

2        A     All right.  Does that make sense?

3        Q     Sure.  Can you give me an example just on --

4        A     Not off the top of my head.  I just wanted to

5   let you know that in the past -- I'm going back since I

6   was 1980.

7        Q     Sure.

8        A     We had documented when we sent out policies.

9   Sometimes a new policy would be in the annual training,

10  but in the current state, do we require them to be

11  signed for?  No.

12       Q     The -- to the best of your recollection as you

13  sit here today were officers -- did officers have to

14  document their review of the taser policy as it was

15  revised in 2012?

16       A     In 2012?

17       Q     Yes.

18       A     I do not know if we had them do it or not.

19       Q     Okay.  What about in 2017, was there a

20  requirement that officers document their review of the -

21            -

22       A     I do not believe so.

23       Q     Okay.  So it's left to the officers to review

24  the policies as necessary; is that a fair statement?

25       A     Yes.

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1    Q    Okay.  And as chief, you would expect that

2    officers would review the policies to the extent

3    necessary so that they are operating within the confines

4    of the policies and procedures of the department; is

5    that correct?

6        A    Correct.

7        Q    Okay.  What was the process in terms of the

8    decision in 2012 to decide that the policies of the

9    department needed to be updated?  So how did it come

10   about and what was your role in it?

11       A    My role in it was that I came in in 2012, I've

12   operated under these different policies and rules and

13   regulations since 1988.

14       Q    Sure.

15       A    And I knew they needed to be revised.  I knew

16   they needed to be updated.  A policy is sort of -- is a

17   breathing document.  It needs to be changed over time.

18   Our rules and regulations had not been changed since

19   1978.  There was one that required you to carry a

20   pencil.  All right.  We needed to update it.  We had

21   numerous different policies pertaining to the violation

22   of law.  All right.  So you can't commit domestic

23   violence.  You can't drive drunk.  You can't do the --

24   all right you just need one.  Don't break the law.  So

25   we simplified them and consolidated down.

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1    Q    Okay.

2    A    And brought more current verbiage in to bring

3    it to today's standards.

4    Q    Okay.  And the actual revisions or rewriting

5    of the policies themselves.  Who was involved in that

6    process?

7    A    That was Matthew Fillenwarth.

8    Q    Okay.  Did you have any role in the actual

9    revising of the policies themselves, meaning not just

10   the final authority to say that they were acceptable,

11   but in actually creating the policy before that decision

12   was made?

13   A    There were occasional questions.  I do not

14   specifically remember --

15   Q    Okay.

16   A    -- what those questions were.  I know in

17   particular that our uniform policy which is by far the

18   lengthiest one, there was questions repeatedly about

19   input on that and that one was done by Officer Falco.

20   Q    Okay.

21   A    Just so you know that Matthew didn't do all of

22   them.

23   Q    Sure.  Fair to say then that your primary role

24   outside of deciding that the policies needed to be

25   updated was approving the policy changes once they were

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1  made by Matthew Fillenwarth or in the instance of the --

2  that one policy that Mr. Falco helped with.  Your role

3  was to basically approve the final versions before they

4  went to the works department or the -- is that correct?

5      A    That is correct.

6      Q    Okay.  Is there a requirement for existing

7  policies to be reviewed or audited, you know, annually

8  or any, you know, given amount of time?

9      A    We -- we review then.  You know, I look

10 through them.  Sometimes things change outside of law

11 enforcement.  We need to make changes on our policies.

12     Q    Okay.

13     A    All right.  I know specifically when the Obama

14 Administration Pillars of Law Enforcement came out we

15 wanted -- we read -- I read those, compared them to

16 ours.  So it's an ongoing --

17     Q    Okay.

18     A    -- situation by us as part of our

19 responsibility as the administration.

20     Q    Sure.  And so the decision -- so, for example,

21 there's no requirement that every year, the policies of

22 the department be audited, for example?

23     A    No.

24     Q    Okay.  And so the decision -- the policies get

25 updated, you know, on a -- that there's no, you know,

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1  annual update to the policies or anything like that but

 2  they do get updated and the decision to update them

 3  would be yours a chief; is that correct?

 4       A    Correct.

 5       Q    Okay.  But knowing -- understanding that any

 6  changes or new policies need to be approved one step

 7  removed from the department; is that correct?

 8       A    Rephrase that.

 9       Q    Sure the works department or sorry, I can't

10  remember.

11       A    The Board of Public Works.

12       Q    The Board of Public Works has to approve any

13  of the changes or new policies, correct?

14       A    That's correct.

15       Q    The taser policy that was created or updated

16  in 2012, that was the policy that was in place at the

17  time of the tasing of Mr. Todero in May 2016; is that

18  correct?

19       A    That is correct.

20       Q    Okay.  Do citizen complaints of excessive

21  force by officers get investigated in a different way

22  than sort of process that we've already talked about?

23  So, for example, is this again one of the instances

24  where you as chief would decide whether an investigation

25  needs to occur?
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

 1       A    Yes.

 2       Q    Okay.  Not every citizen -- is it fair to say

 3  that not every citizen complaint of excessive force

 4  must, or is required to be investigated; is that

 5  correct?

 6       A    No.  Excessive force complaints are something

 7  I -- this administration takes seriously.  Very few and

 8  far between have we had any.  But when you get to the

 9  level of excessive use of force, then, yeah, something's

10  going to be investigated.  All right.  And understand,

11  that's not a daily occurrence?

12       Q    Sure.

13       A    All right.

14       Q    But your -- just so we're fair, we're on the

15  same page, even the sort of complaints, the sort of

16  lower level complaints that officers speeding or being

17  rude are not daily occurrences either; is that correct?

18       A    Are not what?

19       Q    They're not daily occurrences either, correct?

20       A    No.

21       Q    Okay.  So you're not dealing with a ton of

22  citizen complaints on a daily basis is the point?

23       A    That's correct.

24       Q    Okay.  But you do have the authority of, as

25  chief, if you thought that there was no merit to a

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

 1   complaint from a citizen on excessive force, you have

 2   the authority as the chief to decide that no

 3   investigation is needed?

 4        A    I have the authority, but if someone were to

 5   call in and not leave a name and say that somebody

 6   committed excessive force, we would look into that.  All

 7   right.  And it probably would be unfounded.

 8        Q    Sure.

 9        A    But, you know, someone saying that this

10   officer battered him or did this or that, we're going to

11   look into that.

12        Q    Sure.  So just technically speaking, you have

13   the authority as chief to decide no investigation is

14   needed but fair to say that your practice would be to

15   investigate any complaint of excessive force?

16        A    That is correct.

17        Q    Okay.  Knowing again that they're, as you

18   characterized them, few and far between, correct?

19        A    That is correct.

20        Q    Okay.  And the investigations of complaints of

21   excessive force, are those investigated in the same way,

22   meaning either investigation directed by you or you

23   could decide to convene a risk management board?

24        A    That is correct.

25        Q    Okay.  There's not some separate form of

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1    investigation that would take place; is that fair?
 2        A    That is fair.
 3        Q    Okay.  The results of any investigation of a
 4    complaint of excessive force would be something that
 5    would be brought to your desk; is that correct for
 6    review?
 7        A    That is correct.
 8        Q    Okay.  And you, if there was a decision to
 9    discipline the officer in a certain way that would be
10    something that you would again decide on as chief; is
11    that correct?
12        A    That is correct.
13        Q    You could increase it or decrease it as you've
14    already testified, correct?
15        A    Correct.
16        Q    Okay.  You testified earlier that when you
17    assign one of your deputy or assistant chiefs to do an
18    investigation, your practice is not to instruct them on
19    what to investigate or how to carry out their
20    investigation; is that correct?
21        A    Yes.
22        Q    Okay.  Outside of having the final report of
23    investigation being brought to your desk, do you take
24    any role in the investigation of incidents that you've
25    instructed an investigation for?
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1      A      The only role I would have is convey it to the

2  deputy mayor and the mayor himself that we are

3  investigating an officer.

4      Q      Okay.  And you would --

5      A      But -- they would just gloss over it and let

6  him know that this is taking place.

7      Q      Okay.  And during the investigation itself,

8  you -- do you have any -- do you take any oversight role

9  of the investigation itself?  So if it's assistant chief

10  doing the investigation or the deputy chief, would you

11  take any oversight over them?

12      A      Ultimately, I do have oversight, but, no,

13  direct supervision over the investigation, no.

14      Q      Okay.  So would it be fair to say then that as

15  chief, you limited your role in terms of these

16  investigations to deciding whether an investigation

17  needs to take place and then being the final authority

18  on the report of the investigation?

19      A      Yes.

20            MR. FIELD:  Okay.  Let's -- we'll mark just

21        the -- sorry, there's documents in here that don't

22        need to be part of the exhibit.  Let's just mark

23        this as Exhibit 2.  It's Defendant's 22 through 85.

24            (EXHIBIT 2 MARKED FOR IDENTIFICATION)

25            MS. POLLACK:  Do you want the other stuff back,

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1        Vince?
 2            MR. FIELD:  What's that?
 3            MS. POLLACK:  Do you want the other stuff back
 4        that you --
 5            MR. FIELD:  No.  You can --
 6            MS. POLLACK:  So you're going to use them for
 7        something else?
 8            MR. FIELD:  The other one was the Use of Force
 9        Policy, right.  I'll have questions for him about it
10        after, so you can -- oh, the other stuff in that --
11            MS. POLLACK:  Yeah.
12            MR. FIELD:  No.  You can keep it.  I think I
13        have questions about it after.
14            MS. POLLACK:  Okay.
15            MR. FIELD:  If not, I'll just take it.
16            MS. POLLACK:  All right.
17   BY MR. FIELD:
18        Q    The first six pages of this document D22
19   through D27, this is a list of Use of Force Reports that
20   were filled out by officers in the department from -- it
21   looks like the date range is from January 28, 2012
22   through September 9, 2016; is that correct?
23        A    It could be.  I don't recognize this report.
24        Q    Okay.  This is not something that you've seen
25   before?
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1      A      No.

2      Q      **Okay.**

3      A      I recognize the case number and I -- and the

4 officer's names, but have I seen this document?  No.

5      Q      **Okay.  The incident number that's on the left-**

6 **hand side of the page, that relates to use of force**

7 **incident numbers; is that correct?**

8      A      That -- that is a case number assigned to an

9 event.

10      Q      **Okay.**

11      A      So it could be anything from the original case

12 to supplements to property.

13      Q      **Okay.  And then the narrative on the right-**

14 **hand side of the page indicates that -- well, is that**

15 **indicating that a Use of Force Report was filled out for**

16 **this particular incident?**

17      A      That is -- that looks like the heading of the

18 supplemental or use of force.  It's a supplement to the

19 original case.

20      Q      **Well --**

21      A      Again, not having seen this document, it looks

22 like ours.

23      Q      **Okay.**

24      A      All right.

25      Q      **So you're familiar with the incident numbers**

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1  and the officer's names --

2      A    Yes.

3      Q    -- and things like that but this is not -- the

4  report at least in the format that you've seen here

5  today is not something that you're familiar with; is

6  that correct?

7      A    That is correct.

8      Q    Okay.  If an officer has -- well, let me -- if

9  an officer arrests a civilian for some violation of the

10  law and there's no use of force involved, what kind of

11  report would they be filling out for that?

12      A    None.

13      Q    Okay.  So you -- so there's -- so how would an

14  arrest be documented outside of filling out a report?

15  What --

16      A    It's noted in the original case report that

17  there was an arrest.

18      Q    Okay.  So for every arrest, is there a case

19  report?

20      A    Yes.

21      Q    Okay.  And if an arrest involves the use of

22  force of any kind, does a Use of Force Report need to be

23  filled out?

24      A    Yes.

25      Q    Okay.  And you said that that was as

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1    supplemental report to the case report?

2         A    Correct.

3         Q    Okay.  So you'll have case reports where no

4    force was used in the incident and so there would be no

5    supplemental Use of Force Reports, correct?

6         A    Correct.

7         Q    Okay.  And then, obviously, the flip side is

8    also correct.  If there's force involved, then the

9    officer's required to fill out a Use of Force Report?

10        A    Correct.

11        Q    Okay.  If you look at the page that's marked

12   D28.

13        A    Okay.

14        Q    Is this a form or a document that you're

15   familiar with?

16        A    It looks like it's building on the document on

17   top.  The number at the bottom's confusing me.  Down

18   here, is this your internal number?

19        Q    Yes.

20        A    Okay.

21        Q    It's just the page numbers, exactly.

22        A    So that looks like the heading of our reports.

23        Q    Okay.  And so this indicates that it's a

24   Greenwood Police Department deputy supplemental report,

25   correct?

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1        A     Correct.

2        Q     Okay.  Is this -- the next page D29, is this

3    the use of force, or supplemental Use of Force Report

4    that you testified to a second ago?

5        A     Yes.  This is what I generally what we see as

6    the first page of it.  I don't know if this back over

7    here.

8        Q     Okay.

9        A     But it generally starts with this page, right

10   here.

11       Q     Okay.  So typically fair to say that what's

12   marked just for page numbering purposes as pages 29 and

13   30 is what you would typically understand to be the

14   supplemental Use of Force Report?

15       A     Yes.

16       Q     Okay.  On page 30, about middle of that

17   paragraph, do you see where it's indicated "At that time

18   I used the nonlethal X26 taser to administer one five-

19   second burst of energy"?

20       A     One five-second burst of incapacitation.  Not

21   energy.  Wait a minute.  I'm sorry.  Yes.  You are

22   correct.

23       Q     Okay.

24       A     I was a line below you.

25       Q     Sure.  And then the next sentence reads

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1   "Method of incapacitation by the X26 taser is

2   neuromuscular incapacitation NMI.  NMI occurs when a

3   device is able to cause involuntary stimulation of both

4   the sensory nerves and the motor nerves which causes

5   incapacitation"; do you see that?

6      A   Yes.

7      Q   Okay.  Where is that language taken from?

8      A   I believe that when they use this they take

9   that from Taser themselves or from what they've been

10   taught.

11      Q   Okay.

12      A   All right.

13      Q   So this -- so in the supplemental Use of Force

14   Report that involves a taser, you would typically expect

15   to see this language because it's something, as you

16   said, taken either from Taser or from some materials

17   that been used to -- that they've been taught with in

18   terms of the use of taser, that kind of thing?

19      A   Yes and no.  Some officers detail better than

20   others.  So sometimes you'll see it, other times you

21   won't.

22      Q   Okay.  Okay.  Understood.  But when you do see

23   it, it's language to your knowledge that's adopted from

24   either Taser, or from some other training materials

25   related to the taser?  It's not left to the officer

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1   to --
 2        A     Right.  Yeah.
 3        Q     Okay.  Staying with pages 29 and 30, this is
 4   incident ending in the four digits 3725, correct?
 5        A     Correct.
 6        Q     Incident number, and this occurred in June of
 7   2013, correct?
 8        A     That's what the report states, yes.
 9        Q     And that one of the officers involved is
10   Officer Blackwell, correct?
11        A     That's what it states, yes.
12        Q     Okay.  Is there information on this form
13   either on page, again, it's marked internally as page 29
14   and 30 that would indicate who completed, which officer
15   completed the report?
16        A     Well, it's confusing a little bit on that. You
17   have to go to the top where it says "reporting officer,"
18   but he's also -- it says "Lieutenant Brian Blackwell."
19        Q     Okay.
20        A     And then you'll see shift supervisor,
21   Lieutenant Brian Blackwell.  There have -- sometimes
22   you'll see a use of force that could come through that
23   Lieutenant Blackwell was a supervisor but not the
24   administrator of the use of force.  Does that make
25   sense?
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1        Q      Understood.

 2        A      Okay.

 3        Q      But in this case, the reporting officer was

 4    Officer Blackwell, correct?

 5        A      Lieutenant Blackwell, correct.

 6        Q      Okay.  Sorry.  Lieutenant Blackwell.  And

 7    that's because -- well, let me ask it.  The reporting

 8    officer would be the officer who has used the force

 9    that's being reported, is that correct?

10        A      If able, yes.  Correct.

11        Q      Okay.  And what do you mean by "if able"?

12        A      It depends on if the use of force situation as

13    an officer involved shooting.  The officer may be

14    incapacitated and unable to complete the use of force at

15    the time.

16        Q      Sure.

17        A      All right.

18        Q      Okay.

19        A      So the supervisor would.

20        Q      Okay.  But when capable, it would be the

21    officer who was --

22        A      Correct.

23        Q      -- using the force that would be asked to

24    complete the report, correct?

25        A      Correct.
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

 1      Q      Is there a requirement for how soon after an

 2  incident the officer must document what occurred in the

 3  Use of Force Report?

 4      A      They like to see it within 24 hours.

 5      Q      Okay.

 6      A      Generally, at the end of the -- it'll be

 7  completed by the end of the shift.

 8      Q      Okay.  Is that -- is there a requirement for

 9  when it must be completed?

10      A      No.  Not specifically.

11      Q      But as you've testified, as chief, you're --

12  you like to see these reports get created within 24

13  hours of the incident; is that correct?

14      A      That's correct.  And the reason I say that is

15  because the incident may occur at 4:00 in the morning,

16  the officer's off at 6:00 that morning and it's on the

17  weekend, they may put it off until the next shift to

18  complete it knowing it's the weekend and we won't get it

19  until Monday morning.

20      Q      Sure.

21      A      All right.

22      Q      But -- so what is the basis for you wanting

23  them to complete it within 24 hours, what's the

24  reasoning for that?

25      A      We just -- I like to review the Use of Force

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

1   Reports.

2       Q    Okay.  Is part of the reason that you like to

3   see officers complete these reports within 24 hours

4   because the incident would be fresh in their minds in

5   order to recall what occurred?

6       A    It depends on the severity of the situation,

7   all right.  A simple matter where you have the

8   individual in the situation, that's fine.  If you have,

9   like I said, if you have an officer involved shooting,

10  it's general practice to give the officer two complete

11  cycles.

12      Q    Sure.

13      A    All right.  Because what happens to the human

14  brain is such a traumatic event like that.  All right.

15  So I'm not going to expect an officer who's been

16  involved in a shootout to come back and sit down and

17  write this report.

18      Q    Sure.

19      A    Okay.  Because they're -- they're going to be

20  unable to.  They're going to remember facts two days

21  later that they won't articulate into it.

22      Q    Okay.

23      A    All right.

24      Q    But is it fair to say typically you'd like to

25  see -- if the incident is short of something like you've

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

 1    talked about, like a shootout or where lethal force has

 2    been used, typically you'd like to see the reports

 3    completed within 24 hours so the incident is fresh in

 4    the officer's mind; is that fair?

 5         A    Well, yes and no.  I'd like to see it within

 6    24 hours.  I'm not going to sit here and dispute it

 7    about something being fresh in your mind because I

 8    can -- that can go from this -- we can leave here today.

 9    You can be driving back up to Chicago and say, dad gone

10    it, I wish I'd asked him that.

11         Q    Well, I can represent that that will happen.

12         A    Okay.

13         A    But you understand what I'm saying.  You're

14    getting me to agree to something about being fresh in

15    our mind.  I will not agree to that.

16         Q    Sure.  Well, would you agree with me that

17    typically people's memories don't get better over time?

18    They're better closer to an event outside of the

19    traumatic event that you're -- the traumatic type events

20    that --

21         A    I will not agree with that.

22         Q    Okay.

23         A    Because the human brain, having gone to Force

24    Science Institute, and understanding that the human

25    brain can recall better and it cannot recall better.  So

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1    you're asking me to make a -- or agree on something that

2    I can't agree on.  I do not have the medical expertise

3    to say the human brain does that.

4         Q    Okay.

5         A    All right.

6         Q    **How about just from your personal experience,**

7    **does memory get better over time?**

8         A    My memory's awful.  I'm 55 years old, all

9    right.  It's getting worse as we speak.

10        Q    Okay.

11        A    So I'm not going to -- I'm not going to make a

12   statement regarding the human memory.  That is outside

13   of my bailiwick.

14        Q    **Sure.  A second ago you, I think you mentioned**

15   **an academy or something that you had attended.  What was**

16   **that?**

17        A    The Force Science Institute.

18        Q    **Okay.  And when was that?  Is that one that**

19   **you --**

20        A    We're going back to this memory thing again,

21   you realize that?  All right.

22        Q    **That wasn't my plan.**

23        A    It's -- I think it was in '14.

24        Q    **Okay.**

25        A    I'm not sure.

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1        Q    And what is the -- it's Force, right?
 2   F-O-R-C-E?
 3        A    Force Science Institute, yes.
 4        Q    Okay.  And what is that exactly?
 5        A    It's a week-long course pertaining to police
 6   use of force.  They're based in Chicago.
 7        Q    Okay.  And is part of the training related to
 8   how traumatic events or use of force events are
 9   recalled?
10        A    Yes.
11        Q    Okay.  Is the just typically speaking, is the
12   use of a taser by an officer something that would be
13   characterized as a stressful event for the officer?
14        A    It depends on the event and depends on the
15   officer.
16        Q    Okay.  So it could be but there's also
17   circumstances where maybe it's not depending on the
18   officer; is that the fair?
19        A    That's fair.
20        Q    Okay.  The report that we've been looking at
21   that's part of Exhibit 2 at pages 29 and 30, do you --
22   as chief, do you review all of these, all Use of Force
23   Reports that get created?
24        A    Generally.
25        Q    Okay.  In what circumstances would you not
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1   review them?

2        A    I'm out of town.

3        Q    Okay.

4        A    And I wouldn't review them until maybe a week

5   later or something like that.

6        Q    Okay.

7        A    There have been instances where they end up in

8   Deputy Chief Ison's box and I don't get a chance to

9   review one.

10       Q    Okay.

11       A    So it happens but generally no.

12       Q    But typically your practice is to review all

13  the Use of Force Reports --

14       A    Yes.

15       Q    -- that get completed by your officers; is

16  that fair?

17       A    That is fair.

18       Q    Okay.  The Use of Force Report that we've been

19  looking at that -- incident number ending in 3725 from

20  June 2013, is this one that you recall reviewing?

21       A    Yes.

22       Q    Okay.  When you're reviewing these Use of

23  Force Reports, what are you reviewing them for?

24       A    The situation as existed did I think that use

25  of force was warranted.  I want to add something,

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1  though.  When you're referring to this by the last four

2  numbers, you understand that that could be duplicated in

3  G14L13725 as you go forward?

4      Q    So just -- I appreciate that.  But so just for

5  the record, the report that we have -- the Use of Force

6  Report that we have been looking at on page 29 and 30

7  from June 27, 2013, the incident number is actually

8  G13L13725, correct.

9      A    Correct.

10     Q    Okay.  And I appreciate that clarification. So

11 you said you were -- you look at the Use of Force Report

12 to determine whether or not you think -- you thought the

13 use of force was -- or the level of force used was

14 appropriate; is that your testimony?

15     A    Correct.

16     Q    If you determine that the use of force or the

17 level of force used was not appropriate, would that be

18 indicated on the Use of Force Report somewhere?

19     A    If I determined?

20     Q    Yeah.

21     A    No.

22     Q    Okay.  Where would that be indicated?

23     A    That would be if we conduct an internal

24 investigation.

25     Q    Okay.  From 2012 through the present has there

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

Case 1:17-cv-01698-JPH-MJD  Document 125-56  Filed 08/13/18  Page 104 of 288 PageID #:
5542
One Deposition of Chad Duncan taken 03/07/18 27 Page 3
102

1    ever been a time where you've reviewed a Use of Force

2    Report and determined that the level of force used was

3    not appropriate?

4        A    No.

5        Q    The pages D20 through -- D22, sorry, through

6    D27.  Understanding that you've indicated that this is

7    not report or form that your familiar with, but fair to

8    say then, though, that if this actually contains all

9    incidents in which a Use of Force Report was filled out

10   by an officer of the Greenwood Police Department, from

11   January 28, 2012 through the -- June 9, 2016, that your

12   practice would've been to review most if not all of

13   these Use of Force Reports; is that correct?

14       A    Yes.  But I'm not understanding this report

15   why I'm seeing under the narrative arrest as I do  for

16   probable cause.  I understand the supplemental report

17   may be up there and the use of force below it.

18       Q    Sure.

19       A    So you see probable cause in here that some of

20   them I don't understand why they are in this especially

21   because one of them says  I had access to NCI

22   information as follows, and I hope that you did not

23   receive that information.

24       Q    Which one is that?  I can tell you.

25       A    16L09890.

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1     Q     I did not receive that information.

2     A     Good.  Okay.

3     Q     So your testimony is that for the incidents

4 where under narrative it's got something else indicated

5 not Use of Force Report, as you sit here today you can't

6 say one way or another whether there was an actual Use

7 of Force Report filled out for that particular incident?

8     A     Correct.

9     Q     There may have been but there may also not

10 have been.  These may just have been included on here in

11 error?

12    A     To the best of my knowledge.

13    Q     Okay.

14    A     Yes.

15    Q     But for the rest of these where it's indicated

16 under narrative, but a Use of Force Report was completed

17 assuming that the document is accurate, and that Use of

18 Force Reports were completed for the incidents listed

19 here, fair to say that your practice would've been to

20 review most if not all of these?

21    A     Yes.

22    Q     Okay.  And your testimony is that from 2012 to

23 the present you have never found use of force by one of

24 your officers to be unjustified; is that correct?

25    A     To the best of my knowledge, no.  I don't

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 1:17-cv-01698-JPH-MJD   Document 125-56   Filed 08/13/18   Page 106 of 288 PageID #: 5544
Oral Deposition of Officer Brian Nichols, taken 04/Apr/18   2 / Page 3
104

1   remember disciplining an officer on this.

2        Q    Okay.  The report that we have been looking at

3   pages 29 and 30, the narrative -- well, the information

4   included on this report that's at page D30 which for the

5   document itself it indicates that it's page 3.  This

6   indicates that Officer Blackwell tased an individual for

7   throwing a Gatorade bottle at him; is that correct?

8        A    Uh-huh.  Yes.  I'm sorry.

9        Q    Okay.  And so your testimony is that you

10  testified earlier that you do recall reviewing this Use

11  of Force Report, correct?

12       A    I do.

13       Q    Okay.  And you found that the use of force by

14  Officer Blackwell was justified in this case?

15       A    I do.

16       Q    Okay.

17       A    May I add something to that?

18       Q    Yes.

19       A    Kevin Roberts is a known drug user who lived

20  next door to me ironically.  All right.  You see this

21  individual?

22       Q    Yes.  Kevin E. Roberts, Junior, sure.

23       A    All right.  He lived with the girl next door

24  to me.  His temperment was volatile.  He was a known

25  drug user to the point where I kept a gun in my house

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

1  and told my own children if he ever came in to shoot

2  him.  He would walk up and down the street screaming

3  into a phone.  So when you ask me when I said this one,

4  I know this young man.  I know what he's capable of. All

5  right.  So me just saying "yes," throwing the Gatorade

6  bottle.  There's more to it.

7       Q    Sure.  And I appreciate that extra

8  information.  But would you agree with me then that the

9  information that you've just provided in terms of Mr.

10 Roberts would've been important information for Officer

11 Blackwell to include in this report?

12      A    He would not have known.

13      Q    Okay.  So at the time that Officer Blackwell

14 tased Mr. Roberts, he didn't have any of the knowledge

15 about Mr. Roberts that you've just indicated, is that --

16      A    He may have known that he was living next door

17 to me.  I was very vocal about having to live next door

18 to that, because I had a good neighbor who had a

19 daughter that went astray who brought this in.

20      Q    Okay.

21      A    Okay.  So I don't know if he knew that Kevin

22 Roberts lived next door to me or not.

23      Q    Okay.

24      A    All right.  But in this instance when I read

25 this report, I'm like I know this guy and he's a

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

```
1    handful.

2         Q    Okay.  But your testimony is as you sit here

3    today, you don't know whether Officer Blackwell was

4    aware of that information about Mr. Roberts when he

5    tased him; is that correct?

6         A    I don't.  No.  I do not know.

7         Q    Okay.  If a civilian with no previous arrests

8    had thrown a Gatorade bottle at Mr. Blackwell --

9    Lieutenant Blackwell, I'm sorry, and Lieutenant

10   Blackwell had deployed his taser on that individual,

11   would that have been a legitimate use of force?

12             MR. STEPHENSON:  I object.  It's a

13        hypothetical.  You're asking for him to speculate.

14        Q    You can answer.

15        A    Was the bottle half full or empty?

16        Q    Full.

17        A    You know what I mean?  It can become a weapon.

18        Q    So fair to say -- I understand your point.

19   Fair to say then that the hypothetical that I described

20   in certain circumstances it would be possible that the

21   deployment of a taser in your view would be a legitimate

22   use of force?

23        A    Whenever an officer feels threatened, yes.

24   It's a legitimate use of force.  And if the officer

25   feels that throwing a water -- or the bottle, you know,
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 1:17-cv-01698-JPH-MJD   Document 125-56   Filed 08/13/18   Page 109 of 288 PageID #:
5547
The Deposition of CRAIG ALLEN, taken on 04/25/18   2/4/2018   107

 1    I just can't speculate to that.

 2         Q    Right.  But what I'm asking you is: I

 3    understand the, you know, the hypothetical I gave you

 4    was thin on details and I'm guessing -- what I'm asking

 5    is in the circumstances in which an individual who has

 6    no previous arrests throws a Gatorade bottle at an

 7    officer, there are -- your testimony is that there are

 8    certain circumstances in which the deployment of a taser

 9    may be the -- an appropriate use of force; is that fair?

10         A    Can you reword that for me?

11         Q    Sure.  An individual who has no previous

12    arrests throws a Gatorade bottle at an officer.  The

13    officer deploys their taser on that individual.  As you

14    sit here today, your testimony, I believe is that there

15    are factual scenarios related to my hypothetical in

16    which you would believe that the use of a taser was a

17    legitimate use of force.

18         A    Your -- your-- .

19         Q    For example, if the Gatorade bottle was full

20    and it was thrown at full force at the officer's head,

21    and the officer felt threatened that might be an example

22    of a time where the use of a taser was appropriate?

23         A    But your hypothetical's gone for an officer to

24    have a criminal history of an individual who may have

25    just encountered, so I -- I can't answer that question.

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

Case 1:17-cv-01698-JPH-MJD   Document 125-56   Filed 08/13/18   Page 110 of 288 PageID #: 5548
Gwen Ingosoll Thomas crabtree menitas taken 04/24/18   2/1/18 1

108

1      Q    Okay.  But again, the criminal history part

2   isn't important.  The question is really pertaining to

3   the throwing of a Gatorade bottle at an officer.  Is

4   your testimony that there are certain circumstances in

5   which the act of throwing a Gatorade bottle at an

6   officer, the appropriate use of force may be the

7   deployment of a taser?

8      A    Yes.

9      Q    Okay.  You testified a minute ago that you --

10   whenever an officer feels threatened the use of a taser

11   is a legitimate use of force.  Is -- I just want to make

12   sure I'm clear on your testimony.  Is that your --

13      A    If the officer can document the use of it and

14   he felt threatened, yes.

15      Q    If the officer can document what?

16      A    He's going -- the individual's going to have

17   to explain the use.  All right.  And so if it's in a

18   situation into a use of force where an officer is in

19   threats, then, yes.  It's a proper use.

20      Q    Okay.  I guess my question is: Is the -- is it

21   whether an officer feels threatened or is there some

22   sort of objective determination after the fact and

23   whether or not there was a threat that determines

24   whether it was a legitimate use of force?  So to put it

25   another way, if an officer documents that they felt

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1  threatened does that documentation in and of itself make

2  it a legitimate use of force, or do you make a

3  determination objectively as the chief whether or not

4  the officer should have felt threatened in that

5  situation?

6       MR. STEPHENSON:  Vince, I have to object to --

7     object to the form of the question.  It's a multiple

8     question.  It's a compound question.  You can answer

9     if you understand.

10 BY MR. FIELD:

11      Q    Okay.  Go ahead.

12      A    I don't understand.

13      Q    Okay.  When you review Use of Force Reports

14 that involve the use of a taser, are you reviewing to

15 determine whether or not -- as part of your determine --

16 well, strike that.  You've testified earlier that when

17 you review these Use of Force Reports you're looking to

18 see whether the use of force was justified, correct?

19      A    Correct.

20      Q    Okay.  Is one of the things that you look at

21 when you're determining whether or not the use of force

22 was justified, is one of the factors whether or not the

23 officer was in a situation where they should've felt

24 threatened?

25      A    I can't explain that.  It's -- the officer may

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1    feel threatened and they may not put that in the report.

2    You know, you've got threat and jeopardy are reasons to

3    use force.  All right.  So I -- you're asking me to say,

4    look at a report and say did that officer feel

5    threatened.  I can't answer that.

6        Q    Okay.  Well, how about if an officer puts in

7    the report that they felt threatened.  My question is:

8    The fact that they put in the report itself that they

9    felt threatened, is that enough for you in terms of

10   justifying the use of force, or do you look at the

11   situation as a whole and determine whether or not the

12   officer should have felt threatened?

13       A    In total, it would be looked at.  Just simply

14   saying he scared me and I tased him.  That would be

15   something different.  All right.

16       Q    Okay.  So you look at it as a whole to

17   determine whether or not the use of force was

18   appropriate?

19       A    Correct.

20       Q    Sorry that it took 25 questions to get there,

21   it was just bad questions to start off, but I appreciate

22   your patience.  Can you look at what is marked as

23   page D39?  This is a use of force -- let me ask: Is this

24   a Use of Force Report related to incident number

25   G14L05480?

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 1:17-cv-01698-JPH-MJD   Document 125-56   Filed 08/13/18   Page 113 of 288 PageID #: 5551
One Deposition of Chris Hurt taken 27 Apr 18
111

1      A      Not on 39.  On 42, it would be.

2      Q      Okay.  So the first 39 through 41 is the

3  initial report and then 42 is the beginning of the

4  supplemental Use of Force Report; is that correct?

5      A      Yes.

6      Q      Okay.  The narrative on page D41 indicates

7  that -- well -- sorry, let me ask you a question about

8  page D42.  The reporting officer is Officer Elliott,

9  correct?

10     A      Correct.

11     Q      And this also indicates that Officer Elliott

12  was the officer who deployed the taser, correct?

13     A      I think that this is a drive stun.  It is not

14  a deployment.

15     Q      It's a what?  Sorry.  Drive stun?

16     A      Drive stun.

17     Q      Okay.

18     A      In reading this.

19     Q      Okay.  But in any case, on page D42 under

20  reporting officer, it indicates officer deploying taser

21  was R. Elliott, correct?

22     A      Correct.

23     Q      Okay.  And the narrative on page D41 indicates

24  that Officer Elliott tased an individual who was kicking

25  her work computer; is that correct?

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1        A    That is correct.

2        Q    Okay.  And that she told this individual

3   several times to stop, and when the individual refused,

4   she administered her taser two times; is that correct?

5        A    I do not know.

6        Q    Well, the --

7        A    It appears she says in her narrative "I only

8   left the taser on for a quick second because of his

9   condition."  So it appears to me that she gave a drive

10  stun for a second.

11       Q    Okay.  Is this a Use of Force Report that you

12  recall reviewing?

13       A    No.  I don't recall this one but reviewing it

14  here now and I see it.

15       Q    Okay.  And is this one if you -- as you review

16  it here today is this one where you find the use of

17  force or the level of force used appropriate?

18       A    Yes.  As written, yes.

19       Q    Okay.  Can you look at the report starting at

20  D44?  This is for incident G14L06082, correct?

21       A    Yes.

22       Q    The supplemental narrative to this report

23  begins on page D47; is that correct?

24       A    On your numbering?

25       Q    Yes.

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

 1      A     Yes.

 2      Q     Okay.  This is an incident in which Officer

 3   Elliott pepper sprayed a driver; is that correct?

 4      A     Yeah.  That's what the report states, yes.

 5      Q     Okay.  Do you recall this incident as you sit

 6   here today?

 7      A     No.  I do not.

 8      Q     Okay.  If I indicated to you that -- so just

 9   to be clear, as you sit here today do you not recall

10   reviewing any reports in relation to this incident?

11      A     Not at this time, no.

12      Q     Okay.  Possible that you did but you don't

13   recall?

14      A     Exactly.

15      Q     Okay.  If I indicated to you that this was an

16   incident in which Officer Elliott pepper sprayed an

17   individual driver who she believed was intoxicated while

18   she was off duty and never identified herself as a

19   police officer, does that refresh your recollection as

20   to the incident?

21      A     I'm reading this for the first time.  This

22   section of it.

23      Q     Okay.

24      A     Or to my -- maybe not for the first time, but

25   just --

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 1:17-cv-01698-JPH-MJD   Document 125-56   Filed 08/13/18   Page 116 of 288 PageID #:
5554
One Deposition of Chris Chandler 1.17; taken on 4/13/18   2   Page 3
114

1       Q     Sure.  Understood.  You've had a chance to

2   review the report.  Is that something that you recall

3   reviewing?

4       A     Vaguely.  I vaguely remember the incident and

5   you see at the end of it that it was talked to Deputy

6   Chief Duval, and I believe he briefed me on it.

7       Q     Okay.

8       A     This use of force was completed not by

9   Officer Elliott.

10      Q     Okay.  But the narrative indicates that

11  Officer Elliott used her pepper spray on a driver that

12  she believed to be intoxicated and that she didn't

13  identify herself as a police officer, correct?

14      A     Correct.

15      Q     Okay.  On page D50, where it indicates -- the

16  line that indicates suspect impaired, it doesn't

17  indicate one way or the other whether the individual Mr.

18  Chandler was impaired; is that correct?

19      A     That's correct.

20      Q     And the report doesn't indicate whether any

21  kind of sobriety test was performed; is that correct?

22      A     That's correct.

23      Q     Okay.  Was Officer Elliott disciplined for

24  this use of force?

25      A     I do not recall.

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1        Q     Okay.  Oh, your testimony earlier though was

2   that you never disciplined an officer for the use of

3   force; is that correct?

4        A     That's correct.

5        Q     Okay.  So fair to say then it's unlikely that

6   Officer Elliott was --

7        A     That is fair to say.

8        Q     -- disciplined for this use of force, correct?

9        A     Correct.

10       Q     As you sit here today, do you believe that

11  Officer Elliott should've been disciplined for this use

12  of force?

13       A     No.

14       Q     Why do you say she shouldn't have been

15  disciplined?

16       A     In her statement and going by her statement

17  alone and not having interviewed her about this, she

18  states that the driver voluntarily pulled over and she

19  got out to approach to check on his welfare and that's

20  when she talks about his behavior becoming agitated and

21  about calling the police and then the key to me is that

22  "It was at this time he started coming out the window

23  facing toward the rear where I was and I was very

24  concerned he was going to try to harm me."  Those

25  verbiage right there to me tells me that by what she's

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

1    stating her use of force would've been justified.

2        Q    Okay.  Even if she's off duty and she hasn't

3    identified herself as an officer?

4        A    If a woman's standing on a country road, an

5    individual's agitated and is coming out into the truck

6    at her, I would say anyone is properly using force.

7        Q    Okay.  Is there's a policy within the

8    department that if you're going to affect, or attempt to

9    affect an arrest when you're off duty that you identify

10   yourself as a police officer?

11       A    Yes.  But this is not affecting an arrest.

12   She, in her statement, she says she's checking on the

13   welfare.

14       Q    Okay.

15       A    And the driver pulled over on her own.

16       Q    And so this is a -- the contact with this

17   individual was initiated by Officer Elliott, correct?

18       A    Yes.

19       Q    Okay.  As you sit here today, do you believe

20   that Officer Elliott should have identified herself as a

21   police officer?

22       A    I can't answer that.

23       Q    Okay.  Well, do you believe it was violation

24   of the Greenwood Police Department's policy for her not

25   to identify herself as a police officer?

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

 1          A     As she -- as she has put the words in this

 2   statement, no.  She's putting herself as a concerned

 3   person just checking on the individual who's driving.

 4          Q     Okay.

 5          A     All right.  You can turn that into if the

 6   person had been in need of medical assistance and she

 7   drove on by was she have been negligent in her duties?

 8   So I think this is -- this is a what if scenario.  She

 9   just -- according to her, he pulled over, she walked up

10   to check on him.

11          Q     Okay.  Well, if an officer of the Greenwood

12   Police Department is going to deploy one of their

13   service weapons while off duty, are they required by

14   department policy to identify themselves as a police

15   officer before they do so?

16          A     You're comparing use of lethal force as

17   nonlethal.

18          Q     Well, so let's use the use of nonlethal

19   weapons.  If they're going to deploy one of those

20   weapons whether it's a taser, a pepper spray, or a baton

21   while off duty, are they required by Greenwood Police

22   Department policy to identify themselves as a police

23   officer before they do so?

24          A     They are not required.  You're going into an

25   area where I don't understand your question because

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1    you're mixing a person on the side of the road who just

2    stopped to check on somebody to somebody taking a police

3    action.  All right.  So that's where I'm getting

4    confused with what you're saying here.

5         **Q    Okay.  So is it your testimony that the action**

6    **that Officer Elliott took in this incident was not a**

7    **police action?**

8         A    According to her statement, it was not.  It

9    was not intended to be as such.  She was concerned.  She

10   went to check on him.  So you're asking me to get into

11   the mind of an individual.  That's -- those are

12   questions you would have to ask her.

13        **Q    Okay.**

14        A    But what she has written down here, I find

15   that the use of pepper spray was justified if the man's

16   coming out of the truck at her.

17        **Q    Can you look at the page that's marked as D57?**

18   **This is a -- well, this along with page D58 is a Use of**

19   **Force Report incident number G15L09369, correct?**

20        A    Yes.

21        **Q    And it's from May 10, 2015?**

22        A    Yes.

23        **Q    And the reporting officer is Lieutenant**

24   **Blackwell, correct?**

25        A    Correct.

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1       Q     Okay.  And the officer who deployed their

2   taser in this instance was also Lieutenant Blackwell,

3   correct?

4       A     Yes.

5       Q     Okay.  Is this incident in which Officer

6   Blackwell deployed his taser one that you recall

7   reviewing the Use of Force Report at the time?

8       A     Yes.

9       Q     Okay.  And then it says, "Incident 1 in which

10  you believe the use of force by Lieutenant Blackwell was

11  justified"?

12      A     Yes.

13      Q     Okay.  What is the basis for believing the use

14  of force in this instance was justified?

15      A     Well, she -- he makes mention in the narrative

16  section clenched fist and she was advised she was under

17  arrest then she turned around and begun walking away. He

18  attempted to, with the left hand, and she pulled away

19  again at which time that's active -- she was actively

20  resisting so he was proper in using the taser.  He

21  actually displayed it.

22      Q     Okay.  And when he deployed his taser, the

23  individual who was tased, a Ms. Chastity Dawn Martin,

24  was backing up from him; is that correct?

25      A     No.  It said that she had turned around and

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1  began yelling and walking away.  Grabbed her left hand.

2  She went to pull away from me yelling something, pushed

3  his left hand off, right hand, and began backing up. All

4  right.

5       Q    And then after she began backing up he then

6  displayed his taser and ordered her to stop, correct?

7       A    Correct.

8       Q    She continued walking backwards as I verbally

9  warned her to stop or be tased, correct?

10      A    Correct.

11      Q    And then Officer Blackwell deployed his taser,

12 correct?

13      A    Yes.

14      Q    Okay.  And was officer -- in your estimation,

15 was Officer Blackwell under threat at the time that he

16 deployed his taser in this particular instance?

17      A    I can't testify to that.  He doesn't make

18 mention of it.

19      Q    Okay.  Well, does an individual who's been a

20 police officer in one form or another since 1988 would

21 you have deployed your taser in this instance?

22      A    I can't answer that.  You're calling for

23 speculation on my -- I wasn't there.

24      Q    Okay.  But in any case, Officer Blackwell

25 deployed his taser on a female subject that she was

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 1:17-cv-01698-JPH-MJD   Document 125-56   Filed 08/13/18   Page 123 of 288 PageID #:
5561
One Deposition of Dwight Mitchell taken 08/04/18, Volume 1
121

1  backing away from him by his own narrative of the event,

2  correct?

3       A    Correct.

4       Q    Okay.  And he wasn't in any way disciplined

5  for this deployment of his taser, correct?

6       A    No.

7       Q    Okay.  Officer Blackwell indicates in this

8  narrative that the individual he tased urinated herself.

9  Do you see that?

10      A    Yes.

11      Q    Okay.  Is that something that officers are

12  typically told to document in their report whether an

13  individual has urinated themselves or otherwise --

14      A    You would have to ask Lieutenant Blackwell why

15  he included that in.

16      Q    Okay.  Not something that they're required to

17  include?

18      A    No.

19      Q    Okay.  And is it any -- is it information that

20  in any way, in terms of your review of the use of force

21  allows you to determine whether appropriate force was

22  used?

23      A    The only thing that determines she had a full

24  bladder.

25      Q    Okay.  So not a factor you would've

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 1:17-cv-01698-JPH-MJD   Document 125-56   Filed 08/13/18   Page 124 of 288 PageID #:
5562
Video Deposition of Chris Dunn taken 04/05/18 · Vol. 2 · Page 3
122

```
 1   considered?

 2       A    No.

 3       Q    Okay.  Can you look at the page that's marked

 4   as D68?  So this is an incident from October 11, 2015,

 5   or well, I'm not sure, is it October 11th or

 6   December 12th?  There's -- well the incident date.

 7   Let's put it this way, the incident date -- let's put it

 8   this way, the incident doesn't really matter.  The

 9   incident date is listed as October 12, 2015.  And the

10   incident number is G15L2209, or 079, correct?

11       A    Correct.

12       Q    Okay.  And the name on this particular report

13   is Officer Blackwell, correct?

14       A    Correct.

15       Q    Okay.  The following page, page 69 is the Use

16   of Force Report that was created in relation to this

17   incident, correct?  Same incident number, G15L22079?

18       A    I think they're duplicate or something.  No.

19   There's two you said Okay.

20       Q    I'm looking at, sorry, the numbering that

21   we've placed on the pages D69.

22       A    Okay.

23       Q    That's a Use of Force Report related to the

24   same incident, correct?

25       A    Yes.
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1       Q    Okay.  And the reporting officer is Lieutenant
 2   Blackwell, correct?
 3       A    No.  That's where I was confused.  I think
 4   this is reported by Officer Weaver.  If you give me a
 5   minute to read because there's a second one with the
 6   same case number, I believe, yeah, where it looks like
 7   Officer Blackwell completed one, too, and that's on
 8   page 72 of your marking.
 9       Q    I have it in -- I have D69 as the reporting
10   officer being Brian Blackwell.  And then I have D72 as
11   the reporting officer being Officer Weaver.
12       A    I'm confused.
13       Q    Okay.  Are you looking at page --
14       A    No.  I'm looking at page 70 right now.
15       Q    All right.  So can you look at page 69?
16       A    I'm looking at 69.  I'm looking actually at 69
17   to 72 and comparison.  I'm trying to figure out --
18       Q    Okay.  Well, page 69 under reporting officer
19   it lists Brian Blackwell, correct?
20       A    Yes.
21       Q    Okay.  So if you could look at pages 69 and 70
22   together.
23       A    Okay.
24       Q    This is the Use of Force Report that was
25   created for this particular incident by Officer
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1  Blackwell, correct?

 2       A    To the best of my knowledge.  I'm confused on

 3  this one now.

 4       Q    Okay.  Well, and this is also an incident in

 5  which Officer Weaver created a Use of Force Report as

 6  well, correct?

 7       A    Correct.

 8       Q    Okay.  And this is an incident related to

 9  shoplifting, correct?

10       A    Yes.

11       Q    Okay.  Do you as you sit here today, do you

12  recall reviewing the Use of Force Reports for this

13  particular incident?

14       A    I remember the incident, actually reviewing --

15  yes and no.

16       Q    Okay.

17       A    I remember reviewing it and I remember the

18  incident.

19       Q    Okay.  And fair to say based on your earlier

20  testimony that neither Officer Blackwell nor

21  Officer Weaver were disciplined as -- for their use of

22  force in this incident, correct?

23       A    Correct.

24       Q    Okay.  Officer Weaver is the canine officer,

25  correct?
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

 1      A    Correct.

 2      Q    Okay.  And Officer Weaver released his canine

 3  on the shoplifter, correct?

 4      A    Correct.

 5      Q    Okay.  The report also indicates that

 6  Officer Blackwell tased this shoplifter, Rachel Mains;

 7  is that correct?

 8      A    Correct.

 9      Q    Okay.  In fact, the report indicates that he

10  tased her twice?

11      A    Yes.

12      Q    Okay.  Is there a policy in the Greenwood

13  Police Department about the deployment of tasers on

14  individuals who are engaged by canine officers?

15      A    Not at that time.

16      Q    Okay.  The 2017 policy indicate that tasers

17  should not be deployed on individuals engaged by canine

18  officers?

19      A    I would have to look at that policy, but I

20  remember there was a discussion about that.

21      Q    Okay.  Discussion about that in relation to

22  this incident?

23      A    That, I don't remember.

24      Q    Okay.

25      A    Understand, we had -- the canine program had

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1  gone through a revision and we have added new dogs and

2  new training from Vohne Liche Kennels and we had changed

3  a lot of things at that time when it came to the

4  canines.  All right.

5       **Q     Okay.**

6       A     So that's where I'm coming up with that

7  confusion.

8       **Q     Sure.  In any case, page D70 indicates that**

9  **four to five Greenwood Police Department cars responded**

10 **to this incident; is that correct?**

11      A     On page 70, where?

12      **Q     That would be the --**

13      A     Yes.

14      **Q     -- second full paragraph?**

15      A     Okay.  Yes.

16      **Q     It says, "All cars, four to five, had**

17 **emergency lights activated and were fully visible."**

18      A     Okay.

19      **Q     Is that the typical response for a shoplifting**

20 **call?**

21      A     Yes and no.  I hesitate on that because this

22 is something that we as administration has changed over

23 the time is you've got to understand that retail loss

24 prevention stores are encumbering us to make their

25 apprehensions.  They will not walk out of the store and

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1  stop anybody like they used to do.  So they have adopted

2  a practice that we have been going back and forth

3  specifically.  One, in particular, Walmart where they're

4  calling us before the theft is all the way committed

5  expecting us to have officers at the scene.  That's one

6  thing that we change is we're not running lights and

7  siren to these anymore, shoplifting.  Now, there's

8  instances that as the supervisor can change that

9  depending on it.  All right.  So there's a multitude of

10 things that went on that pertained to the shoplifting

11 and things like this.

12      **Q    Okay.  As you sit here today, based on the**

13 **changes in the policy, would you -- do you believe that**

14 **this is an appropriate response to the event as**

15 **described here?**

16      A    Of the cars or the tasing?

17      **Q    Let's start with the cars.**

18      A    I can't -- I don't know what the dispatch came

19 out as, all right.  So I can't -- I don't know why they

20 sent four cars on it.

21      **Q    Okay.**

22      A    Okay.

23      **Q    What about the deployment of the canine on the**

24 **shoplifting?**

25      A    If they're fleeing, yes.

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201



KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1      Q     Okay.  If the individual was fleeing, it's --

2      A     I don't -- I've got to read Officer Weaver's

3   report.

4      Q     Okay.  So -- I'm sorry.  I keep saying mister.

5   Officer Weaver's report is on pages 72 through 74.  So

6   did want -- like to take a minute to review it, go

7   ahead.

8      A     He says here that is that she was refusing to

9   stop.  So, yes, releasing the dog would be appropriate.

10     Q     Okay.  But it is an individual that the

11  officers have been informed was a shoplifter, correct?

12     A     Correct.

13     Q     So at the time that the canine, Odin, is

14  released on this individual, the only crime that she's

15  committed is shoplifting and then not obeying a

16  officer's order to stop; is that correct?

17     A     To the best of my knowledge and reading the

18  report, yes.

19     Q     Okay.  And that would be the same case for

20  when Officer Blackwell deploys his taser?

21     A     No.  Because at that point she's actively

22  resisting, and he makes note that at one time she

23  attempted to bite Officer Weaver.  So she's actively

24  resisting arrest when she was trying to be subdued and

25  she was trying to bite an officer.  So, yes, deployment

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

 1  of the taser is appropriate.

 2      Q    Okay.  And so neither Officer Blackwell for

 3  the deploying his taser twice nor Officer Weaver for

 4  deploying his canine were disciplined in this incident,

 5  correct?

 6      A    No.

 7      Q    And as you sit here today per the policies as

 8  they exist in the department today, do you believe that

 9  this was an appropriate use of force?

10      A    The use of force, yes.

11      Q    Okay.  And the response of four to five cars

12  no longer an appropriate response, assuming that the

13  call went across was just for a shoplifter?

14      A    Depending on the type of call.  If it's just a

15  shoplifting call but there's -- so, yes.

16      Q    Okay.  I guess the only point I'm getting at

17  is that your testimony earlier is that the policy in

18  terms of response -- the department responding to

19  shoplifting calls has changed; is that correct?

20      A    That is correct.

21      Q    Okay.  Is -- is it your testimony that any

22  time an individual who's instructed or ordered by a

23  police officer to stop, disobeys that order that they

24  would be appropriate to deploy a canine on them?

25      A    You've got to give me a better set of

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1  circumstances than that.
 2       Q    Okay.  Well, just so I'm clear, in the
 3  situation where the officer's attempting to stop a
 4  shoplifting -- shoplifter in progress, if the officer
 5  orders that individual to stop and they continue to walk
 6  away, would it be --
 7       A    That's actively resisting arrest, sir. Because
 8  they're -- the shoplifting has been reported, so the
 9  crime has been reported, right?
10       Q    Correct.
11       A    Okay.  So the police officer comes up.  The
12  police officer tells the suspect, the thief, to stop and
13  the thief doesn't stop, then that's resisting arrest,
14  right?
15       Q    Resisting arrest includes nonphysical
16  resisting?
17       A    Absolutely.
18       Q    Okay.  And so at any time an individual is
19  resisting an arrest even if it's nonphysical it's your
20  testimony that it is an appropriate use of force to
21  deploy a canine to prevent that individual from --
22       A    No.  I'm not going to answer that.  You're
23  calling for speculations on what ifs.  Each individual
24  police encounter is its own entity upon itself.  To put
25  a washboard to it's okay to do this, you --
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1      Q    I understand.  So maybe you can help me

2  understand where you're coming from because I would

3  think that from the typical civilian perspective it's an

4  excessive use of force to deploy a canine on a

5  shoplifter.  So I'm looking I guess for the sort of

6  factors that would go into consideration when

7  determining that using a canine on an individual who's

8  only been accused of shoplifting and who has not obeyed

9  the initial order to stop, is an appropriate use of

10  force.

11      A    That's going to be incumbent upon the officer

12  releasing the canine to explain his use of force in that

13  situation.  Again, I'm not going just to put a

14  washboard --

15      Q    Sure.

16      A    -- yes and no.

17      Q    Okay.  And in any case, Officer Weaver wrote a

18  report explaining his use of the canine in this

19  instance, correct?

20      A    Correct.

21      Q    And he wasn't disciplined for his --

22      A    No.

23      Q    -- decision to deploy the canine in this

24  instance, correct?

25      A    No.

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 1:17-cv-01698-JPH-MJD   Document 125-56   Filed 08/13/18   Page 134 of 288 PageID #:
5572
One Deposition of Chris Winchell, Taken on April 18, 2, 4.2, 8

132

1      Q    All right.  And at the bottom of page 73 on to

2    page 74 it indicates that some clothing with tags and a

3    brand new purse is what was found on the individual or

4    on the individual's vehicle when they were arrested; is

5    that correct?

6      A    Yes.

7         MR. FIELD:  Okay.  Do you guys need another

8     break?  Are we good to keep going?

9         MR. STEPHENSON:  I don't,  do you?

10         THE WITNESS:  I'm fine.

11         MR. FIELD:  All right.

12         THE WITNESS:  How much longer do you

13     anticipate?

14         MR. FIELD:  Unfortunately, quite a while to go.

15     So this -- I apologize.  Can we go off the record

16     for a second?

17                    (OFF THE RECORD)

18  BY MR. FIELD:

19      Q    Back on the record.  Are tasers in the

20    Greenwood Police Department assigned to a specific

21    officer?

22      A    Yes.

23      Q    So each officer -- so if a taser's assigned to

24    an officer, they would be the only officer to use that

25    particular taser; is that fair or typically speaking

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 1:17-cv-01698-JPH-MJD   Document 125-56   Filed 08/13/18   Page 135 of 288 PageID #:
5573
One Deposition of Chris Thorn taken on April 2, 2018
133

1   they would be the only officer to use that taser?

2       A    Correct.  Typically.

3       Q    There could be instances in which an officer

4   needs to use a different taser, for example, if the one

5   they're assigned isn't working or something like that;

6   is that --

7       A    There are many different reasons why, but yes.

8       Q    Okay.  But typically they are assigned a

9   specific taser and that's the one that they would use on

10  duty, correct?

11      A    Yes.

12      Q    Okay.  Do you know what a taser function or a

13  spark test is?

14      A    Yes.

15      Q    What is that?

16      A    It's when you test it to make sure it's fully

17  functioning.

18      Q    Okay.  And how often are officers required to

19  do that, or are they required to do it?

20      A    They are required to do it before the start of

21  each shift they use it.

22      Q    Okay.  Let me -- let's mark this as Exhibit 3.

23  Are you familiar with that document you have in front of

24  you?

25              (EXHIBIT 3 MARKED FOR IDENTIFICATION)

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1       A    It's a taser download, yes.

 2       Q    Okay.  And so you've seen reports like this

 3  before?

 4       A    Yes.

 5       Q    Okay.  And this is a taser download for an X26

 6  taser with the serial number X00730387, correct?

 7       A    Yes.

 8       Q    Okay.  The column that indicates the event

 9  type; do you see that?

10       A    Yes.

11       Q    It says, "Synch or trigger."  Those are two

12  event types that are listed?

13       A    Yes.

14       Q    Okay.  When you do a function or spark test,

15  do you know as you sit here today what the event type is

16  listed as?

17       A    No.

18       Q    Okay.

19       A    I would -- and this is my assumption under

20  this taser.  It's going to say trigger because in the

21  old tasers you would take the cartridge out and pull the

22  trigger and it would go.  All right.  So that's --

23       Q    When you -- sorry, when you indicate the old

24  tasers, do you mean the X26?

25       A    Yes.
```

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1        Q    Okay.  So your testimony is you're not certain
 2   but your belief is that for the X26, a function or spark
 3   test would register as a trigger in the event type,
 4   correct?
 5        A    Correct.
 6        Q    Okay.  Do you have any knowledge as you sit
 7   here today in terms of how these taser download reports
 8   are created?
 9        A    Absolutely not.
10        Q    Okay.  So this wouldn't be something that you
11   as chief would create; is that fair?
12        A    No.
13        Q    Okay.  Who in the department would be tasked
14   with creating this?
15        A    Sergeant Polslider.
16        Q    Okay.  On the X26, are you familiar with how
17   the X26 taser functions?
18        A    In layman's terms, yes.
19        Q    Okay.  So if you pull the trigger on an X26,
20   is the default for the electricity that's sent to the
21   individual that's being tased five seconds?
22        A    Correct.
23        Q    Okay.  But an officer can increase the length
24   of time by holding the trigger down; is that correct?
25        A    That is correct.
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

1      Q    Okay.  And they can also decrease the amount
2  of time by letting go of the trigger and I think there's
3  a safety that you would be flipping.  Is that how it
4  works?
5      A    No.  You can just let go of the trigger and
6  it'll stop.  Oh, you're right.  On the old one, it
7  depressed the safety, yes.
8      Q    Okay.  So to be able to -- to prevent it from
9  doing the default five seconds, you have to let go of
10  the trigger before five seconds and also hit the safety,
11  correct?
12      A    To the best of my knowledge.
13      Q    Okay.  If I represent to you that this X26
14  taser was the taser that was assigned to Officer
15  Blackwell at the time of the Todero incident, would you
16  have any reason to think otherwise?
17      A    No.
18      Q    Okay.  So if this -- assuming -- well, let me
19  ask you this: The event types listed in here begin in
20  October of 2013 and they run through the 31st of
21  May 2016, correct?
22      A    Correct.
23      Q    Okay.  And so assuming that this was the taser
24  that was assigned to Officer Blackwell for that entire
25  period of time, each of the trigger pulls on here

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1    would've been trigger pulls initiated by Officer

 2    Blackwell, correct?

 3        A    Correct.

 4        Q    And your testimony you said earlier you're not

 5    100 percent certain but it's quite possible that some of

 6    these trigger pulls are function tests or spark tests,

 7    correct?

 8        A    Yes.

 9        Q    Okay.  Do you have any knowledge as you sit

10    here today in terms of what the event type synch refers

11    to?

12        A    Absolutely not.

13        Q    Okay.  Is there a requirement for, in terms of

14    uploading the data from their tasers to the department's

15    computer system as a requirement for often they're

16    supposed to do that?

17        A    No.  I think that's done in in-service.

18    Usually, they will test them at that time.

19        Q    Okay.  And when you say "in-service," you mean

20    the annual mandatory in-service training?

21        A    Correct.

22        Q    Okay.  So the -- whether it's a policy or not,

23    the practice was to upload the data during the annual

24    in-service training; is that fair?

25        A    Yes.
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 1:17-cv-01698-JPH-MJD   Document 125-56   Filed 08/13/18   Page 140 of 288 PageID #:
5578
The Deposition of CHAD MICHAEL CORNETT, taken 08/24/18   2   Page 3
138

1      Q      Okay.  What about if a taser is deployed in

2    the line of duty?  Is there a requirement to upload the

3    data from the taser after the deployment?

4      A      No.

5      Q      When you're reviewing Use of Force Reports

6    that include the use of a taser, was it -- is it your

7    practice as chief to review the data from the taser

8    itself?

9      A      No.

10     Q      So if the officer indicates in their Use of

11   Force Report that they tased an individual using the

12   drive stun technique three times, would you -- so you

13   would be depending on the officer to accurately report

14   the number of times that they tased the individual

15   rather than looking at the log; is that fair?

16     A      Yes.

17     Q      Okay.  When the taser -- when the data on the

18   tasers are downloaded, is it the duty of anyone in the

19   department to review the data downloads?

20     A      Are you talking about this report?

21     Q      No.  Just generally speaking at the in-service

22   training when the taser data is uploaded to the system?

23     A      No.

24     Q      Okay.  In terms of an incident in which a

25   taser was deployed, in what circumstances would the data

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1   download from the taser be looked at?

2       A    There are no specifics on that.

3       Q    Okay.  So there's no -- there's no specific

4   requirement to review the data from the taser as part of

5   an investigation related to the deployment of a taser;

6   is that fair?

7       A    If there's an investigation, yes, but just a

8   general report of a use of force, no.

9       Q    Oh, okay.  So if you, for whatever reason,

10  decide that an investigation needs to be carried out

11  that relates to an officer deploying a taser, it would

12  be a requirement of the investigation to look at the

13  data download from the taser itself, the

14  investigator --

15      A    I don't -- I wouldn't say it's a requirement.

16  I would say it would be preferred to be done.

17      Q    Okay.

18      A    But there --

19      Q    Fair to say it would be something that you

20  would think is important for the investigator to look at

21  but there's no, for example, written requirement that

22  they do so.

23      A    That is correct.

24      Q    Okay.  And if you've got a report of

25  investigation related to the use of a taser in which you

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1  had directed an investigation should be carried out and

2  the data from the taser had not been looked at, is that

3  something that you would direct the investigator to do?

4      A    You're calling on a hypothetical again, but in

5  general terms, yes.

6      Q    Okay.  Have you ever had to direct an --

7      A    No.

8      Q    Just I'll just put the question on the record,

9  but I appreciate it.

10         MS. POLLACK:  He's just trying to save some

11     time.

12         MR. FIELD:  I know.  I got -- he's helping me

13     out.

14 BY MR. FIELD:

15     Q    So the question is: Have you ever had to

16 direct an officer or one of the individuals who reports

17 to you who's undertaking an investigation to review the

18 data from a taser download.  And your answer is no; is

19 that correct?

20     A    No.

21     Q    Okay.  Can you look at -- so I'll just put

22 this on the record that Exhibit 3, the Bates stamped

23 pages are Todero 4 through 7.  Can you look at what's

24 marked as Todero 7 which is the last page of that

25 document?

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1      A      Yes.

 2      Q      Okay.  Starting at line 190 running through

 3  lines 205, those are trigger pulls by Officer Blackwell

 4  on the 29th of May 2016, correct?

 5      A      Correct.

 6      Q      Okay.  And this -- these trigger pulls were in

 7  relation to the incident with Mr. Todero, correct?

 8      A      Correct.

 9      Q      Okay.  And the data log from Lieutenant

10  Blackwell's taser indicates that he pulled the trigger

11  during that incident a total of 16 times; is that

12  correct?

13      A      Correct.

14      Q      Okay.  And you have no reason to doubt that

15  that's the number of times that Lieutenant Blackwell

16  deployed his taser that day; is that correct?

17      A      No.

18      Q      Okay.  So there's -- it says 16 times.  Your

19  belief is that Officer Blackwell deployed his taser 16

20  times, correct?

21      A      Correct.

22      Q      Okay.  I meant to ask this earlier about the

23  X26 taser.  Does the X26 taser have a camera attachment?

24      A      No.

25      Q      Okay.  Do the ones the department, the X26
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1   tasers that the department had did not have cameras; is
 2   that correct?
 3        A    No.  Yes.  That is correct.
 4        Q    Right.  So the only camera -- I guess the
 5   question is the only cameras that officers wore while
 6   they were on duty were the body-worn cameras and we've
 7   already gone through that.  Sergeants and patrolmen
 8   would wear those?  Lieutenants and above were not
 9   required, correct?
10        A    Correct.
11        Q    Okay.  The column next to event type is
12   duration in seconds; do you see that?
13        A    Yes.
14        Q    And so that's the amount of time in which the
15   taser was deployed, correct?
16        A    Correct.
17        Q    Okay.  And so for each of the 16 times that
18   Officer Blackwell deployed his taser, it indicates how
19   long each deployment lasted; is that correct?
20        A    Correct.
21        Q    Okay.  And do you have any reason to believe
22   that the numbers as listed here for those deployments in
23   terms of duration, do you have any reason to believe
24   that they're incorrect?
25        A    No.
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1        Q    Okay.  So fair to say that in terms of the
 2   amount of time that was -- the duration of the
 3   deployments by Officer Blackwell, the numbers listed
 4   here, to your knowledge, are accurate; is that correct?
 5        A    Correct.
 6        Q    Okay.  There was -- we talked about this
 7   earlier but there was obviously an investigation into
 8   this particular incident, correct?
 9        A    Correct.
10        Q    And you're the one as chief at the time who
11   determined that an investigation should take place,
12   correct?
13        A    Correct.
14        Q    Do you recall when or how soon after the
15   incident you decided that an investigation should take
16   place?
17        A    It was when Charlie Todero's mother came to
18   the station to request a copy of the report is at such
19   time we learned that he'd expired in the hospital.
20        Q    So it was -- so you decided that an
21   investigation should be done.  Or when you made the
22   decision that an investigation should be conducted was
23   after Mr. Todero had passed away; is that correct?
24        A    Correct.
25        Q    Okay.
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1    A    For all we knew he was released and discharged

2  from the hospital.  We did not know.

3           MR. STEPHENSON:  Vince?

4           MR. FIELD:  Yes.

5           MR. STEPHENSON:  Could I speak with you outside

6     for a moment?

7           MR. FIELD:  Sure.  Can we go off the record?

8           MR. STEPHENSON:  You can come, too, if you

9     like.

10                    (OFF THE RECORD)

11    Q    All right.  Back on the record.  I asked you a

12  question a moment ago about when you made the decision

13  to -- that there should be an investigation of the

14  tasing of Mr. Todero, and you said that it was after you

15  had learned that Mr. Todero had passed away, correct?

16    A    Correct.

17    Q    Okay.  We stepped outside, and your counsel

18  reminded me that the investigation actually started

19  earlier than that.  And we'll go through the reports.  So

20  is it possible that you're misremembering when you made

21  the decision?

22    A    Very possible.

23    Q    Okay.  But fair to say that whenever the

24  investigation started, the decision that there should be

25  an investigation was yours as the chief; is that

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1   correct?

 2       A    That is correct.

 3       Q    Okay.  So there wouldn't have been an

 4   investigation into this incident unless you, as chief,

 5   decided that there should be one; is that correct?

 6       A    Correct.

 7       Q    Okay.  You gave the task of investigating the

 8   tasing of Mr. Todero to Deputy Chief Ison; is that

 9   correct?

10       A    That is correct.

11       Q    Okay.  Was there any reason in particular that

12   you decided that Deputy Chief Ison should be the one to

13   do the investigation?

14       A    Because he's the deputy chief over that

15   division.

16       Q    Okay.  And the division is the uniform

17   division?

18       A    Correct.

19       Q    Okay.  In terms of Deputy Chief Ison's

20   investigation, what was your role in the investigation

21   itself after you decided that an investigation should

22   take place?

23       A    Wait until he came back with the findings.

24       Q    Okay.  So between assigning Deputy Chief Ison

25   to investigate the incident to the period of time where
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1    he came back to you with his findings, did you have any

2    role to play in the investigation itself?

3          A    Not that I know of.

4          Q    Okay.  Did you instruct Deputy Chief Ison to

5    interview any particular witnesses?

6          A    No.

7          Q    Did you instruct Deputy Chief Ison that there

8    were certain witnesses that he did not need to

9    interview?

10         A    No.

11         Q    Did you have any role to play in deciding

12   which witnesses should be interviewed?

13         A    No.

14         Q    Okay.  During the investigation by Deputy

15   Chief Ison, did you review any of the evidence related

16   to the Todero incident on your own?

17         A    Yes.

18         Q    What did you review?

19         A    The body-worn camera video.

20         Q    Say that again, sorry.

21         A    The body-worn camera videos.

22         Q    Okay.  And so that was while the investigation

23   was ongoing, correct?

24         A    That is correct.

25         Q    And that would be the body-worn camera videos

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 1:17-cv-01698-JPH-MJD   Document 125-56   Filed 08/13/18   Page 149 of 288 PageID #:
5587
The Deposition of CHRISTOPHER LAUT, taken on April 27, 2018   147

1   of officers Eck and Elliott, correct?

2       A    Correct.

3       Q    Okay.  And again your testimony is that

4   officer -- sorry, Lieutenant Blackwell did not have a

5   body camera because he was not required to wear one as a

6   lieutenant and Officer Laut didn't have one because she

7   was in probationary status and the policy at the time

8   was not to have those officers wear cameras, correct?

9       A    Correct.

10      Q    Okay.  Did you review any other evidence

11  besides the body-worn camera videos during the period of

12  time that Deputy Chief Ison was conducting his

13  investigation?

14      A    The only thing I may, and I don't know the

15  timing of it without having deputy chief's book in front

16  of me is the autopsy, the preliminary.

17      Q    Okay.

18      A    And the -- that the field deputy coroner did

19  at the hospital.  I may have viewed that.  I'm not --

20      Q    The coroner reports?

21      A    The initial.

22      Q    Okay.

23      A    There's the initial and then there's the

24  actual findings.

25      Q    Okay.  So you're not sure, but while --

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 1:17-cv-01698-JPH-MJD   Document 125-56   Filed 08/13/18   Page 150 of 288 PageID #:
5588
Video Deposition of Chris Thurn taken 05/Apr/18   2, Page 3
148

1      A    I reviewed that at some point.

2      Q    Okay.  And you just don't recall as you sit

3   here today whether it was during the investigation or

4   sometime after?

5      A    Well, the coroner report was after but the

6   preliminary report from the deputy coroner, I did review

7   sometime.

8      Q    Okay.  Okay.  Anything else that you reviewed

9   that you can recall as you sit here today reviewing

10  during the investigation?

11     A    Not that I recall.

12     Q    Okay.  Did you conduct any witness interviews

13  yourself as part of the investigation?

14     A    No.

15     Q    Okay.  Did you create -- well, when you --

16  when you reviewed the videos, did you create any notes

17  or otherwise document your viewing of the videos?

18     A    No.

19     Q    Okay.  When you were -- when you reviewed the

20  videos, what were you -- what was the purpose of

21  reviewing them?

22     A    On Officer Eck's to see what was at the scene.

23  On Officer Elliott, I wanted to see what happened at the

24  hospital and heard the statement from the doctor saying

25  the tasing didn't do this.

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1        Q    You heard that while you watched it but
 2   that --
 3        A    Correct.
 4        Q    Was that -- that wasn't the reason why you
 5   were watching the video, correct?
 6        A    Correct.
 7        Q    Okay.  Officer Elliott's camera recorded at
 8   the scene as well, correct?
 9        A    I don't believe so.  I believe when it comes
10   on it's in the car pulling away, or she may have turned
11   it on at the -- yeah, I think she turned it on at the
12   scene, too.
13        Q    Okay.
14        A    I think she did for --
15        Q    So do you recall reviewing -- let's just
16   assume both Officer Eck and Officer Elliott recorded
17   some body-worn camera footage at the scene itself.  Do
18   you recall if -- let's say if that happened, would you
19   have reviewed both videos?
20        A    I did because Officer Eck reminded Officer
21   Elliott to turn hers on and then she flipped it on and
22   there was some at the scene, so yes.
23        Q    Okay.  And so that's something that you
24   reviewed at the -- during the investigation itself?
25        A    Yes.
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1       Q    And what were you looking for when you
 2  reviewed those videos?
 3       A    I was just looking.  Like I said specifically
 4  I wanted to see the hospital video.
 5       Q    Okay.  And why did you want to see the
 6  hospital video?
 7       A    Well, because as reported to me that he had
 8  coded and then they brought him back, and to watch that
 9  and then to see what took place in the hospital, what
10  the --
11       Q    Okay.  You mentioned a moment ago about Dr.
12  Hartman indicating that the injuries were not caused, or
13  his coding was not caused by the tasing.  Is that
14  something that you had learned previous to watching the
15  videos related to the -- what occurred at the hospital?
16       A    I don't recall exactly on that one.  It may --
17  I may have heard that.
18       Q    Okay.
19       A    But --
20       Q    Well, would you have -- had you not heard
21  that, would you have reviewed the video from the
22  hospital?
23       A    Probably.
24       Q    Okay.  Do you -- did you -- you've already
25  said you didn't document your review of the video, so
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1    did you come to any conclusions through your review of

2    the videos whether prior to getting Deputy Chief Ison's

3    report, did you come to any conclusions on whether or

4    not Lieutenant Blackwell's use of force was appropriate?

5         A    No.

6         Q    Any other evidence that you can recall

7    reviewing during the investigation itself?

8         A    Not that I recall.

9         Q    Okay.  Did you have any conversations with

10   Deputy Chief Ison in relation to his investigation while

11   the investigation was ongoing?

12        A    Probably but I don't recall specifics.

13        Q    Okay.  But and as you sit here today, you

14   don't recall directing him to take any specific actions

15   as part of his investigation?

16        A    Not that I recall.  I think I would remember

17   that, but he may have came in and said something after a

18   witness statement.  I don't remember.

19        Q    Okay.  In any case, your testimony from

20   earlier is that your practice was not to interfere in

21   the investigations and let the investigator carry out

22   their investigation?  Is that correct?

23        A    That is correct.

24        Q    Okay.  And, again, you don't recall

25   instructing Deputy Chief Ison to take any particular

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1    steps in relation to his investigation?

 2        A    Correct.

 3        Q    Okay.  Did you discuss -- during

 4    Deputy Chief Ison's investigation itself, did you

 5    discuss the incident with Lieutenant Blackwell?

 6        A    I don't believe so.  And I know that sounds

 7    vague, but he may have --  lieutenant may have came in

 8    and I let Brian know.  So he may have briefly said

 9    something to me.

10        Q    Okay.

11        A    But, no.  I did not sit there in depth and

12    discuss it with him.

13        Q    Okay.  Do you recall if he said something

14    briefly, do you recall what it was?

15        A    No.

16        Q    Okay.  If he -- if you had a conversation with

17    him in relation to the incident is that something as the

18    chief that you would've documented?

19        A    Depending upon what the conversation was.

20        Q    Okay.

21        A    All right.  So him coming in and making a

22    conversation, probably not, but if he came in and said

23    something that was significant to the investigation, I

24    would've.

25        Q    Okay.  If he came in and wanted to talk to you
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1   about the investigation and you ordered him off as you

 2   just indicated, is that something that you would've

 3   documented somewhere?

 4        A     No.

 5        Q     Okay.  I want to go back to Exhibit 2 and look

 6   at page, it's marked as page D82.

 7        A     Which one's Exhibit 2?

 8        Q     It's the one where we went through all the Use

 9   of Force Reports.

10        A     And we're on page 82?

11        Q     Yes.

12        A     All right.  Okay.

13        Q     So pages 82, 83, and 84 are the Use of Force

14   Report that was created by officer, or sorry.  I keep

15   making that mistake, Lieutenant Blackwell in relation to

16   the tasing of Mr. Todero; is that correct?

17        A     Yes.

18        Q     And it's incident number G16L11930, correct?

19        A     Correct.

20        Q     And the date at the top where it says

21   1:02 p.m., June 1, 2016, would that be the date that

22   officer -- Lieutenant Blackwell created the report?

23        A     Yes.

24        Q     Okay.  The date under incident, is that

25   supposed to be the date of the incident?
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1        A     Yes.

 2        Q     Okay.  So that's incorrect; is that right?  It

 3   should've been May 29, 2016?

 4        A     So you say.  I don't --

 5        Q     Well, the taser log indicates that it occurred

 6   on the 29th.

 7        A     Okay.

 8        Q     So let me put it this way: If it occurred on

 9   the 29th, this is an error on the part of --

10        A     That is correct.

11        Q     Okay.  The -- if you could just review the --

12   first of all, is this a Use of Force Report that you

13   recall reviewing at the time?

14        A     Yes.

15        Q     Okay.  And do you recall when you would have

16   reviewed this?

17        A     When available.

18        Q     Okay.  So do you believe as you sit here today

19   you would have reviewed it prior to Deputy Chief Ison

20   completing his investigation?

21        A     Yes.

22        Q     Okay.  And based on your earlier testimony, is

23   it fair to say that you would not have reviewed the data

24   from Lieutenant Blackwell's taser as part of your review

25   of this Use of Force Report; is that correct?
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 1:17-cv-01698-JPH-MJD   Document 125-56   Filed 08/13/18   Page 157 of 288 PageID #:
5595
One Deposition of Chris Blackwell taken 08/04/18   27 age 3
155

1      A     That is correct.

2      Q     Okay.  The -- and I'll give you a moment to

3   look at the narrative here.  So you can correct me if my

4   characterization is wrong, but by my account, officer,

5   or Lieutenant Blackwell indicates that he tased

6   Mr. Todero six times in his Use of Force Report.  Can

7   you review the report and let me know if that's

8   accurate?

9      A     Okay.

10     Q     Is that an accurate reflection of the number

11  of times he indicates he tased Mr. Todero?

12     A     Yes.

13     Q     Okay.  So that's incorrect; is that fair?

14     A     That is fair.

15     Q     Okay.  He's off by ten different applications

16  of the taser?

17     A     Correct.

18     Q     Okay.  When you reviewed this report, did you

19  determine at the time that appropriate use of force had

20  been used?

21     A     Yes.

22     Q     Okay.  And had that indicated that he had in

23  fact tased Mr. Todero 16 times, would your ultimate

24  conclusion have been different?

25          MS. POLLACK:  Well, I'm going to object to the

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1         -- when you say "tased," I think that's -- are you
 2         saying deployed the taser, pulled the trigger 16
 3         times or actually affected a tase on Mr. Todero 16
 4         times, because I think that's mischaracterizes the
 5         evidence in this case.
 6              MR. FIELD:  He pulled the trigger applying the
 7         taser 16 times, deploying the taser 16 times.
 8              MS. POLLACK:  He pulled the trigger 16 times,
 9         but I think there -- I think the evidence shows that
10         he was not tased 16 times, so I don't know which the
11         question is.
12              MR. FIELD:  Okay.
13              MS. POLLACK:  And I understand that you weren't
14         present in the depositions that testified about
15         that, but --
16              MR. FIELD:  Sure.
17              MS. POLLACK:  Yeah.
18    BY MR. FIELD:
19         Q    The trigger or the taser log from Officer
20    Blackwell that we reviewed earlier indicates that the
21    trigger had been pulled on Mr. Blackwell's taser 16
22    times; is that correct?
23         A    Correct.
24         Q    Okay.  It has an event type for that date
25    within a very specific time range of trigger 16
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1  different times, correct?

2       A    Correct.

3       Q    Okay.  And in his use of force report, Officer

4  Blackwell indicates that he deployed the taser -- his

5  word is another application or application of the taser

6  six times; is that correct?

7       A    Yes.

8       Q    Okay.  And an application of the taser, to

9  your knowledge, is that the same thing as pulling the

10  trigger on the taser?

11       A    Yes.

12       Q    Okay.  So had officer -- or Lieutenant

13  Blackwell indicated that he had tased Mr. Todero an

14  additional ten times to the ones that he's listed here,

15  would your determination of whether or not he used

16  appropriate force have differed?

17       A    It would've waited until the investigation was

18  complete because he states in here that he noticed that

19  there was a disconnect.  So until you know exactly how

20  many times there was actual tasing.

21       Q    Okay.

22       A    And I would not know that until the download

23  would've been done.

24       Q    So just so I'm clear, is there something about

25  the number of times had he indicated it was 16 times

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

1   that would've prompted you to wait for -- well,

2   actually, let me ask this: As you sit here today do you

3   recall whether or not you reviewed this Use of Force

4   Report prior to deciding that an investigation should

5   take place?

6       A    That I don't remember.

7       Q    Okay.  But your testimony is as you sit here

8   today assuming you reviewed this prior to -- well let me

9   as you this: If you reviewed this Use of Force Report

10  from Lieutenant Blackwell and you had not yet decided

11  whether an investigation needed to take place, would the

12  fact that had he documented that he had tased Mr. Todero

13  16 times in his Use of Force Report prompted you to

14  initiate an investigation?

15          MS. POLLACK:  I want to show continuing

16      objection to mischaracterizing the evidence that Mr.

17      Todero was tased 16 times.

18          MR. FIELD:  Sure.

19      A    Again, he makes comment of the disconnect of

20  the taser.  So not knowing the totality of the

21  circumstance, that's why it would be the same answer

22  that -- that would cause me to do a download review. But

23  again, he makes contact, he makes content in here, or

24  comment that he knows he's not making connect, full

25  connection.  So how many of those did he actually --

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 1:17-cv-01698-JPH-MJD  Document 125-56  Filed 08/13/18  Page 161 of 288 PageID #:
5599
The Deposition of CHRIS MURE, taken on 04/27/2018
159

```
 1   that's going to be the question that I would want

 2   answered.

 3   BY MR. FIELD:

 4        Q    Okay.

 5        A    All right.

 6        Q    Let's mark this as Exhibit 4.  This is marked

 7   as D1093 through 1098, and is this the final report on

 8   the Todero incident that was provided to you by

 9   Deputy Chief Ison?

10             (EXHIBIT 4 MARKED FOR IDENTIFICATION)

11        A    Yes.  It is.

12        Q    Okay.  And did you -- so when a final report

13   like this is given to you, as chief, are you to -- do

14   you decide whether to adopt or to -- the report, or not?

15   What is your -- what is your role?  Are you approving

16   the report one way or another?

17        A    No.  I'm going to read the report he provided

18   to me before I make any determination.

19        Q    Determination on what?

20        A    What -- what happened or what we're going to

21   do as a department.

22        Q    Okay.  And so did you -- when you received

23   this report from Deputy Chief Ison, did you adopt

24   Deputy Chief Ison's conclusions in terms of deciding

25   what to do next?
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1        A    Yes.

 2        Q    Okay.  So the information as provided here in

 3   relation to the Todero incident is the information that

 4   you adopted as accurate in terms of the incident with

 5   Mr. Todero and in terms of deciding what should be done

 6   next as a department; is that correct?

 7        A    That is correct.

 8        Q    So you adopted these findings as they're

 9   written here by officer -- or Deputy Chief Ison,

10   correct?

11        A    Correct.

12        Q    Okay.  Can you look at page D1097?

13        A    Okay.

14        Q    the second bullet point indicates that

15   Lieutenant Blackwell's taser log indicated that the

16   taser was activated 16 times in a three-minute and ten

17   second time span.  The total duration of time that the

18   taser was activated during this time span was one minute

19   and 38 seconds.  So you adopted that --

20        A    Yes.

21        Q    -- finding, correct?

22        A    Correct.

23        Q    Okay.  And then the report as indicated here

24   attached the Taser Usage Report, correct?

25        A    Correct.
```



Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1      Q    Okay.  And was that something similar or the

2  same as the document that we've been looking at as

3  Exhibit 3, that evidence synch report?

4      A    Yes.

5      Q    Okay.

6      Q    So would you agree with me then that the

7  report as prepared by Officer Blackwell on pages 83 and

8  84 of Exhibit 2 is inaccurate as it pertains to the

9  number of times the taser was deployed?

10     A    Yes.

11     Q    Okay.  Can you look at page D82 of that same

12  Exhibit 2 which is the first page of the -- of the Use

13  of Force Report related to the Todero incident, correct?

14     A    Correct.

15     Q    Okay.  Down at the bottom of the page, it

16  indicates was the drive stun technique used?  The answer

17  is no; do you see that?

18     A    Yes.

19     Q    So that's inaccurate as well; is that fair?

20     A    Yes.

21     Q    Okay.  Because the drive stun technique was

22  used by Officer Blackwell, correct?

23     A    Yes.

24     Q    Okay.  Would you agree with me that it's

25  important to fill out Use of Force Reports accurately?

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1      A     Yes.

2      Q     Okay.  And would you agree with me that this

3    Use of Force Report is not completed accurately?

4      A     Well, there were some errors.

5      Q     Okay.  Well, would you agree with me that the

6    errors that are contained in this Use of Force Report

7    are important errors?

8      A     Yes.

9      Q     So the number of times that a taser is

10    deployed is an important fact in a Use of Force Report,

11    correct?

12      A     Yes.

13      Q     And whether or not a drive stun was used as

14    part of the use of force is an important fact in the Use

15    of Force Report, correct?

16      A     Correct.

17      Q     Okay.  Was officer or Lieutenant Blackwell

18    disciplined in any way for his errors in his Use of

19    Force Report?

20      A     No.

21      Q     As you sit here today, do you believe that

22    Officer Blackwell should've been disciplined for these

23    errors in this Use of Force Report?

24      A     No.

25      Q     Is there a requirement in the department to

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201



KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

 1  fill out Use of Force Reports accurately?

 2      A    Yes.

 3      Q    So it is fair to say that officer or

 4  Lieutenant Blackwell could've been disciplined for his

 5  failure to fill out this Use of Force Report accurately?

 6      A    Yes.

 7      Q    Okay.  And your decision as chief was not to

 8  discipline him, correct?

 9      A    Correct.

10      Q    Okay.  Other than instructing Deputy Chief

11  Ison to undertake an investigation of the Todero

12  incident, did you instruct anyone else in the department

13  to review any evidence related to the case?

14      A    Not to the best of my knowledge.  The only

15  thing I may have done was partition off the case, had

16  that done, and then move the evidence -- may have moved

17  the evidence of body-worn cameras into his area or to

18  another area so they couldn't be viewed by others.

19      Q    Okay.  And when you say "partition off the

20  case," what do you mean?

21      A    So every officer can't read the reports.

22      Q    And what is the purpose of doing that?

23      A    Quite often when you -- in this -- and I'm

24  talking this was later on.  It would've been if you have

25  something that hits the media, we want to control what

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1   is released and not somebody reviewing the report,

2   because you've got to understand because we have a

3   county-wide reporting system a reserve officer at a two-

4   man department would be able to read our reports until

5   we partition them off.  All right.  So that's why.

6      Q    Okay.  So it was -- so that the information

7   related to the investigation including the reports,

8   body-worn camera video, that kind of thing could only be

9   reviewed by those individuals involved in the

10  investigation; is that fair?

11     A    No.  Once the case is partitioned, and I don't

12  know if we did it, but we may have --

13     Q    Okay.

14     A    -- then you have to know the password to

15  review the case.  The body-worn camera video, we will

16  transfer over to, like, the Assistant Chief Fillenwarth

17  so that way the other officer -- anybody can review the

18  body-worn camera video and you partition it to a certain

19  area.

20     Q    Okay.  And as you sit here today, you don't

21  recall whether or not that was partitioned off?

22     A    No.  I do not.

23     Q    Okay.  But your testimony is if you'd had

24  instructed anyone else to do any --

25     A    That's what would've been done.

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 1:17-cv-01698-JPH-MJD   Document 125-56   Filed 08/13/18   Page 167 of 288 PageID #:
5605
One Deposition of Chris Mann - taken 04/12/18   2   Page 3
165

1      Q    Okay.  And that was with -- you said with
2  Assistant Chief Fillenwarth?
3      A    And the Deputy Chief Doug Roller over
4  investigations, he can partition the cases.
5      Q    Okay.  Once you received the final report from
6  Deputy Chief Ison, did you review any evidence related
7  to the case at that point?
8      A    I read the witness statements.  I went through
9  those.
10     Q    Okay.
11     A    With the exception, I don't know if Ian got --
12  yeah.  I did.
13     Q    You were saying with the exception of.
14     A    I can't remember if Ian Godfrey was in yet, or
15  not, but it was.
16     Q    Okay.
17     A    I know that's the last one he had to do, I
18  think, and that's just me trying to remember.
19     Q    When you say "had to do," what do you mean by
20  that?
21     A    Of all the interviews he conducted.
22     Q    That was the last one that he did?
23     A    I think so.
24     Q    Okay.  Besides reading the witness statements,
25  what other evidence, if any, did you review once you

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1    received Deputy Chief Ison's report?

2         A    I read the Trooper Cunningham's report that

3    was included in it.  And, again, I don't think the

4    coroner's report was included in until after the July

5    date and the finding -- when their report was officially

6    done.

7         Q    Okay.

8         A    So it would have been the report after it .

9         Q    Okay.  Anything else?

10        A    Not that I recall.

11        Q    It was indicated in Deputy Chief Ison's report

12   that the taser download log was included.  Do you recall

13   whether you reviewed that?

14        A    Yes.

15        Q    Okay.  Did you review any of the video again

16   that you had reviewed previously while the investigation

17   was ongoing?

18        A    I may have.  I don't recall.

19        Q    Okay.  In your review of the evidence, was

20   there anything in that review that led you to question

21   any of the findings by Deputy Chief Ison?

22        A    No.

23        Q    Okay.  And you've already testified that you

24   adopted those findings as accurate, correct?

25        A    Correct.

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 1:17-cv-01698-JPH-MJD   Document 125-56   Filed 08/13/18   Page 169 of 288 PageID #:
5607
One Deposition of CPD Chief Steve Conrad taken 04/25/18   Page 3
167

1      Q    Okay.  Do you have any knowledge as you sit

2  here today in terms of why Deputy Chief Ison decided to

3  interview certain witnesses and not others?

4      A    No.

5      Q    Okay.  Is it fair to say that the only

6  individual would know why Deputy Chief Ison interviewed

7  certain witnesses and not others would be Deputy Chief

8  Ison?

9      A    Correct.

10      Q    Okay.  You didn't require him to interview

11  anyone in particular; is that fair?

12      A    No.

13      Q    Okay.  As part of this investigation, I asked

14  you some questions earlier about whether officers are

15  required to document in writing their interviews of

16  witnesses and the answer was: They're not required to do

17  so.  And what about as part of an investigation?  If

18  Deputy Chief Ison spoke with a witness, would he have

19  been required to document that he spoke to that witness?

20      A    Document defined as?

21      Q    Indicate somewhere in either the preliminary

22  report or his final report or his notes that he had

23  spoken to that individual?

24      A    He did in his findings to me.  That's who he

25  spoke to.

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1      Q      Okay.  I'll get to my question and it's

2   slightly different.  If there was an individual that he

3   spoke to, for example, who he decided he didn't need to

4   rely on their testimony for his report, would he still

5   have to document the fact that he spoke to that

6   individual somewhere as part of the investigation?

7      A      No.

8      Q      Okay.  So if there are witnesses to the event

9   that are not -- their statements are not included in the

10  Deputy Chief Ison's report, that doesn't necessarily

11  mean that the deputy chief didn't speak to those

12  individuals, it just means that he didn't get

13  information from them that he thought was relevant; is

14  that fair?

15     A      You're going to have to talk to Deputy Chief

16  Ison about that.

17     Q      Okay.  Were there any witnesses to the

18  incident that you believe should have been interviewed

19  that Deputy Chief Ison did not interview?

20     A      Not that I know of.

21     Q      Okay.  If I told you that there were three

22  firefighters on the ambulance that took Mr. Todero to

23  the hospital from the scene, Mr. Godfrey, Mr. Pitts, and

24  Mr. Mitchell, and only Mr. Godfrey was interviewed, as

25  chief would you have wanted Mr. Pitts and Mitchell to

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 1:17-cv-01698-JPH-MJD   Document 125-56   Filed 08/13/18   Page 171 of 288 PageID #: 5609
One Deposition of Chris Wrenn taken on April 18, 2017, Page 3

169

1  also be interviewed?

2       A    I can't answer that question.  I don't know --

3  I don't know -- do not know the determination line

4  Deputy Chief Ison elected not to.

5       Q    Okay.

6       A    It may have been the timing.  It may have been

7  an oversight, so I can't answer that question.

8       Q    Sure.  But how -- how about this question: If

9  you were conducting the investigation, would you -- do

10 you think it would've been important to interview all

11 three of those individuals?

12      A    Only if there was some type of conflicting

13 information that was coming out.

14      Q    Okay.  So if there was some sort of

15 conflicting information on, for example, what occurred

16 in the ambulance on the way from the scene to the

17 hospital then you might have thought it important to

18 interview all three of the individuals on the ambulance,

19 as a hypothetical?

20      A    I don't know what took place in the ambulance

21 so I --

22      Q    Well, I'm -- I understand that and I'm posing

23 a hypothetical question which is if there was a

24 difference in what information was being provided in

25 terms of what occurred on the ambulance, do you think it

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 1:17-cv-01698-JPH-MJD   Document 125-56   Filed 08/13/18   Page 172 of 288 PageID #:
5610
The Deposition of CRAIG SWINTON, taken on April 27, 2018
170

1   would have -- that in that situation it would be

2   important to interview all three individuals who were in

3   the ambulance with Mr. Todero?

4       A    That would be incumbent upon what the

5   difference is.  You know, is paramedic A saying

6   paramedic B is speeding or what type of aid was

7   rendered, then that's something that's -- I -- I don't

8   understand what you're asking me.

9       Q    Sure.  What if -- if there was difference in

10  testimony or information from witnesses in terms of how

11  Mr. Todero was behaving in the ambulance on the way to

12  the hospital, just assume that that's true.  Do you

13  think in that circumstance it would be important to get

14  a witness statement from all three of the individuals

15  who are on the ambulance with Mr. Todero?

16      A    I suppose.  You're asking me a hypothetical

17  question that is difficult to answer because you're

18  calling for speculation that took place something

19  outside the eyes of law enforcement.

20      Q    Sure.

21      A    All right.

22      Q    What I'm asking, though, is if there was some

23  question as to Mr. Todero's behavior on the ambulance

24  and you had three witnesses to that particular event, do

25  you think it's -- would be important to get the

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1  statements from all three witnesses in order to

 2  determine what happened on the ambulance?

 3       A    Again, I go back to why would I be concerned

 4  what was going on in the ambulance.  Once Mr. Todero

 5  left the scene, you know he was taken in the care of the

 6  ambulance and then he was delivered to the hospital and

 7  the officer was there then.  So what transpired in the

 8  ambulance may be interesting, but would it be pertinent

 9  to this investigation?  You can clearly see on the body-

10  worn camera video his resistance at the scene when

11  medics were there.  They had to tie his legs to put him

12  onto the gurney to keep him subdued.  So what transpired

13  in the ambulance I see, I don't understand how that has

14  to do with the detention, immediate detention that he

15  was placed under.

16       Q    So your testimony is that you can clearly see

17  Mr. Todero's resistance at the -- from the body-worn

18  camera videos at the scene; is that your --

19       A    I see resistance and I see the medics tying

20  his legs.

21       Q    Okay.  A second ago, you said you can clearly

22  see his resistance so I'm just trying to get what your

23  testimony is.

24       A    Well, that the individuals are holding another

25  person down and tying their legs, I call that resistance
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1   when they're trying to render aid.  And to go back to
 2   your original question, I just don't understand what his
 3   behavior in the ambulance had to do with our dealings
 4   with him.
 5        Q    Do you know as you sit here today whose
 6   decision it was to seek a report from Trooper
 7   Cunningham?
 8        A    I would -- no.  I'm going to assume Deputy
 9   Chief Ison on that.  I don't know.
10        Q    Okay.  It wasn't something that you
11   directed --
12        A    No.
13        Q    -- that Deputy Chief Ison do; is that correct?
14        A    No.
15        Q    Okay.  There was also a report created after
16   the fact by Shane Pitts who was from the fire
17   department.  Is that something that you instructed
18   Deputy Chief Ison to get?
19        A    No.
20        Q    Okay.  During the course of the investigation,
21   did you speak with Trooper Cunningham?
22        A    No.  To the best of my -- no.
23        Q    Do you recall whether you spoke with
24   Mr. Godfrey, Mr. Pitts, or Mitchell --
25        A    No.
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1      Q      -- during the course of the investigation?

2      A      No.  I did not.

3      Q      Okay.

4      A      Well, spoke with him about this incident.  I

5  don't think I've seen him.  As a matter of fact I

6  wouldn't recognize any of them.

7      Q      Okay.  You indicated earlier in the deposition

8  that as chief one of your responsibilities is public

9  relations; is that correct?

10     A      Yes.

11     Q      Does that involve dealing with the media?

12     A      Occasionally.  Very rarely.

13     Q      Okay.  A press conference was given related to

14  the Todero incident, correct?

15     A      Correct.

16     Q      And you gave that press conference, correct?

17     A      Yes.  I did.

18     Q      Okay.  Whose decision was it to do a press

19  conference?

20     A      That was mine.

21     Q      Okay.  And who determines what information

22  will be shared with the public at any given press

23  conference?

24     A      Well, that's -- at any given or this one in

25  particular?

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

174

```
 1        Q     Let's say this one in particular?

 2        A     It was mine.

 3        Q     Okay.  So the information that was provided to

 4   the public as part of that press conference that you

 5   gave was information that you decided to share with the

 6   public as the Chief of the Greenwood Police Department,

 7   correct?

 8        A     Correct.

 9        Q     Okay.  Was there an attempt by the Greenwood

10   Police Department to get any of the witnesses, civilian

11   witnesses to the Todero incident to appear at the press

12   conference?

13        A     No.

14        Q     If that occurred, is it fair to say that that

15   would not have been something that occurred at your

16   direction?

17        A     I do not understand your question.

18        Q     Did you ever instruct anyone in the Greenwood

19   Police Department to attempt to get civilian witnesses

20   who were at the scene to come to the press conference?

21        A     No.

22        Q     Did you ever contact any of the civilian

23   witnesses yourself to have them come to the press

24   conference?

25        A     No.
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1        Q    Okay.  You've indicated that you adopted the
 2   findings by Deputy Chief Ison.  If you had, for any
 3   reason, disagreed with any of his findings, could you
 4   have directed that Deputy Chief Ison change his report?
 5        A    I would not do that.
 6        Q    Would you document in any way your
 7   disagreement with Deputy Chief Ison's report?
 8        A    I would take different action if I disagreed
 9   with the findings.
10        Q    Okay.  And when you say "take different
11   action," you mean in terms of the discipline to the
12   officers; is that correct?
13        A    Correct.
14        Q    Okay.  And if you were to take different
15   action, is that something that you have to document the
16   reasons for doing so?
17        A    No.
18        Q    There's no requirement for -- so for example,
19   in this case, Deputy Chief Ison's recommendation was for
20   no discipline to the officers, correct?
21        A    Correct.
22        Q    If you had decided that Lieutenant Blackwell
23   should be disciplined, there's no requirement for you to
24   document the reasons for doing so?
25        A    Well, yes.  If I'm going to discipline him, I
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1   would have to -- or document why I'm disciplining him.

 2        Q    Okay.  So you would be providing

 3   information -- so what -- I guess what form do you fill

 4   out when you -- if you're going to decide to discipline

 5   him?  Is there a form to fill out?

 6        A    Disciplinary action forms.

 7        Q    Okay.  And so and there's a -- you would be

 8   providing information for -- in that form why you

 9   decided to --

10        A    Correct.

11        Q    -- provide a different discipline versus what

12   was recommended by Deputy Chief Ison, correct?

13        A    Correct.

14        Q    Okay.  But in this case, you agreed with the

15   recommendation of the deputy chief, correct?

16        A    I did.

17        Q    Okay.  And at the time that you agreed with

18   the recommendation of the deputy chief, you were aware

19   that Lieutenant Blackwell had deployed his taser against

20   Mr. Todero 16 times, correct?

21        A    I knew that he had activated his taser 16

22   times, correct.

23        Q    Okay.  If after reviewing the report by Deputy

24   Chief Ison you believed that there were additional

25   witnesses that should be interviewed, could you direct
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1    the deputy chief to interview those additional
 2    witnesses?
 3         A    Yes.
 4         Q    Okay.  That's not something you did in this
 5    case, correct?
 6         A    Correct.
 7         Q    Okay.  Similarly, if there was other evidence
 8    that you believed that Deputy Chief Ison should consider
 9    as part of his report, you could've instructed him to
10    look at that additional evidence; is that correct?
11         A    That is correct.
12         Q    Okay.  Again, that's not something that you
13    did in this case, correct?
14         A    Correct.
15         Q    Okay.
16              THE WITNESS:  Can we pause for a second?
17              MR. FIELD:  Sure.  Can we go off the record?
18                       (OFF THE RECORD)
19              MR. STEPHENSON:  The chief would like to amend
20         an answer concerning the -- well, go ahead.
21              THE WITNESS:  You have repeatedly asked me
22         about directing this and directing that.  It came to
23         recollection that I did direct Deputy Chief Roller
24         to go to the autopsy.
25              MR. FIELD:  That's during the investigation
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1        itself?

 2              THE WITNESS:  Yes.

 3              MR. FIELD:  Okay.

 4              THE WITNESS:  All right.

 5              MR. FIELD:  Okay.

 6              THE WITNESS:  And it just -- it just -- when I

 7        read this last line it just jogged my memory and I

 8        apologize for that, but yes, I did direct him to go

 9        up there.

10   BY MR. FIELD:

11        Q    And when you say "the last line," you're

12   referring to the final report by the deputy chief,

13   correct?

14        A    Yes.

15        Q    Okay.  And it's just the line in his autopsy

16   was performed on June 13th.  "Preliminary results

17   indicate Todero died of natural causes stemming from

18   liver disease."  That's what -- that's what jogged your

19   memory as to directing that particular officer to go to

20   the autopsy, correct?

21        A    Correct.

22        Q    Okay.  And outside of that direction, as you

23   sit here today, you do not recall instructing any other

24   officers or individuals that report to you to take any

25   action in relation to the investigation of the Todero
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 1:17-cv-01698-JPH-MJD   Document 125-56   Filed 08/13/18   Page 181 of 288 PageID #:
5619
The Deposition of CHIEF JOHN CONROY, taken on April 19, 2018    179

1    incident, correct?

2        A    It may have -- he may -- we may have had

3    discussion about taking Detective Cummings, who is one

4    of our most seasoned detectives in homicides and death

5    investigations to go.

6        Q    To the --

7        A    To the autopsy and that may have been a

8    conversation, it may not have --

9        Q    Okay.

10       A    -- Deputy Chief Roller may have just elected

11   to take her.  I don't remember.

12       Q    Okay.  But outside of that, for example, you

13   didn't direct deputy chief to interview anyone in

14   particular?

15       A    No.  I did not.

16       Q    Okay.  And you didn't direct him to look at

17   any particular evidence, correct?

18       A    No.  I did not.

19       Q    You just allowed the deputy chief to conduct

20   his investigation into the incident, correct?

21       A    Yes.  I did.

22       Q    Okay.  And outside of the things that you've

23   already testified to in terms of what you reviewed

24   during the investigation, there's nothing in addition to

25   that that you -- that you reviewed while the

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1  investigation was ongoing, correct?

2      A    Not that I know of, that is correct.

3      Q    As you sit here today?  Same answer for

4  anything that the evidence that you reviewed after you

5  received the report?  As you sit here today, outside of

6  what you've testified to, you don't recall reviewing any

7  other additional evidence?

8      A    Not that I remember.

9      Q    And after you received the report, you don't

10  recall instructing Deputy Chief Ison or anyone else to

11  take any other additional investigative steps in

12  relation to the Todero incident, correct?

13      A    Correct.

14      Q    Okay.  If you can go back to Exhibit 4 which

15  is the deputy chief's final report.  Well, let me

16  actually ask you this, I'm on page 1095.  At the top it

17  says "ref," and then it has the incident number G16L.  I

18  guess that's the investigation number, or is it the same

19  as the incident number?

20      A    It's the same as the incident number.

21      Q    Okay.  And it says, "Summary of facts"; do you

22  see that?

23      A    Yes.  I do.

24      Q    Okay.  So was there an additional portion to

25  the final report beyond the summary of facts outside of

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1   what it says was attached here which is the taser usage

 2   report?

 3        A    Well, the entire investigation is that you've

 4   been provided with all the witness statements --

 5        Q    Okay.

 6        A    -- and the case report.  The only thing that

 7   came in after that point was the actual autopsy report.

 8        Q    Okay.  So the summary of facts that we're

 9   looking at here was provided to you along with the rest

10   of the investigative file which is as you've testified

11   to, the witness statements and things of that nature; is

12   that correct?

13        A    Correct.

14        Q    Okay.  Deputy Chief Ison video recorded some

15   of his witness interviews, correct?

16        A    Yes.

17        Q    Okay.  Did you review those videos?

18        A    No.  I did not.

19        Q    Okay.  So in terms of witness statements, you

20   testified earlier that you reviewed some of the written

21   summaries of those statements, correct?

22        A    Correct.

23        Q    Okay.  And those are Deputy Chief Ison's

24   summaries of those statements, correct?

25        A    Correct.
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 1:17-cv-01698-JPH-MJD   Document 125-56   Filed 08/13/18   Page 184 of 288 PageID #:
5622
One deposition of Christian Ison, taken on April 18, 2018                    182

1      Q      Okay.  So you -- and you didn't review either

2  during the investigation itself or afterwards any of the

3  videos of the -- those witness interviews, correct?

4      A      Correct.

5      Q      So you depended on the deputy chief to

6  accurately describe what was said by those witnesses,

7  correct?

8      A      Correct.

9      Q      Okay.  So looking at page 1095 of Exhibit 4,

10 the summary of facts from Deputy Ison's final report.

11 The last sentence of the first bullet point reads "The

12 officers involved in this case were also placed at risk

13 of being struck by a vehicle while attempting to take

14 Todero into custody for a psychiatric evaluation."  Do

15 you see that?

16     A      That's 95?

17     Q      1095.

18     A      Okay.  Yes.

19     Q      That was a -- well, let me ask this.  Officer

20 Blackwell in responding to this incident parked his

21 vehicle in the lane of traffic, correct?

22     A      Yes.

23     Q      Okay.  And Officers Elliott and Laut arrived

24 on the scene after Mr. Todero was already on the ground,

25 correct?

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1        A     Yes.

 2        Q     Okay.  Would you agree with me that in the

 3   circumstance of an officer or Lieutenant Blackwell's car

 4   being parked in the lane and that there's the chance

 5   that the officers would be struck by a car coming in

 6   that same direction, is minimal?

 7        A     No.  Police cars get rear-ended all the time

 8   with lights activated.

 9        Q     Okay.  What about would -- well, let me ask

10   you this: Do you believe that there was any additional

11   risk to Lieutenant Blackwell versus Officers Elliott and

12   Laut based on the time that they arrived at the scene?

13        A     Additional risk to Lieutenant Blackwell?

14        Q     Yeah.  In terms of being struck by a vehicle?

15        A     Well, yes, because he was there by himself

16   with Mr. Todero who was trying to walk in and out of

17   traffic before the other officers came.  So he had

18   additional risk until the others came.

19        Q     When you say that he was trying to walk in and

20   out of traffic before the other officers came, what is

21   your basis for that information?

22        A     From the reports.

23        Q     Okay.  And when you say "the reports," what

24   are you referring to?

25        A     In total, the investigation, the case report.
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1      Q    Okay.  There's no video -- or have you

2  reviewed any video that shows Mr. Todero walking in and

3  out of traffic?

4      A    No.  I have not.

5      Q    Okay.  Would you agree with me that the fact

6  that Lieutenant Blackwell parked his car in the lane

7  provided him at least some protection from being struck

8  by traffic?

9      A    It afforded some.  Again, he has what we refer

10  to as a  car.  It doesn't even have a light bar.  It

11  just has minimal lighting.

12     Q    When you say "minimal lighting," what lighting

13  does it have?

14     A    It has to have a red and blue to the rear and

15  I think on that model and that year I think he had

16  lights on the back deck and then the taillights.

17     Q    Okay.  And --

18     A    So it --

19     Q    -- as you sit here today do you know whether

20  he deployed those lights as -- after he parked his car

21  in the lane?

22     A    I believe you see it on the video.  I believe

23  you see his front lights on.  If the front lights are

24  on, the back lights come on first.  So I -- that would

25  be an assumption on my part.  I believe so.

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1        Q    The second paragraph of this same page that
 2   describes -- well, it indicates Lieutenant Blackwell was
 3   on the scene without backup for three minutes and one
 4   second and then it talks about a delusional Mr. Todero
 5   claiming to be Jesus and walking in the roadway; do you
 6   see that?
 7        A    Yes.
 8        Q    Okay.  This information related to how
 9   Mr. Todero was acting comes from Officer Blackwell's
10   version of events, correct?
11        A    I believe it comes from that and statements
12   from individuals at the scene and also the body-worn
13   camera footage you can hear him saying that statement.
14        Q    Okay.  But there is, again, no video footage
15   of Mr. Todero walking in and out of traffic, correct?
16        A    Correct.
17        Q    Okay.  Can you look at page 1096?  First
18   bullet point it indicates Lieutenant Blackwell and Holly
19   Walters -- Holly Walters is a civilian witness on the
20   scene; is that correct?
21        A    Yes.
22        Q    Okay.  Both stated that Todero was given loud
23   verbal commands to lie on the ground and put his hands
24   behind his back and that he was given adequate time to
25   respond to these commands prior to each taser
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 1:17-cv-01698-JPH-MJD   Document 125-56   Filed 08/13/18   Page 188 of 288 PageID #:
5626
One Deposition of CRAIG ALLEN — taken 04/27/18
186

1   application; do you see that?

2       A    Yes.

3       Q    What is adequate time to respond?

4       A    That is -- that is up to an officer's

5   discretion on that.  I can't answer that question.  What

6   is adequate for me may not be adequate for a younger

7   officer; I don't know how to answer that question for

8   you.

9       Q    Okay.  But in terms of the -- this concept of

10  adequate time to respond, that's something that comes

11  from taser training; correct?

12      A    Correct.

13      Q    Okay.  And so officers are trained as part of

14  their taser training that they should give an individual

15  adequate time to respond before deploying their taser an

16  additional time, correct?

17      A    Correct.

18      Q    Okay.  And so this is a law enforcement

19  concept, correct?

20      A    I suppose, yes.

21      Q    Okay.  So what is the basis for Ms. Walters,

22  how would Ms. Walters a civilian know whether or not Mr.

23  Todero had been given adequate time to --

24      A    You'll have to ask Deputy Chief Ison that

25  question.

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1        Q    Okay.  Well; would you agree with me that it's

2   strange that a civilian with no -- we can -- we'll just

3   assume for the sake of argument, with no taser training,

4   and no law enforcement training would be asked whether

5   or not one of the officers of your department was

6   given -- giving Mr. Todero adequate time to respond?

7        A    You're going to have to ask Deputy Chief Ison.

8   That may have been something that Ms. Walters said on

9   her own; I don't know.

10       Q    Okay.

11       A    I think that you're -- we're talking about

12   verbiage of a statement maybe that's taken out of mis --

13   you're going to have to ask Ison why he put that in that

14   way.

15       Q    Okay.  Would you agree with me that it's

16   unlikely that a civilian like Ms. Walters would have any

17   knowledge on what adequate time to respond means in

18   terms of law enforcement practice?

19       A    I can't answer that question.  I can't agree

20   with you on that.

21       Q    Okay.  Also, how would Ms. Walters be aware of

22   whether or not Lieutenant Blackwell was actually

23   deploying his taser?  For example, if he was pulling the

24   trigger and not -- sort of dry stunning him.  How would

25   she be aware of whether he was giving adequate time to

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1    respond in terms of when he was actually deploying his

2    taser?

3         A    That -- you're going to have to ask Ms.

4    Walters.  You're asking me to formulate an opinion for

5    her.

6         Q    Well, so let me ask it to you this way: In

7    order for Ms. Walters to be able to indicate that

8    Lieutenant Blackwell was giving Mr. Todero adequate time

9    to respond before tasing him an additional time, she

10   would have to observe when -- Lieutenant Blackwell was

11   tasing Mr. Todero; is that fair?  In other words, she

12   couldn't speak to whether adequate time was given unless

13   she knew when Mr. Todero was actually getting tased by

14   Officer Blackwell; is that fair?

15        A    I'm still thinking it's subjective and I'm not

16   understanding your questioning to me about what this

17   lady had reported to seeing and not seeing.

18        Q    Well it's --

19        A    And so you're asking me to apply law

20   enforcement terminology to a civilian to, for all I

21   know, may have law enforcement experience in the past. I

22   don't know.

23        Q    Sure.  So let's just take it out of the

24   context of this incident and just, for an individual

25   whether they're law enforcement or not to be able to

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1  comment on whether or not an officer that they're

2  observing tasing an individual whether there was

3  adequate time given in between applications of the

4  taser, they would have to be able to observe when the

5  taser was being applied to the individual, correct?

6  Otherwise, you wouldn't know how much time had passed;

7  is that fair?

8      A    Okay.  I suppose.  I --

9          MR. FIELD:  Let's go off the record for just a

10     second.

11                    (OFF THE RECORD)

12  BY MR. FIELD:

13     Q    I'm going to introduce this as Exhibit 5.  So

14  Exhibit 5, Chief, are these notes that were taken as

15  part of the investigation by Deputy Chief Ison?

16          (EXHIBIT 5 MARKED FOR IDENTIFICATION)

17     A    So you're saying I've never reviewed these

18  before?

19     Q    You've never seen these before?

20     A    No.

21     Q    Okay.  If you could look at the first page

22  which I'd D5064.  The third -- so this is -- looks like

23  this particular section has a relation to statements

24  given by Ian Godfrey; do you see that?

25     A    Yes.

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1      Q     Okay.  So if these are indeed Deputy Chief

2   Ison's notes then they would've been notes he took in

3   relation to his interview of Mr. Godfrey; would you

4   agree with that?

5      A     Yes.

6      Q     Okay.  The third note indicates that Todero

7   was combative at the scene; do you see that?

8      A     Yes.

9      Q     That he was kicking, thrashing, and screaming

10  profanities; do you see that?

11     A     Yes.

12     Q     Okay.  In your review of the body-worn camera

13  videos, is there any portion of the video from the scene

14  itself that you would indicate Mr. Todero was acting

15  combative?

16     A     To the -- applying to the medics and all that

17  they put -- restrained his legs, but I did not see -- I

18  did not hear screaming profanities.

19     Q     Okay.  But your testimony is that when the

20  medics were restraining his legs, you believe Mr. Todero

21  was combative?

22     A     Why else would they restrain his legs, but

23  yes.

24     Q     If you can look at D1097 from Exhibit 4.  This

25  is, again, the final report from Deputy Chief Ison.  The

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 1:17-cv-01698-JPH-MJD  Document 125-56  Filed 08/13/18  Page 193 of 288 PageID #:
5631
Video Deposition of Charles Todero, taken on 4/2/18    191

1  second to last bullet point indicates "Upon the arrival

2  of the paramedics, Todero was still claiming to be Jesus

3  Christ.  The paramedics tied Todero's legs together with

4  a blanket to refrain him from kicking."  Do you see

5  that?

6       A    Yes.

7       Q    That doesn't indicate that he was combative,

8  correct?

9       A    Well, kicking while you're restrained in

10  handcuffs would be combative.

11       Q    Okay.

12       A    And he was in handcuffs at that time.

13       Q    So if -- so your testimony is that when they

14  tied his legs together at the scene, Mr. Todero was

15  being combative; is that correct?

16       A    From what I observed, yes.

17       Q    Okay.  And do you recall observing from your

18  view of the video whether or not he was kicking and

19  thrashing and screaming profanities?

20       A    I did not hear profanities.

21       Q    Did you see him kicking and thrashing?

22       A    I saw -- I saw them tying -- review -- I may

23  have seen him kicking.  I don't remember that.

24       Q    Okay.

25       A    I seem to believe that he was.

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1        Q    Okay.  I'm going to have you review the body-
 2   worn camera videos, and I want you to indicate for me at
 3   what point in either of those videos you believe Mr.
 4   Todero was either kicking and thrashing or being
 5   combative.  Do you have a preference on whether you
 6   review Officer Eck's or Officer Elliott's video?
 7        A    Officer Eck's.
 8        Q    Okay.  I'm going to have you review both, but
 9   we'll start with Officer Eck.  All right.  So this is
10   Officer Eck's body-worn camera video.  We'll use this as
11   Exhibit 6.  I'll allow you to either watch it in its
12   entirety or you can forward the video to the points at
13   which you believe --
14             (EXHIBIT 6 MARKED FOR IDENTIFICATION)
15        A    I'm not operating.
16        Q    Yeah.  I got you.  It's not a touch screen.
17   It's not that fancy.
18        A    Okay.  I got it now.
19        Q    All right.  There you go.
20                  (VIDEO PLAYED)
21        A    Okay.  I have fast forwarded it to two minutes
22   so he's traveling north on Madison Avenue now.  Okay.  I
23   have a question.  On this time at the bottom, is that
24   the time of the taser or this the time of your computer
25   on this video?
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1    Q    On the video, it's whatever time was on the --
2  so you're talking about just the playing time, correct?
3    A    Correct.
4    Q    Yeah.  So that's just on the video itself or
5  the playing time in the computer.  There may be a
6  timestamp within the video.  You can tell me whichever
7  you want to tell me in terms of the portions of it.
8    A    Okay.  So for this, I am using the time that
9  you have provided in this video.
10   Q    Okay.
11   A    All right.  I think I broke his computer.
12 Yeah.  The first thing I notice, and this has nothing to
13 do with use of force but Officer Blackwell, Lieutenant
14 Blackwell's car is facing south in the northbound lane,
15 so he's facing the wrong way.  But, again, it's a
16 minimal lights in the front.  They actually have less
17 lighting in the front.  They actually have less lighting
18 in the front than they do in the rear.
19   Q    Okay.
20   A    Okay.  So at two minutes and 48 seconds, I
21 observed Mr. Todero on the ground and I see two officers
22 restraining him, doing something with him.
23   Q    Okay.  But I'm asking --
24   A    Okay.  Now, I'm moving up.  It's actually
25 three at 2:49.  Now I see that it's three officers.  And

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 1:17-cv-01698-JPH-MJD   Document 125-56   Filed 08/13/18   Page 196 of 288 PageID #:
5634
One Deposition of Craig - Drawn - Kerry takem 04/Apr/18   2   Page 3
194

1  then at 2:15, they go out of view.

2      Q    Okay.

3      A    Okay.  2:58 I see two officers on Mr. Todero

4  so obviously there's some type of resistance going on.

5      Q    When you say "obviously there's some type of

6  resistance," why do you say that?

7      A    Because there's no other reason for them to be

8  doing this.

9      Q    Okay.  But do you see Mr. Todero actually

10  resisting is what I'm asking.

11     A    I have to continually play it if you -- you're

12  going to have to get a bigger viewer for me to

13  specifically to describe what type of resistance unless

14  I see something major here.  Because a lot can be going

15  on because these officer's view is obstructed.  I see

16  their backs and I see their hands on Mr. Todero.

17     Q    Okay.  So your testimony is that --

18     A    Something -- something's happening here that

19  these officers are doing something with him and

20  obviously they're not writing him a citation.

21     Q    Okay.

22     A    Okay.

23     Q    But just before you hit play again.  Your

24  testimony is that you -- without a better view of it

25  you're unable to tell whether or not Mr. Todero is -- or

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1    what he's actually doing if anything?

2         A    In the -- in the study of the use of force,

3    like in this situations, you have to have -- when you

4    get down to milliseconds, you have to have the

5    technology to be able to put it up and move it so slowly

6    because it happens so fast.  So I've advanced forward

7    here.  I don't know how far.  It's now 2:59 which could

8    be a tenth of a second.  Now I see Lieutenant Blackwell

9    kneeling on the leg of Mr. Todero and I see Officer

10   Elliott and Laut on his left side.  I can't say what he

11   is actually doing without knowing -- that's when these

12   officers are going to have to testify as to his amount

13   of resistance.

14        Q    Okay.

15        A    But I as a 30-year veteran can say, like I

16   said, they're not writing him a citation.

17        Q    Sure but it seems like you're also saying that

18   you can't without a better viewer and the ability to

19   advance it by milliseconds --

20        A    Well --

21        Q    -- you can't tell what Mr. Todero is doing for

22   sure?

23        A    I will keep going, but yes.

24        Q    Well, so why don't I ask it this way: Why

25   don't you -- based on what you've indicated to me in

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201



KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1  terms of the nature of the video, why don't you just
2  indicate to me the portions of the video in which you
3  believe Mr. Todero is doing something that you would
4  characterize, again, as a 30-year officer as kicking,
5  thrashing, or being combative?
6        A    Right.  I will go ahead and play it.  Okay.
7  Right at 3:05, you can see the officers struggling to
8  get handcuffs on.
9        Q    Okay.  So my -- I just want to make sure that
10 we're on the same page.  My question is: For you to
11 indicate to me when Mr. Todero is either kicking,
12 thrashing, or being combative.
13       A    Now, 3:16, the officers are coming off.
14       Q    Okay.
15       A    So at this point, they're standing up and
16 obviously they have restrained him.  At 10:30, you see
17 his legs come up in a kick which if they were standing
18 up, it would be classified as a mule kick coming back.
19 And it's after that is they're restraining his legs with
20 the blanket or towel, whatever it is.
21       Q    Okay.  Is he kicking or thrashing while
22 they're doing that?
23       A    They're holding his legs, so I don't know, I
24 can't testify to.
25       Q    Uh-huh.

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201



KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 1:17-cv-01698-JPH-MJD   Document 125-56   Filed 08/13/18   Page 199 of 288 PageID #:
5637
The Deposition of OFFICER MATTHEW RICE, taken on 04/25/18   197

1        A    There was another kick after he was restrained

2   at 12:01, maybe.  That's with being tied down.  He's got

3   both legs together now.  Because you can see them push

4   back down on his legs.  You can't --

5        Q    Okay.  Did you see him kicking or --

6        A    Yes.  And you still see him struggling on the

7   gurney trying to roll, but --

8        Q    What time is that at?

9        A    13:49 from right around that point.

10       Q    Okay.

11       A    His video's over.  The inherent flaws of body

12  worn camera videos is that's a two-dimensional capturing

13  of a three-dimensional event, let alone smell, sight,

14  sounds.  I can't say how strong he was when they were

15  holding him down.  That's up to them to define that.

16       Q    Okay.  But based on what you reviewed in

17  Officer Eck's video, you've already testified and given

18  some timestamps, would you characterize anything that

19  you saw in that video as him thrashing?

20       A    Towards the end, I believe so when he was on

21  the cot, when he was trying to -- I don't know if he was

22  trying to roll or I -- I can't explain that.

23       Q    Okay.  But previous to that point is there

24  anything in the video that you would describe as

25  thrashing?

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1        A    I can't testify to that.  I -- I don't know

 2   what your definition of thrashing is.  I don't know

 3   what -- whomever we're talking about stated--said he was

 4   thrashing.

 5        Q    Okay.

 6        A    All right.  I see resistance by Mr. Todero in

 7   that video.

 8        Q    Okay.  And that's based on the various

 9   timestamps that you've provided, correct?

10        A    Correct.

11        Q    Okay.  As an officer with 30 years of

12   experience, what would be your definition of an

13   individual being combative?

14        A    Well, if you've got somebody who you're trying

15   to ID on who are very dangerous to begin with,

16   especially in a situation like this when you don't know

17   what's going on, and you -- you hear the officers talk

18   about excessive strength of the individual so just

19   simply trying to hold them down can be combative or

20   resistance.

21        Q    Okay.

22        A    You know, I'm going to give you a case in

23   point.

24             MR. STEPHENSON:  Hey John.

25             THE WITNESS:  Yeah.
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1            MR. STEPHENSON:  Respond to questions.
 2            THE WITNESS:  Okay.
 3   BY MR. FIELD:
 4       Q    Do you -- should we review the video of
 5   Officer Elliott?  It's just this first one.  All right.
 6   Yeah.  Feel free to advance it and just looking for
 7   timestamps on the video where you believe Mr. Todero is
 8   either kicking, thrashing, or being combative and we'll
 9   make the Officer Elliott video as Exhibit 7.
10            (EXHIBIT 7 MARKED FOR IDENTIFICATION)
11                  (VIDEO PLAYED)
12       A    Okay.  At 5:25, you see him tensing up his
13   body, his upper body.
14   BY MR. FIELD:
15       Q    Anything that you would classify as kicking,
16   thrashing, or being combative?
17       A    He's tensing up which can be considered
18   combative at that point, but now you see him start to
19   move around, yeah.  Okay.  3:36, he just kicked his legs
20   out from a fetal position to straight out.
21       Q    You said three or five?
22       A    I'm sorry, 5:36.
23       Q    Okay.  Did he -- you're characterizing it as
24   kicking his legs out or moving them?
25       A    He kicked them out.  He was in a fetal
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

 1  position and he kicked them straight out.  Okay.  At
 2  5:48 approximate, you start to see the legs come up but
 3  Officer Elliott camera pans away.
 4       Q    For the last two, the one at 5:36 and 5:38,
 5  Mr. Todero is handcuffed, correct?
 6       A    Correct.
 7       Q    He's on the ground?
 8       A    Correct.
 9       Q    Okay.
10       A    Okay.  6:06 your timestamp is I can tell you
11  it's his right leg is coming up in our camera.  And then
12  followed by his left leg, he kicked over and actually
13  struck his own right leg.
14       Q    And you're -- in both of these, you are
15  characterizing as him kicking?
16       A    His legs are -- they're moving, yes.
17       Q    Okay.  But a leg can move and not be a kick,
18  do you agree with me on that?
19       A    Yes.
20       Q    Okay.  So are you classifying or
21  characterizing what he's doing at 6:06 and 6:07 as
22  kicking or moving his legs?
23       A    I would say the first one's a move, the second
24  one's a kick because he kicked his own calf.
25       Q    Okay.

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1        A    Okay.  6:21 you can see the legs move and now
 2   his left leg -- yeah, it's his left, is coming back up.
 3        Q    Okay.  But, again, is he kicking or is this --
 4        A    Well --
 5        Q    -- his legs moving?
 6        A    -- not watching it fluid because I have paused
 7   it to get the timestamp for you so I've got to watch.
 8        Q    Okay.  Well, I want to know when you believe
 9   he's actually kicking and not just when he's moving his
10   legs, because as you've said, someone can move their
11   legs without kicking.
12        A    Okay.  There's the -- that's a definite kick
13   at 6:24.  Okay.  Timestamp 8:44, 8:45.  One of the
14   medics has their hand on him on his shoulder.  As soon
15   as he takes it off you see him start to, I would say,
16   thrash back and forth.
17        Q    You would characterize it as thrashing?
18        A    Yes.  Okay.  He is out of view in the back of
19   the bus now.  Do you want to continue with this video
20   or --
21        Q    That's fine.  Based on what you saw there
22   outside of what you've already testified to, would you
23   characterize Mr. Todero's actions in the -- as observed
24   in the video from Officer Elliott's body-worn camera as
25   combative?
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

 1        A    Again, not knowing how he was pushing up,

 2   without having hands on him, I can't thank you to

 3   combative.  I can say that he's not being compliant but

 4   I don't know, you know, how many of them -- how many of

 5   those individuals are holding him down.  That's --

 6   that's the problem I have.  I see furtive movements by

 7   his legs.  And then I see on the cot, I see him like

 8   rocking or thrashing back and forth.

 9        Q    Okay.  Would you agree with me that furtive

10   movements is not the same thing as kicking?

11        A    Yes.  That's improper use of the word, I'm

12   sorry.

13        Q    Okay.  And someone can rock back and forth

14   without thrashing; would you agree with me on that?

15        A    Yes.

16        Q    Okay.  I asked you a few minutes ago about

17   your definition as a 30-year officer of the term

18   combative.  Would you classify or would you by your

19   definition of combative, is an individual who is being

20   combative being violent?

21        A    It could be.

22        Q    Okay.  There are circumstances in which an

23   individual can be combative and not be violent?

24        A    Absolutely.

25        Q    Okay.  Can you give me an example of someone

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 1:17-cv-01698-JPH-MJD  Document 125-56  Filed 08/13/18  Page 205 of 288 PageID #:
5643
The Deposition of CHAD ERIC TAYLOR, taken on April 18, 2018          203

1    being combative and not being violent?

2        A    Somebody that you have to -- who trying to

3    hold down and is trying to get up.  You're trying to

4    restrain and they're not trying to -- in this situation

5    right here, is case in point where you have an

6    individual you hear the officers repeatedly say how

7    strong he was just trying to hold him down.  That's

8    combative.

9        Q    Okay.  But not violent?

10       A    You mean you're going to speculation there.

11       Q    Well, let me ask you from what you've seen in

12   the body-worn camera videos from Officer Eck or Officer

13   Elliott, would you characterize any of mister -- would

14   you characterize Mr. Todero as being violent based --

15       A    No.

16       Q    -- on what you saw in these videos?  Okay.  In

17   the video from Officer Elliott, in fact, one of the

18   officers indicates that Mr. Todero has not been violent;

19   is that correct?

20       A    So you say.  I -- I didn't hear that, but I

21   recall but I just --

22       Q    Okay.  Do you recall hearing one of the

23   officers saying "He hasn't been violent.  We can sit him

24   up there and take his handcuffs off"?

25       A    Yes.

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201



KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

 1        Q     Okay.  And which officer said that?

 2        A     Officer Elliott.

 3        Q     Okay.  And would you agree with me that a

 4   police officer wouldn't remove the handcuffs from an

 5   individual that they believe was combative?

 6        A     I believe Officer Elliott was speaking out

 7   of -- that statement there is so incorrect.

 8        Q     Okay.

 9        A     What she said, I have no idea why she said

10   that.

11        Q     Well, was Officer Elliott in any way

12   disciplined as part of this incident?

13        A     No.

14        Q     Okay.  And Officer Elliott was on the scene

15   for a period of time without deploying her body-worn

16   camera, correct?

17        A     Correct.

18        Q     Okay.  And fair to say that per the agreeing

19   with police department policy she should have deployed

20   that camera when she got to the scene?

21        A     Should have but there's a clause written in

22   that we understand in excited situations, sometimes they

23   will forget.

24        Q     Okay.  Well, would you agree with me that her

25   failure to activate her camera is a violation of policy?

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1        A    Yes.

 2        Q    Okay.  And was Officer Elliott disciplined for

 3   her failure to activate her body camera?

 4        A    No.  This is in the for instance when the for

 5   instance where we acknowledge.

 6        Q    Well, would you agree with me going back to --

 7   going back to Exhibit 4, Deputy Chief Ison's final

 8   report, it indicates on page D1094, this is -- it looks

 9   like it's an e-mail from Deputy Chief Lott to yourself;

10   is that correct?

11        A    No.  It's to --

12        Q    It's a memo?

13        A    It's to me from Deputy Chief Ison.  It's

14   not -- this isn't an e-mail.

15        Q    Okay.  So it's part of a memo?

16        A    Correct.

17        Q    Okay.  And in this memo, Deputy Chief Ison

18   indicates that he found that Officers Blackwell,

19   Elliott, Laut, and Eck all performed their duties within

20   the scope of the law and in accordance with Greenwood

21   Police Department policies and procedures; do you see

22   that?

23        A    Yes.

24        Q    Okay.  Well, if Officer Elliott violated GPD

25   policy by not activating her body camera, would you
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1  agree with me that this statement from Deputy Chief Ison

2  is incorrect?

3        A     No.  I will not agree because in the body-worn

4  camera, we wrote that clause in, if it's a situation --

5  you know, in emergency-type situation or something, that

6  there are times we recognize the officer will not turn

7  it on and we didn't want to hold them accountable.  So

8  in this instant, I believe Officer Elliott had said that

9  when -- as soon as they pulled up, she jumped out to

10  help.  So she forgot to turn it on, yes.  But that is

11  written into there.  So the same type of situation is

12  that if an officer was involved in a situation where he

13  had to render aid to another officer in a shooting

14  situation, and he forgot to turn on his camera, it'd be

15  the same way.

16        Q     Are officers in the Greenwood Police

17  Department provided any training on the number of times

18  that they can safely tase an individual?

19        A     Yes.

20        Q     What is the training on how the number of

21  times that they can safely tase an individual?

22        A     The taser training says three, I believe.

23        Q     Okay.  It says 15 seconds, correct?

24        A     So you say.

25        Q     Okay.  Well, if -- let's assume for a second

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201



KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1    that you're correct and it says three deployments of the

2    taser.  The default deployment is a five-second

3    deployment, correct?

4         A    Correct.

5         Q    Okay.  So would you agree with me that if it

6    says three that it's actually indicating 15 seconds?

7         A    Yes.

8         Q    Okay.  All right.  All right.  I'm going to

9    introduce Exhibit 8 which was defendant's production

10   1099 through 1154.  Give that to you.  Let me ask you to

11   look at 1113.  These are -- and it runs through 1147.

12   Would you agree with me that these are slides that are

13   used in the training or certifications of officers in

14   the Greenwood Police Department for the use of tasers?

15              (EXHIBIT 8 MARKED FOR IDENTIFICATION)

16        A    Yes.

17        Q    Okay.  And would you agree with me that they

18   document starting at page 1148 are notes pertaining to

19   each individual slide for that taser training

20   presentation?

21        A    Yes.

22        Q    Okay.  If you'd look at 1150 which are the

23   notes for slide 14.  Do you see this, considerations to

24   avoid CEW excessive force liability?

25        A    Uh-huh.

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1      Q      Okay.

2      A      Yes.

3      Q      Under fully document, it says the second

4  bullet point is "Each use or application of force"; do

5  you see that?

6      A      Yes.

7      Q      Each CEW trigger pull or five-second

8  discharge; do you see that?

9      A      Yes.

10     Q      Okay.  Fair to say that officers in the

11  Greenwood Police Department are trained to do these

12  things in terms of their use of taser?

13     A      Yes.

14     Q      Okay.  And so would you agree with me, then,

15  that Officer Blackwell went against his training when he

16  failed to document each application of force or each CEW

17  trigger pull in his Use of Force Report?

18     A      Yes.

19     Q      Okay.  If you could look at 1151.  The notes

20  for slide 19, avoid extended durations; do you see that?

21     A      Yes.

22     Q      Do you see where it says, "Several law

23  enforcement groups have set out 15 seconds, multiple

24  applications, or continuous of CEW exposure as a

25  significant safety point"; do you see that?

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1      A    Yes.

2      Q    And it lists the law enforcement organizations

3 or groups that have indicated as such?

4      A    Yes.

5      Q    Okay.  Would you agree with me that officers

6 in the Greenwood Police Department are trained that the

7 safety point for the use of the taser is 15 seconds?

8      A    Yes.

9      Q    Okay.  And would you agree with me that

10 Officer Blackwell violated his training in terms of the

11 safety point for the use of taser on Mr. Todero?

12      A    If the definition -- accounting for the

13 disconnect and not knowing exactly how many were, so

14 yes, we train for the 15 seconds but in -- your going --

15 it's going to be incumbent on Lieutenant Blackwell to

16 explain the disconnect and when he was not getting the

17 full use of the taser.

18      Q    Okay.  Well, let's assume for the sake of

19 argument that each of the trigger pulls for the duration

20 listed on Lieutenant Blackwell's taser download are all

21 accurate meaning that he -- Mr. Todero was tased for the

22 number of seconds listed there for each of those 16

23 tas -- trigger pulls.  Would you agree with me in that

24 instance that Officer Blackwell violated his training as

25 it pertains to the safety point and use of taser?

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1      MR. STEPHENSON:  Hold on.  All right.  I object
2   to the question for two reasons.  One to the form.
3   Secondarily, the premise of the question is well the
4   taser download reflects so many seconds; therefore,
5   he's to presume that there was full application, I
6   guess, for each of those --
7      MR. FIELD:  Yeah.  That was
8      MR. STEPHENSON:  -- accountings okay which is
9   not -- is not the evidence.  But you're asking,
10   again it's a hypothetical.  If you understand the
11   question, Chief, you can answer it.
12      A    I don't understand what you're --
13 BY MR. FIELD:
14      Q    Okay.  Let's assume that the -- well, let me
15 ask you this: When we looked at Officer Blackwell, or
16 Lieutenant Blackwell's taser download report, your
17 testimony was that you had no reason to disagree that
18 the number of times that Officer Blackwell deployed his
19 taser was 16 times; do you recall that testimony?
20      A    Yes.
21      Q    Okay.  And you also testified that you had no
22 reason to believe as you sit here today that the number
23 of seconds indicated is the duration in which those
24 trigger pulls lasted was any different than what is
25 indicated on the report; do you recall that testimony?

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

Case 1:17-cv-01698-JPH-MJD   Document 125-56   Filed 08/13/18   Page 213 of 288 PageID #:
5651
One Deposition of Craig Allen, taken 04/24/18   211

```
 1        A     I recall that.
 2        Q     Okay.  So assuming that the taser was deployed
 3   for the number of seconds indicated in Officer
 4   Blackwell's taser report would you agree with me that
 5   deploying a taser for that period of time would violate
 6   Officer Blackwell's training as it pertains to safety
 7   point of the taser?
 8        A     No.
 9        Q     Why is that?
10        A     Again, I do not know how many times he was
11   getting the full effect of the taser.  If it was a
12   disconnect.
13        Q     I'm asking you to assume that he got the full
14   effect of the taser for each trigger pull.  Would you
15   agree with me in that circumstance that Officer
16   Blackwell violated his training as it pertains to safety
17   point of a taser?
18             MR. STEPHENSON:  Before you answer, did you
19        complete your answer, because I think you cut him
20        off.
21             THE WITNESS:  I cut him off or he cut me off?
22             MR. STEPHENSON:  No.  He cut you off.
23             THE WITNESS:  I'm lost at this point.  This
24        whole game.
25   BY MR. FIELD:
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1      Q     Okay.  I can repeat the question.  If you

2   assume that --

3      A     I'm not going to assume.

4      Q     Well, you have to answer hypothetical

5   questions and so I'm posing a hypothetical.  That

6   hypothetical asks you to assume that Officer Blackwell's

7   for each of the 16 trigger pulls the duration of those

8   applications were applied to Mr. Todero without fault

9   meaning there was no disconnect.  I'm asking you to

10  answer a question, if you assume that to be the case

11  would you agree with me that Officer Blackwell violated

12  his training as it pertains to the safety point of the

13  deployment of tasers?

14          MS. POLLACK:  And I'll object to the extent

15      that it mischaracterizes the evidence in this case.

16          MR. FIELD:  That's fine.  It's a hypothetical.

17     A     I can't answer your question.

18  BY MR. FIELD:

19     Q     Well, let me ask it to you this way: If mister

20  -- if Lieutenant Blackwell had tased Mr. Todero for 98

21  seconds, would you agree with me that tasing an

22  individual for 98 seconds violates the GPD department's

23  training as it pertains to the safety point of the -- of

24  taser applications.

25     A     And in the definition of tasing, you're

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1  talking about two-prong contact, no disconnect?

2      Q    Correct.

3      A    In that case, then barring any other

4  unforeseen situations where as if it's somebody is in

5  the excited delirium, yes.  But each individual use of

6  force is separate in upon itself.  So if a person can

7  say -- you're asking me basically if a policy we used to

8  have said -- state two shots and then evaluate before

9  you shot again.  That's gone.  So in this situation, you

10 can see the frustration what was going on.  So

11 hypothetically after 15 seconds, that is what we're

12 taught.  In the real world if after three 15 seconds

13 receiving the taser, if the person is still resisting,

14 then it's going to be incumbent upon the individual

15 officer to articulate why he went again and deployed the

16 taser again.

17     Q    Okay.  Just to be clear, the training is not

18 three separate 15 second applications, correct?  It's a

19 total of 15 seconds; is that correct?

20     A    It's training.  It's says 15 seconds, yes.

21     Q    A total of 15 seconds, correct?

22     A    Correct.

23     Q    Okay.  Are officers trained on what to do if

24 they have deployed their taser for 15 seconds and it

25 fails to get the individual to comply?  Are they trained

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201



KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1    on what they should do next?

2        A    No.

3        Q    Okay.  So it's left to the officer to decide

4    whether or not they should continue to deploy their

5    taser?

6        A    You can't train every use of force situation.

7    They're fluid.  They change.  They change dramatically.

8    Just as your course of questioning has changed in here.

9    Okay.  So every time an officer uses force, they have to

10   justify it.  Me simply placing a hand on an individual

11   and saying "come with me" is using force.  Or taking

12   someone down to the ground, or tasing.  And you can't

13   just say, especially with somebody who has either under

14   the effects of drugs or narcotics, or some type of

15   mental situation going on you can't say after 15 seconds

16   "you need to do something different."  You're putting

17   the officer's lives in jeopardy if you say "ultimately

18   this is it."  That's like saying you can shoot your gun

19   two times, two bullets.

20       Q    Okay.

21       A    So this is training, real world is different

22   than training.

23       Q    Okay.

24       A    We train to the best we can.

25       Q    And your testimony is that officers are not

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201



KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1  provided any training on what to do if they deploy their

2  taser for 15 seconds and it hasn't gotten the individual

3  to comply?

4      A    Do -- have we specifically sat down prior to

5  this event and said if this isn't doing this after

6  three, you need to come -- you need to do something

7  different.  Up to this time, no.

8      **Q    What about since this time?**

9      A    We have started talking about that.

10     **Q    Okay.**

11     A    All right.

12     **Q    So fair to say then that the incident with**

13  **Mr. Todero has led to a conversation in the department**

14  **in terms of the safety of tasing individuals and how**

15  **long you can tase an individual for; is that fair?**

16     A    No.  Use of force has been a topic of

17  conversation in executive level law enforcement since

18  Ferguson.  We discuss different things all the time.

19  Ongoing changes and that.  Different policies, different

20  agencies adopt different policies when it comes to use

21  of force.  So this is what taser recommended.  This is

22  what we trained with.

23          MR. STEPHENSON:  Say this, you mean this

24      policy?

25          THE WITNESS:  Yes.  I'm sorry.

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

BY MR. FIELD:

Q    Sure.

A    So what I'm saying is in the real world, you

can't hold an officer who's by himself on the side of

the roadway with a person claiming to be Jesus Christ to

say after 15 seconds I need to do something different.

**Q    I understand.  My question was slightly**

**different, though.  I'm not saying that you need to tell**

**the officer to do something specific, I'm asking if**

**there's training of any kind for what the officer should**

**do in the event that they've deployed their taser for 15**

**seconds and it hasn't got the individual to comply.  I**

**believe your testimony was that there's no specific**

**training on what to do?**

A    There's no specific training.  After this --

post after this event, the one thing we've talked about

is that you -- and it has a lot more to do with the new

tasers because the prongs are shorter and we're having

more and more disconnects.  So we're telling the officer

that you need to have a plan that if that taser is not

being effective.

**Q    Okay.**

A    So it's a -- it's not the Todero incident,

it's a culmination of the new tasers, this here, all

right.



Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Oral Deposition of Chief Pitman Taken on April 18, 2018                    217

```
 1        Q    When you say "this here," just so we're  on

 2   the -- it's the training materials?

 3        A    The training material.

 4        Q    Okay.  And is it fair to say that the incident

 5   with Mr. Todero also in part led to this conversation

 6   about?

 7        A    Sure.

 8        Q    Okay.  I meant to ask you this earlier and I

 9   forgot to.  Chief Fillenwarth, did he have any role in

10   the investigation beyond what you've already testified

11   to?

12        A    Not that I'm aware.

13        Q    Okay.  If you wouldn't have -- in his position

14   he wouldn't interrupt Deputy Chief Ison in terms of how

15   he should conduct his investigation; is that fair?

16        A    You need to ask him that question, not me.

17        Q    Well, does he have the authority to instruct

18   Deputy Chief Ison?

19        A    He is over Deputy Chief Ison, yes.

20        Q    Okay.  So if -- so your testimony is if Chief

21   Fillenwarth instructed Deputy Chief Ison in his

22   investigation, we'd have to ask Chief Fillenwarth about

23   that; is that correct?

24        A    Correct.

25        Q    Okay.  To your knowledge, he -- is it fair to
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1   say that Chief Fillenwarth did not instruct -- or you're

2   not aware of any instructions by Chief Fillenwarth to

3   Deputy Chief Ison in terms of his investigation; is that

4   fair?

5       A    Not that I'm aware of.

6       Q    Okay.  If you could look at Exhibit 5 which

7   again is the notes from Deputy Chief Ison in relation to

8   his investigation of the Todero incident.  I'll ask you

9   to look at page 5073.  This looks like notes from Deputy

10  Chief Ison related to his interview of Officer Renee

11  Elliott; is that correct?

12      A    I believe so, yes.

13      Q    Okay.  The seventh bullet down indicates that

14  "Todero was in the right lane with his arms under his

15  body.  She observed two prongs in his back," do you see

16  that?

17      A    Yes.

18      Q    So fair to say that according to Officer

19  Elliott when she arrived on the scene, there were two

20  prongs from Officer Blackwell's taser lodged in Mr.

21  Todero's back?

22      A    No.  Because if they had been lodged in his

23  back, we wouldn't have had the disconnect activity on

24  the taser.  It's fair to say that she could see two

25  prongs in his shirt but not in his back.

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201



KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1        Q    Okay.  You didn't review the video of Officer
 2   Elliott's interview; is that correct?
 3        A    No.
 4        Q    Okay.  So you don't know as you sit here today
 5   whether she said she observed them in his shirt or in
 6   his back --
 7        A    No.
 8        Q    -- is that fair?
 9        A    That is fair.
10        Q    Okay.  If you look at the next page, 5074,
11   actually strike that.  That's fine.  Next time earlier.
12   Could you actually just look at page 5086?  This is a
13   CEW event analysis and evidence of collection check
14   list; is that correct?
15        A    Okay.
16        Q    Is this something that you've seen before?
17        A    Absolutely not.  No.
18        Q    Okay.  And fair to say that you have no
19   knowledge as you sit here today as to who filled this
20   out; is that fair?
21        A    That's fair.
22        Q    Okay.  There's no signature on it in terms of
23   who filled it out; is that correct?
24        A    That is correct.
25        Q    It indicates that Lieutenant Blackwell was the
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

1    CEW operator but it doesn't indicate whether Lieutenant

2    Blackwell filled it out, or not; is that fair?

3        A    Was this included with Deputy Chief Ison's

4    notes?

5        Q    Okay.

6        A    I would assume that this is his work product

7    of the investigation.

8        Q    Okay.

9        A    By looking at the writing that's there and

10   some of this other.

11       Q    And you believe that as you sit here today

12   that --

13       A    I believe Deputy Chief Ison --

14       Q    -- Deputy Chief Ison filled it out?

15       A    Yes.

16       Q    Okay.  Would you agree with me then that on

17   page 5086 under that last category the CEW drive stun

18   without cartridges should've been checked off?

19       A    Sure.

20       Q    Well, this is a record of how the taser was

21   used, correct?

22       A    You're going to have to ask Deputy Chief Ison.

23   He completed this form, not I.

24       Q    Okay.  Exhibit 9, defendants 1 through 17, and

25   it's Greenwood Police Department Electronic

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

```
 1   Communications Report by conversation.  Is this a
 2   document that you're familiar with?
 3                (EXHIBIT 9 MARKED FOR IDENTIFICATION)
 4        A    This is the first time I've seen this one.
 5        Q    But is this type of document is something
 6   you're familiar with?
 7        A    Yes.
 8        Q    Okay.  And what is this document purport to
 9   record?
10        A    This is the instant message traffic in a
11   vehicle.
12        Q    Okay.  So these are instant messages that are
13   being sent using the Greenwood Police Department vehicle
14   computers?
15        A    Yes.
16        Q    Okay.  So it's not like a department issued
17   phone, it's an actual -- the computer in the vehicle; is
18   that correct?
19        A    Correct.
20        Q    Okay.  These are communications between
21   various officers on May 29, 2016; is that fair?
22        A    Yes.
23        Q    Okay.  And are you able to determine who those
24   officers are based on their -- based on these codes that
25   are here?
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1        A     Some of them.

 2        Q     Okay.  Is it fair to say that Officer G0BRIBL

 3   is officer -- Lieutenant Blackwell?

 4        A     I believe so.

 5        Q     Okay.  Have you seen this log of

 6   communications previous to today?

 7        A     No.  I have not.

 8        Q     Okay.  If you turn to what's marked as page

 9   D10.  Actually if you just look at D4 first?  I'm sorry.

10   The top of that page indicates that G0BRIBL is Officer

11   Blackwell; is that fair?

12        A     Yes.

13        Q     It's on a Post-It note?  Okay.  If you could

14   go to page D10 now.  That second message on D10 from 5-

15   29-2016, the date of the Todero incident from Officer

16   Blackwell, G0BRIBL.  Reads I capitals "OH, MY BACK, MY

17   BACK."  Do you see that?

18        A     Yes.

19        Q     Okay.  And the message just above that just

20   talks about extreme acid buildup from resisting.  Do you

21   see that?

22        A     Yes.

23        Q     Okay.  Could you look at page D9?  There's a

24   message at 1:20:53 from J9SHASE.  Do you know who

25   J9SHASE is?
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

 1      A    What line is that one?

 2      Q    It is the seventh line from the bottom.

 3      A    I have no idea who that is.

 4      Q    Okay.  Well, the message reads "Well that

 5  should teach him not to resist againmaybe," correct?

 6      A    Okay.

 7      Q    Is that correct?

 8      A    Yes.

 9      Q    Okay.  And then the message in response to

10  J9SHASE from Officer Blackwell is "He won't remember a

11  thing," do you see that?  It's two minutes later.

12      A    Yes.

13      Q    Okay.  The message right above that one says,

14  "Jimmy said hold off on the -- hold off on supplements."

15  Do you see that?

16      A    Yes.

17      Q    Okay.  Is Jimmy, to your knowledge, referring

18  to Deputy Chief Ison?

19      A    Yes.

20      Q    Okay.  And then the response to that one from

21  Officer Blackwell is "We will do them but he wants it

22  block so no one can go back in and change or add things

23  that were not involved"; do you see that?

24      A    Correct.

25      Q    Okay.  Is this referring to the partitioning

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1  off that you were talking about before?

2      A    Yes.

3      Q    Okay.  So did you instruct Deputy Chief Ison

4  to do this partitioning off on the day of the incident

5  itself?

6      A    No.  When Assistant Chief Fillenwarth took the

7  call from Deputy Chief Ison, I believe he told him at

8  that time to block it and then he came back and told me.

9      Q    So you believe that the decision was initially

10  made by Chief Fillenwarth?

11     A    I believe so.

12     Q    Okay.  Can you look at page D5?  Seventh

13  message from the bottom, again from Officer Blackwell,

14  G0BRIBL.  "I had to tase a guy a dozen times today for

15  trying to commit suicide by walking into traffic and he

16  ended up coding when he arrived at the hospital so the

17  chief wants a thorough report"; do you see that?

18     A    Yes.

19     Q    Okay.  Did you instruct officer or Lieutenant

20  Blackwell that you wanted a thorough report of his

21  tasing of Mr. Todero or is that one chief  under you?

22     A    That was an under chief.  I had no

23  conversation with Lieutenant Blackwell that day.

24     Q    Okay.  And the response to officers' text

25  message about tasing Mr. Todero, a dozen times is "LOL,

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

225

```
 1    nice"; do you see that --
 2         A    Yes.  I do.
 3         Q    -- line above that?  Okay.  Do you know who
 4    G0RONDE is?
 5         A    I believe I do but I'm not -- I would be
 6    guessing at it.
 7         Q    So to the best of your knowledge who is that?
 8         A    I know it's a Greenwood officer.
 9         Q    Okay.
10         A    All right.  But I don't --
11         Q    Okay.  And then a few lines above that,
12    Officer Blackwell to the same G0RONDE indicates "I am
13    still here.  I am up here still typing my novel"; do you
14    see that?
15         A    Yes.  I do.
16         Q    Okay.  And then if you could go to D1.  This
17    is a message from Officer Blackwell, Lieutenant
18    Blackwell again on 5-29-2016 to a number of officers
19    that indicates "He just met Jesus on Madison Avenue. How
20    closer do you want"; do you see that?  That's the third
21    line from the bottom?
22         A    Yes.
23         Q    Okay.  And that's in referral to the Todero
24    incident; to your knowledge?
25         A    You'll have to ask Lieutenant Blackwell but it
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1    looks that way.

2        Q    Okay.  Well, if I were to represent to you

3    that the communications that we've gone through in this

4    document were in relation to the Todero incident, how

5    would you as the chief of the department characterize

6    these communications between officers?

7        A    You know, the IM is a friend and a foe of law

8    enforcement.

9        Q    When you say "IM," you're just referencing --

10       A    Instant messages.

11       Q    Yes.

12       A    All right.  I know they exchange things back

13   and forth.  I don't see anything here that is of too

14   concerning.  Officers deal with stressful situations,

15   sometimes by inappropriate humor.  I acknowledge that

16   and I understand that.

17       Q    Okay.  So you would agree with me that "Oh, my

18   back, my back," if it was referring to the tasing of Mr.

19   Todero was inappropriate humor?

20       A    No.  I would refer to that to be in Lieutenant

21   Blackwell complaining of about his back which he does

22   repeatedly.

23       Q    So you don't think that this is in referral to

24   Mr. Todero being tased in the back?

25       A    I think that's in referral -- and I'm just

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1   speculating here but just because I know Lieutenant

2   Blackwell and he's had back issues and complains about

3   it all the time.  I think it would be in reference to

4   Todero to say his back, his back.

5        Q    Unless he was mimicking Mr. Todero, correct?

6        A    I can't answer that.  I've given you enough

7   speculation on that.

8        Q    Okay.  Well, is there any other indication in

9   the messages that you could see that would indicate that

10  Officer Blackwell is describing his own back?

11       A    No.

12       Q    But in any case, your testimony is if we want

13  to know one way or the other the intention behind that

14  comment we'd have to ask Officer Blackwell, Lieutenant

15  Blackwell; is that fair?

16       A    That is fair.

17       Q    Okay.  If the -- would you agree with me that

18  if this comment by Lieutenant Blackwell was in relation

19  to Mr. Todero's back that it would be inappropriate

20  humor?

21       A    I can't agree to that.

22       Q    Well, if it was in relation to Mr. Todero's

23  back and his back hurting from being tased, would you

24  agree that this was an improper use of a vehicle

25  computer to send such a message?

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 1:17-cv-01698-JPH-MJD   Document 125-56   Filed 08/13/18   Page 230 of 288 PageID #:
5668
The Deposition of CHAD MEANS, taken 04/April/18    228

1        A    I wouldn't say improper.  I would say

2   unprofessional.

3        Q    Okay.

4        A    But I'm not going to say it's improper.

5        Q    Okay.  And officers can be disciplined for

6   unprofessional behavior, correct?

7        A    Yes.

8        Q    Okay.  No officer was disciplined as a result

9   of the Todero incident, correct?

10       A    Correct.

11       Q    On D5 and you don't have to pull it out again.

12   This is -- I'm not even sure if this related.  It's more

13   a curiosity.  There's a message from the second one from

14   the top.  It says, "43, we are inside trunking."  What

15   does trunking mean?

16       A    It has to do with their radios.

17       Q    Okay.

18       A    And what they're doing because -- yeah.

19       Q    It has nothing to do with the Todero incident;

20   fair?

21       A    No.  No.  I don't have time to explain that to

22   you.

23       Q    But it has nothing to do with the use of the

24   taser; is that fair?

25       A    Nothing.

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1        Q    Okay.  So this -- this is Exhibit 10.  These

 2   are defendants 4401 through 4409.  Is this a document

 3   that you've seen before?

 4              (EXHIBIT 10 MARKED FOR IDENTIFICATION)

 5        A    Yes.

 6        Q    Okay.  And what is this document?

 7        A    It's an audit trail of disciplinary actions.

 8        Q    Okay.  And how is this document created; to

 9   your knowledge?

10        A    I believe that the administrative assistant

11   keeps that up.

12        Q    Okay.  And is it -- do you know what system is

13   used to maintain these records?

14        A    No.  I'm going to guess Excel, but...

15        Q    Okay.  Do you know what other information is

16   in -- so let me ask it this way, sorry: The information

17   included here is the name of the officer, the date of

18   the V which I'm guessing is violation?

19        A    Right.

20        Q    The action which is the discipline that was

21   provided to the officer, correct?

22        A    Correct.

23        Q    And then the description of the event or

24   whatever led to the discipline; is that correct?

25        A    Correct.
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1        Q    Okay.  Do cases like this that -- where
 2   there's discipline that's provided to the officer or do
 3   they get -- is there like a case number assigned to
 4   each?
 5        A    No.
 6        Q    Okay.  In terms of the action that's listed
 7   here.  Oh, sorry.  In terms of the description,
 8   descriptions that are listed, what would be the
 9   description listed for an officer who's used excessive
10   force?
11        A    Are you talking about post 2012?
12        Q    Yes.
13        A    Then it would be a violation of the Use of
14   Force Policy.
15        Q    Okay.  If you could look at page 4407?  For
16   example, line 409 and 411.  The description is violation
17   of body-worn camera general order.
18        A    Yes.
19        Q    Do you see that?  Would that include the
20   failure to turn on the body-worn camera when required?
21        A    Yes.
22        Q    Okay.
23        A    But let me interject on that.  The -- there
24   was also some discipline for people not even carrying
25   it.  We've -- that's new under the program.  So...
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 1:17-cv-01698-JPH-MJD   Document 125-56   Filed 08/13/18   Page 233 of 288 PageID #:
5671
One Deposition of _____ taken on April 27, 2018
231

 1       Q    Oh, yeah.  It's --

 2       A    Okay.  So just because it says body-worn

 3  camera, it doesn't mean it wasn't turned on.

 4       Q    Sure.

 5       A    It may mean that they didn't bring it with

 6  them or they hadn't used it in maybe a month.

 7       Q    Okay.

 8       A    Okay.

 9       Q    So let me, just so that the record is clear.

10  There is a written policy related to body-worn cameras,

11  correct?

12       A    Yes.  There is.

13       Q    So if it indicates here that there's a body --

14  a violation of the body-worn camera general order, it

15  could be any number of requirements of that order that

16  are violated.  It doesn't necessarily mean that they

17  failed to turn it on.

18       A    Correct.

19       Q    It could be some other violation.  It's just

20  indicating that it's a violation of that particular

21  general order, correct?

22       A    Correct.

23       Q    Okay.  If -- is there more detail provided

24  anywhere else, though.  For example, in the officer's

25  employment file where if we wanted to determine exactly

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1   what portion of that policy was violated it would be

 2   indicated.  So, for example, if they failed to turn it

 3   on?

 4        A    It should be.

 5        Q    Okay.  Outside any other documentation outside

 6   of the officer's employment file where that information

 7   would be found?

 8        A    No.

 9        Q    Okay.  Going back to -- yes, that is

10   Exhibit --

11        A    8.

12        Q    -- 8.  Yes.  Could you look at -- so looking

13   at page 1100, this is the use of force OC spray impact

14   weapons general order that was in effect in 2012,

15   correct?

16        A    Correct.

17        Q    So this is the updated policy; is that fair?

18        A    I don't believe this is the updated one.  The

19   updated one changed later on.

20        Q    Well, it says, "Last revision date was 3-7-

21        2012."

22        A    Okay.

23        Q    So would that indicate to you that it was --

24        A    It was in effect at the time.

25        Q    Okay.  If you could look at 1103 under letter
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1              F, which is required reports of the use of

 2    chemical agents.  It says under number 1 that "Officers

 3    assigned to the uniform division shall be required to

 4    carry at least two less than lethal weapons from the

 5    following list: taser, OC spray, expandable baton"; do

 6    you see that?

 7         A    Yes.

 8         Q    So is it fair to say then in 2012 that

 9    officers, or at least when this policy was in effect

10    officers were not required to carry a taser.  They were

11    required to carry two of those --

12         A    No.

13         Q    -- particular weapons?

14         A    That's -- that is confusing.  We were required

15    to carry the taser.

16         Q    Okay.  So your testimony is that officers were

17    required to carry a taser and then of those two other

18    weapons?

19         A    Yes.

20         Q    Okay.  Okay.  Can you look at 1107?  This is

21    the -- is this the taser policy that was in effect at

22    the date of the Todero incident?

23         A    Yes.

24         Q    Okay.  Do you see the above the bullet point

25    at the bottom of this first page 1107, a second sort of
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1   whole paragraph above it.  It says, "The taser is a

2   defensive weapon listed in the Use of Force Policy after

3   verbal and physical directions or commands and before

4   chemical agents"; do you see that?

5       A    Yes.

6       Q    Okay.  "The decision to use the taser depends

7   on the actions and the critical distance of the threat";

8   do you see that?

9       A    Yes.

10      Q    Okay.  Can you describe for me what physical

11  directions or commands are?

12      A    Verbal directions is telling somebody to go

13  that way.  Sometimes you'll put your hand on somebody

14  and say, "Please come with me."  All right.  So that

15  would be a physical direction.

16      Q    Okay.  And can a physical direction be

17  anything more physical than just putting your hand on

18  someone and saying, "Come with me"?  Could it be an

19  attempt to take an individual to the ground?

20      A    I'm not a defensive -- act -- action

21  instructor on that and this is the taser, but a takedown

22  is above, to me, a physical direction.

23      Q    Well, on the use of force sort of continuum,

24  does a takedown fall before or after the taser in terms

25  of the best option?

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

 1        A     If I remember if you're going hands on to take

 2   them to the ground, you can use a taser.

 3        Q     So if --

 4        A     So if I have to tackle somebody, instead of

 5   tackling them I can tase them.

 6        Q     So you're saying they're essentially at the

 7   same point in the use of force continuum; to your

 8   knowledge?

 9        A     To my knowledge, yeah.

10        Q     Okay.  Can you turn to page 1109?

11        A     Do you see where it says -- this is point 13.

12   The taser will -- oh, sorry.  I mean point 12.  "Once

13   you have used the taser, do not refire the weapon unless

14   the suspect continues to resist.  The taser documents

15   each time the weapon is discharged.  You are engaging

16   the weapon after the suspect has been subdued may be

17   mistaken for mistreatment of the offender"; do you see

18   that?

19        A     Yes.

20        Q     Would you agree with me that if an officer was

21   engaging their taser or applying their taser to a

22   subdued suspect that, by definition, would be

23   mistreatment of the offender?

24        A     To a subdued?

25        Q     To a subdued individual, the use of a taser

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1    after the individual has been subdued.

2         A     Define for me subdued.

3         Q     Well, what is your definition of the term?  It

4    says -- as it's listed here, "After the suspect has been

5    subdued"; what do you take that to mean?

6         A     To me, subdued is the handcuffs are on and

7    it's over.  Then they're subdued.

8         Q     Okay.  So would you agree with me then that

9    the application of a taser to an individual who's

10   subdued per your definition of it would be mistreatment

11   of that individual?

12        A     Yes and no.  because you may have an instance

13   where somebody's in handcuffs on the their way to jail

14   and they decide to bring their legs up and kick a

15   computer which brings their legs up to above the center

16   console which now they are a threat to the officer.

17   So --

18        Q     Right.  But that's not what your definition of

19   subdued was.  I'm talking by your definition of subdued,

20   if someone is in that state, your definition of subdued.

21   Would you agree with me that the application of a taser

22   to somebody in that state would be mistreatment of that

23   individual?

24        A     No.  Just as I explained.  If someone is

25   subdued they're in handcuffs, they're complying.  But if

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1   they're in handcuffs and all of a sudden they decide to

2   become violent, then, you know, you may have to use --

3       Q    Okay.  Well, let me ask it this way: If

4   somebody is in handcuffs and is -- and that individual

5   is also compliant, would you agree with me that the

6   tasing of that individual while they're in handcuffs and

7   compliant would be mistreatment of that individual?

8       A    Complacent, compliant, and passive and if it

9   was used maliciously, yes.

10      Q    Okay.  Well, what if they were complacent,

11  compliant and in handcuffs and it was an affirmative

12  decision was used to tase them whether it was malicious

13  or not, is -- would you agree with me that that's

14  mistreatment?

15      A    Then someone would have to explain why they

16  did that.

17      Q    Well, would you agree with me that they

18  shouldn't do it if they are in that state, complacent,

19  compliant and in handcuffs?

20      A    Sure.  I will agree with that as long as it's

21  not done maliciously.

22      Q    You indicated previously that this was the

23  taser use policy that was in effect during the Todero

24  incident, correct?

25      A    Correct.

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

238

```
 1        Q     Okay.  Do you see point 15 where it says, "The
 2   taser should not be used on a suspect being engaged by a
 3   canine"?
 4        A     Yes.
 5        Q     So earlier your testimony was that at the time
 6   that Officer Blackwell tased the shoplifter who was
 7   being engaged with a canine, it wasn't a violation of
 8   the department's policy.  Is it fair to say that, in
 9   fact, it was?
10        A     I stand corrected.
11        Q     Okay.  So it was a violation.  Him engaging
12   his -- him deploying his taser against that individual
13   who was being engaged by the canine in that one
14   particular use of force incident was a violation of
15   department policy, correct?
16        A     Correct.
17        Q     Okay.  Do you see on 1109 where it indicates
18   supervisor responsibility?  It's letter C.
19        A     Yes.
20        Q     It says, "The immediate supervisor of any
21   officer using the taser in the line of duty shall upon
22   notification or observation of the use ensure that,
23   number one, the officer who uses the taser completes the
24   Use of Force Report.  The report will be submitted to
25   the training director and assistant chief"; do you see
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

1    that?

2       A    Yes.

3       Q    Okay.  Is there -- what role does the

4    assistant chief play in the review of the use of a

5    taser, if any?

6       A    That verbiage was left in from the original

7    before we readopted in 2012.  At that time, they went to

8    the assistant chief.  Now, they go to the training

9    director, the assistant, the deputy, and myself.

10      Q    Okay.  They go to all of those individuals?

11      A    Yeah.  Well --

12      Q    They're supposed to.

13      A    They're supposed to, thank you.

14      Q    They don't necessarily always?  Okay.

15      A    Right.

16      Q    Can you look at D1111?  Do you see letter G,

17   "Technical considerations and limitations"?

18      A    Yes.

19      Q    Letter F is excessive use of the taser in

20   subduing a subject is forbidden.  Do you see that?

21      A    Yes.

22      Q    Okay.  And are officers trained that excessive

23   use of the taser in subduing someone is forbidden?

24      A    Yes.

25      Q    Okay.  And what is -- what are they trained in

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 1:17-cv-01698-JPH-MJD   Document 125-56   Filed 08/13/18   Page 242 of 288 PageID #:
5680
Oral Deposition of Christopher Lacy, taken 04/27/18      240

```
1    terms of what excessive use is?

2         A    We already covered that.

3         Q    Well --

4         A    in the PowerPoint from taser.

5         Q    The 15 seconds?

6         A    Yes.

7         Q    Okay.  So the training is that the application

8    of the taser for longer than 15 seconds is forbidden; is

9    that correct?

10        A    No.  We've been over that earlier.  We got

11   into heated debate about that so we're going to have to

12   agree to disagree on that that there are instances where

13   the taser can and will be used more than 15 seconds

14   depending on the situation.

15        Q    Okay.  But your testimony is, just so I'm

16   clear, and I understand we disagree on some points, but

17   just so I have your testimony straight.  The officers

18   are trained that the excessive use of the taser in

19   subduing a subject is forbidden, correct?

20        A    Correct.

21        Q    And they are also trained that --

22        A    No.  They're not trained that excessive use is

23   forbidden.  On the training if you have to go back to

24   that exhibit, it was not to use more than 15 seconds. It

25   did not use the word forbidden.  The policy uses the
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 1:17-cv-01698-JPH-MJD   Document 125-56   Filed 08/13/18   Page 243 of 288 PageID #:
5681
One deposition MJD Christina on taken 08/Apr/18   2/age 3                     241

 1    word excessive use of the taser.  It's going to be

 2    definitive on defining what the excessive use if we were

 3    going to punish somebody for using it excessively, using

 4    the policy.

 5         Q    Well, I asked you a minute ago about what

 6    excessive -- or if officers were trained on what

 7    excessive use was and you pointed me to those training

 8    materials and the 15 seconds; is that correct

 9    characterization of your testimony?

10         A    In the PowerPoint?

11         Q    Yes.

12         A    Yes.

13         Q    Okay.  Go ahead.

14         A    So right now you see the term excessive.  Is

15    that three five second or is that somebody holding the

16    trigger and tasering somebody for 30 seconds in the

17    first tasing and not letting off the trigger.  So you --

18    that's where my trouble in -- when you're trying to get

19    me to locked in on this.  There's different types of

20    excessiveness, all right.

21         Q    Sure.  I'm not -- so I'm -- just so we're

22    clear.  I'm not trying to lock you in on anything.  I

23    just want to know of officers are trained that the

24    excessive use of the taser in subduing a subject is

25    forbidden.  It's part of the policy so I think it's fair

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1    to assume that that's what they're trained, but I want

2    to make sure that that is something that officers are

3    trained on.  That the excessive use of taser is

4    forbidden.

5         A    Well, I want to go back to the training.

6         Q    Well, let me ask -- let me put it this way:

7    Officers are expected to follow the policies of the

8    department, correct?

9         A    Correct.

10        Q    And one of the policies of the department is

11   related to taser use, correct?

12        A    Correct.

13        Q    And that policy indicates that excessive use

14   of the taser in subduing a subject is forbidden,

15   correct?

16        A    Correct.

17        Q    Okay.  So the policy -- the written policy of

18   the department as it existed at the time of the Todero

19   incident was that excessive use of the taser in subduing

20   a subject is forbidden, correct?

21        A    Yes.

22        Q    Okay.  Are officers provided with any training

23   in terms of what the excessive use of a taser is?

24        A    Per the PowerPoint is what --

25        Q    Okay.  The 15 seconds?

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

 1      A      The 15 seconds.

 2      Q      Okay.  Would you agree with me if that if each

 3   of the 16 taser deployments by officer or by Lieutenant

 4   Blackwell were successful, meaning that there was a full

 5   connection and each time Mr. Todero was actually tased

 6   by the -- by Lieutenant Blackwell's taser, would you

 7   agree with me that that's the excessive use of a taser?

 8              MR. STEPHENSON:  I think it's been asked and

 9      answered.

10              MR. FIELD:  No.  It hasn't.

11   BY MR. FIELD:

12      Q      Even if it has, you can answer that.

13      A      We've already answered that.

14      Q      Well, I'm -- then you'll have to remind me of

15   the testimony.

16      A      I'm going to refer you to the transcript.  If

17   we keep going around and around about this.

18      Q      I'll ask the question again.  I need an answer

19   to this question.  Would you agree with me that if --

20   well, we don't -- we can even take it out of this

21   situation.  If an officer tased an individual 16 times

22   and each one of those tasings was successful, would you

23   agree with me that that's the excessive use of a taser?

24      A      I would have to know the totality of the

25   circumstances.  I can't say "Yes, I agree."

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 1:17-cv-01698-JPH-MJD   Document 125-56   Filed 08/13/18   Page 246 of 288 PageID #:
5684
Oral Deposition of Christopher Lawrence taken 04/24/18   2   Page 2

244

1        Q    Okay.

2        A    Because there may be some -- because we're

3    talking hypothetically?

4        Q    Yes.

5        A    Okay.  So hypothetically the person isn't

6    feeling the effects of the taser and so you don't know.

7        **Q    Okay.  So is your testimony that you can't say**

8    **one way or the other -- this is a hypothetical**

9    **situation.  We're not talking about the Todero incident.**

10   **You can't say one way or the other whether the use of --**

11   **the successful use of a taser against an individual 16**

12   **times without knowing more about the circumstances,**

13   **you're not able to say  whether it's excessive or not;**

14   **is that fair?**

15       A    In my opinion?

16       **Q    Yes.**

17       A    Each individual instance of use of force is

18   independent and needs to be looked at independently.  To

19   blanket and say if you do something X times it's

20   excessive, you're putting yourself into a corner  - to

21   say--same as I go right back to the same thing, okay.

22   How come you shot him five times instead of four.  You

23   get into these arguments when use of force is a fluid

24   situation.

25       Q    Sure.



Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 1:17-cv-01698-JPH-MJD   Document 125-56   Filed 08/13/18   Page 247 of 288 PageID #:
5685
The Deposition of CHIEF ANTHONY LANGLEY, taken on 04/24/18          245

1    A    And so my answer to that would be if an

2    officer maliciously tasered somebody 15 times, 16 times,

3    I would be -- yeah, that's excessive.  That's requiring

4    that it's full contact, and the person was cooperating

5    and submissive.  Now, there's accounts where tasers

6    don't affect, there's multiple tase of individuals. They

7    don't take.  So there's all sorts of things we have to

8    consider before we lock ourselves in and say, "This is

9    it."

10   **Q    Okay.  Is there any number of successful taser**

11   **deployments against an individual where you would be**

12   **willing to indicate that just by the number alone it's**

13   **excessive?**

14   A    Again, I can't answer that question.  And I'm

15   not going to.  I'm not going to say, "This is it,"

16   because, you know, we talked early on about being the

17   chief policymaker, correct?

18   **Q    Sure.**

19   A    And so what I say and do today, if I go out

20   and I have an officer who has a taser that fails to

21   connect or some type of situation, it could come back to

22   this testimony.  So --

23   **Q    But I'm guessing there must be numbers that**

24   **even sitting here today without knowing the**

25   **circumstances you would be willing to say would be**

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201



KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1   excessive use of a taser.  If an officer deployed
 2   successfully a taser against an individual 1,000 times
 3   without knowing the circumstances wouldn't you be
 4   willing to say as you sit here today that the taser use
 5   in that instance was excessive?
 6        A    1,000 times, yes.  I sure would.
 7        Q    Well, what about 500 times, then?
 8        A    500?  Okay.
 9        Q    Also excessive?
10        A    Yeah.
11        Q    And what about 100 times?
12        A    Are we going to work our way down to 16?
13        Q    No.  We're going to work our way down to a
14   number where you're no longer comfortable saying that
15   just by the number alone it's excessive, and we can stop
16   at 100.  If you can't say it for 100, I won't ask it.
17        A    I'm saying I can't answer your question.
18   That's the thing.
19        Q    But you've answered it for 1,000 and 500 so I
20   want to know just by sheer number alone for 100, is --
21   would you consider that excessive?
22             MR. STEPHENSON:  I object.  Your questions are
23        argumentative.  The witness isn't here to offer
24        opinions.  He's not an expert.  He's not even a
25        taser expert or a training expert.  He's the
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

 1        policymaker for a midsized city.

 2             MR. FIELD:  Sure.

 3             MR. STEPHENSON:  I really think your questions

 4        are out of bounds.  I think he's answered them the

 5        best he could.  He's trying to say, in essence --

 6             MR. FIELD:  Well, I don't want you to provide

 7        his testimony but I understand your objection.

 8   BY MR. FIELD:

 9        Q    You're also an officer with 30 years'

10   experience, correct?  Is that correct?

11        A    That's correct.

12        Q    And you are the chief of a department in which

13   you're responsible, as you've testified to earlier, for

14   the revision of the taser policy, correct?

15        A    Correct.

16        Q    Okay.  So in that role, I'm asking you for

17   your opinion on sheer just by number alone, you've

18   already testified that 1,000, you would be willing to

19   say that that's excessive.  For 500, same thing.  You'd

20   be willing to say that just on number alone of

21   deployments that that's excessive.  I'm asking you now

22   for 100.  Are you willing to say the same thing for 100

23   deployments of the taser just on number alone that

24   that's excessive?

25        A    If we can stop the line of question at 100, I

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 1:17-cv-01698-JPH-MJD Document 125-56 Filed 08/13/18 Page 250 of 288 PageID #: 5688
One Deposition of Chris Lawrence Taken on 4/26/18 2, Page 2
248

1    will say 100.

2         Q    You would say 100 is excessive?

3         A    Yes.

4         Q    Okay.  And you're not willing to say for any

5    number below 100 whether or not it's excessive; is that

6    a fair characterization of your testimony?

7         A    No.  It is not fair.  Here's my -- I will

8    testify to this is that after 15 seconds unforeseen an

9    officer needs to start thinking of alternative use of

10   force to take control of a situation.  Locking it in to

11   saying 14 to however many number we're going to come

12   down to that is going to be incumbent upon that

13   individual situation as it exists.  I keep going back to

14   you can't expect me say you can only shoot your gun

15   twice.

16        Q    But I could -- but wouldn't it be fair for me

17   to ask you to say that if you're against a single

18   assailant who has a -- well, we'll just assume that they

19   also have a handgun that firing 15 magazines of rounds

20   at that individual would be excessive.  I mean there

21   must be circumstances in which you can say by number

22   alone that the use of force is excessive, wouldn't you

23   agree with that?

24        A    So is it 15 rounds from one individual officer

25   or six officers with sympathetic fire?

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201



KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 1:17-cv-01698-JPH-MJD   Document 125-56   Filed 08/13/18   Page 251 of 288 PageID #:
5689
One Deposition of Christopher Hayes, taken 05/Apr/18           249

    1        Q     We're talking one individual officer --

    2        A     That's --

    3        Q     -- emptying 15 magazines.  I didn't even say

    4   rounds.  I said magazines worth of --

    5        A     That's impossible.

    6        Q     But it would be excessive, correct?

    7        A     Well, yes.  You'd be shooting something down

    8   on the ground.

    9        Q     Right.  Okay.  So is there any number below

   10   100 in which you are willing to say that the number of

   11   deployments of the taser just by sheer number alone

   12   would be excessive?

   13        A     I'm not going to say what is excessive in

   14   every situation.  I am not going to put that number out

   15   there to you.

   16        Q     Okay.  Would you -- are you willing to

   17   indicate whether or not 75 taser deployments on number

   18   alone is excessive?

   19        A     Yes.  75.

   20        Q     Okay.  What about 50?

   21        A     Sure.

   22        Q     Okay.  What about 25?

   23        A     Okay.  I'll give you 25.

   24        Q     Okay.  As excessive just on shear number

   25   alone, correct?

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 1:17-cv-01698-JPH-MJD   Document 125-56   Filed 08/13/18   Page 252 of 288 PageID #:
5690
One Deposition of Chris Smith taken 04/27/18   Page 2   250

 1      A     Yes.

 2      Q     Okay.  What about 20?

 3      A     We're stopped.  I know where we're going with

 4  this.

 5      Q     So -- but are you saying at 20 you're not

 6  willing to say it?

 7      A     I am not going to say anything.  I'm just

 8  trying to end this questioning with you.

 9      Q     Okay.  I understand that.  It's uncomfortable

10  questioning.  I don't actually enjoy asking the

11  questions either just so you're aware of it.  And I

12  appreciate that you're trying to give testimony to the

13  best of your ability.  But I think it is a legitimate

14  line of questioning based on what occurred in this

15  incident.  And so you've said 20.

16      A     So now we just went from hypothetical to this

17  incident.

18      Q     No.  What I'm saying is the hypothetical I

19  think is a legitimate one based on the incident.  I'm

20  not asking you to comment on what happened in the

21  incident itself and whether or not --

22      A     But Counselor, you just brought it back to

23  that incident.

24      Q     No.  What I'm saying is the line of

25  questioning is relevant based on what the -- this case

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 1:17-cv-01698-JPH-MJD   Document 125-56   Filed 08/13/18   Page 253 of 288 PageID #:
5691
Oral Deposition of Chris Winn 18-07-01 taken 05/Apr/18   2   Page 2   251

1    is about but I'm not asking you to say whether the 16

2    tases in the Todero incident were appropriate or not.

3    We've already gone through that.  I'm asking you just on

4    sheer number alone, not related to the Todero incident,

5    just based on the number, you've testified that you're

6    willing to say that 25 tases is too many just on sheer

7    number alone; is that correct?

8         A    Yes.

9         Q    Okay.  Are you willing to say the same thing

10   for 20?

11        A    You know, this is a situation where you've put

12   me in a damned if I do, damned if I don't.  We are in a

13   federal lawsuit and as chief policymaker I go back to

14   what we have put into place and that's what we stand on.

15   Bringing in these hypotheticals that's going to go in

16   front of a federal court so now I'm saying as the chief

17   policy maker you can do 20, and I don't think that's

18   excessive.  Where maybe I think if you do four it could

19   be excessive if it's done maliciously in malcontent

20   against an individual.  So this question has put me in a

21   corner that I don't appreciate you doing and I think

22   it's improper.  I think you're trying to get me to say

23   something that I can't say.  I stick by what we've

24   already written down.

25        Q    Okay.  And you also stick by the testimony

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
1    that you've provided to this point; is that correct?

2        A    Yes.

3        Q    Okay.  And what is written down in terms of

4    policy is that excessive use is forbidden, correct?

5        A    Yes.

6        Q    And what is written down in terms of the

7    training is that the safety point for taser use is 15

8    seconds; is that correct?

9        A    Correct.

10       Q    Okay.

11            MS. POLLACK:  I think he's got to go.

12            MR. STEPHENSON:  It's now 4 p.m.

13            MS. POLLACK:  Yeah.

14            MR. STEPHENSON:  So.

15            MR. FIELD:  So off the record.

16                      (OFF THE RECORD)

17                      CROSS EXAMINATION

18   BY MS. POLLACK:

19       Q    Chief is there any way you can answer a

20   question about what's excessive without being told

21   whether the subject is still coming at the officer or

22   threatening anybody else still after that number of

23   tases has been implemented?

24       A    No.  I don't believe so.

25       Q    So 100 might not be excessive if they're still
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1   coming at the officer with a knife, or if they're still
 2   threatening another human being, correct?
 3       A    Correct.
 4                    REDIRECT EXAMINATION
 5   BY MR. FIELD:
 6       Q    Just as a follow up you maintain that you
 7   still stick by your prior testimony; is that correct?
 8       A    I stand by that every use of force situation
 9   is fluid and changing and has to be dealt with in a one
10   on one situation.  That putting generalities and numbers
11   on that is not a good idea.
12       Q    Okay.
13            MR. STEPHENSON:  Are you done?
14            MR. FIELD:  Yeah.
15            MR. STEPHENSON:  I do have a question just in
16       case you don't resume.
17            MR. FIELD:  Oh, sure.  I'm happy to come back
18       if people want to have -- I wasn't trying to cut off
19       other people's opportunities.  I --
20            MR. STEPHENSON:  Well, we don't want to come
21       back either.
22            MR. FIELD:  Yeah.  I hear you.
23                        EXAMINATION
24   BY MR. STEPHENSON:
25       Q    Chief, you testified that the investigation
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201



KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1  began after you learned that Todero had died.  The

2  report, however, indicates you initiated the

3  investigation on June 7.  Is that more consistent with

4  your current recollection?

5       A    It could be.  It could be.  I know we had some

6  discussion about it.

7       Q    Okay.

8       A    So...

9       Q    So it's quite possible that you may have

10  initiated the investigation before the death?

11      A    Yes.

12          MR. STEPHENSON:  All right.  That's all we have

13     for today.

14                    RECROSS EXAMINATION

15  BY MS. POLLACK:

16      Q    The 15 seconds, that assumes 15 seconds of

17  actual contact?

18      A    Yes.

19          MS. POLLACK:  All right.

20          MR. STEPHENSON:  All right.  So we're going to

21     either adjourn -- or we're done.  We're going to

22     wait here for a couple minutes.

23          MR. FIELD:  I'll tell you tomorrow by Dr.

24     Hartman's dep whether we need the chief to come

25     back, and I will do my best so you don't have to

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1   come back, sir.

2           THE WITNESS:  Thank you.

3             (DEPOSITION CONCLUDED AT 4:02 P.M.)

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25



Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 1:17-cv-01698-JPH-MJD   Document 125-56   Filed 08/13/18   Page 258 of 288 PageID #:
5696
One Deposition of CHRIS KAMAN taken on April 17, 2018
256

1              CERTIFICATE OF REPORTER

2              STATE OF INDIANA

3

4    I do hereby certify that the witness in the foregoing

5    transcript was taken on the date, and at the time and

6    place set out on the Title page hereof by me after first

7    being duly sworn to testify the truth, the whole truth,

8    and nothing but the truth; and that the said matter was

9    recorded stenographically and mechanically by me and

10   then reduced to typewritten form under my direction, and

11   constitutes a true record of the transcript as taken,

12   all to the best of my skill and ability. I certify that

13   I am not a relative or employee of either counsel, and

14   that I am in no way interested financially, directly or

15   indirectly, in this action.

16

17

18   

19

20

21

22   EMILEE BOLEYN,

23   COURT REPORTER / NOTARY

24   MY COMMISSION EXPIRES:  04/17/2025

25   SUBMITTED ON:  04/20/2018

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 1:17-cv-01698-JPH-MJD   Document 125-56   Filed 08/13/18   Page 259 of 288 PageID #: 5697
One Deposition of CHRIS DIETZ Taken on April 18, 2018

257

**Exhibits**

**EXHIBIT 1**
28:9,12,21
30:3,6

**EXHIBIT 2**
86:23,24 99:21
153:5,7 161:8,
12

**EXHIBIT 3**
133:22,25
140:22 161:3

**EXHIBIT 4**
159:6,10
180:14 182:9
190:24 205:7

**EXHIBIT 5**
189:13,14,16
218:6

**EXHIBIT 8**
207:9,15

**EXHIBIT 9**
220:24 221:3

**EXHIBIT 10**
229:1,4

**0**

**079** 122:10

**08** 17:1

**1**

**1** 13:23 28:9,12,
20,21 30:3,6
119:9 153:21
220:24 233:2

**1,000** 246:2,6,
19 247:18

**10** 118:21
229:1,4

**100** 72:20
137:5 246:11,
16,20 247:22,
25 248:1,2,5
249:10 252:25

**1095** 180:16
182:9,17

**1096** 185:17

**1098** 159:7

**1099** 207:10

**10:30** 196:16

**11** 9:9,12 12:15
122:4

**1100** 232:13

**1103** 232:25

**1107** 233:20,25

**1109** 235:10
238:17

**1113** 207:11

**1147** 207:11

**1148** 207:18

**1150** 207:22

**1151** 208:19

**1154** 207:10

**11th** 122:5

**12** 22:20 122:9
235:12

**12:01** 197:2

**12th** 122:6

**13** 235:11

**13:49** 197:9

**13th** 178:16

**14** 22:23 41:19
42:14 98:23
207:23 248:11

**15** 15:21 41:24
42:3 43:7 72:11
206:23 207:6
208:23 209:7,
14 213:11,12,
18,19,20,21,24
214:15 215:2
216:6,11 238:1
240:5,8,13,24
241:8 242:25
243:1 245:2
248:8,19,24
249:3 252:7

254:16

**16** 18:8 22:22,
23 72:11
141:11,18,19
142:17 155:23
156:2,3,7,8,10,
21,25 157:25
158:13,17
160:16 176:20,
21 209:22
210:19 212:7
243:3,21
244:11 245:2
246:12 251:1

**16L09890**
102:25

**17** 20:24 21:3
220:24

**19** 208:20

**190** 141:2

**1978** 27:22,24
79:19

**1980** 78:6

**1981** 19:21

**1983** 31:23,25
32:3,10,15

**1985** 19:21
20:17,20 21:9

**1988** 9:9 17:24
21:11 22:1
79:13 120:20

**1999** 9:19

**1:02** 153:21

**1:20:53** 222:24

**2**

**2** 86:23,24
99:21 153:5,7
161:8,12

**20** 69:10 250:2,
5,15 251:10,17

**200** 69:10

**2000** 48:24

**2003** 10:10

**2003-2004**
10:12

**2006** 21:7,8

**2007** 17:1

**2008** 19:23
20:20

**2010** 11:10
12:1

**2011** 8:12 9:22,
23 11:9,10 12:1

**2012** 7:24 8:5
12:4,7 13:21,23
15:7 25:22
26:22 27:5,22
28:11 29:14,17
45:23 46:3
60:10 76:23
78:15,16 79:8,
11 82:16 87:21
101:25 102:11
103:22 230:11
232:14,21
233:8 239:7

**2013** 49:8 93:7
100:20 101:7
136:20

**2014** 15:19
45:24

**2015** 43:1
45:25 118:21
122:4,9

**2016** 16:1
30:12 36:9 39:9
40:9 62:4 82:17
87:22 102:11
136:21 141:4
153:21 154:3
221:21

**2017** 26:23
27:5 72:14
78:19 125:16

**205** 141:3

**22** 86:23

**24** 95:4,12,23
96:3 97:3,6

**25** 110:20
249:22,23
251:6

**27** 101:7

**28** 87:21 102:11

**29** 16:1 39:9
40:9 91:12
93:3,13 99:21
101:6 104:3
154:3 221:21

**29-2016**
222:15

**29th** 141:4
154:6,9

**2:15** 194:1

**2:49** 193:25

**2:58** 194:3

**2:59** 195:7

**3**

**3** 104:5 133:22,
25 140:22
161:3

**3-7-** 232:20

**30** 91:13,16
93:3,14 99:21
101:6 104:3
198:11 241:16
247:9

**30-year** 195:15
196:4 202:17

**31st** 136:20

**3725** 93:4
100:19

**38** 160:19

**39** 111:1,2

**3:05** 196:7

**3:16** 196:13

**3:36** 199:19

**4**

**4** 140:23 159:6,
10 180:14
182:9 190:24
205:7 252:12

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

**409** 230:16

**41** 111:2

**411** 230:16

**42** 111:1,3

**43** 228:14

**4401** 229:2

**4407** 230:15

**4409** 229:2

**465** 67:3

**48** 193:20

**4:00** 95:15

**4:02** 255:3

—————

**5**

—————

**5** 189:13,14,16
218:6

**5-** 222:14

**5-29-2016**
225:18

**50** 249:20

**500** 246:7,8,19
247:19

**5073** 218:9

**5074** 219:10

**5086** 219:12
220:17

**54** 60:12

**55** 98:8

**5:25** 199:12

**5:36** 199:22
200:4

**5:38** 200:4

**5:48** 200:2

—————

**6**

—————

**6** 30:9 192:11,
14

**62** 60:14

**64** 60:14

**664** 30:8

**669** 30:8

**69** 122:15
123:15,16,18,
21

**6:00** 95:16

**6:06** 200:10,21

**6:07** 200:21

**6:21** 201:1

**6:24** 201:13

—————

**7**

—————

**7** 140:23,24
199:9,10 254:3

**70** 123:14,21
126:11

**72** 123:8,17
128:5

**73** 132:1

**74** 128:5 132:2

**75** 249:17,19

—————

**8**

—————

**8** 207:9,15
232:11,12

**80s** 48:4

**81** 20:9

**82** 153:10,13

**83** 153:13 161:7

**84** 153:13 161:8

**85** 20:9 86:23

**8:44** 201:13

**8:45** 201:13

—————

**9**

—————

**9** 87:22 102:11
220:24 221:3

**95** 182:16

**98** 212:20,22

**99** 9:7

—————

**A**

—————

**ability** 195:18
250:13

**Absolutely**
13:11 59:21
60:8 130:17
135:9 137:12
202:24 219:17

**abusive** 67:14

**academy** 10:1
21:1,14,19
22:13,14,17
40:2,7,12 98:15

**accept** 53:5
54:6 55:15

**acceptable**
51:21 80:10

**accepted** 22:5
40:5 57:15

**access** 102:21

**accident** 75:13

**accordance**
205:20

**account** 155:4

**accountable**
206:7

**accounting**
209:12

**accountings**
210:8

**accounts**
245:5

**accurate**
103:17 143:4
155:8,10 160:4
166:24 209:21

**accurately**
138:13 161:25
162:3 163:1,5
182:6

**accused** 24:21
131:8

**acid** 222:20

**acknowledge**
205:5 226:15

**acronym**
20:15

**act** 108:5
234:20

**acting** 185:9
190:14

**action** 53:2
55:14 57:9,10
59:9 118:3,5,7
175:8,11,15
176:6 178:25
229:20 230:6
234:20

**actions** 58:9
151:14 201:23
229:7 234:7

**activate**
204:25 205:3

**activated**
126:17 160:16,
18 176:21
183:8

**activating**
205:25

**active** 119:19

**actively**
119:19 128:21,
23 130:7

**activity** 218:23

**actual** 29:10
32:12 42:16
71:16 73:9
80:4,8 103:6
147:24 157:20
181:7 221:17
254:17

**add** 100:25
104:17 223:22

**added** 126:1

**addition**
179:24

**additional**
157:14 176:24
177:1,10 180:7,
11,24 183:10,
13,18 186:16
188:9

**adequate**
185:24 186:3,6,
10,15,23 187:6,
17,25 188:8,12
189:3

**adjourn** 254:21

**administer**
91:18

**administered**
112:4

**administration**
14:6 28:1 29:18
44:10,17,20,21
45:8 81:14,19
83:7 126:22

**administrative**
229:10

**administrator**
93:24

**adopt** 41:5
43:15,20,22
159:14,23
215:20

**adopted** 41:18
43:11 44:8 45:4
92:23 127:1
160:4,8,19
166:24 175:1

**adoption**
71:17,21 72:13

**advance**
195:19 199:6

**advanced**
195:6

**advised**
119:16

**Affairs** 20:13

**affect** 116:8,9
245:6

**affected** 156:3

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

**affecting** 116:11

**affirm** 6:3

**affirmative** 237:11

**afforded** 10:18 184:9

**againmaybe** 223:5

**agencies** 215:20

**agency** 19:15

**agents** 233:2 234:4

**agitated** 115:20 116:5

**agree** 97:14, 15,16,21 98:1,2 105:8 161:6,24 162:2,5 183:2 184:5 187:1,15, 19 190:4 200:18 202:9, 14 204:3,24 205:6 206:1,3 207:5,12,17 208:14 209:5,9, 23 211:4,15 212:11,21 220:16 226:17 227:17,21,24 235:20 236:8, 21 237:5,13,17, 20 240:12 243:2,7,19,23, 25 248:23

**agreed** 176:14, 17

**agreeing** 204:18

**ahead** 109:11 128:7 177:20 196:6 241:13

**aid** 170:6 172:1 206:13

**Albert** 10:14

**alcohol** 48:5

**allowed** 179:19

**alternative** 248:9

**altogether** 55:6

**ambulance** 168:22 169:16, 18,20,25 170:3, 11,15,23 171:2, 4,6,8,13 172:3

**amend** 177:19

**Americorps** 33:10

**amount** 81:8 136:1 142:14 143:2 195:12

**analysis** 219:13

**annual** 70:8 71:8,14 72:1,6 77:18 78:9 82:1 137:20,23

**annually** 81:7

**answering** 7:4,6,7

**answers** 6:24

**anticipate** 47:8 132:13

**anymore** 127:7

**anytime** 44:13 77:14

**apologize** 6:14 132:15 178:8

**appears** 112:7, 9

**application** 157:5,8 186:1 208:4,16 210:5 236:9,21 240:7

**applications** 155:15 189:3 208:24 212:8, 24 213:18

**applied** 21:3, 24 22:4 189:5 212:8

**apply** 21:15,18 188:19

**applying** 156:6 190:16 235:21

**appointed** 10:11,13 12:4, 23 13:18,24 14:2 15:6

**appointment** 13:13

**apprehensions** 126:25

**approach** 115:19

**approval** 51:12 52:1 55:10 56:14

**approve** 51:2 59:25 81:3 82:12

**approved** 52:16,19 82:6

**approves** 52:4

**approving** 80:25 159:15

**approximate** 200:2

**approximately** 10:7,8,24 11:13,14 34:1

**April** 12:15

**area** 117:25 163:17,18 164:19

**argument** 187:3 209:19

**argumentative** 246:23

**arguments** 244:23

**arms** 218:14

**arrest** 23:20

**applied** 89:14,17,18,21 102:15 116:9, 11 119:17 128:24 130:7, 13,15,19

**arrested** 132:4

**arrests** 89:9 106:7 107:6,12

**arrival** 191:1

**arrived** 182:23 183:12 218:19 224:16

**article** 31:21 32:8,9,11 34:13

**articulate** 96:21 213:15

**asks** 212:6

**assailant** 248:18

**assign** 62:15 65:11 75:25 85:17

**assigned** 62:20,25 63:16 65:5,6 73:21 88:8 132:20,23 133:5,8 136:14, 24 230:3 233:3

**assigning** 145:24

**assistance** 117:6

**assistant** 14:23,24 15:5,8 16:2 30:20 37:23 47:7 60:21 85:17 86:9 164:16 165:2 224:6 229:10 238:25 239:4,8,9

**Association** 49:6

**assume** 7:8 149:16 170:12 172:8 187:3 206:25 209:18 210:14 211:13

**assumes** 254:16

**assuming** 65:10 103:17 129:12 136:18, 23 158:8 211:2

**assumption** 134:19 184:25

**astray** 105:19

**attach** 77:1

**attached** 30:3 160:24 181:1

**attaching** 77:7

**attachment** 141:23

**attacks** 16:22

**attempt** 116:8 174:9,19 234:19

**attempted** 119:18 128:23

**attempting** 130:3 182:13

**attend** 21:15 22:12 40:7 70:11

**attended** 19:21 20:25 40:11 98:15

**attending** 21:19

**attention** 56:22 68:9,15

**attorney** 26:6 46:11,15,18 47:2,5

**audio** 74:24

**audit** 229:7

**audited** 81:7, 22

**August** 33:17, 19,20

**212**:2,3,6,10 220:6 242:1 248:18

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

**authorities** 53:7

**authority** 49:23 50:23,25 51:16 52:8 54:11 76:8 80:10 83:24 84:2,4,13 86:17 217:17

**automatically** 63:8 66:6

**autopsy** 147:16 177:24 178:15,20 179:7 181:7

**Avenue** 192:22 225:19

**avoid** 207:24 208:20

**aware** 65:20,21 106:4 176:18 187:21,25 217:12 218:2,5 250:11

**awful** 98:8

**Axon** 41:22 42:20 48:16,21 49:13,18

———————

**B**

**back** 8:12 11:4, 5,15 19:19 20:18 21:3 39:11 44:12,15 48:4 58:17 73:11 78:5 86:25 87:3 91:6 96:16 97:9 98:20 127:2 132:19 144:11 145:23 146:1 150:8 153:5 171:3 172:1 180:14 184:16, 24 185:24 196:18 197:4 201:2,16,18 202:8,13 205:6, 7 218:15,21,23, 25 219:6

**222:**16,17 **223:**22 **224:**8 **226:**12,18,21, 24 **227:**2,4,10, 19,23 **232:**9 **240:**23 **242:**5 **244:**21 **245:**21 **248:**13 **250:**22 **251:**13 **253:**17, 21 **254:**25 **255:**1

**background** 19:18

**backing** 119:24 120:3,5 121:1

**backs** 194:16

**backup** 185:3

**backwards** 120:8

**bad** 7:9 64:19 110:21

**bailiwick** 98:13

**bar** 184:10

**barring** 213:3

**based** 99:6 124:19 127:12 154:22 183:12 195:25 197:16 198:8 201:21 203:14 221:24 250:14,19,25 251:5

**basic** 6:21

**basically** 18:18 19:20 55:5,7 59:1 81:3 213:7

**basis** 60:1,2,7 77:12,18 83:22 95:22 119:13 183:21 186:21

**Bates** 140:22

**baton** 38:9 117:20 233:5

**batons** 32:4

**battered** 84:10

**began** 42:10 120:1,3,5 254:1

**begin** 12:8 136:19 198:15

**beginning** 9:1 111:3

**begins** 112:23

**begun** 119:17

**behaving** 170:11

**behavior** 69:18 115:20 170:23 172:3 228:6

**behest** 13:18

**belief** 135:2 141:19

**believed** 113:17 114:12 176:24 177:8

**believing** 119:13

**big** 19:2

**bigger** 194:12

**bit** 52:25 93:16

**bite** 128:23,25

**Black** 18:19,24 73:23

**Blackwell** 35:18,23 36:5, 12 39:12 93:10, 18,21,23 94:4, 5,6 104:6,14 105:11,13 106:3,8,9,10 118:24 119:2,6, 10 120:11,15, 24 121:7,14 122:13 123:2,7, 10,19 124:1,20 125:6 128:20 129:2 136:15, 24 137:2 141:3, 15,19 142:18 143:3 147:4 152:5 153:15,

**22** 155:5 **156:**20 **157:**4, 13 **158:**10 **161:**7,22 **162:**17,22 **163:**4 **175:**22 **176:**19 **182:**20 **183:**11,13 **184:**6 **185:**2,18 **187:**22 **188:**8, 10,14 **193:**13 **195:**8 **205:**18 **208:**15 **209:**10, 15,24 **210:**15, 18 **211:**16 **212:**11,20 **219:**25 **220:**2 **222:**3,11,16 **223:**10,21 **224:**13,20,23 **225:**12,17,18, 25 **226:**21 **227:**2,10,14,15, 18 **238:**6 **243:**4

**Blackwell's** 141:10 151:4 154:24 156:21 160:15 183:3 185:9 193:14 209:20 210:16 211:4,6 212:6 218:20 243:6

**bladder** 121:24

**blanket** 191:4 196:20 244:19

**block** 223:22 224:8

**Bloomington** 31:24 32:3

**blouse** 37:13, 19,25 70:21

**blue** 184:14

**board** 27:22 50:16 51:1,4,6, 7,8,12,25 52:4, 13,16,19 63:4, 5,7,11,17,24 64:2,8,22,25 65:10 82:11,12 84:23

**boards** 64:17

**body** 31:3,8 147:5 197:11 199:13 205:3, 25 218:15 231:13

**body-** 40:18 43:22 44:8 171:9 192:1

**body-worn** 35:13 36:1,12, 15,19,20 39:11, 13,18,22 41:3, 17 42:19 43:4, 5,15,20 44:5 45:4 142:6 146:19,21,25 147:11 149:17 163:17 164:8, 15,18 171:17 185:12 190:12 192:10 201:24 203:12 204:15 206:3 230:17, 20 231:2,10,14

**book** 15:23 147:15

**bottle** 104:7 105:6 106:8,15, 25 107:6,12,19 108:3,5

**bottom** 132:1 161:15 192:23 223:2 224:13 225:21 233:25

**bottom's** 90:17

**bounds** 247:4

**box** 100:8

**brain** 32:1,17 96:14 97:23,25 98:3

**brand** 132:3

**break** 7:12,15 61:10 79:24 132:8

**breathing** 79:17

**Brian** 93:18,21 123:10,19

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

152:8

**briefed** 114:6

**briefly** 23:1
152:8,14

**bring** 54:13
80:2 231:5
236:14

**Bringing**
251:15

**brings** 236:15

**broke** 193:11

**brought** 56:21
57:16 59:24
68:9,15 80:2
85:5,23 105:19
150:8 250:22

**bubble** 51:1

**budgetary**
36:18 39:15

**building** 90:16

**buildup** 222:20

**bullet** 160:14
182:11 185:18
191:1 208:4
218:13 233:24

**bulletins** 30:4

**bullets** 214:19

**burn** 58:16,21

**burst** 91:19,20

**bus** 201:19

**button** 40:22

**Buy** 18:13 19:6

---

**C**

**calendar** 15:23

**calf** 200:24

**call** 28:3,20
84:5 126:20
129:13,14,15
171:25 224:7

**called** 11:4,5
20:11 33:10

58:15 63:3
66:18 71:20

**calling** 6:17
115:21 120:22
127:4 130:23
140:4 170:18

**calls** 66:13
129:19

**cam** 31:3

**camera** 31:8
35:13 36:1,12,
15,21 39:11,13,
22 40:23 42:20,
23 43:6,24
44:1,6,14 45:12
141:23 142:4
146:19,21,25
147:5,11 149:7,
17 164:8,15,18
171:10,18
185:13 190:12
192:2,10
197:12 200:3,
11 201:24
203:12 204:16,
20,25 205:3,25
206:4,14
230:17,20
231:3,14

**cameras**
36:19,20 39:18
40:19 41:3,17
42:19 43:4,15,
20,23 44:5,9
45:4,10,17,18
46:2,3 142:1,5,
6 147:8 163:17
231:10

**Canada** 18:23

**canine** 46:7
124:24 125:2,
14,17,25
127:23 128:13
129:4,24
130:21 131:4,7,
12,18,23 238:3,
7,13

**canines** 126:4

**capable** 94:20
105:4

**capitals**
222:16

**capturing**
197:12

**car** 44:13 45:12
46:1 66:15
67:3,9 68:7
149:10 183:3,5
184:6,10,20
193:14

**care** 57:11
171:5

**carried** 139:10
140:1

**carry** 36:23,25
37:3,8,13 38:2,
6,14,17,20,22
39:6 70:14,21
71:3 79:19
85:19 151:21
233:4,10,11,15,
17

**carrying** 41:16
230:24

**cars** 44:11
45:17 46:2
126:9,16
127:16,17,20
129:11 183:7

**cartridge**
134:21

**cartridges**
220:18

**case** 15:24,25
23:14,17,19,24
24:2,12,17,18
25:3,9,11,19
35:7 45:22
47:20 48:17,18
51:7 72:17
88:3,8,11,19
89:16,18 90:1,3
94:3 104:14
111:19 120:24
123:6 126:8
128:19 131:17
151:19 156:5
163:13,15,20
164:11,15
165:7 175:19

176:14 177:5,
13 181:6
182:12 183:25
198:22 203:5
212:10,15
213:3 227:12
230:3 250:25
253:16

**cases** 165:4
230:1

**catch** 20:3

**category**
68:20 220:17

**caused**
150:12,13

**center** 236:15

**CEO** 48:25

**certificate**
21:22

**certification**
72:14 73:16
74:5

**certifications**
207:13

**certified** 61:7

**CEW** 207:24
208:7,16,24
219:13 220:1,
17

**chain** 14:12,17
49:21

**chance** 100:8
114:1 183:4

**Chandler**
114:18

**change** 81:10
127:6,8 175:4
214:7 223:22

**changed**
12:19,20 15:6,
10 32:2,6 44:11
49:2 79:17,18
126:2,22
129:19 214:8
232:19

**changing**
253:9

**channels**
65:21

**characterizati
on** 155:4 241:9
248:6

**characterize**
196:4 197:18
201:17,23
203:13,14
226:5

**characterized**
69:17 84:18
99:13

**characterizing**
199:23 200:15,
21

**charges** 54:2,
6,13

**Charles** 14:9

**Charlie** 143:17

**Chastity**
119:23

**check** 115:19
117:10 118:2,
10 219:13

**checked**
220:18

**checking**
116:12 117:3

**chemical**
233:2 234:4

**Chicago** 97:9
99:6

**chief** 6:10,17
7:22 8:8,16,24
10:14,18 11:6
12:4,7,9,11,13,
14,22,23,24
13:13,18 14:4,
8,9,11,13,23,24
15:1,5,7,13,17,
18 16:2,3 18:10
25:13,18,21,22,
24 30:20,21
31:17 33:4
34:16 36:23
37:2,9 38:2
41:15 43:17

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

44:22,24 45:6, 15 46:3 47:7 48:20 49:22 50:1,4,10,13, 19,22 52:8,22 53:19 55:10 56:13 57:1,10, 18 59:24 60:10, 18 61:3,18 62:1,11,25 63:9,24 64:12 65:5,6,12 66:10,11,17,22 67:11,12,23 69:22 70:2,4,6, 13 71:1,2 75:24,25 76:1 79:1 82:3,24 83:25 84:2,13 85:10 86:9,10, 15 95:11 99:22 100:8 109:3 114:6 135:11 138:7 143:10 144:25 145:4,8, 12,14,19,24 146:4,7,15 147:12 151:2, 10,25 152:4,18 154:19 159:9, 13,23,24 160:9 163:7,10 164:16 165:2,3, 6 166:1,11,21 167:2,6,7,18 168:10,11,15, 19,25 169:4 172:9,13,18 173:8 174:6 175:2,4,7,19 176:12,15,18, 24 177:1,8,19, 23 178:12 179:10,13,19 180:10 181:14, 23 182:5 186:24 187:7 189:14,15 190:1,25 205:7, 9,13,17 206:1 210:11 217:9, 14,18,19,20,21, 22 218:1,2,3,7, 10 220:3,13,14, 22 223:18 224:3,6,7,10,

17,21,22 226:5 238:25 239:4,8 245:17 247:12 251:13,16 252:19 253:25 254:24

**chief's** 48:24 49:5 147:15 180:15

**chiefs** 15:8,9 37:23 49:6 60:21,22 85:17

**children** 105:1

**Christ** 191:3 216:5

**Christmas** 19:2

**circumstance** 158:21 170:13 183:3 211:15

**circumstances** 37:18 99:17, 25 106:20 107:5,8 108:4 130:1 138:25 202:22 243:25 244:12 245:25 246:3 248:21

**citation** 194:20 195:16

**citizen** 63:2,8, 25 64:11,15,21 65:9 66:5,12 82:20 83:2,3,22 84:1

**city** 50:16 247:1

**civilian** 55:23 59:20 89:9 106:7 131:3 174:10,19,22 185:19 186:22 187:2,16 188:20

**claiming** 185:5 191:2 216:5

**clarification** 101:10

**class** 34:4,5,11 37:16

**classified** 196:18

**classify** 199:15 202:18

**classifying** 200:20

**clause** 204:21 206:4

**clear** 7:10 24:8 39:2 42:10 43:6 54:9 108:12 113:9 130:2 157:24 213:17 231:9 240:16 241:22

**clenched** 119:16

**closer** 97:18 225:20

**clothing** 132:2

**club** 48:7

**coded** 150:8

**codes** 221:24

**coding** 150:13 224:16

**collection** 219:13

**column** 134:8 142:11

**combative** 190:7,15,21 191:7,10,15 192:5 196:5,12 198:13,19 199:8,16,18 201:25 202:3, 18,19,20,23 203:1,8 204:5

**comfortable** 246:14

**command** 14:12,17 49:21

**commander** 10:11

**commands** 185:23,25 234:3,11

**comment** 158:19,24 189:1 227:14, 18 250:20

**commission** 53:22 54:1,4,5 55:16,20 56:2, 14,18

**commit** 79:22 224:15

**committed** 84:6 127:4 128:15

**common** 6:12 37:24 56:20

**commonly** 68:20

**communications** 221:1,20 222:6 226:3,6

**compared** 81:15

**comparing** 117:16

**comparison** 123:17

**complacent** 237:8,10,18

**complaining** 226:21

**complains** 227:2

**complaint** 63:2,4,8,25 64:4,10,21 65:7,9 66:5,6, 12,19,21,24 67:1,2,12,16 68:3,7,14,21,23 69:4,7,12,13 83:3 84:1,15 85:4

**complaints** 64:3,11,15 67:19,20,21

68:8,19 69:2, 16,21 82:20 83:6,15,16,22 84:20

**complete** 21:5 76:11 94:14,24 95:18,23 96:3, 10 157:18 211:19

**completed** 33:25 34:2,3 93:14,15 95:7,9 97:3 100:15 103:16,18 114:8 123:7 162:3 220:23

**completely** 53:14

**completes** 238:23

**completing** 154:20

**compliant** 202:3 237:5,7, 8,11,19

**comply** 213:25 215:3 216:12

**complying** 236:25

**composed** 63:12

**compound** 109:8

**computer** 111:25 137:15 192:24 193:5, 11 221:17 227:25 236:15

**computers** 221:14

**concentration** 20:13

**concept** 186:9, 19

**concerned** 115:24 117:2 118:9 171:3

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

concerns
39:15

CONCLUDED
255:3

conclusion
155:24

conclusions
151:1,3 159:24

condition
112:9

conduct 62:9
101:23 148:12
179:19 217:15

conducted
143:22 165:21

conducting
147:12 169:9

conference
48:24 173:13,
16,19,23 174:4,
12,20,24

confines 55:12
79:3

conflicting
169:12,15

confused
118:4 123:3,12
124:2

confusing
90:17 93:16
233:14

confusion
126:7

connect
158:24 245:21

connection
158:25 243:5

consecutively
28:25

consideration
131:6

consideration
s 207:23 239:17

considered
27:8 122:1
199:17

consist 71:9

consistent
254:3

console
236:16

consolidated
79:25

contact 116:16
158:23 174:22
213:1 245:4
254:17

contained
162:6

content 29:10
158:23

context 188:24

continually
194:11

continue 44:7
130:5 201:19
214:4

continued
120:8

continues
235:14

continuing
158:15

continuous
208:24

continuum
234:23 235:7

control 18:15
163:25 248:10

convene 63:3,
23 64:7 65:9
84:23

convened 63:7
64:10

convening
64:1,16

Convention
49:5

conversation
47:18,19,22,24
48:11 49:13

152:16,19,22
179:8 215:13,
17 217:5 221:1
224:23

conversations
151:9

convey 86:1

cooperating
245:4

copies 28:16,
19

copy 28:14
143:18

corner 244:20
251:21

coroner
147:18,20
148:5,6

coroner's
166:4

Corporations
48:16

correct 8:9,17
9:11,14,20,25
10:22 12:3,5,6
13:10,11,16,19,
20 14:14,15
16:4 17:4,7,8,
11 18:11 21:21,
22,23 23:23,25
24:13 25:1,9,
10,22,23 26:1,
16,17 27:6,16,
17,19 28:7,8,11
30:14,15,20,21
31:4 32:15,16
33:5,8 35:10,
14,15,24,25
36:2,3,5,7
38:10,11,18
39:15,16,19
40:7,8,12,13,
15,16 42:12,21,
22,24 43:9,13,
17,18 44:15,16
45:6,7,13,14,19
48:13 49:10,19,
20,23,24 50:2,
3,7,20,21,23,24
51:9,13,14,17,

18,22 52:1,2,6,
23,24 53:16,19,
21 54:11,12,15,
16,21 55:6,8,13
56:3,10,15
57:4,22,23
58:17,18 59:7,
17 60:23,24
61:2,21,22,24,
25 62:13,14,17,
18 63:6 64:13,
14,17,18 65:1,
17,21 66:1
67:25 68:17
69:7,15,19,20,
24,25 70:15,19,
22,23 71:7,22,
23 72:3,4,6,18,
19 74:9 75:7,
22,23 76:2,12,
15,16 79:5,6
81:4,5 82:3,4,7,
13,14,18,19
83:5,17,19,23
84:16,18,19,24
85:5,7,11,12,
14,15,20 87:22
88:7 89:6,7
90:2,5,6,8,10,
25 91:1,22
93:4,5,7,10
94:4,5,9,10,22,
24,25 95:13,14
101:8,9,15
102:13 103:8,
24 104:7,11
106:5 109:18,
19 110:19
111:4,9,10,12,
21,22,25 112:1,
4,20,23 113:3
114:13,14,18,
19,21,22 115:3,
4,8,9 116:17
118:19,24,25
119:3,24 120:6,
7,9,10,12
121:2,3,5
122:10,11,13,
14,17,24 123:2,
19 124:1,6,7,9,
22,23,25 125:1,
3,4,7,8 126:10
128:11,12,16
129:5,19,20
130:10 131:19,

20,24 132:5
133:2,10 134:6
135:4,5,22,24,
25 136:11,21,
22 137:2,3,7,21
139:23 140:19
141:4,5,7,8,12,
13,16,20,21
142:2,3,9,10,
15,16,19,20
143:4,5,8,9,12,
13,23,24
144:15,16
145:1,2,5,6,9,
10,18 146:23,
24 147:1,2,8,9
149:3,5,6,8
151:22,23
152:2 153:16,
18,19 154:10,
25 155:1,3,17
156:22,23
157:1,2,6
160:6,7,10,11,
21,22,24,25
161:13,14,22
162:11,15,16
163:8,9 166:24,
25 167:9
172:13 173:9,
14,15,16 174:7,
8 175:12,13,20,
21 176:10,12,
13,15,20,22
177:5,6,10,11,
13,14 178:13,
20,21 179:1,17,
20 180:1,2,12,
13 181:12,13,
15,21,22,24,25
182:3,4,7,8,21,
25 185:10,15,
16,20 186:11,
12,16,17,19
189:5 191:8,15
193:2,3 198:9,
10 200:5,6,8
203:19 204:16,
17 205:10,16
206:23 207:1,3,
4 213:2,18,19,
21,22 217:23,
24 218:11
219:2,14,23,24
220:21 221:18,
19 223:5,7,24

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

227:5 228:6,9, 10 229:21,22, 24,25 231:11, 18,21,22 232:15,16 237:24,25 238:15,16 240:9,19,20 241:8 242:8,9, 11,12,15,16,20 245:17 247:10, 11,14,15 249:6, 25 251:7 252:1, 4,8,9 253:2,3,7

**corrected** 24:5 238:10

**cot** 197:21 202:7

**could've** 163:4 177:9

**council** 50:16

**counsel** 144:17

**counsel's** 35:4

**counseling** 53:12 54:23,25 55:4,18 56:1,4

**Counselor** 250:22

**country** 116:4

**county-wide** 164:3

**couple** 19:11 47:4 254:22

**court** 6:2,7 7:1 251:16

**covered** 32:14 240:2

**create** 135:11 148:15,16

**created** 30:14, 19 31:17 34:16 82:15 95:12 99:23 122:16 123:25 124:5 135:8 153:14, 22 172:15 229:8

**creating** 80:11 135:14

**credit** 20:24 21:4,5

**crime** 128:14 130:9

**criminal** 20:7, 13 23:24 107:24 108:1

**critical** 234:7

**CROSS** 252:17

**crowd** 18:15

**culmination** 216:24

**Cummings** 179:3

**Cunningham** 172:7,21

**Cunningham's** 166:2

**curiosity** 228:13

**current** 14:24 15:1 78:10 80:2 254:4

**custody** 182:14

**cut** 211:19,21, 22 253:18

**cycles** 96:11

—————

**D**

**D1** 225:16

**D10** 222:9,14

**D1093** 159:7

**D1094** 205:8

**D1097** 160:12 190:24

**D1111** 239:16

**D20** 102:5

**D22** 87:18 102:5

**D27** 87:19 102:6

**D28** 90:12

**D29** 91:2

**D30** 104:4

**D39** 110:23

**D4** 222:9

**D41** 111:6,23

**D42** 111:8,19

**D44** 112:20

**D47** 112:23

**D5** 224:12 228:11

**D50** 114:15

**D5064** 189:22

**D57** 118:17

**D58** 118:18

**D68** 122:4

**D69** 122:21 123:9

**D70** 126:8

**D72** 123:10

**D82** 153:6 161:11

**D9** 222:23

**dad** 97:9

**daily** 60:1,3,7 83:11,17,19,22

**damned** 251:12

**dangerous** 198:15

**data** 137:14,23 138:3,7,17,19, 22,25 139:4,13 140:2,18 141:9 154:23

**date** 8:14 16:25 25:25 34:8 40:3 54:4 87:21 122:6,7,9 153:20,21,24,

25 156:24 166:5 222:15 229:17 232:20 233:22

**dates** 43:7

**daughter** 32:1, 18,19,20,24 33:6,22 35:19 47:19 105:19

**Dawn** 119:23

**day** 18:4 19:2, 7,8,10 34:22 36:12,15 53:10 141:16 224:4, 23

**days** 19:11 53:8,10,23,25 54:7,18 96:20

**deal** 226:14

**dealing** 83:21 173:11

**dealings** 172:3

**dealt** 253:9

**death** 179:4 254:10

**debate** 240:11

**December** 122:6

**decide** 38:13 43:22 56:17 62:12,22 63:25 66:11 67:24 68:1 79:8 82:24 84:2,13,23 85:10 139:10 159:14 176:4 214:3 236:14 237:1

**decided** 42:24 143:15,20 145:5,12,21 158:10 167:2 168:3 174:5 175:22 176:9

**decides** 54:5 69:23

**deciding** 80:24

86:16 146:11 158:4 159:24 160:5

**decision** 13:8, 14 41:21 42:14 43:15,19,21 44:17 51:25 53:3 55:15 56:18 63:9,10, 23 64:12 79:8 80:11 81:20,24 82:2 85:8 131:23 143:22 144:12,21,24 163:7 172:6 173:18 224:9 234:6 237:12

**decisions** 65:14,16

**deck** 184:16

**decrease** 53:6 85:13 136:1

**decreased** 56:24 57:21

**default** 135:20 136:9 207:2

**defendant** 23:15 24:2,10 25:13,19 30:8

**defendant's** 86:23 207:9

**defendants** 220:24 229:2

**defensive** 234:2,20

**deferring** 33:16,18

**define** 31:19 36:24 197:15 236:2

**defined** 167:20

**defining** 241:2

**definite** 201:12

**definition** 198:2,12 202:17,19 209:12 212:25

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 1:17-cv-01698-JPH-MJD   Document 125-56   Filed 08/13/18   Page 267 of 288 PageID #:
5705
The Deposition of MJD CRUSE TAYLOR, Taken on April 18, 2018

265

235:22 236:3,
10,18,19,20

**definitive**
241:2

**degree** 19:22
20:6,20,24 21:5

**degrees** 20:23

**delirium** 213:5

**delivered**
171:6

**delusional**
185:4

**Denver** 31:24
32:6 34:13
47:18,23

**dep** 35:9
254:24

**department**
7:23 8:1,23 9:3,
13,16 10:16
14:18 16:6,8,
13,15 17:3,6,18
18:3,10 19:14
21:25 23:18
27:1 29:12
33:4,24 35:18
38:5,17 40:6
41:5,14,18
42:24 43:11,16,
23 44:8 45:5
48:21 49:14,23
50:11,12,25
51:15,20 52:5
55:21,22,25
60:11 62:2
63:13,14 69:22
73:18,19 74:8,
11,14,19 75:1
76:18,19 77:11
79:4,9 81:4,22
82:7,9 87:20
90:24 102:10
116:8 117:12,
14,22 125:13
126:9 129:8,18
132:20 135:13
138:19 141:25
142:1 159:21
160:6 162:25
163:12 164:4
172:17 174:6,

10,19 187:5
204:19 205:21
206:17 207:14
208:11 209:6
215:13 220:25
221:13,16
226:5 238:15
242:8,10,18
247:12

**department's**
116:24 137:14
212:22 238:8

**depend** 63:17

**depended**
182:5

**depending**
99:17 127:9
129:14 138:13
152:19 240:14

**depends** 34:8
64:9 94:12 96:6
99:14 234:6

**deploy** 73:4
117:12,19
129:24 130:21
131:4,23 214:4
215:1

**deployed**
71:16 73:14
106:10 111:12
119:1,6,22
120:11,16,21,
25 125:17
138:1,25
141:16,19
142:15,18
156:2 157:4
161:9 162:10
176:19 184:20
204:19 210:18
211:2 213:15,
24 216:11
246:1

**deploying**
49:15 111:20
129:3,4 139:11
156:7 186:15
187:23 188:1
204:15 211:5
238:12

**deployment**

73:7,9 106:21
107:8 108:7
111:14 121:5
125:13 127:23
128:25 138:3
139:5 142:19
207:2,3 212:13

**deployments**
142:22 143:3
207:1 243:3
245:11 247:21,
23 249:11,17

**deploys**
107:13 128:20

**deposed** 6:20
23:2,4,7,14
24:15 25:16

**deposition**
6:18 24:1,12
25:6,11,17,20,
24 26:3,16
30:17,23 31:10
46:10,12,19
47:6,11 173:7
255:3

**depositions**
156:14

**depressed**
136:7

**depth** 152:11

**deputy** 11:6
14:23 15:1,5,8,
13,17,18 16:3
30:21 31:17
34:16 37:23
60:22 62:25
65:5,6,12
66:10,11,17,22
67:11,23 75:25
76:1 85:17
86:2,10 90:24
100:8 114:5
145:8,12,14,19,
24 146:4,7,14
147:12,15,18
148:6 151:2,10,
25 152:4
154:19 159:9,
23,24 160:9
163:10 165:3,6
166:1,11,21
167:2,6,7,18

168:10,11,15,
19 169:4 172:8,
13,18 175:2,4,
7,19 176:12,15,
18,23 177:1,8,
23 178:12
179:10,13,19
180:10,15
181:14,23
182:5,10
186:24 187:7
189:15 190:1,
25 205:7,9,13,
17 206:1
217:14,18,19,
21 218:3,7,9
220:3,13,14,22
223:18 224:3,7
239:9

**describe** 71:12
182:6 194:13
197:24 234:10

**describes**
185:2

**describing**
227:10

**description**
229:23 230:7,9,
16

**descriptions**
230:8

**desk** 53:3 55:1
59:25 66:6,23
85:5,23

**detail** 52:25
92:19 231:23

**details** 59:16
107:4

**Detective**
179:3

**detectives**
36:19 179:4

**detention**
171:14

**determination**
108:22 109:3
157:15 159:18,
19 169:3

**determine**
75:2 101:12,16
109:15 110:11,
17 121:21
155:19 171:2
221:23 231:25

**determined**
101:19 102:2
143:11

**determines**
108:23 121:23
173:21

**determining**
109:21 131:7

**Detroit** 32:20
33:7

**device** 92:3

**devices** 42:12
45:11

**died** 178:17
254:1

**differ** 72:23

**differed** 157:16

**difference**
169:24 170:5,9

**difficult** 170:17

**digits** 93:4

**Dine** 14:10

**direct** 6:8 21:4
75:20 86:13
140:3,6,16
176:25 177:23
178:8 179:13,
16

**directed** 75:16
84:22 140:1
172:11 175:4

**directing**
151:14 177:22
178:19

**direction**
174:16 178:22
183:6 234:15,
16,22

**directions**
234:3,11,12

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

directly 65:25

director 238:25 239:9

disagree 210:17 240:12, 16

disagreed 175:3,8

disagreement 175:7

disapproval 52:1 55:11

disapprove 59:25

discharge 208:8

discharged 144:1 235:15

disciplinary 53:2 55:14 176:6 229:7

discipline 50:18 52:23 53:14,18 54:22, 25 55:10,17,24, 25 56:8,12,17, 19,21 57:2,8, 17,21 58:3,13 59:10,11,24 85:9 163:8 175:11,20,25 176:4,11 229:20,24 230:2,24

disciplined 53:15 58:10,11, 22 59:9,12 114:23 115:2,8, 11,15 121:4 124:21 129:4 131:21 162:18, 22 163:4 175:23 204:12 205:2 228:5,8

disciplining 104:1 176:1

disconnect 157:19 158:19 209:13,16

211:12 212:9 213:1 218:23

disconnects 216:19

discretion 75:5 186:5

discuss 152:3, 5,12 215:18

discussion 47:20 48:1 125:20,21 179:3 254:6

discussions 73:15

disease 178:18

disobeys 129:23

dispatch 127:18

displayed 119:21 120:6

dispute 97:6

distance 234:7

District 10:4

division 10:11 15:2,3,9,10,13 16:3 33:10 50:5 145:15,16,17 233:3

doctor 148:24

document 30:9 31:15,19 75:2,3,21 76:4 77:22,25 78:14, 20 79:17 87:18 88:4,21 90:14, 16 95:2 103:17 104:5 108:13, 15 121:12 133:23 140:25 148:17 150:25 161:2 167:15, 19,20 168:5 175:6,15,24 176:1 207:18 208:3,16 221:2, 5,8 226:4

229:2,6,8

documentatio n 74:22 109:1 232:5

documented 56:6,7,8 74:20 78:8 89:14 152:18 153:3 158:12

documenting 74:15

documents 26:2,5,7 31:15, 18 34:13 35:8 86:21 108:25 235:14

dog 47:15 59:2 128:9

dogs 126:1

domestic 79:22

door 18:15 104:20,23 105:16,17,22

doubt 141:14

Doug 15:4 165:3

download 134:1,5 135:7 139:1,13 140:18 157:22 158:22 166:12 209:20 210:4, 16

downloaded 138:18

downloads 138:19

dozen 224:14, 25

dramatically 214:7

dress 37:13, 19,25 70:14,21

drive 79:23 111:13,15,16 112:9 138:12

161:16,21 162:13 220:17

driver 113:3,17 114:11 115:18 116:15

driving 97:9 117:3

drove 117:7

drug 104:19,25

drugs 214:14

drunk 79:23

dry 187:24

DUI 23:19

duplicate 122:18

duplicated 101:2

duration 142:12,23 143:2 160:17 209:19 210:23 212:7

durations 208:20

duties 11:21 50:10 117:7 205:19

duty 113:18 116:2,9 117:13, 21 133:10 138:2,18 142:6 238:21

Duval 114:6

Duvall 15:14

— E —

e-mail 77:1,6 205:9,14

E2 71:19

earlier 40:4 49:22 85:16 104:10 109:16 115:1 124:19 129:17 137:4 141:22 143:7

144:19 151:20 154:22 156:20 167:14 173:7 181:20 217:8 219:11 238:5 240:10 247:13

early 40:24,25 245:16

easier 37:11

Easter 32:1

Eck 31:1 35:13, 23 36:2 147:1 149:16,20 192:9 203:12 205:19

Eck's 31:2,3 148:22 192:6,7, 10 197:17

education 19:17 20:19 33:14

effect 26:22,23 28:11 54:19 58:15 211:11, 14 232:14,24 233:9,21 237:23

effective 216:21

effects 214:14 244:6

efficiently 6:23

elected 169:4 179:10

electricity 135:20

Electronic 220:25

Elliott 31:5 35:14,21,23 36:2 111:8,11, 21,24 113:3,16 114:9,11,23 115:6,11 116:17,20 118:6 147:1 148:23 149:16, 21 182:23

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

183:11 195:10 199:5,9 200:3 203:13,17 204:2,6,11,14 205:2,19,24 206:8 218:11, 19

**Elliott's** 31:1,6 149:7 192:6 201:24 219:2

**emergency** 46:21 126:17

**emergency- type** 206:5

**emotions** 48:5

**employed** 7:25 8:3 9:15 10:5 16:6 17:3,17 21:8 49:14 74:11

**employment** 9:2 16:13 17:20 19:9 56:9 231:25 232:6

**empty** 106:15

**emptying** 249:3

**encounter** 130:24

**encountered** 107:25

**encumbering** 126:24

**end** 12:15 95:6, 7 100:7 114:5 197:20 250:8

**ended** 32:5 224:16

**ending** 93:4 100:19

**energy** 91:19, 21

**enforcement** 16:7 17:16,19, 21 18:1 19:15 21:20 22:13,17 40:2,7,12 48:13

49:2 81:11,14 170:19 186:18 187:4,18 188:20,21,25 208:23 209:2 215:17 226:8

**engaged** 125:14,17 238:2,7,13

**engaging** 235:15,21 238:11

**enjoy** 250:10

**ensure** 238:22

**entail** 62:8

**entails** 62:9

**entire** 136:24 181:3

**entirety** 192:12

**entity** 130:24

**Environmental** 20:12

**equipped** 42:19 45:17,24

**equipping** 42:7

**error** 103:11 154:9

**errors** 162:4,6, 7,18,23

**essence** 247:5

**essentially** 72:24 73:1 235:6

**estimation** 120:14

**evaluate** 213:8

**evaluation** 182:14

**event** 63:2 88:9 96:14 97:18,19 99:13,14 121:1 127:14 134:8, 12,15 135:3 136:19 137:10

142:11 156:24 168:8 170:24 197:13 215:5 216:11,16 219:13 229:23

**events** 97:19 99:8 185:10

**evidence** 146:15 147:10 151:6 156:5,9 158:16 161:3 163:13,16,17 165:6,25 166:19 177:7, 10 179:17 180:4,7 210:9 212:15 219:13

**exact** 16:11,25 43:10 59:16

**EXAMINATIO N** 6:8 252:17 253:4,23 254:14

**Excel** 229:14

**exception** 165:11,13

**exceptions** 54:8

**excessive** 24:21 82:20 83:3,6,9 84:1,6, 15,21 85:4 131:4 198:18 207:24 230:9 239:19,22 240:1,18,22 241:1,2,6,7,14, 24 242:3,13,19, 23 243:7,23 244:13,20 245:3,13 246:1, 5,9,15,21 247:19,21,24 248:2,5,20,22 249:6,12,13,18, 24 251:18,19 252:4,20,25

**excessively** 241:3

**excessivenes s** 241:20

**exchange** 226:12

**excited** 204:22 213:5

**excused** 24:22

**executive** 215:17

**exhibit** 28:9, 12,21 30:3,6 35:8 86:22,23, 24 99:21 133:22,25 140:22 153:5,7 159:6,10 161:3, 8,12 180:14 182:9 189:13, 14,16 190:24 192:11,14 199:9,10 205:7 207:9,15 218:6 220:24 221:3 229:1,4 232:10 240:24

**exist** 74:23 129:8

**existed** 100:24 242:18

**existing** 52:7, 9,11 81:6

**exists** 248:13

**expandable** 233:5

**expect** 79:1 92:14 96:15 248:14

**expected** 242:7

**expecting** 127:5

**expensive** 44:2

**experience** 98:6 188:21 198:12 247:10

**expert** 246:24,

25

**expertise** 98:2

**expired** 143:19

**explain** 7:11 21:13 52:25 53:22 108:17 109:25 131:12 197:22 209:16 228:21 237:15

**explained** 236:24

**explaining** 131:18

**exposure** 208:24

**extended** 208:20

**extent** 79:2 212:14

**extra** 105:7

**extreme** 222:20

**eyes** 170:19

———————

F

———————

**F-O-R-C-E** 99:2

**facing** 115:23 193:14,15

**fact** 31:23 108:22 110:8 125:9 155:23 158:12 162:10, 14 168:5 172:16 173:5 184:5 203:17 238:9

**factor** 121:25

**factors** 109:22 131:6

**facts** 96:20 180:21,25 181:8 182:10

**factual** 107:15

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

**failed** 208:16 231:17 232:2

**fails** 213:25 245:20

**failure** 163:5 204:25 205:3 230:20

**fair** 8:15 16:1 25:8 37:21 40:9 48:10 75:6 78:24 80:23 83:2,14 84:14 85:1,2 86:14 91:11 96:24 97:4 99:18,19 100:16,17 102:7 103:19 106:18,19 107:9 115:5,7 124:19 132:25 135:11 137:24 138:15 139:6, 19 143:1 144:23 154:23 155:13,14 161:19 163:3 164:10 167:5, 11 168:14 174:14 188:11, 14 189:7 204:18 208:10 215:12,15 217:4,15,25 218:4,18,24 219:8,9,18,20, 21 220:2 221:21 222:2, 11 227:15,16 228:20,24 232:17 233:8 238:8 241:25 244:14 248:6,7, 16

**Falco** 73:23 80:19 81:2

**fall** 68:20 234:24

**familiar** 34:18 88:25 89:5 90:15 102:7 133:23 135:16 221:2,6

**family** 46:21

**fancy** 192:17

**fast** 192:21 195:6

**fault** 212:8

**FBI** 20:25

**federal** 251:13, 16

**feel** 53:4 110:1, 4 199:6

**feeling** 244:6

**feels** 106:23,25 108:10,21

**felony** 74:23

**felt** 107:21 108:14,25 109:4,23 110:7, 9,12

**female** 120:25

**Ferguson** 215:18

**fetal** 199:20,25

**field** 6:9 28:16, 21,23 29:2,5,8 30:2,5,11 35:1, 2 42:9 61:11,15 86:20 87:2,5,8, 12,15,17 109:10 132:7, 11,14,18 140:12,14 144:4,7 147:18 156:6,12,16,18 158:18 159:3 177:17,25 178:3,5,10 189:9,12 199:3, 14 210:7,13 211:25 212:16, 18 216:1 243:10,11 247:2,6,8 252:15 253:5, 14,17,22 254:23

**figure** 18:23 123:17

**file** 56:8,9 66:21 181:10 231:25 232:6

**filed** 54:2 63:3 65:7 66:5 67:13

**files** 72:18

**fill** 66:20 90:9 161:25 163:1,5 176:3,5

**filled** 87:20 88:15 89:23 102:9 103:7 219:19,23 220:2,14

**Fillenwarth** 14:25 16:2 50:1 80:7 81:1 164:16 165:2 217:9,21,22 218:1,2 224:6, 10

**filling** 89:11,14

**final** 30:13 43:21 50:23,24 51:12,16,20 52:8 80:10 81:3 85:22 86:17 159:7,12 165:5 167:22 178:12 180:15,25 182:10 190:25 205:7

**find** 112:16 118:14

**finding** 160:21 166:5

**findings** 145:23 146:1 147:24 160:8 166:21,24 167:24 175:2,3, 9

**fine** 35:4 41:12 96:8 132:10 201:21 212:16 219:11

**finish** 7:3,6

**fire** 172:16 248:25

**firearm** 37:2

**firefighters** 168:22

**firing** 248:19

**first-class** 34:1

**fist** 119:16

**five-** 91:18

**five-day** 53:19 54:10

**five-second** 91:20 207:2 208:7

**flaws** 197:11

**fleeing** 127:25 128:1

**flip** 90:7

**flipped** 149:21

**flipping** 136:3

**fluctuates** 60:3,5

**fluid** 201:6 214:7 244:23 253:9

**foe** 226:7

**follow** 44:2 242:7 253:6

**food** 33:14

**Foodcorps** 33:11

**footage** 149:17 185:13,14

**forbidden** 239:20,23 240:8,19,23,25 241:25 242:4, 14,20 252:4

**force** 8:13 9:24 10:2,6,17,25 11:3,16 24:19, 21 26:10,11,16 31:15 39:4 59:20 82:21 83:3,6,9 84:1,6, 15,21 85:4

87:8,19 88:6, 15,18 89:10,22 90:4,5,8,9 91:3, 14 92:13 93:22, 24 94:8,12,14, 23 95:3,25 97:1,23 98:17 99:1,3,6,8,22 100:13,18,23, 25 101:5,11,13, 16,17,18 102:1, 2,9,13,17 103:5,7,16,18, 23 104:11,13 106:11,22,24 107:9,17,20 108:6,11,18,24 109:2,13,17,18, 21 110:3,10,17, 23,24 111:4 112:11,17 114:8,24 115:3, 8,12 116:1,6 117:16 118:19 119:7,10,14 121:20,21 122:16,23 123:24 124:5, 12,22 129:9,10 130:20 131:4, 10,12 138:5,11 139:8 151:4 153:9,13 154:12,25 155:6,19 157:3, 16 158:3,9,13 161:13,25 162:3,6,10,14, 15,19,23 163:1, 5 193:13 195:2 207:24 208:4, 16,17 213:6 214:6,9,11 215:16,21 230:10,14 232:13 234:2, 23 235:7 238:14,24 244:17,23 248:10,22 253:8

**forget** 204:23

**forgot** 206:10, 14 217:9

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

**form** 54:22,24
55:7,9,25 56:1
66:21 84:25
90:14 93:12
102:7 109:7
120:20 176:3,5,
8 210:2 220:23

**Formal** 37:20

**format** 89:4

**forms** 38:6,8
55:17,24 56:12
176:6

**formulate**
188:4

**forward** 101:3
192:12 195:6

**forwarded**
192:21

**found** 31:25
103:23 104:13
132:3 205:18
232:7

**frankly** 33:16
44:1

**free** 199:6

**fresh** 96:4
97:3,7,14

**Friday** 18:19,
24 28:24

**friend** 226:7

**front** 51:11
52:12,14
133:23 147:15
184:23 193:16,
17,18 251:16

**frustration**
213:10

**Fugitive** 8:13
9:24 10:2,6

**full** 20:2
106:15,16
107:19,20
121:23 126:14
158:24 209:17
210:5 211:11,
13 243:4 245:4

**fully** 126:17
133:16 208:3

**fulsome** 7:19

**function**
133:12 134:14
135:2 137:6

**functioning**
133:17

**functions**
135:17

**furtive** 202:6,9

**G**

**G0bribl** 222:2,
10,16 224:14

**G0ronde**
225:4,12

**G13l13725**
101:8

**G14l05480**
110:25

**G14l06082**
112:20

**G14l13725**
101:3

**G15l09369**
118:19

**G15l22079**
122:17

**G15l2209**
122:10

**G16l** 180:17

**G16l11930**
153:18

**game** 211:24

**Gary** 15:14

**Gatorade**
104:7 105:5
106:8 107:6,12,
19 108:3,5

**gave** 107:3
112:9 145:7
173:16 174:5

**general** 27:8,
18,21 50:9
96:10 139:8
140:5 230:17
231:14,21
232:14

**generalities**
253:10

**generally** 34:8
40:2 50:9 57:7
64:4 66:10
71:15 73:22
76:24 77:9
91:5,9 95:6
99:24 100:11
138:21

**girl** 104:23

**gist** 48:10

**give** 6:4 18:22
47:12 53:11,23,
25 78:3 96:10
123:4 129:25
155:2 186:14
198:22 202:25
207:10 249:23
250:12

**giving** 53:13
69:9 187:6,25
188:8

**gloss** 86:5

**Godfrey**
165:14 168:23,
24 172:24
189:24 190:3

**good** 33:21
103:2 105:18
132:8 253:11

**GPD** 205:24
212:22

**Grabbed** 120:1

**Greenwood**
7:23 8:1,22 9:3,
13 10:16 14:1
16:6 17:3,17
18:2,10 19:14
21:25 23:18
26:25 33:3,23
35:17 38:17
40:5 41:5 49:14

50:10 62:1
63:12,15 66:15
67:3 74:11,14
90:24 102:10
116:24 117:11,
21 125:12
126:9 132:20
174:6,9,18
205:20 206:16
207:14 208:11
209:6 220:25
221:13 225:8

**greeted** 48:25

**ground** 6:22
182:24 185:23
193:21 200:7
214:12 234:19
235:2 249:8

**grouped** 28:1

**groups** 208:23
209:3

**guess** 22:3
33:21 45:23
64:19 66:5 68:6
108:20 129:16
131:5 142:4
176:3 180:18
210:6 229:14

**guessing**
107:4 225:6
229:18 245:23

**gun** 37:14
104:25 214:18
248:14

**guns** 32:5

**gurney** 171:12
197:7

**guy** 105:25
224:14

**guys** 28:23
132:7

**H**

**half** 106:15

**hand** 6:3 28:10
58:16,21 88:6,
14 119:18
120:1,3 201:14

214:10 234:13,
17

**handcuffed**
200:5

**handcuffs**
191:10,12
196:8 203:24
204:4 236:6,13,
25 237:1,4,6,
11,19

**handed** 76:24

**handful** 106:1

**handgun**
248:19

**hands** 32:7
48:6,7 185:23
194:16 202:2
235:1

**happen** 14:5
97:11

**happened**
77:25 148:23
149:18 159:20
171:2 250:20

**happening**
194:18

**happy** 7:11,13
50:15 253:17

**harm** 115:24

**Hartman**
150:12

**Hartman's**
254:24

**head** 6:25
59:14 63:18
78:4 107:20

**heading** 88:17
90:22

**hear** 16:14 42:4
185:13 190:18
191:20 198:17
203:6,20
253:22

**heard** 148:24
149:1 150:17,
20

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 1:17-cv-01698-JPH-MJD   Document 125-56   Filed 08/13/18   Page 272 of 288 PageID #:
5710
The Deposition of CHRIS TODD, taken on 04/18/2018
270

hearing 54:4,6
203:22

heated 240:11

held 16:7
17:12,25 22:14

helped 81:2

helping 140:12

Henderson
14:9

hesitate 46:6
126:21

Hessman
10:14

Hey 58:20
67:15 198:24

high 14:19
19:19

highest 49:22

hire 34:8

hired 40:10,15

history 9:3
107:24 108:1

hit 136:10
194:23

hits 163:25

hold 198:19
203:3,7 206:7
210:1 216:4
223:14

holding 135:24
171:24 196:23
197:15 202:5
241:15

Holly 185:18,
19

homicides
179:4

honestly 13:3

hope 77:13
102:22

hospital
143:19 144:2
147:19 148:24
150:4,6,9,15,22

168:23 169:17
170:12 171:6
224:16

hot 58:15

hour 69:10

hours 20:24
21:4,5 46:24
47:4 95:4,13,23
96:3 97:3,6

house 104:25

housebreakin
g 59:2

human 96:13
97:23,24 98:3,
12 253:2

humor 226:15,
19 227:20

hurting 227:23

hypothetical
106:13,19
107:3,15 140:4
169:19,23
170:16 210:10
212:4,5,6,16
244:8 250:16,
18

hypothetical's
107:23

hypothetically
36:21 213:11
244:3,5

hypotheticals
251:15

_____

_____

I

I12017 71:21

Ian 165:11,14
189:24

ID 198:15

idea 204:9
223:3 253:11

IDENTIFICATI
ON 28:12 86:24
133:25 159:10
189:16 192:14

199:10 207:15
221:3 229:4

identified
113:18 116:3,
20

identify 114:13
116:9,25
117:14,22

ifs 130:23

IM 226:7,9

immediately
58:16

impact 232:13

impaired
114:16,18

implemented
36:16 43:2
252:23

important
40:21 105:10
108:2 139:20
161:25 162:7,
10,14 169:10,
17 170:2,13,25

importantly
7:8

impose 53:18
54:10

imposed 58:3

impossible
17:24 249:5

improper
202:11 227:24
228:1,4 251:22

in-car 43:24
44:1,6 45:10

in-service
70:8 71:8,14,25
72:1,5,24 73:3
137:17,19,20,
24 138:21

inaccurate
161:8,19

inappropriate
226:15,19
227:19

incapacitated
94:14

incapacitation
91:20 92:1,2,5

incident 15:25
30:12 32:14,15
36:8 49:17,19
62:13,16 64:24
65:4,19,22
88:5,7,16,25
90:4 93:4,6
95:2,13,15
96:4,25 97:3
100:19 101:7
103:7 110:24
112:20 113:2,5,
10,16,20 114:4
118:6,19 119:5,
9 122:4,6,7,8,9,
10,17,24
123:25 124:4,8,
13,14,18,22
125:22 126:10
129:4 136:15
138:24 141:7,
11 143:8,15
145:4,25
146:16 152:5,
17 153:18,24,
25 159:8 160:3,
4 161:13
163:12 168:18
173:4,14
174:11 179:1,
20 180:12,17,
19,20 182:20
188:24 204:12
215:12 216:23
217:4 218:8
222:15 224:4
225:24 226:4
228:9,19
233:22 237:24
238:14 242:19
244:9 250:15,
17,19,21,23
251:2,4

incidents 62:3
65:15 85:24
102:9 103:3,18

include 56:16
61:23 64:1
105:11 121:17
138:6 230:19

included 31:21
60:25 103:10
104:4 121:15
166:3,4,12
168:9 220:3
229:17

includes 49:17
130:15

including
43:3,12 55:18,
25 164:7

incorrect
38:19,23 39:23,
24,25 70:16
142:24 154:2
155:13 204:7
206:2

increase 53:5
55:5 56:21
57:13 85:13
135:23

increased
53:17 56:23
57:2,17

incumbent
131:11 170:4
209:15 213:14
248:12

independent
244:18

independently
244:18

Indiana 19:21,
24 20:4,9,16
21:9 22:15
31:24

Indianapolis
20:1,5,18

indicating
77:7 88:15
150:12 207:6
231:20

indication
227:8

individual
15:12 24:20
38:12 44:4
53:14 62:19
66:13,18,20

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 1:17-cv-01698-JPH-MJD   Document 125-56   Filed 08/13/18   Page 273 of 288 PageID #: 5711
The Deposition of CRIS WREN, taken on April 27, 2018
271

67:6 69:22
75:15 96:8
104:6,21
106:10 107:5,
11,13,24
111:24 112:2,3
113:17 114:17
116:17 117:3
118:11 119:23
120:19 121:8,
13 128:1,10,14
129:22 130:5,
18,21,23 131:7
132:3 135:21
138:11,14
167:6,23 168:2,
6 186:14
188:24 189:2,5
198:13,18
202:19,23
203:6 204:5
206:18,21
207:19 212:22
213:5,14,25
214:10 215:2,
15 216:12
234:19 235:25
236:1,9,11,23
237:4,6,7
238:12 243:21
244:11,17
245:11 246:2
248:13,20,24
249:1 251:20

**individual's**
24:14,16
108:16 116:5
132:4

**individually**
76:20

**individuals**
15:12 63:12,13
125:14,17
140:16 164:9
168:12 169:11,
18 170:2,14
171:24 178:24
185:12 202:5
215:14 239:10
245:6

**information**
93:12 102:22,
23 103:1 104:3
105:8,9,10

106:4 121:19
160:2,3 164:6
168:13 169:13,
15,24 170:10
173:21 174:3,5
176:3,8 183:21
185:8 229:15,
16 232:6

**informed**
128:11

**informing** 77:4

**inherent**
197:11

**initial** 111:3
131:9 147:21,
23

**initially** 224:9

**initiate** 62:5
63:25 64:20
158:14

**initiated**
116:17 137:1
254:2,10

**initiating** 62:7

**injuries** 150:12

**input** 80:19

**inside** 73:19
228:14

**instance** 55:3
62:25 81:1
105:24 119:2,
14 120:16,21
131:19,24
205:4,5 209:24
236:12 244:17
246:5

**instances**
75:11 82:23
100:7 127:8
133:3 240:12

**instant** 206:8
221:10,12
226:10

**instate** 70:5

**Institute** 97:24
98:17 99:3

**instruct** 76:1
85:18 146:4,7
163:12 174:18
217:17 218:1
224:3,19

**instructed**
85:25 129:22
164:24 172:17
177:9 217:21

**instructing**
76:13 151:25
163:10 178:23
180:10

**instructions**
218:2

**instructor**
234:21

**instructors**
74:2

**intended** 118:9

**intention**
227:13

**interaction**
49:11

**intercity** 33:13

**interested**
10:21

**interesting**
171:8

**interfere**
151:20

**interim** 12:8

**interject** 10:10
75:9 230:23

**internal** 58:1
90:18 101:23

**internally**
93:13

**International**
49:6

**interrupt**
217:14

**interview**
75:21 146:5,9
167:3,10
168:19 169:10,

18 170:2 177:1
179:13 190:3
218:10 219:2

**interviewed**
115:17 146:12
167:6 168:18,
24 169:1
176:25

**interviews**
74:16,20 75:2
76:2 148:12
165:21 167:15
181:15 182:3

**intoxicated**
113:17 114:12

**introduce** 35:3
189:13 207:9

**investigate**
63:4 64:8 66:19
67:25 68:2,10
76:6 84:15
85:19 145:25

**investigated**
64:24 65:15
66:12 68:21
69:6,14 82:21
83:4,10 84:21

**investigating**
62:16 86:3
145:7

**investigation**
10:11 15:3,9
34:17 62:3,6,8,
10,12,23 64:1,
12,21 65:3,11,
12 69:23,24
75:25 76:5,10,
11 82:24 84:3,
13,22 85:1,3,
18,20,23,24,25
86:7,9,10,13,
16,18 101:24
139:5,7,10,12,
25 140:1,17
143:7,11,15,21,
22 144:13,18,
24,25 145:4,13,
20,21 146:2,14,
22 147:13
148:3,10,13
149:24 151:7,
10,11,15,22

18 170:2 177:1
179:13 190:3
218:10 219:2

152:1,4,23
153:1 154:20
157:17 158:4,
11,14 163:11
164:7,10
166:16 167:13,
17 168:6 169:9
171:9 172:20
173:1 177:25
178:25 179:20,
24 180:1,18
181:3 182:2
183:25 189:15
217:10,15,22
218:3,8 220:7
253:25 254:3,
10

**investigations**
62:21 84:20
86:16 151:21
165:4 179:5

**investigative**
30:13 31:16
50:5 76:14
180:11 181:10

**investigator**
75:14 76:6,10,
14 139:14,20
140:3 151:21

**involuntary**
92:3

**involve** 47:19
59:19 64:22
109:14 173:11

**involved** 20:19
23:18 57:8
65:22 70:2 73:6
80:5 89:10 90:8
93:9 94:13
96:9,16 164:9
182:12 206:12
223:23

**involves** 89:21
92:14

**involving**
30:13

**ironically**
104:20

**Ison** 15:3,17
16:3 30:20,21

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

31:17 34:16 50:1 62:25 65:5,6,12 66:10,11,17,22 67:11,23 75:25 145:8,12,24 146:4,7,15 147:12 151:10, 25 154:19 159:9,23 160:9 163:11 165:6 166:21 167:2,6, 8,18 168:16,19 169:4 172:9,13, 18 175:2,4 176:12,24 177:8 180:10 181:14 186:24 187:7,13 189:15 190:25 205:13,17 206:1 217:14, 18,19,21 218:3, 7,10 220:13,14, 22 223:18 224:3,7

**Ison's** 100:8 145:19 151:2 152:4 159:24 166:1,11 168:10 175:7, 19 181:23 182:10 190:2 205:7 220:3

**issue** 15:25 40:2

**issued** 221:16

**issues** 44:18 227:2

**issuing** 57:8 58:13

**IUPUI** 20:1,5 21:4

——————

**J**

——————

**J-O-H-N** 6:13

**J9shase** 222:24,25 223:10

**jail** 236:13

**James** 15:3 16:3

**January** 13:23 87:21 102:11

**jeopardy** 110:2 214:17

**Jesus** 185:5 191:2 216:5 225:19

**Jimmy** 223:14, 17

**job** 16:23 18:1 39:14

**jobs** 17:22

**Joe** 10:18 69:13

**jogged** 178:7, 18

**John** 6:12 198:24

**July** 166:4

**jumped** 206:9

**June** 93:6 100:20 101:7 102:11 153:21 178:16 254:3

**Junior** 104:22

**justice** 20:7,13

**justified** 104:14 109:18, 22 116:1 118:15 119:11, 14

**justify** 214:10

**justifying** 110:10

——————

**K**

——————

**Kennels** 126:2

**Kevin** 104:19, 22 105:21

**key** 115:21

**kick** 196:17,18 197:1 200:17, 24 201:12 236:14

**kicked** 199:19, 25 200:1,12,24

**kicking** 111:24 190:9 191:4,9, 18,21,23 192:4 196:4,11,21 197:5 199:8,15, 24 200:15,22 201:3,9,11 202:10

**kind** 21:19,20 89:10,22 92:18 114:21 164:8 216:10

**kneeling** 195:9

**knew** 43:25 79:15 105:21 144:1 176:21 188:13

**knife** 253:1

**knowing** 82:5 84:17 95:18 158:20 195:11 202:1 209:13 244:12 245:24 246:3

**knowledge** 15:18,19 29:7, 11 35:11 41:5 57:5 72:10 92:23 103:12, 25 105:14 124:2 128:17 135:6 136:12 137:9 143:4 157:9 163:14 167:1 187:17 217:25 219:19 223:17 225:7, 24 229:9 235:8, 9

——————

**L**

——————

**L-A-U-T** 6:12

**lady** 188:17

**lane** 182:21 183:4 184:6,21 193:14 218:14

**language** 92:7, 15,23

**lasted** 10:23 142:19 210:24

**late** 58:3

**Laut** 6:10,12, 15,17 35:20,23 39:21 40:10 147:6 182:23 183:12 195:10 205:19

**law** 16:7 17:16, 19,20 18:1 19:15 21:20 22:13,17 40:1, 7,11 48:13 49:1,2 54:8 74:23 79:22,24 81:10,14 89:10 170:19 186:18 187:4,18 188:19,21,25 205:20 208:22 209:2 215:17 226:7

**lawsuit** 24:7,10 251:13

**layman's** 135:18

**learn** 40:22

**learned** 143:19 144:15 150:14 254:1

**learning** 58:6 59:6

**leather** 37:14

**leave** 46:20 47:9 84:5 97:8

**leaves** 66:14

**led** 166:20 215:13 217:5 229:24

**left** 20:16 21:9 38:12 44:10 75:5 78:23

**92:25 112:8** 119:18 120:1,3 171:5 195:10 200:12 201:2 214:3 239:6

**left-** 88:5

**leg** 195:9 200:11,12,13, 17 201:2

**legitimate** 106:11,21,24 107:17 108:11, 24 109:2 250:13,19

**legs** 171:11,20, 25 190:17,20, 22 191:3,14 196:17,19,23 197:3,4 199:19, 24 200:2,16,22 201:1,5,10,11 202:7 236:14, 15

**length** 135:23

**lengthiest** 80:18

**lengthy** 54:6

**let alone** 197:13

**lethal** 38:7,9 39:4,7 97:1 117:16 233:4

**letter** 232:25 238:18 239:16, 19

**letting** 136:2 241:17

**level** 14:17 24:6 57:17 83:9,16 101:13, 17 102:2 112:17 215:17

**liability** 18:18 207:24

**license** 67:8 69:9

**Liche** 126:2

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

**lie** 185:23

**lieutenant**
14:13,16,22
36:5,6,9,11,21
39:12 53:10
58:12 63:21
75:19 93:18,21,
23 94:5,6 106:9
118:23 119:2,
10 121:14
123:1 141:9,15
147:4,6 151:4
152:5,7 153:15,
22 154:24
155:5 157:12
158:10 160:15
162:17 163:4
175:22 176:19
183:3,11,13
184:6 185:2,18
187:22 188:8,
10 193:13
195:8 209:15,
20 210:16
212:20 219:25
220:1 222:3
224:19,23
225:17,25
226:20 227:1,
14,18 243:3,6

**lieutenant's**
39:14

**lieutenants**
36:17 60:16
70:7 77:24
142:8

**life** 32:2

**light** 184:10

**lighting**
184:11,12
193:17

**lights** 126:17
127:6 183:8
184:16,20,23,
24 193:16

**likewise** 7:5

**limitations**
239:17

**limited** 86:15

**lines** 141:3
225:11

**list** 29:2 87:19
219:14 233:5

**listed** 103:18
122:9 134:12,
16 136:19
142:22 143:3
157:14 209:20,
22 230:6,8,9
234:2 236:4

**lists** 123:19
209:2

**live** 105:17

**lived** 104:19,23
105:22

**liver** 178:18

**lives** 32:20
33:6 214:17

**living** 33:9
105:16

**loan** 33:17

**loans** 33:19

**lock** 241:22
245:8

**locked** 241:19

**Locking**
248:10

**lodged** 218:20,
22

**log** 138:15
141:9 154:5
156:19 160:15
166:12 222:5

**LOL** 224:25

**long** 7:22 8:10,
16 9:6,21 10:24
12:13 19:5
22:16 33:22
34:6 37:5 40:20
45:20,21 47:3
68:14 70:13
142:19 215:15
237:20

**long-term** 19:9

**longer** 54:19
129:12 132:12
240:8 246:14

**looked** 26:9
41:20 110:13
139:1 140:2
210:15 244:18

**loss** 18:15
126:23

**lost** 16:23
211:23

**lot** 40:21 65:23
76:22 126:3
194:14 216:17

**Lott** 205:9

**loud** 185:22

**lower** 55:6
83:16

**lowest** 54:22,
24 55:25

**lumped** 24:23
27:20

**lunchtime**
47:16

———

**M**

**made** 13:9,14
23:20 29:19
42:14 43:16
44:17 51:24
59:14 65:16,20
66:18 76:22
80:12 81:1
143:21 144:12,
20 224:10

**Madison**
192:22 225:19

**magazines**
248:19 249:3,4

**main** 56:11

**Mains** 125:6

**maintain**
229:13 253:6

**major** 194:14

**make** 7:16 19:3

43:21 47:15
53:7 55:14 57:9
63:9 76:7 78:2
81:11 93:24
98:1,11 108:11
109:1,2 120:17
126:24 133:16
159:18 196:9
199:9 242:2

**maker** 251:17

**makes** 119:15
128:22 158:19,
23

**making** 22:23
41:21 152:21
153:15 158:24

**malcontent**
251:19

**malicious**
237:12

**maliciously**
237:9,21 245:2
251:19

**man** 105:4
164:4

**man's** 118:15

**management**
63:3,5,7,11,17,
24 64:2,8,17,
22,25 65:10
84:23

**managing**
36:22

**mandatory**
22:11 71:25
72:6 137:20

**mark** 14:1 28:9
86:20,22
133:22 159:6

**marked** 28:12
86:24 90:11
91:12 93:13
110:22 118:17
122:3 133:25
140:24 153:6
159:6,10
189:16 192:14
199:10 207:15
221:3 222:8

229:4

**marking** 123:8

**Marshals** 8:13
9:24 10:5,16
11:13,16

**Martin** 119:23

**material** 217:3

**materials**
92:16,24 217:2
241:8

**math** 9:11

**matter** 31:23
58:1,24 68:13
96:7 122:8
173:5

**Matthew** 14:25
16:2 80:7,21
81:1

**maximum**
53:18

**mayor** 12:10,
23 13:19,24
14:10 44:23
45:1 50:15 86:2

**mayor's** 13:4,
9,14

**Mcqueary**
12:12,23 13:13

**meaning** 13:13
15:25 19:9
21:12 53:14
73:7 80:9 84:22
209:21 212:9
243:4

**means** 168:12
187:17

**meant** 65:8
141:22 217:8

**media** 13:7
163:25 173:11

**medical** 98:2
117:6

**medics**
171:11,19
190:16,20
201:14

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

meet 46:11,14

meeting 46:21 54:16,18

memo 205:12, 15,17

memories 97:17

memory 57:15 59:16 98:7,12, 20 178:7,19

memory's 98:8

mental 48:5 214:15

mention 119:15 120:18

mentioned 23:1 47:17 98:14 150:11

mentoring 61:5,20

merit 53:22 54:1,4,5,8 55:15,20 56:2, 14,18 83:25

message 66:14 221:10 222:14,19,24 223:4,9,13 224:13,25 225:17 227:25 228:13

messages 221:12 226:10 227:9

met 46:23 47:2, 3 225:19

meted 59:5

method 77:4 92:1

middle 91:16

midsized 247:1

Mike 11:6,7

mile 69:10

mill 69:12

milliseconds 195:4,19

mimicking 227:5

mind 97:4,7,15 118:11

minds 96:4

mine 33:21 173:20 174:2

minimal 183:6 184:11,12 193:16

minor 58:4

minute 91:21 108:9 123:5 128:6 160:18 241:5

minutes 185:3 192:21 193:20 202:16 223:11 254:22

mis 187:12

mischaracteri zes 156:4 212:15

mischaracteri zing 158:16

misconduct 69:2

mispronounci ng 6:14

misrememberi ng 144:20

mistake 153:15

mistaken 235:17

mister 128:4 203:13 212:19

mistreatment 235:17,23 236:10,22 237:7,14

Mitchell 168:24,25 172:24

mixing 118:1

model 71:19 184:15

models 41:20

modifications 76:23

moment 144:6, 12 150:11 155:2

Monday 95:19

month 231:6

monthly 60:2,4

morning 7:20 67:3 95:15,16, 19

mother 143:17

motor 92:4

move 10:15 163:16 195:5 199:19 200:17, 23 201:1,10

moved 163:16

movements 202:6,10

moving 193:24 199:24 200:16, 22 201:5,9

mule 196:18

multiple 109:7 208:23 245:6

multitude 127:9

Myers 14:1

―――――――

**N**

named 24:10

names 88:4 89:1

narcotics 214:14

narrative 88:13 102:15 103:4,16 104:3 111:6,23 112:7, 22 114:10 119:15 121:1,8 155:3

National 21:1

natural 178:17

nature 64:10 68:13 71:13 181:11 196:1

NCI 102:21

necessarily 168:10 231:16 239:14

needed 21:5 38:22 79:9,15, 16,20 80:24 84:3,14 158:11

needing 21:20

negligent 117:7

neighbor 105:18

nerves 92:4

neuromuscula r 92:2

newer 44:13

newspaper 31:21 34:12

nice 225:1

night 8:6,7,10, 23 11:16,19,22

NMI 92:2

nodding 6:25

nonlethal 91:18 117:17, 18

nonphysical 130:15,19

normal 37:16

north 192:22

northbound

193:14

note 128:22 190:6 222:13

noted 89:16

notes 34:16, 19,21,24 148:16 167:22 189:14 190:2 207:18,23 208:19 218:7,9 220:4

notice 193:12

noticed 157:18

noticing 30:10

notification 238:22

number 28:20 62:22 64:4 66:23 67:8,9 69:9 88:3,5,8 90:17,18 93:6 100:19 101:7 110:24 118:19 122:10,17 123:6 134:6 138:14 141:15 153:18 155:10 157:25 161:9 162:9 180:17, 18,19,20 206:17,20 209:22 210:18, 22 211:3 225:18 230:3 231:15 233:2 238:23 245:10, 12 246:14,15, 20 247:17,20, 23 248:5,11,21 249:9,10,11,14, 17,24 251:4,5,7 252:22

numbering 91:12 112:24 122:20

numbers 61:1 88:7,25 90:21 101:2 142:22 143:3 245:23 253:10

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

**numerous**
26:9 79:21

**nutrition** 33:14

---

**O**

**Obama** 81:13

**obeyed** 131:8

**obeying**
128:15

**object** 106:12
109:6,7 155:25
210:1 212:14
246:22

**objection**
158:16 247:7

**objective**
108:22

**objectively**
109:3

**observation**
238:22

**observe**
188:10 189:4

**observed**
191:16 193:21
201:23 218:15
219:5

**observing**
189:2 191:17

**obstructed**
194:15

**obtain** 19:22
75:17

**obtained** 19:22

**obvious** 7:4

**OC** 38:9 232:13
233:5

**occasion**
56:24

**occasional**
80:13

**Occasionally**
173:12

**occasions**
37:20 76:24

**occur** 82:25
95:15

**occurred** 65:4,
25 77:7 93:6
95:2 96:5
150:15 154:5,8
169:15,25
174:14,15
250:14

**occurrence**
58:3 83:11

**occurrences**
83:17,19

**occurs** 60:6
92:2

**October** 18:25
122:4,5,9
136:20

**Odin** 128:13

**offender**
235:17,23

**offer** 246:23

**office** 13:4,9,
14 39:18

**officer** 14:3
16:19 24:18,22
31:1,2,3,5,6
32:19,25 33:2,
23 35:17,18,20
36:4,5,11
38:13,16 39:3,
21 40:10 45:12
49:14 53:15
54:1,2,3,14
55:3 59:12
60:19 61:19
64:8 67:12,14
69:5,12,13
73:17,21,23
74:4 75:6,15,
18,20 80:19
84:10 85:9 86:3
89:8,9 92:25
93:10,14,17
94:3,4,8,13,21
95:2 96:9,10,15
99:12,13,15,18
102:10 104:1,6,

14 105:10,13
106:3,23,24
107:7,12,13,21,
23 108:3,6,10,
13,15,18,21,25
109:4,23,25
110:4,6,12
111:8,11,12,20,
24 113:2,16,19
114:9,11,13,23
115:2,6,11
116:3,10,17,20,
21,25 117:11,
15,23 118:6,23
119:1,5 120:11,
14,15,20,24
121:7 122:13
123:1,4,7,10,
11,18,25 124:5,
20,21,24 125:2,
6 128:2,5,20,
23,25 129:2,3,
23 130:4,11,12
131:11,17
132:21,23,24
133:1,3 135:23
136:14,24
137:1 138:10,
13 139:11
140:16 141:3,
19 142:18
143:3 147:4,6
148:22,23
149:7,16,20
153:14,22
155:4 156:19
157:3,12 160:9
161:7,22
162:17,22
163:3,21 164:3,
17 171:7
178:19 182:19
183:3 185:9
186:7 188:14
189:1 192:6,7,
9,10 193:13
195:9 196:4
197:17 198:11
199:5,9 200:3
201:24 202:17
203:12,17
204:1,2,4,6,11,
14 205:2,24
206:6,8,12,13
208:15 209:10,
24 210:15,18

211:3,6,15
212:6,11
213:15 214:3,9
216:4,9,10,19
218:10,18,20
219:1 222:2,3,
10,15 223:10,
21 224:13,19
225:8,12,17
227:10,14
228:8 229:17,
21 230:2,9
235:20 236:16
238:6,21,23
243:3,21 245:2,
20 246:1 247:9
248:9,24 249:1
252:21 253:1

**officer's** 24:24
56:8 88:4 89:1
90:9 95:16 97:4
107:20 128:16
130:3 186:4
194:15 214:17
231:24 232:6

**officers** 32:4
35:13,16,22
36:2 40:17
41:25 42:7,16,
17 43:2,13
44:1,2,5 45:16,
24 48:22 50:18
52:23 57:3
60:9,11,18,23
61:4,18 63:15,
16,22 64:7
65:23 68:22,23
70:2,6 71:6
76:20 77:5,6,
10,17,22 78:13,
20,23 79:2
82:21 83:16
87:20 92:19
93:9 96:3
100:15 103:24
121:11 125:14,
18 127:5
128:11 133:18
142:5 147:1,8
167:14 175:12,
20 178:24
182:12,23
183:5,11,17,20
186:13 187:5
193:21,25

194:3,19
195:12 196:7,
13 198:17
203:6,18,23
205:18 206:16
207:13 208:10
209:5 213:23
214:25 221:21,
24 225:18
226:6,14 228:5
233:2,9,10,16
239:22 240:17
241:6,23 242:2,
7,22 248:25

**officers'**
224:24

**official** 65:7

**officially** 166:5

**offs** 68:19

**one's** 153:7
200:23,24

**ongoing** 81:16
146:23 151:11
166:17 180:1
215:19

**online** 32:13
66:20 76:23,25

**operated**
79:12

**operating**
27:16 29:20
30:6 79:3
192:15

**operation** 11:3

**operator** 220:1

**opinion** 188:4
244:15 247:17

**opinions**
246:24

**opportunities**
253:19

**opportunity**
10:18 59:6

**opt** 38:17

**option** 234:25

**options** 38:8

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 1:17-cv-01698-JPH-MJD   Document 125-56   Filed 08/13/18   Page 278 of 288 PageID #:
5716
The Deposition of JP CHATE, taken on April 27, 2018
276

oral 6:24

order 27:8,18
67:24 96:5
128:16 129:23
131:9 171:1
188:7 230:17
231:14,15,21
232:14

ordered 120:6
129:22 153:1

orders 27:21
130:5

organizations
209:2

original 88:11,
19 89:16 172:2
239:6

outcome 25:3

oversight
50:12 51:2
55:23 76:6
86:8,11,12
169:7

P

p.m. 153:21
252:12 255:3

pages 87:18
91:12 93:3
99:21 102:5
104:3 122:21
123:21 128:5
140:23 153:13
161:7

pans 200:3

paper 31:20

paragraph
91:17 126:14
185:1 234:1

paramedic
170:5,6

paramedics
191:2,3

parked 182:20
183:4 184:6,20

part 10:21 13:9,

14 16:12 17:6,
15,22 18:1,12
19:9 23:22
34:17 63:14
69:4 81:18
86:22 96:2
99:7,21 108:1
109:15 139:4
148:13 151:15
154:9,24
162:14 167:13,
17 168:6 174:4
177:9 184:25
186:13 189:15
204:12 205:15
217:5 241:25

partition
163:15,19
164:5,18 165:4

partitioned
164:11,21

partitioning
223:25 224:4

passed 143:23
144:15 189:6

passive 237:8

password
164:14

past 18:5 77:25
78:5 188:21

patience
110:22

patrol 16:19
24:18,22,24
44:14 45:17
46:2 59:12
63:22

patrolman 9:4,
6,9,12 17:10
19:13,18 21:11,
12,15,19 22:1,
10 34:1,5 40:6,
11 41:14 75:19,
20

patrolmen
60:16 70:7
142:7

pause 177:16

paused 201:6

pay 54:3,15

pencil 79:20

pending 7:15
54:3

people 62:22
230:24 253:18

people's 97:17
253:19

pepper 38:9
113:3,16
114:11 117:20
118:15

percent 72:21
137:5

perfect 57:14

performed
114:21 178:16
205:19

period 9:16
11:12 15:6 16:5
17:2,16,21
18:2,9 20:8
25:12,17 34:7
43:10,17 45:5,
9,10,16,20,21,
25 48:20 56:25
57:17 74:10
136:25 145:25
147:11 204:15
211:5

permanent
14:19

person 50:6
117:3,6 118:1
171:25 213:6,
13 216:5 244:5
245:4

person's
75:12,13

personal 98:6

personnel
72:18

perspective
131:3

pertained
127:10

pertaining
79:21 99:5
108:2 207:18

pertains 72:1
161:8 209:25
211:6,16
212:12,23

pertinent
171:8

Philadelphia
48:24 49:9

phone 105:3
221:17

phonetic 73:22

phrase 66:3

physical
234:3,10,15,16,
17,22

Pillars 81:14

Pitcher 10:19
12:22,25 13:1

Pitts 168:23,25
172:16,24

place 13:4
76:19 82:16
85:1 86:6,17
143:11,16
145:22 150:9
158:5,11
169:20 170:18
251:14

places 44:3

placing 214:10

Plainfield
22:15

plan 98:22
216:20

planning 33:20

plate 67:8 69:9

play 61:4,17
62:2 146:2,11
194:11,23
196:6 239:4

PLAYED
192:20 199:11

playing 193:2,
5

point 9:23 11:9
48:15,19 55:9
56:11 57:7
83:22 104:25
106:18 128:21
129:16 148:1
160:14 165:7
181:7 182:11
185:18 191:1
192:3 196:15
197:9,23
198:23 199:18
203:5 208:4,25
209:7,11,25
211:7,17,23
212:12,23
233:24 235:7,
11,12 238:1
252:1,7

pointed 241:7

points 192:12
240:16

police 7:23 8:1,
22 9:3,13,16
10:16 14:17
16:6,13 17:3,6,
17 18:3,10
19:14 21:25
23:18 26:25
32:3,19,24
33:2,23,24
35:17 38:17
40:5 41:5 49:5,
6,14,22 50:10,
25 62:1 63:12
66:15 67:3
68:22 71:1,2
74:11,14 90:24
99:5 102:10
113:19 114:13
115:21 116:10,
21,24,25
117:12,14,21,
22 118:2,7
120:20 125:13
126:9 129:23
130:11,12,24
132:20 174:6,
10,19 183:7
204:4,19
205:21 206:16
207:14 208:11

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

209:6 220:25
221:13

**policies** 26:13
27:1,3,8,11
28:3,4,6 29:12
51:11,16 52:8,
9,13 76:17,18
77:11,17 78:8,
24 79:2,4,8,12,
21 80:5,9,24
81:7,11,21,24
82:1,6,13 129:7
205:21 215:19,
20 242:7,10

**policy** 26:12,
16,18 27:10,16
28:10,18 29:10,
22 31:16 39:3,8
41:2 43:2,5
44:20 50:22,23
51:3,19,21
52:5,11,15,19
63:19 74:15,19,
24 77:5,6,8,21,
23 78:9,14
79:16 80:11,17,
25 81:2 82:15,
16 87:9 116:7,
24 117:14,22
125:12,16,19
127:13 129:17
137:22 147:7
204:19,25
205:25 213:7
215:24 230:14
231:10 232:1,
17 233:9,21
234:2 237:23
238:8,15
240:25 241:4,
25 242:13,17
247:14 251:17
252:4

**policymaker**
50:13,20
245:17 247:1
251:13

**policymaking**
50:12

**POLLACK**
28:14,20,22,24
29:4 86:25
87:3,6,11,14,16

140:10 155:25
156:8,13,17
158:15 212:14
252:11,13,18
254:15,19

**Polslider**
73:22 135:15

**pool** 46:6

**portion** 180:24
190:13 232:1

**portions** 193:7
196:2

**posing** 169:22
212:5

**position** 8:3,7,
11 9:21 10:13,
23 11:17,25
12:8,9 16:10,17
17:5,6,9,12
18:12,14 19:4,5
25:24 62:20
199:20 200:1
217:13

**positions** 8:22
16:7 17:15

**post** 216:16
230:11

**Post-it** 222:13

**Powerpoint**
71:15 72:2,25
73:8,15 240:4
241:10 242:24

**practice** 76:9
84:14 85:18
96:10 100:12
102:12 103:19
127:2 137:23
138:7 151:20
187:18

**prefer** 6:19
76:5

**preference**
192:5

**preferred**
139:16

**preliminary**
147:16 148:6
167:21 178:16

**premise** 210:3

**preparation**
26:3,15 30:17,
22 31:10 35:9

**prepare** 46:10,
11

**prepared**
161:7

**preparing**
46:18

**present** 15:7
101:25 103:23
156:14

**presentation**
71:16 72:2,25
73:8,9 207:20

**press** 65:23
173:13,16,18,
22 174:4,11,20,
23

**presume**
210:5

**prevent** 18:16
130:21 136:8

**preventing**
48:3

**prevention**
18:16 126:24

**previous** 7:25
8:5 12:11,22
19:4,13 21:11,
25 22:4 23:1
25:18 41:10,13,
15 43:12 44:10,
17,22,24 45:8
48:15,19 49:12
106:7 107:6,11
150:14 197:23
222:6

**previously**
70:1,12 166:16
237:22

**primary** 77:4
80:23

**prior** 29:14,15
151:2 154:19
158:4,8 185:25
215:4 253:7

**probable**
102:16,19

**probation**
33:25

**probationary**
34:4,7 40:1,18
147:7

**problem** 202:6

**procedure**
27:16 29:22
30:7 74:20

**procedures**
27:12 28:3,4,6
29:21 76:17,18
79:4 205:21

**PROCEEDING
S** 6:1

**process** 40:24
71:5 79:7 80:6
82:22

**product** 220:6

**production**
207:9

**products**
42:13

**profanities**
190:10,18
191:19,20

**program** 36:16
41:3,25 125:25
230:25

**progress**
130:4

**promoted** 12:9
14:7

**prompted**
10:15 47:23
158:1,13

**prongs** 216:18
218:15,20,25

**proper** 108:19
119:20

**properly** 116:6

**property** 88:12

**protection**

184:7

**provide** 6:24
7:19 20:2 29:5
61:20 74:7
176:11 247:6

**provided** 26:6
73:17,20 74:12
105:9 159:8,17
160:2 169:24
174:3 181:4,9
184:7 193:9
198:9 206:17
215:1 229:21
230:2 231:23
242:22 252:1

**providing**
23:21 74:5
176:2,8

**psychiatric**
182:14

**public** 20:12
50:15 51:1,4
82:11,12 173:8,
22 174:4,6

**pull** 58:17
120:2 134:21
135:19 208:7,
17 211:14
228:11

**pulled** 115:18
116:15 117:9
119:18 141:10
156:2,6,8,21
206:9

**pulling** 149:10
157:9 187:23

**pulls** 136:25
137:1,6 141:3,6
209:19,23
210:24 212:7

**punish** 59:2,4
241:3

**punishment**
55:7 56:17 59:5

**Purdue** 20:4

**purport** 221:8

**purpose**
148:20 163:22

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

**purposes**
91:12

**purse** 132:3

**pursuant**
64:21

**push** 197:3

**pushed** 120:2

**pushing** 40:22
202:1

**put** 11:16 15:23
22:4 44:4,14
51:2 52:4 58:21
59:1 95:17
108:24 110:1,8
117:1 122:7
130:24 131:13
140:8,21 154:8
171:11 185:23
187:13 190:17
195:5 234:13
242:6 249:14
251:11,14,20

**puts** 110:6

**putting** 44:12
117:2 214:16
234:17 244:20
253:10

———————

**Q**

———————

**qualify** 19:9

**question** 7:3,4,
6,7,8,9,15
27:14 29:11
31:5 50:9 53:23
54:7,10 64:20
66:2 107:25
108:2,20 109:7,
8 110:7 111:7
117:25 140:8,
15 142:5
144:12 156:11
159:1 166:20
168:1 169:2,7,
8,23 170:17,23
172:2 174:17
186:5,7,25
187:19 192:23
196:10 210:2,3,
11 212:1,10,17

**216:7 217:16**
243:18,19
245:14 246:17
247:25 251:20
252:20 253:15

**questioning**
188:16 214:8
250:8,10,14,25

**questions**
6:24 28:18 29:9
46:9 80:13,16,
18 87:9,13
110:20,21
118:12 167:14
199:1 212:5
246:22 247:3
250:11

**quick** 112:8

**quickly** 6:22

**quit** 44:18

———————

**R**

———————

**Rachel** 125:6

**radios** 228:16

**raise** 6:2

**range** 87:21
156:25

**rank** 14:20 43:3

**ranks** 39:18

**rarely** 173:12

**read** 81:15
105:24 123:5
128:2 159:17
163:21 164:4
165:8 166:2
178:7

**reading** 111:18
113:21 128:17
165:24

**readopted**
239:7

**reads** 91:25
182:11 222:16
223:4

**real** 213:12
214:21 216:3

**realize** 98:21

**rear** 115:23
184:14 193:18

**rear-ended**
183:7

**reason** 7:13,18
19:3 22:5 36:14
40:17 46:6
95:14 96:2
136:16 139:9
141:14 142:21,
23 145:11
149:4 175:3
194:7 210:17,
22

**reasoning**
95:24

**reasons** 36:18
45:2 110:2
133:7 175:16,
24 210:2

**recall** 11:10
16:21 17:23
21:6 23:5,6
24:11,17 25:6,
15 31:18 34:14,
15 35:8 46:17
47:3 49:4 50:5
57:24 59:16
60:10 74:2 96:5
97:25 100:20
104:10 112:12,
13 113:5,9,13
114:2,25 119:6
124:12 143:14
148:2,9,11
149:15,18
150:16 151:6,8,
12,14,16,24
152:13,14
154:13,15
158:3 164:21
166:10,12,18
172:23 178:23
180:6,10
191:17 203:21,
22 210:19,25
211:1

**recalled** 99:9

**receive** 102:23
103:1

**received**
159:22 165:5
166:1 180:5,9

**receiving**
213:13

**recertification**
70:25 71:5
72:8,21,22
73:5,6,16 74:5

**recognize**
87:23 88:3
173:6 206:6

**recollection**
8:20 11:11,19
12:2 13:22
23:20 25:3 46:4
57:1,14,19
78:12 113:19
177:23 254:4

**recommendati
on** 175:19
176:15,18

**recommendati
ons** 57:16

**recommended**
57:3,21 176:12
215:21

**record** 6:11
7:14 61:14,16
101:5 132:15,
17,19 140:8,22
144:7,10,11
177:17,18
189:9,11
220:20 221:9
231:9 252:15,
16

**recorded**
74:24 149:7,16
181:14

**recording**
44:18 45:11

**records**
229:13

**RECROSS**
254:14

**red** 184:14

**REDIRECT**

**253:4**

**Reducing**
18:18

**ref** 180:17

**refer** 51:7
184:9 226:20
243:16

**reference**
227:3

**referencing**
70:8 226:9

**referral** 225:23
226:23,25

**referring** 12:21
31:3,7 32:11
101:1 178:12
183:24 223:17,
25 226:18

**refers** 137:10

**refire** 235:13

**reflected**
72:18

**reflection**
155:10

**reflects** 210:4

**refrain** 191:4

**refresh** 113:19

**refused** 112:3

**refusing** 128:8

**register** 135:3

**regular** 65:21
77:11

**regulations**
28:2,4,5 79:13,
18

**related** 27:1,12
29:22 34:13
65:14 92:25
99:7 107:15
110:24 122:23
124:8 139:5,25
146:15 150:15
161:13 163:13
164:7 165:6
173:13 185:8



Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

218:10 228:12
231:10 242:11
251:4

**relates** 88:6
139:11

**relation** 28:6
29:13 48:21
49:13 57:25
69:17 71:9,13
113:10 122:16
125:21 141:7
151:10 152:1,
17 153:15
160:3 178:25
180:12 189:23
190:3 218:7
226:4 227:18,
22

**relations**
50:15 173:9

**released** 125:2
128:14 144:1
164:1

**releasing**
128:9 131:12

**relevant**
168:13 250:25

**rely** 168:4

**remarkable**
32:2

**remember**
8:13 12:18
16:11,25 24:6,
7,14 25:7 40:22
41:16 48:25
59:13 63:22
72:12 73:12
80:14 82:10
96:20 104:1
114:4 124:14,
17 125:20,23
151:16,18
158:6 165:14,
18 179:11
180:8 191:23
223:10 235:1

**remind** 243:14

**reminded**
144:18 149:20

**remove** 204:4

**removed**
12:22 13:2 82:7

**render** 172:1
206:13

**rendered**
170:7

**Renee** 218:10

**repeat** 66:23
212:1

**repeatedly**
80:18 177:21
203:6 226:22

**rephrase** 7:11
27:14 82:8

**report** 30:14,19
31:17 50:2
85:22 86:18
87:23 88:15
89:4,11,14,16,
19,22 90:1,9,24
91:3,14 92:14
93:8,15 94:24
95:3 96:17
99:20 100:18
101:5,6,11,18
102:2,7,9,14,16
103:5,7,16
104:2,4,11
105:11,25
110:1,4,7,8,24
111:3,4 112:11,
19,22 113:4
114:2,20
118:19 119:7
121:12 122:12,
16,23 123:24
124:5 125:5,9
128:3,5,18
131:18 138:11,
13,20 139:8,24
143:18 148:5,6
151:3 153:14,
22 154:12,25
155:6,7,18
157:3 158:4,9,
13 159:7,12,14,
16,17,23
160:23,24
161:3,7,13
162:3,6,10,15,
19,23 163:5

164:1 165:5
166:1,2,4,5,8,
11 167:22
168:4,10 172:6,
15 175:4,7
176:23 177:9
178:12,24
180:5,9,15,25
181:2,6,7
182:10 183:25
190:25 205:8
208:17 210:16,
25 211:4 221:1
224:17,20
238:24 254:2

**reported** 94:9
123:4 130:8,9
150:7 188:17

**reporter** 6:2,7
7:1

**reporting**
93:17 94:3,7
111:8,20
118:23 123:1,9,
11,18 164:3

**reports** 87:19
90:3,5,22 95:12
96:1,3 97:2
99:23 100:13,
23 102:13
103:18 109:13,
17 113:10
124:12 134:2
135:7 138:5
140:16 144:19
147:20 153:9
161:25 163:1,
21 164:4,7
183:22,23
233:1

**represent**
97:11 136:13
226:2

**representation**
35:5

**reprimand**
53:12 55:5

**reprimanded**
55:4

**request** 143:18

**require** 65:24
78:10 167:10

**required** 38:4,
6 39:3,12,18
40:18 43:4
59:10 65:11
71:4 79:19 83:4
90:9 117:13,21,
24 121:16
133:18,19,20
142:9 147:5
167:15,16,19
230:20 233:1,3,
10,11,14,17

**requirement**
38:2 74:18
77:10,17,20,22
78:20 81:6,21
95:1,8 137:13,
15 138:2 139:4,
12,15,21
162:25 175:18,
23

**requirements**
39:14 70:3
231:15

**requiring**
59:11 245:3

**rescind** 53:13

**rescinded**
53:4

**reserve** 164:3

**residence**
44:3

**resist** 223:5
235:14

**resistance**
171:10,17,19,
22,25 194:4,6,
13 195:13
198:6,20

**resisting**
119:20 128:22,
24 130:7,13,15,
16,19 194:10
213:13 222:20

**respond**
185:25 186:3,
10,15 187:6,17

188:1,9 199:1

**responded**
126:9

**responding**
129:18 182:20

**response**
126:19 127:14
129:11,12,18
223:9,20
224:24

**responsibilitie
s** 173:8

**responsibility**
50:17 81:19
238:18

**responsible**
52:22 247:13

**rest** 6:18 74:7
103:15 181:9

**restrain**
190:22 203:4

**restrained**
190:17 191:9
196:16 197:1

**restraining**
190:20 193:22
196:19

**result** 47:23
54:14 63:8
64:16 228:8

**results** 85:3
178:16

**resume** 253:16

**retail** 126:23

**review** 26:2,5,
25 27:3 30:22,
25 32:8 43:5
55:16 66:7
76:11 77:11,14,
17 78:14,20,23
79:2 81:9 85:6
95:25 99:22
100:1,4,9,12
102:12 103:20
109:13,17
112:15 114:2
121:20 128:6
138:7,19 139:4

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201



KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

140:17 146:15, 18 147:10 148:6 150:25 151:1 154:11, 24 155:7 158:22 163:13 164:15,17 165:6,25 166:15,19,20 181:17 182:1 190:12 191:22 192:1,6,8 199:4 219:1 239:4

**reviewed** 26:8, 15,19,20 27:13 30:17 31:6,9, 11,18,23 35:9, 12 36:1 63:19 66:8 77:23 81:7 102:1 148:1,8, 16,19 149:19, 24 150:2,21 154:16,19,23 155:18 156:20 158:3,8,9 164:9 166:13,16 179:23,25 180:4 181:20 184:2 189:17 197:16

**reviewing** 100:20,22,23 104:10 109:14 112:12,13 113:10 114:3 119:7 124:12, 14,17 138:5 148:9,21 149:15 151:7 154:13 164:1 176:23 180:6

**reviews** 76:4,5

**revised** 27:23 52:12,14 77:8 78:15 79:15

**revising** 80:9

**revision** 29:19 52:7,9,12,18 77:3,5 126:1 232:20 247:14

**revisions** 80:4

**revolver** 36:25 48:7

**reword** 107:10

**rewriting** 80:4

**Richard** 12:12

**Rick** 48:25

**right-** 88:13

**risk** 63:3,5,7, 11,17,23 64:2, 8,17,22,25 65:10 84:23 182:12 183:11, 13,18

**road** 116:4 118:1

**roadway** 185:5 216:5

**Robert** 14:10

**Roberts** 104:19,22 105:10,14,15, 22 106:4

**rock** 202:13

**rocking** 202:8

**role** 43:19 61:3, 17 62:2,5 79:10,11 80:8, 23 81:2 85:24 86:1,8,15 145:20 146:2, 11 159:15 217:9 239:3 247:16

**roll** 197:7,22

**Roller** 15:4 165:3 177:23 179:10

**rounds** 248:19, 24 249:4

**rude** 68:24 69:5 83:17

**rules** 6:22 28:2, 4,5 79:12,18

**run** 36:17 69:12 136:20

**running** 29:2 127:6 141:2

**runs** 30:7 207:11

─────────

**S**

**S-P-E-A** 20:15

**safely** 206:18, 21

**safety** 51:1,5 136:3,7,10 208:25 209:7, 11,25 211:6,16 212:12,23 215:14 252:7

**sake** 187:3 209:18

**sales** 18:19

**sat** 24:1,11 25:6,11,17,20 215:4

**save** 140:10

**say--same** 244:21

**scared** 110:14

**scenario** 117:8

**scenarios** 107:15

**scene** 35:17,23 39:21 75:12 127:5 148:22 149:8,12,17,22 168:23 169:16 171:5,10,18 174:20 182:24 183:12 185:3, 12,20 190:7,13 191:14 204:14, 20 218:19

**school** 19:19, 20 20:11,12

**Science** 97:24 98:17 99:3

**scope** 205:20

**screaming** 105:2 190:9,18

191:19

**screen** 192:16

**seasoned** 179:4

**Secondarily** 210:3

**seconds** 135:21 136:9, 10 142:12 160:19 193:20 206:23 207:6 208:23 209:7, 14,22 210:4,23 211:3 212:21, 22 213:11,12, 19,20,21,24 214:15 215:2 216:6,12 240:5, 8,13,24 241:8, 16 242:25 243:1 248:8 252:8 254:16

**section** 113:22 119:16 189:23

**seek** 172:6

**seldom** 69:3

**send** 76:25 77:6 227:25

**sense** 7:16 19:3 53:7 57:9 76:7 78:2 93:25

**sensory** 92:4

**sentence** 91:25 182:11

**separate** 29:21 84:25 213:6,18

**September** 87:22

**sergeant** 8:6, 7,11,23 9:5,7, 17,18 11:4,17, 18,20,22 14:2, 4,8,10,13 24:6, 9,23 43:3,4 53:10 58:8,9, 11,12 59:10,11 63:21 73:22,24 75:19 135:15

**sergeants** 36:18 39:17 43:12 60:16 70:7 75:20 142:7

**serial** 134:6

**service** 36:23, 24 70:5 117:13

**set** 129:25 208:23

**setting** 61:5,19

**settled** 25:4,9

**seventh** 218:13 223:2 224:12

**severity** 56:21 96:6

**shake** 59:14

**Shane** 172:16

**share** 174:5

**shared** 173:22

**shear** 249:24

**sheer** 246:20 247:17 249:11 251:4,6

**shift** 8:6,7,11, 23 11:17,20,22 36:17,22 93:20 95:7,17 133:21

**shirt** 218:25 219:5

**shoot** 32:5 105:1 214:18 248:14

**shooting** 94:13 96:9 206:13 249:7

**shootout** 96:16 97:1

**shoplifter** 125:3,6 128:11 129:13 130:4 131:5 238:6

**shoplifting** 124:9 126:19

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

127:7,10,24
128:15 129:15,
19 130:4,8
131:8

**shopping** 19:2

**short** 61:9 73:9
96:25

**shorter** 216:18

**shot** 213:9
244:22

**shots** 213:8

**should've**
109:23 115:11
154:3 162:22
220:18

**shoulder**
201:14

**show** 77:3
158:15

**shows** 156:9
184:2

**side** 88:6,14
90:7 118:1
195:10 216:4

**sight** 197:13

**signature**
219:22

**signed** 78:11

**significant**
152:23 208:25

**similar** 65:3
161:1

**Similarly**
177:7

**simple** 96:7

**simplified**
79:25

**simply** 58:2
110:13 198:19
214:10

**single** 248:17

**sir** 6:2 10:2
11:8 130:7
255:1

**siren** 127:7

**sit** 16:20 24:11
25:2 35:7 46:17
57:1,15 78:13
96:16 97:6
103:5 106:2
107:14 113:5,9
115:10 116:19
124:11 127:12
129:7 134:15
135:6 137:9
148:2,9 151:13
152:11 154:18
158:2,7 162:21
164:20 167:1
172:5 178:23
180:3,5 184:19
203:23 210:22
219:4,19
220:11 246:4

**site** 67:7

**sitting** 245:24

**situation** 81:18
94:12 96:6,8
100:24 108:18
109:5,23
110:11 130:3
131:13 170:1
198:16 203:4
206:4,5,11,12,
14 213:9 214:6,
15 240:14
243:21 244:9,
24 245:21
248:10,13
249:14 251:11
253:8,10

**situations**
195:3 204:22
213:4 226:14

**slaying** 31:24

**slide** 207:19,23
208:20

**slides** 207:12

**slightly** 168:2
216:7

**slotted** 60:14

**slowly** 195:5

**smell** 197:13

**Smith** 31:24,25
32:6,17,23
34:13 47:18,23
48:25 49:12

**sobriety**
114:21

**solemnly** 6:3

**somebody's**
236:13

**someone's**
69:8

**something's**
83:9 194:18

**SOP40** 30:7

**sort** 6:21 9:2
21:20 79:16
82:22 83:15
108:22 131:5
169:14 187:24
233:25 234:23

**sorts** 245:7

**sounds** 152:6
197:14

**south** 193:14

**Southern** 10:4

**Southport**
16:13,16,17
17:5

**span** 160:17,18

**spark** 133:13
134:14 135:2
137:6

**SPEA** 20:15

**speak** 98:9
144:5 168:11
172:21 188:12

**speaking** 50:9
69:11 84:12
99:11 132:25
138:21 204:6

**special** 74:6

**specific**
132:20 133:9
139:3 151:14
156:25 216:9,
13,15

**specifically**
27:20 43:6 61:6
80:14 81:13
95:10 127:3
150:3 194:13
215:4

**specifics**
139:2 151:12

**speculate** 13:6
106:13 107:1

**speculating**
227:1

**speculation**
120:23 170:18
203:10 227:7

**speculations**
130:23

**speeding** 64:5,
7,9 66:15,24
67:1,3,19,21
68:7 69:5,12
83:16 170:6

**spell** 6:10

**spelling** 6:12

**spent** 46:18

**spoke** 167:18,
19,25 168:3,5
172:23 173:4

**spoken** 48:16,
21 49:18
167:23

**sponge** 40:23

**spouse** 47:12

**spray** 38:9,10
114:11 117:20
118:15 232:13
233:5

**sprayed** 113:3,
16

**stamped**
140:22

**stand** 24:5
238:10 251:14
253:8

**standard**
27:16 29:20

30:6

**standards**
80:3

**standing** 18:15
116:4 196:15,
17

**start** 7:4 9:1
29:15 110:21
127:17 133:20
192:9 199:18
200:2 201:15
248:9

**started** 16:25
21:10 28:24
29:1 41:16,19,
24 115:22
144:18,24
215:9

**starting** 112:19
141:2 207:18

**starts** 30:7
91:9

**state** 6:10
74:23 78:10
213:8 236:20,
22 237:18

**stated** 185:22

**stated--said**
198:3

**statement**
75:12,13,17,21
78:24 98:12
115:16 116:12
117:2 118:8
148:24 151:18
170:14 185:13
187:12 204:7
206:1

**statements**
165:8,24 168:9
171:1 181:4,11,
19,21,24
185:11 189:23

**states** 93:8,11
113:4 115:18
157:18

**stating** 116:1

**station** 143:18

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

status 40:1,18 147:7

stayed 17:1

Staying 93:3

stemming 178:17

step 82:6

STEPHENSON 30:1,3 34:24 42:2,4,8 61:9, 12 106:12 109:6 132:9 144:3,5,8 177:19 198:24 199:1 210:1,8 211:18,22 215:23 243:8 246:22 247:3 252:12,14 253:13,15,20, 24 254:12,20

stepped 144:17

steps 152:1 180:11

stick 251:23,25 253:7

stimulation 92:3

stop 112:3 120:6,9 127:1 128:9,16 129:23 130:3,5, 12,13 131:9 136:6 246:15 247:25

stopped 118:2 250:3

storage 44:18

store 76:23 126:25

stored 76:19, 25

stores 126:24

stove 58:15,16, 21

straight 199:20 200:1 240:17

strange 187:2

street 105:2

strength 198:18

stressful 99:13 226:14

strike 109:16 219:11

strong 197:14 203:7

struck 182:13 183:5,14 184:7 200:13

structure 49:22

struggling 196:7 197:6

student 33:16, 18

study 22:16 195:2

studying 20:8

stuff 65:23 86:25 87:3,10

stun 111:13,15, 16 112:10 138:12 161:16, 21 162:13 220:17

stunning 187:24

subdued 128:24 171:12 235:16,22,24, 25 236:1,2,5,6, 7,10,19,20,25

subduing 239:20,23 240:19 241:24 242:14,19

subject 120:25 239:20 240:19 241:24 242:14, 20 252:21

subjective 188:15

submissive 245:5

submit 67:7

submitted 67:22 68:8,14 238:24

subordinates 62:16

successful 243:4,22 244:11 245:10

successfully 246:2

sudden 237:1

suicide 224:15

summaries 181:21,24

summary 180:21,25 181:8 182:10

supervising 75:18

supervision 50:17 52:23 86:13

supervisor 24:25 53:6 58:5,7 75:11 93:20,23 94:19 127:8 238:18, 20

supplement 88:18

supplemental 88:18 90:1,5,24 91:3,14 92:13 102:16 111:4 112:22

supplements 88:12 223:14

suppose 14:5 170:16 186:20 189:8

supposed

36:17 137:16 153:25 239:12, 13

suspect 114:16 130:12 235:14,16,22 236:4 238:2

suspended 54:3,14,19

suspension 53:7,19 54:10

swear 6:3

swelling 31:25 32:17

sworn 60:17, 18,19,22

sympathetic 248:25

synch 134:11 137:10 161:3

system 44:14 137:15 138:22 164:3 229:12

systems 43:24 44:1,6

———————

T

tackle 235:4

tackling 235:5

tags 132:2

taillights 184:16

takedown 234:21,24

takes 83:7 201:15

taking 51:19 86:6 118:2 179:3 214:11

talk 47:8 152:25 168:15 198:17

talked 31:14 47:5,10,25 48:12 55:12

82:22 97:1 114:5 143:6 216:16 245:16

talking 32:1, 18,21 47:17 51:10 61:16 69:1 138:20 163:24 187:11 193:2 198:3 213:1 215:9 224:1 230:11 236:19 244:3,9 249:1

talks 115:20 185:4 222:20

tas 209:23

tase 156:3 206:18,21 215:15 224:14 235:5 237:12 245:6

tased 104:6 105:14 106:5 110:14 111:24 119:23 120:9 121:8 125:6,10 135:21 138:11, 14 155:5,11,23 156:1,10 157:13 158:12, 17 188:13 209:21 212:20 226:24 227:23 238:6 243:5,21

taser 27:8,10, 12,15 28:6 29:13,22 30:4 31:16 37:3,8, 14,17,23,25 38:2,9,18,19,25 39:6 41:22 42:14,20 48:16, 21,22 49:1,13, 15,19 70:15,16, 22,25 71:4,5 72:1,9,13,22,23 73:4,7,10,17,21 74:12 78:14 82:15 91:18 92:1,9,14,16, 18,24,25 99:12 106:10,21 107:8,13,16,22

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

108:7,10 109:14 111:12, 20 112:4,8 117:20 119:2,6, 20,22 120:6,11, 16,21,25 121:5 128:20 129:1,3 132:25 133:1,4, 9,12 134:1,5,6, 20 135:7,17 136:14,23 138:1,3,6,7,17, 22,25 139:1,4, 5,11,13,25 140:2,18 141:10,16,19, 23 142:15,18 154:5,24 155:16 156:2,7, 19,21 157:4,5, 8,10 158:20 160:15,16,18, 24 161:9 162:9 166:12 176:19, 21 181:1 185:25 186:11, 14,15 187:3,23 188:2 189:4,5 192:24 206:22 207:2,19 208:12 209:7, 11,17,20,25 210:4,16,19 211:2,4,5,7,11, 14,17 212:24 213:13,16,24 214:5 215:2,21 216:11,20 218:20,24 220:20 228:24 233:5,10,15,17, 21 234:1,6,21, 24 235:2,12,13, 14,21,25 236:9, 21 237:23 238:2,12,21,23 239:5,19,23 240:4,8,13,18 241:1,24 242:3, 11,14,19,23 243:3,6,7,23 244:6,11 245:10,20 246:1,2,4,25 247:14,23 249:11,17

252:7

**taser's** 48:9 132:23

**tasered** 245:2

**tasering** 241:16

**tasers** 27:1 41:6,7 47:25 48:2,12 49:2 61:24 71:10,13, 17,18,19 125:13,16 132:19 134:21, 24 137:14 138:18 142:1 207:14 212:13 216:18,24 245:5

**tases** 251:2,6 252:23

**tasing** 15:25 82:17 127:16 144:14 145:8 148:25 150:13 153:16 157:20 188:9,11 189:2 212:21,25 214:12 215:14 224:21,25 226:18 237:6 241:17

**tasings** 243:22

**task** 8:13 9:24 10:2,6,16,25 11:3,16 62:15 145:7

**tasked** 135:13

**tasks** 76:14

**taught** 92:10, 17 213:12

**teach** 223:5

**teaching** 33:14

**Technical** 239:17

**technically** 54:17 84:12

**technique**

138:12 161:16, 21

**technology** 195:5

**telling** 216:19 234:12

**tells** 115:25 130:12

**temperment** 104:24

**ten** 66:21 75:16 155:15 157:14 160:16

**tensing** 199:12,17

**tenth** 195:8

**term** 202:17 236:3 241:14

**terminology** 188:20

**terms** 14:12 30:12 37:22 39:17 48:11 53:13,17 57:12 59:8 65:2 71:13 73:4 74:15 76:9 79:7 86:15 92:18 105:9 110:9 121:20 129:18 135:7, 18 137:10,13 138:24 140:5 142:23 143:1 145:19 159:24 160:4,5 167:2 169:25 170:10 175:11 179:23 181:19 183:14 186:9 187:18 188:1 193:7 196:1 208:12 209:10 215:14 217:14 218:3 219:22 230:6,7 234:24 240:1 242:23 252:3,6

**terrorist** 16:22

**test** 42:14 114:21 133:13,

16 134:14 135:3 137:18

**testified** 40:4 52:21 85:14,16 91:4 95:11 104:10 108:9 109:16 156:14 166:23 179:23 180:6 181:10, 20 197:17 201:22 210:21 217:10 247:13, 18 251:5 253:25

**testify** 120:17 195:12 196:24 198:1 248:8

**testimony** 6:3 7:19 23:22 24:8 25:5 38:21 52:3 69:16 71:24 101:14 103:3, 22 104:9 106:2 107:7,14 108:4, 12 115:1 118:5 124:20 129:17, 21 130:20 135:1 137:4 147:3 151:19 154:22 158:7 164:23 168:4 170:10 171:16, 23 190:19 191:13 194:17, 24 210:17,19, 25 214:25 216:13 217:20 227:12 233:16 238:5 240:15, 17 241:9 243:15 244:7 245:22 247:7 248:6 250:12 251:25 253:7

**testing** 41:19 42:11 43:13

**tests** 137:6

**text** 224:24

**thanked** 49:1

**Thanksgiving** 18:4,8,24

**theft** 18:16 127:4

**thief** 130:12,13

**thin** 107:4

**thing** 7:5 13:12 30:16 34:21 47:7 48:23 58:4 72:25 92:18 98:20 121:23 127:6 147:14 157:9 163:15 164:8 181:6 193:12 202:10 216:16 223:11 244:21 246:18 247:19,22 251:9

**things** 18:21, 23 26:10,15 38:14 40:21 59:13 67:15,22 68:19 69:2,6,14 81:10 89:3 109:20 126:3 127:10,11 179:22 181:11 208:12 215:18 223:22 226:12 245:7

**thinking** 188:15 248:9

**thought** 36:18 38:21 40:24 44:4 83:25 101:12 168:13 169:17

**thrash** 201:16

**thrashing** 190:9 191:19, 21 192:4 196:5, 12,21 197:19, 25 198:2,4 199:8,16 201:17 202:8, 14

**threat** 108:23 110:2 120:15 234:7 236:16

**threatened** 106:23 107:21

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 1:17-cv-01698-JPH-MJD   Document 125-56   Filed 08/13/18   Page 286 of 288 PageID #:
5724
The Deposition of CRAIG DARIN, taken on April 18, 2018
284

108:10,14,21
109:1,4,24
110:1,5,7,9,12

**threatening**
252:22 253:2

**threats** 108:19

**three-dimensional**
197:13

**three-minute**
160:16

**throwing**
104:7 105:5
106:25 108:3,5

**thrown** 106:8
107:20

**throws** 107:6,
12

**tie** 171:11

**tied** 191:3,14
197:2

**till** 41:15

**time** 7:12 8:4,
16 9:16 10:14
11:23,24 15:6,
24 16:5,12
17:6,15,16,22,
25 18:1,2,9,12
19:9 20:9,11
21:9,10 22:5
23:6,14 24:9
25:12,16,17
36:8 41:10,13
43:11,17,24
44:19 45:4,5,9,
11,16,20,21,25
46:18 47:2
48:20 49:12
56:19,25 57:18,
21 59:5 60:4
67:6 72:9 74:10
79:17 81:8
82:17 91:17
94:15 97:17
98:7 102:1
105:13 107:22
113:11,21,24
115:22 119:7,
19 120:15
125:15 126:3,

23 128:13,22
129:22 130:18
135:24 136:2,
15,25 137:18
140:11 142:14
143:2,10,19
145:25 147:7,
12 154:13
155:19 156:25
160:17,18
176:17 183:7,
12 185:24
186:3,10,15,16,
23 187:6,17,25
188:8,9,12
189:3,6 191:12
192:23,24
193:1,2,5,8
197:8 204:15
211:5 214:9
215:7,8,18
219:11 221:4
224:8 227:3
228:21 232:24
235:15 238:5
239:7 242:18
243:5

**times** 22:3 23:4
37:5 46:14
56:16 66:21
75:16 92:20
112:3,4 138:12,
14 141:11,15,
18,20 142:17
155:6,11,23
156:3,4,7,8,10,
22 157:1,6,14,
20,25 158:13,
17 160:16
161:9 162:9
176:20,22
206:6,17,21
210:18,19
211:10 214:19
224:14,25
243:21 244:12,
19,22 245:2
246:2,6,7,11

**timestamp**
193:6 200:10
201:7,13

**timestamps**
197:18 198:9
199:7

**timing** 147:15
169:6

**today** 7:2 11:3
16:20 24:11
25:2,18 26:3
30:17,23 31:10
35:8,9 46:12,17
47:6 48:15,19
49:12 57:1,15
70:17 78:13
89:5 97:8 103:5
106:3 107:14
112:16 113:6,9
115:10 116:19
124:11 127:12
129:7,8 134:15
135:7 137:10
148:3,9 151:13
154:18 158:2,8
162:21 164:20
167:2 172:5
178:23 180:3,5
184:19 210:22
219:4,19
220:11 222:6
224:14 245:19,
24 246:4
254:13

**today's** 80:3

**Todero** 16:1
29:1 30:13
47:24 49:18
62:3 65:4,19
82:17 136:15
140:23,24
141:7 143:23
144:14,15
145:8 146:16
153:16 155:6,
11,23 156:3
157:13 158:12,
17 159:8 160:3,
5 161:13
163:11 168:22
170:3,11,15
171:4 173:14
174:11 176:20
178:17,25
180:12 182:14,
24 183:16
184:2 185:4,9,
15,22 186:23
187:6 188:8,11,
13 190:6,14,20

191:2,14 192:4
193:21 194:3,9,
16,25 195:9,21
196:3,11 198:6
199:7 200:5
203:14,18
209:11,21
212:8,20
215:13 216:23
217:5 218:8,14
222:15 224:21,
25 225:23
226:4,19,24
227:4,5 228:9,
19 233:22
237:23 242:18
243:5 244:9
251:2,4 254:1

**Todero's**
143:17 170:23
171:17 191:3
201:23 218:21
227:19,22

**Toderos** 65:7

**told** 105:1
112:2 121:12
168:21 224:7,8
252:20

**tomorrow**
254:23

**ton** 83:21

**tool** 48:9,13

**tools** 32:7

**top** 63:18 78:4
90:17 93:17
153:20 180:16
222:10 228:14

**topic** 215:16

**total** 110:13
141:11 160:17
183:25 213:19,
21

**totality** 158:20
243:24

**touch** 192:16

**towel** 196:20

**town** 100:2

**track** 46:24

**traffic** 47:8
182:21 183:17,
20 184:3,8
185:15 221:10
224:15

**trail** 229:7

**train** 61:6
209:14 214:6,
24

**trained** 186:13
208:11 209:6
213:23,25
215:22 239:22,
25 240:18,21,
22 241:6,23
242:1,3

**trainer** 61:7

**training** 10:1
21:11,13,14,19
22:11 30:4
61:4,18,19,21,
23 70:2,3,5,9,
25 71:9,13,14,
25 72:1,5,8,9,
14,21,22,23,24
73:3,5,6,17,21
74:6,7,12 75:1
78:9 92:24 99:7
126:2 137:20,
24 138:22
186:11,14
187:3,4 206:17,
20,22 207:13,
19 208:15
209:10,24
211:6,16
212:12,23
213:17,20
214:21,22
215:1 216:10,
14,15 217:2,3
238:25 239:8
240:7,23 241:7
242:5,22
246:25 252:7

**transcript**
243:16

**transfer**
164:16

**transpired**

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

285

171:7,12

**traumatic** 96:14 97:19 99:8

**traveling** 69:10 192:22

**trial** 25:9 45:25

**trigger** 134:11, 20,22 135:3,19, 24 136:2,5,10, 25 137:1,6 141:3,6,10 156:2,6,8,19, 21,25 157:10 187:24 208:7, 17 209:19,23 210:24 211:14 212:7 241:16, 17

**trivial** 58:4,24 59:17,18

**Trooper** 166:2 172:6,21

**trouble** 241:18

**troubling** 67:14 69:18

**truck** 116:5 118:16

**true** 13:12 35:6 170:12

**trunking** 228:14,15

**truth** 6:4,5

**truthful** 7:19

**turn** 40:23 117:5 149:21 206:6,10,14 222:8 230:20 231:17 232:2 235:10

**turned** 22:6 119:17,25 149:10,11 231:3

**twin** 32:20

**two-** 164:3

**two-dimensional** 197:12

**two-prong** 213:1

**tying** 171:19,25 191:22

**type** 53:2 69:23 73:8 97:19 129:14 134:9, 15 135:3 137:10 142:11 156:24 169:12 170:6 194:4,5, 13 206:11 214:14 221:5 245:21

**types** 42:11 67:20 68:18 69:21 134:12 136:19 241:19

**typical** 69:4,7, 12 126:19 131:3

**typically** 62:20 69:11 71:24,25 72:2 91:11,13 92:14 96:24 97:2,17 99:11 100:12 121:12 132:25 133:2,8

**typing** 225:13

**U**

**U.S.** 8:12 9:24 10:5,16 11:13, 16

**uh-huh** 6:25 104:8 196:25 207:25

**ultimate** 50:17 51:24 52:8,22 53:3 155:23

**ultimately** 42:23 52:22 86:12 214:17

**unable** 94:14 96:20 194:25

**uncomfortable** 250:9

**underprivileged** 33:13

**understand** 7:8 56:3,6 66:2, 4 69:8 72:20 75:14 83:10 91:13 97:13 101:2 102:16, 20 106:18 107:3 109:9,12 117:25 125:25 126:23 131:1,2 156:13 164:2 169:22 170:8 171:13 172:2 174:17 204:22 210:10,12 216:7 226:16 240:16 247:7 250:9

**understanding** 82:5 97:24 102:6,14 188:16

**Understood** 92:22 94:1 114:1

**undertake** 76:14 163:11

**undertaking** 140:17

**unforeseen** 213:4 248:8

**unfounded** 84:7

**uniform** 15:2, 9,13 16:3 37:6, 16 39:20 70:13, 14,18,20,21 80:17 145:16 233:3

**units** 41:20 42:11,15,16

**University** 19:21,24 20:4, 10,16,25 21:9

**unjustified**

103:24

**unknown** 66:18

**unprofessional** 228:2,6

**unusual** 14:2,3

**update** 79:20 82:1,2

**updated** 27:24 44:13 79:9,16 80:25 81:25 82:2,15 232:17, 18,19

**upload** 137:23 138:2

**uploaded** 138:22

**uploading** 137:14

**upper** 199:13

**urinated** 121:8,13

**usage** 160:24 181:1

**user** 104:19,25

**V**

**vague** 152:7

**vaguely** 114:4

**vehicle** 44:14 67:1 132:4 182:13,21 183:14 221:11, 13,17 227:24

**vehicles** 64:5 66:24 67:19,22

**vein** 7:2

**verbal** 6:24 53:12 54:23,25 55:4,18 56:1,3 185:23 234:3, 12

**verbally** 120:8

**verbiage** 80:2 115:25 187:12 239:6

**version** 185:10

**versions** 81:3

**versus** 176:11 183:11

**veteran** 195:15

**video** 30:22 31:2,3,6 74:24 146:19 149:5 150:4,6,21,25 164:8,15,18 166:15 171:10 181:14 184:1,2, 22 185:14 190:13 191:18 192:6,10,12,20, 25 193:1,4,6,9 196:1,2 197:17, 19,24 198:7 199:4,7,9,11 201:19,24 203:17 219:1

**video's** 197:11

**videos** 30:25 31:9 35:12,13 36:2 146:21,25 147:11 148:16, 17,20 149:19 150:2,15 151:2 171:18 181:17 182:3 190:13 192:2,3 197:12 203:12,16

**view** 76:4 106:21 191:18 194:1,15,24 201:18

**viewed** 73:15 147:19 163:18

**viewer** 194:12 195:18

**viewing** 148:17

**Vince** 28:15 30:1 87:1 109:6 144:3

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 1:17-cv-01698-JPH-MJD   Document 125-56   Filed 08/13/18   Page 288 of 288 PageID #:
5726
One Deposition of CRIS JOHN LAY, Taken on April 12, 2018
286

violate 211:5

violated 205:24 209:10, 24 211:16 212:11 231:16 232:1

violates 212:22

violation 58:4 79:21 89:9 116:23 204:25 229:18 230:13, 16 231:14,19, 20 238:7,11,14

violence 79:23

violent 202:20, 23 203:1,9,14, 18,23 237:2

Virginia 20:25

visible 126:17

vocal 105:17

Vohne 126:2

voicemail 66:14

volatile 104:24

voluntarily 115:18

---

**W**

wait 91:21 145:23 158:1 254:22

waited 157:17

walk 105:2 126:25 130:5 183:16,19

walked 117:9

walking 119:17 120:1,8 184:2 185:5,15 224:15

Walmart 127:3

Walters 185:19 186:21,22 187:8,16,21

188:4,7

wanted 28:18 43:25 78:4 81:15 148:23 150:4 152:25 168:25 224:20 231:25

wanting 95:22

warned 120:9

warranted 53:4 56:17 100:25

washboard 130:25 131:14

watch 150:8 192:11 201:7

watched 73:14 149:1

watching 149:5 150:14 201:6

water 106:25

ways 62:24 76:22

weapon 36:23, 24 106:17 234:2 235:13, 15,16

weapons 38:9 39:4 117:13,19, 20 232:14 233:4,13,18

wear 36:19,20, 22 37:17,18,23, 25 39:3,18 40:18 43:4 142:8 147:5,8

wearing 39:22

Weaver 123:4, 11 124:5,21,24 125:2 128:23 129:3 131:17

Weaver's 128:2,5

web 67:6

website 67:23

week 58:19 100:4

week-long 99:5

weekend 95:17,18

weekly 60:1,3

weeks 22:20 58:20,22

welfare 115:19 116:13

What'd 28:20

whichever 6:19 74:4 193:6

whomever 198:3

wife 16:23

window 115:22

witnesses 146:5,8,12 167:3,7,16 168:8,17 170:10,24 171:1 174:10, 11,19,23 176:25 177:2 182:6

woman's 116:4

wonderful 48:9

word 157:5 202:11 240:25 241:1

words 117:1 188:11

wore 142:5

work 11:4,23, 24 16:12 17:22 46:8 50:15,16 76:21 111:25 220:6 246:12, 13

worked 18:2 19:14

working 18:13 133:5

works 27:22 33:10,13 50:16 51:1,5,6,7,8,12, 25 52:4,13,16, 19 81:4 82:9, 11,12 136:4

world 213:12 214:21 216:3

world's 32:6

worn 40:19 43:23 44:9 171:10 192:2 197:12

worse 98:9

worth 249:4

would've 39:21 65:24 102:12 103:19 105:10 116:1 121:25 137:1 152:18,24 153:2 157:17, 23 158:1 163:24 164:25 169:10 190:2

Wright 11:6,7

write 67:2,7 96:17

writing 68:14 167:15 194:20 195:16 220:9

written 27:11, 23 29:12,22 31:20 53:12 56:4 68:8 74:19 76:18 112:18 118:14 139:21 160:9 181:20 204:21 206:11 231:10 242:17 251:24 252:3,6

wrong 33:18 155:4 193:15

wrote 131:17 206:4

---

**X**

X00730387 134:6

X26 91:18 92:1 134:5,24 135:2, 16,17,19 136:13 141:23, 25

---

**Y**

year 8:18 10:8, 24 11:13 15:17 16:11,12,21 18:5,6 21:6 22:12 23:9 26:18 34:9,11, 12 40:6,14 41:4 48:25 49:4 71:17 81:21 184:15

year-and-a-half 8:18

years 9:9,12 23:11 34:1 71:16 73:3,11, 12,14 74:3 98:8 198:11

years' 247:9

yelling 120:1,2

yells 66:14

young 40:23 105:4

younger 186:6

your-- 107:18

youth 33:14



Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com