UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| TERESA TODERO, as Special Administrator | ) | |
| of the Estate of CHARLES TODERO, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Cause No. 1:17-cv-1698-TWP-MJD |
| | ) | |
| CITY OF GREENWOOD, BRIAN BLACKWELL, | ) | |
| RENEE ELLIOTT and ELIZABETH LAUT, | ) | |
| | ) | |
| Defendants. | ) | |

## REPLY MEMORANDUM IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT

In effort to defeat the defendants' summary judgment motion, plaintiff takes liberties with the facts and even goes so far as to misstate them. Zealous advocacy is one thing, but misleading assertions are another. The court should take special care to review the evidence because in certain instances the evidence cited by plaintiff does not support the "facts" and inferences she asserts.

Moreover, much of what plaintiff calls evidence is not evidence at all, but documents manufactured by her counsel. For example, plaintiff's radio traffic timeline [Filing No. 125-60], body camera timeline [Filing No. 125-61], and taser deployment timeline [Filing No. 125-62] are documents created by a paralegal in the office of plaintiff's counsel, who plaintiff would have the court believe can state the facts of this case even though he was not an eyewitness, has no specialized knowledge or training with respect to the items he purports to interpret, and does not explain why the court should accept the methodologies he used in interpreting the various items he reviewed to come up with his view of the facts, rather than obtain the facts from the actual documents, video, audio, and testimony in the record. Neither the paralegal nor his timelines

were identified on plaintiff's preliminary or final witness and exhibit lists, [Filing No. 41; Filing No. 124], and the paralegal was never identified as a fact witness or "analyst" for purposes of calculating timelines and offering testimony. The timelines also constitute inadmissible hearsay,[1] and witnesses who are not experts are permitted to testify by affidavit only from their own personal knowledge. *Visser v. Packer Engineering Assoc., 924 F.2d 655, 659 (7th Cir. 1991).* Affidavits may be used to provide only testimony that would be admissible at trial. *Cehovic-Dixneuf v. Wong, 895 F.3d 927, 931 (7th Cir. 2018).* The affidavit and timelines prepared by the paralegal should be disregarded.

Plaintiff also submitted as evidence a report of a police practices expert, Roger Clark. Without burdening the court with a full litany of *Daubert* objections, Clark's conclusion that defendants violated "national standards" and "national police practices" should be disregarded. Whether certain standards are imposed "is not a question of fact, to be resolved by the jury after a battle of experts" but "a question of law, to be resolved by the court." *Bammerlin v. Navistar Int'l Transportation Corp., 30 F.3d 898, 900 (7th Cir. 1994).* Expert testimony as to legal conclusions that will determine the outcome of the case is inadmissible. *Good Shepherd Manor Foundation v. City of Momence, 323 F.3d 557, 564 (7th Cir. 2003).* Also inadmissible is Clark's opinion that Greenwood's alleged "deviation from these standards . . . is reflective of the custom and practice of the City of Greenwood to endorse gross over-dependence on the Taser . . . ."

---

[1]    Plaintiff's brief references other hearsay as well, including the unsworn statements of certain witnesses and the unverified transcripts thereof prepared at the request of plaintiff's counsel—specifically, Filing No. 125-28, Filing No. 125-29, Filing No. 125-30, Filing No. 125-31, Filing No. 125-32, Filing No. 125-33, Filing No. 125-34, Filing No. 125-35, and Filing No. 125-58. These videos and transcripts should be disregarded because testimony offered in connection with the summary judgment must be presented in a sworn affidavit or in a transcript of sworn testimony, not in the form of an unsworn statement. *Baines v. Walgreen Co., 863 F.3d 656, 662 (7th Cir. 2017).* Moreover, each of the witnesses who gave unsworn statements were deposed.

[Filing No. 125-45, at ECF p. 14.] The court, not Clark, will be the judge of whether there is sufficient evidence of a "custom" for *Monell* purposes.

Clark's opinions concerning Elliott and Laut are likewise inadmissible. He claims they "should have perceived that the situation was stable . . . and did not justify any use of force," and that they "had an ethical and professional obligation to intervene" but instead "participated in the unnecessary and dangerous use of force on Mr. Todero by grabbing at his sides and arms, attempting to force him to roll over . . . ." [Filing No. 125-45, at ECF p. 17.] Opinions of this nature are irrelevant to the court's inquiry concerning whether Elliott and Laut's use of force was objectively reasonable based on the circumstances they confronted as required by *Graham v. Connor*, 490 U.S. 386 (1989). "As they did regarding their excessive force claim, plaintiff acts as if her expert reports can replace—or at the very least, allow them to ignore—the established legal standards governing their claim." *Estate of Williams v. Indiana State Police*, 26 F. Supp. 3d 824, 859 (S.D. Ind. 2014), *aff'd*, 797 F.3d 468 (7th Cir. 2015).

