**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF INDIANA**
**INDIANAPOLIS DIVISION**

| | |
|---|---|
| TERESA TODERO, as Special Administrator of the ESTATE OF CHARLES TODERO, )<br><br>*Plaintiff*, )<br><br>v. )<br><br>CITY OF GREENWOOD, BRIAN BLACKWELL, RENEE ELLIOTT, ELIZABETH LAUT, and AS-YET UNIDENTIFIED GREENWOOD POLICE OFFICERS, )<br><br>*Defendants*. ) | Case No. 1:17-cv-1698-TWP-MJD<br><br>Judge Tanya Walton Pratt<br><br>Magistrate Judge Mark J. Dinsmore<br><br>JURY TRIAL DEMANDED |

## PLAINTIFF'S MEMORANDUM OF LAW IN SUPPORT OF MOTION TO BAR THE PROPOSED EXPERT TESTIMONY OF DR. CHARLES WETLI

### INTRODUCTION

On May 29, 2016, in a span of just over three minutes, Defendant Brian Blackwell shot Charlie Todero sixteen times with a Taser. During that short time, Blackwell discharged the Taser for more than ninety-eight seconds. Less than thirty minutes later, Charlie's heart stopped. While medical personnel were able to resuscitate Charlie, he never fully recovered – remaining largely unconscious in a hospital and, ultimately, dying two weeks later. Charlie's estate subsequently commenced this civil rights action.

Throughout this litigation, Defendants have theorized that Defendant Blackwell's use of force – namely, his Taser use – did not cause or contribute to Charlie's death. To that end, they disclosed Dr. Charles Wetli – a forensic pathologist – as an expert to opine on what caused the death. According to Dr. Wetli, it was not Blackwell's repeated Taser use that resulted in Charlie's death, but rather something called "excited delirium syndrome." This Court should bar Dr. Wetli from testifying in this case because: (a) the two opinions disclosed in his report fail to

satisfy the requirements of Federal Rule of Evidence 702 and are improper under *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579 (1993); and (b) his untimely opinion – *i.e.*, those not disclosed in his report are barred under Federal Rule of Civil Procedure 26(a)(2)(B)(i).

As a threshold matter, Dr. Wetli's deposition testimony confirmed the impropriety of his two disclosed opinions.  While Dr. Wetli originally opined that Defendants' use of force did not cause or contribute to Charlie's death, at his deposition, he testified that he could not rule out that Defendants' use of force caused or contributed to Charlie's death.  Similarly, while Dr. Wetli originally opined that Charlie died from complications of what he refers to as "excited delirium syndrome," at his deposition, he made the stunning admission that, based on the actual facts in this case, Charlie did not suffer from excited delirium syndrome.  Thus, this Court should bar Dr. Wetli's opinions and his proposed testimony based on Dr. Wetli's own sworn statements.

Apart from Dr. Wetli's fatal testimony, this Court should bar Dr. Wetli's opinions and testimony because the opinions are unreliable.  Excited delirium syndrome is not generally accepted in the medical field.  The American Medical Association, the World Health Organization and the American Psychiatric Association do not recognize excited delirium syndrome as a diagnosis.  This is not surprising given that no scientific explanation exists for how excited delirium works – rendering Dr. Wetli's opinion speculative.

Additionally, Dr. Wetli tacitly demonstrated the unreliable and speculative nature of his opinion regarding excited delirium by first contending that he could not determine the cause of Charlie's purported excited delirium, but later claiming – based on a severely flawed differential diagnosis and – that it was caused by drugs.

Moreover, in arriving at his excited delirium opinion, Dr. Wetli failed to follow the very methodology he stated forensic pathologists are supposed to follow when investigating a case.

Finally, Dr. Wetli's method of diagnosing excited delirium is not capable of being tested, as its existence in a given situation is subjective

Accordingly, this Court should bar Dr. Wetli's opinions and preclude him from testifying at trial.

## BACKGROUND FACTS REGARDING DR. WETLI

Dr. Wetli graduated medical school in 1969 and has a background in forensic pathology. Dr. Wetli Deposition Transcript, attached hereto as Exhibit A, at 32:12013, 70:25-71:2. While in medical school, he decided he wanted to devote his career to the field of pathology because he was more interested in the science of medicine than the actual practice of medicine. *Id.* at 72:5-8, 11-15.

Since graduating medical school, Dr. Wetli has primarily worked in the field of pathology. *Id.* at 74:5-9. Indeed, Dr. Wetli has not treated patients since he occasionally worked in an Army emergency room in 1976 and has not treated a psychiatric patient since medical school. *Id.* at 74:14-24, 75:24-76:1, 168:7-13. According to Dr. Wetli, "I don't treat patients." *Id.* at 168:19.

