# Exhibit B

**2 Berkery Place**
**Alpine, NJ**
**07620-0398**

**201-750-8220**

## CHARLES V. WETLI, MD
*FORENSIC PATHOLOGIST*

*CharlesVWetli@gmail.com*

10 July 2018

Mr. James S. Stephenson, Esq,
c/o Stephenson Morrow & Semler, P.C.
3077 East 98th Street, Suite 240
Indianapolis, IN 46280

Re:  Todero v City of Greenwood, et al (your file no. 16-6820)

Dear Mr. Stephenson:

Regarding the death of Mr. Charles Todero, the following items were reviewed:

Complaint
Greenwood Police Department Internal Review Report
Greenwood Police Department Documents
TASER Download
Autopsy and Toxicology Reports
Autopsy Photographs
Histological Sections of Tissues taken at Autopsy
Body Cam Videos
Pre-Hospital Care Reports
St. Francis Hospital Records
Community Health Network Medical Records
Witness Interview Statements of Godfrey, Poynter, MacNaughton, Blackwell,
        Elliott, Eck, Laut, Walters, Hartman, Moyer and Moore
Depositions of Laut, Elliott, Pitts, Mitchell, Venne, and Godfrey
Reports of Roger Clark and Dr. Mayer Rashtian

Very briefly, Mr. Charles Todero was a thirty year old man who was walking into traffic
such that drivers had to swerve to avoid hitting him. His actions suggested that he was

trying to commit suicide by getting hit by a car, and calls to 911 were made. The police responded and he was found to be carrying a bible and exclaiming that he was Jesus Christ and a prophet. He kept trying to enter the road into traffic and would not comply with orders by the police. A TASER was deployed in dart mode and at first was not effective as one probe apparently got tangled in his shirt. This was corrected and altogether the TASER was deployed in both dart and drive stun modes about 16 times before he could finally be handcuffed. Once handcuffed he was placed on the pavement with his back leaning on a curb. EMS was called and he was secured onto a stretcher to be brought to a hospital. Once in the ambulance he apparently again became violent and combative. The EMS records indicate they regarded him as having excited delirium syndrome, and midazolam was administered. However, as they approached the hospital he suddenly developed agonal type respirations and his heart rate went from 140 to 33 and then asystole. CPR was initially successful. In the hospital he was found to have a core temperature of 103 degrees F, hyperkalemia, rhabdomyolysis and a blood pH of 6.8. He was given supportive care but died about two weeks later. He had a history of marijuana use and reportedly consumed a half gallon of vodka each day. The police asked him if he had taken "spice" or some other drug. Hospital toxicology revealed THC. At issue is the contribution of the multiple TASER applications to his death.

Mr. Todero clearly had many of the signs of the excited delirium syndrome, including being oblivious to his environment, hyperthermia, being oblivious to pain (viz. TASER applications), and violent behavior. When such individuals suddenly lose vital signs, it invariably occurs after a short period of restraint and, if monitored as in this case, the heart rate suddenly drops drastically and then goes into asystole (as in this instance) or pulseless electrical activity (PEA). The mechanism for the cardiac arrest is thought to be a surge of the hormone nor-epinephrine upon the cessation of strenuous activity. Should they be resuscitated they are found to have a profound lactic acidosis with a blood pH of less than 7.0, rhabdomyolysis (breakdown of skeletal muscle) and, very frequently, elevated potassium levels in the blood (hyperkalemia). It should be noted that these abnormalities are part of the excited delirium syndrome and are independent of any police actions including applications of a conducted electrical weapon. Death occurs usually within a few days from multiorgan failure. The causes of the excited delirium syndrome include certain infections, certain mental illnesses and stimulant or hallucinogenic drugs. The cause of the excited delirium for Mr. Todero was not established. Also, it should be noted that individuals with excited delirium are a significant danger to themselves and others, requiring restraint generally by law enforcement officials. Their resistance to being restrained is what leads to the abnormal physiologic changes that may result in sudden death. And if they are not restrained there is the real possibility they will die from trauma, such as being struck by an automobile as in the case of Mr. Todero.

The complications of this syndrome (viz. rhabdomyolysis, acidosis and hyperkalemia) occurs regardless of the method of police intervention: physical force, application of pepper spray, or the use of conducted electrical weapons such as the TASER. Although it is true that the application of a conducted electrical weapon may cause some skeletal muscle breakdown and locally generate lactic acid, this has been shown to be miniscule

compared to the amount of muscle breakdown and lactic acid accumulation associated with the physical exertion expended in cases of excited delirium. Indeed, recent prospective studies have shown that the application of a conducted electrical weapon in cases of excited delirium is safe and does not contribute to a fatal outcome. To implicate the application of a conducted electrical weapon, even with repeated applications, to the development of acidosis, hyperkalemis and rhabdomyolysis is therefore specious and without foundation. Likewise, the efforts at physically restraining Mr. Todero did not compromise his respirations, cause or contribute to the acidosis, cause or contribute to skeletal muscle breakdown or otherwise contribute to his loss of vital signs and ultimate death.

It is therefore my opinion to a degree of reasonable medical certainty that the efforts to restrain Mr. Todero, including physical restraint and the multiple applications of a conducted electrical weapon (viz. TASER), did not cause or contribute to the death of Mr. Charles Todero who died from the physiological complications of the excited delirium syndrome.

Yours Truly,

Charles V. Wetli, MD

7