# Exhibit J

# Mayer Rashtian, MD, FACC, FHRS

P.O. Box 50361
Pasadena, CA 91115
mrashtianmd@gmail.com

June 29, 2018

Sam Heppell
Loevy & Loevy
311 N. Aberdeen St., Third Floor
Chicago, Illinois 60607

**RE:** *Todero v. City of Greenwood, et al.*, **17-cv-0168 (S.D. Ind.)**

Dear Mr. Heppell,

I understand that your office represents the Plaintiff in the above-captioned case, related to the May 29, 2016 incident in which Charles Todero was tased by officers from the Greenwood Police Department, and Mr. Todero's death a number of days later. Pursuant to your request, I have reviewed the pertinent materials in this case. You have asked me to offer my opinions on a number of issues related to this matter, including Mr. Todero's cause of death.

**Materials Reviewed:**

1. Amended Complaint
2. American Medical Response Ambulance Records
3. Greenwood Fire Department Reports
4. Evidence Sync Download of Lt. Blackwell's X26 model Taser
5. Medical Records from St. Francis Hospital
6. Medical Records from Indianapolis Gastroenterology and Hepatology
7. Case File and Photographs from Marion County Coroner's Office
8. Medical Records from Community Health
9. Medical Records from Wishard Memorial
10. Medical Records from Johnson Memorial
11. GPD Police Reports and investigative materials
12. Transcripts of investigative interviews with:
    a. Brian Blackwell
    b. Randy Eck
    c. Renee Elliott
    d. Ian Godfrey
    e. Elizabeth Laut
    f. Deborah MacNaughton
    g. Jeanne Moore
    h. Terry Moore
    i. Charles Moyer

1

        j. Roger Poynter
        k. Holly Walters
13. Video recordings:
        a. Officer Elliott's body-worn camera footage
        b. GPD Officer Randy Eck's body-worn camera footage
14. Transcript and Exhibits from the depositions of:
        a. Dr. Chris Hartman
        b. Lt. Brian Blackwell
        c. Officer Renee Elliott
        d. Officer Elizabeth Laut
        e. Ian Godfrey
        f. Teresa Todero
        g. Holly Walters
15. TASER Electronic Control Device-Induced Rhabdomyolysis and Renal Failure: A Case Report
16. Taser International materials on Rhabdomyolysis

**Qualifications:**

I am a medical doctor board-certified in cardiology and electrophysiology, the medical subspecialty that studies and treats the heart's electrical system. I graduated from UCLA in 1984 with a Bachelor of Science in chemical engineering. In 1988 I received my medical degree from Drexel University, then known as the Hahnemann University School of Medicine. I was an intern and resident in internal medicine at Loma Linda University Medical Center. I did my fellowship in cardiology at LA County-USC Medical Center and in electrophysiology at Kaiser Permanente Hospital in Los Angeles. I presently maintain an active electrophysiology practice out of my office in Pasadena, California, doing ablations, implanting pacemakers, and performing similar procedures. In the course of my practice as a cardiologist, I have been consulted on numerous patients suffering from rhabdomyolysis, and it is exceedingly common for a rhabdomyolysis patient to be provided with a cardiac consult. My complete academic and professional credentials are set forth in my curriculum vitae, attached as Exhibit A.

**Factual Overview:**

On May 29, 2016, Mr. Todero was walking on Madison Avenue in Greenwood, Indiana. It was reported by passing motorists that he was walking into traffic, and so Greenwood Police were dispatched to the scene. GPD Lt. Blackwell reports that when he arrived on scene, Mr. Todero was sitting on the side of the road, and that when he engaged Mr. Todero in conversation, Mr. Todero stated in response "I am Jesus Christ." Other witnesses to the incident on May 29 gave similar descriptions of Mr. Todero making statement about Jesus or quoting bible verses.

Police later learned that Mr. Todero had been present earlier on May 29 and in the late afternoon and evening of May 28 at the Vineyard Church in Greenwood. Several witnesses described Mr. Todero walking around the church both late on the 28th and early on the 29th having similar interactions with people where he made non-rational statements with religious themes. Some witnesses noted that they believed Mr. Todero had slept on the patio of the church overnight on May 28th. Mr. Todero did not appear to witnesses to be in any medical distress or suffering any

medical emergency while at the church. He left the church walking northbound on Madison Avenue around 11:15 to 11:30am on May 29.

Shortly after Lt. Blackwell first encountered Mr. Todero, he deployed his Taser, firing its two probes into Mr. Todero's back and discharging electricity for a 5 second burst. One of the probes was embedded so deeply into his back that paramedics attempting to remove it later on scene decided they could not safely do so, and instead secured it with tape to be removed at the hospital.

