**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF INDIANA**
**INDIANAPOLIS DIVISION**

| | | |
|---|---|---|
| TERESA TODERO, as Special Administrator of the ESTATE OF CHARLES TODERO, | ) ) ) | |
| | ) | Case No. 1:17-cv-1698-TWP-MJD |
| *Plaintiff*, | ) | |
| | ) | Judge Tanya Walton Pratt |
| v. | ) | |
| | ) | Magistrate Judge Mark J. Dinsmore |
| CITY OF GREENWOOD, BRIAN BLACKWELL, RENEE ELLIOTT, ELIZABETH LAUT, and AS-YET UNIDENTIFIED GREENWOOD POLICE OFFICERS, | ) ) ) ) | JURY TRIAL DEMANDED |
| | ) | |
| *Defendants*. | ) | |

**PLAINTIFF'S MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFF'S MOTION**
**TO BAR THE PROPOSED EXPERT TESTIMONY OF MARK KROLL**

**INTRODUCTION**

On May 29, 2016, in a span of just over three minutes, Defendant Brian Blackwell shot Charlie Todero sixteen times with a Taser. During that short time, Blackwell discharged the Taser for more than ninety-eight seconds. Less than thirty minutes later, Charlie's heart stopped. While medical personnel were able to resuscitate Charlie, he never fully recovered – remaining largely unconscious in a hospital and, ultimately, dying two weeks later. Charlie's estate subsequently commenced this civil rights action. At the crux of this case are two issues: whether or not the use of force by Blackwell and the other Defendant Officers was excessive, and whether or not the use of force caused Charlie Todero's death.

Defendants Greenwood, Elliott and Laut (collectively, "Defendants") have retained Mark Kroll, a biomedical engineer with advanced degrees in electrical engineering whose career has focused on the development of electrical medical devices. Additionally, Kroll has served as a

corporate board member of TASER International (now Axon Enterprise, Inc.)[1] for more than fifteen years.

Kroll's written report spans over seventy pages. Much of it seems to be boilerplate, as it focuses extensively on issues not pertinent to this case. At times, it veers far afield from Kroll's legitimate qualifications as a biomedical engineer, discussing issues of medical diagnosis and treatment, behavioral science and human kinetics, and police practices and policy.

In terms of the opinions Kroll has disclosed, he includes a section titled "Brief Summary of Case Specific Opinions." *See* Report of Mark Kroll, attached hereto as Exhibit A, at 8. Although this section includes nine numbered items, there are additional opinions listed throughout his report, primarily at the end of each subsection under the heading "Relevance to This Case." *See*, *e.g.*, *id.* at 20. Taken together, these various items overlap and address different aspects of the same opinion, such that, read in the context of his entire report, Kroll's opinions can be organized into three discrete categories of opinions:

1. ***The circumstances and timing of Charlie's cardiac arrest on May 29, 2016 rule out electrocution as a cause of death – that is, Charlie's death was not directly caused by electricity. Id. at 8.***

The opinions in Kroll's report that fall into this category are:

- "Mr. Todero was breathing for over 18 minutes after the brief CEW current delivery and this per se eliminates electrocution as a cause of death." Ex. A at 8

- "Mr. Todero was resisting 18 minutes after the brief CEW current delivery and this per se eliminates electrocution as a cause of death." *Id.*

- "Mr. Todero had an essentially normal cardiac rhythm (elevated heart rate) for about 20 minutes after the brief CEW current delivery and this per se eliminates electrocution as a cause of death." *Id.*

---

[1] TASER International rebranded itself as Axon in 2017. For ease of reference, Plaintiff refers generally to the Taser corporation.

- "Mr. Todero's cardiac arrest rhythm was asystole (flat-line). This rhythm is not associated with electrocution and this per se eliminates electrocution as a cause of death." *Id.*

- "The electronic control attempt of Mr. Todero did not cause his unfortunate death. On the contrary, it represented the best opportunity to save his life during his exhibited behaviors and resistance." *Id.*

- "The electronic control attempt of Mr. Todero did not contribute to his unfortunate death. Electrocution is a stand-alone cause of death and does not mix with other causes like a soup recipe." *Id.*

- "No CEW dart was sufficiently close enough to Mr. Todero's heart to raise any concern of electrocution." *Id.*

**2.**   ***The circumstances of Defendant Blackwell's Taser use establish that the best estimate for the total duration of "electronic control" is 6.1 seconds, with an "extreme upper limit" of 11.9 seconds. Id.***

The opinions in Kroll's report that fall into this category are:

- "The bottom probe was lodged in Mr. Todero's shirt and generally not in close contact to his skin. Hence, there was no completed circuit to deliver pulses of current to him." *Id.*

- "Mr. Todero received a fairly typical duration of electronic control. My best estimate of the total duration was 6.1 seconds of equivalent probe-mode electronic control. Sensitivity-testing error analysis allows for the possibility that the equivalent duration was 8.6 s with an extreme upper limit of 11.9 s." *Id.*

- "Causes of Current Delivery Exaggeration" include "1. Broken wires or dislodged probes;" "2. Rounding up to the next second;" "3. Muzzle contact canting with drive-stuns;" "4. Muzzle contact and release delays;" "5. Inadvertent trigger pulls." *Id.* at 15.

- "Lt. Blackwell kept his CEW in the right hand while assisting the other officers. This is a major cause of inadvertent trigger pulls." *Id.* at 20.

- "Lt. Blackwell was 47 years old and hence contralateral contraction activity would be more pronounced than for the typical officer." *Id.*

- "Mr. Todero did not receive any drive-stuns lasting longer than 2 seconds." *Id.* at 22.

- "Officers noticed the loud sound from the broken connection. This demonstrates that a large portion of the CEW discharges and trigger pulls were not delivering current into Mr. Todero." *Id.* at 24.

- "Multiple lines of evidence prove that only 1 probe landed in Mr. Todero's body." *Id.* at 25.

- "There are a number of evidence items consistent with trigger pulls delivering zero current to Mr. Todero." *Id.* at 26.

- "Mr. Todero's muscles received only 39% of the emitted current during the 3-point applications." *Id.* at 29.

### 3. Tasers are generally safe devices that have been widely studied and tested and meet all relevant safety standards.

The opinions in Kroll's report that fall into this category are:

- The different potential durations of electronic control in this case "are well below any safety limits suggested by any authorities in the world. They are also well below the 30 *minutes* (not 30 seconds) known to be safe from animal studies. They are also well below the 30 and 45- second durations demonstrated safe in instrumented human studies." *Id.* at 8.

- "The most misunderstood and exaggerated theoretical risk is that of electrocution. This is extremely unlikely as the output of existing CEWs satisfy all relevant world electrical safety and effectiveness standards including those for the ubiquitous electric fence." *Id.* at 10.

- "Electronic Control is not Dangerous with the Intoxicated." *Id.* at 34.

