# Exhibit E



# Transcript of Mark W. Kroll, Ph.D.

**Date:** September 13, 2018
**Case:** Todero -v- City of Greenwood, et al.

**Planet Depos**
**Phone:** 888.433.3767
**Email::** transcripts@planetdepos.com
**www.planetdepos.com**

1                IN THE UNITED STATES DISTRICT COURT

2              FOR THE SOUTHERN DISTRICT OF INDIANA

3                      INDIANAPOLIS DIVISION

4       _____

5       TERESA TODERO, as Special Administrator

6       of the ESTATE OF CHARLES TODERO,          :

7       Plaintiff,

8       vs.                                        : Case No.

9       CITY OF GREENWOOD, BRIAN              1:17-cv-1698-TWP-MJD

10      BLACKWELL, RENEE ELLIOT, ELIZABETH         :

11      LAUT, and AS-YET UNIDENTIFIED

12      GREENWOOD POLICE OFFICERS,                 :

13      Defendants.

14      _____:

15

16

17

18              DEPOSITION OF MARK W. KROLL, Ph.D.

19              Taken Thursday, September 13, 2018

20                   Scheduled for 9:00 a.m.

21

22

23      JOB NO.: 205440

24      PAGES: 1 - 240

25      REPORTED BY:  DANA S. ANDERSON-LINNELL

```
1    DEPOSITION OF MARK W. KROLL, Ph.D., taken on
2    Thursday, September 13, 2018, commencing at
3    9:10 a.m., at 1400 Rand Tower, 527 Marquette Avenue
4    South, Minneapolis, Minnesota, before Dana S.
5    Anderson-Linnell, a Notary Public of and for the
6    State of Minnesota.
7                     * * * * * * * * * * * * * * *
8
9                     APPEARANCES
10
11   On Behalf of the Plaintiff:
12   Sam Heppell, Esquire
13   Theresa Kleinhaus, Esquire
14   LOEVY & LOEVY
15   311 North Aberdeen Street, Third Floor
16   Chicago, IL 60607
17   Phone:  312.243.5900
18   Email:  sam@loevy.com
19           tess@loevy.com
20
21   (Appearances continued on next page.)
22
23
24
25
```

```
1    APPEARANCES (continued):

2

3    On Behalf of the City of Greenwood, Renee Elliott and

4    Elizabeth Laut:

5    James S. Stephenson, Esquire

6    STEPHENSON MOROW & SEMLER, P.C.

7    3077 East 98th Street, Suite 240

8    Indianapolis, IN 46280

9    Phone:  317.844.3830

10   Email:  jstephenson@stephlaw.com

11

12   On Behalf of Brian Blackwell:

13   Caren L. Pollack, Esquire

14   POLLACK LAW FIRM, P.C.

15   Three Meridian Plaza

16   10333 North Meridian Street, Suite 111

17   Indianapolis, IN 46290

18   Phone:  317.660.4880

19   Email:  cpollack@pollacklawpc.com

20

21   NOTE:  The original transcript will be filed with the

22   Loevy and Loevy Law Firm, pursuant to the applicable

23   Rules of Civil Procedure.

24

25
```

Transcript of Mark W. Kroll, Ph.D.
Conducted on September 13, 2018                    4

```
 1   INDEX                                      PAGE

 2

 3   WITNESS:  Mark W. Kroll, Ph.D.

 4   EXAMINATION BY:

 5   Mr. Heppell                                  6

 6

 7   INSTRUCTIONS NOT TO ANSWER:   (None.)

 8

 9   PRODUCTION REQUESTS:   (None.)

10

11   INDEX OF EXHIBITS:

12

13   Exhibit 1 - Expert Report of Mark Kroll, Ph.D.   14

14

15   Exhibit 2 - Invoice # 201831, August 1, 2018    22

16

17   Exhibit 3 - Mark Kroll's Response to

18   Plaintiff's Subpoena to Produce Documents,

19   Information, or Objects or to Permit

20   Inspection of Premises in a Civil Action        33

21

22   Exhibit 4 - Curriculum Vitae of Mark W.

23   Kroll, Ph.D.                                     54

24

25
```

Transcript of Mark W. Kroll, Ph.D.
Conducted on September 13, 2018                    5

```
 1   INDEX OF EXHIBITS:                        PAGE

 2

 3   Exhibit 5 - List of testimony             87

 4

 5   Exhibit 6 - Invoice # R 201733, June 6, 2017   117

 6

 7   Exhibit 7 - TASER® Handheld CEW Warnings,

 8   Instructions, and Information:  Law

 9   Enforcement, Bates TODERO 011647 to 654    218

10

11   Exhibit 8 - Annual CEW User Update,

12   Version 19, April 2013, Bates D 005119

13   to 160                                    226

14

15   Exhibit 9 - June 13, 2017, email chain

16   from Jason Holtzleiter to James Ison,

17   Bates D 004052 to 4053                     230

18

19   (Original exhibits attached to original transcript;

20   copies to counsel as requested.  Previously marked

21   exhibits referenced not attached.)

22

23

24

25
```

```
1              MARK W. KROLL, Ph.D.,

2    called as a witness, being previously sworn,

3       was examined and testified as follows:

4                    EXAMINATION

5    BY MR. HEPPELL:

6    Q.   Good morning, Dr. Kroll.  How are you?

7    A.   Very good, sir.

8    Q.   I introduced myself off the record, but to

9    do it formally on the record, my name is Sam

10   Heppell.  I'm one of the attorneys for the

11   plaintiff in this case.

12   A.   Honored to meet you.

13   Q.   Dr. Kroll, I think it would be fair to say

14   that you have sat for a deposition a number of

15   times in the past, correct?

16   A.   Correct.

17   Q.   Recognizing that you and I have both been

18   through this format before, I always start a

19   deposition just with a brief overview of the

20   rules and procedures so we're on the same page,

21   okay?

22   A.   Of course.

23   Q.   As you know, there's a court reporter

24   making a written record of my questions and

25   your answers, and for that reason it's
```

1  important that we both use words rather than

2  gestures, uh-huhs, uh-uhs, head nods, head

3  shakes, to convey our meaning.  Does that make

4  sense?

5  A.   Yes.

6  Q.   And similarly it's important that we do

7  our best not to talk over each other just to

8  make a clear written record, okay?

9  A.   Definitely.

10 Q.   If at any point I ask a question that is

11 not clear to you, it may be that I have

12 misunderstood something that you have said in a

13 previous answer, you can tell from the nature

14 of my question that we lost each other along

15 the way or I may have just phrased something

16 poorly, please do let me know, I'll gladly

17 rephrase or work with you to make sure we're on

18 the same page about something, okay?

19 A.   Yes.

20 Q.   If you go ahead and answer my question

21 without seeking clarification, I'm going to

22 assume you were able to understand the

23 question, okay?

24 A.   Fair enough.

25 Q.   If you need to take a break at any time,

Transcript of Mark W. Kroll, Ph.D.
Conducted on September 13, 2018                                8

1    let me know.  That's no problem.  We'll just go

2    off the record and take a break for any reason.

3    The only boundary around that is that if I've

4    asked a question, I'd ask to get your full and

5    complete answer to that question before we go

6    off the record and move on to another question,

7    okay?

8    A.    Understood.

9    Q.    Is there anything -- are you suffering

10   from any medical condition or any other reason

11   you can think of that you wouldn't be able to

12   give truthful and accurate testimony today to

13   the best of your recollection?

14   A.    No.

15   Q.    Dr. Kroll, what did you do to prepare for

16   your deposition today?

17   A.    I read through my expert report.  And I

18   met with Attorney Stephenson for three hours

19   yesterday.

20   Q.    And that was an in-person meeting with

21   Mr. Stephenson?

22   A.    Yes.

23   Q.    And was there any other contact or

24   communications you had with attorneys on this

25   case in preparation for your deposition beyond

1    that three-hour, in-person meeting?
2    A.    No.
3    Q.    And did you meet with or communicate with
4    anyone else in preparation for your deposition
5    other than Mr. Stephenson?
6    A.    No.
7    Q.    And you stated that you read through your
8    expert report.  You're referring to the Rule 26
9    report which was disclosed as part of the
10   Todero litigation, is that correct?
11   A.    Correct.
12   Q.    And approximately how long did you spend
13   reading through your expert report as
14   preparation for the deposition?
15   A.    Maybe an hour.
16   Q.    Other than that approximate hour reading
17   through the report and the approximately
18   three-hour meeting with Mr. Stephenson, did you
19   do anything else to prepare for your deposition
20   today?
21   A.    I pulled up two papers.  And I had time to
22   glance at one of them.  That's about it.
23   Q.    Was that included in the one-hour time you
24   stated previously, or was that additional time
25   on top of the hour that you pulled up and

1    glanced at those papers?

2    A.    That was additional time.

3    Q.    Okay.  Approximately how much time did you

4    spend on that additionally?

5    A.    About seven minutes.

6    Q.    You said you had time to glance at one of

7    them.  The other paper, you didn't have time to

8    glance at at all, or were you able to look at

9    the second paper as well?

10    A.    I glanced at one.  And the other one I

11    simply forwarded to Mr. Stephenson.  I

12    forwarded both papers to Mr. Stephenson.

13    Q.    And what were those papers?

14    A.    One was a report of rhabdomyolysis from a

15    pushup competition or pushup training in

16    teenagers in Taiwan.  And the other was the

17    position paper of the American College of

18    Emergency Physicians on the treatment of

19    excited delirium.

20    Q.    And are those resources cited in your

21    expert report?

22    A.    Probably.

23    Q.    Okay.  If I give you a copy of your expert

24    report, would you be able to identify whether

25    or not they're cited in there?

Transcript of Mark W. Kroll, Ph.D.
Conducted on September 13, 2018                    11

1    A.    You don't even need to do that.  I brought

2    a copy.

3    Q.    Okay.  And just so the record is clear, is

4    that a copy you mind leaving with us today and

5    can we mark that as a deposition exhibit?

6    A.    Sure.  I have no objection.  I would not

7    mind leaving it here.

8    Q.    And so after you've had a chance to look

9    through that, we're going to put an exhibit

10   sticker on the front of that, okay?

11   A.    (Views document.)  I didn't see either

12   one.  But that's not definitive, because I just

13   skimmed through almost 300 references.

14   Q.    Based on the review you just did, you

15   don't see either of those resources cited in

16   your expert report, is that correct?

17   A.    That's correct.  But they may very likely

18   be in there.

19   Q.    Do you recall the names of any of the

20   authors of those -- of the publications you

21   just described that you forwarded to

22   Mr. Stephenson?

23   A.    Yes.

24   Q.    Can you elaborate, please?

25   A.    Vilke, V-i-l-k-e, Treatment of Excited

1    Delirium is the paraphrased title.  And that's

2    in 2012.

3    Q.   And you -- sorry.  You stated that -- the

4    one you're referring to as being authored by --

5    is it Dr. Vilke?

6    A.   Yes.

7    Q.   That's the paper you described as the

8    position paper of the American College of

9    Emergency Room [sic] Physicians?

10   A.   Physicians, yes.

11   Q.   And then the other rhabdomyolysis report

12   related to the pushup competition, do you

13   recall the author or the year of that report?

14   A.   Yeah, I believe it was L-i-n, Nancy, or

15   L-i-m, Mary.

16   Q.   Do you know what periodical or publication

17   that report appeared in?

18   A.   I don't recall.

19   Q.   Do you recall the year of that report?

20   A.   No.

21   Q.   Prior to pulling them up recently,

22   glancing at one and forwarding them to

23   Mr. Stephenson, when was the last time you

24   reviewed either of those documents?

25   A.   I just can't recall.

1   Q.   If you -- strike that.

2        Did you rely on either of those documents

3   in reaching the opinions that are contained in

4   your expert report?  Let me withdraw that and

5   ask a different way.

6        If you relied on those, would they appear

7   in the references section of your report?

8   A.   Yes.

9   Q.   And just so I am clear and so the record

10  is clear, the report that you have in front of

11  you that you just referred to, that's the

12  expert report of Mark Kroll dated 29 July 2018

13  disclosed in the matter of Teresa Todero versus

14  City of Greenwood, et al.?

15  A.   That's the way mine is titled, so

16  presumably you have the same version.

17  Q.   Okay.  And to the best of your

18  understanding, that is the final and complete

19  copy of the report which you prepared in

20  conjunction with this litigation and you

21  provided to Mr. Stephenson to disclose to us in

22  the lawsuit?

23  A.   Yes.

24           MR. HEPPELL:  And could we mark the

25  document that the deponent has in front of him

1    as Kroll Exhibit 1, please.

2              (Exhibit Number 1 marked for

3    identification.)

4    BY MR. HEPPELL:

5    Q.   Why did you pull up those two particular

6    papers and forward them to Mr. Stephenson?

7    A.   They came up in discussion yesterday.

8    Q.   Other than those -- strike that.

9         You forwarded those papers to

10   Mr. Stephenson after meeting with him in

11   preparation for your deposition, correct?

12   A.   Correct.

13   Q.   Other than reviewing your expert report

14   itself that we've marked as Exhibit 1 and

15   glancing at one of the two papers that you just

16   referred to, are there any other documents that

17   you reviewed or glanced at in preparation for

18   your deposition today?

19   A.   No.

20   Q.   You were provided with a number of

21   materials related to the Todero case in order

22   for you to have the information necessary to

23   complete your expert report, is that correct?

24   A.   Yes.

25   Q.   And those materials are listed on page 35

1   of your report, is that correct?

2   A.   Yes.

3   Q.   And is that a complete list of the

4   materials that you received and reviewed in

5   connection with forming the opinions in

6   producing your report in this case?

7   A.   Yes.  And I want to add something else.  I

8   reviewed the rough draft of the deposition

9   transcript of Dr. Rashtian this past weekend.

10  And that's arguably in preparation for this

11  deposition, so I should include that.

12  Q.   Thank you for that clarification.  And

13  that was obviously something that you received

14  after you prepared your expert report, is that

15  correct?

16  A.   Correct.

17  Q.   So you didn't and, in fact, couldn't have

18  relied on that document in forming any of the

19  opinions disclosed in your expert report,

20  correct?

21  A.   Correct.

22  Q.   And that -- evidently as a result, that is

23  not a document that appears on the list of

24  materials that you reviewed or considered on

25  page 35, correct?

1    A.    Correct.

2    Q.    As of the time that you authored this

3    report, is the list on page 35 a complete list

4    of all the materials that you had received and

5    reviewed in conjunction with this case?

6    A.    To the best of my present recollection,

7    and to the best of my ability on that date of

8    the 29th of July, it was correct.  There may be

9    one small thing that's missing.  I can't think

10   of what it would be now.

11   Q.    Okay.  There's not a particular sense you

12   have that something's missing, just that you

13   can't rule out the possibility there was an

14   inadvertent omission in creating that list, is

15   that what you're saying?

16   A.    That's fair.

17   Q.    And you just stated that there wasn't

18   additional material you received subsequent to

19   completing the report, specifically the rough

20   transcript of Dr. Rashtian's deposition,

21   correct?

22   A.    Correct.

23   Q.    Other than that, were there any other

24   materials that you received subsequent to

25   completing your report that are not included on

Transcript of Mark W. Kroll, Ph.D.
Conducted on September 13, 2018                    17

1    the list on page 35?

2    A.   I assume you mean materials that I

3    received directly relevant to this case in

4    preparation for my deposition?

5    Q.   Well, so I'm not limiting it to in

6    preparation for your deposition, but I am

7    referring to case-specific materials, so

8    materials that were generated in conjunction

9    with the -- either with this lawsuit or with

10   the underlying events of the Todero incident.

11   A.   Yesterday morning I went to Google Maps

12   and printed out a map of this intersection

13   where the incident occurred to confirm my

14   memory of my visit there.  That arguably counts

15   as a document, one-page map printout.

16   Q.   And you stated the purpose of pulling up

17   that document was to refresh your memory of

18   having gone on a visit to that location, is

19   that correct?

20   A.   I wouldn't use -- I would say confirm my

21   memory, not necessarily refresh because I have

22   a pretty good memory and I wanted to confirm

23   it.

24   Q.   And that was something you did in

25   preparation for the deposition as well,

1    correct?

2    A.    Correct.

3    Q.    Well, let me, I guess, rephrase my

4    question in this way:  So would it be fair to

5    say that none of the documents contained on the

6    list on page 35 were documents that you

7    independently had access to outside of your

8    involvement in the Todero case, correct?

9    A.    Correct.

10   Q.    And all of the documents on -- listed on

11   page 35 were provided to you by Mr. Stephenson,

12   correct?

13   A.    Either Mr. Stephenson or someone in his

14   office.

15   Q.    Someone in his office.  I appreciate the

16   precision in the clarification.  Were provided

17   to you by counsel for the defendants in this

18   matter, someone in their office?

19   A.    Yes.

20   Q.    And I guess there's a distinction that

21   you're making in setting forth that list of

22   case-specific materials reviewed or considered

23   with the references that you cite that --

24   citations on pages 61 through 73 of your

25   report.  Those are materials that you had

1    access to unrelated to your involvement in the

2    Todero lawsuit, correct?

3    A.    Correct.

4    Q.    Were any of the materials that are listed

5    on pages 63 -- sorry, 61 through 73 of your

6    report materials that were provided to you by

7    defense counsel in this case?

8    A.    No.

9    Q.    And subsequent to the date you finalized

10   your report, July 29th, 2018, have you received

11   any additional materials from defense counsel

12   in this case other than the rough transcript of

13   Dr. Rashtian's deposition?

14   A.    No.

15   Q.    You have a brief section of your report in

16   which you discuss the fees that you charge for

17   your expert consulting services, is that

18   correct?

19   A.    It's not complete.  This is the rate that

20   I charge for this report, and it reflects the

21   rate that I charge for law enforcement work.

22   The rates are different.

23   Q.    And which page are you referring to in

24   your report?

25   A.    Page 59.

Transcript of Mark W. Kroll, Ph.D.
Conducted on September 13, 2018                    20

```
1    Q.    Thank you for that.  So that's the first
2    paragraph on page 59 in which you state your
3    fees for this expert consultant report are $480
4    per hour, is that correct?
5    A.    Yes.
6    Q.    And you were -- if I understood your
7    testimony, that is a rate that you charge in
8    certain circumstances but not all circumstances
9    for expert consulting work, is that correct?
10   A.    That's correct.  It's the rate I charge
11   for law enforcement work.
12   Q.    Okay.  What do you mean by "law
13   enforcement work"?
14   A.    Work involving law enforcement officers,
15   correctional officers.
16   Q.    And that's any time there's litigation and
17   you are retained to provide expert consulting
18   services for one of -- for the law enforcement
19   side in that litigation?
20   A.    Could be either side, but yes.
21   Q.    But in conjunction with litigation related
22   to law enforcement?
23   A.    Correct.
24   Q.    Are there any other circumstances in which
25   you charge the rate of $480 per hour outside of
```

Transcript of Mark W. Kroll, Ph.D.
Conducted on September 13, 2018                                21

1    the circumstance you were just talking about?

2    A.   No.

3    Q.   What other rates do you charge for

4    different types of expert consulting work?

5    A.   In general, I charge $600 an hour.

6    Q.   Can you give me a description or examples

7    of the type of expert consulting work that you

8    do where you charge $600 per hour?

9    A.   Electrical injury not involving law

10   enforcement would be an example.

11   Q.   Are there other types of cases other than

12   electrical injury not involving law enforcement

13   where you've been retained and charged $600 per

14   hour?

15   A.   Yes.

16   Q.   What kinds of cases are those?

17   A.   Patent cases involving patents that

18   involve electrical stimulation or electrical

19   shocks.

20   Q.   Are there other types of cases other than

21   the law enforcement -- strike that.

22        Have you ever been retained to provide

23   expert consulting services in circumstances

24   other than the law enforcement work for which

25   you charge 480 per hour or the electrical

1    injury not involving law enforcement or the

2    patent cases involving patents with electrical

3    stimulation?

4    A.   I can't think of any right now.

5    Q.   If there were one, it would be sort of an

6    odd outlier case, would it be fair to say that

7    describes the bulk of your expert consulting

8    work?

9    A.   Yes.

10            MR. HEPPELL:  Could we mark this as

11   Exhibit 2.

12            (Exhibit Number 2 marked for

13   identification.)

14   BY MR. HEPPELL:

15   Q.   You've been handed a document that's been

16   marked as Kroll Exhibit 2.  It appears on both

17   sides.  The front side of the document, it's an

18   invoice with the number 201831, dated

19   August 1st, 2018.  And then the backside

20   appears to be some sort of time sheet or time

21   record.  Are we looking at the same document?

22   A.   (Views document.)  Yes.

23   Q.   And this is a document that was produced

24   to us in response to a subpoena.  Are you

25   familiar with that subpoena and the production

Transcript of Mark W. Kroll, Ph.D.
Conducted on September 13, 2018                    23

1   of this document?

2   A.    Yes.

3   Q.    And did you prepare both the invoice and

4   the time record on the backside of the

5   document?

6   A.    Not personally.  My administrative

7   assistant does this.

8   Q.    It was prepared at your direction as part

9   of your regular office administration, is that

10  fair to say?

11  A.    Fair.

12  Q.    Okay.  You have no reason to doubt the

13  accuracy of any of the calculations or

14  information on this document?

15  A.    Right.

16  Q.    And this document reflects that as of

17  August 1st, 2018, you had expended 60.0 hours

18  consulting in relation to the Todero v.

19  Greenwood matter, is that correct?

20  A.    Correct.

21  Q.    And that was a total amount of $28,800?

22  A.    Yes.

23  Q.    And the document reflects that there was a

24  deduction of a retainer fee that had already

25  been paid of $4,800, is that correct?

1    A.    Correct.

2    Q.    And then the balance owing then to you is

3    $24,000 as of August 1st, 2018, correct?

4    A.    Correct.

5    Q.    Is that a standard retainer fee that you

6    charge in all your cases for ten hours of your

7    time?

8    A.    That's my standard fee for law

9    enforcement.  For non-law enforcement it's

10   $6,000.

11   Q.    And that also represents ten hours of your

12   time, just at the higher rate that you charge

13   in those cases, is that correct?

14   A.    Yes.

15   Q.    Why do you charge a discounted rate for

16   your law enforcement work?

17   A.    Save the taxpayers money, number 1.

18   Number 2, I find it more interesting than

19   patent work, which is frankly boring and

20   very -- extremely detail oriented.  I was in a

21   deposition last week in Washington, D.C. for --

22   no, I was in New York City.  They argued for an

23   hour about the meaning of a word.  So this

24   is -- it's far more interesting.  And like I

25   said before, I want to save the taxpayers

Transcript of Mark W. Kroll, Ph.D.
Conducted on September 13, 2018                25

1   money.

2   Q.   Well, I will do my best to meet those

3   expectations with you today, Dr. Kroll, and to

4   restrain any arguments to under the one-hour

5   mark, but no promises.

6        Other than those reasons, any other

7   reasons that you have for the bifurcation of

8   your rate?

9   A.   No.

10  Q.   Have you -- how long have you been

11  involved in providing expert consulting

12  services in connection with litigation?

13  A.   I've only done it regularly since my

14  retirement in 2005 from full-time industry

15  work, but I had done it in a case back in 1994

16  for a former employer.

17  Q.   Was the 1994 case the only case prior to

18  your retirement in which you provided expert

19  consulting?

20  A.   No.  Now that I think of it, my next

21  employer used me as an expert in a patent case

22  in 1999.

23  Q.   And those two cases were both an expert

24  situation where you were disclosed by your

25  current employer at the time, is that correct?

1    A.    That's correct.

2    Q.    The first time you were a retained expert

3    by someone other than your present employer was

4    after 2005, is that correct?

5    A.    Yes.

6    Q.    And that was after you became involved

7    with TASER International, now Axon, is that

8    correct?

9    A.    Yes.  But I want to correct.  I may have

10   been disclosed as an expert by a company then

11   known as TASER before I retired from my day

12   job.  And that may have been in 2004.  I

13   retired from what's now Abbott Laboratories

14   pacemaker division in September 2005.  There

15   may have been a case I was disclosed in before

16   that, one or two.

17   Q.    And that would have been in the period

18   sort of immediately preceding or leading up to

19   your retirement within a year beforehand

20   approximately?

21   A.    Approximately.

22   Q.    Okay.  When was your -- well, strike that.

23         The cases you just described in which you

24   recall being retained or disclosed as an expert

25   by the company then known as TASER

1   International, now known as Axon, was that your

2   first involvement or connection with that

3   company?

4   A.   No.

5   Q.   How far back does your connection with the

6   TASER company date?

7   A.   In March 2003, I joined their corporate

8   board.

9   Q.   And so other than the two cases that you

10  referred to as being disclosed as an expert by

11  your then employers, the entirety of your work

12  as a retained expert in litigation has been

13  since you joined the TASER corporate board,

14  correct, to the best of your recollection?

15  A.   Well, since I didn't do any before that,

16  besides the two I mentioned, that would have to

17  be true.

18  Q.   Have you since August 1st, 2018, received

19  payment for the invoice marked as Exhibit 2?

20  A.   Yes.

21  Q.   And did this invoice accurately reflect

22  the entirety of the hours that you expended in

23  relation to the Todero matter as of that date?

24  A.   Yes.  And I have to admit I'm not positive

25  that I was paid for this.  I'm pretty sure that

1    I was.  But I don't handle the finances

2    directly, so I wouldn't know if a bill is

3    really late.

4    Q.   Well, any time you want to take a break

5    and take the matter up with Mr. Stephenson

6    directly, you can let me know.

7    A.   Thank you.

8    Q.   Since August 1st, 2018, and -- have you

9    expended any additional hours related to the

10   Todero matter over and above the hours we

11   discussed previously, the three-hour meeting

12   with Mr. Stephenson and the approximately one

13   hour of your own preparation time in connection

14   with the deposition?

15   A.   Yes.

16   Q.   Have those hours been invoiced yet?

17   A.   No.

18   Q.   Okay.  How many uninvoiced hours do you

19   have in the case to date?  And when I say "to

20   date," I mean not including the portion of the

21   deposition that we've been conducting so far.

22   A.   Somewhere between five and 15 would be my

23   estimate.

24   Q.   Does that include the four hours of

25   deposition preparation time?

Transcript of Mark W. Kroll, Ph.D.
Conducted on September 13, 2018                    29

```
 1    A.    Yes.
 2    Q.    Okay.  So it's somewhere between one and
 3    11 hours of time over and above the deposition
 4    preparation time?
 5    A.    Yes.
 6    Q.    And what tasks have you expended in
 7    between that one and 11 hours of time
 8    completing?
 9    A.    The main part was studying Dr. Rashtian's
10    rough transcript.
11    Q.    Other than that task, are there other
12    tasks that you completed subsequent --
13    A.    Yes.
14    Q.    -- to disclosing your expert report that
15    we haven't already discussed?
16    A.    That's all I can think of right now.
17    Q.    You're not able to be more precise than
18    between one and 11 hours on that task?
19    A.    Well, my estimate was five to 15 as a grab
20    bag just including preparation time and reading
21    the deposition.  When you subtracted out the
22    four hours of deposition, we get sort of an
23    implied precision that perhaps I'm warranted of
24    one to 11 hours.  So I would say maybe
25    somewhere between five and ten hours.
```

Transcript of Mark W. Kroll, Ph.D.
Conducted on September 13, 2018                    30

1   Q.   Okay.  Do you recall when you were first

2   retained as an expert in the Todero matter?

3   A.   Yes.  I think it was fall of 2017.

4   Q.   Okay.  And turning to the second page of

5   Exhibit 2 in front of you.  The second page of

6   Exhibit 2 reflects a -- the first entry on your

7   time record is October 6th, 2017.  It reflects

8   a half-hour expenditure of time that afternoon.

9   Do you see what I'm referring to?

10  A.   I do.

11  Q.   Does that comport with your recollection

12  of when you were first retained, and does that

13  help you state with any more precision when you

14  were first retained in this matter?

15  A.   Yes and no.

16  Q.   Okay.  Would there be any more precise

17  record of exactly when you were retained other

18  than what's reflected in the time sheet?

19  A.   There would be an initial retainer invoice

20  that would have gone to the defense law firm.

21  That would be the best indication.

22  Q.   Okay.  Do you maintain copies of all of

23  those invoices -- strike that.

24      Do you retain copies of all invoices that

25  you send out in connection with your expert

1   consulting services?

2   A.   I do not, but my administrative assistant

3   does.

4   Q.   And that's an administrative assistant

5   that you employ directly, is that correct?

6   A.   Correct.

7   Q.   And that's from whom you retrieved the

8   invoice that we've marked as Exhibit 2, is that

9   correct?

10  A.   Not necessarily.  Since that invoice was

11  provided to the Stephenson law firm, they had

12  access to that, of course, themselves.

13  Q.   Okay.  Do you have any recollection one

14  way or another whether you provided -- well,

15  strike that.

16       Do you recall how you came to be retained

17  as an expert by defense counsel in this matter?

18  A.   No.

19  Q.   So you don't remember if they initially

20  contacted you by phone or by email or by letter

21  or some other means?

22  A.   I presume it's by email because that's the

23  most common, but I can't be completely sure.

24  90 percent of the time it's by email.

25  Q.   When did that first contact take place?

1   A.   Somewhere on or before the 7th of

2   October 2017.

3   Q.   You said "on or before," but do you mean,

4   like, around that date, in rough proximity to

5   that date, or is it could be any time prior to

6   that date?

7   A.   I don't recall exactly.  I would say it

8   has to be on or before because that's when I

9   logged the first time on the case.

10  Q.   But you can't rule out whether the first

11  contact from defendants in this case was days

12  or weeks or even months before the date that

13  you were actually retained?

14  A.   That's unlikely that it would have been

15  months before.  Although I have had a few

16  strange cases where people retain me, and then

17  I hear nothing for years.

18  Q.   But you stated it's your recollection that

19  they retained you in the fall of 2017, is that

20  correct?

21  A.   That's my present recollection.

22  Q.   And there would be an invoice reflecting

23  your request for payment of your retainer fee,

24  correct?

25  A.   Correct.

1    Q.   And that would denote the time that you

2    were actually formally retained or shortly

3    thereafter, I suppose, upon receipt of that

4    retainer payment?

5    A.   That's fair.

6    Q.   Did you provide any consulting services or

7    offer any opinions or information to defense

8    counsel prior to formally being retained in

9    this matter?

10   A.   I don't know.  If I did, it wouldn't have

11   been anything material.

12   Q.   Nothing beyond a brief phone conversation

13   or a brief email, would that be fair to say?

14   A.   I think that's fair.

15   Q.   Okay.

16           MR. HEPPELL:  Could we mark this as

17   Exhibit 3, please.

18           (Exhibit Number 3 marked for

19   identification.)

20   BY MR. HEPPELL:

21   Q.   Dr. Kroll, I've handed you a document.

22   It's been marked as Exhibit 3.  It's entitled

23   Mark Kroll's Response to Plaintiff's Subpoena

24   to Produce Documents, Information, or Objects

25   or to Permit Inspection of Premises in a Civil

1   Action.  Do you see this -- strike that.

2         Are you familiar with this document?

3   A.   (Views document.)  Yes.

4   Q.   Okay.  And this represents your response

5   to a subpoena that you received through defense

6   counsel in this case in connection with a

7   request for certain materials, is that correct?

8   A.   Yes.

9   Q.   Did you review this response prior to it

10  being transmitted to plaintiff's counsel?

11  A.   Yes.

12  Q.   And you see that request number 3, which

13  is at the bottom of the first page going over

14  to the top of the second page, includes a

15  request for any and all documents and

16  communications between you and counsel for

17  defendants in this case.  And there's several

18  categories of such documents and

19  communications; one of which is documents and

20  communications that relate to compensation for

21  your study or testimony.  Do you see what I'm

22  referring to?

23  A.   I do.

24  Q.   And then the response to that request

25  states first that your written report, which is

1    a communication directed to defendants'

2    counsel, has already been produced.  And then

3    continues, "In response to subpart (a),

4    Dr. Kroll's fee schedule has already been

5    produced to plaintiff.  Dr. Kroll produces

6    herewith his August 1, 2018, invoice for

7    services rendered in connection with this

8    case."

9         Do you see what I'm referring to?

10   A.   I do.

11   Q.   And that invoice that's referred to is the

12   invoice that we've marked as Exhibit 2, is that

13   correct?

14   A.   Presumably that's what they sent to you.

15   Q.   And why was a copy of your retainer

16   invoice not produced to us in response to that

17   subpoena?

18   A.   You know, never crossed my mind or the

19   lawyer's mind.  Now looking back and in

20   hindsight, didn't reflect anything that's not

21   shown in this invoice of August 1st.  There it

22   shows that a retainer fee was paid.  It really

23   wouldn't have added information.

24   Q.   Well, with respect it would have added the

25   date that you were retained, correct, that

Transcript of Mark W. Kroll, Ph.D.
Conducted on September 13, 2018                    36

1   would have been reflected on the invoice?

2   A.    That's true.

3   Q.    Okay.  So it was just that -- well, strike

4   that.

5         Are there any other documents that are

6   responsive to our subpoena other than the

7   retainer fee invoice that were not provided?

8   A.    Well, I don't know exactly what was

9   provided to you because that was between Pamela

10  Schneeman in the Stephenson law office and your

11  firm.  So, for example, when it says,

12  "Dr. Kroll's fee schedule has already been

13  produced to plaintiff," I presume that she sent

14  the standard fee statement to you -- forgive

15  me, fee schedule to you that had been sent to

16  them in 2017, but I do not have personal

17  knowledge of that.

18  Q.    And do you have a document reflecting your

19  standard fee schedule, like a standalone

20  document?

21  A.    I do.

22  Q.    And is that a document that you provided

23  to defense counsel in this case?

24  A.    Presumably because that is the standard

25  practice.  My admin will send that two-page

Transcript of Mark W. Kroll, Ph.D.
Conducted on September 13, 2018                           37

```
 1   form, maybe it's three pages, to retaining

 2   counsel.

 3   Q.    So I am going to represent to you so

 4   you're clear on what was provided to us.  In

 5   addition to the formal subpoena response itself

 6   with the narrative answers to each category, we

 7   were provided with a document -- the file of

 8   which was entitled Mark Kroll's Invoice Served

 9   with His Response to Subpoena Duces Tecum,

10   which is the two-page document we've marked as

11   Exhibit 2.  And there was one other document

12   provided, which is a five-page document

13   entitled Mark Kroll's List of Testimony Served

14   with Responses to Subpoena, which is a document

15   I may mark and go through with you later in the

16   deposition.  Those were the only two documents

17   that were provided to us.  And I am also going

18   to represent to you that at the time your

19   expert report was disclosed to us, the only

20   documents disclosed were a copy of your report,

21   which was marked as Exhibit 1 already, and then

22   a copy of your CV dated July of 2018.  So in

23   terms of documents that were either produced to

24   us as part of your expert disclosure or as part

25   of the subpoena response, those are the
```

1  documents just so we're on the same page, okay?

2  A.   Thank you for explaining that.  And if you

3  feel it's important, I could send a text

4  message to my admin and she could email you the

5  retainer invoice and my fee schedule within the

6  next half hour.

7  Q.   I would appreciate that.  Thank you,

8  Dr. Kroll.

9          MR. HEPPELL:  We can go off the

10  record.

11          (Off the record.)

12  BY MR. HEPPELL:

13  Q.   Other than the written fee schedule and

14  the retainer fee invoice and the invoice which

15  has been provided to us, are there any other

16  documents or communications between you and

17  defense counsel in this case that relate to the

18  compensation for your study or testimony?

19  A.   I don't believe so.

20  Q.   Okay.  And request number 3 in the

21  subpoena additionally seeks copies of any

22  documents and communications between you and

23  defense counsel that either identify facts or

24  data that they provided to you and that you

25  considered in forming your opinions or identify

1    assumptions that they provided and that you

2    relied on in forming the opinions.  Do you see

3    those two subcategories, B and C, that I am

4    referring to?

5    A.   I do.

6    Q.   And your subpoena response states,

7    "Dr. Kroll has no documents responsive to

8    subparts B and C," is that correct?

9    A.   That's correct.  And I believe that's

10   accurate even today.

11   Q.   The second page of your invoice marked as

12   Exhibit 2, the backside of it we were looking

13   at briefly previously, and that's your time

14   sheet, is that correct?

15   A.   Yes.

16   Q.   And I haven't gone through and added up

17   all of those hours in the Time column, but is

18   it your understanding that this is a full and

19   complete record of the time you expended in

20   connection with the Todero case up to the date

21   of August 1st, 2018?

22   A.   Yes.

23   Q.   So presumably if we were to do the math,

24   that should add up to 60 hours, unless there

25   was some administrative error in compiling

1   this, correct?

2   A.   Well, it would be a problem with Microsoft

3   Excel because I know that's what she uses.

4   Q.   All right.  So we're fairly confident that

5   we don't need to double-check the math on that?

6   A.   I'm pretty confident.

7   Q.   Okay.  Is it your practice to maintain

8   this as a contemporaneous record as you go

9   along during the case of the time you've

10  expended?

11  A.   Yes.

12  Q.   The only notation in the Item column on

13  this sheet is a three-hour block of time on

14  March 7th, 2018, with a notation, Site Visit.

15  Do you see what I'm referring to?

16  A.   I do.

17  Q.   You made a reference earlier in connection

18  with you pulling up a Google map in preparation

19  for the deposition, you made a reference to a

20  site visit to the scene of the Todero incident,

21  if I understood you, is that correct?

22  A.   That's correct.

23  Q.   And is that what the March 7th, 2018, site

24  visit is referring to?

25  A.   Yes.

Transcript of Mark W. Kroll, Ph.D.
Conducted on September 13, 2018                    41

1    Q.   So am I to understand that on March 7th,

2    2018, you were present in Greenwood, Indiana

3    and visited the scene where Mr. Todero was

4    tased by Lieutenant Blackwell?

5    A.   I visited the scene of the incident.

6    Q.   Do you disagree with my description of the

7    scene that you visited?

8    A.   I don't want to be the word police and

9    quibble about words, but this -- the verb you

10   used, "tased," is not a meaningful word in this

11   area.  But I didn't want to hold things up

12   quibbling about it.

13   Q.   Just so I can endeavor to be more precise,

14   what would be a meaningful verb in the context

15   of this incident?

16   A.   We don't really need a verb in this case

17   because we know the site of the incident where

18   he was encountered and controlled.

19   Q.   If we were to use verbs, though, the verbs

20   you would use would be encountered and

21   controlled rather than tased?

22   A.   Well, tased is not a meaningful word.

23   It's kind of a nonsense term.  That's all.

24   Q.   Tell me what you mean by that.

25   A.   You really want me to take the time for me

1  to be the word police here?  Is that important

2  to you?

3  Q.   Well, you've told me that the word "tased"

4  is a -- to you a nonsense word.  And it's a

5  word that's come up a lot in the case.  So I

6  want to understand what you mean by that.

7  A.   Well, like you said, in my initial

8  admonitions, you know, we need to use words and

9  not gestures.  And words are important.  And

10  one of the problems in the study of electrical

11  weapons and electrical weapon-related

12  litigation is newspaper reporters and

13  pseudo-experts with superficial knowledge.  And

14  they use very imprecise terms.  They make up

15  terms.  And so to be really precise we have to

16  go to basics.  And TASER is a registered

17  federal trademark legally.  It's only to be

18  used as an adjective.  For example, TASER-brand

19  handheld electrical weapon.  Dick's [ph.] is

20  commonly in the street also used as a noun,

21  which leads to great confusion.  And the police

22  will use it as a verb to get instant

23  understanding with someone on the street.  They

24  will say something like:  Stop resisting, or I

25  will tase you.  And they don't really have time

1    or the motivation to use precise terminology

2    because that's something that some guy on the

3    street would understand.  But to then use this

4    as a verb adds great confusion because

5    electrical weapons can be used in about ten

6    different ways.  The duration of the usage can

7    be measured in many, many ways.  And so it ends

8    up being meaningless.

9    Q.   Would it be more accurate to describe it

10   as the scene where Lieutenant Blackwell

11   deployed and discharged his TASER device at

12   Mr. Todero on May 29th, 2016?

13   A.   That works fine.  That's perfect usage.

14   Q.   Well, I should probably stop right now

15   because I'm not going to maintain perfect usage

16   throughout the deposition, but I will endeavor

17   to try.

18   A.   And I don't want to be a pinhead word

19   police, but sometimes this use is nebulous.

20   Neologisms lead to great confusion.  For

21   example, Dr. Rashtian has a -- his own

22   definition of, quote, TASER as a noun, which

23   had led him to some confusion in his

24   deposition.  And it's unfortunate.  So I'll try

25   to point out when it's going to cause confusion

Transcript of Mark W. Kroll, Ph.D.
Conducted on September 13, 2018                    44

1   or not.

2   Q.    I appreciate that because it's my -- well,

3   it's my goal to be efficient with both of our

4   time.   It's also my goal to avoid confusion.

5   So I appreciate that.

6   A.    Thank you.

7   Q.    Why did you conduct a site visit to the

8   area where the Todero incident occurred?

9   A.    If it's convenient and the client agrees,

10  I prefer to have a site visit so I can

11  understand better the context of the incident.

12  And I happened to be in Indianapolis that week

13  lecturing at St. Vincent's Hospital and at the

14  University of Indiana.   And the client agreed

15  that that would be useful, so we did a site

16  visit.

17  Q.    Did you incur any travel expenses or other

18  out-of-pocket expenses in connection with that

19  site visit that you would not have otherwise

20  incurred, whether or not those were invoiced to

21  the defendants in this matter?

22  A.    Nothing material.   There may have been an

23  Uber from my hotel over to the Stephenson law

24  firm office.   But I did not charge them any,

25  for example, air travel charges or hotel

Transcript of Mark W. Kroll, Ph.D.
Conducted on September 13, 2018                    45

1    charges because I was already there.

2    Q.   What portion of the three-hour time charge

3    for that date was spent actually in the

4    vicinity of Madison Avenue in Greenwood,

5    Indiana?

6    A.   About a half an hour.

7    Q.   Did you take any photographs or make any

8    notes or take any measurements in relation to

9    that site visit?

10   A.   No.

11   Q.   Okay.  So it was just a visual inspection

12   that you were committing the scene to memory,

13   is that correct?

14   A.   Yes.

15   Q.   Did the site visit that you conducted

16   provide you any information that you relied on

17   in forming the opinions that you have disclosed

18   in your report?

19   A.   It informed my opinion, yes.  I'm not sure

20   if I specifically mentioned it in my report or

21   not.  And I'd be happy to elaborate.

22   Q.   Which of your opinions that are contained

23   in your written report did that site visit

24   inform?

25   A.   There's nothing here that explicitly

1    reflects what I learned at that site visit.  In

2    my summary of nine specific opinions on page 8,

3    it certainly reinforced important fact number 1

4    on page 9.

5    Q.   How did the site visit inform important

6    background fact number 1 on page 9?

7    A.   That location of on northbound Madison

8    just north of Camby is not a place to be

9    walking.  And I would not have gotten that

10   impression had I not visited there.  There's

11   zero shoulder.  There's only a curb.  And then

12   the grass coming off of the curb goes up at a

13   fairly steep angle.  And then looking

14   southbound, I was frightened by cars coming up

15   over a rise about a block and a half away.  So

16   there was very little warning of cars coming.

17   It was a dangerous place.  I was uncomfortable

18   standing there.

19   Q.   And you don't have any particular

20   expertise or specialized training in traffic

21   conditions or the safety of roadway areas, is

22   that fair to say?

23   A.   That's very fair to say.  Beyond just

24   being a human being that looks both ways before

25   you cross the street and knowing when I am

1   terrified by traffic.  And this was a

2   frightening place to stand.  And it reinforced

3   my understanding that -- I'm sorry.  It

4   initially created my understanding this was an

5   emergent situation.

6   Q.   Just to unpack your answer, those -- well,

7   strike that.

8        And you have no knowledge one way or the

9   other whether the traffic conditions in that

10  vicinity were similar to or different from the

11  traffic conditions as they were on May 29th,

12  2016, is that correct?

13  A.   I was there midday, so it was not heavy

14  rush hour traffic.  And still there were a lot

15  of cars coming by and they would be going

16  surprisingly fast.  This was just south of the

17  place where Madison branches off into

18  essentially a separated four-lane highway, at

19  least a four-lane boulevard, if I'm using the

20  right term.  And so cars were coming at us

21  rapidly and at somewhat of a surprise.  That's

22  all I can say.

23  Q.   And again, I appreciate that, but to

24  reiterate my question, you don't have any basis

25  to say one way or the other whether the traffic

1    conditions that you experienced on your site

2    visit were different or similar to the traffic

3    conditions in that area on May 29th, 2016,

4    correct?

5    A.    That's correct.

6    Q.    Any other aspects of your -- strike that.

7          Any other opinions that are contained in

8    your written report that were informed by your

9    site visit beyond what we've already talked

10   about?

11   A.    That's all I can recall right now.

12   Q.    We were talking briefly earlier in our

13   slight diversion related to the correct usage

14   of the term "TASER."  You'd mentioned

15   Dr. Rashtian's usage of that term.  You did not

16   rely on Dr. Rashtian's opinions in forming any

17   of your opinions in your report, is that

18   correct?

19   A.    Only to the extent that I had some brief

20   comments on some of his opinions in his initial

21   expert report.

22   Q.    And those comments aren't contained on

23   pages 8 or 9 in the listing of your

24   case-specific opinions, is that correct?

25   A.    That's correct.

1    Q.    Other than the items noted as the site

2    visit, were there any other time entries in

3    reflection for your work in this case that

4    involved anything other than reading materials

5    or writing or researching in connection with

6    your report?

7    A.    That's pretty fair.  I would add studying

8    the video, of course.

9    Q.    And what video are you referring to?

10   A.    I'm glad you brought that up.  Because it

11   looks like that video either spilled over onto

12   another page, or it didn't make it on here.

13   One of the officers had a body camera on them.

14   Q.    And that's the video that you referred to

15   just now as reviewing video?

16   A.    And as I sit here today, I can't recall.

17   There may have been a second video.  And I also

18   listened to dispatch audio, some radio traffic.

19   And I apologize it's not on here.  Thank you

20   for bringing that up.

21   Q.    So those are two items in addition to the

22   items on page 35 that you received and reviewed

23   in connection with your work on this case,

24   correct?

25   A.    Correct.

Transcript of Mark W. Kroll, Ph.D.
Conducted on September 13, 2018                    50

1    Q.   Given that it appears there's been some

2    materials left off that list, why don't you

3    take a minute just to read through that list

4    and reflect on your work on this case and see

5    if there are any other materials that you

6    received and reviewed that are not contained on

7    that list.

8    A.   That's all that comes to mind right now.

9    Q.   Okay.  Do you maintain a file either in

10   electronic or paper form or both that contains

11   all of the materials you received in connection

12   with this case?

13   A.   Yes.

14   Q.   And what form do you maintain that file?

15   A.   Generally keep it in a Dropbox folder if

16   it's large videos, otherwise it's going to be a

17   folder on my computer.

18   Q.   So it's an electronic folder that is sort

19   of a comprehensive set of the materials you

20   received?

21   A.   Yes.  Whatever I received from counsel, I

22   keep that in one folder.

23   Q.   And so to the best of your recollection

24   today, the only materials that you did receive

25   that are not reflected on this list are the

1   body camera videos -- video or videos and the

2   dispatch audio, is that correct?

3   A.   Yes.

4   Q.   But if we wanted to verify to make sure,

5   it would be possible to cross-check the list

6   against those materials contained in those

7   folders, is that correct?

8   A.   That's one way to do it.  Could also ask

9   retaining counsel for a list of what they sent

10  me.

11  Q.   You referred to dispatch audio.  My

12  recollection from my understanding of the

13  materials that have been produced is there is a

14  county dispatch radio recording.  There's also

15  two recordings of 911 calls that were placed.

16  Do you know if you had access to the 911 calls

17  in addition to the dispatch radio?

18  A.   I did.  Thank you for bringing that up.

19  Yes.  I did listen to those 911 calls.  I would

20  consider that dispatch audio because the person

21  that receives the 911 calls also does the

22  dispatch.

23  Q.   Understood.  So when you were just

24  describing dispatch audio as an additional item

25  not included on this list, you were referring

Transcript of Mark W. Kroll, Ph.D.
Conducted on September 13, 2018                    52

1    to the 911 calls in addition to the dispatch

2    radio traffic or just the 911 calls?

3    A.   I wouldn't segregate them.  I would

4    consider them all having to do with dispatch.

5    Q.   Okay.  But just so I am clear, as they

6    were produced to us in the litigation, there

7    are three separate audio files, two of which

8    are audio recordings of 911 calls placed by

9    civilians to 911 dispatch, and the other is a

10   recording of back-and-forth radio traffic

11   between police officers and dispatch.  Do you

12   understand the distinction I'm making between

13   those type of materials?

14   A.   I do.

15   Q.   And is it your recollection you had all

16   three of those materials and reviewed them?

17   A.   They certainly ring a bell.  As I sit here

18   now, my memory does not allow me to give an

19   exact count of the videos and audio segments

20   that I listened to.

21   Q.   You mentioned body camera videos, correct?

22   A.   Yes.

23   Q.   And again, I can -- all I can do sitting

24   here right now is describe to you what the --

25   videos that I'm aware of and to try and piece

Transcript of Mark W. Kroll, Ph.D.
Conducted on September 13, 2018                    53

1    together what videos you had, whether it was

2    the same or a subset or additional materials.

3    So the videos that I'm aware of is one body

4    camera video captured by Officer Eck that

5    consists of a recording of him driving to the

6    scene, and then interacting with individuals on

7    the scene.  And then there are three body

8    camera videos recorded by Officer Elliott, one

9    of which comprises events in the vicinity of

10   Madison Avenue and Camby, and subsequent two

11   videos which recorded some of the events at

12   St. Francis Hospital.  Based on my

13   representation to you of what the videos that

14   I'm aware of are in this case, are you able to

15   confirm which, if any, of those videos are the

16   videos you're referring to and that you

17   reviewed?

18   A.   Thanks for refreshing my memory on that.

19   That is consistent with my recollection.  And

20   now it's coming back much more strongly,

21   especially the video in the emergency

22   department.  Yes.  So I did review those.

23   Q.   All four of those videos?

24   A.   Yes.

25           MR. HEPPELL:  Could we mark this as

1    Exhibit 4, please.

2              (Exhibit Number 4 marked for

3    identification.)

4              (Recess.)

5    BY MR. HEPPELL:

6    Q.   All right.  Dr. Kroll, you have in front

7    of you a copy of a document that's been marked

8    by the court reporter as Kroll Exhibit 4.  It's

9    entitled Curriculum Vitae.  And it's a 92-page

10   document front and back, is that correct?

11   A.   (Views document.)  Yes.

12   Q.   And the date on the footer of the document

13   is 28th of July 2018, is that correct?

14   A.   Yes.

15   Q.   And I'm going to represent to you that

16   this document was provided to us at the time

17   your expert report was disclosed to us.  Taking

18   as much time as you need to make sure we're

19   talking about the same thing, does this

20   represent your -- a complete and accurate copy

21   of your CV as of July 29th, 2018, which is the

22   date your report was authored?

23   A.   Yes.

24   Q.   Has your CV changed at all since that

25   date?

1    A.    Not in a material way.  There is a paper

2    on page 92.  It's about halfway down.  It says

3    Electrical Weapons and Excited Delirium:

4    Shocks, Stress and Serum Serotonin.  That has

5    been published just a few weeks ago.

6    Q.    Okay.

7    A.    And the next paper, Perceived Electrical

8    Shock and Bayesian Inference with Multisensory

9    Stimuli, that has been e-published too just a

10   few weeks ago.  Otherwise it looks current.

11   Q.    Okay.  Who is Kroll RM?

12   A.    That's my son, Ryan, Ryan Mark Kroll.

13   Q.    He was a co-author with you on the

14   electrical weapons and excited delirium paper?

15   A.    That's correct.

16   Q.    Are there any qualifications or training

17   or certifications that you are relying on to

18   support the opinions contained in your expert

19   report that we've marked as Exhibit 1 that are

20   not contained in the CV marked as Exhibit 4?

21   A.    If you look at it as a whole body with the

22   papers and patents, that kind of reflects my

23   training because that's how we are scored as

24   scientists.  We don't go to a class and someone

25   says:  Okay, now you're a scientist.  We spend

1    our whole career figuring out the science and

2    publishing it to share with the world.  So I

3    would say that most of my training is reflected

4    in the publication section of the CV.

5    Q.   And if I understand what you mean by that,

6    you mean that the nature of your work is you

7    don't go to a two-week training course where

8    you put down a list of training sessions:  This

9    date to this date I went to this course,

10   instead the training that you do is reflected

11   in your research and study that leads to the

12   publications that are reflected in here, is

13   that --

14   A.   That's basically true.  And the simplest

15   way to understand it is there are no CLEs or

16   CMEs for scientists.  We go to conferences and

17   we share information with each other.  And I

18   lecture and attend conferences all over the

19   world.

20   Q.   So I appreciate the description of the

21   nature of your work and how the items on this

22   CV reflect those qualifications.  Are there any

23   aspects of your background or qualifications

24   that you're relying on to support the opinions

25   that you have disclosed in this case that would

1   not be contained in this document?

2   A.   I'm always learning.  So yes, there are

3   lots of things, conferences that I've attended

4   as a speaker or as a listener, papers that I

5   have read.  And so, yeah, there's a lot of

6   things in here because that's what we do.  We

7   learn and share continuously.

8   Q.   So what conferences have you attended that

9   are not listed in this CV that you are relying

10  on as a basis for your qualifications to reach

11  the opinions that you have included in your

12  written report?

13  A.   Probably a hundred.  And I wouldn't begin

14  to be able to list them.

15  Q.   And is it your contention that those --

16  well, strike that.

17       Have those conferences related to subject

18  matters that are covered in other sections of

19  your report that are listed on your CV?

20  A.   No.  I don't list the conferences that I

21  attend unless I'm a speaker.  I've started

22  listing that in my CV.

23  Q.   So why did you omit from your CV

24  conferences that it's your testimony that you

25  relied on those conferences to form the basis

1    of your opinions in your written report?

2    A.   Scientists don't generally list

3    conferences that we attend.  It's just not

4    standard practice.

5    Q.   So it's your understanding that the

6    standard practice of scientists not to maintain

7    a list of conferences that they are then going

8    to rely on as underpinning the bases of

9    opinions they are going to reach when they are

10   called upon to offer expert opinions, is that

11   correct?

12   A.   That may not be totally fair because it

13   kind of is mixing two things.  We scientists

14   have a standard practice for CVs, which has

15   changed.  We used to list our date of birth and

16   Social Security, by the way.  And that hasn't

17   been done for the last ten years.  But this

18   reflects today's standard practice.  And you

19   are asking, if I'm understanding correctly,

20   about a CV that's designed to give information

21   about everything we've ever learned in our life

22   for an expert report.  And this is my standard

23   CV.  It's not focused in that direction.  It's

24   just based on standard practice within the

25   scientific community.

Transcript of Mark W. Kroll, Ph.D.
Conducted on September 13, 2018                              59

1    Q.    And you testified earlier that you've been

2    working providing expert consulting work

3    regularly since 2005 and on an irregular basis

4    prior to that, is that correct?

5    A.    That's correct.

6    Q.    And so since 2005 you've been working

7    regularly as an expert witness, and since that

8    time you have not maintained a list of

9    conference information that you intend to rely

10   on to provide testimony under oath in those

11   cases?

12   A.    Well, that's true, but I wouldn't limit it

13   to just 2005.  I never kept those conference

14   attendances in my CV before that either.

15   Q.    And so it was -- prior to becoming

16   regularly involved in the business of providing

17   expert testimony, it was your practice not to

18   maintain those list of conferences, correct?

19   A.    That's correct.  And I'm not sure what you

20   mean by business of expert witness.  I don't

21   see myself as being in that business.

22   Q.    Well, you are listed on your CV, page 4,

23   as being a principal of Mark Kroll and

24   Associates, LLC, correct?

25   A.    Yes.

Transcript of Mark W. Kroll, Ph.D.
Conducted on September 13, 2018                    60

1   Q.   Is the expert testimony that you have been

2   retained to provide in this case through Mark

3   Kroll and Associates, LLC?

4   A.   I would have to look at that invoice and

5   see if that's -- whatever it says on the

6   invoice is probably the way that it was done.

7   (Views document.)  Yes, it looks like it.

8   Q.   So would it be fair to say that listing

9   yourself as principal of Mark Kroll and

10  Associates, LLC and through that limited

11  liability corporation providing expert

12  testimony for an hourly rate that you would be

13  in the business of providing expert testimony?

14  A.   The only thing I'm quibbling about is that

15  there's an implication that that's my primary

16  line of work and it's 15 to 20 percent of my

17  annual income.  And so I take pains to

18  differentiate myself from professional expert

19  witnesses that advertise, for example.

20  Q.   Well, it's not your contention that you're

21  an amateur expert witness, though, is that fair

22  to say?

23  A.   I've done it many times.  I've been

24  honored to do it many times.  So I guess I'm

25  not an amateur.  I've done it many times and

1    been paid for it.

2    Q.   And it's your testimony that your expert

3    consulting work represents approximately 15 to

4    20 percent of your income, correct?

5    A.   That's correct.

6    Q.   Can you break down for me the other

7    80 percent of your income?

8              MR. STEPHENSON:  I have to object.

9    That's irrelevant.  It doesn't matter how he

10   secures income from other means.  He's already

11   told you what percentage of income he secures

12   through expert work.

13   BY MR. HEPPELL:

14   Q.   You can go ahead and answer.

15             MR. STEPHENSON:  I don't think he

16   should have to answer that.  If you want to

17   know how he earns income through, you know,

18   investments and what have you, I don't think

19   that's appropriate.  I really don't.

20   BY MR. HEPPELL:

21   Q.   Are you declining to answer the question

22   about the remaining 80 percent of your income?

23   A.   It's probably closer to 85, by the way,

24   now that I think about it.  I can give you some

25   rough outlines.  Some of it's public.  I sit on

1    two public boards.  That pays quite well.  I'm

2    an active investor, been involved in a number

3    of startups.  I am a paid speaker.  I lecture

4    all over the world.  I have a number of sources

5    of income.

6    Q.   So the sources that you listed and

7    reflecting further -- well, strike that.

8         Reflecting further, it's your testimony

9    that your best estimate of the portion of your

10   income that is expert consulting is close to

11   15 percent, correct?

12   A.   That's correct.

13   Q.   And presumably that fluctuates year to

14   year, but that's a rough estimate at least for

15   the past ten years or so, is that fair to say?

16   A.   Yes.

17   Q.   And the sources of income that -- broadly

18   speaking that you just testified that make up

19   that other 85 percent is income from sitting on

20   two boards, ventures in which you've -- in

21   which you're participating as an investor and

22   also getting paid as a paid speaker, those are

23   the categories you listed, correct?

24   A.   Yes.  And I would clarify.  I said I sit

25   on two public boards, which pays very well.  I

1   also sit on some private boards.

2   Q.   And the public/private distinction that

3   you're making, is that between like a publicly

4   listed company versus private companies?

5   A.   Correct.

6   Q.   What are the two public companies on whose

7   boards you sit?

8   A.   Haemonetics and Axon.

9   Q.   And what does the Haemonetics company do?

10  A.   Make blood-handling equipment.

11  Q.   And Axon is the corporation formerly known

12  as TASER International, is that correct?

13  A.   Correct.

14  Q.   And if I throughout the deposition use

15  Axon or the TASER corporation interchangeably,

16  you'll understand what I'm referring to?

17  A.   Yes.

18  Q.   And if it's important to the context of

19  your answer, please clarify, but I don't want

20  us to get hung up on the distinction.

21  A.   That is not a problem at all.  I confuse

22  them myself.

23  Q.   How long have you sat on the board of the

24  TASER corporation?

25  A.   Little over 15 years.

Transcript of Mark W. Kroll, Ph.D.
Conducted on September 13, 2018                              64

1   Q.   Is that annual compensation you receive

2   for sitting on that board?

3   A.   Yes.

4   Q.   What is your current annual compensation

5   that you receive from sitting on the TASER

6   corporation board?

7   A.   I'm willing to disclose this because it's

8   a matter of public record to the penny.  And

9   you can Google it yourself and find it in two

10  seconds.  And the annual compensation is --

11  including stock and cash, it's about $320,000 a

12  year.  And that includes consulting and board

13  fees and committee fees.

14  Q.   So that total compensation of

15  approximately 320,000 per year is compensation

16  for your work as a board member on board

17  committees, and then also providing direct

18  consulting services beyond your role as a board

19  member, am I understanding you correctly?

20  A.   That's good.  That's correct.

21  Q.   Without getting into the details of your

22  consulting work but broadly speaking, what's

23  the nature of the consulting work that you

24  provide for the TASER corporation?

25  A.   Scientific work through the Scientific and

1    Medical Advisory Board.

2    Q.    So that consulting work is provided

3    through your role on the Scientific and Medical

4    Advisory Board?

5    A.    That's correct.

6    Q.    And are you compensated by the hour for

7    that work, or is it sort of a more rough

8    additional compensation over and above your

9    board work reflecting your work in that role?

10   A.    There is an hourly rate theoretically, but

11   it's capped at $100,000 a year, and so it ends

12   up just being a flat 100K per year.

13   Q.    That's for the consulting work?

14   A.    Correct.

15   Q.    And so the remaining approximately 220,000

16   would be compensation for your role on the

17   board and the board committees?

18   A.    Correct.

19   Q.    And has that been -- you stated that

20   you've been on the board of the TASER

21   corporation for a little over 15 years,

22   correct?

23   A.    That's correct.  Started March 2003.

24   Q.    Has your compensation over that 15-year

25   period remained steady at that approximately

1    320,000 per year?

2    A.   No.  They started out as a very small

3    company.  And they paid their directors nominal

4    rates in keeping with the size of the company.

5    And now their director fees are more in line

6    with the size of the company.

7    Q.   For how many years has your compensation

8    from the TASER corporation been up around that

9    $300,000 mark?

10   A.   I think we had our last raise about two

11   years ago.  It went up slightly.  It's typical

12   practice in a public corporation to have

13   director compensation reviewed every two or

14   three years.

15   Q.   What was the approximate compensation

16   prior to the most recent increase?

17   A.   I don't recall.  It would have been within

18   ten or 20 percent of that.

19   Q.   You referred to the early portion of your

20   work there when the TASER corporation was a

21   smaller company, you made reference to nominal

22   rates.  Can you give me a ballpark of what you

23   mean by "nominal rates" in that context?

24   A.   30K of stock options, 20K of cash each

25   year.

Transcript of Mark W. Kroll, Ph.D.
Conducted on September 13, 2018                    67

1    Q.   So approximately 50,000 in total

2    compensation between stock and cash?

3    A.   Yes.

4    Q.   And the 320,000 approximate compensation

5    you currently receive, does that include stock?

6    A.   Yes.

7    Q.   Okay.  And can you just explain broadly

8    speaking the distinction between the cash

9    compensation and the stock compensation and the

10   rough mechanics of how that works?

11   A.   Today or back then?

12   Q.   Well, let's start with today.

13   A.   Today it's restricted stock units, which

14   means that each director gets a block of shares

15   and they vest over a four-year period.  And

16   they're valued at -- to the company, they're

17   valued as of the price on the day that the

18   grant was issued.  To the IRS, they're valued

19   to the stock price on the day that they vest.

20   Q.   When you say they vest over four years, is

21   that based on you maintaining membership on the

22   board for that four years?

23   A.   Exactly.

24   Q.   Okay.  So as compensation -- just so I

25   make sure I'm understanding you correctly, for

1  example, as compensation for 2017, in 2017, you

2  received a stock option valued at a certain

3  amount, but you don't receive that value unless

4  you maintain your membership in the board for

5  four subsequent years, is that correct?

6  A.   That's correct, except that you used the

7  term "stock option."  And stock options have

8  fallen out of favor due to the new accounting

9  rules.  So these were RSUs, what's called a

10  restricted share unit.  15 years ago stock

11  options were very popular and the TASER board

12  compensation was based on options.

13  Q.   So during your 15 years on the board,

14  there was a prior portion of time when your

15  compensation was cash and stock options, is

16  that correct?

17  A.   Correct.

18  Q.   And then at some point there was a

19  switchover, and it's now cash and restricted

20  stock units?

21  A.   Exactly.

22  Q.   Do you recall approximately when that

23  switch from stock options to RSUs took place?

24  A.   Whenever the accounting standards changed

25  so companies were penalized for issuing stock

1  options.  So that was, you know, five to eight

2  years ago.

3  Q.   So that was a change that was made by the

4  TASER corporation and presumably many other

5  corporations based on how they were required to

6  account for stock options that they were

7  issuing?

8  A.   Correct.

9  Q.   Okay.  It didn't -- the change from

10 stock -- did the change from stock options to

11 RSUs have any impact on the value of that to

12 you as a recipient?

13 A.   That's a very complicated question, which

14 gets into compensation theory and whether

15 somebody is optimistic about the stock market

16 or not.  On paper it's supposed to be

17 identical.  And that's about all I can answer.

18 Q.   Which did you prefer, the options or the

19 RSUs?

20 A.   In hindsight, the original options were --

21 turned out to be a lottery ticket because the

22 company had explosive growth due to the social

23 impact of their electrical weapons and $30,000

24 in stock options turned into $3 million of

25 stock options.  So in hindsight that was

1    tremendous.  But most stock options don't work

2    out.  So RSUs you're guaranteed a sum value.

3    Roughly half of stock options never turn into

4    value because they presume that the stock

5    increases in value.

6    Q.   Without getting into a lot of the

7    technical details and perhaps revealing my own

8    ignorance, but the -- one of the differences is

9    that when you get an RSU, you're actually given

10   ownership over some unit of stock provided that

11   you stay long enough for it to vest, is that

12   correct?

13   A.   That's correct.

14   Q.   And so it's in terms of the value of the

15   compensation that's valued at the time that

16   it's given to you, and then it's worth whatever

17   the stock market values that whenever you --

18   whenever it vests, is that fair to say?

19   A.   Yes.  There's an important subtlety.  When

20   the stock vests, now you have an immediate tax

21   liability.  And you have to pay that tax

22   whether or not you sell the stock.  So it can

23   create tax problems, which are -- can be

24   uncomfortable, but otherwise I think you

25   described it accurately.

Transcript of Mark W. Kroll, Ph.D.
Conducted on September 13, 2018                    71

1    Q.   Okay.  So at the time of vesting, you have

2    the option of immediately selling the stock at

3    whatever the market price is and recovering the

4    market value or maintaining it and seeing it

5    increase or decrease as the market will, is

6    that sort of roughly fair?

7    A.   Well, since you're interested in this

8    topic, I'll tell you, you don't always have the

9    option because it looks bad if you're a

10   director and you're selling stock and it's all

11   over the Internet as insider trading.  So

12   it's -- you may have that -- let's call it --

13   use the word "alternative" to differentiate

14   from a stock option.  You may have that

15   alternative choice theoretically.

16   Q.   But in practice maybe not?

17   A.   Correct.

18   Q.   Okay.  And again, without belaboring the

19   point too much but to make sure I'm

20   understanding you correctly, a stock option

21   operates differently in that it's giving you

22   the option of purchasing the stock at that

23   price at a certain future date, correct?

24   A.   That's correct.

25   Q.   And so as you were explaining, that's only

Transcript of Mark W. Kroll, Ph.D.
Conducted on September 13, 2018                    72

1    a value if on the date that vests, you -- the

2    stock price has increased in value from the

3    time it was granted to you, correct?

4    A.    That -- no, that's not quite correct

5    because the option may vest one or two years

6    down the road, but you have seven to ten years

7    to exercise that option.  And so that's the --

8    the value of that is what economists call the

9    optionality of it.  You can choose to exercise

10   or not depending upon the stock price

11   presumably.

12   Q.    So it's a value if at some point in

13   that -- whatever the window of time provided to

14   allow you to -- it's a value to you provided

15   that at some point in that window of time that

16   you're given to exercise the option, the stock

17   price has risen above the value of the option,

18   correct?

19   A.    Correct.

20   Q.    Okay.  And so in describing your stock

21   option compensation at the early portion of

22   your time while you were on the board, if I

23   recall correctly, you described it as a nominal

24   value of -- was it 20,000 stock, 30,000 cash or

25   30,000 --

Transcript of Mark W. Kroll, Ph.D.
Conducted on September 13, 2018                     73

```
1    A.    I think it was the opposite.
2    Q.    Okay.
3    A.    20K cash and 30K option.
4    Q.    Okay.  And the -- that 30K value of the
5    option was the value of the stock at the time
6    you were granted the option, correct?
7    A.    Well, it's a little more complicated than
8    that.  They use formulas for telling you what
9    the price of the -- forgive me, what the value
10   of the option is.  And it ends up being related
11   to the price of stock, but it's usually less
12   because you don't know if the stock has gone
13   up.  There are formulas like Black-Scholes, for
14   example, that are used to estimate the true
15   value.
16   Q.    And you testified earlier that in the case
17   of the TASER corporation, there was a
18   significant increase in the value of the
19   corporation's stock as a result of its success
20   in the marketplace, correct?
21   A.    Yes.  And specifically I think the very
22   first option would be worth over $3 million.
23   And then next year's option was worth another
24   $3-some million.  So it ended up being a very
25   nice lottery ticket that nobody planned on.
```

1    Q.    And so those were the options that were

2    granted to you in your early years on the TASER

3    board, which at the time they were granted had

4    a book value or market value of 30,000, ended

5    up providing you in the range of $3 million in

6    compensation when you were -- $3 million in

7    value when you were able to exercise the

8    option?

9    A.    That's correct.  And I would separate out

10   whether they're value or compensation because

11   value is probably a safer word.

12   Q.    Would it be fair to say that the total

13   compensation -- strike that.

14        Would it be fair to say that the total

15   value of the compensation that you've received

16   from TASER during the period of time that

17   you've sat on the board, including the value of

18   the cash that you've received in compensation

19   and the value of the stock options or RSUs that

20   you have received, is in excess of $10 million?

21   A.    I think the -- I don't know that it's over

22   $10 million.  But have to kind of differentiate

23   compensation versus what the value ended up

24   being.  For example, the best analogy I can

25   come up with, I have a lottery ticket, and I

1    don't know if it's going to pay off or not, I

2    give it to you and you give me $10 for it

3    because we know it's a long shot, and then

4    later you make $10 million on that lottery

5    ticket, so at the time I gave it to you it was

6    really worth $10 million based on our knowledge

7    and ended up being much more valuable.  So it's

8    probably not fair to describe the millions of

9    dollars that I made on TASER stock as

10   compensation.

11   Q.   Well, let's -- let me break it out then.

12   What's your best estimate of the total cash

13   compensation that you've received from the

14   TASER corporation over the period of time that

15   you sat on the corporate board?

16   A.   For being a director or total including

17   consulting?

18   Q.   Total cash compensation including

19   consulting, but setting aside stock options or

20   RSUs.

21   A.   Two million.

22   Q.   And that's over that 15-year period that

23   we've been talking about, correct?

24   A.   Correct.

25   Q.   And then recognizing that you take issue

1    with the terminology "compensation" in the

2    context of the stock, what's the total value of

3    the stock options that you've exercised and the

4    RSUs that you've received over that 15-year

5    period?

6    A.    It's in the millions, somewhere between

7    five and ten million.

8    Q.    So your best estimate as you sit here

9    today of the sum of those figures, the cash

10   compensation and the value of the stock that

11   you've received is somewhere between seven and

12   $12 million?

13   A.    That's probably fair.

14   Q.    You used the lottery ticket analogy.  And

15   I understand the analogy and the -- at the time

16   the option is given to you, you don't have any

17   certain knowledge over what the outcome of that

18   is going to be, correct?

19   A.    Correct.

20   Q.    But the analogy is not a perfect analogy

21   because as a -- presumably as a member of the

22   board of the company you have some influence

23   over the future success of that company?

24   A.    Well, the role of the director is to

25   hopefully represent the public at large and

1    keep the public accurately informed of what the

2    management is doing, otherwise we don't have a

3    lot of influence.  The board can theoretically

4    hire or fire the CEO.  That was never done.

5    And we don't have that prescience to see that

6    the company would be that successful.  Nobody

7    dreamed, certainly not me, that the company was

8    going to be that successful.

9    Q.   Well, in your role as a member of the

10   corporate board, you -- you're a fiduciary for

11   shareholders, correct?

12   A.   I'm not sure I understand the legal term.

13   But that -- so I can't say yes or no.

14   Q.   You understand what the -- you have an

15   understanding of what it means to be a

16   fiduciary, correct?

17   A.   No.

18   Q.   So it's your testimony you have sat on the

19   TASER corporation corporate board for 15 years

20   and you don't understand what's meant by being

21   a fiduciary?

22   A.   No.  If you can define the word, I'd be

23   happy to answer the question.

24   Q.   Well, is it your understanding that as a

25   corporate board member you have a fiduciary

Transcript of Mark W. Kroll, Ph.D.
Conducted on September 13, 2018                    78

1    obligation to anyone?

2    A.    I'm not even sure that I know what that

3    word means as I sit here.  Can you help me out?

4    Q.    Well, would you agree with me that as a

5    member of the corporate board, you have an

6    obligation to -- in the actions you take,

7    influencing the management of the company to

8    act in the best interest of shareholders; would

9    you agree with that?

10   A.    I think it's larger than that.  I think

11   it's shareholders and potential shareholders,

12   which includes the public at large, to make

13   sure that the public has an accurate view of

14   the company.

15   Q.    So it's your understanding that as a

16   member of the corporate board of TASER, you

17   have an obligation to ensure that

18   nonshareholder members of the public have

19   accurate information about the company even if

20   that would negatively impact the share value of

21   the company?

22   A.    Let me think about that hypothetical for a

23   second.  So let's say that I have negative

24   information about the company -- well, of

25   course, because otherwise you're misleading the

1  public.  So if you know something bad is going

2  on, you better tell the public because

3  that's -- somebody would be buying or selling

4  that stock with misinformation, if I understood

5  the question properly.

6  Q.   Do you agree that you -- as a member of

7  the corporate board of the TASER corporation,

8  you have a duty of loyalty to the TASER

9  corporation, now Axon?

10  A.   I'm not a lawyer, but that's not my

11  understanding.  It's my understanding and

12  philosophy and feeling that I have a duty to

13  the public.  And if I'm wrong, please correct

14  me.

15  Q.   Well, I'm not here today to educate you on

16  what your duties are as a member of the TASER

17  corporate board.  But just to be clear, your

18  understanding of your duty of loyalty as a

19  corporate board member is it would permit you

20  to act in ways detrimental to the company?

21  A.   Of course not.  And the most detrimental

22  thing you could do would be to cover up some

23  negative fact about the company because in the

24  long term that would do damage to the public,

25  existing shareholders and the corporation

Transcript of Mark W. Kroll, Ph.D.
Conducted on September 13, 2018                    80

1    itself.

2    Q.   Well, and to be clear, I'm not asking you

3    specifically about a coverup.  My questions are

4    related to what your duties are as a member of

5    the corporate board.  Is it your understanding

6    that as a member of the corporate board you

7    have an obligation to act in the interest of

8    the corporation formerly known as TASER

9    International?

10   A.   I told you before, I tell you how I

11   interpret the role and what my philosophy is

12   for being public director, and I see it as

13   representing the public.

14   Q.   Turning to your CV, which is marked as

15   Exhibit 4, you list your academic degrees on

16   page 2.  You received a bachelor of mathematics

17   in 1975, is that correct?

18   A.   Correct.

19   Q.   Was there a particular specialty or focus

20   of study to that degree?

21   A.   Boy, we're going back a long time now.  I

22   don't think so.

23   Q.   Just going back previously to the

24   discussion of your compensation, we talked

25   about that total seven to $12 million figure.

Transcript of Mark W. Kroll, Ph.D.
Conducted on September 13, 2018                    81

1    You remember us reaching that figure?

2    A.   Yeah, but I think we agreed to disagree

3    about it being considered compensation.

4    Q.   Correct.  The value that we reached in

5    getting to that figure, that does not include

6    your expert consulting work, correct?  And let

7    me clarify.  That includes your consulting work

8    directly for the TASER corporation through the

9    Scientific and Medical Advisory Board, but does

10   not include work in which you've been retained

11   in litigation to provide expert consulting

12   services, is that correct?

13   A.   Are you referring to expert witnessing

14   where TASER was a defendant or expert

15   witnessing in general?

16   Q.   So when -- well, strike that.

17        You have testified as an expert witness in

18   cases in which TASER corporation itself was a

19   defendant, correct?

20   A.   It's been a long time.  But there were a

21   handful.

22   Q.   Okay.

23   A.   I can think of a few.  It's been a long

24   time for the bulk of that.

25   Q.   And in those cases were you compensated by

1   the hour over and above the compensation you

2   were already receiving as a board member and a

3   member of the Scientific and Medical Advisory

4   Board?

5   A.    I included that in the consulting

6   estimates I gave you.  It was never very much

7   money.

8   Q.    And then that seven to $12 million

9   figure -- we're agreeing to disagree about

10  calling it compensation, but that seven to

11  $12 million figure does not include hourly fees

12  you've received for expert consulting work in

13  litigation in which the TASER corporation was

14  not a defendant, correct?

15  A.    No, that's not correct.  I meant to

16  include that.

17  Q.    So when I asked you previously about the

18  total value from your work for the TASER

19  compensation [sic], you were including fees

20  that you were paid, for example, in cases like

21  this where you charge an hourly fee for expert

22  consulting?

23  A.    Yes.  And if it's helpful, it was so

24  trivial it wouldn't really make a material

25  difference.

```
 1    Q.   Well, if I understood your earlier
 2    testimony, it was that you received
 3    approximately 15 percent of the value of your
 4    annual income through your expert consulting
 5    work, is that correct?
 6    A.   That's correct.
 7    Q.   And I don't recall if I asked you this
 8    question.  I apologize if I did.  In the past
 9    number of years, what's been the approximate
10    total annual income that you've received
11    through that expert consulting work?
12              MR. STEPHENSON:  Objection.  He's
13    already given you a percentage.
14              THE WITNESS:  I'm going to -- I
15    think my total income is between me and the
16    IRS.  And I think that's kind of a personal
17    question.  And since I gave you the percentage,
18    if I gave you the amount, you could easily do
19    the division, get my total annual income.  So I
20    would rather not answer that question.
21    BY MR. HEPPELL:
22    Q.   So you're refusing to answer the question
23    of what your total annual income is from your
24    expert consulting work?
25    A.   That's correct.  I gave you the
```

Transcript of Mark W. Kroll, Ph.D.
Conducted on September 13, 2018                84

1   percentage, which is the way I normally hear

2   that question.

3   Q.   Well, you understand, sir, that one of the

4   topics that's relevant in any litigation with

5   any witness, whether they're an expert witness

6   or a lay witness, is their potential bias?  You

7   understand that?

8   A.   Makes sense.

9   Q.   And obviously an individual who's being

10  paid for their testimony, that's a potential

11  source of bias; would you agree with me?

12  A.   I could see situations where that would be

13  the case, sure, assuming they're looking for

14  repeat consulting from the same client.  And

15  just not sure that applies here.

16  Q.   Well, regardless of whether or not you

17  think it applies here -- and I'm not going to

18  get into a debate with you about the legal

19  issues around what's a permissible question

20  other than to say that this is a standard

21  question that's asked in every deposition of an

22  expert witness that I've attended in terms of

23  what their compensation is from their expert

24  consulting services.  So I'm going to ask you

25  again to approximate your total annual income

1    over the last number of years from your expert

2    consulting services.

3    A.    I appreciate you sharing your experience

4    with me.  I can tell you my experience is that

5    a similar question comes up every time, but

6    it's a percentage because deposing counsel

7    wants to know if a person is dependent on

8    expert witnessing for their livelihood.  And

9    I've already gave you the percentage.  And so

10   because it's a trivial arithmetic calculation

11   to get to my total income, I'm going to decline

12   to give that to you.  You already can see from

13   my two public boards that I make a lot of

14   money.  That's already disclosed out there.

15   And I would rather not get into the rest of my

16   personal income.

17   Q.    Dr. Kroll, I think we respectfully

18   disagree over whether this is a piece of

19   information that we're entitled to.  Will you

20   agree to sit for another deposition or

21   supplement your testimony to provide that

22   number if the judge orders you to provide that

23   information?

24          MR. STEPHENSON:  Judge orders it, he

25   has to.

```
 1              THE WITNESS:  I will respect the

 2   federal judge's orders, of course.

 3   BY MR. HEPPELL:

 4   Q.   Approximately what percentage of your

 5   annual income from expert consulting is in law

 6   enforcement cases versus the percentage that's

 7   in non-law enforcement cases?

 8   A.   About half.

 9              MS. POLLACK:  I'm sorry.  What was

10   your answer?

11              THE WITNESS:  It's about half.

12   BY MR. HEPPELL:

13   Q.   And do those law enforcement cases all

14   involve as an issue in the case the use of a

15   TASER?

16   A.   Yes.

17   Q.   During the period of time since -- well,

18   strike that.

19        During the period of time that you

20   provided those expert consulting services in

21   connection with litigation and specifically in

22   connection with law enforcement cases involving

23   the use of a TASER, have you ever been retained

24   by the non-law enforcement side of the

25   litigation?
```

1    A.    You mean whether I was retained on the

2    opposite side of the police officers?

3    Q.    Correct.

4    A.    Yes, several times.

5    Q.    When you say "several times," is there a

6    particular number that you're able to give me?

7    A.    Well, there's three or four that come to

8    mind right away.

9    Q.    Can you tell me about those three or four

10   cases in which you were retained on the side

11   opposite the law enforcement side in the case?

12   A.    Iowa v. Cruise, state criminal court.  I

13   think it's on that listing.  Can I look at

14   that?

15   Q.    Yeah.

16   A.    That may help my memory.  May I just take

17   this copy right here?

18   Q.    You may.  But let's mark it as an exhibit

19   just so we're clear what we're talking about.

20            MR. HEPPELL:  So we can mark this as

21   Kroll Exhibit 5.

22            (Exhibit Number 5 marked for

23   identification.)

24   BY MR. HEPPELL:

25   Q.    Dr. Kroll, what has been marked as

Transcript of Mark W. Kroll, Ph.D.
Conducted on September 13, 2018                 88

1    Exhibit 5 by the court reporter, which you have

2    in front of you, is what was provided to us as

3    part of your subpoena response, which we

4    separately marked as Exhibit 3.  And

5    you -- just to read from that response, it

6    states, "A list of Dr. Kroll's testimony going

7    back four years has already been produced to

8    plaintiff at page 58 of Dr. Kroll's July 29,

9    2018."  I think there's a word missing.  It

10   should say "report" there.  "A list of his

11   testimony going back ten years is produced

12   herewith."

13        Is it your understanding that what's been

14   marked as Exhibit 5 in front of you is a list

15   of your testimony going back ten years?

16   A.   Yes.

17   Q.   And I had just asked you to identify for

18   me those three or four cases that you could

19   recall in which you had been retained to

20   testify opposite the law enforcement side of

21   the case.  And you asked very reasonably to

22   refer to that list.  And so could you help us

23   identify on that list those cases?

24   A.   Georgia v. Eberhart and Weems, criminal

25   case in Georgia state, July 2016.  There I was

1    on the opposite side of the State of Georgia.

2    Q.    Can you briefly explain what the issues

3    were in that case and your role as an expert in

4    that case?

5    A.    The State of Georgia was prosecuting two

6    officers for murder; one officer for murder,

7    the second one for something related to that.

8    And I testified in the defense of the officers

9    against the prosecution in that case.  In that

10   sense it's against law enforcement.

11   Q.    Against law enforcement in the sense that

12   it was against the prosecution in that case, is

13   that what you're referring to?

14   A.    Correct.

15   Q.    But it was in favor of the particular law

16   enforcement officers who were being prosecuted,

17   is that correct?

18   A.    Correct.

19   Q.    And what was -- was the nature of the

20   allegations against the officers that they --

21   that one or both of them had caused harm by

22   improperly using a TASER?

23   A.    Correct.

24   Q.    And it was your testimony in that case

25   that the TASER did not cause the harm that the

1   prosecution was alleging, is that correct?

2   A.   Correct.

3   Q.   What are the other cases that you're able

4   to identify as cases where you testified

5   opposite law enforcement?

6   A.   Georgia v. Olson, March 2018, I've not

7   testified yet.

8   Q.   So that's a case in which you've been

9   retained to offer an opinion and anticipate

10  testifying but have not yet testified, is that

11  correct?

12  A.   Correct.

13  Q.   Have you disclosed a report in that

14  matter?

15  A.   No.

16  Q.   What's the nature, broadly speaking, of

17  the allegations in that case?

18  A.   The officer shot somebody with a pistol

19  and killed them.  And the allegation was he

20  should have used his electrical weapon.

21  Q.   And you've been retained by the defense in

22  that case, is that correct?

23  A.   Yes.

24  Q.   What's the nature of the opinions that you

25  anticipate giving in that case?

1              MR. STEPHENSON:  I have to object to

2    that.  He hasn't rendered opinions.

3    BY MR. HEPPELL:

4    Q.   Have you reached opinions in relation to

5    that case?

6    A.   No.

7    Q.   And that case does not -- that case

8    involves the nonuse of a TASER rather than the

9    use of a TASER, is that correct?

10   A.   Yes.

11   Q.   And again, in that case, you've listed

12   that as being against law enforcement because

13   you're going against the prosecution, correct?

14   A.   Correct.

15   Q.   But you do anticipate testifying on behalf

16   of the individual law enforcement officer

17   involved in that case, correct?

18   A.   Assuming I reach the opinion that helps

19   him, otherwise they may not invite me to court.

20   Q.   But you have been retained in that case,

21   correct?

22   A.   Correct.  Illinois v. McCaslin, criminal

23   case, Illinois state, June 2014.

24   Q.   And what can you tell me about the nature

25   of that case?

Transcript of Mark W. Kroll, Ph.D.
Conducted on September 13, 2018                    92

1    A.    This case, Officer McCaslin was charged

2    with some interesting term that I hadn't heard

3    before, but just being a really bad person for

4    giving this woman a one-second drive-stun to

5    her neck.

6    Q.    You have already testified in that case,

7    is that correct?

8    A.    Yes.

9    Q.    And was the nature of your testimony that

10   the officer did not use the TASER

11   inappropriately?

12   A.    Correct.

13   Q.    Okay.  And that the TASER did not cause

14   the harm that the prosecution was alleging in

15   that case?

16   A.    Well, they didn't allege any harm.  They

17   just said it was inappropriate.

18   Q.    And again, so you have identified that as

19   testifying against law enforcement because

20   you're testifying on the opposite side as the

21   prosecution, correct?

22   A.    Correct.

23   Q.    But in that case you were testifying on

24   behalf of the individual law enforcement

25   officer, correct?

1   A.    Correct.

2   Q.    And the nature of your testimony was that

3   the use of a TASER was appropriate?

4   A.    Yes.

5   Q.    Okay.

6   A.    Fair enough.

7   Q.    Was there another case that you were able

8   to identify off your list where the -- you

9   testified opposite law enforcement?

10  A.    Yes.  The next one is the Australia Crown

11  Court.  It was a criminal case.  And I was

12  hired by the provincial government, by the

13  prosecution in which the police officers were

14  criminally charged for excessive use of

15  electronic control leading to the death of

16  Mr. Curti.

17  Q.    Was it your testimony in that case that

18  the use of the TASER did not lead to the death

19  that the prosecution was alleging?

20  A.    I don't think I got to that.  They just

21  wanted to know the details of how many seconds

22  of current he had, analysis fairly similar to

23  what is in this report in the Todero case,

24  because there were five or six officers and

25  maybe five electrical weapons.  And they wanted

Transcript of Mark W. Kroll, Ph.D.
Conducted on September 13, 2018                    94

1    to know how many seconds of current he had

2    actually received in total.

3    Q.    And you were called by the defense in that

4    matter, is that correct?

5    A.    No, that's not correct.  I was hired by

6    the prosecution.

7    Q.    Okay.  Did you offer an opinion in that

8    case one way or the other about whether the use

9    of the TASER was appropriate?

10   A.    No, I was not asked to opine on that

11   matter.

12   Q.    So you offered no opinion one way or the

13   other about whether the TASER use was

14   appropriate or whether the TASER caused any

15   harm in that case, is that fair to say?

16   A.    I think that's fair to say.

17   Q.    Okay.  Any other cases in relation to your

18   testimony where you've testified opposite law

19   enforcement?

20   A.    Yes.  I'm just looking through here.  I

21   know there are several.  Here's one that

22   arguably belongs on the list.  It is Parrish

23   (Boucher), Mason, Ohio, Ohio federal,

24   October 2012, in which they asked my opinion

25   about the electrical weapon contributing to

Transcript of Mark W. Kroll, Ph.D.
Conducted on September 13, 2018                    95

1   Mr. Boucher's death.  And I said it definitely

2   did, definitely did cause his death.  Although

3   I was hired by the defense in that case.

4   Q.   So that was a civil case, correct?

5   A.   Correct.

6   Q.   And the plaintiff in the case was the

7   decedent's estate or family or someone on

8   behalf of the deceased individual, is that your

9   understanding?

10  A.   Correct.

11  Q.   And the lawsuit was brought against the

12  law enforcement officers and/or the

13  municipality that employed them, is that your

14  understanding?

15  A.   That's correct.  Boucher was the decedent.

16  And Parrish was the family representative.

17  Q.   And you were hired as -- you were retained

18  as an expert and testified as an expert on

19  behalf of the municipality or the police

20  department?

21  A.   I was retained.  I wrote an expert report.

22  And it was settled before I could be deposed.

23  Q.   And you described that you reached the

24  opinion that the TASER did cause Mr. Boucher's

25  death, is that correct?

Transcript of Mark W. Kroll, Ph.D.
Conducted on September 13, 2018                    96

1    A.   That's correct.

2    Q.   What were the circumstances of

3    Mr. Boucher's death?

4    A.   How much detail do you want?

5    Q.   Broadly speaking.  In what manner did the

6    TASER cause Mr. Boucher's death in your opinion

7    that you reached in that case?

8    A.   He was running away from the officers.  He

9    knocked these two officers down when he was

10   running away from them.  And they gave him a

11   probe deployment in the back.  So two probes in

12   the back.  And when you have two probes in the

13   back, the body gets plywood, gets very stiff,

14   you go straight down, you cannot control your

15   arms.  And his head hit right on the curb in

16   front of a Speedway gas station.  And so he had

17   severe brain trauma, which killed him.

18   Q.   Did you offer an opinion in that case that

19   the use of the TASER in those circumstances was

20   appropriate?

21   A.   I don't think I was asked to opine on

22   that.  In general -- I don't opine on use of

23   force in general.

24   Q.   Do you know why the municipality in

25   defense of that case retained you to offer the

1   opinion that the TASER did, in fact, cause the

2   decedent's death?

3   A.   They didn't retain me to reach a specific

4   opinion.  They asked me to opine.

5   Q.   And the opinion you reached was that the

6   TASER did result in the death in that case?

7   A.   Correct.

8   Q.   Okay.  Were there other opinions that you

9   reached in that case that you recall beyond

10  that opinion?

11  A.   That was the main opinion.  There may have

12  been some ancillary opinions that I don't

13  recall the details.

14  Q.   And again, just to clarify, the question

15  and the exercise we're going through right now

16  is to identify cases in which you were retained

17  opposite law enforcement.  I appreciate you

18  being expansive.  And you identified that as

19  one you were retained by law enforcement,

20  although the opinion that you reached was

21  unfavorable to the officers, at least in that

22  aspect; is that why you identified that case?

23  A.   I did.  And plus the way this is stapled

24  together, it's very difficult to page through

25  because it's stapled in the wrong corner.  And

Transcript of Mark W. Kroll, Ph.D.
Conducted on September 13, 2018                    98

```
1    I'd rather not go through this list twice.  So
2    let me throw out one more case with your
3    indulgence.
4    Q.    Absolutely.
5    A.    Martin v. Border Patrol.  I was hired by
6    the United States Department of Justice,
7    California Federal Court, November 2014.  And I
8    reached an opinion that the border patrol
9    officers did indeed cause the death of
10   Mr. Martin by discharging their electrical
11   weapon.  And I think I'm done here.  I'm sure
12   I'm missing one, but that should give you a
13   little bit of a flavor.
14   Q.    Okay.  What was the nature of the
15   mechanism by which Mr. Martin died as a result
16   of the TASER?
17   A.    In my opinion, he had gasoline fumes in
18   his rental car.  And when they broke the window
19   and applied the probe mode through the
20   passenger window, it arced and caused an
21   explosion, which burnt him to death.
22   Q.    And this is a list of your testimony going
23   back ten years, is that correct?
24   A.    Correct.
25   Q.    Are there cases prior to the ten-year
```

1   mark, recognizing that you don't have a list to
2   refer to, where you can recall being retained
3   in a case to give expert testimony that ended
4   up -- or in which you were going against law
5   enforcement?
6   A.   There might be one.  I just can't recall
7   right now.
8   Q.   And just to summarize, in all of the cases
9   in which you've been retained to give expert
10  testimony in relation to a TASER, is it
11  those -- just those two cases we had discussed
12  in which you reached the opinion that the TASER
13  did cause the harm that was being alleged in
14  the case -- in those cases resulting in the
15  death of the individual?
16  A.   Those are the only two that I can recall
17  right now.  There may be another one involving
18  an eye injury from the probe.  I just can't
19  recall it.  And that may have been some time
20  ago.  But this is a pretty good summary.
21  Q.   Okay.  So with the possible inclusion of
22  an eye injury case, and in that case -- if that
23  case is one in which you were retained to offer
24  an opinion, your opinion would have been that
25  the TASER did cause the injury, correct?

Transcript of Mark W. Kroll, Ph.D.
Conducted on September 13, 2018                    100

1    A.    Correct.

2    Q.    And so taking those -- those would be the

3    only three cases in which to the best of your

4    memory you've ever been retained and offered an

5    opinion that the TASER did cause the harm that

6    was being alleged?

7    A.    Yes.  But I'm sure if I sit here long

8    enough, I'll think of another one.  But that's

9    all that comes to mind right now.

10   Q.    And if there is one that comes to mind at

11   any later point in your deposition, please do

12   let me know, okay?

13   A.    I will.

14   Q.    And the same goes for any other question

15   that I've asked.  If there's a revelation that

16   would provide further information, please do

17   let me know.

18   A.    Fair enough.

19   Q.    And fair to say that in all of the other

20   cases in which you've been retained to provide

21   expert testimony in relation to a TASER, your

22   opinion where there was -- where you were asked

23   to opine about the harm caused by the TASER,

24   you reached the conclusion that the harm that

25   was alleged was not caused by the TASER, is

Transcript of Mark W. Kroll, Ph.D.
Conducted on September 13, 2018                    101

1   that fair to say; again, to the best of your

2   recollection?

3   A.   Best of my recollection.  And I just

4   thought of another one; Khottavongsa v.

5   Brooklyn Center.  And there I opined that the

6   use of electronic control did cause the death

7   of the Mr. Khottavongsa based on my initial

8   information.  Later we received some

9   information that suggested that his head injury

10  was due to a vicious assault earlier.  But I

11  know my initial opinion was that it had caused

12  his death.  In fact, I published on that.  And

13  the opinion that stands is that absent the

14  earlier assault, he was beaten earlier, absent

15  that assault, the fall induced by the probe

16  deployment to the back would have killed him.

17  Q.   So again, that was another fall case,

18  TASER deployment resulting in a fall and a

19  trauma injury?

20  A.   Yes.  Because he had probes in the back,

21  the fall is very dramatic.  You lose control of

22  your muscles and you just go straight down,

23  either forward or backwards, like a piece of

24  wood.

25  Q.   And so those cases you've identified, two

1   involved the fall, one involved an injury to

2   the eye caused by the probe, and the other

3   involved an ignition of flammable materials

4   caused by the TASER spark, is that correct?  Is

5   that a summary, broadly speaking, of the nature

6   of the harm in cases where you have testified

7   that the TASER did cause harm?

8   A.   That's correct.

9   Q.   Okay.  You've never testified in a case

10  that the TASER caused harm to an individual as

11  a result of the electrical current going into

12  that person's body, is that correct?

13  A.   And to use the right term, it's called an

14  electrocution.  And I have never testified that

15  a TASER weapon caused an electrocution.

16  Q.   Have you ever testified in a case prior to

17  this case in which, to your understanding,

18  there was an allegation that rhabdomyolysis was

19  involved in the chain of causation leading to

20  the individual's death?

21  A.   I'm sure I have.

22  Q.   Do you recall which cases on that list

23  involved a situation with rhabdomyolysis?

24  A.   Perhaps a third of them.  Rhabdo is a

25  common side effect from cited delirium cases

1    and drug overdoses and alcohol overdoses.  So

2    it's just prolonged hyperactivity from someone

3    out of physical condition.  So it's -- it comes

4    up regularly.

5              THE WITNESS:  When did you want to

6    break for lunch, or can we take a quick bio

7    break now?

8              MR. HEPPELL:  Let's go off the

9    record.

10             (Recess.)

11   BY MR. HEPPELL:

12   Q.   Dr. Kroll, before we took a break,

13   previously you'd been describing some of the

14   cases in which you'd offered testimony related

15   to the harm that TASERs can cause.  And the

16   cases we looked at were an eye injury, two

17   falls and ignition of flammable materials.  Do

18   you recall talking about that?

19   A.   I do.

20   Q.   And you also clarified that you had never

21   offered an opinion in a case that there was

22   harm caused by a TASER by means of

23   electrocution.  Did I understand you correctly?

24   A.   Correct.

25   Q.   And just so I'm clear, when you use --

Transcript of Mark W. Kroll, Ph.D.
Conducted on September 13, 2018                     104

1    A.    Specifically a death.  Let's just say

2    specifically a death caused by electrocution,

3    which is somewhat redundant because

4    electrocution means death by electricity.

5    Q.    I appreciate the clarification.  When you

6    use the term "electrocution," you're referring

7    to death by electricity, that's how you define

8    it?

9    A.    Exactly.

10   Q.    Okay.  And is that limited to death by

11   electricity where the electricity causes the

12   heart to stop within a very short period of

13   time after the electricity is -- enters a

14   persons body?

15   A.    No.  The dictionary definition of

16   electrocution is death by electricity.  And the

17   time limit is not relevant.  In some cases

18   people are hit by lightning and they have nerve

19   or brain damage and they don't die for days or

20   weeks.

21   Q.    Dr. Kroll, do you believe that it's

22   possible for TASERs to cause electrocution,

23   i.e., death by electricity?

24   A.    It's a theoretical possibly.  I've

25   published a lot on this.  The company warns

1    about it.  It would take a freak set of

2    circumstances.  The probe would have to

3    be -- did you want this much detail?

4    Q.   If I -- not to cut you short, and correct

5    me if I'm wrong, but I believe you make

6    reference to this in your expert report where

7    you discuss probes that go very close to the

8    heart on an individual weighing 46 pounds or

9    less, am I remembering that correctly?

10   A.   That's our best estimate based on the

11   animal data.

12   Q.   And so, I guess, outside of extremely

13   unusual medical circumstances, it's your belief

14   that TASERs are not capable of killing an adult

15   by means of electrocution?

16   A.   That's correct.  And I think that's the

17   consensus of authorities in the area.

18   Q.   And I understand that electrocution by

19   definition means resulting in an individual's

20   death, we discussed that, right?

21   A.   In American usage.  In other words to keep

22   this straight because I lecture a lot in

23   Europe, European usage, it's evolved to include

24   significant electrical entry.  But American

25   usage it has to be a death.

Transcript of Mark W. Kroll, Ph.D.
Conducted on September 13, 2018                    106

```
1    Q.   And so let's -- however we want to phrase
2    it or maybe there's no word for it and we'll
3    just use the phrase, but I want to talk with
4    you about a situation where electricity causes
5    significant harm to an individual but doesn't
6    kill them.  And, I guess, again, through the
7    means of the electricity interacting with the
8    body, not by means of the electricity igniting
9    some flammable substance or something like
10   that.  Do you understand the concept that I'm
11   trying to set forth?
12   A.   Can you build up your hypothetical a
13   little more clearly?  I understand the
14   groundwork you're laying.  Maybe you can add
15   more detail to that before you ask the
16   question.
17   Q.   I can try.  What more detail would be
18   helpful to you?
19   A.   Well, in American usage, when you're
20   talking about electricity causing injury but
21   not death, we would call that an electrical
22   injury.
23   Q.   Okay.  Do you understand that definition
24   in American usage of electrical injury?
25   A.   Yes.
```

Transcript of Mark W. Kroll, Ph.D.
Conducted on September 13, 2018                 107

1    Q.   Do you believe that TASERs are capable of
2    causing electrical injury?
3    A.   They're capable of causing minor
4    electrical injuries.  They can cause burns.
5    And we're just talking about the electrical
6    current now, not the probe to an eye, for
7    example?
8    Q.   Correct.
9    A.   The current can cause burns.  The current
10   can cause muscle strain.  And if the --
11   typically this happens with the probes in the
12   back, someone that's fairly athletic, and the
13   contractions of those muscles can be so strong
14   that people have had vertebra crushed, tendons
15   stretched, injuries similar to athletic
16   injuries.  So yes, there are several documented
17   types of injuries from the electrical current.
18   Q.   Going back to your CV, which we've marked
19   as Exhibit 4, I believe, and I think I started
20   asking you about your academic degrees, and
21   then I got sidetracked with something in the
22   moment that I found more interesting, but
23   returning to that, I believe you testified that
24   you did not recall whether your bachelor of
25   mathematics had a particular specialization or

1    focus of study.  Am I correct in that, in my

2    recollection of your prior testimony?

3    A.    That's what I said, yes.

4    Q.    What about your 1993 degree, is that a

5    Master of Science degree?

6    A.    Yes.

7    Q.    Was there a specialization or a particular

8    focus of study related to that degree?

9    A.    Both 1983 and 1987, master's and Ph.D.

10   were in electrical engineering.

11   Q.    Electrical engineering.  What institution

12   did you receive your master's degree in

13   electrical engineering from?

14   A.    University of Minnesota.

15   Q.    Okay.  And what about the Ph.D. in

16   electrical engineering?

17   A.    Same.

18   Q.    Same.  And did your 1990 MBA have a

19   particular focus, or was that just a general

20   business administration degree?

21   A.    Just general.

22   Q.    Where did you receive that degree?

23   A.    University of St. Thomas.

24   Q.    Okay.  Also in Minneapolis, correct?

25   A.    Yes.  Their business school is in

Transcript of Mark W. Kroll, Ph.D.
Conducted on September 13, 2018                    109

1    Minneapolis.  The university is headquartered

2    in St. Paul.

3    Q.    Okay.  We talked earlier in the context of

4    our financial discussion one of your present

5    professional roles is as the principal of Mark

6    Kroll and Associates, LLC, correct?

7    A.    Correct.

8    Q.    And that's been a company that you have

9    been the principal of since March 2006, is that

10   correct?

11   A.    Correct.

12   Q.    And do you do -- we looked at the invoice

13   earlier.  That's the company through which you

14   have provided expert services in this case, is

15   that correct?

16   A.    Yes.

17   Q.    Do you do any work through Mark Kroll and

18   Associates, LLC other than providing expert

19   consulting services?

20   A.    General consulting.  If someone wants me

21   to consult on a given issue, I would do that.

22   It's just an invoicing convenience frankly.

23   Q.    So it's not limited to litigation

24   consulting, it might be someone who wants to

25   take advantage of your expertise in some area

Transcript of Mark W. Kroll, Ph.D.
Conducted on September 13, 2018                    110

1    could call you up and you'd bill them by the

2    hour for your expertise?

3    A.    Correct.

4    Q.    And you do that through Mark Kroll and

5    Associates?

6    A.    That's correct.

7    Q.    Are there associates at Mark Kroll and

8    Associates?

9    A.    No.  Well, outside of Carrie, who is my

10   admin.

11   Q.    So it's just you and an administrative

12   assistant, correct?

13   A.    Correct.

14   Q.    Is she a full-time administrative

15   assistant for you?

16   A.    No.

17   Q.    Other than litigation-related consulting

18   and general consulting, any other services that

19   you provide through Mark Kroll and Associates?

20   A.    No.

21   Q.    And I understand also, again, in the

22   previous financial conversation that you talked

23   about the corporate boards you sit on, both

24   public and private, and that you also play an

25   active role in some ventures that you've

1    invested in, is that correct?

2    A.   That's correct.

3    Q.   And you also talked about being a paid

4    speaker.  In your capacity as a paid speaker,

5    do you give presentations on topics related to

6    the TASER?

7    A.   In part.

8    Q.   What proportion would you say of the paid

9    speaking engagements that you give relate to

10   TASER or TASER-related topics?

11   A.   Probably 100 percent because they

12   include -- well, they're all based on my

13   specialty, which is bioelectricity and the

14   effects of shocks on the body.  And people find

15   the topic so fascinating because it's in the

16   newspaper all the time.  I almost invariably

17   include that topic of electrical weapons in my

18   talks.

19   Q.   So whether it's the main focus or just a

20   portion of the presentation, to the best --

21   your best estimate is that 100 percent of those

22   paid speaking engagements relate in part to the

23   TASER or a conducted electrical weapon?

24   A.   Almost.  I should never say 100 percent.

25   But it's over 90 percent.

```
1    Q.    On page 3 of your CV you have a section
2    titled Academic Affiliations.  Do you see what
3    I'm referring to?
4    A.    I do.
5    Q.    And you list three academic affiliations.
6    Two of which are ongoing to the present.  One
7    ended in 2016.  Which of those were or are paid
8    academic appointments or positions?
9    A.    None of them.
10   Q.    Okay.  Those are all volunteer?
11   A.    Correct.
12   Q.    Okay.  And at present you serve as an
13   adjunct professor in biomedical engineering at
14   both the University of Minnesota in Minneapolis
15   and California Polytechnic, is that correct?
16   A.    Correct.
17   Q.    What is -- on a yearly basis, what is the
18   commitment that you have in terms of teaching
19   at those institutions?
20   A.    At the university I teach a class every
21   fall, University of Minnesota teach a class
22   every fall.  And at Cal Poly I give ad hoc
23   lectures.  Probably averages one lecture a
24   year.
25   Q.    The fall class you teach every year at the
```

Transcript of Mark W. Kroll, Ph.D.
Conducted on September 13, 2018                    113

1    University of Minnesota, is that in-person

2    lectures you give on campus?

3    A.    Correct.

4    Q.    Is that like a once-a-week class that you

5    teach?

6    A.    Every Monday.

7    Q.    And what was your role as -- on the

8    faculty for creativity and innovation program

9    at UCLA?

10   A.    UCLA had a pretty prestigious program on

11   stimulating creativity, innovation.  They're

12   also very expensive.  And I was invited for

13   14 years in a row as a keynote speaker on the

14   creativity process.

15   Q.    I'd asked you previously and we had a

16   conversation about the conferences which you

17   attended.  And if I understood your testimony

18   earlier, those conferences you were relying on

19   in part to give the basis for your opinions in

20   your report, but you -- those aren't listed in

21   your CV.  Is that a fair summary of what we

22   were talking about previously?

23   A.    That's fair because they lead to my

24   overall education.  It's hard to say I learned

25   this at this given conference on this day in

Transcript of Mark W. Kroll, Ph.D.
Conducted on September 13, 2018                              114

1    this city.

2    Q.    And you understand that as an expert

3    witness in a federal case such as this one, the

4    disclosure of your expertise has to comply with

5    federal Rule 26?  Is that your understanding?

6    A.    It's my understanding that a Rule 26

7    report has to comply with Rule 26.  I don't

8    recall as I sit here what the exact details are

9    for what has to be in the CV.

10   Q.    And just because I have the rule pulled up

11   in front of me, one of the requirements under

12   Rule 26 is that the report must contain the

13   witness' qualifications, including a list of

14   all publications authored in the previous ten

15   years.  And so my concern is if you're relying

16   on materials that you're considering to be part

17   of your qualifications to render opinions in

18   the case, but they've not been included on your

19   CV.  Are there any -- are you relying on any of

20   those unlisted conferences to expand the

21   subject matters of opinions -- strike that.

22         In reaching the opinions that you've

23   reached in your written report in this case,

24   are you relying on any of those unlisted

25   conferences that we've been talking about to

Transcript of Mark W. Kroll, Ph.D.
Conducted on September 13, 2018                    115

1   expand the subject matters in which you contend

2   you are qualified to render an opinion beyond

3   those subject matters that are contained in

4   other areas of your CV that you have produced?

5   A.    That was a long question.  I think we're

6   making this too complicated.  I go to these

7   conferences.  It's part of my education.  For

8   example, the Heart Rhythm Society conference, a

9   very prestigious conference on the effects of

10  electricity on the heart.  I've gone to every

11  one of those since 1986.  So that is, what, 30,

12  30 of those.  It's part of my education.  I

13  meet with colleagues.  We talk about research.

14  I go to talks.  I go to posters.  That's part

15  of my education.  I can't point to any given

16  one of those meetings and a given abstract that

17  supports my opinions here.  That's part of my

18  education over my career.

19  Q.    Sure.  But the subject matter of those

20  conferences is also reflected in the other

21  items that are included on your CV, is that

22  correct, or am I incorrect?

23  A.    In the sense that I specialize in the

24  effects of electricity on the body and that's a

25  big part of the Heart Rhythm Society meetings,

Transcript of Mark W. Kroll, Ph.D.
Conducted on September 13, 2018                    116

1    that's correct.

2    Q.    And I guess we talked earlier, for

3    example, about your expertise or lack of

4    particular expertise in this case, in the area

5    of traffic safety and traffic patterns.  Do you

6    recall us talking about that?

7    A.    Yes.

8    Q.    And so it's not the case, for example,

9    that there is an entirely new subject area

10   which would not be evident from your other

11   materials on your CV, say, that you'd, for the

12   last ten years, attended three conferences a

13   year in relation to traffic safety or traffic

14   patterns and were relying on that.  Do you see

15   what I'm getting at in terms of a subject that

16   is not covered by other aspects of the CV that

17   has been produced?

18   A.    Okay.  So you don't want me to surprise

19   you with something like that.  So I should

20   think of conferences that I've gone to that

21   have educated me in areas that are not directly

22   in my core expertise.

23   Q.    And which you're relying on to support the

24   opinions that you've reached in this case.

25   A.    I can't think of anything like that right

1    now.

2    Q.   And maybe I can phrase it a little

3    differently.  It might be helpful, although the

4    answer may be the same.  Are you asserting in

5    this case -- and to support the opinions you've

6    reached in your report, are you asserting

7    expertise in any area that is not reflected on

8    the CV?

9    A.   No.

10   Q.   I probably could've saved us a few minutes

11   if I'd come with that phrasing of the question

12   earlier.  I appreciate you bearing with me.

13            (Exhibit Number 6 marked for

14   identification.)

15   BY MR. HEPPELL:

16   Q.   The court reporter has marked as

17   Exhibit 6, Kroll 6, three pages, single-sided,

18   of documents.  These are the documents that you

19   had your administrative assistant send over.

20   It is an invoice dated June 6th, 2017, a copy

21   of the W-9 form and an expert consulting fee

22   schedule.

23   A.   Thank you.

24   Q.   I've handed those to you.  Are we on the

25   same page about what those documents are?

1    A.   (Views document.)  Yes.

2    Q.   And is it your understanding based on the

3    request that you sent over to your

4    administrative assistant that these represent

5    additional documents related to your

6    compensation in this case that were transmitted

7    to defendants or defense counsel in this

8    matter?

9    A.   Yes.

10   Q.   And I noticed that the date on the W-9

11   form is in April of 2016.  And I know that W-9s

12   are frequently transmitted between individuals

13   who are invoicing people for their services.  I

14   just want to make sure I understand.  The date

15   on that W-9 is not significant in terms of the

16   date of your retention in this litigation --

17   A.   Correct.

18   Q.   -- is that fair to say?

19   A.   Fair to say.

20   Q.   Your practice would be to have a signed

21   W-9 and provide copies of it to people and only

22   update it if the form changed, for example?

23   A.   Or when a client fusses and says they want

24   one for the current year, then I will update

25   it.

1    Q.    Okay.  The date on the invoice for --

2    well, strike that.

3         The third page of that document is a copy

4    of the fee schedule that you provided to

5    defendants in this case, is that correct?

6    A.    Correct.

7    Q.    And again, the date on that fee schedule

8    is April 2017.  Is that date necessarily

9    significant in terms of indicating when you

10   would've been retained in this matter?

11   A.    No.

12   Q.    That would just be the date that you most

13   recently updated your fee schedule?

14   A.    Correct.

15   Q.    The first page in that packet, however,

16   that date is of significance in specific

17   relation to the Todero matter, is that correct?

18   A.    Yes.

19   Q.    And again, just because I don't have that

20   in front of me, that's June 6th, 2017, is that

21   correct?

22   A.    Yes.

23   Q.    Okay.  Thank you.  Based on your

24   recollection specific to this case and your

25   practices generally, are you able to state the

Transcript of Mark W. Kroll, Ph.D.
Conducted on September 13, 2018                120

1    relationship between that date and the date you

2    were retained in this matter?

3    A.   Yes.  And I would state that I was

4    retained somewhere between this date, June 6th,

5    2017, and the date I first had billable time,

6    which was October of 2017.

7    Q.   So just if I understand what I'm inferring

8    from that answer, your practice generally and

9    what it would've been in this case would -- to

10   issue an invoice to be paid a retainer to start

11   work on the case but to not actually start work

12   until you've received that retainer payment, is

13   that correct?

14   A.   That's generally true.  And it's hard to

15   start working without being provided with

16   evidence as well.

17   Q.   So you were not provided any materials in

18   relation to this case prior to that June 6th,

19   2017, date, is that correct?

20   A.   I believe that's correct.

21   Q.   And again, referring specifically to the

22   materials listed in your report that we were

23   discussing earlier, the case-specific

24   materials?

25   A.   Yes.

1    Q.   And so your best recollection in this case

2    is you were provided those materials sometime

3    between June 6th and the fall of 2017?

4    A.   Yes.

5    Q.   And I suppose it may have been several

6    batches of materials.  I don't know if you

7    received everything all at once.  But the

8    initial batch of case materials you received

9    sometime between June 6th of 2017 and that

10   October date, is that correct?

11   A.   Probably correct.

12   Q.   Do you have any reason to think that you

13   would've received that first batch before

14   June 6th, 2017?

15   A.   No.

16   Q.   How did you -- how were the materials

17   transmitted to you in this case?

18   A.   I can't recall specifically.  My normal

19   practice is to request a Dropbox link.

20   Q.   And if you had spent any time reviewing

21   those materials, that would be reflected on the

22   hourly breakdown of your time that was the

23   second page of the invoice that we had marked

24   as Exhibit 2, is that correct?

25   A.   Yes.

1    Q.   So, I guess, regardless of when you

2    received the materials, you didn't begin

3    reviewing them until that October 2017 date, is

4    that correct?

5    A.   That's a reasonable conclusion, yes.

6    Q.   If you had spent any significant amount of

7    time reviewing those materials, you would've

8    billed for that, correct?

9    A.   Yes.

10   Q.   Have you ever been sued, Dr. Kroll?

11   A.   I think indirectly, yes.  Details are kind

12   of foggy.  I don't -- yeah, I think once.

13   Q.   When you say "indirectly," what do you

14   mean by that?

15   A.   In 2005, the TASER company was attacked by

16   short sellers and they drove the stock down.

17   And then people then sued the company saying:

18   Well, you should have known the stock was going

19   down.  And it's my understanding there are

20   lawyers that specialize in suing companies, the

21   stock goes down.  And I think in one of those

22   lawsuits they named the directors personally.

23   I don't recall seeing any paperwork on it, but

24   it's my understanding that I was named on one

25   of those lawsuits.

1    Q.   And you were defended in that case by

2    attorneys retained and paid for by the TASER

3    corporation, is that your understanding?

4    A.   I have no idea if it was them or insurance

5    companies or whatever.  But it was -- it went

6    away.

7    Q.   Other than that one incident, any times

8    that you've been sued?

9    A.   No.

10   Q.   Have you ever brought a lawsuit against

11   anyone?

12   A.   No.  I take that back.  You want to count

13   small claims court?

14   Q.   Sure.

15   A.   When I was in high school, I worked at a

16   gas station, the guy didn't pay me, so I took

17   him to small claims court.

18             MR. STEPHENSON:  Did you win?

19             THE WITNESS:  No.  The guy was

20   pretty slick.  That's when I got a little quick

21   education on the law.  He told the small claims

22   magistrate:  Look, I'll just settle this with

23   this fine young man and we'll work it out.  And

24   I thought:  Okay.  I want to be reasonable.

25   The magistrate said:  Is that okay with you?

1    Fine.

2            We walked out in the hallway, and he

3    says:  Look, swing by my office next week, I'll

4    give you a check.  Of course the guy was smart.

5    And by the -- when I went there, I was beyond

6    the deadline for back wages in Minnesota.  Big

7    deal.  I mean, it was a lot of money to me back

8    then, but now that I look back on it, it was an

9    education.

10   BY MR. HEPPELL:

11   Q.   Beyond that experience, no other times you

12   can recall bringing a lawsuit against anyone?

13   A.   Correct.

14   Q.   Have you ever been subject to professional

15   discipline by any regulatory or licensing body

16   to which you've been subject?

17   A.   No.

18   Q.   Have you ever been disciplined by an

19   employer?

20   A.   How broad do you want to describe that?

21   Q.   I guess anything rising above the level of

22   a verbal warning.  Any written discipline in

23   connection with an employment position you've

24   held?

25   A.   No.

Transcript of Mark W. Kroll, Ph.D.
Conducted on September 13, 2018                          125

1    Q.   You're not a medical doctor, is that

2    correct, Dr. Kroll?

3    A.   Correct.

4    Q.   You don't have a medical degree?

5    A.   Correct.

6    Q.   You never attended medical school?

7    A.   Correct.

8    Q.   You never worked as a paramedic?

9    A.   Correct.

10   Q.   Or any type of emergency medical

11   technician?

12   A.   Correct.

13   Q.   Do you have any medical training

14   whatsoever?

15   A.   What do you mean by "medical" in that

16   case?  What's your definition of the word

17   "medical" in that case?

18   Q.   Any training relating to providing medical

19   treatment to human beings?

20   A.   Can you just define the word "medical"?

21   Because there's -- as a biomedical scientist,

22   there's a lot of overlap and it may not mean

23   much to a lawyer or layperson, but it's a

24   difficult differentiation in my line of work.

25   So if you can define the word "medical" and how

1    you mean to use it, then I can answer the

2    question.

3    Q.   Well, maybe I'll withdraw that question

4    and ask some other questions and see if we can

5    get on the same page.  Are you qualified to

6    treat human patients?

7    A.   That's not what we do as scientists.

8    I'm -- some physicians consider treatment to

9    include the publication of articles and

10   journals that physicians read to help with

11   treatment.  That would certainly be included

12   there.  But in general that's not what we do as

13   scientists.  I get involved maybe once a month

14   in advising a physician on treatment for a very

15   difficult case.

16   Q.   You stated it's your understanding that

17   some doctors consider publication of research

18   articles to be treatment?

19   A.   Yes.  Specifically Dr. Zipes.

20   Q.   Okay.  Other than Dr. Zipes, are you aware

21   of anyone who considers publication of articles

22   to be treatment?

23   A.   He's the only one that I've ever heard

24   state that.

25   Q.   Okay.  Do you consider publication of

1   articles to be treatment?

2   A.   I don't.

3   Q.   And outside of the publication of

4   articles, there's no activities that you do

5   engage in that anyone to your knowledge would

6   consider to be medical treatment, is that fair

7   to say?

8   A.   Outside of advising cardiologists in

9   difficult cases, which comes up about once a

10  month, no, that's not what we do.  We don't

11  touch patients.

12  Q.   And the nature of your advice that you

13  provide in those situations is not medical

14  advice, is that fair to say?

15  A.   Again, this is where it gets really

16  tricky, so I need your definition of "medical."

17  Q.   What is the advice that you give to

18  cardiologists in the situations you're

19  describing?

20  A.   Most common is they're putting in an

21  implantable defibrillator and it doesn't work

22  quite right for the patient, it's not

23  converting their cardiac arrests and they've

24  tried the normal tricks and they will contact

25  me and say:  Here's my patient, very difficult

1    patient, what do you recommend?

2    Q.   And in those situations you're not

3    providing any advice related to the disease

4    process, is that fair to say?

5    A.   Not the disease process, but the

6    treatment.

7    Q.   If I understood your testimony, the type

8    of advice that you provide is related to how

9    the device impacts the heart, is that fair to

10   say?

11   A.   How to implant the advice -- forgive me.

12   How to implant the device, maybe even a change

13   in drugs for a given patient, that comes up

14   sometimes, because some drugs hinder

15   defibrillation, some facilitate defibrillation.

16   But that would be the nature.  Where to put the

17   leads, maybe to move a lead inside the body so

18   it works better.

19   Q.   You're not qualified or authorized to

20   prescribe drugs, is that correct?

21   A.   That's correct.  I have no DEA license.

22   That's not what we do.  I work in electricity.

23   Drugs are kind of my competition, if you will.

24   Q.   And you don't have a background in

25   pharmacology, is that correct?

1    A.    Correct.

2    Q.    Okay.  You just have -- through your work

3    with medical devices, you've learned some

4    information related to the drugs that

5    specifically impact the functioning of the

6    medical device, is that fair to say?

7    A.    As far as my interaction in pharmacology,

8    that's certainly true.  I wonder if it goes

9    beyond that.  I certainly don't hold myself out

10   as an expert in toxicology and pharmacology.

11   That's not my line of work.  But probably

12   something else that comes to mind.  But you're

13   correctly describing the bulk of my advice that

14   I would give in regards to drugs.

15   Q.    Other than providing advice on the

16   functioning of the device and troubleshooting

17   issues related to the functioning of the device

18   and, I guess, including in that the potential

19   limited advice related to your view on drugs

20   that might be impacting the device functioning,

21   anything else beyond that that you think anyone

22   could consider to be medical treatment?

23   A.    That depends on what this hypothetical any

24   other person defines as medical.  Laypeople,

25   they hear about my work, they often -- the

1    first question they ask is:  Are you a doctor?

2    Because there's so much overlap between what we

3    biomedical scientists do.  So if you can define

4    "medical," we can move a lot faster.

5    Q.    Well, is there anything that you consider

6    to be medical treatment beyond what we've

7    described?

8    A.    Now you're going to rely on my definition

9    and I do not have a specific definition.  And

10   just to speed things up a little bit, there's a

11   lot of overlap between what biomedical

12   scientists do and what some physicians do.  So

13   you can't draw a bright line between them.  So

14   the term "medical" is not very useful to a

15   biomedical scientist.  If you have a definition

16   in mind when you ask the question, I would be

17   happy to work with that definition.

18   Q.    Well, if I understood your testimony, you

19   were describing some area of overlap with a

20   type of work that a medical doctor would

21   perform.  Did I understand you correctly?

22   A.    Just now in my previous answer?

23   Q.    Correct.

24   A.    There's a lot of overlap between what

25   biomedical scientists do and what medical

Transcript of Mark W. Kroll, Ph.D.
Conducted on September 13, 2018                    131

1    doctors do.  That's correct.

2    Q.    And in describing that overlap, you were

3    giving the example of you providing advice to a

4    medical doctor around the functioning of a

5    medical device related to the heart, correct?

6    A.    That's correct.

7    Q.    Is that the nature of the overlap that

8    exists between your work and the work of a

9    medical doctor?

10   A.    It goes much beyond that.  That's the --

11   you asked earlier for an example of when I'm

12   involved in treatment.  So that would be the

13   example, most common example of when I'm

14   involved in treatment.  But my research in

15   general has a lot of overlap with different

16   research physicians.

17   Q.    Are there other examples of your

18   involvement in treatment, or is that the extent

19   of your involvement in treatment of illness?

20   A.    That would be the vast majority of my

21   involvement, electrical medical devices,

22   electrical cardiac devices to be very specific,

23   like pacemakers, implantable defibrillators.

24   Q.    You are not qualified to diagnose

25   patients, is that correct?

Transcript of Mark W. Kroll, Ph.D.
Conducted on September 13, 2018                    132

```
1    A.   It would depend on the condition.  If it

2    involves electricity, I do it every day.

3    Q.   You diagnose patients every day?

4    A.   If it involves electricity -- well, maybe

5    that's a little bit of hyperbole.  But

6    certainly once a week involved as far as the

7    role of electricity, yes.

8    Q.   Who retains you or employs you to diagnose

9    patients?

10   A.   One of the most -- one common one is a

11   medical examiner who has a case involving an

12   electrical weapon and is actually

13   scientifically oriented and wants to reach out

14   for some advice and will reach out to me.

15   Q.   The situation of a medical examiner, that

16   would be an individual who is deceased, is that

17   correct?

18   A.   That's correct.

19   Q.   Okay.  And so maybe let me limit my

20   question to live patients.  Does anyone retain

21   you to diagnose live patients?

22   A.   If it involves electricity, yes.  Again,

23   we can go back to the situation of the

24   implantable defibrillator.  Let's simplify

25   things a little bit.  I'm not asked to diagnose
```

Transcript of Mark W. Kroll, Ph.D.
Conducted on September 13, 2018                    133

1    what disease somebody had.  That's not what we

2    do.  My work involves effects of electrical

3    shock; therapeutic and traumatic.  So anything

4    that I would be involved in would be after the

5    fact for diagnosis, like:  Why did this patient

6    die?  Why did this person have this electrical

7    injury?  I have a case right now hired by

8    plaintiffs or a guy that had a very strange

9    shock and it burnt up both arms but it did not

10   stop his heart.  They want me to diagnose what

11   happened.  So it varies.  But it all involves

12   around therapeutic and traumatic effects of

13   electrical shocks.

14   Q.    Would you agree with me that you don't

15   treat electrical injuries but you explain how

16   electricity injures the body?

17   A.    Well, you've got two parts to that

18   question.  Can I break it up?

19   Q.    Sure.

20   A.    Okay.  I do not treat electrical injury.

21   That's the easy one.  What it is that I give

22   advice and opinions on with regard to

23   electricity is almost any effect of electricity

24   on the human body from treating cancer

25   electrically to electrical burns to

Transcript of Mark W. Kroll, Ph.D.
Conducted on September 13, 2018                    134

1    electrocution to electrical therapies.

2    Q.    You don't have any training in medical

3    recordkeeping, is that correct?

4    A.    Correct.

5    Q.    Okay.  Have you ever created a medical

6    record?

7    A.    No.

8    Q.    You're not holding yourself out as an

9    expert in rhabdomyolysis, is that correct?

10   A.    Only to the extent of an electrical

11   involvement I am.

12   Q.    Can you point me to the sections of your

13   CV that set forth your qualifications that give

14   you expertise in that aspect of rhabdomyolysis?

15   A.    I have about a half a dozen papers that

16   deal with rhabdomyolysis presented in my

17   research.  I can't remember all of them.  The

18   most recent one is on page 91 at the very

19   bottom.  The first author is Kunz.  And the

20   title is Cardiac and Skeletal Muscle Effects of

21   Electrical Weapons:  A Review of Human and

22   Animal Studies.  There's at least another six

23   in there that mention in part or deal in part

24   with rhabdomyolysis and electrical

25   contributions.

1    Q.   And Kunz, Adamec and Calkins are your

2    coauthors on that publication, is that correct?

3    A.   Correct.

4    Q.   Are they all medical doctors?

5    A.   Kunz -- no.  Kunz and Calkins are.  Adamec

6    and me are scientists.

7    Q.   And the article that you just referred to

8    at the bottom of page 91, that's a literature

9    review, is that correct?

10   A.   There's also some meta-analysis in there.

11   Q.   Literature review and meta-analysis.  So

12   that's -- can you explain what meta-analysis

13   is?

14   A.   To improve on statistical power, we'll

15   take a number of studies that are similar and

16   average them.

17   Q.   And so in that publication in particular,

18   you, along with those three coauthors, reviewed

19   reports of studies that other individuals had

20   conducted and provided review and some

21   statistical analysis of those studies, is that

22   fair to say?

23   A.   That's fair to say.

24   Q.   Okay.  You mentioned that there were other

25   publications that you would point to as

1   providing the basis for the extent of your

2   expertise in the area of rhabdomyolysis, is

3   that correct?

4   A.   No.  What I said was expertise in the area

5   of electrically induced rhabdo.

6   Q.   I appreciate that clarification.  Do those

7   other studies all fall into that same type of

8   study or category of study as the one we were

9   just referring to in terms of it being a review

10  and meta-analysis of studies that others had

11  conducted?

12  A.   I'm not sure as I look here right now.

13  Q.   Have you ever conducted or been a coauthor

14  on a published study in the first instance

15  related to electrically induced rhabdomyolysis?

16  A.   On the topic of electrically induced

17  rhabdo, no.  We're working on a paper now with

18  some new data, but it hasn't been published

19  yet.

20  Q.   And when you say you're working on a paper

21  now with new data, is that data that you were

22  involving in generating?

23  A.   Involved in analyzing.

24  Q.   So analyzing, but not generating, is that

25  fair to say?

1   A.    That's correct.

2              THE WITNESS:  I need to take a quick

3   bio break.

4              MR. HEPPELL:  Yeah.

5              (Lunch break taken at 12:47 p.m.)

6         AFTERNOON SESSION, 1:26 p.m.

7   BY MR. HEPPELL:

8   Q.   Dr. Kroll, before we took a break, we had

9   been talking briefly about rhabdomyolysis and

10  specifically your contention that you had some

11  expertise in a particular area related to

12  rhabdomyolysis.  Do you recall generally the

13  topic we were talking about?

14  A.   Yes.

15  Q.   You don't have any expertise in the

16  physiological progression of rhabdomyolysis, is

17  that fair to say?

18  A.   Fair.

19  Q.   Okay.  You don't have any expertise in the

20  treatment of rhabdomyolysis?

21  A.   Correct.  That would be a nephrologist or

22  an emergency room physician.

23  Q.   You don't have any expertise in the

24  characteristics that makes someone more or less

25  susceptible to rhabdomyolysis?

Transcript of Mark W. Kroll, Ph.D.
Conducted on September 13, 2018                    138

1    A.   I'm not sure that there -- there are.  But

2    it's nothing that I have studied, so I don't

3    have an opinion on that.

4    Q.   And you've never diagnosed someone with

5    rhabdomyolysis, is that correct?

6    A.   Correct.

7    Q.   Or engaged in the treatment of an

8    individual suffering from rhabdomyolysis,

9    correct?

10   A.   No.  That would be an emergency physician

11   or a nephrologist.  That's a -- there are two

12   specialties that would do that.

13   Q.   But regardless of what specialties would

14   do that, that's not a specialty that you have,

15   correct?

16   A.   Correct.

17   Q.   You're not an expert in blood chemistry,

18   is that fair to say?

19   A.   Correct.  To the exclusion, of course, of

20   effects of electricity on blood chemistry.

21   Obviously that's part of my career study of

22   electrical injury.  But outside of that, that's

23   correct.

24   Q.   And I believe that you testified earlier,

25   but just so I'm clear, you're not an -- you

Transcript of Mark W. Kroll, Ph.D.
Conducted on September 13, 2018                    139

1    don't hold yourself out as an expert in

2    toxicology, is that correct?

3    A.   Correct.

4    Q.   Or as an expert in illicit drugs, illegal

5    drugs?

6    A.   That's correct.

7    Q.   And you don't hold yourself out

8    specifically as an expert on the effect of

9    illicit drugs on the human body?

10   A.   Outside of the interaction with

11   electricity, that's correct.  I mean, there's

12   some interesting interactions, for example,

13   with cocaine and electricity, and I would

14   consider myself one of the few authorities on

15   that.  But outside of that, no.

16   Q.   And I believe if I recall from your

17   report, what you're referring to is that an

18   individual under the influence of cocaine is

19   actually less susceptible to heart attack

20   induced by electrical current, is that correct?

21   A.   Well, it wouldn't be a heart attack.

22   Q.   Cardiac arrest?

23   A.   That's correct.  They're less susceptible

24   to electrical stimulation leading to

25   ventricular fibrillation.

Transcript of Mark W. Kroll, Ph.D.
Conducted on September 13, 2018                    140

1    Q.   And outside of that specific area of

2    expertise, you don't hold yourself out as an

3    expert on the effects of illicit drugs on the

4    human body, correct?

5    A.   Outside of the interaction with

6    electricity, that's correct.

7    Q.   And we had been talking before about the

8    basis in your CV for purported expertise in

9    rhabdomyolysis.  And you drew my attention

10   specifically to a study at the bottom of

11   page 91.  Do you recall that?

12   A.   Yes.

13   Q.   And then I believe you made reference to a

14   number of other articles along with that

15   specific recent one that you drew my attention

16   to, correct?

17   A.   Correct.

18   Q.   Do those other articles appear either as

19   publications listed on your CV or as references

20   listed on your expert report?

21   A.   Well, all -- yes, it would be in either

22   one.

23   Q.   So I'm -- without asking you to go to the

24   exercise of finding them, but I could look

25   through the publications listed in Exhibit 4

1   and I could find those that you're referring

2   to?

3   A.   Not necessarily.  You would have to look

4   at the actual papers because rhabdo may not be

5   in the title.  Some of these papers would be

6   covering several effects of electrical injury.

7   Q.   And, for example, the article that you

8   were referencing is titled Cardiac and Skeletal

9   Muscle Effects of Electrical Weapons?

10  A.   Well, that one is pretty -- that's pretty

11  easy because skeletal muscle effect, the

12  primary one would be rhabdo.

13  Q.   The other articles that you are

14  referencing as providing support for your

15  reference expertise in the area of

16  rhabdomyolysis, you think I may not be able to

17  identify by the titles?

18  A.   I don't think --

19  Q.   That would be potentially nonobvious?

20  A.   Correct.

21  Q.   Okay.  Well, then would you assist me in

22  identifying the particular publications you're

23  referring to then?

24  A.   That might be difficult.

25  Q.   And why do you say that?

Transcript of Mark W. Kroll, Ph.D.
Conducted on September 13, 2018                      142

1    A.   Well, because rhabdo is a relatively small
2    part of publications of electrical weapons
3    because that was dealt with ten years ago and
4    that's not -- no longer a concern of
5    authorities in the area.  So a typical paper
6    might look at ten potential complications of
7    electronic control and there would be a
8    paragraph that says:  Oh, by the way, see these
9    papers that have shown that you don't get
10   rhabdo from electronic control.  So it's not
11   going to be the major part of most papers.  I
12   do see one here on page 82 at the top.  And
13   that is Physiology and Pathology of TASER®
14   Electronic Control Devices.  That was an
15   invited review that I did for the Journal of
16   Forensic and Legal Medicine.  And I do recall
17   that that has little discussion on rhabdo.
18   Q.   There's no article that you've published
19   that has as its primary focus rhabdomyolysis,
20   is that fair to say?
21   A.   That's fair to say.
22   Q.   And you've conducted no studies -- and by
23   "study," I mean that involved in the direct
24   testing on hypotheses with live-study
25   participants.  You've conducted no studies

1    focused on rhabdomyolysis, is that correct?

2    A.   I have not personally.  That is -- that

3    would not be a fruitful field for research

4    because that issue was put to bed five, ten

5    years ago.

6    Q.   When you say it "was put to bed five, ten

7    years ago," what do you mean by that?

8    A.   There were a number of studies, including

9    one by the United States Department of Justice,

10   that looked at CK increase with electrical

11   weapon exposure and they found it was nothing

12   more than a trivial increase.

13   Q.   And are those studies cited in your expert

14   report?

15   A.   Yes.  And they are also meta-analyzed in

16   the Kunz paper of which I wrote 90 percent.

17   Q.   And that's the paper at the bottom of

18   page 91 that you're referring to --

19   A.   Yes.

20   Q.   -- the meta-analysis paper?

21   A.   Meta-analysis and review, correct.

22   Q.   Did any part of your academic training --

23   and by that I'm referring to the four degrees

24   that we went through earlier -- did any part of

25   that background or training relate to

1    rhabdomyolysis?

2    A.    Of course not.  Because when we go to

3    school, when we get our start, we learn the

4    basic science, we learn how does electricity

5    work, how do you do statistics, how do you

6    think logically.  And we don't focus on tiny

7    issues like that.

8    Q.    You're aware that exposure to electricity

9    can cause rhabdomyolysis, correct?

10   A.    Lightning strikes and power lines, yes.

11   Or there's a new experimental extreme body

12   conditioning technique out of Germany that

13   intentionally causes it.  That's not really in

14   the same universe as electrical weapons.

15   Q.    You've testified previously, correct, that

16   the type of electricity discharged by a TASER

17   could over time cause muscle breakdown that

18   could lead to rhabdomyolysis, is that correct?

19   A.    I don't recall saying that.  In fact, I

20   don't see that as being possible.

21   Q.    Well, do you recall being asked this

22   question in a deposition in the Heston case?

23        "Let me ask you this as kind of an

24   alternative to that question:  Is there a

25   buildup of the physiological effects as a

Transcript of Mark W. Kroll, Ph.D.
Conducted on September 13, 2018                    145

1    result of discharge of the TASER from prolonged

2    tasings or multiple tasings?  Answer:  It would

3    take hours.  But at a certain point, maybe

4    hours, days, there would be muscle proteins

5    building up that could lead to rhabdomyolysis."

6        Do you recall giving that testimony?

7    A.   Yes.  And now that you extended it to

8    days, that's plausible, and based on what we

9    knew back in 2007, I think was the year of that

10   depo, or 2008.

11   Q.   Do you --

12   A.   Was it 2007 or 2008?  It doesn't matter.

13   Q.   I don't recall.  I don't have that in

14   front of me.

15   A.   We did not have a lot of studies back

16   then.  Based on what we now know, I think

17   that's unlikely because you'd had this exposure

18   over, say, days, the body is able to handle

19   that CK, and so you would not ever see it

20   getting up to, say, a CK level of a thousand,

21   which might be diagnostic of rhabdo, or, say,

22   10,000 where it starts to become a

23   physiological concern.

24   Q.   But again, you don't have an expertise in

25   the physiological progression of

Transcript of Mark W. Kroll, Ph.D.
Conducted on September 13, 2018                    146

1    rhabdomyolysis, is that correct?

2    A.   I do not have an expertise in that outside

3    of what is known to anybody that looks at the

4    literature, which is that it takes about three

5    days to peak -- two to three days to peak.  And

6    I'm very familiar with the literature on

7    electrical connections between stimulation or

8    electrical injury and rhabdo.

9    Q.   And you agree that exposure to a TASER can

10   cause an increase in CK levels, correct?

11   A.   Nothing material.  It's trivial.  It's

12   hard to tell within the noise of just the

13   exercise that people are doing and between

14   measurements in these studies.  It's probably

15   equivalent to running up two flights of stairs

16   or doing 20 pushups.

17   Q.   You would agree with me that the studies

18   in that area show wide variance between

19   individuals in terms of the levels of CK

20   increase that an individual study participant

21   experienced, correct?

22   A.   They do until you understand how those

23   studies are done.  In which case you see that

24   those differences are basically swamped by the

25   exercise.  And so those studies are done with

1    officers going in for training.  And as part of

2    their training, which is typically two days a

3    year or maybe twice a year, officers will be

4    learning the latest control holds, et cetera,

5    they would get their electrical weapon exposure

6    as part of their training.  And their blood is

7    measured before, after.  And then they go on

8    and do whatever training they're supposed to do

9    that day and they get their blood measured the

10   next day.  Because you'd like to give 24 hours

11   to at least show some minor increase in the CK.

12   And what happens is these officers go into

13   extreme workout because they feel like it or

14   it's part of their training.  And so you do get

15   some fliers.  Some of these guys have a

16   significant increase in CK.  That's what's

17   considered to be the explanation for some of

18   these increases, but none of them are at

19   dangerous levels.

20   Q.   None of those studies concluded that the

21   CK was caused by the exercise and not by the

22   CEW, correct?

23   A.   It's correct that that was not part of the

24   conclusion.  But if you read the discussion

25   section, they weren't about this problem.

1    That's also brought up in the Kunz article,

2    that this is a major confounding issue.

3    Q.    So it's a limitation that the authors of

4    those studies recognized?

5    A.    Correct.

6    Q.    And recognizing those limitations, that

7    didn't change the conclusions that the authors

8    of those studies reached about CK level

9    increases resulting from the CEW exposure, is

10   that correct?

11   A.    I don't have those in front of me.  But

12   yes, there is a trivial increase similar to

13   that's seen with exercise.  And that's well

14   established.

15   Q.    You testified earlier that you don't have

16   any expertise or knowledge about whether or not

17   certain individuals maybe have heightened

18   sensitivity to CK rises or be particularly

19   sensitive or susceptible to rhabdomyolysis,

20   correct?

21   A.    I don't.  And I would add that I'm not

22   sure anybody does.  I'm not sure that there is

23   any supporting literature on that, that people

24   are sensitive to rhabdo.  Certainly not for

25   electrical stimulation.  And I know the

Transcript of Mark W. Kroll, Ph.D.
Conducted on September 13, 2018                    149

1   literature on electrical injury about as well
2   as anybody.  And I don't believe that's ever
3   been published where somebody suggested that
4   somebody was allergic to electricity so they
5   were able to get rhabdo to a minor electrical
6   stimulation when others didn't.
7   Q.   Do you hold yourself as an expert in the
8   syndrome described as excited delirium?
9   A.   I'm not offering an opinion on excited
10  delirium in this case.  I did comment on it in
11  the section where I discussed Dr. Rashtian's
12  first opinion only because he appeared to base
13  his first opinion on an anecdote of somebody
14  that received the electronic control and
15  developed rhabdo.  When I read that anecdote, I
16  saw that this patient was in excited delirium,
17  so I felt it would be helpful to share some
18  papers that show the linkage between excited
19  delirium and rhabdo.
20  Q.   What's your understanding of the
21  definition of excited delirium?
22  A.   That continues to evolve.  I've written
23  the largest checklist on that with 22 items.
24  But the basic definition is someone that is
25  delirious, in other words, they have altered

Transcript of Mark W. Kroll, Ph.D.
Conducted on September 13, 2018                    150

1   view of reality as well as inability to

2   communicate with a human being.  And then they

3   are excited or agitated, which makes them

4   hyperactive and aggressive.  That would be the

5   classic definition from the original two words.

6   As research has improved in this area, starting

7   to find more and more diagnostic elements to

8   better define it diagnostically.  But as far as

9   what the words mean, I think I've explained

10  that.

11  Q.   Based on your understanding of the

12  developments in that area, the more recent

13  understanding goes beyond just those two

14  components, the delirium and agitation and

15  excitement, is that fair to say?

16  A.   Well, forgive me for confusing the

17  definition versus diagnosis, okay?  So do you

18  want the diagnosis or the definition?

19  Q.   Well, why don't you -- can you explain the

20  difference for me and then offer what you mean

21  by each of those?

22  A.   Well, the simple analogy is -- you know

23  what a heart attack is, right?  It's death of

24  heart muscle from loss of blood.  The diagnosis

25  is different.  There's certain signs and

1    symptoms that you look for.  Same thing with

2    excited delirium.

3    Q.    But you're not offering an opinion one way

4    or the other in your written report about

5    whether Mr. Todero was suffering from excited

6    delirium, correct?

7    A.    Correct.

8    Q.    Going back to the issue of CK and, I

9    guess, putting aside the issue of whether some

10   people are more susceptible to CK increases

11   because of CEWs, you agree that some people

12   have a higher baseline CK level than others, is

13   that correct?

14   A.    Certainly.  Especially if they've been

15   working out.

16   Q.    Some people are much more sensitive to

17   exercise, i.e., muscle contraction, through

18   resistance exercise in terms of the increase in

19   CK levels?

20   A.    That's getting beyond my area of expertise

21   if we take electricity out of it.

22   Q.    So you don't have an opinion one way or

23   the other on that?

24   A.    I do not have an opinion on that.

25   Q.    You're not an expert in police practices,

1    correct?

2    A.    Correct.  Outside of these -- knowing

3    these statistics on the risks and benefits of

4    using electrical weapon versus batons or OC

5    spray.

6    Q.    So you're familiar with those statistics?

7    A.    Yes.

8    Q.    But beyond that familiarity, not an area

9    of your expertise, fair to say?

10   A.    Fair to say.

11   Q.    You don't have any police training?

12   A.    Correct.

13   Q.    You've never served in any law enforcement

14   capacity?

15   A.    Correct.

16   Q.    You served as a trainer for law

17   enforcement?

18   A.    No.

19   Q.    You have no expertise in how police

20   internal investigations work, correct?

21   A.    Correct.

22   Q.    And again, I guess other than your

23   familiarity with the statistics you just

24   described, you have no expertise in different

25   use-of-force tactics, is that fair to say?

Transcript of Mark W. Kroll, Ph.D.
Conducted on September 13, 2018                    153

1    A.   That's a little tougher to opine on.  I

2    mean, if the test is can I offer helpful

3    understanding to a jury, yes, because I know

4    those techniques better than the average juror

5    would.  But I wouldn't say that I would know

6    them half as well as a professional police

7    trainer.

8    Q.   Do you consider yourself qualified to

9    offer an opinion about police use-of-force

10   tactics other than the TASER?

11   A.   No.

12   Q.   And you've never personally arrested

13   anyone, correct?

14   A.   Ironically, I have.

15   Q.   Tell me about the time that you've

16   arrested someone.

17   A.   I did a citizen's arrest on this kid.

18   That's it.  Just a trouble-making kid at a

19   shopping center.

20   Q.   When did you conduct a citizen's arrest on

21   a kid at the shopping center?

22   A.   Early '90s.

23   Q.   Was there a use of force in connection

24   with that citizen's arrest?

25   A.   No.  He got pretty compliant when I put my

Transcript of Mark W. Kroll, Ph.D.
Conducted on September 13, 2018                    154

1    hand on his elbow.

2    Q.   And why did you engage in a citizen's

3    arrest at the shopping center in the early

4    '90s?

5    A.   I was irritated that this kid was

6    urinating by the main entrance of this big

7    shopping center and I nicely told him where the

8    bathrooms were and he mouthed off.

9    Q.   Did you call the police?

10   A.   I told somebody inside the shopping

11   center, which happened to be a fast food

12   restaurant, to call the police.

13   Q.   Did you stay there until the police

14   arrived?

15   A.   I did.

16   Q.   What was the end result of that

17   interaction to your knowledge?

18   A.   The end result was that I got a little

19   lesson on the law, found out that at that time

20   public urination was not illegal in Minnesota.

21   Q.   Interesting.

22           MR. STEPHENSON:  Is it now?

23           THE WITNESS:  I think it is now.

24           MS. POLLACK:  Where is it not

25   illegal?

Transcript of Mark W. Kroll, Ph.D.
Conducted on September 13, 2018                    155

```
1              THE WITNESS:  Don't know.
2    BY MR. HEPPELL:
3    Q.   Understanding that you're not certain, I
4    won't rely on any legal advice you're giving on
5    the current state of law in that regard.
6    A.   They did arrest the guy because he was a
7    known troublemaker and they wanted to -- they
8    found some grounds to arrest him and take him
9    into custody after I did the citizen's arrest.
10   Q.   Outside of that unusual incident, you've
11   never arrested anyone, fair to say?
12   A.   I think that's fair to say.
13   Q.   Okay.  We marked earlier in the deposition
14   Exhibit 1, which is your written report in this
15   case, correct?
16   A.   Yes.
17   Q.   There is no opinion contained in this
18   report regarding whether the force used on
19   Mr. Todero was excessive, is that fair to say?
20   A.   Fair to say.
21   Q.   And there's no opinion contained within
22   this written report about what caused
23   Mr. Todero's death, is that fair to say?
24   A.   Outside of the exclusion of the electrical
25   weapon, correct.
```

1    Q.   And there's no opinion contained in this

2    written report on whether Mr. Todero was under

3    the influence of any drugs or other illicit

4    substances on the date of the Todero incident?

5    A.   I'm not expressing opinion on that.  But

6    since Dr. Rashtian made the curious assertion

7    that there was no other possible explanation

8    for the rhabdo, I felt obliged to point out

9    that the medical records mentioned suspected

10   Spice use in a few places.  And I provided a

11   few papers that link Spice to rhabdo.

12   Q.   There's no opinion in here one way or the

13   other on whether or not Mr. Todero was under

14   the influence on May 29th, 2016, correct?

15   A.   Correct.

16   Q.   And there's no opinion contained within

17   this report, Exhibit 1, on the adequacy of any

18   policies or practices of the Greenwood Police

19   Department, is that correct?

20   A.   Correct.

21   Q.   There's no opinion contained in this

22   report on the state of Mr. Todero's health at

23   any point prior to May 29th, 2016, is that

24   correct?

25   A.   Correct.

Transcript of Mark W. Kroll, Ph.D.
Conducted on September 13, 2018                    157

1    Q.   And you have no opinion contained in this

2    written report on what Mr. Todero's medical

3    prognosis would've been if he had not

4    encountered Greenwood police on May 29th, 2016?

5    A.   Correct.

6    Q.   And you have no opinion contained in this

7    written report on what Mr. Todero's life

8    expectancy would've been if he had not

9    encountered Greenwood police May 29th, 2016,

10   correct?

11   A.   Correct.

12   Q.   You have no opinion contained in this

13   written report on the value of Mr. Todero's

14   life, correct?

15   A.   Correct.

16   Q.   You don't have any opinion contained

17   within this written report on the credibility

18   of any witness in the case, is that correct?

19   A.   I don't recall discussing credibility.  I

20   think my role as an expert is to take the most

21   reasonable view of the facts and try to explain

22   them.  But since you're bringing it up now, I

23   would add that the -- for example, Lieutenant

24   Blackwell's description of the events and

25   sequence comports quite accurately with the

1   available evidence that I was able to evaluate.

2   And similar with Officers Elliott and Laut,

3   that's consistent with my understanding of the

4   facts that I've seen so far -- of the evidence,

5   I should say.  They appear to be credible to

6   me, but that really wasn't a key determination

7   I had to make because everything fit together

8   quite nicely.

9   Q.   Is there an opinion contained in this

10  written report about whether any of the police

11  actions taken in this incident were appropriate

12  or not?

13  A.   Well, I just mentioned on the top of

14  page 9 that peer-reviewed literature shows that

15  the use of electronic control reduces injury

16  rates by, like, two-thirds.  I should add they

17  also reduce death rate by two-thirds compared

18  to other uses of force.  I'm not sure if that's

19  an opinion or just stating what the

20  peer-reviewed literature shows.  But I guess

21  you could extend that to say -- suggest that

22  Lieutenant Blackwell used the right tool, but

23  that's not really controversial these days.

24  Q.   Well, that's not what I -- as I read the

25  statement in your report, it was a recitation

1   of statistics and citation to the source of

2   those statistics.  And, in fact, it's contained

3   within the section of your report entitled

4   Brief Summary of Important Background Facts and

5   not under the heading where you purport to list

6   your opinions.  But are you extending it to say

7   that you consider that Lieutenant Blackwell

8   used force -- used the appropriate tool under

9   these circumstances?

10  A.   I clearly did because that's the safest

11  alternative for controlling someone.  And that

12  is supported by the peer-reviewed literature.

13  Q.   Is it your testimony that that's the case

14  regardless of the particularized circumstances,

15  that the TASER is better than alternative uses

16  of force?

17  A.   Not in all cases.  We've got the classic

18  examples of someone that has doused themselves

19  in gasoline or someone that is standing on a

20  high ledge so they could die from the fall.

21  There are exceptions.

22  Q.   And the literature that you cite here, the

23  peer-reviewed literature about the reduction in

24  injury rates, that's not written by peers in

25  your field, is that correct?

1    A.    Well, these are not researchers in

2    bioelectricity, but they are researchers in

3    sociology, criminology and use of force.  And

4    since I am heavily immersed in that area, I

5    would say that I would consider them somewhat

6    peers because I publish a lot on the use of

7    force with the use of electrical weapons; to

8    that extent they're peers.

9    Q.    Beyond being immersed in reading in that

10   area, you have no expertise in the areas of

11   sociology, criminology and use of force, is

12   that correct?

13   A.    I would -- I was going to agree with you

14   up until you hit "use of force."  There's

15   probably no one that has published more papers

16   on the risks of use of force as it applies to

17   electrical weapons, certainly.

18   Q.    Outside of electrical weapons, if I take

19   that out of the equation, would you agree with

20   me?

21   A.    I would have agreed two years ago.  But

22   because the issue of prone restraint is now

23   being used as a substitute causation argument

24   for arrest-related deaths, I have done original

25   research, published my first paper with a

Transcript of Mark W. Kroll, Ph.D.
Conducted on September 13, 2018                    161

1    second paper under review now on the issue of

2    how much weight somebody can handle on their

3    back if they are prone.  So I expect when my

4    second paper is accepted and published, I

5    will -- would be considered an expert in that

6    particular issue of biomedicine, which is prone

7    restraint.  It really is not an issue here

8    because no one is arguing something like, you

9    know, a prone restraint death, but that would

10   be the other narrow little niche.

11   Q.   And just so I'm clear and maybe so we're

12   not talking past each other, you have no

13   expertise in how police officers should select

14   a particular use of force tactic, is that fair

15   to say?

16   A.   Largely because I don't have training in

17   the other uses of force such as the -- well,

18   frankly, what we now consider obsolete, OC

19   spray and batons, et cetera, but to the extent

20   that I understand how electrical weapons fit in

21   there, I have some expertise.

22   Q.   You don't have an expertise in those

23   alternatives that you were discussing, correct?

24   A.   That's correct.

25   Q.   You consider OC spray and batons to be

Transcript of Mark W. Kroll, Ph.D.
Conducted on September 13, 2018                    162

1    obsolete?

2    A.    That's what the peer-reviewed literature

3    says.  And if you look at the belts of the

4    police officers on the street, you would

5    realize that very quickly.

6    Q.    But you're aware that Greenwood police

7    officers were equipped with at least some of

8    those weapons, is that correct?

9    A.    I don't recall right now what they all

10   had, what they carried on them.

11   Q.    It wouldn't surprise you if you learned

12   that they were equipped with one or more of

13   those weapons in 2016?

14   A.    I wouldn't be surprised if they were

15   equipped with one.  And I shouldn't speculate

16   because I don't recall what the answers were to

17   that question in the depositions.  But those

18   weapons are rapidly falling out of favor.

19   They're generally left in the squad car now.

20   Q.    If I were to represent to you that the

21   use-of-force policy of the Greenwood Police

22   Department that was in effect on the date of

23   the Todero incident stated that officers

24   assigned to the uniformed division shall be

25   required to carry at least two less-than-lethal

1    weapons from the following list, TASER, OC

2    spray and expandable baton, would it be your

3    opinion that the use-of-force policy of the

4    Greenwood Police Department was directing its

5    officers to carry at least one weapon that you

6    consider to be obsolete?

7    A.    I don't comment on use-of-force policies.

8    I have -- I do not hold myself out as an expert

9    in use-of-force policies.  But since you

10   brought it up, I will venture to say that

11   clubbing people into submission is considered

12   obsolete today and it is rarely, rarely

13   witnessed.

14   Q.    But not using the TASER to get them to

15   submit?

16   A.    Correct.  That is the preferred use of

17   force now, nonlethal use of force.

18   Q.    Do you disagree with the Greenwood Police

19   Department's description of the TASER as a

20   less-than-lethal weapon?

21   A.    That's minor semantics.  They're using the

22   British term instead of the American term.  And

23   we can all enjoy the humor of British versus

24   American English.  It's a distinction without a

25   difference.

Transcript of Mark W. Kroll, Ph.D.
Conducted on September 13, 2018                          164

```
1    Q.   Can I get you to turn to page 8 of the

2    report.  You offer a -- what's described here

3    as a brief summary of your case-specific

4    opinions.  And then you list them numbered 1

5    through 9.  Do you see what I'm referring to?

6    A.   I do.

7    Q.   The first item on this list is two

8    sentences.  The first sentence states, "The

9    bottom probe was lodged in Mr. Todero's shirt

10   and generally not in close contact to his skin.

11   And then the second sentence, "Hence, there was

12   no completed circuit to deliver pulses of

13   current to him."

14   A.   I'm there.

15   Q.   I just want to understand what you're

16   intending to articulate here in terms of your

17   opinions.  Is it your opinion that the bottom

18   probe was lodged in Mr. Todero's shirt and not

19   in close contact to the skin, or is that just a

20   statement of your understanding of the factual

21   record of the case and it's your opinion on

22   those facts that there was no completed

23   circuit?

24   A.   They're both true.  I mean, the facts are

25   very clear and I enumerate them on page 25.  So
```

1    that's the facts.  And it's also my opinion.

2    Q.   In reaching -- strike that.

3         We talked earlier about electrocution.

4    And I may not remember the exact definition we

5    were using, but it was something along the

6    lines of death caused by electrical injury.  Am

7    I --

8    A.   Electricity.  Death caused by electricity.

9    Q.   Death caused by electricity.  And you

10   devote a section of your report to discussing

11   the particular mechanism of death caused by

12   electricity, which is hypothesized in some

13   cases involving, and again, I may not be using

14   the precise terminology, but cardiac capture

15   where the probes cause direct electrical

16   stimulation which disrupts the rhythm of the

17   heart leading to cardiac arrest?

18   A.   That's mostly true.  Cardiac capture is

19   basically irrelevant.  That's a healthy thing.

20   That's what pacemakers do.  The way that

21   low-level currents sufficient to electrocute,

22   kill by gradually -- and gradually means it all

23   happens in about a second -- increasing

24   repolarization, heterogeneity in the heart.

25   The capture thing is something that came out of

Transcript of Mark W. Kroll, Ph.D.
Conducted on September 13, 2018                    166

1    some litigation and it's not quite right.  But

2    it doesn't really matter.  You had it

3    90 percent right.  That's how low-power

4    electrocution works.  Electrical current

5    reaches the heart sufficient to cause

6    ventricular fibrillation.  That's low-power

7    electrocution.  And I'm complaining it's a

8    low-power electrocution.  High-power

9    electrocution like a lightning strike or power

10   line injury can cause a delayed death.  And so

11   that's separate.

12   Q.   I want to make sure that I understand your

13   opinion correctly.  Would you agree with me

14   based on the materials you reviewed in the

15   case, there's no contention being made that

16   Mr. Todero died as a result of the mechanism

17   you just described with the electricity

18   discharged by the TASER disturbing the

19   electrical rhythm of his heart and causing his

20   heart to stop, is that fair to say?

21   A.   Fair.

22   Q.   Okay.  And that is the -- pages 12 to 13

23   of your report, that's where you discuss that

24   mechanism, correct?

25   A.   Correct.

Transcript of Mark W. Kroll, Ph.D.
Conducted on September 13, 2018                    167

1    Q.    And as I understood your report, the fact

2    that Mr. Todero was breathing for 18 minutes or

3    more after the TASER was discharged per se

4    eliminated this mechanism of death?

5    A.    Correct.  Or I could expand.  It

6    eliminates low-power electrocution as a cause

7    of death.

8    Q.    And is that because in your view the only

9    mechanism of death that is possible to cause it

10   by low-power electrocution is this mechanism of

11   death?

12   A.    Well, it's not my view.  That's 140 years

13   of electrical injury or electrocution research.

14   We know exactly how electricity kills.  And I

15   sit on the top international committees that

16   set these limits, et cetera.  So that's really

17   not a squishy area at all.

18   Q.    Again, just to be clear, I'm not asking

19   you to reiterate your qualifications.  We've

20   talked about that.  But in your opinion, that

21   is the only possible mechanism of death caused

22   by low-power electricity exposure?

23   A.    That's correct.

24   Q.    And so when you give the opinion, for

25   example, on page 3 that Mr. Todero was

1    breathing for over 18 minutes after the brief

2    CEW current delivery and this per se eliminates

3    electrocution as a cause of death, it's your

4    opinion for the reasons you describe on page 12

5    and 13, it eliminates that mechanism of death

6    and it's your opinion that there are no other

7    low-power electricity cause mechanisms of death

8    so therefore it eliminates it entirely,

9    electrocution?

10   A.    That's right.  There's no other known

11   mechanisms for low-power electrocution.  And I

12   fully appreciate that Dr. Rashtian believes he

13   has found the first case, but that's not

14   supported in the literature.

15   Q.    Going back to your opinion about the

16   bottom probe, you're aware that there's a

17   disputed fact in this case about whether that

18   second probe lodged, is that correct?

19   A.    Would you refresh me as to the basis of

20   that dispute?

21   Q.    Well, as you sit here today, you're not

22   aware one way or the other about whether

23   there's a disputed fact related to that issue?

24   A.    Are you telling me that there is an expert

25   that argues that both probes made contact, or

1    that there's a witness that thought that the

2    bottom probe was lodged in his body?

3    Q.   I'm asking you whether as you sit here

4    today based on your review of the materials you

5    can recall whether or not there's a disputed

6    fact about whether that bottom probe lodged?

7    A.   I do recall somebody in some of the

8    material arguing that the bottom probe made

9    contact, but there are five separate pieces of

10   evidence that show that it did so.  I did not

11   spend a lot of time on that.

12   Q.   Can you point me to where in your report

13   you set forth those five different pieces of

14   evidence that the probe did not lodge?

15   A.   Page 25.

16   Q.   You state in your report that the duration

17   of electricity is irrelevant because

18   electricity doesn't build up like poison in the

19   body.  Do you recall offering that statement

20   along those lines in your report?

21   A.   I do.

22   Q.   And that applies, as you described it, to

23   the mechanism of death that you discuss on

24   page 12 and 13 of your report, correct?

25   A.   Certainly it applies to low-power

Transcript of Mark W. Kroll, Ph.D.
Conducted on September 13, 2018                    170

1    electrocution and induction of VF.  That's

2    certainly correct.

3    Q.    And I recognize that you dispute whether

4    Dr. Rashtian's opinion on a mechanism of death

5    is valid.  I understand that.

6    A.    Are you talking about his first opinion or

7    second opinion?

8    Q.    Well, I'm talking about the opinion that

9    you reviewed and commented on in your expert

10   report.

11   A.    Okay.  That would be his first opinion.

12   Q.    Accepting if -- I'm going to ask you to

13   accept the hypothetical that that was a valid

14   mechanism of death from low-power

15   electrocution.  Do you understand the

16   hypothetical that I'm providing?

17   A.    Well, you're asking me to accept something

18   as a hypothetical, something that's not

19   unscientific.  So it's not really a

20   hypothetical.  It's a false premise.

21   Q.    Well, be that as it may, accepting what

22   I'm describing, would you agree with me that if

23   that mechanism by which the discharge of

24   electricity into a human body could lead to

25   death, the duration of the electrical discharge

Transcript of Mark W. Kroll, Ph.D.
Conducted on September 13, 2018                    171

1    would be relevant under that mechanism as

2    Dr. Rashtian describes it?

3    A.   Partly.  It could lead to increases in CK.

4    But we know from the German research with the

5    Bodytec stimulator where they intentionally

6    caused rhabdo and they get an average CK up in

7    the 30,000 range without any drugs on board,

8    without any Spice, et cetera, none of those

9    people ever died.  So ultimately it ends up

10   being irrelevant.

11   Q.   But again, you're not an expert on how or

12   why someone dies or doesn't die from

13   rhabdomyolysis, correct?

14   A.   When you say "rhabdo" -- I'm trying to

15   differentiate lethal complications of rhabdo

16   from a high CK.  And you asked originally about

17   the importance of duration of current flow,

18   would that support this hypothetical curious

19   new theory of Dr. Rashtian's.  And I said it's

20   partially true because under this alternative

21   universe longer the duration of extreme current

22   flow, you would expect the higher level of CK.

23   However, this exact issue has been published on

24   by the Germans because they've done this

25   extreme body stimulation in every muscle in the

1    body for 20 minutes, not 20 seconds.  They get

2    the CK up to 30,000 intentionally to cause

3    muscle damage to build new muscle.  Nobody's

4    died.

5    Q.   This study that you're referencing that

6    the Germans did, is that a reference cited in

7    your report?

8    A.   It is not because I was not -- I didn't

9    find a need to go there at that time.  It came

10   up in Dr. Rashtian's deposition.  And that's

11   why I researched that area.

12   Q.   You would agree with me that in the Dawes

13   study that you do cite, that that study found

14   that additional sites of current exposure from

15   a TASER device would increase CK levels as

16   well, correct?

17   A.   It should because you're stimulating more

18   muscle.  But again, we're talking about nickels

19   and dimes.  We're not talking about 30,000.

20   We're talking about 100 versus 200, something

21   in the realm of exercise.

22   Q.   You offer an opinion in your report

23   related to the total duration of electricity

24   that Mr. Todero was actually exposed to, is

25   that correct?

Transcript of Mark W. Kroll, Ph.D.
Conducted on September 13, 2018                    173

1    A.    That's correct.

2    Q.    That starts at page 15 of your report, is

3    that correct?

4    A.    Well, the analysis on page 30 and 15 I

5    start discussing some of the reasons for

6    confusion among nonspecialists.  I thought that

7    would be helpful.  But my actual analysis is on

8    page 30.  There is a little bit of discussion

9    in the middle of page 20.

10   Q.    At the top of page 15 you state that the

11   total time given by the download, and that's

12   referring to that Evidence Sync download from

13   the TASER device, correct?

14   A.    Correct.

15   Q.    "The total time given by the download is

16   typically two to three times what the actual

17   total duration of current delivery was."

18         You don't include a citation for that in

19   your report, is that correct?

20   A.    That's correct.  That's based on my

21   experience analyzing about a thousand of these

22   cases.

23   Q.    And if I were to look through the

24   references contained in this report, that would

25   not be -- I wouldn't find that statistic

Transcript of Mark W. Kroll, Ph.D.
Conducted on September 13, 2018                    174

1    anywhere in these 289 references, is that

2    correct?

3    A.    Actually you would.  I published one of

4    these through ResearchGate.  Reference 30,

5    reference 32, reference 42.

6    Q.    And when you say "I've published one of

7    these" or some of these, what are you referring

8    to?

9    A.    Those citations right there.  That's one

10   of the modern ways of publishing.  We put it up

11   on ResearchGate so all your colleagues can see

12   it and other interested parties and you invite

13   peer review.  So it's posted immediately.  And

14   then you have public peer review.  It's a

15   little different from the conventional process

16   that I grew up with, but it's faster.

17   Q.    And I have no issue with publishing on

18   ResearchGate.  My question is exactly how these

19   references that you're discussing, the

20   ResearchGate references relate to the uncited

21   statement in your report that the total time

22   given by the Evidence Sync download is

23   typically two to three times the actual

24   duration of current.

25   A.    I think I mentioned that in one of these

Transcript of Mark W. Kroll, Ph.D.
Conducted on September 13, 2018                    175

1    ResearchGate articles.  And it's come out of

2    analyzing the thousand cases.  I'm happy to

3    elaborate how we arrived at that.

4    Q.   Well, I'm not going to ask you that at

5    this time.  But just to clarify, what I would

6    find in the ResearchGate articles is you

7    repeating that assertion, I wouldn't find in

8    those articles a study where you set forth how

9    you reached that number, is that correct?

10   A.   You would probably find both.

11   Q.   Which of the ResearchGate publications

12   could I look to to find how you arrived at that

13   two to three times conclusion?

14   A.   I would look at all three of the ones I

15   mentioned.  It's very easy now because now

16   police officers have these cameras.  So we know

17   exactly what happens.  And the newer weapons

18   that have been made since about the last five

19   years record every single pulse that comes out.

20   So you know exactly how much current is

21   delivered.  And so we can match these up.  We

22   can see a TASER download.  We can look at the

23   camera evidence.  And we can look at the

24   detailed data, which is called a pulse graph.

25   And you can see exactly how these work.  That's

Transcript of Mark W. Kroll, Ph.D.
Conducted on September 13, 2018                176

1    how we know, specialists in the field know how

2    to interpret this download and estimate exactly

3    how many seconds were actually delivered.

4    Q.   The process you just described is not

5    possible in this case, correct?

6    A.   We don't have probes to analyze.  We don't

7    have a camera.  And we don't have that new

8    weapon.  Right.  But we've used that

9    information from these other cases and learned

10   very useful rules of thumb to derive accurate

11   good-faith estimates that I applied here.

12   Q.   And all of the factors that you discuss in

13   this section of your report, I guess, other

14   than the fact that the TASER CEW rounds up to

15   the next second, which is an inherent feature

16   in the device, but other than that one factor,

17   all the other factors are situation-specific,

18   correct?

19   A.   No.

20   Q.   Which of the other factors would you not

21   consider to be situation-specific?

22   A.   All of them rely on a given situation, but

23   that's not a situation unique to this case is

24   what I meant to say.  For example, we know that

25   at two seconds with a drive-stun -- and we

Transcript of Mark W. Kroll, Ph.D.
Conducted on September 13, 2018                    177

1    don't have any drive-stun marks, so we know

2    that none of the drive-stuns at a given

3    location are more than two seconds.

4    Q.   When you say "we don't have any drive-stun

5    marks," the only piece of evidence you cite in

6    your report for concluding that there were no

7    drive-stun marks left on Mr. Todero was the

8    fact that there was -- there were no drive-stun

9    marks commented on in the medical records, is

10   that correct?

11   A.   That's correct.  But I could go into

12   detail on how every one of these numbers is

13   supported scientifically.

14   Q.   I have many questions for you related to

15   those numbers.  It's probably going to be

16   easier for us if you let me go through my

17   questions rather than --

18            THE WITNESS:  Can I have a bio break

19   before we dig into that?

20            MR. HEPPELL:  Sure.  Let's take a

21   quick break.

22            (Recess.)

23   BY MR. HEPPELL:

24   Q.   Dr. Kroll, before we took a break, we were

25   looking at the opinions in your report, the

1    portion of your report dealing with the -- your

2    analysis of the reasons why in your opinion the

3    total duration of electricity that actually

4    entered Mr. Todero's body was significantly

5    less than the total duration of the trigger

6    pull reflected on the download report, correct?

7    A.    Correct.

8    Q.    We talked earlier about your view that

9    typically the amount of electricity actually

10   discharged into the body of the subject is two

11   to three times lower than the total time given

12   by the download?

13   A.    Yes.  And that's a rough rule of thumb.

14   Because you typically have 20, 30 seconds of

15   trigger pull and the amount of current delivery

16   is actually closer to ten seconds.

17   Q.    And in this case if you were to apply that

18   rule of thumb, you would have current delivery

19   of between 30 and 45 seconds into Mr. Todero,

20   correct?

21   A.    That's correct.  And that simple rule of

22   thumb wouldn't apply to a long trigger pull

23   like this.  But when you see long trigger-pull

24   durations like this, you know that things

25   aren't working and you don't have a contact.

Transcript of Mark W. Kroll, Ph.D.
Conducted on September 13, 2018                    179

1    Q.   So you didn't rely on that rule of thumb
2    at all in forming any of your opinions in this
3    case, is that correct?
4    A.   That's correct.  That was just
5    illustrative.  If this comes up on evidence
6    review, I printed two copies of page 27.  Now
7    there's only one.
8    Q.   Just in the -- there was just a duplicate
9    that came out and you pulled it out so there's
10   not a -- okay.
11   A.   Correct.
12   Q.   You go through different causes of -- as
13   you describe it, causes of current delivery
14   exaggeration.  And there are five different
15   categories that you set forth on the bottom of
16   page 15 and then describe them in greater
17   detail on the subsequent pages, is that
18   correct?
19   A.   Yes.
20   Q.   And the first category that you describe
21   is titled Broken Wires Or Dislodged Darts?
22   A.   Correct.
23   Q.   Is there any evidence in the record that
24   you reviewed in this case that the TASER wires
25   were broken?

Transcript of Mark W. Kroll, Ph.D.
Conducted on September 13, 2018                    180

```
 1    A.    No.
 2    Q.    We talked earlier about the number of
 3    other cases in which you've been retained to
 4    provide expert testimony related to the use of
 5    a TASER, correct?
 6    A.    Yes.
 7    Q.    And fair to say that in many of those
 8    cases you've engaged in similar analysis and a
 9    description of the different factors, which in
10    your view caused the actual current delivery to
11    be less than the reflected duration of trigger
12    pulls?
13    A.    Yes and mostly yes.  I always do a
14    detailed timeline of each trigger pull.  There
15    have been some cases, usually it's a
16    five-second probe mode application, where they
17    actually match.  That's rare.
18    Q.    So fair to say that in the vast majority
19    of your reports, you included an opinion that
20    the actual duration of current delivery is
21    significantly less than the amount of time
22    reflected on the trigger-pull download?
23    A.    Correct.  That's true.
24    Q.    Outside of a case in which the trigger
25    pull download reflected a single five-second
```

1   discharge, can you think of any case involving

2   more than five seconds on the trigger-pull

3   download where you reached the opinion that the

4   actual current delivery was more or less

5   equivalent to what was reflected on the

6   download?

7   A.    There is a case where it's 15 seconds.

8   Probably a couple with ten seconds.  It's

9   unusual, but it does occur.  And it's never

10  more than 15 seconds because that's great and

11  plenty enough time to perform handcuffing.  I

12  take it back.  There was a case of a guy in a

13  pickup truck with a knife to his child and the

14  police kept him locked up under control and he

15  was -- did not break the wires, did not slash

16  away and they kept him under -- locked up for

17  quite some time until another officer could

18  come in and rescue the child.  Those are so

19  rare.  I was not an expert in that case either,

20  so it doesn't really matter.

21  Q.    That's just a case that you're familiar

22  with?

23  A.    And it's one of those counterexamples that

24  prove the rule.  It's talked about because it

25  essentially never happens.

Transcript of Mark W. Kroll, Ph.D.
Conducted on September 13, 2018                    182

1    Q.   When the TASER was originally developed

2    and released for use by law enforcement, it did

3    not have the capacity to do that download, is

4    that correct?

5    A.   Correct.

6    Q.   And then that tracking software and the

7    ability to download the record of the trigger

8    pulls was later developed, is that correct?

9    A.   That's correct.  That was developed by the

10   company, TASER, and not by the original people

11   that made the original weapon.  I think that

12   company is called Tasertron.

13   Q.   And the purpose of developing that

14   download software was to help law enforcement

15   agencies determine how the weapon was used,

16   correct?

17   A.   Yes.  I think it was also to maintain

18   accountability.

19   Q.   You're saying despite that, it's your view

20   in the vast majority of cases that that's not

21   an accurate reflection of actually what's

22   happened in terms of the use of the weapon?

23   A.   Well, it's an upper bound.  We would say

24   mathematically it's a number that can never be

25   exceeded.  It's still very useful because it

Transcript of Mark W. Kroll, Ph.D.
Conducted on September 13, 2018                    183

1    gives us a starting point for analysis.

2    Q.    You include on page 16 one of the

3    categories of causes of current delivery

4    exaggeration, as you've described them, muzzle

5    contact canting with drive-stuns.  Do you see

6    what I'm referring to?

7    A.    I do.

8    Q.    What facts in the record are you aware

9    of -- well, strike that.

10        What facts in the record are you relying

11   on to support your conclusion that there was

12   muzzle contact canting in this case, which

13   decreased the amount -- or decreased the

14   duration of electricity which was being

15   transmitted into Mr. Todero's body?

16   A.    I did not apply that.  I conservatively

17   ignored that issue.  Had I applied that, we

18   would have had even less total seconds.  If you

19   look at on page 30, trigger pull eight, for

20   example, five-second trigger pull, we applied

21   the 30 percent rule for canting, that would

22   have given us one and a half seconds of

23   estimated current delivery.  Instead I used the

24   maximum I could use, which is two seconds for

25   the lack of marks.  So had I used canting, the

1    numbers would have been reduced further.

2    Q.    So you do not offer any opinion in this

3    report that muzzle contact canting was a

4    relevant factor causing the duration of current

5    that Mr. Todero experienced to be limited, is

6    that correct?

7    A.    That's correct.  And I can be more

8    explicit.  There was -- probably was not much

9    canting in this case because if the canting is

10   done correctly, he would have gotten better

11   results.  The probe that was lodged in the back

12   was the positive probe.  And the negative

13   connection, it was at the bottom electrode of

14   the muzzle of the weapon.  Had Lieutenant

15   Blackwell been lucky and canted the weapon back

16   about 45 degrees so only the bottom electrode

17   was in connection, then he would have completed

18   the circuit, positive with the probe and the

19   wire, negative with the muzzle, and would have

20   had lockup and things would have been over very

21   quickly.  That's sometimes taught in advanced

22   TASER training.  People can't remember it in a

23   stressful situation.  So I don't think there

24   was canting going on.  Let me say not

25   intentional canting.  With a resistant subject

Transcript of Mark W. Kroll, Ph.D.
Conducted on September 13, 2018                           185

1    moving around, you still get some intermittent

2    contacts that are similar to that.

3    Q.    Are you -- just so I'm clear, based on the

4    record that you reviewed in this case, you

5    aren't offering an opinion either way on

6    whether canting happened in this case?

7    A.    I will offer that we did not see

8    intentional canting, except probably saw it in

9    trigger pull 16.  We finally got some good

10   effects and they were able to cuff Mr. Todero.

11   Outside of trigger pull 16, I don't really see

12   evidence of canting.

13   Q.    Just to be clear, I'm not asking for you

14   to offer new opinions that aren't set forth in

15   your report.  I want to understand the opinions

16   that you have set forth in your written report.

17   Is there an opinion set forth in your written

18   report as to whether there was any muzzle

19   contact canting either intentional or

20   unintentional?

21   A.    I don't have those words in the report.

22   But if you were to ask me to explain trigger

23   pull 16 and I look forward to going through the

24   details of table seven, that would be my

25   explanation.

Transcript of Mark W. Kroll, Ph.D.
Conducted on September 13, 2018                    186

1    Q.   And just so I'm clear, if you were to
2    offer that explanation, it would be that there
3    was an intentional canting that was leading to
4    a more successful creation of that second point
5    of contact, is that correct, with regard to
6    trigger pull 16?
7    A.   I would consider that as a possibility.
8    And upon reflection on this, that would be my
9    thinking.  And then I would have to add 1.22
10   seconds in my estimated equivalent current.
11   And that would take it up to 7.27 seconds.  But
12   as I sit here today, I feel that 16 did reflect
13   intentional canting.  And I would need to
14   increase my equivalent current up to
15   7.27 seconds.
16   Q.   What's the basis for your statement that
17   trigger pull 16 reflects intentional canting?
18   A.   It was successful.  They got control.  It
19   was probably successful.  They may have got
20   control of Mr. Todero's arms because he stopped
21   resisting.  But my recollection of the
22   testimony of the female officers was that this
23   last drive-stun seemed to work.  And Blackwell
24   may have testified similarly.
25   Q.   Is there any evidence in the record that

1   you reviewed in this case that suggests that

2   Lieutenant Blackwell pulled the trigger prior

3   to placing the muzzle of the weapon on

4   Mr. Todero's body during the application of the

5   three-point technique?

6   A.    No.  But that's just the way it happens.

7   It's just -- you just -- that's what happens.

8   It's not like setting a television set down on

9   a table and then plugging the cord in and then

10  going over and turning it on.  You come in for

11  a drive-stun and you pull the trigger as you're

12  coming in.  You don't put it on the guy and

13  deal with all of the resistance and fighting

14  and movement and then say:  Okay, now I'm going

15  to pull the trigger.  For one thing, you would

16  have to use that finger strength to pull the

17  trigger and you may not want to be distracted

18  by that mechanical movement.  So there's always

19  a contact delay.

20  Q.    And just so I understand the basis for

21  that statement, other than your statement that

22  that's the way that it happens, you would agree

23  with me there's no evidence in the record that

24  you're looking to to support that statement,

25  correct?

Transcript of Mark W. Kroll, Ph.D.
Conducted on September 13, 2018                              188

1    A.    Of course Lieutenant Blackwell is not
2    saying:  Oh, I remember pulling the trigger
3    half a second before I contacted Mr. Todero.
4    Having analyzed a thousand of these cases,
5    hundreds of videos on actual field use, I can
6    tell you that's what happens.  And in my
7    opinion, there was a contact delay.  There is
8    almost always a contact delay.
9    Q.    And again, to be clear, there's no video
10   evidence in this case that sheds light on that
11   either way, correct?
12   A.    Correct.
13   Q.    Are officers -- strike that.
14         Did the TASER training materials discuss
15   that contact delay that you're aware of?
16   A.    I don't know.
17   Q.    Is the phenomenon of contact delay that
18   you just described reflected in any of the
19   materials produced by TASER that you're aware
20   of?
21   A.    I don't know.  I'm not involved in their
22   training material.  So I just don't know.
23   Q.    And you don't include any citation in the
24   text of your written report that provides a
25   basis for your statement that officers will

Transcript of Mark W. Kroll, Ph.D.
Conducted on September 13, 2018                    189

1    typically pull the trigger as the muzzle is

2    being brought down towards the subject,

3    correct?

4    A.    I do have a paper on ResearchGate.  In

5    fact, it's entitled Misunderstanding the

6    Trigger-pull Download, which is basically an

7    edit of this whole section.  And if I was

8    remiss in citing it, I was remiss in citing it.

9    But if you go to ResearchGate and you search on

10   Misunderstanding the Trigger-pull Download, you

11   will see it e-published there.

12   Q.    And it's also your opinion that there's a

13   similar effect on the back end when an officer

14   removes the muzzle of the weapon for

15   three-point modes other than an exact five

16   seconds, is that correct?

17   A.    Yes.

18   Q.    And again, you would agree with me there's

19   no evidence in the record that you reviewed to

20   support that phenomenon in this case, correct?

21   A.    That's correct.  We do not have video.

22   And we do not have pulse graph data in this

23   case.

24   Q.    You include a lengthy description of the

25   phenomenon that you described as inadvertent

Transcript of Mark W. Kroll, Ph.D.
Conducted on September 13, 2018                    190

1    trigger pulls, is that correct?

2    A.    Yes.

3    Q.    Is there any evidence in the record in

4    this case to support the idea that any of the

5    16 trigger pulls recorded on the download

6    report were inadvertent?

7    A.    Yes.

8    Q.    Where in your report do you discuss that

9    evidence?

10   A.    On page 31, the first full paragraph.

11   This is what happens when an officer has kept

12   the electrical up in his hand and is trying to

13   help with the left hand.  It is -- it happens

14   for the majority of trigger pulls, especially

15   this situation with female officers attempting

16   to handcuff this fellow.  And we have the

17   testimony of one of the officers, I can't

18   remember if it was Elliott or Laut, that

19   Blackwell was trying to control the legs.  And

20   this would cause inadvertent trigger pulls.

21   Q.    Is there testimony from any officer that

22   they believed that any of the trigger pulls in

23   this case were inadvertent?

24   A.    No.  They wouldn't be aware of that.  They

25   wouldn't be counting trigger pulls in a

Transcript of Mark W. Kroll, Ph.D.
Conducted on September 13, 2018                    191

1    struggle like this.
2    Q.    And do you -- I believe you testified
3    earlier that you reviewed the body camera
4    footage in this incident, is that correct?
5    A.    Yes.
6    Q.    Do you recall a statement made by
7    Lieutenant Blackwell recorded on that body
8    camera shortly after the incident -- shortly
9    after the discharge of the TASER had come to an
10   end that he believed he had discharged his
11   TASER along the lines of 12 to 16 times?
12   A.    I don't remember the exact numbers that he
13   came up with.  It would be unusual that an
14   officer would be keeping count in a stressful
15   situation like this.  Usually they're off by a
16   lot.
17   Q.    Well, do you recall Lieutenant
18   Blackwell -- do you recall one way or another
19   whether Lieutenant Blackwell made such a
20   statement on the body camera video that you
21   reviewed?
22   A.    I have a vague recollection of something
23   like that.  It would not enter in my opinion
24   because that sort of accounting during a time
25   of stress like that is almost always worthless.

Transcript of Mark W. Kroll, Ph.D.
Conducted on September 13, 2018                    192

```
1    Q.   Well, except in this case it almost
2    perfectly lines up with the download report, is
3    that correct?
4    A.   Assuming that your recollection is
5    correct, that would be unusual.  It's
6    impressive if he could keep count like that.
7    Q.   And if -- wouldn't you agree with me that
8    if someone says:  I did something 12 to 16
9    times, and then there's objective evidence that
10   the thing happened 16 times, that would suggest
11   that it wasn't inadvertent?
12   A.   No.  And I can give you a very common
13   example.  Officer has an inadvertent trigger
14   pull, usually they don't even notice it because
15   there's noise, traffic noise, yelling, commands
16   being given and -- but they hear the crackling
17   and they say:  Oh, crap.  And they look over at
18   the weapon.  They flip the safety off.  And
19   then we have an ITP with, say, a two- or
20   three-second delay.  We have only one of those.
21   And that's trigger pull number 15.  We have a
22   three-second stated duration.  That would be
23   one ITP that he recognized because he
24   interrupted the current early.
25   Q.   In your view, is that the only possible
```

Transcript of Mark W. Kroll, Ph.D.
Conducted on September 13, 2018                    193

1   interpretation of that trigger pull?

2   A.    It's not the only possible interpretation.

3   It's the only reasonable interpretation in my

4   opinion.

5   Q.    You can't think of any factors going on in

6   the situation with Mr. Todero, Officer Elliott

7   and Officer Laut both with their hands in

8   contact with Mr. Todero's body that would cause

9   Lieutenant Blackwell to terminate the flow of

10  current prematurely before the full five

11  seconds other than that he had recognized that

12  he had deployed it inadvertently?

13  A.    Nothing that's reasonable.

14  Q.    You would agree with me that there is no

15  statement from any officer at any point in any

16  of the various statements that they made,

17  whether it's police reports, interviews with

18  the police department or their deposition

19  testimony in the case, where anyone has

20  suggested that there were any inadvertent

21  trigger pulls in this case, is that correct?

22  A.    That's correct.  And typical because most

23  of the trainers and the police officers don't

24  understand this to that level of

25  sophistication.  And since we're on this,

Transcript of Mark W. Kroll, Ph.D.
Conducted on September 13, 2018                    194

1    trigger pull number 6 is an additional possible

2    ITP duration of two seconds stated.  I

3    conservatively put that down as a three-point

4    application because we don't have the female

5    officers present.  And so I don't think we had

6    a helping hand situation.  I could go either

7    way on that.  If we put that down for an ITP,

8    there would be no current delivered.  I

9    conservatively put that down as a full

10   effective drive-stun.  I should say a full

11   contact drive-stun.

12   Q.   If I understand your testimony related to

13   the early termination of the current, i.e.,

14   those where the stated duration is fewer than

15   five seconds, it's your testimony that those

16   are indicative of an inadvertent trigger pull,

17   correct?

18   A.   That is one clue.  And for trigger pulls

19   12 through 15 we have the additional

20   information that he was trying to help out the

21   female officers.  And I know in that case that

22   the majority of trigger pulls will be ITPs.

23   And therefore I classified -- well, do you want

24   me to go through the details on the reasons for

25   each trigger pull?  I don't want to burn up all

1  the time.  I could talk about this stuff for

2  days.  I find it very interesting.

3  Q.   Well, I imagine some of the other

4  participants would be unwilling to join us in

5  that exercise, but I appreciate you're being

6  game for it.

7  A.   We'll do it off the record at the tavern.

8  Q.   If I understood your testimony before, was

9  that the trigger pull, number 15, that you've

10  identified as an ITP in part on the basis of

11  reflecting an early shutoff prior to the full

12  five seconds, that's an indication of an

13  inadvertent trigger pull that Lieutenant

14  Blackwell became aware of?

15  A.   I agree.  That was my thinking.  And we're

16  in a helping hand situation and so that

17  evidence leads us to an ITP.

18  Q.   And if I understood your earlier

19  testimony, you also stated that that was

20  possible with regard to trigger pull number 6,

21  although you hadn't classified it as such, is

22  that correct?

23  A.   That's correct.  I conservatively counted

24  that as a full contact three-point connection.

25  Q.   So just if I understand your view of the

Transcript of Mark W. Kroll, Ph.D.
Conducted on September 13, 2018                    196

1    evidence, it's that there is at least one and

2    possibly two inadvertent trigger pulls where

3    Lieutenant Blackwell was aware that he had

4    engaged in an inadvertent trigger pull,

5    correct?

6    A.    Yes.

7    Q.    But you also agree that nowhere in the

8    record, either in his written reports, his oral

9    interview or his deposition, did Lieutenant

10   Blackwell at any point state that he had pulled

11   the trigger inadvertently at any point,

12   correct?

13   A.    They never do.

14   Q.    Even when officers are aware that they've

15   engaged in an inadvertent trigger pull, it's

16   your experience that they never state that?

17   A.    I should never say never.  I can't recall

18   a situation now they did.  And there's some

19   very sad situations where often the majority of

20   the trigger pulls were inadvertent and they

21   didn't realize it.  An officer experienced with

22   his electrical weapon can -- knows how to flip

23   that safety off.  And if they hear it, they're

24   not distracted, they can form that awareness

25   and then make that affirmative step of flipping

1  the safety off.  They may or may not remember

2  it.  They usually don't remember it.  In fact,

3  I can't think of a case now where an officer

4  said he had a couple of inadvertent trigger

5  pulls.  They generally don't like to admit it,

6  because it's almost a fireable offense with a

7  firearm.  There's so much training on

8  inadvertent discharges.  I think they're really

9  trained to not do that, and they certainly

10 don't want to admit to it.

11 Q.   In the context of the TASER, are you aware

12 of anyone that studied the phenomenon of

13 inadvertent trigger pulls other than yourself?

14 A.   No.  I mean, that's coming up.  Got people

15 that want to do that study down in Georgia,

16 just haven't had time to get on it.  So that

17 study has not been done.  The similarities with

18 firearms are so close in terms of position of

19 the trigger, et cetera, and the stressful

20 situations that I rely heavily on the

21 literature on inadvertent trigger pulls for

22 firearms for the basis of my thinking here.

23 Q.   You'd agree with me that it would be

24 important for officers and police departments

25 to try and minimize the amount of times that a

Transcript of Mark W. Kroll, Ph.D.
Conducted on September 13, 2018                    198

1    TASER device is discharged inadvertently,

2    correct?

3    A.   Somewhat.  It's not as serious as with

4    firearms.  I think you all know the case that

5    made national news of the FBI agent that was

6    dancing and had an inadvertent discharge.  I

7    mean, it happened.  People have been killed

8    from inadvertent discharge with firearms.  The

9    only cases that I can think of that led to

10   tragic consequences was an officer in

11   California had an ITP showing the weapon to his

12   stepdaughter and the probe went in the eye.

13   And a case of a police chief in Puerto Rico

14   demonstrating the weapon to his cadets, showing

15   them how it worked, discharged it in his own

16   eye.  So yeah -- I mean, it's a problem,

17   doesn't lead to fatalities, but it can lead

18   to -- you know, frankly, it can lead to an ugly

19   record to nonspecialists who see all the

20   trigger pulls.

21   Q.   Well, in addition to it making an ugly

22   record, every time an individual discharges

23   their TASER and discharges electricity into a

24   person, that's a use of force, correct?

25   A.   Almost no ITPs involve a connection to the

1    body.  So those don't really overlap.

2    Q.   Well, in a situation in which the TASER

3    has been deployed in probe mode, an inadvertent

4    trigger pull, successfully deployed into probe

5    mode with both probes making contact with the

6    person's body, every inadvertent trigger pull

7    would result in the discharge of electricity

8    into the person's body, correct?

9    A.   In that hypothetical situation, that would

10   be correct.  But that's not the situation that

11   leads to an ITP.  The most common situation

12   that leads to an ITP is muscle mirroring or

13   contralateral contraction, especially in older

14   right-handed officers.  Where they're trying to

15   help with the left hand, you cannot help

16   contract your right hand somewhat.  If you just

17   had a probe mode application, the suspect is

18   standing up, you have a successful connection,

19   they go down, we don't have that same mechanism

20   encouraging an ITP or leading to an ITP.

21   Q.   Do any of the -- to your knowledge, do any

22   of the TASER training materials provide any

23   instructions or warnings to officers to avoid

24   inadvertent trigger pulls in their operation of

25   the TASER?

Transcript of Mark W. Kroll, Ph.D.
Conducted on September 13, 2018                    200

1    A.    I don't know.  I've been encouraging them

2    for about two years that this is a serious

3    matter and that they should address it.  And I

4    don't know if they've addressed it or not.  I

5    think they have.  Their newest weapon coming

6    out has a much stronger trigger.  They moved it

7    from maybe two pounds to three or four pounds

8    of trigger pull to make it harder to do.  So I

9    don't know if they've addressed this in their

10   training material.

11   Q.    Would you agree with me that it's

12   important for officers to accurately document

13   their use of the TASER to the best of their

14   ability in -- whether it's in written reports

15   or oral statements or both?

16   A.    That's getting into general use of force

17   and police policy, and I don't claim any

18   expertise there.

19   Q.    Would you agree with me that the TASER

20   training materials reflect that, that it's

21   important for officers to make good

22   documentation of their use of the TASER?

23   A.    I can't agree or disagree.  If it's in

24   there, I would be happy to see it.  But I'm

25   just not aware of that one way or the other.

Transcript of Mark W. Kroll, Ph.D.
Conducted on September 13, 2018                          201

1   Q.   You testified earlier that the only basis

2   in the record for your belief that there were

3   no skin marks left from the drive-stun or a

4   three-point application in this case was that

5   there were no such marks documented in the

6   medical records, is that correct?

7   A.   That's correct.  And I should add and also

8   at autopsy.

9   Q.   Mr. Todero survived, albeit largely

10  unconscious, for 13 days after the incident.

11  Is that your recollection of the record?

12  A.   That sounds about right.

13  Q.   You don't have any expertise in conducting

14  an autopsy, is that correct?

15  A.   That's correct.

16  Q.   So you don't have any expertise one way or

17  the other on whether a 13-day-old drive-stun

18  skin mark is something that would typically be

19  documented by a coroner or a forensic

20  pathologist at autopsy?

21  A.   May I break up your question into two

22  parts?

23  Q.   You may.

24  A.   Okay.  Medical examiners tend to document

25  TASER marks either from a drive-stun because

Transcript of Mark W. Kroll, Ph.D.
Conducted on September 13, 2018                    202

1    the signature marks are very well understood at

2    autopsy, whether it's drive-stun or probe mode.

3    But then you threw in 13 days.  Can you refine

4    that question about 13 days, please?

5    Q.   What do you mean by that?

6    A.   Well, you said would it be noted at

7    autopsy 13 days after an incident.  I'm

8    paraphrasing wildly.  So I've answered the

9    first half of the question.  I don't remember

10   the second half now.

11   Q.   Well, I think I understand your testimony.

12   I'll move on.  Other than -- strike that.

13        And you conclude that none of the

14   three-point mode applications to Mr. Todero

15   were for longer than two seconds, is that

16   correct?

17   A.   Well, that is largely correct.  I made an

18   exception for trigger pull number 7.  And I

19   conservatively allowed for two separate

20   drive-stun locations.  Because if Lieutenant

21   Blackwell were to have applied the

22   drive-stun -- apply the muzzle of the weapon to

23   create the drive-stun contact and held it for

24   two seconds and decided:  Well, that's not

25   working, and then moved to another location,

Transcript of Mark W. Kroll, Ph.D.
Conducted on September 13, 2018                    203

1   then you could have two seconds at each

2   location for a total of four seconds.  But

3   outside of trigger pull number 7, your

4   statement would be correct.

5   Q.   With trigger pull number 7, that was based

6   on two separate applications but each of no

7   more than two seconds, correct?

8   A.   Correct.

9   Q.   There's no basis in the record for your

10  limitation of the three-point application to a

11  maximum of two seconds beyond the fact that in

12  your view there were no drive-stun marks left

13  on Mr. Todero's body, is that correct?

14  A.   Yes.  Let me add to that.  If we apply the

15  normal rule for resistant subjects, we'd get

16  about one and a half seconds based on the

17  30 percent contact time from a resistant

18  subject moving around.  And so if we ignore the

19  markings and we wanted to be a little more

20  aggressive, I could go with a 1.5 seconds by

21  the standard rule of thumb of 30 percent.  But

22  between those two, yes, that's how I came up

23  with two seconds.

24  Q.   But you already testified that you do not

25  have an opinion written in this report that

Transcript of Mark W. Kroll, Ph.D.
Conducted on September 13, 2018                    204

1    that 30 percent good contact was applicable in

2    this case, correct?

3    A.   What I said is I didn't apply -- I applied

4    a more conservative rule of two seconds because

5    of the absence of documented drive-stun marks.

6    Q.   You also testified that there was no

7    evidence in the record to support the idea of

8    muzzle canting beyond trigger pull number 16,

9    correct?

10   A.   We do not have video documentation.  We

11   don't have a pulse graph.  So we do not have

12   explicit evidence of muzzle canting.  Based on

13   my experience in this case, there obviously

14   would have been a lot.  But my only opinion is

15   there was intentional canting probably at

16   trigger pull 16.

17   Q.   Well, is there any evidence in the record

18   that you reviewed in this case to support the

19   idea of any muzzle canting?

20   A.   We don't -- we lack that evidence to rule

21   it in or out.  We don't have the video

22   evidence.  And we do not have the pulse graph.

23   Q.   You testified a number of times now about

24   studies or publications that you post on

25   ResearchGate, correct?

Transcript of Mark W. Kroll, Ph.D.
Conducted on September 13, 2018                    205

1    A.    Yes.

2    Q.    Does the TASER corporation fund those

3    studies?

4    A.    No.

5    Q.    Has the TASER corporation funded any of

6    the studies or research that you have conducted

7    related to the TASER?

8    A.    Yes.

9    Q.    Which of your studies has TASER funded?

10   A.    Some of my earlier papers.  And you would

11   have to pull the exact paper to look at it

12   because that's always disclosed, where funding

13   came from.  And I couldn't tell you from

14   memory.  But I would say most of my earlier

15   papers they partially funded and almost none of

16   the later papers.

17   Q.    It's your opinion that none of the --

18   strike that.

19         You set forth in your trigger pull

20   analysis on page 30 that in your view there was

21   a total of zero seconds of current flow for any

22   of the TASER discharges that were in probe

23   mode, is that correct?

24   A.    Correct.

25   Q.    Would you agree with me that the

1  uncontested evidence in this case is that at

2  the time Lieutenant Blackwell first deployed

3  his TASER, Mr. Todero was in an upright

4  position walking away from him, and that after

5  Lieutenant Blackwell deployed the TASER,

6  Mr. Todero dropped down to his knees?

7  A.   Yes.  And to finish the answer, and that's

8  how we know that we didn't have a complete

9  circuit.

10  Q.   Well, what's your explanation for

11  Mr. Todero dropping to his knees other than

12  that there was some amount of electricity being

13  discharged into his body as a result of the

14  TASER probes?

15  A.   Well, first of all, we know there was no

16  electrical current flowing between those probes

17  because he would have gone to his face not to

18  his knees.  That's well established.  And you

19  can look at YouTube videos if you would like to

20  learn more about that.  You want an alternative

21  explanation for him dropping to his knees, is

22  that what you're looking for?

23  Q.   Well, did you rely on such an alternative

24  explanation in reaching your conclusion that it

25  was a total of zero seconds, or was it just the

1   fact that, in your understanding, every single

2   time someone is in a standing or upright

3   walking position and the TASER is successfully

4   deployed in probe mode, they will fall forward

5   like a plank all the way down onto their face?

6   A.   That's almost correct.  You need probes in

7   the back.  They're not as effective in the

8   front.  Probes in the back are very close to

9   the spine.  And secondly, you need about a

10  nine-inch probe spread.  We can definitely see

11  a nine-inch probe spread on the later video

12  when the probe in the shirt is pulled out.  And

13  then I would agree with your rhetorical

14  question.

15  Q.   Sorry.  I think I missed that answer.

16  Could you explain to me what you mean by that?

17  A.   Someone is walking away from the officer

18  upright and both probes hitting the back with a

19  spacing of nine inches or more, they will

20  face-plant.  They will become rigid like a

21  board and go (indicating) straight down.

22  Q.   And it's your belief that that happens

23  100 percent of the time without exception

24  regardless of the particular gait or forward --

25  nature of the forward motion of the individual?

1    A.    No.  If they're standing, sometimes they

2    will fall backwards.  So they have to have some

3    forward momentum.  The most likely explanation

4    of his dropping to the knees was that he was

5    startled by the ballistic impact of that top

6    probe because it packs quite a wallop.

7    Q.    Are there any materials discussed or cited

8    in your written report that support your view

9    either that 100 percent of the time an

10   individual walking forward with a successful

11   deployment of the probes will fall straight on

12   their face like a plank or that an individual

13   may drop down from a walking or standing

14   position as a result of being startled by the

15   impact of the probes?

16   A.    Yes.  On page 25 you see figure 8 and you

17   see the effects of various probe spreads on the

18   back.  And you see at nine inches and above the

19   person has essentially lost all control of

20   their body.  And this is -- has been documented

21   in a few peer-reviewed studies.  When we stand

22   up, we're not like a statue of concrete.  It

23   requires active muscle control to maintain our

24   stance.  And we balance largely at our hips.

25   Diabetics tend to balance more on their ankles.

1   That's not relevant here.  And so when you lose

2   that ability to balance, you fall either

3   forward or backwards depending upon your

4   momentum.  If you have any forward momentum,

5   you're going to go forward.  If you're

6   standing, you're going to go backwards.  And

7   that citation is 165 that's given in the back

8   of my report.

9   Q.   Do you have any specialized training in

10  the area of human kinetics?

11  A.   Not in -- in general in human kinetics.

12  I've had to study that to a certain extent for

13  research on pacemakers.  We want to have

14  pacemakers analyze how much exercise a person

15  is getting.  So outside of that connection and

16  the connection with electronic control, I have

17  no experience in human kinetics.  Human

18  statics, yes, for the strength of the ribcage

19  for work on prone restraint.  And that would be

20  about it.

21  Q.   Have you authored any studies or reports

22  related to the human kinetics aspect of CEWs?

23  A.   I probably discuss it in 50 expert reports

24  and one large peer-reviewed study of fatal

25  falls.  In fact, I have published the leading

Transcript of Mark W. Kroll, Ph.D.
Conducted on September 13, 2018                    210

1    paper on fatal falls.  And there we get into

2    great detail about the kinetics of falls,

3    forward, backward, fixed hip, falls to the

4    knees, et cetera.

5    Q.   Have you reviewed the training materials

6    ever that TASER provides to police departments

7    related to the CEW?

8    A.   I did once some eight to ten years ago.

9    And I know it's been revised a lot.  I take it

10   back.  Just this summer I reviewed an early

11   draft of a complete rewrite, which is zero

12   base, starting over draft.  And that's far from

13   being finished and sent out.  And that would be

14   about it.

15   Q.   So other than that review of a complete

16   draft of a potential rewrite and that one

17   previous review, other than those two

18   instances, you've never looked at the training

19   materials that TASER provides to police

20   departments?

21   A.   That's my recollection.

22   Q.   So you've been on the board of TASER

23   working on safety issues for 15 years and

24   outside of those two instances never looked at

25   their training materials?

Transcript of Mark W. Kroll, Ph.D.
Conducted on September 13, 2018                    211

```
 1   A.    Is there a connection between those two
 2   parts of the question?  I mean, is there some
 3   disjunction between those that I'm supposed to
 4   comment on, or is the question less subtle than
 5   I thought?
 6   Q.   No, I'm not asking for commentary, just
 7   your response to the question which you've
 8   given on the record.  Thank you.
 9             MR. STEPHENSON:  Well, I don't think
10   he gave an answer, but whatever.
11             Did you give an answer?
12             THE WITNESS:  No.
13             MR. STEPHENSON:  Oh, okay.
14             THE WITNESS:  I don't think I
15   understood the question.
16             MR. HEPPELL:  Will you read back the
17   last question, please.
18             (Whereupon, the court reporter read
19   back the previous question.)
20             THE WITNESS:  I'm still trying to
21   connect the two parts of that sentence.
22   BY MR. HEPPELL:
23   Q.   Do you not understand the question, sir?
24   A.   No, I don't, because you put those two
25   issues into one sentence as if there's some
```

1    disjunction there.  And I could interpret the

2    question a few different ways, such as:  How

3    dare you not have reviewed the training

4    materials because you've been on their board

5    for 15 years, or I could break it up in two

6    sentences such as say:  Will you confirm you've

7    been on the board for 15 years, in which case

8    the answer is yes, and you have only reviewed

9    their training materials twice, and the answer

10   to that would also be yes.

11   Q.    All right.  Thank you.  I promise you that

12   if I want you to answer a question -- a

13   how-dare-you question, I will frame it as a

14   how-dare-you question.

15   A.    Thank you.

16   Q.    There's a section of your report where you

17   conclude, on page 29, "Mr. Todero's muscles

18   received only 39 percent of the emitted current

19   during the three-point applications."

20         Do you see what I'm referring to?

21   A.    Yes.

22   Q.    And again, I'm not asking you to offer new

23   opinions, but I am attempting to understand the

24   opinions that you've written in your report.

25   Is it your testimony that 39 percent of the

1   emitted current was passing between the -- what

2   in your view is a single probe lodged in

3   Mr. Todero's upper back and the point where the

4   -- muzzle of the weapon was placed, is that

5   correct?

6   A.   Exactly.

7   Q.   Okay.  And the remaining 61 percent of the

8   electricity was being discharged into

9   Mr. Todero's body at the point of the muzzle

10  contact, is that correct?

11  A.   Close.  It wouldn't really get into the

12  body.  It mostly travels superficially between

13  those contacts.

14  Q.   There will be -- some amount of that

15  current would be going into Mr. Todero's body,

16  correct?

17  A.   Well, if you count the skin as the body,

18  100 percent.  But there is essentially no depth

19  to that.  90 percent occurs within one

20  centimeter of the surface.

21  Q.   And that will cause pain, correct?

22  A.   It would cause pain to someone that was

23  not high on an analgesic or anesthetic drug and

24  not in a psychotic break theoretically.  But my

25  opinion, he was not feeling pain or he would

Transcript of Mark W. Kroll, Ph.D.
Conducted on September 13, 2018                                214

1   have responded to it.  And Lieutenant Blackwell

2   testified that there was no pain response

3   whatsoever.

4   Q.   Do you have any expertise in pain response

5   in individuals?

6   A.   As far as it relates to electricity, I

7   have a tremendous amount of expertise in that.

8   And I'm working on rewriting the international

9   safety standards for painful shocks.

10  Q.   You have no opinion one way or the other

11  as to whether Mr. Todero was under the

12  influence -- strike that.

13       You have no opinion one way or the other

14  of whether Mr. Todero had taken some substance

15  that had an analgesic effect, is that correct?

16  A.   I'm not offering it as a formal opinion.

17  I think that's the elephant in the room here.

18  I think we all recognize that he was probably

19  on Spice.  His behavior was not quite

20  consistent with someone that had been just

21  drinking Diet Coke.

22  Q.   That's not an opinion that you have

23  authored in your report, is that correct?

24  A.   Correct.

25  Q.   And you have no expertise related to the

1  effect that someone's psychiatric state has on

2  their ability to feel pain, is that correct?

3  A.   I do have some expertise in that area as

4  it regards detecting electrical pain.  And the

5  majority of pain studies are done with

6  electrical shocks.  So there's a lot of overlap

7  between that and what I do.  And there are

8  interesting somewhat contradictory studies on

9  schizophrenia and pain response.  But it's

10  generally well recognized that someone in a

11  psychotic break has a significantly increased

12  pain threshold.  And someone that is highly

13  agitated and angry has an elevated pain

14  threshold to electrical shocks.

15  Q.   There are no studies that have been

16  conducted on human test subjects in that area,

17  is that correct, no prospective studies?

18  A.   No, that's incorrect.  Most pain studies

19  are done with electrical shocks.

20  Q.   I mean, specifically on individuals

21  suffering from a psychiatric disorder.

22  A.   No, that's also not correct.  There have

23  been specific studies done on people on

24  schizophrenics versus non-schizophrenics for

25  pain sensitivity.

Transcript of Mark W. Kroll, Ph.D.
Conducted on September 13, 2018                    216

1    Q.   For the purpose of trying to produce pain

2    in schizophrenic individuals?

3    A.    Trying to understand if the -- I'm not

4    sure exactly what the motivation was.  But

5    there's a lot of research in the epidemic of

6    schizophrenia.  And people have been interested

7    in how it affects pain response.  And I can

8    think of at least two papers that were done

9    comparing the response of schizophrenics to

10   electrical shocks.  Three papers.  And I think

11   two of them said they were more sensitive and

12   one said they were less sensitive.  So that

13   issue is open right now.

14   Q.   Do you know how the researchers in those

15   studies were able to get the informed consent

16   of the psychiatric patients to conduct a study

17   in which they were intentionally inflicting

18   pain on those individuals?

19   A.    I would have to go back and read that

20   section of the papers.  But having done a lot

21   of studies and knowing how the procedure works,

22   I could certainly presume with a high degree of

23   confidence that they explained the study to

24   them.  And then they got their permission.  And

25   they would -- these are people -- obviously

Transcript of Mark W. Kroll, Ph.D.
Conducted on September 13, 2018                217

1    they're functioning well enough to walk into a

2    clinic and participate in a study.

3    Q.   In the early part of your report you

4    testify -- strike that.

5        The early part of your report you state

6    that you've been a retained expert in over

7    150 cases involving a TASER, is that correct?

8    A.   That's correct.

9    Q.   Have your opinions ever been excluded by

10   any court that's considered them?

11   A.   In regards to electrical weapons?

12   Q.   Correct.

13   A.   No.

14   Q.   Has the scope of the opinions that you've

15   offered in a case in relation to conducted

16   energy weapons ever been limited by a court?

17   A.   No.

18   Q.   I'm sorry.  Conducted electrical weapons

19   would be the correct term.

20   A.   Both are just fine.

21            THE WITNESS:  How we doing on time?

22   Are you going to use the whole seven hours?

23            MR. HEPPELL:  I don't know.  I don't

24   have too much left I don't think.  But I'm not

25   right at the end.  It's close to 4:00.

1          Go off the record for a second.

2          (Recess.)

3          MR. HEPPELL:  Mark this as

4    Exhibit 7, please.

5          (Exhibit Number 7 marked for

6    identification.)

7    BY MR. HEPPELL:

8    Q.   Dr. Kroll, are you familiar with the TASER

9    warnings that it provides to law enforcement

10   officers?

11   A.   (Views document.)  Reasonably familiar.  I

12   know that they update them about every two

13   years.  And so I don't recall if I've studied

14   these warnings from 2013 or not, but fairly

15   familiar with them.

16   Q.   And you have in front of you a document

17   marked by the court reporter as Kroll

18   Exhibit 7.  It's been Bates-stamped Todero

19   11647 through 11654.  And this is the

20   eight-page version of the TASER warnings

21   provided to law enforcement that was effective

22   as of March 1st, 2013, is that correct?

23   A.   Yes.  And just to warn you, I think it was

24   operational on the day of this incident was the

25   later warnings and that was nine pages, but

Transcript of Mark W. Kroll, Ph.D.
Conducted on September 13, 2018                    219

1    they're going to be very similar.  So I'm happy
2    to discuss this document.
3    Q.   Okay.  And what's your understanding of
4    when those warnings would have been in effect,
5    those -- that later nine-page warning based on
6    your recollection?
7    A.   Probably about the last three years if I
8    recall the update schedule.  I'm not heavily
9    involved in this, but I do read these from time
10   to time.  I don't write these.
11   Q.   And you're aware that as part of the TASER
12   training provided to officers, trainers are
13   directed to review these warnings with the
14   officers?
15   A.   That sounds right.
16   Q.   And if I understood your testimony, to
17   your knowledge, there's no major substantive
18   difference between this version of the warnings
19   and the subsequent version, is that correct?
20   A.   It's nine pages now.  You know, I think it
21   actually did change a lot.  This doesn't look a
22   lot alike.  But as I sit here, I can't tell you
23   what things were changed.
24   Q.   Turning -- drawing your attention to the
25   first page.  Towards the bottom there's a

1    bolded black bar, white type, "Safety

2    Information:   CEW Risks and Risk Avoidance."

3         Do you see what I'm referring to?

4    A.   I do.

5    Q.   And underneath that there's a

6    black-bordered box with a warning symbol.  It

7    states Cumulative Effects.

8         Do you see what I'm referring to?

9    A.   I do.

10   Q.   In the warning box, it states, "CEW

11   exposure causes certain effects, including

12   physiologic and metabolic changes, stress, and

13   pain.  In some individuals the risk of death or

14   serious injury may increase with cumulative CEW

15   exposure.  Repeated, prolonged, or continuous

16   CEW applications may contribute to cumulative

17   exhaustion, stress, cardiac, physiologic,

18   metabolic, respiratory, and associated medical

19   risks..."  And turning over to the next page,

20   it concludes, "...which could increase the risk

21   of death or serious injury.  Minimize repeated,

22   continuous, or simultaneous exposures."

23         Did I read that correctly?

24   A.   Yes.

25   Q.   Do you agree with the statements contained

Transcript of Mark W. Kroll, Ph.D.
Conducted on September 13, 2018                    221

1    in that TASER warning?

2    A.    I agree with some of them in part.  And I

3    disagree with others.

4    Q.    Okay.  And again, I'm not seeking your

5    explanation of the basis of your disagreement,

6    which I understand you've talked about

7    previously in the deposition and discussed to

8    some extent in your report, but can you please

9    identify which of the statements contained in

10   that box you disagree with in whole or in part?

11   A.    Well, as an overview, this is written by

12   lawyers, not by scientists.  And a lot of it is

13   directed towards use of force.  And so repeated

14   uses of force can be seen as excessive force.

15   So with that overview and that understanding, I

16   can just tell you how I would look at this as a

17   biomedical scientist.  CEW exposure causes

18   certain effects, including physiologic and

19   metabolic changes.  Yes, those are trivial.

20   There is a slight increase in blood acidity.

21   It's measurable; similar to running 20 yards.

22   Q.    Dr. Kroll, just to be clear, I'm not

23   asking to you explain the basis of your

24   disagreement.  I'm just asking you to identify

25   which of the statements you disagree with.

Transcript of Mark W. Kroll, Ph.D.
Conducted on September 13, 2018                                      222

```
1    A.    Well, I disagree with some of them in part
2    and disagree with -- I agree with some in part
3    and disagree with some in part.  Just for
4    example, respiratory risk, that's probably not
5    in the current warnings because there have been
6    probably ten studies that have shown that these
7    things do not interfere with breathing.  And
8    the last sentence, "minimize repeated,
9    continuous, or simultaneous exposures," I think
10   that speaks more to concerns over apparent
11   excessive force.  But I'd be happy to go into
12   as much detail as you want.
13   Q.    Do you agree in whole or agree in part or
14   disagree -- strike that.
15         Do you agree in whole, agree in part,
16   disagree in part or disagree in part --
17   disagree in -- let me try that one more time.
18         Do you agree in its entirety, agree in
19   part, disagree in part or disagree in its
20   entirety with the statement, "Repeated,
21   prolonged, or continuous CEW applications may
22   contribute to cumulative exhaustion, stress,
23   cardiac, physiologic, metabolic, respiratory,
24   and associated medical risks, which could
25   increase the risk of death or serious injury"?
```

Transcript of Mark W. Kroll, Ph.D.
Conducted on September 13, 2018                    223

1    A.   I largely disagree with this.  It's wrong

2    on respiratory.  It's wrong on cardiac.  It's

3    probably correct on stress if you have someone

4    that is feeling the pain.  On the other hand,

5    the studies have shown that there's less stress

6    markers with the use of a prolonged electronic

7    control versus the alternatives.  Yeah, this is

8    definitely a little out of date.  Metabolic,

9    that's not true.  There is a pH shift and an

10   increase in lactate in the first five seconds

11   and it generally levels out.  So I guess I

12   generally would disagree with that sentence.

13   Q.   On the second page continuing down under

14   the bold heading Physiologic and Metabolic

15   Effects, TASER warnings state, "CEW use causes

16   physiologic and/or metabolic effects that may

17   increase the risk of death or serious injury."

18        Do you agree in whole, agree in part,

19   disagree in part or disagree in its entirety

20   with that statement?

21   A.   You have to compare that to the

22   alternative.  If we compare that to the

23   alternative choices for control, then it's

24   excessively conservative.  If you compare it to

25   sitting on the couch at resting metabolism,

Transcript of Mark W. Kroll, Ph.D.
Conducted on September 13, 2018                    224

1   then it's certainly true that there are

2   measurable physiologic and/or metabolic

3   effects, whatever that means.  Physiologic

4   means a normal change.  It's not clear how that

5   fits in there.  There are measurable changes in

6   lactate, cortisole, serotonin.  They're all

7   trivial.  Whether those could increase the risk

8   of death or serious injury, I can't think of a

9   mechanism where that would happen.  Well, I can

10  certainly think of one mechanism which would be

11  essentially physiologic.  You lock up the

12  muscles, person loses their balance, they fall

13  and hit their head and they die.  But these

14  other effects have been studied pretty

15  carefully and there does not appear to be a

16  cumulative effect.  Again, this was written by

17  lawyers.

18  Q.   Turning to the next paragraph, the

19  statement, "Some individuals may be

20  particularly susceptible to the effects of CEW

21  use."

22       Do you agree in whole, agree in part,

23  disagree in part or disagree entirely with that

24  statement?

25  A.   I agree in part.  I've actually published

1    on one of these issues.

2    Q.   These warnings instruct law enforcement

3    officers, "To reduce the risk from CEW

4    exposure:  Minimize the number and duration of

5    CEW exposures."  And goes on to state, "Most

6    human CEW lab testing has not exceeded

7    15 seconds of CEW application, and none has

8    exceeded 45 seconds."

9         Do you see what I'm referring to?

10   A.   I do.

11   Q.   Taking that latter statement first, do you

12   agree with that description of the state of the

13   CEW lab testing on humans?

14   A.   Yes.  Well, it's only because you can't

15   get volunteers to take this for more than

16   45 seconds.  I've done it three times.  It

17   hurts.  And it's kind of hard to get volunteers

18   to sign up for longer durations.  And there's

19   no benefit to it because things have pretty

20   well leveled out at five to ten seconds.

21   Q.   Do you agree or disagree with the

22   direction to reduce the risk from CEW exposure

23   to minimize the number and duration of CEW

24   exposures?

25   A.   I think that's a good practice for

1    concerns of excessive force litigation.

2    Scientifically we've not found any cumulative

3    effects beyond five to ten seconds.

4    Q.   And I understand that you testified that

5    you had not reviewed them recently other than

6    the draft not yet released revisions to the

7    training materials.

8    A.   That's training.  But here we're looking

9    at warning.

10   Q.   I understand.  And I apologize for the

11   lack of clarity.  I paused to gather my

12   thoughts, but I was sort of continuing on with

13   another question related to training materials.

14   A.   Because I did recently review the newer

15   warnings in a case just within the last year.

16   I read through that very carefully.

17   Q.   Are you aware that the TASER training

18   materials also contain a warning related to --

19   that the issue of multiple or continuous CEW

20   applications?

21   A.   I'm sure -- I don't know.  If you have it

22   in front of you, I'd be happy to comment on it.

23            MR. HEPPELL:  I'm going to mark this

24   exhibit.

25            (Exhibit Number 8 marked for

Transcript of Mark W. Kroll, Ph.D.
Conducted on September 13, 2018                    227

1    identification.)

2    BY MR. HEPPELL:

3    Q.    The court reporter has handed you a

4    document that's been marked as Kroll Exhibit 8.

5    It's Bates-stamped D 5119 through 5160.  And

6    it's entitled Annual CEW User Update,

7    Version 19, April 2013.  And I'm going to

8    represent to you this is one of a number of

9    different sets of training materials that's

10   been produced in discovery in this case.

11         And turning to -- and the page number is

12   in the bottom left of the document.  Turning to

13   page D 5137, there's a slide entitled Avoid

14   Extended Durations.

15         Do you see the slide I'm referring to?

16   A.    (Views document.)  I do.

17   Q.    And it states, "Several law enforcement

18   groups have set out 15 seconds, multiple

19   applications or continuous, of CEW exposure as

20   a significant safety point."  And then it sets

21   forth a number of different organizations and

22   their publications, correct?

23   A.    I do.  Did you want me to comment on

24   whether this was scientific or unanimous or

25   what would -- did you just want me to see this

1    slide?

2    Q.   Well, you agree having reviewed it that

3    that material is contained in the TASER

4    training materials that TASER provides to law

5    enforcement, correct?

6    A.   Yes.  But I just want to point out that

7    the company itself has not adopted the baseball

8    rule; three strikes.  And it's pointing out

9    that some of these other agencies do.  There's

10   one error here.  The United States Department

11   of Justice, not the Civil Rights Division, but

12   their National Institute of Justice, which does

13   their research, they've specifically come out

14   against the baseball rule and say it's

15   unscientific.

16   Q.   Well, would you agree that it's an

17   accurate statement that several law enforcement

18   groups have set out 15 seconds as a significant

19   safety point?

20   A.   Yes.  And that's incorrect because there's

21   no scientific basis for saying that 16 seconds

22   is dangerous and 14 seconds is safe.

23   Q.   Respectfully, sir, I'm not asking you to

24   comment on it.  I'm just asking you whether you

25   agree that that's an accurate statement, that

Transcript of Mark W. Kroll, Ph.D.
Conducted on September 13, 2018                    229

1    those groups have set forth this out as a

2    significant safety point?

3    A.    I'm not sure if I can agree or not because

4    these agencies -- a lot of these advisory

5    groups have adopted the baseball rule.  Whether

6    they say it's just good for reasonable force or

7    they really believe that there is some danger

8    at 16 seconds, that's not clear to me.  The

9    most common reason that is articulated for this

10   is that if you have a good connection for

11   15 seconds, that's more than enough time to

12   handcuff somebody and so it should not be

13   necessary.  And, in fact, it usually is not.

14   90 percent of applications are 15 seconds or

15   less because that's enough time for handcuffing

16   if you have good probe spread.

17   Q.    Do you think it's appropriate that TASER

18   instructs police officers in its training

19   materials to avoid extended durations and in

20   the context of that warning, to set forth that

21   a number of groups have identified 15 seconds

22   of exposure as a significant safety point?

23   A.    Is it appropriate as company policy to

24   have done that?

25   Q.    Correct.

1   A.    I think it's smart because for the reason

2   I articulated before, that you should be able

3   to handcuff someone if you have a good

4   connection for 15 seconds.  And if you can't

5   get them handcuffed in 15 seconds, then things

6   aren't working, you need to move to something

7   else, like put a new cartridge in.  And it's

8   also a flash point for litigation because there

9   are some civil rights litigators that play on

10  the TASER download and get the idea that each

11  trigger pull is equivalent to another bullet or

12  another baton strike and there is some

13  cumulative effect.  So it's a real red flag for

14  litigation.  So there's good reasons for this.

15  There's no scientific data to support this as a

16  safety limit.

17              MR. HEPPELL:  Can we go off the

18  record.

19              (Recess.)

20              (Exhibit Number 9 marked for

21  identification.)

22  BY MR. HEPPELL:

23  Q.    Dr. Kroll, I'm handing you what's been

24  marked by the court reporter as Kroll

25  Exhibit 9.  It is two pages.  It's a chain of

Transcript of Mark W. Kroll, Ph.D.
Conducted on September 13, 2018                    231

1    emails between various individuals.  And it's

2    Bates-stamped D 4052 and D 4053.  And I'm going

3    to specifically direct your attention to the

4    email, the substance of which is at the very

5    top of the second page, but the metadata or

6    header sending information is at the bottom of

7    page -- the first page, D 4052, which reflects

8    an email sent Tuesday, June 6, 2017, at

9    4:22 p.m.

10        Do you see the email that I'm referring

11   to?

12   A.   (Views document.)  I do.

13   Q.   The email states, "Expert Mark Kroll says

14   if we have the prongs/darts that stuck to

15   Todero, we can have them microscopically

16   analyzed to see how many seconds electricity

17   actually connected, much less than stated in

18   the TASER deployment report."

19        Did I read that accurately?

20   A.   Yes.

21   Q.   Do you recall having a conversation along

22   those lines sometime prior to June 6, 2017, at

23   4:22 p.m. in relation to the Todero case?

24   A.   I don't recall the date.  But that would

25   be standard practice for me to say please try

Transcript of Mark W. Kroll, Ph.D.
Conducted on September 13, 2018                    232

1    to get ahold of the probes and wires because

2    that can eliminate a lot of misadventures about

3    the duration of current delivery.

4    Q.   And do you have any reason to dispute that

5    the context of that email is an accurate

6    representation of the nature of your

7    conversation?

8    A.   No.

9    Q.   And so you'd agree with me then that as of

10   June 6, 2017, you had already concluded that

11   the number of seconds of electricity actually

12   connected in relation to Mr. Todero was much

13   less than stated in the TASER deployment

14   report?

15   A.   No.

16   Q.   You disagree that that's what that email

17   reflects?

18   A.   It's hard to say what the paraphrasing is.

19   But the -- I can tell you how my normal

20   conversation goes, which is you get these

21   probes, wires microscopically analyzed to see

22   how many seconds of current were actually

23   delivered and it's usually much less than

24   stated in that report.  So there was nothing

25   conclusory in there.  It was just a request for

1    that evidence.

2    Q.   But you already suspected at this point

3    that the number of seconds that the electricity

4    actually connected was much less than stated in

5    the TASER deployment report, correct?

6    A.   I don't know either way.  I would ask

7    regardless for the probes because a lot of

8    times they're lost and I wanted to see if they

9    can get them; the sooner, the better.  It's

10   possible that they told me that there was a

11   98-second download, which is a huge red flag

12   that there was a misconnection.  So I probably

13   suspected at that point assuming they told me

14   it was 98 seconds, but I always ask to have the

15   probes analyzed.  That's on these older weapons

16   that did not have the pulse graph data.

17   Q.   When you say that the 98 seconds -- well,

18   strike that.

19        You stated that the 98 seconds was a huge

20   red flag, correct?

21   A.   Assuming that they told me that -- and I'm

22   not sure that they did.  But if we assume or

23   gleaned that they told me that it was 98

24   seconds, then I would have suspected -- well,

25   based on my experience, I would've been

1  confident that it was a broken probe or a

2  dislodged probe or a broken wire.  But

3  regardless, I asked for the probes and wires to

4  be analyzed.

5  Q.   Ninety-eight seconds is pretty far outside

6  the norm in terms of the number of seconds

7  discharged in an incident involving a TASER, is

8  that fair to say?

9  A.   Of actual current delivery?  Yes.  I've

10  never seen one in ten years that was actually

11  that much current delivery.

12  Q.   What about a trigger pull involving -- in

13  a situation involving a single cartridge

14  deployed in a single TASER, a total of 98

15  seconds?

16  A.   You get those.  I've had them over

17  200 seconds.

18  Q.   And you agree that as of June 6, 2017, you

19  hadn't had the opportunity to review any of the

20  materials in this case, is that correct?

21  A.   Well, I would agree is that -- that's

22  probably true.  And if I did, it was brief

23  enough so I didn't feel like charging for it.

24  Q.   Had you ever heard about Mr. Todero or the

25  Todero incident or the Todero case prior to

Transcript of Mark W. Kroll, Ph.D.
Conducted on September 13, 2018                    235

```
 1   being contacted by defense counsel in this case

 2   in reference to retaining you as an expert?

 3   A.   Not that I recall.

 4   Q.   Did you have any communications at any

 5   point with any of your colleagues on the TASER

 6   board, either the corporate board or the

 7   Scientific and Medical Advisory Board?

 8   A.   No.

 9   Q.   And either prior to being retained in the

10   litigation or at any point thereafter?

11   A.   I circulated Rashtian's expert report to

12   members of the Scientific Advisory Board.

13   Q.   And why did you do that?

14   A.   I had number of motives.  I thought they

15   would find it interesting.  Several of them are

16   electrophysiologists and I wanted them to see

17   some -- a frankly curious opinion from one of

18   their colleagues.  I also have an ulterior

19   motive.  I think that that is worthy of

20   disciplinary action.  And it wouldn't bother me

21   if one of them would refer it to American

22   College of Cardiology for an ethics

23   investigation or the California Board of

24   Medical Licensing.

25   Q.   Did you communicate that to them, that you
```

1  believed it warranted professional discipline?

2  A.   No.  I didn't want to give them my

3  opinions.  They can draw their own conclusions

4  from reading the expert report.

5  Q.   When did you send Dr. Rashtian's expert

6  report to your colleagues on the Scientific and

7  Medical Advisory Board?

8  A.   Four to six weeks ago.

9  Q.   Was that by email?

10  A.   Yes.

11  Q.   What did you say to them in your email?

12  A.   I don't recall the exact words.  But I

13  said:  I thought you might enjoy reading this

14  expert report from one of your colleagues.

15  Q.   Other than that communication, have you

16  had any other communications, whether in

17  writing or orally, about Mr. Todero or any

18  aspect of the Todero incident or Todero case

19  other than communications with defense counsel

20  in this case?

21  A.   I don't believe so.  Nothing that --

22  nothing I can think of right now.

23  Q.   Did any of your colleagues on the

24  Scientific and Medical Advisory Board respond

25  to your email?

Transcript of Mark W. Kroll, Ph.D.
Conducted on September 13, 2018                     237

```
1    A.   Yes.

2    Q.   What did they -- how many colleagues

3    responded?

4    A.   Two or three.

5    Q.   What did they say in response?

6    A.   One of them actually knows Rashtian and

7    said that is really disappointing because he's

8    actually sane in his clinical practice.  Now

9    that I think about it, it wasn't that long ago.

10   Three weeks ago.  I don't recall anymore.  You

11   want all the responses?

12   Q.   Correct.

13   A.   I don't remember.  They were just

14   pretty -- these are physicians.  So they're

15   always disappointed when they see a physician

16   behave like this.  Expressions of

17   disappointment and disgust.

18   Q.   And you don't recall any of the details of

19   their responses beyond that?

20   A.   One of them said we need to have some kind

21   of an educational program.  That's all I

22   recall.

23   Q.   Can I get you to turn back to Exhibit 3,

24   the subpoena for documents in this case.  And I

25   would direct your attention to request
```

1  number 17.  Why didn't you produce the email

2  communications you just described in response

3  to request number 17?

4  A.   Didn't apply.

5  Q.   Why didn't it apply?

6  A.   This is limited to Axon's board of

7  directors.  At the very beginning, "All

8  communication, including electronic

9  communications, which you undertook in your

10  capacity as a member of Axon's board of

11  directors..."  This has nothing to do with my

12  capacity as a member of the board of directors.

13  And it's not between any of their members,

14  officers, agents.  Yeah, exactly, it's not

15  between me and any of their -- members of their

16  board, officers or agents.  So it doesn't apply

17  for two reasons.

18  Q.   Are there any other communications with

19  any member of the Scientific and Medical

20  Advisory Board related to the Todero case

21  beyond what you just described?

22  A.   No.

23  Q.   Do your colleagues who sit on the

24  Scientific and Medical Advisory Board receive

25  compensation for sitting on that board?

1    A.    Yes.

2    Q.    And do you know what that compensation

3    amounts to?

4    A.    Roughly 20, 25K per year.

5           MR. HEPPELL:  All right.  I don't

6    have any further questions at this time.

7           THE WITNESS:  Great.  Thank you.

8           MR. STEPHENSON:  Caren?

9           MS. POLLACK:  No.

10           MR. STEPHENSON:  Okay.  I have no

11    questions.

12           THE WITNESS:  Okay.

13           MR. STEPHENSON:  Do you want to

14    review the transcript for --

15           THE WITNESS:  Yes, sure.

16           (Deposition concluded at 4:47 p.m.)

17              ***************

18

19

20

21

22

23

24

25

Transcript of Mark W. Kroll, Ph.D.
Conducted on September 13, 2018                    240

```
1                    REPORTER'S CERTIFICATE

2

   STATE OF MINNESOTA    )
3                         ) ss.
   COUNTY OF HENNEPIN     )

4

5          I hereby certify that I reported the
   deposition of Mark W. Kroll, Ph.D. on September 13,
6  2018, in Minneapolis, Minnesota, and that the witness
   was by me first duly sworn to tell the whole truth;

7
           That the testimony was transcribed by me and
8  is a true record of the testimony of the witness;

9          That the cost of the original has been
   charged to the party who noticed the deposition, and
10 that all parties who ordered copies have been charged
   at the same rate for such copies;

11
           That I am not a relative or employee or
12 attorney or counsel of any of the parties, or a
   relative or employee of such attorney or counsel;

13
           That I am not financially interested in the
14 action and have no contract with the parties,
   attorneys, or persons with an interest in the action
15 that affects or has a substantial tendency to affect
   my impartiality;

16
           That the right to read and sign the
17 deposition transcript by the witness was reserved.

18
           WITNESS MY HAND AND SEAL THIS 21st day of
19 September, 2018.

20

21

22

23

24 Dana S. Anderson-Linnell
   Notary Public, Hennepin County, MN
25 My commission expires 1/31/2020
```

Transcript of Mark W. Kroll, Ph.D.
Conducted on September 13, 2018

241

**A**

abbott
26:13
aberdeen
2:15
ability
16:7, 182:7,
200:14, 209:2,
215:2
able
7:22, 8:11,
10:8, 10:24,
29:17, 53:14,
57:14, 74:7,
87:6, 90:3,
93:7, 119:25,
141:16, 145:18,
149:5, 158:1,
185:10, 216:15,
230:2
above
28:10, 29:3,
65:8, 72:17,
82:1, 124:21,
208:18
absence
204:5
absent
101:13, 101:14
absolutely
98:4
abstract
115:16
academic
80:15, 107:20,
112:2, 112:5,
112:8, 143:22
accept
170:13, 170:17
accepted
161:4
accepting
170:12, 170:21
access
18:7, 19:1,
31:12, 51:16
account
69:6

accountability
182:18
accounting
68:8, 68:24,
191:24
accuracy
23:13
accurate
8:12, 39:10,
43:9, 54:20,
78:13, 78:19,
176:10, 182:21,
228:17, 228:25,
232:5
accurately
27:21, 70:25,
77:1, 157:25,
200:12, 231:19
acidity
221:20
act
78:8, 79:20,
80:7
action
4:20, 34:1,
235:20, 240:24,
240:25
actions
78:6, 158:11
active
62:2, 110:25,
208:23
activities
127:4
actual
141:4, 173:7,
173:16, 174:23,
180:10, 180:20,
181:4, 188:5,
234:9
actually
32:13, 33:2,
45:3, 70:9,
94:2, 120:11,
132:12, 139:19,
172:24, 174:3,
176:3, 178:3,
178:9, 178:16,

180:17, 182:21,
219:21, 224:25,
231:17, 232:11,
232:22, 233:4,
234:10, 237:6,
237:8
ad
112:22
adamec
135:1, 135:5
add
15:7, 39:24,
49:7, 106:14,
148:21, 157:23,
158:16, 186:9,
201:7, 203:14
added
35:23, 35:24,
39:16
addition
37:5, 49:21,
51:17, 52:1,
198:21
additional
9:24, 10:2,
16:18, 19:11,
28:9, 51:24,
53:2, 65:8,
118:5, 172:14,
194:1, 194:19
additionally
10:4, 38:21
address
200:3
addressed
200:4, 200:9
adds
43:4
adequacy
156:17
adjective
42:18
adjunct
112:13
admin
36:25, 38:4,
110:10
administration
23:9, 108:20

administrative
23:6, 31:2,
31:4, 39:25,
110:11, 110:14,
117:19, 118:4
administrator
1:5
admit
27:24, 197:5,
197:10
admonitions
42:8
adopted
228:7, 229:5
adult
105:14
advanced
184:21
advantage
109:25
advertise
60:19
advice
127:12, 127:14,
127:17, 128:3,
128:8, 128:11,
129:13, 129:15,
129:19, 131:3,
132:14, 133:22,
155:4
advising
126:14, 127:8
advisory
65:1, 65:4,
81:9, 82:3,
229:4, 235:7,
235:12, 236:7,
236:24, 238:20,
238:24
affect
240:26
affects
216:7, 240:26
affiliations
112:2, 112:5
affirmative
196:25
after
11:8, 14:10,

Transcript of Mark W. Kroll, Ph.D.
Conducted on September 13, 2018

242

15:14, 26:4,
26:6, 104:13,
133:4, 147:7,
155:9, 167:3,
168:1, 191:8,
191:9, 201:10,
202:7, 206:4
**afternoon**
30:8, 137:6
**again**
47:23, 52:23,
71:18, 84:25,
91:11, 92:18,
97:14, 101:1,
101:17, 106:6,
110:21, 119:7,
119:19, 120:21,
127:15, 132:22,
145:24, 152:22,
165:13, 167:18,
171:11, 172:18,
188:9, 189:18,
212:22, 221:4,
224:16
**against**
51:6, 89:9,
89:10, 89:11,
89:12, 89:20,
91:12, 91:13,
92:19, 95:11,
99:4, 123:10,
124:12, 228:14
**agencies**
182:15, 228:9,
229:4
**agent**
198:5
**agents**
238:14, 238:16
**aggressive**
150:4, 203:20
**agitated**
150:3, 215:13
**agitation**
150:14
**ago**
55:5, 55:10,
66:11, 68:10,

69:2, 99:20,
142:3, 143:5,
143:7, 160:21,
210:8, 236:8,
237:9, 237:10
**agree**
78:4, 78:9,
79:6, 84:11,
85:20, 133:14,
146:9, 146:17,
151:11, 160:13,
160:19, 166:13,
170:22, 172:12,
187:22, 189:18,
192:7, 193:14,
195:15, 196:7,
197:23, 200:11,
200:19, 200:23,
205:25, 207:13,
220:25, 221:2,
222:2, 222:13,
222:15, 222:18,
223:18, 224:22,
224:25, 225:12,
225:21, 228:2,
228:16, 228:25,
229:3, 232:9,
234:18, 234:21
**agreed**
44:14, 81:2,
160:21
**agreeing**
82:9
**agrees**
44:9
**ahead**
7:20, 61:14
**ahold**
232:1
**air**
44:25
**al**
13:14
**albeit**
201:9
**alcohol**
103:1
**alike**
219:22

**all**
10:8, 16:4,
18:10, 20:8,
24:6, 29:16,
30:22, 30:24,
34:15, 39:17,
40:4, 41:23,
47:22, 48:11,
50:8, 50:11,
52:4, 52:15,
52:23, 53:23,
54:6, 54:24,
56:18, 62:4,
63:21, 69:17,
71:10, 86:13,
99:8, 100:9,
100:19, 111:12,
111:16, 112:10,
114:14, 121:7,
133:11, 134:17,
135:4, 136:7,
140:21, 159:17,
162:9, 163:23,
165:22, 167:17,
174:11, 175:14,
176:12, 176:17,
176:22, 179:2,
187:13, 194:25,
198:4, 198:19,
206:15, 207:5,
208:19, 212:11,
214:18, 224:6,
237:11, 237:21,
238:7, 239:5,
240:16
**allegation**
90:19, 102:18
**allegations**
89:20, 90:17
**allege**
92:16
**alleged**
99:13, 100:6,
100:25
**alleging**
90:1, 92:14,
93:19
**allergic**
149:4

**allow**
52:18, 72:14
**allowed**
202:19
**almost**
11:13, 111:16,
111:24, 133:23,
188:8, 191:25,
192:1, 197:6,
198:25, 205:15,
207:6
**along**
7:14, 40:9,
135:18, 140:14,
165:5, 169:20,
191:11, 231:21
**already**
23:24, 29:15,
35:2, 35:4,
36:12, 37:21,
45:1, 48:9,
61:10, 82:2,
83:13, 85:9,
85:12, 85:14,
88:7, 92:6,
203:24, 232:10,
233:2
**also**
24:11, 37:17,
42:20, 44:4,
49:17, 51:8,
51:14, 51:21,
62:22, 63:1,
64:17, 103:20,
108:24, 110:21,
110:24, 111:3,
113:12, 115:20,
135:10, 143:15,
148:1, 158:17,
165:1, 182:17,
189:12, 195:19,
196:7, 201:7,
204:6, 212:10,
215:22, 226:18,
230:8, 235:18
**altered**
149:25
**alternative**
71:13, 71:15,

Transcript of Mark W. Kroll, Ph.D.
Conducted on September 13, 2018

144:24, 159:11,
159:15, 171:20,
206:20, 206:23,
223:22, 223:23
**alternatives**
161:23, 223:7
**although**
32:15, 95:2,
97:20, 117:3,
195:21
**always**
6:18, 57:2,
71:8, 180:13,
187:18, 188:8,
191:25, 205:12,
233:14, 237:15
**amateur**
60:21, 60:25
**american**
10:17, 12:8,
105:21, 105:24,
106:19, 106:24,
163:22, 163:24,
235:21
**among**
173:6
**amount**
23:21, 68:3,
83:18, 122:6,
178:9, 178:15,
180:21, 183:13,
197:25, 206:12,
213:14, 214:7
**amounts**
239:3
**analgesic**
213:23, 214:15
**analogy**
74:24, 76:14,
76:15, 76:20,
150:22
**analysis**
93:22, 135:21,
173:4, 173:7,
178:2, 180:8,
183:1, 205:20
**analyze**
176:6, 209:14

**analyzed**
188:4, 231:16,
232:21, 233:15,
234:4
**analyzing**
136:23, 136:24,
173:21, 175:2
**ancillary**
97:12
**anderson-linnell**
1:25, 2:5,
240:38
**anecdote**
149:13, 149:15
**anesthetic**
213:23
**angle**
46:13
**angry**
215:13
**animal**
105:11, 134:22
**ankles**
208:25
**annual**
5:11, 60:17,
64:1, 64:4,
64:10, 83:4,
83:10, 83:19,
83:23, 84:25,
86:5, 227:6
**another**
8:6, 31:14,
49:12, 73:23,
85:20, 93:7,
99:17, 100:8,
101:4, 101:17,
134:22, 181:17,
191:18, 202:25,
226:13, 230:11,
230:12
**answer**
4:7, 7:13,
7:20, 8:5, 47:6,
61:14, 61:16,
61:21, 63:19,
69:17, 77:23,
83:20, 83:22,

86:10, 117:4,
120:8, 126:1,
130:22, 145:2,
206:7, 207:15,
211:10, 211:11,
212:8, 212:9,
212:12
**answered**
202:8
**answers**
6:25, 37:6,
162:16
**anticipate**
90:9, 90:25,
91:15
**anybody**
146:3, 148:22,
149:2
**anymore**
237:10
**anyone**
9:4, 78:1,
123:11, 124:12,
126:21, 127:5,
129:21, 132:20,
153:13, 155:11,
193:19, 197:12
**anything**
8:9, 9:19,
33:11, 35:20,
49:4, 116:25,
124:21, 129:21,
130:5, 133:3
**anywhere**
174:1
**apologize**
49:19, 83:8,
226:10
**apparent**
222:10
**appear**
13:6, 140:18,
158:5, 224:15
**appearances**
2:9, 2:21, 3:1
**appeared**
12:17, 149:12
**appears**
15:23, 22:16,

22:20, 50:1
**applicable**
3:22, 204:1
**application**
180:16, 187:4,
194:4, 199:17,
201:4, 203:10,
225:7
**applications**
202:14, 203:6,
212:19, 220:16,
222:21, 226:20,
227:19, 229:14
**applied**
98:19, 176:11,
183:17, 183:20,
202:21, 204:3
**applies**
84:15, 84:17,
160:16, 169:22,
169:25
**apply**
178:17, 178:22,
183:16, 202:22,
203:14, 204:3,
238:4, 238:5,
238:16
**appointments**
112:8
**appreciate**
18:15, 38:7,
44:2, 44:5,
47:23, 56:20,
85:3, 97:17,
104:5, 117:12,
136:6, 168:12,
195:5
**appropriate**
61:19, 93:3,
94:9, 94:14,
96:20, 158:11,
159:8, 229:17,
229:23
**approximate**
9:16, 66:15,
67:4, 83:9,
84:25
**approximately**
9:12, 9:17,

Transcript of Mark W. Kroll, Ph.D.
Conducted on September 13, 2018

244

10:3, 26:20,
26:21, 28:12,
61:3, 64:15,
65:15, 65:25,
67:1, 68:22,
83:3, 86:4
**april**
5:12, 118:11,
119:8, 227:7
**arced**
98:20
**area**
41:11, 44:8,
48:3, 105:17,
109:25, 116:4,
116:9, 117:7,
130:19, 136:2,
136:4, 137:11,
140:1, 141:15,
142:5, 146:18,
150:6, 150:12,
151:20, 152:8,
160:4, 160:10,
167:17, 172:11,
209:10, 215:3,
215:16
**areas**
46:21, 115:4,
116:21, 160:10
**aren't**
48:22, 113:20,
178:25, 185:5,
185:14, 230:6
**arguably**
15:10, 17:14,
94:22
**argued**
24:22
**argues**
168:25
**arguing**
161:8, 169:8
**argument**
160:23
**arguments**
25:4
**arithmetic**
85:10

**arms**
96:15, 133:9,
186:20
**around**
8:3, 32:4,
66:8, 84:19,
131:4, 133:12,
185:1, 203:18
**arrest**
139:22, 153:17,
153:20, 153:24,
154:3, 155:6,
155:8, 155:9,
165:17
**arrest-related**
160:24
**arrested**
153:12, 153:16,
155:11
**arrests**
127:23
**arrived**
154:14, 175:3,
175:12
**article**
135:7, 141:7,
142:18, 148:1
**articles**
126:9, 126:18,
126:21, 127:1,
127:4, 140:14,
140:18, 141:13,
175:1, 175:6,
175:8
**articulate**
164:16
**articulated**
229:9, 230:2
**as-yet**
1:11
**aside**
75:19, 151:9
**ask**
7:10, 8:4,
13:5, 51:8,
84:24, 106:15,
126:4, 130:1,
130:16, 144:23,

170:12, 175:4,
185:22, 233:6,
233:14
**asked**
8:4, 82:17,
83:7, 84:21,
88:17, 88:21,
94:10, 94:24,
96:21, 97:4,
100:15, 100:22,
113:15, 131:11,
132:25, 144:21,
171:16, 234:3
**asking**
58:19, 80:2,
107:20, 140:23,
167:18, 169:3,
170:17, 185:13,
211:6, 212:22,
221:23, 221:24,
228:23, 228:24
**aspect**
97:22, 134:14,
209:22, 236:18
**aspects**
48:6, 56:23,
116:16
**assault**
101:10, 101:14,
101:15
**asserting**
117:4, 117:6
**assertion**
156:6, 175:7
**assigned**
162:24
**assist**
141:21
**assistant**
23:7, 31:2,
31:4, 110:12,
110:15, 117:19,
118:4
**associated**
220:18, 222:24
**associates**
59:24, 60:3,
60:10, 109:6,

109:18, 110:5,
110:7, 110:8,
110:19
**assume**
7:22, 17:2,
233:22
**assuming**
84:13, 91:18,
192:4, 233:13,
233:21
**assumptions**
39:1
**athletic**
107:12, 107:15
**attached**
5:19, 5:21
**attack**
139:19, 139:21,
150:23
**attacked**
122:15
**attempting**
190:15, 212:23
**attend**
56:18, 57:21,
58:3
**attendances**
59:14
**attended**
57:3, 57:8,
84:22, 113:17,
116:12, 125:6
**attention**
140:9, 140:15,
219:24, 231:3,
237:25
**attorney**
8:18, 240:20,
240:21
**attorneys**
6:10, 8:24,
123:2, 240:25
**audio**
49:18, 51:2,
51:11, 51:20,
51:24, 52:7,
52:8, 52:19
**august**
4:15, 22:19,

Transcript of Mark W. Kroll, Ph.D.
Conducted on September 13, 2018

245

23:17, 24:3,
27:18, 28:8,
35:6, 35:21,
39:21
**australia**
93:10
**author**
12:13, 134:19
**authored**
12:4, 16:2,
54:22, 114:14,
209:21, 214:23
**authorities**
105:17, 139:14,
142:5
**authorized**
128:19
**authors**
11:20, 148:3,
148:7
**autopsy**
201:8, 201:14,
201:20, 202:2,
202:7
**available**
158:1
**avenue**
2:3, 45:4,
53:10
**average**
135:16, 153:4,
171:6
**averages**
112:23
**avoid**
44:4, 199:23,
227:13, 229:19
**avoidance**
220:2
**aware**
52:25, 53:3,
53:14, 126:20,
144:8, 162:6,
168:16, 168:22,
183:8, 188:15,
188:19, 190:24,
195:14, 196:3,
196:14, 197:11,

200:25, 219:11,
226:17
**awareness**
196:24
**away**
46:15, 87:8,
96:8, 96:10,
123:6, 181:16,
206:4, 207:17
**axon**
26:7, 27:1,
63:8, 63:11,
63:15, 79:9
**axon's**
238:6, 238:10

**B**

**bachelor**
80:16, 107:24
**back**
25:15, 27:5,
35:19, 53:20,
54:10, 67:11,
80:21, 80:23,
88:7, 88:11,
88:15, 96:11,
96:12, 96:13,
98:23, 101:16,
101:20, 107:12,
107:18, 123:12,
124:6, 124:7,
124:8, 132:23,
145:9, 145:15,
151:8, 161:3,
168:15, 181:12,
184:11, 184:15,
189:13, 207:7,
207:8, 207:18,
208:18, 209:7,
210:10, 211:16,
211:19, 213:3,
216:19, 237:23
**back-and-forth**
52:10
**background**
46:6, 56:23,
128:24, 143:25,
159:4

**backside**
22:19, 23:4,
39:12
**backward**
210:3
**backwards**
101:23, 208:2,
209:3, 209:6
**bad**
71:9, 79:1,
92:3
**bag**
29:20
**balance**
24:2, 208:24,
208:25, 209:2,
224:12
**ballistic**
208:5
**ballpark**
66:22
**bar**
220:1
**base**
149:12, 210:12
**baseball**
228:7, 228:14,
229:5
**based**
11:14, 53:12,
58:24, 67:21,
68:12, 69:5,
75:6, 101:7,
105:10, 111:12,
118:2, 119:23,
145:8, 145:16,
150:11, 166:14,
169:4, 173:20,
185:3, 203:5,
203:16, 204:12,
219:5, 233:25
**baseline**
151:12
**bases**
58:8
**basic**
144:4, 149:24
**basically**
56:14, 146:24,

165:19, 189:6
**basics**
42:16
**basis**
47:24, 57:10,
57:25, 59:3,
112:17, 113:19,
136:1, 140:8,
168:19, 186:16,
187:20, 188:25,
195:10, 197:22,
201:1, 203:9,
221:5, 221:23,
228:21
**batch**
121:8, 121:13
**batches**
121:6
**bates**
5:9, 5:12, 5:17
**bates-stamped**
218:18, 227:5,
231:2
**bathrooms**
154:8
**baton**
163:2, 230:12
**batons**
152:4, 161:19,
161:25
**bayesian**
55:8
**bearing**
117:12
**beaten**
101:14
**became**
26:6, 195:14
**become**
145:22, 207:20
**becoming**
59:15
**bed**
143:4, 143:6
**before**
2:4, 6:18, 8:5,
24:25, 26:11,
26:15, 27:15,

Transcript of Mark W. Kroll, Ph.D.
Conducted on September 13, 2018                                    246

32:1, 32:3,
32:8, 32:12,
32:15, 46:24,
59:14, 80:10,
92:3, 95:22,
103:12, 106:15,
121:13, 137:8,
140:7, 147:7,
177:19, 177:24,
188:3, 193:10,
195:8, 230:2
**beforehand**
26:19
**begin**
57:13, 122:2
**beginning**
238:7
**behalf**
2:11, 3:3,
3:12, 91:15,
92:24, 95:8,
95:19
**behave**
237:16
**behavior**
214:19
**being**
6:2, 12:4,
26:24, 27:10,
33:8, 34:10,
43:8, 46:24,
59:21, 59:23,
65:12, 73:10,
73:24, 74:24,
75:7, 75:16,
77:20, 80:12,
81:3, 84:9,
89:16, 91:12,
92:3, 97:18,
99:2, 99:13,
100:6, 111:3,
120:15, 136:9,
144:20, 144:21,
150:2, 160:9,
160:23, 166:15,
171:10, 183:14,
189:2, 192:16,
195:5, 206:12,

208:14, 210:13,
213:8, 235:1,
235:9
**beings**
125:19
**belaboring**
71:18
**belief**
105:13, 201:2,
207:22
**believe**
12:14, 38:19,
39:9, 104:21,
105:5, 107:1,
107:19, 107:23,
120:20, 138:24,
139:16, 140:13,
149:2, 191:2,
229:7, 236:21
**believed**
190:22, 191:10,
236:1
**believes**
168:12
**bell**
52:17
**belongs**
94:22
**belts**
162:3
**benefit**
225:19
**benefits**
152:3
**besides**
27:16
**best**
7:7, 8:13,
13:17, 16:6,
16:7, 25:2,
27:14, 30:21,
50:23, 62:9,
74:24, 75:12,
76:8, 78:8,
100:3, 101:1,
101:3, 105:10,
111:20, 111:21,
121:1, 200:13

**better**
44:11, 79:2,
128:18, 150:8,
153:4, 159:15,
184:10, 233:9
**between**
28:22, 29:2,
29:7, 29:18,
29:25, 34:16,
36:9, 38:16,
38:22, 52:11,
52:12, 63:3,
67:2, 67:8,
76:6, 76:11,
83:15, 118:12,
120:1, 120:4,
121:3, 121:9,
130:2, 130:11,
130:13, 130:24,
131:8, 146:7,
146:13, 146:18,
149:18, 178:19,
203:22, 206:16,
211:1, 211:3,
213:1, 213:12,
215:7, 219:18,
231:1, 238:13,
238:15
**beyond**
8:25, 33:12,
46:23, 48:9,
64:18, 97:9,
115:2, 124:5,
124:11, 129:9,
129:21, 130:6,
131:10, 150:13,
151:20, 152:8,
160:9, 203:11,
204:8, 226:3,
237:19, 238:21
**bias**
84:6, 84:11
**bifurcation**
25:7
**big**
115:25, 124:6,
154:6
**bill**
28:2, 110:1

**billable**
120:5
**billed**
122:8
**bio**
103:6, 137:3,
177:18
**bioelectricity**
111:13, 160:2
**biomedical**
112:13, 125:21,
130:3, 130:11,
130:15, 130:25,
221:17
**biomedicine**
161:6
**birth**
58:15
**bit**
98:13, 130:10,
132:5, 132:25,
173:8
**black**
220:1
**black-bordered**
220:6
**black-scholes**
73:13
**blackwell**
1:10, 3:12,
41:4, 43:10,
158:22, 159:7,
184:15, 186:23,
187:2, 188:1,
190:19, 191:7,
191:18, 191:19,
193:9, 195:14,
196:3, 196:10,
202:21, 206:2,
206:5, 214:1
**blackwell's**
157:24
**block**
40:13, 46:15,
67:14
**blood**
138:17, 138:20,
147:6, 147:9,

Transcript of Mark W. Kroll, Ph.D.
Conducted on September 13, 2018                                    247

150:24, 221:20
**blood-handling**
63:10
**board**
27:8, 27:13,
63:23, 64:2,
64:6, 64:12,
64:16, 64:18,
65:1, 65:4,
65:9, 65:17,
65:20, 67:22,
68:4, 68:11,
68:13, 72:22,
74:3, 74:17,
75:15, 76:22,
77:3, 77:10,
77:19, 77:25,
78:5, 78:16,
79:7, 79:17,
79:19, 80:5,
80:6, 81:9,
82:2, 82:4,
171:7, 207:21,
210:22, 212:4,
212:7, 235:6,
235:7, 235:12,
235:23, 236:7,
236:24, 238:6,
238:10, 238:12,
238:16, 238:20,
238:24, 238:25
**boards**
62:1, 62:20,
62:25, 63:1,
63:7, 85:13,
110:23
**body**
49:13, 51:1,
52:21, 53:3,
53:7, 55:21,
96:13, 102:12,
104:14, 106:8,
111:14, 115:24,
124:15, 128:17,
133:16, 133:24,
139:9, 140:4,
144:11, 145:18,
169:2, 169:19,

170:24, 171:25,
172:1, 178:4,
178:10, 183:15,
187:4, 191:3,
191:7, 191:20,
193:8, 199:1,
199:6, 199:8,
203:13, 206:13,
208:20, 213:9,
213:12, 213:15,
213:17
**bodytec**
171:5
**bold**
223:14
**bolded**
220:1
**book**
74:4
**border**
98:5, 98:8
**boring**
24:19
**both**
6:17, 7:1,
10:12, 22:16,
23:3, 25:23,
44:3, 46:24,
50:10, 89:21,
108:9, 110:23,
112:14, 133:9,
164:24, 168:25,
175:10, 193:7,
199:5, 200:15,
207:18, 217:20
**bother**
235:20
**bottom**
34:13, 134:19,
135:8, 140:10,
143:17, 164:9,
164:17, 168:16,
169:2, 169:6,
169:8, 179:15,
184:13, 184:16,
219:25, 227:12,
231:6
**boucher**
94:23, 95:15

**boucher's**
95:1, 95:24,
96:3, 96:6
**boulevard**
47:19
**bound**
182:23
**boundary**
8:3
**box**
220:6, 220:10,
221:10
**boy**
80:21
**brain**
96:17, 104:19
**branches**
47:17
**break**
7:25, 8:2,
28:4, 61:6,
75:11, 103:6,
103:7, 103:12,
133:18, 137:3,
137:5, 137:8,
177:18, 177:21,
177:24, 181:15,
201:21, 212:5,
213:24, 215:11
**breakdown**
121:22, 144:17
**breathing**
167:2, 168:1,
222:7
**brian**
1:9, 3:12
**brief**
6:19, 19:15,
33:12, 33:13,
48:19, 159:4,
164:3, 168:1,
234:22
**briefly**
39:13, 48:12,
89:2, 137:9
**bright**
130:13
**bringing**
49:20, 51:18,

124:12, 157:22
**british**
163:22, 163:23
**broad**
124:20
**broadly**
62:17, 64:22,
67:7, 90:16,
96:5, 102:5
**broke**
98:18
**broken**
179:21, 179:25,
234:1, 234:2
**brooklyn**
101:5
**brought**
11:1, 49:10,
95:11, 123:10,
148:1, 163:10,
189:2
**build**
106:12, 169:18,
172:3
**building**
145:5
**buildup**
144:25
**bulk**
22:7, 81:24,
129:13
**bullet**
230:11
**burn**
194:25
**burns**
107:4, 107:9,
133:25
**burnt**
98:21, 133:9
**business**
59:16, 59:20,
59:21, 60:13,
108:20, 108:25
**buying**
79:3

_____
C
_____

**cadets**
198:14

Transcript of Mark W. Kroll, Ph.D.
Conducted on September 13, 2018

248

cal
112:22
calculation
85:10
calculations
23:13
california
98:7, 112:15,
198:11, 235:23
calkins
135:1, 135:5
call
71:12, 72:8,
106:21, 110:1,
154:9, 154:12
called
6:2, 58:10,
68:9, 94:3,
102:13, 175:24,
182:12
calling
82:10
calls
51:15, 51:16,
51:19, 51:21,
52:1, 52:2, 52:8
camby
46:8, 53:10
came
14:7, 31:16,
165:25, 172:9,
179:9, 191:13,
203:22, 205:13
camera
49:13, 51:1,
52:21, 53:4,
53:8, 175:23,
176:7, 191:3,
191:8, 191:20
cameras
175:16
campus
113:2
can't
12:25, 16:9,
16:13, 22:4,
31:23, 32:10,
49:16, 77:13,

99:6, 99:18,
115:15, 116:25,
121:18, 130:13,
134:17, 184:22,
190:17, 193:5,
196:17, 197:3,
200:23, 219:22,
224:8, 225:14,
230:4
cancer
133:24
cannot
96:14, 199:15
canted
184:15
canting
183:5, 183:12,
183:21, 183:25,
184:3, 184:9,
184:24, 184:25,
185:6, 185:8,
185:12, 185:19,
186:3, 186:13,
186:17, 204:8,
204:12, 204:15,
204:19
capable
105:14, 107:1,
107:3
capacity
111:4, 152:14,
182:3, 238:10,
238:12
capped
65:11
capture
165:14, 165:18,
165:25
captured
53:4
car
98:18, 162:19
cardiac
127:23, 131:22,
134:20, 139:22,
141:8, 165:14,
165:17, 165:18,
220:17, 222:23,

223:2
cardiologists
127:8, 127:18
cardiology
235:22
career
56:1, 115:18,
138:21
carefully
224:15, 226:16
caren
3:13, 239:8
carrie
110:9
carried
162:10
carry
162:25, 163:5
cars
46:14, 46:16,
47:15, 47:20
cartridge
230:7, 234:13
case-specific
17:7, 18:22,
48:24, 120:23,
164:3
cases
21:11, 21:16,
21:17, 21:20,
22:2, 24:6,
24:13, 25:23,
26:23, 27:9,
32:16, 59:11,
81:18, 81:25,
82:20, 86:6,
86:7, 86:13,
86:22, 87:10,
88:18, 88:23,
90:3, 90:4,
94:17, 97:16,
98:25, 99:8,
99:11, 99:14,
100:3, 100:20,
101:25, 102:6,
102:22, 102:25,
103:14, 103:16,
104:17, 127:9,

159:17, 165:13,
173:22, 175:2,
176:9, 180:3,
180:8, 180:15,
182:20, 188:4,
198:9, 217:7
cash
64:11, 66:24,
67:2, 67:8,
68:15, 68:19,
72:24, 73:3,
74:18, 75:12,
75:18, 76:9
categories
34:18, 62:23,
179:15, 183:3
category
37:6, 136:8,
179:20
causation
102:19, 160:23
cause
43:25, 89:25,
92:13, 95:2,
95:24, 96:6,
97:1, 98:9,
99:13, 99:25,
100:5, 101:6,
102:7, 103:15,
104:22, 107:4,
107:9, 107:10,
144:9, 144:17,
146:10, 165:15,
166:5, 166:10,
167:6, 167:9,
168:3, 168:7,
172:2, 190:20,
193:8, 213:21,
213:22
caused
89:21, 94:14,
98:20, 100:23,
100:25, 101:11,
102:2, 102:4,
102:10, 102:15,
103:22, 104:2,
147:21, 155:22,
165:6, 165:8,

Transcript of Mark W. Kroll, Ph.D.
Conducted on September 13, 2018

249

165:9, 165:11,
167:21, 171:6,
180:10
**causes**
104:11, 106:4,
144:13, 179:12,
179:13, 183:3,
220:11, 221:17,
223:15
**causing**
106:20, 107:2,
107:3, 166:19,
184:4
**center**
101:5, 153:19,
153:21, 154:3,
154:7, 154:11
**centimeter**
213:20
**ceo**
77:4
**certain**
20:8, 34:7,
68:2, 71:23,
76:17, 145:3,
148:17, 150:25,
155:3, 209:12,
220:11, 221:18
**certainly**
46:3, 52:17,
77:7, 126:11,
129:8, 129:9,
132:6, 148:24,
151:14, 160:17,
169:25, 170:2,
197:9, 216:22,
224:1, 224:10
**certificate**
240:1
**certifications**
55:17
**certify**
240:7
**cetera**
147:4, 161:19,
167:16, 171:8,
197:19, 210:4
**cew**
5:7, 5:11,

147:22, 148:9,
168:2, 176:14,
210:7, 220:2,
220:10, 220:14,
220:16, 221:17,
222:21, 223:15,
224:20, 225:3,
225:5, 225:6,
225:7, 225:13,
225:22, 225:23,
226:19, 227:6,
227:19
**cews**
151:11, 209:22
**chain**
5:15, 102:19,
230:25
**chance**
11:8
**change**
69:3, 69:9,
69:10, 128:12,
148:7, 219:21,
224:4
**changed**
54:24, 58:15,
68:24, 118:22,
219:23
**changes**
220:12, 221:19,
224:5
**characteristics**
137:24
**charge**
19:16, 19:20,
19:21, 20:7,
20:10, 20:25,
21:3, 21:5,
21:8, 21:25,
24:6, 24:12,
24:15, 44:24,
45:2, 82:21
**charged**
21:13, 92:1,
93:14, 240:15,
240:16
**charges**
44:25, 45:1

**charging**
234:23
**charles**
1:6
**check**
124:4
**checklist**
149:23
**chemistry**
138:17, 138:20
**chicago**
2:16
**chief**
198:13
**child**
181:13, 181:18
**choice**
71:15
**choices**
223:23
**choose**
72:9
**circuit**
164:12, 164:23,
184:18, 206:9
**circulated**
235:11
**circumstance**
21:1
**circumstances**
20:8, 20:24,
21:23, 96:2,
96:19, 105:2,
105:13, 159:9,
159:14
**citation**
159:1, 173:18,
188:23, 209:7
**citations**
18:24, 174:9
**cite**
18:23, 159:22,
172:13, 177:5
**cited**
10:20, 10:25,
11:15, 102:25,
143:13, 172:6,
208:7

**citing**
189:8
**citizen's**
153:17, 153:20,
153:24, 154:2,
155:9
**city**
1:9, 3:3,
13:14, 24:22,
114:1
**civil**
3:23, 4:20,
33:25, 95:4,
228:11, 230:9
**civilians**
52:9
**ck**
143:10, 145:19,
145:20, 146:10,
146:19, 147:11,
147:16, 147:21,
148:8, 148:18,
151:8, 151:10,
151:12, 151:19,
171:3, 171:6,
171:16, 171:22,
172:2, 172:15
**claim**
200:17
**claims**
123:13, 123:17,
123:21
**clarification**
7:21, 15:12,
18:16, 104:5,
136:6
**clarified**
103:20
**clarify**
62:24, 63:19,
81:7, 97:14,
175:5
**clarity**
226:11
**class**
55:24, 112:20,
112:21, 112:25,
113:4

Transcript of Mark W. Kroll, Ph.D.
Conducted on September 13, 2018

250

**classic**
150:5, 159:17
**classified**
194:23, 195:21
**clear**
7:8, 7:11,
11:3, 13:9,
13:10, 37:4,
52:5, 79:17,
80:2, 87:19,
103:25, 138:25,
161:11, 164:25,
167:18, 185:3,
185:13, 186:1,
188:9, 221:22,
224:4, 229:8
**clearly**
106:13, 159:10
**cles**
56:15
**client**
44:9, 44:14,
84:14, 118:23
**clinic**
217:2
**clinical**
237:8
**close**
62:10, 105:7,
164:10, 164:19,
197:18, 207:8,
213:11, 217:25
**closer**
61:23, 178:16
**clubbing**
163:11
**clue**
194:18
**cmes**
56:16
**co-author**
55:13
**coauthor**
136:13
**coauthors**
135:2, 135:18
**cocaine**
139:13, 139:18

**coke**
214:21
**colleagues**
115:13, 174:11,
235:5, 235:18,
236:6, 236:14,
236:23, 237:2,
238:23
**college**
10:17, 12:8,
235:22
**column**
39:17, 40:12
**com**
2:18, 2:19,
3:10, 3:19
**come**
42:5, 74:25,
87:7, 117:11,
175:1, 181:18,
187:10, 191:9,
228:13
**comes**
50:8, 85:5,
100:9, 100:10,
103:3, 127:9,
128:13, 129:12,
175:19, 179:5
**coming**
46:12, 46:14,
46:16, 47:15,
47:20, 53:20,
187:12, 197:14,
200:5
**commands**
192:15
**commencing**
2:2
**comment**
149:10, 163:7,
211:4, 226:22,
227:23, 228:24
**commentary**
211:6
**commented**
170:9, 177:9
**comments**
48:20, 48:22

**commission**
240:40
**commitment**
112:18
**committee**
64:13
**committees**
64:17, 65:17,
167:15
**committing**
45:12
**common**
31:23, 102:25,
127:20, 131:13,
132:10, 192:12,
199:11, 229:9
**commonly**
42:20
**communicate**
9:3, 150:2,
235:25
**communication**
35:1, 236:15,
238:8
**communications**
8:24, 34:16,
34:19, 34:20,
38:16, 38:22,
235:4, 236:16,
236:19, 238:2,
238:9, 238:18
**community**
58:25
**companies**
63:4, 63:6,
68:25, 122:20,
123:5
**company**
26:10, 26:25,
27:3, 27:6,
63:4, 63:9,
66:3, 66:4,
66:6, 66:21,
67:16, 69:22,
76:22, 76:23,
77:6, 77:7,
78:7, 78:14,
78:19, 78:21,

**78:24, 79:20,**
79:23, 104:25,
109:8, 109:13,
122:15, 122:17,
182:10, 182:12,
228:7, 229:23
**compare**
223:21, 223:22,
223:24
**compared**
158:17
**comparing**
216:9
**compensated**
65:6, 81:25
**compensation**
34:20, 38:18,
64:1, 64:4,
64:10, 64:14,
64:15, 65:8,
65:16, 65:24,
66:7, 66:13,
66:15, 67:2,
67:4, 67:9,
67:24, 68:1,
68:12, 68:15,
69:14, 70:15,
72:21, 74:6,
74:10, 74:13,
74:15, 74:18,
74:23, 75:10,
75:13, 75:18,
76:1, 76:10,
80:24, 81:3,
82:1, 82:10,
82:19, 84:23,
118:6, 238:25,
239:2
**competition**
10:15, 12:12,
128:23
**compiling**
39:25
**complaining**
166:7
**complete**
8:5, 13:18,
14:23, 15:3,

Transcript of Mark W. Kroll, Ph.D.
Conducted on September 13, 2018

251

16:3, 19:19,
39:19, 54:20,
206:8, 210:11,
210:15
**completed**
29:12, 164:12,
164:22, 184:17
**completely**
31:23
**completing**
16:19, 16:25,
29:8
**compliant**
153:25
**complicated**
69:13, 73:7,
115:6
**complications**
142:6, 171:15
**comply**
114:4, 114:7
**components**
150:14
**comport**
30:11
**comports**
157:25
**comprehensive**
50:19
**comprises**
53:9
**computer**
50:17
**concept**
106:10
**concern**
114:15, 142:4,
145:23
**concerns**
222:10, 226:1
**conclude**
202:13, 212:17
**concluded**
147:20, 232:10,
239:16
**concludes**
220:20
**concluding**
177:6

**conclusion**
100:24, 122:5,
147:24, 175:13,
183:11, 206:24
**conclusions**
148:7, 236:3
**conclusory**
232:25
**concrete**
208:22
**condition**
8:10, 103:3,
132:1
**conditioning**
144:12
**conditions**
46:21, 47:9,
47:11, 48:1,
48:3
**conduct**
44:7, 153:20,
216:16
**conducted**
45:15, 111:23,
135:20, 136:11,
136:13, 142:22,
142:25, 205:6,
215:16, 217:15,
217:18
**conducting**
28:21, 201:13
**conference**
59:9, 59:13,
113:25, 115:8,
115:9
**conferences**
56:16, 56:18,
57:3, 57:8,
57:17, 57:20,
57:24, 57:25,
58:3, 58:7,
59:18, 113:16,
113:18, 114:20,
114:25, 115:7,
115:20, 116:12,
116:20
**confidence**
216:23

**confident**
40:4, 40:6,
234:1
**confirm**
17:13, 17:20,
17:22, 53:15,
212:6
**confounding**
148:2
**confuse**
63:21
**confusing**
150:16
**confusion**
42:21, 43:4,
43:20, 43:23,
43:25, 44:4,
173:6
**conjunction**
13:20, 16:5,
17:8, 20:21
**connect**
211:21
**connected**
231:17, 232:12,
233:4
**connection**
15:5, 25:12,
27:2, 27:5,
28:13, 30:25,
34:6, 35:7,
39:20, 40:17,
44:18, 49:5,
49:23, 50:11,
86:21, 86:22,
124:23, 153:23,
184:13, 184:17,
195:24, 198:25,
199:18, 209:15,
209:16, 211:1,
229:10, 230:4
**connections**
146:7
**consensus**
105:17
**consent**
216:15
**consequences**
198:10

**conservative**
204:4, 223:24
**conservatively**
183:16, 194:3,
194:9, 195:23,
202:19
**consider**
51:20, 52:4,
126:8, 126:17,
126:25, 127:6,
129:22, 130:5,
139:14, 153:8,
159:7, 160:5,
161:18, 161:25,
163:6, 176:21,
186:7
**considered**
15:24, 18:22,
38:25, 81:3,
147:17, 161:5,
163:11, 217:10
**considering**
114:16
**considers**
126:21
**consistent**
53:19, 158:3,
214:20
**consists**
53:5
**consult**
109:21
**consultant**
20:3
**consulting**
19:17, 20:9,
20:17, 21:4,
21:7, 21:23,
22:7, 23:18,
25:11, 25:19,
31:1, 33:6,
59:2, 61:3,
62:10, 64:12,
64:18, 64:22,
64:23, 65:2,
65:13, 75:17,
75:19, 81:6,
81:7, 81:11,

Transcript of Mark W. Kroll, Ph.D.
Conducted on September 13, 2018

252

82:5, 82:12,
82:22, 83:4,
83:11, 83:24,
84:14, 84:24,
85:2, 86:5,
86:20, 109:19,
109:20, 109:24,
110:17, 110:18,
117:21
**contact**
8:23, 31:25,
32:11, 127:24,
164:10, 164:19,
168:25, 169:9,
178:25, 183:5,
183:12, 184:3,
185:19, 186:5,
187:19, 188:7,
188:8, 188:15,
188:17, 193:8,
194:11, 195:24,
199:5, 202:23,
203:17, 204:1,
213:10
**contacted**
31:20, 188:3,
235:1
**contacts**
185:2, 213:13
**contain**
114:12, 226:18
**contained**
13:3, 18:5,
45:22, 48:7,
48:22, 50:6,
51:6, 55:18,
55:20, 57:1,
115:3, 155:17,
155:21, 156:1,
156:16, 156:21,
157:1, 157:6,
157:12, 157:16,
158:9, 159:2,
173:24, 220:25,
221:9, 228:3
**contains**
50:10
**contemporaneous**
40:8

**contend**
115:1
**contention**
57:15, 60:20,
137:10, 166:15
**context**
41:14, 44:11,
63:18, 66:23,
76:2, 109:3,
197:11, 229:20,
232:5
**continued**
2:21, 3:1
**continues**
35:3, 149:22
**continuing**
223:13, 226:12
**continuous**
220:15, 220:22,
222:9, 222:21,
226:19, 227:19
**continuously**
57:7
**contract**
199:16, 240:24
**contraction**
151:17, 199:13
**contractions**
107:13
**contradictory**
215:8
**contralateral**
199:13
**contribute**
220:16, 222:22
**contributing**
94:25
**contributions**
134:25
**control**
93:15, 96:14,
101:6, 101:21,
142:7, 142:10,
142:14, 147:4,
149:14, 158:15,
181:14, 186:18,
186:20, 190:19,
208:19, 208:23,

209:16, 223:7,
223:23
**controlled**
41:18, 41:21
**controlling**
159:11
**controversial**
158:23
**convenience**
109:22
**convenient**
44:9
**conventional**
174:15
**conversation**
33:12, 110:22,
113:16, 231:21,
232:7, 232:20
**converting**
127:23
**convey**
7:3
**copies**
5:20, 30:22,
30:24, 38:21,
118:21, 179:6,
240:16, 240:17
**copy**
10:23, 11:2,
11:4, 13:19,
35:15, 37:20,
37:22, 54:7,
54:20, 87:17,
117:20, 119:3
**cord**
187:9
**core**
116:22
**corner**
97:25
**coroner**
201:19
**corporate**
27:7, 27:13,
75:15, 77:10,
77:19, 77:25,
78:5, 78:16,
79:7, 79:17,

79:19, 80:5,
80:6, 110:23,
235:6
**corporation**
60:11, 63:11,
63:15, 63:24,
64:6, 64:24,
65:21, 66:8,
66:12, 66:20,
69:4, 73:17,
75:14, 77:19,
79:7, 79:9,
79:25, 80:8,
81:8, 81:18,
82:13, 123:3,
205:2, 205:5
**corporation's**
73:19
**corporations**
69:5
**correctional**
20:15
**correctly**
58:19, 64:19,
67:25, 71:20,
72:23, 103:23,
105:9, 129:13,
130:21, 166:13,
184:10, 220:23
**cortisole**
224:6
**cost**
240:14
**couch**
223:25
**could**
13:24, 20:20,
22:10, 32:5,
33:16, 38:3,
38:4, 51:8,
53:25, 79:22,
83:18, 84:12,
88:18, 88:22,
95:22, 110:1,
129:22, 140:24,
141:1, 144:17,
144:18, 145:5,
158:21, 159:20,

Transcript of Mark W. Kroll, Ph.D.
Conducted on September 13, 2018

253

167:5, 170:24,
171:3, 175:12,
177:11, 181:17,
183:24, 192:6,
194:6, 195:1,
203:1, 203:20,
207:16, 212:1,
212:5, 216:22,
220:20, 222:24,
224:7
**could've**
117:10
**couldn't**
15:17, 205:13
**counsel**
5:20, 18:17,
19:7, 19:11,
31:17, 33:8,
34:6, 34:10,
34:16, 35:2,
36:23, 37:2,
38:17, 38:23,
50:21, 51:9,
85:6, 118:7,
235:1, 236:19,
240:20, 240:21
**count**
52:19, 123:12,
191:14, 192:6,
213:17
**counted**
195:23
**counterexamples**
181:23
**counting**
190:25
**counts**
17:14
**county**
51:14, 240:5,
240:39
**couple**
181:8, 197:4
**course**
6:22, 31:12,
49:8, 56:7,
56:9, 78:25,
79:21, 86:2,

124:4, 138:19,
144:2, 188:1
**court**
1:1, 6:23,
54:8, 87:12,
88:1, 91:19,
93:11, 98:7,
117:16, 123:13,
123:17, 211:18,
217:10, 217:16,
218:17, 227:3,
230:24
**cover**
79:22
**covered**
57:18, 116:16
**covering**
141:6
**coverup**
80:3
**cpollack@pollack-lawpc**
3:19
**crackling**
192:16
**crap**
192:17
**create**
70:23, 202:23
**created**
47:4, 134:5
**creating**
16:14
**creation**
186:4
**creativity**
113:8, 113:11,
113:14
**credibility**
157:17, 157:19
**credible**
158:5
**criminal**
87:12, 88:24,
91:22, 93:11
**criminally**
93:14
**criminology**
160:3, 160:11

**cross**
46:25
**cross-check**
51:5
**crossed**
35:18
**crown**
93:10
**cruise**
87:12
**crushed**
107:14
**cuff**
185:10
**cumulative**
220:7, 220:14,
220:16, 222:22,
224:16, 226:2,
230:13
**curb**
46:11, 46:12,
96:15
**curious**
156:6, 171:18,
235:17
**current**
25:25, 55:10,
64:4, 93:22,
94:1, 102:11,
107:6, 107:9,
107:17, 118:24,
139:20, 155:5,
164:13, 166:4,
168:2, 171:17,
171:21, 172:14,
173:17, 174:24,
175:20, 178:15,
178:18, 179:13,
180:10, 180:20,
181:4, 183:3,
183:23, 184:4,
186:10, 186:14,
192:24, 193:10,
194:8, 194:13,
205:21, 206:16,
212:18, 213:1,
213:15, 222:5,
232:3, 232:22,

234:9, 234:11
**currently**
67:5
**currents**
165:21
**curriculum**
4:22, 54:9
**curti**
93:16
**custody**
155:9
**cut**
105:4
**cv**
37:22, 54:21,
54:24, 55:20,
56:4, 56:22,
57:9, 57:19,
57:22, 57:23,
58:20, 58:23,
59:14, 59:22,
80:14, 107:18,
112:1, 113:21,
114:9, 114:19,
115:4, 115:21,
116:11, 116:16,
117:8, 134:13,
140:8, 140:19
**cvs**
58:14

**D**

**damage**
79:24, 104:19,
172:3
**dana**
1:25, 2:4,
240:38
**dancing**
198:6
**danger**
229:7
**dangerous**
46:17, 147:19,
228:22
**dare**
212:3
**darts**
179:21, 231:14

Transcript of Mark W. Kroll, Ph.D.
Conducted on September 13, 2018

254

data
38:24, 105:11,
136:18, 136:21,
175:24, 189:22,
230:15, 233:16
date
16:7, 19:9,
27:6, 27:23,
28:19, 28:20,
32:4, 32:5,
32:6, 32:12,
35:25, 39:20,
45:3, 54:12,
54:22, 54:25,
56:9, 58:15,
71:23, 72:1,
118:10, 118:14,
118:16, 119:1,
119:7, 119:8,
119:12, 119:16,
120:1, 120:4,
120:5, 120:19,
121:10, 122:3,
156:4, 162:22,
223:8, 231:24
dated
13:12, 22:18,
37:22, 117:20
dawes
172:12
day
26:11, 67:17,
67:19, 113:25,
132:2, 132:3,
147:9, 147:10,
218:24, 240:32
day-old
201:17
days
32:11, 104:19,
145:4, 145:8,
145:18, 146:5,
147:2, 158:23,
195:2, 201:10,
202:3, 202:4,
202:7
dea
128:21

deadline
124:6
deal
124:7, 134:16,
134:23, 187:13
dealing
178:1
dealt
142:3
death
93:15, 93:18,
95:1, 95:2,
95:25, 96:3,
96:6, 97:2,
97:6, 98:9,
98:21, 99:15,
101:6, 101:12,
102:20, 104:1,
104:2, 104:4,
104:7, 104:10,
104:16, 104:23,
105:20, 105:25,
106:21, 150:23,
155:23, 158:17,
161:9, 165:6,
165:8, 165:9,
165:11, 166:10,
167:4, 167:7,
167:9, 167:11,
167:21, 168:3,
168:5, 168:7,
169:23, 170:4,
170:14, 170:25,
220:13, 220:21,
222:25, 223:17,
224:8
deaths
160:24
debate
84:18
deceased
95:8, 132:16
decedent
95:15
decedent's
95:7, 97:2
decided
202:24

decline
85:11
declining
61:21
decrease
71:5
decreased
183:13
deduction
23:24
defendant
81:14, 81:19,
82:14
defendants
1:13, 18:17,
32:11, 34:17,
35:1, 44:21,
118:7, 119:5
defended
123:1
defense
19:7, 19:11,
30:20, 31:17,
33:7, 34:5,
36:23, 38:17,
38:23, 89:8,
90:21, 94:3,
95:3, 96:25,
118:7, 235:1,
236:19
defibrillation
128:15
defibrillator
127:21, 132:24
defibrillators
131:23
define
77:22, 104:7,
125:20, 125:25,
130:3, 150:8
defines
129:24
definitely
7:9, 95:1,
95:2, 207:10,
223:8
definition
43:22, 104:15,

105:19, 106:23,
125:16, 127:16,
130:8, 130:9,
130:15, 130:17,
149:21, 149:24,
150:5, 150:17,
150:18, 165:4
definitive
11:12
degree
80:20, 108:4,
108:5, 108:8,
108:12, 108:20,
108:22, 125:4,
216:22
degrees
80:15, 107:20,
143:23, 184:16
delay
187:19, 188:7,
188:8, 188:15,
188:17, 192:20
delayed
166:10
delirious
149:25
delirium
10:19, 12:1,
55:3, 55:14,
102:25, 149:8,
149:10, 149:16,
149:19, 149:21,
150:14, 151:2,
151:6
deliver
164:12
delivered
175:21, 176:3,
194:8, 232:23
delivery
168:2, 173:17,
178:15, 178:18,
179:13, 180:10,
180:20, 181:4,
183:3, 183:23,
232:3, 234:9,
234:11
demonstrating
198:14

Transcript of Mark W. Kroll, Ph.D.
Conducted on September 13, 2018

255

| | | | |
|---|---|---|---|
| **denote** | 17:25, 19:13, | **despite** | 132:25, 133:10 |
| 33:1 | 24:21, 28:14, | 182:19 | **diagnosed** |
| **department** | 28:21, 28:25, | **detail** | 138:4 |
| 53:22, 95:20, | 29:3, 29:21, | 24:20, 96:4, | **diagnosis** |
| 98:6, 143:9, | 29:22, 37:16, | 105:3, 106:15, | 133:5, 150:17, |
| 156:19, 162:22, | 40:19, 43:16, | 106:17, 177:12, | 150:18, 150:24 |
| 163:4, 193:18, | 43:24, 63:14, | 179:17, 210:2, | **diagnostic** |
| 228:10 | 84:21, 85:20, | 222:12 | 145:21, 150:7 |
| **department's** | 100:11, 144:22, | **detailed** | **diagnostically** |
| 163:19 | 155:13, 172:10, | 175:24, 180:14 | 150:8 |
| **departments** | 193:18, 196:9, | **details** | **dick's** |
| 197:24, 210:6, | 221:7, 239:16, | 64:21, 70:7, | 42:19 |
| 210:20 | 240:8, 240:15, | 93:21, 97:13, | **dictionary** |
| **depend** | 240:30 | 114:8, 122:11, | 104:15 |
| 132:1 | **depositions** | 185:24, 194:24, | **didn't** |
| **dependent** | 162:17 | 237:18 | 10:7, 11:11, |
| 85:7 | **depth** | **detecting** | 15:17, 27:15, |
| **depending** | 213:18 | 215:4 | 35:20, 41:11, |
| 72:10, 209:3 | **derive** | **determination** | 49:12, 69:9, |
| **depends** | 176:10 | 158:6 | 92:16, 97:3, |
| 129:23 | **describe** | **determine** | 122:2, 123:16, |
| **deployed** | 43:9, 52:24, | 182:15 | 148:7, 149:6, |
| 43:11, 193:12, | 75:8, 124:20, | **detrimental** | 172:8, 179:1, |
| 199:3, 199:4, | 168:4, 179:13, | 79:20, 79:21 | 196:21, 204:3, |
| 206:2, 206:5, | 179:16, 179:20 | **developed** | 206:8, 234:23, |
| 207:4, 234:14 | **described** | 149:15, 182:1, | 236:2, 238:1, |
| **deployment** | 11:21, 12:7, | 182:8, 182:9 | 238:4, 238:5 |
| 96:11, 101:16, | 26:23, 70:25, | **developing** | **die** |
| 101:18, 208:11, | 72:23, 95:23, | 182:13 | 104:19, 133:6, |
| 231:18, 232:13, | 130:7, 149:8, | **developments** | 159:20, 171:12, |
| 233:5 | 152:24, 164:2, | 150:12 | 224:13 |
| **depo** | 166:17, 169:22, | **device** | **died** |
| 145:10 | 176:4, 183:4, | 43:11, 128:9, | 98:15, 166:16, |
| **deponent** | 188:18, 189:25, | 128:12, 129:6, | 171:9, 172:4 |
| 13:25 | 238:2, 238:21 | 129:16, 129:17, | **dies** |
| **deposed** | **describes** | 129:20, 131:5, | 171:12 |
| 95:22 | 22:7, 171:2 | 172:15, 173:13, | **diet** |
| **deposing** | **describing** | 176:16, 198:1 | 214:21 |
| 85:6 | 51:24, 72:20, | **devices** | **difference** |
| **deposition** | 103:13, 127:19, | 129:3, 131:21, | 82:25, 150:20, |
| 1:18, 2:1, | 129:13, 130:19, | 131:22, 142:14 | 163:25, 219:18 |
| 6:14, 6:19, | 131:2, 170:22 | **devote** | **differences** |
| 8:16, 8:25, 9:4, | **description** | 165:10 | 70:8, 146:24 |
| 9:14, 9:19, | 21:6, 41:6, | **diabetics** | **different** |
| 11:5, 14:11, | 56:20, 157:24, | 208:25 | 13:5, 19:22, |
| 14:18, 15:8, | 163:19, 180:9, | **diagnose** | 21:4, 43:6, |
| 15:11, 16:20, | 189:24, 225:12 | 131:24, 132:3, | 47:10, 48:2, |
| 17:4, 17:6, | **designed** | 132:8, 132:21, | 131:15, 150:25, |
| | 58:20 | | |

Transcript of Mark W. Kroll, Ph.D.
Conducted on September 13, 2018

256

152:24, 169:13,
174:15, 179:12,
179:14, 180:9,
212:2, 227:9,
227:21
**differentiate**
60:18, 71:13,
74:22, 171:15
**differentiation**
125:24
**differently**
71:21, 117:3
**difficult**
97:24, 125:24,
126:15, 127:9,
127:25, 141:24
**dig**
177:19
**dimes**
172:19
**direct**
64:17, 142:23,
165:15, 231:3,
237:25
**directed**
35:1, 219:13,
221:13
**directing**
163:4
**direction**
23:8, 58:23,
225:22
**directly**
17:3, 28:2,
28:6, 31:5,
81:8, 116:21
**director**
66:5, 66:13,
67:14, 71:10,
75:16, 76:24,
80:12
**directors**
66:3, 122:22,
238:7, 238:11,
238:12
**disagree**
41:6, 81:2,
82:9, 85:18,

163:18, 200:23,
221:3, 221:10,
221:25, 222:1,
222:2, 222:3,
222:14, 222:16,
222:17, 222:19,
223:1, 223:12,
223:19, 224:23,
225:21, 232:16
**disagreement**
221:5, 221:24
**disappointed**
237:15
**disappointing**
237:7
**disappointment**
237:17
**discharge**
145:1, 170:23,
170:25, 181:1,
191:9, 198:6,
198:8, 199:7
**discharged**
43:11, 144:16,
166:18, 167:3,
178:10, 191:10,
198:1, 198:15,
206:13, 213:8,
234:7
**discharges**
197:8, 198:22,
198:23, 205:22
**discharging**
98:10
**disciplinary**
235:20
**discipline**
124:15, 124:22,
236:1
**disciplined**
124:18
**disclose**
13:21, 64:7
**disclosed**
9:9, 13:13,
15:19, 25:24,
26:10, 26:15,
26:24, 27:10,

37:19, 37:20,
45:17, 54:17,
56:25, 85:14,
90:13, 205:12
**disclosing**
29:14
**disclosure**
37:24, 114:4
**discounted**
24:15
**discovery**
227:10
**discuss**
19:16, 105:7,
166:23, 169:23,
176:12, 188:14,
190:8, 209:23,
219:2
**discussed**
28:11, 29:15,
99:11, 105:20,
149:11, 208:7,
221:7
**discussing**
120:23, 157:19,
161:23, 165:10,
173:5, 174:19
**discussion**
14:7, 80:24,
109:4, 142:17,
147:24, 173:8
**disease**
128:3, 128:5,
133:1
**disgust**
237:17
**disjunction**
211:3, 212:1
**dislodged**
179:21, 234:2
**disorder**
215:21
**dispatch**
49:18, 51:2,
51:11, 51:14,
51:17, 51:20,
51:22, 51:24,
52:1, 52:4,

52:9, 52:11
**dispute**
168:20, 170:3,
232:4
**disputed**
168:17, 168:23,
169:5
**disrupts**
165:16
**distinction**
18:20, 52:12,
63:2, 63:20,
67:8, 163:24
**distracted**
187:17, 196:24
**district**
1:1, 1:2
**disturbing**
166:18
**diversion**
48:13
**division**
1:3, 26:14,
83:19, 162:24,
228:11
**doctor**
125:1, 130:1,
130:20, 131:4,
131:9
**doctors**
126:17, 131:1,
135:4
**document**
11:11, 13:25,
15:18, 15:23,
17:15, 17:17,
22:15, 22:17,
22:21, 22:22,
22:23, 23:1,
23:5, 23:14,
23:16, 23:23,
33:21, 34:2,
34:3, 36:18,
36:20, 36:22,
37:7, 37:10,
37:11, 37:12,
37:14, 54:7,
54:10, 54:11,

Transcript of Mark W. Kroll, Ph.D.
Conducted on September 13, 2018

257

54:12, 54:16,
57:1, 60:7,
118:1, 119:3,
200:12, 201:24,
218:11, 218:16,
219:2, 227:4,
227:12, 227:16,
231:12
**documentation**
200:22, 204:10
**documented**
107:16, 201:5,
201:19, 204:5,
208:20
**documents**
4:18, 12:24,
13:2, 14:16,
18:5, 18:6,
18:10, 33:24,
34:15, 34:18,
34:19, 36:5,
37:16, 37:20,
37:23, 38:1,
38:16, 38:22,
39:7, 117:18,
117:25, 118:5,
237:24
**does**
7:3, 23:7,
27:5, 28:24,
30:11, 30:12,
31:3, 51:21,
52:18, 54:19,
63:9, 67:5,
81:5, 81:9,
82:11, 91:7,
132:20, 144:4,
148:22, 181:9,
205:2, 224:15,
228:12
**doesn't**
61:9, 106:5,
127:21, 145:12,
166:2, 169:18,
171:12, 181:20,
198:17, 219:21,
238:16
**doing**
77:2, 146:13,

146:16, 217:21
**dollars**
75:9
**done**
25:13, 25:15,
58:17, 60:6,
60:23, 60:25,
77:4, 98:11,
146:23, 146:25,
160:24, 171:24,
184:10, 197:17,
215:5, 215:19,
215:23, 216:8,
216:20, 225:16,
229:24
**double-check**
40:5
**doubt**
23:12
**doused**
159:18
**down**
55:2, 56:8,
61:6, 72:6,
96:9, 96:14,
101:22, 122:16,
122:19, 122:21,
187:8, 189:2,
194:3, 194:7,
194:9, 197:15,
199:19, 206:6,
207:5, 207:21,
208:13, 223:13
**download**
173:11, 173:12,
173:15, 174:22,
175:22, 176:2,
178:6, 178:12,
180:22, 180:25,
181:3, 181:6,
182:3, 182:7,
182:14, 189:6,
189:10, 190:5,
192:2, 230:10,
233:11
**dozen**
134:15
**dr**
6:6, 6:13,

8:15, 12:5,
15:9, 16:20,
19:13, 25:3,
29:9, 33:21,
35:4, 35:5,
36:12, 38:8,
39:7, 43:21,
48:15, 48:16,
54:6, 85:17,
87:25, 88:6,
88:8, 103:12,
104:21, 122:10,
125:2, 126:19,
126:20, 137:8,
149:11, 156:6,
168:12, 170:4,
171:2, 171:19,
172:10, 177:24,
218:8, 221:22,
230:23, 236:5
**draft**
15:8, 210:11,
210:12, 210:16,
226:6
**dramatic**
101:21
**draw**
130:13, 236:3
**drawing**
219:24
**dreamed**
77:7
**drew**
140:9, 140:15
**drinking**
214:21
**drive-stun**
92:4, 176:25,
177:1, 177:4,
177:7, 177:8,
186:23, 187:11,
194:10, 194:11,
201:3, 201:17,
201:25, 202:2,
202:20, 202:22,
202:23, 203:12,
204:5
**drive-stuns**
177:2, 183:5

**driving**
53:5
**drop**
208:13
**dropbox**
50:15, 121:19
**dropped**
206:6
**dropping**
206:11, 206:21,
208:4
**drove**
122:16
**drug**
103:1, 213:23
**drugs**
128:13, 128:14,
128:20, 128:23,
129:4, 129:14,
129:19, 139:4,
139:5, 139:9,
140:3, 156:3,
171:7
**duces**
37:9
**due**
68:8, 69:22,
101:10
**duly**
240:10
**duplicate**
179:8
**duration**
43:6, 169:16,
170:25, 171:17,
171:21, 172:23,
173:17, 174:24,
178:3, 178:5,
180:11, 180:20,
183:14, 184:4,
192:22, 194:2,
194:14, 225:4,
225:23, 232:3
**durations**
178:24, 225:18,
227:14, 229:19
**during**
40:9, 68:13,

Transcript of Mark W. Kroll, Ph.D.
Conducted on September 13, 2018

258

74:16, 86:17, 86:19, 187:4, 191:24, 212:19
**duties**
79:16, 80:4
**duty**
79:8, 79:12, 79:18

**E**

**e-published**
55:9, 189:11
**each**
7:7, 7:14, 37:6, 56:17, 66:24, 67:14, 150:21, 161:12, 180:14, 194:25, 203:1, 203:6, 230:10
**earlier**
40:17, 48:12, 59:1, 73:16, 83:1, 101:10, 101:14, 109:3, 109:13, 113:18, 116:2, 117:12, 120:23, 131:11, 138:24, 143:24, 148:15, 155:13, 165:3, 178:8, 180:2, 191:3, 195:18, 201:1, 205:10, 205:14
**early**
66:19, 72:21, 74:2, 153:22, 154:3, 192:24, 194:13, 195:11, 210:10, 217:3, 217:5
**earns**
61:17
**easier**
177:16
**easily**
83:18
**east**
3:7

**easy**
133:21, 141:11, 175:15
**eberhart**
88:24
**eck**
53:4
**economists**
72:8
**edit**
189:7
**educate**
79:15
**educated**
116:21
**education**
113:24, 115:7, 115:12, 115:15, 115:18, 123:21, 124:9
**educational**
237:21
**effect**
102:25, 133:23, 139:8, 141:11, 162:22, 189:13, 214:15, 215:1, 219:4, 224:16, 230:13
**effective**
194:10, 207:7, 218:21
**effects**
111:14, 115:9, 115:24, 133:2, 133:12, 134:20, 138:20, 140:3, 141:6, 141:9, 144:25, 185:10, 208:17, 220:7, 220:11, 221:18, 223:15, 223:16, 224:3, 224:14, 224:20, 226:3
**efficient**
44:3
**eight**
69:1, 183:19,

210:8
**eight-page**
218:20
**either**
11:11, 11:15, 12:24, 13:2, 17:9, 18:13, 20:20, 37:23, 38:23, 49:11, 50:9, 59:14, 101:23, 140:18, 140:21, 181:19, 185:5, 185:19, 188:11, 194:6, 196:8, 201:25, 208:9, 209:2, 233:6, 235:6, 235:9
**elaborate**
11:24, 45:21, 175:3
**elbow**
154:1
**electrical**
21:9, 21:12, 21:18, 21:25, 22:2, 42:10, 42:11, 42:19, 43:5, 55:3, 55:7, 55:14, 69:23, 90:20, 93:25, 94:25, 98:10, 102:11, 105:24, 106:21, 106:24, 107:2, 107:4, 107:5, 107:17, 108:10, 108:11, 108:13, 108:16, 111:17, 111:23, 131:21, 131:22, 132:12, 133:2, 133:6, 133:13, 133:15, 133:20, 133:25, 134:1, 134:10, 134:21, 134:24, 138:22, 139:20, 139:24, 141:6,

141:9, 142:2, 143:10, 144:14, 146:7, 146:8, 147:5, 148:25, 149:1, 149:5, 152:4, 155:24, 160:7, 160:17, 160:18, 161:20, 165:6, 165:15, 166:4, 166:19, 167:13, 170:25, 190:12, 196:22, 206:16, 215:4, 215:6, 215:14, 215:19, 216:10, 217:11, 217:18
**electrically**
133:25, 136:5, 136:15, 136:16
**electricity**
104:4, 104:7, 104:11, 104:13, 104:16, 104:23, 106:4, 106:7, 106:8, 106:20, 115:10, 115:24, 128:22, 132:2, 132:4, 132:7, 132:22, 133:16, 133:23, 138:20, 139:11, 139:13, 140:6, 144:4, 144:8, 144:16, 149:4, 151:21, 165:8, 165:9, 165:12, 166:17, 167:14, 167:22, 168:7, 169:17, 169:18, 170:24, 172:23, 178:3, 178:9, 183:14, 198:23, 199:7, 206:12, 213:8, 214:6, 231:16, 232:11, 233:3
**electrocute**
165:21
**electrocution**
102:14, 102:15,

Transcript of Mark W. Kroll, Ph.D.
Conducted on September 13, 2018

259

103:23, 104:2,
104:4, 104:6,
104:16, 104:22,
105:15, 105:18,
134:1, 165:3,
166:4, 166:7,
166:8, 166:9,
167:6, 167:10,
167:13, 168:3,
168:9, 168:11,
170:1, 170:15
electrode
184:13, 184:16
electronic
50:10, 50:18,
93:15, 101:6,
142:7, 142:10,
142:14, 149:14,
158:15, 209:16,
223:6, 238:8
electrophysiolog-
ists
235:16
elements
150:7
elephant
214:17
elevated
215:13
eliminate
232:2
eliminated
167:4
eliminates
167:6, 168:2,
168:5, 168:8
elizabeth
1:10, 3:4
elliot
1:10
elliott
3:3, 53:8,
158:2, 190:18,
193:6
else
9:4, 9:19,
15:7, 129:12,
129:21, 230:7

email
2:18, 3:10,
3:19, 5:15,
31:20, 31:22,
31:24, 33:13,
38:4, 231:4,
231:8, 231:10,
231:13, 232:5,
232:16, 236:9,
236:11, 236:25,
238:1
emails
231:1
emergency
10:18, 12:9,
53:21, 125:10,
137:22, 138:10
emergent
47:5
emitted
212:18, 213:1
employ
31:5
employed
95:13
employee
240:19, 240:21
employer
25:16, 25:21,
25:25, 26:3,
124:19
employers
27:11
employment
124:23
employs
132:8
encountered
41:18, 41:20,
157:4, 157:9
encouraging
199:20, 200:1
end
154:16, 154:18,
189:13, 191:10,
217:25
endeavor
41:13, 43:16

ended
73:24, 74:4,
74:23, 75:7,
99:3, 112:7
ends
43:7, 65:11,
73:10, 171:9
energy
217:16
enforcement
5:9, 19:21,
20:11, 20:13,
20:14, 20:18,
20:22, 21:10,
21:12, 21:21,
21:24, 22:1,
24:9, 24:16,
86:6, 86:7,
86:13, 86:22,
86:24, 87:11,
88:20, 89:10,
89:11, 89:16,
90:5, 91:12,
91:16, 92:19,
92:24, 93:9,
94:19, 95:12,
97:17, 97:19,
99:5, 152:13,
152:17, 182:2,
182:14, 218:9,
218:21, 225:2,
227:17, 228:5,
228:17
engage
127:5, 154:2
engaged
138:7, 180:8,
196:4, 196:15
engagements
111:9, 111:22
engineering
108:10, 108:11,
108:13, 108:16,
112:13
english
163:24
enjoy
163:23, 236:13

enough
7:24, 70:11,
93:6, 100:8,
100:18, 181:11,
217:1, 229:11,
229:15, 234:23
ensure
78:17
enter
191:23
entered
178:4
enters
104:13
entirely
116:9, 168:8,
224:23
entirety
27:11, 27:22,
222:18, 222:20,
223:19
entitled
33:22, 37:8,
37:13, 54:9,
85:19, 159:3,
189:5, 227:6,
227:13
entrance
154:6
entries
49:2
entry
30:6, 105:24
enumerate
164:25
epidemic
216:5
equation
160:19
equipment
63:10
equipped
162:7, 162:12,
162:15
equivalent
146:15, 181:5,
186:10, 186:14,
230:11

Transcript of Mark W. Kroll, Ph.D.
Conducted on September 13, 2018

260

error
39:25, 228:10
especially
53:21, 151:14,
190:14, 199:13
esquire
2:12, 2:13,
3:5, 3:13
essentially
47:18, 181:25,
208:19, 213:18,
224:11
established
148:14, 206:18
estate
1:6, 95:7
estimate
28:23, 29:19,
62:9, 62:14,
73:14, 75:12,
76:8, 105:10,
111:21, 176:2
estimated
183:23, 186:10
estimates
82:6, 176:11
et
13:14, 147:4,
161:19, 167:16,
171:8, 197:19,
210:4
ethics
235:22
europe
105:23
european
105:23
evaluate
158:1
even
11:1, 32:12,
39:10, 78:2,
78:19, 128:12,
183:18, 192:14,
196:14
events
17:10, 53:9,
53:11, 157:24

ever
21:22, 58:21,
86:23, 100:4,
102:16, 122:10,
123:10, 124:14,
124:18, 126:23,
134:5, 136:13,
145:19, 149:2,
171:9, 210:6,
217:9, 217:16,
234:24
every
66:13, 84:21,
85:5, 112:20,
112:22, 112:25,
113:6, 115:10,
132:2, 132:3,
171:25, 175:19,
177:12, 198:22,
199:6, 207:1,
218:12
everything
58:21, 121:7,
158:7
evidence
120:16, 158:1,
158:4, 169:10,
169:14, 173:12,
174:22, 175:23,
177:5, 179:5,
179:23, 185:12,
186:25, 187:23,
188:10, 189:19,
190:3, 190:9,
192:9, 195:17,
196:1, 204:7,
204:12, 204:17,
204:20, 204:22,
206:1, 233:1
evident
116:10
evidently
15:22
evolve
149:22
evolved
105:23
exact
52:19, 114:8,

165:4, 171:23,
189:15, 191:12,
205:11, 236:12
exactly
30:17, 32:7,
36:8, 67:23,
68:21, 104:9,
167:14, 174:18,
175:17, 175:20,
175:25, 176:2,
213:6, 216:4,
238:14
exaggeration
179:14, 183:4
examination
4:4, 6:4
examined
6:3
examiner
132:11, 132:15
examiners
201:24
example
21:10, 36:11,
42:18, 43:21,
44:25, 60:19,
68:1, 73:14,
74:24, 82:20,
107:7, 115:8,
116:3, 116:8,
118:22, 131:3,
131:11, 131:13,
139:12, 141:7,
157:23, 167:25,
176:24, 183:20,
192:13, 222:4
examples
21:6, 131:17,
159:18
exceeded
182:25, 225:6,
225:8
excel
40:3
except
68:6, 185:8,
192:1
exception
202:18, 207:23

exceptions
159:21
excess
74:20
excessive
93:14, 155:19,
221:14, 222:11,
226:1
excessively
223:24
excited
10:19, 11:25,
55:3, 55:14,
149:8, 149:9,
149:16, 149:18,
149:21, 150:3,
151:2, 151:5
excitement
150:15
excluded
217:9
exclusion
138:19, 155:24
exercise
72:7, 72:9,
72:16, 74:7,
97:15, 140:24,
146:13, 146:25,
147:21, 148:13,
151:17, 151:18,
172:21, 195:5,
209:14
exercised
76:3
exhaustion
220:17, 222:22
exhibit
4:13, 4:15,
4:17, 4:22, 5:3,
5:5, 5:7, 5:11,
5:15, 11:5,
11:9, 14:1,
14:2, 14:14,
22:11, 22:12,
22:16, 27:19,
30:5, 30:6,
31:8, 33:17,
33:18, 33:22,

Transcript of Mark W. Kroll, Ph.D.
Conducted on September 13, 2018

261

35:12, 37:11,
37:21, 39:12,
54:1, 54:2,
54:8, 55:19,
55:20, 80:15,
87:18, 87:21,
87:22, 88:1,
88:4, 88:14,
107:19, 117:13,
117:17, 121:24,
140:25, 155:14,
156:17, 218:4,
218:5, 218:18,
226:24, 226:25,
227:4, 230:20,
230:25, 237:23
**exhibits**
4:11, 5:1,
5:19, 5:21
**existing**
79:25
**exists**
131:8
**expand**
114:20, 115:1,
167:5
**expandable**
163:2
**expansive**
97:18
**expect**
161:3, 171:22
**expectancy**
157:8
**expectations**
25:3
**expended**
23:17, 27:22,
28:9, 29:6,
39:19, 40:10
**expenditure**
30:8
**expenses**
44:17, 44:18
**expensive**
113:12
**experience**
85:3, 85:4,

124:11, 173:21,
196:16, 204:13,
209:17, 233:25
**experienced**
48:1, 146:21,
184:5, 196:21
**experimental**
144:11
**expertise**
46:20, 109:25,
110:2, 114:4,
116:3, 116:4,
116:22, 117:7,
134:14, 136:2,
136:4, 137:11,
137:15, 137:19,
137:23, 140:2,
140:8, 141:15,
145:24, 146:2,
148:16, 151:20,
152:9, 152:19,
152:24, 160:10,
161:13, 161:21,
161:22, 200:18,
201:13, 201:16,
214:4, 214:7,
214:25, 215:3
**expires**
240:40
**explain**
67:7, 89:2,
133:15, 135:12,
150:19, 157:21,
185:22, 207:16,
221:23
**explained**
150:9, 216:23
**explaining**
38:2, 71:25
**explanation**
147:17, 156:7,
185:25, 186:2,
206:10, 206:21,
206:24, 208:3,
221:5
**explicit**
184:8, 204:12
**explicitly**
45:25

**explosion**
98:21
**explosive**
69:22
**exposed**
172:24
**exposure**
143:11, 144:8,
145:17, 146:9,
147:5, 148:9,
167:22, 172:14,
220:11, 220:15,
221:17, 225:4,
225:22, 227:19,
229:22
**exposures**
220:22, 222:9,
225:5, 225:24
**expressing**
156:5
**expressions**
237:16
**extend**
158:21
**extended**
145:7, 227:14,
229:19
**extending**
159:6
**extent**
48:19, 131:18,
134:10, 136:1,
160:8, 161:19,
209:12, 221:8
**extreme**
144:11, 147:13,
171:21, 171:25
**extremely**
24:20, 105:12
**eye**
99:18, 99:22,
102:2, 103:16,
107:6, 198:12,
198:16

---
**F**
---
**face**
206:17, 207:5,

208:12
**face-plant**
207:20
**facilitate**
128:15
**fact**
15:17, 46:3,
46:6, 79:23,
97:1, 101:12,
133:5, 144:19,
159:2, 167:1,
168:17, 168:23,
169:6, 176:14,
177:8, 189:5,
197:2, 203:11,
207:1, 209:25,
229:13
**factor**
176:16, 184:4
**factors**
176:12, 176:17,
176:20, 180:9,
193:5
**facts**
38:23, 157:21,
158:4, 159:4,
164:22, 164:24,
165:1, 183:8,
183:10
**factual**
164:20
**faculty**
113:8
**fair**
6:13, 7:24,
16:16, 18:4,
22:6, 23:10,
23:11, 33:5,
33:13, 33:14,
46:22, 46:23,
49:7, 58:12,
60:8, 60:21,
62:15, 70:18,
71:6, 74:12,
74:14, 75:8,
76:13, 93:6,
94:15, 94:16,
100:18, 100:19,

Transcript of Mark W. Kroll, Ph.D.
Conducted on September 13, 2018

262

101:1, 113:21,
113:23, 118:18,
118:19, 127:6,
127:14, 128:4,
128:9, 129:6,
135:22, 135:23,
136:25, 137:17,
137:18, 138:18,
142:20, 142:21,
150:15, 152:9,
152:10, 152:25,
155:11, 155:12,
155:19, 155:20,
155:23, 161:14,
166:20, 166:21,
180:7, 180:18,
234:8
**fairly**
40:4, 46:13,
93:22, 107:12,
218:14
**fall**
30:3, 32:19,
101:15, 101:17,
101:18, 101:21,
102:1, 112:21,
112:22, 112:25,
121:3, 136:7,
159:20, 207:4,
208:2, 208:11,
209:2, 224:12
**fallen**
68:8
**falling**
162:18
**falls**
103:17, 209:25,
210:1, 210:2,
210:3
**false**
170:20
**familiar**
22:25, 34:2,
146:6, 152:6,
181:21, 218:8,
218:11, 218:15
**familiarity**
152:8, 152:23

**family**
95:7, 95:16
**far**
24:24, 27:5,
28:21, 129:7,
132:6, 150:8,
158:4, 210:12,
214:6, 234:5
**fascinating**
111:15
**fast**
47:16, 154:11
**faster**
130:4, 174:16
**fatal**
209:24, 210:1
**fatalities**
198:17
**favor**
68:8, 89:15,
162:18
**fbi**
198:5
**feature**
176:15
**federal**
42:17, 86:2,
94:23, 98:7,
114:3, 114:5
**fee**
23:24, 24:5,
24:8, 32:23,
35:4, 35:22,
36:7, 36:12,
36:14, 36:15,
36:19, 38:5,
38:13, 38:14,
82:21, 117:21,
119:4, 119:7,
119:13
**feel**
38:3, 147:13,
186:12, 215:2,
234:23
**feeling**
79:12, 213:25,
223:4
**fees**
19:16, 20:3,

64:13, 66:5,
82:11, 82:19
**fellow**
190:16
**felt**
149:17, 156:8
**female**
186:22, 190:15,
194:4, 194:21
**few**
32:15, 55:5,
55:10, 81:23,
117:10, 139:14,
156:10, 156:11,
208:21, 212:2
**fewer**
194:14
**fibrillation**
139:25, 166:6
**fiduciary**
77:10, 77:16,
77:21, 77:25
**field**
143:3, 159:25,
176:1, 188:5
**fighting**
187:13
**figure**
80:25, 81:1,
81:5, 82:9,
82:11, 208:16
**figures**
76:9
**figuring**
56:1
**file**
37:7, 50:9,
50:14
**filed**
3:21
**files**
52:7
**final**
13:18
**finalized**
19:9
**finally**
185:9

**finances**
28:1
**financial**
109:4, 110:22
**financially**
240:23
**find**
24:18, 64:9,
111:14, 141:1,
150:7, 172:9,
173:25, 175:6,
175:7, 175:10,
175:12, 195:2,
235:15
**finding**
140:24
**fine**
43:13, 123:23,
124:1, 217:20
**finger**
187:16
**finish**
206:7
**finished**
210:13
**fire**
77:4
**fireable**
197:6
**firearm**
197:7
**firearms**
197:18, 197:22,
198:4, 198:8
**firm**
3:14, 3:22,
30:20, 31:11,
36:11, 44:24
**first**
20:1, 26:2,
27:2, 30:1,
30:6, 30:12,
30:14, 31:25,
32:9, 32:10,
34:13, 34:25,
73:22, 119:15,
120:5, 121:13,
130:1, 134:19,

Transcript of Mark W. Kroll, Ph.D.
Conducted on September 13, 2018

263

136:14, 149:12,
149:13, 160:25,
164:7, 164:8,
168:13, 170:6,
170:11, 179:20,
190:10, 202:9,
206:2, 206:15,
219:25, 223:10,
225:11, 231:7,
240:10
**fit**
158:7, 161:20
**fits**
224:5
**five**
28:22, 29:19,
29:25, 69:1,
76:7, 93:24,
93:25, 143:4,
143:6, 169:9,
169:13, 175:18,
179:14, 181:2,
189:15, 193:10,
194:15, 195:12,
223:10, 225:20,
226:3
**five-page**
37:12
**five-second**
180:16, 180:25,
183:20
**fixed**
210:3
**flag**
230:13, 233:11,
233:20
**flammable**
102:3, 103:17,
106:9
**flash**
230:8
**flat**
65:12
**flavor**
98:13
**fliers**
147:15
**flights**
146:15

**flip**
192:18, 196:22
**flipping**
196:25
**floor**
2:15
**flow**
171:17, 171:22,
193:9, 205:21
**flowing**
206:16
**fluctuates**
62:13
**focus**
80:19, 108:1,
108:8, 108:19,
111:19, 142:19,
144:6
**focused**
58:23, 143:1
**foggy**
122:12
**folder**
50:15, 50:17,
50:18, 50:22
**folders**
51:7
**following**
163:1
**follows**
6:3
**food**
154:11
**footage**
191:4
**footer**
54:12
**force**
96:23, 153:23,
155:18, 158:18,
159:8, 159:16,
160:3, 160:7,
160:11, 160:14,
160:16, 161:14,
161:17, 163:17,
198:24, 200:16,
221:13, 221:14,
222:11, 226:1,

229:6
**forensic**
142:16, 201:19
**forgive**
36:14, 73:9,
128:11, 150:16
**form**
37:1, 50:10,
50:14, 57:25,
117:21, 118:11,
118:22, 196:24
**formal**
37:5, 214:16
**formally**
6:9, 33:2, 33:8
**format**
6:18
**former**
25:16
**formerly**
63:11, 80:8
**forming**
15:5, 15:18,
38:25, 39:2,
45:17, 48:16,
179:2
**formulas**
73:8, 73:13
**forth**
18:21, 106:11,
134:13, 169:13,
175:8, 179:15,
185:14, 185:16,
185:17, 205:19,
227:21, 229:1,
229:20
**forward**
14:6, 101:23,
185:23, 207:4,
207:24, 207:25,
208:3, 208:10,
209:3, 209:4,
209:5, 210:3
**forwarded**
10:11, 10:12,
11:21, 14:9
**forwarding**
12:22

**found**
107:22, 143:11,
154:19, 155:8,
168:13, 172:13,
226:2
**four**
28:24, 29:22,
53:23, 67:20,
67:22, 68:5,
87:7, 87:9,
88:7, 88:18,
143:23, 200:7,
203:2, 236:8
**four-lane**
47:18, 47:19
**four-year**
67:15
**frame**
212:13
**francis**
53:12
**frankly**
24:19, 109:22,
161:18, 198:18,
235:17
**freak**
105:1
**frequently**
118:12
**frightened**
46:14
**frightening**
47:2
**from**
5:16, 7:13,
8:10, 10:14,
19:11, 25:14,
26:11, 26:13,
31:7, 32:11,
44:23, 47:10,
50:21, 51:12,
57:23, 60:18,
61:10, 62:19,
64:5, 66:8,
68:23, 69:9,
69:10, 71:14,
72:2, 74:16,
75:13, 82:18,

Transcript of Mark W. Kroll, Ph.D.
Conducted on September 13, 2018

264

83:23, 84:14,
84:23, 85:1,
85:12, 86:5,
88:5, 96:8,
96:10, 99:18,
102:25, 103:2,
107:17, 108:13,
116:10, 120:8,
133:24, 138:8,
139:16, 142:10,
145:1, 148:9,
150:5, 150:24,
151:5, 159:20,
163:1, 170:14,
171:4, 171:12,
171:16, 172:14,
173:12, 174:15,
176:9, 190:21,
193:15, 198:8,
200:7, 201:3,
201:25, 203:17,
205:13, 206:4,
207:17, 208:13,
210:12, 215:21,
218:14, 219:9,
225:3, 225:22,
235:17, 236:4,
236:14

**front**
11:10, 13:10,
13:25, 22:17,
30:5, 54:6,
54:10, 88:2,
88:14, 96:16,
114:11, 119:20,
145:14, 148:11,
207:8, 218:16,
226:22

**fruitful**
143:3

**full**
8:4, 39:18,
190:10, 193:10,
194:9, 194:10,
195:11, 195:24

**full-time**
25:14, 110:14

**fully**
168:12

**fumes**
98:17

**functioning**
129:5, 129:16,
129:17, 129:20,
131:4, 217:1

**fund**
205:2

**funded**
205:5, 205:9,
205:15

**funding**
205:12

**further**
62:7, 62:8,
100:16, 184:1,
239:6

**fusses**
118:23

**future**
71:23, 76:23

---
G
---

**gait**
207:24

**game**
195:6

**gas**
96:16, 123:16

**gasoline**
98:17, 159:19

**gather**
226:11

**gave**
75:5, 82:6,
83:17, 83:18,
83:25, 85:9,
96:10, 211:10

**general**
21:5, 81:15,
96:22, 96:23,
108:19, 108:21,
109:20, 110:18,
126:12, 131:15,
200:16, 209:11

**generally**
50:15, 58:2,
119:25, 120:8,

120:14, 137:12,
162:19, 164:10,
197:5, 215:10,
223:11, 223:12

**generated**
17:8

**generating**
136:22, 136:24

**georgia**
88:24, 88:25,
89:1, 89:5,
90:6, 197:15

**german**
171:4

**germans**
171:24, 172:6

**germany**
144:12

**gestures**
7:2, 42:9

**get**
8:4, 29:22,
42:22, 63:20,
70:9, 83:19,
84:18, 85:11,
85:15, 126:5,
126:13, 142:9,
144:3, 147:5,
147:9, 147:14,
149:5, 163:14,
164:1, 171:6,
172:1, 185:1,
197:16, 203:15,
210:1, 213:11,
216:15, 225:15,
225:17, 230:5,
230:10, 232:1,
232:20, 233:9,
234:16, 237:23

**gets**
67:14, 69:14,
96:13, 127:15

**getting**
62:22, 64:21,
70:6, 81:5,
116:15, 145:20,
151:20, 200:16,
209:15

**give**
8:12, 10:23,
21:6, 52:18,
58:20, 61:24,
66:22, 75:2,
85:12, 87:6,
98:12, 99:3,
99:9, 111:5,
111:9, 112:22,
113:2, 113:19,
124:4, 127:17,
129:14, 133:21,
134:13, 147:10,
167:24, 192:12,
211:11, 236:2

**given**
50:1, 70:9,
70:16, 72:16,
76:16, 83:13,
109:21, 113:25,
115:15, 115:16,
128:13, 173:11,
173:15, 174:22,
176:22, 178:11,
178:11, 183:22,
192:16, 209:7,
211:8

**gives**
183:1

**giving**
71:21, 90:25,
92:4, 131:3,
145:6, 155:4

**glad**
49:10

**gladly**
7:16

**glance**
9:22, 10:6,
10:8

**glanced**
10:1, 10:10,
14:17

**glancing**
12:22, 14:15

**gleaned**
233:23

**go**
7:20, 8:1, 8:5,

Transcript of Mark W. Kroll, Ph.D.
Conducted on September 13, 2018

265

37:15, 38:9,
40:8, 42:16,
55:24, 56:7,
56:16, 61:14,
96:14, 98:1,
101:22, 103:8,
105:7, 115:6,
115:14, 132:23,
140:23, 144:2,
147:7, 147:12,
172:9, 177:11,
177:16, 179:12,
189:9, 194:6,
194:24, 199:19,
203:20, 207:21,
209:5, 209:6,
216:19, 218:1,
222:11, 230:17
**goal**
44:3, 44:4
**goes**
46:12, 100:14,
122:21, 129:8,
131:10, 150:13,
225:5, 232:20
**going**
7:21, 11:9,
34:13, 37:3,
37:17, 43:15,
43:25, 47:15,
50:16, 54:15,
58:7, 58:9,
75:1, 76:18,
77:8, 79:1,
80:21, 80:23,
83:14, 84:17,
84:24, 85:11,
88:6, 88:11,
88:15, 91:13,
97:15, 98:22,
99:4, 102:11,
107:18, 122:18,
130:8, 142:11,
147:1, 151:8,
160:13, 168:15,
170:12, 175:4,
177:15, 184:24,
185:23, 187:10,

187:14, 193:5,
209:5, 209:6,
213:15, 217:22,
219:1, 226:23,
227:7, 231:2
**gone**
17:18, 30:20,
39:16, 73:12,
115:10, 116:20,
206:17
**good**
6:6, 6:7,
17:22, 64:20,
99:20, 185:9,
200:21, 204:1,
225:25, 229:6,
229:10, 229:16,
230:3, 230:14
**good-faith**
176:11
**google**
17:11, 40:18,
64:9
**got**
93:20, 107:21,
123:20, 133:17,
153:25, 154:18,
159:17, 185:9,
186:18, 186:19,
197:14, 216:24
**gotten**
46:9, 184:10
**government**
93:12
**grab**
29:19
**gradually**
165:22
**grant**
67:18
**granted**
72:3, 73:6,
74:2, 74:3
**graph**
175:24, 189:22,
204:11, 204:22,
233:16
**grass**
46:12

**great**
42:21, 43:4,
43:20, 181:10,
210:2, 239:7
**greater**
179:16
**greenwood**
1:9, 1:12, 3:3,
13:14, 23:19,
41:2, 45:4,
156:18, 157:4,
157:9, 162:6,
162:21, 163:4,
163:18
**grew**
174:16
**grounds**
155:8
**groundwork**
106:14
**groups**
227:18, 228:18,
229:1, 229:5,
229:21
**growth**
69:22
**guaranteed**
70:2
**guess**
18:3, 18:20,
60:24, 105:12,
106:6, 116:2,
122:1, 124:21,
129:18, 151:9,
152:22, 158:20,
176:13, 223:11
**guy**
43:2, 123:16,
123:19, 124:4,
133:8, 155:6,
181:12, 187:12
**guys**
147:15

---

**H**

**had**
8:24, 9:21,
10:6, 11:8,

16:4, 18:7,
18:25, 23:17,
23:24, 25:15,
31:11, 32:15,
36:15, 43:23,
46:10, 48:19,
49:13, 51:16,
52:15, 53:1,
66:10, 69:22,
74:3, 88:17,
88:19, 89:21,
93:22, 94:1,
96:16, 98:17,
99:11, 101:11,
101:20, 103:20,
107:14, 107:25,
113:10, 113:15,
117:19, 120:5,
121:20, 121:23,
122:6, 133:1,
133:8, 135:19,
136:10, 137:8,
137:10, 140:7,
145:17, 157:3,
157:8, 158:7,
162:10, 166:2,
183:17, 183:18,
183:25, 184:14,
184:20, 191:9,
191:10, 193:11,
193:12, 194:5,
196:3, 196:10,
197:4, 197:16,
198:6, 198:11,
199:17, 209:12,
214:14, 214:15,
214:20, 226:5,
232:10, 234:16,
234:19, 234:24,
235:14, 236:16
**hadn't**
92:2, 195:21,
234:19
**haemonetics**
63:8, 63:9
**half**
38:6, 45:6,
46:15, 70:3,

Transcript of Mark W. Kroll, Ph.D.
Conducted on September 13, 2018

266

86:8, 86:11,
134:15, 153:6,
183:22, 188:3,
202:9, 202:10,
203:16
**half-hour**
30:8
**halfway**
55:2
**hallway**
124:2
**hand**
154:1, 190:12,
190:13, 194:6,
195:16, 199:15,
199:16, 223:4,
240:32
**handcuff**
190:16, 229:12,
230:3
**handcuffed**
230:5
**handcuffing**
181:11, 229:15
**handed**
22:15, 33:21,
117:24, 227:3
**handful**
81:21
**handheld**
5:7, 42:19
**handing**
230:23
**handle**
28:1, 145:18,
161:2
**hands**
193:7
**happen**
224:9
**happened**
44:12, 133:11,
154:11, 182:22,
185:6, 192:10,
198:7
**happens**
107:11, 147:12,
165:23, 175:17,

181:25, 187:6,
187:7, 187:22,
188:6, 190:11,
190:13, 207:22
**happy**
45:21, 77:23,
130:17, 175:2,
200:24, 219:1,
222:11, 226:22
**hard**
113:24, 120:14,
146:12, 225:17,
232:18
**harder**
200:8
**harm**
89:21, 89:25,
92:14, 92:16,
94:15, 99:13,
100:5, 100:23,
100:24, 102:6,
102:7, 102:10,
103:15, 103:22,
106:5
**has**
13:25, 27:12,
32:8, 35:2,
35:4, 36:12,
38:15, 39:7,
43:21, 54:24,
55:4, 55:9,
58:14, 65:19,
65:24, 66:7,
72:2, 72:17,
73:12, 78:13,
85:25, 87:25,
88:7, 105:25,
114:4, 114:7,
114:9, 116:17,
117:16, 131:15,
132:11, 142:17,
142:19, 150:6,
159:18, 160:15,
168:13, 171:23,
190:11, 192:13,
193:19, 197:17,
199:3, 200:6,
205:5, 205:9,

208:19, 208:20,
215:1, 215:11,
215:13, 217:14,
225:6, 225:7,
227:3, 228:7,
238:11, 240:14,
240:26
**hasn't**
58:16, 91:2,
136:18
**haven't**
29:15, 39:16,
197:16
**having**
17:18, 52:4,
188:4, 216:20,
228:2, 231:21
**he's**
61:10, 83:12,
126:23, 237:7
**head**
7:2, 96:15,
101:9, 224:13
**header**
231:6
**heading**
159:5, 223:14
**headquartered**
109:1
**health**
156:22
**healthy**
165:19
**hear**
32:17, 84:1,
129:25, 192:16,
196:23
**heard**
92:2, 126:23,
234:24
**heart**
104:12, 105:8,
115:8, 115:10,
115:25, 128:9,
131:5, 133:10,
139:19, 139:21,
150:23, 150:24,
165:17, 165:24,

166:5, 166:19,
166:20
**heavily**
160:4, 197:20,
219:8
**heavy**
47:13
**heightened**
148:17
**held**
124:24, 202:23
**help**
30:13, 78:3,
87:16, 88:22,
126:10, 182:14,
190:13, 194:20,
199:15
**helpful**
82:23, 106:18,
117:3, 149:17,
153:2, 173:7
**helping**
194:6, 195:16
**helps**
91:18
**hence**
164:11
**hennepin**
240:5, 240:39
**heppell**
2:12, 4:5, 6:5,
6:10, 13:24,
14:4, 22:10,
22:14, 33:16,
33:20, 38:9,
38:12, 53:25,
54:5, 61:13,
61:20, 83:21,
86:3, 86:12,
87:20, 87:24,
91:3, 103:8,
103:11, 117:15,
124:10, 137:4,
137:7, 155:2,
177:20, 177:23,
211:16, 211:22,
217:23, 218:3,
218:7, 226:23,

Transcript of Mark W. Kroll, Ph.D.
Conducted on September 13, 2018

267

227:2, 230:17, 230:22, 239:5
**her**
92:5
**here**
11:7, 42:1, 45:25, 49:12, 49:16, 49:19, 52:17, 52:24, 56:12, 57:6, 76:8, 78:3, 79:15, 84:15, 84:17, 87:17, 94:20, 98:11, 100:7, 114:8, 115:17, 136:12, 142:12, 156:12, 159:22, 161:7, 164:2, 164:16, 168:21, 169:3, 176:11, 186:12, 197:22, 209:1, 214:17, 219:22, 226:8, 228:10
**here's**
94:21, 127:25
**hereby**
240:7
**herewith**
35:6, 88:12
**heston**
144:22
**heterogeneity**
165:24
**high**
123:15, 159:20, 171:16, 213:23, 216:22
**high-power**
166:8
**higher**
24:12, 151:12, 171:22
**highly**
215:12
**highway**
47:18
**him**
13:25, 14:10,

43:23, 53:5, 91:19, 96:10, 96:17, 98:21, 101:16, 123:17, 154:7, 155:8, 164:13, 181:14, 181:16, 206:4, 206:21
**hinder**
128:14
**hindsight**
35:20, 69:20, 69:25
**hip**
210:3
**hips**
208:24
**hire**
77:4
**hired**
93:12, 94:5, 95:3, 95:17, 98:5, 133:7
**his**
18:13, 18:15, 35:6, 37:9, 43:11, 43:21, 43:23, 48:20, 88:10, 90:20, 95:2, 96:15, 98:18, 101:9, 101:12, 133:10, 149:13, 154:1, 164:10, 166:19, 169:2, 170:6, 170:11, 181:13, 190:12, 191:10, 196:8, 196:9, 196:22, 198:11, 198:14, 198:15, 206:3, 206:6, 206:11, 206:13, 206:17, 206:18, 206:21, 208:4, 214:19, 237:8
**hit**
96:15, 104:18, 160:14, 224:13

**hitting**
207:18
**hoc**
112:22
**hold**
41:11, 129:9, 139:1, 139:7, 140:2, 149:7, 163:8
**holding**
134:8
**holds**
147:4
**holtzleiter**
5:16
**honored**
6:12, 60:24
**hopefully**
76:25
**hospital**
44:13, 53:12
**hotel**
44:23, 44:25
**hour**
9:15, 9:16, 9:25, 20:4, 20:25, 21:5, 21:8, 21:14, 21:25, 24:23, 28:13, 38:6, 45:6, 47:14, 65:6, 82:1, 110:2
**hourly**
60:12, 65:10, 82:11, 82:21, 121:22
**hours**
8:18, 23:17, 24:6, 24:11, 27:22, 28:9, 28:10, 28:16, 28:18, 28:24, 29:3, 29:7, 29:18, 29:22, 29:24, 29:25, 39:17, 39:24, 145:3, 145:4,

147:10, 217:22
**how**
6:6, 9:12, 10:3, 25:10, 27:5, 28:18, 31:16, 46:5, 55:23, 56:21, 61:9, 61:17, 63:23, 66:7, 67:10, 69:5, 80:10, 93:21, 94:1, 96:4, 104:7, 121:16, 124:20, 125:25, 128:8, 128:11, 128:12, 133:15, 144:4, 144:5, 146:22, 152:19, 161:2, 161:13, 161:20, 166:3, 167:14, 171:11, 174:18, 175:3, 175:8, 175:12, 175:20, 175:25, 176:1, 176:3, 177:12, 182:15, 196:22, 198:15, 203:22, 206:8, 209:14, 212:2, 216:7, 216:14, 216:21, 217:21, 221:16, 224:4, 231:16, 232:19, 232:22, 237:2
**how-dare-you**
212:13, 212:14
**however**
106:1, 119:15, 171:23
**huge**
233:11, 233:19
**human**
46:24, 125:19, 126:6, 133:24, 134:21, 139:9, 140:4, 150:2, 170:24, 209:10, 209:11, 209:17,

Transcript of Mark W. Kroll, Ph.D.
Conducted on September 13, 2018

268

209:22, 215:16,
225:6
**humans**
225:13
**humor**
163:23
**hundred**
57:13
**hundreds**
188:5
**hung**
63:20
**hurts**
225:17
**hyperactive**
150:4
**hyperactivity**
103:2
**hyperbole**
132:5
**hypotheses**
142:24
**hypothesized**
165:12
**hypothetical**
78:22, 106:12,
129:23, 170:13,
170:16, 170:18,
170:20, 171:18,
199:9

---

**I**

---

**i'll**
7:16, 43:24,
71:8, 100:8,
123:22, 124:3,
126:3, 202:12
**i've**
8:3, 25:13,
33:21, 57:3,
57:21, 60:23,
60:25, 84:22,
85:9, 90:6,
100:15, 104:24,
115:10, 116:20,
117:24, 126:23,
149:22, 150:9,
158:4, 174:6,

200:1, 202:8,
209:12, 218:13,
224:25, 225:16,
234:9, 234:16
**idea**
123:4, 190:4,
204:7, 204:19,
230:10
**identical**
69:17
**identification**
14:3, 22:13,
33:19, 54:3,
87:23, 117:14,
218:6, 227:1,
230:21
**identified**
92:18, 97:18,
97:22, 101:25,
195:10, 229:21
**identify**
10:24, 38:23,
38:25, 88:17,
88:23, 90:4,
93:8, 97:16,
141:17, 221:9,
221:24
**identifying**
141:22
**igniting**
106:8
**ignition**
102:3, 103:17
**ignorance**
70:8
**ignore**
203:18
**ignored**
183:17
**il**
2:16
**illegal**
139:4, 154:20,
154:25
**illicit**
139:4, 139:9,
140:3, 156:3
**illinois**
91:22, 91:23

**illness**
131:19
**illustrative**
179:5
**imagine**
195:3
**immediate**
70:20
**immediately**
26:18, 71:2,
174:13
**immersed**
160:4, 160:9
**impact**
69:11, 69:23,
78:20, 129:5,
208:5, 208:15
**impacting**
129:20
**impacts**
128:9
**impartiality**
240:27
**implant**
128:11, 128:12
**implantable**
127:21, 131:23,
132:24
**implication**
60:15
**implied**
29:23
**importance**
171:17
**important**
7:1, 7:6, 38:3,
42:1, 42:9,
46:3, 46:5,
63:18, 70:19,
159:4, 197:24,
200:12, 200:21
**imprecise**
42:14
**impression**
46:10
**impressive**
192:6
**improperly**
89:22

**improve**
135:14
**improved**
150:6
**in-person**
8:20, 9:1,
113:1
**inability**
150:1
**inadvertent**
16:14, 189:25,
190:6, 190:20,
190:23, 192:11,
192:13, 193:20,
194:16, 195:13,
196:2, 196:4,
196:15, 196:20,
197:4, 197:8,
197:13, 197:21,
198:6, 198:8,
199:3, 199:6,
199:24
**inadvertently**
193:12, 196:11,
198:1
**inappropriate**
92:17
**inappropriately**
92:11
**inches**
207:19, 208:18
**incident**
17:10, 17:13,
40:20, 41:5,
41:15, 41:17,
44:8, 44:11,
123:7, 155:10,
156:4, 158:11,
162:23, 191:4,
191:8, 201:10,
202:7, 218:24,
234:7, 234:25,
236:18
**include**
15:11, 28:24,
67:5, 81:5,
81:10, 82:11,
82:16, 105:23,

Case 1:17-cv-01698-JPH-MJD   Document 153-5   Filed 10/06/18   Page 271 of 312 PageID #: 8879

Transcript of Mark W. Kroll, Ph.D.
Conducted on September 13, 2018                              269

111:12, 111:17,
126:9, 173:18,
183:2, 188:23,
189:24
**included**
9:23, 16:25,
51:25, 57:11,
82:5, 114:18,
115:21, 126:11,
180:19
**includes**
34:14, 64:12,
78:12, 81:7
**including**
28:20, 29:20,
64:11, 74:17,
75:16, 75:18,
82:19, 114:13,
129:18, 143:8,
220:11, 221:18,
238:8
**inclusion**
99:21
**income**
60:17, 61:4,
61:7, 61:10,
61:11, 61:17,
61:22, 62:5,
62:10, 62:17,
62:19, 83:4,
83:10, 83:15,
83:19, 83:23,
84:25, 85:11,
85:16, 86:5
**incorrect**
115:22, 215:18,
228:20
**increase**
66:16, 71:5,
73:18, 143:10,
143:12, 146:10,
146:20, 147:11,
147:16, 148:12,
151:18, 172:15,
186:14, 220:14,
220:20, 221:20,
222:25, 223:10,
223:17, 224:7

**increased**
72:2, 215:11
**increases**
70:5, 147:18,
148:9, 151:10,
171:3
**increasing**
165:23
**incur**
44:17
**incurred**
44:20
**indeed**
98:9
**independently**
18:7
**index**
4:1, 4:11, 5:1
**indiana**
1:2, 41:2,
44:14, 45:5
**indianapolis**
1:3, 3:8, 3:17,
44:12
**indicating**
119:9, 207:21
**indication**
30:21, 195:12
**indicative**
194:16
**indirectly**
122:11, 122:13
**individual**
84:9, 91:16,
92:24, 95:8,
99:15, 102:10,
105:8, 106:5,
132:16, 138:8,
139:18, 146:20,
198:22, 207:25,
208:10, 208:12
**individual's**
102:20, 105:19
**individuals**
53:6, 118:12,
135:19, 146:19,
148:17, 214:5,
215:20, 216:2,

216:18, 220:13,
224:19, 231:1
**induced**
101:15, 136:5,
136:15, 136:16,
139:20
**induction**
170:1
**indulgence**
98:3
**industry**
25:14
**inference**
55:8
**inferring**
120:7
**inflicting**
216:17
**influence**
76:22, 77:3,
139:18, 156:3,
156:14, 214:12
**influencing**
78:7
**inform**
45:24, 46:5
**information**
4:19, 5:8,
14:22, 23:14,
33:7, 33:24,
35:23, 45:16,
56:17, 58:20,
59:9, 78:19,
78:24, 85:19,
85:23, 100:16,
101:8, 101:9,
129:4, 176:9,
194:20, 220:2,
231:6
**informed**
45:19, 48:8,
77:1, 216:15
**inherent**
176:15
**initial**
30:19, 42:7,
48:20, 101:7,
101:11, 121:8

**initially**
31:19, 47:4
**injures**
133:16
**injuries**
107:4, 107:15,
107:16, 107:17,
133:15
**injury**
21:9, 21:12,
22:1, 99:18,
99:22, 99:25,
101:9, 101:19,
102:1, 103:16,
106:20, 106:22,
106:24, 107:2,
133:7, 133:20,
138:22, 141:6,
146:8, 149:1,
158:15, 159:24,
165:6, 166:10,
167:13, 220:14,
220:21, 222:25,
223:17, 224:8
**innovation**
113:8, 113:11
**inside**
128:17, 154:10
**insider**
71:11
**inspection**
4:20, 33:25,
45:11
**instance**
136:14
**instances**
210:18, 210:24
**instant**
42:22
**instead**
56:10, 163:22,
183:23
**institute**
228:12
**institution**
108:11
**institutions**
112:19

PLANET DEPOS
888.433.3767 | WWW.PLANETDEPOS.COM

Transcript of Mark W. Kroll, Ph.D.
Conducted on September 13, 2018

270

| | | | |
|---|---|---|---|
| **instruct** | **international** | **investor** | 132:4, 132:22, |
| 225:2 | 26:7, 27:1, | 62:2, 62:21 | 133:2, 133:11 |
| **instructions** | 63:12, 80:9, | **invite** | **involving** |
| 4:7, 5:8, | 167:15, 214:8 | 91:19, 174:12 | 20:14, 21:9, |
| 199:23 | **internet** | **invited** | 21:12, 21:17, |
| **instructs** | 71:11 | 113:12, 142:15 | 22:1, 22:2, |
| 229:18 | **interpret** | **invoice** | 86:22, 99:17, |
| **insurance** | 80:11, 176:2, | 4:15, 5:5, | 132:11, 136:22, |
| 123:4 | 212:1 | 22:18, 23:3, | 165:13, 181:1, |
| **intend** | **interpretation** | 27:19, 27:21, | 217:7, 234:7, |
| 59:9 | 193:1, 193:2, | 30:19, 31:8, | 234:12, 234:13 |
| **intending** | 193:3 | 31:10, 32:22, | **iowa** |
| 164:16 | **interrupted** | 35:6, 35:11, | 87:12 |
| **intentional** | 192:24 | 35:12, 35:16, | **ironically** |
| 184:25, 185:8, | **intersection** | 35:21, 36:1, | 153:14 |
| 185:19, 186:3, | 17:12 | 36:7, 37:8, | **irregular** |
| 186:13, 186:17, | **interview** | 38:5, 38:14, | 59:3 |
| 204:15 | 196:9 | 39:11, 60:4, | **irrelevant** |
| **intentionally** | **interviews** | 60:6, 109:12, | 61:9, 165:19, |
| 144:13, 171:5, | 193:17 | 117:20, 119:1, | 169:17, 171:10 |
| 172:2, 216:17 | **into** | 120:10, 121:23 | **irritated** |
| **interacting** | 47:17, 64:21, | **invoiced** | 154:5 |
| 53:6, 106:7 | 69:14, 69:24, | 28:16, 44:20 | **irs** |
| **interaction** | 70:3, 70:6, | **invoices** | 67:18, 83:16 |
| 129:7, 139:10, | 84:18, 85:15, | 30:23, 30:24 | **ison** |
| 140:5, 154:17 | 102:11, 136:7, | **invoicing** | 5:16 |
| **interactions** | 147:12, 155:9, | 109:22, 118:13 | **issue** |
| 139:12 | 163:11, 170:24, | **involve** | 75:25, 86:14, |
| **interchangeably** | 177:11, 177:19, | 21:18, 86:14, | 109:21, 120:10, |
| 63:15 | 178:10, 178:19, | 198:25 | 143:4, 148:2, |
| **interest** | 183:15, 198:23, | **involved** | 151:8, 151:9, |
| 78:8, 80:7, | 199:4, 199:8, | 25:11, 26:6, | 160:22, 161:1, |
| 240:25 | 200:16, 201:21, | 49:4, 59:16, | 161:6, 161:7, |
| **interested** | 206:13, 210:1, | 62:2, 91:17, | 168:23, 171:23, |
| 71:7, 174:12, | 211:25, 213:8, | 102:1, 102:3, | 174:17, 183:17, |
| 216:6, 240:23 | 213:11, 213:15, | 102:19, 102:23, | 216:13, 226:19 |
| **interesting** | 217:1, 222:11 | 126:13, 131:12, | **issued** |
| 24:18, 24:24, | **introduced** | 131:14, 132:6, | 67:18 |
| 92:2, 107:22, | 6:8 | 133:4, 136:23, | **issues** |
| 139:12, 154:21, | **invariably** | 142:23, 188:21, | 84:19, 89:2, |
| 195:2, 215:8, | 111:16 | 219:9 | 129:17, 144:7, |
| 235:15 | **invested** | **involvement** | 210:23, 211:25, |
| **interfere** | 111:1 | 18:8, 19:1, | 225:1 |
| 222:7 | **investigation** | 27:2, 131:18, | **issuing** |
| **intermittent** | 235:23 | 131:19, 131:21, | 68:25, 69:7 |
| 185:1 | **investigations** | 134:11 | **item** |
| **internal** | 152:20 | **involves** | 40:12, 51:24, |
| 152:20 | **investments** | 91:8, 132:2, | 164:7 |
| | 61:18 | | |

Transcript of Mark W. Kroll, Ph.D.
Conducted on September 13, 2018

271

**items**
49:1, 49:21,
49:22, 56:21,
115:21, 149:23
**itp**
192:19, 192:23,
194:2, 194:7,
195:10, 195:17,
198:11, 199:11,
199:12, 199:20
**itps**
194:22, 198:25
**its**
73:19, 142:19,
163:4, 222:18,
222:19, 223:19,
229:18
**itself**
14:14, 37:5,
80:1, 81:18,
228:7

**J**

**james**
3:5, 5:16
**jason**
5:16
**job**
1:23, 26:12
**join**
195:4
**joined**
27:7, 27:13
**journal**
142:15
**journals**
126:10
**jstephenson@step-hlaw**
3:10
**judge**
85:22, 85:24
**judge's**
86:2
**july**
13:12, 16:8,
19:10, 37:22,
54:13, 54:21,

88:8, 88:25
**june**
5:5, 5:15,
91:23, 117:20,
119:20, 120:4,
120:18, 121:3,
121:9, 121:14,
231:8, 231:22,
232:10, 234:18
**juror**
153:4
**jury**
153:3
**justice**
98:6, 143:9,
228:11, 228:12

**K**

**keep**
50:15, 50:22,
77:1, 105:21,
192:6
**keeping**
66:4, 191:14
**kept**
59:13, 181:14,
181:16, 190:11
**key**
158:6
**keynote**
113:13
**khottavongsa**
101:4, 101:7
**kid**
153:17, 153:18,
153:21, 154:5
**kill**
106:6, 165:22
**killed**
90:19, 96:17,
101:16, 198:7
**killing**
105:14
**kills**
167:14
**kind**
41:23, 55:22,
58:13, 74:22,

83:16, 122:11,
128:23, 144:23,
225:17, 237:20
**kinds**
21:16
**kinetics**
209:10, 209:11,
209:17, 209:22,
210:2
**kleinhaus**
2:13
**knees**
206:6, 206:11,
206:18, 206:21,
208:4, 210:4
**knew**
145:9
**knife**
181:13
**knocked**
96:9
**know**
6:23, 7:16,
8:1, 12:16,
28:2, 28:6,
33:10, 35:18,
36:8, 40:3,
41:17, 42:8,
51:16, 61:17,
69:1, 73:12,
74:21, 75:1,
75:3, 78:2,
79:1, 85:7,
93:21, 94:1,
94:21, 96:24,
100:12, 100:17,
101:11, 118:11,
121:6, 145:16,
148:25, 150:22,
153:3, 153:5,
155:1, 161:9,
167:14, 171:4,
175:16, 175:20,
176:1, 176:24,
177:1, 178:24,
188:16, 188:21,
188:22, 194:21,
198:4, 198:18,

200:1, 200:4,
200:9, 206:8,
206:15, 210:9,
216:14, 217:23,
218:12, 219:20,
226:21, 233:6,
239:2
**knowing**
46:25, 152:2,
216:21
**knowledge**
36:17, 42:13,
47:8, 75:6,
76:17, 127:5,
148:16, 154:17,
199:21, 219:17
**known**
26:11, 26:25,
27:1, 63:11,
80:8, 122:18,
146:3, 155:7,
168:10
**knows**
196:22, 237:6
**kroll**
1:18, 2:1, 4:3,
4:13, 4:23, 6:1,
6:6, 6:13, 8:15,
13:12, 14:1,
22:16, 25:3,
33:21, 35:5,
38:8, 39:7,
54:6, 54:8,
55:11, 55:12,
59:23, 60:3,
60:9, 85:17,
87:21, 87:25,
103:12, 104:21,
109:6, 109:17,
110:4, 110:7,
110:19, 117:17,
122:10, 125:2,
137:8, 177:24,
218:8, 218:17,
221:22, 227:4,
230:23, 230:24,
231:13, 240:8
**kroll's**
4:17, 33:23,

Transcript of Mark W. Kroll, Ph.D.
Conducted on September 13, 2018

272

| | | | |
|---|---|---|---|
| 35:4, 36:12, 37:8, 37:13, 88:6, 88:8 | **latest** 147:4 | **lay** 84:6 | **ledge** 159:20 |
| **kunz** 134:19, 135:1, 135:5, 143:16, 148:1 | **latter** 225:11 | **laying** 106:14 | **left** 50:2, 162:19, 177:7, 190:13, 199:15, 201:3, 203:12, 217:24, 227:12 |

**L**

**l-i-m**
12:15
**l-i-n**
12:14
**lab**
225:6, 225:13
**laboratories**
26:13
**lack**
116:3, 183:25, 204:20, 226:11
**lactate**
223:10, 224:6
**large**
50:16, 76:25, 78:12, 209:24
**largely**
161:16, 201:9, 202:17, 208:24, 223:1
**larger**
78:10
**largest**
149:23
**last**
12:23, 24:21, 58:17, 66:10, 85:1, 116:12, 175:18, 186:23, 211:17, 219:7, 222:8, 226:15
**late**
28:3
**later**
37:15, 75:4, 100:11, 101:8, 182:8, 205:16, 207:11, 218:25, 219:5

**laut**
1:11, 3:4, 158:2, 190:18, 193:7
**law**
3:14, 3:22, 5:8, 19:21, 20:11, 20:12, 20:14, 20:18, 20:22, 21:9, 21:12, 21:21, 21:24, 22:1, 24:8, 24:16, 30:20, 31:11, 36:10, 44:23, 86:5, 86:13, 86:22, 87:11, 88:20, 89:10, 89:11, 89:15, 90:5, 91:12, 91:16, 92:19, 92:24, 93:9, 94:18, 95:12, 97:17, 97:19, 99:4, 123:21, 152:13, 152:16, 154:19, 155:5, 182:2, 182:14, 218:9, 218:21, 225:2, 227:17, 228:4, 228:17
**lawsuit**
13:22, 17:9, 19:2, 95:11, 123:10, 124:12
**lawsuits**
122:22, 122:25
**lawyer**
79:10, 125:23
**lawyer's**
35:19
**lawyers**
122:20, 221:12, 224:17

**laypeople**
129:24
**layperson**
125:23
**lead**
43:20, 93:18, 113:23, 128:17, 144:18, 145:5, 170:24, 171:3, 198:17, 198:18
**leading**
26:18, 93:15, 102:19, 139:24, 165:17, 186:3, 199:20, 209:25
**leads**
42:21, 56:11, 128:17, 195:17, 199:11, 199:12
**learn**
57:7, 144:3, 144:4, 206:20
**learned**
46:1, 58:21, 113:24, 129:3, 162:11, 176:9
**learning**
57:2, 147:4
**least**
47:19, 62:14, 97:21, 134:22, 147:11, 162:7, 162:25, 163:5, 196:1, 216:8
**leaving**
11:4, 11:7
**lecture**
56:16, 62:3, 105:22, 112:23
**lectures**
112:23, 113:2
**lecturing**
44:13
**led**
43:23, 198:9

**legal**
77:12, 84:18, 142:16, 155:4
**legally**
42:17
**legs**
190:19
**lengthy**
189:24
**less**
73:11, 105:9, 137:24, 139:19, 139:23, 178:5, 180:11, 180:21, 181:4, 183:18, 211:4, 216:12, 223:5, 229:15, 231:17, 232:13, 232:23, 233:4
**less-than-lethal**
162:25, 163:20
**lesson**
154:19
**let**
7:16, 8:1, 13:4, 18:3, 28:6, 75:11, 78:22, 81:6, 98:2, 100:12, 100:17, 132:19, 144:23, 177:16, 184:24, 203:14, 222:17
**let's**
67:12, 71:12, 75:11, 78:23, 87:18, 103:8, 104:1, 106:1, 132:24, 177:20
**lethal**
171:15

Transcript of Mark W. Kroll, Ph.D.
Conducted on September 13, 2018

273

letter
31:20
level
124:21, 145:20,
148:8, 151:12,
171:22, 193:24
leveled
225:20
levels
146:10, 146:19,
147:19, 151:19,
172:15, 223:11
liability
60:11, 70:21
license
128:21
licensing
124:15, 235:24
lieutenant
41:4, 43:10,
157:23, 158:22,
159:7, 184:14,
187:2, 188:1,
191:7, 191:17,
191:19, 193:9,
195:13, 196:3,
196:9, 202:20,
206:2, 206:5,
214:1
life
58:21, 157:7,
157:14
light
188:10
lightning
104:18, 144:10,
166:9
like
24:24, 32:4,
36:19, 42:7,
42:24, 49:11,
60:7, 63:3,
73:13, 82:20,
101:23, 106:9,
113:4, 116:19,
116:25, 131:23,
133:5, 144:7,
147:10, 147:13,

158:16, 161:8,
166:9, 169:18,
178:23, 178:24,
187:8, 191:1,
191:15, 191:23,
191:25, 192:6,
197:5, 206:19,
207:5, 207:20,
208:12, 208:22,
230:7, 234:23,
237:16
likely
11:17, 208:3
limit
59:12, 104:17,
132:19, 230:16
limitation
148:3, 203:10
limitations
148:6
limited
60:10, 104:10,
109:23, 129:19,
184:5, 217:16,
238:6
limiting
17:5
limits
167:16
line
60:16, 66:5,
125:24, 129:11,
130:13, 166:10
lines
144:10, 165:6,
169:20, 191:11,
192:2, 231:22
link
121:19, 156:11
linkage
149:18
list
5:3, 15:3,
15:23, 16:3,
16:14, 17:1,
18:6, 18:21,
37:13, 50:2,
50:3, 50:7,

50:25, 51:5,
51:9, 51:25,
56:8, 57:14,
57:20, 58:2,
58:7, 58:15,
59:8, 59:18,
80:15, 88:6,
88:10, 88:14,
88:22, 88:23,
93:8, 94:22,
98:1, 98:22,
99:1, 102:22,
112:5, 114:13,
159:5, 163:1,
164:4, 164:7
listed
14:25, 18:10,
19:4, 57:9,
57:19, 59:22,
62:6, 62:23,
63:4, 91:11,
113:20, 120:22,
140:19, 140:20,
140:25
listen
51:19
listened
49:18, 52:20
listener
57:4
listing
48:23, 57:22,
60:8, 87:13
literature
135:8, 135:11,
146:4, 146:6,
148:23, 149:1,
158:14, 158:20,
159:12, 159:22,
159:23, 162:2,
168:14, 197:21
litigation
9:10, 13:20,
20:16, 20:19,
20:21, 25:12,
27:12, 42:12,
52:6, 81:11,
82:13, 84:4,

86:21, 86:25,
109:23, 118:16,
166:1, 226:1,
230:8, 230:14,
235:10
litigation-relat-
ed
110:17
litigators
230:9
little
46:16, 63:25,
65:21, 73:7,
98:13, 106:13,
117:2, 123:20,
130:10, 132:5,
132:25, 142:17,
153:1, 154:18,
161:10, 173:8,
174:15, 203:19,
223:8
live
132:20, 132:21
live-study
142:24
livelihood
85:8
llc
59:24, 60:3,
60:10, 109:6,
109:18
location
17:18, 46:7,
177:3, 202:25,
203:2
locations
202:20
lock
224:11
locked
181:14, 181:16
lockup
184:20
lodge
169:14
lodged
164:9, 164:18,
168:18, 169:2,

Transcript of Mark W. Kroll, Ph.D.
Conducted on September 13, 2018

274

| | | | |
|---|---|---|---|
| 169:6, 184:11, 213:2 | loses 224:12 | 66:21, 69:3, 75:9, 140:13, 156:6, 166:15, 168:25, 169:8, 175:18, 182:11, 191:6, 191:19, 193:16, 198:5, 202:17 | 150:3 |
| loevy 2:14, 3:22 | loss 150:24 | | making 6:24, 18:21, 52:12, 63:3, 115:6, 198:21, 199:5 |
| logged 32:9 | lost 7:14, 208:19, 233:8 | | |
| logically 144:6 | lot 42:5, 47:14, 57:5, 70:6, 77:3, 85:13, 104:25, 105:22, 124:7, 125:22, 130:4, 130:11, 130:24, 131:15, 145:15, 160:6, 169:11, 191:16, 204:14, 210:9, 215:6, 216:5, 216:20, 219:21, 219:22, 221:12, 229:4, 232:2, 233:7 | madison 45:4, 46:7, 47:17, 53:10 | man 123:23 |
| long 9:12, 25:10, 63:23, 70:11, 75:3, 79:24, 80:21, 81:20, 81:23, 100:7, 115:5, 178:22, 178:23, 237:9 | | magistrate 123:22, 123:25 | management 77:2, 78:7 |
| | | main 29:9, 97:11, 111:19, 154:6 | manner 96:5 |
| longer 142:4, 171:21, 202:15, 225:18 | | maintain 30:22, 40:7, 43:15, 50:9, 50:14, 58:6, 59:18, 68:4, 182:17, 208:23 | many 28:18, 43:7, 60:23, 60:24, 60:25, 66:7, 69:4, 93:21, 94:1, 176:3, 177:14, 180:7, 231:16, 232:22, 237:2 |
| look 10:8, 11:8, 55:21, 60:4, 87:13, 123:22, 124:3, 124:8, 136:12, 140:24, 141:3, 142:6, 151:1, 162:3, 173:23, 175:12, 175:14, 175:22, 175:23, 183:19, 185:23, 192:17, 205:11, 206:19, 219:21, 221:16 | | maintained 59:8 | map 17:12, 17:15, 40:18 |
| | lots 57:3 | maintaining 67:21, 71:4 | maps 17:11 |
| | lottery 69:21, 73:25, 74:25, 75:4, 76:14 | major 142:11, 148:2, 219:17 | march 27:7, 40:14, 40:23, 41:1, 65:23, 90:6, 109:9, 218:22 |
| | low-level 165:21 | majority 131:20, 180:18, 182:20, 190:14, 194:22, 196:19, 215:5 | mark 1:18, 2:1, 4:3, 4:13, 4:17, 4:22, 6:1, 11:5, 13:12, 13:24, 22:10, 25:5, 33:16, 33:23, 37:8, 37:13, 37:15, 53:25, 55:12, 59:23, 60:2, 60:9, 66:9, 87:18, 87:20, 99:1, 109:5, 109:17, 110:4, 110:7, 110:19, 201:18, 218:3, 226:23, |
| looked 103:16, 109:12, 143:10, 210:18, 210:24 | low-power 166:3, 166:6, 166:8, 167:6, 167:10, 167:22, 168:7, 168:11, 169:25, 170:14 | | |
| looking 22:21, 35:19, 39:12, 46:13, 84:13, 94:20, 177:25, 187:24, 206:22, 226:8 | lower 178:11 | make 7:3, 7:8, 7:17, 42:14, 45:7, 49:12, 51:4, 54:18, 62:18, 63:10, 67:25, 71:19, 75:4, 78:12, 82:24, 85:13, 105:5, 118:14, 158:7, 166:12, 196:25, 200:8, 200:21 | |
| | loyalty 79:8, 79:18 | | |
| | lucky 184:15 | | |
| looks 46:24, 49:11, 55:10, 60:7, 71:9, 146:3 | lunch 103:6, 137:5 | | |
| | **M** | | |
| lose 101:21, 209:1 | made 40:17, 40:19, | makes 84:8, 137:24, | |

Transcript of Mark W. Kroll, Ph.D.
Conducted on September 13, 2018

275

231:13, 240:8
**marked**
5:20, 14:2,
14:14, 22:12,
22:16, 27:19,
31:8, 33:18,
33:22, 35:12,
37:10, 37:21,
39:11, 54:2,
54:7, 55:19,
55:20, 80:14,
87:22, 87:25,
88:4, 88:14,
107:18, 117:13,
117:16, 121:23,
155:13, 218:5,
218:17, 226:25,
227:4, 230:20,
230:24
**markers**
223:6
**market**
69:15, 70:17,
71:3, 71:4,
71:5, 74:4
**marketplace**
73:20
**markings**
203:19
**marks**
177:1, 177:5,
177:7, 177:9,
183:25, 201:3,
201:5, 201:25,
202:1, 203:12,
204:5
**marquette**
2:3
**martin**
98:5, 98:10,
98:15
**mary**
12:15
**mason**
94:23
**master**
108:5
**master's**
108:9, 108:12

**match**
175:21, 180:17
**material**
16:18, 33:11,
44:22, 55:1,
82:24, 146:11,
169:8, 188:22,
200:10, 228:3
**materials**
14:21, 14:25,
15:4, 15:24,
16:4, 16:24,
17:2, 17:7,
17:8, 18:22,
18:25, 19:4,
19:6, 19:11,
34:7, 49:4,
50:2, 50:5,
50:11, 50:19,
50:24, 51:6,
51:13, 52:13,
52:16, 53:2,
102:3, 103:17,
114:16, 116:11,
120:17, 120:22,
120:24, 121:2,
121:6, 121:8,
121:16, 121:21,
122:2, 122:7,
166:14, 169:4,
188:14, 188:19,
199:22, 200:20,
208:7, 210:5,
210:19, 210:25,
212:4, 212:9,
226:7, 226:13,
226:18, 227:9,
228:4, 229:19,
234:20
**math**
39:23, 40:5
**mathematically**
182:24
**mathematics**
80:16, 107:25
**matter**
13:13, 18:18,
23:19, 27:23,

28:5, 28:10,
30:2, 30:14,
31:17, 33:9,
44:21, 61:9,
64:8, 90:14,
94:4, 94:11,
115:19, 118:8,
119:10, 119:17,
120:2, 145:12,
166:2, 181:20,
200:3
**matters**
57:18, 114:21,
115:1, 115:3
**maximum**
183:24, 203:11
**may**
7:11, 7:15,
11:17, 16:8,
26:9, 26:12,
26:15, 37:15,
43:12, 44:22,
47:11, 48:3,
49:17, 58:12,
71:12, 71:14,
72:5, 87:16,
87:18, 91:19,
97:11, 99:17,
99:19, 117:4,
121:5, 125:22,
141:4, 141:16,
156:14, 156:23,
157:4, 157:9,
165:4, 165:13,
170:21, 186:19,
186:24, 187:17,
197:1, 201:21,
201:23, 208:13,
220:14, 220:16,
222:21, 223:16,
224:19
**maybe**
9:15, 29:24,
37:1, 71:16,
93:25, 106:2,
106:14, 117:2,
126:3, 126:13,
128:12, 128:17,

132:4, 132:19,
145:3, 147:3,
148:17, 161:11,
200:7
**mba**
108:18
**mccaslin**
91:22, 92:1
**mean**
17:2, 20:12,
28:20, 32:3,
41:24, 42:6,
56:5, 56:6,
59:20, 66:23,
87:1, 122:14,
124:7, 125:15,
125:22, 126:1,
139:11, 142:23,
143:7, 150:9,
150:20, 153:2,
164:24, 197:14,
198:7, 198:16,
202:5, 207:16,
211:2, 215:20
**meaning**
7:3, 24:23
**meaningful**
41:10, 41:14,
41:22
**meaningless**
43:8
**means**
31:21, 61:10,
67:14, 77:15,
78:3, 103:22,
104:4, 105:15,
105:19, 106:7,
106:8, 165:22,
224:3, 224:4
**meant**
77:20, 82:15,
176:24
**measurable**
221:21, 224:2,
224:5
**measured**
43:7, 147:7,
147:9

Transcript of Mark W. Kroll, Ph.D.
Conducted on September 13, 2018                                    276

measurements
45:8, 146:14
mechanical
187:18
mechanics
67:10
mechanism
98:15, 165:11,
166:16, 166:24,
167:4, 167:9,
167:10, 167:21,
168:5, 169:23,
170:4, 170:14,
170:23, 171:1,
199:19, 224:9,
224:10
mechanisms
168:7, 168:11
medical
8:10, 65:1,
65:3, 81:9,
82:3, 105:13,
125:1, 125:4,
125:6, 125:10,
125:13, 125:15,
125:17, 125:18,
125:20, 125:25,
127:6, 127:13,
127:16, 129:3,
129:6, 129:22,
129:24, 130:4,
130:6, 130:14,
130:20, 130:25,
131:4, 131:5,
131:9, 131:21,
132:11, 132:15,
134:2, 134:5,
135:4, 156:9,
157:2, 177:9,
201:6, 201:24,
220:18, 222:24,
235:7, 235:24,
236:7, 236:24,
238:19, 238:24
medicine
142:16
meet
6:12, 9:3,

25:2, 115:13
meeting
8:20, 9:1,
9:18, 14:10,
28:11
meetings
115:16, 115:25
member
64:16, 64:19,
76:21, 77:9,
77:25, 78:5,
78:16, 79:6,
79:16, 79:19,
80:4, 80:6,
82:2, 82:3,
238:10, 238:12,
238:19
members
78:18, 235:12,
238:13, 238:15
membership
67:21, 68:4
memory
17:14, 17:17,
17:21, 17:22,
45:12, 52:18,
53:18, 87:16,
100:4, 205:14
mention
134:23
mentioned
27:16, 45:20,
48:14, 52:21,
135:24, 156:9,
158:13, 174:25,
175:15
meridian
3:15, 3:16
message
38:4
met
8:18
meta-analysis
135:10, 135:11,
135:12, 136:10,
143:20, 143:21
meta-analyzed
143:15

metabolic
220:12, 220:18,
221:19, 222:23,
223:8, 223:14,
223:16, 224:2
metabolism
223:25
metadata
231:5
microscopically
231:15, 232:21
microsoft
40:2
midday
47:13
middle
173:9
might
99:6, 109:24,
117:3, 129:20,
141:24, 142:6,
145:21, 236:13
million
69:24, 73:22,
73:24, 74:5,
74:6, 74:20,
74:22, 75:4,
75:6, 75:21,
76:7, 76:12,
80:25, 82:8,
82:11
millions
75:8, 76:6
mind
11:4, 11:7,
35:18, 35:19,
50:8, 87:8,
100:9, 100:10,
129:12, 130:16
mine
13:15
minimize
197:25, 220:21,
222:8, 225:4,
225:23
minneapolis
2:4, 108:24,
109:1, 112:14,

240:9
minnesota
2:4, 2:6,
108:14, 112:14,
112:21, 113:1,
124:6, 154:20,
240:3, 240:9
minor
107:3, 147:11,
149:5, 163:21
minute
50:3
minutes
10:5, 117:10,
167:2, 168:1,
172:1
mirroring
199:12
misadventures
232:2
misconnection
233:12
misinformation
79:4
misleading
78:25
missed
207:15
missing
16:9, 16:12,
88:9, 98:12
misunderstanding
189:5, 189:10
misunderstood
7:12
mixing
58:13
mn
240:39
mode
98:19, 180:16,
199:3, 199:5,
199:17, 202:2,
202:14, 205:23,
207:4
modern
174:10
modes
189:15

Transcript of Mark W. Kroll, Ph.D.
Conducted on September 13, 2018

277

moment
107:22
momentum
208:3, 209:4
monday
113:6
money
24:17, 25:1,
82:7, 85:14,
124:7
month
126:13, 127:10
months
32:12, 32:15
more
24:18, 24:24,
29:17, 30:13,
30:16, 41:13,
43:9, 53:20,
65:7, 66:5,
73:7, 75:7,
98:2, 106:13,
106:15, 106:17,
107:22, 137:24,
143:12, 150:7,
150:12, 151:10,
151:16, 160:15,
162:12, 167:3,
172:17, 177:3,
181:2, 181:4,
181:10, 184:7,
186:4, 203:7,
203:19, 204:4,
206:20, 207:19,
208:25, 216:11,
222:10, 222:17,
225:15, 229:11
morning
6:6, 17:11
morow
3:6
most
31:23, 56:3,
66:16, 70:1,
79:21, 119:12,
127:20, 131:13,
132:10, 134:18,
142:11, 157:20,

193:22, 199:11,
205:14, 208:3,
215:18, 225:5,
229:9
mostly
165:18, 180:13,
213:12
motion
207:25
motivation
43:1, 216:4
motive
235:19
motives
235:14
mouthed
154:8
move
8:6, 128:17,
130:4, 202:12,
230:6
moved
200:6, 202:25
movement
187:14, 187:18
moving
185:1, 203:18
much
10:3, 53:20,
54:18, 71:19,
75:7, 82:6,
96:4, 105:3,
125:23, 130:2,
131:10, 151:16,
161:2, 175:20,
184:8, 197:7,
200:6, 209:14,
217:24, 222:12,
231:17, 232:12,
232:23, 233:4,
234:11
multiple
145:2, 226:19,
227:18
multisensory
55:8
municipality
95:13, 95:19,

96:24
murder
89:6
muscle
107:10, 134:20,
141:9, 141:11,
144:17, 145:4,
150:24, 151:17,
171:25, 172:3,
172:18, 199:12,
208:23
muscles
101:22, 107:13,
212:17, 224:12
must
114:12
muzzle
183:4, 183:12,
184:3, 184:14,
184:19, 185:18,
187:3, 189:1,
189:14, 202:22,
204:8, 204:12,
204:19, 213:4,
213:9
myself
6:8, 59:21,
60:18, 63:22,
129:9, 139:14,
163:8

**N**

name
6:9
named
122:22, 122:24
names
11:19
nancy
12:14
narrative
37:6
narrow
161:10
national
198:5, 228:12
nature
7:13, 56:6,

56:21, 64:23,
89:19, 90:16,
90:24, 91:24,
92:9, 93:2,
98:14, 102:5,
127:12, 128:16,
131:7, 207:25,
232:6
nebulous
43:19
necessarily
17:21, 31:10,
119:8, 141:3
necessary
14:22, 229:13
neck
92:5
need
7:25, 11:1,
40:5, 41:16,
42:8, 54:18,
127:16, 137:2,
172:9, 186:13,
207:6, 207:9,
230:6, 237:20
negative
78:23, 79:23,
184:12, 184:19
negatively
78:20
neologisms
43:20
nephrologist
137:21, 138:11
nerve
104:18
never
35:18, 59:13,
70:3, 77:4,
82:6, 102:9,
102:14, 103:20,
111:24, 125:6,
125:8, 138:4,
152:13, 153:12,
155:11, 181:9,
181:25, 182:24,
196:13, 196:16,
196:17, 210:18,

Transcript of Mark W. Kroll, Ph.D.
Conducted on September 13, 2018

278

new
24:22, 68:8,
116:9, 136:18,
136:21, 144:11,
171:19, 172:3,
176:7, 185:14,
212:22, 230:7
newer
175:17, 226:14
newest
200:5
news
198:5
newspaper
42:12, 111:16
next
2:21, 25:20,
38:6, 55:7,
73:23, 93:10,
124:3, 147:10,
176:15, 220:19,
224:18
nice
73:25
nicely
154:7, 158:8
niche
161:10
nickels
172:18
nine
46:2, 207:19,
208:18, 218:25,
219:20
nine-inch
207:10, 207:11
nine-page
219:5
ninety-eight
234:5
nobody
73:25, 77:6
nobody's
172:3
nods
7:2
noise
146:12, 192:15

nominal
66:3, 66:21,
66:23, 72:23
non-law
24:9, 86:7,
86:24
non-schizophreni-
cs
215:24
none
4:7, 4:9, 18:5,
112:9, 147:18,
147:20, 171:8,
177:2, 202:13,
205:15, 205:17,
225:7
nonlethal
163:17
nonobvious
141:19
nonsense
41:23, 42:4
nonshareholder
78:18
nonspecialists
173:6, 198:19
nonuse
91:8
norm
234:6
normal
121:18, 127:24,
203:15, 224:4,
232:19
normally
84:1
north
2:15, 3:16,
46:8
northbound
46:7
notary
2:5, 240:39
notation
40:12, 40:14
note
3:21
noted
49:1, 202:6

notes
45:8
nothing
32:17, 33:12,
44:22, 45:25,
138:2, 143:11,
146:11, 193:13,
232:24, 236:21,
236:22, 238:11
notice
192:14
noticed
118:10, 240:15
noun
42:20, 43:22
november
98:7
now
16:10, 22:4,
25:20, 26:7,
26:13, 27:1,
29:16, 35:19,
43:14, 48:11,
49:15, 50:8,
52:18, 52:24,
53:20, 55:25,
61:24, 66:5,
68:19, 70:20,
79:9, 80:21,
97:15, 99:7,
99:17, 100:9,
103:7, 107:6,
117:1, 124:8,
130:8, 130:22,
133:7, 136:12,
136:17, 136:21,
145:7, 145:16,
154:22, 154:23,
157:22, 160:22,
161:1, 161:18,
162:9, 162:19,
163:17, 175:15,
179:6, 187:14,
196:18, 197:3,
202:10, 204:23,
216:13, 219:20,
236:22, 237:8
nowhere
196:7

number
6:14, 14:2,
14:20, 22:12,
22:18, 24:17,
24:18, 33:18,
34:12, 38:20,
46:3, 46:6,
54:2, 62:2,
62:4, 83:9,
85:1, 85:22,
87:6, 87:22,
117:13, 135:15,
140:14, 143:8,
175:9, 180:2,
182:24, 192:21,
194:1, 195:9,
195:20, 202:18,
203:3, 203:5,
204:8, 204:23,
218:5, 225:4,
225:23, 226:25,
227:8, 227:11,
227:21, 229:21,
230:20, 232:11,
233:3, 234:6,
235:14, 238:1,
238:3
numbered
164:4
numbers
177:12, 177:15,
184:1, 191:12

O

oath
59:10
object
61:8, 91:1
objection
11:6, 83:12
objective
192:9
objects
4:19, 33:24
obligation
78:1, 78:6,
78:17, 80:7
obliged
156:8

Transcript of Mark W. Kroll, Ph.D.
Conducted on September 13, 2018

279

| | | | |
|---|---|---|---|
| **obsolete** 161:18, 162:1, 163:6, 163:12 **obviously** 15:13, 84:9, 138:21, 204:13, 216:25 **oc** 152:4, 161:18, 161:25, 163:1 **occur** 181:9 **occurred** 17:13, 44:8 **occurs** 213:19 **october** 30:7, 32:2, 94:24, 120:6, 121:10, 122:3 **odd** 22:6 **off** 6:8, 8:2, 8:6, 38:9, 38:11, 46:12, 47:17, 50:2, 75:1, 93:8, 103:8, 154:8, 191:15, 192:18, 195:7, 196:23, 197:1, 218:1, 230:17 **offense** 197:6 **offer** 33:7, 58:10, 90:9, 94:7, 96:18, 96:25, 99:23, 150:20, 153:2, 153:9, 164:2, 172:22, 184:2, 185:7, 185:14, 186:2, 212:22 **offered** 94:12, 100:4, 103:14, 103:21, 217:15 | **offering** 149:9, 151:3, 169:19, 185:5, 214:16 **office** 18:14, 18:15, 18:18, 23:9, 36:10, 44:24, 124:3 **officer** 53:4, 53:8, 89:6, 90:18, 91:16, 92:1, 92:10, 92:25, 181:17, 189:13, 190:11, 190:21, 191:14, 192:13, 193:6, 193:7, 193:15, 196:21, 197:3, 198:10, 207:17 **officers** 1:12, 20:14, 20:15, 49:13, 52:11, 87:2, 89:6, 89:8, 89:16, 89:20, 93:13, 93:24, 95:12, 96:8, 96:9, 97:21, 98:9, 147:1, 147:3, 147:12, 158:2, 161:13, 162:4, 162:7, 162:23, 163:5, 175:16, 186:22, 188:13, 188:25, 190:15, 190:17, 193:23, 194:5, 194:21, 196:14, 197:24, 199:14, 199:23, 200:12, 200:21, 218:10, 219:12, 219:14, 225:3, 229:18, 238:14, 238:16 **often** 129:25, 196:19 | **oh** 142:8, 188:2, 192:17, 211:13 **ohio** 94:23 **okay** 6:21, 7:8, 7:18, 7:23, 8:7, 10:3, 10:23, 11:3, 11:10, 13:17, 16:11, 20:12, 23:12, 26:22, 28:18, 29:2, 30:1, 30:4, 30:16, 30:22, 31:13, 33:15, 34:4, 36:3, 38:1, 38:20, 40:7, 45:11, 50:9, 52:5, 55:6, 55:11, 55:25, 67:7, 67:24, 69:9, 71:1, 71:18, 72:20, 73:2, 73:4, 81:22, 92:13, 93:5, 94:7, 94:17, 97:8, 98:14, 99:21, 100:12, 102:9, 104:10, 106:23, 108:15, 108:24, 109:3, 112:10, 112:12, 116:18, 119:1, 119:23, 123:24, 123:25, 126:20, 126:25, 129:2, 132:19, 133:20, 134:5, 135:24, 137:19, 141:21, 150:17, 155:13, 166:22, 170:11, 179:10, 187:14, 201:24, 211:13, 213:7, 219:3, 221:4, 239:10, 239:12 | **older** 199:13, 233:15 **olson** 90:6 **omission** 16:14 **omit** 57:23 **once** 121:7, 122:12, 126:13, 127:9, 132:6, 210:8 **once-a-week** 113:4 **one-hour** 9:23, 25:4 **one-page** 17:15 **one-second** 92:4 **ones** 175:14 **ongoing** 112:6 **only** 8:3, 25:13, 25:17, 37:16, 37:19, 40:12, 42:17, 46:11, 48:19, 50:24, 60:14, 71:25, 99:16, 100:3, 118:21, 126:23, 134:10, 149:12, 167:8, 167:21, 177:5, 179:7, 184:16, 192:20, 192:25, 193:2, 193:3, 198:9, 201:1, 204:14, 212:8, 212:18, 225:14 **onto** 49:11, 207:5 **open** 216:13 **operates** 71:21 |

Transcript of Mark W. Kroll, Ph.D.
Conducted on September 13, 2018

280

operation
199:24
operational
218:24
opine
94:10, 96:21,
96:22, 97:4,
100:23, 153:1
opined
101:5
opinion
45:19, 90:9,
91:18, 94:7,
94:12, 94:24,
95:24, 96:6,
96:18, 97:1,
97:4, 97:5,
97:10, 97:11,
97:20, 98:8,
98:17, 99:12,
99:24, 100:5,
100:22, 101:11,
101:13, 103:21,
115:2, 138:3,
149:9, 149:12,
149:13, 151:3,
151:22, 151:24,
153:9, 155:17,
155:21, 156:1,
156:5, 156:12,
156:16, 156:21,
157:1, 157:6,
157:12, 157:16,
158:9, 158:19,
163:3, 164:17,
164:21, 165:1,
166:13, 167:20,
167:24, 168:4,
168:6, 168:15,
170:4, 170:6,
170:7, 170:8,
170:11, 172:22,
178:2, 180:19,
181:3, 184:2,
185:5, 185:17,
188:7, 189:12,
191:23, 193:4,
203:25, 204:14,

205:17, 213:25,
214:10, 214:13,
214:16, 214:22,
235:17
opinions
13:3, 15:5,
15:19, 33:7,
38:25, 39:2,
45:17, 45:22,
46:2, 48:7,
48:16, 48:17,
48:20, 48:24,
55:18, 56:24,
57:11, 58:1,
58:9, 58:10,
90:24, 91:2,
91:4, 97:8,
97:12, 113:19,
114:17, 114:21,
114:22, 115:17,
116:24, 117:5,
133:22, 159:6,
164:4, 164:17,
177:25, 179:2,
185:14, 185:15,
212:23, 212:24,
217:9, 217:14,
236:3
opportunity
234:19
opposite
73:1, 87:2,
87:11, 88:20,
89:1, 90:5,
92:20, 93:9,
94:18, 97:17
optimistic
69:15
option
68:2, 68:7,
71:2, 71:9,
71:14, 71:20,
71:22, 72:5,
72:7, 72:16,
72:17, 72:21,
73:3, 73:5,
73:6, 73:10,
73:22, 73:23,

74:8, 76:16
optionality
72:9
options
66:24, 68:7,
68:11, 68:12,
68:15, 68:23,
69:1, 69:6,
69:10, 69:18,
69:20, 69:24,
69:25, 70:1,
70:3, 74:1,
74:19, 75:19,
76:3
oral
196:8, 200:15
orally
236:17
order
14:21
ordered
240:16
orders
85:22, 85:24,
86:2
organizations
227:21
oriented
24:20, 132:13
original
3:21, 5:19,
69:20, 150:5,
160:24, 182:10,
182:11, 240:14
originally
171:16, 182:1
others
136:10, 149:6,
151:12, 221:3
otherwise
44:19, 50:16,
55:10, 70:24,
77:2, 78:25,
91:19
our
7:3, 7:7, 36:6,
44:3, 48:12,
56:1, 58:15,

58:21, 66:10,
75:6, 105:10,
109:4, 144:3,
208:23, 208:24
out
16:13, 17:12,
29:21, 30:25,
32:10, 43:25,
56:1, 66:2,
68:8, 69:21,
70:2, 74:9,
75:11, 78:3,
85:14, 98:2,
103:3, 123:23,
124:2, 129:9,
132:13, 132:14,
134:8, 139:1,
139:7, 140:2,
144:12, 151:15,
151:21, 154:19,
156:8, 160:19,
162:18, 163:8,
165:25, 175:1,
175:19, 179:9,
194:20, 200:6,
204:21, 207:12,
210:13, 223:8,
223:11, 225:20,
227:18, 228:6,
228:8, 228:13,
228:18, 229:1
out-of-pocket
44:18
outcome
76:17
outlier
22:6
outlines
61:25
outside
18:7, 20:25,
105:12, 110:9,
127:3, 127:8,
138:22, 139:10,
139:15, 140:1,
140:5, 146:2,
152:2, 155:10,
155:24, 160:18,

Transcript of Mark W. Kroll, Ph.D.
Conducted on September 13, 2018

281

180:24, 185:11,
203:3, 209:15,
210:24, 234:5
**over**
7:7, 28:10,
29:3, 34:13,
44:23, 46:15,
49:11, 56:18,
62:4, 63:25,
65:8, 65:21,
65:24, 67:15,
67:20, 70:10,
71:11, 73:22,
74:21, 75:14,
75:22, 76:4,
76:17, 76:23,
82:1, 85:1,
85:18, 111:25,
115:18, 117:19,
118:3, 144:17,
145:18, 168:1,
184:20, 187:10,
192:17, 210:12,
217:6, 220:19,
222:10, 234:16
**overall**
113:24
**overdoses**
103:1
**overlap**
125:22, 130:2,
130:11, 130:19,
130:24, 131:2,
131:7, 131:15,
199:1, 215:6
**overview**
6:19, 221:11,
221:15
**owing**
24:2
**own**
28:13, 43:21,
70:7, 198:15,
236:3
**ownership**
70:10

**P**

**pacemaker**
26:14

**pacemakers**
131:23, 165:20,
209:13, 209:14
**packet**
119:15
**packs**
208:6
**page**
2:21, 4:1, 5:1,
6:20, 7:18,
14:25, 15:25,
16:3, 17:1,
18:6, 18:11,
19:23, 19:25,
20:2, 30:4,
30:5, 34:13,
34:14, 38:1,
39:11, 46:2,
46:4, 46:6,
49:12, 49:22,
54:9, 55:2,
59:22, 80:16,
88:8, 97:24,
112:1, 117:25,
119:3, 119:15,
121:23, 126:5,
134:18, 135:8,
140:11, 142:12,
143:18, 158:14,
164:1, 164:25,
167:25, 168:4,
169:15, 169:24,
173:2, 173:4,
173:8, 173:9,
173:10, 179:6,
179:16, 183:2,
183:19, 190:10,
205:20, 208:16,
212:17, 219:25,
220:19, 223:13,
227:11, 227:13,
231:5, 231:7
**pages**
1:24, 18:24,
19:5, 37:1,
48:23, 117:17,
166:22, 179:17,
218:25, 219:20,

230:25
**paid**
23:25, 27:25,
35:22, 61:1,
62:3, 62:22,
66:3, 82:20,
84:10, 111:3,
111:4, 111:8,
111:22, 112:7,
120:10, 123:2
**pain**
213:21, 213:22,
213:25, 214:2,
214:4, 215:2,
215:4, 215:5,
215:9, 215:12,
215:13, 215:18,
215:25, 216:1,
216:7, 216:18,
220:13, 223:4
**painful**
214:9
**pains**
60:17
**pamela**
36:9
**paper**
10:7, 10:9,
10:17, 12:7,
12:8, 50:10,
55:1, 55:7,
55:14, 69:16,
136:17, 136:20,
142:5, 143:16,
143:17, 143:20,
160:25, 161:1,
161:4, 189:4,
205:11, 210:1
**papers**
9:21, 10:1,
10:12, 10:13,
14:6, 14:9,
14:15, 55:22,
57:4, 134:15,
141:4, 141:5,
142:9, 142:11,
149:18, 156:11,
160:15, 205:10,

205:15, 205:16,
216:8, 216:10,
216:20
**paperwork**
122:23
**paragraph**
20:2, 142:8,
190:10, 224:18
**paramedic**
125:8
**paraphrased**
12:1
**paraphrasing**
202:8, 232:18
**parrish**
94:22, 95:16
**part**
9:9, 23:8,
29:9, 37:24,
88:3, 111:7,
111:22, 113:19,
114:16, 115:7,
115:12, 115:14,
115:17, 115:25,
134:23, 138:21,
142:2, 142:11,
143:22, 143:24,
147:1, 147:6,
147:14, 147:23,
195:10, 217:3,
217:5, 219:11,
221:2, 221:10,
222:1, 222:2,
222:3, 222:13,
222:15, 222:16,
222:19, 223:18,
223:19, 224:22,
224:23, 224:25
**partially**
171:20, 205:15
**participant**
146:20
**participants**
142:25, 195:4
**participate**
217:2
**participating**
62:21

Transcript of Mark W. Kroll, Ph.D.
Conducted on September 13, 2018

282

particular
14:5, 16:11,
46:19, 80:19,
87:6, 89:15,
107:25, 108:7,
108:19, 116:4,
135:17, 137:11,
141:22, 161:6,
161:14, 165:11,
207:24
particularized
159:14
particularly
148:18, 224:20
parties
174:12, 240:16,
240:20, 240:24
partly
171:3
parts
133:17, 201:22,
211:2, 211:21
party
240:15
passenger
98:20
passing
213:1
past
6:15, 15:9,
62:15, 83:8,
161:12
patent
21:17, 22:2,
24:19, 25:21
patents
21:17, 22:2,
55:22
pathologist
201:20
pathology
142:13
patient
127:22, 127:25,
128:1, 128:13,
133:5, 149:16
patients
126:6, 127:11,

131:25, 132:3,
132:9, 132:20,
132:21, 216:16
patrol
98:5, 98:8
patterns
116:5, 116:14
paul
109:2
paused
226:11
pay
70:21, 75:1,
123:16
payment
27:19, 32:23,
33:4, 120:12
pays
62:1, 62:25
peak
146:5
peer
174:13, 174:14
peer-reviewed
158:14, 158:20,
159:12, 159:23,
162:2, 208:21,
209:24
peers
159:24, 160:6,
160:8
penalized
68:25
penny
64:8
people
32:16, 104:18,
107:14, 111:14,
118:13, 118:21,
122:17, 146:13,
148:23, 151:10,
151:11, 151:16,
163:11, 171:9,
182:10, 184:22,
197:14, 198:7,
215:23, 216:6,
216:25
per
20:4, 20:25,

21:8, 21:13,
21:25, 64:15,
65:12, 66:1,
167:3, 168:2,
239:4
perceived
55:7
percent
31:24, 60:16,
61:4, 61:7,
61:22, 62:11,
62:19, 66:18,
83:3, 111:11,
111:21, 111:24,
111:25, 143:16,
166:3, 183:21,
203:17, 203:21,
204:1, 207:23,
208:9, 212:18,
212:25, 213:7,
213:18, 213:19,
229:14
percentage
61:11, 83:13,
83:17, 84:1,
85:6, 85:9,
86:4, 86:6
perfect
43:13, 43:15,
76:20
perfectly
192:2
perform
130:21, 181:11
perhaps
29:23, 70:7,
102:24
period
26:17, 65:25,
67:15, 74:16,
75:14, 75:22,
76:5, 86:17,
86:19, 104:12
periodical
12:16
permissible
84:19
permission
216:24

permit
4:19, 33:25,
79:19
person
51:20, 85:7,
92:3, 129:24,
133:6, 198:24,
208:19, 209:14,
224:12
person's
102:12, 199:6,
199:8
personal
36:16, 83:16,
85:16
personally
23:6, 122:22,
143:2, 153:12
persons
104:14, 240:25
ph
1:18, 2:1, 4:3,
4:13, 4:23, 6:1,
42:19, 108:9,
108:15, 223:9,
240:8
pharmacology
128:25, 129:7,
129:10
phenomenon
188:17, 189:20,
189:25, 197:12
philosophy
79:12, 80:11
phone
2:17, 3:9,
3:18, 31:20,
33:12
photographs
45:7
phrase
106:1, 106:3,
117:2
phrased
7:15
phrasing
117:11
physical
103:3

Transcript of Mark W. Kroll, Ph.D.
Conducted on September 13, 2018

283

physician
126:14, 137:22, 138:10, 237:15
physicians
10:18, 12:9, 12:10, 126:8, 126:10, 130:12, 131:16, 237:14
physiologic
220:12, 220:17, 221:18, 222:23, 223:14, 223:16, 224:2, 224:3, 224:11
physiological
137:16, 144:25, 145:23, 145:25
physiology
142:13
pickup
181:13
piece
52:25, 85:18, 101:23, 177:5
pieces
169:9, 169:13
pinhead
43:18
pistol
90:18
place
31:25, 46:8, 46:17, 47:2, 47:17, 68:23
placed
51:15, 52:8, 213:4
places
156:10
placing
187:3
plaintiff
1:7, 2:11, 6:11, 35:5, 36:13, 88:8, 95:6
plaintiff's
4:18, 33:23,

34:10
plaintiffs
133:8
plank
207:5, 208:12
planned
73:25
plausible
145:8
play
110:24, 230:9
plaza
3:15
please
7:16, 11:24, 14:1, 33:17, 54:1, 63:19, 79:13, 100:11, 100:16, 202:4, 211:17, 218:4, 221:8, 231:25
plenty
181:11
plugging
187:9
plus
97:23
plywood
96:13
point
7:10, 43:25, 68:18, 71:19, 72:12, 72:15, 100:11, 115:15, 134:12, 135:25, 145:3, 156:8, 156:23, 169:12, 183:1, 186:4, 193:15, 196:10, 196:11, 213:3, 213:9, 227:20, 228:6, 228:19, 229:2, 229:22, 230:8, 233:2, 233:13, 235:5, 235:10
pointing
228:8

poison
169:18
police
1:12, 41:8, 42:1, 42:21, 43:19, 52:11, 87:2, 93:13, 95:19, 151:25, 152:11, 152:19, 153:6, 153:9, 154:9, 154:12, 154:13, 156:18, 157:4, 157:9, 158:10, 161:13, 162:4, 162:6, 162:21, 163:4, 163:18, 175:16, 181:14, 193:17, 193:18, 193:23, 197:24, 198:13, 200:17, 210:6, 210:19, 229:18
policies
156:18, 163:7, 163:9
policy
162:21, 163:3, 200:17, 229:23
pollack
3:13, 3:14, 86:9, 154:24, 239:9
poly
112:22
polytechnic
112:15
poorly
7:16
popular
68:11
portion
28:20, 45:2, 62:9, 66:19, 68:14, 72:21, 111:20, 178:1
position
10:17, 12:8, 124:23, 197:18,

206:4, 207:3, 208:14
positions
112:8
positive
27:24, 184:12, 184:18
possibility
16:13, 186:7
possible
51:5, 99:21, 104:22, 144:20, 156:7, 167:9, 167:21, 176:5, 192:25, 193:2, 194:1, 195:20, 233:10
possibly
104:24, 196:2
post
204:24
posted
174:13
posters
115:14
potential
78:11, 84:6, 84:10, 129:18, 142:6, 210:16
potentially
141:19
pounds
105:8, 200:7
power
135:14, 144:10, 166:9
practice
36:25, 40:7, 58:4, 58:6, 58:14, 58:18, 58:24, 59:17, 66:12, 71:16, 118:20, 120:8, 121:19, 225:25, 231:25, 237:8
practices
119:25, 151:25, 156:18

Transcript of Mark W. Kroll, Ph.D.
Conducted on September 13, 2018

284

preceding
26:18
precise
29:17, 30:16,
41:13, 42:15,
43:1, 165:14
precision
18:16, 29:23,
30:13
prefer
44:10, 69:18
preferred
163:16
prematurely
193:10
premise
170:20
premises
4:20, 33:25
preparation
8:25, 9:4,
9:14, 14:11,
14:17, 15:10,
17:4, 17:6,
17:25, 28:13,
28:25, 29:4,
29:20, 40:18
prepare
8:15, 9:19,
23:3
prepared
13:19, 15:14,
23:8
prescience
77:5
prescribe
128:20
present
16:6, 26:3,
32:21, 41:2,
109:4, 112:6,
112:12, 194:5
presentation
111:20
presentations
111:5
presented
134:16

prestigious
113:10, 115:9
presumably
13:16, 35:14,
36:24, 39:23,
62:13, 69:4,
72:11, 76:21
presume
31:22, 36:13,
70:4, 216:22
pretty
17:22, 27:25,
40:6, 49:7,
99:20, 113:10,
123:20, 141:10,
153:25, 224:14,
225:19, 234:5,
237:14
previous
7:13, 110:22,
114:14, 130:22,
210:17, 211:19
previously
5:20, 6:2,
9:24, 28:11,
39:13, 80:23,
82:17, 103:13,
113:15, 113:22,
144:15, 221:7
price
67:17, 67:19,
71:3, 71:23,
72:2, 72:10,
72:17, 73:9,
73:11
primary
60:15, 141:12,
142:19
principal
59:23, 60:9,
109:5, 109:9
printed
17:12, 179:6
printout
17:15
prior
12:21, 25:17,
32:5, 33:8,

34:9, 59:4,
59:15, 66:16,
68:14, 98:25,
102:16, 108:2,
120:18, 156:23,
187:2, 195:11,
231:22, 234:25,
235:9
private
63:1, 63:2,
63:4, 110:24
probably
10:22, 43:14,
57:13, 60:6,
61:23, 74:11,
75:8, 76:13,
111:11, 112:23,
117:10, 121:11,
129:11, 146:14,
160:15, 175:10,
177:15, 181:8,
184:8, 185:8,
186:19, 204:15,
209:23, 214:18,
219:7, 222:4,
222:6, 223:3,
233:12, 234:22
probe
96:11, 98:19,
99:18, 101:15,
102:2, 105:2,
107:6, 164:9,
164:18, 168:16,
168:18, 169:2,
169:6, 169:8,
169:14, 180:16,
184:11, 184:12,
184:18, 198:12,
199:3, 199:4,
199:17, 202:2,
205:22, 207:4,
207:10, 207:11,
207:12, 208:6,
208:17, 213:2,
229:16, 234:1,
234:2
probes
96:11, 96:12,

101:20, 105:7,
107:11, 165:15,
168:25, 176:6,
199:5, 206:14,
206:16, 207:6,
207:8, 207:18,
208:11, 208:15,
232:1, 232:21,
233:7, 233:15,
234:3
problem
8:1, 40:2,
63:21, 147:25,
198:16
problems
42:10, 70:23
procedure
3:23, 216:21
procedures
6:20
process
113:14, 128:4,
128:5, 174:15,
176:4
produce
4:18, 33:24,
216:1, 238:1
produced
22:23, 35:2,
35:5, 35:16,
36:13, 37:23,
51:13, 52:6,
88:7, 88:11,
115:4, 116:17,
188:19, 227:10
produces
35:5
producing
15:6
production
4:9, 22:25
professional
60:18, 109:5,
124:14, 153:6,
236:1
professor
112:13
prognosis
157:3

Transcript of Mark W. Kroll, Ph.D.
Conducted on September 13, 2018

285

program
113:8, 113:10, 237:21
progression
137:16, 145:25
prolonged
103:2, 145:1, 220:15, 222:21, 223:6
promise
212:11
promises
25:5
prone
160:22, 161:3, 161:6, 161:9, 209:19
prongs
231:14
properly
79:5
proportion
111:8
prosecuted
89:16
prosecuting
89:5
prosecution
89:9, 89:12, 90:1, 91:13, 92:14, 92:21, 93:13, 93:19, 94:6
prospective
215:17
proteins
145:4
prove
181:24
provide
20:17, 21:22, 33:6, 45:16, 59:10, 60:2, 64:24, 81:11, 85:21, 85:22, 100:16, 100:20, 110:19, 118:21, 127:13, 128:8,

180:4, 199:22
provided
13:21, 14:20, 18:11, 18:16, 19:6, 25:18, 31:11, 31:14, 36:7, 36:9, 36:22, 37:4, 37:7, 37:12, 37:17, 38:15, 38:24, 39:1, 54:16, 65:2, 70:10, 72:13, 72:14, 86:20, 88:2, 109:14, 119:4, 120:15, 120:17, 121:2, 135:20, 156:10, 218:21, 219:12
provides
188:24, 210:6, 210:19, 218:9, 228:4
providing
25:11, 59:2, 59:16, 60:11, 60:13, 64:17, 74:5, 109:18, 125:18, 128:3, 129:15, 131:3, 136:1, 141:14, 170:16
provincial
93:12
proximity
32:4
pseudo-experts
42:13
psychiatric
215:1, 215:21, 216:16
psychotic
213:24, 215:11
public
2:5, 61:25, 62:1, 62:25, 63:2, 63:6, 64:8, 66:12,

76:25, 77:1, 78:12, 78:13, 78:18, 79:1, 79:2, 79:13, 79:24, 80:12, 80:13, 85:13, 110:24, 154:20, 174:14, 240:39
publication
12:16, 56:4, 126:9, 126:17, 126:21, 126:25, 127:3, 135:2, 135:17
publications
11:20, 56:12, 114:14, 135:25, 140:19, 140:25, 141:22, 142:2, 175:11, 204:24, 227:22
publicly
63:3
publish
160:6
published
55:5, 101:12, 104:25, 136:14, 136:18, 142:18, 149:3, 160:15, 160:25, 161:4, 171:23, 174:3, 174:6, 209:25, 224:25
publishing
56:2, 174:10, 174:17
puerto
198:13
pull
14:5, 178:6, 178:15, 178:22, 180:14, 180:25, 183:19, 183:20, 185:9, 185:11, 185:23, 186:6, 186:17, 187:11, 187:15, 187:16,

189:1, 192:14, 192:21, 193:1, 194:1, 194:16, 194:25, 195:9, 195:13, 195:20, 196:4, 196:15, 199:4, 199:6, 200:8, 202:18, 203:3, 203:5, 204:8, 204:16, 205:11, 205:19, 230:11, 234:12
pulled
9:21, 9:25, 114:10, 179:9, 187:2, 196:10, 207:12
pulling
12:21, 17:16, 40:18, 188:2
pulls
180:12, 182:8, 190:1, 190:5, 190:14, 190:20, 190:22, 190:25, 193:21, 194:18, 194:22, 196:2, 196:20, 197:5, 197:13, 197:21, 198:20, 199:24
pulse
175:19, 175:24, 189:22, 204:11, 204:22, 233:16
pulses
164:12
purchasing
71:22
purport
159:5
purported
140:8
purpose
17:16, 182:13, 216:1
pursuant
3:22
pushup
10:15, 12:12

Transcript of Mark W. Kroll, Ph.D.
Conducted on September 13, 2018

286

pushups
146:16
put
11:9, 56:8,
128:16, 143:4,
143:6, 153:25,
174:10, 187:12,
194:3, 194:7,
194:9, 211:24,
230:7
putting
127:20, 151:9

**Q**

qualifications
55:16, 56:22,
56:23, 57:10,
114:13, 114:17,
134:13, 167:19
qualified
115:2, 126:5,
128:19, 131:24,
153:8
question
7:10, 7:14,
7:20, 7:23, 8:4,
8:5, 8:6, 18:4,
47:24, 61:21,
69:13, 77:23,
79:5, 83:8,
83:17, 83:20,
83:22, 84:2,
84:19, 84:21,
85:5, 97:14,
100:14, 106:16,
115:5, 117:11,
126:2, 126:3,
130:1, 130:16,
132:20, 133:18,
144:22, 144:24,
162:17, 174:18,
201:21, 202:4,
202:9, 207:14,
211:2, 211:4,
211:7, 211:15,
211:17, 211:19,
211:23, 212:2,
212:12, 212:13,

212:14, 226:13
questions
6:24, 80:3,
126:4, 177:14,
177:17, 239:6,
239:11
quibble
41:9
quibbling
41:12, 60:14
quick
103:6, 123:20,
137:2, 177:21
quickly
162:5, 184:21
quite
62:1, 72:4,
127:22, 157:25,
158:8, 166:1,
181:17, 208:6,
214:19
quote
43:22

**R**

radio
49:18, 51:14,
51:17, 52:2,
52:10
raise
66:10
rand
2:3
range
74:5, 171:7
rapidly
47:21, 162:18
rare
180:17, 181:19
rarely
163:12
rashtian
15:9, 43:21,
156:6, 168:12,
171:2, 237:6
rashtian's
16:20, 19:13,
29:9, 48:15,

48:16, 149:11,
170:4, 171:19,
172:10, 235:11,
236:5
rate
19:19, 19:21,
20:7, 20:10,
20:25, 24:12,
24:15, 25:8,
60:12, 65:10,
158:17, 240:17
rates
19:22, 21:3,
66:4, 66:22,
66:23, 158:16,
159:24
rather
7:1, 41:21,
83:20, 85:15,
91:8, 98:1,
177:17
reach
57:10, 58:9,
91:18, 97:3,
132:13, 132:14
reached
81:4, 91:4,
95:23, 96:7,
97:5, 97:9,
97:20, 98:8,
99:12, 100:24,
114:23, 116:24,
117:6, 148:8,
175:9, 181:3
reaches
166:5
reaching
13:3, 81:1,
114:22, 165:2,
206:24
read
8:17, 9:7,
50:3, 57:5,
88:5, 126:10,
147:24, 149:15,
158:24, 211:16,
211:18, 216:19,
219:9, 220:23,

226:16, 231:19,
240:29
reading
9:13, 9:16,
29:20, 49:4,
160:9, 236:4,
236:13
real
230:13
reality
150:1
realize
162:5, 196:21
really
28:3, 35:22,
41:16, 41:25,
42:15, 42:25,
61:19, 75:6,
82:24, 92:3,
127:15, 144:13,
158:6, 158:23,
161:7, 166:2,
167:16, 170:19,
181:20, 185:11,
197:8, 199:1,
213:11, 229:7,
237:7
realm
172:21
reason
6:25, 8:2,
8:10, 23:12,
121:12, 229:9,
230:1, 232:4
reasonable
122:5, 123:24,
157:21, 193:3,
193:13, 229:6
reasonably
88:21, 218:11
reasons
25:6, 25:7,
168:4, 173:5,
178:2, 194:24,
230:14, 238:17
recall
11:19, 12:13,
12:18, 12:19,

Transcript of Mark W. Kroll, Ph.D.
Conducted on September 13, 2018

12:25, 26:24, 30:1, 31:16, 32:7, 48:11, 49:16, 66:17, 68:22, 72:23, 83:7, 88:19, 97:9, 97:13, 99:2, 99:6, 99:16, 99:19, 102:22, 103:18, 107:24, 114:8, 116:6, 121:18, 122:23, 124:12, 137:12, 139:16, 140:11, 142:16, 144:19, 144:21, 145:6, 145:13, 157:19, 162:9, 162:16, 169:5, 169:7, 169:19, 191:6, 191:17, 191:18, 196:17, 218:13, 219:8, 231:21, 231:24, 235:3, 236:12, 237:10, 237:18, 237:22

**receipt**
33:3
**receive**
50:24, 64:1, 64:5, 67:5, 68:3, 108:12, 108:22, 238:24
**received**
15:4, 15:13, 16:4, 16:18, 16:24, 17:3, 19:10, 27:18, 34:5, 49:22, 50:6, 50:11, 50:20, 50:21, 68:2, 74:15, 74:18, 74:20, 75:13, 76:4, 76:11, 80:16, 82:12, 83:2, 83:10, 94:2,

101:8, 120:12, 121:7, 121:8, 121:13, 122:2, 149:14, 212:18
**receives**
51:21
**receiving**
82:2
**recent**
66:16, 134:18, 140:15, 150:12
**recently**
12:21, 119:13, 226:5, 226:14
**recess**
54:4, 103:10, 177:22, 218:2, 230:19
**recipient**
69:12
**recitation**
158:25
**recognize**
170:3, 214:18
**recognized**
148:4, 192:23, 193:11, 215:10
**recognizing**
6:17, 75:25, 99:1, 148:6
**recollection**
8:13, 16:6, 27:14, 30:11, 31:13, 32:18, 32:21, 50:23, 51:12, 52:15, 53:19, 101:2, 101:3, 108:2, 119:24, 121:1, 186:21, 191:22, 192:4, 201:11, 210:21, 219:6
**recommend**
128:1
**record**
6:8, 6:9, 6:24, 7:8, 8:2, 8:6, 11:3, 13:9,

22:21, 23:4, 30:7, 30:17, 38:10, 38:11, 39:19, 40:8, 64:8, 103:9, 134:6, 164:21, 175:19, 179:23, 182:7, 183:8, 183:10, 185:4, 186:25, 187:23, 189:19, 190:3, 195:7, 196:8, 198:19, 198:22, 201:2, 201:11, 203:9, 204:7, 204:17, 211:8, 218:1, 230:18, 240:13
**recorded**
53:8, 53:11, 190:5, 191:7
**recording**
51:14, 52:10, 53:5
**recordings**
51:15, 52:8
**recordkeeping**
134:3
**records**
156:9, 177:9, 201:6
**recovering**
71:3
**red**
230:13, 233:11, 233:20
**reduce**
158:17, 225:3, 225:22
**reduced**
184:1
**reduces**
158:15
**reduction**
159:23
**redundant**
104:3
**refer**
88:22, 99:2,

235:21
**reference**
40:17, 40:19, 66:21, 105:6, 140:13, 141:15, 172:6, 174:4, 174:5, 235:2
**referenced**
5:21
**references**
11:13, 13:7, 18:23, 140:19, 173:24, 174:1, 174:19, 174:20
**referencing**
141:8, 141:14, 172:5
**referred**
13:11, 14:16, 27:10, 35:11, 49:14, 51:11, 66:19, 135:7
**referring**
9:8, 12:4, 17:7, 19:23, 30:9, 34:22, 35:9, 39:4, 40:15, 40:24, 49:9, 51:25, 53:16, 63:16, 81:13, 89:13, 104:6, 112:3, 120:21, 136:9, 139:17, 141:1, 141:23, 143:18, 143:23, 164:5, 173:12, 174:7, 183:6, 212:20, 220:3, 220:8, 225:9, 227:15, 231:10
**refine**
202:3
**reflect**
27:21, 35:20, 50:4, 56:22, 186:12, 200:20
**reflected**
30:18, 36:1,

Transcript of Mark W. Kroll, Ph.D.
Conducted on September 13, 2018

288

50:25, 56:3,
56:10, 56:12,
115:20, 117:7,
121:21, 178:6,
180:11, 180:22,
180:25, 181:5,
188:18
**reflecting**
32:22, 36:18,
62:7, 62:8,
65:9, 195:11
**reflection**
49:3, 182:21,
186:8
**reflects**
19:20, 23:16,
23:23, 30:6,
30:7, 46:1,
55:22, 58:18,
186:17, 231:7,
232:17
**refresh**
17:17, 17:21,
168:19
**refreshing**
53:18
**refusing**
83:22
**regard**
133:22, 155:5,
186:5, 195:20
**regarding**
155:18
**regardless**
84:16, 122:1,
138:13, 159:14,
207:24, 233:7,
234:3
**regards**
129:14, 215:4,
217:11
**registered**
42:16
**regular**
23:9
**regularly**
25:13, 59:3,
59:7, 59:16,

103:4
**regulatory**
124:15
**reinforced**
46:3, 47:2
**reiterate**
47:24, 167:19
**relate**
34:20, 38:17,
111:9, 111:22,
143:25, 174:20
**related**
12:12, 14:21,
20:21, 28:9,
48:13, 57:17,
73:10, 80:4,
89:7, 103:14,
108:8, 111:5,
118:5, 128:3,
128:8, 129:4,
129:17, 129:19,
131:5, 136:15,
137:11, 168:23,
172:23, 177:14,
180:4, 194:12,
205:7, 209:22,
210:7, 214:25,
226:13, 226:18,
238:20
**relates**
214:6
**relating**
125:18
**relation**
23:18, 27:23,
45:8, 91:4,
94:17, 99:10,
100:21, 116:13,
119:17, 120:18,
217:15, 231:23,
232:12
**relationship**
120:1
**relative**
240:19, 240:21
**relatively**
142:1
**released**
182:2, 226:6

**relevant**
17:3, 84:4,
104:17, 171:1,
184:4, 209:1
**relied**
13:6, 15:18,
39:2, 45:16,
57:25
**rely**
13:2, 48:16,
58:8, 59:9,
130:8, 155:4,
176:22, 179:1,
197:20, 206:23
**relying**
55:17, 56:24,
57:9, 113:18,
114:15, 114:19,
114:24, 116:14,
116:23, 183:10
**remained**
65:25
**remaining**
61:22, 65:15,
213:7
**remember**
31:19, 81:1,
134:17, 165:4,
184:22, 188:2,
190:18, 191:12,
197:1, 197:2,
202:9, 237:13
**remembering**
105:9
**remiss**
189:8
**removes**
189:14
**render**
114:17, 115:2
**rendered**
35:7, 91:2
**renee**
1:10, 3:3
**rental**
98:18
**repeat**
84:14

**repeated**
220:15, 220:21,
221:13, 222:8,
222:20
**repeating**
175:7
**rephrase**
7:17, 18:3
**repolarization**
165:24
**reported**
1:25, 240:7
**reporter**
6:23, 54:8,
88:1, 117:16,
211:18, 218:17,
227:3, 230:24
**reporter's**
240:1
**reporters**
42:12
**reports**
135:19, 180:19,
193:17, 196:8,
200:14, 209:21,
209:23
**represent**
37:3, 37:18,
54:15, 54:20,
76:25, 118:4,
162:20, 227:8
**representation**
53:13, 232:6
**representative**
95:16
**representing**
80:13
**represents**
24:11, 34:4,
61:3
**request**
32:23, 34:7,
34:12, 34:15,
34:24, 38:20,
118:3, 121:19,
232:25, 237:25,
238:3
**requested**
5:20

Transcript of Mark W. Kroll, Ph.D.
Conducted on September 13, 2018

289

requests
4:9
required
69:5, 162:25
requirements
114:11
requires
208:23
rescue
181:18
research
56:11, 115:13,
126:17, 131:14,
131:16, 134:17,
143:3, 150:6,
160:25, 167:13,
171:4, 205:6,
209:13, 216:5,
228:13
researched
172:11
researchers
160:1, 160:2,
216:14
researchgate
174:4, 174:11,
174:18, 174:20,
175:1, 175:6,
175:11, 189:4,
189:9, 204:25
researching
49:5
reserved
240:30
resistance
151:18, 187:13
resistant
184:25, 203:15,
203:17
resisting
42:24, 186:21
resources
10:20, 11:15
respect
35:24, 86:1
respectfully
85:17, 228:23
respiratory
220:18, 222:4,

222:23, 223:2
respond
236:24
responded
214:1, 237:3
response
4:17, 22:24,
33:23, 34:4,
34:9, 34:24,
35:3, 35:16,
37:5, 37:9,
37:25, 39:6,
88:3, 88:5,
211:7, 214:2,
214:4, 215:9,
216:7, 216:9,
237:5, 238:2
responses
37:14, 237:11,
237:19
responsive
36:6, 39:7
rest
85:15
restaurant
154:12
resting
223:25
restrain
25:4
restraint
160:22, 161:7,
161:9, 209:19
restricted
67:13, 68:10,
68:19
result
15:22, 73:19,
97:6, 98:15,
102:11, 145:1,
154:16, 154:18,
166:16, 199:7,
206:13, 208:14
resulting
99:14, 101:18,
105:19, 148:9
results
184:11

retain
30:24, 32:16,
97:3, 132:20
retained
20:17, 21:13,
21:22, 26:2,
26:24, 27:12,
30:2, 30:12,
30:14, 30:17,
31:16, 32:13,
32:19, 33:2,
33:8, 35:25,
60:2, 81:10,
86:23, 87:1,
87:10, 88:19,
90:9, 90:21,
91:20, 95:17,
95:21, 96:25,
97:16, 97:19,
99:2, 99:9,
99:23, 100:4,
100:20, 119:10,
120:2, 120:4,
123:2, 180:3,
217:6, 235:9
retainer
23:24, 24:5,
30:19, 32:23,
33:4, 35:15,
35:22, 36:7,
38:5, 38:14,
120:10, 120:12
retaining
37:1, 51:9,
235:2
retains
132:8
retention
118:16
retired
26:11, 26:13
retirement
25:14, 25:18,
26:19
retrieved
31:7
returning
107:23

revealing
70:7
revelation
100:15
review
11:14, 34:9,
53:22, 134:21,
135:9, 135:11,
135:20, 136:9,
142:15, 143:21,
161:1, 169:4,
174:13, 174:14,
179:6, 210:15,
210:17, 219:13,
226:14, 234:19,
239:14
reviewed
12:24, 14:17,
15:4, 15:8,
15:24, 16:5,
18:22, 49:22,
50:6, 52:16,
53:17, 66:13,
135:18, 166:14,
170:9, 179:24,
185:4, 187:1,
189:19, 191:3,
191:21, 204:18,
210:5, 210:10,
212:3, 212:8,
226:5, 228:2
reviewing
14:13, 49:15,
121:20, 122:3,
122:7
revised
210:9
revisions
226:6
rewrite
210:11, 210:16
rewriting
214:8
rhabdo
102:24, 136:5,
136:17, 141:4,
141:12, 142:1,
142:10, 142:17,

Transcript of Mark W. Kroll, Ph.D.
Conducted on September 13, 2018

290

145:21, 146:8,
148:24, 149:5,
149:15, 149:19,
156:8, 156:11,
171:6, 171:14,
171:15
**rhabdomyolysis**
10:14, 12:11,
102:18, 102:23,
134:9, 134:14,
134:16, 134:24,
136:2, 136:15,
137:9, 137:12,
137:16, 137:20,
137:25, 138:5,
138:8, 140:9,
141:16, 142:19,
143:1, 144:1,
144:9, 144:18,
145:5, 146:1,
148:19, 171:13
**rhetorical**
207:13
**rhythm**
115:8, 115:25,
165:16, 166:19
**ribcage**
209:18
**rico**
198:13
**right**
22:4, 23:15,
29:16, 40:4,
43:14, 47:20,
48:11, 50:8,
52:24, 54:6,
87:8, 87:17,
96:15, 97:15,
99:7, 99:17,
100:9, 102:13,
105:20, 116:25,
127:22, 133:7,
136:12, 150:23,
158:22, 162:9,
166:1, 166:3,
168:10, 174:9,
176:8, 199:16,
201:12, 212:11,

216:13, 217:25,
219:15, 236:22,
239:5, 240:29
**right-handed**
199:14
**rights**
228:11, 230:9
**rigid**
207:20
**ring**
52:17
**rise**
46:15
**risen**
72:17
**rises**
148:18
**rising**
124:21
**risk**
220:2, 220:13,
220:20, 222:4,
222:25, 223:17,
224:7, 225:3,
225:22
**risks**
152:3, 160:16,
220:2, 220:19,
222:24
**rm**
55:11
**road**
72:6
**roadway**
46:21
**role**
64:18, 65:3,
65:9, 65:16,
76:24, 77:9,
80:11, 89:3,
110:25, 113:7,
132:7, 157:20
**roles**
109:5
**room**
12:9, 137:22,
214:17
**rough**
15:8, 16:19,

19:12, 29:10,
32:4, 61:25,
62:14, 65:7,
67:10, 178:13
**roughly**
70:3, 71:6,
239:4
**rounds**
176:14
**row**
113:13
**rsu**
70:9
**rsus**
68:9, 68:23,
69:11, 69:19,
70:2, 74:19,
75:20, 76:4
**rule**
9:8, 16:13,
32:10, 114:5,
114:6, 114:7,
114:10, 114:12,
178:13, 178:18,
178:21, 179:1,
181:24, 183:21,
203:15, 203:21,
204:4, 204:20,
228:8, 228:14,
229:5
**rules**
3:23, 6:20,
68:9, 176:10
**running**
96:8, 96:10,
146:15, 221:21
**rush**
47:14
**ryan**
55:12

**S**

**s**
153:22, 154:4
**sad**
196:19
**safe**
228:22

**safer**
74:11
**safest**
159:10
**safety**
46:21, 116:5,
116:13, 192:18,
196:23, 197:1,
210:23, 214:9,
220:1, 227:20,
228:19, 229:2,
229:22, 230:16
**said**
7:12, 10:6,
24:25, 32:3,
42:7, 62:24,
92:17, 95:1,
108:3, 123:25,
136:4, 171:19,
197:4, 202:6,
204:3, 216:11,
216:12, 236:13,
237:7, 237:20
**sam**
2:12, 6:9
**sam@loevy**
2:18
**same**
6:20, 7:18,
13:16, 22:21,
38:1, 53:2,
54:19, 84:14,
100:14, 108:17,
108:18, 117:4,
117:25, 126:5,
136:7, 144:14,
151:1, 199:19,
240:17
**sane**
237:8
**sat**
6:14, 63:23,
74:17, 75:15,
77:18
**save**
24:17, 24:25
**saved**
117:10

Transcript of Mark W. Kroll, Ph.D.
Conducted on September 13, 2018

291

saw
149:16, 185:8
say
6:13, 17:20,
18:5, 22:6,
23:10, 28:19,
29:24, 32:7,
33:13, 42:24,
46:22, 46:23,
47:22, 47:25,
56:3, 60:8,
60:22, 62:15,
67:20, 70:18,
74:12, 74:14,
77:13, 78:23,
84:20, 87:5,
88:10, 94:15,
94:16, 100:19,
101:1, 104:1,
111:8, 111:24,
113:24, 116:11,
118:18, 118:19,
122:13, 127:7,
127:14, 127:25,
128:4, 128:10,
129:6, 135:22,
135:23, 136:20,
136:25, 137:17,
138:18, 141:25,
142:20, 142:21,
143:6, 145:18,
145:20, 145:21,
150:15, 152:9,
152:10, 152:25,
153:5, 155:11,
155:12, 155:19,
155:20, 155:23,
158:5, 158:21,
159:6, 160:5,
161:15, 163:10,
166:20, 171:14,
174:6, 176:24,
177:4, 180:7,
180:18, 182:23,
184:24, 187:14,
192:17, 192:19,
194:10, 196:17,
205:14, 212:6,

228:14, 229:6,
231:25, 232:18,
233:17, 234:8,
236:11, 237:5
saying
16:15, 122:17,
144:19, 182:19,
188:2, 228:21
says
36:11, 55:2,
55:25, 60:5,
118:23, 124:3,
142:8, 162:3,
192:8, 231:13
scene
40:20, 41:3,
41:5, 41:7,
43:10, 45:12,
53:6, 53:7
schedule
35:4, 36:12,
36:15, 36:19,
38:5, 38:13,
117:22, 119:4,
119:7, 119:13,
219:8
scheduled
1:20
schizophrenia
215:9, 216:6
schizophrenic
216:2
schizophrenics
215:24, 216:9
schneeman
36:10
school
108:25, 123:15,
125:6, 144:3
science
56:1, 108:5,
144:4
scientific
58:25, 64:25,
65:3, 81:9,
82:3, 227:24,
228:21, 230:15,
235:7, 235:12,

236:6, 236:24,
238:19, 238:24
scientifically
132:13, 177:13,
226:2
scientist
55:25, 125:21,
130:15, 221:17
scientists
55:24, 56:16,
58:2, 58:6,
58:13, 126:7,
126:13, 130:3,
130:12, 130:25,
135:6, 221:12
scope
217:14
scored
55:23
se
167:3, 168:2
seal
240:32
search
189:9
second
10:9, 30:4,
30:5, 34:14,
39:11, 49:17,
78:23, 89:7,
121:23, 161:1,
161:4, 164:11,
165:23, 168:18,
170:7, 176:15,
186:4, 188:3,
202:10, 218:1,
223:13, 231:5,
233:11
secondly
207:9
seconds
64:10, 93:21,
94:1, 172:1,
176:3, 176:25,
177:3, 178:14,
178:16, 178:19,
181:2, 181:7,
181:8, 181:10,

183:18, 183:22,
183:24, 186:10,
186:11, 186:15,
189:16, 193:11,
194:2, 194:15,
195:12, 202:15,
202:24, 203:1,
203:2, 203:7,
203:11, 203:16,
203:20, 203:23,
204:4, 205:21,
206:25, 223:10,
225:7, 225:8,
225:16, 225:20,
226:3, 227:18,
228:18, 228:21,
228:22, 229:8,
229:11, 229:14,
229:21, 230:4,
230:5, 231:16,
232:11, 232:22,
233:3, 233:14,
233:17, 233:19,
233:24, 234:5,
234:6, 234:15,
234:17
section
13:7, 19:15,
56:4, 112:1,
147:25, 149:11,
159:3, 165:10,
176:13, 189:7,
212:16, 216:20
sections
57:18, 134:12
secures
61:10, 61:11
security
58:16
see
11:11, 11:15,
30:9, 34:1,
34:12, 34:21,
35:9, 39:2,
40:15, 50:4,
59:21, 60:5,
77:5, 80:12,
84:12, 85:12,

Transcript of Mark W. Kroll, Ph.D.
Conducted on September 13, 2018

292

112:2, 116:14,
126:4, 142:8,
142:12, 144:20,
145:19, 146:23,
164:5, 174:11,
175:22, 175:25,
178:23, 183:5,
185:7, 185:11,
189:11, 198:19,
200:24, 207:10,
208:16, 208:17,
208:18, 212:20,
220:3, 220:8,
225:9, 227:15,
227:25, 231:10,
231:16, 232:21,
233:8, 235:16,
237:15
**seeing**
71:4, 122:23
**seeking**
7:21, 221:4
**seeks**
38:21
**seemed**
186:23
**seen**
148:13, 158:4,
221:14, 234:10
**segments**
52:19
**segregate**
52:3
**select**
161:13
**sell**
70:22
**sellers**
122:16
**selling**
71:2, 71:10,
79:3
**semantics**
163:21
**semler**
3:6
**send**
30:25, 36:25,

38:3, 117:19,
236:5
**sending**
231:6
**sense**
7:4, 16:11,
84:8, 89:10,
89:11, 115:23
**sensitive**
148:19, 148:24,
151:16, 216:11,
216:12
**sensitivity**
148:18, 215:25
**sent**
35:14, 36:13,
36:15, 51:9,
118:3, 210:13,
231:8
**sentence**
164:8, 164:11,
211:21, 211:25,
222:8, 223:12
**sentences**
164:8, 212:6
**separate**
52:7, 74:9,
166:11, 169:9,
202:19, 203:6
**separated**
47:18
**separately**
88:4
**september**
1:19, 2:2,
26:14, 240:8,
240:33
**sequence**
157:25
**serious**
198:3, 200:2,
220:14, 220:21,
222:25, 223:17,
224:8
**serotonin**
55:4, 224:6
**serum**
55:4

**serve**
112:12
**served**
37:8, 37:13,
152:13, 152:16
**services**
19:17, 20:18,
21:23, 25:12,
31:1, 33:6,
35:7, 64:18,
81:12, 84:24,
85:2, 86:20,
109:14, 109:19,
110:18, 118:13
**session**
137:6
**sessions**
56:8
**set**
50:19, 105:1,
106:11, 134:13,
167:16, 169:13,
175:8, 179:15,
185:14, 185:16,
185:17, 187:8,
205:19, 227:18,
228:18, 229:1,
229:20
**sets**
227:9, 227:20
**setting**
18:21, 75:19,
187:8
**settle**
123:22
**settled**
95:22
**seven**
10:5, 72:6,
76:11, 80:25,
82:8, 82:10,
185:24, 217:22
**several**
34:17, 87:4,
87:5, 94:21,
107:16, 121:5,
141:6, 227:17,
228:17, 235:15

**severe**
96:17
**shakes**
7:3
**shall**
162:24
**share**
56:2, 56:17,
57:7, 68:10,
78:20, 149:17
**shareholders**
77:11, 78:8,
78:11, 79:25
**shares**
67:14
**sharing**
85:3
**she**
36:13, 38:4,
40:3, 110:14
**sheds**
188:10
**sheet**
22:20, 30:18,
39:14, 40:13
**shift**
223:9
**shirt**
164:9, 164:18,
207:12
**shock**
55:8, 133:3,
133:9
**shocks**
21:19, 55:4,
111:14, 133:13,
214:9, 215:6,
215:14, 215:19,
216:10
**shopping**
153:19, 153:21,
154:3, 154:7,
154:10
**short**
104:12, 105:4,
122:16
**shortly**
33:2, 191:8

Transcript of Mark W. Kroll, Ph.D.
Conducted on September 13, 2018                                    293

| | | | |
|---|---|---|---|
| **shot** | **signed** | 163:9, 175:18, | **situations** |
| 75:3, 90:18 | 118:20 | 193:25 | 84:12, 127:13, |
| **should** | **significance** | **single** | 127:18, 128:2, |
| 15:11, 39:24, | 119:16 | 175:19, 180:25, | 196:19, 197:20 |
| 43:14, 61:16, | **significant** | 207:1, 213:2, | **six** |
| 88:10, 90:20, | 73:18, 105:24, | 234:13, 234:14 | 93:24, 134:22, |
| 98:12, 111:24, | 106:5, 118:15, | **single-sided** | 236:8 |
| 116:19, 122:18, | 119:9, 122:6, | 117:17 | **size** |
| 158:5, 158:16, | 147:16, 227:20, | **sir** | 66:4, 66:6 |
| 161:13, 172:17, | 228:18, 229:2, | 6:7, 84:3, | **skeletal** |
| 194:10, 196:17, | 229:22 | 211:23, 228:23 | 134:20, 141:8, |
| 200:3, 201:7, | **significantly** | **sit** | 141:11 |
| 229:12, 230:2 | 178:4, 180:21, | 49:16, 52:17, | **skimmed** |
| **shoulder** | 215:11 | 61:25, 62:24, | 11:13 |
| 46:11 | **signs** | 63:1, 63:7, | **skin** |
| **shouldn't** | 150:25 | 76:8, 78:3, | 164:10, 164:19, |
| 162:15 | **similar** | 85:20, 100:7, | 201:3, 201:18, |
| **show** | 47:10, 48:2, | 110:23, 114:8, | 213:17 |
| 146:18, 147:11, | 85:5, 93:22, | 167:15, 168:21, | **slash** |
| 149:18, 169:10 | 107:15, 135:15, | 169:3, 186:12, | 181:15 |
| **showing** | 148:12, 158:2, | 219:22, 238:23 | **slick** |
| 198:11, 198:14 | 180:8, 185:2, | **site** | 123:20 |
| **shown** | 189:13, 219:1, | 40:14, 40:20, | **slide** |
| 35:21, 142:9, | 221:21 | 40:23, 41:17, | 227:13, 227:15, |
| 222:6, 223:5 | **similarities** | 44:7, 44:10, | 228:1 |
| **shows** | 197:17 | 44:15, 44:19, | **slight** |
| 35:22, 158:14, | **similarly** | 45:9, 45:15, | 48:13, 221:20 |
| 158:20 | 7:6, 186:24 | 45:23, 46:1, | **slightly** |
| **shutoff** | **simple** | 46:5, 48:1, | 66:11 |
| 195:11 | 150:22, 178:21 | 48:9, 49:1 | **small** |
| **sic** | **simplest** | **sites** | 16:9, 66:2, |
| 12:9, 82:19 | 56:14 | 172:14 | 123:13, 123:17, |
| **side** | **simplify** | **sitting** | 123:21, 142:1 |
| 20:19, 20:20, | 132:24 | 52:23, 62:19, | **smaller** |
| 22:17, 86:24, | **simply** | 64:2, 64:5, | 66:21 |
| 87:2, 87:10, | 10:11 | 223:25, 238:25 | **smart** |
| 87:11, 88:20, | **simultaneous** | **situation** | 124:4, 230:1 |
| 89:1, 92:20, | 220:22, 222:9 | 25:24, 47:5, | **social** |
| 102:25 | **since** | 102:23, 106:4, | 58:16, 69:22 |
| **sides** | 25:13, 27:13, | 132:15, 132:23, | **society** |
| 22:17 | 27:15, 27:18, | 176:22, 176:23, | 115:8, 115:25 |
| **sidetracked** | 28:8, 31:10, | 184:23, 190:15, | **sociology** |
| 107:21 | 54:24, 59:3, | 191:15, 193:6, | 160:3, 160:11 |
| **sign** | 59:6, 59:7, | 194:6, 195:16, | **software** |
| 225:18, 240:29 | 71:7, 83:17, | 196:18, 199:2, | 182:6, 182:14 |
| **signature** | 86:17, 109:9, | 199:9, 199:10, | **some** |
| 202:1 | 115:11, 156:6, | 199:11, 234:13 | 22:20, 31:21, |
| **signature-lv2k0** | 157:22, 160:4, | **situation-specif-** | 39:25, 43:2, |
| 240:35 | | **ic** | |
| | | 176:17, 176:21 | |

Transcript of Mark W. Kroll, Ph.D.
Conducted on September 13, 2018

294

43:23, 48:19,
48:20, 49:18,
50:1, 53:11,
61:24, 61:25,
63:1, 68:18,
70:10, 72:12,
72:15, 73:24,
76:22, 79:22,
92:2, 97:12,
99:19, 101:8,
103:13, 104:17,
106:9, 109:25,
110:25, 126:4,
126:8, 126:17,
128:14, 128:15,
129:3, 130:12,
130:19, 132:14,
135:10, 135:20,
136:18, 137:10,
139:12, 141:5,
147:11, 147:15,
147:17, 149:17,
151:9, 151:11,
151:16, 155:8,
161:21, 162:7,
165:12, 166:1,
169:7, 173:5,
174:7, 180:15,
181:17, 185:1,
185:9, 195:3,
196:18, 205:10,
206:12, 208:2,
210:8, 211:2,
211:25, 213:14,
214:14, 215:3,
220:13, 221:2,
221:8, 222:1,
222:2, 222:3,
224:19, 228:9,
229:7, 230:9,
230:12, 235:17,
237:20
**somebody**
69:15, 79:3,
90:18, 133:1,
149:3, 149:4,
149:13, 154:10,
161:2, 169:7,

229:12
**someone**
18:13, 18:15,
18:18, 26:3,
42:23, 55:24,
95:7, 103:2,
107:12, 109:20,
109:24, 137:24,
138:4, 149:24,
153:16, 159:11,
159:18, 159:19,
171:12, 192:8,
207:2, 207:17,
213:22, 214:20,
215:10, 215:12,
223:3, 230:3
**someone's**
215:1
**something**
7:12, 7:15,
7:18, 15:7,
15:13, 17:24,
42:24, 43:2,
79:1, 89:7,
106:9, 107:21,
116:19, 129:12,
161:8, 165:5,
165:25, 170:17,
170:18, 172:20,
191:22, 192:8,
201:18, 230:6
**something's**
16:12
**sometime**
121:2, 121:9,
231:22
**sometimes**
43:19, 128:14,
184:21, 208:1
**somewhat**
47:21, 104:3,
160:5, 198:3,
199:16, 215:8
**somewhere**
28:22, 29:2,
29:25, 32:1,
76:6, 76:11,
120:4

**son**
55:12
**sooner**
233:9
**sophistication**
193:25
**sorry**
12:3, 19:5,
47:3, 86:9,
207:15, 217:18
**sort**
22:5, 22:20,
26:18, 29:22,
50:18, 65:7,
71:6, 191:24,
226:12
**sounds**
201:12, 219:15
**source**
84:11, 159:1
**sources**
62:4, 62:6,
62:17
**south**
2:4, 47:16
**southbound**
46:14
**southern**
1:2
**spacing**
207:19
**spark**
102:4
**speaker**
57:4, 57:21,
62:3, 62:22,
111:4, 113:13
**speaking**
62:18, 64:22,
67:8, 90:16,
96:5, 102:5,
111:9, 111:22
**speaks**
222:10
**special**
1:5
**specialists**
176:1

**specialization**
107:25, 108:7
**specialize**
115:23, 122:20
**specialized**
46:20, 209:9
**specialties**
138:12, 138:13
**specialty**
80:19, 111:13,
138:14
**specific**
46:2, 97:3,
119:16, 119:24,
130:9, 131:22,
140:1, 140:15,
215:23
**specifically**
16:19, 45:20,
73:21, 80:3,
86:21, 104:1,
104:2, 120:21,
121:18, 126:19,
129:5, 137:10,
139:8, 140:10,
215:20, 228:13,
231:3
**speculate**
162:15
**speed**
130:10
**speedway**
96:16
**spend**
9:12, 10:4,
55:25, 169:11
**spent**
45:3, 121:20,
122:6
**spice**
156:10, 156:11,
171:8, 214:19
**spilled**
49:11
**spine**
207:9
**spray**
152:5, 161:19,

Transcript of Mark W. Kroll, Ph.D.
Conducted on September 13, 2018

295

161:25, 163:2
**spread**
207:10, 207:11,
229:16
**spreads**
208:17
**squad**
162:19
**squishy**
167:17
**ss**
240:4
**st**
44:13, 53:12,
108:23, 109:2,
240:32
**stairs**
146:15
**stance**
208:24
**stand**
47:2, 208:21
**standalone**
36:19
**standard**
24:5, 24:8,
36:14, 36:19,
36:24, 58:4,
58:6, 58:14,
58:18, 58:22,
58:24, 84:20,
203:21, 231:25
**standards**
68:24, 214:9
**standing**
46:18, 159:19,
199:18, 207:2,
208:1, 208:13,
209:6
**stands**
101:13
**stapled**
97:23, 97:25
**start**
6:18, 67:12,
120:10, 120:11,
120:15, 144:3,
173:5

**started**
57:21, 65:23,
66:2, 107:19
**starting**
150:6, 183:1,
210:12
**startled**
208:5, 208:14
**starts**
145:22, 173:2
**startups**
62:3
**state**
2:6, 20:2,
30:13, 87:12,
88:25, 89:1,
89:5, 91:23,
119:25, 120:3,
126:24, 155:5,
156:22, 169:16,
173:10, 196:10,
196:16, 215:1,
217:5, 223:15,
225:5, 225:12,
240:3
**stated**
9:7, 9:24,
12:3, 16:17,
17:16, 32:18,
65:19, 126:16,
162:23, 192:22,
194:2, 194:14,
195:19, 231:17,
232:13, 232:24,
233:4, 233:19
**statement**
36:14, 158:25,
164:20, 169:19,
174:21, 186:16,
187:21, 187:24,
188:25, 191:6,
191:20, 193:15,
203:4, 222:20,
223:20, 224:19,
224:24, 225:11,
228:17, 228:25
**statements**
193:16, 200:15,

220:25, 221:9,
221:25
**states**
1:1, 34:25,
39:6, 88:6,
98:6, 143:9,
164:8, 220:7,
220:10, 227:17,
228:10, 231:13
**statics**
209:18
**stating**
158:19
**station**
96:16, 123:16
**statistic**
173:25
**statistical**
135:14, 135:21
**statistics**
144:5, 152:3,
152:6, 152:23,
159:1, 159:2
**statue**
208:22
**stay**
70:11, 154:13
**steady**
65:25
**steep**
46:13
**step**
196:25
**stepdaughter**
198:12
**stephenson**
3:5, 3:6, 8:18,
8:21, 9:5, 9:18,
10:11, 10:12,
11:22, 12:23,
13:21, 14:6,
14:10, 18:11,
18:13, 28:5,
28:12, 31:11,
36:10, 44:23,
61:8, 61:15,
83:12, 85:24,
91:1, 123:18,

154:22, 211:9,
211:13, 239:8,
239:10, 239:13
**sticker**
11:10
**stiff**
96:13
**still**
47:14, 182:25,
185:1, 211:20
**stimulating**
113:11, 172:17
**stimulation**
21:18, 22:3,
139:24, 146:7,
148:25, 149:6,
165:16, 171:25
**stimulator**
171:5
**stimuli**
55:9
**stock**
64:11, 66:24,
67:2, 67:5,
67:9, 67:13,
67:19, 68:2,
68:7, 68:10,
68:15, 68:20,
68:23, 68:25,
69:6, 69:10,
69:15, 69:24,
69:25, 70:1,
70:3, 70:4,
70:10, 70:17,
70:20, 70:22,
71:2, 71:10,
71:14, 71:20,
71:22, 72:2,
72:10, 72:16,
72:20, 72:24,
73:5, 73:11,
73:12, 73:19,
74:19, 75:9,
75:19, 76:2,
76:3, 76:10,
79:4, 122:16,
122:18, 122:21
**stop**
42:24, 43:14,

Transcript of Mark W. Kroll, Ph.D.
Conducted on September 13, 2018

296

104:12, 133:10,
166:20
**stopped**
186:20
**straight**
96:14, 101:22,
105:22, 207:21,
208:11
**strain**
107:10
**strange**
32:16, 133:8
**street**
2:15, 3:7,
3:16, 42:20,
42:23, 43:3,
46:25, 162:4
**strength**
187:16, 209:18
**stress**
55:4, 191:25,
220:12, 220:17,
222:22, 223:3,
223:5
**stressful**
184:23, 191:14,
197:19
**stretched**
107:15
**strike**
13:1, 14:8,
21:21, 26:22,
30:23, 31:15,
34:1, 36:3,
47:7, 48:6,
57:16, 62:7,
74:13, 81:16,
86:18, 114:21,
119:2, 165:2,
166:9, 183:9,
188:13, 202:12,
205:18, 214:12,
217:4, 222:14,
230:12, 233:18
**strikes**
144:10, 228:8
**strong**
107:13

**stronger**
200:6
**strongly**
53:20
**struggle**
191:1
**stuck**
231:14
**studied**
138:2, 197:12,
218:13, 224:14
**studies**
134:22, 135:15,
135:19, 135:21,
136:7, 136:10,
142:22, 142:25,
143:8, 143:13,
145:15, 146:14,
146:17, 146:23,
146:25, 147:20,
148:4, 148:8,
204:24, 205:3,
205:6, 205:9,
208:21, 209:21,
215:5, 215:8,
215:15, 215:17,
215:18, 215:23,
216:15, 216:21,
222:6, 223:5
**study**
34:21, 38:18,
42:10, 56:11,
80:20, 108:1,
108:8, 136:8,
136:14, 138:21,
140:10, 142:23,
146:20, 172:5,
172:13, 175:8,
197:15, 197:17,
209:12, 209:24,
216:16, 216:23,
217:2
**studying**
29:9, 49:7
**stuff**
195:1
**subcategories**
39:3

**subject**
57:17, 114:21,
115:1, 115:3,
115:19, 116:9,
116:15, 124:14,
124:16, 178:10,
184:25, 189:2,
203:18
**subjects**
203:15, 215:16
**submission**
163:11
**submit**
163:15
**subpart**
35:3
**subparts**
39:8
**subpoena**
4:18, 22:24,
22:25, 33:23,
34:5, 35:17,
36:6, 37:5,
37:9, 37:14,
37:25, 38:21,
39:6, 88:3,
237:24
**subsequent**
16:18, 16:24,
19:9, 29:12,
53:10, 68:5,
179:17, 219:19
**subset**
53:2
**substance**
106:9, 214:14,
231:4
**substances**
156:4
**substantial**
240:26
**substantive**
219:17
**substitute**
160:23
**subtle**
211:4
**subtlety**
70:19

**subtracted**
29:21
**success**
73:19, 76:23
**successful**
77:6, 77:8,
186:4, 186:18,
186:19, 199:18,
208:10
**successfully**
199:4, 207:3
**such**
34:18, 114:3,
161:17, 191:19,
195:21, 201:5,
206:23, 212:2,
212:6, 240:17,
240:21
**sued**
122:10, 122:17,
123:8
**suffering**
8:9, 138:8,
151:5, 215:21
**sufficient**
165:21, 166:5
**suggest**
158:21, 192:10
**suggested**
101:9, 149:3,
193:20
**suggests**
187:1
**suing**
122:20
**suite**
3:7, 3:16
**sum**
70:2, 76:9
**summarize**
99:8
**summary**
46:2, 99:20,
102:5, 113:21,
159:4, 164:3
**summer**
210:10
**superficial**
42:13

Transcript of Mark W. Kroll, Ph.D.
Conducted on September 13, 2018

297

**superficially**
213:12
**supplement**
85:21
**support**
55:18, 56:24,
116:23, 117:5,
141:14, 171:18,
183:11, 187:24,
189:20, 190:4,
204:7, 204:18,
208:8, 230:15
**supported**
159:12, 168:14,
177:13
**supporting**
148:23
**supports**
115:17
**suppose**
33:3, 121:5
**supposed**
69:16, 147:8,
211:3
**sure**
7:17, 11:6,
27:25, 31:23,
45:19, 51:4,
54:18, 59:19,
67:25, 71:19,
77:12, 78:2,
78:13, 84:13,
84:15, 98:11,
100:7, 102:21,
115:19, 118:14,
123:14, 133:19,
136:12, 138:1,
148:22, 158:18,
166:12, 177:20,
216:4, 226:21,
229:3, 233:22,
239:15
**surface**
213:20
**surprise**
47:21, 116:18,
162:11
**surprised**
162:14

**surprisingly**
47:16
**survived**
201:9
**susceptible**
137:25, 139:19,
139:23, 148:19,
151:10, 224:20
**suspect**
199:17
**suspected**
156:9, 233:2,
233:13, 233:24
**swamped**
146:24
**swing**
124:3
**switch**
68:23
**switchover**
68:19
**sworn**
6:2, 240:10
**symbol**
220:6
**symptoms**
151:1
**sync**
173:12, 174:22
**syndrome**
149:8

**T**
**table**
185:24, 187:9
**tactic**
161:14
**tactics**
152:25, 153:10
**taiwan**
10:16
**take**
7:25, 8:2,
28:4, 28:5,
31:25, 41:25,
45:7, 45:8,
50:3, 60:17,
75:25, 78:6,

87:16, 103:6,
105:1, 109:25,
123:12, 135:15,
137:2, 145:3,
151:21, 155:8,
157:20, 160:18,
177:20, 181:12,
186:11, 210:9,
225:15
**taken**
1:19, 2:1,
137:5, 158:11,
214:14
**takes**
146:4
**taking**
54:17, 100:2,
225:11
**talk**
7:7, 106:3,
115:13, 195:1
**talked**
48:9, 80:24,
109:3, 110:22,
111:3, 116:2,
165:3, 167:20,
178:8, 180:2,
181:24, 221:6
**talking**
21:1, 48:12,
54:19, 75:23,
87:19, 103:18,
106:20, 107:5,
113:22, 114:25,
116:6, 137:9,
137:13, 140:7,
161:12, 170:6,
170:8, 172:18,
172:19, 172:20
**talks**
111:18, 115:14
**tase**
42:25
**tased**
41:4, 41:10,
41:21, 41:22,
42:3
**taser-brand**
42:18

**taser-related**
111:10
**tasers**
103:15, 104:22,
105:14, 107:1
**tasertron**
182:12
**taser®**
5:7, 142:13
**tasings**
145:2
**task**
29:11, 29:18
**tasks**
29:6, 29:12
**taught**
184:21
**tavern**
195:7
**tax**
70:20, 70:21,
70:23
**taxpayers**
24:17, 24:25
**teach**
112:20, 112:21,
112:25, 113:5
**teaching**
112:18
**technical**
70:7
**technician**
125:11
**technique**
144:12, 187:5
**techniques**
153:4
**tecum**
37:9
**teenagers**
10:16
**television**
187:8
**tell**
7:13, 41:24,
71:8, 79:2,
80:10, 85:4,
87:9, 91:24,

Transcript of Mark W. Kroll, Ph.D.
Conducted on September 13, 2018

298

146:12, 153:15,
188:6, 205:13,
219:22, 221:16,
232:19, 240:10
**telling**
73:8, 168:24
**ten**
24:6, 24:11,
29:25, 43:5,
58:17, 62:15,
66:18, 72:6,
76:7, 88:11,
88:15, 98:23,
114:14, 116:12,
142:3, 142:6,
143:4, 143:6,
178:16, 181:8,
210:8, 222:6,
225:20, 226:3,
234:10
**ten-year**
98:25
**tend**
201:24, 208:25
**tendency**
240:26
**tendons**
107:14
**teresa**
1:5, 13:13
**term**
41:23, 47:20,
48:14, 48:15,
68:7, 77:12,
79:24, 92:2,
102:13, 104:6,
130:14, 163:22,
217:19
**terminate**
193:9
**termination**
194:13
**terminology**
43:1, 76:1,
165:14
**terms**
37:23, 42:14,
42:15, 70:14,

84:22, 112:18,
116:15, 118:15,
119:9, 136:9,
146:19, 151:18,
164:16, 182:22,
197:18, 234:6
**terrified**
47:1
**tess@loevy**
2:19
**test**
153:2, 215:16
**testified**
6:3, 59:1,
62:18, 73:16,
81:17, 89:8,
90:4, 90:7,
90:10, 92:6,
93:9, 94:18,
95:18, 102:6,
102:9, 102:14,
102:16, 107:23,
138:24, 144:15,
148:15, 186:24,
191:2, 201:1,
203:24, 204:6,
204:23, 214:2,
226:4
**testify**
88:20, 217:4
**testifying**
90:10, 91:15,
92:19, 92:20,
92:23
**testimony**
5:3, 8:12,
20:7, 34:21,
37:13, 38:18,
57:24, 59:10,
59:17, 60:1,
60:12, 60:13,
61:2, 62:8,
77:18, 83:2,
84:10, 85:21,
88:6, 88:11,
88:15, 89:24,
92:9, 93:2,
93:17, 94:18,

98:22, 99:3,
99:10, 100:21,
103:14, 108:2,
113:17, 128:7,
130:18, 145:6,
159:13, 180:4,
186:22, 190:17,
190:21, 193:19,
194:12, 194:15,
195:8, 195:19,
202:11, 212:25,
219:16, 240:12,
240:13
**testing**
142:24, 225:6,
225:13
**text**
38:3, 188:24
**th**
3:7, 16:8,
19:10, 43:12,
47:11, 48:3,
54:13, 54:21,
156:14, 156:23,
157:4, 157:9
**than**
7:1, 9:5, 9:16,
14:8, 14:13,
16:23, 19:12,
21:11, 21:20,
21:24, 24:18,
25:6, 26:3,
27:9, 29:11,
29:17, 30:18,
36:6, 38:13,
41:21, 49:1,
49:4, 73:7,
78:10, 84:20,
91:8, 109:18,
110:17, 123:7,
126:20, 129:15,
143:12, 151:12,
152:22, 153:4,
153:10, 159:15,
176:14, 176:16,
177:3, 177:17,
178:5, 178:11,
180:11, 180:21,

181:2, 181:10,
187:21, 189:15,
193:11, 194:14,
197:13, 202:12,
202:15, 203:7,
206:11, 210:15,
210:17, 211:4,
225:15, 226:5,
229:11, 231:17,
232:13, 232:23,
233:4, 236:15,
236:19
**thank**
15:12, 20:1,
28:7, 38:2,
38:7, 44:6,
49:19, 51:18,
117:23, 119:23,
211:8, 212:11,
212:15, 239:7
**thanks**
53:18
**their**
18:18, 27:7,
66:3, 66:5,
69:23, 84:6,
84:10, 84:23,
85:8, 98:10,
108:25, 118:13,
127:23, 147:2,
147:5, 147:6,
147:9, 147:14,
161:2, 188:21,
193:7, 193:18,
198:23, 199:24,
200:5, 200:9,
200:13, 200:22,
207:5, 208:12,
208:20, 208:25,
210:25, 212:4,
212:9, 215:2,
216:24, 224:12,
224:13, 224:22,
228:12, 228:13,
235:18, 236:3,
237:19, 238:13,
238:15
**them**
9:22, 10:7,

Transcript of Mark W. Kroll, Ph.D.
Conducted on September 13, 2018

299

12:21, 12:22,
14:6, 36:16,
44:24, 49:13,
52:3, 52:4,
52:16, 57:14,
63:22, 89:21,
90:19, 95:13,
96:10, 102:24,
106:6, 110:1,
112:9, 122:3,
123:4, 130:13,
134:17, 135:16,
140:24, 147:18,
150:3, 153:6,
157:22, 160:5,
162:10, 163:14,
164:4, 164:25,
176:22, 179:16,
183:4, 198:15,
200:1, 216:11,
216:24, 217:10,
218:12, 218:15,
221:2, 222:1,
226:5, 230:5,
231:15, 233:9,
234:16, 235:15,
235:16, 235:21,
235:25, 236:2,
236:11, 237:6,
237:20
**themselves**
31:12, 159:18
**then**
12:11, 22:19,
24:2, 26:10,
26:25, 27:11,
32:16, 34:24,
35:2, 37:21,
43:3, 46:11,
46:13, 53:6,
53:7, 58:7,
64:17, 67:11,
68:18, 70:16,
73:23, 75:3,
75:11, 75:25,
82:8, 107:21,
118:24, 122:17,
124:8, 126:1,

140:13, 141:21,
141:23, 145:16,
147:7, 150:2,
150:20, 164:4,
164:11, 174:14,
179:16, 182:6,
184:17, 186:9,
187:9, 187:14,
192:9, 192:19,
196:25, 202:3,
202:25, 203:1,
207:13, 216:24,
223:23, 224:1,
227:20, 230:5,
232:9, 233:24
**theoretical**
104:24
**theoretically**
65:10, 71:15,
77:3, 213:24
**theory**
69:14, 171:19
**therapeutic**
133:3, 133:12
**therapies**
134:1
**there's**
6:23, 16:11,
18:20, 20:16,
34:17, 45:25,
46:10, 46:11,
50:1, 51:14,
57:5, 60:15,
70:19, 87:7,
88:9, 100:15,
106:2, 125:21,
125:22, 127:4,
130:2, 130:10,
130:24, 134:22,
135:10, 139:11,
142:18, 144:11,
150:25, 155:21,
156:1, 156:12,
156:16, 156:21,
160:14, 166:15,
168:10, 168:16,
168:23, 169:1,
169:5, 179:7,

179:9, 187:18,
187:23, 188:9,
189:12, 189:18,
192:9, 192:15,
196:18, 197:7,
203:9, 211:25,
212:16, 215:6,
216:5, 219:17,
219:25, 220:5,
223:5, 225:18,
227:13, 228:9,
228:20, 230:14,
230:15
**thereafter**
33:3, 235:10
**therefore**
168:8, 194:23
**theresa**
2:13
**these**
68:9, 96:9,
115:6, 117:18,
118:4, 141:5,
142:8, 146:14,
147:12, 147:15,
147:18, 152:2,
152:3, 158:23,
159:9, 160:1,
167:16, 173:21,
174:1, 174:4,
174:7, 174:18,
174:25, 175:16,
175:21, 175:25,
176:9, 177:12,
188:4, 216:25,
218:14, 219:9,
219:10, 219:13,
222:6, 224:13,
225:1, 225:2,
228:9, 229:4,
232:20, 233:15,
237:14
**they're**
10:25, 67:16,
67:18, 74:10,
84:5, 84:13,
107:3, 111:12,
113:11, 127:20,

139:23, 147:8,
160:8, 162:19,
163:21, 164:24,
191:15, 196:23,
197:8, 199:14,
207:7, 208:1,
217:1, 219:1,
224:6, 233:8,
237:14
**they've**
114:18, 127:23,
151:14, 171:24,
196:14, 200:4,
200:9, 228:13
**thing**
16:9, 54:19,
60:14, 79:22,
151:1, 165:19,
165:25, 187:15,
192:10
**things**
41:11, 57:3,
57:6, 58:13,
130:10, 132:25,
178:24, 184:20,
219:23, 222:7,
225:19, 230:5
**think**
6:13, 8:11,
16:9, 22:4,
25:20, 29:16,
30:3, 33:14,
61:15, 61:18,
61:24, 66:10,
70:24, 73:1,
73:21, 74:21,
78:10, 78:22,
80:22, 81:2,
81:23, 83:15,
83:16, 84:17,
85:17, 87:13,
88:9, 93:20,
94:16, 96:21,
98:11, 100:8,
105:16, 107:19,
115:5, 116:20,
116:25, 121:12,
122:11, 122:12,

Transcript of Mark W. Kroll, Ph.D.
Conducted on September 13, 2018

300

122:21, 129:21,
141:16, 141:18,
144:6, 145:9,
145:16, 150:9,
154:23, 155:12,
157:20, 174:25,
181:1, 182:11,
182:17, 184:23,
193:5, 194:5,
197:3, 197:8,
198:4, 198:9,
200:5, 202:11,
207:15, 211:9,
211:14, 214:17,
214:18, 216:8,
216:10, 217:24,
218:23, 219:20,
222:9, 224:8,
224:10, 225:25,
229:17, 230:1,
235:19, 236:22,
237:9
**thinking**
186:9, 195:15,
197:22
**third**
2:15, 102:24,
119:3
**thomas**
108:23
**though**
41:19, 60:21
**thought**
101:4, 123:24,
169:1, 173:6,
211:5, 235:14,
236:13
**thoughts**
226:12
**thousand**
145:20, 173:21,
175:2, 188:4
**three**
3:15, 8:18,
37:1, 52:7,
52:16, 53:7,
66:14, 87:7,
87:9, 88:18,

100:3, 112:5,
116:12, 117:17,
135:18, 146:4,
146:5, 173:16,
174:23, 175:13,
175:14, 178:11,
200:7, 216:10,
219:7, 225:16,
228:8, 237:4,
237:10
**three-hour**
9:1, 9:18,
28:11, 40:13,
45:2
**three-point**
187:5, 189:15,
194:3, 195:24,
201:4, 202:14,
203:10, 212:19
**three-second**
192:20, 192:22
**threshold**
215:12, 215:14
**threw**
202:3
**through**
6:18, 8:17,
9:7, 9:13, 9:17,
11:9, 11:13,
18:24, 19:5,
34:5, 37:15,
39:16, 50:3,
60:2, 60:10,
61:12, 61:17,
64:25, 65:3,
81:8, 83:4,
83:11, 94:20,
97:15, 97:24,
98:1, 98:19,
106:6, 109:13,
109:17, 110:4,
110:19, 129:2,
140:25, 143:24,
151:17, 164:5,
173:23, 174:4,
177:16, 179:12,
185:23, 194:19,
194:24, 218:19,

226:16, 227:5
**throughout**
43:16, 63:14
**throw**
98:2
**thumb**
176:10, 178:13,
178:18, 178:22,
179:1, 203:21
**thursday**
1:19, 2:2
**ticket**
69:21, 73:25,
74:25, 75:5,
76:14
**timeline**
180:14
**times**
6:15, 60:23,
60:24, 60:25,
87:4, 87:5,
123:7, 124:11,
173:16, 174:23,
175:13, 178:11,
191:11, 192:9,
192:10, 197:25,
204:23, 225:16,
233:8
**tiny**
144:6
**title**
12:1, 134:20,
141:5
**titled**
13:15, 112:2,
141:8, 179:21
**titles**
141:17
**today**
8:12, 8:16,
9:20, 11:4,
14:18, 25:3,
39:10, 49:16,
50:24, 67:11,
67:12, 67:13,
76:9, 79:15,
163:12, 168:21,
169:4, 186:12

**today's**
58:18
**todero**
1:5, 1:6, 5:9,
9:10, 13:13,
14:21, 17:10,
18:8, 19:2,
23:18, 27:23,
28:10, 30:2,
39:20, 40:20,
41:3, 43:12,
44:8, 93:23,
119:17, 151:5,
155:19, 156:2,
156:4, 156:13,
162:23, 166:16,
167:2, 167:25,
172:24, 177:7,
178:19, 184:5,
185:10, 188:3,
193:6, 201:9,
202:14, 206:3,
206:6, 206:11,
214:11, 214:14,
218:18, 231:15,
231:23, 232:12,
234:24, 234:25,
236:17, 236:18,
238:20
**todero's**
155:23, 156:22,
157:2, 157:7,
157:13, 164:9,
164:18, 178:4,
183:15, 186:20,
187:4, 193:8,
203:13, 212:17,
213:3, 213:9,
213:15
**together**
53:1, 97:24,
158:7
**told**
42:3, 61:11,
80:10, 123:21,
154:7, 154:10,
233:10, 233:13,
233:21, 233:23

Transcript of Mark W. Kroll, Ph.D.
Conducted on September 13, 2018

301

**too**
55:9, 71:19,
115:6, 217:24
**took**
68:23, 103:12,
123:16, 137:8,
177:24
**tool**
158:22, 159:8
**top**
9:25, 34:14,
142:12, 158:13,
167:15, 173:10,
208:5, 231:5
**topic**
71:8, 111:15,
111:17, 136:16,
137:13
**topics**
84:4, 111:5,
111:10
**total**
23:21, 64:14,
67:1, 74:12,
74:14, 75:12,
75:16, 75:18,
76:2, 80:25,
82:18, 83:10,
83:15, 83:19,
83:23, 84:25,
85:11, 94:2,
172:23, 173:11,
173:15, 173:17,
174:21, 178:3,
178:5, 178:11,
183:18, 203:2,
205:21, 206:25,
234:14
**totally**
58:12
**touch**
127:11
**tougher**
153:1
**towards**
189:2, 219:25,
221:13
**tower**
2:3

**toxicology**
129:10, 139:2
**tracking**
182:6
**trademark**
42:17
**trading**
71:11
**traffic**
46:20, 47:1,
47:9, 47:11,
47:14, 47:25,
48:2, 49:18,
52:2, 52:10,
116:5, 116:13,
192:15
**tragic**
198:10
**trained**
197:9
**trainer**
152:16, 153:7
**trainers**
193:23, 219:12
**training**
10:15, 46:20,
55:16, 55:23,
56:3, 56:7,
56:8, 56:10,
125:13, 125:18,
134:2, 143:22,
143:25, 147:1,
147:2, 147:6,
147:8, 147:14,
152:11, 161:16,
184:22, 188:14,
188:22, 197:7,
199:22, 200:10,
200:20, 209:9,
210:5, 210:18,
210:25, 212:3,
212:9, 219:12,
226:7, 226:8,
226:13, 226:17,
227:9, 228:4,
229:18
**transcribed**
240:12

**transcript**
3:21, 5:19,
15:9, 16:20,
19:12, 29:10,
239:14, 240:30
**transmitted**
34:10, 118:6,
118:12, 121:17,
183:15
**trauma**
96:17, 101:19
**traumatic**
133:3, 133:12
**travel**
44:17, 44:25
**travels**
213:12
**treat**
126:6, 133:15,
133:20
**treating**
133:24
**treatment**
10:18, 11:25,
125:19, 126:8,
126:11, 126:14,
126:18, 126:22,
127:1, 127:6,
128:6, 129:22,
130:6, 131:12,
131:14, 131:18,
131:19, 137:20,
138:7
**tremendous**
70:1, 214:7
**tricks**
127:24
**tricky**
127:16
**tried**
127:24
**trigger**
178:5, 178:15,
178:22, 180:11,
180:14, 180:24,
182:7, 183:19,
183:20, 185:9,
185:11, 185:22,

186:6, 186:17,
187:2, 187:11,
187:15, 187:17,
188:2, 189:1,
190:1, 190:5,
190:14, 190:20,
190:22, 190:25,
192:13, 192:21,
193:1, 193:21,
194:1, 194:16,
194:18, 194:22,
194:25, 195:9,
195:13, 195:20,
196:2, 196:4,
196:11, 196:15,
196:20, 197:4,
197:13, 197:19,
197:21, 198:20,
199:4, 199:6,
199:24, 200:6,
200:8, 202:18,
203:3, 203:5,
204:8, 204:16,
205:19, 230:11,
234:12
**trigger-pull**
178:23, 180:22,
181:2, 189:6,
189:10
**trivial**
82:24, 85:10,
143:12, 146:11,
148:12, 221:19,
224:7
**trouble-making**
153:18
**troublemaker**
155:7
**troubleshooting**
129:16
**truck**
181:13
**true**
27:17, 36:2,
56:14, 59:12,
73:14, 120:14,
129:8, 164:24,
165:18, 171:20,

Transcript of Mark W. Kroll, Ph.D.
Conducted on September 13, 2018                                                302

180:23, 223:9,
224:1, 234:22,
240:13
**truth**
240:10
**truthful**
8:12
**try**
43:17, 43:24,
52:25, 106:17,
157:21, 197:25,
222:17, 231:25
**trying**
106:11, 171:14,
190:12, 190:19,
194:20, 199:14,
211:20, 216:1,
216:3
**tuesday**
231:8
**turn**
70:3, 164:1,
237:23
**turned**
69:21, 69:24
**turning**
30:4, 80:14,
187:10, 219:24,
220:19, 224:18,
227:11, 227:12
**twice**
98:1, 147:3,
212:9
**two**
9:21, 14:5,
14:15, 25:23,
26:16, 27:9,
27:16, 37:16,
39:3, 49:21,
51:15, 52:7,
53:10, 58:13,
62:1, 62:20,
62:25, 63:6,
64:9, 66:10,
66:13, 72:5,
75:21, 85:13,
89:5, 96:9,
96:11, 96:12,

99:11, 99:16,
101:25, 103:16,
112:6, 133:17,
138:11, 146:5,
146:15, 147:2,
150:5, 150:13,
160:21, 162:25,
164:7, 173:16,
174:23, 175:13,
176:25, 177:3,
178:10, 179:6,
183:24, 192:19,
194:2, 196:2,
200:2, 200:7,
201:21, 202:15,
202:19, 202:24,
203:1, 203:6,
203:7, 203:11,
203:22, 203:23,
204:4, 210:17,
210:24, 211:1,
211:21, 211:24,
212:5, 216:8,
216:11, 218:12,
230:25, 237:4,
238:17
**two-page**
36:25, 37:10
**two-thirds**
158:16, 158:17
**two-week**
56:7
**type**
21:7, 52:13,
125:10, 128:7,
130:20, 136:7,
144:16, 220:1
**types**
21:4, 21:11,
21:20, 107:17
**typical**
66:11, 142:5,
193:22
**typically**
107:11, 147:2,
173:16, 174:23,
178:9, 178:14,
189:1, 201:18

**U**
**uber**
44:23
**ucla**
113:9, 113:10
**ugly**
198:18, 198:21
**uh-huhs**
7:2
**uh-uhs**
7:2
**ulterior**
235:18
**ultimately**
171:9
**unanimous**
227:24
**uncited**
174:20
**uncomfortable**
46:17, 70:24
**unconscious**
201:10
**uncontested**
206:1
**under**
25:4, 59:10,
114:11, 139:18,
156:2, 156:13,
159:5, 159:8,
161:1, 171:1,
171:20, 181:14,
181:16, 214:11,
223:13
**underlying**
17:10
**underneath**
220:5
**underpinning**
58:8
**understand**
7:22, 41:1,
42:6, 43:3,
44:11, 52:12,
56:5, 56:15,
63:16, 76:15,
77:12, 77:14,

77:20, 84:3,
84:7, 103:23,
105:18, 106:10,
106:13, 106:23,
110:21, 114:2,
118:14, 120:7,
130:21, 146:22,
161:20, 164:15,
166:12, 170:5,
170:15, 185:15,
187:20, 193:24,
194:12, 195:25,
202:11, 211:23,
212:23, 216:3,
221:6, 226:4,
226:10
**understanding**
13:18, 39:18,
42:23, 47:3,
47:4, 51:12,
58:5, 58:19,
64:19, 67:25,
71:20, 77:15,
77:24, 78:15,
79:11, 79:18,
80:5, 88:13,
95:9, 95:14,
102:17, 114:5,
114:6, 118:2,
122:19, 122:24,
123:3, 126:16,
149:20, 150:11,
150:13, 153:3,
155:3, 158:3,
164:20, 207:1,
219:3, 221:15
**understood**
8:8, 20:6,
40:21, 51:23,
79:4, 83:1,
113:17, 128:7,
130:18, 167:1,
195:8, 195:18,
202:1, 211:15,
219:16
**undertook**
238:9
**unfavorable**
97:21

Transcript of Mark W. Kroll, Ph.D.
Conducted on September 13, 2018                                    303

unfortunate
43:24
unidentified
1:11
uniformed
162:24
unintentional
185:20
uninvoiced
28:18
unique
176:23
unit
68:10, 70:10
united
1:1, 98:6,
143:9, 228:10
units
67:13, 68:20
universe
144:14, 171:21
university
44:14, 108:14,
108:23, 109:1,
112:14, 112:20,
112:21, 113:1
unless
39:24, 57:21,
68:3
unlikely
32:14, 145:17
unlisted
114:20, 114:24
unpack
47:6
unrelated
19:1
unscientific
170:19, 228:15
until
120:12, 122:3,
146:22, 154:13,
160:14, 181:17
unusual
105:13, 155:10,
181:9, 191:13,
192:5
unwilling
195:4

update
5:11, 118:22,
118:24, 218:12,
219:8, 227:6
updated
119:13
upon
33:3, 58:10,
72:10, 186:8,
209:3
upper
182:23, 213:3
upright
206:3, 207:2,
207:18
urinating
154:6
urination
154:20
usage
43:6, 43:13,
43:15, 48:13,
48:15, 105:21,
105:23, 105:25,
106:19, 106:24
use
7:1, 17:20,
41:19, 41:20,
42:8, 42:14,
42:22, 43:1,
43:3, 43:19,
63:14, 71:13,
73:8, 86:14,
86:23, 91:9,
92:10, 93:3,
93:14, 93:18,
94:8, 94:13,
96:19, 96:22,
101:6, 102:13,
103:25, 104:6,
106:3, 126:1,
153:23, 156:10,
158:15, 160:3,
160:6, 160:7,
160:11, 160:14,
160:16, 161:14,
163:16, 163:17,
180:4, 182:2,

182:22, 183:24,
187:16, 188:5,
198:24, 200:13,
200:16, 200:22,
217:22, 221:13,
223:6, 223:15,
224:21
use-of-force
152:25, 153:9,
162:21, 163:3,
163:7, 163:9
used
25:21, 41:10,
42:18, 42:20,
43:5, 58:15,
68:6, 73:14,
76:14, 90:20,
155:18, 158:22,
159:8, 160:23,
176:8, 182:15,
183:23, 183:25
useful
44:15, 130:14,
176:10, 182:25
user
5:11, 227:6
uses
40:3, 158:18,
159:15, 161:17,
221:14
using
47:19, 89:22,
152:4, 163:14,
163:21, 165:5,
165:13
usually
73:11, 180:15,
191:15, 192:14,
197:2, 229:13,
232:23

V

v-i-l-k-e
11:25
vague
191:22
valid
170:5, 170:13

valuable
75:7
value
68:3, 69:11,
70:2, 70:4,
70:5, 70:14,
71:4, 72:1,
72:2, 72:8,
72:12, 72:14,
72:17, 72:24,
73:4, 73:5,
73:9, 73:15,
73:18, 74:4,
74:7, 74:10,
74:11, 74:15,
74:17, 74:19,
74:23, 76:2,
76:10, 78:20,
81:4, 82:18,
83:3, 157:13
valued
67:16, 67:17,
67:18, 68:2,
70:15
values
70:17
variance
146:18
varies
133:11
various
193:16, 208:17,
231:1
vast
131:20, 180:18,
182:20
ventricular
139:25, 166:6
venture
163:10
ventures
62:20, 110:25
verb
41:9, 41:14,
41:16, 42:22,
43:4
verbal
124:22

Transcript of Mark W. Kroll, Ph.D.
Conducted on September 13, 2018

304

verbs
41:19
verify
51:4
version
5:12, 13:16,
218:20, 219:18,
219:19, 227:7
versus
13:13, 63:4,
74:23, 86:6,
150:17, 152:4,
163:23, 172:20,
215:24, 223:7
vertebra
107:14
very
6:7, 11:17,
24:20, 42:14,
46:16, 46:23,
62:25, 66:2,
68:11, 69:13,
73:21, 73:24,
82:6, 88:21,
96:13, 97:24,
101:21, 104:12,
105:7, 113:12,
115:9, 126:14,
127:25, 130:14,
131:22, 133:8,
134:18, 146:6,
162:5, 164:25,
175:15, 176:10,
182:25, 184:20,
192:12, 195:2,
196:19, 202:1,
207:8, 219:1,
226:16, 231:4,
238:7
vest
67:15, 67:19,
67:20, 70:11,
72:5
vesting
71:1
vests
70:18, 70:20,
72:1

vf
170:1
vicinity
45:4, 47:10,
53:9
vicious
101:10
video
49:8, 49:9,
49:11, 49:14,
49:15, 49:17,
51:1, 53:4,
53:21, 188:9,
189:21, 191:20,
204:10, 204:21,
207:11
videos
50:16, 51:1,
52:19, 52:21,
52:25, 53:1,
53:3, 53:8,
53:11, 53:13,
53:15, 53:16,
53:23, 188:5,
206:19
view
78:13, 129:19,
150:1, 157:21,
167:8, 167:12,
178:8, 180:10,
182:19, 192:25,
195:25, 203:12,
205:20, 208:8,
213:2
views
11:11, 22:22,
34:3, 54:11,
60:7, 118:1,
218:11, 227:16,
231:12
vilke
11:25, 12:5
vincent's
44:13
visit
17:14, 17:18,
40:14, 40:20,
40:24, 44:7,

44:10, 44:16,
44:19, 45:9,
45:15, 45:23,
46:1, 46:5,
48:2, 48:9, 49:2
visited
41:3, 41:5,
41:7, 46:10
visual
45:11
vitae
4:22, 54:9
volunteer
112:10
volunteers
225:15, 225:17
vs
1:8

W

w-9
117:21, 118:10,
118:15, 118:21
w-9s
118:11
wages
124:6
walk
217:1
walked
124:2
walking
46:9, 206:4,
207:3, 207:17,
208:10, 208:13
wallop
208:6
want
15:7, 24:25,
26:9, 28:4,
41:8, 41:11,
41:25, 42:6,
43:18, 61:16,
63:19, 96:4,
103:5, 105:3,
106:1, 106:3,
116:18, 118:14,
118:23, 123:12,

123:24, 124:20,
133:10, 150:18,
164:15, 166:12,
185:15, 187:17,
194:23, 194:25,
197:10, 197:15,
206:20, 209:13,
212:12, 222:12,
227:23, 227:25,
228:6, 236:2,
237:11, 239:13
wanted
17:22, 51:4,
93:21, 93:25,
155:7, 203:19,
233:8, 235:16
wants
85:7, 109:20,
109:24, 132:13
warn
218:23
warning
46:16, 124:22,
219:5, 220:6,
220:10, 221:1,
226:9, 226:18,
229:20
warnings
5:7, 199:23,
218:9, 218:14,
218:20, 218:25,
219:4, 219:13,
219:18, 222:5,
223:15, 225:2,
226:15
warns
104:25
warranted
29:23, 236:1
washington
24:21
wasn't
16:17, 158:6,
192:11, 237:9
way
7:15, 13:5,
13:15, 18:4,
31:14, 47:8,

Transcript of Mark W. Kroll, Ph.D.
Conducted on September 13, 2018

305

47:25, 51:8,
55:1, 56:15,
58:16, 60:6,
61:23, 84:1,
94:8, 94:12,
97:23, 142:8,
151:3, 151:22,
156:12, 165:20,
168:22, 185:5,
187:6, 187:22,
188:11, 191:18,
194:7, 200:25,
201:16, 207:5,
214:10, 214:13,
233:6
**ways**
43:6, 43:7,
46:24, 79:20,
174:10, 212:2
**we'd**
203:15
**we'll**
8:1, 106:2,
123:23, 135:14,
195:7
**we're**
6:20, 7:17,
11:9, 38:1,
40:4, 54:18,
80:21, 82:9,
85:19, 87:19,
97:15, 107:5,
115:5, 136:17,
161:11, 172:18,
172:19, 172:20,
193:25, 195:15,
208:22, 226:8
**we've**
14:14, 28:21,
31:8, 35:12,
37:10, 48:9,
55:19, 58:21,
75:23, 107:18,
114:25, 130:6,
159:17, 167:19,
176:8, 226:2
**weapon**
42:19, 90:20,

94:25, 98:11,
102:15, 111:23,
132:12, 143:11,
147:5, 152:4,
155:25, 163:5,
163:20, 176:8,
182:11, 182:15,
182:22, 184:14,
184:15, 187:3,
189:14, 192:18,
196:22, 198:11,
198:14, 200:5,
202:22, 213:4
**weapon-related**
42:11
**weapons**
42:11, 43:5,
55:3, 55:14,
69:23, 93:25,
111:17, 134:21,
141:9, 142:2,
144:14, 160:7,
160:17, 160:18,
161:20, 162:8,
162:13, 162:18,
163:1, 175:17,
217:11, 217:16,
217:18, 233:15
**week**
24:21, 44:12,
124:3, 132:6
**weekend**
15:9
**weeks**
32:12, 55:5,
55:10, 104:20,
236:8, 237:10
**weems**
88:24
**weighing**
105:8
**weight**
161:2
**went**
17:11, 56:9,
66:11, 123:5,
124:5, 143:24,
198:12

**weren't**
147:25
**what's**
26:13, 30:18,
64:22, 68:9,
75:12, 76:2,
77:20, 83:9,
84:19, 88:13,
90:16, 90:24,
125:16, 147:16,
149:20, 164:2,
182:21, 186:16,
206:10, 219:3,
230:23
**whatever**
50:21, 60:5,
70:16, 71:3,
72:13, 123:5,
147:8, 211:10,
224:3
**whatsoever**
125:14, 214:3
**when**
12:23, 26:22,
28:19, 29:21,
30:1, 30:12,
30:13, 30:17,
31:25, 32:8,
36:11, 43:25,
46:25, 51:23,
58:9, 66:20,
67:20, 68:14,
68:22, 70:9,
70:19, 74:6,
74:7, 81:16,
82:17, 87:5,
96:9, 96:12,
98:18, 103:5,
103:25, 104:5,
106:19, 118:23,
119:9, 122:1,
122:13, 123:15,
123:20, 124:5,
130:16, 131:11,
131:13, 136:20,
143:6, 144:2,
144:3, 149:6,
149:15, 153:20,

153:25, 161:3,
167:24, 171:14,
174:6, 177:4,
178:23, 182:1,
189:13, 190:11,
196:14, 207:12,
208:21, 209:1,
219:4, 233:17,
236:5, 237:15
**whenever**
68:24, 70:17,
70:18
**where**
17:13, 21:8,
21:13, 25:24,
32:16, 41:3,
41:17, 43:10,
44:8, 47:17,
56:7, 81:14,
82:21, 84:12,
90:4, 93:8,
94:18, 99:2,
100:22, 102:6,
104:11, 105:6,
106:4, 108:22,
127:15, 128:16,
145:22, 149:3,
149:11, 154:7,
154:24, 159:5,
165:15, 166:23,
169:12, 171:5,
175:8, 180:16,
181:3, 181:7,
190:8, 193:19,
194:14, 196:2,
196:19, 197:3,
199:14, 205:12,
212:16, 213:3,
224:9
**whereupon**
211:18
**whether**
10:24, 31:14,
32:10, 44:20,
47:9, 47:25,
53:1, 69:14,
70:22, 74:10,
84:5, 84:16,

Transcript of Mark W. Kroll, Ph.D.
Conducted on September 13, 2018

306

85:18, 87:1,
94:8, 94:13,
94:14, 107:24,
111:19, 148:16,
151:5, 151:9,
155:18, 156:2,
156:13, 158:10,
168:17, 168:22,
169:3, 169:5,
169:6, 170:3,
185:6, 185:18,
191:19, 193:17,
200:14, 201:17,
202:2, 214:11,
214:14, 224:7,
227:24, 228:24,
229:5, 236:16
**while**
72:22
**white**
220:1
**who**
55:11, 89:16,
109:24, 110:9,
118:13, 126:21,
132:8, 132:11,
132:16, 198:19,
238:23, 240:15,
240:16
**who's**
84:9
**whole**
55:21, 56:1,
189:7, 217:22,
221:10, 222:13,
222:15, 223:18,
224:22, 240:10
**whom**
31:7
**whose**
63:6
**why**
14:5, 24:15,
35:15, 44:7,
50:2, 57:23,
96:24, 97:22,
133:5, 133:6,
141:25, 150:19,

154:2, 171:12,
172:11, 178:2,
235:13, 238:1,
238:5
**wide**
146:18
**wildly**
202:8
**will**
3:21, 25:2,
36:25, 42:22,
42:24, 42:25,
43:16, 71:5,
85:19, 86:1,
100:13, 118:24,
127:24, 128:23,
132:14, 147:3,
161:5, 163:10,
185:7, 188:25,
189:11, 194:22,
207:4, 207:19,
207:20, 208:2,
208:11, 211:16,
212:6, 212:13,
213:14, 213:21
**willing**
64:7
**win**
123:18
**window**
72:13, 72:15,
98:18, 98:20
**wire**
184:19, 234:2
**wires**
179:21, 179:24,
181:15, 232:1,
232:21, 234:3
**withdraw**
13:4, 126:3
**within**
26:19, 38:5,
58:24, 66:17,
104:12, 146:12,
155:21, 156:16,
157:17, 159:3,
213:19, 226:15
**without**
7:21, 64:21,

70:6, 71:18,
120:15, 140:23,
163:24, 171:7,
171:8, 207:23
**witness**
4:3, 6:2, 59:7,
59:20, 60:21,
81:17, 83:14,
84:5, 84:6,
84:22, 86:1,
86:11, 103:5,
114:3, 114:13,
123:19, 137:2,
154:23, 155:1,
157:18, 169:1,
177:18, 211:12,
211:14, 211:20,
217:21, 239:7,
239:12, 239:15,
240:9, 240:13,
240:30, 240:32
**witnessed**
163:13
**witnesses**
60:19
**witnessing**
81:13, 81:15,
85:8
**woman**
92:4
**won't**
155:4
**wonder**
129:8
**wood**
101:24
**word**
24:23, 41:8,
41:10, 41:22,
42:1, 42:3,
42:4, 42:5,
43:18, 71:13,
74:11, 77:22,
78:3, 88:9,
106:2, 125:16,
125:20, 125:25
**words**
7:1, 41:9,

42:8, 42:9,
105:21, 149:25,
150:5, 150:9,
185:21, 236:12
**work**
7:17, 19:21,
20:9, 20:11,
20:13, 20:14,
21:4, 21:7,
21:24, 22:8,
24:16, 24:19,
25:15, 27:11,
49:3, 49:23,
50:4, 56:6,
56:21, 59:2,
60:16, 61:3,
61:12, 64:16,
64:22, 64:23,
64:25, 65:2,
65:7, 65:9,
65:13, 66:20,
70:1, 81:6,
81:7, 81:10,
82:12, 82:18,
83:5, 83:11,
83:24, 109:17,
120:11, 123:23,
125:24, 127:21,
128:22, 129:2,
129:11, 129:25,
130:17, 130:20,
131:8, 133:2,
144:5, 152:20,
175:25, 186:23,
209:19
**worked**
123:15, 125:8,
198:15
**working**
59:2, 59:6,
120:15, 136:17,
136:20, 151:15,
178:25, 202:25,
210:23, 214:8,
230:6
**workout**
147:13
**works**
43:13, 67:10,

Transcript of Mark W. Kroll, Ph.D.
Conducted on September 13, 2018

307

128:18, 166:4,
216:21
**world**
56:2, 56:19,
62:4
**worth**
70:16, 73:22,
73:23, 75:6
**worthless**
191:25
**worthy**
235:19
**would've**
119:10, 120:9,
121:13, 122:7,
157:3, 157:8,
233:25
**wouldn't**
8:11, 17:20,
28:2, 33:10,
35:23, 52:3,
57:13, 59:12,
82:24, 139:21,
153:5, 162:11,
162:14, 173:25,
175:7, 178:22,
190:24, 190:25,
192:7, 213:11,
235:20
**write**
219:10
**writing**
49:5, 236:17
**written**
6:24, 7:8,
34:25, 38:13,
45:23, 48:8,
57:12, 58:1,
114:23, 124:22,
149:22, 151:4,
155:14, 155:22,
156:2, 157:2,
157:7, 157:13,
157:17, 158:10,
159:24, 185:16,
185:17, 188:24,
196:8, 200:14,
203:25, 208:8,

212:24, 221:11,
224:16
**wrong**
79:13, 97:25,
105:5, 223:1,
223:2
**wrote**
95:21, 143:16

**Y**

**yards**
221:21
**yeah**
12:14, 57:5,
81:2, 87:15,
122:12, 137:4,
198:16, 223:7,
238:14
**year**
12:13, 12:19,
26:19, 62:13,
62:14, 64:12,
64:15, 65:11,
65:12, 65:24,
66:1, 66:25,
75:22, 76:4,
112:24, 112:25,
116:13, 118:24,
145:9, 147:3,
226:15, 239:4
**year's**
73:23
**yearly**
112:17
**years**
32:17, 58:17,
62:15, 63:25,
65:21, 66:7,
66:11, 66:14,
67:20, 67:22,
68:5, 68:10,
68:13, 69:2,
72:5, 72:6,
74:2, 77:19,
83:9, 85:1,
88:7, 88:11,
88:15, 98:23,
113:13, 114:15,

116:12, 142:3,
143:5, 143:7,
160:21, 167:12,
175:19, 200:2,
210:8, 210:23,
212:5, 212:7,
218:13, 219:7,
234:10
**yelling**
192:15
**yesterday**
8:19, 14:7,
17:11
**yet**
28:16, 90:7,
90:10, 136:19,
226:6
**york**
24:22
**you'd**
48:14, 103:13,
103:14, 110:1,
116:11, 145:17,
147:10, 197:23,
232:9
**you'll**
63:16
**you're**
9:8, 12:4,
16:15, 18:21,
29:17, 37:4,
53:16, 55:25,
56:24, 60:20,
62:21, 63:3,
70:2, 70:9,
71:7, 71:9,
71:10, 72:16,
77:10, 78:25,
83:22, 87:6,
89:13, 90:3,
91:13, 92:20,
104:6, 106:14,
106:19, 114:15,
114:16, 116:23,
125:1, 127:18,
128:2, 128:19,
129:12, 130:8,
134:8, 136:20,

138:17, 138:25,
139:17, 141:1,
141:22, 143:18,
144:8, 151:3,
151:25, 152:6,
155:3, 155:4,
157:22, 162:6,
164:15, 168:16,
168:21, 170:17,
171:11, 172:5,
172:17, 174:19,
181:21, 182:19,
187:11, 187:24,
188:15, 188:19,
195:5, 206:22,
209:5, 209:6,
219:11
**you've**
11:8, 21:13,
22:15, 40:9,
42:3, 59:1,
59:6, 62:20,
65:20, 74:15,
74:17, 74:18,
75:13, 76:3,
76:4, 76:11,
81:10, 82:12,
83:10, 90:8,
90:21, 91:11,
94:18, 99:9,
100:4, 100:20,
101:25, 102:9,
110:25, 114:22,
116:24, 117:5,
120:12, 123:8,
124:16, 124:23,
129:3, 133:17,
138:4, 142:18,
142:22, 142:25,
144:15, 152:13,
153:12, 153:15,
155:10, 180:3,
180:8, 183:4,
195:9, 210:18,
210:22, 211:7,
212:4, 212:6,
212:24, 217:6,
217:14, 221:6

Transcript of Mark W. Kroll, Ph.D.
Conducted on September 13, 2018                    308

young
123:23
yourself
60:9, 64:9,
134:8, 139:1,
139:7, 140:2,
149:7, 153:8,
197:13
youtube
206:19

**Z**

zero
46:11, 205:21,
206:25, 210:11
zipes
126:19, 126:20

**$**

$10
74:20, 74:22,
75:2, 75:4, 75:6
$100,000
65:11
$12
76:12, 80:25,
82:8, 82:11
$24,000
24:3
$28,800
23:21
$3
69:24, 73:22,
73:24, 74:5,
74:6
$30,000
69:23
$300,000
66:9
$320,000
64:11
$4,800
23:25
$480
20:3, 20:25
$6,000
24:10
$600
21:5, 21:8,

21:13

**.**

.3830
3:9
.4880
3:18
.5900
2:17

**0**

00
1:20, 217:25
004052
5:17
0051
5:12
005119
5:12
011647
5:9

**1**

1
137:6
1.22
186:9
1.5
203:20
10
2:3
10,000
145:22
100
65:12, 111:11,
111:21, 111:24,
172:20, 207:23,
208:9, 213:18
10333
3:16
11
29:3, 29:7,
29:18, 29:24
111
3:16
11647
218:19
11654
218:19

117
5:5
12
137:5, 166:22,
168:4, 169:24,
191:11, 192:8,
194:19
13
1:19, 2:2,
5:15, 166:22,
168:5, 169:24,
201:10, 201:17,
202:3, 202:4,
202:7, 240:8
14
4:13, 113:13,
228:22
140
167:12
1400
2:3
15
28:22, 29:19,
60:16, 61:3,
62:11, 63:25,
65:21, 65:24,
68:10, 68:13,
75:22, 76:4,
77:19, 83:3,
173:2, 173:4,
173:10, 179:16,
181:7, 181:10,
192:21, 194:19,
195:9, 210:23,
212:5, 212:7,
225:7, 227:18,
228:18, 229:11,
229:14, 229:21,
230:4, 230:5
150
217:7
16
183:2, 185:9,
185:11, 185:23,
186:6, 186:12,
186:17, 190:5,
191:11, 192:8,
192:10, 204:8,

204:16, 228:21,
229:8
160
5:13
165
209:7
1698
1:9
17
1:9, 238:1,
238:3
18
167:2, 168:1
19
5:12, 227:7
1975
80:17
1983
108:9
1986
115:11
1987
108:9
1990
108:18
1993
108:4
1994
25:15, 25:17
1999
25:22
1:-cv--twp-mjd
1:9
1st
22:19, 23:17,
24:3, 27:18,
28:8, 35:21,
39:21, 218:22

**2**

20
60:16, 61:4,
66:18, 66:24,
73:3, 146:16,
172:1, 173:9,
178:14, 221:21,
239:4
20,000
72:24

Transcript of Mark W. Kroll, Ph.D.
Conducted on September 13, 2018

309

**200**
172:20, 234:17
**2003**
27:7, 65:23
**2004**
26:12
**2005**
25:14, 26:4,
26:14, 59:3,
59:6, 59:13,
122:15
**2006**
109:9
**2007**
145:9, 145:12
**2008**
145:10, 145:12
**2012**
12:2, 94:24
**2013**
5:12, 218:14,
218:22, 227:7
**2014**
91:23, 98:7
**2016**
43:12, 47:12,
48:3, 88:25,
112:7, 118:11,
156:14, 156:23,
157:4, 157:9,
162:13
**2017**
5:5, 5:15,
30:3, 30:7,
32:2, 32:19,
36:16, 68:1,
117:20, 119:8,
119:20, 120:5,
120:6, 120:19,
121:3, 121:9,
121:14, 122:3,
231:8, 231:22,
232:10, 234:18
**201733**
5:5
**2018**
1:19, 2:2,
4:15, 13:12,

19:10, 22:19,
23:17, 24:3,
27:18, 28:8,
35:6, 37:22,
39:21, 40:14,
40:23, 41:2,
54:13, 54:21,
88:9, 90:6,
240:9, 240:33
**201831**
4:15, 22:18
**2020**
240:40
**205440**
1:23
**21**
240:32
**218**
5:9
**22**
4:15, 149:23,
231:9, 231:23
**220,000**
65:15
**226**
5:13
**230**
5:17
**24**
147:10
**240**
1:24, 3:7
**25**
164:25, 169:15,
208:16, 239:4
**26**
9:8, 114:5,
114:6, 114:7,
114:12, 137:6
**27**
179:6
**28**
54:13
**289**
174:1
**29**
13:12, 16:8,
19:10, 43:12,

47:11, 48:3,
54:21, 88:8,
156:14, 156:23,
157:4, 157:9,
212:17
**3**
**30**
66:24, 73:3,
73:4, 115:11,
115:12, 173:4,
173:8, 174:4,
178:14, 178:19,
183:19, 183:21,
203:17, 203:21,
204:1, 205:20
**30,000**
72:24, 72:25,
74:4, 171:7,
172:2, 172:19
**300**
11:13
**3077**
3:7
**31**
190:10, 240:40
**311**
2:15
**312.243**
2:17
**317.660**
3:18
**317.844**
3:9
**32**
174:5
**320,000**
64:15, 66:1,
67:4
**33**
4:20
**35**
14:25, 15:25,
16:3, 17:1,
18:6, 18:11,
49:22
**39**
212:18, 212:25

**4**
**4**
217:25, 231:9,
231:23, 239:16
**4052**
231:2, 231:7
**4053**
5:17, 231:2
**42**
174:5
**45**
178:19, 184:16,
225:8, 225:16
**46**
105:8
**46280**
3:8
**46290**
3:17
**47**
137:5, 239:16
**480**
21:25
**5**
**50**
209:23
**50,000**
67:1
**5119**
227:5
**5137**
227:13
**5160**
227:5
**527**
2:3
**54**
4:23
**58**
88:8
**59**
19:25, 20:2
**6**
**60**
39:24

Transcript of Mark W. Kroll, Ph.D.
Conducted on September 13, 2018

310

**60.0**
23:17
**60607**
2:16
**61**
18:24, 19:5,
213:7
**63**
19:5
**654**
5:9
**6th**
30:7, 117:20,
119:20, 120:4,
120:18, 121:3,
121:9, 121:14

**7**

**7.27**
186:11, 186:15
**73**
18:24, 19:5
**7th**
32:1, 40:14,
40:23, 41:1

**8**

**80**
61:7, 61:22
**82**
142:12
**85**
61:23, 62:19
**87**
5:3

**9**

**9**
1:20, 2:3
**90**
31:24, 111:25,
143:16, 153:22,
154:4, 166:3,
213:19, 229:14
**91**
134:18, 135:8,
140:11, 143:18
**911**
51:15, 51:16,

51:19, 51:21,
52:1, 52:2,
52:8, 52:9
**92**
54:9, 55:2
**98**
3:7, 233:11,
233:14, 233:17,
233:19, 233:23,
234:14