Ian R. Godfrey
June 14, 2018

1

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

- - -

TERESA TODERO, as Special )
Administrator of the )
ESTATE OF CHARLES TODERO, )
)
Plaintiff, )
)
vs. ) Cause No.
) 1:17-cv-1698-TWP-MJD
CITY OF GREENWOOD, BRIAN )
BLACKWELL, RENEE ELLIOT, )
ELIZABETH LAUT, and AS-YET )
UNIDENTIFIED GREENWOOD )
POLICE OFFICERS, )
)
Defendants. )

- - -

DEPOSITION

of IAN R. GODFREY, called pursuant to notice by the Plaintiff under the applicable rules of procedure, taken before me, Lindy L. Meyer, Jr., a Notary Public in and for the State of Indiana, County of Shelby, at the Law Resources Center, 170 North Jackson Street, Franklin, Indiana, on Thursday, June 14, 2018 at 9:00 o'clock a.m.

- - -

FILLENWARTH REPORTING SERVICE
775 Hummingbird Lane
Whiteland, Indiana  46184
(317) 535-1607

Ian R. Godfrey
June 14, 2018

**Page 22**

1  Mobile Data Console. The Mobile Data Console is a
2  computer which runs a program, and in this case,
3  Greenwood uses one called Spillman, and it gives
4  you basic information about the call. It tells
5  you where you're going, what you are going for, if
6  there are any additional notes, like if the police
7  have radioed into the dispatch center and said,
8  "This is what's going on" and the dispatcher feels
9  it's pertinent, they'll put it in the notes. It
10 gives you your time stamps of when you get
11 dispatched, respond, arrive, transport, et cetera.
12    Q. Do you know if that dispatch system is
13 integrated with the Greenwood Fire Department, or
14 at the time if it was integrated with the
15 Greenwood Fire Department, the Spillman system?
16    A. Yes, it was.
17    Q. Okay. And was it also integrated with the
18 Greenwood Police Department?
19    A. I -- I don't know.
20    Q. Okay. And just so I'm clear, the answer
21 you just gave describing that, the dual dispatch
22 system, that's based on your general memory of how
23 the dispatch system worked at the time --
24    A. Yes.
25    Q. -- is that correct? And you know you

**Page 23**

1  would have been dispatched that way because that's
2  how you were always dispatched, but you don't have
3  a specific memory of being dispatched on May 29th?
4     A. Right. I mean the only two instances
5  where that wouldn't be the case is, one, if the
6  firehouse alerting system, or what we call the
7  locution system, which is the overhead paging
8  system in the firehouse, was not working, or if
9  the Spillman system was not working at the time,
10 which did -- I mean it's a computer technology.
11 Occasionally they do updates and things like that,
12 so occasionally it was down. But in terms of that
13 specific day, I don't recall whether either system
14 was running or down. I'm just explaining how
15 we -- we're generally dispatched to calls.
16    Q. I appreciate that. Based on the
17 description you gave of the dispatch, you would
18 receive certain details about the nature of the
19 call; is that correct?
20    A. Oh, again, it depended on what was
21 available. Some calls were -- there were more
22 details available, like if there was a police
23 officer on-scene that had been involved in
24 something, there would generally be more notes,
25 because they would relay information to their

**Page 24**

1  dispatcher, who would relay it to our dispatcher,
2  who would put it into our notes when we were
3  dispatched. But, you know, if we were going to
4  just a 911 call at a house, there would generally
5  be very few notes. It would basically be address,
6  chief complaint, and possibly age, gender, things
7  like that.
8     Q. Do you have any memory of what details
9  were included in the dispatch that you received on
10 May 29th --
11    A. No --
12    Q. -- 2016?
13    A. -- I do not.
14    Q. What's the first memory you do have of
15 your role in that incident that day?
16    A. My -- I mean my overall independent
17 memory, I mean, is very, very vague. I remember
18 responding to the call, I remember the general
19 situation of the call, I remember some -- some
20 things about the call, but again, they're very,
21 very vague. And then I obviously remember the
22 outcome of the call, but again, it's mostly --
23 it's mostly broad strokes, not finite details from
24 my independent memory.
25    Q. Okay. What are those broad strokes that

**Page 25**

1  you have in terms of your independent memory?
2     A. So, I remember that there was a subject
3  who had been tased and that he was lying on the
4  ground when we arrived, that he was extremely
5  uncooperative and agitated, despite being tased.
6  We lifted him to the stretcher, we put him in the
7  ambulance, he was -- he continued to be extremely
8  agitated, combative, and so we ultimately
9  administered a sedative to him, and then we were
10 transporting him to the hospital, and shortly
11 before our arrival at the hospital, he went into
12 cardiac arrest.
13    Q. You stated that there was a subject who
14 had been tased. Was that something that you
15 remember learning before you arrived on the scene?
16    A. I don't recall.
17    Q. Okay. You might have learned it while you
18 were on the way or it might have been something
19 you learned after your arrival?
20    A. It's -- yes, it's possible we learned it
21 on the way, either from dispatch over the radio or
22 through the Mobile Data terminal on the Spillman
23 program. It's completely possible, but I don't --
24 I don't recall off the top of my head.
25    Q. And you were not on the scene for any of

Ian R. Godfrey
June 14, 2018

---

26

1  the tases; is that correct?
2  A. That is correct.
3  Q. Okay. So, you have no first-hand
4  knowledge of why the police officer tased
5  Mr. Todero that day?
6  A. That's correct.
7  Q. And no first-hand knowledge of what he was
8  doing at the time that he was tased?
9  A. No.
10 Q. Okay.
11     MS. SCHNEEMAN: He -- to clarify the
12 record, you mean -- who is "he"?
13     MR. HEPPELL: Mr. Todero.
14 A. That's correct, I don't have any
15 first-hand knowledge of that, that's correct.
16 Q. Your -- you described the subject was
17 lying on the ground when you arrived?
18 A. Yes.
19 Q. And so we're clear, that subject you're
20 referring to, that's Mr. Todero; is --
21 A. Yes.
22 Q. -- that correct?
23 A. Yes.
24 Q. Do you recall any -- any more detail in
25 terms of his appearance and position when you

---

27

1  arrived beyond that he was lying on the ground?
2  A. Not off the top of my head.
3  Q. Okay.
4  A. I would think -- I know you would think
5  after reviewing the chart as many times as I have
6  recently, I would remember, but I just came off my
7  shift. I don't remember off the top of my head.
8  Q. No, that's --
9  A. I'm sorry.
10 Q. -- that's -- that's fine. And again, if I
11 understand your answer, it sounds like you -- you
12 believe that information to be recorded in your
13 report?
14 A. Yes.
15 Q. And that's --
16 A. Yes.
17 Q. -- that's something we're going to look
18 at.
19 A. Okay.
20 Q. But in terms of -- I guess what I'm
21 interested in most right now is not your ability
22 to remember what's in the report in terms of what
23 you've read recently, but actually casting your
24 mind back to that day, so --
25 A. In that case, I don't -- I don't recall.

