UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| TERESA TODERO as Special Administrator of the ESTATE OF CHARLES TODERO, | ) ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | No. 1:17-cv-01698-JPH-MJD |
| BRIAN BLACKWELL, RENEE ELLIOT, ELIZABETH LAUT, AS-YET UNIDENTIFIED GREENWOOD POLICE OFFICERS, CITY OF GREENWOOD, | ) ) ) ) ) ) ) | |
| Defendants. | ) | |

**ORDER ON DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT**

Teresa Todero alleges that police officers from the City of Greenwood, Indiana used excessive force and otherwise violated her son's constitutional rights while arresting him. Defendants—the City of Greenwood and Officers Renee Elliot, Elizabeth Laut, and Brian Blackwell—have moved for summary judgment on certain claims. As explained in detail below, summary judgment is **GRANTED in part and DENIED in part**.

**I.**
**Facts and Background**

Because Defendants have moved for summary judgment under Federal Rule of Civil Procedure 56(a), the Court views and recites the evidence "in the light most favorable to the non-moving party and draw[s] all reasonable

inferences in that party's favor." *Zerante v. DeLuca*, 555 F.3d 582, 584 (7th Cir. 2009) (citation omitted).  The Court will note some factual disputes.

### A. Charles Todero

Charles Todero was a longtime resident of Greenwood, Indiana.  Dkt. 125-22 at 8–9, 19 (T. Todero Dep. at 6–7, 17).  In May 2016, he lived with his mother and brother in nearby Trafalgar.  Dkt. 125-22 at 8 (T. Todero Dep. at 6).  That month, Mr. Todero's father suddenly died; the funeral was on May 27, 2016.  Dkt. 125-22 at 23, 27–28 (T. Todero Dep. at 21, 25–26).

Late in the morning on May 29, 2016, Mr. Todero stepped onto Madison Avenue in Greenwood, Indiana.  Dkt. 112-1 at 2 (MacNaughton Dep. at 12).  Looking neither left nor right, he crossed the street, turned around, and walked back into traffic.  Dkt. 112-1 at 3 (MacNaughton Dep. at 13–14).  Two drivers nearly hit Mr. Todero; they each called 911.  Dkt. 112–1 at 4–5 (MacNaughton Dep. at 39, 43); dkt. 112-2 at 2–3 (Poynter Dep. at 12, 16).  The dispatcher reported that Mr. Todero was attempting to commit suicide in traffic.  Dkt. 112-5 at 4 (Blackwell Dep. at 29).

### B. Mr. Todero's encounter with Greenwood police officers

Greenwood Police Department Officer Brian Blackwell responded to the scene and found Mr. Todero sitting on the curb.  Dkt. 112-5 at 3–4, 6 (Blackwell Dep. at 18, 29, 38).  Officer Blackwell noticed that Mr. Todero held a Bible on his lap.  Dkt. 112-5 at 6 (Blackwell Dep. at 41).  As Officer Blackwell approached, he asked Mr. Todero what was going on, but got no response.  Dkt. 112-5 at 7 (Blackwell Dep. at 42).  Unsure if Mr. Todero was mentally ill,

intoxicated, or impaired, Officer Blackwell walked to about five feet from Mr. Todero and again asked "what's going on"; Mr. Todero replied by talking about "Jesus Christ the Prophet." Dkt. 112-5 at 7 (Blackwell Dep. at 42–44).

Mr. Todero then stood up and walked onto the road. Dkt. 112-5 at 7–8 (Blackwell Dep. at 44–46). He initially stayed close to the curb as Officer Blackwell kept talking to him. Dkt. 112-5 at 9 (Blackwell Dep. at 50–51). As Mr. Todero kept walking—the parties dispute whether he veered away from the curb—Officer Blackwell pulled out his Taser, put his hand on Mr. Todero's shoulder, and ordered Mr. Todero to stop. Dkt. 112-5 at 9 (Blackwell Dep. at 51–52).

When Mr. Todero took about two more steps, Officer Blackwell warned him that he would be tased, then tased him in the back from two or three feet away. Dkt. 112-5 at 9–10 (Blackwell Dep. at 53–55). Officer Blackwell continued to pull the Taser trigger and, after about the fourth time, placed the Taser on Mr. Todero's calf and deployed it again. Dkt. 112-5 at 11–15 (Blackwell Dep. at 59–75). By that time, Mr. Todero was flat on his face with his hands beneath him. Dkt. 112-5 at 11–15 (Blackwell Dep. at 59–75). Because Mr. Todero's hands were not behind his back, Officer Blackwell kept pulling the Taser trigger. Dkt. 112-5 at 15 (Blackwell Dep. at 74–75).

Officers Elliott and Laut arrived to find Mr. Todero with his hands underneath him, clutching the Bible. Dkt. 112-10 at 5 (Elliott Dep. at 122–23). To gain control of Mr. Todero's arms, Officer Elliott put her knee on his shoulder and tried to use a pressure point behind his ear. Dkt. 113-17 at 9

3

(Elliott Dep. at 160–61); dkt. 125-20 at 32–33 (Walters Dep. at 30–31). Officers Elliott and Laut both tried to pull Mr. Todero's arms behind his back. Dkt. 125-18 at 234–38 (Laut Dep.). Eventually, Officer Elliott took the Bible and, with Officer Laut, gained control of Mr. Todero's hands and handcuffed him. Dkt. 112-10 at 7 (Elliott Dep. at 129, 167); dkt. 112-9 at 9 (Laut Dep. at 263).

In total, Officer Blackwell's Taser logged sixteen discharges in four minutes, dkt. 125-15, though the parties dispute whether it worked properly for each discharge. Dkt. 131 at 16–17; dkt. 112-5 at 15 (Blackwell Dep. at 75); dkt. 112-8 at 2 (Holtzleiter Dep. at 22–25).[1] Officers Elliott and Laut arrived between the sixth and thirteenth discharges. Dkt. 112-5 at 18 (Blackwell Dep. at 86).

