UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

TERESA TODERO, as Special Administrator )
of the Estate of CHARLES TODERO, )
)
Plaintiff, )
)
v. )                    Cause No. 1:17-cv-1698-JPH-MJD
)
CITY OF GREENWOOD, BRIAN BLACKWELL, )
RENEE ELLIOTT and ELIZABETH LAUT, )
)
Defendants. )

### GREENWOOD'S, ELLIOTT'S, AND LAUT'S RESPONSE IN OPPOSITION TO PLAINTIFF'S MOTION TO BAR THE PROPOSED EXPERT TESTIMONY OF DR. MARK KROLL

This case arises out of the death of Charles Todero, a 31-year old man who died 13 days after an encounter with officers from the Greenwood Police Department during which a conducted electrical weapon or "CEW" (commonly referred to as a "Taser") was deployed. It involves state and federal claims brought by Todero's Estate based on the theory that the Taser "killed Charlie." [Filing No. 25 (Am. Compl. at ¶ 1).]

The Estate's complaint asserts that the Taser "[shot] electricity into Charlie's body for more than a minute and a half." [*Id.* at ¶ 4.] It characterizes the CEW usage as an "extreme electrocution," states that within minutes of the "extreme electrocution," Charlie's heart stopped, and avers that "the medical hallmarks of a death caused by extreme and grossly excessive electrocution by Taser are obvious in the record of Charlie's medical treatment following [the tasing]." [*Id.* at ¶¶ 4, 5 & 40).] It further states that the medical harm to Charlie was "electrocution by taser." [*Id.* at p. 7 (section heading).] In addition, the Estate's proffered medical expert, Dr.

Mayer Rashtian, stands ready to offer the opinion that that "Todero was subjected to essentially continuous electrocution for extended periods of time." [Rashtian Rule 26(a) report at p. 6.][1]

Because the Estate's complaint advanced the theory that Todero was "electrocuted" and died as a result of his being exposed to more than a minute and a half of electricity from a Taser, this case involves questions about Tasers, the science and technology behind them, how the electricity emitted by a Taser effects the human body, how much electricity Todero was actually was exposed to by the Taser, and whether the electricity associated with the Taser caused or led to the cause of Todero's death. The defendants therefore consulted with and ultimately retained Mark Kroll, Ph.D, a biomedical scientist with a primary specialty in bioelectricity. Kroll is widely published on the effect of CEWs on the human body and has been previously accepted as an expert under Rule 702 to offer testimony and opinions about whether the electricity from a Taser caused or contributed to the cause of a person's death. *See e.g.*, *Silva v. Chung*, 2019 WL 2195201, *4 (D. Hawaii May 21, 2019); *Martin v. City of Reading,* 2015 WL 4714649, *2 (E.D. Penn. Aug. 7, 2015); *Estate of Carlock v. Williamson,* 2012 WL 75765, *2-6 (C.D. Ill. Jan. 10, 2012); *Heston v. City of Salinas,* Cause No. 5:05-cv-3658-JW (filed Sept. 12, 2005 N.D. Ca.), Dkt. 345—Trial Transcript, Kroll Direct Examination at ECF p. 53/transcript p. 1754, l. 3-10 (court's acceptance of Kroll as an expert in electrophysiology).]

Kroll holds opinions that the Estate finds threatening to its case. The Estate has therefore moved the Court to bar him from offering any opinions or testimony at trial. For the reasons explained below, the Court should deny the Estate's motion.

---

[1] Rashtian's Rule 26(a) report is already in the record at Filing No. 125-46.

# DISCUSSION

**A.     Kroll is extraordinarily and uniquely well-qualified through his knowledge, skill, experience, training and education to provide expert testimony and opinions in this case.**

Given the Estate's allegation that electricity from a Taser killed Todero, there is probably no one in the United States, if not the world, better qualified than Kroll to provide testimony and opinions on the issues in this case.

Kroll has a Ph.D. in electrical engineering. [Kroll Dep. 108:4-17.][2] He works as a biomedical scientist with a primary specialty in bioelectricity and has devoted his career to studying the interaction and effects of electricity on the human body. [Kroll Rule 26(a) report at p. 5.][3] Kroll is also an Adjunct Full Professor of Biomedical Engineering at both the University of Minnesota and California Polytechnical University. [Kroll CV at p. 3.][4] Because of his knowledge, expertise, and scientific contributions in the fields of both cardiology and biomedical sciences, Kroll has been bestowed the high honor of "Fellow" from the American College of Cardiology, the Heart Rhythm Society, the Institute of Electrical and Electronics Engineers' Engineering in Medicine and Biology Society, and the American Institute for Medical and Biological Engineering. [*Id.* at p. 5.] He is believed to be the only individual who has ever received the prestigious recognition of "Fellow" from both cardiology and biomedical societies. [*Id.*] He is also only one of five Americans elected to sit on the top international committee on electrical injury and electrocution for the International Electrotechnical Commission. [International

---

[2]     The transcript of Kroll's deposition (without exhibits) is already in the record at Filing No. 153-5

[3]     Kroll's Rule 26(a) report is already in the record at Filing No. 153-1.

[4]     Kroll's CV is already in the record at Filing No. 153-4.

Electrotechnical Commission Members (*available at* https://www.iec.ch/dyn/www/f?p =103: 14:5767377794476::::FSP_ORG_ID,FSP_LANG_ID:2551,25 (last visited Feb. 14, 2020).]

Besides his scientific research, a major focus of Kroll's professional life has been on the development of electrical medical devices, like implantable pacemakers and defibrillators. [*Id.*] Notably, he holds the most patents on electrical medical devices of anyone in the world. [*Id.*; Kroll CV at p. 6-40 (list of patents).]

Although Kroll is a scientist and not a medical doctor, there is a lot of overlap between what he does and what some research physicians do. [Kroll Dep. 130:24 – 131:1.] He regularly lectures to and educates cardiac electrophysiologists (like Rashtian, the cardiac electrophysiologist that the Estate has retained as its medical expert) about the effects of electrical shocks, including shocks from CEWs, on the human body. [Kroll Rule 26(a) report at p. 5; *Heston,* Cause No. 5:05-cv-3658-JW, Dkt. 345—Trial Transcript, Kroll Direct Examination at ECF p. 50/transcript p. 1751, l. 23 – ECF p. 51/transcript p. 1752, l. 20 (describing Kroll's lectures on CEWs to clinical cardiac electrophysiologists to help them understand those devices).] He does not treat patients, but he is regularly consulted by and advises cardiologists, and he makes treatment recommendations to cardiologists in difficult cases. [Kroll Dep. 127:3 -128:6; *Heston,* Cause No. 5:05-cv-3658-JW, Dkt. 345—Trial Transcript, Kroll Re-Direct Examination at ECF p. 65/transcript p. 1766, l. 22 – ECF p. 66/transcript p. 1767, l. 22 (medical doctors consult him when they have difficult patients).]

The Estate repeatedly argues that Kroll is not a medical doctor as if only medical doctors could understand the effects of electricity on the body, but, significantly, medical doctors could not do the work they do and treat their patients without the research and inventions of scientists like Kroll. For example, over one million people have had Kroll's patented medical inventions

surgically implanted in their chests by medical doctors. [*Heston,* Cause No. 5:05-cv-3658-JW, Dkt. 345—Trial Transcript, Kroll Direct Examination at ECF p. 49/transcript p. 1750, l. -25 (number of persons into which Kroll's inventions have been implanted).]

While Kroll works closely with cardiologists, medical doctors in a variety of specialties seek his advice and opinions about electricity's effect on the human body, including in connection with the treatment of electrical burns, electrocution, and electrical therapies. [Kroll Dep. 127:3 -128:6.] He is often asked by medical doctors to explain the reason or the science behind why a person who sustained an electrical shock injury had the resultant outcome. [*Id.* at 131:24 – 133:1.][5]

The Estate's filing suggests that medical schools teach the effects of electrical shocks, implying that any medical doctor would know at least as much, if not more, than Kroll about the effects of electricity on the human body. In fact, they do not. Bioelectricity is a scientific specialty and there is no corresponding medical specialty focusing on electrical injuries. [*See* American Board of Internal Medicine, Subspecialties of Internal Medicine available at https:\\www.abim.org\about\_mission.aspx (last visited Feb. 14, 2020) (observe the absence of medical specialties focusing on electrical injuries).]

