# Exhibit 1

## Expert Report of Roger Clark

# Roger Clark

## Police Procedures Consultant, Inc.

10207 Moino Road.  Santee, CA 92071
Phone: (208) 351-2458,  Fax: (619) 258-0045
rclark9314@aol.com

June 29, 2018

Sam Heppell, Esq.
Loevy & Loevy
311 North Aberdeen Street, Third Floor
Chicago, Illinois 60607

**_Regarding:_     _Teresa Todero, as Special Administrator of the Estate of Charles Todero vs. City of Greenwood, Brian Blackwell, Renee Elliott, and Elizabeth Laut, Case No. 1:17-cv-01698-TWP-MJD_**

Dear Mr. Heppell:

Thank you for retaining me to analyze and render opinions regarding the May 29, 2016 use of lethal force against Mr. Charles Todero (Mr. Todero), by City of Greenwood Police Department (GPD) Lieutenant Brian Blackwell (Lieutenant Blackwell), Officer Renee Elliott (Officer Elliott), and Officer Elizabeth Laut (Officer Laut).  Pursuant to the requirements of Rule 26, I have reviewed the GPD reports, video/audio recordings, GPD policy and training records, deposition testimony and exhibits, and other material (as listed below) provided to me thus far regarding this case.

It is also necessary to state at the beginning of this report that I do not make credibility determinations in expressing my opinions.  That is, where there are differences in the events proffered by the defendants versus those proffered by the Plaintiff or other witnesses, I do not opine for the trier of fact regarding who are the more believable witnesses.  The resolution of any such conflicts is obviously within the purview of a jury to decide.

## Materials Reviewed Thus Far:

     1.     Amended Complaint

**Exhibit 1**

2.      Defendants' Responses to Written Discovery (Interrogatories and Requests for Admission)

3.      Evidence Sync Download of Lieutenant Blackwell's X26 model Taser.

4.      Audio recordings:
        a.      911 call from Roger Poynter
        b.      911 call from Deborah MacNaughton
        c.      Dispatch radio traffic

5.      Video recordings:
        a.      Officer Elliott's body-worn camera footage
        b.      GPD Officer Randy Eck's body-worn camera footage

6.      GPD Police Reports and investigative materials

7.      Video recordings and interview transcripts of investigative interviews with:
        a.      Brian Blackwell
        b.      Randy Eck
        c.      Renee Elliott
        d.      Ian Godfrey
        e.      Elizabeth Laut
        f.      Deborah MacNaughton
        g.      Jeanne Moore
        h.      Terry Moore
        I.      Charles Moyer
        j.      Roger Poynter
        k.      Holly Walters

8.      Transcript and Exhibits from the depositions of:
        a.      GPD Lieutenant Blackwell.
        b.      GPD Officer Elliott.
        c.      GPD Officer Laut.
        d.      GPD Chief John Laut.
        e.      GPD Sergeant Jason Holtzleiter.
        f.      Ms. Teresa Todero (Mother-Plaintiff).
        g.      Ms. Holly Walters (Witness).

9.    GPD written policies.

10.    GPD training materials.

11.    GPD use of force reports and statistics.

12.    GPD training records.

13.    *2011 Electronic Control Weapon Guidelines*. U.S. Department of
Justice Office of Community Oriented Policing Services and Police
Executive Research Forum. Washington, D.C., 2011.

14.    Columbia Human Rights Law Review, "Unreasonable Seizures of
Unreasonable People:  Defining the Totality of Circumstances
Relevant to Assessing the Police Use of Force Against Emotionally
Disturbed People," by Professor Michael Avery, Spring, 2003.

15.    Greenwood Police Department 2016 and 2017 Annual Reports.


**Brief Overview of Events and Commentary:**

On May 29, 2016, Mr. Todero was walking on Madison Avenue between Main Street and
Fry Road in Greenwood, Indiana.  He was carrying the bible belonging to his father, who
had recently passed away.  Two motorists called 911 to report a man walking into traffic,
and Johnson County radio dispatch reported "Madison Ave, South of Fry Road, North of
Main, a white male subject attempting to commit suicide by traffic."  Lieutenant
Blackwell who was in a solo police unit, responded to the dispatch call and drove to the
scene.  He did not await the arrival of a back-up unit.

When Lieutenant Blackwell arrived in the vicinity of Madison Avenue and Camby Street,
he encountered Mr. Todero sitting on the side of the road, holding the bible in front of
him.  Lieutenant Blackwell reports that he engaged Mr. Todero in conversation, and Mr.
Todero stated in response "I am Jesus Christ."  Throughout their interaction, Mr. Todero
made repeated statements along the lines of "I am Jesus Christ the Prophet" or similar
statements.

Lieutenant Blackwell reported that Mr. Todero got up from the curb and began to walk
away from him.  Lieutenant Blackwell made various statements directing Mr. Todero to

go back to the side of the road and sit down, but Mr. Todero did not respond. Lieutenant Blackwell placed his hand on Mr. Todero's shoulder, but again received no response. Lieutenant Blackwell reports that at this point, Mr. Todero turned and began to walk at more of an angle towards the center of the roadway. In response, Lieutenant Blackwell deployed his Taser, firing two probes into Mr. Todero's back and discharging a 5 second burst of electricity into his body. At no point prior to Lieutenant Blackwell's use of the Taser had Mr. Todero done anything to threaten or approach Lieutenant Blackwell.

Lieutenant Blackwell reports that this Taser discharge caused Mr. Todero to drop down to his knees, approximately 2 feet into the roadway from the curb. Lieutenant Blackwell commanded Mr. Todero to get down on the ground and put his hands behind his back. Mr. Todero did not respond, held the bible in his hands in front of him, and again stated "I am Jesus Christ." Lieutenant Blackwell reports that he discharged his Taser an additional two or three times using the probe mode, sending electricity through the Taser wires and into the probes located in Mr. Todero's back, and then once in the elongated stun mode, placing the Taser unit in direct contact with the back of Mr. Todero's leg. Lieutenant Blackwell reports that, at this point, Mr. Todero fell forward face down onto the ground with his hands underneath his body.

