UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| TERESA TODERO as Special Administrator of the ESTATE OF CHARLES TODERO, | ) ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) | No. 1:17-cv-01698-JPH-MJD |
| | ) | |
| BRIAN BLACKWELL, RENEE ELLIOT, ELIZABETH LAUT, AS-YET UNIDENTIFIED GREENWOOD POLICE OFFICERS, CITY OF GREENWOOD, | ) ) ) ) ) ) | |
| Defendants. | ) ) | |

**ORDER ON MOTIONS TO EXCLUDE EXPERT TESTIMONY**

The parties have filed six motions to exclude expert testimony at trial.

Defendants City of Greenwood, Renee Elliot, and Elizabeth Laut ("Greenwood

Defendants") have filed a motion to substitute Dr. Gary Vilke as an expert.

Dkt. [217].  For the reasons explained below, the motion to substitute is

**GRANTED**, dkt. [217], the motion to exclude the testimony of Dr. Charles Wetli

is **DENIED as moot**, dkt. [199], and the remaining motions to exclude expert

testimony are **GRANTED in part and DENIED in part**.  Dkt. [191]; dkt. [193];

dkt. [195]; dkt. [197]; dkt. [201].

**I.
Facts and Background**

Teresa Todero, as special administrator of her son Charles Todero's

estate, brought this case alleging constitutional violations under 42 U.S.C. §

1

1983 and state-law torts committed during his arrest.  Defendants moved for summary judgment, which the Court granted in part and denied in part.  Dkt. 177.  That left an excessive-force claim against Officer Brian Blackwell; a failure-to-intervene claim against Officers Renee Elliot and Elizabeth Laut; and Indiana-law claims for survival, assault and battery, and intentional infliction of emotional distress against the City of Greenwood.  *Id.* at 29.

The parties have filed six motions to exclude expert testimony at trial. Defendants have filed two motions to exclude testimony of Roger Clark, dkt. 191; dkt. 197, and two motions to exclude testimony of Dr. Mayer Rashtian, dkt. 193; dkt. 195.  Ms. Todero has filed a motion to exclude testimony of Dr. Charles Wetli, dkt. 199, and a motion to exclude testimony of Dr. Mark Kroll, dkt. 201.  Dr. Wetli is no longer available to testify at trial, so Greenwood Defendants have filed a motion to substitute Dr. Gary Vilke in place of Dr. Wetli.  Dkt. 217.

## II.
## Applicable Law

To testify as an expert, a witness must be qualified "by knowledge, skill, experience, training, or education."  Fed. R. Evid. 702; *Hall v. Flannery*, 840 F.3d 922, 926 (7th Cir. 2016).  General qualifications are not enough; a foundation for answering specific questions is required.  *Hall*, 840 F.3d at 926. A witness qualified with respect to the specific question being asked may give opinion testimony if:

a) The expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;

b) The testimony is based on sufficient facts or data;

c) The testimony is the product of reliable principles and methods; and

d) The expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702; *Hall*, 840 F.3d at 926.  These requirements are evaluated under the two-step *Daubert* framework.  *Robinson v. Davol Inc.*, 913 F.3d 690, 695 (7th Cir. 2019) (citing *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 593–94 (1993)).

For the first step, the proponent must "establish that the proposed witness would testify to valid scientific, technical, or other specialized knowledge." *Id.*  At this step, the Court "evaluates whether the expert's theory has been (1) tested, (2) subjected to peer review and publication, (3) analyzed for known or potential error rate, and/or is (4) generally accepted within the specific scientific field." *Id.*

If step one is satisfied, the proponent "must then show that the expert testimony will assist the trier of fact." *Id.*  For this step, the Court "evaluates whether the proposed scientific testimony fits the issue to which the expert is testifying." *Id.*

**III.**
**Analysis**

**A. Roger Clark**

Ms. Todero plans to call Roger Clark as an expert in police practices and procedures and use of force.  Dkt. 205 at 1.  Defendants challenge the admissibility of some of his designated opinions.  *See* dkt. 191; dkt. 197.

**1. Opinions based on the 2011 Electronic Weapons Control Guidelines**

Defendants seek to bar Mr. Clark from testifying that Officer Blackwell's conduct violated nationally accepted standards.  Dkt. 192 at 8–10; dkt. 198 at 3–6.  Mr. Clark bases his opinions on the 2011 Electronic Weapons Control Guidelines ("Guidelines") produced by the Police Executive Research Forum with a grant from Community Oriented Policing Services, United States Department of Justice.  Dkt. 205-3 at 2–3.  The Guidelines "are not standards," *id.* at 15, but are "a result of a national survey that examined the use of [electronic control weapons], specifically what policies, practices, and training were being employed in the field."  *Id.* at 7.

Ms. Todero argues that it was "methodologically sound" for Mr. Clark to consult the Guidelines and that they would help the jury understand police practices and policies surrounding Taser use.  Dkt. 205 at 8–12.  Defendants argue that the Guidelines are not national standards and that opinions based on them would invade the jury's role on deciding the "ultimate issue" whether Officer Blackwell used excessive force.  Dkt. 192 at 8–12; dkt. 198 at 3–7.

Fourth Amendment excessive force turns on whether the officer "used greater force than was reasonably necessary." *United States v. Brown*, 871 F.3d 532, 536 (7th Cir. 2017).  Reasonableness does not turn on an officer's compliance with or deviation from policies or guidelines.  *Id.* at 537.  If it did, the police department that made the policies or the organization drafting the guidelines "would become the arbiter of Fourth Amendment reasonableness"— which is contrary to the Fourth Amendment's design.  *Id.*  Mr. Clark thus **may not opine** that the Guidelines reflect the constitutional standard for excessive force or that Officer Blackwell used excessive force.  And because the "excessive-force inquiry is governed by constitutional principles, not police-department regulations," *id.* at 537–38, Mr. Clark **may not opine** on whether the City of Greenwood specifically has adopted the Guidelines, whether the City's policies or training align with the Guidelines, or whether Mr. Blackwell violated the City's policies.  But there are other opinions of Mr. Clark that Ms. Todero intends to offer at trial that fit within the *Daubert* framework.

