**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION**

| | | |
|---|---|---|
| TERESA TODERO, as Special Administrator of the ESTATE OF CHARLES TODERO, | ) ) ) | |
| | ) | Case No. 1:17-cv-1698-JPH-MJD |
| *Plaintiff*, | ) ) | Judge James Patrick Hanlon |
| v. | ) ) | Magistrate Judge Mark J. Dinsmore |
| CITY OF GREENWOOD, BRIAN BLACKWELL, RENEE ELLIOTT, ELIZABETH LAUT, and AS-YET UNIDENTIFIED GREENWOOD POLICE OFFICERS, | ) ) ) ) | JURY TRIAL DEMANDED |
| | ) ) | |
| *Defendants*. | ) | |

**PLAINTIFF'S MEMORANDUM OF LAW IN SUPPORT OF HER
MOTION TO BAR THE PROPOSED EXPERT TESTIMONY OF DR. GARY VILKE**

**INTRODUCTION**

On May 29, 2016, in a span of just over three minutes, Defendant Brian Blackwell shot Charlie Todero sixteen times with a Taser. During that short time, Blackwell discharged the Taser for more than ninety-eight seconds. Less than thirty minutes later, Charlie's heart stopped. While medical personnel were able to resuscitate Charlie, he never fully recovered—remaining largely unconscious in a hospital and, ultimately, dying two weeks later. Charlie's estate subsequently commenced this civil rights action.

Throughout this litigation, Defendants have theorized that Defendant Blackwell's use of force—namely, his Taser use—did not cause or contribute to Charlie's death. To that end, they disclosed Dr. Charles Wetli—a forensic pathologist—as an expert to opine on what caused the death. According to Dr. Wetli, it was not Blackwell's repeated Taser use that resulted in Charlie's death, but rather something called "excited delirium syndrome." After Dr. Wetli

unexpectedly passed away, Defendants retained Dr. Vilke, an emergency room physician, to serve as a substitute expert for Dr. Wetli.

This Court should bar Dr. Vilke from testifying in this case. The opinions disclosed in his report fail to satisfy the requirements of Federal Rule of Evidence 702 and are improper under *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579 (1993); his untimely opinions—*i.e.,* those not disclosed in his report are barred under Federal Rule of Civil Procedure 26(a)(2)(B)(i); and he is not an appropriate substitute expert for Dr. Wetli in light of their divergent methodologies and approaches.

## ARGUMENT

### I.   Legal Standards

Federal Rule of Evidence 702 governs expert witness testimony. According to the Rule:

A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:

(a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or determine a fact in issue;

(b) the testimony is based on sufficient facts or data;

(c) the testimony is the product of reliable principles and methods; and

(d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702. The trial judge occupies "a gatekeeping role" and must scrutinize proffered expert testimony to ensure it satisfies each requirement of Rule 702. *Daubert*, 509 U.S. at 592-93, 597. The objective of the court's gatekeeping requirement is to ensure the relevancy and reliability of expert testimony. *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 152 (1999). In evaluating the admissibility of expert testimony, non-exclusive factors the court may consider include: (a) whether the theory is testable; (b) whether it has been subject to peer-review and publication; (c) whether it has a known rate of error; and (d) whether it is generally accepted in

2

the relevant scientific community. *Daubert*, 509 U.S. at 593-94; *see also Kumho Tire Co.*, 526 U.S. at 149-50.

The proponent of the expert evidence bears the burden of establishing, by a preponderance of the evidence, that the requirements set forth in Rule 702 and *Daubert* have been satisfied. *Lewis v. CITGO Petroleum Corp.*, 561 F.3d 698, 705 (7th Cir. 2009).

**II.    The Court should bar Dr. Vilke from testifying that Mr. Todero was suffering from Excited Delirium Syndrome and that this caused Mr. Todero's death, because this opinion is unreliable.**

Dr. Vilke opines that "the cause of Mr. Todero's cardiac arrest was, to a degree of medical certainty, complications from Ex[cited ]D[elirium ]S[yndrome], which led to multi organ failure and resulted in his subsequent death." Ex. H at 11. Excited Delirium Syndrome is not a generally-accepted medical diagnosis. And even if it were, Dr. Vilke lacks a valid scientific explanation for how it caused Mr. Todero's death, lacks a testable diagnostic methodology for determining whether someone like Mr. Todero is experiencing it, and fails to consider and rule out alternative causes of the observed behavior and symptoms other than Excited Delirium Syndrome. Thus, this opinion is unreliable and should be barred.

**A.    Excited Delirium Syndrome is not a generally accepted medical diagnosis.**

In evaluating whether an expert's proffered theory is scientifically valid, the Court should consider whether that theory is generally accepted in the relevant scientific community. *See Daubert,* 509 U.S. at 594. "[A] known technique which has been able to attract only minimal support within the community . . . may properly be viewed with skepticism." *Id.*

Dr. Vilke's opinion that Mr. Todero died as a result of Excited Delirium Syndrome is not reliable because Excited Delirium Syndrome is not a generally-accepted medical diagnosis. Neither the American Medical Association, nor the World Health Organization's International Classification of Diseases and Related Health Problems ("ICD"), nor the American Psychiatric

3

Association's *Diagnostic and Statistical Manual of Mental Disorders* ("DSM") recognize Excited Delirium Syndrome as a medical diagnosis. *See* Ex. A (Vilke Dep.) at 155:22-156:25; *see also* Ex. B (Wetli Dep.) at 152:20-53:1, 153:15-24; World Health Organization, International Classification of Diseases and Related Health Problems, *available at* http://www.who.int/classifications/icd/en/ (last accessed December 7, 2020); *Diagnostic and Statistical Manual of Mental Disorders*, 136-37 (American Psychiatric Ass'n, 4th ed. 2000), attached hereto as Exhibit C; *Diagnostic and Statistical Manual of Mental Disorders*, 596 (American Psychiatric Ass'n, 5th ed. 2013), attached hereto as Exhibit D.

