UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

TERESA TODERO, as Special Administrator )
of the Estate of CHARLES TODERO, )
 )
Plaintiff, )
 )
v. ) Cause No. 1:17-cv-1698-JPH-MJD
 )
CITY OF GREENWOOD, BRIAN BLACKWELL, )
RENEE ELLIOTT and ELIZABETH LAUT, )
 )
Defendants. )

**RESPONSE IN OPPOSITION TO PLAINTIFF'S MOTION TO BAR
PROPOSED EXPERT TESTIMONY OF DR. VILKE**

As the court is aware, this case involves the tasering of Todero and a struggle which ultimately resulted in him being handcuffed, after which he was breathing and talking, all of which is shown on body cam video. EMS arrived, placed him on a gurney and into an ambulance to be taken to the hospital. EMS personnel did not consider it a medical emergency. Once in the ambulance Todero became sufficiently combative such that the paramedic could not secure his blood pressure or pulse oximetry so he gave him a sedative. About 20 minutes after Todero was handcuffed he sustained cardiac arrest. All the experts, including plaintiff's expert Rashtian, concede that the tasering did not cause ventricular fibrillation, i.e., electric shock directly to the heart which could have caused heart stoppage (Rashtian depo., 138:3-7; 193:8-25; 194:1-3).

Plaintiff by her memorandum asserts that "[t]hroughout this litigation, Defendants have theorized that Defendant Blackwell's use of force – namely, his Taser use – did not cause or contribute to Charlie's death" (DE 237, p. 1). Any theorizing however was on the part of the plaintiff, who alleged by her complaint that muscle contractions from "electrocution" caused Todero's muscle tissue to break down, resulting in rhabdomyolysis and kidney damage (DE 25, amended complaint, ¶ 49). Plaintiff

retained an expert, Dr. Rashtian, who opined that Taser-induced rhabdomyolysis caused Todero's elevated potassium levels and metabolic acidosis which caused heart, kidney and liver damage resulting in multi-system organ failure and death (Rashtian report, ex. A, p. 5).  Before the court recently excluded any such testimony from Dr. Rashtian as to tasering having caused the rhabdomyolysis (see order on *Daubert* motions, DE 227, p. 15), defendants, confronted with plaintiff's allegations and Rashtian's report, were called upon to evaluate and if appropriate, rebut the allegations made by plaintiff and Rashtian concerning the cause of Todero's rhabdomyolysis.  To that end defendants retained Dr. Mark Kroll, a biomedical scientist, and Dr. Charles Wetli, a forensic pathologist who unfortunately passed away this year.

Dr. Kroll opines that electrical shock from the Taser according to peer-reviewed literature results in only insignificant increases in CK, the primary marker for rhabdomyolysis (DE 202-1, Kroll report, pp. 41-42; DE 202-5, Kroll depo., pp. 146-149).  Dr. Kroll however is not a medical doctor and therefore may not offer an opinion that the tasering was unrelated to Todero's death (DE 227, p. 22).  Dr. Wetli offered an opinion as to the cause of Todero's death.  After Dr. Wetli died defendants moved the court to substitute Dr. Vilke as a testifying expert.  Dr. Vilke issued his own report which offers opinions in accord with those offered by Dr. Wetli.

Plaintiff's response refers to Dr. Vilke as "an emergency room physician" (DE 237-2).  Vilke is not only an emergency room physician but an independent researcher on the physiologic effects of restraint and body position, excited delirium syndrome, and Taser electric control devices (DE 237-8, p. 1).  He is a full-time faculty member in the Department of Emergency Medicine at the University of California San Diego Medical Center, and also works full time as a practicing clinician in the emergency department of a busy urban hospital (*Id.* at 13).  He has evaluated hundreds of patients within the last 25 years who have been in cardiac arrest and thousands who have presented in a state of delirium (*Id.* at

p. 14).  His curriculum vitae shows Dr. Vilke is the author of three textbooks, 71 book chapters concerning emergency procedures including chapters on Tasers and excited delirium syndrome (ExDS), as well as 282 peer-reviewed articles, some of which address excited delirium syndrome and sudden cardiac arrest and death following application of shocks from a Taser.  His report and curriculum vitae further detail his qualifications in the areas of ExDS and whether a Taser can induce rhabdomyolysis or other conditions.

Dr. Vilke agreed with Dr. Wetli that Todero was exhibiting signs and symptoms consistent with excited delirium, noting that persons suffering from excited delirium syndrome are delusional, often hallucinating (Rashtian agrees Todero was hallucinating on the date of occurrence and the day before, see Rashtian depo., 54:15-16; 92:15-17; 124:17-18; 132:20-21; 171:13-15), are hyperactive, may be violent despite threats of force, fight inappropriately, have elevated body temperatures, and display superhuman strength (Vilke report, DE 237-8, p. 9).  Excited delirium syndrome places the individual at increased risk for sudden death syndrome, felt by most experts to be caused by the increased stress and work on the heart by the excited, overstimulated, agitated physical state (*Id.* at pp. 9-10).  Once the heart goes into irregular beat or stops, blood flow through the body ceases and shortly thereafter, the individual will lose consciousness due to lack of blood flow to the brain and stops breathing (*Id.* at p. 10).

According to Dr. Vilke, Todero had a number of symptoms consistent with excited delirium.  He was agitated and delusional, reporting that he was Jesus and repeatedly making other biblical references.  He was walking in and out of traffic.  He was not following commands given by officers and paramedics and was too combative for the paramedic to even obtain a blood pressure reading.  He had a high tolerance for pain, was breathing fast, an elevated heart rate, and a body temperature of 103 while at the hospital at 1:11 p.m., more than an hour after he was transported from the scene (*Id.*).  He was described

as super strong and resilient (*Id.*).  His heart rate while in the ambulance suddenly decreased from 140 bpm to 30 bpm and then quickly flatlined, a common finding of excited delirium syndrome (*Id.*).  Each of these are clinical findings of the syndrome (*Id.*).  Dr. Vilke therefore agrees with Dr. Wetli that the cause of Todero's cardiac arrest was, to a degree of medical certainty, complications from excited delirium syndrome which led to multi-organ failure and his subsequent death (*Id.* at 11).  Todero died from multi-organ failure, as described in the autopsy report, resulting from pre-existing rhabdomyolysis.

Dr. Rashtian agrees that complications from rhabdomyolysis were the cause of Todero's multi-organ failure, though he claimed the rhabdomyolysis was caused by the tasering.  Drs. Vilke, Wetli and Rashtian are therefore in agreement that Todero's rhabdomyolysis caused multi-organ system failure and his ultimate death. See Vilke report, p. 12 and deposition testimony at 253-255 (rhabdomyolysis releases myoglobin and CK to enzymes which can damage the kidneys and cause kidney dysfunction; malfunctioning kidneys cause elevations in potassium which can be life-threatening; cardiac arrest can cause an elevation in creatinine kinase (CK) levels due to multi-organ damage; the kidneys typically will filter and adjust the release of potassium into the blood system but if the kidneys are not working and there is additional potassium in the system and it will build up).

Therefore it came as no surprise to plaintiff that Drs. Vilke and Wetli opined that Todero had acidosis, hyperkalemia and rhabdomyolysis.  The difference of opinion was whether these conditions were pre-existing or were caused by the Taser.  Dr. Vilke's opinions are grounded upon the conclusion that Todero's rhabdomyolysis did not result from the tasering, a conclusion supported by peer-reviewed literature, and that the cause instead resulted from the fact that Todero was suffering from excited delirium syndrome and pre-existing rhabdomyolysis.   The complications from excited delirium syndrome caused cardiac arrest from which Todero could not recover due to his pre-existing rhabdomyolysis and accompanying conditions.

Of course the entire issue on the cause of death may be academic at this point, seeing as the court ruled Dr. Rashtian cannot offer his opinion that tasering caused Todero's rhabdomyolysis which led to his subsequent death. That being the case, and because the plaintiff bears the burden of proof on causation, the entire wrongful death claim should not be presented to the jury, in which case cause of death is not at issue and plaintiff's claim would be confined to one for Todero's conscious pain and suffering, i.e., a survival claim.[1]

**A)    Todero's Behavior and Cardiac Arrest 20 Minutes After Cessation of the Struggle Are Signs of "Classic Excited Delirium."**

The facts concerning Todero's behavior before and after Blackwell's arrival at the scene are set forth in defendants' response in opposition to plaintiff's motion to bar Dr. Wetli (DE 204, pp. 9-11), and brief in support of their motion for summary judgment (DE 116; pp. 2-12). Todero during the efforts at handcuffing displayed the classic elements of excited delirium syndrome including pain tolerance, unexpected physical strength (DE 113-12 at ECF pp. 2-3; DE 113-17 at ECF p. 10; DE 125-35 at ECF p. 11; Elizabeth Laut depo., DE 204-4, p. 231, lns. 1, 23), and hyperthermia (Elizabeth Laut depo., p. 231, lns. 20-23, DE 204-4 ; "He was hot to touch. He was still kind of mumbling his nonsense about being Jesus and whatever else he was saying. Just very strong."). Todero's arms and back were hot to the touch (DE 204-4, Laut depo., p. 233, lns. 15-18). While paramedics and EMTS were attending to Todero he continued to describe himself as Jesus Christ or the Prophet (DE 113-9 at ECF p. 4).

