IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | |
|---|---|
| TERESA TODERO, as Special Administrator of the ESTATE OF CHARLES TODERO, <br><br> *Plaintiff*, <br><br> v. <br><br> CITY OF GREENWOOD, BRIAN BLACKWELL, RENEE ELLIOTT, ELIZABETH LAUT, and AS-YET UNIDENTIFIED GREENWOOD POLICE OFFICERS, <br><br> *Defendants*. | Case No. 1:17-cv-1698-JPH-MJD <br><br> Judge James Patrick Hanlon <br><br> Magistrate Judge Mark J. Dinsmore <br><br> JURY TRIAL DEMANDED |

## PLAINTIFF'S REPLY IN SUPPORT OF HER MOTION TO BAR THE PROPOSED EXPERT TESTIMONY OF DR. GARY VILKE

### INTRODUCTION

Defendants' response brief devotes many words to general bolstering of Dr. Vilke's medical and research credentials, inappropriate and premature arguments about the evidence and theories that Plaintiff should be permitted to advance at trial, discussion of factually and legally inapposite cases which touch generally on the subject of Excited Delirium Syndrome, and citation to a plethora of irrelevant scientific and pseudo-scientific literature. Yet Defendants fail to persuasively rebut Plaintiff's arguments regarding the fatal flaws with Dr. Vilke's proffered opinions. As detailed in Plaintiff's *Daubert* motion, Dr. Vilke's opinions are unreliable, Dkt. 237 §§ II-III, undisclosed, *id.* § V, or both, *id.* § IV. Furthermore, while Dr. Vilke's opinions bear a facial similarity to those previously disclosed by Dr. Wetli, a careful examination reveals that they use divergent methodologies, that they disagree about the symptoms suffered by Mr. Todero, and that each describes a markedly different version of the purported "Excited Delirium

Syndrome" upon which they opine, with different diagnostic criteria and etiologies. *Id.* § VI. Dr. Vilke's opinions' lack of reliability, and their divergence from those of Dr. Wetli, each provide an independent basis to bar them. Defendants fail to rebut either set of arguments from Plaintiff's motion, so the Court should grant the motion and bar Dr. Vilke's testimony.

## ARGUMENT

**I.  Defendants fail to rebut the argument that Dr. Vilke failed to rule out alternative causes for the symptoms which he labels as "Excited Delirium Syndrome."**

Defendants repeatedly invoke this Court's prior ruling on *Daubert* challenges in their response brief. Plaintiff agrees that the Court should be consistent and should apply the same standards and principles articulated in that ruling to Dr. Vilke's opinions. Held up against this benchmark, Dr. Vilke's opinion must be barred. As Plaintiff argued in her motion, Dkt. 237 § II.D, this Court has held that an expert who seeks to opine as to a particular diagnosis or cause of death must adequately account for, and rule out, alternative potential causes. Dkt. 227 at 14. In this case, for Dr. Vilke's opinion that Mr. Todero was suffering from Excited Delirium Syndrome to be reliable, he must adequately explain and exclude other potential causes of the symptoms Mr. Todero experienced—among them, in this case, "exertion, medicinal drug use, infections, endocrine disorders, and neuroleptic malignant syndrome." *Id.* Dr. Vilke's purported diagnosis of Excited Delirium Syndrome likewise cannot stand if he is unable to rule out Defendants' use of force, as opposed to the claimed underlying Syndrome, as the cause of Mr. Todero's symptoms (the so-called "classic" signs of Excited Delirium). Since Dr. Vilke's opinions fail both of these tests, either of which would be fatal, they must be barred.

**A.  Defendants' response brief offers nothing to rebut Plaintiff's argument that Dr. Vilke fails to rule out alternative causes for Mr. Todero's symptoms.**

Plaintiff's motion explains Dr. Vilke's failure to consider potential alternative causes for Mr. Todero's symptoms, noting that his Rule 26 report contains no discussion or explanation of

2

alternatives other than Excited Delirium Syndrome. Dkt. 237 § II.D. Such a failure is particularly noteworthy (and particularly troubling) for an expert who proffers an Excited Delirium diagnosis, since there are numerous other potential conditions which Dr. Vilke recognizes can "mimic an Ex[cited ]D[elirium ]S[yndrome]-like state." *Id.* (citing Dkt. 237-7 at 10).

