**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF INDIANA**
**INDIANAPOLIS DIVISION**

| | | |
|---|---|---|
| TERESA TODERO, as Special Administrator of the ESTATE OF CHARLES TODERO, | ) ) | |
| | ) | Case No. 1:17-cv-1698-JPH-MJD |
| *Plaintiff*, | ) ) | |
| | ) | Judge James Patrick Hanlon |
| v. | ) ) | Magistrate Judge Mark J. Dinsmore |
| CITY OF GREENWOOD, BRIAN BLACKWELL, RENEE ELLIOTT, ELIZABETH LAUT, and AS-YET UNIDENTIFIED GREENWOOD POLICE OFFICERS, | ) ) ) ) | JURY TRIAL DEMANDED |
| | ) | |
| *Defendants*. | ) | |

**PLAINTIFF'S MOTIONS *IN LIMINE***

# TABLE OF CONTENTS

Introduction ................................................................................................................1

Motions *In Limine* .....................................................................................................2

1.  Plaintiffs' Motion *In Limine* No. 1 to Bar Undisclosed Expert Opinion Testimony ...........2

    A.  Background.........................................................................................................2

    B.  This Court should exclude any undisclosed expert opinions, including any opinion testimony from Dr. Hartman ...........................................................................3

2.  Plaintiffs' Motion *In Limine* No. 2 to Bar Testimony From Witnesses Not Disclosed in Rule 26(a)(1) Disclosures ........................................................................8

3.  Plaintiff's Motion *In Limine* No. 3 to Bar Any Reference to the Individual Defendants' Financial Inability to Pay A Judgment for Compensatory Damages ......................................10

4.  Plaintiff's Motion *In Limine* No. 4 to Bar Reference to the Fact That Plaintiff's Attorneys Are From Out of Town ........................................................................11

5.  Plaintiff's Motion *In Limine* No. 5 to Bar References to Defendants' Commendations, Awards, Complimentary History, or Positive Job Evaluations.................................................11

6.  Plaintiff's Motion *In Limine* No. 6 to Bar Argument or Insinuation That A Jury Verdict Against the Defendants May Have Adverse Employment or Criminal Consequences for Them 13

7.  Plaintiff's Motion *In Limine* No. 7 to Bar Any Reference to Jurors' Pecuniary Interests .13

8.  Plaintiff's Motion *In Limine* No. 8 to Bar Duplicative Witness Examinations .................14

9.  Plaintiff's Motion *In Limine* No. 9 to Bar Former Claims or Other or Former Defendants 15

10. Plaintiffs' Motion *In Limine* No. 10 to Bar Mark Kroll from Testifying About Electrocution ............................................................................................................16

11. Plaintiff's Motion *In Limine* No. 11 to Bar Mark Kroll from Testifying About the General Safety of Tasers.........................................................................................18

12. Plaintiff's Motion *In Limine* No. 12 to Bar References to Charlie Todero's Heart Attack at Age 16 ..............................................................................................................20

13. Plaintiffs' Motion *In Limine* No. 13 to Bar Speculation That Charlie Todero Was Under the Influence of Synthetic Marijuana or Other Undetected Drug at the Time of the Incident ..22

14. Plaintiff's Motion *In Limine* No. 14 to Bar Evidence that Charlie Todero Had Traces of Cannabinoids in His System at the Time of the Incident. ....................................................25

15. Plaintiff's Motion *In Limine* No. 15 to Bar References to Charlie Todero's Alleged Prior Bad Acts and Prejudicial Past Conduct That Was Unknown to the Individual Defendants at the Time of the Incident ................................................................26

    A. Constitutional Question at Trial Confined to What Defendants Knew At the Time Blackwell Shot Mr. Todero With a Taser ........................................................26

    B. Pre- and Post-Shooting Events Discovered After the Taser Shooting Are Not Probative and Are Highly Prejudicial ...............................................................28

    C. The After-Acquired Evidence at Issue Is Also Inadmissible Propensity Evidence under Rule of Evidence 404 ........................................................................29

    D. This Court Exclude Should the Following Specific "Bad Act" Evidence ....................30

16. Plaintiff's Motion *In Limine* No. 16 to Bar References to Any Criminal History of Any Other Members of the Todero Family ....................................................35

    A. Defendants Failed to Disclose Criminal Convictions of Plaintiff's Witnesses in Discovery.........................................................................................35

    B. Convictions, Arrests, or Any Other Prior Bad Acts of Plaintiff's Witnesses Under Rule 402, 403, and 404(b) ........................................................................36

17. Plaintiff's Motion *In Limine* No. 17 to Bar Any Speculation That Charlie Todero Was Suicidal ......................................................................................37

18. Plaintiffs' Motion *In Limine* No. 18 to Bar Prior Statements of Teresa Todero Regarding Alleged Conflict between Charlie and Teresa ......................................39

19. Plaintiff's Motion *In Limine* No. 19 to Bar Prior Statements of the Todero Family and Other Speculation About Charlie Todero's Condition and Cause of Death............................40

20. Plaintiff's Motion *In Limine* No. 20 to Bar Dr. Vilke's Undisclosed Opinion That Charlie Todero's Purported Excited Delirium was Caused By Undetected Drug Intoxication.42

21. Plaintiff's Motion *In Limine* No. 21 to Bar Dr. Vilke's Opinions That Go Beyond the Scope of Those Opinions Expressed by Dr. Wetli.................................................43

    A. As a substitute expert, Dr. Vilke's opinions must strictly track those previously disclosed by Dr. Wetli.................................................................................43

    B. Dr. Vilke's opinions regarding Acute Kidney Injury and Mr. Todero's metabolic levels should be barred.............................................................................45

    C. Dr. Vilke's opinion about the purported non-effect of the Taser relies on a completely different methodology from that followed by Dr. Wetli.....................................46

    D. Dr. Vilke's version of Excited Delirium is not the same syndrome which Dr. Wetli described and opined on.................................................................................46

E.   Dr. Vilke disagrees with Dr. Wetli's opinion that Mr. Todero was agitated, which is fatal to his diagnosis of Excited Delirium Syndrome. ........................................................47

F.   Dr. Vilke disagrees with Dr. Wetli about the possible causes of Excited Delirium Syndrome. ................................................................................................................................48

G.   Dr. Vilke's methodology relies on a starkly different set of records from those utilized by Dr. Wetli. ..................................................................................................................................49

22.   Plaintiff's Motion *In Limine* No. 22 to Permit Plaintiff to Use Defendant Blackwell's Admissions Against Defendant and to Bar Argument and Evidence Contrary to Those Admissions ....................................................................................................................................50

23.   Plaintiff's Motion *In Limine* No. 23 to Bar After-Acquired Evidence About Charlie Todero's Activities Prior to the Time Defendants Encountered Him ......................................52

24.   Plaintiff's Motion *In Limine* No. 24 to Bar Any Evidence or Argument That Actions of First Responders or Hospital Doctors Caused Charlie Todero's Heart to Stop or His Eventual Death 57

25.   Plaintiff's Motion *In Limine* No. 25 to Bar Plaintiff's Statements and Conversations Regarding the Value of this Case. ........................................................................................................59

Plaintiff TERESA TODERO, as Special Administrator of the ESTATE OF CHARLES TODERO, by her attorneys, respectfully submits the following motions *in limine*:

## Introduction

On May 29, 2016, Defendant Blackwell responded to a dispatch call for a man walking into traffic, and encountered Charlie Todero sitting on the side of the road holding a bible. When Charlie Todero got up and walked away from Blackwell, Blackwell shot Charlie Todero 16 times with his Taser in the span of approximately 3 minutes on May 29, 2016. During much of this time, Defendants Elliott and Laut were present on the scene while doing nothing to intervene to prevent Defendant Blackwell's use of force.

Less than half an hour later, Charlie's heart stopped in the back of the ambulance that was taking him to a nearby hospital. Although emergency room personnel were able to revive him, he never recovered, and he suffered numerous additional heart attacks and multi-system organ failure. Charlie never fully recovered consciousness, and he died less than two weeks after the Taser incident.

Plaintiff Teresa Todero, Charlie's mother, brings claims under the U.S. Constitution against Defendant Blackwell for his use of excessive force and against Defendants Elliott and Laut for their failure to intervene, and under Indiana law against the City of Greenwood for state law claims arising from these same acts. Plaintiff and Defendants vigorously dispute both liability and damages, including whether the Taser use caused Charlie Todero's death. There are numerous issues of fact and credibility which a jury must decide at the upcoming trial. In order for Plaintiff to receive a fair trial and to focus the matter on relevant issues and not on issues which are tangential, confusing and overly prejudicial, Plaintiff respectfully submits the

following motions *in limine* seeking this Court's pre-trial ruling barring or limiting the use of the evidence discussed below.

## Motions *In Limine*

### 1. Plaintiffs' Motion *In Limine* No. 1 to Bar Undisclosed Expert Opinion Testimony

Plaintiff moves *in limine* to bar Defendants from eliciting any opinion testimony not properly disclosed by way of a Federal Rule of Civil Procedure 26(a)(2)(B) written report or 26(a)(2)(C) written disclosure, including but not limited to any opinion testimony from Dr. Chris Hartman.

#### A. Background

The Federal rules require expert opinions, as with any piece of evidence, to be properly disclosed to be used in litigation. FED. R. CIV. P. 26(a)(2)(A) ("[A] party must disclose to the other parties the identity of any witness it may use at trial to present [expert opinion] evidence . . . ."). There are two mechanisms by which a party can disclose expert opinions. Rule26(a)(2)(B) governs the disclosure of opinions from witnesses who are "retained or specially employed to provide expert testimony in the case," and requires disclosure of a written report containing "a complete statement of all opinions the witness will express and the basis and reasons for them," among other requirements. To admit an opinion from an expert who is not so "retained or specially employed," a party must comply with Rule 26(a)(2)(C), which requires a written disclosure of both "the subject matter on which the witness is expected to present [expert opinion' evidence" and "a summary of the facts and opinions to which the witness is expected to testify."

This Court set a discovery schedule for disclosures pursuant to these rules, and Defendants City of Greenwood, Elliot, and Laut disclosed two experts under Rule 26(a)(2)(B):

Mark Kroll and Dr. Charles Wetli. Defendants City of Greenwood, Elliot, and Laut then moved to substitute Dr. Gary Vilke as a retained expert in place of Dr. Wetli. Dkt. 217. This Court granted their motion. Dkt. 227. Defendant Blackwell did not disclose any expert opinions pursuant to Rule 26(a)(2)(B). None of the Defendants disclosed any experts under Rule 26(a)(2)(C).

Defendants disclosed one doctor, Dr. Chris Hartman, as a fact witness pursuant to Rule 26(a)(1). Dr. Hartman was an emergency room doctor at St. Francis Hospital who provided treatment to Mr. Todero on the day he was admitted. Dr. Hartman is the only treating doctor who has been deposed by either party.

**B.     This Court should exclude any undisclosed expert opinions, including any opinion testimony from Dr. Hartman**

As described above, expert opinions were required to be disclosed on the Court's schedule, pursuant to either Rule 26(a)(2)(B) or (C). Rule 37(c)(1) provides that "[i]f a party fails to . . . identify a witness as requires by Rule 26(a) . . . the party is not allowed to use that witness" at trial. "This sanction is 'automatic and mandatory' unless the offending party can establish 'that its violation of Rule 26(a)(2) was either justified or harmless.'" *Ciomber v. Coop. Plus, Inc.*, 527 F.3d 635, 641 (7th Cir. 2008). No such showing could be made here regarding any undisclosed expert opinion in this case. This matter has been pending for more than four years, including a lengthy discovery period. The Court set deadlines giving the parties an opportunity to challenge any disclosed expert opinions which they contended did not satisfy the requirements of Federal Rule of Evidence 702, as interpreted by *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579 (1993) and its progeny. Those challenges were made and the Court has largely ruled on them. Plaintiff has relied on that settled playing field in preparing for trial. It would be far from harmless to permit Defendants to inject previously undisclosed expert

opinions into the case at this late hour. And given the clarity of the Court's scheduling orders, and the evident understanding of those orders demonstrated by all parties, no showing of substantial justification could be made either.

In particular, no opinion testimony should be permitted from Dr. Hartman at trial. At no point was Dr. Hartman identified as an expert witness. He was identified as a fact witness, on all parties' Rule 26(a)(1) disclosures, and accordingly Plaintiff conducted his deposition in a manner designed to elicit those facts. To the extent that Dr. Hartman's medical reports and deposition testimony contains opinions, Plaintiff was entitled to rely on the fact that no party had designated any of those opinions as required by Rule 26(a)(2), in electing not to pursue vigorous cross-examination of such opinions at the deposition.[1] Had Plaintiff been put on notice via proper Rule 26(a)(2) disclosure that any party intended to rely on Dr. Hartman to give any *opinion* testimony, she could have sought to re-depose Dr. Hartman on the specific opinions that were disclosed, and could have obtained a supplemental report from her retained expert, Dr. Rashtian, to provide a fulsome rebuttal targeting such opinions. More crucially, she could have sought to bar, in whole or in part, Dr. Hartman's opinions by filing a *Daubert* motion on the schedule set by the Court. But because Dr. Hartman was never disclosed as an expert witness, Plaintiff did none of these things. Permitting any opinion testimony from Dr. Hartman at this stage would be highly prejudicial to Plaintiff.

---

[1] Moreover, any suggestion that the failure to disclose under Rule 26(a)(2) is in any way mitigated by the fact that Dr. Hartman was deposed is a nonstarter under Seventh Circuit precedent. "Rule 26(a)(2) does not allow parties to cure deficient expert [disclosures] by supplementing them with later deposition testimony," because the purpose of the disclosure is to "provide notice to opposing counsel—before the deposition—as to what the expert witness will testify," and permitting deficiencies to be cured in this way would "further undermine a primary goal of Rule 26(a)(2): 'to shorten or decrease the need for expert depositions.'" *Ciomber*, 527 F.3d at 642.

