Deposition of

# Gary Michael Vilke, M.D.

November 09, 2020

Todero

vs.

City of Greenwood



www.aptusCR.com / 866.999.8310

```
 1               IN THE UNITED STATES DISTRICT COURT

 2             FOR THE SOUTHERN DISTRICT OF INDIANA

 3                    INDIANAPOLIS DIVISION

 4      _____
                                        )
 5      TERESA TODERO, as Special       )
        Administrator of the ESTATE OF  )
 6      CHARLES TODERO,                  )
                                        )
 7                     Plaintiff,        )
                                        )
 8          vs.                         )  Case No.:
                                        )    1:17-cv-1698-JPH-MJD
 9      CITY OF GREENWOOD, BRIAN        )
        BLACKWELL, RENEE ELLIOT, ELIZABETH)
10      LAUT, and AS-YET UNIDENTIFIED   )
        GREENWOOD POLICE OFFICERS,      )
11                                      )
                       Defendants.       )
12      _____)

13

14

15          DEPOSITION OF GARY MICHAEL VILKE, M.D.

16          Monday, November 9, 2020, 9:02 a.m.

17             600 West Broadway, Suite 300

18                  San Diego, California

19

20

21

22      Reported by:

23      Doreen Furuta Landes

24      RPR, CSR No. 5778

25      Job No.: 10074066
```

```
 1                IN THE UNITED STATES DISTRICT COURT

 2              FOR THE SOUTHERN DISTRICT OF INDIANA

 3                      INDIANAPOLIS DIVISION

 4      _____
                                      )
 5      TERESA TODERO, as Special      )
        Administrator of the ESTATE OF )
 6      CHARLES TODERO,                )
                                       )
 7                      Plaintiff,     )
                                       )
 8           vs.                       ) Case No.:
                                       )     1:17-cv-1698-JPH-MJD
 9      CITY OF GREENWOOD, BRIAN       )
        BLACKWELL, RENEE ELLIOT, ELIZABETH)
10      LAUT, and AS-YET UNIDENTIFIED  )
        GREENWOOD POLICE OFFICERS,     )
11                                     )
                        Defendants.    )
12      _____)

13

14

15

16           DEPOSITION OF GARY MICHAEL VILKE, M.D.

17              Taken on behalf of the Plaintiff, at Aptus Court

18      Reporting, 600 West Broadway, Suite 300, San Diego,

19      California, beginning at 9:02 a.m. and ending at 4:40 p.m.,

20      on Monday, November 9, 2020, before Doreen Furuta Landes,

21      RPR, Certified Shorthand Reporter No. 5778 in and for the

22      State of California.

23

24

25
```

Gary Michael Vilke, M.D.

Todero vs.
City of Greenwood

```
 1    APPEARANCES:

 2
          For the Plaintiff:
 3
              (Via Zoom Videoconference)
 4
              LOEVY & LOEVY
 5            BY:  SAM HEPPELL, ESQ.
              311 North Aberdeen Street, Third Floor
 6            Chicago, Illinois  60607
              (312) 243-5900
 7            sam@loevy.com

 8        For Defendants City of Greenwood, Renee Elliot
           and Elizabeth Laut:
 9
              STEPHENSON MOROW & SEMLER
10            BY:  JAMES S. STEPHENSON, ESQ.
              3077 East 98th Street, Suite 240
11            Indianapolis, Indiana  46280
              (317) 844-3830
12            jstephenson@stephlaw.com

13        For Defendant Brian Blackwell:

14            (Via Zoom Videoconference)

15            POLLACK LAW FIRM, P.C.
              BY:  CAREN L. POLLACK, ESQ.
16            10333 North Meridian Street, Suite 111
              Indianapolis, Indiana  46290
17            (317) 660-4880
              cpollack@pollacklawpc.com
18

19                        - o O o -

20

21

22

23

24

25
```

```
1                          I N D E X

2

3    Deposition: GARY MICHAEL VILKE, M.D.

4         Monday, November 9, 2020

5    Examination:                                    Page

6         By Mr. Heppell                              5
           (Further)                                263
7
          By Ms. Pollack                            246
8
          By Mr. Stephenson                         250
9

10

11                       E X H I B I T S

12   For the Plaintiff:                             Page

13    Exhibit A    Dr. Vilke's report dated September 28,   13
                   2020 (124 pages)
14
      Exhibit B    Report dated July 10, 2018 by Charles   145
15                 V. Wetli, M.D. (3 pages)

16    Exhibit C    American College of Emergency           157
                   Physicians White Paper Report on
17                 Excited Delirium Syndrome (22 pages)

18    Exhibit D    Transcript of Charles Wetli, M.D.       194
                   dated September 11, 2016 (112 pages)
19

20

21

22   Witness Declaration Page:    Page 272
     Witness Correction Page:     Page 273,274
23

24

25
```

1    SAN DIEGO, CALIFORNIA, MONDAY, NOVEMBER 9, 2020, 9:04 A.M.

2                          - o O o -

3                    GARY MICHAEL VILKE, M.D.,

4        a witness herein, called by the Plaintiff and having

5         been first duly placed under oath, testified as follows:

6

7                            EXAMINATION

8    BY MR. HEPPELL:

9        Q.   The court reporter has sworn you in and I'm going

10   to start the record feature.

11            Dr. Vilke, could you please state and spell your

12   full name for the record.

13       A.   Sure.  Gary Michael Vilke, V--as in

14   Victor--i-l-k-e.

15       Q.   And it's Vilke, I apologize.  It's not Vilke; is

16   that correct?

17       A.   That -- that's how I pronounce it, yes.

18       Q.   Okay.  Dr. Vilke, my apologies.

19            Dr. Vilke, would it fair to say that you've

20   testified a number of times at depositions before today?

21       A.   Yes.

22       Q.   Okay.  And I certainly have taken my fair share

23   of depositions, but be that as it may, we're both

24   experienced.  I'm going to go through just some of the

25   background rules and protocols so we're both on the same

1   page before we get started.  Does that make sense?

2       A.   Sure.

3       Q.   Okay.  As you know, there's a court reporter who

4   is making a written record of my questions and your answers.

5   And so for that reason, it's important that you give your

6   answers verbally.  Relying on gestures or things like

7   "uh-huhs", "huh-uhs", which are easy for us to understand in

8   the moment, but make it hard to make a written record.

9   Okay?

10      A.   Okay.

11      Q.   Similarly, it's very unnatural, but it's important

12  for you to let me -- to get all the way to the end of my

13  question before jumping in with your answer.  Does that make

14  sense?

15      A.   It does, yes.

16      Q.   And similarly, I've got to let you finish your

17  answer before I jump in with my next question.  Okay?

18      A.   Okay.

19      Q.   And there's probably times when you would think

20  that it would save us both some time for you to jump, but in

21  reality, I'll just have to ask my question over again so

22  there's a clean record.  So I hope you'll bear with me with

23  that.

24           I -- if there's a question that I ask at any

25  point that you don't understand, either because you haven't

1    been able to hear the question properly or just there's

2    something about the question that's unclear to you, please

3    do let me know.  And I will gladly rephrase the question or

4    work with you so we can get on the same page.  Does that

5    make sense?

6         A.   It does, yes.

7         Q.   Okay.  If you go ahead and answer a question that

8    I ask, I'm going to assume that you were able to understand

9    the question.  Okay?

10        A.   Okay.

11        Q.   That is something I say at every deposition, but

12   it holds doubly true (A), with the fact that at least the

13   bulk of us and myself are proceeding via video rather than

14   being in person in the same room as you, and so if at any

15   point the technology makes it difficult for you to

16   understand what I'm saying, if there's an issue with the

17   levels on the audio or if the connection is glitchy at all,

18   please do let me know because it's important that we're able

19   to understand each other.  Okay?

20        A.   Okay.

21        Q.   And similarly, for the court reporter, I hope this

22   goes without saying, but if there's anything either with the

23   quality of the connection or the -- the overly enthusiastic

24   way that either the questioner or the witness is jumping in

25   that makes it difficult to make a clean record, I would

1    certainly prefer you to interrupt me and for us to get a

2    cleaner record than for you to hang back and that not to be

3    the case.  So we'll bear with each other going forward

4    today.

5            Dr. Vilke, what did you do to prepare for your

6    deposition today?

7        A.   Umm, I reviewed my reports.  I reviewed some of

8    the materials I had provided, met with the attorney last

9    night.

10       Q.   And approximately how long did you spend meeting

11   with Mr. Stephenson to prepare for your deposition?

12       A.   I think the meeting ran about two-and-a-half

13   hours.

14       Q.   Okay.  And that was an in-person meeting; is that

15   correct?

16       A.   That is correct.

17       Q.   Okay.  Other than that approximately

18   two-and-a-half hour in-person meeting, have you had any

19   conversations with Mr. Stephenson or anyone else

20   specifically to prepare for your deposition?

21       A.   No.

22       Q.   And you stated that you reviewed your report as

23   preparation for your deposition.  Approximately how long did

24   you spend reviewing your report?

25       A.   Well, physically on the report was probably 20

Gary Michael Vilke, M.D.

**Todero vs.**
**City of Greenwood**

1    minutes.

2        Q.   And then you also stated that you reviewed some of

3    the underlying materials, some of the materials that were

4    provided to you; is that correct?

5        A.   That is correct.

6        Q.   And specifically in preparation for your

7    deposition, you reviewed some of those materials; correct?

8        A.   That is correct.

9        Q.   Approximately how long did you spend reviewing

10   materials to prepare for your deposition?

11       A.   Probably initial two to three hours or so.

12       Q.   And there's a -- fair to say a fairly lengthy list

13   of materials in terms of factual materials related to this

14   case that you were provided and that you list in your

15   report; is that correct?

16       A.   That is correct.

17       Q.   Was it a particular subset of those materials that

18   you reviewed to prepare for your deposition?

19       A.   Yes.  I did not review all of them, but I did

20   review some of them.

21       Q.   Okay.  Which of the materials did you specifically

22   review to prepare for your deposition today?

23       A.   I looked at the videos.  I looked at certain

24   aspects of some of the depositions of the paramedic and of

25   the officers and some of the witnesses, looked at parts of

1   the hospital records, parts of the EMS records, State

2   Trooper reports, the report of Dr. Wetli.  I think I looked

3   at some of the other reports from the other experts as well.

4       Q.   Okay.  And those were the materials that you spent

5   approximately two to three hours reviewing to prepare for

6   your deposition?

7       A.   There may have been others thrown in there, but

8   for the most part, yes, that's -- that's roughly the

9   group --

10      Q.   Okay.

11      A.   -- I looked at.

12      Q.   Any -- Anything else beyond what you listed that

13  you can recall that you reviewed specifically to prepare for

14  your deposition?

15      A.   I don't -- yeah, I think I looked at the TASER

16  download.  But I -- yeah, as far as that goes, I think

17  that's the majority of what I can at least recall for right

18  now.

19      Q.   And so just to recap, you spent approximately

20  two-and-a-half hours meeting with Mr. Stephenson,

21  approximately 20 minutes reviewing your own report and

22  somewhere between two and three hours approximately

23  reviewing case materials; is that correct?

24      A.   That's -- that's a reasonable estimate, sure.

25      Q.   Anything other than what I just described that you

1    did to prepare for your deposition today?

2         A.   Umm, I don't think so.  I think it's the majority

3    of what I recall looking at and talking with the attorney

4    on.

5         Q.   And you understand, Dr. Vilke, that you have been

6    retained in this case to provide opinions due to the passing

7    of Dr. Wetli who had previously been disclosed as an expert

8    in this case and had previously testified at a deposition;

9    is that your understanding?

10        A.   That is my understanding, yes.

11        Q.   And you mentioned that one of the materials that

12   you reviewed specifically to prepare for your deposition was

13   Dr. Wetli's previous expert report; is that correct?

14        A.   That is correct.

15        Q.   And we'll get to this when we look specifically at

16   your report, but I know you -- in your expert report, you

17   quote at some length aspects of Dr. Wetli's expert report;

18   is that correct?

19        A.   I do have some quotes from his report in mine,

20   yes.

21        Q.   And you indicate, at least with regard to those

22   quotations, that you -- you agree with the opinion disclosed

23   by Dr. Wetli in that report; is that correct?

24        A.   What I refer to my report that I agree with, yes.

25        Q.   Okay.  And you've read the entirety of Dr. Wetli's

1   expert report; is that correct?

2        A.   I have, yes.

3        Q.   Not only in preparation from your deposition but

4   prior to preparing your expert report in this case, fair to

5   say?

6        A.   That is fair to say.

7        Q.   Is there anything stated in Dr. Wetli's expert

8   report that you disagree with?

9        A.   I don't think there's anything that I disagree

10  with in his report.  I can't think of anything off the top

11  of my head.  There are things that may be elaborated on

12  more, but as far as pure disagreements, I don't think so.

13       Q.   Okay.  And in addition to his report, did you also

14  have access to Dr. Wetli's deposition transcript at the time

15  that you prepared your -- your expert report?

16       A.   I think so.  I'd have to look at my -- my list on

17  my reports.  If it's on there, then the answer is yes.  If

18  it's not, then the answer would be no.  I don't remember --

19       Q.   Okay.

20       A.   -- specifically.

21       Q.   Okay.  And do you have a copy of your report in

22  front of you?

23       A.   I do not.

24       Q.   Okay.  I -- I am -- I'm prepared to share

25  materials using the screen share function if we need to

1    or --

2         A.   I now have a copy of the report in front of me.

3         Q.   Okay, great.  I appreciate that.  And thank you

4    for that, Jim.  And we need to -- I'm trying to be tree

5    conscious and use the electronic features as much as

6    possible.  If you need -- if it's easier at any point to

7    review materials on paper, I'm certainly happy to take a

8    break, permitting the court reporter hopefully to -- to

9    print up certain materials if -- if that's easier.

10              But in any event, you have a copy of your expert

11   report in front of you that's been provided to you by

12   Mr. Stephenson; is that correct?

13        A.   That is correct.

14        MR. HEPPELL:  And we -- I don't want to take that copy

15   if you need that back, Jim.  But can we designate that as

16   Exhibit A and I can provide an additional copy to the court

17   reporter if we need that to make it formally part of the

18   record?

19        MR. STEPHENSON:  Yeah, you can mark it as Exhibit A.

20        MR. HEPPELL:  Okay.  We'll mark that as Exhibit A.

21             (Exhibit A was marked.)

22   BY MR. HEPPELL:

23        Q.   And, Dr. Vilke, turning to Page 4 of the expert

24   disclosure, that's the start of the list of the

25   case-specific materials; is that correct?

1    A.   That is, yes.

2    Q.   Okay.  And do you see Item Number 5 on that list

3  is the deposition of Dr. Charles Wetli, M.D. and exhibits?

4    A.   I do, yes.

5    Q.   Okay.  And seeing that notation there, does that

6  refresh your recollection that Dr. Wetli's deposition

7  transcript was one of the items you were provided with?

8    A.   That would be correct, yes.

9    Q.   Okay.  And did you review -- fair to say that you

10  reviewed Dr. Wetli's deposition prior to writing your report

11  if it's listed on that list of materials there?

12    A.   That is fair to say, yes, I would have reviewed

13  that.

14    Q.   Is Dr. Wetli's deposition transcript one of the

15  materials that you reviewed in preparation for your

16  deposition?

17    A.   I think I may have looked at a few excerpts out of

18  that, sure.

19    Q.   Okay.  And so those are excerpts you would have

20  reviewed more recently, but prior to authoring your report,

21  fair to say that you would have reviewed Dr. Wetli's

22  deposition transcript in its entirety?

23    A.   That is fair, yes, uh-huh.

24    Q.   Okay.  Is there anything in -- contained in

25  Dr. Wetli's deposition testimony that you disagree with?

1    A.   Umm, I didn't really read it from that

2    perspective.  So off the top of my head, I can't think of

3    anything that I disagree with.  I think there's a section

4    where they're asking him about violent or agitated behavior

5    that was there and he was talking a lot about crossing the

6    street, and I think that he did not mention the -- the

7    aggressive or agitated behavior in the back of the

8    ambulance.  So it's not really a disagreement, but it's

9    something that I think was -- was overlooked by him.

10   **Q.   Okay.  Other than the example you just gave, are**

11   **there any other aspects of Dr. Wetli's deposition testimony**

12   **that you disagree with or aspects of his deposition**

13   **testimony where you feel like he overlooked anything?**

14   A.   Again, I probably would have to look at it from

15   that vantage point.  I didn't look at it from that

16   perspective, but off the top of my head, I can't think of

17   anything specifically right now.

18   **Q.   You say that you -- you weren't looking at it from**

19   **that vantage point.  Can you explain what you mean by that?**

20   A.   Yes.  I was asked to review this case from a

21   perspective of excited delirium and what may have or may not

22   have contributed or caused the cardiac arrest.  And I

23   reviewed that independently.

24        I reviewed Dr. Wetli's reports and -- or report

25   and deposition sort of afterwards to see if it would -- what

1    that was.  I had my own opinion formed by that point.  But I

2    wasn't looking to disagree to Dr. Wetli, I wasn't looking to

3    agree with him.  I was looking to see what he had to say.

4    And if in line with what I had to say, then I'd feel

5    comfortable writing a report for this case since it was a

6    substitution rather than a de novo report.

7        **Q.   Okay.  And so you -- you did understand at the**

8    **time that you were initially reviewing the materials that**

9    **your -- your role was not to offer de novo opinions but to**

10   **serve as a substitute expert, is it fair to say?**

11       A.   Well, it was to -- to review the materials and

12   come to my own opinions, which I did.  But then my -- when I

13   had to, I guess, put a report together, it would be staying

14   in the -- I guess, the lanes that Dr. Wetli was in, not to

15   go outside those because of the way this -- this case has

16   sort of evolved.  So it's not to use his opinions but rather

17   to -- if I agreed with them, then those would be my

18   opinions, they just happened to be in agreement with his, if

19   that makes sense.

20       **Q.   And -- and you reviewed his report for that**

21   **purpose, to ensure that the opinions you were disclosing**

22   **stayed within the lanes of his disclosed opinions; is that**

23   **correct?**

24       A.   Lanes or, you know, the general areas of it, the

25   major areas.

1      Q.   Okay.  And did you also review his deposition

2    testimony with that -- with that purpose in mind?

3      A.   For the most part, yes.  To see again how he --

4    again, he's covering his opinions there and so to make sure

5    that I'm -- I'm understanding his opinions so that I -- if

6    my opinions are in line with that, then I can certainly feel

7    comfortable putting my report together.

8      Q.   Okay.  And understanding, obviously, that as you

9    sit here today, you don't specifically remember every word

10   that Dr. Wetli uttered during his deposition, but given the

11   purpose of your review, fair to say that there were not

12   aspects of his deposition testimony that you did not feel

13   comfortable containing your opinions within -- within that

14   scope; is that fair to say?

15     A.   That's a fair assessment, yes.  Nothing that

16   jumped out at me as -- as being contradictory or -- or

17   something I didn't agree with specifically.

18     Q.   Okay.  And contained within the expert materials

19   that have been disclosed in this case is a copy of your

20   C.V.; is that correct?

21     A.   That is correct.

22     Q.   And that is contained as Appendix A to your

23   report, I believe starting at Page 18 of what you have in

24   front of you as Exhibit A?

25     A.   Page 18, yes.

1    Q.   Okay.  So that's somewhat confusing, Appendix A to

2    Exhibit A; is that correct?

3        A.   In this case it is now, yes.

4        Q.   Okay.  And perhaps I should have called it

5    Exhibit 1, but in any event, here we are.

6             And is -- that was the -- the C.V. that was

7    disclosed at the time of your report which is dated

8    September 28, 2020, that's the date on the very first page

9    of the report; is that correct?

10       A.   That is correct.

11       Q.   Was that C.V. accurate and complete as of

12   September 28, 2020?

13       A.   To the best of my knowledge, yes.

14       Q.   Okay.  Have there been any changes to your C.V.

15   since September 28?

16       A.   Probably.  There -- I tend to publish papers, they

17   come out intermittently, so there's probably a couple more

18   papers that would have been added on there.  Maybe another

19   committee or two that I'm on, but nothing I think of --

20       Q.   Okay.

21       A.   -- that's true substance to this case.

22       Q.   And other than sort of the regular updating of --

23   with additional papers or committees that you may join or

24   drop out of, do you anticipate there being any substantive

25   changes to your C.V. in the coming months?

1      A.   Nothing that would be applicable to the details of

2   this case, no.

3      Q.   Okay.  And looking at Page 18, so the first page

4   of your C.V., it lists your academic credentials, your

5   education; is that correct?

6      A.   That is correct.

7      Q.   And those -- the C.V. reflects that you obtained

8   your undergraduate degree in zoology in 1988 from the

9   University California at Berkeley; is that correct?

10      A.   That is correct.

11      Q.   And then immediately thereafter, from 1988 to

12   1992, you attended medical school and then obtained your

13   medical degree from University of California, San Diego; is

14   that correct?

15      A.   That is correct.

16      Q.   Okay.  And then immediately thereafter completed

17   an internship in the Department of Surgery also at

18   University of California, San Diego; is that correct?

19      A.   That is correct.

20      Q.   And then completed a residency in the Department

21   of Emergency Medicine at that same facility; is that

22   correct?

23      A.   That is correct.

24      Q.   And can you -- and then the last item listed under

25   education is described as Physician Leadership Academy,

1     again also at the San Diego Medical Center from 2007 to

2     2009; is that correct?

3          A.   That is correct.

4          Q.   Can you explain what that item on your -- on your

5     C.V. entails?

6          A.   Sure.  It was a two-year program put together by

7     the University of California, San Diego School of Medicine

8     to educate potential and future or ongoing leaders in

9     preparing them to be, I guess, more in the leadership roles

10    at the University School of Medicine and Health Center.  So

11    it was a course going over budgets and collaboration and all

12    that type of thing.

13         Q.   Fair to say that that was leadership training and

14    sort of training designed toward the administrative aspect

15    of your position as opposed to substantive medical training?

16         A.   Yes.  It was not medical training, it was more

17    leadership and administrative work.

18         Q.   Okay.  And you are a licensed medical doctor in

19    the State of California; is that correct?

20         A.   That's correct.

21         Q.   Have you ever held licensure in any other

22    jurisdiction other than California?

23         A.   I have not.

24         Q.   Okay.  And in addition to that general licensure

25    as a medical doctor, you also have two areas of board

1    certification listed on your C.V.; is that correct?

2         A.   That's correct.

3         Q.   And so you have a -- a 1993 board certification

4    listed with the National Board of Medical Examiners; is that

5    correct?

6         A.   That is correct.

7         Q.   Is that -- Do you currently hold that board

8    certification or has that lapsed?

9         A.   So just to make sure we're on the same page,

10   that's an examination we have to take at the end of medical

11   school as part of our -- after our internship to move

12   forward to get licensed.  So it's not a board specialty, if

13   that makes sense.  It's board certification.

14        Q.   Understood.  So that doesn't provide you any

15   credential as a -- as a specialist in any particular area,

16   that was just part of the process of transitioning from

17   medical school to the practice of medicine?

18        A.   That's a fair -- fair assessment, sure.

19        Q.   Okay.  And then underneath that, it lists the

20   American Board of Emergency Medicine with board

21   certification in 1997 and then renewed every ten years

22   thereafter, most recently in 2017; is that correct?

23        A.   That is correct.

24        Q.   And can you explain what that board certification

25   signifies?

1    A.   Sure.  I am trained in emergency medicine is my

2    specialty.  And so after you finish your training, you have

3    to pass a written and oral boards to get certified as a

4    board certified emergency physician, which is what happened

5    in 2000 -- in 1997.  And then every ten years, we have to

6    recertify with a written examination, which is what happened

7    in 2007 and 2017, to keep my board certification in

8    emergency medicine contemporary.

9    Q.   What is emergency medicine?

10    A.   In, I guess, a nutshell, it's the care of patients

11    in the emergency department.  It sort of would take care of

12    all comers, obviously, from pediatrics to geriatrics,

13    obstetrics, all kinds of acute emergencies, subacute

14    emergencies, and even some chronic diseases that end up

15    there.  So, it's sort of the -- the care of emergency

16    department type patients I guess would probably be the

17    easiest way to look at it.

18    Q.   I guess from a layperson's point of view, you're

19    specialized in seeing the people that would come into an

20    emergency room at a hospital; is that fair to say?

21    A.   Probably the easiest way to put it, sure.

22    Q.   Okay.  And based on your description as a -- would

23    you -- strike that.

24         Based on the description you just gave, would it

25    be fair to say that as compared with some other medical

```
1    specialties, a board certification specialization in

2    emergency medicine has a pretty broad scope in terms of the

3    types of patients and types of conditions that you would see

4    on a regular basis?

5         A.   We do see a lot more broad type patients than say

6    a cardiologist might or a neurologist, sure.

7         Q.   Okay.  And then fair to say that in the course of

8    your practice of that medical specialty, you're frequently

9    in the position of referring patients on to or passing

10   treatment of patients on to specialists in -- in a wide

11   variety of other areas depending upon the particulars of the

12   condition that the patient is suffering?

13        A.   We do use consultants, sometimes for additional

14   information, sometimes to admit the patient or, I guess,

15   pass them on as you sort of described.  And sometimes we end

16   up being the end user and provider for that patient as well

17   so --

18        Q.   Okay.

19        A.   -- that's the case.

20        Q.   So if I understand -- if I understood the

21   distinction or clarification you were making, there would be

22   certain situations where you as the specialist in emergency

23   medicine would be -- would continue as the primary treating

24   physician but would consult with an expert in a different

25   specialty, and there would also be times when you would pass
```

Gary Michael Vilke, M.D.

```
1    the care on to a specialist and a patient would sort of

2    transition on to the care of that specialist and that would

3    end your role in that patient's treatment; is that fair to

4    say?

5         A.   Those both do happen in my field, yes.

6         Q.   Okay.  Other than your board certification in

7    emergency medicine -- well, strike that.

8              You -- you -- Your C.V. reflects that you

9    completed your internship from 1992 to 1993 in the

10   Department of the Surgery; is that correct?

11        A.   That is correct.

12        Q.   Do you hold any specialists certifications in --

13   in the area of surgery?

14        A.   Nothing beyond the training that I received as an

15   intern.

16        Q.   Okay.  And then you completed your residency

17   within the Department of Emergency Medicine; correct?

18        A.   That is correct.

19        Q.   And that aligns with your current board

20   certification?

21        A.   That's what enabled me to be board certified in

22   that, yes.

23        Q.   And outside of the one-year internship in the

24   Department of Surgery, do you have any specific medical

25   training or medical certification beyond the area of
```

Page 24

1  emergency medicine?

2      A.   So certification, no.  Other than I've had some

3  advanced cardiac life support, advanced trauma life support

4  training.  And as far as education, though, we educate on a

5  constant basis.  So we have conferences and trainings weekly

6  actually.  So, I'm being trained by neurologists or

7  cardiologists or trained by, you know, other emergency

8  physician specialists on certain disease processes or

9  medical conditions.

10     **Q.   And the ongoing training that you just described,**

11 **is that something that is typical of every licensed**

12 **physician or is that some -- something specific, some**

13 **specific additional course of ongoing training that you have**

14 **taken on?**

15     A.   Umm, all physicians have to do some sort of

16 continuing medical education.  So there's certain

17 requirement for, again, cardiologists, neurologists,

18 emergency physicians on an annual basis.  Since I work at a

19 academic medical center, we have training for our residents

20 and medical students once a week.  So we end up doing a lot

21 more training, a lot more education on an ongoing basis

22 than -- your question is asking for the average physician,

23 so I think we're much more frequently getting educated or

24 updates in the medical field compared to the average

25 physician or even average emergency physician nationwide.

1      Q.   And that's because of the specific nature of the

2   institution where you hold your appointment; is that

3   correct?

4      A.   Of -- most educational institutions do that.  Most

5   doctors are not affiliated with an institution like this,

6   they're private practice.  And so that's I think the

7   differentiation.

8      Q.   Okay.  Turning to the next page of your résumé, so

9   that's Page 19 and the second page of Appendix A, that

10   reflects your -- your current appointments; is that correct?

11      A.   That's -- yes, that would be correct.

12      Q.   And have any -- Have any of these changed since

13   your report was disclosed?

14      A.   They have not changed, no.

15      Q.   Okay.  And do you anticipate any of these changing

16   in the upcoming number of months?

17      A.   I do not.

18      Q.   Okay.  Unlike a résumé that I might be familiar

19   with or what I might have myself, I only have one sort of

20   current job listed.  It looks like you've got six different

21   appointments that are all sort of to the present day; is

22   that correct?

23      A.   There are six listed on this section of the --

24      Q.   Okay.

25      A.   -- appointments, yes.

1    Q.   Without kind of oversimplifying your -- your

2    varied job responsibilities, is there one of those that sort

3    of would be considered your -- your main job?

4        A.   Well, my -- my main job is the -- is being a

5    Professor of Clinical Emergency Medicine.  I am an ER

6    physician, and so that's an appointment through a School of

7    Medicine to be at the University.  So that's -- I guess that

8    would be my main job.

9        Q.   Okay.  And that's the one that's listed first on

10   your C.V. that you have since September 2011; is that

11   correct?

12       A.   That is correct.

13       Q.   Okay.  And what are your job duties as Professor

14   of Clinical Emergency Medicine and Professor of Medicine at

15   University of California, San Diego School of Medicine?

16       A.   So I guess in summary, we -- we're -- we work as

17   clinical professors.  And so I work in the Emergency

18   Department taking care of patients, that's my primary role.

19   But we also have the mission of education for students and

20   residents and other -- other trainees.  We have the role of

21   having some research, sort of one of our pillars.  And then

22   community service, serving on committees or other -- other

23   groups such as that.  So those are the -- the main

24   categories that fall under being a professor at the School

25   of Medicine.

1    Q.   Approximately how many hours per week do you spend

2    completing your job duties related to that particular

3    position?

4        A.   That's going to be very difficult to separate out

5    because some of my job descriptions will overlap with other

6    of my missions there.  Meaning if you're going to go through

7    each of the six of them and try to separate numbers of

8    hours, it's going to be difficult for me.  Part of my

9    education, for example, with the second line, the Joint

10   Powers Authority with the EMS providers, I'm educating and

11   I'm also medical directing and there's overlap.  But my

12   workload for the week encompassing my University service and

13   these appointments is probably about 60 hours a week on

14   average I put into it.

15       Q.   Okay.  And so that 60 hours a week on average

16   encompasses all six of those appointments, is that -- am I

17   understanding you correctly?

18       A.   That's fair, yes.

19       Q.   But based on that sort of interlocking nature of

20   those positions, it would be hard for you to break that 60

21   hours down into "X" number of hours for Item 1, a different

22   number for Item 2; am I understanding you correctly?

23       A.   That is correct.

24       Q.   Okay.  Well, perhaps then it would be most helpful

25   for me if we could go through those -- those other

1    appointments to help me understand them better and -- and

2    how they relate to each other.  So, turning to that second

3    appointment on your list, you serve as Medical Director of

4    the North County Dispatch Joint Powers Authority; is that

5    correct?

6         A.   That is correct.

7         Q.   What is the North County Dispatch Joint Powers

8    Authority?

9         A.   It is a collaboration amongst 19 agencies in the

10   North County of San Diego, EMS fire agencies.  So a number

11   of cities and regions as well as two dispatch centers have

12   coordinated to form this Joint Powers Authority.  And they

13   have basically hired me as one of their two medical

14   directors to help with medical direction of their sites.

15        Q.   When you say "medical direction of their sites",

16   can you explain what you mean by that?

17        A.   Sure.  Many of them are city fire departments, the

18   City of Oceanside or Carlsbad or San Marcos.  They did not

19   have medical directors specifically for their cities, they

20   use the default of the County Medical Director as their sort

21   of medical director on paper.  They have decided that as a

22   group they wanted to have independent medical direction that

23   gives them a little bit more freedom to do certain protocols

24   and pollices that didn't have to go through the County

25   Medical Director.

1          So, I serve as one of the two to review policies,

2     practices, quality assurance, help them with difficult

3     cases, do education and training, and that type of thing.

4       Q.   Okay.  And if I understood you correctly, you've

5     described those as, I think, fire -- fire departments and

6     EMS providers; is that correct?

7       A.   Fire departments, EMS providers, and two dispatch

8     agencies, so they dispatch --

9       Q.   Dispatch agencies, okay.  And so in terms of the

10    provision of medical care associated with those different

11    entities, fair to say that there is no facility where

12    medical care is provided, like in a clinical setting

13    associated with any of those; is that correct?

14      A.   Yeah, they're not -- it's not a building that you

15    take patients to.  They are fire departments or areas where

16    you dispatch from to go and take them to another hospital.

17      Q.   Right.  And this is probably one of those areas

18    where a layperson asking you this question in conversation

19    would cut to the chase much simpler and quicker than a

20    lawyer would.  They'll probably -- from that perspective.

21    But essentially the -- the provision of medical care through

22    those entities is -- essentially would be out in the field

23    and responding to some emergency call; is that fair to say?

24      A.   Yes, prehospital or out of hospital care.

25      Q.   And then depending on the nature of the call, the

1    provision of care might end in the field or it might result

2    in transportation to a hospital which would be a clinical

3    setting under a different jurisdiction than the EMS or fire

4    or dispatcher, fair to say?

5         A.   That's a fair statement, sure.

6         Q.   And so in terms of your role as medical director

7    for the joint -- the Dispatch Joint Powers Authority, you

8    are not medical director overseeing a facility providing

9    medical care; correct?

10        A.   That is correct.  The dispatch -- dispatch are the

11   facility.  They have all the radio rooms, the actual

12   facility.  But it's not a medical care providing facility

13   other than any over-the-phone direction.

14        Q.   Understood.  What -- So what are your job duties

15   as medical director given the -- given the nature of that

16   particular entity?

17        A.   The Joint Powers Authority you mean?  I think I --

18        Q.   Correct.

19        A.   -- I think I said a little bit earlier about that.

20   It's medical oversight, looking at policies and procedures,

21   quality assurance, education, taking care -- talking about

22   difficult cases or challenging cases.  You know, part of it

23   may be using my DEA license for them to be able to prescribe

24   certain -- or purchase certain medications for their

25   systems, things like that.

1    Q.   Okay.  If I understand -- if I understood the

2   description you just gave, but please correct me if I'm

3   wrong, there would -- there would -- a certain aspect of

4   that is -- is the prospective in terms of helping to set the

5   policies and procedures that guide how those entities and

6   those individual providers, those individual employees go

7   about providing medical care through EMS or fire; is that

8   fair to say?

9    A.   In part, yes.

10   Q.   And then there's an aspect that is a retrospective

11   if there's a need to review how a certain incident was

12   responded to, how certain care was provided, that you would

13   play a role in that sort of retrospective aspect; is that

14   fair to say?

15   A.   That can happen as well, sure.

16   Q.   Okay.  Do you have any role as medical director in

17   overseeing or consulting sort of during these provision of

18   emergency medical care by any of the providers through

19   those -- through those entities?

20   A.   In general, they're not going to call me during

21   a -- an on-scene call.  They will call a base hospital for

22   that.

23   Q.   Okay.  Any aspects of that position beyond the

24   overview that -- that you've testified to?

25   A.   There's always the duties as a side component of

 1    things, but for the most part, that's the areas that I spent

 2    most of the time with that -- that role.

 3         Q.   Okay.  And how did that role relate to your

 4    position, what we've described as your main -- your main job

 5    or your primary position as the Professor of Emergency

 6    Medicine at the University of California?

 7         A.   Sure.  There's certainly the aspects of education.

 8    We have an EMS fellowship that I help train our EMS fellow

 9    with.  We have EMS residents rotating, part of that would be

10    education for them.  The lecturing is part of my -- my

11    teaching and training aspect.  This also tends to fall under

12    the -- the community service aspect of my professorship.  So

13    it's sort of -- it falls into the line of those types of

14    activities, not just the medical care aspect of it, albeit

15    often retrospective in reviewing cases.

16         Q.   Okay.  And then turning to the third item on

17    your -- the list of appointments, you serve as Vice Chair of

18    Clinical Operations at the UC San Diego Department of

19    Emergency Medicine; is that correct?

20         A.   That is correct.

21         Q.   And can you explain what that position entails?

22         A.   Sure.  Our department has a Chair who is sort of

23    responsible for everything under emergency medicine.  And

24    then they have three Vice Chairs to help sort of diffuse out

25    some of the labor and work:  A Vice Chair of Education, a

1    Vice Chair of Academic Affairs, and a Vice Chair of Clinical

2    Operations.  I serve as the Vice Chair of Clinical

3    Operations.  So under that area is really anything that is,

4    I guess, clinically relevant for the operations aspect of

5    the hospital.

6            So, I oversee the medical direction at both of our

7    emergency departments in San Diego as well as the emergency

8    department we staff out in El Centro.  We have two urgent

9    cares that I oversee the medical direction of.  I interact

10   with other services with regards to policies, procedures,

11   guidelines.  I oversee some of the aspects with regards to

12   information technology, updates, and changes in our medical

13   records.  It's a -- it's a fairly broad role.  Everything

14   from a -- a complaint from a patient to a -- an issue with

15   the care between services to, you know, compliments and

16   positive feedback to my staff.  So it's sort of a very broad

17   role.

18       Q.   And if I understood that description correctly,

19   that essentially involves you having a leadership role over

20   the Department of Emergency Medicine, which is the

21   department in which you also practice as a -- essentially a

22   line-level emergency room doctor as well; is that correct?

23       A.   I mean, in -- in the simplest form, sure, that's a

24   leadership role with a clinical aspect.

25       Q.   Okay.  The -- the next item on your list of

1    appointments is your position as Assistant Director of the

2    Division of Emergency Medical Services, slash, Disaster

3    Medicine at UC San Diego Medical Center; is that correct?

4        A.   That is correct.

5        Q.   Can you describe what that position entails?

6        A.   Sure.  In our department, we have a number of

7    divisions:  Division of Toxicology, Division of Hyperbaric

8    Medicine, Division of Ultrasound Medicine.  One of the

9    divisions is EMS and Disaster Medicine.  I served as the

10   chair for a number of years of that division.  And then I

11   stepped down to allow one of my -- our junior colleagues to

12   take that leadership role.  So now I serve as the -- I guess

13   the Vice Chair, Assistant Director of that division.

14       Q.   Okay.  And is that a -- sort of a

15   subspecialization or particular focus within the field of

16   emergency medicine that you have chosen to focus on at the

17   Emergency Medical Services/Disaster Medicine aspect of

18   things?

19       A.   That is a subspecialization in emergency medicine

20   and I do have experience and training in that, yes.

21       Q.   Okay.  Are there any sort of formal certifications

22   that you -- you hold connected with any subspecialization

23   within emergency medicine?

24       A.   I do not.

25       Q.   Okay.  But sort of as a practical matter, that's

Gary Michael Vilke, M.D.

1   an area where you have focused a significant amount of your

2   professional time and professional training; is that fair to

3   say?

4        A.   That's fair to say, sure.

5        Q.   Are there other subspecializations other than --

6   sorry, strike that.

7             The subspecialization is in Disaster Medicine; is

8   that correct?  Or is it Emergency Medical Services, slash,

9   Diaster Medicine?

10       A.   It's Emergency Medical Services, slash, Diaster

11  Medicine.  We sort of -- sort of keep them together in a

12  sense.

13       Q.   Okay.  And can you describe a little bit more

14  what -- what exactly that entails as a subspecialization

15  within emergency medicine?

16       A.   Sure.  In many ways the roles that we described

17  earlier under the Joint Powers Authority, it is working with

18  prehospital providers, working with protocols, policies,

19  procedures, quality assurance, education, that type of thing

20  in the field of the Emergency Medicine Services -- Emergency

21  Medical Services.

22             Disaster Medicine is a part of that, so the idea

23  of response to major events, field set-ups, triaging for

24  mass casualty events, staging for large proactive events

25  such as marathons or large concerts, that type of thing also

**Page 36**

1    rolls into this area.

2        Q.   Are there other subspecialties within the field of

3    emergency medicine that you either currently focus in -- on

4    or have in the past spent a significant portion of your

5    professional career focusing on?

6        A.   So, we have a division of emergency medicine

7    research, it's -- it -- I do a lot of work with that.  I've

8    participated in that for many years.  So, it's not

9    necessarily a subspecialty that is like toxicology or

10   hyperbarics, but it is noted.  So just to answer your

11   question, I engaged in that.

12       Q.   Okay.  Other than that addition, any other

13   subspecialties that you either currently or previously

14   had -- had focused -- focused on?

15       A.   Not particularly focused on, other than -- not, I

16   guess, recognized areas of -- you know, of emergency

17   medicine, but I've obviously put a number of years in my

18   career into the area of in-custody deaths and the

19   physiologic effects of use of force.  It's not a formalized

20   subspecialty, but it's an area of training and education

21   I've been involved in.

22       Q.   Anything else fitting within the -- the bounds of

23   my previous question beyond what you've already testified

24   to?

25       A.   Not in the field of emergency medicine I can think

```
 1    of, no.

 2         Q.   Okay.  Anything outside of the field of emergency

 3    medicine that you -- you focused on?

 4         A.   It's sort of a very broad question.  Look at the

 5    sub -- subspecialty of emergency medicine was the original

 6    question obviously --

 7         Q.   Sure.

 8         A.   -- get down to Number 6, Risk -- or Number 5,

 9    which is Risk Management.  It's outside the area of

10    emergency medicine, but it's within the walls of the

11    hospital and -- and administration, so I'm obviously focused

12    on that as well.

13         Q.   And so that, intended or not, is a good segue to

14    the next item on your list of appointments.  And so you were

15    referencing the position you hold as Medical Director of

16    Risk Management at -- within the UC San Diego Health System;

17    is that correct?

18         A.   That is correct.

19         Q.   And can you describe what that position entails?

20         A.   Sure.  Originally, we had all of our claims and

21    lawsuits and malpractice cases go to the Department of Risk

22    Management at our facility.  There was really no physician

23    involvement in the early forms of cases.  It would come to

24    risk management committee at some point for evaluation, but

25    that was a small minority of cases.
```

```
 1            And the health center thought it would be a
 2    prudent idea to maybe have a clinician reviewing cases when
 3    they first came in and determine, you know, is there -- is
 4    there concern for it or is it, you know, standard of care
 5    appears to have been met type of an evaluation early on.
 6    And so they brought me in as a physician with sort of a
 7    broad-based experience in medicine to serve that role.  And
 8    then it comes with the title the Medical Director of Risk
 9    Management.
10        Q.   And just -- I think you used a terminology
11    "reviewing cases" that came in.  Are you referring to sort
12    of lawsuits or claims that are filed or are you referring to
13    pre- -- you know, potentially prelitigation but a situation
14    arises where there's some concern about whether standard of
15    care was met and then you're reviewing it at that stage?
16        A.   Sure.  I think it's all the above.  I review
17    claims and lawsuits when they get filed, but I also review
18    we call potential medical issues is what we call -- or
19    potential areas of problems, you know, complications or
20    unexpected deaths in the hospital.  And so they get reviewed
21    at certain committees, but sometimes they get pushed over to
22    Risk Management to sort of keep an eye on and evaluate.
23        Q.   Okay.  And what is -- So what is the -- the end
24    result of your evaluation?  So what is the -- the purpose of
25    that role that you serve in that position?
```

1       A.   It depends on the particular case.  It may be a

2   review that says I think this, you know, claim is without

3   merit.  I think the standard of care was met.  We still may

4   get outside experts to review.  We may use our internal peer

5   review process.  We may wait to see if a formal suit is

6   filed.  So it depends on the particular aspects of the case.

7   Or if it's a case where I think we have significant

8   vulnerability because we did deviate from the standard of

9   care, we may utilize that input to think about early

10  resolution.

11      Q.   And we had segued into this topic by talking about

12  risk management being another focus of yours that is not

13  a -- that is not considered a subspecialty of emergency

14  medicine; is that correct?

15      A.   That is correct.

16      Q.   And perhaps this is a -- an artificial

17  distinction, but would it be fair to say that in your role

18  of risk management, that's not -- that's not an aspect of

19  the practice of medicine per se in terms of treating

20  patients, it's more on the administrative side of things?

21      A.   A lot of medicine is administrative, and this is

22  one of those such areas, yeah.  But it's not clinical

23  practice.

24      Q.   For example, there's no board certification

25  available in risk management?

1      A.   Not to my knowledge.

2      Q.   Okay.  And then the last position listed, and

3  appears to be your longest held position since July of 1994

4  as Base Hospital Physician at University of California

5  Medical Center; is that correct?

6      A.   It's as listed there, yes, is my longest position.

7  Just for point of clarification, the top one, the professor

8  role is from 2011 till present.  That's when I became a full

9  professor.  I was an assistant and associate professor in

10  the School of Medicine since the same time, 19 -- actually

11  started 1996.  So, it would still be my longest position,

12  but it's -- it's similar to the other one.

13      Q.   Understood.  And I -- I appreciate that

14  clarification.

15           Can you explain what the Base Hospital Physician

16  role entails?

17      A.   Sure.  Our hospital is a base hospital for

18  paramedic -- or is a paramedic base hospital I guess

19  probably a better way of putting it.  So if the paramedics

20  need to get medical direction, we talked about earlier they

21  would not call the agency medical director, they would call

22  a base hospital.  And so while I am working in the hospital,

23  I am -- I have been trained and passed some County tests to

24  be a Base Hospital Physician.  And so that first passage was

25  in 1994 and I have been in that role ever since.  So, it's

1    an appointed role from the County to say that we are allowed

2    to give medical direction to paramedics.

3         Q.   Okay.  And are there a number of individuals

4    who -- who serve as Base Hospital Physicians at any given

5    time?

6         A.   All of our faculty are trained to be Base Hospital

7    Physicians because any time they are working, they may have

8    to give medical direction.  And our senior residents also

9    get trained to be that, so they can do that role in their

10   last two years of training.

11        Q.   Okay.  And if I understood your description of the

12   position correctly, essentially that position entails if

13   there is an issue that emergency medical providers out in

14   the field feel like they need some direction or want to

15   consult with a medical doctor, that they could contact you

16   and obtain your input in the situation that they're

17   encountering out in the field; is that fair to say?

18        A.   That's one such potential role.  Probably the more

19   common role is that certain protocols require a Base

20   Hospital Physician order to do it.  So they can do things on

21   standing order, they can do things based on the mobile

22   intensive care nurse order, but certain things they want a

23   physician to be involved in before giving that order.  So

24   that's what we would be involved in that.

25        Q.   Okay.  So not necessarily like an open-ended, "We

1    need your help, we need a consultation," but just "this is

2    what we think needs to happen, and we need a base physician

3    to sign off on it according to the protocols"; am I

4    understanding you correctly?

5         A.   Typically, there's an ask.  They want to give a

6    certain medication that may be restricted or it could be

7    something that is outside the norm.  That's probably going

8    to be a minority of the cases.  Sometimes it's pronouncement

9    in the field for the cardiac arrest.  They can't pronounce

10   themselves, they have to have a physician to give that

11   order.  So those types of things.

12        Q.   Understood.  And those six different appointments

13   that you hold, in terms of the physical work location while

14   you're working on those different roles, fair to say that

15   the majority of those, the majority of your time would be

16   physically on the campus of the UC San Diego School of

17   Medicine?

18        A.   It would have been maybe if you asked the -- asked

19   me a year ago.  With the COVID restrictions, the only work

20   that I'm really doing on-site for the most part is my

21   clinical work in the emergency department and a few meetings

22   here and there.  A lot of my work is administrative with

23   meetings, so yes, it used to be on campus, now it's a lot by

24   Zoom.

25        Q.   Understood.  I appreciate that clarification and

1    obviously we're following similar protocols here today

2    with -- with at least some of the parties in terms of your

3    deposition.  But in terms of the -- I guess to ask it a

4    different way, there is not, like, a long list of different

5    facilities that you would typically be physically present in

6    to accomplish these different roles, generally speaking

7    those are all out of the UC San Diego facility?

8        A.   Umm, I work at both emergency departments in San

9    Diego, both Urgent Cares in San Diego and I have an office

10   on -- at the Med Center that I have a lot of my meetings at.

11   But a lot of the work is done offline at -- in my home

12   office via email or phone or conference call.

13       Q.   Those -- So those are the six appointments that

14   you list on your C.V.  Are there any other appointments

15   or -- or jobs that you hold that aren't listed there?

16       A.   Well, appointments, I sort of -- I guess I hold --

17   I think these are roles that I've been put into.  Jobs,

18   that's a much broader topic.  I give lectures.  I do

19   continuing education lectures.  Obviously consulting is a --

20   is a job, but it's not necessarily a University-based job,

21   so it's not on my C.V.

22            So it varies.  I think it depends on what you mean

23   by jobs.  I mentor people.  I do research with the -- the

24   international program at UCSD.  So I have a lot of different

25   other roles that probably aren't captured on these six

1    positions, but it would be captured in my -- under my role

2    of Professor of -- of Emergency Medicine.

3        Q.   Got it.  And maybe -- I appreciate that, that

4    clarification.  The six roles that are listed on your C.V.,

5    are those sort of six independently paid positions or is

6    there sort of one main position which your, you know,

7    employment compensation is attached to and the others are

8    sort of leadership roles that may not be separately

9    compensated?

10       A.   A little of both, I think.  The -- the -- my

11   paycheck comes from the University in my role as the

12   Professor of Emergency Medicine.  There are some stipends

13   that are associated with some of the other positions that

14   would get paid through the University and come out in that

15   paycheck, if that makes sense.

16       Q.   Sure.  So kind of like a bump or top up in pay to

17   reflect the additional responsibilities you're taking on for

18   some of those appointments; is that fair to say generally?

19       A.   Yeah, yeah.  They call it a stipend, yes.

20       Q.   And you had mentioned, I think, consulting as

21   another job that you perform that's not listed on your list

22   of appointments; fair to say?

23       A.   That is fair to say.

24       Q.   And that's something that you're compensated for

25   separately as opposed to through the paycheck through the

1    University that is calculated to include the various roles

2    you have; is that correct?

3         A.   It's not part of my base compensation from the

4    University as far as that goes, no.

5         Q.   Other than the -- the appointments that you have

6    listed there and your work as a consultant in litigation

7    matters, are there any other sources of paid compensation --

8    or paid employment, rather, that you have?

9         A.   I do some continuing education work where I get

10   paid to give conference lectures intermittently, but not --

11   it's not a significant source of income.

12        Q.   Okay.  Those are not compensated through the

13   University, but you're sort of compensated directly as a

14   lecturer on a fee-for-service basis; is that fair to say?

15        A.   That's fair to say, sure.

16        Q.   Okay.  Would it be fair to say that that's less

17   frequent than on a weekly basis that you would engage in

18   that kind of paid employment, lecturing at -- lecturing for

19   pay through, you know, continuing education, something like

20   that you were just describing?

21        A.   Yes.  It's definitely less frequent than weekly.

22        Q.   Okay.  What about your work as a consulting expert

23   in litigation, is that something that you engage in in a

24   number of hours on a weekly basis?

25        A.   It varies depending on, you know, cases,

1    availability, you know, it's our whole -- I guess it would

2    be a waxing and waning depending on what's going on.  A

3    little more work this week because preparing for deposition

4    and stuff, but weeks past in this case, it would be maybe

5    less work.  So it depends.

6        Q.   Can you give an approximation of the amount of

7    time that you would spend either -- you know, on average in

8    a week or if, you know, an average month is easier for you

9    to give an approximation, but some approximation of the

10   amount of time that you devote to your work as a consultant

11   for --

12       A.   It's -- again, sort of waxes and wanes depending

13   on cases and things like that and what's going on with them.

14   I -- it's probably about 10 percent of my -- 10 percent of

15   my professional time, if you want to sort of go from those

16   types of numbers, that would probably be a reasonable

17   estimate.

18       Q.   And then so it's approximately 10 percent of your

19   professional time.  In terms of your -- your annual

20   compensation from all sources, approximately what percentage

21   would you say you derive from your work was a consulting

22   expert?

23       A.   Best estimate would be somewhere around 20 percent

24   of my income probably comes from that.

25       Q.   Okay.  And in an average year, and I imagine just

```
 1   like the time waxes and wanes, the amount waxes and wanes

 2   per year, but what would you say on an average year is your

 3   total compensation from your work as a consulting expert?

 4        A.   And I don't have good numbers for that.  I just

 5   turn everything over to my tax consultants, so I don't have

 6   numbers to be able to provide.

 7        Q.   Okay.  You're not able to -- to give any

 8   approximation of that?

 9        A.   I wouldn't feel comfortable doing that because I

10   really don't know the numbers to that level.

11        Q.   Okay.  But it's -- it's approximately 20 percent

12   of your total compensation?

13        A.   It's -- that's an estimate.

14        Q.   A rough estimate?

15        A.   A rough estimate, yeah.

16        Q.   So what -- what is your total annual compensation

17   from all sources?

18        A.   That I don't know as well because I have 1099

19   income, I have University income.  Again, I provide all that

20   to my tax person, he tells me how much I owe at the end of

21   the year, so I don't really go into gross and net and things

22   like that, unfortunately.

23        Q.   You're not able to ballpark your approximate

24   annual compensation from all sources?

25        A.   I'm really not able to, no, unfortunately.
```

1        Q.    Okay.  Do you know what your approximate annual

2    income is solely from -- through your University employment?

3        A.    I don't, because it changes year to year depending

4    on my stipends and my roles and things like that, so I -- I

5    don't know the actual numbers for that.

6        Q.    Okay.  Are you able to give an approximation of

7    that?

8        A.    I know it's over 300,000, but I don't know if it's

9    significantly more than that or not.  I can give you that

10   much at least.

11       Q.    Over 300,000 and fair to say less than 400,000?

12       A.    I don't know that, that's the problem.  I -- I got

13   the recent contract for the JPA.  They have a certain cut

14   they take out of it.  The Dean's office takes a cut.  I know

15   the dump number is there, and then it gets put into my

16   income as a Z-component, which I have no idea where that

17   comes from.  And so that -- that's the problem, it changes.

18   And then if I add another role on on a new committee that

19   may have some stipend, it gets up in there.  So it changes

20   on a regular basis, so I don't really keep tabs on that.

21       Q.    When you said the contract with the -- GPA, did I

22   hear you correctly?

23       A.    The JPA, uh-huh.

24       Q.    JPA.

25       A.    Uh-huh.

1    Q.   And can you explain what that is?

2    A.   That's the North Zone Joint Powers Authority we

3    talked about earlier.

4    Q.   Okay.

5    A.   They contract through the University for my

6    services.  So they put the money to the University and the

7    University again sort of taxes it to some level and it gets

8    put into my account.  So that's sort of where the gross

9    numbers versus net numbers are very difficult to follow.

10    Q.   So they -- the JPA pays the University for your

11    services and you receive -- you personally receive a portion

12    of that, but not 100 percent of that amount?

13    A.   That is correct.

14    Q.   Okay.  Okay.  Other than the certification in

15    emergency medicine and the other roles that we've just

16    discussed going over your background, are there any other

17    specialties or special areas of focus within the field of

18    medicine, whether formally certified as a specialist or with

19    an informal focus or specialty beyond what you've already

20    testified to?

21    A.   I think that covers the majority of those areas,

22    yeah.  I mean, I've done airway medicine, you know, did a

23    lot of research in airway management.  But again, it's a

24    focus of my research over a period of time.  So again,

25    it's -- you can get sort of -- agitation's been an area of

1    my focus, psychiatric emergencies.  But again, not

2    certified, but I have a number of book chapters or -- or

3    papers and publications on those sort of smaller areas.

4           And I don't know how granular you want to get, but

5    I've done cardiac arrest research, I've been funded for

6    that.  But again, it's -- it can be get very granular as far

7    as my career.

8    **Q.    Those are sort of areas of focus within the field**

9    **of emergency medicine; is that fair to say?**

10   A.    They are, yes.

11   **Q.    Okay.  And fair to say that, for example, focusing**

12   **on -- on cardiac arrest research within the field of**

13   **emergency medicine, isn't equivalent to a full-blown**

14   **specialist certification as a cardiologist, for example?**

15   A.    It's certainly not a board certified cardiology

16   position as far as that goes, no.

17   **Q.    Okay.  You don't hold any other board certified**

18   **positions or hold yourself out as a certified specialist in**

19   **any area other than emergency medicine; is that fair to say?**

20   A.    As far as certifications, that's correct.

21   **Q.    Okay.**

22   A.    Maybe I'll -- just to clarify that, board

23   certifications.  You know, I've been certified in other

24   areas of advanced cardiac life support, pediatric advanced

25   life support, but I want to make sure we're on the same

1    page.

2        Q.   Understood.  And would -- would those

3    certifications you were describing there be considered

4    certifications on areas of medical practice that are -- fall

5    within the scope of your work as -- as a certified

6    specialist in emergency medicine?

7        A.   They fall into that world as -- yes, of emergency

8    medicine, but they also fall into the world of cardiologist

9    and critical care physician, so I just wanted to --

10       Q.   Sure.

11       A.   -- just wanted to make sure it was clear.

12       Q.   And again -- sorry, I didn't mean to cut you off.

13       A.   I just wanted to -- when you use the word

14   "certification", it's a -- you know, it's a certification --

15   you know, you get a certificate on the wall type of thing,

16   but it's not a board specialty certification.

17       Q.   Understood.  And I guess this sort of touches on a

18   point that we had made earlier, but sort of inherit in the

19   nature of your board certification in emergency medicine,

20   that there is going to be overlap between areas that you

21   focus on and other formal specialties; is that fair to say?

22       A.   That is fair to say.

23       Q.   Okay.  But it's not a -- that certification within

24   emergency medicine is not equivalent to a formal board

25   certification in any of those other areas; is that fair to

1   say?

2       A.   Correct.  I do a lot of work with cardiology and

3   take care of a lot of cardiac patients, but I am not board

4   certified in cardiology.

5       Q.   Okay.  And that's not to -- a mere technicality

6   that you haven't undergone that process, but you -- you

7   would agree that the -- that certification be done within

8   the field of emergency medicine aren't substantively

9   equivalent to full-blown board certification as a cardiac

10  specialist, for example?

11      A.   For the full areas of cardiology in which they

12  operate, no, that is correct.  For emergency cardiology, we

13  do a lot of the management of their patients, but I don't do

14  caths or I don't do ongoing management of their patients in

15  clinic basis type of things, correct.

16      Q.   And same for other areas where you may have a -- a

17  specific focus within the field of emergency medicine, that

18  would not be equivalent to the full-blown board

19  certification in -- in another specialty; correct?

20      A.   Other than we talked about the EMS work in

21  emergency medicine, that is correct.

22      MR. HEPPELL:  Can we go off the record and take a

23  ten-minute break?

24      MR. STEPHENSON:  Okay.

25      MS. POLLACK:  That's fine with me.  Whatever you guys

1    want.

2        MR. HEPPELL:  All right.  So I'll pause the recording

3    here.  It's a quarter after now, so come back at 25 after

4    10:00 where you are; is that right?

5        THE WITNESS:  Perfect, yes.

6        MR. HEPPELL:  Okay, great.  Thank you.

7        MR. STEPHENSON:  Thanks.

8        MS. POLLACK:  Okay.

9            (An eleven-minute break was taken at 10:15 a.m.)

10   BY MR. HEPPELL:

11       Q.   We can go right back on the record.

12            Dr. Vilke, I want to turn to Page 2 of Exhibit A

13   which is the report that you have in front of you.  That

14   starts out the -- the list of the materials that you have

15   reviewed; is that correct?

16       A.   That is correct.

17       Q.   And you have split that -- the Materials Reviewed

18   section into two different categories.  You've got a

19   Category A labeled Medical and Scientific Literature, and a

20   Category B labeled Case-Specific Materials; is that correct?

21       A.   That is correct.

22       Q.   And the lead-in to that section states, "I have

23   reviewed extensive materials pertaining to the

24   above-referenced case.  And then, "This includes, but is not

25   limited to", colon.  And then you've got the list heading A

1    and list heading B.  Did I describe that correctly?

2         A.    That is correct.

3         Q.    Within the category of case-specific materials,

4    what items did you review pertaining to the case that are

5    not listed under Section B there?

6         A.    Can you reask that question again, please?  I'm

7    sorry, I...

8         Q.    Sure.  And so I -- your -- the lead into that

9    section reflects that the list of materials that you

10   reviewed includes, but is not limited to the items set forth

11   here.  So my question is:  What are the case-specific

12   materials that you reviewed that are not reflected in the, I

13   guess, list of Items 1 through 44 that are contained on

14   Pages 4 and 5 of your report?

15        A.    Thank you, that -- that makes sense.  That "not

16   limited to" is referencing I think more for the Section A

17   where I've read lots of literature.  I didn't list every

18   piece I've ever reviewed.  I don't believe there are any

19   case-specific materials that I have not listed here that I

20   have had.

21        Q.    Okay.  Understood.  So to the -- to the best of

22   your recollection and I guess the intent of preparing that

23   44 numbered list in Section B, that was intended to cover

24   every case-specific item, i.e. discovery documents,

25   depositions or -- or pleadings in connection with the Todero

1  case.  That's intended to be a comprehensive list of

2  everything that you were provided by Mr. Stephenson or one

3  of his associates; is that -- is that correct?

4       A.   Yes, that is the intent.

5       Q.   And so the -- that including but not limited to

6  language was -- was more in reference to the items contained

7  in Category A, that medical and scientific literature --

8       A.   Correct.

9       Q.   -- is that correct?

10      A.   Correct.

11      Q.   Okay.  And the report states that you have

12  reviewed materials pertaining to this case.  And then the --

13  the list of medical and scientific -- the medical and

14  scientific literature items are listed, it looks like

15  there's -- there's certainly over at least a couple of dozen

16  items on that list.  I could count them, but it's a lengthy

17  list of materials.

18           Just for my clarification, is -- is that list

19  intended to reflect specific papers or publications that you

20  reviewed in connection with your work on this case or does

21  that include items that you had previously reviewed, sort of

22  formed part of your general knowledge on these -- on these

23  topics that you then have brought to bear on -- on your

24  opinions in this case?

25      A.   I think it's more the latter, these are papers

1    that I have reviewed previously.  They're part of my

2    knowledge base.  There's more out there that sort of are

3    maybe not redundant, but, you know, very similar in -- in

4    results and outcomes, but representative of materials that

5    would be potentially applicable to some of the specifics of

6    this case.

7         Q.   And so in terms of the reference to additional

8    materials that you -- in your terminology as reflected in

9    the report reviewed pertaining to this case, if I understood

10   you just now, those would be, if not redundant, then sort of

11   additional materials reflecting the same items of medical

12   and scientific knowledge as are reflected on that list; is

13   that fair to say?

14        A.   Yeah.  And maybe the word redundant wasn't the

15   best word that I chose, but basically there are many studies

16   that have looked at certain physiologic aspects of certain

17   types of use of force or components.  And so, you know,

18   they're all, I think in my mind, important from that

19   perspective.  And so some of the representative samples are

20   here, some are in my C.V., and then some I didn't list at

21   all.

22        Q.   As you sit here today, are there any specific

23   items of medical or scientific literature upon which you are

24   relying to reach the opinions contained in your report that

25   are not contained on that list?

1       A.   Not that I can tell, no.

2       Q.   Okay.  In terms of the process by which you formed

3   your opinions and created the report which you disclosed, if

4   I understood your testimony, you didn't sit down and

5   re-review every single one of the items listed on -- on the

6   Category A of documents; is that correct?

7       A.   Yeah, I didn't go read them from front to back.

8   Some I may have relooked at their conclusions or looked at

9   if they had studied certain aspects of -- of the medical --

10  of the medical components or physiologic components, but

11  certainly did not read each one of these over specifically

12  for this case.

13      Q.   Are there some of the items on that list that you

14  did not review at all in connection with your specific work

15  on this case?

16      A.   The answer is probably yes.  Some of them I'm

17  familiar with because they're my work, so I wouldn't need to

18  necessarily go reread them to know what the conclusions are,

19  what the data shows.  So I think the answer is yes, there

20  are some I didn't pull out specifically to read for this

21  case, but I'm aware of the information in there.

22      Q.   As you sit here today, are there any specific

23  items on that list that you can recall looking at in

24  connection with your work creating this specific report for

25  this specific case?

```
 1          A.   Ones that I actually looked at doing the report?

 2          Q.   Correct.

 3          A.   Yes, I can certainly give you some of them.  I did

 4     relook at the sixth one down, my paper with coauthor Sloane

 5     and Bouton entitled Physiologic effects of conducted

 6     electrical weapons on human subjects.  I also pulled the

 7     fourth one down, Vilke, Sloane, Suffecool,

 8     S-u-f-f-e-c-o-o-l, Physiologic effects of TASER after

 9     exercise.

10          Umm, I pulled the one on the second page, one,

11     two, three, four -- fifth one down, I'm lead author with

12     Payne-James, that's P-a-y-n-e, dash, James, Excited Delirium

13     Syndrome (ExDS), colon, redefining an old diagnosis.

14          I pulled the one two below that, Vilke, DeBard,

15     D-e-B-a-r-d, and Chan and others, Excited delirium syndrome

16     (ExDS), colon, defining based on a review of the literature.

17     Two lower, I pulled the White Paper on Excited Delirium

18     Syndrome from ACEP, A-C-E-P.

19          I looked at the Mash article entitled Excited

20     Delirium and Sudden Death:  A syndromal disorder at the

21     extreme end of the neuropsychiatric continuum.

22          I looked at Gonin, G-o-n-i-n, et al., Excited

23     Delirium:  A systemic review.  I looked at Labay, L-a-b-a-y,

24     et al.:  Synthetic cannabinoid drug use as a cause or

25     contributory cause of death.
```

```
 1             I looked at Kemp, K-e-m-p, et al.:  Top ten facts
 2     you need to know about synthetic cannabinoids.  And I looked
 3     at Kesha, K-e-s-h-a, et al. -- I'll spell it for you --
 4     m-e-t-h-y-l-e-n-e-d-i-o-x-y-p-y-r-o-v-a-l-e-r-o-n-e, then
 5     parentheses around bath salts, comma, related death:  Case
 6     report and review of the literature.
 7             Those I remember pulling out and looking at
 8     certain parts, not necessarily reading them cover to cover,
 9     but having some refresher on them.  There may be more, but
10     that's the ones I specifically recall.
11          Q.   And understanding that you may not have read those
12     cover to cover but were sort of reviewing for specific
13     aspects, what's your best approximation of how much time you
14     spent reviewing those -- those materials as a subset of the
15     total time you spent preparing your report?
16          A.   A subset of time preparing my report?  Umm, it --
17     it probably took an hour or two to look at some of those,
18     maybe a little more, maybe a little less, something like
19     that.
20          Q.   Okay.  And then a -- a longer list of items
21     contained within the list of case-specific materials; is
22     that fair to say?
23          A.   A longer list?  You're referring to the 44 --
24          Q.   The 44 items.
25          A.   Yes, those are case-specific materials that I was
```

1    provided and reviewed.

2         Q.   And unlike the items listed under the medical and

3    scientific literature category, is it fair to say that none

4    of those case-specific materials were materials with which

5    you had any prior familiarity?

6         A.   I believe that would be correct, yes.

7         Q.   Okay.  And can you describe generally your

8    methodology in preparing a report such as this one in terms

9    of how you go about reviewing a voluminous set of case

10   materials such as the materials that are reflected on

11   Section B, Items 1 through 44 of your report?

12        A.   Sure.  It's -- it's more of a scientific

13   methodology trying to look at it from the perspective of --

14   it's almost a chronology.  The events, if it's, in this

15   case, an in-custody cardiac arrest or a -- I guess in -- in

16   custody and being transported cardiac arrest, I would look

17   at the materials available that led up and to the point of

18   the police encounter.  That would include, you know, if

19   there's 911 calls or if there are witness statements,

20   components like that.

21             I would look at the videos available, which is

22   usually -- they can be very helpful in giving a visual

23   component.  And then look at whatever statements, reports,

24   or if there's depositions that surround the materials of

25   that, review those.  I go -- and maybe I'll back up just a

1    moment.  I usually go through the objective data first:  The

2    911 calls, audio, events leading up to it, video, specific

3    reports that were written about it, EMS reports that were

4    done.  If the patient is transported to a hospital, review

5    the hospital records, particularly the emergency department

6    records and the initial resuscitation, if there is such, and

7    then autopsy and toxicology records if it's -- if it's a

8    death case.  And then if there's old records from outside

9    hospitals to see if there is a need to review those to

10   determine a pattern of behavior that may or may not apply to

11   the case.

12          And then I review materials that were given to me,

13   particularly from depositions of those involved, whether in

14   this case be police, paramedics, the like there, the

15   treating physicians, and review those in the context of what

16   I reviewed objectively.

17          And then if there's reports from experts and

18   things like that, I -- I review those essentially last,

19   because I don't have them in most of these cases as -- this

20   is an atypical case, but I would still review those last to

21   see what their opinions are based on what I've already

22   formulated as my opinions after my review.

23      Q.   And just to make sure that I -- I understood what

24   you were saying, you described going through the -- the

25   objective data first and I think you had referenced EMS

1    reports and -- and 911 calls, items like that, and hospital

2    records, autopsy records, things -- things like that?

3         A.   Yeah.

4         Q.   Correct?

5         A.   And -- and I guess to take it back one more notch,

6    if there's a formal or specific complaint, I may look at

7    that to see what concerns are about the case so I can focus

8    in on that.  But then I go through the objective data

9    particularly in a chronic order as best as available.  So

10   911 calls, meaning is there a call for assistance to take

11   care of somebody or help somebody or to protect from

12   somebody.  Then the police response, EMS response, medical

13   records from the hospital, care, autopsy records, and then

14   the reports associated with that.

15        Q.   And can you -- so I think the objective data was

16   your -- your choice of -- or wording on that.  Can you

17   explain what you mean by "objective data" in the context of

18   those types of records that you -- that you were describing?

19        A.   Sure.  Obviously, there's subjective components to

20   it, but objective data would be things like vital signs,

21   direct visualization of what I see on the video, behavior

22   activities, lab work, autopsy findings, heart size,

23   toxicology reports.  Those type of things that are embedded

24   in those reports.  Certainly there may be subjective

25   components to it, and that's part of what I review but

```
 1   also -- that's why I use the term objective versus I think,

 2   you know, depositions and -- and testimony and interviews

 3   may be somewhat more subjective.  There may be some

 4   objective details in there, but that's why I use that term

 5   specifically.

 6        Q.   Understood.  And so it sounds like the -- the

 7   focus then would be on the objective aspects of those

 8   documents recognizing that there would be a subjective

 9   component as well, is -- am I understanding you correctly?

10        A.   Yes.  The objective gives me a framework, right,

11   certain things.  If the -- if the temperature is 103, the

12   temperature is 103.  The framework of some of the

13   subjective, "he felt hot" or "he was sweaty" may be

14   components that build around that.

15        Q.   Okay.  The -- Going through the items listed on --

16   on the report, so the first item that's listed is the First

17   Amended Complaint.  Is that an item that you reviewed in its

18   entirety or just portions of that?

19        A.   Umm, I tend to read it fairly carefully to make

20   sure that -- everybody writes their complaints in different

21   ways.  I'm really trying to find out what the focus of some

22   of the issues of the case may be as well as often there is

23   a -- a reported chronologic event history there that

24   sometimes gives me some early framework to look at.

25             Some the legalese at the very end I may or may not
```

1   read line by line, obviously.

2        Q.   And if I understood your testimony just now,

3   that's more to orient yourself to the case as opposed to

4   relying on specific facts or specific aspects of the

5   complaint to formulate your opinions?

6        A.   Well, certainly to orient myself to the case.  But

7   if there are very specific notations in there of blood

8   pressures or timing or things like that, then I would

9   take -- take note of that to see if it is supported by the

10  data that I have been provided.  Or if not, you know, to see

11  where that may have come from.  So, I do take heed of

12  certain things that are put in there that are very specific,

13  sure.

14       Q.   And I -- Item Number 2, listed under case-specific

15  materials is "body cam video 911 audio", and is that

16  referring separately to video files of the body cameras and

17  then separately the audio recording of 911 calls?

18       A.   Yes.

19       Q.   Okay.  And do you recall how many different body

20  camera videos you were provided with and reviewed?

21       A.   I believe there were five files provided, if I

22  remember correctly, of body cam videos.

23       Q.   Okay.

24       A.   One officer's I think was broken into three parts.

25  Four -- four or -- I'm sorry, there may only be four files.

 1  I'm trying to remember specifically.  I think it's four

 2  files, one officer had a single file and then the other one

 3  was broken into three files, if I remember correctly.

 4      Q.   Okay.  And two of the files recordings are video

 5  from the -- the scene on the roadway and then two of the

 6  files from recording video from the hospital, does that

 7  accord with your recollection?

 8      A.   That is, yes.

 9      Q.   Okay.  And then in terms of the 911 audio, do you

10  recall how many 911 recordings you reviewed?

11      A.   I don't recall specifically because I reviewed

12  them a while back, but there were -- there were several

13  people had called in sort of reporting the events on -- on

14  the roadway.

15      Q.   Okay.  And did you -- (audio disruption) -- and

16  listen to those audios in their entirety?

17      A.   And I think one of your words cut out.  Can you

18  repeat that for me, please?

19      Q.   Sure.  Did you sort of watch each of those videos

20  and listen to each of the audio files at least once in their

21  entirety?

22      A.   That is my typical practice and I believe that's

23  what I did in this case as well.  The --

24      Q.   And --

25      A.   -- ones in the ER there may be -- I may have

1   truncated some of that because it didn't apply to some of my

2   aspects of it.  But I certainly look at the ones that are --

3   the audios to the 911 definitely, as well as the field

4   videos more than once, but it's -- but definitely in its

5   entirety.

6       Q.   Okay.  And you said more than once and it sounds

7   like you focused more on the video recordings from the scene

8   as opposed to at the hospital; is that fair to say?

9       A.   That's fair to say.  And let me clarify that when

10   the -- I'm looking at the scene videos, there's certainly

11   aspects of it where the car's going from -- going through

12   traffic to get to the scene, I tend to sort of skip forward

13   until they get out of their car to be honest.  I don't

14   necessarily listen to every aspect of that piece.

15       Q.   Understood.  In terms of the facts that you are

16   relying on in your report to reach the opinions that you've

17   disclosed, what are the aspects of the body camera video and

18   the 911 audio recording, what are the facts you derive from

19   those sources that you are relying on to form your opinions?

20       A.   There's a lot of overlap with different areas of

21   fact, I should say.  You know, there is audio, there is

22   interviews, there are depositions, and many of them overlap.

23   But from the audio is the description of what Mr. Todero was

24   doing crossing the street that was -- that may have come out

25   there.  I think it's better described in some of the

1    interviews and depositions, but I guess from a fact

2    perspective, that would be one -- one area.

3            Regarding the videos, it's certainly -- I look at

4    the behavior that he's act -- that he's there, position that

5    he's in, you know, sort of the duration of time.  I look for

6    the -- the aspects with regards to how long he is in certain

7    positions or his activity levels, those types of things.

8    Those are certain facts that, you know, if I see things on

9    the video, behaviors, things that he says, those are things

10   that would be, I guess, part of that fact, but they also may

11   be represented in deposition testimony as well as reports.

12   So, it's hard to sometimes parse out which I got the

13   information from first or used it from specifically.

14       Q.   All right.  And understanding obviously that

15   there -- there's inherently overlap in the materials and,

16   you know, you have a video recording of an event and then

17   different people who are at the event testifying, there's

18   going to be overlap between the sources of information.  But

19   in terms of the facts you had to -- you've described in

20   terms of the 911 audio, the description of what Mr. Todero

21   was doing crossing the street, what -- what specific facts

22   from that 911 audio, recognizing that it may also be covered

23   in other materials as well, did you take and rely on in

24   forming the opinions in your expert report?

25       A.   And I'm not sure I can give you an exact answer

1    there because I can't recall specifically which source that

2    I used which fact from.  Meaning that I know that he was

3    reported walking across with a Bible, sort of oblivious to

4    traffic.  I can't remember if that came out in the 911 call

5    or if that was -- it came out more in the interviews and

6    depositions.  I -- I -- I can't give you that level of

7    recall.

8           I certainly know that -- I don't believe in the --

9    it may have been in the 911 call where they said he almost

10   caused an accident or not versus in the depositions and

11   interviews.  But I -- so I can't give you that level of

12   detail where I remember which specific facts was from, but I

13   know I got it from that collaboration of information.

14   **Q.   Understood.  And -- and then in terms of the body**

15   **camera video, what are the facts that you are relying on to**

16   **form the opinions that you reached in your report that**

17   **specifically come from the body camera video?**

18   A.   Well, certainly some -- the same concept is there

19   that some of the -- the facts were repeated in other venues.

20   But what I recall from the video was initially he was sort

21   of in that constant moving activity, legs moving, breathing

22   heavily.  He was -- I could hear some evidence of his

23   delusions there, talking about religious components that

24   were reported as well by others.

25           He was wearing the same clothes reportedly that he

1    was seen wearing the night -- the day before by State

2    Troopers.  Could see what looked like he was a little bit on

3    a sweaty side, but initially when I first looked at them and

4    then I -- I saw the pattern of his behavior, I guess would

5    be the other piece you see in that video.

6        Q.   When you say the pattern of his behavior that you

7    can see on the video, can you explain specifically what --

8    what you mean by that?

9        A.   Sure.  Initially, he was sort of, I guess, more

10   twitchy in movements, legs going back and forth, sort of

11   more of a rocking pattern.  At some point, he gets a little

12   bit more catatonic or holds still which is, you know,

13   something you look for in some of these cases to see if they

14   have that behavior pattern.  Sometimes it's constant

15   activity, sometimes it's constant activity with some

16   catatonia.  So that's -- those are the types of things that

17   I was looking for and noted in his pattern of behavior

18   there.

19       Q.   Any other aspects of the videos that you are

20   relying on in terms of sources of facts for --

21       A.   I think --

22       Q.   -- the report?

23       A.   I think that it doesn't seem to be an issue in

24   this case, but if you look at positions of people, position

25   that he is in, he's, you know, sitting upright with his

1    hands behind him handcuffed.  There's nobody, you know,

2    putting pressure on or holding him.  Those are facts, I

3    guess, I look for in a review of a case in general.  In this

4    case in particular, I noted those -- those facts were as I

5    just noted, there was really nobody holding him down, he was

6    sitting upright or sitting, you know, semi-recumbent

7    position, changing positions on the edge of a curb.

8         Q.   And then the -- the next item contained on your

9    list of case-specific materials is the coroner's office

10   records and photos, Item Number 3; is that correct?

11        A.   That is correct.

12        Q.   And approximately how long did you spend reviewing

13   the coroner's office report and records and photos in

14   connection with your preparation of a report in this case?

15        A.   That's a -- I guess 15, 20 minutes.  I -- it

16   depends how quickly I read it.  I don't remember

17   specifically.  I wasn't timing it, but I would guesstimate

18   15, 20 minutes to review certain parts of it.  I can't

19   remember the whole file, if it was with the background

20   material or just the autopsy reports.  So that's why I'm

21   giving you sort of a rough, I'm-not-sure estimate because I

22   can't remember if it included all those extra background

23   parts or not which would have taken me longer to read,

24   obviously.

25        Q.   And are there any specific facts that you're

1   relying on to form your opinions in this case that you are

2   obtaining from the coroner's records?

3        A.   I think, you know, when you look at a coroner's

4   records, you're looking for anatomic issues or anatomic

5   variability.  In this case, he had an enlarged heart with

6   some dilated ventricle and atria on the right.  He had a

7   toxicology screen that was done there that didn't show any

8   specific drugs of abuse.  He had the -- sort of the cause of

9   death or contributory medical issues listed there.

10          So I look at all those things as I'm reviewing it.

11   I look for other alternative potential causes of death.  In

12   this case particularly, I think the things that stuck out to

13   me was his enlarged heart and the lack of really other

14   findings there from a medical perspective, lungs and liver.

15   There's -- he's got some abnormalities, but nothing that

16   would likely have caused a sudden cardiac arrest I guess is

17   what I'm referring to.  We know he's got medical conditions,

18   but nothing was specific.  I noted all those things when I

19   reviewed it, though.

20        Q.   So nothing -- nothing in those coroner's records

21   which you saw as shedding light on or indicating a -- a

22   preexisting condition which was a -- was a cause of his

23   death; is that -- am I understanding you correctly?

24        A.   Umm, as a specific cause, no.  But enlarged hearts

25   from individuals who have, you know, history of drug use put

1    them at increased risk for sudden cardiac death, so I did

2    note that on the autopsy.  He had a 400 gram heart with

3    dilated right ventricle and atrium if I remember

4    specifically.  So compared to somebody without an enlarged

5    heart, without dilated ventricles, he would be at more risk

6    for a sudden cardiac event.  The heart is more irritable,

7    basically.  So, not a cause of death but could be

8    potentially contributing to a cardiac arrest.

9        Q.   Is that -- is that something that you have noted

10   specifically in your written report, the link between the --

11   the findings at autopsy and the -- the potential for

12   being -- you know, contributing to the risk of death?  Is

13   that something that's contained in your written report?

14       A.   My written report was to look at -- and ultimately

15   when I put it together, it was using what Dr. Wetli had

16   used.  So I tried to go there.  But the answer is it's -- it

17   is, as you asked me about the autopsy, it is a finding that

18   I consider important.  It was not in Dr. Wetli's report, so

19   I did not add it in.  But had I been creating a de novo

20   report on this, that would definitely be a factor that I

21   think would be contributing to cardiac arrest.

22       Q.   Understood.  But because that was not an aspect of

23   Dr. Wetli's analysis, that's why you didn't include it in

24   your written report; is that -- am I understanding you

25   correctly?

1    A.   That's why I did not add it in there as part of

2    the written report, correct.

3    Q.   Okay.  Beyond what you have already testified to,

4    any other aspects of the coroner's records that you are

5    relying on to form the opinions that are contained in your

6    written report?

7    A.   I don't think so, no.  I think that's pretty

8    clean.

9    Q.   Okay.  And then there are Items 4 through 17 on

10   the list are a number of depositions of different

11   individuals, some of -- some of which include exhibits as

12   well.  Those individuals range from -- well, Dr. Wetli, the

13   previous consulting expert; the emergency room physician,

14   Dr. Hartman; police officers, fire, and EMS personnel and

15   then certain members of Mr. Todero's family, certain

16   civilian eyewitnesses, sort of a broad range of different

17   categories of witnesses that you had their deposition

18   transcripts available; is that fair to say?

19   A.   That is fair to say, yes.

20   Q.   Did you review each of those deposition

21   transcripts in their entirety?

22   A.   So, I think the answer would be no.  I reviewed

23   every transcript and I reviewed the details of the

24   transcript, but the first couple pages of every deposition

25   are the admonitions, I don't read through those.  So, I sort

1    of move towards things -- I don't necessarily go through a

2    lot of the training involvement of an officer.  I'm looking

3    more for the areas involved with the actual parts that I'm

4    involved in.  So background, certifications I will skim

5    through.  But it's like I don't want to admit that I've read

6    cover to cover, but I've gone through them.

7         Q.   But I guess if I'm -- if I'm understanding the

8    review process that you're describing, you would sort of at

9    least cast your eyes down on every page of the transcript,

10   but skimming through the part that -- that did not appear to

11   be directly related to the facts of this incident; is that

12   fair to say?

13        A.   That's a reasonable description of how I look at

14   it, yes.  I do definitely look at every page, but I don't

15   read every word on every page depending on the line.

16        Q.   Approximately how long did you spend reading or

17   sort of re-reviewing deposition transcripts during the

18   course of preparing your expert report in this case?

19        A.   I have no idea specifically.  You know, the

20   deposition, if it's fairly detailed and involved, like the

21   deposition of Dr. Wetli, compared to a family member, you

22   know, same number of pages may take me less time or more

23   time, obviously.  So I -- I can't give you a good estimate

24   as far as the numbers there.  It certainly is a lot of

25   depositions, it would take me a number of hours to get

```
1    through them.  I just can't estimate that for you

2    specifically.

3         Q.   Okay.  And I think you sort of anticipated my next

4    question in terms of some of these in terms of the subject

5    matter and the nature of the testimony involved, fair to say

6    that some of those deposition transcripts would be more

7    central to your work than -- than the others; is that fair

8    to say?

9         A.   Certainly they're all important to go through, but

10   some may have more information that may be applicable to my

11   portion of a review than -- than others, yeah.

12        Q.   And in terms of the specific facts about the case

13   that you relied on to form the opinions that are contained

14   in your report, what are the facts that you derived from the

15   deposition testimony that you reviewed?

16        A.   So again, sort of going back to the overlapping of

17   information, some of the deposition information was in

18   interviews or in reports or in video or audio.  And so, to

19   say which one specifically I pulled out from the deposition

20   that I didn't get from somewhere else, I can't tell you.

21   But certainly a lot of the facts that are in my report come

22   from the testimony in deposition -- or I'm sorry, are

23   included in the deposition testimony, but may not be the

24   where -- the place where I first found that information, if

25   that makes sense.
```

1    My process, my methodology for reviewing these is

2  to go through the -- again the report -- the objective data

3  first and then follow up with deposition.  So sometimes it

4  adds more context to what it was originally, but I can't

5  give you specifics about which was from the deposition only

6  and not from a report or not from an interview.

7    **Q.   Are there any of those deposition transcripts that**

8  **stick out at you as being particularly central in terms of**

9  **the facts that you considered in forming the opinions**

10  **disclosed in your report?**

11    A.   Some of the information that Dr. Hartman described

12  clinically, you know, mirrors with what a lot of my clinical

13  impressions would be as far as the presentation and timing

14  of events with regards to elevation of CK levels and

15  elevation in potassium and kidney functions, if I remember

16  correctly.

17    There was in the deposition of -- I think it was

18  Ian Godfrey, I believe he was the paramedic.  I think he was

19  the one describing the behavior of Mr. Todero in the back of

20  the ambulance and the difficulty in getting oxygen

21  saturation and blood pressure.  But I can't remember if that

22  was part of the report or part of his deposition

23  specifically, but I believe there's more descriptive of that

24  in the deposition and the -- the thrashing about in the back

25  of ambulance.

1        I believe Holly Waters described him as being

2   super strong or very strong and -- and, you know, sort of

3   some of the objective findings for -- or some of the

4   subjective evaluations of which she saw in the case there

5   that were outside of what came in reports from the law

6   enforcement side.  So I think those I remember coming out

7   about things.

8        Obviously, I think some of the aspects of Brian

9   Blackwell's description of how the TASER functioned when he

10  was trying to use it or in his -- his estimation didn't

11  function when he was trying to use it, the reaction that he

12  got from Mr. Todero when he was using it in pro mode and --

13  and how it didn't seem to function the way he was used to

14  functioning and the sounds that he heard, making louder

15  noises which could be indicative of probably not a good

16  connection and not functioning, those I believe came out of

17  his deposition, but I think they were also in other areas of

18  the -- of the materials.

19      **Q.   And are those -- where in your written report**

20  **is -- is that discussion about the effectiveness of the**

21  **TASER, Mr. Blackwell's discussion of the TASER found, the**

22  **TASER operation?**

23      A.   Sure.  I didn't go into details of his operation

24  or the details of the TASER sounds or even the numbers of

25  TASER activations.  But it's material that I put together in

1   my mind in evaluating this -- I was able to come to the

2   conclusions that the TASER didn't have physiologic effects

3   or later cause or contribute to the cardiac arrest.

4       Q.   And you don't -- you don't disclose any opinion in

5   your written report as to whether or not Mr. Blackwell's

6   TASER device was functioning correctly either in terms of

7   the device itself or in terms of a good connection with --

8   with Mr. Todero, that opinion is not contained in your

9   report; is that correct?

10      A.   That specifically is not in there, yes, correct.

11      Q.   Okay.  And you don't hold yourself out as -- as an

12  expert in terms of police tactics or procedures; is that

13  fair to say?

14      A.   I am not a police practices expert, no.

15      Q.   Okay.  And you're also not an expert in the sort

16  of mechanical functioning or the electrical functioning of

17  TASERs; is that fair to say?

18      A.   I -- I'm an expert in the physiologic effects of

19  TASERs on humans but not on the mechanical operations of a

20  TASER.  I have knowledge of it, but I wouldn't put myself

21  out as an expert on the actual operation of the device.

22      Q.   And you don't have any opinions on that subject

23  matter within your report; is that fair to say?

24      A.   Correct.  I did not go into details about the

25  TASER and the physiologic effects specifically or whether I

1    thought it was functioning in this particular case or not,

2    no.

3        Q.   And then there's -- continuing on with the list of

4    case-specific materials, there's interviews of -- of

5    Ms. McNaughton and Mr. Poynter listed at 18 and 19 on the

6    list.  And then the -- and again, State Police report of

7    May 28, 2016.  Are you able to say approximately how much

8    time you spent reviewing those materials?

9        A.   I don't remember them being very long, but I --

10   again, I -- it's based on how long it is and how long it

11   takes me to read.  So I can't give you a good estimate, but

12   probably -- probably less than an hour.  I -- it's an

13   estimate, I don't know.

14       Q.   And then Item 21 on the list, just described as

15   Internal Investigation - Greenwood Police Department

16   Optimized.  Do you see what I'm referring to?

17       A.   I see what's being referred to there, yes.

18       Q.   Can you describe the materials that you received

19   and reviewed that are sort of denoted with that item on your

20   list?

21       A.   I don't recall what those are.  Based on the

22   description, it sounds like internal investigation or review

23   of the case, but I don't remember if it's 20 pages or 200

24   pages.  I -- I couldn't give it to you off the top of my

25   head at this point.

1     Q.   Okay.  As you sit here today, you don't have any

2     recollection about the length of materials that are

3     encompassed by that item on your list?

4     A.   I do not have a specific recall, no.

5     Q.   Do you have any recollection as to the nature of

6     the materials that are denoted by that description?

7     A.   Umm, it's an investigation, so I suspect that -- I

8     don't have independent recall of what was in there as far

9     as, you know, specific interviews or reports or things like

10    that.  I just -- I reviewed it at the time, but I don't

11    recall at this moment.

12    Q.   As you sit here today then, fair to say that there

13    aren't any specific facts that you can recall from that set

14    of materials that you are relying on to reach the opinions

15    that are contained in your report?

16    A.   Right.  There certainly may be facts that I used

17    in there, but at this moment I can't say that that's where I

18    got them from as far as -- and put them into my report.  So

19    there may be, but I can't remember which ones would they be.

20    Q.   And then there are -- the next two items on the

21    list are Item 22 and 23, Community Health Medical Records

22    from 2009, 2012 and then Wishard Hospital Medical Records

23    from 2010.  Approximately how long did you spend reviewing

24    those records?

25    A.   It would be the same answer.  I don't remember how

1   long they were, so I can't -- I can only estimate even based

2   on how long they were how long it would take me to read

3   them, and I can't even recall that.  So it -- it would be a

4   double estimate, so to speak, if it depends on -- if it's --

5   I think one of the records was for an arm injury or

6   something like that and I didn't need to review it in that

7   much detail.

8          One of them was a record about him I think smoking

9   marijuana dipped in formaldehyde or something like that.  I

10  think I reviewed that in a little bit more detail looking

11  for information.  But again, I'm giving -- giving recall

12  from a number of months ago, some -- of the materials that

13  were there, so I don't recall specifically.

14      **Q.  As you sit here testifying right now, you can't**

15  **recall the scope of those materials or the amount of time**

16  **you spent reviewing them; is that fair to say?**

17      A.   I certainly can't answer the amount of time I

18  spent reviewing them.  Like I said, I believe he had past

19  medical records that reflected some drug use history.  I

20  think there was some alcohol and opioid use as well as

21  there's some -- one of them was, I think, smoking a

22  marijuana cigarette laced with formaldehyde or the thought

23  of that.  So again, I would have reviewed those in more

24  detail.

25          But I can't remember if that was -- those specific

1    records, whether it was Wishard Hospital or Community Health

2    or the records somewhere else that may be listed here that I

3    don't recall.  But I do remember old records having some of

4    that information in it.

5         Q.   Are there any facts that were contained in those

6    prior medical records that you relied on in reaching any of

7    the opinions that are contained within your written expert

8    report?

9         A.   The records just reflect a history of previous

10   drug use and -- and abuse of substances.  So I think from

11   that perspective, it goes to the -- the concept of -- of

12   excited delirium syndrome as a -- as a diagnosis.  But

13   specifically for this case, it doesn't -- it's not required,

14   it's just more consistent with that.

15        Q.   Is it fair to say that if you had not been

16   provided access to those records or those records had not

17   reflected any prior incidents of drug use, your opinions

18   that are disclosed in your report would be the same as they

19   are today; is that fair to say?

20        A.   My opinions -- those records, the parts that I

21   commented on bolster the -- the diagnosis, but they're not

22   required to make the diagnosis.  I think it shows a track

23   history or -- a history of substance abuse which is

24   consistent with excited delirium syndrome, previous

25   histories of that as we see in these individuals.  But had

1    those records not been available, I believe his other

2    testimony that talked about his drug use, that would have

3    also been supportive of that diagnosis.

4          Q.   And what testimony are you referring to?

5          A.   There was some family members who talked about

6    they think he may have been using, or friends or something

7    like that, talking about some potential drug use previously.

8          Q.   Okay.  Is that an item that's reflected in your

9    report?

10         A.   It is not.

11         Q.   Why isn't that reflected in your report?

12         A.   Because Dr. Wetli did not put that in his report.

13   Had I done a de novo report on this topic, I would have

14   included that history.

15         Q.   Okay.  That's another item that you acknowledge

16   goes beyond the scope of what Dr. Wetli had opined on in his

17   prior report; fair to say?

18         A.   It is a -- is a piece of excited delirium which is

19   what his opinion was that supports it, but he did not report

20   that in his written report that I saw.

21         Q.   And then the next two items on the list are the

22   Ambulance Prehospital Care records and then the records from

23   St. Francis Hospital, Item 24 and 25.  And specifically the

24   St. Francis records are voluminous; is that fair to say?

25         A.   Yes, they are.

1    Q.   And my recollection is that somewhere in the

2    ballpark of 10,000 pages of medical records; fair to say?

3    A.   I'd have to look back at that, but I certainly

4    remember he was in the hospital for long enough to create

5    10,000 pages, if that's what they ended up having.

6    Q.   How much time did you spend reviewing those

7    records, the -- the ambulance records and then the records

8    from St. Francis?

9    A.   Sort of the same answer.  I don't sort of try to

10   time out each set of records that I do review.  But the

11   ambulance records I -- you know, I read very carefully.

12   They're not voluminous, just a few pages, so I -- again, I

13   don't know, certainly less than an hour.

14         The hospital records, it may have been an hour to

15   two hours to go through and sort of screen for certain

16   aspects and read for certain aspects and looking for certain

17   types of medicine.  I can't recall how long it took me to

18   find the notes.  The reading itself is not that long, it's

19   the matter of finding what I need to look for and then

20   screen through things, particularly for the first portion of

21   the hospitalization was where my interest was.

22   Q.   Did you review every page of that 10,000 pages or

23   were you able to -- or were there some numbers of the pages

24   that you did not review at all?

25   A.   Right.  There are certain aspects of that, you

Gary Michael Vilke, M.D.

1    know, ICU nursing notes for multiple shifts on multiple days

2    which would be dozens and dozens of pages, I don't go

3    through each of those.  So, there are certainly ways I -- I

4    review the record, but I did not say -- I can't say that I

5    flipped through 10,000 pages.

6        Q.   Item 26 on your list of materials is Radio Traffic

7    from Dispatch.  Did you listen to that radio traffic in its

8    entirety?

9        A.   I'm thinking that may have been a written dispatch

10   record, but I'd have to confirm that.  I think it was a

11   written timing of records and a couple pages I would have

12   looked at in -- in its entirety, yes.

13       Q.   Sitting here today, do you recall specifically

14   any -- any fact from those records that you rely on in

15   forming the opinions that are contained and disclosed in

16   your expert report?

17       A.   There's timing issues that are a part of the --

18   the evaluation of the case.  Part of it may have come from

19   those specifically versus what I saw in the video versus

20   other -- other areas, but that's one area where he gets into

21   timing information.

22       Q.   And then the -- the next three items on the list

23   are expert reports disclosed by other experts in the case:

24   Mark Kroll, Dr. Rashtian, and Roger Clark.  Do you see

25   those -- those items listed 27 through 29?

1        A.   I do see them listed, yes.

2        Q.   **What was your purpose in reviewing those -- those**

3   **materials?**

4        A.   I guess when you're provided materials, you should

5   review them as part of the case.  So the purpose is to make

6   sure I'm not missing something.  But particularly -- in

7   general cases, you want to see what the other opinions are

8   and areas of concept or concern or findings they had to make

9   sure that you didn't miss something.  Or sometimes you see

10  that they had materials that you didn't get, so part of the

11  reason is to review for that kind detail.

12        Again, this case is a little more unique because I

13  was coming in more as a substitution.  So, I'm reviewing the

14  case using my methodology, but, for example, the report of

15  Dr. Rashtian, that's R-a-s- -- R-a-s-h-t-i-a-n, he has a lot

16  of opinions that if I was writing a de novo report myself

17  would have gone well beyond what Dr. Wetli had done.  So,

18  that's often why I read these reports, to see what the

19  others are opining on.

20        Q.   **Some of the facts related to the underlying events**

21  **in the case, did you use those, any of the expert reports as**

22  **a source of those facts?**

23        A.   Not as a source of fact, but maybe as a source of

24  confirmation of fact.  Meaning if I -- if I saw they had a

25  very different fact than I had, I would go back to make sure

```
1   my fact was correct, but not actually using it as a source

2   for my report.

3        Q.   Okay.  And just to clarify, Dr. Wetli's expert

4   report is not listed separately on this list of materials,

5   but I understand that -- I recall from taking his deposition

6   that his expert report was one of the exhibits to his

7   deposition, so fair to say that that would be encompassed

8   under Item 5 on the -- on the list?

9        A.   That would be correct, that's where I saw his

10  report, yes.

11       Q.   You did -- You did have access to his report --

12       A.   Yes.  I believe --

13       Q.   -- prior to --

14       A.   I believe it was Exhibit A, yes, I had that prior

15  to my report.

16       Q.   Okay.  Then there's a -- a TASER download from

17  May 25, 2016 listed as Item 30 on your list of materials

18  reviewed.  Approximately how long did you spend reviewing

19  that document?

20       A.   Oh, jeez, five minutes, ten minutes.  It's -- it's

21  not a voluminous amount of records.

22       Q.   And then Items 31 through 38 are a number of video

23  interviews of -- of witnesses including some of the same

24  witnesses you had also reviewed deposition transcripts of.

25  Did you review the video interviews in their entirety?
```

Gary Michael Vilke, M.D.

```
1       A.   I would have them going -- the answer is yes, I
2    would review them in their entirety.  But I would be
3    potential listening for certain aspects of it in the
4    background while I'm looking at other things.  So -- but
5    yes, I would run through them.
6       Q.   And then it appears that the remaining items on
7    your list, Items 39 through 44 are -- are legal briefs that
8    were filed in this case related to arguments over the
9    admissibility of different expert opinions.  What was your
10   purpose in reviewing those documents?
11      A.   Well, the purpose again is they were provided to
12   me, so I probably should review them to be familiar with
13   what's on them.  And then when I -- as I'm going through
14   them, again sort of fact confirmation looking at what
15   aspects are being commented on.  I guess each one is a
16   little different, so it depends on which one you're
17   referring to.  But really the purpose is to be aware of
18   whatever the materials are, particularly from, say, the
19   objective materials, make sure it's information that I have
20   been privy to, that I have reviewed and I've reviewed
21   correctly.
22      Q.   And did you use those legal briefs as the source
23   of any of the facts that you are relying on to form any of
24   the opinions that you've disclosed in your report?
25      A.   They would not have been the source, no.
```

1    Q.   Okay.  Are there any facts that you relied on to

2    form any of the opinions disclosed in your report that were

3    not contained in any of the materials listed at Items 1

4    through 44 of your list of case-specific materials?

5    A.   No.

6    Q.   Were there any facts that were provided to you by

7    Mr. Stephenson or one of the other lawyers for the

8    defendants that you relied on to form any of your opinions

9    disclosed in your report?

10   A.   To make sure I'm answering your question, they --

11   they provided me all of the information.  They gave me all

12   the details.  Did they give me anything outside of what is

13   listed on my report 1 through 44, no.

14   Q.   Are there any assumptions that were provided to

15   you, you were asked to assume certain facts or pieces of

16   information to reach the opinions in your report?

17   A.   No.

18   Q.   Were there any -- Are there any assumptions that

19   you personally chose to adopt or -- or assume that you're

20   relying on to -- to reach any of the opinions contained in

21   your written report?

22   A.   No.  I mean, I guess -- other than when you hear

23   somebody say that -- you're assuming that when somebody

24   testifies to something, that it is accurate.  So my

25   assumption is that those are accurate, but it's not an

Gary Michael Vilke, M.D.

Todero vs.
City of Greenwood

```
1    assumption outside of what is reported or brought out in one
2    of the depositions or materials.
3        Q.   What about -- how -- How did you resolve areas in
4    which there were disputed facts or differences in the
5    versions of events that were reflected in the testimony
6    of -- of certain individuals or the -- the materials that
7    you reviewed?  How did you go about resolving those disputes
8    of fact or choosing which -- which versions of facts to --
9    to use to inform the opinions in your report?
10       A.   Well, that's obviously very -- very vague and
11   open.  It depends, I guess, is the -- the answer for that.
12   It depends on which facts you might be referencing.  But
13   people can see the same -- same thing and have different
14   recalls of it.  So, if it's something that was available on
15   video that I could see, that may be where I get that
16   disputed -- covered.
17           If it's a question of how long something was and I
18   can actually time it out on a video or use other
19   methodologies to evaluate that, that may be the way that I
20   would use it to be more specific.  But it -- each -- each, I
21   guess, facts conflict would have to -- it would depend on
22   what is available for that review objectively.
23       Q.   Did you -- As you sit here today, are there areas
24   that you recall being disputed facts or facts that were
25   reflected differently in -- in some of the different case
```

1    materials that you recall working through in the course of

2    forming your expert opinions?

3         A.   Umm, I think there's some recall issues with

4    regards to how many times the TASER was used, for example.

5    I don't remember specifically because I had the objective

6    data in the TASER download if I wanted to be more specific

7    about that.

8              Certainly, I think there was some timing -- how

9    long was it until this or that, but there's a very nice

10   timeline available based on having the video available of at

11   least the parts from him being handcuffed around that time

12   until the ambulance left.  So I was able to -- to have a

13   more objective timeline based on video footage.  But I can't

14   give you specifics where I had significant concerns about

15   facts that I -- that I had to -- or there were disagreements

16   in facts that I had to differentiate, but if there's an

17   example, I'd be happy to try to answer that.

18        Q.   Okay.  The -- You testified earlier and it's

19   listed on -- on -- as one of the items, materials that you

20   reviewed was that you reviewed the TASER download report; is

21   that correct?

22        A.   That is correct.

23        Q.   And is it your recollection that that download

24   report reflected that Lieutenant Blackwell's TASER was

25   discharged, the trigger was pulled 16 times during the

```
1    course of the incident that's at issue in this lawsuit

2    during -- during the course of Lieutenant Blackwell's

3    encounter with Mr. Todero on May 29th, 2016?

4         A.   Yes, I believe the download reflected 16 trigger

5    pulls.

6         Q.   Okay.  And the download also reflected a

7    accumulated total of trigger duration of, I believe it was,

8    98 seconds; is that your recollection as well?

9         A.   That is my recollection of the download as well,

10   yes.

11        Q.   Okay.  And there's nothing in -- in your written

12   report that contains any opinion as to whether or how the --

13   the number of trigger pulls and the duration reflected on

14   that report actually translated into durations of -- of

15   electricity that Mr. Todero was subject to, that's not an

16   opinion contained in your report; correct?

17        A.   Yes, my -- my report does not opine on how many of

18   those 98 seconds would have transmitted electricity or not

19   to Mr. Todero.

20        Q.   Okay.  And fair to say that you're aware from

21   reviewing, I guess at a minimum, the expert materials that

22   you reviewed that there is a dispute as to the duration of

23   electricity that was actually transmitted during the course

24   of the incident?

25        A.   There's a dispute, at least amongst some of the
```

1    experts, but there's also testimony and the -- of what was

2    occurring at the time that would also be part of an

3    evaluation of the amount of electricity or effectiveness of

4    the TASER activations.

5        Q.   The materials, the medical and scientific

6    literature that you reviewed that's listed in your report,

7    includes a number of studies where test subjects have been

8    subjected to TASER shots of -- in one form or another; is

9    that fair to say?

10       A.   A number of these studies are evaluation of the

11   physiologic effects of a TASER activation.

12       Q.   And a number of those studies that are listed

13   on -- on your report, the -- the evaluation was of a single

14   TASER discharge of approximately five seconds; is that

15   correct?

16       A.   Some of the earlier studies were five-second

17   activations, yes.

18       Q.   Okay.  And then some of the other studies involve

19   durations of up to 15 seconds, is -- (audio disruption)

20       A.   You just froze.

21       Q.   Can you -- can you hear or see me?

22       A.   I can now.  Can you repeat that --

23       Q.   Okay.

24       A.   -- question, please, thanks.

25       Q.   Yes, I will.

1      Some of the -- so you agreed with me that some of

2  the studies reflected five-second durations of TASER used;

3  correct?

4      A.   Correct.

5      Q.   And then some of the studies included durations of

6  TASER use of up to 15 seconds; is that correct?

7      A.   That is correct for humans, yes.

8      Q.   Do any of the studies contained on your list of

9  medical and scientific literature reflect studies of TASER

10  exposure beyond 15 seconds?

11      A.   I'd have to look back specifically.  Some of them

12  are review articles that may include some longer durations.

13  And I -- I'll sort of, to help keep this moving, some of

14  them were in animal studies that were definitely longer than

15  15 seconds.  But as far as specifics here, I don't think any

16  of them were primary studies that had more than 15 seconds,

17  but there may be reviews of them.

18      Q.   Certainly no studies conducted on humans that had

19  a 90-second duration of TASER exposure or even anything

20  approaching a 90-second duration of TASER exposure; would

21  that be fair to say?

22      A.   On humans, no, there is no studies that looked at

23  specific number of -- or that specific duration of time.

24      Q.   And similarly, the -- the five seconds studies

25  that we had referenced earlier, that would be a single TASER

1    trigger pulling used in those studies; is that correct?

2        A.   In the ones that only had a five second duration,

3    that would be a single trigger pull, yes.

4        Q.   And for the -- the 15 second studies, do you

5    recall if that was a -- a single trigger pull for 15 second

6    duration or -- or three separate five second trigger pulls?

7        A.   I believe they looked at both of those, where one

8    would be a 15 second trigger pull and one would be three

9    serial five second pulls.

10       Q.   Okay.  In any of the studies that you reviewed or

11   relied on in forming the opinions in your report, was there

12   anything asked or even approaching 16 trigger pulls in a --

13   conducted on humans?

14       A.   Make sure I'm answering the question you're

15   asking.  None of the studies on my list here have 16 trigger

16   pulls or up to 90 seconds of duration in a human.

17       Q.   Okay.  In fact, it would -- Would you agree with

18   me that it would not be ethical to conduct a study where you

19   are subjecting a -- a human subject to 90 seconds of -- of

20   exposure to a TASER or 16 separate trigger pulls, you

21   couldn't ethically conduct that study; is that fair to say?

22       A.   Without building up to that, probably not.  An IRB

23   would want to see -- that's why the first studies were five

24   seconds, subsequent studies were 15 seconds.  There are

25   studies looking at 30 seconds.  So you would have to build

1    up to it.  So right now to do it today jumping from a -- up

2    to 90 seconds would probably be not -- use the word

3    unethical, it probably would not be approved by a human

4    subjects committee.  But you could, if you wanted to do --

5    build up to that point over time, then it would be a

6    possibility.

7         Q.   But you're not aware of any efforts in progress

8    to -- to build up to that 90 seconds; is that fair to say?

9         A.   I'm not aware of any, no.

10        Q.   Okay.  And -- and perhaps to -- to clarify your

11   testimony, because I may have used a -- a term that may be a

12   term of art and also a layperson's term and -- and if I

13   understand the process, but I'm sure you'll correct me if

14   I'm wrong, in any situation where you're conducting a study

15   of that nature on humans, you have to, as a researcher, get

16   approval of the -- of the methodology of that study in

17   advance before conducting it; is that fair to say?

18        A.   Typically, a study like that would have to go

19   through a human subjects committee, which typically looks

20   for safety.  So, when you first start studying, you start

21   and you build upon it, which is why the first studies were

22   five seconds and then ten seconds and 15 seconds.  So,

23   you -- you would have to build it out that way from a

24   building of -- of a foundation of safety before you get to

25   90 seconds.

1      Q.   And based on your understanding of the state of

2   the medical and scientific literature today, there would not

3   be any basis in existing literature that would allow such a

4   committee to conclude it was safe to subject test subjects

5   to 90 seconds of TASER exposure?

6      A.   There has to be some foundation.  There has to be

7   some reasoning for it, as far as looking at a study, why

8   would you do a study for 90 seconds.  If, you know, the

9   majority of the field episodes are 90 seconds of conducted

10   electricity, there may be a reason to do it.  If there's a

11   90 seconds of trigger pulls, but really only 25 seconds of

12   conduction or less, then there probably isn't a reason to do

13   90 seconds.  So you have to look at the reasonings behind

14   doing the study as well as the foundation of safety building

15   up to it.

16      Q.   Sure.  But setting aside the reasons for doing it,

17   if I understood your testimony, at this point based on the

18   existing studies, the existing literature, there would not

19   be a basis to conclude it was safe to conduct such a study;

20   is that fair to say?

21      A.   Basis to conclude safe -- it certainly would -- it

22   would not -- there's a basis to conclude it is safe to

23   continue studying.  But to jump up to 90 seconds, you should

24   do additional base studies to evaluate for that safety

25   purpose.  I wouldn't say it's unsafe, I would just say you

1    have to build better foundation to get to that level if you

2    want to.

3         Q.   Sure.  But based on the existing state of the

4    literature and understanding it's hypothetical, it's your

5    belief, your opinion that a committee would not approve a 90

6    second study based on the existing information that's out

7    there today?

8         A.   If I applied today, I probably would not get

9    approval at my IRB because of what -- the information I

10   have.  Is there other data out there that I'm aware?  It is

11   possible, but from what I know right now, if I tried to

12   apply for a study like that, I would be requested to do a

13   shorter duration first.

14        Q.   Sure.  And one -- one consideration that you

15   talked about, that we'll go into that, would be that that's

16   a pretty sharp -- significant -- strike that.

17             If I understood your testimony earlier, one of the

18   factors that is leading you to that conclusion that you

19   would likely not get approval is that there -- that

20   represents a significant increase, a jump over where the

21   existing studies, the existing literature have been

22   conducted; is that fair to say?

23        A.   That's in part.  That is a bigger jump than some

24   of the studies that I'm aware of.  But it's also because you

25   have to have a reason to do a study like that as well.

1    If -- if there's a lot of involvement in -- at that level,

2    then it should be something worth considering.  But if it's

3    a once-in-a-while type of a use like that, then there may

4    not be a basis to support the -- the justification for it.

5          Q.   Sure.  And is one factor in a study like -- strike

6    that.

7               Would it be fair to say that one factor in

8    determining whether you could conduct a study like that

9    would be to what extent that exceeded the device

10   manufacturer's specifications on how that device should be

11   used?

12         A.   Well, a study -- studies aren't always limited to

13   manufacturers' specifications, it depends on which

14   specification specifically.  Otherwise, we would never

15   expand out to different treatments -- areas of treatment for

16   medications or medical devices.  So, I don't think you're

17   limited by that, but you would have to take that into

18   consideration.

19         Q.   Sure.  So, if I understand your testimony, that's

20   not a hard cap, you say you cannot do a study that -- that

21   exceeds a manufacturer's specifications, but that's one

22   factor that you would consider and that would -- that's one

23   factor you would consider; correct?

24         A.   If a manufacturer's specification had a specific

25   item that you wanted to review and you wanted to go beyond

1   that, you would have to, part of your IRB application,

2   explain why, what the purpose is, what your basis for safety

3   is, what the basis for their manufacturer's recommendations

4   are.  So you have to look into all that in order to go

5   beyond that.  Just like certain therapies, you know,

6   radiation versus chemotherapy agents, we are -- we're

7   pushing the envelope all the time.  And so we have to

8   justify why we do that and that's just another area in which

9   you would have to do that.

10      Q.   And you're aware that a 90 -- 98 second duration

11   and 16 separate trigger pulls far exceeds the TASER

12   manufacturer's specifications in terms of how that device

13   should be used; is that fair to say?

14      A.   I don't know if it's a specification versus a

15   recommendation, but it's not typically something that they

16   would say go ahead and use it 16 times or 98 seconds.  But I

17   think they have certain recommendations that they do offer.

18      Q.   And it's not just, you know, 80 seconds versus 90

19   seconds, that's a significant -- significantly in excess of

20   what the device manufacturer's recommendations are; is that

21   correct to your understanding?

22      A.   I haven't read the manufacturer's recommendations

23   recently, but if I recall, it is a lot more trigger pulls

24   than is typically utilized.

25      Q.   Well, not just that's typically utilized, but also

1    that's recommended by the manufacturer; is that your

2    understanding?

3         A.   Again, I haven't read their -- their

4    recommendations.  They change them on a fairly regular

5    basis, so I couldn't give you what the most recent ones are,

6    so I probably shouldn't give you any opinion on that.

7         Q.   Okay.  And to the best of your recollection,

8    though, you're not -- you don't recall any recommendations

9    by the TASER manufacturer that come close to 16 uses or come

10   close to 98 seconds of exposure; is that fair to say?

11        A.   I'm sorry, could you repeat that one more time,

12   please?

13        Q.   Yes.  Understanding that you don't feel

14   comfortable sitting here today offering opinion testimony or

15   fact testimony as to what the existing TASER manufacturer

16   recommendations are, I understand that, but based on your

17   recollection, your most recent recollection of what those

18   recommendations are, 98 seconds of exposure or 16 separate

19   applications, that would significantly exceed what your

20   recollection is of the most recent manufacturer

21   recommendations that you're aware; is that correct?

22        A.   The most recent ones I'm aware of are a number of

23   years old, but that would exceed that, yes.

24        MR. HEPPELL:  Okay.  The -- Could we go off the record

25   for one second?

```
1         THE WITNESS:  Sure.

2              (A 37-minute lunch break was taken at 11:43 a.m.)

3    BY MR. HEPPELL:

4         Q.   Dr. Vilke, I want to turn to -- to your report,

5    the substance of your report, and I want to make sure that I

6    understand what are the opinions that you are disclosing in

7    your written report.  And so I'm going to, if you'll bear

8    with me, go through each different section of the report and

9    make sure that we're on the same page.

10             So, turning to the very front page of the report,

11   Page 1 is a section, after, you know, your letterhead and

12   the case caption, is a section titled Introduction.  It

13   gives some background on who you are in -- in that first

14   paragraph.

15             Are there any opinions of yours contained in that

16   first paragraph of the introduction?

17        A.   There are not.

18        Q.   Okay.  And then that second paragraph, the first

19   sentence describes the purpose of your retention in this

20   case; is that fair to say?

21        A.   That's the intent, yes, uh-huh.

22        Q.   And then the -- the last sentence of that

23   introduction section, the last sentence of Page 1 states,

24   "After careful review, it is my opinion to a reasonable

25   degree of medical certainty, which is in agreement with the
```

1  late Dr. Charles Wetli's opinion, that the efforts to

2  restrain Mr. Todero, including physical restraint and the

3  multiple applications of a TASER ECD, did not cause or

4  contribute to the death of Mr. Charles Todero, who died from

5  physiological complications of excited delirium syndrome.

6  These opinions and related opinions are set forth in the

7  expert report."

8      So fair to say that that -- I guess that was two

9  sentences, wasn't it?  The very last sentence and then a

10  longer substantive sentence.  So the last two sentences on

11  that page, fair to say that that's intended to be an

12  overview of the conclusions that you reached in the

13  substance of your report?

14      A.   That's -- yeah, that's a fair assessment.  It's an

15  overview.

16      Q.   Okay.  In terms of the specific opinions that are

17  disclosed in summary form in that, I guess, second to last

18  sentence in the introduction, can you clarify what the

19  opinions are that are -- that are being disclosed in that

20  summary sentence?

21      A.   Well, that's why it's a summary sentence.  This

22  is -- the specifics are going to be on Page 6.  Probably the

23  best way of doing that, rather than trying to summarize the

24  summary, is go to the specifics.

25      Q.   Okay.  Fair to say that there's nothing -- there's

1    no opinions that are on Page 1 of your report that aren't

2    contained later in the report?

3         A.   I don't believe so.  I think they're -- they're

4    all covered there.

5         Q.   Okay.  Then Page 2 through 5 of the report, we've

6    looked at that already, but that's the materials reviewed;

7    correct?

8         A.   Correct.

9         Q.   And fair to say that there are no opinions of

10   yours contained on those pages?

11        A.   That is correct, yes.

12        Q.   So then after that introduction and the list of

13   cases, the substance of your report begins on -- on Page 6,

14   fair to say?

15        A.   That's fair to say, yes.

16        Q.   And then it starts with a section labeled Overview

17   of Opinions.  It states, "An overview of my opinions is as

18   follows with more descriptions of each below."  And then

19   there's Number 1, "I agree with Dr. Wetli that Mr. Todero

20   was exhibiting signs and symptoms consistent with excited

21   delirium and that this was the likely cause of his cardiac

22   arrest and death."

23             Number 2, "I agree with Dr. Wetli that the

24   elevated potassium level (hyperkalemia), acidosis and

25   rhabdomyolysis found in Mr. Todero when he arrived at the

1   hospital was not caused by the use of the TASER ECD or

2   restraint by the officers."

3           Did I read that correctly?

4       A.   You did, yes.

5       Q.   Okay.  And can you -- Are those the two opinions

6   that you have reached and that you are disclosing in this

7   expert report?

8       A.   Those are the two opinions, and the basis of them

9   described and expanded upon are basically but -- in the

10  detailed section.  But yes, those are the two opinions.

11      Q.   Okay.  And so if -- while we're asking you how

12  many opinions you had reached in this case that were

13  disclosed in your report, that number one and number two,

14  that track those -- that overview that's contained at the

15  top of your report there?

16      A.   Yes.  Those are the two main opinions with the

17  descriptions and the qualifiers that's part of the

18  discussion in the paragraphs behind them.

19      Q.   Okay.  Then there is a section, continuing on

20  halfway down Page 6, labeled Analysis.  And that is one,

21  two, three, four relatively short paragraphs, the bottom

22  half of Page 6, the top half of Page 7.  Fair to say that

23  that's sort of a relatively brief overview of the facts from

24  your perspective as you derive from the materials that

25  you've reviewed?

1     A.   Yes.  It's a brief overview, correct.

2     **Q.   Is there any opinions of yours that are contained**

3  **within that section labeled Analysis on the bottom of 6, top**

4  **of 7?**

5     A.   There are no opinions actually in this section,

6  no.

7     **Q.   Okay.  How did you come to decide which facts to**

8  **include in this Overview Analysis section?**

9     A.   Umm, basically when I put in an overview, it's

10  really just to paint the broad landscape of what the case is

11  about.  More as a reminder of this -- certain aspects, the

12  TASER was used, where he was found, some of the timing

13  aspects, you know, some of the basic objective data, you

14  know, EMS component, hospital component.

15          It's really meant just to paint the picture so

16  that we're on the same page as far as the -- the background

17  and flow of the case.  Some cases don't go to a hospital.

18  Or some cases may not have EMS involvement or whatever.  So

19  just to sort of cover some of those areas, but really

20  that's -- that's how I put this together.

21     **Q.   Are there facts that you listed in that section**

22  **that you're not necessarily relying on to form any of your**

23  **opinions, but are just some background facts about the case?**

24     A.   I think the answer is probably, yes.  He was 31

25  years ago old at the time.  Whether he was 30, 29, 28 is not

**Gary Michael Vilke, M.D.**

1   necessarily impacting my opinion.  I guess if he was 70, it

2   would be -- may be -- may be a component, but it's

3   background facts.  But some of the pieces I do use.  And so

4   I -- it's not meant to be a -- an exhaustive review of the

5   case in detail, it's meant to be more of a -- almost a

6   bulleted version put into prose.

7        Q.   Are there any facts that you relied on to form any

8   of the opinions you reach in your report that are not

9   described in that analysis section?

10       A.   The analysis was not meant to be the detailed

11  component of my facts to back up or to support my opinions.

12  The paragraphs after the opinions were meant to be more of

13  the detailed use of, you know, what I felt to be important

14  for those -- for those specific --

15       Q.   Okay.

16       A.   -- opinions.

17       Q.   The facts that you're relying on to support your

18  opinions are contained or described in the substance of the

19  written report; is that correct?

20       A.   Umm, the facts that I'm using, yes, they're in

21  there.

22       Q.   There aren't any facts that you're relying on to

23  back up your opinions that you have not listed specifically

24  in your report; is that fair to say?

25       A.   I rely on -- there are some facts that I relied on

1    in my forming of my opinions.  They're not in my report as

2    we talked about earlier because they were not contained in

3    Dr. Wetli's report.  So the cardiomegaly, the enlarged heart

4    is not in my report, although when I was forming my opinions

5    prior to reviewing Dr. Wetli's report and all the other

6    experts' reports, that was part of my -- my support for my

7    opinions.  But because he didn't comment on it, I did not

8    include it in my report.  But it does support my opinions, I

9    guess, in my mind and in my background, but it's not

10   specifically written in the report because of those reasons.

11        Q.   Okay.  And -- and so maybe let me -- I want to

12   understand what you're saying there a little more clearly.

13   As I understand it, you have reached those two opinions

14   in -- in the report which we had looked at in the overview

15   of opinion section and which, as you relay it in the report,

16   which you view as tracking the opinions that were reached by

17   Dr. Wetli?

18        A.   Correct.  Dr. Wetli and I reached the same

19   opinions.  I reached mine by my review.  He reached his by

20   his review.  I have additional pieces of information that I

21   would include into a report if I was writing the complete

22   report without needing to sort of, I guess, match what

23   Dr. Wetli had previously used.  So my report would have a

24   few more items in there that would support the -- my

25   conclusions, which is why I'm very confident with my

Gary Michael Vilke, M.D.

Todero vs.
City of Greenwood

1   conclusions.

2           We reached the same conclusions just -- very

3   similar paths, but I had a few more things in it that I

4   didn't include in my report for the reasons we talked about.

5       Q.   In -- in terms of understanding your role in this

6   case of providing a substitute opinion for Dr. Wetli, that

7   was why you did not include those -- those facts, for

8   example, the cardiomegaly that you had described, that's why

9   you did not include those in -- in the written report?

10      A.   Correct.  I did not include them because Dr. Wetli

11  had not included them.  Although we both have the same

12  conclusions, mine would have -- would have added that as an

13  additional fact that supported my conclusions.

14      Q.   And in terms of the -- a basis for the opinions

15  that you do reach, is it fair to say that you are

16  comfortable reaching the opinions that you've described with

17  the basis of the facts that are contained in the written

18  report and not relying on any facts that in your mind,

19  reviewing the materials, that you latched on to but chose

20  not to include in the written report because it didn't track

21  Dr. Wetli's report?

22      A.   Yes.  My written report and the basis for them

23  that are included here, I'm confident with that.  The

24  additional information just strengthens that.

25      Q.   Okay.  And the -- turning to the Detailed

1    discussion and basis of opinions, under that heading at the

2    bottom of Page 7 and continuing on -- well, for Bullet

3    Number 1 or Opinion Number 1 and continues through to the

4    top of Page 11.  The -- the language in heading Number 1, in

5    that bold language, that tracks the bold language we -- we

6    saw in the overview of opinions; is that correct?

7         A.   Correct.  That should be the same opinion

8    rewritten down there.

9         Q.   Okay.  Are there any additional opinions that are

10   contained in the body of the text of your report underneath

11   that Heading 1 through the top of Page 11 when you hit

12   Heading 2 other than the opinion that is in bold and -- and

13   listed as Opinion Number 1?

14        A.   Well, I think -- I mean, the boiled-down version

15   of the opinion, there are certainly details in my

16   description that I have to support it and the parts I'm

17   using to opine that that opinion is correct.  So, you know,

18   my opinion is that certain aspects of his presentation were

19   consistent with excited delirium syndrome.  The -- you know,

20   the elevated temperature, the warm and diaphoretic skin,

21   those are my opinions that those are symptoms consistent

22   with excited delirium, so I guess those would be opinions.

23             And then put them together and I come up with this

24   final opinion that, you know, his symptoms are consistent

25   with excited delirium syndrome.  But so the other ones are

1   opinions that I have that build up to this, I guess.

2       Q.   Okay.  And I -- I hope you'll bear with me as we

3   walk through and -- and I, you know, always try to avoid

4   belaboring things unnecessarily, although perhaps reasonable

5   people could disagree as to how much belaboring is necessary

6   at any given moment.  But I'd like to go through sort of

7   paragraph by paragraph to make sure I understand what you

8   view as opinions that help support that overall opinion

9   that's listed as Number 1.

10          And so at the very first paragraph underneath

11  Bullet Point 1 or -- or Opinion 1 that starts on the second

12  half of Page 7, you start out, "In his report, Dr. Wetli

13  noted" -- and then it's a lengthy quote taken from

14  Dr. Wetli's report.  And that -- that entire paragraph is --

15  is a quote from Dr. Wetli's report; is that correct?

16      A.   That is correct.

17      Q.   And then in fact, the next paragraph starts off,

18  "Dr. Wetli goes on to opine", and then that continues on

19  with a -- with a quote from Dr. Wetli's report.  And that

20  second paragraph ends with a statement, "I agree with this

21  opinion."

22          In terms of your opinions, is there anything in

23  those two paragraphs that is your opinion?

24      A.   Well, I agree with the opinion, obviously.  I

25  agree that the asystole is the presenting rhythm.  I agree

1    with the resuscitation issues that he notes.  I agree that

2    if they do get resuscitated, they often die and -- and don't

3    survive to hospital discharge from multiple organ failure.

4    So I do agree with those aspects that he puts in there.

5         Q.   Are -- Are those areas of agreement then opinions

6    that you go on to explain separately and independently in

7    the forthcoming paragraphs or they're opinions that you view

8    as you having disclosed in those two paragraphs that aren't

9    contained anywhere else in your report that you've disclosed

10   solely by quoting Dr. Wetli's opinions and then saying, "I

11   agree with them"?

12        A.   I believe I do reiterate or resupport most, if not

13   all, of those areas.  We can go line by line, but I think I

14   covered everything in my report.

15        Q.   And -- and fair to say that in terms of providing

16   a basis for an opinion, simply block quoting someone else's

17   opinion saying "I agree with this", there's -- that doesn't

18   disclose your own basis for opinions; is that fair to say?

19   That would have to be contained in -- in subsequent

20   photographs?

21        A.   Correct.  I was -- I was agreeing with his

22   opinions.  I -- if he had a basis in there, I would support

23   that if I agreed with it, which I -- you know, but I do

24   support my own opinions based on the basis for it which was

25   held forth in the next couple pages.

**Page 113**

1        Q.   Okay.  And I want to make sure that -- well, so

2    strike that.

3             So, again, just to clarify, if I'm wanting to make

4    sure I've got a full catalog of the opinions that you are

5    reaching that are written in this report, that are disclosed

6    in this report, do I need to find any of those opinions in

7    those two paragraphs which are primarily block quotes of

8    Dr. Wetli or can I confine my review to the -- to the

9    subsequent paragraphs that are -- that are your own prose

10   that you've written in the report here?

11       A.   I believe -- I believe my report prose will

12   address the basis for my opinions and the opinions

13   associated with that.

14       Q.   Okay.  So, turning to the -- I guess the first

15   substantive paragraph that is not a -- primarily a block

16   quote from Dr. Wetli's report, it starts with, "Excited

17   delirium syndrome", and then you introduce the abbreviation

18   capital E, lower case x, capital D, capital S as a sort of

19   shorthand for excited delirium syndrome; is that correct?

20       A.   That is correct.

21       Q.   That paragraph, are there any opinions contained

22   in that paragraph or is that purely a sort of background

23   your view of the certain relevant background information

24   regarding the excited delirium syndrome?

25       A.   I think for the most part it is a background of

1   excited delirium syndrome.  It does supply the -- the

2   thought that certain expanded drug screenings and specialty

3   testing would be needed to look for certain medications or

4   drugs that can cause excited delirium syndrome.  I'm not

5   sure if you consider that an opinion or not, but it

6   certainly is a true fact.

7        Q.   Okay.

8        A.   Beyond that, I think it's all factual.

9        Q.   It's fact -- factual that different toxicology

10  screens detect certain things and some types of substances

11  are not detected on certain types of toxicology screens, so

12  sort of factual background.  You're not reaching -- in that

13  paragraph, there's no opinion disclosed related to those --

14  those screens or their applicability to this case beyond

15  that factual description of tox screens; is that fair to

16  say?

17       A.   It's introducing the -- the concept of a negative

18  drug screen does not rule out excited delirium syndrome, but

19  yes.

20       Q.   Okay.  Then this next paragraph starts with,

21  "Classically, people suffering from excited delirium

22  syndrome," and then it continues on describing various

23  aspects of what I suppose is, in your view, the classical

24  presentation of excited delirium syndrome; is that fair to

25  say?

1        A.    Classical or common, yes.  Uh-huh.

2        Q.    Are there any opinions of yours related to this

3    case that are contained in --

4        A.    I think the opinions will be described later, I

5    guess more basis of opinions.  This is really again more

6    background information on -- on the syndrome.

7        Q.    Okay.  Next paragraph, it says, "The actual

8    pathophysiology of excited delirium syndrome is complex and

9    not well understood."  And then it continues on with

10   additional information along those lines.  Are there any

11   opinions of yours related to this case contained in that

12   paragraph?

13       A.    No.  I think it's more factual background.

14       Q.    Okay.  And then the next paragraph, "Even more

15   supportive of central dopamine simulation as a pathway," the

16   sentence that begins with that.  As I understand it, the

17   continuation of the same thought described in the previous

18   paragraph as factual background about the understanding of

19   excited delirium syndrome; is that fair to say?

20       A.    That's reasonable, yes.

21       Q.    And so that paragraph again does not contain any

22   opinions of yours related to this case?

23       A.    Correct.  It's more the background and supporting

24   information.

25       Q.    Okay.  The next paragraph then starting at the

1    bottom of Page 9 and continuing on to the next page,

2    "Excited delirium syndrome places the individual at

3    increased risk for sudden death syndrome, felt by most

4    experts to be caused by an irregular for stoppage of the

5    heartbeat," and the sentence continues on there.  Are there

6    any opinions of yours related to this case that are

7    contained in that paragraph?

8        A.   This is basically more background information on

9    the presentation and be supporting for the basis of my

10   opinions, but not an actual opinion.

11       Q.   Okay.  And then the next paragraph states,

12   "Mr. Todero was reported to have a number of symptoms

13   consistent with excited delirium syndrome."  And then the

14   paragraph continues on with -- of what I understand to be

15   sentences reciting your perspective on some of the facts of

16   this case; is that fair to say?

17       A.   Some of the supporting facts that would be used to

18   come to the conclusion of excited delirium syndrome being

19   present in Mr. Todero.

20       Q.   Okay.  Is there an opinion of yours that's

21   disclosed in this report related to this case contained in

22   that paragraph?

23       A.   Other than all of the last line which says, "All

24   of these are clinical findings of excited delirium

25   syndrome."  I guess they're facts, but they're also my

1    opinion that they are clinical --

2        Q.   Okay.

3        A.   -- findings of it.

4        Q.   So there's contained within that paragraph there's

5    the opinion that the list of -- that the list of factual

6    sentences contained in that paragraph that -- your opinion

7    is all of those, each -- each of those sentence are clinical

8    findings of excited delirium syndrome; is that correct?

9        A.   That's a fair assessment, yeah.  They're --

10   they're the clinical features that would be consistent with

11   that diagnosis.

12       Q.   Okay.  And in terms of the number -- the numbered

13   Opinion Number 1, "I agree with Dr. Wetli that Mr. Todero

14   was exhibiting signs and symptoms consistent with excited

15   delirium," is that aspect to that sentence, that first half

16   of that sentence, is that what you're expanding on in this

17   paragraph with the statement "all of these are clinical

18   findings of excited delirium syndrome"?

19       A.   Correct.  That was -- I was expanding and

20   basically supporting my opinion by showing the signs and

21   symptoms consistent with that.

22       Q.   Okay.  So it's not a -- not per se a separate

23   opinion from the -- from the first path of Sentence Number 1

24   or Opinion Number 1, but just a -- a more detailed version

25   of it or a version that references the specific supporting

1    facts that you're relying on?

2        A.   Correct.  If I wanted to be detailed, I guess in

3    the specific number one, I would have said something along

4    the lines of "I agree with Dr. Wetli that Mr. Todero was

5    exhibiting hyperthermia, rapid heart rate," all those things

6    which are consistent.  Instead of doing that, I made a --

7    more of a summary opinion with all those listed in the --

8    the body of my -- my report here.

9        Q.   Is it fair to say that each of the facts that you

10   are viewing from the case materials as being a clinical

11   finding of excited delirium syndrome or supporting a

12   clinical finding of excited delirium syndrome are contained

13   in paragraph -- in that paragraph on Page 10?

14       A.   Umm, I think examples of each of the symptoms or

15   signs are listed there.  There may be others that are

16   repeated, in a sense.  There are several places where he was

17   noted to be sweaty and hot.  And so I reference that, but I

18   don't go through each detailed location or time or person

19   who observed it opinion in there, but I sort of left it as a

20   single event.

21       Q.   Understood.  And just to make sure I understand

22   what you're saying, you gave the example of the fact that he

23   was described as sweaty and if I understood your statement,

24   you -- you haven't referenced every time in the record or

25   every witness who described him as sweaty or every instance

Gary Michael Vilke, M.D.

```
1    of time along the timeline that he was described as sweaty,

2    you -- you've -- you've included that fact once in your --

3    in your listing of the facts there, but there are not

4    additional -- additional facts that aren't listed in some

5    form in that paragraph that you are relying on in your

6    report as supporting that these are clinical findings of

7    excited delirium syndrome?

8        A.   That I think --

9        Q.   Do you understand my question?

10       A.   I -- I think so, basically.  I didn't go through

11   every episode.  Once I identified him as sweaty, I didn't

12   list the other ten places that it comes out as, but

13   representative of the concept that more than one person may

14   have recognized that.  It is listed here one time.

15       Q.   But if, for example, Mr. -- a witness had

16   described Mr. Todero as pale, that would be different from

17   sweaty.  There aren't facts of a different nature that

18   you're relying on -- that's maybe a bad example.  I am not

19   suggesting that's what the facts are, but just a --

20   something that is not a repeated fact but a new fact or a

21   different fact.  There aren't things that you haven't

22   included at least in some form in that paragraph that you're

23   relying on as your list of clinical findings; is that fair

24   to say?

25       A.   Let me just answer it, I -- I think I know what
```

```
1    you're asking.  These are the signs and symptoms consistent

2    with excited delirium that I found as representing or

3    representative in the information I reviewed.  Certainly

4    there was evidence of him being delusional.  He was talking

5    about that he was Jesus and there's other references.  I

6    didn't go through all the different specifics -- you know,

7    specific comments that showed his delusions, all the

8    different times they occurred.  But once I have evidence of

9    him being delusional, I stopped there and didn't need to --

10   I didn't pile on more references.

11         Each of these is -- is basically along the same

12   lines.  These are symptoms or signs consistent with excited

13   delirium.  I didn't go through all his clinical features

14   that may have been outside of those signs and symptoms

15   and -- and include them here.

16   Q.   Any opinions beyond what we've just been

17   describing that are -- that are contained in that paragraph?

18   A.   I don't think so, no.

19   Q.   And then the next paragraph starts with the

20   sentence, "An exact" -- well, strike that.

21         You state, the last sentence of the paragraph we

22   were just looking at is, "All of these are clinical findings

23   of excited delirium syndrome."

24         What is a clinical finding?

25   A.   A clinical finding is a -- a feature that you can
```

1    observe or measure.  Whether it's being sweaty, whether it's

2    having a rapid heart rate, whether it's being agitated,

3    whether it's being delusional, those are something you can

4    either observe or ascertain by an evaluation.

5          Q.   And what does it mean for something to be a

6    clinical finding of excited delirium syndrome?  Or if it's

7    helpful to answer the question, what -- in general, what

8    does it mean for something to be a clinical finding --

9    (audio disruption) -- or a diagnosis?

10         A.   We'll probably need to repeat that one.  You broke

11   up for just a moment in the middle that question.

12         Q.   Sure.  No problem.

13              So, you described what a clinical finding is.

14   What does it mean for something to be a clinical finding of

15   excited delirium syndrome?

16         A.   Sure.  A clinical finding of any syndrome is

17   basically the syndrome will have certain features of it.

18   And if you have that feature, that would be a clinical

19   finding of it.  A clinical finding of influenza-like illness

20   might be fever or chills or cough or congestion.  If you

21   have those symptoms, you would be having a clinical finding

22   of it.

23              In excited delirium syndrome, there are certain

24   clinical features that are consistent with it which we

25   described in the earlier paragraph of, you know, the rapid,

1   breathing and the heart rate and the agitation.  And so this

2   is just a delineation of those clinical findings that were

3   specific to Mr. Todero that would be consistent with the

4   clinical syndrome of excited delirium.

5       Q.   And actually, you -- you used the phrase

6   "consistent with" in your answer just now.  And you also

7   used the phrase consistent with in the first lead-in

8   sentence to that paragraph, "Mr. Todero was reported to have

9   a number of symptoms consistent with excited delirium

10  syndrome."  From a medical perspective, what does -- what

11  does it mean for a symptom to be consistent with a syndrome?

12      A.   Well, as far as you -- to diagnose the syndrome,

13  you have to have enough of or the specific features of or --

14  or something else that sort of leads you into that syndrome.

15  So cracked lips and a lymph node are symptoms consistent

16  with Kawasaki's disease.  But if you don't have all of the

17  other features, you cannot diagnose Kawasaki's disease.

18          So, until you put them all together, you can't

19  necessarily call it the diagnosis of that syndrome.  So each

20  of these is a symptom or a finding that is clinically

21  consistent with excited delirium syndrome.  When you put

22  them all together and you rule out certain other causes,

23  then you can come to the conclusion that more likely than

24  not this is excited delirium syndrome.

25      Q.   And then turning to the next paragraph, and this

Gary Michael Vilke, M.D.

```
 1   is the final paragraph under the heading -- under the
 2   heading of -- of Opinion 1, under that subheading.  It
 3   states, "An exact etiology of Mr. Todero's excited delirium
 4   syndrome is not easily identified as the basic toxicology
 5   screen performed on his blood was negative for common drugs
 6   of abuse; however, as noted above, there are other commonly
 7   abused drugs that can precipitate excited delirium syndrome
 8   that do not show on basic toxicology screen."  I'm going to
 9   pause there, taking that one sentence.
10          Is there any opinion of yours related to the facts
11   of this case that is contained in that sentence?
12       A.   Yeah, I can't -- it's sort of toeing the line
13   between fact, description of fact versus opinion.  It's my
14   opinion that an exact etiology was not identified.  It's
15   also, I guess a fact, so I'm not sure how you -- how you
16   parse those apart.
17       Q.   Well, and -- and perhaps it -- it's -- maybe falls
18   more into the category of an -- of an absence of an opinion.
19   When you say "is not easily identified", are -- is that
20   you -- is it fair to say that you have not reached and
21   disclosed in this report an opinion regarding what the
22   etiology of Mr. Todero's excited delirium syndrome is?
23       A.   Right.  Based on the review of the records that
24   are available, all materials we talked about, there is no
25   easily identifiable drug etiology for his behavior.  There
```

1    are certainly some that are on the list of possibilities

2    including spice.  That's come up a number of times in the --

3    in the nephrology section in other reports.  But the

4    toxicology screen didn't screen for that and so, therefore,

5    you can't conclude as the -- as the exact etiology, which is

6    why I put that in there.

7         Q.   What is an "etiology"?

8         A.   Etiology is a cause or -- or, you know, the

9    starting event.

10        Q.   Okay.  And you referenced in the answer you just

11   gave, you referenced certain toxicological causes or drugs

12   that -- that are known in -- in your view and in the

13   materials you provided are -- are believed to cause excited

14   delirium syndrome.  And there's also some -- a number of

15   non-toxicological or nondrug-related etiologies for excited

16   delirium syndrome; is that correct?

17        A.   There are drug-induced and nondrug-induced causes

18   for excited delirium syndrome.

19        Q.   And there is no opinion of yours disclosed either

20   in this -- in that sentence or indeed anywhere in your

21   report as to the etiology of Mr. Todero's excited delirium

22   syndrome; is that correct?

23        A.   Right, the exact etiology.  I reference that spice

24   or flakka or bath salts could cause it and wouldn't be

25   picked up on drug tests, but I cannot tell you exactly which

1    one caused his.  Signs and symptoms and behavior was

2    consistent with drug intoxication, but I can't tell you

3    which one exactly.

4        Q.  And you could -- you could include that statement

5    in any -- any report, correct, that in -- in your opinion

6    based on your review of the literature, spice or flakka or

7    bath salts can cause excited delirium syndrome and they

8    were -- there's no evidence one way or the other on the drug

9    screens in this case because those substance were not tested

10   for; is that fair to say?

11       A.  So, those are facts that they can cause it and

12   wouldn't come up on a drug screen.  What I was speaking

13   earlier is his behavior was consistent with a simulant drug

14   intoxication of which those that didn't show up on his drug

15   screen could include spice or flakka or bath salts.

16       Q.  Where -- Can you direct me to where in your report

17   you reached the conclusion that his -- or the opinion that

18   Mr. Todero's behavior was consistent with drug intoxication?

19       A.  The next line goes into his -- overall, his

20   "presentation, signs and symptoms, vital signs and behaviors

21   noted on the video as well as reports are consistent with

22   classic excited delirium syndrome."  It didn't say exactly

23   it was caused by a drug, but as I spoke earlier, the drugs

24   are the most common cause for these syndromes.

25       Q.  And then they're -- there are causes that are not

1    drug related; correct?

2        A.    Psychiatric disorders are the other features that

3    tend to present the most, yes.

4        Q.    It's -- some causes -- Are there causes other than

5    drugs or psychiatric conditions?

6        A.    Some lump in certain infections, although it's --

7    either infections can be its own diagnosis or you can sort

8    of roll it in.  So it's -- that sometimes gets rolled in.  I

9    tend to think of it more as psychiatric versus drug.

10       Q.    Okay.  You tend to think of it as psychiatric

11   versus drugs, but also infections are contained in the

12   literature on excited delirium syndrome as one of the

13   potential aspects of the range of etiologies; correct?

14       A.    It is consistent with some of the literature, yes.

15       Q.    Again, going back to my question, you don't

16   disclose anywhere in this report an opinion that

17   Mr. Todero's behavior was consistent with drug intoxication?

18       A.    By virtue of the fact they didn't have any

19   psychiatric disorders or infectious etiologies, his excited

20   delirium is consistent with drug-induced excited delirium

21   syndrome.

22       Q.    Can you direct me to where in your report you

23   disclose that particular opinion?

24       A.    Right.  And I -- I think I read to you the line.

25   It didn't say exactly drug induced, it says, "presentation,

1    signs and symptoms, vital signs, behaviors noted on the

2    video as well as reports are consistent with classic excited

3    delirium syndrome."  But you're right, I didn't say

4    specifically caused by spice or caused by some other drug.

5        Q.   Or caused by infection or caused by psychiatric

6    condition, none of -- you didn't specify amongst any of

7    those potential causes in that sentence that you just read

8    to me; correct?

9        A.   He has no history of psychiatric disorder or

10    evidence of infection, so there would be no reason to

11    disclose that because we weren't causes.

12        Q.   Well, that's not my question with respect,

13    Dr. Vilke.  My question is:  In that sentence that you had

14    read and that you had pointed me to as being the basis for

15    your opinion, there's nothing in that sentence which

16    discloses any opinion one way or the other amongst the

17    multiple potential etiologies of excited delirium syndrome;

18    correct?

19        A.   The two etiologies that I reference are

20    psychiatric and drug induced, but I didn't differentiate

21    that in that sentence, that is correct.

22        Q.   Right.  Nor did you differentiate infection, which

23    you have acknowledged in your deposition today is also in

24    the literature considered potential within the range of

25    etiologies for excited delirium syndrome?

1    A.   And I clarified that.  Typically, when you find an

2    infection source for excited delirium syndrome, you usually

3    would identify that as the diagnosis, such as encephalitis

4    or meningitis.  You wouldn't call it excited delirium

5    syndrome, but it is in the literature out there.

6    Q.   In fact, the only opinion that you have reached

7    and disclosed in this report is the general opinion that

8    "Mr. Todero's presentation, signs and symptoms, vital signs

9    and behavior as noted on the video as well as in reports

10    are consistent with classic excited delirium syndrome";

11    correct?

12    A.   And then the -- the symptoms that were identified

13    as that, yes.

14    Q.   Right.  But there's no -- no opinion written in

15    the report which purports to parse which of the potential

16    etiologies of excited delirium syndrome, whether it be drugs

17    versus psychiatric versus infection or within the range of

18    drugs that might be known to cause it, you don't have any

19    written opinion disclosed in this report which purports to

20    offer an opinion of -- of selecting within that range of

21    possibilities; correct?

22    A.   The last paragraph says an exact etiology of his

23    excited delirium syndrome is not easily identified because

24    of the tox screen.  That is reference that symptoms are most

25    consistent with the toxicologic version because he has no

1   history of psychiatric etiology.  So --

2        Q.   Where in your report does --

3        MR. STEPHENSON:  Wait a minute.  Let him finish his

4   answer.

5             Go on, Doctor.

6        THE WITNESS:  And I say, "However, as noted above,

7   there are commonly abused drugs that can precipitate excited

8   delirium syndrome" and don't show on the tox screen.  So I'm

9   not going to commit to say this is spice when I can't say

10  it's spice, it could be bath salts.  But I'm referencing in

11  my report that I believe a toxicologic etiology is here.

12  BY MR. HEPPELL:

13       Q.   Well, there's -- The sentence you've just pointed

14  to, you could include that sentence in any report in

15  reference to any person regardless of their own personal

16  history of -- of drug abuse or lack thereafter; correct?

17       A.   Well, this is based on Mr. Todero's records, the

18  44 records or pieces of information I reviewed, not just any

19  report.  This is specific to him.

20       Q.   But the -- the sentence that you had just read

21  that "An exact etiology of Mr. Todero's excited delirium

22  syndrome is not easily identified as the basic toxicology

23  screen performed on his blood was negative for common drugs

24  of abuse," that's a fact specific to this case; correct?

25       A.   Correct.

1    Q.   But it's a fact that doesn't -- that discloses the

2    absence of drugs or at least the absence of the drugs that

3    were specifically tested for on that toxicological screen;

4    correct?

5    A.   It's saying that he didn't have PCP,

6    methamphetamine, cocaine in his system as an etiology, but

7    based on the facts that there are other possibilities that

8    could have -- that could be playing in this case.

9    Q.   But, "As noted above, there are other commonly

10   abused drugs that can precipitate excited delirium syndrome

11   that do not show on a basic toxicology screen," that's a

12   fact regardless of the identity of the person who is being

13   discussed or the specifics of any history of drug use they

14   have; correct?

15   A.   That half a sentence, yes.  I'm putting these

16   two sentences in this last paragraph together.  You're

17   taking them as separate sentences.  It's the whole concept

18   of no -- nothing on the drug screen showed it, but all his

19   signs, symptoms, vital signs are consistent with excited

20   delirium syndrome despite the absence of something on the

21   drug screen, there are some that could show up.  This isn't

22   one sentence versus the other, this is a complete thought

23   here.

24   Q.   So you -- you cannot -- In your opinion you cannot

25   rule out that drugs were at issue here simply because there

Gary Michael Vilke, M.D.

1    are some drugs that in your opinion are known to cause

2    excited delirium syndrome that were not tested for on the

3    toxicological screen?

4         A.   Right.  And present just the same clinical

5    presentation that he did his last 24 hours.

6         Q.   And where in your written report is that opinion

7    contained, that the drugs that were not tested for were

8    consistent with his -- his behavior?

9         A.   That's this whole paragraph.  I'm saying there are

10   drugs that can cause excited delirium syndrome that aren't

11   showing up, and his presentation, signs, symptoms, vital

12   signs and behaviors are all consistent with the classic

13   excited delirium syndrome.  It's -- they're not independent

14   thoughts, it's one -- one concept.  And so I'm saying that

15   even though I don't see an etiology for it, his symptoms and

16   signs and presentation are consistent with excited delirium

17   syndrome, most likely due to a -- a cause or a -- the drugs

18   that aren't showing up on toxicology screen.

19        Q.   Well, but the opinion that it's most likely the

20   drugs that are not showing up on the toxicology screen,

21   where in your report is that idea disclosed?  Because that's

22   the part that I'm not seeing, Dr. Vilke.  I'm with you all

23   the way up until you say excited delirium syndrome, I see

24   that.

25        A.   Okay.

1    Q.   And then this last phrase you just read, "most

2    likely because of", I don't see that in your report.  Can

3    you please direct me to where that is contained in your

4    report?

5    A.   I just went through this paragraph.  And I'm

6    saying if you're not understanding it, I'm trying to explain

7    it to you in this deposition.  My opinion is that there are

8    drugs that cause excited delirium syndrome that do not show

9    up on drug screen, and his behavior was consistent with

10   excited delirium syndrome, all those aspects of it.  There's

11   no indication for psychiatric disorders.  I don't agree with

12   the idea of infectious -- and there's no history of

13   infectious disease, so that leaves drug intoxication, which

14   is the symptoms he's consistent with.

15   Q.   But where in your -- so it sounds like it's a

16   diagnosis -- What you've just described is excluding the

17   other factors and saying, "It must be drugs because I'm

18   ruling out psychiatric factors and I don't believe in

19   infection as a -- as an etiology"?

20   A.   Well, I define --

21   Q.   Where in your report -- sorry.

22        Where in your report does it state that?

23   A.   Which "that"?  I'm sorry.

24   Q.   Are you ruling out --

25   A.   It --

1    Q.    Where in your report does it state that you are

2   ruling out psychiatric factors and that you are ruling out

3   infection as a factor?  Point me to your report where it

4   says that.

5    A.    I don't -- I don't need to put it in my report for

6   the infectious because I defined excited delirium at the

7   very beginning of psychiatric or -- or drug induced.  But I

8   explained to you that I think if you call it infectious

9   etiology, you should call it as the infectious etiology, not

10  call it excited delirium syndrome.

11        With regards to the psychiatric disorders, there's

12  nothing in his history that I've reported here that

13  demonstrates he's got a history of psychiatric disorders.

14  And so if there was, I certainly would have put that in

15  there, "He's got a long history of schizophrenia, he's

16  untreated."  But there was no reason to put that in there

17  because he didn't have any.

18        So, I take it as a person who comes in with

19  evidence and clinical findings of drug intoxication and

20  then -- but a negative drug screen, that's why I put those

21  two sentences together at the end.  I -- I get that you

22  don't agree with me, I'm just telling what you my opinion

23  is.  My opinion is that his symptoms, presentation, all that

24  is consistent with excited delirium syndrome.  And the --

25  and just before I write that up, I say there are drugs that

1  show -- don't show on drug screen that are the likely

2  etiologies of that.

3      Q.  Well, in -- and just to be clear, Dr. Vilke, it's

4  not -- it's neither here nor there whether I agree or

5  disagree with you, but it's a question of what is contained

6  in your report and that's what I'm trying to find out.

7  What -- where -- where you contend you disclosed or

8  explained a certain opinion.

9          Regarding the -- so if I understood the answer

10 that you just gave, it's your testimony that the -- the part

11 of your report where you've ruled out infection as a

12 potential etiology for Mr. Todero's excited delirium

13 syndrome is that you -- you don't view infection as a

14 legitimate etiology although the literature does discuss it,

15 and you don't list infection in your report when you discuss

16 excited delirium syndrome generally; am I understanding you

17 correctly?

18     A.  Right.  It's a -- it's in some literature.  The

19 most current literature doesn't usually reference infection

20 because if you have an infection, they usually call that --

21 whatever infection is causing it as the etiology not excited

22 delirium syndrome.  But delirium due to encephalitis.

23 That's -- again, that's semantics amongst -- amongst

24 providers, but as far as the true etiologies that are mostly

25 accepted by the major groups, ACEP and NAME is drugs and

1   psychiatric disorders.

2       Q.   And the basis for that in your report is simply

3   that you don't mention infection, you mention -- you mention

4   drugs; correct?

5       A.   That's my -- my background -- the background that

6   I gave you on excited delirium, whether you call it an

7   opinion or not, that's my background.

8       Q.   And in terms of your contention here today that

9   you have disclosed the opinion ruling out a psychiatric

10  cause, you're relying on the fact that nowhere in your

11  report do you discuss a psychiatric history for Mr. Todero;

12  is that correct?

13      A.   I ruled it out as part of my evaluation, you're --

14  you're correct.  I do not write specifically there is no

15  history of mental illness in his background.  They're --

16  we're discussing that now in deposition, but the reality is

17  I did not put that in there because it didn't impact my

18  opinion going forward.  My opinion going forward was that he

19  was under the influence of something that was consistent

20  with a drug-induced excited delirium syndrome.

21      Q.   If -- You had discussed the fact that there were

22  two prior incidents of drug use that were contained in

23  medical records that you've reviewed prior to the medical

24  records in this incident; is that correct?

25      A.   We've talked about there were at least two

Gary Michael Vilke, M.D.

1    episodes of substance abuse at -- that came to a hospital.

2        Q.   Okay.  No other medical records that you reviewed

3    that revealed any substance abuse; correct?

4        A.   Not that I'm aware of, no.

5        Q.   Isn't -- Is marijuana one of the drugs that is

6    known to cause excited delirium?

7        A.   In and of itself, it's really not felt to be a

8    drug that typically causes excited delirium.

9        Q.   Okay.  And one of the two prior instances of drug

10   use documented in medical records for Mr. Todero was related

11   to marijuana; correct?

12       A.   It was related to marijuana, dipping it into other

13   substances that are abused.  I think it was formaldehyde or

14   something, I can't remember exactly.

15       Q.   Okay.  Is there any basis in the medical

16   literature that marijuana dipped in formaldehyde causes

17   excited delirium?

18       A.   Well, that was, I think, the presumption at the

19   time.  I'm not sure if it's actually confirmed.  But

20   certainly marijuana dipped in PCP can do it or other

21   substances, but formaldehyde itself I'm not familiar with

22   having an kind of etiology.

23       Q.   And Mr. Todero tested negative for PCP; correct?

24       A.   At what time point?  I'm sorry.

25       Q.   At the time of his death or at the time of his --

Page 137

1   this incident, we know whatever the causes were, we know it

2   was not PCP; correct?

3        A.   The tox screen in the emergency department and

4   autopsy did not show PCP, that is correct.

5        Q.   Okay.  So the -- that prior incident of drug use

6   does not support a history of drug -- of using drugs of the

7   kind that would cause excited delirium; correct?

8        A.   That's what I was getting at.  I think they

9   presumed it was formaldehyde, but I don't remember if a

10  screen was done to look for other drugs of abuse at that

11  point.  So it could have been another drug, I just don't

12  know because I don't think if they tested for them at that

13  point.

14       Q.   You're referring to the medical record related to

15  that prior incident?

16       A.   Correct.  I -- I don't remember the details of

17  whether it -- they did a tox screen at that time to look for

18  other drugs of abuse including synthetics or not, but I

19  don't -- but I -- I do know they discussed him using

20  marijuana but more than just marijuana, marijuana dipped in

21  other substances which is a -- a pattern of substance abuse.

22       Q.   In that particular instance, a pattern of

23  substance abuse of a kind that would not cause excited

24  delirium syndrome; correct?

25       A.   If it was only formaldehyde, there's no -- yeah,

Gary Michael Vilke, M.D.

```
 1   no indication that would cause excited delirium syndrome.
 2        Q.   So then there -- do you recall the substance that
 3   was at issue in the other prior incident that you had
 4   referenced?
 5        A.   As far as the hospitalizations, I believe we
 6   referenced I think it was alcohol and opioids.
 7        Q.   Okay.  Are those -- Are either of those substances
 8   on the list of substances that are known to or cause excited
 9   delirium syndrome?
10        A.   In and of themselves neither are.
11        Q.   Okay.  So of the medically documented history of
12   drug use that Mr. Todero has, at least in the records that
13   you reviewed, there is no history of using drugs or
14   intoxicants of a kind that are known to cause excited
15   delirium syndrome; correct?
16        A.   The -- the few previous hospitalizations did not
17   show that, that is correct.
18        Q.   Okay.  So it's essentially speculation on your
19   part that because he had used those other drugs in the past,
20   more likely he was using a different kind of drug at this
21   different period of time which caused his excited delirium
22   syndrome; correct?
23        A.   And -- and I think we talked earlier there's
24   somebody, I can't remember if it was a friend or a family
25   member who reported that he was using some other -- some
```

**Gary Michael Vilke, M.D.**                                    **Todero vs.**
                                                        **City of Greenwood**

1    stimulant substances, I think it was either -- it was

2    cocaine they were referencing at some point.  So as far as

3    the medical records, no.  As far as other reports in the

4    materials given to me, there was some notation of that.

5         Q.   And is that then the basis for you testifying

6    today that it was drugs and not another potential etiology

7    for excited delirium syndrome?

8         A.   Well, the basis was lack of previous psychiatric

9    history in any of the records or medications consistent with

10   that based on my review.  And then the behavior that was

11   documented by the State Trooper, by the people at the

12   church, and as well as by the officers arresting him, the --

13   the erratic behavior, the -- the bizarre delusions, and all

14   the agitation plus the tachycardia and the other findings we

15   talked about there, all those put together are consistent

16   with a clinical evidence of stimulants or hallucinogenic

17   drug intoxication.

18        Q.   That statement is not contained anywhere in your

19   report that those symptoms are consistent with stimulant

20   abuse; correct?

21        A.   They're contained to the degree I opined that

22   those symptoms are consistent with excited delirium

23   syndrome.  And excited delirium syndrome is caused by

24   stimulants.  But I didn't put the two together into one

25   sentence for you, no.

                                                        **Page 140**

1    Q.   And -- and you also note that there are other

2    causes -- you note in your report that there are other

3    causes of excited delirium syndrome, specifically

4    psychiatric conditions; correct?

5    A.   I do note that as a possible etiology, yes.

6    Q.   And you also acknowledge that the literature

7    supports, although you don't personally subscribe to the

8    view, that infections are essentially within that range of

9    etiologies of excited delirium syndrome; correct?

10   A.   The older literature refer -- references to the

11   infectious etiologies and I don't subscribe to that, that is

12   correct.

13   Q.   Okay.  And then the -- the last sentence in that

14   paragraph, "Based on the signs and" -- this is at the top of

15   Page 11.  "Based on the signs and symptoms being exhibited

16   by Mr. Todero, I agree with Dr. Wetli that the cause of

17   Mr. Todero's cardiac arrest was, to a degree of medical

18   certainty, complications from excited delirium syndrome,

19   which led to multi organ failure and resulted in his

20   subsequent death."

21        Is that -- is that a -- a separate opinion that

22   you have reached or is that essentially a -- a continuation

23   of this same opinion that we have been discussing

24   previously?

25   A.   I think it's -- again, it's referencing the signs

```
 1   and symptoms that he's exhibiting, it's consistent with

 2   excited delirium syndrome.  So it's probably more of a

 3   continuation or a reiteration of that.

 4        Q.   There's no separate explanation contained either

 5   in this paragraph or any -- anywhere else in your report

 6   about the complications from excited delirium syndrome

 7   leading to multi organ failure beyond what -- what we've

 8   already discussed; correct?

 9        A.   Right.  Dr. Wetli's quote that I put in there

10   talks about that and I agreed with that quote, but I didn't

11   go into the details of the multiple organ failure component

12   myself.

13        Q.   And that concludes all of the explanatory support

14   for the main Opinion Number 1; correct?

15        A.   Explanatory and basis, yes.

16        Q.   And then the remaining portion of the report here

17   on Page 11 continuing through to Page 13 when it transitions

18   to your background, that's related to this second numbered

19   opinion that you agree with Dr. Wetli that elevated

20   potassium level, acidosis and rhabdomyolysis found in

21   Mr. Todero when he arrived at the hospital was not caused

22   by the use of the TASER or restraint by the officers;

23   correct?

24        A.   That is correct.

25        Q.   Okay.  And so looking at that specific numbered
```

1    opinion, that first paragraph again takes the form of your

2    statement that "Dr. Wetli noted in his report" and then a

3    long block quote from Dr. Wetli's report; correct?

4        A.   That is correct.

5        Q.   Nowhere in that paragraph is there disclosed an

6    opinion that you have reached; is that fair to say?

7        A.   That's fair to say that's his opinion written out

8    there, yes.

9        Q.   Okay.  So you're just quoting his report?

10       A.   Right.  I'm quoting his report.  I'm -- you know,

11   I'm agreeing with his opinion, but I'm going to go into my

12   details of it as we go through.

13       Q.   Right.  And the next paragraph starts, "Mr. Todero

14   was taken to the emergency department May 29, 2016 in

15   cardiac arrest status and was evaluated by hospital staff",

16   and continues on with various -- your recitation of certain

17   facts and related to the timeline of certain events in the

18   case; is that fair to say?

19       A.   That's fair to say, sure.

20       Q.   Are there any opinions of yours that are contained

21   within that paragraph?

22       A.   I don't think so, no.  I think it's merely facts.

23       Q.   Okay.  The next paragraph continues on,

24   "Mr. Todero had basic laboratory chemistry levels of his

25   blood checked on May 29, 2016", and then goes on to describe

1    certain of those readings and certain of those levels.  Are

2    there any opinions of yours contained within that paragraph?

3         A.   Other than -- I -- fact versus opinion, the second

4    to the last line, "The potassium is elevated typically

5    because of renal failure, which was already present in

6    Mr. Todero that day."  I mean, we know it's elevated when he

7    gets to the hospital, so it's probably more of a fact than

8    anything else.

9         Q.   Okay.  But the fact is that potassium is elevated

10   typically because of renal failure?

11        A.   That's correct.  The kidney is not working,

12   doesn't regulate correctly so that the potassium rises up.

13   And that -- again, we know that it was already present that

14   day, I don't specify a time I guess, where my -- where the

15   opinion -- we'll get more into that in a little bit,

16   though.

17        Q.   Okay.  Where do -- strike that.

18             I believe you should have in -- in front of you a

19   copy of Dr. Wetli's report.  Has that been made available to

20   you, Dr. Vilke?

21        A.   I got a transcript of his deposition.

22        Q.   And is one of the other documents his -- a copy of

23   his three-page report?

24        A.   I got a copy of the White Paper, but no report.

25        Q.   No report?

Gary Michael Vilke, M.D.

```
1        A.   And it's not attached to his deposition in this
2   case.
3        Q.   Well, I thought that I had sent that along as
4   well, but perhaps I did not.  So maybe we could take five
5   minutes while I work -- work out the logistics of getting
6   you a copy of Dr. Wetli's report to review.  I think that's
7   going to be easier than me trying to pull up sections on the
8   screen.  Despite my aspirations of saving paper, that may
9   not be possible.  So --
10       A.   Sounds good.
11       MR. HEPPELL:  So let's -- let's take five minutes while
12   I work on that.  Apologies for the logistical stuff.
13            (A five-minute break was taken at 1:26 p.m.)
14   BY MR. HEPPELL:
15       Q.   Back on the record.  Apologies for that brief
16   interlude.
17            Dr. Vilke, you now have in front of you a copy of
18   Dr. Wetli's three-page expert report; is that correct?
19       A.   That is correct.
20       MR. HEPPELL:  And can we -- let's designate that
21   Exhibit B.  I believe that we're only on Exhibit B.  We had
22   your report as Exhibit A.
23            (Exhibit B was marked.)
24   BY MR. HEPPELL:
25       Q.   So you -- we had just been looking in your report
```

1    at the paragraph on Page 12, that middle paragraph on

2    Page 12.  And you discuss various factual findings related

3    to Mr. Todero's lab chemistry levels.  And then you also

4    state that those results are consistent with stage 4 kidney

5    damage and consistent with acute kidney injury or AKI.  Do

6    you see what I'm referring to?

7         A.   Yes.

8         Q.   Would you agree with me that those -- that those

9    conclusions related to kidney damage or kidney injury are

10   not contained in Dr. Wetli's report?

11        A.   He references rhabdomyolysis which typically is

12   associated with a kidney injury, but I don't see -- and the

13   hyperkalemia which is associated with it, but I don't see

14   him referencing AKI in here.

15        Q.   Okay.  And so Dr. Wetli does not reference AKI or

16   stage 4 kidney damage; correct?

17        A.   He does not use the word stage 4 kidney damage

18   either in here, no.

19        Q.   Nor does Dr. Wetli draw any connection between any

20   of Mr. Todero's laboratory chemistry levels and kidney

21   injury or kidney damage; correct?

22        A.   He talked about rhabdomyolysis which the mechanism

23   is to damage kidneys, but he doesn't actually specifically

24   say that beyond multi organ failure, which also includes the

25   kidney, but, yeah, he doesn't actually reference the kidney

```
 1   specifically other than the multi organ failure.

 2       Q.   The next paragraph of your report, turning back to

 3   Exhibit A, the bottom of Page 12, states that "The

 4   physiologic effects of TASER ECD on humans have been studied

 5   extensively using probe mode and also in drive stun."

 6           And it continues on, "In probe mode, the probes

 7   are fired into a subject and cause a larger group of muscles

 8   to contract, and even durations of up to 15 seconds have

 9   been shown to not cause any acute elevations in creatinine

10   and do not require specific evaluation or treatment."

11           And it goes on to describe, "In drive stun, there

12   are even fewer muscle groups being contracted, so even fewer

13   muscle contractions would occur that would potentially

14   release enzymes into the blood that might injure the

15   kidneys.  AKI has not been described in nor supported by the

16   peer reviewed medical literature as being caused by a TASER

17   ECD activation."

18           Are there any opinions of yours related to this

19   case that are contained in that paragraph?

20       A.   I think it's more basis of opinions, but not

21   actual opinions.

22       Q.   Okay.  So those are sort of factual statements

23   independent from the facts of this case that you're reciting

24   for the basis of other opinions elsewhere in your report;

25   correct?
```

Todero vs.
                                                                City of Greenwood

1        A.   That sounds fair, yes.

2        Q.   Okay.  And we had discussed earlier, so that

3    paragraph that references studies that had tested durations

4    of up to 15 seconds.  And we had discussed earlier that

5    studies of longer durations of 90 seconds or -- or above had

6    not been conducted, at least to your knowledge; is that

7    correct?

8        A.   Not in humans, that's correct.

9        Q.   Okay.  Are you aware of studies in humans that

10   have gone any longer than 15 seconds?

11       A.   There have been some uses of 30 seconds and 60

12   seconds, but beyond that, no.

13       Q.   Do you cite any of those studies in your -- in

14   your report?

15       A.   I think there are references to my studies, but --

16   or to those studies, but not as specific studies.  They -- I

17   think they came out as more case series rather than

18   independent research, so that's why.

19       Q.   Can you -- can you explain the distinction that

20   you just made?

21       A.   Right.  The ones -- the ones I'm referencing here

22   are organized studies.  There were some references in like

23   the -- I think the article by Kroll about longer durations

24   in the -- in the evaluation of CK levels of TASERs up to 30

25   seconds and 60 seconds.  But as far as other papers that

                                                            **Page 148**

1    have it as a -- you know, "We have 15 subjects and we did

2    this, we measured that", those types of studies, I haven't

3    seen them with those long durations.  I have seen references

4    to them, but I haven't actually seen the papers that showed

5    the -- the methodology behind it.

6        Q.   Okay.  So in terms of studies that you personally

7    are familiar with that you reviewed and are relying on for

8    this report, the longest duration on humans that you've seen

9    the -- the underlying materials for is fifteen second

10   duration; correct?

11       A.   That looked at CK levels, yes.

12       Q.   Okay.  And I'm turning to the last paragraph in

13   this section, it starts with, "Mr. Todero was suffering from

14   acute kidney injury when he arrived at the ED that

15   afternoon."  That refers to Emergency Department; is that

16   correct?

17       A.   Correct.

18       Q.   Okay.  That opinion is not contained anywhere in

19   Dr. Wetli's report; is that fair to say?

20       A.   He doesn't reference specifically AKI.  He does

21   talk about multi organ failure as being a component of

22   excited delirium, but not -- not AKI.

23       Q.   And -- and then the -- the rest of your paragraph

24   goes on to -- to make additional factual statements and

25   additional evaluations of the record in this case related to

1    AKI; is that correct?

2         A.   That's -- AKI and rhabdomyolysis, yes.

3         Q.   Okay.  And rhabdomyolysis is referenced just in

4    the final sentence of this paragraph; correct?

5         A.   Well, the rhabdomyolysis is referenced by the

6    elevated CK levels.  So rhabdomyolysis is elevation of CK

7    that goes on to damage kidneys.  So I talk about the CK

8    levels earlier, but the word rhabdomyolysis I think looks

9    like it only shows up in that last paragraph.

10        Q.   Okay.  Going back to -- briefly going back to what

11   we had discussed under the -- well, strike that.

12             That -- the remaining portion of your report

13   starts with the heading Background and that is a description

14   of your personal background, sort of a narrative form of

15   some of the information that's contained in your C.V.; is

16   that correct?

17        A.   Some of it, yeah, back -- background specific to

18   the areas that I am offering opinions on.

19        Q.   There are no -- there are no opinions of yours

20   related to this case that are contained in that background

21   section; is that fair to say?

22        A.   Yes, there are no opinions there, that's correct.

23        Q.   Okay.  So in terms of identifying the sum total of

24   your opinions disclosed in this report, once we hit that

25   halfway down Page 13, we can stop looking; fair to say?

1     A.   That is fair, yes.

2     Q.   Okay.  Umm, turning back to the portion of

3  Opinion 1 and specifically the -- the paragraph where you

4  describe factually the number of symptoms that you view as

5  being consistent with excited delirium syndrome, as you

6  phrased it, or that those are clinical findings of excited

7  delirium syndrome.  Are you familiar with the paragraph that

8  I'm referring to and the concept that we discussed earlier?

9     A.   So you're on Page 10; is that correct?

10     Q.   Correct.

11     A.   Yes.

12     Q.   Okay.  Fair to say that many of the individual

13  facts that are listed in that paragraph are consistent with

14  a number of different syndromes or diagnoses; correct?

15     A.   You mean like an elevated temperature could be

16  consistent with many different diagnoses, yes, that's --

17     Q.   Correct.

18     A.   -- true, sure.

19     Q.   Okay.  Is there anywhere in your written report

20  where you disclose an opinion related to the minimum number

21  of required clinical findings of excited delirium syndrome

22  that are required to be present for one to reach the

23  conclusion that the -- those findings are in fact caused by

24  excited delirium syndrome?

25     A.   Do I -- do I write that out specifically that

1   there are a certain number, no.  It's felt to be six out of

2   ten.  It's referenced in the papers that I had put into my

3   reference section, but not written out specifically in my

4   report.

5        Q.   Okay.  Is there anywhere in your report that you

6   disclose that certain clinical findings are required, that

7   you cannot conclude -- you cannot reach a conclusion of

8   excited delirium syndrome without a certain specific one

9   being present, is that included anywhere in your report?

10       A.   I don't go into the details of what is required.

11  I -- I guess I cover them in my report, but I don't say this

12  is a requirement.  If it wasn't there, I wouldn't be opining

13  that it was consistent with excited delirium or the

14  diagnosis would be more likely than not excited delirium.

15  But no, I don't go out and say you have to be delirious to

16  have excited delirium, that sort of goes without saying.

17       Q.   You had referenced just now that there is some

18  supporting literature that suggests that six out of ten are

19  required?

20       A.   That's been put out by Chris Hall and seems to be

21  adopted by a number of different groups as -- as a

22  reasonable set of criteria to define it.

23       Q.   Is that somewhat of a subjective determination

24  whether six is enough or whether five would be enough or

25  seven should be shown?

**Gary Michael Vilke, M.D.**

1    A.   It has been studied and so up in Canada, Chris

2    Hall's group has looked at symptoms of presentations of

3    people in the field prospectively and found that if you're

4    six or above, you're more consistent with the diagnosis of

5    excited delirium than if you are three or below.  There's a

6    range in the three to -- the four, five range which is

7    probably more ambiguous, but they settled on take out that,

8    you jump to six and above and it -- it would be consistent

9    or diagnostic of excited delirium syndrome.

10   **Q.   Outside of the -- outside of the number of**

11   **clinical findings that are present, there's no -- there's no**

12   **underlying physiological test that can be done to sort of**

13   **conclusively rule in or rule out excited delirium syndrome;**

14   **correct?**

15   A.   In a living person, there's no blood test or

16   imaging study or something along those lines.  Postmortem,

17   they have been doing testing at University of Miami looking

18   at certain portions of the brain and dopamine receptor

19   numbers and have -- have ways of determining that the brain

20   is consistent with a -- a diagnosis of excited delirium.

21   But that being said, it's a postmortem specialty test, it's

22   not done most places.

23   **Q.   Okay.  And you -- there's no opinion that you've**

24   **disclosed in this report related to any postmortem findings**

25   **of Mr. Todero supporting that kind of conclusion; correct?**

**Page 153**

Gary Michael Vilke, M.D.

1      A.   His brain was not sent down to Miami, so that is

2   correct.

3      Q.   Okay.  So the only -- the only bases for your

4   opinion related to Mr. Todero suffering from excited

5   delirium syndrome are related to those clinical findings as

6   you've described based on his -- based on his behavior and

7   those other aspects of clinical findings while he was alive;

8   correct?

9      A.   That's how the diagnosis of excited delirium

10  syndrome is almost uniformly made is by -- based on clinical

11  presentation.

12     Q.   But there's no conclusive determination that can

13  be made while a person is alive; is that correct?

14     A.   Beyond clinical syndrome -- syndromic

15  classification of findings, there's not a test you can order

16  that's a yes, no or positive or negative or something like

17  that.

18     Q.   Okay.

19     A.   Correct.

20     Q.   And this is -- perhaps you could come up with a

21  better analogy or example, but to use, I guess, an example

22  of cancer, cancer is something that there might be clinical

23  findings that would lead one to suspect or believe that a

24  person might have cancer, correct, observable behaviors or

25  symptoms that someone was suffering from?

```
 1        A.   There can be clinical finding for certain cancers,
 2   yes.
 3        Q.   And then -- but ultimately you're able to do,
 4   through biopsy or some testing, you can -- you can reach a
 5   conclusive determination whether or not cancer is present;
 6   correct?
 7        A.   That depends on the cancer and the location and
 8   things like that.  There's no -- there have been many
 9   cancers that didn't have determinations initially for many
10   years until they were determined.  Any -- any nascent field
11   of medicine is the same way.  So, ultimately we look to seek
12   tests out that can identify things, but for many diseases
13   there goes long periods of time before that occurs.
14        Q.   For right now, excited delirium syndrome, there is
15   no -- there is no test you can do, no finding you can point
16   to conclusively to say, "Right here, this is excited
17   delirium syndrome," it's simply based on that listing of
18   clinical findings and that range of less than three is not
19   enough, more than six is enough; is that fair to say?
20        A.   Similar to other medical -- medical illnesses and
21   syndromes, that is -- that is correct.
22        Q.   And excited delirium syndrome is not a diagnosis
23   that is recognized by the American Medical Association; is
24   that correct?
25        A.   The American Medical Association recognizes some
```

 1    disorders.  They don't recognize every, and it is not

 2    currently recognized by them, that is correct.

 3         Q.   And the same with the World Health Organization,

 4    right, and ICB codes, there's no recognition of excited

 5    delirium syndrome by the WHO; is that correct?

 6         A.   I think WHO is the same as the AMA in the sense

 7    that they don't recognize everything and they don't -- they

 8    don't recognize this disorder.

 9         Q.   Okay.  And excited delirium syndrome is also not

10    recognized in the Diagnostic and Statistical Manual,

11    correct, the DSM?

12         A.   The DSM is a psychiatric disorder manual put out

13    by the American Psychiatric Association.  And this isn't a,

14    you know, classic psychiatric diagnosis, so it wouldn't be

15    in there any more likely than any other nonpsychiatric

16    diagnosis.

17         Q.   Although it can have a psychiatric etiology in

18    there; is that correct?

19         A.   It could have a psychiatric etiology, but it's not

20    something that's typically taken care of by psychiatrist in

21    an emergency setting or in office settings.

22         Q.   So you agree with me that it's not contained in

23    the DSM; correct?

24         A.   Yes, as a psychiatric -- as a psychiatric

25    diagnosis, it is not contained in there.

1    Q.   Okay.  Can you -- I believe you should have in

2    front of you a copy of the -- what I think you referred to

3    as the White Paper.  Let's designate it as Exhibit C.

4            (Exhibit C was marked.)

5      MR. HEPPELL:  This is the American College of Emergency

6    Physicians White Paper on Excited Delirium Syndrome dated

7    September 10, 2009.  This is a copy of a document that was

8    provided in your subpoena response.

9            Caren, I'm not sure a Bates stamped version of

10   this document was produced previously.  It's possible it

11   was.  This version I pulled was in Dr. Vilke's subpoena

12   response that was sent by Jim to me.  Do you -- do you want

13   me to email -- email that document --

14     MS. POLLACK:  I've got the folder in front of me, let

15   me just grab it.  Yeah, I've got it.

16     MR. HEPPELL:  Okay, great.  So we'll mark that as

17   Exhibit C.

18   BY MR. HEPPELL:

19     Q.   Do you have that document in front of you,

20   Dr. Vilke?

21     A.   I do, thank you, yes.

22     Q.   Okay.  And you -- on Page 2 of that document, you

23   are -- or you were a -- sorry, Page 3 of the document, you

24   were listed as one of the members of this task force; is

25   that correct?

1      A.   That is correct, yes.

2      Q.   And this White Paper Report is the result of your

3    work and the work of the other members of that task force;

4    correct?

5      A.   Correct.

6      Q.   On Page 5, I don't know if there are numbered

7    pages, it's Page 5 in the PDF that I have, it looks like

8    it's the second substantive page of the report itself after

9    the cover page and the listed members.  On -- on that page,

10   and this left-hand column, the very top full paragraph on

11   the left-hand column, it starts with, "Despite increased

12   research."  Do you see the paragraph I'm referring to?

13     A.   I do, yes.

14     Q.   And that -- that reads, "Despite increased

15   research, the exact pathophysiology of excited delirium

16   syndrome remains unidentified.  Some recent research in the

17   area of fatal excited delirium syndrome points to dopamine

18   transporter abnormalities.  Eventually, there might be found

19   a genetic susceptibility, an enzyme excess or deficiency, an

20   overdose or withdrawal state, or some other multifactorial

21   trigger, including a variety of medical and psychiatric

22   conditions."

23          Did I read that correctly?

24     A.   You did, yes.

25     Q.   Okay.  And do you agree with the statements

1    contained in that paragraph as -- as reflected in the Task

2    Force White Paper?

3        A.   In 2009, that's what we wrote in there, yes.

4        Q.   Okay.  Are you -- are you -- Are you suggesting

5    that that's no longer the case?

6        A.   Well, I'm just rereading it now.  I'm just

7    referencing what you read at the time, so --

8        Q.   Sure.

9        A.   Yeah.  And it's -- it's sort of over -- all

10   encompassing, certainly withdrawal states or overdoses are

11   typically not part of the package of it, but at the time it

12   was -- it was a possibility, so it was put in there.  So I

13   think it's -- it's not an unreasonable statement.

14       Q.   Okay.  Not an unreasonable statement for the time,

15   but do you agree with it as it stands today?

16       A.   "There might be found" -- yeah, I guess that's --

17   it's still -- it's still appropriate or applicable today,

18   sure.

19       Q.   Okay.  And then continuing on to the next

20   paragraph, "At present, physicians and other medical and

21   nonmedical personnel involved in personal interactions with

22   these patients do not have a definitive diagnostic, quote,

23   'test' for excited delirium syndrome.  It must be identified

24   by its clinical features.  This also makes it very difficult

25   to ascertain the true incidence of excited delirium

Page 159

1    syndrome."

2        Did I read that correctly?

3    A.   You did, yes.

4    Q.   Okay.  And do you agree with -- with those

5    statements as well?

6    A.   I think it's -- again, it's an appropriate

7    statement, sure.

8    Q.   Okay.  Just not appropriate as of the date of the

9    report, but appropriate based on the state of the -- of your

10   view of the science today; correct?

11   A.   Incidences hard to define because of different

12   uses of diagnostic criteria, identified by clinical features

13   as accurate, and there is no definitive diagnostic test, I

14   think it is appropriate.

15   Q.   Then turning to the next page, Page 6 of the PDF,

16   I guess it's the third substantive page of the report under

17   Epidemiology, do you see the paragraph I'm referring to

18   under that heading?

19   A.   Yes.

20   Q.   And then that paragraph reads, "The exact

21   incidence of excited delirium syndrome is impossible to

22   determine as there is no current standardize case definition

23   to identify excited delirium syndrome."  Do you agree with

24   that statement?

25   A.   That's accurate as with many diagnoses, yes.

Gary Michael Vilke, M.D.

1      Q.    "In addition, since excited" -- the paragraph

2  continues -- "In addition, since excited delirium syndrome

3  is mainly discussed in the forensic literature and is a

4  diagnostic" -- strike that.  I did not read that correctly.

5  Let me start the sentence over.

6           "In addition, since excited delirium syndrome is

7  a -- is mainly discussed in the forensic literature and is a

8  diagnosis of exclusion established on autopsy, there is

9  little documentation about survivors of the syndrome."  Did

10  I read that correctly?

11     A.    That is read correctly, yes.

12     Q.    Did you read -- strike that.

13           Do you agree with that statement?

14     A.    I think the exact incidence is, you know,

15  impossible to determine.  Again, there is no standardized

16  case definitions, that is true, people will call it

17  different things.

18           And "since excited delirium syndrome is mainly

19  discussed in the forensic literature", that was back in

20  2009.  There was little established -- or "there is little

21  documentation about survivors of the syndrome", I think that

22  has evolved over the last decade or so.  So, I think there's

23  more information on survivors, how they present, clinical

24  presentations and things like that.  So I don't -- I think

25  that was -- that -- that second line is more dated.  It was

1    appropriate at the time, but not so applicable now.

2        Q.   Do you agree with the statement that excited

3    delirium syndrome is a diagnosis of exclusion established on

4    autopsy?

5        A.   It can be.  But we diagnose it in the emergency

6    department on a regular basis.  So it's -- you have to rule

7    out other etiologies of death before you can opine that it

8    was excited delirium syndrome.  And that's back to what we

9    talked about, infections or other -- other things that could

10   manifest with delirium and agitation.

11       But so it is -- when it's on autopsy, medical

12   examiners do look at other etiologies of death and then look

13   at the clinical features and then make a determination at

14   that point.

15       Q.   If I understood your answer correctly, you agree

16   that it's a diagnosis -- diagnosis of exclusion, but you

17   don't agree that it is necessarily determined at autopsy; is

18   that correct?

19       A.   It is a diagnosis of looking at the clinical

20   features and also excluding other causes.  For example, if

21   somebody is completely agitated and hot and sweaty and has a

22   thyroid level that's incredibly high from thyrotoxicosis,

23   you wouldn't call it excited delirium syndrome, you would

24   call it thyrotoxicosis.  But if they had the exact same

25   presentation, their thyroid levels were normal and they had,

1    you know, drugs in their system or presented consistent with

2    drug intoxication, then it might be interpreted as excited

3    delirium as a diagnosis.

4         Q.   What if there were -- In the hypothetical you just

5    gave, what if there were no drugs or intoxication present in

6    their system?

7         A.   Then you have to look at the history leading up

8    and to how the patient arrived to the hospital, look at

9    features that were going on, the presentation, the behavior

10   associated with its past medical history and things like

11   that as part of the evaluation.

12        Q.   But you -- you could reach a conclusion of -- of

13   excited delirium syndrome even without any conclusive

14   evidence of drugs or intoxication and without any conclusive

15   determination of psychiatric history; correct?

16        A.   That can occur, yes.

17        Q.   If you excluded all other potential causes for the

18   patient that -- that you're seeing, even without any leads

19   on what the etiology might be, you can apply the label

20   excited delirium syndrome; is that correct?

21        A.   In -- in the -- in appropriate candidates, with

22   the -- again, the behavior leading up to the events are

23   clinical indicators as well.  So without another etiology,

24   if the presentation is ramping up like that, it certainly

25   can be consistent with that and be diagnostic and so you can

1    come to that conclusion of a diagnosis.

2             Typically, there is drugs and intoxication or an

3    underlying psychiatric history in which there is not

4    treatment or under-treatment.  But if the presentation is

5    consistent with drug intoxication and there hasn't been a

6    complete evaluation for all the synthetic stimulants or

7    designer drugs, but the presentation and history are

8    consistent with that, you can come to that diagnosis.

9        Q.   And that's the opinion that you've reached here,

10   there was no finding of any drug or intoxication in

11   Mr. Todero's system that has any known link to excited

12   delirium syndrome; correct?

13       A.   Right.  An incomplete urine toxicology and drug

14   toxicology screen was done.  But in his case, he had

15   previous documented clinical presentation consistent with

16   drug intoxication and delusions by the State Trooper and by

17   the people at the church.  So he had a pattern of behavior

18   that would be consistent with the drug intoxication.

19       Q.   But also consistent with, for example, a

20   psychiatric disorder?

21       A.   Could he have had a primary psych break?  That

22   could be.  It would be very atypical for it to happen in his

23   thirties.  And that certainly could be a triggering for

24   excited delirium syndrome, but that would be very difficult.

25   Usually there's more of a ramping-up period over weeks not

1   just a day.

2       Q.   The physiological connection between drug

3   intoxication and the clinical findings of excited delirium

4   syndrome versus a psychiatric cause, those are different

5   physiological processes; is that fair to say?

6       A.   I -- I missed -- different physiologic

7   progressions from which?  I'm sorry.

8       Q.   Well, if someone is suffering from drug

9   intoxication, those are, you know, chemicals that have been

10  introduced in the body that has certain physiological

11  effects on the body; correct?

12      A.   They do, yes.

13      Q.   And psychiatric symptoms, it's the absence of --

14  there's no chemicals that have -- there's no extraneous

15  chemicals that have been introduced in the body, instead

16  it's a psychiatric issue; correct?

17      A.   The psychiatric -- there's a primary psychiatric

18  issue that has manifestations that can affect dopamine

19  transporters and uptake and things like that, but yes.

20  The -- the etiology, the starting points are different, but

21  the pathways come together for excited delirium where it's

22  basically overproduction of dopamine less transporters and

23  then a spinning up of all the metabolism.

24      Q.   There's no conclusive scientific research on the

25  physiological process by which the psychiatric symptoms, the

Gary Michael Vilke, M.D.

```
1    psychiatric issue leads to the -- the physiological results
2    that are seen in excited delirium syndrome; is that correct?
3         A.   There's some data looking at dopamine transport
4    and uptake, but there's not a study per se of taking 100
5    schizophrenics and looking at certain aspects of it because
6    of the limitation of the human subjects.
7         Q.   There's no study that makes that link between how
8    the psychiatric condition results in the excited delirium
9    syndrome; correct?
10        A.   The exact pathophysiology has not been mapped out,
11   but there's lots of data looking at the progression of
12   disease in an untreated schizophrenic or other mental health
13   disorder that has the same propensity.
14        Q.   And is that same -- Is that same statement true
15   that the exact pathophysiology from the drug intoxication to
16   the resulting excited delirium syndrome has not been mapped
17   out?
18        A.   The exact pathophysiology has not been mapped out,
19   yes.
20        Q.   Okay.  Let me say that -- well, I believe you
21   testified earlier that the most common etiology of excited
22   delirium syndrome relates to stimulant drug use; correct?
23        A.   Currently, yes.
24        Q.   And within that -- the most commonly seen specific
25   substance that is known to lead to excited delirium syndrome
```

1    is cocaine; is that correct?

2        A.   Cocaine and methamphetamine both are fairly high

3    on that list because of frequency of use.

4        Q.   And then PCP and LSD are also common, but not as

5    common as cocaine and methamphetamine; is that correct?

6        A.   Common -- they're not as common in usage nor are

7    they common as the cause for the excited delirium syndrome,

8    probably because of the -- the rate of usage.

9        Q.   Okay.  Turning to Page 65 -- the very bottom of

10   Page 6, that's the third substantive page, the very last

11   sentence on that page and turning onto Page 7, quote, "The

12   majority of cases involve stimulant abuse, most commonly

13   cocaine, though methamphetamine, PCP, and LSD have also been

14   described."

15           Did I read that correctly?

16       A.   Yes, you did.

17       Q.   And do you agree with that statement?

18       A.   In 2009, the answer would be yes.  I think

19   methamphetamine has moved up as I commented earlier.

20       Q.   Okay.  Other than the methamphetamine has maybe

21   sort of pulled even with cocaine, any other amendments to

22   that statement or that sentence?

23       A.   Well, there's other -- there's other drugs that

24   have been described since then.  This is not an exhaustive

25   list, so that in and of itself, the comment is correct.

1    Getting back to, I think, what is commonly is cocaine and

2    methamphetamine, but it has described the PCP and LSD and

3    other -- other stimulant drugs as well.  But again, this --

4    this I don't think was meant to be a complete list.  In

5    2009, some of these other drugs weren't available as well.

6         Q.   You would agree with me that nowhere in your

7    report do you disclose any opinion that there's any evidence

8    that Mr. Todero was suffering from a psychiatric illness on

9    May 29th, 2016?

10        A.   Correct.  In my report, I don't imply that he had

11   a psychiatric disorder.

12        Q.   Okay.  And then the sentence that -- other than

13   the paragraph at the bottom of Page 10 continuing on to

14   Page 11 in your report which we were vigorously discussing

15   earlier, and I don't wish to rehash our vigorous discussion

16   earlier, but other than what's contained in that paragraph,

17   is there anywhere else in your report which you disclose an

18   opinion relating to evidence that Mr. Todero was suffering

19   from drug intoxication on May 29th, 2016?

20        A.   I think that's really where I described the

21   intoxication possibility with the fact that he has symptoms

22   consistent with that.

23        Q.   So, fair to say that whatever our disagreement

24   about what that particular paragraph says, we're in

25   agreement that nowhere else in your report do you -- do you

1    discuss any evidence of Mr. Todero's drug intoxication?

2         A.   Not that I recall, no.

3         Q.   Okay.  Taking as much time as you need, if you

4    want to review any other aspects of your report, again not

5    to belabor it for the sake of belaboring it, but I do want

6    to make sure I'm clearly understanding the nature of your

7    opinions.

8         A.   Right.  No, I -- I spend most of my time

9    discussing the specifics of excited delirium syndrome, which

10   again are often induced by drugs, as we've just alluded to

11   and talked to about as far as statistics, but I don't

12   believe I had other areas where I tried to parse out drug

13   intoxication and excited delirium.  I just stated with

14   excited delirium.

15        Q.   Fair to say that as an emergency room physician,

16   you can't diagnose someone as being under the influence of a

17   stimulant drug or -- or suffering from drug intoxication

18   without either a positive toxicology screen or some

19   self-report of drug use?

20        A.   Drug screens are helpful.  Self-report is helpful.

21   Sometimes you find the drugs on them, even though they deny

22   it, so that's another possibility of making the diagnosis.

23   Or a -- other report, meaning a family member or friend

24   reporting that "Bob took this".  But we also make the -- the

25   distinction of diagnosing as somebody with a stimulant drug

```
 1    toxidrome, if they present as such, even though the tox

 2    screen might be negative.  So we can make a diagnosis of,

 3    you know, stimulant drug intoxication without having

 4    something solid if that's what everything sort of leads up

 5    to, we may just not be able to diagnose specifically which

 6    one it is.

 7         Q.   Understood.  Turning back -- I apologize for

 8    jumping around.  Turning back to Exhibit C, which is the

 9    Task Force White Paper.  And under -- on Page 7, which is

10    Page 4 of the substance of the report under the heading

11    Pathophysiology, do you see that section of the White Paper?

12         A.   I do, yes.

13         Q.   It states, "The pathophysiology of excited

14    delirium syndrome is complex and poorly understood.  The

15    fundamental manifestation is delirium.  There are several

16    different potential underlying associations or causes,

17    including stimulant drug abuse, psychiatric disease,

18    psychiatric drug withdrawal, and metabolic disorders.

19    Unknown mechanisms lead from these conditions to the overt

20    excited delirium state.  Specific manifestations vary among

21    different cases.  We do not fully understand why some cases

22    progress to death and why some do not."

23              Did I read that correctly?

24         A.   You did, yes.

25         Q.   Perhaps a more difficult question, do you agree
```

1   with this statement that I just read?

2        A.   I think for the most part it's fairly -- I agree

3   with it.  Again, we talked about the potential underlying

4   associations or causes including stimulant drug abuse, which

5   we've talked about and I agree with.  Psychiatric disease,

6   which I agree with.  Psychiatric drug withdrawal and

7   metabolic disorders, again those tend to be moved over to

8   they can potentially create a state of such that if there's

9   drug intoxication with it or psychiatric disorders

10  underlying, but in and of themselves, it would typically be

11  diagnosed now as the metabolic disorder that's causing it

12  even though the symptoms might be consistent with excited

13  delirium syndrome presentation.

14       **Q.   And that's a -- a point we discussed earlier and**

15  **you agreed that there was still support in the literature,**

16  **although it was not your personal view, related to that**

17  **metabolic -- metabolic etiology; is that correct?**

18       A.   I think earlier we were talking about infections

19  and that was --

20       **Q.   Okay.**

21       A.   -- older -- older literature prior to this where

22  they would, you know, encephalitis and things like that

23  could potentially present like this.  But the diagnosis

24  would be encephalitis, agitation -- or agitation due to

25  encephalitis.  That's what I was sort of saying, metabolic

1   disorders, if you have a primary metabolic disorder that

2   predisposed you to the dopamine issues, it is a possibility

3   since the pathway is not exactly recognized.

4       **Q.   Is there anywhere in your written report where you**

5   **discuss and rule out infections as a etiology of the excited**

6   **delirium syndrome that you have perceived in Mr. Todero?**

7       A.   Yes.  As part of my evaluation of the case, I

8   looked for infections, especially when I see a fever 103 in

9   the ER.  So the records reflect that there's no evidence of

10  an inciting etiology for the infection or fever.  But I did

11  not go into details of writing what he didn't have, I was

12  more focused on what he did have.

13      **Q.   Right.  Same for metabolic disorder, nowhere in**

14  **your report do you discuss any opinion ruling out metabolic**

15  **disorder as a potential explanation for the symptoms that**

16  **you perceive?**

17      A.   Sort of as I discussed previous, the metabolic

18  disorder component is sort of a catchall for things that we

19  may not have under -- understood at the time for metabolic

20  function.  But in the review of the records, there was no

21  obvious metabolic disorder that would have caused his

22  symptomology.

23          Again, I didn't reference it in my report, one,

24  because I tend to think of the two main causes of

25  psychiatric versus drug induced; and secondly, I wasn't

1    focusing on what he didn't have, what medical condition he

2    didn't have, but rather what medical condition he did have.

3         **Q.   Although looking at the statement we looked at**

4    **earlier about the diagnosis of -- diagnosis of exclusion,**

5    **that requires looking at what someone doesn't have to reach**

6    **a determination of what they do have; correct?**

7         A.   Yeah.  You would look for other metabolic

8    findings, like I was talking about thyroid issues or

9    underlying infections or other causes for the presentation,

10   which I did when I looked through the medical records.  So,

11   if I found those things, I wouldn't have been opining that

12   he had excited delirium syndrome, I would have opined that

13   he had underlying encephalitis that was causing his

14   behavior, but that wasn't there.  And based on the fact

15   those -- the absence of those and the diagnoses and his

16   clinical presentation, I was coming to the conclusion that

17   he had -- had excited delirium syndrome which is why my

18   opinion is focused on that.

19        **Q.   Turning back to your report and specifically**

20   **the -- turning to Page 6 in the Analysis section of your**

21   **report, the last sentence of that first paragraph -- or**

22   **rather the last two sentences of that first paragraph under**

23   **Analysis states, "After he was handcuffed, Mr. Todero was**

24   **placed in a sitting position awaiting the arrival of**

25   **paramedics.  He was talking and clearly breathing."**

1        Do you see that?

2        A.   Yes.

3        Q.   Do you recall -- And you testified earlier that

4   you reviewed the body camera footage from the scene;

5   correct?

6        A.   That is correct.

7        Q.   And that was one of the materials that you not

8   only reviewed in preparation for writing your report, but

9   you re-reviewed in preparation for your deposition; is that

10  correct?

11       A.   Correct.

12       Q.   And do you recall from viewing that body camera

13  footage that shortly after the -- the footage begins, that

14  Mr. Todero is no longer talking and is essentially not in an

15  upright sitting position but slumped down basically parallel

16  to the ground with his head resting on the curb?  Do you

17  recall that?

18       A.   Yeah, I think I mentioned earlier that initially

19  was sitting, legs were moving, he was having some delusional

20  commentary.  And then he shifted his position into more of a

21  catatonic position laying flat, legs out a little bit more,

22  yes.

23       Q.   Okay.  The next sentence -- or strike that.

24            The next paragraph in your report makes reference

25  to Mr. Todero being reported to be combative.  Do you see --

1   Do you see what I'm referring to?

2        A.   Yes.

3        Q.   And did you view on any of the body camera footage

4   any behavior which you would -- which you perceived as

5   Mr. Todero being combative?

6        A.   Not the views out at the curb, he did not have any

7   evidence of combativeness there.  I think this was referring

8   to when he was moved into the closed space of the ambulance.

9        Q.   Got it.  And so just -- just to be clear, because

10  there was no -- neither the police officer was -- strike

11  that.

12           Let me ask it this way:  Just so I'm clear, at no

13  point on the body camera footage did you view any behavior

14  which you would view as being appropriately described as

15  combative; correct?

16       A.   On the video, he was fidgety and catatonic at

17  times, but I don't recall a specific combative appearance.

18       Q.   And do you recall from -- you reviewed

19  Mr. Godfrey's deposition, correct, one of the paramedics?

20       A.   I did, yes.

21       Q.   Do you recall from Mr. Godfrey's deposition that

22  he testified that in fact he should not have used the word

23  "combative" in his report, but the more appropriate word

24  would have been "uncooperative"?  Do you recall that?

25       A.   I recall that portion, but also he was referencing

1    that he was flailing or rocking and, you know, flailing

2    around, that's why he couldn't get the pulse ox to stay on

3    and get a blood pressure.  But he did adjust the word

4    combative I think because more terminology rather than

5    description.

6        Q.   And do you recall the testimony from Mr. Godfrey

7    and another of the EMS personnel and fire personnel that say

8    they did not view any of Mr. Todero -- Mr. Todero's behavior

9    as threatening to others but were concerned for his own

10   safety, do you recall that?

11       A.   Umm, I don't recall that specifically.  I do

12   recall the concern for him striking his head and injuring

13   himself.  I -- I don't recall the specifics about others'

14   safety or not.  Flailing is obviously a risk for getting

15   struck, but I don't recall what they actually said.

16       Q.   Do you have a -- Do you have any recollection from

17   any supporting materials that Mr. Todero was acting of his

18   own volition in a violent combative way as opposed to

19   thrashing which -- which may have caused concern about his

20   own safety but was not viewed as volitionally violent

21   behavior?

22       A.   It's interesting to describe I think when a

23   patient -- having seen many patients that thrash, it's hard

24   to say what's going on in their heads, especially if they're

25   delusional.  But whether they're trying to harm themselves,

1   harm others, or move away, I don't think you can interpret.

2   So, I'm not sure how somebody can interpret the fact that

3   they -- the person was not trying to harm them versus harm

4   themselves versus just thrash about.  I've seen many people

5   get struck by thrashing individuals, I'm not sure how you

6   separate that out.

7      Q.   You would agree with me that the -- the precise

8   nature and extent of the thrashing or uncooperativeness or

9   combativeness that you described, the precise nature and

10  extent of that, there were different descriptions from the

11  different witnesses whose testimony you reviewed?

12     A.   Yes.  I -- whenever you see something, there's

13  usually slightly different variations of it, but yes,

14  there's different descriptions.

15     Q.   There's no objective evidence of that, correct,

16  that's solely based on the subjective impressions of

17  different individuals who testified?

18     A.   Heart rate of 142 is objective of some sort of

19  agitation or some underlying condition.  An inability to get

20  a pulse ox, which is basically just putting something on

21  your finger, again the thrashing is so much you can't get

22  that, it is a measure or marker of how aggressive the

23  behavior was.  But from a video perspective or some sort of

24  an audio perspective, no, there's no objective data that

25  way.

Gary Michael Vilke, M.D.

1      Q.   The -- turning to paragraph -- the paragraph on

2   Page 10 where you list the various clinical findings which

3   in your view are consistent with excited delirium syndrome,

4   do you see the paragraph that I'm referring to?

5      A.   I am, yes.

6      Q.   It's your -- well, strike that.

7           Is it your opinion that Mr. Todero was suffering

8   from excited delirium prior to his encounter with the

9   police?

10     A.   Yeah, he was having -- he was having excited

11  delirium -- or he was in a -- I guess in -- diagnosed with

12  excited delirium when the police came up to him if that's

13  what you're asking.  I'm sorry, maybe I'm getting your

14  timing wrong.

15     Q.   And which -- which of these clinical findings is

16  there evidence in the record that Mr. Todero had prior to

17  being tased?

18     A.   He had delusion --

19     Q.   Well, let me --

20     A.   Yeah, he had delusion --

21     Q.   Let me -- let me break it out because I think

22  that's -- sorry, not to interrupt you, but just that's a

23  question that leads to a very long answer and it might be

24  easier to break them down finding by finding, if that makes

25  sense to you.

1      So the -- the statement that the second -- looking

2   at that paragraph on Page 10 states, "Mr. Todero was

3   reported to have a number of symptoms consistent with

4   excited delirium syndrome."  And then it states, "He was

5   agitated"; correct?

6      A.   Yes.

7      Q.   What evidence in the records did you review, if

8   any, to conclude -- to conclude that Mr. Todero was agitated

9   prior to being tased by Mr. -- by Lieutenant Blackwell?

10     A.   Just to be clear, my diagnosis of excited delirium

11  is not diagnosed in isolation of a time, it's a diagnosis

12  over time.  Meaning the elevated temperature was not

13  diagnosed until the hospital, it doesn't mean it wasn't

14  there.

15     So, as far as agitation prior to the tasing event,

16  I don't have any video to look at, so I can't give you any

17  component there.  But he was not following commands.  I

18  don't -- I can't tell if he was agitated, because I don't

19  have any objective data to say he was agitated at that

20  specific time, but he certainly was later in the back of the

21  ambulance.

22     Q.   Sure.  And I guess, you know, obviously you have

23  your -- your opinion is that the TASER did not cause the --

24  the aspect of Mr. Todero's misbehavior that you described,

25  that those were aspects of excited delirium syndrome which

Gary Michael Vilke, M.D.

1  preexisted his encounter with police.  That's your opinion;

2  correct?

3       A.   Correct.

4       Q.   But you would agree with me that there's no

5  evidence in the records to support a conclusion that prior

6  to being tased, Mr. Todero was agitated?

7       A.   In its purest form of agitation, other than --

8  yeah, I can't say he was significantly agitated at that

9  point other than not being compliant.  But I don't -- I

10  can't say he --

11       Q.   Sure.

12       A.   -- was agitated or violent at that point, no.

13       Q.   And there's many reasons why people might be

14  noncompliant with directions from a police officer; correct?

15       A.   I guess there can be many reasons, sure.

16       Q.   And there's nothing in Mr. Blackwell's description

17  of Mr. Todero's behavior prior to the tase that in any way

18  evidence agitation, would you agree with me?

19       A.   I don't recall any agitation component there.

20  When I was reviewing the case, I was reviewing in its

21  totality, not minute by minute.  You look at the symptoms

22  over time.  And over the time period, he had the symptoms

23  consistent with excited delirium.

24       Q.   Sure.  And just specifically, though, do you

25  recall Lieutenant Blackwell's testimony that when he first

1   encountered Mr. Todero, that Mr. Todero was sitting on the

2   curb?

3        A.   I don't recall that specifically, but it's

4   certainly possible.

5        Q.   Okay.  And that's not agitated behavior, sitting

6   on the curb; correct?

7        A.   That would not be consistent with an agitation

8   episode, no.

9        Q.   And then, again, do you recall Lieutenant

10  Blackwell's testimony that shortly after Blackwell arrived

11  on the scene, Mr. Todero got up from the curb and started

12  walking away from Lieutenant Blackwell at first sort of

13  parallel -- parallel to the -- to the curb, walking straight

14  up the road away from him, do you recall that description?

15       A.   Again, I don't recall that specifically, but it

16  certainly could be.

17       Q.   And that would not be evidence of agitation,

18  correct, nothing agitated about getting up and walking away

19  from a police officer, even if that police officer is giving

20  instructions to the contrary?

21       A.   In -- it depends how you describe it.  If they can

22  get up and be agitated, they can get up and be non-agitated,

23  I just don't remember the description.

24       Q.   You don't -- As you sit here today, you don't

25  remember any aspects of Lieutenant Blackwell's description

1    of that that led you to the conclusion or support the

2    conclusion that Mr. Todero was agitated in that moment;

3    correct?

4         A.   I don't recall any agitation at that point,

5    correct.

6         Q.   Okay.  What about delusional, what, if any,

7    evidence in the record is there that Mr. Todero was

8    exhibiting delusional behavior prior to being tased?

9         A.   Umm, I believe there was some questions about

10   what -- what his name was and he referenced himself as Jesus

11   Christ or some other biblical references as far as his

12   responses.  In fact -- well, prior to being tased, I can't

13   remember exactly the timing of it.  It may have been right

14   after the tasing, but I -- it was in that venue, but I -- I

15   don't remember the timing of it.

16        Q.   Possible that all of that -- the delusional

17   behavior that you observed in the record occurred after

18   Mr. Todero was tased; correct?

19        A.   If you're talking about that specific event, the

20   event with the Troopers and the event at the church, you

21   know, a couple hours earlier showed evidence of delusional

22   behavior predating the event with -- with officer -- with

23   Lieutenant Blackwell.  But from his testimony, I don't

24   remember specifically when he first recognized some of the

25   delusional comments that were coming out of Mr. Todero.

Gary Michael Vilke, M.D.

Todero vs.
City of Greenwood

1      Q.   The events of the -- just -- just so we're clear,

2   the events with the State Trooper were the previous day;

3   correct?

4      A.   Correct.  And then the events with the church

5   folks I think were a couple hours earlier.

6      Q.   Okay.  And then so you had -- again, continuing on

7   with that sentence reporting that he was Jesus and was

8   talking about other biblical reference repeatedly, those

9   aren't independent clinical findings, those are sort of

10  descriptors of what evidence you reviewed in the record

11  related to delusional behavior; correct?

12     A.   Those -- those are evidence of delusional

13  behavior, yes.

14     Q.   And that's what we've just been discussing in

15  terms of what, if any, evidence of delusional behavior prior

16  to the tasing had taken place.  But "He was zoning out and

17  walking into traffic."  That -- there's evidence in the

18  record of that prior to the tasing; is that correct?

19     A.   That is correct, yes.

20     Q.   In what -- What clinical finding consistent with

21  excited delirium syndrome is -- is that a description of?

22     A.   It can be from sort of delusional or supporting

23  delusional behavior or lack of awareness.

24     Q.   So lack -- okay.  It's your -- It's your view that

25  that supports a finding of delusional behavior, walking into

1    traffic?

2        A.   It is not normal behavior, that -- that -- as far

3    as that goes.  It can be consistent with delusional

4    behavior.  I can't say it's diagnostic of delusional

5    behavior.  It can be considered self-harm behavior, lack of

6    awareness, lack of ability to perceive what's going on

7    around them, so perception issues, which is part of

8    delirium.  So it -- it -- it falls in that category of

9    delirium cognition and perception issues.

10       Q.   So, that's sort of one -- if I understood from the

11   testimony you just gave us, sort of one additional step

12   removed, that that behavior is consistent with but not

13   solely or only consistent with delusional behavior and

14   delusional behavior is consistent with but not solely

15   consistent with excited delirium; is that correct?

16       A.   Consistent with but not necessarily diagnostic

17   alone of excited delirium syndrome.

18       Q.   Okay.  So there's two layers of -- I don't know

19   what you would call it.  There's two layers of potential

20   divergence there:  Delusional behavior is consistent with

21   but not necessarily diagnostic of excited delirium syndrome,

22   and walking into traffic is consistent with but not

23   necessarily diagnostic of delusional behavior; correct?

24       A.   That's a fair assessment, sure.

25       Q.   Okay.  "He was not following commands given by the

1    officers and paramedics."  That's the next sentence;

2    correct?

3        A.   I didn't hear the last part of your sentence

4    there.

5        Q.   Sorry.  "He was not following commands given by

6    the officers and paramedics."  That's the next sentence in

7    your paragraph on Page 10; correct?

8        A.   That is correct.

9        Q.   Your list of clinical findings?

10       A.   Is that correct.

11       Q.   What clinical finding in -- in support of a

12   conclusion of excited delirium syndrome is -- is that

13   related to?

14       A.   It would fall more into, I guess, into the police

15   noncompliance aspect of it.  Noncompliance with commands,

16   that type of -- that type of diagnostic criteria.

17       Q.   Okay.  So is -- is that one of the -- On the list

18   of clinical findings that are consistent with excited

19   delirium syndrome, noncompliance with police demands is on

20   that list; is that correct?

21       A.   It is, yes.

22       Q.   Okay.  And we -- I think we discussed earlier

23   not -- there may -- on any given day in any given city,

24   there's many people who are noncompliant with police

25   commands who do not suffer from excited delirium syndrome;

1    correct?

2         A.    That's why you can't use a single finding as a

3    diagnostic -- or diagnostic solely, you have to put the

4    whole picture together.  So, yes, there are many reasons

5    why.

6         Q.    And then the -- "He was reported to be too

7    combative for the paramedics to even obtain a blood pressure

8    on him."  And we discussed earlier the -- some of the

9    evidence in the record and some of the different --

10   differences of description related to Mr. Todero's behavior.

11   But regardless, there's no evidence of that behavior that

12   you saw in the record prior to the tasing; is that correct?

13        A.    Not that I noted, correct.

14        Q.    Okay.  And high tolerance to pain, nothing in the

15   record prior to the tasing that evidences a high tolerance

16   to pain; is that correct?

17        A.    Prior to the tasing, no, I didn't see that.

18        Q.    You state, "The fact that he kept being combative

19   and trying to throw himself off of the ambulance gurney and

20   strike his head," you described that as being evidence of a

21   high tolerance to pain.  Can you explain the linkage between

22   those facts and that conclusion?

23        A.    The -- the idea of you're being restrained, you're

24   restrained down to some level, you're trying to rock a

25   gurney is not a comfortable thing to be doing.  And trying

1    to strike yourself is not a comfortable thing to be doing.

2    That's -- that would be consistent with agitation and

3    potentially, you know, the -- not -- what do you call it? --

4    tolerance to -- tolerance to pain or discomfort.

5        Q.   Are you aware of any evidence in the record that

6    suggested that Mr. Todero was intentionally trying to strike

7    his head as opposed to that he was in some level of

8    distress, obviously, and was thrashing about and there was

9    concern that he might strike his head?

10       A.   I don't think we can know what his intent was, so

11   you kind of look at the behavior.

12       Q.   Right.  Wouldn't thrashing about while restrained

13   on a gurney be equally consistent with being in pain as

14   opposed to being tolerant of pain?

15       A.   I think it depends what your -- your hypothetical

16   cause of pain is.  If something is hurting to move, then you

17   wouldn't want to move it in general.  If there's something

18   that's causing pain, usually you identify that and you try

19   to address it versus thrashing about would not be a typical

20   response, the -- at least in my experience in somebody who

21   has -- has awareness of what's going on.

22       Q.   The next sentence states Mr. -- that "He was

23   breathing fast as noted on the video and in the paramedic

24   report."  There's no evidence in the record of anything

25   related to abnormal breathing prior to being tased, would

1   you agree with that?

2        A.   I'd have to look back.  I mean, as far as that

3   goes, I don't recall -- I wasn't looking specifically for

4   timing of rapid breathing.  He was certainly doing it at the

5   time I was watching sitting on the curb, but I -- so I

6   can't -- I can't answer that question and say there was no

7   evidence.  I just -- I wasn't looking for it specifically in

8   the time frame prior to the tasing.

9        Q.   All right.  Well, just to be clear, the video

10  evidence is -- is entirely after the tasing; correct?

11       A.   That's correct.

12       Q.   Okay.  And so it wouldn't be in the -- you would

13  not be able to perceive or view any rapid breathing prior to

14  the tasing by reviewing those video evidence; correct?

15       A.   You asked about evidence specifically, not video

16  evidence, so I couldn't use the video evidence, obviously.

17  But there might be descriptions with the church people or

18  with others that were there that I didn't look for

19  specifically because I wasn't -- it wasn't part of what I

20  was reviewing.  When I saw him breathing fast already, I

21  recognize that as a -- a symptom.

22       Q.   As you sit here today, you can't recall any

23  specific evidence in the record revealing fast breathing

24  that occurred prior to the tasing; correct?

25       A.   Again, not having looked for it, no, I can't -- I

1  can't specifically recall anything.

2      Q.   Same thing with elevated heart rate, no evidence

3  in the record that you can recall revealing an elevated

4  heart rate prior to being tased?

5      A.   Again, I don't think there would be any record,

6  evidence of that because nobody checked a pulse prior to

7  that, so there wouldn't be evidence of that.

8      Q.   And skin is -- skin was reported to be warm and

9  diaphoretic.  What does "diaphoretic" mean?

10     A.   Sweaty.

11     Q.   The next, "He was also described as sweaty."

12 That's kind of redundant; right?

13     A.   That would be, I guess, it's semi redundant, yes.

14     Q.   One's a term that a paramedic might use and the

15 other is a term that a lay witness might use for the same

16 phenomenon?

17     A.   I think that's fair, yes.

18     Q.   Any evidence in the record that you can recall

19 describing Mr. Todero as sweaty or describing his skin as

20 warm prior to tasing?

21     A.   The Trooper said he described him as sweaty the

22 day before, so technically it's beforehand.  I don't

23 remember what the church people described him as because I

24 wasn't really looking for that.  I -- again, I wasn't

25 looking for the timing of when he was diaphoretic or sweaty

Gary Michael Vilke, M.D.

1   but rather that he had it or didn't have it.  And based on

2   descriptions, he was definitely sweaty.

3        Q.   "He was described as super strong and resilient."

4   No -- no evidence of that in the record prior to the tasing;

5   is it fair to say?

6        A.   Umm, not prior to the -- prior to the tasing that

7   I am aware of, correct.

8        Q.   So, I skipped over the temperature, but that -- I

9   mean, "He was noted to have a temperature of 103 degrees

10  Fahrenheit at 1311 at the hospital."  That obviously

11  postdates -- this is after the tasing; correct?

12       A.   That would be after the tasing event, yes.

13       Q.   And the combativeness we had discussed earlier.

14  That's -- there's no other additional clinical finding

15  contained in that sentence in addition to what was described

16  previously; is that fair to say?  The combativeness?

17       A.   Other than when they're trying to get him

18  handcuffed, I think he was resistant and -- it depends on

19  who is describing.  I think one of the witnesses described

20  him as resistant and strong and resilient and along that

21  line there.

22       Q.   And there's also -- fair to say that that's an

23  area where there is divergent testimony in the record based

24  on what you reviewed?

25       A.   There's different testimony, sure.

1    Q.    One of the -- one of the officers in the interview

2  described him as being passive resistant.  Do you recall

3  that?

4    A.    Passive -- I thought there was resistant -- he

5  wasn't actively fighting him but wouldn't let go of his arm,

6  so that would be consistent with passive but resistance,

7  yes.

8    Q.    And you were discussing earlier the difficulty in

9  ascribing sort of volitional intent to certain behaviors.

10  Is it fair to say that it's difficult to ascribe volitional

11  intent to someone whose arms are underneath him and being

12  ordered to put them behind his back, whether he's able to

13  but refusing to put them behind his back or he's unable to

14  put them behind his back; fair to say?

15    A.    Unable to put them behind his back?  I think it --

16  it would have to be qualified.  If there's no physical

17  reason why they couldn't do it, then it would be considered

18  volitional that they wouldn't do it.  So I think they would

19  be choosing not to.

20    Q.    Well, if your arms are out in front of you and you

21  are in the process of being shocked by a TASER or within a

22  few seconds after having been shocked by a TASER, that might

23  explain why you were unable to move your arms from

24  underneath your body to behind your back; correct?

25    A.    Depending on the TASER, the mode, the location,

1   the effectiveness, it could impair it for the moments that a

2   TASER is active.  But otherwise, there's no volitional --

3   there's no obstructive ability to move during -- in between

4   TASER episodes.

5       Q.   And there was obviously no heart rate finding in

6   the record prior to Mr. Todero being tased; correct?

7       A.   That -- yeah, in that time period, yes.  The --

8   being specific, I know what you mean.  But, yeah, that --

9   there's old records that show heart rate, but none in that

10  day of the event.

11      Q.   Right.

12      A.   Yeah.

13      Q.   Weeks or months or years prior?

14      A.   Correct.  I'm just trying to be accurate with you.

15      Q.   I -- I appreciate that.  I appreciate that.  So,

16  in terms of clinical findings of excited delirium syndrome

17  that there is evidence in the record were in place prior to

18  the tasing, you stated that zoning out and walking into

19  traffic is consistent with but not diagnostic of delusion

20  which in turn is consistent with but not diagnostic of

21  excited delirium syndrome; correct?

22      A.   The evidence of delusions prior to the tasing.

23      Q.   Okay.  And then not following commands is one

24  also; correct?

25      A.   That occurred, yes.

1    Q.   And then I think you had suggested that there was

2    some evidence that the day before, he had been observed to

3    be sweaty by -- by the prior officer, the State Trooper;

4    correct?

5    A.   He was noted to be sweaty beforehand.  I don't

6    remember the specific details of what observations were

7    prior to the tasing because, again, I wasn't looking for

8    that when I reviewed the case.

9    Q.   Those findings alone would not support any finding

10   of excited delirium syndrome; correct?  If those were the

11   only facts you had to work with, that would not be able to

12   reach a reliable conclusion that Mr. Todero was suffering

13   from excited delirium syndrome?

14   A.   Right.  Those three facts alone with no other

15   supporting facts, I would not conclude that that person had

16   excited delirium.  They could, but there could be other

17   things, that is correct.

18   Q.   I would ask you to -- starting to turn to

19   Dr. Wetli's deposition transcript which I believe you have

20   in front of you and have had in front of you for --

21   tantalizing you for a while now.

22   A.   Yes.

23   MR. HEPPELL:  And we'll mark that as Exhibit D, unless

24   someone chimes in that I'm off in my -- my number scheme, or

25   lettering scheme there.

1        (Exhibit D was marked.)

2    BY MR. HEPPELL:

3        Q.   Is that consistent with what you have, Exhibit D?

4        A.   Yes.

5        Q.   Okay.  And you testified earlier that you had

6    reviewed Dr. Wetli's deposition in the course of reviewing

7    the case materials to prepare your opinions in this case;

8    correct?

9        A.   Yes.

10       Q.   And if I recall your earlier testimony, there

11   was -- there was nothing you recall from having reviewed

12   that testimony that you disagreed with; is that correct?

13       A.   I didn't look at it from a perspective of trying

14   to disagree with him.  I was looking at his conclusions and

15   if they were in parallel with mine with reasonably similar

16   reasonings.  But I wasn't actually reviewing it, so I can't

17   recall specifically if there were anything.

18       MR. HEPPELL:  And, Jim, did we make two copies for you?

19   You have a copy of that in front of you?

20       MR. STEPHENSON:  Are you talking to me?

21       MR. HEPPELL:  Yeah, I'm sorry.  Do you have a copy of

22   said transcript --

23       MR. STEPHENSON:  Yes.

24       MR. HEPPELL:  -- in front of you as well?

25       MR. STEPHENSON:  Yes.

```
1        MR. HEPPELL:  Caren, do you have access to a copy of
2   Dr. Wetli's deposition transcript if you want to follow
3   along?
4        MS. POLLACK:  Oh, okay.  Yeah, I'm fine.  Yeah, I got
5   it, thank you.
6   BY MR. HEPPELL:
7        Q.   Okay.  Dr. Vilke, turning to Page 108 of
8   Dr. Wetli's deposition transcript and starting at Line 7.
9   And just to give the context here, it's talking -- going
10  through some of the materials in the case that Dr. Wetli had
11  reviewed.
12           Starting at Line 7:
13           "Q.  Do you know, having heard that description of
14  the different body camera video evidence in the case,
15  whether you received all four of those video clips."
16           "Answer:  I believe I did."
17           "Question:  Did you review all four of those video
18  clips?"
19           "Answer:  Yes."
20           "Question:  Did you ascribe any importance to
21  anything depicted on any of those video clips?"
22           "Answer:  No."
23           "Question:  Why is that?"
24           "Answer:  They didn't show anything."
25           And that's Line 7 to 19 on Page 108 of his
```

1    deposition transcript.  Do you see that portion of

2    Dr. Wetli's testimony?

3        A.   I do, yes.

4        Q.   You took a somewhat different view of the

5    relevance of the body camera footage; is that correct?

6        A.   Well, I think we both look at it, we both use it

7    as part of our information.  If his answer is it didn't show

8    anything that was different than any of the reports,

9    depositions, and other data, then maybe that was what he was

10   referring to.  But I think that that single question there

11   is not necessarily something that's he and I differ on.

12   He -- I tend to look at the video earlier and then the other

13   data with it.  He may have already looked at all the other

14   data and realized it doesn't show me much more than I

15   already knew based on all the other reports.

16       Q.   Sure.  I guess you're speculating that Dr. Wetli

17   meant something slightly different than he said.  But to be

18   clear, in this deposition transcript, he doesn't say, "I

19   didn't ascribe any importance to them because, you know,

20   they were duplicative of other evidence in the case," he

21   said, "They didn't show anything."  Those are the words in

22   the transcript; correct?

23       A.   "Didn't show anything" are the words in the

24   transcript.  Does that mean -- "didn't show anything" means

25   that the videos didn't work, because it showed something.

1    So I'm not sure what he means by that.

2        Q.   Okay.  You're not -- You're not able to divine

3    what Mr. -- what Dr. Wetli meant when he was asked, "Did you

4    ascribe any importance to anything depicted on any of those

5    video clips?"  And he says, "No".  He's asked, "Why is

6    that?"  He says, "They didn't show anything."

7            You're just -- your testimony is you were not able

8    to figure out what he was getting at there?

9        A.   I already answered what I thought he was probably

10   getting at is he may have already looked at the other

11   materials and realized it doesn't show anything more than I

12   already knew.  So versus you look at them first and then the

13   depositions don't show much more than I already knew.  So I

14   think it -- that's how I would interpret if you're asking me

15   that question.

16       Q.   Do you recall from reviewing Dr. Wetli's

17   deposition transcript that he testified that anyone who was

18   exhibiting delirium and was demonstrating agitation by

19   definition was suffering from excited delirium which he used

20   interchangeably with agitated delirium?  Do you recall that?

21       A.   I recall some commentary about agitation and

22   delirium equals agitated delirium, which I guess makes

23   sense.  But as a pure diagnosis, excited delirium syndrome,

24   which is the syndrome that we're discussing with the

25   multiple features, that would not be necessarily as

1  consistent with that.

2      Q.   Okay.  Well, so, in turning specifically to

3  Page -- for example, Page 141 of the deposition transcript,

4  Lines 19 through 25.  I -- are you on that page?

5      A.   Yes.

6      Q.   "Question:  What do you contend -- and here I'm

7  asking generally, not specific to this case.  But what in

8  your view are the symptoms that are indicative of someone

9  who is experiencing the syndrome "excited delirium"?

10         "Answer:  Basically, they have delirium and

11  they're agitated."

12         Did I read that correctly?

13      A.   That's what you read, yes, that's correct.

14      Q.   Okay.  And then turning -- continuing on to

15  Page 143, Line 14:

16         "Question:  But, is it your view that every

17  individual who is experiencing both delirium and agitation

18  is by definition suffering from the syndrome excited

19  delirium?

20         "Answer:  Sure.  Agitated delirium.  You just

21  defined it."

22         Did I read that correctly?

23      A.   You did.

24      Q.   Do you agree with Dr. Wetli's testimony in those

25  portions that I read you that you can reach a conclusion

1    related to excited delirium syndrome by concluding that

2    someone is suffering from agitation and that they're

3    experiencing delirium?

4        A.   Based on the way that question is answered, I'm

5    not sure he answered your question.  It says, "Sure.

6    Agitated delirium."  That's not excited delirium syndrome,

7    that's somebody who is delirious and agitated.

8            So I -- so it's -- it's a poor -- it's a -- it

9    looks like an answer to a question that was necessarily

10   answered -- or asked, in the sense that you asked about

11   delirium and agitation and he says, "Sure.  Agitated

12   delirium."  Even though I know at the end of the question it

13   says "suffering from the syndrome excited delirium."

14           If he would have said, "Sure, excited delirium

15   syndrome", then I'd question that.  But he's calling it

16   agitated delirium which are -- it's a -- I know he uses it

17   interchangeably here and there.  And I can't figure out why

18   he said that, but that's what he says.

19       Q.   So is it your -- Is it your testimony that in your

20   view agitated delirium, excited delirium syndrome are not

21   interchangeable?

22       A.   I think a lot of people interchange them

23   frequently.  I mean, it's -- and it's common, it happens.

24   If you're referring to, you know, agitation, delirium as two

25   separate clinical findings only, yes, somebody is -- is

1    agitated, delirium or altered delirium or -- but if you're

2    referring to the true excited delirium syndrome that we've

3    been sort of discussing, then you have to have more criteria

4    to be able to -- to define that.

5         Q.   So it's your belief, your view as supported

6    presumably by your understanding of the scientific

7    literature, that those terms are not interchangeable;

8    correct?

9         A.   I think people interchange them and I think people

10   use them interchangeably.  I think it's important when

11   you're using them interchangeably to define what you mean by

12   them, specifically.  So you're referring to excited delirium

13   syndrome as -- as put out by ACEP and NAME with the features

14   that we've been discussing today, then you should define it

15   as such.

16            You can call it agitated delirium, but you want to

17   make sure you're defining the same process because a

18   psychiatrist may call it agitated delirium as somebody who

19   is delirious and agitated and doesn't want to take meds and

20   is, you know, upset at the psych ward, but truly not excited

21   delirium syndrome that we're talking about.

22        Q.   Well, and just -- just so I'm clear, though, and

23   you're -- you seem to be suggesting that in your view,

24   people were imprecise in their -- in their use of the

25   phrasing or the labels.  But so I'm clear, in your view,

1    someone who is solely experiencing the symptoms of being

2    agitated and experiencing delirium, that does not rise to

3    the level of being able to conclude that they are

4    experiencing excited delirium syndrome as you understand

5    that phrase and as you have opined in your report that

6    Mr. Todero was suffering from on May 29th, 2016; is that

7    correct?

8         A.   If they only have those two symptoms and either

9    you can't assess any of the other symptoms we've talked

10   about or he has none of those symptoms, either way I think

11   you can't come to that conclusion until you either rectify

12   the -- you know, getting temperatures and heart rates and

13   things like that.  But, otherwise, yeah, I think, you have

14   to have the -- the complement of symptoms to be able to come

15   to a final diagnosis excited delirium syndrome.

16        Q.   In your view, that's not enough, those two

17   standing alone; correct?

18        A.   Those are things that are -- that are consistent

19   with, we've talked about that, that are not completely

20   diagnostic in and of themselves.

21        Q.   Sure.  Just like disobeying a police order is

22   consistent with and consistent with many other things;

23   correct?

24        A.   That is correct.

25        Q.   You need some quantum of -- in your opinion, you

1    need some number of consistent clinical findings, which I

2    think you had testified, although it's not contained in your

3    report, was somewhere on the order of six to feel confident

4    that you could make a finding of excited delirium syndrome;

5    correct?

6        A.   That's typically what the diagnostic criteria

7    would be, you know, as far as that goes, yes.  Sometimes you

8    don't always have a temperature because somebody didn't take

9    a temp, but maybe tactilely warm or hot to touch.  And so,

10   yes, you want to make sure you get the six symptoms is the

11   cutoff that most people will use.

12       Q.   And so, I guess, looking at -- at -- turning back

13   to Page 142 of Dr. Wetli's deposition transcript, starting

14   at Line 23 on Page 142:

15           "Q.  Are there any other medical explanations or

16   medical causes for someone to be experiencing delirium and

17   experiencing agitation?  Or is the only medical explanation

18   for those symptoms excited delirium?

19           "Answer:  Your question is impossible to answer.

20   You can have agitation and you can have delirium.  They can

21   be both totally independent of each other.  When they're

22   together, then you have a syndrome of excited delirium or

23   agitated delirium."

24           Fair to say that you do not agree with that

25   conclusion, as least as stated in the transcript?

1    A.   "Your question is impossible to answer", I see

2   that part.  "You can have agitation and you can have

3   delirium."  Those would be consistent.  "They can be

4   independent."  When you have them together, "then you have a

5   syndrome of excited delirium or agitated" -- yeah, he's --

6   if he's implying that those are the only two symptoms, then

7   I -- versus he thinks there might be other symptoms

8   associated when you get to that level, but yeah, that --

9   that phrase by itself could be interpreted that he's only

10   saying those two things and that would be maybe for him to

11   explain rather than me explaining it.

12    Q.   Sure.  And -- and I'm not asking you to explain

13   it.  But if that is in fact what he's meaning, and then you

14   would disagree with that; correct?

15    A.   I certainly agree that the question is difficult

16   to answer.

17    Q.   Well, editorializing about the quality of my

18   questions aside, in terms of his apparent statement as to

19   those two symptoms or clinical findings being sufficient,

20   you disagree with that?

21    A.   If we're referring to the formal excited delirium

22   syndrome, you would need more than two specific symptoms

23   only.

24    Q.   And turning to Page 144 of the transcript,

25   starting at Line 20:

Gary Michael Vilke, M.D.

1    "Question:  So any time someone is exhibiting both

2   the symptoms of delirium and agitation, in your view that is

3   by definition excited delirium; correct?"

4    "Answer:  Yeah, by definition."

5    "Question:  Regardless of the underlying

6   physiological cause for these symptoms?"

7    "Answer:  Right.  Exactly.  You have the excited

8   delirium, then you have to find out the cause for it."

9    That's pretty unambiguous, wouldn't you say,

10   Dr. Vilke?

11    A.   Well, I'm just taking a look a little further

12   because, again, I want to make sure that it's -- it's full

13   out of context -- full in its specific context.

14    (Reviewing document) Yeah, he -- he seems to be

15   using that as a -- as a formal diagnosis as to the -- two of

16   the symptoms that can help make the diagnosis.

17    Q.   That seems to be what he's saying in that

18   transcript; correct?

19    A.   That's what it appears to be in some of those

20   parts there, yeah.

21    Q.   Yeah.  And I mean, he's -- I'm sure -- well,

22   strike that.

23    He seems to be saying that in different ways over

24   and over again.  I've read you several different portions of

25   the transcript; correct?

```
1        A.   Right.  He describes other symptoms that can be

2   there and -- and stuff like that, but he does reference that

3   you have to have both those and that can be diagnostic of

4   excited or agitated delirium.

5        Q.   He said both -- that you have to have both of

6   those and also that both of those are independently

7   sufficient; correct?

8        A.   Not independently sufficient.

9        Q.   Sorry.  Both of those together, but independent of

10  any other factors, his opinion or his statements in the

11  transcript is that that's sufficient; correct?

12       A.   In the transcript, it does show evidence that

13  that's what you're saying, yes.

14       Q.   And, again, you do not agree with that fact?

15       A.   If that's what the transcript shows, I think that

16  you have to have more symptoms to come to the final

17  diagnosis of true excited delirium syndrome, not just

18  somebody who is excited and delirious, yeah.

19       Q.   And in your view, as you understand the literature

20  and the science behind it, excited delirium syndrome and

21  agitated delirium are not interchangeable phrases; is that

22  correct?

23       A.   They're used -- they're used interchangeably and

24  people will use them.  As long as the definitions are

25  predefined, then you can use them interchangeably.  It's
```

1    sort of like certain other positions can be used -- have

2    different names and the same position as long as you

3    understand that they may be -- people may interpret them

4    differently.  So you have to know what the definitions are

5    that you're asking about.

6         Q.   Okay.  And I -- I think you maybe have read ahead

7    looking at -- looking for context to distinguish that and

8    perhaps didn't find it.  But just to put it clearly on the

9    record, I want to read this next section starting on

10   Page 145 at Line 12:

11            "Q.  In the answer to my question, you have

12   articulated sort of the definitional components of excited

13   delirium; right?  Every time someone has delirium and

14   agitation, it's excited delirium.  And if one or both of

15   those is missing, it's not excited delirium; is that

16   correct?"

17            "Answer:  Correct."

18            "Question:  Are there other objective or

19   subjective indicators that you look to to determine whether

20   an individual is in your view experiencing the symptom of

21   excited delirium?"

22            "Answer:  Well, like any syndrome, there are many

23   other signs which may or may not be present at any

24   particular case.  Very frequently people have excited

25   delirium show that apparently increase of strength.  They're

Gary Michael Vilke, M.D.

```
1    impervious to pain.  They're impervious to exhaustion.  They
2    may have hyperthermia.  Increased stamina.  All kinds of
3    things are like that that can happen with them.  They have a
4    tendency to break glass, inappropriate disrobing.  But not
5    every particular case is going to exhibit all of these
6    particular signs."
7              "Question:  Are those signs relevant in evaluating
8    a situation to determine if an individual was experienced
9    excited delirium -- was experiencing excited delirium?"
10             "Answer:  No.  Excited delirium is based on the
11   fact that they're agitated and that they have delirium.  And
12   then given that, they may or may not have a whole variety of
13   other things that are frequently seen along with the
14   syndrome."
15             Did I read that correctly --
16        A.   You did.
17        Q.   -- Dr. Vilke?
18        A.   You did, yes.
19        Q.   And you would disagree with Dr. Wetli's testimony
20   that those other signs, the imperviousness to pain, the
21   increase of strength, the hyperthermia, you would disagree
22   with Dr. Wetli's statement that those signs are not relevant
23   in evaluating a situation to determine if an individual was
24   experiencing excited delirium; correct?
25        A.   In listening to you read this, it sounds
```

1    differently.  The definitional components of excited

2    delirium you have to have agitation, you have to have

3    delirium.  That's definitional.  The other ones are not

4    defining of it, they are components that have to be there.

5    But impervious to pain is not defining, it doesn't have to

6    be there.  You may have --

7         Q.  Sure.

8         A.  -- the other ones instead.  Sort of like a

9    flu-like illness, you don't have to have fever and cough and

10   sore throat, but you have to have certain components to it.

11   So if the -- if his intent was that there are those two

12   diagnoses -- or two symptoms of agitation and delirium only

13   are necessary to make the diagnosis, I think we've discussed

14   that I -- I believe you have to have more symptoms.

15        But in listening to this being read, those two are

16   definitional, absolutely have to be there.  And the other

17   ones may or may not have a whole variety of other things

18   that are frequently seen along with the syndrome.  That is

19   true, they may or may not.  You may or may not have

20   impervious to pain.  You may or may not have elevated

21   temperature.  But you should have the groups -- the groups

22   that I was talking about, at least six of those items.

23        Q.  Certainly.  And so you are looking at the totality

24   of the circumstances, any one of those may or may not be

25   present; correct?

Gary Michael Vilke, M.D.

```
 1        A.   Any one of the additional things.  You should be
 2   delirious, you should be agitated.
 3        Q.   Right.  But so the -- the factors, like
 4   imperviousness to pain or hyperthermia, may or may not be
 5   there in your understanding of the syndrome and the
 6   literature supporting it; correct?
 7        A.   Correct.
 8        Q.   But you would certainly want to look to those and
 9   evaluating how many of those additional clinical findings
10   are present is in your view a requirement to reach a
11   conclusion of excited delirium syndrome; correct?
12        A.   Right.  You should be looking for all of those.
13   Now, there are cases where you may not get vital signs in
14   somebody, and so you're looking at the behavior surrounding
15   it.  But the idea is you should be -- those are all symptoms
16   consistent with it.
17        Q.   Any particular one may be absent or maybe you
18   can't determine based on the specific facts of the case, but
19   you want to be looking to those all to reach your
20   conclusion; correct?
21        A.   That's what I do, yes.
22        Q.   And that's the opposite of what Dr. Wetli does
23   when he testified "Are those signs" -- referring to those
24   additional factors -- "Are those signs relevant in
25   evaluating a situation to determine if an individual was
```

1   experiencing excited delirium?"  "Answer:  No."

2          You disagree with that?  Dr. Wetli says they're

3   not relevant, you say not only are they relevant, they're

4   required, you need six?

5      A.   Right.  And I'm not sure what he's meaning by

6   relevant.  He said -- he's saying they're not relevant --

7   all of them are not relevant as far as you don't have to

8   have all of them, but you need to have some of them, so they

9   are components.  Again, I'm not understanding how he's

10  answering this question.

11     Q.   Well, and I'm not asking you to parse his words,

12  but you know what relevant means.  And relevant doesn't mean

13  you have to have it, relevant is you want to look for it.

14  Its presence or absence is something you should consider,

15  that's what relevant means; correct?

16     A.   That is correct in looking at "Are those signs

17  relevant in evaluating a situation", I guess they are

18  relevant in evaluating it.  Are they necessary or do they

19  have to be there, if that's -- if that's how you define the

20  relevance, then no, they don't have to be.  So but --

21     Q.   Okay.

22     A.   -- as far as evaluation, you're looking for it.

23     Q.   So if when Dr. Wetli uses the word relevant, he

24  means necessary, you might agree with him.  But if he uses

25  the word relevant to mean relevant as we would commonly use

1    the word, you disagree with him; correct?

2        A.   Again, you're asking me to try to understand what

3    he was meaning here.  I would probably ask different

4    questions.  But as far as that goes, if it -- if he's saying

5    you don't have to look for those at all, then, yeah, I would

6    say you should be looking for those as far as I define it.

7        Q.   Well, let me ask it this way:  Medical

8    professionals all the time are -- are conversant with the

9    idea of whether a particular symptom or condition is

10   relevant to a particular diagnosis, that's not a -- a

11   foreign or tricky concept; correct?

12       A.   It may be -- relevant is -- it's a level of

13   degree, sure.

14       Q.   Right.  And it's a -- it's a different level of

15   degree than necessary?

16       A.   Can you repeat that one, please?

17       Q.   Sure.  Whether something is relevant to a

18   particular finding is -- is different than whether something

19   is necessary to a particular finding?

20       A.   I think necessary, yeah, is a stronger version of

21   it.

22       Q.   Okay.

23       A.   Relevant can be high level of relevancy or a low

24   level of relevancy.

25       MS. POLLACK:  Does anyone mind taking a five-minute

1    break?

2         MR. HEPPELL:  I don't mind at all.

3         MS. POLLACK:  Okay.

4         MR. HEPPELL:  I think -- yeah, that sounds good.

5         MR. STEPHENSON:  Sam, how much more do you have?

6         MR. HEPPELL:  I would say probably half an hour, best

7    estimate.

8         MR. STEPHENSON:  Well -- okay.  Caren, do you have --

9    Are you going to have questions?

10         MS. POLLACK:  I'm going to have just very few.

11         MR. STEPHENSON:  All right.  I'm going to have a few.

12    Caren is going to have a few.  And Dr. Wetli (sic) has a

13    dinner appointment, so he wants to be out by -- by when?

14         THE WITNESS:  Dr. Vilke.

15         MR. STEPHENSON:  Oh, I'm sorry, Dr. Vilke.

16         THE WITNESS:  I'd like to be out by 5:00 out the door,

17    if possible.

18         MR. HEPPELL:  And then --

19         MS. POLLACK:  By 5:00 Pacific?

20         MR. STEPHENSON:  5:00 Pacific.

21              (A discussion was held off the record.)

22              (A seven-minute break was taken at 3:14 p.m.)

23    BY MR. HEPPELL:

24         Q.   Back on the record.

25              Dr. Vilke, turning to Page 147 of Dr. Wetli's

1    deposition transcript, and looking specifically at --

2    starting at Line 21.

3             "Question:  And then his agitation factor, is that

4    what you were describing earlier as violent behavior?"

5             "Answer:  Well, not necessarily violent, but

6    agitation can be out in the middle of traffic, something

7    violent, screaming that you are a prophet."

8             "Question:  And is that your understanding of the

9    facts of the case, that Mr. Todero was out in the middle of

10   the traffic, thumping on his Bible and screaming that he was

11   a prophet?"

12            "Answer:  Something like that."

13            "Question:  What if I present to you an alternate

14   hypothetical that the facts of the case were that Mr. Todero

15   was walking across the street, holding a Bible in front of

16   him and that there weren't -- there was no testimony from

17   witness who watched him cross the street that he was

18   gesturing or exclaiming anything verbally.  Would that alter

19   your conclusion that that was evidence of agitation?"

20            "Answer:  Obviously.  What you described right

21   there wouldn't -- he would not have agitated delirium."

22            "Question:  So if those were the facts of the

23   case, that would alter your opinion that Mr. Todero had

24   agitated delirium?"

25            "Answer:  Of course.  If those were the facts of

1    the case."

2          Did I read that correctly?

3      A.   You did, yes.

4      Q.   Okay.  Do you agree with Dr. Wetli's testimony

5    that if those were the facts of the case, Mr. Todero would

6    not have had agitated delirium or excited delirium?

7      A.   And I'm going to give you the -- I -- it depends

8    on how he is interpreting this -- this hypothetical.  If

9    he's just saying those are the only facts, which is what he

10   seems to be saying, then, yeah, that's -- that's not enough

11   to say it's excited delirium.

12          If he is saying that the only change in the facts,

13   we know that he has a temperature of 103 and he gets

14   agitated in the back of an ambulance and he's got, you know,

15   a heart rate of 142 and all that stuff going on, then I

16   think that that wouldn't change the opinion, at least my

17   opinion, that he has excited delirium.  And I'm not sure

18   that's how he's interpreting this.

19     Q.   Setting aside -- setting aside the -- the issues

20   about how specifically to interpret Dr. Wetli's testimony

21   there, you would -- you would not agree with the statement

22   that evidence that Mr. Todero was walking across the street

23   without gesturing or exclaiming verbally but just walking

24   into traffic, you would not agree that that would be a

25   conclusion that he did not -- he was not suffering from

1   excited delirium syndrome at that time?

2       A.   Right.  If that was the only facts given to me, it

3   would be no difference than somebody walking looking at

4   their cell phone walking across the street obliviously and I

5   wouldn't say that either.  So, I'd have -- if those are the

6   only facts, then I would not conclude that they were

7   suffering from excited delirium.

8       Q.   But -- understood that if those were the only

9   facts.  But taking the facts of this case, it is your

10  understanding that those are the facts of this case as they

11  apply to the description of the motorist who observed

12  Mr. Todero walking into traffic as reflected in their

13  interviews and as reflected on the 911 calls?

14      A.   So in this case, the walking across as -- in the

15  hypothetical component of this street portion of it, yeah,

16  that's roughly what the -- the --

17      Q.   Okay.

18      A.   -- or the motorist reported.

19      Q.   That -- that portion of the -- of the proceedings,

20  that's an accurate hypothetical that I gave Dr. Wetli?

21      A.   Based on my review -- based on my review of the

22  materials, he was walking across oblivious to traffic

23  carrying his Bible.

24      Q.   Right.  But no evidence in the record of, during

25  that time, gesturing or exclaiming anything verbally;

1    correct?

2         A.   Again, not that I recall.  Again, I was -- the

3    agitation that I was referencing is part of the diagnostic

4    criteria was what he was doing in the back of the ambulance.

5    So there could have been some agitated behavior, animated

6    behavior, I just don't recall any of it.

7         Q.   And turning to Page 162 of Dr. Wetli's deposition

8    and specifically Page 162 starting at Line 12.

9              "Q.  Are there any other facts contained in the

10   factual summary that you included in your report there are

11   evidence of Mr. Todero's lack of awareness of his

12   environment, other than walking into traffic?"

13             "Answer:  Well, not necessarily.  Certainly not

14   complying with the police."

15             "Question:  But you'd agree with me that people

16   not complying with commands from the police is not uncommon

17   phenomenon?"

18             "Answer:  Correct."

19             "Question:  And that's not -- that's not

20   necessarily indicative of an individual who is not aware of

21   their environment?"

22             "Answer:  Correct."

23             "Question:  And would you agree with me that the

24   vast majority of times that an individual fails to comply

25   with police commands is not because they're unaware of their

1   environment?"

2           "Answer:  True."

3           "Q.  Any other facts that you discuss in the

4   factual section of your report providing the basis for your

5   conclusion that Mr. Todero was unaware of his environment,

6   other than those we just discussed?"

7           "Answer:  No, I think that's it."

8           Dr. Vilke, do you agree with Dr. Wetli that the

9   only relevant fact indicating Mr. Todero's lack of awareness

10  of his environment was walking into traffic?

11      A.   Again, not having gone back through the details,

12  the -- you -- I know you can certainly have hallucinations

13  and delusions that make you less aware of what's really

14  going on around you, the concept of the Jesus Christ

15  component and thinking he's a prophet or whatnot.  We don't

16  know how that is -- how he's interpreting his environment

17  based on that.  He might think he's on a cloud in heaven, we

18  don't know.

19          So I think that is a potential aspect of it, but

20  from what you're reading there, he seems to be referencing

21  the walking in and out of traffic.  But I know he talks

22  about the delusions of -- of the deity-type stuff.

23      Q.   Okay.  And then continuing on on Page 164 -- well,

24  let me ask -- let me ask you this, Dr. Vilke.  You -- Do you

25  agree that it does not require medical training to -- to

1    determine that someone who is claiming to be Jesus Christ

2    and walking into traffic in front of cars appears to be

3    demonstrating a -- some sort of disconnect with the

4    environment around them or lack of awareness of the true

5    environment around them?

6         A.   I think that that is something a layperson can

7    probably pick up that somebody is, you know, talking about

8    being something that they're not and doing things that are

9    of hazard to themselves.

10        Q.   And same for agitation, right, agitation is

11   something that a layperson can observe and perceive, you

12   don't need any specific medical training to conclude that

13   someone is suffering from agitation?

14        A.   There's different types of agitation, so I think

15   that people recognize different forms of agitation.  You

16   know, somebody who is screaming and yelling or fighting

17   would be an obvious one.  But sometimes there's different

18   forms of agitation that are more subtle and picked up by

19   medical professionals.

20        Q.   The types of agitation that you observed in this

21   case were not subtle types of agitation that would require a

22   medical professional type to perceive; is that fair to say?

23        A.   I think they could be picked up by somebody who

24   did not have specific training in that and say there's

25   something not correct about that behavior.

Gary Michael Vilke, M.D.

1      Q.   Okay.  And assuming Dr. Wetli was expressing

2   himself correctly when he appeared to be expressing that

3   those two criteria were sufficient, both of the -- both of

4   his two necessary and sufficient criteria for excited

5   delirium syndrome could be perceived by a layperson, at

6   least as they were manifested in this case; is that fair to

7   say?

8      A.   The -- the symptoms of agitation that he

9   references could be picked up by a layperson.  I think that

10   that could occur that way, sure.

11      Q.   And also the symptoms of delirium that he

12   described?

13      A.   With the hallucinations and the sort of disconnect

14   from his ability to care for himself, wandering into

15   traffic, I think that could be picked up by laypersons as

16   well as not being normal behavior.  Whether they define it

17   as delirium or not, but they could certainly recognize it as

18   not normal behavior.

19      Q.   Sure.  So other than the -- you know, knowing

20   what, you know, capital D, delirium label to put on it,

21   nothing beyond the ken of a layperson in terms of those two

22   aspects; fair to say?

23      A.   I think putting together, you can sort of say

24   that.  They certainly could be -- look of confusion or

25   something else.  But, yeah, I think the behavior itself

1  being abnormal could be picked up by a layperson.  How would

2  they would define it I think would be -- need to be done by

3  a medical interpretation.

4      Q.   Can you repeat that -- that last part?

5      A.   Sure.  I think that a layperson could pick up the

6  behavior of walking into the streets as -- as altered

7  behavior.  Not typically normal, although some people do

8  that.  As well as if you have somebody recognizing the

9  hallucinatory type of behavior with the "I'm Jesus Christ",

10  "I'm" -- whatever -- whatever the phrase is being brought up

11  as abnormal behavior.

12      But interpreting them as far as confusion versus

13  delirium versus coming up with a medical terminology behind

14  that, I think that the layperson could say, "Abnormal, don't

15  know what's causing it."  They wouldn't -- they wouldn't

16  make a diagnosis, they would just make an assessment.  Sort

17  of like paramedics, they don't make diagnoses, they make

18  assessments.

19      Q.   Although, again, accepting Dr. Wetli's criteria at

20  least as he articulates them, there's no diagnostic work

21  required other than check (A) for agitation, check (D) for

22  delirium, you've got them both, that's excited delirium

23  syndrome.  There's no additional diagnostic work beyond --

24  (audio disruption) -- at least as he described it; fair to

25  say?

Gary Michael Vilke, M.D.

```
1        A.   No, it's a -- it's a very watered down, boiled

2    down version of his testimony because it was asked many

3    questions in different aspects of symptoms, but he certainly

4    did at times comment that if you are agitated and delirious,

5    you could be agitated delirium.

6        Q.   Turning to -- let's see.  Page 166, so we had just

7    been discussing -- well, we -- we had been discussing my

8    previous discussion with Dr. Wetli of evidence of delirium;

9    correct?

10       A.   Yes.

11       Q.   The portions we had just looked at.  Okay.  And

12   now looking at the transcript, Page 166, Line 22.

13            "Question:  And what is the -- what are the facts

14   and the factual summary of the case that you've included in

15   your report that in your view are evidence of Mr. Todero's

16   agitation?"

17            "Answer:  Going in and out of traffic."

18            "Question:  Any other facts in the factual summary

19   contained in your report that are evidence of agitation in

20   your view?"

21            "Answer:  Not that I know of now."

22            "Question:  Okay.  And that was also evidence of

23   his delirium; right?  His lack of awareness of the cars

24   around him; correct?"

25            "Answer:  Correct."
```

Gary Michael Vilke, M.D.

1        "Q.  That same fact you see as bearing on both the

2   delirium prong and the agitation prong?"

3        "Answer:  Correct."

4        "Question:  Any other facts related to the

5   agitation prong?"

6        "Answer:  No."

7        Did I read that correctly?

8   A.   You did, yes.

9   Q.   Do you agree with that aspect of Dr. Wetli's

10  testimony that the fact that Mr. Todero was walking into

11  traffic, going in and out of traffic, was sufficient as

12  evidence both of him suffering from delirium and of him

13  suffering from agitation?  Do you agree with that?

14  A.   So, I -- I felt more that the agitation in the

15  back of ambulance was my definition of the agitation in this

16  case.  Dr. Wetli didn't comment on that for -- for unknown

17  reason in his deposition in this line of questioning.

18        But as far as the specifics of him walking out in

19  the streets, some people define it as a -- mild terms of

20  agitation.  I wouldn't.  So it's -- it's in the eye of the

21  beholder.  And so he interpreted it as such.  I don't.

22  Q.   For you, that would not be evidence of agitation

23  or at least not sufficient evidence of agitation, walking

24  into traffic?

25  A.   I was -- when I saw the evidence of what was

1    happening in the back of ambulance, I didn't go back to try

2    to really parse down how agitated he was in traffic because

3    it didn't matter to me at that point.  He had significant

4    evidence of agitation with the paramedics, the tachycardia

5    and the behavior there where you couldn't get a blood

6    pressure.  So that's enough to be saying he is significantly

7    agitated and -- for the definition.

8           I didn't need to go back and see did I think he

9    was thumping the Bible, did I think he was walking

10   aimlessly.  I didn't go in that detail.  So that was why

11   I -- I mean, I'm answering that question.  So I don't -- I

12   didn't go back to try to figure that out.

13   **Q.   Sure.  Because in your view, the stuff in the back**

14   **of ambulance was what -- what you were looking at, what you**

15   **were focused on; correct?**

16   A.   What I was independently reviewing this for was

17   this excited delirium, that's what I used as my criteria.

18   Dr. Wetli obviously independently reviewed his and he used

19   different criteria but came to the same conclusion.

20   **Q.   But using his criteria, you would not come to his**

21   **conclusion; correct?**

22   A.   Again --

23   **Q.   Looking solely at the walking into traffic.**

24   A.   Right.  Again, my recall of the walking into

25   traffic, I don't believe it was significant agitation, but I

1   didn't look at from the perspective to see if I would have

2   defined it as such.

3       Q.   Okay.  I -- I guess you're suggesting or at least

4   I understand you from your answer to be suggesting that it's

5   possible there's evidence in the record of a particularly

6   agitated version of him walking into traffic that you just

7   didn't -- that you just don't recall as you sit here today

8   because you weren't focused on that aspect of his testimony.

9            I guess accepting my representation that my

10  recollections of the facts is that there is no evidence of

11  agitated walking into traffic, with the hypothetical that I

12  described earlier to Dr. Wetli about him just walking calmly

13  and -- you know, across the street, accepting that as being

14  an accurate reflection of the record, you would not find

15  that sufficient to meet the agitation criteria; is that

16  correct?

17      A.   In the hypothetical of him being calmly walking,

18  that would be, I guess, the opposite of agitation, so I

19  would not call that hypothetical as agitated.

20      Q.   Okay.  Turning to Page 180 of Dr. Wetli's

21  deposition.  And I know we had discussed somewhat earlier,

22  Dr. Vilke, the pathophysiology of the excited delirium

23  syndrome and the limits on the medical science on that.  But

24  let me read to you Dr. Wetli's testimony here starting at

25  Line -- Page 180, Line 9.  Well, let me -- let me back up a

1    little.  Let me start at 180, Line 2.  And we had been

2    looking at -- at the outset of this testimony at a chapter

3    of Dr. Wetli's -- one of Dr. Wetli's publications.  Starting

4    at Line 2.

5              "Question:  Is there anywhere in this chapter

6    where you discuss any situations in which the exact

7    mechanism for death from excited delirium is clear?"

8              "Answer:  No, not unless you are looking at

9    delayed death.  In which case, it's pretty clear because you

10   have rhabdomyolysis and the acidosis and all those other

11   metabolic complications."

12             "Question:  Let me phrase it this way then.  In

13   those situations, the exact mechanism of death is clear

14   because the death is caused by the multisystem organ

15   failure --"

16             "Answer:  Right."

17             "Question:  "Resulting from the rhabdomyolysis and

18   other symptoms; correct?"

19             "Answer:  Right."

20             "Question:  Is the mechanism by which the excited

21   delirium causes the rhabdomyolysis clear?"

22             "Answer:  No."

23             "Question:  That's also unknown by the state of

24   the medical science as it exists today; correct?"

25             "Answer:  We know that rhabdomyolysis frequently

1   accompanies excited delirium, once they are resuscitated.

2   But that's all we know about it."

3           Do you agree with that testimony of Dr. Wetli

4   regarding the lack of understanding -- the lack of any

5   scientific knowledge about the mechanism by which excited

6   delirium causes rhabdomyolysis?

7       A.   So excited delirium itself may or may not be

8   causing rhabdomyolysis.  And I think that's why he's

9   answering that it's -- the exact mechanism is not there.  We

10  know that the drug use in the majority of cases can in and

11  of itself cause rhabdomyolysis.

12          In this case here we know that CPK levels and the

13  creatinine levels were elevated prior to police involvement

14  based on timing.  So there's -- the rhabdomyolysis is more

15  likely due to dehydration, renal failure, some sort of

16  activity, as well as use of drugs can all do that.  Excited

17  delirium is just a -- an elevation of activity level that

18  can contribute to additional rhabdomyolysis, but it's due to

19  the drugs and the drug intoxication that causes the excited

20  delirium which all wraps up with that.

21          The multi organ failure is usually due to the

22  cardiac arrest.  So once you go into cardiac arrest, you

23  stun your kidneys, your liver, all those different organs.

24  And on top of that, you've already got some predisposing

25  issues from the metabolic hyperactivity that accompany it.

**Gary Michael Vilke, M.D.**                                      **Todero vs.**
                                                                 **City of Greenwood**

 1   And that in itself is additional hits to those organs down

 2   the road will cause death in most of these cases.  But the

 3   exact path, the exact mechanism in each individual case is

 4   going to vary depending on what they're doing prior to the

 5   starting of their event, what was the etiology, what drug

 6   was used, how much of it, stuff like that.

 7        Q.   If I understood your testimony just now, excited

 8   delirium syndrome was not, in your view at least in this

 9   case, a primary driver of Mr. Todero's rhabdomyolysis?

10        A.   I think he had -- he had elevations of CK levels

11   basically when he got to the hospital as well as his kidney

12   function was already compromised, you know, an hour after he

13   was approached by the officers.  If -- if anything in his

14   event going on at that point would have caused it, that

15   would have -- that -- any of the -- I guess I should say

16   anything from the police activity would have caused it, it

17   wouldn't have been -- rise until later.

18             So we know that whatever was going on in his

19   physiology with his agitation or his suspected drug use

20   based on his clinical presentation, that probably is what

21   was causing his kidney dysfunction, his elevated CK levels

22   that were seen on arrival to the hospital.

23        Q.   Well, so I guess I'm confused then, Dr. Vilke.  Is

24   it the excited delirium that was the likely cause of

25   Mr. Todero's death or was it something else in your opinion?

**Page 227**

1    A.   The excited delirium itself led to the cardiac

2    arrest.  The cardiac arrest then injures all those organs we

3    talked about there and then will in and of itself with a

4    temperature of 103, the tachycardia, all that physiologic

5    stress that's going on, the elevated lactate, those add

6    additional insults to those origans.

7         If you went into cardiac arrest right now with no

8    drugs and no excited delirium and we resuscitate you, you

9    wouldn't have all that additional damage happening to your

10   organs once you got resuscitated.  The elevated heart rate,

11   the elevated temperature add additional insults to that.

12   And so the excited delirium itself on top -- that led to the

13   cardiac arrest then creates the multi organ dysfunction that

14   leads to ultimate death in the end.

15   **Q.   So it's your testimony that it's the excited**

16   **delirium that causes the cardiac arrest and the cardiac**

17   **arrest that causes the rhabdomyolysis and then the other**

18   **symptoms you just described?**

19   MR. STEPHENSON:  Objection; that's not what he said at

20   all.  He said it was his preexisting.

21        Go ahead and answer.

22   THE WITNESS:  He was in -- he was in excited delirium

23   syndrome.  He had an enlarged heart which puts him at

24   increased risk for cardiac arrest.  And he had an elevated

25   potassium that we know on arrival to the hospital likely due

1   to his renal dysfunction that happened predating the police

2   involvement.  All those things lead to a more irritable

3   heart and risk for cardiac arrest, as does the excited

4   delirium itself with the rapid heart rate and all the hyper

5   stimulated aspects.

6          The excited delirium ultimately led to his cardiac

7   arrest.  Once somebody goes into cardiac arrest from excited

8   delirium, they're very hard to resuscitate successfully.  We

9   discussed earlier, people who don't go into cardiac arrest

10  tend to do okay and most people do survive.  But once they

11  go into cardiac arrest, all those insults to the additional

12  organs systems there make it very hard for recovery compared

13  to, say, someone who just had a heart attack and went into

14  cardiac arrest.

15  BY MR. HEPPELL:

16      **Q.   Are you aware of any studies that have been**

17  **conducted on people who are suffering from an enlarged heart**

18  **and excited delirium and are under the influence of an**

19  **intoxicant and then who are subjected to TASER discharge?**

20  **Are you aware of any studies testing the effect of a TASER**

21  **on those populations?**

22      A.   I don't believe they've studied individuals who

23  are under the influence of drugs.  You can't randomize

24  people like that.

25      **Q.   So that's essentially difficult to do a study that**

1  would -- a randomized study involving that population?

2       A.   If you're trying to randomize it, yes.  There's

3  plenty of studies looking at individuals who have cardiac

4  arrest and excited delirium.  You know, some have a TASER

5  application, many don't, and they still go into cardiac

6  arrest.

7            As far as epidemiologic evaluations, yes.  As far

8  as specific randomizing to you're in a state of excited

9  delirium, this person is going to get a TASER application

10  and this one is not, that -- that study obviously will never

11  be done.

12       Q.   Right.  So there's no -- there's no studies that

13  are done on that population of people, people suffering from

14  one or more enlarged heart and excited delirium and under

15  the influence of drugs that show that a TASER shock is --

16  does not contribute to cardiac arrest or does not cause any

17  symptoms; correct?  Those studies just don't exist?

18       A.   I think I did say they do.  Epidemiologic studies

19  looking at populations of people in excited delirium and

20  what uses of force were used prior to that are out there.

21       Q.   All right.  Well, some people get tased and then

22  they have a heart -- heart attack and some people aren't

23  tased and then they have a heart attack, both of those have

24  happened; right?

25       A.   You used the term "heart attack" to imply a

```
1    myocardial infarction.  They don't have that, they have a

2    cardiac arrest.  The heart stops, so it's a --

3         Q.   All right.  Cardiac arrest.  Some people are tased

4    and they have a cardiac arrest, and some people aren't tased

5    and then they have a cardiac arrest; correct?

6         A.   Those are two possibilities of outcomes, sure.

7         Q.   All right.  And that doesn't tell you that the

8    person who -- those two facts alone don't tell you if the

9    person who was tased and had a cardiac arrest, that the

10   TASER had nothing to do with it, that's not a valid

11   scientific conclusion from the two cases I described?

12        A.   Well, if you're only referring to two cases, that

13   would be two possible outcomes, certainly not an

14   epidemiologic study.

15        Q.   Turning to Page 182 of Dr. Wetli's deposition,

16   Line 11.

17             "Question:  If there had been no police

18   intervention -- well, the statement is that regardless of

19   the method of police intervention, the complications would

20   have occurred.  What if there had been no police

21   intervention?"

22             "Answer:  He would have probably been struck and

23   killed by a car."

24             "Question:  Other than the possibility of being

25   struck and killed by a car, do you have any other
```

1   information based on your medical expertise and your review

2   of the materials in the record, about how Mr. Todero would

3   have fared if there had been no police intervention in this

4   case?"

5           "Answer:  There is no way of knowing that because

6   most cases of excited delirium require or result either

7   citizens or police being called and restrain the individual.

8   The individuals that are not restrained usually die from

9   their bizarre behavior.  I don't think anybody knows what

10  would happen if you had a person with bizarre behavior and

11  you just let them run around where they couldn't hurt

12  themselves and see what would happen to then, I don't know."

13          "Question:  Or what if, for example, if police for

14  example had been able to secure the scene, close the road,

15  but not attempted to physically engage with Mr. Todero, you

16  are just not sure what the medical result of that situation

17  would have been?"

18          "Answer:  I've never seen that happen.  I don't

19  know."

20          Do you agree with Dr. Wetli's testimony that it's

21  just not possible to tell what would have happened to

22  Mr. Todero if there had not been any police intervention in

23  this case?

24      A.   I think that -- I think that his response with

25  regards to drug-induced excited delirium letting them sort

1   of run free to see what happens has not been answered.  I

2   think that looking at psychiatrically induced excited

3   delirium, if you go back to the 1800s before we had

4   medications to treat and sedate, they -- those symptoms and

5   those individual resulted in a 75 percent morality rate.

6   So, letting them sort of -- we're trying to optimize

7   horrible medical care at that time still ended up with a

8   75 percent morality rate.

9         I suspect that you if -- if you extrapolate that

10  to drug-induced versions of it currently and you just let

11  them run around with the central cranking up of their

12  temperature and thalamic tracks and dopamine and all those

13  things we talked about earlier, it's going to keep spinning

14  up until either they collapse, have a cardiac arrest or some

15  other behavior gets them the need to be intervened with.

16       Q.   So that's your opinion which differs from

17  Dr. Wetli's opinion who says "I don't know"; right?

18       A.   Well, I'm telling you I can't say I don't know.

19  I'm giving you a bunch of possibilities.  So if you're

20  asking what specifically would have happened in this case,

21  my answer would be the same as Dr. Wetli.  I don't know.

22  But I'm giving you some likely scenarios what would happen

23  based on the best information we have available.

24       Q.   But you're -- And again, to be clear Dr. Wetli

25  didn't say that 75 percent chance that he would die from

Gary Michael Vilke, M.D.

1  this, this or this, he said "I don't know."  That's not your

2  answer, just a straight "I don't know"; correct?

3       A.   I'd like to qualify my answer.  There's some data

4  out there that you can extrapolate, but it's certainly not

5  an exact extrapolation because that data was not

6  drug-induced excited delirium.  That study has not been

7  performed.  We don't let people just sit in a room and not

8  treat them and see what happens to them.  We sedate them

9  when we have the opportunity to.  So, the exact answer is I

10 don't know, but I suspect they would have some sort of a

11 negative outcome based on historical issues.

12      Q.   That's based on the medical data from the 1800s

13 you were describing; correct?

14      A.   And through the early 1900s through the 1950s,

15 yes.

16      Q.   Okay.  Turning to Page 183 starting at Line 17.

17           "Question:  But it is your testimony that the

18 physiological course of death that Mr. Todero experienced

19 the rhabdomyolysis, hyperkalemia and acidosis, led to the

20 multisystem organ failure that would not have played out the

21 same way if the police had not engaged him and attempted to

22 restrain him; correct?"

23           "Answer:  Right.  Well -- if they had not tried to

24 restrain him, he would have likely died from trauma as I

25 said before."

1       You don't agree with that statement; correct?

2       A.   Well, if they didn't engage him, there was

3   certainly a chance that he would have gotten hit by a car.

4   So I don't disagree with that possible outcome.  I just

5   can't give you a more-likely-than-not scenario of what

6   exactly would have happened.

7       Q.   Possibly he would have hit by a car, but you can't

8   say that that was the likely -- likely result; correct?

9       A.   I can't tell you that he would have gone right

10  back out to the street and doing the same thing he was

11  before.  So if he was not in the street, unlikely, but I

12  don't think you can truly predict that.

13       Had they not intervened with him, he was certainly

14  going to be wandering the streets is what was happening

15  prior to any police involvement.  So I guess Dr. Wetli's

16  opinion is not unreasonable, but I can't give you an exact

17  more-likely-than-not scenario.

18       Q.   And Dr. Wetli's testimony that the physiological

19  course of death of rhabdomyolysis, hyperkalemia, acidosis,

20  and multisystem organ failure would not have played out the

21  same way if the police had not engaged him, he said right,

22  he agreed with that.

23       Do you -- Do you agree with that statement?

24       A.   He said right, and then he qualified that, right,

25  that he would likely have died from trauma.  So, of course,

1   if you got hit by trauma, those scenarios wouldn't have

2   played out.  So based on his opinion there, I -- I -- he's

3   right.

4       Q.   Well, setting aside the issue for -- of trauma.

5   Again, I'm not asking you to parse what your interpretation

6   of Dr. Wetli's testimony is.  I'm just asking for your

7   opinion.  Do you agree that if the police had not restrained

8   Mr. Todero, he would not have experienced rhabdomyolysis,

9   hyperkalemia, and acidosis leading to multisystem organ

10  failure?

11      A.   Based on the answer if he got hit by a car, I

12  agree, he wouldn't have had all those things.

13      Q.   Well, I'm not asking you to answer based on if he

14  was hit by a car.  My question is:  If the police had not

15  engaged Mr. Todero and attempted to restrain him, is it your

16  opinion that Mr. Todero would not have experienced

17  rhabdomyolysis, hyperkalemia, acidosis leading to

18  multisystem organ failure?

19      A.   And I answered that earlier, I believe one of

20  several things would like have happened:  Either trauma, got

21  hit by the car; collapse in cardiac arrest and died

22  suddenly; or gotten in such an event that somebody is going

23  to have to get involved and restrain him because he's

24  engaging in some sort of activity that required that.  I

25  can't tell you which, but -- and then if he had sudden

1    cardiac arrest, you may or may not be resuscitatable.  If

2    he's not resuscitatable, then he would not go through that

3    process of rhabdomyolysis, hyperkalemia, and multi organ

4    failure because you would be dead on scene.  If he was

5    resuscitatable, then he likely would have gone to that same

6    cascade of -- of multi organ failure.

7         Q.   Understood.  Dr. Vilke, you testified earlier

8    about your -- your work as consulting expert.  Do you

9    advertise your services anywhere?

10        A.   I do not.

11        Q.   Okay.  How do you -- how do you find new -- new

12   clients, new cases?

13        A.   I don't find them, they find me.  I think it's

14   word of mouth aspects.

15        Q.   Okay.  You disclosed a -- your fee schedule as

16   part of your report; is that correct?

17        A.   That is correct.

18        Q.   And I believe that's all the way at the very end,

19   Page 124.  You charge $500 per hour for your time reviewing

20   materials, report writing, preparing for deposition, all of

21   that non-testimonial work; correct?

22        A.   Correct.

23        Q.   $1,000 an hour for testifying; correct?

24        A.   That is correct.

25        Q.   Why do you charge twice as much for your time to

1    testify as you do for report writing or -- or preparation

2    work?

3         A.   In part because when I do testify, I have to block

4    off a significant chunk of time because nobody will pay a

5    half day or full day minimum type of thing and so I have to

6    block off a full day in general for that.  And so it goes

7    to -- if I block it off, it's only one hour, and then I

8    blocked off a whole time.  So I charge a little bit more for

9    that for the -- I guess the inconvenience of having to keep

10   that time block off open.

11        Q.   You sent invoices for your work so far in this

12   case; is that correct?

13        A.   I have, yes.

14        Q.   And I -- you know, those invoices have been

15   provided to us.  And I don't -- I won't belabor the point

16   going -- pulling them up and having you analyze them.  But

17   fair to say you've billed $15,500 for your work from -- from

18   the outset of the case until approximately mid-August?  Does

19   that sound right to you?

20        A.   That sounds right.  Or reasonable, yes.

21        Q.   And then an additional approximately $2600 work

22   from mid-August towards the end of September when your

23   report was disclosed.  Does that sound approximately

24   correct?

25        A.   That sounds approximately correct, yes.

1    Q.   For a total a little over 18,000 that has been

2    invoiced to date for your work through the end of September?

3    A.   That would be -- if your math is right, then I

4    would agree with that.

5    Q.   Approximately how many hours of work beyond the

6    end of September have you put in that has not been invoiced

7    yet?

8    A.   Somewhere probably between five and ten hours,

9    something like that.

10    Q.   Okay.  And that's not including your time at the

11    deposition today; correct?

12    A.   Correct.

13    Q.   So somewhere between five and ten hours at the

14    $500 an hour rate and then $1,000 an hour for your time at

15    your deposition today?

16    A.   That would be correct.

17    Q.   Okay.  You disclosed with your report a list of

18    your past testimony in the last four years.  That's

19    Appendix B starting at Page 113 broken out by deposition

20    testimony and then also courtroom testimony.  You're

21    generally familiar with those -- those cases over the last

22    four years; is that fair to say?

23    A.   Generally.  I -- if you're asking me details, I

24    probably won't be able to give any details, but yes.

25    Q.   Sure.  What -- what percentage of -- of your cases

1    involves testifying on behalf of law enforcement officers or

2    law enforcement entities or employers, whether it's police

3    or correctional?

4         A.   Sure.  Probably about half the cases I do are

5    involving law enforcement, sort of the -- the cases similar

6    to this type of thing, use of force.

7         Q.   In fact, if I was -- if I had done my math right

8    interpreting your -- your case description correctly, it

9    looks like in the past four years it was about 52

10   depositions you had done over the past four years and 36 of

11   those cases was testifying on behalf of a law enforcement

12   defendant, whether an officer or an entity.  Does that sound

13   ballpark correct to you?

14        A.   If you're referencing jail medical care as a law

15   enforcement entity, then that's probably right.  Those are

16   usually more med-mal type cases.  They just happen to --

17        Q.   Okay.

18        A.   -- occur in jail.  So I tend to parse them out as

19   med-mal.

20        Q.   Understood.  And then similarly, again taking jail

21   medical care along with police officer type of cases, your

22   21 instances of courtroom testimony in the last four years,

23   15 testifying on behalf of the law enforcement defendant,

24   whether entity or an officer.  Does that sound approximately

25   correct to you as well?

1      A.   Again, the same caveat that some of those are

2   medical care that happened in the jail facility, yeah.

3      **Q.   Have you ever testified on behalf of a plaintiff**

4   **in a case involving a law enforcement officer or entity?**

5      A.   I have, yes.

6      **Q.   And what -- On how many occasions?**

7      A.   One that I recall.

8      **Q.   Okay.  When did that take place?**

9      A.   More than twenty years ago.  I don't -- I don't

10  remember the specifics of it, but it was -- it was a

11  plaintiff case.

12     **Q.   And between then and today, ballpark how many**

13  **cases would you say you've been retained to give opinion**

14  **testimony on behalf of the defendant side in a case**

15  **involving law enforcement, whether police or correctional?**

16     A.   Sure.  Let me qualify, I think it's actually just

17  under twenty years ago, not quite over twenty years, the

18  previous case.  But as far as -- I think -- if I'm

19  remembering -- if I'm answering the question, you asked

20  about testimony on behalf of law enforcement versus non-law

21  enforcement percentages.  The majority -- greater than

22  95 percent is -- is on behalf of defense law enforcement

23  officers.

24     **Q.   And it was -- 52 depositions and approximately 21**

25  **instances of trial testimony or courtroom testimony in the**

Gary Michael Vilke, M.D.

1    last four years as disclosed on your report.  Fair to say

2    it's going to be some number of multiples of that going back

3    twenty years or just under twenty years?

4        A.   I've had more cases in the recent years than I had

5    years before, so I wouldn't -- you can't extrapolate

6    straight back as far as trying to calculate how many cases.

7        Q.   Over 100 different cases in the last 20 years?

8        A.   Yes, that's a good number.  Uh-huh.

9        Q.   And of those over 100 cases, one in which you

10   testified on behalf of a plaintiff in a case involving law

11   enforcement; correct?

12       A.   Well, you're saying 100 cases.  I get -- if you're

13   lumping all my med-mal cases in there and the jail medical

14   care cases and that type of thing in there, purely from a --

15   from a law enforcement agency or officer, only one plaintiff

16   case that I gave testimony in.

17       Q.   What was the -- what was the nature of that case?

18       A.   It was an elderly gentleman who had some

19   significant medical conditions who was restrained with a lot

20   of weight and there was a delay in allowing EMS to provide

21   medical care.

22       Q.   Other than in that one case, have you ever given

23   an expert opinion in a case that was not favorable to the

24   law enforcement position in the case?

25       A.   Umm, I have given opinions of cases that would be,

1   I guess, not -- not favorable.  I give my opinion, they may

2   have interpreted it as -- as something that would be

3   concerning for them to try to defend.

4       Q.   Could you repeat what you just -- the last part of

5   what you just said?

6       A.   Probably not, but I'll try to rephrase it.  I --

7   I've given opinions after I review a case, and I can recall

8   a case -- or two cases in which I think it was going to be

9   difficult for them to defend the case based on the details

10  of the case.

11      Q.   Obviously those were not cases in which you were

12  then retained and had your opinions disclosed as an expert;

13  fair to say?

14      A.   That would be fair to say.

15      Q.   Have you ever given an expert opinion that a TASER

16  caused or contributed to someone's death in any case in

17  which you've been retained?

18      A.   I gave an opinion that it was concerning that it

19  could have been, yes.

20      Q.   And that was a case in which you were retained and

21  disclosed as an expert?

22      A.   No.  It was a case that I gave an opinion on that

23  I was no longer retained as an expert but as a consultant.

24      Q.   Other than that one instance, is that the only

25  time you've given an opinion in your professional capacity

1  as a consultant related to a TASER causing or contributing

2  to someone's death?

3      A.   Yes, I believe so.

4      Q.   All right.  What were the circumstances of the

5  TASER used in that case?

6      A.   A thin walled male, TASER right over the heart,

7  went down into ventricular fibrillation, sudden cardiac

8  arrest.  So he sort of meets the criteria for the one in 2.5

9  million possible TASER-related electrical deaths.  So -- and

10 there wasn't a good plausible alternative diagnosis in that

11 case, and so I said it's possible that the TASER did cause

12 that and they can interpret it how they want to.

13     Q.   Other than that example, have you ever given an

14 expert opinion that a TASER caused or contributed to

15 someone's serious injury in a case?

16     A.   Serious injury?  I don't believe I have, no.

17     Q.   Okay.  Have you ever been paid to do work either

18 directly for or on behalf of Axon or TASER International?

19     A.   I have not.  I've been involved in cases in which

20 they were defendants, just make sure I'm answering you

21 correctly here.  I have not done work for them as far as

22 research or education or anything like that where they paid

23 me.  As far as legal consulting, I've been involved in cases

24 in which they were co-defendants or defendants.  So I would

25 be potentially in those cases, but not paid directly through

**Gary Michael Vilke, M.D.**

 1   them, but rather from attorneys or entities.

 2       Q.   Okay.  Those cases where you are retained on

 3   behalf of that defendant or retained on behalf of a

 4   co-defendant?

 5       A.   I know most of them were cases I was retained by

 6   the entity being sued and Axon or at the time TASER was a

 7   co-defendant in the case.  So more on the side of the

 8   entity.

 9       Q.   Have you ever served on any boards or committees

10   for Axon or TASER International?

11       A.   I have not.

12       Q.   Have you ever participated in studies or research

13   funded by Axon or TASER International?

14       A.   I have not.

15       Q.   And you -- You don't hold yourself out as an

16   expert in the physiological progression of rhabdomyolysis;

17   is that correct?

18       A.   The physiological progression?  I -- I consider

19   myself an expert in rhabdomyolysis diagnosis, treatment and

20   the natural history of it.  I note that I don't treat

21   patients in an ICU or an IMU setting for the weeks following

22   that.

23       MR. HEPPELL:  All right.  Those are questions I have at

24   this time.  I understand that Jim and Caren may have some

25   questions for you as well.  Thank you for your time with me,

1    Dr. Vilke.  I may have some follow-up briefly based on their

2    questions.

3         THE WITNESS:  Thank you.

4

5                           EXAMINATION

6    BY MS. POLLACK:

7         Q.   Hi, Dr. Vilke.  I will have many fewer questions

8    than Sam did.

9              So, it looks like on Page 6 of your report, that

10   you are basing all your opinions in this case on the

11   presumption that both probes made contact with Mr. Todero's

12   body; is that correct?

13        A.   Let me pull my report there.  But I --

14        Q.   Sure.

15        A.   -- I usually assume the maximum case scenario as

16   far as that goes.  I believe that the data would support

17   that it wasn't each -- all those weren't effective, but when

18   I evaluate the case I would make the -- the most -- the

19   longest assumption, if that makes sense.

20        Q.   All right.  So if you said on your analysis "after

21   a TASER ECD was applied in probe mode with the probes

22   located in his back", you're presuming worst case scenario,

23   both probes were in his back; is that correct?

24        A.   You said worst case, not I.

25        Q.   Okay.

1      A.   But yes.  Yes.

2      Q.   So if -- if the evidence is that only one probe

3   was located in his back, what does that do to your opinions,

4   if anything?

5      A.   And let me look at my note, because I believe one

6   was in the back and one was either in the shirt or a hand.

7   So if I wrote both in the back, but it doesn't change my

8   opinions, to answer your question.

9      Q.   Okay.  And if one was stuck in his shirt, does

10  that change your opinions at all?

11     A.   It doesn't change my opinions, no.

12     Q.   So your opinions with respect to what type of

13  muscle breakdown may be caused by the conducted electrical

14  weapon, is that all based upon the assumption of a good

15  connection with both probes?

16     A.   That would be based on that assumption, correct.

17     Q.   And if there's not a good connection with both

18  probes, how would that opinion be affected with respect to

19  skeletal muscular breakdown and the generation of lactic

20  acid?

21     MR. HEPPELL:  Make an objection to the extent in terms

22  of eliciting testimony beyond the scope of Dr. Vilke's

23  opinions beyond what's written in his report.  And I could

24  make that a standing objection rather than keep jumping in,

25  but that's my objection.

1          You can go ahead and answer.

2       THE WITNESS:  Okay.  Thanks.

3          Yeah, as far as the muscle contractions, we

4    certainly know it contracts muscles.  As far as muscle

5    breakdown, there's very minimal that occurs with a TASER, so

6    it's not even measurable at times.

7          If there was less connectivity in the sense that

8    there was, you know, a fraction of the amount of the -- the

9    TASER activations that were effective, obviously that would

10   reduce -- reduce the amount of potential breakdown.

11   Although, again, my opinion is it really doesn't have any

12   clinically significant effects.

13   BY MS. POLLACK:

14       Q.   You discuss on Page 9 of your report that excited

15   delirium syndrome places the individual at increased risk

16   for sudden death syndrome.  Can you explain to me what

17   sudden death symptom is, Doctor?

18       A.   Sure.  Basically having a sudden cardiac arrest.

19   Heart stopping, brady-asystolic arrest.

20       Q.   And is that like sudden infant death syndrome

21   where they really don't know the cause of what happened?

22       A.   The -- the pathophysiology is not exactly mapped

23   out for excited delirium.  I think we talked about earlier

24   we have some etiology that we know that everything is sort

25   of ramped up and revved up.  But exactly why, the answer is

 1   no, we don't know that quite yet.

 2        Q.   So, Doctor, had you reviewed -- I assume -- well,

 3   it seems like you reviewed pretty much everything -- the

 4   deposition of Dr. Chris Hartman and the body camera footage

 5   of him in the emergency department that day?

 6        A.   Yes.  I -- I certainly reviewed his deposition.

 7   The body cam footage, I may -- you know, I may have skimmed

 8   through as I was going through that.  I can't remember

 9   specifically.  I certainly don't remember details of it.

10        Q.   So do you agree with his opinions with respect to

11   the fact that Mr. Todero was in the -- in a medical state

12   such that he was going to end up in that ED sooner or later

13   irrespective of whether he encountered my client, Brian

14   Blackwell?

15        A.   Oh, absolutely.

16        MR. HEPPELL:  Objection to form, foundation.

17             Go ahead.

18        THE WITNESS:  Yeah, I do agree with that opinion, yes.

19        MS. POLLACK:  All right.  Thank you.  Those are all my

20   questions.

21        MR. STEPHENSON:  Should I go over there?

22        THE REPORTER:  You're fine there if you want --

23        THE WITNESS:  Can they hear you in the microphone?

24        MR. STEPHENSON:  Keep your distance.

25        THE WITNESS:  We're hovering around the microphone.

**Page 249**

```
 1          MR. STEPHENSON:  Yeah.

 2

 3                          EXAMINATION

 4    BY MR. STEPHENSON:

 5          Q.   Doctor, I want to ask you some questions

 6    concerning your report.  On Page 12 -- I wish I had another

 7    copy so that I could look on.  You note that Mr. Todero had

 8    basic laboratory chemistry levels of his blood checked on

 9    May 29, 2016 which included blood cell counts, kidney

10    function, and electrolytes, and that his creatinine was

11    elevated at 2.7.  What does that mean and how is that

12    significant to your opinions?

13          A.   Sure.  So the creatinine is a marker of renal

14    function.  It was elevated basically at the -- the arrival

15    of him to the emergency department about an hour after he

16    was encountered by the police.  That's significant in the

17    sense that we know that the kidney dysfunction had to

18    predate the police involvement because if he were to have

19    kidney involvement based on any -- any event there, it would

20    take time for that to occur.  Rhabdomyolysis takes time to

21    have kidney dysfunction.  If you have elevated CK levels

22    enough to damage the kidney from the -- the CK and the

23    myoglobin, that usually takes 12 to 24 hours to manifest in

24    kidney dysfunction.  So whatever caused this kidney

25    dysfunction predated the involvement of police officers that
```

1    day.

2         Q.   Okay.  And your report goes on to state his

3    glomerular, g-l-o-m-e-r-u-l-a-r, filtration rate was noted

4    to be 28.  What does that mean and how does that bear on

5    your opinions?

6         A.   Sure.  Glomer- --

7         MR. HEPPELL:  I'm just going to make an objection,

8    sorry.  Just an objection, I can make it a standing

9    objection to the extent counsel is attempting to elicit

10   testimony that expands the scope of the witness's opinions

11   beyond those reflected in the report.

12              You can go ahead.

13        MR. STEPHENSON:  I just read from it the report, Sam.

14   BY MR. STEPHENSON:

15        Q.   Go ahead.

16        A.   The glomerular filtration rate is a marker of

17   kidney function.  And it was noted to be 28, and basically

18   that's equivalent number that would be correlated with

19   stage 4 kidney damage.

20        Q.   And you noted in your report that Mr. Todero had

21   stage 4 kidney damage?

22        A.   Correct.  On his arrival to the emergency

23   department when they checked his labs, this was the result

24   that was there.  So again, if anything had happened the last

25   hour was not going to suddenly change his kidney function.

Gary Michael Vilke, M.D.

1   This is something that's predating any event.  You know,

2   again, that could be caused by drug use, caused by

3   dehydration, poor nutrition over the last 24, 28 hours.  But

4   I can tell you that's not something that happened because of

5   police involvement because that takes time for it to evolve

6   to the level that you're seeing there.

7       Q.   How many stages are there?

8       A.   There are -- there are multiple stages.  So I

9   think it goes up to five.  So it was fairly significant at

10  this point.

11      Q.   You further note in his -- in your report that at

12  1455 -- which is 2:55 p.m.?

13      A.   Correct.

14      Q.   Blood was sent to check for creatinine kinase,

15  k-i-n-a-s-e, abbreviated CK level, which was noted to be

16  elevated at 8272.  And then a normal level is 30 to 223.

17  What is the significance of that fact in respect to your

18  opinions?

19      A.   Sure.  So he got to the hospital I believe at

20  about -- had blood drawn at 1255 originally, and that's

21  where they found the kidney dysfunction.  And typically when

22  that occurs, they'll check a CK level, which they did.  And

23  that's why it's a delayed check.  It's elevated.

24           And again, if there was issues with regards to,

25  for example, TASER causing muscle breakdown, that wouldn't

Page 252

1    manifest itself so quickly.  It takes hours for muscle

2    breakdown to raise in the -- in the blood there.  So from

3    that perspective this predated his involvement with the law

4    enforcement officers.

5         Q.   Is elevated CK a marker for rhabdomyolysis?

6         A.   It is, yes.  CK is what you use to define

7    rhabdomyolysis typically.

8         Q.   What is rhabdomyolysis?

9         A.   Rhabdomyolysis is basically the breakdown of

10   muscle in the body releasing myoglobin and creatinine

11   kinase, two enzymes.  It can release other -- other

12   components as well.  But the -- the concern with that is the

13   myoglobin can damage the kidneys and that can cause kidney

14   dysfunction.  When the kidneys are dysfunctioning or not

15   functioning correctly, then you can have elevations of

16   potassium which can be life threatening.

17        Q.   Is it your opinion that Mr. Todero had

18   rhabdomyolysis prior to the police encounter?

19        A.   Correct.  He had -- his elevation at this time

20   would not have been due to the police encounter but

21   something that happened in the 12 to 24 hours prior to that.

22   And it could be anything from activity, overactivity,

23   undernourishment, dehydration, or a combination of that or

24   drug induced which can also do it.

25        Q.   Now, when he was in the hospital, his CK level

1    increased rather dramatically to 20,000, did it not?

2        A.   It did, yes.

3        Q.   And do you know what might have caused that to

4    occur?

5        MR. HEPPELL:  Object to form.  Calls for speculation.

6            You can go ahead.

7        THE WITNESS:  Yeah.  Cardiac arrest can certainly cause

8    an elevation in the CK levels after an event there where you

9    have multi organs including the muscles being damaged.

10   BY MR. STEPHENSON:

11       Q.   So cardiac arrest is a possible cause?

12       A.   Of worsening -- of worsening CK levels.  Or it

13   could have been on the rise already from his previous

14   activity.  It could have been in the 24 hour manifestations

15   that were going to continue to rise whatever happened prior

16   to that.

17       Q.   You further note that at 12:55 p.m., his potassium

18   was noted to be 6.1, which is elevated.  The normal range is

19   3.5 to 5.1.  You further note potassium elevation is

20   typically due to renal failure which in Todero's case was

21   also present.  That's what you wrote; correct?

22       A.   Correct.

23       Q.   Can you explain that for us?

24       A.   Sure.  So cell breakdown can release potassium

25   into the system there.  And then the kidneys typically will

1    filter and adjust.  When the kidneys aren't working and

2    there's additional potassium in the system or normal amounts

3    of potassium, the potassium will build up in the system.

4              So his kidney function, his stage 4 kidney disease

5    is the likely cause why his potassium levels were built up

6    at the time of his arrival to the emergency department.

7    That would have predated any involvement of the law -- law

8    enforcement officers.

9        Q.   How do you know that the elevated potassium would

10   have predated any involvement with the law enforcement

11   officers?

12       A.   Because it follows with the creatinine.  So the

13   creatinine is elevated and when the kidneys are not

14   functioning, the potassium will build up.  So it was -- it

15   was in response to the kidney dysfunction.  And so the

16   elevation that occurred at that time was in response to the

17   kidney dysfunction which we know predated the law

18   enforcement officers.  The level 6.1, it could have been

19   6.0, 6.1, so the degree of elevation is variable.  But as

20   far as it goes, it did predate -- the hyperkalemia predated

21   the law enforcement officer involvement.

22       Q.   Okay.  It's your opinion, therefore, that these

23   various conditions Todero had -- rhabdomyolysis, elevated

24   CK, elevated potassium -- he was -- he had those before he

25   encountered Officer Blackwell?

1      A.   That is correct.

2      Q.   And you know that to be true because of these

3   conditions take time to develop?

4      A.   Correct.  They -- they don't happen in 20, 30, 40,

5   60 minutes.  They -- they take half a day to a day,

6   sometimes longer, depending on the original insulting

7   factor.

8      Q.   Could Todero, having been subject to multiple

9   tasing, have caused this conditions?

10      A.   They could not, no.  The timing would not be

11   reflective of this.  The -- the data behind TASER

12   activations, it doesn't raise potassium.  It does not cause

13   kidney damage.  If somebody wanted to surmise that you

14   create muscle contractions enough to release CK and cause

15   kidney damage, that you would see a day later, you wouldn't

16   see it at the time of his arrival.

17           But the concept of muscle contractions with

18   TASERs, it's a locking of muscles.  It's -- it's a tetany,

19   so to speak.  The muscles are sort of holding still.  When

20   we see rhabdomyolysis, it's usually from repetitive

21   activities, people who do lots of either exercise,

22   particularly if they're not in the best shape, walking,

23   squats, those types of things.  And if you're dehydrated

24   because you're not taking care of yourself physiologically,

25   that can add insult to it and raise it even faster.

**Todero vs.**
                                                                    **City of Greenwood**

1    Q.   Okay.  Sam asked you questions in connection with

2    the number of tasings and the duration.  Even accepting,

3    which I dispute, but even accepting that Todero was

4    subjected to a full 98 seconds of electrical charge via

5    TASER, would that have -- if that were true, would that have

6    any bearing on your opinions?

7    A.   It would not.

8    Q.   Why not?

9    A.   Because again, the findings that we have here with

10   regards to his clinical presentation from his physiology,

11   his kidney function, his CK levels, those could not have

12   been caused by TASER activations.  Even if I thought they

13   would be able to raise a CK level to some degree, it's too

14   soon for it to have manifested that.

15        And secondly, his behavior prior -- throughout

16   that, with the elevated heart rate, the temperature of

17   103 -- obviously the temperature of 103 is not caused by a

18   TASER.  The persistent tachycardia, the heart rate of 142.

19   When a TASER is on, it can cause some discomfort if you're

20   able to physiologically feel discomfort, if you're not so

21   disassociated.  But once the TASER is off, your physiology

22   calms down.  So persistent heart rate elevation and elevated

23   temperature and the agitation happening at least ten minutes

24   later or so, would not be related to a TASER.

25   Q.   Okay.  So when his temperature was measured at

                                                            **Page 257**

1    103, was that at the hospital or in the ambulance or both?

2         A.   I believe that was at the hospital.

3         Q.   Hospital.  And the heart rate was measured where?

4         A.   It was initially measured in the back of the

5    ambulance as being 142.

6         Q.   And this would have been some 20 minutes after the

7    struggle ended?

8         A.   In that range, yeah.

9         MR. HEPPELL:  Form.

10             Go ahead.  Sorry.

11        THE WITNESS:  Sure.  In that range.  I think timing was

12   at least 10 to 15 minutes, maybe 20 minutes.  But it's

13   certainly not immediately after a struggle or after the

14   TASER activation.

15   BY MR. STEPHENSON:

16        Q.   Well, what is the significance of the fact that

17   Todero had a temperature of a 103 and a heart rate of 142

18   some period of time after he was handcuffed?

19        A.   Okay.  It's significant because he had something

20   exogenous going on in his system that -- or I better say

21   endogenous, something happening within that's causing his

22   physiology to be revved up.  You know, when you saw him

23   laying on the street there, almost in a catatonic state for

24   a period of time, he certainly wasn't agitated.  But we know

25   that some time after that, he still has a heart rate of 142.

1    He still has a temperature of 103.  That's something from

2    his physiology that's revving up, which is why it's part of

3    the diagnostic criteria for excited delirium syndrome that

4    his central system is all -- all, I guess, revved up and

5    physiologically spinning out of control.

6        Q.   And is that part and parcel of your opinion on

7    excited delirium?

8        A.   Part and parcel of that.  And it's also why we see

9    certain individuals go into cardiac arrest and others not.

10   Back to I think the temperature of 103 is significant as it

11   shows a significant elevation in -- in the stress physiology

12   going on.  In fact, patients who go into cardiac arrest from

13   excited delirium syndrome often will have an elevate --

14   significantly elevated temperature.

15       Q.   With regard to this line of questioning concerning

16   what would have happened had Todero not been -- not

17   interacted with the police, let me simply ask you:  Assuming

18   there were no police interaction that day, would Todero's

19   physiological condition have remained the same whether tased

20   or not?

21       A.   His physiologic condition -- so if he had a

22   temperature of 103, it would have stayed 103.  If he had a

23   heart rate of 142, it would have stayed 142.  You wouldn't

24   expect it to improve because he didn't get TASER activation.

25   You wouldn't expect it to worsen because of TASER

1    activation.

2        Q.   So your opinion essentially is that TASERing had

3    nothing to do with his death?

4        A.   That is correct.

5        Q.   Can you explain to us why the event of the day

6    before when Todero was walking across an interstate highway

7    and was encountered by state police is relevant to your

8    opinions?

9        A.   Sure.  It implies his behavior, pattern of

10   behavior.  Again, we talked about previous episodes of

11   some -- some illicit drug use or drug use.  His behavior was

12   consistent with a stimulant or hallucinogenic drug

13   intoxication, ongoing hallucinations and delusions, you

14   know, some notation of sweaty, odd behavior, described

15   basically like somebody who might be under the influence of

16   a stimulant.

17            And with regards to his excited delirium, often

18   you'll see a pattern of usage.  And then at some point

19   the -- the person will trip and sort of, you know, become

20   hyper -- hyperadrenergic is a term basically where your --

21   everything starts to stimulate up, the heart rate, the

22   temperature, the breathing, the sweating.  And it just -- it

23   will keep revving up and escalating.

24       Q.   I see.  Is it not a fact that walking into moving

25   traffic is often a -- a sign or symptom of excited delirium?

```
1        A.   A lot of these cases --

2        MR. HEPPELL:  Object to form.

3        THE WITNESS:  A lot of these cases end up being

4    identified by individuals being in traffic.  There's a -- an

5    attraction to glass or mirrors that's been proposed as

6    something that we often see as individuals will break

7    mirrors and glass.  Some of the thought is that it may be

8    involved with the idea of lots of cars and shininess may be

9    an attraction to them, but that's difficult to prove.

10   BY MR. STEPHENSON:

11       Q.   When you read the witness accounts of the

12   individuals who encountered Todero on the day of the

13   occurrence who were driving, did they not report that he was

14   walking across the road and then backwards oblivious to

15   traffic?

16       A.   That is what they reported, yes.

17       Q.   So, the record does not simply reveal some guy

18   walking across the road like any other pedestrian?

19       A.   No, it was not -- it was not what they interpreted

20   or reported as being sort of normal behavior.  He was acting

21   semi erratic.

22       Q.   Am I correct that Todero died from multi organ

23   failure; correct?

24       A.   Ultimately, that was the final diagnosis what --

25   what led to his final death, yes.
```

1     Q.   And the multi organ failure resulted from cardiac

2   arrest?

3     A.   Correct.

4     Q.   And finally, Doctor, could you just provide us a

5   summary as to why you concluded that Todero was suffering

6   from excited delirium syndrome?

7     A.   Sure.

8     MR. HEPPELL:  Objection; form, asked and answered.

9          You can go ahead.

10   THE WITNESS:  Sure.  So he had sort of bizarre

11  behavior.  And again, this wasn't all necessarily at one

12  point in time, but he had some bizarre delusional behavior.

13  He had agitation, he went through a waxing and waning stage.

14  He was a little bit more resistant to cuffing and then he

15  went into sort of a hyperactivity and then sort of catatonic

16  and then he got agitated again.  This is not atypical for

17  excited delirium.

18        Then he also then had other criteria that would be

19  consistent with it including elevated heart rate, elevated

20  temperature, seemingly strong strength, resistance to police

21  interaction or police commands, breathing fast, sweating.

22  All those things we sort of talked about earlier which met

23  criteria.  And he had a bizarre behavior of almost a

24  stimulant intoxication going on as witnessed at least by two

25  different sets of individuals in the 24 hours prior to his

1    event here.  It would also be consistent with the -- the

2    potential drug intoxication that can lead to excited

3    delirium.

4            And finally, the -- the cardiac arrest, the

5    brady-asystolic arrest would be consistent with that, and

6    difficulty to resuscitate him.

7    BY MR. STEPHENSON:

8        Q.   Okay.  And then finally is there a relationship or

9    link between rhabdomyolysis and acute kidney injury?

10       A.   There is.

11       Q.   What is that?

12       A.   Rhabdomyolysis is the elevation of CK levels and

13   release of myoglobin in the bloodstream.  The myoglobin

14   itself is very damaging to kidneys and can lead to kidney

15   dysfunction or kidney failure.

16       Q.   Is rhabdomyolysis the likely cause of Mr. Todero's

17   acute kidney injury?

18       A.   Yes.

19       MR. STEPHENSON:  All right.  Those are all the

20   questions I have, Doctor.  Thank you.

21

22                        FURTHER EXAMINATION

23   BY MR. HEPPELL:

24       Q.   Just a couple of brief follow-up questions,

25   Dr. Vilke.  Dr. Vilke, you had given some testimony

1    regarding your views on the potential evidence of

2    Mr. Todero's -- what you viewed as evidence of his

3    consumption of stimulant or drug intoxication as evidenced

4    by his behavior in the day prior to this incident.  Can you

5    direct me to where you discuss that topic in your report?

6         A.   I don't believe I talked about the specifics of

7    the day before.  I just reference his behavior and -- and,

8    in general, behavior, physiology, and presentation to be

9    consistent, but I didn't go into details of the two visits

10   before.

11        Q.   You didn't go into the details of his behavior nor

12   your conclusion discussed for the first time today that

13   that, in your view, was evidence of drug intoxication; is

14   that correct?

15        A.   I didn't go into the specifics of the behavior in

16   there, that is correct, as evidence for drug intoxication.

17        Q.   Right.  Neither the -- your report doesn't contain

18   any discussion of Mr. Todero's encounter with the State

19   Trooper the day before, nor his encounter with folks at the

20   church either the day before or the morning of the incident.

21   It doesn't discuss either of those in the context of

22   evidence of drug intoxication; is that correct?

23        A.   That I believe is correct.

24        Q.   Okay.  And lastly, you were asked questions I

25   believe by both Caren and Jim related to whether your

 1   opinions were impacted -- would be impacted in any way by

 2   the duration of the tasing, the number of TASERs given the

 3   disputes in the case about how many TASER shocks were

 4   affected, the actual duration of the electric shocks, and I

 5   believe your testimony was that that did not affect your

 6   opinion in any way; is that correct?

 7        A.    That is correct.

 8        Q.    Is there any duration of TASER shock that would

 9   cause you to revise your opinion that the TASER had nothing

10   to do with Mr. Todero's death?

11        A.    Well, the specifics of this case, we know that he

12   has predating kidney dysfunction.  We know he has predating

13   CPK levels.  We know he has a temperature of 103.  So the

14   TASER episode there didn't cause or create any of that.

15   That was predating them.  So I can't -- if you're going to

16   say a million discharges, well, now we're talking, you know,

17   an hour to do it, so that changes the -- the whole scenario.

18   So I think it -- it's very difficult to say, well, 98 versus

19   120 versus 150.  What I'm saying is with the facts here,

20   I -- I feel comfortable that my opinion would not change.

21        Q.    Sure.  And I guess I'm not -- I'm not going to say

22   a million discharges, but if it was, you know, 30 or 40

23   discharges for a total of, you know, 200 or more seconds,

24   would your opinion change if those were the facts of the

25   case?

1    A.   Well, again, you would have to go through the

2    details of what -- because that changes the whole scenario,

3    right.  It's additional time, officers are coming on the

4    scene before that period because of -- it -- it changes the

5    case or the scenario because you have to add additional time

6    into it.  But purely based on TASER activations, we know

7    that that wouldn't have changed his physiology on -- on

8    arrival at the EMS providers nor of the hospital assuming

9    the same time course of distance between the last TASER

10   activation and the EMS involvement.

11   **Q.   And again, just to be clear, I mean, we're not**

12   **talking -- Again, we're not talking a million.  If I was**

13   **saying, you know, 30 or 40, 200 seconds, 300 seconds, I**

14   **mean, that's a matter of a number of minutes in terms of an**

15   **effect on the timeline.  So again, that would not change**

16   **your opinion if he had been tased 30 times, 300 seconds**

17   **total duration, your opinion wouldn't change as to the**

18   **impact of the TASER here?**

19   A.   Again, I -- I said it depends on how the scenario

20   is played out, right.  If it's done every five seconds or

21   every ten seconds to get those additional, that's a number

22   of minutes left there.  Does the ambulance come in later?

23   Does the ambulance come in earlier as part of your -- your

24   hypothetical?  So that's why I said you would have to -- I

25   would need more details.  But purely based on the TASER

1   activations, more of those, with everything sort of being

2   the same, it should not impact his physiologic outcome.  It

3   wouldn't change my opinion.

4        Q.   So essentially there's no -- no amount of TASER

5   shocks that you could view in a record in a case like this

6   that would lead you to the conclusion that it was the TASER

7   that caused the death and not excited delirium syndrome; is

8   that correct?

9        A.   That is not correct.

10       Q.   So there's -- there's some amount of TASER shocks

11  you would look at and say, "Wow, that's maybe too much, that

12  could have played an impact in his death.  I don't think

13  excited delirium syndrome is the -- is what we're looking at

14  here"?

15       A.   There could be a potential scenario where it's

16  going on for 15 minutes of off and on TASER activation and

17  he gets more agitated.  And there's -- you know, so you're

18  changing the whole scenario by adding more time on because

19  it's either delaying the ambulance arrival or it's

20  prolonging the field scenario because you're adding time on

21  to these TASER activations.

22            So that's what I'm saying, at some point there

23  would be a delay in timing.  It may not be related to the

24  TASER activation themselves, but unfortunately it would

25  change the entire scenario and have to evaluate that

1   independently with the materials that were available.

2        Q.   Well, I'm having a hard time squaring that

3   testimony with your testimony earlier that the -- the TASER

4   timing could be totally written out because it would have

5   had to have been, you know, 24 hours beforehand to see the

6   levels that -- that he had seen.  But now you're saying a 15

7   minute difference in timing, your opinion might be different

8   on whether the TASER was involved.

9        A.   Well, if -- again, your scenario is not complete.

10  Your hypothetical is partial because you're adding on

11  another 30 activations or another 15 activations or another

12  20 activations.  Are they 5 second activations?  10 second

13  activations?  How long in between one?  What's going on with

14  the officers trying to handcuff him during that point or are

15  there other officers?  What happens with the arrival of EMS?

16  Does it -- those things are all part of the timing when I

17  evaluate this case.

18             I know that in this case, at the end of 98 seconds

19  of trigger pulls, he is sitting on the -- on the ground

20  there.  He's breathing fast.  He's awake, alert, a little

21  jittery.  Then he lays down flat and he seems to be more

22  catatonic.  And I know what happens after that.  Your --

23  your scenario changes all that by adding more time for all

24  these additional trigger pulls.  And I don't know what's

25  happening in your scenario.  So that's why I say I'd have to

1    evaluate it independently with all those other features like

2    I did in this case specifically.

3        **Q.  You're not categorically ruling out that a TASER**

4    **can cause this, just not on the facts of this case, the**

5    **timeline you're seeing, you don't rule it out categorically**

6    **as a possibility?**

7        A.   I rule nothing out categorically.  I like to

8    evaluate the case for a specific finding before I make a

9    decision.

10        MR. HEPPELL:  All right.  Those are the follow-up

11    questions I have at this time.

12        MR. STEPHENSON:  Caren?

13        MS. POLLACK:  I don't have anything else.

14        MR. STEPHENSON:  Okay.  I have nothing else.

15           Doctor, do you want to read this deposition or do

16    you want to waive your signature?  And let me ask, do you

17    charge $1,000 to read?  Sorry.

18        THE WITNESS:  I'm a slow reader, no.  I -- I prefer to

19    read.

20        MR. STEPHENSON:  You can, yes.

21        THE WITNESS:  Okay.

22        MR. STEPHENSON:  He'll read and sign.

23        MR. HEPPELL:  Thank you very much for your time today,

24    Dr. Vilke.  I hope we are getting you out in time to make

25    your dinner plans.

```
 1          THE WITNESS:  Perfect.  Thank you.

 2          MR. STEPHENSON:  Appreciate it.

 3          MR. HEPPELL:  And we are going to order a copy of the

 4    deposition.  We don't need a paper copy, just an electronic

 5    PDF and, you know, to my paralegal is -- is fine for us.

 6          MS. POLLACK:  I do not need a copy.

 7          MR. STEPHENSON:  I do need an electronic copy and a

 8    paper copy also.

 9               (Whereupon, the deposition was concluded
                  at 4:40 p.m.)
10
                         *    *    *
11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

Page 270

**Gary Michael Vilke, M.D.**                                    **Todero vs.**
                                                               **City of Greenwood**

1        I, the undersigned, a Certified Shorthand Reporter

2    of the State of California, do hereby certify:

3        That the foregoing proceedings were taken before

4    me at the time and place herein set forth; that any

5    witnesses in the foregoing proceedings, prior to testifying,

6    were duly sworn; that a record of the proceedings was made

7    by me using machine shorthand, which was thereafter

8    transcribed under my direction; that the foregoing

9    transcript is a true record of the testimony given.

10       Further, that if the foregoing pertains to the

11   original transcript of a deposition in a federal case,

12   before completion of the proceedings, review of the

13   transcript {X} was { } was not requested.

14

15       I further certify I am neither financially

16   interested in the action nor a relative or employee of any

17   attorney or party to this action.

18       IN WITNESS WHEREOF, I have this date subscribed by

19   name.

20

21   Dated:  November 20, 2020

22

23   _____
     Doreen Furuta Landes
24   RPR, CSR No. 5778
     State of California

25

```
1              DECLARATION UNDER PENALTY OF PERJURY

2     Case Name: Todero vs. City of Greenwood

3     Date of Deposition: 11/09/2020

4     Job No.: 10074066

5

6                I, GARY MICHAEL VILKE, M.D., hereby certify

7     under penalty of perjury under the laws of the State of

8     _____ that the foregoing is true and correct.

9                Executed this _____ day of

10    _____, 2020, at _____.

11

12

13                      _____

14                      GARY MICHAEL VILKE, M.D.

15

16    NOTARIZATION (If Required)

17    State of _____

18    County of _____

19    Subscribed and sworn to (or affirmed) before me on

20    this _____ day of _____, 20__,

21    by_____,    proved to me on the

22    basis of satisfactory evidence to be the person

23    who appeared before me.

24    Signature: _____ (Seal)

25
```

**Gary Michael Vilke, M.D.**                                      **Todero vs.**
                                                                  **City of Greenwood**

```
 1   DEPOSITION ERRATA SHEET

 2   Case Name: Todero vs. City of Greenwood
     Name of Witness: Gary Michael Vilke, M.D.
 3   Date of Deposition: 11/09/2020
     Job No.: 10074066
 4   Reason Codes:  1. To clarify the record.
                    2. To conform to the facts.
 5                  3. To correct transcription errors.

 6   Page _____  Line _____  Reason _____

 7   From _____ to _____

 8   Page _____  Line _____  Reason _____

 9   From _____ to _____

10   Page _____  Line _____  Reason _____

11   From _____ to _____

12   Page _____  Line _____  Reason _____

13   From _____ to _____

14   Page _____  Line _____  Reason _____

15   From _____ to _____

16   Page _____  Line _____  Reason _____

17   From _____ to _____

18   Page _____  Line _____  Reason _____

19   From _____ to _____

20   Page _____  Line _____  Reason _____

21   From _____ to _____

22   Page _____  Line _____  Reason _____

23   From _____ to _____

24   Page _____  Line _____  Reason _____

25   From _____ to _____
```

**Page 273**

**Gary Michael Vilke, M.D.**

**Todero vs.
City of Greenwood**

```
 1    DEPOSITION ERRATA SHEET

 2    Page _____ Line _____ Reason _____

 3    From _____ to _____

 4    Page _____ Line _____ Reason _____

 5    From _____ to _____

 6    Page _____ Line _____ Reason _____

 7    From _____ to _____

 8    Page _____ Line _____ Reason _____

 9    From _____ to _____

10    Page _____ Line _____ Reason _____

11    From _____ to _____

12    Page _____ Line _____ Reason _____

13    From _____ to _____

14    Page _____ Line _____ Reason _____

15    From _____ to _____

16    Page _____ Line _____ Reason _____

17    From _____ to _____

18    Page _____ Line _____ Reason _____

19    From _____ to _____

20    Page _____ Line _____ Reason _____

21    From _____ to _____

22    _____ Subject to the above changes, I certify that the
              transcript is true and correct

23    _____ No changes have been made. I certify that the
              transcript  is true and correct.

24

25              _____
                     GARY MICHAEL VILKE, M.D.
```

**Page 274**

Gary Michael Vilke, M.D.

Todero vs.<br>City of Greenwood

**$**

**$1,000** 237:23 239:14 269:17

**$15,500** 238:17

**$2600** 238:21

**$500** 237:19 239:14

**(**

**(A)** 7:12 220:21

**(D)** 220:21

**1**

**1** 18:5 28:21 55:13 61:11 90:3,13 103:11,23 105:1,19 111:3,4,11,13 112:9, 11 118:13,23,24 124:2 142:14 151:3

**10** 47:14,18 119:13 151:9 157:7 168:13 178:2 179:2 185:7 258:12 268:12

**10,000** 85:2,5,22 86:5

**100** 50:12 166:4 242:7,9,12

**103** 64:11,12 172:8 190:9 214:13 228:4 257:17 258:1,17 259:5,10,22 265:13

**108** 195:7,25

**1099** 48:18

**10:00** 54:4

**10:15** 54:9

**11** 111:4,11 141:15 142:17 168:14

231:16

**113** 239:19

**11:43** 103:2

**12** 146:1,2 147:3 206:10 216:8 250:6, 23 253:21

**120** 265:19

**124** 237:19

**1255** 252:20

**12:55** 254:17

**13** 142:17 150:25

**1311** 190:10

**14** 198:15

**141** 198:3

**142** 177:18 202:13,14 214:15 257:18 258:5,17,25 259:23

**143** 198:15

**144** 203:24

**145** 206:10

**1455** 252:12

**147** 212:25

**15** 71:15,18 94:19 95:6,10,15,16 96:4, 5,8,24 97:22 147:8 148:4,10 149:1 240:23 258:12 267:16 268:6,11

**150** 265:19

**16** 92:25 93:4 96:12, 15,20 101:11,16 102:9,18

**162** 216:7,8

**164** 217:23

**166** 221:6,12

**17** 74:9 234:16

**18** 17:23,25 19:3 80:5

**18,000** 239:1

**180** 224:20,25 225:1

**1800s** 233:3 234:12

**182** 231:15

**183** 234:16

**19** 26:9 29:9 41:10 80:5 195:25 198:4

**1900s** 234:14

**1950s** 234:14

**1988** 19:8,11

**1992** 19:12 24:9

**1993** 21:3 24:9

**1994** 41:3,25

**1996** 41:11

**1997** 21:21 22:5

**1:26** 145:13

**2**

**2** 28:22 54:12 65:14 105:5,23 111:12 157:22 225:1,4

**2.5** 244:8

**2.7** 250:11

**20** 8:25 10:21 47:23 48:11 71:15,18 80:23 203:25 242:7 256:4 258:6,12 268:12

**20,000** 254:1

**200** 80:23 265:23 266:13

**2000** 22:5

**2007** 20:1 22:7

**2009** 20:2 81:22 157:7 159:3 161:20 167:18 168:5

**2010** 81:23

**2011** 27:10 41:8

**2012** 81:22

**2016** 80:7 88:17 93:3 143:14,25 168:9,19 201:6 250:9

**2017** 21:22 22:7

**2020** 5:1 18:8,12

**21** 80:14 213:2 240:22 241:24

**22** 81:21 221:12

**223** 252:16

**23** 81:21 202:14

**24** 84:23 132:5 250:23 252:3 253:21 254:14 262:25 268:5

**25** 54:3 84:23 88:17 98:11 198:4

**26** 86:6

**27** 86:25

**28** 18:8,12,15 80:7 107:25 251:4,17 252:3

**29** 86:25 107:25 143:14,25 250:9

**29th** 93:3 168:9,19 201:6

**2:55** 252:12

**3**

**3** 71:10 157:23

**Gary Michael Vilke, M.D.**

**3.5** 254:19

**30** 88:17 96:25
107:25 148:11,24
252:16 256:4 265:22
266:13,16 268:11

**300** 266:13,16

**300,000** 49:8,11

**31** 88:22 107:24

**36** 240:10

**37-minute** 103:2

**38** 88:22

**39** 89:7

**3:14** 212:22

---

**4**

**4** 13:23 55:14 74:9
146:4,16,17 170:10
251:19,21 255:4

**40** 256:4 265:22
266:13

**400** 73:2

**400,000** 49:11

**44** 55:13,23 60:23,24
61:11 89:7 90:4,13
130:18

**4:40** 270:9

---

**5**

**5** 14:2 38:8 55:14
88:8 105:5 158:6,7
268:12

**5.1** 254:19

**52** 240:9 241:24

**5:00** 212:16,19,20

---

**6**

**6** 38:8 104:22 105:13
106:20,22 107:3
160:15 167:10
173:20 246:9

**6.0** 255:19

**6.1** 254:18 255:18,19

**60** 28:13,15,20
148:11,25 256:5

**65** 167:9

---

**7**

**7** 106:22 107:4 111:2
112:12 167:11 170:9
195:8,12,25

**70** 108:1

**75** 233:5,8,25

---

**8**

**80** 101:18

**8272** 252:16

---

**9**

**9** 5:1 117:1 224:25
248:14

**90** 96:16,19 97:2,8,25
98:5,8,9,11,13,23
99:5 101:10,18
148:5

**90-second** 95:19,20

**911** 61:19 62:2 63:1,
10 65:15,17 66:9,10
67:3,18 68:20,22
69:4,9 215:13

---

**95** 241:22

**98** 93:8,18 101:10,16
102:10,18 257:4
265:18 268:18

**9:04** 5:1

---

**A**

**A-C-E-P** 59:18

**a.m.** 5:1 54:9 103:2

**abbreviated** 252:15

**abbreviation** 114:17

**ability** 184:6 192:3
219:14

**able** 7:1,8,18 31:23
48:6,7,23,25 49:6
79:1 80:7 85:23
92:12 155:3 170:5
188:13 191:12
193:11 197:2,7
200:4 201:3,14
232:14 239:24
257:13,20

**abnormal** 187:25
220:1,11,14

**abnormalities** 72:15
158:18

**above-referenced**
54:24

**absence** 124:18
131:2,20 165:13
173:15 210:14

**absent** 209:17

**absolutely** 208:16
249:15

**abuse** 72:8 83:10,23
124:6 130:16,24
137:1,3 138:10,18,
21,23 140:20 167:12

---

170:17 171:4

**abused** 124:7 130:7
131:10 137:13

**academic** 19:4 25:19
34:1

**Academy** 19:25

**accepted** 135:25

**accepting** 220:19
224:9,13 257:2,3

**access** 12:14 83:16
88:11 195:1

**accident** 69:10

**accompanies** 226:1

**accompany** 226:25

**accomplish** 44:6

**accord** 66:7

**account** 50:8

**accounts** 261:11

**accumulated** 93:7

**accurate** 18:11 90:24,
25 160:13,25 192:14
215:20 224:14

**ACEP** 59:18 135:25
200:13

**acid** 247:20

**acidosis** 105:24
142:20 225:10
234:19 235:19
236:9,17

**acknowledge** 84:15
141:6

**acknowledged**
128:23

**act** 68:4

**acting** 176:17 261:20

**activation** 94:11

---

**Gary Michael Vilke, M.D.**

147:17 258:14 259:24 260:1 266:10 267:16,24

**activations** 78:25 94:4,17 248:9 256:12 257:12 266:6 267:1,21 268:11,12, 13

**active** 192:2

**actively** 191:5

**activities** 33:14 63:22 256:21

**activity** 68:7 69:21 70:15 226:16,17 227:16 236:24 253:22 254:14

**actual** 31:11 49:5 75:3 79:21 116:7 117:10 147:21 265:4

**acute** 22:13 146:5 147:9 149:14 263:9, 17

**add** 49:18 73:19 74:1 228:5,11 256:25 266:5

**added** 18:18 110:12

**adding** 267:18,20 268:10,23

**addition** 12:13 20:24 37:12 161:1,2,6 190:15

**additional** 13:16 18:23 23:13 25:13 45:17 57:7,11 98:24 109:20 110:13,24 111:9 116:10 120:4 149:24,25 184:11 190:14 209:1,9,24 220:23 226:18 227:1 228:6,9,11 229:11 238:21 255:2 266:3,

5,21 268:24

**address** 114:12 187:19

**adds** 77:4

**adjust** 176:3 255:1

**administration** 38:11

**administrative** 20:14, 17 40:20,21 43:22

**admissibility** 89:9

**admit** 23:14 75:5

**admonitions** 74:25

**adopt** 90:19

**adopted** 152:21

**advance** 97:17

**advanced** 25:3 51:24

**advertise** 237:9

**Affairs** 34:1

**affect** 165:18 265:5

**affiliated** 26:5

**afternoon** 149:15

**agencies** 29:9,10 30:8,9

**agency** 41:21 242:15

**agents** 101:6

**aggressive** 15:7 177:22

**agitated** 15:4,7 122:2 162:21 179:5,8,18, 19 180:6,8,12 181:5, 18,22 182:2 197:20, 22 198:11,20 199:6, 7,11,16,20 200:1,16, 18,19 201:2 202:23 203:5 205:4,21 207:11 209:2 213:21,24 214:6,14 216:5 221:4,5 223:2,

7 224:6,11,19 258:24 262:16 267:17

**agitation** 123:1 140:14 162:10 171:24 177:19 179:15 180:7,18,19 181:7,17 182:4 187:2 197:18,21 198:17 199:2,11,24 202:17,20 203:2 204:2 206:14 208:2, 12 213:3,6,19 216:3 218:10,13,14,15,18, 20,21 219:8 220:21 221:16,19 222:2,5, 13,14,15,20,22,23 223:4,25 224:15,18 227:19 257:23 262:13

**agitation's** 50:25

**ago** 43:19 82:12 107:25 241:9,17

**agree** 11:22,24 16:3 17:17 53:7 96:17 105:19,23 112:20, 24,25 113:1,4,11,17 118:13 119:4 133:11 134:22 135:4 141:16 142:19 146:8 156:22 158:25 159:15 160:4,23 161:13 162:2,15,17 167:17 168:6 170:25 171:2, 5,6 177:7 180:4,18 188:1 198:24 202:24 203:15 205:14 210:24 214:4,21,24 216:15,23 217:8,25 222:9,13 226:3 232:20 235:1,23 236:7,12 239:4 249:10,18

**agreed** 16:17 95:1 113:23 142:10 171:15 235:22

**agreeing** 113:21 143:11

**agreement** 16:18 103:25 113:5 168:25

**ahead** 7:7 101:16 206:6 228:21 248:1 249:17 251:12,15 254:6 258:10 262:9

**aimlessly** 223:10

**airway** 50:22,23

**AKI** 146:5,14,15 147:15 149:20,21 150:1,2

**albeit** 33:14

**alcohol** 82:20 139:6

**alert** 268:20

**aligns** 24:19

**alive** 154:7,13

**allow** 35:11 98:3

**allowed** 42:1

**allowing** 242:20

**alluded** 169:10

**alter** 213:18,23

**altered** 200:1 220:6

**alternate** 213:13

**alternative** 72:11 244:10

**AMA** 156:6

**ambiguous** 153:7

**ambulance** 15:8 77:20,25 84:22 85:7, 11 92:12 175:8 179:21 186:19 214:14 216:4 222:15

**Gary Michael Vilke, M.D.**

223:1,14 258:1,5 266:22,23 267:19

**Amended** 64:17

**amendments** 167:21

**American** 21:20 155:23,25 156:13 157:5

**amount** 36:1 47:6,10 48:1 50:12 82:15,17 88:21 94:3 248:8,10 267:4,10

**amounts** 255:2

**analogy** 154:21

**analysis** 73:23 106:20 107:3,8 108:9,10 173:20,23 246:20

**analyze** 238:16

**anatomic** 72:4

**animal** 95:14

**animated** 216:5

**annual** 25:18 47:19 48:16,24 49:1

**answer** 6:13,17 7:7 12:17,18 37:10 58:16,19 68:25 73:16 74:22 81:25 82:17 85:9 89:1 91:11 92:17 107:24 120:25 122:7 123:6 125:10 130:4 135:9 162:15 167:18 178:23 188:6 195:16,19,22,24 196:7 198:10,20 199:9 202:19 203:1, 16 204:4,7 206:11, 17,22 207:10 210:1 213:5,12,20,25 216:13,18,22 217:2,

7 221:17,21,25 222:3,6 224:4 225:8, 16,19,22,25 228:21 231:22 232:5,18 233:21 234:2,3,9,23 236:11,13 247:8 248:1,25

**answered** 197:9 199:4,5,10 233:1 236:19 262:8

**answering** 90:10 96:14 210:10 223:11 226:9 241:19 244:20

**answers** 6:4,6

**anticipate** 18:24 26:15

**anticipated** 76:3

**anybody** 232:9

**apart** 124:16

**apologies** 5:18 145:12,15

**apologize** 5:15 170:7

**apparent** 203:18

**apparently** 206:25

**appear** 75:10

**appearance** 175:17

**appeared** 219:2

**appears** 39:5 41:3 89:6 204:19 218:2

**Appendix** 17:22 18:1 26:9 239:19

**applicability** 115:14

**applicable** 19:1 57:5 76:10 159:17 162:1

**application** 101:1 230:5,9

**applications** 102:19

104:3

**applied** 99:8 246:21

**apply** 62:10 67:1 99:12 163:19 215:11

**appointed** 42:1

**appointment** 26:2 27:6 29:3 212:13

**appointments** 26:10, 21,25 28:13,16 29:1 33:17 35:1 38:14 43:12 44:13,14,16 45:18,22 46:5

**appreciate** 13:3 41:13 43:25 45:3 192:15 270:2

**approached** 227:13

**approaching** 95:20 96:12

**appropriate** 159:17 160:6,8,9,14 162:1 163:21 175:23

**appropriately** 175:14

**approval** 97:16 99:9, 19

**approve** 99:5

**approved** 97:3

**approximate** 48:23 49:1

**approximately** 8:10, 17,23 9:9 10:5,19, 21,22 28:1 47:18,20 48:11 71:12 75:16 80:7 81:23 88:18 94:14 238:18,21,23, 25 239:5 240:24 241:24

**approximation** 47:6,9 48:8 49:6 60:13

**area** 21:15 24:13,25 34:3 36:1 37:1,18,20 38:9 50:25 51:19 68:2 86:20 101:8 158:17 190:23

**areas** 16:24,25 20:25 23:11 30:15,17 33:1 37:16 39:19 40:22 50:17,21 51:3,8,24 52:4,20,25 53:11,16 67:20 75:3 78:17 86:20 87:8 91:3,23 100:15 107:19 113:5,13 150:18 169:12

**arguments** 89:8

**arises** 39:14

**arm** 82:5 191:5

**arms** 191:11,20,23

**arrest** 15:22 43:9 51:5,12 61:15,16 72:16 73:8,21 79:3 105:22 141:17 143:15 226:22 228:2,7,13,16,17,24 229:3,7,9,11,14 230:4,6,16 231:2,3, 4,5,9 233:14 236:21 237:1 244:8 248:18, 19 254:7,11 259:9, 12 262:2 263:4,5

**arresting** 140:12

**arrival** 173:24 227:22 228:25 250:14 251:22 255:6 256:16 266:8 267:19 268:15

**arrived** 105:25 142:21 149:14 163:8 181:10

**art** 97:12

**article** 59:19 148:23

**articles** 95:12

**articulated** 206:12

**articulates** 220:20

**artificial** 40:16

**ascertain** 122:4 159:25

**ascribe** 191:10 195:20 196:19 197:4

**ascribing** 191:9

**aside** 98:16 203:18 214:19 236:4

**asked** 15:20 43:18 73:17 90:15 96:12 188:15 197:3,5 199:10 221:2 241:19 257:1 262:8 264:24

**asking** 15:4 25:22 30:18 96:15 106:11 121:1 178:13 197:14 198:7 203:12 206:5 210:11 211:2 233:20 236:5,6,13 239:23

**aspect** 20:14 32:3,10, 13 33:11,12,14 34:4, 24 35:17 40:18 67:14 73:22 118:15 179:24 185:15 217:19 222:9 224:8

**aspects** 9:24 11:17 15:11,12 17:12 32:23 33:7 34:11 40:6 57:16 58:9 60:13 64:7 65:4 67:2,11,17 68:6 70:19 74:4 78:8 85:16,25 89:3,15 107:11,13 111:18 113:4 115:23 127:13 133:10 154:7 166:5 169:4 179:25 181:25 219:22 221:3 229:5

237:14

**aspirations** 145:8

**assess** 201:9

**assessment** 17:15 21:18 104:14 118:9 184:24 220:16

**assessments** 220:18

**assistance** 63:10

**assistant** 35:1,13 41:9

**associate** 41:9

**associated** 30:10,13 45:13 63:14 114:13 146:12,13 163:10 203:8

**associates** 56:3

**Association** 155:23, 25 156:13

**associations** 170:16 171:4

**assume** 7:8 90:15,19 246:15 249:2

**assuming** 90:23 219:1 259:17 266:8

**assumption** 90:25 91:1 246:19 247:14, 16

**assumptions** 90:14, 18

**assurance** 30:2 31:21 36:19

**asystole** 112:25

**atria** 72:6

**atrium** 73:3

**attached** 45:7 145:1

**attack** 229:13 230:22, 23,25

**attempted** 232:15 234:21 236:15

**attempting** 251:9

**attended** 19:12

**attorney** 8:8 11:3

**attorneys** 245:1

**attraction** 261:5,9

**atypical** 62:20 164:22 262:16

**audio** 7:17 62:2 65:15,17 66:9,15,20 67:18,21,23 68:20, 22 76:18 94:19 122:9 177:24 220:24

**audios** 66:16 67:3

**author** 59:11

**authoring** 14:20

**Authority** 28:10 29:4, 8,12 31:7,17 36:17 50:2

**autopsy** 62:7 63:2,13, 22 71:20 73:2,11,17 138:4 161:8 162:4, 11,17

**availability** 47:1

**available** 40:25 61:17,21 63:9 74:18 84:1 91:14,22 92:10 124:24 144:19 168:5 233:23 268:1

**average** 25:22,24,25 28:14,15 47:7,8,25 48:2

**avoid** 112:3

**awaiting** 173:24

**awake** 268:20

**aware** 58:21 89:17 93:20 97:7,9 99:10,

24 101:10 102:21,22 137:4 148:9 187:5 190:7 216:20 217:13 229:16,20

**awareness** 183:23 184:6 187:21 216:11 217:9 218:4 221:23

**Axon** 244:18 245:6, 10,13

---

**B**

**back** 8:2 13:15 15:7 54:3,11 58:7 61:25 63:5 66:12 70:10 76:16 77:19,24 85:3 87:25 95:11 108:11, 23 127:15 145:15 147:2 150:10,17 151:2 161:19 162:8 168:1 170:7,8 173:19 179:20 188:2 191:12,13,14,15,24 202:12 212:24 214:14 216:4 217:11 222:15 223:1,8,12, 13 224:25 233:3 235:10 242:2,6 246:22,23 247:3,6,7 258:4 259:10

**background** 5:25 50:16 71:19,22 75:4 89:4 103:13 107:16, 23 108:3 109:9 114:22,23,25 115:12 116:6,13,18,23 117:8 136:5,7,15 142:18 150:13,14, 17,20

**backwards** 261:14

**bad** 120:18

**ballpark** 48:23 85:2 240:13 241:12

**base** 32:21 41:4,15, 17,18,22,24 42:4,6, 19 43:2 46:3 57:2 98:24

**based** 22:22,24 28:19 42:21 59:16 62:21 80:10,21 82:1 92:10, 13 98:1,17 99:3,6 102:16 113:24 124:23 126:6 130:17 131:7 140:10 141:14,15 154:6,10 155:17 160:9 173:14 177:16 190:1,23 196:15 199:4 207:10 209:18 215:21 217:17 226:14 227:20 232:1 233:23 234:11,12 236:2,11, 13 243:9 246:1 247:14,16 250:19 266:6,25

**bases** 154:3

**basic** 107:13 124:4,8 130:22 131:11 143:24 250:8

**basically** 29:13 57:15 73:7 106:9 107:9 117:8 118:20 120:10 121:11 122:17 165:22 174:15 177:20 198:10 227:11 248:18 250:14 251:17 253:9 260:15,20

**basing** 246:10

**basis** 23:4 25:5,18,21 46:14,17,24 49:20 53:15 98:3,19,21,22 100:4 101:2,3 102:5 106:8 110:14,17,22 111:1 113:16,18,22, 24 114:12 116:5

**base** 117:9 128:14 136:2 137:15 140:5,8 142:15 147:20,24 162:6 217:4

**Bates** 157:9

**bath** 60:5 125:24 126:7,15 130:10

**bear** 6:22 8:3 56:23 103:7 112:2 251:4

**bearing** 222:1 257:6

**beginning** 134:7

**begins** 105:13 116:16 174:13

**behalf** 240:1,11,23 241:3,14,20,22 242:10 244:18 245:3

**behavior** 15:4,7 62:10 63:21 68:4 70:4,6,14,17 77:19 124:25 126:1,13,18 127:17 129:9 132:8 133:9 140:10,13 154:6 163:9,22 164:17 173:14 175:4,13 176:8,21 177:23 180:17 181:5 182:8,17,22 183:11, 13,15,23,25 184:2,4, 5,12,13,14,20,23 186:10,11 187:11 209:14 213:4 216:5, 6 218:25 219:16,18, 25 220:6,7,9,11 223:5 232:9,10 233:15 257:15 260:9,10,11,14 261:20 262:11,12,23 264:4,7,8,11,15

**behaviors** 68:9 126:20 128:1 132:12 154:24 191:9

**beholder** 222:21

**belabor** 169:5 238:15

**belaboring** 112:4,5 169:5

**belief** 99:5 200:5

**believe** 17:23 55:18 61:6 65:21 66:22 69:8 77:18,23 78:1, 16 82:18 84:1 88:12, 14 93:4,7 96:7 105:3 113:12 114:11 130:11 133:18 139:5 144:18 145:21 154:23 157:1 166:20 169:12 182:9 193:19 195:16 208:14 223:25 229:22 236:19 237:18 244:3,16 246:16 247:5 252:19 258:2 264:6,23,25 265:5

**believed** 125:13

**Berkeley** 19:9

**best** 18:13 47:23 55:21 57:15 60:13 63:9 102:7 104:23 212:6 233:23 256:22

**better** 29:1 41:19 67:25 99:1 154:21 258:20

**beyond** 10:12 24:14, 25 32:23 37:23 50:19 74:3 84:16 87:17 95:10 100:25 101:5 115:8,14 121:16 142:7 146:24 148:12 154:14 219:21 220:23 239:5 247:22,23 251:11

**Bible** 69:3 213:10,15 215:23 223:9

**biblical** 182:11 183:8

**bigger** 99:23

**billed** 238:17

**biopsy** 155:4

**bit** 29:23 31:19 36:13 70:2,12 82:10 144:15 174:21 238:8 262:14

**bizarre** 140:13 232:9, 10 262:10,12,23

**Blackwell** 179:9 181:10,12 182:23 249:14 255:25

**Blackwell's** 78:9,21 79:5 92:24 93:2 180:16,25 181:10,25

**block** 113:16 114:7, 15 143:3 238:3,6,7, 10

**blocked** 238:8

**blood** 65:7 77:21 124:5 130:23 143:25 147:14 153:15 176:3 186:7 223:5 250:8,9 252:14,20 253:2

**bloodstream** 263:13

**board** 20:25 21:3,4,7, 12,13,20,24 22:4,7 23:1 24:6,19,21 40:24 51:15,17,22 52:16,19,24 53:3,9, 18

**boards** 22:3 245:9

**Bob** 169:24

**body** 65:15,16,19,22 67:17 69:14,17 111:10 119:8 165:10,11,15 174:4, 12 175:3,13 191:24

195:14 196:5 246:12
249:4,7 253:10

**boiled** 221:1

**boiled-down** 111:14

**bold** 111:5,12

**bolster** 83:21

**book** 51:2

**bottom** 106:21 107:3
111:2 117:1 147:3
167:9 168:13

**bounds** 37:22

**Bouton** 59:5

**brady-asystolic**
248:19 263:5

**brain** 153:18,19 154:1

**break** 13:8 28:20
53:23 54:9 103:2
145:13 164:21
178:21,24 207:4
212:1,22 261:6

**breakdown** 247:13,
19 248:5,10 252:25
253:2,9 254:24

**breathing** 69:21
123:1 173:25
187:23,25 188:4,13,
20,23 260:22 262:21
268:20

**Brian** 78:8 249:13

**brief** 106:23 107:1
145:15 263:24

**briefly** 150:10 246:1

**briefs** 89:7,22

**broad** 23:2,5 34:13,
16 38:4 74:16
107:10

**broad-based** 39:7

**broader** 44:18

**broke** 122:10

**broken** 65:24 66:3
239:19

**brought** 39:6 56:23
91:1 220:10

**budgets** 20:11

**build** 64:14 96:25
97:5,8,21,23 99:1
112:1 255:3,14

**building** 30:14 96:22
97:24 98:14

**built** 255:5

**bulk** 7:13

**Bullet** 111:2 112:11

**bulleted** 108:6

**bump** 45:16

**bunch** 233:19

---

**C**

**C.V.** 17:20 18:6,11,
14,25 19:4,7 20:5
21:1 24:8 27:10
44:14,21 45:4 57:20
150:15

**calculate** 242:6

**calculated** 46:1

**California** 5:1 19:9,
13,18 20:7,19,22
27:15 33:6 41:4

**call** 30:23,25 32:20,
21 39:18 41:21
44:12 45:19 63:10
69:4,9 123:19 129:4
134:8,9,10 135:20
136:6 161:16
162:23,24 184:19

187:3 200:16,18
224:19

**called** 5:4 18:4 66:13
232:7

**calling** 199:15

**calls** 61:19 62:2 63:1,
10 65:17 215:13
254:5

**calmly** 224:12,17

**calms** 257:22

**cam** 65:15,22 249:7

**camera** 65:20 67:17
69:15,17 174:4,12
175:3,13 195:14
196:5 249:4

**cameras** 65:16

**campus** 43:16,23

**Canada** 153:1

**cancer** 154:22,24
155:5,7

**cancers** 155:1,9

**candidates** 163:21

**cannabinoid** 59:24

**cannabinoids** 60:2

**cap** 100:20

**capacity** 243:25

**capital** 114:18 219:20

**caption** 103:12

**captured** 44:25 45:1

**car** 67:13 231:23,25
235:3,7 236:11,14,
21

**car's** 67:11

**cardiac** 15:22 25:3
43:9 51:5,12,24
53:3,9 61:15,16

72:16 73:1,6,8,21
79:3 105:21 141:17
143:15 226:22
228:1,2,7,13,16,24
229:3,6,7,9,11,14
230:3,5,16 231:2,3,
4,5,9 233:14 236:21
237:1 244:7 248:18
254:7,11 259:9,12
262:1 263:4

**cardiologist** 23:6
51:14 52:8

**cardiologists** 25:7,17

**cardiology** 51:15
53:2,4,11,12

**cardiomegaly** 109:3
110:8

**care** 22:10,11,15
24:1,2 27:18 30:10,
12,21,24 31:1,9,12,
21 32:7,12,18 33:14
34:15 39:4,15 40:3,9
42:22 52:9 53:3
63:11,13 84:22
156:20 219:14 233:7
240:14,21 241:2
242:14,21 256:24

**career** 37:5,18 51:7

**careful** 103:24

**carefully** 64:19 85:11

**Caren** 157:9 195:1
212:8,12 245:24
264:25 269:12

**cares** 34:9 44:9

**Carlsbad** 29:18

**carrying** 215:23

**cars** 218:2 221:23
261:8

**cascade** 237:6

Index: boiled–cascade

Gary Michael Vilke, M.D.

**case** 8:3 9:14 10:23 11:6,8 12:4 15:20 16:5,15 17:19 18:3, 21 19:2 23:19 40:1, 6,7 47:4 54:24 55:4 56:1,12,20,24 57:6,9 58:12,15,21,25 60:5 61:9,15 62:8,11,14, 20 63:7 64:22 65:3,6 66:23 70:24 71:3,4, 14 72:1,5,12 75:18 76:12 78:4 80:1,23 83:13 86:18,23 87:5, 12,14,21 89:8 91:25 103:12,20 106:12 107:10,17,23 108:5 110:6 114:18 115:14 116:3,11,22 117:6, 16,21 119:10 124:11 126:9 130:24 131:8 143:18 145:2 147:19,23 148:17 149:25 150:20 159:5 160:22 161:16 164:14 172:7 180:20 193:8 194:7 195:10, 14 196:20 198:7 206:24 207:5 209:18 213:9,14,23 214:1,5 215:9,10,14 218:21 219:6 221:14 222:16 225:9 226:12 227:3, 9 232:4,23 233:20 238:12,18 240:8 241:4,11,14,18 242:10,16,17,22,23, 24 243:7,8,9,10,16, 20,22 244:5,11,15 245:7 246:10,15,18, 22,24 254:20 265:3, 11,25 266:5 267:5 268:17,18 269:2,4,8

**case-specific** 13:25 54:20 55:3,11,19,24 60:21,25 61:4 65:14

71:9 80:4 90:4

**cases** 30:3 31:22 33:15 38:21,23,25 39:2,11 43:8 46:25 47:13 62:19 70:13 87:7 105:13 107:17, 18 167:12 170:21 209:13 226:10 227:2 231:11,12 232:6 237:12 239:21,25 240:4,5,11,16,21 241:13 242:4,6,7,9, 12,13,14,25 243:8, 11 244:19,23,25 245:2,5 261:1,3

**cast** 75:9

**casualty** 36:24

**catalog** 114:4

**catatonia** 70:16

**catatonic** 70:12 174:21 175:16 258:23 262:15 268:22

**catchall** 172:18

**categorically** 269:3, 5,7

**categories** 27:24 54:18 74:17

**category** 54:19,20 55:3 56:7 58:6 61:3 124:18 184:8

**caths** 53:14

**cause** 59:24,25 72:8, 22,24 73:7 79:3 104:3 105:21 115:4 125:8,13,24 126:7, 11,24 129:18 132:1, 10,17 133:8 136:10 137:6 138:7,23 139:1,8,14 141:16 147:7,9 165:4 167:7

179:23 187:16 204:6,8 226:11 227:2,24 230:16 244:11 248:21 253:13 254:7,11 255:5 256:12,14 257:19 263:16 265:9,14 269:4

**caused** 15:22 69:10 72:16 106:1 117:4 126:1,23 128:4,5 139:21 140:23 142:21 147:16 151:23 172:21 176:19 225:14 227:14,16 243:16 244:14 247:13 250:24 252:2 254:3 256:9 257:12,17 267:7

**causes** 72:11 123:22 125:11,17 126:25 127:4 128:7,11 137:8,16 138:1 141:2,3 162:20 163:17 170:16 171:4 172:24 173:9 202:16 225:21 226:6,19 228:16,17

**causing** 135:21 171:11 173:13 187:18 220:15 226:8 227:21 244:1 252:25 258:21

**caveat** 241:1

**cell** 215:4 250:9 254:24

**center** 20:1,10 25:19 35:3 39:1 41:5 44:10

**centers** 29:11

**central** 76:7 77:8 116:15 233:11 259:4

**Centro** 34:8

**certain** 9:23 13:9 23:22 25:8,16 29:23 31:24 32:3,11,12 39:21 42:19,22 43:6 49:13 57:16 58:9 60:8 64:11 65:12 68:6,8 71:18 74:15 85:15,16,25 89:3 90:15 91:6 101:5,17 107:11 111:18 114:23 115:2,3,10, 11 122:17,23 123:22 125:11 127:6 135:8 143:16,17 144:1 152:1,6,8 153:18 155:1 165:10 166:5 191:9 206:1 208:10 259:9

**certainly** 5:22 8:1 13:7 17:6 33:7 51:15 56:15 58:11 59:3 63:24 65:6 67:2,10 68:3 69:8,18 75:24 76:9,21 81:16 82:17 85:3,13 86:3 92:8 95:18 98:21 111:15 115:6 121:3 125:1 134:14 137:20 159:10 163:24 164:23 179:20 181:4,16 188:4 203:15 208:23 209:8 216:13 217:12 219:17,24 221:3 231:13 234:4 235:3, 13 248:4 249:6,9 254:7 258:13,24

**certainty** 103:25 141:18

**certificate** 52:15

**certification** 21:1,3,8, 13,21,24 22:7 23:1

Index: case–certification

**Gary Michael Vilke, M.D.**

24:6,20,25 25:2
40:24 50:14 51:14
52:14,16,19,23,25
53:7,9,19

**certifications** 24:12
35:21 51:20,23 52:3,
4 75:4

**certified** 22:3,4 24:21
50:18 51:2,15,17,18,
23 52:5 53:4

**chair** 33:17,22,25
34:1,2 35:10,13

**Chairs** 33:24

**challenging** 31:22

**Chan** 59:15

**chance** 233:25 235:3

**change** 102:4 214:12,
16 247:7,10,11
251:25 265:20,24
266:15,17 267:3,25

**changed** 26:12,14
266:7

**changes** 18:14,25
34:12 49:3,17,19
265:17 266:2,4
268:23

**changing** 26:15 71:7
267:18

**chapter** 225:2,5

**chapters** 51:2

**charge** 237:19,25
238:8 257:4 269:17

**Charles** 14:3 104:1,4

**chase** 30:19

**check** 220:21 252:14,
22,23

**checked** 143:25
189:6 250:8 251:23

**chemicals** 165:9,14,
15

**chemistry** 143:24
146:3,20 250:8

**chemotherapy** 101:6

**chills** 122:20

**chimes** 193:24

**choice** 63:16

**choosing** 91:8
191:19

**chose** 57:15 90:19
110:19

**chosen** 35:16

**Chris** 152:20 153:1
249:4

**Christ** 182:11 217:14
218:1 220:9

**chronic** 22:14 63:9

**chronologic** 64:23

**chronology** 61:14

**chunk** 238:4

**church** 140:12
164:17 182:20 183:4
188:17 189:23
264:20

**cigarette** 82:22

**circumstances**
208:24 244:4

**cite** 148:13

**cities** 29:11,19

**citizens** 232:7

**city** 29:17,18 185:23

**civilian** 74:16

**CK** 77:14 148:24
149:11 150:6,7
227:10,21 250:21,22

252:15,22 253:5,6,
25 254:8,12 255:24
256:14 257:11,13
263:12

**claim** 40:2

**claiming** 218:1

**claims** 38:20 39:12,
17

**clarification** 23:21
41:7,14 43:25 45:4
56:18

**clarified** 129:1

**clarify** 51:22 67:9
88:3 97:10 104:18
114:3

**Clark** 86:24

**classic** 126:22 128:2
129:10 132:12
156:14

**classical** 115:23
116:1

**Classically** 115:21

**classification** 154:15

**clean** 6:22 7:25 74:8

**cleaner** 8:2

**clear** 52:11 135:3
175:9,12 179:10
183:1 188:9 196:18
200:22,25 225:7,9,
13,21 233:24 266:11

**clearly** 109:12 169:6
173:25 206:8

**client** 249:13

**clients** 237:12

**clinic** 53:15

**clinical** 27:5,14,17
30:12 31:2 33:18
34:1,2,24 40:22

43:21 77:12 117:24
118:1,7,10,17
119:10,12 120:6,23
121:13,22,24,25
122:6,8,13,14,16,18,
19,21,24 123:2,4
132:4 134:19 140:16
151:6,21 152:6
153:11 154:5,7,10,
14,22 155:1,18
159:24 160:12
161:23 162:13,19
163:23 164:15 165:3
173:16 178:2,15
183:9,20 185:9,11,
18 190:14 192:16
199:25 202:1 203:19
209:9 227:20 257:10

**clinically** 34:4 77:12
123:20 248:12

**clinician** 39:2

**clips** 195:15,18,21
197:5

**close** 102:9,10
232:14

**closed** 175:8

**clothes** 69:25

**cloud** 217:17

**co-defendant** 245:4,7

**co-defendants**
244:24

**coauthor** 59:4

**cocaine** 131:6 140:2
167:1,2,5,13,21
168:1

**codes** 156:4

**cognition** 184:9

**collaboration** 20:11
29:9 69:13

collapse 233:14 236:21

colleagues 35:11

College 157:5

colon 54:25 59:13,16

column 158:10,11

combative 174:25 175:5,15,17,23 176:4,18 186:7,18

combativeness 175:7 177:9 190:13, 16

combination 253:23

come 16:12 18:17 22:19 38:23 45:14 54:3 65:11 67:24 69:17 76:21 79:1 86:18 102:9 107:7 111:23 117:18 123:23 125:2 126:12 154:20 164:1,8 165:21 201:11,14 205:16 223:20 266:22,23

comers 22:12

comes 39:8 45:11 47:24 49:17 120:12 134:18

comfortable 16:5 17:7,13 48:9 102:14 110:16 186:25 187:1 265:20

coming 18:25 78:6 87:13 173:16 182:25 220:13 266:3

comma 60:5

commands 179:17 184:25 185:5,15,25 192:23 216:16,25 262:21

comment 109:7 167:25 221:4 222:16

commentary 174:20 197:21

commented 83:21 89:15 167:19

comments 121:7 182:25

commit 130:9

committee 18:19 38:24 49:18 97:4,19 98:4 99:5

committees 18:23 27:22 39:21 245:9

common 42:19 116:1 124:5 126:24 130:23 166:21 167:4,5,6,7 199:23

commonly 124:6 130:7 131:9 166:24 167:12 168:1 210:25

community 27:22 33:12 81:21 83:1

compared 22:25 25:24 73:4 75:21 229:12

compensated 45:9, 24 46:12,13

compensation 45:7 46:3,7 47:20 48:3, 12,16,24

complaint 34:14 63:6 64:17 65:5

complaints 64:20

complement 201:14

complete 18:11 109:21 131:22 164:6 168:4 268:9

completed 19:16,20 24:9,16

completely 162:21 201:19

completing 28:2

complex 116:8 170:14

compliant 180:9

complications 39:19 104:5 141:18 142:6 225:11 231:19

compliments 34:15

comply 216:24

complying 216:14,16

component 32:25 61:23 64:9 107:14 108:2,11 142:11 149:21 172:18 179:17 180:19 215:15 217:15

components 57:17 58:10 61:20 63:19, 25 64:14 69:23 206:12 208:1,4,10 210:9 253:12

comprehensive 56:1

compromised 227:12

concept 69:18 83:11 87:8 115:17 120:13 131:17 132:14 151:8 211:11 217:14 256:17

concern 39:4,14 87:8 176:12,19 187:9 253:12

concerned 176:9

concerning 243:3,18 250:6 259:15

concerns 63:7 92:14

concerts 36:25

conclude 98:4,19,21, 22 125:5 152:7 179:8 193:15 201:3 215:6 218:12

concluded 262:5 270:9

concludes 142:13

concluding 199:1

conclusion 99:18 117:18 123:23 126:17 151:23 152:7 153:25 163:12 164:1 173:16 180:5 182:1, 2 185:12 186:22 193:12 198:25 201:11 202:25 209:11,20 213:19 214:25 217:5 223:19,21 231:11 264:12 267:6

conclusions 58:8,18 79:2 104:12 109:25 110:1,2,12,13 146:9 194:14

conclusive 154:12 155:5 163:13,14 165:24

conclusively 153:13 155:16

condition 23:12 72:22 128:6 166:8 173:1,2 177:19 211:9 259:19,21

conditions 23:3 25:9 72:17 127:5 141:4 158:22 170:19 242:19 255:23 256:3,9

**conduct** 96:18,21 98:19 100:8

**conducted** 59:5 95:18 96:13 98:9 99:22 148:6 229:17 247:13

**conducting** 97:14,17

**conduction** 98:12

**conference** 44:12 46:10

**conferences** 25:5

**confident** 109:25 110:23 202:3

**confine** 114:8

**confirm** 86:10

**confirmation** 87:24 89:14

**confirmed** 137:19

**conflict** 91:21

**confused** 227:23

**confusing** 18:1

**confusion** 219:24 220:12

**congestion** 122:20

**connected** 35:22

**connection** 7:17,23 55:25 56:20 58:14, 24 71:14 78:16 79:7 146:19 165:2 247:15,17 257:1

**connectivity** 248:7

**conscious** 13:5

**consider** 73:18 100:22,23 115:5 210:14 245:18

**consideration** 99:14 100:18

**considered** 27:3 40:13 52:3 77:9 128:24 184:5 191:17

**considering** 100:2

**consistent** 83:14,24 105:20 111:19,21,24 117:13 118:10,14,21 119:6 121:1,12 122:24 123:3,6,7,9, 11,15,21 126:2,13, 18,21 127:14,17,20 128:2 129:10,25 131:19 132:8,12,16 133:9,14 134:24 136:19 140:9,15,19, 22 142:1 146:4,5 151:5,13,16 152:13 153:4,8,20 163:1,25 164:5,8,15,18,19 168:22 171:12 178:3 179:3 180:23 181:7 183:20 184:3,12,13, 14,15,16,20,22 185:18 187:2,13 191:6 192:19,20 194:3 198:1 201:18, 22 202:1 203:3 209:16 260:12 262:19 263:1,5 264:9

**constant** 25:5 69:21 70:14,15

**consult** 23:24 42:15

**consultant** 46:6 47:10 243:23 244:1

**consultants** 23:13 48:5

**consultation** 43:1

**consulting** 32:17 44:19 45:20 46:22 47:21 48:3 74:13 237:8 244:23

**consumption** 264:3

**contact** 42:15 246:11

**contain** 116:21 264:17

**contained** 14:24 17:18,22 55:13 56:6 57:24,25 60:21 71:8 73:13 74:5 76:13 79:8 81:15 83:5,7 86:15 90:3,20 93:16 95:8 103:15 105:2, 10 106:14 107:2 108:18 109:2 110:17 111:10 113:9,19 114:21 116:3,11 117:7,21 118:4,6 119:12 121:17 124:11 127:11 132:7 133:3 135:5 136:22 140:18,21 142:4 143:20 144:2 146:10 147:19 149:18 150:15,20 156:22,25 159:1 168:16 190:15 202:2 216:9 221:19

**containing** 17:13

**contains** 93:12

**contemporary** 22:8

**contend** 135:7 198:6

**contention** 136:8

**context** 62:15 63:17 77:4 195:9 204:13 206:7 264:21

**continuation** 116:17 141:22 142:3

**continue** 23:23 98:23 254:15

**continues** 111:3 112:18 115:22 116:9 117:5,14 143:16,23 147:6 161:2

**continuing** 25:16 44:19 46:9,19 80:3 106:19 111:2 117:1 142:17 159:19 168:13 183:6 198:14 217:23

**continuum** 59:21

**contract** 49:13,21 50:5 147:8

**contracted** 147:12

**contractions** 147:13 248:3 256:14,17

**contracts** 248:4

**contradictory** 17:16

**contrary** 181:20

**contribute** 79:3 104:4 226:18 230:16

**contributed** 15:22 243:16 244:14

**contributing** 73:8,12, 21 244:1

**contributory** 59:25 72:9

**control** 259:5

**conversant** 211:8

**conversation** 30:18

**conversations** 8:19

**coordinated** 29:12

**copies** 194:18

**copy** 12:21 13:2,10, 14,16 17:19 144:19, 22,24 145:6,17 157:2,7 194:19,21 195:1 250:7 270:3,4, 6,7,8

**coroner's** 71:9,13 72:2,3,20 74:4

**correct** 5:16 8:15,16 9:4,5,7,8,15,16 10:23 11:13,14,18, 23 12:1 13:12,13,25 14:8 16:23 17:20,21 18:2,9,10 19:5,6,9, 10,14,15,18,19,22, 23 20:2,3,19,20 21:1,2,5,6,22,23 24:10,11,17,18 26:3, 10,11,22 27:11,12 28:23 29:5,6 30:6,13 31:9,10,18 32:2 33:19,20 34:22 35:3, 4 36:8 38:17,18 40:14,15 41:5 46:2 50:13 51:20 53:2,12, 15,19,21 54:15,16, 20,21 55:2 56:3,8,9, 10 58:6 59:2 61:6 63:4 71:10,11 74:2 79:9,10,24 88:1,9 92:21,22 93:16 94:15 95:3,4,6,7 96:1 97:13 100:23 101:21 102:21 105:7,8,11 107:1 108:19 109:18 110:10 111:6,7,17 112:15,16 113:21 114:19,20 116:23 118:8,19 119:2 125:16,22 126:5 127:1,13 128:8,18, 21 129:11,21 130:16,24,25 131:4, 14 136:4,12,14,24 137:3,11,23 138:2,4, 7,16,24 139:15,17, 22 140:20 141:4,9, 12 142:8,14,23,24 143:3,4 144:11 145:18,19 146:16,21 147:25 148:7,8 149:10,16,17 150:1, 4,16,22 151:9,10,14,

17 153:14,25 154:2, 8,13,19,24 155:6,21, 24 156:2,5,11,18,23 157:25 158:1,4,5 160:10 162:18 163:15,20 164:12 165:11,16 166:2,9, 22 167:1,5,25 168:10 171:17 173:6 174:5,6,10,11 175:15,19 177:15 179:5 180:2,3,14 181:6,18 182:3,5,18 183:3,4,11,18,19 184:15,23 185:2,7,8, 10,20 186:1,12,13, 16 188:10,11,14,24 190:7,11 191:24 192:6,14,21,24 193:4,10,17 194:8, 12 196:5,22 198:13 200:8 201:7,17,23, 24 202:5 203:14 204:3,18,25 205:7, 11,22 206:16,17 207:24 208:25 209:6,7,11,20 210:15,16 211:1,11 216:1,18,22 218:25 221:9,24,25 222:3 223:15,21 224:16 225:18,24 230:17 231:5 234:2,13,22 235:1,8 237:16,17, 21,22,23,24 238:12, 24,25 239:11,12,16 240:13,25 242:11 245:17 246:12,23 247:16 251:22 252:13 253:19 254:21,22 256:1,4 260:4 261:22,23 262:3 264:14,16,22, 23 265:6,7 267:8,9

**correctional** 240:3

241:15

**correctly** 28:17,22 30:4 34:18 42:12 43:4 49:22 55:1 64:9 65:22 66:3 72:23 73:25 77:16 79:6 89:21 106:3 135:17 144:12 158:23 160:2 161:4,10,11 162:15 167:15 170:23 198:12,22 207:15 214:2 219:2 222:7 240:8 244:21 253:15

**correlated** 251:18

**cough** 122:20 208:9

**counsel** 251:9

**count** 56:16

**counts** 250:9

**County** 29:4,7,10,20, 24 41:23 42:1

**couple** 18:17 56:15 74:24 86:11 113:25 182:21 183:5 263:24

**course** 20:11 23:7 25:13 75:18 92:1 93:1,2,23 194:6 213:25 234:18 235:19,25 266:9

**court** 5:9 6:3 7:21 13:8,16

**courtroom** 239:20 240:22 241:25

**cover** 55:23 60:8,12 75:6 107:19 152:11 158:9

**covered** 68:22 91:16 105:4 113:14

**covering** 17:4

**covers** 50:21

**COVID** 43:19

**CPK** 226:12 265:13

**cracked** 123:15

**cranking** 233:11

**create** 85:4 171:8 256:14 265:14

**created** 58:3

**creates** 228:13

**creating** 58:24 73:19

**creatinine** 147:9 226:13 250:10,13 252:14 253:10 255:12,13

**credential** 21:15

**credentials** 19:4

**criteria** 152:22 160:12 185:16 200:3 202:6 216:4 219:3,4 220:19 223:17,19,20 224:15 244:8 259:3 262:18,23

**critical** 52:9

**cross** 213:17

**crossing** 15:5 67:24 68:21

**cuffing** 262:14

**curb** 71:7 174:16 175:6 181:2,6,11,13 188:5

**current** 24:19 26:10, 20 135:19 160:22

**currently** 21:7 37:3, 13 156:2 166:23 233:10

**custody** 61:16

**cut** 30:19 49:13,14 52:12 66:17

**cutoff** 202:11

---

**D**

**D-E-B-A-R-D** 59:15

**damage** 146:5,9,16, 17,21,23 150:7 228:9 250:22 251:19,21 253:13 256:13,15

**damaged** 254:9

**damaging** 263:14

**dash** 59:12

**data** 58:19 62:1,25 63:8,15,17,20 65:10 77:2 92:6 99:10 107:13 166:3,11 177:24 179:19 196:9,13,14 234:3,5, 12 246:16 256:11

**date** 18:8 160:8 239:2

**dated** 18:7 157:6 161:25

**day** 26:21 70:1 144:6, 14 165:1 183:2 185:23 189:22 192:10 193:2 238:5, 6 249:5 251:1 256:5, 15 259:18 260:5 261:12 264:4,7,19, 20

**days** 86:1

**de** 16:6,9 73:19 84:13 87:16

**DEA** 31:23

**dead** 237:4

**Dean's** 49:14

**death** 59:20,25 60:5 62:8 72:9,11,23

73:1,7,12 104:4 105:22 117:3 137:25 141:20 162:7,12 170:22 225:7,9,13, 14 227:2,25 228:14 234:18 235:19 243:16 244:2 248:16,17,20 260:3 261:25 265:10 267:7,12

**deaths** 37:18 39:20 244:9

**Debard** 59:14

**decade** 161:22

**decide** 107:7

**decided** 29:21

**decision** 269:9

**default** 29:20

**defend** 243:3,9

**defendant** 240:12,23 241:14 245:3

**defendants** 90:8 244:20,24

**defense** 241:22

**deficiency** 158:19

**define** 133:20 152:22 160:11 200:4,11,14 210:19 211:6 219:16 220:2 222:19 253:6

**defined** 134:6 198:21 224:2

**defining** 59:16 200:17 208:4,5

**definitely** 46:21 67:3, 4 73:20 75:14 95:14 190:2

**definition** 160:22 197:19 198:18 204:3,4 222:15

223:7

**definitional** 206:12 208:1,3,16

**definitions** 161:16 205:24 206:4

**definitive** 159:22 160:13

**degree** 19:8,13 103:25 140:21 141:17 211:13,15 255:19 257:13

**degrees** 190:9

**dehydrated** 256:23

**dehydration** 226:15 252:3 253:23

**deity-type** 217:22

**delay** 242:20 267:23

**delayed** 225:9 252:23

**delaying** 267:19

**delineation** 123:2

**delirious** 152:15 199:7 200:19 205:18 209:2 221:4

**delirium** 15:21 59:12, 15,17,20,23 83:12, 24 84:18 104:5 105:21 111:19,22,25 114:17,19,24 115:1, 4,18,21,24 116:8,19 117:2,13,18,24 118:8,15,18 119:11, 12 120:7 121:2,13, 23 122:6,15,23 123:4,9,21,24 124:3, 7,22 125:14,16,18, 21 126:7,22 127:12, 20 128:3,17,25 129:2,4,10,16,23 130:8,21 131:10,20 132:2,10,13,16,23

133:8,10 134:6,10, 24 135:12,16,22 136:6,20 137:6,8,17 138:7,24 139:1,9,15, 21 140:7,22,23 141:3,9,18 142:2,6 149:22 151:5,7,21, 24 152:8,13,14,16 153:5,9,13,20 154:5, 9 155:14,17,22 156:5,9 157:6 158:15,17 159:23,25 160:21,23 161:2,6, 18 162:3,8,10,23 163:3,13,20 164:12, 24 165:3,21 166:2,8, 16,22,25 167:7 169:9,13,14 170:14, 15,20 171:13 172:6 173:12,17 178:3,8, 11,12 179:4,10,25 180:23 183:21 184:8,9,15,17,21 185:12,19,25 192:16,21 193:10, 13,16 197:18,19,20, 22,23 198:9,10,17, 19,20 199:1,3,6,11, 12,13,14,16,20,24 200:1,2,12,16,18,21 201:2,4,15 202:4,16, 18,20,22,23 203:3,5, 21 204:2,3,8 205:4, 17,20,21 206:13,14, 15,21,25 207:9,10, 11,24 208:2,3,12 209:11 210:1 213:21,24 214:6,11, 17 215:1,7 219:5,11, 17,20 220:13,22 221:5,8,23 222:2,12 223:17 224:22 225:7,21 226:1,6,7, 17,20 227:8,24 228:1,8,12,16,22 229:4,6,8,18 230:4,

**Gary Michael Vilke, M.D.**

9,14,19 232:6,25 233:3 234:6 248:15, 23 259:3,7,13 260:17,25 262:6,17 263:3 267:7,13

**delusion** 178:18,20 192:19

**delusional** 121:4,9 122:3 174:19 176:25 182:6,8,16,21,25 183:11,12,15,22,23, 25 184:3,4,13,14,20, 23 262:12

**delusions** 69:23 121:7 140:13 164:16 192:22 217:13,22 260:13

**demands** 185:19

**demonstrates** 134:13

**demonstrating** 197:18 218:3

**denoted** 80:19 81:6

**deny** 169:21

**department** 19:17,20 22:11,16 24:10,17, 24 27:18 33:18,22 34:8,20,21 35:6 38:21 43:21 62:5 80:15 138:3 143:14 149:15 162:6 249:5 250:15 251:23 255:6

**departments** 29:17 30:5,7,15 34:7 44:8

**depend** 91:21

**depending** 23:11 30:25 46:25 47:2,12 49:3 75:15 191:25 227:4 256:6

**depends** 40:1,6 44:22 47:5 71:16 82:4

89:16 91:11,12 100:13 155:7 181:21 187:15 190:18 214:7 266:19

**depicted** 195:21 197:4

**deposition** 7:11 8:6, 11,20,23 9:7,10,18, 22 10:6,14 11:1,8,12 12:3,14 14:3,6,10, 14,16,22,25 15:11, 12,25 17:1,10,12 44:3 47:3 68:11 74:17,20,24 75:17, 20,21 76:6,15,17,19, 22,23 77:3,5,7,17, 22,24 78:17 88:5,7, 24 128:23 133:7 136:16 144:21 145:1 174:9 175:19,21 193:19 194:6 195:2, 8 196:1,18 197:17 198:3 202:13 213:1 216:7 222:17 224:21 231:15 237:20 239:11,15,19 249:4, 6 269:15 270:4,9

**depositions** 5:20,23 9:24 55:25 61:24 62:13 64:2 67:22 68:1 69:6,10 74:10 75:25 91:2 196:9 197:13 240:10 241:24

**derive** 47:21 67:18 106:24

**derived** 76:14

**describe** 35:5 36:13 38:19 55:1 61:7 80:18 143:25 147:11 151:4 176:22 181:21

**described** 10:25 19:25 23:15 25:10

30:5 33:4 36:16 62:24 67:25 68:19 77:11 78:1 80:14 106:9 108:9,18 110:8,16 116:4,17 119:23,25 120:1,16 122:13,25 133:16 147:15 154:6 167:14,24 168:2,20 175:14 177:9 179:24 186:20 189:11,21,23 190:3,15,19 191:2 213:20 219:12 220:24 224:12 228:18 231:11 260:14

**describes** 103:19 205:1

**describing** 46:20 52:3 63:18 75:8 77:19 115:22 121:17 189:19 190:19 213:4 234:13

**description** 22:22,24 32:2 34:18 42:11 67:23 68:20 75:13 78:9 80:22 81:6 111:16 115:15 124:13 150:13 176:5 180:16 181:14,23,25 183:21 186:10 195:13 215:11 240:8

**descriptions** 28:5 105:18 106:17 177:10,14 188:17 190:2

**descriptive** 77:23

**descriptors** 183:10

**designate** 13:15 145:20 157:3

**designed** 20:14

**designer** 164:7

**despite** 131:20 145:8 158:11,14

**detail** 69:12 82:7,10, 24 87:11 108:5 223:10

**detailed** 75:20 106:10 108:10,13 110:25 118:24 119:2,18

**details** 19:1 64:4 74:23 78:23,24 79:24 90:12 111:15 138:16 142:11 143:12 152:10 172:11 193:6 217:11 239:23,24 243:9 249:9 264:9,11 266:2,25

**detect** 115:10

**detected** 115:11

**determination** 152:23 154:12 155:5 162:13 163:15 173:6

**determinations** 155:9

**determine** 39:3 62:10 160:22 161:15 206:19 207:8,23 209:18,25 218:1

**determined** 155:10 162:17

**determining** 100:8 153:19

**develop** 256:3

**deviate** 40:8

**device** 79:6,7,21 100:9,10 101:12,20

**devices** 100:16

**devote** 47:10

**diagnose** 123:12,17 162:5 169:16 170:5

Gary Michael Vilke, M.D.

**diagnosed** 171:11 178:11 179:11,13

**diagnoses** 151:14,16 160:25 173:15 208:12 220:17

**diagnosing** 169:25

**diagnosis** 59:13 83:12,21,22 84:3 118:11 122:9 123:19 127:7 129:3 133:16 152:14 153:4,20 154:9 155:22 156:14,16,25 161:8 162:3,16,19 163:3 164:1,8 169:22 170:2 171:23 173:4 179:10,11 197:23 201:15 204:15,16 205:17 208:13 211:10 220:16 244:10 245:19 261:24

**diagnostic** 153:9 156:10 159:22 160:12,13 161:4 163:25 184:4,16,21, 23 185:16 186:3 192:19,20 201:20 202:6 205:3 216:3 220:20,23 259:3

**diaphoretic** 111:20 189:9,25

**Diaster** 36:9,10

**die** 113:2 232:8 233:25

**died** 104:4 234:24 235:25 236:21 261:22

**Diego** 5:1 19:13,18 20:1,7 27:15 29:10 33:18 34:7 35:3 38:16 43:16 44:7,9

**differ** 196:11

**difference** 215:3 268:7

**differences** 91:4 186:10

**different** 23:24 26:20 28:21 30:10 31:3 43:12,14 44:4,6,24 54:18 64:20 65:19 67:20 68:17 74:10, 16 87:25 89:9,16 91:13,25 100:15 103:8 115:9 120:16, 17,21 121:6,8 139:20,21 151:14,16 152:21 160:11 161:17 165:4,6,20 170:16,21 177:10, 11,13,14,17 186:9 190:25 195:14 196:4,8,17 204:23, 24 206:2 211:3,14, 18 218:14,15,17 221:3 223:19 226:23 242:7 262:25 268:7

**differentiate** 92:16 128:20,22

**differentiation** 26:7

**differently** 91:25 206:4 208:1

**differs** 233:16

**difficult** 7:15,25 28:4, 8 30:2 31:22 50:9 159:24 164:24 170:25 191:10 203:15 229:25 243:9 261:9 265:18

**difficulty** 77:20 191:8 263:6

**diffuse** 33:24

**dilated** 72:6 73:3,5

**dinner** 212:13 269:25

**dipped** 82:9 137:16, 20 138:20

**dipping** 137:12

**direct** 63:21 126:16 127:22 133:3 264:5

**directing** 28:11

**direction** 29:14,15,22 31:13 34:6,9 41:20 42:2,8,14

**directions** 180:14

**directly** 46:13 75:11 244:18,25

**director** 29:3,20,21, 25 31:6,8,15 32:16 35:1,13 38:15 39:8 41:21

**directors** 29:14,19

**disagree** 12:8,9 14:25 15:3,12 16:2 112:5 135:5 194:14 203:14,20 207:19,21 210:2 211:1 235:4

**disagreed** 194:12

**disagreement** 15:8 168:23

**disagreements** 12:12 92:15

**disassociated** 257:21

**Disaster** 35:2,9 36:7, 22

**discharge** 94:14 113:3 229:19

**discharged** 92:25

**discharges** 265:16, 22,23

**disclose** 79:4 113:18 127:16,23 128:11

151:20 152:6 168:7, 17

**disclosed** 11:7,22 16:22 17:19 18:7 26:13 58:3 67:17 77:10 83:18 86:15, 23 89:24 90:2,9 104:17,19 106:13 113:8,9 114:5 115:13 117:21 124:21 125:19 129:7,19 132:21 135:7 136:9 143:5 150:24 153:24 237:15 238:23 239:17 242:1 243:12,21

**discloses** 128:16 131:1

**disclosing** 16:21 103:6 106:6

**disclosure** 13:24

**discomfort** 187:4 257:19,20

**disconnect** 218:3 219:13

**discovery** 55:24

**discuss** 135:14,15 136:11 146:2 169:1 172:5,14 217:3 225:6 248:14 264:5, 21

**discussed** 50:16 131:13 136:21 138:19 142:8 148:2, 4 150:11 151:8 161:3,7,19 171:14 172:17 185:22 186:8 190:13 208:13 217:6 224:21 229:9 264:12

**discussing** 136:16

141:23 168:14 169:9
183:14 191:8 197:24
200:3,14 221:7

**discussion** 78:20,21
106:18 111:1 168:15
212:21 221:8 264:18

**disease** 25:8 123:16,
17 133:13 166:12
170:17 171:5 255:4

**diseases** 22:14
155:12

**disobeying** 201:21

**disorder** 59:20 128:9
156:8,12 164:20
166:13 168:11
171:11 172:1,13,15,
18,21

**disorders** 127:2,19
133:11 134:11,13
136:1 156:1 170:18
171:7,9 172:1

**dispatch** 29:4,7,11
30:7,8,9,16 31:7,10
86:7,9

**dispatcher** 31:4

**dispute** 93:22,25
257:3

**disputed** 91:4,16,24

**disputes** 91:7 265:3

**disrobing** 207:4

**disruption** 66:15
94:19 122:9 220:24

**distance** 249:24
266:9

**distinction** 23:21
40:17 148:19 169:25

**distinguish** 206:7

**distress** 187:8

**divergence** 184:20

**divergent** 190:23

**divine** 197:2

**division** 35:2,7,8,10,
13 37:6

**divisions** 35:7,9

**doctor** 20:18,25
34:22 42:15 130:5
248:17 249:2 250:5
262:4 263:20 269:15

**doctors** 26:5

**document** 88:19
157:7,10,13,19,22,
23 204:14

**documentation**
161:9,21

**documented** 137:10
139:11 140:11
164:15

**documents** 55:24
58:6 64:8 89:10
144:22

**doing** 25:20 43:20
48:9 59:1 67:24
68:21 98:14,16
104:23 119:6 153:17
186:25 187:1 188:4
216:4 218:8 227:4
235:10

**door** 212:16

**dopamine** 116:15
153:18 158:17
165:18,22 166:3
172:2 233:12

**double** 82:4

**doubly** 7:12

**download** 10:16
88:16 92:6,20,23
93:4,6,9

**dozen** 56:15

**dozens** 86:2

**Dr** 5:11,18,19 8:5
10:2 11:5,7,13,17,
23,25 12:7,14 13:23
14:3,6,10,14,21,25
15:11,24 16:2,14
17:10 54:12 73:15,
18,23 74:12,14
75:21 77:11 84:12,
16 86:24 87:15,17
88:3 103:4 104:1
105:19,23 109:3,5,
17,18,23 110:6,10,
21 112:12,14,15,18,
19 113:10 114:8,16
118:13 119:4 128:13
132:22 135:3 141:16
142:9,19 143:2,3
144:19,20 145:6,17,
18 146:10,15,19
149:19 157:11,20
193:19 194:6 195:2,
7,8,10 196:2,16
197:3,16 198:24
202:13 204:10
207:17,19,22 209:22
210:2,23 212:12,14,
15,25 214:4,20
215:20 216:7 217:8,
24 219:1 220:19
221:8 222:9,16
223:18 224:12,20,
22,24 225:3 226:3
227:23 231:15
232:20 233:17,21,24
235:15,18 236:6
237:7 246:1,7
247:22 249:4 263:25
269:24

**dramatically** 254:1

**draw** 146:19

**drawn** 252:20

**drive** 147:5,11

**driver** 227:9

**driving** 261:13

**drop** 18:24

**drug** 59:24 72:25
82:19 83:10,17 84:2,
7 115:2,18 124:25
125:25 126:2,8,12,
13,14,18,23 127:1,9,
17,25 128:4,20
130:16 131:13,18,21
133:9,13 134:7,19,
20 135:1 136:22
137:8,9 138:5,6,11
139:12,20 140:17
163:2 164:5,10,13,
16,18 165:2,8
166:15,22 168:19
169:1,12,17,19,20,
25 170:3,17,18
171:4,6,9 172:25
226:10,19 227:5,19
252:2 253:24
260:11,12 263:2
264:3,13,16,22

**drug-induced** 125:17
127:20 136:20
232:25 233:10 234:6

**drugs** 72:8 115:4
124:5,7 125:11
126:23 127:5,11
129:16,18 130:7,23
131:2,10,25 132:1,7,
10,17,20 133:8,17
134:25 135:25 136:4
137:5 138:6,10,18
139:13,19 140:6
163:1,5,14 164:2,7
167:23 168:3,5
169:10,21 226:16,19
228:8 229:23 230:15

**DSM** 156:11,12,23

**due** 11:6 132:17 135:22 171:24 226:15,18,21 228:25 253:20 254:20

**duly** 5:5

**dump** 49:15

**duplicative** 196:20

**duration** 68:5 93:7, 13,22 95:19,20,23 96:2,6,16 99:13 101:10 149:8,10 257:2 265:2,4,8 266:17

**durations** 93:14 94:19 95:2,5,12 147:8 148:3,5,23 149:3

**duties** 27:13 28:2 31:14 32:25

**dysfunction** 227:21 228:13 229:1 250:17,21,24,25 252:21 253:14 255:15,17 263:15 265:12

**dysfunctioning** 253:14

**E**

**earlier** 31:19 36:17 41:20 50:3 52:18 92:18 94:16 95:25 99:17 109:2 122:25 126:13,23 139:23 148:2,4 150:8 151:8 166:21 167:19 168:15,16 171:14,18 173:4 174:3,18 182:21 183:5 185:22 186:8 190:13 191:8 194:5,10 196:12

213:4 224:12,21 229:9 233:13 236:19 237:7 248:23 262:22 266:23 268:3

**early** 38:23 39:5 40:9 64:24 234:14

**easier** 13:6,9 47:8 145:7 178:24

**easiest** 22:17,21

**easily** 124:4,19,25 129:23 130:22

**easy** 6:7

**ECD** 104:3 106:1 147:4,17 246:21

**ED** 149:14 249:12

**edge** 71:7

**editorializing** 203:17

**educate** 20:8 25:4

**educated** 25:23

**educating** 28:10

**education** 19:5,25 25:4,16,21 27:19 28:9 30:3 31:21 33:7,10,25 36:19 37:20 44:19 46:9,19 244:22

**educational** 26:4

**effect** 229:20 266:15

**effective** 246:17 248:9

**effectiveness** 78:20 94:3 192:1

**effects** 37:19 59:5,8 79:2,18,25 94:11 147:4 165:11 248:12

**efforts** 97:7 104:1

**either** 6:25 7:22,24

37:3,13 47:7 79:6 122:4 125:19 127:7 139:7 140:1 142:4 146:18 169:18 201:8,10,11 215:5 232:6 233:14 236:20 244:17 247:6 256:21 264:20,21 267:19

**EI** 34:8

**elaborated** 12:11

**elderly** 242:18

**electric** 265:4

**electrical** 59:6 79:16 244:9 247:13 257:4

**electricity** 93:15,18, 23 94:3 98:10

**electrolytes** 250:10

**electronic** 13:5 270:4,7

**elevate** 259:13

**elevated** 105:24 111:20 142:19 144:4,6,9 150:6 151:15 179:12 189:2,3 208:20 226:13 227:21 228:5,10,11,24 250:11,14,21 252:16,23 253:5 254:18 255:9,13,23, 24 257:16,22 259:14 262:19

**elevation** 77:14,15 150:6 226:17 253:19 254:8,19 255:16,19 257:22 259:11 263:12

**elevations** 147:9 227:10 253:15

**eleven-minute** 54:9

**elicit** 251:9

**eliciting** 247:22

**else's** 113:16

**email** 44:12 157:13

**embedded** 63:23

**emergencies** 22:13, 14 51:1

**emergency** 19:21 21:20 22:1,4,8,9,11, 15,20 23:2,22 24:7, 17 25:1,7,18,25 27:5,14,17 30:23 32:18 33:5,19,23 34:7,20,22 35:2,16, 17,19,23 36:8,10,15, 20 37:3,6,16,25 38:2,5,10 40:13 42:13 43:21 44:8 45:2,12 50:15 51:9, 13,19 52:6,7,19,24 53:8,12,17,21 62:5 74:13 138:3 143:14 149:15 156:21 157:5 162:5 169:15 249:5 250:15 251:22 255:6

**employees** 32:6

**employers** 240:2

**employment** 45:7 46:8,18 49:2

**EMS** 10:1 28:10 29:10 30:6,7 31:3 32:7 33:8,9 35:9 53:20 62:3,25 63:12 74:14 107:14,18 176:7 242:20 266:8,10 268:15

**enabled** 24:21

**encephalitis** 129:3 135:22 171:22,24,25 173:13

Gary Michael Vilke, M.D.

**encompassed** 81:3 88:7

**encompasses** 28:16

**encompassing** 28:12 159:10

**encounter** 61:18 93:3 178:8 180:1 253:18, 20 264:18,19

**encountered** 181:1 249:13 250:16 255:25 260:7 261:12

**encountering** 42:17

**ended** 85:5 233:7 258:7

**endogenous** 258:21

**ends** 112:20

**enforcement** 78:6 240:1,2,5,11,15,23 241:4,15,20,21,22 242:11,15,24 253:4 255:8,10,18,21

**engage** 46:17,23 232:15 235:2

**engaged** 37:11 234:21 235:21 236:15

**engaging** 236:24

**enlarged** 72:5,13,24 73:4 109:3 228:23 229:17 230:14

**ensure** 16:21

**entails** 20:5 33:21 35:5 36:14 38:19 41:16 42:12

**enthusiastic** 7:23

**entire** 112:14 267:25

**entirely** 188:10

**entirety** 11:25 14:22 64:18 66:16,21 67:5 74:21 86:8,12 88:25 89:2

**entities** 30:11,22 32:5,19 240:2 245:1

**entitled** 59:5,19

**entity** 31:16 240:12, 15,24 241:4 245:6,8

**envelope** 101:7

**environment** 216:12, 21 217:1,5,10,16 218:4,5

**enzyme** 158:19

**enzymes** 147:14 253:11

**epidemiologic** 230:7, 18 231:14

**Epidemiology** 160:17

**episode** 120:11 181:8 265:14

**episodes** 98:9 137:1 192:4 260:10

**equally** 187:13

**equals** 197:22

**equivalent** 51:13 52:24 53:9,18 251:18

**ER** 27:5 66:25 172:9

**erratic** 140:13 261:21

**escalating** 260:23

**especially** 172:8 176:24

**essentially** 30:21,22 34:19,21 42:12 62:18 139:18 141:8, 22 174:14 229:25 260:2 267:4

**established** 161:8,20 162:3

**estimate** 10:24 47:17, 23 48:13,14,15 71:21 75:23 76:1 80:11,13 82:1,4 212:7

**estimation** 78:10

**et al** 59:22,24 60:1,3

**ethical** 96:18

**ethically** 96:21

**etiologies** 125:15 127:13,19 128:17, 19,25 129:16 135:2, 24 141:9,11 162:7, 12

**etiology** 124:3,14,22, 25 125:5,7,8,21,23 129:22 130:1,11,21 131:6 132:15 133:19 134:9 135:12,14,21 137:22 140:6 141:5 156:17,19 163:19,23 165:20 166:21 171:17 172:5,10 227:5 248:24

**evaluate** 39:22 91:19 98:24 246:18 267:25 268:17 269:1,8

**evaluated** 143:15

**evaluating** 79:1 207:7,23 209:9,25 210:17,18

**evaluation** 38:24 39:5,24 86:18 94:3, 10,13 122:4 136:13 147:10 148:24 163:11 164:6 172:7 210:22

**evaluations** 78:4 149:25 230:7

**event** 13:10 18:5 64:23 68:16,17 73:6 119:20 125:9 179:15 182:19,20,22 190:12 192:10 227:5,14 236:22 250:19 252:1 254:8 260:5 263:1

**events** 36:23,24 61:14 62:2 66:13 77:14 87:20 91:5 143:17 163:22 183:1,2,4

**Eventually** 158:18

**everybody** 64:20

**evidence** 69:22 121:4,8 126:8 128:10 134:19 140:16 163:14 168:7,18 169:1 172:9 175:7 177:15 178:16 179:7 180:5, 18 181:17 182:7,21 183:10,12,15,17 186:9,11,20 187:5, 24 188:7,10,14,15, 16,23 189:2,6,7,18 190:4 192:17,22 193:2 195:14 196:20 205:12 213:19 214:22 215:24 216:11 221:8,15,19, 22 222:12,22,23,25 223:4 224:5,10 247:2 264:1,2,13,16, 22

**evidenced** 264:3

**evidences** 186:15

**evolve** 252:5

**evolved** 16:16 161:22

**exact** 68:25 121:20 124:3,14 125:5,23 129:22 130:21

Gary Michael Vilke, M.D.

158:15 160:20 161:14 162:24 166:10,15,18 225:6, 13 226:9 227:3 234:5,9 235:16

**exactly** 36:14 125:25 126:3,22 127:25 137:14 172:3 182:13 204:7 235:6 248:22, 25

**examination** 5:7 21:10 22:6 246:5 250:3 263:22

**examiners** 21:4 162:12

**example** 15:10 28:9 40:24 51:11,14 53:10 87:14 92:4,17 110:8 119:22 120:15,18 154:21 162:20 164:19 198:3 232:13,14 244:13 252:25

**examples** 119:14

**exceed** 102:19,23

**exceeded** 100:9

**exceeds** 100:21 101:11

**excerpts** 14:17,19

**excess** 101:19 158:19

**excited** 15:21 59:12, 15,17,19,22 83:12, 24 84:18 104:5 105:20 111:19,22,25 114:16,19,24 115:1, 4,18,21,24 116:8,19 117:2,13,18,24 118:8,14,18 119:11, 12 120:7 121:2,12, 23 122:6,15,23

123:4,9,21,24 124:3, 7,22 125:13,15,18, 21 126:7,22 127:12, 19,20 128:2,17,25 129:2,4,10,16,23 130:7,21 131:10,19 132:2,10,13,16,23 133:8,10 134:6,10, 24 135:12,16,21 136:6,20 137:6,8,17 138:7,23 139:1,8,14, 21 140:7,22,23 141:3,9,18 142:2,6 149:22 151:5,6,21, 24 152:8,13,14,16 153:5,9,13,20 154:4, 9 155:14,16,22 156:4,9 157:6 158:15,17 159:23,25 160:21,23 161:1,2,6, 18 162:2,8,23 163:2, 13,20 164:11,24 165:3,21 166:2,8,16, 21,25 167:7 169:9, 13,14 170:13,20 171:12 172:5 173:12,17 178:3,8, 10,12 179:4,10,25 180:23 183:21 184:15,17,21 185:12,18,25 192:16,21 193:10, 13,16 197:19,23 198:9,18 199:1,6,13, 14,20 200:2,12,20 201:4,15 202:4,18, 22 203:5,21 204:3,7 205:4,17,18,20 206:12,14,15,21,24 207:9,10,24 208:1 209:11 210:1 214:6, 11,17 215:1,7 219:4 220:22 223:17 224:22 225:7,20 226:1,5,7,16,19 227:7,24 228:1,8,12,

15,22 229:3,6,7,18 230:4,8,14,19 232:6, 25 233:2 234:6 248:14,23 259:3,7, 13 260:17,25 262:6, 17 263:2 267:7,13

**exclaiming** 213:18 214:23 215:25

**excluded** 163:17

**excluding** 133:16 162:20

**exclusion** 161:8 162:3,16 173:4

**Exds** 59:13,16

**exercise** 59:9 256:21

**exhaustion** 207:1

**exhaustive** 108:4 167:24

**exhibit** 13:16,19,20, 21 17:24 18:2,5 54:12 88:14 145:21, 22,23 147:3 157:3,4, 17 170:8 193:23 194:1,3 207:5

**exhibited** 141:15

**exhibiting** 105:20 118:14 119:5 142:1 182:8 197:18 204:1

**exhibits** 14:3 74:11 88:6

**exist** 230:17

**existing** 98:3,18 99:3, 6,21 102:15

**exists** 225:24

**exogenous** 258:20

**expand** 100:15

**expanded** 106:9 115:2

**expanding** 118:16,19

**expands** 251:10

**expect** 259:24,25

**experience** 35:20 39:7 187:20

**experienced** 5:24 207:8 234:18 236:8, 16

**experiencing** 198:9, 17 199:3 201:1,2,4 202:16,17 206:20 207:9,24 210:1

**expert** 11:7,13,16,17 12:1,4,7,15 13:10,23 16:10 17:18 23:24 46:22 47:22 48:3 68:24 74:13 75:18 79:12,14,15,18,21 83:7 86:16,23 87:21 88:3,6 89:9 92:2 93:21 104:7 106:7 145:18 237:8 242:23 243:12,15,21,23 244:14 245:16,19

**expertise** 232:1

**experts** 10:3 40:4 62:17 86:23 94:1 117:4

**experts'** 109:6

**explain** 15:19 20:4 21:24 29:16 33:21 41:15 50:1 63:17 70:7 101:2 113:6 133:6 148:19 186:21 191:23 203:11,12 248:16 254:23 260:5

**explained** 134:8 135:8

**explaining** 203:11

**explanation** 142:4

172:15 202:17

**explanations** 202:15

**explanatory** 142:13, 15

**exposure** 95:10,19, 20 96:20 98:5 102:10,18

**expressing** 219:1,2

**extensive** 54:23

**extensively** 147:5

**extent** 100:9 177:8,10 247:21 251:9

**extra** 71:22

**extraneous** 165:14

**extrapolate** 233:9 234:4 242:5

**extrapolation** 234:5

**extreme** 59:21

**eye** 39:22 222:20

**eyes** 75:9

**eyewitnesses** 74:16

**F**

**facilities** 44:5

**facility** 19:21 30:11 31:8,11,12 38:22 44:7 241:2

**fact** 7:12 67:21 68:1, 10 69:2 86:14 87:23, 24,25 88:1 89:14 91:8 96:17 102:15 110:13 112:17 115:6,9 119:22 120:2,20,21 124:13, 15 127:18 129:6 130:24 131:1,12 136:10,21 144:3,7,9

151:23 168:21 173:14 175:22 177:2 182:12 186:18 203:13 205:14 207:11 217:9 222:1, 10 240:7 249:11 252:17 258:16 259:12 260:24

**factor** 73:20 100:5,7, 22,23 134:3 213:3 256:7

**factors** 99:18 133:17, 18 134:2 205:10 209:3,24

**facts** 60:1 65:4 67:15, 18 68:8,19,21 69:12, 15,19 70:20 71:2,4, 25 75:11 76:12,14, 21 77:9 81:13,16 83:5 87:20,22 89:23 90:1,6,15 91:4,8,12, 21,24 92:15,16 106:23 107:7,21,23 108:3,7,11,17,20,22, 25 110:7,17,18 117:15,17,25 119:1, 9 120:3,4,17,19 124:10 126:11 131:7 143:17,22 147:23 151:13 186:22 193:11,14,15 209:18 213:9,14,22,25 214:5,9,12 215:2,6, 9,10 216:9 217:3 221:13,18 222:4 224:10 231:8 265:19,24 269:4

**factual** 9:13 115:8,9, 12,15 116:13,18 118:5 146:2 147:22 149:24 216:10 217:4 221:14,18

**factually** 151:4

**faculty** 42:6

**Fahrenheit** 190:10

**fails** 216:24

**failure** 113:3 141:19 142:7,11 144:5,10 146:24 147:1 149:21 225:15 226:15,21 234:20 235:20 236:10,18 237:4,6 254:20 261:23 262:1 263:15

**fair** 5:19,22 9:12 12:4, 6 14:9,12,21,23 16:10 17:11,14,15 20:13 21:18 22:20, 25 23:7 24:3 28:18 30:11,23 31:4,5 32:8,14 36:2,4 40:17 42:17 43:14 45:18, 22,23 46:14,15,16 49:11 51:9,11,19 52:21,22,25 57:13 60:22 61:3 67:8,9 74:18,19 75:12 76:5, 7 79:13,17,23 81:12 82:16 83:15,19 84:17,24 85:2 88:7 93:20 94:9 95:21 96:21 97:8,17 98:20 99:22 100:7 101:13 102:10 103:20 104:8,11,14,25 105:9,14,15 106:22 108:24 110:15 113:15,18 115:15,24 116:19 117:16 118:9 119:9 120:23 124:20 126:10 143:6,7,18, 19 148:1 149:19 150:21,25 151:1,12 155:19 165:5 168:23 169:15 184:24 189:17 190:5,16,22 191:10,14 202:24

218:22 219:6,22 220:24 238:17 239:22 242:1 243:13,14

**fairly** 9:12 34:13 64:19 75:20 102:4 167:2 171:2 252:9

**fall** 27:24 33:11 52:4, 7,8 185:14

**falls** 33:13 124:17 184:8

**familiar** 26:18 58:17 89:12 137:21 149:7 151:7 239:21

**familiarity** 61:5

**family** 74:15 75:21 84:5 139:24 169:23

**far** 10:16 12:12 25:4 46:4 51:6,16,20 75:24 77:13 81:8,18 95:15 98:7 101:11 107:16 123:12 135:24 139:5 140:2, 3 148:25 169:11 179:15 182:11 184:2 188:2 202:7 210:7, 22 211:4,6 220:12 222:18 230:7 238:11 241:18 242:6 244:21,23 246:16 248:3,4 255:20

**fared** 232:3

**fast** 187:23 188:20,23 262:21 268:20

**faster** 256:25

**fatal** 158:17

**favorable** 242:23 243:1

**feature** 5:10 121:25 122:18

**features** 13:5 118:10 121:13 122:17,24 123:13,17 127:2 159:24 160:12 162:13,20 163:9 197:25 200:13 269:1

**fee** 237:15

**fee-for-service** 46:14

**feedback** 34:16

**feel** 15:13 16:4 17:6, 12 42:14 48:9 102:13 202:3 257:20 265:20

**fellow** 33:8

**fellowship** 33:8

**felt** 64:13 108:13 117:3 137:7 152:1 222:14

**fever** 122:20 172:8,10 208:9

**fewer** 147:12 246:7

**fibrillation** 244:7

**fidgety** 175:16

**field** 24:5 25:24 30:22 31:1 35:15 36:20,23 37:2,25 38:2 42:14, 17 43:9 50:17 51:8, 12 53:8,17 67:3 98:9 153:3 155:10 267:20

**fifteen** 149:9

**fifth** 59:11

**fighting** 191:5 218:16

**figure** 197:8 199:17 223:12

**file** 66:2 71:19

**filed** 39:12,17 40:6 89:8

**files** 65:16,21,25 66:2,3,4,6,20

**filter** 255:1

**filtration** 251:3,16

**final** 111:24 124:1 150:4 201:15 205:16 261:24,25

**finally** 262:4 263:4,8

**find** 64:21 85:18 114:6 129:1 135:6 169:21 204:8 206:8 224:14 237:11,13

**finding** 73:17 85:19 119:11,12 121:24,25 122:6,8,13,14,16,19, 21 123:20 155:1,15 164:10 178:24 183:20,25 185:11 186:2 190:14 192:5 193:9 202:4 211:18, 19 269:8

**findings** 63:22 72:14 73:11 78:3 87:8 117:24 118:3,8,18 120:6,23 121:22 123:2 134:19 140:14 146:2 151:6,21,23 152:6 153:11,24 154:5,7,15,23 155:18 165:3 173:8 178:2,15 183:9 185:9,18 192:16 193:9 199:25 202:1 203:19 209:9 257:9

**fine** 53:25 195:4 249:22 270:5

**finger** 177:21

**finish** 6:16 22:2 130:3

**fire** 29:10,17 30:5,7, 15 31:3 32:7 74:14 176:7

**fired** 147:7

**first** 5:5 18:8 19:3 27:9 39:3 41:24 62:1,25 64:16 68:13 70:3 74:24 76:24 77:3 85:20 96:23 97:20,21 99:13 103:13,16,18 112:10 114:14 118:15,23 123:7 143:1 173:21, 22 180:25 181:12 182:24 197:12 264:12

**fitting** 37:22

**five** 65:21 88:20 94:14 95:24 96:2,6, 9,23 97:22 145:4,11 152:24 153:6 239:8, 13 252:9 266:20

**five-minute** 145:13 211:25

**five-second** 94:16 95:2

**flailing** 176:1,14

**flakka** 125:24 126:6, 15

**flat** 174:21 268:21

**flipped** 86:5

**flow** 107:17

**flu-like** 208:9

**focus** 35:15,16 37:3 40:12 50:17,19,24 51:1,8 52:21 53:17 63:7 64:7,21

**focused** 36:1 37:14, 15 38:3,11 67:7 172:12 173:18 223:15 224:8

**focusing** 37:5 51:11 173:1

**folder** 157:14

**folks** 183:5 264:19

**follow** 50:9 77:3 195:2

**follow-up** 246:1 263:24 269:10

**following** 44:1 179:17 184:25 185:5 192:23 245:21

**follows** 5:5 105:18 255:12

**footage** 92:13 174:4, 13 175:3,13 196:5 249:4,7

**force** 37:19 57:17 157:24 158:3 159:2 170:9 230:20 240:6

**foreign** 211:11

**forensic** 161:3,7,19

**form** 29:12 34:23 67:19 69:16 72:1 74:5 76:13 89:23 90:2,8 94:8 104:17 107:22 108:7 120:5, 22 143:1 150:14 180:7 249:16 254:5 258:9 261:2 262:8

**formal** 35:21 40:5 52:21,24 63:6 203:21 204:15

**formaldehyde** 82:9, 22 137:13,16,21 138:9,25

**formalized** 37:19

**formally** 13:17 50:18

**formed** 16:1 56:22 58:2

**forming** 68:24 77:9 86:15 92:2 96:11

109:1,4

**forms** 38:23 218:15, 18

**formulate** 65:5

**formulated** 62:22

**forth** 55:10 70:10 104:6 113:25

**forthcoming** 113:7

**forward** 8:3 21:12 67:12 136:18

**found** 76:24 78:21 105:25 107:12 121:2 142:20 153:3 158:18 159:16 173:11 252:21

**foundation** 97:24 98:6,14 99:1 249:16

**four** 59:11 65:25 66:1 106:21 153:6 195:15,17 239:18,22 240:9,10,22 242:1

**fourth** 59:7

**fraction** 248:8

**frame** 188:8

**framework** 64:10,12, 24

**Francis** 84:23,24 85:8

**free** 233:1

**freedom** 29:23

**frequency** 167:3

**frequent** 46:17,21

**frequently** 23:8 25:23 199:23 206:24 207:13 208:18 225:25

**friend** 139:24 169:23

**friends** 84:6

**front** 12:22 13:2,11 17:24 54:13 58:7 103:10 144:18 145:17 157:2,14,19 191:20 193:20 194:19,24 213:15 218:2

**froze** 94:20

**full** 5:12 41:8 53:11 114:4 158:10 204:12,13 238:5,6 257:4

**full-blown** 51:13 53:9,18

**fully** 170:21

**function** 12:25 78:11, 13 172:20 227:12 250:10,14 251:17,25 255:4 257:11

**functioned** 78:9

**functioning** 78:14,16 79:6,16 80:1 253:15 255:14

**functions** 77:15

**fundamental** 170:15

**funded** 51:5 245:13

**further** 204:11 252:11 254:17,19 263:22

**future** 20:8

---

## G

**g-l-o-m-e-r-u-l-a-r** 251:3

**G-O-N-I-N** 59:22

**Gary** 5:3,13

**general** 16:24 20:24 32:20 56:22 71:3 87:7 122:7 129:7

187:17 238:6 264:8

**generally** 44:6 45:18 61:7 135:16 198:7 239:21,23

**generation** 247:19

**genetic** 158:19

**gentleman** 242:18

**geriatrics** 22:12

**gestures** 6:6

**gesturing** 213:18 214:23 215:25

**get all** 6:12

**getting** 25:23 77:20 138:8 145:5 168:1 176:14 178:13 181:18 197:8,10 201:12 269:24

**give** 6:5 42:2,8 43:5, 10 44:18 46:10 47:6, 9 48:7 49:6,9 59:3 68:25 69:6,11 75:23 77:5 80:11,24 90:12 92:14 102:5,6 179:16 195:9 214:7 235:5,16 239:24 241:13 243:1

**given** 17:10 31:15 42:4 62:12 112:6 140:4 184:25 185:5, 23 207:12 215:2 242:22,25 243:7,15, 25 244:13 263:25 265:2

**gives** 29:23 64:10,24 103:13

**giving** 42:23 61:22 71:21 82:11 181:19 233:19,22

**gladly** 7:3

**glass** 207:4 261:5,7

**glitchy** 7:17

**Glomer-** 251:6

**glomerular** 251:3,16

**go** 5:24 7:7 16:15 28:6,25 29:24 30:16 32:6 38:21 47:15 48:21 53:22 54:11 58:7,18 61:9,25 62:1 63:8 73:16 75:1 76:9 77:2 78:23 79:24 85:15 86:2 87:25 91:7 97:18 99:15 100:25 101:4,16 102:24 103:8 104:24 107:17 112:6 113:6, 13 119:18 120:10 121:6,13 130:5 142:11 143:11,12 152:10,15 172:11 191:5 223:1,8,10,12 226:22 228:21 229:9,11 230:5 233:3 237:2 248:1 249:17,21 251:12,15 254:6 258:10 259:9, 12 262:9 264:9,11, 15 266:1

**Godfrey** 77:18 176:6

**Godfrey's** 175:19,21

**goes** 7:22 10:16 46:4 51:16 83:11 84:16 112:18 126:19 143:25 147:11 149:24 150:7 152:16 155:13 184:3 188:3 202:7 211:4 229:7 238:6 246:16 251:2 252:9 255:20

**going** 5:9,24 7:8 8:3 20:11 28:4,6,8 32:20 43:7 47:2,13 50:16

52:20 62:24 64:15
67:11 68:18 70:10
76:16 89:1,13 103:7
104:22 124:8 127:15
130:9 136:18 143:11
145:7 150:10 163:9
176:24 184:6 187:21
195:9 207:5 212:9,
10,11,12 214:7,15
217:14 221:17
222:11 227:4,14,18
228:5 230:9 233:13
235:14 236:22
238:16 242:2 243:8
249:8,12 251:7,25
254:15 258:20
259:12 262:24
265:15,21 267:16
268:13 270:3

**Gonin** 59:22

**good** 38:13 48:4
75:23 78:15 79:7
80:11 145:10 212:4
242:8 244:10
247:14,17

**gotten** 235:3 236:22

**GPA** 49:21

**grab** 157:15

**gram** 73:2

**granular** 51:4,6

**great** 13:3 54:6
157:16

**greater** 241:21

**Greenwood** 80:15

**gross** 48:21 50:8

**ground** 174:16
268:19

**group** 10:9 29:22
147:7 153:2

**groups** 27:23 135:25
147:12 152:21
208:21

**guess** 16:13,14 20:9
22:10,16,18 23:14
27:7,16 34:4 35:12
37:16 41:18 44:3,16
47:1 52:17 55:13,22
61:15 63:5 68:1,10
70:4,9 71:3,15 72:16
75:7 87:4 89:15
90:22 91:11,21
93:21 104:8,17
108:1 109:9,22
111:22 112:1 114:14
116:5 117:25 119:2
124:15 144:14
152:11 154:21
159:16 160:16
178:11 179:22
180:15 185:14
189:13 196:16
197:22 202:12
210:17 224:3,9,18
227:15,23 235:15
238:9 243:1 259:4
265:21

**guesstimate** 71:17

**guide** 32:5

**guidelines** 34:11

**gurney** 186:19,25
187:13

**guy** 261:17

**guys** 53:25

---

**H**

**half** 106:22 112:12
118:15 131:15 212:6
238:5 240:4 256:5

**halfway** 106:20
150:25

**Hall** 152:20

**Hall's** 153:2

**hallucinations**
217:12 219:13
260:13

**hallucinatory** 220:9

**hallucinogenic**
140:16 260:12

**hand** 247:6

**handcuff** 268:14

**handcuffed** 71:1
92:11 173:23 190:18
258:18

**hands** 71:1

**hang** 8:2

**happen** 24:5 32:15
43:2 164:22 207:3
232:10,12,18 233:22
240:16 256:4

**happened** 16:18
22:4,6 229:1 230:24
232:21 233:20 235:6
236:20 241:2 248:21
251:24 252:4 253:21
254:15 259:16

**happening** 223:1
228:9 235:14 257:23
258:21 268:25

**happens** 199:23
233:1 234:8 268:15,
22

**happy** 13:7 92:17

**hard** 6:8 28:20 68:12
100:20 160:11
176:23 229:8,12
268:2

**harm** 176:25 177:1,3

**Hartman** 74:14 77:11
249:4

**hazard** 218:9

**He'll** 269:22

**head** 12:11 15:2,16
80:25 174:16 176:12
186:20 187:7,9

**heading** 54:25 55:1
111:1,4,11,12 124:1,
2 150:13 160:18
170:10

**heads** 176:24

**health** 20:10 38:16
39:1 81:21 83:1
156:3 166:12

**hear** 7:1 49:22 69:22
90:22 94:21 185:3
249:23

**heard** 78:14 195:13

**heart** 63:22 72:5,13
73:2,5,6 109:3 119:5
122:2 123:1 177:18
189:2,4 192:5,9
201:12 214:15
228:10,23 229:3,4,
13,17 230:14,22,23,
25 231:2 244:6
248:19 257:16,18,22
258:3,17,25 259:23
260:21 262:19

**heartbeat** 117:5

**hearts** 72:24

**heaven** 217:17

**heavily** 69:22

**heed** 65:11

**held** 20:21 41:3
113:25 212:21

**help** 29:1,14 30:2
33:8,24 43:1 63:11
95:13 112:8 204:16

**helpful** 28:24 61:22

122:7 169:20

**helping** 32:4

**HEPPELL** 5:8 13:14, 20,22 53:22 54:2,6, 10 102:24 103:3 130:12 145:11,14, 20,24 157:5,16,18 193:23 194:2,18,21, 24 195:1,6 212:2,4, 6,18,23 229:15 245:23 247:21 249:16 251:7 254:5 258:9 261:2 262:8 263:23 269:10,23 270:3

**Hi** 246:7

**high** 162:22 167:2 186:14,15,21 211:23

**highway** 260:6

**hired** 29:13

**historical** 234:11

**histories** 83:25

**history** 64:23 72:25 82:19 83:9,23 84:14 128:9 130:1,16 131:13 133:12 134:12,13,15 136:11,15 138:6 139:11,13 140:9 163:7,10,15 164:3,7 245:20

**hit** 111:11 150:24 235:3,7 236:1,11,14, 21

**hits** 227:1

**hold** 21:7 24:12 26:2 35:22 38:15 43:13 44:15,16 51:17,18 79:11 245:15

**holding** 71:2,5

**holds** 7:12 70:12

**Holly** 78:1

**home** 44:11

**honest** 67:13

**hope** 6:22 7:21 112:2 269:24

**hopefully** 13:8

**horrible** 233:7

**hospital** 10:1 22:20 30:16,24 31:2 32:21 34:5 38:11 39:20 41:4,15,17,18,22,24 42:4,6,20 62:4,5 63:1,13 66:6 67:8 81:22 83:1 84:23 85:4,14 106:1 107:14,17 113:3 137:1 142:21 143:15 144:7 163:8 179:13 190:10 227:11,22 228:25 252:19 253:25 258:1,2,3 266:8

**hospitalization** 85:21

**hospitalizations** 139:5,16

**hospitals** 62:9

**hot** 64:13 119:17 162:21 202:9

**hour** 8:18 60:17 80:12 85:13,14 212:6 227:12 237:19,23 238:7 239:14 250:15 251:25 254:14 265:17

**hours** 8:13 9:11 10:5, 20,22 28:1,8,13,15, 21 46:24 75:25

85:15 132:5 182:21 183:5 239:5,8,13 250:23 252:3 253:1, 21 262:25 268:5

**hovering** 249:25

**huh-uhs** 6:7

**human** 59:6 96:16,19 97:3,19 166:6

**humans** 79:19 95:7, 18,22 96:13 97:15 147:4 148:8,9 149:8

**hurt** 232:11

**hurting** 187:16

**hyper** 229:4 260:20

**hyperactivity** 226:25 262:15

**hyperadrenergic** 260:20

**Hyperbaric** 35:7

**hyperbarics** 37:10

**hyperkalemia** 105:24 146:13 234:19 235:19 236:9,17 237:3 255:20

**hyperthermia** 119:5 207:2,21 209:4

**hypothetical** 99:4 163:4 187:15 213:14 214:8 215:15,20 224:11,17,19 266:24 268:10

---

**I**

**I'M-NOT-SURE** 71:21

**i.e.** 55:24

**Ian** 77:18

**ICB** 156:4

**ICU** 86:1 245:21

**idea** 36:22 39:2 49:16 75:19 132:21 133:12 186:23 209:15 211:9 261:8

**identifiable** 124:25

**identified** 120:11 124:4,14,19 129:12, 23 130:22 159:23 160:12 261:4

**identify** 129:3 155:12 160:23 187:18

**identifying** 150:23

**identity** 131:12

**illicit** 260:11

**illness** 122:19 136:15 168:8 208:9

**illnesses** 155:20

**imagine** 47:25

**imaging** 153:16

**immediately** 19:11,16 258:13

**impact** 136:17 266:18 267:2,12

**impacted** 265:1

**impacting** 108:1

**impair** 192:1

**impervious** 207:1 208:5,20

**imperviousness** 207:20 209:4

**implies** 260:9

**imply** 168:10 230:25

**implying** 203:6

**importance** 195:20 196:19 197:4

Gary Michael Vilke, M.D.

**important** 6:5,11 7:18 57:18 73:18 76:9 108:13 200:10

**impossible** 160:21 161:15 202:19 203:1

**imprecise** 200:24

**impressions** 77:13 177:16

**improve** 259:24

**IMU** 245:21

**in-custody** 37:18 61:15

**in-person** 8:14,18

**inability** 177:19

**inappropriate** 207:4

**incidence** 159:25 160:21 161:14

**Incidences** 160:11

**incident** 32:11 75:11 93:1,24 136:24 138:1,5,15 139:3 264:4,20

**incidents** 83:17 136:22

**inciting** 172:10

**include** 46:1 56:21 61:18 73:23 74:11 95:12 107:8 109:8, 21 110:4,7,9,10,20 121:15 126:4,15 130:14

**included** 71:22 76:23 84:14 95:5 110:11, 23 120:2,22 152:9 216:10 221:14 250:9

**includes** 54:24 55:10 94:7 146:24

**including** 56:5 88:23

**104:**2 125:2 138:18 158:21 170:17 171:4 239:10 254:9 262:19

**income** 46:11 47:24 48:19 49:2,16

**incomplete** 164:13

**inconvenience** 238:9

**increase** 99:20 206:25 207:21

**increased** 73:1 117:3 158:11,14 207:2 228:24 248:15 254:1

**incredibly** 162:22

**independent** 29:22 81:8 132:13 147:23 148:18 183:9 202:21 203:4 205:9

**independently** 15:23 45:5 113:6 205:6,8 223:16,18 268:1 269:1

**indicate** 11:21

**indicating** 72:21 217:9

**indication** 133:11 139:1

**indicative** 78:15 198:8 216:20

**indicators** 163:23 206:19

**individual** 32:6 117:2 151:12 198:17 206:20 207:8,23 209:25 216:20,24 227:3 232:7 233:5 248:15

**individuals** 42:3 72:25 74:11,12 83:25 91:6 177:5,17

**229:**22 230:3 232:8 259:9 261:4,6,12 262:25

**induced** 127:25 128:20 134:7 169:10 172:25 233:2 253:24

**infant** 248:20

**infarction** 231:1

**infection** 128:5,10,22 129:2,17 133:19 134:3 135:11,13,15, 19,20,21 136:3 172:10

**infections** 127:6,7,11 141:8 162:9 171:18 172:5,8 173:9

**infectious** 127:19 133:12,13 134:6,8,9 141:11

**influence** 136:19 169:16 229:18,23 230:15 260:15

**influenza-like** 122:19

**inform** 91:9

**informal** 50:19

**information** 23:14 34:12 58:21 68:13, 18 69:13 76:10,17, 24 77:11 82:11 83:4 86:21 89:19 90:11, 16 99:6,9 109:20 110:24 114:23 116:6,10,24 117:8 121:3 130:18 150:15 161:23 196:7 232:1 233:23

**inherently** 68:15

**inherit** 52:18

**initial** 9:11 62:6

**initially** 16:8 69:20 70:3,9 155:9 174:18 258:4

**injure** 147:14

**injures** 228:2

**injuring** 176:12

**injury** 82:5 146:5,9, 12,21 149:14 244:15,16 263:9,17

**input** 40:9 42:16

**instance** 119:25 138:22 243:24

**instances** 137:9 240:22 241:25

**institution** 26:2,5

**institutions** 26:4

**instructions** 181:20

**insult** 256:25

**insulting** 256:6

**insults** 228:6,11 229:11

**intended** 38:13 55:23 56:1,19 104:11

**intensive** 42:22

**intent** 55:22 56:4 103:21 187:10 191:9,11 208:11

**intentionally** 187:6

**interact** 34:9

**interacted** 259:17

**interaction** 259:18 262:21

**interactions** 159:21

**interchange** 199:22 200:9

**interchangeable**

**Gary Michael Vilke, M.D.**

199:21 200:7 205:21

**interchangeably**
197:20 199:17
200:10,11 205:23,25

**interest** 85:21

**interesting** 176:22

**interlocking** 28:19

**interlude** 145:16

**intermittently** 18:17
46:10

**intern** 24:15

**internal** 40:4 80:15,
22

**international** 44:24
244:18 245:10,13

**internship** 19:17
21:11 24:9,23

**interpret** 177:1,2
197:14 206:3 214:20
244:12

**interpretation** 220:3
236:5

**interpreted** 163:2
203:9 222:21 243:2
261:19

**interpreting** 214:8,18
217:16 220:12 240:8

**interrupt** 8:1 178:22

**interstate** 260:6

**intervened** 233:15
235:13

**intervention** 231:18,
19,21 232:3,22

**interview** 77:6 191:1

**interviews** 64:2 67:22
68:1 69:5,11 76:18
80:4 81:9 88:23,25

215:13

**intoxicant** 229:19

**intoxicants** 139:14

**intoxication** 126:2,
14,18 127:17 133:13
134:19 140:17
163:2,5,14 164:2,5,
10,16,18 165:3,9
166:15 168:19,21
169:1,13,17 170:3
171:9 226:19 260:13
262:24 263:2 264:3,
13,16,22

**introduce** 114:17

**introduced** 165:10,15

**introducing** 115:17

**introduction** 103:12,
16,23 104:18 105:12

**investigation** 80:15,
22 81:7

**invoiced** 239:2,6

**invoices** 238:11,14

**involve** 94:18 167:12

**involved** 37:21 42:23,
24 62:13 75:3,4,20
76:5 159:21 236:23
244:19,23 261:8
268:8

**involvement** 38:23
75:2 100:1 107:18
226:13 229:2 235:15
250:18,19,25 252:5
253:3 255:7,10,21
266:10

**involves** 34:19 240:1

**involving** 230:1 240:5
241:4,15 242:10

**IRB** 96:22 99:9 101:1

**irregular** 117:4

**irrespective** 249:13

**irritable** 73:6 229:2

**isolation** 179:11

**issue** 7:16 34:14
42:13 70:23 93:1
131:25 139:3
165:16,18 166:1
236:4

**issues** 39:18 64:22
72:4,9 86:17 92:3
113:1 172:2 173:8
184:7,9 214:19
226:25 234:11
252:24

**item** 14:2 19:24 20:4
28:21,22 33:16
34:25 38:14 55:24
64:16,17 65:14 71:8,
10 80:14,19 81:3,21
84:8,15,23 86:6
88:8,17 100:25

**items** 14:7 55:4,10,13
56:6,14,16,21 57:11,
23 58:5,13,23 60:20,
24 61:2,11 63:1
64:15 74:9 81:20
84:21 86:22,25
88:22 89:6,7 90:3
92:19 109:24 208:22

---

**J**

**jail** 240:14,18,20
241:2 242:13

**James** 59:12

**jeez** 88:20

**Jesus** 121:5 182:10
183:7 217:14 218:1
220:9

**Jim** 13:4,15 157:12
194:18 245:24
264:25

**jittery** 268:21

**job** 26:20 27:2,3,4,8,
13 28:2,5 31:14 33:4
44:20 45:21

**jobs** 44:15,17,23

**join** 18:23

**joint** 28:9 29:4,7,12
31:7,17 36:17 50:2

**JPA** 49:13,23,24
50:10

**July** 41:3

**jump** 6:17,20 98:23
99:20,23 153:8

**jumped** 17:16

**jumping** 6:13 7:24
97:1 170:8 247:24

**junior** 35:11

**jurisdiction** 20:22
31:3

**justification** 100:4

**justify** 101:8

---

**K**

**K-E-M-P** 60:1

**K-E-S-H-A** 60:3

**k-i-n-a-s-e** 252:15

**Kawasaki's** 123:16,
17

**keep** 22:7 36:11
39:22 49:20 95:13
233:13 238:9 247:24
249:24 260:23

**Kemp** 60:1

**ken** 219:21

**kept** 186:18

**Kesha** 60:3

**kidney** 77:15 144:11
146:4,5,9,12,16,17,
20,21,25 149:14
227:11,21 250:9,17,
19,21,22,24 251:17,
19,21,25 252:21
253:13 255:4,15,17
256:13,15 257:11
263:9,14,15,17
265:12

**kidneys** 146:23
147:15 150:7 226:23
253:13,14 254:25
255:1,13 263:14

**killed** 231:23,25

**kinase** 252:14 253:11

**kind** 27:1 45:16 46:18
87:11 137:22 138:7,
23 139:14,20 153:25
187:11 189:12

**kinds** 22:13 207:2

**knew** 196:15 197:12,
13

**know** 6:3 7:3,18
11:16 16:24 25:7
31:22 34:15 37:16
39:3,4,13,19 40:2
45:6 46:19,25 47:1,
7,8 48:10,18 49:1,5,
8,12,14 50:22 51:4,
23 52:14,15 57:3,17
58:18 60:2 61:18
64:2 65:10 67:21
68:5,8,16 69:2,8,13
70:12,25 71:1,6
72:3,17,25 73:12
75:19,22 77:12 78:2
80:13 81:9 85:11,13

86:1 98:8 99:11
101:5,14,18 103:11
107:13,14 108:13
111:17,19,24 112:3
113:23 120:25 121:6
122:25 125:8 138:1,
12,19 143:10 144:6,
13 149:1 156:14
158:6 161:14 163:1
165:9 170:3 171:22
176:1 179:22 182:21
184:18 187:3,10
192:8 195:13 196:19
199:12,16,24 200:20
201:12 202:7 206:4
210:12 214:13,14
217:12,16,18,21
218:7,16 219:19,20
220:15 221:21
224:13,21 225:25
226:2,10,12 227:12,
18 228:25 230:4
232:12,19 233:17,
18,21 234:1,2,10
238:14 245:5 248:4,
8,21,24 249:1,7
250:17 252:1 254:3
255:9,17 256:2
258:22,24 260:14,19
265:11,12,13,16,22,
23 266:6,13 267:17
268:5,18,22,24
270:5

**knowing** 219:19
232:5

**knowledge** 18:13
41:1 56:22 57:2,12
79:20 148:6 226:5

**known** 125:12 129:18
132:1 137:6 139:8,
14 164:11 166:25

**knows** 232:9

**Kroll** 86:24 148:23

**L**

**L-A-B-A-Y** 59:23

**lab** 63:22 146:3

**Labay** 59:23

**label** 163:19 219:20

**labeled** 54:19,20
105:16 106:20 107:3

**labels** 200:25

**labor** 33:25

**laboratory** 143:24
146:20 250:8

**labs** 251:23

**laced** 82:22

**lack** 72:13 130:16
140:8 183:23,24
184:5,6 216:11
217:9 218:4 221:23
226:4

**lactate** 228:5

**lactic** 247:19

**landscape** 107:10

**lanes** 16:14,22,24

**language** 56:6 111:4,
5

**lapsed** 21:8

**large** 36:24,25

**larger** 147:7

**lastly** 264:24

**latched** 110:19

**late** 104:1

**law** 78:5 240:1,2,5,11,
14,23 241:4,15,20,
22 242:10,15,24
253:3 255:7,10,17,

21

**lawsuit** 93:1

**lawsuits** 38:21 39:12,
17

**lawyer** 30:20

**lawyers** 90:7

**lay** 189:15

**layers** 184:18,19

**laying** 174:21 258:23

**layperson** 30:18
218:6,11 219:5,9,21
220:1,5,14

**layperson's** 22:18
97:12

**laypersons** 219:15

**lays** 268:21

**lead** 55:8 59:11
154:23 166:25
170:19 229:2 263:2,
14 267:6

**lead-in** 54:22 123:7

**leaders** 20:8

**leadership** 19:25
20:9,13,17 34:19,24
35:12 45:8

**leading** 62:2 99:18
142:7 163:7,22
236:9,17

**leads** 123:14 163:18
166:1 170:4 178:23
228:14

**leaves** 133:13

**lecturer** 46:14

**lectures** 44:18,19
46:10

**lecturing** 33:10 46:18

**led** 61:17 141:19 182:1 228:1,12 229:6 234:19 261:25

**left** 92:12 119:19 266:22

**left-hand** 158:10,11

**legal** 89:7,22 244:23

**legalese** 64:25

**legitimate** 135:14

**legs** 69:21 70:10 174:19,21

**length** 11:17 81:2

**lengthy** 9:12 56:16 112:13

**let's** 145:11,20 157:3 221:6

**letterhead** 103:11

**lettering** 193:25

**letting** 232:25 233:6

**level** 48:10 50:7 69:6, 11 99:1 100:1 105:24 142:20 162:22 186:24 187:7 201:3 203:8 211:12, 14,23,24 226:17 252:6,15,16,22 253:25 255:18 257:13

**levels** 7:17 68:7 77:14 143:24 144:1 146:3,20 148:24 149:11 150:6,8 162:25 226:12,13 227:10,21 250:8,21 254:8,12 255:5 257:11 263:12 265:13 268:6

**license** 31:23

**licensed** 20:18 21:12

25:11

**licensure** 20:21,24

**Lieutenant** 92:24 93:2 179:9 180:25 181:9,12,25 182:23

**life** 25:3 51:24,25 253:16

**light** 72:21

**limitation** 166:6

**limited** 54:25 55:10, 16 56:5 100:12,17

**limits** 224:23

**line** 16:4 17:6 28:9 33:13 65:1 75:15 113:13 117:23 124:12 126:19 127:24 144:4 161:25 190:21 195:8,12,25 198:15 202:14 203:25 206:10 213:2 216:8 221:12 222:17 224:25 225:1,4 231:16 234:16 259:15

**line-level** 34:22

**lines** 116:10 119:4 121:12 153:16 198:4

**link** 73:10 164:11 166:7 263:9

**linkage** 186:21

**lips** 123:15

**list** 9:12,14 12:16 13:24 14:2,11 29:3 33:17 34:25 38:14 44:4,14 45:21 54:14, 25 55:1,9,13,17,23 56:1,13,16,17,18 57:12,20,25 58:13, 23 60:20,21,23 71:9 74:10 80:3,6,14,20

81:3,21 84:21 86:6, 22 88:4,8,17 89:7 90:4 95:8 96:15 105:12 118:5 120:12,23 125:1 135:15 139:8 167:3, 25 168:4 178:2 185:9,17,20 239:17

**listed** 10:12 14:11 19:24 21:1,4 26:20, 23 27:9 41:2,6 44:15 45:4,21 46:6 55:5,19 56:14 58:5 61:2 64:15,16 65:14 72:9 80:5 83:2 86:25 87:1 88:4,17 90:3,13 92:19 94:6,12 107:21 108:23 111:13 112:9 119:7, 15 120:4,14 151:13 157:24 158:9

**listen** 66:16,20 67:14 86:7

**listening** 89:3 207:25 208:15

**listing** 120:3 155:17

**lists** 19:4 21:19

**literature** 54:19 55:17 56:7,14 57:23 59:16 60:6 61:3 94:6 95:9 98:2,3,18 99:4,21 126:6 127:12,14 128:24 129:5 135:14,18,19 137:16 141:6,10 147:16 152:18 161:3,7,19 171:15,21 200:7 205:19 209:6

**litigation** 46:6,23

**little** 29:23 31:19 36:13 45:10 47:3 60:18 70:2,11 82:10

87:12 89:16 109:12 144:15 161:9,20 174:21 204:11 225:1 238:8 239:1 262:14 268:20

**liver** 72:14 226:23

**living** 153:15

**located** 246:22 247:3

**location** 43:13 119:18 155:7 191:25

**locking** 256:18

**logistical** 145:12

**logistics** 145:5

**long** 8:10,23 9:9 44:4 68:6 71:12 75:16 80:9,10 81:23 82:1,2 85:4,17,18 88:18 91:17 92:9 134:15 143:3 149:3 155:13 178:23 205:24 206:2 268:13

**longer** 60:20,23 71:23 95:12,14 104:10 148:5,10,23 159:5 174:14 243:23 256:6

**longest** 41:3,6,11 149:8 246:19

**look** 11:15 12:16 15:14,15 22:17 38:4 60:17 61:13,16,21, 23 63:6 64:24 67:2 68:3,5 70:13,24 71:3 72:3,10,11 73:14 75:13,14 85:3,19 95:11 98:13 101:4 115:3 138:10,17 155:11 162:12 163:7,8 173:7 179:16 180:21 187:11 188:2,18

**looked** 9:23,25 10:2, 11,15 14:17 57:16 58:8 59:1,19,22,23 60:1,2 70:2,3 86:12 95:22 96:7 105:6 109:14 149:11 153:2 172:8 173:3,10 188:25 196:13 197:10 221:11

194:13 196:6,12 197:12 204:11 206:19 209:8 210:13 211:5 219:24 224:1 247:5 250:7 267:11

**looking** 11:3 15:18 16:2,3 19:3 31:20 58:23 60:7 67:10 70:17 72:4 75:2 82:10 85:16 89:4,14 96:25 98:7 121:22 142:25 145:25 150:25 153:17 162:19 166:3,5,11 173:3,5 179:1 188:3, 7 189:24,25 193:7 194:14 202:12 206:7 208:23 209:12,14,19 210:16,22 211:6 213:1 215:3 221:12 223:14,23 225:2,8 230:3,19 233:2 267:13

**looks** 26:20 56:14 97:19 150:8 158:7 199:9 240:9 246:9

**lot** 15:5 23:5 25:20,21 37:7 40:21 43:22,23 44:10,11,24 50:23 53:2,3,13 67:20 75:2,24 76:21 77:12 87:15 100:1 101:23 199:22 242:19 261:1,3

**lots** 55:17 166:11 256:21 261:8

**louder** 78:14

**low** 211:23

**lower** 59:17 114:18

**LSD** 167:4,13 168:2

**lump** 127:6

**lumping** 242:13

**lunch** 103:2

**lungs** 72:14

**lymph** 123:15

---

**M**

**m-e-t-h-y-l-e-n-e-d-i-o-x-y-p-y-r-o-v-a-l-e-r-o-n-e** 60:4

**M.D.** 5:3 14:3

**main** 27:3,4,8,23 33:4 45:6 106:16 142:14 172:24

**major** 16:25 36:23 135:25

**majority** 10:17 11:2 43:15 50:21 98:9 167:12 216:24 226:10 241:21

**making** 6:4 23:21 78:14 169:22

**male** 244:6

**malpractice** 38:21

**management** 38:9, 16,22,24 39:9,22 40:12,18,25 50:23 53:13,14

**manifest** 162:10 250:23 253:1

**manifestation** 170:15

**manifestations** 165:18 170:20 254:14

**manifested** 219:6 257:14

**manual** 156:10,12

**manufacturer** 102:1, 9,15,20

**manufacturer's** 100:10,21,24 101:3, 12,20,22

**manufacturers'** 100:13

**mapped** 166:10,16,18 248:22

**marathons** 36:25

**Marcos** 29:18

**marijuana** 82:9,22 137:5,11,12,16,20 138:20

**mark** 13:19,20 86:24 157:16 193:23

**marked** 13:21 145:23 157:4 194:1

**marker** 177:22 250:13 251:16 253:5

**Mash** 59:19

**mass** 36:24

**match** 109:22

**material** 71:20 78:25

**materials** 8:8 9:3,7, 10,13,17,21 10:4,23 11:11 12:25 13:7,9, 25 14:11,15 16:8,11 17:18 54:14,17,20, 23 55:3,9,12,19 56:12,17 57:4,8,11

**manifestation** 60:14,21,25 61:4,10, 17,24 62:12 65:15 68:15,23 71:9 78:18 80:4,8,18 81:2,6,14 82:12,15 86:6 87:3, 4,10 88:4,17 89:18, 19 90:3,4 91:2,6 92:1,19 93:21 94:5 105:6 106:24 110:19 119:10 124:24 125:13 140:4 149:9 174:7 176:17 194:7 195:10 197:11 215:22 232:2 237:20 268:1

**math** 239:3 240:7

**matter** 35:25 76:5 79:23 85:19 223:3 266:14

**matters** 46:7

**maximum** 246:15

**Mcnaughton** 80:5

**mean** 15:19 29:16 31:17 34:23 44:22 50:22 52:12 63:17 70:8 90:22 111:14 122:5,8,14 123:11 144:6 151:15 179:13 188:2 189:9 190:9 192:8 196:24 199:23 200:11 204:21 210:12,25 223:11 250:11 251:4 266:11,14

**meaning** 28:6 63:10 69:2 87:24 169:23 179:12 203:13 210:5 211:3

**means** 196:24 197:1 210:12,15,24

**meant** 107:15 108:4, 5,10,12 168:4

196:17 197:3

**measurable** 248:6

**measure** 122:1
177:22

**measured** 149:2
257:25 258:3,4

**mechanical** 79:16,19

**mechanism** 146:22
225:7,13,20 226:5,9
227:3

**mechanisms** 170:19

**Med** 44:10

**med-mal** 240:16,19
242:13

**medical** 19:12,13
20:1,15,16,18,25
21:4,10,17 22:25
23:8 24:24,25 25:9,
16,19,20,24 28:11
29:3,13,14,15,19,20,
21,22,25 30:10,12,
21 31:6,8,9,12,15,20
32:7,16,18 33:14
34:6,9,12 35:2,3,17
36:8,10,21 38:15
39:8,18 41:5,20,21
42:2,8,13,15 52:4
54:19 56:7,13 57:11,
23 58:9,10 61:2
63:12 72:9,14,17
81:21,22 82:19 83:6
85:2 94:5 95:9 98:2
100:16 103:25
123:10 136:23
137:2,10,15 138:14
140:3 141:17 147:16
155:20,23,25 158:21
159:20 162:11
163:10 173:1,2,10
202:15,16,17 211:7
217:25 218:12,19,22
220:3,13 224:23

225:24 232:1,16
233:7 234:12
240:14,21 241:2
242:13,19,21 249:11

**medically** 139:11

**medication** 43:6

**medications** 31:24
100:16 115:3 140:9
233:4

**medicine** 19:21 20:7,
10 21:17,20 22:1,8,9
23:2,23 24:7,17 25:1
27:5,7,14,15,25
33:6,19,23 34:20
35:3,8,9,16,17,19,23
36:7,9,11,15,20,22
37:3,6,17,25 38:3,5,
10 39:7 40:14,19,21
41:10 43:17 45:2,12
50:15,18,22 51:9,13,
19 52:6,8,19,24
53:8,17,21 85:17
155:11

**meds** 200:19

**meet** 224:15

**meeting** 8:10,12,14,
18 10:20

**meetings** 43:21,23
44:10

**meets** 244:8

**member** 75:21
139:25 169:23

**members** 74:15 84:5
157:24 158:3,9

**meningitis** 129:4

**mental** 136:15 166:12

**mention** 15:6 136:3

**mentioned** 11:11
45:20 174:18

**mentor** 44:23

**mere** 53:5

**merely** 143:22

**merit** 40:3

**met** 8:8 39:5,15 40:3
262:22

**metabolic** 170:18
171:7,11,17,25
172:1,13,14,17,19,
21 173:7 225:11
226:25

**metabolism** 165:23

**methamphetamine**
131:6 167:2,5,13,19,
20 168:2

**method** 231:19

**methodologies** 91:19

**methodology** 61:8,13
77:1 87:14 97:16
149:5

**Miami** 153:17 154:1

**Michael** 5:3,13

**microphone** 249:23,
25

**mid-august** 238:18,
22

**middle** 122:11 146:1
213:6,9

**mild** 222:19

**million** 244:9 265:16,
22 266:12

**mind** 17:2 57:18 79:1
109:9 110:18 211:25
212:2

**mine** 11:19 109:19
110:12 194:15

**minimal** 248:5

**minimum** 93:21
151:20 238:5

**minority** 38:25 43:8

**minute** 130:3 180:21
268:7

**minutes** 9:1 10:21
71:15,18 88:20
145:5,11 256:5
257:23 258:6,12
266:14,22 267:16

**mirrors** 77:12 261:5,7

**misbehavior** 179:24

**missed** 165:6

**missing** 87:6 206:15

**mission** 27:19

**missions** 28:6

**mobile** 42:21

**mode** 78:12 147:5,6
191:25 246:21

**moment** 6:8 62:1
81:11,17 112:6
122:11 182:2

**moments** 192:1

**MONDAY** 5:1

**money** 50:6

**month** 47:8

**months** 18:25 26:16
82:12 192:13

**morality** 233:5,8

**more-likely-than-not**
235:5,17

**morning** 264:20

**motorist** 215:11,18

**mouth** 237:14

**move** 21:11 75:1
177:1 187:16,17

Index: measurable–move

**Gary Michael Vilke, M.D.**

191:23 192:3

**moved** 167:19 171:7 175:8

**movements** 70:10

**moving** 69:21 95:13 174:19 260:24

**multi** 141:19 142:7 146:24 147:1 149:21 226:21 228:13 237:3,6 254:9 261:22 262:1

**multifactorial** 158:20

**multiple** 86:1 104:3 113:3 128:17 142:11 197:25 252:8 256:8

**multiples** 242:2

**multisystem** 225:14 234:20 235:20 236:9,18

**muscle** 147:12,13 247:13 248:3,4 252:25 253:1,10 256:14,17

**muscles** 147:7 248:4 254:9 256:18,19

**muscular** 247:19

**myocardial** 231:1

**myoglobin** 250:23 253:10,13 263:13

**N**

**name** 5:12 135:25 182:10 200:13

**names** 206:2

**narrative** 150:14

**nascent** 155:10

**National** 21:4

**nationwide** 25:25

**natural** 245:20

**nature** 26:1 28:19 30:25 31:15 52:19 76:5 81:5 97:15 120:17 169:6 177:8, 9 242:17

**necessarily** 37:9 42:25 44:20 58:18 60:8 67:14 75:1 107:22 108:1 123:19 162:17 184:16,21,23 196:11 197:25 199:9 213:5 216:13,20 262:11

**necessary** 112:5 208:13 210:18,24 211:15,19,20 219:4

**need** 12:25 13:4,6,15, 17 32:11 41:20 42:14 43:1,2 58:17 60:2 62:9 82:6 85:19 114:6 121:9 122:10 134:5 169:3 201:25 202:1 203:22 210:4, 8 218:12 220:2 223:8 233:15 266:25 270:4,6,7

**needed** 115:3

**needing** 109:22

**needs** 43:2

**negative** 115:17 124:5 130:23 134:20 137:23 154:16 170:2 234:11

**neither** 135:4 139:10 175:10 264:17

**nephrology** 125:3

**net** 48:21 50:9

**neurologist** 23:6

**neurologists** 25:6,17

**neuropsychiatric** 59:21

**never** 100:14 230:10 232:18

**new** 49:18 120:20 237:11,12

**nice** 92:9

**night** 8:9 70:1

**node** 123:15

**noises** 78:15

**non-agitated** 181:22

**non-law** 241:20

**non-testimonial** 237:21

**non-toxicological** 125:15

**noncompliance** 185:15,19

**noncompliant** 180:14 185:24

**nondrug-induced** 125:17

**nondrug-related** 125:15

**nonmedical** 159:21

**nonpsychiatric** 156:15

**norm** 43:7

**normal** 162:25 184:2 219:16,18 220:7 252:16 254:18 255:2 261:20

**North** 29:4,7,10 50:2

**notation** 14:5 140:4 260:14

**notations** 65:7

**notch** 63:5

**note** 65:9 73:2 141:1, 2,5 245:20 247:5 250:7 252:11 254:17,19

**noted** 37:10 70:17 71:4,5 72:18 73:9 112:13 119:17 124:6 126:21 128:1 129:9 130:6 131:9 143:2 186:13 187:23 190:9 193:5 251:3,17,20 252:15 254:18

**notes** 85:18 86:1 113:1

**NOVEMBER** 5:1

**novo** 16:6,9 73:19 84:13 87:16

**number** 5:20 14:2 26:16 28:21,22 29:10 35:6,10 37:17 38:8 42:3 46:24 49:15 51:2 65:14 71:10 74:10 75:22, 25 82:12 88:22 93:13 94:7,10,12 95:23 102:22 105:19,23 106:13 111:3,4,13 112:9 117:12 118:12,13, 23,24 119:3 123:9 125:2,14 142:14 151:4,14,20 152:1, 21 153:10 179:3 193:24 202:1 242:2, 8 251:18 257:2 265:2 266:14,21

**numbered** 55:23 118:12 142:18,25 158:6

**numbers** 28:7 47:16

Gary Michael Vilke, M.D.

48:4,6,10 49:5 50:9 75:24 78:24 85:23 153:19

**nurse** 42:22

**nursing** 86:1

**nutrition** 252:3

**nutshell** 22:10

---

**O**

**oath** 5:5

**Object** 254:5 261:2

**objection** 228:19 247:21,24,25 249:16 251:7,8,9 262:8

**objective** 62:1,25 63:8,15,17,20 64:1, 4,7,10 77:2 78:3 89:19 92:5,13 107:13 177:15,18,24 179:19 206:18

**objectively** 62:16 91:22

**oblivious** 69:3 215:22 261:14

**obliviously** 215:4

**observable** 154:24

**observations** 193:6

**observe** 122:1,4 218:11

**observed** 119:19 182:17 193:2 215:11 218:20

**obstetrics** 22:13

**obstructive** 192:3

**obtain** 42:16 186:7

**obtained** 19:7,12

**obtaining** 72:2

**obvious** 172:21 218:17

**obviously** 17:8 22:12 37:17 38:6,11 44:1, 19 63:19 65:1 68:14 71:24 75:23 78:8 91:10 112:24 176:14 179:22 187:8 188:16 190:10 192:5 213:20 223:18 230:10 243:11 248:9 257:17

**occasions** 241:6

**occur** 147:13 163:16 219:10 240:18 250:20 254:4

**occurred** 121:8 182:17 188:24 192:25 231:20 255:16

**occurrence** 261:13

**occurring** 94:2

**occurs** 155:13 248:5 252:22

**Oceanside** 29:18

**odd** 260:14

**offer** 16:9 101:17 129:20

**offering** 102:14 150:18

**office** 44:9,12 49:14 71:9,13 156:21

**officer** 66:2 75:2 175:10 180:14 181:19 182:22 193:3 240:12,21,24 241:4 242:15 255:21,25

**officer's** 65:24

**officers** 9:25 74:14

106:2 140:12 142:22 185:1,6 191:1 227:13 240:1 241:23 250:25 253:4 255:8, 11,18 266:3 268:14, 15

**offline** 44:11

**Oh** 88:20 195:4 212:15 249:15

**okay** 5:18,22 6:3,9, 10,17,18 7:7,9,10, 19,20 8:14,17 9:21 10:4,10 11:25 12:13, 19,21,24 13:3,20 14:2,5,9,19,24 15:10 16:7 17:1,8,18 18:1, 4,14,20 19:3,16 20:18,24 21:19 22:22 23:7,18 24:6, 16 26:8,15,18,24 27:9,13 28:15,24 30:4,9 32:1,16,23 33:3,16 34:25 35:14, 21,25 36:13 37:12 38:2 39:23 41:2 42:3,11,25 46:12,16, 22 47:25 48:7,11 49:1,6 50:4,14 51:11,17,21 52:23 53:5,24 54:6,8 55:21 56:11 58:2 60:20 61:7 64:15 65:19,23 66:4,9,15 67:6 74:3, 9 76:3 79:11,15 81:1 84:8,15 88:3,16 90:1 92:18 93:6,11,20 94:18,23 96:10,17 97:10 102:7,24 103:18 104:16,25 105:5 106:5,11,19 107:7 108:15 109:11 110:25 111:9 112:2 114:1,14 115:7,20 116:7,14,25 117:11,

20 118:2,12,22 125:10 127:10 132:25 137:2,9,15 138:5 139:7,11,18 141:13 142:25 143:9,23 144:9,17 146:15 147:22 148:2,9 149:6,12,18 150:3,10,23 151:2, 12,19 152:5 153:23 154:3,18 156:9 157:1,16,22 158:25 159:4,14,19 160:4,8 166:20 167:9,20 168:12 169:3 171:20 174:23 181:5 182:6 183:6,24 184:18,25 185:17,22 186:14 188:12 192:23 194:5 195:4,7 197:2 198:2, 14 206:6 210:21 211:22 212:3,8 214:4 215:17 217:23 219:1 221:11,22 224:3,20 229:10 234:16 237:11,15 239:10,17 240:17 241:8 244:17 245:2 246:25 247:9 248:2 251:2 255:22 257:1, 25 258:19 263:8 264:24 269:14,21

**old** 59:13 62:8 83:3 102:23 107:25 192:9

**older** 141:10 171:21

**on-scene** 32:21

**on-site** 43:20

**once** 25:20 66:20 67:4,6 120:2,11 121:8 150:24 226:1, 22 228:10 229:7,10 257:21

**once-in-a-while**

100:3

**One's** 189:14

**one-year** 24:23

**ones** 59:1 60:10 66:25 67:2 81:19 96:2 102:5,22 111:25 148:21 208:3,8,17

**ongoing** 20:8 25:10, 13,21 53:14 260:13

**open** 91:11 238:10

**open-ended** 42:25

**operate** 53:12

**operation** 78:22,23 79:21

**operations** 33:18 34:2,3,4 79:19

**opine** 93:17 111:17 112:18 162:7

**opined** 84:16 140:21 173:12 201:5

**opining** 87:19 152:12 173:11

**opinion** 11:22 16:1 79:4,8 84:19 93:12, 16 99:5 102:6,14 103:24 104:1 108:1 109:15 110:6 111:3, 7,12,13,15,17,18,24 112:8,11,21,23,24 113:16,17 115:5,13 117:10,20 118:1,5,6, 13,20,23,24 119:7, 19 124:2,10,13,14, 18,21 125:19 126:5, 17 127:16,23 128:15,16 129:6,7, 14,19,20 131:24 132:1,6,19 133:7 134:22,23 135:8

136:7,9,18 141:21, 23 142:14,19 143:1, 6,7,11 144:3,15 149:18 151:3,20 153:23 154:4 164:9 168:7,18 172:14 173:18 178:7 179:23 180:1 201:25 205:10 213:23 214:16,17 227:25 233:16,17 235:16 236:2,7,16 241:13 242:23 243:1,15,18,22,25 244:14 247:18 248:11 249:18 253:17 255:22 259:6 260:2 265:6,9,20,24 266:16,17 267:3 268:7

**opinions** 11:6 16:9, 12,16,18,21,22 17:4, 5,6,13 56:24 57:24 58:3 62:21,22 65:5 67:16,19 68:24 69:16 72:1 74:5 76:13 77:9 79:22 81:14 83:7,17,20 86:15 87:7,16 89:9, 24 90:2,8,16,20 91:9 92:2 96:11 103:6,15 104:6,16,19 105:1,9, 17 106:5,8,10,12,16 107:2,5,23 108:8,11, 12,16,18,23 109:1,4, 7,8,13,16,19 110:14, 16 111:1,6,9,21,22 112:1,8,22 113:5,7, 10,18,22,24 114:4,6, 12,21 116:2,4,5,11, 22 117:6,10 121:16 143:20 144:2 147:18,20,21,24 150:18,19,22,24 169:7 194:7 242:25 243:7,12 246:10

247:3,8,10,11,12,23 249:10 250:12 251:5,10 252:18 257:6 260:8 265:1

**opioid** 82:20

**opioids** 139:6

**opportunity** 234:9

**opposed** 20:15 45:25 65:3 67:8 176:18 187:7,14

**opposite** 209:22 224:18

**optimize** 233:6

**Optimized** 80:16

**oral** 22:3

**order** 42:20,21,22,23 43:11 63:9 101:4 154:15 201:21 202:3 270:3

**ordered** 191:12

**organ** 113:3 141:19 142:7,11 146:24 147:1 149:21 225:14 226:21 228:13 234:20 235:20 236:9,18 237:3,6 261:22 262:1

**Organization** 156:3

**organized** 148:22

**organs** 226:23 227:1 228:2,10 229:12 254:9

**orient** 65:3,6

**origans** 228:6

**original** 38:5 256:6

**originally** 38:20 77:4 252:20

**others'** 176:13

**outcome** 234:11 235:4 267:2

**outcomes** 57:4 231:6,13

**outset** 225:2 238:18

**outside** 16:15 24:23 38:2,9 40:4 43:7 62:8 78:5 90:12 91:1 121:14 153:10

**over-the-phone** 31:13

**overactivity** 253:22

**overall** 112:8 126:19

**overdose** 158:20

**overdoses** 159:10

**overlap** 28:5,11 52:20 67:20,22 68:15,18

**overlapping** 76:16

**overlooked** 15:9,13

**overly** 7:23

**overproduction** 165:22

**oversee** 34:6,9,11

**overseeing** 31:8 32:17

**oversight** 31:20

**oversimplifying** 27:1

**overt** 170:19

**overview** 32:24 104:12,15 105:16,17 106:14,23 107:1,8,9 109:14 111:6

**owe** 48:20

**ox** 176:2 177:20

**oxygen** 77:20

Gary Michael Vilke, M.D.

Todero vs.
City of Greenwood

---

**P**

**P-A-Y-N-E** 59:12

**p.m.** 145:13 212:22 252:12 254:17 270:9

**Pacific** 212:19,20

**package** 159:11

**page** 6:1 7:4 13:23 17:23,25 18:8 19:3 21:9 26:8,9 52:1 54:12 59:10 75:9,14, 15 85:22 103:9,10, 11,23 104:11,22 105:1,5,13 106:20, 22 107:16 111:2,4, 11 112:12 117:1 119:13 141:15 142:17 146:1,2 147:3 150:25 151:9 157:22,23 158:6,7,8, 9 160:15,16 167:9, 10,11 168:13,14 170:9,10 173:20 178:2 179:2 185:7 195:7,25 198:3,4,15 202:13,14 203:24 206:10 212:25 216:7,8 217:23 221:6,12 224:20,25 231:15 234:16 237:19 239:19 246:9 248:14 250:6

**pages** 55:14 74:24 75:22 80:23,24 85:2, 5,12,22,23 86:2,5,11 105:10 113:25 158:7

**paid** 45:5,14 46:7,8, 10,18 244:17,22,25

**pain** 186:14,16,21 187:4,13,14,16,18 207:1,20 208:5,20 209:4

**paint** 107:10,15

**pale** 120:16

**paper** 13:7 29:21 59:4,17 144:24 145:8 157:3,6 158:2 159:2 170:9,11 270:4,8

**papers** 18:16,18,23 51:3 56:19,25 148:25 149:4 152:2

**paragraph** 103:14,16, 18 112:7,10,14,17, 20 114:15,21,22 115:13,20 116:7,12, 14,18,21,25 117:7, 11,14,22 118:4,6,17 119:13 120:5,22 121:17,19,21 122:25 123:8,25 124:1 129:22 131:16 132:9 133:5 141:14 142:5 143:1,5,13,21,23 144:2 146:1 147:2, 19 148:3 149:12,23 150:4,9 151:3,7,13 158:10,12 159:1,20 160:17,20 161:1 168:13,16,24 173:21,22 174:24 178:1,4 179:2 185:7

**paragraphs** 106:18, 21 108:12 112:23 113:7,8 114:7,9

**paralegal** 270:5

**parallel** 174:11 181:13 194:15

**paramedic** 9:24 41:18 77:18 187:23 189:14

**paramedics** 41:19 42:2 62:14 173:25 175:19 185:1,6

**paint** 107:10,15

**parcel** 259:6,8

**parentheses** 60:5

**parse** 68:12 124:16 129:15 169:12 210:11 223:2 236:5 240:18

**part** 10:8 13:17 17:3 21:11,16 28:8 31:22 32:9 33:1,9,10 36:22 43:20 46:3 56:22 57:1 63:25 68:10 74:1 75:10 77:22 86:17,18 87:5,10 94:2 99:23 101:1 106:17 109:6 114:25 132:22 135:10 136:13 139:19 159:11 163:11 171:2 172:7 184:7 185:3 188:19 196:7 203:2 216:3 220:4 237:16 238:3 243:4 259:2,6, 8 266:23 268:16

**partial** 268:10

**participated** 37:8 245:12

**particular** 9:17 21:15 28:2 31:16 35:15 40:1,6 71:4 80:1 127:23 138:22 168:24 206:24 207:5,6 209:17 211:9,10,18,19

**particularly** 37:15 62:5,13 63:9 72:12 77:8 85:20 87:6 89:18 224:5 256:22

**particulars** 23:11

**parties** 44:2

**parts** 9:25 10:1 60:8

186:7 220:17 223:4

**parcel** 259:6,8

**parentheses** 60:5

65:24 71:18,23 75:3 83:20 92:11 111:16 204:20

**pass** 22:3 23:15,25

**passage** 41:24

**passed** 41:23

**passing** 11:6 23:9

**passive** 191:2,4,6

**path** 118:23 227:3

**pathophysiology** 116:8 158:15 166:10,15,18 170:11,13 224:22 248:22

**paths** 110:3

**pathway** 116:15 172:3

**pathways** 165:21

**patient** 23:12,14,16 24:1 34:14 62:4 163:8,18 176:23

**patient's** 24:3

**patients** 22:10,16 23:3,5,9,10 27:18 30:15 40:20 53:3,13, 14 159:22 176:23 245:21 259:12

**pattern** 62:10 70:4,6, 11,14,17 138:21,22 164:17 260:9,18

**pause** 54:2 124:9

**pay** 45:16 46:19 238:4

**paycheck** 45:11,15, 25

**Payne-james** 59:12

**pays** 50:10

---

**PCP** 131:5 137:20,23 138:2,4 167:4,13 168:2

**PDF** 158:7 160:15 270:5

**pedestrian** 261:18

**pediatric** 51:24

**pediatrics** 22:12

**peer** 40:4 147:16

**people** 22:19 44:23 66:13 68:17 70:24 91:13 112:5 115:21 140:11 153:3 161:16 164:17 177:4 180:13 185:24 188:17 189:23 199:22 200:9,24 202:11 205:24 206:3,24 216:15 218:15 220:7 222:19 229:9,10,17, 24 230:13,19,21,22 231:3,4 234:7 256:21

**perceive** 172:16 184:6 188:13 218:11,22

**perceived** 172:6 175:4 219:5

**percent** 47:14,18,23 48:11 50:12 233:5,8, 25 241:22

**percentage** 47:20 239:25

**percentages** 241:21

**perception** 184:7,9

**Perfect** 54:5 270:1

**perform** 45:21

**performed** 124:5 130:23 234:7

**period** 50:24 139:21 164:25 180:22 192:7 258:18,24 266:4

**periods** 155:13

**permitting** 13:8

**persistent** 257:18,22

**person** 7:14 48:20 119:18 120:13 130:15 131:12 134:18 153:15 154:13,24 177:3 193:15 230:9 231:8, 9 232:10 260:19

**personal** 130:15 150:14 159:21 171:16

**personally** 50:11 90:19 141:7 149:6

**personnel** 74:14 159:21 176:7

**perspective** 15:2,16, 21 30:20 57:19 61:13 68:2 72:14 83:11 106:24 117:15 123:10 177:23,24 194:13 224:1 253:3

**pertaining** 54:23 55:4 56:12 57:9

**phenomenon** 189:16 216:17

**phone** 44:12 215:4

**photographs** 113:20

**photos** 71:10,13

**phrase** 123:5,7 133:1 201:5 203:9 220:10 225:12

**phrased** 151:6

**phrases** 205:21

**phrasing** 200:25

**physical** 43:13 104:2 191:16

**physically** 8:25 43:16 44:5 232:15

**physician** 19:25 22:4 23:24 25:8,12,22,25 27:6 38:22 39:6 41:4,15,24 42:20,23 43:2,10 52:9 74:13 169:15

**physicians** 25:15,18 42:4,7 62:15 157:6 159:20

**physiologic** 37:19 57:16 58:10 59:5,8 79:2,18,25 94:11 147:4 165:6 228:4 259:21 267:2

**physiological** 104:5 153:12 165:2,5,10, 25 166:1 204:6 234:18 235:18 245:16,18 259:19

**physiologically** 256:24 257:20 259:5

**physiology** 227:19 257:10,21 258:22 259:2,11 264:8 266:7

**pick** 218:7 220:5

**picked** 125:25 218:18,23 219:9,15 220:1

**picture** 107:15 186:4

**piece** 55:18 67:14 70:5 84:18

**pieces** 90:15 108:3 109:20 130:18

**pile** 121:10

**pillars** 27:21

**place** 76:24 183:16 192:17 241:8

**placed** 5:5 173:24

**places** 117:2 119:16 120:12 153:22 248:15

**plaintiff** 5:4 241:3,11 242:10,15

**plans** 269:25

**plausible** 244:10

**play** 32:13

**played** 234:20 235:20 236:2 266:20 267:12

**playing** 131:8

**pleadings** 55:25

**please** 5:11 7:2,18 32:2 55:6 66:18 94:24 102:12 133:3 211:16

**plenty** 230:3

**plus** 140:14

**point** 6:25 7:15 13:6 15:15,19 16:1 22:18 38:24 41:7 52:18 61:17 70:11 80:25 97:5 98:17 112:11 134:3 137:24 138:11,13 140:2 155:15 162:14 171:14 175:13 180:9,12 182:4 223:3 227:14 238:15 252:10 260:18 262:12 267:22 268:14

**pointed** 128:14 130:13

Gary Michael Vilke, M.D.

points 158:17 165:20

police 61:18 62:14 63:12 74:14 79:12, 14 80:6,15 175:10 178:9,12 180:1,14 181:19 185:14,19,24 201:21 216:14,16,25 226:13 227:16 229:1 231:17,19,20 232:3, 7,13,22 234:21 235:15,21 236:7,14 240:2,21 241:15 250:16,18,25 252:5 253:18,20 259:17,18 260:7 262:20,21

policies 30:1 31:20 32:5 34:10 36:18

POLLACK 53:25 54:8 157:14 195:4 211:25 212:3,10,19 246:6 248:13 249:19 269:13 270:6

pollices 29:24

poor 199:8 252:3

poorly 170:14

population 230:1,13

populations 229:21 230:19

portion 37:4 50:11 76:11 85:20 142:16 150:12 151:2 175:25 196:1 215:15,19

portions 64:18 153:18 198:25 204:24 221:11

position 20:15 23:9 28:3 32:23 33:4,5,21 35:1,5 38:15,19 39:25 41:2,3,6,11 42:12 45:6 51:16 68:4 70:24 71:7

173:24 174:15,20,21 206:2 242:24

positions 28:20 45:1, 5,13 51:18 68:7 70:24 71:7 206:1

positive 34:16 154:16 169:18

possibilities 125:1 129:21 131:7 231:6 233:19

possibility 97:6 159:12 168:21 169:22 172:2 231:24 269:6

possible 13:6 99:11 141:5 145:9 157:10 181:4 182:16 212:17 224:5 231:13 232:21 235:4 244:9,11 254:11

Possibly 235:7

postdates 190:11

postmortem 153:16, 21,24

potassium 77:15 105:24 142:20 144:4,9,12 228:25 253:16 254:17,19,24 255:2,3,5,9,14,24 256:12

potential 20:8 39:18, 19 42:18 72:11 73:11 84:7 89:3 127:13 128:7,17,24 129:15 135:12 140:6 163:17 170:16 171:3 172:15 184:19 217:19 248:10 263:2 264:1 267:15

potentially 39:13 57:5 73:8 147:13

171:8,23 187:3 244:25

Powers 28:10 29:4,7, 12 31:7,17 36:17 50:2

Poynter 80:5

practical 35:25

practice 21:17 23:8 26:6 34:21 40:19,23 52:4 66:22

practices 30:2 79:14

pre- 39:13

precipitate 124:7 130:7 131:10

precise 177:7,9

predate 250:18 255:20

predated 250:25 253:3 255:7,10,17, 20

predating 182:22 229:1 252:1 265:12, 15

predefined 205:25

predict 235:12

predisposed 172:2

predisposing 226:24

preexisted 180:1

preexisting 72:22 228:20

prefer 8:1 269:18

prehospital 30:24 36:18 84:22

prelitigation 39:13

preparation 8:23 9:6 12:3 14:15 71:14 174:8,9 238:1

prepare 8:5,11,20 9:10,18,22 10:5,13 11:1,12 194:7

prepared 12:15,24

preparing 12:4 20:9 47:3 55:22 60:15,16 61:8 75:18 237:20

prescribe 31:23

presence 210:14

present 26:21 41:8 44:5 117:19 127:3 132:4 144:5,13 151:22 152:9 153:11 155:5 159:20 161:23 163:5 170:1 171:23 206:23 208:25 209:10 213:13 254:21

presentation 77:13 111:18 115:24 117:9 126:20 127:25 129:8 132:5,11,16 134:23 154:11 162:25 163:9,24 164:4,7,15 171:13 173:9,16 227:20 257:10 264:8

presentations 153:2 161:24

presented 163:1

presenting 112:25

pressure 71:2 77:21 176:3 186:7 223:6

pressures 65:8

presumably 200:6

presumed 138:9

presuming 246:22

presumption 137:18 246:11

pretty 23:2 74:7

**Gary Michael Vilke, M.D.**

99:16 204:9 225:9 249:3

**previous** 11:13 37:23 74:13 83:9,24 116:17 139:16 140:8 164:15 172:17 183:2 221:8 241:18 254:13 260:10

**previously** 11:7,8 37:13 56:21 57:1 84:7 109:23 141:24 157:10 190:16

**primarily** 114:7,15

**primary** 23:23 27:18 33:5 95:16 164:21 165:17 172:1 227:9

**print** 13:9

**prior** 12:4 14:10,20 61:5 83:6,17 84:17 88:13,14 109:5 136:22,23 137:9 138:5,15 139:3 171:21 178:8,16 179:9,15 180:5,17 182:8,12 183:15,18 186:12,15,17 187:25 188:8,13,24 189:4,6, 20 190:4,6 192:6,13, 17,22 193:3,7 226:13 227:4 230:20 235:15 253:18,21 254:15 257:15 262:25 264:4

**private** 26:6

**privy** 89:20

**pro** 78:12

**proactive** 36:24

**probably** 6:19 8:25 9:11 15:14 18:16,17 22:16,21 28:13 30:17,20 41:19

42:18 43:7 44:25 47:14,16,24 58:16 60:17 78:15 80:12 89:12 96:22 97:2,3 98:12 99:8 102:6 104:22 107:24 122:10 142:2 144:7 153:7 167:8 197:9 211:3 212:6 218:7 227:20 231:22 239:8,24 240:4,15 243:6

**probe** 147:5,6 246:21 247:2

**probes** 147:6 246:11, 21,23 247:15,18

**problem** 49:12,17 122:12

**problems** 39:19

**procedures** 31:20 32:5 34:10 36:19 79:12

**proceeding** 7:13

**proceedings** 215:19

**process** 21:16 40:5 53:6 58:2 75:8 77:1 97:13 165:25 191:21 200:17 237:3

**processes** 25:8 165:5

**produced** 157:10

**professional** 36:2 37:5 47:15,19 218:22 243:25

**professionals** 211:8 218:19

**professor** 27:5,13,14, 24 33:5 41:7,9 45:2, 12

**professors** 27:17

**professorship** 33:12

**program** 20:6 44:24

**progress** 97:7 170:22

**progression** 166:11 245:16,18

**progressions** 165:7

**prolonging** 267:20

**prong** 222:2,5

**pronounce** 5:17 43:9

**pronouncement** 43:8

**propensity** 166:13

**properly** 7:1

**prophet** 213:7,11 217:15

**proposed** 261:5

**prose** 108:6 114:9,11

**prospective** 32:4

**prospectively** 153:3

**protect** 63:11

**protocols** 5:25 29:23 36:18 42:19 43:3 44:1

**prove** 261:9

**provide** 11:6 13:16 21:14 48:6,19 242:20 262:4

**provided** 8:8 9:4,14 13:11 14:7 30:12 32:12 56:2 61:1 65:10,20,21 83:16 87:4 89:11 90:6,11, 14 125:13 157:8 238:15

**provider** 23:16

**providers** 28:10 30:6, 7 32:6,18 36:18 42:13 135:24 266:8

**providing** 31:8,12 32:7 110:6 113:15 217:4

**provision** 30:10,21 31:1 32:17

**prudent** 39:2

**psych** 164:21 200:20

**psychiatric** 51:1 127:2,5,9,10,19 128:5,9,20 129:17 130:1 133:11,18 134:2,7,11,13 136:1, 9,11 140:8 141:4 156:12,13,14,17,19, 24 158:21 163:15 164:3,20 165:4,13, 16,17,25 166:1,8 168:8,11 170:17,18 171:5,6,9 172:25

**psychiatrically** 233:2

**psychiatrist** 156:20 200:18

**publications** 51:3 56:19 225:3

**publish** 18:16

**pull** 58:20 96:3,5,8 145:7 246:13

**pulled** 59:6,10,14,17 76:19 92:25 157:11 167:21

**pulling** 60:7 96:1 238:16

**pulls** 93:5,13 96:6,9, 12,16,20 98:11 101:11,23 268:19,24

**pulse** 176:2 177:20 189:6

**purchase** 31:24

**pure** 12:12 197:23

Index: previous–pure

**purely** 114:22 242:14 266:6,25

**purest** 180:7

**purports** 129:15,19

**purpose** 16:21 17:2, 11 39:24 87:2,5 89:10,11,17 98:25 101:2 103:19

**pushed** 39:21

**pushing** 101:7

**put** 16:13 20:6 22:21 28:14 37:17 44:17 49:15 50:6,8 65:12 72:25 73:15 78:25 79:20 81:18 84:12 107:9,20 108:6 111:23 123:18,21 125:6 134:5,14,16, 20 136:17 140:15,24 142:9 152:2,20 156:12 159:12 186:3 191:12,13,14,15 200:13 206:8 219:20 239:6

**puts** 113:4 228:23

**putting** 17:7 41:19 71:2 131:15 177:20 219:23

---

**Q**

**qualified** 191:16 235:24

**qualifiers** 106:17

**qualify** 234:3 241:16

**quality** 7:23 30:2 31:21 36:19 203:17

**quantum** 201:25

**quarter** 54:3

**question** 6:13,17,21, 24 7:1,2,3,7,9 25:22 30:18 37:11,23 38:4, 6 55:6,11 76:4 90:10 91:17 94:24 96:14 120:9 122:7,11 127:15 128:12,13 135:5 170:25 178:23 188:6 195:17,20,23 196:10 197:15 198:6,16 199:4,5,9, 12,15 202:19 203:1, 15 204:1,5 206:11, 18 207:7 210:10 213:3,8,13,22 216:15,19,23 221:13,18,22 222:4 223:11 225:5,12,17, 20,23 231:17,24 232:13 234:17 236:14 241:19 247:8

**questioner** 7:24

**questioning** 222:17 259:15

**questions** 6:4 182:9 203:18 211:4 212:9 221:3 245:23,25 246:2,7 249:20 250:5 257:1 263:20, 24 264:24 269:11

**quicker** 30:19

**quickly** 71:16 253:1

**quite** 241:17 249:1

**quotations** 11:22

**quote** 11:17 112:13, 15,19 114:16 142:9, 10 143:3 159:22 167:11

**quotes** 11:19 114:7

**quoting** 113:10,16 143:9,10

---

**R**

**R-A-S-** 87:15

**R-A-S-H-T-I-A-N** 87:15

**radiation** 101:6

**radio** 31:11 86:6,7

**raise** 253:2 256:12,25 257:13

**ramped** 248:25

**ramping** 163:24

**ramping-up** 164:25

**ran** 8:12

**randomize** 229:23 230:2

**randomized** 230:1

**randomizing** 230:8

**range** 74:12,16 127:13 128:24 129:17,20 141:8 153:6 155:18 254:18 258:8,11

**rapid** 119:5 122:2,25 188:4,13 229:4

**Rashtian** 86:24 87:15

**rate** 119:5 122:2 123:1 167:8 177:18 189:2,4 192:5,9 214:15 228:10 229:4 233:5,8 239:14 251:3,16 257:16,18, 22 258:3,17,25 259:23 260:21 262:19

**rates** 201:12

**re-review** 58:5

**re-reviewed** 174:9

**re-reviewing** 75:17

**reach** 57:24 67:16 81:14 90:16,20 108:8 110:15 151:22 152:7 155:4 163:12 173:5 193:12 198:25 209:10,19

**reached** 69:16 104:12 106:6,12 109:13,16, 18,19 110:2 124:20 126:17 129:6 141:22 143:6 164:9

**reaching** 83:6 110:16 114:5 115:12

**reaction** 78:11

**read** 11:25 15:1 55:17 58:7,11,20 60:11 64:19 65:1 71:16,23 74:25 75:5,15 80:11 82:2 85:11,16 87:18 101:22 102:3 106:3 127:24 128:7,14 130:20 133:1 158:23 159:7 160:2 161:4, 10,11,12 167:15 170:23 171:1 198:12,13,22,25 204:24 206:6,9 207:15,25 208:15 214:2 222:7 224:24 251:13 261:11 269:15,17,19,22

**reader** 269:18

**reading** 60:8 75:16 85:18 217:20

**readings** 144:1

**reads** 158:14 160:20

**reality** 6:21 136:16

**realized** 196:14 197:11

Gary Michael Vilke, M.D.

**really** 15:1,8 34:3 38:22 43:20 48:10, 21,25 49:20 64:21 71:5 72:13 89:17 98:11 107:10,15,19 116:5 137:7 168:20 189:24 217:13 223:2 248:11,21

**reask** 55:6

**reason** 6:5 87:11 98:10,12 99:25 128:10 134:16 191:17 222:17

**reasonable** 10:24 47:16 75:13 103:24 112:4 116:20 152:22 238:20

**reasonably** 194:15

**reasoning** 98:7

**reasonings** 98:13 194:16

**reasons** 98:16 109:10 110:4 180:13,15 186:4

**recall** 10:13,17 11:3 58:23 60:10 65:19 66:10,11 69:1,7,20 80:21 81:4,8,11,13 82:3,11,13,15 83:3 85:17 86:13 88:5 91:24 92:1,3 96:5 101:23 102:8 139:2 169:2 174:3,12,17 175:17,18,21,24,25 176:6,10,11,12,13, 15 180:19,25 181:3, 9,14,15 182:4 188:3, 22 189:1,3,18 191:2 194:10,11,17 197:16,20,21 216:2, 6 223:24 224:7 241:7 243:7

**recalls** 91:14

**recap** 10:19

**receive** 50:11

**received** 24:14 80:18 195:15

**receptor** 153:18

**recertify** 22:6

**recitation** 143:16

**reciting** 117:15 147:23

**recognition** 156:4

**recognize** 156:1,7,8 188:21 218:15 219:17

**recognized** 37:16 120:14 155:23 156:2,10 172:3 182:24

**recognizes** 155:25

**recognizing** 64:8 68:22 220:8

**recollection** 14:6 55:22 66:7 81:2,5 85:1 92:23 93:8,9 102:7,17,20 176:16

**recollections** 224:10

**recommendation** 101:15

**recommendations** 101:3,17,20,22 102:4,8,16,18,21

**recommended** 102:1

**record** 5:10,12 6:4,8, 22 7:25 8:2 13:18 53:22 54:11 82:8 86:4,10 102:24 119:24 138:14 145:15 149:25

178:16 182:7,17 183:10,18 186:9,12, 15 187:5,24 188:23 189:3,5,18 190:4,23 192:6,17 206:9 212:21,24 215:24 224:5,14 232:2 261:17 267:5

**recording** 54:2 65:17 66:6 67:18 68:16

**recordings** 66:4,10 67:7

**records** 10:1 34:13 62:5,6,7,8 63:2,13, 18 71:10,13 72:2,4, 20 74:4 81:21,22,24 82:5,19 83:1,2,3,6,9, 16,20 84:1,22,24 85:2,7,10,11,14 86:11,14 88:21 124:23 130:17,18 136:23,24 137:2,10 139:12 140:3,9 172:9,20 173:10 179:7 180:5 192:9

**recovery** 229:12

**rectify** 201:11

**redefining** 59:13

**reduce** 248:10

**redundant** 57:3,10,14 189:12,13

**refer** 11:24 141:10

**reference** 56:6 57:7 119:17 125:23 128:19 129:24 130:15 135:19 146:15,25 149:20 152:3 172:23 174:24 183:8 205:2 264:7

**referenced** 62:25 95:25 119:24

125:10,11 139:4,6 150:3,5 152:2,17 182:10

**references** 118:25 121:5,10 141:10 146:11 148:3,15,22 149:3 182:11 219:9

**referencing** 38:15 55:16 91:12 130:10 140:2 141:25 146:14 148:21 159:7 175:25 216:3 217:20 240:14

**referred** 80:17 157:2

**referring** 23:9 39:11, 12 60:23 65:16 72:17 80:16 84:4 89:17 138:14 146:6 151:8 158:12 160:17 175:1,7 178:4 196:10 199:24 200:2,12 203:21 209:23 231:12

**refers** 149:15

**reflect** 45:17 56:19 83:9 95:9 172:9

**reflected** 55:12 57:8, 12 61:10 82:19 83:17 84:8,11 91:5, 25 92:24 93:4,6,13 95:2 159:1 215:12, 13 251:11

**reflecting** 57:11

**reflection** 224:14

**reflective** 256:11

**reflects** 19:7 24:8 26:10 55:9

**refresh** 14:6

**refresher** 60:9

**refusing** 191:13

**Index: really–refusing**

Gary Michael Vilke, M.D.

regard 11:21 259:15

regarding 68:3
114:24 124:21 135:9
226:4 264:1

regardless 130:15
131:12 186:11 204:5
231:18

regards 34:10,11
68:6 77:14 92:4
134:11 232:25
252:24 257:10
260:17

regions 29:11

regular 18:22 23:4
49:20 102:4 162:6

regulate 144:12

rehash 168:15

reiterate 113:12

reiteration 142:3

relate 29:2 33:3

related 9:13 28:2 60:5
75:11 87:20 89:8
104:6 115:13 116:2,
11,22 117:6,21
124:10 127:1
137:10,12 138:14
142:18 143:17
146:2,9 147:18
149:25 150:20
151:20 153:24
154:4,5 171:16
183:11 185:13
186:10 187:25 199:1
222:4 244:1 257:24
264:25 267:23

relates 166:22

relating 168:18

relationship 263:8

relatively 106:21,23

relay 109:15

release 147:14
253:11 254:24
256:14 263:13

releasing 253:10

relevance 196:5
210:20

relevancy 211:23,24

relevant 34:4 114:23
207:7,22 209:24
210:3,6,7,12,13,15,
17,18,23,25 211:10,
12,17,23 217:9
260:7

reliable 193:12

relied 76:13 83:6
90:1,8 96:11 108:7,
25

religious 69:23

relook 59:4

relooked 58:8

rely 68:23 86:14
108:25

relying 6:6 57:24 65:4
67:16,19 69:15
70:20 72:1 74:5
81:14 89:23 90:20
107:22 108:17,22
110:18 119:1 120:5,
18,23 136:10 149:7

remained 259:19

remaining 89:6
142:16 150:12

remains 158:16

remember 12:18 17:9
60:7 65:22 66:1,3
69:4,12 71:16,19,22
73:3 77:15,21 78:6
80:9,23 81:19,25

82:25 83:3 85:4 92:5
137:14 138:9,16
139:24 181:23,25
182:13,15,24 189:23
193:6 241:10 249:8,
9

remembering 241:19

reminder 107:11

removed 184:12

renal 144:5,10 226:15
229:1 250:13 254:20

renewed 21:21

repeat 66:18 94:22
102:11 122:10
211:16 220:4 243:4

repeated 69:19
119:16 120:20

repeatedly 183:8

repetitive 256:20

rephrase 7:3 243:6

report 8:22,24,25
9:15 10:2,21 11:13,
16,17,19,23,24 12:1,
4,8,10,13,15,21
13:2,11 14:10,20
15:24 16:5,6,13,20
17:7,23 18:7,9 26:13
54:13 55:14 56:11
57:9,24 58:3,24 59:1
60:6,15,16 61:8,11
64:16 67:16 68:24
69:16 70:22 71:13,
14 73:10,13,14,18,
20,24 74:2,6 75:18
76:14,21 77:2,6,10,
22 78:19 79:5,9,23
80:6 81:15,18 83:8,
18 84:9,11,12,13,17,
19,20 86:16 87:14,
16 88:2,4,6,10,11,15
89:24 90:2,9,13,16,

21 91:9 92:20,24
93:12,14,16,17 94:6,
13 96:11 103:4,5,7,
8,10 104:7,13 105:1,
2,5,13 106:7,13,15
108:8,19,24 109:1,3,
4,5,8,10,14,15,21,
22,23 110:4,9,18,20,
21,22 111:10
112:12,14,15,19
113:9,14 114:5,6,10,
11,16 117:21 119:8
120:6 124:21 125:21
126:5,16 127:16,22
129:7,15,19 130:2,
11,14,19 132:6,21
133:2,4,21,22 134:1,
3,5 135:6,11,15
136:2,11 140:19
141:2 142:5,16
143:2,3,9,10 144:19,
23,24,25 145:6,18,
22,25 146:10 147:2,
24 148:14 149:8,19
150:12,24 151:19
152:4,5,9,11 153:24
158:2,8 160:9,16
168:7,10,14,17,25
169:4,23 170:10
172:4,14,23 173:19,
21 174:8,24 175:23
187:24 201:5 202:3
216:10 217:4
221:15,19 237:16,20
238:1,23 239:17
242:1 246:9,13
247:23 248:14 250:6
251:2,11,13,20
252:11 261:13
264:5,17

reported 64:23 69:3,
24 91:1 117:12
123:8 134:12 139:25
174:25 179:3 186:6
189:8 215:18

261:16,20

reportedly 69:25

reporter 5:9 6:3 7:21 13:8,17 249:22

reporting 66:13 169:24 183:7

reports 8:7 10:2,3 12:17 15:24 61:23 62:3,17 63:1,14,23, 24 68:11 71:20 76:18 78:5 81:9 86:23 87:18,21 109:6 125:3 126:21 128:2 129:9 140:3 196:8,15

representation 224:9

representative 57:4, 19 120:13 121:3

represented 68:11

representing 121:2

represents 99:20

requested 99:12

require 42:19 147:10 217:25 218:21 232:6

required 83:13,22 151:21,22 152:6,10, 19 210:4 220:21 236:24

requirement 25:17 152:12 209:10

requires 173:5

reread 58:18

rereading 159:6

research 27:21 37:7 44:23 50:23,24 51:5, 12 148:18 158:12, 15,16 165:24 244:22 245:12

researcher 97:15

residency 19:20 24:16

residents 25:19 27:20 33:9 42:8

resilient 190:3,20

resistance 191:6 262:20

resistant 190:18,20 191:2,4 262:14

resolution 40:10

resolve 91:3

resolving 91:7

respect 128:12 247:12,18 249:10 252:17

responded 32:12

responding 30:23

response 36:23 63:12 157:8,12 187:20 232:24 255:15,16

responses 182:12

responsibilities 27:2 45:17

responsible 33:23

rest 149:23

resting 174:16

restrain 104:2 232:7 234:22,24 236:15,23

restrained 186:23,24 187:12 232:8 236:7 242:19

restraint 104:2 106:2 142:22

restricted 43:6

restrictions 43:19

result 31:1 39:24 158:2 232:6,16 235:8 251:23

resulted 141:19 233:5 262:1

resulting 166:16 225:17

results 57:4 146:4 166:1,8

resupport 113:12

resuscitatable 237:1, 2,5

resuscitate 228:8 229:8 263:6

resuscitated 113:2 226:1 228:10

resuscitation 62:6 113:1

retained 11:6 241:13 243:12,17,20,23 245:2,3,5

retention 103:19

retrospective 32:10, 13 33:15

reveal 261:17

revealed 137:3

revealing 188:23 189:3

review 9:19,20,22 13:7 14:9 15:20 16:11 17:1,11 30:1 32:11 39:16,17 40:2, 4,5 55:4 58:14 59:16,23 60:6 61:25 62:4,9,12,15,18,20, 22 63:25 71:3,18 74:20 75:8 76:11 80:22 82:6 85:10,22,

24 86:4 87:5,11 88:25 89:2,12 91:22 95:12 100:25 103:24 108:4 109:19,20 114:8 124:23 126:6 140:10 145:6 169:4 172:20 179:7 195:17 215:21 232:1 243:7

reviewed 8:7,22 9:2, 7,18 10:13 11:12 14:10,12,15,20,21 15:23,24 16:20 39:20 54:15,17,23 55:10,12,18 56:12, 20,21 57:1,9 61:1 62:16 64:17 65:20 66:10,11 72:19 74:22,23 76:15 80:19 81:10 82:10, 23 88:18,24 89:20 91:7 92:20 93:22 94:6 96:10 105:6 106:25 121:3 130:18 136:23 137:2 139:13 147:16 149:7 174:4, 8 175:18 177:11 183:10 190:24 193:8 194:6,11 195:11 223:18 249:2,3,6

reviewing 8:24 9:9 10:5,21,23 16:8 33:15 39:2,11,15 60:12,14 61:9 71:12 72:10 77:1 80:8 81:23 82:16,18 85:6 87:2,13 88:18 89:10 93:21 109:5 110:19 180:20 188:14,20 194:6,16 197:16 204:14 223:16 237:19

reviews 95:17

revise 265:9

**Gary Michael Vilke, M.D.**

**revved** 248:25 258:22 259:4

**revving** 259:2 260:23

**rewritten** 111:8

**rhabdomyolysis** 105:25 142:20 146:11,22 150:2,3,5, 6,8 225:10,17,21,25 226:6,8,11,14,18 227:9 228:17 234:19 235:19 236:8,17 237:3 245:16,19 250:20 253:5,7,8,9, 18 255:23 256:20 263:9,12,16

**rhythm** 112:25

**right** 10:17 15:17 30:17 54:2,4,11 64:10 68:14 72:6 73:3 81:16 82:14 85:25 97:1 99:11 124:23 125:23 127:24 128:3,22 129:14 132:4 135:18 142:9 143:10,13 148:21 155:14,16 156:4 164:13 169:8 172:13 182:13 187:12 188:9 189:12 192:11 193:14 204:7 205:1 206:13 209:3, 12 210:5 211:14 212:11 213:20 215:2,24 218:10 221:23 223:24 225:16,19 228:7 230:12,21,24 231:3, 7 233:17 234:23 235:9,21,24 236:3 238:19,20 239:3 240:7,15 244:4,6 245:23 246:20 249:19 263:19

264:17 266:3,20 269:10

**rise** 201:2 227:17 254:13,15

**rises** 144:12

**risk** 38:8,9,16,21,24 39:8,22 40:12,18,25 73:1,5,12 117:3 176:14 228:24 229:3 248:15

**road** 181:14 227:2 232:14 261:14,18

**roadway** 66:5,14

**rock** 186:24

**rocking** 70:11 176:1

**Roger** 86:24

**role** 16:9 24:3 27:18, 20 31:6 32:13,16 33:2,3 34:13,17,19, 24 35:12 39:7,25 40:17 41:8,16,25 42:1,9,18,19 45:1,11 49:18 110:5

**roles** 20:9 36:16 43:14 44:6,17,25 45:4,8 46:1 49:4 50:15

**roll** 127:8

**rolled** 127:8

**rolls** 37:1

**room** 7:14 22:20 34:22 74:13 169:15 234:7

**rooms** 31:11

**rotating** 33:9

**rough** 48:14,15 71:21

**roughly** 10:8 215:16

**rule** 115:18 123:22 131:25 153:13 162:6 172:5 269:5,7

**ruled** 135:11 136:13

**rules** 5:25

**ruling** 133:18,24 134:2 136:9 172:14 269:3

**run** 89:5 232:11 233:1,11

**résumé** 26:8,18

---

## S

**S-U-F-F-E-C-O-O-L** 59:8

**safe** 98:4,19,21,22

**safety** 97:20,24 98:14,24 101:2 176:10,14,20

**sake** 169:5

**salts** 60:5 125:24 126:7,15 130:10

**Sam** 212:5 246:8 251:13 257:1

**samples** 57:19

**San** 5:1 19:13,18 20:1,7 27:15 29:10, 18 33:18 34:7 35:3 38:16 43:16 44:7,8,9

**saturation** 77:21

**save** 6:20

**saving** 145:8

**saw** 70:4 72:21 78:4 84:20 86:19 87:24 88:9 111:6 186:12 188:20 222:25 258:22

**saying** 7:16,22 62:24 109:12 113:10,17 119:22 131:5 132:9, 14 133:6,17 152:16 171:25 203:10 204:17,23 205:13 210:6 211:4 214:9, 10,12 223:6 242:12 265:19 266:13 267:22 268:6

**says** 40:2 68:9 116:7 117:23 127:25 129:22 134:4 168:24 197:5,6 199:5,11,13, 18 210:2 233:17

**scenario** 235:5,17 246:15,22 265:17 266:2,5,19 267:15, 18,20,25 268:9,23, 25

**scenarios** 233:22 236:1

**scene** 66:5 67:7,10, 12 174:4 181:11 232:14 237:4 266:4

**schedule** 237:15

**scheme** 193:24,25

**schizophrenia** 134:15

**schizophrenic** 166:12

**schizophrenics** 166:5

**school** 19:12 20:7,10 21:11,17 27:6,15,24 41:10 43:16

**science** 160:10 205:20 224:23 225:24

**scientific** 54:19 56:7, 13,14 57:12,23 61:3,

12 94:5 95:9 98:2
165:24 200:6 226:5
231:11

**scope** 17:14 23:2
52:5 82:15 84:16
247:22 251:10

**screaming** 213:7,10
218:16

**screen** 12:25 72:7
85:15,20 115:18
124:5,8 125:4
126:12,15 129:24
130:8,23 131:3,11,
18,21 132:3,18,20
133:9 134:20 135:1
138:3,10,17 145:8
164:14 169:18 170:2

**screenings** 115:2

**screens** 115:10,11,
14,15 126:9 169:20

**se** 40:19 118:22
166:4

**second** 26:9 28:9
29:2 59:10 96:2,4,5,
6,8,9 99:6 101:10
102:25 103:18
104:17 112:11,20
142:18 144:3 149:9
158:8 161:25 179:1
268:12

**secondly** 172:25
257:15

**seconds** 93:8,18
94:14,19 95:6,10,15,
16,24 96:16,19,24,
25 97:2,8,22,25
98:5,8,9,11,13,23
101:16,18,19
102:10,18 147:8
148:4,5,10,11,12,25
191:22 257:4 265:23
266:13,16,20,21

268:18

**section** 15:3 26:23
54:18,22 55:5,9,16,
23 61:11 103:8,11,
12,23 105:16
106:10,19 107:3,5,8,
21 108:9 109:15
125:3 149:13 150:21
152:3 170:11 173:20
206:9 217:4

**sections** 145:7

**secure** 232:14

**sedate** 233:4 234:8

**see** 14:2 15:25 16:3
17:3 23:3,5 40:5
62:9,21 63:7,21
65:9,10 68:8 70:2,5,
7,13 80:16,17 83:25
86:24 87:1,7,9,18
91:13,15 94:21
96:23 132:15,23
133:2 146:6,12,13
158:12 160:17
170:11 172:8 174:1,
25 175:1 177:12
178:4 186:17 196:1
203:1 221:6 222:1
223:8 224:1 232:12
233:1 234:8 256:15,
16,20 259:8 260:18,
24 261:6 268:5

**seeing** 14:5 22:19
132:22 163:18 252:6
269:5

**seek** 155:11

**seemingly** 262:20

**seen** 70:1 149:3,4,8
166:2,24 176:23
177:4 207:13 208:18
227:22 232:18 268:6

**segue** 38:13

**segued** 40:11

**selecting** 129:20

**self-harm** 184:5

**self-report** 169:19,20

**semantics** 135:23

**semi** 189:13 261:21

**semi-recumbent** 71:6

**senior** 42:8

**sense** 6:1,14 7:5
16:19 21:13 36:12
45:15 55:15 76:25
119:16 156:6 178:25
197:23 199:10
246:19 248:7 250:17

**sent** 145:3 154:1
157:12 238:11
252:14

**sentence** 103:19,22,
23 104:9,10,18,20,
21 116:16 117:5
118:7,15,16,23
121:20,21 123:8
124:9,11 125:20
128:7,13,15,21
130:13,14,20
131:15,22 140:25
141:13 150:4 161:5
167:11,22 168:12
173:21 174:23 183:7
185:1,3,6 187:22
190:15

**sentences** 104:9,10
117:15 118:6
131:16,17 134:21
173:22

**separate** 28:4,7 96:6,
20 101:11 102:18
118:22 131:17
141:21 142:4 177:6
199:25

**separately** 45:8,25
65:16,17 88:4 113:6

**September** 18:8,12,
15 27:10 157:7
238:22 239:2,6

**serial** 96:9

**series** 148:17

**serious** 244:15,16

**serve** 16:10 29:3 30:1
33:17 34:2 35:12
39:7,25 42:4

**served** 35:9 245:9

**service** 27:22 28:12
33:12

**services** 34:10,15
35:2 36:8,10,20,21
50:6,11 237:9

**Services/disaster**
35:17

**serving** 27:22

**set** 32:4 55:10 61:9
81:13 85:10 104:6
152:22

**set-ups** 36:23

**sets** 262:25

**setting** 30:12 31:3
98:16 156:21 214:19
236:4 245:21

**settings** 156:21

**settled** 153:7

**seven** 152:25

**seven-minute** 212:22

**shape** 256:22

**share** 5:22 12:24,25

**sharp** 99:16

**shedding** 72:21

**shifted** 174:20

**shifts** 86:1

**shininess** 261:8

**shirt** 247:6,9

**shock** 230:15 265:8

**shocked** 191:21,22

**shocks** 265:3,4 267:5,10

**short** 106:21

**shorter** 99:13

**shorthand** 114:19

**shortly** 174:13 181:10

**shots** 94:8

**show** 72:7 124:8 126:14 130:8 131:11,21 133:8 135:1 138:4 139:17 192:9 195:24 196:7, 14,21,23,24 197:6, 11,13 205:12 206:25 230:15

**showed** 121:7 131:18 149:4 182:21 196:25

**showing** 118:20 132:11,18,20

**shown** 147:9 152:25

**shows** 58:19 83:22 150:9 205:15 259:11

**sic** 212:12

**side** 32:25 40:20 70:3 78:6 241:14 245:7

**sign** 43:3 260:25 269:22

**signature** 269:16

**significance** 252:17 258:16

**significant** 36:1 37:4 40:7 46:11 92:14 99:16,20 101:19 223:3,25 238:4 242:19 248:12 250:12,16 252:9 258:19 259:10,11

**significantly** 49:9 101:19 102:19 180:8 223:6 259:14

**signifies** 21:25

**signs** 63:20 105:20 118:14,20 119:15 121:1,12,14 126:1, 20 128:1 129:8 131:19 132:11,12,16 141:14,15,25 206:23 207:6,7,20,22 209:13,23,24 210:16

**similar** 41:12 44:1 57:3 110:3 155:20 194:15 240:5

**similarly** 6:11,16 7:21 95:24 240:20

**simpler** 30:19

**simplest** 34:23

**simply** 113:16 131:25 136:2 155:17 259:17 261:17

**simulant** 126:13

**simulation** 116:15

**single** 58:5 66:2 94:13 95:25 96:3,5 119:20 186:2 196:10

**sit** 17:9 57:22 58:4,22 81:1,12 82:14 91:23 181:24 188:22 224:7 234:7

**sites** 29:14,15

**sitting** 70:25 71:6 86:13 102:14 173:24 174:15,19 181:1,5 188:5 268:19

**situation** 39:13 42:16 97:14 207:8,23 209:25 210:17 232:16

**situations** 23:22 225:6,13

**six** 26:20,23 28:7,16 43:12 44:13,25 45:4, 5 152:1,18,24 153:4, 8 155:19 202:3,10 208:22 210:4

**sixth** 59:4

**size** 63:22

**skeletal** 247:19

**skim** 75:4

**skimmed** 249:7

**skimming** 75:10

**skin** 111:20 189:8,19

**skip** 67:12

**skipped** 190:8

**slash** 35:2 36:8,10

**slightly** 177:13 196:17

**Sloane** 59:4,7

**slow** 269:18

**slumped** 174:15

**small** 38:25

**smaller** 51:3

**smoking** 82:8,21

**solely** 49:2 113:10 177:16 184:13,14 186:3 201:1 223:23

**solid** 170:4

**somebody** 63:11,12 73:4 90:23 139:24 162:21 169:25 177:2 187:20 199:7,25 200:18 202:8 205:18 209:14 215:3 218:7, 16,23 220:8 229:7 236:22 256:13 260:15

**someone's** 243:16 244:2,15

**somewhat** 18:1 64:3 152:23 196:4 224:21

**soon** 257:14

**sooner** 249:12

**sore** 208:10

**sorry** 36:6 52:12 55:7 65:25 76:22 102:11 133:21,23 137:24 157:23 165:7 178:13,22 185:5 194:21 205:9 212:15 251:8 258:10 269:17

**sort** 15:25 16:16 18:22 20:14 22:11, 15 23:15 24:1 25:15 26:19,21 27:2,21 28:19 29:20 32:13, 17 33:13,22,24 34:16 35:14,21,25 36:11 38:4 39:6,11, 22 44:16 45:5,6,8 46:13 47:12,15 50:7, 8,25 51:3,8 52:17,18 56:21 57:2,10 60:12 66:13,19 67:12 68:5 69:3,20 70:9,10 71:21 72:8 74:16,25 75:8,17 76:3,16 78:2 79:15 80:19 85:9,15 89:14 95:13 106:23

107:19 109:22 112:6 114:18,22 115:12 119:19 123:14 124:12 127:7 147:22 150:14 152:16 153:12 159:9 167:21 170:4 171:25 172:17,18 177:18,23 181:12 183:9,22 184:10,11 191:9 200:3 206:1,12 208:8 218:3 219:13, 23 220:16 226:15 232:25 233:6 234:10 236:24 240:5 244:8 248:24 256:19 260:19 261:20 262:10,15,22 267:1

**sound** 238:19,23 240:12,24

**sounds** 64:6 67:6 78:14,24 80:22 133:15 145:10 148:1 207:25 212:4 238:20,25

**source** 46:11 69:1 87:22,23 88:1 89:22, 25 129:2

**sources** 46:7 47:20 48:17,24 67:19 68:18 70:20

**space** 175:8

**speak** 82:4 256:19

**speaking** 44:6 126:12

**special** 50:17

**specialist** 21:15 23:22 24:1,2 50:18 51:14,18 52:6 53:10

**specialists** 23:10 24:12 25:8

**specialization** 23:1

**specialized** 22:19

**specialties** 23:1 50:17 52:21

**specialty** 21:12 22:2 23:8,25 50:19 52:16 53:19 115:2 153:21

**specific** 24:24 25:12, 13 26:1 53:17 56:19 57:22 58:14,22,24, 25 60:12 62:2 63:6 65:4,7,12 68:21 69:12 71:25 72:8,18, 24 76:12 81:4,9,13 82:25 91:20 92:6 95:23 100:24 104:16 108:14 118:25 119:3 121:7 123:3,13 130:19,24 142:25 147:10 148:16 150:17 152:8 166:24 170:20 175:17 179:20 182:19 188:23 192:8 193:6 198:7 203:22 204:13 209:18 218:12,24 230:8 269:8

**specifically** 8:20 9:6, 21 10:13 11:12,15 12:20 15:17 17:9,17 29:19 58:11,20 60:10 64:5 66:1,11 68:13 69:1,17 70:7 71:17 73:4,10 75:19 76:2,19 77:23 79:10, 25 82:13 83:13 84:23 86:13,19 92:5 95:11 100:14 108:23 109:10 128:4 131:3 136:14 141:3 146:23 147:1 149:20 151:3, 25 152:3 170:5 173:19 176:11 180:24 181:3,15 182:24 188:3,7,15,

19 189:1 194:17 198:2 200:12 213:1 214:20 216:8 233:20 249:9 269:2

**specification** 100:14, 24 101:14

**specifications** 100:10,13,21 101:12

**specifics** 57:5 77:5 92:14 95:15 104:22, 24 121:6 131:13 169:9 176:13 222:18 241:10 264:6,15 265:11

**specify** 128:6 144:14

**speculating** 196:16

**speculation** 139:18 254:5

**spell** 5:11 60:3

**spend** 8:10,24 9:9 28:1 47:7 71:12 75:16 81:23 85:6 88:18 169:8

**spent** 10:4,19 33:1 37:4 60:14,15 80:8 82:16,18

**spice** 125:2,23 126:6, 15 128:4 130:9,10

**spinning** 165:23 233:13 259:5

**split** 54:17

**spoke** 126:23

**squaring** 268:2

**squats** 256:23

**St** 84:23,24 85:8

**staff** 34:8,16 143:15

**stage** 39:15 146:4,16, 17 251:19,21 255:4

262:13

**stages** 252:7,8

**staging** 36:24

**stamina** 207:2

**stamped** 157:9

**standard** 39:4,14 40:3,8

**standardize** 160:22

**standardized** 161:15

**standing** 42:21 201:17 247:24 251:8

**stands** 159:15

**start** 5:10 13:24 97:20 112:12 161:5 225:1

**started** 6:1 41:11 181:11

**starting** 17:23 116:25 125:9 165:20 193:18 195:8,12 202:13 203:25 206:9 213:2 216:8 224:24 225:3 227:5 234:16 239:19

**starts** 54:14 105:16 112:11,17 114:16 115:20 121:19 143:13 149:13 150:13 158:11 260:21

**state** 5:11 10:1 20:19 70:1 80:6 98:1 99:3 121:21 133:22 134:1 140:11 146:4 158:20 160:9 164:16 170:20 171:8 183:2 186:18 193:3 225:23 230:8 249:11 251:2 258:23 260:7 264:18

**stated** 8:22 9:2 12:7 169:13 192:18

**Gary Michael Vilke, M.D.**

202:25

**statement** 31:5 112:20 118:17 119:23 126:4 140:18 143:2 159:13,14 160:7,24 161:13 162:2 166:14 167:17,22 171:1 173:3 179:1 203:18 207:22 214:21 231:18 235:1,23

**statements** 61:19,23 147:22 149:24 158:25 160:5 205:10

**states** 54:22 56:11 103:23 105:17 117:11 124:3 147:3 159:10 170:13 173:23 179:2,4 187:22

**Statistical** 156:10

**statistics** 169:11

**status** 143:15

**stay** 176:2

**stayed** 16:22 259:22, 23

**staying** 16:13

**step** 184:11

**Stephenson** 8:11,19 10:20 13:12,19 53:24 54:7 56:2 90:7 130:3 194:20,23,25 212:5,8,11,15,20 228:19 249:21,24 250:1,4 251:13,14 254:10 258:15 261:10 263:7,19 269:12,14,20,22 270:2,7

**stepped** 35:11

**stick** 77:8

**stimulant** 140:1,19 166:22 167:12 168:3 169:17,25 170:3,17 171:4 260:12,16 262:24 264:3

**stimulants** 140:16,24 164:6

**stimulate** 260:21

**stimulated** 229:5

**stipend** 45:19 49:19

**stipends** 45:12 49:4

**stop** 150:25

**stoppage** 117:4

**stopped** 121:9

**stopping** 248:19

**stops** 231:2

**straight** 181:13 234:2 242:6

**street** 15:6 67:24 68:21 213:15,17 214:22 215:4,15 224:13 235:10,11 258:23

**streets** 220:6 222:19 235:14

**strength** 206:25 207:21 262:20

**strengthens** 110:24

**stress** 228:5 259:11

**strike** 22:23 24:7 36:6 99:16 100:5 114:2 121:20 144:17 150:11 161:4,12 174:23 175:10 178:6 186:20 187:1,6,9 204:22

**striking** 176:12

**strong** 78:2 190:3,20 262:20

**stronger** 211:20

**struck** 176:15 177:5 231:22,25

**struggle** 258:7,13

**stuck** 72:12 247:9

**students** 25:20 27:19

**studied** 58:9 147:4 153:1 229:22

**studies** 57:15 94:7, 10,12,16,18 95:2,5, 8,9,14,16,18,22,24 96:1,4,10,15,23,24, 25 97:21 98:18,24 99:21,24 100:12 148:3,5,9,13,15,16, 22 149:2,6 229:16, 20 230:3,12,17,18 245:12

**study** 96:18,21 97:14, 16,18 98:7,8,14,19 99:6,12,25 100:5,8, 12,20 153:16 166:4, 7 229:25 230:1,10 231:14 234:6

**studying** 97:20 98:23

**stuff** 47:4 145:12 205:2 214:15 217:22 223:13 227:6

**stun** 147:5,11 226:23

**sub** 38:5

**subacute** 22:13

**subheading** 124:2

**subject** 76:4 79:22 93:15 96:19 98:4 147:7 256:8

**subjected** 94:8 229:19 257:4

**subjecting** 96:19

**subjective** 63:19,24 64:3,8,13 78:4 152:23 177:16 206:19

**subjects** 59:6 94:7 97:4,19 98:4 149:1 166:6

**subpoena** 157:8,11

**subscribe** 141:7,11

**subsequent** 96:24 113:19 114:9 141:20

**subset** 9:17 60:14,16

**subspecialization** 35:15,19,22 36:7,14

**subspecializations** 36:5

**subspecialties** 37:2, 13

**subspecialty** 37:9,20 38:5 40:13

**substance** 18:21 83:23 103:5 104:13 105:13 108:18 126:9 137:1,3 138:21,23 139:2 166:25 170:10

**substances** 83:10 115:10 137:13,21 138:21 139:7,8 140:1

**substantive** 18:24 20:15 104:10 114:15 158:8 160:16 167:10

**substantively** 53:8

**substitute** 16:10 110:6

**Gary Michael Vilke, M.D.**

**substitution** 16:6
87:13

**subtle** 218:18,21

**successfully** 229:8

**sudden** 59:20 72:16
73:1,6 117:3 236:25
244:7 248:16,17,18,
20

**suddenly** 236:22
251:25

**sued** 245:6

**Suffecool** 59:7

**suffer** 185:25

**suffering** 23:12
115:21 149:13
154:4,25 165:8
168:8,18 169:17
178:7 193:12 197:19
198:18 199:2,13
201:6 214:25 215:7
218:13 222:12,13
229:17 230:13 262:5

**sufficient** 203:19
205:7,8,11 219:3,4
222:11,23 224:15

**suggested** 187:6
193:1

**suggesting** 120:19
159:4 200:23 224:3,
4

**suggests** 152:18

**suit** 40:5

**sum** 150:23

**summarize** 104:23

**summary** 27:16
104:17,20,21,24
119:7 216:10
221:14,18 262:5

**super** 78:2 190:3

**supply** 115:1

**support** 25:3 51:24,
25 100:4 108:11,17
109:6,8,24 111:16
112:8 113:22,24
138:6 142:13 171:15
180:5 182:1 185:11
193:9 246:16

**supported** 65:9
110:13 147:15 200:5

**supporting** 116:23
117:9,17 118:20,25
119:11 120:6 152:18
153:25 176:17
183:22 193:15 209:6

**supportive** 84:3
116:15

**supports** 84:19 141:7
183:25

**suppose** 115:23

**sure** 5:13 6:2 10:24
14:18 17:4 20:6
21:9,18 22:1,21 23:6
29:17 31:5 32:15
33:7,22 34:23 35:6
36:4,16 38:7,20
39:16 41:17 45:16
46:15 51:25 52:10,
11 55:8 61:12 62:23
63:19 64:20 65:13
66:19 68:25 70:9
78:23 87:6,9,25
89:19 90:10 96:14
97:13 98:16 99:3,14
100:5,19 103:1,5,9
112:7 114:1,4 115:5
119:21 122:12,16
124:15 137:19
143:19 151:18 157:9
159:8,18 160:7
169:6 177:2,5

179:22 180:11,15,24
184:24 190:25
196:16 197:1 198:20
199:5,11,14 200:17
201:21 202:10
203:12 204:12,21
208:7 210:5 211:13,
17 214:17 219:10,19
220:5 223:13 231:6
232:16 239:25 240:4
241:16 244:20
246:14 248:18
250:13 251:6 252:19
254:24 258:11 260:9
262:7,10 265:21

**surgery** 19:17 24:10,
13,24

**surmise** 256:13

**surround** 61:24

**surrounding** 209:14

**survive** 113:3 229:10

**survivors** 161:9,21,
23

**susceptibility** 158:19

**suspect** 81:7 154:23
233:9 234:10

**suspected** 227:19

**sweating** 260:22
262:21

**sweaty** 64:13 70:3
119:17,23,25 120:1,
11,17 122:1 162:21
189:10,11,19,21,25
190:2 193:3,5
260:14

**sworn** 5:9

**symptom** 123:11,20
188:21 206:20 211:9
248:17 260:25

**symptomology**
172:22

**symptoms** 105:20
111:21,24 117:12
118:14,21 119:14
121:1,12,14 122:21
123:9,15 126:1,20
128:1 129:8,12,24
131:19 132:11,15
133:14 134:23
140:19,22 141:15
142:1 151:4 153:2
154:25 165:13,25
168:21 171:12
172:15 179:3
180:21,22 198:8
201:1,8,9,10,14
202:10,18 203:6,7,
19,22 204:2,6,16
205:1,16 208:12,14
209:15 219:8,11
221:3 225:18 228:18
230:17 233:4

**syndromal** 59:20

**syndrome** 59:13,15,
18 83:12,24 104:5
111:19,25 114:17,
19,24 115:1,4,18,22,
24 116:6,8,19 117:2,
3,13,18,25 118:8,18
119:11,12 120:7
121:23 122:6,15,16,
17,23 123:4,10,11,
12,14,19,21,24
124:4,7,22 125:14,
16,18,22 126:7,22
127:12,21 128:3,17,
25 129:2,5,10,16,23
130:8,22 131:10,20
132:2,10,13,17,23
133:8,10 134:10,24
135:13,16,22 136:20
138:24 139:1,9,15,
22 140:7,23 141:3,9,

18 142:2,6 151:5,7, 21,24 152:8 153:9, 13 154:5,10,14 155:14,17,22 156:5, 9 157:6 158:16,17 159:23 160:1,21,23 161:2,6,9,18,21 162:3,8,23 163:13, 20 164:12,24 165:4 166:2,9,16,22,25 167:7 169:9 170:14 171:13 172:6 173:12,17 178:3 179:4,25 183:21 184:17,21 185:12, 19,25 192:16,21 193:10,13 197:23,24 198:9,18 199:1,6,13, 15,20 200:2,13,21 201:4,15 202:4,22 203:5,22 205:17,20 206:22 207:14 208:18 209:5,11 215:1 219:5 220:23 224:23 227:8 228:23 248:15,16,20 259:3, 13 262:6 267:7,13

**syndromes** 126:24 151:14 155:21

**syndromic** 154:14

**synthetic** 59:24 60:2 164:6

**synthetics** 138:18

**system** 38:16 131:6 163:1,6 164:11 254:25 255:2,3 258:20 259:4

**systemic** 59:23

**systems** 31:25 229:12

---

**T**

**tabs** 49:20

**tachycardia** 140:14 223:4 228:4 257:18

**tactics** 79:12

**tactilely** 202:9

**take** 13:7,14 21:10 22:11 30:15,16 35:12 49:14 53:3,22 63:5,10 65:9,11 68:23 75:22,25 82:2 100:17 134:18 145:4,11 153:7 200:19 202:8 241:8 250:20 256:3,5

**taken** 5:22 25:14 54:9 71:23 103:2 112:13 143:14 145:13 156:20 183:16 212:22

**takes** 49:14 80:11 143:1 250:20,23 252:5 253:1

**talk** 149:21 150:7

**talked** 41:20 50:3 53:20 84:2,5 99:15 109:2 110:4 124:24 136:25 139:23 140:15 146:22 162:9 169:11 171:3,5 201:9,19 228:3 233:13 248:23 260:10 262:22 264:6

**talking** 11:3 15:5 31:21 40:11 69:23 84:7 121:4 171:18 173:8,25 174:14 182:19 183:8 194:20 195:9 200:21 208:22 218:7 265:16 266:12

**talks** 142:10 217:21

**tantalizing** 193:21

**tase** 180:17

**tased** 178:17 179:9 180:6 182:8,12,18 187:25 189:4 192:6 230:21,23 231:3,4,9 259:19 266:16

**TASER** 10:15 59:8 78:9,21,22,24,25 79:2,6,20,25 88:16 92:4,6,20,24 94:4,8, 11,14 95:2,6,9,19, 20,25 96:20 98:5 101:11 102:9,15 104:3 106:1 107:12 142:22 147:4,16 179:23 191:21,22,25 192:2,4 229:19,20 230:4,9,15 231:10 243:15 244:1,5,6,11, 14,18 245:6,10,13 246:21 248:5,9 252:25 256:11 257:5,12,18,19,21, 24 258:14 259:24,25 265:3,8,9,14 266:6, 9,18,25 267:4,6,10, 16,21,24 268:3,8 269:3

**TASER-RELATED** 244:9

**TASERING** 260:2

**TASERS** 79:17,19 148:24 256:18 265:2

**tasing** 179:15 182:14 183:16,18 186:12, 15,17 188:8,10,14, 24 189:20 190:4,6, 11,12 192:18,22 193:7 256:9 265:2

**tasings** 257:2

**task** 157:24 158:3 159:1 170:9

**tax** 48:5,20

**taxes** 50:7

**teaching** 33:11

**technicality** 53:5

**technically** 189:22

**technology** 7:15 34:12

**tell** 58:1 76:20 125:25 126:2 179:18 231:7, 8 232:21 235:9 236:25 252:4

**telling** 134:22 233:18

**tells** 48:20

**temp** 202:9

**temperature** 64:11,12 111:20 151:15 179:12 190:8,9 202:8 208:21 214:13 228:4,11 233:12 257:16,17,23,25 258:17 259:1,10,14, 22 260:22 262:20 265:13

**temperatures** 201:12

**ten** 21:21 22:5 60:1 88:20 97:22 120:12 152:2,18 239:8,13 257:23 266:21

**ten-minute** 53:23

**tend** 18:16 64:19 67:12 127:3,9,10 171:7 172:24 196:12 229:10 240:18

**tendency** 207:4

**tends** 33:11

**term** 64:1,4 97:11,12

**Gary Michael Vilke, M.D.**

189:14,15 230:25 260:20

**terminology** 39:10 57:8 176:4 220:13

**terms** 9:13 23:2 30:9 31:6 32:4 40:19 43:13 44:2,3 47:19 57:7 58:2 61:8 66:9 67:15 68:19,20 69:14 70:20 76:4,12 77:8 79:6,7,12 101:12 104:16 110:5,14 112:22 113:15 118:12 136:8 149:6 150:23 183:15 192:16 200:7 203:18 219:21 222:19 247:21 266:14

**test** 94:7 98:4 153:12, 15,21 154:15 155:15 159:23 160:13

**tested** 126:9 131:3 132:2,7 137:23 138:12 148:3

**testified** 5:5,20 11:8 32:24 37:23 50:20 74:3 92:18 166:21 174:3 175:22 177:17 194:5 197:17 202:2 209:23 237:7 241:3 242:10

**testifies** 90:24

**testify** 238:1,3

**testifying** 68:17 82:14 140:5 237:23 240:1,11,23

**testimony** 14:25 15:11,13 17:2,12 58:4 64:2 65:2 68:11 76:5,15,22,23 84:2,4 91:5 94:1 97:11 98:17 99:17 100:19

102:14,15 135:10 176:6 177:11 180:25 181:10 182:23 184:11 190:23,25 194:10,12 196:2 197:7 198:24 199:19 207:19 213:16 214:4,20 221:2 222:10 224:8,24 225:2 226:3 227:7 228:15 232:20 234:17 235:18 236:6 239:18,20 240:22 241:14,20,25 242:16 247:22 251:10 263:25 265:5 268:3

**testing** 115:3 153:17 155:4 229:20

**tests** 41:23 125:25 155:12

**tetany** 256:18

**text** 111:10

**thalamic** 233:12

**thank** 13:3 54:6 55:15 157:21 195:5 245:25 246:3 249:19 263:20 269:23 270:1

**thanks** 54:7 94:24 248:2

**therapies** 101:5

**thin** 244:6

**thing** 20:12 30:3 36:19,25 52:15 91:13 186:25 187:1 189:2 235:10 238:5 240:6 242:14

**things** 6:6 12:11 31:25 33:1 35:18 40:20 42:20,21,22 43:11 47:13 48:21 49:4 53:15 62:18

63:2,20,23 64:11 65:8,12 68:7,8,9 70:16 72:10,12,18 75:1 78:7 81:9 85:20 89:4 110:3 112:4 115:10 119:5 120:21 155:8,12 161:17,24 162:9 163:10 165:19 171:22 172:18 173:11 193:17 201:13,18,22 203:10 207:3,13 208:17 209:1 218:8 229:2 233:13 236:12,20 256:23 262:22 268:16

**think** 6:19 8:12 10:2, 15,16 11:2 12:9,10, 12,16 14:17 15:2,3, 6,9,16 18:19 25:23 26:6 30:5 31:17,19 37:25 39:10,16 40:2, 3,7,9 43:2 44:17,22 45:10,20 50:21 55:16 56:25 57:18 58:19 62:25 63:15 64:1 65:24 66:1,17 67:25 70:21,23 72:3, 12 73:21 74:7,22 76:3 77:17,18 78:6, 8,17 82:5,8,10,20,21 83:10,22 84:6 86:10 92:3,8 95:15 100:16 101:17 105:3 107:24 111:14 113:13 114:25 115:8 116:4, 13 119:14 120:8,10, 25 121:18 127:9,10, 24 134:8 137:13,18 138:8,12 139:6,23 140:1 141:25 143:22 145:6 147:20 148:15,17,23 150:8 156:6 157:2 159:13 160:6,14 161:14,21,

22,24 167:18 168:1, 4,20 171:2,18 172:24 174:18 175:7 176:4,22 177:1 178:21 183:5 185:22 187:10,15 189:5,17 190:18,19 191:15,18 193:1 196:6,10 197:14 199:22 200:9,10 201:10,13 202:2 205:15 206:6 208:13 211:20 212:4 214:16 217:7,17,19 218:6,14,23 219:9, 15,23,25 220:2,5,14 223:8,9 226:8 227:10 230:18 232:9,24 233:2 235:12 237:13 241:16,18 243:8 248:23 252:9 258:11 259:10 265:18 267:12

**thinking** 86:9 217:15

**thinks** 203:7

**third** 33:16 160:16 167:10

**thirties** 164:23

**thought** 39:1 80:1 82:22 115:2 116:17 131:22 145:3 191:4 197:9 257:12 261:7

**thoughts** 132:14

**thrash** 176:23 177:4

**thrashing** 77:24 176:19 177:5,8,21 187:8,12,19

**threatening** 176:9 253:16

**three** 9:11 10:5,22 33:24 59:11 65:24

**Gary Michael Vilke, M.D.**

66:3 86:22 96:6,8 106:21 153:5,6 155:18 193:14

**three-page** 144:23 145:18

**throat** 208:10

**throw** 186:19

**thrown** 10:7

**thumping** 213:10 223:9

**thyroid** 162:22,25 173:8

**thyrotoxicosis** 162:22,24

**till** 41:8

**time** 6:20 12:14 16:8 18:7 33:2 36:2 41:10 42:5,7 43:15 47:7, 10,15,19 48:1 50:24 60:13,15,16 68:5 75:22,23 80:8 81:10 82:15,17 85:6,10 91:18 92:11 94:2 95:23 97:5 101:7 102:11 107:25 119:18,24 120:1,14 137:19,24,25 138:17 139:21 144:14 155:13 159:7,11,14 162:1 169:3,8 172:19 179:11,12,20 180:22 188:5,8 192:7 204:1 206:13 211:8 215:1,25 233:7 237:19,25 238:4,8,10 239:10, 14 243:25 245:6,24, 25 250:20 252:5 253:19 255:6,16 256:3,16 258:18,24, 25 262:12 264:12 266:3,5,9 267:18,20

268:2,23 269:11,23, 24

**timeline** 92:10,13 120:1 143:17 266:15 269:5

**times** 5:20 6:19 23:25 92:4,25 101:16 121:8 125:2 175:17 216:24 221:4 248:6 266:16

**timing** 65:8 71:17 77:13 86:11,17,21 92:8 107:12 178:14 182:13,15 188:4 189:25 226:14 256:10 258:11 267:23 268:4,7,16

**title** 39:8

**titled** 103:12

**today** 5:20 8:4,6 9:22 11:1 17:9 44:1 57:22 58:22 81:1,12 83:19 86:13 91:23 97:1 98:2 99:7,8 102:14 128:23 136:8 140:6 159:15,17 160:10 181:24 188:22 200:14 224:7 225:24 239:11,15 241:12 264:12 269:23

**Todero** 55:25 67:23 68:20 77:19 78:12 79:8 93:3,15,19 104:2,4 105:19,25 117:12,19 118:13 119:4 120:16 123:3, 8 136:11 137:10,23 139:12 141:16 142:21 143:13,24 144:6 149:13 153:25 154:4 168:8,18 172:6 173:23 174:14,25 175:5

176:8,17 178:7,16 179:2,8 180:6 181:1, 11 182:2,7,18,25 187:6 189:19 192:6 193:12 201:6 213:9, 14,23 214:5,22 215:12 217:5 222:10 232:2,15,22 234:18 236:8,15,16 249:11 250:7 251:20 253:17 255:23 256:8 257:3 258:17 259:16 260:6 261:12,22 262:5

**Todero's** 74:15 124:3,22 125:21 126:18 127:17 129:8 130:17,21 135:12 141:17 146:3,20 164:11 169:1 176:8 179:24 180:17 186:10 216:11 217:9 221:15 227:9,25 246:11 254:20 259:18 263:16 264:2,18 265:10

**toeing** 124:12

**tolerance** 186:14,15, 21 187:4

**tolerant** 187:14

**top** 12:10 15:2,16 41:7 45:16 60:1 80:24 106:15,22 107:3 111:4,11 141:14 158:10 226:24 228:12

**topic** 40:11 44:18 84:13 264:5

**topics** 56:23

**total** 48:3,12,16 60:15 93:7 150:23 239:1 265:23 266:17

**totality** 180:21 208:23

**totally** 202:21 268:4

**touch** 202:9

**touches** 52:17

**tox** 115:15 129:24 130:8 138:3,17 170:1

**toxicologic** 129:25 130:11

**toxicological** 125:11 131:3 132:3

**toxicology** 35:7 37:9 62:7 63:23 72:7 115:9,11 124:4,8 125:4 130:22 131:11 132:18,20 164:13,14 169:18

**toxidrome** 170:1

**track** 83:22 106:14 110:20

**tracking** 109:16

**tracks** 111:5 233:12

**traffic** 67:12 69:4 86:6,7 183:17 184:1, 22 192:19 213:6,10 214:24 215:12,22 216:12 217:10,21 218:2 219:15 221:17 222:11,24 223:2,23, 25 224:6,11 260:25 261:4,15

**train** 33:8

**trained** 22:1 25:6,7 41:23 42:6,9

**trainees** 27:20

**training** 20:13,14,15, 16 22:2 24:14,25 25:4,10,13,19,21 30:3 33:11 35:20 36:2 37:20 42:10

Index: three-page–training

75:2 217:25 218:12,
24

**trainings** 25:5

**transcript** 12:14 14:7,
14,22 74:23,24 75:9
144:21 193:19
194:22 195:2,8
196:1,18,22,24
197:17 198:3
202:13,25 203:24
204:18,25 205:11,
12,15 213:1 221:12

**transcripts** 74:18,21
75:17 76:6 77:7
88:24

**transition** 24:2

**transitioning** 21:16

**transitions** 142:17

**translated** 93:14

**transmitted** 93:18,23

**transport** 166:3

**transportation** 31:2

**transported** 61:16
62:4

**transporter** 158:18

**transporters** 165:19,
22

**trauma** 25:3 234:24
235:25 236:1,4,20

**treat** 233:4 234:8
245:20

**treating** 23:23 40:19
62:15

**treatment** 23:10 24:3
100:15 147:10 164:4
245:19

**treatments** 100:15

**tree** 13:4

**triaging** 36:23

**trial** 241:25

**tricky** 211:11

**tried** 73:16 99:11
169:12 234:23

**trigger** 92:25 93:4,7,
13 96:1,3,5,6,8,12,
15,20 98:11 101:11,
23 158:21 268:19,24

**triggering** 164:23

**trip** 260:19

**Trooper** 10:2 140:11
164:16 183:2 189:21
193:3 264:19

**Troopers** 70:2 182:20

**true** 7:12 18:21 115:6
135:24 151:18
159:25 161:16
166:14 200:2 205:17
208:19 217:2 218:4
256:2 257:5

**truly** 200:20 235:12

**truncated** 67:1

**try** 28:7 85:9 92:17
112:3 187:18 211:2
223:1,12 243:3,6

**trying** 13:4 61:13
64:21 66:1 78:10,11
104:23 133:6 135:6
145:7 176:25 177:3
186:19,24,25 187:6
190:17 192:14
194:13 230:2 233:6
242:6 268:14

**turn** 48:5 54:12 103:4
192:20 193:18

**turning** 13:23 26:8
29:2 33:16 103:10

110:25 114:14
123:25 147:2 149:12
151:2 160:15 167:9,
11 170:7,8 173:19,
20 178:1 195:7
198:2,14 202:12
203:24 212:25 216:7
221:6 224:20 231:15
234:16

**twenty** 241:9,17
242:3

**twice** 237:25

**twitchy** 70:10

**two** 9:11 10:5,22
18:19 20:25 29:11,
13 30:1,7 34:8 42:10
54:18 59:11,14,17
60:17 66:4,5 81:20
84:21 85:15 104:8,
10 106:5,8,10,13,16,
21 109:13 112:23
113:8 114:7 128:19
131:16 134:21
136:22,25 137:9
140:24 172:24
173:22 184:18,19
194:18 199:24
201:8,16 203:6,10,
19,22 204:15
208:11,12,15 219:3,
4,21 231:6,8,11,12,
13 243:8 253:11
262:24 264:9

**two-and-a-half** 8:12,
18 10:20

**two-year** 20:6

**type** 20:12 22:16 23:5
30:3 36:19,25 39:5
52:15 53:15 63:23
100:3 185:16 218:22
220:9 238:5 240:6,
16,21 242:14 247:12

**types** 23:3 33:13
43:11 47:16 57:17
63:18 68:7 70:16
85:17 115:10,11
149:2 218:14,20,21
256:23

**typical** 25:11 66:22
187:19

**typically** 43:5 44:5
97:18,19 101:15,24,
25 129:1 137:8
144:4,10 146:11
156:20 159:11 164:2
171:10 202:6 220:7
252:21 253:7
254:20,25

---

**U**

**UC** 33:18 35:3 38:16
43:16 44:7

**UCSD** 44:24

**uh-huh** 14:23 49:23,
25 103:21 116:1
242:8

**uh-huhs** 6:7

**ultimate** 228:14

**ultimately** 73:14
155:3,11 229:6
261:24

**Ultrasound** 35:8

**Umm** 8:7 11:2 15:1
25:15 44:8 59:10
60:16 64:19 72:24
81:7 92:3 107:9
108:20 119:14 151:2
176:11 182:9 190:6
242:25

**unable** 191:13,15,23

**unambiguous** 204:9

unaware 216:25
217:5

unclear 7:2

uncommon 216:16

uncooperative
175:24

uncooperativeness
177:8

under-treatment
164:4

undergone 53:6

undergraduate 19:8

underlying 9:3 87:20
149:9 153:12 164:3
170:16 171:3,10
173:9,13 177:19
204:5

underneath 21:19
111:10 112:10
191:11,24

undernourishment
253:23

understand 6:7,25
7:8,16,19 11:5 16:7
23:20 29:1 32:1 88:5
97:13 100:19 102:16
103:6 109:12,13
112:7 116:16 117:14
119:21 120:9 170:21
201:4 205:19 206:3
211:2 224:4 245:24

understanding 11:9,
10 17:5,8 28:17,22
43:4 60:11 64:9
68:14 72:23 73:24
75:7 98:1 99:4
101:21 102:2,13
110:5 116:18 133:6
135:16 169:6 200:6
209:5 210:9 213:8
215:10 226:4

understood 21:14
23:20 30:4 31:14
32:1 34:18 41:13
42:11 43:12,25 52:2,
17 55:21 57:9 58:4
62:23 64:6 65:2
67:15 69:14 73:22
98:17 99:17 116:9
119:21,23 135:9
162:15 170:7,14
172:19 184:10 215:8
227:7 237:7 240:20

unethical 97:3

unexpected 39:20

unfortunately 48:22,
25 267:24

unidentified 158:16

uniformly 154:10

unique 87:12

University 19:9,13,18
20:7,10 27:7,15
28:12 33:6 41:4
45:11,14 46:1,4,13
48:19 49:2 50:5,6,7,
10 153:17

University-based
44:20

unknown 170:19
222:16 225:23

unnatural 6:11

unnecessarily 112:4

unreasonable
159:13,14 235:16

unsafe 98:25

untreated 134:16
166:12

upcoming 26:16

updates 25:24 34:12

updating 18:22

upright 70:25 71:6
174:15

upset 200:20

uptake 165:19 166:4

urgent 34:8 44:9

urine 164:13

usage 167:6,8 260:18

use 13:5 16:16 23:13
29:20 37:19 40:4
52:13 57:17 59:24
64:1,4 72:25 78:10,
11 82:19,20 83:10,
17 84:2,7 87:21
89:22 91:9,18,20
95:6 97:2 100:3
101:16 106:1 108:3,
13 131:13 136:22
137:10 138:5 139:12
142:22 146:17
154:21 166:22 167:3
169:19 186:2 188:16
189:14,15 196:6
200:10,24 202:11
205:24,25 210:25
226:10,16 227:19
240:6 252:2 253:6
260:11

user 23:16

uses 102:9 148:11
160:12 199:16
210:23,24 230:20

usually 61:22 62:1
129:2 135:19,20
164:25 177:13
187:18 226:21 232:8
240:16 246:15
250:23 256:20

utilize 40:9

utilized 101:24,25

updating 18:22

upright 70:25 71:6
174:15

V--AS 5:13

vague 91:10

valid 231:10

vantage 15:15,19

variability 72:5

variable 255:19

variations 177:13

varied 27:2

varies 44:22 46:25

variety 23:11 158:21
207:12 208:17

various 46:1 115:22
143:16 146:2 178:2
255:23

vary 170:20 227:4

vast 216:24

ventricle 72:6 73:3

ventricles 73:5

ventricular 244:7

venue 182:14

venues 69:19

verbally 6:6 213:18
214:23 215:25

version 108:6 111:14
118:24,25 129:25
157:9,11 211:20
221:2 224:6

versions 91:5,8
233:10

versus 50:9 64:1
69:10 86:19 101:6,
14,18 124:13 127:9,

11 129:17 131:22 144:3 165:4 172:25 177:3,4 187:19 197:12 203:7 220:12,13 241:20 265:18,19

**Vice** 33:17,24,25 34:1,2 35:13

**Victor--i-l-k-e** 5:14

**video** 7:13 62:2 63:21 65:15,16 66:4,6 67:7,17 68:9,16 69:15,17,20 70:5,7 76:18 86:19 88:22, 25 91:15,18 92:10, 13 126:21 128:2 129:9 175:16 177:23 179:16 187:23 188:9,14,15,16 195:14,15,17,21 196:12 197:5

**videos** 9:23 61:21 65:20,22 66:19 67:4, 10 68:3 70:19 196:25

**view** 22:18 109:16 112:8 113:7 114:23 115:23 125:12 135:13 141:8 151:4 160:10 171:16 175:3,13,14 176:8 178:3 183:24 188:13 196:4 198:8,16 199:20 200:5,23,25 201:16 204:2 205:19 206:20 209:10 221:15,20 223:13 227:8 264:13 267:5

**viewed** 176:20 264:2

**viewing** 119:10 174:12

**views** 175:6 264:1

**vigorous** 168:15

**vigorously** 168:14

**Vilke** 5:3,11,13,15,18, 19 8:5 11:5 13:23 54:12 59:7,14 103:4 128:13 132:22 135:3 144:20 145:17 157:20 195:7 204:10 207:17 212:14,15,25 217:8,24 224:22 227:23 237:7 246:1, 7 263:25 269:24

**Vilke's** 157:11 247:22

**violent** 15:4 176:18, 20 180:12 213:4,5,7

**virtue** 127:18

**visits** 264:9

**visual** 61:22

**visualization** 63:21

**vital** 63:20 126:20 128:1 129:8 131:19 132:11 209:13

**volition** 176:18

**volitional** 191:9,10,18 192:2

**volitionally** 176:20

**voluminous** 61:9 84:24 85:12 88:21

**vulnerability** 40:8

──────────

**W**

**wait** 40:5 130:3

**waive** 269:16

**walk** 112:3

**walking** 69:3 181:12, 13,18 183:17,25 184:22 192:18

213:15 214:22,23 215:3,4,12,14,22 216:12 217:10,21 218:2 220:6 222:10, 18,23 223:9,23,24 224:6,11,12,17 256:22 260:6,24 261:14,18

**wall** 52:15

**walled** 244:6

**walls** 38:10

**wandering** 219:14 235:14

**wanes** 47:12 48:1

**waning** 47:2 262:13

**want** 13:14 42:14,22 43:5 47:15 51:4,25 54:1,12 75:5 87:7 96:23 99:2 103:4,5 109:11 114:1 157:12 169:4,5 187:17 195:2 200:16,19 202:10 204:12 206:9 209:8,19 210:13 244:12 249:22 250:5 269:15,16

**wanted** 29:22 52:9, 11,13 92:6 97:4 100:25 119:2 256:13

**wanting** 114:3

**wants** 212:13

**ward** 200:20

**warm** 111:20 189:8, 20 202:9

**wasn't** 16:2 57:14 71:17 104:9 152:12 172:25 173:14 179:13 188:3,7,19 189:24 191:5 193:7 194:16 244:10

246:17 258:24 262:11

**watch** 66:19

**watched** 213:17

**watching** 188:5

**watered** 221:1

**Waters** 78:1

**waxes** 47:12 48:1

**waxing** 47:2 262:13

**way** 6:12 7:24 16:15 22:17,21 41:19 44:4 78:13 91:19 97:23 104:23 126:8 128:16 132:23 155:11 175:12 176:18 177:25 180:17 199:4 201:10 211:7 219:10 225:12 232:5 234:21 235:21 237:18 265:1,6

**ways** 36:16 64:21 86:3 153:19 204:23

**we'll** 8:3 11:15 13:20 99:15 122:10 144:15 157:16 193:23

**we're** 5:23,25 7:18 21:9 25:23 27:16 44:1 51:25 101:6 103:9 106:11 107:16 136:16 145:21 168:24 183:1 197:24 200:21 203:21 233:6 249:25 265:16 266:11,12 267:13

**we've** 33:4 50:15 105:5 121:16 136:25 142:7 169:10 171:5 183:14 200:2,14 201:9,19 208:13

**weapon** 247:14

**weapons** 59:6

**wearing** 69:25 70:1

**week** 25:20 28:1,12, 13,15 47:3,8

**weekly** 25:5 46:17,21, 24

**weeks** 47:4 164:25 192:13 245:21

**weight** 242:20

**went** 133:5 228:7 229:13 244:7 262:13,15

**weren't** 15:18 128:11 168:5 213:16 224:8 246:17

**Wetli** 10:2 11:7,23 14:3 16:2,14 17:10 73:15 74:12 75:21 84:12,16 87:17 105:19,23 109:17, 18,23 110:6,10 112:12,18 114:8 118:13 119:4 141:16 142:19 143:2 146:15,19 195:10 196:16 197:3 209:22 210:2,23 212:12 215:20 217:8 219:1 221:8 222:16 223:18 224:12 226:3 233:21,24

**Wetli's** 11:13,17,25 12:7,14 14:6,10,14, 21,25 15:11,24 73:18,23 88:3 104:1 109:3,5 110:21 112:14,15,19 113:10 114:16 142:9 143:3 144:19 145:6,18 146:10 149:19 193:19 194:6 195:2, 8 196:2 197:16

198:24 202:13 207:19,22 212:25 214:4,20 216:7 220:19 222:9 224:20,24 225:3 231:15 232:20 233:17 235:15,18 236:6

**whatnot** 217:15

**White** 59:17 144:24 157:3,6 158:2 159:2 170:9,11

**wide** 23:10

**wish** 168:15 250:6

**Wishard** 81:22 83:1

**withdrawal** 158:20 159:10 170:18 171:6

**witness** 5:4 7:24 54:5 61:19 103:1 119:25 120:15 130:6 189:15 212:14,16 213:17 228:22 246:3 248:2 249:18,23,25 254:7 258:11 261:3,11 262:10 269:18,21 270:1

**witness's** 251:10

**witnessed** 262:24

**witnesses** 9:25 74:17 88:23,24 177:11 190:19

**word** 17:9 52:13 57:14,15 75:15 97:2 146:17 150:8 175:22,23 176:3 210:23,25 211:1 237:14

**wording** 63:16

**words** 66:17 196:21, 23 210:11

**work** 7:4 20:17 25:18 27:16,17 33:25 37:7 43:13,19,21,22 44:8, 11 46:6,9,22 47:3,5, 10,21 48:3 52:5 53:2,20 56:20 58:14, 17,24 63:22 76:7 145:5,12 158:3 193:11 196:25 220:20,23 237:8,21 238:2,11,17,21 239:2,5 244:17,21

**working** 36:17,18 41:22 42:7 43:14 92:1 144:11 255:1

**workload** 28:12

**world** 52:7,8 156:3

**worsen** 259:25

**worsening** 254:12

**worst** 246:22,24

**worth** 100:2

**wouldn't** 48:9 58:17 79:20 98:25 125:24 126:12 129:4 152:12 156:14 162:23 173:11 187:12,17 188:12 189:7 191:5, 18 204:9 213:21 214:16 215:5 220:15 222:20 227:17 228:9 236:1,12 242:5 252:25 256:15 259:23,25 266:7,17 267:3

**Wow** 267:11

**wraps** 226:20

**write** 134:25 136:14 151:25

**writes** 64:20

**writing** 14:10 16:5

87:16 109:21 172:11 174:8 237:20 238:1

**written** 6:4,8 22:3,6 62:3 73:10,13,14,24 74:2,6 78:19 79:5 83:7 84:20 86:9,11 90:21 93:11 103:7 108:19 109:10 110:9,17,20,22 114:5,10 129:14,19 132:6 143:7 151:19 152:3 172:4 247:23 268:4

**wrong** 32:3 97:14 178:14

**wrote** 159:3 247:7 254:21

---

**Y**

**yeah** 10:15,16 13:19 30:14 40:22 45:19 48:15 50:22 57:14 58:7 63:3 76:11 104:14 118:9 124:12 138:25 146:25 150:17 157:15 159:9,16 173:7 174:18 178:10,20 180:8 192:7,8,12 194:21 195:4 201:13 203:5,8 204:4,14,20, 21 205:18 211:5,20 212:4 214:10 215:15 219:25 241:2 248:3 249:18 250:1 254:7 258:8

**year** 43:19 47:25 48:2,21 49:3

**years** 21:21 22:5 35:10 37:8,17 42:10 102:23 107:25 155:10 192:13

239:18,22 240:9,10, 22 241:9,17 242:1,3, 4,5,7

**yelling**  218:16

---

### Z

**Z-COMPONENT**
  49:16

**Zone**  50:2

**zoning**  183:16 192:18

**zoology**  19:8

**Zoom**  43:24