UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| TERESA TODERO as Special Administrator of the ESTATE OF CHARLES TODERO, | ) ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | No. 1:17-cv-01698-JPH-MJD |
| BRIAN BLACKWELL, RENEE ELLIOT, ELIZABETH LAUT, CITY OF GREENWOOD, | ) ) ) ) ) | |
| Defendants. | ) | |

**ORDER ON MOTION TO EXCLUDE DR. VILKE'S EXPERT TESTIMONY**

Plaintiff, Teresa Todero, has filed a motion to exclude the expert testimony of Dr. Gary Vilke.  Dkt. [236].  For the reasons below, that motion is **GRANTED in part and DENIED in part**.

**I.**
**Facts and Background**

Teresa Todero, as special administrator of her son Charles Todero's estate, brought this case alleging constitutional violations under 42 U.S.C. § 1983 and state-law torts committed during his arrest.  Defendants moved for summary judgment, which the Court granted in part and denied in part.  Dkt. 177.  That left an excessive-force claim against Officer Brian Blackwell; a failure-to-intervene claim against Officers Renee Elliot and Elizabeth Laut; and Indiana-law claims for survival, assault and battery, and intentional infliction of emotional distress against the City of Greenwood.  *Id.* at 29.

1

In June 2020, Defendants City of Greenwood, Renee Elliot, and Elizabeth Laut ("Greenwood Defendants") filed a motion to substitute Dr. Gary Vilke as an expert to replace Dr. Charles Wetli, who was unable to testify.  Dkt. 217; *see* dkt. 221.  The Court granted the motion to substitute and set a deadline for objections to Dr. Vilke's expert testimony.  Dkt. 227 at 28–29.  Ms. Todero has filed a motion to exclude Dr. Vilke's testimony.  Dkt. 236.

## II.
## Applicable Law

Federal Rule of Evidence 702 "confides to the district court a gatekeeping responsibility" to ensure that expert testimony is both relevant and reliable.  *Kirk v. Clark Equip. Co.*, 991 F.3d 865, 872 (7th Cir. 2021) (citing *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 593–94 (1993)).  "In performing this role, the district court must engage in a three-step analysis, evaluating: (1) the proffered expert's qualifications; (2) the reliability of the expert's methodology; and (3) the relevance of the expert's testimony."  *Id.* (quoting *Gopalratnam v. Hewlett-Packard Co.*, 877 F.3d 771, 779 (7th Cir. 2017)).

For the first step, a witness must be qualified "by knowledge, skill, experience, training, or education."  Fed. R. Evid. 702; *Hall v. Flannery*, 840 F.3d 922, 926 (7th Cir. 2016).  General qualifications are not enough; a foundation for answering specific questions is required.  *Hall*, 840 F.3d at 926. A witness qualified with respect to the specific question being asked may give opinion testimony if:

a) The expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
b) The testimony is based on sufficient facts or data;
c) The testimony is the product of reliable principles and methods; and
d) The expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702; *Hall*, 840 F.3d at 926.

For the second step, the Court therefore must make "a preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid." *Kirk*, 991 F.3d at 872 (quoting *Daubert*, 509 U.S. at 592–93). Relevant factors may include "whether the expert's theory has been (1) tested, (2) subjected to peer review and publication, (3) analyzed for known or potential error rate, and/or is (4) generally accepted within the specific scientific field." *Id.* "[T]his list is neither exhaustive nor mandatory." *Gopalratnam*, 877 F.3d at 780. Instead, the test is "flexible" because "the gatekeeping inquiry must be tied to the facts of a particular case" and "the precise sort of testimony at issue." *Id.*

If step two is satisfied, the Court must then assess whether "the expert testimony will assist the trier of fact." *Robinson v. Davol Inc.*, 913 F.3d 690, 695 (7th Cir. 2019). For this step, the Court "evaluates whether the proposed scientific testimony fits the issue to which the expert is testifying." *Id.*

### III.
### Analysis

Greenwood Defendants plan to call Dr. Gary Vilke—an emergency room physician and professor of medicine—as a medical expert. *See* dkt. 241. Ms.

Todero has filed a motion to exclude his opinions, arguing that they are unreliable.  Dkt. 236.[1]

### A. Opinions about Excited Delirium Syndrome

Ms. Todero seeks to exclude Dr. Vilke's opinion that Excited Delirium Syndrome caused Mr. Todero's cardiac arrest and ultimately his death.  Dkt. 237 at 3.  Ms. Todero argues that Excited Delirium Syndrome "is not a generally accepted medical diagnosis," and even if it were, Dr. Vilke's opinion is not based on a reliable methodology.  *Id.* at 3–6.

### 1. Challenges to Excited Delirium Syndrome generally

Ms. Todero argues that Excited Delirium Syndrome is not generally accepted in the medical community because it has not been recognized by the American Medical Association, the World Health Organization, or the American Psychiatric Association.  Dkt. 237 at 3–4.  The Greenwood Defendants respond that peer-reviewed journals have recognized Excited Delirium Syndrome for years.  Dkt. 241 at 7–8.