### A) Response to plaintiff's Statement of Material Facts in Dispute—Elliott and Laut

Plaintiff's Statement of Material Facts in Dispute mischaracterizes and misstates the evidence in attempt to cast the efforts of Elliott and Laut in securing Todero in handcuffs as excessive force. Her brief at page 15, styled "Elliott and Laut Use Force on Charlie," asserts that the following bullet-pointed statements are "facts."

- "Elliott put her left knee into Charlie's left shoulder." [Filing No. 128-2, at ECF p. 24.]

According to plaintiff, this "fact" is supported by "Ex. 20A at 14:7-15:3; Ex. 9 at 160:12-161:11." [Filing No. 128-2, at ECF p. 24.] However, Elliott's actual statement as found in plaintiff's Exhibit 20A (notably, an unsworn statement) was:

> Elizabeth comes over. And I remember when she came over after I did the pressure point, we're yelling to give the arm, even kind of put my left knee on his left shoulder a little bit. And then Elizabeth and I kind of rolled him up once she got there. Rolled him up, I got the arm—as she pulled it out. I don't remember who pulled it out. But, I mean, we didn't hurt him. We just pulled it out and then handcuffed him.

[Filing No. 125-30  (Elliott Unsworn Statement to Ison at p. 14, l. 13-22).] Moreover, Elliott's actual deposition testimony as found in plaintiff's Exhibit 9 is that when Todero refused to give up his arm following application of a pressure point technique, Elliott "put [her] knee up on his shoulder to get a good angle." [Filing No. 125-17, at ECF p. 162-63 (Elliott Dep. p. 160, l. 25 – p. 161, l. 1).] The citations in plaintiff's brief do not support plaintiff's claim that it is a "fact" that Elliott used excessive force by putting her left knee into Charlie's left shoulder.

- "She [Elliott] put the full weight of her knee on his back."

According to plaintiff, this "fact" is supported by "Ex. 12A at 30:22-32:1; Ex. 9 at 160:12-161:1." However, witness Holly Walters's actual statement as found in plaintiff's Exhibit 12 A was:

> Q.     And how was she doing that (i.e., how was Elliott assisting Blackwell to get Todero's hands out from underneath him)?
>
> A.     I believe she was on, you know, like on his back, perhaps, with like a knee on his back to hold his, maybe, body still. And then trying to get his arms up while they're still pleading to just do it voluntarily.

[Filing No. 125-20, at ECF p. 32-33 (Walters Dep. p. 30, l. 22 – p. 31, l. 2).] And plaintiff's citation to Exhibit 9 is the same deposition testimony quoted above—i.e., that after the pressure point technique was unsuccessful, Elliott "put [her] knee up on [Todero's] shoulder to get a good angle." [Filing No. 125-17, at ECF p. 162-63 (Elliott Dep. p. 160, l. 25 – p. 161, l. 1).] The citations in plaintiff's brief do not support plaintiff's claim that it is a "fact" that Elliott "put the

4

full weight of her knee on [Todero's] back."

- "Elliott and Laut held Charlie down and climbed on top of him."
  [Filing No. 128-2, at ECF p. 24.]

According to plaintiff, this "fact" is supported by "Ex. 8 at 84:10-16; Ex. 20A at 9:1-9;

Ex. 46 (Eck Interview) at 3:20-4:9." [Filing No. 128-2, at ECF p. 24.] However, Blackwell's

actual deposition testimony as found on page 84 of plaintiff's Exhibit 8 was:

> Q.      No?
>
> A.      Not that I remember, so you know, I'm sitting here moving it, like, around, a couple of times until I was, like, surely there's going to be a spot here that's going to make it through the blue jeans or get a better connection.
>
> Q.      Why didn't you—
>
> A.      But it never did.
>
> Q.      -- do it on his arms?
>
> A.      Well, because officer Elliott was on top of him and his arms were underneath him.
>
> Q.      On his back. Same place where you tased him?
>
> A.      Officer Elliott was on top.
>
> Q.      You couldn't find a place?
>
> A.      Well, yeah. I was. I was moving all around his legs.
>
> Q.      Oh. Did you ask her to move so you could find a place?
>
> A.      No. It was a little chaotic. I mean, she's on top of him trying—or trying to get him—or not on top of him, but she's to the side of him to where, you know . . .

[Filing No. 125-16, at ECF p. 86 (Blackwell Dep. p. 84, l. 1-25).] And the cited portion of

plaintiff's Exhibit 20A, Elliott's unsworn statement to Ison, is as follows:

> Q.      The first arm you got, was his right arm?

A.     His right, his right arm. Because as soon as he tased him, it jerked down because I'm over him. He's laying here with his head facing north, and I'm over him this way. I get that right arm, get the handcuff on. He's tased again. Charlie jerks my arm down right in between the barbs. So (inaudible) I get shocked."

[Filing No. 125-30, at ECF p. 11 (Elliott Unsworn Statement to Ison p. 9, l. 1-9).] When the Court examines the actual evidence, it will see that neither plaintiff's Exhibit 8 nor plaintiff's Exhibit 20A support the notion that Elliott and Laut held Todero down and climbed on top of him.