In this case it is undisputed that after Charlie sustained the sixteen Taser shots, his body suffered from a clinical condition known as rhabdomyolysis, which results in the breakdown of skeletal muscle and can lead to multisystem organ failure. According to Dr. Wetli, he does not remember if he has ever treated a patient with rhabdomyolysis. *Id.* at 168:14-17. When asked if he has expertise in the "physiological progression of rhabdomyolysis," Dr. Wetli merely responded, "I know what it is. I know what happens." *Id.* at 168:20-23. Dr. Wetli then admitted that he had not received any training on that physiological progression since medical school. *Id.* at 169:5-8. When asked if he had any expertise in the treatment of rhabdomyolysis, Dr. Wetli

responded, "Of course not."  *Id.* at 169:9-11.  Dr. Wetli followed that up by testifying, "I don't have expertise in the treatment of anything."  *Id.* at 14-17.

## ARGUMENT

### I.      Legal Standards

Federal Rule of Evidence 702 governs expert witness testimony.  According to the Rule:

A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:

(a)      the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or determine a fact in issue;

(b)      the testimony is based on sufficient facts or data;

(c)      the testimony is the product of reliable principles and methods; and

(d)      the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702.  The trial judge occupies "a gatekeeping role" and must scrutinize proffered expert testimony to ensure it satisfies each requirement of Rule 702.  *Daubert*, 509 U.S. at 592-93, 597.  The objective of the court's gatekeeping requirement is to ensure the relevancy and reliability of expert testimony. *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 152 (1999).  In evaluating the admissibility of expert testimony, non-exclusive factors the court may consider include: (a) whether the theory is testable; (b) whether it has been subject to peer-review and publication; (c) whether it has a known rate of error; and (d) whether it is generally accepted in the relevant scientific community.  *Daubert*, 509 U.S. at 593-94; *see also Kumho Tire Co.*, 526 U.S. at 149-50.

The  proponent  of  the  expert  evidence  bears  the  burden  of  establishing,  by  a preponderance of the evidence, that the requirements set forth in Rule 702 and *Daubert* have been satisfied.  *Lewis v. CITGO Petroleum Corp.*, 561 F.3d 698, 705 (7th Cir. 2009).

## II.    The Court Should Bar Dr. Wetli from Testifying that Defendants' Efforts to Restrain Charlie Did Not Cause or Contribute to Charlie's Death Because the Opinion Is Unreliable.

In his report, Dr. Wetli opines that Defendants' use of force did not cause or contribute to Charlie's death.  Ex. B at 3.  However, Dr. Wetli has now fatally admitted that he actually does not know if the use of force caused or contributed to Charlie's death.  *See* Ex. A at 182:15-84:12.  As such, his opinion is unreliable and should be barred.

In his report, Dr. Wetli states that "the efforts to restrain Mr. Todero, including physical restraint and the multiple applications of a conducted electrical weapon (viz. TASER), did not cause or contribute to the death of Mr. Charles Todero . . . ."  Ex. B at 3.  According to the report, the rhabdomyolysis, acidosis and hyperkalemia that Charlie Todero suffered after his interaction with police – which the parties agree led to Charlie's death – would have occurred "regardless of the method of police intervention."  *Id.* at 2.  Further, according to the report, the above-described "abnormalities are part of the excited delirium syndrome and are independent of any police actions including applications of a conducted electrical weapon."  *Id.*

Contrary to Dr. Wetli's definitive statement in his report, at his deposition, he conceded that that he actually does not know whether Charlie's so-called medical "abnormalities" were "independent of any police actions," and he agreed that Charlie's physiological cause of death would have been different absent police attempting to engage and restrain him.  *See* Ex. A at 182:15-84:12.  According to Dr. Wetli, there is no way to know what happens to individuals purportedly suffering from excited delirium who are not restrained – *i.e.,* when there is no use of force.  *Id.*  The best Dr. Wetli could do was speculate that those people would likely be struck and killed by a car or otherwise "die from their bizarre behavior":

Q:     What if there had been no police intervention?

A:     He would have probably been struck and killed by a car.

Q:     Other than the possibility of being struck and killed by a car, ***do you have any other information based on your medical expertise and your review of the materials in the record about how Mr. Todero would have faired if there had been no police intervention in this case?***

A:     ***There is no way of knowing that*** because most cases of excited delirium require or result either in citizens or police being called and restrain the individual.  The individuals that are not restrained usually die from their bizarre behavior.  ***I don't think anybody knows what would happen if you had a person with bizarre behavior and you just let them run around*** . . . .

*     *     *

Q:     ***But it is your testimony that the physiological course of death that Mr. Todero experienced . . . that would not have played out the same way if the police had not engaged him and attempt [sic] to restrain him, correct?***

A:     ***Right.***  Well – if they had not tried to restrain him, he would have likely died from trauma as I said before.