The log from Lt. Blackwell's Taser reflects that over the course of the next 3 minutes and 15 seconds, Lt. Blackwell fired his Taser a total of 16 times, for a total duration of 98 seconds. The Taser shots ranged from as short as 2 seconds to as long as 13 seconds. Some of the Taser shots were fired within less than a second of the prior shot being terminated.

A timeline of events put together by GPD during their investigation of the incident reflects that Lt. Blackwell's repeated Taser deployments occurred between approximately 11:52am and 11:55am. EMTs from the Greenwood Fire Department and Paramedics with American Medical Response arrived on scene at approximately 12:00pm and 12:01pm respectively.

The witnesses present on the scene in the immediate aftermath of the tasing give diverging subjective descriptions of Mr. Todero's behavior after he was tased, ranging from not combative to extremely combative, but they are generally consistent (as corroborated by the body-worn camera video) in their objective descriptions that Mr. Todero was to some extent squirming or writhing around, which caused the first responders to be concerned that he might fall off the stretcher or otherwise injure himself as a result of these movements.

Shortly before paramedics arrived, Officer Elliott observed that Mr. Todero was breathing rapidly, stating (as captured on the body-worn camera video) that "he's gonna start hyperventilating in a second," although Lt. Blackwell stated shortly afterwards that "he's fine, he's got great breathing." Paramedic Ian Godfrey did not perceive any problems with Mr. Todero's breathing, but observed that his heart rate was mildly elevated.

First responders lifted Mr. Todero onto a stretcher, secured him in place with three cross-body straps, and brought him into the back of the ambulance. Paramedic Ian Godfrey was joined in the back of the ambulance by two Greenwood firefighters.

At 12:08pm, shortly after Mr. Todero was placed in the back of the ambulance, Mr. Todero's pulse rate was measured at 142, hyperventilating with respiration at 24, and an EKG reflected that he was suffering from Sinus Tachycardia.

Mr. Godfrey states that Mr. Todero's movements in the back of the ambulance caused him concern that Mr. Todero might hurt himself by rolling off the stretcher or hitting his head on something, and that they were also interfering with Mr. Godfrey's efforts to monitor his condition and provide medical care, so Mr. Godfrey made the decision to sedate Mr. Todero. At approximately 12:14pm, he administered a 5mg dose of Midazolam (aka Versed) by injection into Mr. Todero's right deltoid muscle. Mr. Godfrey describes this as a standard dose which he

3

has administered on many prior occasions. The Midazolam was effective in calming Mr. Todero's physical movements.

Mr. Godfrey states that he and the two firefighters were monitoring Mr. Todero very closely, as he was aware of the risk that Mr. Todero's breathing might drop.

At approximately 12:18pm, just as the ambulance was in the process of arriving at St. Francis Hospital, Mr. Godfrey's ambulance report reflects that Mr. Todero's "heart rate dropped sharply from the 140s to the 30s and [he] began breathing agonally." Shortly after that, Mr. Todero went into asystole, and he had a zero pulse rate and a breathing rate of 12.

Mr. Todero's asystole commenced just as the ambulance was pulling into the ambulance bay at the hospital. CPR was administered initially by the first responders and was transferred over to emergency room staff. Mr. Todero was revived in the emergency room. However, Mr. Todero went into asystole again at 12:30pm, and he was again revived shortly thereafter.

The emergency room physician Dr. Chris Hartman noted in the medical records that Mr. Todero was suffering from rhabdomyolysis. Laboratory results from shortly after Mr. Todero's arrival at the hospital revealed he was suffering from hyperkalemia and metabolic acidosis. A urine drug screen did not reveal the presence of any drugs other than a positive test for cannabinoids.

Mr. Todero's CPK level was measured at over 8,000 on May 29, and increased to over 20,000 on May 30 and May 31.

Mr. Todero was present at the hospital for two weeks, from May 29 to June 11. During that time he received aggressive treatment from his physicians there, including cardiothoracic surgery, and which required intubation, sedation, a feeding tube, and other invasive diagnostic and treatment-related procedures.

During portions of his hospitalization, the medical records reflect that Mr. Todero was to some extent responsive, for example squeezing a nurse's hand in response to a command, or grimacing in response to painful stimuli. However, his condition deteriorated and ultimately he became unresponsive.