In addition to Kroll's opinions related to whether Defendant Blackwell's use of a Taser directly led to Charlie's death, Kroll also opines on the expert witnesses disclosed by Plaintiff. *Id.* at 36-44

The Court should exclude all of Kroll's opinions and bar him from testifying. The opinions fail to satisfy the requirements of Federal Rule of Evidence 702 and *Merrell Dow Pharm., Inc.*, 509 U.S. 579 (1993). Specifically, this Court should exclude all opinions in the first category because they are irrelevant. Those opinions seek to rebut a hypothetical cause of

death theory that no one in this case is advancing – namely, electrocution. No party contends that Charlie's death was directly caused by electricity. Plaintiff has disclosed an expert report from Dr. Mayer Rashtian, a medical doctor and practicing clinician with a specialty in electrocardiology, who opines that the repeated Taser shocks caused muscle breakdown, leading to rhabdomyolysis which ultimately caused multi-system organ failure and death. *See* Report of Dr. Mayer Rashtian, attached hereto as Exhibit B, at 5.

This Court should, likewise, exclude all opinions in the second category because they are not reliable. While Kroll attempts to couch in science and precision his reduction of the number of seconds the Taser discharged electricity into Charlie, in actuality Kroll reached this opinion relying on: (a) a cherry-picked version of the factual record; (b) areas of medical and behavioral science far beyond his area of legitimate expertise; and (c) assumptions with no factual support in the record. This is not a reliable methodology, and allowing Kroll to present these calculations with their faux-precision and lack of evidentiary foundation poses a high risk of confusing and misleading the jury.

This Court should exclude all opinions in the third category because they are irrelevant. Each of the opinions seems more geared towards a product liability action than the actual federal civil rights lawsuit at issue here. The fact that Tasers may be safe, in general, or meet certain industry standards offers no help to the factfinder charged with determining whether Defendants' use of force and other wrongdoings violated Charlie's civil rights and, ultimately, cost him his life. Allowing these general opinions into evidence will be prejudicial and, undoubtedly, confuse the jury who will incorrectly think it needs to decide whether a Taser is safe in a laboratory.

Finally, regarding Kroll's opinions on Plaintiff's expert witnesses, this Court should exclude those opinions because Kroll lacks the qualifications to offer them. Kroll has no training or qualifications as a medical doctor or in law enforcement – the areas of expertise of Plaintiff's expert witnesses.

Exercising its role as gatekeeper, this Court should find each of Kroll's sundry opinions inadmissible. Accordingly, this Court should bar exclude all of Kroll's opinions and bar him from testifying at trial.

## BACKGROUND FACTS REGARDING KROLL

Defendants have disclosed a seventy-two page written report written by Mark Kroll. Ex. A. Kroll describes himself as a "Biomedical scientist with a primary specialty in bioelectricity." *Id.* at 5. Since 2006, Kroll's "professional position" has been as Principal of Mark Kroll & Associates, LLC, where he is the sole consultant providing general and litigation-consulting services. Ex. D at 4; Ex. E at 109:3-110:20.

In 2003, Kroll joined the corporate board of the Taser corporation and has served on their board of directors continuously since that time. Ex. E at 27:5-8, 63:23-25. Kroll also provides consulting work to the Taser corporation as a member of their scientific and medical advisory board. *Id.* at 64:21-65:5. He receives $220,000 per year in compensation from Taser for sitting on the corporate board and board committees, and an additional $100,000 per year for his work with the scientific and medical advisory board. *Id.* at 65:6-18. Over the fifteen years he has sat on Taser's, he estimates he has received a total of between $7 and $12 million combined cash compensation and stock value. *Id.* at 75:18-76:13.

Kroll is not a medical doctor, holds no medical degree, never attended medical school, and has never worked as a paramedic or any kind of emergency medical technician. *Id.* at 125:1-

12. When asked if he is qualified to treat human patients, he testified "[t]hat's not what we do as scientists," and he "do[es] not treat electrical injury." *Id.* at 126:5-7, 133:20-21. He also is "not asked to diagnose what disease somebody had. That's not what we do." *Id.* at 132:25-133:2. He has no training in medical recordkeeping and has never created a medical record. *Id.* at 134:2-7.

Kroll has no background in pharmacology or toxicology, is not qualified or authorized to prescribe drugs, and outside of his knowledge of the effect of cocaine intoxication on an individual's susceptibility to cardiac arrest, he has no expertise on the effect of illicit drugs on the body. *Id.* at 128:19-129:10, 138:24-140:6.

Further, Kroll has no expertise in the treatment, diagnosis, or physiological progression of rhabdomyolysis, or in the characteristics that make someone more or less susceptible to rhabdomyolysis. *Id.* at 137:15-138:16. He has never "conducted or been a coauthor on a published study in the first instance related to electrically induced rhabdomyolysis." *Id.* at 136:13-137:1. He has never published an article that has rhabdomyolysis as its primary focus, nor has he conducted any studies focused on rhabdomyolysis. *Id.* at 142:18-143:2. None of his academic background or training relates to rhabdomyolysis. *Id.* at 143:22-144:2. He does not profess any expertise related to rhabdomyolysis "outside of what is known to anybody that looks at the literature." *Id.* at 146:2-4.

Outside of being familiar with statistics on the risks and benefits of Taser use versus other uses of force, Kroll concedes he has no expertise in police practices. *Id.* at 151:25-152:10. He has no police training, has never been involved in providing training to law enforcement, and has never served in any law enforcement capacity. *Id.* at 152:11-18.

**ARGUMENT**

## I.   Legal Standards

Federal Rule of Evidence 702 governs expert witness testimony. According to the Rule:

A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:

(a)   the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or determine a fact in issue;

(b)   the testimony is based on sufficient facts or data;

(c)   the testimony is the product of reliable principles and methods; and

(d)   the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702. The trial judge occupies "a gatekeeping role" and must scrutinize proffered expert testimony to ensure it satisfies each requirement of Rule 702. *Daubert*, 509 U.S. at 592-93, 597. The objective of the court's gatekeeping requirement is to ensure the relevancy and reliability of expert testimony. *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 152 (1999). In evaluating the admissibility of expert testimony, non-exclusive factors the court may consider include: (a) whether the theory is testable; (b) whether it has been subject to peer-review and publication; (c) whether it has a known rate of error; and (d) whether it is generally accepted in the relevant scientific community. *Daubert*, 509 U.S. at 593-94; *see also Kumho Tire Co.*, 526 U.S. at 149-50.

The proponent of the expert evidence bears the burden of establishing, by a preponderance of the evidence, that the requirements set forth in Rule 702 and *Daubert* have been satisfied. *Lewis v. CITGO Petroleum Corp.*, 561 F.3d 698, 705 (7th Cir. 2009).

## II.     This Court Should Exclude Kroll's Opinion that the Circumstances of Charlie's Cardiac Arrest Rule Out Electrocution as a Cause Of Death.