---

28

1  Q. Okay. Are there any details, again, at
2  this time casting your mind independently back to
3  that day, about Mr. Todero's appearance, physical
4  appearance, upon your arrival beyond that you
5  remember he was lying on the ground?
6  A. I don't recall.
7  Q. The -- the next thing you describe, sort
8  of going through those broad strokes that you
9  remembered, was Mr. Todero being extremely
10 uncooperative and agitated?
11 A. Yes.
12 Q. What do you remember, again, you know,
13 casting your mind back independently to that day,
14 in terms of the specifics of his behavior?
15 A. Independently, not much that I can recall.
16 Q. Is there anything independently that you
17 can recall in terms of his behavior that sort of
18 leads you --
19 A. I'm trying to -- I'm trying to kind of
20 draw -- I'm trying to put -- those why I'm kind of
21 squinting my eyes, is I'm trying to kind of hone
22 myself in to remember that. Oh, gosh. No, I
23 don't -- I don't remember.
24 Q. Okay. That's no problem. You described
25 the next step is lifting him up onto the

---

29

1  stretcher. Again, do you have any independent
2  memory of how that process went?
3  A. No.
4  Q. Okay. Just a memory that that's something
5  that happened?
6  A. Yes.
7  Q. Okay. And then in terms of the process
8  of, you know, getting him into the back of the
9  ambulance, any memory of that process?
10 A. We were concerned about keeping him on the
11 stretcher because of how he was thrashing around.
12 Q. Do you -- so, you remember being
13 concerned?
14 A. Yes, I remember that we had at least one
15 person on either side of him to make sure he
16 didn't tip the stretcher or fall off.
17 Q. Do you -- again, casting your mind back as
18 you're sitting here today, do you have a memory of
19 his behavior in terms of that thrashing around?
20 A. Can you clarify that question?
21     MS. SCHNEEMAN: Well, he just said he
22 was thrashing around --
23 Q. Well --
24     MS. SCHNEEMAN: -- so he obviously
25 remembers it.

---

8 (Pages 26 to 29)

Ian R. Godfrey
June 14, 2018

### Page 78

1  Q. Is that also another aspect of the
2  conversation that you've just remembered?
3  A. Yes.
4  Q. Okay.
5  A. Yes.
6  Q. Is there any other -- you stated you
7  hadn't watched the video --
8  A. No, I have not.
9  Q. -- is that correct?
10  A. No, I have not.
11  Q. At any point in time?
12  A. No, I have never seen the video.
13  Q. Okay. Is there any other source for your
14  understanding right now about the nature of that
15  conversation beyond your independent memory?
16  A. No.
17  Q. Okay. And it's your independent memory
18  that he said something along the lines of if he
19  had been in the situation that you'd been in, or
20  if Mr. Todero had arrived in the ER, he would have
21  given the same does of Versed or potentially
22  double?
23  A. Right. In our conversation on the phone
24  when I spoke with you a few weeks go, before I
25  even knew about the body camera footage or even

### Page 79

1  received it in the e-mail, and like I said, I have
2  not watched it, I had told you that specific
3  detail, actually.
4  Q. You talked about the spectrum of opinion
5  within the medical community in terms of some
6  doctors feeling very strongly that Tasers can
7  cause issues, some feeling very strongly that they
8  couldn't, and I think you said some fall somewhere
9  in the middle.
10  A. Yes.
11  Q. Do you have any position on that issue?
12  Would you place yourself somewhere on that
13  spectrum?
14  A. Honestly, I have absolutely no opinion
15  whatsoever on it. I don't know enough about
16  Tasers to make an educated and informed opinion
17  about it. I just -- I don't know enough about the
18  way their current works, how much current. I
19  just -- I don't know enough to make that opinion.
20  Q. So, would it be fair to say that you're
21  aware of the debate, but you don't know enough
22  about the facts underlying it to lead you to have
23  an opinion one way or the other?
24  A. That's correct.
25  Q. Okay. Do you have any opinion about

### Page 80

1  whether or not the Taser in this case played any
2  role in Mr. Todero's medical condition?
3  A. I have no opinion. Like I said, I don't
4  know enough about Tasers and the exact way that
5  they work to make even an opinion on the matter.
6  Q. Okay. And I guess maybe to ask it a
7  little more crisply and --
8  A. Okay.
9  Q. -- a better worded question, do you have
10  any opinion one way or the other about whether the
11  Taser played any role in Mr. Todero's death?
12  A. I do not have an opinion, no.
13  Q. Do you recall whether there were other
14  vital signs or measurements taken of Mr. Todero
15  while you were at the emergency room?
16  A. I -- independently, I don't. I don't
17  know. I'm sure there were, but I don't -- I don't
18  remember what they were.
19  Q. As for example, do you have an independent
20  memory of whether there had been a measurement of
21  the level of Mr. Todero's blood acid?
22  A. Yes.
23  Q. What do you remember about that?
24  A. I remember that he was extremely acidotic.
25  Q. Okay. Do you have an -- any opinion on

### Page 81

1  what caused that level of acidity in his blood?
2  A. My best medical opinion would be that it's
3  the condition known as excited delirium.
4  Q. What do you know about excited delirium?
5  A. So, excited delirium basically is an
6  increased metabolic state in the body which causes
7  lactic acidosis, and therefore an increased acid
8  level or lower pH in the body.
9  Q. Do you know what causes excited delirium
10  or what leads to excited delirium?
11  A. There could be any number of -- there can
12  be any number of reasons. It can be a psychiatric
13  issue, it can be a medication interaction, it can
14  be -- it can be a drug reaction, it can just be a
15  physical stressor on the body that can cause it.
16  Q. Is that something that you've researched,
17  excited delirium?
18  A. It's just -- it's something that, in my
19  being a Paramedic, we get a lot -- excuse me -- a
20  lot of training in it. When I was talking before
21  about kind of the phasing out of Versed and the
22  phasing in of ketamine as a sedative, the reason
23  is because of the condition of excited delirium.
24  They find that ketamine has much better results in
25  actually sedating people with excited -- true

21 (Pages 78 to 81)

Ian R. Godfrey
June 14, 2018

**Page 82**

```
 1    excited delirium than Versed does.
 2       Q. Do you have an opinion of whether
 3    Mr. Todero was suffering from excited delirium on
 4    May 29th, 2016?
 5       A. I do believe he was.
 6       Q. What are the -- what are the reasons that
 7    you hold that opinion?
 8       A. So, the reasons I hold that opinion are
 9    his level of agitation and -- his level of
10    agitation that was, you know, beyond any ability
11    to verbally de-escalate him, the -- his general
12    presentation, his high heart rate initially, the
13    amount that he was sweating, just things like
14    that.
15       Q. Just so I'm clear, was general
16    presentation a separate factor, or was that
17    describing his heart rate and the amount that he
18    was sweating?
19       A. Can you -- I'm sorry. I don't understand
20    what you're asking me.
21       Q. Sure. Let me rephrase it.
22       A. Yeah.
23       Q. So, the question that I had asked was for
24    you to name the different -- the reasons why you
25    believed --
```

**Page 83**

```
 1       A. Okay.
 2       Q. -- that he was suffering from excited --
 3       A. Okay.
 4       Q. -- delirium, and in the notes that I took,
 5    you listed his level of agitation, his general
 6    presentation, his high heart rate, and the amount
 7    that he was sweating --
 8       A. Uh-huh.
 9       Q. -- is that correct?
10       A. Yes.
11       Q. Are there any other factors beyond those
12    that you listed that leads you to your opinion
13    that he was suffering from excited delirium?
14       A. Like I said, the lack of the ability to be
15    verbally reasoned with, and even verbally
16    interact, where, you know, we couldn't say
17    something to him, and we couldn't even get a
18    response directed at us. So, that was -- that was
19    part of it.
20       Q. Anything beyond that?
21       A. Not that I can recall, yeah.
22       Q. And in that context, what -- what did you
23    mean by "general presentation"?
24       A. General -- I just meant his level of
25    agita -- I meant all of those --
```