When firefighters and paramedics arrived, Mr. Todero was lying on the ground. Dkt. 112-11 at 2, 7 (Godfrey Dep. at 25, 52). They lifted him onto a stretcher and put him in an ambulance, where they administered a sedative and took him to the hospital. Dkt. 112-11 at 2 (Godfrey Dep. at 25). Mr. Todero died in the hospital on June 11, 2016. Dkt. 112-12 at 2, 9 (Hartman Dep. at 16, 102–04).

---

[1] Viewing the facts in the light most favorable to Ms. Todero, each discharge was in a Taser mode aimed at causing the "ultimate goal of the Taser"— neuromuscular incapacitation—rather than mere "pain compliance," which results when the Taser itself but neither probe contacts the target. Dkt. 112-5 at 10, 14 (Blackwell Dep. at 57, 70–71); dkt. 125-55 at 23–29 (Holtzleiter Dep. at 22–28). The Defendants do not argue otherwise at this summary judgment stage. *See* dkt. 111 at 4, 13; dkt. 116 at 5; dkt. 137 at 7.

### C. Officer Blackwell's prior training and Taser use

Officer Blackwell completed a Taser refresher course in 2013 and another Taser training less than two years before his encounter with Mr. Todero, dkt. 113-1 at 4; dkt. 113-16 at 25–26 (Blackwell Dep. at 163–69), and may have been trained with a use-of-force policy that allowed Taser use in cases of "[v]erbal non-compliance," dkt. 125-54 at 84–86 (Ison Dep. at 84–86). Before the encounter with Mr. Todero, Officer Blackwell had filed four use-of-force reports describing prior Taser uses on suspects in varying situations. Dkt. 125-68; dkt. 125-69; dkt. 125-70; dkt. 125-71.

### D. Procedural history

Teresa Todero—Mr. Todero's mother and Special Administrator of his estate—brings this action alleging excessive force, failure to intervene, and conspiracy under 42 U.S.C. section 1983, and several Indiana-law claims. Dkt. 25. Officer Blackwell has moved for summary judgment on Ms. Todero's 42 U.S.C. section 1983 and Indiana-law claims. Dkt. 110. The City of Greenwood and Officers Elliott and Laut have moved for summary judgment on Ms. Todero's 42 U.S.C. section 1983, *Monell* liability, and Indiana-law claims. Dkt. 107. The Court heard oral argument on the summary judgment motions on May 9, 2019. Dkt. 176.

## II.
## Applicable Law

### A. Summary judgment

Summary judgment should be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party must inform the court "of the basis for its motion" and specify evidence demonstrating "the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Once the moving party meets this burden, the nonmoving party must "go beyond the pleadings" and identify "specific facts showing that there is a genuine issue for trial." *Id.* at 324.

In ruling on a motion for summary judgment, the Court views the evidence "in the light most favorable to the non-moving party and draw[s] all reasonable inferences in that party's favor." *Zerante*, 555 F.3d at 584 (citation omitted).

### B. Qualified immunity

"[Q]ualified immunity shields officials from civil liability so long as their conduct 'does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Mullenix v. Luna*, 136 S. Ct. 305, 308 (2015) (quoting *Pearson v. Callahan*, 555 U.S. 223, 232 (2009)). This "clearly established" standard ensures "that officials can 'reasonably . . . anticipate when their conduct may give rise to liability for damages.'" *Reichle v. Howards*, 566 U.S. 658, 664 (2012) (quoting *Anderson v. Creighton,* 483 U.S.

635, 646 (1987)).  Qualified immunity thus "balances two important interests—the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officers from harassment, distraction, and liability when they perform their duties reasonably."  *Pearson,* 555 U.S. at 231.

The "difficult part" of the qualified-immunity test is "identifying the level of generality at which the constitutional right must be clearly established." *Volkman v. Ryker,* 736 F.3d 1084, 1090 (7th Cir. 2013).  A "high level of generality" is not appropriate; instead, the question is "whether the law was clear in relation to the specific facts confronting the public official when he acted."  *Id.*  "Such specificity is especially important in the Fourth Amendment context," because "it is sometimes difficult for an officer to determine how the relevant legal doctrine, here excessive force, will apply to the factual situation the officer confronts."  *Mullenix,* 136 S. Ct. at 308 (quotation and citation omitted).

In excessive force cases, "the result depends very much on the facts of each case," so officers are entitled to qualified immunity unless precedent "*squarely governs*" the case at hand.  *Id.* at 309 (emphasis in original) (quoting *Brosseau v. Haugen,* 543 U.S. 194, 201 (2004)).  While a case directly on point is not required, "existing precedent must have placed the statutory or constitutional question beyond debate."  *Mullenix,* 136 S. Ct. at 308.

"To overcome the defendant's invocation of qualified immunity, [a plaintiff] must show both (1) that the facts make out a constitutional violation, and (2) that the constitutional right was 'clearly established' at the time of the

official's alleged misconduct." *Abbott v. Sangamon Cty., Ill.*, 705 F.3d 706, 713 (7th Cir. 2013).

### III.
### Analysis

The Court addresses the following claims in turn: excessive force against Officer Blackwell; excessive force against Officers Elliott and Laut; failure to intervene against Officers Elliott and Laut; conspiracy against Officers Blackwell, Elliott, and Laut; *Monell* liability against the City of Greenwood; and Indiana-law claims against all Defendants.

#### A. Excessive force against Officer Blackwell

Officer Blackwell argues that he is entitled to qualified immunity on the excessive-force claim because he did not violate clearly established law. Dkt. 111 at 8. He reasons that Mr. Todero was not merely passively resisting him and that no existing precedent clearly established that he should not have used his Taser in the evolving and complex situation he faced. Dkt. 111 at 8–9; dkt. 137 at 2. Ms. Todero responds that Mr. Todero was passively resisting and that clearly established Fourth Amendment law shows that Officer Blackwell's Taser discharges were excessive force. Dkt. 131 at 30–35. Because Officer Blackwell relies on qualified immunity and the parties focus on whether his actions violated clearly established law, the Court exercises its discretion to begin with that prong of the qualified-immunity analysis. *See Pearson*, 555 U.S. at 236.