Particularly relevant for purposes of this lawsuit, Kroll has devoted a large part of his professional life to studying and understanding the effects of CEWs on the human body. He is probably the most published authority on electrical weapons in the world. [Kroll CV at p. 41-92

---

[5]         *See also*: (1) Kroll MW, Ritter MB, Perkins PE, Shams L, Andrews CJ (2019) Perceived Electrical Injury: Misleading Symptomology Due to Multisensory Stimuli. J Emerg Med 56 (5):e71-e79. doi:10.1016/j.jemermed.2019.01.013; (2) Kroll MW, Ritter MB, Perkins PE, Shams L, Andrews CJ (2019) Perceived electrical shock and Bayesian inference with multisensory stimuli. Am J Emerg Med 37 (3):547-548. doi:10.1016/j.ajem.2018.07.042; (3) Kroll MW, Hail SL, Kroll RM, Wetli CV, Criscione JC (2018) Electrical weapons and excited delirium: shocks, stress, and serum serotonin. Forensic Sci Med Pathol 14 (4):478-483. doi:10.1007/s12024-018-0005-8; and (4) Kunz SN, Calkins H, Adamec J, Kroll MW (2018) Cardiac and skeletal muscle effects of electrical weapons: A review of human and animal studies. Forensic Sci Med Pathol 14 (3):358-366. doi:10.1007/s12024-018-9997-3—all providing advice to physicians.

& (list of publications).] He has written over 200 abstracts, papers, and book chapters, and co-edited four books, including the only two scientific treatises that have ever been published on CEWs. [Kroll Rule 26(a) report at p. 5-7; Kroll CV at p. 41-92 (list of publications).] Notably, more than 80 of his published papers, books, book chapters, and MedLine-indexed letters specifically address CEWs and deaths following police encounters. [*Id.*] Because of his expertise, he was asked by Taser International, Inc. (now Axon Enterprises) to sit on its Board of Directors, advise the company, and initially head its Scientific and Medical Advisory Board which researches and studies medical, scientific, and safety issues relating to Tasers. [Kroll Rule 26(a) report at p. 7; Kroll CV at p. 5.]

Although the Estate claims that Kroll has no knowledge or expertise with respect to electrically-induced rhabdomyolysis, the truth of the matter is that Kroll "knows the literature on electrical injury about as well as anybody" and is "very familiar" with the literature on electrical connections between stimulation or electrical injury and rhabdomyolysis. [Kroll Dep. 146:5-8; 148:15 – 149:6.] Beyond his familiarity with the literature, however, he has written and published on the connection (or, rather the lack of connection) between electrical shock and rhabdomyolysis. Indeed, he has authored or co-authored at least a half dozen articles and book chapters that discuss rhabdomyolysis, including one published in 2009 and another published in June of 2018. [Kroll Dep. 134:8 – 35; 142:1-17; Kroll CV at p. 82 (*Physiology and Pathology of TASER® Electronic Control Devices, J Forensic and Legal Medicine*, 2009;16:173-177) & p. 91 (*Kunz S, Adamec J, Calkins H, Kroll MW, Cardiac and Skeletal Muscle Effects of Electrical Weapons: A Review of Human and Animal Studies*, Forensic Science Med Pathol., 2018 Epublished June 2018).]

The Estate tries to discount Kroll's knowledge of the connection (or, rather the lack of connection) between electrical shock and rhabdomyolysis, by pointing out that: (1) all of Kroll's

publications on the subject utilized data developed by others and not data developed "in the first instance" by Kroll himself; and (2) none of Kroll's publications have had rhabdomyolysis as a "primary focus." [Filing No. 202 (Pls' Memo to Exclude Kroll at p. 7).] While the Estate argues that these facts disprove Kroll's expertise, legitimate research and scientific analysis is routinely done utilizing raw data and test results developed by others. *See*, *e.g., Cummins v. Lyle Industries*, 93 F.3d 362, 369 (7th Cir. 1996) (noting that "hands-on testing" is not "an absolute prerequisite to the admission of expert testimony" and that an expert may review data generated by others in the field); *Manning v. Buchan*, 357 F. Supp.2d 1036, 1044 (N.D. Ill. 2004) ("an expert is not required to substantiate his opinions through testing particularized to the specific case if the science he is using has already been shown experimentally to be reliable"); *Wetherill v. University of Chicago*, 565 F. Supp. 1553, 1564 (N.D. Ill.1983) ("Rule 702 expressly permits expert witnesses to form their opinions by studying the work of others rather than through first-hand empirical observation"). Moreover, the fact that Kroll's writings on rhabdomyolysis address rhabdomyolysis in relationship to the electricity emitted by CEWs (and not rhabdomyolysis more broadly as a medical condition) is no reason to discount Kroll's expertise on the subject of CEWs and rhabdomyolysis.

Because of his Ph.D. in electrical engineering, his work as a biomedical scientist, his study of the effects of CEWs on the human body, his work with medical doctors, and his work with Taser/Axon, Kroll is uniquely well-versed on how Tasers actually work, the science and technology behind them, how much electricity is emitted to a person when a Taser is deployed, and how the electricity emitted by a Taser affects the human body. Given the issues in this case as framed by the Estate's complaint, there can be no doubt that Kroll has the relevant and appropriate

expertise to offer expert testimony and opinions on the questions and issues involved in this litigation.

**B.**     **The Estate's concession that Todero did not die "directly" from electrocution is no reason to exclude Kroll's opinions and testimony in their entirely.**

After pleading in its complaint and repeatedly stating in its filings with the Court that Todero was "electrocuted," the Estate argues that Kroll should be precluded from offering any testimony and opinions at trial because the Estate does not claim that Todero was electrocuted. Rather, the Estate claims that electricity emitted from the Taser initiated a chain of biological events in Todero's body that caused the organ failure that then caused Todero's death some 13 days after the police encounter. Even so, the Estate insists that it should be allowed use the word "electrocution" at trial. [Filing No. 170 (Pls' prior Reply in Support of Motion to Exclude Kroll) at p. 3, n. 2).] The Estate cannot have it both ways. If it wants to assert that electricity from a Taser caused Todero's death, then it cannot honestly claim that Kroll's expertise, opinions, and testimony about electrocution, the electricity emitted by CEWs, and the effect that electricity emitted by CEWs has on the human body is irrelevant.

In effort to avoid this contradiction, the Estate mischaracterizes Kroll's Rule 26(a) report. It claims that Kroll's opinions focused exclusively on "electrocution" in the technical, scientific sense of a direct and immediate death caused by electricity and not on "electrocution" in the layperson way that the Estate uses the word to mean simply any transmission of electricity into the body. [Filing No. 202 (Pls' Memo to Strike Kroll at p. 9-11); Filing No. 170 (Pls' prior Reply in Support of Motion to Exclude Kroll) at p. 2-3.] It then argues that because Todero did not immediately die when electricity was applied to his body, Kroll's opinions and testimony are irrelevant. [*Id.*]

It is true that Kroll holds the opinion that Todero was not "electrocuted"—that is, Todero did not die directly and immediately from a "low power electrocution." [Kroll Rule 26(a) report a p. 12.] But that is not Kroll's only opinion. Kroll also holds the opinion that the Estate's theory of how the electricity from the Taser indirectly caused Todero's death is contradicted by the peer-reviewed scientific literature memorializing 140 years of electrical safety and 20 years of electrical weapon research.

Kroll expressed that opinion on pages 41 through 44 of his Rule 26(a) report wherein he explained why, given his extensive knowledge about the effects of electricity on the human body, his research on the effects of the electricity emitted by CEWs on the human body, his knowledge of the peer-reviewed literature on the subject of CEWs and electrically-induced rhabdomyolysis, and his own research and writing on the subject of CEWs and electrically-induced rhabdomyolysis, the Estate's theory is not based on the science. [Kroll Rule 26(a) report at p. 41-44.] Kroll is eminently qualified to provide that opinion.

### C. Kroll did not offer a pre-fabricated, self-serving opinion that the Taser played no role in Todero's death.

The Estate argues that Kroll's opinion that electricity did not cause Todero's death fails to meet the *Daubert* requirement of reliability because it is based on nothing more than a pre-fabricated, self-serving assumption that Tasers cannot cause death at all because they do not electrocute people—an opinion that Kroll would offer in any case, regardless of the facts. The Estate misrepresents Kroll's work and opinions.

Kroll has never said in this case or in any other context that electrical weapons cannot cause death. Kroll has published on numerous deaths indirectly caused by electrical weapons from falls and fires. [Kroll CV at p. 89 (Kroll MW, Adamec J, Wetli CV, Williams HE, *Fatal traumatic brain injury with electrical weapon falls,* Journal of Forensic and Legal Medicine, 2016;43:12-

19) & p. 90 (Kroll MW, Ritter MB, Williams HE, *Fatal and Non-Fatal Burn Injuries with Electrical Weapons and Explosive Fumes*, J Forensic & Legal Medicine, 2017;50:6-11).[6]

Kroll has also expressly recognized that electrical weapons can electrocute people. He wrote about the circumstances when the CEW can cause death by electrocution in two peer-reviewed papers. [Kroll CV at p. 82 (Kroll M, Lakkireddy D, Rahko P, Panescu D.,*Ventricular Fibrillation Risk Estimation for Conducted Electrical Weapons: Critical Convolutions*, 2011, Aug.2011:255-8) & p. 88 (Dorin Panescu, Mark Kroll, Michael Brave, *Cardiac Fibrillation Risks with TASER Conducted Electrical Weapons*, Conf Proc IEEE Eng Med Biol Soc., 2015;37:323-329).]