Lieutenant Blackwell continued to repeatedly discharge his Taser using some combination of the probe and elongated stun modes while Mr. Todero was lying face down with his hands underneath him. The only stated justification for this use of force was Mr. Todero's failure to comply with Lieutenant Blackwell's commands to place his hands behind his back. At some point after Mr. Todero fell face down and was lying in the roadway, Officers Elliott and Laut arrived on the scene, and both officers at various points used force on Mr. Todero by grabbing at his arms and torso while attempting to force his hands behind his back.

In total, Lieutenant Blackwell discharged his Taser for a total of 98 seconds over a period of three minutes and 15 seconds.

Mr. Todero was eventually handcuffed. The officers called for medical assistance, and both firefighters and paramedics responded to the scene. Mr. Todero was placed in an ambulance and transported to St. Francis hospital. His heart stopped in the back of the ambulance shortly before he arrived at the hospital, and although medical staff were able to revive him, he ultimately died on June 11, 2016.

Lieutenant Blackwell was not equipped with a body-worn camera. Officer Elliott was equipped with a body-worn camera, but she failed to activate it upon her arrival on scene. As a result, the earliest body-worn camera footage of the incident was captured by GPD

Officer Randy Eck, who arrived on the scene just as Lieutenant Blackwell, Officer Elliott and Officer Laut were placing handcuffs on Mr. Todero, and apparently after all 16 Taser discharges had taken place. Officer Eck can be heard on his recording asking Officer Elliott if she had activated her camera, to which Officer Elliott responded that she had not. Shortly thereafter, she did activate her body-worn camera.

Although the body-worn camera footage does not capture the Taser use itself, it does provide some insight into the events that transpired. The video depicts Lieutenant Blackwell removing one of the Taser probes from Mr. Todero's back. The second probe was so deeply embedded in Mr. Todero's back that paramedics could not safely remove it, and they simply taped it in place to secure it for removal at the hospital.

On the video recording, Officer Elliott can be heard asking, "Is he just going to the hospital?," stating that "he hasn't been violent," to which Lieutenant Blackwell responds "he's not knowingly and intentionally doing anything." This is consistent with Lieutenant Blackwell, Officer Elliott and Officer Laut's later statements during the GPD investigation and with their testimony during this litigation. Each officer agrees that Mr. Todero did not commit any acts of violence, or threaten any violence. The only physical resistance that the officers describe is Mr. Todero resisting their efforts to pull his arms behind his back by tensing his arms to keep them underneath his body, and resisting their efforts to roll him up onto his side by pushing back in the opposite direction. During her interview with GPD Deputy Chief Ison, Officer Elliott states that when Mr. Todero "jerked" his arm away when she was trying to handcuff him, she believes it was a result of him being tased, and that his behavior was "passive resistance."

The GPD conducted a review of the May 29, 2016 incident, including interviews conducted by Deputy Chief Ison with all involved officers and third-party witnesses. The GPD concluded that Lieutenant Blackwell, Officer Elliott, and Officer Laut acted consistently with all of GPD's policies and procedures.

It is apparent from Lieutenant Blackwell and the other officers' descriptions of Mr. Todero's behavior that Mr. Todero was unarmed, non-violent throughout the incident, and posed no threat at any time. Under these circumstances, no use of force was justified on Mr. Todero. The use of force by these officers is inconsistent with nationally accepted standards of police practice and training. Lieutenant Blackwell's use of a Taser was particularly inappropriate, as the Taser is an intermediate use of force tool that should be deployed in response to assaultive or combative behavior. The duration of Lieutenant Blackwell's Taser use - 16 discharges totaling 98 seconds over a period of slightly more than three minutes - was wildly excessive, and a massive deviation from nationally accepted standards on Taser use and Taser's own guidelines.

It is also apparent that even before he arrived on scene, Lieutenant Blackwell should have been aware based on the nature of the call ("subject attempting to commit suicide by traffic") that he would be encountering a vulnerable person suffering from some sort of mental or emotional crisis. Certainly, once Lieutenant Blackwell arrived on scene and encountered Mr. Todero stating "I am Jesus Christ the Prophet" and failing to respond coherently to attempts at conversation, he was aware that Mr. Todero was delusional and could not be expected to respond rationally to instructions or commands. Lieutenant Blackwell's stated justification for his repeated Taser use was to secure Mr. Todero's compliance with his commands to lie down and put his hands behind his back. However, as Lieutenant Blackwell was aware that Mr. Todero was delusional and not responding rationally to the world around him, repeatedly using his Taser to try to obtain voluntary compliance with his commands was inappropriate, violated nationally accepted standards of police practice and training, and defied logic. Moreover, even if Mr. Todero had been in a position to respond rationally to Lieutenant Blackwell's commands, the Taser log shows that Lieutenant Blackwell frequently did not even give Mr. Todero any opportunity to comply, as he repeatedly pulled the trigger and discharged a new jolt of electricity without providing a sufficient recovery time for Mr. Todero to regain his senses after the painful and disorienting experience of being tased and respond to the commands he was being given.

**Established Federal Standards Regarding the Use of the Taser Weapon:**

The Taser has three modes of use: "probe," "touch stun," and "elongated stun" modes. In the probe mode, the cartridges project, through a set of wires, a pair of barbs (or darts with hooks) that attach to clothing or penetrate the skin after the Taser is fired, delivering an electrical charge. When the barbs strike, the electrical current is sent down the wires and through the body between the two barb points. In the "elongated stun" mode the activated weapon is moved to a distant part of the body while the probes are imbedded into the body creating a longer path of electrical energy extending from the darts to the weapon. In the "touch stun" (also known as "drive stun") mode, electrical contacts on the Taser are pressed directly onto a person and there is a similar, but greatly reduced neuromuscular effect.