While the excessive-force inquiry is governed by constitutional principles rather than policies or standards, "expert testimony concerning police policy is not categorically barred."  *Id.*  In some cases—such as when jurors "may not fully grasp particular techniques or equipment used by police officers in the field—"specialized knowledge of law-enforcement custom" and standard training or practice can help the jury.  *Brown*, 871 F.3d at 537.

The Guidelines reflect such standard practice, since they are based on "what policies, practices, and training were being employed in the field."  Dkt.

205-3 at 7.  Mr. Clark's consultation of the Guidelines is therefore a methodologically permissible basis for an expert opinion on the Guidelines governing Tasers and "departures from them," including whether Officer Blackwell's conduct departed from the Guidelines.  *Jimenez v. City of Chicago*, 732 F.3d 710, 721 (7th Cir. 2013).  This does not, however, necessarily mean that this testimony will be admissible at trial.  Defendants' arguments about relevance are subject to evaluation under, for example, Federal Rules of Evidence 401 and 403 if raised in a motion in limine or at trial.

### 2. Opinions about a Taser's duration of shocks and pain caused

Defendants seek to bar Mr. Clark from testifying about the amount of time Mr. Todero was tased and the pain that would have been inflicted, arguing that he is not qualified to do so.  Dkt. 192 at 7–8; dkt. 198 at 10–11.

Mr. Clark's report concludes that Mr. Todero was tased for a total of 98 seconds.  Dkt. 205-1 at 5–7, 11, 14.  Ms. Todero argues that Mr. Clark is qualified to reach that conclusion because he has reviewed Taser's training materials, completed a Sheriff's Office Taser training, and operated a Taser.  Dkt. 205 at 4, 15–16.  Defendants argue that Mr. Clark has no relevant Taser experience and "no background, education, or training in electricity or bioelectricity, how the electricity from a Taser is emitted, or how [that electricity] works upon the human body."  Dkt. 192 at 7–8; dkt. 198 at 10–11.

How long a Taser attempts to deploy a shock is a question of Taser operation and programming.  Mr. Clark is trained on those things, so he has technical or specialized knowledge that he can apply to opine about how long

the Taser here deployed a shock.  *See* dkt. 250-2 at 50 (Clark Dep. at 153);

*Smith v. Ford Motor Co.*, 215 F.3d 713, 718 (7th Cir. 2000).  Any gaps in that

training or lack of specific scientific knowledge about bioelectricity are issues

for cross-examination.  *See Daubert*, 509 U.S. at 596 ("Vigorous cross-

examination, presentation of contrary evidence, and careful instruction on the

burden of proof are the traditional and appropriate means of attacking shaky

but admissible evidence.").

The duration of electricity that Mr. Todero specifically was subject to will

likely depend on disputed underlying facts, including whether the Taser

worked properly.  Mr. Clark may "give an opinion to the jury concerning the

facts," even if those facts are disputed.  *Lapsley v. Xtek, Inc.*, 689 F.3d 802, 809

(7th Cir. 2012); *see Stecyk v. Bell Helicopter Textron, Inc.*, 295 F.3d 408, 414

(3rd Cir. 2002).  The jury will decide whether the underlying facts are true, and

"the burden of exploring the facts and assumptions underlying the testimony of

an expert witness is on opposing counsel during cross-examination."  *Stecyk*,

295 F.3d at 414; *see also Daubert,* 509 U.S. at 596 ("Vigorous cross-

examination, presentation of contrary evidence, and careful instruction on the

burden of proof are the traditional and appropriate means of attacking shaky

but admissible evidence.").

However, Mr. Clark **may not** attempt to resolve factual disputes for the

jury.  *See Lapsley*, 689 F.3d at 809 (expert testimony must "have a factual

basis").   He also **may not** present opinions lacking a factual basis.  *Id.*  Mr.

Clark therefore **may opine** about the amount and duration of electricity Mr.

7

Todero was subjected to as long as that testimony has a factual basis, and he **may identify and explain** the facts and evidence underlying his opinions.

Mr. Clark also opines that Mr. Todero's tasing would have been "excruciatingly painful and disorienting" and would have "reduce[d] if not eliminate[d]" his ability to obey commands to put his hands behind his back. Dkt. 205-1 at 14.  Plaintiff argues that Mr. Clark is qualified to offer that opinion because he tased someone once and observed its effect.  But Mr. Clark's experience is limited to having reluctantly tased a lawyer, with precautions in place, to prove a point in another case.  Dkt. 205-2 at 16–18 (Clark Dep. at 46–48).  That is nothing like the situation when Mr. Todero was tased.  Moreover, the "kind of experience that Rule 702 contemplates" is "extensive hands-on experience over a meaningful period of time during which a person develops a working expertise in a certain area." *Jones v. Lincoln Elec. Co.*, 188 F.3d 709, 724 (7th Cir. 1999); *see Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 156 (1999) ("[N]o one denies that an expert might draw a conclusion from a *set of observations* based on *extensive and specialized experience*." (emphases added)).  Plaintiff cites no other experience that Mr. Clark has with the pain caused by Tasers, so Mr. Clark **may not opine** on Mr. Todero's pain and the possible effects of that pain.