Both Dr. Vilke and Dr. Wetli acknowledge the lack of general acceptance. Ex. A (Vilke Dep.) at 155:22-156:25; Ex. B (Wetli Dep.) at 152:20-53:1, 153:15-24. Indeed, at his deposition Dr. Wetli conceded that excited delirium is the only diagnosis of which he is aware that is not recognized by the American Medical Association, although he emphasized that he did not care what the American Medical Association recognizes or does not recognize. Ex. B at 154:4-11.

Regarding Excited Delirium's absence from the DSM, Dr. Vilke and Dr. Wetli gave conflicting explanations. Dr. Vilke claimed that excited delirium was not included in the DSM because it is not a "classic psychiatric diagnosis, so it wouldn't be in there any more likely than any other nonpsychiatric diagnosis," and is "not something that's typically taken care of by psychiatrists in an emergency setting or in office settings," although he conceded that Excited Delirium Syndrome "could have a psychiatric etiology." Ex. A at 156:9-25. Dr. Wetli took the exact opposite tack, contending that Excited Delirium Syndrome actually *is* included within the DSM—just not by name. *See* Ex. B at 155:23-56:5. Regardless, it is a fact that neither the DSM-IV nor the DSM-5 (the two most recent versions) contains diagnostic criteria that: (a) mention an

"excited form of delirium," *see id.* at 157:13-14; or (b) require any element of agitation or excitement. *See* Exs. C and D.

As public awareness and scrutiny of police violence has heightened, the use of the "Excited Delirium" label—not as a legitimate medical diagnosis, but as a justification and excuse for the negative consequences of police use of force—has drawn widespread criticism. For example, in a widely-reported article published in The Washington Post co-authored by Dr. Méabh O'Hare,[1] Dr. Joshua Budhu,[2] and Dr. Altaf Saadi,[3] the use of the "excited delirium" label was derided as "pseudoscience," as the authors noted that "[i]t isn't a valid diagnosis" but rather is "a misappropriation of medical terminology." *See* The Washington Post, Police keep using 'excited delirium' to justify brutality. It's junk science., July 17, 2020, *available at* https://www.washingtonpost.com/outlook/chokehold-police-excited-delirium/2020/07/17/fe907ec8-c6bc-11ea-b037-f9711f89ee46_story.html, attached hereto as Exhibit E. The authors contrast "delirium"—"a well-recognized diagnosis frequently seen and treated by neurologists and psychiatrists," and listed in the DSM, but which "is not associated with sudden unexpected death"—with "exited delirium," which is not a recognized diagnosis by neurological or psychiatric professionals—and note that while Excited Delirium "draws upon aspects of real medical conditions such as delirium, psychosis, drug intoxication and sudden cardiac death," it is not itself a legitimate medical condition. *Id.* In a similar piece exposing the dubious medical basis of "Excited Delirium Syndrome," an empirical review of ten years' worth

---

[1] Dr. O'Hare is a neuromuscular fellow at Massachusetts General Hospital and Brigham and Women's Hospital. *See* Harvard Catalyst Profile, *available at* https://connects.catalyst.harvard.edu/Profiles/display/Person/161757 (last accessed December 7, 2020).

[2] Dr. Budhu is a neuro-oncology fellow at Massachusetts General Hospital, the Dana Farber Cancer Institute and Brigham and Women's Hospital. *See* Harvard Catalyst Profile, *available at* https://connects.catalyst.harvard.edu/Profiles/display/Person/161783 (last accessed December 7, 2020).

[3] Dr. Saadi is a general academic neurologist at Massachusetts General Hospital and an instructor of neurology at Harvard Medical School. *See* Physicians for Human Rights Biography, *available at* https://phr.org/people/dr-altaf-saadi/ (last accessed December 7, 2020).

of deaths attributed to "excited delirium" in the State of Florida found that an overwhelming majority (nearly 70%) of the cases involved the confirmed presence of stimulant narcotics like cocaine or methamphetamine, while "[a]ll but one of the cases that did not involve drugs involved use of force by law enforcement. *See* Florida Today, Excited delirium: Rare and deadly syndrome or a condition to excuse deaths by police?, Jan. 30, 2020, *available at* https://www.floridatoday.com/in-depth/news/2019/10/24/excited-delirium-custody-deaths-gregory-edwards-melbourne-taser/2374304001/, attached hereto as Ex. F. In that review article, medical examiners describe Excited Delirium as "more of a behavioral state than an underlying medical diagnosis," and note that "[b]ecause excited delrium does not have a specific cause, it is not helpful to record as a cause of death . . . ." *Id.*

These critiques are not outliers. Indeed, they align with the conclusions of Dr. Vilke's own published work on the topic, in which he acknowledges that "there is no current standardized case definition with which to identify Ex[cited ]D[elirium ]Syndrome," that "[f]aced with the lack of a clear definition and pathophysiologic etiology, Ex[cited ]D[elirium ]Syndrome has more recently been defined as a syndrome instead of a unique disease," and ultimately that "[w]ithout clear case definitions and prospective clinical studies, treatment of Ex[cited ]D[elirium ]S[yndrome] remains largely speculative . . . ." *See* G.M. Vilke et al., Excited delirium syndrome (ExDS): Redefining an old diagnosis, Journal of Forensic and Legal Medicine 19 (2012) at 8-10, attached hereto as Ex. G.

Plainly, if this "syndrome" lacks a clear definition, and has a treatment that "remains largely speculative," it falls far short of the required level of general acceptance as a legitimate diagnosis, and thus Dr. Vilke's opinions on the topic are unreliable.

**B.     Like Dr. Wetli, Dr. Vilke lacks a scientific explanation for how Excited Delirium Syndrome works, rendering the opinion speculative.**

As Plaintiff argued previously, Dr. Wetli lacked a scientific explanation for how Excited Delirium Syndrome works, rendering his opinion too speculative to be reliable. *See* Dkt. 200 at 12-13. Dr. Vilke's opinion suffers from this same fatal flaw.