Common features of excited delirium syndrome include altered mental status and delirium,

---

[1] To reiterate, Dr. Rashtian opined "[t]he cause of Mr. Todero's death was the repeated application of Taser shocks on May 29, 2016, causing rhabdomyolysis and leading to cardio-respiratory failure and multi-organ system failure" (Rashtian report, p. 5). He attributed no other cause in his report nor at deposition (Rashtian depo., 188: 1-6; 193: 13-16. "The Taser-induced rhabdomyolysis led to hyperventilation, tachycardia, and his heart stopping" (193: 24-25), "[o]r in other way, Taser killed him" (193:16)).

bizarre behavior, profuse sweating, incoherent speech, extraordinary strength and endurance, lack of response to painful stimuli, extreme exertion and hyperthermia (Wetli, *Excited Delirium*, p. 101(ex. B), Vilke report, p. 9, all of which were displayed by Todero.

Peer-reviewed medical literature supports the conclusion that Todero was suffering from excited delirium syndrome. *See, e.g.,*

> • "The criteria [for excited delirium syndrome] most frequently cited are hyperaggressive behavior with superhuman strength and a combative attitude toward the police, hyperactivity, bizarre behaviors, unusual pain tolerance, and hyperthermia." Gonin, et al., *Excited Delirium: A Systematic Review*, Society for Academic Emergency Medicine, p. 561 (2017) (ex. C).

> • "Probable cases of ExDS are based on the presence of at least six of the following 10 potential criteria for ExDS: pain tolerance, constant/near constant activity, not responsive to police presence, superhuman strength, rapid breathing, does not fatigue, naked/inappropriately clothed, sweating profusely, tactile hyperthermia, and glass attraction/destruction." Baldwin, et al., *Excited Delirium Syndrome (ExDS): Situational Factors and Risks to Officer Safety and Non-Fatal Use of Force Encounters*, p. 2, International Journal of Law and Psychiatry (2018), (ex. D) citing American College of Emergency Physicians Excited Delirium Task Force White Paper, 2009, (ex. E).

> • "Law enforcement and emergency services (EMS) have many years of experience in dealing with individuals suffering from ExDS. These subjects most frequently come to the attention of law enforcement professionals because of their bizarre, violent, agitated and erratic behaviour. EMS are often called to sedate or transport individuals after they have been arrested and restrained, or to treat ExDS – associated cardiac arrest. These out-of-hospital ExDS subjects have been taken to custodial institutions or hospitals and survived for years; however, a small but significant subset will have a sudden cardiac arrest." Vilke, et al., *Excited Delirium Syndrome: Aetiology, Identification and Treatment*, page 99, Current Practice in Forensic Medicine, chapter 6 (2016) (ex. F).

Dr. Vilke's report at page 10 describes the findings which support the ExDS diagnosis.

Other courts have allowed testimony regarding excited delirium syndrome, including expert testimony, under similar facts. *See, e.g., Silva v. Chung,* 2020 WL 515810 at *3-6, 15 (D. Haw. 2020), where the decedent suffering from excited delirium syndrome was walking in the middle of a busy, six-lane street. Witnesses testified cars had to change lanes to avoid hitting him; officers instructed decedent

to move to the sidewalk, the decedent evaded officers, was tased with no effect, and then apprehended but resisted handcuffing.  Once handcuffed he was removed from the street and was discovered to have stopped breathing.  The defense expert testified that Taser did not cause the death and the death resulted from excited delirium syndrome, *see id.* at *15.

*See also Waters v. Coleman,* 632 Fed. Appx. 431 (10th Cir. 2015) (decedent was sweating profusely and displayed unusual strength and mental confusion, was tased and struggled against being handcuffed, was finally handcuffed and remained on his stomach for two to five minutes, during which he stopped breathing.  District court found the decedent displayed signs of excited delirium syndrome and reversed denial of summary judgment in favor of officers based on qualified immunity); *Hoyt v. Cooks,* 672 F.3d 972, 975-76 (11th Cir. 2012), *cert. denied* (decedent, claiming demons were trying to get him, refused to put his hands behind his back while on the ground in order to be handcuffed, officer tased decedent multiple times while other officers tried to handcuff him, decedent refused to let officers grab his arms for handcuffing so additional Taser drive stuns were applied; officers ceased using Tasers and were able to handcuff decedent by use of physical force, and placed decedent in rear of patrol unit which drove to sheriff's office but upon arrival decedent was discovered to be dead.  The cause of death was determined to be cocaine-induced excited delirium in a background of coronary atherosclerotic disease).

Even the paramedic who treated Todero at the scene, Ian Godfrey, thought Todero was suffering from excited delirium syndrome (Godfrey depo., p . 81, lns. 2-3; p. 115, lns. 22-24, DE 204-2; Godfrey report, p. 2, DE 204-1). As a paramedic, Godfrey received a lot of training concerning excited delirium (Godfrey depo., p. 81, lns. 4-20).

**B)**      **Excited Delirium Syndrome Has Been Recognized for Many Years.**

Numerous peer-reviewed authorities support the conclusion that excited delirium syndrome is a

unique and diagnosable disorder. *See, e.g.,* Vilke, et al., *supra,* ex. F at pages 97-99 ("There are no specific diagnostic laboratory tests or radiographic imaging studies that can be used to make or confirm the diagnosis, but like other syndromes, ExDS is a specific clinical presentation with a number of common clinical features, which have been identified.   These are pain tolerance, constant or near constant physical activity, not responding to police presence, superhuman strength, rapid breathing, not tiring despite heavy physical exertion, naked or inappropriately clothed, profuse sweating, hot to touch, and attraction to or destruction of glass and reflective surfaces . . . .  In 2004, the National Association of Medical Examiners (NAME), the body that represents the forensic pathologists in the United States, published a position paper that validated the existence of an Excited Delirium Syndrome for the first time"); *Excited Delirium Task Force White Paper Report to Council and Board of Directors of American College of Emergency Physicians*, Sept. 10, 2009, p. 1 (ex. E) ("It is the consensus of the Task Force that ExDS is a unique syndrome which may be identified by the presence of a distinctive group of clinical and behavioral characteristics that can be recognized in the pre-mortem state"); Ross, et al., *Assessing the Symptoms Associated with Excited Delirium Syndrome and the Use of Conducted Energy Weapons*, Forensic Research and Criminology International Journal, (2018) (ex. G), excerpts of which provide:

> Excited delirium syndrome (ExDS) has been defined as the sudden death of an individual involving an acute (minutes to hours) transient disturbance in consciousness and cognition, marked by disorientation, disorganized and inconsistent thought processes, inability to distinguish reality from hallucinations, disturbances in speech, disorientation to time and place, and misidentification of individuals.  In the majority of these deaths the individual exhibited violent behaviors, struggled with police, correction officers, or medical personnel during control and physical restraint to the person, within a matter of several minutes after the cessation of the struggle the person is observed to be in cardiopulmonary arrest and resuscitation is usually unsuccessful.  *Frequently an autopsy does not reveal anatomic evidence to show trauma or natural disease or toxicological findings sufficient to explain the death*. Commonly, pathologists cite the symptoms of ExDS on the death certificate as contributing factors of the death (emphasis added) (p. 187).

                                        *   *   *

8

Explaining the specific pathophysiology of ExDS can be complex and it remains uncertain why some individuals die while others do not. Generally, males, with an average age of 37 comprise a majority of the deaths associated with ExDS. Of the common features of ExDS, four have been identified as major symptoms of ExDS: delirium with agitation, hyperthermia, respiratory arrest, and death (p. 188).

\* \* \*

Combined with Hall, et al., and Baldwin, et al., prospective research findings, we believe the symptoms documented in this study supports a detailed definition of ExDS and the prevalence of associated symptoms underscores the validity of ExDS as a bona fide clinical syndrome (p. 192).

*See also* Vilke, et al., *Excited Delirium Syndrome (ExDS): Treatment Options and Considerations*, Journal of Forensic and Legal Medicine, p. 1 (2012) (ex. H) ("Recently the American College of Emergency Physicians (ACEP) published the findings of a white paper on the topic of ExDS seeking consensus on the issues of definition, diagnosis and treatment. In doing so, ACEP joined the National Association of Medical Examiners (NAME) in recognizing ExDS as a medical condition.").

The fact that ExDS diagnosis is not specifically listed in the Diagnostic and Statistical Manual of Mental Disorders (DSM-4 and 5) or in the International Classification of Diseases (ICD-10) coding system does not mean ExDS is not a bona fide diagnosis. *See* Vilke, et al., *supra* (ex. F) at page 100:

"The fact that the diagnosis does not exist in the American Psychiatric Association's *Diagnostic and Statistical Manual of Mental Disord*ers, 5th edition (DSM-5) has been raised to question whether ExDS is a 'real' entity or diagnosis (American Psychiatric Association, 2013). The 10th edition of the *International Classification of Diseases* (ICD-10)[2] coding system does not specifically list Excited Delirium Syndrome either. In both publications, however, though not referred to directly, there are a number of other diagnoses that describe the population of patients exhibiting signs and symptoms of ExDS that can be diagnosed. The ICD-10 codes that overlap with ExDS are included in Table 6.1. In the United States, although a billable, (i.e., fundable) diagnosis for ExDS does not exist specifically, the descriptive behaviour and identified aetiology, such as cocaine or methamphetamine, are described."