In response, Defendants focus the entirety of their argument on a different issue—namely, whether Dr. Vilke has adequately explained his determination that Mr. Todero's Excited Delirium Syndrome arose from one potential etiology over another. *See* Dkt. 241 § D. Indeed, the heading on this section of Defendants' argument reveals their error. They title this section of their response brief "Dr. Vilke Ruled Out Infection and Psychiatric Disorder as a Cause of Todero's Excited Delirium Syndrome." But that framing presupposes that Excited Delirium Syndrome is the correct diagnosis, and tackles the task of whether Dr. Vilke adequately selected from among the potential causes of that syndrome. This merely begs the question, and Defendants gloss over entirely the more relevant, and more fundamental question—was Dr. Vilke correct to apply the label Excited Delirium Syndrome at all, in light of the other conditions which Dr. Vilke concedes "may mimic" what he calls Excited Delirium? Defendants' failure to respond to this argument at all is telling. Any such response is now forfeited, and Dr. Vilke's opinion must be barred as a result.

While Defendants' factual response is entirely misplaced, they appear to reject the legal premise of Plaintiff's argument, stating that "*Daubert* does not explicitly require that an expert exclude all other potential causes of death before concluding complications resulted from excited delirium as the cause of death," and citing one out-of-district case "where the court rejected the notion that an expert was required to exclude all other causes of death before concluding excited delirium was the cause." Dkt. 241 at 19-20 (citing *Barnwell v. Roane Cnty. Tennessee,* 2016 WL

3

1457928 (E.D. Tenn. 2016)). However, whatever *Daubert* may or may not "explicitly" require, this Court's prior ruling on the Parties' *Daubert* motion demonstrates that, in this case, experts will be held to the requirement that they adequately address alternative causes or diagnoses before settling on their preferred conclusion. While weaknesses in such analysis may merely offer grounds for cross-examination, where (as here) the expert fails entirely to address such alternative causes, that is grounds for exclusion, as such an opinion is fatally unreliable. Dkt. 227 at 14. Dr. Vilke's opinion must be excluded on this basis.

> **B.  Defendants' response brief offers nothing to rebut Plaintiff's argument that Dr. Vilke cannot reliably opine that Mr. Todero suffered from Excited Delirium Syndrome prior to Defendants' use of force.**

As Plaintiff explained in her motion, Dr. Vilke conceded at his deposition that he cannot opine that Mr. Todero was suffering from Excited Delirium Syndrome at any point prior to Defendant Blackwell's use of force. Dkt. 237 § III.B. This both renders unreliable Dr. Vilke's opinion that the Taser use did not cause Mr. Todero's death, *id.*, and also serves as further evidence of Dr. Vilke's failure to eliminate alternative explanations for Mr. Todero's symptoms.

According to Dr. Vilke (and in stark contrast to Dr. Wetli's diagnostic criteria), an individual must present with at least six of the ten purported "clinical findings" to support a diagnosis of Excited Delirium Syndrome. *See, e.g.*, Dkt. 237-1 at 151:19-152:22. Yet Dr. Vilke conceded at his deposition that there was no evidence in the record from which he could conclude that, prior to the tasing, Mr. Todero was exhibiting six or more such clinical findings. Dr. Vilke conceded that, prior to the tasing, <u>there was no evidence in the record to support any finding that</u>:

> -Mr. Todero was exhibiting signs of agitation, *see* Dkt. 237-1 at 179:7-180:19 ("So, as far as agitation prior to the tasing event . . . I can't tell if he was agitated, because I don't have any objective data to say he was agitated at that specific time . . . ." . . . "I can't say he was agitated or violent at that point, no." . . . "I don't recall any agitation component there.");

4

-Mr. Todero was conclusively exhibiting signs of delusion, *see id.* at 182:6-15 ("I believe there was some questions about what -- what his name was and he referenced himself as Jesus Christ or some other biblical references as far as his responses. In fact -- well, prior to being tased, I can't remember exactly the timing of it. It may have been right after the tasing . . . ."); *id.* at 183:24-184:24 ("I can't say [that walking into traffic is] diagnostic of delusional behavior.");

-Mr. Todero was combative, *see id.* at 186:6-13 ("Q: . . . there's no evidence of [combative] behavior that you saw in the record prior to the tasing; is that correct? A. Not that I noted, correct.");

-Mr. Todero was demonstrating a high tolerance to pain, *see id.* at 186:14-17 ("Q. . . . nothing in the record prior to the tasing that evidences a high tolerance to pain; is that correct? A. Prior to the tasing, no, I didn't see that.");

-Mr. Todero was exhibiting rapid breathing, *see id.* at 187:22-189:1 ("Q. As you sit here today, you can't recall any specific evidence in the record revealing fast breathing that occurred prior to the tasing; correct? A. Again, not having looked for it, no, I can't -- I can't specifically recall anything.");

-Mr. Todero was exhibiting an elevated heart rate, *see id.* at 189:2-7 ("Q. Same thing with elevated heart rate, no evidence in the record that you can recall revealing an elevated heart rate prior to being tased? A. Again, I don't think there would be any record, evidence of that because nobody checked a pulse prior to that, so there wouldn't be evidence of that.");

-Mr. Todero was sweaty, *see id.* at 189:18-190:2 (conceding that he only recalled testimony about pre-Taser sweatiness from the State Trooper, which was "technically" beforehand but took place the day before); and

-Mr. Todero was hyperthermic, *see id.* at 190:8-12 ("That would be after the tasing event, yes.").