Indeed, even treating experts disclosed under Rule 26(a)(2)(C) are expressly limited to providing testimony actions taken during their work on the underlying case. Witness in that position cannot opine generally on subjects relevant to the case, even if they have relevant expertise. *E.E.O.C. v. AutoZone, Inc.*, 707 F.3d 824, 833 (7th Cir. 2013) (non-report writing expert can provide an expert opinion only if that opinion was formed during the course of the underlying treatment, and not in preparation for litigation); *Hambach v. Builders Transp. Co., LLC*, 2016 WL 5847045, at *2 (S.D. Ill. Oct. 6, 2016) ("[A]s a Rule26(a)(2)(C) non-retained expert witness, Dr. Wolf's testimony is limited to the determinations made in the course of providing treatment to the plaintiff."); *Brown v. Burlington N. Santa Fe Ry. Co.*, 2013 WL 1729094, at *4 (C.D. Ill. Apr. 22, 2013) (excluding expert testimony from treating physician because "[n]o good cause has been demonstrated for Plaintiff's failure to disclose that [his experts] would be testifying about causation, and no showing has been made that the doctors' opinions on causation were necessarily derived during or necessary for their treatment of the Plaintiff"); *see also McGowan v. Chapman*, 2011 WL 5374116, at *2 (S.D. Ill. Nov. 7, 2011); *Taylor v. Union Pac. R.R. Co.*, 2010 WL 5463132, at *2 (S.D. Ill. Dec. 29, 2010); *Jimenez v. United States*, 2008 WL 3849915, at *4 (N.D. Ill. Aug. 14, 2008). Thus, given that Dr. Hartman was not disclosed as a treating expert, he should not be allowed to offer any opinions at trial, and most certainly should not be allowed to offer opinions that he did not formulate during his treatment.

Without exhaustively identifying all potential opinions Dr. Hartman might hold, some examples of the opinions which the Court should bar include:

- <u>The cause of Mr. Todero's death.</u> Dr. Hartman testified at his deposition that Mr. Todero died from multisystem organ failure caused by a combination of factors. *E.g.* Ex. 1

(Hartman Dep.) at 103-104. Dr. Hartman should not be allowed to opine on the cause of Mr. Todero's death. He treated Mr. Todero only May 29, 2016—the day Mr. Todero was admitted to the hospital. Mr. Todero died on June 11, 2016. Therefore Dr. Hartman did not form any opinions about the cause of Mr. Todero's death during the course of his treatment.

- The number of times Mr. Todero was Tased, or whether multiple Tasings could have had a cumulative impact on the body. Dr. Hartman testified that the number of times a patient was Tased is not relevant to how the patient should be treated, and that the care he provides would not change depending on the number of times a patient has been Tased. *Id.* at 21-23. Therefore, any opinion Dr. Hartman has about the number of times Mr. Todero was Tased did not play a role in his treatment.

- What caused Mr. Todero's conditions, including whether Mr. Todero had used drugs. Dr. Hartman diagnosed Mr. Todero with cardiac arrest, hyperthermia, rhabdomyolysis, and "acute psychosis by report." *Id.* at 39. He testified at his deposition that he also could have added diagnoses of hyperkalemia and lactic acidosis. *Id.* at 47. Dr. Hartman was also asked a number of questions at his deposition about whether IV drug abuse, Hepatitis-C, or alcoholism could have caused some of the conditions present in Mr. Todero's panel. *Id.* at 106-110. Dr. Hartman also testified that he did not know at the time he treated Mr. Todero whether he had a history of IV drug use or Hepatitis, or experienced "shock liver," *id.* at 94, 122-23, but still offered several opinions throughout his deposition about Mr. Todero's drug or alcohol use and whether drugs or alcohol played any role in his condition. *E.g., id.* at 100-106; 111-14. These opinions are not only

speculative (as Dr. Hartman himself acknowledged, *id.* at 123), but Dr. Hartman did not rely on this information when treating Mr. Todero on May 29.

- <u>Conditions he did not personally observe.</u> Dr. Hartman testified that did not observe Mr. Todero's purported "acute psychosis"; he testified that someone informed him about this behavior. *Id.* at 34-35, 39-40. He should not be permitted to testify about it, or to speculate about its cause. Dr. Hartman was also asked about Mr. Todero's behavior immediately after he was Tased. Dr. Hartman did not personally observe Mr. Todero's condition immediately after he was Tased and should not be allowed to offer testimony about it. *Id.* at 44-45.

- <u>Whether a Taser can cause various medical conditions, including, but not limited to, sudden cardiac arrest, ventricular arrhythmia, shock liver, acute kidney injury, and metabolic acidosis.</u> Dr. Hartman was asked a number of questions at his deposition about whether Tasing can cause various maladies and impact body systems in specific ways, but did not form these opinions during his treatment of Mr. Todero. For instance, Dr. Hartman testified that Mr. Todero had no ventricular arrhythmia, but when pressed about whether a Taser still could have caused his cardiac arrest, he stated that he had no opinion. *Id.* at 60-62. Further, Dr. Hartman testified at his deposition that he has no formal training about providing care to people who have been Tased, and that he had only a "very novice understanding of the mechanics" of how Tasers work. *Id.* at 22-24. He also testified that he could not recall a single other instance in which he treated a patient whose heart stopped after being Tased. *Id.* at 61. Dr. Hartman is not qualified to offer these opinions.

These opinions, and any others that Dr. Hartman might hold, should be barred because they are undisclosed, which is not substantially justified and has certainly prejudiced Plaintiff. Defendants had the opportunity to develop and properly disclose expert testimony on these, and should not be permitted to short-circuit the discovery deadlines, hinder the *Daubert*-briefing processes, and sandbag Plaintiff with Dr. Hartman's undisclosed opinions at trial. They should also be barred because Dr. Hartman did not formulate them during the course of his treatment of Mr. Todero, or because Dr. Hartman is not qualified to offer them.

WHEREFORE, Plaintiff respectfully requests that this Court bar opinion testimony from any witness who has not been disclosed under Rule 26(a)(2)(C) witnesses, including, but not limited to, Dr. Hartman.

## 2. Plaintiffs' Motion *In Limine* No. 2 to Bar Testimony From Witnesses Not Disclosed in Rule 26(a)(1) Disclosures

Plaintiff moves *in limine* to bar undisclosed witnesses from testifying at trial. Under Rule 26(a)(1), each party must disclose the name and contact information "of each individual likely to have discoverable information—along with the subjects of that information—that the disclosing party may use to support its claims or defenses." FED. R. CIV. P. 26(a)(1)(A)(i). Rule 26(e) requires timely supplementation of disclosures if additional information otherwise unknown to the other parties comes to light. FED. R. CIV. P. 26(e).

Defendants issued their respective Rule 26(a)(1) disclosures on September 22, 2017, identifying 33 potential witnesses. *See* Ex. 2, Ex. 3. Plaintiff relied on those representations in deciding which witnesses to depose during discovery, an exercise that required significant discretion—since it is not feasible nor practical to depose nearly three dozen witnesses.

Defendants should be barred from calling any fact witness other than those specifically identified by name in their 2017 disclosures. "If a party fails to provide information or identify a

witness as required by Rule 26(a) or (e), the party is not allowed to use that information or witness to supply evidence on a motion, at a hearing, or at a trial, unless the failure was substantially justified or is harmless." FED. R. CIV. P. 37(c)(1). The Seventh Circuit has repeatedly held that, absent such showing of justification or harmlessness, exclusion for failure to disclose in compliance with Rule 26 is "automatic and mandatory." *Musser v. Gentiva Health Servs.,* 356 F.3d 751, 758 (7th Cir. 2004); *see also Salgado by Salgado v. Gen. Motors Corp.*, 150 F.3d 735, 742 (7th Cir. 1998) (same); *Finley v. Marathon Oil Co.*, 75 F.3d 1225, 1230 (7th Cir. 1996) (same); *Ott v. City of Milwaukee*, No. 09 C 870 2015 WL 12219587, at *15 (E.D. Wis. 2015) (barring witnesses that the City of Milwaukee failed to disclose in Rule 26 disclosures); *Heidelberg Harris, Inc., v. Mitsubishi Heavy Indus., Ltd.*, No. 95 C 0673, 1996 WL 680243, at *8 (N.D. Ill. 1996) (purpose of the mandatory disclosure and supplementation rules "is to prevent trial by ambush"). Introducing a previously undisclosed witness at trial would prejudice Plaintiff, who would not have had the opportunity to depose that individual and conduct other related discovery.

For the foregoing reasons, testimony from undisclosed witnesses should be barred. *See Anglin v. Sears, Roebuck and Co.*, 139 F. Supp. 2d 914, 917-18 (N.D. Ill. 2001) ("Courts in the Seventh Circuit routinely bar witnesses from testifying at trial, where the witnesses have not been produced in accordance with a court's discovery deadlines, thereby impeding opposing party's opportunity to adequately prepare for trial.").[2] The only individuals whom Defendants

---

[2] *See also Jimenez v. City of Chicago*, 877 F. Supp. 2d 649, 665-666 (N.D. Ill. 2012) (excluding one witness disclosed two months before trial); *Santiago v. Furniture Chauffeurs, Piano Movers, Packers, and Handlers Local 705*, No. 99 C 2886, 2001 WL 11058, at * 7 (N.D. Ill. Jan. 4, 2001) (barring witnesses from testifying because they were not disclosed until after the discovery cut-off date); *Scranton Gillette Communications, Inc. v. Dannhausen*, No. 96 8353, 1998 WL 566668, at * 3 (N.D.Ill. Aug. 26, 1998) (excluding nine witnesses because plaintiff had not shown diligence during discovery in producing them, and had not shown that allowing them to

should be permitted to call at trial as fact witnesses are the individuals disclosed in their Rule 26(a)(1) disclosures.

WHEREFORE, Plaintiff respectfully requests that this Court bar Defendants from calling any fact witness not disclosed in their Rule 26(a)(1) disclosures.

3.     **Plaintiff's Motion *In Limine* No. 3 to Bar Any Reference to the Individual Defendants' Financial Inability to Pay A Judgment for Compensatory Damages**

Plaintiff moves *in limine* for an order barring any reference to the individual Defendants' financial inability to pay a judgment for compensatory damages. The Seventh Circuit and courts in this circuit have consistently held that an individual defendant is not allowed to put on evidence that he or she is too poor to pay a judgment when an employer or an insurance company will have the ultimate responsibility of paying the judgment. *Kemezy v. Peters*, 79 F.3d 33, 97 (7th Cir. 1996) (holding that a "defendant should not be allowed to plead poverty if his employer or an insurance company is going to pick up the tab"); *Hill v. City of Chicago*, No. 06 C 6772, 2011 WL 3205304, at \*4 (N.D. Ill. July 28, 2011) (noting that a defendant who improperly puts on evidence of his or her financial condition opens the door to the admission of evidence about indemnification).

The individual Defendants in this case may attempt to introduce evidence and testimony to suggest that they cannot pay for the harm caused to Plaintiff. All such evidence should be barred on the ground that it will unreasonably cause the jury to deflate a potential damages award. See *Lawson v. Trowbridge*, 153 F.3d 368, 379 (7th Cir. 1998) (noting that courts bar evidence of indemnification routinely because it has the opposite, inflationary, effect). In the alternative, if the Court disagrees and permits the Defendants to present such arguments—or in the event that the Defendants simply present such evidence at trial or suggest that the individual

_____

testify would not be unfair to defendants).

Defendants cannot pay a judgment—this Court should then allow Plaintiff to introduce evidence about how any judgment against the individual Defendants for compensatory damages will be paid by the City of Greenwood or their insurers. See, e.g., *Galvan v. Norberg*, 2006 WL 1343680, at *2 (N.D. Ill. May 10, 2006) (Shadur, J.); *Moore v. City of Chicago*, 2008 WL 4549137, at *5 (N.D. Ill. Apr. 15, 2008); *Mohr v. Chicago Sch. Reform Bd. of Trustees*, 155 F. Supp. 2d 923, 928-29 (N.D. Ill. 2001); *Bursley v. Surane*, 2006 WL 1120577, *1 (N.D. Ill. April 26, 2006); *Kies v. City of Aurora*, 156 F.Supp.2d 970, 978 (N.D. Ill. 2001).

WHEREFORE, for the foregoing reasons, Plaintiff respectfully moves this Court for an order barring any reference to the Individual Defendants' financial inability to pay a judgment for compensatory damages.

4.      **Plaintiff's Motion *In Limine* No. 4 to Bar Reference to the Fact That Plaintiff's Attorneys Are From Out of Town**

Plaintiff moves *in limine* for an order barring reference to the fact that Plaintiff's attorneys are from out of town. Plaintiff's attorneys practice in offices in Chicago. They do not have an office in Indianapolis. Where Plaintiff's attorneys from is not important to any issue that the jury must resolve, and Defendants should not be permitted to suggest to the jury that Plaintiff's attorneys should be viewed as outsiders.

WHEREFORE, Plaintiff respectfully requests that this Court enter an order barring reference to the fact that Plaintiff's attorneys are from out of town.

5.      **Plaintiff's Motion *In Limine* No. 5 to Bar References to Defendants' Commendations, Awards, Complimentary History, or Positive Job Evaluations**

Plaintiff moves *in limine* for an order barring Defendants from introducing evidence of their own good character, including commendations, awards, and positive employment history. Defendants may seek to introduce evidence of their "good character" by reference to prior work-related commendations, awards, complimentary history, or performance reviews. Plaintiff

objects to this attempt to interject good character evidence into the trial. Rule 404(a) could not be clearer that "[e]vidence of a person's character or a trait of character is not admissible for the purpose of proving action in conformity therewith on a particular occasion." Fed. R. Evid. 404(a). Evidence of commendations and awards could not be possibly be relevant to an issue in this trial other than to suggest that Defendants conducted themselves as model officers. The evidence is irrelevant for that purpose *per se*.

Courts have repeatedly barred precisely this same type of evidence in trials alleging constitutional violations. See, e.g., *Charles v. Cotter*, 867 F. Supp. 648, 659 n.6 (N.D. Ill. 1994) (granting motion *in limine* and explaining that "the court strongly suspects that evidence of defendants' commendations, awards or honors could only serve the improper function of providing evidence of defendants' character for the purpose of proving action in conformity therewith on the night in question."); *White v. Gerardot*, 2008 WL 4724000, at *2 (N.D. Ind. Oct. 24, 2008) (granting motion *in limine* to bar evidence of officer's awards as irrelevant); *Graham v. Bennett*, 2007 WL 781763, at *3 (C.D. Ill. Mar. 12, 2007) (barring evidence of officer's awards and commendations, because such "evidence would be more prejudicial than probative to the issue of whether Defendant used excessive force on the night in question. Evidence of prior commendations could serve the improper function of providing evidence of action in conformity with Defendant's prior good performance on the police force."). The same is true here.