In 2008, the American College of Emergency Physicians tasked nineteen experts with researching and summarizing the literature on Excited Delirium Syndrome, including whether the syndrome exists and, if so, how it could be identified and treated.  Dkt. 237-9 at 1–4.  The consensus was that Excited Delirium Syndrome "is a unique syndrome which may be identified by the presence of a distinctive group of clinical and behavioral characteristics."  *Id.* Later articles in peer-reviewed journals—including articles by Dr. Vilke—also

---

[1] Ms. Todero has not challenged Dr. Vilke's qualifications.  *See* dkt. 236.

address Excited Delirium Syndrome.  *See* dkt. 241-10[2]; dkt. 241-11[3].  There is therefore support in the scientific community for the existence of Excited Delirium Syndrome, even if the American Medical Association, World Health Organization, and American Psychiatric Association haven't recognized it.  *See Braun v. Lorillard Inc.*, 84 F.3d 230, 234 (7th Cir. 1996) ("[T]he opinion evidence of reputable scientists is admissible . . . even if the particular methods . . . are not yet accepted as canonical."); *cf. Robinson*, 913 F.3d at 695–96 (theories not "subjected to peer review[ ] or described in the medical literature" may be unreliable).

Excited Delirium Syndrome therefore does not lack acceptance in the scientific community and has been subjected to peer review.  *See Daubert*, 509 U.S. at 593–94.  Several courts have thus allowed testimony about Excited Delirium Syndrome.  *See, e.g.*, *Silva v. Chung*, No. 15-00436 HG-KJM, 2019 WL 2195201 at *2–3 (D. Haw. May 21, 2019); *Estate v. Barnwell v. Roane Cty., Tenn.*, No. 3:13-CV-124-PLR-HBG, 2016 WL 1457928 at *3–4 (E.D. Tenn. Apr. 12, 2016); *cf. Waters v. Coleman*, 632 Fed. App'x 432 (10th Cir. 2015).

In response, Ms. Todero presents two news articles—one from *The*

---

[2] Ross & Hazlett, *Assessing the symptoms associated with excited delirium syndrome and the use of conducted energy weapons*, 2018.6(3) Forensic Res. & Crim. Int'l J. 187 (2018).

[3] Vilke et al., *Excited delirium syndrome: Treatment options and considerations*, Journal of Forensic & Legal Med. (2012).

*Washington Post* and one from *Florida Today*[4], dkt. 237-5; dkt. 237-6—and cites a publication[5] from Dr. Vilke noting that the treatment for Excited Delirium Syndrome "remains largely speculative," dkt. 237 at 5–6.  But Ms. Todero does not explain why media criticism can overcome the journal articles and testimony in the record, or why questions about the most effective treatment show that Excited Delirium Syndrome is an illegitimate diagnosis. *See id.* at 6.  Any remaining questions about the syndrome generally must be left for "[v]igorous cross-examination" and the "presentation of contrary evidence."  *See Daubert*, 509 U.S. at 596.

Ms. Todero next argues that Dr. Vilke's testimony is speculative because there's no scientific explanation "for how Excited Delirium Syndrome works." Dkt. 237 at 7.  The Greenwood Defendants respond that Dr. Vilke has explained the symptoms of Excited Delirium Syndrome and some of its physiological aspects.  Dkt. 241 at 10–12.

Dr. Vilke's report recognizes that "[t]he actual pathophysiology of [Excited Delirium Syndrome] is complex and not well understood."  Dkt. 237-8 at 7–9. However, it explains that some studies, primarily from post-mortem brain examinations, "suggest[ ] that one potential pathway for the development of [Excited Delirium Syndrome] is excessive dopamine stimulation in the

---

[4] O'Hare et al, *The Washington Post*, Police keep using 'excited delirium' to justify brutality.  It's junk science., July 17, 2020; Sassoon, *Florida Today*, Excited delirium: Rare and deadly syndrome or a condition to excuse deaths by police?, Jan. 30, 2020.

[5] Vilke et al., *Excited delirium syndrome: Redefining an old diagnosis*, 19 J. Forensic & Legal Med. 7 (2012).

striatum."  *Id.*  That theory is supported by the "profound elevated temperatures" and "elevated levels of heat shock proteins" reported in Excited Delirium Syndrome patients.  *Id.*  And it "provides a link to psychiatric etiologies and the delirious presentation in" Excited Delirium Syndrome patients.  *Id.*

In short, while the physiological mechanisms associated with Excited Delirium Syndrome have not been established, it is a diagnosis that is supported in forensic-medicine literature and that Dr. Vilke and other doctors in his emergency department make "on a regular basis."  Dkt. 237-1 at 42 (Vilke Dep. at 162); *see Cooper v. Carl A. Nelson & Co.*, 211 F.3d 1008, 1019–20 (7th Cir. 2000) (reversing a district court's exclusion of expert medical testimony about chronic pain syndrome, which was "generally, although not universally, recognized among members of the medical profession" and for which "trauma is generally recognized as a cause").  The Seventh Circuit has instructed district courts to not apply "an overly demanding gatekeeping role" simply because the "mechanism [of a medical condition] is not understood." *Cooper*, 211 F.3d at 1020.  Here, as explained below and as in *Cooper*, Dr. Vilke has explained the symptoms of Excited Delirium Syndrome, that Mr. Todero exhibited more than enough symptoms for a diagnosis, and that those symptoms are "a sufficient basis for diagnosis."  *Id.*  No more is required.

### 2. Challenges to Dr. Vilke's methodology

The parties dispute the methodology underlying two of Dr. Vilke's opinions: (1) that Mr. Todero was suffering from Excited Delirium Syndrome,

and (2) that Excited Delirium Syndrome caused Mr. Todero's death. *See* dkt. 237-8 at 11 ("[T]he cause of Mr. Todero's cardiac arrest was, to a degree of medical certainty, complications from [Excited Delirium Syndrome], which led to multi organ failure and resulted in his subsequent death.").