Likewise, when the Court reviews Eck's unsworn statement to Ison, which plaintiff refers to as "Ex. 46," it will see that Eck said:

Q.     Did you observe them applying handcuffs or was he already handcuffed?

A.     They were applying them – just finishing applying them as I showed up. So, when I exited my vehicle, I kind of saw Officer Elliott on top of him placing the handcuffs on him. So, they already began the process of just kind of, maybe, getting the last one on when I walked up to them. I could see they had him under control. He wasn't physically fighting anymore, so I didn't need to go assist them in detaining him or trying to settle him down anymore.

[Filing No. 125-58, at ECF p. 5-6 (Eck Unsworn Statement to Ison at p. 3, l. 20 – p. 4, l. 9).] Eck did not say that Elliott and Laut held Todero down and climbed on top of him. Moreover, Eck's observations are plainly visible in the video captured by his body camera, which does not show Elliott or Laut holding Todero down and climbing on top of him. [Filing No. 113-15 (video at 2:58).]

Plaintiff even goes so far as to claim Todero sustained a skull fracture when she knows full well that he did not. Had Todero sustained a skull fracture, plaintiff would have supplied the court with the x-rays and/or medical records revealing that fracture. The finalized autopsy report

shows otherwise. [Filing No. 79, at ECF p. 2 ("no fractures of the basilar skull").] Plaintiff's

assertion that Elliott and Laut dropped Todero's head on the curb causing a skull fracture, [Filing

No. 128-2, at ECF p. 44], is not supported by the record.

False "facts," mischaracterizations of the record, and the assertion of inferences that

cannot be reasonably drawn from the evidence do not preclude summary judgment. The facts

that are fairly and honestly supported by the record show that both Elliott and Laut were

confronted with a situation involving an individual who had been tased (they did not know what

he had done to cause the taser deployment) and was refusing commands to place his hands

behind his back. They took action to try to pry his arm out from under him to get him

handcuffed, and once he was handcuffed, any efforts to employ force came to an end.

### B) Response to plaintiff's Statement of Material Facts in Dispute—Greenwood Policy

Plaintiff's Statement of Material Facts in Dispute relating to Greenwood's policies and

training of its police officers as set forth on pages 24 to 26 of her brief also misstates and

mischaracterizes the evidence. The voluminous evidence designated by plaintiff, but not cited in

her response brief, establishes the following facts:

- Greenwood officers are taught to continually evaluate situations and that if one form of force is not working to consider transitioning to a different use of force. [Filing No. 125-55, at ECF p. 84-85 (Holtzleiter Dep. 83:22-25; 84:1-9).]

- While Greenwood policy does not impose a specific number of times an officer can use a taser upon a subject, the burden is placed on the officer to constantly evaluate his continued use of the taser. [Filing No. 125-55, at ECF p. 80; Filing No. 125-55, at ECF p. 87 (Holtzleiter Dep. 79:13-17; 86:4-11).]

- Officers are taught that each time they pull the trigger on the taser, it is a separate use-of-force situation that has to be justified each time the trigger is pulled. [Filing No. 125-55, at ECF p. 80 (Holtzleiter Dep. 79:7-21).]

- If the taser is ineffective, officer training directs the officer to go hands on or utilize a different method. [Filing No. 125-18, at ECF p. 16 (Elizabeth Laut Dep. 13:3-10).]

Officers are not trained to tase a subject 16 times. [Filing No. 125-18, at ECF p. 15 (Elizabeth Laut Dep. 12:18).

- Greenwood officers, Blackwell included, are trained as part of their taser training to give the subject adequate time to respond before deploying the taser again. [Filing No. 125-56, at ECF p. 188 (John Laut Dep. 186:13-17).]

- Blackwell was trained that multiple taser applications cannot be justified solely on grounds that a subject fails to comply with a command, [Filing No. 125-16, at ECF p. 211 (Blackwell Dep. 209:8-12), and that any decision to apply multiple taser applications needed to take into consideration whether the suspect was capable of responding to the officer's command [Filing No. 125-16, at ECF p. 213 (Blackwell Dep. 211:11-16).]

- Blackwell was trained to use the minimal level of force necessary. [Filing No. 125-36, at ECF p. 3-4 (Blackwell's responses to requests for admission nos. 6 and 7).]

The Greenwood policy concerning taser use [Filing No. 125-85] provides:

- The taser will be used as a supplementary police tool and is not intended to replace firearms or other self-defense techniques. [Filing No. 125-85, at ECF p. 2 (Taser Use Policy, p. 1).]

- Tasers may be used in connection with individuals that pose a threat to themselves or others. *Id.*

- Tasers may also be used in other circumstances where the officer by virtue of his or her specialized training with the taser deem appropriate. [Filing No. 125-85, at ECF p. 3 (Taser Use Policy, p. 2).]