*Id.* (emphasis added).  Thus, according to Dr. Wetli, if a person afflicted with excited delirium is restrained, he will suffer the "abnormalities" described above and die.  Dr. Wetli cannot say the same thing about a person afflicted with excited delirium who has not been restrained.  Because Dr. Wetli has "no way of knowing" what would have happened to Charlie had police not sought to restrain him, his opinion that the restraint efforts utilized by police did not cause or contribute to Charlie's death is without basis.  The uncertainty of Dr. Wetli's opinion renders it unreliable and, therefore, this Court should not allow Dr. Wetli to present it to the jury.

6

III.     **The Court Should Preclude Dr. Wetli from Opining that Charlie Died from the Physiological Complications of Excited Delirium Syndrome.**

Dr. Wetli's second opinion provides that Charlie "died from the physiological complications of the excited delirium syndrome."  Ex. B at 3.  This Court should preclude Dr. Wetli from testifying regarding this opinion because it is both irrelevant and unreliable.

A.     **Dr. Wetli Has Conceded that Based on the Actual Facts, Charlie Did Not Suffer from Excited Delirium, Rendering His Opinion Irrelevant and Unreliable.**

Dr. Wetli's excited delirium opinion fails for the simple reason that he bases it on facts that find no support in the record.  Based on the actual facts of the case, Dr. Wetli could not state that Charlie suffered from excited delirium.  As such the opinion and any testimony regarding that opinion are irrelevant, as well as unreliable.

"An expert's opinions must be based on the evidence in the case." *In re Ready-Mixed Concrete Antitrust Litig.*, 261 F.R.D. 154, 165 (S.D. Ind. 2009); *see* Fed. R. Evid. 702(b).  While ordinarily "[t]he soundness of the factual underpinnings of the expert's analysis . . . are factual matters to be determined by the trier of fact," a reliable expert opinion must rest on evidence that is "in fact, supported by the record."  *Id.*

According to Dr. Wetli, the necessary symptoms to a proper diagnosis of excited delirium are that a person "have delirium and they're agitated."  Ex. A at 141:19-25.  In Dr. Wetli's view, any time a person exhibits both symptoms, "regardless of the underlying physiological cause," then "by definition" that person is experiencing excited delirium.  *Id.* at 144:15-145:3.  Conversely, if a person fails to exhibit one of the two necessary symptoms, the person cannot be properly diagnosed with excited delirium.  *Id.* at 142:5-20.

With respect to the present case, Dr. Wetli testified at his deposition that, based on his understanding of the facts, Charlie displayed both necessary symptoms of excited delirium on

7

May 29, 2016. *See id.* at 147:17-48:6. When asked at his deposition to state his specific basis for concluding that Charlie was agitated, Dr. Wetli testified that "agitation can be out in the middle of traffic, something violent, screaming that you are a prophet." *Id.* at 147:21-48:1.

The facts belie Dr. Wetli's description of Charlie's purportedly agitated behavior on the date in question. The only two people who reported observing Charlie's behavior before the arrival of law enforcement were Deborah MacNaughton and Roger Poynter. Both MacNaughton and Poynter called 911 to report that behavior, and each subsequently gave a video recorded interview to Greenwood Police. *See* Deputy Chief Ison's Report of MacNaughton Interview, attached hereto as Exhibit C; MacNaughton Interview Tr., attached hereto as Exhibit D; Deputy Chief Ison's Report of Poynter Interview, attached hereto as Exhibit E; Poynter Interview Tr., attached hereto as Exhibit F.

Contrary to Dr. Wetli's description of Charlie's behavior, neither eyewitness stated that he or she observed Charlie screaming that he was a prophet or otherwise doing "something violent." MacNaughton stated simply that: (a) she observed Charlie crossing the road, "not looking at on-coming traffic and . . . void of any facial expression"; (b) Charlie "walked into her lane of travel"; and (c) "she had to swerve abruptly into the right lane to avoid hitting him." *See* Exs. C and D. Poynter reported that he: (a) also had seen Charlie crossing the road, "looking forward and not looking left or right at traffic"; and (b) "yelled" at Charlie when Charlie walked in front of his vehicle, but Charlie "just kept walking and did not respond."[1] *See* Exs. E and F.

---

[1] While Dr. Wetli listed MacNaughton and Poynter's witness interviews among the materials he reviewed, it is unclear what he actually reviewed. Ex. B at 1; Ex. A at 105:4-06:11. According to Dr. Wetli, he was not provided transcripts of the video interviews, and it is possible that he did not view the video interviews at all. *Id.* Dr. Wetli's reason for not watching the videos was "time and they're boring." *Id.* at 105:12-16. Dr. Wetli may have read the police reports documenting the witness interviews. *Id.* at 105:17-20.