As a result of the rhabdomyolysis that led to multi-organ system failure, and despite the aggressive, supportive and proper medical care provided at the hospital that is extensively documented in the medical records, Mr. Todero could not survive the injuries. Based on the advice of medical staff that he would not recover, Mr. Todero's family decided to withdraw life support and Mr. Todero was ultimately pronounced dead on June 11, 2016 at approximately 11:48pm.

The Marion County Coroner's office conducted an autopsy and recorded Mr. Todero's cause of death as complications of multi-organ system failure.

**Opinions:**

I hold the following opinions to a reasonable degree of medical certainty, based on the information available to me as of the date of this report. In arriving at these opinions, I relied on the medical records covering the entirety of Mr. Todero's medical treatment in relation to this incident, from the initial contact with paramedics at the scene of the incident through his hospitalization at St. Francis Hospital up until the autopsy report and coroner's materials.

1. The cause of Mr. Todero's death was the repeated application of Taser shocks on May 29, 2016, causing rhabdomyolysis and leading to cardio-respiratory failure and to multi-organ system failure. Rhabdomyolysis is a condition caused by muscle injury leading to the death of muscle fibers and the release of their contents into the bloodstream. The extensive and excessive Taser discharges across multiple large muscle areas triggered the rhabdomyolysis that Mr. Todero experienced. Rhabdomyolysis can be diagnosed by testing a patient's levels of creatinine phosphokinase (CPK), which is a product of muscle breakdown. High levels of CPK indicate that a patient may be suffering from rhabdomyolysis. Mr. Todero's levels of CPK were highly elevated upon his arrival at St. Francis Hospital, and became even more extremely elevated in the following days (it is expected that CPK levels will increase as the rhabdomyolysis progresses even though the cause of the rhabdomyloysis, in this case the tasering, has ended). Rhabdomyolysis also causes hyperkalemia (elevated potassium levels). Mr. Todero's potassium levels were also highly elevated when he arrived at St. Francis Hospital. Another indicator of rhabdomyolysis is metabolic acidosis, because damage muscle cells release acids into the bloodstream. Mr. Todero's blood acid levels were also highly elevated when he arrived at St. Francis Hospital. The release of dead muscle cells into the bloodstream and the resulting elevated potassium and blood acid levels can damage multiple different organs in the body, including the heart, kidney, and liver. Mr. Todero suffered repeat cardiac arrests while at St. Francis, and was also diagnosed with significant kidney and liver damage. These were manifestations of the multi-organ system failure caused by the Taser-induced rhabdomyolysis. The more severe the trauma to a person's muscles, the more significant and severe the death and breakdown of muscle tissue and the corresponding spike in potassium and blood acid levels. Due to the severe trauma to Mr. Todero during the 3 minutes and 15 seconds in which he was repeatedly tased by Lt. Blackwell, he experienced extreme muscle damage and breakdown of muscle tissue, leading to a rapid onset of severe rhabdomyolysis which released toxic agents into his bloodstream causing damage to his heart, kidneys and liver, resulting in multi-organ system failure that proved not to be survivable. The cause of death listed by the Marion County Coroner's Office— multi-system organ failure—is consistent with this finding. The Coroner's Office's description of Mr. Todero's death as resulting from "natural causes" would be the standard notation for a death resulting from multi-system organ failure and does not suggest any conclusion one way or the other about the role that Lt. Blackwell's Taser use played in his death.

5

2. I understand that there is a factual dispute over the quality of the connection between the Taser probes and Mr. Todero's body, and a contention by the Defendants in this case that not all of the Taser discharges fired by Lt. Blackwell were effective. My opinion in this case regarding Mr. Todero's cause of death does not rely on all 16 of the Taser shots being effective, or Mr. Todero receiving an electric shock for every one of the 98 seconds that the Taser log reflects the Taser trigger was pulled. The rhabdomyolysis leading to multi-system organ failure could have been caused by fewer than 16 Taser shots and fewer than 98 seconds of electrical exposure. Regardless of the exact number, with each additional second of Taser discharge Mr. Todero's muscles would have suffered additional damage leading to a more severe presentation of rhabdomyolysis. Also relevant to the severity of the rhabdomyolysis is the number of instances in which the Taser log reveals there was no or minimal downtime between Taser discharges, which meant that Mr. Todero was subjected to essentially continuous electrocution for extended periods of time, and would have experienced prolonged periods of intense involuntary muscle contraction.