### A.     Kroll's Opinion that Charlie's Death Was Not Caused by Electrocution Is Irrelevant.

Despite there being no issue in this case that electricity directly caused Charlie's death – *i.e.,* Charlie was not electrocuted – Kroll spends a large amount of time in his report ruling out electrocution as a cause of death.[2] Ex. A at 12-13. Because electrocution is not an issue, this Court, without more, may simply strike each of Kroll's electrocution opinions – *i.e.*, each opinion set forth in category 1, above. Each of those opinions is irrelevant.

Out an abundance of caution, Plaintiff provides additional information about Kroll's irrelevant electrocution opinions here. Kroll contends that low-power electrocution deaths occur due to "the electrical current inducing VF (ventricular fibrillation)" – *i.e.*, a heart rhythm characterized by "the heart muscle cells continu[ing] to contract but at nearly random times" – resulting in "no blood [being] pumped from the heart." *Id.* at 12. Kroll asserts that in a low-power electrocution, only one to five seconds of sufficient electrical current is necessary. *Id.* The electrocution results in: (a) instantaneous loss of pulse; (b) loss of consciousness within a matter of seconds; and (c) loss of normal breathing within a matter of minutes. *Id.*

In his report, Kroll lays out why the facts of this case rule-out electrocution as the cause of Charlie's death: (a) Charlie was breathing, "resisting," and demonstrating a normal cardiac rhythm (#3, #4 and #5) for too long after his exposure to the Taser; (b) the asystole he suffered was the wrong type of cardiac rhythm to indicate death by electrocution (#6); and (c) the Taser barbs were not close enough to his heart to pose any risk of electrocution (#9). *Id.* at 8. Kroll also

---

[2] An issue is the case is whether Defendant's repeated use of the Taser, ultimately, led to Charlie's death. This is different than electrocution.

contends that electrocution is a stand-alone cause of death that does not contribute to death in combination with other factors (#8). *Id.*

Again, as set forth above, Kroll's electrocution opinions are irrelevant. Plaintiff contends that Charlie died because Blackwell's Taser use caused rhabdomyolysis – "a condition caused by muscle injury leading to the death of muscle fibers and the release of their contents into the bloodstream" – which led to "cardio-respiratory failure and to multi-organ system failure." Ex. B at 5. This is far different from electrocution, where electricity directly causes the death.

Rule 702 requires that an expert's testimony be relevant in order to be admissible – that is, "the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue." Fed. R. Evid. 702(a). "When analyzing the relevance of proposed testimony, the district court must consider whether the testimony will assist the trier of fact with its analysis of any of the issues involved in the case." *Smith v. Ford Motor Co.*, 215 F.3d 713, 718 (7th Cir. 2000).

"The general qualifications of an expert witness do not guarantee that the witness will provide proficient assistance in any given instance," and even an expert with "impeccable qualifications" is properly excluded where "his testimony 'mainly concern[s] a matter not in issue.'" *Stevens v. McBride*, 489 F.3d 883, 891 (7th Cir. 2007) (quoting *In re Brand Name Prescription Drugs Antitrust Litigation,* 186 F.3d 781, 786 (7th Cir. 1999)). Allowing Kroll to opine that Charlie's death was not caused by electrocution will do nothing to help the jury "to understand the evidence or to determine a fact in issue." Fed. R. Evid. 702(a). On the contrary, it poses a substantial risk of confusing the jury and prejudicing Plaintiff by conveying the false impression that these factors weigh against accepting Plaintiff's evidence on cause of death,

when they do not. This opinion fails to meet the basic "*Daubert* threshold of relevance," *Lapsley*, 689 F.3d at 805, and this Court should exclude it on this basis.

**B.** **Kroll's Attempt to Broaden His Electrocution Opinion to Eliminate Any Role the Taser Played in Causing Charlie's Death Is Unreliable Because it Rests on Nothing More than Kroll's Self-Serving Assumption Tasers Do Not Cause Death.**

On the list of opinions in the first category described above, Kroll frames one opinion more broadly than simply eliminating electrocution. Kroll opines that "[t]he electronic control attempt of Mr. Todero did not *cause* his unfortunate death. On the contrary, it represented the best opportunity to save his life during his exhibited behaviors and resistance." Ex. A at 8.

As a threshold matter, Kroll's claim that the Taser use "represented the best opportunity to save [Charlie's] life" plainly exceeds his expertise, as he admits he has no experience in police practices beyond a general familiarity with the statistics comparing Tasers to other uses of force. Ex. E at 151:25-152:10. Notably, Kroll's testimony has been barred on this basis before. *See Khottavongsa v. City of Brooklyn Ctr.*, No. 16-CV-1031 (RHK/DTS), 2017 WL 3822877, at *6 (D. Minn. Aug. 30, 2017) ("Dr. Kroll is not qualified to offer opinions on the force options available to the police officers who responded to the scene here. Nor can he testify that the use of the taser was the "safest" option the police had. That is simply beyond his expertise."). Additionally, while Kroll's opinion suggests that police action was needed "to save his life," Kroll agreed at his deposition that he was offering no opinion on what Charlie's medical prognosis or life expectancy would have been had he not encountered Greenwood police on May 29, 2016. Ex. E at 157:1-11. As such, there is no logical basis for him to suggest that Charlie needed any intervention on May 29, 2016 to help save his life, much less sixteen discharges of a Taser.

Furthermore, Kroll's statement that the Taser use "represented the best opportunity to save [Charlie's] life" is, in substance, an opinion that the officers did not use excessive force. Yet, Kroll states that he has no opinion on this topic one way or the other. *Id.* at 155:17-20. Moreover, Seventh Circuit precedent expressly precludes Kroll from offering such an opinion. *See Thompson v. City of Chicago*, 472 F.3d 444, 458 (7th Cir. 2006) (affirming exclusion of expert opinion on whether defendant officer used excessive force, and observing that such opinions "would have been of little value except as to possibly causing confusion and bore a substantial risk of prejudice" because "[t]he jury, after having heard all of the evidence presented, was in as good a position as the experts to judge whether the force used by the officers to subdue [plaintiff] was objectively reasonable given the circumstances in this case").

As for the other portion of Kroll's opinion – namely, that "[t]he electronic control attempt of Mr. Todero did not *cause* his unfortunate death," Ex. A at 8, Kroll offers no analysis of how he reaches such a broad, generalized conclusion other than to claim that he rejects electrocution as a cause of death.[3] *See* Ex. E at 167:18-168:11. At his deposition, Kroll explained that he was able to eliminate the Taser as a cause of death, generally, because "[electrocution] is the only possible mechanism of death caused by low-power electricity exposure." Ex. E at 167:18-168:11. Thus, according to Kroll, once he ruled out electrocution as a cause of death, he ruled out the possibility that a Taser could cause death at all.