**Page 84**

```
 1       Q. Okay.
 2       A. -- all of those other things that I stated
 3    combined.
 4       Q. Got it.
 5       A. Yeah.
 6       Q. So, that's not like a separate --
 7       A. No, no, no.
 8       Q. Okay. Got it. Thank you. Since the --
 9    well, strike that. At some point, did you learn
10    that Mr. Todero had passed away?
11       A. Yes.
12       Q. How did you learn that Mr. Todero had
13    passed away?
14       A. Oh, gosh, I don't even remember.
15       Q. So, at this point, you don't have an
16    independent memory of how you learned that fact?
17       A. Yeah. I mean I don't -- I don't remember
18    whether it was -- because I know there was talk
19    about it at the firehouse. I know at some point
20    the Battalion Chief contacted me to be in contact
21    with Chief Ison to make an official statement. I
22    don't remember exactly how it all tran -- how it
23    all transpired. I don't.
24       Q. Do you -- if I understood the answer you
25    just gave, there was sort of talk around the fire
```

**Page 85**

```
 1    station around the time that Mr. Todero had died?
 2       A. Yes.
 3       Q. Do you remember who specifically you
 4    communicated with or spoke with at that time on
 5    that topic?
 6       A. No, but generally what happens is if
 7    somebody finds out that a patient we were taking
 8    care of either has had an exceedingly good outcome
 9    or an unfortunately exceedingly bad outcome, you
10    know, they'll -- when -- the next shift that we're
11    working together, they'll just come up and say,
12    "Hey, did you know that so-and-so was either
13    discharged from the hospital," or "so-and-so
14    died?" You know, I don't -- I don't recall who it
15    was, but I know that it was not from any of my own
16    information that I found that out.
17       Q. And you also mentioned a communication
18    with the Battalion Chief; is that correct?
19       A. Yes.
20       Q. Is that the Chief of the Fire Department?
21       A. So, Battalion Chief of the Fire
22    Department. The way that the rank structure works
23    is that there's the Chief of the whole Department,
24    then there are the Deputy Chiefs over the
25    Department, and then there are the Battalion
```

22 (Pages 82 to 85)

Ian R. Godfrey
June 14, 2018

### 110

1  there is a series of times and descriptions listed
2  under the heading, "Treatments." Do you see what
3  I'm -- do you see what I'm referring to?
4     A. Yes.
5     Q. How are these populated or included in the
6  report?
7        MS. SCHNEEMAN: I'm sorry; under what,
8  the "Treatments" section?
9        MR. HEPPELL: Under the "Treatments"
10 heading --
11       MS. SCHNEEMAN: Okay.
12       MR. HEPPELL: -- on the bottom of the
13 page, spilling over onto the top half of the next
14 page.
15       MS. SCHNEEMAN: Okay.
16    A. So, these are recorded as we go along, and
17 then they're manually entered into the report.
18    Q. Okay. How -- how are those recorded as
19 you go along?
20    A. They're written, handwritten.
21    Q. Okay. So, these would be handwritten
22 notes that -- that you or another individual had
23 taken during the course of providing treatment to
24 Mr. Todero?
25    A. That's correct.

### 111

1     Q. Okay. And so, the -- in terms of the
2  individual categorized under "Caregiver," is that
3  the -- does that denote that that's the source of
4  the information for each of those items?
5     A. Yes.
6     Q. Okay. So, for example, the first item at
7  12:02 p.m. lists "Caregiver" as "Law Enforcement,"
8  and it provides some -- essentially, "Psychiatric
9  hold status" and some other information. Is that
10 reflecting that was information given to you by
11 law enforcement upon your arrival at the scene?
12    A. Yes.
13    Q. And then there's a -- the next entry, at
14 the time of 12:02, reflects that Tiffany Howard
15 took a pupil -- I guess a pupil assessment of
16 Mr. Todero; is that what that reflects?
17    A. Yes.
18    Q. And it states, "Patient uncooperative with
19 assessment." Do you see what I'm referring to?
20    A. Yes.
21    Q. Do you have any memory of how Mr. Todero
22 was uncooperative with Tiffany Howard's efforts
23 to, I guess, assess his pupils?
24    A. I don't recall.
25    Q. Okay. Is that a standard practice, to do

### 112

1  a pupil assessment?
2     A. Yes.
3     Q. Does that just involve looking in
4  someone's eyes?
5     A. Yes, taking a light, looking at their eyes
6  to see if they're reactive and equal.
7     Q. Okay. Then it reflects that you made an
8  assessment, a skin assessment, at 12:02 p.m. also;
9  is that correct?
10    A. Yes.
11    Q. And would those have been notes that you
12 took on the scene, or is that something from
13 memory that you might have filled in, or you're
14 not sure either way?
15    A. I'm not sure either way, but honestly,
16 those are probably things from memory. The things
17 that we more keep notes of are our actual vital
18 signs, our medications, I.V. attempts, things like
19 that. That sort of information is just
20 included -- you know, that's as soon as we get to
21 the patient, that's the first thing we do, you
22 know, reach down and check a radial pulse, to see
23 their skin color, condition, temperature and their
24 pulse and all of that stuff.
25       And then, you know, one person may be

### 113

1  assessing their pupils or doing something else.
2  If -- you know, if their airway's compromised or
3  things that like, one person may be doing that
4  while -- these are all kinds of things that happen
5  concurrently, as soon as you get to the patient.
6     Q. Okay. And then do you see a listing on
7  the list of "Treatments" reflecting documentation
8  of the radial pulse assessment that you were
9  describing earlier on the scene?
10    A. No, I do not.
11    Q. Okay. Is it -- are you surprised not to
12 see that on the report?
13    A. Not totally, no.
14    Q. Okay.
15    A. That's not generally something that we
16 document. The skin assessment obviously draws the
17 conclusion that I had some contact with the
18 patient's skin, and that contact is checking the
19 patient's pulse. That's the first thing that you
20 do when you get to the patient. Generally we --
21 you know, we log things when we officially attempt
22 or take a full set of vital signs.
23    Q. The -- the next entry after the skin
24 assessment is an "EKG/ECG Indication."
25    A. Yes.

**Page 114**

1  Q. And is that -- based on the substance of
2  the information contained therein, is that
3  something that would have happened in the back of
4  the ambulance?
5  A. Yes.
6  Q. Okay. So, in terms of the time line of
7  the amount of -- in terms of the time in which you
8  are on the scene on the road versus on the scene
9  in the back of the ambulance, would it be fair to
10 say that at -- by 12:08 p.m., you were in the back
11 of the ambulance with Mr. Todero?
12 A. Yes.
13 Q. Can you help me understand the substance
14 of the information contained in that EKG/ECG
15 Indication?
16 A. Okay. So, the Indication is medication
17 administration, so I was planning to give him
18 Versed. Any time a patient is given, really, any
19 medication, but especially a sedative or something
20 of that effect that can decrease their mental
21 status, we want to keep a close eye on them, and
22 so, the cardiac monitor is an absolute must.
23 Clinical and -- "Type: 4 Lead," so we have a 4
24 Lead or a 12 Lead. A 4 Lead shows the rate and
25 the rhythm, just kind of a quick assessment. A 12

**Page 115**

1  Lead would show if they were having a heart attack
2  or something like that.
3       My interpretation was a sinus tachycardia,
4  which means it's a normal -- normal looking
5  heartbeat, just faster than normal, but not
6  exceedingly fast. I mean if it were exceedingly
7  fast and if it were a narrow or normal heart rate,
8  that's what we would classify as a
9  supraventricular tachycardia, or an SVT. So, it
10 was fast, but not like "Oh, my gosh, we need to
11 treat this right now" fast.
12      The next -- okay. The next thing,
13 "Elevation: False; Depression: False," those are
14 not things that would be able to be seen on a
15 4-Lead, but again, those are prepopulated things
16 on there. What that refers to is if we had done a
17 12-Lead EKG, which takes a comprehensive look at
18 the heart, and we saw what's called ST segment
19 elevation, which would indicate a heart attack or
20 ST segment depression, which would indicate a lack
21 of oxygen to a certain part of the heart.
22      And then "Comments," I noted that he was
23 combative, and I believe that he was an excited
24 delirium patient.
25 Q. Can you just help me understand the