Whether Officer Blackwell is entitled to qualified immunity is tied to a fact question: Whether Mr. Todero was actively or passively resisting him.

While "the use of a taser against an actively resisting suspect [generally] does not violate clearly established law," officers cannot "use significant force on nonresisting or passively resisting suspects." *Abbott,* 705 F.3d at 727.

Taking the facts in the light most favorable to Ms. Todero as the non-moving party, *Cyrus v. Town of Mukwonago,* 624 F.3d 856, 858 (7th Cir. 2010), Mr. Todero was only passively resisting. Dispatch reported that Mr. Todero was suicidal—not hostile or dangerous. Dkt. 112-5 at 4 (Blackwell Dep. at 29). When Officer Blackwell arrived and began talking to him, Mr. Todero stood up and walked away. Dkt. 112-5 at 7–8 (Blackwell Dep. at 44–46). Officer Blackwell told him to stop, and Mr. Todero continued walking away. Dkt. 112-5 at 7–8 (Blackwell Dep. at 51–52). Mr. Todero was not far from the curb when Officer Blackwell tased him in the back, causing him to fall either to his knees or to the ground. Dkt. 125-16 at 55–58, 141 (Blackwell Dep. at 55–58, 141); dkt. 125-17 at 144 (Elliott Dep. at 144). After he was tased again, Mr. Todero was on the ground with his hands underneath him. Dkt. 112-5 at 11–15 (Blackwell Dep. at 59–75). Not long after, Officers Elliott and Laut arrived and handcuffed Mr. Todero's hands behind his back. Dkt. 112-9 at 9 (Laut Dep. at 263); dkt. 112-10 at 11 (Elliott Dep. at 167).

Under Seventh Circuit precedent, that was passive resistance. *Becker v. Elfreich,* 821 F.3d 920, 927 (7th Cir. 2016) (Hearing and not complying with a command to get on the ground is passive resistance); *Phillips v. Comm. Ins. Corp.,* 678 F.3d 513, 525 (7th Cir. 2012) (Drunkenly refusing commands to exit

a vehicle is passive resistance); *Abbott,* 705 F.3d at 730 (Not moving when ordered to turn over after being tased is passive noncompliance).

Turning to qualified immunity, the question is whether clearly established law gave Officer Blackwell "fair and clear warning" that his specific use of force was unlawful. *Kisela v. Hughes,* 138 S. Ct. 1148, 1153 (2018) ("An officer 'cannot be said to have violated a clearly established right unless the right's contours were sufficiently definite that any reasonable official in the defendant's shoes would have understood he was violating it.'" (quoting *Plumhoff v. Rickard,* 572 U.S. 765, 778–79 (2014)). Here, the law did provide that clear warning, putting Officer Blackwell on notice that repeated Taser use on a person who had committed no crime, posed little or no threat to officer safety, and was passively resisting was unlawful. This unfortunate event occurred in May 2016, years after the Seventh Circuit cases that "squarely govern" these facts were decided: 2010 (*Cyrus*), 2012 (*Phillips*) and 2013 (*Abbott*).

In *Cyrus,* 624 F.3d at 858, Nickolos Cyrus—in a delusional state from mental illness—wandered into a partially built home. A police officer arrived and asked Cyrus to come to his squad car to talk. *Id.* at 859. When Cyrus walked away from the officer toward the house, the officer tased him in the back. *Id.* Cyrus fell after trying to stand, and the officer tased him again. *Id.* Then, when the officer had trouble handcuffing Cyrus, he tased him "several times over the next minute or so." *Id.* at 860. Some evidence showed six Taser deployments, but the Taser's internal readout showed twelve trigger pulls. *Id.*

The Seventh Circuit held that a jury could find that Cyrus's constitutional rights were violated because, while he did not obey the officer's commands, he may have been merely walking away from the officer when he was first tased. *Id.* at 862. The court noted that Cyrus "had, at most, committed a misdemeanor offense" and did not violently resist handcuffing, yet was tased up to twelve times. *Id.* at 862–63. Finally, the court recognized that "[i]f the suspect is mentally ill, the officer's awareness of his mental illness is also a factor in the analysis." *Id.*

*Cyrus*'s facts are remarkably like the facts here in three ways. First, since Officer Blackwell was aware of Mr. Todero's possible mental illness, he was required to take that into account.[2] *See Cyrus,* 624 F.3d at 862. Second, Mr. Todero committed no major offense. And third, Mr. Todero—like Cyrus—was ignoring commands but passively walking away from Officer Blackwell when he was first tased and was nonviolently resisting being handcuffed when he was tased up to sixteen times.

In *Abbott,* 705 F.3d 706, a police dispute escalated when a woman began screaming after a police cruiser (with her arrested son inside) rolled into her car. *Id.* at 710. She started moving toward the cruiser and a police officer

---

[2] Officer Blackwell received the dispatch that Mr. Todero was attempting to commit suicide in traffic; heard Mr. Todero talk about "Jesus Christ the Prophet"; and quickly recognized that Mr. Todero had a mental illness, was intoxicated, or was impaired. Dkt. 112-5 at 4, 7 (Blackwell Dep. at 29, 42–43). Before the first Taser discharge, Officer Blackwell realized that Mr. Todero "wasn't with us mentally" and knew that he was "dealing with someone with a mental problem." Dkt. 112-5 at 7–8 (Blackwell Dep. at 45, 48).

tased her in the abdomen.  *Id.* at 711.  He tased her again after she disobeyed an order to roll over.  *Id.*

The first tase was unchallenged on appeal, but the Seventh Circuit held that a jury could find the second tase unreasonable because, while the woman did not comply with commands, "she did not move and at most exhibited passive noncompliance."  *Id.* at 730.  In deciding that the officer was not entitled to qualified immunity, the Seventh Circuit concluded:

> It was clearly established on [the date of the incident] that it is unlawful to deploy a taser in dart mode against a nonviolent misdemeanant who had just been tased in dart mode and made no movement when, after the first tasing, the officer instructed her to turn over.  Prior to 2007, it was well-established in this circuit that police officers could not use significant force on nonresisting or passively resisting suspects. . . .  [I]t was well-established in 2007 that police officers cannot continue to use force once a suspect is subdued.