The Estate's argument that Kroll would have arrived at his opinion that the Taser did not cause Todero's death, regardless of the evidence in this case, is also false. No one can read Kroll's comprehensive and well-supported Rule 26(a) report, including the detailed timelines used to analyze the facts, and reasonably draw the conclusion that Kroll did not review and consider the evidence specific to this case. Likewise, no one can read his Rule 26(a) report and reasonably draw the conclusion that the evidence in this case did not inform his opinions. Moreover, Kroll's opinion that Todero's rhabdomyolysis was not electrically-induced is grounded not only in his own studies and publications, but also on the medical and scientific literature (more about that in section F(2) below).

The notion that Kroll arrived at his opinions in this case "without doing any work," [Filing No. 170 (Pls' prior Reply in Support of Motion to Exclude Kroll) at p. 4], is plainly contradicted

---

[6]    *See also*, Kroll M, Brave M, Pratt H, Witte K, Kunz S, Luceri R (2019) *Benefits, Risks, and Myths of TASER® Handheld Electrical Weapons*, Human Factors and Mechanical Engineering for Defense and Safety (available at https://www.semanticscholar.org/paper/Benefits%2C-Risks%2C-and-Myths-of-TASER%C2%AE-Handheld-Kroll-Brave/9907639a2c7814e9d57a13326efab256e2eb 20f6 (last visited Feb. 14, 2020).]

by Kroll's Rule 26(a) report. Kroll has explained why the Estate's theory of how electricity from the Taser indirectly killed Todero is incorrect. [Kroll Rule 26(a) report at p. 42-44.]

**D.      Kroll's opinions about the amount or duration of the electricity
to which Todero was exposed should be allowed.**

The Estate seeks to exclude Kroll's testimony and opinions about the amount or duration of the electricity to which Todero was exposed for two reasons. First, it says Kroll's testimony and opinions are based on false and "cherry-picked" facts. Second, it says that Kroll's science and methodology are unreliable. Both arguments lack merit.

**1.      Kroll's testimony and opinions should not be excluded
merely because some of the facts are disputed.**

It is true that some of the facts in this case are disputed, including whether both Taser probes lodged in Todero's back or whether one of the Taser probes did not make a good connection because it was dangling in Todero's shirt.[7] That factual dispute does not, however, mean that Kroll must be barred from offering opinions on the amount whether the Taser probes made a good connection or the duration of the electricity to which Todero was exposed.

It is a fact, and courts have recognized it as a fact, that the "activation" of a Taser does not mean that the Taser actually delivered electrical current into a person's body. *See e.g.*, *Hoyt v. Cooks*, 672 F.3d 972, 976 (11th Cir. 2012) (recognizing that the "activation" of a Taser does not mean a person is "stunned"); *Bussey-Morice v. Gomez*, 587 Fed. Appx. 621, 625 (11th Cir. 2014) (acknowledging Kroll's expert testimony that deployment of a Taser does not necessarily mean that electricity is transmitted into the body of the subject). Accordingly, Kroll should be permitted to testify why in his opinion: (1) the Estate's contention that Todero was exposed to more than a

---

[7]      The Estate has previously argued that the defendants have conceded that Kroll cannot offer his opinion that one of the Taser probes lodged in Todero's clothing. [Filing No. 170 (Pls' prior Reply in Support of Motion to Exclude Kroll) at pl 5.] The defendants have not and do not concede any such thing.

minute and a half of electricity is inaccurate; and (2) Todero would have been exposed to 6.1 seconds of actual equivalent current.

In an attempt to prevent Kroll from offering this testimony, the Estate argues that Kroll has no expertise that will help the jury decide the disputed facts in this case and that the jury is perfectly capable of resolving the disputed facts for themselves without the need for expert testimony. This argument is dishonest. Kroll does not intend to use his expertise to tell the jury how they should resolve certain factual disputes. All he would do, and, of course, is required to do, is explain the facts upon which his testimony and opinions are based. If the Estate thinks his testimony and opinions should be discounted because his view of the facts is wrong, then it can cross-examine him. Kroll is not, however, required to accept the Estate's view of the facts as a precondition to being allowed to offer his opinions on the amount and duration of the electricity to which Todero was exposed. *See*, *Stecyk v. Bell Helicopter Textron, Inc.*, 295 F.3d 408, 414 (3d Cir. 2002) (an expert is free "to base his opinion on a particular version of disputed facts," and the burden is on opposing counsel to "explor[e] the facts and assumptions underlying the testimony of an expert witness . . . during cross examination.")

If the Estate cross-examines Kroll about the facts upon which his testimony and opinions are based, Kroll will respond to the several criticisms raised by the Estate as follows.

First, Kroll will tell the Estate that Lieutenant Blackwell's deposition testimony was not the only fact upon which he relied in forming his opinion that the second Taser probe did not make a good connection. The several facts he relied upon that caused him to determine there was a bad connection are expressly set forth in his Rule 26(a) report and include: (1) the sound of a broken connection; (2) Lieutenant Blackwell's observations; (3) Lieutenant Blackwell's actions; (4)

Todero's hospital records; (5) Todero's conduct; and (6) the autopsy photos. [Kroll Rule 26(a) report at p. 24-26 (listing the several facts that indicated a bad connection).]

Second, he will tell the Estate that he is uniquely qualified to explain to the jury why the facts establish that lower probe was lodged in Todero's clothing. He has published ten papers and book chapters that address the issue of probes becoming lodged in clothing and failing to make good contact, that clothing interference occurs in approximately 30% of all Taser deployments, and the signs and indicators of clothing interference.[8] Based on the research and study he performed to write those papers and book chapters, he will explain why the facts of this case caused him to determine that there was a bad connection and tell the Estate why he does not consider the Estate's unscientific interpretation of what it thinks it sees on the body camera video is dispositive of the matter.[9] [Kroll Rule 26(a) report at p. 8 & 15-32.] He will also tell the Estate that he does,

---

[8] Those papers and book chapters, which are included on his CV include: (1) Kroll M, Brave M. TASER® Conducted Electrical Weapons. In: Vilke Ra, ed. *Guidelines for Investigating Officer Involved Shootings, Arrest-Related Deaths, and Deaths in Custody.* Rutledge, NY: Taylor and Francis; 2017:246-271; (2) Kroll MW, Ritter MB, Guilbault RA, Panescu D. Infection Risk From Conducted Electrical Weapon Probes: What Do We Know? *J Forensic Sci.* 2016;61(6):1556-1562; (3) Kroll M. Significance of Sound During CEW Application. *Technical Note: ResearchGate.net* [Technical Report]. 2015; 15 April 2015:https://www.researchgate.net/publication/275024090Significance_of_Sound_During_CEW_Application; (4) Kroll M. Conducted Electrical Weapon Drive-Stun Mode: Skin Rub vs. Injection. *Technical Note: ResearchGate.net* [Technical Report]. 2015; 16 April 2015:https://www.researchgate.net/publication/_275035976_Conducted_Electrical_Weapon_Drive-Stun_Mode_Skin_Rub_vs_Injection; (5) Kroll M. Baseball, Poison, and Soup Recipes: The TASER Trio of Popular Myths. *Technical Note: ResearchGate.net* [Technical Report]. 2015;1-3. Available at: https://www.researchgate.net/publication/275034594Baseball_Poison_andSoup_Recipes_The_TASER_Trio_of_Popular_Myths; (6) Kroll M. Realities of biomedical product liability suits and the role of junk science: from breast implants to TASER weapons. *IEEE Pulse.* 2012;3(5):27-32; (7) Kroll M. TASER® Conducted Electrical Weapons: Clinical Forensic Medicine: A Physician's Guide. In: Stark M, ed. *Clinical Forensic Medicine: A Physician's Guide.* New York: Springer; 2011:233-276; (8) Kroll MW. Physiology and pathology of TASER electronic control devices. *J Forensic Leg Med.* 2009;16(4):173-177; (9) Kroll M. TASER® Electronic Control Devices. In: Fish R, Geddes L, eds. *Electrical Injuries: Medical and Bioengineering Aspects.* 2 ed. Tucson, AZ: Lawyers and Judges Publishing Company, Inc.; 2009:455-491; and (10) Kroll M. Crafting the Perfect Shock. *IEEE Spectrum.* 2007;44(12):27-30.