It is uncontested in the record that Lieutenant Blackwell inflicted repeated multiple cycles of tasering from his Taser into Mr. Todero. The EvidenceSync log downloaded from his Taser reveals that Lieutenant Blackwell pulled the trigger on his Taser 16 times, inflicting a cumulative total of 98 seconds of electricity discharge on Mr. Todero. The default duration of a single discharge is 5 seconds, but an officer can cause the discharge to last longer than 5 seconds by holding down the Taser trigger. The download log reveals that

for 4 of the 16 Taser trigger pulls, Lieutenant Blackwell held down the trigger, overriding the default 5 second maximum and discharging electricity for a total of between 8 and 13 seconds.  The testimony from witnesses diverges with regard to the exact breakdown of the Taser use between probe and elongated stun modes, but it is uncontested that Lieutenant Blackwell utilized multiple instances of both modes during the incident on May 29.

The International Association of Chiefs of Police (IACP), with support from the Office of Community Oriented Policing Services (COPS), the Bureau of Justice Assistance (BJI), the National Institute of Justice (NIJ), and other policing organizations and associations developed and published in 2006 and 2011 defining documents regarding the use of the Taser weapon (listed as item 13 on page 2 of this report.)  Among other issues, these standards set forth the medical risks of excessive applications, and listed 52 specific and necessary guidelines governing the use of the Taser weapon.  As such, the document expresses the accepted professional standard of care and is endorsed by the U.S. Department of Justice.  I have noted a number of significant specific apparent departures from the guidelines by Lieutenant Blackwell which, in my opinion, contributed significantly to this incident and inflicted very serious and ultimately fatal injuries on Mr. Todero in violation of published and trained Federal guidelines, as follows:

**"Policy and Training Considerations**

"PERF believes that ECWs, when used appropriately and with a full understanding of their risks, are a useful weapon that can effectively help to resolve serious situations.  ECWs can reduce the need for other force options and can enable officers to subdue actively resisting or aggressive subjects while lowering the rates of injury to law enforcement officers and subjects.

"At the same time, ECWs are not harmless or risk-free, and ECWs should not be used in situations where alternative options, including other types of force or verbal de-escalation techniques, are more appropriate.  Furthermore, ECWs do not always work as intended, so officers must be prepared to consider and exercise other force options when the ECW is not having its intended effect or continued use will endanger the subject." (page 12)

**"Medical Considerations: Repeated or multiple applications may increase risk of death**

Page 7 of  24

"It is important to recognize that ECWs have been cited by medical authorities as a cause of, or contributing factor in, some deaths.  A number of factors appear to be associated with fatal and other serious outcomes. These factors include how the ECW was used and the physical or medical condition of the subject who received an ECW application.  Indeed, in July 2010 the American Academy of Emergency Medicine issued a Clinical Practice Statement advising physicians that they should consider additional evaluation and treatment for individuals who experienced an ECW application longer than 15 seconds (Vilke et al. 2010).

"Although causation factors are not clear, the most common factors that appear to be associated with fatal and other serious outcomes include 1) repeated and multiple applications, 2) cycling time that exceeds 15 seconds in duration, whether the time is consecutive or cumulative, and 3) simultaneous applications by more than one ECW.  **Officers must be trained to understand that repeated applications and continuous cycling of ECWs may increase the risk of death or serious injury and should be avoided.**" (page 13)

"**Medical Considerations: High-risk populations**

"Some populations currently believed to be at a heightened risk for serious injury or death following an ECW application include pregnant women, elderly persons, young children, visibly frail persons or persons with a slight build, persons with known heart conditions, persons in medical/mental crisis, and persons under the influence of drugs (prescription and illegal) or alcohol.  Personnel should be trained about the medical complications that may occur after ECW use and should be made aware that certain individuals, such as those in a state of excited delirium, may be at a heightened risk for serious injury or death when subjected to ECW application or other uses of force to subdue them." (page 14)

**Electronic Control Weapon Guidelines**

**Agency Policy**

2.      Agencies should develop policies and training curricula for ECWs that are integrated with the agency's overall use-of-force policy.

**Training**

10.    Agencies should not rely solely on training curriculum provided by
an ECW manufacturer. When they do use the curriculum, agencies
should ensure the manufacturer's training does not contradict agency
use-of-force policies and values. Agencies should ensure that their
ECW curricula are integrated into their overall use-of-force training
curriculum.

12.    ECW recertification should occur at least annually and should
consist of physical competency and weapon retention, agency policy
including any changes, technology changes, and reviews of local and
national trends in ECW use. Recertification should also include
scenario-based training.

13.    Personnel should be trained to use an ECW for one standard cycle
(five seconds) and then evaluate the situation to determine if
subsequent cycles are necessary. Training protocols should
emphasize that multiple applications or continuous cycling of an
ECW resulting in an exposure longer than 15 seconds (whether
continuous or cumulative) may increase the risk of serious injury or
death and should be avoided.

17.    Personnel should be trained to attempt hands-on control tactics
during ECW application, including handcuffing the subject during
ECW application (i.e., handcuffing under power). Training should
emphasize that personnel who touch a subject during ECW
application will not receive exposure to the electrical charge, so long
as caution is taken not to touch the subject along the circuit (i.e.,
between the locations of the two probes).

**Using the ECW**

21.    Personnel should use an ECW for one standard cycle (five seconds)
and then evaluate the situation to determine if subsequent cycles are
necessary. Personnel should consider that exposure to the ECW for
longer than 15 seconds (whether due to multiple applications or
continuous cycling) may increase the risk of death or serious injury.

Any subsequent applications should be independently justifiable, and the risks should be weighed against other force options.

25.  ECWs should be used only against subjects who are exhibiting active aggression or who are actively resisting in a manner that, in the officer's judgment, is likely to result in injuries to themselves or others.  ECWs should not be used against a passive subject.

26.  Fleeing should not be the sole justification for using an ECW against a subject.  Personnel should consider the severity of the offense, the subject's threat level to others, and the risk of serious injury to the subject before deciding to use an ECW on a fleeing subject.

27.  ECWs should not generally be used against pregnant women, elderly persons, young children, and visibly frail persons.  Personnel should evaluate whether the use of the ECW is reasonable, based upon all circumstances, including the subject's age and physical condition.  In some cases, other control techniques may be more appropriate as determined by the subject's threat level to others.