### 3. Opinions about Officer Blackwell's prior Taser incidents

Ms. Todero argues that Mr. Clark is qualified to testify about Officer Blackwell's prior Taser deployments, and that Federal Rules of Evidence 403 and 404 do not make that testimony inadmissible.  Dkt. 205 at 16–19.  Officer

Blackwell argues that this evidence is inadmissible under Rules 403 and 404. Dkt. 192 at 12–14. Because these arguments focus on Rules 403 and 404 instead of on Rule 702, the Court defers ruling until the parties have briefed the anticipated motion in limine on this issue. *See* dkt. 205 at 17 n.6.

### 4. Opinions about body cameras

Greenwood defendants seek to exclude Mr. Clark's opinions about body cameras. Dkt. 198 at 7. Ms. Todero argues that Mr. Clark's "fifty combined years as a police officer and police practices consultant" qualify him to testify about whether Officer Elliot should have turned on her body camera and whether Officer Blackwell should have had a body camera. Dkt. 205 at 22. Greenwood Defendants argue that Mr. Clark has identified no guidelines or national standards on body-camera use. Dkt. 198 at 7.

Mr. Clark has not shown that he's qualified to testify about body cameras. While in his fifty years' experience he has "developed an understanding of . . . nationally accepted standards," he has not identified any standards governing body cameras and does not point to any specialized knowledge or experience that he has related to body cameras. Dkt. 205-2 at 103 (Clark Dep. at 338). In short, while Mr. Clark has general qualifications, he has not shown the required "foundation for answering specific questions" about body cameras. *Hall*, 840 F.3d at 926. Mr. Clark therefore **may not opine** about body cameras.

### 5. Opinions about excessive force and failure to intervene

Ms. Todero argues that Mr. Clark may opine that Officer Blackwell used excessive force and that Officers Elliot and Laut failed to intervene in a departure from nationally accepted standards.  Dkt. 205 at 19, 23.  Defendants argue that those are inadmissible legal opinions on ultimate issues.  Dkt. 192 at 10; dkt. 198 at 9.

Under Federal Rule of Evidence 704, an expert opinion "is not objectionable just because it embraces an ultimate issue."  However, experts may not "merely tell the jury what result to reach."  *United States v. Brown*, 871 F.3d 532, 539 (7th Cir. 2017); *accord Good Shepherd Manor Found. v. City of Momence*, 323 F.3d 557, 564 (7th Cir. 2003).  That's what would happen if Mr. Clark merely told the jury that Officer Blackwell used excessive force, or that Officers Elliot and Laut failed to intervene in violation of the constitution, so Mr. Clark **may not opine** on those legal conclusions.  *See Brown*, 871 F.3d at 539 (upholding the exclusion of an expert opinion that the defendant "acted reasonably under the circumstances" in a Fourth Amendment excessive-force case).

However, expert opinions on issues that "have direct implications for applying" the excessive-force and failure-to-intervene legal standards, including "sound professional standards" and alternatives that may have been available, are relevant and can help the jury.  *Jimenez v. City of Chicago*, 732 F.3d 710, 721 (7th Cir. 2013).  Defendants do not argue that Mr. Clark is unqualified to offer those opinions, dkt. 207 at 4; dkt. 208 at 4, and he has training and

10

experience in these areas.  Mr. Clark therefore **may opine** on those issues, "limited to describing sound professional standards and identifying departures from them."  *Jimenez*, 732 F.3d at 721.  But, again, identifying departures may not stray into identifying ultimate constitutional violations.

Ms. Todero also argues that Mr. Clark should be allowed to opine that the City of Greenwood failed to supervise and discipline Officer Blackwell and failed to train Officers Elliot and Laut.  Dkt. 205 at 19, 23.  The Court defers ruling on these issues pending potential motions in limine on issues such as relevance.

### 6. Opinions about Mr. Todero's medical condition and cause of death

In response to Defendants' arguments, dkt. 192 at 4–7; dkt. 198 at 12, Ms. Todero says Mr. Clark would not testify about medical causation, dkt. 205 at 23–24.  She does not address Mr. Clark's qualifications to offer other medical opinions.  Mr. Clark therefore **may not opine** on any medical topics, including cause of death, physical or mental medical condition, excited delirium, rhabdomyolysis, delusions, and the medical effects of Tasers.

### 7. Use of "flowery language"

Greenwood Defendants argue that the Court should admonish Mr. Clark "not to characterize the evidence using flowery language" like "disturbing," "outrageous," and "inexcusable."  Dkt. 198 at 12–13.  Because Mr. Clark will be offering expert opinions, his testimony must be supported by sound methodology.  *Hall*, 840 F.3d at 926.  Mr. Clark therefore **may not** offer

subjective glosses or conclusions that are not supported by his expert qualifications.

### B. Dr. Mayer Rashtian

Ms. Todero plans to call Dr. Mayer Rashtian, a cardiac electrophysiologist, as a medical expert.  Defendants challenge the admissibility of some of his opinions.

### 1. Methodology for opinion that Taser shocks caused Mr. Todero to experience rhabdomyolysis

Defendants seek to exclude Dr. Rashtian's opinion that the use of the Taser caused Mr. Todero to experience rhabdomyolysis, resulting in his death. Dkt. 194 at 3–10; dkt. 196 at 5–8.  Defendants challenge both his qualifications and the methodology he used to reach this conclusion.[1]  Ms. Todero argues that Dr. Rashtian used a reliable "building block" methodology that uses several different tools to determine causation.  Dkt. 206 at 18–26. Defendants contend that Dr. Rashtian's methodology is unreliable because he failed to consider several potential causes of rhabdomyolysis.  Dkt. 194 at 8–10; dkt. 196 at 4–8.