This is an inherent and insurmountable deficiency with any opinions related to the Excited Delirium Syndrome, "[t]he actual pathophysiology of [which] is complex and not well understood," as Dr. Vilke's concedes in his written report. *See* Ex. H at 9. Stated more plainly, whatever descriptive value the Syndrome may have to label observable behaviors, the abnormal physiological processes by which this purported condition manifests in the human body are at present a matter of guesswork, although Dr. Vilke suggests "one potential pathway" may be "excessive dopamine stimulation" in the brain. *Id.*

Given the lack of understanding as to how Excited Delirium Syndrome physiologically manifests and progresses in the body, it should come as no surprise that, as Dr. Vilke found in his own paper, "[c]urrently there are no clear reasons why some patients progress to death and why some do not." *See* Ex. G at 9. Moreover, as described in the American College of Emergency Physicians Excited Delirium Task Force White Paper Report, of which Dr. Vilke was a Task Force Member, since Excited Delirium Syndrome "is a diagnosis of exclusion established on autopsy, there is little documentation about survivors of the syndrome," and its "exact incidence" is "impossible to determine. *See* White Paper Report on Excited Delirium Syndrome, Sept. 10, 2009, at 6, attached hereto as Ex. I; *see also* Ex. A at 158:14-160:25 (confirming these weaknesses identified in 2009 White Paper persist to the present day).

Dr. Vilke purports to opine that "the cause of Mr. Todero's cardiac arrest was, to a degree of medical certainty, complications from Ex[cited ]D[elirium ]S[yndrome], which led to multi

organ failure and resulted in his subsequent death." Ex. H at 11. Yet the physiological connection between the "Syndrome"—defined simply by a checklist of observable and primarily behavioral criteria, *see infra.* Arg. II.C—and these adverse health outcomes is, as Dr. Vilke concedes, presently unknown and unknowable. Moreover, as a "diagnosis of exclusion established on autopsy," Ex. I at 6, Excited Delirium Syndrome is evidently just a label applied to a sudden death where no other explanation can be readily determined.

This is too speculative to pass muster. A court should bar opinions based on subjective belief or unsupported speculation unless the testimony has been subjected to the scientific method. *Clark v. Takata Corp.*, 192 F.3d 750, 757 (7th Cir. 1999). Here, Dr. Vilke's opinion that "complications from complications from Ex[cited ]D[elirium ]S[yndrome]" caused Mr. Todero's death are pure speculation, given the acknowledged unknowable link between the Syndrome and Mr. Todero's other symptoms. The opinion is unreliable, and this Court should bar Dr. Vilke from providing any testimony regarding the opinion.

### C.     Like Dr. Wetli, Dr. Vilke's diagnostic methodology cannot be tested.

For all its flaws, Dr. Wetli's definition of Excited Delirium Syndrome had an elegant simplicity. A person has excited delirium if he is agitated and has delirium. Ex. B at 141:19-25, 142:5-8, 144:15-45:3. Conversely, if a person is not both agitated and delirious, he cannot have excited delirium. *Id.* at 142:9-20. While Dr. Vilke rejects this simplistic approach, *see infra.* Arg. VI.D, his definition, while more complex, is a difference in degree, not in kind. As set forth in Dr. Vilke's report, Mr. Todero had "a number of symptoms consistent with Ex[cited ]D[elirium ]S[yndrome]," or what Dr. Vilke describes as "clinical findings." Ex. H at 10. Yet Dr. Vilke acknowledges that each of these clinical findings, standing alone, could be consistent with many different diagnoses. Ex. A at 151:12-18. So in order for Dr. Vilke to apply the "Excited Delirium" label, a subject must exhibit a series of these symptoms/clinical findings, although the

exact number is a somewhat flexible standard. Dr. Vilke testified that "[i]t's felt to be six out of ten," but that "[t]here's a range in the three to – the four, five range which is probably more ambiguous." Ex. A at 151:19-152:4, 152:23-153:9.

So, how does Dr. Vilke's diagnostic methodology progress? A subject is evaluated to see how many of the "clinical findings"—for example, being agitated, or sweaty, or not complying with a police officer's command, Ex. H at 9—they are demonstrating. If that number is six or more, then Dr. Vilke considers that a sufficient number to confidently apply the "Excited Delirium" label. A handful of clinical findings, but less than six, is ambiguous, he says. Ex. A at 151:19-152:4, 152:23-153:9. Of course, the number you select as your cut-off has a significant impact on the prevalence of "Excited Delirium" that you will find. In his own review of an empirical dataset of police encounters involving use of force, using a cut-off of at least six of the "potential clinical criteria" yielded 24 (out of 698) "probable" cases of Excited Delirium Syndrome. Ex. G at 9. But as Dr. Vilke's paper notes, if you move that cut-off up one notch, requiring at least seven clinical findings, the number drops to 18 of 698—a 25% drop in the observed prevalence of the Syndrome, driven solely by where you draw that line. *Id.*

Notably, there is no scientific basis to see if a "diagnosis" of excited delirium is or is not correct, since the diagnosis is solely driven by meeting or failing to meet this threshold. As Dr. Vilke conceded, there is no underlying physiological test that can be done to conclusively rule in or rule out Excited Delirium Syndrome. Ex. A at 153:10-22. By definition, you have it if you hit six (or seven, or four or five – depending on where you feel comfortable drawing that line), and you don't have it if you fall short.

As the Supreme Court held in *Daubert*, "a key question to be answered in determining whether a theory or technique is scientific knowledge that will assist the trier of fact will be

whether it can be (and has been) tested. 509 U.S. at 593. Here, Dr. Vilke's method of diagnosing excited delirium cannot be tested as there is no underlying syndrome or condition that is separable from the list of symptoms that define excited delirium, itself – *i.e.*, there is no objective way to falsify the conclusion. *See id.* ("[s]cientific methodology today is based on generating hypotheses and testing them to see if they can be falsified."). Notably, there is no objectively demonstrable error rate of diagnosing excited delirium, another key *Daubert* criterion. This serves to underscore the unreliability of his opinion.