---

[2]The ICD does have billing codes for Delirium of Mixed Origin, Agitation, Psychomotor Agitation, Psychomotor Excitement, Abnormal Excitement, Vilke, et al., *Excited Delirium Syndrome (ExDS): Redefining an Old Diagnosis,* Journal of Forensic and Legal Medicine, p. 2 (2011) (ex. I). The DSM describe delirium, substance intoxication delirium, etc., resulting from "multiple etiologies."

*See also* ex. E, *supra,* p. 7. "The minimum features for ExDS to be considered include the presence of both delirium and an excited or agitated state. As described in DSM-IV-R, the features of delirium are constant and defined by a disturbance of consciousness (reduced clarity of the awareness of the environment) with reduced ability to focus, sustain or shift attention."

Multiple courts which have addressed the issue have held excited delirium syndrome is a recognized medical condition and the proper subject of expert testimony. For example the District of Hawaii last year said:

> Dr. Hail's expert opinion is based upon reliable data, principles, and methods Fed. R. Evid. 702; *Daubert,* 509 U.S. at 589.
>
> ***
>
> The Eleventh Circuit Court of Appeals has explained that "'excited delirium' is a widely accepted entity in forensic pathology and is cited by medical examiners to explain the sudden in-custody deaths of individuals who are combative and in a highly agitated state." *Mann v. Taser Int'l, Inc.*, 588 F.3d 1291, 1299 n. 4 (11th Cir. 2009) (citing the Report of the Council on Science and Public Health, 453 (Am. Medical Assoc., Annual Meeting, 2009)). Numerous federal district courts have found expert testimony regarding Excited Delirium Syndrome to be sufficiently reliable and admissible despite *Daubert* challenges to its admissibility. *See, e.g., Lass v. Cnty. of Orange,* 2010 WL 11561183, *1 (C.D. Cal., Sept. 17, 2010); *Galack v. PTS of Am., LLC,* 2015 WL 5692327, *18 (N.D. Ga., July 6, 2015); *Barnwell v. Roane Cnty.,* 2016 WL 1457928, *3-*4 (E.D. Tenn., Apr. 12, 2016).
>
> The Ninth Circuit Court of Appeals has permitted district courts to rely on expert testimony regarding Excited Delirium Syndrome and granted police officers qualified immunity in Section 1983 cases. *Marquez v. City of Phoenix,* 693 F.3d 1167, 1171 (9th Cir. 2012); *Gregory v. Cnty. of Maui,* 523 F.3d 1103, 1109-10 (9th Cir. 2008).
>
> ***
>
> Plaintiff objects to Dr. Hail's conclusion that the Decedent's death was caused by Excited Delirium Syndrome on the basis that it is a differential diagnosis rather than the result of a definitive diagnostic test. Plaintiff's objection is misplaced. The Ninth Circuit Court of Appeals has found that differential diagnosis is a common, reliable methodology under the *Daubert* standard that is admissible . . . .
>
> ***

> Plaintiff's challenges to Dr. Hail's expertise and opinions go to the weight of her opinion, but they do not provide a basis for exclusion of the testimony . . . .

*Silva v. Chung,* 2019 WL 2195201 at *2 and *3 (D. Haw. 2019). See also *Barnwell v. Roane Cnty. Tennessee,* 2016 WL 1457928 at *3 (E.D. Tenn. 2016), *aff'd,* 2020 WL 290425 (6th Cir. 2020) (holding ExDS diagnosis reliable despite its "multiple etiologies"); *Weigel v. Cox,* 2010 WL 11590909 (D. Wyo. 2010) (finding testimony concerning ExDS met *Daubert* reliability standard).

The argument that expert opinion concerning excited delirium syndrome should be excluded because the syndrome is not recognized by the American Medical Association,[3] American Psychiatric Association[4] or World Health Organization has been rejected. *See Silva, supra,* 2019 WL 2195201 at *2. The district court in *Silva* ruled that such an argument "goes to weight, not admissibility. The district court is not tasked with deciding whether the expert is right or wrong, just whether the testimony has substance such that it would be helpful to the jury." *Id.* Excited delirium is recognized as a diagnosis by the National Association of Medical Examiners and American College of Emergency Physicians (Wetli depo., DE 237-2, 203:23-25; 204:1-4).

Dr. Vilke in his report also described the mechanism for cardiac arrest for subjects undergoing excited delirium, (Vilke report, p. 10). This mechanism of death is supported by medical literature, *see, e.g,.* Baldwin, et al., *supra,* (ex. D), p. 27:

> A struggle between an officer and a subject, particularly one with a subject who is already agitated and displaying the symptomatology of ExDS, would be expected to increase the risk of the subject experiencing ARD [arrest related death]. For example, Ho et al. (2010) conducted a study where they simulated physical resistance and fleeing; this led to increased metabolic acidosis (too much acid in bodily fluids) and catecholamine surge.

---

[3] The repeated assertion is in dispute as the AMA in 2009 passed a resolution at their 2009 national meeting which recognized excited delirium syndrome as a "widely accepted entity in forensic pathology." *See* Report of Council on Science and Public Health (ex. J), discussed in *Silva, supra,* 2019 WL 2195201, *3.

[4] The DSM is a psychiatric disorder manual published by the American Psychiatric Association. ExDS is not a condition typically taken care of by a psychiatrist (Vilke depo., 156:12-21).

They concluded that acidosis and/or surges in catecholamines can act as contributing or causal mechanisms in sudden deaths. Vilke, DeBard, et al (2012) have also noted that metabolic acidosis appears to contribute to cardiovascular collapse in fatal cases of ExDS.

Hyperthermia is a distinguishing feature of ExDS (Baldwin et.al, 2016), it has been described as a harbinger of death (Hall et al., 2013). Vilke and Payne-James, 2016). Hyperthermia is defined as an elevated body temperature due to failed thermoregulation. (Vilke, Bozeman, Dawes, Demers & Wilson, 2012). A prolonged and strenuous struggle with an overheating subject can contribute to increases in core body temperature and exacerbate a hyperthermic state . . . .

\* \* \*

Excessive strenuous movement in combination with heavy drug use, dehydration, or poor nutrition can also cause rhabdomyolysis (Vilke & Payne-James, 2016). This occurs when ". . . muscle fibers break down releasing chemicals, namely myoglobin, into the blood that are harmful to the kidneys."

*See also* Mash, *Excited Delirium and Sudden Death: A Syndromal Disorder at the Extreme End of the Neuropsychiatric Continuum* (2016), p. 6 (ex. K) ("Victims of ExDS usually die from cardiopulmonary arrest (Takeuchi et al., 2011; Vilke et al, 2012). Sudden cardiac death induced by life-threatening stressor results from a generalized sympathetic storm within the autonomic nervous system (Samuels, 2007)."

Various courts have recognized the common features of excited delirium syndrome. *Roell v. Hamilton Cnty. Bd. of Cnty. Comm.,* 2016 WL 4363112, n. 1 (S.D. Ohio 2016), *aff'd* 870 F.3d 471 (6th Cir. 2017), citing *Mann v. Taser Int'l, Inc.,* 588 F.3d 1291, 1299 n. 4 (11th Cir. 2009). "Symptoms include 'imperviousness to pain, great strength, bizarre behavior, aggression, and hallucinations.'" *Callwood v. Jones,* 727 Fed. Appx. 552 at n. 2 (11th Cir. 2018), citing *Hoyt v. Cooks,* 672 F.3d 972, 979 n. 7 (11th Cir. 2012), *cert. denied.*

Todero had hyperthermia, the "harbinger of death," Baldwin, *supra.,* (ex. D, p. 27). He underwent a prolonged and strenuous struggle. Such a struggle with an overheating subject increased his core body temperature. The facts support the conclusion that Todero was suffering from excited

delirium syndrome. Both Dr. Vilke and the medical literature show excited delirium syndrome is a bona fide diagnosis.

**C)**  **Vilke Used Proper Methodology; the Excited Delirium Diagnosis is Tested by the Number of Clinical Findings Displayed by Todero.**

Dr. Vilke was supplied and reviewed a significant volume of material including the hospital record, depositions, body cam video, etc. (Vilke depo., 61-62). His methodology was to look at all the material that led up to the police encounter including videos, and objective data including 911 calls, medical records, deposition testimony and reports supplied by other experts (*Id.*). He looks at the complaint to see what the allegations are and then evaluates the objective data including vital signs, direct visualization of what occurred as shown on the body cam video, lab work, autopsy findings, behavioral activity, and toxicology reports (*Id.* at 63).