Indeed, as Plaintiff's motion demonstrates, the only three "clinical findings" of the purported Excited Delirium Syndrome for which Dr. Vilke could find record evidence prior to Defendant Blackwell's Taser use were (1) according to Blackwell, Mr. Todero did not comply with Blackwell's command to stop walking away and return to the curb; (2) Mr. Todero was observed walking into traffic, which is "consistent with but not diagnostic of delusion"; and (3) Mr. Todero was sweaty the day before the tasing. Dkt. 237 at 14. And of course, Dr. Vilke concedes that three (or two, or even one, depending on how generously one credits these three

5

findings) "clinical findings" are not sufficient to make a diagnosis of Excited Delirium Syndrome. Dkt. 237-1 at 151:19-152:22.

In their response brief, Defendants' purport to rebut this argument, suggesting that Plaintiff's motion somehow cherry-picked or distorted Dr. Vilke's deposition testimony or the findings in his report. Defendants state that "Plaintiff ignores the fact that there were multiple other clinical findings [beyond the three stated above] which supported the excited delirium diagnosis as described in Dr. Vilke's report." Dkt. 241 at 24. But yet again, Defendants' response brief misses the mark, for it is aimed at the wrong target. All of these "multiple other clinical findings" to which Defendants purport to point are found in the record only <u>after</u> Blackwell's use of the Taser. They offer nothing to rebut Plaintiff's argument or to contradict Dr. Vilke's clear concessions that he lacks sufficient evidence to conclude that Mr. Todero was exhibiting sufficient clinical findings to diagnose him with Excited Delirium Syndrome prior to the tasing.

Accepting this, then, it is evident what shaky ground Dr. Vilke's diagnosis rests upon. The overwhelming majority of Dr. Vilke's clinical findings are only evident in the record after the Tasing, and the overwhelming majority of <u>those</u> are exactly the sorts of symptoms that are entirely consistent with someone who has just been subjected to repeated prolonged and painful Taser exposures, along with hands-on physical force from two additional officers yanking at his arms and wrists—e.g., rapid breathing, elevated heart rate, sweatiness, and agitation. Indeed, this serves to illustrate the core failing of Excited Delirium Syndrome as a reliable diagnosis in these circumstances. In essence, it is a self-fulfilling prophecy—whenever police use significant force in an attempt to restrain an individual, their efforts will generate a high number of "clinical findings" of Excited Delirium Syndrome. Stated another way, any time an individual demonstrating some sort of abnormal behavior that can be described as delusion is encountered

6

by police, who elect to use significant force on that person, the situation is highly likely to develop and escalate in a way that will lead to additional symptoms that can later be pointed to as some evidence of an underlying Excited Delirium Syndrome, which is then used to excuse the police use of force. *See also* Dkt. 237 at 5-6.

This Court should rightly be troubled by this broader, underlying flaw in the premise of Excited Delirium Syndrome in general, but it need not rest its conclusion on such grounds, because on the specific facts of this case, regardless of the overall legitimacy of Excited Delirium Syndrome, Dr. Vilke's testimony and report demonstrates that he cannot rule out the Defendants' use of force as the cause of Mr. Todero's Excited Delirium Syndrome symptoms. This inability to rule out such an alternative explanation for his "clinical findings" dooms Dr. Vilke's opinions. Indeed, Defendants concede that a valid Excited Delirium diagnosis requires "looking at clinical features <u>and excluding other causes</u>." Dkt. 241 at 13-14 (emphasis added). Dr. Vilke's opinions fail to live up to his own stated methodology, and they should be barred.