WHEREFORE, Plaintiff respectfully requests an order barring Defendants from introducing evidence of their own good character, including commendations, awards, and positive employment history.

6.      **Plaintiff's Motion *In Limine* No. 6 to Bar Argument or Insinuation That A Jury Verdict Against the Defendants May Have Adverse Employment or Criminal Consequences for Them**

Plaintiff moves *in limine* for an order barring any argument or insinuation that a jury verdict against the Defendants may have an adverse employment or criminal consequence for them. Based on prior experience litigating police misconduct cases, Plaintiff's counsel anticipates that defense counsel may intend to elicit sympathy for the individual Defendants by insinuating to a jury that a finding of liability against them will cause them to lose their jobs or to be charged criminally. Any such attempt should be barred as improper and prejudicial.

Such an insinuation is also untrue – there is no chance that Defendants will either face adverse employment or criminal consequences should the jury find in Plaintiff's favor. The relevant law enforcement agencies have already investigated the Todero tasing, and they have determined there was no misconduct. There is no indication that a finding of liability against the Defendants would cause any law enforcement agency to revisit that decision. There is no reason to think that a jury verdict against the Defendants will result in any negative employment or criminal consequences against them. Therefore, any argument insinuating there will be negative employment or criminal consequences against the Defendants is both prejudicial and unsupported by evidence. It should be barred from being argued at trial.

WHEREFORE, Plaintiff respectfully requests that this Court enter an order barring argument or insinuation that a jury verdict for Plaintiff may have adverse employment or criminal consequences for the Defendants.

7.      **Plaintiff's Motion *In Limine* No. 7 to Bar Any Reference to Jurors' Pecuniary Interests**

Plaintiff moves *in limine* for an order barring any reference to jurors' pecuniary interests. The Seventh Circuit has long held that arguments that play on jurors' pecuniary interests or their

interests as taxpayers are unquestionably unacceptable. *United States v. Scott* explains that because pecuniary interests would necessarily disqualify a prospective juror from service, it is "patently improper to make an appeal to that interest" at trial. 600 F.2d 1145, 1170 (7th Cir. 1981); *see also Moore ex rel. Estate of Grady v. Tulja*, 546 F.3d 423, 430 (7th Cir. 2008) (remarking that an appeal to the financial interests of jurors as taxpayers is "of course" generally improper).

WHEREFORE, for the foregoing reasons, Plaintiff respectfully moves this Court for an order barring any reference to jurors' pecuniary interests or their interests as taxpayers.

8.    **Plaintiff's Motion *In Limine* No. 8 to Bar Duplicative Witness Examinations**

Plaintiff moves *in limine* for an order directing the Defendants to designate one primary attorney per witness per examination and cross-examination. Defendants in this matter have been represented by two sets of attorneys—one set for Defendant Blackwell, and the other set for the City of Greenwood and the other individual Defendants. All of Defendants' interests in this case are aligned in most respects. It would unnecessarily prolong the trial to permit counsel for one Defendant to duplicate cross-examination areas already covered by counsel for the other, to say nothing of the inherent unfairness of this practice. The only fair method is to require the Defendants to do what Plaintiff is going to do:, designate one primary attorney per witness per cross-examination. If an area or topic exists which was not covered by that defense attorney, counsel for the other Defendant could supplement that discrete area—without repeating cross-examination on topics already covered. For example, after a comprehensive cross-examination by Blackwell's counsel, Greenwood's counsel might be permitted to follow-up with questions that bear on claims against it. But duplicative cross-examination should be barred. Any other result risks a free-for-all of redundancy. *United States v. Mills*, 138 F.3d 928, 937 (11th Cir. 1998) (frowning upon "tag team" cross-examinations by counsel representing the same interest);

*United Nat. Records, Inc. v. MCA, Inc.*, 106 F.R.D. 39, 41 -42 (N.D. Ill. 1985) ("tag team"

questioning by counsel at deposition is improper); *Cable Belt Conveyors, Inc. v. Alumina*

*Partners of Jamaica*, 717 F. Supp. 1021, 1027 1028 (S.D.N.Y. 1989) ("double teaming" during

witness exams is improper).

WHEREFORE, Plaintiff respectfully requests an order directing the Defendants to

designate one primary attorney per witness per cross-examination, with counsel for the other

Defendants to follow-up only with topic areas not previously covered bearing on their client's

defenses.

9.      **Plaintiff's Motion *In Limine* No. 9 to Bar Former Claims or Other or Former Defendants**

Plaintiff moves *in limine* for an order barring Defendants at trial from referencing claims

that are no longer in the case or other individuals who should be Defendants or who were

Defendants in the case. Throughout this litigation, Plaintiff has asked Defendants to identify all

Greenwood Police officers who were involved in the use of force against Mr. Todero.

Defendants have affirmed that no unidentified current or former Greenwood Police Officers they

know of were involved in the incident. At summary judgment, this Court granted in part and

denied in part Defendants' motions for summary judgment, granting judgment on some claims

against some Defendants. *Todero v. Blackwell*, 383 F.Supp.3d 826 (N.D. Ind. 2019). The

litigation has now proceeded to trial.

Defendants should be barred at trial from suggesting that other individuals who are

current or former employees of the Greenwood Police Department should be defendants in this

case. In addition, the Defendants should be barred from mentioning dismissed claims against

certain Defendants. It would be prejudicial to Plaintiff if the jury were to hear that claims against

an employee of the Greenwood Police Department had been dismissed, in that it would invite

unfounded speculation among the jurors about why those claims are no longer in the case. It would be still more prejudicial to Plaintiff if the defense were allowed to "try an empty chair" by suggesting to the jury that some other employee of the Greenwood Police Department in fact should now be a party to this action. *See Archer Daniels Midland Co. v. Hartford Fire Ins. Co.*, 243 F.3d 369, 371-72 (7th Cir. 2011) (discussing the problem of parties trying the empty chair in a civil case). Moreover, whether a claim has been dismissed, or whether an individual should be or was previously a Defendant, has no probative value to the central issues in this lawsuit, which is whether the Defendants used excessive force and failed to intervene in the use of that force. *See* Fed. R. Evid. 401, 402, and 403; *see also Graham v. Bennett*, WL 781763 (C.D. Ill. Mar. 12, 2007) ("This court agrees with Plaintiffs that evidence of these dismissed counts is irrelevant to whether Defendant used excessive force and the prejudice resulting from admission of this evidence outweighs its probative value.").

WHEREFORE, for the foregoing reasons, Plaintiff respectfully moves this Court for an order barring Defendants at trial from referencing claims that are no longer in the case or other individuals who should be Defendants or who were Defendants in the case.

**10.    Plaintiffs' Motion *In Limine* No. 10 to Bar Mark Kroll from Testifying About Electrocution**

Plaintiff moves *in limine* for an order barring defense expert witness Mark Kroll from offering any opinions or testimony at trial relating to "electrocution," which is not an issue in the case.

Mark Kroll was disclosed by Defendants as a purported expert in bioelectricity, along with a 73 page report spanning a wide array of topics. One topic he returned to frequently in his report is his opinion that "[t]he circumstances and timing of Charlie's cardiac arrest on May 29, 2016 rule out electrocution as a cause of death – that is, Charlie's death was not directly caused

by electricity. Ex. 4 (Kroll report) at 8. The opinions in Kroll's report that fall into this category are:

-"Mr. Todero was breathing for over 18 minutes after the brief CEW current delivery and this per se eliminates electrocution as a cause of death." *Id.*

- "Mr. Todero was resisting 18 minutes after the brief CEW current delivery and this per se eliminates electrocution as a cause of death." *Id.*

-"Mr. Todero had an essentially normal cardiac rhythm (elevated heart rate) for about 20 minutes after the brief CEW current delivery and this per se eliminates electrocution as a cause of death." *Id.*

-"Mr. Todero's cardiac arrest rhythm was asystole (flat-line). This rhythm is not associated with electrocution and this per se eliminates electrocution as a cause of death." *Id.*

-"The electronic control attempt of Mr. Todero did not cause his unfortunate death. On the contrary, it represented the best opportunity to save his life during his exhibited behaviors and resistance." *Id.*

-"The electronic control attempt of Mr. Todero did not contribute to his unfortunate death. Electrocution is a stand-alone cause of death and does not mix with other causes like a soup recipe." *Id.*

-"No CEW dart was sufficiently close enough to Mr. Todero's heart to raise any concern of electrocution." *Id.*

Because electrocution, as Mr. Kroll defines it, is not an issue is this case, the Court should bar Defendants from eliciting these opinions at trial. Each of these opinions is irrelevant.

Plaintiff contends that Charlie died because Blackwell's Taser use caused rhabdomyolysis—that is, the Taser use caused involuntary muscle contractions, leading to muscle injury and breakdown, and ultimately leading to multi-organ system failure and death. This is far different from electrocution, as Mr. Kroll defines it, where electricity directly causes the death, due to "the electrical current inducing VF (ventricular fibrillation)"–*i.e.*, a heart rhythm characterized by "the heart muscle cells continu[ing] to contract but at nearly random times"—resulting in "no blood [being] pumped from the heart." *Id.* at 12.

Even an expert with "impeccable qualifications" is properly excluded where "his testimony 'mainly concern[s] a matter not in issue.'" *Stevens v. McBride*, 489 F.3d 883, 891 (7th Cir. 2007) (quoting *In re Brand Name Prescription Drugs Antitrust Litigation,* 186 F.3d 781, 786 (7th Cir. 1999)). Allowing Kroll to opine that Charlie's death was not caused by electrocution will do nothing to help the jury "to understand the evidence or to determine a fact in issue." Fed. R. Evid. 702(a). On the contrary, it poses a substantial risk of confusing the jury and prejudicing Plaintiff by conveying the false impression that these factors weigh against accepting Plaintiff's evidence on cause of death (when they do not), in contravention of Rule 403. Fed. R. Evid. 403.

WHEREFORE, for the foregoing reasons, Plaintiff respectfully moves this Court for an order barring Defendants at trial from eliciting testimony from Mark Kroll that electrocution did not cause Charlie Todero's death.

## 11. Plaintiff's Motion *In Limine* No. 11 to Bar Mark Kroll from Testifying About the General Safety of Tasers

Plaintiff moves *in limine* for an order barring defense expert witness Mark Kroll from offering any opinions or testimony at trial about the general safety of Tasers.

Mr. Kroll offers several opinions in his report that serve no purpose beyond gratuitously bolstering the apparent safety of Taser devices without any connection to the facts of this case. After discussing his opinion on the likely durations of electricity discharged into Charlie's body, Kroll opines that these durations "are well below any safety limits suggested by any authorities in the world," "well below the 30 minutes (not 30 seconds) known to be safe from animal studies," and "well below the 30 and 45- second durations demonstrated safe in instrumented human studies." Ex. 4 (Kroll report) at 8. He contends that the risk of electrocution is "misunderstood and exaggerated" because "the output of existing CEWs satisfy all relevant world electrical safety and effectiveness standards including those for the ubiquitous electric fence." *Id*. at 10. He also asserts that "Electronic Control is not Dangerous with the Intoxicated." *Id*. at 34. These opinions should all be excluded because they are irrelevant. This is not a product liability case, and the general safety of Taser devices is not on trial. Nor is their compliance with relevant industry standards. Whether or not Tasers are generally safe offers no help to the factfinder charged with determining, on the specific facts of this case, whether Charlie's death was caused by Blackwell's Taser use. These opinions offer no assistance to the jury in determining the facts at issue. Moreover, it will be prejudicial and risk jury confusion to have the trial sidetracked by these opinions designed to bolster the jury's perception of the Taser. *See* Fed. R. Evid. 403.

WHEREFORE, for the foregoing reasons, Plaintiff respectfully moves this Court for an order barring Defendants at trial from eliciting testimony from Mark Kroll about the general safety of Tasers.

**12.  Plaintiff's Motion *In Limine* No. 12 to Bar References to Charlie Todero's Heart Attack at Age 16**

Plaintiff moves *in limine* to bar Defendants from eliciting any testimony related to the drug overdose Charlie Todero experienced when he was 16.

During the depositions of several of Charlie Todero's family members, defense counsel elicited testimony about an incident that took place when Charlie Todero was 16, when he apparently experienced a heart attack and was hospitalized as a result, and which may have been connected with drugs given to him by his father, Chuck Crowe. For example, during his deposition, Charlie Todero's brother Aaron Crowe was asked "[w]hen Charles was a teenager, did he have a heart attack?," to which he answered "Yes." Ex. 5 (Aaron Crowe Dep.) at 50:7-8. Aaron Crowe testified that this heart attack was caused by "drugs" which he "think[s] he got [] from my dad," but that he was not living with Chuck or Charlie at the time, that he does not remember how long Charlie was in the hospital, and that "at the time I was really unaware of what was, you know, really happening." *Id.* at 50:10-51:24. Similarly, Barbara Crowe, Charlie's grandmother, testified that she "don't know a whole lot about it," Ex. 6 (Barbara Crowe Dep.) at 20:21:24. The same goes for Tyler Todero, Charlie's brother, who doesn't really know anything about this alleged incident since he was only six or seven at the time, Ex. 7 (Tyler Todero dep.) at 46:2-12, and for Teresa herself, who testified that she didn't know what happened because she "wasn't there," and that she only knows "things that I heard from while at the hospital, but I don't know exactly," Ex. 8 (Teresa Todero dep.) at 11:22-12:19.

Aside from this vague testimony from family members, constituting some combination of hearsay barely recalled from the hospital, hearsay barely recalled from some newspaper article about the incident, and hearsay barely recalled from the statements of other family members, Defendants have developed no evidence about this prior incident. And even if they had, any

testimony about it is both irrelevant under Federal Rule of Evidence 401 and prejudicial under Rule 403.

First, as discussed in greater detail in motion *in limine* no. 15, this evidence is entirely irrelevant on the issue of Defendants' liability. The relevant inquiry in this case is confined to whether Defendant Blackwell's use of force was excessive under the circumstances known to him at the time, and similar inquiries regarding the other Defendants' failure to intervene. Lurid details about prior unknown incidents are irrelevant and inadmissible on these central questions of liability. *Abbott v. Sangamon County*, 705 F.3d 706, 724 (7th Cir. 2013); *Smith v. City of Chicago*, 242 F.3d 737, 743-44 (7th Cir. 2001) (holding that contested facts unknown to the defendant officers were irrelevant since the jury must consider "what happened from an officer's point of view and assess its reasonableness objectively").