### a. Opinion that Mr. Todero was suffering from Excited Delirium Syndrome

Dr. Vilke testified that "there's not a test" that can give a positive or negative result for Excited Delirium Syndrome, but that it must be "identified by its clinical features." Dkt. 237-1 at 40–41 (Vilke Dep. at 153–54, 159). He also testified that, to diagnose Excited Delirium Syndrome, "you have to rule out other etiologies" including "infections or other [ ] things that could manifest with delirium and agitation." *Id.* at 42 (Vilke Dep. at 162) ("It is a diagnosis of looking at the clinical features and also excluding other causes."). Excited Delirium Syndrome may have several symptoms:

> [P]eople with [Excited Delirium Syndrome] are delusional [and] often hallucinating or paranoid, are hyperactive, may be violent despite threats or overwhelming force, fight inappropriately, be inappropriately dressed for the conditions or take off their clothes or do actions to cool themselves down, may be sweaty, have elevated body temperatures, and are often breathing fast. They are also often destructive and described as having superhuman strength. Some have reported an attraction to glass or mirrors.

Dkt. 237-8 at 9. The published studies about Excited Delirium Syndrome identify six symptoms as the threshold for "clinical findings of excited delirium

8

syndrome." Dkt. 237-1 at 39, 52 (Vilke Dep. at 152, 202) ("[Y]ou want to make

sure you get the six symptoms [that] is the cutoff that most people will use.").

Here, Dr. Vilke noted that "Mr. Todero was reported to have a number of"

Excited Delirium Syndrome symptoms:

> He was agitated and was delusional, reporting that he
> was Jesus and was talking about other biblical
> references repeatedly. He was zoning out and walking
> into traffic. He was not following commands given by
> the officers and paramedics. He was reported to be too
> combative for the paramedics to even obtain a blood
> pressure on him. He had a high tolerance for pain as
> evidenced by the fact that he kept being combative and
> trying to throw himself off of the ambulance gurney and
> strike his head. He was breathing fast as noted on the
> video and in the paramedic report. He had a very
> elevated heart rate, reported as 142 beats per minute
> (BPM) by the paramedics. His skin was reported to be
> warm and diaphoretic by the paramedics. He was also
> described as sweaty. In fact, he was noted to have a
> temperature of 103°F at 1311 at the hospital. He was
> described as super strong and resilient. He was also
> described as being extremely combative, flailing and
> kicking. Finally, paramedics noted his heartrate to
> suddenly decrease from around 140 BPM to 30 BPM
> then quickly to asystole (flatline).

Dkt. 237-8 at 10. While Dr. Vilke recognized that the "cause of the excited

delirium for Mr. Todero was not established," *id.* at 8, he testified that this is

not uncommon for Excited Delirium Syndrome and that it does not prevent the

syndrome's diagnosis "in the emergency department on a regular basis," dkt.

237-1 at 42 (Vilke Dep. at 162–63) ("[W]ithout another etiology, if the

presentation is ramping up like that, it certainly can be consistent with

[Excited Delirium Syndrome] and be diagnostic and so you can come to that

conclusion of a diagnosis.").  And he excluded other possible causes—infection and psychiatric or drug-induced metabolic disorders—as inconsistent with Mr. Todero's medical records.  *Id.* at 44–45 (Vilke Dep. at 172–73).

Ms. Todero nevertheless argues that Dr. Vilke's opinion must be excluded because he didn't rule out other potential conditions that could "mimic an [Excited Delirium Syndrome]-like state."  Dkt. 237 at 11.  To be sure, experts' methodology must account for "obvious potential alternative causes."  *Brown v. Burlington N. Santa Fe Ry. Co.*, 765 F.3d 765, 773 (7th Cir. 2014).  That's why this Court excluded Dr. Rashtian's opinion on causation—Dr. Rashtain admitted that "rhabdomyolysis is not a common complication of Taser exposure" and failed to account for more common causes like exertion, medicinal drug use, and infections.  Dkt. 227 at 14–15.  Dr. Vilke, by contrast, addressed potential alternative causes and explained that Mr. Todero had enough symptoms of Excited Delirium Syndrome for Dr. Vilke to make the diagnosis under the medical literature.  *See* dkt. 237-1 at 44–45, 52 (Vilke Dep. at 172–73, 201–02).  That satisfies *Daubert*'s gatekeeping requirement.  *See Schultz v. Akzo Nobel Paints, LLC*, 721 F.3d 426, 434 (7th Cir. 2013) ("[W]hile *Myers* [*v. Ill. Cent. R. Co.*, 629 F.3d 639 (7th Cir. 2010)] and the [Rule 702] Committee Notes suggest that a reliable expert should consider alternative causes, they do not require an expert to rule out every alternative cause.").

Next, Ms. Todero argues that Dr. Vilke's diagnosis is unsupportable because several of the symptoms he relies on were observed only after police tased him and used force to subdue him.  Dkt. 243 at 4–7.  But this argument

10

does not undermine the methodology that Dr. Vilke applied; instead, it offers an alternate explanation that Dr. Vilke considered and excluded based on the time it would take for Mr. Todero's medical conditions to develop.  Dkt. 237-1 at 65–66 (Vilke Dep. at 255–58); *see Gayton v. McCoy*, 593 F.3d 610, 619 (7th Cir. 2010) ("As we have held on many occasions, an expert need not testify with complete certainty about the cause of an injury.").  This is therefore a subject for cross-examination, rather than a basis for excluding Dr. Vilke's opinion. *Gayton v. McCoy*, 593 F.3d at 619 ("The possibility that [another] cause . . . was ultimately responsible . . . is properly left for exploration on cross-examination."); *see Gopalratnam*, 877 F.3d at 781.