- A taser shall be issued only to sworn personnel who have completed the taser training program. *Id.*

- Once the situation requires the immediate use of force to protect the officer or a third party, officers operating a taser are to always have a backup officer present in any direct confrontation. *Id.*

- Once the officer deploys the taser he is not to refire the taser unless the suspect continues to resist; continued engagement of the taser after the suspect has been subdued may be mistaken for mistreatment of the suspect. [Filing No. 125-85, at ECF p. 4 (Taser Use Policy, p. 3).]

- Following the use of a taser the officer must complete a use of force report. *Id.*

- Officers are to always seek medical attention of the affected subject after use of a taser. [Filing No. 125-85, at ECF p. 5 (Taser Use Policy, p. 4).]

8

- Officers authorized to use a taser must successfully complete retraining and receive certification with the device at least once every two years to remain eligible to use the device. [Filing No. 125-85, at ECF p. 6 (Taser Use Policy, p. 5).

- All Greenwood officers must attend training on the M-26 or X-26 taser. *Id*.

- Tasers are not to be used as a tool of coercion, punishment or other unjustified use not necessary for the officer or others' safety or to subdue and restrain a subject. *Id*.

- Excessive use of the taser in subduing a subject is forbidden. *Id*.

Once again, the court should not permit itself to be misled to think that plaintiff's "facts" and mischaracterization of the record precludes summary judgment.

**C)   Argument**

**1)   The force employed by Elliott and Laut to get Todero handcuffed was objectively reasonable.**

The court need look no further than the Seventh Circuit decision in *Padula v. Leimbach, 656 F.3d 595 (7th Cir. 2011)* to conclude that the actions undertaken by Elliott and Laut were objectively reasonable as a matter of law. In *Padula* plaintiff's decedent (Clement), a diabetic, was suffering from a hypoglycemic episode while driving and veered off the road into a parking lot. Officers responded to the scene. The plaintiff did not comply with their commands to get out of the car so he was physically removed, maced two or three times, and struck four times with a baton in order to place him in handcuffs.

Like Todero, the plaintiff in *Padula* "responded in incomprehensible gibberish." Id. at 598. Also, like Todero, "while lying on his stomach, he ignored their commands to put his hands behind his back and physically resisted their attempts to handcuff him." Id. at 598. A passerby "did not think Clement knew what was going on or was consciously fighting the officers, but rather that he was flailing around 'like he was having…a seizure of some sort maybe.'" *Id*., 599.

9

The officers in *Padula* managed to cuff one of Clement's hands but he did not obey commands to put his other arm behind his back, so an officer struck his free arm with a baton while trying to place it in handcuffs. *Id.* One officer had a knee on Clement's head while the other officers held him in the prone position. *Id.* They eventually secured the second handcuff but "[d]uring the struggle, Officer Leimbach struck Clement's leg with the baton three times because he was kicking Officer Leimbach and screaming." *Id.* The officers also sprayed mace into Clement's face at least once and possibly twice while trying to remove him from the car and get him to the ground. *Id.* Once at the emergency room Clement was intubated and diagnosed with acute cardiac and respiratory failure, severe hypoglycemia and severe metabolic and respiratory acidosis. *Id.* at 600. He died two weeks later. *Id.* at 600.

On these facts, the Seventh Circuit found the officers' use of force in *Padula* was objectively reasonable as a matter of law and affirmed the entry of summary judgment on their behalf. As to placing a knee on the plaintiff's head, the court noted "there is no indication that the officer applied excessive pressure with his knee or that his knee injured Clement in any way." *Id.* at 604. The same is true here with respect to Elliott.

Plaintiff instead cites case law involving more egregious facts and then attempts to characterize Laut and Elliott's conduct as somehow analogous to the facts in those cases. For example, plaintiff cites *McAllister v. Price,* 615 F.3d 877 (7th Cir. 2010), where the plaintiff was forcibly removed from a car and then thrown to the ground, with an officer applying his knee to the plaintiff's lower back with his full body weight behind it. He sustained a broken hip and a bruised lung as a result of being tossed on the ground.

Like in *Padula,* the plaintiff in *McAllister* was driving a vehicle when he lapsed into hypoglycemic shock and upon the officer's arrival at the scene was "lethargic and non-

responsive." *McAllister,* 615 F.3d at 879. The court reversed the entry of summary judgment, reasoning that prior authority "would not suggest to a reasonable officer that he may slam an unresponsive, convulsing driver into the ground with force sufficient to break the driver's hip and place his knee on the driver's back with enough force to bruise his lung." *Id.* at 886. The facts in *McAllister* are not analogous to those here in connection with Elliott and Laut.

Plaintiff also relies upon *Alicea v. Thomas,* 815 F.3d 283 (7th Cir. 2016), where the plaintiff claimed that the officer "grabb[ed] Alicea by the collar, pulling him over the pool, and dragging him onto the ground outside the pool," where he "landed on his face, and [the officer] pressed his knee into Alicea's back, punched his backside and ribs, and kicked and stomped on his head," after which "Alicea was then taken to the squad car, where he was handcuffed." *Alicea,* 815 F.3d at 287. Alicea was already face down on the ground when the officer began to punch, kick and stomp on him. *Id.* at 291. The court held the evidence created a material issue as to whether the officer used excessive force. The facts in *Alicea* are not analogous to those present here in connection with Laut and Elliott.