When presented with the above-described actual facts at his deposition, Dr. Wetli conceeded that – under those facts – Charlie would not have been experiencing excited delirium:

> Q.      What if I present to you an alternate hypothetical that the facts of the case were that Mr. Todero was walking across the street, holding a bible in front of him and that there weren't – there was no testimony from witness [sic] who watched him cross the street that he was gesturing or exclaiming anything verbally.  **Would that alter your conclusion that that was evidence of agitation?**
>
> A.      **Obviously, what you described right there wouldn't – he would not have agitated delirium.**[2]
>
> Q.      **So if those were the facts of the case, that would alter your opinion that Mr. Todero had agitated delirium?**
>
> A.      **Of course**.  If those were the facts of the case.

*Id.* at 148:7-22 (emphasis added).  As established above – and to quote Dr. Wetli – "those were the actual facts of the case."  *Id.* at 148:21-22.

Dr. Wetli's concession is fatal.  On the actual facts, Dr. Wetli concluded that Charlie did not suffer from excited delirium, rendering his opinion wholly irrelevant, as well as unreliable. Accordingly, this Court should bar the opinion and any testimony regarding it.

**B.      Dr. Wetli's Opinion Is Not Reliable.**

For myriad reasons, Dr. Wetli's opinion regarding excited delirium is also unreliable, and this Court should, therefore, bar the opinion and any testimony related thereto.

**1.      Excited Delirium Is Not a Generally Accepted Medical Diagnosis.**

In evaluating whether an expert's proffered theory is scientifically valid, the Court should consider whether that theory is generally accepted in the relevant scientific community.  *See Daubert,* 509 U.S. at 594.  "[A] known technique which has been able to attract only minimal support within the community . . . may properly be viewed with skepticism." *Id.*

---

[2] At his deposition, Dr. Wetli used the terms "excited delirium" and "agitated delirium" interchangeably. Ex. A at 149:1-5

Dr. Wetli's opinion that Charlie died as a result of excited delirium is not reliable because excited delirium is not a generally-accepted medical diagnosis.  Indeed, the American Medical Association, as well as the World Health Organization's International Classification of Diseases and Related Health Problems ("ICD"), and the American Psychiatric Association's *Diagnostic and Statistical Manual of Mental Disorders* ("DSM") do not recognize excited delirium as a medical diagnosis.  *See* Ex. A at 152:20-53:1, 153:15-24; *see also* World Health Organization, International Classification of Diseases and Related Health Problems, *available at* http://www.who.int/classifications/icd/en/ (last accessed October 2, 2018); *Diagnostic and Statistical Manual of Mental Disorders*, 136-37 (American Psychiatric Ass'n, 4th ed. 2000), attached hereto as Exhibit G; *Diagnostic and Statistical Manual of Mental Disorders*, 596 (American Psychiatric Ass'n, 5th ed. 2013), attached hereto as Exhibit H.

Dr. Wetli acknowledges the lack of general acceptance.  Indeed, at his deposition Dr. Wetli conceded that excited delirium is the only diagnosis of which he is aware that is not recognized by the American Medical Association, and he emphasized that he does not care what the American Medical Association recognizes or does not recognize: [3]

Q:     So as you sit here today, ***the only diagnosis, which you contend is a valid diagnosis not recognized by the AMA is excited delirium, correct?***

A:     ***That's the only one I'm aware of.  But that doesn't mean anything.  I don't really care what the American Medical Association recognizes or doesn't recognize.***

Ex. A at 154:4-11 (emphasis added); *see also id.* at 152:20-53-1 ("Of course [the American Medical Association] wouldn't recognize it.").

---

[3]Dr. Wetli asserted that "excited delirium" is recognized by "a whole slew" of organizations, but could name only two: (a) the National Association of Medical Examiners; and (b) the American College of Emergency Physicians.  Ex. A at 204:1-6.

Similarly, while Dr. Wetli did not specifically know whether excited delirium was included in the ICD, he testified that he would not expect it to be. *Id.* at 154:20-24; 155:19-22. Regarding the DSM, Dr. Wetli claimed that excited delirium actually is included within the manual – just not by name. *See id.* at 155:23-56:5. However, he admitted that he does not have any specialized knowledge or training with respect to DSM and has not treated a patient with psychiatric symptoms since he was in medical school. *Id.* at 167:25-68:13. Contrary to Dr. Wetli's self-serving contention regarding the DSM, neither the DSM-IV nor the DSM-5 (the two most recent versions) contains diagnostic criteria that: (a) mention an "excited form of delirium," *see id.* at 157:13-14; or (b) require any element of agitation or excitement. *See* Exs. G and H.

When pressed, Dr. Wetli admitted that the DSM only recognizes delirium – "the DSM does not distinguish by terminology between stuporous and excited delirium. They have a thing delirium." *Id.* at 157:4-15. Undeterred, and in an effort to save his opinions, Dr. Wetli contended that delirium and excited delirium are essentially synonymous, testifying that all of the opinions in his report would be the same if the words "excited delirium" were replaced with the word "delirium." *Id.* at 4-9. Of course, that contention conflicts directly with his own definition of "excited delirium," which – according to Dr. Wetli – requires both delirium and agitation. *Id.* at 141:19-25 ("they have delirium and they're agitated.").