3. There is no evidence in the records (both the medical records and the records of the police investigation) I have reviewed that reveal a plausible alternative cause of the rhabdomyolysis that Mr. Todero was suffering. The muscle damage required to trigger rhabdomyolysis can be caused by a prolonged period of muscle compression, such as an extended duration of immobilization or lying unconscious on a hard surface. I am aware that there is evidence that Mr. Todero may have slept outside on the patio of the Vineyard Church on the night before the incident involving Lt. Blackwell. However, witness descriptions indicate that Mr. Todero had a similar demeanor both the evening before and the morning after, and the evidence in the record shows that Mr. Todero was able to walk around actively and was not demonstrating any outwardly visible signs of medical distress on the morning of May 29, so I am confident that the severe rhabdomyolysis that was later detected had not yet transpired prior to the tasing incident. Nothing in the autopsy report reveals any underlying medical condition that explains the rhabdomyolysis and multi-organ system failure that Mr. Todero experienced. The only drug detected in Mr. Todero's system during the toxicological screen conducted upon his admission to St. Francis hospital was cannabis, which is not known to cause rhabdomyolysis.

4. Mr. Todero was suffering from some neuropsychiatric symptoms on May 28 and May 29, evidenced by his delusional behavior and irrational statements. The exact cause of those symptoms and behavior are not apparent from the records that I have reviewed. It is possible that the cause was some underlying psychiatric condition, or it could have been a physical illness such as an infection that manifested itself in neuropsychiatric symptoms. The odd behavior demonstrated by Mr. Todero is not a symptom of rhabdomyolysis and therefore does not indicate that the rhabdomyolysis was present prior to the time that he was tased.

5. The use of the sedative in the back of the ambulance by the paramedic did not cause Mr. Todero's death. As Mr. Godfrey stated, a 5mg dose of Midazolam is a standard dose that is not remarkable. There are always risks associated with chemical sedation,

6

and those risks include respiratory arrest. Mr. Godfrey stated that he was aware for the potential that Mr. Todero might stop breathing, and was ensuring that he was being monitored closely, by himself and the other first responders in the back of the ambulance. In an alternative hypothetical where Mr. Todero had been given the Midazolam but had not suffered the multiple tasings leading to rhabdomyolysis, at worst the Midazolam might have led to respiratory arrest from which he would have been quickly resuscitated if monitored appropriately. Such an event would have been survivable. In an alternative hypothetical where Mr. Todero had been subjected to the same multiple tasings leading to rhabdomyolysis but was not administered Midazolam, it is possible that the onset of cardiac arrest would not have occurred at the same precise time, but the progress of organ damage leading to multi-organ system failure causing death would have followed a similar path. Put a different way, Mr. Todero would have died from multi-organ system failure regardless of whether he had a heart attack in the back of the ambulance on the way to the hospital. Additionally, while respiratory arrest is a known risk of chemical sedation, the fact that Mr. Todero went into cardiac arrest leading to asystole is a result of the toxic agents present in his bloodstream that were a secondary consequence of the rhabdomyolysis caused by the tasing.

6. Mr. Todero's physical movements in the immediate aftermath of the tasing, as described by Mr. Godfrey and other witnesses—that is, his squirming and writhing about—can be explained by the severe pain that Mr. Todero had experienced and would have been experiencing in the aftermath of the extreme Taser exposure, and by accompanying anxiety and distress during what would have been a highly disorienting experience for him.

7. Based on the documentation in the medical records of some responsiveness by Mr. Todero during portions of his hospitalization, including response to simple commands and painful stimuli, it is reasonable to conclude that there were periods of time when Mr. Todero had some level of awareness. During those periods, both as a result of his extensive injuries and the invasive efforts at diagnosis and treatment (including intubation for both breathing and feeding), Mr. Todero would have experienced significant pain, agony and discomfort.

8. I have reviewed the deposition testimony of Dr. Hartman regarding his opinions on the cause of Mr. Todero's death and the potential causation of various different symptoms. For the reasons I have explained above, I disagree with Dr. Hartman's conclusion that the Taser did not cause Mr. Todero's death. Nothing in his explanation for that conclusion is inconsistent with my opinion on cause of death. Additionally, nothing in Dr. Hartman's discussion of the potential hypothetical range of causal factors for different symptoms observed in this case is inconsistent with my opinions as outlined above, based on the facts in the record in this case.

Attached, as Exhibit A is my CV, which includes a listing of my prior expert testimony in the last four years.

I charge $500/hr for my expert consultations with a minimum $3,000 retainer fee. For a half day deposition I charge for 5 hours of my time, for a full day I charge 8 hours.

I reserve the right to modify my opinions to the extent additional information is provided.

I declare under penalty of perjury that the foregoing is true and correct.

Executed June 29, 2018, at Pasadena, California.

_____

Mayer Rashtian, MD, FACC, FHRS

8