Kroll's methodology for eliminating *any* link between the Taser use and Charlie's death fails to meet the *Daubert* requirement of reliability. In order to be admissible, an expert opinion must be "based on sufficient facts or data." Fed. R. Evid. 702(b). Put plainly, "[a]n expert's opinions must be based on the evidence in the case." *In re Ready-Mixed Concrete*

---

[3] Kroll purports to offer some commentary in response to Dr. Rashtian's opinions, Ex. A at 41-44, but for the reasons discussed *infra* at Argument III, he is not qualified to do so.

*Antitrust Litig.*, 261 F.R.D. 154, 165 (S.D. Ind. 2009). Here, however, Kroll reached his highly generalized opinion without any consideration or analysis of the particular facts related to Charlie's death. Instead, he made the self-serving determination that Tasers cannot cause death at all because Tasers cannot electrocute people. This is a methodological shortcut that Rule 702 does not permit. *See Rowe v. Gibson*, 798 F.3d 622, 627 (7th Cir. 2015) ("[W]e look to the basis of the expert's opinion, and not the bare opinion alone. A claim cannot stand or fall on the mere ipse dixit of a credentialed witness."); *United States v. Noel*, 581 F.3d 490, 497 (7th Cir. 2009) ("An expert who supplies nothing but a bottom line supplies nothing of value to the judicial process.").

To illustrate the point, having reached the view that there are no other possible mechanisms by which low-power electricity exposure can cause death other than electrocution, in any case (like this one) where electrocution is not contended, Kroll could reach his opinion without reviewing a single piece of evidence or page of materials from the case record. More fatally, no matter how many pages he did review or what they contained, nothing would alter his opinion, because in his view no other mechanism is possible. The Seventh Circuit has rejected this type of expert opinion. Specifically, an expert who enters the arena with the assumption that the issue at hand is impossible – as Kroll does here – that expert offers nothing of value. *See Clark v. Takata Corp.*, 192 F.3d 750, 757 (7th Cir. 1999) ("Simply put, an expert does not assist the trier of fact in determining whether a product failed if he starts his analysis based upon the assumption that the product failed (the very question that he was called upon to resolve), and thus, the court's refusal to accept and give credence to [his] opinion was proper.").

As the Supreme Court stated in *Daubert*, "a key question to be answered in determining whether a theory or technique is scientific knowledge that will assist the trier of fact will be

whether it can be (and has been) tested." 509 U.S. at 593. In *Daubert*, the Court held that "[s]cientific methodology today is based on generating hypotheses and testing them to see if they can be falsified," and "the criterion of the scientific status of a theory is its falsifiability, or refutability, or testability." *Id.* Kroll's broadbrush elimination of the Taser as a potential cause of death offers nothing to test. There is no way to pick apart the analysis, because he has done none. He has simply applied his pre-fabricated conclusion that Tasers categorically cannot cause death other than by way of electrocution. *Daubert* does not allow this. *Bourelle v. Crown Equip. Corp.*, 220 F.3d 532, 539 (7th Cir. 2000) ("[E]xperts' work is admissible only to the extent it is reasoned, uses the methods of the discipline, and is founded on data."). Accordingly, this Court should find that Kroll's categorical elimination of the Taser as a possible cause of Charlie's death is unreliable and should, therefore, bar exclude it.

III.   **The Court Should Exclude Kroll's Opinion About the Duration of the "Electronic Control" Because It Is Unreliable.**

Kroll's second category of opinions addresses the number of seconds that Defendant Blackwell's Taser discharged electricity into Charlie's body. Kroll purports to reach an extremely specific, scientific-sounding conclusion about this "duration of electronic control," calculated down to one-tenth of a second, with his "best estimate" of 6.1 seconds and "an extreme upper limit of 11.9 s[econds]." Ex. A at 8. Kroll's "calculation" relies on other opinions which themselves rest on a cherry-picked factual record and assumptions with no evidentiary basis.

A.   **Kroll Should Be Barred From Opining that the Bottom Taser Barb Was Not Lodged in Charlie's Back.**

The summary judgment briefing in this case reveals hotly disputed facts around whether: (a) Blackwell's Taser was working effectively; and (b) whether one or both of the Taser barbs

were embedded in Charlie's back. *Compare* Doc. No. 111 at 3-6 *and* Doc. No. 116 at 5-6 *with* Doc. No. 131 at 16-17.[4] Inexplicably, Kroll purports to resolve this factual dispute and jury question, opining that "[t]he bottom probe was lodged in Mr. Todero's shirt" rather than in his back. Ex. A at 8. Kroll reaches this opinion without applying any specialized knowledge from his field of expertise. Rather, he simply conducts the same analysis of the disputed facts that the jury will be asked to conduct.

Because Kroll's opinion is not based on any special skill, knowledge or experience, this Court should exclude it. "Even if it is clear that the field in general qualifies for expert testimony, the proffered testimony may or may not be based upon the expert's special skills," and "an expert's opinion is helpful only to the extent the expert draws on some special skill, knowledge, or experience to formulate his opinion." *United States v. Hall*, 93 F.3d 1337, 1343 (7th Cir. 1996) (quoting *United States v. Benson,* 941 F.2d 598, 604 (7th Cir. 1991)).

### 1. The Purported Evidence that the Second Probe Was Dangling Does Not Require Expert Testimony.

Kroll asserts that "multiple lines of evidence prove that only [one] probe landed in Mr. Todero's body" and lists five examples. Ex. A at 25-26. None of this evidence requires the use of an expert in order for it to be understood. First, Kroll simply recites Defendant Blackwell's testimony that one barb was "dangling in Mr. Todero's shirt." *Id.* at 25. The jury will hear and consider that testimony and determine what it means and what weight to give it. Kroll is neither qualified nor permitted to bolster Blackwell's statement. *See Phillips v. Wilkerson*, No. 115CV00151JMSMPB, 2016 WL 5394404, at *3 (S.D. Ind. Sept. 27, 2016) ("The jury in this case will determine whose version of events it will believe, and conclusory opinions based on another person's credibility assessment are unhelpful and unnecessary.").

---

[4] Cites to "Doc. No. __," are to the docket.

Second, and contradictory to the point above, Kroll notes that while one of the barbs was so deeply lodged that paramedics were unable to remove it, "Blackwell easily **removed** the lower probe." Ex. A at 25 (emphasis added). While Kroll opines that "had the lower probe landed in the body it would have been similarly deeply lodged," he ignores the fact that the other probe required removal – necessarily indicating that it was not dangling. *Id*. Notably, this removal is seen on the body camera video.[5]

Setting aside this important contradiction, again, Kroll offers nothing to add to the jury's consideration of what the body camera video shows and what Blackwell describes about how he removed the probe at issue. Kroll is an electrical engineer with a specialty in bioelectricity – he does not possess any specialized knowledge in the aerodynamic properties of Taser barbs nor of their propensity to embed in human skin with different force or effectiveness. Further, Kroll cites no studies or analysis that support his assumption that two barbs from a single Taser shot will embed equally deeply (an assumption that seemingly defies common sense and fails to account for a body angle in relation to the Taser gun, the potential for clothing to be bunched or arranged in a different manner, the probe landing in fattier versus more muscular tissue, or any other number of potential variables). Kroll adds nothing to the jury's consideration of this point.