**Page 116**

1  distinction you drew between the ST and the SVT
2  that you were describing?
3  A. Okay. So, SVT refers to a particular
4  rhythm, so without going into -- without teaching
5  a cardiology class, it's -- so, the S -- so -- and
6  this is going to be hard for our recorder to take
7  down. An EKG, if you take all of the waves of an
8  EKG and look at them, it comes in several
9  different sections. There's what's known as the P
10 wave, which is the first bump that you'll see.
11     Then there's the PR interval, which is the
12 interval between where the P wave ends, that first
13 bump ends, and the up-and-down deflection begins
14 that you see on the EKG. That up-and-down
15 deflection is known as the QRS complex.
16     Then after the QRS complex, there's the ST
17 segment, and the ST segment follows what's called
18 the J point, and the J point is where you look for
19 elevations and depressions to determine whether a
20 person's suffering from some sort of cardial event
21 or not. And the next thing that you see is what's
22 called the T wave, and that's the final bump on
23 the EKG.
24     So -- I'm sorry. I didn't finish my
25 explanation; I'm sorry. I kind of got lost in the

**Page 117**

1  question. Okay. So, when I refer to an SVT, a
2  supraventricular tachycardia, that means that it's
3  just very, very, very fast, so those QRS
4  complexes, P waves and T waves are very, very
5  close together on the monitor.
6       When I refer to ST segment, what I'm
7  referring to is that particular wave on the EKG
8  where it meets the -- where it meets what's called
9  the isoelectric lines, so that's basically the
10 base line where everything starts and ends. When
11 it's elevated -- when it's above or below it, that
12 refers to ST elevation and depression. Is that a
13 clear enough explanation, or do you need a further
14 explanation?
15 Q. I guess I -- just in terms of your
16 interpretation of sinus tachycardia --
17 A. Yes.
18 Q. -- how would that have mani -- how did
19 that manifest itself on the EKG?
20 A. So, like I said before, it was faster than
21 my heart rate or your heart rate, so generally
22 what's accepted is 60 to 100 is a normal heart
23 rate, but less than what we would consider an SVT,
24 which is generally above 150 to 180.
25 Q. Okay. Maybe I'll ask it this way: So,

Ian R. Godfrey
June 14, 2018

**118**

1  going up a little bit above the "Treatments"
2  section, there's a "Vital Signs" section.
3     A. Yes.
4     Q. Do you see what I'm referring to? And
5  that includes various columns of information, one
6  of which is "Pulse"; is that correct?
7     A. Yes.
8     Q. And it reflects at 12:08 p.m.,
9  corresponding with this entry of -- that we were
10 looking at earlier, he had a pulse rate of 142.
11    A. Okay.
12    Q. Do you see what I'm referring to?
13    A. Yes.
14    Q. Is that something -- a number that would
15 have been visible to you off the heart rate
16 monitor?
17    A. Yes.
18    Q. And that would -- is that something you
19 would have taken note of?
20    A. Yes.
21    Q. Okay. And that's above the normal -- a
22 normal resting heart rate; correct?
23    A. Yes.
24    Q. Just looking at that number, 142, without
25 even looking at the EKG --

**119**

1     A. Uh-huh.
2     Q. -- is that -- is that enough information
3  to be able to make the interpretation of the sinus
4  tachycardia, or is there something more than just
5  the heart rate?
6     A. No, there's more than just the heart rate.
7     Q. Okay.
8     A. So, that QRS complex that I was -- that
9  up-and-down complex that I was talking about,
10 if -- so, if the P wave, the first bump, is absent
11 and that QRS complex is wide, then it is not a
12 rhythm from the sinus.
13       I don't know if you want me to go into the
14 way cardiac conduction works, but it starts out at
15 the top of the heart, and the SA node, the
16 sinoatrial node, goes down to the atrioventricular
17 node, goes down through the bundle of His into the
18 bundle branches, and then to the Purkinje fibers,
19 so it kind of fires in sequence. And so, if you
20 knock out that SA node, which is the sinoatrial
21 node, then you go down to the atrioventricular
22 node and you get what's called a junctional
23 rhythm, and that's where you're missing the P
24 wave, but you're still a narrow complex.
25       And then if you knock out the AV node, all

**120**

1  you're left with is the bundle branches and the
2  bundle of His -- bundles of His, I should say --
3  and that's when you'll get a ventricular rhythm,
4  which is a very wide rhythm. So, a narrow complex
5  rhythm is less than .12 milliseconds, which is
6  determined by looking at the number of boxes on
7  the EKG paper. The EKG paper is set up where
8  each -- where each increment is in 0.4 millisecond
9  increments.
10       And then -- so, if you look at the EKG
11 rhythm and it's wider than a certain number of --
12 if it's wider than .12 seconds, then you know you
13 have a wide complex rhythm. If it's less than .12
14 seconds, it's a narrow complex rhythm. And so, if
15 it's a narrow complex, you're looking at either a
16 sinus or a junctional. If it has a P wave, then
17 it's a sinus; if there's no P wave, it's a
18 junctional.
19    Q. Got it. And then there's -- all right.
20 Under that "Vital Signs" section, there's a 24
21 under "Resp." Does that stand for respirations?
22    A. Yes.
23    Q. Was that something that you had a
24 quantitative measure of, or would that be like an
25 approximation, just by observing him?

**121**

1     A. That would be -- that would be an
2  approximation by observing.
3     Q. Okay. And at the same time, you --
4  there's also an entry on the "Glascow Coma Scale"
5  recorded.
6     A. Yes.
7     Q. Can you explain what that means?
8     A. So, the Glasgow Coma Scale, although
9  initially not intended for this, it was initially
10 invented in Glasgow to determine long-term
11 outcomes of neurologic head injury patients, is
12 now used in common practice in the medical field
13 to determine a patient's kind of mental status, I
14 guess you would say. So, it consists of three
15 things. It consists of eye opening, verbal
16 response and motor response. So, the highest you
17 can get is 15 and the lowest you can get is three.
18 Three you get just for being there.
19       So, starting with zero in the eye opening
20 cat -- or starting with one, I'm sorry -- in the
21 eye opening category, that's no eye opening
22 whatsoever, they will not open their eyes at all.
23 Going with a two, they open their eyes to painful
24 stimuli, so if you rub on their sternum, pinch
25 their nail bed with a pin, something like that,

**154**

1  hospital?
2  A. That would be from the scene to the
3  hospital.
4  Q. Okay. The scene where you picked up
5  Mr. Todero?
6  A. Yes, Madison and Camby.
7  Q. Okay. And I know under the column on the
8  far left, "Destination decision: Diversion" --
9  A. Yes.
10 Q. -- just because I want to be clear
11 about -- who was it that made the destination
12 decision? Was that you, or was that someone else?
13       MR. HEPPELL: Objection. Asked and
14 answered.
15       You can go ahead.
16 A. Okay. So, we had originally requested
17 Community South as the closest facility. They
18 would not accept us due to their diversion status.
19 The next closest hospital was St. Francis, so that
20 was dictated by our protocol.
21 Q. Okay. Do you have a sense of how much
22 closer in mileage from that scene where you put
23 Mr. Todero in the ambulance that it would have
24 been to St. Francis?
25 A. So, I mean to get to Community South, you