*Abbott,* 705 F.3d at 732 (collecting cases) (citations omitted).

*Abbott*'s holding is not an outlier, but is grounded in prior Seventh Circuit precedent and is consistent with many other circuits that have "found the use of a taser against nonviolent, nonresisting misdemeanants to violate clearly established law."  *Id.* at 733 (collecting cases).

The facts here, viewed in Ms. Todero's favor, are much the same—Officer Blackwell continued to tase Mr. Todero after he disobeyed an order to put his hands behind his back.

The third case—though it does not involve Tasers—is *Phillips v. Community Insurance.*  678 F.3d 513, 524–25 (7th Cir. 2012) (recognizing that

the weapon need not be identical for a case to clearly establish a constitutional violation). In *Phillips*, the Seventh Circuit held that police violated the Fourth Amendment by using an SL6 baton launcher—a "shoulder-fired semi-automatic firearm that fires polyurethane bullets"—on someone who heard and chose not to obey police commands to exit a vehicle but was not actively resisting arrest. *Id.* at 524–25.

*Phillips* teaches that "[e]ven when officers' goals are eminently reasonable, there are definite limits to the force officers may use to prod arrestees into obeying commands." *Id.* at 527. Accordingly, "[p]ermitting substantial escalation of force in response to passive non-compliance would be incompatible with [the Seventh Circuit's] excessive force doctrine." *Id.* Here, Officer Blackwell substantially escalated the force applied as Mr. Todero passively failed to comply. *See Cyrus*, 624 F.3d at 863 ("Force also becomes increasingly severe the more often it is used . . . ."). He did so even though the "need to mitigate force when apprehending a non-resisting suspect, particularly when the suspect is known to have diminished capacity," is "commonsense." *Phillips*, 678 F.3d at 526. Under *Phillips*, then, Officer Blackwell is not entitled to qualified immunity. *Id.* at 527–30.

Officer Blackwell tries to distinguish these cases. He argues that *Cyrus* "is an open-ended decision" with disputed facts, so it cannot show him that he was violating a clearly established right. Dkt. 137 at 4. Yet the Seventh Circuit has cited *Cyrus* and *Abbott* as setting clearly established law. *See Felton v. City of Chicago*, 827 F.3d 632, 636 (7th Cir. 2016). Even without that,

*Cyrus*'s conclusion that a reasonable jury could find excessive force does not make its holding "open-ended" or unclear. *See Cyrus*, 624 F.3d at 863. *Cyrus*'s jury-centric language is only a reflection of the summary judgment standard that "when material facts are in dispute, then the case must go to a jury." *Id.* at 662 (quotation and citation omitted). As explained above, *Cyrus* recounts the facts and reasonable inferences in the light most favorable to the non-moving party and explains why, if found by a jury, they show excessive force. *Id.* at 862–63. As *Felton* recognized, that is clearly established law.

Officer Blackwell next tries to distinguish *Phillips*, arguing that the SL6— unlike a Taser—is an impact weapon. Dkt. 137 at 5–6. *Phillips* itself, though, recognized the similarities between the SL6 and Tasers, looking to *Cyrus* as a key guide to its excessive-force analysis. 678 F.3d at 525–26, 529. And the Seventh Circuit has completed the circle by applying *Phillips* in a Taser qualified-immunity analysis. *Abbott*, 705 F.3d at 733 (citing *Phillips*, 678 F.3d at 528–29).

*Phillips* also forecloses Officer Blackwell's argument that Mr. Todero was walking into traffic and was thus a danger to himself, to Officer Blackwell, and to motorists, dkt. 111 at 11. Even setting aside the factual dispute on where Mr. Todero was headed, he was not more than two feet off the curb, so the danger to and from motorists was low. Dkt. 125-16 at 55–58, 141 (Blackwell Dep. at 55–58, 141); dkt. 125-17 at 144 (Elliott Dep. at 144). That's especially true since Officer Blackwell's police car was blocking the lane with its lights on. Dkt. 125-12. The Seventh Circuit has "never suggested that any level of force

is permissible to extinguish" a minor threat from cars. *Phillips*, 678 F.3d at 525. Nor is "the desire to resolve a potentially dangerous situation . . . the type of government interest that, standing alone, justifies the use of force that may cause serious injury." *Id.* Moreover, because Officer Blackwell was behind Mr. Todero, the highest danger was to Mr. Todero himself. Danger to only a suspect cannot justify force in the same way that danger to others can. *See Williams v. Ind. State Police Dept.*, 797 F.3d 468, 485 (7th Cir. 2015) (denying qualified immunity because a suspect posed a potential threat only to himself).

Mr. Todero's passive resistance not only makes *Cyrus*, *Abbott*, and *Phillips* controlling here, it also distinguishes the cases that Officer Blackwell relies on. Officer Blackwell cites a different part of *Abbott*, in which the Seventh Circuit granted qualified immunity to a Taser-using officer when the suspect "admitted to struggling and even 'overpowering' the deputy." Dkt. 111 at 11 (citing *Abbott*, 705 F.3d at 727). He also cites *Forrest v. Prine*, in which the Seventh Circuit found Taser use reasonable when a jail detainee "struck a police officer in the face during his arrest" and "was yelling obscenities with clenched fists," dkt. 111 at 11 (citing *Forrest v. Prine*, 620 F.3d 739 (7th Cir. 2010)), and *Sheffy v. City of Covington*, in which the Sixth Circuit found eight Taser deployments reasonable after a large and seemingly disturbed man with a gun moved toward an officer, dkt. 111 at 14–15 (citing *Sheffy v. City of Covington*, 564 Fed. App'x. 783 (6th Cir. 2014)). Those cases do not help Officer Blackwell because in each of them the suspect was actively resisting

and clearly presented a danger to the officer—a situation that allows more force and thus calls for a different analysis. *See generally Abbott*, 705 F.3d 726.