[9] The Estate's proffered police procedures expert stands ready to testify that he believes the second Taser probe lodged in Todero's back based on his review of body camera video. His opinion is not based on scientific study or analysis—only watching a video that the jury is capable of watching for itself.

in fact, have specialized knowledge in the ballistic and aerodynamic properties of Taser probes and has published several papers dealing with the exact issue of probe flight and landing.[10]

Third, he will tell the Estate that while he may not have training in "medical record keeping" that does not mean he cannot observe the absence of a notation in a hospital record. He will also point out to the Estate that he has co-authored and edited the *Atlas of Conducted Electrical Weapon Wounds and Forensic Analysis*, the only textbook on wounds, including puncture marks, caused by Tasers. [Kroll Rule 26(a) report at p. 5 (*Atlas of Conducted Electrical Weapon Wounds and Forensic Analysis*: Springer-Kluwer 2012).] Based on the research and study performed to write that textbook, he will explain why he is better equipped than the average juror to understand how a single probe-mark correlates to the effectiveness and total electrical current delivery.

Fourth, he will explain to the jury that a probe spread of "at least 9 inches" from the upper embedded taser probe to the lower probe (were it embedded) would have been sufficient to cause a total body lockup, and Todero would have simply fallen over face first had that occurred. [Kroll Rule 26(a) report at p. 25.] He will explain how the fact that Todero's body did not lockup and Todero did not fall informed his opinions. [*Id*. at 15-32.] He will also tell the Estate that he does not need to be an expert in police procedures—that is, what police agencies tell their officers about Tasers and when to deploy them—to understand how the Taser works and the effect that it is intended to have on the human body when deployed. His expertise as a biomedical scientist with a primary specialty in bioelectricity makes him far more qualified to understand how the Taser

---

10        Kroll wrote about probe flight and landing in: (1) Kroll MW, Ritter M"B, Guilbault RA, Panescu D. Infection Risk From Conducted Electrical Weapon Probes: What Do We Know? J Forensic Sci. 2016;61(6):1556-1562; (2) Kroll MW, Ritter MB, Kennedy EA, et al. Eye injuries from electrical weapon probes: Incidents, prevalence, and legal implications. *J Forensic Leg Med.* 2018;55:52-57; and (3) Kroll MW, Ritter MB, Kennedy EA, et al. Eye injury from electrical weapon probes: Mechanisms and treatment. *Am J Emerg Med.* 2018:published. These articles are listed in his CV.

works than the Estate's proffered police procedure expert, who knows nothing about the effect of electricity on the human body.

Fifth, he will tell the Estate that he does, in fact, have specialized knowledge on Taser wounds and their healing. He co-authored and edited the only book on what those probe wounds look like as shown in Figure 1.



*Figure 1. Front cover of Ho, Dawes, and Kroll textbook on probe wounds*

[*Id*. at p. 5 (*Atlas of Conducted Electrical Weapon Wounds and Forensic Analysis*: Springer-Kluwer 2012).]

As an editor of that book, he was responsible for ensuring that every word and photograph in the book was accurate and reliable. He also co-authored the chapter titled "Physics of Electrical Injury" which addresses the amount of time it takes to develop a burn from an electrical shock and supports his experience and opinion that a drive-stun will cause a burn after 2 seconds. [*Id*.]

In addition, Kroll wrote the chapter titled "TASER Conducted Electrical Weapons" in the respected forensic pathology textbook, Clinical Forensic Medicine: A Physician's Guide, 3d. Ed., Margaret M. Stark Editor (*available at* https://epdf.pub/clinical-forensic-medicine-a-physicians-guide-3rd-edition.html (last visited Feb. 14, 2020). Therein, he presented several photographs of CEW skin wounds. [*Id*. at 246-248 & 251-252 (including probe puncture wounds and drive-stun

marks and blistering)] He is better equipped than the jury to understand how a single probe-mark ties into the estimates of effectiveness and total current delivery.

Sixth, he will tell the Estate that he does not intend to testify as an expert about what the officers heard, but rather how the sound of what they say they heard informed his opinions. The Estate argues that a jury can understand that a Taser makes different sounds without the need for Kroll's expert testimony. [Filing No. 170 (Pls' prior Reply in Support of Motion to Exclude Kroll) at p. 7.] The jury, however, requires expert testimony to understand the significance of those different sounds. [Kroll Rule 26(a) report at p. 23-24.] Notably less than one year ago, Kroll was qualified as an expert and permitted to testify as an expert to explain the significance of those sounds in *Silva v. Chung*, No. 1:15-cv- 00436 HG/KJM (filed Oct. 20, 2015 D. Hawaii) (Dkt. No. 385 – Trial Testimony of Mark Kroll at p. 83, l. 5-9; p. 111, l. 20 – 112, l. 17; & p. 160, l. 2 p. 161, l. 1 (allowing Kroll not only to testify about the significance of the Taser's sounds, but also to perform an in-court demonstration to exemplify the different sounds for the jury).

And seventh, he will tell the Estate, just as set forth in his Rule 26(a) report, why the shock to Officer Elliott informed his opinion that there was not a good connection. [*Id*. at p. 26.] With a good connection, the voltage is held down (under 3000 volts) and an officer will not feel the shock through the wire. [*Id*.] Conversely, with a bad connection, the voltage jumps to around 50,000 volts (in an attempt to generate the arc-connection) and an officer will feel the shock through the wire. [*Id*.]

Kroll has the requisite knowledge, skill, and expertise to state why he believes the Taser probes did not make a good connection in this case and how the lack of a good connection informed his opinion about the amount and duration of the electricity that Todero was actually exposed to.

His testimony will be helpful to the jury in understanding the facts, resolving the disputed facts, and it should not be excluded.

### 2. Kroll's testimony and opinions should be allowed because his science and methodology are reliable.

The Estate also claims that Kroll's testimony and opinion about the amount and duration of electricity that Todero would have been exposed to during the tasing should not be allowed because Kroll's science and methodology are unreliable. The Estate's claim is wrong.

Based on his review of the Taser download log (and not any specialized knowledge of the science and technology behind the Taser, the amount of electricity they emit, and how that electricity is emitted), the Estate's medical expert, Rashtian, asserts that there was "a total duration of 98 seconds" of electricity. [Rashtian Rule 26(a) report at p. 3.] He offers that the taser shots ranged from as short as two seconds to as long as 13 seconds and concludes that "[t]he cause of Mr. Todero's death was repeated application of taser shocks on May 29, 2016, causing rhabdomyolysis and leading to cardio-respiratory failure and multi-organ system failure." [*Id*. at p. 5.]

The Estate's proffered police procedure's expert, Roger Clark, similarly relying solely on the Taser download log (and not any specialized knowledge of the science and technology behind the Taser, the amount of electricity they emit, and how that electricity is emitted), asserts that Todero was "tased for a cumulative total of 98 seconds over a period of slightly over three minutes" causing him excruciating pain and making it unlikely that he could comply with officer commands. [Clark Rule 26(a) report at p. 13.][11]

The "activation" of a Taser as reflected in a Taser download log does not, however, establish that the Taser actually delivered electrical current into a person's body. *See e.g.*, *Hoyt*,

---

[11]     Clark's Rule 26(a) report is already in the record at Filing No. 125-45.

672 F.3d at 975 (recognizing that the "activation" of a Taser does not mean a person is "stunned"). And in this case, Kroll disagrees that the Taser download log accurately represents the amount or duration of electricity to which Todero was exposed. As described in great detail in his Rule 26(a) report, Kroll systematically and scientifically analyzed each of the 16 trigger pulls and estimated that, given the facts and circumstances of this case, only 6.1 seconds of equivalent muscle stimulation was actually delivered to Todero, not 98 seconds as described in the Taser download log. [Kroll Rule 26(a) report, p. 8 & 15-32.]

The overly simplistic, flawed, and unscientific determination of the amount of conclusions reached by Rashtian and Clark will mislead the jury into thinking that because the Taser download log shows that the Taser was activated for 98 seconds, Todero was necessarily subjected to 98 seconds of electrical stimulation. Kroll believes he was not, and there is no more qualified expert in the world other than Kroll to explain to the jury why a Taser download log does not reflect the actual amount of electrical current to which a subject is exposed.

As explained in Kroll's Rule 26(a) report:

> A common forensic analysis error is to assume that the "TASER" data download in any way represents current delivery to the subject. It does not. It represents only an upper (rounded up) bound on the seconds of current discharged. The total time given by the download is typically 2-3 times what the actual total duration of current delivery was . . . . *However, novice CEW "experts" often stress the total-trigger pull time so it should be addressed.*

[*Id*. at p. 15 (emphasis added).]