**Medical Considerations**

34.  Personnel should be aware that there is a higher risk of sudden death in subjects under the influence of drugs and/or exhibiting symptoms associated with excited delirium.

35.  When possible, emergency medical personnel should be notified when officers respond to calls for service in which they anticipate an ECW application may be used against a subject.

In my opinion, Lieutenant Blackwell's actions on May 29, 2016 constituted a gross departure from these nationally accepted standards of police practice and training.  The use of a Taser at all during this incident, and even more egregiously the use of a Taser 16 times for a cumulative total application of 98 seconds, grossly deviated from these standards.  Additionally, it is apparent that the GPD's policies and practices related to Taser use by its officers, including its training regimen, formal policies governing Taser use and use of force, and officer discipline and supervision reflect a significant deviation from these standards, and is reflective of the custom and practice of the City of Greenwood to endorse the gross over-dependence on the Taser weapon when other far

more reasonable and appropriate methods of force (if actually necessary) should be deployed.

**Opinions Thus Far:**

I hold these opinions with a reasonable degree of professional certainty:

1. This incident was a medical/mental health emergency and did not involve criminal activity. Accordingly, there was clearly no criminal activity requiring a use of force whatsoever—including any use of a Taser. The responsibility of all involved officers was to respond to Mr. Todero's need for medical/mental health evaluation and treatment. They all utterly failed in their duty in this regard and violated nationally accepted standards of police practice and training, including those set forth above, when they instead used force, and indeed, a grossly excessive amount of force, causing serious and ultimately fatal injuries to Mr. Todero.

2. Lieutenant Blackwell violated nationally accepted standards of police practice and training when he chose to respond to the Todero call for service alone, without another officer present in his vehicle and without requesting backup. He should have (and any reasonable officer would have) known, based on the nature of the call ("subject attempting to commit suicide by traffic"), that he would likely be encountering an individual suffering from some type of mental or emotional distress or disturbance, who was in need of assistance bringing him to safety and ultimately to a medical facility for evaluation and treatment. This type of call requires two officers to safely respond, and had there been another officer present when Lieutenant Blackwell initially encountered Mr. Todero, he would have additional options (beyond those he already did have) to resolve the situation safely.

3. Even accepting his arrival on scene by himself, Lieutenant Blackwell's actions after his arrival violated accepted police practices. Lieutenant Blackwell's stated justification for his initial decision to deploy his Taser was to prevent Mr. Todero from walking out into traffic. Lieutenant Blackwell had parked his police

vehicle with emergency lights activated to the south of the position where he encountered Mr. Todero, blocking the curb-adjacent northbound lane of traffic.  Lieutenant Blackwell stated in his interview with Deputy Chief Ison that at the time he used his Taser, Mr. Todero was only approximately two feet into the roadway from the curb.  This statement is corroborated by Officer Eck's body-worn camera footage, which shows Mr. Todero's position immediately adjacent to the curb.  Mr. Todero was walking, not running, and still in a position close to the curb, and so the use of a Taser to purportedly prevent him from walking into traffic was obviously premature.  Moreover, even without the additional backup officer who he should have ensured was there to assist him,  Lieutenant Blackwell had ample options available to him to prevent Mr. Todero from walking into the roadway before resorting to the Taser.  His decision to transition to the Taser after he reached out to touch Mr. Todero's shoulder and was shrugged off was inappropriate and against widely accepted police standards and practices.  Taser use must be in response to assaultive, combative behavior - Mr. Todero simply failed to respond (likely because he did not comprehend the situation or what he was being instructed to do).  Lieutenant Blackwell could have and should have attempted other means of moving Mr. Todero to the curb before deploying his Taser, for example, herding techniques by positioning his body in front of Mr. Todero blocking his ability to progress further into the roadway and persuading him through physical body movement to return to the curb.

4.      Once Mr. Todero had been dropped to his knees by the first Taser deployment, there was zero justification for any subsequent Taser use, and each of the 15 subsequent Taser discharges was independently a violation of national police practice standards.  From that point forward, the purported justification for the Taser use was to get Mr. Todero to comply with orders to put his hands behind his back.  However, national standards on Taser use, including those set forth above, do not permit the Taser to be used as a tool of compliance or convenience on a subject who is not engaged in any violent or assaultive behavior but is simply refusing to comply with a command.  This is particularly true when the subject is exhibiting obvious delusional behavior or signs of mental crisis or distress, such

that there is strong evidence they may not even be comprehending the commands given to them.  Additionally, the failure to provide adequate recovery periods between Lieutenant Blackwell's Taser discharges meant that Mr. Todero would have been unable to comply with the commands even if he were in a position to comprehend them.  Finally, the appropriate and nationally accepted practice when in a situation where multiple successive Taser discharges are contemplated is to wait for verbal confirmation of non-compliance before discharging the Taser for a subsequent application, in order to ensure that the non-compliance is voluntary rather than the subject still in a state of incapacitation and inability to comply.

5.      Immediately upon their arrival on the scene, Officer Elliott and Officer Laut should have perceived that the situation was stable, under control, and did not justify any use of force. When Lieutenant Blackwell announced his intent to discharge his Taser, they had an ethical and professional obligation to intervene and state that there was no basis to use force on Mr. Todero. Instead, they failed to intervene and in fact participated in the unnecessary and dangerous use of force on Mr. Todero by grabbing at his sides and arms, attempting to force him to roll over, and using a pressure point technique, while Lieutenant Blackwell continued to repeatedly use his Taser on Mr. Todero.

6.      Being tased is an extremely painful experience.  Mr. Todero was tased for a cumulative total of 98 seconds over a period of slightly over three minutes.  In other words, over that 3 minute and 15 second period, the majority of the time, Mr. Todero was being tased. This would have been an excruciatingly painful and disorienting experience, and served to further reduce if not eliminate any prospect that he would or could voluntarily comply with commands to place his hands behind his back.