Dr. Rashtian testified that he reviewed Mr. Todero's records and determined that the "only thing" that could have caused Mr. Todero's elevated creatine kinase levels and rhabdomyolysis was the Taser exposure.  Dkt. 206-3 at 40 (Rashtian Dep. at 54).  That's because Mr. Todero had just been tased and had not been immobile or intoxicated with alcohol or cocaine.  *Id.* at 40–43

---

[1] Because this opinion must be excluded under the methodology analysis, the Court does not address qualifications.

(Rashtian Dep. at 54–57).  Dr. Rashtian also relied on a case report that found that Taser exposure has induced rhabdomyolysis in some patients who may be predisposed based on genetics or other unknown factors.  *Id.* at 11 (Rashtian Dep. at 22).

In short, Dr. Rashtian considered several possible causes like immobility and intoxication, and then ruled them out based on the facts surrounding Mr. Todero's death as he understood them.  The parties dispute whether this is a "differential etiology," in which a doctor "rules in all the potential causes of a patient's ailment and then by systematically ruling out causes that would not apply to the patient . . . arrives at what is the likely cause of the ailment." *Myers v. Ill. Cent. R.R.*, 629 F.3d 639, 644 (7th Cir. 2010).  Defendants argue that it was a differential etiology, while Ms. Todero argues that Dr. Rashtian affirmatively determined Taser shocks to be the cause *in addition to* ruling out alternate causes.  Dkt. 206 at 23.

Labelling Dr. Rashtian's methodology is unnecessary because it cannot support his opinions either way.  Dr. Rashtian testified that Tasers can cause rhabdomyolysis in rare situations based on genetic predisposition or other unspecified factors.  Dkt. 206-3 at 55 (Rashtian Dep. at 69).  But he was unable to testify why that would be true for Mr. Todero:

> Q: "Do you know what, if any, genetic predisposition Mr. Todero may have had?"
> A: "I don't know.  Again, all I know, that I'm confident that Mr. Todero had rhabdomyolysis from the Taser. *What was his predisposing factor, what kind of a genetic predisposition he had, I don't know.*"

13

*Id.* at 57 (Rashtian Dep. at 71) (emphasis added).

Dr. Rashtian's methodology is therefore guesswork, which cannot pass *Daubert* muster. *See Myers*, 629 F.3d at 645 (describing etiology based on assumptions as "a hunch or an informed guess" that cannot support an opinion). Nor is his observation that Mr. Todero experienced rhabdomyolysis shortly after he was tased a reliable methodology. *See Ervin v. Johnson & Johnson*, 492 F.3d 901, 904–05 (7th Cir. 2007) ("The mere existence of a temporal relationship . . . does not show a sufficient causal relationship.").

Moreover, even if Dr. Rashtian's methodology were a differential etiology, it would not be reliable here. Differential etiology can be reliable under *Daubert* on a case-by-case basis depending on "which potential causes should be 'ruled in' and which should be 'ruled out.'" *Id.* But Dr. Rashtian did not reliably reach his conclusions through differential etiology. Defendants cite, and Ms. Todero does not challenge, a medical journal article listing exertion, medicinal drug use, infections, endocrine disorders, and neuroleptic malignant syndrome—but not electrical shock—as causes for rhabdomyolysis. Dkt. 194 at 1. Dr. Rashtian did not account for those potential causes. *See* dkt. 206-3 at 40–43 (Rashtian Dep. at 54–57). Indeed, for exertion, he testified that he "[has]n't done research" on whether it can lead to rhabdomyolysis when combined with extreme heat and dehydration. *Id.* at 87 (Rashtian Dep. at 101). Nor did he provide any evidence that electrical shock causes rhabdomyolysis as commonly or more commonly than those other potential causes. *See id.* at 11

14

(Rashtian Dep. at 22) ("Again, rhabdomyolysis is not a common complication of Taser exposure.").

That failure to account for several other potential causes makes Dr. Rashtian's methodology unreliable, undermining his opinion that the Taser caused Mr. Todero's death.  Several factors could have caused Mr. Todero to experience rhabdomyolysis, including exertion, dehydration, and infection.  *See* dkt. 211 at 5–6.  Dr. Rashtian's failure to consider those "unknown, potentially wide-ranging variables is not a scientific exercise."  *Brown v. Burlington N. Sante Fe R.R.*, 765 F.3d 773, 774 (7th Cir. 2014).  "[S]uch guesswork" is not "widely accepted in the scientific community."  *Id.* (affirming the exclusion of testimony because the medical expert's failure to consider motorcycle riding and volunteer firefighting as potential causes for cumulative-trauma wrist, elbow, and shoulder injuries was "flatly inconsistent with differential etiology").

In short, Dr. Rashtian found *a* potential cause that fit "common sense," and opined that it was *the* cause.  Dkt. 206-3 at 40 (Rashtian Dep. at 54) ("So, for me, it was just [ ] common sense.").  But "[o]ther than common sense, there was no methodology to [his] etiology."  *Myers*, 629 F.3d at 645.  "And 'the courtroom is no place for scientific guesswork, even of the inspired sort.'"  *Id.* (quoting *Rosen v. Ciba-Geigy Corp.*, 78 F.3d 316, 319 (7th Cir. 1996).  Dr. Rashtian therefore **may not opine** about what caused Mr. Todero to experience rhabdomyolysis.

### 2. Opinions about Mr. Todero's pain

Greenwood Defendants seek to bar Dr. Rashtian from testifying about pain from the physical effects of the Taser.  Dkt. 196 at 9–11.  Ms. Todero argues that Dr. Rashtian's training and experience qualify him to opine about the pain that Mr. Todero felt when he was tased and while he was in the hospital.  Dkt. 206 at 10–12.  Greenwood Defendants argue that Dr. Rashtian lacks experience with pain from Tasers and that opinions about Mr. Todero's pain in the hospital would be speculative.  Dkt. 196 at 10–11.