### D.   Dr. Vilke fails to consider alternative explanations for Mr. Todero's symptoms other than Excited Delirium Syndrome.

As this Court held in its ruling on *Daubert* challenges to other experts, an expert who seeks to opine as to a particular cause of death must adequately account for, and rule out, alternative potential causes—among them, in this case, "exertion, medicinal drug use, infections, endocrine disorders, and neuroleptic malignant syndrome" as potential causes for the rhabdomyolysis that Mr. Todero experienced. Dkt. 227 at 14. This requirement is no less true for an expert who proposes Excited Delirium as the cause of death, and failure to account for alternative explanations renders such an opinion unreliable. *See, e.g.*, *Est. of Berger v. Spokane County*, 2:15-CV-140-RMP, 2017 WL 5639941, at *2 (E.D. Wash. June 16, 2017) (barring expert opinion on excited delirium where the report failed to identify "any alternative causes for [the decedent's] behavior and/or his death that [the purported expert] considered before ruling"). Yet Dr. Vilke's report contains no discussion or analysis of potential alternative causes of Mr. Todero's behavior and symptoms other than Excited Delirium. *See generally* Ex. H at 7-13.

This is a particularly troubling deficiency in the context of Excited Delirium. As Dr. Vilke has himself written, "identification of Ex[cited ]D[elirium ]S[yndrome] is challenging" because "the spectrum of behaviors and clinical signs overlap with many other disease

presentations," "such as hypoglycemia or hyperthyroidism," treatment for which "may

potentially resolve the clinical symptoms and findings of the subject who [otherwise] has

symptoms consistent with Ex[cited ]D[elirium ]S[yndrome]." Ex. G at 8. Indeed, as Dr. Vilke

describes it, eliminating other potential conditions that look like, but are not, Excited Delirium

Syndrome is a very delicate task:

> Several specific entities that cause altered mental status and may mimic ExDS and
> deserve specific mention. Diabetic hypoglycemic reactions, heat stroke,
> thyrotoxicosis, serotonin syndrome and neuroleptic malignant syndrome (NMS)
> all share some clinical characteristics with ExDS. Psychiatric issues may also
> mimic ExDS. Psychotropic drug withdrawal or non-compliance, substance abuse
> and many psychiatric conditions themselves, including acute paranoid
> schizophrenia, bipolar disorder, and even emotional rage from acute stressful
> social circumstances, may mimic an ExDS-like state.

*Id.* at 10. Yet Dr. Vilke completely fails to grapple with these potential alternative explanations.

He should therefore not be permitted to testify that Mr. Todero was suffering from Excited

Delirium Syndrome.

**III.    This Court should bar Dr. Vilke from testifying that Mr. Todero's symptoms and
eventual death were not caused by Defendants' Taser use or other use of force,
because this opinion is unreliable.**

Dr. Vilke opines that Defendants' Taser use, and use of force more broadly, can be ruled

out as the cause of Mr. Todero's rhabdomyolysis, hyperkalemia and acidosis. Ex. H at 11-13.

But the studies on which he relies involve Taser usage of a completely dissimilar extent and on a

completely dissimilar population. Moreover, since Dr. Vilke concedes he is unable to diagnose

Mr. Todero with Excited Delirium Syndrome at any point prior to Defendants' use of force, his

conclusion exonerating that force as a cause of Mr. Todero's adverse health outcomes is

misplaced. And Dr. Vilke offers no basis for his opinion that non-Taser restraint or use of force

can be ruled out as playing a causal role in Mr. Todero's symptoms. This opinion is therefore

unreliable and should be barred.

**A.    Dr. Vilke's opinion relies solely on studies of dissimilar Taser usage on dissimilar population.**

Dr. Vilke's opinion that the Taser could not have caused Mr. Todero's symptoms flows from his statement that "[t]he physiologic effects of TASER ECD on humans have been studied extensively," and "even durations of up to 15 seconds have been shown to not cause any acute elevations in creatinine and do not require specific evaluation or treatment." Ex. H at 12. But these studies upon which Dr. Vilke relies do not offer a reliable basis for excluding the Taser as a potential causal factor here.

Dr. Vilke's written report contains a long list of "Medical and Scientific Literature" which he states he "reviewed . . . pertaining to the above referenced case," Ex. H at 2-4, although at his deposition he clarified that primarily these were papers he had "reviewed previously" and were "part of my knowledge base" but that he had not looked at most of them specifically in the context of preparing his report in this case, Ex. A at 56:18-57:2. Of those papers which Dr. Vilke did specifically review in connection with this case, *id.* at 58:22-60:10, only two were on the subject of the physiologic effects of Taser use, *see Vilke et al.*, Physiological Effects of Conducted Electrical Weapons on Humans, Annals of Emergency Medicine 2007 at 1-7, attached hereto as Ex. J; *Vilke et al.*, Physiologic Effects of the TASER After Exercise, Academic Emergency Medicine 2009, 16:704-710, attached hereto as Ex. K. Both of these studies involved the discharge of a single 5 second Taser activation, used test subjects comprising a group of "healthy" law enforcement volunteers. *See* Ex. J at 1; Ex. K at 1. None of the randomized studies reflected on Dr. Vilke's list of materials he relied on reflected studies of Taser exposure of longer than 15 seconds, Ex. A at 95:8-17, and none of the randomized studies he relied on involved Taser exposure on subjects who were under the influence of drugs or otherwise medically vulnerable, *id.* at 229:16-24.