Dr. Vilke is an expert on physiological effects of Tasers on humans (Vilke depo., 79:18-19), and has published peer-reviewed publications on excited delirium syndrome (report, p. 15). Review of his curriculum vitae shows that among the hundreds of book chapters and articles he has authored on various medical and physiological topics, he has authored multiple articles and several book chapters concerning the physiological effects of Tasers and the general acceptance of excited delirium syndrome, and how it is diagnosed.[5] His report describes clinical findings and features consistent with excited delirium and he opined that Todero's behavior was consistent with classic excited delirium syndrome (Vilke depo. 126, 131-33). Excited delirium syndrome is diagnosed in the emergency department on a regular basis (Vilke depo., 162:5-6). It is a diagnosis based upon looking at clinical features and excluding other

---

[5] See Vilke curriculum vitae, book chapters numbered 36 and 46 (Tasers) and 65 (excited delirium syndrome); peer-reviewed articles numbered 118, 120, 121, 133, 135, 146, 170 and 266 (Tasers and physiological effects*)* and 148, 150, 155, 156, 166, 185, 256 (excited delirium syndrome). *See also* Dr. Vilke's consortium publications numbered 112, 123-125, 127, 131 and 133 concerning Tasers and physiological effects.

causes (162:19-20).  A single finding is not diagnostic of excited delirium syndrome (186:2-5).  Walking in and out of traffic is consistent with delusional behavior (183:24-25; 184:1-9; 192:15-22) and while agitation and delirium are "definitional" (208:1-3), you have to have a complement of other symptoms to come to the diagnosis (201:13-20), six symptoms being considered the minimum ( 202:3-11).

The excited delirium led to Todero's cardiac arrest (Vilke depo. 228:1-2).  The cardiac arrest injured Todero's organs, creating multi-organ dysfunction that ultimately led to his death (228:2-14).  Once an individual goes into cardiac arrest from excited delirium it is very hard to resuscitate him successfully (229:7-8).  The fact that Todero had a temperature of 103 and a heart rate of 142 some period of time after he was handcuffed is significant and diagnostic for excited delirium syndrome, insofar as Todero's central system was "physiologically spinning out of control" (258:16-25; 259:1-5).  Patients who go into cardiac arrest from excited delirium syndrome often have significantly elevated temperature (259:12-14).  When asked to provide a summary as to why he concluded Todero was suffering from excited delirium syndrome, the doctor answered as follows:

> So he had sort of bizarre behavior.  And again, this wasn't all necessarily at one point in time, but he had some bizarre delusional behavior.  He had agitation, he went through a waxing and waning stage.  He was a little bit more resistant to cuffing and then he went into sort of a hyperactivity and then sort of catatonic, and then he got agitated again.  This is not atypical for excited delirium.
>
> Then he also then had other criteria that would be consistent with it including elevated heart rate, elevated temperature, seemingly strong strength, resistance to police interaction or police commands, breathing fast, sweating.  All those things we sort of talked about earlier which met criteria.  And he had a bizarre behavior of almost a stimulant intoxication going on as witnessed by at least two different sets of individuals in the 24 hours prior to his event here.  It would also be consistent with the – the potential drug intoxication that can lead to excited delirium.
>
> And finally, the – the cardiac arrest, the brady-asystolic arrest would be consistent with that, and difficulty to resuscitate him.

(Vilke depo., 262:4-25; 263:1-6).

Peer-reviewed medical literature, including some authored by Dr. Vilke, support a diagnosis

based upon at least six of ten potential clinical criteria for excited delirium syndrome. *See, e.g.,* Vilke, ex. J, supra, "[t]hese probable cases were defined based upon the presence of perceived abnormal behavior including agitation and at least six of the 10 potential criteria for ExDS"; Baldwin, supra (ex. D) ("Probable cases of ExDS are based on the presence of at least 6 of the following 10 potential criteria for ExDS: pain tolerance, constant/near constant activity, not responsive to police presence, superhuman strength, rapid breathing, does not fatigue, naked/inappropriately clothed, sweating profusely, tactile hyperthermia, and glass attraction/destruction," citing American College of Emergency Physicians Excited Delirium Task Force *White Paper* (ex. E). "It is the consensus of the Task Force that ExDS is a unique syndrome which may be identified by the presence of a distinctive group of clinical and behavioral characteristics that can be recognized in the pre-mortem state. . . . At present, physicians and other medical and non-medical personnel involved in personal interactions with these patients do not have a definitive diagnostic 'test' for ExDS. It must be identified by its clinical features . . . . While not universally fatal, it is clear that a proportion of patients with ExDS progress to cardiac arrest and death)." The *White Paper* goes on to describe that "[w]hile the specific precipitants of fatal ExDS remain unclear, epidemiologic and clinical reports provide understanding of the underlying pathophysiology. When available, cardiac rhythm analysis demonstrates brady-asystole . . . ." *Id.,* pp. 4, 8. Todero was brady-asystolic. "Severe acidosis appears to play a prominent role in lethal ExDS-associated cardiovascular collapse," *Id.* at p. 8. Todero was severely acidotic as measured by his pH level.

It is well settled that the *Daubert* factors, which include testing, peer review, error rates, standards and acceptability in the relevant scientific community are illustrative but not exhaustive, and may be inapplicable in any given case. *Daubert v. Merrill Dow Pharms, Inc.,* 43 F.3d 1311, 1316 (9th Cir. 1995) ("*Daubert II*"). Thus, the trial court may question whether the expert is proposing to testify about matters "growing naturally and directly out of the research they have conducted independent of

the litigation, or whether they have developed their opinions expressly for the purposes of testifying" as a significant inquiry weighing on reliability. (*Id.*at 1317). "That the testimony proffered by an expert is based directly on legitimate, pre-existing research unrelated to the litigation provides the most persuasive basis for concluding that the opinions he expresses were 'derived by the scientific method.'" (*Id.*) Unlike plaintiff's expert Rashtian, Dr. Vilke's opinions were not arrived at expressly for the purpose of this lawsuit. Both he and others in his field have conducted research and issued publications on the subject at issue. Review of Dr. Vilke's publication list alone should satisfy the court that he is not an expert who comes up with opinions in order to satisfy litigation purposes.

Other courts have confronted and rejected arguments like those proffered by the plaintiff to the effect that opinions concerning excited delirium "cannot be tested" and are based solely on subjective assessments. In *Weigel v. Cox,* 2010 WL 11590909 (D. Wyo. 2010), the court rejected an argument that excited delirium syndrome cannot be confirmed or refuted by testing, rejecting plaintiff's argument that the expert testimony should be excluded because "none of the supporting science involves a controlled experiment, that is, testing one variable against a control group in order to disprove a hypothesis." *Weigel,* at *3. The court noted that such testing was not available given the great risk of harm to experimental subjects, and that "[a]ccordingly the current understanding of excited delirium derives almost exclusively from a process of inductive reasoning. Although this process may, arguably, be less reliable than a controlled experiment, it is clear to the Court that no experimental alternative is realistically available." *Id.* The court therefore denied the motion to exclude the expert's opinion despite the inability to "test" the opinion via control groups, and held excited delirium opinion testimony met the requirements of Rule 702 and *Daubert*.

Nor can excited delirium syndrome testimony be excluded simply because it cannot be determined via a definitive diagnostic test. *See Silva v. Chung, supra,* 2019 WL 2195201 at *3, where

the court refused to exclude the expert's opinion evidence as to the decedent's death being caused by excited delirium syndrome on the basis that it is a differential diagnosis as opposed to a result of a definitive diagnostic test.  While whether an expert's methodology has been tested or is capable of being tested is a factor for any court to consider on the *Daubert* challenge, but other factors include whether the theory has been subjected to peer review and publication and has been generally accepted in the relevant scientific community.  The *Daubert* factors are "not a definitive checklist or test" and the court must apply the factors "in case-specific evidentiary circumstances." *Chapman v. Proctor & Gamble Distributing, LLC,* 766 F.3d 1296, 1305 (11th Cir. 2014).  The gatekeeping function of Rule 702 is not intended to supplant the adversary system or the role of the jury by way of relieving the parties of cross-examination or presentation of contrary evidence.  *Adams v. Lap Corp. of Am.,* 760 F.3d 1322, 1334 (11th Cir. 2014). "*Daubert* neither requires nor empowers trial courts to determine which of several competing theories has the best provenance." *Ruiz-Troche v. Pepsi-Cola of Puerto Rico Bottling Co.*, 161 F.3d 77, 85 (1st Cir. 1998).  It is therefore noteworthy that plaintiff did not disclose a qualified expert who refutes excited delirium as a medical diagnosis or as a cause of Todero's cardiac arrest.  *See Silva v. Chung, supra,* 2020 WL 515810 at *15.[6]

It is also noteworthy to point out that the district court judge in *Silva v. Chung*, in ruling on a post-trial motion, again rejected the plaintiff's continued argument that the defense expert on excited delirium should not have been allowed to testify:

> The Court found that expert Dr. Stacey Hail had the requisite training, education, and skill to testify as an expert concerning cause of death and that her methods were based on reliable data, principles, and methods.  The Court cited to numerous federal cases that have permitted Dr. Hail to testify as an expert witness in similar cases. . . .  The Court also cited to numerous cases rejecting *Daubert* challenges to the admissibility of expert testimony concerning cause of death based on excited delirium syndrome, including Ninth Circuit case law that has permitted district courts to admit expert testimony regarding excited delirium syndrome in cases brought pursuant to 42 U.S.C. § 1983. . . .

---

[6]The court ruled Dr. Rashtian cannot offer opinions regarding excited delirium (DE 227, p. 20).