**II.     Defendants fail to rebut the argument that Excited Delirium Syndrome as a purported cause of death lacks a sufficient scientific basis, and their response supports Plaintiff's contention that it was the police use of force that caused Mr. Todero's death.**

Plaintiff's motion explains in compelling detail, supported by Dr. Vilke's own scientific writings, that the purported mechanism by which Excited Delirium Syndrome causes a person's death is too speculative to serve as a reliable basis for expert testimony. Dkt. 237 § 2.B. Indeed, Dr. Vilke's research recognizes that "there are no clear reasons why some patients progress to death and why some do not," and the "pathophysiology" of Excited Delirium Syndrome—that is, the abnormal physiological processes by which this purported condition manifests in the human body—is "not well understood." *Id.* (citing Dkt. 237-7 at 9, Dkt. 237-8 at 9).

Defendants' response claims to rebut this by offering an explanation for the "mechanism of death" that is "supported by medical literature." Dkt. 241 at 11. Not only do Defendants take a position contrary to their own expert in doing so, but, remarkably, their cited evidence <u>supports Plaintiff's contention that it was the police use of force on Mr. Todero which caused his death</u>. Specifically, Defendants cite, apparently though inexplicably in opposition to the motion to exclude their expert, medical literature which shows that:

> "A struggle between an officer and a subject, particularly one with a subject who is already agitated and displaying the symptomatology of ExDS, would be expected to increase the risk of the subject experiencing ARD [arrest related death]. For example, Ho et al. (2010) conducted a study where they simulated physical resistance and fleeing; this led to increased metabolic acidosis (too much acid in bodily fluids) and catecholamine surge."

*Id.* Here, while the evidence demonstrates that Mr. Todero was, in the words of Officer Elliot, "being passive resistan[t]," Dkt. 131 at 24, there was certainly a struggle, albeit an almost entirely one-sided one—Defendant Blackwell repeatedly sent shock after shock of electricity coursing through Mr. Todero's body with his 16 Taser shots, while Defendants Elliot and Laut yanked aggressively at Mr. Todero's hands and arms which were pinned underneath him and which, amid the Taser onslaught, he was unable to get free to comply with their commands. *Id.* at 21-23. Thus, the only response that Defendants offer to rebut Plaintiff's argument that Excited Delirium Syndrome lacks a scientifically reliable explanation for how it causes death directly supports Plaintiff's theory of liability and fatally undercuts Dr. Vilke's opinion that the Taser and the Defendants' use of force did not cause Mr. Todero's death. *See also* Dkt. 241 at 12 (arguing that Mr. Todero suffered from hyperthermia, the "harbinger of death," which in turn had been caused by the "prolonged . . . struggle" inflicted upon him by the Defendant Officers). In seeking to save one of Dr. Vilke's opinions, Defendants proffer an explanation that contradicts a different

one (that the Taser and police use of force did not cause Mr. Todero's death). In the face of such contradiction, none of Dr. Vilke's opinions can reliably withstand Plaintiff's *Daubert* challenge.

**III.    Defendants' response fails to demonstrate the admissibility of testimony regarding Excited Delirium Syndrome "under similar facts."**

Defendants claim in their response brief that "[o]ther courts have allowed testimony regarding excited delirium syndrome, including expert testimony, under similar facts." Dkt. 241 at 6-7. Of course, regardless of whether this is so, Dr. Vilke's opinions in this case must still satisfy *Daubert*'s reliability threshold. But in any event, the three cases they cite in support of this claim are both factually and legally inapposite.

Defendants cite *Silva v. Chung*, CV 15-00436 HG-KJM, 2020 WL 515810 (D. Haw. Jan. 31, 2020), describing it as a case "where the decedent suffering from excited delirium syndrome was walking in the middle of a busy, six-lane street." Dkt. 241 at 6. But Defendants' description of the case omits mention of the fact that, unlike Mr. Todero's at-most "passive resistance", the decedent in *Silva* "took a fighting stance directed toward [one of the officers] and physically charged at [another]." *Silva*, 2020 WL 515810 at *12. More crucially, in terms of its support for admitting Dr. Vilke's opinions, the decedent in *Silva* tested positive for methamphetamine, and was found to have died "from methamphetamine-induced excited delirium syndrome." *Id.* at *7. Whatever support for admitting an expert opinion on Excited Delirium Syndrome may have existed on those facts, with a conclusive positive drug test for a substance which, as Dr. Vilke testified is "fairly high" on the list of causes for Excited Delirium Syndrome, Dkt. 237-1 at 166:24-167:3, it is of limited use to support Dr. Vilke's far shakier conclusions here.