Second, Defendants have developed no evidence that would make this incident relevant to any question of Plaintiff's damages. On cause of death, no expert opinion has been offered to suggest that Charlie Todero's heart stopped at age 30 as a relapse of this incident from 14 years before, entirely unrelated to the Taser—and to the extent Defendants would seek to use the prior incident to suggest Charlie had a weak heart and was more vulnerable to an otherwise reasonable use of force, that argument is foreclosed by the eggshell plaintiff rule. Blackwell's force was either reasonable or it wasn't, and if he used unreasonable force that had catastrophic results because Charlie had a weak heart, he is liable for the full measure of those damages. *See Cobige v. City of Chicago*, 651 F.3d 780, 782 (7th Cir. 2011) ("This is an application of the 'eggshell skull' rule: A tortfeasor takes his victim as he finds him, and if a special vulnerability (a thin skull, or here a ventricular hypertrophy) leads to an unusually large loss, the wrongdoer is fully

liable."). And there has been no opinion offered by any witness that this 14 year old incident had any impact on Charlie's life expectancy.

Because it is irrelevant both to liability and damages, the incident must be excluded under Rule 401. Fed. R. Evid. 401. But even if it had marginal relevance, its shreds of relevance would be far outweighed by its prejudicial impact. Fed. R. Evid. 403. This incident is, as alleged, shocking —a father gives his minor child drugs, causing a heart attack—and tends to cast Charlie and his father, and by extension and implication the whole Todero family, in a negative light. It paints Chuck Crowe as a bad father, inviting the jury to speculate that Teresa Todero is a bad mother, if only for permitting this to happen to her son. It suggests, without any foundation, that Charlie was into drugs as a young man, which is both prejudicial as a general proposition and in particular given Defendants' theory of drug-induced excited delirium as a cause of death. "[T]here is considerable danger that evidence that a witness has used illegal drugs may so prejudice the jury that it will excessively discount the witness' testimony…. A court must, therefore, be wary in admitting such evidence when it is offered for the sole purpose of making a general character attack." *United States v. Cameron*, 814 F.2d 403, 405 (7th Cir. 1987).

WHEREFORE, Plaintiff respectfully requests that this Court enter an order barring Defendants from eliciting any evidence related to the heart attack Charlie Todero purportedly experienced when he was 16.

13. **Plaintiffs' Motion *In Limine* No. 13 to Bar Speculation That Charlie Todero Was Under the Influence of Synthetic Marijuana or Other Undetected Drug at the Time of the Incident**

Plaintiff moves *in limine* for an order barring Defendants from making any argument, or introducing any evidence purporting to show, that Charlie Todero was under the influence of synthetic marijuana, or any other substance not detected on the toxicology screen, at the time of the incident.

On May 29, 2016, after Charlie Todero was admitted to the hospital on May 29, 2016, he was given a toxicology screen which did not reveal the presence of any drugs in his system, licit or illicit, other than cannabinoids (a/k/a marijuana). *See* Ex. 9 (noting that Charlie's "drug screen was only positive for cannabinoids."); Ex. 10 (urine drug screen showing negative results for all drugs tested for other than cannabis, including phencyclidine (PCP), cocaine, opiates, and amphetamines). Charlie was also tested for alcohol, and found to have no alcohol in his system either. Ex. 11 (results of alcohol screen below reference range). At no point did Charlie make any statements, either at the scene of the Taser use or at the hospital, that he had consumed any drugs, nor has any witness in this case ever testified that they saw Charlie use drugs or heard him admit to using drugs on the day of the incident. Thus, the only *evidence* about Charlie's drug use on the day of the incident is that a toxicology screen came back negative for all drugs other than marijuana.

Anxious to shift the blame away from Defendant Blackwell's Taser, throughout discovery Defendants have pressed a theory that, notwithstanding the negative toxicology screen, Charlie was under the influence of some mystery, undetected drug—specifically, synthetic marijuana, or "Spice"—at the time he encountered Defendant Blackwell. They lean heavily on the fact that the drug screen that was run at the hospital did not test for synthetic marijuana, so the negative drug test is not conclusive proof of its absence. But absent any factual support, they offer nothing but speculation.

None of the police officer or civilian eyewitnesses to Charlie Todero's behavior on May 29, 2016 have any qualifications to be able to identify any of that behavior as drug-induced—and certainly not induced by a *specific drug* that was not detectable on the toxicology screen. Nor has

there been any properly-disclosed expert opinion purporting to link Charlie's behavior with a particular drug.[3]

It is axiomatic that "of course speculation is not evidence," *In re Cohen*, 507 F.3d 610, 614 (7th Cir. 2007), but Defendants have none of the latter, only the former. The only scientific evidence of Charlie's drug consumption was that he had consumed marijuana at some point before May 29, 2016. But that was no help, because Defendants' theory is that Charlie died from excited delirium, and even Defendants' own expert acknowledged that "[i]n and of itself, [marijuana is] really not felt to be a drug that typically causes excited delirium. Ex. 12 (Vilke dep.) at 137:5-8. Defendants have attempted to seize on to some other, mystery, 'untested-for' drug, but because neither the toxicology screen nor Charlie Todero's observed behavior provide any logical support for the contention that he was under the influence of Spice or some other drug of abuse, this speculation must be barred.

And even if there were some shreds of non-speculative "evidence" related to Charlie's consumption of an undetected drug, that would be of such limited probative value that Rule 403 would plainly apply to exclude it. It would be highly prejudicial to permit Defendants to speculate about a drug that Charlie may have consumed when there is no evidence that he did, and when the only witness who could testify to refute that charge is dead as a result of Defendants' misconduct.

WHEREFORE, Plaintiff respectfully requests that the Court enter an order barring Defendants from eliciting any evidence or making any argument that Charlie Todero was under the influence of any undetected drug at the time of the incident.

---

[3] Dr. Vilke's improperly disclosed opinion regarding the purported connection between synthetic marijuana or other drug consumption and Charlie's behavior is the subject of Plaintiff's motion *in limine* no. 20.

**14.    Plaintiff's Motion *In Limine* No. 14 to Bar Evidence that Charlie Todero Had Traces of Cannabinoids in His System at the Time of the Incident.**

Plaintiff moves *in limine* for an order barring Defendants from eliciting the fact that Charlie Todero tested positive for marijuana.

As discussed above in motion *in limine* no. 13, Charlie was given a drug toxicology screen upon being admitted to the hospital, and the only drug found to be present in his system was marijuana. That fact has no relevance to any issue in the case, and so the Court should bar this evidence. To be admissible as relevant evidence under Rule 401, evidence must "tend[] to make a [material] fact more or less probable than it would be without the evidence." Fed. R. Evid. 401. That Charlie Todero had consumed marijuana at some point prior to the incident on May 29, 2016 sheds no light on any material issue in the case. As noted above, Defendants' theory is that Charlie died from excited delirium, and even their expert testified that marijuana is "really not felt to be a drug that typically causes excited delirium." Ex. 12 (Vilke dep) at 137:5-8. And while "[e]vidence that a witness has used illegal drugs may be probative of the witness' possible inability to recollect and relate," *Kunz v. DeFelice*, 538 F.3d 667, 677 (7th Cir. 2008), since Charlie Todero is not a witness in the case, any hypothetical impact of marijuana use on his recollection of events is of no probative value.

Even if there were some shred of probative value, the prejudicial impact of evidence of Charlie's marijuana use would make it an obvious target for exclusion under Rule 403. Indeed, the Seventh Circuit has held that "there is considerable danger" that evidence of illegal drug use will prejudice the jury, and a "court must, therefore, be chary in admitting such evidence when it is offered for the sole purpose of making a general character attack." *Id.* Any minimal probative value of the fact of Charlie's marijuana use would be "substantially outweighed by a danger of" unfair prejudice, Fed. R. Evid. 403, and the Court should exclude this evidence.

WHEREFORE, for the foregoing reasons, Plaintiff respectfully moves this Court for an order barring Defendants at trial from introducing evidence that Charlie Todero had marijuana in his system at the time of the incident on May 29, 2016.

15.     **Plaintiff's Motion *In Limine* No. 15 to Bar References to Charlie Todero's Alleged Prior Bad Acts and Prejudicial Past Conduct That Was Unknown to the Individual Defendants at the Time of the Incident**

The law is clear that only those facts known to Defendant Blackwell at the time he encountered Charlie Todero are relevant to the jury's consideration of Plaintiff's excessive force claim. In this case, that scope of information is narrow: Blackwell had not interacted with Charlie in four years, and had only the benefit of information gleaned during some brief dispatch radio traffic and what he observed at the scene before he made the decision to shoot Charlie with a taser. Information about Charlie Todero's background and prior conduct unknown to Blackwell is entirely irrelevant and inadmissible on this issue. And while the scope of the jury's inquiry is wider when it comes to considering Plaintiff's damages, there too the Rules of Evidence circumscribe the admissible evidence to ensure that only probative facts are put before the jury, and that the jury is not misled by a disproportionate focus on marginally relevant but highly prejudicial instances of alleged prior misconduct. Applying those rules here, the Court should exclude evidence of Charlie Todero's prior alleged "bad act" evidence.

A.      **Constitutional Question at Trial Confined to What Defendants Knew At the Time Blackwell Shot Mr. Todero With a Taser**

At trial, the jury will be asked to decide whether, when Defendant Blackwell used a Taser to shoot Charlie Todero, his use of force was objectively reasonable. The jury will answer this question based on "the totality of the facts and circumstances known to the officer *at the time the force is applied.*" *Abbott v. Sangamon County*, 705 F.3d 706, 724 (7th Cir. 2013) (emphasis added). the totality of the circumstances "includes information which the officer had at the time

of his actions, but not information uncovered later." *Deering v. Reich*, 183 F.3d 645, 650 (7th Cir.1999) (citing *Sherrod v. Berry*, 856 F.2d 802 (7th Cir. 1988) (en banc)).

As a result, after-the-fact information cannot be factored into the Fourth Amendment reasonableness calculus—the relevant and admissible evidence at this trial is confined to what Blackwell knew at the time he shot Charlie with a Taser. *Sherrod*, 856 F.2d at 804 ("[I]t is obvious that 'under the circumstances' refers only to those circumstances known and information available to the officer at the time of his action (firing the fatal shot)."); *Deering*, 183 F.3d at 670 (same); *see also Ochana v. Flores*, 347 F.3d 266, 272 (7th Cir. 2003) ("It was not an abuse of discretion for the court to grant the officers' motion *in limine* to bar . . . the disposition of the underlying criminal charges, because these were not facts within the officers' knowledge at the time of the arrest."); *Smith v. Ball State Univ.*, 295 F.3d 763, 769 (7th Cir. 2002) (fact that plaintiff had unknown medical condition at the time of the use of force irrelevant to assessing officer's force because unknown at the time); *Smith v. City of Chicago*, 242 F.3d 737, 743-44 (7th Cir. 2001) (holding that certain contested facts unknown to the defendant officers were irrelevant since "we consider what happened from an officer's point of view and assess its reasonableness objectively").

In light of this precedent, the admissible evidence at trial should begin and end with what Blackwell knew when he encountered Charlie Todero on May 29, 2016. All of the highly prejudicial pre- and post-incident facts, events, or speculations were only discovered during the post-shooting investigation. As such, all of these "facts and circumstances gained after the fact . . . ha[ve] no place in the trial court's or jury's proper *post-hoc* analysis of the reasonableness of the actor's judgement." *Sherrod*, 856 F.2d at 805; *see also Palmquist v. Selvik*, 111 F.3d 1332, 1339 (7th Cir. 1997) (noting that in the Seventh Circuit, "when considering a charge of excessive

force under the Fourth Amendment, evidence outside the time frame of the shooting is irrelevant and prejudicial."). Courts regularly exclude this sort of evidence. *See, e.g., White v. Gerardot*, 2008 WL 4724000, at *2 (N.D. Ind. Oct. 24, 2008) (granting motion to exclude "evidence that happened at the [scene] before the shooting, about which [the officer] had no knowledge," and granting motion to exclude documents concerning post-shooting searches, and other "evidence about or evidence derived from post-shooting searches" as irrelevant).

**B. Pre- and Post-Shooting Events Discovered After the Taser Shooting Are Not Probative and Are Highly Prejudicial**

Any attempt by Defendants to try and introduce evidence of Charlie's pre-incident conduct that was unknown to Blackwell at the time of the Taser shooting must fail for another reason: any arguable probative value would be substantially outweighed by the possibility of unfair prejudice, and therefore subject to exclusion under Rule 403.

The Seventh Circuit has repeatedly excluded after-acquired evidence in § 1983 actions alleging Fourth Amendment violations, concluding it improperly induces the jury to judge the officer's actions based on more information than the officer had at the time, and inappropriately shifts the focus to the plaintiff rather than the defendant officer. *See, e.g., Wallace v. Mulholland*, 957 F.2d 333, 336 (7th Cir. 1992) (discussing "the danger that a jury will conclude that [the plaintiff] . . . somehow 'asked for' mistreatment at the hands of two policemen" where "the police officers had no specific knowledge of" the prejudicial information); *Sherrod*, 856 F.2d at 805 (explaining that allowing evidence of after-acquired information would inappropriately induce the jury to decide the case based on "more information than the officer possessed when he made the crucial decision" and must be excluded.); *White*, 2008 WL 4724000, at *5 (concluding that "evidence about or evidence derived from post-shooting searches are irrelevant, and even if

somehow deemed relevant, the prejudicial effect clearly outweighs any probative value" (citing FED. R. EVID. 403)).

Here, by shifting the jury's attention to information not possessed by Defendant Blackwell, the jury may be tempted to speculate that, in hindsight, Charlie's character or prior (and unknown) propensities "justified the officers' reaction." *Palmquist*, 111 F.3d at 1340 (quoting *Wallace v. Mulholland*, 957 F.2d 333, 336 (7th Cir. 1992) (affirming exclusion of evidence "not within [defendant officer's] personal knowledge at the time" of the Fourth Amendment violation)). Those are improper considerations in determining whether the officer's use of force is reasonable, and thus the after-acquired evidence in this case should be excluded. *West v. Love*, 776 F.2d 170, 174 (7th Cir. 1985).