Dr. Vilke therefore **may opine** that Mr. Todero was suffering from Excited Delirium Syndrome.

### b. Opinion that Excited Delirium Syndrome caused Mr. Todero's death

For Dr. Vilke's second opinion—that Excited Delirium Syndrome caused Mr. Todero's death—he explained that "the excited, over-stimulated, agitated physical state" causes "increased risk for sudden death syndrome."  Dkt. 237-8 at 9–10.  He also testified that Mr. Todero had an enlarged heart and elevated potassium levels—which placed him at a higher risk of sudden cardiac death— and that he saw no records pointing to an alternate cause of Mr. Todero's death.  Dkt. 237-1 at 19–20, 58–59 (Vilke Dep. at 72–73, 228–29) ("[H]e's got some abnormalities, but nothing that would likely have caused a sudden cardiac arrest.").  He therefore testified that "[t]he excited delirium itself . . . led

to the cardiac arrest [which] then creates the multi organ dysfunction that leads to ultimate death." *Id.* at 58–59 (Vilke Dep. at 228–29).

Ms. Todero argues that this opinion must be excluded because Dr. Vilke does not explain how Excited Delirium Syndrome could cause multiple organ failure or death. Dkt. 237 at 7–8. The Greenwood Defendants respond that Dr. Vilke's opinion about causation is supported by his report and aligns with medical publications about Excited Delirium Syndrome. *See* dkt. 241 at 11–18.

In his report, Dr. Vilke explained that Excited Delirium Syndrome "places the individual at increased risk for sudden death syndrome, felt by most experts to be caused by an irregular or stoppage of the heartbeat, caused by the increased stress and work on the heart by the excited, over-stimulated, agitated physical state." Dkt. 237-8 at 9–10. After that, "blood flow through the body ceases and shortly thereafter, the subject will lose consciousness due to lack of blood flow to the brain and stops breathing." *Id.* at 10. The medical literature supports this opinion by identifying several symptoms of Excited Delirium Syndrome that contribute to cardiac arrest. Dkt. 241 at 11–12 (quoting dkt. 241-14[6]).

Dr. Vilke has therefore explained the methodology underlying his opinion that Excited Delirium Syndrome caused Mr. Todero's cardiac arrest. Dr. Vilke reached that opinion based on his review of Mr. Todero's medical records and

---

[6] Mash, *Excited Delirium and Sudden Death: A Syndromal Disorder at the Extreme End of the Neuropsychiatric Continuum*, 7 Frontiers in Physiology 1–10 (2016).

the testimony of officers who observed him leading up to the cardiac arrest. *See Hall v. Flannery*, 840 F.3d 922, 928 (7th Cir. 2016) (finding "sufficiently reliable methodology" because the medical expert "arrived at his conclusions based on his review of the autopsy report; . . . medical records . . . ; and deposition testimony").  Dr. Vilke also "relied on his medical experience," *id.*, which included practicing emergency medicine and diagnosing Excited Delirium Syndrome "on a regular basis," dkt. 237-1 at 8, 42 (Vilke Dep. at 27–28, 162).   That is enough to support his expert opinion on causation.  *Hall*, 840 F.3d at 928.

Finally, Ms. Todero argues that allowing Dr. Vilke's testimony is inconsistent with this Court's order excluding portions of Dr. Rashtian's expert testimony.  *See* dkt. 243 at 2.  But, as that order explained, Dr. Rashtian's opinion that Mr. Todero's rhabdomyolysis was caused by Taser exposure did not rule out far more common causes of rhabdomyolysis.  Dkt. 227 at 14–15.  That failure to "account for 'obvious potential alternative causes'" makes Dr. Rashtian's opinion inadmissible.  *Kirk v. Clark Equip. Co.*, 991 F.3d 865, 876–77 (7th Cir. 2021) ("An expert . . . must substantiate his opinion, rather than assume it to be true.").  Here, as explained above, Dr. Vilke accounted for likely alternative causes of Excited Delirium Syndrome and found that there were no likely alternative causes for Mr. Todero's cardiac arrest.  *See Schultz*, 721 F.3d at 434 ("Unlike the expert in *Myers*[, 629 F.3d 639], Dr. Gore considered which alternative causes should be ruled in, and which could be ruled out.").  Any remaining questions are therefore for cross-examination and for the jury to

resolve.  *See Gopalratnam*, 877 F.3d at 781 ("The jury must still be allowed to play its essential role as the arbiter of the weight and credibility of expert testimony.").

In sum, Dr. Vilke explained his methodology, which is sufficiently reliable to pass the Court's gatekeeping function, and there is no conflict with the Court's ruling on Dr. Rashtian's expert opinions.  Dr. Vilke therefore **may opine** on the cause of Mr. Todero's cardiac arrest and subsequent death.