Plaintiff mischaracterizes the decision in *Cyrus v. Town of Mukwonago,* 624 F.3d 856 (7th Cir. 2010) as holding "officers who handcuffed Cyrus after he had been tased used unreasonable force." [Filing No. 128-2, at ECF p. 45 (Pl.'s Resp. Br., p. 36).] The appeal in *Cyrus* was directed solely to the entry of summary judgment in favor of the officer who deployed the taser. The plaintiff abandoned appeal of entry of summary judgment on a failure to intervene claim against another officer and on the *Monell* claim. *Cyrus,* 624 F.3d at n. 4.

Plaintiff also claims that upon Elliott and Laut's arrival at the scene "Todero was utterly incapacitated," [Filing No. 128-2, at ECF p. 45 (Pl.'s Resp. Br., p. 36)], and that the force used by Elliott and Laut therefore must be viewed in light of that as a fact. To begin with, neither

Elliott nor Laut knew that Todero was "utterly incapacitated" and in fact the evidence shows just the opposite: he resisted handcuffing, displaying considerable strength in refusing to relinquish his right arm, which resulted in both women trying to pry his arm out in order to get it handcuffed. They did not know why he was tased. They only knew that a superior officer was shouting commands to him to put his hands behind his back and he was refusing to do so. Todero was not a "passively compliant" arrestee and Laut and Elliott used only the force necessary to get him handcuffed, and it was not much force at that, seeing as their efforts constituted little more than attempting to pry his arm out to try to get it handcuffed. The court should find that any force employed by Elliott and Laut was objectively reasonable as a matter of law.

### 2)   Elliott and Laut are entitled to qualified immunity.

Plaintiff has failed to meet her burden of supplying the court with prior precedent on reasonably analogous facts to overcome defendants' qualified immunity defense. "The defense provides 'ample room for mistaken judgments' and protects all but the 'plainly incompetent and those who knowingly violate the law.'" *Green v. Newport,* 868 F.3d 629, 633 (7th Cir. 2017). Existing precedent must have placed the statutory or constitutional question "beyond debate." *Kemp v. Liebel,* 877 F.3d 346, 351 (7th Cir. 2017), *citing Mullenix v. Luna,* 136 S.Ct. 305, 308 (2015). "The Supreme Court has 'repeatedly told courts . . . not to define clearly established law at a high level of generality.'" *Kemp,* 877 F.3d at 351, *citing Volkman v. Ryker,* 736 F.3d 1084, 1090 (7th Cir. 2013). "The dispositive question is 'whether the violative nature of *particular* conduct is clearly established." *Mullenix v. Luna,* 136 S.Ct. 305, 308 (2015). The test is "whether the law was clear in relation to the facts confronting the public official when he acted." *Volkman,* 736 F.3d at 1090.

Plaintiff does not defeat defendants' qualified immunity argument with the general

statement of law that officers can be liable for failing to intervene to prevent another officer's excessive use of force. It was instead incumbent upon her to come forward with cases with reasonably analogous facts from this circuit or the Supreme Court which held that officers who arrive at a scene while a subject is being tased and struggle to handcuff a resisting subject violate the Constitution. No case so holds, whether Elliott or Laut were present for four tasings by Blackwell, seven or ten. This is what the test for qualified immunity requires as to the existence of prior precedent, clearly established, "in relation to the specific facts confronting the public official when he acted." *Kemp, supra.*

*Cyrus,* relied upon by plaintiff, may serve as prior precedent in connection with excessive deployment of a taser, but its holding is confined to just that: multiple applications of a taser upon an allegedly subdued arrestee may violate the Fourth Amendment. *Cyrus* does not hold that officers, accused of failing to intervene when confronted with a subject who refuses to be handcuffed, violate the Constitution by attempting to handcuff him while another officer deploys a taser during the handcuffing process. Nor is there clearly established law holding that the force used by Elliott and Laut to effect the handcuffing violates the Fourth Amendment. *Padula,* discussed above, instead provides that their conduct was objectively reasonable as a matter of law. Even the recent Fourth Circuit decision in *Estate of Armstrong v. Village of Pinehurst,* 810 F.3d 892 (4th Cir. 2016), which plaintiff chose to not comment upon, did not provide "fair warning" to Elliott and Laut that they would violate the Constitution by attempting to handcuff Todero under the circumstances they confronted. In *Armstrong* a superior officer instructed another officer to deploy his taser upon the plaintiff, who was clinging to a sign post off the roadway, and who refused to move despite shouted orders to let go of the post. He was tased five times over two minutes, to no effect. The Fourth Circuit held that repeated tasings under those

circumstances were excessive, but that the officers were nevertheless entitled to qualified immunity, citing a split in circuits. The court cited *Cyrus* in its discussion of a survey of other circuits' decisional law.