At his deposition, Dr. Wetli tried to explain excited delirium's lack of general acceptance. *See id.* at 153:3-11. But the explanation only served to underscore the conclusions reached by the respected medical organizations discussed above that excited delirium is not an actual diagnosis. According to Dr. Wetli, organizations such as the American Medical Association and the World Health Organization do not recognize excited delirium because it is not an actual diagnosis:

[E]xcited delirium is always secondary to something else . . . . So for example, cocaine intoxication would be listed as a recognized diagnosis. Excited delirium would not be, but if you had excited delirium due to cocaine intoxication, cocaine intoxication would be listed but not the excited delirium.

*Id.*

Dr. Wetli's description of excited delirium as always being "secondary to something else," is entirely consistent with the description of "excited delirium" given by Plaintiff's medical expert Dr. Mayer Rashtian: "[e]xcited delirium . . . is a wastebasket diagnosis by some of the medical examiners" where they assert that the patient "died from excited delirium and not putting a fault on the real mechanism." *See* Rashtian Deposition Tr., attached hereto as Exhibit I, at 84:21-85:6. According to Dr. Rashtian, excited delirium is "not a recognized medical diagnosis," "not a recognized psychiatric diagnosis," and in all of his work as a clinician, including work with emergency room doctors, he has "never, ever seen anybody in our hospital using the terminology 'excited delirium' on a medical record." *Id*. at 85:12-18.

### 2. Dr. Wetli Has No Scientific Explanation for How Excited Delirium Works, Rendering the Opinion Speculative.

According to Dr. Wetli, Charlie "died from the physiological complications of the excited delirium syndrome." Ex. B at 3. However, Dr. Wetli admits that "the physiological mechanism by which excited delirium causes death is not yet conclusively determined." Ex. A at 171:16-21. Dr. Wetli could only speculate as to how it is thought that excited delirium leads to death. *Id.* at 171:16-72:5; *see also* Ex. B at 2 (describing what the mechanism by excited delirium leads to cardiac arrest is "thought to be.").

With respect to Charlie's death, while Dr. Wetli agrees with Plaintiff that Charlie died from "the multisystem organ failure" which "result[ed] from . . . rhabdomyolysis" and other related metabolic complications, he only speculates as to the connection between excited

delirium and the cause of death. *Id.* at 180:5-24; *see also* Report of Dr. Mayer Rashtian, attached hereto as Exhibit J, at 5 (opining that Charlie Todero died as a result of "rhabdomyolysis . . . leading to cardio-respiratory failure and to multi-organ system failure"). According to Dr. Wetli, "the mechanism by which the excited delirium causes the rhabdomyolysis" is not clear. Ex. A at 180:17-19. In fact, according to Dr. Wetli, "by the state of the medical science as it exists today," "[w]e know that rhabdomyolysis frequently accompanies excited delirium . . . [b]ut that's all we know about it." *Id.* at 180:20-24. Dr. Wetli states he has read "limited information" about this which "assumes" that the rhabdomyolysis is due to physical exertion associated with the excited delirium, but "[t]hat's about it" and "[n]obody I don't think has ever really specifically focused on the development of rhabdomyolysis, per se." *Id.* at 181:4-10.

A court should bar opinions based on subjective belief or unsupported speculation unless the testimony has been subjected to the scientific method. *Clark v. Takata Corp.*, 192 F.3d 750, 757 (7th Cir. 1999). Here, Dr. Wetli's opinion regarding Charlie dying from the "physiological complications of the excited delirium syndrome" is based on unsupported speculation. Dr. Wetli provided no evidence that this unsupported speculation has been subjected to the scientific method. Instead, he conceded that he had read very little on the issue and that he did not think anybody had focused on the issue. The opinion is unreliable, and this Court should bar Dr. Wetli from providing any testimony regarding the opinion.

### 3. Dr. Wetli Is Not Qualified to Opine on Whether a Hallucinogenic or Stimulant Drug Caused Charlie's Purported Excited Delirium, Which Opinion Was Undisclosed and Speculative.

In his expert report, Dr. Wetli identified three possible causes of excited delirium – "certain infections, certain mental illnesses and stimulant or hallucinogenic drugs" – but concluded that the "cause of excited delirium for Mr. Todero was not established." Ex. B at 2.

Given the finite number of factors that can lead to excited delirium, Dr. Wetli's inability to identify any of them as the cause of Charlie's death exposes the speculative nature of the opinion – *i.e.*, Dr. Wetli simply contends Charlie has excited delirium but has no idea why.