Third, Kroll notes that the hospital records list one puncture mark from the Taser probe (presumably the one too deeply embedded to safely remove on scene), but do not mention a second mark. Ex. A at 25. Kroll has no expertise in medical recordkeeping. Thus, he is no better equipped than the jury in evaluating the significance of the absence of any notation of a second mark. Ex. E at 134:2-7.

---

[5] The relevant video excerpt submitted as Exhibit 53 to Plaintiff's summary judgment response.

Fourth, Kroll contends that if the second probe had been embedded, it would have caused "essentially a total body lock-up." Ex. A at 25. Kroll further contends that total body lock-up did not happen because, if it had, "the struggle would have been quickly over." *Id*. Kroll supports this conclusion by saying if the probes had been nine inches apart in Charlie's back, then his body would have locked up. *Id.* Kroll offers no explanation for his assumption that the second probe would have been "at least 9 inches" away from the first probe. *Id.*

Even if Kroll somehow knew how far the second probe was from the first, he has no expert qualifications that allow him to conclude that Charlie's muscles did not lock-up. Kroll asserts that Charlie did not lock-up because "the struggle" was not "quickly over." *Id.* However, this ignores the ample evidence that Charlie *was* experiencing significant muscle lock-up, including that he "jerked real bad" in response to the tasing and that his whole body tensed-up. Doc. No. 131 at 17. Thus, again, Kroll is doing nothing more than essentially substituting himself in place of the jury in evaluating the conflicting factual record. Regarding whether a second probe connection would have resulted in the "struggle" quickly ending, Kroll is not an expert in police practices or the use of restraint techniques. Ex. E at 151:25-152:18. Thus, Kroll is no better equipped than the jury in considering how long it should have taken police to end the "struggle" with Charlie.

Fifth, Kroll points to an autopsy photograph which, in his view, shows no evidence of a Taser probe mark. Ex. A at 26. But Charlie died on June 11, nearly two weeks after he was tased on May 29. It is undisputed that the second probe was not lodged as deeply in Charlie as the first probe. Thus, the jury can decide whether the significance of there not being a second mark on Charlie. Indeed, Kroll is no better than a lay juror on this point because, as a bioelectrician, he has no specialized expertise in how long it takes an impact wound to heal.

Each of the above items may be evidence with some probative value to assist the jury in determining whether the second Taser probe was embedded in Charlie's back or dangling in his shirt. Importantly, however, Kroll's expertise adds nothing to this process, and the opinion should therefore be excluded.

        2.       **The Purported Evidence of Incomplete Connections Does Not Require Expert Testimony.**

Kroll engages in a similar exercise when he cites four factors that he contends provide "Evidence of Incomplete Connections." Ex. A at 26. Again, his expertise adds nothing to the jury's consideration of this evidence. His first point simply adopts his impermissible opinion that only a single probe was lodged in Charlie's skin. *Id.* His second point boils down to the same analysis as point four above – that because Charlie was not "controlled" within a short period of time, the Taser must not have been working. But Kroll lacks the expertise in police tactics and training to comment on the officers' interactions with and efforts to subdue Charlie. Equally important, the evidence belies Kroll's statement that Charlie was not "controlled" during the use of the Taser. Indeed, the evidence shows that during this time Charlie was non-violent and doing nothing to threaten the officers. Doc. No. 131 at 11-2. At most, Charlie was "being "passive resistan[t]" to the officers while lying face down. Doc. No. 125-30 at 9:12-19.

Kroll's third point is that officers heard a sound from the Taser indicating a lack of good connection. Ex. A at 26. Maybe so. But that fact does not require expert testimony. The police officers are perfectly capable of testifying as to what they heard and what that meant to them.[6]

Fourth, Kroll states that Defendant Elliott received a "shock from touching a wire" and contends that only the higher voltage of a broken connection would overcome the insulation of

---

[6] For the same reason, Kroll should be precluded from testifying that "[o]fficers noticed the loud sound from the broken connection" and that this "demonstrates that a large portion of the CEW discharges and trigger pulls were not delivering current into Mr. Todero." Ex. A at 24.

the Taser wire. *Id.* But during Elliott's interview with Deputy Chief Ison, she stated she got shocked not by touching a Taser wire but when Charlie "jerks my arm down right in between the barbs." Doc. No. 125-30 at 9:8.

Kroll's expertise adds nothing to the jury's consideration of the conflicting evidence on whether or not the Taser probes resulted in a good connection, and so his opinion that they did not should be excluded.

**B.      Kroll's Purported Calculation of the Duration of Electric Current Exposure Should Be Excluded as Unreliable.**

The Taser log in this case reveals that Blackwell pulled the Taser trigger a total of sixteen times and caused the weapon to discharge electricity for a total of 98 seconds over a span of slightly more than three minutes. *See* Doc. No. 125-15 at 5. Kroll expends many pages of his report in a quest to winnow down these numbers. Ex. A at 15-22, 27-32. Kroll ultimately contends that the actual duration of electric shock that Charlie received was likely only 6.1 seconds, and in no event more than 11.9 seconds. *Id.* at 8.

To reach this conclusion, however, Kroll has taken a one-sided view of the factual record, cherry-picking only those facts that best support his outcome-driven goal of reducing the duration of the electric exposure. Where an expert "cherry-picked the facts he considered to render an expert opinion," courts should "bar[] his testimony because such a selective use of facts fails to satisfy the scientific method and *Daubert,* and it thus fails to 'assist the trier of fact.'" *Barber v. United Airlines, Inc.*, 17 F. App'x 433, 437 (7th Cir. 2001). Moreover, "[i]gnoring relevant data is not a scientifically valid method . . . [and] an expert is not permitted to simply ignore evidence that is contrary to her opinion . . . ." *Cates v. Whirlpool Corp.*, No. 15-CV-5980, 2017 WL 1862640, at *15 (N.D. Ill. May 9, 2017). *See also Fail-Safe, L.L.C. v. A.O. Smith Corp.*, 744 F. Supp. 2d 870, 889-91 (E.D. Wis. 2010) (barring testimony of expert who

"all but 'cherry picked' the data he wanted to use" and who "uniformly treated all evidence that undermined his underlying conclusion [with] unwarranted dismissal . . . or outright blindness," finding that this selective use of facts, "without any explanation provided by [the expert] on why he chose the data he did," rendered his methodology unreliable).