**155**

1  go up Madison, you take a left on County Line, and
2  that would take you to Community South. You -- in
3  order to get to St. Francis, you have to take a
4  right on County Line, go to Emerson, take a left
5  on Emerson, and then arrive at St. Francis. I
6  would say it's probably about two miles further.
7  Q. Two miles further to go to St. Francis?
8  A. Yes, yes.
9  Q. Okay. So, if I understand your testimony,
10 it would have been about what, 1.7 miles to go to
11 St. Francis, and it was --
12 A. Community South.
13 Q. Or -- okay. Yeah. Thank you. 1.7 to go
14 to Community South and 3.7 to go to St. Francis?
15 A. Roughly.
16 Q. Okay.
17 A. If may have been even less to get to
18 Community South. I don't --
19 Q. Okay. But either way, you were able to
20 get from the location of Mr. Todero's -- the
21 location of the scene where you loaded Mr. Todero
22 into the ambulance to St. Francis in five minutes;
23 is that how I'm reading the report?
24 A. That would be correct, yes.
25 Q. Under the "Impression" category on page

**156**

1  four of what's been marked as Godfrey Exhibit 2 --
2  A. Okay.
3  Q. -- I understand that you -- under "Primary
4  Impression," you had to select from some drop-down
5  options; that was something that you could not
6  free text in there?
7  A. That's correct.
8  Q. Okay. If you had been able to free text
9  something in there, would you have written
10 something different?
11 A. I would have put "excited delirium" as my
12 primary impression.
13 Q. Okay. Under "Secondary Impression," if
14 you had had the opportunity to write something
15 else in there, would you have written something
16 else in there?
17 A. I don't know. Like I said, I would have
18 had to -- I'm not back there, so obviously it's
19 hard to armchair quarterback what -- what I put in
20 there, but I don't know circumstances or
21 otherwise, information that I was given, if that's
22 why I put that in there. I don't recall why I put
23 that.
24 Q. Okay. That's fair enough. Did it look to
25 you, based on your observations of Mr. Todero at

**157**

1  the scene, that he might have been on some kind of
2  illegal drugs?
3  A. Yes.
4        MR. HEPPELL: Objection. That calls
5  for speculation.
6        MS. SCHNEEMAN: Okay.
7        MR. HEPPELL: You can answer.
8  Q. Can you explain what about him that you
9  observed that cause you to draw that conclusion?
10 A. Well, in 2016 I had been in Emergency
11 Medical Services for 15 years, I had seen, gosh, I
12 don't know how many tens of thousands of patients.
13 It was a combination of his presentation and his
14 behavior, his heart rate, and other things that --
15 such as his pupil size, his -- his very sweaty
16 skin, that would lead me to believe that that was
17 possible.
18 Q. Under the "Vital Signs" on that same
19 page --
20 A. Yes.
21 Q. -- I see that there's -- there are the
22 letters "NT" under some of the columns.
23 A. Yes.
24 Q. Does that mean "not taken"?
25 A. That's correct.

158

1  Q. Okay. And is there a reason that the
2  blood pressure was not taken?
3  A. So, if --
4      MR. HEPPELL: Objection. Asked and
5  answered.
6      You can go ahead.
7  A. Okay. So, if you actually go into the
8  "Treatments" category, and you go to dah-dah-dah,
9  dah-dah-dah, go to 12:08, "Vital Signs...patient
10 handcuffed and combative, blood pressure attempted
11 without success." Then again it states,
12 "Combative -- handcuffed and combative, blood
13 pressure attempted without success" on the next
14 page as well. So, that was -- that was why.
15 Q. Does that mean you weren't able to get a
16 blood pressure cuff on him because of the way he
17 was moving about and acting?
18     MR. HEPPELL: Object to form.
19     Go ahead.
20 Q. Go ahead.
21 A. Okay. So, that's correct. So, either we
22 were unable to get the cuff physically on him, or
23 when we attempted to obtain the blood pressure, we
24 were unable to due to excessive movement and --
25 excessive movement and things like that.

159

1  Q. Do you have a recollection of whether you
2  weren't able to get a blood pressure reading
3  because you couldn't get the cuff on him, or
4  excessive movement, or perhaps both?
5  A. I don't remember.
6  Q. Okay. Under the "Treatments" section,
7  12:02 --
8  A. Yes.
9  Q. -- the pupil readings --
10 A. Yes.
11 Q. -- that were taken, how would you
12 interpret those pupil readings? Are they normal
13 or something other than normal?
14 A. Normal on an adult is about three to four
15 millimeters, so five millimeters is slightly
16 dilated, which would be consistent with a
17 stimulant use, and the stimulant use would be
18 consistent with his heart rate, his behavior, and
19 his skin condition.
20 Q. Okay. And when you say "stimulant use,"
21 what do you mean by the word "stimulant"?
22 A. Any kind of central nervous stimulant,
23 whether it be an illicit drug, a prescription
24 drug, something, you know, such as Ritalin,
25 Adderall, anything like that, any kind of drug

160

1  which would accelerate the central nervous system.
2  Q. Could that be an illegal drug as well?
3  A. Yeah, I mean it could -- yes, it could
4  be -- it could be anything from cocaine to spice
5  to any number of things.
6  Q. Would the pupil measurement there have
7  played any role in your deciding to choose, under
8  the category "Impressions," the "Secondary
9  Impression...illegal drug"?
10 A. Most likely.
11 Q. At 12:02, under the "Skin Assessment," I
12 see that it reads, "Normal color."
13 A. Yes.
14 Q. What -- what would "normal color" mean to
15 you? Why would you have written that?
16 A. So, in a Caucasian person, normal color
17 would be a pinkish tint to the skin, not
18 excessively pale, not bluish, which we refer to as
19 cyanotic, not ashen or kind of a grayish color.
20 So, in a Caucasian person, it would be a pinkish
21 color of the cheeks. They would have -- they
22 wouldn't be excessively red or flushed. They
23 would be a normal color.
24 Q. Okay. And that -- at 12:02, was that --
25 remind me: Was that assessment made before he got

161

1  in the ambulance?
2  A. Yes.
3  Q. Okay. Now, I see it also says, "Warm
4  temperature."
5  A. Yes.
6  Q. Can you explain to me what that means?
7  A. So, warm temperature is -- unfortunately,
8  you know, skin temperature's kind of a tricky
9  thing, because unless somebody is very, very cold
10 or very, very hot, you know, you're feeling
11 somebody through a pair of gloves, but warm means
12 that they're not excessively cold to the touch and
13 not excessively hot to the touch, so you don't
14 feel that they are febrile or hypothermic.
15 Q. And fibrile [sic], what does that mean?
16 A. Have a fever.
17 Q. Okay. Now, I see that in the report
18 you've also used -- so, for instance, at 12:08 --
19 there's a couple of 12:08 entries --
20 A. Yes.
21 Q. -- you've used the word "combative"
22 several times.
23 A. Yes.
24 Q. And I know you explained to us earlier
25 today that the -- I guess the preferred word in

**162**

1  the industry now is uncooperative?
2  A. Yes.
3  Q. Do you think combative is an -- was an
4  appropriate word choice at the time to describe
5  his behavior?
6  A. At the time, I did.
7  Q. Okay. And can you describe with any more
8  particularity what he was doing that was
9  combative?
10      MR. HEPPELL: Objection. Asked and
11  answered.
12      You can go ahead.
13  A. Again, I mean from -- from what I've said
14  and what I've read out of my report, I mean that's
15  pretty much what I can recall, not any other
16  specifics.
17  Q. Okay. Do you recall him twisting with his
18  torso and shoulders?
19  A. I don't recall. Certainly from reviewing
20  the video, it appeared that that was the case.
21  Q. Okay. Do you -- and I'm asking about
22  anything that you recall, even if your memory's
23  been refreshed by --
24  A. Okay.
25  Q. -- the video.