Finally, Officer Blackwell argues that his sixteen Taser trigger pulls were not clearly unreasonable because he believed that the Taser was ineffective. Dkt. 111 at 13–14, dkt. 137 at 7–8. The parties dispute the relevant facts and whether Officer Blackwell's belief was reasonable. For summary judgment purposes, though, the facts support sixteen Taser deployments because the Taser's internal log recorded sixteen trigger pulls. Dkt. 125-15. "[T]he Taser's internal computer record creates enough of a factual discrepancy on the degree of force used to preclude summary judgment." *Cyrus*, 624 F.3d at 862.

Under *Cyrus*, *Abbott*, and *Phillips*, Officer Blackwell's Taser use was excessive under clearly established law. *See Felton*, 827 F.3d at 636 (recognizing that under *Abbott* and *Cyrus*, shooting a passively resisting suspect "with stun guns could violate clearly established law"). The Court has considered and applied the Supreme Court's mantra that qualified immunity "attaches when an official's conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *City of Escondido v. Emmons*, 139 S. Ct. 500, 503 (2019) (collecting recent Supreme Court opinions). The Court is not second guessing with the benefit of hindsight an officer's judgment in a situation "evolv[ing] so rapidly that a reasonable officer would not have had time to recalibrate the reasonable quantum of force." *Abbott*, 705 F.3d at 733. No reasonable officer could have understood Mr. Todero to have been actively resisting; the situation was not

rapidly evolving or complex; and the existing precedent gave Officer Blackwell clear warning.   Officer Blackwell is thus unprotected by qualified immunity, so summary judgment on the excessive force claim against him is denied.

**B. Excessive force against Officers Elliott and Laut**

Officers Elliott and Laut argue that they (1) did not violate the Fourth Amendment's excessive-force prohibition when they handcuffed Mr. Todero and (2) are regardless entitled to qualified immunity because they violated no clearly established right.   Dkt. 116 at 19, 25.  Ms. Todero responds that Officers Elliott and Laut used substantial force to handcuff Mr. Todero and dropped his head on the curb in violation of clearly established law.   Dkt. 131 at 35.  Here again, the Court exercises its discretion to begin with the "clearly established law" prong of the qualified-immunity analysis.  *See Pearson*, 555 U.S. at 236.

Ms. Todero argues that Officers Elliott and Laut violated clearly established Fourth Amendment law under three cases.  In *McAllister v. Price, 615 F.3d 877 (7th Cir. 2010)*, the officer "ignored obvious signs" of incapacitation and used extreme force merely out of anger, so the Seventh Circuit denied qualified immunity.  *Id.* at 884–85.  In *Alicea v. Thomas, 815 F.3d 283 (7th Cir. 2016)*, an officer kicked, stomped on, and punched an already-subdued suspect.  *Id.* at 290.  There too the officer's actions were a "substantial escalation of force" in the face of the suspect's "clear" need for medical attention, resulting in a denial of qualified immunity.  *Id.* at 291.  Finally, in *Miller v. Gonzalez, 761 F.3d 822 (7th Cir. 2014)*, the Seventh Circuit

denied summary judgment to an officer who used his knee to break a suspect's jaw after the suspect was "subdued at gunpoint, lying motionless and spread-eagled on the ground." *Id.* at 829.

This case is different. When Officers Elliott and Laut arrived, Mr. Todero was lying in the street, not complying with repeated orders to put his hands behind his back. He was not obviously incapacitated or subdued, because it took these officers' full body weight and some time to gain control of Mr. Todero's hands. Dkt. 125-18 at 234–35 (Laut Dep. at 234–25). Ms. Todero's cited cases therefore do not clearly establish a Fourth Amendment violation here.

This case is more like *Smith v. Ball State University.* 295 F.3d 763 (7th Cir. 2002). There, an officer arrived at a scene where two officers were forcibly removing an unresponsive suspect from a car. *Id.* at 766. Believing that the three were in a struggle, the officer attempted to knee strike the suspect but slipped, tackling the other officers and the suspect instead. The three officers then handcuffed the suspect. *Id.* at 766–67. The Seventh Circuit found no excessive force because the officer arrived to "a fluid situation," reasonably believed that there was an ongoing struggle, and "could reasonably misconstrue [the suspect's] unresponsiveness as resistance requiring the minimal use of force." *Id.* at 770-71.

Similarly here, when Officers Elliott and Laut arrived, they knew only that Officer Blackwell had used his Taser—they did not know why he had done so, or whether any prior use was unjustified. Also, like in *Smith,* Officers

18

Elliott and Laut could "reasonably misconstrue" any incapacitation as resistance allowing immediate action and the use of enough force to get Mr. Todero's hands out from under his body. *Id.* at 770–71. Fourth Amendment reasonableness accounts for the fact that officers "are often forced to make split-second judgments" in tense and uncertain situations "about the amount of force that is necessary in a particular situation." *Graham v. Connor*, 490 U.S. 386, 396–97 (1989).

As for the allegation that Officers Elliott and Laut "dropped [Mr. Todero's] head on the curb after he was handcuffed," dkt. 131 at 35, the evidence shows only Mr. Todero falling backwards from his seat on the street, dkt. 125-1 at 0:45–1:15. Ms. Todero does not argue that Officers Elliott and Laut violated clearly established law in any way related to this fall. *See* dkt. 131 at 35–37. The closest case, *Holmes v. Village of Hoffman Estate*, is inapposite because there the officer slammed the suspect's head against the roof of a car. 511 F.3d 673, 686 (7th Cir. 2007).