Kroll's Rule 26(a) report also describes his methodology and the science behind his opinion. Reported trigger pull durations are rounded up from the first 1/100th of a second—i.e., if the actual duration was 2.01 seconds then it is reported on the download as 3 seconds. [*Id*. at p. 16.] Consequently, the best estimate of the actual trigger pull is a half second less than what is

reported in a Taser download log. [*Id*. at 15 – 32.] In addition, effective drive-stun applications require that the muzzle of the CEW be kept nearly perpendicular to the body's surface and that positioning can be difficult to accomplish when a subject is moving and squirming, hence on average, a good contact is only made about 30% of the time. [*Id*.] Further, when officers apply the unit in drive-stun mode, they pull the trigger as the muzzle is being brought down toward the subject, resulting in the trigger pull duration overstating the current delivery by another half second [*Id*.] Kroll will explain that these factors are simply not accounted for on the Taser download log. He is qualified to give this opinion based on his 15 years of experience analyzing over 1,000 CEW incidents and his publication on the very question. [Misunderstanding the Trigger-pull Download, Mark W. Kroll (Aug. 2017) (*available at* https://www.researchgate.net/profile/Mark_Kroll/ publication/321339912Misunderstanding_the_Trigger-pull_Download/links/5a1d9bfda6fdcc0af 3272712/Misunderstanding-the-Trigger-pull-Download.pdf?origin=publication_detail (last visited Feb. 14, 2020).]

In his Rule 26(a) report, Kroll also explains why, in this instance, Todero could not have received any drive-stuns lasting longer than two seconds. True, Lieutenant Blackwell testified that he began drive-stunning Todero starting with the fourth or fifth application out of the 16. Yet as Kroll knows from his research and study (and having edited the only textbook on the forensic analysis of wounds caused by CEWs), a drive-stun leaves a distinctive pair of marks—i.e., a small red dot in the center surrounded by a white ring or "doughnut" of blanching. [*Id*. at p. 21-22]. After 12 hours the appearance changes slightly during the healing process. [*Id.*] It is well-established and published that a five second drive-stun will leave an obvious mark but based upon Kroll's experience of investigating over 800 uses of CEWs in the field, he has found that a one-second exposure generally will not leave marks. [*Id.*] In Todero's case, the hospital records do not mention

any drive-stun marks on Todero. [*Id*.] And because there were no burn marks reported in the hospital examination, Kroll can conclude that the electrical current flow from the Taser to Todero could not have been any more than two seconds as opposed to five seconds (or more) per trigger pull. [*Id*. at p. 31.] Lieutenant Blackwell's testimony is not therefore dispositive of the matter.

In effort to be thorough in his scientific analysis of the meaning of the single burn mark, Kroll even accounted for the possibility the hospital might have failed to inspect Todero's thighs and buttocks for a second or other marks, although the hospital's failure to document another mark seems highly unlikely given that the hospital notes reflected injuries to Todero's back and scrapes to his knees. Even under the hypothetical scenario that the hospital had failed to check for or identify a second mark, Kroll determined the total amount of electrical stimulation would still be substantially less than 98 seconds.

Kroll's testimony is also relevant to inform the jury that that scientific literature establishes that drive-stuns do not cause neuromuscular capacitation—i.e., muscle stimulation. *See* Panescu, et al, *Current Distribution in Tissues with Conducted Electrical Weapons Operated in Drive Stun Mode*, Conf. Proc. IEEE (2016) (cited in Kroll Rule 26(a) report on page 61 at ¶ 18). In fact, numerous courts have recognized that fact. *See e.g.*, *Abbott v. Sangamon Cnty. Ill.*, 705 F.3d 706 726 (7th Cir. 2013) (recognizing that CEW in "drivestun mode" "becomes a pain compliance tool with limited threat reduction"); *Brossart v. Janke,* 859 F.3d 616, 629 (8th Cir. 2017) (use of taser in drive stun mode "only causes discomfort and does not incapacitate the subject"); *Brooks v. City of Seattle.* 599 F.3d 1018, 1027-28 (9th Cir. 2010), reh'g en banc (recognizing that when used in drive-stun mode, CEW does not override a person's central nervous system as it does in dart-mode); (*Mattos v. Agarano*, 661 F.3d 633 (9th Cir. 2011) (use of taser in drive stun mode is painful but is without incapacitating muscle contractions or significant lasting injury").

Kroll's opinion that drive-stuns do not cause neuromuscular capacitation is not, as the Estate has previously argued, a "new opinion." [Filing No. 170 (Pls' prior Reply in Support of Motion to Exclude Kroll) at p. 10.] Kroll addressed the subject of neuromuscular incapacitation on pages 48 and 49 of his Rule 26(a) report, explaining that with the drive-stun "[s]ince there is insufficient depth of current flow to capture muscles, the drive-stun mode serves only as a [pain] compliance technique. . . . The electrical current simply does not penetrate deeply enough to affect any human muscles or organs." [Kroll Rule 26(a) report at p. 48.] Kroll's report directly addressed the difference between the CEW's drive-stun and prob-mode options and the different impact those two options have on the human body. [*Id*. at p. 48-49.]

The fact that CEWs when used in drive-stun mode do not cause neuromuscular capacitation—i.e., muscle stimulation—is a problem for the Estate because it wants the jury to believe that every one of the 16 trigger pulls of the Taser caused Todero's muscles to contract which, in turn, caused his rhabdomyolysis. However, the fact of the matter is that the trigger pulls in drive-stun mode would not have caused Todero's muscles to contract. [*Id*.] Kroll is qualified as an expert to explain that to the jury.

Kroll will also explain to the jury that a probe spread from the upper embedded taser probe to the lower probe (were it embedded) would have been sufficient to cause a total body lockup, and Todero would have simply fallen to his face, not his knees, had that occurred. [Kroll Rule 26(a) report at p. 25; Kroll Dep. 205:25 – 207:14.] Yet the autopsy photos show no evidence of a probe landing in the right back side. [*Id*. at p. 26; Kroll Dep. 201:1-8.]

There is also testimony that the officers at the scene heard a crackling sound, which informed Kroll's opinions. Contrary to the Estate's proffered police procedure's expert, Clark, who opined that to the extent there is any perceptible difference between the sound of a taser

discharge with a good and bad connection, it is "a very subtle distinction that would be hard for anyone other than a highly trained operator to distinguish," [Clark Rule 26(a) report at p. 14], Kroll will explain to the jury that the difference in sound between a good connection and a bad connection is both enormous in terms of character and volume, [Kroll Rule 26(a) report at p. 39], which opinion is supported by his own publication on the issue, Kroll, *Significance of Sound During CEW Application*, Technical Note: Research Gate (2015). [Kroll Rule 26(a) report at p. 62, ¶ 30]. As noted above, Kroll has previously been qualified as an expert to explain to a jury the significance of the Taser's sound insofar as good and bad connections are concerned. *Silva v. Chung*, No. 1:15-cv- 00436 HG/KJM (filed Oct. 20, 2015 D. Hawaii) (Dkt. No. 385 – Trial Testimony of Mark Kroll at p. 83, l. 5-9; p. 111, l. 20 – 112, l. 17; & p. 160, l. 2 p. 161, l. 1 (allowing Kroll not only to testify about the significance of the Taser's sounds, but also to perform an in-court demonstration to exemplify his testimony about the sound for the jury).

Moreover, Officer Elliott testified that she received a shock from touching a wire. As Kroll will explain to the jury, if there was full connection of both probes the voltage is blocked by insulation of the wires, but if the connection is broken then an arcing voltage is presented in the wires in an attempt to establish an arc in connection to the intended subject. Therefore another officer could feel the shock if there was no successful conductance of current into the intended subject. [Kroll Rule 26(a) report at p. 26 with referenced scientific sources supporting that conclusion).] This is not a simple fact that the jury can determine on its own; expert testimony is required. As the world's foremost expert on electrical weapons, Kroll understands how and when a probe will be lodged in clothing and how to diagnose whether that is a fact or not. As noted above, he has published at least ten papers and book chapters that address the important issue of a probe lodged in clothing. Kroll has also previously been qualified as an expert and testified about

the failure of the Taser prongs to make a complete connection in *Bussey-Morice*, 587 Fed. Appx. at 625 (acknowledging Kroll's expert testimony that deployment of a Taser does not necessarily mean that electricity is transmitted into the body of the subject).[12]

If the Estate wants to argue to the jury that the lower probe was in fact embedded in Todero, it can do so, and it is free to cross-examine Kroll in connection with his opinion along those lines. The fact remains however electricity requires two contacts in order to complete a circuit capable of passing or delivering a current.

Having studied over 800 field uses of CEWs, Kroll is qualified to opine that with a good connection and probe spread in the back, the struggle is over within seconds, which obviously did not occur in the case of Todero. He has opined on this exact issue in dozens of lawsuits and addressed the issue in a recent book chapter wherein he stated "expect [a fall with] probe application with probe spread greater than nine inches on back or twelve inches on the front chest for rapid takedown."[13] [Kroll Dep. 205:25 – 207:21.]