7.      In my opinion, the record clearly establishes that Lieutenant Blackwell's Taser was deployed successfully and operated effectively each of the 16 times that Lieutenant Blackwell pulled the trigger.  During his interview with Deputy Chief Ison, Lieutenant Blackwell stated that after he initially shot the Taser at Mr. Todero, "it appeared that I got two good contacts, both barbs went in."

Although Lieutenant Blackwell later claimed to have seen one of the probes "dangling" in Mr. Todero's shirt, this statement is not consistent with the video recording from Officer Elliott's body-worn camera, which shows Lieutenant Blackwell pulling this Taser probe out of Mr. Todero's back and dropping it down towards his hand, where it was later recovered by paramedics. (The second of the two probes was undisputedly lodged so deeply in Mr. Todero's back that paramedics could not safely remove it on scene).  Moreover, even if Lieutenant Blackwell did observe the Taser probe lodged in Mr. Todero's shirt, this would not suggest that the Taser circuit was incomplete.  Mr. Todero's was wearing only a t-shirt which appears to fit him relatively snugly around the area of his back, and even a Taser probe that is caught up in clothing rather than embedded in the subject's skin will make a successful connection where it lies in close proximity to the skin, within approximately half-an-inch to an inch.  Additionally, all of Mr. Todero's responses to the numerous Taser discharge described by the various witnesses on the scene - dropping from a standing position down to his knees, later dropping forward onto his face, and jerking his arms, tensing his body and widening his eyes - are all consistent with the Taser making a successful electric connection, and are inconsistent with a bad connection or broken circuit.  The witness testimony regarding sounds that the Taser was making on the scene does not offer any useful evidence about whether the Taser was making a proper connection.  To the extent that there is any perceptible difference between the sound of a Taser discharge with a good and bad connection, it is a very subtle distinction that would be hard for anyone other than a highly trained operator to distinguish in practice in the field.

8.     Even in the event that one of the Taser probes was neither embedded in Mr. Todero's back nor in close enough contact with his body to make a consistently successful connection, each of the occasions on which Lieutenant Blackwell placed the Taser unit against Mr. Todero's body directly using the elongated stun mode would have provided the necessary second point of contact and would undisputedly have resulted in a good connection and successful discharge of electricity.

9.    Both the sheer number of Taser discharges and their total duration was outrageous, wildly excessive, grossly disproportionate to the situation, and a severe violation of nationally accepted standards of police practice and training.  Those standards - and Taser's own materials on which Lieutenant Blackwell was trained - establish that officers should not exceed 3 Taser discharges or a cumulative total of 15 seconds of discharge, and that it can be dangerous to the health and life of the subject to do so.

10.   Officer Elliott's failure to turn on her body camera during her dispatch to, or at a minimum upon her arrival, at the scene not only violated GPD's policy on body-worn camera use, but was a significant departure from the national standards of police practice, which resulted in the non-preservation of evidence related to the officers' use of force which would have been highly relevant both to this civil litigation and to the police investigation into the use of force.  Additionally, while it may be appropriate not to equip senior officers such as a Lieutenant with body-worn cameras where those officers' duties are primarily supervisory or administrative, Lieutenant Blackwell's response to the scene as a regular responding officer to a call for service demonstrates that was not his role in the department, and he too should have been equipped with a body-worn camera.

11.   The Taser training provided to Lieutenant Blackwell and the other officers by GPD was deficient.  The department's training officer testified that the department's Taser training primarily consisted of pulling the most recent Taser training power-point from Taser's website and instructing officers based on that power-point, with an additional component walking through the department's written Taser policy.  However, as noted above in the national standards, it is inappropriate to rely solely on Taser's training materials, and it is necessary to ensure those materials do not contradict the department's own use of force policies and values.  There is no evidence of an effort here to properly integrate the online Taser materials into the department's own training curriculum.  Additionally, no record is maintained of precisely what Taser training materials were used, what version of the user course was taught, and whether it was a full certification course or an

abbreviated refresher course, making it impossible to evaluate or monitor exactly how officers are being trained.

12.    The GPD's written policies regarding Taser use are deficient.  They do not provide any meaningful guidance on how to avoid excessive Taser use, or the circumstances in which Taser use is appropriate. There is also a serious lack of integration between the Taser policy and the GPD's separate use of force policy, in that the Taser policy articulates that the Taser occupies a certain position on the use of force continuum as reflected in the Use of Force policy, but the Use of Force policy does not match up with this categorization.  This adds confusion to a policy which is already lacking in clarity and guidance on what circumstances are appropriate for Taser use.

13.    Lieutenant Blackwell's prior use of force incidents reveal a disturbing pattern of inappropriate Taser use.  Specifically, the narrative descriptions provided by Lieutenant Blackwell in his reports for incidents G13L13725, G13L24072, G15L09369, G15L22079 reveal that Lieutenant Blackwell has a documented history of resorting to his Taser prematurely, and in situations where he has used it as a tool of compliance or convenience rather than in responses to assaultive or violent behavior warranting a less-lethal use of force response.  As the guiding principles of the national standards cited above set forth, "ECWs should be used as a weapon of need, not a tool of convenience."  Additionally, the fact that no remedial action was taken in response to these documented inappropriate uses of force by Lieutenant Blackwell, and that the GPD Chief ratified Lieutenant Blackwell's use of force in these incidents during his deposition in this case, demonstrates a serious failure to supervise and failure to discipline officers for inappropriate Taser use within the GPD.

14.    Lieutenant Blackwell's reports in this incident reveals an inexcusable omission of facts, which appear designed to mitigate his grossly excessive and unnecessary use of force, including his denial in the report that he used drive stun, his grossly understated number of applications, omission of any justification for the necessity of using the Taser in the first place, and omission of any explanation for his confrontational and provocative approach to someone he knows is delusional.  This incomplete and inappropriate documentation

appears to be part of Lieutenant Blackwell's habit or practice with regard to documenting Taser use of force incidents, as his reports in the prior incidents listed above reveal similar deficiencies, for example the omission of appropriate documentation of the number of times the Taser was discharged and omission of appropriate justification to use the Taser in the first place.