As an electrophysiologist, Dr. Rashtian is "more familiar with the electrical effects on the body than any other practicing clinician."  Dkt. 206-3 at 127 (Rashtian Dep. at 213).  And he has worked with patients who had suffered electrical injuries, mostly from power lines.  *Id.* at 132 (Rashtian Dep. at 220).  Paired with his review of the Taser manual, that is enough education and experience to qualify him to testify that the electricity from a Taser causes involuntary muscle contraction, which to most people feels like pain.  *Id.* at 120 (Rashtian Dep. at 185); *see Traharne v. Wayne/Scott Fetzer Co.*, 156 F.Supp.2d 697, 716 (N.D. Ill. 2001).

While Dr. Rashtian cannot recall working with any patient who had been tased, dkt. 206-3 at 80 (Rashtian Dep. at 94), that is an issue for the adversarial process.  *See Gayton v. McCoy*, 593 F.3d 610, 616 (7th Cir. 2010); *Daubert*, 509 U.S. at 596.  Dr. Rashtian **may opine** about pain that Mr. Todero may have suffered from being tased.

For Mr. Todero's pain while he was in the hospital, Ms. Todero cites no evidence that Dr. Rashtian is qualified to opine on pain that someone in Mr. Todero's situation may have felt while hospitalized.  *See* dkt. 206 at 12.  And the qualifications section of Dr. Rashtian's report does not reveal education or experience on this issue.  *See* dkt. 206-1 at 3.  Dr. Rashtian therefore **may not opine** on Mr. Todero's pain while he was in the hospital.

### 3. Opinions about Dr. Kroll's research and biases

Greenwood Defendants seek to bar Dr. Rashtian from testifying about Dr. Kroll's credibility and biases.  Dkt. 196 at 11–13.  Ms. Todero argues that Dr. Rashtian may opine that Dr. Kroll used biased populations in his studies and that Dr. Kroll is biased because he's a Taser advocate and sits on Taser's board.  Dkt. 206 at 13–14.  Greenwood Defendants argue that Dr. Rashtian's medical expertise does not qualify him to opine on Dr. Kroll's credibility.  Dkt. 196 at 11–12.

Dr. Rashtian is a physician with substantial medical research experience, but Greenwood Defendants point to evidence that he has not read at least Dr. Kroll's most recent studies.  *See* dkt. 206-3 at 111 (Rashtian Dep. at 154).  Ms. Todero does not argue that Dr. Rashtian has read Dr. Kroll's articles or examined the populations studied in them.  Dkt. 206 at 14.  Ms. Todero therefore has not shown that Dr. Rashtian's opinions about the

populations in Dr. Kroll's studies are reliable,[2] so Dr. Rashtian **may not opine** on them.

Ms. Todero also provides no evidence or argument that Dr. Rashtian is qualified to opine on whether Dr. Kroll is personally biased. *See* dkt. 206 at 14. Dr. Rashtian **may not opine** on that issue.

### 4. Opinions about Taser's past claims

Greenwood Defendants seek to exclude Dr. Rashtian's opinions about past safety claims from Taser International. Dkt. 126 at 13–14. Ms. Todero argues that Dr. Rashtian is qualified to testify about Taser's historical claims that its products do not cause certain injuries. Dkt. 206 at 14–15. Greenwood Defendants argue that Dr. Rashtian isn't qualified to do so because "he has no expertise in either rhabdomyolysis or Tasers," dkt. 196 at 13, and because he has considered the effects of Tasers only twice, dkt. 212 at 17.

While Dr. Rashtian's experience with Tasers may be limited, his medical education and research qualify him to evaluate Taser's past claims about the medical effects of its products, *see Gayton*, 593 F.3d at 616, and Defendants have not challenged Dr. Rashtian's methodology in reaching those opinions, *see* dkt. 212 at 17–18. So, to the extent it's relevant and otherwise admissible, he **may opine** about the accuracy of Taser's past medical claims.

### 5. Opinions about underreporting of Taser-induced rhabdomyolysis

---

[2] While Greenwood Defendants call this a challenge to Dr. Rashtian's qualifications, it is apparently a challenge to his methodology (or lack thereof) in evaluating Dr. Kroll's articles.

Greenwood Defendants seek to exclude Dr. Rashtian's testimony that Taser-induced rhabdomyolysis is underreported in the scientific literature. Dkt. 196 at 14–15.  Ms. Todero argues that Dr. Rashtian's extensive experience with medical research qualifies him to testify that Taser-induced rhabdomyolysis is underreported in the medical literature.  Dkt. 206 at 16. Greenwood Defendants argue that Dr. Rashtian lacks expertise in rhabdomyolysis or Tasers and has not read the most relevant research.  Dkt. 196 at 14.

Dr. Rashtian's research experience is relevant to his qualifications, but whether he has read the studies that he would opine on goes to his methodology.  Ms. Todero does not argue that Dr. Rashtian has read or analyzed the relevant studies and does not explain the methodology that Dr. Rashtian applied to reach his opinion.  Dkt. 206 at 16. Dr. Rashtian therefore **may not opine** on whether the medical research underreports Taser-induced rhabdomyolysis.