These studies do not provide a reliable basis for any conclusions about Mr. Todero's Taser exposure. While there are factual disputes about the exact duration during which Mr. Todero was exposed to Taser current, Dr. Vilke acknowledged that the Taser download reflects that Blackwell pulled the Taser trigger 16 times, and that the Taser was activated for a total duration of 98 seconds, during the encounter between Blackwell and Todero. *Id.* at 92:23-93:10. Furthermore, Dr. Vilke believes (although without basis, as discussed *infra* at Arg. IV.C) that Mr. Todero was under the influence of drugs at the time of the encounter, and in any event was clearly in some medical distress that required care. Yet Dr. Vilke opines, on the basis of these studies of brief duration Taser exposure on healthy law enforcement volunteers, that a much longer duration of Taser exposure, on a potentially much sicker or more vulnerable individual, had no effect. This is not a reliable opinion, given the cavernous disconnect between the studies cited and the facts of the case. And particularly so where Taser's own product warnings state that "[s]ome individuals may be particularly susceptible to the effects of CEW use," including "people suffering from excited delirium, profound agitations, severe exhaustion, drug intoxication or chronic drug abuse, and/or over-exertion from physical struggle." Ex. L at 2. Indeed, Taser itself acknowledges Taser use does "cause[] physiologic and/or metabolic effects that may increase the risk of death or serious injury," including "changes in blood chemistry, blood pressure, respiration, heart rate and rhythm, and adrenaline and stress hormones, and that "[i]n a physiologically or metabolically compromised person, any physiologic or metabolic change may cause or contribute to sudden death." *Id.* Dr. Vilke's opinion fails to account for these warnings that are directly relevant to the potential facts of Mr. Todero's (disputed) pre-existing health conditions, and instead relies solely on studies of incomparable duration and on

incomparable individuals. This is a fatal flaw that renders his opinion about the effect of the

Taser unreliable.

> **B.      Dr. Vilke concedes that he cannot diagnose Mr. Todero with Excited**
> **Delirium Syndrome prior to the Taser use, rendering unreliable his opinion**
> **that the Taser use is unrelated to Mr. Todero's symptoms and eventual**
> **death.**

The upshot of Dr. Vilke's two core opinions is that the Taser use and other use of force

did not cause the adverse health symptoms that Mr. Todero experienced, but rather those

symptoms flowed from Mr. Todero's condition of Excited Delirium Syndrome. For these

opinions to logically hold, however, Mr. Todero must have been suffering from Excited Delirium

prior to his encounter with police—since, if the onset of Excited Delirium only occurred after the

Taser and other force was used, then even if the Excited Delirium caused the cardiac arrest, if the

Taser use caused the excited delirium then Defendants' use of force still "caused" Mr. Todero's

death.

However, Dr. Vilke concedes that, on the available evidence, he *cannot* opine that Mr.

Todero was suffering from Excited Delirium at any point prior to the Taser use. *See generally*

Ex. A at 192:15-193:17. Indeed, far from the required six or more clinical findings, Dr. Vilke

could point to only two or three that the record revealed pre-existed the police use of force on

Mr. Todero—that he was reportedly walking into traffic, which is "consistent with but not

diagnostic of delusion," which is one of Dr. Vilke's clinical findings for Excited Delirium

Syndrome; that, according to Blackwell, Mr. Todero did not comply with Blackwell's initial

commands to stop walking away and return to the curb; and that, a full day before the Taser

incident, Mr. Todero was sweaty. *Id.*

Because Dr. Vilke does not (and cannot) opine that Mr. Todero was experiencing Excited

Delirium Syndrome prior to his encounter with police, Dr. Vilke lacks a reliable basis for

opining that the Taser use and other use of force by police was not part of the causal chain that led to Mr. Todero's cardiac arrest, and ultimately to his death.

### C. Dr. Vilke offers no basis for his purported opinion that the non-Taser use of force is unrelated to any of Mr. Todero's symptoms and eventual death.

Dr. Vilke's written report purports to go further than just ruling out the Taser as a cause of Mr. Todero's symptoms. His report also suggests that other police use of force, such as their efforts to restrain Mr. Todero through handcuffing and physical force, can be ruled out as playing any causal role in the symptoms he was experiencing at the hospital. Ex. H at 11-13. However, unlike with his opinion Taser use, for which he at least cites some literature (albeit unreliably disconnected from the actual facts of the case), he cites no basis in the medical literature for his opinion ruling out the non-Taser use of force as a cause of Mr. Todero's symptoms. *Id.* The only mention of any explanation for this aspect of his opinion is his conclusory statement that the acute kidney injury ("AKI") Mr. Todero was suffering would have taken at least 12-24 hours to develop. This opinion is impermissible as it goes beyond the scope of the opinions Dr. Wetli previously offered, *see infra.* Arg. VI.B, but more to the point it only address one of the numerous symptoms that Mr. Todero suffered—Dr. Vilke says nothing at all to explain why he can rule out the non-Taser use of force as a causal role in Mr. Todero's hyperkalemia, acidosis, or cardiac arrest. This aspect of the opinion should be barred as without any reliable methodology underpinning it.

### IV. This Court should bar Dr. Vilke's undisclosed and unreliable opinion that Mr. Todero's purported Excited Delirium Syndrome was caused by undetected drug intoxication.

### A. Experts are barred from offering opinions that are not properly disclosed in their Rule 26 report.

This Court should bar all of Dr. Vilke's opinions that were was not properly disclosed in his written report. *See Ciomber v. Coop. Plus, Inc.*, 527 F.3d 635, 642 (7th Cir. 2008) (Fed. R.

Civ. P. 26(a)(2) does not allow parties to cure deficient expert reports by supplementing them with later deposition testimony).

**B.      Dr. Vilke's opinion that Mr. Todero's purported Excited Delirium Syndrome was caused by drug intoxication was not disclosed and so should be barred.**

In his expert report, Dr. Vilke did not claim to identify the cause of Mr. Todero's purported Excited Delirium Syndrome. In fact, Dr. Vilke expressly stated that "[a]n exact etiology of Mr. Todero's ExDS is not easily identified as the basic toxicology screen performed on his blood was negative for common drugs of abuse." Ex. H at 10. In terms of evaluating Mr. Todero's behavior, he stated simply that it was "consistent with classic excited delirium syndrome. *Id.* at 11.