> Contrary to Plaintiff's argument, Plaintiff was not limited in cross-examining Stacey Hail about the cause of death.  Plaintiff had the opportunity to cross-examine Dr. Hail about her opinions as to cause of death at length . . . .   There was also extensive cross-examination about Dr. Hail's reliance upon the American College of Emergency Physicians "Excited Delirium Task Force White Paper Report To The Council And Board Of Directors, . . . .
>
> ****
>
> Plaintiff claims that excited delirium is "highly controversial" but introduced no expert testimony to support his position.  Plaintiff chose to not obtain his own expert to either establish his theory of the case or to refute the Defendants' admissible evidence concerning excited delirium syndrome.  Plaintiff now attempts to re-litigate the issue and seeks a second chance to rebut Defendants' evidence.  Plaintiff has not demonstrated that a new trial is warranted on this basis.

*Silva v. Chung,* 2020 WL 515810 at *15.

This Court should follow such reasoning of the district court and reject plaintiff's argument concerning methodology and testing as grounds to exclude Dr. Vilke's testimony.

### D)    Dr. Vilke Ruled Out Infection and Psychiatric Disorder as a Cause of Todero's Excited Delirium Syndrome.

Plaintiff argues Dr. Vilke failed to consider alternative explanations for Todero's symptoms other than excited delirium syndrome and that his testimony should therefore be barred on that basis. But Dr. Vilke acknowledged that psychiatric disorders can also be a cause of excited delirium syndrome and that some parties believe certain infections can also be a cause (Vilke depo., 126:25; 127:1-9); "Persons with psychiatric illnesses comprise the other cohort of ExDS cases and deaths. . . .  The actual pathophysiology of patients who have been previously identified with signs and symptoms of ExDS is complex and poorly understood.  The fundamental manifestation is delirium.  As described above, there are several different potential underlying associations or causes, including stimulant drug use, psychiatric disease, psychiatric drug withdrawal and metabolic disorders,"  Vilke, et al., *Excited Delirium Syndrome (ExDS): Defining Based on Review of the Literature, Journal of Emergency Medicine* (2011), p. 4 (ex. M).  But the doctor determined Todero did not have any psychiatric disorders

or infectious causes for his excited delirium (Vilke depo. 127:18-21).  There is nothing in Todero's history that demonstrates he had a history of psychiatric disorders, and if there were such history Dr. Vilke would have noted that Todero had a history of schizophrenia untreated (Vilke depo. 134:11-17).  If he thought the cause of Todero's excited delirium was infectious he would have described the cause as infectious and not described it as excited delirium syndrome (*Id.,* 134:7-10).

He acknowledged that excited delirium can be a diagnosis of exclusion, though it is diagnosed regularly  in the emergency department, and that the physician has to rule out other causes before arriving at an opinion that it was in fact excited delirium, based upon clinical features and exclusion of other causes (Vilke depo., 162:2-8).  Using the tested scientific methodology of forming a differential diagnosis, Dr. Vilke considered and excluded other possible etiologies for the clinical presentation.  He ruled out infections as a cause because as part of his evaluation he looked for infections in the medical records when he saw Todero had a fever of 103, but the medical records  reflect no evidence of infection as a cause (Vilke depo., 172:4-10).  There was also no obvious metabolic disorder that would have caused Todero's symptomatology (172:13-22).  He would have looked for other metabolic findings and if he found such evidence, he would not be offering the opinion that Todero had excited delirium syndrome but would instead opine that he had an underlying condition such as encephalitis that was causing his behavior, but there was no such evidence (173:3-14).  It was the absence of other causes and accompanying evidence that led him to the conclusion that Todero had excited delirium syndrome (173:15-18).

*Daubert* does not explicitly require that an expert exclude all other potential causes of death before concluding complications resulted from excited delirium as the cause of death.  For example, in *Bussey-Morice v. Kennedy,* 2013 WL 12149551 at *4 (M.D. Fla. 2013), *reversed* on qualified immunity grounds, 587 Fed. Appx. 621 (11th Cir. 2014), the expert "could not determine whether or not the

Decedent would have died due to excited delirium absent any taser usage." The court ruled the expert's inability to rule out other causes or contributing factors to the death went to the weight to be given to his testimony, not its admissibility, as "[t]he expert is not required to eliminate all other possible causes of death." *See also Estate of Barnwell v. Roane County, Tenn., supra,* where the court rejected the notion that an expert was required to exclude all other causes of death before concluding excited delirium was the cause. Yet in this instance, Dr. Vilke examined the entire medical record and concluded there could be no other cause for Todero's excited delirium, including any metabolic disorders.

As to plaintiff's citation to *Estate of Berger v. Spokane County,* 2017 WL 5639941 (E.D. Wash. 2017), that ruling is not supportive of plaintiff's position. In that case the defense expert issued a report, the majority of which addressed whether the use of a Taser had any role in causing the decedent's death. The court was satisfied that the expert discussed in sufficient detail the bases for determining the effect of a Taser to support the admission of his testimony on that issue. But as to excited delirium, the expert offered nothing more than a single paragraph in his report to the effect that "it seems clear to me that he was in the throes of [excited delirium syndrome] . . . . This condition alone is well described in the medical literature . . . ." *Estate of Berger* at *2.

The court found this insufficient to survive *Daubert* challenge, seeing as the expert did not supply the factual basis supporting his opinion that the decedent had excited delirium syndrome, "[n]or can the Court identify any reliable methodology that Dr. Ho employed for diagnosing Mr. Berger as suffering from excited delirium syndrome. For instance, the Court does not identify in the report any alternative causes for Mr. Berger's behavior and/or his death that Dr. Ho considered before ruling in excited delirium syndrome as the cause. Nor can the court decipher what Dr. Ho's opinion is regarding the connection between excited delirium syndrome and Mr. Berger's death." *Id.* Thus, the failure on the part of the expert in *Estate of Berger* to identify potential alternative causes is simply an example of the

deficiency of his report and absence of factual support and described methodology, and nothing more.

**E)**    **Dr. Vilke is Allowed to Testify that the Taser Did Not Cause Todero's Death**.

The only use of force in this case involved deployment of a Taser by officer Blackwell and the attempts by officers Elliott and Laut to get Todero handcuffed by trying to pull his arm out which he was keeping underneath his body.  The court has already entered summary judgment in favor of Elliott and Laut on plaintiff's claim against them alleging excessive use of force.  So the only use of force at issue here for trial purposes is whether Blackwell's use of the Taser was excessive.

To that end, Dr. Vilke is uniquely qualified to offer opinion testimony to the effect that Blackwell's use of the Taser did not cause Todero's underlying rhabdomyolysis and was not a cause of his cardiac arrest and subsequent multi-organ failure. Dr. Vilke is an expert on the physiological effects of Tasers on humans (Vilke depo. 79:18-19).  He was described by an opposing expert as "the predominant author in the field of human research on the effects of tasers on the human body." *Bussey-Morice, supra,* at *3.  He has authored peer-reviewed medical literature on the subject.[7]  The issue has been addressed by other writers as well, Vilke report, pp. 2 and 3, including the very recent article by Kroll, Witte, et al. addressing electrical weapons and rhabdomyolysis published in Forensic Science, Medicine & Pathology (ex. M), identified in Dr. Vilke's report as one of the articles he relied upon. Plaintiff complains that these studies involved only five second Taser applications on healthy volunteers, apparently suggesting Todero was not in a good state of health.  The studies, including those of Dr.

---

[7]Among the various studies identified as relied upon by Dr. Vilke in connection with this subject, see Vilke report, pp. 2-3, are studies and articles authored by Dr. Vilke himself:  *Emergency Dept. Evaluation After Conducted Energy Weapon or Use*:  *Review Energy the Literature for Clinician*, Journal of Energy Medicine (2011), (ex. O); *Twelve-Lead Electrocardiogram monitoring of subjects before and after voluntary exposure to the Taser X26,* American Journal of Emergency Medicine (2008) (ex. P); *Physiological Effects of Conducted Electrical Weapon on Human Subjects,* Annals of Emergency Medicine (2007) (ex. Q); *Physiologic Effects of the TASER After Exercise*, Society for Academic Emergency Medicine (2009) (ex. R).

Vilke, support the conclusion that a Taser cannot cause rhabdomyolysis, an opinion also supported by expert Kroll.

The recent study by Kroll, Witte, et al. involved the taking of blood samples before, five minutes after, and 24 hours after Taser exposure, which samples were then analyzed for serum levels, the most important of which appear to be creatine kinase (CK), myoglobin and lactic acid (Kroll study, ex. M, p. 2). The only biomarker with any measurable increase was myoglobin, though that increase was still clinically trivial (*Id.*, p. 5). The conclusion was that Taser exposure does not result in clinically significant changes in serum protein or enzyme levels and the blood testing showed no biomarker evidence for rhabdomyolysis resulting from Taser usage. Plaintiff offers no contrary medical literature, only media accounts. As far as there being no testing on subjects under the influence of illegal drugs such as cocaine and methamphetamine, no such study can ethically be undertaken.