Defendants' citation to *Waters v. Coleman*, 632 Fed. Appx. 431 (10th Cir. 2015) is even less compelling. Dkt. 241 at 7. *Waters* was an appellate decision that reversed the trial court's denial of qualified immunity; it has nothing to do with *Daubert* or the reliability or admissibility

9

of expert opinions. At most, the court in *Waters* noted that the record revealed that the decedent "may have been suffering from excited delirium," 632 Fed. Appx. at 436, and indeed it appears to have been the plaintiff in that case arguing in favor of a finding of excited delirium, which the plaintiff contended would have given the officers waning that using significant force was risky and dangerous, *id.* at 436-38—a line of argument which is hardly helpful to Defendants here. Additionally, as in *Silva*, the decedent in *Waters* was far more violent than Mr. Todero—the decedent had "attacked" a security guard prior to the arrival of police, "resulting in a few cuts and scrapes," and when police intervened at the scene, he "moved toward" one of the officers and "threw punches." *Id.* at 433. And *Hoyt v. Cooks*, 672 F.3d 972, 976 (11th Cir. 2012), is similarly unpersuasive. Like *Waters*, *Hoyt* involves an appeal following the trial court's denial of qualified immunity, and has nothing to do with *Daubert* or expert admissibility. Like *Silva*, *Hoyt* involves a much more obvious case of Excited Delirium Syndrome and a second, obvious non-Taser comorbidity—"[t]he cause of death was listed as 'cocaine-induced excited delirium in a background of coronary atherosclerotic disease." *Hoyt*, 672 F.3d at 976.

These cases offer little in the way of support for admitting Dr. Vilke's opinions, and do nothing to rebut the arguments in Plaintiff's motion demonstrating why those opinions are unreliable.

## IV. Defendants fail to rebut the argument that Dr. Vilke relied on scientific studies which are too disanalogous from the use of force at issue here.

Plaintiff explains in her motion that, as set forth in Dr. Vilke's Rule 26 report, his opinion that Defendant Blackwell's Taser use could not have caused Mr. Todero's symptoms relies solely on scientific studies involving Taser durations of five to at-most fifteen seconds of Taser exposure, far less than the 98 seconds of Taser activation which Blackwell's Taser log establishes here. Dkt. 237 at 12-13. The extreme divergence between the quantum of Taser use in

10

these studies, conducted on healthy police officer volunteers, and the circumstances of the Taser use on Mr. Todero, show that Dr. Vilke's opinion flowing from those studies is unreliable.

In their response, Defendants' offer nothing of substance to rebut Plaintiff's central contention that these studies are disanalogous. First, they misstate the nature of the relevant use of force evidence which the jury will consider at trial, arguing that since the Court "has already entered summary judgment in favor of Elliott and Laut on plaintiff's claim against them alleging excessive use of force," therefore "the only use of force at issue here for trial purposes is whether Blackwell's use of the Taser was excessive." Dkt. 241 at 21. This contention muddles two distinct issues—whose use of force must Plaintiff prove was unreasonable to establish her § 1983 Excessive Force claim, and what use of force may the jury consider in assessing Plaintiff's damages (including in evaluating cause of death). The Court's summary judgment opinion made clear that it was granting summary judgment to Elliot and Laut on that claim <u>not</u> because there was no evidence that they used force, but simply that they were entitled to qualified immunity because no clearly established case placed their use of force out of bounds based on the situation as they would have reasonably perceived it. Dkt. 177 at 17-19. Crucially, the Court rested its decision in this regard on Elliott and Laut's lack of knowledge of whether or why Blackwell's Taser use was justified, and that they could "reasonably misconstrue" Mr. Todero's incapacitation resulting from that Taser use as resistance requiring their use of force. *Id.* at 18-19. Thus, to the extent Defendants argue that Elliott and Laut's use of force against Mr. Todero—caused by Blackwell's prior Taser use which created the situation to which Elliott and Laut responded—cannot be considered in assessing whether the officer's use of force against Mr. Todero caused his death, Defendants misconstrue the Court's summary judgment findings. In any event, this issue has little relevance to the issue before the Court, which is not the

11

admissibility of evidence or Plaintiff's permissible theories at trial, but whether Dr. Vilke's opinions are reliable.[1]

Second, and regardless of the scope of force considered, Defendants do not rebut that the studies upon which Dr. Vilke relied involved Taser use of much shorter duration and on individuals in circumstances entirely distinct from those facing Mr. Todero. They offer rhetoric—claiming that Dr. Vilke is "uniquely qualified" to offer expert opinion about the effect of Blackwell's Taser on Mr. Todero, and apparently rely on the opinion of another expert in another case to the effect that Dr. Vilke is "the predominant author in the field." Dkt. 241 at 21. But Defendants offer nothing to counter Plaintiff's argument that this "field" is limited to studies that are too divergent from the use of force at issue here to be reliable. Defendants are surely correct that there can be "no testing on subjects under the influence of illegal drugs such as cocaine and methamphetamine," because "no such study can ethically be undertaken." Dkt. 241 at 22. Likewise, studies involving longer Taser durations cannot "ethically be undertaken"—and those studies of longer duration Taser exposure have *not* been studied because they may be dangerous. Dr. Vilke testified at his deposition that you could not ethically perform a study of Taser exposure of the duration faced by Mr. Todero without first doing "additional base studies [at lower levels of duration] to evaluate for that safety purpose." Dkt. 237-1 at 98:16-25. Dr.