### C. The After-Acquired Evidence at Issue Is Also Inadmissible Propensity Evidence under Rule of Evidence 404

The after-acquired evidence discussed above is also inadmissible because it constitutes impermissible propensity evidence prohibited under Rule 404(b)(1). Fed. R. Evid. 404(b)(1) (prohibiting evidence of any "crime, wrong, or other act" used to prove a person's character or propensity to act in a particular way, or that such person acted in accordance with that character or propensity on any particular occasion). Much of the evidence discussed herein, if presented to a jury, would serve no purpose beyond insinuating that Charlie Todero was a bad person with violent tendencies, who is therefore more likely to have threatened Defendant Blackwell warranting being shot repeatedly with a Taser, as Defendants contend. This is the quintessential type of impermissible propensity arguments that Rule 404 was created to bar.

Evidence of prior bad acts may be admissible only if such evidence tends to prove such things as motive, knowledge, or intent. *See* Fed. R. Evid. 404(b)(2). None of those exceptions apply here. The inquiry in this case hinges on Defendant Blackwell's actions, and none of these

pre- or post-incident events and circumstances can constitute motive, knowledge, or intent when they were unknown to Blackwell. Furthermore, even if evidence of other acts falls into one of 404(b)(2) exceptions, such evidence cannot be admitted unless it is "relevant without relying on a propensity inference," *United States v. Gomez*, 763 F.3d 845 (7th Cir. 2014) (en banc), which is a test the evidence here cannot surpass.

### D. This Court Exclude Should the Following Specific "Bad Act" Evidence

To be specific, Plaintiff moves to exclude all references to Charlie Todero's arrests, charges, or other police contact; past drug use; and disputes with his mother, as explained more fully below.

### i. Arrests, Criminal Charges, or Other Police Contact

Plaintiff Teresa Todero testified that many years prior to May 29, 2016, Charlie had been charged with driving under the influence and with theft relating to borrowing a car. Ex. 8 (Teresa Todero dep.) at 102-103. And Charlie Todero's other family members testified during discovery about police contacts with Mr. Todero that did not lead to any arrests or convictions. Of course, none of this is remotely relevant to the issues that will be before the jury. To the extend Defendants had any knowledge of Charlie Todero's criminal history, it was that he had been in trouble "back in the '90s and 2000s" but "he'd been off the radar for a while;" Defendant Blackwell had no knowledge one way or the other as to whether Charlie had ever been convicted of a felony. Ex. 13 (Blackwell dep.) at 318:11-319:19. This tenuous and stale-dated evidence is so weak as to be probative of nothing at all, and any other evidence unknown to the Defendants is irrelevant and unduly prejudicial, and thus inadmissible under Rules 402 and 403. *See Sherrod*, 856 F.3d at 806 ("Knowledge of facts and circumstances gained after the fact … has no place in the trial court's or jury's proper post-hoc analysis of the reasonableness of the actor's

judgment. Were the rule otherwise, as the trial court ruled in this instance, the jury would possess more information than the officer possessed when he made the crucial decision.").

Evidence of Mr. Todero's prior arrests or other police contact is particularly violative of Rule 403. As a general matter, as the discussion above highlights, the probative value of the evidence at issue is practically zero, and would be substantially outweighed by the possibility of unfair prejudice. Admission of Charlie's prior arrests or other police contact might induce the jury to make a judgement call based on Charlie's perceived criminality, rather than on the reasonableness of Defendants' use of deadly force and failure-to-intervene. *See Gora v. Costa*, 971 F.2d 1325, 1331 (7th Cir. 1992) (explaining that courts must be "careful to ensure that a civil rights plaintiff's criminal past is not used to unfairly prejudice him or her")).

Rule 609 also supports the exclusion of this highly prejudicial evidence. Rule 609 contemplates that a conviction may only be used to attempt to attack a testifying witness's character for untruthfulness. But, because Mr. Todero is deceased, he will not be testifying at trial, and so there is no Rule 609 basis to admit such prejudicial evidence. *See, e.g.*, *Thomas v. Sheahan*, 514 F. Supp. 2d 1028 (N.D. Ill. 2007) (granting motion *in limine* to exclude prior interaction with law enforcement and convictions of decedent in § 1983 suit on his behalf because, among other reasons, the decedent was "deceased and unable to testify at trial.").

Mr. Todero's prior arrests are additionally and independently inadmissible because they constitute impermissible propensity evidence. It is well established that arrests that do not result in the arrestee's conviction are generally inadmissible. *See Anderson v. Sternes*, 243 F.3d 1049, 1054 (7th Cir. 2001) ("The law is clear that a defendant's prior arrest record is inadmissible, and while the reference to Anderson's past arrest was only indirect, it was still improper."). Mr.

Todero's prior arrests are irrelevant, and admitting them would only invite the jury to infer that he was the type of person against whom lethal force was necessary to subdue.

Defendant also may not rely on the propensity argument to try and minimize Plaintiff's damages. That Charlie was charged with crimes many years before the incident at issue in this lawsuit is not relevant in any way to establish the sum of money necessary to make the Estate whole. Charlie's love, affection, and care for his family are unaffected by his years-old charges, and admission of this evidence would be unduly prejudicial because it carries very high risk of clouding the jury's ability to impartially weigh the facts and award Plaintiff the full value of Charlie's lost life.

### ii.  Substance Abuse

Plaintiff expects Defendants to offer evidence at trial of Charlie Todero's alleged use of drugs and alcohol referenced by his family during their depositions in this case, *see, e.g.* Ex. 8 (Teresa Todero dep.) at 24, 25, 133, 193; Ex. 14 (James Todero dep.) at 53, 59, as well as two prior incidents (from six and four years before the incident at issue in this case) where he sought medical treatment after ingesting drugs, *see* Ex. 12 (Dr. Vilke dep.) at 136:21-139:10 (describing two prior instances of drug use, while noting that neither of the drugs at issue was known to cause excited delirium); Ex. 15 (record of 2012 medical treatment for Vicodin use); Ex. 16 (record of 2010 medical treatment for marijuana dipped in formaldehyde).

Echoing the reasons outlined above, none of this highly prejudicial bad acts evidence should be introduced at trial. These events, alleged or actual, do not have any bearing on the reasonableness of Defendant Blackwell's use of force because Blackwell did not know these facts at the time. The evidence is therefore inadmissible under Rule 401 and 402.

The Seventh Circuit has emphasized: "there is considerable danger that evidence that a witness has used illegal drugs may so prejudice the jury that it will excessively discount the

witness' testimony." *Kunz v. DeFelice*, 538 F.3d 667, 676-67 (7th Cir. 2008); *see also United States v. Robinson*, 404 F. App'x 77, 80 (7th Cir. 2010) (upholding district court's exclusion of alcohol-abuse evidence in part because it posed a risk of unfair prejudice); *Mankey v. Bennett*, 38 F.3d 353, 360 (7th Cir. 1994) (pointing to "the danger of unfair prejudice" posed by evidence of alcohol abuse).

Indeed, for many jurors, drug usage or alcohol abuse is a "deal breaker" that is so inflammatory it prevents them from fairly fulfilling their duty in assessing whether or not the Constitution was violated: as one court held: "In today's climate, any evidence as to a litigant's use of drugs has an obvious potential for being extraordinarily prejudicial— for creating the prospect of deflecting the factfinders' attention from the matters that are really at issue in the case to everyone's universally-shared concerns as to the problems that drug usage is creating for our society." *Volland-Golden v. Chicago*, 2016 WL 4678299, at *2 (N.D. Ill. Sept. 7, 2016); *see also In re Testosterone Replacement Therapy Prod. Liab. Litig. Coordinated Pretrial Proceedings,* 2017 WL 2313201, at *11 (N.D. Ill. May 29, 2017) (excluding evidence of alcohol use because "any probative value the evidence has [regarding heart attack sufferer's "sedentary lifestyle] is far outweighed by its potential for unfair prejudice").

### iii. Disputes with Teresa Todero

The same reasoning goes for any insinuation that Mr. Todero fought with and threatened Plaintiff Teresa Todero. *See, e.g.*, Ex. 8 (Teresa Todero dep.) at 31, 223. Admission of that evidence simply paints Mr. Todero as an undeserving person and impermissibly invites the jury to find against Plaintiff, or to award her minimal damages, not based on any competent evidence of the facts of what happened or the extent of her damages, but rather because the jury simply does not like Mr. Todero.

Evidence of prior instances of violence is highly inflammatory and should be excluded under Rule 403. *United States v. Ingram*, 2018 WL 5619450, at *3 (S.D. Ind. Oct. 29, 2018) (excluding testimony regarding alleged prior instances of domestic violence because it "will have no probative value . . . and will be unfairly prejudicial." ); *see also United States v. Hands*, 184 F.3d 1322, 1328-29 (11th Cir. 1999) ("On the other side of the Rule 403 inquiry, the evidence had great potential to incite unfair prejudice. Some types of extrinsic acts are particularly likely to incite a jury to an irrational decision; few would doubt that violent spousal abuse falls into this category," and finding reversible error where "the domestic violence evidence's prejudicial nature so heavily outweighed its probative value that the district court should have excluded it."); *United States v. Gochis*, 169 F. Supp. 2d 918, 920 (N.D. Ill. 2001) ("[T]he obvious prejudice toward Bothum that would likely be caused by such testimony [domestic dispute] clearly outweighs whatever probative value the it has, making it prime for exclusion under Federal Rule of Evidence 403").

Plaintiff's damages claims do not alter the analysis. Plaintiff's damages include the pain and suffering from the time Charlie was shot to the time he died, as well as the loss of value of his life. Any suggestion that because Charlie relationship with his mother had ups and downs, his life was worth less would be unsupported and unduly prejudicial. *See, e.g.*, *Earl v. Denny's, Inc.*, 2002 WL 31819021, at *8 (N.D. Ill. Dec. 13, 2002) ("[A] jury may deny plaintiff a verdict and an award, not because it doubts its veracity, but because it is appalled by his prior conduct that has nothing to do with the events in question. That is precisely the kind of unfair prejudice that Rule 403 seeks to prevent"). And even to the extent that these incidents are of marginal relevant to the extent of Plaintiff's damages for loss of society, that marginal relevance is far outweighed by the extreme danger of prejudice.

In addition, asking the jury to focus on specific details on disputes between Charlie and his mother opens up an unnecessary side-trial that can only distract the jury from the issues at hand. Cross examination cannot undo the harm of the unfair and inaccurate implication that Charlie's disputes with his mother means that his life had no value or Ms. Todero did not suffer from losing her son. In these circumstances, Rule 403 calls for exclusion of the evidence.

WHEREFORE, Plaintiff respectfully requests that the Court enter an order barring Defendants from making any argument or introducing evidence regarding Charlie Todero's alleged prior bad acts and prejudicial past conduct that was unknown to the individual Defendants at the time of the incident.

**16.** **Plaintiff's Motion *In Limine* No. 16 to Bar References to Any Criminal History of Any Other Members of the Todero Family**

The trial in this case is likely to include the testimony of several of Charlie Todero's family members, including Plaintiff Teresa Todero, James Todero, Tyler Todero, and Aaron Crowe—all of whom have arrest and/or conviction records. Plaintiff anticipates that Defendants will try to gain a credibility advantage with the jury by introducing as much evidence related to these witnesses' criminal convictions, arrests, and prior bad acts as they can. The Court should not allow this.

**A.** **Defendants Failed to Disclose Criminal Convictions of Plaintiff's Witnesses in Discovery**

Plaintiff sent interrogatories to each Defendant, asking that they identify any and all criminal convictions of any party or witness with knowledge relating to any of the claims or defenses in this action; and to identify the person who has been convicted, the nature of the conviction, and the complete factual basis as to why the conviction qualifies as admissible under Federal Rule of Evidence 609. Defendants were reminded of their duty to supplement their

responses, and informed that Plaintiff would move to bar *in limine* any criminal convictions not disclosed in these interrogatories.

Defendant Blackwell answered that he did not have any criminal convictions while Defendants Elliot, Laut, and City of Greenwood did not identify any criminal convictions of any party or witness in this case. *See* Ex. 17 (Blackwell's Answers to Plaintiff's First Set Of Interrogatories) at No. 4; Ex. 18 (Elliot and Laut's Answers to Plaintiff's First Set of Interrogatories) at No. 4; Ex. 19 (Greenwood's Answers to Plaintiff's First Set of Interrogatories) at No. 5. Because Defendants failed to disclose any convictions of any witnesses in this case, as was their discovery obligation, the Court should bar them from attempting to introduce any criminal convictions for purposes of impeachment under Rule 609.

**B.**      **Convictions, Arrests, or Any Other Prior Bad Acts of Plaintiff's Witnesses Under Rule 402, 403, and 404(b)**

Prior bad act evidence of Charlie Todero's family members puts Plaintiff at risk of unfair prejudice: "[T]here is considerable danger that evidence that a witness has used illegal drugs [, for example,] may so prejudice the jury that it will excessively discount the witness' testimony.... A court must, therefore, be wary in admitting such evidence when it is offered for the sole purpose of making a general character attack." *United States v. Cameron*, 814 F.2d 403, 405 (7th Cir. 1987). Courts routinely exclude evidence of arrests in civil rights cases, and this Court should do the same if Defendants seek to introduce any such evidence. *See, e.g.*, *Nelson v. City of Chicago*, 810 F. 3d 1061, 1067 (7th Cir. 2016) (reversible error to admit the arrest record of a civil rights plaintiff because "the probative value of such evidence is so overwhelmingly outweighed by its inevitable tendency to inflame and prejudice the jury against the party-witness that total and complete exclusion is required in order that the right to trial by a fair and impartial jury may not be impaired."); *see also Cruz v. Safford*, 579 F.3d 840, 845 (7th Cir. 2009) (noting

that "seven arrests and one battery conviction were not credibility matters, but highly prejudicial"), *Estate of O'Bryan v. Town of Sellersburg,* WL 1234215, at *8 (S.D. Ind. May 20, 2004) (excluding arrest records under Federal Rules of Evidence 403 and 404(b)), *Young v. Cook County*, 2009 WL 2231782, at *6 (N.D. Ill. Jan.27, 2009) (excluding evidence of "arrests that have not resulted in convictions" as "grossly unfairly prejudicial in a way that greatly outweighs its minuscule probative value").