### B. Opinions about Defendants' Taser use and other force

Dr. Vilke opined that Mr. Todero's elevated potassium level, acidosis, and rhabdomyolysis were not caused by Defendants' Taser use or by their restraining Mr. Todero.  Dkt. 237-8 at 11.  He noted that, after Mr. Todero was taken to the emergency department, he had elevated creatinine and potassium levels, which are consistent with kidney injury and renal failure.  *Id.* at 12.  Dr. Vilke then explained that studies of Tasers' effects on humans show that "durations of up to 15 seconds have been shown to not cause any acute elevations in creatinine."  *Id.*  He also opined that the elevated levels appeared too quickly to be caused by the Taser or from being restrained.  *Id.* at 13.

Ms. Todero argues that this opinion is unreliable because the studies that Dr. Vilke relies on involve shorter Taser durations than Mr. Todero was exposed to and studied a different population.  Dkt. 237 at 11–13.  She contends that Mr. Todero wasn't healthy and may have had much longer Taser exposure, so there is a "cavernous disconnect between the studies cited and the facts of this case."  *Id.* at 12–13.  The Greenwood Defendants respond that

14

the studies support Dr. Vilke's conclusions because they show at least that short Taser activations on healthy volunteers did not cause test results like Mr. Todero's.  Dkt. 241 at 21–23.

Of course, the duration of Mr. Todero's Taser exposure will affect how similar those studies are to the facts of this case, but Ms. Todero admits that there are "factual disputes" on that question that a jury must resolve.  Dkt. 237 at 13; *see Kawasaki Kisen Kaisha, Ltd. v. Plano Molding Co.*, 782 F.3d 353, 360 (7th Cir. 2015) ("When expert testimony has been admitted under *Daubert*, the soundness of the factual underpinnings . . . [is a] factual matter[ ] to be determined by the trier of fact.").  Dr. Vilke may be cross-examined about how the length of Taser exposure may affect or undermine his opinion, but this question goes to the weight rather than the admissibility of his opinion.  *See Daubert*, 509 U.S. at 596.  The jury will decide the weight to be given to these studies and Dr. Vilke's corresponding opinion.  *See Gopalratnam*, 877 F.3d at 781.[7]  Under *Daubert*, it's enough that the studies support the opinion that Taser exposure does not cause the elevated potassium and creatinine levels that Mr. Todero displayed.  *See Schultz*, 721 F.3d at 432–33.

Moreover, Dr. Vilke opined that Mr. Todero's elevated test results from "only one hour" after being tased and handcuffed show that the cause of the cardiac arrest "predated the interaction with the officers."  Dkt. 237-8 at 13.

---

[7] The parties agree that a study on longer Taser exposures cannot be ethically conducted. *See C.W. ex rel. Wood v. Textron, Inc.*, 807 F.3d 827, 837 (7th Cir. 2015) (finding the point "well taken" that studies at a certain level of specificity "are unavailable because of . . . ethical and moral concerns").  Regardless, as explained, this is an issue for cross-examination and for the jury to resolve.

Ms. Todero argues that Dr. Vilke connects the timing to only kidney injuries, dkt. 237 at 15, but Dr. Vilke connected kidney function to creatine levels, rhabdomyolysis, and cardiac arrest, dkt. 237-1 at 21, 37–38, 58 (Vilke Dep. at 77, 144–46, 225).  Specifically, he testified that those conditions "don't happen 20, 30, 40, 60 minutes" but "take half a day to a day [and] sometimes longer." *Id.* at 65 (Vilke Dep. at 256).  And as explained above, Dr. Vilke may opine about the connections between Mr. Todero's symptoms and his cardiac arrest.  This is therefore a subject for cross-examination.  *See Daubert*, 509 U.S. at 596.

Dr. Vilke **may opine** about the physiological effects of being tased and restrained.

### C. Opinion that drug intoxication caused Mr. Todero's Excited Delirium Syndrome

Ms. Todero argues that "Dr. Vilke has no reliable basis to claim that Mr. Todero was experiencing drug intoxication."  Dkt. 237 at 16–17.  The Greenwood Defendants respond that "[p]rior drug use is not required for an excited delirium diagnosis but is consistent with it."  Dkt. 241 at 26.  They point to a note from Mr. Todero's hospital records noting that his "[c]linical picture is consistent with synthetic marijuana (Spice) toxicity."  *Id.* (citing dkt. 160-4 at 1).

However, Mr. Todero's toxicology screen showed no "specific drugs of abuse."  Dkt. 237-1 at 19 (Vilke Dep. at 72).  And while that screen does not identify all drugs, including "spice," the Greenwood Defendants point to no evidence that Mr. Todero had taken drugs—much less that drugs caused

16

excited delirium.  *See* dkt. 241 at 25–28.  Dr. Vilke's "own speculation" based merely on what may be "consistent" with Excited Delirium Syndrome is not enough to support expert testimony that Mr. Todero was on spice or another drug.  *Kirk*, 991 F.3d at 874.  He similarly cannot rely on the speculation in Mr. Todero's medical records, which cite no supporting evidence.  *Timm v. Goodyear Dunlop Tires N. Am., Ltd.*, 932 F.3d 986, 994 (7th Cir. 2019) ("To satisfy the requirements of Rule 702 and *Daubert*, [an expert must] show that his conclusions were . . . something more than mere speculation.").  Dr. Vilke therefore **may not opine** that drug intoxication caused Mr. Todero's Excited Delirium Syndrome.

### D. Opinions about pain, Taser functioning, and police practices

By agreement of the parties, Dr. Vilke **may not opine** about any pain that Mr. Todero may have experienced, whether the Taser "was functioning properly or made a good connection," or about police practices.  Dkt. 241 at 28.