As noted in defendants' opening brief, *Cyrus* does not address failure to intervene or even qualified immunity, and it did not provide notice to officers such as Laut and Elliott that they violate the Constitution by attempting to handcuff a resisting individual who had been commanded to place his hands behind his back by a superior officer. Absent the "robust consensus of cases of persuasive authority" needed to defeat qualified immunity, *District of Columbia v. Wesby,* 138 S.Ct. 577, 589-90 (2018), which hold under analogous facts that the conduct of Elliott and Laut violated clearly established law, Elliott and Laut are entitled to qualified immunity and the § 1983 claims against them should be dismissed.

3)      **There is no evidence of a "conspiracy" and plaintiff has failed to defeat the qualified immunity defense as to any such claim.**

There is no evidence of a § 1983 conspiracy, nor is any such claim even necessary, seeing as plaintiff claims that each of the officers deprived Todero of constitutional rights. Unlike the cases cited by plaintiff, there is no evidence of communications between the officers to fashion a "scheme" to deprive Todero of constitutional rights. Elliott and Laut simply responded to a scene after a fellow officer requested assistance and thereupon undertook efforts to attempt to get the subject handcuffed.

*Lenard v. Argento,* 699 F.2d 874 (7th Cir. 1983) involved a conspiracy claim under § 1985(3) based on alleged racially discriminatory animus sufficient to sustain an equal protection violation. Here, plaintiff's count III alleges § 1983 conspiracy, not a conspiracy under § 1985(3). Nor is there evidence of any racial or class-based animus here sufficient to sustain a claim as

described in *Lenard*. Plaintiff also cites *Miller v. Village of Dolton*, 1995 WL 137051 (N.D. Ill. 1995), but there is no evidence that Elliott and Laut "conferred at the scene" with Blackwell to arrive at an agreement to violate Todero's rights. Nor is there evidence of communications toward a "common goal" to take steps to violate constitutional rights, as per *Pantaleo v. Hayes*, 2003 WL 5311450 (N.D. Ill. 2013). As to whether a § 1983 conspiracy claim is viable at all absent involvement of a private actor, the Seventh Circuit decision in *Williams v. Seniff*, 342 F.3d 774 (7th Cir. 2003), which involved state actor defendants, provides that "[t]o establish section 1983 liability through a conspiracy theory, a plaintiff must demonstrate that . . . a state official and a private individual(s) reached an understanding to deprive plaintiff of his constitutional rights . . . ." *Id.* at 785. Neither *Lewis v. Washington*, 300 F.3d 829 (7th Cir. 2002) nor *Ryan v. Mary Immaculate Queen Center*, 188 F.3d 857 (7th Cir. 1999) (dismissing conspiracy claim due to insufficient pleading) hold that a § 1983 conspiracy claim does not need to involve conspiracy with a private actor. Nor did plaintiff attempt to meet her burden on qualified immunity by providing the court prior precedent on reasonably analogous facts which show that Elliott or Laut can be liable for § 1983 conspiracy. The court should dismiss the conspiracy claim.

### 4) The city is entitled to summary judgment on plaintiff's § 1983 claim.

As to the *Monell* claim, plaintiff's first argument is that the city should be liable because its taser policy does not explicitly state that tasers should not be used against passively resisting suspects, and that it fails to restrict the number of times a taser can be used.[2]

---

[2]    The claim that the department engaged in a "cover up" is not relevant to the court's inquiry. Ratifying or approving use of force after the use of force takes place does not establish *Monell* liability. For example, in *Thomas ex rel. Thomas v. Roberts*, 261 F.3d 1160 (11th Cir. 2001) *cert. granted, judgment vacated sub nom*, 122 S.Ct. 2653, *opinion reinstated*, 323 F.3d

To begin with, the taser policy is not deficient, it is relatively detailed. More importantly, the Greenwood Police Department has a policy concerning use of tasers which is not unconstitutional on its face. A municipality can be liable if a constitutional deprivation by a subordinate is caused by an official policy of the city, *Valentino v. Village of South Chicago Heights,* 575 F.3d 664, 674 (7th Cir. 2009), but this is not a case where the city's taser policy caused a constitutional deprivation, such as where "proof that a municipality's legislative body or authorized decision maker has intentionally deprived a plaintiff of a federally protected right," which by definition "necessarily establishes that the municipality acted culpably." *Board of Commissioners of Bryan County v. Brown,* 520 U.S. 397, 405 (1997). There is nothing unconstitutional about Greenwood's taser policy.