Seemingly recognizing that his inability to identify a cause for Charlie's purported excited delirium would raise issues regarding the reliability of his opinion, Dr. Wetli sought to correct this at his deposition. There, Dr. Wetli revealed that he had determined via differential diagnosis that the cause of Charlie's purported excited delirium was a hallucinogenic or stimulant drug. *See* Ex. A at 135:11-36:18, 204:20-05:11.

As a threshold matter, this Court should bar Dr. Wetli's new opinion because it was not disclosed in his report. *See Ciomber v. Coop. Plus, Inc.*, 527 F.3d 635, 642 (7th Cir. 2008) (Fed. R. Civ. P. 26(a)(2) does not allow parties to cure deficient expert reports by supplementing them with later deposition testimony). To the extent the Court does not strike the opinion as untimely, it should bar Dr. Wetli from offering the opinion because he does not have the expertise to offer the opinion, and it is based on unreliable methods and is speculative.

At his deposition, Dr. Wetli reiterated that the three possible causes of excited delirium are mental illness, infection and stimulant or hallucinogenic drugs. Ex. A at 135:11-17. He then engaged in a differential diagnosis, ruling out mental illness and infection. *Id.* at 137:14-16. Claiming he could not rule out hallucinogenic or stimulant drugs, Dr. Wetli concluded that Charlie's purported excited delirium was caused by a synthetic hallucinogen or stimulant. *Id.* at 136:3-18, 204:7-05:11. Dr. Wetli gave some indication that the purported hallucinogen or stimulant was a drug known as Spice. *See id.* (testifying that a medical record suggested that Charlie had taken Spice).

14

Dr. Wetli's new opinion suffers from many defects.  First, the opinion is inconsistent with the results of two toxicology screens – one at the time of Charlie's admission to the hospital and the other post-mortem.  The toxicology screens indicated "only that he had been exposed to marijuana."  *Id.* at 134:1-9.  Notably, the screens also showed that Charlie tested negative for alcohol, PCPs, drugs like Valium or Xanax, cocaine, amphetamines, opiates, barbiturates, and anti-depressants.  *Id.* at 175:19-177:1.

To avoid this damning objective evidence, Dr. Wetli testified that the behavior he "saw" in connection with Charlie was consistent with toxicity from a synthetic drug.  *Id.* at 205:5-9.  According to Dr. Wetli, synthetic drugs would not show up in a drug screen performed by a hospital or medical examiner's office.  *Id.* at 204:7-18.

Dr. Wetli's testimony regarding synthetic drugs highlights a second defect with his new opinion – namely, the methodology upon which it is based.  The only synthetic drug mentioned by Dr. Wetli during his deposition testimony was Spice.  *See id.* at 17:21-18:2, 18:10-19:8, 204:20-05:4.  Notably, Dr. Wetli admitted he had no independent knowledge regarding Spice and learned from Defendants' attorney, Mr. Stephenson, that it was "[s]ome kind of hallucinogenic drug like amphetamine."  *Id.* at 18:15-18.  Dr. Wetli did not believe he engaged in any additional research regarding Spice, nor did he review other materials to further educate himself.  *Id.* at 18:22-25.

Based on the above-described facts, to the extent Dr. Wetli has concluded that the purported drug that caused Charlie's purported excited delirium was Spice, Dr. Wetli has made clear that he has no independent knowledge of what Spice is.  *Id.* at 18:15-18.  Further, Dr. Wetli cannot credibly contend that forensic pathologists normally rely on biased defense attorneys to help determine the method, mechanism or cause of a person's death.  *See* Fed. R. Evid. 703

(requiring trial court to determine whether inadmissible information relied on by an expert is of the type reasonably relied upon by other experts in the field).

To the extent, Dr. Wetli has reached his conclusion based on a differential diagnosis that diagnosis was tainted by critical flaws resulting in an unreliable opinion – a third defect with the new opinion. *See Ervin v. Johnson & Johnson*, 492 F.3d 901, 904 (7th Cir. 2007) (barring expert opinion based on tainted differential diagnosis). Specifically, to support his differential diagnosis, Dr. Wetli would have to rely on: (a) uncorroborated information he received from the defense attorney in this case, *see id.* at 18:15-18; (b) two stale medical records from 2010 and 2012 showing that Charlie had smoked marijuana soaked in formaldehyde and once had an issue related to alcohol and Vicodin, *id.* at 21:10-22:19; and (c) a record showing that a doctor suggested that Charlie may have been suffering from Spice toxicity. *Id.* at 204:20-23. Dr. Wetli did not do any of his own research, seek to conduct additional post-mortem drug screens or conduct any interviews with witnesses or Charlie's treating doctors.

Moreover, in conducting the differential diagnosis, Dr. Wetli assumed that Charlie suffered from excited delirium and then worked to find the cause for it – ultimately, settling on a hallucinogenic or stimulant drug. As demonstrated throughout, Dr. Wetli made this assumption based on incorrect facts and, now, admits that the actual facts show that Charlie did not suffer from excited delirium. *See id.* at 148:7-17.