Kroll lists five factors as "causes of current delivery exaggeration" which in his view account for the wide gap between the duration of electricity discharge listed on the Taser download log and the much shorter duration purportedly delivered to Charlie:

1. Broken wires or dislodged probes

2. Rounding up to the next second

3. Muzzle contact canting with drive-stuns

4. Muzzle contact and release delays

5. Inadvertent trigger pulls

Ex. A at 15. Plaintiff does not dispute Kroll's explanation of the 'rounding up to the next second,' although this plays a minimal role in his trigger pull analysis. Viewing each of the others, in turn, reveals how Kroll impermissibly cherry-picked his data.

### 1. Broken wires or dislodged probes

Kroll devotes two full paragraphs to discussing the frequency with which the Taser wires break, and how this is a "significant reason for multiple or prolonged CEW trigger pulls." *Id.* at 16. At his deposition, however, he agreed that there was no evidence in the record that the Taser wires were broken, so this is a meaningless factor. Ex. E at 179:23-180:1.

Kroll goes on to state that "[p]robes are often lodged in the clothing instead of the skin." Ex. A at 16. He offers no supporting citation for this proposition as a general principle and, as discussed above, whether a probe was dislodged is a jury question that does not require expert testimony.

Kroll also contends, without explanation, that each of the first five of the sixteen trigger pulls was in probe mode, despite the fact that Blackwell's own deposition testimony was that only the first four were in probe mode, at which point he transitioned to elongated stun. Doc. No. 125-16 at 85:18-21. By distorting some facts and disregarding others, Kroll assigns a value of 0 seconds to the first five trigger pulls, when the Taser download log reflects forty-five seconds of electricity discharge. Ex. A at 30. Given that Kroll's opinion is premised on disregarded and distorted facts, this Court should preclude him from testifying regarding his analysis and the opinions he derived therefrom. In the absence of such a ruling, Plaintiff will suffer extreme prejudice as a result of the jury being led to believe that scientific evidence demonstrates – to the tenth of a second – the amount of time electricity was discharged into Charlie's body. See Fed. R. Evid. 403.

### 2. Muzzle contact canting with drive-stuns

While Kroll cites muzzle contact canting as a basis for reducing the amount of time during which he contends the Taser was discharging electricity into Charlie's body, Kroll clarified at his deposition that: (a) he *did not* apply canting in this case as a basis for reducing the current duration; (b) he had no opinion to that effect; and (c) his view of the record was that there "probably was not much canting in this case." Ex. E at 183:10-184:9. In reality, Kroll has no basis for saying there was any canting at all. Kroll opines that an effective connection between the Taser muzzle and a subject "can be difficult" when the subject is moving because the subject "will reflexively pull or roll away from the attempted shock." Ex. A at 16. As a result, "on average, a good contact is only made about 30% of the time," and "the typical correction is to subtract 70% from the download times."

Kroll offers no citation or explanation for the self-serving claim that reducing the duration of drive stun or elongated stun mode by 70% from that reported on the Taser log is "typical." Moreover, the record belies the facts on which Kroll purports to rely. The record reveals no evidence that Charlie was pulling away from the Taser muzzle – rather, he was lying face down while Blackwell applied the Taser muzzle to the back of Charlie's calf, thigh, and buttocks. Doc. No. 125-16 at 91:14-20, 93:16-20, 101:22-25, 117:25-118:7. Accordingly, there is no basis to testify to anything contained in this section of Kroll's report and it should be excluded.

### 3. Muzzle contact and release delays

Kroll states that "[w]ith a drive-stun the officer will typically pull the trigger as the muzzle is being brought down towards the subject," resulting in a 0.5 second overstatement of the actual current delivery on the download log, with a concurrent 0.5 second overstatement as the officer pulls the weapon back. Ex. A at 16. Again, Kroll offers no support for this proposition. When asked if there was any evidence in the record to support the conclusion that Blackwell pulled the trigger prior to placing the Taser muzzle on Charlie's body, Kroll stated "No. But that's just the way it happens. It's just – you just – that's what happens." Ex. E at 186:25-187:7. This opinion therefore plainly lacks any evidentiary foundation. When pressed on the absence of a citation for this proposition, he asserted that there was a ResearchGate publication entitled "Misunderstanding the Trigger-pull Download" which should be cited in his list of references, and if not then Kroll was "remiss in citing it." *Id.* at 188:23-189:11. That paper is not cited in Kroll's list of 289 references. Ex. A at 61-73. Moreover, the publication with that title that is available on ResearchGate, which was published by Kroll, makes no mention of the topic of muzzle contact and release delays. *See* Misunderstanding the Trigger-pull Download,

https://www.researchgate.net/publication/321339912_Misunderstanding_the_Trigger-pull_Download/, attached hereto as Exhibit F.

### 4. Inadvertent Trigger Pulls

Kroll includes in his report a lengthy discussion of an alleged phenomenon called inadvertent trigger pulls. According to Kroll, an inadvertent trigger pull is a phenomenon whereby the Taser trigger is pulled due to an involuntary muscle contraction rather than the volitional intent of the officer. Ex. A at 17-20. In his trigger pull analysis, Kroll marks four of the sixteen trigger pulls as "ITP" – *i.e.,* inadvertent trigger pull – and assigns each of them an electric current flow duration of zero seconds rather than the total of eighteen seconds reflected in the log. *Id.* at 30. Of course, even if these trigger pulls *were* inadvertent, they would still discharge electric current into Charlie's body if both probes were lodge in him. As discussed above, whether or not both probes were lodged in Charlie is a factual dispute that Kroll cannot resolve.

With respect to whether the trigger pulls were inadvertent, Kroll contends they were, based solely on the fact that "they [were] exactly five seconds long and came only one second after the previous pull," and the assertion that "in such a scenario, 2/3 of the trigger pulls" are inadvertent trigger pulls. *Id.* at 30-31. Again, he makes these claims with no citation to research or evidentiary support.

Notwithstanding Kroll's purported basis for contending that there were four inadvertent trigger pulls, Kroll agrees that "there is no statement from any officer at any point in any of the various statements that they made, whether it's police reports, interviews with the police department or their deposition testimony in the case, where anyone has suggested that there were any inadvertent trigger pulls in this case." Ex. E at 193:14-25. Incredibly, Kroll contends that he knows better than the officers what actually happened, stating that officers would not know if

they had inadvertently pulled the trigger. *Id.* But Kroll's incredible contention ignores that – according to Kroll – such a pull would make a loud arcing noise. It also ignores the fact that Blackwell repeatedly stated in the immediate aftermath of the incident, as recorded on the body camera footage, that he tased Charlie "probably 15 to 20 times," and that "I'll bet I had over 15 to 20 five-second stuns, oh at minimum." Doc. No. 131 at 16 (citing Eck Body Camera at 3:50, 13:38).[7] Finally, while Kroll is an expert in bioelectricity, he has no particular specialty in human kinetics that would permit him to opine with expertise on the topic of inadvertent trigger pulls.

Kroll's inadvertent trigger pull opinion is totally lacking support in the record and offers the jury nothing more than pure speculation. If anything, the record refutes this hypothesis. He should be barred from offering the opinion, and barred from testifying to the current duration calculations which rely on this meritless assumption.