**163**

1  A. Uh-huh.
2  Q. Do you recall him kicking at any point?
3  A. I don't independently recall. Like I
4  said, in the video someone was holding his legs
5  down. There was a firefighter across his legs,
6  and I marked it in my report, so I -- this was
7  written, you know, within an hour of when we did
8  the call. This is now two years later, so --
9  Q. Right. Well, that brings me to a good
10  point. Under the -- I know I'm skipping around on
11  your report here --
12  A. No, no, you're fine.
13  Q. -- but under the "Narrative" section --
14  A. Yes.
15  Q. -- would you have written any of that at
16  the time if it had not been true?
17  A. Absolutely not.
18  Q. And at the time you wrote this, this was
19  the same day of the incident; is that correct?
20  A. Yes, it was within an hour of -- actually,
21  I closed it almost an hour to the second of when
22  we received our call.
23  Q. Okay. And at that point, you had no idea
24  if a lawsuit would ever be filed; correct?
25  A. Absolutely not.

**164**

1  Q. So, there was no reason for you to tailor
2  this negative -- or to tailor your negative to the
3  benefit of any particular person?
4  A. Absolutely not.
5      MR. HEPPELL: Object to form.
6      MS. POLLACK: Do you mean narrative?
7      THE WITNESS: Oh.
8      MR. HEPPELL: Argumentative. Sorry.
9      MS. POLLACK: Tailor -- tailor his
10  narrative?
11      MS. SCHNEEMAN: Right.
12  Q. There was no -- there was no reason for
13  you to tailor your nega -- your -- I'm sorry -- to
14  tailor your narrative because you, at that time,
15  anticipated a lawsuit would be filed?
16      MR. HEPPELL: Same objection.
17      Go ahead.
18  A. That's correct.
19  Q. Okay. And the words that you chose to
20  describe Mr. Todero's appearance and conduct,
21  those were the words that you thought at the time
22  best described his behavior and appearance;
23  correct?
24  A. That's correct.
25  Q. Since we're talking about the narrative,

**165**

1  up towards the top, it says that Mr. Todero was
2  "screaming expletives."
3  A. Yes.
4  Q. Okay. It -- to you, is the word
5  "expletives" another word or the same as
6  profanities?
7  A. Yes.
8  Q. Okay. Same as curse words?
9  A. Yes.
10  Q. Do you recall any of the particular curse
11  words he was using?
12      MR. HEPPELL: Objection. Asked and
13  answered.
14      Go ahead.
15  A. I don't recall any particulars, no.
16  Q. Did the -- do you recall if he was using
17  curse words both on the street when you arrived,
18  and continued to use them in the ambulance, or was
19  he only using them at particular points in time?
20  A. I don't recall.
21  Q. Okay. Do you recall whether he used
22  expletives in the ambulance?
23  A. Well, in my narrative, it says, "He
24  continued to yell expletives but became less
25  physically combative." So, according to this

Ian R. Godfrey
June 14, 2018

**166**

1  narrative, then yes.
2     Q. Okay. And the narrative says, "He was
3  flailing and kicking." Would you have written
4  that if he had not been doing those things?
5     A. Absolutely not.
6     Q. The narrative explains that "The police
7  received a call for a check [on the welfare of a
8  patient due to] walking in...traffic claiming he
9  was a prophet and the second coming of Christ."
10 Do you see that there?
11    A. Yes.
12    Q. That's information that you received from
13 the police?
14    A. Yes.
15    Q. When you were present at the scene, did
16 you hear Mr. Todero make any claims that he was a
17 prophet or the second coming of Christ?
18    A. I don't recall.
19    Q. Okay. Did you ever hear him say anything
20 about the Bible or make -- recite things that
21 might have sounded like Bible passages?
22    A. I don't recall.
23    Q. A few lines down further, it says, "The
24 patient's skin was pink, arm and diaphoretic and
25 he was uncooperative with a pupillary and lung

**167**

1  sound assessment."
2     A. Yes.
3     Q. Do you have a recollection or do you
4  recall how Mr. Todero was being uncooperative with
5  a pupillary and/or lung sound assessment?
6     A. I don't specifically recall now.
7     Q. Okay. What is involved in a lung sound
8  assessment?
9     A. So, in order to assess lung sounds, we
10 listen in five places on the back, because there
11 are five lobes of the lung, three on the right,
12 two on the left, so we listen to the -- to both
13 uppers, then we listen to the middle right, and
14 then we listen to both lowers. Then we listen in
15 the what's called midaxillary or below the
16 armpits, then we listen -- and then we listen to
17 the front as well.
18    Q. And is it docu -- do you have a
19 recollection or is it documented in your report
20 the results of that lung sound assessment?
21    A. No. Under "Chest," it says, "Symmetric
22 with bilateral chest rise," so that would have
23 strictly been an observational thing. We were not
24 able to listen to his lungs, but we -- that's
25 another way of assessing somebody's respiratory

**168**

1  status, and noting that there is no chance of --
2  that a lung has collapsed, or what's called a
3  pneumothorax, or that they have an injury to their
4  chest is that both sides of their chest are
5  equally moving and that they rise and fall with
6  every breath.
7     Q. Okay. Now, are you able to tell from your
8  report, or does your report refresh your memory,
9  as to whether the lung sound assessment was normal
10 or concerning in any way?
11    A. Well, I was unable to perform it because
12 he was uncooperative with it.
13    Q. Okay.
14    A. But certainly if he was yelling, like I
15 said before, we knew his airway was patent, we
16 knew his respiratory status was intact, and there
17 was no severe concern for a lack of oxygen at that
18 time.
19    Q. You said, "no severe concern." Was there
20 any concern at all about him being able to get
21 oxygen?
22    A. No.
23    Q. Further down in the narrative, and this is
24 kind of just below the middle, I guess, it states,
25 "The cardiac monitor was applied to the patient's

**169**

1  shoulder and flank."
2     A. Uh-huh.
3     Q. "Due to patient's combativeness, multiple
4  attempts at blood pressure and pulse o x failed."
5     A. Uh-huh.
6     Q. The term "pulse o x," what is that?
7     A. So, pulse ox is pulse oximetry. It's the
8  measurement of oxygen in the blood, and the way
9  that it works is that a little plastic finger
10 probe goes on the finger, and it's spring loaded,
11 so just -- it just clips right onto the finger,
12 and it's got an infrared light which shines
13 through the bed -- the nail bed, basically, and it
14 measures the percent of oxygen bound to the red
15 blood cells, and then it gives you a quantitative
16 number on the monitor. But the problem is that
17 somebody who is resisting treatment and who's
18 uncooperative, that probe -- like I said, it's
19 just a little spring-loaded probe. It's very
20 easily flung off and things like that.
21    Q. Was -- did Mr. Todero fling off the pulse
22 oximetry?
23    A. I didn't specifically state that, but I'm
24 guessing that's why we were unable to obtain
25 a reading. It says that multiple attempts failed.