For these reasons, Officers Elliott and Laut are entitled to qualified immunity—and thus to summary judgment—on the excessive force claim.

### C. Failure to intervene

Officers Elliott and Laut argue they are entitled to summary judgment on the failure-to-intervene claim because—as active participants in a struggle—they had no opportunity to intervene. Dkt. 116 at 23. Ms. Todero responds that they had the opportunity to intervene because they could have at least cautioned Officer Blackwell to stop using his Taser. Dkt. 131 at 40. As the

parties recognize, officers can be liable if they "had reason to know . . . that excessive force was being used" and "had a realistic opportunity to intervene to prevent the harm from occurring." Dkt. 131 at 39–40 (quoting *Yang v. Hardin,* *37 F.3d 282, 285 (7th Cir. 1994)*). The Seventh Circuit "has made clear that the prongs of this analysis almost always implicate questions of fact for the jury." *Abdullahi v. City of Madison,* 423 F.3d 763, 774 (7th Cir. 2005). The disputed facts here make this case no different.

Taking those facts in Ms. Todero's favor, Officers Elliott and Laut may have been present for and aware of as many as ten Taser discharges. *See* *Abdullahi,* 423 F.3d at 774 (finding enough evidence of awareness to preclude summary judgment when defendants were "mere feet away" from the conduct in question). A reasonable jury could find that Officers Elliott and Laut heard the noise that the Taser emits with each discharge and Officer Blackwell's announcements that he was going to deploy the Taser again. *Id.*; *see* dkt. 125-16 at 57, 102 (Blackwell Dep. at 55, 100).

A reasonable jury could also find that Officers Elliott and Laut were aware that those Taser deployments were excessive force. While Mr. Todero kept tensing up, a jury could find that to be an involuntary reaction to Taser shocks instead of resistance that required more shocks. *See* *Cyrus,* 624 F.3d at 863. Regardless, ten Taser discharges would have been excessive given Mr. Todero's mild resistance. *Id.* ("Force is reasonable only when exercised in proportion to the threat posed. . . . Force also becomes increasingly severe the

more often it is used; striking a resisting suspect once is not the same as striking him ten times.").

On the realistic opportunity to intervene, Officers Elliott and Laut argue that because they were active participants in a struggle—instead of bystanders—they cannot be liable. But summary judgment is appropriate only if "a reasonable jury *could not possibly conclude*" that Officers Elliott and Laut "could have . . . cautioned [Officer Blackwell] to stop." *Abdullahi*, 423 F.3d at 774. The evidence shows that Officers Elliott and Laut were communicating with Officer Blackwell; Officer Elliott even told him that one Taser discharge was shocking her too. Dkt. 113-9 at 9 (Elliott Dep. at 158–60). Officers Elliott and Laut were struggling to handcuff Mr. Todero, dkt. 116 at 23, but that does not prevent intervening any more than in *Abdullahi*, where two defendants could have intervened even as they fought to restrain a suspect's legs, 423 F.3d at 765–66, 774. A reasonable jury could therefore conclude that Officers Elliott and Laut had a realistic opportunity to intervene, *see id.*, or it could conclude the opposite. Either way though, a jury—not the Court—must weigh witness credibility and disputed issues of fact.

Officers Elliott and Laut are also not entitled to qualified immunity on this claim because, under clearly established case law, they should have intervened if it was apparent to them that Officer Blackwell was applying potentially deadly pressure to Mr. Todero. *Id.* at 774–75. How apparent that was to them is a disputed fact, so "[a] jury should decide." *Id.* at 775. Indeed, this case is indistinguishable from *Abdullahi*, in which two defendants did not

intervene even as they fought to restrain a suspect's legs and had their backs to the officer who was applying excessive force. *Id.* The Seventh Circuit denied qualified immunity even though "it may have been difficult to tell" how much force the other officer was applying. *Id.* Qualified immunity did not apply there, so it does not here either.

Officers Elliott and Laut are thus denied summary judgment on the failure-to-intervene claim.

### D. Conspiracy

Officers Elliott and Laut argue that Ms. Todero has shown no evidence of "an understanding to deprive" constitutional rights as required for a conspiracy claim under section 1983. Dkt. 116 at 24–25; *Williams v. Seniff*, 342 F.3d 774, 785 (7th Cir. 2003). Ms. Todero argues that an agreement can form in a short period of time and that a jury could find an implicit agreement from Officers Elliott, Laut, and Blackwell's actions.

Evidence of an agreement may be circumstantial, but it must be more than speculative. *Williams*, 342 F.3d at 785. Here, the only evidence of a conspiracy is concurrent action: Officers Elliott and Laut worked to restrain Mr. Todero while Officer Blackwell tased him. *See* dkt. 131 at 41. That is less than a "glance of mutual understanding," which the Seventh Circuit has held to be merely speculative and "far short of supporting an inference of a conspiracy." *Akbar v. Calumet City*, 632 Fed. App'x. 868, 872 (7th Cir. 2015).

Summary judgment for Officers Blackwell, Elliott, and Laut is thus warranted on Ms. Todero's conspiracy claim.

### E. *Monell* liability against the City of Greenwood

A municipality cannot be held vicariously liable under section 1983 for the actions of its agent or employee. *Los Angeles Cty. v. Humphries*, 562 U.S. 29, 35–36 (2010) (explaining *Monell v. Dept. of Soc. Servs.*, 436 U.S. 658 (1978)). Rather, a municipality can be liable only for its own actions and corresponding harm. *Id.* "The critical question under Monell remains this: is the action about which the plaintiff is complaining one of the institution itself, or is it merely one untaken by a subordinate actor?" *Glisson v. Ind. Dept. of Corrections*, 849 F.3d 372, 381 (7th Cir. 2017) (*en banc*). An action is one of the "institution itself," *id.*, when the municipality's "official policy, widespread custom, or action by an official with policy-making authority was the 'moving force' behind [the] constitutional injury," *Dixon v. Cty. of Cook*, 819 F.3d 343, 348 (7th Cir. 2016) (citing *Monell*, 436 U.S. 658; *City of Canton v. Harris*, 489 U.S. 378, 379 (1989)); *see Humphries*, 562 U.S. at 36 (reciting the "list of types of municipal action" that can lead to liability).