Kroll has also studied and written extensively on the issue of inadvertent trigger pulls.[14] If the Estate thinks that the testimony of the police officers at the scene disproves the science and discredits his opinions, the Estate may cross-examine Kroll on those points. But the Estate's

---

[12] If the Court permits the Estate's proffered police procedures expert—who never carried a Taser during his career in law enforcement, has not had any formal training on the Taser, and has no expertise in electricity—to testify that the sound a Taser makes when it is deployed offers no "useful evidence about whether the Taser was making a proper connection," [Clark Rule 26(a) report at p. 14], then Kroll is certainly qualified and should be permitted to explain his disagreement with Clark in that regard.

[13] *See* Kroll M, Brave M. TASER® Conducted Electrical Weapons. In: Vilke Ra, ed. Guidelines for Investigating Officer Involved Shootings, Arrest-Related Deaths, and Deaths in Custody. Rutledge, NY: Taylor and Francis; 2017:246-271 (included in Kroll Rule 26(a) report at p. 61, ¶ 8.]

[14] Kroll published on inadvertent trigger pulls in Kroll M. Misunderstanding the Trigger-pull Download. *ResearchGate* [Technical Report]. 2016; Oct 2016:1-6. Available at: https://www.researchgate.net/publication /321339912_Misunderstanding_the_Trigger-pull_Download (included in Kroll CV at p. 90).

insistence that the facts are other than what Kroll, in his scientific opinion, believes them to be is not a reason to bar Kroll as an expert in this case.

### E. Kroll should not be barred from testifying about the science and technology behind Tasers, how they work, and their effects on the human body.

The Estate asserts that Kroll should not be allowed to testify about Tasers in general, including how they work, the science and technology behind them, and the extensive testing that has done to determine their safety and effects on the human body. The Estate argues that such information may be relevant in a products liability case, but this is not a products liability case. It says that because this is not a products liability case, such information will not assist the jury in deciding the issues, will only serve to confuse them, and would be offered for no reason other than to gratuitously bolster the apparent safety of these devices without any connection to the facts of this case. The defendants agree that this is not a products liability case, but they disagree that the jury should not be permitted to hear any information about Tasers in general.

Throughout this case, the Estate has repeatedly used language to conjure the idea that the Taser is nearly the same thing as a handgun, a brutal and deadly weapon, and capable of causing death by electrocution. Indeed, the Estate has said things like "Defendant Brian Blackwell *shot* Charlie Todero sixteen times," [Pls' Memo to Exclude Kroll at p. 1 (emphasis added)], "The 16 Taser *Shots Kill* Charlie," [Compl. at p. 6 (title of subheading) (emphasis added)], the tasing was a "*brutal and deadly* assault," [*Id*. at p. 1, ¶ 1 (emphasis added)], Charlie was subjected to an "*extreme electrocution*," [*Id*. at p. 2, ¶ 5 (emphasis added)], and "within minutes of this *extreme electrocution* . . . Charlie's heart stopped, [*Id*.; Filing No. 131 (Pls' MSJ Brief at p. 1).] It is thus apparent that the Estate wants the jury to think that the Taser is analogous to a handgun and is a dangerous weapon that electrocutes people and causes death.

Given the Estate's portrayal of the Taser, the defendants should be permitted to offer evidence through Kroll explaining what a Taser actually is and does. In any event, given the issues in this case, the jury will certainly wonder about how Tasers work, the science and technology behind them, their safety, and effects on the human body. The jury cannot fairly and impartially decide whether the electricity emitted from Blackwell's Taser "killed" Todero, as the Estate claims, without knowing anything more about Tasers than when they walked into the courtroom for *voir dire* based on what they might have seen on television or the movies. Moreover, the notion that educating the jury about Tasers would be unduly prejudicial to the Estate is absurd. The Estate contends Tasers are dangerous and capable of inflicting death. Keeping the jury in the dark as to how Tasers actually work, the science and technology behind them, and the extensive testing that has done to determine their safety and effects on the human body would be prejudicial to the defendants.

F. **Kroll should not be barred from responding to the opinions and testimony offered by the Estate's experts.**

The Estate contends that because Kroll is not an expert in police practices and procedures or a medical doctor, he should be barred from offering any testimony or opinions in response to or to rebut the testimony and opinions that will be offered by its experts at trial. Simply because Kroll does not have expertise identical to that claimed by Clark or Rashtian does not mean he is unqualified to respond to or rebut anything they might say at trial (that is, if they are permitted to testify at trial).[15] In fact, when the Court compares the expertise of the parties' experts, it should

---

[15]     As the Court knows, the defendants contend that the Rashtian is unqualified to offer the testimony and opinions that the Estate would have him provide in this case. [Filing Nos. 195 & 196.] The defendants also contend that Clark is qualified to offer only some of the testimony and opinions that the Estate would have him provide. [Filing Nos. 197 & 198.]

conclude that Kroll is far more qualified than either Clark or Rashtian to offer opinions and testimony relative to the issues in this case.

### 1. Kroll is qualified to respond to certain testimony and opinions of Roger Clark.

If the Court permits Clark, the police practices and procedures expert retained by the Estate (who retired from the Los Angeles Sheriff's Office some 25 years ago and never carried a Taser during his career as a law enforcement officer) to testify as an "expert" about the amount and duration of the electricity that was emitted into Todero's body and its neuromuscular effect on him, then it should permit Kroll to respond to that testimony. [*See generally*, Kroll Rule 26(a) report at p. 36-40.]

While Clark's claimed expertise comes from his having read all of the materials published by Taser/Axon that are available on Taser/Axon's website and having watched YouTube videos showing people being tased, he has no *scientific* understanding of Tasers, how they work, the electricity emitted by them, and how they effect the human body. [Clark Dep. 214:16 – 217:20 & 275:1-20.][16] Nevertheless, he stands ready to tell the jury that a full 98 seconds of electricity was emitted into Todero's body based on his reading of Lieutenant Blackwell's Taser download log reflecting that the Taser's trigger was pulled 16 times and that the Taser emitted electricity for a total of 98 seconds. [Clark Rule 26(a) report at p. 13.]

Kroll, who is an expert on the science and technology behind CEWs, the type, nature, and duration of the electricity they emit, and the effect they have on the human body, should be permitted to testify why the simple reading of a Taser download log is overly simplistic and "confuses" download time with duration of current delivery. There is no reason that Kroll's

---

[16]     The Clark deposition excerpts are already in the record at Filing No. 161-1.

testimony should be excluded simply because it would reveal to the jury the faults in Clark's testimony.

Similarly, if Clark is permitted to testify that the Department of Justice has established as a "national standard" that Tasers should not be deployed for more than three trigger pulls or a total of 15 seconds based on his reading of the PERF 2011 Electronic Weapon Guidelines to suggest to the jury that any Taser exposure over 15 seconds is dangerous and to further suggest that there is consensus that any exposure over 15 seconds is dangerous, then Kroll should be permitted to respond. Kroll should not be precluded from explaining what the science, his own studies, and the scientific and medical literature have all concluded about the dangers (or the lack of dangers) to humans associated the amount and duration of electricity emitted by CEWs.

In providing that explanation, there is no reason why Kroll should not be allowed to draw an analogy to American baseball and discuss why three trigger pulls or "three strikes" might be a policy that some police agencies have adopted, but is unsupported by the science. Drawing an analogy to baseball will help the jury understand his testimony and is not, as the Estate argues, "pejorative." Analogies are simply a way of helping people understand a concept by relating it to another concept with which they are already familiar.[17] Moreover, explaining the science with a baseball analogy does not, as the Estate asserts, wade into the area of police practices and procedures where Kroll has no expertise. Kroll is qualified to explain the science and to state the opinion that the science does not support the claimed police policy. In fact, the United States

---

[17] The Estate's argument that Kroll should be precluded from drawing this analogy because it is "pejorative" is curious given that Rashtian has drawn and, if permitted to testify at trial, plans to draw an analogy to explain his opinions to the jury. Indeed, Rashtian plans to explain his inability to explain how or why Todero developed rhabdomyolysis after being exposed to the electricity emitted by a Taser when most people would not, by comparing Todero's rhabdomyolysis to an allergy—i.e., that medical professionals do not know how or why some people develop allergies and others do not, but that inability to explain how or why does not change the fact that the person still has the allergy.

Department of Justice, which Clark finds authoritative,[18] has actually criticized the originator of the three strikes rule for not having a scientific basis for that the three strikes "rule" when it stated that:

> There is no standard definition of "prolonged" CEW exposure for either continuous duration or number of multiple interrupted discharges.
>
> \* \* \* \*
>
> After a review of anecdotes that seemed to indicate that multiple exposures were more hazardous, one researcher recommended in 2005—*without supporting documentation*—that law enforcement agents should ". . . [l]imit the number of TASER exposures when possible (3 is probably a reasonable number)."