15.    GPD's statistics on the proportion of its use of force incidents that involve the use of Tasers reveals a systemic problem with over-reliance on Tasers.  GPD's 2016 annual report documents that 39% of GPD's use of force incidents in 2016 involved a Taser.  In 2017, fully 34% of use of force incidents involved a Taser that was actually deployed, with an additional 4% in which the Taser was displayed. These numbers are significantly higher than what would be expected from a department of this size and illustrate a systemic, GPD wide culture of excessive reliance on Tasers.

16.    GPD has no written policy regarding police interactions with individuals who are suffering from mental health issues.  The GPD training on this topic is poorly documented, and that which is documented is sporadic and insufficient to equip officers to properly handle situations involving vulnerable persons who are delusional. Nationally accepted standards of police practice and training require that officers be trained to recognize indications of mental illness, including delusional or irrational behavior ("I am Jesus Christ"), and be trained on appropriate techniques to manage interactions with such individuals.  Specifically, officers should be trained that for every action they take that increase the anxiety and stress of the situation/interaction, the ability of the person they are dealing with to respond rationally and to manage the situation decreases proportionally.

**My Qualifications To Review This Case:**

My opinions are based in part on my training, professional experience and education.  I am a twenty seven year veteran of the Los Angeles County Sheriff's Department (LASD). I was hired on December 1, 1965, and I retired from active service on March 31, 1993. My career included six years at the rank of Deputy Sheriff, six years as a Sergeant, and

fifteen years as a Lieutenant. I retired holding a California Peace Officer Standards and Training (POST) Advanced Certificate, and I am a graduate of the POST Command College (class #5, 1988). The POST Command College was a Masters level two-year course of study requiring a thesis, in Police Administration, with the diploma awarded by the California Department of Justice (and not the California University system).

During the course of my service with the department, I had a wide range of duties. Those duties included an 18 month assignment as a staff jail deputy and two years as an Administrator/Lieutenant in the same jail facility (Men's Central Jail). I also served on the department as a patrol officer, field supervisor, jail watch commander and administrator, station watch commander, and commanding officer of investigative units. I was a field training officer while assigned as a patrol deputy, and I trained new officers in POST and department approved patrol procedures, field investigations, apprehension techniques, and emergency procedures.

I was a Station Detective and, as such, reviewed and assessed cases passed on to me by the patrol officers. Those cases included possible complaints relating to both misdemeanor and felony crimes. They frequently required follow up investigations and interviews before the exact nature of the case could be determined. As a field officer and detective, I was trained in interview and interrogation methods and subsequently trained other officers.

Among other assignments as a Sergeant, I supervised field officers and station detectives as they took complaints and conducted preliminary investigations regarding criminal and administrative matters.

As a Sergeant and as a Lieutenant, I served on the training staff of the Los Angeles County Sheriff's Department's Patrol School which taught the POST accepted patrol tactics, and investigation and apprehension methods.

As a Watch Commander and as a Lieutenant, I responded to, investigated, and reported on the use of force and officer-involved shootings. I was also assigned by my Department to sit as a member of Departmental review committees regarding the reasonable or unreasonable use of force and tactics.

As stated above, during my career I was assigned to the Los Angeles County Men's Central Jail (MCJ) for a period of 18 months as a line officer. Upon my subsequent promotion to Lieutenant, I returned to the same facility approximately 10 years later. During that time, I was assigned as a Jail Watch Commander, and as the Facility Training

and Logistics Administrator. At the time of my assignment, the MCJ held a daily population in excess of 7,000 inmates, including a hospital, which was serviced by a staff of more than 900 sworn and civilian personnel.

During my assignment as the Administrative Lieutenant of the Department's Reserve Forces Bureau, I worked closely with the State of California Peace Officer Standards and Training in revamping our Reserve Academy to bring it into state compliance. This process gave me an expertise in the POST Basic curriculum. I also supervised the training of cadets at our Reserve Training Academy. They were taught proper investigation, interview, and apprehension procedures. Among other topics, I lectured the Reserve Academy on the POST syllabus: "The Legal and Moral Use of Force and Firearms."

During the 1984 Olympics held in Los Angeles, I was assigned and served as the Department's Intelligence Officer at the Los Angeles Olympics Emergency Operations Center.

During the last five and one half years of my career, I commanded a specialized unit known as the North Regional Surveillance and Apprehension Team (N.O.R.S.A.T.), which was created to investigate, locate, observe and arrest major (career) criminals. I held this position until my retirement from the Department on March 31, 1993.

Criminals investigated and arrested by N.O.R.S.A.T. included suspects involved with homicide, robbery, kidnaping, extortion, burglary, major narcotics violations and police corruption. The majority of our cases were homicide cases, including the murder of police officers. Arrests frequently occurred in dynamic circumstances including crimes in progress.

My unit also conducted major narcotics investigations including undercover narcotics buys, buy busts, and reverse stings. We frequently deployed at the request of investigative units, such as Narcotics, which provided the initial investigative leads for our operations. These narcotics cases usually involved multiple kilogram quantities of drugs and amounts of money ranging from one hundred thousand to more than one million dollars.

Approximately 80% of cases assigned to N.O.R.S.A.T. were active Homicide investigations. In that regard, the unit processed, under my command and supervision, various aspects (depending on the complexity of the cases involved) of approximately 1,000 Homicides ranging from deaths of police officers to serial homicide suspects.

Page 19 of 24

Additionally, the majority of the over 1750 cases for which I have been retained as a consultant (since 1993) have involved injuries or deaths connected with some aspect of force during either apprehension or while in police custody.

During the first three months of my command of N.O.R.S.A.T., the unit had three justifiable shooting incidents.  From that time, and over the next five years of my command, N.O.R.S.A.T. established a remarkable record of more than two thousand arrests of career criminals without a single shot fired – either by my officers or by the suspects whom we arrested.