### 6. Opinions about excited delirium

Greenwood Defendants seek to exclude Dr. Rashtian's opinions about excited delirium as a "wastebasket" diagnosis.  Dkt. 126 at 15–16.  Ms. Todero argues that Dr. Rashtian is qualified to opine that excited delirium "is not a recognized medical or psychiatric diagnosis."  Dkt. 206 at 16.  Greenwood Defendants argue that Dr. Rashtian has not considered the medical research on the link between excited delirium and rhabdomyolysis or recognized the "many articles" on excited delirium published since 1985.  Dkt. 196 at 19–20.

19

Ms. Todero points to no evidence that Dr. Rashtian has studied or investigated excited delirium; only that he heard that "some of the medical examiners" call it a "wastebasket diagnosis." Dkt. 206-3 at 70 (Rashtian Dep. at 84). She argues that's enough—even though Dr. Rashtian has never been taught about or trained on excited delirium, dkt. 206-3 at 8 (Rashtian Dep. at 19)—because excited delirium "does not exist" so it's not surprising that he wasn't familiar with it. Dkt. 206 at 17. That argument, however, overlooks the medical research on excited delirium; Ms. Todero cites no evidence that Dr. Rashtian has reviewed or considered that research in forming his opinion. *See* dkt. 212 at 19–20.

Ms. Todero therefore has not shown that Dr. Rashtian is qualified on this topic, so he **may not opine** on excited delirium. Similarly, by agreement of the parties, Dr. Rashtian **may not opine** "that Wikipedia and other source documentation suggest that Taser invented excited delirium." Dkt. 206 at 18 n.4.

### C. Dr. Mark Kroll

Defendants plan to call Dr. Mark Kroll as an expert in bioelectricity. Dkt. 203 at 2. Ms. Todero seeks to exclude several of his opinions.

#### 1. Opinions about Mr. Todero's cause of death

##### a. Opinions about electrocution's role

Ms. Todero argues that Dr. Kroll's opinions ruling out electrocution as a cause of death are irrelevant because electrocution is not an issue. Dkt. 202 at

9. Because these arguments focus on relevance instead of *Daubert*, the Court defers ruling on this issue for a potential motion in limine.

### b. Opinions about Taser shocks' role

Ms. Todero seeks to exclude several opinions about the role the Taser played in causing Mr. Todero's death.  Dkt. 202 at 9–14.

### i.   Qualifications

Ms. Todero seeks to exclude Dr. Kroll's opinion that Taser use was the "best opportunity to save [Mr. Todero's] life."  Dkt. 202 at 11.  Greenwood Defendants argue that Dr. Kroll has published research on numerous deaths indirectly caused by Tasers, but do not address his qualifications to offer opinions on police practices and force options.  *See* dkt. 203 at 8–10.  Ms. Todero contends that Dr. Kroll "admits he has no experience in police practices beyond a general familiarity with the statistics comparing Tasers to other uses of force."  *Id.*  Dr. Kroll therefore **may not opine** on police officers' alternatives to using a Taser or whether the Taser use was prudent.

### ii. Methodology

For Dr. Kroll's other opinions on the Taser shocks, the parties dispute whether he applied a reliable methodology to reach the opinion that the shocks did not cause Mr. Todero's death.  Ms. Todero argues that "[Dr. Kroll] offers no analysis of how he reaches such a broad, generalized conclusion other than to claim that he rejects electrocution as a cause of death."  Dkt. 202 at 12.  She contends that his opinions are pre-formulated conclusions unsupported by analysis or methodology.  Dkt. 209 at 4–5.  Defendants argue that Dr. Kroll's

conclusions are based on published work and peer-reviewed papers, "including detailed timelines used to analyze the facts." Dkt. 203 at 9-12.

The focus is on the Dr. Kroll's methodology, not his ultimate conclusions. *Kopplin v. Wisc. Cent. Ltd.*, 914 F.3d 1099, 1104 (7th Cir. 2019). An expert may offer conclusions that are subject to doubt if they are based on valid methodology. *Gopalratnam v. Hewlett-Packard Co.*, 877 F.3d 771, 781 (7th Cir. 2017). The methodology must present a "rational connection between the data and the opinion." *Id.* at 781 (quoting *Manpower, Inc. v. Ins. Co. of Penn.*, 732 F.3d 796 (7th Cir. 2013)).

Dr. Kroll explains—and Ms. Todero does not dispute—that Mr. Todero's creatine kinase ("CK") levels were elevated and "are diagnostic of rhabdomyolysis." Dkt. 202-1 at 42. He then cites published research concluding that "[e]lectronic control simply does not cause more than trivial increases in CK levels—and far less than those seen in safe exercise workouts." *Id.* at 43. Ms. Todero appears not to challenge that methodology, so Dr. Kroll **may opine** on the Taser's role in causing Mr. Todero to experience rhabdomyolysis. *See Smith v. Ford*, 215 F.3d 713, 719 (7th Cir. 2000) (quoting *Daubert,* 509 U.S. at 593-94).

However, Defendants do not point to methodology supporting a broader opinion that Taser shocks were wholly unrelated to Mr. Todero's death. *See* dkt. 203 at 11. Dr. Kroll therefore **may not opine** generally that Taser shocks played no role in Mr. Todero's death.

### 2. Opinion about amount and duration of "electronic control"

Ms. Todero seeks to exclude Dr. Kroll's opinions about the amount and duration of electricity the Taser discharged into Mr. Todero's body.  Dkt. 202 at 14–19.  Greenwood Defendants argue that Dr. Kroll's conclusions should not be excluded because, while the facts are disputed, his science and methodology are reliable and he will "explain the facts upon which his testimony and opinions are based."  Dkt. 203 at 12.  Ms. Todero argues that Dr. Kroll bases his opinions on disputed facts "without applying any specialized knowledge from his field of expertise" and rather "simply conducts the same analysis of disputed facts that the jury will be asked to conduct."  Dkt. 202 at 15.