At his deposition, however, Dr. Vilke repudiated this aspect of his written report, and instead claimed to be able to opine that Mr. Todero's behavior was consistent with drug intoxication, as a cause of the Excited Delirium Syndrome. Ex. A at 125:19-126:15. Dr. Vilke did concede, however, that this opinion was not disclosed in his written report, stating that "[i]t didn't say exactly it was caused by a drug, but as I spoke earlier, the drugs are the most common cause for these syndromes." *Id.* at 126:22-24. Dr. Vilke's undisclosed opinion about the claimed cause of Mr. Todero's Excited Delirium Syndrome should be barred.

**C.      Dr. Vilke's opinion that Mr. Todero's purported Excited Delirium Syndrome was caused by drug intoxication is entirely speculative and unreliable and so should be barred.**

Even if it were properly disclosed, Dr. Vilke has no reliable basis to claim that Mr. Todero was experiencing drug intoxication. Mr. Todero was given a standard toxicological screen upon his admission to the hospital, which tested negative for drugs (other than metabolized cannabis in his system), confirming (among the various drugs tested for) that Mr. Todero was not under the influence of PCP, methamphetamine, or cocaine, Ex. A at 131:1-6. Dr.

Vilke states that this standard toxicological screen did not test for certain other drugs which can, in his view, cause Excited Delirium Syndrome, but of course, this does not serve as any affirmative evidence that Mr. Todero was in fact under the influence of any such substance.

Other than the pure speculation that Mr. Todero might have been under the influence of some drug that was not tested for on the toxicological screen, Dr. Vilke points to two prior incidences of drug use in Mr. Todero's past medical records which he claims allow him to reach the conclusion that the Excited Delirium Syndrome was caused by drug intoxication, and not, for example, a psychiatric etiology. Dr. Vilke claimed to be able to rule in the drug cause, and rule out a psychiatric cause, because Mr. Todero had a history of drug use, and no prior psychiatric history. Ex. A at 136:21-140:17. However, not only were these two claimed prior instances of drug use found in the records long predating the events in question, but they also involved the use of particular drugs—marijuana dipped in formaldehyde, in one case, and intoxication with alcohol and opioids in the other—which Dr. Vilke concedes are *not* associated with Excited Delirium. *Id.* at 137:15-139:10.

In sum, Dr. Vilke's entire basis for concluding that Mr. Todero's purported Excited Delirium was caused by drug intoxication was that, on two occasions in the distant past, Mr. Todero had sought medical treatment related to using drugs which do *not* cause Excited Delirium. That is not a reliable basis to conclude anything about Mr. Todero's later drug use, of some variety that evaded detection on the standard toxicological screen. This opinion is pure speculation and should be barred.

Notably, this is the same bait and switch that Dr. Wetli attempted—preparing a written report which took no position on the etiology of the Excited Delirium syndrome, only to be repudiated at the deposition with a claimed ability to specifically identify drug use as the cause.

17

Plaintiff's arguments in opposition to that effort apply with equal force here as well. *See* Dkt.

200 at 13-17.

V.     **This Court should bar Dr. Vilke from testifying about the interaction between Taser use and the Excited Delirium Syndrome and other opinions he does not discuss in his report.**

Dr. Vilke opines that Mr. Todero was suffering from Excited Delirium Syndrome, and

separately opines that the use of the Taser did not play any causal role in Mr. Todero's symptoms

observed at the hospital. However, Dr. Vilke offers no opinion about the impact of Taser use on

an individual suffering from excited delirium, or any opinion about the interplay between Tasers

and the Excited Delirium Syndrome, and so he should be barred from offering any such

testimony at trial. *See* Ex. H.

Similarly, Dr. Vilke expressly disclaimed that he was offering no opinion on whether or

not Defendant Blackwell's Taser device was functioning properly or had made a good

connection with Mr. Todero, and acknowledged that he had no expertise in police practices or

tactics or on the mechanical functioning of the Taser device. Ex. A at 79:4-80:2. Accordingly,

Dr. Vilke should be barred from offering any such opinions at trial.

VI.    **The Court should bar Dr. Vilke from testifying because his opinions diverge too far from Dr. Wetli's.**

For all of the reasons discussed above, Dr. Vilke's opinions are unreliable and they

should be barred in their entirety. But even if that were not the case, Dr. Vilke's opinions should

be barred because they stray too far from the opinions and methodologies used by Dr. Wetli, for

whom Dr. Vilke has been substituted and whose prior opinions Dr. Vilke must strictly track.

A.     **As a substitute expert, Dr. Vilke's opinions must strictly track those previously disclosed by Dr. Wetli.**

When substitution of an expert is permitted, in order to avoid prejudice to the opposing

party, courts do not permit the substitute expert to stray far from the prior expert's field of

18

expertise, previously disclosed opinions, or theories underlying those opinions. *See, e.g.*, *Indiana Ins. Co. ex rel. Pell & Sons v. Valmont Elec., Inc.*, No. TH97-009-C-T/F, 2003 WL 22244787, at *1 (S.D. Ind. July 31, 2003) (noting earlier ruling that substitute expert must "have a similar area of expertise and will express only opinions like those previously held by the deceased expert," and excluding substitute experts' opinions that strayed from this limitation). "Courts confronted with an expert who dies before trial have allowed a substitute expert to issue a new report that falls 'within the scope of the original expert's report, addresses the same subject matter, and utilizes the same theories of liability [or] damages' or expresses the original expert's 'opinions in their own language provided they address the same subject matter <u>without meaningful change</u>.'" *McDonald*, 2016 WL 1383191, at *7 (emphasis added) (quoting *Abbott v. Lockheed Martin Corp.*, No. 3:06-CV-701-NJR-DGW, 2014 WL 12570095, at *4 (S.D. Ill. Nov. 7, 2014)).