The court has already ruled that Dr. Kroll, a biomedical scientist but not a physician, can testify Tasers do not cause any more than trivial increases in CK, and as to the absence of linkage between tasering and developing rhabdomyolysis (DE 227, p. 22). Dr. Vilke's report and accompanying deposition testimony also explain that Todero's rhabdomyolysis, which ultimately led to multi-organ failure, was a pre-existing condition which could not have been created by Taser usage. Dr. Vilke is an expert in rhabdomyolysis diagnosis, and acknowledged that Taser applications contract muscles but cause very minimal muscle breakdown (Vilke depo. 248:3-6). It takes hours for muscle breakdown to manifest in the blood (252:14-25; 253:1-4). Elevated CK is a marker for rhabdomyolysis, which is the breakdown of muscle in the body releasing myoglobin and creatinine kinase (253:5-16). The release of myoglobin can damage kidneys which cause kidney dysfunction; when the kidneys are not functioning properly potassium becomes elevated which can become life-threatening (*Id.*). Todero's blood was drawn at 12:55 p.m. which revealed the elevated CK and kidney dysfunction (252:20-22). If you have

elevated CK levels enough to damage the kidneys it usually takes 12 to 24 hours to manifest, so whatever damaged Todero's kidneys pre-dated involvement of the police that day (250:16-25; 251:1). Kidney damage could have been caused by drug use, dehydration or poor nutrition over the prior 24 hours (251:24-25; 252:1-6). The elevated CK could have resulted from overactivity, under nourishment, dehydration, a combination thereof, or have been drug-induced (253:22-24).

Todero's potassium level at 12:55 p.m. was highly elevated. Potassium elevation is typically due to renal failure, which was the case with Todero. Todero had stage IV kidney disease which is likely why his potassium levels were built up when he arrived in the ER (Vilke depo., 254:17-25; 255:1-8). This too would have predated any involvement of the law enforcement officers. (*Id.*). Therefore, according to Dr. Vilke, Todero's rhabdomyolysis, elevated CK and elevated potassium pre-existed his encounter with officer Blackwell as these conditions cannot develop in 20, 30 or even 60 minutes; they take a half day to a day and sometimes longer (Vilke depo. 255:22-25; 256:1-7).[8] Dr. Vilke testified that even if Todero had been subjected to a full 98 seconds of electrical discharge his opinion would not change because the findings with regard to clinical presentation of his physiology, kidney function and CK levels could not have been caused by Taser activations (257:1-14). Even if he concluded Taser activations could have raised the CK level to some degree, it was too soon for the increased CK level to have manifested itself upon arrival in the emergency room (*Id.*). Nor could his elevated heart rate, temperature of 103 or persistent tachycardia (heart rate of 142) be caused by a Taser because once the Taser is off the patient's physiology calms down (257:15-24). In short, Dr. Vilke testified that the

---

[8]Dr. Hartman, who treated Todero, agrees: "[y]ou aren't going to have total CPK with 8000 unless it was happening before you arrived to the emergency department. . . . I've never seen that in 23 years that it's that high . . . so it had to exist prior to arresting . . . same with the total CPK . . . [y]ou don't have rhabdomyolysis right away. You have to develop it, and you have to have it going on actively within your body" (Hartman depo. DE 204-3, 108:3-13; 109:12-15). He described Todero as a "chronically ill person" (Hartman depo. 107:21).

tasering had nothing to do with Todero's death (260:2-4).

Finally, as to the arguments advanced by plaintiff on pages 14 and 15 of plaintiff's brief to the effect that "Dr. Vilke concedes he cannot diagnose Mr. Todero with excited delirium syndrome prior to the taser use" and as to ruling out other "use of force" causing Todero's symptoms and death, defendants respond as follows. Plaintiff cites Vilke's deposition at pages 192-93 in support of the proposition that Dr. Vilke somehow conceded that he cannot opine Todero was suffering excited delirium at any point prior to the Taser use. If the deposition testimony reflected nothing more than that Todero was walking in and out of traffic, not following commands and was sweaty, "[t]hose three facts alone with no other supporting facts, I would not conclude that that person had excited delirium" (Vilke depo. 193:14-16). Plaintiff ignores the fact that there were multiple other clinical findings which supported the excited delirium diagnosis as described in Dr. Vilke's report.  Dr. Vilke also made clear during his deposition that you cannot use a single finding as diagnostic, you have to put the whole picture together (depo., 186:2-5).  Walking in and out of traffic is consistent with delusional behavior and falls in the category of delirium cognition and perception issues; it is consistent with but standing alone is not diagnostic of excited delirium (183:24-25; 184:1-9).  His report describes those clinical findings consistent with excited delirium;  examples of other findings demonstrating Todero had excited delirium were his superhuman strength, his imperviousness to pain, his hyperthermia, the core temperature of 103, and testimony concerning him being hot to touch.  Todero displayed evidence of agitation in the ambulance such that the paramedic could not even get a blood pressure cuff on him (222:22-25; 223:1-7).  The behavior from the day prior with the state police is significant to Dr. Vilke because it showed Todero's pattern of behavior which was consistent with stimulant or hallucinogenic drug intoxication, because with excited delirium you will see a pattern where the person becomes hyperadrenergic, where everything starts to stimulate the heart rate, temperature, breathing and sweating, revving and escalating

(260:5-23). Moreover, the cardiac arrest itself, being brady-asystolic, is consistent with excited delirium (263:4-7).

As to the "other use of force" argument offered by plaintiff, this is a strange argument in view of the fact that plaintiff's own expert Rashtian conceded at his deposition that neither officers Laut nor Elliott did anything at the scene which caused Todero's rhabdomyolysis, seeing as neither deployed a Taser on Todero (Rashtian depo., 186:18-25; 187:1-22). And plaintiff's police practices expert, Roger Clark, testified at deposition that the use of force by Elliott and Laut in trying to get Todero handcuffed was appropriate and did not constitute "lethal force" (Clark depo. 229:4-19). The court, even without the benefit of that deposition testimony, ruled that Elliott and Laut were entitled to summary judgment on plaintiff's excessive force claim against them (DE 177, pp. 17-19).

Plaintiff's case from the outset, from the filing of the complaint through the proffering of Rashtian's report, was that Blackwell's tasering of Todero caused the rhabdomyolysis which resulted in multi-organ failure and his death. Dr. Rashtian in his report stated Todero had "significant kidney and liver damage" which were "manifestations of multi-organ system failure caused by the Taser-induced rhabdomyolysis " (Rashtian report, p. 5). For Dr. Vilke to simply acknowledge that Todero had acute kidney injury, as did Rashtian, certainly came as no surprise to the plaintiff. But in view of how the case has been prosecuted over these several years, and the court's ruling on summary judgment and on prior *Daubert* motions, if the court precludes Dr. Vilke from offering an opinion that other use of force, i.e., by Elliott and Laut, played no causal role, then the plaintiff too must be precluded from attempting to offer any such opinion evidence seeing as her own expert Rashtian not only offered no such opinion in his report or deposition testimony but in fact refuted any such conclusion.

    **F)**    **<u>Dr. Vilke Denies that His Opinion That Todero's Excited Delirium Was Likely Linked to Drug Intoxication Was Not Disclosed by His Report, Nor is Such an Opinion Speculative or Unreliable.</u>**

Prior drug use is not required for an excited delirium diagnosis but is consistent with it (Vilke depo., 83:10-14). Todero's medical records do show a history of substance abuse (*id.*), and as noted in Dr. Vilke's report, excited delirium syndrome is most commonly caused by use of stimulant drugs, and routine toxicology analysis will typically identify potential causative drugs like methamphetamine, cocaine and PCP (Vilke report, pp. 8 and 9). Dr. Vilke however goes on to point out there are a number of illicit drugs that can cause excited delirium that are not identified on routine toxicology screens such as synthetic cannabinoids, bath salts and flakka, and to identify these drugs expanded drug screens and specialty testing is typically needed (*Id.*). Todero's probable use of Spice came up in the St. Francis Hospital records[9] but the toxicology screen did not screen for Spice so Dr. Vilke could not conclude that was the exact cause (Vilke depo., 124-125). But Todero's behavior however was consistent with stimulant drug use, the type that would not show up on the drug screen (125:12-15).