---

[1] This is not the only example where Defendants seek to muddy the waters with extraneous, inappropriate, and premature argument about the nature of the evidence admissible at trial, entirely unrelated to Dr. Vilke's opinions. For example, they note in an aside that, following the Court's opinion limiting the scope of Dr. Rashtian's admissible opinions, they believe that "the entire issue on the cause of death may be academic at this point" since Plaintiff bears the burden of proof on causation. Dkt. 241 at 5. Plaintiff need not and will not respond fully to this argument at this juncture, which has nothing to do with *Daubert*, but notes that there is ample remaining admissible expert testimony supporting her case, and in any event expert testimony is not generally required to prove causation. *See, e.g.*, *Wallace v. McGlothan*, 606 F.3d 410, 420 (7th Cir. 2010) ("[E]xpert testimony is not required in every personal injury case, even when proximate cause is at issue.")

Vilke also testified that studying Taser exposures in excess of the manufacturer's recommended safe exposure level would require heightened justification, and an explanation for how the study could be done safely. *Id.* at 100:19-101:9. And of course, Taser's product warnings expressly state that to "reduce the risk from [Taser] exposure" it is important to "[m]inimize the number and duration of [Taser] exposures, because "[m]ost human [Taser] lab testing has not exceeded 15 seconds of [Taser] application." Ex. 237-12 at 2. And the reliance on studies of healthy police officers to conclude that the Taser use on Mr. Todero was harmless, when simultaneously concluding that Mr. Todero was suffering from a severe (and soon to be fatal) case of Excited Delirium Syndrome, poses an inexplicable and irreconcilable contradiction, since Taser's product warnings explicitly warn that "[s]ome individuals may be particularly susceptible to the effects of [Taser] use, in particular "people suffering from excited delirium, profound agitation, severe exhaustion, drug intoxication or chronic drug abuse, and/or over-exertion from physical struggle," and that "[i]n a physiologically or metabolically compromised person, any physiologic or metabolic change may cause or contribute to sudden death." Dkt. 237 at 13 (quoting Dkt. 237-12 at 2).

Thus, Defendants' rebuttal that Dr. Vilke cannot be expected to rely on analogous studies because it would be too dangerous to conduct such studies is precisely why those anodyne studies cannot offer support for a reliable opinion that Defendant Blackwell's Taser use on Mr. Todero did not cause his death. To be clear, Plaintiff does not argue that a perfectly analogous study is required in every case for an expert's opinion to be admissible. But where, as here, the disanalogous studies are the sole basis for the expert's conclusion that the Taser use was safe, and where all of the facts surrounding the Taser use line up with the very same reasons why it would be dangerous to conduct such a study, the jury would not be aided, but would be misled

13

and misdirected, by permitting Dr. Vilke to testify based solely on these studies that Blackwell's Taser use on Mr. Todero did not cause or contribute to his death. This opinion must be barred.

**V.    Defendants do not rebut Plaintiff's contention that Dr. Vilke's report did not properly disclose any opinion that Mr. Todero's purported Excited Delirium Syndrome was drug-induced.**

Plaintiff's motion notes that expert opinions that are not properly disclosed must be barred, Dkt. 237 § IV.A, and demonstrates that Dr. Vilke's deposition testimony that Mr. Todero's Excited Delirium was drug-induced was not properly disclosed in his expert report, *id.* § IV.B. Defendants' response on this point only underscores the strength of Plaintiff's argument. Defendants quote the relevant excerpt from Dr. Vilke's report, where he (1) states that "[a]n exact etiology of Mr. Todero's Ex[cited ]D[elirium ]S[yndrome] is not easily identified" because Mr. Todero's toxicology screen was "negative for common drugs of abuse"; (2) notes that, as a general matter, other drugs can precipitate Excited Delirium that do not show up on a basic toxicology screen; and (3) concludes that "[o]verall" the evidence shows that Mr. Todero's symptoms were "consistent with classic excited delirium syndrome." Dkt. 241 at 26 (citing 237-8 at 10-11). Plaintiff agrees that this portion of Dr. Vilke's report is the relevant focus of inquiry. But Defendants apparently claim that this aspect of Dr. Vilke's report "was sufficient to place Plaintiff on notice" of Dr. Vilke's opinion that Mr. Todero's "entire presentation was consistent with classic excited delirium <u>caused by drug intoxication</u>." Dkt. 241 at 26 (emphasis added). This argument only illustrates the merits of Plaintiff's motion in this regard. The underlined text—"caused by drug intoxication"—is entirely lacking from Dr. Vilke's written report. That causation opinion is undisclosed. Defendants apparent contention that Plaintiff should have somehow read between the lines to find this hidden causation opinion, or perhaps interpreted the adjective "classic" to mean "drug-induced", is untenable. And Defendants do themselves no favors by pointing to Dr. Wetli's opinion that Mr. Todero's Excited Delirium was drug-induced,