Inserting such evidence into this trial would also be a waste of time. Neither the reason for the witness's criminal history nor any other misbehavior in these witnesses' pasts is relevant to whether the Defendant Blackwell's use of deadly force was objectively reasonable and whether Defendants Elliot and Laut failed to intervene to prevent Blackwell's use of deadly force.

WHEREFORE, for the foregoing reasons, Plaintiff respectfully moves this Court for an order barring Defendants at trial from referencing any criminal history of any other members of the Todero family.

## 17.    Plaintiff's Motion *In Limine* No. 17 to Bar Any Speculation That Charlie Todero Was Suicidal

Defendants should be barred from speculating that Charlie Todero was suicidal when he encountered Defendants on May 29, 2016. There is no evidence that can be introduced at trial to support such speculation.

Defendants have no basis to introduce argument or testimony about suicide. While discovery revealed that the radio dispatch call was for a suicidal person, Ex. 20 (Dispatch Radio Audio), Blackwell testified that when he arrived on the scene, Charlie was on the side of the road reading a Bible, unarmed, did not threaten anyone, and never said or suggested he was suicidal. Ex. 13 at 40, 45 ("He never said anything else . . . I don't remember him saying anything else."),

224; Ex. 21 (Blackwell Responses to 1st Requests for Admission) at No. 12. Blackwell and the remaining Defendants have maintained throughout this litigation and up until today that when they encountered Charlie, he never said or suggested he was suicidal. In fairness, they should not be allowed to reverse course now.

The only remaining option for introducing such speculation is through Plaintiff Teresa Todero, who testified at her deposition about Facebook messages she sent after Charlie's death referencing suicide. Plaintiff is obviously not a psychological expert and has no qualifications or expertise to opine on whether Charlie was suicidal. What's more, it is clear from Plaintiff's messages that her belief that Charlie was suicidal came from what she was told by police; in later messages, after having learned more, Ms. Todero says that she does not think Charlie's death was a suicide. *See, e.g.,* Ex. 22 ("He didn't try to commit suicide[;] we assumed."); Ex. 23 ("People here thought it was a suicide attempt. I don't think that's what happened.") All this is to say, Ms. Todero's references to suicide lack foundation, are classic hearsay, and are based on pure speculation.

Without any basis to claim that Mr. Todero was suicidal, Defendants cannot advance a suicide theory. Accordingly, any testimony or argument that Mr. Todero committed suicide would be pure speculation based on lay opinions from Defendants that contradicts their prior testimony or from Ms. Todero, who lacks foundation or qualifications to offer such an opinion. And, in response, Plaintiff would be entitled to the opportunity to present a mountain of evidence to rebut Defendants' unsupported speculation, creating a mini-trial on the issue.

WHEREFORE, for the foregoing reasons, Plaintiff respectfully moves this Court for an order barring Defendants at trial from any speculation that Charlie Todero was suicidal.

18. **Plaintiffs' Motion *In Limine* No. 18 to Bar Prior Statements of Teresa Todero Regarding Alleged Conflict between Charlie and Teresa**

In her deposition, Plaintiff was asked about and referenced messages she sent on Facebook in the days after Charlie was shot with a Taser describing him as abusive, selfish, juvenile, demanding, and other unflattering descriptions. *See,* e.g., Ex. 8 at 223-225. Ms. Todero says in later messages that her callousness towards Charlie was due to her being upset with him from an earlier, unrelated incident. *See, e.g.*, Ex. 24. Many of her messages discussing Charlie paint their relationship as complicated, but ultimately loving. Ex. 25 ("Well if he wondered if I loved him, I did very much.").

Evidence of Ms. Todero's negative comments about Charlie in the days after he was shot with a Taser are irrelevant and should be excluded from trial. For purposes of constitutional liability, Defendant Blackwell did not know anything about Ms. Todero and Charlie's relationship, nor would it matter if he did. *Sherrod v. Berry*, 856 F.2d 820, 804 (7th Cir. 1988) ("[I]t is obvious that 'under the circumstances' refers only to those circumstances known and information available to the officer at the time of his action (firing the fatal shot)."); *see also Wallace v. Mulholland*, 957 F.2d 333, 336 (7th Cir. 1992) (noting "danger that a jury will conclude that a plaintiff, regardless of his actual behavior, somehow 'asked for' mistreatment at the hands of . . . policemen is greater than the value of such evidence to explain the police officers' use of force."). For purposes of damages, Ms. Todero's initial negative comments about Charlie are similarly irrelevant, and are made all the less relevant by the fact that her prior comments were made out of anger, and she made many other comments discussing how much she loved her son.

This evidence should also be excluded as unduly prejudicial. Since this type of evidence is so wholly irrelevant as to the underlying constitutional liability at issue, Plaintiff's counsel can

only assume that any references to Ms. Todero's negative comments would be used to paint her as less deserving of a damages award. Any such usage would be wholly inappropriate, and inadmissible at trial under Federal Rule of Evidence 403, in addition to distracting the jury from the issues it must decide. *See, e.g.*, *Holmes v. City of Chicago,* 2016 WL 6442117, at *8 (N.D. Ill. Nov. 1, 2016) (in a false arrest case, excluding the plaintiff's e-mails about pornography under Rule 403 to avoid "a lengthy side show in the issue.").

WHEREFORE, for the foregoing reasons, Plaintiff respectfully moves this Court for an order barring Defendants at trial from referencing any prior statements of Teresa Todero regarding alleged conflict between Charlie Todero and Teresa Todero.

**19.     Plaintiff's Motion *In Limine* No. 19 to Bar Prior Statements of the Todero Family and Other Speculation About Charlie Todero's Condition and Cause of Death**

In their depositions, Charlie Todero's family members were asked about the discussions they had on Facebook and with each other about Charlie's condition in the days following the Taser shooting. Specifically, Charlie's family offered lay opinions that Charlie's condition was not critical and speculated other causes for Charlie's death other than the Taser shooting. *See, e.g.*, Ex. 8 (Teresa Todero dep.) at 168 (speculating that Charlie died from vodka destroying his kidneys and liver); *id.* at 221-222 (speculating whether EMS workers might have given Charlie "something that killed him"); Ex. 14 (James Todero dep.) at 91-93 (speculating about whether Charlie was in critical condition). Plaintiff expects Defendants to offer this testimony evidence in rebuttal to Plaintiff's damages evidence and in support of their argument that the Taser shooting did not cause Charlie's death. This evidence should be excluded for either purpose for the reasons explained below.

First, it cannot be seriously disputed that none of Charlie's family members are qualified to offer any medical expert testimony on Charlie's medical condition following the Taser

shooting, or the medical cause of Charlie's death. Even if Charlie's family were qualified to offer these medical opinions, the issue of causation is a fact question for the jury, and no witnesses—lay or expert—can opine on the ultimate factual issue in the case. *See Gayton v. McCoy*, 593 F.3d 610, 624 (7th Cir. 2010).

Second, this testimony and evidence is rank speculation, as evidenced by the family's lack of expertise and also their changing opinions about Charlie's conditions and cause of death. The family testified and said in Facebook messages that their initial statements about Charlie were based on what was told to them by the hospital staff and police, and once they learned more information, they understood the seriousness of Charlie's conditions and the role that the Taser played in Charlie's injuries and death. Ex. 14 (James Todero dep.) at 44-45 (testifying that once the family knew of the severity of Charlie's condition, they immediately visited him in the hospital). Evidence that relies on speculation "is not reasonable and not permitted" in the Seventh Circuit. *United States v. Jones*, 713 F.3d 336, 352 (7th Cir. 2013).

Third, this testimony should also be excluded to the extent that it is hearsay. While testimony about what witnesses personally observed is, at least, arguably admissible, any testimony about what Charlie's family was told offered for the truth of the matter asserted are inadmissible hearsay that do not meet any of the hearsay exceptions. Fed. R. Evid. 801 & 802; *see also Gordon v. FedEx Freight, Inc.*, 674 F.3d 769, 774-75 (7th Cir. 2012); *Carlisle v. Deere & Co.*, 576 F.3d 649, 655-56 (7th Cir. 2009).

Finally, asking the jury to focus on specific details on the Todero family's speculative discussions about Charlie's condition or cause of death opens up an unnecessary side-trial that can only distract the jury from the issues at hand. In these circumstances, Rule 403 calls for exclusion of the evidence.

WHEREFORE, for the foregoing reasons, Plaintiff respectfully requests that this Court

enter an order barring prior statements of the Todero family and other speculation about Charlie

Todero's condition and cause of death.

**20.** **Plaintiff's Motion *In Limine* No. 20 to Bar Dr. Vilke's Undisclosed Opinion That Charlie Todero's Purported Excited Delirium was Caused By Undetected Drug Intoxication.[4]**

Plaintiff moves *in limine* for an order barring Defendants from admitting Dr. Vilke's

undisclosed opinions about Charlie Todero's claimed undetected drug intoxication being a cause

of his purported excited delirium syndrome.

This Court should bar all of Dr. Vilke's opinions that were was not properly disclosed in

his written report. *See Ciomber v. Coop. Plus, Inc.*, 527 F.3d 635, 642 (7th Cir. 2008) (Fed. R.

Civ. P. 26(a)(2) does not allow parties to cure deficient expert reports by supplementing them

with later deposition testimony).

In his expert report, Dr. Vilke did not claim to identify the cause of Mr. Todero's

purported Excited Delirium Syndrome. In fact, Dr. Vilke expressly stated that "[a]n exact

etiology of Mr. Todero's ExDS is not easily identified as the basic toxicology screen performed

on his blood was negative for common drugs of abuse." Ex. 26 at 10. In terms of evaluating Mr.

Todero's behavior, he stated simply that it was "consistent with classic excited delirium

syndrome. *Id.* at 11.

At his deposition, however, Dr. Vilke repudiated this aspect of his written report, and

instead claimed to be able to opine that Mr. Todero's behavior was consistent with drug

---

[4] Plaintiff's request to bar this opinion is also contained as part of her *Daubert* motion challenging Dr. Vilke's testimony under Fed. R. Civ. P. 702. *See* Dkt. 237 at 15-18. Since that motion has not yet been resolved, and out of an abundance of caution in the event the Court deems this argument more properly made as a motion *in limine* rather than under the *Daubert* framework, Plaintiff re-iterates this argument as part of her motions *in limine*.

intoxication, as a cause of the Excited Delirium Syndrome. Ex. 12 at 125:19-126:15. Dr. Vilke did concede, however, that this opinion was not disclosed in his written report, stating that "[i]t didn't say exactly it was caused by a drug, but as I spoke earlier, the drugs are the most common cause for these syndromes." *Id.* at 126:22-24. Dr. Vilke's undisclosed opinion about the claimed cause of Mr. Todero's Excited Delirium Syndrome should be barred.

WHEREFORE, for the foregoing reasons, Plaintiff respectfully requests that this Court enter an order barring Dr. Vilke's undisclosed opinion that Charlie Todero's purported excited delirium was caused by undetected drug intoxication.

21. **Plaintiff's Motion *In Limine* No. 21 to Bar Dr. Vilke's Opinions That Go Beyond the Scope of Those Opinions Expressed by Dr. Wetli.[5]**

Plaintiff moves *in limine* for an order barring defense expert Dr. Vilke's from offering opinions that go beyond the scope of the opinions of the expert he was substituted to replace, Dr. Wetli.

Defendants were permitted to tender a replacement expert, Dr. Vilke, after the death of their previously disclosed medical expert, Dr. Wetli. Dr. Vilke's opinions should be barred because they stray too far from the opinions and methodologies used by Dr. Wetli, for whom Dr. Vilke has been substituted and whose prior opinions Dr. Vilke must strictly track.

A. **As a substitute expert, Dr. Vilke's opinions must strictly track those previously disclosed by Dr. Wetli.**

When substitution of an expert is permitted, in order to avoid prejudice to the opposing party, courts do not permit the substitute expert to stray far from the prior expert's field of

---

[5] Plaintiff's request to bar this opinion is also contained as part of her *Daubert* motion challenging Dr. Vilke's testimony under Fed. R. Civ. P. 702. *See* Dkt. 237 at 18-25. Since that motion has not yet been resolved, and out of an abundance of caution in the event the Court deems this argument more properly made as a motion *in limine* rather than under the *Daubert* framework, Plaintiff re-iterates this argument as part of her motions *in limine*.

expertise, previously disclosed opinions, or theories underlying those opinions. *See, e.g.*, *Indiana Ins. Co. ex rel. Pell & Sons v. Valmont Elec., Inc.*, No. TH97-009-C-T/F, 2003 WL 22244787, at *1 (S.D. Ind. July 31, 2003) (noting earlier ruling that substitute expert must "have a similar area of expertise and will express only opinions like those previously held by the deceased expert," and excluding substitute experts' opinions that strayed from this limitation). "Courts confronted with an expert who dies before trial have allowed a substitute expert to issue a new report that falls 'within the scope of the original expert's report, addresses the same subject matter, and utilizes the same theories of liability [or] damages' or expresses the original expert's 'opinions in their own language provided they address the same subject matter without meaningful change.'" *McDonald*, 2016 WL 1383191, at *7 (emphasis added) (quoting *Abbott v. Lockheed Martin Corp.*, No. 3:06-CV-701-NJR-DGW, 2014 WL 12570095, at *4 (S.D. Ill. Nov. 7, 2014)).

Indeed, a substitute expert must "be only that"—a substitute—and must be "prepared to testify in strict conformity with the [prior expert's r]eport." *Dunkin' Donuts, Inc. v. N.A.S.T., Inc.,* No. 02 C 1272, 2005 U.S. Dist. LEXIS 16703, at *2 (N.D.Ill. Aug. 10, 2005). *See also, e.g.*, *Park v. CAS Enterprises, Inc.*, No. CIV. 08CV385DMSNLS, 2009 WL 4057888, at *3 (S.D. Cal. Nov. 19, 2009) (holding that the substitute expert "may not, however, espouse any other opinions or theories not found in [the prior] expert reports," because "[i]t would be both prejudicial and unduly burdensome . . . to allow submission of new expert reports with new theories and opinions"). *See also Stringer v. Cambria Fabshop-Indianapolis, LLC*, No. 113CV00659SEBTAB, 2015 WL 13632234, at *2 (S.D. Ind. Oct. 2, 2015) (permitting expert substitution provided that it occur "without significant changes in the testimony"); *Baumann v. Am. Family Mut. Ins. Co.*, 278 F.R.D. 614, 616 (D. Colo. 2012) (permitting expert substitution, but cautioning there must be no "meaningful change in testimony" as a result of the new expert's

opinions); *Crandall v. Hartford Cas. Ins. Co.*, No. CV 10-00127-REB, 2012 WL 6086598, at *3 (D. Idaho Dec. 6, 2012) (while an expert's death is "a legitimate and appropriate reason for allowing a new expert to be named," substitution cannot operate to relieve a party's "buyer's remorse" by offering relief from the testimony of an expert who "did not initially opine in a manner that [party] would prefer"); *Morel v. Daimler-Chrysler Corp.*, 259 F.R.D. 17, 21 (D.P.R. 2009) (recognizing that plaintiff would not be prejudiced by substitution provided that there is no "meaningful change in testimony").