### E. Substitute expert for Dr. Wetli

Ms. Todero last argues that "Dr. Vilke's opinions should be barred because they stray too far from the opinions and methodologies used by Dr. Wetli, for whom Dr. Vilke has been substituted."  Dkt. 237 at 18.  The Greenwood Defendants respond that Dr. Vilke's opinions do not diverge from Dr. Wetli's because Dr. Vilke recited and agreed with Dr. Wetli's opinions and refrained from adding opinions that Dr. Wetli had not reached.  Dkt. 241 at 29.

District courts in this circuit addressing this issue have held that substitute experts like Dr. Vilke must "have a similar area of expertise and

17

address the same subject matter as the previous expert." *Stringer v. Cambria Fabshop—Indianapolis, LLC*, No. 1:13-cv-659-SEB-TAB, 2015 WL 13632234 at *2 (S.D. Ind. Oct. 2, 2015).[8] But the expert may "review all of the evidence, conduct his own independent analysis, and express his opinion in his own words." *Id.*

Here, Dr. Vilke's report quoted generously from Dr. Wetli's expert report, explained that he agreed, and elaborated on his reasons for agreeing without straying outside Dr. Wetli's areas of expertise. Dkt. 237-8 at 7–13. Nevertheless, Ms. Todero argues that several of Dr. Vilke's opinions must be excluded because they go beyond Dr. Wetli's opinions.

### 1. Prejudice

In addition to challenging specific portions of Dr. Vilke's opinions, Ms. Todero argues that she would be prejudiced by his substitution for Dr. Wetli. *See* dkt. 237 at 24 ("Defendants should not be permitted the windfall of substituting a new expert who uses a different methodology to shore up their expert opinions."). Indeed, at the final pretrial conference, Ms. Todero's counsel argued that Defendants have used Dr. Wetli's death "as an opportunity for a redo" and to designate Dr. Vilke as a "buyer's remorse expert."

There is no prejudice here. On June 25, 2020, Defendants filed a motion to substitute experts, explaining that Dr. Wetli would not be able to testify for medical reasons and identifying Dr. Vilke as their proposed substitute. Dkt.

---

[8] The Seventh Circuit has not set any limitations on a substitute expert's testimony, or clarified the standard that district courts should apply. Both parties, however, have accepted *Stringer*'s limited analysis of this issue. *See* dkt. 237 at 19; dkt. 241 at 29.

217.  On August 10, 2020, Defendants provided notice that Dr. Wetli had died.
Dkt. 226.  And on September 16, 2020, the Court granted Defendants' motion
to substitute experts.  Dkt. 227.  That left ample time for Ms. Todero to review
Dr. Vilke's expert report, depose him, and prepare an extensive *Daubert* motion
and motion in limine.  *See* dkt. 227 at 29; dkt. 233 (granting additional time to
depose Dr. Vilke and object to his testimony); dkt. 236; dkt. 237; dkt. 271;
*Abbott v. Lockheed Martin Corp.*, No. 06-cv-701-MJR-DGW, 2014 WL 6613148
at *2 (S.D. Ill. Nov. 21, 2014) (Three months before trial is generally "ample lead
time for preventing prejudice to the party opposing a substitute expert.").

Moreover, there is no indication that Defendants would have litigated
this case differently had they designated Dr. Vilke, instead of Dr. Wetli, as the
expert from the beginning of this case.  Nor is there any indication that they
delayed their substitution motion once they learned that Dr. Wetli's health
would not allow him to testify.  And finally, Plaintiffs have provided no support
for their contention that Defendants took advantage of Dr. Wetli's death in
order to cure their "buyer's remorse" by disclosing a better expert.  There is
therefore no prejudice in the expert substitution that could require the
exclusion of Dr. Vilke's testimony.  *See Kaepplinger v. Michelotti*, No. 17 CV
5847, 2021 WL 2633312 at *4–6 (N.D. Ill. June 25, 2021) (no prejudice when
plaintiffs promptly sought substitution and ample time remained before trial).
The Court therefore turns to Ms. Todero's specific contentions.

19

### 2. Acute kidney injury

Ms. Todero argues that Dr. Vilke should be barred from testifying about acute kidney injury because Dr. Wetli never mentioned an acute kidney injury or kidney damage in his report.  Dkt. 237 at 20–21.  Dr. Vilke's opinion, however, is based on facts recognized by Dr. Wetli and by Ms. Todero's expert, Dr. Rashtian.  *See* dkt. 237-1 at 37–38 (Vilke Dep. at 144–46) (explaining the supporting facts); dkt. 241-4 at 6 (Dr. Rashtian's report concluding that "Mr. Todero suffered repeated cardiac arrests while at St. Francis, and was also diagnosed with significant kidney and liver damage").  Dr. Vilke's opinion about acute kidney injury is therefore within "the same subject matter" as Dr. Wetli's opinions, "without meaningful changes."  *Stringer*, 2015 WL 1362234 at *2.

### 3. Excited Delirium Syndrome without intervention

Ms. Todero argues that Dr. Vilke should be barred from testifying about what may have happened to Mr. Todero if police had not intervened.  Dkt. 237 at 21.  Dr. Wetli had testified that if police had not intervened, Mr. Todero "would have probably been struck and killed by a car" but "[t]here is no way of knowing" because most cases of excited delirium require intervention.  Dkt. 200-1 at 182–83 (Wetli Dep.).  Dr. Vilke testified that he also did not know what would have happened, but that he "suspect[ed]" that Mr. Todero would have had "a cardiac arrest or some other behavior" that required intervention.  Dkt. 237-1 at 59–60 (Vilke Dep. at 232–33).  Dr. Vilke's opinion therefore does not meaningfully diverge from Dr. Wetli's.