Thus, a claim of "failure to make policy" as advanced by the plaintiff is no more than a form of alleging the city was deliberately indifferent to a pattern or custom of unconstitutional conduct by its employees which the adoption of a new policy might address. *Cornfield by Lewis v. Consolidated High School Dist. 230,* 991 F.2d 1316, 1326 (7th Cir. 1993); *Thomas v. Cook County Sheriff's Dept.*, 604 F.3d 293, 303 (7th Cir. 2010) ("To demonstrate that the County is liable for a harmful custom or practice, the plaintiff must show that County policymakers were 'deliberately indifferent' as to [the] known or obvious consequences . . . . In other words, they must have been aware of the risk created by the custom or practice and must have failed to take appropriate steps to protect the plaintiff . . . . Therefore, in situations where rules or regulations are required to remedy a potentially dangerous practice, the County's failure to make policy is

---

950, a school teacher and police officer performed unconstitutional searches of students. The plaintiffs argued that by clearing everyone of wrongdoing the school district had "ratifi[ed]"the unconstitutional searches. *Id.* at 1174. The Eleventh Circuit held that "[b]ecause the [d]istrict had no opportunity to ratify the decision to search the children before the searches occurred," the plaintiffs' ratification argument was "misplaced." *Id.* at 1174-75.

also actionable."). Negligence on the part of policymakers is not sufficient to show deliberate indifference. *Arnett v. Webster,* 658 F.3d 742, 751 (7th Cir. 2011).

Here, there was no "custom" of violating citizen's rights in Greenwood by use of tasers, much less deliberate indifference on the part of the chief of police to any such custom. Simply stating that a certain percentage of use of force instances in Greenwood involved the use or threatened use of a taser does not prove a custom of condoning constitutional deprivations. For all the court knows, each instance involved use or threatened use of a taser within constitutional norms; the plaintiff offers no proof otherwise.

Plaintiff next claims that Blackwell was inadequately trained. As with attempting to prove a custom, a plaintiff asserting § 1983 municipal liability on a failure to train claim must prove that the "municipality's failure to train its employees in a relevant respect . . . must amount to 'deliberate indifference to the rights of persons with whom the [untrained employees] come into contact." *Connick v. Thompson,* 131 S.Ct. 1350, 1359 (2011). "A municipality's culpability . . . is at its most tenuous where a claim turns on a failure to train." *Id.* In a failure to train context, a plaintiff can prove deliberate indifference in one of two ways: 1) "when it fails to train its employees to handle a recurring situation that presents an obvious potential for a constitutional violation and this failure to train results in a constitutional violation," or 2) "if it fails to provide further training after learning of a pattern of constitutional violations by the police." *Dunn v. City of Elgin,* 347 F.3d 641, 646 (7th Cir. 2003). Scenario 1, the "obvious exception," otherwise known as the *Canton* hypothetical, *Canton v. Harris,* 109 S.Ct. 1197 (1989), assumes that officers have no relevant training whatsoever: the *Canton* hypothetical "assumes that the armed police officers have no knowledge at all of the constitutional limits on the use of deadly force." *Connick,* 131 S.Ct. at 1363. That is obviously not the case here; Greenwood provided training to

its officers and required recertification every two years.

What plaintiff is really arguing is that Greenwood's taser training program is not as rigorous as promoted by her retained expert. But this is essentially an argument that the training the officers received could or should have been better. As the Supreme Court made clear in *City of Canton v. Harris,* the focus must be on the adequacy of the training program, i.e., whether the city provided training. If so, the city was not deliberately indifferent to the need for training even if its training program could have been better. That theory for municipal liability has been rejected multiple times:

> The estate's argument boils down to "no special training = deficient training." We cannot accept this equation. To do so would ignore the training the officers did receive . . . . It is against these "better or more" training scenarios that the Court warned in *City of Canton,* 489 U.S. 391, 109 S.Ct. 1206 ("Neither will it suffice to prove that an injury or accident could have been avoided if an officer had had better or more training, sufficient to equip him to avoid the particular injury-causing conduct."). To conclude otherwise would be to subject all municipalities which employ police officers who attended either of the only two Illinois police training institutes to liability for "inadequate" training in handling abnormally behaving individuals.

*Palmquist v. Selvik,* 111 F.3d 1332, 1345 (7th Cir. 1997); *Estate of Lee v. City of Washington,* 2010 WL 4778725 *16 (S.D. Ind. 2010)* (relying on *Palmquist* in rejecting plaintiff's failure to train claim based on department's deficient training in handling suicidal individuals). The Seventh Circuit has in fact explicitly stated that the training the Greenwood officers received from the Indiana Law Enforcement Academy is "evidence that, as a matter of law, it was not the policy of [municipal employers to] inadequately . . . train police officers." *Ross v. Town of Austin,* 343 F.3d 915, 918 (7th Cir. 2003). *See also Estate of Lee, supra,* at *16 ("While it is possible that a state's minimum standards do not adequately address a particular area of training, compliance by a municipality with state training standards defeats any possibility that a

reasonable jury could uphold a charge of deliberate indifference.") This holds true not only with respect to Greenwood officers' training on taser usage, but in connection with the plaintiff's expert's criticism of the department's policy and training on officer interaction with the mentally ill. [Filing No. 125-45, at ECF p. 21 (Clark Report, p. 17).] Blackwell, Elliott and other officers received state-mandated training in mental illness. [Filing No. 113-1, at ECF p. 2 (John Laut aff., ¶ 3).] Blackwell last underwent such training in 2013, [Filing No. 113-1, at ECF p. 2 (John Laut aff., ¶ 4)], and Elliott in 2013 as well [Filing No. 113-1, at ECF p. 3 (John Laut aff., ¶ 6) & Filing No. 113-4 (Elliott's Training History Report)].