Further, Dr. Wetli does not have the expertise to properly conduct the differential diagnosis or, for that matter, determine whether an individual's behavior is consistent with synthetic drug use. Dr. Wetli admittedly has not treated a patient since 1976, and he has focused his entire career almost solely on pathology. *See id.* at 74:5-75:9, 75:24-76:1. Thus, it is beyond his expertise for him to determine whether a person's behavior was consistent with synthetic

drug use.  This conclusion is underscored by Dr. Wetli's reliance on Defendants' attorney in this case for information related to the purported drug at issue.  Given Dr. Wetli's lack of knowledge regarding Spice and synthetic drugs, he did not have the skillset or knowledge base necessary to be able to rule hallucinogenic or stimulant drugs in or out of his analysis.

Finally, Dr. Wetli's differential diagnosis is questionable given that he originally opined that he did not know what caused the purported excited delirium.  *Compare* Ex. B at 2 and Ex. A at 205:5-11.  As in *Ervin*, Dr. Wetli has no reliable basis for his differential diagnosis.  *See Ervin*, 492 F.3d at 904.  This Court should preclude the new opinion and any testimony related thereto.

### 4. Dr. Wetli Failed to Follow the Methodology of a Forensic Pathologist.

In his deposition, Dr. Wetli described the basic role of a forensic pathologist as "investigat[ing] the cause, manner, and mechanism of death."  Ex. A at 78:10-11.  The methodology utilized by a forensic pathologist in "day-to-day practice" involves initially deciding "whether or not you are going to perform an autopsy or not, and then what ancillary studies will be needed, such as toxicology, histology, serology, whatever.  Once you have you all of that information, then you come to your various conclusions."  *Id.* at 78:16-22.  The approach of a forensic pathologist acting as a consulting expert is "basically the same," "but you don't have to do the autopsy because it's already been done.  And the idea is to gather as much information as possible to come to the same conclusions."  *Id.* at 78:9-10, 78:25-79:3.

In analyzing a death, a forensic pathologist also necessarily relies on a decedent's "personal medical background" and information about "the terminal event at the very least," as well as "any additional information that may be pertinent, whether it's medical or nonmedical."  *Id.* at 81:7-10.  In sum, the methodology of a forensic pathologist is rooted in an examination of the objective post-mortem findings of the autopsy and ancillary testing, supplemented by a broad

consideration of additional medical and non-medical information which may help shed light on the objective findings. *See id.* at 85:8-11 ("You basically get as much information as possible, combine that with the autopsy findings, combine that with your ancillary studies and then you have to make a decision.").

The Seventh Circuit has made clear that it is not enough for an expert to articulate the reliable methodology of his field; he has to follow it. *See Brown v. Burlington N. Santa Fe Ry. Co.*, 765 F.3d 765, 773 (7th Cir. 2014) ("[A]n expert must do more than just state that she is applying a respected methodology; she must follow through with it."). Dr. Wetli failed to do that.

Instead of broadly considering the plethora of objective medical evidence in this case, Dr. Wetli disregarded as irrelevant vast swaths of the record and focused almost exclusively on subjective, non-medical evidence that supported his ultimate conclusion that Charlie was agitated and delirious on May 29, 2016. While Dr. Wetli reviewed tissue samples from Charlie's various organs, he concluded "they don't tell me anything." Ex. B at 106:25-107:16. Similarly, Dr. Wetli disregarded the coroner's autopsy findings and analysis and, instead, utilized the coroner's file to find non-medical accounts of Charlie's behavior on the relevant date. *Id.* at 191:17-192:1. Moreover, Dr. Wetli essentially disregarded the more than 10,000 pages of Charlie's medical records from his treatment at St. Francis Hospital during the two weeks prior to his death. *Id.* at 192:2-12.

In lieu of the objective medical evidence, Dr. Wetli claimed to have looked to eyewitness descriptions of Charlie's behavior on the roadway on May 29, 2016. *Id.* at 166:22-167:16. However, as described in § III.A, above, it is unclear whether Dr. Wetli even took the time to thoroughly review the eyewitness accounts. *See* § III.A, above.

The actual methodology utilized by Dr. Wetli bore virtually no resemblance to the methodology Dr. Wetli testified forensic pathologists utilize. Rather than investigate the manner, mechanism and cause of Charlie's death, Dr. Wetli set out searching for facts to support what seems to have been his predetermined conclusion that Charlie suffered from excited delirium. Even when facts did not support this conclusion, Dr. Wetli made them up – as evidenced by his inaccurate description of Charlie's conduct before police arrived on May 29, 2016. *See id.*

### 5. Dr. Wetli's Diagnostic Methodology Cannot Be Tested.

As described above, according to Dr. Wetli, a person has excited delirium if he is agitated and has delirium. Ex. A at 141:19-25, 142:5-8, 144:15-45:3. Conversely, if a person is not both agitated and delirious, he cannot have excited delirium. *Id.* at 142:9-20. Notably, there is no scientific basis to see if a diagnosis of excited delirium is correct.