### 5. Drive-stun Skin Marks

In addition to the five factors he sets out under the heading "Misunderstanding the trigger pull download," Kroll argues that Charlie did not receive any drive-stuns lasting longer than two seconds. Ex. A at 21-22. He uses this premise to adjust the duration downwards on six of the sixteen Taser trigger pulls, taking them from a recorded duration of thirty-three seconds to his purported estimate of only fourteen seconds. *Id.* at 30-31. The *only* basis for this opinion is that Mr. Todero's medical records do not mention any drive-stun marks, which Kroll contends would be present in any individual having received more than two seconds of drive-stun exposure. Again, Kroll has no training in medical recordkeeping and has never created a medical record, Ex. E at 134:2-7, so he has no qualifications to opine on whether one would or would not expect to see such marks documented in a medical record. There is no basis to make this assumption,

---

[7] The relevant video excerpt was submitted as Exhibit 4 to Plaintiff's summary judgment response.

and even if there were it does not involve any application of expertise by Kroll, so this opinion too should be barred.

### 6.    Current Delivery During 3-Point Hybrid Application

Finally, Kroll applies a further blanket deduction of 61% for each of the elongated stun or 3-point mode Taser shots, denoting an "equivalent current" of 0.78 seconds for the already-reduced two second shot durations. Ex. A at 30-31. He sets forth the calculations he uses to derive this figure, but they rely on underlying assumptions that are fatally flawed. *Id.* at 27-29.

First, the calculations are all based on the premise that only one of the two probes was embedded, *id.* at 27, which as discussed above is a disputed fact about which Kroll has no expertise to assist the jury in resolving. Second, Kroll uses a constant fifty-six centimeters as his estimate for the distance between the Taser muzzle and what he assumes to be the single probe embedded in Charlie's back. *Id.* at 28. He does not explain how or why he reaches this figure. Moreover, using a constant fifty-six centimeters figure does not comport with the record, which reflects that Blackwell used the elongated stun mode by applying the Taser variously to Charlie's calf, thigh, and buttocks. Doc.  No. 125-16 at 91:14-20, 93:16-20, 101:22-25, 117:25-118:7.

Significantly, the calculation is misleading and inaccurate because, in reality, 100% of the electric current still enters the body – it is simply that 39% travels between the muzzle and the embedded probe, while the remaining 61% enters the body at the site of the muzzle, causing extreme pain. Ex. E at 212:22-213:24. It is also misleading to apply the 39% to reduce the *duration* of the tasing, when the calculation merely represents a reduction of the intensity of the electric discharge over the same period of tasing. Finally, Kroll asserts that 39% of the injected current "was insufficient to cause good muscle control," but he provides no citation, evidence, or analysis to support the point. Ex. A at 29.

*    *    *

In short, Kroll's Trigger Pull Analysis does not meet the standards of reliability required for expert opinions. While Kroll cloaks the opinions in purported science and mathematics, as shown above, he builds the opinions on a fatally-flawed foundation. It is axiomatic that "[a]n expert's opinions must be based on the evidence in the case." *In re Ready-Mixed Concrete Antitrust Litig.*, 261 F.R.D. 154, 165 (S.D. Ind. 2009). Moreover, Kroll steps well outside the expertise of a bioelectrician in conducting these calculations. Accordingly, this Court should preclude Kroll from offering these opinions.

## IV. This Court Should Bar Kroll From Opining About the General Safety of Tasers.

Kroll offers several opinions that serve no purpose beyond gratuitously bolstering the apparent safety of Taser devices without any connection to the facts of this case. After discussing his opinion on the likely durations of electricity discharged into Charlie's body, Kroll opines that these durations "are well below any safety limits suggested by any authorities in the world," "well below the 30 minutes (not 30 seconds) known to be safe from animal studies," and "well below the 30 and 45- second durations demonstrated safe in instrumented human studies." Ex. A at 8. He contends that the risk of electrocution is "misunderstood and exaggerated" because "the output of existing CEWs satisfy all relevant world electrical safety and effectiveness standards including those for the ubiquitous electric fence." *Id.* at 10. He also asserts that "Electronic Control is not Dangerous with the Intoxicated." *Id*. at 34.

These opinions should all be excluded because they are irrelevant. This is not a product liability case, and the general safety of Taser devices is not on trial. Nor is their compliance with relevant industry standards. Whether or not Tasers are generally safe offers no help to the factfinder charged with determining, on the specifics facts of *this* case, whether Charlie's death

26

was caused by Blackwell's Taser use. These opinions offer no assistance to the jury in determining the facts at issue. Moreover, it will be prejudicial and risk jury confusion to have the trial sidetracked by these opinions designed to bolster the jury's perception of the Taser. *See* Fed. R. Evid. 403.

## V.     This Court Should Bar Kroll's Comments on Plaintiff's Experts.

At the end of his report, Kroll offers several pages framed as "comments" on the opinions disclosed by Plaintiff's police practices expert Roger Clark and her expert electrophysiologist Dr. Rashtian. Ex. A at 36-44. It is unclear if he intends to offer these comments as opinions. Regardless, he is either not qualified to do so or they are irrelevant, so they should be barred.

### A.     Kroll's Comments on Roger Clark's Opinions Should Be Barred.

Kroll frames his comments on Clark's opinions as wishing to comment on those "which may differ from the peer reviewed scientific literature." *Id.* at 36. However, the comments go far beyond that, offering critiques of Clark's use of terminology and seeking to impugn Clark's knowledge of modern police practices. None of Kroll's comments are sufficiently relevant and reliable to put before a jury. Notably, Kroll has no expertise in police practices or police training, has never been involved in providing training to law enforcement, and has never served in any law enforcement capacity. *Id.* at 151:25-152:18.

Kroll critiques Clark's use of terminology despite admitting he is deploying "common simplifications." Ex. A at 36. Ironically, Kroll critiques Clark for using Taser instead of Axon as the name of the manufacturer, when at his deposition Kroll was asked if the distinction mattered and he testified "I confuse them myself." Ex. E at 63:14-22. There is nothing improper or surprising about an expert choosing "common simplifications" over something more technical but unfamiliar where the distinction is non-substantive and the simplification will be more

accessible to the jury. In any event, Kroll should not be permitted to opine that this usage suggests Clark has a "superficial knowledge" of Tasers. Ex. A at 36. Nor should he be permitted to opine that Clark demonstrates a superficial knowledge simply in areas where the two experts disagree. For example, in the event Kroll is permitted to testify regarding the Trigger Pull Duration, the jury will have to decide between the most persuasive view of the evidence, but it is not accurate to say that Clark "confuses" the download time with the duration of the current delivery – he simply disagrees with Kroll that there is evidence to support the drastic reductions that Kroll engaged in here. *Id.*

Kroll should also not be permitted to wade into areas of police policy making or use of force tactics, as he has no expertise in these areas. Accordingly, his pejorative description of police policies limiting the duration of Taser use as "logical failures" and a "myth . . . reinforced by some American baseball and incarceration rules" lacks any reliability, as has no insight regarding police policy making processes. *Id.* at 37-38. Equally lacking in any foundation in his qualifications are the opinions that "pain interfering with compliance goes against all police training and experience," or that Tasers are far safer than any other use of force technique while Clark's experience is influenced by his use of "obsolete and rarely seen" baton strikes. *Id.* at 39-40.