**170**

1    Q. The narrative continues on that the
2  patient was given 5 [milligrams] of midazolam,"
3  and that's the Versed that we were talking about
4  earlier?
5    A. Yes.
6    Q. Okay. And then it goes on to say, "The
7  patient continued to yell expletives..." So, am I
8  correct to understand that after the Versed was
9  administered, Mr. Todero continued to shout
10 profanities inside the ambulance?
11   A. Yes.
12   Q. But you don't remember specifically the
13 curse words he was using?
14   A. That's correct.
15   Q. And the narrative here states, a little
16 further down, "While preparing to pull the patient
17 out of the ambulance, the patient went into
18 [astole and the monitor] -- on the monitor and
19 pulse was lost." Am I correct to understand that
20 Mr. Todero went into cardiac arrest as you were
21 trying to pull him out of the ambulance?
22   A. Right. So, basically when we arrive at
23 the hospital, there are a number of things that we
24 do. We have to secure all of the equipment to the
25 stretcher to make sure that it won't fall off the

**171**

1  stretcher as we're transporting somebody in. You
2  know, in this case we were ventilating Mr. Todero,
3  we were breathing for him, so we have to move the
4  oxygen tubing from the oxygen that's secured in
5  the ambulance to the one that's on the stretcher.
6      There are a number of kind of procedural
7  things that happen when you arrive at the hospital
8  before you actually pull the patient out, and so,
9  this was -- what this says to me is that while
10 kind of the back doors were open, my partner was
11 waiting to pull the patient out, we were getting
12 everything kind of moved over, secured, and that's
13 when it happened.
14   Q. And that's -- and that's -- you mean when
15 the heart rate on the monitor went to zero?
16   A. Yes, when he went into asystole and his
17 heart rate -- and his heart stopped.
18   Q. Okay. And it's my understanding, and
19 correct me if I'm wrong, that once the ambulance
20 was actually on the hospital property, that's when
21 you all noticed the heart rate dropped
22 dramatically and started taking the steps to get
23 the air bag and the -- do what you needed to do,
24 but it wasn't until actually the ambulance doors
25 opened that the heart rate went to zero?

**172**

1    A. That's correct.
2    Q. And I take it when it says, "End Report,"
3  and then there looks like some initials, those are
4  your initials?
5    A. Those are my initials, yes.
6    Q. Did anyone suggest to you what you ought
7  to write in your narrative?
8    A. No.
9    Q. This was all your words?
10   A. Yes.
11   Q. And I guess just to be clear, no one from
12 the Greenwood Police Department attempted to tell
13 you what to write in this narrative?
14   A. No.
15   Q. Turning your attention back to page one of
16 Exhibit 2 --
17   A. Okay.
18   Q. -- I know you had talked a little bit
19 earlier in your deposition today about the
20 "Dispatch Information" and the "Transport Mode."
21   A. Right.
22   Q. And under "Transport Mode," where it says,
23 "No Lights and Siren" --
24   A. Yes.
25   Q. -- if my understanding of your testimony

**173**

1  was correct, that means when you loaded Mr. Todero
2  into the ambulance and set off for St. Francis
3  Hospital, the ambulance was not running with its
4  lights and sirens on; is that correct?
5    A. Yes.
6    Q. Okay. And I think you said also earlier
7  today that it's fairly common not to run lights
8  and sirens to a hospital.
9    A. That's absolutely correct.
10   Q. Okay. What would be -- what would be --
11 well, when would you run lights and sirens? What
12 would have to be -- what facts would have to be
13 present to run lights and sirens?
14   A. An obvious heart attack, an obvious
15 stroke, something like a gunshot wound, a
16 stabbing, if we were performing any kind of
17 cardiac interventions and not seeing improvement.
18 In fact, generally, even people who we find to be
19 critically ill when we get to their side, as long
20 as we can provide immediate stabilizing care, we
21 do not transport them with lights and sirens to
22 the hospital.
23     So, people who are having severe difficulty
24 breathing who need to have a special -- a special
25 mask put on, breathing treatments, I.V. steroids,

202

1     A. That's correct. I couldn't speak --
2 possibly speak to what had happened beforehand.
3     Q. You don't have an opinion one way or the
4 other of whether or not they acted professionally
5 or appropriately prior to your arrival; correct?
6     A. Absolutely not.
7     Q. You were asked some questions along the
8 lines of whether you believed Deputy Chief Ison
9 attempted to influence your testimony in any way.
10 Do you recall those questions?
11     A. Yes.
12     Q. Do you recall the portion of your
13 interview where you were discussing metabolic
14 acidosis, and you listed off a number of different
15 causes that might lead to metabolic acidosis?
16     A. Yes.
17     Q. Okay. And one of the causes that you
18 listed was drug use; is that correct?
19     A. Yes.
20     Q. And you also listed a number of other
21 potential causes, such as poor hygiene, infection
22 or, I think you said, any number of things?
23     A. That's correct, yes.
24     Q. Okay. And then shortly after you gave
25 that answer in the interview, do you recall Deputy

203

1 Chief Ison asking you a question, "So, it was
2 more -- and I'm not trying to speculate, but it
3 was more drug related than chemical related?" Do
4 you recall him asking you that?
5     A. Yes.
6     Q. Did it seem odd to you that after
7 giving -- after just having given Deputy Chief
8 Ison a long list of potential causes, that he was
9 suggesting to you that it was more drug related?
10         MS. SCHNEEMAN: Objection. Form.
11   Go ahead.
12     A. Yes.
13     Q. That did seem odd to you?
14     A. Yes.
15     Q. You were asked some questions about the
16 telephone conversation that we had.
17     A. Yes.
18     Q. And the transcript will reflect what your
19 answer was, but if I recall the answer you gave in
20 relation to the conversation we had around the
21 video of the -- the body cam video of your
22 conversation with Dr. Hartman --
23     A. Yes.
24     Q. -- you'd stated that you had asked me
25 whether you could have a copy, and I think your

204

1 testimony was that you believed that I said
2 something along the lines of that I did not
3 believe that was possible.
4     A. Yes.
5     Q. Okay. Is it possible that I said I wasn't
6 sure if it was possible and I'd have to check, or
7 something along those lines, instead?
8     A. It is possible, yes.
9     Q. And you were asked some questions about
10 whether you had the opinion that I was trying to
11 cause you to be an uncooperative witness and not
12 show up for your deposition. Do you recall
13 that --
14         MS. SCHNEEMAN: Objection. Form.
15 Misstates my question.
16   But go ahead.
17     Q. Do you recall a question along those
18 lines?
19     A. Yes.
20     Q. Okay. And your testimony was that that
21 was not your impression of what I was trying to
22 do; is that correct?
23     A. Correct.
24     Q. And in fact, during the conversation, did
25 I ask about your work schedule and discuss with

205

1 you potential scheduling of the deposition?
2     A. Probably. I don't specifically remember.
3     Q. Okay. You talked about being upset during
4 the conversation.
5     A. Yes.
6     Q. Was one of the reasons that you were upset
7 that you felt that the body camera video that had
8 captured your conversation with Dr. Hartman had
9 invaded what you had considered to be a private
10 conversation?
11     A. Yes.
12     Q. Okay. And you understand that neither the
13 Todero family nor her attorneys had anything to do
14 with causing that conversation to be recorded;
15 correct?
16     A. That's correct, yeah.
17     Q. Okay. Do you -- what's -- do you have a
18 favorable opinion of law enforcement, generally?
19     A. I work side by side with them every day.
20 I work with a lot of great men and women, but
21 there are also some officers that I don't get
22 along with, and I don't believe that they follow
23 prudent behavior, I guess you would say.
24     Q. Do you have an opinion one way or the
25 other about people who sue the police or bring