The "stringent" and precise grounds for *Monell* liability are required by section 1983. *Bd. of Cty. Comm'rs v. Brown*, 520 U.S. 397, 402–404, 415 (1997); *see Humphries*, 562 U.S. at 36. Courts must apply "rigorous standards of culpability and causation" to prevent municipal liability from collapsing into *respondeat superior* liability, which section 1983 prohibits. *Brown*, 520 U.S. at 405; 415.

The City of Greenwood argues that municipal liability cannot apply because any deprivation of Mr. Todero's constitutional rights was not from its

(1) express policies, (2) implicit policies or custom, or (3) failure to train its officers. Dkt. 116 at 30. Ms. Todero responds that enough evidence allows a reasonable jury to find the city liable under each of these theories. Dkt. 131 at 51.

The City of Greenwood cannot be liable under the first express-policy theory that its use-of-force policy allowed Taser use in cases of "[v]erbal non-compliance." Dkt. 125-54 at 84–86 (Ison Dep. at 84–86). That permission is not enough to say that the policy "causes a constitutional deprivation," *Calhoun v. Ramsey*, 408 F.3d 375, 380 (7th Cir. 2005), because it does not require officers to tase passively resisting suspects, *Roddy v. Canine Officer*, 293 F.Supp.2d 906, 915 (S.D. Ind. 2003). So even though the city "consciously chose" its policy, that policy is "not one that gave rise to a [constitutional] violation." *Glisson*, 849 F.3d at 380.

As the Supreme Court has explained:

> The "policy" of the New York City Department of Social Services that was challenged in *Monell* was a policy that by its terms compelled pregnant employees to take mandatory leaves of absence before such leaves were required for medical reasons; this policy *in and of itself* violated the constitutional rights of pregnant employees . . . . Obviously, it requires only one application of a policy such as this to satisfy fully *Monell*'s requirement that a municipal corporation be held liable only for constitutional violations resulting from the municipality's official policy.

*City of Okla. City v. Tuttle*, 471 U.S. 808, 822–23 (1985) (emphasis added). But showing that a "more nebulous" policy—one that is "a good deal further removed

from the constitutional violation"—caused a constitutional violation is "not susceptible to such easy proof." *Id.* Here, the designated evidence shows only a policy that "might lead to 'police misconduct'"; such a policy "is hardly enough to satisfy *Monell*'s requirement that the particular policy be the 'moving force' behind a *constitutional* violation." *Id.* at 824 n.8.

The second express-policy theory is based on an absence of or gap in express policies. *See Glisson*, 849 F.3d at 381 (quoting *Thomas v. Cook Cnty. Sheriff's Dept.*, 604 F.3d 293, 303 (7th Cir. 2010)).[3] Certainly "in situations that call for procedures, rules, or regulations, the failure to make policy itself may be actionable." But "[t]he key is whether there is a conscious decision not to take action." *Id.* Here, no designated evidence reveals a "memo or decision showing that the choice not to act is deliberate." No designated evidence reveals (as explained below) "numerous examples of the constitutional violation in question." *Id.* And no designated evidence reveals (again, as explained below) an "absence of protocols," because the city had a Taser-use policy and provided some Taser training. Dkt. 113-16 at 25–26 (Blackwell Dep. at 163–69); dkt. 125-85. The evidence would not allow a reasonable jury to find that the action was "one of the institution itself," rather than "merely one undertaken by a subordinate actor." *Glisson*, 849 F.3d at 381.

---

[3] The difference between an absence of policy and a gap in policy may be important. *Glisson* appears to teach that an absence of policy can allow municipal liability without past examples of the constitutional violation, while *Thomas* says that a mere gap in an existing policy requires evidence of "a widespread practice" of the alleged constitutional harm. *Glisson*, 849 F.3d at 381; *Thomas*, 604 F.3d at 303. Here, though, such a parsing is unnecessary as the evidence does not show a deliberate choice not to act.

The next theory—implicit policy or custom—requires evidence showing more than a "random event." *Thomas,* 604 F.3d at 303. The key question is whether the City of Greenwood made "a conscious decision not to take action" in the face of constitutional violations. *Glisson,* 849 F.3d at 381. Ms. Todero argues that's the case here because the city did nothing in response to Officer Blackwell's prior use-of-force incidents, which included improper Taser use. Dkt. 131 at 53.

Ms. Todero, however, points to evidence about the nature of only four incidents, and in two of the four the suspects were more than passively resisting. Dkt. 125-80 at 4 (taser use during a continuing "physical confrontation"); dkt. 125-82 at 4 (taser use after a verbally hostile suspect threw a full bottle of Gatorade toward two officers). Even if the remaining two prior incidents show evidence of the "same problem" of Taser use on passively resisting suspects, *Calhoun,* 408 F.3d at 380, the evidence does not show more than three prior similar incidents as required for *Monell* liability. *See Thomas,* 604 F.3d at 303 (recognizing that "even three" incidents cannot support *Monell* liability); *id.*

The final theory is a failure to train, which carries "a stringent standard of fault" that requires a "pattern of similar constitutional violations" except when "the unconstitutional consequences of failing to train" are "patently obvious." *Connick v. Thompson,* 563 U.S. 51, 62–64 (2011). But as already shown, the evidence does not support a pattern of similar violations.