[Kroll Rule 26(a) report at p. 37-38 9 (citing "Study of Deaths Following Electro Muscular Disruption," U.S. Department of Justice, Office of Justice Programs, May 2011 (emphasis added), *available at* https://www.ncjrs.gov/pdffiles1/nij/233432.pdf (last visited Feb. 14, 2020).]

> ## 2.  Kroll is qualified to respond to the testimony and opinions of Rashtian.

The fact that Kroll is a scientist and not a medical doctor does not render him unqualified to offer testimony and opinions in response to the claimed causal connection between exposure to electricity and rhabdomyolysis that will be offered by Rashtian (that is, if Rashtian is allowed to testify). [*See generally*, Kroll Rule 26(a) report at p. 41-43.] As noted above, although Kroll is not a medical doctor, he has devoted his entire career to studying the effects of electricity on the human body and, in fact, there is a lot of overlap between what he does and what some advanced medical doctors do. [Kroll CV; Kroll Dep. 130:24 – 131:1.] As Kroll has previously explained,

---

[18]    Kroll has been retained by the U.S. Department of Justice for several CEW cases involving the Border Patrol, US Marshals, and Criminal (prosecution) division so they clearly consider him an expert. [*See* Kroll CV at p. 6.]

bioelectricity "covers a crossover region between pure medicine and pure physical and electrical science/engineering." *Carlock,* 2012 WL 75765, at *3.

Kroll regularly lectures to and educates cardiac electrophysiologists (like Rashtian) about the effects of electrical shocks on the human body because cardiologists generally do not have the knowledge and expertise that he has. [Kroll Rule 26(a) report at p. 5.] Although he does not treat patients, he is regularly consulted by and advises cardiologists, and he makes treatment recommendations to cardiologists in difficult cases. [Kroll Dep. 127:3 -128:6.] In fact, Rashtian admits that it is very likely he has consulted Kroll's research and writings. [Rashtian Dep. 40:21 - 41:24.][19] And while Kroll works most closely with cardiologists, medical doctors in a variety of specialties seek his advice and opinions about electricity's effect on the human body, including in connection with the treatment of electrical burns, injuries caused by electrocution, and electrical therapies. [Kroll Dep. 127:3 – 128:6.] He is often asked by medical doctors to explain the reason or the science behind why a person who sustained an electrical shock injury had the resultant outcome. [*Id.* at 131:24 – 133:1.]

The fact that Kroll is a scientist not a medical doctor has not caused other courts to exclude him as an expert on matters relating to the effect of electricity on the human body and respond to and rebut the competing testimony of medical doctors. *See e.g., Carlock*, 2012 WL 75765, at *2-3. It is well-established that a person's lack of a medical degree is not dispositive of the question whether he or she is qualified to offer testimony and opinions on medical issues or questions touching on medical issues. *See Crisostomo v. Stanley*, 857 F.2d 1146, 1153, n. 18 (7th Cir. 1988) (pre-Daubert case noting that "[t]here is no reason why a witness who is not a medical doctor

---

[19]     The transcript of Rashtian's deposition (without the exhibits) is already in the record at Filing No. 153-3.

should be automatically disqualified as a medical expert, if he is otherwise well schooled in the field".)

It is important to note that the biomedical science of bioelectricity is not included in medical school training. [*See* American Board of Internal Medicine, Subspecialties of Internal Medicine *available at* https:\\www.abim.org\about\mission.aspx (last visited Feb. 14, 2020).] The American Board of Internal Medicine recognizes and certifies 130 medical specialties and sub-specialties, none of which teach anything about the subtleties of electrical shocks. [*Id.*] Emergency medicine and cardiac electrophysiology teach the use of defibrillation shocks and emergency medicine and dermatology teach about electrical burns, but bioelectricity remains a scientific specialty and not a medical specialty. In fact, U.S. medical schools are required to teach only three items concerning electrical injury, which include: (1) alternating current can cause ventricular fibrillation; (2) lightning strikes can cause asystole; and (3) electrical shocks can cause burns. *Silva v. Chung*, No. 1:15-cv- 00436 HG/KJM (filed Oct. 20, 2015 D. Hawaii) (Dkt. No. 385 – Trial Testimony of Mark Kroll at p. 98, l. 10 – p. 90, l. 9.] Only a biomedical scientist, like Kroll, is competent to offer an opinion concerning there being no scientific evidence linking the development of rhabdomyolysis to deployment of a taser. [*Id.* at p. 90, l. 2-9 (there is no medical specialty for electrical injury; bioelectricity remains a scientific specialty, not a medical specialty).]

Biomedical scientists spend their time researching and publishing to help educate physicians in whatever specialties relate to the scientist's research. Physicians use their training, augmented by what they learn from scientists, to diagnose and treat patients. Rashtian himself recognized this distinction and concedes he is not an expert in bioelectricity. [Rashtian Dep. 39:23 – 40:20.] Even Rashtian recognizes Kroll's publication contributions to the specific area of how

electrical shocks affect the heart for defibrillation. [*Id.* at 40:21 – 41:24.] In short, for issues within their specific specialty, a biomedical scientist has more knowledge than any physician.

Although the Estate claims that Kroll has no knowledge or expertise with respect to the treatment and progression of rhabdomyolysis, Kroll has not and does not plan to offer any testimony or opinions on the diagnosis and progression of Todero's rhabdomyolysis or whether his physicians treated it properly.[20] The fact that Todero had rhabdomyolysis is not in dispute. Kroll intends only to offer testimony and opinions about electrically-induced rhabdomyolysis and what the studies and research have concluded about Taser-induced rhabdomyolysis. His testimony is relevant because: (1) the Estate alleges in its complaint that muscle contractions caused by Todero's "electrocution" caused his muscle tissue to breakdown and causes serious kidney injury—i.e., rhabdomyolysis [Am. Compl. at ¶ 49]; and (2) Rashtian's opinion as described in his Rule 26(a) report is that the mechanism of electrocution was massive electrical overstimulation of Todero's skeletal muscles which led to the release of breakdown enzymes (primarily creatine kinase or "CK"), which fatally clogged his kidneys—i.e., rhabdomyolysis. [Rashtian Rule 26(a) report at p. 5.]

And although the Estate claims that Kroll has no specialized knowledge or expertise on the entire subject of rhabdomyolysis, the truth of the matter is that Kroll "knows the literature on electrical injury about as well as anybody" and is "very familiar" with the literature on electrical connections between stimulation or electrical injury and rhabdomyolysis. [Kroll Dep. 146: 5-8; 148:15 – 149:6.] In fact, Kroll knows that literature far better than Rashtian, who admits that he never read the literature or considered the relationship between electricity and rhabdomyolysis

---

[20] This is not, as the Estate has previously agued, [Filing No. 170 (Pls' prior Reply in Support of Motion to Exclude Kroll) at p. 12], an admission that Kroll lacks expertise to offer an opinion on whether electricity can cause rhabdomyolysis or what the scientific research and studies have concluded about the connection between CEWs and rhabdomyolysis.

until the Estate asked him to do so in order to serve as the Estate's expert in this case. [Rashtian

Dep. 65:5-15 & 220:8-11.] Not only does Rashtian not know the relevant literature, his report relies

exclusively on one study, which study actually refutes his opinion by concluding,

> Shocks from TASER devices have not caused thermal disruption or
> electroporation leading to clinically significant release of
> intracellular myoglobin and CK. Rather, most reports of TASER
> induced rhabdomyolysis have been mild and point to a mechanism
> of sustained muscle contraction, ATP [adenosine triphosphate]
> depletion, [and] accumulation of lactic acid . . . .

[Rashtian Dep. Ex. D – *Taser Electronic Control Device-Induced Rhabdomyolysis and Renal*

*Failure: A Case Report*.][21]  Significantly, the study relied upon by Rashtian discusses a subject

taken into custody by police who displayed symptoms of excited delirium—and excited delirium,

unlike electricity, is commonly associated with rhabdomyolysis. [*Id.*]

Beyond Kroll's familiarity with the literature, however, Kroll has written and published on

the connection (or, rather the lack of evidence of any connection) between electrical shock and

rhabdomyolysis. The Estate's contention that he has not is just wrong. Kroll has authored at least

a half dozen peer-reviewed papers and book chapters that discuss rhabdomyolysis, including but

not limited to a paper published in 2009 titled *Physiology and Pathology of TASER Electronic*

*Control Devises* and another paper published in June of 2018 titled *Cardiac and Skeletal Muscle*

*Effects of Electrical Weapons: A Review of Human and Animal Studies*. [Kroll Dep. 134:8 – 35;

142:1-17; Kroll CV at p. 82 & 91.][22]

---

[21]     Exhibit D to Rashtian's deposition is already in the record at Filing No. 161-2.]