Many of these suspects were armed and considered to be very dangerous.  Some were apprehended during the course of their crimes and were very prone to use firearms to escape apprehension.  This record of excellence was accomplished through the use of proper tactics, management and supervision of personnel, training in correct apprehension methods, and adherence to the moral and ethical standards endorsed by California POST and my Department.  These methods and principles are also embraced by every state training commission of which I am aware, as well as the national standards established by the U.S. Department of Justice.

As a result of my position and record as the commanding officer of N.O.R.S.A.T., I was assigned to author Field Operations Directive 89-3, "Tactical Operations Involving Detective Personnel."  This order remained in force 20 years (until September 30, 2009), and included the basic standards and considerations with which investigative officers must comply in the event of a tactical deployment such as the dynamic entry into a building for the purpose of an arrest and/or seizure of evidence.

Since my retirement, I have testified as an expert on use of force, jail procedures and jail administration, investigations, police procedures, police tactics, investigative procedures, shooting scene reconstruction, and police administration in Arizona State Courts, California State Courts, Washington State Courts and Federal Courts in Arizona, California, Colorado, Florida, Illinois, Indiana, Louisiana, Missouri, Nevada, Ohio, Oregon, Pennsylvania, Texas, Utah, Washington, New Mexico, New York and Wisconsin.  I have testified before the Los Angeles Police Department Board of Rights and the Los Angeles County Civil Service Commission.  I have testified before the Harris County (Texas) Grand Jury and the Cleveland Grand Jury.  I have also submitted written opinions in matters before Alaska, Delaware, Idaho, Montana, North Carolina, New York, Oregon, Kentucky, and Wyoming Federal and State Courts.  I was selected (January 20, 2007) to present on the topic of: "Police Experts" at the National Police Accountability Project held at Loyola Law School, Los Angeles, California.  I was

selected (September 23, 2010) to present on the topic of: "Using POST Modules to
Establish Police Officer' Standard of Care" at the National Police Accountability Project,
National Lawyers Guild Convention, in New Orleans, Louisiana.  I was selected (March
30, 2012) to present to the Kern County Public Defenders in Bakersfield, California, on
the topics of "Ethics, Police Investigations, the California POST Curriculum, and the
M26 and X26 Taser weapons."  On August 7, 2013 I was invited and presented to the
Texas Civil Rights Project (TCRP) 2013 Annual Legal Summit in Austin, Texas on the
topic: "Ethically Working with Experts from the Prospective of a Police Expert."  On
October 15, 2015 I was the invited presenter at a Community Forum in Victorville,
California on the topics of Police Procedures, Community Policing, Use of Force, and
features of the M26, X26 and X2 Taser weapons.

I have worked on several projects with the Paso Del Norte (El Paso, Texas) Civil Rights
Project and the Texas Civil Rights Project (Austin, Texas).  As a result of my expert
testimony in *Border Network, et al. v. Otero County, et al.*, Case No. 07-cv-01045
(D.N.M. 2008), a federal court issued a temporary injunction to stop the illegal and
widespread immigration raids in Chaparral, New Mexico, implemented pursuant to
Operation Stonegarden.  The case resulted in the adoption of a model policy for inquiring
into a person's immigration status, which has been adopted nationwide and has also been
presented to the United States Senate, the Secretary of Homeland Security, and other
government officials seeking to reform immigration enforcement.

I have been recognized, and my expert report was quoted by the USDC in *Burns v. City of
Redwood City*, 737 F.Supp2nd.1047.  I have been recognized, and my expert report was
quoted by, the United States Court of Appeals for the Ninth Circuit as an expert in Police
Administration and Use of Force in *Blankenhorn v. City of Orange, et al.*, 485 F.3d 463,
485 (9th Cir. 2007).  The Ninth Circuit also drew from my expert report in a second
published case involving Police Detective Investigations. *Torres, et al. v. City of Los
Angeles, et al.*, 540 F.3d 1031, 1042-43 (9th Cir. 2008).  The *Torres* case was appealed to
the U.S. Supreme Court and returned for trial.  I provided the expert opinion in *Chavies
Hoskin v. City of Milwaukee, et al.*  (USDC Case No. 13-cv-0920), regarding field strip
and cavity searches, hiring, training, discipline and supervision, and which resulted in
significant policy changes within the MPD.  My opinions supported argument in the
Ninth Circuit case: *Chaudhry v. City of Los Angeles*, 751 F.3d 1096, 1102 (9th Cir. 2014).
The Ninth Circuit also drew from my expert reports regarding credible threats justifying
the use of force, *Hayes v. County of San Diego*, 658 F.3d 867 (9th Cir. 2011), and *Young
v. County of Los Angeles*, 655 F.3d 1156 (9th Cir. 2011).  The Ninth Circuit also drew
from my expert reports regarding Jail Administration and Administrative Responsibilities,
*Starr v. Baca*, 652 F.3d 1202 (9th Cir. 2011).  The Ninth Circuit also drew from my
expert reports regarding an officer's violation of the 14th Amendment if an officer kills a