Under *Daubert*, Dr. Kroll may opine about Tasers if his "scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or determine a fact in issue."  *Robinson*, 913 F.3d at 695 (citing *Daubert*, 509 U.S. at 593-94).  That's the case here because, as discussed above, jurors are likely to be unfamiliar with Tasers, especially the amount and duration of electronic control coming from a Taser.  *See Abbott v. Sangamon County, Illinois*, 705 F.3d 706, 726 (7th Cir. 2013); *accord Brown*, 871 F.3d at 538 (explaining that expert testimony may be helpful when police used tools such as a gun, mace, or a slapjack).  So, as a general matter, Dr. Kroll's "specialized knowledge" of Tasers would benefit the jury.  *Brown*, 871 F.3d at 537.

More specifically, Dr. Kroll seeks to opine that a single probe landed in Mr. Todero's body and that the trigger pulls delivered no current to Mr. Todero. Ex. A at 25-26.  Those opinions turn on disputed facts; whether (1) the lower

23

Taser probe made a complete connection with Mr. Todero, (2) the Taser was functioning properly.  Dkt. 202-1 at 25–26.  The parties also dispute whether any of the Taser trigger pulls were inadvertent.  *See id.* at 18.

Defendants do not argue that Dr. Kroll is qualified to testify whether those facts are true, so he **may not opine** that disputed underlying facts are true.  Dkt. 203 at 12 ("Kroll does not intend to use his expertise to tell the jury how they should resolve certain factual disputes.").  However, that these facts are disputed does not change the admissibility of Dr. Kroll's opinions—he may "give an opinion to the jury concerning the facts," even if those facts are disputed.  *Lapsley v. Xtek, Inc.*, 689 F.3d 802, 809 (7th Cir. 2012); *see Stecyk v. Bell Helicopter Textron, Inc.*, 295 F.3d 408, 414 (3rd Cir. 2002).  The jury will decide whether the underlying facts are true, and "the burden of exploring the facts and assumptions underlying the testimony of an expert witness is on opposing counsel during cross-examination."  *Stecyk*, 295 F.3d at 414; *see also Daubert,* 509 U.S. at 596 ("Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence.").

Therefore, as with Dr. Clark—see above at pages 7 and 8—Dr. Kroll **may identify and explain** the facts and evidence underlying his opinions, but **may not** attempt to resolve factual disputes for the jury.  *See Lapsley*, 689 F.3d at 809 (expert testimony must "have a factual basis").   Dr. Kroll **may opine** about the amount and duration of electricity Mr. Todero was subjected to as long as

that testimony has a factual basis. *Id.* However, Dr. Kroll admits that his opinions on the premature trigger pulls and broken wires are not supported by record evidence. Dkt. 202-5 at 181–82, 191 (Kroll Dep. at 179–180, 189). They therefore do not "have a factual basis," *Lapsley*, 689 F.3d at 809, so Dr. Kroll **may not opine** that they affected the amount of duration of electricity Mr. Todero was subjected to.

### 3. Opinions about general safety of Tasers

Ms. Todero argues that Dr. Kroll's opinions about the general safety of Tasers are irrelevant. Dkt. 202 at 26. Greenwood Defendants argue that his opinions on Tasers, including how they work, the science and technology behind Tasers, their safety, and their effects on the human body are relevant. Dkt. 203 at 24–25. Because these arguments focus on relevance instead of *Daubert*, the Court defers ruling on this issue for a potential motion in limine.

### 4. Opinions on Plaintiff's experts

Ms. Todero seeks to exclude Dr. Kroll's opinions about Mr. Clark's and Dr. Rashtian's opinions. Dkt. 202 at 27–31. The parties also dispute whether Dr. Kroll's opinions are relevant.

#### a. Opinions on Mr. Clark's testimony

Greenwood Defendants argue that Dr. Kroll is qualified to explain the science and to state the opinion that the science does not support the claimed police policy. Dkt. 203 at 27. Ms. Todero argues that because Dr. Kroll has no training or expertise in police practices, he is unqualified to opine about Mr.

Clark's opinions about nationally accepted standards on Tasers and Mr.

Todero's ability to comply with Officer Blackwell's commands.  Dkt. 202 at 27.

Dr. Kroll's report states that "[e]very day, law-enforcement officers use

pain compliance techniques," and Mr. Clark's "opinion that pain would

interfere with compliance goes against all police training and experience."  Dkt.

202-1 at 38.  These opinions about police training and experience and law-

enforcement techniques go beyond his expertise as a biomedical scientist.  *See*

dkt. 202-5 at 154-155.  Dr. Kroll therefore **may not** opine on Mr. Clark's

opinions about police training and experience.

### b. Opinions on Dr. Rashtian's opinions

Greenwood Defendants argue that "[t]he fact that [Dr. Kroll] is a scientist

and not a medical doctor does not render him unqualified" to comment on Dr.

Rashtian's opinions.  Dkt. 203 at 28.  Ms. Todero argues that Dr. Kroll is not a

medical doctor and therefore "expands into areas in which he is not qualified to

opine" by commenting on medical causal connections between electricity and

rhabdomyolysis.  Dkt. 202 at 29.  To opine on what caused Mr. Todero to

experience rhabdomyolysis, Dr. Kroll must be qualified by "knowledge, skill,

experience, training, or education."  *Hall*, 840 F.3d at 926 (quoting Fed. R.

Evid. 702).