Indeed, a substitute expert must "be only that"—a substitute—and must be "prepared to testify in strict conformity with the [prior expert's r]eport." *Dunkin' Donuts, Inc. v. N.A.S.T., Inc.,* No. 02 C 1272, 2005 U.S. Dist. LEXIS 16703, at *2 (N.D.Ill. Aug. 10, 2005). *See also, e.g.*, *Park v. CAS Enterprises, Inc.*, No. CIV. 08CV385DMSNLS, 2009 WL 4057888, at *3 (S.D. Cal. Nov. 19, 2009) (holding that the substitute expert "may not, however, espouse any other opinions or theories not found in [the prior] expert reports," because "[i]t would be both prejudicial and unduly burdensome . . . to allow submission of new expert reports with new theories and opinions"). *See also Stringer v. Cambria Fabshop-Indianapolis, LLC*, No. 113CV00659SEBTAB, 2015 WL 13632234, at *2 (S.D. Ind. Oct. 2, 2015) (permitting expert substitution provided that it occur "without significant changes in the testimony"); *Baumann v. Am. Family Mut. Ins. Co.*, 278 F.R.D. 614, 616 (D. Colo. 2012) (permitting expert substitution, but cautioning there must be no "meaningful change in testimony" as a result of the new expert's

opinions); *Crandall v. Hartford Cas. Ins. Co.*, No. CV 10-00127-REB, 2012 WL 6086598, at *3 (D. Idaho Dec. 6, 2012) (while an expert's death is "a legitimate and appropriate reason for allowing a new expert to be named," substitution cannot operate to relieve a party's "buyer's remorse" by offering relief from the testimony of an expert who "did not initially opine in a manner that [party] would prefer"); *Morel v. Daimler-Chrysler Corp.*, 259 F.R.D. 17, 21 (D.P.R. 2009) (recognizing that plaintiff would not be prejudiced by substitution provided that there is no "meaningful change in testimony").

"The introduction of a substitute expert does not *ipso facto* permit the party requesting the substitution to escape from the concessions or admissions of the previous expert." *Lincoln Nat. Life Ins. Co. v. Transamerica Fin. Life Ins. Co.*, No. 1:04-CV-396, 2010 WL 3892860, at *2 (N.D. Ind. Sept. 30, 2010) (quoting *Morel,* 259 F.R.D. at 22). The goal is to preserve the playing field as it lies, not to permit a substitute expert to shake things up and inject new areas of expertise, opinions or supporting theories to tilt that field in one party's favor. Rather, the goal must be to ensure that "the posture of the case at trial will be the same as if [the prior expert] had not been knocked out of commission," with the substitute expert "available as a defense witness to provide testimony that conforms precisely to the [prior expert's r]eport (but not beyond, or in contravention of, that report)." *Dunkin' Donuts, Inc.*, 2005 U.S. Dist. LEXIS 16703, at *4.

**B.    Dr. Vilke's opinions regarding Acute Kidney Injury and Mr. Todero's metabolic levels should be barred.**

Dr. Vilke's report includes a discussion of the significance of Mr. Todero's metabolic levels, the timeline upon which Dr. Vilke believes the underlying injury causing those levels would have had to have occurred, and reaches the conclusion that "Mr. Todero was suffering from acute kidney injury (AKI) when he arrived at the ED that afternoon." Ex. H at 12-13. But Dr. Vilke acknowledged that while Dr. Wetli discussed rhabdomyolysis, he did not reference

AKI or stage 4 kidney damage anywhere in his report, nor rely in any way on Mr. Todero's laboratory chemistry levels. Ex. A at 145:25-147:1. These opinions must be barred as they go beyond the scope of Dr. Wetli's report and disclosed opinions. *See* Ex. M (Wetli report).

      **C.**    **Dr. Vilke's opinion about the purported non-effect of the Taser relies on a completely different methodology from that followed by Dr. Wetli.**

Dr. Vilke is not an appropriate substitute expert for Dr. Wetli because his methodology used to opine that the Taser did not cause Mr. Todero's symptoms was completely different from that used by Dr. Wetli.

As described in Plaintiff's prior motion to bar Dr. Wetli, Dr. Wetli conceded at his deposition that he did not know whether Mr. Todero's medical condition was independent of police action, and agreed that Mr. Todero's physiological cause of death would have been different if police had not attempted to engage him and restrain him. Dkt. 200 at 5-6. Specifically, Dr. Wetli concluded that if not for the police intervention, Mr. Todero would have been struck and killed by a car. *Id.*

Dr. Vilke expressly repudiated this opinion. Instead, Dr. Vilke offered the opinion at his deposition, for the first time, that if Mr. Todero had been left to his own devices to "let [him] run around," he would likely "collapse, [or] have a cardiac arrest," due to various metabolic imbalances which Dr. Vilke believed would "keep spinning up." Ex. A at 232:20-233:23. Dr. Vilke should not be permitted to prejudice Plaintiff by repudiating Dr. Wetli's unreliable testimony in this regard, and by substituting a completely different opinion.

      **D.**    **Dr. Vilke's version of Excited Delirium is not the same syndrome which Dr. Wetli described and opined on.**

Throughout his deposition, Dr. Wetli was crystal clear: the necessary symptoms to a proper diagnosis of excited delirium are that a person "have delirium and they're agitated." Ex. B at 141:19-25. In Dr. Wetli's view, any time a person exhibits both symptoms, "regardless of the underlying

physiological cause," then "by definition" that person is experiencing excited delirium. *Id.* at 144:15-145:3. Conversely, if a person fails to exhibit one of the two necessary symptoms, the person cannot be properly diagnosed with excited delirium. *Id.* at 142:5-20.