Dr. Vilke conceded in his report that "[a]n exact etiology of Mr. Todero's ExDS is not easily identified as the basic toxicology screen performed on his blood was negative for common drugs of abuse; however, as noted above there are other commonly abused drugs that can precipitate ExDS that do not show on a basic toxicology screen. Overall, Mr. Todero's presentation, signs and symptoms, vital symptoms and behaviors noted on the video as well as in the reports are consistent with classic excited delirium syndrome" (report, pp. 10-11). This was sufficient to place the plaintiff on notice that while the exact cause of Todero's excited delirium is not identified via tox screen, his entire presentation was consistent with classic excited delirium caused by drug intoxication (Vilke depo. 125:19-25; 126:1-24; 130-132). Todero's symptoms and signs and presentation were consistent with excited delirium and

---

[9]See Rashtian depo. ex. K, DE 204-20, "Clinical picture is consistent with synthetic marijuana (Spice) toxicity. AKI (acute kidney injury) is most likely due to rhabdomyolysis and ischemic ATN +/- direct Spice toxicity" (St. Francis – Indianapolis consult note on Todero, Dr. James Elliott, May 29, 2016).

the most likely cause was drugs, despite the toxicology screen (132:14-18),[10]

In *Galack v. PTS of America, LLC,* 2015 WL 5692327 (N.D. Ga. 2015), the decedent's routine toxicology screen did not reveal he had taken drugs, *id.* at *8, but the expert was allowed to offer the opinion that complications from excited delirium was the cause of death based on "the medical literature, his own clinical knowledge and experience, and the facts in the record." (*Id.* at *18). "At best, this contention [regarding the expert's methodology] is a matter that goes to the weight to be afforded to Dr. Burton's testimony, not to its admissibility." *Id.* The court further noted that "whether Mr. Galack evidenced every symptom of excited delirium is a matter for cross-examination, not outright exclusion of Dr. Burton's testimony." *Id. See also* Rashtian depo. ex. N. Sherpa, et al., *Synthetic Cannabinoids: The Multi-Organ Failure and Metabolic Derangement Associated With Getting High,* Journal of Community Hospital Internal Medicine Perspectives (2015) ("Synthetic cannabinoids (SC), though not detected with routine urine toxicology screening, can cause severe metabolic derangements and widespread deleterious effects multiple organ symptoms."). Even Dr. Rashtian acknowledged medical literature describes a connection between synthetic marijuana and rhabdomyolysis (Rashtian depo., 159:11-15) and acknowledged that the pulmonologist at St. Francis concluded Todero's acute kidney injury was consistent with Spice toxicity (*Id.* at 160:5-25; 161:1-13).

It is incorrect wherein plaintiff claims that Dr. Vilke's basis for concluding Todero's excited delirium was caused by drug intoxication was based upon two recorded instances of drug usage from the past. That is not Dr. Vilke's opinion. His opinion is that Todero displayed the signs and symptoms

---

[10]Dr. Hartman at St. Francis conceded the hospital's urine drug screens were "horrible" (Hartman depo. 114, lns. 19-21, DE 204-3) and that "commonly people admit to taking methadone, meth, Spice, and nothing comes up [on the urine screen]" (*Id.* at 23-24). Further, as noted by the coroner's field deputy, St. Francis does not test for Spice, a hallucinogenic drug (field deputy report, p. 3, DE 204-18). Even plaintiff's expert Rashtian agrees Spice would not show up on a toxicology screen unless the hospital tested for Spice (Rashtian depo. p. 52, lns. 23-25 and 53, lns. 1-7).

of classic excited delirium syndrome, that he was able to rule out psychiatric disorder and infection as causes, and therefore drug intoxication was the most likely cause of Todero's ExDS,[11] and the fact that the routine toxicology screen did not show stimulants does not mean that Todero was not under the influence of a drug.

**G)    Dr. Vilke Does Not Intend to Offer Opinions Not Addressed in His Report.**

Plaintiff's argument on page 18 is not entirely clear.  Plaintiff notes "Dr. Vilke offers no opinion about the impact of Taser use on an individual suffering from excited delirium." It is unclear exactly what plaintiff means by that.  But if the upshot is Vilke did not offer an opinion as to whether Todero was experiencing pain, that point is conceded by defendants.

Plaintiff goes on to state Vilke offered no opinion about the interplay between Tasers and the excited delirium syndrome.  This assertion is too vague to justify *Daubert* exclusion, as it is not clear what plaintiff means by "interplay" between Taser usage and excited delirium.

As far as Dr. Vilke disclaiming he was offering opinion as to whether Blackwell's Taser device was functioning properly or made a good connection and that he had no expertise in police practices or with respect to whether the Taser was malfunctioning, Dr. Vilke has no intention of offering such opinions.

**H)    Dr. Vilke's Opinions Do Not Diverge from Dr. Wetli's.**

Faced with the unfortunate passing of their expert, defendants had to quickly locate a new expert willing to look at the case on short notice, in the hope the court would grant leave to allow substitution of an expert.  Dr. Vilke agreed to review the materials in order to formulate his own opinions.  Upon being advised that his opinions were consonant with Dr. Wetli's, Dr. Vilke assumed the role of

---

[11]Dr. Wetli had the same opinion, *see* Wetli depo., DE 237-2, 135:13-22; 136:12-18; 137:3-25; 138:1-12.

"substitute expert." He understood he needed to "stay within the lanes" of Dr. Wetli's report and not to go beyond those lanes (Vilke depo., 16:7-19). He therefore went about preparing his report, going so far as to recite discussion and opinions from Wetli's report in his report, and then noting that he agreed with Dr. Wetli's opinions.

Dr. Vilke even went so far as to concede that he did not include in his report certain opinions which he would have included had he been retained from the outset. For example, he noted that Todero had an enlarged heart with a dilated ventricle and atrium on the right side which put him at increased risk of cardiac death (Vilke depo., 73:2-21). According to Dr. Vilke that is an important fact but because it was not in Dr. Wetli's report he did not include it in his report; had he been writing the report at the outset he would have definitely included that as a factor contributing to Todero's cardiac arrest (*Id.*).

It cannot be said with any legitimacy that Dr. Vilke did not attempt to "stay in the lanes" of Dr. Wetli's report. A substituted expert is required to have a similar area of expertise and address the same subject matter as the prior expert without meaningful changes, but the new expert is allowed to review all the evidence, conduct his own independent analysis and express his opinions in his own words. *Stringer v. Cambria Fabshop-Indianapolis,* 2015 WL 13632234 at *2 (S.D. Ind. 2015). "Courts confronted with an expert who dies before trial have allowed a substitute expert to issue a new report that falls 'within the scope of the original expert's report, address[es] the same subject matter, and utilize[s] the same theories of liability in damages or expresses the original expert's opinions in their own language . . . provided they address the same subject matter without meaningful change.'" *McDonald v. Wexford Health Sources,* 2016 WL 1383191 at *7 (N.D. Ill. 2016). As long as there is no "meaningful change in testimony" the courts find no prejudice to the opposing side by the substituted expert. *Morel v. Daimler-Chrysler Corp.*, 259 F.R.D. 17, 21 (D. Puerto Rico 2009). The substituting expert may express his opinions in his own language rather than being limited to merely confirming the

prior's expert's conclusions verbatim. *Noffsinger v. Valspar Corp.*, 2013 WL 12340488 at *6 (N.D. Ill. 2013).  Exceptions would be such as where the new expert generates "an entirely new damages theory," *Lincoln Nat'l Life Ins. Co v. Transamerica Fin. Lie Ins. Co.*, 2010 WL 3892860 at *3 (N.D. Ind. 2010), or where the substituted expert attempts to overcome multiple deficiencies in the original expert's report which would cause undue prejudice to the opposing side, *McDonald, supra,* at 8.  The substituting expert must not issue a report which would reasonably cause "the other side [to be] surprised by new subject matter or a new theory of liability." *Id.* at 8, citing *Morel.*

Moreover, the purpose of Rule 26 expert reports is not to replicate every word the expert might say on the stand, but is instead meant to convey the substance of the expert's opinions so the opponent will be ready to rebut, cross-examine and offer a competing expert if necessary.  M*etavante Corp. v. Emigrant Savings Bank,* 619 F.3d 748 (7th Cir 2010), *citing Walsh v. Chez,* 583 F.3d 990, 994 (7th Cir. 2009).  The report must be sufficiently detailed to allow the opponent to rebut, cross-examine and to offer a competing expert if necessary, *White v. City of Chicago,* 2011 WL 697905 at *6 (N.D. Ill. 2011). *See, e.g., Lyons v. Leatt Corp.,* 322 F.R.D. 327  (N.D. Ind. 2017) (expert did not disclose in his report that he conducted a biomedical study using the plaintiff, generating 270 photos, which disclosure did not take place until he gave his deposition revealing he had done a biomedical reconstruction of the accident.  The court found failure to disclose the study was not harmless because the defendant's attorney found himself conducting a deposition without knowing the critical bases for the expert's opinions, and was therefore "ambushed" with this information at the deposition).

Read fairly, the reports of Drs. Vilke and Wetli came to the same conclusions:  that Todero was suffering from excited delirium syndrome, and that his rhabdomyolysis which led to multi-organ failure was not caused by the Taser and was therefore a pre-existing condition.  While Dr. Wetli's report did not specifically address acute kidney injury, as noted by Dr. Vilke, acute kidney injury accompanies

rhabdomyolysis, and it is apparent from the hospital records and Rashtian's own report that Todero was suffering from acute kidney injury. The mere fact that Dr. Vilke commented upon acute kidney injury in his report, a condition plaintiff's must concede that Todero possessed, is not grounds for excluding any mention of acute kidney injury before the jury. If Todero had pre-existing rhabdomyolysis then he necessarily had acute kidney injury as demonstrated by the laboratory chemistry levels. As noted in Dr. Rashtian's report, "Rhabdomyolysis also causes hyperkalemia (elevated potassium levels). Mr. Todero's potassium levels were also highly elevated when he arrived at St. Francis Hospital. Another indicator of rhabdomyolysis is metabolic acidosis because damaged muscle cells release acids into the bloodstream. Mr. Todero's blood acid levels were also highly elevated when he arrived at St. Francis Hospital." (Rashtian report, p. 5). Dr. Wetli too in his report reported that individuals suffering from excited delirium upon resuscitation have lactic acidosis, rhabdomyolysis and potassium levels in the blood (hyperkalemia) (Wetli report, DE 237-13, p. 2). Plaintiff was not "ambushed" or otherwise taken by surprise by the mere fact that Dr. Vilke commented upon Todero's acute kidney injury resulting from elevated potassium or that he was suffering from metabolic acidosis, noted by Dr. Wetli in his report in connection with Todero's abnormal pH.