14

Dkt. 241 at 28, n.11, since Dr. Wetli's report and subsequent deposition had the same flaw—the report was silent on causation, and like Dr. Vilke, Dr. Wetli' freelanced this new opinion only at the deposition. *See* Dkt. 151 at 13-14.

VI.     **Defendants do not rebut Plaintiff's contention that Dr. Vilke's opinion that Mr. Todero's purported excited delirium was drug-induced is unreliable.**

Defendants do not seriously grapple with the unreliability of Dr. Vilke's opinion that Mr. Todero's purported excited delirium syndrome was drug-induced, despite the negative drug screen. Plaintiff's motion demonstrates that his sole basis for concluding that the syndrome was drug-induced, notwithstanding the toxicology screen, was the fact that on two long-distant occasions, Mr. Todero had sought medical treatment for using drugs of a type that are not known to cause Excited Delirium Syndrome. Dkt. 237 at 17. Defendants dispute that this is the extent of the support for Dr. Vilke's opinion, but they offer nothing concrete in addition. They claim that, additionally, Dr. Vilke opined that "Todero displayed the signs and symptoms of classic excited delirium syndrome," Dkt. 241 at 27-28, but this meaningless and conclusory statement again presupposes that "classic" means "drug-induced." And while Defendants note that Dr. Vilke "was able to rule out psychiatric disorder and infection as causes," *id.* at 28, this simply underlines the unreliability of his opinion. Dr. Vilke had a patchy medical history of Mr. Todero, with limited available medical records predating the Taser incident, yet from this scant evidence he concluded (1) for a psychiatric etiology, absence of evidence is evidence of absence, and the lack of records documenting any history of psychiatric disorder was sufficient to rule that out, whereas (2) for a drug-induced etiology, absence of evidence is no problem, because the negative toxicology screen can be explained away by two stale-dated instances of using drugs that do not cause Excited Delirium. This methodology is internally irreconcilable, and shows that it is results-oriented and not reliable. Nor can Dr. Vilke's opinion reliable rest on the fact that

"Todero's probable use of Spice came up in the St. Francis Hospital records." Dkt. 241 at 26. Defendants statement in this regard is highly misleading. The "probable use of Spice" to which they refer is a notation in a medical record from a Dr. James Elliot that states "Clinical picture is consistent with synthetic marijuana (Spice) toxicity." *Id.* at 26, n. 9. Dr. Elliott has not been disclosed as an expert by any party, was not deposed during discovery, and the basis for his conclusion, if any, is entirely absent from the record. It is axiomatic that "[a]n expert's opinions must be based on the evidence in the case." *In re Ready-Mixed Concrete Antitrust Litig.*, 261 F.R.D. 154, 165 (S.D. Ind. 2009); *see* Fed. R. Evid. 702(b). While ordinarily "[t]he soundness of the factual underpinnings of the expert's analysis . . . are factual matters to be determined by the trier of fact," a reliable expert opinion must rest on evidence that is "in fact, supported by the record." *Id.* Dr. Vilke has no basis whatsoever to rely on Dr. Elliott's unexplained and entirely conclusory notation. He cannot simply regurgitate the opinion of this other doctor who is not a disclosed expert, and it cannot serve as a basis for a reliable opinion of his own.

The one case Defendants cite, *Galack v. PTS of America, LLC,* 2015 WL 5692327 (N.D. Ga. 2015), does not support their argument that Dr. Vilke's opinion is reliable. Dkt. 241 at 27. In *Galack*, the issue was whether the proffered expert could offer an opinion about excited delirium, period, and the court in *Galack* simply concluded that the mere fact that the decedent had a negative toxicology screen did not *per se* preclude an opinion that he was suffering from excited delirium. *Galack*, 2015 WL 5692327 at *8, 18. Nowhere in *Galack* did that court conclude that the expert could reliably offer an opinion that the excited delirium was <u>caused by</u> drugs, even with a negative toxicology screen, which is the opinion Dr. Vilke reaches here.