"The introduction of a substitute expert does not *ipso facto* permit the party requesting the substitution to escape from the concessions or admissions of the previous expert." *Lincoln Nat. Life Ins. Co. v. Transamerica Fin. Life Ins. Co.*, No. 1:04-CV-396, 2010 WL 3892860, at *2 (N.D. Ind. Sept. 30, 2010) (quoting *Morel,* 259 F.R.D. at 22). The goal is to preserve the playing field as it lies, not to permit a substitute expert to shake things up and inject new areas of expertise, opinions or supporting theories to tilt that field in one party's favor. Rather, the goal must be to ensure that "the posture of the case at trial will be the same as if [the prior expert] had not been knocked out of commission," with the substitute expert "available as a defense witness to provide testimony that conforms precisely to the [prior expert's r]eport (but not beyond, or in contravention of, that report)." *Dunkin' Donuts, Inc.*, 2005 U.S. Dist. LEXIS 16703, at *4.

**B.  Dr. Vilke's opinions regarding Acute Kidney Injury and Mr. Todero's metabolic levels should be barred.**

Dr. Vilke's report includes a discussion of the significance of Mr. Todero's metabolic levels, the timeline upon which Dr. Vilke believes the underlying injury causing those levels would have had to have occurred, and reaches the conclusion that "Mr. Todero was suffering from acute kidney injury (AKI) when he arrived at the ED that afternoon." Ex. 26 at 12-13. But Dr. Vilke acknowledged that while Dr. Wetli discussed rhabdomyolysis, he did not reference

AKI or stage 4 kidney damage anywhere in his report, nor rely in any way on Mr. Todero's laboratory chemistry levels. Ex. 12 at 145:25-147:1. These opinions must be barred as they go beyond the scope of Dr. Wetli's report and disclosed opinions. *See* Ex. 27 (Wetli report).

**C.** **Dr. Vilke's opinion about the purported non-effect of the Taser relies on a completely different methodology from that followed by Dr. Wetli.**

Dr. Vilke is not an appropriate substitute expert for Dr. Wetli because his methodology used to opine that the Taser did not cause Mr. Todero's symptoms was completely different from that used by Dr. Wetli.

As described in Plaintiff's prior motion to bar Dr. Wetli, Dr. Wetli conceded at his deposition that he did not know whether Mr. Todero's medical condition was independent of police action, and agreed that Mr. Todero's physiological cause of death would have been different if police had not attempted to engage him and restrain him. Dkt. 200 at 5-6. Specifically, Dr. Wetli concluded that if not for the police intervention, Mr. Todero would have been struck and killed by a car. *Id.*

Dr. Vilke expressly repudiated this opinion. Instead, Dr. Vilke offered the opinion at his deposition, for the first time, that if Mr. Todero had been left to his own devices to "let [him] run around," he would likely "collapse, [or] have a cardiac arrest," due to various metabolic imbalances which Dr. Vilke believed would "keep spinning up." Ex. 12 at 232:20-233:23. Dr. Vilke should not be permitted to prejudice Plaintiff by repudiating Dr. Wetli's unreliable testimony in this regard, and by substituting a completely different opinion.

**D.** **Dr. Vilke's version of Excited Delirium is not the same syndrome which Dr. Wetli described and opined on.**

Throughout his deposition, Dr. Wetli was crystal clear: the necessary symptoms to a proper diagnosis of excited delirium are that a person "have delirium and they're agitated." Ex. 28 at 141:19-25. In Dr. Wetli's view, any time a person exhibits both symptoms, "regardless of

the underlying physiological cause," then "by definition" that person is experiencing excited delirium. *Id.* at 144:15-145:3. Conversely, if a person fails to exhibit one of the two necessary symptoms, the person cannot be properly diagnosed with excited delirium. *Id.* at 142:5-20.

Dr. Vilke's diagnostic criteria for Excited Delirium Syndrome are starkly different. Dr. Vilke uses a flexible metric, with ten "clinical findings" that can indicate Excited Delirium Syndrome, and with a requirement to find at least six of these ten in order to make a diagnosis. Ex. 26 (Vilke report) at 10; Ex. 12 (Vilke dep.) at 151:12-152:4, 152:23-153:9. And Dr. Vilke directly and explicitly rejects Dr. Wetli's view (that a finding of agitation and delirium by themselves are sufficient), stating at his deposition that "[i]f they only have those two symptoms . . . you can't come to that conclusion," because you "have to have the complement of symptoms to be able to come to a final diagnosis [of] excited delirium syndrome." Ex. 12 (Vilke dep.) at 200:22-201:20. "If we're referring to the formal excited delirium syndrome, you would need more than two specific symptoms only." *Id.* at 203:21-23.

While Dr. Vilke and Dr. Wetli use the same label, it is apparent that they have fundamentally incompatible and divergent diagnostic criteria for what each means by Excited Delirium Syndrome. Dr. Vilke is not an appropriate substitute expert for Dr. Wetli in this regard.

**E.      Dr. Vilke disagrees with Dr. Wetli's opinion that Mr. Todero was agitated, which is fatal to his diagnosis of Excited Delirium Syndrome.**

Dr. Wetli concluded that Mr. Todero met the required "agitation" component of Excited Delirium because "agitation can be out in the middle of traffic, something violent, screaming that you are a prophet." Ex. 28 (Wetli dep.) at 147:21-48:1. As described in Plaintiff's motion to bar Dr. Wetli's testimony, the facts in the record belie this description of Mr. Todero's behavior, in that the two eyewitnesses to Mr. Todero's behavior crossing the road described him as walking calmly, simply staring straight ahead and not responding. Dkt. 200 at 7-9. Thus, based on Dr.

Wetli's expressed diagnostic criteria and the facts in the record, Dr. Wetli's opinion is that Mr. Todero was not suffering from excited delirium. *Id.*

Dr. Vilke takes a very different approach to the "agitation" element. Dr. Vilke expressly rejects Mr. Todero's "walking into traffic" as being "significant agitation." Ex. 12 (Vilke dep.) at 223:20-224:2. Instead, Dr. Vilke's perception of Mr. Todero's "agitation" was based on his behavior "in the back of the ambulance," which he acknowledges that "Dr. Wetli didn't comment on that . . . for unknown reasons." *Id.* at 222:14-17. Again, given their divergent approaches to analysing Mr. Todero's purported agitation, including the crucial aspect of whether there is any evidence of Mr. Todero's agitation prior to his encounter with the police, Dr. Vilke is not an appropriate substitute expert for Dr. Wetli.

### F. Dr. Vilke disagrees with Dr. Wetli about the possible causes of Excited Delirium Syndrome.

In his Rule 26 report, Dr. Wetli stated that "[t]he causes of the excited delirium syndrome include certain infections, certain mental illnesses and stimulant or hallucinogenic drugs." Ex. 27 at 2. Dr. Vilke disagrees, however, and stated in his deposition that, in his view, the two causes of Excited Delirium Syndrome are drug intoxication and psychiatric disorders, and that while "[s]ome lump in certain infections," "infections can be its own diagnosis" and so "I tend to think of it more as psychiatric versus drug." Ex. 12 at 126:25-127:9. Indeed, Dr. Vilke's view is that "the true etiologies that are mostly accepted by the major groups . . . [are] drugs and psychiatric disorders," and [t]he most current literature doesn't usually reference infection." *Id.* at 135:18-136:1. This is yet another illustration of Dr. Vilke and Dr. Wetli's divergent understanding of the Excited Delirium Syndrome, and why Dr. Vilke is not an appropriate substitute expert.

### G. Dr. Vilke's methodology relies on a starkly different set of records from those utilized by Dr. Wetli.

Dr. Vilke and Dr. Wetli used divergent methodologies in their choice of case materials upon which to rely. As described in Plaintiff's motion to bar Dr. Wetli's testimony, "Dr. Wetli disregarded as irrelevant vast swaths of the record and focused almost exclusively on subjective, non-medical evidence that supported his ultimate conclusion that Charlie was agitated and delirious on May 29, 2016," including disregarding the coroner's autopsy findings and the hospital medical records, and instead relying on subjective eyewitness descriptions of Mr. Todero's behavior. *See* Dkt. 200 at 17-19. Continuing the pattern described above, Dr. Vilke takes the exact opposite approach, using a methodology that prioritizes the objective data, "things like vital signs, direct visualization of what I see on the video, behavior activities, lab work, autopsy findings, heart size, toxicology reports." Ex. 12 (Vilke dep.) at 63:15-23. Only after first drawing conclusions from the available objective data does Dr. Vilke go on to consider any additional value provided by subject evidence in the case like "testimony and interviews." *Id.* at 64:2. Indeed, Dr. Vilke relied heavily on evidence, such as the body camera videos, which Dr. Wetli concluded "didn't show anything." *Id.* at 196:16-197:15. Dr. Wetli's approach plainly failed to follow the appropriate methodology for a forensic pathologist, Dkt. 200 at 17-19, and Defendants should not be permitted the windfall of substituting a new expert who uses a different methodology to shore up their expert opinions.

WHEREFORE, for the foregoing reasons, Plaintiff respectfully requests that this Court enter an order barring Dr. Vilke's opinions that go beyond the scope of those opinions expressed by Dr. Wetli.

22. **Plaintiff's Motion *In Limine* No. 22 to Permit Plaintiff to Use Defendant Blackwell's Admissions Against Defendant and to Bar Argument and Evidence Contrary to Those Admissions**

Plaintiff moves *in limine* for an order permitting Plaintiff to use Defendant Blackwell's admissions against Defendants at trial, and barring Defendants from contradicting those admissions through argument or evidence. During discovery in this case, Plaintiff served requests for admission on all Defendants, pursuant to Federal Rule of Civil Procedure 36. Defendant Blackwell responded to those requests for admissions as follows:

**REQUESTS FOR ADMISSION NO. 1 [FIRST SET]**. Admit that Brian Blackwell used a Taser on Charles Todero 16 times on May 29, 2016.

**RESPONSE**: Defendant admits that he activated the Taser 16 times. Defendant denies the activations made contact as intended.

**REQUESTS FOR ADMISSION NO. 4 [FIRST SET]**. Admit that none of the Defendants acted or attempt to stop Brian Blackwell from using force on May 29, 2016.

**RESPONSE**: Defendant is unable to address the actions or efforts of others as he lacks personal knowledge. He admits that he is unaware of any attempts to stop his appropriate use of force.

**REQUESTS FOR ADMISSION NO. 12 [FIRST SET]**. Admit that Charles Todero was sitting on the ground when Brian Blackwell first encountered Charles Todero on May 29, 2016.

**RESPONSE**: Admit.

**REQUESTS FOR ADMISSION NO. 13 [FIRST SET]**. Admit that Brian Blackwell engaged Charles Todero in conversation when Brian Blackwell first encountered Charles Todero on May 29, 2016.

**RESPONSE**: Admit.

**REQUESTS FOR ADMISSION NO. 14 [FIRST SET]**. Admit that Charles Todero did not threaten Brian Blackwell at any time prior to Brian Blackwell's first use of his Taser.

**RESPONSE**: Admit.

*See* Ex. 21.

**REQUESTS FOR ADMISSION NO. 1 [SECOND SET]**. Admit that at the time that you encountered Charles Todero on May 29, 2016, you had no knowledge of where Charles Todero had been or what he had been doing prior to 11:30 a.m. that day.

**RESPONSE**: Admit.

**REQUESTS FOR ADMISSION NO. 4 [SECOND SET]**. Admit that Charles Todero went into cardiac arrest within 30 minutes of the last time that Defendant Blackwell caused Charles Todero to be shocked with an electric current from his Taser on May 29, 2016.

**RESPONSE**: Admit.

**REQUESTS FOR ADMISSION NO. 5 [SECOND SET]**. Admit that Charles Todero was determined by emergency medical personnel to be in asystole within 30 minutes of the Taser discharge recorded at Line 205 of the Taser use log Bates-stamped TODERO 00026 through 00029.

**RESPONSE**: Admit.

**REQUESTS FOR ADMISSION NO. 9 [SECOND SET]**. Admit that Defendant Blackwell used a Taser against Charles Todero fewer than 5 times in drive-stun mode on May 29, 2016.

**RESPONSE**: Admit.

*See* Ex. 30.

Rule 36 provides that "[a] matter admitted under this rule is conclusively established unless the court, on motion, permits the admission to be withdrawn or amended," before going on to describe circumstances in which a court may permit withdrawal or amendment, none of which applies here. Fed. R. Civ. P. 36. Defendants have never moved to withdraw or amend Defendant Blackwell's admissions; there is no basis to permit amendment under the Rule; and trial too late to withdraw or amend. Accordingly, Defendant Blackwell's admission are not only evidence admissible against Defendants that can be weighed by the jury, but they are also judicial admissions that under the plain terms of the rule are "conclusively established." Fed. R. Civ. P. 36; *see generally* 8B Wright & Miller, Federal Practice & Procedure § 2264 (3d ed. 2021).[6] Accordingly, this Court should permit Plaintiff to use the above admission against Defendants at trial, and Defendants should not be permitted to contradict those admissions through argument or evidence at trial.