### 4. Signs of Excited Delirium Syndrome

Ms. Todero argues that Dr. Wetli and Dr. Vilke based their Excited Delirium Syndrome diagnosis on "starkly different" criteria.  Dkt. 237 at 21–22.  She contends that Dr. Wetli looked only at whether the person had delirium and was agitated, while Dr. Vilke "use[d] a flexible metric" which required six out of ten clinical findings to be present.  Dkt. 237 at 21–22; dkt. 271 at 50–51.

To be sure, Dr. Vilke testified that for "formal excited delirium syndrome" there must be "more than two specific symptoms," Dkt. 237-1 at 52 (Vilke Dep. at 203), while Dr. Wetli testified that his two core symptoms would be enough, dkt. 200-1 at 146 (Wetli Dep.).  But that does not show a fundamental difference in their opinions, especially in the context of their reports and deposition testimony.  Both Dr. Wetli and Dr. Vilke testified that delirium and agitation together are the core features of Excited Delirium Syndrome.  *See id.* (Wetli Dep.) (Someone "exhibiting both the symptoms of delirium and agitation" is "by definition" exhibiting excited delirium.); dkt. 237-1 at 53 (Vilke Dep. at 208) ("The definitional components of excited delirium [are that] you have to have agitation, you have to have delirium.  That's definitional.").  They also both recognized other signs of excited delirium.  *See* dkt. 200-1 at 145–46 (Wetli Dep.) ("Very frequently people [who] have excited delirium show" increased strength, imperviousness to pain and exhaustion, hyperthermia, increased stamina, breaking glass, and inappropriate disrobing.); dkt. 237-1 at 53–54 (Vilke Dep. at 208–10) (explaining that a person should have at least six symptoms, including hyperactivity, violence despite threats or overwhelming

21

force, being inappropriately dressed for the conditions or taking off their clothes, being sweaty or having elevated body temperatures, having superhuman strength, and reporting an attraction to glass or mirrors).

Dr. Wetli and Dr. Vilke therefore did not use "fundamentally incompatible and divergent diagnostic criteria," and Dr. Vilke's testimony is a permissible substitute. *See Stringer*, 2015 WL 1362234 at *2. As an expert, Dr. Vilke is not expected to "simply adopt the prior expert's conclusions verbatim—in effect doing little more than authenticating and confirming the prior expert's conclusions." *Kaepplinger*, 2021 WL 2633312 at *7.

Ms. Todero also has not identified any prejudice from the differences between Dr. Wetli's and Dr. Vilke's testimony. While Dr. Vilke's opinion requires six symptoms—rather than only two—for an Excited Delirium Syndrome diagnosis, Ms. Todero may introduce evidence about how many symptoms were present, cross-examine Dr. Vilke about what is required to show each symptom, and argue to the jury that the evidence does not support such a diagnosis. *See Daubert*, 509 U.S. at 593–94 (identifying "[v]igorous cross-examination" and the "presentation of contrary evidence" as the "traditional and appropriate means of attacking shaky but admissible evidence")

### 5. Underlying facts regarding agitation

Ms. Todero argues that Dr. Wetli and Dr. Vilke used "divergent approaches" to Mr. Todero's agitation because Dr. Wetli relied on his behavior before the police interaction while Dr. Vilke relied on his behavior afterwards,

when paramedics were with Mr. Todero in an ambulance.  Dkt. 237 at 22–23.

She points to a portion of Dr. Wetli's deposition, where he testified that a

hypothetical set of facts would not constitute excited delirium:

> Q.      What if I present to you an alternate hypothetical
> that the facts of the case were that Mr. Todero was
> walking across the street, holding a [B]ible in front of
> him and that . . . there was no testimony from
> witness[es] who watched him cross the street that he
> was gesturing or exclaiming anything verbally.  Would
> that alter your conclusion that that was evidence of
> agitation?
> A.      Obviously, what you described right there
> wouldn't—he would not have agitated delirium.

Dkt. 200-1 at 148 (Wetli Dep.).

That hypothetical question, however, does not capture the extent and

context of Dr. Wetli's testimony.  Dr. Wetli added that his opinion would

depend on the actual facts of the case and that people "can go in and out of

excited delirium."  *Id.* at 148–49.  Moreover, Dr. Wetli—like Dr. Vilke—noted

Mr. Todero's violent behavior while in the ambulance and testified that his

opinion about Mr. Todero's agitation was based on his "entire review of the

record" including from before and after Mr. Todero was placed in the

ambulance.  Dkt. 200-1 at 126 (Wetli Dep.).  Similarly, Dr. Vilke testified that

Mr. Todero's behavior in the ambulance was "significant evidence of agitation,"

so he did not consider all the facts from before the police interaction "from the

perspective" of defining agitation.  Dkt. 237-1 at 57 (Vilke Dep. at 222–24).

Dr. Wetli therefore found more examples of agitation, but there is no

"meaningful change[ ]" that would make Dr. Vilke's testimony inadmissible.