### 5) State law claims

Despite claiming in her complaint, throughout this litigation, and again in her response brief that the tasing killed Todero, plaintiff tries to preserve a state law survival action predicated upon common law claims for assault, battery and intentional infliction of emotional distress. These common law torts can be advanced by way of a survival claim under Indiana Code § 34-9-3-4, but when a plaintiff's true claim is wrongful death (as it is here), a court should dismiss the survival claim and associated torts and allow the matter to proceed as a state law wrongful death claim. *Foster v. Evergreen Healthcare, Inc.,* 716 N.E.2d 19, 25 (Ind. App. 1999) (survival and associated common law claims precluded when plaintiff's claim is predicated upon the alleged wrongful act which caused the death). Indeed, a plaintiff estate cannot recover under both a wrongful death action and a survival action; it can recover under one but not both theories. *Best Homes, Inc. v. Rainwater,* 714 N.E.2d 702, 705 (Ind. App. 1999).

The decision in *Cahoon v. Cummings,* 734 N.E.2d 535 (Ind. 2000) cited by plaintiff involved a medical malpractice action against physicians for failing to diagnose a patient's cancer. While the court held that the election of remedies doctrine did not prevent the plaintiff

from simultaneously pursuing wrongful death and survival actions, the court reaffirmed that a plaintiff cannot recover on both a wrongful death claim and a claim under the survival statute. *Id.* at 544. Here, plaintiff's claim is one in wrongful death. Her own medical expert, whose opinions are being proffered to the court on summary judgment, so contends. [Filing No. 46, at ECF p. 9.] There is no purpose in continued litigation, particularly through trial, of a survival action to advance tort claims for assault, battery or intentional infliction of emotional distress by way of a survival action.[3]

### 6) Defendants did not concede the cause of Todero's death.

On page 48 of her brief, Plaintiff asserts that defendants forfeited the argument that Blackwell's use of force was not the cause Todero's death. It is true that Elliott, Laut, and Greenwood did not move for summary judgment on the cause of Todero's death and concede that Greenwood is not entitled to summary judgment on plaintiff's state law wrongful death claim; they recognize that there are genuine issues of material fact on that issue. Not moving for summary judgment on a particular issue is not the same as conceding it. Plaintiff chose as part of her summary judgment submission to supply the opinion of her retained expert as to medical causation, knowing full well that defendants have retained their own experts offering contrary opinions. In the view of Elliott, Laut, and Greenwood, the cause of Todero's death should be tried in state court as part of plaintiff's state law wrongful death claim against Greenwood and no other party.

---

[3]     As to the IIED claim, existing law provides that "[c]ommon law 'add-on' torts, such as IIED, are not exceptions to the law enforcement immunity under the ITCA [i.e., Indiana Tort Claims Act]." *Parish v. City of Elkhart,* 2010 WL 4054271 at *4 (N.D. Ind. 2010); *Hendricks v. New Albany Police Dept.*, 749 F.Supp.2d 863, 873 (S.D. Ind. 2010); *Serino v. Hensley,* 2012 WL 6025751 at *7 (S.D. Ind. 2012); *Ashcraft v. City of Crown Point,* 2013 WL 5934612 at *6 (N.D. Ind. 2013). *But see* Bowens v. City of Indianapolis, 2014 WL 4680662 (S.D. Ind. 2014). Unlike excessive use of force or negligent operation of an emergency vehicle, IIED is not a tort proscribed by statute.

Respectfully submitted,

STEPHENSON MOROW & SEMLER


*s/ James S. Stephenson*
James S. Stephenson
Attorney No. 11434-98
Attorney for defendants,
City of Greenwood, Renee Elliott,
and Elizabeth Laut

## **CERTIFICATE OF SERVICE**

I hereby certify that on August 29, 2018, a copy of this document was filed electronically.

Notice of this filing will be sent to the following persons by operation of the court's electronic

filing system. Parties may access this filing through the court's system.

Arthur Loevy
arthur@loevy.com
D. Samuel Heppell
sam@loevy.com
Jonathan I. Loevy
jon@loevy.com
Steven E. Art
steve@loevy.com
Vince Field
vince@loevy.com
LOEVY & LOEVY
311 North Aberdeen, 3rd Floor
Chicago, IL 60607

Caren L. Pollack
cpollack@pollacklawpc.com
Lana R. Swingler
lswingler@pollacklawpc.com
Zachary J. Stock
zstock@pollacklawpc.com
POLLACK LAW FIRM, P.C.
10333 N. Meridian Street
Suite 111
Indianapolis, IN 46290

*s/ James S. Stephenson*
James S. Stephenson

STEPHENSON MOROW & SEMLER
3077 East 98th Street, Suite 240
Indianapolis, IN 46280
Telephone: (317) 844-3830
Fax: (317) 573-4194
E-mail: jstephenson@stephlaw.com

16-6820/bb