As the Supreme Court held in *Daubert*, "a key question to be answered in determining whether a theory or technique is scientific knowledge that will assist the trier of fact will be whether it can be (and has been) tested. 509 U.S. at 593. Here, Dr. Wetli's method of diagnosing excited delirium cannot be tested as there is no underlying syndrome or condition that is separable from the two symptoms that define excited delirium, itself – *i.e.*, there is no objective way to falsify the conclusion. *See id.* ("[s]cientific methodology today is based on generating hypotheses and testing them to see if they can be falsified."). Notably, there is no objectively demonstrable error rate of diagnosing excited delirium, another key *Daubert* criterion.

**IV.  This Court Should Bar Dr. Wetli from Offering Any Opinions Not Disclosed in His Written Report.**

For all of the reasons discussed above, this Court should bar Dr. Wetli from testifying at all.  To the extent Dr. Wetli is permitted to testify, this Court should preclude him from offering any opinions not disclosed in his written report.

Federal Rule of Civil Procedure Rule 26(a)(2)(B)(i) requires that an expert's written report contain "a complete statement of all opinions the witness will express and the basis and reasons for them."  Fed. R. Civ. P. 26(a)(2)(B)(i).  Dr. Wetli's Rule 26 written report is limited to the following two opinions: (1) Defendants' "efforts to restrain Mr. Todero, including physical restraint and the multiple applications of a conducted electrical weapon . . . did not cause or contribute to [his] death"; and (2) Mr. Todero "died from the physiological complications of the excited delirium syndrome."  Ex. B at 3; Ex. A at 141:9-18 (confirming the only opinions in the report are the two opinions contained in its last paragraph).  Further, as discussed in § III.B.3, above, the Seventh Circuit has held that it is impermissible for parties to seek to cure deficient expert reports by supplementing them with later deposition testimony.  *Ciomber*, 527 F.3d at 642.

At his deposition, however, Dr. Wetli repeatedly sought to impermissibly expand the scope of his opinions beyond those that were properly disclosed in his written report.  Plaintiff's counsel repeatedly noted his objection to Dr. Wetli's efforts to improperly disclose new opinions, *see, e.g.*, Ex. A at 136:19-23, including objections to defense counsel's efforts to introduce new opinions through his cross-examination of Dr. Wetli.  *Id.* at 200:25-01:3, 202:10-15. Most notably, this occurred in Dr. Wetli's new opinion that Charlie Todero's excited delirium was caused by drug intoxication.  *See* § III.B.3, above.  Dr. Wetli agreed that his

statements about Charlie's excited delirium purportedly being caused by drugs were not contained anywhere in the written report.  Ex. A at 136:24-137:2, 138:13-139:8.

In addition to the drug-induced excited delirium opinion and the series of undisclosed opinions elicited by defense counsel, Ex. A at 200:9-09:15, there are a number of other improperly disclosed opinions, many of which also fail because they plainly go beyond Dr. Wetli's qualifications as a forensic pathologist.  For example, Dr. Wetli opined that if Charlie had not been restrained by police, he would have been struck and killed by a car.  Ex. A at 182:11-18.

This Court should bar Dr. Wetli from offering any opinions beyond the two disclosed in his report.   Fed. R. Civ. P. 26(a)(2)(B)(i); *Ciomber*, 527 F.3d at 642.

**CONCLUSION**

This Court should bar Dr. Wetli from testifying at the trial of this matter because his opinions are irrelevant and unreliable and, therefore, inadmissible.  To the extent the Court allows Dr. Wetli to testify, it should limit the testimony to that portion of the two opinions disclosed in his written report that the Court deems appropriate under Federal Rule of Evidence 702.  The Court should bar any opinions not disclosed in Dr. Wetli's report.

RESPECTFULLY SUBMITTED,

**Teresa Todero,**
**as Special Administrator of the**
**Estate of Charles Todero**

BY:   /s/ Sam Heppell
*One of Plaintiff's Attorneys*

Arthur Loevy
Jon Loevy
Steve Art
Sam Heppell
Theresa Kleinhaus
LOEVY & LOEVY
311 North Aberdeen St., Third Floor
Chicago, IL 60607
(312) 243-5900

## CERTIFICATE OF SERVICE

I, Sam Heppell, an attorney, hereby certify that on October 5, 2018, I caused the foregoing Plaintiff's Memorandum of Law in Support of Motion to Bar the Proposed Expert Testimony of Dr. Charles Wetli to be filed using the Court's CM/ECF system, which effected service on all counsel of record.

/s/ Sam Heppell
*One of Plaintiff's Attorneys*