**B.      Kroll's Comments on Dr. Rashtian's Opinions Should Be Barred.**

Kroll should also not be permitted to offer his "comments" on Dr. Rashtian's opinions. While he purports not to offer comments on "Dr. Rashtian's legitimate medical opinions" (which Kroll arbitrarily and wrongly limits solely to "those regarding the medical treatment received (by Mr. Todero)"), and instead claims to cabin his remarks solely within "the scientific area of

bioelectricity and the scientific literature regarding electrical weapons," he fails to do so and expands into areas in which he is not qualified to opine.

Kroll is not a medical doctor, holds no medical degree, and never attended medical school. Ex. E at 125:1-12. Kroll is not qualified to treat human patients, including patients with electrical injury. *Id.* at 126:5-7, 133:20-21. He also is "not asked to diagnose what disease somebody had. That's not what we do." *Id.* at 132:25-133:2.

Kroll lacks expertise in the treatment, diagnosis, or physiological progression of rhabdomyolysis, or in the characteristics that make someone more or less susceptible to rhabdomyolysis. *Id.* at 137:15-138:16. Although he claims to have some expertise in rhabdomyolysis "to the extent of an electrical involvement," *id.* at 134:8-137:1, he has never published an article that has rhabdomyolysis as its primary focus, nor has he conducted any studies focused on rhabdomyolysis, *id.* at 142:18-143:2. None of his academic background or training relates to rhabdomyolysis. *Id.* at 143:22-144:2. Fatally, he does not profess any expertise related to rhabdomyolysis "outside of what is known to anybody that looks at the literature." *Id.* at 146:2-4.

Kroll seeks to rebut Dr. Rashtian's opinions by pointing to various peer reviewed studies in which Tasers were not shown to cause rhabdomyolysis or clinically significant increases in CPK level. Ex. A at 42-43. However, Kroll's limitation as a scientist who has merely read and reviewed papers and studies conducted by others, as opposed to a clinician who actually treats patients, is evident in his critique.

Kroll can identify that the studies found certain objective measures in terms of the increase in CPK levels, but as a non-physician and non-clinician who does not treat patients and has no expertise in the physiological progression of rhabdomyolysis, he is unqualified to offer

the opinion that these studies categorically rule out the possibility that in certain individuals, Taser exposure could induce rhabdomyolysis. *See Goodwin v. MTD Prod., Inc.*, 232 F.3d 600, 609 (7th Cir. 2000) (affirming district court's ruling that engineer "was not qualified to give an expert opinion concerning the nature, scope, or cause of an eye injury," because he had "neither a medical degree nor any medical training, and an individual with a degree in mechanical engineering is not qualified to give expert testimony on medical questions"). This is particularly true given Kroll's erroneous view that there is no supporting literature that "certain individuals maybe have heightened sensitivity to C[P]K rises or be particularly sensitive or susceptible to rhabdomyolysis," Ex. E at 148:15-25, when in fact the medical literature strongly supports the phenomenon that certain individuals, for genetic reasons, have a heightened tendency to experience large spikes in CPK. *See* The Creatine Kinase Response to Resistance Exercise, attached hereto as Exhibit G, at 2 ("Some individuals studied have been classified as "high-responders" (HR) in light of the much higher rise in CK after resistance exercise as compared to an average, or normal response (NR).").

Kroll is also not qualified to critique Dr. Rashtian's purported use of a "diagnosis of exclusion," Ex. A at 43, as he is not a medical doctor, nor is he trained or experienced in how to diagnose patients. Regardless, the critique is misplaced, as Dr. Rashtian was clear at his deposition that his diagnosis "was not a diagnosis of exclusion." Dr. Rashtian Deposition Transcript, attached hereto as Exhibit C, at 59:7-10.

Finally, Kroll has no background in pharmacology or toxicology, and outside of his knowledge of the effect of cocaine intoxication on an individual's susceptibility to cardiac arrest, he has no expertise on the effect of illicit drugs on the body." Ex. E at 128:19-129:10, 138:24-140:6. Despite this, he includes in his report excerpts from Charlie's medical records which in

his view "clearly suggest Spice as the causative agent," and the opinion that "Spice has been strongly linked to rhabdomyolysis." Ex. A at 44. Kroll testified at his deposition that he was not offering an opinion on whether Charlie was under the influence of drugs on May 29, 2016. Ex. E at 156:12-15. However, he went on to state "I'm not offering it as a formal opinion. I think that's the elephant in the room here. I think we all recognize that he was probably on Spice. His behavior was not quite consistent with someone that had been just drinking Diet Coke." *Id.* at 214:13-21. This sly approach that Kroll evidences throughout his critique of Dr. Rashtian – despite lacking the necessary qualifications (here, he has no background or training in psychiatry, pharmacology, *or* toxicology, and so is plainly unqualified to testify as to what Charlie's behavior was or was not consistent with) demonstrates that Kroll is more than willing to speculate what was "probably" happening because "I think we all recognize" what was really going on here. *Daubert* is designed precisely to protect juries from these types of unfounded, speculative opinions that may nonetheless come wrapped in the veneer of a well-credentialed, well-researched and persuasive expert. *See Bourelle v. Crown Equip. Corp.*, 220 F.3d 532, 539 (7th Cir. 2000) ("Experts' work is admissible only to the extent it is reasoned, uses the methods of the discipline, and is founded on data.").

For all of these reasons, Kroll's commentary on Dr. Rashtian's opinions should be barred.

## CONCLUSION

For the reasons discussed above, this Court should bar Kroll's opinions in their entirety and preclude Kroll from testifying at the trial of this matter.

RESPECTFULLY SUBMITTED,

**Teresa Todero,**
**as Special Administrator of the**
**Estate of Charles Todero**

BY: /s/ Sam Heppell
*One of Plaintiff's Attorneys*

Arthur Loevy
Jon Loevy
Steve Art
Sam Heppell
Theresa Kleinhaus
LOEVY & LOEVY
311 North Aberdeen St., Third Floor
Chicago, IL 60607
(312) 243-5900

**CERTIFICATE OF SERVICE**

I, Sam Heppell, an attorney, hereby certify that on October 5, 2018, I caused the foregoing Memorandum of Law in Support of Plaintiff's Motion to Bar the Proposed Expert Testimony of Mark Kroll to be filed using the Court's CM/ECF system, which effected service on all counsel of record.

/s/ Sam Heppell
*One of Plaintiff's Attorneys*