**206**

1  lawsuits against police departments?
2     A. And I believe we talked about this in my
3  phone conversation with you. You know, there are
4  police officers who act poorly, and, you know, I
5  do believe that in those situations, families are
6  due a reasonable compensation for what has
7  happened.
8        However, there are a lot of tragic things
9  that happen in this world, and the fact that a
10 30-year-old man died as a result of something is
11 certainly tragic, but do I believe that that
12 necessarily means that there needs to be a
13 lawsuit? Absolutely not. And I believe -- I
14 believe that I expressed my opinions on the
15 litigious society that we live in, in my
16 conversation with you, and I think that kind of
17 best represents what I said to you.
18    Q. Okay. Do you have an opinion one way or
19 the other about whether it was appropriate for the
20 Todero family to bring this lawsuit?
21    A. Absolutely not.
22    Q. Okay.
23        MR. HEPPELL: I don't have anything
24 further.
25        MS. SCHNEEMAN: Okay. I do have a

**207**

1  couple of follow-up questions.
2               - - -
3        FURTHER EXAMINATION
4  BY MS. SCHNEEMAN:
5     Q. Mr. Heppell just asked you about whether a
6  question Deputy Ison posed to you seemed odd, and
7  you said yes, it did seem odd?
8     A. Yes.
9     Q. Could you explain what about Deputy Ison's
10 questions seemed odd?
11    A. Well, I think, as Mr. Heppell said, you
12 know, I had listed several causes of acidosis, and
13 included in them was drug use, and it just seemed
14 kind of odd that -- that, you know, he was trying
15 to kind of spotlight that one and pick that out of
16 my -- pick that out of my -- my statement.
17    Q. Did it -- did it change your statement in
18 any regard?
19    A. No.
20    Q. Did you think by asking the question he
21 was trying to get you to change anything about
22 what you were saying?
23    A. I really can't testify as to what his
24 motive is --
25    Q. Okay.

**208**

1     A. -- or was.
2     Q. Let me direct you back to Godfrey
3  Exhibit --
4     A. Yep.
5     Q. -- 2. I think in your testimony earlier
6  today, and correct me if I'm wrong, under that
7  section with Impressions --
8     A. Right.
9     Q. -- you did choose "illegal drugs" from the
10 drop-down --
11    A. Right.
12    Q. -- box; correct?
13    A. Right.
14    Q. And you did -- correct me if I'm wrong,
15 but I thought your testimony earlier today was
16 that Mr. Todero's behavior and the observations
17 you made at him -- of him at the scene did seem
18 consistent with someone who might be on illegal
19 drugs --
20    A. That's correct.
21    Q. -- correct? Okay. So, given that, you
22 think Deputy -- do you think Deputy Chief Ison was
23 trying to steer your testimony in a certain way?
24    A. No, I don't believe that.
25    Q. Okay. Mr. Heppell also asked you a couple

**209**

1  of questions about whether you knew if Charlie
2  Todero's -- I may not be using the right word, but
3  blood toxicology -- whether his blood was tested
4  for drugs, in --
5     A. Correct.
6     Q. -- other words.
7     A. Correct.
8     Q. And I can't remember your answer. You
9  said you didn't know?
10    A. No, I did not know.
11    Q. Okay. Would you agree that the toxicology
12 report would only show the presence of whatever
13 drugs the toxicology report was testing for?
14    A. Yes.
15    Q. So, there could have been drugs in
16 Mr. Todero's system that the toxicology report
17 didn't test for?
18        MR. HEPPELL: Object to foundation.
19 Calls for speculation.
20        Go ahead.
21    A. And that's -- that's correct. So, right
22 now in Indianapolis, we're seeing a huge surge of
23 two drugs. One of them's called KATY and one of
24 them's called Wet, and neither one of them will
25 show up on a toxicology screen. Wet is marijuana

Ian R. Godfrey
June 14, 2018

### 210

1  that's mixed with formaldehyde and smoked, and it
2  causes people to become combative and violent.
3      The other one's KATY, which is synthetic
4  marijuana, also referred to as Spice in some -- in
5  some circles, and that also can cause people to
6  become combative and violent. And that is not
7  routinely -- they're not routinely tested for on a
8  toxicology screen.
9      MS. SCHNEEMAN: I think that's all I
10  have. Thank you.
11      MS. POLLACK: Nothing.
12      - - -
13      FURTHER EXAMINATION
14  BY MR. HEPPELL:
15    Q. Do you believe that Mr. Todero was under
16  the influence of a drug that could not be detected
17  by a toxicology screen on May 29th, 2016?
18    A. It's possible.
19    Q. It's possible, but do you believe that to
20  be the case, or do you have an opinion one way or
21  the other on that?
22    A. I don't have an opinion. Like I said,
23  there are any number of things that could have
24  caused what happened to happen, and so, I don't
25  really have an opinion.

### 211

1      MR. HEPPELL: I have nothing further.
2      MS. SCHNEEMAN: Okay. I do just want
3  to put this on the record.
4      THE WITNESS: Yes, ma'am.
5      MS. SCHNEEMAN: You have the right, if
6  you would like to, to review the transcript. So,
7  what the court reporter's going to do is he's
8  going to put together like a little booklet, and
9  if you've seen it, question, answer, question,
10  answer.
11      THE WITNESS: Yeah.
12      MS. SCHNEEMAN: You have the right to
13  review that for any typographical mistakes,
14  misspellings, that sort of thing. You talked
15  about a lot of medical terms today that I'm
16  guessing our court reporter may not know. He's
17  really good --
18      THE WITNESS: I was going to say, I
19  don't know. I have a feeling he's been doing this
20  a while.
21      MS. SCHNEEMAN: But I don't know that
22  he would -- he might ask you for spellings today,
23  but --
24      THE WITNESS: Okay.
25      MS. SCHNEEMAN: -- would you like to

### 212

1  get a copy of that transcript when it's ready for
2  your review, and you can review it? You have the
3  right to make any corrections, and then you would
4  sign it and approve it. The other option is just
5  to go with whatever the court reporter types up.
6      THE WITNESS: I would like to review
7  it, yes.
8      MS. SCHNEEMAN: Okay. When that --
9  when that is ready, would you like him to e-mail
10  it? He can send you an electronic copy, e-mail it
11  directly to you. Would you like -- how would you
12  like to receive it? I guess he can mail you a
13  paper copy or electronic.
14      THE WITNESS: I would say electronic
15  would probably be easier.
16      MS. SCHNEEMAN: Okay.
17      THE WITNESS: That's fine.
18      MS. SCHNEEMAN: Then the court
19  reporter will need your contact information, and I
20  guess -- do you want that in the transcript, or do
21  you want to give it off the record?
22      MR. HEPPELL: I think it's on
23  Exhibit 3.
24      MS. SCHNEEMAN: Yeah. Okay. Well,
25  why don't you -- why don't you give it to the

### 213

1  court reporter after we're done here, and you guys
2  can make whatever arrangements you need, if --
3      THE WITNESS: Wonderful.
4      MS. SCHNEEMAN: -- that makes sense.
5      THE WITNESS: That's perfect.
6      MS. SCHNEEMAN: Do you have any
7  problem with that?
8      MR. HEPPELL: No --
9      MS. SCHNEEMAN: Okay.
10      MR. HEPPELL: -- not at all.
11    Thank you very much for your time today,
12  Mr. Godfrey.
13      THE WITNESS: Thank you guys very
14  much.
15      MS. SCHNEEMAN: Yeah, thank you.
16
17      - - -
    Thereupon, the proceedings of
    June 14, 2018 were concluded
18      at 2:05 o'clock p.m.
    - - -
19
20
21
22  (Signature of witness subscribed above is
    subject to any notations on errata sheet.)
23
24
25

54 (Pages 210 to 213)

Fillenwarth Reporting Service
317.535.1607