Nor is this the "rare" case when a single situation allows liability because it was "patently obvious" that the training would cause constitutional violations. *Id.* That situation exists, for example, when a city arms novice police officers with firearms and provides no training on the constitutional limits of deadly force. *Id.* at 64 (citing *Harris,* 489 U.S. at 390 n.10). Here though, the City of Greenwood did provide some Taser training. Dkt. 113-16 at 25–26 (Blackwell Dep. at 163–69). Ms. Todero essentially argues that the city should have provided "special training," "more training," or "better training," but that argument "would ignore the training the officers did receive." *Palmquist v. Selvik,* 111 F.3d 1332, 1345 (7th Cir. 1997) (applying *Harris,* 489 U.S. at 391); *see Lapre v. City of Chicago,* 911 F.3d 424, 437 (7th Cir. 2018). In short, liability from a single incident requires training that leaves an "utter lack of an ability to cope with constitutional standards"; Ms. Todero relies instead on the "sort of nuance [that] simply cannot support an inference of deliberate indifference." *Connick,* 563 U.S. at 67.

Under the stringent and precise limitations on *Monell* liability established by the Supreme Court and Seventh Circuit, district courts cannot declare a factual record "close enough" to subject a municipality to potential liability. *See Brown,* 520 U.S. at 415. Rather, section 1983 demands rigorous standards of culpability and causation. *Id.* Applying those standards here, the actions that form the basis of Ms. Todero's claims were undertaken only by the individual officers—not by the City of Greenwood itself. The City of Greenwood is thus entitled to summary judgment on Ms. Todero's *Monell* liability claims.

**F. Indiana-law claims**

The parties agree that Ms. Todero cannot maintain her Indiana-law claims against Officers Blackwell, Elliott, and Laut personally because they were acting within the scope of their employment. *See* Dkt. 131 at 49–50. The City of Greenwood then asks for summary judgment on Ms. Todero's survival, assault and battery, and intentional infliction of emotional distress claims.

On the survival claim, the city argues that plaintiffs may not pursue survival and wrongful death claims simultaneously. The Indiana Supreme Court, however, has held that they can be pursued together "to verdict." *Cahoon v. Cummings*, 734 N.E.2d 535, 542–43 (Ind. 2000). The city's argument on the assault and battery claim hinges on winning its survival claim argument, dkt. 116 at 34, so the City of Greenwood is entitled to summary judgment on neither of them.

On the intentional infliction of emotional distress claim, the city argues that it is immune under Indiana Code section 34-13-3-3(8), which provides some immunity for law-enforcement activities. Ms. Todero responds that the tort arises out of excessive force, so immunity does not bar her claim.

Immunity under section 34-13-3-3(8) does not apply to conduct that constitutes excessive force. *See Wilson v. Isaacs*, 929 N.E.2d 200, 203 (Ind. 2010) (citing *Kemezy v. Peters*, 622 N.E.2d 1296, 1297 (Ind. 1993)). For example, "[i]f an officer uses unnecessary or excessive force, the officer may commit the torts of assault and battery," and immunity will not apply to the resulting assault-and-battery claim. *Id.* at 203–04. Similarly here, Ms. Todero

28

alleges that in using excessive force, Officers Blackwell, Elliott, and Laut intentionally inflicted emotional distress, so section 34-13-3-3(8) immunity does not apply. *See Bowens v. City of Indianapolis*, No. 1:13-cv-00072-DML-SEB, 2014 WL 4680662 at *6–7 (S.D. Ind. Sept. 19, 2014) (explaining that section 34-13-3-3(8) immunity is conduct—not claim—based so it does not bar intentional infliction of emotion distress claims with excessive-force foundations).

The Court therefore grants summary judgment on Ms. Todero's Indiana-law claims to Officers Blackwell, Elliott, and Laut based on the parties' agreement, but denies summary judgment on the Indiana-law claims to the City of Greenwood.

## IV.
## Conclusion

The City of Greenwood's and Officers Elliot and Laut's motion for summary judgment, dkt. [107], is **GRANTED in part** and **DENIED in part**. Officers Elliot and Laut are **GRANTED** summary judgment on Ms. Todero's excessive force, conspiracy, and Indiana-law claims and **DENIED** summary judgment on Ms. Todero's failure-to-intervene claim. The City of Greenwood is **GRANTED** summary judgment on Ms. Todero's *Monell* liability claims and **DENIED** summary judgment on Ms. Todero's Indiana-law claims.

Officer Blackwell's motion for summary judgment, dkt. [110], is **GRANTED** on Ms. Todero's Indiana-law claims and **DENIED** on Ms. Todero's excessive-force claim.

Magistrate Judge Dinsmore is asked to conduct a second settlement conference. If no settlement is reached, the Court will hold a status conference to schedule final pretrial and trial settings.

**SO ORDERED.**

Date: 5/28/2019

_James Patrick Hanlon_
James Patrick Hanlon
United States District Judge
Southern District of Indiana

Distribution:

Steven E. Art
LOEVY & LOEVY
steve@loevy.com

Scott R. Drury
LOEVY & LOEVY
drury@loevy.com

D. Samuel Heppell
LOEVY & LOEVY
sam@loevy.com

Mark A. Holloway
STEPHENSON MOROW & SEMLER
mholloway@stephlaw.com

Theresa Kleinhaus
LOEVY & LOEVY
tess@loevy.com

Arthur Loevy
LOEVY & LOEVY
arthur@loevy.com

Jonathan I. Loevy
LOEVY & LOEVY
jon@loevy.com

Caren L. Pollack
POLLACK LAW FIRM, P.C.
cpollack@pollacklawpc.com

Pamela G. Schneeman
STEPHENSON MOROW & SEMLER
pschneeman@stephlaw.com

James S. Stephenson
STEPHENSON MOROW & SEMLER
jstephenson@stephlaw.com

Zachary J. Stock
POLLACK LAW FIRM PC
zstock@pollacklawpc.com

Lana R. Swingler
POLLACK LAW FIRM PC
lswingler@pollacklawpc.com

Magistrate Judge Dinsmore