[22]     *See also*: (1) Kroll, M.W., Fish, R.M., Lakkireddy, D., Luceri, R.M., Panescu, D., "Essentials of Low-Power
Electrocution: Established and Speculated Mechanisms," Conf. Proc. IEEE EMBC, 2012:34:5734-5740; (2) Kroll,
M., "Taser Conducted Electrical Weapons" found in Stark, M., ed. Clinical Forensic Medicine: A Physician's Guide,
New York: Springer, 2011:233-276; (3) Kroll, M. "Taser Electronic Control Devices" as found in Fish, R., Geddes,
L., eds. Electrical Injuries: Medical and Bioengineering Aspects. 2 ed. Tuscon, AZ: Lawyers and Judges Publishing
Co., 2008:455-491; and (4) Kroll, M., Wetli, C., Marsh, D., Karch, S., Graham, M., Ho., J., "Excited Delirium
Syndrome Checklist" as found in Taser Conducted Electrical Weapons: Physiology, Pathology, and Law, New York
City-Springer-Kluwer: 2009).]

The Estate's claim that Kroll has never written a paper with a "primary focus" on the effects of CEWs and rhabdomyolysis is also wrong. The paper co-authored by Kroll and published in 2018 examined the cases of 241 persons who voluntarily submitted to Taser exposure, found that the Taser exposures resulted in no more than a trivial increase in creatine kinase (a/k/a CK, the enzyme indicating rhabdomyolysis), and concluded that rhabdomyolysis would not be expected from exposure to a CEW. Kroll himself wrote the portions of that paper stating:

> The electrical waveform of a CEW creates and electric field between the dart electrodes, which stimulates type A-α motor neurons, initiating a tonic muscle contraction throughout parts of the body. Such tension of the musculoskeletal system could lead to muscle cell damages with release of the intracellular muscle enzyme creatine kinase (CK), myoglobin, and potassium.IN this context, the major concern is, whether this can cause an extreme increase of C with medical complications, such as rhabdomyolysis with the danger of kidney failure . . . .In summary, recent clinical research could not prove a direct link between CEWs and the development of rhabdomyolysis or hypo-hyperkalemia. Even though an increase in CK cannot be excluded, no clinical signs have been noted.

[Kunz, S.N., Calkins, H., Adamec, J., Kroll, M.W., *Cardiac and Skeletal Muscle Effects of Electrical Weapons: A Review of Human and Animal Studies," Forensic Science, Medicine and Pathology*, 2018:358-366 (cited in Kroll CV at p. 91).]

Since this paper was not only identified in Kroll's report but supplied to Rashtian as an exhibit at his deposition, the Estate was well aware of it. In fact, Kroll has authored at least eight papers and book chapters that discuss rhabdomyolysis. [Kroll Rule 26(a) report at p. 61 (reference publications listed in ¶¶ 1, 52, 59, 64, 5, 44, and 60).] No one in the world has published more papers or book chapters focusing on or discussing the issue of rhabdomyolysis and electrical weapons. Most of his papers were published in peer-reviewed physician-oriented scientific journals. If Kroll's opinions are good enough for educating specialist physicians, they are certainly good enough for educating jurors. In fact, if patient treatment were the test for expert admissibility,

then Rashtian would not be qualified to testify either as a cardiac electrophysiologist does not treat rhabdomyolysis. Patients with rhabdomyolysis are treated by emergency room physicians initially and then by nephrologists, who are kidney specialists.

As to Rashtian's new opinion announced at his deposition that Todero might be one of a subset of individuals with "heightened sensitivity to CK increases" from taser deployments, Kroll testified that neither he nor anyone else has any expertise about whether such individuals in fact exist, and he is sure there is no supporting literature on that subject, and he "know[s] the literature on electrical injury about as well as anybody. And I do not believe that has ever been published where somebody suggested that somebody was allergic to electricity so they were able to get rhabdo to a minor electrical stimulation when others did not." [Kroll Dep. 148:25- 148:6.]

The Estate seeks to preclude Kroll from testifying that the medical and scientific literature dispels the notion that: (1) certain individuals have a heightened sensitivity to CK rises; or (2) are particularly susceptible to developing rhabdomyolysis. The Estate claims that any such testimony would be wrong because the article titled *The Creatine Kinase Response to Resistance Exercise* (Filing No. 202-6—Exhibit G to the Estate's Motion to Strike Kroll) establishes that it is wrong. What the Estate omits from this argument is that said article had nothing to do with electricity and or whether electrical shocks cause rhabdomyolysis. The article showed that extraordinarily vigorous resistance exercise and the extreme working of skeletal muscle can lead to rhabdomyolysis. The article—addressing the well-known phenomena of rhabdomyolysis induced by extreme exercise—does not disprove Kroll's views about Taser induced rhabdomyolysis. Kroll himself presented two similar articles in his Rule 26(a) report.[23] If the Estate thinks the article

---

[23]     Those reports were: (1) Kenney K, Landau ME, Gonzalez RS, Hundertmark J, O'Brien K, Campbell WW. Serum creatine kinase after exercise: drawing the line between physiological response and exertional rhabdomyolysis. Muscle Nerve. 2012;45(3):356-62. doi:10.1002/mus.22317; and (2) Koch AJ, Pereira R, Machado M. The creatine kinase response to resistance exercise. J Musculoskeletal Neuronal Interact. 2014;14(1):68-77.

discredits Kroll's views, then the Estate can cross-examine Kroll on the article at trial, but the article itself provides no reason to exclude Kroll's testimony and opinions.

Moreover, in selectively quoting of Kroll's deposition testimony, the Estate fails to acknowledge for the Court that Kroll never discounts that vigorous exercise could induce rhabdomyolysis in some persons.

> Q: You testified earlier that you don't have any expertise or knowledge about whether or not certain individuals may have heightened sensitivity to CK rises or be particularly sensitive or susceptible to rhabdomyolysis, correct?
>
> A: I don't. And I would add that I'm not sure anybody does. I'm not sure that there is any supporting literature that, that people are sensitive to rhabdo. *Certainly not for electrical stimulation. And I know the literature on electrical injury about as well as anybody.*

[Kroll Dep. 148:15 – 149:2 (emphasis added).] Kroll's testimony and opinions are squarely within his expertise.

Finally, as to the Estate's assertion that Kroll has no background in pharmacology or toxicology, Kroll will not be offering any testimony or opinions about whether Todero was under the influence of illicit drugs such as Spice (a/k/a synthetic marijuana) at the time he was tased. Kroll merely noted in his Rule 26(a) report that Todero's clinical presentation was consistent with the use of Spice because the link between synthetic marijuana and the development of rhabdomyolysis is well-known and well documented in the medical and scientific literature and was something that Rashtian completely ignored. Pointing out the obvious and something that Rashtian overlooked does not disqualify his testimony and opinions.

## **CONCLUSION**

For the reasons explained above, there is no reason for the Court to exclude Kroll's testimony and opinions in this case, and the Court should not do so.

Respectfully submitted,

STEPHENSON MOROW & SEMLER

_s/ Pamela G. Schneeman_
Pamela G. Schneeman
Attorney No. 18142-53
Attorney for Defendants,
City of Greenwood, Renee Elliott,
and Elizabeth Laut

STEPHENSON MOROW & SEMLER
3077 East 98th Street, Suite 240
Indianapolis, IN 46280
Telephone: (317) 844-3830
Fax: (317) 573-4194
E-mail: pschneeman@stephlaw.com

## CERTIFICATE OF SERVICE

I hereby certify that on February 17, 2020, a copy of the foregoing GREENWOOD'S ELLIOTT'S, AND LAUT'S RESPONSE IN OPPOSITION TO PLAINTIFF'S MOTION TO BAR THE PROPOSED EXPERT TESTIMONY OF DR. MARK KROLL was filed electronically. Notice of this filing will be sent to the following persons by operation of the court's electronic filing system. Parties may access this filing through the court's system.

Arthur Loevy
arthur@loevy.com
D. Samuel Heppell
sam@loevy.com
Jonathan I. Loevy
jon@loevy.com
Steven E. Art
steve@loevy.com
Vince Field
vince@loevy.com
LOEVY & LOEVY
311 North Aberdeen, 3rd Floor
Chicago, IL 60607

Caren L. Pollack
cpollack@pollacklawpc.com
Lana R. Swingler
lswingler@pollacklawpc.com
Zachary J. Stock
zstock@pollacklawpc.com
POLLACK LAW FIRM, P.C.
10333 N. Meridian Street
Suite 111
Indianapolis, IN 46290


*s/ Pamela G. Schneeman*
Pamela G. Schneeman

STEPHENSON MOROW & SEMLER
3077 East 98th Street, Suite 240
Indianapolis, IN 46280
Telephone: (317) 844-3830
Fax: (317) 573-4194
E-mail: pschneeman@stephlaw.com