suspect when acting with the purpose to harm, unrelated to a legitimate law enforcement objective, in *AD v. California Highway Patrol*, 712 F. 3d 446 (9th Cir. 2013). The Fifth Circuit drew from my expert report regarding search and seizure, investigations and no-knock requirements in *Bishop et al. v. Arcuri et al.*, 674 F.3d 456 (5th Cir. 2012). The Ninth Circuit also drew from my expert report regarding the use of impact weapons (PepperBall) on civilians in *Nelson v. City of Davis*, 685 F.3d 867 (9th Cir. 2012). I was the expert in the Ninth Circuit opinion regarding the allegations proffered by police officers and their use/display of firearms against civilians in *Green v. City and County of San Francisco*, 751 F. 3d 1039 (9th Cir. 2014). Most recently, I was the expert in an important Ninth Circuit opinion regarding the allegations proffered by police officers and their use of lethal force against unarmed persons in *Jennifer Cruz, et al., v. City of Anaheim, et al.*, 765 F.3d 1076 (9th Cir. 2014). I was the expert at trial in the Ninth Circuit opinion regarding the order of evidence at trial in *Estate of Manuel Diaz, v. City of Anaheim*, et al., No. 14-55644. My opinion is quoted in the Ninth Circuit opinion regarding the use of lethal force in *A.K.H. a minor, et al, v. City of Tustin, et al.*, No. 14-55184. My opinions supported argument in the Ninth Circuit case: *Estate of Angel Lopez, et al., v. Kristopher Michael Walb*, No. 14-57007 (not for publication) wherein the Ninth Circuit Affirmed the Denial of Summary Judgement by the District Court. My opinions supported argument in the Ninth Circuit case: *Estate of Shakina Ortega, et al., v. City of San Diego, et al.* No. 14-56824 (not for publication) wherein the Ninth Circuit Affirmed the Denial of Summary Judgement by the District Court. My opinions supported argument in the Ninth Circuit case: *Jerry Newmaker, et al., v. City of Fortuna, et al.* No. 14-15098 (for publication). My opinions supported argument in the Ninth Circuit case: *Tonya E. Shirar, v. Miguel Guerrero, et al.* regarding use of lethal force and "suicide by cop," No. 15-55029 (not for publication). My opinions supported argument in the Ninth Circuit Case *Angel Mendez; Jennifer Lynn Garcia, v County of Los Angeles, et al.*, Nos. 13-56686, and 13-57072 (for publication) and which was settled before the Supreme Court, No. 16-369, regarding the use of lethal force and searches. My opinions supported argument in the Ninth Circuit case: *Chien Van Bui, et al, v City and County of San Francisco, et al*, No. 14-16585 (not for publication), regarding the use of lethal force. My opinions supported argument in the Sixth Circuit opinion, Case No. 16-5322, *Carey Woodcock v. City of Bowling Green, et al*, Originating Case No. 1:13-cv-00124 regarding the use of lethal force. My opinions supported argument in the Ninth Circuit opinion, Case No. No. 14-17388 (for publication), *Johnathan Jones, et al v. Las Vegas Metropolitan Police Department, et al*, Originating Case No. 2:12-cv-01636- regarding the use of lethal force and Taser weapons. My opinions supported argument in the Ninth Circuit opinion, Case No. 16-15606 (for publication), *Christian Longoria, et al v. Pinal County, et al*, Originating Case No. 2:15-cv-00043, PHX SRB, regarding the use of lethal force after a vehicle pursuit. My opinions supported argument in the Ninth Circuit case: *S. B. v. County of San Diego*, 864 F.3rd 1010 (9th Cir. 2017), (for publication) regarding

issues of qualified immunity.  My opinions supported argument in the Tenth Circuit case: *Russell Tenorio v. Brian Pitzer,* Case No. 2012-CV-01295 (U.S. Supreme Court No. 15-795) regarding issues of qualified immunity and use of deadly force.

The California Court of Appeal (Second Appellate District) drew in part from my expert report regarding search warrant service, *Macias v. County of Los Angeles*, 144 Cal. App.4th 313, 50 Cal. Rptr.3d 364 (2006).  The California Supreme Court drew in part from my expert opinion regarding police tactics and the use of deadly force, *Hayes et al. v. County of San Diego et al.*, 57 Cal.4th 622 (2013).

On February 10, 1989, I was personally commended at the Los Angeles County Hall of Administration by United States Attorney General, the Honorable Edwin Meese III, for my work to establish California Penal Code Section 311.11 (forbidding the Possession of Child Pornography).  On February 22, 1993 (at the time of my retirement), Mr. Meese presented a second personal commendation for the success of this critical five-year effort to bring this law into effect.  California Penal Code Section 311.11 is required training for all Law Enforcement Officers in California and taught extensively in the POST Basic Learning Domain #9: "Crimes Against Children,"pages 1-18 to pages 1-21.

On December 7, 2015 I was requested by the Cleveland District Attorney to present my opinions to the Cleveland Grand Jury regarding the November 22, 2014 shooting death of Tamir Rice by City of Cleveland police officers.  In March, 2016 I was requested by the Delaware Attorney General to review and provide my opinions regarding the shooting death of Jeremy McDole.  The AG report was published May 12, 2016.

I have been found competent by both Federal and State Courts to render opinions as to responsibilities as occurred in this case.  A number of my cases have involved law enforcement officers as civil plaintiffs and as criminal defendants.

Since my retirement, I have become an expert in the features and the use of TASER International's products, including the Model M26, Model X26 and Model X2 ECDs.  I own each, along with the download software.  I have reviewed all the TASER training materials and am familiar with the risks and tactics associated with these potentially lethal devices.  I have qualified as an expert on TASER products and testified both in deposition and before juries on their usage.  Two published examples are *Lee v. Nashville*, 596 F. Supp. 2d 1101, 1121-22 (M.D. Tenn. 2009), and *Heston v. City of Salinas*, 2007 U.S. Dist. LEXIS 98433, *25-*26 (E.D. Cal. 2007).  My most recent Federal acceptance/certifications as an expert in the general use and deployment of the TASER weapon (including Taser International product warnings/bulletins sent to every agency using the Taser weapon) occurred in Los Angles, California on November 7, 2017 in

Page 23 of  24

*William Mears, et al., v. City of Los Angeles, et al,* USDC Case No.: CV 15-08441 JAK (AJWx) and on February 22, 2018 in *Maria Hernandez; A.J., Jr., et al, v. City of Los Angeles, et al,* USDC Case No. 2:16-c-02689 AB (JEMx), and on May 3, 2018 in Heleine Tchayou, et al. v. City of Los Angeles, et al., Case No. 16-cv-06073-TJH-MRW. There are many others.

Attached as Exhibit A is a statement listing my law enforcement qualifications and experience; Exhibit B is my fee schedule; Exhibit C is a listing of matters in which I have testified in the last four years as an expert.

I reserve the right to modify my opinions to the extent additional information is provided.

I declare under penalty of perjury that the foregoing is true and correct. Executed June 29, 2018, at Santee, CA.


Roger A. Clark