A lack of a medical degree or any medical training can render an expert

witness unqualified to give expert testimony on medical questions.  *See e.g.,*

*Goodwin v. MTD Prods., Inc.*, 232 F.3d 600, 609 (7th Cir. 2000) (an expert with

a degree in mechanical engineering was not qualified to give expert testimony

on medical questions, including the cause of an eye injury); *Jones v. Lincoln Elec. Co.*, 188 F.3d 709, 723–24 (7th Cir. 1999) (a witness who had a mechanical engineering degree but lacked a medical degree or medical training was not qualified to give expert testimony on medical questions about the effects of manganese and manganese fumes on the human body). But whether a person who is not a doctor is qualified to offer expert testimony on a medical question is an individual, fact-specific inquiry and the facts here support the admissibility of Dr. Kroll's opinion. *See Hall*, 840 F.3d at 926.

Dr. Kroll is a biomedical scientist with a primary specialty in bioelectricity. His primary focus is on the effect of electrical shocks on the human body. Ex. A at 5. He holds a Ph.D. and M.S. in Electrical Engineering. Ex. D at 2. Dr. Kroll also researches and develops electrical devices to diagnose and treat disease. He has authored over 200 abstracts, papers, and book chapters, and has served as co-editor of four books including the only two scientific treatises on Tasers. Ex. A at 5.

Although Dr. Kroll is not a medical doctor, he is qualified to comment science behind the effects of exposure of electricity on the human body, including the causes of rhabdomyolysis. Dr. Kroll therefore **may opine** about Dr. Rashtian's opinions on that topic, subject to any future rulings in limine on issues such as relevance.

### D. Greenwood Defendants' motion to substitute Dr. Vilke for Dr. Wetli

Greenwood Defendants have filed a motion to substitute Dr. Vilke as an expert for Dr. Wetli, who is incapacitated and will not be able to testify at trial.

Dkt. 217.  Ms. Todero "agrees that it would not be 'just' to permit Dr. Wetli's unfortunate and unforeseen health problems to be the cause of Defendants' inability to present expert medical testimony at the upcoming trial."  Dkt. 221 at 4; *see Stringer v. Cambria Fabshop—Indianapolis, LLC*, No. 1:13-cv-659-SEB-TAB, 2015 WL 13632234 at *2 (S.D. Ind. Oct. 2, 2015).  She objects only that the substitution should not place Defendants in a better position than they would have been with Dr. Wetli's testimony, asking the Court to rule on her motion to exclude Dr. Wetli's testimony before ruling on the motion to substitute.  Dkt. 221 at 1, 4, 10–12.

Ms. Todero argues that it would be "highly inefficient" to require *Daubert* briefing on Dr. Vilke's opinions based on alleged flaws in Dr. Wetli's opinions. Dkt. 221 at 7.  But Ms. Todero agrees that approach "would obviate the windfall to Defendants," *id.* at 7, and other Courts have taken that route. Moreover, it would be at least as inefficient to issue an advisory opinion on Dr. Wetli's expert testimony, only some of which may affect Dr. Vilke's testimony. If Ms. Todero believes that any of Dr. Vilke's testimony should be excluded because it goes beyond the subject matter of Dr. Wetli's testimony, she can incorporate her previous arguments and any new ones into a future *Daubert* motion.

Greenwood Defendants' motion to substitute expert witness is therefore **GRANTED**, dkt. [217], and Ms. Todero's motion to bar Dr. Wetli's expert testimony is **DENIED as moot**, dkt. [199].

Dr. Vilke shall have through **September 30, 2020** to complete his expert report.  Ms. Todero shall have through **October 30, 2020** to depose Dr. Vilke. Objections to Dr. Vilke's expert testimony shall be filed by **November 30, 2020**.

## IV.
## Conclusion

Greenwood Defendants' motion to substitute expert witness is **GRANTED**, dkt. [217], and Ms. Todero's motion to bar Dr. Wetli's expert testimony is **DENIED as moot**, dkt. [199].  Dr. Vilke shall have through **September 30, 2020** to complete his expert report.  Ms. Todero shall have through **October 30, 2020** to depose Dr. Vilke.  Objections to Dr. Vilke's expert testimony shall be filed by **November 30, 2020**.

The remaining motions to exclude expert testimony are **GRANTED in part and DENIED in part**.  Dkt. [191]; dkt. [193]; dkt. [195]; dkt. [197]; dkt. [201].

This order is subject to future rulings, such as orders in limine.  Each party **SHALL ENSURE** that its experts understand and follow this order and all future orders relevant to their testimony.  The Court expects all counsel—who are experienced, sophisticated lawyers—to prepare the expert witnesses accordingly.

**SO ORDERED.**

Date: 9/16/2020

_James Patrick Hanlon_
James Patrick Hanlon
United States District Judge
Southern District of Indiana

Distribution:

Steven E. Art
LOEVY & LOEVY
steve@loevy.com

Scott R. Drury
LOEVY & LOEVY
drury@loevy.com

D. Samuel Heppell
LOEVY & LOEVY
sam@loevy.com

Mark A. Holloway
STEPHENSON MOROW & SEMLER
mholloway@stephlaw.com

Theresa Kleinhaus
LOEVY & LOEVY
tess@loevy.com

Arthur Loevy
LOEVY & LOEVY
arthur@loevy.com

Jonathan I. Loevy
LOEVY & LOEVY
jon@loevy.com

Caren L. Pollack
POLLACK LAW FIRM, P.C.
cpollack@pollacklawpc.com

Pamela G. Schneeman
STEPHENSON MOROW & SEMLER
pschneeman@stephlaw.com

James S. Stephenson

STEPHENSON MOROW & SEMLER
jstephenson@stephlaw.com

Zachary J. Stock
POLLACK LAW FIRM PC
zstock@pollacklawpc.com

Lana R. Swingler
POLLACK LAW FIRM PC
lswingler@pollacklawpc.com