As discussed above, Dr. Vilke's diagnostic criteria for Excited Delirium Syndrome are starkly different. Dr. Vilke uses a flexible metric, with ten "clinical findings" that can indicate Excited Delirium Syndrome, and with a requirement to find at least six of these ten in order to make a diagnosis. And Dr. Vilke directly and explicitly rejects Dr. Wetli's view (that a finding of agitation and delirium by themselves are sufficient), stating at his deposition that "[i]f they only have those two symptoms . . . you can't come to that conclusion," because you "have to have the complement of symptoms to be able to come to a final diagnosis [of] excited delirium syndrome." Ex. A at 200:22-201:20. "If we're referring to the formal excited delirium syndrome, you would need more than two specific symptoms only." *Id.* at 203:21-23.

While Dr. Vilke and Dr. Wetli use the same label, it is apparent that they have fundamentally incompatible and divergent diagnostic criteria for what each means by Excited Delirium Syndrome. Dr. Vilke is not an appropriate substitute expert for Dr. Wetli in this regard.

**E.    Dr. Vilke disagrees with Dr. Wetli's opinion that Mr. Todero was agitated, which is fatal to his diagnosis of Excited Delirium Syndrome.**

Dr. Wetli concluded that Mr. Todero met the required "agitation" component of Excited Delirium because "agitation can be out in the middle of traffic, something violent, screaming that you are a prophet." Ex. B at 147:21-48:1. As described in Plaintiff's motion to bar Dr. Wetli's testimony, the facts in the record belie this description of Mr. Todero's behavior, in that the two eyewitnesses to Mr. Todero's behavior crossing the road described him as walking calmly, simply staring straight ahead and not responding. Dkt. 200 at 7-9. Thus, based on Dr. Wetli's

22

expressed diagnostic criteria and the facts in the record, Dr. Wetli's opinion is that Mr. Todero was not suffering from excited delirium. *Id.*

Dr. Vilke takes a very different approach to the "agitation" element. Dr. Vilke expressly rejects Mr. Todero's "walking into traffic" as being "significant agitation." Ex. A at 223:20-224:2. Instead, Dr. Vilke's perception of Mr. Todero's "agitation" was based on his behavior "in the back of the ambulance," which he acknowledges that "Dr. Wetli didn't comment on that . . . for unknown reasons." *Id.* at 222:14-17. Again, given their divergent approaches to analysing Mr. Todero's purported agitation, including the crucial aspect of whether there is any evidence of Mr. Todero's agitation prior to his encounter with the police, Dr. Vilke is not an appropriate substitute expert for Dr. Wetli.

> **F.  Dr. Vilke disagrees with Dr. Wetli about the possible causes of Excited Delirium Syndrome.**

In his Rule 26 report, Dr. Wetli stated that "[t]he causes of the excited delirium syndrome include certain infections, certain mental illnesses and stimulant or hallucinogenic drugs." Ex. M at 2. Dr. Vilke disagrees, however, and stated in his deposition that, in his view, the two causes of Excited Delirium Syndrome are drug intoxication and psychiatric disorders, and that while "[s]ome lump in certain infections," "infections can be its own diagnosis" and so "I tend to think of it more as psychiatric versus drug." Ex. A at 126:25-127:9. Indeed, Dr. Vilke's view is that "the true etiologies that are mostly accepted by the major groups . . . [are] drugs and psychiatric disorders," and [t]he most current literature doesn't usually reference infection." *Id.* at 135:18-136:1. This is yet another illustration of Dr. Vilke and Dr. Wetli's divergent understanding of the Excited Delirium Syndrome, and why Dr. Vilke is not an appropriate substitute expert.

**G.    Dr. Vilke's methodology relies on a starkly different set of records from those utilized by Dr. Wetli.**

Dr. Vilke and Dr. Wetli used divergent methodologies in their choice of case materials upon which to rely. As described in Plaintiff's motion to bar Dr. Wetli's testimony, "Dr. Wetli disregarded as irrelevant vast swaths of the record and focused almost exclusively on subjective, non-medical evidence that supported his ultimate conclusion that Charlie was agitated and delirious on May 29, 2016," including disregarding the coroner's autopsy findings and the hospital medical records, and instead relying on subjective eyewitness descriptions of Mr. Todero's behavior. *See* Dkt. 200 at 17-19. Continuing the pattern described above, Dr. Vilke takes the exact opposite approach, using a methodology that prioritizes the objective data, "things like vital signs, direct visualization of what I see on the video, behavior activities, lab work, autopsy findings, heart size, toxicology reports." Ex. A at 63:15-23. Only after first drawing conclusions from the available objective data does Dr. Vilke go on to consider any additional value provided by subject evidence in the case like "testimony and interviews." *Id.* at 64:2. Indeed, Dr. Vilke relied heavily on evidence, such as the body camera videos, which Dr. Wetli concluded "didn't show anything." *Id.* at 196:16-197:15. Dr. Wetli's approach plainly failed to follow the appropriate methodology for a forensic pathologist, Dkt. 200 at 17-19, and Defendants should not be permitted the windfall of substituting a new expert who uses a different methodology to shore up their expert opinions.

24

## CONCLUSION

WHEREFORE, Plaintiff Teresa Todero, as Special Administrator of the Estate of Charles

Todero, respectfully requests that this Court enter an order barring Dr. Gary Vilke from

testifying as an expert witness in this matter and barring any and all of his opinions.

Dated: December 7, 2020

RESPECTFULLY SUBMITTED,
**Teresa Todero,**
**as Special Administrator of the**
**Estate of Charles Todero**

BY: /s/ Sam Heppell
*One of Plaintiff's Attorneys*

Arthur Loevy
Jon Loevy
Steve Art
Sam Heppell
Scott Drury
LOEVY & LOEVY
311 North Aberdeen St.
Chicago, IL 60607
(312) 243-5900

## CERTIFICATE OF SERVICE

I, Sam Heppell, an attorney, hereby certify that on December 7, 2020, I caused the foregoing document to be filed using the Court's CM/ECF system, which effected service on all counsel of record.

/s/ Sam Heppell
*One of Plaintiff's Attorneys*

25