Nor did the doctors rely on different methodology. They both looked at the materials generated through discovery and came to the same conclusions. Dr. Wetli was asked at deposition that if there had been no police intervention what would have occurred, and he responded Todero probably would have been struck and killed by a car (Wetli depo. 182:15-18). Wetli then went on to note that there is really no way of knowing what would have happened to Todero or any other subject suffering from excited delirium syndrome were there no police intervention because cases of excited delirium always result in either citizens or police being called and restraint upon the subject (*Id.* at p. 182:19-25 and 183:1-3). "The individuals that are not restrained usually die from their bizarre behavior" (*Id.* at 183:3-

5).  Plaintiff's counsel then asked Dr. Wetli whether the cause of Todero's death would have "played out the same way" if police had not engaged in and attempted to restrain him, and Dr. Wetli simply answered that had police not engaged Todero (and had there been no struggle) he likely would have died from trauma, i.e., be hit by a car (*Id.* at p. 183:17-25; 184:1-6).

The above is hardly a refutation of Dr. Wetli's opinion that the physiological complications from excited delirium did not exist absent police intervention.  Had the police never engaged Todero and had he not he been struck by a car would he have collapsed and died?  Nobody knows for sure, and the fact that Wetli could not confirm speculation as to what would have happened to Todero had there been no police intervention is not a refutation of his opinion as to cause of death not resulting from the tasing.  Nor did Dr. Vilke "repudiate" Dr. Wetli's opinion and in fact stated that he too does not know what would have happened to Todero had there been no police encounter (Vilke depo. 232:20-25; 233:1-23), and if asked what would have happened in this case his answer would be the same as Wetli's (*Id.*).  Another potential scenario would be Todero continuing to walk around, cranking up his temperature and dopamine and sustaining cardiac arrest (*Id.*, 233:11-14).

As to any purported discrepancy between Dr. Wetli's opinion and Dr. Vilke's concerning the number of symptoms required to properly diagnose excited delirium, Dr. Wetli testified there could be a number of causes for both delirium and agitation, including schizophrenia, bipolar disorder, hallucinogenic drugs and stimulant drugs (Wetli depo. 144:5-14).  He then responded to questioning from plaintiff's counsel as to whether any time someone is exhibiting both delirium and agitation does that by definition that constitutes excited delirium by stating "Yeah, by definition" (Wetli depo. 144:18-23).  Indeed, the White Paper report on excited delirium syndrome provides "[t]he minimum features for ExDS to be considered include the presence of both delirium and an excited or agitated state" (White Paper, p. 10).  Plaintiff's counsel asked Dr. Wetli if he had "articulated sort of the definitional

components of excited delirium," the delirium and agitation, and Dr. Wetli so confirmed (*Id.*, 145:12-18) and went on to elaborate, testifying "Well, like any syndrome, there are many other signs which may or may not be present in any particular case.  Very frequently people who have excited delirium show that apparently increase of strength, they're impervious to pain.  They're impervious to exhaustion. They may have hyperthermia.  Increased stamina.  All kinds of things are like that that can happen with them" (*Id.*,  145:19-25; 146:1-8).

Dr. Vilke agreed in response to plaintiff's questioning that agitation and delirium are the "definitional components of excited delirium" (Vilke depo. 208:1-2).  He then went on to inform counsel that "the other ones [increased strength, hyperthermia, other signs] are not defining of it [excited delirium], they are components that have to be there" (*Id.*, 208:3-4).

There is no meaningful distinction between the opinions of the two experts, at least not sufficient to exclude Dr. Vilke from testifying.  Both arrived at the same diagnosis.  According to Dr. Wetli, the definitional requirements of delirium and agitation are required to make the diagnosis and then the other symptoms support the diagnosis.  According to Dr. Vilke, the definitional components of agitation and delirium are required but other findings such as imperviousness to pain, hyperthermia, etc., are needed to make the diagnosis. These are not meaningful changes in expert opinion causing prejudice to plaintiff. Dr. Vilke is not espousing an opinion or theory not found in Dr. Wetli's report and deposition testimony: they both concluded Todero suffered from excited delirium. The substitute expert is not required to adopt the prior expert's conclusions verbatim, and is allowed to express his opinions in his own language after reviewing the evidence.  *Lincoln Nat'l Life, supra,* 2010 WL 3892860 at *4.  The substitute may not introduce a new and different theory in the case, *id.* at *3, but that was not done here.

The same can be said concerning Dr. Wetli's stating at deposition that Todero was agitated because he was walking in and out of traffic, whereas Dr. Vilke ascribed the agitation element to

Todero's behavior in the ambulance.  The facts in the record do not support plaintiff's characterization of Todero as simply walking calmly across the street.  Todero was walking across a four-way roadway not paying attention to traffic, and then walking back across the roadway, oblivious to traffic.  He was almost hit by vehicles, causing passers-by to call 911.  Witnesses had to swerve to avoid hitting him. He never turned to see if traffic was oncoming.  Upon Blackwell's arrival at the scene Todero repeatedly described himself as Jesus Christ the Prophet.

While Dr. Vilke describes the agitation component as Todero's behavior while in the ambulance, he also confirmed that Todero's "zoning out  and walking into traffic" (report, p. 10), like the decedent in *Silva v. Chung,* supported an excited delirium diagnosis (Vilke depo. 260:24-25; 261:3-4).  Again, the doctor's testimony concerning agitation is not a "meaningful change" which would cause prejudice to plaintiff and justify exclusion on Dr. Vilke as a testifying witness.  Both experts concluded Todero was suffering from agitation.  Had plaintiff's counsel asked Dr. Wetli in his deposition whether he considered Todero's behavior in the ambulance "agitated" he likely may have confirmed that as well.

As to plaintiff's final argument, Dr. Wetli did not "disregard as irrelevant vast swaths of the record."  As described in his deposition, his task was to gather as much information as possible to arrive at conclusions, including non-medical information from law enforcement and family members (Wetli depo., pp. 78, 79:1-3; 81:2-19).  He was supplied the complete hospital chart from St. Francis, depositions, witness statements, the deposition of Dr. Hartman (Wetli depo., 13:22-25; 14:1-7). He did not "disregard" the coroner's autopsy findings but simply disagreed with the death certificate because it identified the mechanism of death and did not describe the cause of death.  In his opinion the cause of death was physiological complications of excited delirium syndrome, whereas the manner of death should have been described as undetermined (Wetli depo., pp. 194-197).  As to Dr. Wetli's remark at deposition that the body cam videos "didn't show anything," Dr. Vilke aptly noted that "I already

answered what I thought he was probably getting at is he may have already looked at the other materials and realized it [the video] doesn't show anything more than I already knew. So versus you look at them first and then the depositions don't show much more than I already knew. So I think it – that's how I would interpret if you're asking me that question" (Vilke depo., 197:9-15). Dr. Vilke confirmed "that single question there is not necessarily something that he and I differ on. He – I tend to look at the video earlier and then the other data with it. He may have already looked at all the other data and realized it doesn't show me much more than I already knew based on all the other reports" (Vilke depo., 196:10-15). The same methodology of reviewing available materials was used by both experts, though the order in which materials were reviewed may have varied. This is hardly supportive of plaintiff's argument that the experts used different methodology which supports the exclusion of Dr. Vilke from testifying at trial.

For the foregoing reasons, the defendants, City of Greenwood, Renee Elliott and Elizabeth Laut, request the court deny plaintiff's motion to bar the testimony of Dr. Vilke.

Respectfully submitted,

STEPHENSON MOROW & SEMLER

*s/ James S. Stephenson*
James S. Stephenson
Attorney No. 11434-98
Attorney for defendants,
City of Greenwood, Renee Elliott,
and Elizabeth Laut

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on December 21, 2020, a copy of this document was filed electronically.

Notice of this filing will be sent to the following persons by operation of the court's electronic filing

system.  Parties may access this filing through the court's system.

Arthur Loevy
arthur@loevy.com
D. Samuel Heppell
sam@loevy.com
Jonathan I. Loevy
jon@loevy.com
Steven E. Art
steve@loevy.com
Scott R. Drury
drury@loevy.com
Theresa Kleinham
tess@loevy.com
LOEVY & LOEVY
311 North Aberdeen, 3rd Floor
Chicago, IL 60607

Caren L. Pollack
cpollack@pollacklawpc.com
Lana R. Swingler
lswingler@pollacklawpc.com
POLLACK LAW FIRM, P.C.
10333 N. Meridian Street
Suite 111
Indianapolis, IN  46290


*s/ James S. Stephenson*
James S. Stephenson

STEPHENSON MOROW & SEMLER
3077 East 98th Street, Suite 240
Indianapolis, IN 46280
Telephone: (317) 844-3830
Fax: (317) 573-4194
E-mail: jstephenson@stephlaw.com

16-6820/bb.slc.b