16

**VII.    Defendants do not rebut Plaintiff's contention that Dr. Vilke and Dr. Wetli rely on divergent methodologies and have fundamentally incompatible understandings of what "Excited Delirium Syndrome" is.**

Plaintiff's motion establishes that, while similar at first glance, the opinions offered by the late Dr. Wetli are not mirrored by his purported substitute, Dr. Vilke. As a substitute expert, Dr. Vilke's opinions and methodology must track those of Dr. Wetli, Dkt. 237 § VI.A, but instead Dr. Vilke (1) offers an entirely new opinion about Acute Kidney Injury, *id.* § VI.B; (2) repudiates Dr. Wetli's opinion about what would have happened to Mr. Todero absent police intervention, *id.* § VI.C; (3) uses an entirely different diagnostic method to determine whether or not someone is suffering from Excited Delirium Syndrome, *id.* § VI.D; (4) disagrees with Dr. Wetli's opinion that Mr. Todero was agitated, *id.* § VI.E; (5) disagrees with Dr. Wetli's views about the range of etiologies of Excited Delirium Syndrome, *id.* § VI.F; and (6) relies on the polar opposite sub-set of records, revealing his starkly different methodology, *id.* § VI.G.

Defendants offer nothing persuasive to rebut these issues. While it is true that a substitute expert need not perfectly mirror the prior expert in every way, it is not enough, as Defendants claim, that "the reports of Drs. Vilke and Wetli came to the same conclusions." Dkt. 241 at 30. Rather, the substitution must avoid "significant changes in the testimony." *See, e.g.*, *Stringer v. Cambria Fabshop-Indianapolis, LLC*, No. 113CV00659SEBTAB, 2015 WL 13632234, at *2 (S.D. Ind. Oct. 2, 2015). Each of the above 6 areas demonstrates significant divergences, but most serious, and independently fatal, are the divergent diagnostic criteria utilized by Dr. Wetli and Dr. Vilke. While Defendants try their best to paper over this chasm by pointing out that Dr. Vilke agreed that agitation and delirium are "definitional components of excited delirium," Dkt. 241 at 33, both experts could not have been clearer—Dr. Vilke testified that his diagnosis required a determination that at least six clinical findings were present out of the list of ten possible symptoms, while Dr. Wetli clearly, repeatedly, and unambiguously testified at his

17

deposition that his version of Excited Delirium Syndrome required a showing only that a person "have delirium and they're agitated," regardless of the presence or absence of any other potential factors. Dkt. 237 § VI.D (citing Dkt. 237-2 at 141:19-25). Dr. Vilke expressly rejected Dr. Wetli's view that these two symptoms alone could suffice. *Id.* (citing Dkt. 237-1 at 200:22-201:20). As an aside, these divergent and inconsistent sets of diagnostic criteria provide a compelling illustration of the point, articulated in detail in Plaintiff's motion, that Excited Delirium Syndrome is not a reliable and recognized medical diagnosis, given these evidently highly flexible goalposts about what exactly the syndrome requires to diagnose. But regardless of such broader conclusion, this incongruity along with the others discussed in Plaintiff's motion shows that Dr. Vilke is not an appropriate substitute for Dr. Wetli, and should be barred on this basis as well.

## CONCLUSION

WHEREFORE, Plaintiff Teresa Todero, as Special Administrator of the Estate of Charles Todero, respectfully requests that this Court enter an order barring Dr. Gary Vilke from testifying as an expert witness in this matter and barring any and all of his opinions, for the reasons stated in her motion and in this reply.

Dated: December 30, 2020

RESPECTFULLY SUBMITTED,

**Teresa Todero,**
**as Special Administrator of the**
**Estate of Charles Todero**

BY:  /s/ Sam Heppell
*One of Plaintiff's Attorneys*

Arthur Loevy
Jon Loevy
Steve Art
Sam Heppell
Scott Drury

18

LOEVY & LOEVY
311 North Aberdeen St.
Chicago, IL 60607
(312) 243-5900

## CERTIFICATE OF SERVICE

    I, Sam Heppell, an attorney, hereby certify that on December 30, 2020, I caused the foregoing document to be filed using the Court's CM/ECF system, which effected service on all counsel of record.

                                        /s/ Sam Heppell
                                        *One of Plaintiff's Attorneys*