WHEREFORE, for the foregoing reasons, Plaintiff respectfully moves this Court for an order permitting Plaintiff to use Defendant Blackwell's admissions against Defendants at trial, and barring Defendants from contradicting those admissions through argument or evidence

**23. Plaintiff's Motion *In Limine* No. 23 to Bar After-Acquired Evidence About Charlie Todero's Activities Prior to the Time Defendants Encountered Him**

Plaintiff moves *in limine* for an order barring Defendants from making any argument or introducing evidence regarding Charlie Todero's activities before the time that Defendants encountered him on May 29, 2016 in support of their defense of Plaintiff's constitutional and state law claims. Any knowledge regarding those prior activities that Defendant obtained after

---

[6] Because they are party admissions, Defendants cannot use their own responses to Plaintiff's requests for admission as evidence in the case. Instead, only Plaintiff can use those responses against Defendants. Fed. R. Evid. 801(d)(2).

their encounter with Charlie is irrelevant to the issues the jury must decide in order to determine Defendants' liability, and it is highly prejudicial.

As Plaintiff explained in her response to Defendants' motion for summary judgment, Defendants have focused energy in this litigation on facts about what Charlie had been doing prior to their encounter with him on May 29 that they did not know at all when they began their encounter with him. Dkt. 131 at 3-5. Indeed, while Defendants' lawyers have focused on these after-acquired facts in their briefs, Dkt. 111 at 1-2; Dkt. 116 at 2-3, Defendants themselves admit that they had no knowledge of what Charlie had been doing on May 29 prior to Defendant Blackwell finding him on the side of the road reading his Bible, with the exception of the following statement made by a dispatcher over police radio: "Madison avenue, south of Fry road, north of main. A white male subject attempting to commit suicide in traffic." Ex. 13 (Blackwell Dep.) at 29:13-24, 32:8-33:2; Ex. 29 (Elliott Dep.) at 102:1-11; Ex. 30 (Blackwell Resp to 2nd Requests for Admission) at 2 (No. 1). Other than that, Defendants only had knowledge of the fact they observed at the scene when they arrived and during their interaction with Charlie.

With the exception of the precise words that Defendants heard over the radio, Defendants should be barred from testifying to or eliciting other evidence about Charlie's activities prior to their encounter with him on May 29. At the end of this trial, the jury will be asked to decide whether the use of deadly force against Charlie was objectively reasonable. The jury will answer that question based on "the totality of the facts and circumstances *known to the officer* at the time the force is applied." *Abbott v. Sangamon County*, 705 F.3d 706, 724 (7th Cir. 2013) (emphasis added). The totality of the circumstances "includes information which the officer had at the time of his actions, but not information uncovered later." *Deering v. Reich*, 183 F.3d 645, 650 (7th Cir. 1999) (citing Sherrod v. Berry, 856 F.2d 802 (7th Cir. 1988) (en banc)).

As a result, neither party may attempt to introduce evidence learned after the fact into the reasonableness analysis. Instead, relevant and admissible evidence is confined to what Defendants knew at the time they used force against Charlie. *Sherrod*, 856 F.2d at 804 ("[I]t is obvious that 'under the circumstances' refers only to those circumstances known and information available to the officer at the time of his action (firing the fatal shot)."); *Deering*, 183 F.3d at 670 (same); *see also Ochana v. Flores*, 347 F.3d 266, 272 (7th Cir. 2003) ("It was not an abuse of discretion for the court to grant the officers' motion *in limine* to bar ... the disposition of the underlying criminal charges, because these were not facts within the officers' knowledge at the time of the arrest."); *Smith v. Ball State Univ.*, 295 F.3d 763, 769 (7th Cir. 2002) (the fact that plaintiff had an unknown medical condition at the time of the use of force is irrelevant to assessing the officer's use of force because it was unknown at the time); *Smith v. City of Chicago*, 242 F.3d 737, 743-44 (7th Cir. 2001) (holding that contested facts unknown to the defendant officers were irrelevant since "we consider what happened from an officer's point of view and assess its reasonableness objectively"); *Estate of Phillips v. City of Milwaukee*, 123 F.3d 586, 594 (7th Cir. 1997) (assessing an officer's use of force from the time of force, and excluding evidence of the decedent's medical condition because the medical conditions that exacerbated this use of force and resulted in the plaintiff's death were not observable to the untrained eye).

Outside of the two sentences they heard over the police radio, quoted above, Defendants knew nothing about Charlie's activities leading up to their encounter, and any such evidence should be included at trial. To be specific, that evidence includes observations of motorists driving at the scene before Defendants arrived, 911 calls made by those drivers, and witnesses who interacted with Charlie in the hours and days prior to his encounter with Defendants.

Defendants should not be permitted to elicit any of that evidence or to make any reference to or argument based on that evidence.

All of these facts were discovered by Defendants at earliest after the tasing was concluded; all are irrelevant to the issue of Defendants' liability, and all are highly prejudicial. As such, these "facts and circumstances gained after the fact…ha[ve] no place in the trial court's or jury's proper post-hoc analysis of the reasonableness of the actor's judgment." *Sherrod*, 856 F.2d at 805; *see also Palmquist v. Selvik*, 111 F.3d 1332, 1339 (7th Cir. 1997) (noting that in the Seventh Circuit, "when considering a charge of excessive force under the Fourth Amendment, evidence outside the time frame of the shooting is irrelevant and prejudicial."). Courts regularly exclude this sort of evidence. *See, e.g., White v. Gerardot*, 2008 WL 4724000, at *2 (N.D. Ind. Oct. 24, 2008) (granting motion to exclude "evidence that happened at the [scene] before the shooting, about which [the officer] had no knowledge," and granting motion to exclude documents concerning post-shooting searches, and other "evidence about or evidence derived from post-shooting searches" as irrelevant); *Graham v. Bennett*, 2007 WL 781763, at *3 (C.D. Ill. Mar. 12, 2007) (barring evidence of "acts engaged in by Plaintiffs outside of [the officer's] presence" because "any incident which occurred outside the presence of Defendant and of which he had no knowledge at the time the pepper spray was dispersed has no relevance to the issue of whether Defendant's use of force was reasonable from the perspective of a reasonable officer.").

Even if after-acquired evidence had some probative value, which it does not, the evidence is far more unfairly prejudicial than it might be probative of an issue tangential to the case. Evidence is unfairly prejudicial if it creates "an undue tendency to suggest decision on an improper basis." Fed. R. Evid. 403, advisory committee notes. The Seventh Circuit has repeatedly excluded after-acquired evidence in §1983 actions alleging Fourth Amendment

violations, concluding it improperly induces the jury to judge the officer's actions based on more information than the officer had at the time and inappropriately shifts the focus to the plaintiff rather than the defendant officer. *See*, e.g.*, Wallace v. Mulholland*, 957 F.2d 333, 336 (7th Cir. 1992) (discussing "the danger that a jury will conclude that [the plaintiff] . . . somehow 'asked for' mistreatment at the hands of two policemen" where "the police officers had no specific knowledge of" the prejudicial information); *Sherrod*, 856 F.2d at 805 (explaining that allowing evidence of after-acquired information would inappropriately induce the jury to decide the case based on "more information than the officer possessed when he made the crucial decision" and must be excluded.); *see also White*, 2008 WL 4724000, at *5 (citing Federal Rule of Evidence 403 and concluding that "evidence about or evidence derived from post-shooting searches are irrelevant, and even if somehow deemed relevant, the prejudicial effect clearly outweighs any probative value"). By shifting the jury's attention to information not possessed by Defendants— specifically activities of Charlie that occurred outside of their presence and without their knowledge—the jury may be tempted to speculate that Charlie's conduct in hindsight "justified the officer's reaction." *Palmquist*, 111 F.3d at 1340 (quoting Wallace, 957 F.2d at 336) (upholding decision to exclude evidence "not within [defendant officer's] personal knowledge at the time" of the Fourth Amendment violation)). Those are improper considerations in determining whether the officer's use of force is reasonable, and thus the after-acquired evidence in this case should be excluded as unfairly prejudicial under Rule 403. *West v. Love*, 776 F.2d 170, 174 (7th Cir. 1985) (quoting *United States v. Medina*, 755 F.2d 1269, 1274 (7th Cir.1985)).

WHEREFORE, Plaintiff respectfully requests that the Court enter an order barring Defendants from making any argument or introducing evidence regarding Charlie Todero's activities before the time that Defendants encountered him on May 29, 2016, with the exception

of the dispatcher statement: "Madison avenue, south of Fry road, north of main. A white male subject attempting to commit suicide in traffic."

24.     **Plaintiff's Motion *In Limine* No. 24 to Bar Any Evidence or Argument That Actions of First Responders or Hospital Doctors Caused Charlie Todero's Heart to Stop or His Eventual Death**

At trial, the jury may hear about the actions taken by the first responders at the scene of the Taser shooting and by hospital doctors in attempts to save Charlie's life. Plaintiff expects Defendants to argue at trial that any one of these actions was the cause of Charlie's heart stopping and eventual death, and absolves Defendants of liability. This argument is contrary to law, as explained below, and should be barred.

The subsequent actions of the first responders or doctors is not probative of any issue in the case, particularly not of Defendants' liability for causing Charlie Todero's death. Defendants should be barred from making any argument that the medical interventions following the Taser shooting, rather than their own unreasonable use of deadly force and failure-to-intervene, caused Charlie's death. Section 1983 is construed with basic tort principles in mind, and those principles hold that Defendants are responsible for all reasonably foreseeable consequences of their actions. *Monroe v. Pape*, 365 U.S. 167, 187 (1961); *see also Jones v. City of Chicago*, 856 F.2d 985, 993-94 (1988).

Should Plaintiff prove Defendants' use of deadly force was unreasonable in this case, then that use of deadly force is the cause in fact and proximate cause of Charlie's death. Indeed, the eminently foreseeable result of Defendant Blackwell shooting Charlie with a Taser 16 times is that Charlie would suffer severe injuries, including death. Charlie would never have needed emergency medical services at the scene or at the hospital if he had not been shot 16 times with a Taser by Defendant Blackwell. All of the injuries that befell Charlie as the result of the Taser

shooting was caused by Defendants. *Malley v. Briggs*, 475 U.S. 335, 344 n.7 (1986) (Section 1983 defendants are "responsible for the natural consequences of their actions").

What Defendants would be arguing by is that their own liability for Plaintiff's damages and Charlie's death is cut off entirely as the result of medical procedures performed on Charlie after he was shot with a Taser. That is fundamentally an argument that the medical interventions are a superseding cause of Charlie's death. But for an alternate cause to be a superseding cause sufficient to cut off liability, it must bring about a harm that was an entirely unforeseeable consequence of the Defendants' actions. *Whitlock v. Brueggemann*, 682 F.3d 567, 584 (7th Cir. 2012) (superseding causes "make[] the plaintiff's injury an unforeseeable consequence of the defendant's [misconduct]"); *Scottsdale Ins. Co. v. Subscription Plus, Inc.*, 299 F.3d 618, 621 (7th Cir. 2002) (superseding causes "bring about results of an entirely different kind"); Keeton, et al., Prosser & Keeton on the Law of Torts § 44, at 311-12 (5th ed. 1984); Rest. (2d) Torts §§ 442 & 451. Defendants cannot show that the medical procedures brought about a type of harm different from the foreseeable consequence of Blackwell's use of excessive deadly force. Defendants should be prohibited under the law from simply pointing to some alternative proximate cause and claiming that the alternative proximate cause renders them not liable. *Scottsdale*, 299 F.3d at 621 (evidence of alternative proximate causes "irrelevant to liability").

Furthermore, any argument that any medical interventions by paramedics or emergency room doctors had an adverse impact on Charlie Todero's health or prospects of survival would be entirely speculative. No witness has offered any such testimony, whether by expert opinion or otherwise, and Defendants should not offer such rank speculation at trial.

WHEREFORE, Plaintiff respectfully requests that this Court enter an order barring any evidence or argument that actions of first responders or hospital doctors caused Charlie Todero's heart to stop or his eventual death.

**25.    Plaintiff's Motion *In Limine* No. 25 to Bar Plaintiff's Statements and Conversations Regarding the Value of this Case.**

Plaintiff produced extensive records of her Facebook communications in discovery, which were explored in detail at her deposition. In particular, Plaintiff was asked questions about her conversations with various friends, during which she relayed various irrelevant and prejudicial pieces of information about the litigation history and Plaintiff's conversation with prior counsel she had retained before her present undersigned counsel. Ex. 8 at 178:12-188:1. For example, Plaintiff was asked about conversations during which she relayed that "the first lawyer said we had no case" and that he didn't go to court just to pay the hospital bills, and conversations during which her friends told her that "the deal would be in the mega millions" and Defendants would be forced to settle, and similar statements made to Plaintiff containing speculation from others about the potential value of the case.

Both the deposition testimony and the underlying communications, as well as any testimony at trial, should be barred on these topics. They are entirely irrelevant, and are highly prejudicial. The determination made by a law firm which ultimately decided not to pursue litigation—without the benefit of the extensive evidence developed by undersigned counsel—is hearsay, is of no relevance to the issues the jury must decide, and is highly confusing and prejudicial to the extent the jury would be inclined to defer to the determination made by those lawyers. Moreover, the personal opinions of Plaintiff's current counsel are not relevant and are inadmissible, and so too for Plaintiff's prior counsel.

The same holds true for any statements made by or to (although primarily *to*) Plaintiff containing speculation about the value of the case or the litigation or settlement posture that Defendants may take. Again, the statements are hearsay and without any foundation, serve to distract the jury from evaluating the claims at issue, and are prejudicial in that they would be used to paint Plaintiff as "in it for the money." Of course, money damages are all that the civil legal system can offer Plaintiff, and any negative aspersions in this regard are impermissible.

Under Rule 401 and 403, all of this evidence and any similar statements should be barred.

WHEREFORE, Plaintiff respectfully requests that this Court enter an order barring Defendants from eliciting any of Plaintiff's statements or conversations about the potential value of this litigation.

RESPECTFULLY SUBMITTED,
**Teresa Todero,**
**as Special Administrator of the**
**Estate of Charles Todero**
BY: /s/ Sam Heppell
*One of Plaintiff's Attorneys*

Arthur Loevy
Jon Loevy
Steve Art
Scott Rauscher
Theresa Kleinhaus
Scott Drury
Sam Heppell
LOEVY & LOEVY
311 North Aberdeen St.
Chicago, IL 60607
(312) 243-5900

## CERTIFICATE OF SERVICE

I, Sam Heppell, an attorney, hereby certify that on August 30, 2021, I caused the foregoing document to be filed using the Court's CM/ECF system, which effected service on all counsel of record.

/s/ Sam Heppell
*One of Plaintiff's Attorneys*