*See Stringer*, 2015 WL 1362234 at *2.  Instead, Dr. Vilke "conduct[ed] his own independent analysis," and—similar to Dr. Wetli—noted Mr. Todero's agitation in the ambulance after the police interaction.  *Id.*  Certainly, Dr. Vilke's testimony falls within "the same subject matter as the prior expert without meaningful changes."  *Kaepplinger*, 2021 WL 2633312 at *7.  He is not required to recite Dr. Wetli's opinions "verbatim," or merely "authenticat[e] and confirm[ ]" Dr. Wetli's conclusions.  *Id.*

Moreover, Ms. Todero has not explained how any differences between Dr. Wetli's and Dr. Vilke's testimony could prejudice her.  Neither witness ruled out either Mr. Todero's actions while walking across the street or in the ambulance as evidence of Excited Delirium Syndrome, and Ms. Todero may cross-examine Dr. Vilke about whether either or both of those situations can support an Excited Delirium Syndrome diagnosis.  *See Daubert*, 509 U.S. at 593–94.

### 6.  Possible causes of Excited Delirium Syndrome

Ms. Todero argues that Dr. Wetli and Dr. Vilke disagree about Excited Delirium Syndrome's possible causes.  Dkt. 237 at 23.  Dr. Wetli identified the causes as including "certain infections, certain mental illnesses[,] and stimulant or hallucinogenic drugs."  Dkt. 237-13 at 2.  Dr. Vilke testified that the causes are "drugs and psychiatric disorders" and explained that "[t]he most current literature doesn't usually reference infection."  Dkt. 237-1 at 35 (Vilke Dep. at 135–36).  Here too, their opinions are therefore within "the same subject matter . . . without meaningful changes."  *Stringer*, 2015 WL 1362234 at *2.

### 7. Case materials relevant to Excited Delirium Syndrome

Ms. Todero argues that Dr. Wetli and Dr. Vilke "used divergent methodologies in their choice of case materials" to rely on.  Dkt. 237 at 24. She contends that Dr. Wetli relied on "subjective, non-medical evidence" while Dr. Vilke "prioritize[d] the objective data, things like vital signs . . . behavior activities, lab work, autopsy findings, heart size, [and] toxicology reports."  *Id.* But Ms. Todero does not cite evidence that Dr. Wetli categorically disregarded medical evidence in favor of subjective accounts.  *See id.*; dkt. 200 at 17–19. Instead, Dr. Wetli's report specifies that he reviewed autopsy and toxicology reports and hospital records.  Dkt. 237-13 at 1.  He then relied on paramedic records, hospital records, and toxicology reports.  *Id.* at 2.  Indeed, the only discrepancy that Ms. Todero identifies is that Dr. Wetli testified that body-camera footage "didn't show anything," dkt. 200-1 at 108 (Wetli Dep.), while Dr. Vilke testified that he used it to gather background information for his opinion, dkt. 237-1 at 50–51 (Vilke Dep. at 196–97).  But that is not a fundamental methodological difference and does not show any "significant changes in the testimony" that would be offered by each witness.  *See Stringer*, 2015 WL 1362234 at *2.  Nor does it show that Defendants gained "the windfall of substituting a new expert who uses a different methodology."  Dkt. 237 at 24. Instead, this variation is within "the same subject matter" and is from Dr. Vilke permissibly "conduct[ing] his own independent analysis and express[ing] his opinion in his own words."  *See Stringer*, 2015 WL 1362234 at *2.

For these reasons, Dr. Vilke is a permissible substitute for Dr. Wetli.

## IV.
## Conclusion

Ms. Todero's motion to exclude Dr. Vilke's expert testimony is **GRANTED in part and DENIED in part**.  Dkt. [236].  It is **GRANTED** to the extent that Dr. Vilke **may not opine** (1) that drug intoxication caused Mr. Todero's Excited Delirium Syndrome, (2) about any pain that Mr. Todero may have experienced, (3) whether the Taser "was functioning properly or made a good connection," or (4) about police practices.  The motion is otherwise **DENIED**.

As with the Court's previous order on expert testimony, dkt. 227, this order is subject to future rulings, such as orders in limine.  Each party **SHALL ENSURE** that its experts understand and follow all orders relevant to their testimony.  The Court expects all counsel—who are experienced, sophisticated lawyers—to prepare the expert witnesses accordingly.

**SO ORDERED.**

Date: 9/30/2021

_James Patrick Hanlon_
James Patrick Hanlon
United States District Judge
Southern District of Indiana


Distribution:

Steven E. Art
LOEVY & LOEVY
steve@loevy.com

Scott R. Drury
LOEVY & LOEVY
drury@loevy.com

26

D. Samuel Heppell
LOEVY & LOEVY
sam@loevy.com

Mark A. Holloway
STEPHENSON MOROW & SEMLER
mholloway@stephlaw.com

Theresa Kleinhaus
LOEVY & LOEVY
tess@loevy.com

Arthur Loevy
LOEVY & LOEVY
arthur@loevy.com

Jonathan I. Loevy
LOEVY & LOEVY
jon@loevy.com

Caren L. Pollack
POLLACK LAW FIRM, P.C.
cpollack@pollacklawpc.com

Scott R. Rauscher
LOEVY & LOEVY
scott@loevy.com

Makeba Rutahindurwa
LOEVY & LOEVY
makeba@loevy.com
Pamela G. Schneeman
STEPHENSON MOROW & SEMLER
pschneeman@stephlaw.com

James S. Stephenson
STEPHENSON MOROW & SEMLER
jstephenson@stephlaw.com

Lana R. Swingler
POLLACK LAW FIRM PC
lswingler@pollacklawpc.com